IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N–343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUN 3 0 2005

GREGORY C. LANGHAM
CLERK

---

Claim Number 03-060
Category III
Claimant: Alan Mount, #56047
Address of Claimant: AVCF, P.O. Box 1000, Crowley, CO 81034-1000

---

**FINAL ORDER OF SPECIAL MASTER**

---

    THIS MATTER came before the Special Master for a hearing on June 16, 2005. This hearing was held at the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. Present were the following: Alan Mount(Claimant); and James Quinn, attorney for Defendants.

    Testimony was received from the following witnesses: Claimant and Lt. William Parker. Claimant's Exhibits 1 through 8 were admitted into evidence. Defendants' Exhibits A through I were admitted into evidence. All documentation previously submitted by both sides was accepted. After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

    This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide an opt out provision for any individual member of the designated class. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file claims seeking damages or other relief available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, p.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who

do not need require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. Based upon the testimony of the witnesses, exhibits and documents previously made part of the file, the Special Master finds the following to be the facts necessary for resolution of the claim.

Claimant came into CDOC custody in 1987. He was placed initially at the Centennial Correction Facility in Canon City, Colorado. He has been incarcerated at other CDOC facilities over the years and was placed at AVCF in 2001. Claimant is presently at AVCF, and that is where the hearing was held on this claim.

In 1989, Claimant was diagnosed with vascular disease. This has led to neuropathy in his legs and a condition which he described as "drop foot." He has a brace for each foot to help stabilize his condition.

In the early 1990's, Claimant was diagnosed as having diabetes. He was treated initially with a drug called glucophage. He also had to watch his diet. As time as progressed, his condition worsened. He ultimately began to receive daily insulin shots. His treatment now requires at least two insulin shots per day, plus finger sticks to monitor his blood sugar level. He normally receives his insulin by shot in the morning and evening. Claimant testified that the medicine line is often long at AVCF, and he cannot stand forever. Occasionally, he will miss a shot because of the long lines.

Claimant received heart bypass surgery in 2003. His vascular condition also had included the

blockage of arteries. Claimant did not indicate that any additional health problems had arisen from the surgery.

Claimant testified that his mobility problems related to the neuropathy. He has had braces for his lower legs since 1989-90. His mobility situation has stabilized. He acknowledged on cross-examination that he is able to walk for more than one hundred yards and that he can climb stairs, provided there is a hand rail.

In response to questions from Defendants' counsel, Claimant stated that he felt that he had been discriminated against because of the lack of pain medications. He admitted that he had become dependent on various pain medications. That fact is corroborated by his medical records. With the pain medications, he was able to deal with the pain in his feet and legs. From the evidence presented as to this claim, as well as evidence presented as to different claims, the Special Master understands that CDOC made the decision to discontinue narcotic medications to all but a handful of extremely ill and potentially terminal inmates. Claimant is not alone in having pain medication withdrawn. He and other inmates are now expected to deal with pain with the use of Tylenol and other over the counter pain medications.

He has not been denied access to any programs while in CDOC. He had refused to be part of a GED program because he testified that he already received such a certificate, but that it had been lost. He further did not want to take up any training programs, as he did not feel that he would ever be released from custody.[1]

Claimant did make the request for a "wet cell." This is a cell that has a toilet in it. Presently at AVCF, Claimant has usage of a communal bathroom on his pod. He has a key to his cell and is able to use the bathroom at most any time. He stated that his pod has between a 100 and 150 other inmates for the communal toilet. He has a single cell, but it does not have a toilet. From the evidence, it appears that single "wet cells" do not exist at AVCF.

Claimant acknowledges further that his diabetes has stabilized. He remains in pain and would like to have the pain medications returned to him.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004, as well as applicable case law. Each criteria will be taken separately.

---

[1] Exhibits submitted by both sides reiterated the feeling by Claimant that he was in for life. That view is not shared by his case manager and others in CDOC who have had contact with him. It would be a real tragedy if Claimant never undertook those steps that might convince the parole board that he should be granted parole.

**1. Is the Claimant a disabled individual who is a member of the class?** Defendants concede that Claimant is diabetic and is, therefore, a member of the class. Defendants do deny that Claimant has a mobility disability, as he is able to walk more than one hundred yards without stopping and is able to climb stairs. For purposes of this order, the Special Master determines that Claimant is disabled with both diabetes and with a lower extremity condition ("drop foot").

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by CDOC?** No evidence was presented that Claimant could not have participated in any program or activity while in CDOC custody. No evidence was presented that Claimant was a security risk or that he had disciplinary problems that prevented him from participating in programs.

**3. Was the Claimant discriminated against by DOC because of his disability?** The answer to this question is no. The reasons for this answer will require a discussion of the Settlement Agreement.

The Settlement Agreement mirrors the basic statutory provisions of the ADA and Rehabilitation Act. An individual who has diabetes or a mobility disability must establish by a preponderance of the evidence that he or she was treated differently than someone without a disability. The nature and quality of medical care poses a problem for any claimant in light of recent case law.

The United States Court of Appeals for the Tenth Circuit issued on April 11, 2005 its opinion in *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134 (10th Cir. 2005). In that case, the plaintiff was incarcerated in a private prison in Oklahoma. He complained about the medical care that he received after a fall. The plaintiff was an insulin-dependent diabetic with a history of low blood sugars and seizures. He fell during a seizure or diabetic coma and fractured his upper femur. He alleged in his complaint that he should have received surgery, but the private prison did nothing. The evidence submitted in support of defendants' motion for summary judgment indicated that the prison had been advised that surgery was the best option, but that doing nothing was also an appropriate medical option.

