|    |      |                                                                    |
|----|------|--------------------------------------------------------------------|
| 1  |      | OFFICE OF LEGAL RESOLUTION CENTER                                   |
| 2  |      | DENVER CORPORATE CENTER III                                        |
| 3  |      | INTERVIEW OF DAVID PAUL WOLF – DAMAGE CLAIM                        |
| 4  |      | JUNE 6, 2005 – 9:00 A.M.                                            |
| 5  |      |                                                                    |
| 6  | SM:  | you can hear me okay Mr. Wolf?                                      |
| 7  | DPW: | Yes sir.                                                            |
| 8  | SM:  | Okay good…this is 97N870 Montez vs. Owens and were here today for a |
| 9  |      | hearing on the claim of David Paul Wolf.  That is Claim No. 03029.  Uh, Mr. |
| 10 |      | Wolf is present by phone.  Would counsel for the State enter it's appearance |
| 11 |      | please.                                                             |
| 12 | JQ;  | James Quinn your Honor appearing on behalf of the Defendants.       |
| 13 | SM:  | Mr. Wolf if you are unable to hear Mr. Quinn or the State's witness let me |
| 14 |      | know and I'll move the phone over towards them when they speak.     |
| 15 | DPW: | It is kind of vague…                                                |
| 16 | SM:  | I thought it might be ….okay.                                       |
| 17 | DPW: | popping in and out.                                                 |
| 18 | SM:  | Okay…well is it popping in and out when I'm talking?                |
| 19 | DPW: | Inaudible                                                           |
| 20 | SM:  | pardone me.                                                         |
| 21 | DPW: | Yes it is.                                                          |
| 22 | SM:  | Well.                                                               |
| 23 | DPW: | Well it's probably something that we can't control.                 |

1   SM:   Well…I mean we can try and call back and get a better line but I'm not…let's

2         go forward and if it gets too bad…let me know…just interrupt me and let me

3         know that you're not uh…you're not picking it up and we'll try and do

4         something different.

5   DPW: yes sir.

6   SM:   Okay…the way we'll proceed today is I will…Mr. Wolf since you're the

7         Claimant; I'm going to ask you to uh testify first.  Do you have any other

8         witnesses other than yourself sir?

9   DPW: Uh I'm incarcerated in Texas…

10  SM:   Okay.

11  DPW: There's no one here that's even a part of the class.

12  SM:   Okay so you're, you're…the only witness that you'll be calling today is

13        yourself?

14  DPW: Yes sir.

15  SM:   Okay…uh well we'll start with your testimony and then when that's

16        concluded, the State can put on their testimony.  Uh, then if you have any

17        reply testimony or rebuttal testimony that you want to present uh either

18        through yourself or you could call another witness if they were available, but

19        in any event any rebuttal testimony that you want to present, you'll be able to

20        do that and at the conclusion of that uh within a few days, I'll issue a written

21        order on your claim…okay?

22  DPW: Yes Sir.

1    SM:    Okay…I'm going to have Mr. Valente, my assistant swear you in.  The reason

2           that I'm going to do that is because he's a notary and has the ability to

3           administer oaths and I'm not a notary so I don't think I have the ability to

4           administer oaths anymore…so I'm going to ask you to raise your right hand

5           and Mr. Valente will administer the oath.

6    MV:    Thank you…Mr. Wolf can you hear me?

7    DPW:  Yes.

8    MV:    Mr. Wolf do you solemnly swear or affirm that the testimony you are about to

9           give is truthful?

10   DPW:  Yes sir.

11   MV:    Thank you.

12   SM:    All right…would you please state your full name.

13   DPW:  David Paul Wolf.

14   SM:    Okay and Mr. Wolf where are you currently incarcerated?

15   DPW:  (inaudible) facility at Texas Department of Criminal Justice.

16   SM:    Okay…Mr. Quinn are you able to hear okay?

17   JQ:    Yes.

18   SM:    If you want you can move down here if that would help…and Mr. Quinn you

19           were uh…you did file a claim in this matter…correct?

20   DPW:  yes.

21   SM:    Okay…and in what facility or facilities were in incarcerated that the claim

22           relates to?

23   DPW:  Uh, I was in the Fremont Correctional Facility…

3

1    SM:    Okay.

2    DPW:  in Canon City…

3    SM:    Okay.

4    DPW:  and then they sent me to uh…I'm sorry I've been having problems with

5            memories here lately…

6    SM:    Okay.

7    DPW:  Uh then I went to…I ended up the territorial facility…on a medical unit.

8    SM:    Well it says here Buena Vista…minimum center…is that?

9    DPW:  Right, Buena Vista.

10   SM:    Okay.

11   DPW:  I was just there a very, very short time.

12   SM:    Okay…so it was Buena Vista and Fremont?

13   DPW:  Uh, Buena Vista is up in uh… up in the mountains.

14   SM:    Yeah, okay.

15   DPW:  Fremont is right down on the outskirts of Canon City.

16   SM:    Yeah, okay…uh now probably the best thing for me to do is just ask you some

17           questions and then you can just respond to them and then I'll give you an

18           opportunity to simply make whatever statement you want to make regarding

19           your claim.

20   DPW:  Yes sir.

21   SM:    Uh, could you describe for us the nature of your disability?

22   DPW:  Uh, I have a spinal injury that affected my left leg.  Uh, it became uh…after

23           being…I had to walk on it…that I was refused a wheel chair.  Uh, I walked on

4

1       it for several months and uh I was sent to Buena Vista because I couldn't get

2       around and it was…like I say I made the doctor mad on the Fremont Facility.

3   SM:   Did you have the spinal injury at the time you were admitted to Fremont?

4   DPW: I've had it since 1985.

5   SM:   When were you admitted to Fremont?

6   DPW: Uh,

7   SM:   It says 1998 is that…?

8   DPW: It was `99.

9   SM:   Okay so it was prior…you had the spinal injury prior to the time you entered

10      the facility?

11  DPW: Yes sir.

12  SM:   Okay…go ahead.

13  DPW: Uh, I had foot drop to the point to where my foot turned constantly…uh I

14      finally fell and they shipped me.  They sent me to Buena Vista and they put

15      me in solitary and I stayed in solitary until the doctor there said you know you

16      have no business here…you know and they shipped me from there…they sent

17      me back to the territorial.

18  SM:   Okay…during the time that uh…well let's do it this way…you don't have any

19      hearing impairment correct?

20  DPW: No I don't.

21  SM:   No vision impairment?

22  DPW: Yes.

23  SM:   Correct?

1   DPW: I have a problem with my vision.

2   SM:    Okay, tell me about that.

3   DPW: Uh, it just…well without glasses I can't see hardly at all and the ones I have to

4           use are magnifiers that brings everything in real close.

5   SM:    Okay…and you're not diabetic…correct?

6   DPW: No sir.

7   SM:    Okay…is your claim…now there are four categories of claims that are covered

8           by this class action.  There is mobility, impairment, hearing impairment, vision

9           impairment and diabetic.  Uh, I understand your claims certainly involves

10          mobility impairment…is that correct?

11  DPW: Yes sir.

12  SM:    Okay, does it involve vision impairment at all?

13  DPW: Uh, no sir I can't say that it does.

14  SM:    Okay.

15  DPW: I don't even believe that I put that down.

16  SM:    Okay fine.

17  DPW: I was then wearing glasses of course.

18  SM:    Okay…so your mobility impairment…you've told me that you had a spinal

19          injury that affected your left leg…how did that affect your mobility?

20  DPW: Uh, I've had polio on my right side for…since I was four…

21  SM:    Uh huh.

22  DPW: I'm fifty now.

23  SM:    Uh huh.

1  DPW: Uh, for several years it was okay…Uh, it came back as post-polio syndrome.

2       They were aware of this.  I make them very much aware of it because of the

3       atrophy and everything that was going on at the time.

4  SM:  Okay were you able to…at the time you entered the facility, were you able to

5       walk?

6  DPW: Well, actually I had no choice…they gave me a walker and refused a

7       wheelchair.

8  SM:  Okay…but at the time you came into the facility you were not in a wheelchair

9       is that correct?

10 DPW: I was in a wheelchair up to time that I entered the prison itself.

11 SM:  Okay so you were in a wheelchair before you entered the prison?

12 DPW: yes sir.

13 SM:  and was that…were you permanently in a wheelchair?

14 DPW: Uh, it was kind of fifty…my situation gets good at times and bad at

15      times…it's kind of reoccurring.

16 SM:  Okay.

17 DPW: but I'm weak on one side and I fall…other times uh it's not like that.  It's

18      according to what I do…how tired I get.

19 SM:  Okay…all right why don't you continue and tell us about the nature of your

20      disability and…

21 DPW: Uh, I have uh…after my surgery of course I lost the left bottom part of my leg.

22      The ankle had to be fused there.  Dr. Patterson in Canon City there at the St.

1        Thomas Moore Hospital…he fused the ankle and uh he told me that it may not

2        work…it may work but he fused it anyway.

3   SM:   Okay and when did that occur…do you recall approximately

4   DPW: Uh around October `02…

5   SM:   Okay

6   DPW: and at the same time, they took me to uh…they took me and did a fusion on

7        my neck…Dr. Lilly had a…out of Parkview North in Denver did the fusion.

8   SM:   Okay…that was the same time?

9   DPW: yes sir…I'd say within a month of each other…

10  SM:   Okay.

11  DPW: so after that I was having a hard time of getting any medical care at all.  I was

12        uh in a situation to where after I fell and injured my neck that's why they had

13        to fuse it.  Uh, after I fell and injured my neck, they put me in a wheelchair.

14  SM:   Okay.

15  DPW: and uh then after that I just lived in a wheelchair the whole time I was there on

16        the facility.

17  SM:   Okay…so you were in a wheelchair from October `02 is that…

18  DPW: No, from uh `99…I fell in the Fremont unit trying to use a walker.

19  SM:   Okay.

20  DPW: and it took from that point, which is in the later part of `99…that's when they

21        shipped me to Buena Vista and then back to Territorial.

22  SM:   Okay…so let me see if I've got the timing correct.  You entered the facility in

23        1998…correct?

1    DPW:  I believe it was in `99.

2    SM:    Okay…`99 and at that time you weren't using the wheelchair…you didn't

3            have a wheelchair…you'd use the wheelchair periodically before you entered

4            the facility correct?

5    DPW:  Yes sir.

6    SM:    Okay then you had…you fell and when did you fall?

7    DPW:  Uh, I was still at the Fremont Unit so that would be in the later part of `99.

8    SM:    Okay so you fell in later part of `99 and after you fell, is that when you had the

9            fusion or was that much later?

10   DPW:  No sir…they didn't even talk to me about a fusion until uh…

11   SM:    2002.

12   DPW:  2002.

13   SM:    Okay uh from the fall of `99 after you fell down, were you in a wheelchair

14           then?

15   DPW:  Uh, they moved me to Buena Vista and put me right in a wheelchair.

16   SM:    Okay from the fall of `99 on…you were in a wheelchair…is that correct?

17   DPW:  Yes sir.

18   SM:    Okay and was that…were you permanently in a wheelchair?

19   DPW:  I am now.

20   SM:    Yeah but in 1999, after your fall, did you use the wheelchair intermittently or

21           was it…did you use it all the time?

22   DPW:  I was in it all the time.

23   SM:    Okay, okay…all right and then you had the fusion in 2002.

1    DPW:  I had two fusions…one on my left ankle for stability and the one on my neck

2          where they put plates and screws in there…to hold it.

3    SM:    Okay…all right did those fusions affect your mobility at all?

4    DPW:  Well yes sir.

5    SM:    Okay tell me about that.

6    DPW:  Where I could walk a little bit before…I can't walk at all now.

7    SM:    Okay…well you'd been in a wheelchair since `99 basically on a permanent

8          basis, right?

