IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

FILED
UNITED STATES DISTRICT COURT
~~~~~, COLORADO

SEP - 6 2005

GREGORY C. LANGHAM
CLERK

---

Claim Number 03-005
Category III
Claimant: Roy J. Whitehead, #53122
Address of Claimant: 1790 W. Picacho Ave. Apt. 1, Las Cruces, NM 88005

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER came before the Special Master for hearing on Monday, August 1, 2005 at 9:00a.m. at the office of Legal Resolution Center, Denver Corporate Center III, Suite 1100, 7900 East Union, Denver, Colorado. Present were the following: Roy J. Whitehead, Claimant; Jess Dance, from the Office of the Attorney General, for Defendants; Cary Shames, D.O., Colorado Department of Corrections chief medical officer, witness for Defendants.

Testimony was received from the following witnesses: Claimant and Cary Shames. Eleven exhibits were entered into the record by Defendants:

| | |
|---|---|
| Exhibit A: | Accommodation Resolution of 12/1/04 |
| Exhibit B: | Mobility Screening dated 12-1-04 |
| Exhibit C: | Vision Screening dated 12-1-04 |
| Exhibit D: | Hearing Screening dated 12-1-04 |
| Exhibit E: | Colorado Department of Corrections Official Time Computation Report as of 12/10/2004 |
| Exhibit F: | Offender Track Query Timetrans 07/29/2005 |
| Exhibit G: | Time & Release Query Timetrans 07/27/2005 |
| Exhibit H: | Colorado Department of Corrections Progress Assessment Summary date of PAS 12/28/2004 |

| Exhibit I: | Colorado Department of Corrections Progress Assessment Summary date of PAS 08/10/2004 |
| Exhibit J: | Colorado Department of Corrections Progress Assessment Summary date of PAS 02/02/2004 |
| Exhibit K: | Colorado Department of Corrections Progress Assessment Summary date of PAS 01/17/2003 |

At the conclusion of the hearing, Claimant requested that copies of the documents introduced at the hearing by Defendants be sent to him along with a complete copy of the documents on file at LRC for his claim. The Special Master granted the request.[1] The claim was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

## I.   BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part as follows:

Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:

| I. | General inconvenience or nominal damages; |
| II. | Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury; |
| III. | Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death); |
| IV. | Damages due to severe physical injuries; and |

---

[1] On August 8, 2005, Margie Dykstra, the Special Assistant to the Special Masters mailed to Claimant at his present address the requested documents along with a letter itemizing the documents sent.

V.     Damages due to death.

Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

## II.     FINDINGS OF FACT

Being duly advised, the Special Master makes the following findings of fact:

1.     On March 30, 2004 and March 5, 2004, Claimant submitted duplicate copies of his initial claim which was assigned claim number 03-005. The claims were received on April 1, 2004 and April 7, 2004, respectively. The bases of the claims are a mobility impairment, a hearing impairment and a vision impairment. Supplemental claims for mobility, hearing and vision impairments were submitted on April 27, 2004 and received on April 30, 2004.

2.     Claimant's claim was assigned to Category III based upon the Remedial Plan as set forth above.

3.     Claimant's current address and telephone number is:

> 1790 W. Picacho Ave. Apt. 1
> Las Cruces, NM 88005
> 1-505-541-0241[2]

4.     Proper notice of the hearing was given and Claimant appeared by telephone. Counsel for defendants was present in person.

5.     Claimant was under the jurisdiction of the Colorado Department of Corrections (CDOC) from October 1984 – 1991 and June 2001 - 2005.

6.     During his incarceration, Claimant was housed at Four Mile Correctional Center (FMCC), Shadow Mountain, Crowley County Correctional Facility (CCCF), Las Animas[3] and Fremont Correctional Facility (FCF)

7.     Claimant testified that in 1976 that prior to entering CDOC jurisdiction, he suffered a stroke which paralyzed his left side. He suffers left-foot drag. While in

---

[2] The Special Master notes the Claimant indicated that the phone number was to become inactive shortly after the period and that the number of 1-505-523-2219 is a possible contact number. Claimant is advised to keep the Special Master and the Court informed of address and telephone number changes.
[3] The Special Master is unclear if Las Animas is the same facility as the private Bent County Correctional Facility (BCCF) located in Las Animas.

