IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

SEP 06 2005

GREGORY C. LANGHAM
CLERK

---

Claim Number 03-064
Category III
Claimant: Bradley R. Clemens, #99048
Address of Claimant: 12761 E. Parklane Drive, Aurora, CO 80011

---

## FINAL ORDER OF SPECIAL MASTER

THIS MATTER came before the Special Master for hearing on Tuesday, July 26, 2005 at 3:00p.m. and was a continuation of the hearing commenced on Tuesday, June 28, 2005 at the office of Legal Resolution Center, Denver Corporate Center III, Suite 1100, 7900 East Union, Denver, Colorado. Present were the following: Bradley R. Clemens, Claimant; Tami McQuiston, Claimant's wife; Jess Dance, from the Office of the Attorney General, for Defendants; Cary Shames, D.O., Colorado Department of Corrections chief medical officer, witness for Defendants.

Testimony was received from the following witnesses: Claimant, Tami McQuiston and Cary Shames. Three exhibits were entered into the record by Defendants:

    Exhibit A:    Colorado Department of Corrections Physical Examination dated 11/8/02.
    Exhibit B:    Colorado Department of Corrections Self Reported History dated 11/6/02.
    Exhibit C:    Colorado Department of Corrections Progress Assessment Summary date of PAS 04/01/2004.

1

At the conclusion of the hearing, the claim was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.[1]

## I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part as follows:

Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:

   I.   General inconvenience or nominal damages;
   II.  Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
   III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
   IV.  Damages due to severe physical injuries; and
   V.   Damages due to death.

---

[1] The Special master notes that on August 4, 2005, Claimant called the Office of Legal Resolution Center seeking to talk with the Special Master concerning an issue from the hearing. Since the Special Master did not have all parties present, the Special Master had his staff attorney contact Claimant. The report back to the Special Master from his staff attorney is that Claimant was concerned that when Dr. Shames testified to the documents in the file that a page attached to Claimant's supplemental claim for vision disability was not in the medical file or in the file of the Special Master. Claimant indicated that he had been unable to produce the document at the evidentiary hearing because his copy had been taped to another document while in CDOC custody. The Special Master notes that a copy of that document was filed with the Special Master and is part of Claimant's supplemental claim and file.

2

Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following findings of fact:

1.  Claimant on April 26, 2004, Claimant filed an Initial Claim for Damages with the Special Master claiming a mobility disability and a vision impairment. A Supplemental Claim for Damages for Mobility Impairment and Vision Impairment was filed with the Special Master on June 1, 2004.

2.  Claimant's claim was assigned to Category III based upon the Remedial Plan as set forth above.

3.  Claimant's current address and telephone number is:

    12761 E. Parklane Dr.
    Aurora, CO 80011
    720-427-8608

4.  Proper notice of the hearing was given and Claimant appeared along with Defendants.

5.  Claimant was under the jurisdiction of the Colorado Department of Corrections (CDOC) from May 2002 through August 2004.

6.  Claimant was housed at the Sterling Correctional Facility (SCF).

7.  Claimant testified that prior to coming under CDOC jurisdiction, in February, 2000, his arm was broken in five places and surgically repaired. The injury was sustained from "horseplay." Upon entry to CDOC, Claimant provided copies of his X-Rays to CDOC when he was processed at the Denver Reception & Diagnostic Center (DRDC).

8.  While at SCF, Claimant's arm was wrapped the entire time. On April 2, 2003, Claimant was taken to the Sterling Hospital because one of the bolts used to repair his arm was physically coming out of his skin. The bolt was surgically removed; however, the bolt was not replaced and the arm was not casted. Claimant suffered an infection three days later and spent seven days in Denver at the DRDC infirmary where he received antibiotic treatment. Claimant was given 10 days of oral antibiotics, he then contracted strep throat and was given 10 more days of antibiotics. Claimant was

3

provided with an ace bandage and a sling, and was given a lower bunk restriction. However, Claimant received no therapy and no further treatment. During a shakedown, Claimant's bandages and sling were taken away and a write-up was attempted for having a contraband sling.

        9.     Claimant testified that because of his arm he couldn't utilize the gym, play baseball or play basketball. He could not carry items with his right hand, and could not open a door. Claimant did take a computer class.

        10.     On March 23, 2003, Claimant's Social Security Disability was granted but the CDOC did not consider Claimant to be disabled. The result was the CDOC would not provide a Med 9 form and Claimant has had to re-establish his disability after he was no longer incarcerated.

        11.     Claimant testified to a general lack of medical treatment. He indicated that he had to pay inmates to move his 200-plus pound footlocker and that he had requested assistance from the facility to move the footlocker. After returning from medical, a guard put Claimant's footlocker on a cart and said, "there you go."

        12.     Claimant testified that he could have participated hobby shops and etching mirrors with accommodations and treatment.

