IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

   Plaintiffs,

-vs.-

BILL OWENS, et al.

   Defendants.

FILED
UNITED STATES DISTRICT COURT

SEP - 6 2005

GREGORY C. LANGHAM
            CLERK

---

Claim Number 03-020
Category III
Claimant: Jeremy Molbert, #114529
Address of Claimant: FCF, P.O. Box 999, Canon City, CO 81215-0999

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER came before the Special Master for hearing on August 18, 2005. The hearing was held at the Fremont Correctional Facility (FCF) in Canon City, Colorado. Present were the following: Jeremy Molbert (Claimant); and Adam Wiens, attorney for Defendants.

Testimony was received from the following witnesses: Claimant and Barbara Wilson (by telephone). All documentation previously submitted by both sides was accepted. Claimant offered into evidence Exhibit 1, and it was admitted. Defendants offered into evidence Exhibits A through J. All were admitted. After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who

2

do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. Based upon the testimony from the witnesses, plus a review of exhibits and submitted documents, the Special Master finds the following to be the facts necessary for resolution of the claim.

Claimant began having trouble with his ears when he was three years old. He lived in Louisiana at the time. As a result of his ear problems, tubes were inserted into his ears. The initial

placement of tubes in Claimant's ears was not successful, and a second surgery was required. As a result of the tubes, special care was needed to keep Claimant away from water.

Claimant continued to have ear problems as he grew older. He and his mother relocated to the Canon City area. In the mid-1990's, Claimant went to see Dr. Victoria King, M.D. who is an ear, nose and throat specialist in Canon City. Dr. King referred Claimant and his mother to Dr. Cameron Shaw in Denver. As a result of this referral, Claimant underwent a surgery known as a mastoidectomy on his right ear. A similar surgery was to be performed on the left ear, but that did not occur before Claimant's incarceration.

Claimant's involvement in the criminal justice system took him off the streets in late 2001 or early 2002. He was incarcerated in the Fremont County Jail. He ultimately was convicted and sentenced to the Colorado Department of Corrections (CDOC).[1] He came into CDOC custody on September 9, 2002 and has remained in custody since that date.

For evaluation purposes, Claimant was placed originally at the Denver Regional Diagnostic Center (DRDC). He was at that facility for a few weeks and then was transferred to the Fremont Correctional Facility (FCF). He has been at FCF ever since.

Claimant already had ear problems when he came into the custody of CDOC. There is some question as to whether he advised intake staff of these problems when he was at DRDC. He did not have any form of hearing test after he entered into CDOC custody. His last audiogram was in 1999.

After his imprisonment, Claimant had trouble hearing some announcements made by correctional staff. His ears continued to have drainage. He occasionally would have blood on his pillow as the result of discharge from his ears while he was sleeping.

Claimant was able to find work at the furniture plant. This position paid better than most inmate employment positions. Claimant was required to wear earplugs because of the machinery in the shop. Claimant indicated that these created problems for him, as they were painful to his ears and diminished his hearing further.

On or about October 22, 2003, Claimant was playing football in the yard area at FCF. Though the exact details were unclear, the football game ended with a disagreement between some players. As a result, one player threw a football right at Claimant and it hit him in the right ear. Claimant became concerned about this ear, as it already had problems. He had pain in the ear because of the hit on the side of his head. He experienced some discharge after the injury and dizziness.

After the football incident, Claimant began to experience additional problems in hearing individuals and announcements. He sought medical care for his ear. He was seen by Dr. Tim Creeny,

---

[1] The Special Master has been provided no information as to Claimant's underlying criminal conviction. Such information is irrelevant to resolution of the claim.

4

M.D., who is the assigned physician at FCF. Dr. Creeny advised Claimant that he needed to be seen by an ENT specialist and probably would need additional surgery. Claimant was placed under a restriction that prevents him from being placed in camps or being housed at a facility that is higher than eight thousand feet.

