IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92—870 (OES) (Consolidated for all purposes with Civil Action No. 96—343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-070
Category III
Claimant: Thomas Rush, #49217
Address of Claimant: SCF, P.O. Box 6000, Sterling, CO 80751-6000

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on September 15, 2005. This hearing was held at the Sterling Correctional Facility (SCF) in Sterling, Colorado. Present were the following: Thomas Rush (Claimant); and Jess Dance, attorney for Defendants.

Testimony was received from the following witnesses called by Claimant: Major Jeffrey Revord; Sergeant Leon Johnson; Captain Misty Logan; Dr. Gangadeep Singh, M.D.; and Claimant. All documentation previously submitted by both sides was accepted. Claimant offered Exhibit #1, and it was received into evidence. Defendants offered into evidence Exhibits A through O, and all were admitted. After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp. 28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they may exercise only the jurisdiction agreed upon by the parties.

> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. Based upon the testimony from the witnesses, plus a review of exhibits and submitted documents, the Special Master finds the following to be the facts necessary for resolution of the claim.

Claimant came into CDOC custody in August, 1995. After an evaluation period at the Denver Regional Diagnostic Center, Claimant was transferred to the Buena Vista Correctional Facility (BVCF). He remained at that facility until 1999. He was placed then at the Limon Correctional Facility (LCF) in Limon, Colorado. He was there for two years and then transferred to SCF.

In 2000, Claimant was diagnosed with diabetes. He was treated with medication and placed on a diabetic diet. In late 2001 or early 2002, Claimant was taken off the medication by CDOC medical personnel. He continued on the diet. In 2004, Dr. Singh reinstated medication (glucophage) and continued Claimant on a special diet. The diet was for a diabetic, but was also lactose free.

Claimant testified that he used to be able to run but has not been able to do so for some time. He stated that he has heart and blood pressure problems. Claimant stated that he has had to work to keep his blood pressure under control, and Dr. Singh had been a lot of help to him with this problem.

Claimant testified that he had complained about his treatment for diabetes in the past. When his blood sugar would be out of control, he would become irritable and verbally abusive. He indicated that this had led to disciplinary problems. Claimant maintained that his termination from the kitchen on five occasions was the result of his blood sugars being out of control. He believed that he would not have had some of his prior problems if his diabetes had been under control.

During the hearing, Claimant mentioned that his name tag on his clothing is now in green. This denotes that he is diabetic. The Special Master specifically asked Claimant if he objected to having a name tag in a color that was different from most of the other inmates. He stated clearly that he did not have any objection to the green name tag, as it provided some protection to him.

Claimant testified that during a lock down period in February, 2005, his diabetic diet was canceled. It was restarted after a brief period of time, but was not provided to him for at least two days. Although it is unclear what was the precipitating cause for the lock down, it appears to have been the result of a serious assault on an inmate in the prison yard.

On cross-examination, Claimant testified that his diabetes has been well controlled. He presently works in the hobby shop, although this is on a self-employed basis. Claimant acknowledged that he can walk more than one hundred yards. When specifically asked by counsel

for Defendants what his major concern was, Claimant stated that he believed that he had received inappropriate medical care.

All witnesses who testified were called by Claimant. Sergeant Johnson testified that he did not remember anything about a lock down in February, 2005. He indicated that lock downs occur with some frequency and he could not provide any specifics about this specific period of time. Captain Logan remembered the lock down and having a discussion with Claimant. Captain Logan contacted the kitchen after the discussion with Claimant to inquire about his diabetic diet. She was advised that Major Revord had directed the kitchen to send general meals to Claimant and others during the lock down.

Major Revord testified that he is in charge of the kitchen for the unit that houses Claimant. He did not specifically recall this particular lock down, as there have been several this year. He could not recall if he issued an order directing the cessation of special diets. He indicated that he may have done so, but that would have been the result of security concerns. In any event, the special diets were resumed after the lock down was ended.

Claimant called Dr. Singh as a witness. Dr. Singh was the SCF physician for over two years, but recently transferred to the Denver Regional Diagnostic Center. Dr. Singh testified that Claimant was non-compliant with the diabetic diet at times. In addition, he would not eat all of his meals. He also was non-compliant on occasion taking his medicine. Dr. Singh indicated that Claimant's problem was, at times, low blood sugar levels. This was the result of not eating all of his meals. Dr. Singh indicated that low blood sugar levels can kill a person, while high blood sugar levels will lead to long-term problems. It is important not to have low blood sugar levels.

Dr. Singh testified that Claimant's major medical problem is his blood pressure. He has a family history of high blood pressure, and both of Claimant's parents died from the condition or complications from it. Dr. Singh testified that he had not seen any long term problems from Claimant's diabetes. Dr. Singh further testified that there is no relationship between high blood pressure and diabetes. Claimant has been assigned an M 4 rating which precludes him from going to camps or a facility in the mountains. This rating is based solely on the blood pressure problem which has been chronic.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, each claimed impairment or disability must be examined.

**Diabetes:** The evidence substantiates that Claimant is diabetic. Therefore, he is part of the Class.

**Mobility Impairment:** The Settlement Agreement provides that an individual is mobility impaired if he is permanently wheelchair bound or has a lower extremity disability. Claimant is not confined to a wheelchair and is able to walk more than one hundred yards. Under the very narrow definition of mobility impairment set forth in the Settlement Agreement, Claimant has not established that he has a mobility impairment.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services.

Claimant's blood pressure condition is not covered by the Settlement Agreement. The evidence presented reflected his disqualification from camps and higher altitude facilities was the result of this condition, not his diabetes.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** There was no evidence that would lead to the conclusion that Claimant had been the victim of discrimination prohibited by the ADA or Rehabilitation Act. Claimant has received regular medical care and has been authorized to have a special diet. Claimant is upset about the quality of medical care that he has received while incarcerated in CDOC. He takes issue with some of that care.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the case provided to him, that is beyond the jurisdiction of the Special Masters. Since the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law, Claimant may pursue separately any rights that he may have concerning the quality of his medical care.

The evidence does reflect that Claimant's diabetic diet was stopped for a brief period of time in February, 2005. This was the result of the lock down. The Special Master specifically finds that a brief termination of the diabetic diet as the result of a significant and undisputed security issue is not a violation of the ADA or Rehabilitation Act.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Questions #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Thomas Rush is denied, as he had failed to

6

prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before December 5, 2005.**

SIGNED this 27th day of September, 2005.

BY THE COURT:

Richard M. Borchers
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this 27th day of September, 2005 to the following:

Mr. Thomas Rush
#49217
SCF
P.O. Box 6000
Sterling, CO 80751-6000

Mr. James X. Quinn
Mr. Jess A. Dance
Mr. Adam Wiens
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

_Margie Dykstra_