IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

OCT - 5 2005

G.  C. LANGHAM
CLERK

---

Claim Number 03-114
Category III
Claimant: Byron Cortez, #45627
Address of Claimant: LCF, 49030 State Highway 71, Limon, CO 80826

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER came before the Special Master for hearing on September 2, 2005. This hearing was held at the Limon Correctional Facility (LCF) in Limon, Colorado. Present were the following: Byron Cortez (Claimant); and Jess Dance, attorney for Defendants.

Testimony was received from the following witnesses: Claimant and Dr. Orville Neufeld, D.O. All documentation previously submitted by both sides was accepted. Neither Claimant nor Defendants offered into evidence any exhibits. After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

      Inmate with a permanent disability/impairment which substantially
      limits his or her ability to perform a major life activity.
      C. PERMANENT DISABILITY/IMPAIRMENT
      A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

  The Settlement Agreement further provides, in part, as follows:

    2. Permanent Hearing Impairments
    Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
    3. Permanent Vision Impairment
    Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
    4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
    Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

  On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

    2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
      1. Is the claimant a disabled individual who is a member of the class?
      2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
      3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
      4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

3

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. Based upon the testimony from the witnesses, plus a review of exhibits and submitted documents, the Special Master finds the following to be the facts necessary for resolution of the claim.

Claimant came into DOC custody in April, 1991. Claimant testified that both of his knees were worn out before he came into custody. There was no cartilage in either knee. Over the years since coming into DOC custody, Claimant has had eight surgeries on both of his knees. He had a staph infection after one surgery that led to problems with his femur. A recommendation was made on several occasions after the surgeries that Claimant receive orthopedic shoes. For a period of time, Claimant did have such shoes.

Claimant had a right knee replacement in January, 2005. He was advised by medical staff to try to refrain from using a brace or cane. He was told also that he would need orthopedic shoes. These would provide more support for his feet and help alleviate his foot and knee problems. Claimant has given up his cane, but has been unable to obtain special shoes.

On cross-examination, Claimant testified that he had been discriminated against in not being allowed to have othopedic shoes. He had offered to buy the shoes, but needed something more than the soft soled shoes available through the Canteen. Claimant testified that there are days when his feet feel dead and that it has been hard to work. Claimant indicated that he always has maintained a job while in prison and just wants to be able to do his time as comfortably as possible. He testified further that he had been in a wheelchair off and on prior to his knee replacement.

Claimant testified that he had been denied orthopedic shoes, even when he offered to buy them at his expense. He stated that a number of inmates at LCF have medical shoes, and he was concerned that he was not allowed the same right to have such shoes.

Defendants called as witness Dr. Orville Neufeld, D.O. He testified that he had reviewed Claimant's medical records. Those records reflected that Claimant had special shoes in the past. Dr. Neufeld acknowledged that there had been a recommendation for medical shoes by specialists, but that sometimes such recommendations were not followed by DOC. An inmate must abide by the policy dealing with shoes and cannot purchase shoes from an outside supplier.

## III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** The evidence in this case is unrefuted. Claimant has had two bad knees since he entered into DOC custody. He has had numerous surgeries on both knees. No evidence was presented by Defendants that Claimant did not have a lower extremity mobility impairment. The Special Master specifically finds that Claimant did have a mobility disability on August 27, 2003. Claimant is part of the class.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services.

**3. Was the Claimant discriminated against by DOC. because of his or her disability?** The answer to this question is yes. This claim presents a clear issue that the Special Master will take some time to discuss.

Claimant has had bad knees since his entry into DOC. The medical records that he submitted reflect on-going problems. Medical recommendations were made for soft-soled shoes instead of DOC issued boots. *See, Consultation Report Form, September 18, 2001; Consultation Report Form, February 21, 2002.* Claimant testified that orthopedic shoes were recommended after his knee replacement earlier this year. Claimant's testimony is believable and accepted. It is also clear that he had special shoes in the past to help care for his knees, but those shoes simply wore out.

