In The U.S. District Court
for Colorado
Case No. 92-N-870

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

OCT 18 2005

GREGORY C. LANGHAM
CLERK

L.R. Moore, J. Montez, et al,
Plaintiffs/Claimants

v.

Gov. Bill Owens, et al, Defendants.

Claimant O3030; L.R. Moore;
Prisoner #47702; Box 777;
CSP C-2-18; Cañon City CO 81215;
no phone; pro se

## Affadavit to Perjury Motion

Plaintiff-Claimant Moore affirms
additional acts by Defendants as
further proof of deceit and bad
faith, as stated in his prior Perjury
Motion re 15 July 05 Hearing.
The acts affirmed herein, are
solely the result of Defendants' egos
trumping facts and common sense,
in attempting to moot said Perjury
Motion. Rather than simply do the
cheap and easy and harmless things
Claimant asked at Hearing, Defendants
egregiously or expensively and
needlessly proceed to do

-2-

many other things to conceal
the fact that they refuse
to act in good faith. That
is, they do many things
claiming to act right, but
actually act wrong.
    The Perjury Motion resulted
in, according to Special Master
Borchers, an inquiry from this
Court to him. Claimants request
for copy of this from Borchers
was rejected. Request for copy
from this Court goes unreplied.
Borchers sent copy of his own
order to defendants to explain
why no new wheelchair delivered
altho claimed to be on hand at
CSP before 15 July 05. This
was early September, explanation
due 30 Sept. Then he
cancelled order, citing Claimants
objections to his prior Final
Order (sic) such as Perjury
Motion. That is, Claimant objected
because Final Order was based
in defense perjury, thus needed
to be voided. Defendant's never
replied formally to Borchers,
or to this Court, to best of

-3-

Claimant's knowledge or he never got copy of such. Rather they keep doing things that he never requested or are minor and often only worsen conditions, all while claiming the opposite. He has seen pictures taken of such acts, presumably as part of some reply to Boucher's inquiry order, or for defense to a de novo hearing. They have burned off the normal cell stool. This was welded under writing desk, thus made writing on desk by a para difficult, thus Claimant used stool only as a shelf. Other POC prisoners using same stool in wheelchair cells sometimes have a bolt on/bolt off stool, or a swing out one. Many more 'chair cells than 'chair users, thus burning off stools in every CSP 'chair cell would be stupid. As CSP likes to shuttle prisoners, even burning off one is stupid. Either make it swing or bolt off, or leave it in as a shelf. Desk is

- 4 -

too low to write on standing up thus bounding off stool ruins desk for all other users. And, due to loss of ~~the~~ stool as shelf, does not really help Claimant. He did point out that, except as shelf, twas only an obstruction to him, but this only when told he could not use it as a shelf because it was for him to "sit on" despite fact he can not. Thus he kept using it as a shelf.

He requested a lower pullup bar as others had one too high for him due to his being seated. Easily welded to same cantilevered frame in exercise ~~cell~~ and has been so done at SCCF. Instead CSP installed commode bars.

These bars give minimal ~~aid~~ and unfamiliar (not in most other POC prisons) aid but ∅ exercise. These are used at SCCF but omitted (and rightly so?) at CSP. Perhaps needed by stroke victims. He is not one. He notes that other CSP chair cells ~~_____~~ still lack bars, still have stools, thus it seems only his cells remodeled.

And on 5Oct 05, he was

-5-

removed from E 3 11 for "concrete work" (who knows what this really is?) to Intake (Ø bunk, slept on floor for 2 days) then C 2 11. This was third excuse to remove all his files from cell (a tool burning first, then "commode bar installation) and "inspect" them (mix them up by dumping them into one pile). In none of these was he told to pack up files. In first 2, files dumped while in visiting room. In last, he was told to go to visiting but taken to Intake — i.e. to be a visit rather than a move with packing.
     Thus, for these planned well in advance and thus easily could have been allowed to pack. files, there three were largely done to harass him, legal complaints as such rely on file access. Also his grievances.
     Meanwhile, CSP Clinical Services Supervisor Lynn Erickson repeatedly sent envoys claiming C.S. would deliver "new chair" if he'd first sign for it, Having thus been tricked by CSI, into

—6—

signing, thus receiving, for another prisoner's prescription glasses as his own, he refused to sign without first inspecting the "new" chair. This demand was rejected by envoys twice. On glasses, he broke his frame in Dec. 04, asked to repair/replacement, was told to sign in Jan 05, was then given wrong RX glasses, immediately complained but ~~text~~ C.S. delayed acting until he saw optometrist in June and proved to optometrist that glasses did not match his RX which opto had in front of him. Only then could he get right RX which arrived in July, just prior to leaving. Meanwhile Erickson continuously denied any error made, and thus billed him wrongly for the correction.

