IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

Plaintiffs,

-vs.-

BILL OWENS, et al.

Defendants.

---

Claim Number 03-014
Category III
Claimant: James Smith, #112593
Address of Claimant: F LCF, P.O. Box 1000, Fort Lyon, CO 81038-1000

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on June 9, 2005. This hearing was held at the Fort Lyon Correctional Facility (FLCF) in Fort Lyon, Colorado. Present were the following: James Smith (Claimant); and Jess Dance, attorney for Defendants.

Testimony was received from the following witnesses: Claimant; Dr. Timothy Creany, M.D.; Charley Smith; and Ray Hamlin. All documentation previously submitted by both sides was accepted. Claimant did not formally offer into evidence any exhibits. Defendants offered into evidence Exhibits A through G, and all were admitted. Final closing arguments were presented. Claimant was granted time in which to submit additional documents, and he has done so. Defendants have responded to those documents. This case has been taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for

Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp. 28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

3

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. The Special Master will summarize the important parts of the testimony of witnesses.

Claimant called as his first witness Dr. Timothy Creany, M.D. Dr. Creany is a physician who works for DOC at the Fremont Correctional Facility (FCF). Dr. Creany testified by telephone from FCF. Claimant had been at FCF prior to his being placed at FLCF. Dr. Creany did not have a copy of Claimant's medical records before him but remembered him and some treatment issues. Dr. Creany remembered that Claimant had a fear of needles. It was difficult to administer shots, and Claimant would not do finger sticks for diabetes checks. Dr. Creany testified that he was unaware of any connection between Claimant being cold all the time and his condition of neuropathy. Dr. Creany testified that Claimant is wheelchair bound, but he could not recall why that was the case.

On cross-examination, Dr. Creany testified that diabetics must do a lifestyle modification in order to keep the disease under control. Checking blood sugar levels is very important. Failure to control blood sugar levels will lead to further problems, including possible damage to the eyes and kidneys. Finger sticks allow the best way to monitor the blood sugar levels, but Claimant refused to do finger sticks because of his aversion to needles. Dr. Creany testified that it is very difficult to treat diabetes without tests. Treatment of diabetes without test results of blood sugar levels can lead to hypoglycemia, which can be worse. Dr. Creany further stated that he was reluctant to provide medications, including insulin, without test results. Dr. Creany testified that diet is an important part of a diabetic's life. Candy bars would not be appropriate for consumption by a diabetic. On redirect examination, Dr. Creany testified that he was unaware of inhaled insulin treatment. He also indicated that treatment through use of insulin is difficult if a person does not take finger sticks or allow needles to be used for injections.

Ray Hamlin was called as Claimant's second witness. He is an inmate at FLCF. His job at the facility is to be the full-time pusher for Claimant. Mr. Hamlin testified that he has observed vindictiveness against Claimant. He recalled one time when staff held Claimant down in order to take a finger stick. He had turned in medical kites for Claimant, and some had not been answered. He recalled further when Claimant was directed not to submit kites except for an emergency.

Claimant testified that he came into DOC custody in 2001. He went first to the Denver Regional Diagnostic Center (DRDC) for evaluation. He was placed into the Colorado Territorial Correctional Facility (CTCF). He returned to DRDC for a period of time and then was placed at the San Carlos Correctional Facility (SCCF) in Pueblo, Colorado. He was at SCCF for about eight months before being transferred to the FCF. After about one year, Claimant was transferred to FLCF. At the time of the hearing, Claimant had been at FLCF for almost one year.

Claimant testified that he had been sent forms for determination of his disability on two occasions. He explained that he has been dealing with the problem of neuropathy for some period of time. He has had significant falls during the time he has been in DOC custody. There were no showers with handrails at FCF. He was worried about his safety because of the lack of these bars. The fear of falling still is present.

Claimant testified that he is terrified by needles. He was sent to SCCF for treatment concerning his anxiety over needles, but that was not successful. He also testified that he believed that he had suffered a partial stroke while in DOC custody. He suffered a seizure which has heightened his health concerns. A tooth was knocked out when he fell as the result of the seizure. Claimant explained that he has no gall bladder, pancreas or part of his stomach. He must take his time when eating, but that runs counter to DOC's timetable for feeding prisoners. It takes him longer to get his medicine from the medical line because of being wheelchair bound. Sometimes he simply would not be called for his medicine. When he had his tooth broken as the result of the fall from the seizure, he was unable to get repair of the teeth without having a shot for pain. After several falls, he was advised to remain in his wheelchair full time. He also was knocked out of his wheelchair on occasion at FCF.

Claimant testified further that he is cold as the result of his neuropathy. He has been housed in air conditioned cells or pods, which has been difficult for him because he is physically cold all the time. Claimant explained that he is on a significant number of medicines. He has knee problems and believes that medical treatment that has been provided to him has not been appropriate.

Claimant acknowledged that he had refused medical treatment if it involved needles. He had requested a walker after a number of falls, but was not granted one for some period of time. He was provided a diabetic diet for awhile, but that was withdrawn.

