IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

Plaintiffs,

-vs.-

BILL OWENS, et al.

Defendants.

---

Claim Number 03-140
Category III
Claimant: Shawn M. Winkler, #48319
Address of Claimant: LCF, 49030 State Highway 71, Limon, CO 80826

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on September 2, 2005. This hearing was held at the Limon Correctional Facility (LCF) in Limon, Colorado. Present were the following: Shawn M. Winkler (Claimant); and Jess Dance, attorney for Defendants.

Testimony was received from the following witnesses: Claimant; Dr. Orville Neufeld, D.O.; Cathie Holst; and Lisa Adelman. All documentation previously submitted by both sides was accepted. Claimant did not formally offer into evidence any exhibits. Defendants offered into evidence Exhibits A through G, and all were admitted. After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>    A. COVERED DISABILITIES
>    The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
>    B. QUALIFIED INMATE

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

3

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. Based upon the testimony from the witnesses, plus a review of exhibits and submitted documents, the Special Master finds the following to be the facts necessary for resolution of the claim.

Claimant first came into the custody of DOC in 1983. At some point he was released. It is unclear whether this release was the result of parole being granted or the discharge of a prior sentence. He returned to DOC custody in March, 1994 and has remained incarcerated from that point forward. Claimant has been placed at a variety of facilities, including being transported to a private correctional facility in Minnesota in the mid-1990's.

In 1999, Claimant was incarcerated at the Buena Vista Correctional Facility (BVCF) in Buena Vista, Colorado. On August 13, 1999, Claimant was directed to work on a dishwasher at the facility. Claimant maintains that he was subjected to a significant electrical shock while repairing the dishwasher. He maintains further that this shock sent him across the room resulting in a broken back and other injuries.

The evidence substantiates that something happened on August 13, 1999. Claimant was taken to medical on that date and was dazed. He was given medicine to relax his muscles. The medical records do not mention anything about an electrical shock until 2001. However, the testimony of Claimant is accepted as to something significant occurring on August 13, 1999.

Claimant had x-rays taken on September 14, 1999. The report from the radiologist indicated that Claimant had suffered a L-1 compression fracture. *See, Medical Record of 9/14/99*. That fracture ultimately healed on its own.

As the result of the incident on August 13, 1999, Claimant believed that he lost hearing in both ears, had vision problems, and had mobility problems. He was provided a hearing aid for one ear, but not the other. He eventually was placed into a wheelchair. He remained in the wheelchair until recently, as DOC medical staff now believe that Claimant can and should walk, rather then use the wheelchair.

From late 1999 to the present, Claimant has sought medical care on a continuing basis. He has complained of vertigo ever since the 1999 incident. He has suffered more than just dizziness. He described his situation as receiving a complete lack of medical care. The file reflects numerous grievances that have been filed seeking medical care. The evidence presented indicated that Claimant did receive a neurological consultation and MRI, but these were negative.

On cross-examination, Claimant testified that he had received an electrical shock at BVCF

4

in 1999. He stated that Dr. Singh at the Sterling Correctional Facility eventually got a report concerning severe electrical shocks. Dr. Singh approved the use of a wheelchair by Claimant. Claimant requested a disability screening which did take place this year. As a result of that screening, DOC removed Claimant's wheelchair. Claimant also had used a walker at times, and that was taken from him.

Claimant testified further on cross-examination that he has had one hearing aid since 2000. He had a vision check and has some problems seeing. He maintained that he did not walk one hundred yards or more since 2002 without stopping, including at the disability screening.

Claimant is in an unassigned status at the present time. He remains in his cell most of the time. He is presently on permanent lay-in status. As a result, he cannot go to the yard. He admitted that as a result of several disciplinary convictions he is not qualified for some programs.

On redirect testimony, Claimant stated that he did not understand fully the totality of his medical problems. He knew that he had not received appropriate care.

Defendants called Lisa Adelman as a witness. She is the case manager for Claimant, but had only met him one time prior to the hearing. She indicated that she had made several job and program referrals to Claimant. He had refused to follow up on them. She stated further that Claimant refused to go to a job interview.

Dr. Orville Neufeld, D.O. is a former DOC physician who is now a consultant. He had reviewed all of Claimant's medical records. Dr. Neufeld did not believe that Claimant met any of the definitions for disabilities under the Settlement Agreement. Dr. Neufeld acknowledged that there was some hearing loss in both ears, but Claimant was able to function with the one hearing aid.

