IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 01-092
Category I
Claimant: James Rudnick, #68432
Address of Claimant: LCF, 49030 State Highway 71, Limon, CO 80826

---

### FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Claimant. The Special Master has reviewed the claim and all documents filed by both sides. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The *Remedial Plan* was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the *Remedial Plan* (also referred to as Settlement Agreement). The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of the Settlement Agreement, as they have only the jurisdiction agreed upon by the parties. Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the Class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the *Remedial Plan* (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class. The Settlement Agreement did not provide for an opt out provision for any individual but set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> *III. DEFINITIONS*
> *A. COVERED DISABILITIES*
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> *B. QUALIFIED INMATE*
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> *C. PERMANENT DISABILITY/IMPAIRMENT*
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A, pp.4-5.*

2

> *1. Permanent Mobility Impairments*
> a) Permanent Wheelchair: Inmates who use wheelchairs full or part time due to a permanent disability.
> b) Permanent Mobility Impairment: (non-wheelchair): Inmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking: *e.g.,* an inmate who cannot walk 100 yards on a level surface or climb a flight of stairs without a pause. Such impairment may require use of a cane, prosthesis, walker or other assistive devices.
> *2. Permanent Hearing Impairments*
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> *3. Permanent Vision Impairment*
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> *4. Permanent Diabetics: Insulin or Non-Insulin Dependent Diabetics*
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A, pp.4-5* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

In January, 2005, the Special Master issued an order which stated in part that Mr. Rudnick's

3

claim had been assigned to Category I. Upon re-examination of the initial and supplemental claim forms and supporting documents, the Special Master has determined that the claim should have been assigned to Category II. However, the Settlement Agreement provides that Claimants will not receive a hearing on any claims assigned to either Category I or Category II. Therefore, Mr. Rudnick's claim will be resolved based upon the written documents submitted by each side.

The Special Master has reviewed the claim, supplemental forms, and other documents submitted by Claimant.[1] The Special Master has reviewed the response of Defendants and Claimant's "Reply in Opposition" to Defendants' response. The Special Master finds the following to be the facts necessary for resolution of the claim.

Claimant filed his initial claim in July, 2004 and supplemental claim form for mobility and vision impairments in September, 2004. Mr. Rudnick has been incarcerated in CDOC since April, 1992. He states that he has worn contacts and glasses since 1978. From the exhibits submitted by Claimant, it appears that his disagreement regarding DOC's medical treatment of his vision problems began in 2000 when the rules and regulations at DOC changed to preclude DOC from having to provide contact lenses, except for specific eye conditions. As determined by DOC, Mr. Rudnick does not have an ocular disease that requires contacts for treatment. Sometime in 2001, Mr. Rudnick received glasses. He claims these glasses are "one size fits all," but they do not adequately address his particular vision needs.[2]

Mr. Rudnick was involved in a motorcycle accident in 1984. The exhibits submitted by Claimant on 1/31/05 document his lower extremity mobility issues since at least 2000. Claimant is 6'4" or 6'5" and weighs 270 pounds. He claims that he has chronic hip and back pain, arthritis in his feet and painful bunions which limit his ability to work at certain jobs and to participate in recreational activities. Mr. Rudnick has requested properly fitting boots with orthotics, a medical mattress and heating pad for his back and hip pain, and a chair and stool that will allow him to sit with the proper support for his height and weight.

Defendants response to the claim is to state that Mr. Rudnick has no vision or mobility

---

[1] The following documents submitted by the Claimant are in the file and have been reviewed by the Special Master: 5/26/04 letter regarding CDOC "Retaliation Actions Result of Montez Plan"; 6/24/04 "Initial Claim for Damages"; 9/5/04 Supplemental forms for mobility and vision impairments with five pages of supporting documentation; 9/8/04 "Motion to Raise or Adjust Claim Category Level"; 10/21/04 letter to Special Master; 3/29/05 "Supplemental Information to Claim #01-092"; 5/17/05 "Response Against Defendants Motion for Enlargement of Time"; 5/26/05 "Notice to the Court and/or Motion for Judicial Intervention"; 1/31/05 "Exhibits Attachment for Claim 01-092; and 9/9/05 "Claimants Reply in Opposition".

