IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92—870 (OES) (Consolidated for all purposes with Civil Action No. 96—343)

JESSE MONTEZ, et al.

     Plaintiffs,

-vs.-

BILL OWENS, et al.

     Defendants.

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

DEC 1 2 2005

GREGORY C. LANGHAM
CLERK

---

Claim Number 03-119
Category III
Claimant: Thomas Castro, #81977
Address of Claimant: CCF, P.O. Box 600, Canon City, CO 81215-0600

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on July 14, 2005. This hearing was held at the Colorado State Penitentiary(CSP) in Canon City, Colorado.[1] Present were the following: Thomas Castro (Claimant); and Stacy Worthington, attorney for Defendants.

Testimony was received from the following witnesses; Claimant; Sergeant Steve Dowd; and Virginia Barragree, R.N.. All documentation previously submitted by both sides was accepted. Claimant offered into evidence Exhibits 1 through 9, and all were admitted. Defendants offered into evidence Exhibits A through K, and all were admitted. Final closing arguments were made by Claimant and counsel for Defendants. Claimant requested time to submit additional documents in support of his claim. That request was granted, and additional materials were provided by Claimant. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the

---

[1] Claimant is incarcerated at the Centennial Correctional Facility in Canon City. That facility does not have a suitable room for a hearing. Claimant was transported to CSP in order to conduct a hearing in an appropriate room.

Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[2] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp. 28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

III. DEFINITIONS

---

[2]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they may exercise only the jurisdiction agreed upon by the parties.

A. COVERED DISABILITIES
The persons covered by this Plan are individuals with mobility,
hearing, and vision impairments and inmates with diabetes.
B. QUALIFIED INMATE
Inmate with a permanent disability/impairment which substantially
limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement.
*Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to
"[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who
do not require a wheelchair but who have a permanent lower extremity mobility impairment that
substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

2. Permanent Hearing Impairments
Inmates who are permanently deaf or who have a permanent hearing
impairment so severe that they must rely on written communication, lip reading, or
signing because their residual hearing, with aids, does not enable them either to
communicate effectively or hear an emergency warning.
3. Permanent Vision Impairment
Inmates who are permanently blind or who have a vision impairment not
correctable to central vision acuity of 20/200 or better, even with corrective lenses.
4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
Inmates who are diabetic and who are or are not dependent on insulin for
regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of
the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the
criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2. The Special Masters shall evaluate individual damage claims submitted in
this case by considering the following questions:
1. Is the claimant a disabled individual who is a member of the class?
2. Was the claimant otherwise qualified to participate in the programs
or receive the benefits or services offered by DOC?
3. Was the claimant discriminated against by DOC because of his or
her disability? (e.g., were accommodations requested and denied because of the
disability?)

3

4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. The Special Master will note the important parts of the testimony provided by the witnesses.

Claimant came into DOC custody in the fall of 1995. He was placed initially at the Denver Regional Diagnostic Center (DRDC) for evaluation. He then was transferred to the Limon Correctional Facility (LCF) in Limon, Colorado. After LCF, he was placed at the Colorado State Penitentiary (CSP) in Canon City, Colorado. He then was placed at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado for a brief period. He was transferred to Centennial Correctional Facility (CCF) on February 9, 2005.

Claimant testified that he is a diabetic. When he was transferred to CCF, he went for 6 ½ days without his medications and without a diabetic diet. He was dizzy and felt weak without his medications. Claimant indicated that he has been on multiple medications for some period of time. He was often ignored when he requested his medications, although other inmates received all of their required medications.

When Claimant arrived at CCF in February, 2005, the entire facility was on lock down. The lock down remained in force for five weeks. For 6 ½ days, Claimant was without his insulin. He was not provided a diabetic diet meal for thirteen days.

Claimant also described his back problem extending back several years. He had sought treatment for what appeared to be herniated disks. Claimant filed kites to obtain medical care. Claimant received an appointment with a different doctor. An MRI showed two ruptured disks in his back at L3-L4. He was to be transported to Pueblo to see a specialist, but the trip was canceled. Claimant believed that he should receive surgery for his back. There were other trips to see specialists that were futile, as medical records or MRI's were not sent along with him. Claimant believed that surgery had been scheduled for him but was cancelled. No one has told him why his surgery did not proceed to fix his back.

Claimant testified that he has pain that shoots down his left leg. There is numbness also present. He has spasms in his back, but no treatment has been provided by DOC to relieve the spasms and pain. He testified that he did not trust DOC doctors and does not believe that they are looking out for his health. Claimant testified that on one occasion he was advised that he was going to be taken to the state hospital to see a doctor and have surgery on his back, but was required to wear a stun belt for travel. This was a security requirement because of Claimant's custody status.

4

Claimant testified that he refused to wear the apparatus and the trip was cancelled.

In addition to the disk problem, Claimant suffered a tear in his left shoulder. This occurred in 2005 at CCF when Claimant was taking a shower and the water abruptly turned boiling hot. Claimant stepped back from the shower and then fell. He hit his head and back.  This led to the  tear in the left shoulder.

As to his diabetes, Claimant testified that he was diagnosed as diabetic in 2000. When he was transferred to CSP, Dr. Wermers who is the physician assigned to the facility denied Claimant a diabetic diet for one year. Later, Dr. Wermers agreed that Claimant was diabetic and restored the diabetic diet. As a result of the diabetes, Claimant's vision became blurry at times. Claimant testified that he needed a special boot because of problems with his feet that are related to his illness. Claimant wanted boots to protect his feet. He agreed to pay for the boots. Claimant testified that earlier in his sentence to DOC he was granted the right to have privately secured boots, but they were taken from him when he arrived at CSP.

