IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

F I L E D
UNITED STATES DISTRICT COURT
DENVER, COLORADO

DEC 1 2 2005

GREGORY C. LANGHAM
CLERK

---

Claim Number: 03-054
Category III
Claimant: William Shaffstall, #58868
Address of Claimant: 6579 Kit Carson St., Centennial, CO 80121

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on November 14, 2005. Present were the following: William Shaffstall, Claimant; Jess Dance and Aaron Atkinson from the Office of the Attorney General, for Defendants.

Testimony was received from the following witnesses: Claimant; Lu Parades, for the Claimant; Orville G. Neufeld, Ph.D., D.O., for the Defendants. The following Exhibits were offered into evidence by Defendants and admitted:

| | | |
|---|---|---|
| Exhibit A: | 3 pages | Offender Profile for William A. Shaffstall, dated 10/26/2005. |
| Exhibit B: | 1 page | Colorado Department of Corrections Offender Grievance Form, Step I filed by William Shaffstall on August 8, 2002. |
| Exhibit C: | 1 page | State of Colorado Department of Corrections Clinical Services Informal Resolution Attempt for William Shaffstall dated 7-16-02. |

At the conclusion of the hearing, the claim was taken under advisement. This Order shall constitute the final action by the Special Master on this specific claim.

1

## I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I.   General inconvenience or nominal damages;
> II.  Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV.  Damages due to severe physical injuries; and
> V.   Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following findings of fact:
2

1. Claimant submitted a claim which was assigned claim number 03-054 and the basis of his claim is a mobility impairment.

2. Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

3. Proper notice of the hearing was given and Claimant along with Defendants appeared.

4. The dates and locations of Claimant's CDOC custody are as follows:

| | |
|---|---|
| 1986-1987 | |
| Dec. 7, 1998 to March 26, 1999 | Fremont Correctional Facility |
| March 26, 1999 to Dec. 12, 1999 | Parole status |
| June 25, 2002 to July 3, 2002 | DRDC |
| July 3, 2002 to Sept. 19, 2002 | Buena Vista |
| Sept. 19, 2002 to Jan. 14, 2003 | Arrowhead |
| Jan 14, 2003 to April 14, 2003 | Mtn. Park Halfway House |
| April 14, 2003 to May 8, 2003 | Williams House |
| Sept. 15, 2003 to March 25, 2004 | Intensive supervised parole |
| March 25, 2004 to Sept. 28, 2004 | Sterling Correctional Facility |
| Sept. 28, 2004 to April 19, 2004 | Four Mile Correctional Center |
| August 3, 2005 | Paroled |

5. Claimant did not have a mobility disability when he arrived at Fremont Correctional Facility (FCF) in December of 1998. He asserts that when he arrived at FCF, he was given standard issue boots that did not fit properly and were of different sizes. Within the first few days, his feet began to hurt and he was examined by medical personnel. By December 12, 1998, when he received a properly fitted pair of boots, Claimant states that he could not walk, and both feet were tender and swollen. He could not use the recreation room or the yard because they were too far away. In January of 1999, he was provided with splints and heel cups. He was diagnosed with plantar fasciitis. At time he left FCF, he was able to walk with the assistance of arch supports and was able to negotiate stairs.

6. When he arrived at DRDC in June of 2002, he was given a first-tier/lower-bunk restriction by medical. Despite this restriction, while at DRDC he was assigned to the third floor which made it difficult for him to get to the television room. He did not request a cane or a wheelchair.

7. He was then transferred to the Buena Vista Correctional Complex (BVCC) where his first-tier/lower-bunk restriction was not honored and he was not provided with heel cups. The evidence shows, however, that BVCC did not have any housing on the first tier. By the end of July, 2002, Claimant could no longer walk 100 yards or negotiate a flight of stairs. Although Claimant received a cortisone shot, this provided only minor

3

and temporary relief. He finally was able to obtain arch supports toward the end of November, 2002 by having his mother purchase them and send them to the institution.

8.  While at Buena Vista, Claimant was given a job as a tier porter. Claimant worked for two different one-month periods wiping hand rails and washing windows. Claimant was able to get to the chow hall because it did not require him to negotiate any stairs. However, he had to go up and down the stairs to get to the recreation room and to the library. While at BVCC, Claimant's mobility problem was accommodated by allowing him to put in kites for library books that were then delivered to his cell.

