IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92--870 (OES) (Consolidated for all purposes with Civil Action No. 96—343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

DEC 1 2 2005

GREGORY C. LANGHAM
CLERK

---

Claim Number 03-135
Category III
Claimant: Mark N. Johnson, #66287
Address of Claimant: HCCC, 304 Ray Sandoval Street, Walsenburg, CO 81089

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on October 21, 2005.  This hearing was held at the Huerfano County Correctional Center (HCCC) in Walsenburg, Colorado. Present were the following: Mark N. Johnson (Claimant); and Adam Wiens, attorney for Defendants.

Testimony was received from Claimant.  All documentation previously submitted by both sides was accepted. Claimant offered into evidence Exhibits 1 through 18, and all were admitted. Defendants offered into evidence Exhibits A through G, and all were admitted. After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794.* During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp. 28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they may exercise only the jurisdiction agreed upon by the parties.

2

Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

2. Permanent Hearing Impairments
Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
3. Permanent Vision Impairment
Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
1. Is the claimant a disabled individual who is a member of the class?
2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

3

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. Based upon the testimony from the witnesses, plus a review of exhibits and submitted documents, the Special Master finds the following to be the facts necessary for resolution of the claim.

Claimant originally came into the custody of DOC in October, 1991. He was taken to the Denver Regional Diagnostic Center (DRDC) in Denver, Colorado. Claimant told medical staff at DRDC that he had ear problems and difficulty in hearing. Claimant was told that he would have a hearing test and an appointment would be set with an ear specialist, but that never happened. He received no medical attention for his ear. He was released from DOC custody in late 1992.

Claimant returned to DOC custody in January, 1998. Claimant again advised medical staff at DRDC that he had a hearing loss. Claimant was advised that he would see a specialist. At some point, DOC staff did determine that there was a hearing loss. Claimant was serving a sixteen-month sentence, and no extraordinary medical services were provided concerning the loss of hearing. He received no consultation with a specialist.

During this part of his incarceration, Claimant was advised that he had developed gout and had a tumor in his chest. No surgery was performed on the tumor. Claimant was discharged after completion of the sentence in late 1999.

Claimant returned again to DOC custody in September, 2002. Initially, Claimant was placed at DRDC in Denver. He advised health staff that he had hearing and mobility problems. Claimant also advised medical staff that he had the tumor in his chest. No special evaluations were made of Claimant's limbs or ears.

Claimant was transferred to the Crowley County Correctional Facility (CCCF) in Olney Springs, Colorado. This facility is owned and operated by Corrections Corporation of America (CCA). When he arrived at CCCF, Claimant advised medical staff of his health problems, including his hearing loss. He also advised staff that his gout was creating chronic pain. Claimant requested a lower bunk and first tier restrictions.

In January, 2003, Claimant reported to medical staff that he had swelling in his feet. He experienced stiffness in his ankles and feet. He sought medical care and was advised he would receive soft sided shoes. Claimant also asked if he could have a hearing aid, as he was experiencing problems in hearing announcements and some oral statements that were directed to him. He was advised by CCCF staff that DOC policy would not provide for a hearing aid.

Claimant was taken to the Colorado State Hospital for a hearing test. He testified that his

4

right ear tested as having normal hearing. Claimant said that he took issue with the hearing test results.

Claimant testified that his hearing loss led to significant problems for him at CCCF. He had difficulty in hearing announcements over the public address system. The riot that occurred at CCCF in early 2004 led to additional problems for Claimant. He was hit in the head by another inmate who had a lock in a sock that he was using as a weapon. Claimant was banged up and had extreme fear for his life. The riot left significant damage to one building at CCCF.

Claimant then was transferred to HCCC in Walsenburg, Colorado. This is another facility owned and operated by CCA. Upon his arrival at HCCC, Claimant advised medical staff of his hearing loss and gout. He saw a doctor in June, 2005 and was told he would receive a further hearing exam. Claimant requested a cell that was for a hearing-impaired inmate, but that was not provided to him. He did receive a lower bunk.

Claimant testified that he was not able to obtain certain jobs because of his hearing condition. He again requested a hearing aid but was denied. Claimant cannot communicate with his family on the telephone because the background noise is too much. Though promised an additional hearing examination, that has not taken place. HCCC has no classes for the hearing impaired. Occasionally, Claimant also will have trouble speaking which he attributes to his hearing loss.

