IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92—870 (OES) (Consolidated for all purposes with Civil Action No. 96—343)

JESSE MONTEZ, et al.

Plaintiffs,

-vs.-

BILL OWENS, et al.

Defendants.

---

Claim Number 03-133
Category III
Claimant: Jose-Luis Dole, #109864
Address of Claimant: HCCC, 304 Ray Sandoval Street, Walsenburg, CO 81089

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER came before the Special Master for hearing on October 21, 2005. This hearing was held at the Huerfano County Correctional Center (HCCC) in Walsenburg, Colorado. Present were the following: Jose-Luis Dole (Claimant); and Adam Wiens, attorney for Defendants.

Testimony was received from the following witnesses: Claimant; Hormoz Pourat (by telephone); Donald Kiefer; Dr. Kevin McClintocks, M.D.(by telephone); and Anna Jolly, R.N. (by telephone on October 25, 2005). All documentation previously submitted by both sides was accepted. Claimant did not offer any exhibits. Defendants offered into evidence Exhibits A through F, and all were admitted. After final closing arguments on October 25, 2005, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.¹ Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp. 28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>     A. COVERED DISABILITIES
>     The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
>     B. QUALIFIED INMATE

---

¹The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they may exercise only the jurisdiction agreed upon by the parties.

> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

3

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. Based upon the testimony from the witnesses, plus a review of exhibits and submitted documents, the Special Master finds the following to be the facts necessary for resolution of the claim.

Claimant came into the custody of DOC on April 27, 2000. He was placed at the Denver Regional Diagnostic Center (DRDC) for three weeks. While at DRDC, he advised medical staff that he had been diabetic for over fifteen years at that point in time. He then was placed at the Fremont Correctional Facility (FCF) in Canon City, Colorado. He was at that facility for eight months.

Claimant was transferred to HCCC in 2001. HCCC is a private facility owned by Corrections Corporation of America (CCA). DOC places inmates at HCCC, as well as other private facilities in Colorado owned by CCA. Other states also place inmates at HCCC.

Claimant was diagnosed as diabetic long before he came into DOC custody. He had managed his diabetes through diet. While at FCF, Claimant started to take insulin by oral medication. He then switched to taking insulin by shot about three years ago.

In order to clarify his claim, Claimant discussed each health condition separately. Claimant has been experiencing hearing problems since his service in the military in Vietnam. He has been tested and has a hearing loss. Claimant was issued a hearing aid after coming into DOC custody. He had trouble with the hearing aid and ceased using it. Claimant testified that the hearing aid provided too much background noise. He has learned to read lips which helps him in communication.

Claimant was trained as a technician in opthalmology. He has retinopathy in both eyes as the result of his diabetes. He worries about his eyesight, as he is able to see an opthalmologist only once per year. He does not know what damage has been done to his eyes.

While at FCF, Claimant was taking seven pills per day for his health conditions. Now at HCCC, he is up to eighteen pills per day. In addition to the health conditions already discussed, Claimant is suffering from high blood pressure and heart burn. He is under stress and is worried about his future. Claimant has pain in his arm which makes it difficult to sleep.

Claimant testified that since he has been at HCCC he has learned to give himself shots of insulin. Like other diabetic inmates, he is required to do so. HCCC occasionally will run out of insulin. All inmates who are diabetic have to go up to two days before medicine is secured.

Claimant stated that he walks a lot in order to keep himself in decent physical shape. He does not have proper socks or shoes. His feet are not in good shape, with the loss of feeling at times in

his little toes. The diet at HCCC is supposed to be for diabetics, but Claimant is not sure that it is any different from what is given to inmates in general population. Claimant testified that he has a fear that he will not make it out of DOC custody.

On cross-examination, Claimant testified that his vision has changed. He stated that the retinopathy has affected his vision. Also he noted hat he is receiving two shots of insulin each day, with one in the morning and the other in the afternoon.

In response to questions from the Special Master, Claimant testified that he believes that he has been discriminated against as the result of his medical treatment. Claimant indicated that he wanted DOC to provide him with a pancreas transplant as that would allow him to end the daily shots of insulin. Claimant described medical care at HCCC as being inadequate. On one occasion, Claimant passed out in the chow hall. He ended up in the hospital. He believed that this was the result of having waited too long to eat. At HCCC diabetics and others having special meals (kosher or other religious food) would eat last.

Claimant called a number of other witnesses. Hormoz Pourat was an inmate at HCCC until he was recently transferred. He was present when Claimant passed out in the chow hall. Mr. Pourat was aware that Claimant had gone to get his insulin shot. Claimant had tried to get into the chow hall but was not allowed to do so because of the procedure to serve special diets last. When allowed into the chow hall, Claimant indicated he was not feeling well. Mr. Pourat helped him with his tray. Claimant then passed out. Medical staff was summoned, and Claimant was taken to the hospital.

Donald Kiefer is a fellow inmate at HCCC. He is Jewish and eats a kosher diet. He often would eat with Claimant, as both were required to eat last because of special diets. Mr. Kiefer testified that he observed the diabetic diet on a regular basis. It did not look any different from the food given to inmates in general population. A change in diets took place after a DOC audit last year. Mr. Kiefer indicated that the special diets appear to be more appropriate now.

