IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

F I L E D
UNITED STATES DISTRICT COURT
DE...VER, COLORADO

DEC 1 2 2005

GREGORY C. LANGHAM
CLERK

---

Claim Number: 03-158[1]
Category III
Claimant: Richard Zamora, #55874
Address of Claimant: 1681 E. 47th Ave., Apt. #5, Denver, CO 80216

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on November 28, 2005. Present were the following: Richard Zamora, Claimant; Aaron Atkinson from the Office of the Attorney General, for Defendants.

Testimony was received from the following witnesses: Claimant; Cary Shames, D.O., Chief Medical Examiner, Colorado Department of Corrections, for the Defendants. Exhibits A through I were offered into evidence. Attached as part of this order is a comprehensive Appendix of Exhibits listing each exhibit admitted into evidence and each exhibit not admitted into evidence. At the conclusion of the hearing, the claim was taken under advisement. This Order shall constitute the final action by the Special Master on this specific claim.

### I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying

---

[1] Claim was originally Category II, Claim 02-017 and was reassigned to Category III on August 26, 2005 by Order of Special Master Borchers.

to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part as follows:

Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:

I.      General inconvenience or nominal damages;

II.     Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;

III.    Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);

IV.    Damages due to severe physical injuries; and

V.     Damages due to death.

Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following findings of fact:

1.     Claimant submitted a claim which was originally assigned claim number 02-017 and placed into Category II pursuant to the Remedial Plan as set forth above. The claim is premised on an alleged mobility impairment.

2.     On April 19, 2005, Special Master Borchers reassigned Claimant's claim to Category III pursuant to the Remedial Plan as set forth above.   The claim was reassigned claim number 03-158.

3.     Proper notice of the hearing was given and Claimant along with Defendants appeared.  On the record, Claimant verified his current address and telephone number to be:

> 1681 E. 47th Ave., Apt. #5
> Denver, CO 80216
> Phone:  720-309-1344

4.     Claimant first went into CDOC custody in 1986.  With the exception of a short period of time in the 1990s and a two-year period from 2000-2002, Claimant remained in the custody of the CDOC until he was released in 2004.

5.     Claimant has suffered from Legg Perthes disease, a disease of the hip joint, since he was a child.  He underwent surgery to stabilize his hip.  While the surgery was apparently successful, it did leave Claimant with a leg discrepancy that has been reported to be anywhere from ½" to 1 ½".  If not corrected with a shoe lift, a leg discrepancy can result in lower back and hip problems.

6.     When Claimant first went into CDOC custody, he could walk and negotiate stairs.  He testified that with the exception of short periods when he needed to use a wheelchair, he was able to ambulate adequately until approximately 1997. Claimant stated that in 1997, while incarcerated at Bent County Correctional Facility (BCCF), his back and hip problems grew worse and he could no longer walk.  He obtained the assistance of other inmates, who would carry him to the shower, the bathroom and the chow hall.  Claimant indicated that the guards at BCCF said that he could not have other inmates assist him.  According to Claimant, he requested a wheelchair but his request was denied.  At first, prison personnel brought Claimant's food to his cell but then stopped providing this accommodation.  Claimant stated that his friends would bring him food from the canteen.

7.     Shortly after Claimant began asserting that he could no longer walk, he was transferred to the Arkansas Valley Correctional Facility (AVCF), where he was provided with a wheelchair.  Thereafter, he was transferred to the Territorial Prison, where he continued to use a wheelchair.  Claimant remained in a wheelchair until he was paroled in 2000.

8.     An MRI taken in 1999 revealed that Claimant had a herniated disc and surgical intervention was recommended.  The surgery was not performed.

9.     Claimant reentered DOC custody in 2002 as a result of parole violations. He testified that from 2002 until he was released in 2004, he was able to walk but could not negotiate stairs without assistance.

3

10.    Claimant also asserts that he has suffered from other medical problems while in CDOC custody, including panic attacks, a nervous breakdown and a shoulder problem.

11.    Claimant's testimony regarding alleged mobility disability appears to be inconsistent with his medical records.  Claimant's X-rays and MRIs showed that his surgery successfully corrected his Legg Perthes and that his hip was stable.  According to Defendants' medical expert, Dr. Shames, Claimant's hip and back problems, as reflected in his medical records, would not have prevented him from walking or negotiating stairs. There is also a significant conflict in the testimony as to whether Claimant received and used heel lifts to correct his leg discrepancy.  Claimant testified that for most of his incarceration, he was either not provided with heel lifts or could not use the heel lifts that were provided because they were the wrong size.  Claimant's medical records indicate that heel lifts were ordered for him on several different occasions and that he signed for receipt of some of them.   There is a further conflict in the evidence regarding the suggested surgery for Claimant's herniated disc.  Claimant asserted that the doctor who recommended surgery refused to perform it, while Claimant's medical records state that Claimant refused surgery.   It is undisputed that in 1999, Claimant was given a prescription for physical therapy but he refused to participate because he did not agree with the therapist's treatment methods.

