IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number: 03-105
Category III
Claimant: Barbara Freeman, #105776
Address of Claimant: DWCF, P.O. Box 392005, Denver, CO. 80239

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER came before the Special Master for hearing on November 18, 2005. Present were the following: Barbara Freeman, Claimant; Danielle Moore from the Office of the Attorney General, for Defendants.

Testimony was received from the following witnesses: Claimant; Dr. Mitra Razzaghi; Hillary Victoroff; Cary Shames, D.O., Chief Medical Officer, Department of Corrections. Exhibits A1-22, B1-6 and C1-7 were offered and admitted into evidence. Attached, as part of this Order, is a comprehensive Appendix of Exhibits listing each exhibit. At the conclusion of the hearing, the claim was taken under advisement. This Order shall constitute the final action by the Special Master on this specific claim.[1]

**I. BACKGROUND**

---

[1] Claimant has submitted a plethora of Motions regarding her claim. Virtually all of the Motions deal with grievances that she has filed with the DOC; the merits of her *Montez* claim; or other constitutional or disability issues not covered by the Remedial Plan. The Special Master finds and concludes that these Motions are either outside of the scope of jurisdiction conferred on the Special Master by the Remedial Plan, as further defined in the Order in Response to Report and Recommendation of the Special Masters to Judge John Kane, dated November 23, 2004 or are subsumed by this Final Order.

1

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed her claim and requested that the Special Master award appropriate damages for relief.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following findings of fact:

2

1. Claimant submitted a claim which was assigned claim number 03-105. The basis of her claim is alleged vision impairment/disability and alleged mobility impairment/disability.

2. Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

3. Proper notice of the hearing was given and Claimant along with Defendants appeared.

4. Claimant was placed in the custody of the DOC in July of 2000. She was housed at the Colorado Women's Correctional Facility (CWCF) until March of 2001 and has been housed at the Denver Women's Correctional Facility (DWCF) from March of 2001 to the present.

5. When she entered CDOC custody, Claimant had mild to moderate degenerative joint disease and osteoarthritis in the left knee, back and hip. She also had cataracts and glaucoma. All of these conditions were progressive and became worse over the time she has been in CDOC custody. She now has no vision in her right eye but is being seen by an ophthalmologist every three months. Her glaucoma is stable. Claimant's vision acuity as of August 29, 2003 was 20/50 with correction. In September of 2004, Claimant underwent a total knee replacement. As a complication of the surgery, she now has a permanent foot drop and requires a brace on a full time basis.

6. Claimant testified that prior to August of 2003, she was unable to walk 100 yards without stopping and that she could not negotiate stairs. There is evidence in the record, however, suggesting that Claimant could walk prior to August of 2003. The evidence indicates that Claimant can read with the assistance of glasses.

7. Claimant testified that she has received numerous accommodations to enable her to access and to utilize the services, programs, facilities and benefits offered by the institutions in which she has been housed. She was provided with a standard knee brace and later with a custom made knee brace. Claimant was also provided with a wheelchair and a pusher in 2002, when she was having difficulty walking to the chow hall. She has been given an elevator pass so that she does not have to negotiate stairs. Some assistance has been provided to her in reading the small print in legal books in the library. Up until 2005, she was able to obtain help in cleaning her living quarters. At one point, Claimant was questioned as to whether she wanted to learn Braille but she declined. Claimant did testify that she is unable to use computers or to watch T.V. because of her vision problems but stated that she does not know of any accommodation that could have been provided that would have allowed her to engage in these activities.

8. Claimant stated that since July of 2005, she has shared her cell with another wheelchair-bound inmate, which made the living quarters cramped. Because Claimant and her roommate both have mobility problems, they now have problems keeping the cell clean. Claimant states that she has had to pay other inmates to clean the cell.

## III. CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794, *et seq.;* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

Based on the criteria established by the Rehabilitation Act, the ADA and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

The Remedial Plan was signed on August 27, 2003. Although the Remedial Plan fails expressly to address the issue of damage claims that might arise after its execution date, there is nothing in the Remedial Plan that would suggest that paragraph XXXII thereof, authorizing the recovery of damages and establishing claims procedures was intended to apply to claims for damages that had not yet arisen. The Special Master finds and concludes that the damages that may be awarded under the Remedial Plan are limited to those resulting from violations of the ADA and/or Rehabilitation Act cognizable under the Remedial Plan and occurring prior to August 27, 2003.

