IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

DEC 1 9 2005

GREGORY C. LANGHAM
CLERK

---

Claim Number: 03-102
Category III
Claimant: Charity Lehnert #101821
Address of Claimant: DWCF, P.O. Box 392005, Denver, CO 80239

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER came before the Special Master for hearing on July 19, 2005 and November 18, 2005. Present were the following: Charity Lehnert, Claimant; Doug Cox from the Office of the Attorney General, for Defendants.

Testimony was received from the following witnesses: Claimant; Dr. Mitra Razzaghi; Debra Ahlin; Cathie Holst; Cary Shames, D.O., Chief Medical Officer, Colorado Department of Corrections. Exhibits 1 through 21 were offered and admitted into evidence. A comprehensive Appendix of Exhibits is attached as part of this Order. At the conclusion of the hearing, the claim was taken under advisement. This Order shall constitute the final action by the Special Master on this specific claim.

**I. BACKGROUND**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

1

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part as follows:

Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:

I.      General inconvenience or nominal damages;

II.     Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;

III.    Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);

IV.     Damages due to severe physical injuries; and

V.      Damages due to death.

Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed her claim and requested that the Special Master award appropriate damages for relief.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following findings of fact:

1.      Claimant submitted a claim which was assigned claim number 03-102. The claim is premised on alleged mobility impairment, vision impairment and diabetes.

2.      Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

3.      Proper notice of the hearing was given and Claimant along with Defendants appeared.

4.     Claimant is currently under the jurisdiction of the Colorado Department of Corrections (CDOC). She entered CDOC custody on August 7, 2001. She was housed at the Colorado Women's Correctional Facility (CWCF) for approximately eight months and then at the Denver County Jail for approximately fourteen months. She has been housed at the Denver Women's Correctional Facility (DWCF) since June of 2003.

5.     Claimant suffers from Myotonic dystrophy, a chronic slowly progressing inherited disease characterized by wasting of the muscles; failing vision; and general muscular weakness. She has also developed plantar faciitis.

6.     No evidence was presented that Claimant currently suffers from diabetes. Although Claimant's vision has deteriorated, no evidence was submitted indicating that Claimant's vision substantially limits her from engaging in any major life activity. Claimant indicated that she feared that she would suffer from cataracts and diabetes in the future due to the nature of her illness and her family history.

7.     Claimant testified that she had no difficulty walking or negotiating stairs prior to February of 2004. Claimant asserts that in February of 2004, she could no longer walk. Since February of 2004, she has moved around by sitting on the floor or on a pillow on the floor and sliding her body along the floor with her arms. There is evidence in the record suggesting that Claimant does not suffer from any physical permanent mobility impairment and that most of her problems are psychological.

8.     For almost the entire time that she has been housed at DWCF, Claimant has been in administrative segregation and has been locked down for 23 hours a day. As a result, there have been virtually no programs in which Claimant was eligible to participate. The evidence indicates that Claimant has never requested to participate in GED classes, business classes or computer classes. She receives her meals in her room. Claimant testified that because of her mobility impairment, she does have difficulty getting to and from the shower and cannot get to the room where haircuts are given. She also indicated that she is sometimes too tired to drag herself to the tray slot to receive her meals and medications.

9.     Claimant stated that beginning in early 2004, she repeatedly submitted kites for a wheelchair but her requests were rejected. She also asserts that she was denied proper medical treatment, including but not limited to the ability to see a neurologist and an eye doctor.

10.     Sometime subsequent to the commencement of her hearing on July 19, 2005, Claimant underwent an ADA screening. It appears that she has now been provided with a wheelchair.

### III. CONCLUSIONS OF LAW

1.     The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and (c) the Americans with Disabilities Act.(ADA), 42 U.S.C. § 12101 *et seq.*

2.     The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class.  Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially *limits* one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B).  The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.  29 C.F.R. § 1630.2(j)(1).  "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes.  *Remedial Plan* ¶ III(A).  Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments.  *Remedial Plan* ¶ III(B).  A permanent disability/impairment is a condition which is not expected to improve within six months.  *Remedial Plan* ¶ III(C).

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.  The Special Master finds and concludes that Claimant is a disabled individual who is a member of the class.  Claimant has a permanent physical mobility impairment that substantially limits the major life activities of walking, working and perhaps performing manual tasks.

The Special Master finds and concludes that Claimant has not sustained her claim that she has a vision disability or a disability.  No testimony or documentary evidence was presented regarding Claimant's vision acuity.  While Claimant stated that her vision is somewhat blurred, she is not blind.

The Special Master finds and concludes that Claimant has not sustained her claim that she has a disability due to diabetes.  There is no evidence that Claimant has in the past or presently suffers from diabetes.

4

The Special Master further finds and concludes that Claimant's alleged mobility disability is not cognizable under Paragraph XXXII of the Remedial Plan. The Remedial Plan was signed on August 27, 2003. Although the Remedial Plan fails expressly to address the issue of damage claims that might arise after its execution date, there is nothing in the Remedial Plan that would suggest that paragraph XXXII thereof, authorizing the recovery of damages and establishing claims procedures, was intended to apply to claims for damages that had not yet arisen. The Special Master finds and concludes that the damages that may be awarded under the Remedial Plan are limited to those resulting from violations of the ADA and Rehabilitation Act cognizable under the Remedial Plan and occurring prior to August 27, 2003. Claimant concedes that as of August 27, 2003, she was able to walk and had no mobility disability. To the extent that Claimant has suffered from a permanent mobility impairment arising after August 27, 2003 and has been subject to discrimination because of her disability, she may potentially have a viable claim under the ADA and/or the Rehabilitation Act. However, the Special Master finds and concludes that her post-August 27, 2003 mobility impairment cannot be entertained under the *Montez* Remedial Plan.

