IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

　　　　Plaintiffs,

-vs.-

BILL OWENS, et al.

　　　　Defendants.

---

Claim Number 02-040
Category II
Claimant: Russell Larson, #92099
Address of Claimant: FCF, P.O. Box 999, Canon City, CO 81215-0999

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER comes before the Special Master on the claim of Russell Larson (Claimant). Claimant is incarcerated in the Colorado Department of Corrections (DOC) at the Fremont Correctional Facility (FCF) in Canon City, Colorado.

This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of his claim. Defendants have filed a response to the claim. Claimant was given the opportunity to reply to the response of Defendants, but he has filed no further documents. Further argument will be waived.

I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp. 28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

3

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody in June, 1997. Claimant was placed initially at the Denver Regional Diagnostic Center (DRDC). He then was placed at other facilities before being placed at FCF.

Claimant checked only the box for hearing impaired on his claim form. In response to the question concerning disabilities, he stated as follows:

> My hearing loss is primarily in my left ear. People who speak in low tones or are talking to me from the left side or behind me can't be heard. Their speech is distorted and muffled. If they are not in front of me I am unable to hear and understand what they are trying to say. It causes a great deal of difficulty to me and to the people around me.

Further in the initial claim form when asked about discriminatory actions against him, Claimant stated as follows:

> The staff and employees of Colorado D.O.C. have often been sarcastic, disrespectful and have made profane comments to me because of my difficulty in hearing.

Claimant submitted a supplemental form for hearing impairment and restated his concerns. He indicated in that form that he had lost 85% of his hearing in his left ear. He further stated that it had taken eight months to replace a hearing aid. Claimant stated further:

> My hearing just went out gradually but DOC didn't do anything about my hearing loss over an 8 year period. DOC just plain dropped the ball on this whole thing! Mental distress!

Claimant attached to his supplemental form several medical records. He received an audiology test on November 17, 1999 at the Colorado Mental Health Institute in Pueblo which reflected bilateral sensory neural hearing loss. The report reflects that Claimant had medical problems with his ears when he was much younger. Tubes had been inserted into Claimant's ears when he was a child. An entry in the report of November, 1999 states that there should be "consideration for amplification."

Claimant has had other testing done over the years which reflected hearing loss. Claimant did receive a hearing aid on July 17, 2002. That hearing aid was fitted on that date, and Claimant began to use it.

Claimant came back to his cell on October 20, 2002 and took out his hearing aid. He then placed the hearing aid in its case. He claims that he came back the next day and it was gone. He searched for the hearing aid and could not find it. He asked his cell mate if he had seen it, and he indicated that he had not. The loss was reported to correctional staff. Claimant believed that the hearing aid had been taken during a shakedown by correctional officers. DOC staff denied that the hearing aid had been taken by any correctional officer. The hearing aid was not found, and Claimant had to go for several months before a new hearing aid was secured for him.

Documents submitted by Claimant reflected that attempts were made to secure a replacement hearing aid. Initial requests were denied by Colorado Access, the over all medical care management provider for DOC.

Claimant also attached to his supplemental form a letter to class counsel that dealt with the loss of the hearing aid. In that letter, Claimant stated that the hearing aid was stolen out of his cell. He requested in the letter help in securing a new hearing aid.

Attached to Defendants' answer were several documents. At one point in July, 2003, Claimant was advised that additional information would have to be secured to determine if he really needed a replacement hearing aid. *Defendants' Exhibit F*. The initial request for a new hearing aid were denied. Additional information was secured, and Colorado Access authorized a replacement hearing aid in January, 2004. *Defendants' Exhibit G*. Claimant did receive a new hearing to replace the one that was lost in October, 2002.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** This is a very close question. There is no dispute that Claimant has hearing loss in both ears. He has received two hearing aids while in DOC custody. He has argued that he did not receive the first hearing aid as quickly as he should have.

The Settlement Agreement provides the only basis upon which the Special Masters may adjudicate claims. The definition for hearing impairment is as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

This definition is extremely narrow. In order to be part of the class for hearing impaired, a claimant

5

must show that he or she has to rely upon lip reading, written communication or signing, even if they have hearing aids.

Claimant does not fall into the class of hearing impaired, as there is no evidence that he has had to rely on signing, lip reading or written communication when he has had his hearing aids. There is no question that Claimant has a hearing loss. That loss is not severe enough to place him into the hearing impaired category under the Settlement Agreement.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** This question does not need to be reached in light of the no answer to the first question.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** There has been insufficient evidence presented by Claimant that would lead to the conclusion that he was subjected to discrimination by DOC staff. There is no evidence that the first hearing aid was taken during a shakedown. As reflected in one letter, Claimant believed it may have been stolen. There is insufficient evidence that the delay in securing a second hearing aid was an act of discrimination. In fact, the documents Claimant submitted reflected concern on the part of DOC staff to secure Colorado Access approval for a replacement. The answer to this question is no.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Russell Larson is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before April 3, 2006.**

SIGNED this 23 day of January, 2006.

BY THE COURT:

Richard M. Borchers
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this 23 day of January, 2006 to the following:

Mr. Russell Larson
#92099
FCF
P.O. Box 999
Canon City, CO 81215-0999

Mr. James X. Quinn
Mr. Jess A. Dance
Mr. Aaron Atkinson
Ms. Brooke Meyer
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203