Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

---

JESSE (JESUS) MONTEZ, et al.,

    Plaintiffs,

v.

BILL OWENS, et al.

    Defendants.

---

### REPORTER'S TRANSCRIPT

---

    PURSUANT TO NOTICE, the above-entitled hearing was taken before the HONORABLE ROBBIE M. BARR, ^ at ^ , Suite , Denver, Colorado, on Thursday, November 10, 2005, at 9:38 a.m., before Teresa Chaplin, Registered Professional Reporter and Notary Public.



EXHIBIT 6 Plaintiffs

Calderwood-Mackelprang, Inc. 303.477.3500

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 2

```
 1  APPEARANCES:
    For the Plaintiffs:
 2    PAULA GREISEN, ESQ., and
      DAVID H. MILLER, ESQ.
 3    King & Greisen, LLP
      1670 York Street
 4    Denver, Colorado 80206
      (303) 298-9878
 5
    For the Defendants:
 6    ELIZABETH H. McCANN, ESQ.,
      Deputy Attorney General, and
 7    JAMES X. QUINN, ESQ.
      Assistant Attorney General
 8    1525 Sherman Street, 5th Floor
      Denver, Colorado 80203
 9    (303) 866-5443
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            PROCEEDINGS
 2       WHEREUPON, the following proceedings were
 3  taken pursuant to the Federal Rules of Civil Procedure.
 4       *  *  *  *  *
 5       THE COURT:  Would you announce
 6  appearances for the record, please.
 7       MS. GREISEN:  Paula Greisen and
 8  David Miller appearing on behalf of the plaintiff
 9  class, as well as Ed Connor.
10       MS. McCANN:  And Beth McCann and
11  Jim Quinn appearing on behalf of the defendants.
12       THE COURT:  Nice to see you again.
13       MS. McCANN:  Thank you.  Do you have an
14  idea how you would like to proceed?
15       MS. GREISEN:  I anticipated that I would
16  offer my testimony and Mr. Miller's testimony, and then
17  the testimony of Mr. Kahn, and then offer any rebuttal
18  testimony after they've presented their argument.
19       THE COURT:  Okay.  Then we're here on
20  fees which have been incurred during a compliance and
21  monitoring period, I'm supposed to have a hearing not
22  to exceed one day, and questions are as to
23  reasonableness of the fees and costs and entitlement to
24  attorneys' fees to the extent they were incurred in
25  assistance on the damages issues, as opposed to the
```

Page 4

```
 1  monitoring.  All right.  Do you want to make any
 2  opening remarks that aren't covered in your statements?
 3       MS. GREISEN:  Judge, I don't want to make
 4  any opening remarks, in general, I think a lot of my
 5  testimony will just confirm some, or be regard to some
 6  of the issues that are raised in our statements, but
 7  since you've reviewed our submission, I don't see the
 8  need for opening.
 9       (The witnesses were sworn.)
10       MS. GREISEN:  Judge, since the last
11  arbitration, the Court, Judge Nottingham, signed the
12  remedial plan and the compliance period started.  As we
13  pointed out in our submission, Section 31 provides that
14  class counsel will be compensated for time and
15  resources, quote, reasonably necessary to monitor
16  compliance during the compliance period.  And, of
17  course, that's why we are here today.
18       After the court signed the remedial plan,
19  we spent a significant amount of time communicating
20  with clients with respect to the settlement, we spent
21  time talking with experts about achieving compliance at
22  DOC, and, of course, we spent a significant amount of
23  time monitoring compliance with the overall plan,
24  including compliance with the damage claim process.
25  And that seems to be the heart of the issue today, so
```

Page 5

```
 1  I'm going to just spend the time talking about that,
 2  unless, of course, you have questions with respect to
 3  other issues.
 4       Judge, the remedial plan is a very
 5  comprehensive document, it's the product of a
 6  month-long negotiation, and though the parties tried to
 7  be as detailed as possible when they made that plan,
 8  there's no way that the parties could foresee all the
 9  parameters that would need to be discussed in the
10  execution of that plan.
11       I think it's fair to say, it's certainly
12  our position that all the parties anticipated that
13  there would be aspects of the plan that would have to
14  be determined during the course of the compliance and
15  the monitoring period.  With respect to the damage
16  claim process, issues that arose initially had to be
17  resolved that were not specifically addressed in the
18  remedial plan, such as the damage claim forms, what
19  would those forms look like, what kind of instructions
20  would be given to clients as to how to fill out those
21  forms, would we need a different form for the
22  different -- we have five different classes, would we
23  need a different form for each class, would there be
24  several different types of forms for them to fill out.
25  Those issues were not simple, and they certainly
```

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

### Page 6

1  weren't discussed in the negotiation of the remedial
2  plan.
3       All the parties met, counsel for both
4  sides met, we've met frequently with the special
5  masters to devise those plans. There was never any
6  objection at that point that class counsel should not
7  have been involved, because I believe it was by
8  agreement of the parties that we would sit down and
9  resolve some of these technical issues during the
10 compliance period.
11      There were other issues that weren't
12 addressed in the remedial plan, such as who pays the
13 cost of discovery and what discovery do the claimants
14 get. There were also various meetings between counsel
15 for both sides to discuss these issues. After the
16 damage claim process began, in other words, after forms
17 began to be filed by the claimants, there was -- the
18 vast majority of our time, class counsel's time, was
19 spent responding to attempts by the defense to, we
20 believe, eliminate any type of relief that would have
21 been offered under the remedial plan. In other words,
22 and this is the biggest area --
23      THE COURT: Any type of monitoring
24 relief?
25      MS. GREISEN: Correct. Actually, Judge,

### Page 7

1  any type of relief at all, because one of the issues
2  they raised was that our clients weren't entitled to
3  injunctive relief, as well, there was a brief on that
4  issue. So in essence, they raised not only liability
5  raised defenses, and I've outlined them in the
6  submission, and unless you want me to go through them,
7  but they raised 11th Amendment issue, they raised
8  issues such as the ADA does not allow for damages, they
9  raised issues such as the burden of proof, whether or
10 not our clients had to prove intentional discrimination
11 under the rehab act, they raised claims such as
12 currently the Prison Litigation Relief Act exhaustion
13 requirements, they also argued that our clients were
14 not entitled to any injunctive relief.
15      These types of defenses that were raised
16 would have eradicated any form of relief under the
17 damage claim process. It is our belief that part of
18 monitoring the remedial plan was and is monitoring the
19 damage claim process to ensure the integrity of that
20 process for our clients. If these claims had been
21 successful, and to date, none of them have been, if
22 these defendants had been successful, it would have,
23 without doubt, ensured no remedy for our clients.
24      In approaching the damage claim process,
25 I think it's important for the Court to know that we

### Page 8

1  approached it on two different fronts, we approached it
2  first as class counsel, and our responsibility as class
3  counsel to ensure the integrity of the process. There
4  were also, I believe, 10 different people that we are
5  currently representing during the damage claim process
6  on the merits of their individual claims.
7       Those cases are -- we have separate
8  billing procedures in our office to track billing on
9  those cases. We have not included any of those
10 billings in the submission. We agree with the defense
11 that we are not entitled to fees on those specific
12 cases unless and until we prevail on those cases. What
13 we are asking for today is our fees in acting as class
14 counsel with respect to the issues that affect the
15 class.
16      THE COURT: I need to interrupt you to
17 ask a couple basic questions. Why are there two judges
18 involved?
19      MS. GREISEN: That's a good question.
20 And it was a question that caused some confusion
21 initially. The remedial plan specifies that if there
22 is an appeal with the individual merits of any
23 particular case, that those appeals would be heard by
24 Judge Kane. Initially the parties were submitting all
25 of their appeals on these issues to Judge Kane. And

### Page 9

1  Judge Kane held a status conference, in which he said
2  that he didn't think that these policy issues were
3  issues that were properly before him because they go to
4  the overall intent of the remedial plan.
5       THE COURT: By policy issue, do you mean
6  issues related to what damages are available?
7       MS. GREISEN: Correct. Those issues I
8  think initially were addressed to him, but they didn't
9  have to do with the merits of individual cases. He
10 believed -- he initially said he was going to talk with
11 Judge Nottingham about whether Judge Nottingham would
12 retain supervision over those questions that go to
13 overall procedures and policy in the case, maybe
14 "policy" is not the right word, but interpreting the
15 remedial plan.
16      We did subsequently have a hearing in
17 front of Judge Nottingham, the Court at that time
18 instructed the parties to make a list of all the
19 pending cases and inform the Court which judge they
20 thought should hear which issues. The parties did
21 that, and I point the Court's attention to, I believe
22 it's Exhibit 11 ...
23      THE COURT: Uh-huh.
24      MS. GREISEN: -- where we filed those
25 motions. And that was another part of what I intended

