Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 66

1  BY MS. McCANN:
2      Q.  Mr. Kahn, you understand the remedial
3  plan in this case set up a separate process for inmates
4  who believe they've been discriminated against because
5  of a disability, to file a damages claim?
6      MR. KAHN:  I do.
7      MS. McCANN:  And in fact, the remedial
8  plan, itself, says that there is no obligation on
9  behalf of plaintiff's counsel, class counsel, to
10 represent anyone in those damages claims?
11     MR. KAHN:  Correct.
12     MS. McCANN:  Are you familiar with that?
13     MR. KAHN:  Correct.
14     MS. McCANN:  And when class counsel --
15 let me back up a minute.  Typically in a class case,
16 class action case, there are class representatives that
17 represent the interests of the class; is that right?
18     MR. KAHN:  There are named plaintiffs who
19 usually are the class representatives who are supposed
20 to do that, yes.
21     MS. McCANN:  And the point of having
22 class representatives is that the plaintiffs' class
23 counsel communicates with those representatives with
24 respect to issues involving the general class?
25     MR. KAHN:  Well, one of the things you

Page 67

1  would hope would happen would be that, sure.
2      MS. McCANN:  Well, in fact, in this case,
3  the plaintiffs' attorneys requested compensation for
4  class representatives because they were performing
5  extra work because they were representing the class;
6  isn't that right?
7      MR. KAHN:  They did request that in the
8  earlier proceeding, that's right.
9      MS. McCANN:  And so when plaintiffs class
10 counsel has an issue of general compliance, they should
11 look to the class representatives to express or to
12 decide or give them input as to how the agreement is
13 being implemented?
14     MR. KAHN:  I don't think that's correct.
15 I think that the question of what their legal duty is
16 cannot be -- to the class can be informed, to some
17 extent, by the wishes or the views of named plaintiffs
18 or class representative, but I think those duties are
19 set forth in the law of class actions.  And for
20 example, if a class representative said, oh, you don't
21 have to bother with that, leave that to individual
22 counsel, I don't think that would absolve class counsel
23 in this case from going in and having the obligation to
24 challenge the assertion of these broad defenses.
25     MS. McCANN:  So do you know if counsel in

Page 68

1  this case has used class representatives in the fashion
2  that I've suggested?
3      MR. KAHN:  I don't know whether or not
4  they consulted with the class representatives on that
5  issue, I doubt that they did, but I didn't review the
6  time sheets with that in mind.
7      MS. McCANN:  In reviewing them, you
8  didn't notice anything that particularly indicated that
9  they were meeting with class representatives to discuss
10 compliance?
11     MR. KAHN:  That's right.
12     MS. McCANN:  Now, in a class action, for
13 example, in a products liability kind of case, class
14 counsel has named representatives, as we've discussed,
15 and then there are other members of the class with whom
16 they have very little, if any contact during the
17 pendency of the case, isn't that the way that they
18 work?
19     MR. KAHN:  I think typically there's
20 relatively little contact between plaintiff's counsel
21 and the unnamed class members in a large class action,
22 except when notices go out to the a class of damage
23 action, then there are usually contacts about that.
24 But I think in general, you could say that typically
25 contacts are infrequent between the unnamed members of

Page 69

1  the class and class counsel.
2      MS. McCANN:  And what happens typically
3  is an individual will get a letter from, I guess, the
4  plaintiff's class counsel, saying there's a proposed
5  settlement of this class action, and some of you can
6  opt in, and some of you can opt out, but that
7  individual damages will be determined at a later time,
8  and there is a provision for input, if necessary, or
9  if -- not necessary, if desired by an unnamed class
10 member?
11     MR. KAHN:  Well, I think the analogy to a
12 products liability action is not perfect, because here
13 you have injunctive relief, as well as damages
14 availability.  But it's true that the -- at some point
15 in the action there's usually notice to a class of
16 what's occurred, and then an opportunity for them to
17 comment or take action, if appropriate, or simply be
18 informed that action may be proceeding without their
19 taking action, those are all possibilities that are
20 created.
21     MS. McCANN:  Well, you mentioned the
22 difference because of an injunctive component of this
23 case; but isn't that often the case?  For example,
24 there was a recent class action against Blockbuster
25 because of their advertisement that there would be no

Page 70

1  late fees, and as part of that settlement, Blockbuster
2  had to change the way they advertised that in the
3  future, and in addition, individuals were entitled to
4  submit a claim for possible damages?
5      MR. KAHN: I think that's right in that
6  case, yes.
7      MS. McCANN: And that's sometimes the
8  case, at any rate?
9      MR. KAHN: Right, I think that happens,
10 yes, I think that's common, something like that.
11     MS. McCANN: So an individual in a class
12 action case that does result in a settlement can --
13 often can file an individual claim, but that does not
14 mean they are represented individually by class
15 counsel, and there's often, again, no contact at all
16 between the counsel and the claimant in those cases.
17     MR. KAHN: I think that that's often
18 true.
19     MS. McCANN: And in order to monitor
20 compliance, class counsel does not have to go speak to
21 every single unnamed class representative in those
22 cases, correct?
23     MR. KAHN: Certainly they don't have to
24 speak to every unnamed class representative, but I
25 think they would be taking steps to monitor whether the

Page 71

1  stores were complying, and one easy way to do that if
2  you had the information as to the various locations
3  across the country, would be to contact class members
4  and say, what information do you have about whether or
5  not late fees are being charged.
6      MS. McCANN: And class counsel might do
7  that on a selective basis, a random basis, they would,
8  perhaps, rather than visit, I don't know how many
9  Blockbuster stores there are, but I assume there are
10 probably hundreds, if not thousands, they wouldn't go
11 visit every single one of them, they would randomly
12 select certain stores to determine whether they're in
13 compliance.
14     MR. KAHN: They could do it either way.
15     MS. McCANN: Let me put it this way, that
16 would be a reasonable approach.
17     MR. KAHN: I think that the given modern
18 statistical sampling techniques, it would be reasonable
19 to contact or visit only some of the five thousand, or
20 so, Blockbuster stores there are around the country.  I
21 think you have a different situation here, where there
22 are a limited number of facilities, and various
23 components to the decree, aspects of the decree of the
24 kinds of medical or disability conditions of the
25 members of the class, and a class which is not usually

Page 72

1  articulate in communicating, at least from my
2  experience, the prisoners are not especially articulate
3  in communicating difficulties, so I think it would be
4  different than the commercial case, where you could
5  rely on --
6      MS. McCANN: The average Blockbuster ...
7      MR. KAHN: The average consumer to take
8  steps to protect themselves.
9      MS. McCANN: Have you looked at any of
10 the complaints that have been filed by the inmates in
11 this case?
12     MR. KAHN: I have not.
13     MS. McCANN: So you don't know how
14 articulate or inarticulate they are in expressing their
15 disabilities?
16     MR. KAHN: I don't know the answer to
17 that, but I also know that inmates often use other
18 inmates to file pleadings when they're doing something
19 pro se, and that it's the -- it's not the inmate,
20 themselves, that puts together the filing.  But if you
21 actually talk to that inmate, it might be more
22 difficult to ascertain what's really happening, but
23 there are inmates that are quite articulate, I would
24 agree.
25     MS. McCANN: And you haven't attended any

Page 73

1  of the hearings in this case, inmate hearings?
2      MR. KAHN: None of the inmate hearings.
3  I don't think I attended any hearing before Judge
4  Nottingham, but I -- early in the case I may have seen
5  something.
6      MS. McCANN: And a reasonable effort to
7  ensure compliance in this case would be to selectively
8  interview inmates or selectively review inmate file,
9  wouldn't you agree?
10     MR. KAHN: I think I'd leave that up to
11 counsel to determine.  There may be more than one way
12 to skin this cat, and I would leave it to experienced
13 counsel in prison cases such as here to determine the
14 best methods of determining compliance, I don't think
15 I'm in a position to second-guess that.
16     MS. McCANN: Well, you're the expert
17 here.
18     MR. KAHN: I'm the expert on fees, but
19 not on what's the best way to determine compliance.
20     MS. McCANN: Well, would you disagree
21 that it would be a reasonable approach to selectively
22 review files or talk to inmates, rather than reviewing
23 every single file and every single letter?
24     MR. KAHN: I think that what Mr. Miller
25 testified to was that he --

