IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-EWN-OES

JESSE (JESUS) MONTEZ, *et al.*,

v.

BILL OWENS, *et al.*,

Defendants.

RECEIVED
FEB 3 2006
BY:

Claim Number: 02-420
Category: II
Claimant: Jimmy Graham #58513
Address of Claimant: DCC, 4102 Sawmill Mesa Road, Delta CO 81416

## PLAINTIFF CLASS POSITION STATEMENT REGARDING "GREEN TAGS"

In response to the Special Master's Order dated November 10, 2005, The Plaintiff Class hereby submits the following Position Statement regarding the "green tag" issue raised by the grievance of inmate Jimmy Graham.

### INTRODUCTION

On August 1, 2005, without conferring with Class counsel or otherwise attempting to negotiate, Defendant Department of Corrections apparently adopted a policy by written memo under which "offenders with a verified qualifying disability" would be "required to wear green offender identification tags on all of their clothing." *Def. Ex. A.* An inmate, Jimmy Graham (#58513), thereafter filed a letter complaint with the Special Master regarding DOC's actions, and a grievance within DOC. Those documents report several troubling developments:

EXHIBIT D

- An inmate rumor that the tags signal "protective custody" places wearers at risk of inmate-on-inmate violence;

- A staff member broadcast loudly that the green tag meant that Graham had "AIDS"; and

- At a minimum, the visibility of the tags constitutes a public communication of confidential medical information.

DOC has responded, defending its unilateral decision as both permitted by the Remedial Plan and otherwise passing constitutional muster by serving a "legitimate penological interest." DOC further charges that because the tags do not specify the offender's medical condition, no privacy rights are implicated. The Special Master has asked for a position statement from undersigned counsel.

## ARGUMENT

### I. The "Green Tag" Policy Is Prohibited by the Remedial Plan.

The Remedial Plan, in both letter and spirit, is fundamentally designed to prohibit discrimination against inmates with disabilities, and the placement of a stigmatizing visible label plainly violates the Plan. The Policy Statement at the beginning of the Plan states as follows:

> All facilities designated to house inmates with disabilities will provide comparable programs, services and benefits available throughout comparable DOC facilities to *ensure that inmates with disabilities are not discriminated against because of their disability.*

Remedial Plan, § I (emphasis added). Ironically, of course, the so-called "green tags" are likely to facilitate, rather than avoid, discrimination.

When this case was being settled, the parties specifically conferred about the permissibility of DOC placement of visual identifiers on inmates who were class members. In particular, counsel specifically discussed the proposed use of "yellow vests"

2

in the prison ADA case of *Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2003) in California, and counsel for the Plaintiff Class made it clear that they would not allow such identifiers in the settlement in the *Montez* case. In light of that discussion, Defendants *abandoned* their position that disabled inmates in the Colorado DOC would be forced to wear a visual identifier indicating their disability status.

Now, more than two years after the parties entered into and the court approved the Remedial Plan, Defendants have unilaterally chosen to adopt a reading of the Remedial Plan that was specifically and jointly *rejected* during the negotiation and drafting process.

Throughout the lengthy Remedial Plan, the two sides memorialized the agreed upon methods for identifying, tracking, and treating disabled inmates, and none of those provisions suggests anything like "green tagging." In fact, various provisions throughout the Agreement confirm that such high visibility labeling is completely inappropriate.

For example, Section IX of the Remedial Plan contains a description of the agreed upon method for tracking disabled inmates and most certainly says nothing about marked uniforms or other visible identifiers. Next, Section XIX confirms that custody staff will be trained in the identity and needs of disabled inmates:

> *Custody staff* for each housing unit to which inmates with disabilities are assigned *will be made aware of the inmate's disabilities and how to accommodate the special needs of those inmates,* including but not limited to whether the inmate is a diabetic and how to recognize diabetes-related complications, ... and what procedures need to be taken for such conditions, including the need for prompt medical attention.

Remedial Plan § XIX (emphasis added). Finally, Section XX (regarding emergency evacuation procedures) specifies how staff shall be made aware of persons with disabilities in their unit:

3

> *The list of inmates with disabilities* and the positions responsible for their evacuation *shall be posted in the control centers* in each housing unit.

Remedial Plan, § XX(B) (emphasis added). That the Remedial Plan envisions posting of a list in a confidential location (the control center) plainly undermines DOC's theory that "green tagging" is consistent with the remedial plan.

