IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

                                                 ED
                            TRICT C
                           RADC

                   JA?   2006

Claim Number 03–039
Category III
Claimant: Kevin Stuck, #97806
Address of Claimant: FLCF, P.O. Box 1000, Fort Lyon, CO 81038-1000

---

## FINAL ORDER OF SPECIAL MASTER

---

      THIS MATTER came before the Special Master for hearing on December 29, 2005 at the Fort Lyon Correctional Facility (FLCF), Fort Lyon, Colorado. Present were the following: Kevin Stuck (Claimant) and Jess Dance, attorney for Defendants.

      Testimony was received from Claimant, Major Patricio Manzanares, and Jan Yunker. The Special Master also received Claimant's Exhibit 1 and Defendants' Exhibits A through K. All documentation previously submitted by both sides was accepted. Defendants were allowed to present the affidavit of Dr. Cary Shames, D.O. That has been received and reviewed. This order shall constitute the final action by the Special Master on this specific claim.

### I.

      This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide an opt out provision for any individual class member. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section stated, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or
> services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, p.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provided the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further went on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments were limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who

2

do not need require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

In addition, Judges Nottingham and Kane stated as follows:

> All claims are to be evaluated based solely upon the criteria in paragraph #1. The claims are limited to those that encompass a disability within the meaning of the Rehabilitation Act, provided, however, that a claimant need not prove intentional discrimination, an issue which was resolved by execution of the Remedial Plan. The Remedial Plan and, if necessary, case law concerning disabilities under the Rehabilitation Act and Americans with Disabilities Act may be reviewed for assistance in applying the criteria.

Thus, the Special Masters must look to the Settlement Agreement first to determine if a claimant has proven each of the four criteria set forth above.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. The following are the highlights of the testimony presented by both sides.

Claimant came into CDOC custody in August, 1998. He was placed first at the Denver Reception and Diagnostic Center (DRDC). He was at DRDC for six months. He then was transferred to the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. He was at that facility for a very short period of time and then went to the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. Claimant remained at CTCF until September, 2002 when Claimant

was granted a community placement.

Claimant's community placement was not successful and was revoked. He was returned to DOC custody in December, 2003. He was placed at the Sterling Correctional Facility (SCF) in Sterling, Colorado until he was transferred to FLCF in mid-April, 2005. He remains at FLCF at this time.

Claimant had surgery on his neck before his problems with the law arose. In March, 1998, Claimant suffered a stroke while in the custody of the Larimer County Detention Center. He was hospitalized for a period of time. He testified that the stroke affected the right side of his brain. After his hospitalization, he was sentenced to serve a period of time in DOC custody.

When he arrived at DRDC, he had no feeling in his left side due to the stroke. He was given a wheelchair. He saw a physical therapist at DRDC. He developed a condition known as drop foot which meant that he dragged his left foot along as there was little or no feeling in it. While at DRDC, Claimant had a COPD conviction based on parts being removed from his wheelchair. Claimant testified that the wheelchair was old and missing parts when it was provided to him.

Claimant was transferred to CTCF in December, 1998. This facility as a well-staffed infirmary and provides medical care for significantly disabled or impaired inmates. While at CTCF, Claimant remained in a wheelchair. He requested but did not receive an aide to push him around the facility. Claimant testified that he had to turn the wheelchair around and use his right leg to push the chair in a backward manner.

Claimant also requested use of the therapy room at CTCF. The physical therapist at DRDC had provided instruction on exercises that could be done by Claimant. The request for use of the therapy room was help facilitate increased recovery from the stroke. Claimant was denied use of the therapy room. He had to do his own therapy.

Claimant made an effort to secure work in the tag plant at CTCF. This plant produces the number and month tags for license plates. It also provides the best daily wages for inmates at CTCF. Claimant testified that he was denied a position because he was in a wheelchair. Claimant also testified that the auditorium at CTCF was not wheelchair accessible during the time that he was at that facility. The auditorium contained video games and was the site for programs for inmates.

After a period of three years, Claimant was able to transition from a wheelchair to a walker. He was accepted into the dental tech program. This program trained inmates to make dentures. That program was phased out when DOC sent all orders for dentures to an outside company. Claimant then began to work in a kitchen.

Claimant still had no feeling in his left leg and foot. Claimant had two surgeries while in DOC custody in 1999 and in 2001. He has received five MRI's to determine the status of his neck and spine.

Claimant's community placement failed as a result of a failure to abide by restrictions on driving. Claimant came back to DOC custody in December, 2003. Claimant testified that he came to FLCF and requested to have his medical restrictions removed. He was able to obtain work and assisted in fixing mechanical equipment at the facility. In doing his work, he fell from a ladder. He testified that things have improved a lot for handicapped inmates. He testified that he was scheduled to see a neurosurgeon in the future.

The affidavit of Dr. Shames provides a corroborating history of Claimant's medical conditions while in DOC custody. The medical records reflect that Claimant had two strokes prior to coming into DOC custody (June 1997 and March 1998). He was provided a wheelchair and cane at DRDC. He did see a physical therapist on several occasions. He was provided a brace for his left foot which was devoid of feeling. The affidavit of Dr. Shames states, in part, that "...Stuck was given low top tennis shoes (to fit around his brace) until he could afford to purchase his own shoes at the canteen." *Affidavit, §g.* He continued to need a wheelchair for longer distances. He was not able to use a wheelchair for a period of time after his COPD conviction. He was required to use a walker.

