Page 18

```
 1  prerequisite to submitting her time in a fee
 2  position -- in a fee petition.
 3          The next entry, 12-17-03, David Miller
 4  will speak on this issue, as well. The defense
 5  objected to both counsel touring Fort Lyons. And I'm
 6  going to say briefly that Fort Lyons is the facility
 7  where most of our class members are housed, and a place
 8  where arguably most of the changes would occur.
 9          It was a large meeting, a meeting that
10  occurred with architectural experts and DOC personnel,
11  both Beth McCann and James Quinn attended the meeting,
12  we had some group tours, but Mr. Miller and I split up,
13  and he'll discuss that trip further during his
14  testimony.
15          The next issue that they raised were the
16  conferences. The defendants argue that apparently that
17  we should have all attended the conferences with the
18  same amount of time, and that it's indicative of sloppy
19  bookkeeping that our time was different on these
20  conferences.
21          And I would say to the contrary, our
22  personnel tried to be very specific on how much time
23  each person spent in the conference. The fact is, some
24  people came late to meetings and some people left early
25  for meetings, and some of the time entries that are
```

Page 19

```
 1  reflected here reflect efforts other than just the
 2  meeting, itself.
 3          And for instance, I just picked out a
 4  few, but on the 6-30-04, entry, they objected because
 5  Mr. Miller billed .3 more for a meeting than myself and
 6  Alison Butler Daniels did. Well, if you look at that
 7  entry, you'll see that in addition to the meeting, he
 8  also prepared the status memo for the group after the
 9  meeting. And I think if you go down each one of these,
10  you can find something similar.
11          The 9-1-04, meeting that they contest,
12  well, in that meeting, actually ABD and CH, that's the
13  associate and the paralegal, they left the meeting
14  after their portion of the meeting was done, and David
15  and I continued on. I mean, that's efficient use of
16  time, we didn't have them sit to listen to topics that
17  weren't of pertinence to them.
18          I actually personally remember the
19  6-27-05, meeting, in which they claim there's a
20  difference in billing, because David billed 1.6 and I
21  billed 1.8. I remember that meeting because David had
22  to leave early, and I continued on with the meeting
23  with Linda Edwards, who is our diabetic expert. So
24  these are, I think, indicative of trying to be accurate
25  in our time records, not indicativeness of sloppiness.
```

Page 20

```
 1          On page 6, 7-29-04, and 8-27-04, those
 2  were entries Mr. Miller spent, one was on briefing the
 3  issue of who was going to pay the costs of discovery,
 4  those were issues that were spent on monitoring the
 5  damage claim process. Mr. Miller, he'll testify to
 6  this, has not worked on individual damage cases, those
 7  entries, therefore, could not relate to individual
 8  damage cases.
 9          And the same, I think, with the next two
10  entries go to the general issue that we're discussing
11  here, both the next two entries are contested because
12  they have to do with monitoring the damage claim
13  process. The conference call was a call regarding an
14  order that Nottingham issued, it was an order regarding
15  what kind of liability issues could be raised during
16  the damage claim process.
17          This was the first order that he issued
18  that said, defense cannot raise these type of claims.
19  And I'll point out to the Court that even after that
20  order was issued, and that was in November, I believe,
21  of 2004 --
22          THE COURT: When you say he issued, you
23  meant the special master?
24          MS. GREISEN: I'm talking about Judge
25  Nottingham, I'm sorry. Judge Nottingham issued the
```

Page 21

```
 1  order in 2004, and even after that order issued, the
 2  defense continued to raise liability based defenses,
 3  such as the PLRA exhaustion requirement was raised
 4  after Judge Nottingham issued that order.
 5          The next entry, the PSB, was Patricia
 6  Bellock, regarding research on what claim survived
 7  death, what 1983 claim survived death. That's a
 8  particularly complicated issue in the scope of the
 9  damage claim process. The class five claimants, those
10  who have died during this case, the issue is whether
11  under the ADA or the Rehab Act they can get claims once
12  they have died.
13          Under 1983, the special master initially
14  entered an order saying that none of the 8th Amendment
15  claims survived in the case. Now, that finding is
16  erroneous, and that's agreed to by the defense. In
17  subsequent briefings the defense has agreed that there
18  are still some 8th Amendment claims alive in this case.
19  But the special master determined first that there were
20  not any 8th Amendment claims, and because of that, the
21  only kind of damages that could be recovered by class
22  five claimants were damages allowed under the ADA and
23  Rehab Act.
24          And the issue of what damages survive in
25  an ADA and Rehab Act is an issue of first impression,
```

