34
1 waste time.
2         Now, it may appear, and I think the
3 defendants flagged one time where I spent on May 4th of
4 2005, and if you review that you'll see that the time
5 slip says, review inmate letters, re, conditions,
6 claims, and settlement. Now, that was my standard
7 practice, I would look to see if the letters that came
8 in raised issues with respect to general compliance and
9 whether the defendants were behaving as they're
10 required to behave under the settlement agreement.
11         To the extent that we considered that
12 case as an individual case, that's what I normally
13 referred on to Ms. Bellock, who would split the time
14 out, because I asked her to do both, look at compliance
15 issues, in general, and I'll talk about that in a
16 minute, and then look at individual cases, also.
17         Now, in this one instance, I mentioned a
18 conference with Ms. CPH, who is Chu Pai, C-H-U P-A-I,
19 last name Ho, H-O, who is my paralegal, and I just told
20 her in this case, oh, by the way, decline these half a
21 dozen people, they don't raise issues that I'm even
22 going to pass on to Ms. Bellock.
23         In my experience, I can't pretend to
24 remember that conversation, my guess is it took
25 probably 10 seconds of my time, but because I didn't

35
1 split it out, we're willing to just eliminate that
2 charge, because it's not clear from the time record in
3 that instance, even though -- and I don't have a
4 specific memory. If I had a specific memory, I'd argue
5 that we should get the vast majority of that, but
6 because I don't, so we'll just withdraw that claim.
7         But the point is that the practice was
8 for me to review general compliance matters and to pass
9 on individual issues to Ms. Bellock. Now, Ms. Bellock
10 was given specific instructions from me, and here were
11 those instructions: They were, we have two lines of
12 analysis going on, one is, we have, we, being the law
13 firm that you're working with, we have an obligation to
14 monitor compliance.
15         Ms. Greisen and I decided that we could
16 hire Ms. Bellock at $180 an hour, as opposed to taking
17 up our time at 275- or $300 an hour, and more
18 efficiently handle the monitoring of compliance,
19 because we have other matters to handle in our
20 practice.
21         And from a deficiency standpoint, it made
22 much more sense to pay somebody a fee much less
23 expensive than our own time would have been to monitor
24 compliance. So she was instructed, Ms. Bellock was
25 instructed to review the letters that we had with

36
1 respect to not just individual issues, but with respect
2 to class compliance issues, if I believed there was a
3 larger class issue involved.
4         And what you see in these time slips in
5 front of you today are Ms. Bellock's time slips that
6 have been individually reviewed and only relate to
7 general class compliance matters. Now, is there some
8 overlap? The answer is, there's overlap in the
9 individuals that were contacted, but not in the time
10 that was spent.
11         So Ms. Bellock might talk to inmate A
12 about general compliance matters, and that would go
13 beyond the nature of individual inmate A's concerns or
14 may go beyond individual inmate A's personal concerns.
15 For example, let's say inmate A has a hearing
16 disability, but not a mobility disability, but because
17 inmate A is down at the facility and walks the same
18 route that the inmates do who are mobility impaired,
19 can see whether or not ramps have been built as they're
20 supposed to be built, or whether a pusher as an
21 assistant has been provided to individuals, and so it
22 would have information outside of that individual's
23 scope of personal damages, if you will.
24         To the extent that the person who
25 Ms. Bellock would be talking to would also be able to

37
1 relate their personal experiences that were in
2 violation of the agreement, it was our position that
3 information generally going to compliance, with
4 standards and requirements set out in the settlement
5 agreement, could legitimately come from and be billed
6 from contact with that person.
7         So for example, if that person says, I
8 didn't get a claim sheet, they're supposed to hand it
9 out to me, but they didn't give it to me, that may or
10 may not have relevance in their individual claim if
11 damages were later sought for them, but certainly has
12 relevance with respect to the compliance issues of
13 whether or not the defendants are doing what they're
14 required to do under the settlement agreement.
15         So sometimes while it's a more
16 complicated issue because of a situation like that,
17 those were the guidelines that we drew for Ms. Bellock
18 and her involvement.
19         Why did we involve her? Because, as I
20 said, it ended up being a lot less expensive to have a
21 person who charged at a much lower rate to look at
22 those issues than a person that charged at a higher
23 rate.
24         Specifically with regard to the issues
25 that Ms. Greisen said I'd address, the first trip that

