66
1 district federal decisions especially, and state
2 decisions, as well, to the extent I'm familiar with
3 those.
4     And I think the Court, this Court
5 previously approved similar charges in the earlier
6 ruling, so it seems to me that all of that points to
7 reasonableness.
8     MS. GREISEN: Just a minute.
9     (A discussion was held off the record.)
10     MS. GREISEN: We have nothing further.
11     THE COURT: Do you have any cross?
12     MS. McCANN: Yes, I'm sorry, I do.
13     CROSS-EXAMINATION
14 BY MS. McCANN:
15   Q.  Mr. Kahn, you understand the remedial
16 plan in this case set up a separate process for inmates
17 who believe they've been discriminated against because
18 of a disability to file a damages claim?
19   A.  Yes, I do.
20   Q.  And in fact, the remedial plan, itself,
21 says that there is no obligation on behalf of
22 plaintiff's counsel, or class counsel, to represent
23 anyone in those damages claims.
24   A.  Correct.
25   Q.  Are you familiar with that? And when

67
1 class counsel -- let me back up a minute. Typically in
2 a class case, class action case, there are class
3 representatives that represent the interests of the
4 class; is that right?
5   A.  There are named plaintiffs who usually
6 are the class representatives who are supposed to do
7 that, yes.
8   Q.  And the point of having class
9 representatives is that the plaintiffs' class counsel
10 communicates with those representatives with respect to
11 issues involving the general class.
12   A.  Well, one of the things you would hope
13 would happen would be that, sure.
14   Q.  Well, in fact, in this case, the
15 plaintiffs' attorneys requested compensation for class
16 representatives because they were performing extra work
17 because they were representing the class; isn't that
18 right?
19   A.  They did request that in the earlier
20 proceeding, that's right.
21   Q.  And so when plaintiffs' class counsel has
22 an issue of general compliance, they should look to the
23 class representatives to express or to decide or give
24 them input as to how the agreement is being
25 implemented.

68
1   A.  I don't think that's correct. I think
2 that the question of what their legal duty is cannot
3 be -- to the class can be informed, to some extent, by
4 the wishes or the views of named plaintiffs or class
5 representatives, but I think those duties are set forth
6 in the law of class actions.
7     And for example, if a class
8 representative said, oh, you don't have to bother with
9 that, leave that to individual counsel, I don't think
10 that would absolve class counsel in this case from
11 going in and having the obligation to challenge the
12 assertion of these broad defenses.
13   Q.  So do you know if counsel in this case
14 has used class representatives in the fashion that I've
15 suggested?
16   A.  I don't know whether or not they
17 consulted with the class representatives on that issue,
18 I doubt that they did, but I didn't review the time
19 sheets with that in mind.
20   Q.  In reviewing them, you didn't notice
21 anything that particularly indicated that they were
22 meeting with class representatives to discuss
23 compliance?
24   A.  That's right.
25   Q.  Now, in a class action, for example, in a

69
1 products liability kind of case, class counsel has
2 named representatives, as we've discussed, and then
3 there are other members of the class with whom they
4 have very little, if any, contact during the pendency
5 of the case, isn't that the way that they work?
6   A.  I think typically there's relatively
7 little contact between plaintiff's counsel and the
8 unnamed class members in a large class action, except
9 when notices go out to the class of a damage action,
10 and then there are usually contacts about that. But I
11 think in general, you could say that typically contacts
12 are infrequent between the unnamed members of the class
13 and class counsel.
14   Q.  And what happens typically is an
15 individual will get a letter from, I guess, the
16 plaintiffs' class counsel, saying there's a proposed
17 settlement of this class action, and some of you can
18 opt in, and some of you can opt out, but that
19 individual damages will be determined at a later time,
20 and there is a provision for input, if necessary, or
21 if -- not necessary, if desired by an unnamed class
22 member.
23   A.  Well, I think the analogy to a products
24 liability action is not perfect, because here you have
25 injunctive relief, as well as damages availability.

