Page 98

1    the work that they did where they were successful, for
2    instance, I think on the exhaustion question under the
3    prisoner rights litigation?
4          MS. McCANN: Right, our position is still
5    that that is an issue relating to damages, and that
6    until they actually win some damages claims, they're
7    not entitled to recover for those costs, or those fees.
8          THE COURT: And then you disagree,
9    therefore, that the right to pursue damages, which is
10   granted in the remedial plan, would be rendered
11   meaningless or impotent if the pro se litigants were
12   required to, for instance, brief the 8th Amendment
13   question or the exhaustion question?
14         MS. McCANN: Well --
15         THE COURT: I mean, in other words,
16   basically, they need to go in front of the judge, the
17   special master pro se and respond to those legal
18   arguments pro se --
19         MS. McCANN: Yes, it has to be raised in
20   the context of the individual claim.
21         THE COURT: Okay.
22         MS. McCANN: And not all of them are pro
23   se, by the way. And it's fact specific, some of them
24   did exhaust administrative remedy, some of them may
25   have satisfied whatever requirements there are to prove

Page 99

1    their cases, it has to be looked at on an individual
2    case-by-case basis.
3          THE COURT: Of the 50 or 60 that have had
4    hearings, how many of those were pro se?
5          MS. McCANN: So far, just one.
6          THE COURT: And what was the result of
7    that one?
8          MS. McCANN: He recovered a small amount
9    of money. And that actually is still on appeal, that
10   case hasn't been finally concluded.
11         MS. GREISEN: I'm sorry, that was just
12   one person represented by an attorney or one person was
13   pro se?
14         MS. McCANN: Oh, no, one person was
15   represented by an attorney. Did I say it incorrectly?
16         THE COURT: Yeah, I had it the other way,
17   I was astounded.
18         MS. McCANN: Yeah, just one was
19   represented by an attorney, and he did recover, and he
20   appealed it.
21         THE COURT: Okay.
22         MS. McCANN: Okay. So one thing that has
23   not -- that I did not put in our response, which I want
24   to address also today, is that if the Court, this Court
25   is inclined to allow damages for the plaintiffs' class

Page 100

1    counsel work on the issue of medical malpractice and
2    8th Amendment claims, those are clearly governed by the
3    PLRA, in fact, that was stipulated to in the remedial
4    plan, so the fees have to be cut down at the PLRA rate,
5    which is $135.
6          And that's in the remedial plan, section
7    33, page 30, plaintiffs stipulate that time spent
8    solely on 8th Amendment matters that do not implicate
9    the ADA or Rehab Act will be subject to the fees cap
10   under the Prison Litigation Reform Act.
11         And that's fairly easy to separate out,
12   because they've done a lot of research and a lot of
13   briefing just on the 8th Amendment claims, and that's
14   an issue that's still pending in front of Judge
15   Nottingham.
16         Now, we do object to the Court giving
17   them fees at all on the 8th Amendment argument, but if
18   the Court is inclined, then clearly those have to be
19   reduced to the $135 an hour rate.
20         I also wanted to address the compliance
21   issues, a couple of issues relating to the compliance,
22   itself. I listed some specifics in my response, which
23   you have before you, but also, what the plaintiffs'
24   counsel are doing right now is they're going down to
25   DOC and they're going through every single request for

Page 101

1    accommodations by even people who aren't class members,
2    well, I guess they are now if they request the -- no,
3    they're not, if -- what happens is, under the plan,
4    people who are currently incarcerated may file a claim
5    saying, I'm disabled, and then DOC decides whether or
6    not they're disabled, and they have a clinical
7    screening by a doctor, and so forth, and all of those
8    files are contained at DOC.
9          And what plaintiffs' counsel is doing is
10   going through every single one of them, and many of
11   them are not even class members. And that is part of
12   what they are billing us for the last couple of months,
13   and I can point out those billings. But the point of
14   that is, they do not -- that is not time that they need
15   to spend.
16         It is reasonable to do random checks of
17   files or random checks of cases, individual claims that
18   have been filed, but they have taken it upon themselves
19   to go through every single document filed by any inmate
20   claiming a disability, and it's taking huge amounts of
21   time.
22         Just Tuesday they were down there with
23   four lawyers, no paralegals, no law clerks, four
24   lawyers, including the two of them, billing at 300 and
25   275 an hour respectively, going through individual

