114

next of kin for the class five category, that's going to be another issue, it involves the damage claim process, but it's our -- I think it's our duty, as counsel, to make sure that those claimants receive adequate notice of the damage claim process. I anticipate that there will be a lot more.

In any event, it's an entire category of damages, and if we don't answer it, I believe it will be eradicated, which is contrary to the intent of the remedial plan. And again, all of these come back to the intent of the remedial plan, and I believe that's why they're all set in front of Judge Nottingham, and that's why the participation of class counsel is required. Can I have just a moment, Judge?

THE COURT: Uh-huh.

(A discussion was held off the record.)

MS. GREISEN: Another issue that was raised by Ms. McCann, unless you have any questions -- oh, I did want to raise one other issue on the discovery costs. Just so the Court's aware, the Department of Corrections is trying to charge pro se inmates $1.20 a page for discovery across the board. That, we believe, is a class issue, because our class members simply do not have the kind of money to pay those kind of discovery costs.

115

The people who are damaged the most do have complicated medical files and often do have lengthy stays in the Department of Corrections, and therefore, there are a lot of documents that they want to present with the damage claim form, we believe that kind of discovery cost precludes them from a meaningful damage claim review.

The one other issue I want to talk about with respect to issues Ms. McCann raised was in the general compliance, and she pointed out a review of documents that's going on at Colorado Springs. And I want to address that, because I think -- I think it's an important issue.

August 27 of 2005 was the two-year deadline for the Department of Corrections to come in to compliance with the remedial plan. Many of the visits, especially many of the visits that were discussed regarding Patricia Bellock, were around that date, and that's because we then started having to review more aggressively to determine whether or not DOC was going to be in compliance with the remedial plan.

We believe that one of the most telling ways of determining compliance with the remedial plan is to see what our class members are saying about

116

whether or not they're being provided accommodations appropriately, and whether the DOC has implemented appropriate policies in accordance with the remedial plan.

The documents that are being reviewed at the Department of Corrections are the ADA grievance files pursuant to the new ADA grievance procedure outlined in the remedial plan. There are hundreds and hundreds of files, many of those files have nothing in them, and many of them have an enormous amount of information in them.

I disagree fundamentally with Ms. McCann's characterization that this is a very easy thing to review. In fact, personnel at the Department of Corrections have admitted on several occasions that whether or not an issue is an ADA issue often isn't very clear, so it's not always very clear whether the inmate should go through the regular grievance process or the ADA grievance process.

What happens is the class member files -- has to file a request for an accommodation and be screened for a disability, and only then, once -- if the Department of Corrections determines that person has a disability, is the person then entitled to ADA status. We have learned a wealth of information that

117

we did not previously know about what's going on at the Department of Corrections by reviewing those files.

There is, no doubt, a catch-22. If we had done the kind of one out of every 20 review that Ms. McCann suggests, when we have to stand before Judge Kane for the compliance hearing, if we were only to give anecdotal evidence like that, I have no doubt that they would be arguing that we didn't do a sufficient review to show noncompliance.

We believe that these are probably the most important set of documents to review regarding compliance with the remedial plan. It's not something a paralegal can look at and determine whether it fits the contours of a complicated 32-page remedial plan.

Frankly, Mr. Miller and I went down one day and did not get through, I think, more than a couple file drawers, and decided it would be much more efficient to have a group go at once rather than continue to make trips back and forth. And that's what we were attempting to do when we went down Tuesday, to try to get as much done at one time without having to make recurrent trips.

There's no way -- the suggestion was that a paralegal could take a half a day to review the grievance files, I can simply represent to the Court

118

that the volume of files and the intricacy of the issues raised, that that would simply not be a reasonable approach to showing compliance.

I do briefly also want to talk about the issues with respect to Patricia Bellock that they raised and with the exhibits that they've put before the Court. And I only -- Exhibit A is the only exhibit that I see any relevance to. I'm going to object to B and C as to why they're relevant. We have stipulated that we represent about 10 people, and I think that's what all these exhibits show, they certainly don't show any dishonesty or inappropriate billing on behalf of the client.

And in fact, if anything, if you look at Exhibit C, which is June 6 of 2005, and you look at our billing on that date, you'll see there is no entry for Patricia Bellock to write the June 6th of 2005 letter, there's no billing for that that's being submitted to you, that's because that was billed on the individual client cases.

With respect to the other letter, the March 29th, 2005, letter, referencing her visits, I will point out for the Court that of the time she spent there, she only charged half a day. It's apparent from this letter that she was going for two days. None of

119

her time on April 1st has been charged in this fee submission.

