IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

F I L E D
UNITED STATES DISTRICT COURT
DENVER, COLORADO

DEC 1 2 2005

GREGORY C. LANGHAM
CLERK

---

Claim Number: 03-077
Category III
Claimant: John Cerrone, #58685
Address of Claimant:

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER came before the Special Master for hearing on November 14, 2005. Present were the following: John Cerrone, Claimant; Danielle Moore from the Office of the Attorney General, for Defendants.

Testimony was received from the following witnesses: Claimant; Levi Martinez, for Claimant; Orville G. Neufeld, Ph.D., D.O., for Defendants. Exhibits A through G were offered into evidence and admitted. Attached as part of this Order is a comprehensive Appendix of Exhibits listing each exhibit admitted into evidence. At the conclusion of the hearing, the claim was taken under advisement. This Order shall constitute the final action by the Special Master on this specific claim.

### I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following findings of fact:

1. Claimant submitted a claim which was assigned claim number 03-077 and the basis of his claim is a mobility impairment and diabetes.

2. Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

2

3. Proper notice of the hearing was given and Claimant along with Defendants appeared. On the record, Claimant verified his address and phone number as follows:

>   6175 Sheridan Blvd.
>   Arvada, CO 80003
>   Phone: 303-424-8200

4. Claimant was under the jurisdiction of the Colorado Department of Corrections (CDOC) from 1995 to May 4, 2000. Commencing on October 10, 1995, he was housed at the Denver Reception & Diagnostic Center (DRDC) for a couple of weeks and then transferred to the Shadow Mountain Correctional Facility (SMCF)[1], where he remained from 1995 to 1997. In 1997, Claimant was transferred to the Limon Correctional Facility (LCF) and was again transferred on Sept. 17, 1999 to Arrowhead Correctional Facility (ACF). He remained at ACF until his release.

5. When Claimant entered CDOC custody, he had a bad back as a result of a previous work related accident. Shortly after entering CDOC custody, Claimant began suffering from a severely infected toe, which apparently did not respond to conventional treatment. Approximately 90 days after being placed in the custody of the CDOC, Claimant became wheelchair-bound and remained in a wheelchair from the remainder of his incarceration. Approximately 5 to 7 months prior to his release, he underwent surgery and the tip of his toe was removed.

6. Claimant has suffered from diabetes since at least 1980. He has controlled the diabetes through diet and has never taken insulin.

7. Witness Levi Martinez testified that he has known Claimant since the late 1970s and that Claimant has never been able to work due to his back problems. Mr. Martinez also confirmed Claimant's testimony that Claimant was still in a wheelchair when he was released from CDOC custody.

8. Claimant testified it was difficult for him to move the wheelchair with his arms. Through his own efforts, Claimant informally arranged for other inmates to push his wheelchair. There is no indication in the medical records that a pusher was formally assigned by the CDOC or that Claimant ever requested CDOC to assign a pusher. However, Claimant testified that he did ask medical for a pusher. He stated that a captain directed that the pusher who was informally assisting Claimant cease providing help. Claimant testified that as a result of being deprived of the assistance of a pusher, he was unable to attend GED class, that he could not get to the yard for recreation and that on one occasion he fell trying to negotiate his wheelchair up a steep hill in order to get to the visitation area. He also testified that he was not allowed to go to a camp, such as Camp George West.

---

[1] The Special Master notes that in 1991, SMCF was merged into one facility with the Fremont Correctional Facility (FCF) and, today, the combined facility is known as the Fremont Correctional Facility (FCF) but many of the inmates still refer to the SMCF part of FCF as "Shadow Mountain."

3

9. Claimant stated that although he needed a special diet to control his diabetes, he was given the same food as everyone else but his portions were smaller. The medical records indicate that a diabetic diet was ordered by medical and that Claimant's diet was established by a dietician familiar with his medical problems and needs. The evidence also indicates that Claimant was not compliant with his diabetic diet and often ate non-compliant foods and snacks purchased from the canteen.

10. Finally, Claimant testified that at Shadow Mountain (FCF) and LCF, he was placed in end cells which were colder than middle cells. The evidence indicates that the end cells were able to accommodate handicapped prisoners while the middle cells were not.

### III. CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*; and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the DOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

Case No. 1:92-cv-00870-CMA-MEH   Document 1653-1   filed 02/23/06   USDC Colorado   pg 5
of 10
Case 1:92-cv-00870-EWN-OES   Document 1223   Filed 12/12/2005   Page 5 of 10

The Special Master finds and concludes that Claimant is a disabled individual who is a member of the class. During virtually his entire incarceration, Claimant had a permanent physical mobility impairment that substantially limited the major life activities of walking. From approximately 90 days after entering CDOC custody until the time of his release, Claimant was relegated to the use of a wheelchair on a full-time basis.

The Special Master also finds and concludes that Claimant is a permanent diabetic but that his diabetes has always been controlled by diet and does not substantially limit any major life activity. Consequently, the Special Master finds and concludes that Claimant's diabetes does not constitute a permanent disability/impairment within the meaning of the ADA and/or the Rehabilitation Act. *See Martin v. AT&T Corp.*, 321 F. Supp. 2d 1274, 1299 (D. Colo. 2004); *Sepulvida v. Glickman*, 167 F.2d 186, 191 (D.P.R. 2001).

