IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 03-153
Category III
Claimant: Roy Ford, #65743
Address of Claimant: 250 West 14th Avenue, #208, Denver, Colorado 80204

---

**FINAL ORDER OF SPECIAL MASTER**

---

      THIS MATTER came before the Special Master on March 14, 2006 for hearing. The matter was heard in Denver, Colorado. Present were the following; Roy Ford (Claimant) and Brooke Meyer, attorney for Defendants. Claimant was the only witness presented by either side. Claimant offered no exhibits. Defendants offered into evidence Exhibits A through F, and all were admitted. After closing arguments, the case was taken under advisement. This order will constitute final resolution of this claim.

**I.**

      This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by

---

      [1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have

counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.

---

only the jurisdiction agreed upon by the parties.

         C. PERMANENT DISABILITY/IMPAIRMENT
       A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

  The Settlement Agreement further provides, in part, as follows:

    2. Permanent Hearing Impairments
  Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
    3. Permanent Vision Impairment
  Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
    4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
  Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

  On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

    2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
      1. Is the claimant a disabled individual who is a member of the class?
      2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
      3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
      4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Since this claim was placed into Category III, Claimant was entitled to a hearing. The Special Master has reviewed the testimony presented, all exhibits submitted, and all written documentation filed prior to the hearing.

Claimant first came into DOC custody in July, 1991. He was placed at various facilities and then was released in August, 1992. He returned to DOC custody in November, 1992. He remained in such custody until July, 1993 when he was transferred to work in the Denver mountain parks.[2] Claimant returned again to DOC custody in August, 1994. He paroled to Samaritan House in Denver in September, 1994. Parole was violated and Claimant came back to DOC custody in 1995. He discharged that sentence in August, 1997.

Claimant was sentenced on a new conviction in February, 2001. He was placed at the Sterling Correctional Facility (SCF) in Sterling, Colorado. He paroled on that conviction in September, 2001. Claimant violated his parole in 2002 and was returned to DOC custody. He was placed again at SCF and remained there until he discharged in 2004.

Claimant checked all four boxes for impairments on his claim form. He testified that he was diagnosed as having diabetes while in DOC custody. He was sent to the Colorado State Hospital for a short stay, and tests confirmed that he was diabetic. He had to treat his diabetes with insulin.

In 2002, Claimant violated his parole and was taken back into custody. He went to SCF. When he arrived, DOC medical staff had no record of him being diagnosed as a diabetic. He sent a number of kites to medical personnel to attempt to receive insulin. He finally was successful in obtaining insulin.

While at SCF, Claimant had a surgery for a hernia. He also had difficulty in keeping his blood pressure under control. His vision started to blur, and he sought help for that condition. Nothing happened at first, but he was later able to obtain medicine for his blood pressure. He experienced the loss of sight in his right eye for a period of time. He testified that he has diminished sight remaining in his left eye.

On June 13, 2003, Claimant had a stroke. He was referred to the infirmary at SCF. He had trouble with his equilibrium. He claimed that he was unable to walk because of the dizziness. He was placed on medication to help with his condition.

On cross-examination, Claimant testified that his heart problems had been, in part, the result of cocaine usage. Claimant stated that he had no complaints from his first stay in DOC in the early 1990's. He stated further that his stroke in June, 2003 had led to problems in his right ear. He could

---

[2] It was unclear at the hearing, but it appears that this transfer was made because Claimant had a misdemeanor sentence to serve that was separate from his felony conviction.

hardly hear out of the right ear. He acknowledged that he had been offered surgery on the ear, but he turned that down.

Claimant discussed the classes that he completed while in DOC custody. He further indicated that he had worked while in custody. His last position at SCF was that of a porter. He had to give that job up because he could not see well enough to insure that everything was cleaned. He testified that he did the best that he could, but he just could not see.

Claimant acknowledged that he had taken his blood pressure medication regularly, but had refused insulin on some occasions. He testified further that he had never been in a wheelchair and did attempt to exercise at SCF.

Defendants offered into evidence various records and an affidavit from Dr. Roderic Gottula, M.D. Attached to the affidavit were several of Claimant's medical records. Those medical records reflected significant instances when Claimant refused medical treatment. *Exhibit A, Documents F, G, H, I, J, K, L, and R*. Other records reflected an unwillingness to eat a diabetic diet.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, each claimed impairment or disability must be examined.

