IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-143
Category III
Claimant: Duane Allen Hoffman, #110008
Address of Claimant: c/o Samaritan House, 2301 Lawrence Street, Denver, CO 80205-2126

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

THIS MATTER came before the Special Master for hearing on December 23, 2005. This hearing was held at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. Present were the following: Duane Allen Hoffman (Claimant); and Aaron Atkinson, attorney for Defendants.

Testimony was received from Claimant. Defendants presented the following witnesses: Nona O'Malley; Suzanne Tate; Joan Shoemaker; and Amy Duran. All exhibits offered into evidence by both sides were accepted. Claimant requested time to submit information to counter the affidavit of Dr. Neufeld. That request was granted. Additional information was submitted from Claimant, and that has been reviewed. Further argument will be waived. This order shall constitute the final action by the Special Master on this specific claim.

I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29*. Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who

do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. <u>Permanent Hearing Impairments</u>
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. <u>Permanent Vision Impairment</u>
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. <u>Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic</u>
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. Based upon the testimony from the witnesses, plus a review of exhibits and submitted documents, the Special Master finds the following to be the facts necessary for resolution of the claim.

Claimant first came into the custody of DOC on August 15, 2001. He had been sentenced to DOC by the district court in Jefferson County. Claimant was transferred from the custody of Jefferson County to DOC at the Denver Reception and Diagnostic Center (DRDC). Claimant was evaluated at DRDC for placement, health and other issues.

Claimant remained at DRDC for an extended period of time. He was seen by Dr. John H. Bloor, M.D. On October 5, 2001, Dr. Bloor prepared a report which reads, in part, as follows:

> This is a brief summary of the medical condition of Duane A. Hoffman, CDOC #110008, DOB 9/28/62. I have been involved in his care since approximately 8/6/2001 when he was transferred to DRDC from county jail. Old medical records are not available at this time and the information below is based on the patient's self-reported history and on testing that has been done since his arrival in CDOC.
> Mr. Hoffman has had HIV infection and AIDS since at least 1987....In 1988 and 1989 he had two episodes of meningitis, both probably related to his AIDS and probably (partly) the cause of his seizure disorder which continues to cause him problems. He has also had epileptic seizures since his childhood. In 10/2000 and again in 4/2001 he had strokes. These have left him with a severe right-sided paralysis and are probably responsible for the right-sided loss of hearing and vision and bowel and bladder incontinence. He is unable to walk, requiring a wheelchair for mobility.....
> There is essentially no chance that Mr. Hoffman will improve medically beyond his current state. It is virtually guaranteed that his medical problems will worsen, leading eventually to death.

*Letter of October 5, 2001.* Other medical records reflect Dr. Bloor's diagnosis and thoughts concerning the health of Claimant.

Claimant was released on parole on December 1, 2001. Claimant was assigned to the case load of Amy Duran, a parole agent for DOC in Denver. When Ms. Duran came in contact with Claimant in January, 2002, he was homeless and in a wheelchair. Ms. Duran and fellow parole staff were able to help Claimant find housing in an assisted living facility. Ms. Duran did have to help Claimant get around for appointments. Further, she had to help him move from one nursing home to another.

In late winter 2002, Claimant absconded from his parole supervision. He testified that he had gone to California, as he had friends in that state.[1] Claimant did not call his parole agent or any official at DOC while in California. On October 1, 2002, Claimant was arrested by officers of the Beverly Hills police department. It was unclear at the hearing, but Claimant apparently was under investigation for new charges in California. Defendants presented at the hearing a copy of the video

---

[1] Claimant has maintained that he is a German citizen. The file contains no acknowledgment from that country that he is a citizen and, therefore, entitled to consular help.

tape of Claimant's booking in Beverly Hills. Claimant was not in wheelchair and was able to walk slowly.

Claimant remained in California until October 4, 2004. Claimant eventually had waived extradition and agreed to return to Colorado. Transport of Claimant took place by a private company that returns prisoners to other states. This van ride took several days and was unpleasant for Claimant. Transport was not in a handicapped van. Claimant stated that he was abused by other prisoners when they discovered he was gay and had contracted AIDS. When Claimant arrived in Colorado, he had soiled clothes and was not well. He was taken initially to the Jefferson County Detention Facility. He then was transported to DRDC. He spent an extended period of time at that location and then was transferred to CTCF.

Claimant received medical and related services while at CTCF.[2] Claimant was hospitalized in 2005 and received medical tests, including a full colonoscopy. He was held initially in cell house 5. There were two flights of stairs in that cell house, and the elevator did not work. There was no handicapped equipped shower. Claimant was moved to the infirmary as his health condition waxed and waned.

### III.

The Settlement Agreement provides, in part, as follows:

> Damage claims must be filed within 90 days or receipt by the inmate of the Damage Claims Form. However, if a claim arises during the compliance period, then the inmate may amend his/her claim to request compensation for additional damages. No additional claims for damages will be allowed during the monitoring period, but any individual who has a claim for damages which arises after the compliance period may bring their claim in any court of competent jurisdiction regardless of the on-going jurisdiction exercised by the federal court in this case.

