IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-108
Category III
Claimant: Tommy B. Sturges, #66923
Address of Claimant: 12492 Hickman Place, Denver, CO 80239

_____

## FINAL ORDER OF SPECIAL MASTER

_____

THIS MATTER came before the Special Master for hearing on June 10, 2005. This hearing was held at the Fort Lyon Correctional Facility (FLCF) in Fort Lyon, Colorado. Present were the following: Tommy B. Sturges (Claimant); and Jess Dance, attorney for Defendants.

Testimony was received the following witnesses: Claimant; Dr. Patty Beecraft, M.D. and Ronald Peterson, R.N. The parties stipulated as to what would be the testimony of Officer Maes at the Bent County Correctional Facility (BCCF). All exhibits offered into evidence by both sides were accepted.

Claimant requested the opportunity to present testimony from Cathie Holst and to allow the hearing to remain open. That request was granted. The testimony of Ms. Holst was taken on December 15, 2005. The Special Master gave both sides an opportunity to provide closing arguments. Further argument will be waived. This order shall constitute the final action by the Special Master on this specific claim.

## I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During

the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

2

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive

a hearing. Based upon the testimony from the witnesses, plus a review of exhibits and submitted documents, the Special Master finds the following to be the facts necessary for resolution of the claim.

Claimant first came into DOC custody on February 6, 1992. He was placed at the Denver Reception and Diagnostic Center (DRDC) in Denver, Colorado. DRDC is an intake facility that does testing and evaluates the medical condition of inmates. Claimant was evaluated and determined to have cerebral palsy (CP). Claimant then was transferred to the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. Subsequent transfers took him to Fremont Correctional Facility (FCF), Arrowhead Correctional Facility (ACF), and Limon Correctional Facility (LCF). He was discharged from this sentence in 1995.

In 2000, Claimant returned to DOC custody. This was for a new sentence. Claimant again went to DRDC and then was placed at LCF. In late 2000, Claimant paroled from LCF. He was able to complete his parole term.

On August 29, 2003, Claimant returned to DOC on a new conviction. He was assigned to DRDC for evaluation and placement. Claimant then was transferred to the Bent County Correctional Facility (BCCF) in Las Animas, Colorado. In mid-2004, Claimant was transferred to FLCF. He was at this facility until his discharge in February, 2006.

Claimant's main concern has been the lack of an accommodation resolution for him. He testified that DOC staff did not appear to understand that he has CP and that it affects his ability to walk. Claimant said his CP also affects the work that he was able to do while in prison. Claimant was required to work in the kitchen at BCCF and had a fall. As a result, he suffered a gash to the head and some additional bruises. Claimant did request a transfer from BCCF, and that did happen. Claimant was most upset by the ADA evaluation performed by Dr. Beecroft. In her evaluation, Dr. Beecroft stated that she did not feel that Claimant met the criteria for mobility impairment because he could climb stairs and walk more than one hundred yards.

In response to a question on cross-examination, Claimant testified what he really wanted was a new disability evaluation. He also wanted orthopedic shoes. He had received tennis shoes at BCCF, but needed medical shoes. He also stated that he needed an exemption from standing in line for food, recreation and other things.

### III.

The Settlement Agreement provides, in part, as follows:

Damage claims must be filed within 90 days or receipt by the inmate of the Damage Claims Form. However, if a claim arises during the compliance period, then the inmate may amend his/her claim to request compensation for additional damages. No additional claims for damages will be allowed during the monitoring period, but any individual who has a claim for damages which arises after the compliance period

may bring their claim in any court of competent jurisdiction regardless of the on-going jurisdiction exercised by the federal court in this case.

This provision means that a claimant must have been in custody on or before August 27, 2003 and been the victim of discrimination that was prohibited by the ADA and Rehabilitation Act during that period of time. If a claimant can establish a valid claim for actions prior to August 27, 2003, then he or she may amend the claim to include other acts of discrimination that post-date August 27, 2003, provided the discriminatory acts did not occur after the conclusion of the compliance period.

Claimant testified that he came back into DOC custody on August 29, 2003. If he had no prior incarceration periods, Claimant would not be able to file a claim. Individuals coming into DOC custody for the first time on or after August 28, 2003 may not file a claim for damages, as they are not part of the class. Those individuals retain the right to file their own separate lawsuits under the ADA and Rehabilitation Act.

Claimant must establish that he was disabled, as defined by the Settlement Agreement, on or before the date that he was placed on parole in 2000. This may include the previous period of incarceration that ended in 1995. Absent establishing such disability and showing an act of discrimination, Claimant may not pursue his claim for anything that occurred after August 29, 2003.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, the claimed impairment or disability must be examined. Claimant checked only the box for mobility disability on his claim form.[1]

**Mobility Impairment:** The Settlement Agreement provides that an individual is mobility impaired if he is permanently wheelchair bound or has a lower extremity disability. Claimant argues that his CP qualifies him under the terms of the Settlement Agreement. As noted, Defendants counter that this is not correct, as Claimant has had a disability screening and found not to qualify.

