1                             MONTEZ VS. OWEN

2                    CASE #92 N 870 – CLAIM # 03087

3    SM:    All right, we're on the record.  Uh, this is case 92N870, Montez vs. Owens and

4           we're here today for a hearing on Claim # 03087.  The Claimant is Mr.

5           Duncan Leach.  Would counsel enter their appearances please?

6    EM:    Yes, H. Earl Moyer of the firm of Moyer, Beal and Vernesik, Registration No.

7           0060, appearing for on behalf of the Claimant Duncan Leach.

8    JQ:    James Quinn appearing on behalf of the Defendants.

9    SM:    0060?

10   EM:    Yes sir.

11   SM:    60?

12   EM:    60.  Okay.

13   SM:    All right uh…are there any preliminary matters that we need to take up or are

14          we ready to start testimony?

15   EM:    Plaintiff has no preliminary matters at this time.

16   JQ:    Your Honor I had a discussion with Mr. Leach yesterday and as it turns out

17          he…

18   SM:    Mr. Leach?

19   JQ:    or Mr.…I'm sorry, Mr. Moyer.

20   SM:    Oh.

21   JQ:    Uh, Mr. Moyer advised me that he had uh a theory or a claim in this case that

22          was not contained in his claim forms and would be pursuing that theory today.

1       I would request that he be restricted to pursuing the claims as set forth in this

2       claim form.

3   SM:   Okay, well what's this all about…what, what language…?

4   EM:   All right very simply your Honor, last July, 2004, uh pardon me June of 2004,

5       I requested medical records of Duncan Leach.  I received them in May of

6       2005.  Uh, when I received the medical records, I ascertained that Mr. Leach

7       had, had uh incurred several faults during the course of his incarceration.  He

8       had been…he had also received uh certain MRI examinations showing that on

9       the first two falls, uh when he was first examined, when he went into the

10      prison, he had no problems with his back, he had no sign of scoliosis and he

11      certainly had no herniated disks.  Uh, as a result of certain falls which he

12      encountered uh while getting in and out of his wheelchair in his cell, uh Mr.

13      Leach became severely disabled.  I received this information in May of 2005

14      as to the details, but there are medical records in the file that show clearly that

15      Duncan Leach uh had a MRI in 1995, which showed only Scoliosis in his

16      back.

17  SM:   Okay and…

18  EM:   Following another fall he had a MRI which showed a moderate herniation an

19      L4S045 and then in 1997, he had a fall which resulted in a large herniation in

20      his disk and required surgery.  He was ultimately required to have uh an uh

21      mamonectomy and an uh fusion in the back.  It is our position that the failure

22      of the uh State of Colorado to comply with the ADA caused the injuries that

23      Mr. Leach has suffered, that they are serious and permanent and we're entitled

2

1      to compensation on that basis.  I note that we put it in the file.  We gave the

2      information in the files that Mr. Leach had suffered a herniation…herniated

3      disk, that he had required surgery, it was all in my initial uh claim form for

4      damages in the section that we attached to the claim form containing the

5      damages uh found on page 3, uh wrong one, page 4.

6  JQ:    But uh…your Honor I believe even Mr. Moore will admit that this is a change

7      from what's contained in his initial claim form.  His initial claim form and his

8      expert were all based upon the premise that Mr. Leach's herniated disk was

9      caused by the ramps at the facilities he was at and not the falls.

10  EM:    I have, I have a specialist who will testify that what happened was that his uh

11      condition of scoliosis and spondylolsis was caused by the uh over use of his

12      body as a result of the ramps not being compliance with ADA, but we have

13      always claimed that there was failure of the prison system to accommodate

14      people with a physical handicap such as Mr. Leach has possessed from the

15      time of his incarceration.

16  SM:    Okay, let me see if I understand where we're headed here.  Uh, initially your

17      claim is that Mr. Leach has a disability which is…is he wheelchair bound?

18  EM:    Yes.

19  SM:    Okay…uh due to uh cerebral palsy…is that what it is?

20  EM:    That is correct your Honor.

21  SM:    Okay, all right and that uh, uh the ramps at the prison facility where he was

22      housed, uh weren't…didn't reasonably accommodate that disability…okay.

23  EM:    That is correct your Honor.

1    SM:    Okay and initially you claimed that as a result of the ramps not being able to

2            accommodate his disability, he suffered other medical impairments, scoliosis I

3            guess…

4    EM:    Scoliosis and spondylolsis.

5    SM:    Those are the two…right and now what you're saying is he also suffered other

6            injuries as a result or that uh as re…yeah…that as a result of the ramps not

7            being compliant uh he also fell is that…?

8    EM:    He fell in his cell your Honor…

9    SM:    Oh he fell…

10   EM:    cause there were no grab bars.

11   SM:    Okay, so that's not a ramp issue that's a….

12   EM:    It's not solely a ramp issue, no…

13   SM:    Okay and that the issue about the injuries that he suffered in his cell aren't in

14           the claim, is that what you're saying?  I'm just trying to figure out…

15   JQ:    That, that's…

16   EM:    That's correct your Honor…that is correct your Honor except in general we

17           made a claim that there were improper grab bars uh and that was part of the

18           original claim.

19   SM:    You, you made a claim that there was improper grab bars in the cell?

20   EM:    There were no grab bars.

21   SM:    There were no grab bars in the cell.

22   EM:    Uh, in the cell and, and anywhere and this a part of the problem.  Uh…

23   JQ:    But there's no mention of a fall or that that caused anything.

1   EM:   That there is no mention of a fall…

2   SM:   Okay did you depose Mr. Leach?

3   JQ:   I did not your Honor.

4   SM:   Okay uh, what does…?

5   JQ:   Although his, his deposition was taken years ago in uh…in the underlying

6          case.

