| 1 | | MONTEZ VS. OWEN – 3 - 4 |
|---|---|---|

MONTEZ VS. OWEN – 3 - 4

CASE #92 N 870 – CLAIM # 03-087

3   SM:   You want to call your next witness Jim?

4   JQ:   Uh, yes your Honor, I just gave him the uh phone number.

5   DVa:   Uh, Mr. Hill this is Dino Valenti, Judge Pringle's staff attorney.  Are you

6        ready to go?   Let me make sure that uh…Okay who's there?  Hello…I lost

7        them all.

8   SM:   Okay let me know when they're all on.

END OF TRANSCRIPTION

10   SM:   All right, we're back on the record.  Call your next witness Mr. Quinn.

11   JQ:   your Honor I'm gonna call Gerald Veehill.

12   SM:   Okay…Mr. Veehill would you raise your right hand and my staff

13        attorney/assistant will swear you in.

14   DVa:   Can you hear me Mr. Veehill?

15   DV:   Yes I can.

16   DVa:   Do you solemnly swear or affirm that the testimony you are about to give is

17        yours and is truthful to the best of your knowledge?

18   DV:   yes I do.

19   DVa:   Thank you.

20   JQ:   Uh, Mr. Veehill we're discussing inmate Duncan Leach, uh are you aware of

21        uh, uh the programs that he participated in while he was in DOC custody?

22   DV:   Uh, yes sir.

23   JQ:   What programs were those?

1   DV:   In 1995, Mr. Leach was involved as a utility worker uh actually for two

2         months.  Uh, he was assigned as a record clerk for approximately oh May of

3         1992 and then again in January of 1993.  He was assigned as a clerk uh

4         amendment five of 1990, and May 30th of 1991, he was assigned as janitor,

5         March 1990, uh May 1991 again and then he was student uh from 1990 to

6         1991.  Uh, (inaudible)

7   JQ:   Okay…your answer just reflected his inmate jobs, is that correct?

8   DV:   That's inmate jobs.

9   JQ:   Okay, can we talk about programs?

10  DV:   Now due to the program availability, I can't say anything in regard to his

11        programs because there wasn't a file to review.

12  JQ:   Okay.  What about earned time and good time, did he receive earn time?

13  DV:   He did receive earn time, yes he did.

14  JQ:   Uh, was any uh earn time or good time denied?

15  DV:   Yes sir, earn time was denied for Mr. Leach and that was due to disciplinary

16        uh issues that he had throughout his incarceration.

17  JQ:   and are you aware of a memorandum uh drafted by Chris Mescetti, who's the

18        time release person?

19  DV:   Uh, yes I am that's infirmary…

20  JQ:   Your Honor, I believe it's Plaintiff Exhibit 13.  Does that outline the good time

21        uh…

22  SM;   Thirteen?

23  JQ:   Thirteen your Honor, yeah.

1   SM:   Yeah, okay.

2   JQ:   Uh, does that outline the earn time credits uh and why they were denied…the

3         total earn time credits and why they were denied to Mr. Leach?

4   DV:   That's correct.

5   JQ:   Are you aware if Mr. Leach participated in sex offender treatment?

6   DV:   Uh, no I am not.

7   JQ:   Okay.

8   EM:   Objection your Honor, I think it's immaterial at this time.

9   JQ:   Okay.

10  SM:   (inaudible) he didn't know anyway so it's a moot point.

11  JQ:   No further questions your Honor.

12  SM:   Cross examination?

13  EM;   Uh, if I heard you correctly Mr. Leach only had one bit of work uh for which

14        you have a record uh since 1994, which was that of a utility worker for two

15        months in 1995?

16  DV:   Are you asking me that question Mr. Moyer?

17  EM:   Yes I am…is that correct?

18  DV:   What were the dates again sir.

19  EM:   I think you testified sir that he in 1995, he worked two months as a utility

20        worker, is that correct?

21  DV:   Uh, that's what (inaudible) testified to, but I'm still a little bit confused on

22        where we're going with this question.

1   SM:   You don't need to know where we're going, if you know the answer, answer

2         it.  What's the problem?

3   JQ:   I believe that's Mr. Leach speaking not Mr. Veehill.

4   SM:   Oh, oh, oh okay…

5   EM:   Sorry wrong person is getting questioned.

6   SM:   Excuse me; I'm sorry I missed that too.  All right let's stick with the witness.

7   EM:   The question is addressed to Mr. Veehill.

8   DL:   We all missed it.

9   SM:   Okay, sorry about that folks.

10  DH:   Yeah, the, the department's records reflect that uh he was assigned as a utility

11        worker uh from 5/8/95 to 6/8/95.

12  EM:   Oh, that would be one month then.

13  DH:   Yes.

14  EM:   and that's the last thing you have with his being assigned?

15  DH:   as uh work history, yes, that's, that's all that I can find, yes that's correct.

16  EM:   and you had a month or two….you had some time in 1992 when he's listed as

17        what a clerk or ….

