...

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number 03-072
Category III
Claimant: John L. Sladek, #116680
Address of Claimant: P.O. Box 513, Saguache, CO 81149

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER came before the Special Master for hearing on Monday, January 23, 2006, 10:30a.m., at the office of Legal Resolution Center, Denver Corporate Center III, Suite 1100, 7900 East Union, Denver, Colorado. Present were the following: John L. Sladek, Claimant; Scott McKinsey, by telephone, witness for the Claimant; Brooke Meyer and Jess Dance, from the Office of the Attorney General, for Defendants; Cary Shames, D.O., witness for the Defendants.

Testimony was received from the following witnesses: Claimant; Scott McKinsey, by telephone; Cary Shames, D.O. Claimant submitted Exhibits marked "A" through "I" and Defendants submitted Exhibits marked "1" and "2." An Appendix of Exhibits is attached as part of this Order. At the conclusion of the hearing, the claim was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying

1

to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part as follows:

Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:

   I.    General inconvenience or nominal damages;
   II.   Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
   III.  Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
   IV.   Damages due to severe physical injuries; and
   V.    Damages due to death.

Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following findings of fact:

1.   Claimant submitted an initial claim on May 10, 2004 which was assigned claim number 03-072.

2.   Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

3.   Claimant is currently residing in Saguache, Colorado with a mailing address of P.O. Box 513, Saguache, CO 81149.

2

4. Proper notice of the hearing was given, and both Claimant and the Defendants appeared for the evidentiary hearing.

5. Claimant was in the custody of the Colorado Department of Corrections (CDOC) from approximately March 3, 2003 until his parole in July, 2005.

6. Claimant is diabetic.

7. Claimant has had Type I, Juvenile Onset Diabetes for 43 years. Prior to incarceration, Claimant's A1C blood sugar tests remained solidly below 6 which is normal for an "in control" diabetic. An "in control" diabetic typically has an A1C test result between 6 and 7. Claimant provided information that prior to incarceration, in February 2002, his A1C was 5.6 and in October 2002, his A1C was 6.5. Typically, Claimant keeps his diabetes under control with lots of exercise, many small meals and a vegetarian diet.

8. While in CDOC custody, Claimant indicates that his A1C was never below 7.0. He provided testimony that in August, 2003, his A1C was 7.4.

9. Claimant indicated that while in prison, he tried to no avail to get CDOC to keep him healthy. The dietician recommended that he have a late night snack of tuna and milk but canteen wouldn't comply. As a result, Claimant indicated that he suffered numerous hypoglycemic attacks. Claimant introduced a kite and resolution whereby his request for nighttime milk was granted. The kitchen, however, refused to provide the milk. On occasion, the police would help him to get the milk and some All Bran. Claimant also introduced a copy of a laminated pass allowing him to get nighttime milk. His testimony was that in spite of being "legal" he couldn't get milk from the kitchen and it was hard to get milk from the infirmary. Claimant indicated that his was a "three year and four month battle to stay healthy."

10. On August 8, 2004 and again on September 4, 2004, Claimant was given doses of insulin four times what he normally takes and that the insulin given to him on each of those two occasions was enough to kill him. Claimant also testified that he didn't always take his "sticks" to test his blood sugars because medical's timing was "off" which gave him false highs, so he did not test. Claimant also indicated that the insulin given by CDOC was "inferior" to that available on the outside.

11. As a result of the higher blood sugar during his incarceration, Claimant now suffers from night blindness and neuropathy in his hands. The hand neuropathy began to develop in 2004.

12. While in prison, Claimant worked as a gardener because he was "good at gardening" which, Claimant testified, was what he was in prison for. Claimant also worked in the dog program. He had no restrictions in the facilities. At Colorado Territorial Correctional Facility (CTCF), he took every program including: learning

3

Spanish, victim impact class, health class. Prior to his release, Claimant began to teach Spanish classes.

13. Claimant is an electrician by trade but, since he is on parole in Saguache, he is unable to practice his trade and is presently working in the wood mill. He seeks damages of $3,200.00 to get him what he needs medically.

14. Testimony was received that Claimant's failure to follow the prescribed diet and to take daily blood stick tests resulted in Claimant's diabetes not remaining in control. Additioanlly, the A1C test is a test for a 90-120 day average and does not measure the daily levels like a stick test does.

15. Testimony from Claimant's former roommate Scott McKinsey was received that when Claimant's blood sugar became low, he had problems talking and being functional. Claimant would have bizarre episodes at night and Mr. McKinsey had concern that Claimant would become violent during the episodes.

