IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 02-246
Category II
Claimant: Miranda Hassania, #109128
Address of Claimant: PMC, P.O. Box 3, Pueblo, CO 81003

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER comes before the Special Master on the claim of Miranda Hassania (Claimant). Claimant is incarcerated in the Colorado Department of Corrections (DOC) at the Pueblo Minimum Center (PMC) in Pueblo, Colorado.

This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of her claim. Defendants have filed a response to the claim. Claimant was given the opportunity to reply to the response of Defendants, but she has filed no further documents. Further argument will be waived.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

> The Settlement Agreement further provides, in part, as follows:
>
> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody 2001. Claimant was placed initially at the Denver Reception and Diagnostic Center (DRDC). She then was placed at PMC. The documents she has submitted reflect that she was placed at the Denver Women's Correctional Facility (DWCF) for a brief period of time.

Claimant filed two separate initial claim forms. Both were consolidated into one file. The first claim form is for mobility impairment. Claimant states, in part, as follows:

> At risk of damage to cerebrum & skull. Impairment of memory, also resultant fear and anxiety due to fragility of skull (weak spots referred to as "bird nests" by medical department). Tremendous headaches, frequent dizziness, pain. When pressed there are several placed on the upper left region of my skull which make "clicking" noises which I can hear & also feel. I am restricted minimal physical endeavor due to risk.

Claimant responded to the question concerning discrimination by DOC and its staff as follows:

> I was and am discriminated by my having a language barrier - I speak with an accent, and rather than taking time to clarify what I am saying, I am brushed aside. I can speak and understand English if it is spoken slowly and clearly. When I spoke with Dr. Wormers (at PMC) & also Ms. Holloway about this problem and was poked fun of, and laughed at, I was degraded, felt helpless; left to fend for myself.

In the second initial claim form, Claimant checked the box for vision impairment. She stated, in part, as follows:

> Cancer of female organs, cervical cancer, ovarian, tubes, etc. I am in need of a complete hysterectomy. Brain tumor, asthma, hypertension (chronic). I had three brain tumors removed. Retains fluid in at side from brain surgery.

Claimant goes on to indicate that she has had deliberate indifference to some medical problems. She indicates further that she has a French accent and that people will not take time to listen to her.

In the supplemental form for mobility impairment, Claimant states, in part, as follows:

> Dizziness, falling over objects I can't see, legs and knees. Weak memory.
>
> I can't walk long distances to programs. They deny pillows for positions, cane and other devices for stabilization.

On her supplemental form for vision impairment, Claimant states, in part, as follows:

> Blurry vision causing mobility problems.
>
> Causing dizziness, ringing in the hear, staggering and difficulty in reading and writing. I am having more mobility problems now.

Claimant also submitted in conjunction with her supplemental forms a memo, dated January 18, 2005, from Cheryl Neumeister, LPC which reads, in part, as follows:

> I first encountered Ms. Hassania upon her arrival to PMC 11-21-02. She has been previously treated for major depression, psychosis NOS, and mood disorder. The last two diagnosis were likely secondary to meninogomia, or a type of brain tumor.... She has been very forthcoming to request mental health intervention when she's depressed or anxious and it's been apparent that most of her symptoms are related to the possibility of further complications stemming from the removal of the tumor or having it come back somehow; she recently did have to have another surgery to rule out another tumor and she came to me before and after to enhance her coping strategies.

Defendants' response to the claim contains no medical or other records. It is more of a motion to dismiss than a response. Defendants have placed upon Claimant the burden of proof to establish her claim. As noted before, Claimant was given the opportunity to file a reply to the response, but she has not filed anything further.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant has checked the boxes for mobility impaired and vision impaired. The question then is whether she meets the criteria as set by the Settlement Agreement. Each claimed impairment will be examined.

**Vision Impairment**: Claimant has stated that she has blurry vision and some difficulty in seeing. It appears that the vision problems are related to the removal of the tumors from her brain.

The criteria for vision impairment is set forth in the Settlement Agreement. It is as follows:

> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

To be blunt, a claimant must be legally blind in order to meet this criteria. As of the issuance of this

Order, no claimant has yet to meet the vision impairment definition.

Claimant has not presented any evidence which reflects that she is permanently blind or has vision that cannot be corrected to 20/200. Her statements reflect that she is able to see, but with some difficulty. Claimant has not proven that she meets the criteria for vision impairment and this part of her claim will be dismissed.

**Mobility Impairment**: There is no question that Claimant has significant health issues. She has had several tumors removed from her brain. She had surgery in early 2005 to rule out another tumor. She has legitimate concerns about soft spots in her skull and the future of her health.

The Settlement Agreement provides a very narrow qualification for mobility impairment. Permanent mobility impairment is limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." There has been no evidence presented that Claimant is in a wheelchair full or part-time.

Claimant does not have a permanent lower extremity impairment. The evidence presented by Claimant establishes that she has motor issues related to her brain surgery. She may fall over objects due to instability. In order to fall under the criteria of the Settlement Agreement, Claimant must establish that she has a permanent lower extremity condition that limits her ability to walk. Claimant has not established such a condition.

The Special Masters are bound by the definitions in the Settlement Agreement. Claimant may well have a condition that is protected by the ADA and Rehabilitation Act. Her remedy is to pursue separate litigation. She has not established that any condition falls within the definitions of the Settlement Agreement.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?**  The answer to this question is yes. Nothing presented by Defendants reflected that Claimant could not participate in any programs or serves due to other issues, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The answer to this question is no. There is no evidence that DOC staff have discriminated against Claimant due to a disability.

Claimant sets forth at several locations in her documents that she has been treated poorly by DOC staff because she speaks English with an accent. She states that staff will not speak slowly or take the time to understand her. This problem is not one that comes under the ADA or Rehabilitation Act. There may be other laws that protect Claimant, but the Special Master has no jurisdiction over

any such claim. [2]

Claimant has concern also with the quality of medical care that she has received. There is no question that she has received some care. The United States Court of Appeals for the Tenth Circuit ruled on April 11, 2005 that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). The ruling in *Fitzgerald* is now controlling law in this jurisdiction. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under either the ADA or Rehabilitation Act. All claims for substandard medical care must be brought under the Eighth Amendment or pursuant to state statutes.

Claimant does not meet the narrow criteria for mobility impairment under the Settlement Agreement. Her remedy is to file a separate lawsuit, but she may not pursue her claim.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #1 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Miranda Hassania is denied, as she has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before August 21, 2006.**

SIGNED this 6th day of June, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

Richard M. Borchers
Special Master

---

[2] The Special Master can appreciate Claimant's concerns. This Special Master does speak French, but has had problems with his accent over the years. Communication in a second or third language can be extremely frustrating, especially when it involves a matter of concern.