IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-157
Category III
Claimant: Thomas C. Snyder, #57207
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on June 15, 2006. This hearing was held at the Fort Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Thomas C. Snyder (Claimant); and Berina Ibrisagic, attorney for Defendants.

Testimony was received from the following witnesses called by Claimant: Don Larson; Sergeant Cory Burnett; Lieutenant Daniel Strong; and Claimant. All documentation previously submitted by both sides was accepted. Defendants offered into evidence Exhibit A, and that was admitted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>     A. COVERED DISABILITIES
>     The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

>The Settlement Agreement further provides, in part, as follows:
>
>>2. Permanent Hearing Impairments
>>Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
>>3. Permanent Vision Impairment
>>Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
>>4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
>>Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>>1. Is the claimant a disabled individual who is a member of the class?
>>2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. The Special Master will detail briefly the testimony elicited from the witnesses called by Claimant.

Lieutenant Daniel Strong testified that he knows Claimant from work in food service. Claimant does have a cane, but Lt. Strong had observed Claimant walking without a cane. He was aware that Claimant would take breaks during his work shift. Claimant's work shift is from 2:00 p.m. to 7:00 p.m.

Sergeant Cory Burkett works an the day shift in Cell House 4 at FLCF. He recalled a conversation with Claimant concerning a lower level room and bunk. Burkett testified that the cell house has an elevator for those who cannot climb stairs. Burkett noted that Claimant had been moved back downstairs for medical reasons. Claimant was upstairs for a period of time because of lack of room availability. Burkett also stated that an officer was always available to allow use of the elevator.

Donald Larson is a physician's assistant employed by DOC. He testified that he did not know Claimant and had not treated him. He discussed in general terms the condition known as gout. It is a condition that can be quite painful and could damage a joint. He further indicated that gout is a condition that has ebbs and flows. It can be controlled with medication. Sometimes gout will go into remission.

Claimant testified that he first came into DOC custody in 1987. He was paroled in 1988 and discharged his sentence on April 8, 1989. Claimant returned to DOC custody on October 14, 1992. He was placed initially at the Denver Reception and Diagnostic Center (DRDC). He then spent the bulk of his sentence at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. He was placed into a community placement, but returned to incarceration in pre-release. He discharged his second sentence in February, 1994.

Claimant returned to DOC custody on June 6, 1997. He was placed at DRDC for evaluation and then went to the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. Claimant was at AVCF from June, 1997 to the end of October, 1997. He was placed on intensive supervised parole and discharged his sentence.

Claimant returned to DOC custody on January 6, 2000. He was placed at DRDC for evaluation and then went to CTCF for a short stay. He then was transferred to the Huerfano County Correctional Center (HCCC) in Walsenburg, Colorado. Claimant was at HCCC for about six months. He was placed then into pre-release and discharged his sentence in April, 2001.

In November, 2001 Claimant returned to DOC custody. He was placed at DRDC for a short

period of time and then went to CTCF. He was at that facility for 1 week and then was placed at the Four Mile Correctional Complex (FMCC) in Canon City. He was at FMCC for a short period of time and then was placed into a community program. He walked away from his community placement. He returned to DOC custody on April 24, 2002. He then was placed at the Buena Vista Correctional Complex (BVCC) at Buena Vista, Colorado. He was at BVCC until March 18, 2003. Claimant then was transferred to the Crowley County Correctional Center (CCCF) in Olney Springs, Colorado. He was paroled on January 3, 2005. Parole later was revoked. Claimant then was placed at Kit Carson Correctional Complex (KCCC) at Burlington, Colorado. He remained there until released to a community placement in October, 2005. Claimant regressed to the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado.

Claimant was placed then at FLCF. Claimant testified that he did not know why he had been placed at FLCF.

Claimant testified that while at CCCF he began to experience serious problems caused by gout. He thought that he had a broken bone because of the pain. He tried to get help, but with little success. He began using a cane to help with his stability. Claimant tried to get medical personnel to help with his condition. Claimant testified that he has made repeated efforts to obtain proper care, but without any success.

At some point, Claimant began experiencing gout attacks which would last for three to four days. He was and is receiving medications for his condition. He has been advised that the medications will continue forever. Claimant testified that he could not walk at times because of his condition and pain. Attacks are occasional, but basically paralyze Claimant in his daily activities when they hit.

Claimant also has a failing kidney. Claimant believes that his diabetes has something to do with his kidney condition. Claimant testified that he did not receive appropriate shoes, especially in light of a recommendation for medical shoes.

On cross-examination, Claimant acknowledged that his first request for help with his gout was in May, 2003. Claimant had problems with his foot and could not climb a flight of stairs without stopping.

Upon arrival at FLCF, Claimant received a job in the kitchen. He was unable to use his cane at the kitchen because of safety concerns. Claimant testified that he has a limp when he walks, even when not using his cane. He also has to take frequent breaks. Claimant testified further that he has manic attacks that sometimes will hit him.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant checked only the box for mobility impaired on his initial claim form. He bases his claim on his gout which affects him on a periodic basis.

In order to establish a mobility impairment claim, a claimant must meet the definition set forth in the Settlement Agreement. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." There was no evidence presented by either side that Claimant was using a wheelchair full or part-time on or before August 27, 2003. Claimant does not fall under the first part of the definition.

Claimant has substantiated that he has gout. Claimant also has substantiated that this condition is permanent, but can be controlled with medications. Claimant also has testified as to the difficulties he has walking when a severe attack hits him. The Special Master determines that Claimant did have a lower extremity condition on August 27, 2003 that was permanent and affected his ability to walk. Claimant is part of the class as mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Even if Claimant met the definition of mobility impairment under the Settlement Agreement, there is no evidence of discrimination under the ADA and Rehabilitation Act. Claimant's complaint is the quality of medical care provided to him over the years while in DOC custody.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

In light of the *Fitzgerald* decision, a claimant must show that he was the subject of discrimination prohibited by the ADA and Rehabilitation Act. An example would be being placed

into a facility that had no ramps for wheelchairs or not providing braille educational resources for a blind inmate. Claimant has raised concerns about his medical care that are not frivolous. These cannot be raised as part of the claim process in light of *Fitzgerald*.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Questions #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Thomas C. Snyder is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before September 17, 2006.**

SIGNED this 28th day of June, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*
_____
Richard M. Borchers
Special Master