IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 02-222
Category II
Claimant: Epifanio Nieto, Sr. #116453
Address of Claimant: FCF, P.O. Box 999, Canon City, CO 81215-0999

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

THIS MATTER comes before the Special Master on the claim of Epifanio Nieto, Sr. (Claimant). Claimant is incarcerated in the Colorado Department of Corrections (DOC) at the Fremont Correctional Facility (FCF) in Canon City, Colorado.

This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of his claim. Defendants have filed a response to the claim. Claimant was given the opportunity to reply to the response of Defendants, but he has filed no further documents. Additional argument will be waived.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

        B. QUALIFIED INMATE
Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
        C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." This definition controls as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals that involve mobility impairment.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>     1. Is the claimant a disabled individual who is a member of the class?
>     2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>     3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>     4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into the custody of DOC on February 5, 2003. He was placed at the Denver Diagnostic and Reception Center (DRDC) initially. He then was transferred to FCF in Canon City, Colorado.

Claimant checked only the box for mobility impairment on his initial claim form. Claimant stated, in part, as follows:

> Arthritis in both knees. I arrived at DRDC at Denver on 25 Feb. 03. At this time I was given a medical for special shoes, but a PA named Jasmin. I was transferred to Cell House 5 at Canon City on 10 Mar. 03. And I was given a pair of size 10 ½ shoe, so that I no longer had to walk on the outside of my shoes. I was transferred to Fremont Facility on 02 Apr. 03. And I struggled to get the right pair

3

of shoes.

My first Dr. appt. here at this facility was 25 Apr. 03. I have a bad case of planter's warts on the ball of my feet. And I also have worn bursa sacks in my shoulders. These problems I had a family physician taken care of me. Dr. Timothy Hopf (internal medicine Cherry Creek). I was x-rayed 29 Apr 03 shoulders, Another dr. appt. 05 May 05. 16 May 03 discuss x-rays 21 may03. The P.A. here Connie Batson took me off the bottom tier restriction and I was moved to B pod cell #208B on 28 July 03. On 03 Aug. 03 I called my ex-wife in La Junta, Co to fax all my medical files to the facility. I was finally given a pair of special shoes 08 Aug 2003. On 09 Sept. 03 I was x-rayed on my knees.

In response to the question on the initial claim form concerning discrimination by DOC or its staff, Claimant stated as follows:

To start they could have given me the appropriate shoes. And they could have given me shots for my shoulders. While I was in DRDC in March. They could have given me my medication that I was on and not changed to their brands. And saved my some discomfort and bleeding stomach. And Ms. Batson could have left me on my restrictions and gone by my records not an appearance. She said you look fine to me! And the medical department could have looked at my feet sooner.

Claimant filed a supplemental form for mobility impairment. He indicated that a lower bunk restriction had been put back into effect. He stated that he had chronic pain that was getting worse. He still was having trouble getting the right size of shoe. He had a fear of falling on stairs when he was placed on a second tier at FCF by Ms. Batson.

In a subsequent letter, Claimant indicated that arthritis was affecting his wrists and elbows, as well as his knees. He also was having trouble getting to sleep because of his pain.

Defendants' response attached several medical records of Claimant. An x-ray on September 9, 2003 reflected that Claimant does have degenerative joint disease. Those records reflect that Claimant did receive some medical care while at FCF.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant checked only the box for mobility impairment. Claimant does carry the burden to establish that he was mobility impaired during the time he was in DOC custody.

In order to establish a claim, a claimant must provide evidence that he or she has a permanent disability that will not improve within six months. Permanent mobility impairments are limited to

4

"[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." The Settlement Agreement is binding upon the Special Masters, and there is no discretion to expand the categories of disabilities or the definitions of those disabilities.

Claimant has established that he came into DOC custody with knee problems. The evidence also reflects that he has difficulty walking due to the arthritis in the knees.

The Special Master finds that Claimant has established that he has permanent lower extremity condition that affects his walking. Claimant is a member of the class because of his mobility impairment.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** There is no evidence that Claimant was prohibited from having access to programs and services for disciplinary or other reasons. Claimant was qualified to participate in DOC programs and to receive DOC services.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The answer to this question is no. Claimant has shown no denial of access to programs or services that was the result of discrimination based upon his physical condition with bad knees. The rescission of the lower bunk restriction and the problem with the right size of shoe were not based upon a discriminatory animus.

Claimant's real concerns are with the medical care provided to him in DOC. Claimant has expressed concern about the medical and vision care that she has received. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice.

Claimant has not established that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003. Claimant retains the right to bring a separate lawsuit if he believes that he received inappropriate or substandard medical care.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** This question does not need to be reached in light of the no answer to the third question.

IT IS HEREBY ORDERED that the claim of Epifanio Nieto, Jr. is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before September 25, 2006.**

SIGNED this 6th day of July, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master