IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-234
Category III
Claimant: Rex Rhorer, #60918
Address of Claimant: 10051 Dallas Street, Henderson, CO 80640

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER came before the Special Master for hearing on June 9, 2006. The hearing was held at the offices of Legal Resolution Center, Westminster, Colorado. Present were the following: Rex Rhorer (Claimant) and Celia Randolph, attorney for Defendants.

Testimony was received from Claimant. All documentation previously submitted by both sides was accepted. Claimant offered into evidence Exhibits 1 through 8. Defendants offered into evidence Exhibits A through D, and all were admitted. Final closing arguments were presented. This case then was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." This definition is controlling on all claims filed by individuals who believe that they have a mobility impairment.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>>1. Is the claimant a disabled individual who is a member of the class?
>>2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. The Special Master has considered all testimony presented, along with the documents submitted by both sides.

Claimant came into DOC custody on August 3, 1993. He was placed initially at the Denver Reception and Diagnostic Center (DRDC) for evaluation. He was at DRDC for three weeks and then was placed at the Fremont Correctional Facility (FCF) for two years.

Claimant was transferred then to a private correctional facility in Appleton, Minnesota. He was there for almost four years. He was transported to and from Minnesota by van. Claimant returned to Colorado and was placed into the Crowley County Correctional Facility (CCCF) in Olney Springs, Colorado. This facility is private and operated by Corrections Corporation of

America (CCA). Claimant remained at CCCF for two years.

On January 5, 2000, Claimant was transferred to the Four Mile Correctional Facility (FMCC) in Canon City, Colorado. He was there for only two and one-half months. He then was transferred to the Huerfano County Correctional Facility (HCCC) in Walsenburg, Colorado. HCCC is a facility owned and operated by CCA. He then transferred to the Sterling Correctional Facility (SCF) in Sterling, Colorado. He was transferred to the Kit Carson Correctional Center (KCCC) in Burlington, Colorado in 2001 and remained there for nineteen months. He was transferred finally to the Arrowhead Correctional Center (ACC) in Canon City, Colorado. Claimant was paroled in 2005 from ACC.

Claimant has had problems with his knees for some period of time. He began to have difficulties in walking because of his knees. He initially was told by DOC medical staff that nothing was wrong with his knees. He then was advised that he was experiencing minor degeneration in his knee. He was sent at one point to Denver Health Medical Center (DHMC) for an evaluation. Because of the constant pain, Claimant was taking Motrin on a daily and excessive basis. He was not able to get anything stronger for his pain.

On October 29, 2002, Claimant suffered an injury. He could not move his leg. He was advised that it probably was a pinched nerve. Claimant discussed with medical what could be done and received a cane to allow him to get around.

Claimant was scheduled for arthroscopic surgery on his knee. That did take place, but Claimant was advised that he would need a total knee replacement. Claimant testified that he was placed into an M-2 medical status. He had difficulty in finding employment at the facilities he was placed into, and he believed that this was the result of his physical condition. He also was placed into second floor rooms which were difficult to reach by stairs.

Claimant testified that he could not walk because of his knee problems. He had secured work as a vocational janitor, but that was difficult for him to do because of standing and walking. He was also assisting with a class. The teacher did not appreciate Claimant's medical level. Claimant requested a new job, but had to make a posting on the job board. Eventually he was terminated from his position in the class. It took some time before other work was found, and Claimant believed that this was based upon his medical condition.

Claimant was advised that he was going to have knee replacement surgery. This ultimately took place on March 8, 2005 at St. Thomas More Hospital in Canon City, Colorado. The surgery had complications as the result of a reaction to the anesthesia. Claimant was placed in the infirmary at the Colorado Territorial Correctional facility (CTCF) in Canon City, Colorado.

Claimant then was returned to ACC but was placed in segregation. He then was directed to continue his work as a porter. He was given the job to clean a three-tier stairwell. He did the job, through not physically able to do it. Claimant was finally released from segregation status. He was released to a community placement on May 11, 2005. The community placement was part of the

parole process.

Claimant indicated that he received no physical therapy after his knee replacement surgery. Prior to the replacement surgery, Claimant testified that he had to have his knee drained once per month.

On cross-examination, Claimant stated that he had concerns with the medical care that he had received. He acknowledged that he had received a total knee replacement. In response to a specific question from counsel for Defendants, Claimant testified that he had received substandard medical care. He further testified that his medical level had been raised and that he was unable to obtain a gate pass at ACC which would have provided more employment opportunities for him.

After his knee surgery, Claimant received crutches to use. He also was provided a cane that he used on occasion. After the surgery, Claimant testified that he was denied certain jobs. In response to a specific question, Claimant said that he had shot baskets at the gym but was not able to play basketball. He also said that he lifts weights for his upper body strength.

Review of all medical records submitted by both sides confirmed that Claimant had problems with his knees for years. He did have arthroscopic surgery on December 20, 2002. This was followed by a total knee replacement on March 8, 2005.

