IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 03-226
Category III
Claimant: Charles R. Cunningham III, #112847
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master on July 21, 2006 for hearing at the Fort Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Charles R. Cunningham III (Claimant) and Jess Dance, attorney for Defendants.

Claimant testified in support of his claim. Claimant offered no exhibits. Defendants called the following witnesses: Dr. Orville Neufeld, D.O.; Lynn Erickson, R.N.; William Beard; and John Breidenbach. Defendants offered into evidence Exhibits A through N. All were admitted. After closing arguments, the case was taken under advisement. This order will constitute the final resolution of this claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.

> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

B. QUALIFIED INMATE
Inmate with a permanent disability/impairment which substantially
limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
1. Is the claimant a disabled individual who is a member of the class?
2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

This claim was placed into Category III, and Claimant was entitled to a hearing. The Special Master has reviewed the testimony presented, all exhibits submitted, and all written documentation filed prior to the hearing.

Claimant came into DOC custody on April 15, 2002. He was evaluated initially at the Denver Reception and Diagnostic Center (DRDC). Claimant was at DRDC for approximately ten days and then was transferred to the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. While at AVCF, something occurred that led to a disciplinary conviction for Claimant and a transfer to the Colorado State Penitentiary (CSP) in Canon City, Colorado. It is unclear exactly what transpired and the disciplinary conviction has only limited impact on the issues surrounding this claim. Claimant was transferred to CSP in April, 2003 and remained there until December 10, 2004. He then was transferred to FLCF.

3

Claimant was involved in an automobile accident in the mid-1990's. He testified that this was in conjunction with military service. As a result of the accident, Claimant suffered back injuries. He underwent surgery to repair a disk. Those injuries have continued to create problems for Claimant, and he has been in pain since.

Claimant testified that his medical condition has led him to undergo treatment for his pain. He has undergone nerve blocks in the lower back, but with limited success. When he first arrived at CSP, he was receiving Tylenol 3 for his pain. DOC then changed its rules and prohibited narcotic pain medications. As a result, Claimant was left with using basic over-the-counter pain medications.

Claimant testified further that his knees are now giving him problems. Claimant is 6'7" tall and weighs well over three hundred pounds. His right knee will swell up. Claimant has sought medical treatment and relief from his pain on a continuing basis.

While at AVCF, Claimant was allowed to use a cane. After his transfer to CSP, Claimant began using a wheelchair full-time in May, 2003. He continues to use the wheelchair at this time. Claimant testified that he cannot put any weight on his back and has fallen when attempting to stand up. Claimant stated that he was referred to Dr. Jacob Patterson, M.D., an orthopaedic surgeon, and was advised by him that he would need knee replacements. Dr. Patterson did administer steroid injections.

Claimant testified that he was prohibited from having a wheelchair in his cell at CSP. As a result, he would have to crawl to the door slot to get food, mail, or other things. He stated that he had been laughed at by correctional officers and denied medical care.

Upon his transfer to FLCF, Claimant requested to see a neurosurgeon. That has yet to occur. An attempt was made to take his wheelchair, but that was overridden by Dr. Beecroft. He has continued to seek additional medical care.

On cross-examination, Claimant acknowledged that his major complaint stems from the medical care that he has received in DOC. Claimant also testified the he was trained as a baker at AVCF but has been unable to work in this job at FLCF. He believed that this was discrimination, as the head of the FLCF food service indicated that a wheelchair would not work in the close confines of the FLCF kitchen. Claimant stated that it has been hard to find work because he is in a wheelchair. He works rolling flat wear for the kitchen.

Claimant testified that he believed that he was not provided proper medical care at CSP. He acknowledged that he was in a wet cell at CSP and an ADA cell at FLCF. He reiterated his desire to obtain relief from the pain that is constant.

Defendants presented several witnesses. Ms. Lynn Erickson, R.N. was called by telephone as a witness. Ms. Erickson is the Health Services Administrator at CSP. She testified that she did not treat Claimant while he was at CSP and only remembered his name. Sergeant John Breidenbach oversees one of the housing sections at CSP. He recalled Claimant as big, tall, and lazy. He testified

that Claimant always was complaining. He did not recall Claimant ever falling while at CSP. Sergeant Breidenbach did recall Claimant having difficulty in walking. He stated that CSP policy precludes an inmate from having a wheelchair in his cell at CSP.

Mr. William Beard testified that he was the case manager for Claimant at CSP. He recalled that Claimant was in a wheelchair and that there were medical issues. He did not recall anything about Claimant falling or having to crawl. He did recall that Claimant had to lean against the wall in order to support himself.

