IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-229
Category III
Claimant: Marvin Vasicek, #49326
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

_____

## FINAL ORDER OF SPECIAL MASTER

_____

      THIS MATTER came before the Special Master on July 21, 2006 for hearing at the Fort Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Marvin Vasicek (Claimant) and Jess Dance, attorney for Defendants. Claimant testified in support of his claim. Claimant also presented Exhibits 1 and 2, and both were admitted. Defendants called Kellie Wasko as a witness and offered into evidence Exhibits A through E. All were admitted. After closing arguments, the case was taken under advisement. This order will constitute final resolution of this claim.

### I.

      This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

B. QUALIFIED INMATE
Inmate with a permanent disability/impairment which substantially
limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement.
*Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to
"[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who
do not require a wheelchair but who have a permanent lower extremity mobility impairment that
substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

2. Permanent Hearing Impairments
Inmates who are permanently deaf or who have a permanent hearing
impairment so severe that they must rely on written communication, lip reading, or
signing because their residual hearing, with aids, does not enable them either to
communicate effectively or hear an emergency warning.
3. Permanent Vision Impairment
Inmates who are permanently blind or who have a vision impairment not
correctable to central vision acuity of 20/200 or better, even with corrective lenses.
4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
Inmates who are diabetic and who are or are not dependent on insulin for
regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of
the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the
criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2. The Special Masters shall evaluate individual damage claims submitted in
this case by considering the following questions:
1. Is the claimant a disabled individual who is a member of the class?
2. Was the claimant otherwise qualified to participate in the programs
or receive the benefits or services offered by DOC?
3. Was the claimant discriminated against by DOC because of his or
her disability? (e.g., were accommodations requested and denied because of the
disability?)
4. Did this conduct cause the claimant harm and if so, what is an
appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

This claim was placed into Category III, and Claimant was entitled to a hearing. The Special Master has reviewed the testimony presented, all exhibits submitted, and all written documentation filed prior to the hearing.

Claimant came into the custody of DOC on March 15, 1993. Claimant was placed initially at the Denver Reception and Diagnostic Center (DRDC). He has been in many institutions over the years. For purposes of this claim, Claimant's problems began while in custody at the Sterling Correctional Facility (SCF) in Sterling, Colorado. He began his stay at SCF in December, 1999. He was at that institution until July, 2002.

In July, 2002, Claimant went back to DRDC and then was transferred to the infirmary at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. In 2002, Claimant was hospitalized and placed into custody at the CTCF infirmary. He was placed at the Arkansas Valley Correctional Facility (AVCF) at Crowley, Colorado on October 1, 2002. He was then transferred on December 31, 2003 to the Fremont Correctional Facility (FCF) in Canon City, Colorado where he remained for a brief period of time. He was transferred to FLCF on February 5, 2003. He was transferred to CTCF in March, 2003, but returned to FLCF on October 14, 2004.

Claimant testified that his back problems began during spring, 2002 at SCF. Claimant had pain that radiated into his knees. He was working at the upholstery shop at SCF at the time but had difficulty standing. He sought medical treatment and was diagnosed as having arthritis in the knees. He was placed on a medication for the pain. Claimant then began to experience pain the precluded him from working. The pain was in the back and extended down through the knees.

Claimant had an MRI done on his back. He then was transported to the Denver Health Medical Center for further testing. That facility recommended surgery for pulverized disks in the back. Claimant did not receive immediate surgery but was taken back to CTCF. Claimant was required to walk on his own, even though the pain was substantial. Claimant had troubled getting up from his bed and fell on occasion. The surgery was completed in 2002, but Claimant suffered the residual affects of a left leg that no longer works.

During the period of time that Claimant began experiencing significant back and leg pain, he was diagnosed with diabetes. Claimant is a Type II diabetic. His diabetes makes him more vulnerable to infections and cellulitis. Claimant has had occasional staff infections.

Since his back surgery, Claimant has been using a wheelchair. He testified that his left leg is useless and cannot support his weight. As a result, Claimant cannot stand for any length of time. Claimant has been advised that the condition of his leg will be, at best, the same for the rest of his life. Claimant testified concerning the problems in using a food tray at the chow hall while in a

wheelchair. Claimant has requested chronic care status in order to preclude a co-pay charge of $5.00 per visit for his health issues.

On cross-examination, Claimant testified that he is concerned about his health condition. He believes that the surgery should have been done sooner. He was placed into the special needs unit, but has been removed from it. Claimant is able to dress himself and take care of his daily needs, even though confined to a wheelchair. Claimant acknowledged that those in the special needs unit now have more severe problems than he does.

Prior to his surgery, Claimant was unable to ambulate and often had to crawl. At SCF he requested a pusher but did not receive one at times. At CTCF, the medical line began at 7:00 a.m. but conflicted with breakfast. Claimant needed to do finger sticks but often had to miss breakfast to do so. He was concerned always with missing breakfast because of its implications for his diabetes. At CTCF, it was difficult to obtain sugar-free syrup and diabetic sugar.

Claimant also indicated in his pleadings that he was denied use of a wheelchair while at DRDC. Even though having problems with his leg, Claimant was forced to climb steps at CTCF, even though he advised staff that he had an established disability. He was told he could walk or not eat.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately. Further, a claimant must show that he was disabled on or before August 27, 2003. It was on that date when the Settlement Agreement was approved and the class was designated.

**1. Is the Claimant a disabled individual who is a member of the class?**  Defendants do not dispute that Claimant is mobility impaired because he is in a wheelchair and was on and before August 27, 2003. Claimant is a member of the class for mobility.

There is no question that Claimant is diabetic. That is acknowledged by Defendants, though they dispute that any major life activity has been affected by the diabetes. For purposes of this order, the Special Master finds that Claimant is a diabetic and is a member of the class for that reason.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as multiple disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The answer to this question is yes. As will be seen, this discrimination was in limited instances.

Claimant's main concern was the delay in receiving the surgery on his back. Claimant

submitted a letter from Dr. Lindsay Lilly, Jr., M.D. *Exhibit #1*. Dr. Lilly opined that the issue of earlier surgery is not clear in the medical literature, but "the feeling in the medical community is that the sooner an operation is carried out following the onset of symptoms, particularly severe neurological symptoms such as paralysis, the better the chance for recovery." What Claimant has described is essentially medical negligence by DOC medical staff.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning quality of the medical care provided to him, that is beyond the jurisdiction of the Special Masters. Claimant has the right to pursue a separate action for medical negligence or malpractice.

What Claimant has established is that he was denied use of a wheelchair on certain occasions when there could be no question that he had severe lower extremity problems. In addition, Claimant described in his pleadings the problem at CTCF of having to stand in line for extraordinary periods of time in order to receive a finger stick test. On some occasions Claimant missed breakfast. Claimant also indicated, and it is not rebutted, that sugar-free sugar or alternatives and sugar-free syrup were not available in the chow hall. Basic services for inmates means not placing any inmate in a position of missing breakfast to have a finger stick and to provide food that can be consumed by a diabetic. Claimant has established his claim to the extent noted.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant did suffer harm from the discrimination that took place. He is entitled to compensation in the amount of $225.00.

IT IS HEREBY ORDERED that the claim of Marvin Vasicek is granted to the extent noted in this order and is denied in all other regards; and

IT IS FURTHER ORDERED that Claimant is entitled to compensation from Defendants in the amount of $225.00; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before October 23, 2006.**

SIGNED this 31st day of July, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____

Richard M. Borchers
Special Master