IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-233
Category III
Claimant: Robert E. Lobato, #47884
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

_____

## FINAL ORDER OF SPECIAL MASTER
_____

THIS MATTER came before the Special Master on July 21, 2006 for hearing at the Fort Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Robert E. Lobato (Claimant) and Jess Dance, attorney for Defendants. Claimant testified in support of his claim. Claimant offered no exhibits. Defendants called Dr. Orville Neufeld, D.O. and Wendy Grover as witnesses. Defendants offered into evidence Exhibits A through T. All were admitted. After closing arguments, the case was taken under advisement. This order will constitute the final resolution of this claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

>The Settlement Agreement further provides, in part, as follows:
>
>>2. Permanent Hearing Impairments
>>Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
>>3. Permanent Vision Impairment
>>Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
>>4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
>>Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>>1. Is the claimant a disabled individual who is a member of the class?
>>2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

3

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

This claim was placed into Category III, and Claimant was entitled to a hearing. The Special Master has reviewed the testimony presented, all exhibits submitted, and all written documentation filed prior to the hearing.

Claimant initially came into the custody of DOC on September 10, 1981. Claimant was housed at various correctional facilities over the years and was discharged on that sentence on August 3, 1992. Claimant returned to DOC custody on a new conviction on June 23, 1997. Claimant was evaluated at the Denver Reception and Diagnostic Center (DRDC) for a period of period of approximately two weeks.

Claimant was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado. He arrived at FCF on July 18, 1997. Within days of arriving at FCF, Claimant suffered a severe stroke. He was hospitalized and then placed into the infirmary at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. Since the stroke, Claimant has been confined to a wheelchair. Claimant also suffered two heart attacks while in custody at CTCF.

Claimant has been placed into the San Carlos Correctional Facility (SCCF) in Pueblo, Colorado. SCCF is a special facility that deals with inmates who have mental health issues. Claimant is receiving Prozac and has been at SCCF on two separate occasions. Claimant also has been at FLCF on two occasions. His most recent arrival at FLCF occurred on October 15, 2004.

Claimant testified that he has been diagnosed as having diabetes. He takes insulin by shot, normally receiving two shots per day. Claimant testified that he had received the wrong dosage at times because he received the insulin that was designated for another inmate. He also testified that he was in a coma for a period of time and has had difficulty in monitoring his blood sugar levels. He has trouble balancing things and would like to see an eye doctor.

On cross-examination, Claimant testified that he was first diagnosed as having diabetes in 1997. He has received a lot of medication while in DOC custody for his health conditions. He testified further that he did not like the diabetic diets and often skipped meals. He indicated that he did not miss finger sticks or medical treatment.

In response to further cross-examination, Claimant testified that he was taken off his diabetic diet by a doctor. He has sores that are the result of his diabetes and medical providers do not want to do anything to help cure the sores. Claimant acknowledged that he had been placed at SCCF because he had been suicidal and was paranoid.

Defendants presented as a witness Dr. Orville Neufeld, D.O. Dr. Neufeld testified that Claimant is a brittle diabetic. He is supposed to be taking insulin daily. Claimant's diabetes is acute

and difficult to treat. Maintaining the correct blood sugar level is not easy. Dr. Neufeld testified that Claimant's diabetic diets were canceled because of non-compliance with medical treatment.

Dr. Neufeld further testified that there was no evidence that Claimant had received some other inmate's dosage of insulin. Further, eye examinations had been given to Claimant and were within normal limits.

Defendants' Exhibit A reflects that Claimant has been granted an accommodation resolution for both diabetes and mobility. Exhibits D through S are refusal documents reflecting when Claimant refused finger sticks and medication.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately. Further, a claimant must show that he was disabled on or before August 27, 2003. It was on that date when the Settlement Agreement was approved and the class was designated.

**1. Is the Claimant a disabled individual who is a member of the class?** Defendants do not dispute that Claimant is mobility impaired because he was on August 27, 2003 and is now in a wheelchair. Further, Defendants do not dispute that Claimant is diabetic. Claimant was diabetic on and before August 27, 2003. Claimant is a member of the class for both disabilities.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as multiple disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The answer to this question is no. No discrimination has been established that would violate the ADA and Rehabilitation Act.

Claimant has concerns about the medical care he has received. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning quality of the medical care provided to him, that is beyond the jurisdiction of the Special Masters. Claimant has the right to pursue a separate action for medical negligence or malpractice.

The Special Master has reviewed everything filed by Claimant. Nothing has been presented that would reflect Claimant was subjected to discrimination that was prohibited by the ADA. Claimant has received medical care at all times while in DOC custody. There is no indication that the stroke would not have occurred, even if Claimant had not been incarcerated. There is no question that he has been significantly affected by the stroke. There also is no question that Claimant is a brittle diabetic who has had trouble controlling his blood sugar courts. The problem is that the evidence supports Defendants' allegations that Claimant has done many things to harm his condition. The refusal to take tests and medicine rests on Claimant's shoulders. He has not established that he was treated differently because of his medical conditions. The burden is on Claimant to establish that he was the victim of discrimination, and he has not done so.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is no, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Robert E. Lobato is denied, as he has failed to answer affirmatively all four of the questions set forth the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before October 23, 2006.**

SIGNED this 31st day of July, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

───────────────────────────────
Richard M. Borchers
Special Master