IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-250
Category III
Claimant: Donnell Monroe, #97586
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

THIS MATTER came before the Special Master on July 21, 2006 for hearing at the Fort Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Donnell Monroe (Claimant) and Jess Dance, attorney for Defendants.

Claimant testified in support of his claim. Claimant offered Exhibits 1 through 3, and all were admitted. Defendants did not call any witnesses. Defendants offered into evidence Exhibits A through K. All were admitted. After closing arguments, the case was taken under advisement. This order will constitute the final resolution of this claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794.* During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

    B. QUALIFIED INMATE
    Inmate with a permanent disability/impairment which substantially
    limits his or her ability to perform a major life activity.
    C. PERMANENT DISABILITY/IMPAIRMENT
    A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

    The Settlement Agreement further provides, in part, as follows:

    2. Permanent Hearing Impairments
    Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
    3. Permanent Vision Impairment
    Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
    4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
    Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

    On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

    2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
      1. Is the claimant a disabled individual who is a member of the class?
      2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
      3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
      4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

This claim was placed into Category III, and Claimant was entitled to a hearing. The Special Master has reviewed the testimony presented, all exhibits submitted, and all written documentation filed prior to the hearing.

Claimant initially came into DOC custody on July 19, 1998. Claimant was placed into a community program in 2000. Claimant testified that he returned to DOC control in March, 2001. The offender profile (*Defendants' Exhibit A*) reflects that Claimant returned in February, 2001 and was placed at the Sterling Correctional Facility (SCF). He was granted parole in early March, 2001.

Parole failed, and Claimant returned to the custody of DOC in March, 2002. Claimant was placed at the Fremont Correctional Facility (FCF) in Canon City, Colorado in April, 2002. According to the records, Claimant was transferred to the Denver Reception and Diagnostic Center (DRDC) in June, 2002. Claimant then returned to FCF on June 4, 2002. He remained at FCF until transferred to the Four Mile Correctional Center (FMCC) on October 10, 2002. Claimant returned to DRDC in January, 2004. Claimant returned to FMCC in early February, 2004 and then was placed in a community placement on March 18, 2005.

Claimant remained in the community placement until August 11, 2005 when he was placed on intensive supervised probation (ISP). That lasted until mid-November, 2005 when Claimant was arrested. Claimant then was transferred to FLCF. He has remained at that facility and will do so until his sentence discharge in October, 2006.

In response to a specific question from the Special Master, the Claimant testified that he is not making any claim for the time period prior to March, 2001. No further discussion will take place concerning Claimant's time in custody with DOC prior to that date.

Claimant comes from a family that has a significant history of heart and vascular disease. The medical records submitted by both sides reflect that Claimant has had a long history of chest pain.  He had angina attacks in the past before coming into DOC custody. He has had other health problems that are not germane to this claim.

In November, 2001, Claimant suffered a deep venous thrombosis with a pulmonary embolism (blood clot in the lungs). Claimant received treatment through use of anti-coagulant medicine through June, 2002. The anti-coagulant was discontinued at that time, as it was believed by medical personnel that Claimant had suffered only one pulmonary embolism. Claimant was referred to Dr. Kevin Brown, M.D. at Denver Health Medical Center, and Dr. Brown resumed the prescription for anti-coagulant medicine. Dr. Brown believed that there had been more than one episode of pulmonary thrombosis. Dr. Brown also advised Claimant that he might be on an anti-coagulant for the rest of his life.

Other medical records of Claimant reflect that he has varicose veins and hardening of the

arteries. He has been placed on work restrictions over the past few months because of concern about his health. He began to pass out on occasion. As the result of additional health tests, Claimant was scheduled for surgery to have a pacemaker placed into his heart. It was clear that Claimant suffered from heart flutter and abnormal heart rhythm. That surgery was continued at one point earlier this year, but was completed. Claimant has been placed on restrictions due to the installation of the pacemaker. As an example, Claimant has been directed not to lift his arms over his head. Claimant has been advised to be careful in his movements in order to not disturb the connections with the pacemaker.

