IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number: 03-214
Category III
Claimant: Paul Valverde, #51675
Address of Claimant: CTCF, P.O. Box 1010, Canon City, CO. 81215-1010

---

### FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on Friday, June 30, 2006 at 10:30a.m. at the Colorado Territorial Correctional Facility, Canon City, Colorado.

Present were the following: Paul Valverde, Claimant; Brooke Meyer from the office of the Attorney General, for Defendants; Dr. Orville Neufeld, witness for Defendants.

Testimony was received from the following witnesses: Claimant; Jean Connette, by telephone; Mike Tritz; Dr. Orville Neufeld. Exhibits A through Z were offered into evidence by Claimant and Exhibits 1 through 17 were offered into evidence by Defendants. Attached as part of this order is a comprehensive Appendix of Exhibits listing each exhibit admitted into evidence and each exhibit not admitted into evidence. At the conclusion of the hearing, the claim was taken under advisement. This Order shall constitute the final action by the Special Master on this specific claim.

### I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was

1

brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I.   General inconvenience or nominal damages;
> II.  Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV.  Damages due to severe physical injuries; and
> V.   Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9*.

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Settlement Agreement provides the following definitions:

> III. DEFINITIONS
>
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates

2

>with diabetes.
>
>B.  QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>
>C.  PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "inmates who do not need or require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking . . ." Permanent hearing impairments affect those inmates who are "permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning." An inmate is deemed to have a "permanent vision impairment" if he or she is "permanently blind," or if he or she has a "vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses. Permanent diabetics are those "Insulin or Non Insulin Dependent Diabetic Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities." *Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2.  The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>
>>1.  Is the claimant a disabled individual who is a member of the class?
>>2.  Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>3.  Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>4.  Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Valverde submitted a claim that was assigned claim number 03-214. The claim is premised on an alleged mobility disability and disability due to diabetes.

2. Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

3. Claimant Valverde first entered CDOC custody in 1984. He was discharged in 1989; he re-entered CDOC custody in 1992; he was paroled in 1993; he again re-entered CDOC custody in 1994; he was discharged in 1995; and again re-entered CDOC custody 1997. He has been housed at the Colorado Territorial Correctional Facility (CTCF) since 1998.

4. Claimant has suffered from cerebral palsy since birth and has undergone numerous operations related to this condition. He also suffers from diabetes, which was diagnosed in the 1980s.

5. Claimant Valverde asserts that he suffers from a permanent mobility impairment as a result of his cerebral palsy. He does not utilize a wheelchair but indicates that he cannot climb stairs at all. In 1997, CDOC placed Valverde under the following medical restrictions due to his cerebral palsy: (a) lower bunk; (b) no assignment to camps; (c) no vigorous exercise; (d) no intensive labor. In 1999, CDOC added restrictions precluding heavy lifting and prolonged standing over a specified time.

6. Claimant Valverde alleges that he has suffered job discrimination and discrimination with respect to participation in programs as a result of his cerebral palsy and alleged mobility disability. He indicates that up until 2004, he worked as a porter in cell house # 1, where he was housed. In 2001, Valverde completed a training course for clean-up of blood spills and potentially infectious materials. In July of 2004, Valverde was moved to a different cell house, resulting in a loss of his porter job. Valverde asserts that his move to another cell house was due to discrimination because of his disability. After he was moved, Claimant worked for a short time in the kitchen, but was terminated for refusing to comply with an order. Thereafter, he worked in the laundry and received a certificate for successful completion of training in laundry infection control practices. According to Valverde, his job in the laundry was terminated without explanation in September of 2005. Since that time, he has applied for jobs in the tag and tab plants but

has not been hired for either of these positions. Valverde testified that because he does not have a job, he is precluded from participating in prison programs.

7. Valverde also contends that he has not received proper medical treatment for his cerebral palsy and alleged mobility disability. He asserts that he has been denied the ability to see a cerebral palsy specialist, and that he is not receiving necessary physical therapy. Although he was provided with special medical boots, Valverde testified that recreational tennis shoes are more comfortable and make it easier for him to walk without pain. While he is allowed to purchase tennis shoes from the canteen, Valverde complains that CTCF will not provide him with tennis shoes free of charge.

