IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  92-cv-00870-EWN

JESSE (JESUS) MONTEZ, *et al.,*

      v.

BILL OWENS, *et al.,*

        Defendants.

---

## PLAINTIFF CLASS' MOTION REGARDING LEGALITY OF THE DOC'S  MEDICAL CO-PAY PROGRAM AND THE UNDERLYING COLORADO CO-PAY STATUTE

---

The Plaintiff Class, through undersigned counsel of record, Paula Greisen, Esq.,

of the law firm of King & Greisen, LLP, hereby moves for the Court to find that C.R.S. §

17-36-113 (the co-pay statute) violates the Remedial Plan as it has a discriminatory,

disparate impact on inmates with diabetes and/or is unconstitutional because of the

additional medical co-pays imposed on inmates with diabetes within the Colorado

Department of Corrections ("DOC") pursuant to C.R.S. §17-36-113 and DOC

Administrative Regulation 700-30 for ongoing medical treatment of their chronic illness.

As grounds for this motion, the Plaintiff Class states as follows:

### I.  INTRODUCTION

The Remedial Plan in this case provides that "no qualified inmate with a disability

. . . be excluded from participation in or denied the benefit of services programs or

activities of the DOC or be subjected to discrimination."  Remedial Plan (Court Order

August 27, 2003), p.1.  This Motion, brought by the Plaintiff Class, seeks redress of the

DOC's violation of the Remedial Plan, violation of Title II of the Americans with Disabilities Act ("ADA") and its violations of inmates with diabetes' rights secured to them under the Eighth Amendment's proscription against cruel and unusual punishment, as that proscription is made applicable to the states under the Fourteen Amendment to United States Constitution, under a claim pursuant to 42 U.S.C. §1983.   Procedurally, this Motion is brought pursuant to the Parties' stipulation to present this issue to the Court at this time.  Docket #2228 (Stipulation, B(2), p. 2).

## II. FACTUAL BACKDROP

The Plaintiff Class in this case is made up of inmates with mobility, vision, and hearing impairments, and inmates with diabetes.   Members of the Plaintiff Class face a variety of challenges as individuals with disabilities incarcerated in the DOC, particularly those with diabetes.

Inmates with diabetes have recurring and predictable daily needs and thus face unique problems related to the management of their disease.  Unlike other inmates without chronic conditions, inmates with diabetes, especially those who are dependent on medication such as insulin, often require daily monitoring with medical supplies, such as a blood test finger-stick, for the care and maintenance of their disability.   The failure to receive necessary daily monitoring can result in serious implications, including death.

Inmates with diabetes also face additional issues arising from the fact they are in an institutional setting and must deal with standardized procedures that often create a higher need for medical intervention.  For example, there is wide variation between the time that insulin is administered to diabetic inmates and the time they are actually

permitted to eat at DOC facilities.   For example, there is no priority for people with

diabetes to get to the food line, regardless of blood sugar levels.  Attachment 1, Hearing

Transcript from Hearing on Compliance Hearing on April 24-25, 2006, Vol. I, pg.

198:17-25.  Delay of meals can be caused by a variety of situations outside the inmates

control.  For instance, at some facilities, inmates on the special diabetic diet eat last

because all special meals are served last.  Also, they may be in lockdown or count delays

that create life-threatening situations for inmates who have already been administered

insulin, but not had an opportunity to eat.

The timing between food and insulin injections is imperative.  If a meal is

delayed, inmates are susceptible to low blood sugar reactions.  *Id.*, Vol. I, pg. 198:22-25.

Low blood sugar reactions include loss of consciousness and even death.  *Id.*, Vol. I., pg.

199:1-3.

Also, inmates with diabetes are generally on multiple prescriptions at one time,

necessitating, again, numerous interactions with medical personnel to get those

prescriptions initially written and then refilled.  *Id.*, Vol. I, pg. 167:16-25.  Each time an

inmate needs a prescription refilled, the inmate is charged $5.00.  Thus insulin-dependent

diabetics are charged $5.00 every time they get their insulin prescription refilled,

regardless of how long they have been on insulin.

