FILED

1      IN THE UNITED STATES DISTRICT COURT UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLORADO          DENVER, COLORADO

2                                                    OCT 3 1990

3    JAMES T. KOSAGE, et al.,          )        JAMES R. MANSPEAKER

4                       Plaintiff,     )        _____ CLERK

5    vs.                               )             87-N-1718

6    ROY ROMER, Governor of Colorado,  )
     in his official capacity, et al., )
7                                      )
                        Defendant.     )
8

9
                          JUDGE'S RULING
10                    TRANSCRIPT OF PROCEEDINGS

11
            Proceedings held before the HONORABLE EDWARD W.
12
     NOTTINGHAM, U.S. District Judge, for the District of Colorado,
13
     beginning at 8:30 a.m. on the 18th day of September, 1990, in
14
     Courtroom C-203, United States Courthouse, Denver, Colorado.
15
                            APPEARANCES
16
     For the Plaintiff:          Robbin Lego, Esq.
17                               Karen Robertson, Esq.
                                 Boyd Boland, Esq.
18                               Holme, Roberts & Owen
                                 1700 Lincoln Street
19                               Denver, Colorado 80203

20   For the Defendant:          Carolyn Lievers, Esq.
                                 Stacy Worthington, Esq.
21                               1525 Sherman Street, 3rd Floor
                                 Denver, Colorado 80203
22

23

24

25        Proceedings recorded by electronic sound recording,
            transcript produced by transcription service.

39

1         FINDINGS OF FACT AND CONCLUSIONS OF LAW

2         (At 8:30 a.m. on September 18, 1990, in the United States

3 District Court at Denver, Colorado, before the HONORABLE

4 EDWARD W. NOTTINGHAM, U.S. District Judge, with Ms. Robbin

5 Lego, Ms. Karen Robertson, and Mr. Boyd Boland appearing as

6 counsel for the plaintiffs, and Ms. Carolyn Lievers and Ms.

7 Stacy Worthington appearing as counsel for the defendants, the

8 following proceedings were had:)

9         THE COURT: All right. It's ordered that the caption of

10 the case be amended to drop Walter Kautzky as a defendant and

11 to add Frank O. Gunter, Executive Director, Colorado Depart-

12 ment of Corrections in his official capacity as a defendant.

13         This case is an action brought by certain inmates of

14 the Colorado State Penitentiary System, five in number as the

15 case currently stands. Their names are Richard Collins, John

16 Cox, Paul Bobb, and Michael Watson. Ira Lutzgarden has been

17 dismissed pursuant to a stipulation between counsel. James

18 Kosage has previously been dismissed because he was paroled

19 and his claim for injunctive relief is therefore moot.

20         The defendants in the case are Roy Romer, the

21 Governor of the State of Colorado, Frank O. Gunter, the

22 Executive Director of the Department of Corrections, and

23 Dennis Kleinsasser, the Director of Clinical Services of the

24 Colorado Department of Corrections, all of whom are sued in

25 this case for injunctive relief in their official capacities;

1    that is to say that they are sued as the people having overall
2    responsibility for the policies of the Colorado Department of
3    Corrections.

4           The Court has jurisdiction of this case pursuant to
5    28 USC 1331 in that the case arises under the Constitution of
6    the United States.  The Court also has jurisdiction under 28
7    USC 1343 in that this is a case by the plaintiffs to redress
8    the alleged violation of certain rights secured to them by the
9    Fourteenth Amendment to the United States Constitution and is
10   therefore a case to redress the alleged violation of certain
11   civil rights secured to them by the Constitution.  The case is
12   brought under 42 USC 1983 which prohibits any person acting
13   under color of law from violating another person's rights
14   secured by the Constitution.

15          As a preliminary matter, I want to state, as I
16   indicated in argument during the course of closing argument,
17   what is not before the Court today.  I assume the attorneys
18   are aware of what is not before the Court, but the people who
19   are not attorneys may not be aware of what the case involves.
20   The issue before the Court is not whether the statute in
21   question, which we'll call the copayment statute, is good
22   legislation or wise legislation.

