IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

       Plaintiffs,

-vs.-

BILL OWENS, et al.

       Defendants.

---

Claim Number 03-051
Category III
Claimant: Steven Paul Walker, #114350
Address of Claimant: FLCF, P.O. Box 1000, Fort Lyon, CO 81038-1000

---

### FINAL ORDER OF SPECIAL MASTER

---

       THIS MATTER came before the Special Master for hearing on May 24, 2005. Present were the following: Steven Paul Walker (Claimant); and Jess Dance and James Quinn, attorneys for Defendants.

       Testimony was received from the following witnesses: Claimant and Dr. Cary Shames, D.O. The Special Master received the affidavit of Ms. Cathie Holst (Defendants' Exhibit E). The Special Master also received Defendants' Exhibits A through D. All documentation submitted by both sides was accepted. After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

       This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and the Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class. It did not include an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp. 28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who

2

do not need require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III will receive a hearing. As to this claim, a hearing was held on May 24, 2005. Testimony and documents were received and have been reviewed. The Special Master has determined the following to be the facts, as established by the testimony and evidence presented by both sides.

In early 2002, Claimant received a gunshot wound to his lower right leg. The injuries suffered to the leg led to the amputation of the right leg about six inches below the knee. What was left of the bone below the knee was held together by surgical screws. The surgery on the leg took place at Denver Health Medical Center.

At some point, Claimant was incarcerated in the Adams County Jail awaiting resolution of criminal charges. Claimant was recovering from the loss of his leg, but jail officials did not attempt to fit Claimant for a prosthesis. While at the Adams County Jail, Claimant used a wheelchair to get around.

In August, 2002, Claimant was placed into the custody of the Colorado Department of Corrections (CDOC). He was assigned initially to the Denver Regional Diagnostic Center (DRDC).[1]

---

[1] DRDC is a diagnostic and evaluation facility. Absent overwhelming and significant medical issues, an inmate will remain at DRDC for a short period of time and then be transferred to a long-term facility. Claimant's medical issues did not preclude a transfer from DRDC.

3

Claimant testified that upon arrival at DRDC he was seen by William Beiswanger of Abilities Unlimited. The evidence reflected that this company had made prostheses for CDOC inmates who had lost limbs. After the evaluation had been completed by Mr. Beiswanger, a request was made by him or someone at CDOC to Colorado Access for approval. The testimony of Dr. Cary Shames, D.O., chief medical officer for CDOC, indicated that Colorado Access is a medical management organization that oversees inmate medical care. Dr. Shames testified that Colorado Access also handles medical management for Medicaid in Colorado.

The evidence indicated that Colorado Access did not approve the proposal of Mr. Beiswanger. A reasonable inference from the evidence was that the proposal was deemed as too expensive. As a result, Claimant did not receive any prosthesis during the time he was at DRDC.

On September 11, 2002, Claimant was transferred to the Limon Correctional Facility (LCF) in Limon, Colorado. Upon arrival, Claimant was placed into general population. He was given a wheelchair to use while at LCF.

While at LCF, an employee of Denver Prosthetics came to see and evaluate Claimant. This individual apparently was requested to come to LCF by CDOC and/or Colorado Access to prepare a proposal for building a prosthesis for Claimant. The proposal was for a basic prosthesis. Claimant was concerned about having a prosthesis that he believed would limit his life functions. As a result, the family of the Claimant offered to pay for an upgrade. That was approved by CDOC, but the prosthesis was never provided to Claimant while at LCF.

Claimant described his living situation at LCF. He was assigned to a cell house that had a shower with no hand rails. Claimant was in fear whenever he took a shower that he would fall and hurt himself. He was given a shower chair, but it was dangerous to use. He also described the embarrassment that he experienced when he took a shower.

Claimant tried to exercise but was unable to do so because he was in a wheelchair. He had no pusher for his wheelchair. He wanted to go to the music room at LCF, but that was located on the second floor. There was no way for anyone in a wheelchair to get to the music room. Claimant played guitar and would have liked to have played the instrument while at LCF. The music room was inaccessible to him.

Claimant indicated also that the lack of a prosthesis affected his options for exercise. Claimant testified that exercise at LCF meant utilizing "the yard," which is an open area between various buildings. He could not walk or jog on the track, as he did not have a prosthesis. He was unable to play baseball, as he did not have a prosthesis. Claimant had been active all of his life and wanted to exercise in order to maintain his health. Claimant further testified that the lack of a prosthesis had made it impossible for him to obtain full-time work at LCF.

On March 12, 2003, Claimant was transferred to the Fort Lyon Correction Facility (FLCF) at Fort Lyon, Colorado. In response to a question from the Special Master, Claimant testified that

he did not have any complaints concerning his treatment at FLCF. He had been treated fairly by staff. It was after he arrived at FLCF that he received his prosthesis. Claimant testified further that his prosthesis has since broken. Claimant was in a wheelchair for the hearing. No evidence was presented as to the estimated time to secure repairs to the prosthesis.

