IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-870-EWN-OES

JESSE (JESUS) MONTEZ, *et al.,*

    Plaintiffs, as representatives of themselves and all others similarly situated in this class action,

    v.

BILL OWENS, *et al.,*

    Defendants.

## PLAINTIFF CLASS MOTION FOR CLARIFICATION ON STANDARDS USED TO DETERMINE DISABILITY STATUS

The Plaintiff Class, through counsel of record, Paula Greisen, Esq., of the law firm of King & Greisen, LLP, files this Motion to Clarify the Standards Used to Determine Disability Status as follows:

### SUMMARY

As a result of the compliance hearings, the Colorado Department of Corrections ("DOC") stipulated it was not in substantial compliance with the non-architectural portions of the Remedial Plan as required by August 27, 2005. As one of the sanctions for the DOC not being in compliance, the parties stipulated that the court would review the standards being applied by the Special Masters and the DOC to determine whether a person is "disabled" within the meaning of the Remedial Plan. The stipulation further provides that if this Court determines that the Special Masters have used the wrong criteria in determining disability during the damage

claim process, the Special Masters shall review all such orders, regardless of whether those orders have been appealed or not.

In summary, the Class argues that the Special Masters, at the urging of the DOC, have incorrectly adopted the very narrow criteria for those who need special housing as the criteria for determining who is disabled under the Plan. This incorrect application of the disability standard has resulted in the erroneous exclusion of qualified class members from participating in the damage claim process. The second argument advanced in this motion is that the DOC is misapplying the United State Supreme Court's holding in *Sutton v. United Airlines*, 119 S. Ct. 2139 (June 22, 1999) to deny disability status to inmates with disabilities under the Remedial Plan.

**ARGUMENT**

**I.      The Special Masters Are Using the Wrong Criteria to Determine "Disability" in the Damage Claim Process**

The Remedial Plan establishes procedures for the DOC to identify inmates with disabilities and ensure that class members, individuals with mobility, hearing, and vision impairments, and inmates with diabetes, are not subjected to discrimination at the DOC. Remedial Plan, hereafter "RP," Exhibit A, pg. 1, I and IIIA. The Plan defines a disability as those who have "a permanent physical disability/impairment which substantially limits one or more of the major life activities of such individual." RP p. 2, IIIB. The Plan further provides that a "permanent disability or impairment is a condition which is not expected to improve within six (6) months." RP pg. 2, IIIC.

In addition, the Plan recognizes that there are some inmates who have disabilities that are <u>so severe</u> that they will be presumed to require special accessible housing. RP pg. 4, V.

2

Specifically, if the individual meets any of the following criteria, they will be presumed to require special ADA compliant housing:

1. Inmates with mobility disabilities that are so severe as to require the use of wheelchairs on a full or part time basis.  RP p. 4, VA (1)(a);

2. Inmates with permanent mobility impairments who do not require a wheelchair but whose impairment substantially limits walking and may require the use of a cane, prosthesis, walker, or other assistive devices.  RP p. 4 VA (1)(b);

3. Inmates who are permanently deaf or who have an impairment so severe they rely on written communication, lip reading, or signing, because their residual hearing, with aids, does not enable them to communicate effectively or hear an emergency warning. RP p. 5, VA (2);

4. Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.  RP p. 5, VA (3); and

5. Inmates who are diabetic and who are not dependent on insulin for regulation and require special housing to accommodate their disabilities. RP p. 5, VA (4).

Thus, under the terms of the Plan, an inmate would be identified as disabled if they have an impairment which substantially limits one or more of the major life activities.  These individuals may or may not require special housing to accommodate their disability.  The Plan specifically provides that "DOC shall consider, on a case-by-case basis, accommodations for inmates with disabilities that are not so severe as to require placement in a designated facility or that are temporary in nature."  RP , p. 11, XA.  The Plan then creates a sub-category of inmates with disabilities whose impairments are so severe that it is presumed they will require special housing.

