# EXHIBIT A

**REMEDIAL PLAN**
**COLORADO DEPARTMENT OF CORRECTIONS**
**AUGUST 27, 2003**

## I.      POLICY

It is the policy of the Colorado Department of Corrections (DOC) to provide inmates with disabilities, with or without reasonable accommodation, access to its programs and services consistent with legitimate penological interests.  No qualified inmate with a disability, as defined in Title 42 of the United States Code, Section 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities of the DOC or be subjected to discrimination.  All facilities designated to house inmates with disabilities will provide comparable programs, services and benefits available throughout comparable DOC facilities to ensure that inmates with disabilities are not discriminated against because of their disability.

## II.     ADA INMATE COORDINATOR

There shall be a position entitled the ADA Inmate Coordinator (the "AIC") who will be responsible for ensuring that specific policies and procedures are developed and implemented by DOC to assure nondiscrimination against all inmates who have disabilities, whether or not the disability impacts placement.  These policies will provide specific guidelines on the methods to be employed to ensure nondiscriminatory treatment.  The AIC will be Cathie Holst, the current Manager of the Office of Correctional Legal Services.  If, for any reason, Ms. Holst is no longer assigned to the AIC position, the position will be filled by an  individual who is agreed to by the parties in this case.  If the parties cannot agree on the person to fill this position, it shall be determined by Judge Kane.

The AIC will also be responsible for the tracking of all inmates with disabilities throughout the DOC, for ensuring that they are not denied access to programs, services and benefits offered by DOC because of their disability, and coordinating the placement and treatment decisions regarding inmates with disabilities with appropriate personnel throughout the DOC as further defined in this Plan.  After an inmate has been identified as an inmate with a disability under this Plan, a copy of the Inmate Verification Form shall be forwarded to the AIC.

The AIC will receive medical training relevant to the disabilities identified in this plan which may be similar to that provided to facility staff.

## III.    DEFINITIONS

### A.      COVERED DISABILITIES

The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

### B.      QUALIFIED INMATE

Inmate with a permanent physical disability/impairment which substantially limits his or her ability to perform a major life activity.

C.     PERMANENT DISABILITY/IMPAIRMENT

A condition which is not expected to improve within six months.


## IV.     DRDC:  RECEPTION CENTER PROCESSING

All inmates sentenced to the DOC will initially be processed through the Denver Diagnostic and Reception Center (DRDC).  Generally, inmates shall be processed out of DRDC in a timely manner, no more than 60 days from the date they are received by the DOC.  Detention at DRDC in excess of 60 days shall not be based on an inmate's disability.

If an inmate with a disability is housed at DRDC beyond 60 days, DRDC will ensure that the inmate is not denied access to programs, benefits and services comparable to those at the designated facilities.  These programs may be provided through video transmission.

At the beginning of the intake processing, it shall be determined whether the inmate has a disability.  If so, the disability shall be identified on the Inmate Disability Verification Form. The inmate shall then be referred to the designated ADA Intake person who will coordinate the intake process at DRDC to determine if any accommodations are required to assist the inmate through the DRDC intake process.  Such accommodations may include, but are not limited to providing a sign language interpreter, testing in large print Braille or other assistive devices.  Any such accommodations provided shall be documented in the inmate's file and forwarded to the AIC.  The Inmate Disability Verification Form shall be forwarded to the AIC and shall become part of the inmate's files, and recorded in a central computerized system.  The inmate's status as an inmate with a disability shall be effective until a change in the inmate's condition causes a change in disability status.

As a part of the intake process, inmates with disabilities will be provided written information regarding their rights as individuals with disabilities, the accommodations that can be provided relative to their disability, and informed that they will not be denied access to the programs, benefits and services simply because of their disability.  They will be provided contact information for the AIC.  The inmates will also be informed of the ADA grievance process and the method for filing such grievances.  The information will be provided in a way that accommodates an inmate's specific disability.  Inmates with disabilities who are illiterate or sight impaired will be provided a video orientation regarding these procedures.

Inmates must cooperate with staff in the staff's efforts to obtain documents or other information necessary to verify a disability, including but not limited to, signing a release for medical or mental health information, if necessary. Verification may be triggered by any of the following:

1.      The inmate self-identifies or claims to have a disability.

2.      Staff observe what appears to be a disability severe enough to impact placement, affect program access, or present a safety or security concern.

3.      The inmate health care or central file contains documentation of his or her disability.

4.      A third party (such as a family member) requests an evaluation of the inmate for an alleged disability.  Any such request shall be routed to the ADA Intake person.

<u>Disability Arising After DRDC Intake</u>

If an inmate appears to have or develop a disability that might affect placement after the DRDC intake process, the case manager shall refer the inmate for verification of the disability to the ADA Inmate Coordinator and the Chief Medical Officer.  The Chief Medical Officer or one of the licensed medical doctors at DOC shall verify the disability within sixty (60) days, will determine if the inmate's disability affects placement and, if so, give written notice to the AIC and complete the Inmate Disability Verification Form.

If the Chief Medical Officer or a licensed medical doctor who is designated by the Chief Medical Officer and who is qualified to treat the disability at issue determines that the inmate does not have one of the four categories of disabilities that may affect placement, he or she shall check the appropriate area on the Form and enter an explanation in the comments section.  Within the 60 day period, the Chief Medical Officer or one of the licensed medical doctors at DOC will notify the AIC of the inmate's disability status.  If movement to a designated facility is necessary, the AIC shall coordinate the inmate's move with the Office of  Offender Services, and ensure that the new facility is advised of the inmate's change in status and that appropriate orientation of the inmate occurs at the new facility to advise the inmate of the available accommodations such as sign language, Braille, etc., that will be provided to the inmate, including any special training the inmate may need to adjust to the disability.

<u>Inmates with Disabilities currently in DOC</u>

Inmates with disabilities who are currently in DOC will be identified by Clinical Services staff and an Inmate Verification Form for each inmate so identified will be sent by staff to the AIC. Verification of disability status may also be triggered by any of the four verification triggers listed in Section IV. If an inmate claims to have a disability and clinical staff disagrees, the Chief Medical Officer or a licensed medical doctor who is designated by the Chief Medical Officer and who is qualified to treat the disability at issue will review the situation and make a determination. If the inmate is not satisfied, he or she may pursue a grievance through the ADA grievance procedure.

## V.   PLACEMENT

Certain facilities will be designated for inmates with disabilities requiring special placement. Inmates with diabetes, permanent mobility, hearing, or vision impairments and other disabilities or compound conditions severe enough to require special housing and programming will be assigned to placement in these designated facilities.  Inmates with an impairment of lesser severity or which is temporary will not be assigned to special placement.

All inmates with mobility impairments will be placed in handicapped accessible cells unless the Chief Medical Officer determines that special placement is not required; inmates with hearing and vision impairments will be housed in cells which accommodate their disability.  Diabetics will not be presumed to need a handicapped accessible cell unless they have other conditions that require accommodation.  Inmates will be screened at DRDC to determine if they have a disability that requires placement in a designated facility.

All inmates verified to have a disability on the Inmate Disability Verification Form shall be placed in a designated facility as required in this Plan.  The Office of Offender Services will determine assignments to designated DOC facilities in cooperation with the AIC, and taking into account any additional health care placement concerns as well as necessary program and educational requirements.

Inmates who are currently in DOC and are moved to a designated facility because of a disability and pursuant to this agreement will have the same privileges and property rights as they possess in their current placement.

### A.   CATEGORIES & CRITERIA FOR SPECIAL PLACEMENT

Inmates with disabilities that fall within the below categories will be presumed to require housing in the designated facilities:

1.   <u>Permanent Mobility Impairments</u>

a) Permanent Wheelchair: Inmates who use wheelchairs full or part time due to a permanent disability.

b) Permanent Mobility Impairment (non-wheelchair): Inmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking: i.e., an inmate who cannot walk 100 yards on a level surface or climb a flight of stairs without a pause.  Such impairment may require use of a cane, prosthesis, or walker, or other assistive devices.

