# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-144
Category III
Claimant: James Riley, #96931
Address of Claimant: FLCF, P.O. Box 1000, Fort Lyon, CO 81038-1000

---

### FINAL ORDER OF SPECIAL MASTER

THIS MATTER came before the Special Master for hearing on December 29, 2005. This hearing was held at the Fort Lyon Correctional Facility (FLCF) in Fort Lyon, Colorado. Present were the following: James Riley (Claimant); and Jess Dance, attorney for Defendants.

Testimony was received from Claimant, Scott Riley, Dwight Martinez, and Daryl Vigil. All documentation previously submitted by both sides was accepted. Claimant did not offer into evidence any exhibits. Defendants offered Exhibits A through R, and all were admitted. After final closing arguments, the case was kept open to allow the submission by Defendants of an affidavit from Dr. Cary Shames, D.O. That affidavit has been received and reviewed, along with a rebuttal document submitted by Claimant. This order shall constitute the final action by the Special Master on this specific claim.

I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>    A. COVERED DISABILITIES
>    The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

      B. QUALIFIED INMATE
      Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
      C. PERMANENT DISABILITY/IMPAIRMENT
      A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

      2. Permanent Hearing Impairments
      Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
      3. Permanent Vision Impairment
      Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
      4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
      Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

      2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
            1. Is the claimant a disabled individual who is a member of the class?
            2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
            3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
            4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. The Special Master will detail briefly the testimony elicited from the witnesses called by both sides.

Claimant called as his first witness Scott Riley. Mr. Riley is a fellow DOC inmate who is presently placed at the Huerfano County Correctional Facility in Walsenberg, Colorado. Mr. Riley testified that he was in the same class with Claimant for Phase One and Phase Two of the Sexual Offender Treatment Program (SOTP). He recalled that Claimant had difficulty hearing in class. Mr. Riley took notes for Claimant. Others in the class also tried to assist Claimant. On cross-examination, Mr. Riley indicated that Claimant often would ask to have something repeated. Instructors in the classes would repeat the question or answer. Claimant would physically move around in classes. On redirect examination, Mr. Riley testified that he never saw any hearing amplification or vision help ever provided to Claimant.

Dwight Martinez was called as a witness by Claimant. Mr. Martinez is a social worker and counselor at the Arrowhead Correctional Center (ACC) in Canon City, Colorado. Mr. Martinez testified that he remembered Claimant from when Claimant was at ACC. Claimant had told him that he had a hearing problem. Claimant was moved around in the classrooms to allow him to hear better. Group meetings were in circles. Mr. Martinez testified that he did not remember any noise that interfered with the classes, other than the public address system would come on with general announcements. There was no sound amplification for the any of the classes or groups. On cross-examination, Mr. Martinez testified that he had worked with Claimant in the Phase Two program. Claimant was terminated from the program as the result of an incident related to chili peppers in the ACC garden. Further, Mr. Martinez testified that Claimant was resistive and confrontational. He did not admit his involvement in the crime that led to his incarceration. As a result, Claimant lost three days of earned time per month. Claimant never told Mr. Martinez of any vision problems. In addition, he was able to walk to class. On redirect examination, Mr. Martinez admitted that Claimant never received a write up for the alleged theft of a chili pepper. On re-cross examination, Mr. Martinez testified that Claimant remains in denial as to his criminal activity and that this has led to his on-going issue of loss of earned time.

Claimant came into DOC custody on March 20, 1998. He was placed initially at the Denver Reception and Diagnostic Center (DRDC). He was there for about on month and then was transferred to the Fremont Correction Facility (FCF). He was transferred briefly to the Colorado Territorial Correctional Facility (CTCF) and then went back to FCF. In April, 2000, Claimant was transferred to the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. He returned to FCF in June, 2002. He was transferred to ACC in July, 2003. He was there until transferred to the Bent County Correctional Facility in Las Animas, Colorado in November, 2003. He was placed at FLCF in February, 2004.

Claimant testified that he is diabetic. He was on insulin by shot but was not at the time of the hearing. He had a problem with shoes over the years, but did receive soft sided shoes when he arrived at FLCF. He testified that the medical care for his diabetes had been good. He receives a kosher diet which he believes helps him control his diabetes.

Claimant has been concerned about his vision. He does receive regular checkups. He has had some bleeding in his eyes. He had a concern about cataracts and did receive surgery during the Phase One class at FCF. A subsequent surgery for cataracts has also taken place. He testified that there is a need for further cataract surgery. He cannot see small print at the present time. He cannot do work in the law library because of the inability to read small print. As to his hearing loss, Claimant testified that he was told he needed hearing aids shortly after he arrived into DOC custody. He did not receive such aids for some time.

