IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-–870 (OES) (Consolidated for all purposes with Civil Action No. 96—343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-227
Category III
Claimant: Deon Caballero, #82913
Address of Claimant: SCF, P.O. Box 6000, Sterling, CO 80751-6000

---

**FINAL ORDER OF SPECIAL MASTER**

---

    THIS MATTER came before the Special Master for hearing on August 31, 2006. The hearing was held at the Sterling Correctional Facility (SCF) in Sterling, Colorado. Present were the following: Deon Caballero (Claimant); and Scott Wilkonson, attorney for Defendants.

    Testimony was received from the Claimant, but he did not offer any exhibits. Defendants offered into evidence Exhibit A and presented testimony from Robert Manning and Lt. Robin Fiscus. After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

    This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.¹   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

¹The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they may exercise only the jurisdiction agreed upon by the parties.

2

      B. QUALIFIED INMATE
      Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
      C. PERMANENT DISABILITY/IMPAIRMENT
      A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

  On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

    2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
      1. Is the claimant a disabled individual who is a member of the class?
      2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
      3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
      4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

  The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. A brief recap of testimony presented would be helpful.

  Claimant came into CDOC custody in March, 1994. He was placed into the Denver Reception and Diagnostic Center (DRDC) for evaluation. He then was transferred to the Limon Correctional Facility (LCF) in Limon, Colorado. He remained at LCF for approximately three years and then was transferred to the Colorado State Penitentiary (CSP) in Canon City, Colorado. He remained at CSP for almost eight years. His transition out of CSP was through the Centennial Correctional Facility (CCF) in Canon City, Colorado. His time at CCF was only a few months, but Claimant described it as part of the program for inmates who are to be placed at less restrictive facilities. Claimant then was transferred to SCF, where he has been for over two years.

  Claimant was first diagnosed with diabetes by medical staff at the Colorado State Hospital

(CSH) in Pueblo, Colorado. Claimant has suffered from long-term mental illness and has been evaluated and treated at the CSH over the years.

Once Claimant was diagnosed as being a diabetic, DOC medical staff provided medicine to control the illness. That did not stabilize his blood sugar levels. He began to take insulin. He is now on one shot of insulin per day. He also continues to receive medication by pill.

Claimant described his condition as being Type II. He has had problems in receiving an appropriate diet over the years. Claimant testified that he believed his diabetes was the result of DOC treatment, specifically the inactivity that occurs at CSP because of the twenty-three hour per day lock down. Claimant did testify that diabetes did not run in the family. Claimant indicated that he has been suffering from complications to his liver caused by the diabetes.

Claimant acknowledged that he has received medical care over the years for his diabetes, but has had concerns with that care. A nurse at CSP often bruised Claimant when giving insulin by shot to him. He always had a concern about dirty needles, as one nurse used to joke that she used one needle for multiple shots of insulin.

DOC officials sent Claimant to CSH in early 2001. Some DOC officials believed that Claimant was a malingerer. This created conflict with staff members and less than fair treatment. As part of the treatment for diabetes that he was receiving in 2000 or 2001, Claimant was provided by medical staff with glucose tablets. Claimant was encouraged by medical staff to keep the glucose tablets on his person at all times. He did keep them in his pocket and had to use them occasionally. Prior to the time Claimant was to be released from CSP, he was sent to DRDC for an evaluation. DOC correctional officers took the glucose tablets from Claimant. Later in the day as the van was traveling to Denver, Claimant began to feel sick. He experienced low blood sugar levels but was unable to obtain a glucose tablet from the correctional officers who were guarding him on the trip to Denver. He received medical help when he arrived at DRDC. Claimant was fearful for his life.

After being transferred to SCF, Claimant began to experience added problems. He was assigned to work in the kitchen . He had low blood sugar reactions and tried to obtain help. He was accused of being on drugs because he appeared to be lethargic. He began to be hassled in the kitchen, and ultimately was terminated from the position.

Claimant testified that SCF medical officials indicated that diabetics were too much trouble to deal with. Claimant indicated that Lt. Fiscus and Correctional Officer Nichols both said to others that it was just too much work to deal with diabetics.

On cross-examination, Claimant acknowledged that he first received a diabetic diet in the late 1990's. He had sometimes not eaten all meals prepared on that diet. Claimant now attempts to exercise daily in order to control his blood sugar levels. Exercise was extremely limited while he was at CSP. Claimant also acknowledged that he has been taking medication for years for his emotional illness. He became more depressed and paranoid after being diagnosed as a diabetic. He had trouble further with some medications for his diabetes, including Glucophage and Diabeta.

