IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-EWN-MEH (Consolidated for all purposes with Civil Action No. 96-cv-00343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

**DEFENDANTS' RESPONSE TO "PLAINTIFF CLASS MOTION FOR CLARIFICATION ON STANDARDS USED TO DETERMINE DISABILITY STATUS"**

Defendants, through the Colorado Attorney General, respectfully submit their Response to "Plaintiff Class Motion for Clarification on Standards Used to Determine Disability Status."

**ARGUMENT**

**I.    THIS COURT HAS REPEATEDLY HELD THAT THE SPECIAL MASTERS ARE CORRECTLY EVALUATING DAMAGES CLAIMS.**

This Court has provided the Special Masters with four criteria to be analyzed in evaluating damages claims. (November 23, 2004 Order of Judges Kane and Nottingham, ¶ 2, docketed at 745, copy attached to

Defendants' Brief Regarding the Special Masters' Evaluation of Whether Claimants Are Disabled).  The first question the Special Masters must resolve is "[i]s the claimant a disabled individual who is a member of the class?" (Id.).  "The Remedial Plan and, if necessary, case law concerning disabilities under the Rehabilitation Act and the Americans with Disabilities Act may be reviewed for assistance in applying the criteria." (Id., ¶ 3).  In accordance with this Order, the Special Masters note that "[t]he legal standards applicable to [claims] are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act; and (c) the Americans with Disabilities Act (ADA)." (See, e.g., Final Order RE Coit, p. 5, docketed at 1253 (citations omitted)).  The Special Masters have diligently and correctly evaluated hundreds of claims in accordance with this Court's instructions.

Moreover, this Court has repeatedly held that the Special Masters' evaluation of claims, including the criteria they look to, contain "no errors of law" and are "well within the provision of the Settlement Agreement."  In reviewing several Final Orders where the Special Masters cited the special placement criteria set out in Section V(A) of the Remedial Plan, this Court has repeatedly held that the Special Masters properly applied the law.

For example, in the Special Master's Final Order regarding James Duncan, the Special Master stated that "[t]hese definitions [from Section

2

V(A)] control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals." (Final Order RE Duncan, p. 3). The Special Master denied Duncan's claim in part because he does not meet the criteria for mobility and vision disabilities set out in Section V(A). (Id., p. 2-3, 5-6). After reviewing the Final Order, this Court held that "the Special Master's ruling is based entirely on the evidence and a <u>correct application of the law that this claim does not fall within the provision of the settlement agreement</u>." (Order of Judge Kane RE Duncan, March 22, 2006, docketed at 1784 (emphasis added)).

In reviewing the Special Master's denial of Thomas Castro's mobility claim because "he does not meet the criteria for mobility disability" from Section V(A), (Final Order RE Castro, p. 7, docketed at 1728), this Court held that "[t]he findings are made on the basis of the evidence presented and amply supported. There are <u>no errors of law</u>. <u>The Final Order is well within the provision of the Settlement Agreement</u>." (Order of Judge Kane RE Castro, April 13, 2006, docketed at 1898 (emphasis added)). In numerous orders, this Court has repeatedly emphasized that the Special Master's Final Orders are "well within the provision of the Settlement Agreement" and

3

"there are no errors of law."[1]  Similarly, Judge Nottingham recently held that "the record before the court on this appeal demonstrates that the special masters are faithfully considering the issues which the court directed them to consider." (Order Concerning Damages and Attorney Fees, Judge Nottingham, August 22, 2006, docketed at 2216, p. 7).

As Class Counsel points out, the Joint Stipulation "provides that if this Court determines that the Special Masters have used the wrong criteria in determining disability during the damage claim process, the Special Masters shall review all such orders, regardless of whether those orders have been appealed or not." (Plaintiff Class Motion for Clarification, p. 1-2).  Because this Court has already repeatedly held that the Special Masters are correctly evaluating damages claims, there is no need to order the Special Masters to reevaluate the over 800 claims that have already been resolved.

