IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-870-EWN-OES

JESSE (JESUS) MONTEZ, *et al.,*

    Plaintiffs, as representatives of themselves and all others similarly situated in this class action,

    v.

BILL OWENS, *et al.,*

    Defendants.

---

**PLAINTIFF CLASS RESPONSE TO DEFENDANTS'
BRIEF REGARDING SPECIAL MASTERS' EVALUATION
OF WHETHER CLAIMANTS ARE DISABLED**

---

The Plaintiff Class, through undersigned counsel of record, Paula Greisen, Esq., of King & Greisen, LLP, hereby responds to the Defendant's Brief regarding Special Masters' evaluation of whether claimants are disabled. (Docket 2224).

**INTRODUCTION**

In the DOC's Brief regarding the criteria to be used by the Special Masters to determine whether an inmate is "disabled" and thus be allowed to assert a claim for damages, the DOC admits that the Special Masters have been using the wrong criteria, the very narrow special housing criteria, to determine whether a claimant is disabled. Despite this admission, the DOC argues that this Court should not now reach the merits of this issue because the Special Masters have already "resolved" many cases and thus Plaintiffs have somehow "waived" the right to make this challenge. These arguments are

simply an attempt to circumvent the agreement of the parties that this Court would in fact, reach the merits of this issue and make a *de novo* determination.

As this Court is aware, during the compliance hearings in this case, the DOC agreed to stipulate that it was not in compliance with the Remedial Plan, except with respect to the architectural issues. In negotiating that stipulation, Plaintiffs required the DOC to agree to certain conditions and sanctions for its non-compliance. Specifically, the parties agreed that this Court would determine the appropriate criteria to be used in implementing the Remedial Plan and the damage claim process. Once this Court determined the correct criteria, the Special Masters would then review all prior determinations, regardless of whether those determinations had been appealed or not, and issue amended rulings if appropriate. Amended Stipulation and Order, paragraph 7, Docket 2228.

The fact that the parties specified that the proper criteria would be decided by this Court, and the Special Masters would then review their previous orders regardless of whether their previous orders had been appealed further evinces that the parties intended that this Court would review this issue *de novo*. In fact, during negotiations the parties specifically discussed that this Court would not be reviewing individual damage claims to determine the merits of any specific case – but rather would *only* determine the correct general criteria that should be used by the Special Masters. As stated in the agreement, the parties anticipated that the Special Masters would have the responsibility of applying the Court's ruling on the merits of this issue to all prior determinations.[1]

---

[1] The parties specifically discussed the fact that all of the damage claim hearings were recorded so the Special Masters would only need to review the record of those hearings to determine if the previous rulings would need to be amended. In addition, a vast majority of the claims filed were dismissed by the Special Masters because they were not timely, the claimant failed to state any claim for relief, the claimants have

Now, despite the agreement of the parties, the DOC argues that this Court should not address the merits of this issue because many cases have already been "resolved" and Plaintiffs have waited too long to assert the issue. Plaintiffs request that this Court enforce the agreement of the parties and address the merits of the issue – whether the Special Masters erred by using the "special housing" criteria to determine whether a claimant is disabled.

**I.     The Special Masters May Look to Controlling Case Law to Determine Disability But Case Law Does Not Support Using the Extremely Narrow "Special Housing" Definition Under the Remedial Plan to Determine Disability.**

In the first portion of its Brief, the DOC cites to numerous cases regarding the standards to be used in determining whether an individual has a disability under the ADA. The Remedial Plan expressly states that in order for an inmate to be qualified as disabled under the Plan, the inmate must have a permanent physical disability/impairment which substantially limits his or her ability to perform a major life activity. Plaintiffs agree that this is the correct standard for determining disability. Plaintiffs also agree that in general, the Special Masters can use existing relevant precedent to determine disability if it assists the Special Masters in evaluating claims.[2] In essence, use of relevant case law is appropriate because it confirms that each claim has to be decided on a case-by-case basis to determine if the claimant's impairment results in substantial limitations of their daily activities.

