IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 02-529
Category II
Claimant: Debbie Short, #103105
Address of Claimant: 510 S. Irvin Street, Granada, CO 81041

---

## FINAL ORDER OF SPECIAL MASTER

      THIS MATTER comes before the Special Master on the claim of Debbie Short (Claimant). Claimant was incarcerated in the Colorado Department of Corrections (DOC) at the Denver Women's Correctional Facility (DWCF) at the time she filed her claim. Claimant was incarcerated earlier this year in the Adams County Jail (ACJ) when an order was issued to Claimant granting her time to file a reply to Defendants' response to her claim. She was released from the ACJ on June 28, 2006 and provided the jail the above forwarding address in Granada, Colorado. Claimant is no longer under the control of DOC.

      This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of her claim. Defendants have filed a response to the claim. As noted previously, Claimant was given the opportunity to reply to the response of Defendants, but she has not done so. Further argument will be waived.

**I.**

      This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The

Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29*. Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>     A. COVERED DISABILITIES

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>> 1. Is the claimant a disabled individual who is a member of the class?
>> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

According to the information provided in her initial claim form, Claimant came into DOC custody on January 29, 2000. She was released on November 26, 2002. She returned to DOC custody on October 16, 2003 and then was released from DOC custody. Claimant was at DWCF when she filed her initial claim form.

Claimant checked the mobility impaired and vision impaired boxes on her claim form. In her initial claim form, Claimant stated, in part, as follows:

> I have very poor eye vision. I have a very hard time seeing in the day and I can't see at night at all.
> Also, I have tendinitis in my arms. I have one leg that is 3/4 inch longer than

3

>the other. It makes it very hard to walk or stand and I am in pain badly all the time. They gave me a shoe lift. But it took them three years to do anything and the shoe lift is not right. I have pain in my hip, butt & legs, & lower back . I also have two hernias in my stomach. I also have a over curved spine that causes a great deal of pain.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

>Because it has taken them too long to fix my leg difference and it still has not been fixed right, I have been in bad pain for years because of DOC.
>I bought a pair of eye glasses, but DOC has done nothing to fix my eye sight.

Claimant was provided supplemental forms to complete. Those have been submitted to the Special Master. As to the mobility impairment claim, Claimant stated in her supplemental form that the fact that her right leg is longer than the left requires that she walk with a limp. It is difficult for Claimant to walk or exercise. She has been given restrictions for first tier, no intense labor, no heavy lifting, no prolonged standing, and others. She alleges that these restrictions have prevented her from going to the Therapeutic Community Program (TC) because it is on the third floor at DWCF. The inability to attend the TC program has made it impossible for Claimant to be placed into a half-way house.

Claimant stated further that she has Osgood Slaughters disease in her right knee and has requested treatment. Claimant stated, in part, as follows:

>My disability keeps me from getting a gate pass. It keeps me from getting jobs and it keeps me from going to some programs such as T.C. therapeutic community, which has kept me from leaving early or going to a half way house.

Claimant also alleged that she was provided a lift for her shoe in 2004, but it was too high. She has continued to suffer pain, and the problem is becoming worse.

Defendants filed an answer to the claim. Defendants dispute that Claimant is disabled as defined by the Settlement Agreement. Defendants do acknowledge that Claimant has one leg that is shorter than the other and that she has a condition called Osgood-Schlatter disease. Defendants have attached a number of documents from Claimant's medical records. Claimant received a heel lift in May, 2001. She has been permitted to wear tennis shoes. She received other medical care over the years that she was in DOC custody. She also received medical restrictions that included no squatting, kneeling or extended standing.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

4

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, each claimed impairment or disability must be examined.

**Vision Impairment**: Claimant's allegations concerning her vision are extremely vague. She states that she cannot see well and cannot see at night.

The Settlement Agreement provides that a claimant must have "a permanent disability/impairment which substantially limits his or her ability to perform a major life activity." Vision problems are not sufficient, in and of themselves, to constitute a disability. There must be a limitation on performing a major life activity. Claimant has made no such allegation. She has not shown any such limitation, even though granted an opportunity to reply to Defendants' response to her claim.

The evidence presented reflects that Claimant did receive vision examinations. She was provided glasses. There is no evidence that a major life activity was impaired by the claimed vision problems. Claimant is not part of the class for vision impairment.

**Mobility Impairment**: Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." Claimant has not alleged that she used a wheelchair at any time while in DOC custody. Claimant has alleged, and Defendants concede, that she has orthopedic problems caused by one leg being longer than the other and having a knee condition. The Special Master finds that Claimant is mobility impaired and part of the class due to that condition.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** The answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons.

**3. Was the Claimant discriminated against by CDOC because of his or her disability?**
The answer to this question is no. Claimant has presented insufficient evidence to establish that she was discriminated against because of her mobility impairment. Claimant received medical care and restrictions while in DOC custody. She has not proven that she was denied services or programs solely because of her mobility impairment.

Claimant's real concern is with the medical care that she received while in DOC custody. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by

5

Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to her, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that she may have concerning her medical care.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Debbie Short is denied, as she has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before January 29, 2007.**

SIGNED this 9th day of October, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master