IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

___

Claim Number: 02-551
Category: II
Claimant: Cheryel Rhodes, #58294
Address of Claimant: DWCF, P.O. Box 392005, Denver, CO 80239

___

**FINAL ORDER OF SPECIAL MASTER**
___

THIS MATTER comes before the Special Master on the claim of Claimant Cheryel Rhodes. The Special Master has reviewed the claim and all documents filed by both sides. This Order shall constitute the final action of the Special Master on this specific claim.

**I. BACKGROUND**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial Plan also created a mechanism for

individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III. DEFINITIONS
>
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
>
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II.  FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Rhodes submitted a claim which was assigned claim number 02-551. The claim is premised on an alleged permanent mobility disability, an alleged permanent vision disability, an alleged permanent hearing disability and alleged permanent disability due to diabetes.

2. Claimant's claim was assigned to Category II pursuant to the Remedial Plan as set forth above.

3. Claimant Rhodes entered CDOC custody in 1988. During her CDOC custody, Claimant has been housed at the Colorado Women's Correctional Facility (CWCF) and the Denver Women's Correctional Facility (DWCF).

4. Claimant Rhodes claims to suffer from a host of ailments and medical problems. The illnesses, impairments and medical conditions identified in the approximately 100 handwritten pages that she has submitted in support of her claim include degenerative arthritic joint disease, back and spinal pain, impairment due to a knee injury that occurred in August of 2001, hypoglycemia, vision impairment rendering her legally blind, bi-polar disorder, schizophrenia, irritable bowel syndrome, claustrophobia, dizziness, post traumatic stress disorder, impaired hearing that makes her sensitive to loud noises and panic attacks. She states that she must drag one of her legs in

order to ambulate if her legs are overused, that she cannot run or jog and that she trips and falls often. She indicates that she cannot read without large print and that it is difficult for her to see the television.

      5.    It is virtually impossible to isolate specific claims of alleged disability discrimination from Claimant's submissions, which basically attack every aspect of prison life. She asserts that she has received negligent medical treatment, that CDOC personnel and medical providers are deliberately indifferent to her medical care and that the medications provided by CDOC medical personnel have either caused many of her medical problems or have made them significantly worse. She contends that she has been denied prescription sunglasses and that she can only obtain sunglasses by purchasing them from the canteen. She complains of improper lighting in the cells. She asserts that she has not been provided with a proper diet. Claimant states that she has been unable to obtain work because of her injuries but also contends that she has been required to work excessive hours for low wages in the special needs unit. Claimant indicates that she has been denied an elevator pass because she exercises with equipment and videos to help her heal and strengthen her joints. She complains that CDOC does not adequately control other inmates but also asserts that prisoners are subject to unreasonable lockdowns. According to Claimant, prisoner complaints are not taken seriously and are ignored. A myriad of similar allegations permeate Claimant's written submissions.

      6.    The few medical records provided by Claimant to the Special Master confirm that Claimant suffers from mental illness and has a host of mental health issues including: severe borderline personality disorder, delusions, paranoid schizophrenia and active regressive psychotic symptoms. However, the medical records fail to corroborate any of the severe physical maladies and impairments described by Claimant. X-rays taken in 1998, 2002 and 2005 reveal early and minimal degenerative disc changes in her lumbosacral spine and minimal patellofemoral degenerative changes in her left knee. The only visual acuity record submitted to the Special Master indicates that in a January 2003 test, Claimant had corrected visual acuity in both the left and right eye of 20/25. Claimant has been given lifting restrictions but no work restrictions. She has also been provided with a special diet.

      The records indicate that Claimant slipped a fell in December of 2004. She was seen by CDOC medical providers, complaining of severe knee and back pain. An ambulatory health record of January 28, 2005 observes that Claimant's gait was steady and rapid and that there was no laxity, swelling or deformity in her left knee. At that time, Claimant was denied an elevator pass because she was observed walking stairs without difficulty.

### III.  CONCLUSIONS OF LAW

      1.    The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

  2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

  The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C). As discussed in Section I above, the Remedial Plan further limits permanent mobility, hearing, vision, and diabetes disability/impairment to those that conform to the criteria of Section V, paragraph A of the Plan.

  Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

  As is discussed more fully in paragraph 3 below, neither the ADA nor the Rehabilitation Act are designed to remedy alleged deficiencies or omissions in medical treatment provided to prisoners by CDOC. Rather, the ADA and Rehabilitation Act are designed to insure that those who have permanent disabilities that prevent them from engaging in one or more major life activities are not discriminated against because of their disabilities. The Remedial Plan, which defines the scope of the Special Masters' authority, limits the disabilities for which damage claims can be asserted to those relating to mobility, vision, hearing and diabetes.

  The Special Master finds and concludes that Claimant Rhodes has failed to establish by a preponderance of the evidence that she suffers from a permanent mobility disability. According to Claimant, she has difficulty negotiating stairs and drags her leg after walking for a period of time. She complains of extreme pain. While her medical

