IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

_____

Claim Number 02-751
Category II
Claimant: Floyd Allen, #117789
Address of Claimant: CTCF, P.O. Box 1010, Canon City, CO 81215-1010

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

THIS MATTER comes before the Special Master on the claim of Floyd Allen (Claimant). Claimant is incarcerated in the Colorado Department of Corrections (DOC) at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado.

This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of his claim. Defendants have filed a response to the claim. Claimant was given the opportunity to reply to the response of Defendants, but he has filed nothing further in support of his claim. Further argument will be waived.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>    A. COVERED DISABILITIES
>    The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody in June, 2003. Claimant was placed initially at the Denver Reception and Diagnostic Center (DRDC). After evaluation, Claimant was placed at the Sterling Correctional Facility (SCF) in Sterling, Colorado. He then was placed at the Ft. Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Claimant was at FLCF when he filed his claim. He since has been transferred to CTCF.

In his initial claim form, Claimant checked the boxes for mobility and vision impairments. Claimant stated, in part, as follows:

> Bottom bunk restricted, forced to go up stairs against doctors orders, feet hurt all the time. Both arms have rotary cuff tears and very limited use. Can't lift, push, or pull by doctors orders. Can not open heavy doors. Have had five heart operations and forced to live like everyone else.
> Must wear bi-focals and not right corrective lenses. Vision blurred all the time and no regular doctor examination.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

> No regular eye doctor examinations. Forced to go up and down stairs. Not given the right eye glasses. Forced to open heavy doors. Lack of competent dental care.

In his supplemental form on mobility, Claimant stated, in part, as follows:

> I suffer from a damaged leg, knee and hip caused by a failed "spinal tap" performed by DOC. Additionally, and due to this condition, I have fallen repeatedly which has resulted in my leg, knee and hips being stiff, swollen and very painful. Today, I am unable to walk unassisted.

Claimant stated further that he was living in a third floor room and required to go up and down stairs. He further stated:

> After my injury and after each reinjury, I have pleaded with the health providers for bandages, braces, medication and therapy only to be told "no." When I asked for a wheelchair, I was given a cane. When I've asked for assistance walking, I have been denied any help.

Concerning his vision impairment, Claimant stated in his supplemental form, in part, as follows:

4

> My vision is blurred. I have constant headaches. I cannot see to read or write or see things at a distance. Note: This documents and the attached were prepared with inmate assistance as I cannot see to read or write correctly.

In April, 2005, Claimant submitted several medical records in support of his claim. A report from Dr. Gibson, a cardiovascular physician, detailed that Claimant has significant heart and vascular problems. He has had several heart attacks in the past. Claimant also attached kites and letters written seeking medical care. Of the documents submitted, the earliest entry is August 28, 2003. There was also a referral to Denver Health Medical Center on October 9, 2003.

Claimant provided a letter in April 14, 2006 which indicated he had been diagnosed as having diabetes. An earlier entry in his medical records reflected that there was a family history of the disease.

Defendants' response to the claim has several attachments. An offender profile indicates that Claimant arrived in DOC custody on June 25, 2003. He was at DRDC until July 15, 2003 and then was transferred to SCF. He returned to DRDC on August 26, 2006 and then returned to SCF on September 11, 2003. He arrived at FLCF on January 15, 2004. He then was transferred to CTCF on March 23, 2006.

On June 27, 2003, Claimant received a medical screening at DRDC. That screening reflected the significant heart problems that Claimant was facing. Limitations placed on Claimant were no strenuous labor, no lifting, and no camps. A vision examination reflected that had corrected vision of 20/50 in his left eye and 20/70 in his right eye. The attached documents reflect that Claimant was provided state issued glasses on December 9, 2004.

In 2005, Claimant received an angioplasty and reported that his chest pains were better. He was diagnosed as having chronic obstructed pulmonary disease.

## III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, each claimed impairment or disability must be examined. Under the Settlement Agreement, Claimant must establish that he was disabled on or before August 27, 2003. It was on that date that the Settlement Agreement was approved by Judge Nottingham and the class was established.

**Vision Impairment:** Claimant has alleged that he is vision impaired and has not received appropriate glasses. Claimant has alleged that he had prescription glasses that were taken from him and replaced with inferior glasses.

In order to qualify as vision impaired, a claimant must establish that he had a vision problem that affected a major life activity on or before August 27, 2003. The burden is upon a claimant to prove that the disability existed. Claimant has not established on that date that he was vision impaired, as defined by the Settlement Agreement.

Claimant received a vision exam at intake on June 27, 2003. The evidence presented does not indicate that Claimant was vision impaired on that date or any date prior to August 27, 2003. No major activity of daily life was affected by the vision issues that Claimant has alleged. Claimant was given the opportunity to rebut the response of Defendants and he did not do so. Claimant has failed to establish that he was vision impaired, as defined by the Settlement Agreement, on or before August 27, 2003.

**Mobility Impairment:** In their response, Defendants acknowledge that Claimant is a very sick man. They further concede that "he is permanently mobility impaired under the Remedial Plan." Therefore, Claimant is a member of the class.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** The answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons.

**3. Was the Claimant discriminated against by CDOC because of his or her disability?** Claimant must establish that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003. If Claimant establishes that he was discriminated against during that period of time, then he may include acts of discrimination that post-date August 27, 2003 as part of his claim.

Claimant came into DOC custody on June 25, 2003. The evidence submitted by both sides does not reflect that Claimant was discriminated against by DOC and its staff because of his mobility disability. Claimant bears the responsibility of establishing that he was treated differently because of the disability and that was in violation of the ADA and Rehabilitation Act. The evidence presented reflects that Claimant was at DRDC until July 15, 2003. During his time at DRDC, he was evaluated and received medical care. There was nothing presented that indicated that any discrimination took place at SCF up to and including August 26, 2003 when Claimant returned to DRDC. Since Claimant has not established that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act for the period ending August 27, 2003, the Special Master cannot consider anything that occurred after August 27, 2003.

Claimant is concerned about his health, and this is not a frivolous concern. Claimant is upset about the medical care that he has received while incarcerated in DOC. He has concerns about the care provided, and his concerns may have some legitimacy.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment.

*Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability.  A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

Claimant also has the right to pursue separately any claim that he may have that arises after August 27, 2003. Since Claimant has not established that he was the victim of discrimination on or before August 27, 2003, he may pursue separately any ADA discrimination claims that he may have for the period that post-dates August 27, 2003.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Floyd Allen is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before February 20, 2007.**

SIGNED this 31st day of October, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*
_____
Richard M. Borchers
Special Master