IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

_____

Claim Number:  02-568
Category:  II
Claimant:  Paul Condit a/k/a MaryKay Lynn Condit, #53124
Address of Claimant:  CTCF, P.O. Box 1010, Canon City, CO 81215-1010

_____

**FINAL ORDER OF SPECIAL MASTER**

_____

THIS MATTER comes before the Special Master on the claim of Claimant Paul Condit a/k/a MaryKay Lynn Condit.  The Special Master has reviewed the claim and all documents filed by both sides.  This Order shall constitute the final action of the Special Master on this specific claim.

**I.  BACKGROUND**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC).  The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*.  During the summer of 2003, the parties began the process of trying to reach a settlement of all issues.  The Court was advised that a settlement had been reached between members of the class and Defendants.  Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham.  After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved.  That approval established the class and did not provide for an opt-out provision for class members.  The Remedial Plan also created a mechanism for

1

individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:

I.      General inconvenience or nominal damages;
II.     Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
III.    Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
IV.     Damages due to severe physical injuries; and
V.      Damages due to death.

Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

III.    DEFINITIONS

A.  COVERED DISABILITIES
The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

B.  QUALIFIED INMATE
Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.

C.  PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

2

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>  2.  The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>
>>  1.  Is the claimant a disabled individual who is a member of the class?
>>  2.  Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>  3.  Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>  4.  Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1.      Claimant Condit submitted a claim which was assigned claim number 02-568. The claim is premised on an alleged permanent mobility disability, a disability due to post-traumatic stress disorder and a disability due to intersexualism (transexualism).

2.      Claimant's claim was assigned to Category II pursuant to the Remedial Plan as set forth above.

3.      Claimant Condit entered CDOC custody in 1993. During Claimant's CDOC custody, Claimant has been housed at the Limon Correctional Facility (LCF) and the Colorado Territorial Correctional Facility (CTCF).

4.      Claimant Condit states that Claimant suffers from carpal tunnel syndrome in Claimant's wrists, which causes Claimant extreme pain. Claimant also indicates that Claimant ruptured both knees in 1977 and then ruptured the left knee again as a result of a fall in July of 2003. Claimant fell again two weeks later, injuring the right knee. Claimant describes many other incidents when Claimant has fallen. Claimant states that Claimant is hampered when bending knees as Claimant tries to walk or move. Claimant indicates that Claimant's problems with ambulating begin when getting up to go to the restroom, to move from Claimant's cell to the shower, or to go down the staircase from

the third floor.  Claimant must go down four flights of stairs every time Claimant wishes to go outside of the cell block and the pod at Unit 7, CTCF.  Claimant further states that when Claimant stands in line for long periods of time, Claimant's knees swell and Claimant has pain in the knees and hips.  At night, the pain keeps Claimant awake.  All walking is painful.  Claimant has difficulty going to the yard, to work, to church, to the law library, to the visiting room, to medical and to mental health.  Claimant states that Claimant does not go to the food hall because of fear of falling.

Claimant also suffers from post-traumatic stress disorder and intersexualism.  A very substantial amount of the documentation submitted by Claimant in connection with Claimant's *Montez* claim relates to these two conditions.  For reasons that will become apparent in the Conclusions of Law, *infra*, the Special Master finds and concludes that there is no need to make detailed findings regarding the impact of these conditions on Claimant's major life activities, nor is there a need to make detailed findings regarding the alleged acts of discrimination by CDOC because of these conditions.

Finally, Claimant asserts that Claimant has been subject to retaliation and harassment because Claimant filed a *Montez* claim.  Again, for reasons that will become apparent in the Conclusions of Law, *infra,* there is no need for the Special Master to make detailed findings regarding the nature and extent of the alleged retaliation and/or harassment.

5.     With respect to Claimant's mobility impairment, Claimant asserts that since entering CDOC custody, Claimant has been denied a lower bunk and/or lower floor restriction.  At one point in Claimant's claim form, Claimant Condit complains that Claimant requested knee braces and a cane, but that Claimant was denied this equipment for 12 years.  At another point, however, Claimant indicates that Claimant requested a knee brace and cane after falling at work on July 3, 2003.  Additionally, Claimant asserts that Claimant has been denied special footwear that would reduce the risk of slipping and falling down.  Claimant also contends that Claimant has been denied free medical treatment and medication.

