IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES)(Consolidated for all purposes with
Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,
                     Plaintiffs,

v.

BILL OWENS, et al.,
                     Defendants.

F I L E D
UNITED STATES DISTRICT COURT
DENVER, COLORADO

NOV 1 7 2006

GREGORY C. LANGHAM
CLERK

---

Claim Number: 02-459

Category: II

Claimant: Ronald G. Pierce, # 53627

Address of Claimant: A.V.C.F., P.O. Box 1000, Crowley, Colorado 81034-1000

---

CLAIMANT'S OBJECTION TO FINAL ORDER OF SPECIAL MASTER PURSUANT TO
FEDERAL RULES OF CIVIL PROCEDURE, RULE 53(g)(2)

---

COMES NOW, the above named Claimant, Ronald G. Pierce, PRO-SE, pursuant to the Special Master's Final Order of September 11, 2006 and Federal Rules of Civil Procedure, Rule 53(g)(2), and submits the following Objection To Final Order Of Special Master in the above entitled Action:

I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC).

1

The case was brought under the Americans with Disabilities Act, 42 U.S.C. § 12101, and Rehabilitation Act, 29 U.S.C. § 794. During the Summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the Class and the Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
I. General inconvenience or nominal damages;
II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
IV. Damages due to severe physical injuries;
V. Damages due to death.

Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. Remedial Plan ¶ 28-29.

Pursuant to this provision, Mr. Pierce filed his Claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following defintions:

III. DEFINITIONS.
A. COVERED DISABILITIES. The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
B. QUALIFIED INMATE. Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT. A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim.

They stated, in part, as follows:

2. The Special Master shall evaluate individual damage claims submitted in this case by considering the following questions:
1. Is the claimant a disabled individual who is a member of the class ?
2. Was the claimant otherwise qualified to participate in the programs or recieve the benefits or services offered by DOC ?
3. Was the claimant discriminated against by DOC because of his or her disability (e.g., were accomodations requested and denied because of the disability ?).
4. Did this conduct cause the claimant harm, and if so, what is an appropriate remedy ?
This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderence of the evidence each of the above four criteria.

3

## II. FINDINGS OF FACT

As an initial matter, Mr. Pierce asserts that the findings of the Special Master are in conflict with the evidence submitted and, Mr. Pierce submits the following facts relevant to his claim:

1. Claimant Ronald G. Pierce, submitted a claim which was assigned claim number 02-459. The claim is premised on a permanent vision disability.
2. Claimant's claim was assigned to Category II pursuant to the Remedial Plan as set forth above. infra. at pp 2-3.
3. Claimant entered CDOC custody on December 9, 1987. He has been housed in the Centennial Correctional Facility in Canon City, Colorado, the Limon Correctional Facility in Limon, Colorado, as well as the Arkansas Valley Correctional Facility in Crowley, Colorado. Relative to the instant claim, the vision impairment has worsened while at A.V.C.F..
4. Mr. Pierce asserts that he does, in fact, have a permanent vision disability/impairment. Mr. Pierce's vision acuity is 20/175 in each eye, which is supported by the evidence submitted in the Initial Claim Form and Supplemental Claim Form. While the record may seem somewhat vague as to whether the vision acuity is corrected or uncorrected, Mr. Pierce maintains that it is uncorrected, hence the need for upgraded prescriptions. Mr. Pierce's ability to see more than a short distance can only be corrected by evasive eye surgery or, in a lesser degree, the usage of transitional lense glasses that assist with the ever-changing lighting in the cell house, his cell, and while working at his computer.

4

Mr. Pierce maintains that when his physical symptoms begin to affect him, they include intense tension headaches, swelling of the eyes, and serious fatigue, which results in a limited period of contact with bright light such as sun light or incandescent and fluorescent lighting.

