IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 02-666
Category II
Claimant: Erica D. Williams, #65317
Address of Claimant: CWCF, P.O. Box 500, Canon City, CO 81215-0500

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

THIS MATTER comes before the Special Master on the claim of Erica D. Williams (Claimant). Claimant is incarcerated in the Colorado Department of Corrections (DOC) and is placed at the Colorado Women's Correctional Facility (CWCF) in Canon City, Colorado. At the time she filed her claim, she was at the Denver Women's Correctional Facility (DWCF).

This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of her claim. Defendants have filed a motion to dismiss the claim. Claimant was given the opportunity to respond to Defendants' motion to dismiss, but she has filed nothing in response to the motion nor has she submitted additional documents in support of her claim. Further argument will be waived.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.¹   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>     A. COVERED DISABILITIES
>     The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

¹The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> > 1. Is the claimant a disabled individual who is a member of the class?
> > 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> > 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> > 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on October 30, 1995 and has remained in custody since that date. Claimant originally was evaluated at the Denver Reception and Diagnostic Center (DRDC) and then placed at DWCF. It is not clear when she arrived at CWCF or if she had been placed at other facilities over the years.

In her initial claim form, Claimant checked the box for mobility impairment. Claimant stated, in part, as follows:

> I have problems with and in my neck (causing excruciating headaches). Also in my upper spinal area and lower back due to an accident on a maintenance work crew (DOC) which was supervisor's and one co-worker's fault. I've had to have one epideral shot (which come in threes). However, DOC won't pay for nor will they pay for a surgical procedure that would burn and seal the discs in my lower back. My back goes out quite often (muscle relaxers don't help). I can't move when this happens. My legs go numb and sometimes I am totally immobile. Due to the restrictions that I have, I've been discriminated against for the clerical jobs at which I was more than qualified for. There's not a day that goes by that I'm not in pain. I've been told by outside doctors that I would be living in pain for the rest of my life and that I'd probably not be able to work a job as a person without mobility limitations would.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

> I applied for a gate pass in order to obtain a higher paying DOC job with Juniper Valley at Garfield along with a job working at canteen. I was denied per my case manager Gudewell because of my medical restrictions. I was applying for a clerical position that was open and I was more than qualified for and it wouldn't have interfered with my restrictions. The job at canteen I could have worked a half a day. Both Garfield & canteen was willing to hire me. However, the DWCF classification committee/job board said no and denied my gate pass for either job due to my medical restrictions. Being that I can work and the fact that I'm not crippled, DOC will not give me the proper medical attention and procedures needed to help me because of their insurance carrier, Colorado Access.

Claimant submitted a supplemental form for mobility impairment. Claimant stated, in part, as follows:

> I have problems with and in my neck (causing excruciating headaches). Also in my upper spinal area and lower back due to an accident on a DOC maintenance

work crew. Both of my feet are bad and both of my ankles were broken in DOC. I have lifting, sitting and standing restrictions.

Defendants' motion to dismiss is predicated on a belief that Claimant has failed to set forth sufficient allegations to allow the claim to be further adjudicated. Defendants did not submit any medical or other records for consideration by the Special Master. Claimant was given the opportunity to file a response to the motion to dismiss, but she has filed nothing further.

### III.

Since Defendants have filed a motion to dismiss, all reasonable allegations of Claimant must be accepted as true. The Special Master must examine the allegations and evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004.

Claimant must establish that she was disabled, as defined by the Settlement Agreement, on or before August 27, 2003. It was on that date that the Settlement Agreement was approved by Judge Nottingham and the class was established.

Claimant has checked only the box for mobility impairment. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." There are no allegations and no evidence that Claimant ever used a wheelchair while in DOC custody.

The allegations set forth by Claimant concern her neck and back. Claimant states that her legs go numb occasionally. She does state that she is in constant pain.

Claimant's allegations do not set forth a claim of a permanent mobility impairment, as defined by the Settlement Agreement. Claimant could not prevail on her claim, even if Defendants submitted no evidence, as there are no allegations of a permanent lower extremity mobility impairment that substantially limits walking.

Claimant may well have a disability that is not covered by the Settlement Agreement. Claimant's remedy is to file a separate lawsuit concerning that disability, specifically her neck and spine. Claimant has not alleged a permanent mobility impairment as defined by the Settlement Agreement.

IT IS HEREBY ORDERED that Defendants' motion to dismiss is granted, and the claim of Erica Williams is dismissed; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before March 5, 2007.**

SIGNED this 29th day of November, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master