The Tenth Circuit held, in part, as follows:

Fitzgerald's ADA and Rehabilitation Act claims are also on tenuous grounds. In addition to ruling that Fitzgerald did not receive substandard medical care, the District Court further held, with respect to Fitzgerald's ADA claim: "it is well settled that the ADA does not provide a private right of action for substandard medical treatment." The District Court did not comment on the Rehabilitation Act, but for practical purposes the requirements to state a claim under either statute are identical here. Under either the ADA or the Rehabilitation Act, Fitzgerald is obligated to show that he was "otherwise qualified" for the benefits he sought and that he was denied those "solely by reason of disability." *See, e.g., Johnson by Johnson v. Thompson,*

971 F.2d 1487, 1492 (10th Cir.1992), *cert. denied*, 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993). Further, we have held that "the term otherwise qualified cannot ordinarily be applied 'in the comparatively fluid context of medical treatment decisions without distorting its plain meaning.' " *Johnson*, 971 F.2d at 1493-94. As to whether treatment was denied "solely" by reason of disability, the Second Circuit has stated: "Where the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say ... that a particular decision was 'discriminatory.' " *United States v. University Hospital*, 729 F.2d 144, 157 (2nd Cir.1984) (Rehabilitation Act).

Several circuits have expressly concluded that neither the ADA nor the Rehabilitation Act provide remedies for alleged medical negligence. *See Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir.1996) ("ADA does not create remedy for medical malpractice"); *Grzan v. Charter Hospital of Northwest Indiana*, 104 F.3d 116, 121, 123 (7th Cir.1997) (affirming district court's dismissal under Fed.R.Civ.P. 12(b)(6) of plaintiff's section 504 claim because "section 504 [which 'is materially identical to the ADA'] does not provide a federal malpractice tort remedy" and allegations of discriminatory medical treatment do not fit into the four-element framework required by Section 504.).

In the instant case, the principal basis for Fitzgerald's claim against Dr. Josephson is the doctor's recommendation that the prison may "do nothing" as an acceptable course of treatment for Fitzgerald's injuries. Dr. Josephson suggested the non-treatment option as one option, but also recommended surgery as another option. He did not make the final decision to deny treatment. Even if Dr. Josephson had been the final decision-maker, Fitzgerald would not have been "otherwise qualified" for such treatment in the absence of his alleged disability--his alleged disability in this case was the reason why Fitzgerald was seeking medical treatment. These are the sort of purely medical decisions that we have held do not ordinarily fall within the scope of the ADA or the Rehabilitation Act. Fitzgerald's claims against Dr. Josephson under the ADA and Rehabilitation Acts were therefore properly rejected on the merits under § 1997e(c)(2).

*Id. at 1143-44.* This decision means that the ADA and Rehabilitation Act are not available to prisoners or other potential plaintiffs who are claiming medical negligence on the part of prison doctors or medical staff.

Claimant testified that his biggest concern has been the loss of pain medication. His testimony indicated further that he questioned some of the medical judgments made by CDOC medical staff. In light of the *Fitzgerald* decision, Claimant must revert back to utilization of other legal bases to challenge medical care. That means using the Eighth Amendment or state law claims for medical negligence. In the order of November 23, 2004, Judges Nottingham and Kane indicated that Eighth Amendment claims of medical negligence could not be considered by the Special

Masters unless the four criteria were met under the ADA and Rehabilitation Act.

An Eighth Amendment claims requires a showing of deliberate indifference to a known medical condition of an inmate. *Farmer v. Brennan*, 511 U.S. 825 (1994); *Handy v. Price*, 996 F.2d 1064(10th Cir. 1993). To meet this standard will require expert testimony in virtually every case. Claimant, as well as others similarly situated, may never be able to meet such a high standard. *Id.*

The evidence presented substantiated that Claimant has significant health problems. He is in pain, and the medications previously provided to him helped control that pain. A medical decision was made to switch to non-narcotic pain relievers. There is no evidence to indicate that this decision was made solely against Claimant. In fact, the evidence is just the opposite, as narcotic pain relievers were withdrawn from all but a few inmates.

The facts of Claimant's case are not dissimilar from those in *Fitzgerald*. In light of the Claimant's testimony, there has been no showing of disparate treatment based upon his disabilities. He has received medical treatment, and now that treatment has changed. *Fitzgerald* precludes use of the ADA and Rehabilitation Act as bases for challenging medical treatment decisions, provided some treatment is given. In light of *Fitzgerald* and the order of November 23, 2004, there is no basis for finding that Claimant has been discriminated against by CDOC or its staff in violation of the ADA and Rehabilitation Act.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**
This question does not need to be answered, as the preceding question has been answered in the negative .

IT IS HEREBY ORDERED that the claim of Alan Mount is denied for the reasons set forth herein; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before August 22, 2005.**

SIGNED this *27th* day of June, 2005.

BY THE COURT:

Richard M. Borchers
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this *27th* day of June, 2005 to the following:

Mr. Alan Mount
#56047
AVCF
P.O. Box 1000
Crowley, CO 81034-1000

Ms. Paula Greisen
Mr. David Miller
Counsel for the Class
King & Greisen, LLP
1670 York Street
Denver, CO 80206

Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203