9    DPW:  Yes sir he set my heel about four inches off the floor where I had to walk on

10         the tip toe…

11   SM:    Uh huh.

12   DPW:  and if I put very much pressure on it, it breaks…

13   SM:    Okay.

14   DPW:  and then that sets me…well, I just can't walk.

15   SM:    Okay so I, I…what I'm trying to determine Mr. Wolf is what changed in terms

16         of your mobility situation from right before the fusion and then after the

17         fusion…cause you told me you were in a wheelchair pretty much permanently

18         from the fall of `99 on…is that right?

19   DPW:  Yes sir.

20   SM:    Okay…and that I assume didn't change at all after the fusion…you were still

21         in a wheelchair?

22   DPW:  Correct.

1    SM:     Okay…uh all right when did you uh…you were in the facility until when…in

2            Colorado?

3    DPW:   Uh, December 23, 2002.

4    SM:     Okay…all right that's all the questions I have concerning your disability but I

5            want you to go ahead and tell me whatever else you want to tell me about it.

6    DPW:   Well sir I pretty much covered it…uh you know I'm not trying to make you

7            know a great bit thing of this…even though it has changed my life a lot being

8            in a wheelchair…I never realized just how much.  Uh, the request that I made

9            over the time requesting assistance before the atrophy got so bad and before

10           my neck got to the point where I couldn't turn it…uh it was just taken care of

11           by medication.  Uh they would give me morphine three times a day and uh

12           needless to say when they released me from prison, uh they just gave me one

13           card and said wish you luck,

14   SM:     Okay well let me try and explain something here and I'm sure the states…I'm

15           not trying to act as anybody's lawyer here, I want at least give you my

16           understanding of what the claims are that can be brought under this class

17           action that was settled and I'm sure Mr. Quinn will let me know if he thinks

18           I'm wrong.  Uh, in terms of any claims relating to whether you received proper

19           or improper medical treatment…I don't think those are claims that really come

20           within this class or if they do it would take medical testimony…some doctor

21           on your part testifying in order to establish those…so I don't think those are

22           what we're here for today.  What we're really here for is to determine what the

23           nature of your disability is and that's why I asked you about that and then to

1       determine what the uh facility did or did not do to accommodate that disability

2       in terms of making services uh, programs, the physical aspects of the facility

3       available to you.

4   DPW: I see.

5   SM:    Okay so that's why I asked you first of the nature of your disability so I could

6       understand that and uh the next thing that I wanted to ask you about is what

7       programs or benefits or services that are offered by the facility were you

8       precluded from or limited in your ability to participate in because of your

9       disability.

10  DPW: Let me uh…the recreational field when I first got to the Territorial…

11  SM:    Uh huh.

12  DPW: Just had a small area to where a wheelchair could do there.

13  SM:    and that's the outside recreational field?

14  DPW: yes sir.

15  SM:    Okay.

16  DPW: It had a small stretch and then the rest of it was gravel so we was able to go to

17      one area and that was it.  Uh, the inside recreation was all upstairs except for

18      the gymnasium…

19  SM:    Okay so inside recreation and what was upstairs?

20  DPW: Well they had it set up for uh people with disabilities, but it was only for those

21      that walked.  They had video games, they had…well I don't really know

22      everything that was up there but it was TVs and stuff like that.

23  SM:    Okay I got ya…okay

1    DPW: and I never made it up there.

2    SM:    Okay and then there was a gymnasium downstairs?

3    DPW: yes sir it was…they had a…well they had like bowling that they would set up

4            about once a month…

5    SM:    Okay.

6    DPW: then they had uh inside fenced in area for working out…couldn't get in there

7            with a wheelchair.

8    SM:    Okay so you couldn't get in the workout area…is that right?

9    DPW: Yes sir.

10   SM:    Okay so we've talked about the recreational field that had only a small area for

11           wheelchairs, we've talked about the inside recreation facility…the portion that

12           was upstairs…you weren't able to get there is that correct?

13   DPW: Right.

14   SM:    and the work out area in the gymnasium downstairs you couldn't get to with a

15           wheelchair…is that correct?

16   DPW: You couldn't get in through the gate.  It was a chain link fenced in area…

17   SM:    Uh huh.

18   DPW: It was so small and everything jammed together that it wasn't accessible at all.

19   SM:    Okay so you couldn't get in there?

20   DPW: Right.

21   SM:    Okay…what else?

22   DPW: Going into the dining hall…the dining hall had one ramp that went up into the

23           door.  It was about a ninety degree angle.  Even though we did have pushers

1        that was supposed to assist the wheelchairs around, they weren't always

2        available…that you would sit down there in front of the chow hall either in the

3        rain or the snow or sit outside until somebody you know on the compound

4        would help you get up the ramp.  It was so steep you just couldn't get up by

5        yourself in a wheelchair and uh that was a problem.

6  SM:    Okay…

7  DPW: Other than that, uh the school was accessible, the uh pharmacy where we got

8        our medications all of that…we could get to stuff like that.

9  SM:    Okay so I have in terms of facilities that you couldn't access, uh the recreation

10       facility outside…the recreation field…well you could access it but it was only

11       a small area that wheelchairs were allowed in.  I've got the inside recreation

12       area…upstairs that you couldn't access, I've got the workout area that you

13       couldn't get through the gate to get into and I've got the dining hall that uh

14       there was only one ramp and it was too steep for you to get up yourself so you

15       needed to wait until a pusher was available…is that correct?

16  DPW: Yes sir.  I do need to say though that the inside recreation…

17  SM:    Yes.

18  DPW: It was above the dining hall.

19  SM:    Uh huh.

20  DPW: and you had to go up the ramp to get into the dining hall and then go up two

21       little flights of stairs to get to it.

22  SM:    Okay…but well…

23  DPW: Along within the gymnasium itself.

1   SM:   No, no I understand that.

2   DPW: Okay.

3   SM:   But in any even t, wherever it was you couldn't get up the stairs to use that

4          room is that what you're saying?

5   RP:   Yes sir.

6   SM:   Okay…uh are there any other benefits, facilities, employment…anything like

7          that that you believe you were uh denied or limited on because of your

8          disability?

9   DPW: Well they had me working on the Fremont facility in the dining hall…my job

10         there was just to fill up containers, wipe the tables, the restroom facility

11         there…they would have to release us to go back to the unit…go back to our

12         dorm where we lived in order to go to the restroom cause the bathroom wasn't

13         accessible.

14  SM:   Okay so bathroom wasn't accessible in the work area where you were

15         working?

16  DPW: Yes sir…I lost my job because of that.  When they sent me to Buena Vista,

17         nothing was accessible so that's when they locked me up in the hole which

18         they made me go down…uh, Buena Vista…they've got three steps that goes

19         down into the hole area and I had to get out of the wheelchair and sit on the

20         floor and scoot down the steps just to be locked up and they held me there

21         until the doctor seen me and he just said no way we're not going to do this and

22         immediately he shipped me back to the Territorial.

23  SM:   Okay…how long were you in Buena Vista?

1   DPW: Uh, about a week and a half…two weeks…I don't remember exactly now.

2   SM:   Okay…did they…I assume you couldn't…you say nothing was accessible in

3        Buena Vista?

4   DPW: The only floors that they could put me on were the…it was level with the

5        hallway…

6   SM:   Uh huh.

7   DPW: then I had to…if I wanted to get into the room where I was living…I actually

8        had to get out of the chair, which I couldn't leave in the hall on the chase

9        itself…I had to take everything into a two man room where you just didn't

10       have any room…with the locker boxes and TVs, the beds and everything…is

11       just a very small (inaudible)

12  SM:   How did you get to that room…was it on the same floor?

13  DPW: It was on the same floor as the hallway…it was the…

14  SM:   Okay, so you could get to the room but it was too small for your wheelchair, is

15       that what you're saying?

16  DPW: Right and you couldn't get down the uh walkway and then the recreation there

17       was also downstairs where the TVs were any everything…the only thing they

18       did when they took me in there…they just said this is not accessible for you.

19       There's no way we can get you in and out of this room in a wheelchair so

20       we're going to have to lock you up in a hole, where they did and from that

21       point on I just sat there until they transferred me.

22  SM:   Well you did have a room at Buena Vista or you didn't?

23  DPW: Well they put in a…well they assigned me to a room…

1    SM:     Right.

2    DPW:   and after they seen that I couldn't get the wheelchair in there, they just locked

3             me up.

4    SM:     Okay then they put you in a different area.

5    DPW:   Yes sir…actually what they did… they put me in solitary with a camera…

6    SM:     Okay

7    DPW:   and they sit and watch me…that was the thing…I guess they was trying to see

8             if I was going to get up and hop around the room or something.

9    SM:     Okay.

10   DPW:   Okay so I sit there in that one room you know until the doctor come down and

11            he just said…no take him to my office now you know and then from his office

12            they just said put him on a van and take him to territorial…so that was the end

13            of that.

14   SM:     Okay…all right is there anything else that you want to tell me about facilities,

15            programs, benefits, employment that you were denied because of your

16            disabilities?

17   DPW:   Well I was denied all uh job opportunity when I was there at the Territorial….

18   SM:     At Buena Vista?

19   DPW:   Territorial.

20   SM:     Is that the one at Fremont?

21   DPW:   Uh, no that's uh…

22   SM:     That's Buena Vista…is that what you're referring to?

23   DPW:   Well they didn't even offer me a job at Buena Vista.

17

1    SM:    Okay where is the Territorial prison?

2    DPW:  Territorial is downtown Canon City.

3    SM:    Oh okay…you were in there as well?

4    DPW:  Well that was the main medical facility…Territorial.

5    SM:    Oh…

6    DPW:  That's where I ended up uh and that's where I stayed and discharged.

7    SM:    Okay so I've got it wrong here cause I've got…you went in…I mean you

8           checked into Fremont I mean that is where you first went in is Fremont, right?

9    DPW:  Yes sir.

10   SM:    and then you went to Buena Vista for a short period of time…a week and a

11          half, two weeks.

12   DPW:  Yes.

13   SM:    When did you go to the Territorial prison?

14   DPW:  Uh, just as soon as I left Buena Vista.

15   SM:    So that would have been when?

16   DPW:  Uh, probably 2000.

17   SM:    2000.

18   DPW:  Somewhere along in there…it was before Christmas.

19   SM:    Okay so when you were telling me about the recreation field, uh the workout

20          area, the dining hall…was that at Fremont or was that at the Territorial prison?

21   DPW:  That was Territorial.

22   SM:    I've gotcha…okay so all of the lack of accommodation occurred either at the

23          Territorial or at Buena Vista the couple weeks you were there?

18

1   DPW: Yes sir.

2   SM:   Okay…I misunderstood, I'm sorry.  Okay…uh lets go back to my

3         question…are there any other facilities, programs, benefits, services that you

4         were denied access to or your access was limited to because of your

5         disability…other than what we've talked about?

6   DPW: Uh, my religious preference of course…they had a problem with uh me

7         changing my…changing to Judaism actually what it was.

8   SM:   Okay.

9   DPW: Change to a Jewish faith.

10  SM:   Okay…I don't think that's a class issue either…cause that's not a disability

11        issue.

12  DPW: It was until we couldn't get to the services.

13  SM:   Uh…okay well tell me about that.

14  DPW: Well they just…they just put it to an area we couldn't get in, in wheelchairs

15        and uh…

16  SM:   So the services were held in an area that you couldn't access?

17  DPW: Yes sir…but we had…we actually moved that and then where we had our

18        Ramadan…we actually had to go to the office area which is in the front around

19        the Warden's area and uh…I'd say you can only go down so many ramps in a

20        wheelchair.