CDOC, therapy was recommended but he contends that he was denied proper treatment for his back. He did have some physical therapy on his left side.

8.   Claimant testified that in high school he suffered permanent back injuries and has left leg degenerative bone disease.

9.   While working on the job at FMCC, Claimant was kicked by a cow in his bad knee. He used a cane but never had surgery. He did not use a wheelchair because of a lack of pushers. He can't use crutches because of the paralysis in his left side. He claims that he was forced to work, which aggravated his problems.

10.   At FCF, while in Unit 2, Claimant couldn't utilize the library facilities and he was often limited in his ability to utilize services, benefits, and programs because he was too slow walking with the drag movement of his leg. He was denied use of the machine shop, some classes and other activities due to his mobility injury. Claimant's slow walk is always a hindrance.

11.   While at Shadow Mountain, the staff there didn't like canes used. There were no assigned pushers in the facility. The disabled helped each other out as best they could.

12.   Claimant testified that proper shoes and physical therapy would have helped. He testified that he was told that medical shoes couldn't be purchased in his size (16) because no funds were available and he had to purchase them himself.

13.   Claimant testified that over 50% of the time he was medically restricted to lower bunk and lower tier with no prolonged standing and no lifting. The doctor wanted Claimant to be in the state hospital but Claimant wanted to be in a regular place to utilize the facilities, yard and the library.

14.   In 1989-90, Claimant got a leg-drag brace but it kept breaking. It was was not specifically designed for his use, but it did help with walking, exercise and weight loss. From 2001-5, he was denied a leg brace.

15.   With respect to his hearing impairment, Claimant testified that he couldn't hear and understand the intercom. He has bad hearing from the doors slamming in the facility. Around 1989-90, at the Pueblo State Hospital his ears were tested pursuant to a grievance that Claimant filed. He suffers from a left-side hearing problem because of the 1976 stroke and often can't hear and misunderstands.

16.   Claimant's testimony indicates that his vision hampers his law work in the library and his religious studies. In 2004, he suffered a TIA at Crowley County and he wears reading glasses. He needs "375" over-the-counter reading glasses just to use the telephone. He did receive glasses while under CDOC jurisdiction but at 6-8 month gap existed. Claimant testified that because of a CDOC policy allowing one pair of glasses every two years, he had to work with broken glasses and couldn't pursue his education

4

because he couldn't see his books. Since 1996, his vision has gotten worse. His last eye exam was while incarcerated and consisted of nothing more than a standing "E" chart test.

20.     Cary Shames, Chief Medical Officer for CDOC testified that Claimant was screened for hearing, vision and mobility and that the file indicates some left-side weakness but no paralysis. He testified that a wheelchair is not needed. In 1988, the record indicates that Claimant had a full range of motion and average strength; and that in 1990, he was seen by a neurologist. Dr. Shames also testified that the records indicate that Claimant has left hemi-paresis: a weakness in the left side. The file indicates a weakness but there is no indication in the medical records that Claimant can't walk.

21.     Dr. Shames indicated that on December 1, 2004, Claimant has right eye vision of 20/50 and left eye vision of 20/40. Claimant's medical record fails to show any significant hearing impairment. Dr. Shames noted that Claimant appeared to be communicating well by the telephone.

## III.   CONCLUSIONS OF LAW

1.     The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and (c) the Americans with Disabilities Act.(ADA), 42 U.S.C. § 12101 *et seq.*

2.     The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

## A.   MOBILITY DISABILITY

1.   The Special Master finds and concludes that Claimant does suffer from a permanent mobility disability within the meaning of the Remedial Plan. Under the terms of the Remedial Plan, Permanent Mobility Impairments are defined as follows:

a)   Permanent Wheelchair: Inmates who use wheelchairs full or part time due to a permanent disability.

b)   Permanent Mobility Impairment (non-wheelchair): Inmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking: *e.g.*, an inmate who cannot walk 100 yards on a level surface or climb a flight of stairs without a pause. Such impairment may require use of a cane, prosthesis, or walker, or other assistive devices.

*Remedial Plan* ¶ V(A)(1).

Claimant's testimony indicated that he suffers from lower mobility issues related to his stroke. Claimant is a slow walker with left leg drop and has continual need to use a brace and/or cane.