        13.     With respect to vision, Claimant testified that at DRDC his vision was tested to be 20/50 or 20/70 and that he needed to see the eye doctor. Claimant never saw the eye doctor and was informed in writing[2] that he would not be given an appointment because his parole eligibility and mandatory release dates were too close. While in SCF, Claimant couldn't read documents in the law library, the Bible, or maerials with small print. His vision also limited his ability to perform in computer class.

        14.     At present, Claimant has received no vision treatment, and indigent care does not provide for it.

        15.     On cross examination of Claimant, he acknowledged that was not denied a job but rather refused to work.

        16.     Ms. McQuiston, a witness for Claimant, testified that she received many calls from him in which he indicated that prison guards had attempted to place him on the top bunk, and that his sling and ACE bandage had been taken. She also testified that she received no notice of Claimant's surgery until six weeks after the surgery had been performed. Her testimony also indicated that she personally brought copies of Claimant's X-Rays and medical documents to DRDC as well as the Social Security information.

---

[2] The Special Master notes that this document was copied to the file with Claimant's Supplemental Vision claim and has been reviewed by the Special Master.

4

17. Dr. Cary Shames testified that Claimant's medical records indicate that in his physical examination of 11/8/02, Claimant had right eye acuity of 20/40 and left eye acuity of 20/50 and that Claimant had undergone eye surgery in 1974. Dr. Shames believes that Claimant received adequate treatment for his elbow but admits that he never personally examined Claimant.

### III. CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and (c) the Americans with Disabilities Act.(ADA), 42 U.S.C. § 12101 *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

### A. MOBILITY DISABILITY

1. The Special Master finds and concludes that Claimant does not suffer from a permanent mobility disability, within the meaning of the Remedial Plan. Under the terms of the Remedial Plan, Permanent Mobility Impairments are defined as follows:

    a)    Permanent Wheelchair: Inmates who use wheelchairs full or part time due to a permanent disability.

    b)    Permanent Mobility Impairment (non-wheelchair): Inmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking: *e.g.*, an inmate who cannot walk 100 yards on a level surface or climb a flight of stairs without a pause. Such impairment may require use of a cane, prosthesis, or walker, or other assistive devices.

*Remedial Plan* ¶ V(A)(1).

Claimant's arm problems do not meet the lower extremity permanent mobility impairment requirement of the Plan. Claimant did not present evidence that he uses a wheelchair or that he is substantially limited in his ability to walk. The evidence fails to establish that Claimant cannot walk 100 yards on a level surface or climb a flight of stairs without pause.

    2.    Since Claimant cannot prove that he suffers from a permanent mobility impairment that fits the criteria of the Remedial Plan, the analysis need not go further. Nevertheless, the Special Master notes that even if Claimant's alleged disabilities fall within the scope of the Remedial Plan, his contentions are primarily based upon the alleged failure of the CDOC to provide proper medical treatment and/or the alleged deliberate indifference of the CDOC to her condition. While these may constitute legitimate claims under other statutes or constitutional provisions, they are not cognizable under the Rehabilitation Act, the ADA or the Remedial Plan. *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005).

### B.   VISION DISABILITY

    1.    The Special Master finds and concludes that Claimant does not suffer from a vision disability within the meaning of the Remedial Plan. Under the Remedial Plan, Permanent Vision Impairments are defined as:

    Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

*Remedial Plan* ¶ V(A)(3).

    2.    The testimony of both Claimant and Dr. Shames indicated that Claimant has some vision problems. While discrepancies exist between Claimant's testimony and Dr. Shames' testimony, it is clear that the uncorrected acuity in each of Claimant's eyes is well within the allowable corrected limits set forth by the Remedial Plan. Additionally, Claimant's physical examination supports the testimony of Dr. Shames that Claimant's right eye acuity is 20/40 and his left eye acuity is 20/50. *See, Exhibit A*.

3.     Since Claimant cannot prove that he suffers from a permanent vision impairment that meets the criteria of the Remedial Plan, his vision disability claim must fail.

## IV. ORDER

IT IS ORDERED that based upon the foregoing Findings of Fact and Conclusions of Law, Claimant has not met his burden of proving his claims by a preponderance of the evidence and, therefore, his Claim in this matter is DENIED.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before October 7, 2005** with the Clerk of the United States District Court at the following address:

> 901 19th Street
> Denver, CO 80294.

SIGNED this 23rd day of August, 2005.

_____
Bruce D. Pringle,
Special Master

7

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this 23rd day of August, 2005 to the following:

Mr. Bradley R. Clemens, #99048
12761 E. Parklane Dr.
Aurora, CO 80011

Ms. Paula Greisen
Mr. David H. Miller
Counsel for the Class
King & Greisen, LLP
1670 York Street
Denver, CO 80206

Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

_____
Margie Dykstra

8