Claimant understands his ear condition as continuing to deteriorate. He believes that he has fluid in his ears and that the gland near the left ear is swollen. The fluid will not discharge properly from both ears and there is a deterioration of the bones in the both ears. Claimant is fearful that the end result will be deafness in one or both ears.

On cross-examination, Claimant acknowledged that he had been scheduled to go for surgery on the other ear. He was contacted by officials at FCF but did not want to go for the surgery on that specific date. He was taking classes for his GED and did not want to interrupt that program. He did complete the classes and receive his GED. Claimant's medical records reflect that the trip for surgery was missed.

Claimant also testified that he has vision problems. He testified that he has trouble reading and light bothered his eyes. He had surgeries on his eye when he was much younger. He believes that he should be provided glasses. He acknowledges that he is able to see.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, each claimed impairment or disability must be examined.

**Vision Impairment:** The Special Masters are bound by the categories and definitions set forth in the Settlement Agreement. Having an eye problem is not, in and of itself, sufficient to establish a vision impairment.

The Settlement Agreement provides that a vision impairment means "[i]nmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses." This definition is extremely narrow and would include only claimants who are suffering extreme eyesight problems. Claimant's own testimony indicates that he does not fall under this definition. He has some reduced vision but is able to see. Claimant does not meet the very narrow definition of vision impairment in the Settlement Agreement.

**Hearing Impairment:** The Settlement Agreement was approved on August 27, 2003. On that date, the class was set by order of Judge Nottingham. In order to be part of the class in a given category, a claimant had to meet the criteria in the Settlement Agreement on that date.

As with vision impairment, the definition for hearing impairment is very narrow. The definition is as follows:

> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

As of August 27, 2003, Claimant was not deaf in both ears. Claimant was not required to rely upon written communication, lip reading, or signing. Claimant did not have a hearing aid on August 27, 2003, nor does he have one today. Under the very narrow definition of the Settlement Agreement for hearing impairment, Claimant does not qualify as hearing impaired.

This is a troublesome case. Review of the medical records submitted by both sides clearly indicates that Claimant has significant problems with both ears. He needs to see a specialist to determine what his condition truly is. At this time Claimant does not have a disability that meets the criteria of the ADA and Rehabilitation Act. Absent care for his ears, it would appear that it is only a matter of time before he will meet that criteria. It was not disputed at the hearing that Dr. Creeny believed that a referral to an ENT specialist was appropriate. The referral has not taken place. It may only be a matter of time before Claimant is able to file an Eighth Amendment claim.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by CDOC?** The answer here is generally yes. Claimant had a disciplinary conviction that required him to leave his position in the furniture shop. He is hoping to return to that shop to work, provided he can obtain ear muffs for his ears. There was no other reason why Claimant could not participate in all programs and services at FCF and in CDOC.

**3. Was the Claimant discriminated against by CDOC because of his or her disability?** The answer to this question is no. Generally, there was no evidence that would lead to the conclusion that Claimant had been the victim of discrimination prohibited by the ADA or Rehabilitation Act.

Claimant received medical care. He has had legitimate concerns about that care. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**

6

This question need not be answer in light of the negative answer to Question #3.

IT IS HEREBY ORDERED that the claim of Jeremy Molbert is dismissed, as he has failed to establish by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before October 19, 2005.**

SIGNED this 25th day of August, 2005.

BY THE COURT:

Richard M. Borchers
Special Master

7

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this 25th day of August, 2005 to the following:

Mr. Jeremy Molbert
#114529
FCF
P.O. Box 999
Canon City, CO 81215-0999

Ms. Barbara Kay Wilson
2433 Central Avenue, Space 17
Canon City, CO 81212

Ms. Paula Greisen
Mr. David Miller
Counsel for the Class
King & Greisen, LLP
1670 York Street
Denver, CO 80206

Mr. James X. Quinn
Mr. Jess A. Dance
Adam Wiens
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

_____