As with other claims, Defendants have relied on certain defenses. First, they argue that there is a policy that precludes special shoes. The testimony of Claimant substantiates that this "policy" has not precluded other inmates from receiving appropriate shoes for their medical conditions. The Special Master will take judicial notice that in other hearings on other claims that the "policy" does not appear to apply to other correctional facilities. Most importantly, the "policy" has never been provided to this Special Master in writing. Examination of the DOC website and administrative regulations did not provide any insight as the basis for this "policy." *See, www.doc.state.co.us.* It simply is not enough to claim that a policy exists. The policy must be one that is reduced to writing and one that does not offend the ADA and Rehabilitation Act. The Special Master specifically finds that no "policy" concerning shoes has been established by competent evidence as to this claim.

Second, the argument is that a medical decision was made to not authorize orthopedic shoes for Claimant. Dr. Neufeld reviewed the medical records of Claimant. He did not testify that Claimant was not mobility impaired. More importantly, Dr. Neufeld did not indicate who had overridden the recommendations of the orthopedic surgeons that Claimant receive orthopedic shoes. Defendants chose not to present direct evidence as why the recommendations were overridden, but instead presented testimony that simply involved a review of the medical records. For all the Special Master knows from what was presented, the "medical" decision not to provide orthopedic shoes was premised on financial considerations, not based upon the long-term health of Claimant. As with the issue of a "policy," it is insufficient to simply say that a medical decision was made. That is not the end of the discussion on some claims. Here, Claimant had special shoes until they wore out. Why

they were not replaced, especially in light of the recommendations of the orthopedic surgeons, is unknown.

Third, it is not enough to say that something can be purchased from the Canteen. The Special Master will take judicial notice that few inmates have large amounts in their accounts for purchase of items from the Canteen. All inmates now must make a co-payment to receive medical care. *C.R.S. §17-1-113*. Availability of an item on the Canteen list is not a substitute for services and programs that must be provided. Under the ADA and Rehabilitation Act, services, programs and activities can be very basic. *Crawford v. Indiana Dept. of Corrections*, 115 F.3d 481 (7th Cir. 1997); *Schmidt v. Odell*, 64 F.Supp.2d 1014 (D.Kan.1999); *Kaufman v. Carter*, 952 F.Supp. 520 (W.D.Mich.1996). As to this claim, the evidence supports the reasonable inference that the decision not to provide appropriate orthopedic shoes was driven by fiscal concerns. Soft soled shoes purchased by Claimant would not be a substitute for services recommended by the physicians who dealt with Claimant's knees.

This claim is not one that deals with a disagreement over the quality of medical care provided and, therefore, subject to the 10th Circuit's decision in *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). This claim involves basic services to be provided to an individual who is disabled under the ADA, Rehabilitation Act, and Settlement Agreement. The decision not to provide him orthopedic shoes was not based upon his medical condition. Claimant is entitled to orthopedic shoes as an accommodation to his mobility disability.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** The answer to this question is clearly yes. Claimant is worried about the future of his health. He probably will need a left knee replacement. Such replacements do not last forever. Additional replacements down the line are probable.

Claimant has a right to expect the necessary shoes to protect his knees. Since DOC apparently will not allow shoes to be purchased from an outside vendor, except for Canteen purchases, DOC will be responsible for appropriate orthopedic shoes for Claimant. It is inconceivable that appropriate shoes, as recommended by Claimant's surgeons, cannot be found that also meet security requirements. Defendants will be given thirty days to fit and provide orthopedic shoes to Claimant.

Claimant requested only orthopedic shoes. He did not request any monetary award or other relief. To his credit, Claimant focused in on what he needed in order to protect his knees.

IT IS HEREBY ORDERED that the claim of Byron Cortez is granted; and

IT IS FURTHER ORDERED that Defendants shall provide within thirty days orthopedic shoes for Claimant that will protect his knees and feet; and

IT IS FURTHER ORDERED that Defendants shall provide a certificate on or before **November 14, 2005** indicating that Claimant has received the orthopedic shoes ordered herein; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before December 5, 2005.**

SIGNED this 27th day of September, 2005.

BY THE COURT:

Richard M. Borchers
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this 27th day of September, 2005 to the following:

Mr. Byron Cortez
#45627
LCF
49030 State Highway 71
Limon, CO 80826

Mr. James X. Quinn
Mr. Jess A. Dance
Mr. Adam Wiens
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

*Margie Dykstra*