So as to not be restocked twice, he demanded to inspect

-7-

chair before signing for it. when
he was finally allowed to, 8 Oct, he
noted it was NOT new but
had been "repaired" by welding
which envoy then admitted.
that is, it had been broken
yet he was asked to sign
an invoice stating it was
new. He pointed out that
"repair" would seem to
prohibit transfer to shower
bench, thus making chair
unusable by him. Envoy
agreed. He asked that such
be written on invoice by
envoy (presumably Nurse
Anderson as such stated by
others after she left - he
forgot to ask) and signed by
her. She refused.

Again he refused to sign.
Now his attitude was "You
broke it, you bought it."
that is, he wasn't accepting
as new, a broken wheelchair.
He asked that its parts be used
to replace worn out parts on
others, including one he currently uses,
if they fit. He presumes some do
that this "new" chair is not first of

-8-

model ordered by DOC, altho it
might be. His request was
rejected by envoy.

He repeated above in
writing, both in letter and
by sick call kite, to
Clinical/Anderson/Erickson.
And to the Pod staffer
present, c/o Romero, to
clarify to him what he heard.
The problem of replacing
worn out parts of chairs is
one CSP CS refuses to address
despite having several
chairs with such. The sole
parts ever replaced were brake
lever covers, perhaps the first
item to wear out on any
chair, and the most universal or
to one fits all. At Hearing, CS
admitted (chair present as proof)
that armpads and back needed
replacing immediately, but
claimed to have new chair thus
would not order parts. This
makes no sense as chair
still needs parts even if only
going to storage as a reserve.
Yet Borchein cited new chair as

-9-

adequate reason to not
address replacement problem.
The fact is, there is no
new chair and there has been
none. That is, all there has
been is defense perjury and
obfuscation. E Pod did
get a new Pod chair, but
said it was NOT for use
by any individual. This was
the cheapest model and met
all CSP Security Rules
(mostly unwritten) thus could
be immediately used as is in
cell by individuals. Thus,
a matter of to whom this
chair assigned. Claimant's
request for this chair
denied.
        C.S. claims that it's "new"
(welded) chair did not meet CSP
Security requirements (then
why was it ordered instead
of a clone of E Pod's?)
thus could not be delivered
despite being on hand 15
July. This claim CS refuses
to put in writing. CS did
ask claimant to so that ADL

-10-

(Activity of Daily Living) for them and he did. Then this was written as an Medical Record, and wrongly, as he noted, in writing to Erickson, because tape corder confused right and left. Further, some chair showers at CSP have right hand benches and some have left hand, thus shower transfer depends on which, thus both sides must be usable, thus both legrests must be removable or "concave" (a term he explained during ADA demo. — legrests described as fixed (nonremovable) are "concave", others are "convex"). Thus C.S. seems to have deliberately ordered unusable wheelchair, then ruined it, while demanding Claimant sign for it. Exactly why C.S. did this is unknown as is why CSP stole Claimant's personal wheelchair upon his arrival. This theft was

— 11 —

noted at 15 July Hearing but omitted in Final Order.

This Affirmation is written and sent for xerox on 12 Oct. 05, thus will be submitted later. Claimant affirms that it is true and complete as of time of writing.

Claimant stresses that there are major problems that DOC refuses to address re disabled prisoners, especially chair users, that this is exactly why this class action persists. And the attitude of DOC towards such prisoners is exactly why ADA was enacted as shown by its introduction. Boucher's Final Order refuses to even attempt to address these problems. His next order then concedes at least one needs to be addressed. His last concedes he will not address this problem, that he does not wish to, and, in context with what he said at Hearing, lacks power to, despite ADA. That is, he feels that ADA

—12—

is totally unenforceable in state prisons.

Claimant concedes that Borchers believes this, thus has ordered in accordance (the $50⁰⁰ Borchers ordered has NOT been paid). Therefore Borchers is correctly gone from a case he never should have been in.

Claimant states that this Court need not believe an Borchers, that this Court can, and should try to enforce APA in Colorado State Prisons, especially in Colorado State Penitentiary (CSP).

Claimant states that enforcement at CSP must begin by addressing the chair problems — where did his go? — how can replacement parts 'be reasonably obtained (he has offered to have them shipped, pre-paid by him)? — why was he asked to sign for a broken chair as if new? — why wasn't chair ordered to meet "security requirements" or any such actually exist? In short, he asks this court

−13−

to demand CSP CS stop lying
and obsfoscating, to stop libeling
and to expunge libelous records,
to try to solve problems rather
than increase them. Such would
seem to not require de novo
hearing or a series of speedy
interrogatories that allow
Claimant to nail down answers.
    Unless such done, the
problems will persist and be of the
likely produce new affirmations
of new incidents by CS and
other CSP staff.
    Respectfully submitted on
17 October 2005 by Claimant
pro ses affirming above as
true and/or believed by some.

                    G R Moore