In response to questions from the Special Master, Claimant stated that he had trouble with doors while at FCF. This would occur because he was in a wheelchair. Doors were difficult to open, and the mechanical doors sometimes would close too quickly. Claimant indicated that most of his problems occurred while at FCF, including the fall that led to his broken tooth. He also has problems getting his medicine because he is in a wheelchair.

Claimant also called as a witness Charley Campbell. Mr. Campbell was an inmate at FCF during the time that Claimant was there. He testified that he was in the same pod as Claimant and was aware of the problems that existed with the doors. The mechanical doors would close too quickly on someone in a wheelchair. Mr. Campbell testified that all inmates in wheelchairs who were at FCF have been transferred to other facilities. Prior to transfer of all inmates in wheelchairs, the FCF administration had terminated the work of pushers for disabled inmates. He was aware of one period of time when Claimant stayed in his cell for more than ten days. He finally indicated that inmates with disabilities are often preyed upon by other inmates.

Defendants did not call any witnesses to testify. Several exhibits were offered and admitted.

Those exhibits reflect that Claimant does have a fear of needles and has refused medical treatment and will not allow finger sticks to be used to check his blood sugar levels. He was on a diabetic diet from a period of time, but that stopped after Claimant refused it and wanted additional food choices. There is little question that Claimant has fallen on several occasions.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, each claimed impairment or disability must be examined.

**Vision Impairment:** The Special Masters are bound by the categories and definitions set forth in the Settlement Agreement in the same way that they are bound by a statute. The Settlement Agreement provides that a vision impairment means "[i]nmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses." This definition is very narrow and includes only claimants suffering extreme eyesight problems.

Claimant's own testimony indicates that he does not fall under this definition. He has vision problems, but those problems are not covered by the definition in the Settlement Agreement. The very narrow definition means that a person must be legally blind to fall into the category. Claimant does not fall into the category of vision impairment as defined by the Settlement Agreement.

**Mobility Impairment:** The Settlement Agreement provides that individuals are mobility impaired if they "use wheelchairs full or part time due to a permanent disability." Claimant was using a wheelchair part-time and had lower extremity problems on that date. Claimant was a member of the class on August 27, 2003.

**Hearing Impairment:** The definition in the Settlement Agreement for hearing impairment is as follows:

> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

To be blunt, a claimant can only meet this definition if he is totally deaf.

Claimant's own testimony indicates that he is able to hear. Claimant does not meet the definition of being disabled due to a hearing impairment, as he is able to communicate and is able to hear emergency warnings.

6

**Diabetes:** Defendants concede that Claimant was diabetic on August 27, 2003. He thus is part of the class based upon his diabetes.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides and as related to the date of August 27, 2003, the answer to this question is yes. Other than health issues on that date, there does not appear to have been any disqualification from programs, benefits, or services.

**3. Was the Claimant discriminated against by DOC because of his or her disability?**
With one exception, the answer to this question is no. Generally, there was no evidence that would lead to the conclusion that Claimant had been the victim of discrimination prohibited by the ADA or Rehabilitation Act. Claimant is upset about the medical care that he has received while incarcerated in DOC. It is clear that Claimant received medical treatment. Some of the care Claimant believed was inappropriate. Claimant has requested that no treatment be provided to him that involves needles. As noted by Dr. Creany, this has seriously limited the ability to provide medical care to Claimant for his diabetes. The Special Master can appreciate the concern involving needles and finger sticks, but Claimant provided no evidence that alternatives to shot by insulin and finger sticks were readily available or as effective. Claimant has been allowed to refuse insulin by shot or monitoring by finger sticks. The problem is that Claimant cannot argue that he has been subjected to any discriminatory conduct as the result of the inability or unwillingness of DOC medical personnel to provide alternative treatment that would not involve use of needles.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the case provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

Claimant has provided credible testimony that leads to the conclusion that he, as well as others, did not receive appropriate services while at FCF. Specifically, Claimant was required to bathe in showers that had no hand rails. Claimant correctly notes that his history of falls extends back in time, and he was disabled to the point of needing safety features while taking a shower at FCF. In addition, the situation for an inmate in a wheelchair at FCF was precarious because of the doors. As noted by Charley Campbell, all inmates in wheelchairs have left FCF. Claimant has established that the lack of shower rails and the operation of the doors led to non-nominal emotional injuries

while at FCF.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**
Claimant has failed to establish his claim except to the extent noted in the previous section. Claimant has established that he suffered non-nominal emotional injuries and should be compensated in the amount of $200.00.

Claimant's claims concerning inappropriate medical care cannot be resolved in this claim. Claimant retains the right to pursue a separate action under the Eighth Amendment or under state law if he believes that he was victim of medical negligence.

IT IS HEREBY ORDERED that the claim of James Smith is granted to the extent set forth in this order, and he is awarded $200.00 in damages; and

IT IS FURTHER ORDERED that the claim of James Smith is denied in all other respects; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before December 19, 2005.**

SIGNED this _11th_ day of October, 2005.

BY THE COURT:

Richard M. Borchers
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this 1-14 day of October, 2005 to the following:

Mr. James Smith
#112593
FLCF
P.O. Box 1000
Fort Lyon, CO 81038-1000

Mr. James X. Quinn
Mr. Jess A. Dance
Mr. Adam Wiens
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

*/s/ Margie Dykstra*