In reviewing the medical notes of August, 1999, Dr. Neufeld stated that Claimant appeared to be confused on two occasions. The first mention of an electrical shock in the medical records appeared on January 12, 2001. Dr. Neufeld indicated that Claimant has received an MRI since 1999, as well as significant medical treatment. The records reflected that one neurologist who had seen Claimant since 1999 described him as having an "atypical neurological condition."

Dr. Neufeld noted that Claimant had a number of restrictions, including first tier and no heavy lifting. He believed that Claimant did not need a wheelchair and would benefit from walking. The medical records reflected that medications sometimes were not taken by Claimant. In some instances, he would "cheek" the medicine. Some of Claimant's disciplinary convictions are the result of not taking his medicine and hoarding the pills. Claimant was hospitalized in 2002 with a drug overdose and hypertension.

Ms. Cathie Holst testified Claimant had been screened for disabilities this year but did not have a cognizable disability. She further determined that based upon the evaluation that he was not in need of accommodations. Ms. Holst admitted that Dr. Singh initially had found a disability, but

re-evaluated Claimant after talking to her and admitting that incorrect definitions were used.

## III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, each claimed impairment or disability must be examined.

**Vision Impairment:** The Special Masters are bound by the categories and definitions set forth in the Settlement Agreement in the same way that they are bound by a statute. The Settlement Agreement provides that a vision impairment means "[i]nmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses." This definition is very narrow and includes only claimants suffering extreme eyesight problems.

Claimant's own testimony indicates that he does not fall under this definition. He has vision problems, but those problems are not covered by the definition in the Settlement Agreement. Claimant does not fall into the category of vision impairment as defined by the Settlement Agreement.

**Hearing Impairment:** The definition in the Settlement Agreement for hearing impairment is as follows:

> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

To be blunt, a claimant can only meet this definition if he is totally deaf.

Claimant's own testimony indicates that he has hearing loss in both ears. He has a hearing aid and is able to hear. Claimant does not meet the definition of being disabled due to a hearing impairment, as he is able to communicate and is able to hear emergency warnings.

**Mobility Impairment:** A great deal of time was spent by both sides dealing with events that post-date August 27, 2003. It is that date that is crucial for determining whether a claimant has a disability as defined by the Settlement Agreement.

The Settlement Agreement provides that individuals are mobility impaired if they "use wheelchairs full or part time due to a permanent disability." On August 27, 2003, Claimant was using a wheelchair. This had been authorized by medical personnel at SCF. Claimant met the

6

definition of mobility impairment on that date and is part of the class.[2]

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides and as related to the date of August 27, 2003, the answer to this question is yes. Other than health issues on that date, there does not appear to have been a total disqualification from programs, benefits, or services for other reasons. He had been disqualified from some programs because of disciplinary problems.

**3. Was the Claimant discriminated against by CDOC because of his or her disability?**
The answer to this question is no. Generally, there was no evidence that would lead to the conclusion that Claimant had been the victim of discrimination prohibited by the ADA or Rehabilitation Act. Claimant is upset about the medical care that he has received while incarcerated in DOC. His concern about that medical care is legitimate. Contrary to the assertion made by Claimant that there had been an absolute lack of care, it is clear that Claimant has received medical treatment while in DOC custody.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the case provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

Claimant's case is the type discussed in *Fitzgerald*. Claimant has had medical care since August, 1999. Some may question his claimed ailments and medical problems, but the Special Master finds that something did occur on August 13, 1999. The type and quality of medical care cannot be determined by the Special Master nor should it. Pursuant to the Settlement Agreement and the order of November 23, 2004, only the ADA and Rehabilitation Act can be utilized for adjudication of claims. Claimant has described an Eighth Amendment claim which is beyond the jurisdiction of the Special Masters. Claimant retains the right to bring a separate action if he believes his medical care has been substandard under the Eighth Amendment or under state law.

---

[2] Dr. Singh's finding of a disability in 2005 and then changing his mind later is not relevant as to whether Claimant had a mobility disability on August 27, 2003.

7

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answers to Questions #1 and #3 are in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Shawn M. Winkler is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before December 5, 2005.**

SIGNED this 4th day of October, 2005.

BY THE COURT:

Richard M. Borchers
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this _4th_ day of October, 2005 to the following:

Mr. Shawn M. Winkler
#48319
LCF
49030 State Highway 71
Limon, CO 80826

Mr. James X. Quinn
Mr. Jess A. Dance
Mr. Adam Wiens
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

_____
Margie Dykstra