[2] Limon Correctional Facility does not allow inmates to purchase prescription eye glasses from outside vendors. *(Claimant's Exhibit, "Vision Impairment, Part A, p.74, 3/9/01 letter from Christopher Petrozzi, Clinical Team Leader).*

4

impairment that would constitute a disability under the Settlement Agreement. Defendants further state that even if Claimant is disabled he has not demonstrated that he was denied "access to a program, benefit or service for which he was otherwise qualified." *(Defendants' Response, p. 4)*.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

*I. Vision Impairment:*

**1. Is the Claimant a disabled individual who is a member of the class?** The answer to this question is no. Claimant does not have a "vision impairment" as defined in the Settlement Agreement that would qualify him as disabled under the Settlement Agreement.

The Special Masters are bound by the Settlement Agreement in the same way that they are bound by a statute. The Settlement Agreement provides that a vision impairment means "[i]nmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses." As the Special Master understands the test for central vision acuity, a reading of 20/200 means that the person being tested can see at 20 feet what a person with excellent vision can see at 200 feet. Under the Settlement Agreement, a Claimant, even with the use of corrective lenses, does not have to have central vision acuity that is better than 20/200. Claimant does not fall into the very narrow category of vision impairment as defined by the Settlement Agreement.

The Special Master would note that even if Mr. Rudnick qualified as disabled because of a vision impairment under the Settlement Agreement, the United States Court of Appeals for the Tenth Circuit ruled on April 11, 2005, that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act.

All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

**2. Was the Claimant otherwise qualified to participate in programs or receive the benefits or services offered by DOC?** The answer to this question is yes. The Special Master has

5

reviewed the documents filed by both sides. Claimant does not appear to have been disqualified from programs, benefits or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Since Claimant does not meet the definition of disabled with a " vision impairment", this question need not be answered.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** This question need not be reached in light of the answer to Questions #1 and #3.

## *II. Mobility Impairment:*

**1. Is the Claimant a disabled individual who is a member of the class?** The answer to this question is yes. The Settlement Agreement provides that an individual is mobility impaired even if not confined to a wheelchair if the person has a permanent lower extremity impairment that substantially limits walking and the person's ability to perform a major life activity. Both Claimant and Defendants submitted documentation that would substantiate that Claimant has had ongoing medical problems related to his back, hips and feet. Claimant's documentation for his mobility disability, which is extensive, precedes August 27, 2003, the date the class was certified.

Defendants argue that Claimant does not have a lower extremity impairment because he is "completely capable of ambulating 100 yards despite complaints of back, hip and foot pain." *(Defendants' Response, p. 3; See, Defendants' Exhibit B).* Defendants' Exhibit B is entitled "Accommodation Resolution." The document was signed by A. Bloor, M.D., on February 8, 2005 and by Cathie Holst, the ADA Inmate Coordinator on February 22, 2005. Defendants' Exhibit B states that Mr. Rudnick has no qualifying disability as determined by Dr. Bloor and therefore he is not entitled to any accommodation. "This offender was screened by the physician and is not disabled in any way. His vision is well within normal in spite of his claim of poorly made eyeglasses and he is completely capable of ambulating 100 yards in (sic) despite complaints of back, hip and foot pain."

Some of the statements contained in Defendants' Exhibit B denying an accommodation are directly contradicted by Defendants Exhibit J. On January 11, 2005, Dr. Bloor "verified" that Claimant had a mobility disability. *(See, Defendants' Exhibit J, p.1).*[3] In the mobility screening evaluation performed on the same day Dr. Bloor answers "Yes" to question #5 - "Does the patient require the use of other assistive devices (cane, walker, crutches, special clothing, footwear or prosthetics, etc.)? If so, what?" Dr. Bloor reiterates Claimant's request for a medical mattress and

---

[3] In the same document, Dr. Bloor verified that Claimant also has a "vision" disability. However, the vision screening evaluation that she completed the same day contradicts this conclusion. Despite this inconsistency, the Special Master is required to follow the clear language of the Settlement Agreement which precludes Claimant from qualifying for a disability based on a vision impairment.

6

heating pad, a chair and stool to accommodate Claimant's height and weight and to provide proper support for his back, as well as wider boots with orthotics that accommodate the length, width and condition of his feet. Claimant's mobility impairment and his request for accommodations have remained essentially unchanged since at least the year 2000. To date, Defendants have provided no assistive devices despite indicating the need for them.