Claimant also testified that he has a foot disease. The condition causes the nails on his toes to fall off. Claimant testified that nothing has been done to help with this health issue. He has been told to use alcohol pads, but that has not worked.

For his vision, Claimant was using his own prescription glasses. He was directed to send those to a relative. He has been advised that he needs bifocals but has not received them. In addition, he has had blood pressure problems. He used to be monitored for his blood pressure on a weekly basis, but that stopped when he was transferred to CSP.

Claimant stated that he has received medical care that was not correct and not in keeping with his medical issues. He has been limited in what he can do, such as climbing the big hill in the yard at CCF.

On cross-examination, Claimant testified that he injured his back while taking a shower. The water turned boiling hot and he fell while stepping back. He testified further that he had changed religions in order to obtain a kosher diet. He had not been able to obtain a diabetic diet prior to CCF and wanted to eat food that was healthier than the regular diet. He has been receiving the diabetic diet since his transfer to CCF.

On redirect examination, Claimant verified that he had used the grievance system repeatedly to seek rectification of wrongs. He testified as to his being treated inappropriately by a sergeant who picks on him.

Sergeant Steve Dodd testified that he has worked for DOC at CCF for four years. He is responsible for repair and oversight of the physical facility at CCF. He testified that CCF does have trouble with its showers, but that he is able to fix the problems most of the time. The hot water is supposed to be restricted in temperature. There have been problems with the water being too hot.

5

Sergeant Dodd testified that there are no handicapped handrails in the showers nor are there any handicapped cells at CCF.

Sergeant Dodd described the conditions at CCF as not good. The facility is old and in need of repairs. There are holes in windows and leaks along the edges of windows. Dust and dirt, as well as bugs, are facts of life. Inmates use toilet paper to try to plug the holes. Plastic sheets are provided to inmates in the winter to cover the windows in cells to keep out the snow. Sergeant Dodd was familiar with the cell in which Claimant lives and knew that it needed caulking in the floor. There was a major infestation of bugs in Claimant's cell.

On cross-examination, Sergeant Dodd testified that CCF has forty-eight inmates per pod, and a total of seven pods. Each pod has a top and bottom tier. The water for showers goes into mixer valves and each value is checked monthly. Sometimes the water is above 120 degrees. It does take five to six minutes for the water to warm up.

Claimant also called as a witness Ms. Virginia Barragree, R.N. She was assigned to provide medications to inmates during the lock down period at CCF. She denied ever refusing to provide medication to Claimant during this period of time. She provided medications according to protocol and based upon physician's orders. She remembered the lock down and remembered going from cell to cell. Insulin was provided to inmates who were diabetic. When a lock down occurs, she testified it is normally twenty-four hours before medications are provided to inmates, except for essential emergency medications.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** On his claim form, Claimant checked two categories: mobility disability and diabetes. Each will be discussed separately.

The Settlement Agreement requires that a claimant have a stated disability on or before August 27, 2003. The Settlement Agreement further provides that there must have been an act of discrimination prohibited by the ADA and Rehabilitation Act on or before this date.

**Mobility Disability:** The Settlement Agreement narrowly defines mobility disability. This category is limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The testimony given by Claimant reflects that he is able to walk, though with pain. His major concern is his back, as he has been having significant problems over the years. The very narrow definition in the Settlement Agreement limits mobility disability to those in wheelchairs and those

who have a lower mobility disability that substantially limits walking. The Special Masters had nothing to do with the negotiation of the Settlement Agreement, but the Special Masters absolutely are bound by it. Claimant's own testimony establishes that he does not meet the criteria for mobility disability.

**Diabetes:** There is a factual dispute as to when Claimant was diagnosed as being diabetic. From all of the evidence, the Special Master determines that Claimant was diagnosed as diabetic in 2000. Therefore, he is part of the class.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** No evidence has been presented that indicated that Claimant was disqualified from programs or services for reasons unrelated to his health. There was no evidence of disciplinary convictions that prevented him from participating in any program.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** There was no evidence that would lead to the conclusion that Claimant had been the victim of discrimination prohibited by the ADA or Rehabilitation Act on or before August 27, 2003. Claimant's main concern is the quality of medical care that he has received over the years since he came into DOC custody.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters. Claimant may pursue separately any rights that he may have concerning the quality of his medical care in a new case.

In order to prevail under the ADA and Rehabilitation Act, a claimant must show that he received treatment that was different because of his disability. An example would be a disabled individual being told that he would never be considered for a position of employment, even though otherwise qualified. In this case, Claimant has received medical care throughout his time in CDOC. He has some concerns about that care. In one instance, he refused to be transported for surgery because of his fear of the stun belt. It is unclear how Claimant would feel today if he had gone on the trip for the surgery.

The evidence presented by Claimant indicated that he went without insulin for six days at CCF due to the lock down. This would appear to be a violation of the ADA and Rehabilitation Act. This period of time postdates August 27, 2003. Claimant has not established that he was the victim

7

of discrimination for his diabetes prior to this date. The Settlement Agreement provides that an act of discrimination after August 27, 2003 can be added to a claim, but only if the claim could be established on its own for something prior to that date. Claimant cannot do that. Claimant does have the right to bring a separate action concerning incidents that postdate August 27, 2003.

   **4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

   IT IS HEREBY ORDERED that the claim of Thomas Castro is denied, as he had failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

   IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before January 9, 2006.**

   SIGNED this _5th_ day of _December,_ 2005.

                              BY THE COURT:

                              _____
                              Richard M. Borchers
                              Special Master

8

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this _5th_ day of December, 2005 to the following:

Mr. Thomas Castro
#81977
CCF
P.O. Box 600
Canon City, CO  81215-0600

Mr. James X. Quinn
Mr. Jess A. Dance
Mr. Adam Wiens
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO  80203