### III. CONCLUSIONS OF LAW

1.  The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794, *et seq.;* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*

2.  The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the DOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

A disability or impairment is not "permanent," and, thus, not within the ambit of the ADA or the Rehabilitation Act unless it is expected to be of long-term duration.

*Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198 (2002). The Remedial Plan itself recognizes this limitation by defining "permanent disability/impairment" as "[a] condition which is not expected to improve within six months." *Remedial Plan* ¶III(C).

Claimant was prone to flair-ups of his plantar fasciitis that lasted for a few months at a time. While other treatments were tried, it appears that heel cups or arch supports provided relief from his symptoms. The evidence does not indicate that any flair-up of Claimant's plantar fasciitis lasted more than perhaps five months; and there is no indication that it was anticipated that the symptoms which affected his ambulation would last more than six months. Accordingly, the Special Master finds and concludes that Claimant was not an individual with a permanent disability cognizable under the ADA, the Rehabilitation Act or the Remedial Plan.

2. The next question which must be answered is whether Claimant was qualified to participate in the programs or to receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs or activities because of disciplinary reasons, health reasons or other valid penal justifications. *Miller v. King,* 384 F.3d 1248, 1266 (11th Cir. 2004). It appears to be undisputed that Claimant was otherwise qualified to participate in the GED class, utilize the yard, and receive visitors in the visitation area. On the other hand, based on the evidence presented, the Special Master finds and concludes that Claimant was disqualified by health reasons from going to camp and that this medical disqualification could not be overcome by reasonable accommodation.

3. Even assuming that Claimant is a qualified individual with a permanent mobility disability/impairment, he must also establish that he was discriminated against because of her disability or that the Defendants failed to accommodate his disability, thereby impeding his ability to take advantage of the programs, services, activities and/or facilities offered by the institution. Claimant's primary dispute with Defendants relates to his contention that the Defendants failed to provide proper medical treatment for his plantar fasciitis and that there were significant delays in supplying him with heel cups and arch supports. He also takes issue with the CDOC's decision that Claimant had to order and pay for his own arch supports. Claims of improper medical treatment do not fall within the ambit of the ADA or the Rehabilitation Act. *Fitzgerald v. Corrections Corp. of America,* 403 F.3d 1134 (10th Cir. 2005); *United States v. University Hospital,* 729 F.2d 144 (2nd Cir. 1984).

Furthermore, no claim for disability discrimination is established unless the delay in supplying heel cups and arch supports or the CDOC's decision requiring Claimant to pay for the same unreasonably denied Claimant the opportunity to take advantage of the benefits, services, programs, or facilities of the institutions in which he was housed. The evidence demonstrates that Claimant was provided accommodation so he could receive books from the library at BVCC. The evidence further indicates that while at BVCC, he was housed on the same floor as the chow hall and was able to get to and from the chow hall for his meals. While he was unable to negotiate the stairs from the tier where he was

housed at DRDC in order to utilize the television room, this situation only lasted for a few days.

Although Claimant complains that he was not provided with first tier housing at BVCC, he acknowledges that there is no housing on the first tier of this facility. He further acknowledges that regardless of what tier he was housed on at BVCC, there would be portions of the facility that would require him to negotiate stairs.

In summary, the Special Master finds and concludes that Claimant has failed to sustain his claim that he was discriminated against because of his alleged disability or that Defendants failed reasonably to accommodate his alleged disability.

## IV. ORDER

IT IS HEREBY ORDERED that based upon the foregoing Findings of Fact and Conclusions of Law, judgment should be entered in favor of the Defendants and against Claimant dismissing Claimant's *Montez* claim with prejudice;

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be file on or before **January 19, 2006** with the Clerk of the United States District Court at the following address:

> 901 19th Street
> Denver, CO 80294.

SIGNED this 6th day of December, 2005.

Bruce D. Pringle,
Special Master

6

## CERTIFICATE OF MAILING

      I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this 6th day of December, 2005 to the following:

Mr. William Shaffstall, #58868
6579 S. Kit Carson St.
Centennial, CO 80121

Mr. Jess A. Dance
Mr. J. Aaron Atkinson
Mr. James X. Quinn
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

_____
Margie Dykstra