The gout condition creates problems in getting around. In November, 2002, Claimant's feet swelled up and made it impossible for him to wear his boots. He was promised soft sided and soled shoes. He inquired in February, 2003 why he not received those shoes. The gout has made it difficult for Claimant to walk normally. He has been assigned to a second tier cell. He has concern about safety issues because of his physical condition. He has fallen down the steps because of no markings on the edges. He further asked for a reduced diet in hopes of losing some weight. The special diet order expired, and he was advised that he would need to see the doctor to get a new diet order. Such a visit costs five dollars, money that he did not have.

Claimant testified that he had been denied parole, but was unclear why. He needed to know what his status is, as he has only a few months before his release. He is worried about his health and what he will do when released.

On cross-examination, Claimant testified that he went to see medical personnel after a fall in January, 2003. He has been trained as a para-professional in basic education but has had difficulty working in that job. He is taking medications for various conditions three times per day. He testified further that he has great concerns about the medical care he is receiving. Medical staff appears to be deliberately indifferent to his care, as well as that of other inmates.

Claimant testified after submission of Defendants' exhibits that his hearing problem has never been dealt with by Defendants. He further testified that his gout makes it impossible for him to walk or climb any stairs.

## III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** On his claim form, Claimant checked both hearing impairment and mobility impairment. Each will be discussed separately.

**Hearing Impairment:** The Settlement Agreement provides the following definition for hearing impairment.

> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

As to claims of hearing impairment, the Special Masters are bound by this definition. The Settlement Agreement provides that a claimant must be permanently deaf or be unable to communicate except by lip reading, written communication or signing.

Claimant's own testimony established that he did not meet the narrow definition of hearing impaired. Claimant was able to communicate during his hearing, even without a hearing aid. It is clear that Claimant has some hearing loss. That loss does not bring him within the very narrow definition for hearing impairment. Claimant is not part of the class for hearing impairment.

**Mobility:** Mobility disability is defined as inmates who use wheelchairs full or part-time or "[i]nmates who do not need require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." The application of this definition has to be as of August 27, 2003, the date the class was set.

Claimant's own testimony established that he was not using a wheelchair full or part-time for a permanent disability on August 27, 2003. Under the *specific* definitions of the Settlement Agreement, this is a close case. The Special Master finds from the testimony of Claimant that he has difficulty walking with his gout and difficulty climbing stairs. All reasonable inferences will be resolved in his favor. Claimant is part of the class as to mobility impairment.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by CDOC?** Based upon the testimony provided by both sides, the answer to this question is yes. There does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

6

**3. Was the Claimant discriminated against by CDOC because of his or her disability?**
With one exception, there was no evidence that would lead to the conclusion that Claimant had been the victim of discrimination prohibited by the ADA or Rehabilitation Act. Claimant's concern is the quality of medical care that he has received over the years.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters. Since the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law, Claimant may pursue separately any rights that he may have concerning the quality of his medical care.

In order to prevail under the ADA and Rehabilitation Act, a claimant must show that he received treatment that was different because of his disability. An example would be a disabled individual being told that he would never be considered for a position of employment, even though otherwise qualified. In this case, Claimant has received medical care throughout his time in CDOC for his gout. He has many concerns about that care. His concern about the future is legitimate.

The records provided by both sides reflect that Claimant was ordered to have soft sided shoes. Those shoes were never provided, even though medically indicated. Claimant is thus being treated differently from others without gout in that they have shoes that do not create problems for their feet and allow them to walk with less pain.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**
The only conduct at issue in this claim is the failure to provide soft sided shoes. Claimant is entitled to those shoes at DOC expense.

IT IS HEREBY ORDERED that the claim of Mark N. Johnson is granted solely as to the issue of failure to provide soft sided shoes; and

IT IS FURTHER ORDERED that the claim of Mark N. Johnson is denied in all other regards, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Defendants shall provide Mark N. Johnson soft sided shoes on or before January 16, 2006; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before January 16, 2006.**

SIGNED this _10th_ day of November, 2005.

BY THE COURT:

Richard M. Borchers
Special Master

8

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this _10th_ day of November, 2005 to the following:

Mr. Mark N. Johnson
#66287
HCCC
304 Ray Sandoval Street
Walsenburg, CO 81089

Mr. James X. Quinn
Mr. Jess A. Dance
Mr. Adam Wiens
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203