Dr. Kevin McClintocks, M.D. testified by telephone for Claimant. Dr. McClintocks works part-time at HCCC as a contract physician. He has treated Claimant since March, 2003. He testified that Claimant's diabetes has not gotten any better during this period of time. Claimant's sugar levels have been very high. Dr. McClintocks testified that he was not qualified to give an opinion as to whether Claimant needed a pancreas transplant. He understood such transplants to be rare and still experimental.

On cross-examination, Dr. McClintocks stated that diabetes has to be medically managed. Claimant's body is resistant to insulin. He was unaware if Claimant was eating the proper diet or having snacks from canteen.

Ms. Ann Jolly, R.N. testified by telephone on October 25, 2005. She was aware that Claimant had passed out in the chow hall. She had been called to assist Claimant. She was aware that he was taken by ambulance to the hospital. She was not aware of what had caused Claimant to pass out.

## III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** On his claim form, Claimant checked all four boxes: hearing impaired; vision impaired; mobility impaired; and diabetes. Each will be discussed separately.

**Mobility:** Mobility disability is defined as inmates who use wheelchairs full or part-time or "[i]nmates who do not need require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." The application of this definition has to be as of August 27, 2003, the date the class was set.

Claimant acknowledged at the beginning of the hearing that his mobility issue arose as the result of an accident in August, 2004. This accident affected Claimant's right knee. Claimant testified that he had no mobility problems prior to this accident.

The Special Master ruled that Claimant's injury post-dated the establishment of the class. Since Claimant did not have a mobility impairment on or before August 27, 2003, he could not pursue his claim as to the accident in August, 2004. Claimant retains the right to pursue separate litigation as to this accident and what followed from it.

**Hearing Impairment:** The Settlement Agreement provides the following definition for hearing impairment.

> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

As to claims of hearing impairment, the Special Masters are bound by this definition. The Settlement Agreement provides that a claimant must be permanently deaf or be unable to communicate except by lip reading, written communication or signing.

The testimony provided Claimant at the hearing established that he did not meet the narrow definition of hearing impaired on or before August 27, 2003. There is no question that he has some hearing loss. To be blunt, no claimant qualifies under this definition unless they are totally deaf. Claimant is not totally deaf. Claimant is not part of the class for hearing impairment.

**Vision Impairment:** The definition for vision impairment includes "inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200

6

or better, even with corrective lenses." As with the definition for hearing impairment, this definition is extremely narrow. In order to fall into the category of vision impaired, a claimant has to be legally blind.

Claimant's own testimony indicates that he does not meet this definition. He has concerns about his vision, and rightly so. Diabetes can affect eyesight dramatically. The problem is that the definition that has to be applied to conditions that existed on or before August 27, 2003 does not encompass Claimant's vision condition. Claimant is not part of the class for vision impairment.

**Diabetes:** Claimant has been diabetic for the entire time he has been in DOC. He is a member of the class as a diabetic.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. There does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** With one exception, there was no evidence that would lead to the conclusion that Claimant had been the victim of discrimination prohibited by the ADA or Rehabilitation Act. Claimant's overriding concern is the quality of medical care that he has received over the years.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters. Since the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law, Claimant may pursue separately any rights that he may have concerning the quality of his medical care.

In order to prevail under the ADA and Rehabilitation Act, a claimant must show that he received treatment that was different because of his disability. An example would be a disabled individual being told that he would never be considered for a position of employment, even though otherwise qualified. In this case, Claimant has received medical care throughout his time in DOC. He has many concerns about that care. His concern about the future is legitimate.

The unrefuted testimony provided at the hearing indicated that HCCC ran out of insulin on occasion. As a result, Claimant and other diabetics had to wait up to two days for insulin. This was

and is absolutely unacceptable. Claimant and others at HCCC who are diabetic must rely on DOC staff or contractors to provide basic medical care. Claimant cannot go to a local pharmacy in Walsenburg and obtain insulin. Health care is a basic necessity, as is insulin for many diabetics. Under the ADA and Rehabilitation Act, services, programs and activities can be very basic. *Crawford v. Indiana Dept. of Corrections*, 115 F.3d 481 (7th Cir. 1997); *Schmidt v. Odell*, 64 F.Supp.2d 1014 (D.Kan.1999); *Kaufman v. Carter*, 952F.Supp. 520 (W.D.Mich.1996). Claimant is entitled to know that he will receive insulin each day, as there is no question it is an essential part of his life and well-being.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant testified as to his fear of not making it out of DOC custody. Part of that fear related to the lack of insulin that was available on certain days at HCCC. That fear is real. It is a fear that Claimant and other diabetic inmates should not have to experience while in DOC custody. Claimant is entitled to compensation in the amount of $250.00.

IT IS HEREBY ORDERED that the claim of Jose-Luis Dole is granted as to his condition of diabetes and the failure of DOC and its contractor to have insulin available on a daily basis; and

IT IS FURTHER ORDERED that the claim of Jose-Luis Dole is denied in all other regards, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Defendants shall pay on or before January 16, 2006 to Claimant the sum of $250.00 for the non-nominal emotional injury that Claimant endured as the result of not being provided insulin on a daily basis at HCCC; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before January 16, 2006.**

SIGNED this 5th day of December, 2005.

BY THE COURT:

Richard M. Borchers
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this _5th_ day of December, 2005 to the following:

Mr. Jose-Luis Dole
#109864
HCCC
304 Ray Sandoval Street
Walsenburg, CO 81089

Mr. James X. Quinn
Mr. Jess A. Dance
Mr. Adam Wiens
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

_____