12.    Claimant testified regarding various alleged failures on the part of Defendants to accommodate his alleged mobility disability.  For example, he indicated that his request for a wheelchair at BCCF was denied; and that he was prevented from utilizing other inmates to carry him to the shower, bathroom and chow hall.   Also, Claimant notes that although his food was initially brought to his cell, this accommodation was discontinued.  Claimant stated that despite his continued requests, he was provided with a pusher only sporadically.  While at AVCF and at Territorial Prison, he was unable to access the game room, the yard, the hobby area or the chapel because they could not be reached without negotiating stairs.  Claimant indicated that there was probably no accommodation that could have been provided which would have enabled him to get to the areas where these activities were held.  Claimant also contends that although he was classified as a minimum security risk, he was not allowed to go to a halfway house or to any facility below a medium security risk facility due to his mobility impairment.  The evidence does indicate that in the late 1980s and early 1990s, Claimant was placed in a variety of halfway houses but walked away from some and was removed from others because of disciplinary violations.

13.    The evidence reflects that Claimant did receive accommodations for his hip and back problems.  For example, from the time he entered AVCF until he was paroled in 2000, he was provided with a wheelchair, despite the fact that his MRIs and X-rays indicated that his Legg Perthes had successfully been arrested by surgery.  Shortly after he began asserting that he could not walk, Claimant was transferred from BCCF to a facility that could better accommodate his medical issues.  Claimant was provided with heel lifts on several occasions and was offered surgery to correct his herniated disc.  He

was given medical restrictions of lower bunk, lower tier, no prolonged standing, no bending and no intensive labor. In 1998, he was approved to use the handicapped line.

14.     Claimant testified that since his release in 2004, he has been able to walk. He currently walks with a slight limp. Claimant indicated that he is not using a heel lift and that he has not sought any medical treatment in the year since his release. Claimant further testified that he has not pursued the surgery for his herniated disc that was recommended while he was in CDOC custody.

### III. CONCLUSIONS OF LAW

1.     The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794, *et seq.;* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*

2.     The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

A disability or impairment is not "permanent," and, thus, not within the ambit of the ADA or the Rehabilitation Act unless it expect to be of long-term duration. *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198 (2002). The Remedial Plan itself

recognizes this limitation by defining "permanent disability/impairment" as "[a] condition which is not expected to improve within six months." *Remedial Plan* ¶III(C).

Based on the conflicting evidence, the Special Master finds and concludes that Claimant does not currently and did not during the time of his CDOC custody suffer from a permanent mobility disability, as defined in the Remedial Plan. Claimant's medical records indicate that his Legg Perthes was successfully arrested through surgery and that his leg discrepancy did not prevent him from walking or negotiating stairs. In short, although Claimant asserted that he could not walk and/or negotiate stairs there is no objective evidence in his medical records to support his subjective assertions.

Additionally, much of Claimant's dispute with Defendants concerns his contention that he was denied appropriate medical treatment, or that there were significant delays in treating his medical needs. However, claims of improper or delayed medical treatment do not fall within the ambit of the ADA or the Rehabilitation Act. *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005); *United States v. University Hospital*, 729 F.2d 144 (2nd Cir. 1984).

3.  Even assuming that Claimant had a permanent mobility disability within the meaning of the Remedial Plan, there is no evidence in the record that Defendants discriminated against him because of his disability or that Claimant was denied accommodations that would have enabled him more fully to access and utilize the programs, benefits, services and facilities offered by the institutions in which he was housed. Claimant did have some short term difficulties accessing the shower, bathroom, and chow hall at BCCF but, very soon after Claimant began asserting that he could no longer walk to these facilities, he was transferred to AVCF, which was better equipped to accommodate his asserted medical problems. Claimant indicates that while at Territorial, he was unable to get to the game room, chapel, yard and hobby area. However, there is no evidence that Claimant ever requested an accommodation that would enable him to access these areas and, in fact, conceded that there was probably no accommodation that could have been provided.

Furthermore, the Special Master finds and concludes that Claimant failed or refused to comply many of the recommendations of his doctors that would have allowed him better to walk and to negotiate stairs. For example, it is undisputed that Claimant refused physical therapy because he disagreed with the therapist's treatment program. Claimant wore heel lifts sporadically and rejected some of the heel lifts that had been ordered for him. Finally, Claimant declined surgery to correct his herniated disc.

## IV. ORDER

IT IS HEREBY ORDERED that based upon the foregoing Findings of Fact and Conclusions of Law, judgment should be entered in favor of the Defendants and against Claimant dismissing Claimant's *Montez* claim with prejudice.

6

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be file on or before **January 19, 2006** with the Clerk of the United States District Court at the following address:

901 19th Street
Denver, CO 80294.

SIGNED this _6th_ day of December, 2005.

Bruce D. Pringle,
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this _6h_ day of December, 2005 to the following:

Mr. Richard Zamora, # 55874
1681 E. 47th Ave., Apt. #5
Denver, CO 80216

Mr. J. Aaron Atkinson
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

Margie Dykstra