4

The Special Master finds and concludes that Claimant had a permanent mobility disability cognizable under the ADA, the Rehabilitation Act and the Remedial Plan. Although there is conflicting evidence as to whether Claimant was able to walk 100 yards prior to August 27, 2003, Claimant's testimony that she could not negotiate stairs prior to August 27, 2003 is uncontroverted.

The Special Master finds and concludes that Claimant does not suffer from a vision disability or impairment that substantially limits her ability to perform any major life activity. Her vision acuity, with corrective lenses, has always been better than the 20/200 standard established by the Remedial Plan. *See Remedial Plan* ¶V(A)(3).

2. The next question which must be answered is whether Claimant was qualified to participate in the programs or to receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs or activities because of disciplinary reasons, health reasons or other valid penal justifications. *Miller v. King*, 384 F.3d 1248, 1266 (11th Cir. 2004). The evidence record fully supports the proposition that Claimant is otherwise qualified to take advantage of the benefits, services, programs and facilities offered by the institutions where she has been housed.

3. The key issues remaining are whether Claimant was discriminated against because of her disability or whether the Defendants failed reasonably to accommodate her disability so that she could access and utilize the benefits, services, programs and facilities offered by the institutions where she was housed. The Special Master finds and concludes that Claimant has failed to sustain her burden of establishing either discrimination because of her disability or a failure to provide reasonable accommodation. Claimant admits that she has received continuing treatment on a regular basis from a specialist for her eye problems. She was offered Braille classes but declined them. She has received a wheelchair and a pusher. Claimant has been provided with an elevator pass so that she can get to the chow hall. Claimant's complaints regarding her cramped quarters and the lack of assistance in cleaning her living quarters relate arose long after August of 2003. Consequently, they are not within the ambit of the Remedial Plan damages provisions, even assuming that they would be sufficient to establish a failure to accommodate under the ADA or the Rehabilitation Act.

## IV. ORDER

IT IS HEREBY ORDERED that based upon the foregoing Findings of Fact and Conclusions of Law, judgment should be entered in favor of the Defendants and against Claimant dismissing Claimant's *Montez* claim with prejudice; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be file **on or before January 29, 2006** with the Clerk of the United States District Court at the following address:

901 19th Street
Denver, CO 80294.

SIGNED this 15th day of December, 2005.

_____
Bruce D. Pringle,
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this  15th  day of December, 2005 to the following:

Ms. Barbara Freeman, #105776
DWCF
P.O. Box 392005
Denver, CO 80239

Ms. Danielle Moore
Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

_____
Margie Dykstra

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number 03-105
Category III
Claimant: Barbara Freeman, #105776
Address of Claimant: DWCF, P.O. Box 392005, Denver, CO 80239

---

## APPENDIX OF EXHIBITS

---

The following is a list of Exhibits offered into Evidence by Defendants and ADMITTED:

| | |
|---|---|
| EXHIBIT A1: 1 page | Glaucoma Flow Card for Barbara Freeman, dated 1999. |
| EXHIBIT A2: 1 page | Centura Health Physician's Orders for Barbara Freeman, dated 10/1/99. |
| EXHIBIT A3: 1 page | Centura Health Eye Lab YAG LASER Peripheral Iredotomy for Barbara Freeman, dated -3-99. |
| EXHIBIT A4: 1 page | Glaucoma Flow Card for Barbara Freeman, dated 10/99. |
| EXHIBIT A5: 1 page | Glaucoma Flow Card for Barbara Freeman, dated 4/11/00. |
| EXHIBIT A6: 1 page | State of Colorado – Department of Corrections Physical Examination for Barbara Freeman dated 7-12-00. |
| EXHIBIT A7: 1 page | Denver Health Outpatient Encounter Record for Barbara Freeman, dated 7-27-00. |