3.     Additionally, although Claimant contends that she was not provided with proper medical treatment, there is no evidence tying these contentions to any inability on the part of Claimant to utilize the institution's facilities or to take part in the institution's programs and services. Without such evidence, claims of failure to provide proper medical treatment, medications and/or medical devices may be cognizable under the Eighth Amendment but they do not trigger the protections of Title II of the ADA or the Rehabilitation Act. *Fitzgerald v. Corrections Corp. of America,* 403 F.3d 1134 (10th Cir. 2005); *United States v. University Hospital,* 729 F.2d 144 (2nd Cir. 1984).

4.     As noted in paragraph 2 in the Conclusions of Law above, Claimant does not have a vision disability or a disability due to diabetes. Further, the claim that Claimant may have under the ADA and/or the Rehabilitation Act for discrimination or failure to accommodate her alleged mobility disability is not cognizable under Paragraph XXXII of the Remedial Plan. Consequently, there is no need for the Special Master to consider whether, subsequent to August 27, 2003 (a) Claimant was otherwise qualified to participate in and utilize programs, facilities, services and benefits offered by the institution in which she is housed; (b) Claimant was discriminated against because of her disability; or (c) Claimant was denied reasonable accommodations.

## IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law:

(A)   Judgment be entered in favor of Defendant and against Claimant on her vision and diabetes disability claims; and

(B)   Claimant's post-August 27, 2003 mobility disability claim be dismissed without prejudice; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before January 29, 2005** with the Clerk of the United States District Court at the following address:

> 901 19th Street
> Denver, CO 80294.

SIGNED this _15th_ day of December, 2005.

Bruce D. Pringle,
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this _15th_ day of December, 2005 to the following:

Ms. Charity Lenhert # 101821
DWCF
P.O. Box 392005
Denver, CO 80239

Mr. Doug Cox
Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203


_____
Margie Dykstra

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number 03-102
Category III
Claimant: Charity Lehnert, #101821
Address of Claimant: DWCF, P.O. Box 392005, Denver, CO 80239

---

## APPENDIX OF EXHIBITS

---

The following is a list of Exhibits offered into Evidence and ADMITTED:

| | | |
|---|---|---|
| EXHIBIT 1: | 1 page | Department of Corrections Ambulatory Health Record for Charity Lehnert, dated 6/16/04. |
| EXHIBIT 2: | 1 page | Letter to "Edie" from Charity Lehnert dated 8/4/04. |
| EXHIBIT 3: | 2 pages | State of Colorado Department of Corrections Request for Interview, dated 8/4/04 from Charity Lehnert. |
| EXHIBIT 4: | 1 page | Letter to "To Whom It May Concern" from Charity Lehnert dated 5/3/04 |
| EXHIBIT 5: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for C. Lennert dated 2/11/04 and 02/04/03. |
| EXHIBIT 6: | 2 pages | State of Colorado Department of Corrections Request for Interview, dated 8/18/04 from Charity Lehnert. |
| EXHIBIT 7: | 3 pages | E-mail and 2 pages of Denver Complex Incident Forms. |

- 1 -

EXHIBIT 8:   1 page        State of Colorado Department of Corrections Chronological
                          Recording Sheet.

EXHIBIT 9:   1 page        State of Colorado Chronlog Report, print date 07/15/2005
                          for Charity Lehnert.

EXHIBIT 10:  2 pages       Memorandum from Cathie Holst to Charity Lehnert dated
                          November 24, 2004.

EXHIBIT 11:  1 page        Memorandum from Cathie Holst to Charity Lehnert dated
                          December 29, 2004.

EXHIBIT 12:  1 page        Response to Step I ADA Grievance from Cathie Holst
                          sent 2/25/05.

EXHIBIT 13:  1 video       Security video of Claimant ambulating through DWCF on
                          a pillow.

EXHIBIT 14:  1 page        Accommodation Resolution for Charity Lehnert, dated
                          11/1/05.

EXHIBIT 15:  1 page        Department of Corrections Ambulatory Health Record for
                          Charity Lehnert dated 08/02/2005.

EXHIBIT 16:  1 page        Department of Corrections Ambulatory Health Record for
                          Charity Lehnert dated 08/04/2005.

EXHIBIT 17:  1 page        Partial medical  record dated 8/12/05.

EXHIBIT 18:  1 page        Department of Corrections Ambulatory Health Record
                          for Charity Lehnert dated 08/15/2005.

EXHIBIT 19:  1 page        Department of Corrections Ambulatory Health Record for
                          Charity Lehnert dated 09/01/2005.

EXHIBIT 20:  23 pages      Pikes Peak Physical Medicine report and documentation
                          From Jeffrey P. Jenks, M.D. to Charity Lehnert dated
                          October 4, 2005.

EXHIBIT 21:  1/8 page      Handwritten definition of "Muscular Dystrophy".