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 10

1  to say, was that if you look at the submissions, the
2  issues that we're submitting in our fee petition today,
3  the issues that are currently pending, the Fitzgerald
4  issue, and I believe there's 8th Amendment issues.
5  Even the defendants agree that those issues are issues
6  in front of Judge Nottingham because they affect either
7  the entire class or they affect an entire category of
8  claimants. Those are the only types of issues which we
9  have become involved in the damage claim process.
10         THE COURT: Since you submitted the list
11  to Judges Nottingham and Kane, have they taken any
12  actions that would indicate to you that they were
13  paying any attention to the list?
14         MS. GREISEN: Well, I can tell the Court
15  that prior to the list -- prior to us submitting the
16  status report, all of these big policy issues or
17  procedural issues have been decided by Judge
18  Nottingham, he decided the 11th Amendment immunity
19  issues, all the motions that have been decided to date,
20  the PLRA issues, any kind of liability based defenses
21  have been decided by Judge Nottingham, and have been
22  decided based on what he believes the intent of the
23  remedial plan was.
24         THE COURT: But those issues got raised
25  initially because -- they were raised because the state

Page 11

1  raised the issue with regard to an individual's claim
2  for damages?
3         MS. GREISEN: That's correct. And so
4  what we did was we filed an appeal, and if you notice
5  on our briefing, all of the appeals that we filed we
6  entered as class counsel or as -- on behalf of
7  similarly situated people.
8         In those appeals, we did not discuss the
9  merits of any of the individual cases, we never have
10  discussed the merits of any of the individual cases, we
11  have only discussed the overall liability defenses that
12  have been raised, such as the 8th Amendment or the PLRA
13  issues.
14         THE COURT: The two that are still
15  pending are the Fitzgerald issues, which is whether
16  damages are permitted under the ADA.
17         MS. GREISEN: The Fitzgerald issue,
18  there's also -- you know, and I'm trying to remember, I
19  think at the time that we submitted Exhibit 11 there
20  was the Fitzgerald issue, and I think there might have
21  also been the 8th Amendment issue, whether or not all
22  8th Amendment claims were dismissed by the Court.
23         Now, since the status report, there's
24  also been another briefing, and that's the briefing on
25  whether or not class five claimants, those who have

Page 12

1  died during the pendency of the case, are entitled to
2  damages. That briefing has also been submitted to
3  Judge Nottingham, and that was subsequent to the status
4  reports that were prepared.
5         But to answer your question, neither
6  Judge Nottingham nor Judge Kane have taken any steps
7  with respect to the status reports, or there hasn't
8  been any decisions on those cases. The defendant's
9  status report also lists several different individual
10  appeals that they are pursuing, and they note that
11  those appeals are directed to Judge Kane.
12         THE COURT: Okay, thank you. What do I
13  make of, then, Judge Borcher, or Special Master
14  Borcher's comment in the order that was attached to the
15  defendants' submission, special order No. 2, which
16  says, counsel may file motion, class counsel, on
17  specific claims in which they have entered an
18  appearance -- as to any claim in which an injury of
19  appearance has not been filed, class counsel has no
20  legal standing to appear and argue any generic issue.
21         MS. GREISEN: I read that order, and I --
22  you know, this order happened, I believe the sequence
23  of events, and I will premise this with I was out on
24  maternity leave when I think a hearing took place, and
25  Patricia Belac, who is one of the associates working on

Page 13

1  this case, attended. At that hearing I believe that an
2  issue was raised with respect to whether attorneys'
3  fees would be granted on this particular case, and my
4  understanding that there was a lot of things discussed
5  during the status conference that he references in the
6  special order.
7         At that time the special master, and for
8  some reason, I will note that the special order says it
9  comes before the special master on his own motion, so
10  there wasn't, I don't believe, a pending -- there was
11  no motion filed for attorneys' fees, or anything like
12  that, but I believe at the time he was saying that that
13  issue couldn't be raised because it had to be raised in
14  the context of a specific case.
15         I understand how this order is being
16  interpreted to be very broad, saying that we don't have
17  any standing essentially to come in on any of these
18  issues. I'll note first, Judge, that the special
19  master asked us I believe -- on every single briefing
20  that we've done, the special master directed class
21  counsel to either file brief on it initially or with
22  the -- I think the first round of issues, the 8th
23  Amendment, 11th immunity issues, the special master
24  basically said he did not believe he had jurisdiction
25  to even answer those issues, and was going to put it

4 (Pages 10 to 13)

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 14

1  before Judge Nottingham and Judge Kane, and let the
2  court decide it.
3          This, I believe, had to do simply with
4  this discussion about attorneys' fees, I don't believe
5  that this goes to an overall issue that we don't have
6  standing to address the liability based defenses, I
7  think it's being read broader than what he meant on it.
8  I don't believe that Judge Nottingham will say, when we
9  go before him to argue the liability based defenses,
10 that class counsel doesn't have a right and an
11 obligation to present the counter argument to why
12 exhaustion should be applied.
13         In fact, in none of the briefings to
14 date, although we have done briefings on all of them,
15 all of the issues that Judge Nottingham has decided, he
16 has never indicated that it's been inappropriate for
17 class counsel to participate in the discussions about
18 the damage claim process. I simply think that this had
19 to do with a specific issue that was before the Court
20 on attorneys' fee. And frankly, if it goes beyond
21 that, I would simply suggest that the special master is
22 wrong.
23         I agree that we do not have -- we would
24 not have standing to intervene to argue the merits of
25 any individual's case if we did not enter appearance on

Page 15

1  that case. However, with respect to these much broader
2  issues, I don't think we can step aside and not
3  intervene on those issues. I think we have an ethical
4  duty, as well, to ensure that issues that affect a
5  substantial number of claimants are addressed by class
6  counsel.
7          As the Court knows, most of these
8  claimants are pro se, as was anticipated by the
9  remedial plan, we can't simply throw them to the wolves
10 in the damage claim process, although we had no intent
11 to represent them individually.
12         THE COURT: By throwing them to the
13 wolves, are you colorfully trying to say we can't let
14 them try to argue legal issues that they're not trained
15 to argue?
16         MS. GREISEN: That's a much more
17 articulate way to say it, yes. Let me sum up that with
18 saying we think that our efforts during the damage
19 claim process have been essential to ensuring integrity
20 of the process and the intent of the remedial plan, we
21 believe the fees that we incurred were reasonable and
22 necessary.
23         We also believe that the fees and the
24 monitoring of the damage claim process and the
25 compliance, in general, are recoverable, despite

Page 16

1  whether or not we had been successful in arguing the
2  liability based defenses or not. I think there's some
3  suggestion in their brief that we would only be
4  entitled to fees if, in fact, we were successful in
5  arguing those issues. And I believe Mr. Kahn and
6  Mr. Miller will both talk about that. Although I would
7  say we have been successful, we believe, on every issue
8  to date, we don't believe that's a necessary component
9  of having our fees compensated.
10         I did want to simply go through the
11 specific challenges by the defense in their submission,
12 if I can, and then obviously anything further that they
13 have today, I would like an opportunity to do that.
14 With respect to -- and I'll start on page 4 of their
15 submission at the bottom, and just kind of go through
16 them line by line.
17         They first challenge the entry of
18 9-23-03, two entries of CKC, that's Kansas Crawford,
19 who was a paralegal with us, regarding appeal issues
20 and filing the review. The first of those entries was
21 for research of certificate of interested party and
22 file review for appeal. Ms. Crawford is no longer with
23 our firm, so I couldn't clarify the entry, but I would
24 point out to the Court that entry has been no-charged,
25 so it's of no moment one way or the other in the

Page 17

1  exercise of billing judgment.
2          The second entry was a, quote, call with
3  inmates regarding the settlement and review client mail
4  and organize, that's a fully compensable activity, we
5  believe, for a paralegal, so we believe that that's --
6  there should not be an issue with respect to that
7  entry.
8          The next two issues objected to by the
9  defense are 10-16-03, and 10-27-03, those were entries
10 for a DSK, who is Diane King, one of the partners in
11 our office, she spent some time, not a lot of time, I
12 might add, but some time assisting us and editing the
13 final response to the defendants' objections to the
14 special master's report previously.
15         As the Court knows, that was a
16 million-dollar fee and cost award that we were looking
17 at preserving on appeal. We don't think it's
18 inappropriate for another partner in the office to
19 spend a small amount of time reviewing it. I don't
20 think at any moment that Ms. King is not formally
21 entered on the case, I don't think that's a
22 prerequisite to submitting her time in a fee
23 position -- in a fee petition.
24         The next entry, 12-17-03, David Miller
25 will speak on this issue, as well. The defense