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 74

1  MS. McCANN: No, no, I just want you to
2  answer my question.
3  MR. KAHN: Well, when you say every
4  single file, are you talking about every inmate in
5  every institution or are you talking about those that
6  have been filed with the court? I guess I don't
7  understand the question.
8  MS. McCANN: That's all right, let me
9  clarify it. Every inmate who filed a claim -- let me
10  back up a minute. In this case there are claims being
11  filed, and also grievances or requests for
12  accommodation being filed that may not result in a
13  claim actually being filed for damages, so my question
14  is, in trying to determine compliance, would it be
15  reasonable for plaintiffs' class counsel to selectively
16  review requests for accommodation that are made, review
17  claims that are filed by inmates in court, and also,
18  letters that inmates are sending regarding compliance
19  issues?
20  MR. KAHN: I think that the best course
21  would be to use a paralegal to do a first cut at all of
22  the material that comes to one's attention, or could
23  come to one's attention, and that if there are matters
24  within that that would lend themselves to -- or would
25  seem to be more important, those should be brought to a

Page 75

1  lawyer's attention, or you could use a low level
2  associate for that.
3  I think there is a danger that if you
4  don't review all the material, that you might miss
5  something that's important to the compliance effort.
6  So I don't think the number here are so large that the
7  sampling approach has the assurance of being
8  sufficient.
9  MS. McCANN: But would it be a reasonable
10  approach?
11  MR. KAHN: I guess I don't know enough to
12  comment on that.
13  MS. McCANN: Well, have you reviewed --
14  you've reviewed the file, you've been hired as an
15  expert in the case to evaluate whether the fees were
16  reasonable and necessary, so I'm asking you, would a
17  reasonable approach be to selectively review claims
18  that are filed, request for accommodations that are
19  made in the Department of Corrections, rather than
20  trying to review all of them?
21  MR. KAHN: And my answer is that I don't
22  know whether a selective review would be sufficient,
23  but I'm certain that a universal review, trying to use
24  associates or paralegals, would be a good way to do it.
25  MS. McCANN: Do you know how many

Page 76

1  requests for accommodation have been filed in this
2  case?
3  MR. KAHN: No.
4  MS. McCANN: And do you know whether or
5  not counsel are going through every single file of any
6  inmate that's requested reasonable accommodations?
7  MR. KAHN: I don't know for sure.
8  MS. McCANN: Do you know whether they're
9  using paralegals to take a first cut or if they're
10  actually reviewing them themselves?
11  MR. KAHN: I don't know for certain, but
12  I think, from my review, they're either lower billing
13  rate associates or paralegals involved.
14  MS. McCANN: Now, I think when we talked
15  at the last hearing you agreed that with respect to
16  travel time, that you typically bill at half time for
17  travel time if it is not during regular hours; is that
18  right?
19  MR. KAHN: I think that's what I said,
20  yes.
21  MS. McCANN: And you understand in this
22  case that every time the attorneys drive to Colorado
23  Springs, they both bill full hourly rates, so the
24  Department of Corrections pays these attorneys $550 an
25  hour to drive to Colorado Springs, and they pay, if

Page 77

1  they take others with them, they pay their hourly rate,
2  as well, do you think that's reasonable?
3  MR. KAHN: I think if it's during normal
4  business hours, and the presumption is if it's normal
5  business hours, it takes them away from other billing
6  work, that that is reasonable. It's not the counsel's
7  fault that the DOC is located in Colorado Springs or
8  that these facilities are sometimes located in remote
9  areas.
10  MS. McCANN: Did you see any effort in
11  the billings to limit these visits to one attorney or
12  one paralegal?
13  MR. KAHN: I think that -- no, I think
14  that in some cases, one individual, like Ms. Belac, did
15  go, in other cases there were two, Ms. Greisen and
16  Mr. Miller. But I assume they talked about the case on
17  the way and used some of the time at least for that.
18  And that, as the explanation here is, they split up the
19  inmates, and it was more effective to have two of them
20  do it in one day than one of them do it over several
21  days, so I don't see the inefficiencies in that
22  particular occasion.
23  MS. McCANN: That was one occasion that's
24  been testified about.
25  MR. KAHN: Correct.

20 (Pages 74 to 77)

Calderwood-Mackelprang, Inc. 303.477.3500

ba1b909a-d700-450e-8507-25769f4932cf

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 78

1   MS. McCANN: Now, in reviewing the
2   billings that you did, did you notice that Ms. Belac's
3   time is primarily directed towards these damages issues
4   versus compliance, in general?
5   MR. KAHN: I think that there were more
6   of the entries on that ledger than the other ledger, I
7   didn't specifically --
8   MS. McCANN: Did you have any discussion
9   with class counsel about the role of Ms. Belac?
10  MR. KAHN: I did. My understanding is
11  that, in part, she was filling in for Ms. Greisen while
12  Ms. Greisen was on maternity leave. I didn't have a
13  discussion beyond that on her role.
14  MS. McCANN: There was some discussion
15  about a necessity of winning a damages claim in order
16  to collect attorneys' fees. Now, if you bring an
17  individual action for damages under either the 8th
18  Amendment -- well, let's say under the 8th Amendment or
19  under the rehabilitation act, in order to recover
20  attorneys' fees, you have to be successful in that
21  case; isn't that correct?
22  MR. KAHN: As I understand it, if you
23  bring a case from scratch without there being some
24  decree up there, yes.
25  MS. McCANN: Well, let's take Mr. Moyer,

Page 79

1   for example, Mr. Moyer represents at least one of the
2   individual claimants, and I think more than one in this
3   case. Now, he's filing individual damage claims with
4   the special master, and she has proceeded to a hearing.
5   You're not suggesting that if he loses that case, he's
6   entitled to attorneys' fee, are you?
7   MR. KAHN: I'm not opining on that.
8   That's not my understanding, but I'm also not opining
9   on that.
10  MS. McCANN: What's not your
11  understanding.
12  MR. KAHN: That he's entitled to fees
13  even if he loses the individual claim's case. If
14  that's the only thing he's doing in that case is
15  representing an individual on an individual claim, then
16  I don't have an opinion -- I mean, I'm not opining this
17  morning on whether he's entitled to fees, but ...
18  MS. GREISEN: So I'm going to object to
19  the question.
20  A.   Without studying it further, I think
21  you're right, that he's not entitled to fees, I think
22  I'd have to do a little more research.
23  MS. McCANN: Were you aware of the fact
24  that the issues that Ms. Greisen was asking you about
25  that were raised with Judge Nottingham, were raised in

Page 80

1   the context of one individual claimant, Mr. Ross?
2   MR. KAHN: I was aware that these issues
3   came up in -- initially arose in the context of an
4   individual claim, but that they had implications for a
5   much broader group of class members, and that's why
6   counsel thought it was incumbent on him to act.
7   Ms. McCann: Mr. Kahn, you are aware of
8   the fact, and I'm sorry if I've asked you this before,
9   but under Section 32 of the remedial plan, that
10  plaintiffs' class counsel does not have an obligation
11  to represent any individual in this case with respect
12  to their individual damages claims?
13  MR. KAHN: Yes.
14  MS. McCANN: Just a moment. I believe
15  you said this in your previous testimony, but some law
16  firms do absorb legal research costs in their overhead;
17  isn't that correct?
18  MR. KAHN: Yes.
19  MS. McCANN: And typically -- that's all
20  I have, thank you.
21  MS. GREISEN: Just a quick redirect.
22  REDIRECT EXAMINATION
23  BY MS. GREISEN:
24  Q.   I've placed in front of you what has been
25  submitted to the court as Exhibit 5, and one of the

Page 81

1   submissions is the response by class plaintiffs, the
2   report and recommendation of a special master's, the
3   senior united district court Judge John Kane concerning
4   defendants' response to claimants' to bring documents,
5   that may be the longest title that I've submitted in
6   this case, regarding claimant Carl Ross, do you see
7   that document?
8   MR. KAHN: Yes.
9   MS. GREISEN: That's a document -- one of
10  the briefs on the issue that Ms. McCann just
11  referenced, that was the briefs concerning whether or
12  not the defendants could raise certain liability based
13  defenses during the damage claim process; is that
14  correct?
15  MR. KAHN: Right.
16  MS. GREISEN: Do you see on the front of
17  that pleading how class counsel entered their
18  appearance with respect to that issue, in the very
19  first paragraph?
20  MR. KAHN: It indicated they were
21  representing the class plaintiffs and not the
22  individual.
23  MS. GREISEN: And in fact, in that brief,
24  the merits of Mr. Ross' individual claim was not
25  raised; is that correct?