The "green tag" policy also contradicts DOC's own strict standards for confidentiality of inmate medical information. Compare AR 700-02 ("[o]ffender's rights shall include ... confidentiality and privacy in the consultation, examination, procedures, and treatments provided by Clinical Services."). For example, the confidentiality requirement for HIV-positive inmates provides as follows:

> Confidentiality: It will be the responsibility of all staff to ensure that an Offender's medical condition is not entered into the case file. Medical files will be available only to medical staff. Correctional personnel will take precautions to treat the information as classified and not divulge any information concerning the medical AIDS-related status of any individual.

AR 700-09(G).[1]

## II.   The "Green Tag" Policy Does Not Otherwise Pass Constitutional Muster.

There can be no dispute that confidential medical information is entitled to constitutional privacy protection. *See Lankford v. Medrano*, 27 F. 3d 477 (10th Cir. 1994);

---

[1] Counsel for the Plaintiff Class notes that during the last 2 ½ years, while the parties have been operating under the Remedial Plan, on numerous occasions Class Counsel has attempted to speak with DOC representative about individual inmates who were class members, and/or to obtain information relating to such person, only to be informed by representatives of the DOC that no information about the referenced inmate could be shared—even to confirm whether or not that such person was or was not considered to be a member of the plaintiff class—until Class Counsel produced a Release, signed by the inmate, that allowed the DOC to talk to *the inmate's own counsel* about his or her medical condition. The fact that the DOC now has adopted a unilateral policy under which, by virtue of the mandatory public labeling of every disabled inmate in its entire system, it is disclosing the medical status of each such inmate, runs directly counter to any and every theory of inmate medical privacy previously pursued by the DOC in this case.

4

*Mares v. ConAgra*, 971 F.2d 492, 496 (10th Cir. 1992). Inmates "retain[ ] those [constitutional] rights that are not inconsistent with [their] status as···· prisoner[s] or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). The question, then is whether the new DOC policy threatens the Class Members' privacy rights, and whether it is nevertheless permissible because of the State's claimed penological interest in visibly marking disabled inmates.

In *Nolley v. County of Erie*, 776 F. Supp. 715 (W.D.N.Y. 1991), a federal district court in New York invalidated a prison's "red sticker" policy on the grounds that it unreasonably disclosed the plaintiff's HIV status to non-medical personnel. In that case, the facility affixed red stickers to plaintiff's personal effects to denote that she had an infectious disease. Staff and fellow inmates then surmised that she was infected with HIV. *Id.*, 776 F. Supp. at 720-721. The facility defended its policy, noting that because the red stickers were used for a variety of ailments (such as TB, hepatitis, herpes, chicken pox, measles, or syphilis), the policy did not specifically disclose information regarding the plaintiff's HIV status. *Id.* at 726. The court concluded that the sticker policy violated state statutes regarding HIV confidentiality as well as her constitutional privacy rights. *Id.* at 728-31.

The *Nolley* court then turned its attention to the facility's proffered justification for the policy and concluded that the "red sticker" program was not reasonably related to legitimate penological interests in accordance with *Turner v. Safley*, 482 U.S. 78, 89 (1987). The court concluded that the use of the stickers was an exaggerated response to the contagion issue, and that the facility's concerns of infection could be addressed in a

5

less onerous manner—by adhering to standardized anti-contagion protocols ("universal precautions") for all inmates. *Nolley*, 776 F. Supp. at 732-33.

The *Nolley* case, along with consideration of the four-factor test in *Turner v. Safely*, provides useful guidance here. It cannot reasonably be disputed that disabled inmates have a constitutional right of privacy in their medical information. Furthermore, as in *Nolley*, for those inmates who do not suffer from an obvious impairment already visible to their peers, a system of colored labeling will lead to suspicion, inquiry, and accusation. *Compare Grievance of Jimmy Graham*, 9/22/05 ("green tag" lead to accusation that he had AIDS). In addition, there can be no doubt that labelling class members as disabled, especially the hearing and sight impaired, increases their vulnerability to attacks by other inmates who might not be otherwise aware that the class member was a disability.

Class counsel does not necessarily impugn DOC's motives. DOC avers that it has a legitimate penological interest: "The green tags are the quickest and most effective way to alert staff of a disabled inmate who may have special needs." *DOC Resp. at p. 3.* Unfortunately, because DOC failed to confer with class counsel, the special master, or other group prior to implementing its unilateral decision, there was no opportunity for analyzing alternative methods of meeting this objective which do not violate the privacy rights of disabled inmates. *Compare* Remedial Plan, § XXXVI(B)(parties must confer in disputes regarding implementation of the Remedial Plan).