The affidavit further verifies that there were surgeries done in 1999 and in 2001. During part of that time, Claimant was in a wheelchair. Use of the wheelchair was discontinued in April, 2002, but Claimant continued to use a cane.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant was in CDOC custody prior to August 27, 2003. Claimant bears the burden of showing that he met the criteria for each disability on or before August 27, 2003.

Claimant checked only the box for mobility impairment on his claim form. The evidence reflects two periods of time at issue. The first period of time stretches from August, 1998 to September, 2002 when Claimant went into a community placement.[1] The second period of time was from December, 2003 to the present. Claimant arrived back into DOC custody after the approval of the Settlement Agreement on August 27, 2003. The class was set on that date, so Claimant must establish that he was disabled and the victim of discrimination prior to August 27, 2003.

The Settlement Agreement provides the only basis upon which a claim may be filed and adjudicated. A permanent physical disability is a "condition which is not expected to improve within six months." *Remedial Plan, §III.* Permanent mobility impairments are further defined and are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or

---

[1] There was no evidence that this community placement was under DOC control. The Special Master finds that the time in community placement was not the responsibility of DOC and has not been considered in any fashion.

"[i]nmates who do not need require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking..."

The evidence presented by both sides establishes that Claimant met the definition of mobility impaired during the period of August, 1998 to September, 2002. During that period of time, Claimant was having significant medical problems and was in a wheelchair or was using a walker and cane. During that period of time there was no expectation that Claimant would improve. The fact that he has improved is a testament to his work and determination to recover his health.[2]

Defendants appear to argue that Claimant is not disabled at the present moment. As Claimants know full well, a claimant must show that he or she was disabled on or before August 27, 2003. A claimant's condition in 2006 is not relevant to a determination of disability prior to August 27, 2003. Claimant has carried that burden.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by CDOC?** There was no evidence that Claimant was disqualified from any program or benefits as the result of violent behavior, COPD convictions, or the like.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The answer to this question is yes, but only as to the time period when Claimant was at CTCF. Claimant's own testimony did not establish that there had been any discrimination as the result of his disability after his return in December, 2003 to DOC custody.

The Special Master finds the following acts of discrimination that took place at CTCF. First, the auditorium was not wheelchair accessible.[3] Second, Claimant was denied work at the tag plant because he was then wheelchair bound.

Third, Claimant needed tennis shoes due to his brace. He was provided tennis shoes but only until he could be required to buy them from the canteen. There was no dispute that these tennis shoes were necessary to accommodate the brace on the left foot. The United States Supreme Court noted recently that the ADA can be violated by non-accommodation due to medical issues. *United States v. Georgia*, ___U.S.___, 2006 WL 43973. The evidence reflects that the foot brace could not used in normal DOC footwear, but Claimant was forced to buy tennis shoes on his own. There is no more basic program in a prison than medical care. The case here is not a situation where there is a dispute

---

[2] The affidavit of Dr. Shames in many paragraphs deals with issues that are totally irrelevant to the claim process. Those paragraphs have been given no evidentiary weight by the Special Master.

[3] Defendants called two witnesses in an attempt to portray the situation at CTCF as something other than described by Claimant. The Special Master allowed these individuals to testify, even though they were not endorsed prior to the hearing. The Special Master did not find their testimony to be persuasive.

about the quality of medical care. The problem is a refusal to provide a needed item to accommodate a disabling condition.

Finally, Claimant was instructed as part of his physical therapy to continue to do exercises. The request to utilize the physical therapy equipment at CTCF was not unreasonable and in keeping with a disabled inmate's desire to improve his health. That was even more true in light of the fact that Dr. Shames has acknowledged that physical therapy sessions are limited in nature and the inmate is expected to carry on with those on his own. Claimant was at CTCF because of his medical condition. No evidence was presented by Defendants as to why he could not have used the physical therapy room to continue his recovery.

Claimant has established that he was subjected to discrimination prohibited by the ADA while at CTCF. The question then is what is an appropriate remedy.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant's testimony establishes that there was harm as the result of the conduct of DOC and its staff at CTCF. Claimant also acknowledged that his health has improved and that conditions at FLCF are better than other facilities in the past. The Special Master finds that Claimant should be awarded $750.00 for the treatment that he received at CTCF from January, 1999 to September, 2002.

IT IS HEREBY ORDERED that the claim of Kevin Stuck is granted to the extent set forth in this Order, as he has proven by a preponderance of the evidence each of the criteria set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Defendants are directed to compensate Claimant for his damages in the amount of $750.00; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before April 10, 2006.**

SIGNED this 27 day of January, 2006.

BY THE COURT:

_____
Richard M. Borchers
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this _27_ day of January, 2006 to the following:

Mr. Kevin Stuck
#97806
FLCF
P.O. Box 1000
Fort Lyon, CO 81038-1000

Mr. James X. Quinn
Mr. Jess A. Dance
Mr. Aaron Atkinson
Ms. Brooke Meyer
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203