**Page 22**

1  not only in this circuit, but across the nation. I
2  could not find case law on this point, so we have had
3  to do extensive research to argue this point. In
4  essence, the special master initially determined that
5  the only relief that was going to be provided to class
6  five plaintiffs was economic loss prior to death.
7  Well, these are all incarcerated
8  individuals, their economic loss is de minimus, so
9  essentially there would be no damages whatsoever for
10  class five plaintiffs under this analysis. This was a
11  part -- Patricia Bellock's research was a part of
12  researching this issue, as to what kind of damages
13  class five plaintiffs are going to be entitled to, and
14  we think that that's a compensable issue under the
15  damage claim process.
16  The next two entries I'm going to defer
17  to David Miller's testimony on. He worked with
18  Patricia Bellock during the time I was on maternity
19  leave, from March until June, actually to August, seems
20  like a long time ago, and so I'm going to let him
21  provide testimony on those issues.
22  The cost issue, the LEXUS research issue,
23  I -- there's additional supplemental time submitted on
24  LEXUS, as well, because not all the LEXUS research time
25  was billed in our original submissions. Judge, these

**Page 23**

1  are charges that we regularly bill to clients on every
2  case, they are not in our overhead, we do not assume
3  these costs in our overhead. If we did research by
4  hand at our hourly rate, it would be an extremely
5  inefficient use of counsel's time.
6  Given the large number of legal issues
7  raised by the defendants, the charges are reasonable,
8  we believe, and efficient use of our time. The copying
9  costs we also believe were reasonably necessary to
10  monitor the --
11  THE COURT: May I ask a question?
12  MS. GREISEN: Sure.
13  THE COURT: Are the copying costs for
14  in-house copies or external?
15  MS. GREISEN: I believe they're all
16  in-house, I can look.
17  THE COURT: I don't think I'm supposed to
18  rely on my own experience, but it's sort of a profit
19  center.
20  MS. GREISEN: And as you might remember
21  David Brohm's (phonetic) testimony in the first
22  arbitration, he testified that it's the most efficient
23  money maker in his firm.
24  THE COURT: Right.
25  MS. GREISEN: There is -- our fees are

**Page 24**

1  reasonable at 15 cents a copy, it's less than you could
2  get, I think outside usually charges 20 cents, but my
3  memory is that most of these are, in fact, inside copy
4  costs.
5  And we didn't make six copies of
6  everything that came through, we have an enormous
7  volume of material coming through our office. Not only
8  the initial claim forms that come through, but as well
9  as the supplemental claim forms, any orders that are
10  issued by the special master on any particular case,
11  the findings of the special master, the appeals that
12  are filed with respect to the special master's orders,
13  on top of that, the volume of correspondence we get
14  from our clients. We have tried to be very mainstream
15  and streamline in copying, it's just a tremendous
16  volume of material that comes through.
17  We do, when necessary, or when possible,
18  have a paralegal review the material and determine
19  whether it needs to be copied further, rather than
20  having everything copied to every person.
21  And I should say, we're not being
22  notified by the defense when they raise these liability
23  based issues, it's not like we get a phone call that
24  says, heads up, this issue is coming down the pipeline.
25  We have to review everything that comes through because

**Page 25**

1  that's the only way we remain aware of what issues are
2  raised that could potentially have class-wide
3  implications. And because of that, it's necessary for
4  us to review all this material that goes through the
5  damage claim process.
6  With respect to the travel expenses, the
7  first issue that they raise is the travel expense of
8  8-31-03, it's travel expenses for prisons back in July
9  of '03. We did do a lot of travel back in July of '03,
10  I went back and looked to see whether those expenses
11  were submitted in the previous arbitration, and
12  honestly, Judge, I couldn't tell, there were some
13  travel expenses submitted in our previous arbitration,
14  and not for that particular amount, so my guess is that
15  these expenses came through after that arbitration, but
16  because I didn't want to spend an hour in attorneys'
17  fees trying to figure the issue, we're just going to
18  withdraw the claim for $365.07.
19  The rest of the travel expenses, we
20  believe, are appropriate and compensable as costs
21  reasonably necessary to travel to the facilities to
22  facilitate -- to the facilities to discuss compliance
23  issues with class members.
24  And as we pointed out in our submissions,
25  I think it was sometime in 2003 the Department of