**Page 38**

1  Ms. Greisen and I took down to Fort Lyons was in
2  December of '03, and the argument from the defendants
3  is that only one attorney should have taken that trip,
4  and it was, therefore, double billing. The bottom line
5  is, Ms. Greisen and I split up and we talked to
6  different inmates, we had to talk to them about
7  compliance issues and what the process was to implement
8  the settlement agreement.
9      Had we done that with one attorney, we
10 would never have finished in one day, it would have
11 taken much longer than it otherwise took, and would
12 have been inefficient for a person to stay two or even
13 three days when two people could go down and handle it
14 within the scope of one day.
15     That was true additionally because we had
16 an expert witness come down. And so while one
17 individual followed the expert witness, another person
18 could be talking to inmates at times.
19     The issue on Ms. Bellock, if you look at
20 page 6 of the defendants' response, references the
21 significant or what they call a series of large amounts
22 of time billed by Patricia Bellock for visits and
23 meetings with class members.
24     (Interruption.)
25     THE COURT: Go ahead.

**Page 39**

1      MR. MILLER: Her time slips are as they
2  are in the fee petition for the reasons I mentioned,
3  because of the time that she went down, and it's billed
4  here, is time she spent discussing with inmates, not
5  even inmates that we're currently representing, matters
6  of general compliance.
7      So for example, when it says she talked
8  to inmates, that might include five or six different
9  people; whereas, we only considered even the claims of
10 perhaps one or two of them. So Ms. Bellock was not
11 simply going down to talk with individuals who we
12 currently are now representing or were considering
13 representing, a lot of these contacts came through
14 letters and correspondence.
15     Because we were not on the attorney SIPs
16 list, the Colorado inmate phone system list, of every
17 class member, those inmates were not allowed to call
18 us. And dealing with them through letters is an
19 impossible burden because, as you appreciate,
20 information gathering is a two-way street, it's not a
21 fill in the following answers to the following
22 questions, it's an exploration that requires a dialogue
23 sometimes, and in these cases, required us to go down,
24 talk to some inmates, and then use information that we
25 got from them to talk to other inmates, just the kind

**Page 40**

1  of discovery process that requires the discussions.
2      In the real world practice of law, you
3  don't interview clients, you don't gather facts through
4  having them write you letters. You might become
5  alerted to an issue by a letter, but you don't become
6  aware of all the facts by having serial back-and-forth
7  letter writing to people.
8      So that was the reason for Ms. Bellock's
9  travel to these facilities and the separation between
10 the individual inmate cases, on the one hand, which you
11 don't see time entries for, and the general compliance
12 issues that you do see time entries for.
13     Additionally, just backing up, and
14 hopefully not confusing you, with respect to the trip
15 to Fort Lyons by Ms. Greisen and I, those trips are not
16 spent observing the scenery and wondering at the beauty
17 of Colorado, they're spent talking about individual
18 inmate cases.
19     To the extent there's an objection to
20 travel time, as the records will indicate, that
21 transportation time also included meetings, discussing
22 the individual inmate cases, or compliance issues that
23 we're going down to review. So if inmates A and B both
24 told us they were having the same kind of problem,
25 discussions about those issues would be the substance

**Page 41**

1  of our discussions while travelling.
2      With respect to the issue of the 5-4
3  date, I've already addressed that, we'll withdraw that,
4  even though I believe it's 99-percent compensable.
5      I don't know if the material that's been
6  submitted to the Court already assures the Court of
7  these matters I'm about to briefly mention, but
8  Ms. Greisen and I assured ourselves the reasonableness
9  of our hourly rates. I don't believe they're being
10 contested, but to the extent they've been previously
11 awarded by the court and/or yourself in this case, I
12 don't think there's a dispute.
13     We've individually reviewed the time
14 slips and made such adjustments to the time as would
15 reflect what would be billed to a paying client, and
16 that is reflected in either omissions from the billing
17 slips or notes of no charge.
18     And by omissions, I mean, you don't
19 really get a lot of credit for having something not be
20 there, but, for example, with respect to Ms. Bellock,
21 if you are to look at Ms. Bellock's time slips when she
22 came on in the February, March time, or so, of 2005,
23 you'll see that she has noted that she spent time with
24 me talking about these very issues, how do we charge
25 things, what am I supposed to look at, what are the