**Page 70**

1  But it's true that the -- at some point in the action
2  there's usually notice to a class of what's occurred,
3  and then an opportunity for them to comment or take
4  action, if appropriate, or simply be informed that
5  action may be proceeding without their taking action,
6  those are all possibilities that are created.
7      Q.  Well, you mentioned the difference
8  because of an injunctive component of this case, but
9  isn't that often the case?  For example, there was a
10 recent class action against Blockbuster because of
11 their advertisement that there would be no late fees,
12 and as part of that settlement, Blockbuster had to
13 change the way they advertised that in the future, and
14 in addition, individuals were entitled to submit a
15 claim for possible damages.
16     A.  I think that's right in that case, yes.
17     Q.  And that's sometimes the case, at any
18 rate.
19     A.  Right, I think that happens, yes, I think
20 that's common, something like that.
21     Q.  So an individual in a class action case
22 that does result in a settlement can -- often can file
23 an individual claim, but that does not mean they are
24 represented individually by class counsel, and there's
25 often, again, no contact at all between the counsel and

**Page 71**

1  the claimant in those cases.
2      A.  I think that that's often true.
3      Q.  And in order to monitor compliance, class
4  counsel does not have to go speak to every single
5  unnamed class representative in those cases, correct?
6      A.  Certainly they don't have to speak to
7  every unnamed class representative, but I think they
8  would be taking steps to monitor whether the stores
9  were complying.  And one easy way to do that, if you
10 had the information as to the various locations across
11 the country, would be to contact class members and say,
12 what information do you have about whether or not late
13 fees are being charged.
14     Q.  And class counsel might do that on a
15 selective basis, a random basis, they would, perhaps,
16 rather than visit, I don't know how many Blockbuster
17 stores there are, but I assume there are probably
18 hundreds, if not thousands, they wouldn't go visit
19 every single one of them, they would randomly select
20 certain stores to determine whether they're in
21 compliance.
22     A.  They could do it either way.
23     Q.  Let me put it this way, that would be a
24 reasonable approach?
25     A.  I think that the given modern statistical

**Page 72**

1  sampling techniques, it would be reasonable to contact
2  or visit only some of the 5,000, or so, Blockbuster
3  stores there are around the country.
4      I think you have a different situation
5  here, where there are a limited number of facilities,
6  and various components to the decree, aspects of the
7  decree of the kinds of medical or disability conditions
8  of the members of the class, and a class which is not
9  usually articulate in communicating, at least from my
10 experience, that prisoners are not especially
11 articulate in communicating difficulties, so I think it
12 would be different than the commercial case, where you
13 could rely on --
14     Q.  The average Blockbuster ...
15     A.  The average consumer to take steps to
16 protect themselves.
17     Q.  Have you looked at any of the complaints
18 that have been filed by the inmates in this case?
19     A.  I have not.
20     Q.  So you don't know how articulate or
21 inarticulate they are in expressing their disabilities?
22     A.  I don't know the answer to that, but I
23 also know that inmates often use other inmates to file
24 pleadings when they're doing something pro se, and that
25 it's the -- it's not the inmate, themselves, who puts

**Page 73**

1  together the filing, but if you actually talk to that
2  inmate, it might be more difficult to ascertain what's
3  really happening, but there are inmates that are quite
4  articulate, I would agree.
5      Q.  And you haven't attended any of the
6  hearings in this case, inmate hearings?
7      A.  None of the inmate hearings.  I don't
8  think I attended any hearing before Judge Nottingham,
9  but I -- early in the case I may have seen something.
10     Q.  And a reasonable effort to ensure
11 compliance in this case would be to selectively
12 interview inmates or selectively review inmate files,
13 wouldn't you agree?
14     A.  I think I'd leave that up to counsel to
15 determine.  There may be more than one way to skin this
16 cat, and I would leave it to experienced counsel, in
17 prison cases such as here, to determine the best
18 methods of determining compliance, I don't think I'm in
19 a position to second-guess that.
20     Q.  Well, you're the expert here.
21     A.  I'm the expert on fees, but not on what's
22 the best way to determine compliance.
23     Q.  Well, would you disagree that it would be
24 a reasonable approach to selectively review files or
25 talk to inmates, rather than reviewing every single