## Page 102

1  files. We don't think that the Department of
2  Corrections is required to compensate them for spending
3  that amount of time and that amount of money on a
4  compliance issue. They can pick out every 10th file,
5  however, every 15th file, even their own expert
6  acknowledged that that's a reasonable thing to do.
7       And more importantly, he opined that it
8  would be reasonable to have a paralegal or a lower paid
9  attorney do that initial review, and than bring to the
10 attention of the higher priced attorneys some issue
11 that may be -- should be addressed by them. That's not
12 what's happening in this case, we are paying the two of
13 them to drive down there and spend four or five hours
14 looking at files.
15      And these are not complicated issues,
16 these are simple little, I think I'm disabled, here's
17 why, here's the screening report, what the doctor said,
18 and here's the conclusion of DOC. You don't need to be
19 paying 800-, $900 an hour to have four lawyers sit
20 there and do that, it's outrageous, frankly, in my
21 opinion.
22      And I can show you -- well, on the recent
23 submission, which I have not had time to go through in
24 detail, because we just got it -- I got it this
25 morning, but there's time billed for Tuesday, I

## Page 103

1  believe, yes, November 8th, it totals up to about
2  $8,000 for one day down in Colorado Springs.
3       And you know, even their own expert says,
4  if you travel during nonbusiness hours, they would bill
5  at half time, or they should bill at half rate, but
6  they work it so they're -- I mean, they're driving
7  during business hours. So the Department of
8  Corrections is paying this time when for compliance,
9  it's perfectly adequate and reasonable for them to
10 review samples, selective files to see if DOC is in
11 compliance.
12      THE COURT: How do you suggest they get
13 the files, the selected files?
14      MS. McCANN: I suggest that they send a
15 paralegal down there, maybe two, to go through every
16 10th file, every 15th file, maybe every 20th file, and
17 see what DOC's doing and how they're complying, and we
18 pay the paralegal for maybe a half day, or maybe it
19 will take a whole day, and that's it. That's
20 reasonable, we don't object to that, but it really is
21 unreasonable to pay $8,000 a day for them to go down
22 and look through individual files.
23      And who knows, maybe they're looking for
24 individual plaintiffs that they want to represent, I
25 mean, we have no way of knowing, but -- and I'm not

## Page 104

1  suggesting that they're being dishonest about it, but
2  it's -- I just don't think the State should pay for
3  that, I think we should pay for reasonable monitoring,
4  or compliance.
5       THE COURT: Okay.
6       MS. McCANN: For example, Paula
7  mentioned, too, this is a little different topic, but
8  the visit to Fort Lyons, I did not go, Jim went, so we
9  had one lawyer down there, they had two lawyers. I've
10 never gone on any visits to Fort Lyons. I went on to
11 one visit to Limon, but that was before we even made
12 the agreement, I believe, when we were still meeting
13 with the expert. So we believe that one lawyer is
14 adequate to address the monitoring issues, certainly.
15      So just to summarize, we don't object to
16 paying reasonable fees for monitoring for compliance,
17 and those are -- except for the specific areas that
18 I've addressed to the Court. And also, just so I don't
19 miss it, there was also a visit when they both went
20 down to review, to go through these files, and I think
21 that was in September, yes, September 7th was another
22 day that both of them went down to Colorado Springs to
23 go through all these individual files, and that day was
24 about 5,000 or -- $5,000 for that day.
25      So in summary, we are objecting to paying

## Page 105

1  any of the fees that are in the damages section of
2  their fees. And we believe that those are issues that
3  are appropriately raised in the individual damages
4  claims, and that at a later time, there will be a
5  determination as to whether or not they are successful
6  in those claims by the special masters who are
7  appointed for that purpose, and at that time, we can
8  discuss appropriate attorneys' fees for those costs,
9  but in the interim, they're only entitled to reasonable
10 fees for compliance issues.
11      THE COURT: At what point -- if you agree
12 that they might be entitled to compensation for at
13 least designing the damages forms and instructions, at
14 what point would that stop, when did claims start being
15 filed?
16      MS. McCANN: Well, we are not contesting
17 their billing -- the billings where they have entered
18 that they were working on the damage claim forms. I
19 think the damage claim forms went out in March of '04,
20 I believe, or February of '04, maybe they recall, but
21 claims -- or work that they were doing up until then on
22 the damage claim forms they're entitled to, but once
23 the individual damages --
24      THE COURT: But not, for instance,
25 discovery issues.