So if anything, it looks -- it appears from this exhibit that a minority of the time was actually charged, which I think goes against the suggestion that somehow we're simply not being truthful with you about the time that we're spending talking with regard to compliance issues. And again, yes, some of those compliance visits did start in spring and summer of this year, and that's because we were gearing up to have to show compliance.

I have not been on a compliance visit with Patricia Bellock, I'm not quite sure what was being referenced, but neither myself nor David Miller has taken visits to the prisons with Patricia Bellock. As Mr. Miller testified earlier, we sent her in an effort to keep costs down in that regard.

Under the analysis of the defense, it sounds like we should not be able to go to the prisons at all to discuss compliance issues with individual class members under any theory, according to their argument.

I will say, there was some issue raised about whether or not we should be communicating just with named class representatives. A lot of those

120

people are no longer in the Department of Corrections, Jess Montez, our named person, has passed away; Duncan Leach is paroled, several of the people have paroled or moved on; Richard Allen has died; another class member, David Brian, actually we do communicate with on a pretty regular basis.

Their names are not included in the billing, because frankly, our clients have a lot of fear of retribution, so we specifically don't include the names of people that we're communicating with and writing letters to, but I can represent that there are named class representatives that we speak with about these issues on a frequent basis.

I believe that's all I have. Mr. Miller is going to talk about the PLRA cap issues, unless there's any other questions that you have for me.

THE COURT: Is there any law on attorney obligations? I mean, you said -- all I know is an unpublished opinion by Judge Carrigan where he said the obligations arise from the settlement agreement. Any other law on what the attorneys' obligations are for monitoring compliance or how an attorney knows how to do that?

MS. GREISEN: Well, I would submit that whether or not we should or should not be doing

121

something is governed by the remedial plan. The remedial plan says whatever steps are reasonably necessary. That's a factual determination, regardless of what other precedent there may be out there, that that's a determination for you as to whether or not these compliance efforts were reasonably necessary under the terms of the remedial plan to monitor compliance.

If you would want us to submit -- I don't know of any law, off the top of my head, if you want us to attempt to find that, we're happy to submit that to you.

THE COURT: Nope, that's all right.

MR. MILLER: Couple of things, Your Honor. The answer is yes, there's a general standard, and it's set out in Newberg (phonetic) in class action, and it depends on the type of class action, whether it's a B2 class action or a B3 class action, or if it's only a B3, as opposed to a B2, et cetera.

In some of those areas that have been discussed here, do we have the obligation to represent the individuals. In a B3 action where individuals are on their own for damage claims, for example, if that's what the settlement agreement is, then they may have their own attorneys who ethically have the obligation,

122

as reflected in not only the law, in general, but in the settlement agreement.

So I think, to some extent, that was addressed, our obligation in the first round of briefing, if it wasn't, Newberg on class actions addresses that, and references both the settlement agreement, the general law of obligation of counsel save by the interest of the class, and like I said, the ethical obligations, the agreement, and the general interest of representing continuing interest in the class.

In terms of individual cases, the only one I was involved where this kind of argument was made was the one that Judge Carrigan ruled on, and we'll just supplement and give you a copy of that, if that's at all helpful.

THE COURT: And Ms. McCann.

MR. MILLER: Of course, sure.

The thing that I wanted to talk to the Court about was the issue raised that I don't think was raised except in argument by Ms. McCann, and that has to do with the PLRA, that's the Prisoners Litigation Relief Act claim, and it sets a limit of X percent over the Equal Access to Justice Act rate for work done under it.

123

Well, the point is, if we were involved in any of these claims, then the amount of attorneys' fees that we would be entitled to pursuant to the settlement agreement would be limited by that provision in the settlement agreement that talks about what your rate's going to be. That's not this part of the case.

This part of the case is us, as class counsel, arguing that these people to make those claims don't have to go through the exhaustion requirement of a typical PLRA case because we have a settlement agreement. So again, it's our office arguing the general right for these people to pursue their claims. And it's a distinction that apparently the defendants don't wish to make, and it's where the entire argument between the parties lies, as far as I can see.

Our claim is that the plaintiffs' counsel has an obligation to protect the damage-making process for the individual claimants without arguing about getting attorneys' fees in any individual case. And the defendants seem to be arguing that that's been excepted out, damages are different, you have to litigate that within the context of each damage case, and that's just simply a difference that you're going to have to resolve and that the Court is going to have to resolve, is what's the obligation of counsel, does

124

it include incompliance, to make them comply with the damage collection process, if you will, or is that in some way not clear.