3.  The next question which must be answered is whether Claimant was qualified to participate in the programs or to receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs or activities because of disciplinary reasons, health reasons or other valid penal justifications. *Miller v. King*, 384 F.3d 1248, 1266 (11th Cir. 2004). It appears to be undisputed that Claimant was otherwise qualified to participate in the GED class, to utilize the yard and to receive visitors in the visitation area. On the other hand, based on the evidence presented, the Special Master finds and concludes that Claimant was disqualified by health reasons from going to camp and that this medical disqualification could not be overcome by reasonable accommodation.

The key issue is whether Claimant was discriminated against because of his disability during the time covered by the Remedial Plan. A portion of Claimant's discrimination claim is predicated on an alleged lack of proper medical care for his infected toe. Such claims do not fall within the ambit of the ADA or the Rehabilitation Act. *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005); *United States v. University Hospital*, 729 F.2d 144 (2nd Cir. 1984). Nevertheless, there is a substantial part of the claim that relates to the CDOC's alleged failure to accommodate Claimant's mobility disability by assigning him a pusher so that he could attend GED class, utilize the yard to recreate and safely access the visitation area. Defendants have offered no evidence to contradict Claimant's testimony that he made informal arrangements for a pusher and that prison personnel prevented him from receiving this informal assistance. Instead, Defendants point to the fact that the medical records do not show that a pusher was ever formally requested or assigned. The absence of such a notation in the medical records is at odds with Claimant's testimony that he did request medical personnel to assign a pusher but that he received no response to his request. The Special Master resolves this dispute in the evidence in favor of the Claimant, finding and concluding that Defendants failed reasonably to accommodate Claimant's mobility disability by not responding to Claimant's request for a pusher and by preventing Claimant from utilizing pushers that he had obtained through informal means.

The Special Master finds and concludes that Claimant was not discriminated against or denied accommodation by reason of the Defendants' failure to place him in a middle cell while at Shadow Mountain (FCF) and LCF. The evidence shows that Claimant was placed in an end cell specifically for the purpose of accommodating his mobility disability.

Finally, the Special Master has previously found and concluded that Claimant's diabetes does not constitute a permanent disability/impairment within the meaning of the ADA or the Rehabilitation Act. However, even assuming for purposes of argument that Claimant's diabetes is a permanent disability/impairment, the Special Master finds and concludes that Defendants reasonably accommodated Claimant's diabetes by providing him with an appropriate diabetic diet and the Claimant himself failed to comply with the treatment plan established by his medical providers.

4. The Special Master finds and concludes that as a result of Defendants' failure to accommodate Claimant's mobility disability, Claimant was unable to attend GED classes, was unable to utilize the yard and was unable safely to access the visitation area. The inability to be able safely to access the visitation area resulted Claimant falling from his wheelchair. There is no evidence establishing that Claimant suffered any physical injuries as a result of the fall. However, Claimant's testimony is uncontroverted that prison personnel who witnessed the fall laughed, causing Claimant embarrassment. The Special Master finds and concludes that the sum of $750.00 is appropriate compensation for these non-economic damages.

## IV. ORDER

IT IS HEREBY ORDERED that based upon the foregoing Findings of Fact and Conclusions of Law, with respect to the diabetes claim, Claimant has not met his burden of proving his claim by a preponderance of the evidence and, therefore, his claim is DENIED;

IT IS FURTHER ORDERED that based upon the foregoing Findings of Fact and Conclusions of Law, with respect to the mobility claim, Claimant has met his burden and proved his claim by a preponderance of the evidence and judgment should be entered in favor of the Claimant and against Defendants in the amount of $750.00; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be file on or before **January 19, 2006** with the Clerk of the United States District Court at the following address:

901 19th Street
Denver, CO 80294.

SIGNED this 6th day of December, 2005.

_____
Bruce D. Pringle,
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this _6th_ day of December, 2005 to the following:

Mr. John Cerrone, #58685
6175 Sheridan Blvd.
Arvada, CO 80003

Ms. Danielle Moore
Mr. Jess A. Dance
Mr. James X. Quinn
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

_____
Margie Dykstra

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number 03-077
Category III
Claimant: John Cerrone, #58685
Address of Claimant: 6175 Sheridan Blvd., Arvada, CO 80003

---

### APPENDIX OF EXHIBITS

---

The following is a list of Exhibits introduced by Defendants and ADMITTED into evidence in the above referenced claim:

| | | |
|---|---|---|
| EXHIBIT A: | 20 pages | Canteen Items Issued to: 58685 CERRONE, JOHN, dated 8/10/1994-11/08/2005. |
| EXHIBIT B: | 2 pages | Orville G. Neufeld, Ph.D., D.O. Resume/Curriculum Vitae Summary |
| EXHIBIT C: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for John Cerrone, dated 11/5/99 and 11/2/99. |
| EXHIBIT D: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for John Cerrone, dated 10-4.99. |
| EXHIBIT E: | 1 page | Diabetic diet for Thursday, September 30, for Cerrone, J. with notations. |
| EXHIBIT F: | 1page | Colorado Department of Corrections Food Service Diet Incident Report for John Cerrone dated 9/30/99. |

- 2 -

EXHIBIT G:   1 page        Colorado Department of Corrections / Ambulatory Health Record for John Cerrone dated 2/12/98 and 12 Feb. 98.