**Vision Impairment:** The Special Masters are bound by the categories and definitions set forth in the Settlement Agreement. Having an eye problem is not, in and of itself, sufficient to establish a vision impairment.

The Settlement Agreement provides that a vision impairment means "[i]nmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses." This definition is very narrow and would include only claimants who are suffering extreme eyesight problems.

There is no question that Claimant has vision problems. A physician at Denver Health Medical Center indicated that he was legally blind. He has continuing retina problems will create on-going problems for the rest of his life. His right eye is legally blind, but his left eye does have corrected vision of better than 20/200. He is able to see. Claimant does not fall into the narrow category of vision impairment as defined by the Settlement Agreement.

**Mobility Impairment:** The Settlement Agreement provides that an individual is mobility impaired if he is permanently wheelchair bound or has a lower extremity disability. Claimant has had a variety of problems since first entering DOC custody.

Claimant did not use a wheelchair while in DOC custody. He did not have a lower extremity

condition that limited his mobility. Claimant does not meet the criteria for being mobility impaired.

**Hearing Impairment:** The criteria for hearing impairment is narrow. A claimant must show the following:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

Claimant has had problems with his ears. His hearing has been affected, but he is not deaf. There was no evidence that Claimant had to use lip reading, signing or written communication. Claimant does not meet the criteria for hearing impairment.

**Diabetes:** There is no question that Claimant is diabetic. That is acknowledged by Defendants. Defendants dispute that the diabetes affected his daily living while in DOC custody.

The Settlement Agreement provides that diabetes relates to those "[i]nmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities." The evidence reflects that Claimant was dependent, at times, upon insulin, receiving two shots per day. The Settlement Agreement does not define further the term "accessible housing." This Special Master has found that the term "accessible housing" means access to those things that are needed to live. This would include health care. Claimant has testified that he was denied insulin by medical staff for a period of time when he returned to DOC custody in 2001. The Special Master would note that inmates do not have options for medical care. For a period of time, Claimant was at SCF without access to insulin.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as multiple disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** With one exception, the answer to this question is no. Generally, there was no evidence that would lead to the conclusion that Claimant had been the victim of discrimination prohibited by the ADA or Rehabilitation Act.

Claimant received medical and vision care. He has had concerns about that care. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant

to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the case provided to him, that is beyond the jurisdiction of the Special Masters.

Claimant was without insulin for a period of time at SCF because no one could find his records. Medical staff did not believe that he was diabetic. Claimant was fearful due to the lack of care because no one believed that he was diabetic. Lack of insulin can cause major problems for a diabetic. Claimant was not in a position to do anything about the denial of insulin. He had to wait until later to obtain his insulin. He sent several kites to medical seeking help at that time. The Special Master will acknowledge that Claimant later refused treatment and became unwilling to take what he described as regular insulin. At the time he was placed at SCF after his parole was revoked, he was taking insulin. That was reflected in his DOC records. Those records were not found for some period of time, and Claimant received no insulin. The program of general life in prison means that an inmate must be provided those things absolutely necessary to him to continue living. Claimant was the victim of discrimination because of the lack of insulin during this period of time at SCF.[3]

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant has established his claim only to the extent of the denial of insulin for a period of time when he first was placed at SCF. The Special Master determines that damages in the amount of $200.00 would be appropriate.

IT IS HEREBY ORDERED that the claim of Roy Ford is granted, but only as to the time when insulin was withheld from him; and

IT IS FURTHER ORDERED that the remainder of the claim of Roy Ford is dismissed, because he has failed to prove by a preponderance each of the criteria set in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant is awarded damages of $200.00 for the denial of insulin when he first arrived at SCF; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before June 5, 2006.**

---

[3] The Special Master will acknowledge that Claimant did not provide the greatest detail as to the period of time when medical staff failed to provide him insulin. The Special Master has listened to Claimant's testimony. It is believable and accepted. Whether the period of time was one day or one month, there is no excuse in not providing insulin to an inmate who is diabetic.

SIGNED this 31st day of March, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master