This provision means that a claimant must have been in custody on or before August 27, 2003 and been the victim of discrimination that was prohibited by the ADA and Rehabilitation Act during that period of time. If a claimant can establish a valid claim for actions prior to August 27, 2003, then he or she may amend the claim to include other acts of discrimination that post-date August 27, 2003, provided the discriminatory acts did not occur after the conclusion of the compliance period. Thus, Claimant must established that he was disabled during his period of incarceration in DOC in 2001 and that he suffered discriminatory actions against him during that same period of time.

The evidence presented by both sides leads to the inescapable conclusion that Claimant is seriously ill, with a multitude of problems. Many of those problems are beyond the scope of this claim, including his AIDS and seizures. Claimant may be living on borrowed time, as suggested by

---

[2] Claimant discharged his sentence on March 28, 2006.

Dr. Bloor.

The Special Masters may only deal with the four conditions set forth in the Settlement Agreement. Those conditions are further defined in the Settlement Agreement. Claimant's AIDS and seizures would establish disabilities, but not disabilities covered by the Settlement Agreement.

As to the four conditions set forth in the Settlement Agreement, the Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, each claimed impairment or disability must be examined.

**Vision Impairment:** The Special Masters are bound by the categories and definitions set forth in the Settlement Agreement. Having an eye problem is not, in and of itself, sufficient to establish a vision impairment.

The Settlement Agreement provides that a vision impairment means "[i]nmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses." This definition is very narrow and would include only claimants who are suffering extreme eyesight problems.

Claimant testified at the hearing that he is able see using his left eye. He has been issued glasses. Claimant is not vision impaired as narrowly defined by the Settlement Agreement.

**Diabetes:** Claimant did not check the box for diabetes on his initial claim form, and he has not made any request to amend to include such a claim. Claimant was not a diabetic during the year 2001.

**Hearing Impairment:** In order fall into the category of hearing impaired, a claimant must meet the following definition:

> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

This very narrow definition means that a claimant must be totally deaf and unable to communicate, except through written communication, signing or lip reading.

There was no evidence presented by either side that Claimant met the narrow definition for

hearing impaired.[3] Claimant does not fall into the category of being hearing impaired.

**Mobility Impairment:** The Settlement Agreement provides that an individual is mobility impaired if he is permanently wheelchair bound or has a lower extremity disability. Defendants thrust has been to argue that Claimant is a fraud and has been able to walk during this entire period. In support of their position, they have relied upon the testimony of Amy Duran and the videotape from the Beverly Hills police department.

The evidence presented by both sides reflects that Claimant was in a wheel chair during the entire period in 2001 that he was in DOC custody. The letter of Dr. Bloor reflects his professional opinion that Claimant was unable to ambulate due to a variety of health problems. The Special Master finds that Claimant was wheel chair bound for the period in 2001 that he was in DOC custody.

The video tape is compelling evidence that Claimant had some ability to walk. Claimant did testify that he received medical care in California, and that care helped improve his ability to walk. Defendants further note that no evidence was presented that Claimant absconded to California in a wheel chair. The Special Master specifically determines that Claimant has failed to establish his claim of mobility impairment for the period of time extending from November, 2004 to March 28, 2006.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant testified that he had a number of problems while at DRDC in 2001. He specifically testified that he was in a non-handicapped equipped cell for a period of time. He further testified that he had to use a shower that was non-handicapped equipped. He testified that he fell on several occasions, and that evidence has not been refuted. The Special Master finds that Claimant was subjected to discrimination in 2001 due to placement in non-handicapped cells at DRDC.

Claimant had complaints about the medical and vision care that he received while in DOC custody. He had concerns about that care. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and

---

[3] At the time of issuance of this order, no claimant had been determined to be hearing impaired under the strict definition in the Settlement Agreement.

quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the case provided to him, that is beyond the jurisdiction of the Special Masters.

The Special Master has limited his findings to the period in 2001 when Claimant was in DOC custody. The Special Master finds further that Claimant has failed to prove any discriminatory actions against him under the ADA and Rehabilitation Act after his return to DOC custody in 2004. The Special Master further determines that the transport of Claimant to Colorado was done by a private company and that the actions of that company cannot be imposed upon Defendants or the State of Colorado.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant has established that he was placed into non-handicapped cells and showers in 2001 while at DRDC. He fell and suffered bruises. He also suffered emotional stress because of the fear of falling. Claimant is entitled to receive $200 for his damages that occurred in 2001.

IT IS HEREBY ORDERED that the claim of Duane Allen Hoffman is granted to the extent set forth in this Order concerning placement at DRDC in 2001; and

IT IS FURTHER ORDERED that the claim of Duane Allen Hoffman is denied in all other respects; and

IT IS FURTHER ORDERED that Duane Allen Hoffman is awarded damages in the amount of $200; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before June 12, 2006.**

SIGNED this 5th day of April, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master