Claimant's medical history reflects that he had CP before entering into DOC custody. His medical form filled out on January 9, 1992 clearly reflects CP. In April, 1992, Claimant had surgery to help correct problems with his knees. Dr. Shroyer stated, in part, in a medical note of April 21, 1992 as follows:

    A. 1. Cerebral Palsy with residuals.
       2. Current mild symptoms.
    P. 1. No treatment indicated at the present time. While incarcerated his

---

[1] No evidence was presented that would establish a claim for hearing or vision impairment. Claimant is not diabetic.

environment should be protected, walking or working at heights, squatting, stooping, cannot be tolerated. His gait is unstable and he should not be in a work environment where falling might injure himself or others.

In a medical note from January 1993, Dr. Jacob Patterson stated that Claimant had CP. Dr. Patterson noted that Claimant was able to run, but he did not recommend that because of its affect on Claimant's knees. As he noted, Claimant also faced the prospect of further contractures. CP is not a disease but a physical condition from birth. *See, e.g. Thalos v. Dillon Companies, Inc.,* 86 F.Supp.2d 1079 (D.Colo. 2000).

The Special Master has reviewed carefully all documents submitted by both sides. During Claimant's second stay in DOC custody, he was placed at LCF for the vast majority of time. Only one medical record has been submitted that relates to that sentence. *Defendants' Exhibit K.* In that medical record, it reflects that Claimant came back into DOC custody in February, 2000. Claimant told the medical care provider that he would be released in November, 2000. The note reflects that Claimant had CP. Instructions were provided for exercises to allow strengthening of Claimant's legs. He was also prescribed Motrin for pain.

Defendants acknowledge that Claimant has CP. Dr. Shames, DOC Chief Medical Officer, states that Claimant "does have cerebral palsy, which does affect his mobility." *Defendants' Exhibit F.* Defendants have rested their case on the accommodation evaluation done by Dr. Beecroft on April 12, 2005. *Defendants' Exhibit G.*

The Settlement Agreement provides for an evaluation of inmates for placement purposes. *Section V, Remedial Plan.* This section provides, in part, as follows:

> b) Permanent Mobility Impairment (non-wheelchair); Inmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking; e.g., an inmate who cannot walk 100 yards on a level surface or climb a flight of stairs without a pause. Such impairment may require use of a cane, prosthesis, or walker, or other assistive devices.

Defendants have used the one hundred yards and stairs as integral parts of their screening. These are only examples of what may be examined in determining a mobility impairment.

The Special Master has observed Claimant walk. He has a profound scissors gait and moves slowly. He also appears unstable, though he did not fall at any time during the hearing. His CP is a lower extremity condition that will not go away. It will be with him for the rest of his life. From review of all information presented from the period ending in December, 2000, the Special Master finds that Claimant was and is mobility impaired and falls into that class provision.[2]

---

[2] There was reference to a vision impairment in the evaluation by Dr. Beecroft. Claimant does not meet the criteria for vision impairment, as he is able to see with corrected vision.

6

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. Claimant has a record of disciplinary convictions, but these do not appear to have had any effect on Claimant's access to programs and services.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant and Defendants pursued this case as if everything that occurred recently was important. Claimant came into DOC custody on August 29, 2003 by his own admission, and this is substantiated by records submitted by both sides. That is when he arrived at DRDC. In order to satisfy this question, Claimant has to establish that he was disabled on or before August 27, 2003 and was subjected to discriminatory acts prohibited by the ADA and Rehabilitation Act on or before that same date.

The Special Master has reviewed carefully all documents submitted by both sides. There is no evidence or even an allegation by Claimant that he was subjected to any discriminatory actions by DOC or any staff during the period of incarceration that ended in 1995. Claimant has failed to establish that the ADA and Rehabilitation Act were violated as to the time period extending from February, 1992 to his release in 1995.

The same is also true concerning his incarceration during the year 2000. There is no evidence or even an allegation that he was subjected to discriminatory actions by DOC or any staff during the year 2000. Claimant has failed to establish that the ADA and Rehabilitation Act were violated as to his incarceration in 2000.

The Special Masters have no jurisdiction except that which is provided in the Settlement Agreement. As a result, the Special Master cannot expand the Settlement Agreement to include additional disabilities or time periods. The class was set by order of Judge Nottingham on August 27, 2003. In order to pursue a claim, an individual had to have been in custody on that date and been subjected to discrimination prior to August 27, 2003. Only if such a claim can be established may a claimant amend the claim and include actions that occurred after August 27, 2003. Claimant has not proven any violations of the ADA or Rehabilitation Act occurred in 2000 or during the time period from 1992 to 1995.

Claimant may pursue through a separate lawsuit his allegations concerning what occurred after he arrived in DOC on August 29, 2003. Claimant cannot pursue his claim for the reasons set forth in this Order.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** This question does not need to be reached in light of the previous answer of "no" to Question #3.

IT IS HEREBY ORDERED that the claim of Tommy B. Sturges is dismissed, as he is not part of the class for the reasons set forth herein; and

IT IS FURTHER ORDERED that Tommy B. Sturges may pursue his claims for relief for what happened after August 29, 2003 through a separate lawsuit; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before June 12, 2006.**

SIGNED this 6th day of April, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master

8