7   SM:   Oh yeah, okay, but….okay so let's assume that that is the case that this…that

8          you were unaware until yesterday that uh, uh part of uh Mr. Leach's claim is

9          that he uh suffered falls as a result of the lack of grab bars in his cell I guess…

10  JQ:   and I think it's one or two falls in particular.

11  SM:   Okay.

12  EM:   I believe so yes.

13  SM:   Okay…uh that he suffered those falls thereby incurring physical injuries.

14  EM:   There in medical reports or course.

15  SM:   There in medical reports that were provided to you…?

16  EM:   Yes.

17  SM:   that are the DOC's medical reports.

18  EM:   Right

19  SM:   All right, so what, what do you need to do to prepare for that?  Suppose it was

20         in the original claim, what would you do to prepare for that, that you hadn't

21         been able to do?

22  JQ:   I would have discussed the issue more thoroughly with people at the facility

23         uh to find out particularly about the cell, which cell it was and whether it was

5

| | | |
|---|---|---|
| 1 | | inaccessible for a handicap cell at the time and what was the cause of the fall |
| 2 | | and issues of that nature. |
| 3 | SM: | Okay, now Mr. Moyer's saying that he didn't even know about these until he |
| 4 | | got the medical records in late May so that and that he requested the medical |
| 5 | | records long before that so… |
| 6 | JQ: | and, and there was a delay your Honor in getting the medical records, cause |
| 7 | | they're all over the state and we've got to kind of bring them together in one |
| 8 | | place and in addition to all the other documents he requested which were all |
| 9 | | over the state as well, but that aside, if there, if there was gonna be a claim |
| 10 | | asserted based upon these falls and the injuries resulting thereto, there should |
| 11 | | have been a supplement to the claim form to have put us on notice that we |
| 12 | | would be defending that type of issue. |
| 13 | SM: | No I agree with that, but he didn't know about what the supplement…he didn't |
| 14 | | know about the supplemental claim until he got the medical records, which he |
| 15 | | didn't get until a couple weeks ago. |
| 16 | JQ: | Well no he had them in…I believe it was April or… |
| 17 | SM | He said that he didn't get… |
| 18 | EM: | I think it was early May, but I may be wrong… |
| 19 | JQ: | No I, I… |
| 20 | EM: | I'm not gonna stand on that one too strongly because it could have been in late |
| 21 | | April… |
| 22 | JQ: | It was at least two months I believe Earl… when you were at my office. |

1   EM:   Was it that long ago…I can't remember I'll be honest with you (inaudible)

2         yeah and it was another week or so after that when we got them all together,

3         but your Honor the problem we have here is simply this.  Uh, my client has

4         sustained serious disabilities…

5   SM:   When did…when were you retained Mr. Moyer…do you remember?

6   EM:   I believe your Honor I was retained approximately a year ago and at the time

7         we were concerned with the more broad issues and not the precise injuries to

8         the claimant.

9   SM:   Well…

10  EM:   It wasn't until I received the medical reports and went through them very

11        carefully and your Honor there were a great number of medical reports the…

12  SM:   How long, how long has Mr. Leach been incarcerated?

13  EM:   Uh, since 2000 and…probably 2003.

14  SM:   Okay and is he incarcerated now or…?

15  EM:   Yes, in Texas.

16  SM:   Oh, oh okay…all right, right.

17  EM:   and of course I hadn't had access from you, but I would be relying primarily

18        on the medical reports that are…that were prepared by the Department of

19        Corrections.

20  SM:   Well but you have…you have to have some kind of medical testimony to

21        establish causation.

22  EM:   I believe I will have that your Honor…if I do not, if I do not that's uh…that is

23        a problem that we have to face.

7

1    SM:    Well I know but if you do, they're not prepared to meet that testimony…that's

2           the problem.  Uh…

3    EM:    I gave them the medical…or the report of the anesthesiologist but I did not

4           have any…I do not have any reports specifically that the fall uh resulting in

5           the herniated disk.

6    SM:    So there's no medical report that indicates…

7    EM:    Except the MRI reports and the reports of Dr. Davenchep.

8    JQ:    In fact your Honor, the report from his…uh the gentleman from Texas

9           Christian University…

10   EM:    Yes…he's a chemist (inaudible)

11   JQ:    the reports…that report specifically says that the steep ramps is what caused

12          the herniated disks.

13   SM:    All right, uh, uh…anything further on this issue?

14   JQ:    No your Honor.

15   EM:    Nothing further at this time.

16   SM:    Okay, uh it appears to me that uh if the...obviously the claim that the

17          inadequacy of ramps caused physical injury is a different matter uh in terms of

18          proof, in terms of perhaps even legal theory, but certainly in terms of factual

19          proof from a claim that uh, uh inadequate uh cell facilities caused injures.

20          Now apparently there was a claim about inadequate cell facilities in the

21          original claim, absent of grab bars or at least that's what Mr. Moyer's

22          indicated.  However, the injuries and the, or the events that occurred as a result

23          of that and the injuries which flowed from those events, don't appear

|   |   |   |
|---|---|---|
| 1 |    | anywhere in the claim forms and apparently don't appear in any of the reports |
| 2 |    | that Mr. Moyer has provided.  They may be suggested in medical records that |
| 3 |    | the Department of Corrections had but the Department of Corrections can only |
| 4 |    | prepare to defend those claims which are asserted.  Uh, there was delay in |
| 5 |    | getting medical records, but the medical records have been available since |
| 6 |    | either late April or early May and uh, uh there was no indication by the |
| 7 |    | Claimant that he was modifying or changing or in adding I guess to the uh |
| 8 |    | nature of his claims until just a few days ago.  Uh, for those reasons, I don't |
| 9 |    | think it's fair to require the Defendants to try and defend against those claims |
| 10 |    | now…the claims relating to the falls as a result of uh lack of grab bars, which |
| 11 |    | in turn resulted in further injuries, so I'm going grant the Defendant's request |
| 12 |    | to exclude that evidence.  All right that's…anything else? |
| 13 | EM: | Your Honor will you allow us to bring that up at a later hearing if we should |
| 14 |    | choose to do so, will you not preclude us from that? |
| 15 | SM: | Well, I don't know when there's gonna be a…why would there be a later |
| 16 |    | hearing? |
| 17 | EM: | Well I would…I would prefer to uh either allow this matter to be continued at |
| 18 |    | this point so as not to preclude my client the right to recover for the very |
| 19 |    | serious conditions he has incurred or in the alternative, uh I would ask the |
| 20 |    | Court to give me the right to uh leave this part of the claim open in the event |
| 21 |    | we can bring another time. |

1    SM:    Well I don't want to leave part of a case open…I don't want to do that.  Uh, I

2           guess the other alternative is simply continue the matter.  Uh, but uh this has

3           been set…when was it set?