18  DH:   A record clerk, yes sir.

19  EM:   Record clerk and how much time was that?

20  DH:   Uh, the records reflect that it was from May 15, 1992 to January 12, 1993.

21  EM:   Okay.  All right uh…is that an ordinary routine for an inmate is to have uh

22        only a slight amount of work time?

1   DH:   Uh, no I believe that it would depend on you know several factors uh number

2         one would be you know which is prioritized in regard to treatment verses work

3         assignment during their incarceration.  There may be for example if an inmate

4         has code violations or is not compliant with rules, uh most of the time they

5         become ineligible for program participation or work assignment.  Uh, facility

6         transfer may affect you know their job assignment and they have to go to the

7         bottom of the wait list because there's other inmates that maybe waiting for

8         specific jobs or treatment programs.

9   EM:   What about physical disability?

10  DH:   Physical disability…there are limitations in regard to the type of uh job

11        assignment that they may have.  Uh, for example in uh classification review,

12        uh you know along with facility assignment and cell assignment, we're

13        looking you know maybe lower bunk or uh no heavy lifting, maybe a

14        limitation, uh the length that they may have to stand or sit, uh there may be uh

15        issues regarding uh the security clearance into certain areas of the facility, uh

16        you know due to maybe uh the type of shoes they wear or prosthesis or you

17        know something of that nature.

18  EM:   Sir, were you physically acquaint…or were you personally acquainted with

19        Duncan Leach?

20  DH:   I am not personally acquainted with him, no.

21  EM:   Were you aware that he was a wheelchair or handicapped individual?

22  DH:   Uh, I'm not aware of that until (inaudible) with this particular issue.

23  EM:   All right.  Thank you.  I have no further questions.

5

1   SM:   Anything further from this witness?

2   JQ:   Uh, briefly your Honor.  Uh, Mr. Veehill looking at the uh Exhibit 13, the

3         memorandum from uh Chris Muskay, that indicates uh a number of COPDs

4         Mr. Leach had?

5   DV:   Uh, yes that that does reflect uh for a time being denied due to code violations.

6   JQ:   and basically there is one COPD for every year from `89 to `98?

7   DV:   Yes, it does look that way, absolutely.

8   JQ:   No more questions your Honor.

9   EM:   Nothing further.

10  SM:   All right you're excused Mr. Veehill, thank you.

11  DV:   Thank you.

12  SM:   All right, uh any further witnesses from Defendant?

13  JQ:   No your Honor.

14  SM:   All right Defendant rests…any rebuttal?

15  EM:   Yes your Honor, I would call Mr. Duncan Leach.

16  SM:   All right.  Mr. Leach you're still under oath.  Uh, you may proceed.

17  EM:   Uh, Mr. Leach you heard the testimony of Kathy Holst for a few moments,

18        just before lunch, is that correct?

19  DL:   Yes sir I did.

20  EM:   and she referred to the fact that she was aware that you had an inmate assistant

21        or an inmate pusher.  Uh, would you state your knowledge as to that situation

22        and your knowledge of Kathy Holst for that matter?

1   DL:   Well uh my knowledge of Ms. Holst is that she uh she was the legal assistant

2          at the Fremont Correctional Facility that was combined with Shadow

3          Mountain.  Uh, I would argue that her recollection…

4   SM:   Well I don't want…hold on, hold on, hold on…

5   DL:   Don't argue sir.

6   SM:   Hold on…we don't want your argument, the question is uh…the question of

7          the table was, do you know Kathy Holst and I think you've testified to

8          that…what was the other question.

9   EM:   All right let me ask the question.

10   SM:   yeah ask the question again.

11   EM:   Uh, Ms. Holst has testified that you were furnished an inmate assistant or an

12         inmate pusher during the time you were there.  Would you state whether or not

13         you agree with that statement of Ms. Holst?

14   DL:   I disagree.

15   EM:   and why do you disagree?

16   DL:   Uh, I believe she's uh mistaken me and another inmate.

17   EM:   and who was the inmate that you believe she was mistaken?

18   SM:   Whoa, whoa wait a second…how would he know what…you're gonna have to

19         lay a foundation for that one.

20   EM:   All right let me lay the foundation if I may sir.  Uh, how would you be aware

21         that there could be a mistake?  Could you state…

22   DL:   I have personal knowledge that there was at least one other inmate at the

23         facility who had uh, uh inmate helper.

1    JQ:    (inaudible) object

2    EM:    (inaudible)

3    SM:    Well let uh…overruled…go ahead let's see where this is all going anyway.

4    EM:    All right and was the nature of that other inmates' disability different than

5           your own?

6    DL:    yes.

7    EM:    In what way?

8    DL:    Uh, the individual was blind.

9    EM:    and to your knowledge sir, uh were there any other people in that facility at

10          that time that Ms. Holst was referring to being 1992 I believe.