### III. CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and (c) the Americans with Disabilities Act.(ADA), 42 U.S.C. § 12101 *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

4

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, the Special Master finds and concludes that a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

The Special Master finds and concludes that Claimant Sladek is a disabled individual who is a member of the class. Claimant has diabetes.

3. The next question which must be answered is whether Claimant was qualified to participate in the programs or receive the benefits or services offered by the CDOC. There is nothing in the evidentiary record suggesting that Claimant Sladek was otherwise unqualified to participate in any program or to receive any benefit or services. As a result, the Special Master finds and concludes that Claimant Sladek has met this requirement of the ADA, the Rehabilitation Act and the Remedial Plan.

4. The third, and probably key issue before the Special Master, is whether Claimant was discriminated against by CDOC because of his or her disability. In order to establish discrimination in the context of the Remedial Plan, Claimant must demonstrate that he requested accommodation for his disability and that reasonable accommodation was denied. No evidence of discrimination was offered by Claimant. Quite the opposite is true. Claimant testified that he participated in every program at CTCF, had no restrictions, was provided milk for his diet and worked out regularly

5. It should be noted that many of Claimant's complaints relate to an alleged failure of the CDOC to provide reasonable medical care and treatment for his disability or to an alleged deliberative indifference of the CDOC to Claimant's medical needs. These claims are not cognizable under the Rehabilitation Act, the ADA or the Remedial Plan. *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005).

6. Since Claimant cannot prove that he was discriminated against, the analysis need not go further.

### IV. ORDER

WHEREFORE, based upon the foregoing Findings of Fact and Conclusions of Law, Claimant has not met his burden of proving his claim by a preponderance of the evidence and, therefore, his claim in this matter is DENIED.

IT IS FURTHER ORDERED that that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before July 9, 2006** with the Clerk of the United States District Court at the following address:

5

901 19th Street
Denver, CO 80294.

SIGNED this _9th_ day of May, 2006

BY THE COURT:

/s/ Richard C. Davidson

_____
Richard C. Davidson,
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this _9th_ day of May, 2006 to the following:

Mr. John L. Sladek #116680
P.O. Box 513
Saguache, CO 81149

Mr. James X. Quinn
Mr. Jess A. Dance
Ms. Brooke Meyer
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

/s/ Susan L. Carter
Susan L. Carter

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number 03-072
Category III
Claimant: John L. Sladek, #116680
Address of Claimant: P.O. Box 513, Saguache, CO 81149

---

## APPENDIX OF EXHIBITS

---

The following is a list of Exhibits introduced by CLAIMANT and ADMITTED into evidence in the above referenced claim:

EXHIBIT A: 1 page(2 sides)List of Reports and Incidents prepared by Claimant

EXHIBIT B: 1 page    Colorado Department of Corrections / Ambulatory Health Record for John Sladek dated 6/15/04 and 7/6/04.

EXHIBIT C: 1 page    Pink Request for Sick Call for J. Sladek dated 5/6/03 and White Request for Sick Call for John Sladek dated 8/24/04 both requests are stapled to one sheet of paper.

EXHIBIT D: 1 page    Laminated CTCF Medical Certificate for John Sladek dated 3/21/05.

EXHIBIT E: 1 page    Canary Request for Interview dated April 22, 2005 by John Sladek stapled with answer letter from Lt. Sandoval dated April 26, 2005 concerning dietary restriction.

EXHIBIT F: 1 page    CDOC Consultation Report Form for John Sladek dated

- 1 -

|  |  |  |
|---|---|---|
|  |  | 8/25/2004. |
| EXHIBIT G: | 1 page | Canary Request for Sick Call for John Sladek dated 8/24/04 and a handwritten note to the doctor dated 3/06/05. Both are stapled to one sheet of paper. |
| EXHIBIT H: | 1 page | Copy of CDOC Consultation Report Form for John Sladek dated 8/25/05. |
| EXHIBIT I: | 1 page | San Luis Valley Regional Medical Center admit and tests of blood sugars for Johnny Taft[1] in the year 2002. |

The following is a list of Exhibits introduced by Defendants and ADMITTED into evidence in the above referenced claim:

| EXHIBIT 1: | 22 pages[2] | A compendium of Department of Corrections Ambulatory Health Records for John Sladek. |
|---|---|---|
| EXHIBIT 2: | 2 pages | Canteen Sales Summary for John L. Sladek for 01/01/2003 - 01/18/2006. |

---

[1] Testimony was received on cross examination that "Johnny Taft" was an alias used by Claimant prior to his arrest. No dispute exists that Johnny Taft and John Sladek are the same person.

[2] The red numbers at the bottom of each page of this exhibit were made by counsel for Defendants. The numbers do not match as "7" was marked on each of two different pages.

- 2 -