### III.

A claimant must establish that he was a member of the class as of August 27, 2003 and had been subjected to discrimination prohibited by the ADA and Rehabilitation Act on or before that date. If a claimant establishes these requirements, then acts of discrimination after August 27, 2003 may be considered as part of the claim process.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** The most important question is whether a claimant is a member of the class. The Special Master is bound by the Settlement Agreement and its definitions.

Review of all records indicates that Claimant had serious knee problems that grew worse over the years. The knee problems were the result of degenerative changes. The arthroscopic surgery did not correct the problem. As a result, Claimant underwent a total replacement of his left knee on March 8, 2005.

Review of all medical records and the testimony of Claimant leads to the finding that Claimant had a permanent lower extremity condition on August 27, 2003. This condition affected his ability to walk. The Special Master finds that Claimant is a member of the class as mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides and as related to the date of August 27, 2003, the answer to this question is yes. Other than health issues on that date, there does not appear to have been any disqualification from programs, benefits, or services. Claimant had no major disciplinary problems.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** In order to establish this point, a claimant must prove that he was denied programs or services because of his disability. In other words, there must be a showing of disparate treatment. An example could be a showing that a claimant who is wheelchair bound was placed into a facility that was unsuitable for such inmates and he was denied the opportunity to participate in programs that were available to non-wheelchair bound inmates.

A substantial portion of the case presented by Claimant relates to the medical care he was provided while in DOC. Claimant's initial allegations were set forth in his claim form. He stated as follows:

> I have severe arthritic condition in my left knee. I injured it in October 2003. I had to walk around on it for 2 months. I had a broken piece of bone floating around in my knee the whole time. I finally went in for surgery on Dec. 22nd of "03". The Ortho stated to me at that time that if he could have gotten my knee when this happened it wouldn't have been as bad as it was. My knee is in really bad condition. I continue to have problems with the knee which are not being addressed (i.e., continually getting water on the knee which I literally have to beg to have drained. I currently have been requesting it be drained for nearly four months at this writing). Because of this I am unable to properly exercise and have gained a significant amount of weight which is compounding my problem. I am also in constant pain.

In the initial claim form, Claimant responded to the question concerning discrimination by DOC and its staff as follows:

> Because of the lack of treatment relating to my knee I can not actively participate in recreational activities. I have been denied certain jobs because I can not stand on my leg for prolonged periods of time. In addition to this my condition is worsening and my knee continues to deteriorate making it hard to climb stairs and generally move around without extreme pain and discomfort.

Claimant testified at the hearing that he was always concerned with his physical condition, as his knees hurt and were not working as they once did. The medical records certainly substantiate that his left knee was in bad shape and ultimately had to be replaced.

Claimant's case, as well as others alleging inadequate or substandard medical care, was affected by the decision in *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). The United States Court of Appeals for the Tenth Circuit ruled that the ADA and

Rehabilitation Act are not available for claims of substandard medical treatment. Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement.

The documents submitted by Claimant establish that he did receive medical care while in DOC custody. He had arthroscopic surgery and a knee replacement. Claimant has questioned the adequacy and propriety of that care. Determination of the appropriateness of medical care is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant's concerns about his medical care may be raised in a separate lawsuit. Under the *Fitzgerald* decision, Claimant cannot pursue issues of medical negligence or malpractice through this claim.

As mentioned previously, a claimant must establish that he was the subject of discrimination because of his disability on or before August 27, 2003. Claimant testified at length concerning his termination from a job in early 2005. He was working as a tutor in a classroom. Claimant believes that he was terminated because of his physical condition that precluded him from doing a job that the teacher requested. The Special Master may only consider this incident if there has been established a violation of the ADA on or before August 27, 2003.

Claimant has testified that he believed that he was the victim of discrimination prior to August 27, 2003. Claimant testified that his major problems commenced with the injury on October 29, 2002. Though there was evidence that the left knee was having problems, there was no testimony concerning any specific discriminatory act prior to this date that was unrelated to medical treatment. From October 29, 2002 to August 27, 2003, Claimant's concerns were directed to his medical care. There is no question that Claimant was in pain during this period of time. There was insufficient evidence to establish a violation of the ADA and Rehabilitation Act during this period of time. Under *Fitzgerald*, the Special Master cannot consider issues concerning the adequacy of medical care and whether malpractice took place. Since Claimant did not establish a violation of the ADA and Rehabilitation Act prior to August 27, 2003, the Special Master may not consider actions that occurred after that date.

As mentioned previously, Claimant is not precluded from pursuing claims concerning his medical care through a separate lawsuit. The Special Master has not drawn any conclusions concerning that care. Under *Fitzgerald,* Claimant may not pursue medical claims through this claim process.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**
This question does not need to be answer in light of the negative answer to Question #3.

IT IS HEREBY ORDERED that the claim of Rex Rhorer is denied, as he has failed to

answer affirmatively each of the four questions set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before September 25, 2006.**

SIGNED this 6th day of July, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master