Dr. Orville Neufeld, D.O. testified concerning Claimant's medical issues. Claimant has had a variety of tests while in DOC custody. Dr. Neufeld stated that the objective findings related in the medical records do not substantiate Claimant's need to use a wheelchair. He further stated that the wheelchair was provided to Claimant as a "litigation avoidance" measure. Dr. Neufeld offered his opinion that Claimant is a malingerer. He saw no basis to believe that neurosurgery would resolve the pain problems. On cross-examination, Dr. Neufeld acknowledged that there is scar tissue due to the surgery on the back in 1996 due to motor vehicle accident. Dr. Neufeld indicated that Claimant should be able to walk again.

In rebuttal, Claimant testified that he did have limitations. At CSP he could not reach his television without having pain. He requested a wedge pillow and did not receive it. He stated that he could not fake pain for two and one-half years. He acknowledged that he needs to lose weight because he weighs one hundred pounds more than when he came into DOC custody.

Review of the medical records submitted by Defendants reflects a view by DOC medical staff that Claimant should be able to walk. Claimant testified that he believed that some of the entries in his medical records were false.

### III.

The Settlement Agreement was approved on August 27, 2003. It was on that date that the class was set by Judge Nottingham. The Settlement Agreement provides that an inmate or former inmate who was in custody on or before August 27, 2003 may file a claim seeking damages or other relief. The claimant must show that he had a listed disability on or before August 27, 2003 and was the victim of discrimination prohibited by the ADA and Rehabilitation Act. If such discrimination is established, then a claimant may amend his claim to reflect discrimination subsequent to August 27, 2003.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?**  There is no dispute that Claimant has been using a wheelchair since May, 2003. Defendants have attempted to cast doubt on Claimant and have argued that he should be able to walk. Defendants have gone as far as to label Claimant as a malingerer.

Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." A permanent disability is one that is not expected to improve for six months.

Claimant was in a wheelchair on August 27, 2003 and had been since May of that year. He remains in a wheelchair. The Special Master determines that Claimant was mobility impaired on August 27, 2003. Therefore, he is a member of the class.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Claimant had a significant event at AVCF in April, 2003. His transfer to CSP reflected a DOC decision that he was not able at that point to be at a facility in general population.

CSP is the facility with the most limitations on inmates. As a result of the transfer, and Claimant does not deny that this was the result of his actions, Claimant was placed into a facility where programs and services would be curtailed. The Special Master is thus limited to examining the basic services that did exist for CSP inmates on or before August 27, 2003.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** In response to a question from the Special Master, Claimant stated that he had no major complaints concerning his treatment in DOC up through the time of his transfer to CSP in April, 2003. Claimant was in pain, but he was able to walk with the assistance of a cane.

The question then is whether Claimant has established that he was subjected to prohibited discrimination during the time period of April, 2003 to August 27, 2003. The Special Master does not find that to be the case. Claimant began using a wheelchair in May, 2003. He testified that he was not able to keep a wheelchair in his cell, but he did receive use of a wheelchair while outside of the cell. A wheelchair has been available to Claimant since.

Claimant's concerns relate to his medical care. He has requested help in obtaining relief from the constant pain he is experiencing. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning quality of the medical care provided to him, that is beyond the jurisdiction of the Special Masters.

Claimant maintains that he is in constant pain, and the Special Master finds that to be case. Under the *Fitzgerald* decision, the Special Master has no power to order any specific course of

medical treatment. Claimant has received medical care while in DOC custody, including receiving outside evaluations. This treatment has not alleviated the pain for Claimant, and he believes that it has been substandard.

The allegations that Claimant was unable to use a wheelchair in his cell at CSP are troublesome, but there was no showing that such preclusion was discriminatory. The Special Master is aware that inmates at CSP are locked down for twenty-three hours per days and housed individually. There was no evidence presented by Claimant that he could have used the wheelchair within the cell.[2] The evidence submitted by both sides reflects that Claimant was able to use a wheelchair while outside of his cell at CSP.

Claimant may have a valid claim concerning the quality of his medical care. Claimant is not precluded from pursuing a separate lawsuit under the Eighth Amendment or state statute to seek additional or different medical care. Claimant will carry the burden to show that something more than a difference of opinion concerning his care exists. Claimant did receive medical care, and the Special Master finds that *Fitzgerald* controls all of Claimant's claim. As a result, there is no jurisdiction to determine the propriety of the medical care received by Claimant. The Special Master is bound by the *Fitzgerald* decision and must abide by it.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**
Since the answer to Question #3 is no, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Charles R. Cunningham III is denied, as he has failed to answer affirmatively all four of the questions set forth the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before October 23, 2006.**

SIGNED this 31st day of July, 2006.

---

[2] In a previous hearing, evidence was presented by a claimant that he had ripped parts off of his wheelchair while at CSP. Such actions do constitute a safety factor that must be taken into account when reviewing actions by DOC staff at that facility.

BY THE COURT:

*/s/ Richard M. Borchers*

_____

Richard M. Borchers
Special Master