In his testimony, Claimant stated that he had been concerned about his medical care while in DOC custody. He expressed concern about future health problems that might lead to a coma. He wanted a special helmet to protect his head if he fell again. DOC has refused to provide protective head gear. Claimant testified that he has hit his head twice during periods when he has passed out while at FLCF. Claimant testified that he requested early parole but that was denied. Claimant said that an immediate pressing concern is getting support hose.

On cross-examination, Claimant testified that he had been the victim of medical malpractice by DOC medical staff. He stated that he had not received proper medical care. He stated further that he had just received a cane while at FLCF. In response to a question about playing basketball, Claimant replied that he had played some basketball in 2003. He did hurt his knee twice while playing basketball. Claimant stated further than he was able to walk in 2003 but not without some problems. Standing in line was difficult for him. Claimant stated that he has pain in his legs and also has headaches.

On redirect examination, Claimant testified that he played some basketball in 2003 and earlier to try to keep his heart rate up. Claimant stated that he had done his own medical research, as that was necessary in order to protect himself from inappropriate treatment. He relayed that his lower veins are deteriorating and becoming more problematic. He also stated that he is in need of mental health care due to his depression. Claimant stated that he should have received additional help before going into a community placement, as he was at risk of not completing the placement. More assistance might have helped him succeed in such a placement.

On re-cross examination, Claimant testified that he has been in a community placement twice. He was regressed from a community placement in 2005 because of a dirty urine screen. Claimant also indicated that he was experiencing some memory problems.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

It must be noted that a claimant must show that he was disabled on or before August 27, 2003. It was on that date when the Settlement Agreement was approved and the class was designated. A claimant must establish that he was the victim of discrimination prohibited by the

5

ADA and Rehabilitation Act on or before August 27, 2003. If a claimant establishes that he was disabled and subjected to discrimination prior to August 27, 2003, then that claimant may amend his claim to cover any discriminatory act relating to the disability after that date. If a claimant cannot establish that he was disabled on or before August 27, 2003 and subjected to discriminatory acts on or before that date, then the claimant is not precluded from filing a separate lawsuit for those acts that did occur after August 27, 2003.

**1. Is the Claimant a disabled individual who is a member of the class?**  The Settlement Agreement provides only four categories for disabilities. Other disabilities are not covered by the Settlement Agreement, and a claimant may bring a separate action as to those disabilities. Claimant has alleged only vision and mobility impairments. Each category must be examined separately:

**Vision Impairment:** Vision is defined by the Settlement Agreement as follows:

> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

To be blunt, a person would have to be blind in order meet this definition.

Claimant does wear glasses. His testimony and submitted documents reflect that he has some vision issues, but he is not blind and has corrected vision with glasses. Claimant does not meet the definition of vision impaired and is not part of the class for that disability.

**Mobility Impairment:** The issue of whether Claimant had a mobility impairment on or before August 27, 2003 is not easily answered. In fairness, Claimant may have understood the Settlement Agreement to be something different than it is. Certainly, a number of claimants have misunderstood the provisions of the Settlement Agreement and that has affected the resolution of their claims.

Section XXXII of the Settlement Agreement sets forth the procedure for determining whether a claimant is entitled to damages. This section reads, in part, as follows:

> Damages of individual class members shall be determined by a special master designated as Richard Borchers and/or Bruce Pringle. After approval of the Remedial Plan, class members will be provided a Damage Claim Form to fill out concerning their individual damage claims. Class members may attach any relevant information to this form, including proof of injury or the denial of services or benefits, affidavits, medical information, or any other information desired to be submitted that is relevant to his/her claim of damages. Inmates who have ongoing claims for damages may submit claims for future damages....

*Remedial Plan, p.28.* This part of Section XXXII requires a showing of a valid claim for something

that occurred on or before August 27, 2003. Class members who are eligible to file claims are those individuals who were in DOC custody on or before August 27, 2003.