8. Valverde testified that he contracted a MRSA infection for which he did not receive proper medical treatment. He asserts that as a result of the infection, he has scars and has lost his toe nails.

9. Claimant contends that he has not received any training or instruction on how to care for his diabetes or on how to administer insulin injections. He testified that he has not been provided with a proper diet and has never been allowed to consult with a dietician.

10. Lt. Mike Tritz testified regarding his decision to move Valverde from cell house # 1 to cell house # 7. Tritz stated that Valverde was moved from cell house # 1 due to Valverde's allegations that Tritz was making racial slurs.

11. Jean Connette, a rehabilitation technician, testified that part of her job is to help find employment for offenders. She testified that she is in charge of hiring for the tab plant, and that there are 15 special slots for disabled inmates. Although Valverde applied for a job in the tab plant, Connette did not have any openings. She told Valverde to apply with the tag plant, the laundry and the kitchen. He did get a job in the kitchen, but was terminated for refusing to comply with an order. Connette indicated that some job positions, such as those in the tag plant, are not available to inmates who are on probation; and that Valverde is on probation for the incident that resulted in the termination of his kitchen job.

12. Dr. Neufeld testified based upon his review of Valverde's medical records. Neufeld indicated that the records disclose that Valverde was provided with education regarding his diabetes, a diabetic diet and diabetic snacks in 1997. Valverde's records show that he has not complied with his diabetic diet and has signed refusals so that he could take a regular food tray. Neufeld further testified that Valverde's records show that his cerebral palsy is relatively mild and that he has been seen by both CDOC doctors and specialists regarding his foot problems. He has been provided with an ankle foot brace and was given a permit to purchase shoes from the canteen.

### III. CONCLUSIONS OF LAW

1.      The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and (c) the Americans with Disabilities Act.(ADA), 42 U.S.C. § 12101 *et seq.*

2.      The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class.  Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment."  42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B).  The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.  29 C.F.R. § 1630.2(j)(1).  "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes.  *Remedial Plan* ¶ III(A).  Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments.  *Remedial Plan* ¶ III(B).  A permanent disability/impairment is a condition which is not expected to improve within six months.  *Remedial Plan* ¶ III(C).  As discussed in Section I above, the Remedial Plan further limits permanent mobility, hearing, vision, and diabetes disability/impairment to those that conform to the criteria of Section V, paragraph A of the Plan.

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

The Special Master finds and concludes that Claimant Valverde's diabetes does not substantially limit his ability to engage in any major life activity.  Although his diabetes is not fully under control due to this failure to comply with a diabetic diet, there is no evidence in the record that Valverde is unable to engage in major life activities due to his diabetes.

The Special Master also finds and concludes that Valverde's cerebral palsy does not constitute a permanent mobility disability within the meaning of the Remedial Plan.  Valverde is not wheelchair bound and the evidence indicates that he is able to walk.

6

Although Valverde testified that he cannot negotiate a flight of stairs, there is nothing in his medical records that would substantiate this claim.

3. Even if Claimant Valverde is deemed to have a permanent mobility disability within the meaning of the Remedial Plan, he has not established that he has been discriminated against because of his alleged disability. Valverde's primary claim is that he has been denied a job. However, there is no evidence linking Valverde's difficulties in obtaining a job with his mobility problems. Valverde lost his porter's job as a result of his involuntary move from cell house # 1 to cell house # 7. At best, the evidence indicates that move was the result of Valverde's claim that one of the guards was using racial slurs and was biased against him because of his national origin. There is no suggestion in Valverde's grievance filed in connection with his involuntary move that his alleged mobility disability was implicated in any way. Likewise, the evidence fails to establish that Valverde's loss of his jobs in the kitchen and laundry or that his inability to obtain a job in the tab or tag plant was due to his mobility problems.