As outlined more below, under the current version of C.R.S. §17-36-113, the

DOC can now charge inmates medical co-pays for treatment by nurses, nurse

practitioners, physicians and a whole host of other medical personnel.   The DOC has

issued an Administrative Regulation regulating the collection of co-pays under C.R.S.

§17-36-113.  Pursuant to that regulation, AR 700-30, the DOC charges $5.00 for each

visit initiated by an inmate (except for services listed under its exclusion section) [1], to any

medical personnel, including nurses, nurse practitioners, social workers, x-ray technicians

and more. Attachment 2, AR 700-30, III(E).   The DOC also charges a $10.00 co-pay for

each "self-declared emergency visit" (*Id.*, at IV(A)4) and it is unclear whether an inmate

is charged a $10.00 or $5.00 co-pay for every "confirmed emergency visit," but it does

appear that some co-pay amount is charged.   *Id.*, at IV(A)2 & 4.   The application of the

emergency co-pay applies even to emergency treatment for chronic illnesses, such as

diabetes.  Attachment 1, Vol. I, pg. 166-167.

      In addition to medical co-pays, inmates must also pay for a number of other

necessary items.  For example, inmates are required to pay for their own hygiene items,

including soap, toothpaste, toothbrush, shaving materials, feminine hygiene products,

toilet paper, denture cleaner and adhesives, etc.  Attachment 3, AR 850-11 IV (C)(3).

      Inmates must have the funds available if they wish to purchase stationary and

clothing.  *Beerheide v. Suthers*, 286 F.3d 1179, 1189 (2002).  They also pay up-front for

telephone calls (Attachment 4,  AR 850-12 IV(A)(5)-(9)), including calls to their

attorneys (Attachment 5,  AR 750-03 IV & IV(A)).  They must also pay for photocopies

---

[1] Under AR 700-30 IV(B), co-payment fees are not assessed for the following services:
1) Intake health examinations or screenings; 2) Intake mental health screenings; 3)
Dialysis; 4) Treatment orders such as dressing changes, wound checks, and medication
administration; 5) Lab work and x-rays; 6) Work related injuries; 7) Health related
educational settings; 8) Departmental initiated health measures necessary to prevent the
spread of infectious or contagious disease; 9) Pregnancy related visits; 10) Follow-up
appointments initiated/scheduled by a healthcare provider; 11) Sexual assault
examinations, including mental health services necessary to treat the offender; 12)
Subsequent appointments (not initial) as a result of admission to a DOC special needs
unit; 13) ADA screenings; 14) Medically unassigned (or other equivalent code); 15)
Referrals to specialists/sub-specialists, x-ray 16) Any request or appointment
initiated/scheduled by medical staff.  Attachment 2.

for court filings and court filing fees (See e.g. Attachment 6, AR 750-01, IV(D)(6) &

(E)(2)), and postage (Attachment 7, AR 300-38 IV(B)(8) & (C))

The move to charge inmates for these items and for medical treatment began in

the 1980's after the DOC started paying a small wage to the inmates for work they

performed in the prison.   Oddly, the inmate wage range has dropped from

$0.25 /day - $2.00/day in the early 1990's to its current rate of between

$0.23/day - $0.60/day, while the cost of the items inmates must purchase and the co-pay

for medical treatment have increased over that same time.   Compare Attachment 8,

Transcript in *Kosage, et al. v. Romer, et al.*, Civil Action No. 87-N-1718, p. 11 (Hearing

Date October 3, 1990) p. 12 (hereafter "*Kosage*") and Attachment 9, AR 850-03 IV

(E)(2).