23          There is considerable evidence mainly from Dr.
24   Leidig that the statute does not save or make any money as it
25   was intended to do.  There is also considerable evidence from

4

1 Dr. Leidig and others that the $3.00 copayment mandated by the
2 statute is exorbitant, high, or unreasonable compared at least
3 to the wages that are earned by the prisoners in the
4 institution.  I note in passing here that Dr. Leidig and the
5 others did not consider other sources of income in determining
6 or reaching the opinion that the $3.00 fee was exorbitant,
7 high, or unreasonable.  But, in any event, all of those
8 considerations are considerations of policy which are properly
9 before the legislature, which properly may be considered by
10 the Department of Corrections and the legislature in enacting
11 the statute and in deciding what revisions may from time to
12 time be needed in the statute, but they are not necessarily
13 the considerations that are to be passed upon by this Court.
14 The Court sits only to decide whether the legislation, whether
15 it be good or bad, wise or unwise, violates some prohibition
16 in the United States Constitution.

17          As a corollary to that, I note that this Court does
18 not sit to referee disputes between the Executive Branch of
19 the State Government and the Legislative Branch of the State
20 Government.  I say that because there is in the record
21 considerable evidence of disagreement by employees of the
22 Department of Corrections with certain aspects of the
23 legislation, even certain aspects of the amended legislation
24 passed in 1989.  Those are matters, as I said before, that may
25 properly be brought to the attention of the legislature by the

1  Department of Corrections, by physicians who are associated or
2  employed by the Department of Corrections, and by anyone else
3  who has matters that they wish to bring to the attention of
4  the legislature.  They are not necessarily matters that
5  require determination by this Court.  The sole issue for the
6  Court is whether the system as it presently exists today
7  violates the Eighth Amendment proscription against cruel and
8  unusual punishment as that proscription is made applicable to
9  the states through the Fourteenth Amendment.

10          The leading case of the United States Supreme Court
11  in this area is the case of Estell v. Gambel found at 97
12  Supreme Court Reporter 285.  In that case, the Court in a
13  seven to one decision discussed the standards by which Courts
14  are to determine whether a state prison system has inflicted
15  cruel and unusual punishment on inmates by denying them
16  adequate medical care.  Before the Court reached the specific
17  issue of adequate medical care, it spent a good deal of time
18  talking about the general standard prescribed by the Eighth
19  Amendment for determining cases of this sort and I think that
20  it is worth repeating here in light of the specific evidence
21  which has been brought forth here in the trial.

22          After reviewing the early history of the Amendment,
23  the Court articulates the general standard that the Eighth
24  Amendment as it is interpreted today requires.  And, that is
25  that the Eighth Amendment prohibits punishments which are

1  incompatible with "the evolving standards of decency that mark
2  the progress of a maturing society" and the Court cites some
3  of its previous cases.  And, it also notes that the Eighth
4  Amendment prohibits punishments which "involve the unnecessary
5  and wanton infliction of pain".  The Court then went on to
6  apply those general precepts which have since been articulated
7  by the Court in more recent cases to the specific issue of the
8  Government's obligation to provide medical care for those whom
9  it is punishing by incarceration.  The standard that comes out
10  of Estell v. Gambel is that--and I quote--"deliberate
11  indifference to serious medical needs of prisoners constitutes
12  the unnecessary and wanton infliction of pain" and therefore
13  violates the Eighth Amendment.  As the 3rd Circuit has noted
14  in the case of West v. Keve reported at 571 F.2d, Page 158,
15  that language sets forth a two-pronged standard.  It requires
16  deliberate indifference on the part of prison officials and it
17  requires the prisoners' medical needs to be serious.