The evidence established that it took ten months for Claimant to receive a prosthesis. No explanation for the delay was offered by Defendants. Colorado Access apparently had refused the initial proposal of Claimant, and it took some time for an upgraded version to be built. During the period of time he was waiting, Claimant was unable to carry on basic life functions at LCF. That was particularly true as to showering and obtaining full-time work.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

1. **Is the Claimant a disabled individual who is a member of the class?** Claimant was in CDOC custody on August 27, 2003 and had a lower disability condition on that date. Defendants concede that he was disabled and a member of the class that was established on August 27, 2003.

2. **Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by CDOC?** No evidence was presented that Claimant could not have participated in work, outside exercise, and a music program at LCF, but for his disability. No evidence was presented that Claimant was a security risk or that he had disciplinary problems that prevented him from participating in programs.

3. **Was the Claimant discriminated against by DOC because of his or her disability?** The evidence presented by both sides and as found by the Special Master indicated that the answer to this question is yes. Claimant was placed into an unsafe situation when he was required to use a shower that had no handrails. Claimant was denied the ability to work and to exercise at LCF. No reasonable or rational basis was provided as to why it took ten months for Claimant to receive a prosthesis. No reasonable explanation was provided by Defendants as to why Claimant was required to use a shower that placed him at risk. Merely saying that LCF was ADA compliant was and is insufficient. Under the ADA and Rehabilitation Act, services, programs and activities can be very basic. *Crawford v. Indiana Dept. of Corrections*, 115 F.3d 481 (7th Cir. 1997); *Schmidt v. Odell*, 64 F.Supp.2d 1014 (D.Kan.1999); *Kaufman v. Carter*, 952F.Supp. 520 (W.D.Mich. 1996). Claimant was entitled to the safe use of showers and exercise facilities. That did not happen at LCF. Had Claimant received his prosthesis within a reasonable period of time, then he could have worked at LCF, exercised to maintain his health, and utilized the music room.

4. **Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant described the harm that he suffered in terms of humiliation and lack of opportunities to exercise and work. Claimant indicated in his testimony that work and exercise were important to

him, as he will not discharge his sentence until 2018 and wants to maintain his health until he departs from CDOC custody. An appropriate remedy will be discussed in the next section of this Order.

Claimant has established his claim by a preponderance of the evidence as to the time period when he was at LCF. He further has proven his claim as to the issue of lack of a prosthesis for almost ten months. Claimant has stated that he has no complaints concerning his treatment at FLCF. To the extent that his claim may involve allegations concerning anything that occurred at FLCF, those allegations are dismissed.

## IV.

The question next is what is an appropriate remedy. The Order of November 23, 2004 by Judges Nottingham and Kane provides some guidance, but also limitations. The order states, in part, as follows:

> 6. The Special Masters may consider and grant future damages and/or injunctive relief in individual cases but only with respect to an individual claimant's situation. For example, a Special Master could order that credit be given to a claimant for earned time or an inmate be provided a hearing aid or cane. However, the Special Masters may not order injunctive relief on a facility wide or system wide basis. All of those matters were resolved in the Remedial Plan.

Thus, it would be improper to order any changes at the facility at LCF. Any remedy must be limited to relief for Claimant alone.

Claimant throughout his testimony consistently indicated that what he wanted was a "Flex Foot Modular 3, Carbon X Active Heel." This prosthesis was described by Dr. Shames as an upgraded model that would allow greater activity by Claimant. Dr. Shames indicated that this model was not medically necessary for Claimant. It also is clear from the evidence that this model would allow Claimant to be more active and would allow him to work at a job at FLCF or elsewhere. Claimant's concern about maintaining his health is legitimate.

As to this claim, Defendants are directed to provide Claimant with a Flex Foot Modular 3, Carbon X Active Heel prosthesis. Further, Defendants are directed to provide maintenance for this prosthesis in the same fashion that they would for a different model. This prosthesis is to be provided to Claimant within ninety days of this order, or within ninety days of the final resolution of any appeal by Judge Kane.

This prosthesis will help Claimant become more active and will allow him to contribute more to the correctional society of which he is a part. Providing a Flex Foot Modular 3, Carbon X Active Heel prosthesis to Claimant will resolve this claim.

IT IS HEREBY ORDERED that judgment is entered in favor of Steven Paul Walker as to actions by Defendants, their staff, and their employees at the Limon Correctional Facility, as set forth in this Order; and

IT IS FURTHER ORDERED that Defendants are to provide to Steven Paul Walker a "Flex Foot Modular 3, Carbon X Active Heel" prosthesis as the remedy for what occurred at the Limon Correctional Facility; and

IT IS FURTHER ORDERED that Defendants are to assume maintenance of the "Flex Foot Modular 3, Carbon X Active Heel" prosthesis in the same fashion as they would for a different model.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before August 8, 2005.**

SIGNED this 13th day of June, 2005.

BY THE COURT:

Richard M. Borchers
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this 13th day of June, 2005 to the following:

Mr. Steven Paul Walker
#114350
FLCF
P.O. Box 1000
Fort Lyon, CO 81038-1000

Ms. Paula Greisen
Mr. David Miller
Counsel for the Class
King & Greisen, LLP
1670 York Street
Denver, CO 80206

Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

_____
Margie Dykstra