When the DOC began implementing the Remedial Plan, it incorrectly conflated the criteria for determining whether a person was disabled with the criteria to be used for special housing.  In other words, an inmate was determined to not be disabled unless he or she met the above narrow criteria for placement in special housing.  For example, an inmate with a hearing

3

impairment was not qualified as a person with a disability by the DOC unless he or she "relied on written communication, lip reading, or signing, because their residual hearing, with aids, does not enable them to communicate effectively or hear an emergency warning."  Thus, generally, only a very narrow group of individuals – those in need of special housing – were qualified as disabled under the Plan.[1]

After the DOC stipulated that it was not in compliance with the Remedial Plan, the ADA Inmate Coordinator (the "AIC") for the DOC admitted that the special housing criteria were not the proper criteria for determining disability status.  As a result, the DOC has agreed that it will re-screen potential class members using the "substantially limits a major life activity" criteria.  Plaintiffs agree that this broader criteria is the correct standard that is required by the Remedial Plan.  Because the DOC has conceded this issue and is addressing it, we will not address that issue here.

The problem is, however, that in the damage claim process, the DOC has argued that the Special Masters should use the special housing criteria to determine whether an inmate has a disability and can thus seek damages.[2]  Rather than using the criteria for disability specified by the Remedial Plan, e.g. that an inmate is qualified if they have an impairment that substantially limits a major life activity, the Special Masters have accepted the DOC's argument and consistently rule that if an inmate does not meet the disability criteria for special housing, they are not "disabled" under the Plan and consequentially, do not qualify to receive damages in the

---

[1] This is true except for diabetics, whom the DOC initially recognized as class members but now have changed their stance on this issue, which will be addressed further below.

[2] The DOC filed substantive written responses on all category I and II claims and have consistently argued that the Special Masters should apply the special housing criteria to determine disability.  See, for example, Response to Claim and Supporting Documents in the claim of Keith Schwinaman, Exhibit D, p. 9 in which DOC argues that "Inmates with qualified vision impairments are those 'who are permanently blind or have vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses."

4

damage claim process.[3] In fact, in almost every opinion issued by the Special Masters,[4] they first state that the claimants have to meet <u>the special placement criteria</u> in order to be disabled under the meaning of the Remedial Plan.

For instance, Jose Luis-Dole, a diabetic inmate claimed he has a hearing, vision and mobility impairment. In the Final Order issued by the Special Master concerning this claim, the Special Master listed the narrow special housing criteria and then stated "These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals." Exhibit B, Final Order of Special Master, p. 3. With respect to his hearing impairment, the Special Master specifically ruled:

> The Settlement Agreement provides the following definition for hearing impairment:
>
>> Inmates who are permanently deaf or who have an impairment so severe they rely on written communication, lip reading, or signing, because their residual hearing, with aids, does not enable them to communicate effectively or hear an emergency warning.
>
> As to claims of hearing impairment, the Special Masters are bound by this definition. The Settlement Agreement provides that a claimant must be permanently deaf or be unable to communicate except by lip reading, written communication or signing.
>
> The testimony provided [by] Claimant at the hearing established that he did not meet the narrow definition of hearing impaired on or before August 27, 2003. There is no question that he has some hearing loss. **To be blunt, no claimant qualifies under this definition unless they are totally deaf. Claimant is not totally deaf. Claimant is not part of the class for hearing impairment.**

*Id.* p. 6. (emphasis added).

---

[3] The Special Masters have <u>not</u> adopted this argument with respect to the sub-class of inmates with diabetes and thus Plaintiffs are not challenging the Special Masters' decisions concerning that category.
[4] There are some opinions in which the claim is not timely filed or the claim is dismissed for other reasons.

Similarly, with respect to Mr. Luis-Doles' claim for his visual disability, the Special Master ruled:

> The definition for vision impairment includes "inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses." **As with the definition for hearing impairment, this definition is extremely narrow. In order to fall into the category of vision impaired, a claimant has to be legally blind.**
>
> Claimant's own testimony indicates that he does not meet this definition. He has concerns about his vision, and rightly so. Diabetes can affect eyesight dramatically. The problem is that the definition that has to be applied to conditions that existed on or before August 27, 2003 does not encompass Claimant's vision condition. Claimant is not part of the class for vision impairment.

*Id.* p. 6-7. (emphasis added).

With respect to Mr. Luis-Dole's mobility impairment, the Special Master again reiterated the special housing criteria articulated in Section V, paragraph A of the Remedial Plan (the special housing criteria) and found that because Mr. Luis- Dole did not meet those criteria, he is not a member of the class of mobility impaired. *Id*. pg. 6.