2.   <u>Permanent Hearing Impairments</u>

4

Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

3.      Permanent Vision Impairment

Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

4.      Permanent Diabetics:  Insulin or Non Insulin Dependent Diabetics

Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

## VI.   DESIGNATED FACILITIES

The designated facilities in which inmates with disabilities will be housed shall include facilities at each security level within DOC, including boot camp.  Inmates with disabilities shall be allowed to progress through the system in a manner consistent with that of inmates without disabilities.  Inmates shall not be housed at higher security facilities solely because of their disability.  The institutions identified below are designated facilities at which inmates with disabilities shall be housed:

A.      MALE INSTITUTIONS

Level I:

Camp George West – (not for wheelchair bound)
Sterling Correctional Facility
Skyline Correctional Center
Ft. Lyon Correctional Facility
Colorado Correctional Alternative (Boot Camp)

Level II:

Arrowhead Correctional Center
Four Mile Correctional Center
Sterling Correctional Facility
Buena Vista Minimum Center-(not for mobility or visually impaired)
Pueblo Minimum Center- (not for mobility or visually impaired)
Ft. Lyon Correctional Facility

<u>Level III</u>:

        Colorado Territorial Correctional Facility
        Ft. Lyon Correctional Facility
        Sterling Correctional Facility
        Arkansas Valley Correctional Facility-(not for mobility or visually impaired)

<u>Level IV</u>:

        Limon Correctional Facility
        Sterling Correctional Facility

<u>Level V</u>:

        Colorado State Penitentiary/Colorado State Penitentiary II when completed
        San Carlos Correctional Facility
        Denver Reception and Diagnostic Center
        Sterling Correctional Facility

The Youth Offender System (YOS) shall also be a designated facility.

Boot camp and YOS will be accessible for inmates with disabilities and no inmate will be denied access to YOS or Boot Camp solely because of a disability.

B.     FEMALE INSTITUTIONS

Denver Women's Correctional Facility
Colorado Women's Correctional Facility-(not for mobility or visually impaired)
Pueblo Minimum Center-(not for mobility or visually impaired)

C.  OPTING OUT OF PLACEMENT AT DESIGNATED FACILITIES

Inmates with disabilities who do not desire to be placed in the designated facilities may opt out of such placement by providing written notice to DOC of his/her desire to be exempt from placement in a designated facility.  If an inmate desires to opt out of placement at a designated facility, the inmate will be deemed to understand that he or she may be placed in a facility that is not specifically designed to accommodate their disability.  The notice of an inmate's desire to opt out of placement at a designated facility must be provided to the inmate's case manager.  After receiving such notice, the case manager will forward the request to the AIC, who will then inform the Office of Offender Services of the inmate's desire and coordinate the new placement, if appropriate, of the inmate. An inmate who has previously provided notice to opt out of placement at a designated facility may later change his/her request to be placed at a designated facility by providing written notice of this request to his or her case manager.

## VII.   STRUCTURAL COMPLIANCE/PHYSICAL PLANT CHANGES

The designated facilities will be brought into compliance with accessibility standards under the ADA and Rehabilitation Act of 1973, using ADAAG standards, to ensure that the programs, services and benefits at the facilities are not denied to any individual because of his/her disability.

Structural modifications or, where appropriate, programmatic accommodations, shall be made to ensure inmates with disabilities have full use and enjoyment of all of the following areas, including but not limited to accessible housing, inmate cells, restrooms, and bathing areas, water fountains, recreation areas such as gyms, yards, and weight rooms; medical clinics; infirmaries; laundry facilities; cafeterias and/or dining halls; chapels; visiting areas; vocational training; employment opportunities; libraries; pathways, including evacuation routes, and other programs, services and benefits.

### A.   ACCESSIBLE HOUSING REQUIREMENTS

The DOC shall ensure that the number of medical  accessible beds at the designated facilities shall total no less than 2% of the total DOC inmate capacity (including the capacity of contract facilities).  The accessible beds shall be distributed throughout the designated facilities in accordance with the number of total beds at each security level. For example, if there are a total of 2000 Level III beds and 1000 Level IV beds, then 40 (2% of 2000) of the  accessible beds need to be provided at Level III facilities and 20 (2% of 1000) of the  accessible beds need to be provided at Level IV facilities.  If there are an insufficient number of available  accessible beds at a given security level, the individual with a disability in need of the accessible cell may be progressed down to a lower security level accessible cell.  In no event may a class member be housed in a higher security level facility because of the unavailability of an accessible cell at the lower security facility and in no event shall an inmate who requires an accessible cell be denied such housing.  The accessible beds shall be distributed throughout the designated facilities in accordance with the distribution guidelines in the ADA.

Programs, services or benefits at the designated facilities which are uniquely group functions, including but not limited to music rooms, band, group meeting areas, religious services, group therapy, television/game/video rooms, shall be permanently located in areas that are accessible to inmates with disabilities, except that the music room at Limon will not permanently be relocated to an accessible location unless an inmate with a disability requests to participate in the program(s) held at that location.  In the event there is such a request, the music room at Limon will be relocated to an accessible location during the duration of time that the inmate with a disability participates in that program.

Structural modifications and/or when applicable, policy and/or programmatic changes identified in the ADA audits prepared by Peter Orleans and the ABO-Copeland team from 1997 to 2002 (hereafter "the Orleans Reports") will be implemented throughout the designated

7

facilities to the extent that the audits reference areas to which inmates have access.  These reports are expressly incorporated herein, attached as Exhibit A.  The only authorized modifications to the Orleans Reports are as follows:

1. <u>Arrowhead</u>

The accessible cells will be located only in C and E Cell houses and will meet the criteria established in Orleans Report.  There will be one accessible drinking fountain in each of the two cell houses that have accessible housing.

2. <u>Colorado State Penitentiary</u>

It is agreed that the inmate work areas specified in the Orleans Report do not have to be accessible as long as the reintegration program is located at another facility.  If the reintegration program is located at a non-designated facility, then any inmate with a disability who is approved to enter the reintegration program ("pre-pro"), that inmate will be placed back into general population rather than into the reintegration program at the time they would have been moved to the reintegration program.  When the reintegration program is located at CSP II, the inmate work areas will be accessible.

3. <u>Colorado Territorial Correctional Facility</u>

The pill dispensing area is being renovated in compliance with ADAAG standards and the pill-dispensing surface will be lowered.  A new ADAAG compliant drinking fountain will be installed.

DOC will reconfigure the two toilet rooms in the kitchen work area in compliance with ADAAG, but the final configuration may vary from the suggestions in the Orleans report.

The recreational activities for inmates in the recreational area have been relocated in an accessible location and will remain in an accessible location**.**

The accessible cells will be located in cell houses except Cell House 1 at this time.  In any event, DOC will maintain a sufficient number of accessible beds at this facility as required by this Plan.

4. <u>Ft. Lyon Correctional Facility</u>

There will be at least 130 accessible ADAAG compliant beds distributed throughout Bldgs. 4, 5, and 8.

The changes to the laundry area, electrical building and the garage do not have to be made as long as there are jobs available to inmates with disabilities at this facility that are comparable to the types of jobs offered at other DOC facilities.

5.   Limon Correctional Facility

DOC agrees to correct the items listed as non-compliant in the inmate cell area and will make the cells conform with ADAAG standards.

The music room will not permanently be relocated to an accessible location unless an inmate with a disability requests to participate in the program(s) held at that location.  In the event there is such a request, the music room at Limon will be relocated to an accessible location during the duration of time that the inmate with a disability participates in that program.