Claimant testified on rebuttal that he was forced into a guilty plea by his attorney. He denied that he was guilty of the charge for which he has been sentenced. He has refused to admit his guilt during the SOTP program classes. Claimant further testified that he would take a lie detector test to support his denial of any wrongdoing. Claimant has struggled with hearing since he has been in DOC. He has not been able to effectively communicate without hearing aids. He believed that he had been treated unfairly in not receiving hearing aids. As a result, he has had trouble understanding what is transpiring in classes. He also has had difficulty in seeing at times.

Claimant testified that he lost his left arm at the elbow through an accident when he was ten years old. He has had difficulty in his life time in doing normal daily activities. It was difficult for him to unlock his footlocker while at FCF because it had a key lock. This task normally required two hands.

In his testimony, Claimant described sciatic nerve problems that affected his back and legs. He stated that he could not walk well at times. He requested a cane. His leg has improved and was not a problem at the time of the hearing. His right shoulder also has problems and limits his ability to do activities with it.

On cross-examination, Claimant was asked about his diabetes. He indicated that he uses finger sticks to check his blood sugar levels. He made an effort to end his use of insulin. He would like access to glucose tablets.

Claimant stated further that he first requested a hearing aid when he came into DOC custody in 1998. He did receive a hearing aid in 2000, but accidentally stepped on it in October, 2004. He has recently received a new hearing aid. DOC has provided a vibrating watch to him. He has been employed while in custody and has had no major disciplinary problems.

On re-direct examination, Claimant stated that DOC has not done what was expected under the ADA. He still needed a magnifying glass for reading. He also alleged that he had lost good time and was denied parole because he could not hear in classes. As a result, he was not able to complete those classes that were needed for parole consideration.

Defendants called Daryl Vigil as a witness. He testified concerning the process of receiving earned time. After reviewing Claimant's files, Mr. Vigil testified that Claimant was denied three days earned time each month because he would not admit to his criminal act. Termination from the sexual offender programs will occur because of refusal to accept responsibility for the criminal act/s.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** The Settlement Agreement provides the basis for determination of claimed disabilities. The ADA and Rehabilitation Act provide a broader range of disabilities. The Special Masters are limited to the criteria set forth in the Settlement Agreement. Each of Claimant's disabilities will be examined separately.

*Mobility Impairment*: Claimant has checked all four boxes on the claim form as to alleged disabilities. One of the boxes checked was for mobility impairment.

The Settlement Agreement provides a limitation to mobility impairment to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." Claimant lost his left arm early in his life. He detailed some of the difficulties that he has had in DOC with only one hand. He cannot open a lock easily with one hand. He cannot use shoes that have laces. Velcro shoes have been provided to him. He has had trouble in other areas with the loss of his left arm below the elbow.

The evidence presented by both sides reflected that on or before August 27, 2003 that Claimant was not using a wheelchair and was able to walk. He may have had some pain in walking, but there was no evidence presented of a permanent lower extremity condition that limited walking. Claimant may have a disability under the ADA concerning his arm, but that condition is not part of the Settlement Agreement. The Special Masters are jurisdictionally bound by the definitions in the Settlement Agreement.

Claimant has failed to prove that he had a mobility impairment as defined by the Settlement Agreement. He was able to walk and was not confined to a wheelchair. To the extent that Claimant may have a claim concerning having only one hand, he may pursue a separate lawsuit as to any violation of the ADA and Rehabilitation Act that occurred.

*Hearing Impairment*: Claimant has a hearing loss. The evidence reflects that he came into DOC custody with hearing problems. The loss of hearing probably was the result of being around farm tractors and equipment. Claimant was provided a hearing aid in 2000 by DOC, but he testified that he continued to have problems. Claimant has maintained that he has lost good time because of his inability to complete appropriate courses, as he cannot hear.

Defendants acknowledge that Claimant has a hearing loss. He has received an accommodation and has been provided with a vibrating watch, strobe light alarm, telephone amplification and subtitled movies and television.

The Settlement Agreement sets forth the criteria for hearing impairment as follows:

> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

This criteria is extremely narrow and limited.[2] Claimant's hearing loss is sufficient to be covered by the ADA. It is not covered by the Settlement Agreement. To be blunt, a hearing impaired claimant would have to be totally deaf and have to rely on written communication, lip reading or signing in order to communicate. Claimant does not meet this criteria and is not part of the class for hearing impaired.