4

Claimant stated that he had Hepatitis C before entering into DOC custody. He had a liver biopsy over one year ago and has been waiting for interferon treatment. He has recently been diagnosed with thyroid problems and is losing weight. Claimant also testified that he has cataracts in his eyes.

While working in the kitchen, Claimant stated that he had problems getting to the med line for his insulin. He was not alone. On redirect examination, Claimant testified that care at SCF was not adequate for inmates with medical problems. No mental health therapy was available for his unit.

Defendants called as a witness Robert Manning, case manager for Claimant. He took over Claimant's case in June, 2006. Claimant is unassigned at the present time due to a COPD conviction for refusal to work. Mr. Manning testified that he has supervised other diabetics who were able to work in the kitchen. Due to Claimant's disciplinary conviction, he will have to seek a job at SCF.

Lt. Robin Fiscus was called as a witness for Defendants. She has been the supervisor of the kitchen at SCF since January, 2000. She supervised Claimant while at he worked in the kitchen, but remembered little about him.

Claimant in rebuttal testified that his diabetes has been controlled at times while in DOC custody. He has begun to wear bifocal lenses due to his cataracts.

Defendants submitted the affidavit of Dr. Orville Neufeld, D.O. Dr. Neufeld acknowledged that the medical records of Claimant reflect that he is a diabetic. He also stated that Claimant has macular degeneration in his eyes. This condition is not the result of diabetes. He also has cataracts. Claimant has received eye glasses.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** The evidence substantiates that Claimant was a diabetic on and before August 27, 2003. This is not disputed by Claimant. Therefore, Claimant is part of the Class as a diabetic.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by CDOC?** Based upon the testimony provided by both sides, the answer to this question is yes. The time period at issue is August 27, 2003 and before. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services before that date.

**3. Was the Claimant discriminated against by CDOC because of his or her disability?** With one exception, the answer to this question is no. Claimant testified at length concerning the quality of medical that he has received while in DOC. There is no question is that he has received

medical care.

Some of the medical records reflect Claimant's struggle with mental illness. In 2001, Claimant told Dr. Neufeld that he wanted to go into a diabetic coma for a "near death experience." In 1999, Claimant told medical staff that he was deliberately eating chocolates because he was hungry. He refused finger sticks in 2005 and signed a refusal form. On occasion, the blood sugar levels have been unstable to the point that Claimant had to be taken for medical care. Claimant testified that he has paranoid thoughts and does not trust DOC personnel.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the medical care provided to him, that is beyond the jurisdiction of the Special Masters. Since the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law, Claimant must pursue separately any rights that he may have concerning the quality of his medical care.

Mental health issues are not part of the Settlement Agreement. Claimant testified that he has not been receiving mental health treatment recently. That lack of care may be the subject of a separate lawsuit. It cannot be adjudicated in this case.

The evidence reflects concerns with the quality of medical care. Under *Fitzgerald*, the Special Masters have no jurisdiction to determine whether the care was sufficient under the Eighth Amendment. Claimant retains his right to commence a separate lawsuit concerning the quality of medical care that he has received.

Claimant has established one significant discriminatory act. Claimant had received glucose tablets as part of the medical care for his diabetes. He was supposed to keep the tablets available in case he started to feel weak. On his trip to DRDC, DOC staff took the tablets from Claimant. He testified that they were not available to him and that he had a low blood sugar level. He became ill and was terrified concerning his health and well being. Claimant was denied the glucose tablets when he needed them. Services for an inmate can be very basic. Discrimination occurred when DOC staff took the tablets that were necessary for Claimant's health, even though he had been prescribed such tablets and they had been given to him. Claimant became sick and was unable to obtain the tablets. As a result, he suffered emotional trauma that was at that time unnecessary.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**
Claimant has established one incident of discrimination. As a result, he was placed into jeopardy for his well being. Claimant is entitled to $150.00 as damages for this incident.

IT IS HEREBY ORDERED that the claim of Deon Caballero is granted to the extent noted and denied in all other respects; and

IT IS FURTHER ORDERED that Claimant is awarded $150.00 for damages for violation of the ADA and Rehabilitation Act; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before December 11, 2006.**

SIGNED this 11th day of September, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master