---

[1] See, e.g., Order of Judge Kane RE Winkler, March 22, 2006, docketed at 1786 ("The rulings of the Special Master are based on the evidence and the law was properly applied") (affirming Final Order docketed at 1147); Order of Judge Kane RE Baker, March 29, 2006, docketed at 1827 ("the Special Master has correctly decided that Mr. Baker's claims do not fall within the scope of the settlement agreement") (affirming Final Order docketed at 1227); Order of Judge Kane RE Coit, July 19, 2006, docketed at 2139 ("the findings made are consistent with the evidence presented and there are no errors of law") (affirming Final Order docketed at 1253); Order of Judge Kane RE Smith, July 19, 2006, docketed at 2141 ("the findings made are consistent with the evidence presented are there are no errors of law") (affirming Final Order docketed at 1917); Order of Judge Kane RE Freeman, July 20, 2006, docketed at 2144 ("the Special Master made extensive findings of fact and conclusions of law based on the evidence and testimony presented. He did not abuse his discretion.  There are no errors of law") (affirming Final Order docketed at 1252).

Granting Class Counsel's motion would require this Court to overturn its previous orders finding that Special Master's evaluations contain "no errors of law" and would throw the damages process into chaos. In 2004, the Special Masters announced that they interpreted Section V(A) of the Remedial Plan as providing guiding language for evaluating individual damages claims. (See, e.g., Order of Special Master Dismissing Claim RE Hull, August 3, 2004, docketed at 656 (referring to without citing Remedial Plan, ¶ V(A)(1)); Order of Dismissal RE Slusher, October 11, 2004, docketed at 722 ("[t]he language of the settlement agreement controls")). Class Counsel did not object at the time. Indeed, Class Counsel did not object until nearly two years later in July 2006.

When Defendants began responding to the merits of individual claims in 2005, the Special Masters had already made clear that they were considering the criteria from Section V(A) in evaluating claims. In light of the Special Masters' orders citing the criteria from Section V(A) and this Court's subsequent approval of the Special Masters' approach, it appeared that the Special Masters' approach was the undisputed law of the case. Consequently, Defendants relied upon the Special Masters' statement of the governing law, as well as this Court's approval, in litigating individual

5

damages claims. Granting Class Counsel's motion would require the Special Masters (and Defendants) to redo the last two year's worth of work.

This Court should continue to hold that the Special Master's interpretation is "well within the provision of the Settlement Agreement" and their analytical approach contains "no errors of law."

## II. THE CDOC FOLLOWS THE APPROACH SET OUT BY THE U.S. SUPREME COURT IN EVALUATING WHETHER INMATES ARE DISABLED.

In evaluating whether an inmate is "disabled", the CDOC, through the ADA Inmate Coordinator ("AIC"), follows the approach set out by the U.S. Supreme Court. Under the ADA and Rehabilitation Act, a "disability" is a physical or mental impairment that substantially limits a major life activity. 42 U.S.C. § 12101(2); 29 U.S.C. § 705(20)(A); Remedial Plan, § III(B). That a person has an impairment does not mean he or she is disabled.

> It is insufficient for individuals . . . to merely submit evidence of a medical diagnosis or an impairment. Instead, the ADA requires those claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation in terms of their own experience . . . is substantial.

Toyota Motor Manuf. v. Williams, 534 U.S. 184, 198 (2002) (quotation omitted).

A physical or mental impairment only constitutes a disability if it substantially limits a major life activity. The U.S. Supreme Court has

6

explained that "substantially" means "considerable" or "to a large degree." Toyota, 534 U.S. at 196. "The word 'substantial' thus clearly precludes impairments that interfere in only a minor way with [a major life activity] from qualifying as disabilities." Id. at 197. This term "needs to be interpreted strictly to create a demanding standard for qualifying as disabled." Id. (emphasis added).

A court must consider any corrective or mitigating measures used by an individual in analyzing whether there is a substantial limitation. See Sutton v. United Airlines, 527 U.S. 471, 482-83 (1999) (severely myopic plaintiffs were not disabled under the ADA because, with glasses, they were not substantially limited in their ability to see). "A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." Id. Examples of mitigating and corrective measures include glasses, hearing aids, medication, canes, and braces.