---

left DOC and abandoned their claims, or they allege disabilities that are not covered by the Remedial Plan. Obviously, the Court's ruling on this issue will not affect those determinations.

[2] Plaintiffs do not agree that a strict interpretation of *Sutton v. United Airlines*, 527 U.S. 471 (1999) is applicable to this case, as discussed in Section III of this Brief.

3

Telling, however, is that the DOC does not cite any authority for the proposition that a disability can be established *only* by using the type of narrow "special housing" criteria in the Remedial Plan. It is clear from the express language of the Remedial Plan that individuals do not have to meet this special housing criteria to be considered disabled – the criteria was only developed to assist the DOC in determining who was presumed to need ADA compliant housing. If all inmates were required to meet the special housing criteria to be deemed disabled, then the criteria would have been incorporated into the language defining "Qualified Inmate" under Section III(B) of the Remedial Plan.

The reason the DOC is unable to cite case law that supports using this very narrow criteria to determine disability is clear. These definitions are so narrow, they would exclude anyone not requiring ADAAG accessible housing.[3] There has never been a case in which a court has found that only individuals who require ADAAG accessible housing qualify as disabled under the ADA. As the Special Masters have erroneously held that claimants must satisfy the "special housing" criteria in order to qualify as disabled, they are neither following existing case law nor the dictates of the Remedial Plan.

## II.    The DOC Should Not Be Allowed to Assert Procedural Bars to Prevent This Court From Deciding the Merits Of the Issue As Agreed to By the Parties.

In the next two portions of its Brief, the DOC argues that even if the Special Masters have been using the wrong criteria, this Court should not review this issue because some of the Final Orders of the Special Masters have already been affirmed by

---

[3] For instance, the Special Masters repeatedly state in their Orders that no claimant has satisfied the criteria for hearing impairment because of their belief that a person would have to be totally deaf to qualify under the Remedial Plan. No Court has ever held that a person must be totally deaf to be considered a person with a hearing disability.

4

this Court and Plaintiffs waited too long to address this issue. Again, these arguments are an attempt to circumvent the agreement that this Court would address the merits of the criteria issue.

        a.   The Special Masters Have Been Using the Wrong Criteria and This Court Has Not Previously Addressed this Issue.

Although the DOC appears to argue that the Special Masters have only "considered" the special housing criteria in determining disability and that they are just using these criteria as "guidance" in interpreting the Remedial Plan, the DOC then goes on to admit that the Special Masters have repeatedly held that the special housing criteria "controls" the adjudication of all claims. Defendants' Brief, Docket 2244, p. 9. As Plaintiffs pointed out in their initial Brief, the Special Masters have repeatedly held that if an inmate does not meet the objective "special housing" criteria, they will not be determined to be disabled. If the Special Masters were only using these criteria as one source of "guidance" as initially suggested by the Defendants, there would be no issue. But that is not the case. Repeatedly, the Special Masters have dismissed claims because the claimant did not meet the very narrow housing criteria.

The DOC next argues that because this Court has repeatedly affirmed the Special Masters' Orders the Court should not re-visit the issue now. As previously stated, if the agreement reached by the parties intended to preclude the review of any of the cases already appealed to this Court, then the parties would not have expressly provided in their Agreement that the Special Masters will review their findings to comply with the Court's decision in this matter, regardless of whether those findings had been appealed or not.