5

records confirm that she does have some minor degenerative changes in her lumbosacral spine and her left knee, this in itself is insufficient to sustain a mobility disability claim under the ADA and/or the Rehabilitation Act. The fact that Claimant has a mild degenerative arthritic condition does not render her disabled or qualify her for relief. Rather, she must present evidence establishing that these problems substantially limit her ability to engage in one or more major life activities. The United States Supreme Court has noted that the term "substantial" must "be interpreted strictly to create a demanding standard for qualifying as disabled. *Toyota Motor Mfg., Ky. Inc. v. Williams,* 534 U.S. 184 (2002). Claimants must prove the limitations caused by their impairments are substantial in terms of their own experience. *Albertson's Inc. v. Kirkingburg,* 527 U.S. 555 (1999). Furthermore, even accepting Claimant's contention that she has some restrictions on her ability to walk and negotiate stairs, this is insufficient to demonstrate a **substantial limitation** on the major life activity of walking. Both the case law and regulations dealing with this issue have concluded that diseases, injuries and conditions that result in moderate restrictions on one's ability to walk, stand, sit and climb stairs do not qualify as substantial limitations on a major life activity. *E.g., Talk v. Delta Airlines, Inc.,* 165 F.3d 1021 (5th Cir. 1999); *Kelly v. Drexel University,* 94 F.3d 102 (3d Cir. 1996); *Stewart v. Weast,* 228 F. Supp. 2d 660 (D. Md. 2002); 29 C.F.R. § 1630.2(j)(2).

There is no objective medical evidence in the record supporting Claimant's contention that she has a permanent hearing disability. Accordingly, the Special Master finds and concludes that Claimant Rhodes has failed to demonstrate by a preponderance of the evidence that she is suffers from a hearing impairment significant enough to constitute a disability within the meaning of the ADA and/or the Rehabilitation Act.

Although Claimant has indicated on her claim forms that she suffers from diabetes, neither her lengthy discussion of her medical conditions or the medical records submitted to the Special Master suggest that she has ever been diagnosed with diabetes. She contends that she suffers from hypoglycemia. Hypoglycemia, or low blood sugar, is a condition that occurs from time to time with those suffering from diabetes but there are many other causes of hypoglycemia. There is no evidence in the record that Claimant's hypoglycemia is diabetes related.

Finally, Claimant asserts that she has a permanent vision disability. Again, while she portrays her vision impairment as severe, the objective medical evidence in the records submitted to the Special Master fail to corroborate her allegations. Although Claimant states that she often does not wear her corrective lenses, it is uncontroverted that she has been provided with corrective lenses. Under these circumstances, the United States Supreme Court has clearly established that corrective measures must be taken into account in determining whether a disability exists. *Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999). Thus, it is only Claimant's corrected visual acuity that is relevant. The only acuity test submitted to the Special Master indicates that Claimant's corrected vision is basically normal.

Accordingly, the Special Master finds and concludes that Claimant has failed to prove by a preponderance of the evidence that she has a permanent mobility disability, a

permanent hearing disability, a permanent vision disability or a permanent disability due to diabetes. The records submitted to the Special Master strongly suggest that Claimant may have a permanent disability due to mental illness that could give rise to claims under the ADA and/or the Rehabilitation Act. However, disabilities due to mental illness are beyond the scope of the Remedial Plan and, therefore, beyond the scope of the Special Masters' jurisdiction.

3. A very significant portion of Claimant's complaints relate to disagreements with her medical providers regarding her treatment, care, medications and diet. Failure to provide proper medical care, medications and medical diet at best amount to allegations of deliberate indifference to medical needs under the Eighth and Fourteenth Amendments to the United States Constitution. Both our Circuit and others have clearly stated that deliberate indifference to medical needs does not give rise to a claim under either the ADA or the Rehabilitation Act, nor do claims of negligent medical treatment fall within the ambit of either of these statutes. *See Fitzgerald v. Corrections Corp. of America,* 403 F.3d 1134 (10th Cir. 2005). *See also Kiman v. New Hampshire Dept. of Corrections,* 451 F.3d 274 (1st Cir. 2006); *Burger v. Bloomberg,* 418 F.3d 882 (8th Cir. 2005); *Schiavo ex rel. Schindler v. Schiavo,* 403 F.3d 1289 (11th Cir. 2005); *United States v. University Hospital,* 729 F.2d 144 (2nd Cir. 1984). Furthermore, a claim for deliberate indifference to medical needs is not cognizable under the Remedial Plan unless it is tied to a showing of discrimination because of a disability. As stated above, no such showing has been made here.

4. Additionally, it appears that Claimant's allegations of mobility impairment are in large part based upon her condition after she sustained injuries in a slip-and-fall that occurred in 2004. The Remedial Plan was signed on August 27, 2003. Although the Remedial Plan fails expressly to address the issue of damage claims that might arise after its execution date, there is nothing in the Remedial Plan that would suggest that paragraph XXXII thereof, authorizing the recovery of damages and establishing claims procedures was intended to apply to claims for damages that had not yet arisen. The Special Master finds and concludes that the damages that may be awarded under the Remedial Plan are limited to those resulting from violations of the ADA cognizable under the Remedial Plan and occurring prior to August 27, 2003. While post-August 27, 2003 discrimination may be taken into account, there must be a showing that Claimant did in fact suffer discrimination through a failure to accommodate his/her disability prior to the execution of the Remedial Plan.

Because Claimant Rhodes has failed to demonstrate that she has a permanent mobility disability, a permanent hearing disability, a permanent vision disability and/or a permanent disability due to diabetes, her *Montez* claim must be denied.

### IV. ORDER

IT IS HEREBY ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment be entered in favor of Defendants and against Claimant dismissing Claimant Rhodes' claim with prejudice; and

      IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before December 24, 2006** with the Clerk of the United States District Court at the following address:

                901 19th Street
                Denver, CO 80294.

SIGNED this 24th day of October, 2006

                BY THE COURT:

                /s/ Bruce D. Pringle
                _____
                Bruce D. Pringle,
                Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this 24th day of October, 2006 to the following:

Ms. Cheryel Rhodes, #58294
DWCF
P.O. Box 392005
Denver, CO 80239

Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

/s/ Susan L. Carter
_____
Susan L. Carter

9