6.     The medical records provided by Claimant to the Special Master do not support Claimant's description of the severity of Claimant's knee problems.  An x-ray of the right knee taken in 1995 indicated very minimal degenerative change in the lateral compartment, the subpatellar space was normal and the remainder of the knee was unremarkable.  Surrounding soft tissue was also normal.  In 1996, Claimant's left knee was x-rayed.  The x-ray was negative, with no evidence of arthritis.  X-rays of both knees were taken again in May of 2001.  The radiographic findings were negative and both knees were found to be normal.  Yet another set of x-rays were taken of the left knee on July 15, 2003, after Claimant injured it in the July 3, 2003 fall.  Again the radiographic findings were negative and the knee was found to be normal.

An ambulatory health record of a medical visit in December of 2001, after Claimant had fallen in the kitchen, noted that the left knee was swollen and red but that Claimant was ambulatory in the clinic.  Motrin was prescribed along with ice to the

affected area.  An examination of the knee was performed immediately after the July 3, 2003 accident and the knee was found to be tender with slight swelling.  Medical again prescribed Motrin and an Ace wrap.  A follow-up examination a few days later diagnosed the injury as a probable knee strain and possible meniscus tear.  However, as noted above, the x-ray taken on July 15, 2003 was normal.  Finally, an ambulatory health record from October 27, 2006 indicates that Claimant exchanged knee braces for a new set of two hinged braces.  A cane was also issued, along with permits for one year.  An examination of the knees at that time revealed that the ligaments were intact and that there was no edema but some tenderness.

## III.  CONCLUSIONS OF LAW

1.     The legal standards applicable to this claim are derived from three sources:  (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2.     The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class.  Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment."  42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B).  The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.  29 C.F.R. § 1630.2(j)(1).  "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes.  *Remedial Plan* ¶ III(A).  Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments.  *Remedial Plan* ¶ III(B).  A permanent disability/impairment is a condition which is not expected to improve within six months.  *Remedial Plan* ¶ III(C).  As discussed in Section I above, the Remedial Plan further limits permanent mobility, hearing, vision, and diabetes disability/impairment to those that conform to the criteria of Section V, paragraph A of the Plan.

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was

a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

As is discussed more fully in paragraph 3 below, neither the ADA nor the Rehabilitation Act are designed to remedy alleged deficiencies or omissions in medical treatment provided to prisoners by CDOC. Rather, the ADA and Rehabilitation Act are designed to insure that those who have permanent disabilities that prevent them from engaging in one or more major life activities are not discriminated against because of their disabilities. The Remedial Plan, which defines the scope of the Special Masters' authority, limits the disabilities for which damage claims can be asserted to those relating to mobility, vision, hearing and diabetes.

Initially, the Special Master finds and concludes that any ADA and/or Rehabilitation Act claim based upon Claimant's shoulder and wrist impairments is beyond the scope of the Remedial Plan and, therefore, beyond the scope of the Special Master's jurisdiction. While the Remedial Plan states that it covers persons with "mobility impairments," it does not generally define the term "mobility impairments." *Remedial Plan* ¶ III(A). However, the references to "mobility impairment" in the Remedial Plan indicate that the parties intended the term to encompass diseases, injuries and/or conditions involving the lower extremities that impose a substantial limitation on the major life activity of walking. *See, Remedial Plan* ¶ V(A)(1)(dealing with presumed need for special housing, and defining "permanent mobility impairment" as "a permanent lower extremity mobility impairment that substantially limits walking."); *Remedial Plan* ¶ XVI(A)(identifying health care appliances as including "orthopedic prostheses, orthopedic braces or shoes, crutches, canes, walkers, wheelchairs . . . gloves for wheelchair use only," thereby strongly suggesting that "mobility impaired" inmates are those with diseases, injuries and/or conditions involving their lower extremities.).

In short, there is no indication in the Remedial Plan that its coverage of inmates with "mobility impairments" extends beyond those who are substantially limited in their major life activity of walking because of diseases, injuries and/or conditions involving their lower extremities. There is no evidence that Claimant Condit's arm and/or wrist problems involve Claimant's lower extremities or substantially limit Claimant's ability to engage in the major life activity of walking.