5. In the Special Master's Order of 9/11/06, Judge Pringle's interpretation of Mr. Pierce's claim as being "solely related to the CDOC policy implemented in July of 2004" is in err. The CDOC policy to which Judge Pringle references is in response to the law suit filed against CDOC, it is a form of corporal punishment due to inmates' challenging the inadequacy and indiffernce of medical personnel and CDOC's acquiescence to medicals' responses to legitimate complaints by inmates. Until this CDOC policy in 2004, inmates with special vision needs, specifically those with light-sensitivity issues, were able to either order transitional lense glasses at their own expense, or they could order State-issued glasses and then purchase the non-UV protective coated clip-on sun glasses. In this entire suit, there has been no explanation by the Defendants as to why the need for such a policy exists.

The fact that Mr. Pierce's vision impairment has worsened due to this implementation of the 2004 policy is in direct relationship for the need to be enjoined with the Class, implicates CDOC's willful and wanton disregard to the change in Mr. Pierce's vision impairment. In other words, CDOC has long recognized Mr. Pierce's vision impairment, it's in the medical file itself, yet CDOC implements a policy that, before 2004, was never an issue, in so doing, CDOC's actions have caused Mr. Pierce's vision impairment to worsen, leading to the need for the transitional lense upgrades in his presecription glasses.

5

Additionally, the fact that CDOC offers either the non-UV protection glasses or clip-ons to inmates with no vision problems or inmates whose vision is not light sensitivity related, bears no significance to this case, because the inmates with this specific instance/type of vision impairment, are of a small minority who cannot medically rely on the same medical aparatus that other inmates can rely upon.

### III. CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 et seq.; and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.

2. The first issue before the Special Master was/is whether Mr. Pierce is a disabled individual who is a member of the Class. Mr. Pierce relies upon the statutory definitions outlined in § 12102, which provides the following:

**42 U.S.C. § 12102.** DEFINITIONS...(2) disability...the term "disability" means with respect to an individual---(A) <u>A physical</u> or mental <u>impairment that substantially limits one or more of the major life activities of such individual</u>; (B) <u>A record of such impairment</u>; or (C) being regarded as having such an impairment.
See 42 U.S.C. § 12102(2)(A)(B)(C) (Emphasis Added); 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B).

**Disability**...As used in connection with workers' compensation acts, disability is a composite of (1) actual incapacity to perform the tasks usually encountered in one's employment and the wage loss resulting therefrom (i.e., impairment of earning capacity), and (2) physical impairment of the body that may or may not be incapacitating.  Russell v. Bankers Life Co., 46 Cal.App. 3d 405, 120 Cal. Rptr. 627,633.  Statutory definition of a "disability" for social security benefits purposes, imposes three requirements: (1) that there be a medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration; (2) that there be an inability to engage in any substantial gainful employment; and (3) that the inability be by reason of the impairment. 42 U.S.C. §§ 416(i)(1), 423(d).  Pierce v. Gardner, C.A.Ill., 388 F.2d 846,847. Inability to work without some pain or discomfort does not necessarily satisfy the test of disability.  DeFortes v. Celebrezze, 226 F.Supp. 327,330 (D.C.R.I.). However, pain by itself or pain in conjunction with other injuries may be the basis for "disability" within the meaning of the Social Security Act. Farmer v. Weinberger, D.C. Pa. 368 F.Supp. 1,5.  Absence of competent physical, intellectual, or moral powers; impairment of earning capacity; loss of physical function that reduces efficiency; inability to work.  Rorbaugh v. Great Eastern Casualty Co., 117 Wash. 7, 200 P.2d 587,590.  Under Unifirm Probate Code, an incapacitated person is one who is impaired by reason of physical disability. GENERAL CLASSIFICATION... A physical disability is a disability or incapacity caused by a physical defect or infirmity, or bodily imperfection...

Black's Law Dictionary, Sixth Edition, pp 461-62.

As to the applicable standard for determining whether Mr. Pierce has a "disability", his physical "impairment" is spelled out in great detail in the Initial Claim Form and the Supplemental Form For Claimants Who Have Vision Impairments.  Mr. Pierce has substantially shown that he has a vision impairment, in fact, Judge Pringle conceded Mr. Pierce's vision acuity of 20/175, and as such, constitutes an impairment.