21  SM:   Okay was this at the Territorial prison?

22  DPW: yes sir.

1    SM:    Okay so at the Territorial prison, uh you say that…well lets go back…you said

2           that the services were held in an area that…well let's go back even further than

3           that…what was your religious affiliation at the time that you uh got to the

4           Territorial prison?

5    DPW:   None at all.

6    SM:    None…okay and then it became what?

7    DPW:   Uh Jewish.

8    SM:    Okay…and when you uh…and they had Jewish services at the prison?

9    DPW:   Yes sir.

10   SM:    and where were those held?

11   DPW:   They were held down in the…well actually that would be one building …what

12          we call the death row area…uh we would get together a group of us…we'd get

13          together…it was in the chapel…

14   DPW:   Okay.

15   SM:    But we would meet in our housing area for just like personal uplift…

16   SM:    Uh huh.

17   DPW:   and when we'd go to the chapel…that was pretty small.

18   SM:    Okay so you would meet in your rooms…is that where you'd meet for your …

19   DPW:   In the common areas.

20   SM:    Common areas…okay now tell me about the problems that you had accessing

21          uh either the chapel or the common areas where…

22   DPW:   Well the Chapel was just small…I mean it was just for a prison you can't

23          really expect a whole lot of room, but uh the chapel there was really small.

20

1    SM:    Okay…what other problems did you have accessing the areas where you

2           practiced your religion?

3    DPW:   Uh, just the ramps getting to and from.  Our preachers couldn't go outside the

4           fence and uh the way it was set up over there…when you go…you had to go

5           through…let see…one fence and down two ramps…

6    SM:    and this was to get to where?

7    DPW:   Uh, just to get to the like the Ramadan…we had to go through that for a

8           week…

9    SM:    What was the Ramadan?

10   DPW:   That's a religious holiday.

11   SM:    Okay but that's not a Jewish religious holiday is it?

12   DPW:   Yes.

13   SM:    Okay…and where was that located?

14   DPW:   We had to move everything out of the main chow hall because you can't be

15           around like bread crumbs, stuff like this.

16   SM:    Right.

17   DPW:   We had to go take it actually to the office area in the front building and uh that

18           was where the problem was because the doors wasn't accessible, ramps

19           were…like say for one person there were a lot…there was a lot of ramps, but

20           they did have ramps at least…they didn't have stairs.

21   SM:    Uh, but there were a lot of ramps?

22   DPW:   Yes.

23   SM:    to get to that area?

1   DPW:   Well there was just two steep ones is what it was…they were just too

2          steep…real long and uh (inaudible) as I'd been doing…I had a hard time with

3          ramps…I didn't have anybody to help me get up and down the hills and stuff,

4          which were at that facility…you're either going up or down and uh I just

5          couldn't get around.

6   SM:    Okay…did you miss any of those uh services or…

7   DPW:   Yes I did…I missed two of them.

8   SM:    Was that because you couldn't use the ramps or was that because of some

9          other reason?

10  DPW:   One time was because of the ramps and the other times was uh… I couldn't

11         get out of the building.

12  SM:    and why couldn't you get out of the building?

13  DPW:   Uh they just didn't believe that I had a Jewish faith.

14  SM:    Oh, okay…All right anything else in terms of services, programs, facilities,

15         benefits, employment that you were denied or limited on because of your

16         disability?

17  DPW:   No sir I think I just about covered it.

18  SM:    Okay then the next question is what harm did you suffer as a result of the

19         denial of the facilities or the ability to access the facilities that you told us

20         about and what do you think is the appropriate remedy?

21  DPW:   Well uh being down here, I'm not really sure if they've made any changes to

22         the facility itself…when I was there, they hadn't.

1   SM:    Okay…well in term of changes to the facility I think that's covered really by

2          the plan itself so uh really I think what I'm…at this point you're no longer in

3          any of those facilities so uh I guess the only potential remedy here is monetary

4          damages.  I don't see any other remedy that would be available.  Uh, are you

5          making a claim for monetary damages?

6   DPW:  Uh, yes I am.

7   SM:    Okay and how much are you claiming?

8   DPW:  Well I haven't really…it would be hard for me set a figure in my own head…

9   SM:    Okay.

10  DPW:  but for uh…well I just don't even know how to say it…I guess I could just be

11         blunt as I usually am.

12  SM:    Well I think you need to be yeah.

13  DPW:  Uh, I went through a lot…more than I'm saying here you know just with the

14         personal and physical anguish of everything trying to get to places, trying to be

15         with other people, friends…it leaves you completely stuck out…if you can't

16         get somewhere and everybody else goes there then the only place you can go

17         is back to your room…

18  SM:    Uh huh.

19  DPW:  It took me a year to even get into a wheelchair accessible room…where I was

20         living…I had to live with other people that was in the room that complained

21         about uh my wheelchair having to be in the room, and uh that caused an

22         altercation…

23  SM:    Was that again at the Territorial prison or was that at Fremont?

1   DPW:  It was at the Territorial.

2   SM:   Okay.

3   DPW:  and the rooms…they had one two man room of course and if you was in a

4         wheelchair you were supposed to be in an accessible room…well they didn't

5         always do that…they would put you in a room to see if you could make or

6         would make it and then that didn't always work out cause they had a mixture

7         of people…well I got into an altercation with a guy when I was in my

8         wheelchair…he wasn't…because of the wheelchair having to be closed up and

9         put on one wall and after that was when I started having the headaches that led

10        to the surgery…

11  SM:   Okay

12  DPW:  because I was hit…matter of fact hit several times…uh that…I don't know

13        that just seemed to change me in a way…

14  SM:   Okay.

15  DPW:  I've never really been susceptible of being afraid of someone because I've

16        always been able to take care of myself to a point and that changed everything

17        the way I look at being disabled.  Uh, having a sensibility just to be able to

18        live…it just completely freaked me out…I mean it really did.  I never really

19        understood what anybody had to go through until I was put in this chair and

20        I'm still living in this chair and uh it was really a problem.  I set and I think

21        everybody wants to be a millionaire but I'm not going to ask for something

22        like that.  It's the idea of them just not…just not even caring enough to try to

23        correct anything that's going on with you and making it worse retaliation by

24

1      sending me to Buena Vista because I couldn't get around on Fremont and they

2      raised my security and everything for no reason…I got no disciplinary

3      cases…uh I didn't get into trouble everyday, I didn't run around a cuss

4      people…I just don't do it…I just do my time.

5   SM:   Okay.

6   DPW:  But it got to the point to where the constant state of depression that I stayed in

7      and uh I just really…I think I would actually have to leave that up the court.

8   SM:   Okay.

9   DPW:  I wouldn't feel right just and amount because I don't believe I would know

10      what it would be.

11  SM:   All right Mr. Wolf do you have anything you want add…that completes the

12      questions I had so if there is anything you want to add at this time in the way

13      of testimony uh the floor is yours.

14  DPW:  Well I do believe…I believe in my heart that if I got the medical care that I

15      should have got I wouldn't be in this wheelchair today.  I don't think it was

16      intentional on the surgeons part…I just had to go so long before I got that

17      attention…before I got the surgeries itself.  When they found out that I was

18      getting out of prison, then they started rushing me through these surgeries and

19      then after my surgery was over, they just turned me loose on the streets with

20      nothing…they said okay it's up to you…well naturally I couldn't make

21      it…there's no way I could make it.  Uh, I'm uh…you know I voluntarily come

22      down here and turned myself in just to get this over with because I didn't have

23      any place to go…I couldn't go out there and expect my family to support me

25

1      and take care of me because of the condition I'm in.  They're not set up for a

2      wheelchair in their home …they don't know what to do and at my age you

3      know…they got enough problems.  When I came about all this medical done

4      and everything, uh I really believed that I was going to be able to get around

5      but they just kept putting me off and putting me off and like I said they put me

6      on a job…that didn't work out.  Then after I got in a wheelchair it was just like

7      okay…that's it, we're not going to try anymore.  It was…like I say it was uh a

8      mental strain on that.  I guess that all I have to add your Honor.

9    SM:    Okay thank you very much…uh now Mr. Quinn, the attorney for the State will

10      have a chance to cross-examine you at this point so I'm going to put the phone

11      over next to him here and uh then he can ask you some questions as

12      well…okay?

13   DPW: Okay.

14   SM:    Well you're going to have to move close to the phone…it won't go any

15      further…okay you can begin cross examination.

16   JQ:    Good morning Mr. Wolf can you hear me?

17   DPW: Yes sir.

18   JQ:    Okay…uh my understanding is you claim to be mobility impaired…that's the

19      basis for your claim?

20   DPW: Yes sir.

21   JQ:    and you're not claiming any other disability in this case?

22   DPW: No sir.

1  JQ:    Okay…now reading through your claim form and I guess hearing your

2         testimony now…there was a number of things you never brought up in your

3         claim form such as the religious issues…

4  DPW: Yes.

5  JQ:    Uh, and missing religious services…uh some of the claims relating to uh the

6         yard accessibility…is there any reason you didn't include those in your initial

7         claim forms?

8  DPW: Uh, I think on the questionnaire…is that the one you're talking about?

9  JQ:    Well there were two questionnaires…there was an initial claim form

10        correct…?

11 DPW: Right.

12 JQ:    and then there was a supplemental claim form relating specifically to mobility

13        impairments correct?

14 DPW: Uh I believe…I can't remember now…I have a problem with real key memory

15        things ever since I had the surgery on my neck…you know if it's not too far

16        away I can remember it.

17 JQ:    Well you would agree with me that a number of issues you've raised here

18        today were not included in the claim forms…isn't that true?

19 DPW: I don't believe that I brought up the religious on there.  I didn't think that had

20        anything to do with the disability area other than except the building.

21 JQ:    What about the ramp to the dining hall?

22 DPW: The ramp to the dining hall…I don't remember if I put that on there or

23        not…not to be honest with you.  I think it was just accessibility to the dining

1        hall I think I had because that's where, that's where the uh recreational thing

2        was…it was all in the same building.

3   JQ:    and that's at Territorial…correct?

4   DPW: Yes sir…Territorial.

5   JQ:    You're not complaining about the dining hall at Fremont.

6   DPW: Fremont was ground level.

7   JQ:    My understanding reading your claim form…a lot of your complaint is you're

8        upset about the medical care you received…isn't that true?

9   DPW: Well it was the disregard for the medical all together…that led to me being in

10       a wheelchair in the first place…

11  JQ:    But, but you can see that you had used a wheelchair before you came into the

12       Department of Corrections, true?

13  DPW: Yes, they were aware of that at the time.

14  JQ:    Okay.

15  DPW: I made it a point to let them know that I had a problem with my mobility and

16       what they did…they gave me a walker and said that the wheelchairs all had to

17       live in one building and since I was in…as a matter of fact I was in one

18       building in Fremont and it was not wheelchair accessible.

19  JQ:    Well let me ask you this…when you arrived at the Denver Reception and

20       Diagnostic Center when you were very first incarcerated…did you have a

21       wheelchair?

22  DPW: No, I didn't.

23  JQ:    and did you have a wheelchair when you were in the county jail?

1    DPW: We're going in an out again/

2    JQ:    Okay my question was did you have a wheelchair when you were housed in

3            the county jail before you came to the Department of Corrections?

4    DPW: No sir I didn't.  Uh, can you hear me?

5    JQ:    Yes sir.

6    DPW: Okay if this thing is poppin in and out again.

7    JQ:    Let me try to move a little closer and talk a little louder.

8    DPW: I did not have a wheelchair in the county.

9    JQ:    Okay…now when you were first…one of the claims you raised in your claim

10           form is that you were placed in a higher level security prison…

11   DPW: Yes sir.

12   JQ:    Uh, you initially were sent to DRDC…the reception center correct?

13   DPW: Yes sir.

14   JQ:    and that's where everybody goes.

15   DPW: Yes sir.

16   JQ:    and then you were sent to Buena Vista?

17   DPW: No I was sent to Fremont.

18   JQ:    Uh, Mr. Wolf isn't it true from DRDC you went to Territorial for transport to

19           Buena Vista?

20   DPW: No, I went from DRDC by bus right straight to Fremont.

21   JQ:    Okay and how long were you at Fremont?

22   DPW: Uh, I can't really say the exact time…uh I don't think it was over a couple of

23           months…

1    JQ:    Okay…well let me tell you my records show that you went to Territorial for

2            transport and then you went to Buena Vista and you were at Buena Vista for

3            approximately one week…isn't that true?