2.   The next question which must be answered is whether Claimant was qualified to participate in the programs or receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs, or activities because of disciplinary reasons, health reasons, or other valid penal justifications. *Miller v. King*, 384 F.3d 1248, 1266 (11th Cir. 2004). The record amply supports the conclusion that Claimant was qualified to participate in most programs.

3.   The third, and probably key issue before the Special Master is whether Claimant was discriminated against by CDOC because of his or her disability. In order to establish discrimination in the context of the Remedial Plan, Claimant must demonstrate that he requested accommodation for his disability and that reasonable accommodation was denied. Claimant has not established a case that he was denied access or the opportunity to utilize the various available services, programs, benefits, and facilities available to non-disabled prisoners. His sole complaints were that, on occasion, he could not use the law library because it was filled by the time he arrived; that on occasion his religious studies were impeded; and that he could not utilize the machine shop. Such occasional or isolated instances do not establish a violation of either the Rehabilitation

6

Act or the ADA. Furthermore, there is no evidence that Claimant requested accommodation to utilize the machine shop or that he would have been able to use it even with accommodation. Consequently, the Special Master finds and concludes that Claimant has failed to prove by a preponderance of the evidence that he suffered discrimination by reason of his disability.

The Special Master notes that most of Claimant's complaints are based upon the alleged failure of the CDOC to provide proper medical treatment and/or the alleged deliberate indifference of the CDOC to his medical condition. While these may constitute legitimate claims under other statutes or constitutional provisions, they are not cognizable under the Rehabilitation Act, the ADA or the Remedial Plan. *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005).

## B.   VISION DISABILITY

1.     The Special Master finds and concludes that Claimant does not suffer from a vision disability within the meaning of the Remedial Plan. Under the Remedial Plan, Permanent Vision Impairments are defined as:

> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

*Remedial Plan* ¶ V(A)(3).

2.     The testimony of Dr. Shames indicated that Claimant was screened for his vision on December 1, 2004. The results of the screening indicated that Claimant has uncorrected right eye acuity of 20/50 and uncorrected left eye acuity of 20/40. *See, Exhibit C.* While Claimant does wear reading glasses, Claimant's uncorrected vision is better than the standard set forth in the Remedial Plan of 20/200.

3.     Since Claimant cannot prove that he suffers from a permanent vision impairment that fits the criteria of the Remedial Plan, his vision disability claim must fail.

## C.   HEARING DISABILITY

1.     The Special Master finds and concludes that Claimant does not suffer from a hearing disability within the meaning of the Remedial Plan. Under the Remedial Plan, Permanent Hearing Impairments are defined as:

> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

*Remedial Plan* ¶ V(A)(2).

2.     Claimant probably does suffer some hearing loss on his left side.  His hearing screening on December 1, 2004 indicates that Claimant does have some roaring in his ears, dizziness and hearing loss and that he does some lip reading.  *Exhibit D.* However, no testimony or evidence was presented that Claimant is permanently deaf or that Claimant's hearing impairment is so severe that he must rely on lip reading, sign language or written communication.  No testimony or evidence was presented that Claimant uses a hearing aid.  The Special Master also notes that since Claimant appeared by telephone, no requests for TDD assistance or other telephone assistance were made and that Claimant did not present himself as struggling to hear the proceedings.

3.     Since Claimant cannot prove that he suffers from a permanent hearing impairment that fits the criteria of the Remedial Plan, his hearing disability claim must fail.

## IV. ORDER

IT IS ORDERED that based upon the foregoing Findings of Fact and Conclusions of Law, Claimant has not met his burden of proving his claims by a preponderance of the evidence and, therefore, his Claim in this matter is DENIED.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before September 31, 2005** with the Clerk of the United States District Court at the following address:

901 19th Street
Denver, CO 80294.

SIGNED this *16th* day of August, 2005.

_____
Bruce D. Pringle,
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this _16th_ day of August, 2005 to the following:

Mr. Roy J. Whitehead, #53122
1790 W. Picacho Ave., Apt. 1
Las Cruces, NM 88005

Ms. Paula Greisen
Mr. David H. Miller
Counsel for the Class
King & Greisen, LLP
1670 York Street
Denver, CO 80206

Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

Margie Dykstra

9