Defendants assert that Mr. Rudnick can walk 100 yards on a level surface or climb a flight of stairs without pause. Defendants' argument is that, if Claimant can pass this "test," he does not have a mobility impairment. To fit the definition of a lower extremity permanent impairment, three criteria must be met: 1) Claimant's ability to walk has to be substantially limited by his lower extremity impairment; 2) the lower extremity impairment has to substantially limit Claimant's ability to perform a major life activity; and 3) the lower extremity impairment is not expected to improve within six months. The Special Master specifically finds that the reference to a Claimant's ability or inability to walk a 100 yards is an example of one measurement that might be used to determine if a Claimant's ability to walk has been substantially limited. The Settlement Agreement does not specify that it is an exclusive measurement. The Special Master finds that Claimant's ability to walk has been substantially limited by his mobility impairment.

Defendants are in error when they state that Claimant "does not make any assertion that he is substantially limited in his ability to perform major life activities." *(Defendants' Response, p.4)*. Claimant asserts that his disability prevents him from "sitting, sleeping, or standing in one position for periods of over 30 minutes or suffer great pain and difficulty moving and straightening out." Claimant asserts that his mobility impairment makes it difficult for him to move quickly in response to orders from DOC staff. Claimant asserts that his mobility impairment limits his ability to participate in recreational activities. *(See, Claimant's Initial and Supplemental Claim Forms for Damages)*. The Special Master finds that Claimant's mobility impairment significantly restricts his ability to perform the above enumerated major life activities.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** The answer to this question is yes. The Claimant does not have any disciplinary convictions or other documented reasons that would disqualify him from participating in the programs or receiving the benefit or services offered by DOC.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The answer to this question is yes.

The Special Master has already found that Mr. Rudnick has a permanent lower extremity mobility impairment that substantially limits his ability to walk and perform other major life activities. Defendants argue that Claimant was not discriminated against or denied accommodations because of his disability, but for other legitimate reasons. *(Defendants' Response, p.5)*. Over the last five years, Defendants have agreed on different occasions that Claimant needs an adjustable stool and chair for his back and hip pain. For five years, Claimant has requested boots that fit by taking into account his height, weight and the medical condition of his feet. Claimant has requested

7

orthotics that will prevent his feet from bleeding and blistering when he stands and walks. For five years, Claimant has requested a medical mattress and heating pad to help lessen the pain in his hips and back so that he can sleep better at night and function better during the day. Defendants state that Claimant has been denied all of these accommodations because they "are in fact requests for medical treatment which the AIC cannot authorize." *(Defendants' Exhibit B).* [4]

The Special Master finds that Claimant has been discriminated against and denied accommodations because of his disability. One of the "services" offered by DOC are medical assistive devices. These devices have been repeatedly recommended by DOC staff to address Claimant's permanent lower extremity mobility impairment. Defendants argue that Claimant does not meet DOC criteria for a medical mattress and that the orthotics Claimant requests can be purchased from the canteen. Defendants provide little or no evidence to substantiate these assertions. On the other hand, Claimant has presented numerous documents that dispute Defendants' assertions and support his request and need for medical assistive devices to help him walk and function in prison.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** The answer to the first part of this question is yes. Defendants' conduct harmed the Claimant. The Special Master finds that the appropriate remedy is to provide Claimant with the medical assistive devices recommended by DOC to address Claimant's permanent lower mobility impairment.

IT IS HEREBY ORDERED that the claim of James Rudnick as to vision impairment is denied as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the District Court's Order of November 23, 2004; and

IT IS FURTHER ORDERED that the claim of James Rudnick is granted as to permanent lower extremity mobility impairment is granted and within the next thirty days DOC is to provide Mr. Rudnick with the following: a medical mattress; a heating pad; boots that fit his feet; custom made orthotics, not the orthotics or insoles that can be purchased in the canteen; and a chair and an adjustable stool that accommodates his height and weight and adequately supports his back and lower extremities; and

IT IS FURTHER ORDERED that all other aspects of the claim of James Rudnick are dismissed; and

IT IS FURTHER ORDERED that Defendants are to file an affidavit within thirty days affirming that the above enumerated medical devices have been provided to Mr. Rudnick; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection

---

[4] This argument is disingenuous at best. If carried to its logical conclusion, DOC could deny all requests for accommodations by characterizing them as requests for medical treatment.

must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before December 5, 2005.**

SIGNED this ___ day of September, 2005.

BY THE COURT:

Richard M. Borchers
Special Master

9

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this 27th day of September, 2005 to the following:

Mr. James Rudnick
#68432
LCF
49030 State Highway 71
Limon, CO 80826

Mr. James X. Quinn
Mr. Jess A. Dance
Mr. Adam Wiens
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

_____