| | |
|---|---|
| EXHIBIT A8: 1 page | Medical Record of receipt of state issue prescription glasses for B. Freeman dated 11/28/03. |
| EXHIBIT A9: 1 page | Glaucoma Flow Sheet for Barbara Freeman, marked Feb. 15, 2001. |
| EXHIBIT A10:1 page | Denver Health Outpatient Encounter Record for Barbara Freeman dated 8-29-01. |
| EXHIBIT A11:1 page | Denver Health Outpatient Encounter Record for Barbara Freeman dated 9/24/01. |
| EXHIBIT A12:1 page | Denver Health Outpatient Encounter Record for Barbara Freeman dated 11/21/01. |
| EXHIBIT A13:1 page | Denver Health Outpatient Encounter Record for Barbara Freeman dated 3-19-02. |
| EXHIBIT A14:1 page | DHMC Emergency Department Visit for Barbara Freeman dated 08/29/03. |
| EXHIBIT A15:1 page | Denver Health Medical Center Eye Examination Follow Up Encounter Form for Barbara Freeman dated 9.05.03 |
| EXHIBIT A16:1 page | Denver Health Medical Center Outpatient Encounter Eye Clinic Follow Up Exam for Barbara Freeman dated 10/08/03. |
| EXHIBIT A17:1 page | Denver Health Medical Center Outpatient Encounter Eye Clinic Follow Up Exam for Barbara Freeman dated 10/30/03. |
| EXHIBIT A18:1 page | Denver Health Medical Center Outpatient Encounter Eye Clinic Follow Up Exam for Barbara Freeman dated 01/20/04. |
| EXHIBIT A19:1 page | Denver Health Medical Center Outpatient Encounter Eye Clinic Follow Up Exam for Barbara Freeman dated 05/18/04. |
| EXHIBIT A20:1 page | Denver Health Medical Center Outpatient Encounter Eye Clinic Follow Up Exam for Barbara Freeman dated 09/07/04. |
| EXHIBIT A21:1 page | Denver Health Medical Center Outpatient Encounter Eye |

|  |  |
|---|---|
|  | Clinic Follow Up Exam for Barbara Freeman dated 01/04/05. |
| EXHIBIT A22:1 page | Denver Health Outpatient Encounter Eye Clinic for Barbara Freeman dated 08/02/05. |
| EXHIBIT B1: 1 page | Request for Accommodation for Barbara Freeman dated 10/20/05. |
| EXHIBIT B2: 1 page | Vision Screening for Barbara Freeman dated 10/20/05. |
| EXHIBIT B3: 1 page | Mobility Screening for Barbara Freeman dated 10/20/05. |
| EXHIBIT B4: 1 page | Page 1 of 2 of Department of Corrections Ambulatory Health Record for Barbara Freeman dated 10/20/2005. |
| EXHIBIT B5: 1 page | Page 2 of 2 of Department of Corrections Ambulatory Health Record for Barbara Freeman dated 10/20/2005. |
| EXHIBIT B6: 1 page | Colorado Department of Corrections Statement of Patient Barbara Freeman, dated 10/20/05. |
| EXHIBIT C1: 1 page | Department of Corrections Ambulatory Health Record for Barbara Freeman dated 11/23/2004. |
| EXHIBIT C2: 1 page | Page 1 of 2 of Department of Corrections Ambulatory Health Record for Barbara Freeman dated 10/20/2005. |
| EXHIBIT C3: 1 page | Page 2 of 2 of Department of Corrections Ambulatory Health Record for Barbara Freeman dated 10/20/2005. |
| EXHIBIT C4: 1 page | Department of Corrections Ambulatory Health Record for Barbara Freeman dated 10/20/2005. |
| EXHIBIT C5: 1 page | Page 1 of 2 of Department of Corrections Ambulatory Health Record for Barbara Freeman dated 11/03/2005. |
| EXHIBIT C6: 1 page | Page 2 of 2 of Department of Corrections Ambulatory Health Record for Barbara Freeman dated 11/03/05. |
| EXHIBIT C7: 1 page | Department of Corrections Ambulatory Health Record for Barbara Freman dated 11/17/2005. |