5 (Pages 14 to 17)

Calderwood-Mackelprang, Inc. 303.477.3500

Page 18

1  objected to both counsel touring Fort Lyons. And I'm
2  going to say briefly that Fort Lyons is the facility
3  where most of our class members are housed, in a place
4  where arguably most of the changes would occur, it was
5  a large meeting, a meeting that occurred with
6  architectural experts and DOC personnel, both
7  Beth McCann and James Quinn attended the meeting, we
8  had some group tours, but Mr. Miller and I split up,
9  and he'll discuss that trip further during his
10 testimony.
11       The next issue that they raised were the
12 conferences. The defendants argue that apparently we
13 should have all attended the conferences with the same
14 amount of time, and that it's indicative of sloppy
15 bookkeeping, that our time was different on these
16 conferences.
17       And I would say to the contrary, our
18 personnel tried to be very specific on how much time
19 each person spent in the conference. The fact is, some
20 people came late to meetings and some people left early
21 for meetings, and some of the time entries that are
22 reflected here reflect efforts other than just the
23 meeting, itself.
24       And for instance, I just picked out a
25 few, but on the 6-30-04, entry, they objected because

Page 19

1  Mr. Miller billed .3 more for a meeting than myself and
2  Alison Butler Daniels did. Well, if you look at that
3  entry, you'll see that in addition to the meeting, he
4  also prepared a status memo for the group after the
5  meeting. And I think if you go down each one of those
6  these, you can find something similar.
7       The 9-1-04, meeting that they contest, in
8  that meeting, actually ABD and CH, that's the associate
9  and the paralegal, they left the meeting after their
10 portion of the meeting was done, and David and I
11 continued on. I mean, that's efficient use of time, we
12 didn't have them sit to listen to topics that weren't
13 of pertinent to them.
14       I actually personally remember the
15 6-27-05, meeting, in which they claim there's a
16 difference in billing, because David billed 1.6 and I
17 billed 1.8. I remember that meeting because David had
18 to leave early, and I continued on with the meeting
19 with Linda Edwards, who is our diabetic expert. So
20 these are, I think, indicative of trying to be accurate
21 in our time records, not indicativeness of sloppiness.
22       On page 6, 7-29-04, and 8-27-04, those
23 were entries Mr. Miller spent, one was on briefing the
24 issue of who was going to pay the costs of discovery,
25 those were issues that were spent on monitoring the

Page 20

1  damage claim process. Mr. Miller, he'll testify to
2  this, has not worked on individual damage cases, those
3  entries, therefore, could not relate to individual
4  damage cases.
5       And the same, I think, with the next two
6  entries go to the general issue that we're discussing
7  here, both the next two entries are contested because
8  they have to do with monitoring the damage claim
9  process. The conference call was a call regarding an
10 order that Nottingham issued, it was an order regarding
11 what kind of liability issues could be raised during
12 the damage claim process. This was the first order
13 that he issued that said, defense cannot raise these
14 type of claims. And I'll point out to the Court that
15 even after that order was issued, and that was in
16 November, I believe, of 2004 --
17       THE COURT: When you say he issued, you
18 meant the special master?
19       MS. GREISEN: I'm talking about Judge
20 Nottingham, I'm sorry. Judge Nottingham issued the
21 order in 2004, and even after that order issued, the
22 defense continued to raise liability based defenses,
23 such as the PLRA exhaustion requirement was raised
24 after Judge Nottingham issued that order.
25       The next entry, the PSB, was Patricia

Page 21

1  Belac, regarding research on what claim survived death,
2  what 1983 claim survived death. That's a particularly
3  complicated issue in scope of the damage claim process.
4  The class five claimants, those who have died during
5  this case, the issue is whether under the ADA or the
6  Rehab Act they can get claims once they have died.
7       Under 1983, the special master initially
8  entered an order saying that none of the 8th Amendment
9  claims survived in the case. Now, that finding is
10 erroneous, and that's agreed to by the defense, in
11 subsequent briefings the defense has agreed that there
12 are still some 8th Amendment claims alive in this case;
13 but the special master determined first that there were
14 not any 8th Amendment claims, and because of that, the
15 only kind of damages that could be recovered by class
16 five claimants were damages allowed under the ADA and
17 Rehab Act.
18       And the issue of what damages survive in
19 an ADA and Rehab Act is an issue of first impression,
20 not only in this circuit, but across the nation. I
21 could not find case law on this point, so we have had
22 to do extensive research to argue this point. In
23 essence, the special master initially determined that
24 the only relief that was going to be provided to class
25 five plaintiffs was economic loss prior to death.

Page 22

1   Well, these are all incarcerated
2   individuals, their economic loss is de minimus, so
3   essentially there would be no damages whatsoever for
4   class five plaintiffs under this analysis. This was a
5   part, Patricia Belac's research was a part of research
6   to this issue as to what kind of damages class five
7   plaintiffs are going to be entitled to, and we think
8   that's a compensable issue under the damage claim
9   process.
10   The next two entries I'm going to refer
11   to David Miller's testimony on, he worked with Patricia
12   Belac during the time I was on maternity leave from
13   March until June, actually to August, seems like a long
14   time ago, and so I'm going to let him provide testimony
15   on those issues.
16   The cost issue, the LEXUS research issue,
17   I -- there's additional supplemental time submitted on
18   LEXUS, as well, because not all the LEXUS research time
19   was billed in our original submission. Judge, these
20   are charges that we regularly bill to clients on every
21   case, they are not in our overhead, we do not assume
22   these costs in our overhead. If we did research by
23   hand at our hourly rate, it would be an extremely
24   inefficient use of counsel's time.
25   Given the large number of legal issues

Page 23

1   raised by the defendants, the charges are reasonable,
2   we believe, and efficient use of our time. The copying
3   costs we also believe were reasonably necessary to
4   monitor the --
5   THE COURT: May I ask a question?
6   MS. GREISEN: Sure.
7   THE COURT: Are the copying costs for
8   in-house copies or external?
9   MS. GREISEN: I believe they're all
10   in-house, I can look.
11   THE COURT: I don't think I'm supposed to
12   rely on my own experience, but it's sort of a profit
13   center.
14   MS. GREISEN: And as you might remember
15   David Brohm's testimony in the first arbitration, he
16   testified that it's the most efficient money maker in
17   his firm. There is -- our fees are reasonable at 15
18   cents a copy, it's less than you could get, I think,
19   outside usually charges 20 cents, but my memory is that
20   most of these are, in fact, inside copy costs.
21   And we didn't make six copies of
22   everything that came through, we have an enormous
23   volume of material coming through our office. Not only
24   the initial claim forms that come through, but as well
25   as the supplemental claim forms, any orders that are

Page 24

1   issued by the special master on any particular case,
2   the findings of the special master, the appeals that
3   are filed with respect to the special master's orders,
4   on top of that, the volume of correspondence we get
5   from our clients.
6   We have tried to be very mainstream and
7   streamline in copying, it's just a tremendous volume of
8   material that comes through. We do, when necessary, or
9   when possible, have a paralegal review the material and
10   determine whether it needs to be copied further, rather
11   than having everything copied to every person.
12   And I should say, we're not being
13   notified by the defense when they raise these liability
14   based issues, it's not like we get a phone call that
15   says, heads up, this issue is coming down the pipeline.
16   We have to review everything that comes through because
17   that's the only way we remain aware of what issues are
18   raised that could potentially have class-wide
19   implications. And because of that, it's necessary for
20   us to review all this material that goes through the
21   damage claim process.
22   With respect to the travel expenses, the
23   first issue that they raise is the travel expense of
24   8-31-03, travel expenses for prisons back in July of
25   '03. We did do a lot of travel back in July of '03, I

Page 25

1   went back and looked to see if those expenses were
2   submitted in the previous arbitration, and honestly
3   judge, I couldn't tell, there were some travel expenses
4   submitted in our previous arbitration, and not for that
5   particular amount, so my guess is that these expenses
6   came through after that arbitration. But because I
7   didn't want to spend an hour in attorneys' fees trying
8   to figure the issue, we're just going to withdraw the
9   claim for $365.7.
10   The rest of the travel expenses we
11   believe are appropriate and compensable as costs
12   reasonably necessary to travel to the facilities to
13   facilitate -- to the facilities to discuss compliance
14   issues with class members.
15   And as we pointed out in our submission,
16   I think it was sometime in 2003 the Department of
17   Corrections changed its policy and would no longer
18   allow attorney/client phone calls be made to
19   individuals at DOC facilities. The rule was, unless
20   there was an immediate hearing of which you did not
21   have previous notice, you were no longer allowed to
22   call inmates at the facilities. That necessitates
23   travel to the facilities.
24   The rest of my testimony is contained in
25   my affidavit, which I would incorporate in my testimony