21 (Pages 78 to 81)

Calderwood-Mackelprang, Inc. 303.477.3500

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 82

1  MR. KAHN: That's correct.
2  MS. GREISEN: I don't have anything
3  further, Judge.
4  THE COURT: Thank you. Would you like to
5  take a brief lunch break before you present, or do you
6  want to work through, what's your preference?
7  MS. McCANN: I'm okay with either way,
8  but I don't mind just finishing up, I don't think we
9  have -- we're just going to have argument, right? We
10 don't have any witnesses to present.
11 MS. GREISEN: That's fine. I assume
12 there may be other issues raised that I may need your
13 testimony on, I'm not sure, so ...
14 MR. KAHN: Well, I'm happy to stay, sure.
15 MS. McCANN: I don't think we'll need
16 Mr. Kahn any further. Since we're paying for him, I
17 would be just as happy --
18 MS. GREISEN: I have not received the
19 defendants' response to our submission. I saw their
20 submission, but they got our submission, of course,
21 after they filed their submission, so I'm not in a
22 position to anticipate whether they will now have an
23 issue with my hourly rate or other issues that I may
24 need his testimony on, so I'm going to ask him to stay.
25 MS. McCANN: We did not submit anything

Page 83

1  further than what you received, so ... And we are not
2  contesting the hourly rates, although personally, I
3  would, but the courts seem to be against me on the
4  issue of how much lawyers are really worth. So
5  we'll ...
6  THE COURT: Now, that's a bigger issue
7  than what I decided.
8  MS. McCANN: So we will just proceed to
9  our argument, then, if that's all right.
10 THE COURT: Thank you.
11            CLOSING ARGUMENT
12 BY MS. McCANN:
13 The way we view this remedial plan and
14 the settlement agreement in this case is that there are
15 really two components to it. The first is the
16 injunctive component, in which DOC is required to make
17 structural changes, as well as programatic changes.
18 The second component is a process that's
19 somewhat unusual, I think, in class action, where
20 individual inmates have the ability to file a claim
21 with specific special masters who were hired or engaged
22 specifically to handle the damages portion of this
23 settlement.
24 And so what happens is, an individual
25 claimant must show that he or she is disabled within

Page 84

1  the meaning of the Act and within the meaning of the
2  remedial plan, and that that disability -- that because
3  of that disability, he or she has been discriminated
4  against by the Department of Corrections, and that has
5  resulted in damage or injury.
6  That is a whole separate process which
7  Judge Borchers mentions in his special order, too,
8  which this Court has reference, that individual
9  claimants are filing claims, and that they may be
10 represented by class counsel, they may be represented
11 by independent counsel, they may be pro se. And to
12 date, we've had probably 60 to 70 hearings already, and
13 they are proceeding even as we speak. So individual
14 inmates have --
15 THE COURT: By the way, thank you very
16 much for not agreeing to use me.
17 MS. McCANN: Yes, I think the special
18 masters are sort of regretting that they agreed. But
19 at any rate, they are proceeding, the inmates are
20 presenting their cases, they are being awarded money
21 damages, they are being awarded prosthetic devices, and
22 other aides, health aides, some of them are winning,
23 some of them are losing. So in the course of these
24 individual claims --
25 THE COURT: May I ask a question?

Page 85

1  MS. McCANN: Yes.
2  THE COURT: At the hearing, was the DOC
3  represented by counsel, or do they have a
4  representative who appears who is not an attorney?
5  MS. McCANN: Someone from our office
6  appears at those hearings.
7  THE COURT: Someone with a law degree?
8  MS. McCANN: Yes, yes, a lawyer appears.
9  And our position in the attorneys fees area is that we
10 understand that plaintiffs' counsel are entitled to
11 compensation, reasonable compensation for monitoring
12 the compliance issues. And they have done some of that
13 over the course of the last two years, but in terms of
14 questions relating to damages, they are not entitled to
15 attorneys' fees at this stage in the litigation.
16 They have chosen to represent 10 --
17 approximately 10 individual claimants, they will be
18 filing claims on behalf -- well, they already have
19 filed claims on behalf of those individuals, and they
20 will be having hearings.
21 They may raise whatever issues they want
22 to raise in those hearings, and if they are successful
23 in those hearings, just as an individual attorney would
24 be entitled to attorneys' fees, they will at that point
25 be entitled to attorneys' fees for issues regarding

22 (Pages 82 to 85)

Calderwood-Mackelprang, Inc. 303.477.3500

Page 86

1  damages.
2  And in fact, these issues have come up in
3  the context of individual damages claims. The issues
4  that they have -- some of the issues that are
5  referenced in their billings. I think it's
6  particularly telling that they, themselves, separated
7  out their billings for compliance issues and damages
8  issues, and you can see by looking at the billings that
9  the damages billings go more toward these damages
10 issues.
11     Now, we also object to the entries
12 particularly by Ms. Belac, but really, of all of them
13 for these visits to the individual facilities when
14 individual damages claims are being addressed, because
15 what they were doing when they went to the facilities
16 was meeting with individuals to decide whether or not
17 they were going to represent them, and that is part of
18 the damages process, and should not be compensable at
19 this stage.
20     Some of the visits where they talked
21 completely about compliance, like the early visits that
22 happen after the remedial plan was agreed to, we don't
23 object to those, they went down to the facilities, they
24 had meetings with a big group, they had meetings in the
25 auditorium where they would explain the settlement

Page 87

1  agreement to the inmates, what we object to is the
2  visits that began in the spring of -- well, most of
3  them, I think, were in the spring of 2005, but there
4  may have been some in 2004, where they went to the
5  facilities to talk to individual claimants, and --
6     THE COURT: Could you be more specific,
7  are you saying they, are you primarily talking about
8  Ms. Belac?
9     MS. McCANN: Well, Ms. Belac, primarily,
10 most of the visits were her, but Ms. Greisen and
11 Mr. Miller went on some of those visits, as well, but
12 it's primarily hers. And the ones that I'm talking
13 about were the ones where all three of them went. The
14 ones where Mr. Greisen and Mr. Miller we're not
15 objecting to, other than that we think one attorney
16 would have been sufficient.
17     THE COURT: I thought Mr. Miller
18 testified that billing for visits to the extent they
19 were to determine they were to accept a client was done
20 separately, so is there evidence, other than just
21 Belac's billing records, that leads you to conclude
22 that's not --
23     MS. McCANN: Yes. And I apologize, I did
24 mean to get these marked and admitted, these letters
25 that I was showing to Ms. Miller.

Page 88

1     THE COURT: Okay, I'm pretty flexible, go
2  ahead.
3     MS. GREISEN: Can we have a copy of
4  those? I would like to look at them, if she's going to
5  argue the exhibits.
6     MS. McCANN: Sure, can we make copies?
7     THE COURT: Yeah, if you go to the front
8  desk, she can make them for you.
9     MS. McCANN: Why don't I get them marked
10 first.
11     (Exhibits A, B, and C were marked.)
12     (Pause in proceedings.)
13     MS. McCANN: So I would now offer to the
14 Court Exhibits A, B, and C, and particularly A, A
15 demonstrates that when Patricia Belac went to some of
16 these facilities, particularly Fremont, she designated
17 individuals that she was meeting with regarding
18 individual claims. And she also mentions all the other
19 facilities' individuals she was meeting with for two
20 purposes, individual claim and compliance.
21     So our position is that clearly the
22 purpose of these visits was not just for compliance,
23 but was also to decide who they were going to represent
24 in the individual damage claims.
25     THE COURT: Well, hang on, did you

Page 89

1  compare this to the billing?
2     MS. McCANN: Yes, there are -- if you
3  look in the damages billing there's a series of visits
4  by Ms. Belac in the spring, which I'm not finding at
5  the moment.
6     THE COURT: There's -- because she's
7  asking permission for the March 31st and April 1st of
8  this year, and there's no entries that I see on those
9  two dated, other than review order of Judge Borcher's.
10    MS. GREISEN: I believe, instead of being
11 in the damages, she's looking at the two -- it's in the
12 compliance section.
13    MS. McCANN: It's in the compliance,
14 sorry. Thank you.
15    THE COURT: Well, that would have been a
16 lot easier.
17    MS. McCANN: You see the 3-31, well, it's
18 3-30, 3-31 entries regarding her visits at Canon City,
19 and then on 4-21 was her visit to Fort Lyons, and on
20 4-25 was her visit to Arkansas Valley.
21    THE COURT: Yeah, can we do one at a
22 time? If you look at March 31, which is one of the
23 days she says she's going to meet with individual
24 clients, and you look at the billing, there's half of
25 it, or half a day, basically.