Because the "green tag" labels an inmate without explanation, DOC's hypotheticals—that the green tag may help an unconscious diabetic obtain faster access

6

to insulin[2] or excuse a deaf inmate's failure to stand for count--are without merit. Both of DOC's hypotheticals describe situations in which a disabled inmate is not well-served by a "green tag." The tag tells staff little or nothing.[3] For example, using the DOC's hypothetical, it does not inform a corrections officer if an inmate can—or cannot—stand up. Meanwhile, expanding the information on the tag to include a description of an inmate's disability or delineation of any accommodation needed, would only compound the privacy problem.

Plaintiff Class would propose that DOC explore alternatives that can both better serve the proffered penological objective, and better protect inmate privacy. One option would be for tags to be placed on the *inside* of inmate clothes in a way that cannot be openly observed. In that location, and if they were truly not visible, they could probably even include a description of the specific disability, such as "diabetic" or "deaf." Plaintiff Class believes that such an approach would address the proffered privacy concerns while better serving the DOC's penological interest. Class counsel offered this to DOC as an alternative approach but it was rejected without explanation.

In *Turner v. Safley*, the Supreme Court specifically held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 79. In turn, the courts consider four factors when evaluating such a policy: 1) whether the regulation has a "'valid, rational connection'" to a legitimate governmental interest; 2) whether alternative means are open to inmates to exercise the asserted right; 3) what impact an

---

[2] An unconscious diabetic is likely hypoglycemic and needing his or her blood sugar elevated, not hyperglycemic, and the administration of insulin would be contraindicated.
[3] Attached, as Exhibit 1, is a picture of an inmate wearing the DOC's green tag identifier for disabled inmates. As can be seen, the tag is obvious and unmistakable, even at a distance.

7

accommodation of the right would have on guards and inmates and prison resources; 4) and whether there are "ready alternatives" to the regulation. *Id.* at 89-91. At this juncture, the DOC's "green tag" policy does not satisfy the four-pronged test set forth in *Turner* and its progeny.

Here, although the "green tag" policy arguably bears a relationship to a legitimate governmental interest (accommodating and treating disabled inmates), that relationship does not override the class members' more protected privacy rights. DOC suggests that the "green tags" are essentially required by language in the Remedial Plan which provides that "[c]ustody staff for each housing unit to which inmates with disabilities are assigned will be made aware of the inmate's disabilities and how to accommodate the special needs of those inmates." *DOC Resp. at 3, quoting Remedial Plan § XIX.* This justification misses the mark. First, as argued above, Defendants have known that the public labelling approach was jointly and specifically agreed *not* to be part of the interpretation of the Remedial Plan. Further, there is nothing about the use of green uniform tags that alerts staff to the nature of an inmate's disability or explains any "special needs" which require accommodation. The tags include no explanation and no emergency information. They are simply an unexplained "Scarlet D," indicating that the wearer has a disabling medical condition. In any event, the Remedial Plan requires the custody staff to be aware of inmate disabilities—not that such information is broadcast to the entire prison population.

Obviously, the DOC policy fails the second prong: whether there is an alternate avenue for the inmates to access their constitutional rights. The right at issue here—constitutionally protected confidentiality—cannot be regained after it is lost.

8

Likewise, accommodation of the medical privacy rights of disabled inmates would not work an undue hardship on guards or prison resources (Prong 3). Indeed, DOC has identified no hardship whatsoever. Finally—and most important—there are "ready alternatives" to the "green tag" policy (Prong 4). Plaintiff Class has proposed one such alternative above, and is willing to confer with DOC regarding other approaches.

## CONCLUSION

Based on the above argument, Defendants should not be allowed to require disabled inmates to wear a green tag on the outside of their clothing.

RESPECTFULLY SUBMITTED on this 1st day of February 2006.

KING & GREISEN, LLP

~/s *David H. Miller*
_____

Paula D. Greisen
David H. Miller
1670 York Street
Denver, CO 80206
(303) 298-9878
(303) 298-9879 (fax)
greisen@kinggreisen.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of February 2006, I served the foregoing **PLAINTIFF CLASS POSITION STATEMENT REGARDING "GREEN TAG" ISSUE**, via facsimile, and pursuant to instruction by the court, Exhibit 1 thereof (a color photograph) was served via conventional service, through United States Mail, in a properly sealed, 1st class postage prepaid envelope mailed to:

James Quinn
Jess Dance
Assistant Attorney General
1525 Sherman Street, 5th Floor
Denver, Colorado   80203

Mr. Jimmy Graham, # 58513
DCC
4102 Sawmill Mesa Road
Delta, CO 81416

Hon. Richard M. Borchers
Legal Resolution Center
7907 Zenobia Street
Westminister, CO  80030

~/s *Toni L. Taylor*
_____