Page 26

1  Corrections changed its policy and would no longer
2  allow attorney/client phone calls be made to
3  individuals at DOC facilities. The rule was, unless
4  there was an immediate hearing of which you did not
5  have previous notice, you were no longer allowed to
6  call inmates at the facilities, that necessitates
7  travel to the facilities.
8          The rest of my testimony is contained in
9  my affidavit, which I would incorporate in my testimony
10 in the arbitration. Unless you have other specific
11 questions, Judge, I will turn it over for
12 David Miller's testimony.
13         THE COURT: All right. But I think it
14 would be appropriate, before you turn it over, to
15 determine whether the State has any cross-examination.
16         MS. McCANN: I think we'll cover our
17 position in our statement.
18         THE COURT: Okay.
19              TESTIMONY
20         MR. MILLER: If I may, Judge, as
21 Ms. Greisen explained, we both worked on this case
22 while Ms. Greisen was out on maternity leave for a
23 period of about five months, I ended up being the
24 supervising attorney within the office. And it was
25 during that time that several of these issues came up

Page 27

1  that we've been talking about.
2          This case is not either our office's or
3  my first time around the compliance block in prisoner
4  class litigation within the Department of Corrections
5  in Colorado. I've been involved in approximately a
6  half dozen or more such compliance cases, starting with
7  a case that was filed back in the '70s, called Marony
8  (phonetic). versus the Colorado State Penitentiary,
9  that successfully challenged and resulted in a
10 settlement revamping the entire inmate classification,
11 intake, maximum security, and progression system within
12 the state Department of Corrections.
13         Then moving on to one of the cases that
14 are cited by the -- cited by the defendants, the Ramos
15 versus Lamb case, where I was strictly compliance
16 counsel, because that case had been tried in 19 -- the
17 end of the '70s, early '80/'81 time, and then my
18 involvement began in 1983 and lasted literally
19 throughout my stay at the ACLU.
20         When I left in 1996, we were still
21 litigating some issues connected with that, so that was
22 the case I told my executive director would be over in
23 compliance in three years, and ended up being active 12
24 or 13 years later, and several of the same kinds of
25 issues arose.

Page 28

1          And I tell that to the Court because I
2  think it has relevance on what the district court has
3  previously found to be reasonably necessary monitoring
4  compliance work. And because those rulings have both
5  educated me and the office about those issues and have
6  influenced me and the office at which I've worked as to
7  how to charge for those kinds of behaviors, which of
8  those behaviors involved and working on a case where
9  there's a compliance order is or are compensable, and
10 which are simply not.
11         In addition to those cases I've been
12 involved in the Velasco (phonetic) versus Romer case,
13 the Diaz versus Romer case, the Arguello versus Romer
14 case, and several, as well as this one. And in almost
15 every one of those cases this question arises with
16 respect to what's the proper mechanism under which
17 class counsel should be involved, number one, in
18 compliance; and number two, be compensated for
19 compliance.
20         Probably the most instructive of my
21 experiences relevant to the issues before you were at
22 the end of the monitoring and compliance -- arose at
23 the end of the monitoring and compliance period in the
24 Ramos versus Lamb case cited by the defendants.
25         And in that case Judge Jim Carrigan

Page 29

1  (phonetic) was, I think, the third or fourth of the
2  district court judges on whose shoulders that case had
3  progressed, devolved, or evolved, depending on your
4  perspective. And one issue that arose was, what was an
5  adequate level of medical care, because the settlement
6  agreement touched on the requirements for minimally
7  adequate medical care under the 8th Amendment, but the
8  settlement agreement had to be interpreted to address
9  the issue of the new problem within the prisons, which
10 was the development of HIV, the human immunodeficiency
11 virus.
12         The Department of Corrections took a
13 position that said, we're going to do X, but we really
14 don't care what the result of this fight is. And the
15 fight came about because part of the inmate class said,
16 we don't want to be housed with these people because
17 they're --
18         MS. McCANN: Your Honor, I fail to see
19 the relevance of this, and I object to going into the
20 details of another case at this point. The issue is
21 whether or not they're entitled to reasonable fees for
22 monitoring compliance in this case, I don't think we
23 need to have a recitation of actions he's brought
24 against the Department of Corrections in the past or
25 the details of that.