Page 42

1  compliance issues that I'm supposed to be looking at.
2       So you'll see entries on literally --
3  I'll give you a few where she's indicated that she
4  spent time with me, and you'll see no time entries for
5  me. That's because while educating her about these
6  issues, I simply did not charge, so it's a de facto
7  exercise of billing judgment at the time.
8       For example, on 2-22-04, you'll see a
9  meeting with me with Patricia Bellock about case
10 management and class issues, you'll see no entry of
11 time for me, simply just didn't charge.
12      THE COURT: What was the date?
13      MR. MILLER: 2-22-05. You'll see the
14 same thing on 2-25-05, where she notes a meeting with
15 myself concerning the interview process, in other
16 words, me saying, here's what you've got to do to get
17 information about general compliance when you go down
18 there. She met with me for a brief period of time, I
19 simply didn't charge for that background education.
20      Again, on 2-26 you'll see the same kind
21 of time entry with her, where she's met with me about
22 what issues relate to San Carlos, what she's supposed
23 to be looking at in terms of general compliance, no
24 entry from me. In my mind, that was simply time spent
25 educating her, and therefore, better not charge to the

Page 43

1  other side, so I just simply didn't enter a time slip.
2  I think that's all I have, unless you have any
3  questions.
4       THE COURT: Other than page 30 of the
5  remedial plan, second from the last full paragraph on
6  the page, is there anything that delimits my
7  jurisdiction in determining attorneys' fees? Because
8  it just said incurred during the compliance and
9  monitoring period, it doesn't really say incurred how.
10      MR. MILLER: Well, other than the general
11 statement that appears elsewhere in the agreement, that
12 attorneys are to spend time reasonably necessary in
13 these matters.
14      THE COURT: And where is that?
15      MR. MILLER: I think it's in paragraph
16 31.
17      THE COURT: Okay.
18      MS. McCANN: And we would also direct the
19 Court to page 29, the last full paragraph, indicating
20 that plaintiffs' class counsel does not have an
21 obligation to represent any individual with respect to
22 individual damage claims, and they may or may not
23 represent individual damage claimants.
24      THE COURT: Okay, thank you.
25      MR. MILLER: And just to clarify, I'll

Page 44

1  just tell you that we are, the special master, I'll
2  tell you that we have entered appearances on about a
3  dozen cases, you do not see any time records for any of
4  those matters where time is spent on their individual
5  cases.
6       THE COURT: Okay. I assume you don't
7  need cross on this, either?
8       MS. McCANN: I have a few questions,
9  actually.
10      THE COURT: Okay.
11          CROSS-EXAMINATION
12 BY MS. McCANN:
13      Q.   David, in the Ramos case, correct me if
14 I'm wrong because I'm not that familiar with it, but
15 there was no procedure for individual hearings on
16 damages claims, was there?
17      A.   There was no damages claim at all in that
18 case, it was an injunctive relief. That's not true in
19 Marony, though.
20      Q.   Now, you also mentioned that you have
21 been reviewing all of the letters that come in from the
22 inmates to determine whether or not they involve
23 general issues or specific issues, did I understand you
24 correctly with what you said?
25      A.   No, I don't know that I've reviewed all

Page 45

1  of the letters, I reviewed all of the filings with
2  respect, all of the matters that have been filed to the
3  Court or before Magistrate Pringle with respect to
4  individuals.
5       Q.   So the actual claims that are being filed
6  by the individuals in the special -- with the special
7  masters is what you're reviewing?
8       A.   I've looked at the filings of -- I've
9  looked at the filings in the special master's case,
10 correct.
11      Q.   Well, part of what you're doing when
12 you -- let me change track a little bit. Part of what
13 you're doing when you go down and visit with these
14 inmates, or Patricia Bellock visits with them, is
15 determining whether or not you're going to represent
16 these inmates in their individual claims; isn't that
17 right?
18      A.   Well, to the extent that that's the
19 information people have, some people just write and
20 say, look, here's what they're doing, they're not
21 following the agreement, and we'll talk to them whether
22 or not they have a claim.
23          Or some of them have claims that simply
24 aren't three, four, five claims, they're one, two,
25 claims, and, Your Honor, those are the class of their