74
1  file and every single letter?
2  A.  I think that what Mr. Miller testified to
3  was that he --
4  Q.  No, no, I just want you to answer my
5  question.
6  A.  Well, when you say every single file, are
7  you talking about every inmate in every institution, or
8  are you talking about those that have been filed with
9  the court?  I guess I don't understand the question.
10  Q.  That's all right, let me clarify it.
11  Every inmate who filed a claim -- let me back up a
12  minute.  In this case there are claims being filed, and
13  also grievances or requests for accommodation being
14  filed that may not result in a claim actually being
15  filed for damages, so my question is, in trying to
16  determine compliance, would it be reasonable for
17  plaintiffs' class counsel to selectively review
18  requests for accommodation that are made, review claims
19  that are filed by inmates in court, and also, letters
20  that inmates are sending regarding compliance issues?
21  A.  I think that the best course would be to
22  use a paralegal to do a first cut at all of the
23  material that comes to one's attention, or could come
24  to one's attention, and that if there are matters
25  within that that would lend themselves to -- or would

75
1  seem to be more important, those should be brought to a
2  lawyer's attention, or you could use a low level
3  associate for that.
4      I think there is a danger that if you
5  don't review all the material, that you might miss
6  something that's important to the compliance effort.
7  So I don't think the numbers here are so large that the
8  sampling approach has the assurance of being
9  sufficient.
10  Q.  But would it be a reasonable approach?
11  A.  I guess I don't know enough to comment on
12  that.
13  Q.  Well, have you reviewed -- you've
14  reviewed the file, you've been hired as an expert in
15  the case to evaluate whether the fees were reasonable
16  and necessary, so I'm asking you, would a reasonable
17  approach be to selectively review claims that are
18  filed, requests for accommodations that are made in the
19  Department of Corrections, rather than trying to review
20  all of them?
21  A.  And my answer is that I don't know
22  whether a selective review would be sufficient, but I'm
23  certain that a universal review, trying to use
24  associates or paralegals, would be a good way to do it.
25  Q.  Do you know how many requests for

76
1  accommodation have been filed in this case?
2  A.  No.
3  Q.  And do you know whether or not counsel
4  are going through every single file of any inmate
5  that's requested reasonable accommodations?
6  A.  I don't know for sure.
7  Q.  Do you know whether they're using
8  paralegals to take a first cut or if they're actually
9  reviewing them themselves?
10  A.  I don't know for certain, but I think,
11  from my review, they're either lower billing rate
12  associates or paralegals involved.
13  Q.  Now, I think when we talked at the last
14  hearing, you agreed that with respect to travel time,
15  that you typically bill at halftime for travel time if
16  it is not during regular hours; is that right?
17  A.  I think that's what I said, yes.
18  Q.  And you understand in this case that
19  every time the attorneys drive to Colorado Springs,
20  they both bill full hourly rates, so the Department of
21  Corrections pays these attorneys $550 an hour to drive
22  to Colorado Springs, and they pay -- if they take
23  others with them, they pay their hourly rate, as well,
24  do you think that's reasonable?
25  A.  I think if it's during normal business

77
1  hours, and the presumption is if it's normal business
2  hours, it takes them away from other billing work, that
3  that is reasonable.  It's not the counsels' fault that
4  the DOC is located in Colorado Springs or that these
5  facilities are sometimes located in remote areas.
6  Q.  Did you see any effort in the billings to
7  limit these visits to one attorney or one paralegal?
8  A.  I think that -- no, I think that in some
9  cases, one individual, like Ms. Bellock, did go, in
10  other cases there were two, Ms. Greisen and Mr. Miller.
11  But I assume they talked about the case on the way and
12  used some of the time at least for that.
13      And that, as the explanation here is,
14  they split up the inmates, and it was more effective to
15  have two of them do it in one day than one of them do
16  it over several days, so I don't see the inefficiencies
17  in that particular occasion.
18  Q.  That was one occasion that's been
19  testified about?
20  A.  Correct.
21  Q.  Now, in reviewing the billings that you
22  did, did you notice that Ms. Bellock's time is
23  primarily directed towards these damages issues versus
24  compliance, in general?
25  A.  I think that there were more of the