106

1  MS. McCANN: I don't think the discovery
2  issues came into play until after that, because they
3  came into play as people were filing individual claims.
4  You know, I mean, the thing is, if
5  they're not successful on the medical malpractice
6  argument that they're making and the 8th Amendment, and
7  we've already paid their fees for that, that's not
8  right. I mean, they're not entitled to fees unless
9  they're successful on that claim. And so far they
10 haven't been, special master ruled against them,
11 special master has ruled against them on the class five
12 claim for damages, the deceased inmates, so they
13 haven't won those yet.
14 And if they don't, they won't be able to
15 make those claims in their damage claims for their
16 individuals that they represent, so they should not be
17 compensated for that, that's not compensable until they
18 are successful.
19 THE COURT: I think a last question, it
20 seemed to me that Judge Nottingham was fairly clear
21 before, that regardless what you all agreed, he was
22 looking at me as a Rule 53 special master, and that he
23 could and had the obligation to review findings of
24 fact -- I mean law, and he was pretty hands off on
25 findings of fact. Notwithstanding one sort of snide

107

1  comment, but go ahead.
2  I think under that standard that he would
3  look at whichever way I ruled, if I did, on the issue
4  of their entitlement to compensation on these undecided
5  damages questions as a matter of law, so it seems to me
6  it would be efficient to make at least the factual
7  determinations, now that I've heard the evidence, on
8  that in the event that he ultimately decides they're
9  entitled, either now or later, do you agree, disagree?
10 MS. McCANN: Well, ultimately, Judge
11 Nottingham is going to make the decision on this
12 anyway, so --
13 THE COURT: Right, that's what I'm
14 saying.
15 MS. McCANN: Yeah. So I'm not quite sure
16 I understand what you mean about what factual findings
17 you --
18 THE COURT: Well, I could make as factual
19 findings, I would say certain hours were, for instance,
20 unreasonable, or that costs shouldn't be awarded or
21 should be awarded.
22 MS. McCANN: Right, I think it would be
23 appropriate --
24 THE COURT: And then you wouldn't have to
25 do it again.

108

1  MS. McCANN: I think it would be
2  appropriate for you to do that now in the context of
3  this proceeding.
4  THE COURT: That's what I was wondering.
5  Okay.
6  MR. QUINN: And I apologize, Your Honor,
7  and everybody, I have a previous appointment that I
8  have to get to.
9  (Mr. Quinn left the room.)
10 MS. GREISEN: Judge, I would like my
11 remarks also taken as rebuttal testimony. I am still
12 under oath, and for the record purposes, I want to
13 submit this as testimony, as well.
14 THE COURT: Sworn argument and testimony.
15 MS. GREISEN: Thank you.
16 CLOSING ARGUMENT AND REBUTTAL TESTIMONY
17 BY MS. GREISEN:
18 The defense is asking you to rewrite the
19 remedial plan. What they want the remedial plan to say
20 is that we're allowed our reasonably necessary fees and
21 costs to monitor the plan during the compliance period,
22 except for monitoring the damage claim process, that's
23 how the defense asks you to read the remedial plan, and
24 that's not what the plan says.
25 The plan clearly does not delineate which

109

1  parts of the remedial plan will or will not be
2  monitored, it clearly anticipates that the entire
3  remedial plan will be monitored during the compliance
4  and the monitoring periods.
5  There is a fundamental difference between
6  arguing whether an individual or a side can present an
7  argument during the damage claim process versus whether
8  an individual will prevail on that argument.
9  Class counsel has never made the latter
10 argument. We have never gone into the merits of an
11 individual case with the briefings that we've submitted
12 to you. We have argued general principles of law that
13 will apply to the damage claim process and the
14 interpretation of the remedial plan. When these issues
15 are brought before Judge Nottingham, what he does is he
16 interprets the remedial plan and the intent of the
17 parties, we are there and must be there to safeguard
18 the class position on the intent of the remedial plan.
19 The vast majority of claimants are
20 pro se. There have been about 1,300 claims to date, I
21 am aware of approximately 10 individuals who are
22 represented by attorneys other than us in the entire
23 class. I have no idea of the general sophistication
24 level of those attorneys or whether they've generally
25 practiced in this area or not, whether one attorney may