Now, as far as we're concerned, it's very clear that compliance includes the integrity of the damage process, because if any one of these arguments are made, for example, let's take the one Ms. McCann made concerning the PLRA. If the Court were to say in any one case, or the special master deciding these individuals was to say, oh, you've got to meet the exhaustion requirement, none of you have done that in a timely manner, therefore, none of you have any claims, then the entire remedy would be removed.

For us to come in and generally make the argument that that's not a requirement is part of enforcing the settlement agreement at our standard rate, at a reasonable rate, not being limited to the amount we would get under a claim if we won any one particular claim in that PLRA-related case. It just, again, reflects the very fundamental difference in viewpoints that the parties have about interpreting the settlement agreement .

But I'll close by saying, it's not to the PLRA that this decision-making should go, it's not to Section 1983 or Section 1988 that you, as the

125

decision-maker, is going to have to look, it's to what's in the settlement agreement, that's what we're arguing, and that we're arguing that under the settlement agreement, we're entitled to our regular rate, a reasonable rate, and one that's not limited by these extraneous -- by these issues extraneous to the settlement agreement.

MS. McCANN: I'd like to respond to a couple of points, if I might.

THE COURT: Okay. Can you wait one second?

MS. McCANN: Sure.

THE COURT: Okay.

MS. McCANN: Just in response to Mr. Miller's argument about the PLRA, we're not suggesting that all the time they've spent on all the damage issues are subject to the limits of the PLRA, but there are specifically -- they have specifically filed a brief concerning whether or not 8th Amendment claims are available to these inmates in the context of medical malpractice claims in Section 1983, and also, they raised the issue with the exhaustion of remedies, or they responded to the issue of exhaustion of remedies under the 8th Amendment.

They -- the remedial plan could not be

126

more clear, it states that plaintiffs stipulate that time spent solely on 8th Amendment matters that do not implicate, they will be subject to the fee caps under the $135 an hour.

And you can see from the brief that I think they included in your packet or in your notebook, that a whole – one whole big issue that is in front of Judge Nottingham has to do with the applicability of 8th Amendment claims, and that's all it has to do with, it doesn't have to do with the ADA and the Rehab Act. The time spent preparing those briefs and researching that issue is clearly subject to limitations under the PLRA.

Then just a couple of other matters that were mentioned. Ms. Greisen said something about the implication was that they had to enter on all cases in order to recover these damages fees, that's not what we're arguing, we're arguing that they have entered on about 10 cases, and they are arguing those issues in those 10 cases, and that's where attorneys' fees would be awarded if appropriate, and that would be true for anyone who enters on any of the cases.

And I also take issue with the statement that we've appealed to every case or close to every case where awards have been made. I believe, and I

127

don't have the figures right with me, but I believe we've only appealed two cases, maybe three, at the most, and there have been several other cases where damages have been awarded that we have not appealed.

And with respect to the issue of Claud Burton, we don't object to fees for that, since they were requested specifically by the special masters to contact Mr. Burton. He's an individual, he's got an individual damage claim, that's what they're contacting him about, and that's -- you know, they -- if they are responding to a simple question, which is, is he being coerced to withdraw his claim, that's fine.

Now, if they actually enter on his behalf and make argument regarding what damages are available to him, then our argument would be the same, that they're only entitled to attorneys' fees if they're successful on the damages, but just to contact him on this specific issue, because that is part of the general compliance, if inmates are being coerced in any way by DOC. And I think that I've addressed the other issues adequately. Thank you.

THE COURT: Thank you. Okay.

(The hearing was concluded at 1:16 p.m.)

128

CERTIFICATE

STATE OF COLORADO )
COUNTY OF DENVER ) ss.

I, Teresa Chaplin, a Registered Professional Reporter and Notary Public for the State of Colorado, do hereby certify that the above-entitled hearing was taken in shorthand by me and was reduced to typewritten form by computer-aided transcription; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had; that I am not attorney, nor counsel, nor in any way connected with any attorney or counsel for any of the parties to said action or otherwise interested in its event.

IN WITNESS WHEREOF, I have hereunto affixed my hand and notarial seal this 13th day of February, 2006.

My commission expires: January 4, 2008.

TERESA CHAPLIN
Registered Professional Reporter
and Notary Public
CALDERWOOD-MACKELPRANG, INC.