4    JQ:    Two months ago.

5    SM:    This has been set for two months…uh, uh if this claim wasn't raised, I don't

6           think it's fair to make the Defendant uh defend against it and uh everybody's

7           here now ready to proceed uh at least the Defendants are and I assume

8           Claimant is and I don't think It's right to continue the matter and have to reset

9           it for another date.  We have witnesses here uh ready to go so uh the request

10          for continuance or to uh bifurcate the hearing is also denied.  Uh, okay let's

11          move on.  Uh, ready to present your testimony?

12   EM:    Ready to present testimony.

13   SM:    All right and you may call your first witness.

14   EM:    I will call Duncan Leach.'

15   SM:    Okay.

16   EM:    Mr. Leach have you heard all that's gone on?

17   DL:    Yes sir I have.

18   SM:    Okay Mr. Leach, I'm going to ask you to raise your right hand and I'm gonna

19          have my courtroom or my assistance here swear you in okay?

20   DL:    Okay.

21   ?V:    Can you hear me Mr. Leach?

22   DL:    Yes I can.

| | | |
|---|---|---|
| 1 | ?V: | Thank you.  Uh, Mr. Leach do you solemnly swear or affirm that the |
| 2 | | testimony you are about to give is yours and yours alone and is truthful? |
| 3 | DL: | Yes sir I do. |
| 4 | ?V: | Thank you. |
| 5 | SM: | Uh, what we determined was that because Mr. Valente is a notary, he has the |
| 6 | | authority to administer oaths and I probably don't, so that's why he's swearing |
| 7 | | in the witnesses. |
| 8 | DL: | That's fine your Honor. |
| 9 | SM: | Okay. |
| 10 | DL: | May I ask a question?  If I have difficulty hearing someone, may I ask…? |
| 11 | SM: | Yeah, please, please let us know…if you have difficulty hearing anyone, just |
| 12 | | stop us.  Don't feel uh shy about just breaking in. |
| 13 | DL: | Okay. |
| 14 | SM: | Okay and we'll try and either move the phone.  We have a limited phone cord |
| 15 | | here so…it can't be moved too much but maybe we can move people around |
| 16 | | in their seats to make it easier for you to hear, okay? |
| 17 | DL: | Right, thank you sir. |
| 18 | SM: | All right and Mr. Moyer if you want to move closer so that you're… |
| 19 | EM: | I believe Mr. Leach can hear me alright, is that correct Duncan? |
| 20 | DL: | Yes I can sir. |
| 21 | SM: | Okay go ahead. |
| 22 | EM: | All right…okay.  Mr. Leach you have brought a claim in this matter uh for |
| 23 | | damages that you had suffered as a result of the failure of the State of |

1    Colorado to comply with the American with Disabilities Act.  Would you

2    please detail the items which you believe…the areas in which you believe the

3    Americans with Disabilities Act was not complied with by the prison system

4    of the State of Colorado at the Freemont facility and would you also identify

5    where you were incarcerated?

6 DL: All right, uh during the time frame of 1992, which is when this suit began until

7    uh…let me look at my notes here.  Uh, 1998 I was housed at the Freemont

8    Correctional Facility in Canon City, Colorado.  Uh, with the exception of a

9    few brief periods of uh hospitalization, that was my primary housing facility.

10    Uh, the areas of noncompliance within the Fremont Correctional Facility uh is

11    very vast.  The facility itself is over fifty years old and many of the cell houses

12    are not uh accessible to people in wheelchairs.  Uh, in order to get around, you

13    must go up ramps that are extremely steep, noncompliant, uh cells do not have

14    grab bars in them, they don't have proper toilet facilities for people in

15    wheelchairs, uh water accessibility from the sink is a problem, showers are not

16    accessible, uh many of the programs and services that are offered at the facility

17    are not accessible, uh it's, it's kind of an endless bag of, of problems at the

18    facility.  If you have a specific thing, I can probably go into more detail that as

19    a general rule at the time of my incarceration, the Fremont Correctional

20    Facility was not accessible uh to any reasonable degree to a person in a

21    wheelchair.

22 EM: When were you first incarcerated in this system…for this uh offense?

1    DL:    Uh, I was first incarcerated in 1989 and uh I was received at the diagnostic

2           unit in Canon City in I believe it was February of 1989.

3    EM:    Mr. Leach do you have a copy of the exhibit list which I had presented to the

4           Court and the counsel in this matter…?

5    DL:    Yes I do.

6    EM:    and have you examined that exhibit list…

7    DL:    Yes sir.

8    EM:    and do you also have a copy of the exhibits themselves?

9    DL:    Yes sir I do.

10   EM:    Directing your attention to Exhibit A…did you undergo an examination at the

11          State of Colorado…uh Colorado Department of Corrections on or about

12          February 24, 1989…

13   DL:    Yes sir I did.

14   EM:    and did you provide a medical history and examination at that time…to the

15          proper authorities…?

16   DL     Yes sir I did.

17   EM:    At that time, was there any mention of any back problems either scoliosis,

18          spondylolsis, herniated disks, in your (inaudible)…?

19   DL:    No sir.

20   EM:    All right.  Now…

21   SM:    Is this Exhibit A?

22   EM:    Exhibit A.

23   DL:    Exhibit 1A, I believe your Honor.

1 SM: 1A?

2 DL: Yes sir.

3 SM: All right, thank you.

4 EM: and Mr. Leach referring to your uh exhibit 1A, the first page, will you look at

5   the medical problems that are listed?