11   SM:    Well.

12   JQ:    Your Honor I'm gonna take…this was proper cross examination for Ms. Holst.

13   SM:    The objection sustained.  I don't think he can testify…there's no way that he

14          can answer that question.  I mean …he can't…unless you can lay a foundation

15          that he knows what's in Ms. Holst's mind because he's talked to her or she's

16          told him something…I don't see how he can testify to that.

17   EM:    What I'm trying to ascertain sir is whether or not you were aware of the

18          inmates who had disabilities who were in that facility in 1992?

19   DL:    yes I was.

20   SM:    Okay.

21   EM:    All right.  Now with regard to those inmates, who had disabilities, uh did any

22          of the inmates have the use of a helper…inmate assistant or helper…?

23   DL:    yes.

8

1    EM:    and what was the nature of the inmate helper…what was the purpose for that

2           inmate helper…if you know?

3    DL:    Yes I do know.  The purpose of the inmate helper was to, to, guide the uh

4           individual around the facility since he was blind.

5    EM:    All right.  Now, let me ask the question in another manner.  Did you at any

6           time have an inmate assistant or inmate pusher as described by Kathy Holst

7           while you were in that facility?

8    DL:    Not one that was assigned no.

9    EM:    Did you have on occasion people who would assist you?

10   DL:    on occasion, yes.

11   EM:    and what was the nature of that assistance?

12   DL:    Uh, they would see me struggling to get up a ramp or a sidewalk and uh offer

13          to give me a push to the top of the ramp or the sidewalk.

14   EM:    Was that the only occasions for which you received help with an inmate

15          assistant or inmate pusher?

16   DL:    yes.

17   EM:    During the entire period of time you were in the facility?

18   DL:    yes.

19   EM:    Thank you.  Now referring to testimony of Mr. Bennett, you receive…I was

20          quoting to you from a memo of 1995, uh which is Plaintiff's Exhibit 15 I

21          believe.  With regard to that memo, how many pages long was it?

22   DL:    Uh, I'll get the memo here.

1   EM:   Now that's the one that I was furnished just recently in January of `95.  I don't

2          have it as part of your list of exhibits.

3   DL:   Well, I do not know the length of that particular memorandum.

4   EM:   Okay, it was dated January 18, 1995…uh could you tell me whether or not you

5          furnished more than one page for that memo?

6   DL:   I do not recall.

7   EM:   All right sir.  Did you furnish information in 1995 to Mr. Bennett concerning

8          your particular cell block… housing location?  I believe CH1 as you were

9          referring to in your letter to uh Superintendent Emory.

10  DL:   In reference to the memo that was dated 1/18/95?

11  EM:   No I'm asking you now about the memo to Mr. Emory.

12  DL:   Okay and that would be exhibit number…9?

13  EM:   Just a second.

14  DL:   your 9?

15  EM:   yes, that would be Exhibit No. 8.

16  DL:   Number 8, okay…give me a moment here.  All right I have it in front of me.

17  EM:   Okay, referring to page…well let me ask you first, did you write such an

18         exhibit…such a letter to Superintendent Emory?

19  DL    Yes.

20  EM:   Would you refer please to paragraph 2 of that memo.

21  DL:   Okay.

1   EM:   It says recently I provided Mr. Bennett with all the information concerning the

2         changes which should be completed in CH1 for those disabled inmates who

3         are currently housed there.

4   DL:   yes.

5   EM:   Did you provide that in the form of a written document to Mr. Bennett?

6   DL:   Uh, yes to the best of my knowledge uh that's how I would normally transmit

7         uh pertinent information uh to create a paper trail.

8   EM:   All right.  Uh, do you have any independent memory as to the changes you

9         were talking about that should be completed in Cell House One?

10  DL:   Uh, I can refer to my testimony at the deposition, if I can do that then yes I

11        can.

12  EM:   All right and when was that deposition sir?

13  DL:   Uh,…

14  SM:   It's in the record isn't it?

15  EM:   It's in the record of March 21, 1996…what page of the deposition are you

16        referring to?

17  DL:   let me …it will take me a minute to find it.

18  EM:   I believe you may find it on page 23...

19  DL:   twenty three…

20  EM:   take a look.

21  DL:   Uh, I…what I see on page 21 would refer to the memorandum that you're

22        speaking of…

23  EM:   Okay.

1    DL:    I need to read it to make sure…yes that that does refer to the memorandum

2           that you're speaking about.

3    EM:    Okay.  Now that memorandum uh refers to your determination of how many

4           grab bars would be necessary?

5    DL:    Uh, yes uh Mr. Bennett had, had uh requested that I provide a uh kind of a

6           short list of uh the, the accommodations that need to be made for uh cells to be

7           modified over in Cell House One.  Prior to our move to Cell House Seven and

8           which is what I completed and provided to him.