Claimant has acknowledged that he cannot make a claim for anything that occurred prior to his return to DOC in February, 2001. One problem that exists is determining when Claimant was in DOC custody after February, 2001. DOC is not responsible for the conduct of staff at community placements, such as Phoenix Center.[2] The same is true concerning care obtained by Claimant while on parole.

Defendants' *Exhibit A* is the offender profile of Claimant and reflects his placements. According to this document which is accepted as true, Claimant returned to DOC custody on February 5, 2001. Claimant was placed then at the Sterling Correctional Facility (SCF) on February 12, 2001. Claimant remained there until he was placed on parole on March 4, 2001. Claimant remained on parole until March 27, 2002 when he was placed into the intake unit at the Denver Reception and Diagnostic Center (DRDC). Claimant remained at DRDC until April 10, 2002 when he was transferred to Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. Claimant remained at CTCF until April 17, 2002. On that date, he was placed at Fremont Correctional Facility (FCF) in Canon City, Colorado. Claimant remained in DOC custody until his placement at Phoenix Center on March 18, 2005.

Claimant's hospitalization with the pulmonary embolism occurred while he was on parole. It is clear that when Claimant returned to DOC custody on March 27, 2002 he had health problems that were more significant than when he left on parole. Claimant still attempted to exercise through playing basketball. He did hurt his knees and sought medical care for the knee problems. There was no evidence presented that Claimant could not walk for extended distances prior to August 27, 2003 or climb stairs. Claimant was ambulatory at that time.

Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." This is the definition from the Settlement Agreement that must be adhered to by the Special Masters. There has been insufficient evidence presented by either side to establish that Claimant was mobility impaired by a lower extremity condition while in DOC custody from February, 2001 to August 27, 2003. As a result, Claimant is not mobility impaired as defined by the Settlement Agreement.

Claimant's condition has worsened as time has progressed. Upon his return to DOC custody on November 15, 2005, Claimant did have a lower extremity condition that was the result of clots in his leg and heart circulation problems. Claimant had to be a member of the class on or before August 27, 2003 before he could "submit claims for future damages."

---

[2] Claimant testified about his concerns relating to treatment at Phoenix Center. Claimant may pursue a claim against that facility, or any other community placement, through a separate lawsuit.

7

Claimant needs to understand that he is not precluded from bringing a separate lawsuit for actions that occurred after August 27, 2003 or before that date that were not covered by the Settlement Agreement. Claimant has the right to consult with an attorney concerning his options.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. There does not appear to have been any disqualification from DOC programs, benefits, or services for other reasons, such as multiple disciplinary convictions. The issue of Claimant's regression from community placements and the revocation of parole is not germane to this question.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant made clear in his testimony that he believed that he was subjected to medical malpractice. He thought the quality of medical care was bad.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the quality of the medical care provided to him, that is beyond the jurisdiction of the Special Masters. Claimant may want to consult with an attorney upon his release concerning his options. The documents submitted by both sides reflect that Claimant did receive some medical care. Under the *Fitzgerald* decision, the Special Masters cannot adjudicate whether such care was inappropriate and in violation of the Eighth Amendment.

The evidence presented for the time period from February, 2001 to August 27, 2003 does not establish any discriminatory conduct prohibited by the ADA and Rehabilitation Act. In light of *Fitzgerald*, the issue of the quality of any medical care will need to be resolved in a different lawsuit. Claimant is not precluded from pursuing separate litigation to seek a determination of whether a violation of the Eighth Amendment occurred or he was subjected to medical malpractice.

The Special Master has reviewed carefully everything submitted in this case. The Special Master has only the jurisdiction granted by the Settlement Agreement. The Special Master appreciates the concerns Claimant has about his health. Hopefully, the installation of the pacemaker will make life better and healthier for Claimant. Resolution of the other legal issues noted cannot occur in this case for the reasons set forth.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is no, this question does not need to be answered.

8

IT IS HEREBY ORDERED that the claim of Donnell Monroe is denied, as he has failed to answer affirmatively all four of the questions set forth the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before October 30, 2006.**

SIGNED this 3rd day of August, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master