4. Claimant also contends that he has not received proper medical treatment. However, there is no evidence tying his claim of inadequate medical treatment to his alleged hearing disability. Furthermore, evidence relating substandard medical care, lack of medical care and/or failure of the CDOC to treat properly or to provide proper medication for Claimant's medical conditions does not establish a violation of the ADA or the Rehabilitation Act. While such actions or failures to act may give rise to claims for deliberate indifference to medical needs, the courts have held that substandard medical care or failure to properly treat a medical condition or disability does not constitute discrimination because of a disability, within the meaning of either the ADA or the Rehabilitation Act. *Fitzgerald v. Corrections Corporation*, 403 F.3d 1134, 1144 (10th Cir. 2005); *United States v. University Hospital,* 729 F.2d 144 (2nd Cir. 1984).

5. Additionally, the Special Master notes that several of the events which Claimant relies upon in support of his claim occurred after August 27, 2003. The Remedial Plan was signed on August 27, 2003. Although the Remedial Plan fails expressly to address the issue of damage claims that might arise after its execution date, there is nothing in the Remedial Plan that would suggest that paragraph XXXII thereof, authorizing the recovery of damages and establishing claims procedures was intended to apply to claims for damages that had not yet arisen. The Special Master finds and concludes that the damages that may be awarded under the Remedial Plan are limited to those resulting from violations of the ADA cognizable under the Remedial Plan and occurring prior to August 27, 2003.

### IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment be entered in favor of Defendants and against Claimant dismissing Claimant Valverde's claim with prejudice.

      IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before October 14, 2006** with the Clerk of the United States District Court at the following address:

> 901 19th Street
> Denver, CO 80294.

      SIGNED this 14th day of August, 2006;

> BY THE COURT:
>
> /s/ Bruce D. Pringle
>
> _____
> Bruce D. Pringle,
> Special Master

## CERTIFICATE OF MAILING

      I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this 14th day of August, 2006 to the following:

Mr. Paul Valverde, #51675
CTCF
P.O. Box 1010
Canon City, CO 81215-1010

Ms. Brooke Meyer
Mr. Jess Dance
Mr. James X. Quinn
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

                                            /s/ Susan L. Carter

                                            Susan L. Carter

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number 03-214
Category III
Claimant: Paul Valverde, #51675
Address of Claimant: CTCF, P.O. Box 1010, Canon City, CO 80215-1010

---

**APPENDIX OF EXHIBITS**

---

The following is a list of Exhibits introduced by CLAIMANT and ADMITTED into evidence in the above referenced claim:

| | | |
|---|---|---|
| EXHIBIT A: | 2 pages | State of Colorado Department of Corrections Notice of Charges dated 7-22-04. |
| EXHIBIT B: | 2 pages | Department of Corrections, Colorado Territorial Facility Memorandum dated 3/8/2000. |
| EXHIBIT C: | 2 pages | Colorado Correctional Industires Employment Application for Tab Shop for Paul Valverde, dated 9-27-2005. |
| EXHIBIT D: | 2 pages | Department of Corrections Employment/Academic/Vocational Evaluation for Paul Valverde. |
| EXHIBIT E: | 1 page | Colorado Department of Corrections Offender Grievance Form, Step 1 for Paul Valverde, dated 01/15/06. |