While the DOC provides free hygiene products and allows inmates to still have

access to postage for legal mail and the ability to make legal photocopies if the inmate is

deemed "indigent," meeting the criteria of "indigent" is a difficult.  Attachment 10, 850-

14, IV(B) – (C).  The determination of indecency is based on four criteria:

a.      the offender has not received offender pay for the preceding 30 days;
b.      the offender is not currently employed;
c.      the offender's available account balance has not reached the amounts
specified in sections IV.C of this AR; **and**
d.      the offender is not in Community Corrections or on parole.

*Id.,* at IV(B)(1).  (Emphasis added.).

As a result, an inmate with a disability who has worked in the preceding thirty

days, or who is currently working, cannot meet the definition of indigent, regardless if

they carry a negative balance of thousands of dollars from deductions for medical co-

pays. Attachment 10, AR 850-14 IV (C)(1)-(3).  Thus, a working inmate with a disability

who works every work day available, yet carries a negative account balance, will not

have the ability to acquire materials necessary to access to the courts, their attorneys and

their families or be able to purchase toilet paper, toothbrush/toothpaste and feminine

hygiene products.

The effect of this regulation has a disproportionate impact on inmates with

diabetes.  In addition to being charged the chronic care co-pay of $10.00 a year, inmates

with diabetes are subjected to a barrage of co-pays for medical treatment related to

diabetic care.  These $5.00 co-pay charges are assessed for routine diabetic maintenance

and care, including but not limited to, finger-sticks for blood sugar monitoring, requests

for glucose tabs, follow up appointments with nurses and nurse practitioners, and

emergency care for complications resulting from drops in blood sugar levels.

### III.  LEGISLATIVE BACKGROUND

Prior to the 1980's, the DOC did not charge inmates for medical care, visits to

physicians or other medical personnel, or for basic hygiene products, such as soap,

toothpaste, toothbrush, shaving materials and underwear.  Attachment 8, *Kosage* p.11.

However, during the 1980s, the system changed, and as noted above, the DOC

began paying a small wage to inmates ranging from $0.25/day for the lowest paid

inmates to $2.00/day for the highest paid inmates. Attachment 8, *Kosage*, p. 11.

The medical co-pay issue first arose in 1987 when Colorado passed the initial

version of C.R.S. §17-36-113, authorizing the DOC to charge inmates a $3.00 co-pay for

each initial medical visit.   In response to the enactment of that statute, several inmates in

the custody of the DOC brought an action under 42 U.S.C. § 1983 challenging a the co-pay statute. Attachment 8, *Kosage,* pg. 12.

As summarized in *Collins v. Romer*, 962 F.2d 1508, 1510-11 (10th Cir. 1992), the plaintiffs asserted that the co-payment statute violated the rights of prison inmates under the Eighth Amendment to the U.S. Constitution. *Id.* The First Amended Complaint in *Kosage* asserted that the statute forced the Plaintiffs to choose between basic medical care or basic hygiene necessities, since few inmates could afford both. *Id.*

In 1989, while the Motion for Leave to File Second Amended Complaint and the Motions for Class Action and Summary Judgment were pending, the Colorado legislature substantially amended the medical co-payment statute, effective July 1, 1989, to eliminate most of the instances in which inmates are charged co-pay fees. *Id.* Generally, under the amended statute, inmates were to be assessed a co-pays only when the inmate saw a physician without a referral from a nurse or a physician's assistant. *Id.*; Attachment 11, *Kosage*, p.15-16.

The *Kosage* Plaintiffs filed a Third Amended Complaint in February 1990, challenging the constitutionality of the 1989 amendment and adding additional Plaintiffs. *Collins,* 962 F.2d at 1511. The inmates proceeded to trial challenging *only the amended statute*. This Court did express that were it only to consider the 1987 statute, it would have agreed with the Plaintiffs that at some level the amount of the co-pay can act as a deterrent to an inmate seeking medical care. The Court's concern with the 1987 statute was because it did not make any exception for continuing treatment of serious medical conditions nor did it make any exceptions for instances where referrals to physicians

were made.  Attachment 11, *Kosage,* pg. 14-15.  However, based largely on the exclusion

of co-pays for follow-up visits per the 1989 amendment, this Court held that the amended

statute was constitutional both on its face and as applied to the named Plaintiffs.  *Id.*;

Attachment 11, *Kosage*, p.16.