18        The 10th Circuit has discussed the issue of
19  prisoners' medical needs most extensively in the well-known
20  case of Ramos v. Lamm reported at 639 F.2d, Page 559, a
21  decision which was issued in 1980.  There has been some
22  suggestion in the Plaintiffs' argument that the decision in
23  Ramos varies or explains at least the Supreme Court's decision
24  in Estell in the context of a system-wide attack on medical
25  facilities, procedures, and personnel.  And, the Plaintiffs'

7

1 mention the Court's discussion on Page 574 of the decision and
2 I quote, "We are convinced that the duty to provide reasonable
3 medical care to persons whom the state is punishing
4 necessarily requires that the state "make available to inmates
5 a level of medical care which is reasonably designed to meet
6 the routine and emergency health care needs of inmates" and it
7 cites two Federal District Court decisions.

8         The Circuit, however, goes on to talk about the
9 Estell case and it approvingly quotes from the 3rd Circuit's
10 decision in West v. Keve reaffirming that Estell sets forth a
11 two part standard, namely deliberate indifference and that the
12 prisoners' medical needs be serious.  While there, in my mind
13 at least, is some ambiguity in the Circuit's decision, I don't
14 find that the Circuit is intending to expand the test that was
15 originally articulated in Estell and explained in West v.
16 Keve.  Rather what the Circuit seems to be saying is that a
17 state or prison system shows deliberate indifference to
18 prisoners' serious medical needs when it fails to make
19 available to inmates a level of medical care which is
20 reasonably designed to meet the routine and emergency health
21 care needs of inmates.  And, I underscore the language of the
22 routine and emergency health care needs of inmates.

23         I note that the Circuit has also addressed the
24 question in the Salt Lake City case entitled Garcia v. Salt
25 Lake County reported at 768 F.2d, Page 303, a decision which

1  was issued in 1985 and which affirmed a jury verdict against
2  the county of Salt Lake in Utah.  The Court quoted the
3  District Court's instructions to the jury approvingly and said
4  that--and I quote--"deliberate indifference to serious medical
5  needs may be shown by proving there are such gross
6  deficiencies in staffing, facilities, equipment, or
7  procedures"--I underscore the language "or procedures"--"that
8  the inmate is effectively denied access to adequate medical
9  care and it cites Ramos.

10          It also probably doesn't expressly approve the
11  District Court's instruction, quotes it without disapproving
12  it or casting any doubt on it.  And, that instruction reads as
13  follows:

14          "The Constitutional right to medical treatments
15      is violated where there is deliberate indifference
16      or gross negligence of jail officials or employees
17      in regard to the serious medical needs of a person
18      confined in jail.  Mere negligence is not enough.  A
19      medical need is serious if it is one that has been
20      diagnosed by a physician as mandating treatment or
21      one that is so obvious that even a lay person would
22      easily recognize the necessity for a doctor's
23      attention.  Deliberate indifference to serious
24      medical needs is shown when jail officials or
25      employees prevent a person confined in jail from

1    receiving recommended treatment or deny such person
2    access to medical personnel capable of evaluating
3    their need for treatment."  And, I again stress the
4    language "access to medical personnel capable of
5    evaluating their need for treatment".

6        "Deliberate indifference to serious medical
7    needs may also be shown by proving a pattern or
8    practice on the part of jail officials or employees
9    or on the part of the Governmental entity operating
10   the jail showing gross deficiencies in staffing,
11   facilities, equipment, or procedures that effec-
12   tively deprive persons confined in jail of reason-
13   able and adequate medical care for their serious
14   medical needs."

15       That instruction, to me, embodies an accurate
16   statement of the law.  I believe the instruction is based on
17   the Circuit's decision in Ramos.  It was at least confirmed by
18   the Circuit's decision in Garcia.  And, I note also that both
19   Garcia and Ramos involve what I would characterize as gross
20   inadequacies in the entire system.  That is to say there were
21   no trained personnel in some instances.  The Ramos Court
22   specifically notes that on Page 576 of its decision where it
23   notes that certain people were being used as substitute
24   physicians or are being forced to make decisions or perform
25   services for which they are neither trained nor qualified.