Similarly, in the claim of James Riley, a diabetic inmate with a hearing disability, the Special Master denied him membership in the hearing impairment class. See Exhibit C, Final Order of Special Master. After acknowledging that Mr. Riley has a hearing loss and wore a hearing aid, the Special Master went on to rule that:

> The Settlement Agreement sets forth the criteria for hearing impairment as follows:
>
>> Inmates who are permanently deaf or who have an impairment so severe they rely on written communication, lip reading, or signing, because their residual hearing, with aids, does not enable them to communicate effectively or hear an emergency warning.

6

> **This criteria is extremely narrow and limited.  Claimant's hearing loss is sufficient to be covered by the ADA.  It is not covered by the Settlement Agreement.  To be blunt, a hearing impaired claimant would have to be totally deaf and have to rely on written communication, lip reading or signing in order to communicate.**  Claimant does not meet this criteria and is not part of the class for hearing impaired.

*Id.* p. 7.  (emphasis added).

The Special Master included in a footnote that "As of the issuance of this order [April 3, 2006], no claimant has met the criteria in the Settlement Agreement for hearing impaired." *Id.*

As stated above, in every ruling on the merits issued by the Special Masters, they have adopted the position urged by the DOC that <u>the claimants must satisfy the special housing criteria in order to meet the definition of disability under the Remedial Plan</u>.  Thus, the Special Masters are using the wrong criteria to determine whether a person is disabled under the Remedial Plan and thus entitled to apply for damages.  By adopting the special housing criteria, rather than the "substantial limitation of a major life activity" criteria dictated by the Remedial Plan, a significant number of claimants have been denied damages because they do not meet the narrow definition of disability required by the special housing criteria.[5]  Accordingly, the Class requests that this Court clarify that the correct standard to be used by the Special Masters to determining disability under the Remedial Plan is the "substantially limits a major life activity" standard – and not the special housing criteria standard.

### II. The DOC is Improperly Disqualifying Inmates With Disabilities In Reliance on *Sutton v. United Airlines*.

As the Court is aware, the Remedial Plan sets up a comprehensive scheme to remedy discrimination against inmates with disabilities in the DOC.  The ADA Inmate Coordinator (the "AIC") is the person at the DOC charged with implementing the Plan and ensuring that class

---

[5] To be clear, Class counsel is not attempting to argue the merits of any particular case, but rather that the Special Masters have used the wrong criteria and thus must revisit their opinions that rely on this incorrect criteria.

7

members are not discriminated against and receive the accommodations they require. Specifically, the Remedial Plan dictates that the AIC will be responsible for identifying the class members, ensuring that they are not denied access to programs, services and benefits offered by the DOC because of their disability, and "coordinating the placement and treatment decisions regarding inmates with disabilities with appropriate personnel throughout the DOC . . ." Exhibit A, RP, p.1, II.  The Plan further provides that the "AIC will receive medical training relevant to the disabilities identified in this plan which may be similar to that provided to facility staff." *Id.*

In order to implement the Remedial Plan, the DOC was first charged with identifying all inmates with disabilities as defined by the Remedial Plan.[6]  The Plaintiffs contend that the DOC has been improperly excluding qualified inmates with disabilities from receiving "disability" status within the DOC and thus are denying them the protections and oversight of the AIC.

A. Diabetics

Initially, the DOC was verifying that all inmates with diabetes qualified for "disability" status under the Remedial Plan – as was intended by the parties.  Sometime in 2005, however, the DOC changed its policy and **now automatically denies all inmates with diabetes any disability status related to their diabetes**.[7]  In other words, if you are an inmate with diabetes and ask to be verified as having a disability because of your diabetes – or for that matter ask for an accommodation because of your diabetes, the uniform answer is "no, you are not disabled."

Jose Luis-Dole, the insulin-dependent diabetic discussed above, is a typical example.  At his damage claim hearing, a DOC doctor testified that his body has become resistant to insulin.  Exhibit B, p. 5.  The testimony also showed that he passed out because he had to wait too long to

---

[6] As stated previously, the DOC initially used the special housing criteria to screen inmates but has now conceded that the more general "substantially limits" criteria is the correct standard.

[7] In fact, the DOC is in the process of "re-screening" all of the diabetics it previously certified as disabled to deny them disability status.