6.   Youth Offender Services at Pueblo

DOC will need to bring in a new visiting trailer or have the existing one modified.

7.   Skyline Correctional Facility

DOC will make free weights available to any inmate with disabilities that requests them.  There shall be a specific policy directive that staff is to provide inmates with this accommodation.

When a programmatic or policy change is identified as necessary by the Orleans Reports, the AIC will develop the programmatic or policy changes in conjunction with the relevant facilities' personnel and ensure the changes are implemented.

Areas in the designated facilities to which inmates have access but were not reviewed by Peter Orleans shall be reviewed for accessibility by Orleans and his agreed upon assistant to determine if structural or programmatic/policy changes are necessary to meet accessibility standards.  With respect to these areas, if DOC does not agree with the modifications proposed by Orleans, and the issue cannot be resolved by the parties, then the issue shall be submitted to Judge Kane as the final arbitrator on the issue.

All new facilities built by DOC after the effective date of this Plan shall be built in accordance with the new construction standards as required by the American with Disabilities and the Rehabilitation Act of 1973.

With respect to existing DOC facilities, alterations to inmate areas that house inmates with disabilities will be designed to be accessible pursuant to state and federal accessibility standards. With respect to non-designated facilities and areas of DOC facilities that will not house inmates with disabilities, structural alterations will be reviewed at the project design

9

phase for compliance with accessibility requirements. At that time, a determination will be made whether structural accessibility to the maximum extent feasible is warranted, in view of budgetary and penological considerations.

## VIII.   SPECIAL PLACEMENT HOUSING

The Department shall provide accessible special placement housing for inmates with disabilities as follows:

A.   ADMINISTRATIVE/PUNITIVE SEGREGATION UNIT (ASU/PSU)

Designated facilities shall provide accessible ASU/PSU housing to accommodate inmates with disabilities. Where accessible ASU/PSU housing is unavailable, alternate placement may be made temporarily in another appropriate location consistent with the ADA, such as the highest security level accessible cell available. As a last resort to transfer, an ASU/PSU inmate with a disability affecting placement may be housed temporarily in an accessible infirmary.

B.   PLACEMENT IN INFIRMARIES

When an inmate with a disability affecting placement is housed in an infirmary for long term placement due to health care needs, the inmate will not be denied access to programs, benefits, and services comparable to those at the designated facilities. These programs may be provided through video transmission.

## IX.   TRACKING

A.   The AIC will be responsible for tracking each inmate designated as having a disability as defined herein throughout the inmate's incarceration to ensure that the individual is not denied access to programs, services and benefits offered by DOC because of his/her disability.  The AIC shall be made aware of and consulted prior to the transfer of an inmate with a disability to a different DOC facility or transfer to any other institution (hospital, county jail, etc.) in order to ensure that the inmate has appropriate assistive devices for the transfer and that appropriate transfer methods are employed.  The AIC shall also be responsible for working with the case managers assigned to inmates with disabilities to ensure that those inmates are not denied access to the programs, benefits and services offered to other inmates, based solely on a disability.

B.   The Office of Offender Services and the AIC will be responsible for ensuring that inmates with disabilities are placed in appropriate designated facilities. The Office of Offender Services shall maintain a database which tracks the placement of inmates with disabilities by using special disability related codes for the disability categories referenced herein. The database will identify those inmates who are placed in the designated facilities because of their disability. When a request to transfer an inmate with a disability is received by the Office of Offender Services, the database will alert the user that the inmate has special needs and requires special placement.

10

C.      The AIC, in consultation with Clinical Services, may temporarily grant an accommodation pending verification, on the condition that the accommodation will be withdrawn if the AIC is unable to verify the disability.  Such conditional grants are particularly appropriate where the lack of an accommodation may cause serious or irreparable harm.

X.      **REASONABLE ACCOMMODATIONS**

A.      GENERAL

Inmates who have disabilities as defined herein shall be provided reasonable accommodations to ensure that they have access to comparable programs, services and benefits provided to non-disabled inmates.  Examples of reasonable accommodations include providing special equipment (such as readers, sound amplification devices, or Braille materials), providing inmate or staff assistance, qualified sign language interpreters, or modifying work or program schedules.

The DOC shall consider, on a case-by-case basis, accommodations for inmates with disabilities that are not so severe as to require placement in a designated facility or that are temporary in nature.

An inmate with a disability may submit a request for accommodation for access to benefits, programs or services to his or her case manager and may attach any relevant documentation of his or her disability that is in the inmate's possession or is easily obtainable by the inmate and that is not already in his or her DOC file(s).  The case manager, in conjunction with the AIC, will decide within 30 days whether to grant the requested accommodation.  If the request is denied the inmate may file a grievance following the process as defined hereinafter.

B.      EFFECTIVE COMMUNICATION

1.      <u>General</u>

Reasonable accommodations shall be provided to inmates with disabilities to ensure effective communication with staff, and where applicable, other inmates and the public.  Auxiliary aids, which are reasonable, effective, and appropriate to the needs of the inmate, shall be provided when simple written or oral communication is not effective and will not be counted as personal property.   Such aids may include but are not limited to, aides (inmates or staff), qualified interpreters, readers, sound amplification devices, hearing aids, captioned television/video text displays, Telecommunication Devices for the Deaf (TDD), audio taped texts, tape players/recorders, Braille materials, large print materials, and signage. Sign language interpreters will not be denied because of the cost of services.  Interpreters will be contacted to assist inmates when necessary.

Each designated facility shall maintain a list of auxiliary aids, which are available to hearing and sight impaired inmates and shall inform the inmates of their availability during orientation at the facility.  The list shall be maintained at the facility library.  Each facility shall also maintain a list of qualified interpreters or interpreter providers who are available to assist hearing impaired inmates.

2.      Telecommunication Devices for the hearing Impaired/Telephones

Telecommunication Devices for the Deaf (TDD) and telephones shall be made available to all inmates who are designated as within the class of hearing/speech impaired inmates. Verification of an inmate's need for TDD may be confirmed with the AIC and should be documented in the inmate's file.  If the inmate does not have a hearing/speech impairment but desires to call an outside party who requires the use of a TDD, the outside party shall forward a physician's statement of TDD verification to the inmate's case manager.  Upon meeting all verification requirements, the inmate may sign up for telephone calls pursuant to the facility policy.  The TDD sign-up sheets shall be maintained by the facility manager or his/her designee.  The TDD calls shall have extended time increments due to the time delay associated with the TDD relay process, and shall be up to 45 minutes, unless the case manager decides, in his/her discretion, to extend the time.  The TDD sheet shall be delivered to the AIC every 90 days.

Public telephones with volume amplification devices will be accessible to inmates in all locations where inmates with hearing impairments are housed.

3.      Communication During Disciplinary Hearings and The Delivery of Heath Care

Because of the critical importance of communication during disciplinary hearings and the delivery of health care services, the standard for effective communication is higher when these interests are involved.  The degree of enhanced communication accommodation that may be warranted under these special circumstances shall be determined on a case-by-case basis.  However, if it is determined during the DRDC intake process that a hearing impaired inmate cannot communicate effectively via lip-reading or written communication, then it shall be presumed that a sign language interpreter will be necessary for disciplinary hearings and the delivery of health care, if the inmate can communicate in sign language.  Staff responsible for completion of all forms involving disciplinary processes and health care shall document steps taken to ensure effective communication for inmates with disabilities.  Communication assistance involving health care delivery shall recognize the privacy interests involved between the health care provider and the inmate/patient.

4.      Qualified Interpreters

A qualified interpreter is an individual who is able to interpret effectively, accurately and impartially, both receptively and expressively, using any necessary specialized vocabulary.  A qualified interpreter includes a person adept at American Sign Language.  Each designated facility will maintain a list of qualified interpreters and the inmate's case manager is responsible for assisting the inmate in obtaining the services of these interpreters when necessary.  DOC shall maintain a contract with Sign Language Network, or its equivalent, to ensure that interpreter services are provided as necessary.