**Diabetes:** Claimant is diabetic, and this is acknowledged by Defendants. The Settlement Agreement requires a determination as to whether a disability existed on or before August 27, 2003. In this case, Claimant is found to be a member of the class for diabetes.

**Vision Impairment:** There is no dispute that Claimant has some vision loss and eye problems. Part of this is the result of the diabetes.

The Settlement Agreement defines vision impairment as follows:

> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

Under this definition, a claimant would have to be legally blind. Claimant is not blind and does not have a vision impairment as defined by the Settlement Agreement.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?**

This question must be answered as to two different areas. Claimant has not be precluded from programs because of disciplinary convictions or other problems. He has taken classes and worked since arriving in DOC custody. He has not been prevented from programs or services for legitimate, non-health reasons.

---

[2] As of the issuance of this order, no claimant has met the criteria in the Settlement Agreement for hearing impairment.

Claimant has had problems in sexual treatment programs. He adamantly denies any criminal wrongdoing in the past. He maintains he did not engage in improper sexual behavior. Claimant has a right to maintain his innocence, but it is clear that sexual offender treatment programs require admission of wrongdoing and acceptance of responsibility. There is a conflict between these two positions, but it is not a matter for review under the ADA and Rehabilitation Act. To the extent that Claimant has not accepted responsibility for his actions in the past, he has been denied completion of courses.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** With one exception, the answer to this question is no. Claimant has health and disability issues. Some of those have been accommodated, such as through issuance of velcro shoes. He has received additional hearing appliances, such as the vibrating watch, to make life easier for him.

In order to prove a claim under the ADA and Rehabilitation Act, a claimant must show that he or she had a disability and was discriminated against because of that. An example would be an individual who had no legs and was forced to utilize a top bunk as punishment for some transgression of prison rules.

Claimant has argued that he was unable to complete the sexual offender programs because he could not hear in class. He argues further that this has led to loss of good time and lack of parole consideration. The evidence presented by both sides reflects that Claimant did not and will not accept responsibility for the acts that led to his conviction. As result, he has lost good time and did not complete the sexual offender programs. There is no evidence that substantiates that non-completion of classes was the result of hearing problems. It may have been difficult for Claimant to hear in class, but even his own witnesses acknowledged that instructors worked with him to insure that he understood what was going on.

Claimant has expressed concern about the medical care that he has received. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning the quality of his medical care.

The Special Master does find one area of discrimination did occur prior to August 27, 2003. One of the more baffling aspects of the entire claim process dealing with diabetics has been the issue of shoes. All diabetics have concern about their extremities, as diabetes is a cruel disease that can

8

lead to loss of toes, feet and legs. Claimant testified, and the Special Master so finds, that he received a recommendation from medical staff at FCF to purchase soft sided shoes. Claimant was experiencing problems with his feet at the time, and the shoes would help alleviate concerns about further diabetic complications.

Claimant did purchase the shoes from the canteen.[3]

When Claimant was transferred to AVCF, the shoes were taken from him. No reason was provided as to why this occurred. The lack of uniformity among facilities concerning soft shoes prior to August 27, 2003 led to this type of situation. Either the soft shoes are necessary or they are not. In this case, Claimant received a recommendation to buy the shoes and he did so. This recommendation was based upon his diabetes which was still present when he went to AVCF. Claimant was denied these shoes, despite a medical recommendation, and no valid basis was presented as to why this occurred. Claimant was discriminated against in that he did not receive a service (soft shoes). That is especially true since he paid for the shoes.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** The answer to this question is yes, but only to the extent that Claimant lost his soft shoes that he purchased through the canteen. The harm that Claimant suffered was the loss of the shoes and the inability to use those shoes while at AVCF. The Special Master determines that $125 would be appropriate compensation for the shoes and the loss of their use.

IT IS HEREBY ORDERED that the claim of James Riley is sustained as to the loss of his soft shoes in 2000 and the inability to use those shoes; and

IT IS FURTHER ORDERED that the claim of James Riley is denied in all other aspects, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant is awarded $125 for the loss of the shoes and the use of those shoes; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before June 5, 2006.**

SIGNED this 3rd day of April, 2006.

---

[3] The issue of whether soft shoes should be provided without cost need not be reached as to this claim.

BY THE COURT:

*/s/ Richard M. Borchers*
_____
Richard M. Borchers
Special Master