Class Counsel asks this Court to order the CDOC to ignore an inmate's use of any corrective or mitigating measures in determining whether an inmate is disabled. (Plaintiff Class Motion for Clarification, p. 16). In other words, Class Counsel wants this Court to order the CDOC to

ignore Sutton, a ruling of the U.S. Supreme Court. Class Counsel's request should be denied for several reasons.

Sutton is a U.S. Supreme Court decision which clarifies how to determine whether a person is disabled under the ADA and Rehabilitation Act. Because prisons are subject to the requirements of the ADA and Rehabilitation Act, Pennsylvania Dept of Corrs. v. Yeskey, 524 U.S. 206 (1998), the CDOC is bound to follow binding precedent which interpret these acts, including Sutton. Despite Class Counsel's request, the CDOC is not free to disregard an opinion of the U.S. Supreme Court.

Class Counsel argues that Sutton cannot apply in a prison setting due to the differences between an employment situation in the real world and a custodial prison setting. (Plaintiff Class Motion for Clarification, p. 15). By arguing that the CDOC should not be allowed to consider an inmate's condition with the use of corrective or mitigating measures, Class Counsel seems to argue that inmates should be held to a lower standard for qualifying as disabled than non-inmates in the general population. This argument is without merit. Just as nothing in the ADA exempts prisons from the ADA's coverage, Yeskey, 524 U.S. at 209-210, nothing the ADA exempts inmates from the "demanding standard for qualifying as disabled". Toyota, 534 U.S. at 197. Those who are incarcerated due to commission of a crime are not

8

entitled to greater protection under the ADA or Rehabilitation than law-abiding individuals outside the prison system.

Furthermore, Class Counsel mischaracterizes the CDOC's use of Sutton. Class Counsel claims that the CDOC automatically denies everyone with a hearing aid, glasses, or diabetes medication disability status because corrective or mitigating measures may hypothetical mitigate any impairment. (Plaintiff Class Motion for Clarification, p. 14). This is incorrect. The CDOC does not use any *per se* rules in determining disability status. It is an inmate's ability to perform major life activities, with the use of corrective measures, that determines disability status. This is an individualized, case-by-case inquiry.

The ADA and Rehabilitation Act require an "individualized inquiry." Sutton, 527 U.S. at 483. The CDOC is aware that "[t]he use or nonuse of a corrective device does not determine whether an individual is disabled; that determination depends on whether the limitations an individual with an impairment *actually* faces are in fact substantially limiting." Id. at 488 (emphasis in original). In compliance with the ADA and Rehabilitation Act, the CDOC looks to how an inmate functions with the use of corrective or mitigating devices. "[I]f a plaintiff can see normally while wearing glasses or can walk without significant impairment while wearing a brace or using a

9

cane, she or he cannot be considered disabled within the meaning of the ADA." Vass v. Riester & Thesmacher Co., 79 F.Supp.2d 853, 861 (N.D. Ohio 2000).

Some inmates may be substantially limited in a major life activity even with the use of medication, hearing aids, or other corrective devices. The CDOC considers such inmates disabled. Other inmates, however, may be able to complete major life activities when using corrective or mitigating measures. According to the Supreme Court, such inmates are not disabled under the ADA and Rehabilitation Act.

Despite the U.S. Supreme Court's call for an "individualized inquiry" in evaluating whether a person is disabled, Class Counsel advocates a *per se* standard, at least for diabetics. According to Class Counsel, "all inmates with diabetes" qualify for disability status. (See Plaintiff Class Motion for Clarification, p. 8). No person is disabled simply because he or she has a physical impairment or medical diagnosis. See Toyota, 534 U.S. at 198.

Class Counsel's position "that persons be judged in their uncorrected or unmitigated states runs directly counter to the individualized inquiry mandated by the ADA." Sutton, 527 U.S. at 483. This approach "would, in many cases, force [courts and employers] to make a disability determination

10

based on general information about how an uncorrected impairment usually affects individuals, rather than on the individual's actual condition." Id.