Moreover, none of the six appeals cited by the defense in which this Court upheld the Special Masters' findings raised the specific issue that is raised here - whether the special housing criteria should be the exclusive standard for disability. Thus, this Court has not squarely addressed this issue in any of its prior ruling. For instance, in the case of Leroy Baker, a claimant who asserted mobility and vision impairments and diabetes, the appeal addressed due process violations, accusations that the Special Masters are "hired hands" and that he should qualify as vision impaired because his broken glasses were not replaced by the DOC. Docket 1350. The appeal of James Smith discussed only the issue that the claimant was denied copies of his records for the claims hearing. Docket 1917. In Barbara Freeman's appeal, she only contested that the Special Masters ruled that her grievances were beyond the scope of the Remedial Plan. Docket 2056. In the voluminous appeal by Jill Coit, the only issue she raised regarding her disability determination concerned her belief that her hand impairment should have qualified as a mobility disability. Docket 1781. In several of these cases, the Special Masters determined that the claimant did satisfy the special housing disability criteria, and thus those portions of the Final Orders would not need to be reviewed even if this Court determined the wrong criteria was used.

Although some of the appeals do argue that the claimants should have been found disabled when they were denied a disability finding by the Special Masters, *see* appeals of James Duncan, Docket 1155, Leroy Baker, 1350, and Thomas Castro, Docket 1728, again, none of these appeals raise the specific issue raised here – whether the Special Masters were erroneously applying the special housing criteria.[4] Rather, the claimants

---

[4] In fact, it appears that in many instances, this Court perceived that the claimants were appealing the issue of their medical care because the Court's opinions state: "The rulings of the Special Master are based on

6

generally try to argue that they do meet the narrow special housing criteria – apparently in the mistaken belief that this criteria controls.

The DOC's cite to a portion of an opinion by Judge Nottingham is equally unavailing. Judge Nottingham has never reviewed any of the Special Masters' orders to determine if they were erroneously using the special housing standard to determine disability.

b. <u>Plaintiff Class Has Not Waived Its Objection to the Use of Wrong Criteria</u>.

Finally, the DOC argues that this Court should not review this issue because Plaintiffs' objection is untimely. Again, despite having agreed that this Court would address this issue as part of the stipulated sanctions, the DOC now seeks to evade its agreement.

First, the error complained of is error caused by the DOC. As explained in Plaintiffs' opening Brief, it was the DOC who repeatedly argued to the Special Masters that they should adopt the special housing criteria to determine disability. The Special Masters accepted this standard at the request of the DOC. The DOC should not be allowed to argue that "equity" is in its corner and the error cannot be corrected. Even after the DOC became aware that the special housing criteria should not be used to determine disability, it continued to argue to the Special Masters that they should use that narrow standard.[5] The problem was exacerbated by the fact that the damage claim process is a *pro se* proceeding. The claimants, who are often uneducated, cannot be

---

the evidence and the law was properly applied. The claimant's complaints regarding quality of his medical care are well beyond the scope of this case and must be heard, if at all, by a separate individual action, and not as part of the remedial plan in this case." *See* Order re Winkler, Docket # 1786.

[5] As stated in Plaintiffs' opening Brief, DOC admitted during negotiations that it had erroneously used the special housing criteria to determine disability within the DOC and was now re-screening all of the inmates under the broader "substantially limits" criteria.

7

expected to understand the intricate details of the legal analysis made by the Special Masters. In essence, the problem was created by the DOC who should not now be allowed to cry foul when it needs to be rectified.

Although the DOC repeatedly states that the Special Masters "have resolved over 800 claims," and that the Special Masters would have to reevaluate all of these claims (Docket # 2316, p. 4), presumably in an attempt to dissuade this Court from addressing the issue, this is a red-herring. Notably, the DOC does not state how many of the "resolved" claims actually involved any adjudication on the merits. As previously stated, the vast majority of claims that were dismissed early in this case did not reach the merits of the claim because they were dismissed on procedural grounds or because the claimant did not have one of the four disabilities covered by this case. Those claims would not have to be re-evaluated.

Similarly, the DOC's insistence that if the Special Masters were required to use the correct criteria, it would "throw the damage claim process into chaos." (Docket # 2316, p. 5). Exactly why it would be "chaotic" is not explained by the DOC. The fact that the DOC would no longer be receiving an unfair advantage in the damage claim process if the Special Masters used the correct disability criteria may be disappointing to the defense, but it would hardly cause "chaos."