The Special Master further finds and concludes that Claimant's allegations based upon post-traumatic stress disorder and intersexualism are also beyond the scope of the Remedial Plan. The Remedial Plan is expressly limited to disability claims based upon mobility impairments, hearing impairments, vision impairments and diabetes. While Claimant's allegations regarding post-traumatic stress disorder and intersexualism may well be cognizable under the ADA and/or the Rehabilitation Act, they are not cognizable under the *Montez* Remedial Plan and must be pursued in a separate legal action.

Additionally, the Special Master finds and concludes that Claimant's retaliation/harassment claim is outside the scope of the matters referred to the Special

Master for resolution.  Neither the Remedial Plan nor the November 23, 2004 Order of Judges Kane and Nottingham confer authority on the Special Master to hear claims for harassment or retaliation arising after the execution of the Remedial Plan.

This leaves Claimant's assertion that Claimant's knee impairments constitute a permanent mobility disability within the meaning of the ADA and/or the Rehabilitation Act.  This portion of Claimant's claim requires resolution of conflicting facts.  Although the issue is not free from doubt, if Claimant's description of the effects of the knee impairment on Claimant's daily life activities is accepted as true, Claimant would probably qualify as disabled under the ADA and/or Rehabilitation Act.  However, the objective medical evidence in the record is substantially inconsistent with Claimant's self-serving assertions regarding the nature and extent of Claimant's knee injuries.  Indeed, the objective medical evidence from x-rays and examinations compiled over many years reveals little or no damage to Claimant's knees.  In short, there is nothing in the medical records submitted to the Special Master that would suggest that Claimant has a mobility impairment that substantially limits Claimant's ability to engage in any major life activity.

There appears to be a conflict in the ADA/Rehabilitation Act case law as to whether a claim can be sustained based on the Plaintiff's description of the effects of an impairment without supporting medical testimony and/or objective medical documentation.  *Compare Marinelli v. City of Erie,* 216 F.3d 354 (3d Cir. 2000)(ADA claim can be based solely on Plaintiff's testimony regarding effect of impairment on major life activities) *and United States v. City of Denver,* 49 F. Supp. 2d 1233 (D. Colo. 1999) (same), *with Douglas v. Victor Capital Group,* 21 F. Supp. 2d 379 (S.D.N.Y. 1998)(absence of supporting medical evidence requires dismissal of ADA and/or Rehabilitation Act claim as a matter of law) *and Farley v. Gibson Container, Inc.,* 891 F. Supp. 322 (N.D. Miss. 1995)(same).  However, the problem in the instant matter is not an absence of objective medical evidence.  There is certainly objective medical evidence in the records submitted to the Special Master.  Rather, the problem here is that the objective medical evidence is diametrically contrary to Claimant's assertions regarding the nature and extent of the knee impairment.  In such a situation, the matter simply becomes one of credibility.  The Special Master finds and concludes that the medical evidence from the x-rays and examinations performed periodically over several years is more credible regarding the nature and extent of Claimant's knee problems than Claimant's testimony.  These medical records fail to demonstrate any medical condition with respect to Claimant's knees that would substantially limit Claimant's ability to perform major life activities.  Consequently, the Special Master finds and concludes that Claimant has failed to prove by a preponderance of the evidence that Claimant suffers from a permanent mobility disability within the meaning of the ADA and/or the Rehabilitation Act.

Because Claimant Condit has failed to demonstrate that Claimant has a permanent mobility disability, Claimant's *Montez* claim must be denied.

## IV. ORDER

IT IS HEREBY ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment be entered in favor of Defendants and against Claimant dismissing Claimant Condit's claim with prejudice; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before January 1, 2007** with the Clerk of the United States District Court at the following address:

901 19th Street
Denver, CO 80294.


SIGNED this 31st day of October, 2006

BY THE COURT:

/s/ Bruce D. Pringle

_____

Bruce D. Pringle,
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this 31st day of October, 2006 to the following:

Paul Condit, #53124
a/k/a MaryKay Lynn Condit
CTCF
P.O. Box 1010
Canon City, CO 81215-1010

Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

/s/ Susan L. Carter

_____

Susan L. Carter