**Impair.** To weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner. To diminish in quality, value, excellence or strength...

Black's Law Dictionary, Sixth Edition, p 752.

**Impair.** To make or cause to become worse; diminish in ability, value, excellence, etc.; weaken or damage...

**Impaired.** Weakened, diminished or damaged; functioning poorly or inadequately.

Webster's Encyclopedic Unabridged Dictionary of the English Language, p 958.

Additionally, the Defendant have <u>never</u> challenged Mr. Pierce's impairment, they have <u>never</u> utilized the expert witness determination of Optomitrists or Opthamologists, Mr. Pierce, on the other hand, has utilized these experts when he originally obtained his glasses, which he has owned and worn for over the past 15 years. The Defendants, in their Motion To Dismiss Pierce's Claim, cite the Remedial Plan ¶ 1, 4-5 for their argument that Mr. Pierce is not a member of the class and does not have an impairment. (Defendant's Motion To Dismiss, pp 2-3). The Special Master's determination is a more narrowed interpretation of the ADA and 29 U.S.C. § 794(d), 29 U.S.C. § 705(9)(B), 29 C.F.R. § 1630.2(j)(1), 29 C.F.R. § 1630.2(h)(2)(i), and is not based upon the facts of Mr. Pierce's vision impairment. (Final Order of Special Master, pp 4-6).

Mr. Pierce argues that the parameters of the defining aspects of what constitutes a "disability" and/or "impairment" falls squarely within the definitions outlined in § 12102(2) and the Remedial Plan (Rem. Plan III.A.B.C.), and are specifically confined to those sources.

8

See KOEHL V. DALSEIM, 85 F.3d 86,88 (2nd. Cir. 1996)(<u>Inmate's need for prescription eye-glasses constituted serious medical condition where, as a result of not having glasses, the inmate suffered headaches, his vision deteriorated, and he was **impaired** in daily activities</u>);
KAUFMAN V. CARTER, 952 F.Supp. 520,527 (W.D. Mich. 1996)("A medical condition that threatens one's ability to walk, even if ultimately reversable, is unquestionably a serious matter.");
See also 42 U.S.C. §§ 12213, 12102; PACELLA V. TUFTS UNIVERSITY, SCHOOL OF DENTAL MEDICINE, 66 F.Supp. 2d 234 (D. Mass. 1999);
PERSON V. WAL-MART STORES, INC., 65 F.Supp. 2d 361 (E.D.N.C. 1999);
HORSEWOOD V. KIDS 'R' US, 27 F.Supp. 2d 1279 (D. Kan. 1998);
COLEMAN V. SOUTHERN PACIFIC TRANSPORTATION CO., 997 F.Supp. 1197 (D. Ariz. 1998);
LOFTON V. TALEM, INC., 965 F.Supp. 882 (N.D. Tex. 1997);
FALLACARO V. RICHARDSON, 965 F.Supp. 87 (D. D.C. 1997); PEACOCK V. COUNTY OF MARIN, 953 F.Supp. 306 (N.D. Cal. 1997); STILL V. FREEPORT-McMORAN, INC., 120 F.3d 50 (5th. Cir. 1997); DOANE V. CITY OF OMAHA, 115 F.3d 624 (8th. Cir. 1997).

Here, in the context of § 12102(2), § 794(d), § 705(9)(B), § 1630.2(j)(1), and § 1630.2(h)(2)(i), the term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity. "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

Mr. Pierce concisely laid out the specific "major life activities" that have been affected by his worsening vision impairment. (See Claimant's Initial Claim Form w/Attachments; Supplemental Form For Claimants Who Have Vision Impairments w/Attachments). At no time have the Defendants ever contested or argued or provided evidence to the contrary that the "major life activities" of Mr. Pierce have been hampered. In fact, in the Defendant's Motion To Dismiss, there is no rebuttal to Mr. Pierce's claim other than the erroneous conclusion that he is not a member of the Class, and the erroneous interpretation of the Remedial Plan as to the classification of "disability" and/or "impairment". (See Defendant's Motion To Dismiss, pp 1-3).