4    DPW:  Uh, well I said you know…before I said about a week and a half or two weeks

5            but when you're in the hole you don't have the time…you know it's uh…it

6            could have been a week, it could have been a week and a half…

7    JQ:    So you had just come into the facility correct?

8    DPW:  I was on uh…they brought me in on a regular chain bus and assigned me to a

9            room.

10   JQ:    Okay…and that Buena Vista is a medium security prison?

11   DPW:  Yes it is.

12   JQ:    Okay and that's what you had scored…you scored for placement in a medium

13           security prison, correct?

14   DPW:  Uh, I'm not even sure about that…I was checking my records the other

15           day…trying to find out if I was a medium or low…when I was there but it's

16           the housing area that they put you in for like…

17   JQ:    Mr. Wolf you're not answering my question…you are a medium security

18           inmate isn't that true?

19   DPW:  Uh yes I believe I was.

20   JQ:    Okay and from there you went to Fremont…isn't that true…from Buena

21           Vista?

22   DPW:  I was at Fremont and I went to Buena Vista and then I went back to Territorial.

23   JQ:    Okay, well Fremont is a medium facility as well…isn't that true

1   DPW: I don't know.

2   JQ:    Okay and Territorial is a medium custody facility?

3   DPW: Territorial is a little bit of everything…it's a medical facility.

4   JQ:    but they house medium custody inmates there…correct?

5   DPW: The house medium there and low and high.

6   JQ:    Did you file your custody classification throughout the DOC?

7   DPW: Not really cause it never changed.  Uh, I said it didn't get uh…I try not to get

8         in any trouble at all you know and the only records that I have there are just

9         says I remained you know with no problems there and discharge and that is the

10        only paperwork I have.

11  JQ:    Well that's not entirely true is it Mr. Wolf.  You had a number of disciplinary

12        violations.

13  DPW: Uh…I don't remember if I did or not…the were according to what the

14        infractions were.

15  JQ:    You don't recall a number of violations for verbal abuse?

16  DPW: Verbal abuse…oh verbal abuse is if you use a cuss word.  I mean not cussing

17        somebody they just hear you saying a cuss word…that was a write up.

18  JQ:    Do you recall getting write ups for verbal abuse?

19  DPW: I probably got one.

20  JQ:    In fact do you recall getting a write up of disobeying a lawful order?

21  DPW: I don't remember.

22  JQ:    Okay you don't recall Associate Warden, Gary Neat ordering you to move into

23        a single cell and you refusing to move into a single cell.

1    DPW:  Single cell…Gary Neat…which, which uh facility?

2    JQ:    That was at Fremont.

3    DPW:  To a single cell?

4    JQ:    Yes.

5    DPW:  The only incident I can bring to mind on that…it was the only incident that I

6    can remember on something like that was when I was told to move to an upper

7    floor up a real steep ramp that I couldn't get there.

8    JQ:    and I'm sorry I misspoke it was Associate Warden Gary Watkins…do you

9    recall him giving you an order to move into a wheelchair accessible single cell

10   and you refused to do that.

11   DPW:  Oh…that was…I was told to move to an upstairs single area…I couldn't get

12   up the ramp.

13   JQ:    In fact it was cell C100 which is on the main floor isn't that true…ground

14   level?

15   DPW:  I don't know…don't think it is.

16   SM:    Tell you what…we're going to take about a two minute break here

17   okay…we've going for about an hour…Mr. Wolf why don't you stay on the

18   phone and we'll reconvene in about five minutes…is that okay?

19   DPW:  Okay.

20   SM:    All right…Okay we're back on the record now…Mr. Quinn you may continue

21   your cross examination.

22   JQ:    Uh, Mr. Wolf can you tell me specially what programs you claim you were

23   denied access to…I know there was the gym at Territorial…

1    DPW: Yes.

2    JQ:    Uh, and the outdoor yard at Territorial.

3    DPW: Yes.

4    JQ:    and the…I think it was the auditorium at Territorial.

5    DPW: Uh, yes sir…now I wouldn't deny access to the auditorium…I was denied

6          access to the weight room where we get our physical therapy…uh on the

7          inside of the auditorium.

8    JQ:    Okay…now is that the auditorium above the cafeteria?

9    DPW: No sir that's the one on ground level.

10   JQ:    Okay.

11   DPW: The auditorium that was above the uh dining hall…that was just no access at

12          all.

13   JQ:    Okay that's what I was referring to now so there's an outdoor yard and there's

14          an indoor auditorium or gym is that what you're complaining about?

15   DPW: There's two indoor …one above the dining hall, which was you have to go up

16          stairs and then the other one is on the ground level where it's just a basketball

17          court.

18   JQ:    Okay that's an indoor gymnasium correct?

19   DPW: Right.

20   JQ:    Okay…uh and then you had a complaint about the ramp at uh the cafeteria.

21   DPW: Yes sir that was the same uh accessible ramp that you have to go up to get into

22          uh the recreation…to go up the stairs to the recreation…the upstairs

23          auditorium.

1   JQ:     Now, are those the only complaints you have?

2   DPW: Uh, actually I would be in the room there selves you know when I was in a

3           double room…the only ones I didn't have accessibility to…uh…you know but

4           the hills and everything that was on the outside that just comes with the

5           ground…you can't change that.

6   JQ:     Now in any cell you were housed in you had thirty-six inches of space

7           between the wall and the bed…isn't that true?

8   DPW: In the single cells for wheelchairs, yes.

9   JQ:     Even in the double cells.

10  DPW: Not when you put a wheelchair in there.

11  JQ:     Well there's…

12  DPW: You couldn't even get the wheelchair to the door.

13  JQ:     I'm talking about without a wheelchair in the room…there's thirty-six inches

14          of space between the bed and the wall.

15  DPW: Oh, I don't know that…I've never measured it.

16  JQ:     Okay have we covered everything then?

17  DPW: Uh, I would like to say…

18  JQ:     Well you'll get another chance, but let me…have we covered all the areas that

19          you claim are problematic?

20  DPW: I believe.

21  JQ:     and those are all at territorial…you're not talking about anything at Fremont?

22  DPW: Uh, Fremont was just the accessibility to the bathroom where I was working.

23  JQ:     and that's in the kitchen?

34

1    DPW:  That was in the back of the kitchen, yes.

2    JQ:    and in fact that if you had to use the restroom, they would allow you to get

3           back to your cell house and come back…

4    DPW:  Yeah, you didn't have a choice… I mean you had to go and stay there…I

5           mean your work day was over.  We wasn't allowed to go back and forth, that's

6           what I'm saying.

7    JQ:    Let me ask you this question…the game room in the auditorium at

8           Fremont…were you otherwise qualified to participate in those programs

9           offered up there?

10   DPW:  Uh, sure if we could get to em.

11   SM:    That was at Territorial right?

12   JQ:    Yes…isn't it true you had to be write up free to be allowed to go up to the

13          game room?

14   DPW:  Uh, I don't really know Mr. Quinn…I really don't.  I never even tried to go up

15          there because uh…I couldn't.

16   JQ:    and so you never even requested to go up there?

17   DPW:  I asked them if there was any other way to get up there…I was told that there

18          was an elevator in the back of the dining hall but we couldn't use it.

19   JQ:    But you never asked if you were qualified to participate in the programs

20          offered up there?

21   DPW:  I never even crossed my mind…it was open to the general populations at all

22          times…I just figured it was open to everyone.

1   JQ:   What about the…for instance uh with respect to the weight rooms…or the

2          weigh piles…did you ever request that free weights be brought out so that you

3          could use them?

4   DPW: No, they wouldn't do that.

5   JQ:   Did you ever ask?

6   DPW: That the free weights that they had on the compound uh were on the inside of a

7          chain link fence…that's where they had to stay on the rubber mats.

8   JQ:   Did you ever make a request to be allowed to use those weights?

9   DPW: Uh, no I didn't…we couldn't get to them…you can catch a wheelchair on the

10         inside of a weight area.  The one on the inside the auditorium, which was the

11         one downstairs…the gymnasium….uh the chain link fence area...all of that

12         was behind a chain link fence…it was small area of…if you could get in there

13         you could work out.

14  JQ:   But you never requested any accommodations or that you be allowed to

15         possess the weights outside the fence isn't that true?

16  DPW: Well that wasn't even a question there…cause we already knew you couldn't

17         do that…that was just the rule that says…

18  JQ:   But you never made a request did you?

19  DPW: We asked for accessible areas where we could work out and that never

20         happened.

21  JQ:   and in fact during your write ups that your gym privileges and weight

22         privileges were suspended…isn't that true?

1  DPW: Uh, probably if uh…yeah I'm not trying to be vague where the write ups are

2          concerned…I just don't remember that far back…you know six years ago…uh

3          everything going on now I just don't remember.

4  JQ:   The ramp to the cafeteria…you don't know how steep that is do you?

5  DPW: If I just had a guess, I would say it would be about a ninety degree because I

6          can get up some pretty steep ramps, you know if you really try hard and that

7          one I couldn't get up at all.

8  JQ:   Did it have a rise or more than uh one inch for every eight inches?

9  DPW: At least…

10  JQ:   Okay a rise of more than uh one inch for every twenty inches?

11  DPW: In an areas of about a two foot long…that's how long the ramp was…it went

12          from the edge right pretty much straight to the ground…You had to hit it at an

13          angle to get up it.  We had to get runs on it…we had to get a run comin down

14          the hill to get up it by yourself.

15  JQ:   But you don't know how steep it was…you've never measured it?

16  DPW: Oh no…we didn't have anything to measure it with.

17  JQ:   and you said on occasion…in fact on several occasions you had pusher isn't

18          that true?

19  DPW: Sure I had one assigned to me.

20  JQ:   Okay and he would take you to your meals and to your programs?

21  DPW: If you could find him…they weren't always around.

22  JQ:   So he was specifically assigned to you?

1   DPW:  Yes sir…they were assigned to clean your room, take your laundry, and push

2            you to meals…that's what their job was.

3   JQ:     Let's talk about…you claim you were denied access to Jewish Ramadan

4            services.

5   DPW:  Uh, I was actually taken off the list of the Jewish services.  I actually didn't

6            understand a lot of the religion but I transferred over to it.  One occasion I just

7            couldn't get to it and the other occasion they wouldn't let me out to get to it

8            and that was through the (inaudible) if you had to move at a certain time.

9   JQ:     Okay and uh how many Ramadan services did you attend?

10  DPW:  That was the last year I was there so the Ramadan services there I just went to

11           the one.  After that I spent most of my time up in the hospitals on my surgeries

12           in the infirmary there on the facility …after surgery trying to recuperate and

13           then they just released me.  I wasn't able to get around any where.

14  JQ:     and you claim to be a Jewish offender, correct.

15  DPW:  No sir I wasn't at the time…I changed my religion from nothing to a Judaism.

16  JQ:     Okay…and your position is that Ramadan is a Jewish holiday.

17  DPW:  Oh I may not be saying that right to be honest with you…cause it was just

18           the…it was like the uh…I don't even…uh a Christian holiday…yeah it was

19           just like their Christian holiday…the first one that I went to I knew that I

20           wanted to keep going to their services.  I went there as uh a guest and I did all

21           the paperwork after that and they accepted me.

22  JQ:     Now your claim with respect to the chapel…it's just that chapel is too small?

38

1   DPW: Yes sir…you know I …you can't really point your finger at anything like

2         that…it was just a small chapel.  If you get more than two wheelchairs in an

3         area like that then everybody else sittin around in their chairs…it was too

4         small to actually get around.

5   JQ:   That's true of everybody, whether they are disabled or not isn't it…if a room

6         is small it's small.

7   DPW: I would say so yes sir.

8   JQ:   Now you claim you were denied job opportunities?

9   DPW: I was taken off of a job because of my disability.

10  JQ:   Specifically because of your disability or was it due to a write up?

11  DPW: It was due that I couldn't get into the bathroom and you can't get in there to

12        wash your hands or use the restroom.