Page 26

1  in the arbitration. Unless you have other specific
2  questions, judge, I will turn it over for David
3  Miller's testimony.
4      THE COURT: All right. But I think it
5  would be appropriate, before you turn it over, to
6  determine whether the State has any cross-examination.
7      MS. McCANN: I think we'll cover our
8  position in our statement.
9      THE COURT: Okay.
10     MR. MILLER: If I may, judge, as
11 Ms. Greisen explained, we both worked on this case
12 while Ms. Greisen was out on maternity leave for a
13 period of about five months, I ended up being the
14 supervising attorney within the office. And it was
15 during that time that several of these issues came up
16 that we've been talking about.
17     This case is not either our office's or
18 my first time around the compliance block in prison nor
19 class litigation within the Department of Corrections
20 in Colorado. I've been involved in approximately a
21 half dozen or more such compliance cases, starting with
22 a case that was filed back in the '70s, called
23 Marion O. versus the Colorado State Penitentiary that
24 successfully challenged and resulted in a settlement
25 revamping the entire inmate classification, intake,

Page 27

1  maximum security, and aggression system within the
2  state Department of Corrections.
3      Then moving on to one of the cases that
4  are cited by the -- cited by the defendant, the Ramos
5  versus Lamb case, where I was strictly compliance
6  counsel, because that case had been tried in 19 -- the
7  end of the '70s, early '80/'81 time, and then my
8  involvement began in 1983 and lasted literally
9  throughout my stay at the ACLU. When I left in 1996,
10 we were still litigating some issues connected with
11 that, so that was the case I told my executive director
12 would be over in compliance in three years, and ended
13 up being active 12 or 13 years later, and several of
14 the same kinds of issues arose.
15     And I tell that to the court because I
16 think it has relevance on what the district court has
17 previously found to be reasonably necessary monitoring
18 compliance work. And because those rulings have both
19 educated me and the office about those issues and have
20 influenced me and the office at which I've worked as to
21 how to charge for those kinds of behaviors, which of
22 those behaviors involved in working on a case where
23 there's a compliance order is or a compensable and
24 which are simply not.
25     In addition to those cases I've been

Page 28

1  involved in the Velasco versus Romer case, the Diaz
2  versus Romer case, the Arguello versus Romer case, and
3  several, as well as this one. And in almost every one
4  of those cases this question arises with respect to
5  what's the proper mechanism under which class counsel
6  should be involved, number one, in compliance; and
7  number two, be compensated for compliance.
8      Probably the most instructive of my
9  experience is relevant to the issues before you were at
10 the end of the monitoring and compliance -- arose at
11 the end of the monitoring and compliance period in the
12 Ramos versus Lamb case cited by the defendants.
13     And in that case Judge Jim Carrigan was,
14 I think, the third or fourth of the district court
15 judges on whose shoulders that case had progressed,
16 evolved, or revolved, depending on your perspective.
17 And one issue that arose was what was an adequate level
18 of medical care, because the settlement agreement
19 touched on the requirements for minimally adequate
20 medical care under the 8th Amendment, but the
21 settlement agreement had to be interpreted to address
22 the issue of the new problem within the prisons, which
23 was the development of HIV, the human immuno deficiency
24 virus.
25     The Department of Corrections took a

Page 29

1  position that said, we're going to do X, but we really
2  don't care what the result of this fight is. And the
3  fight came about because part of the ^ admit class
4  said we don't want to be housed with these people
5  because they're --
6      MS. McCANN: Your Honor, I fail to see
7  the relevance of this, and I object of going into the
8  details of another case at this point. The issue is
9  whether or not they're entitled to reasonable fees for
10 monitoring compliance in this case, I don't think we
11 need to have recitation of actions he's brought against
12 the Department of Corrections in the past, or the
13 details of that.
14     THE COURT: Okay. Is where you're going
15 in terms of telling me what the district court did in
16 that case?
17     MR. MILLER: Where I'm going, Your Honor,
18 is to tell you how my experience involving these same
19 kinds of cases where these same kinds of issues has
20 influenced me as to how I charge in this case
21 specifically.
22     THE COURT: Okay, I'm going to overrule
23 the objection.
24     MR. MILLER: And so I'll try to cut it a
25 little shorter, but I think it's important because the

8 (Pages 26 to 29)

Calderwood-Mackelprang, Inc. 303.477.3500

ba1b909a-d700-450e-8507-25769f4932cf

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 30

1  question arose as to when there was a dispute between
2  the parties, part of the inmate class and another part
3  of the inmate class. And so the question arose as to
4  under the terms of the settlement agreement, what was
5  counsel supposed to do, what was a plaintiff's lawyer,
6  who was class counsel, reasonably required to do to
7  enforce the rights of the class.
8        And as it was made clear to me by Judge
9  Carrigan, the terms of the settlement agreement were
10  what were important, not the state of Section 1983 law,
11  and so I was instructed to look at what the settlement
12  agreement -- what obligation the settlement agreement
13  laid upon class counsel's shoulders.
14        In that case, it was the same obligation
15  as laid upon our shoulders in this case, and that was
16  to do what was reasonably necessary to represent the
17  interest, the legal interest of the plaintiff class.
18  Now, it turned out that the part of the class that I
19  represented didn't prevail in the fight between
20  factions of a plaintiff class.
21        That didn't stop the Court from saying,
22  the analysis is, was it reasonably necessary for class
23  counsel to take this position to defend or to argue a
24  reasonable interpretation of the settlement agreement.
25  And so the Court ruled that both sides of the plaintiff

Page 31

1  class counsel were entitled to reasonable compensation
2  because their actions had to be taken ethically, as
3  well as legally with respect to interpreting what the
4  settlement meant.
5        THE COURT: Is that a published decision?
6        MR. MILLER: I don't believe that Judge
7  Carrigan published that. I'd be glad to provide the
8  Court with a copy of that. And so it ended up that the
9  Department of Corrections ended up paying both sides,
10  the winning side and the losing side of that dispute.
11  And the reason was, as explained to me, and which is
12  the reason I've taken the position that I did in how I
13  handled charges in this case, that as class counsel, I
14  am required, or was required in that case, to argue a
15  reasonable position with respect to the interest of the
16  client under the settlement agreement, not looking at
17  whether you prevailed under Section 1983 law, that was
18  an issue that was over and done with, so that's what
19  happened in this case.
20        When issues arose, our office's practice
21  was to look at the settlement agreement, decide whether
22  the action we had to take or believed we were
23  considering taking, decided to take, was reasonably
24  necessary to affect the rights of the plaintiff class.
25  So it was very clear to me, when I was dealing with

Page 32

1  Patricia Belac, PSB in the time slips report, that we
2  were not charged with representing individual
3  defendants in -- plaintiffs, rather, in their
4  individual damage claims, but we were charged with
5  enforcing the rights of all plaintiffs who are members
6  of the class in collective rights, if you will, under
7  the settlement agreement.
8        And so I reviewed decisions that came
9  down, claims that were made by individuals who were pro
10  se to see simply whether they raised issues that
11  touched on the larger class issues. And to the extent
12  they did, I would charge for that time. To the extent
13  they did not, I would either not charge for that time
14  or refer the matter to Ms. Belac, who I instructed
15  quite clearly to separate her time out and to charge
16  individual cases.
17        And the way that was charged was through
18  the name of the individual plaintiff, not under Montez,
19  the name Montez, but rather to open up separate
20  accounts for individual damage actions by separately
21  named class members who we were considering
22  representing individually.
23        And so what does not appear before you
24  today are all of those time slips that relate to
25  individual class members' claims for damages. I simply

Page 33

1  have never involved myself in any of those individual
2  claims. The only exception to that broad statement
3  I've just made is if a letter from a class member did
4  not alert us to interests of general applicability, and
5  asked us to represent him or her, I would take it upon
6  myself occasionally to say, look, this is a frivolous
7  matter, we're not going to get involved in this, and I
8  would tell my staff to inform the individual, as
9  opposed to referring that to Ms. Belac so she would
10  have to make that decision and waste time.
11        Now, it may appear, and I think the
12  defendants flagged one time where I spent, on May 4th
13  of 2005, and if you review that you'll see that the
14  time slip says, review inmate letters, re, condition,
15  claims, and settlement. Now, that was my standard
16  practice, I would look to see if the letters that came
17  in raised issues with respect to general compliance and
18  whether the defendants were behaving as they're
19  required to behave under the settlement agreement.
20        To the extent that we considered that
21  case as an individual case, that's what I normally
22  referred on to Ms. Belac, who would split the time out,
23  because I asked her to do both, look at compliance
24  issues, in general, and I'll talk about that in a
25  minute, and look at individual cases, also.