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 90

1   MS. McCANN: Well, there's the day
2   before, also, travel, 3-30, so those two entries. But
3   our position is that all of the visits that Ms. Belac
4   made to the facilities, we don't have letters for every
5   single one of those, and we, of course, you know, can't
6   sit in on those interviews, we don't know exactly what
7   was going on, but we think this is representative of
8   what was occurring during all of these visits.
9         And there are several throughout the
10  months of April, March and April and May, I believe,
11  yeah, there's May 9th she went to Buena Vista,
12  May 10th, April 24th she went to Fort Lyons, April 25th
13  she met at Fort Lyons. Our position is that all of
14  those visits are really at least partially for damages
15  issue, and really, primarily for damages issues,
16  because that was what Ms. Belac was doing, she was
17  researching damages claims and filing briefs on damages
18  issues.
19        THE COURT: So essentially you would have
20  me reject her description which says, for instance, on
21  May 5th, arrange visits, re, compliance issues, and on
22  May 9th where it says, meet with inmate, re, compliance
23  issues, that that's not accurate?
24        MS. McCANN: That's correct, our position
25  is that she may have -- a portion of the meeting may

Page 91

1   have been regarding compliance issues, but when you
2   look at the totality of what Ms. Belac was doing, it
3   was damages issues. In the briefs that she wrote all
4   related to damages issues.
5         And this document is indicative of that
6   for all of those kinds of visits. How else are the
7   plaintiffs going to figure out who they are
8   representing individually unless they went and talked
9   to them? And that's what she was doing.
10        And it appears that, you know, they
11  were -- she was only mentioning the compliance issues
12  because they understood that they could only bill for
13  the compliance issues, and so in the compliance section
14  of their billings, that's how she characterized it.
15  But if you look at the letter that she actually sent to
16  DOC, she characterizes it some for individual damages
17  only, some for both.
18        Nowhere in this letter does she say I'm
19  only visiting these inmates for compliance issues, it's
20  always either both or just damage claims. And it's
21  reflected throughout the billings that she does, her
22  primary purpose was to address damage issues. So we
23  think that the plaintiffs' counsel are not entitled to
24  collect for those visits at this time.
25        It's very similar to if you have -- well,

Page 92

1   let me back up a second. Let's talk about the damage
2   issues that they claim are general, that that's why
3   they should be compensated, because they apply. There
4   are really two categories, one is the issue of medical
5   malpractice, and does this case encompass individual
6   medical malpractice claims. Plaintiffs say yes, we say
7   no.
8         So far the special master has ruled in
9   our favor, it's with Judge Nottingham now, but let's
10  assume they're correct, and medical malpractice claims
11  do apply in this case, let's take the situation of an
12  individual case. Plaintiffs' lawyer brings a medical
13  malpractice case under the 8th Amendment, which is the
14  way they are bringing it, Section 1983 and the 8th
15  Amendment.
16        They go to trial, they spend a lot of
17  time on motions, arguing about the damages that are
18  available in the case and the extent of damages that
19  are available in the case; they spend a lot of
20  attorneys' time researching, they go talk to their
21  clients , they hire experts, they do all of that work,
22  they go to trial, and they lose, the Court says, you
23  didn't prove that you're entitled to damages for
24  medical malpractice under the 8th Amendment and Section
25  1983, they don't get any fees, even though they spent

Page 93

1   hours and hours and hours and hours and hours and hours
2   researching general damage questions.
3         It's exactly the same situation here,
4   these issues have to be raised in the individual cases.
5   When they go -- when they present a case on behalf of X
6   inmate, they have to argue, we think we can show under
7   the 8th Amendment that we're entitled to these damages.
8   If they win under the 8th Amendment in section 1983,
9   then they are entitled to fees, but if they don't,
10  they're not.
11        And the same applies to the other
12  argument, which is the big general argument, which is
13  what damages are available when the inmate is dead, and
14  those are the class five claims. There are only about
15  five or six of those cases all together, in each
16  individual case, that issue needs to be raised, what
17  damages are available when the inmate is deceased in a
18  class five.
19        We have also made this argument in front
20  of the special master, and they have ruled in our
21  favor, also, and that is also up to Judge Nottingham.
22  But these are issues, that same if you bought -- if
23  they represented -- let's say Mr. Moyer has one of
24  those cases where an inmate is deceased, he's got to go
25  and make that argument in that individual damage claim.

24 (Pages 90 to 93)

Page 94

1  A deceased inmate, I think I'm entitled
2  to damages for more than just injuries before he died,
3  that he survives, he's got to make that argument, and
4  if he wins, he'll get attorneys' fees under Section
5  1988; if he doesn't win, he doesn't get attorneys'
6  fees. And that's what we're trying to make clear in
7  this case.
8  And the third issue is the discovery
9  cost, it's the same analysis. What they're entitled to
10  in discovery relates to their damage claim, and really,
11  the issue is just who's going to pay for it. We've
12  already agreed that the first 10 copies are provided by
13  DOC, so again, these are issues that will be raised in
14  the individual cases, an inmate asks for -- all the
15  inmates are allowed to review their medical files, and
16  they can select documents that they want to have
17  copied, so in each individual case, the special masters
18  are looking at this issue and deciding the issue, and
19  that's what those special masters are supposed to be
20  doing, they're supposed to be deciding these issues,
21  and they've already decided them. Because they were
22  adverse to the claimants, we are now hearing them in
23  front of Judge Nottingham, but the point is --
24  THE COURT: So you disagree, I think with
25  what Mr. Kahn was saying -- or we don't have to go that

Page 95

1  far. You disagree that when plaintiffs' counsel
2  recovers, or at least recovers a victory in a class
3  action case where damages are undecided, individualized
4  claims are undecided, that they're entitled to fees for
5  briefing the issues of damages and what damages are
6  available to the class?
7  MS. McCANN: In this case, because under
8  the remedial plan, it -- which they agreed to, it's
9  very specific, that they are entitled to reasonable and
10  necessary fees for monitoring compliance, and that they
11  do not have any obligation to represent individual
12  claimants. And so this is unusual in that sense,
13  because each individual plaintiff brings their claim
14  for damages.
15  Just as in a Blockbuster case, for
16  example, if I'm a member of the class, but I'm not a
17  class representative, I can hire my own attorney and go
18  and seek damages, and that attorney presumably,
19  depends, I guess, on the settlement agreement, but that
20  attorney --
21  THE COURT: The settlement agreement
22  gives you a ticket for a buck off, so it's not a good
23  analogy.
24  MS. McCANN: Well, but it is a good
25  analogy, because each individual plaintiff is

Page 96

1  getting -- is a part of the class and is getting some
2  recovery. So the point of it is that this remedial
3  plan drew a real distinction between compliance and
4  damages, and damages are a separate issue.
5  They have selected people that they are
6  representing on damages, these issues are raised in the
7  context of individual damages claims, and they go
8  through the special master, and the special master
9  decides on those individual claims.
10  And that's precisely what Judge Borcher
11  said in his order, he said, you can't just come in here
12  and assert general claims, you have to represent
13  individuals. In that context, then it's determined
14  whether or not they get attorneys' fees. We're not
15  contesting that they're entitled to attorneys fees for
16  monitoring meetings with their experts to monitor the
17  diabetic training, or monitoring -- and in fact, I need
18  to clarify something.
19  We're not objecting to their obtaining
20  fees for helping put together the damage claim form
21  because that was done before any individual damages
22  claims were arrived at, and that was part of the
23  agreement that we came to, was that they would
24  participate in drafting that form, so we think that's
25  an appropriate expense.