Calderwood-Mackelprang, Inc. 303.477.3500

30

1  THE COURT: Okay. Is where you're going
2  in terms of telling me what the district court did in
3  that case?
4  MR. MILLER: Where I'm going, Your Honor,
5  is to tell you how my experience involving these same
6  kinds of cases where these same kinds of issues has
7  influenced me as to how I charge in this case
8  specifically.
9  THE COURT: Okay, I'm going to overrule
10  the objection.
11  MR. MILLER: And so I'll try to cut it a
12  little shorter, but I think it's important because the
13  question arose as to when there was a dispute between
14  the parties, part of the inmate class, and another part
15  of the inmate class.
16  And so the question arose as to under the
17  terms of the settlement agreement, what was counsel
18  supposed to do, what was a plaintiff's lawyer, who was
19  class counsel, reasonably required to do to enforce the
20  rights of the class.
21  And as it was made clear to me by Judge
22  Carrigan, the terms of the settlement agreement were
23  what were important, not the state of Section 1983 law,
24  and so I was instructed to look at what the settlement
25  agreement -- what obligation the settlement agreement

31

1  laid upon class counsel's shoulders.
2  In that case, it was the same obligation
3  as laid upon our shoulders in this case, and that was
4  to do what was reasonably necessary to represent the
5  interest, the legal interest of the plaintiff class.
6  Now, it turned out that the part of the class that I
7  represented didn't prevail in the fight between
8  factions of a plaintiff class.
9  That didn't stop the Court from saying,
10  the analysis is, was it reasonably necessary for class
11  counsel to take this position to defend or to argue a
12  reasonable interpretation of the settlement agreement.
13  And so the Court ruled that both sides of the plaintiff
14  class counsel were entitled to reasonable compensation
15  because their actions had to be taken ethically, as
16  well as legally with respect to interpreting what the
17  settlement meant.
18  THE COURT: Is that a published decision?
19  MR. MILLER: I don't believe that Judge
20  Carrigan published that. I'd be glad to provide the
21  Court with a copy of that.
22  And so it ended up that -- the Department
23  of Corrections ended up paying both sides, the winning
24  side and the losing side of that dispute. And the
25  reason was, as explained to me, and which -- the reason

32

1  I've taken the position that I did in how I handled
2  charges in this case, that as class counsel, I am
3  required, or was required in that case, to argue a
4  reasonable position with respect to the interests of
5  the client under the settlement agreement, not looking
6  at whether I prevailed under Section 1983 law, that was
7  an issue that was over and done with, so that's what
8  happened in this case.
9  When issues arose, our office's practice
10  was to look at the settlement agreement, decide whether
11  the action we had to take or believed we were
12  considering taking, decided to take, was reasonably
13  necessary to effect the rights of the plaintiff class.
14  So it was very clear to me, when I was
15  dealing with Patricia Bellock, PSB in the time slips
16  report, that we were not charged with representing
17  individual defendants in -- plaintiffs, rather, in
18  their individual damage claims, but we were charged
19  with enforcing the rights of all plaintiffs who are
20  members of the class in collective rights, if you will,
21  under the settlement agreement.
22  And so I reviewed decisions that came
23  down and claims that were made by individuals who were
24  pro se to see simply whether they raised issues that
25  touched on the larger class issues. And to the extent

33

1  they did, I would charge for that time. To the extent
2  they did not, I would either not charge for that time
3  or refer the matter to Ms. Bellock, who I instructed
4  quite clearly to separate her time out and to charge
5  individual cases.
6  And the way that was charged was through
7  the name of the individual plaintiff, not under Montez,
8  the name Montez, but rather to open up separate
9  accounts for individual damage actions by separately
10  named class members who we were considering
11  representing individually.
12  And so what does not appear before you
13  today are all of those time slips that relate to
14  individual class members' claims for damages. I simply
15  have never involved myself in any of those individual
16  claims.
17  The only exception to that broad
18  statement I've just made is if a letter from a class
19  member did not alert us to interests of general
20  applicability, and asked us to represent him or her, I
21  would take it upon myself occasionally to say, look,
22  this is a frivolous matter, we're not going to get
23  involved in this , and I would tell my staff to so
24  inform the individual, as opposed to referring that to
25  Ms. Bellock so she would have to make that decision and