46

1 damages and wouldn't be subject to a matter that we'd
2 get involved in. But on the other hand, some cases do
3 involve individuals who say, here are all the problems
4 that relate to the case, and I want you to represent
5 me.
6    Q.   And you have to, then, or you or
7 Patricia Bellock talk to the client or talk to the
8 inmate to decide whether or not you're actually going
9 to represent them in an individual claim?
10   A.   That's correct, the majority of that or
11 the vast majority if not all of it would be
12 Patricia Bellock.
13   Q.   She actually -- I mean, she essentially,
14 you guys essentially hired her to handle the damages
15 aspect of this case, didn't you?
16   A.   No, to help us review materials and to
17 assist with damage claims that we decided to take,
18 yeah.
19   Q.   Well, I'm just going to show you this as
20 an example, this is a letter that was received by DOC
21 from Patricia Bellock, dated March 29th of 2005, does
22 that appear to be a letter on your all's (sic)
23 letterhead?
24   A.   On our letterhead, yes. Well, it's on a
25 letterhead that she's authorized to use from us.

47

1    Q.   Well, you don't have any quarrel with the
2 authenticity of that letter?
3    A.   No.
4    Q.   And you can see from that letter that she
5 specifies that she's going to visit at one of the
6 facilities some individuals to talk with them about
7 their individual claims.
8    A.   Yes, I see that.
9    Q.   All right, thank you. I'll be happy to
10 make a copy of that for you. So in some of this
11 business that she's conducting at the different
12 locations, she's clearly talking to the individuals
13 about individual damages claims?
14   A.   As she says in that letter, she wants to
15 see this person about individual claims and compliance,
16 so I'm believing she's doing that.
17   Q.   Some she says she's just going to see for
18 individual claims.
19       MS. GREISEN:  Can I see the letter again?
20       MS. McCANN:  Sure, but I'm actually
21 directing this to Mr. Miller at this point.
22   A.   No, I think I saw one where it said she
23 wants to talk about individual claim and claim
24 retaliation.
25   Q.   (By Ms. McCann) And how about these

48

1 three down here?
2    A.   That SCF, there are three she says she's
3 going down to talk about individual claims for.
4    Q.   And in fact, you all separated out your
5 billings so that you have billings for compliance and
6 billings for damages, and in the damages portion of
7 your billings, almost all the entries are
8 Patricia Bellock's; is that right?
9    A.   Well, I haven't looked to parse them out.
10 There are three categories within which we billed, the
11 compliance, damages that were issues that related to
12 the entire class that we believe related to compliance,
13 and then -- and the collective right to pursue damage
14 claims; and then the individual inmates.
15       Now, some of them, to the extent we ended
16 up representing them, they have their separate files;
17 and other people who we've decided not to represent,
18 they have their own, but nobody will ever see those
19 records, because they will never be requested.
20   Q.   But what I'm asking you is, in your
21 submissions that you gave to the special master in the
22 attorneys' fees section , you separated out your fees
23 so that you have some that are denoted as damages at
24 the top of the entry, and those entries contain most of
25 Ms. Bellock's billings; isn't that right?

49

1    A.   I don't know that that is right. I mean,
2 what the records show is what they are.
3    Q.   All right. Well, but the briefs that
4 Ms. Bellock has been involved in relate to issues about
5 what damages are recoverable in this case; is that
6 correct?
7    A.   Well, some of them do, that's correct.
8    Q.   Well, what other briefs has she written
9 that don't involve the issue of damages?
10   A.   I think she's done some work with respect
11 to discovery costs.
12   Q.   Well, that's a damages issue, isn't it?
13   A.   Maybe I'm parsing too finely, but no, I
14 don't believe damages are the same thing as profit.
15   Q.   Well, the only purpose to get discovery
16 in these cases is to determine whether or not they're
17 individual damages. I mean, the discovery issues that
18 we're having now has to do with what the individual
19 inmates are entitled to recover in their individual
20 damages claims, right? I mean, you've gotten all the
21 discovery on the general compliance issues, or you're
22 in the process of reviewing that.
23   A.   The reason I don't know how to answer
24 that, is some of the work with respect to briefing or
25 discussions about availability of ADA relief, or