**Page 78**

```
 1  entries on that ledger than the other ledger. I didn't
 2  specifically --
 3      Q.  Did you have any discussion with class
 4  counsel about the role of Ms. Bellock?
 5      A.  I did. My understanding is that, in
 6  part, she was filling in for Ms. Greisen while
 7  Ms. Greisen was on maternity leave. I didn't have a
 8  discussion beyond that on her role.
 9      Q.  There was some discussion about the
10  necessity of winning a damages claim in order to
11  collect attorneys' fees. Now, if you bring an
12  individual action for damages under either the 8th
13  Amendment -- well, let's say under the 8th Amendment or
14  under the Rehabilitation Act, in order to recover
15  attorneys' fees, you have to be successful in that
16  case; isn't that correct?
17      A.  As I understand it, if you bring a case
18  from scratch without there being some decree out there,
19  yes.
20      Q.  Well, let's take Mr. Moyer, for example.
21  Mr. Moyer represents at least one of the individual
22  claimants, and I think more than one in this case.
23  Now, he's filing individual damage claims with the
24  special master, and he has proceeded to a hearing.
25  You're not suggesting that if he loses that case, he's
```

**Page 79**

```
 1  entitled to attorneys' fees, are you?
 2      A.  I'm not opining on that. That's not my
 3  understanding, but I'm also not opining on that.
 4      Q.  What's not your understanding?
 5      A.  That he's entitled to fees even if he
 6  loses the individual claims case. If that's the only
 7  thing he's doing in that case, is representing an
 8  individual on an individual claim, then I don't have an
 9  opinion -- I mean, I'm not opining this morning on
10  whether he's entitled to fees, but ...
11          MS. GREISEN: I'm going to object to the
12  question.
13      A.  Without studying it further, I think
14  you're right, that he's not entitled to fees, I think
15  I'd have to do a little more research.
16      Q.  (By Ms. McCann) Were you aware of the
17  fact that the issues that Ms. Greisen was asking you
18  about that were raised with Judge Nottingham, were
19  raised in the context of one individual claimant,
20  Mr. Ross?
21      A.  I was aware that these issues came up
22  in -- initially arose in the context of an individual
23  claim, but that they had implications for a much
24  broader group of class members, and that's why counsel
25  thought it was incumbent on him to act.
```

**Page 80**

```
 1      Q.  Mr. Kahn, you are aware of the fact, and
 2  I'm sorry if I've asked you this before, but under
 3  Section 32 of the remedial plan, that plaintiffs' class
 4  counsel does not have an obligation to represent any
 5  individual in this case with respect to their
 6  individual damages claims?
 7      A.  Yes.
 8          MS. McCANN: Just a moment.
 9      Q.  (By Ms. McCann) I believe you said this
10  in your previous testimony, but some law firms do
11  absorb legal research costs in their overhead; isn't
12  that correct?
13      A.  Yes.
14      Q.  And typically --
15          MS. McCANN: That's all I have, thank
16  you.
17          MS. GREISEN: Just a quick redirect.
18          REDIRECT EXAMINATION
19  BY MS. GREISEN:
20      Q.  I've placed in front of you what has been
21  submitted to the Court as Exhibit 5, and one of the
22  submissions is the response by class plaintiffs, the
23  report and recommendation of a special masters, the
24  senior united district court Judge John Kane concerning
25  defendants' response to claimants to bring documents,
```

**Page 81**

```
 1  that may be the longest title that I've submitted in
 2  this case, regarding claimant Carl Ross, do you see
 3  that document?
 4      A.  Yes.
 5      Q.  That's a document -- one of the briefs on
 6  the issue that Ms. McCann just referenced, that was the
 7  briefs concerning whether or not the defendants could
 8  raise certain liability based defenses during the
 9  damage claim process; is that correct?
10      A.  Right.
11      Q.  Do you see on the front of that pleading
12  how class counsel entered their appearance with respect
13  to that issue, in the very first paragraph?
14      A.  It indicated they were representing the
15  class plaintiffs and not the individual.
16      Q.  And in fact, in that brief, the merits of
17  Mr. Ross' individual claim was not raised; is that
18  correct?
19      A.  That's correct.
20          MS. GREISEN: I don't have anything
21  further, Judge.
22          THE COURT: Thank you. Would you like to
23  take a brief lunch break before you present, or do you
24  want to work through, what's your preference?
25          MS. McCANN: I'm okay with either way,
```

21 (Pages 78 to 81)