<table>
<tr><td>

110
1  or may not ask for attorneys' fees I don't think is
2  indicative of whether or not class counsel should be
3  asking for attorney fees on this issue.
4      THE COURT: Let me ask a question,
5  though. Won't your prevailing on these general issues
6  ultimately benefit the 10 clients or 12 clients you do
7  represent?
8      MS. GREISEN: Oh, I -- of course, if
9  they're allowed to bring a damage claim, it's the same
10 benefit to those 10 clients as it brings to every
11 member of the class, it effectively allows them to
12 bring the damage claim, it does not decide the merits
13 of their individual case. But does it have a benefit
14 for every class member, absolutely.
15     We are not raising issues that have only
16 been raised, and frankly, I don't think any of these
17 issues were raised -- the briefing on the people that
18 we represent is not that far along, frankly, that any
19 of these issues have even been raised in those cases
20 yet, to my knowledge, these were all issues that were
21 raised initially, actually in the past year, with
22 claims that went through quickly. The easier claims
23 were done first, as you might imagine, the other claims
24 are having more discovery.
25     So is there some spillover benefit, sure,

</td></tr>
</table>

111
1  in the fact that our class members are allowed to
2  proceed. We never looked at whether or not these
3  defenses could or would be raised with our individual
4  cases. Frankly, I don't even know -- for the vast
5  majority of people that we decided to represent, I
6  don't even think those decisions were made until
7  early -- for most of them, I don't think they were made
8  until early 2005.
9      We may have entered some appearances, I
10 know we entered an appearance for Jesse Montez, who is
11 a deceased class member, probably a year ago, but with
12 the rest of them, I'm not even sure that decision was
13 made until sometime early this year.
14     What's being suggested, though, is that
15 we have to enter an appearance essentially in every
16 single place in order to get our fees recovered, which
17 means we have to represent all 1,300 individuals, which
18 is not feasible in this case, and it certainly wasn't
19 the intent of the remedial plan.
20     These issues are complicated legal
21 issues. It is true that there are some people that can
22 go through this process, and there are some articulate
23 people in DOC, but if you've spent any amount of time,
24 and I know if you have, dealing with people who are
25 incarcerated, there is also a fair number who can't

112
1  manage to read the damage claim forms by themselves.
2      I will say, in almost every significant
3  appeal, every significant case where DOC has been --
4  there has been a significant award of damages or
5  injunctive relief to a claimant, DOC has appealed. So
6  they are in litigation mode, and they have been in
7  litigation mode during the damage claim process.
8      It's a -- an approach which requires, I
9  believe, class counsel to carefully monitor, not just
10 look at now and then in a sample, but they have been
11 very aggressive with their defense tactics. And I
12 think that necessitates us to take the kind of steps
13 we've taken to ensure, again, that the process has some
14 integrity.
15     We have not participated in any of the
16 individual appeals regarding the merits of an
17 individual's case, and again, in none of the briefings
18 have we discussed the merits of the individual's case.
19     I should also point out, I understand
20 they're not objecting to us preparing the damage claim
21 form. The discovery cost issue -- that issue was
22 raised, if you look at Exhibit 4, that issue was raised
23 by the special master prior to the filing -- prior to
24 any particular case raising it, it doesn't mention a
25 particular case, the special master held several status

113
1  conferences where the issue was discussed. This was
2  very early on in the process, and he asked both sides
3  to brief it, and we did.
4      And that's happened on several different
5  cases, that Judge Borchers has asked us to intervene,
6  more specifically the issue of Claud Burton, I think I
7  put that in the submission. Claud Burton is a person
8  who we are not representing individually, he wrote a
9  letter to the special master, telling the special
10 master he felt coerced into withdrawing his claim, he
11 was being intimidated by certain guards at his
12 facility, the special master issued an order to us to
13 investigate the situation. Well, we're not in his
14 individual case, does it have to do with an individual
15 person, absolutely. I don't believe we have any choice
16 but to heed the special master's order in that regard.
17     With respect to the class five claims,
18 and I'm only going to touch on this briefly, that's a
19 very complicated issue. The defense says only five or
20 six people fit that category. Well, 24 people have
21 died during the damage claim process, alone, 24
22 claimants during the damage claim process.
23     There will be an issue, I anticipate this
24 issue coming up, the defense has not yet provided us
25 evidence of notice that they've attempted to notify the