6 DL: Yes sir.

7 EM: At that time you were using crutches is that correct?

8 DL: I was walking on a four arm crutch which is…can also be called Canadian

9   crutch…it's an aluminum crutch with a cuff that goes around the wrist and

10   your hand goes on uh, on uh handle that sticks out.

11 SM: What did you call that a Canadian Crutch?

12 DL: It's, it's, it's…there's several names.  It's called a Canadian crutch or a

13   loftstrand crutch…

14 SM: Okay.

15 DL: The Loftstrand cane.

16 SM: Thank you.

17 DL: uh huh.

18 EM: Now at that time Duncan, did you have any problems with your back in any

19   way?

20 DL: No.

21 EM: Okay.  Directing your attention to Exhibit 1B…

22 DL: Yes sir.

23 EM: what was the date of that exhibit sir?

14

1    DL:    The date on the form indicates uh February 24, 1989.

2    EM:    All right…uh now Mr. Leach, at that time it was recommended that you

3            receive an inmate helper for winter care.  Would you explain the

4            circumstances for that sir?

5    DL:    Uh, are you are now referring to Exhibit 1B?

6    EM:    Yes…number one.

7    DL:    Okay…at the time of my uh incarceration, it was February of `89, which is

8            mid-winter for Colorado and uh I uh was having trouble getting around the

9            facility.  I was at the Territorial Unit at that time, which was considered old

10           uh…old max.  Uh, I was housed in Cell House 7, which I don't know if I

11           should go into where that is located and the layout of the facility, uh, but it sets

12           high on a hill and uh in order for me to go anywhere in the facility, I had to

13           leave the cell house and go onto an accessible route, which was paved uh in

14           order to get anywhere such as chow hall or the medication line, I had to

15           traverse over that accessible road and uh for the first several months, I didn't

16           have too many problems because it was…there wasn't too much snow and I

17           was you know getting along reasonably well.  Uh, summer came and went and

18           uh there was a situation where we got an early snowstorm that kind of socked

19           the facility in and I couldn't go anywhere, I couldn't go to the chow hall, I

20           couldn't go to medication lines because they were having trouble keeping the

21           snow clear, so I went and I went down to medical and spoke to uh the uh

22           nurses down there and requested that I have an inmate helper.  There was an

1        inmate there that uh assistance and I felt that that was probably in my best

2        interest to have some help getting around the facility.

3   EM:   What happened to that request?

4   DL:   Uh, I spoke to Cheryl Smith who was the one that wrote the uh information on

5        the ambulatory health record, uh she referred that request to Radine.  Uh, I do

6        not recall Radine's last name…uh she was a nurse down in the medical unit

7        down there and uh it was referred to her and there was no action taken on it.

8        There was never an inmate helper assigned to me to assist in my getting

9        around the facility.

10  EM:   Okay.  Now directing your attention then to…

11  SM:   Can I ask a couple questions here…this form 1B is what?  Is this your request

12       or this a recommendation of somebody with the facility or what is it?

13  DL:   Do you want me to answer that question?

14  SM:   Yeah please.

15  DL:   How, how uh…this is a hard question to answer.  When you go down to the

16       medical department for anything whether it be for an appointment to see the

17       doctor or to get medical treatment, uh they normally document that in your

18       health record.  This is considered ambulatory health record…

19  SM:   Right.

20  DL:   and what they do is if you go down there with a request that needs action on,

21       they will write it up on this form and then they will, will parcel it out to

22       whoever is responsible for taking care of that problem.  If it's a nurse then they

23       will refer it to the nurse, it it's a doctor then it's referred to the doctor.  This is

1       just standard way that DOC does their documentation basically…under most

2       circumstances.

3   SM:   Okay so in other words, am I correct that Exhibit 1B is a record of your visit

4       on 11/22/89 to uh the uh health or I don't know whether it's a clinic but the

5       health facility there…?

6   DL:   That's correct your Honor.

7   SM:   and it indicates you requested an inmate helper uh and it says refer to Radine

8       about inmate helper.  Is that right?

9   DL:   That's correct.

10  SM:   Okay, all right.  I've got you.  By the way, are these exhibits uh being offered?

11  EM:   yes your Honor.

12  SM:   Is there any objection to these…they are apparently DOC medical records.

13  JQ:   To the extent that they are DOC medical records, no objection your Honor.

14  SM:   Well I assume you'll let me know if they are not, okay.

15  JQ:   Yes I will.

16  SM:   Okay.

17  EM:   Okay, now would you refer please to Exhibit 1C…

18  DL:   Yes sir.

19  EM:   bearing the date of 7/20/95.  Uh, would you tell us what the purpose of that

20       exhibit was please?

21  DL:   Uh, the purpose of this visit to the clinic was uh I had fallen in my cell and I

22       struck my back…I hit my back.

17

1   JQ:   I'm going to object your Honor to the extent that this is beyond the scope of

2         the claim as discussed prior to the Hearing.

3   SM:   Well I don't know whether it is not yet…

4   EM:   No it isn't.

5   SM:   so I'll overrule the objection right now, let's see where it goes.

6   EM:   All right.  Now as a result of this uh ambulatory health record dated 7/20/95,

7         were you then provided uh certain further treatment involving radio graphic

8         examination?

9   DL:   Uh, yes sir.

10  EM:   and referring please to the next page of that folder, which I can't find a number

11        on…uh dated uh 8/1 of `95.  I believe there was a report of findings on a radio

12        graphic examination…

13  DL:   Yes sir.

14  EM:   and uh that was where it was determined that you had a mild rightward

15        scoliosis of the thoracic spine apex at the T7 level, with a bilateral

16        spondylolsis and L5…

17  DL:   That's correct

18  EM:   and that the examination was otherwise unremarkable.

19  DL:   Correct.

20  EM:   What treatment did you receive as a result of that sir?

21  DL:   Uh, after uh being uh seen by uh I believe it was a physician's assistance at

22        that time, uh as well as a nurse.  The physician's assistant prescribed Percoset

1        QID times 14 days and ordered the x-ray of my back which is the radiological

2        report uh noted in Exhibit 1D, D as in dog.