9    EM:    All right.  Were those changes actually made?

10   DL:    Uh, some were, some were not.

11   EM:    Would you describe the ones that were not and how they affected you?

12   DL:    Uh, to the best of my recollection uh upon our arrival from Cell House Seven

13          to Cell House One, uh the toilets had not been modified…had not been, been

14          raised to the proper level, uh the water access dials had not been, been changed

15          so you can access the water a little easier, uh I do not believe there were grab

16          bars in the shower at that point.  Uh, they, they were subsequently installed uh

17          a short time after…I don't recall, I don't remember specific dates

18   EM:    Okay.

19   DL:    Uh, I do recall that at one point, we were…they were, they were going to be

20          modifying the toilet and they moved us out of that particular pod or cell house

21          to a different cell house…now I may be confused as to whether that was Cell

22          House One or Cell House Two, but there was a one day move in there where

1         they moved us from uh…in looking at the time sheet uh it would indicate that

2         they had moved us from Cell House Two to Cell House One.

3    EM:   All right.

4    DL:   While they, they did the modification during a one day period.

5    EM:   All right.  Let me, let me ask another question.  Uh, you originally set forth

6         claims for discrimination against you uh and how it affected you in the

7         Fremont Correctional Facility and as part of it, you testified of the problems of

8         getting that to the gym.  Where was the gym located?

9    DL:   Uh, the gym was located on the east side of the facility uh which would be the

10        older portion of the facility that Mr. Bennett had testified to earlier.  Uh, the

11        gym is a, is a uh I believe it's a buffer building, a federal building.  It was built

12        uh probably fifteen years prior to my arriving there and it would have been to

13        the south of Cell House Seven within uh guesstimating uh hundred and fifty

14        yards or less…hundred yards or less from the cell house.

15    EM:   All right, now was there any problem for a wheelchair bound individual to use

16        that gym?

17    DL:   Yes there was.

18    EM:   Would…you've heard Mr. Bennett say that the gym was on a flat surface.  Uh,

19        would you explain what you found while trying to use your wheelchair on that

20        so called flat surface?

21    JQ:   your Honor if I could, I believe we've been through all this on his direct

22        testimony.

23    SM:   Okay well I don't know…

1  EM:  This is contradiction of Mr. Bennett.

2  SM:  That…I'm gonna overrule the objection, go ahead.

3  EM:  Go ahead you may answer.

4  DL:  Uh, the, the gym uh the surface of the gym floor is yes a flat surface, however,

5       access to the gym building uh was not on a flat surface.  There's a drainage

6       ditch or small culvert uh for lack of a better word that, that you must cross to

7       get into the gym and what they had done is they had basically put a uh…I

8       don't know how to describe it…uh you know it's a metal culvert…can you put

9       to, to, uh…sorry your Honor, I'm just a little bit frazzled here…uh a way for

10      the water to, to go down the culvert uh and not interfere with the door… they

11      had placed uh, uh concrete I, I, for lack of a better word a blob of concrete

12      over the top of this culvert so it, it, created a an uphill climb to the door.

13 EM:  All right.

14 DL:  but it was not a flat surface to the gym area.

15 EM:  and were you able to maneuver that in a wheelchair?

16 DL:  uh, not in uh…no.

17 EM:  Now you talked…uh Mr. Bennett also talked about uh changing the subject

18      briefly, uh the Territorial facility chow hall as I believe he described as.  Uh,

19      and stated that it was wheelchair accessible.

20 DL:  yes sir.

21 EM:  Uh, was it wheelchair accessible during the period of time you were

22      incarcerated?

23 DL:  No sir.

1   EM:   Why not?

2   DL:   Uh, the, the, the, chow hall at Territorial uh there is, there are two chow halls

3         in Territorial, one is on the gee whiz I'm not sure even what direction it is.

4         Uh, for lack of a better description, let say that chow hall number one is on the

5         north side and chow hall number two is on the south side.

6   EM:   All right.

7   DL:   uh, chow hall number one and I'm going to say that the north side is on the

8         west…the west side chow hall and the south side is the right side chow hall.

9         The west side had stairs going up to it; the right side had a ramp.  Uh, again

10        more like a blob of concrete than anything else.  It was not a ramp, it was not

11        uh and accessible ramp for someone in a wheelchair.  In addition to that uh

12        Territorial Prison if I remember correctly was built in about 1870 something.

13        The door that accesses the chow hall uh weighs a ton.  Uh, it is a, a, a, boiler

14        plate special door uh that must be opened uh to gain access into the chow hall.

15        Going up, up this ramp and opening the door was uh impossible to do uh

16        without assistance and uh, uh in on a windy day you don't even try to get in

17        there because the wind would slam you in the door.

18   EM:   All right.

19   DL:   the door would slam shut on you as you're going into the chow hall.  So, no

20        the chow hall was not accessible at the time that I was at the Fremont

21        Correctional Facility…I mean at Territorial.

22   EM:   Thank you.  Uh, now there was some issues raised about the shower in Cell

23        House Seven.  Uh, because I asked Mr. Bennett whether there was a

1       problem…whether Cell House Seven was ever equipped with grab bars and a

2       shower seat during the period of time from 1992 through 1998.  Uh, can you

3       state of your knowledge what condition that uh shower area was in?