1

| | | |
|---|---|---|
| EXHIBIT F: | 1 page | Colorado Department of Corrections Offender Grievance Form, Step 2 for Paul Valverde, dated 02-13-06. |
| EXHIBIT G: | 1 page | Colorado Department of Corrections Offender Grievance Form, Step 3 for Paul Valverede dated 4-18-06. |
| EXHIBIT H: | 1 page | Request for Sick Call for Paul Valverde, dated 7/30/00. |
| EXHIBIT I: | 1 page | Request for Sick Call for Paul Valverde. |
| EXHIBIT J: | 1 page | Partial form for Paul Valverde dated 2/19/98 with Shakedown List. |
| EXHIBIT K: | 1 page | Colorado Department of Corrections Medical Services Department Diet Request for Paul Valverde, dated 12/17/97 or 12/19/97. |
| EXHIBIT L: | 1 page | Certificate of Achievement for Paul Valverde for completing Laundry Infection Control Practices for Inmate Workers, dated 08-24-2005. |
| EXHIBIT M: | 1 page | Colorado Territorial Facility Certificate of Completion for Paul Valverde in Clean-Up of Blood Spills and Potentially Infectious Materials dated 06th day of April, 2001. |
| EXHIBIT N1-4: | 2 pages | N1: Department of Corrections CTCF Inmate Pass for Paul Valverde, 3-17-06.<br>N2: Department of Corrections CTCF Inmate Pass for Paul Valverde 02-13-2006.<br>N3: Department of Corrections CTCF Inmate Pass for Paul Valverde 2-16-06.<br>N4: Department of Corrections CTCF Inmate Pass for Paul Valverde dated 4/10/2006. |
| EXHIBIT O: | 2 pages | Colorado Department of Corrections Offender Personal Inventory Quantity and Liability Limits for Paul Valverde Dated 02/13/2003. |
| EXHIBIT P: | 1 page | Request for Sick Call for Paul Valverde dated 8-22-05. |
| EXHIBIT Q: | 1 page | Request for Sick Call for Paul Valverde dated 1-30-6. |
| EXHIBIT R: | 1 page | Request for Sick Call for P Valverde. |
| EXHIBIT S: | 1 page | Request for Sick Call.[1] |

---

[1] The original of this document was equally unreadable.

| | | |
|---|---|---|
| EXHIBIT T: | 1 page | Request for Sick Call.[2] |
| EXHIBIT U: | 1 page | Partial report for Paul Valverde dated 2-24-05. |
| EXHIBIT V: | 1 page | Partial report for Paul Valverde dated 4-1-98. |
| EXHIBIT W: | 1 page | Partial report for Valverde dated 1-17-02. |
| EXHIBIT X: | 1 page | Partial report for Valverde dated 6/29/05. |
| EXHIBIT Y: | 2 pages | Abilities Unlimited business card for William D. Beiswenger.[3] |
| EXHIBIT Z: | 15 pages | Release of medical information from Paul Valverde To Children's Hospital dated 7-3-84 with attached Medical report. |

The following is a list of Exhibits introduced by Defendants and ADMITTED into evidence in the above referenced claim:

| | | |
|---|---|---|
| EXHIBIT 1: | 2 pages | Offender Profile for Paul Valverde, dated 06/30/2006. |
| EXHIBIT 2: | 1 page | Colorado Territorial Correctional Facility Incident Report For Paul Valverde dated 25 May 2006. |
| EXHIBIT 3: | 3 pages | Colorado Department of Corrections Progress Assessment Summary for Paul Valverde dated 04/08/2004. |
| EXHIBIT 4: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for Paul Valverde dated 12/9/97. |
| EXHIBIT 5: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for Paul Valverde dated 12/14/97. |
| EXHIBIT 6: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for Paul Valverde dated 12/17/97. |
| EXHIBIT 7: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for Paul Valverde dated 2-17-98. |
| EXHIBIT 8: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for Paul Valverde dated 9/4/98. |

---

[2] The original of this document was equally unreadable.
[3] Page 1 of this document is the back side of the business card and page 2 of the document is the front side of the business card.

| | | |
|---|---|---|
| EXHIBIT 9: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for Paul Valverde dated 7/19/99. |
| EXHIBIT 10: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for Paul Valverde dated 4/30/04. |
| EXHIBIT 11: | 1 page | Paul Valverde CTCF Food Service Department – Diet Service Line report from 01/01/2003 – 01/31/2003. |
| EXHIBIT 12: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for Paul Valverde dated 12/19/02. |
| EXHIBIT 13: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for Paul Valverde dated 2/21/03. |
| EXHIBIT 14: | 1 page | Ambulatory Health Record for Paul Valverde dated 6-24-05. |
| EXHIBIT 15: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for Paul Valverde dated 4-23-98. |
| EXHIBIT 16: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for Paul Valverde dated 8/10/98. |
| EXHIBIT 17: | 1 page | Colorado Department of Corrections / Ambulatory Health Record for Paul Valverde dated 6-15-98. |