However, in 1998, the 1989 medical co-pay statute was substantially amended to

allow the DOC to charge a co-pay for *every* visit to *any* medical personnel, including

nurses and nurse practitioners, even when the inmate was directed to return for follow-up

visits by medical personnel, and even for confirmed emergencies.  C.R.S. §17-36-113

(2005).  Accordingly, the 1998 amendment reintroduced the same provisions from the

original 1987 statute that this Court in *Kosage* found so troubling. [2]  Attachment 11,

*Kosage*, p. 14-15.

Plaintiff Class contends that C.R.S. §17-36-113 and AR 700-30 violate Title II of

the ADA and are unconstitutional under the Eighth Amendment as the medical co-pay

deductions:  (1) result in a disparate adverse impact on qualified individuals with

diabetes; and (2) drive inmates with diabetes accounts into a negative balance,

prohibiting them from being able to purchase any other items such hygiene items, phone

calls to their families, stationary, photocopies for court filings/attorney communication,

and access and phone calls to attorneys.

---

[2] While the current 2005 version of version of AR 700-30 does not impose co-pays for every circumstance currently allowable under C.R.S. §17-36-113, ARs can be changed at any time at the DOC's discretion.

## IV.  ARGUMENT

**A.      The Co-Pay Statute, C.R.S. § 17-36-113, And Its Companion AR 700-30, Violate The Remedial Plan By Creating A Disparate Impact On Inmates With Diabetes, Thereby Discriminating Against Class Members Under Title II Of The Americans With Disability Act.**

A disparate impact occurs where the application of a facially neutral practice or criteria results in a less favorable impact upon individuals with a qualified disability, *regardless of whether there was intent to discriminate*. *Chaffin v. Kansas St. Fair Bd.,* 348 F.3d 850, 859-60 (10th Cir. 2003); 42 U.S.C. § 12112(b) (Disparate-impact claims are cognizable under Title II of the ADA as the statute defines "discriminate" to include "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability."); 42 U.S.C.§ 12132 (Title II prohibits discrimination "by reason of such disability" and unambiguously prohibits disparate impact discrimination.).

Arguably, the medical co-pay program dictated by C.R.S. § 17-36-113 and AR 700-30 is facially neutral.  The DOC automatically deducts $5.00 from all inmates for each medical visit not listed as an excludable visit found in AR 700-30(IV)(B) and $10.00 for every self-declared emergency visit.  Attachment 2, AR 700-30(III)(A)(4).

However, in a factually analogous case, the Ninth Circuit in *Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996) found a state statute requiring the quarantine of all dogs entering the state discriminatory because of the disparate impact on visually impaired persons who rely on guide dogs.  The court reasoned:

> Although Hawaii's quarantine requirement applies equally to all persons entering the state with a dog, its enforcement burdens visually-impaired persons in a manner different and greater than it burdens others.  Because of the unique dependence upon guide dogs among many of the visually-

> impaired, Hawaii's quarantine effectively denies these persons - the plaintiffs in this case - meaningful access to state services, programs, and activities while such services, programs, and activities remain open and easily accessible by others. The quarantine, therefore, discriminates against the plaintiffs by reason of their disability.

*Crowder* 81 F.3d at 1484.  Here, the enforcement of the co-pay statute burdens inmates with diabetes, in a manner different and greater than it burdens non-disabled inmates.

Obviously, while the co-pay requirements of C.R.S. § 17-36-113 and AR 700-30 apply to all inmates, inmates with diabetes need medical attention on a more frequent and recurring basis than non-disabled inmates, resulting in multiple co-pay charges.  For example, a non-disabled inmate may put in a kite to see medical on the sporadic occasions that he or she feels sick or is injured, while a diabetic inmate often requires daily medical attention, via a blood test finger-stick, for the care and maintenance of his or her disability, resulting in a co-pay of $5.00 for every finger-stick.