1   And, similarly, in Garcia, there were serious inadequacies in
2   staffing and in the availability of and the number of
3   physicians who were present to meet the plaintiffs' medical
4   needs.

5           And, finally, in discussing the law, there is one
6   case mentioned by the Plaintiffs that I do wish to
7   specifically discuss and that is the case of Todaro v. Ward, a
8   2nd Circuit decision reported at 565 F.2d, Page 48.  In that
9   case, the 2nd Circuit affirmed an injunction against certain
10  state officials and part of the facts involved there were the
11  initial hurdle in the form of what was called the Lobby Clinic
12  which was essentially the intake section of the sick ward.  In
13  other words, that's the first place that a prisoner had to go
14  when he or she experienced an ailment.  The facility was
15  staffed by a single nurse who was behind some kind of a
16  partition who did no physical examinations and who wrote down
17  cryptic comments concerning the complaints of the prisoners.
18  The District Judge had granted some limited relief ordering
19  that the state officials either place a physician in the Lobby
20  Clinic or to substantially improve the screening procedure.
21  And, that language comes directly from the Appellate Court's
22  decision at Page 51.  In a footnote, the Appellate Court notes
23  that other improvements mandated by Judge Ward who was the
24  District Judge included requirements that the Lobby Clinic
25  nurse, after adequate training in triage or screening

1 techniques, make adequate physical examinations, have each

2 inmate's records available, set a definite doctor's appoint-

3 ment to be held within two weeks of the complaint, and keep

4 detailed records.

5      Now, with the exception of the requirement that

6 doctor's appointments be set within two weeks of the initial

7 complaint, Judge Ward's relief in that case comes close, as I

8 will recite in my findings of fact to what the Department does

9 here currently under the 1989 law. So, I find the Todaro case

10 to be distinguishable on its facts and, in fact, I find the

11 Todaro case to be consistent with the judgment that I'm going

12 to enter here and essentially consistent with what the state

13 is already doing. Those are the legal standards by which the

14 facts of this case must be evaluated.

15      With respect to the specific facts in this case, I

16 find as follows. At some point in the past and the evidence

17 is not precisely clear on when, the state prison system did

18 not charge its inmates for either basic hygiene items, that is

19 to say soap, toothpaste, toothbrush, shaving materials, and

20 underwear, or for medical care, visits to any physician, any

21 physician's assistant, or any other medical personnel.

22      At some point and the evidence is again not clear as

23 to precisely when, although there's some suggestion that it

24 was between five and 10 years ago, the system changed in that

25 the Department started paying a small wage to the inmates and

1  the evidence is that that wage ranges from 25 cents per day
2  for the lowest paid inmates to up to $2.00 at certain times in
3  the past for other inmates who receive higher pay.

4          At the same time that it started paying small wages
5  to the inmates, the Department instituted a policy requiring
6  the inmates to pay for items from the canteen including
7  personal hygiene items such as those that I mentioned earlier.
8  This system was instituted in an effort to instill a sense of
9  fiscal responsibility in the inmates and therefore to assist
10  in efforts to rehabilitate them and no witness, even the
11  Plaintiffs' experts, seriously takes issue with that require-
12  ment.  In other words, everybody seems to support the system
13  of encouraging inmates to make their own decisions concerning
14  the use to which they wish to put wages and to make decisions
15  on whether they wish to buy the basic items or whether they
16  wish to buy other items that they may not regard as so basic.

17          The problem that the Plaintiffs are addressing in
18  this case arose in 1987 when the Colorado legislature passed
19  the initial version of the statute with which the Plaintiffs
20  are taking issue here.  The initial version of the statute
21  read as follows:

22          "The Department shall charge $3.00 against an
23       inmate's account for each visit by such inmate to an
24       institutional or non-institutional physician,
25       dentist, or optometrist, except that such charge