8

eat after having his insulin shot because the inmates on special diets (such as the diabetic diet) have to eat last at his facility. *Id*. p. 5. The evidence also showed that on occasion, his facility simply ran out of insulin and the diabetics thus were deprived of their medication for several days. *Id*. p. 4. In fact, the DOC screening performed on Mr. Luis-Dole confirmed he is insulin-dependent, is on a special diet, is compliant with his treatment plan and suffers from retinopathy and neuropathy of his feet. Despite all of these issues, the DOC issued Mr. Luis- Dole an "Accommodation Resolution" form[8] stating that he does not have a disability and is not in need of any accommodations. Exhibit E, Accommodation Resolution Form. Thus, despite that Mr. Luis-Dole clearly needs to have the accommodation of having his insulin shots timed with his meals and the basic accommodation of having his insulin provided to him as prescribed by his doctors, he cannot seek the resources of the AIC to help him with these accommodations because he has been designated "not disabled."

The DOC has apparently adopted the position that diabetics cannot not qualify as "disabled" because hypothetically, diabetes can be controlled by diet, exercise and/or medication. Relying on *Sutton v. United Airlines, supra*, the DOC is asserting in the damage claim process that all inmates with diabetes are not qualified as members of the class because "*if* [an inmate's] diabetes can be controlled by diet, exercise, or medication, then the claimant is not disabled under the Remedial Plan, ADA or Rehab Act." See Exhibit F, Response, p. 3 (emphasis added)[9]. Thus, according to DOC, even if an inmate has uncontrolled diabetes, the person will not be given "disability" status because his or her diabetes because of the sheer possibly that the disease can be controlled.

---

[8] This is the standard type of form issued to all inmates after they are screened for a disability.
[9] It should be noted that the Special Masters have not yet adopted this position.

9

B. <u>Hearing, Vision and Mobility Impaired</u>

The DOC is taking a similar approach with those with hearing, vision or mobility impairments.  For instance, with respect to the hearing impaired, if an individual can hear only with the help of a hearing aid, the DOC will not qualify that person as "disabled."  The result of this application of *Sutton* is that an individual who needs a hearing aid is denied disability status – <u>even if he or she does not receive the necessary hearing aid for prolonged periods of time</u>.

Further, according to the DOC, the hearing aid is a "medical device" and thus not within the purview of the accommodations that the AIC must oversee.  For example, Michael Schrecongost filed for disability status and requested a hearing aid for his right ear as he has very limited in hearing in that ear and is completely deaf in his left ear.  Exhibit G, Request for Accommodation.  Although DOC physicians screened him <u>three times in 2005</u>, Exhibit H, and each time verified that he relied on lip reading, could not hear emergency warnings in certain situations, previously wore a hearing aid in his right ear and was deaf in his left ear, his "Accommodation Resolution" form shows that he is denied any hearing disability status.  Attachment I, Accommodation Resolution.  Instead, the Resolution states that if he needs assistive devices he must direct his inquiries to Clinical Services – rather than to the AIC.

The other practical result of the refusal to identify these hearing impaired inmates as disabled is the consistent problem with the DOC failing to repair their hearing aids in a timely manner and its failure to provide a sufficient supply of batteries.  For instance, Mr. Echemendia Diaz is a hearing impaired Class Member whom the DOC admitted has a hearing impairment.  Exhibit J, Response, p. 2 ("Diaz was examined by Dr. Bloor and was found to have a hearing disability.") and Exhibit K (DOC disability screening form).  The DOC also admitted that as a result of his disability status, he was initially provided several accommodations, including a

10

hearing aid for one ear.  Exhibit J, p. 3.  However, the records show that he complained about the fact that his hearing aid was broken, beginning in November 2005.  Exhibit L, AIC Accommodation Worksheet and Grievance.  The AIC Accommodation Worksheet shows that **he did not actually get the repaired hearing aid until May 2005 – over 6 months after the hearing aid needed repair**.  Exhibit L.   Although on two separate occasions, the DOC issued Mr. Echemendia Diaz Accommodation Resolution forms verifying that he had a hearing disability, (Exhibit M, Accommodation Resolution), the AIC Worksheet indicates that in May 2006, "Due to recent changes in the position being taken by DOC and offenders with hearing aids it is necessary to have this offender re-screened.  According to case law if his hearing is correctable by the use of hearing aids then he would not be considered to be disabled as long as his hearing aid is in proper working order and he wears it."  Exhibit L, Accommodation Worksheet, p. 2.  Accordingly, Mr. Echemendia Diaz recently received that new screening and is now being issued an "Accommodation Resolution" form that denies he has any disability.  Exhibit N, Accommodation Resolution.  Moreover, the form states that he must direct all issues related to his hearing impairment to Clinical Services and not the AIC.  The form also provides that if his "condition worsens," he can essentially start the process all over again by submitting a new Request for Accommodation to the AIC.  Given that it has taken DOC over six months to screen most of the class members for the first time, and it is now undertaking to re-screen all of the original application – it is hard to imagine that telling a person who has already been verified as having a disability that they can now start over will bring any relief to aggrieved class members.  As Mr. Echemendia Diaz could not get his hearing aid fixed in a timely manner even when he was verified as having a hearing disability, it seems unlikely that he will get any better treatment now that he has been disqualified as a member of the protected class.