5.      Equal Access

Reasonable accommodations shall be made to ensure equal access for inmates with disabilities to the courts, to legal representation, to health care, educational, vocation, and rehabilitation services, and to all other programs, benefits and services at DOC.

## XI.      JUSTIFICATION FOR DENIAL OF REQUESTS FOR REASONABLE ACCOMMODATION

A.      LEGITIMATE PENOLOGICAL INTEREST

A request for accommodation may be denied when it would pose a serious risk to the safety or security of the institution, staff, or the public; or when the request would adversely impact other legitimate penological interests, including deterring crime and maintaining inmate discipline.  In all determinations of reasonable accommodation, public safety and the health, safety, and security of all inmates and staff shall remain the overriding consideration.

B.      UNDUE BURDEN AND FUNDAMENTAL ALTERATION DEFENSES

The DOC need not take an action to provide accessibility to a service, program, or activity if it can prove that the action would impose an undue financial or administrative burden on the agency, or would fundamentally alter the nature of the service, program, or activity.  The determination that an action would result in an undue burden or fundamental alteration may only be made by the Executive Director or his/her designee.  The decision must be made only after consultation with the AIC and consideration of all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of reasons for reaching that conclusion.  Even if the requested action would impose an undue burden or fundamentally alter a service, program or activity, the DOC must take any other action that would not result in an undue burden or fundamental alteration, but would still ensure that disabled inmates receive the benefits of the service, program, or activity.

## XII.      ADA GRIEVANCE PROCEDURE

When an inmate with a disability has been unable to resolve an issue related to his/her disability, including, but not limited to issues of placement, requested accommodation, or job placement, the inmate may utilize the ADA grievance process as follows:

1.     The inmate shall first pursue an informal resolution with the party or parties involved.  Any such grievance regarding an inmate's disability shall be brought to the attention of the inmate's case manager and shall be documented in the inmate's working file.  The response to the grievance shall also be documented in the inmate's working and department files.

2.     If the issue is not resolved at the informal level, the inmate has 5 calendar days
to file Step I ADA grievance after receipt of the informal resolution attempt.  The case manager shall forward the grievance to the AIC within 5 calendar days of receipt of the grievance.  The AIC shall then issue a written determination within 25 calendar days following the AIC's receipt of the grievance.  The AIC shall maintain a file of all ADA grievances by inmate name and their resolution in the office of the AIC.

3.     If the issue is not resolved at the Step I level, the inmate may file an ADA Step II grievance within 5 calendar days of receipt of the Step I response.  The inmate shall file the Step II grievance, along with copies of the informal and Step I grievance and responses with his/her case manager.  The case manager shall then, within 5 calendar days of receiving the Step II grievance, forward the grievance and accompany documents to the appropriate Regional Assistant Director.  The Regional Assistant Director shall then issue a written determination within 25 days of receipt of the Step II grievance.  The Regional Assistant Director shall maintain records on all ADA grievances and their resolutions.  Grievances shall be sent to the following individuals:

For SCF, LCF, AVCF, TCF, San Carlos/Pueblo Minimum Center, DRDC, DWCF, CCC, and Ft. Lyon, send grievances to:

Asst. Director, Eastern Region
San Carlos Correctional Facility
1410 West 13th St.
P.O. Box 300
Pueblo, Co. 81003

For all Canon facilities, DCC, RCC, Buena Vista Complex, send grievances to:

Asst. Director, Western Region
Facility Mgt. Services Field Office

P.O. Box 300
Canon City, Co. 81215

For the YOS, send grievances to:

Assistant Director of Adult Parole, Community
Corrections and YOS
12157 West Cedar Drive
Lakewood, Co. 802284.

If the issue is not resolved at the ADA Step II level, the inmate may file an ADA Step III grievance within 5 calendar days of receipt of the Step II response. The inmate shall forward the Step III grievance, along with copies of the informal, Step I and Step II grievances, and the responses thereto, to the Step III Grievance Officer. The Step III Grievance Officer shall issue a written determination of the grievance within 45 calendar days of receipt of the grievance. His/Her decision shall be considered final agency action. The Step III grievance officer shall maintain records of all ADA grievances in an orderly fashion by inmate name, separate and distinct from all other grievance files.

Case managers shall assist inmates with disabilities regarding preparation of the grievances, and may waive any copying charges.

The AIC, Regional Assistant Director and Step III Grievance Officer shall receive ADA training on all areas specified in the training portion of this Plan, except for the medical training provided regarding diabetes.

It is the responsibility of the inmate's case manager to verify whether the inmate has a documented disability and indicate such by checking the appropriate box, e.g., IWD (Inmate with Disability) on the grievance form. The case manager shall contact the AIC if it is unclear if the grievance is disability related.

Extension of Time:  The time for a non-emergency request for accommodation may be extended for ten working days when the issue requires expert consultation.
If the request for accommodation is denied and involves a matter that may result in an immediate threat to the inmate's safety, health or well- being, or may cause other serious or irreparable harm, the inmate shall identify the request as an emergency, give the request to his/her case manager, and the case manager shall forward the request immediately to Clinical Services and the AIC. Appeals that qualify for an expedited appeal may include, but are not limited to, the following:

1.    Providing appliances or aids that are essential to performing major life activities;

2.    Providing equipment or modifications essential to safety; and

      3.     Providing assistance to permit effective communication in disciplinary hearing

             processes or settings or for health care provider communications.

The AIC shall review an emergency request in cooperation with Clinical Services and make a determination as soon as possible, but in no event no more than 3 business days following receipt of the request unless the situation is life threatening.  In cases where the situation is life threatening, Clinical Services will immediately contact the inmate and make an immediate determination, subject to the review of the AIC.

## XIII.   INMATE PROGRAMS, ACTIVITIES AND WORK ASSIGNMENTS

A.     All designated facilities shall offer inmates with disabilities a range of programming, jobs and vocational opportunities equivalent to that available at the non-designated facilities.  Group programs/activities shall be located in handicap accessible rooms, except the music room at Limon, as indicated above. No inmate shall be denied access to educational, vocational and work programs based solely on a disability.  There shall be a variety of jobs in every pay scale available to qualified inmates with disabilities, comparable to those offered to other inmates.  Any programs initiated at designated facilities after the date of this Plan shall be provided in an accessible area.

B.     The AIC in conjunction with the case manager assigned to the inmate shall evaluate placement opportunities in educational, vocational or work programs. Eligibility to participate in any program depends upon the inmate's ability to perform the essential functions and to meet the eligibility criteria of the assignment with or without reasonable accommodations.  Otherwise qualified inmates with disabilities shall not be denied jobs or access to education or vocational programs solely because of their disability.

     **ESSENTIAL FUNCTIONS OF A JOB:** The essential functions of a job are defined as the basic duties/requirements of the job.  This does not include the marginal duties of the job.  Duties/requirements of inmate jobs shall be examined to determine essential and non-essential functions.

C.     Reasonable accommodations shall be provided for inmates with diabetes or those who require dialysis who may need to be excused from programs at times to permit insulin or dialysis treatment.  Such reasonable accommodations shall include modified work, school or program schedules.

D.     The AIC shall review educational, vocational and work programs available to inmates with disabilities to ensure that the assignment of the inmates is nondiscriminatory.

E.     In the event that an inmate with a disability is unable to work or participate in programs because of his or her disability, that individual shall not be penalized because of the failure to participate in these programs with respect to earned time or

placement issues and further shall be provided the benefits allowed to other inmates who are able to work and participate in programs, including but not limited to yard time and other activities.