Using diabetes as their example, the U.S. Supreme Court explicitly rejected the argument advanced by Class Counsel.

> [U]nder [Class Counsel's] view, courts would almost certainly find all diabetics to be disabled, because if they failed to monitor their blood sugar levels and administer insulin, they would almost certainly be substantially limited in one or more major life activities. A diabetic whose illness does not impair his or her daily activities would therefore be considered disabled simply because he or she has diabetes. Thus, [this] approach would create a system in which persons often must be treated as members of a group of people with similar impairments, rather than as individuals. This is contrary to both the letter and the spirit of the ADA.

Sutton, 527 U.S. at 483-84 (emphasis added).

"The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. Some impairments may be disabling for particular individuals but not for others." 29 C.F.R. pt. 1630 app., § 1630.2(j). The ADA bars the *per se* approach that Class Counsel advocates. "Whether an impairment 'substantially limits' a major life activity depends on the individual and the impairment. Such determinations are not susceptible to per se rules; they

11

must be made on a case-by-case basis." Aldrich v. Boeing Co., 146 F.3d 1265, 1270 (10th Cir. 1998).

Nor, as Class Counsel suggests, does the Remedial Plan declare that "all inmates with diabetes qualif[y] for 'disability' status under the Remedial Plan." (Plaintiff Class Motion for Clarification, p. 8). Nothing in the Remedial Plan states that all diabetics are automatically considered disabled, just as it does not state that all inmates with any vision, hearing, or mobility problems are automatically disabled. As noted above, such a *per se* approach would violate the ADA and Rehabilitation Act. See Sutton, 527 U.S. at 483-84. Instead, the Remedial Plan adopts the definition from the ADA and Rehabilitation Act: an inmate is disabled only if he or she has a "permanent physical disability/impairment which substantially limits his or her ability to perform a major life activity." (Remedial Plan, ¶ III(B)).

That the Remedial Plan repeatedly uses the phrase "inmates with diabetes" does not mean that all inmates diagnosed with diabetes are automatically disabled. Several parts of the Remedial Plan require the CDOC to do certain things for all inmates, not just those with verified disabilities. For example, upon entering DRDC, all inmates are informed about their potential rights under the ADA, Rehabilitation Act, and Remedial Plan. (Remedial Plan, § IV). (Providing this information to all

12

inmates facilitates identification of those incoming inmates who may be disabled.) Similarly, all diabetics, whether or not their condition is disabling, are entitled to receive education "regarding the care and management of diabetes." (Remedial Plan, § XV(B)). Hopefully, providing such information to all diabetics will help more diabetic inmates control their diabetes, thus preventing their condition from becoming disabling.

As noted above, the CDOC uses a case-by-case approach in determining whether an inmate's diabetes rises to the level of a disability. Diabetes is a disease that affects different people differently depending on the individual and the stage of the disease. Many diabetics control their diabetes through diet, exercise, and, if necessary, medication, and suffer no substantial limitation in their ability to perform major life activities. These individuals are not disabled. Other diabetics are unable to control their diabetes and do suffer substantial limitations. Such diabetics are disabled.

The CDOC's analytical framework—an inmate is disabled if, taking into consideration any corrective or mitigating measures, he or she is substantially limited in a major life activity—is the approach mandated by the U.S. Supreme Court. The CDOC has never disputed that diabetes is a serious disease that, even when treated with medication and diet, can constitute a disability for some inmates. The CDOC asks this Court to allow

13

the CDOC to continue evaluating diabetics on a case-by-case basis as mandated the ADA and Rehabilitation Act.

While the CDOC is confident that it has adopted the correct approach, the CDOC admits that there are practical aspects to the screening and monitoring processes that need to be improved for the CDOC to come into substantial compliance with the Remedial Plan.  For example, it is the CDOC's position that if an inmate can hear well using a hearing aid, then he or she is not disabled.  This position is consistent with the ADA and Rehabilitation Act. See Sutton, 527 U.S. at 482-84.  However, the CDOC then must ensure that that such an inmate has a working hearing aid.  As Class Counsel points out, it would be unfair for the CDOC to conclude that an inmate does not have a hearing disability because he or she can hear using a hearing aid, but then fail to provide that inmate with a hearing aid.  This is a legitimate concern the CDOC is working to fix.