The DOC's attempt to insert the defenses of "acquiescence or laches" is also misguided. In order for a party to assert the defense of laches, the party must prove that it was prejudiced by the delay. *City of Thornton v. Bijour Irrigation Co.*, 926 P.2d. 1 (Colo. 1996). The DOC has shown no such prejudice here. On the other hand, a waiver can only occur when there is an "intentional relinquishment of a known right." *Johnson*

8

*v. Industrial Com. of State*, 761 P.2d 1140 (Colo. 1988).[6]  The concept of a waiver cannot not apply when claimants are proceeding *pro se* in a damage claim process in this case.

Despite the intent of the Remedial Plan to have a relatively simple damage claim process where claimants could effectively seek redress in a *pro se* forum, the DOC has "lawyered up" the process, employing a team of lawyers to submit lengthy legal briefs in every single claim that has been filed, arguing complicated legal theories in often unsettled areas of law.  In addition, the DOC has repeatedly argued that Class Counsel has no standing to interject in these proceedings to defeat the application of legal principles raised by the defense.  In fact, the defense has repeatedly asserted that Class Counsel should not even be compensated for any time they spend in addressing systemic problems in the damage claim process.  *See* Defendants' Objections to Special Master's Recommended Award of Fees and Costs, Docket 1567.  Indeed,  Judge Nottingham did not confirm that Class Counsel would be compensated for time spent monitoring the damage claim process until August 27, 2006.  Docket # 2216.

Nevertheless, the defense cannot point to a single claimant that intentionally relinquished his or her known right to have the express terms of the Remedial Plan enforced.  As the Remedial Plan expressly provides that Class Counsel has no obligation to represent any individual in the damage claim process, Remedial Plan XXXII, p. 29,

---

[6] The DOC uses the term "acquiescence" or "estoppel by acquiescence."  As articulated in *Mile High Indus. v. Cohen*, 222 F.3d 845 (10th Cir. 2000) as there is no federal law on this issue, the Court should look to the controlling state law to determine the viability of this equitable defense.  The term "estoppel by acquiescence," however,  is not one commonly used in Colorado law.  Class counsel could only find four published cases using this term,  three of which were around the beginning of the 1900s and concerned arguments that a property owner relinquishing property to public entities. See *Chicago, Rock Island & Pacific Railways v. Hayes*, 49 Colo. 333, 113 P. 315 (1910); *Denver & S.F. Railway Co. v. School District No. 22*, 14 Colo. 327, 23 P. 978 (1890); *Fallon v. Worthington v. O'Donnell*, 13 Colo. 559, 22 P. 960 (1889).   The other case, a 1990 case, used this term in the dissent but there was no discussion on the meaning of the phrase under Colorado law.  *See Sullivan v. Industrial Claims Appeal*, 796 P.2d 31 (Colo. App. 1990).

9

Class Counsel cannot "waive" this right on behalf of the individual claimants. In any event, the parties agreed that this issue would be resolved on its merits as a sanction for the DOC's non-compliance with the Remedial Plan, and the DOC should not be allowed to invoke "equitable" considerations to defeat that agreement.