In paragraph 3 of the Special Master's Order, (p 5), Judge Pringle conceded that he could not determine whether Mr. Pierce's vision impairment was a perminent one and that it is unclear if Mr. Pierce's vision acuity of 20/175 is corrected or uncorrected. First, the Remedial Plan provides that to be considered "perminent", the impairment must be a condition which is not expected to improve within six months. (See Remedial Plan, ¶ III. C.). Since Mr. Pierce has been experiencing worsening vision, the date when CDOC implemented the new policy of not allowing the prescribed transitional lense glasses, it is obvious that his vision acuity has not improved in the six months outlined in the Remedial Plan, and, for the sake of clarity on the point of when Mr. Pierce's vision impairment began to worsen is apparent in the last appointment for CDOC eye doctors almost 4 years ago, per the medical records in the Defendants' control.

10

Additionally, the Special Master conceded to the fact that Mr. Pierce suffers from a permanent vision disability. (Final Order of Special Master, p 5 ¶ para. 3). As to point 4 of the Special Master's Final Order, what Judge Pringle fails to recognize is that the prejudice to which Mr. Pierce refers relevant to the 2004 CDOC policy, is that the 2004 policy is a direct result of the implementation of the Remedial Plan, it is punishment for the inmates who have challenged the medical, or lack thereof, regarding the ADA claims, which encompass inmates with vision disabilities.

The CDOC, based on the Remedial Plan, must make or provide accomodations to those inmates who qualify as a Class member, therefore, by implementing this policy in 2004, the CDOC has attempted to eliminate a certain sector of inmates who have a specific type of vision impairment, specifically those inmates who rely on outside sources to provide the needed medical aparatus, in this case, transitional lense glasses. The claims which have arisen since the Remedial Plan's inception, are, for the most part, a result of that Remedial Plan, at least vision impairments have been.

While Judge Pringle's opinion that paragraph XXXII does not necessarily authorize damages for claims post-dateing the Remedial Plan, the same can be said that there is nothing in the Remedial Plan that would prohibit post-Remedial Plan claims. If the purpose of the Remedial Plan is to effectively reduce the number of claims or correct certain types of problems that have arisen in the CDOC relative to disabled inmates, then it is only logical that any results from the Remedial Plan that further erode the quality of life of inmates with disabilities or impairments be brought to light and reviewed.

Upon review of the Policy underlying the Remedial Plan, it is quite clear that inmates who qualify as being "disabled" or having "impairments" are not to be discriminated against, using 42 U.S.C. § 12102 as the guidepost for the determination of an inmate's disability or impairment. Mr. Pierce argues that once the Remedial Plan itself was put into place, that is when he was, in fact, discriminated against by not allowing him to obtain the medically prescribed transitional lense glasses. (See Remedial Plan ¶ I. Policy, p 1).

Mr. Pierce argues here that Judge Pringle has already conceded to the fact that Mr. Pierce is suffering from a permanent disability, and as such, Mr. Pierce <u>Must</u> be found to be a Member of the Class, and, since the prejudice resulted from the implementation of the Remedial Plan, Mr. Pierce should be compensated and/or accomodated per his requests in the Initial Claim Form and the Supplemental Claim Form.

Therefore, based upon the foregoing reasons, arguments, and authorities, Mr. Pierce respectfully requests that this Court find that Judge Pringles findings were in err, and further find that Mr. Pierce is a member of the Class and award the requested accomodations in Mr. Pierce's claim.

Respectfully Submitted,

*/s/ Ronald Pierce*

Ronald G. Pierce
Register # 53627
P.O. Box  1000
A.V.C.F.
Crowley, Colorado
81034

Dated this 8th. day of November, 2006.