13  JQ:   Now wouldn't they allow you to go back to your cell to use the restroom?

14  DPW: They actually would send you back to your house and that's where you'd stay.

15  JQ:   Okay.

16  DPW: You couldn't go back and forth…if you had to go to the restroom you got

17        there and you know your going to try to make any money, which is your only

18        support in there…uh they paid you to work.

19  JQ:   What are the dates…the date of that termination…do you recall?

20  DPW: Well it was when I first got to Fremont…I worked the…

21  JQ:   Now are we talking about Fremont or Territorial?

22  DPW: Fremont.

23  JQ:   Okay…

1   DPW: I didn't have a job at Territorial.

2   JQ:    but you said the cafeteria area was accessible at Fremont correct?

3   DPW: Oh yes.

4   JQ:    Okay…and do you recall specifically when you were terminated from that

5          job?

6   DPW: Probably the first week I worked there…as far as dates go no…that's a little

7          bit too far gone for me.

8   JQ:    Isn't it true that you were terminated because you received a write up?

9   DPW: I don't think that had anything to do with the jobs there.

10  JQ:    but you did receive a write up correct?

11  DPW: I don't remember.

12  JQ:    No more questions your Honor.

13  SM:    Okay…all right Mr. Wolf that concludes Mr. Quinn's cross-examination…uh

14         I have one question…just a minor one that uh I want to ask you and then you

15         can offer any statement you want in reply or in rebuttal.  Uh I guess it would

16         be redirect is really what the proper term would be, but what was you salary

17         for the week that you worked at Fremont?

18  DPW: Oh it's…

19  SM:    Do you remember how much you were getting paid?

20  DPW: I don't even…I think it was like eleven cents…eleven cents an hour.

21  SM:    Okay.

22  DPW: It wasn't that much…I mean if you didn't work they gave you five dollars a

23         month just for hygiene.

1   SM:    Okay.

2   DPW:   but it wasn't no great sum but you could live off it if you had to.

3   SM:    Okay…all right do you have any redirect testimony in other testimony you

4          want to give now in light of what Mr. Quinn asked you on cross-examination.

5          Anything that uh you want to fill in now that you think you were not able to

6          fill in when he asked you the questions?

7   DPW:   Yes, I would like to say one thing.

8   SM:    Sure go right ahead.

9   DPW:   Uh, I'm not trying to be vague in my answers towards to write ups and the

10         dates and times…I just don't remember.  Uh, being where I'm at now, I know

11         it's no excuse, but being where I'm at now uh is totally different than what it is

12         up there.

13  SM:    Well these events all occurred some three years ago anyway or earlier.

14  DPW:   Uh, yes sir.

15  SM:    Yeah okay.

16  DPW:   It's a…I've got a problem remembering things.  If I don't write it down, which

17         I don't have…the only paperwork that I have here is what I've got in the last

18         year from the court.  I don't have the initial filing, I don't have anything that I

19         sent from the Territorial or Fremont or the medical records that I sent for

20         uh…I don't have any of that and I need that here…my medical records…uh I

21         don't have any of that here cause I think the court said that we could request

22         ten items or something like that in one of the orders from the court…

23  SM:    Correct yes.

1    DPW:  I requested my surgery records, both in Denver and in Canon City, and my

2          medical records there on the facility and uh you know I actually never even

3          thought about asking for my disciplinary report…I didn't think that anything

4          to do with medical at the time.  Uh, but I never received any of that.  Uh, I was

5          allowed to buy my X-rays, which I turned over to uh the Texas Department of

6          Criminal Justice here…

7    SM:   Uh huh.

8    DPW:  when I first came down showing them the extremities where they cut bone out

9          of my foot and you know replaced it and put screws and stuff in my neck.  Uh,

10         but like I said that was done there and not here and so there not treating me so

11         bad here either.

12   SM:   Right I understand…

13   DPW:  It's a little different here…uh I just said I'm not trying to be real vague about

14         this, I just don't remember a lot of the things that went on.  I remember the

15         areas but not every little detail.

16   SM:   Okay…anything further Mr. Wolf?

17   DPW:  No sir I don't believe so.

18   SM:   Okay and you don't have any other witnesses so that completes your case is

19         that correct or the evidence in support of your claim?

20   DPW:  Yes.

21   SM:   All right then the Claimant is going to rest at this point and the State may put

22         on their evidence.  Uh, I noticed that the phone line we have hooked up here

23         isn't very long so we're going to have to make some adjustments in where

1      people are sitting so that you'll be able to hear Mr. Wolf and I may have to

2      move…that's probably the easiest way to do it and Mr. Quinn you're going to

3      call Dr. Shams?

4    JQ:      and Mr. Vigil…

5    SM:      Okay

6    JQ:      via telephone.  Uh, I would prefer to do Mr. Vigil first…he is leaving for…he

7      is having a medical procedure done today and he needs to leave at 11:00 so…

8    SM:      Okay then what I'm going to have to do uh is we're going to stop the record

9      here…the tape recording for a minute because END OF RECORDING.

10    SM:      Okay, Mr. Vigil would you raise your right hand and I'm going to have my

11      assistance give you the oath.

12    DV:      Yes sir.

13    MV:      Can you hear me Mr. Vigil?

14    DV:      Yes.

15    MV:      Thank you…uh Mr. Vigil do you solemnly swear or affirm that the testimony

16      you are about to give is yours and is truthful?

17    DV:      Yes.

18    MV:      Thank you.

19    SM:      Now Mr. Wolf if at any time you can't hear let us know…just stop us okay?

20    DPW:      Yes.

21    SM:      Okay…thank you go ahead.

22    JQ:      Thank you.  Mr. Vigil can you uh tell us what your current position is with the

23      Department of Corrections?

1   DV:   yes, I am currently a supervisor in Offender Services and Classification Unit.

2   JQ:   and can you describe your job duties?

3   DV:   Yes…I supervise and oversee seven facilities classification specialists.  Uh,

4           my job is to ensure that they are following the policy and regulations dealing

5           with classification and inmate placement on a daily basis for the Department

6           of Corrections.

7   JQ:   and have you reviewed the files of uh inmate David Wolf?

8   DV:   Yes I have.

9   JQ:   Okay…well why don't we talk about the DOC placement procedures in

10          general…can you describe those?

11  DV:   yes…individuals, once they're sentenced to the Department of Corrections are

12         received at the diagnostic unit in Denver Colorado.  Uh the programmers there

13         at the Denver Diagnostic Center uh interview…medical testing is done by …

14  DPW: Excuse me this is cutting completely out.

15  SM:   Mr. Wolf you're not hearing?

16  DPW: No, it's cutting off.

17  SM:   Okay let's try it again…why don't you restate your question…let's see if it's

18         better now.

19  JQ:   Uh Mr. Vigil can you describe the placement procedures for DOC in general?

20  DV:   Yes.  Uh when inmates are received at the diagnostic unit uh an initial custody

21         document is generated from the diagnostic unit and sent to a central

22         classification which is my division.  Each file is reviewed by one of facility

23         liaisons…they take into consideration…

1   DPW: I'm sorry it's gone.

2   SM:   you're not hearing it?

3   DPW: No it's uh…his words like I'm getting one every fifth.

4   SM:   Umm…okay Mr. Vigil can you try and speak up a little…let's try that.

5   DV:   I'll slow it down a little bit.

6   SM:   yeah slow it down…let's see if that works…I mean there's only a limited

7           number of things we can do here…so if we can't fix the problem we're gone

8           have to come up with some other solution to it…uh okay let's try again.  Mr.

9           Vigil why don't you slow your answers down and speak up and hopefully that

10          will work.  Mr. Wolf you're able to hear me okay?

11  DPW: I can hear it fine, it's just cuts completely out.

12  SM:   Okay…is it cutting out on what I'm saying as well?

13  DPW: Yes it's cutting out on you too.

14  SM:   Okay.

15  DPW: It's been doing this all along …it's just…his seems to be worse.

16  SM:   It's worse now.  Huh…do you think that's

17  MV:   I think the HVACs system is causing part of it.

18  SM:   Well…I don't know what we can do about it…All right let's try one more time

19          here and again Mr. Wolf if it's cutting out and your missing things, stop us

20          again and we'll see what we can do okay?

21  DPW: Yes sir.

22  SM:   Okay…Mr. Quinn.

1    JQ:    Uh, Mr. Vigil I believe you were describing the placement procedures for

2           inmates at DOC?

3    DV:    yes.

4    JQ:    Go ahead and continue.

5    DV:    Okay…once the file is received in our office, facility liaisons will look at the

6           classification document to first determine their classification custody

7           level…that would be administrative segregation, closed medium, minimum or

8           minimum.  They also take into consideration programs needs, treatment needs,

9           medical level, psychological level and also custody issues…very important.

10          Once all that data has been reviewed by a liaison, that individual will wait list

11          that person for facility assignment in the general population.

12   JQ:    Where was Mr. Wolf initially placed?

13   DV:    Mr. Wolf was initially placed…he scored nineteen points medium.  He came

14          into the system and was assigned to Buena Vista Correctional Facility in

15          Buena Vista, Colorado.

16   JQ:    and what custody level is Buena Vista?

17   DV:    It is a level three – medium custody.

18   JQ:    and approximately how long was he there?

19   DV:    He arrived at Buena Vista April 8, 1999, was moved to Fremont Correctional

20          Facility on the 15th of April, 1999.

21   JQ:    So he was there for approximately one week?

22   DV:    Yes sir.

23   JQ:    and do you recall why he was moved?

1    DV:    He was moved due to medical issues.

2    JQ:    Where did he go…he went to Fremont after that?

3    DV:    From Buena Vista he went to Fremont Correctional Facility, yes.

4    JQ:    and how long was he at Fremont?

5    DV:    He was at Fremont Correctional Facility from April 15, 1999 until June 8,

6            1999.

7    JQ:    and what custody level is Fremont Correctional Facility?

8    DV:    Fremont is a level three facility – medium custody or below.

9    JQ:    Was Mr. Wolf ever housed at a higher security level facility than what he

10           scored?

11   DV:    Uh, no.

12   JQ:    Was he ever housed at a lower custody level that what he had scored?

13   DV:    Uh no.

14   JQ:    What score would warrant placement in a closed custody facility?

15   DV:    Uh, I believe it's thirty-five points or higher.

16   JQ:    and did Mr. Wolf ever score thirty-five points or higher?

17   DV:    Uh yes he did.

18   JQ:    and was he placed in a closed custody facility?

19   DV:    No he was not.

20   JQ:    Okay…why was he not placed in a closed custody facility?

21   DV:    The classification document to the recommendation from the facility is that he

22           be retained at that facility.

23   JQ:    and why is that?

47

1   DV:   Most of the time it was due to medical codes…medical needs.

2   JQ:   Now Mr. Vigil you're familiar with the Territorial Correctional Facility?

3   DV:   Yes.

4   JQ:   Uh, let's talk about the outdoor recreation area at Territorial Correctional

5         Facility.  Is that area accessible to wheelchairs?

6   DV:   Yes it is.

7   JQ:   and what about the weight pile in the outdoor uh.

8   SM:   Can we stop for just a minute…I want to catch up on my notes here…

9   JQ:   I'm sorry I'll slow down too.

10  SM:   That's okay…that's all right…it's…give me one second to catch up on my

11        notes.  Okay, we were talking about the Territorial facility.

12  JQ:   Yes, Mr. Vigil, the weight area and the recreation area that is outdoors at

13        Territorial is that accessible to wheelchairs?

14  DV:   yes it is.

15  JQ:   Are there accommodations made for inmates in wheelchairs at that facility?

16  SM:   We're talking about what time period?

17  JQ:   Uh, at the time period when uh Mr. Wolf was at that faculty.

18  DV:   Yes, there's ramps in place.

19  JQ:   What about use of the, the weight lifting equipment and the other equipment

20        available in the yard.

21  DV:   Yes, there has been accommodations in place so inmates in wheelchairs would

22        have access to the weight pile.