9 (Pages 30 to 33)

Calderwood-Mackelprang, Inc. 303.477.3500

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 34

1   Now, this one instance, I mentioned a
2 conference with Ms. CPH, was Chu Pai, C-H-U P-A-I, last
3 name Ho, H-O, who is my paralegal, and I just told her
4 in this case, oh, by the way, decline these half a
5 dozen people, they don't raise issues that I'm even
6 going to pass on to Ms. Belac.
7   In my experience, I can't pretend to
8 remember that conversation, my guess is it took
9 probably 10 seconds of my time, but because I didn't
10 split it out, we're willing to just eliminate that
11 charge, because it's not clear from the time record in
12 that instance, even though -- and I don't have a
13 specific memory. If I had a specific memory, I'd argue
14 that we should get the vast majority of that, but I
15 don't, so we'll just withdraw that claim.
16   But the point is that the practice was
17 for me to review general compliance matters and to pass
18 along the individual issues to Ms. Belac. Now,
19 Ms. Belac was given specific instructions from me, and
20 here were those instructions: They were -- we have two
21 lines of analysis going on, one is, we have, we, being
22 the law firm that you're working with, we have an
23 obligation to monitor compliance. Ms. Greisen and I
24 decided that we could hire Ms. Belac at $180 an hour,
25 as opposed to taking up our time at 275- or $300 an

Page 35

1 hour, and we'll efficiently handle the monitoring of
2 compliance, because we have other matters to handle in
3 our practice.
4   And from a deficiency standpoint, it made
5 much more sense to pay somebody a fee much less
6 expensive than our own time would have been to monitor
7 compliance. So she was instructed, Ms. Belac was
8 instructed to review the letters that we had with
9 respect to not just individual issues, but with respect
10 to class compliance issues, if I believed there was a
11 larger class issue involved.
12   And what you see in these time slips in
13 front of you today are Ms. Belac's time slips that have
14 been individually reviewed and only relate to general
15 class compliance matters. Now, is there some overlap?
16 The answer is, there's overlap in the individuals that
17 were contacted, but not in the time that was spent.
18   So Ms. Belac might talk to inmate A about
19 general compliance matters, and that would go beyond
20 the nature of individual inmate A's concerns or may go
21 beyond individual inmate A's personal concerns. For
22 example, let's say inmate A has a hearing disability,
23 but not a mobility disability, but because inmate A is
24 down at the facility and walks the same route that the
25 inmates do who are mobility impaired, can see whether

Page 36

1 or not ramps have been built as they're supposed to be
2 built, or whether a pusher as an assistant has been
3 provided to individuals. And so we'd have information
4 outside of that individual's scope of personal damages,
5 if you will.
6   To the extent that the person who
7 Ms. Belac would be talking to would also be able to
8 relate their personal experiences that were in
9 violation of the agreement, it was our position that
10 information generally going to compliance with
11 standards and requirements set out in the settlement
12 agreement could legitimately come from and be billed
13 from contact with that person.
14   So for example, if that person says, I
15 didn't get a claim sheet, they're supposed to hand it
16 out to me, but they didn't give it to me, that may or
17 may not have relevance in their individual claim if
18 damages were later sought for them, but certainly has
19 relevance with respect to the compliance issues of
20 whether or not the defendants are doing what they're
21 required to do under the settlement agreement. So
22 sometimes while it's a more complicated issue because
23 of a situation like that, those were the guidelines
24 that we drew for Ms. Belac and her involvement.
25   Why did we involve her? Because, as I

Page 37

1 said, it ended up being a lot less expensive to have a
2 person who charged at a much lower rate to look at
3 those issues than a person that charged at a higher
4 rate, specifically with regard to the issues that
5 Ms. Greisen said I'd address.
6   The first trip that Ms. Greisen and I
7 took down to Fort Lyons was in December of '03, and the
8 argument from the defendants is that only one attorney
9 should have taken that trip, and it was, therefore,
10 double billing. The bottom line is, Ms. Greisen and I
11 split up and talked to different inmates, we had to
12 talk to them about compliance issues and what the
13 process was to implement the settlement agreement.
14   Had we done that with one attorney, we
15 would never have finished in one day, it would have
16 taken much longer that than it otherwise took. And
17 would have been inefficient for a person to stay two or
18 even three days when two people could go down and
19 handle it within the scope of one day.
20   That was true additionally because we had
21 an expert witness come down. And so while one
22 individual followed the expert witness, another person
23 could be talking to inmates at times. The issue on
24 Ms. Belac, if you look at a page 6 of the defendants'
25 response, references the significant, or what they call

10 (Pages 34 to 37)

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

### Page 38

1  a series of large amounts of time billed by Patricia
2  Belac and meetings with class members.
3          (Interruption.)
4          THE COURT: Go ahead.
5          MR. MILLER: Her time slips are as they
6  are in the fee petition for the reasons I mentioned,
7  because of the time that she went down, and it's billed
8  here is time she spent discussing with inmates, not
9  even inmates that we're currently representing, matters
10 of general compliance.
11         So for example, when it says she talked
12 to inmates, that might include five or six different
13 people; whereas, we only considered even the claims of
14 perhaps one or two of them. So Ms. Belac was not
15 simply going down to talk with individuals who we
16 currently are now representing or were considering
17 representing, a lot of these contacts came through
18 letters and correspondence.
19         Because we were not on the attorney SIPs
20 list, the Colorado inmate phone system list, of every
21 class member, those inmates were not allowed to call
22 us. And dealing with them through letters is an
23 impossible burden because, as a you appreciate,
24 information gathering is a two-way street, it's not a
25 fill in the following answers to the following

### Page 39

1  questions, it's an exploration that requires a dialogue
2  sometimes, and in these cases, required us to go down,
3  talk to some inmates, and then use information that we
4  got from them to talk to other inmates, just the kind
5  of discovery process that requires the discussions.
6          In the real world practice of law, you
7  don't interview clients, you don't gather facts through
8  having them write you letters. You might become
9  alerted to an issue by a letter, but you don't become
10 aware of all the facts by having serial back-and-forth
11 letter writing to people.
12         So that was the reason for Ms. Belac's
13 travel to these facilities and the separation between
14 the individual inmate cases, on the one hand, which you
15 don't see time entries for, and the general compliance
16 issues that you do see time entries for. Additionally,
17 just backing up, hopefully not confusing you, with
18 respect to the trip to Fort Lyons by Ms. Greisen and I,
19 those trips are not spent observing the scenery and
20 wondering of the beauty of Colorado, they're spent
21 talking about individual inmate cases.
22         To the extent there's an objection to
23 travel time, as the records will indicate, that
24 transportation time also included meetings, discussing
25 the individual inmate cases or compliance issues that

### Page 40

1  we're going down to review. So if inmates A and B both
2  told us they were having the same kind of problem,
3  discussions about those issues would be the substance
4  of our discussions while travelling.
5          With respect to the issue of the 5-4
6  date, I've already addressed that. We'll withdraw
7  that, even though I believe it's 99-percent
8  compensable. I don't know if the material that's been
9  submitted to the Court already assures the Court of
10 these matters I'm about to briefly mention, but
11 Ms. Greisen and I assured ourselves the reasonableness
12 of our hourly rates. I don't believe they're being
13 contested, but to the extent they've been previously
14 awarded by the court and/or yourself in this case, I
15 don't think there's a dispute.
16         We've individually reviewed the time
17 slips, made such adjustments to the time as would
18 reflect what would be billed to a paying client, and
19 that is reflected in either omissions from the billing
20 slips or notes of no charge.
21         And by omissions, I mean, you don't
22 really get a lot of credit for having something not be
23 there, but for example, with respect to Ms. Belac, if
24 you are to look at Ms. Belac's time slips when she came
25 on in February, March time, or so, of 2005, you'll see

### Page 41

1  that she has noted that she spent time with me talking
2  about these very issues, how do we charge things, what
3  am I supposed to look at, what are the compliance
4  issues that I'm supposed to be looking at.
5          So you'll see entries on literally --
6  I'll give you a few where she's indicated that she
7  spent time with me, and you'll see no time entries for
8  me. That's because while educating her about these
9  issues, I simply did not charge, so it's a de facto
10 exercise of billing judgment at the time.
11         For example, on 2-22-04, you'll see a
12 meeting with me, with Patricia Belac, about case
13 management and class issues, you'll see no entry of
14 time for me, simply just didn't charge.
15         THE COURT: What was the date?
16         MR. MILLER: 2-22-05. You'll see the
17 same thing on 2-25-05, where she notes a meeting with
18 myself concerning the interview process, in other
19 words, me saying, here's what you've got to do to get
20 information about general compliance when you go down
21 there. She met with me for a brief period of time, I
22 simply didn't charge for that background education.
23         Again, on 2-26 you'll see the same kind
24 of time entry with her, where she's met with me about
25 what issues relate to San Carlos, what she's supposed