Page 97

1  But once the forms are drafted and
2  distributed to the individuals, it then became the
3  responsibility of the individuals to bring their
4  individual claims. I also think it's interesting that
5  they initially, and I don't know exactly which
6  pleadings they provided to you, but they intervened in
7  these cases on individual cases.
8  THE COURT: Can I ask you something?
9  MS. McCANN: Sure.
10  THE COURT: In your submission to -- in
11  your defendants' list of pending matters as of
12  September 14, 2005, you do say on page 2, paragraph 3,
13  the issue, which is basically whether individuals can
14  recover for 8th Amendment 1983 medical malpractice
15  claim, that's what you were just arguing, should be
16  decided by Judge Nottingham, because the ruling will
17  affect several class members.
18  MS. McCANN: That's true, but in terms of
19  whether they're entitled to attorneys' fees for that
20  argument, it's got to be determined on those individual
21  cases. So the ones where they represent plaintiffs and
22  they are claiming medical malpractice damages, if they
23  are successful, then they would be entitled to recover
24  attorneys' fees for making that argument. But at this
25  stage, they haven't been successful on that claim. In

25 (Pages 94 to 97)

Calderwood-Mackelprang, Inc. 303.477.3500

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 98

1  fact, the special master ruled against them.
2       THE COURT: All right. Well, what about
3  the work that they did where they were successful, for
4  instance, I think on the exhaustion question under the
5  prisoner rights litigation?
6       MS. McCANN: Right, our position is that
7  still is an issue relating to damages, and that until
8  they actually win some damages claims, they're not
9  entitled to recover for those costs, or those fees.
10      THE COURT: And then you disagree,
11 therefore, that the right to pursue damages, which is
12 granted in the remedial plan, would be rendered
13 meaningless or impotent if the pro se litigants were
14 required to, for instance, brief the 8th Amendment
15 question, or the exhaustion question?
16      MS. McCANN: Well --
17      THE COURT: I mean, in other words,
18 basically, they need to go in front of the judge, the
19 special master pro se and respond to those legal
20 arguments pro se --
21      MS. McCANN: Yes, it has to be raised in
22 the context of the individual claim.
23      THE COURT: Okay.
24      MS. McCANN: And not all of them are pro
25 se, by the way. And it's fact specific, some of them

Page 99

1  did exhaust administrative remedy, some of them may
2  have satisfied whatever requirements there are to prove
3  their case, it has to be looked at on an individual
4  case-by-case basis.
5       THE COURT: Of the 50 or 60 that have had
6  hearings, how many of those were pro se?
7       MS. McCANN: So far, just one.
8       THE COURT: And what was the result of
9  that one?
10      MS. McCANN: He recovered a small amount
11 of money. And that actually is still on appeal, that
12 case hasn't been finally concluded.
13      MS. GREISEN: I'm sorry, that was just
14 one person represented by an attorney.
15      MS. McCANN: Oh, no, one person was
16 represented by an attorney, did I say it incorrectly?
17      THE COURT: Yeah, I had it the other way.
18      MS. McCANN: Just one was represented by
19 an attorney, and he did recover, and he appealed it.
20      THE COURT: Okay.
21      MS. McCANN: Okay. So one thing that has
22 not -- that I did not put in our response, which I want
23 to address also today, is that if the Court, this Court
24 is inclined to allow damages for the plaintiffs' class
25 counsel work on the issue of medical malpractice and

Page 100

1  8th Amendment claims, those are clearly governed by the
2  PLRA, In fact, that was stipulated to in the remedial
3  plan.
4       So the fees have to be cut down at the
5  PLRA rate, which is $135, and that's in the remedial
6  plan, section 33, page 30, plaintiffs stipulate that
7  time spent solely on 8th Amendment matters that do not
8  implicate the ADA or Rehab Act will be subject to the
9  fees cap under the Prison Litigation Reform Act.
10      And that's fairly easy to separate out,
11 because they've done a lot of research and a lot of
12 briefing just on the 8th Amendment claim, and that's an
13 issue that's still pending in front of Judge
14 Nottingham.
15      Now, we do object to the Court giving
16 them fees at all on the 8th Amendment argument. But if
17 the Court is inclined, then clearly those have to be
18 reduced to the $135 an hour rate.
19      I also wanted to address the compliance
20 issues, a couple of issues relating to the compliance,
21 itself. I listed some specifics in my response, which
22 you have before you, but also, what the plaintiffs
23 counsel are doing right now is they're going down to
24 DOC and they're going through every single request for
25 accommodation by even people who aren't class members,

Page 101

1  well, I guess they are now if they request the -- no,
2  they're not, if -- what happens is, under the plan,
3  people who are currently incarcerated may file a claim
4  saying, I'm disabled, and then DOC decides, then,
5  whether or not they're disabled, and they have a
6  clinical screening by a doctor, and so forth, and all
7  of those files are contained at DOC.
8       And what plaintiffs' counsel is doing is
9  going through every single one of them. And many of
10 them are not even class members, and that is part of
11 what they are billing us for the last couple of months,
12 and I can point out those billings.
13      But the point of that is, they do not --
14 that is not time that they need to spend. It is
15 reasonable to do random checks of files or random
16 checks of cases, individual claims that have been
17 filed, but they have taken it upon themselves to go
18 through every single document filed by any inmate
19 claiming a disability, and it's taking huge amounts of
20 time.
21      Just Tuesday they were down there with
22 four lawyers, no paralegals, no law clerks, four
23 lawyers, including the two of them, billing at 300 and
24 275 an hour respectively, going through individual
25 files. We don't think that the Department of

26 (Pages 98 to 101)

Calderwood-Mackelprang, Inc. 303.477.3500

Page 102

1  Corrections is required to compensate them for spending
2  that amount of time and that amount of money on a
3  compliance issue. They can pick out every 10th file,
4  however, every 15th file, even their own expert
5  acknowledged that that's a reasonable thing to do.
6       And more importantly, he opined that it
7  would be reasonable to have a paralegal or a lower paid
8  attorney do that initial review, and than bring to the
9  attention of the higher priced attorneys some issue
10 that may be -- should be addressed by them. That's not
11 what's happening in this case, we are paying the two of
12 them to drive down there and spend four or five hours
13 looking at files.
14      And these are not complicated issues,
15 these are simple little, I think I'm disabled, here's
16 why, here's the screening report, what the doctor said,
17 and here's the conclusion of DOC. You don't need to be
18 paying 800-, $900 an hour to have lawyers sit there and
19 do that, it's outrageous, simply, in my opinion.
20      And I can show you -- well, on the recent
21 submission, which I have not had time to go through in
22 detail, because we just got it -- I just got it this
23 morning, but there's time billed for Tuesday, I
24 believe, yes, November 8th, it totals up to about
25 $8,000 for one day down in Colorado Springs.

Page 103

1       And you know, even their own expert says,
2  if you travel during nonbusiness hours, they would bill
3  at half time, or they should bill at half rate, but
4  they work it so they're -- they're driving during
5  business hours. So the Department of Corrections is
6  paying this time when for compliance, it's perfectly
7  adequate and reasonable for them to review samples,
8  selective files to see if DOC is in compliance.
9       THE COURT: How do you suggest they get
10 the files, the selected files?
11      MS. McCANN: I suggest that they send a
12 paralegal down there, maybe two, to go through every
13 10th file, every 15th file, maybe every 20th file, and
14 see what DOC's doing and how are he complying, and we
15 pay the paralegal for maybe a half day, or maybe it
16 will take a whole day, and that's it. That's
17 reasonable, we don't object to that, but it really is
18 unreasonable to pay $8,000 a day for them to go down
19 and look through individual files.
20      And who knows, maybe they're looking for
21 individual plaintiffs that they want to represent, I
22 mean, we have no way of knowing, but -- and I'm not
23 suggesting that they're being dishonest about it, but
24 it's -- I just don't think the State should pay for
25 that, I think we should pay for reasonable monitoring,

Page 104

1  or compliance.
2       THE COURT: Okay.
3       MS. McCANN: For example, Paula
4  mentioned, too, this is a little different topic, but
5  the visit to Fort Lyons, I did not go, Jim went, so we
6  one lawyer down there, they had two lawyers. I've
7  never gone on any visits to Fort Lyons. I went on to
8  one visit to Limon, but that was before we even made
9  the agreement, I believe, when we were still meeting
10 with the expert. So we believe that one lawyer is
11 adequate to address the monitoring issues, certainly.
12      So just to summarize, we don't object to
13 paying reasonable fees for monitoring for compliance,
14 and those are -- except for the specific areas that
15 I've addressed to the Court. And also, just so I don't
16 miss it, there was also a visit when they both went
17 down to review, to go through these files, and I think
18 that was in September, yes, September 7th was another
19 day that both of them went down to Colorado Springs to
20 go through all these individual files, and that day was
21 about 5,000 or -- $5,000 for that day.
22      So in summary, we are objecting to paying
23 any of the fees that are in the damages section of
24 their fees. And we believe that those are issues that
25 are appropriately raised in the individual damages

Page 105

1  claims, and that at a later time, there will be a
2  determination as to whether or not they are successful
3  in those claims by the special masters who are
4  appointed for that purpose, and at that time, we can
5  discuss appropriate attorneys' fees for those costs,
6  but in the interim, they're only entitled to reasonable
7  fees for compliance issues.
8       THE COURT: At what point -- if you agree
9  that they might be entitled to compensation for at
10 least designing the damages forms and instructions, at
11 what point would that stop, when did claims start being
12 filed?
13      MS. McCANN: Well, we are not contesting
14 their billing -- the billings where they have entered
15 that they were working on the damage claim form, I
16 think the damage claim forms went out in March of '04,
17 I believe, or February of '04, maybe they recall, but
18 claims -- or work that they were doing up until then on
19 the damage claim forms, they're entitled to, but once
20 the individual damages --
21      THE COURT: But not, for instance,
22 discovery issues.
23      MS. McCANN: I don't think the discovery
24 issues came into play until after that, because they
25 came into play as people were filing individual claims.