3  EM:  Okay.  Now directing your attention to Exhibit 1E bearing a date of 9/3/95.

4        Can you tell us what was the purpose of that situation?

5  DL:  Uh, I had uh…I, I went to the medication line and requested that I,I, that they

6        give me something for my back uh I woke up about 2:00 with severe back

7        spasms and that they would not go away and uh I attempted to treat it myself

8        within the confines of my cell by using the heating pad that had been

9        previously uh issued to me uh with no results.

10  EM:  All right…thank you.  Now you were examined uh at various times after that

11       but that the most significant was uh after that was the Exhibit 1F in which you

12       were taken to the neuro clinic, is that correct?

13  DL:  Which exhibit is that Mr. Meyer?

14  EM:  1F…

15  DL:  F, yes sir.

16  EM:  and that was on 5/21 of `96…?

17  DL:  Correct.

18  EM:  at which time they referred to the uh doctor having…Doctor Riles having seen

19       you the last time being last September.  Was that the matter that you were

20       referring to?

21  DL:  Yes.

22  EM:  All right.  Now, you were referred for progressive lower extremity weakness,

23       would you tell us what that consisted of?

1  DL:   Uh, generalized weakness in the, in the legs, uh no support uh to give a little

2        bit of, of, of, medical uh information here.  When, when, when  a person has

3        cerebral palsy, uh it creates spasticity in the legs, which is more akin a severe

4        muscle cramp…uh which is an ongoing situation that does not go away.  It's a

5        continual type of thing.  When I stand up, the only support that I have to stand

6        up is because of the spasticity in my legs.  If the spasticity was gone or

7        reduced then I would you know I, I would, I would fall, I would, I would

8        uh…what's the word I'm looking for…I, I would lose control of my legs.

9  EM:   Okay.  What cell were you in when you were at the neuro clinic…I'm sorry,

10       when you were treated by the neuro clinic on May 21, 1996 sir?

11 DL:   What cell was I in?

12 EM:   or what location were you at?

13 DL:   Uh, at that time and I'm going to refer to an exhibit that we have not explored

14       yet…uh Exhibit 13, which is the State of Colorado Memorandum.  It's the

15       (inaudible) computation sheet that's been prepared by Christina Busgetti.

16 SM:   Let me find it here.

17 EM:   All right wait until we find it.

18 SM:   13…

19 JQ:   I think it's almost the last one Judge.

20 SM:   yeah…I've got it okay.  It's a January 20th, 2005 memo?

21 DL:   Right.

22 SM:   yeah okay.

1    DL:    I'm turning to oh lets see here…the second to last page where at the top of the

2           page it has offender tract uh, my name and social security number and the

3           sentences that I've been convicted of.  To the right of that is a listing of the

4           cell house assignments that I uh was at during any given period of time.  Uh,

5           so on May 21st 1996, uh my housing assignment at that time would be Fremont

6           Correctional Facility, old living unit two.  Now, uh in fairness to everybody

7           involved here, I'm a little bit confused regarding this exhibit insofar as where I

8           was uh housed at uh because of the cell house designations that they have

9           listed here uh, for instance if you look at the very top, under history, it has

10          Fremont Correctional Facility living unit five as my present facility location.

11          That was on March 19, 1998.  Uh, if memory serves me correct, uh Cell House

12          Five has stairs in it.  You got to go down stairs or up stairs to get to the unit.

13          Uh, I never was housed in Cell House Five uh and that's what's confusing to

14          me is because I'm not sure if this is an accurate uh information.

15   EM:    Okay, well let me ask the question in another manner.  Uh, at the time of May

16          21, 1996, where you in a cell that had any accommodations or a handicapped

17          individual as opposed to someone who was simply an inmate?

18   DL     On May 21, 1996?

19   EM:    Yes.

20   DL:    Uh, I was in a cell that had uh some modifications made to it.

21   EM:    What modifications were made?

1   DL:   Uh, at that time uh I kind of need to back up here a little bit to, to, kind of lay

2         the ground work for this.  Uh, in…let see here…in uh…okay…this gets

3         confusing your Honor, I, I apologize for….

4   SM:   That's okay…take your time.

5   DL:   delays here uh…in March of 1995, we were moved from the east side of

6         Fremont.  At one time Fremont and Shadow Mountain were separate facilities.

7         In 1991 I believe, they combined the facilities and Cell House Five, Six and

8         Seven and the Mods, the modular units, were on the east side of the facility.

9         Cell House One, Two, Three and Four, which was Shadow Mountains side,

10        was on the west side of the facility.  So, in March of 1995, we were moved

11        from Cell House Seven over to Cell House One.  After, we remained in Cell

12        House One until September of 1995 while they were renovating Cell House

13        Two.  After September 6, 1995, I was housed in Cell House Two.  So on the

14        day you asked, May 21, 1996, I was housed in Cell House Two on the Shadow

15        Mountain side of the facility.

16  EM:   and what modifications have been made to take care of mobility impaired

17        individuals at that time?

18  DL:   At that time uh the modifications that had been completed for Cell House One

19        or Cell House Two at that time in `96 was…they had uh removed and replaced

20        the, the, the uh cell house door and in its place they put a forty inch door,

21        forty inch wide door, they had installed toilet grab bars around the toilet and

22        they had installed a shower ramp into the shower and that was it.  That was the

23        only modifications that they had made at the time that I was there.

1   EM:   Now, referring to this situation in May of `96, were you then referred for a

2        second MRI?

3   DL:   Uh, a second MRI?

4   EM:   Yes…(inaudible)

5   DL:   I was given a second MRI as part of the (inaudible) surgical procedure.

6   EM:   another MRI as contained in Exhibit 1G.

7   DL:   This one is the first MRI that they conducted.

8   EM:   All right, what did they conduct in `95?

9   DL:   Uh…

10  EM:   the radio graphic study.

11  DL:   None that I'm aware of.

12  SM:   That was just x-rays wasn't it?

13  EM:   Was that just x-rays?

14  DL:   Yes that, that's just a standard uh x-ray…wasn't an MRI or anything it was

15        just uh…make sure there wasn't anything broken.