4   DL:   Well I can, I can state uh that between uh 1992 when the ADA when the ADA

5       went into affect and until uh I believe was in March…let me check my

6       (inaudible) here…March 17, 1995, uh there were no uh grab bars installed in

7       the shower of Cell House Seven.

8   EM:   Was there ever any uh seat installed in the shower at Cell House Seven as

9       ordered by the ADA?

10   DL:   and no portable showers made available for an inmates use.

11   EM:   Thank you.  Did you have occasion to go past the laundry room in the Fremont

12       Facility?

13   DL:   At which time?

14   EM:   At any time.

15   DL:   yes.

16   EM:   and was there a ramp there that had to be used if you went past the laundry

17       room toward the rest of the building?

18   DL:   Uh, there's, there's, there's a series of ramps uh that are on the west side of the

19       facility that were uh built uh in conjunction with the, the, the new chow hall

20       medical unit and laundry facilities for access by uh Cell Houses One, Two,

21       Three and Four.

22   EM:   Were the inmates to use those ramps?

23   DL:   yes.

1    EM:    and were you able to use them, using the wheelchair?

2    DL:    Uh, no not in a safe manner.

3    EM:    What do you mean not in a safe manner?

4    DL:    Well, uh they, they did not have any railings uh on the east side of the ramps

5           to prevent the wheelchair from going off the side of the sidewalk.

6    EM:    Okay.  You have spoken of difficulty using the ramps.  Would you explain

7           what physical damage that you noticed you incurred as a result of having to

8           use those ramps while in a wheelchair?

9    DL:    Uh, yeah, the, the…well let me refer to in exhibit here and may it will help

10          explain the question you are asking me here.

11   EM:    All right.

12   DL:    if you look at Exhibit 7.

13   EM:    Exhibit 7?

14   DL:    yes…Fremont Correctional Facility people to access issues…

15   EM:    All right.

16   DL:    On page…from page uh…(inaudible) page seven.

17   EM:    and what number is that referring to?

18   DL:    Uh, if you, if go down the list, you will see a one, two, three.

19   EM:    No you've got numbers…4.19 etc.

20   DL:    Okay…4.8.

21   EM:    Thank you.

22   DL:    on all three …the lower three are the ones that we're talking about right now.

23   EM:    4.8…all right.

1  DL:  Uh, so the ramp to the laundry room uh, uh, the ramp is longer that 30 feet and

2       has no hand railing, it has no level landing uh or area of recovery, which is

3       required for (inaudible) uh the ramp should have a five, five inch or five foot

4       level landing in an area of recovery.  It should have hand rails on both sides of

5       ramp it's on its entire length.  Uh, the ramps go under the roof as low as low as

6       well as the two below it, uh does now have any, any of those features.

7  EM:  All right, how did that affect you personally?

8  DL:  Well, in having to go from the cell house to the chow hall, on, on many

9       occasions…uh the it was, it was scary going down a ramp without handrails on

10      it uh especially in, in, inclement weather and uh if it's raining out the, the,

11      concrete is slick…Uh, if you get water on your hands, you get water on the

12      rims of the wheelchair uh at that time the rims are like (inaudible), like trying

13      to hold on to an ice cube, you know uh my big fear is putting it mildly and uh

14      you know emotional distresses is not going far enough…

15 JQ:  your Honor now I think we're beyond the scope of rebuttal…

16 EM:  All right…this goes to…

17 SM:  hold on…uh well we may be but uh I'll let him go ahead and testify…I said

18      that he could go beyond the scope of rebuttal rather than recall him during his

19      case, so…objection is overruled.

20 EM:  All right…uh, now as far as your uh physical discomfort is concerned, would

21      you explain what parts of your body were affected by the use of the ramp or by

22      the use of the wheelchair when you had to use the ramps and how it affected

23      your well-being?

1   DL:   Uh, going down the ramp uh towards the, the, the chow hall uh it would affect

2         my hands and my wrist because I would have to be constantly uh correcting

3         the direction of the wheelchair uh and, and, moving past inmates or inmates

4         coming one direction while I'm going in another direction, uh, uh upper body

5         uh…it would be exhausting to try to control uh the wheelchair or my

6         wheelchair and not running into people uh and certainly not running…rolling

7         off the side of sidewalk.

8   EM:   What about going up the ramp?

9   DL:   Going up the ramp is a totally different ball of wax.

10  EM:   Would you explain that?

11  DL:   The, the ramp as described in, in, the exhibit uh, uh, exceeds the, the scope

12        first of all.

13  SM:   Now look…hold on

14  EM:   Wait a minute.

15  SM:   The question was how did it affect you…the question had nothing to do with

16        whether the ramp exceeded anything.