Further, experts have acknowledged, and inmates have testified, that because of the $10.00 emergency co-pay, inmates with diabetes do not report episodes of shocking out or going into a coma, obvious emergency situations.  Attachment 1, Vol. I, pg. 166:22-25; Vol. I, pg. 211:1-19; Attachment 12, Hearing Transcript from Hearing on Compliance Hearing on April 24-25, 2006, Vol. II, pg. 288:24-25 and pg. 298:1.

Inmates with diabetes often have multiple prescriptions and will wait for all of the prescriptions to run out before submitting a kite for refills so as to only be charged $5.00 once.  *Id.*, Vol. I, pg. 167:16-25.  Waiting to fill prescriptions results in inmates going

without certain medications for the period of time he or she waits for others to run out, placing a chronically ill inmate in great danger.

In general, inmates are not regularly confronted with having to choose between spending their limited resources on on-going medical care versus spending money on hygiene items, photocopies, and correspondence with attorneys and their families. Rather, this dilemma falls upon diabetic inmates, who, as a result of the difficulty of managing their chronic illness in the confines of a prison setting, can lapse into a coma or even death, should they make the wrong decision.

This problem is only compounded by the fact that the DOC routinely fails to facilitate proper management of diabetic care, forcing inmates to incur $5.00 or $10.00 co-pays for medical intervention necessitated from circumstances outside of the inmates' control. As noted above, experts report that at the DOC facilities there is wide variation between times insulin is administered to diabetic inmates and times they are actually permitted to eat, with potentially grave results. In sum, the DOC's lack of accommodation forces diabetics to use more medical resources and forces them to pay both a *monetary and physical* price for being disabled.

While no inmate is denied medical care because of lack of funds in their account, as a practical matter, for all these reasons, many diabetics must spend most or all of their limited funds to treat their chronic condition, driving their inmate trust account is in permanent arrears. So, although all inmates are subject to the mandates of C.R.S. § 17-36-113 and AR 700-30, inmates with disabilities are disproportionately faced with the adverse ramifications of a negative account

balance at a higher rate due to frequent, but necessary, medical treatments and

resulting medical co-pays.  Because inmates with disabilities depend upon

frequent medical treatment and care, the financial requirements of the statute

effectively denies these inmates meaningful access to medical services.

In sum, C.R.S. § 17-36-113 and AR 700-30 have a disparate impact on inmates

with diabetes, because such individuals, by the very nature of their disease, require more

medical care in order to simply stay alive and, therefore, incur more co-pay fees than

other inmates.  Under *Crowder*, when, as here, "a state's policies, practices or procedures

discriminate against the disabled in violation of the ADA, Department of Justice

regulations require reasonable modifications in such policies, practices or procedures

'when the modifications are necessary to avoid discrimination on the basis of disability,

unless the public entity can demonstrate that making the modifications would

fundamentally alter the nature of the service, program, or activity.'"  *Crowder*, 81 F.3d at

1485 (internal quotations omitted).

Here, the Plaintiff Class requests the Court to order that the DOC provide

reasonable accommodation to the inmates with diabetes.  Specifically, the Class requests

that the Court order that the DOC cease imposing multiple co-pays for supplies and

ongoing treatment and instead, impose only the six-month $5.00 chronic care co-pay as

arguably already required under its medical co-pay AR.  Attachment 2, AR 700-
30(IV)(A)(7).

**B.      C.R.S. § 17-36-113 is Unconstitutional Under the Eighth Amendment:**

The graveman of the Plaintiff Class' § 1983 complaint is that the DOC has

subjected them to cruel and unusual punishment in violation of the Eighth Amendment,

made applicable to the States by the Fourteenth Amendment.  See *Estelle v. Gambel*, 429

U.S. 97, 102 (1976).