11

Similar applications of *Sutton* are being used by the DOC to disqualify inmates with vision or mobility impairments. The premise is the same - if the DOC provides an assistive device such as eyeglasses or a cane, then the individual is deemed not "disabled." Thus, the inmate is in a catch-22: if the inmate can use an assistive device, then he or she will not qualify as disabled – even if they can't get the assistive device. Thus, if an inmate who needs glasses to see and those glasses get broken, he or she will still not be deemed "disabled" by the DOC and thus has no real recourse through the AIC to get an accommodation for his or her loss of vision, i.e., new glasses – which is contrary to the specific intent of the Remedial Plan.

C. Misapplication of *Sutton*

The DOC is misapplying the United State Supreme Court decision in *Sutton*. First, with respect to diabetes, this class action specifically covers the class of all inmates with diabetes and the DOC's attempt to exclude this entire category of persons is an attempt to rewrite the bargain the DOC struck by entering into the Settlement Agreement in the first place. The Second Amended Complaint listed the categories of persons covered by this case and "Subclass B" consisted of "class members who have diabetes." Second Amended Complaint, paragraph 34.[10] The Second Amended Complaint specifically alleged that inmates with diabetes were being subject to discrimination "because DOC personnel are not qualified to diagnose or care for persons with diabetes, and the facilities are lacking the necessary medications and treatment programs." *Id*., paragraph 53.

Furthermore, the Remedial Plan - the contract entered into by the DOC - expressly protects all inmates with diabetes. For instance, the Remedial Plan specifically states that the "persons covered by this Plan are individuals with mobility, hearing, and vision impairments and <u>inmates with diabetes</u>." Exhibit A, RP, p. 1, III (emphasis added). Further, as discussed above,

---

[10] At no time did Defendants object to the category of inmates with diabetes as an improper subclass in this case.

inmates with diabetes are covered regardless of whether they need accessible housing or do not. See RP, p. 4, Section V ("<u>Inmates with diabetes</u> . . . severe enough to require special housing and programming will be assigned to placement in these designated facilities. . . . <u>Diabetics</u> will not be presumed to need a handicapped accessible cell unless they have other conditions that require accommodation.") (emphasis added).  The Plan also provides that "[r]easonable accommodations shall be provided for <u>inmates with diabetes</u> or those who require dialysis who may need to be excused from programs at times to permit insulin or dialysis treatment.  Such reasonable accommodations shall include modified work, school or program schedules." RP, p. 16, XIII (emphasis added).  Custody staff for each housing unit must be made aware of the identity of inmates with diabetes and how to recognize diabetes-related complications, RP, p. 23, XIX, and special training is required for medical and non-medical staff regarding the care and treatment of <u>inmates with diabetes</u>, including the need for access to water and diabetic snacks, the need for meal timing, medication administration timing, as well as the symptoms related to diabetes-related complications such as acidkesotosis and hypo- or hyper-glycemia.  RP, p. 17, XV.  Thus, it is clear that the intent of the Remedial Plan was that all inmates with diabetes would be granted the protections secured by the Plan – and the DOC should not be allowed to evade this contractual obligation by redefining the group of eligible class members through the back door.

Similarly, with respect to the other categories of class members, the DOC cannot use *Sutton* to re-write the terms of the contract it made.  As discussed above, the Remedial Plan requires the AIC's involvement in almost every aspect of the class members' custodial life, including but not limited to, whether they need or get assistive devices, when and how those devices are repaired, who is contacted if there is a conflict between medical and security staff, how assistive devices are removed and when, what procedures need to occur before health care

devices may be removed, and the procedures and protocols that need to be followed when class members are transported to different facilities, etc.  Simply put, the DOC cannot now eliminate the AIC's involvement with these issues by arguing a legal defense they might have been able to assert if this matter had gone to trial.