F.      Evaluation of an inmate's removal from a program assignment shall be done on a case-by-case basis, and will take into account a number of factors including the inmate's ability to perform the essential functions of the program or the inmate's misbehavior or refusal or failure to work as directed.  Inmates with disabilities who are denied jobs or access to programs may file an ADA grievance as set forth herein.

## XIV.   EVERYDAY LIVING ASSISTANCE

Any inmate with a disability who requires assistance with the performance of everyday activities shall be provided inmate aides to assist the inmate. DOC shall designate inmate aides to perform these services and shall provide appropriate training to the inmate rendering the services.  Inmate aides will be screened to ensure that they do not have exhibited tendencies to victimize other inmates and that they are compatible with the care-giving skills required.  Inmates who have a history of violent behavior or a history of theft will not be designated as inmate aides.  At no time will inmate aides perform duties or functions routinely performed by medical staff and will not provide medical care to the inmates.

Every effort will be made to assign the inmate aides to either the same cell, or in the same living area, as the inmate with a disability that they are assisting.

## XV.   TRAINING

A.      GENERAL

During the compliance period of this Plan, and on an annual basis thereafter, all DOC staff who are involved in providing programs, benefits, or services to inmates shall be provided training regarding the unique needs of inmates with disabilities.  Such training shall include, but is not limited to, disability cultural issues, special needs, assistive devices and training regarding how and when reasonable accommodations are to be provided, training with respect to ADA grievance procedures, the unique vulnerability of inmates with disabilities to crime from other inmates and staff, and the protocols to be employed with inmates with disabilities during evacuation and emergency procedures.

B.      DIABETES TRAINING

Specific training shall also be provided to all staff who are involved in providing programs, benefits, and services to inmates regarding the need to be cognizant of the special requirements of diabetics, including their need for access to water and diabetic snacks, the need for meal timing, medication administration timing, as well as the symptoms related to diabetes-related complications such as acidkesotosis and hypo- or hyper-glycemia.  Staff shall be trained regarding what emergency procedures need to be taken with respect to these symptoms, including the need for immediate

17

intervention and medical attention.  Inmates with diabetes complaining of dizziness, disorientation, and other symptoms related to acidkesotosis and hypo- or hyper-glycemia shall be provided immediate access to medical personnel.  Written material shall be provided to the staff regarding each topic.

Training on the above issues will also be incorporated into the basic training provided to all new DOC personnel.

Medical staff shall receive specific training regarding all aspects of the care and management of inmates with diabetes.  This training shall occur during the compliance period and during regular intervals thereafter.

Inmates with diabetes will also be provided training on a regular basis, including written information that complies with current American Diabetes Association guidelines, regarding the care and management of diabetes.

During the compliance period of this Plan, Linda Edwards, in cooperation with DOC medical staff, shall design a plan and assist with the implementation of the training of medical and non-medical staff, and the inmates, regarding diabetes issues.  This shall include the training to be conducted during the  basic training course as well as the annual training of medical staff.  In addition, the diabetic diet issued by DOC shall be reviewed by Ms. Edwards for compliance with American Diabetes Association guidelines regarding diabetic meal management and appropriate changes to that diet will be implemented.

Written material will be provided to the staff regarding the above topics.  Training provided by Linda Edwards may occur through video presentation.

C.      TRAINING REGARDING HEARING IMPAIRMENT ISSUES

During the compliance period of this plan, and at regular intervals thereafter, Sign Language Network will provide training to the medical and non-medical staff at each of the designated facilities regarding communication with and the cultural awareness issues concerning inmates with hearing impairments.  This training may include, but is not limited to the types of accommodations available to assist inmates with hearing impairments, how to use TDD devices, and available community resources for individuals with hearing impairments.

Sign Language Network will also assist in the development of training protocols to be used during the basic  training of all new DOC staff regarding the communication with and cultural awareness issues concerning inmates with hearing impairments.

D.   TRAINING REGARDING VISION IMPAIRMENT ISSUES

During the compliance period of this plan, and at regular intervals thereafter, the Colorado Center for the Blind will provide training to the medical and non-medical

staff at each of the designated facilities regarding the unique issues related to inmates with vision impairments. This training may include, but is not limited to the types of accommodations available to assist inmates with vision impairments, unique safety issues for the inmate, training available for inmates who have newly developed vision impairments, and available community resources for individuals with vision impairments.

The Colorado Center for the Blind will also assist in the development of training protocols to be used during the basic training of all new DOC staff regarding the unique issues concerning inmates with vision impairments.

E. ACCESSIBILITY TRAINING

All case managers shall receive training regarding their responsibility to ensure that inmates with disabilities are not discriminated against in their participation in programs, jobs, vocational programs and other services and benefits at DOC because of their disability. Case managers shall receive training on the ability of inmates with disabilities to perform a variety of jobs and the need to take a proactive approach to ensuring that accommodations are provided when appropriate to ensure that inmates with disabilities have access to a range of jobs and all available programming and services for which they are qualified. Case managers shall be trained regarding the available accommodations at their facility as well as those available in the community, the availability and appropriate use of interpreters, the ADA Grievance procedures, and need to coordinate the management of inmates with disabilities through the AIC.

F. STRUCTURAL ACCESSIBILITY TRAINING

Plant managers and staff involved in the physical plant maintenance shall be trained with respect to structural accessibility standards and ADAAG guidelines regarding the care and maintenance of the physical plants.

G. TRAINING VERIFICATION

Written material shall be provided to the staff regarding the above topics. If there are written examinations during the initial training of new DOC staff, then any such written exam shall include testing in the above areas. Training provided to existing DOC personnel on the above issues shall be documented as to who received the specific training and when the training was provided.

F. DISPUTE RESOLUTION

If there are disagreements between the specified outside experts and those within DOC regarding the training to be provided under this Plan, and the parties cannot

resolve the issues, the dispute shall be submitted to Judge Kane as the final arbitrator on the issue.

## XVI.  HEALTH CARE APPLIANCES

### A.      DEFINITION

Health care appliances are assistive devices or medical support equipment, which have been prescribed for the inmate and approved by Clinical Services.  Health care appliances include, but are not limited to, orthopedic prostheses, orthopedic braces or shoes, crutches, canes, walkers, wheelchairs, hearing aids, prescription eyeglasses, artificial eyes, dental prostheses, breathing devices, and gloves for wheelchair use only.

### B.      PRESCRIPTION AND APPROVAL

Health care appliances shall be prescribed and approved for eligible inmates by licensed DOC health care providers, subject to medical necessity, safety, and security.
If custody staff, upon inspecting the appliance, denies it to the inmate for safety or security reasons, the Chief Medical Officer or a licensed physician designated by the Chief Medical Officer who is qualified to treat the disability in question, shall be consulted as soon as possible  to determine appropriate action to accommodate the inmate's needs but in any event, no later than five working days unless the removal of the assistive device is a medical necessity, and if so, the consultation should occur immediately.  Accommodation may include modifying the appliance or substituting a different appliance at state expense. Any disagreement will be referred to the Warden for quick resolution.

### C.      POSSESSION OF HEALTH CARE APPLIANCES

Health care appliances shall be documented as property of the inmate or DOC and appropriately identified as such, in accordance with departmental and institutional policy; however, they shall not be included in the volume limit for personal property established.  DOC staff will evaluate any health care application brought into a facility by an inmate for safety and security reasons. No inmate shall be deprived of a health care appliance that was in the inmate's possession upon entry into the DOC system or was properly obtained while in DOC custody, unless for documented safety or security reasons or the Chief Medical Officer determines that the appliance is no longer medically necessary or appropriate. If the heath care appliance is taken away for safety or security reasons, the Chief Medical Officer or a licensed physician designated by the Chief Medical Officer who is qualified to treat the disability in question shall be consulted immediately to determine appropriate action to accommodate the inmate's needs.
D. PURCHASE OF HEALTH CARE APPLIANCES

Prescribed appliances shall be provided by the DOC facility with the approval of the Chief Medical Officer or a licensed physician designated by the Chief Medical Officer who is qualified to treat the disability in question.  Health care appliances deemed necessary shall be ordered by medical no more than 7 working days after it is determined the inmate is in need of the appliance and the appliance shall be provided as expeditiously as possible.  When medical staff receives the appliance, it shall be evaluated to determine that the appliance meets the individual's needs.  If the appliance is to be attached to the inmate's body, such as a prosthetic leg or arm, then personnel specifically trained in the fitting of such application shall fit the device to the inmate to ensure proper working order.