In the past, the AIC's office has been understaffed and has only been able to focus primarily on coordinating new screenings and responding to grievances.  As a result, the AIC's office was unable to follow up to ensure that inmates who require medical devices (whether as a remedial measure that prevents that inmate's condition from being disabling or as a reasonable accommodation to help a disabled inmate access jobs, services, or programs)

14

received the needed device from Clinical Services. The CDOC is currently fixing this problem.

The parties' Joint Stipulation from July, 2006, required the CDOC to seek additional funding from the State Legislature to help the CDOC come into compliance with the Remedial Plan. (See Stipulation and Order Regarding Status of Compliance by DOC with Remedial Plan, ¶¶ B(1)). In September, 2006, the CDOC's request for additional funding was approved. The AIC is already advertising to fill additional staff positions. Clinical Services will contract with additional medical personnel. These additional resources will allow the CDOC to improve its compliance by improving the speed and accuracy of the screening and monitoring requirements of the Remedial Plan. In addition, an expanded staff will allow the AIC to engage in more meaningful monitoring of disabled and impaired inmates.

Class Counsel has alleged that the AIC ignores the needs of all inmates not previously deemed to be disabled. This is incorrect. The AIC intervenes not only on behalf of all inmates with confirmed disabilities, but also on behalf of any inmate who requires something (for example, a hearing aid) in order to not be disabled. For example, as noted above, some diabetics' can be medically controlled with diet and medication, and thus are not disabled. That a specific inmate's diabetes does not rise to the level of a

15

disability will not prevent the AIC from intervening if she learns (whether by a letter or grievance from the inmate, a call from the facility, or however) that the diabetic is not receiving his or her medication.

Similarly, the AIC will intervene if she learns that a hearing-impaired inmate's hearing aid is broken. In such situations, the AIC will become involved regardless of what the inmate's disability screening says or whether the inmate has ever requested accommodations before. When necessary, the AIC will contact and work with Clinical Services and may issue a Temporary Accommodation Resolution to provide accommodations until the situation is remedied (for example, until the hearing aid is repaired). With additional staff, the AIC will better be able to monitor such inmates which will hopefully prevent such problems before they occur.

## CONCLUSION

Pursuant to this Court's instructions, the Special Masters look to the Remedial Plan, the ADA, and the Rehabilitation Act in evaluating damages claims. As Judge Nottingham has observed, "the special masters are faithfully considering the issues which the court directed them to consider." (Order Concerning Damages and Attorney Fees, p. 7). The Special Masters have resolved over 800 claims so far. This Court has repeatedly held that the Special Master's evaluations contain "no errors of law." Because this

Court has already held that the Special Masters are correctly applying the law, Class Counsel's motion should be denied.

In addition, the CDOC has been correctly applying the Remedial Plan in compliance with U.S. Supreme Court and Tenth Circuit case law. With the approval of supplemental funding by the legislature, the CDOC will be able to be more efficient in future implementation of the Remedial Plan.

Respectfully submitted this 5th day of October, 2006.

                                      JOHN W. SUTHERS
                                      Attorney General


                                      s/ Jess A. Dance
                                      JESS A. DANCE, 35803*
                                      Assistant Attorney General
                                      Civil Litigation & Employment Law
                                         Section
                                      Attorney for Defendants

                                      Colorado Attorney General's Office
                                      1525 Sherman Street, 5th Floor
                                      Denver, Colorado  80203
                                      Telephone:  (303) 866-5165
                                      Fax: (303) 866-5443
                                      Email: jess.dance@state.co.us

## CERTIFICATE OF SERVICE

I certify that on the 5th day of October, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Paula Greisen
greisen@kinggreisen.com
King & Greisen, LLP
1670 York St.
Denver, CO 80206

*Courtesy Copy To:*

Cathie Holst

                                                          s/ Jess A. Dance