**III.      The DOC Is Improperly Disqualifying Inmates with Disabilities in Reliance on *Sutton*.**

In response to the Plaintiff Class' arguments concerning the misapplication of *Sutton*, *infra*, in a custodial setting, the DOC argues that it is conducting a case-by-case evaluation of each inmate's status to determine whether he or she has an impairment that substantially limits daily life activities. Contrary to the DOC's assertion, however, that is not what the facts show. Nowhere in its Brief does the DOC address the examples offered by Plaintiffs in their Brief concerning the inmates who are summarily denied disability status, such as Mr. Luis-Dole, Mr. Schrecongost, and Mr. Echemendia Diaz. Docket 2245, pgs. 8-11. The fact that the DOC promises to do a better job assisting inmates in obtaining accommodations for their disabilities does not address the issue. The fact is that the DOC has <u>automatically</u> denied disability status to every single inmate with diabetes that it has screened this year – and it obviously intends to continue this practice regardless of its assertion that it is addressing these screenings on a case-by-case basis. The DOC does not provide any evidence in its Brief that it is actually conducting this individualized inquiry nor does it provide any examples that any inmate with diabetes, or who has at least one hearing aid, has been granted disability status in the last year.

Finally, Plaintiffs understand that <u>relevant</u> case law should be applied in determining whether an individual has a disability. However, that does not translate to a

10

wholesale adoption of the analysis in *Sutton,* which involves an entirely different factual and legal setting.  Custodial environments are unique and cannot be equated to the standards announced in a routine employment case.  Employers do not generally have complete control over when and what their employees eat, when their employees take medication or get access to medication, when their employees need emergency medical care or how they get access to that care, or have any control over what type of assistive devices are available to their employees with disabilities.  Dealing with inmates with disabilities in a custodial environment is completely different than determining whether an employee is disabled for the purposes of a job.  Simply put, the DOC can't have it both ways, denying disability status because an individual has an accommodation that allows him or her to function, and then refusing or delaying the granting of the accommodation.

Inmates with diabetes need accommodations on a daily, sometimes hourly basis.  There is simply no method by which the ADA Inmate Coordinator (the AIC) who is located in Colorado Springs can ensure that every diabetic is provided these necessary accommodations (even if there is additional staffing in that office) unless the inmate is verified as a person with a disability and thus entitled to have the staff accommodate these needs.  The concept urged by the DOC, that the additional funding will somehow alleviate these concerns, is ill guided.  The Plaintiff Class requests that this Court clarify the proper standards to be employed so that inmates with disabilities are not continued to be left with no redress for the course of action that DOC has adopted.

Moreover, this case is first controlled by the express agreement between the parties as contained in the Remedial Plan.  There was certainly nothing that required that

11

the DOC stipulate that all diabetics would be covered as inmates with disabilities when it agreed to the Plan – but that is what it did. Plaintiffs request that this Court enforce the terms of the Remedial Plan.

## CONCLUSION

In the DOC's Brief, it admits that the Special Masters are using the special housing criteria to unfairly limit the determination of whether a claimant is disabled. Plaintiffs request that this Court enforce the terms of the stipulation and the Remedial Plan and determine that the special housing criteria is not the criteria to be used to determine disability status in the damage claim process.

Plaintiff Class also requests that this Court clarify the standards to be used by the DOC in determining disability and limit the application of *Sutton* to ensure inmates with disabilities, especially those with diabetes, are granted the protections they are guaranteed under the Remedial Plan.

RESPECTFULLY SUBMITTED on this 6th day of October 2006.

                              KING & GREISEN

                              /Paula Greisen
                              Paula Greisen
                              1670 York Street
                              Denver, CO 80206
                              (303) 298-9878

CERTIFICATE OF SERVICE

   I, the undersigned, hereby certify that on this 6th day of October 2006, I electronically filed the foregoing PLAINTIFF CLASS RESPONSE TO DEFENDANTS' BRIEF REGARDING SPECIAL MASTERS' EVALUATION OF WHETHER CLAIMANTS ARE DISABLED with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses via U.S. Mail, addressed to:

Beth McCann, Esq.
James X. Quinn, Esq.
Jess Dance, Esq.
Assistant Attorney General
Civil Litigation and Employment Law Section
1525 Sherman St., 5th Floor
Denver, CO 80203
beth.mccann@state.co.us
james.quinn@state.co.us
jess.dance@state.co.us

             ___*s*/ Paula Greisen____
             Paula Greisen