23  JQ:   and what are those accommodations?

48

1   DV:   They're ramps.

2   JQ:   Do they have access to the weight lifting equipment?

3   DV:   yes.

4   JQ:   What about the gymnasium at Territorial, is that accessible to wheelchairs?

5   DV:   The gymnasium is accessible to wheelchairs.

6   JQ:   and is the equipment available in the gymnasium accessible to inmates in

7          wheelchairs?

8   DV:   yes it is.

9   JQ:   Do you have any specific knowledge of what accommodations are made?

10  SM:   Okay now again…Mr. Quinn you keep asking the question as is…I'm

11         assuming that all of the answers you're giving Mr. Vigil related to the time

12         period that Mr. Wolf was incarcerated at Territorial, correct…Mr. Vigil?

13  DV:   Yes.

14  SM:   Yeah okay…well we're going to go under that assumption…all of your

15         answers relate to the time period when Mr. Wolf was there…okay?

16  DV:   yes sir.

17  SM:   All right.

18  JQ:   Are those…is the equipment made available to inmates in wheelchairs…was

19         the equipment at the time Mr. Wolf was there made available to inmates in

20         wheelchairs?

21  DV:   you're talking about the equipment in the gymnasium?

22  JQ:   yes sir.

23  DV:   Yes it was.

49

1   JQ:   and how would an inmate go about requesting use of those materials?

2   DV:   Well during yard time or recreation time, uh inmates have access to equipment

3          or programs based number one on leisure time activity and number two…uh if

4          they are uh program compliant and if they haven't had any write ups then they

5          would have access to those different leisure time activities.

6   JQ:   Have you reviewed Mr. Wolf's disciplinary reports?

7   DV:   yes I have.

8   JQ:   Can you tell us about his disciplinary history while at Territorial?

9   DV:   Uh, yes…uh during Mr. Wolf's incarceration at Territorial, he received six

10         code violations.

11  JQ:   Are those commonly referred to as code of penal discipline violations?

12  DV:   Yes they are.

13  JQ:   and how long was Mr. Wolf at Territorial?

14  DV:   Mr. Wolf was assigned to Territorial actually went into cell house three on

15         July 29, 1999, was there until November 3, 2000, and was assigned to Limon

16         Correctional Facility for one day…actually five days I'm sorry, and then went

17         back to Territorial from April 17, 2001 until his discharge in October

18         2002…his parole I'm sorry.

19  JQ:   Where was he between November 3, 2000 and April 17th of 2001?

20  DV:   Can you give me those dates again?

21  JQ:   Well you testified that he was at Territorial from July 29, 1999 through

22         November 3rd of 2000…

23  DV:   He was at Limon Correctional Facility.

1   JQ:   Okay and then you said he was at Limon for about five days?

2   DV:   yes.

3   SM:   So what days was he at Limon?

4   DV:   He was at Limon from April 12th, 2001 and then moved back to Territorial on

5         April 17th, 2001.

6   JQ:   Where was he between November 3rd of 2000 and April 12th of 2001?

7   DV:   Those dates again.

8   JQ:   Uh…November 3rd, 2000 and April 12th, 2001.

9   DV:   Territorial.

10  JQ:   and how many write ups did Mr. Wolf have…I'm sorry I didn't write that

11        down?

12  DV:   six

13  JQ:   and those are at Territorial…did he have any while he was a Fremont?

14  DV:   yes he did.

15  JQ:   how many did he have there?

16  DV:   four.

17  SM:   Okay I'm confused over the timing here…let me go back.  You initially said

18        Mr. Vigil that Mr. Wolf was in Territorial I think from July 29, 1999 to

19        November 3rd, 2000…okay…was he there now until April of 2001 is that what

20        you're saying now?

21  DV:   Okay…I'm getting kind of confused myself…

22  SM:   So am I yeah.

23  DV:   Let's start from scratch here…

1   SM:   Okay.

2   DV:   Mr. Wolf was assigned to Territorial July 29th, 1999…

3   SM:   Right I have that.

4   DV:   Okay and he remained there until April 12th 2001.

5   SM:   Uh…okay I've got it then…that's fine.  Thank you.

6   DV:   you're welcome.

7   JQ:   So Mr. Wolf received a number of write ups at Fremont as well?

8   DV:   four.

9   JQ:   Do you recall what those write ups were for?

10  DV:   Yes, I do…I have record here that they were for verbal abuse, unauthorized

11         possession, disobeying a lawful order and verbal abuse.

12  JQ:   Now, lets talk about the auditorium at Territorial…at the time Mr. Wolf was at

13         Territorial, was there any activity allowed in the auditorium?

14  DV:   There were two types of activity at Territorial at that time…one of them was

15         uh the music program and the other one is uh…you know they have plays and

16         choirs and singing and things like that during the holidays.

17  JQ:   Now in order to participate in those programs, were there any…or to be

18         qualified to be allowed to participate in those programs, were there any

19         requirements?

20  DV:   Yes, the music program you have be report free for six months…along with a

21         recommendation from the case manager.

22  JQ:   Were there any games or, or anything else offered up there?

23  DV:   Very few.

1    JQ:    Was Mr. Wolf qualified to participate in the programs offered in the

2           auditorium?

3    DV:    The music program he would not have been eligible due to the write ups at

4           Territorial…the code violation.

5    JQ:    What about the other programs offered in the auditorium?

6    DV:    It's my understanding at that time, that uh if there was an individual that met

7           the guidelines for participation in those programs uh they would bring a

8           musical instrument down to the inmate so he can practice or play in the

9           gymnasium.

10   JQ:    So uh if an inmate was otherwise qualified to participate in the programs

11          offered in the auditorium, there was an accommodation made?

12   DV:    Yes.

13   JQ:    Do you have knowledge of whether Mr. Wolf ever requested any sort of

14          accommodations for access to those programs?

15   DV:    I do not.

16   JQ:    With respect to Mr. Wolf's disciplinary write up for disobeying a lawful order,

17          do you have knowledge of the specific facts relating to that disciplinary

18          conviction?

19   DV:    The one at Fremont on 6-8-99?

20   JQ:    yes.

21   DV:    Yes I do.

22   JQ:    What were the circumstances surrounding that code of penal discipline

23          conviction?

1   DV:   The Notice of Charge stated that Associate Warden, Gary Watkins gave a

2         direct order to inmate Wolf to move into a medically assigned cell and he

3         refused.

4   JQ:   I have no more questions for Mr. Vigil.

5   SM:   All right…Mr. Vigil can you…the last question I think had to do with a

6         violation…when was that?

7   DV:   That was June 8, 1999.

8   SM:   So that would have been at Territorial?

9   DV:   That would have been at the Fremont Correctional Facility.

10  SM:   At Fremont…okay, all right.  Okay I have nothing further.  Uh Mr. Wolf do

11        you have any questions for Mr. Vigil?

12  DPW: Uh a couple.

13  SM:   Okay…go ahead.

14  DPW: Uh, Mr. Vigil…

15  DV:   yes sir.

16  DPW: Uh you said that I was on the Limon facility…

17  DV:   Yes.

18  DPW: Uh…I've never been on the Limon facility…I've never even transferred to the

19        Limon Facility.

20  SM:   Well I tell you what…here's what we're going to do Mr. Wolf and I

21        understand you're not an attorney so let me explain how we're going to do

22        this…you can ask any questions you want of Mr. Vigil…if you disagree with

23        his answers I'm going to give you an opportunity when the State finishes their

1       case to put on any rebuttal testimony that you might have so…if there are any

2       things that you disagree with Mr. Vigil on, you'll have an opportunity to

3       provide your testimony later on, on those points okay?

4   DPW: Okay.

5   SM:  so right now all you need to do is ask your questions and whatever the answers

6       are…if you disagree with them, you'll have a chance later on to correct them,

7       okay?

8   DPW: Yes sir.

9   SM:  Okay…go ahead.

10  DPW: Uh, Mr. Vigil…

11  DV:  Yes.

12  DPW: Was you aware of the TV video program they put in after the action was filed?

13  DV:  No I'm not.

14  DPW: Cause that was what…well okay…all right.  Uh, and you said that we had

15      ramps going into the weight area on the recreation yard and that we had

16      accessibility all the way around the track…was it my understanding you said

17      the entire outdoors was accessible to wheelchairs?

18  DV:  My question was regarding the weight pile.  Uh I don't think anybody asked

19      me anything about the tract.

20  DPW: Okay…thank you…that'd be all.

21  SM:  All right…any redirect?

22  JQ:  No your Honor.

1    SM:    All right…can we excuse Mr. Vigil then and we'll move on to the next

2           witness…Mr. Wolf is that okay with you?

3    DPW:   Yes.

4    SM:    Okay…is it alright if Mr. Vigil is excused?

5    JQ:    Yes your Honor.

6    SM:    Okay…lets go off the record for…what I'm going to do…is your next witness

7           Dr. Shames?

8    JQ:    Yes your Honor.

9    SM:    Okay I'm going to move because I want Dr. Shames next to the phone and Mr.

10          Quinn next to the phone and again uh Mr. Wolf if you have any problems

11          hearing or if it's cutting out again…

12   SM:    Okay are we back on the record?

13   ??:    yes.

14   SM:    All right…you may call your next witness uh Mr. Quinn.

15   JQ:    It would Dr. Cary Shames.

16   SM:    Okay…Dr. Shames if you would raise your right hand and be sworn.

17   MV:    Dr. Shames do you solemnly swear or affirm to that the testimony you are

18          about to give is yours and is truthful?

19   CS:    I do.

20   SM:    All right you may proceed.

21   JQ:    Dr. Shames how are you currently employed?

22   CS:    I'm chief medical officer Colorado Department of Corrections.

23   JQ:    and how long have you been a doctor?

1    CS:    Since 1983.

2    SM:    Can you speak up just a little bit?

3    CS:    Since 1983.

4    JQ:    Can you briefly describe your educational background?

5    CS:    Uh, college LaSalle University and medical school, (inaudible) College of

6           Osteopathic Medicine and then on to internship for Family Medicine.

7    JQ:    and why don't you just describe your work history.

8    CS:    I practiced Family Medicine for fourteen years in South Florida; I had started

9           out a solo practitioner and ended up as a fifty man group with a six thousand

10          physician IPA that I was the President of.  I went on to be Associate Medical

11          Director with Humana, also Medical Director for HCA which was then

12          Columbia…six of their hospitals, then became Chief Medical Officer of

13          National Healthcare Consulting Company, New Health Management then

14          moved on to be the Regional Medical Director for Etna Health Care, then

15          moved on to Pacific Care as their Senior Medical Director before becoming

16          Chief Medical Officer, Colorado Department of Correction.

17   JQ:    Do you currently hold medical licenses and in what states?

18   CS:    I hold an active medical license in Colorado, hold inactive license in Florida

19          and Pennsylvania.

20   JQ:    Do you hold any certifications?

21   CS:    Board certified in family medicine and also board certified for the American

22          Board of Qualify Assurance and Utilization Review Physicians.

23   JQ:    Uh, any other activities?

1    CS:    Yes, I am senior instructor at the University of Colorado, School of Medicine

2            where I teach a course.  Also am professorial lecturer in the Department of

3            Psychiatry and am on the Board of Admissions for the medical school at the

4            University of Colorado.

5    JQ:    Any other specialties?

6    CS:    Just the two specialties.

7    JQ:    Do you have experience reviewing medical records?

8    CS:    Correct that's what one of the certifications is for.

9    JQ:    Have you reviewed the medical files of inmate Wolf?

10   CS:    I have.

11   JQ:    and are those records here today?

12   CS:    They are.

13   JQ:    Uh, you've identified a number of pages throughout the medical records

14            pertinent to Mr. Wolf's claim?

15   CS:    yes.

16   JQ:    or claims…why don't we go through those chronologically and discuss the

17            areas that uh you have flagged for purposes of Mr. Wolf's claims.

18   CS:    Yes…Mr. Wolf was a…first came into the unit at DRDC where all the

19            inmates…uh I call them patients cause to me all the individuals are patients

20            that we take care of.  On the fifteen, he was seen in and examined, on the 17th

21            …J

22   JQ:    Seventeenth of …

23   CS:    March 17, 1999…

1   SM:   While people are interrupting you, let me interrupt for a minute…you referred

2         a number of times to DRDC…what does that stand for?