11 (Pages 38 to 41)

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 42

1  to be looking at in terms of general compliance, no
2  entry from me. In my mind, that was simply time spent
3  educating her, and therefore, better not charge to the
4  other side, so I just simply didn't enter a time slip.
5  I think that's all I have, unless you have any
6  questions.
7     THE COURT: Other than page 30 of the
8  remedial plan, second from the last full paragraph on
9  the page, is there anything that delimits my
10 jurisdiction in determining attorneys' fees? Because
11 it just said incurred during the compliance and
12 monitoring period, it doesn't really say incurred how.
13    MR. MILLER: Well, other than the general
14 statement that appears elsewhere in the agreement, that
15 attorneys are to spend time reasonably necessary
16 adjusting matters.
17    THE COURT: And where is that?
18    MR. MILLER: I think it's in paragraph
19 31.
20    THE COURT: Okay.
21    MS. McCANN: And we would also direct the
22 Court to page 29, the last full paragraph, indicating
23 that plaintiffs' class counsel does not have an
24 obligation to represent any individual with respect to
25 individual damage claims, and they may or may not

Page 43

1  represent individual damage claimants.
2     THE COURT: Okay, thank you.
3     MR. MILLER: Just to clarify, I'll just
4  tell you that we are, the special master, I'll tell you
5  that we have entered appearances on about a dozen
6  cases, you do not see any time records for any of those
7  matters where time is spent on their individual cases.
8     THE COURT: Okay. I assume you don't
9  need cross on this, either?
10    MS. McCANN: I have a few questions,
11 actually.
12    THE COURT: Okay.
13    MS. McCANN: David, in the Ramos case,
14 correct me if I'm wrong, because I'm not that familiar
15 with it, but there was no procedure for individual
16 hearings on damages claims, was there?
17    MR. MILLER: There was no damages claim
18 at all in that cases, it was an injunctive relief.
19 That's not true in Marony, though.
20    MS. McCANN: Now, you also mentioned that
21 you have been reviewing all of the letters that come in
22 from the inmates to determine whether or not they
23 involve general issues or specific issues, did I
24 understand you correctly with what you said?
25    MR. MILLER: No, I don't know that I've

Page 44

1  reviewed all of the letters, I reviewed all of the
2  filings with respect, all of the matters that have been
3  filed to the Court or before Magistrate Pringle with
4  respect to individuals.
5     MS. McCANN: So the actual claims that
6  are being filed by the individuals in the special --
7  with the special masters is what you're reviewing?
8     MR. MILLER: I've looked at the filings
9  of -- I've looked at the filings in the special
10 master's case, correct.
11    MS. McCANN: Well, part of what you're
12 doing when you -- let me change tracks a little bit.
13 Part of what you're doing when you go down and visit
14 with these inmates, or Patricia Belac visits with them,
15 is determining whether or not you're going to represent
16 these inmates in their individual claims; is that
17 right?
18    MR. MILLER: Well, to the extent that
19 that's the information people have, some people just
20 write and say, look, here's what they're doing, they're
21 not following the agreement, and we'll talk to them
22 whether or not they have a claim. Or some of them have
23 claims that simply aren't three, four, five claims,
24 they're one, two, claims, and Your Honor, those are the
25 class of their damages and wouldn't be subject to a

Page 45

1  matter that we'd get involved in. But on the other
2  hand, some cases do involve individuals who say, here
3  are all the problems that relate to the case, and I
4  want you to represent me.
5     MS. McCANN: And you have to, then, or
6  you or Patricia Belac talk to the client or talk to the
7  inmate to decide whether or not you're actually going
8  to represent them in an individual claim?
9     MR. MILLER: That's correct, the majority
10 of that or the vast majority if not all of it would be
11 Patricia Belac.
12    MS. McCANN: She actually -- I mean, she
13 essentially, you guys essentially hired her to handle
14 the damages aspect of this case, didn't you?
15    MR. MILLER: No, to help us review
16 materials and to assist with the damage claims that we
17 decided to take, yeah.
18    MS. McCANN: Well, I'm just going to show
19 you this as an example, this is a letter that was
20 received by DOC from Patricia Belac dated March 29th of
21 2005, does that appear to be a letter on your all's
22 letterhead?
23    MR. MILLER: On our letterhead, yes,
24 well, it's on a letterhead that she's authorized to use
25 from us.

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 46

1    MS. McCANN: Well, you don't have any
2  quarrel with the authenticity of that letter.
3    MR. MILLER: No.
4    MS. McCANN: And you can see from that
5  letter that she specifies she's going to visit at one
6  of the facilities some individuals to talk with them
7  about their individual claims.
8    MR. MILLER: Yes, I see that.
9    MS. McCANN: All right, thank you. I'll
10 be happy to make a copy of that for you. So in some of
11 this business that she's conducting at the different
12 locations, she's clearly talking to the individuals
13 about individual damages claims.
14   MR. MILLER: As she says in that letter,
15 she wants to see this person about individual claim and
16 compliance.
17   MS. McCANN: Some she says she's just
18 going to see for individual claims.
19   MS. GREISEN: Can I see the letter again?
20   MS. McCANN: Sure, but I'm actually
21 directing this to Mr. Miller at this point.
22   MR. MILLER: No, I think I saw one where
23 she wants to talk about individual claim and claim
24 retaliation.
25   MS. McCANN: And how about these three

Page 47

1  down here?
2    MR. MILLER: That SCF, there are three
3  she says she's going down to talk about individual
4  claims for.
5    MS. McCANN: And in fact, you all
6  separated out your billings so that you have billings
7  for compliance and billings for damages, and in the
8  damages portion of your billings, almost all the
9  entries are Patricia Belac's; is that right?
10   MR. MILLER: Well, I haven't looked to
11 parch them out. There are three categories within
12 which we billed, the compliance, damages that were
13 issued that related to the entire class that we believe
14 related to compliance, and then -- and the collective
15 right to pursue damage claims, and then the individual
16 inmates.
17   Now, some of them, to the extent we ended
18 up representing them, they have their separate files;
19 and other people who we decided not to represent, they
20 have their own, but nobody will ever see those records,
21 because they will never be requested.
22   MS. McCANN: But what I'm asking you is,
23 in your submission that you gave to the special master
24 in your attorneys' fees section, you separated out your
25 fees so that you have some denoted as damages at the

Page 48

1  top of the entry, and those entries contain most of
2  Ms. Belac's billings; isn't that right?
3    MR. MILLER: I don't know that that is
4  right. I mean, what the records show is what they are.
5    MS. McCANN: All right. Well, but the
6  briefs that Ms. Belac has been involved in relate to
7  issues about what damages are recoverable in this case;
8  is that correct?
9    MR. MILLER: Well, some of them do,
10 that's correct.
11   MS. McCANN: Well, what other briefs has
12 she written that don't involve the issue of damages?
13   MR. MILLER: I think she's done some work
14 with respect to discovery costs.
15   MS. McCANN: Well, that's a damages
16 issue, isn't it?
17   MR. MILLER: Maybe I'm parsing it too
18 finely, but no, I don't believe damages are the same
19 thing as profit.
20   MS. McCANN: Well, the only purpose to
21 get discovery in these cases is to determine whether or
22 not they're individual damages. I mean, the discovery
23 issue that we're having now has to do with what the
24 individual inmates are entitled to recover in their
25 individual damages claims, right? I mean, you've

Page 49

1  gotten all the discovery on the general compliance
2  issues, or you're in the process of reviewing that?
3    MR. MILLER: The reason I don't know how
4  to answer that is some of the work with respect to
5  briefing or discussions about availability of ADA
6  relief, or Section 1983 relief can relate to matters
7  that go beyond an individual's damage claim, so ...
8    MS. McCANN: But they go to the issue of
9  what damages are recoverable by individuals in this
10 case.
11   MR. MILLER: Again, I just refer you to
12 the time entry.
13   MS. McCANN: But my question is, these
14 disputes or issues that are being briefed that
15 Ms. Greisen mentioned all go to the question of what
16 damages are recoverable in this case, or what discovery
17 individual inmates can get in their damages claims.
18   MR. MILLER: Well, they do relate to what
19 the remaining claims are, and to the extent they're
20 damage claims, they're general damage claims. So I'm
21 not arguing with you, I'm just trying to draw a
22 distinction between what remedy is available to the
23 class, as opposed to individuals, because we've had her
24 take those positions with respect to class, not with
25 respect to an individual.