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 106

1  You know, I mean, the thing is, if they're not
2  successful on the medical malpractice argument that
3  they're making and the 8th Amendment, and we've already
4  paid their fees for that, that's not right.
5      I mean, they're not entitled to fees
6  unless they're successful on that claim, and so far
7  they haven't been, special master ruled against them,
8  special master has ruled against them on the class five
9  claim for damages, the deceased inmates, so they
10 haven't have won those yet. And if they don't, they
11 won't be able to make those claims in their damage
12 claims for their individuals that they represent, so
13 they should not be compensated yet, that's not
14 compensable until they are successful.
15     THE COURT: I think a last question, it
16 seemed to me that Judge Nottingham was fairly clear
17 before that, regardless what you all agreed, he was
18 looking at me as a Rule 53 special master, and that he
19 could and had the obligation to review findings of
20 fact -- I mean law, and he was pretty hands off on
21 findings of fact.
22     I think under that standard that he would
23 look at whichever way I ruled, if I did, on the issue
24 of their entitlement to compensation on these undecided
25 damages questions as a matter of law, so it seems to me

Page 107

1  it would be efficient to make at least a factual
2  determinations now that I've heard the evidence, on
3  that in the event that he ultimately decides to entitle
4  it, either now or later, do you agree, disagree?
5      MS. McCANN: Well, ultimately Judge
6  Nottingham is going to make the decision on this
7  anyway, so --
8      THE COURT: Right, that's what I'm
9  saying.
10     MS. McCANN: So I'm not quite sure I
11 understand what you mean about what factual findings
12 you --
13     THE COURT: Well, I could make as factual
14 findings, I would say certain hours were, for instance,
15 unreasonable, or that costs shouldn't be awarded or
16 should be awarded.
17     MS. McCANN: Right, I think it would be
18 appropriate --
19     THE COURT: And then you wouldn't have to
20 do it again.
21     MS. McCANN: I think it would be
22 appropriate for you to do that now in the context of
23 this proceeding.
24     THE COURT: That's what I was wondering.
25 Okay.

Page 108

1      MR. QUINN: And I apologize, Your Honor,
2  and everybody, I have a previous appointment that I
3  have to get to.
4      (Mr. Quinn left the room.)
5      MS. GREISEN: Judge, I would like my
6  remarks also taken as rebuttal testimony, I am still
7  under oath, and for the record purposes, I want to
8  submit this as testimony, as well.
9      THE COURT: Sworn argument and testimony.
10     MS. GREISEN: Thank you.
11        CLOSING ARGUMENT
12 BY MS. GREISEN:
13     The defense is asking you to rewrite the
14 remedial plan. What they want the remedial plan to say
15 is that we're allowed our reasonably, necessary fees
16 and costs to monitor the plan during the compliance
17 period, except for monitoring the damage claim process,
18 that's how the defense asks you to read the remedial
19 plan, and that's not what the plan says.
20     The plan clearly does not delineate which
21 parts of the remedial plan will or will not be
22 monitored, it clearly anticipates that the entire
23 remedial plan will be monitored during the compliance
24 and the monitoring periods. There is a fundamental
25 difference between arguing whether an individual or a

Page 109

1  side can present an argument during the damage claim
2  process versus whether an individual will prevail on
3  that argument. Class counsel has never made the latter
4  argument.
5      We have never gone into the merits of an
6  individual case with the briefings that we've submitted
7  to you. We have argued general principles of law that
8  will apply to the damage claim process and the
9  interpretation of the remedial plan. When these issues
10 are brought before Judge Nottingham, what he does is he
11 interprets the remedial plan and the intent of the
12 parties, we are there and must be there to safeguard
13 the class position on the intent of the remedial plan.
14     The vast majority of claims are pro se,
15 there have been about 1,300 claims to date, I am aware
16 of approximately 10 individuals who are represented by
17 attorneys other than us in the entire class. I have no
18 idea of the general sophistication level of those
19 attorneys or whether they've generally practiced in
20 this area or not, whether one attorney may or may not
21 ask for attorneys' fees I don't think is indicative of
22 whether or not class counsel should be asking for
23 attorney fees on this issue.
24     THE COURT: Let me ask a question,
25 though. Won't your prevailing on these general issues

Page 110

1  ultimately benefit the 10 clients or 12 clients you do
2  represent?
3          MS. GREISEN: Oh, I -- of course, if
4  they're allowed to bring a damage claim, it's the same
5  benefit to those 10 clients as it brings to every
6  member of the class, it effectively allows them to
7  bring the damage claim, it does not decide the merits
8  of their individual case. But does it have a benefit
9  for every class member, absolutely.
10         We are not raising issues that have only
11 been raised, and frankly, I don't think any of these
12 issues were raised -- the briefing on the people that
13 we represent is not that far along, frankly, that any
14 of these issues have even been raised in those cases
15 yet, to my knowledge, these were all issues that were
16 raised initially, actually in the past year, with
17 claims that went through quickly. The easier claims
18 were done first, as you might imagine, the other claims
19 are having nor discovery.
20         So is there some spillover benefit, sure,
21 in the fact that our class members are allowed to
22 proceed. We never looked at whether or not these
23 defenses could or would be raised with our individual
24 cases. Frankly, I don't even know -- for the vast
25 majority of people that we decided to represent, I

Page 111

1  don't even think those decisions were made until
2  early -- for most of them, I don't think they were made
3  until early 2005.
4          We may have entered some appearance, I
5  know we entered an appearance for Jesse Montez, who is
6  a deceased class member, probably a year ago, but with
7  the rest of them, I don't think that decision was made
8  until sometime early this year.
9          What's being suggested, though, is that
10 we have to enter an appearance essentially in every
11 single place in order to get our fees recovered, which
12 means we have to represent all 1,300 individuals, which
13 is not feasible in this case, and it certainly wasn't
14 the intent of the remedial plan.
15         These issues are complicated legal
16 issues. It is true that there are some people that can
17 go through this process, and there are some articulate
18 people in DOC, and if you've spent any amount of time,
19 and I know that you have, dealing with people who are
20 incarcerated, there is also a fair number who can't
21 manage to read the damage claim forms by themselves.
22         I will say, in almost every significant
23 appeal, every significant case where DOC has been
24 there has been a significant award of damages or
25 injunctive relief to a claimant, DOC has appealed, so

Page 112

1  they are in litigation mode, and they have been in
2  litigation mode during the damage claim process, it's
3  a -- an approach which requires, I believe, class
4  counsel to carefully monitor, not just look at now and
5  then in a sample, but they have been very aggressive
6  with their defense tactics.
7          And I think that necessitates us to take
8  the kind of steps we've taken to ensure, again, that
9  the process has some integrity. We have not
10 participated in any of the individual appeals regarding
11 the merits of an individual's case, and again, in none
12 of the briefings have we discussed the merit of the
13 individual cases.
14         I should also point out, I understand
15 they're not objecting to us preparing the damage claim
16 form. The discovery cost issue, that issue was raised,
17 if you look at Exhibit 4, that issue was raised by the
18 special master prior to the filing -- prior to any
19 particular case raising it, it doesn't mention a
20 particular case, the special master held several status
21 conferences where the issue was discussed.
22         This was very early in the process, and
23 he asked both sides to brief it, and we did. And
24 that's happened on several different cases, that Judge
25 Borchers has asked us to intervene, more specifically