16  EM:   All right.  Now on July 17th of 1996, you did have an MRI of the lumbar spine,

17        did you not?

18  DL:   July what?

19  EM:   July 17, 1996 as contained in Exhibit 1G.

20  DL:   Yes I did.

21  EM:   and at that time they determined that you had a moderate size herniated disk.

22  DL:   Correct.

23  EM:   at L5S1, is that correct?

23

1   DL:   yes sir.

2   EM:   All right…and then on 7/30/96, uh was there a follow up on your condition?

3   DL:   Uh, yes there…well there was a follow up on the MRI that was done uh on the

4         17th I believe.

5   EM:   I see.

6   DL:   17th of July.

7   EM:   All right.  Now you had previously reported that you had fallen again in your

8         cell on 7/3/96, isn't that correct?

9   DL:   yes.

10  EM:   and you fell in your cell to get into your chair…would you explain that please.

11  DL:   Uh,…

12  JQ:   I'm gonna object to…

13  SM:   Hold on…hold on a minute.

14  DL:   Sure.

15  JQ:   To the extent we're getting back into the issues of the falling in the cell rather

16        than the issues of the ramps, which is…

17  SM:   Well I don't know…where is this going?

18  EM:   Well, I'm trying to show that uh while trying to get into his wheelchair…

19  SM:   Uh huh.

20  EM:   he was unable to uh control his wheelchair and because they didn't have the

21        ceiling type holder or grab bars in the ceiling of the cell and that at no time

22        have they ever completed the work that was scheduled to be done.  This is our

1       point your Honor.  I believe that it is valid because all of the reports show

2       what should have been done and I will question (inaudible)

3  SM:  Well is this, is this…uh okay so he's gonna testify that he fell trying to get into

4       his wheelchair because there were insufficient grab bars?

5  EM:  In the ceiling…

6  SM:  okay…all right and as a result of that what?

7  EM:  Well as a result of that he has fallen on numerous occasions and his condition

8       has progressively become worse…even though…even though the uh…all the

9       reports on the uh compliance with ADA, which is in this folder, uh or all of the

10      repairs that were supposed to be made haven't been made through (inaudible)

11      and as a consequence my client has suffered damages.  Now I'm not

12      specifying damages for the back, but he has incurred continuing damages to

13      his body because there was no compliance with ADA.

14  SM:  Well I understand but doesn't this get back to what we dealt with at the very

15      beginning?

16  EM:  Only if it were connected to a specific herniation.  I am talking to continuing

17      falls which have caused him pain and suffering for many years…

18  SM:  Okay…so, so…

19  EM:  and I believe I'm entitled to show that your Honor.

20  SM:  All right so…let's, let's uh…let's go back here.  Uh, what you had wanted to

21      do initially that we discussed before we started the evidence was to present

22      evidence of falls resulting from the lack of grab bars that uh proximately

23      caused him to uh develop what…?

1   EM:   Develop a herniated disk.

2   SM:   Develop a herniated disk…okay and that was objected to on the grounds that

3         that claim wasn't made initially.

4   JQ:   Right.

5   EM:   Right.

6   SM:   Okay…uh there was…well at least I assume for purposes of discussion cause

7         it was a matter that's much significance that the claim form did have …uh, uh,

8         a claim of lack of grab bars…did it?

9   JQ:   Uh, and I'm not…specifically I would say no Judge.  I think he does state

10        generally that there is a uh…he did not have compliant housing assignments.

11  DL:   May I, may I address that?

12  JQ:   well as far as the…

13  SM:   Well no… hold on just a minute.

14  JQ:   as far as when you look at the section form dealing with special and additional

15        damages…it reads because of the failure of the Colorado Correctional System

16        to place Claimant in a facility that ADA compliant ramps or at least minimally

17        to provide uh Claimant with an inmate aide, Claimant sustained a herniated

18        disk as a result of extreme lower back stress.  The herniation required

19        Claimant to undergo spinal fusion…

20  SM:   Right and so that's, that's the herniated disk claim…

21  JQ:   That's their claim for damages, Judge.

22  SM:   Well let me see this…Uh, Mr. Moyer I don't see anything in this claim form

23        that would indicate that him making a claim as a result of falls that occurred

1       due to a lack of a compliant housing.  There is a section on housing

2       assignment that indicates that it's not compliant in several respects, but then it

3       goes on to explain what the result of that was and nowhere does it mention

4       falls or does it?  I mean I don't see it here.

5   EM:  Well…

6   SM:  So, I mean I think you know this is the claim form and this defines the claims

7       that are operative and this proceeding and I…you know I think it's too late to

8       amend it…that's what I held before, so I think you know…uh and what this

9       says in terms of special additional damages is because of the failure of the

10      correctional system to place the Claimant in a facility that had ADA compliant

11      ramps or to provide an inmate aid…Claimant suffered…sustained a herniated

12      disk…uh that's…

13  EM:  Well your Honor I agree with you as to herniated disk but I think I should be

14      able to show it as to the fact that it caused him continual problems throughout

15      his incarceration because they never did provide ADA acceptable facilities….

16  SM:  Well, I mean I don't have…I don't have a problem with in general…I mean

17      that…you do have an allegation that it was…that the housing facility uh…I

18      thought I saw somewhere in something about uh…did not assess the need for

19      handicap cell, uh her estimated of cell no toilet facilities limited space…

20  EM:  and I think that should be sufficient your Honor because it has limited space

21      for someone in a wheelchair to safely maneuver…obviously he couldn't

22      maneuver, he fell out it…a lot getting into it.