17  DL:   Okay.

18  SM:   Okay…so…let's answer the question.

19  DL:   Okay, uh in having to propel myself up the ramp, uh it would be physically

20        discomforting uh exerting an enormous amount of energy, uh because you

21        can't stop on the sidewalk, uh because there's no level area if you stop half

22        way up, you're at a dead standstill and to try to get going again you have to

1       exert more energy.  Uh it was just, just physically demanding to move my

2       weight plus the wheelchair up this ramp.

3  EM:   Okay…and did you feel any pressure on your back as a result of doing that?

4  DL:   Yes, I'm you know and it goes without saying that there's…that you, you, you

5       have to uh use your, your, your upper body as well as your lower body to

6       propel this wheelchair up the ramp.  Uh, Dr. Shames testified that something

7       about a thirty degree uh a maximum of a thirty degree angle of attack and I

8       believe what he was saying was that if I'm sitting straight up in the

9       wheelchair, then my forward movement would be no more than thirty percent.

10      Uh, I would have to disagree with that.  Uh, if you're trying to move up a ramp

11      that's not compliant, uh you have to basically throw your whole weight into

12      moving up the ramp so you would be bending over further uh for two

13      reasons…one to get the momentum to move you forward and two to prevent

14      the wheelchair from flipping over backwards.

15  EM:  and what effect did that have on your body…to your knowledge?

16  DL:   Uh, other than the fact that, that, it was physically demanding and uh I was

17      tired afterward, uh my back would hurt, my arms would hurt, my wrists would

18      hurt.

19  EM:  How would that affect you after you got back to your cell sir?

20  DL:   Uh, I wouldn't be able to do very much for awhile…I just have to recuperate, I

21      have to rest, I wouldn't be able to, to uh, to go back out…you know I would

22      have to, to rest, to recuperate.

1   EM:   Okay and after had rested and got up and started to get out of your wheelchair,

2          what was your condition at that time?

3   DL:   Uh, tired.

4   EM:   Did it cause you, either your upper body or your legs to uh feel weak and give

5          way on you?

6   DL:   It could have, yes sir.  It very well could have.

7   EM:   All right.

8   DL:   I don't, I don't recall specific times that it did, but you know…uh.

9   EM:   All right.  Did you make application for job opportunities uh that you were

10         turned down for because of your physical limitations and inability to get to the

11         locations because of your wheelchair usage?

12  DL:   Uh, yes I did.

13  EM:   Would you explain that please?

14  DL:   Uh, well it was different in each facility.  Would you like me to…?

15  EM:   start with Fremont please.

16  DL:   Start with Fremont, okay.  Uh, at Fremont you were assigned a case manager

17         and it was the case manager's responsibility to try to find you a job.  Uh, you

18         were not allowed to just uh gallivant around the facility to look for jobs, uh

19         that was just you know…you're in prison you just don't have that, that luxury.

20         Uh, so it was the case manager's responsibility to try to find you a job.  Uh, on

21         numerous occasions, I would, I would have to find work…I'll either be told

22         from the case manager as well as (inaudible) I would see workers in the

23         hallway uh talk to them you know about a job…they'd say well you can't get

1        out there…it's not accessible you can't get out there and at that point you

2        know when you have a case manager telling you that you can't get out there

3        uh they're not going to allow you the opportunity to go out and see if you can

4        get out there or not.

5    EM:    and what was the kind of job that you were trying to see in which the case

6        manager said that you couldn't get out there?

7    DL:    Uh, I do not recall specific case manager; I had several (inaudible) at Fremont.

8        Uh…

9    EM:    I'm not asking for the case manager, I'm asking for the job you were trying to

10        do.

11    DL:    I was trying…at one point I was trying to get any clerical job within the

12        correctional industries portion of DOC.

13    EM:    I see.

14    DL:    at the Fremont facility.

15    EM:    All right.  Well let's talk about Territorial.

16    DL:    Okay.

17    EM:    At the Territorial facility, were you told you could not uh obtain a job because

18        you couldn't uh maneuver to the location where it was, or do the work?

19    DL:    yes.

20    EM:    and what job was that?

21    DL:    Uh, I remember asking for a job in the tab plant T-A-B, uh I recall asking

22        about the first job in the uh tag plant, T-A-G is in.  I don't know if you can get

23        Colorado's north end news of not but when I lived there they had the little tab

1        that you put in the corner of your license plate which would indicate the year

2        and the month you have to renew your license…

3   EM:   All right.

4   DL:   you had the tag plant where you made the license plates (inaudible).  They

5        were two separate uh jobs.

6   EM:   and you made requests for both of those and were turned down because of

7        your physical disability?

8   DL:   I would say I was turned down because I could not access the building that

9        they were in.

10  EM:   Could not access the building they were in?

11  DL:   Right.

12  EM:   Okay.  Uh, Mr. Leach have I covered those items which you have expressed to

13        me your concerns about after hearing testimony of other witnesses?

14  DL:   Uh, let see here…looking over my notes here.  Uh, (inaudible) I'm not sure

15        how, how…uh do I answer no and then try to elaborate or what…

16  EM:   If you have any other issues, if you have any other issues, this is your

17        opportunity to make them known.