The Tenth Circuit discussed the issue of prisoners' medical needs extensively in

*Ramos v. Lamm*, 639 F.2d 559 (1980).  As noted by this Court in *Kosage* while analyzing

*Ramos*, deliberate indifference to prisoners' serious medical needs can be demonstrated

by a state or prison system's failure to make available a level of medical care that is

"reasonably designed to meet the *routine* and *emergency* health care needs of inmates."

Attachment 8, *Kosage*, p. 7.  (Emphasis added).

After reviewing *Estelle*, *Ramos*, and other related Tenth Circuit opinions, this

Court held in *Kosage* that:

> Deliberate indifference to serious medical needs may also be shown by
> proving a pattern or practice on the part of jail officials or employees or on
> the part of the Governmental entity operating the jail showing gross
> deficiencies in staffing, facilities, equipment, or **procedures that**
> **effectively deprive persons confined in jail or reasonable and**
> **adequate medical care for their serious medical needs.**

Attachment 8, *Kosage*, p. 9 *quoting Garcia v. Salt Lake County*, 768 F.2d 303, 308

(1985). (Emphasis added).

Here, inmates with diabetes are faced with a Hobson's choice:  drive their trust

accounts to a negative balance, or, forgo even legitimate emergency treatment in order to

be able to continue to purchase basic hygiene items and/or continue to access the courts,

their attorneys and their families.

Moreover, as noted above, the most inmates can currently earn is $0.23/day - $0.60/day.   Attachment 9, AR 850-03 IV E(2).  Under C.R.S. §17-36-113 and AR 700-30, emergency visits alone cost $10.00.  Attachment 2, AR 700-30(III)(A)(4).  This emergency co-pay applies even to emergency treatment for chronic illnesses, such as diabetes.  Attachment 1, Vol. I, pg. 166-167.

The level of co-pays permitted under C.R.S. §17-36-113 are clearly so excessive as to prevent inmates from seeking medical care.  *See e.g.* Attachment 11, *Kosage*, p. 15.  One self-declared emergency visit alone costs an inmate almost an entire month's pay.  The remedy for this discrepancy would be for the Court to order that the DOC apply only the $10.00/year chronic-care co-pay to all treatment sought by inmates for their diabetic condition.

Further, while the DOC continues to treat inmates that cannot pay the co-pay, this policy only drives inmates' trust accounts into a perpetual negative balance.  As noted by the Tenth Circuit in *Beerheide, et al. v. Suthers, et. al.*, 286 F.3d 1179, 1187-88 (10th Cir. 2002), there are constitutional concerns about the implications of expecting inmates to fall into debt in order to receive constitutionally mandated services as well as questions whether such a program would in fact run *counter* to penological goals. [3]   As eloquently stated by the Honorable Judge Babcock in the lower *Beerheide* decision in discussing a proposed co-pay on constitutionally required kosher meals:

> I have serious concerns that if Plaintiffs do not have sufficient funds to pay the 25% co-pay, their inmate accounts would maintain a negative balance to be turned over to DOC collections upon the inmate's discharge from prison. A major goal of parole is rehabilitation. *See Griffin v. Wisconsin*, 483 U.S. 868, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987); *Latta*

---

[3] If inmate's account has a negative balance when he or she is released from prison, the account could be turned over to DOC central collections, or his or her parole officer could be instructed to collect the amount.  *Beerheid II*, F. Supp 2nd at 1196.

> *v. Fitzharris*, 521 F.2d 246, 249 (9th Cir. 1975)("The overriding goal of the parole system is to give the parolee a chance to further and to demonstrate his rehabilitation while serving a part of his sentence outside the prison walls."). To begin parole with a financial debt to DOC runs counter to this laudatory goal. Moreover, it sets the questionable precedent of encouraging the inmate to spend money he does not have.