Moreover, by applying *Sutton* across the board to deny everyone with diabetes, everyone with a hearing aid, and everyone with glasses any disability status, the DOC is doing exactly what *Sutton* prohibits.  One of the main premises underlying the Court's reasoning in *Sutton* is that each person with a disability has to be evaluated on a case-by-case basis, rather than as members of a group.  *Sutton, supra* at 484.  It is correct that *Sutton* states disability is determined by taking into account corrective measures, such as eyeglasses.  However, the holding in *Sutton* is that the person is not disabled <u>only</u> if the impairment <u>is corrected</u> by the mitigating measures to the extent that <u>the person is no longer substantially limited in a major life activity</u>.  *Id*. at 483.  Despite the DOC's assertions, it is not enough under *Sutton* that a mitigating measure could *hypothetically* mitigate the disability – it must actually do so, and do so well enough that the person is no longer "substantially limited in a major life activity."

Thus, the mere assertion that "diet, exercise and medication" may control diabetes is not sufficient to deny every person with diabetes "disability" status under the Remedial Plan.  Similarly, the fact that a person may get a hearing aid does not necessarily mean that they are no longer "substantially limited" in the major life activity of hearing – especially if the person is completely deaf in one ear.  The same analysis applies to eyeglasses and other assistive devices or corrective measures.  The DOC is attempting to artificially narrow the class of disabled inmates by assuming that once it provides an assistive device, the individuals are automatically no longer substantially limited.   This is contrary to holding of *Sutton*.

14

Finally, a strict application of *Sutton* simply cannot be applied in a custodial setting. The facts in *Sutton* involved employment plaintiffs who had assistive devices that actually did fully correct the impairment at issue. In an institutional setting, however, the inmates do not have any control over their access to assistive devices, or to the repair of these devices. This is especially true for inmates with diabetes who have little to no control over when they get their insulin, the timing of their medication with their meals, when they get fingersticks or how often, when or if they get snacks, exercise, and often what type of food they are served. Similarly, an inmate who requires a hearing aid cannot simply go to the store and purchase additional batteries anymore than a person with a vision impairment can call and order a new set of prescription glasses when needed. As opposed to a person who is not incarcerated, there are real dangers to persons in a custodial setting who must function without their assistive devices, even on a temporary basis.

D. Conclusion

The impact of denying inmates "disability" status is that they are then stripped of any of the protections of the Remedial Plan: they are not monitored or tracked by the AIC; they cannot file "ADA" grievances; they are not protected from discrimination with respect to access to programs and services; and importantly, they cannot request any accommodations from the AIC – such as the timing of meals, the timely repairs of assistive devices, sign language interpreters, etc. Thus, if a hearing impaired person has a hearing aid that breaks or needs batteries, and the person has been denied "disability" status, the only place the person can turn is to clinical services – and frankly, the failure of clinical services to adequately protect the rights of these individuals is one of the reasons this action was initiated in the first place.

The Remedial Plan was specifically designed so that the AIC would be involved in every aspect of the these individuals' lives to ensure that they are not only provided access to the same

15

educational, vocational and rehabilitational services – but also to appropriate medical services and assistive devices.

Accordingly, the Plaintiffs request that this Court require DOC to abide by the terms of the Remedial Plan and to qualify all inmates with a disability as disabled under the Plan regardless without regard to mitigating measures.

WHEREFORE, the Plaintiff Class requests that the Court clarify for the DOC the appropriate criteria to be used by the Special Masters, order that the DOC abide by the terms of the Remedial Plan, and order that the DOC qualify all inmates with a disability as disabled under the Plan without regard to mitigation efforts, and order such other relief the Court deems appropriate.

Respectfully submitted this 6th day of September, 2006.

KING & GREISEN, LLP

s/Paula Greisen
Paula Greisen
King & Greisen, LLP
1670 York Street
Denver, Colorado 80206
(303) 298-9878

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of September, 2006, I electronically filed the foregoing **PLAINTIFF CLASS MOTION FOR CLARIFICATION ON STANDARDS USED TO DETERMINE DISABILITY STATUS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Elizabeth McCann, Esq.

James Quinn, Esq.

Attorney General's Office

elizabeth.mccann@state.co.us

James.quinn@state.co.us

                                            s/Paula Greisen