E. MAINTENANCE AND REPAIR OF HEALTH CARE APPLIANCES

It is the joint responsibility of DOC and the inmate to maintain all health care appliances in good repair and operation.  Whenever an appliance, exclusive of wheelchairs, is in need of repair or replacement, the inmate shall utilize approved DOC procedures for notifying health care staff of health care needs.  Health care staff shall schedule the inmate for an appointment and evaluate the condition of the appliance.  Once the need for repair or replacement is verified, the inmate shall be issued an appropriate appliance or accommodation as soon as possible.  This procedure applies to replacement of batteries for hearing aids and other appliances. The inmate shall be financially responsible for damage of the appliance attributable to his or her negligence, but replacement or repair of the device will not be delayed because an inmate's account will have to go into debt to pay for the repair or replacement.  Expenses related to other repairs and replacement of appliances, parts and batteries needed as a result of normal wear and tear shall be covered by the facility.

F.   MAINTENANCE AND REPAIR OF WHEELCHAIRS

All state-issued wheelchairs will comply at least with minimum federal standards.  A state-issued wheelchair in need of repair shall be exchanged for one in good working condition. When a personal wheelchair is submitted for repair, the inmate shall be loaned another for the duration of the repair.  The inmate shall be financially responsible for damage or repairs to the wheelchair caused by the inmate's negligence.  Expenses for other repairs or replacements needed as a result of normal wear and tear will be covered by the facility.  Wheelchairs shall be sent to the medical department for repairs.

Health care appliances shall be retained and maintained by inmates upon release to parole.

G.   MAINTENANCE OF ACCESSIBLE FEATURES AND EQUIPMENT

The DOC has a duty to maintain structural features and equipment in operable working conditions in order to make the prison system's services, programs, and activities accessible to disabled inmates.  Isolated or temporary interruptions in service or access due to maintenance or repairs are not prohibited, as long as the facility is taking prompt action to correct the deficiency.

## XVII.  LIBRARY EQUIPMENT

Electronic equipment, such as audio equipment, tape recorders, and computers will be available for use and when appropriate, to be checked out, in the general library and other areas where appropriate, for use by inmates with disabilities.  Each facility will be responsible for training staff and inmates with disabilities, in the proper use of the equipment.  Each facility shall provide a list of such equipment available to inmates with disabilities to the AIC and submit a protocol for the use of this equipment to be approved by the AIC.  There will be a protocol, approved by the AIC that will be used for each facility.  The librarians shall maintain a list of resources regarding available accommodations which can be provided, such as books-on-tape and inter-library loan programs.

## XVIII. INSTITUTION PROCEDURES

### A.    ORIENTATION AT PLACEMENT FACILITY

When an inmate with a disability initially arrives at a new facility, the case manager assigned to the inmate shall ensure that during the orientation process, the inmate is provided relevant information regarding the accommodations and/or assistive devices that will be made available to that inmate to accommodate his/her needs.  The inmate shall also be informed of the availability of the AIC for assistance with programs, services or benefits at DOC and of the ADA Grievance Process.  The information shall be provided in a format that is accessible to the inmate.

### B.    NOTICES, ANNOUNCEMENTS, AND ALARMS

#### 1.   Written and/or Recorded Materials

Each designated facility shall ensure that the printed materials that are distributed to inmates are accessible to inmates with disabilities. Accommodations such as large print, computer assisted devices, audio tapes, and Braille will be made available on a case by case basis.  When such assistive devices are not adequate to communicate with the inmate, then it is the responsibility of the inmate's case manager to ensure that the inmate is aware of the distributed material. Each facility will adopt an Implementation/ Adjustments (I/A) or an Operational Memorandum (O/M) that identifies a position that will be responsible for  providing the assistance and equipment necessary to all inmates with disabilities to ensure that inmates who have difficulty reading and/or communicating in writing will be provided reasonable access to forms, regulations, and procedures.

The Code of Penal Discipline shall be made available on tape at each designated facility.

Inmates with disabilities who are denied access to these devices, material, information, or accommodations may file an ADA grievance through the ADA grievance process previously outlined.

2. Verbal Announcements/Alarms

Each facility will adopt an Implementation/Adjustment (I/A) or Operational Memorandum (O/M) that identifies a position that will be responsible for ensuring that effective communication is made with inmates with disabilities regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, unlock, etc. Local policies, procedures and post orders shall be adopted to reflect this obligation. Inmates with disabilities shall be provided written information at orientation to the facility regarding the procedures that will be followed with respect to verbal announcements and alarms.

## XIX.   SPECIAL IDENTIFICATION

Custody staff for each housing unit to which inmates with disabilities are assigned will be made aware of the inmate's disabilities and how to accommodate the special needs of those inmates, including but not limited to whether the inmate is a diabetic and how to recognize diabetes-related complications, such as acidkesotosis and hypo- or hyper-glycemia, and what procedures need to be taken for such conditions, including the need for prompt medical attention.

## XX.   EVACUATION/EMERGENCY PROCEDURES

A.   Each institution/facility shall ensure the safe and effective evacuation of inmates with disabilities and shall develop evacuation procedures specifically to deal with the evacuation of inmates with disabilities. Custody staff shall be specifically trained on the evacuation of inmates with disabilities and their unique responsibilities concerning these individuals during emergencies.

B.   Custody staff shall always remain primarily responsible for the evacuation of inmates with disabilities. At no time will the evacuation of inmates with disabilities be designated to other inmates. Additional staffing will be brought in to assist the evacuation of inmates with disabilities during emergency or evacuation procedures if there is insufficient custody staff to accompany inmates with disabilities during these procedures. Specifically, when an inmate with a disability is assigned to a housing unit, there shall be an identified staff position designated to assist that inmate in the event of an evacuation. The list of inmates with disabilities and the positions responsible for their evacuation shall be posted in the control centers in each housing unit.

C.      All inmates with disabilities will be provided evacuation/emergency procedures in an accessible format during orientation, and routine evacuation/emergency drills at the facility will incorporate these procedures. Inmates with vision impairments will be provided a tape recording containing this information.

D.      Each designated facility shall ensure that all inmate areas will be equipped with strobe and audio alarms in areas where inmates have independent means of egress.

## XXI.      COUNT

Inmates who have a disability that prevents them from standing during count shall be reasonably accommodated to provide for effective performance of count.

Each institution/facility shall develop local procedures to reasonably accommodate inmates who are unable to stand for count due to their disability.

## XXII.      RESTRAINTS

Inmates who have a disability that prevents application of restraint equipment in the ordinarily prescribed manner shall be afforded reasonable accommodation, under the direction of the supervisor in charge. Mechanical restraints shall be applied so as to assure effective application while reasonably accommodating the inmate's disability.  If the restraint involves the removal of any prosthetic device attached to the inmate's body, the removal of the prosthetic will only be performed under the supervision of medical staff unless the situation involves an emergency.

## XXIII.      SEARCHES

A.      Inmates who have a disability that prevents the employment of standard search methods shall be afforded reasonable accommodation under the direction of the supervisor in charge. Such searches shall be thorough and professional, with safety and security being the paramount concern.