3   CS:   That's Denver Diagnostic …

4   SM:   Uh huh.

5   JQ:   Denver Reception and Diagnostic Center…

6   CS:   Denver…right.

7   SM:   Denver Reception….

8   JQ:   and diagnostic center.

9   SM:   Thank you.

10  CS:   I even forget what it means…

11  JQ:   Why don't you tell the Judge briefly what that facility is?

12  CS:   Uh, that is the intake facility for the whole state.  Uh, both men and women

13        come in through that facility and there is a special program of intake where

14        day one there is a uh screen intake for any disabilities to be determined, any

15        medications that the patients are on from other facilities, any specific

16        needs…they have some testing done at that time…this is all medical.  Day two

17        is programming where they actually go through eight hours of psychological

18        as well as functional testing to determine what their needs may be in terms of

19        the levels of care that they may require as well as security and so forth and

20        then day three they are seen by the providers and given any changes in care

21        and the starting their actual care through the Department of Correction.

| | | |
|---|---|---|
| 1 | JQ: | Okay…let's go back to my previous question relating to the screening and the |
| 2 | | treatment of Wolf from the beginning of his incarceration as it relates to his |
| 3 | | claims in this case. |
| 4 | CS: | Yes, well in 03/17/99, when he was first reviewed, he was not in a wheelchair |
| 5 | | and uh as a matter of fact uh he did not have a cane and he was provided a |
| 6 | | cane.  At the same time, he was also provided special shoes – light brown |
| 7 | | canvas suede high boots because of a problem that he was having with his |
| 8 | | ankle at the time and also as I said he was provided the cane and X-ray was |
| 9 | | taken of his left ankle due to a prior surgery for which he stated that he had |
| 10 | | pins in there or screws.  After which time uh he was seen again on the 23rd for |
| 11 | | sick call saying that his pain medication was not strong enough and he was |
| 12 | | provided with narcotic medication at that time, which was Vicodin.  Uh, he |
| 13 | | continued with the cane and did not have any problems as it related uh the |
| 14 | | ability to function, move, use all extremities, sensation in all extremities, uh |
| 15 | | though he did complain about some numbness in the lateral aspect of the right |
| 16 | | foot and thigh.  From there he was seen on 03/29 for which he said that he uh |
| 17 | | fell where his leg gave out and as we go through you'll see that there is a |
| 18 | | pattern of falling by this patient and that was the reason why because in uh |
| 19 | | clinical care, especially as it related to rehabilitative medicine, you want the |
| 20 | | patient to have the most functionality as possible.  Therefore, you would never |
| 21 | | want to go to a wheelchair if you could have the patient with a walker and you |
| 22 | | wouldn't want have a walker if in fact you could use a cane because the more |
| 23 | | that you do not use the lower extremity musculature or upper for that matter, |

1      the less likely that you are to be able to keep muscle tone and therefore you

2      would develop atrophy and more additional medical problems.  So, he did

3      have the cane at that time.  He was seen again on 04/01 and uh again for a fall

4      on which he stated that he fell.  Again, he was seen of 04/02 and that's when

5      he started complaining of back pain.  His old records were ascertained and saw

6      that he had a surgical intervention secondary to a motor vehicle accident and

7      he was actually placed in the infirmary to assist him with physical therapy

8      during that period of time.  Also, X-rays were taken.  On 04/08, he was

9      provided accommodations of uh no stairs and provided a single cell that's

10     upon the move to Buena Vista so he did go from DRDC to the transport unit

11     directly to Buena Vista and the reason why he went there was because his

12     medical code using a cane, able to ambulate…his medical problems did not

13     require him at that time to be at Territorial on an ongoing basis, though he was

14     provided uh a single cell at that time and the actual orders from the physician

15     was no stairs, single cell and med on assigns.  From that point he actually fell

16     again on 04/09.  He stated he fell on 04/09…x-rays were taken which were

17     found to be negative and he complains of uh loss of bladder control for which

18     it was felt that his level of care based on his medical problems, after he got out

19     there, was higher than they believed that they could handle and therefore they

20     transferred him to Territorial…excuse me to Fremont.  At that time, at

21     Fremont, the initial orders again on 04/16/99 stated no stair climbing, single

22     cell, and he was in fact placed on uh narcotic medication for his uh what was

23     noted to be post-polio syndrome as well as some back pain.  He was on

1     04/09/99 at Territorial…excuse me at Fremont.  There was a review of the

2     patient and the chart and revealed that uh they had a team conference as

3     related to patient's pain an provided…and I'll read it…staffing of multi-

4     disciplinary providers for a coordinated therapeutic plan to preserve as much

5     neurologic function as long as possible for the good care of this patient.  So,

6     this is continual uh that you see through the chart through the years that he was

7     with us that he was seen anywhere on a monthly basis from a few times a

8     month up to over fifteen times a month.  Just in April of 1999, he was seen

9     eleven times by medical.  So there cannot be seen to be uh any issues as it

10    related to his care and continued very good care by the providers.  On

11    04/16/99, because of his continued falls, he was provided with a walker

12    instead of the cane even though there was no evidence of any neurologic

13    problems, no problems with balance at the time, though because of his falls, he

14    was provided a walker to help to stabilize him more.  That did not seen to

15    deter the uh continued falls as the patient continued uh to fall and on 04/21/99,

16    uh NORO was consulted…that's an outside consult with a neurologist because

17    of the patient's continued falls and his uh complaint of neurogentic bladder.

18    At Fremont, he continued there and continued to have what was noted as falls

19    on dates 04/23 again 04/26,…this is all 1999, again on…well uh after 04/26

20    fall, the provider beside increasing his pain medication, getting x-rays,

21    ordering the NORO consult, also ordered a wheelchair…again for protection

22    of the patient as he continued to have falls.  Physical therapy was ordered for

23    this patient on 04/29/99 and can be noted that the patient refused physical

1    therapy.  Also on 05/12/99, MRI was completed of the thoracic and lumbar-

2    acryl area, which showed just generative joint changes, but no evidence of

3    spinal stenosis nor uh herniated disk.  There was not good evidence that the

4    patient had an acute neurologic or orthopedic problem for which surgical

5    intervention was necessary at that time.  On 06/01/99, the patient was seen by

6    neurologist and even though there was uh not a evidence by x-ray…by radio

7    logic, by either by MRI or EMG results, that he had a reason for his

8    symptomatology, the patient still refused physical therapy, and he refused to

9    get out of his wheelchair to enjoin in physical therapy.  It says here inmate

10    refused to get out of wheelchair.  Uh, though initially he stated he was willing

11    to uh learn exercises, refuses gate and parallel bars…I do not want to hurt my

12    back any worse so therefore he on his own uh was deciding what care he was

13    going to allow and what care he was not, even though this care was ordered by

14    a specialist as well as with our uh mid-level and physician providers at

15    Fremont.  Patient continued to be seen on almost uh every week or so, then it's

16    interesting to note and I need to note that uh when the patient first came in

17    through DRDC, that the patient is a substance abuser by history and through

18    his period of incarceration, uh he would try and manipulate the type of

19    medications that he would take and here's evidence of it but I'll show you

20    evidence throughout his whole chart in which he was narcotic seeking and he

21    would refuse other medications in order to receive narcotics and here it states

22    that uh forty-five year old male, post-polio syndrome, chronic low back pain

23    with continued pain, states inadequate pain treatment…very lengthy

1      discussion regarding physical therapy, noncompliance, MRI results negative,

2      EMG results uh probably old changes…patient refused Elovo for

3      pain…requests Vicodin…explain to patient that narcotics use not indicated for

4      chronic pain, patient states: "I'll just let the courts handle my case."  This

5      patient used the court back in 1999 as leverage to try and gain narcotic.

6   SM:   Let me just stop here for a minute…uh as I indicated at the beginning of the

7      Hearing to Mr. Wolf and I'll indicate again, to the extent that Mr. Wolf's

8      claims and certainly he has made claims that he didn't receive proper medical

9      treatment, but whether his medical treatment was proper or improper, what

10     that medical treatment really involved, I don't see that that's an issue in these

11     proceedings, so…uh what I'm more interested in today and I think the only

12     matters that are covered…I mean that's the basis for some other action or legal

13     proceeding, but the claims that we're supposed to determine here, based on the

14     plan and the orders that have been entered by the Court are; what are his

15     disabilities, what was done to accommodate those disabilities, was he qualified

16     with those disabilities to participate in various programs and so forth…so uh

17     and I understand some of these medical issues touch on that, but to the extent

18     they don't, I think we're getting into a lot of material that probably, ultimately

19     is not going to be significant in terms of a decision here…you understand what

20     I'm saying?

21  JQ:   I do your Honor and maybe we can streamline it…

22  SM:   Okay…I mean if you disagree with that…tell me…but that's my position on

23     these things that we're not going to be resolving issues of whether the medical

1        care that…if there's a dispute over whether the medical care was adequate and

2        proper, that's an issue I can't resolve in these proceedings….okay so…

3   JQ:  Why don't proceed and just talk about the medical accommodations that were

4        provided to Mr. Wolf such as the cane you had mentioned, the walker and now

5        the wheelchair.

6   CS:  Well there was uh through the course of Mr. Walker's incarceration when he

7        initially came in he was provided a cane…

8   SM:  Mr. Wolf…

9   CS:  Excuse me Mr. Wolf…did I say Mr. Walker?

10  JQ:  I think you did.

11  SM:  Yes.

12  SM:  I was getting to walker…that was the next accommodation.  Uh but was also

13       provided uh various shoes in order to help him in terms of accommodations,

14       also single cell in terms of accommodations, the facility that he went to

15       initially was believe to be an appropriate facility for him and it was changed

16       almost uh immediately within a week or two as he seemed to have a problem

17       there and they believed that he needed higher level of care and uh

18       accommodations.  After that you can see that with the falls, they provided him

19       additional accommodation as it related to the use of a walker and then still

20       with accommodations both medication accommodations as well non-

21       medication accommodations in terms of facility type of accommodations for

22       him to be able to get around appropriately and safely and then after that, the

23       use of the wheelchair and also the continued accommodations that some were

1       medical and some were non-medical but clearly the patient required as it

2       related to appropriate accommodations.  It was noted that uh throughout the

3       course of his various stays that the accommodations continued and were

4       provided whenever he in fact requested any type of accommodations that not

5       only went for uh him stating that he would have increased pain or any increase

6       of his uh past medical problems, he saw both specialists on the outside, he had

7       diagnostic as well as imaging testing that was provided in terms of

8       determining whether or not there were any additional accommodations that

9       were required for him and uh if any were required, he was provided with those

10      accommodations on an ongoing basis.

11  JQ:    Was he ever provided with a pusher?

12  CS:    Correct, he was…at Territorial it was noted that there was a medical order for

13       him to have a pusher and I believe that Mr. Wolf stated that in fact somebody

14       was provided to him that was because of a medical order for accommodation.

15  JQ:    Now with respect to these falls…was there ever any evidence in the record

16       that these falls were intentional or for purposes other than an accident…I

17       guess.

18  CS:    Yes, yes there was…actually you know there was a feeling early on that he

19       went from the cane to needing the walker without any neurologic uh evidence

20       of why that would be in terms of functionality.  Then he went to the

21       wheelchair, but it's interesting that even after he was provided the

22       wheelchair…entry on 07/09/99 states on 07/02, late entry, this nurse observed

23       patient to walk across cell, B13, caught foot on floor, fell forward to door,

1       patient lands on left knee, caught weight with left arm, slapped hands on

2       door…patient did not hit head or back, appeared to this nurse to witness

3       intentional fall, patient taken by wheelchair to medical to be seen…so even

4       though there was feeling that the patient was manipulating the system as it

5       related to these continued falls and even some that were observed by clinical,

6       they still did provide all the care and accommodations as to the extent that the

7       thought was is that he may have these problems that were being complained

8       about.