13 (Pages 46 to 49)

Calderwood-Mackelprang, Inc. 303.477.3500

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 50

1    MS. McCANN: I understand that, but the
2  issue concerns what damages are available.
3    MR. MILLER: It concerns what the remedy
4  is under the settlement agreement. Okay, hang on a
5  second.
6    (Pause in proceedings.)
7    MS. McCANN: And in this case, in the
8  status of this case or the posture of this case now,
9  there is no general damage claim left, damages are
10 being handled by individuals making claims for damages.
11   MR. MILLER: I think that's fair, there's
12 no pot that the general plaintiff class is seeking to
13 get to then distribute in some way.
14   MS. McCANN: Right, each individual
15 claimant has to prove or show that he's been
16 discriminated against because of a disability in order
17 to recover damages.
18   MR. MILLER: Has to meet the three-part
19 test set out in the settlement agreement.
20   (A discussion was held off the record.)
21   MS. McCANN: Hang on just a second. And
22 actually, your firm has entered on about 10 individual
23 damage claims; is that correct?
24   MR. MILLER: Sounds roughly correct.
25   MS. McCANN: But you are reviewing every

Page 51

1  single claim that's entered by any inmate regardless of
2  whether or not they're represented by counsel?
3    MR. MILLER: Well, we're certainly
4  looking at the claims that are filed through the
5  special master process.
6    MS. McCANN: And you could intervene in
7  those claims if you felt that you needed to,
8  individually, or you could ask to intervene, let me put
9  it that way.
10   MR. MILLER: Well, we continue to be
11 class counsel, and so while we could, if we were
12 interested in getting a certain amount of money for
13 inmate X, move to represent inmate X if an issue in
14 inmate X's case relates generally to the case, there's
15 other cases in which we've filed pleadings, if you
16 will.
17   MS. McCANN: And actually, there are a
18 few inmates who are represented by other individual
19 attorneys, Mr. Moyer, for example?
20   MR. MILLER: That's my understanding.
21   MS. McCANN: And any of the inmates have
22 the ability to ask or to have an attorney represent
23 them if they can find an attorney that will.
24   MR. MILLER: I don't know what the
25 individual circumstances of the inmates are, but

Page 52

1  they're not concluded, as far as I know, under the
2  settlement agreement from finding an attorney.
3    MS. McCANN: And in fact, hundreds of
4  them have asked your firm to represent them in their
5  damages claims, haven't they?
6    MR. MILLER: Many have, I haven't kept a
7  count.
8    MS. McCANN: And you've turned down all
9  of those requests, except the 10 that you've chosen to
10 take?
11   MR. MILLER: That's my understanding.
12   MS. McCANN: Well, it's your firm, so
13 isn't that the way it's worked, you've turned down all
14 the other people who have requested representation, and
15 have selected 10 or so to represent?
16   MR. MILLER: Like I testified, I haven't
17 been involved in the individual inmate case decision
18 making, so ...
19   MS. McCANN: Well, Ms. Belac has been to
20 one who's been doing the primary research on which
21 individuals you're going to represent?
22   MR. MILLER: She's certainly looked at
23 the individual cases.
24   MS. McCANN: Hang on one second.
25   (A discussion was held off the record.)

Page 53

1    MS. McCANN: And actually, through this
2  agreement, we set up a whole process for individual
3  inmates to request damages by presenting their case to
4  a different special master than is present here today?
5    MR. MILLER: That's correct, the
6  agreement does that.
7    MS. McCANN: And so individual claimants
8  are filing claims with the special masters who have
9  been specifically designated to handle all the damages
10 aspects of this case?
11   MR. MILLER: They're specifically
12 designated to handle the individual claims in this
13 case.
14   MS. McCANN: Just one second. That's all
15 I have, thank you.
16   THE COURT: Could I ask a question?
17 Obviously I can. There were a few entries that seemed
18 to not fit the profile, for instance, 6-2-2004, ABD,
19 meeting with plaintiff to assist in filling out damage
20 claim form.
21   MR. MILLER: Would you direct me there
22 again?
23   THE COURT: Page 5, 6-2.
24   MS. GREISEN: I can speak to that one,
25 Judge, because I recall that, actually. We have --

14 (Pages 50 to 53)

## Page 54

1  since the remedial plan entered, not only do we get
2  calls from people, people who get paroled just stop by
3  and want an explanation about the process, and they
4  want help; to the extent that we can, we explain
5  information to people.
6       There are some people, and this person, I
7  believe, is a partially blind individual, we weren't
8  representing him, and we didn't agree to represent him
9  on an individual claim form, but I think I remember two
10 or three times during the course over the last two
11 years we've had people drop by the office and say, can
12 you just help us, I don't know how to fill out a claim
13 form, and we've sat with them and spent some time.
14      To the extent there are a couple of
15 entries like that, I'm fine if the Court wants to
16 preclude them, they're not people we entered an
17 appearance on. We thought we had an obligation as
18 class counsel when that happen, frankly, I just didn't
19 think it was right to say, no, go away.
20      MS. McCANN: I'm sorry, what was the date
21 of the three you were asking about?
22      THE COURT: June 2, 2004. Similarly ...
23      MS. GREISEN: Let me say, Judge, we
24 weren't filling out the claim form for him, we were
25 simply explaining what the questions meant, because

## Page 55

1  some of these people, as you might anticipate, don't
2  operate at a level where they can understand some of
3  the legalese in these claim forms. I'm sorry, is there
4  another entry, George?
5       THE COURT: I was just wondering, who is
6  Richard Allen?
7       MS. GREISEN: Well, there are actually
8  two Richard Allens.
9       THE COURT: 8-1-2005, Mr. Miller.
10      MS. GREISEN: Richard Allen was one of
11 the named plaintiffs.
12      THE COURT: It says Ray Hone letter.
13      MR. MILLER: Dr. Hone is an expert that
14 we were looking at in terms of reviewing compliance
15 with the requirements to provide adequate care for
16 diabetics, in general. So when we had complaints that
17 went to the issue of, are they following the procedures
18 required, we would forward them on to Dr. Hone. I
19 don't believe there's been a charge for her, it's a
20 female doctor out of Kaiser, I don't believe there's
21 been a charge for her services.
22      THE COURT: No, there's an entry that
23 indicates that you met with Ms. Belac about that
24 letter, an amendment of same on Richard Allen, so I was
25 just wondering why is that even in the damages portion

## Page 56

1  if it has to do with compliance. And if it doesn't,
2  what is it? And there's another one a little later,
3  8-9, and actually, also on 8-9, wasn't Orleans one of
4  the experts.
5       MR. MILLER: Orleans is one of the
6  experts, that's correct.
7       THE COURT: Right, the review of that
8  letter says no charge, but the one below seems, again,
9  to be ...
10      MS. GREISEN: The Peter Orleans was
11 somebody that we have been in constant contact
12 regarding compliance issues, he's the architectural
13 expert, so it's possible that that entry should have
14 been under the et al., or the compliance category, it
15 just was located in the wrong place. I think with
16 respect to ones that represent Richard Allen, we would
17 agree that --
18      MR. MILLER: Yeah, I'd have to look and
19 see whether or not there was a case involving Richard
20 Allen, it says there's a motion by PSB, so off the top
21 of my head, I don't remember.
22      MS. GREISEN: I think it would be
23 appropriate to strike those entries.
24      THE COURT: Okay.
25      MS. McCANN: And I might just point out,

## Page 57

1  if I might, that they have a diabetic expert for the
2  general compliance issue, so any reference to another
3  diabetic expert has got to be reference to individual
4  damage claim, they already have an expert for that
5  piece, and it's not Dr. Hone.
6       MR. MILLER: Well, there's an agreed
7  expert, Linda Edwards, who is not a doctor, and to the
8  extent -- we've talked to lots of experts, I could give
9  you the names of half a dozen more experts that we've
10 talked to in trying to decide what the proper
11 procedures are for fulfilling requirements under the
12 settlement agreement.
13      MS. GREISEN: One of the things we are
14 doing in the monitoring period is whether our diabetics
15 are currently getting treated properly, that's been a
16 huge issue in this case, whether or not they're
17 receiving proper diet, proper insulins, and that's part
18 of compliance.
19      THE COURT: Okay. I don't remember
20 marking anything else, I was low on stickies. Because
21 the other ones I think where I had a question were not
22 charged.
23      MS. McCANN: And I have a couple of other
24 letters that we might want to introduce, and so I don't
25 know if they will have an objection to the authenticity