Page 113

1  the issue of Claud Burton, I think I put that in the
2  petition.
3          Claud Burton is a person who we are not
4  representing individually, he wrote a letter to the
5  special master, telling the special master that he felt
6  coerced into withdrawing his claim, he was being
7  intimidated by certain guards at his facility, the
8  special master issued an order to us to investigate the
9  situation. Well, we're not in his individual case,
10 does it have to do with an individual person,
11 absolutely. I don't believe we have any choice but to
12 heed the special master's order in that regard.
13         With respect to the class five claims,
14 and I'm only going to touch on this briefly, that's a
15 very complicated issue. The defense says only five or
16 six people fit that category. Well, 24 people have
17 died during the damage claim process, alone, 24 claims
18 during the damage claim process.
19         There will be an issue, I anticipate this
20 issue coming up, the defense has not yet provided us
21 evidence of notice that they've attempted to notify the
22 next of kin for the class five category, that's going
23 to be another issue, it involves the damage claim
24 process, but it's our -- I think it's our duty as
25 counsel to make sure that those claimants receive

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 114

1  adequate notice of the damage claim process. I
2  anticipate that there will be a lot more.
3       In any event, it's an entire category of
4  damages, and if we don't answer it, I believe it will
5  eradicated, which is contrary to the intent of the
6  remedial plan. And I believe that's why they're all
7  set in front of Judge Nottingham, and that's why the
8  participation of class counsel is required. Can I have
9  just a moment, judge?
10      THE COURT: Uh-huh.
11      (A discussion was held off the record.)
12      MS. GREISEN: Another issue that was
13  raised by Ms. McCann, unless you have any questions --
14  oh, I did want to raise one other issue on the
15  discovery costs. Just so the Court's aware, the
16  Department of Corrections is trying to charge pro se
17  inmates 1.20 a page for discovery across the board.
18  That, we believe, is a class issue, because our class
19  members simply do not have the kind of money to pay
20  those kind of discovery costs.
21      The people who are damaged the most do
22  have complicated medical files and often do have
23  lengthy stays in the Department of Corrections, and
24  therefore, there are a lot of documents that they want
25  to present with a damage claim form, we believe that

Page 115

1  kind of discovery cost precludes them from a meaningful
2  damage claim review.
3       The one other issue I want to talk about
4  with respect to issues Ms. McCann raised was in the
5  general compliance, and she pointed out a review of
6  documents that's going on at Colorado Springs. And I
7  want to address that, because I think -- I think it's
8  an important issue.
9       August 27 of 2005 was the two-year
10 deadline for the Department of Corrections to come into
11 compliance with the remedial plan. Many of the visits,
12 especially many of the visits that were discussed
13 regarding Patricia Belac, were around that date, and
14 that's because we then started having to review more
15 aggressively to determine whether or not DOC was going
16 to be in compliance with the remedial plan.
17      We believe that one of the most telling
18 ways of determining compliance with the remedial plan
19 is to see what our class members are saying about
20 whether or not they're being provided accommodations
21 appropriately, and whether the DOC has implemented
22 appropriate policies in accordance with the remedial
23 plan.
24      The documents that are being reviewed at
25 the Department of Corrections are the ADA grievance

Page 116

1  files pursuant to the new ADA grievance procedure
2  outlined in the remedial plan. There are hundreds and
3  hundreds of files, many of those files have nothing in
4  them, and many of them have an enormous amount of
5  information this them.
6       I disagree fundamentally with
7  Ms. McCann's characterization that this is a very easy
8  thing to review. In fact, personnel at the Department
9  of Corrections have admitted on several occasions that
10 whether or not an issue is an ADA issue often isn't
11 very clear, so it's not often very clear whether the
12 inmate should go through the regular grievance process
13 or the ADA grievance process.
14      What happens is the class member files --
15 has to file a request for an accommodation and be
16 screened for a disability, and only then, once -- if
17 the Department of Corrections determines that person
18 has a disability, is that person entitled to ADA
19 status. We have learned a wealth of information that
20 we did not previously know about what's going on at the
21 Department of Corrections by reviewing those files.
22      There is, no doubt, a catch-22. If we
23 had done the kind of one out of every 20 review that
24 Ms. McCann suggests, when we have to stand before Judge
25 Kane for the compliance hearing, if we were only to

Page 117

1  give anecdotal evidence like that, I have no doubt that
2  they would be arguing that we didn't do a sufficient
3  review to show noncompliance.
4       We believe that these are probably the
5  most important set of documents to review regarding
6  compliance with the remedial plan, it's not something a
7  paralegal can look at and determine whether it fits the
8  contours of a complicated 32-page remedial plan.
9       Frankly, Mr. Miller and I went down one
10 day and did not get through, I think, more than a
11 couple file drawers, and decided it would be more much
12 more efficient to have a group go at once rather than
13 continue to take trips back and forth. And that's what
14 we were attempting to do when we went down Tuesday, to
15 try to get as much done at one time without having to
16 make recurrent trips.
17      There's no way -- the suggestion was that
18 a paralegal could take a half a day to review the
19 grievance files, I can simply represent to the Court
20 that the volume of files and the intricacy of the
21 issues raised, that that would simply not be a
22 reasonable approach to showing compliance.
23      I do briefly also want to talk about the
24 issues with respect to a Patricia Belac that they
25 raised with the exhibits that they've put before the

30 (Pages 114 to 117)

Calderwood-Mackelprang, Inc. 303.477.3500

ba1b909a-d700-450e-8507-25769f4932cf

Page 118

1  Court. And I only -- Exhibit A is the only exhibit
2  that I see any relevance to. I'm going to object to B
3  and C as to why they're relevant. We have stipulated
4  that we represent about 10 people, and I think that's
5  what all these exhibits show, they certainly don't show
6  any dishonesty or inappropriate billing on behalf of
7  the client.
8          And in fact, if anything, if you look at
9  Exhibit C, which is June 6 of 2005, and you look at our
10 billing on that date, you'll see there was no entry for
11 Patricia Belac to write the June 6th of 2005 letter,
12 there's no billing for that that's being submitted to
13 you, that's because that was billed on the individual
14 client cases.
15         With respect to the other letter, the
16 March 29th, 2005, letter, referencing her visits, I
17 will point out for the Court that of the time she spent
18 there, she only charged half a day. It's apparent from
19 this letter that she was going for two days. None of
20 her time on April 1st has been charged in this fee
21 submission.
22         So if anything, it looks -- it appears
23 from this exhibit that a minority of the time was
24 actually charged, which I think goes against the
25 suggestion that somehow we're simply not being truthful

Page 119

1  with you about the time that we're spending talking
2  with regard to compliance issues. And again, yes, some
3  of those compliance issues did start in spring and
4  summer of this year, and that's because we were gearing
5  up to have to show compliance.
6          I have not been on a compliance visit
7  with Patricia Belac, I'm not quite sure what was being
8  references, but neither myself nor David Miller has
9  taken visits to the prisons with Patricia Belac. As
10 Mr. Miller testified earlier, we sent her in an effort
11 to keep costs down in that regard.
12         Under the analysis of the defense, it
13 sounds like we should not be able to go to the prisons
14 at all to discuss compliance issues with individual
15 class members under any theory, according to their
16 argument.
17         I will say, there was some issue raised
18 about whether or not we should be communicating just
19 with named class representatives. A lot of those
20 people are no longer in the Department of Corrections,
21 Jesse Montez, our named person, has passed away; Duncan
22 Leach is paroled, several of the people have paroled or
23 moved on; Richard Allen has died; another class member,
24 David Brian, actually we do communicate with on a
25 regular basis.