1   SM:   But there's no indication in this claim form that…at least in the claim form

2         itself that he suffered any injury as a result of that.  I mean I don't see anything

3         in the housing…the only claimed injury that I see in the housing assignment

4         section is that because he was forced to double bunk with inmates not of his

5         choosing, etc…okay…but I don't see anything else in there.  Uh…

6   EM:   Well your Honor…

7   SM:   so I mean…

8   EM:   I understand what the Court is saying but I would submit that the comments

9         that were placed here saying that there was insufficient space for someone in a

10        wheelchair to safely maneuver does encompass the likelihood of falls….

11  SM:   Well it may but I mean you've got a claim form and the other side is entitled

12        to know what your claiming and if I read the claim form, I wouldn't read it as

13        indicating that uh, that someone may have fallen as a result of that…I mean if

14        that was the case it should have been in the claim form…

15  EM:   your Honor…

16  SM:   then they would have been on notice…

17  EM:   your Honor…

18  SM:   Uh, I'm gonna sustain the objection.

19  EM:   Very well.

20  SM:   Okay…let's move on.

21  EM:   Now Mr. Leach would you direct your attention to Exhibit 1I please…

22  DL:   Yes sir.

1    EM:    and without going into details as to what happened to your uh, to your back,

2           can you tell us what happened while you were uh on February 20, 1997?

3    DL:    Uh, what I was doing and how I was doing it?

4    EM:    Yes.

5    DL:    Is that what you're asking?

6    EM:    yes.

7    DL:    Okay uh, uh…

8    JQ:    Forgive me your Honor I think this is the same…

9    SM:    Well…

10   DL:    attempted to get into my wheelchair uh…

11   SM:    Hold on…I mean I don't have a problem with the testimony he's giving if the

12          purpose of it is introductory to some uh medical assessment or something like

13          that that may relate to the claim he's making.  Uh, so if that's what this for you

14          may do that…

15   EM:    If I may your Honor, I think I can establish that…

16   SM:    Okay go ahead sure…that's fine.

17   EM:    what we're trying to do…Uh, would you explain what happened on that

18          occasion sir?

19   DL:    I was attempting to get from uh my bed into my wheelchair and uh I, I, I,

20          basically didn't have anything to hold onto and I fell.

21   EM:    Okay…now as a result of that fall, did you sustain uh damage to your uh

22          bladder…to your knowledge?

23   DL:    Repeat the question.

1 EM: I said as a result of that fall, did you then experience difficulty with your

2   bladder?

3 DL: Uh, not that I'm aware of, no.

4 EM: No.  All right at what time then sir did you have further difficulties which

5   caused you to have problems with your bladder?

6 DL: Uh, approximately uh early June I believe.

7 EM: and what happened?

8 SM: What, what year is this now?

9 EM: 1997 sir.

10 DL: 1997 your Honor I'm sorry.

11 SM: Okay that's fine…June of `97?

12 DL: Yes sir.

13 SM: Thank you.

14 EM: and what happened?

15 DL: Uh, I began to uh lose bladder control on a fairly frequent basis uh and I, I

16   went down to medical and spoke to them and they uh, they addressed the

17   issue.

18 EM: and when they addressed the issue, what did they do with you?

19 DL: Uh, they ordered a male catheter uh external catheter uh and urine bag uh for

20   me to wear during the day and the evening time.

21 EM: and were you then examined by uh a physician?

1   DL:   I, I believe that I was…I first saw a Doctor Alice O'Neil uh maybe a day or

2         two after uh this episode took place and she referred me to the neurosurgeon or

3         referred me again to the neurosurgeon for further evaluation.

4   EM:   What happened as a result of that further evaluation?

5   DL:   Uh, the, the neurosurgeon uh made no, no, no bones about it, he said we need

6         to get you on the table and, and remove the disk or uh you could suffer

7         permanent paralysis…simply because that the herniation was, was pinching on

8         the nerves that directly uh related to uh bladder control and, and, everything

9         from the waist down basically.

10  EM:   All right.  Were you then sent over to the main territorial correctional facility

11        to be transferred for surgery?

12  DL:   Uh, no I was transferred from…directly from Fremont to uh the hospital.  I

13        don't remember how long between the uh examination by the neurosurgeon

14        and the hospital admission but I, I believe it was within a week or two.

15  EM:   All right and as a result of that uh determination by the physician, did you then

16        uh undergo a uh spinal laminectomy and fusion?

17  DL:   yes sir I did.

18  EM:   All right.  In what manner were you taken care of when you were returned to

19        the facility?

20  DL:   Uh, upon release from uh Parkview Hospital in Pueblo, I was transferred to the

21        uh Territorial infirmary or the uh behind the walls…the infirmary at Territorial

22        for, for recuperation…for a period of recuperation.

23  EM:   All right and then were ultimately transferred back to uh Fremont?

1    DL:    Right.

2    EM:    Okay.  Uh, did the operation correct your bladder problems?

3    DL:    Yes sir it did.

4    EM:    All right.  Now were you left with certain limitations as a result of this surgery

5           sir?

6    DL:    Yes.

7    EM:    and would you refer to uh…I'm sorry let me rephrase that if I may…uh would

8           you refer to Exhibit 1O, dated 11/7/97?

9    DL:    yes sir.

10   EM:    Can you tell us what that was about?

11   DL:    Uh, 11/7/97 uh I uh was transferring from my bed to the toilet via the

12          wheelchair uh.  The bed is located on one wall, the toilet is on the other wall

13          so I would have had to have gotten into my wheelchair in order to get to the

14          toilet and uh I fell and hit my back on the truck, which is located in my cell.

15   EM:    All right.

16   SM:    One what?

17   EM:    1O.

18   SM:    Oh, oh, oh okay it's not ten, it's 1O…okay I've got it.

19   EM:    Now…Mr. Leach let's back up and go into the issues relating to the uh claim

20          you have made that the uh facilities did not provide accessible routes uh which

21          were compliant.  Uh, how did you open the doors to those facilities while you

22          were in your wheelchair?

1    DL:    Uh, depending on which unit I was in, the doors either slid to the side or uh

2           opened by pulling towards me…pulling the door towards me.