18  DL:   Okay…uh, the uh…in regards to Mr. Bennett's testimony uh he testified that

19        the (inaudible) or that the industry section of Fremont was accessible, uh if

20        you refer to Exhibit number…

21  SM:   What is the industry section?

1   DL:   The industry section is where uh the Colorado Industries Program they

2         do…they have a number of uh opportunities…you can work in the carpentry

3         shop, metal products, uh…

4   SM:   Where, where is this?

5   DL:   This is, this is, is at Fremont, uh it's in a section that's uh at the south…

6   SM:   Okay…it's at Fremont…go ahead that's what I'm….

7   DL:   It would be in the southwest corner of the facility and you have to go to a

8         midway checkpoint to get there.

9   EM:   A midway what?

10  DL:   Midway checkpoint. (inaudible) facility…I don't remember (inaudible) I'm

11        not certain though

12  EM:   Is there anything in going through that midway checkpoint that you were

13        unable to do because of your physical disabilities?

14  DL:   Uh, yes…the accessible route to the area was not accessible.

15  EM:   Why not?

16  DL:   Uh, it was, it was not paved, it was uh a very rough route to go over in a

17        wheelchair, uh (inaudible) uh if you look again…if you look at Exhibit #7…

18  EM:   yes.

19  DL:   on page 3 of that document…

20  EM:   All right.

21  DL:   the second from the bottom, it's the carpentry shop.

22  EM:   All right.

1   DL:   Uh, it simple says that there is no access for persons having disabilities

2         because of safety issues.

3   EM:   Okay.

4   DL:   now although it does say that it would be very difficult to make this area

5         accessible…I, I, fail to understand the safety issues in regards to a clerical

6         position in working within the carpentry shop itself.

7   EM:   All right.

8   SM:   All right.

9   EM:   Thank you would you have…is there anything else?

10  DL:   Uh, Mr. Bennett indicated that the facility was moving towards compliance, uh

11        after we had done the the, the survey in 1992, uh however there is no date on

12        Exhibit #7 or Exhibit #6, uh I do not believe that that was factual.

13  EM:   All right.  Uh, would you explain just very briefly sir what your present

14        condition is as far as your ability to function today?

15  DL:   Uh, I am able to, to walk short distances on crutches, uh, I am able to in most

16        cases take care of myself with the exception of when I have to uh bend over or

17        uh put clothing on is difficult, uh preparing meals are difficult just for

18        standing, those types of issues.

19  EM:   All right.  Now you were recommended uh from the Spalding Rehabilitation

20        Center that you should have a twenty-four hour caretaker, were you not?

21  DL:   yes I was.

22  EM:   and why was that?

1   DL:   Uh, I had been having difficulties with uh, uh getting around the house that I
2         owned at that time and going grocery shopping and getting around the Denver
3         area on buses and those kind of access issues and the doctor that I was seeing
4         at that time suggested that I have an evaluation done by Spalding to determine
5         exactly what my needs were.

6   EM:   I see, has your condition changed since that time?

7   DL:   Uh, I would say overall no.

8   EM:   All right.

9   DL:   I have my good days and my bad days.

10  EM:   Okay.  All right, anything else you wish to say?

11  DL:   Uh, not that I can think of, no.

12  EM:   Thank you I have no further questions for this witness.

13  SM:   Cross examination.

14  JQ:   Now Mr. Leach when you came into the DOC system, you were in a wheel
15        chair as well were you not?

16  DL:   No I was not.

17  JQ:   and you could walk short distances at that time?

18  DL:   Yes.

19  JQ:   Okay, when were you first assigned a wheelchair, I believe it was in `89 or
20        `90?

21  DL:   Uh, somewhere in that time frame, yes.

22  JQ:   So, you came into the system in `89 correct?

23  DL:   I believe it was February, yes.

26

1   JQ:   Okay, so `from `90 forward you were in a wheelchair part of the time?

2   DL:   yes.

3   JQ:   Uh, Mr. Leach and we went through this before, do you recall having your

4         deposition taken in this case…the underlying case back in `96?

5   DL:   Yes I do.

6   JQ:   and when Mr. Moyer asked you if you had ever been told that you could not

7         have a job because you were in a wheel chair.

8   DL:   I do not believe that that's what I testified to sir.

9   SM:   Today?  You're talking about today?

10  JQ:   Today, yes.

11  SM:   Oh.  He may have misunderstood the time frame because you were referring to

12        his deposition, why don't you start over.

13  JQ:   you testified earlier today or just awhile ago that you were told by someone at

14        DOC that you could not have a job because of you were in a wheelchair,

15        because of your disability.

16  DL:   I was told that the, they jobs that were available uh that I'd seen were not

17        accessible.

18  JQ:   Well let…can you turn to uh Exhibit 12, page 45, line 24 and weren't you

19        asked the following question, you gave the following answer?  Let me ask

20        you, have you ever been told by anyone at any of the DOC facilities that you

21        can't have a job because your in a chair or because of some other disability

22        and you answer was no.