*Beerheide v. Suthers*, 82 F.Supp.2d 1190, 1198 (D. Colo. 2000).  In support of its position in *Beerheide*, the DOC argued that the implementation of a co-payment program for the provision of kosher meals was supported by their use of a medical co-payment program under the 1989 version of the co-pay statute as a means of preventing inmate abuse of the medical services program.  *Id*. at 1199.

The Tenth Circuit rejected this argument finding the 1989 version of the medical co-pay statute to be *less* burdensome than the proposed kosher meal co-payment program because of its exclusion of charging co-pays for doctor referred visits *and treatment for ongoing or pre-existing conditions.  Beerheide*, 286 F.3d at 1188, n. 5 (emphasis added). (The Tenth Circuit reasoned that because the medical co-payment program did not require payment for medical service received as treatment for an ongoing or preexisting condition, it served a gate-keeping function without punishing prisoners for requiring regular legitimate medical care.)

In contrast to the 1989 statute, however, the current version of the co-pay statute allows the DOC to charge an inmate every time they request an additional finger-stick, feel the need to obtain glucose tablets, have a prescription refilled, see a nurse for follow-up at the order of their physician, and need emergency medical care.  For all the reasons above, the Plaintiff Class contends that current co-pay statute fails to balance the cost of

the expanded co-pays versus the lower pay inmates currently receive, driving chronically

ill and disabled inmates into debt, and excluding working inmates with diabetes from

equal access to the courts/attorneys/families/basic hygiene provisions supplied to the

narrowly defined "indigent" offenders.  Thus, the Plaintiff Class contends that as for

inmates with diabetes, the medical co-payment program it is subjected to today

constitutes cruel and unusual punishment in violation of their Eighth Amendment rights.

## V. CONCLUSION

In accordance with the Remedial Plan and Title II of the ADA, the Plaintiff Class

requests the Court to order that in regards to inmates with diabetes, any co-pays beyond

the six-month chronic care co-pay be stricken as having a disparate impact and as a

reasonable accommodation to inmates with diabetes.  Alternatively, the Plaintiff Class

requests the Court to find the statute unconstitutional under the Eighth Amendment.

Should the Court conclude that the Plaintiff Class has not proffered a sufficient record to

establish adverse impact on its diabetic Class Members, the Plaintiff Class requests that

the Court afford it an opportunity to present such evidence at an evidentiary hearing.

### Compliance with Colo.LR 7.1A

Plaintiffs' Class Counsel has consulted with opposing counsel who objects to the

Court granting the relief requested in this motion.


WHEREFORE, undersigned counsel requests this Court to Order the DOC to

modify AR 700-30 to exclude co-pay requirements for treatment of ongoing chronic

illnesses and exclude for inmates with diabetes all emergency visits from co-pay

16

requirements for them as well.  In the alternative, counsel requests this Court to declare

C.R.S. § 17-36-113 unconstitutional under the Eighth Amendment.

RESPECTFULLY SUBMITTED on this 1st day of September, 2006.

KING & GREISEN, LLP

~/Paula D. Greisen

Paula D. Greisen
1670 York Street
Denver, CO  80206
(303) 298-9878
(303) 298-9879 (fax)
greisen@kinggreisen.com

Counsel for the Plaintiff Class

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 1st  day of September 2006, I electronically filed the foregoing **PLAINTIFF CLASS' MOTION REGARDING LEGALITY OF THE DOC'S  MEDICAL CO-PAY PROGRAM AND THE UNDERLYING COLORADO CO-PAY STATUTE** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses via U.S. Mail, addressed to:

Beth McCann, Esq.
James X. Quinn, Esq.
Assistant Attorney General
Civil Litigation and Employment Law Section
1525 Sherman St., 5th Floor
Denver, CO 80203
beth.mccann@state.co.us
james.quinn@state.co.us

Hon. Richard M. Borchers
Legal Resolution Center
707 Zenobia St.
Westminister, CO  80030
dborchers@legalres.com

~s/ Paula Greisen
Paula Greisen