B.      Inmates who use wheelchairs and who have severe mobility impairments and are unable to perform standard unclothed body search maneuvers shall be afforded reasonable accommodation to ensure a thorough search, including body cavities. If the search includes removal or disassembly of a health care appliance, it shall be conducted in a clean setting.

C.      If a search requires removal of the appliance, a compliant inmate shall be allowed to remove the appliance and tender it to staff.  If forcible removal of an appliance from an noncompliant inmate is necessary, it shall be removed in the presence of qualified medical personnel unless the situation involves an emergency.

D.      No inmate shall be required to lay or sit on extremely hot or cold surfaces to perform strip search maneuvers.

E.      Complex devices (i.e., electronic medical devices, etc.) shall be disassembled for inspection only when there is reasonable cause to believe the inmate has concealed contraband inside the device.  Provisions shall be made for the device to be reassembled if possible or a new device will be provided.

## XXIV.      TRANSPORTATION

A.      The special needs of inmates with disabilities shall be accommodated during transport.  An inmate's special health care aids and appliances shall accompany the inmate upon transfer.

B.      Accessible vehicles shall be used to transport inmates in wheelchairs and those whose disability necessitates specialized transportation.

## XXV.      VISITING

A.      Reasonable accommodations shall be afforded inmates with disabilities to facilitate their full participation in visiting, whether contact, noncontact, or family visiting.

B.      Noncontact visiting booths will be accessible for inmates with disabilities. Auxiliary aids and assistive devices for effective communication will be provided for noncontact visits, including but not limited to volume amplification devices on phones.

C.      Inmates with disabilities shall be provided with the accommodation necessary for them to participate in the contact visiting program. The accommodations shall be provided as appropriate to assist inmates with their participation in the visiting program and shall be in a manner consistent with ensuring the safety and security of staff, inmates, or the public.

D.      Visitors shall not be permitted to bring in outside equipment for effective communication when it is available at the institution. Any equipment that visitors are permitted to bring in will be subject to search.

## XXVI.      HEALTH CARE STATUS DETERMINATION

A.      When an inmate's disability appears to limit the inmate's ability to participate in work, educational or other programs, Clinical Services staff shall evaluate the inmate's ability to participate in work, educational and other programs and document the nature and severity of the inmate's limitations in cooperation with the AIC. Based on that evaluation, a determination shall be made as to the inmate's ability to participate in the work, educational, and vocational activity.

B.      When the inmate's documented limitations are such that the inmate, even with reasonable accommodation, is unable to perform the essential functions of any work, educational or other such program, the inmate will be designated as MEDICALLY UNASSIGNED (or some other equivalent code).  This code shall indicated that the individual is unable to participate in any assigned work, educational or other such program activity, even with reasonable accommodation, because of a physical impairment.  Inmates on Medically Unassigned status shall be scheduled for classification review no less often than every six months for reevaluation of status.

Inmates who are classified as Medically Unassigned will not be housed in higher security facilities nor denied access to educational, vocational, and work programs solely because of their disability nor will they be denied earned time or parole hearings because they were not eligible to participate in educational or vocational programs or work assignments because of their disability.

C.  Copays for all medical visits shall be waived for inmates who are classified as medically unassigned.

## XXVII.      REMOVAL OF HEALTH CARE APPLIANCES IN ASU/PSU DISCIPLINARY DETENTION UNITS

A.      Health care appliances shall not be taken away from an inmate in ASU/PSU, or other disciplinary detention units, unless it is necessary to ensure the safety of persons, the security of the institution, or to assist in an investigation (which may include collecting the appliance as evidence of a crime) and only when supported by documented evidence. No inmate will be deprived of his or her appliance because of the acts of another inmate.

B.      If the health care appliance presents a direct and immediate threat to safety and

security, the appliance may be taken away immediately by any custody staff unless it is medically attached to the inmate.  If the appliance is medically attached, it may only be removed in the presence of qualified medical professionals. The senior custody officer on duty may temporarily authorize the taking away of an inmate's appliance for any of the reasons listed in the foregoing paragraph; however, the process described below must be followed as soon as possible, at least by the next business day, if the appliance is to be retained. In no event shall the procedures set out herein obstruct standard protocols for crime scene preservation, evidence collection, emergency response or any other measure necessary for the safety of persons and security of the institution.

C.      When a health care appliance is taken away from an inmate in special housing for reasons of safety and security, the senior custody officer in charge shall consult the Clinical Team Leader or designee, and the AIC regarding the inmate's need for the appliance and reasonable alternative in-cell accommodations. The senior officer in charge shall then inform the Warden or designee of the incident and the alternative means to accommodate the inmate. The Warden and the AIC shall decide what course

26

to take regarding depriving the inmate of the appliance and providing alternative in-cell accommodation. If the decision is to retain the appliance, it will be stored in a designated location in the unit and provided to the inmate if needed when released from his or her cell for yard, escorts, visits, etc. Medical staff shall evaluate the inmate's ability to function without the appliance, as appropriate.

## XXVIII.        PAROLE HEARINGS ACCOMMODATION PLAN

DOC will ensure that all parole hearings are accessible to inmates with disabilities.  If necessary, reasonable accommodations will be provided to inmates with disabilities.   Prior to a parole eligibility hearing, a case manager shall determine whether any accommodations are required for the hearing.  The case manager may contact the AIC for assistance if necessary and take necessary steps to make accommodations.  In the case of a parole revocation, parole officers will make reasonable efforts to ensure that inmates with disabilities will be provided accommodations.

If the inmate's request for accommodation is denied, the inmate may invoke the ADA grievance procedure, or if necessary, may invoke the ADA emergency grievance procedure.

## XXIX.        COMMUNITY CORRECTIONAL FACILITIES

Inmates with disabilities will not be excluded from referral to the Community Corrections program (CC) based solely on their disability. With respect to nonresidential placement, there shall be reasonable accommodation provided to ensure inmates with disabilities have access to and can effectively communicate with Community Corrections staff or their designee(s).

## XXX.        PAROLE FIELD OPERATIONS

### A.        POLICY

It is the policy of the Department to provide reasonable accommodation to parolees with disabilities consistent with established departmental policies and procedures. Parole planning and supervising is conducted on a case-by-case basis to meet the unique needs of the parolee while protecting legitimate parole interests of DOC.

### B.        RELEASE

Prior to the release of an inmate with disabilities, the case manager shall provide notice and documentation of disabilities to parole staff of the special needs related to the parolee's disability; i.e., need for qualified interpreters or need for TDD access. Parole officers shall ensure effective means of communication with parolee.

### C.        FIELD SUPERVISION/OFFICE VISITS

27

Parole staff shall continue to follow existing procedures as they pertain to the supervision of parolees.  If a parolee has a disability, parole staff shall make reasonable modifications in procedures, if necessary, to ensure that services are provided at an accessible location; i.e., parole office or parolee's residence.

## XXXI.        COMPLIANCE AND MONITORING PERIODS

The DOC shall have no more than two years within which to come into substantial compliance with the terms of this Remedial Plan, hereafter the "Compliance Period."  A review will be made by counsel for the parties and their experts after one year from the date of the fairness hearing to determine if substantial compliance has been achieved.  If substantial compliance has not been achieved after one year, then there shall be another review for substantial compliance in six months.  If the parties disagree as to whether substantial compliance has been achieved, the dispute shall be submitted to Judge Kane for a final determination.

Once it has been determined that DOC is in substantial compliance with this Remedial Plan, then a two year "Monitoring Period" commences during which class counsel will monitor the designated facilities to ensure compliance is maintained during this period.  During the Monitoring Period, class counsel may tour each designated facility up to two times a year to ensure compliance.  In addition, class counsel may spend the time and resources reasonably necessary to monitor compliance during the Compliance Period.  Once the monitoring period is complete, this Plan is no longer in effect unless, prior to the completion of the monitoring period, there has been an objection filed alleging non-compliance.  If such objection is filed, the monitoring period will be extended until there has been a final determination with respect to the merits of the objections.