9  JQ:    Are there records of other accommodations both medical and non-medical

10      contained in the file?

11  CS:    There is.  Actually it was on 07/29/99 is where the patient, after being uh DCd

12      from the infirmary, is where he is given a pusher along with his

13      wheelchair…that's noted in the record.  His continued use of narcotics, he saw

14      both neurologist and neurosurgeon within the third quarter of 1999.  Tennis

15      shoes were provided to him in terms of accommodation in 1999 and also he

16      was provided and fitted for a ankle brace for which the feeling was that the

17      brace could potentially help him in terms of relief of his pain that he was

18      complaining about in his uh ankle where he had the previous surgery.  He

19      would complain of the use of pushing the wheelchair and was provided gloves

20      for the use of the wheelchair on a continual basis.

21  JQ:    and what was it Dr. that uh resulted in him being prescribed or allowed an

22      inmate pusher?

23  CS:    The uh…

1   JQ:   Was that a result of his complaint or…

2   CS:   No, the indication from the chart was that the …let me see who it was…the

3         evidence was is that it was uh the mid-level and signed off by the physician

4         that that was something that they just ordered for him…there's no evidence

5         and nothing in complaint or chief complaint, nor any of the medical grievances

6         that I saw that had to do with uh him requesting a pusher.  This was provided

7         for him by medical.

8   JQ:   Was there anything in the chart to indicate that he was denied exercise or

9         physical therapy?

10  CS:   Actually to the contrary…not only was he uh provided physical therapy uh it

11        was recommendation in order of both CDOC physician mid-level provider

12        along with a neurologist that he have physical therapy and there's evidence

13        documented throughout the chart of his refusal of the physical therapy stating

14        that he'll do it himself.

15  JQ:   and to you knowledge was the…did the facility allow him or the facilities he

16        was housed at, at the time allow him to do it himself?

17  CS:   Correct.  We had physical therapists that would actually come into the

18        facilities and provide the physical therapy themselves along with training of

19        both providers and the patients for them to be able to carry on with it…but that

20        was refused by the patient.

21  JQ:   and were those allowed in the gymnasiums and recreation areas?

1    CS:    The various exercises can be done in the patient's own cell; they can be done

2           in the clinic…the medical clinics, or could be done in a variety of other areas

3           including the weight or recreation areas.

4    JQ:    Is there anything else from the file indicating the accommodations that were

5           provided to this inmate?

6    CS:    There are notes throughout as it related to uh continued accommodations for

7           the patient as it related to the complaints that he had.

8    JQ:    I have…unless you have anything else you'd like to add doctor, I don't have

9           anything else.

10   SM:    I have one question and then I'll let Mr. Wolf cross-examine the doctor.

11          You'd indicated that at Buena Vista and I think at Fremont, the order was no

12          stairs, single cell…is that correct?

13   CS:    That is correct.

14   SM:    Did the single cell order ever change…?

15   CS:    Uh…

16   SM:    or was that always the order?

17   CS:    I, I don't have any indication from the chart of a change of a cell other than

18          what it said to provide the patient with single cell at the two times that I noted

19          earlier.

20   SM:    Okay…do you know whether the patient had a single cell at Territorial?

21   CS:    I do not.

22   SM:    Was the order the same at Territorial…could it be no stairs, single cell?

1   CS:   I see orders for both when he went to Buena Vista and when he went to

2         Fremont…

3   SM:   Right.

4   CS:   I'm trying to see if it stated anything along those lines medically…cause

5         Territorial is a mobility accommodations specific facility…

6   SM:   Right, that's why I'm asking whether…

7   CS:   and the others are not necessarily so that would be the reason for that order…

8   SM:   Oh, I see…

9   CS:   I don't see one specifically for Territorial.

10  SM:   Well are you familiar with the cells at Fremont and Buena Vista and

11        Territorial?

12  CS:   Uh, I have been through all the facilities…I don't think I could tell you which

13        ones uh would be appropriate.  I can tell you that from review of the chart it

14        looks that very apparent that both Buena Vista as well as Fremont, where they

15        have or had less experience with mobility type of patients, that they

16        specifically put orders in the chart as it related to…to make sure that he got the

17        accommodations necessary.  Territorial…there are many more disabled

18        patients, at least now that I know of.

19  SM:   Right.

20  CS:   I only started last year so I cannot speak to 1999.

21  SM:   Okay thank you.  Uh, Mr. Wolf, do you have questions for Dr. Shames?

22  DPW:  Uh, actually I just uh…if he's new…if he is new to the system there…

23  SM:   yes.

1    DPW:  then I really don't think he would be aware of what was going on three years

2          ago....

3    SM:   No all he's done is testify from the medical records so I think you're right uh

4          let me just ask Dr. Shames...you don't have any personal first-hand

5          knowledge about Mr. Wolf or what was done or not done in terms of his

6          medical needs...all your testifying to is based on his records is that correct?

7    CS:   Correct, correct.

8    SM:   Okay...so you're correct Mr. Wolf.

9    DPW:  Okay I don't have any more.

10   SM:   Okay...may Dr. Shames be excused?

11   DPW:  Yes.

12   SM:   Okay...do you have any other witnesses?

13   JQ:   No your Honor.

14   SM:   Okay...let me switch places with you here Dr. Shames.

15   CS:   Thank you.

16   SM:   Okay the State rests?

17   JQ:   Yes your Honor.

18   SM:   Okay uh Mr. Wolf, you have an opportunity now to testify in rebuttal if you

19         wish to add anything to your testimony in rebuttal of what uh Mr. Vigil or Dr.

20         Shames has testified to.

21   DPW:  Okay...Mr. Shames, you brought up the point that's clarity in my record out in

22         no way am I trying to challenge is credibility.  It seems like he's been to

23         enough places where he knows what he's doing...uh but the reviews that he's

1    given on the falls and everything else in there.  I fall a lot you know I agree

2    with this…but they did not seem to understand what was going on because the

3    only thing I was told was they did not understand post-polio syndrome and

4    very few people do.  They don't have an opportunity to treat it…uh the falling

5    they said that I appear to uh in a stall by myself…they said intentional fall, that

6    I caught myself with my left side you know my left knee and my left

7    arm…well I usually…when something gives out on me it's always on my right

8    side and that's why I have to catch myself…I mean I don't think anybody

9    would just let there self fall and cram there self against a wall or which I've

10    done myself several times…uh refuses therapy and stuff like that…if your in

11    pain which apparently they understood that I was…the neurologist and the

12    orthopedic…they wouldn't have kept me on the medication that I was taking.

13    It wasn't a…please give me mediation thing, it was to try to give me some

14    kind of comfort…now we're talking here again between a present provider

15    who sees everybody about everything compared to two specialists who is Dr.

16    Patterson the Orthopedist and uh Dr. Lilly who did…both of them did

17    surgeries on me.  Uh, I don't want to sound like I'm saying nothing that I got

18    was good.  Being seen constantly was just part of the routine that I went

19    through as a chronic care patient; you're going to be seen a lot.  They call you

20    in for everything, they furnish you with braces, and they furnish you with

21    therapy.  They tell you if you want to do your therapy in your house….go

22    ahead.  Uh, the…as far as the allegations that uh was placed by Mr. Vigil…he

23    was saying that uh we had accessibility to the weighs, we had accessibility to

1       everything…I'll admit at the last part of doing my time in Colorado, they

2       actually put in TV-Videos for us on an open movement basis.  You go out

3       there, you give them your ID card…well then that was after the action was

4       filed.  Most of this stuff that was changed was changed after the action was

5       filed itself.  Uh of course it got better…you know we had a lawyer come in

6       there…actually she came here three times that I know of…the entire time the

7       action went on…and uh stuck around you know to see what was going on.

8       Uh, bell houses…I just…they said that I was at one correctional facility that

9       Limon Correctional.  I couldn't even tell you where that is, but I know I've

10      never been there…not even for five days.

11  SM:    Okay.

12  DPW: I don't even know…that kind of surprised me when he said it because uh

13      talking about taking everybody to Fort Lyon as a permanent resident for

14      people that was handicapped.

15  SM:    Uh huh.

16  DPW: First, I don't even know if they've done that cause I haven't been there so

17      uh…I don't…I'm not here to challenge the integrity of anybody…the only

18      thing that I can tell you is what I went through there in order to get adequate

19      medical care it wasn't just to go down an ask them and they would do it…it

20      wasn't to pretend that you're sick because you've got (inaudible) there and

21      they're going to do surgery on you on the allegations that you tell them hey

22      I'm in pain here, would you check and see what's going on and they check and

23      they find a problem and do surgery on it.  I don't think they did surgery on me

1          just for the heck of it…and the outcome of it didn't turn out to swift, but I

2          don't guess they can guarantee it.  Other than that, you know I mean I'm…I

3          really don't have anything else to say…uh

4    SM:   Okay.

5    DPW: I don't remember…I'm kind of stumped on the thing about them saying I went

6          to Buena Vista first after the reception center cause I know I went to Fremont

7          first and then I was sent to Buena Vista and then they sent me back to

8          Territorial.  Now if I went back to Fremont, I don't even remember that.  So

9          that's…

10   SM:   Well most of your complaints relate to Territorial anyway so and some to

11         Buena Vista…

12   DPW: As he said the medical records indicate…certainly my medical record there is

13         thick enough…if he had it with him you could see for yourself that there's a

14         lot of entries there.  Uh, I've seen it so I know it was a thick folder…that was

15         over a period of everything…anything that they did especially after

16         surgery…the things that they had to provide…that stuff that I needed that I

17         just had to have…uh after I had my neck surgery, I you know being

18         incontinent and various other things until I could get control of myself…I

19         don't know how many tests they did on me on that to find out what was going

20         on…uh there's a period of a lot of medical that was going on at one time.

21         Ninety percent of it they kept control of by the narcotics that they gave me and

22         they did give me narcotics quite often and uh whether you ask for them or

23         not…that's, that's…there again that's the doctor himself…they're not just

1       going to give you narcotics just cause you go in there and say hey, I want

2       some narcotics.  Up where I'm at right here, the strongest thing I take is

3       Motrin.  Uh, I've never asked them for narcotics, not on my record…I take

4       blood pressure medication and that's it.  Uh, actually I don't think narcotics

5       would do me any good in here you know…it didn't really help me that much

6       when I was up there…but there again, like I said I don't want to try to

7       challenge the credibility of a doctor or the classification…you know if it's on

8       record they have to follow it I understand that.  So I guess that's all I have to

9       say.

10   SM:   All right…then the evidence is now closed and what I will do is issue a

11       report…let me just go through what the procedure will be from here on out.

12       Uh, within the next few days hopefully, I'll issue a report…a written report uh

13       making my findings and conclusions on Mr. Wolf's claim.  Then it will be up

14       to a District Court Judge uh either Judge Kane or Judge Nottingham…I'm not

15       sure which one is handling these to dock my report or reject it and there's a

16       period of time and I'll put this at the end of the report…I think it's thirty days

17       but I'm sure myself, but anyway I'll put it in the report itself to give you the

18       time period in which either side has to file objections to the report with the

19       United States District Court Judge and if there are no objections, I assume

20       he'll adopt the report and if there are objections, he'll have to rule on those.

21   DPW:  Okay.

22   SM:   Okay…well thank you very much Mr. Wolf for participating today and taking

23       the time to do that and I thank the State for their participation and there input

1       as well.  This concludes the Hearing and uh it's about ten minutes to twelve

2       o'clock Mountain Standard Time.  Uh, we're going to hang up now Mr. Wolf

3       and the State will go back to their offices I guess and I'll go back to my office

4       and get to work on this.

5   DPW:  Okay thank you sir.

6   SM:   Thank you.

7   JQ:   Thank you Mr. Wolf.

8   SM:   Bye bye.

9       AG ALPHA:
10      AG File:                Q:\LT\LTQUINJX\RETAIN\MONTEZ\INTERVIEW OF DAVID PAUL WOLF.DOC
11
12