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 58

1  of these, so ...
2       MS. GREISEN: I think we'd just like to
3  see them first.
4       MS. McCANN: I'll show them to her, since
5  we have them as witnesses right now.
6       MS. GREISEN: We certainly don't object
7  to the authenticity, I don't know what relevance they
8  are being submitted for.
9       THE COURT: Okay. Apparently our fax was
10 broken yesterday, so I just got your submissions.
11      MS. GREISEN: Shall we move on? This
12 court's already noted Mr. Kahn's credentials, would you
13 like us to go through them again, Judge, or ...
14      MS. McCANN: We have no objection to
15 Mr. Kahn as an expert in legal fees. But I wouldn't
16 mind a five-minute break.
17      THE COURT: Okay.
18      (A short break was taken.)
19      THE COURT: Whenever you're ready.
20      MS. GREISEN: I might add, just as a
21 small aside, Judge, I did -- in the costs, I didn't
22 mention this, but in our supplemental fees, we added
23 supplemental fees and costs, we added supplemental
24 costs, there was a facsimile charge which I didn't
25 catch, and we previously deducted all our facsimile

Page 59

1  charges in our original submission, so I will withdraw
2  the facsimile charge that's in our supplemental
3  submission, I think it's a 50-cent charge. Well, with
4  the stipulation that Mr. Kahn is an uncontested expert
5  on fees and costs, then I will just resume with his
6  testimony.
7       MS. GREISEN: Let's talk first about
8  Mr. Kahn, about class counsel's responsibility to
9  monitor the damage claim possess. First, have you
10 reviewed the fees and costs in this case submitted by
11 class counsel?
12      MR. KAHN: I have.
13      MS. GREISEN: Have you also reviewed the
14 remedial plan in this case?
15      MR. KAHN: Yes.
16      MS. GREISEN: Do you have an opinion
17 regarding whether the fees charged by class counsel to
18 monitor, let's first just start the damage claim
19 process, whether those fees were reasonable and
20 necessary.
21      MR. KAHN: I do.
22      MS. GREISEN: Could you share with us
23 your opinion?
24      MR. KAHN: My opinion is that the fees
25 were reasonable and necessary to monitor compliance and

Page 60

1  to protect the integrity of the settlement agreement.
2  Seems to me when class counsel negotiates a settlement,
3  and there are issues that go to the effectiveness of
4  that settlement in a potentially major way, such as the
5  attack on remedies by the defendants here, that class
6  counsel do have an obligation to protect the class,
7  just as they would if, in the litigation before the
8  settlement, such an attack had taken place.
9       I think there are -- when class actions
10 are settled, the obligations of class counsel don't
11 immediately cease with the settlement beyond -- well,
12 beyond -- one of those obligations is to protect the
13 effectiveness of the settlement, in general. So I see
14 the -- what the work they did here as both appropriate
15 to the postsettlement phase and tied to a compliance
16 effort.
17      MS. GREISEN: Let me ask you specifically
18 about the major issues that were briefed during the
19 damage claim process. I take it you're familiar with
20 the issues, or are you familiar with the issues?
21      MR. KAHN: I'm familiar with them in
22 general, I know that they dealt with categories of
23 remedy, whether damages were available for -- under
24 particular acts or for particular kinds of harm, which
25 were raised postjudgment, postsettlement, rather.

Page 61

1       MS. GREISEN: In your opinion, were the
2  issues that were addressed by class counsel the -- I'm
3  using the term liability based defenses to cover
4  everything from the denial of -- or attempts to deny
5  injunctive relief, to the Fitzgerald issue, to the PLRA
6  issue, that those types off issues that were briefed,
7  in your opinion, was it reasonable necessary for class
8  counsel to address those specific issues that were
9  addressed?
10      MR. KAHN: Yes, I believe it was.
11      MS. GREISEN: In your opinion, and this
12 may be redundant, but I'll ask you, in your opinion, if
13 class counsel had not participated on those issues,
14 would there have been a substantial risk of eradication
15 of damages under the damage claim process on a class
16 five basis?
17      MR. KAHN: Well, as I understand the
18 issues that were raised, that was their purpose, to
19 limit the damage remedies. And had class counsel not
20 opposed the raising of those defenses, it's unlikely
21 that individuals, especially pro se individuals, would
22 have done so, or would have done so effectively, and so
23 there is a danger that what was potentially available
24 remained available, and would not have remained
25 available.

16 (Pages 58 to 61)

Calderwood-Mackelprang, Inc. 303.477.3500

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 62

1  MS. GREISEN: In your opinion, were the
2  issues or the efforts by class counsel to monitor the
3  damage claim process efforts taken on behalf of
4  individuals or efforts taken that affected a class or
5  majority of class remembers?
6  MR. KAHN: Well, I think they could be
7  fairly characterized as primarily affecting the group,
8  the class. One example is just the design of the claim
9  forms, part of the time that's sought here is working
10 on the -- and negotiating with the defendants the
11 design of the claim forms to be used in the process
12 contemplated by the settlement agreement.
13      If there had been no universal claim
14 form, the administration would have been much more
15 cumbersome, and it would potentially have been more
16 difficult to process individual claims. But that
17 benefits the group, as a whole, and is the kind of work
18 that one would expect class counsel to be engaged in
19 after a settlement of this kind in connection with
20 effecting the settlement.
21      MS. GREISEN: In your opinion, is there
22 an ethical duty on behalf of class counsel to monitor
23 the damage claim process?
24      MR. KAHN: I think that class counsel
25 would have been running a pretty serious risk of being

Page 63

1  charged with abandoning the class if they had not
2  participated in asserting -- challenging the defenses
3  that were being raised.
4      Class counsel had not withdrawn from the
5  case, they continued to represent the class, and a
6  prisoner could reasonably assert that there was this
7  continuing duty. And you know, I can't give you a
8  definitive opinion on how that would have come out had
9  such a challenge been raised, I think there's enough of
10 a risk of that that it was very prudent for counsel to
11 do what they did, and reasonable and necessary to the
12 case, as well.
13      MS. GREISEN: There is a suggestion that
14 class counsel should not recover fees for monitoring
15 the damage claim process unless they are successful on
16 the particular issue that's argued at the time, do you
17 have an opinion with respect to that issue?
18      MR. KAHN: Well, based on my
19 understanding of the law of consent judgments or
20 settlement, my understanding is that the achieving of
21 substantial relief in the first place creates an
22 entitlement for counsel of fees against the
23 governmental entity down the line for work done to
24 enforce, whether or not those enforcement efforts are
25 successful.

Page 64

1       The liability is created by having
2  prevailed in the first instance, and there's not a
3  necessity, as I understand it under the law, to prevail
4  on any particular motion or any group of motions, or
5  postsettlement, or postdecree. The entitlement stems
6  from the original decree, so I don't think there's a
7  requirement under the law that plaintiffs need to
8  prevail on any particular matter opposed to create.
9       Here, I think they have prevailed on most
10 of these postdecree defenses that have been raised, so
11 if there were, such a requirement would have been met,
12 but I don't think it's a necessity.
13      MS. GREISEN: Mr. Kahn, you said you
14 reviewed the fee petition, let's just talk about the
15 fees other than those -- other than the damage claim
16 process monitoring fees. In your opinion, was the
17 other time spent monitoring compliance with the
18 remedial plan reasonably necessary?
19      MR. KAHN: Well, based on both the
20 affidavits and a review of the time sheets, it seems so
21 to me, yes.
22      MS. GREISEN: And with respect to costs,
23 have you reviewed the cost submission in the case?
24      MR. KAHN: I have.
25      MS. GREISEN: In general, in your

Page 65

1  opinion, were the costs billed by class counsel
2  reasonably necessary to monitor compliance?
3      MR. KAHN: Yes, I think that, again, you
4  rely on counsel's statement that these are the kinds of
5  items that are charged to ordinary clients, but nothing
6  jumped out at me as out of the ordinary. Our firm
7  charges 15 cents per copy and has done so since 1978, I
8  think, I don't think that's ever changed, and there are
9  other firms that charge that amount, some charge less,
10 some charge more, our firm charges for Westlaw and
11 LEXUS research to clients, so again, some firms absorb
12 that in overhead, other firms don't.
13      It's a permitted practice under the fee
14 decisions in the district federal decisions, especially
15 and state decision, as well, to the extent I'm familiar
16 with those. And I think the Court, this court
17 previously approved similar charges in the earlier
18 ruling, so it seems to me that all of that points to
19 reasonableness.
20      MS. GREISEN: Just a minute.
21      (A discussion was held off the record.)
22      MS. GREISEN: We have nothing further.
23      THE COURT: Do you have any cross?
24      MS. McCANN: Yes, I'm sorry, I do.
25      CROSS-EXAMINATION

17 (Pages 62 to 65)

Calderwood-Mackelprang, Inc. 303.477.3500

ba1b909a-d700-450e-8507-25769f4932cf