Page 120

1  Their names are not included in the
2  billing, because frankly, our clients have a lot of
3  fear of retribution, so we specifically don't include
4  the names of people that we're communicating with and
5  writing letters to, but I can represent that there are
6  named class representatives that we speak with about
7  these issues on a frequent basis.
8          I believe that's all I have. Mr. Miller
9  is going to talk about the PLRA cap issues, unless
10 there's any other questions that you have for me.
11         THE COURT: Is there any law on attorney
12 obligations? I mean, you said -- all I know is an
13 unpublished opinion by Judge Carrigan where he said the
14 obligations arise from the settlement agreement. Any
15 other law on what the attorneys' obligations are for
16 monitoring compliance or how an attorney knows how to
17 do that?
18         MS. GREISEN: Well, I would submit that
19 whether or not we should or should not be doing
20 something is governed by the remedial plan. The
21 remedial plan says whatever steps are reasonably
22 necessary, that's a factual determination, regardless
23 of what other precedent there may be out there, that
24 that's a determination for you, as to whether or not
25 these compliance efforts were reasonably necessary

Page 121

1  under the terms of the remedial plan to monitor
2  compliance.
3          If you would want us to submit -- I don't
4  know of any law, off the top of my head, if you want us
5  to attempt to find that, we're happy to submit that to
6  you.
7          THE COURT: Nope, that's all right.
8          MR. MILLER: Couple of things, Your
9  Honor. The answer is yes, there's a general standard,
10 and it's set out in Newberg in class action. And it
11 depends on the type of class action. Whether it's a B2
12 class action or a B3 class action, or if it's only a
13 B3, as opposed to a B2, et cetera.
14         In some of those areas that have been
15 discussed here, do we have the obligation to represent
16 the individuals. In a B3 action where individuals are
17 on their own for damage claims, for example, if that's
18 what the settlement agreement is, then they may have
19 their own attorneys who ethically have the obligation,
20 as reflected in not only the law, in general, but in
21 the settlement agreement.
22         So I think, to some extent, that was
23 addressed, our obligation in the first round of
24 briefing, if it wasn't, Newberg on class actions
25 addresses that, and references both the settlement

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 122

1  agreement, the general law of obligation of counsel
2  saved by the interest of the class, and like I said,
3  the ethical obligations, the agreement, and the general
4  interest of representing continuing interest in the
5  class.
6        In terms of individual cases, the only
7  one I was involved where this kind of argument was made
8  was the one that Judge Carrigan ruled on, and we'll
9  just supplement and give you a copy of that, if that
10 will help.
11       THE COURT: And Ms. McCann.
12       MR. MILLER: Of course, sure. The thing
13 that I wanted to talk to the Court about was the issue
14 raised that I don't think was raised except in argument
15 by Ms. McCann, and that has to do with the PLRA, that's
16 the Prisoners Litigation Relief Act claim, and it sets
17 a limit of X percent over the Equal Access to Justice
18 Act rate for work done under it.
19       Well, the point is, if we were involved
20 in any of these claims, then the amount of attorneys'
21 fees that we would be entitled to pursuant to the
22 settlement agreement would be limited by that provision
23 in the settlement agreement that talks about what your
24 rate's going to be. That's not this part of this case.
25       This part of the case is us, as class

Page 123

1  counsel, arguing that these people to make those claims
2  don't have to go through the exhaustion requirement of
3  a typical PLRA case because we have a settlement
4  agreement. So again, it's our office arguing the
5  general right for these people to pursue their claims.
6  And it's a distinction that apparently the defendants
7  don't wish to make, and it's where the entire argument
8  between the parties lies as far as I can see.
9        Our claim is that the plaintiffs' counsel
10 has an obligation to protect the damage-making process
11 for individual claimants without arguing about getting
12 attorneys' fees in any individual case. And the
13 defendants seem to be arguing that that's been accepted
14 out, damages are different, you have to litigate that
15 within the context of each damage case, and that's just
16 simply a difference that you're going to have to
17 resolve and that the Court is going to have to resolve,
18 is what's the obligation of counsel, does can it
19 include in compliance to make them comply with the
20 damage collection process, if you will, or is that in
21 some way not clear.
22       Now, as far as we're concerned, it's very
23 clear that compliance includes the integrity of the
24 damage process, because if any one of these arguments
25 are made, for example, let's take the one Ms. McCann

Page 124

1  made concerning the PLRA. If the Court were to say in
2  any one case, or the special master deciding these
3  individuals was to say, oh, you've got to meet the
4  exhaustion requirement, none of you have done that in a
5  timely manner, therefore, none of you have any claims,
6  then the entire remedy would be removed.
7        For us to come in and generally make the
8  argument that that's not a requirement is part of
9  enforcing the settlement agreement at our standard
10 rate, at a reasonable rate, not being limited to the
11 amount we would get under a claim if we won any one
12 particular claim in that PLRA related case. It just,
13 again, reflects the very fundamental difference in
14 viewpoints that the parties have about interpreting the
15 settlement agreement.
16       But I'll close by saying, it's not to the
17 PLRA that this decision-making should go, it's not to
18 Section 1983 or Section 1988 that you, as the
19 decision-maker, is going to have to look, it's to
20 what's in the settlement agreement, that's what we're
21 arguing, and that we're arguing that under the
22 settlement agreement, we're entitled to our regular
23 rate, a reasonable rate, and one that's not limited by
24 these extraneous -- by these issues extraneous to the
25 settlement agreement.

Page 125

1        MS. McCANN: I'd like to respond to a
2  couple of points, if I might.
3        THE COURT: Okay. Can you wait one
4  second?
5        MS. McCANN: Sure.
6        THE COURT: Okay.
7        MS. McCANN: Just in response to
8  Mr. Miller's argument about the PLRA, we're not
9  suggesting that all the time they've spent on all the
10 damage issues are subject to the limits of the PLRA,
11 but there are specifically -- they have specifically
12 filed a brief concerning whether or not 8th Amendment
13 claims are available to these inmates in the context of
14 medical malpractice claims in Section 1983, and also,
15 they raised the issue with the exhaustion of remedies,
16 or they responded to the issue of exhaustion of
17 remedies under the 8th Amendment.
18       They -- the remedial plan could not be
19 more clear, it states that plaintiffs stipulate that
20 time spent solely on 8th Amendment matters that do not
21 implicate, they will be subject to the fee caps under
22 the prisoner, $135 an hour. And you can see from the
23 brief that I think they included in your packet or in
24 your notebook, that a whole -- one whole big issue that
25 is in front of Judge Nottingham has to do with the

32 (Pages 122 to 125)

Calderwood-Mackelprang, Inc. 303.477.3500

Rough Draft - Montez, et al v. Owens, et al. 11-10-2005

Page 126

1  applicability of 8th amend claims, and that's all it
2  has to do with, it doesn't have to do with the ADA and
3  the Rehab Act. The time spent preparing those briefs
4  and researching that issue is clearly subject to
5  limitations under the PLRA.
6      Then just a couple of over matters that
7  were mentioned. Ms. Greisen said something about the
8  implication was that they had to enter on all cases in
9  order to recover these damages fee, that's not what
10 we're arguing, we're arguing that they have entered on
11 about 10 cases, and they are arguing those issues in
12 those 10 cases, and that's where attorneys' fees would
13 be awarded if appropriate, and that would be true for
14 anyone who enters on any of the cases.
15      And I also take issue with the statement
16 that we've appealed to every case or close to every
17 case where awards have been made. I believe, and I
18 don't have the figures right with me, but I believe
19 weave only appealed two cases, maybe three, at the
20 most, and there have been several other cases where
21 damages have been awarded that we have not appealed.
22      And with respect to the issue of Claud
23 Burton, we don't object to fees for that, since they
24 were requested specifically by the special masters to
25 contact Mr. Burton. He's an individual, he's got an

Page 127

1  individual damage claim, that's what they're contacting
2  him about, and that's -- you know, they -- if they are
3  responding to a simple question, which is, is he being
4  coerced to withdraw his claim, that's fine.
5      Now, if they actually enter on his behalf
6  and make argument regarding what damages are available
7  to him, then our argument would be the same, that
8  they're only entitled to attorneys' fees if they're
9  successful on the damages, but just to contact him on
10 this specific issue, because that is part of the
11 general compliance, if inmates are being coerced in any
12 way by DOC. And I think that I've addressed the other
13 issues adequately. Thank you.
14     THE COURT: Thank you. Okay.
15     (Whereupon, the hearing was recessed at
16 1:16 p.m.)
17
18
19
20
21
22
23
24
25

Page 128

1           CERTIFICATE
2  STATE OF COLORADO    )
   COUNTY OF DENVER     ) ss.
3
4      I, Teresa Chaplin, a Registered Professional
5  Reporter and Notary Public for the State of Colorado,
6  do hereby certify that the above-entitled hearing was
7  taken in shorthand by me and was reduced to typewritten
8  form by computer-aided transcription; that the
9  foregoing is a true transcript of the questions asked,
10 testimony given, and proceedings had; that I am not
11 attorney, nor counsel, nor in any way connected with
12 any attorney or counsel for any of the parties to said
13 action or otherwise interested in its event.
14     IN WITNESS WHEREOF, I have hereunto affixed my
15 hand and notarial seal this day of , .
16     My commission expires: January 4, 2008.
17
18  _____
           TERESA CHAPLIN
19       Registered Professional Reporter
           and Notary Public
20     CALDERWOOD-MACKELPRANG, INC.
21
22
23
24
25

33 (Pages 126 to 128)

Calderwood-Mackelprang, Inc. 303.477.3500

ba1b909a-d700-450e-8507-25769f4932cf