3    EM:    and was that…did that place any stress on your body?

4    DL:    Yes.

5    EM:    Now when you say opening the doors by pulling the doors towards you, would

6           you explain how you did that sir while you were in your wheelchair…or did

7           you have to get out of the wheelchair?

8    DL:    No uh…one of the major inherent problems in a prison is that you have to

9           have big, heavy, metal doors.  Uh, that's just a given in any prison

10          situation…uh the doors that I would have to open are extremely heavy.  Uh, in

11          order to do so…when I, when I approach a door uh if the door handle is

12          on…well describing it is difficult uh without a diagram…I, I apologize uh, lets

13          say that I'm facing a door and the door handle is on the right hand side, so I

14          would be opening it with my left hand.  In order to do so I have to place the

15          wheelchair uh to the right of the door handle and right hand against

16          an…apparently the wall that's there that's holding the door up and pull the

17          door open.

18   EM:    and how many times a day did you have to do that sir?

19   DL:    Uh, well you would have to go to uh to chow, which would be three times a

20          day, uh various medication lines are open…most of the time during chow that

21          there's a late night uh, uh med line at eight or nine o'clock, uh going to the

22          office or case management office or any you know any place I would have to

23          go on a regular basis and I'd have to say I probably have to open up the door

33

1  ten to twelve times a day…and that's just not one door…that's uh…when I

2  was in Cell House Two, there were…there was an outside door that entered

3  into a foyer area and then there was an interior door to the pod itself and so

4  you're opening up two doors but from uh two different sides.  When you're

5  opening up the door going into the unit, you're on the left hand side or you're

6  on the right hand side of the door, when you're opening the door to get into the

7  pod, you're on the left hand side of the door.

8 EM: So you had to use both arms during those times?

9 DL: So, so, you, you, you, you exerted uh stress on both sides of the body basically

10  to get in through two doors.

11 EM: Okay.  Let us talk for a moment about ramps.  How many ramps did you have

12  to traverse each day?

13 DL: Uh, numerous uh…when I was house in Cell House Seven, which if you recall

14  is on the east side of the facility, uh when I was there from approximately `92

15  til `95, uh there is a ramp that goes up the center hallway.  Uh, it's called main

16  street or, or, or, the, the, main street of the facility that goes from one end of

17  the building to the other end of the building…this ramp is, is, uh has three or

18  four different uh sizes and level uh, uh in other words, I, I, left the center

19  house, I would go up a ramp and then there would be a level area and then I

20  would have to go up another section to another level area and then up another

21  section to another level area…uh and that's to get anywhere, with the

22  exception of the gym.  Uh, if I had to go to the chow hall I had to access that

1       ramp, if I had to go to medical I had to access that ramp…uh on a daily basis

2       and we're talking numerous trips during the day.

3  EM:  We're the ramps that you are describing in compliance with ADA?

4  DL:  No.

5  EM:  How do you know that sir?

6  DL:  Uh, in 1992, I was hired uh by the fire marshall uh actually Tom Cooper, who

7       was the warden at that time to conduct the Fremont Correctional Facility ADA

8       survey.  Uh, at that time I became very familiar with ADA uh law,

9       compliance, uh, uh and uh all around information so that's how I was knew

10      that the ramps were not in compliance.

11  EM:  Now directing your attention to Exhibit 4, which is the Fremont survey of

12      2002.

13  SM:  Let me find that exhibit here…exhibit 10, I think it's this one.  Okay.

14  EM:  It is identified as the ADA 1992 survey conducted by Timothy A. Bennett,

15      Fire Marshall Safety Officer?

16  DL:  Yes sir.

17  EM:  Is that the exhibit which you said you started under Mr. Cooper, the

18      Warden…to your knowledge?

19  DL:  Repeat the question…yes it is the, it is the exhibit that I had put together.

20  EM:  That's the survey that you initially started working on?

21  DL:  Correct.

22  EM:  and that was the job you had in the prison?

23  DL:  that was the job assignment that I was given uh…yes.

1    EM:    Were you paid to perform that job assignment?

2    DL:    Yes, I was.

3    EM:    and were you capable of performing that job assignment?

4    DL:    yes.

5    EM:    How did you perform the job assignment?

6    DL:    I would uh, I would go to uh the…around the facilities to all the different

7           departments, all the different buildings and uh conduct the survey as directed

8           by the central office in Colorado Springs…they supplied materials and uh how

9           to conduct the survey and that's how I put the report together.

10   EM:    This report is approximately a hundred and twenty four pages…uh how long

11          did it take you to do it?

12   DL:    Six months.

13   EM:    Okay.  During that time, were you required to examine the statutes of the ADA

14          in order to determine whether or not the facility was in compliance with those

15          statutes?

16   DL:    Uh, yes the information that the central office forwarded to Fremont Facility,

17          uh contained uh survey materials.  I don't know where they obtained the actual

18          survey materials from, uh but they contained survey materials, uh, the, the, uh

19          the Adag requirements, which is the architectural design requirements that

20          they used in the Americans with Disability Act and uh I, I, reviewed all that

21          information and uh began the process of evaluating the facility.

22   EM:    As part of your evaluation, did you determine that the ramps were not in

23          compliance with the Americans with Disabilities Act?

36

1    DL:    Yes sir I did.

2    EM:    In what way were they not in compliance?

3    DL:    No, the ramp…you're speaking about the, the, the main uh, the main street of,

4           of Fremont, correct?

5    EM:    Well we'll start with that.

6    DL:    Okay.  Hold on for just a moment here.  I need to…

7    SM:    Tell you what, would this be a good time to take a break for about five

8           minutes.

9    DL:    Uh, that's, that's up to you…I'm, I'm doing fine, I'm fine.

10   EM:    I would like a break your Honor.

11   SM:    Okay, let's take a five minute break.  Uh, Mr. Moyer if you want to confer

12          with Mr. Leach, you can stay in the room here and do that.

13   EM:    All right, I think I will do that…

14   SM:    and I'm gonna step out…we'll all step out.

15                                 END OF TRANSCRIPTION