23  DL:   That's correct.

1    JQ:    and then further down the page, on page 46, uh you state at line 22 that you

2           thought about it and the more information I got regarding accessibility, I felt

3           that it would be a waste of my time to go over there and argue my point and

4           the next question you were asked was at page 47, line 4, so it's sounds to me

5           like you're saying you didn't, you didn't apply because the job was not there,

6           was physical barriers to, to the take the job even if it was offered to you and

7           your answer was yeah.  But you never applied and you never requested any

8           accommodations did you?

9    DL:    For that particular job?

10   JQ:    Yes.

11   DL:    How can I make that determination if I'm unable to go out and survey the

12          situation?

13   JQ:    Mr. Leach…that's not my question…you never requested any

14          accommodations did you?

15   DL:    I can't answer that question Mr. Quinn.  It's an impossible question to answer.

16          You don't' go to a job and…

17   JQ:    Mr. Leach…

18   SM:    Hold on.

19   DL:    determination of whether you can do the job without any, any

20          accommodations …you have to be able to look at the situation to determine

21          whether accommodation is needed or not.

1    JQ:    Mr. Leach my question was you never asked anybody about receiving an

2           accommodation so you could get out to the carpentry shop and seek one of

3           those positions.  It's a yes or no question sir…you either asked or you did not.

4    DL:    Pardon.

5    JQ:    you either asked for an accommodation or you did not…did you ask?

6    DL:    I did not ask for an accommodation because I could not get out there…to make

7           a determination as to whether an accommodation was needed.

8    JQ:    and you had the COPD write ups for uh basically every year you were

9           incarcerated, isn't that correct?

10   DL:    With the exception of 1994, that's correct.

11   JQ:    and isn't true that you need to be COPD report free before you're allowed to

12          go out to that shop?

13   DL:    I do not know.

14   JQ:    You need to COPD report free from one year before you're allowed access

15          outside the secured perimeter… isn't that true?

16   DL:    That's not true to my knowledge, because when I first assigned to Mr. Bennett,

17          I was in that area…that's where his office was first located, so yes I was

18          (inaudible) facility but that's not true.  Mr. Bennett's office was in the west

19          maintenance building which was out uh past the carpentry shop.

20   JQ:    and isn't it true that as an accommodation for that position, they allowed you

21          to keep a number of items in your cell with respect to your work with Mr.

22          Bennett?

23   DL:    yes.

1   JQ:   Uh, no further questions.

2   SM:   All right anything further?

3   EM:   Nothing further.

4   SM:   All right, any further witnesses from either side?

5   JQ:   No your Honor.

6   EM:   No further witnesses.

7   SM:   All right, the evidence is closed then.

8   EM:   Your Honor for the record at this time I would respectfully request permission

9        of the Court to modify the terms of the uh Complaint to comply with and

10       conform to the evidence which has been introduced in this case and as not for

11       proof I would submit that the evidence from the medical officer in question

12       establish that the claimant's injury uh which uh has caused him the most

13       trouble and is the most severe was caused by a fall in his cell.

14  SM:   Well that may be but the evidence also from the same witness that your

15       referring to, indicates that based on the report, the fall had nothing to do with

16       uh, uh issues relating to uh failures to accommodate or uh anything that would

17       relate to a claim in this case that I know of, but in any event, I've already ruled

18       on that matter, I'm not gonna uh…I'm not going to uh, uh consider that

19       particular claim so if that's the purpose for your motion it's denied.

20  EM:   Thank you your Honor….I was merely putting it on the record.

21  SM:   Okay…I mean I have no problem allowing the claims to conform to the

22       evidence, but when I've already ruled that certain claims can't be asserted, that

23       ruling stands.

1    EM:    Thank you your Honor.

2    SM:    All right, uh now do we want to make any closing statements or do you want

3           to just uh leave it to me to do my findings and conclusions?  Mr. Moyer.

4    EM:    Under the circumstances…

5    SM:    This is your chance to make a closing statement if you want to make it…

6    JQ:    or entertain written closings…

7    SM:    I don't think we need to do that.

8    JQ:    Okay.

9    EM:    I believe I'll simply waive the closing statement in this case your Honor.

10   SM:    All right.

11   JQ:    Uh, very briefly your Honor…

12   SM:    I'll let you respond to his opening statement then if you want to do that…yeah.

13   JQ:    What if I waive mine too then.

14   SM:    Well then there won't be any…so that's your choice.

15   JQ:    Uh, why don't we go home?

16   SM:    All right…the proceeding is closed I'll try and get findings and conclusions

17          out within the next couple days.  Thank you folks.

18   EM:    Thank you Duncan and I'll talk to you later.

19   DL:    Okay thank you.

20   JQ:    Good Luck to you Mr. Leach.

21   DL:    Thank you Mr. Quinn, have a good day.

22   JQ:    you too.

23   END OF TRANSCRIPTION'