## XXXII.        DAMAGES

Damages of individual class members shall be determined by a special master designated as Richard Borchers and/or Bruce Pringle.  After approval of this Remedial Plan, class members will be provided a Damage Claim Form to fill out concerning their individual damage claims. Class members may attach any relevant information to this form, including proof of injury or the denial of services or benefits, affidavits, medical information, or any other information desired to be submitted that is relevant to his/her claim of damages.  Inmates who have ongoing claims for damages may submit claims for future damages.  Claim forms will then be sent to the Special Master.  The Special Master shall then determine which of the following five categories of damages shall apply to each class member:

> I.  General inconvenience or nominal damages;

> II.  Damages due to loss of good time/earned time/access to programs or services that have not resulted in physical injury;

> III.  Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);

IV.  Damages due to severe physical injuries; and

V.  Damages due to death.

Only one of the above categories may be applied to each class member.  For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

Class members with damages allocated under categories 1 and 2 shall not be entitled to a hearing before the special master.  Class members (or their representatives) with damages under categories 3, 4 & 5 shall be entitled to a hearing before the Special Master. Generally, these hearings should be no more than two hours in length.  However, the Special Master may extend the time for the hearing when the issues require additional time.  Class members that are entitled to a hearing on their respective damages are entitled to counsel during that hearing, to present witnesses, make argument, and to any remedy otherwise available in a court of law.

After review of the evidence, the Special Master shall issue a written determination as to the damages awarded to each claimant.  These awards may be appealed on an abuse of discretion review to the Honorable Judge Kane.

Class members, their representatives and counsel are entitled to discovery regarding their damage claims and shall be provided copies of the relevant DOC files upon request, including but not limited to medical information, as well as relevant internal quality assurance documents as allowed by the special master.

Damage claims must be filed within 90 days of receipt by the inmate of the Damage Claims Form.  However, if a claim arises during the compliance period, then the inmate may amend his/her claim to request compensation for additional damages.  No additional claims for damages will be allowed during the monitoring period, but any individual who has a claim for damages which arises after the compliance period may bring their claim in any court of competent jurisdiction regardless of the on-going jurisdiction exercised by the federal court in this case.  The Special Master may only extend the time limits for filing a damage claim upon a showing that the class member was prevented from, or incapable of filing within the specified time period.

Plaintiffs' Class Counsel may or may not represent individual class members with respect to their individual damage claims.  Class counsel does not have an obligation to represent any individual with respect to their individual damage claim.

## XXXIII.        ATTORNEYS' FEES AND COSTS

Attorneys' fees and costs incurred prior to the compliance and monitoring periods will be determined in a hearing before a special master, designated as Robbie Barr, who will hold a hearing, not in excess of two days, with each side getting equal time, regarding Plaintiffs' attorneys' fees and costs. Both sides will be allowed to submit the testimony of one expert witness at that hearing. Defendants will stipulate that Plaintiffs are "prevailing parties" for all claims for purposes of the fee petition. The only issues which will be

subject to argument at the fee petition hearing are the reasonableness of counsels' rates, whether counsel spent too much time performing a particular task, and the overall results obtained by counsel, except that Defendants may not argue that Plaintiffs are not "prevailing parties" for any matter in this litigation. Defendants also stipulate that this agreement, which is enforceable through the jurisdiction of the federal court, is a judicially sanctioned change in the legal relationship between the parties to support the award of attorneys' fees and costs to counsel for Plaintiffs. Plaintiffs stipulate that time spent solely on Eighth Amendment matters that do not implicate the ADA or Rehab Act will be subject to the fee caps under the Prison Litigation Reform Act. All other claims are not governed by the PLRA and reasonable hourly rates would apply.  Plaintiffs' counsel may also request that the class representatives are entitled to an additional amount of compensation for their service as representatives.

At the same time that the issue of attorneys' fees and costs prior to the compliance and monitoring periods are submitted to the special master, the parties shall also submit the outstanding attorneys' fees petition relating to the contempt finding entered by the Court to the special master for determination.  The special master shall determine the award of fees' relating to this matter at the same time that the award of fees and costs prior to the compliance/monitoring periods are determined.  The special master will be paid by the Defendants.

It is agreed that the fairness hearing will occur during the time the court has allotted for the trial in this case, with the permission of the court. The parties agree that the special master will thereafter decide the attorneys' fees and costs within 30 days of the fairness hearing. The special master's decision will be subject only to an abuse of discretion review by Judge Nottingham and, unless the special master's decision is overturned by the Court within 30 days, the decision by the special master will stand as the final decision in the case.

If the parties do not agree to the attorneys' fees and costs incurred during the compliance and monitoring periods, then the determination of those fees and costs will also be submitted to the same special master, who will hold a hearing, not in excess of one day, with each side getting equal time, regarding Plaintiffs' attorneys' fees and costs.  Counsel for Plaintiffs may submit their fees and costs petitions on an annual basis for determination.

## XXXVI.      MISCELLANEOUS PROVISIONS

### A.      RESOLUTION OF DISPUTES

In the event the Parties are unable to resolve their disagreement concerning the rights and obligations under or concerning the proper interpretation of this Remedial Plan, representatives of each Party shall confer and attempt expeditiously and in good faith to resolve their disagreement.  In the event the Parties are unavailable to resolve their disagreement, and one party seeks to assert a violation of this Remedial Plan against the other parties, the parties will submit the issue to Judge Kane for resolution.

If Judge Kane is unable to hear any disputes that arise under this plan, the disputes will be heard and determined by an individual agreed upon by the

parties. If the parties are unable to agree on an individual, Judge Nottingham will appoint a person to resolve disputes under this plan.

B.      ADMINISTRATIVE CLOSURE AND DISMISSAL

No later than 30 days from the Approval of the Remedial Plan, the parties shall jointly move the Court for an Order for the administrative closure of this lawsuit under D.C.COLO. L.Civ 41.2.  The lawsuit shall remain administratively closed and shall not be reopened absent a showing of good cause upon motion from either Plaintiffs or Defendants.  The parties stipulate that "good cause" will be shown by an allegation that either party has failed to comply with a determination made by Judge Kane or a special master and seeks enforcement of that decision. After the lawsuit has been administratively closed for the duration of the compliance and monitoring periods, unless the monitoring period has been extended as outlined above, then the Court may proceed to dismiss the lawsuit with prejudice *sua sponte* and without further action from either Plaintiffs or the Defendants.

C.      NOTICE AND COPIES OF THE REMEDIAL PLAN

Inmates with disabilities will be informed of this Remedial Plan and where they may obtain a copy during their orientation process at DRDC during the compliance and monitoring periods.  A notice regarding the availability of a copy of this Remedial Plan and attachments thereto shall be placed in the library of each designated facility and shall explain how an inmate can read or obtain a copy.  The notice shall be placed in a conspicuous location, in a form that an inmate can read regardless of his/her disability. In addition, a copy of this Remedial Plan shall be placed in each library in each institution.  If there is no library, then the copy shall be placed in a central location accessible to inmates on a daily basis.  A copy of this Remedial Plan shall be provided to an inmate upon request during the monitoring and compliance period.

Dated August 27,  2003

Respectfully Submitted By:

Plaintiffs' Counsel:                          Defendants' Counsel:


_____                 _____

Paula Greisen                                  Elizabeth McCann
King & Greisen LLP                        Office of the Attorney General
1670 York Street                             1525 Sherman Street, 5th Floor
Denver, Colorado 80206                 Denver, Colorado 80203
(303) 298-9878                               (3030 866-5236