IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 02-674
Category II
Claimant: Michael J. Velasquez, #57916
Address of Claimant: 8 Chesnut, Pueblo, CO 81005

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Michael J. Velasquez (Claimant). Claimant was incarcerated in the Colorado Department of Corrections (DOC) at the time he filed his claim. He was at that time at the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. He has been discharged from his sentence with DOC.

This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of his claim. Defendants have filed a motion to dismiss the claim. Claimant was given the opportunity to respond to Defendants' motion to dismiss, but he has filed nothing in response to the motion nor has he submitted additional documents in support of his claim. Further argument will be waived.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

>The Settlement Agreement further provides, in part, as follows:
>
>>2. Permanent Hearing Impairments
>>Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
>>3. Permanent Vision Impairment
>>Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
>>4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
>>Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>>1. Is the claimant a disabled individual who is a member of the class?
>>2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant filed his initial claim form in July, 2004. On that form, he indicated that he had come into DOC custody on December 22, 2003. He also indicated that his expected release date was September 22, 2004.

In reviewing all of the documents submitted by Claimant, it is clear that he previously entered DOC custody sometime in the early 1990's. He has submitted medical records reflecting treatment from 1992 through 1996. He was discharged or paroled in 1996. His incarceration on December 22, 2003 was for a new offense. The Special Master is unaware of any DOC custody periods from 1996 to December 22, 2003.

In his initial claim form, Claimant checked the box for mobility impairment. Claimant stated, in part, as follows:

> I recently re-injured my knee. I snapped the ACL ligament in my right knee. I am a HVAC technician and now I am unable to perform the duty as it requires a lot of climbing on roofs and ladders. I am licensed and I am afraid of settling for a job that pays $6.00 hr. as opposed to $18.00 hr. It has brought on depression for my future that will not be fixed by DOC. I also reported to them back problems and they keep telling me there's no problem and give me Motrin without giving me an x-ray. This also affects my mental health cause I'm afraid of future problems.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

> I keep reporting injuries and that I need medical attention right away and they keep telling me and the officers I ask to call them if I am not able to walk is the only way they will see me. Also because every time I am to be released they tell me there is nothing they can do. I have had to live with this injury 8 years and I am afraid to continue to live with it any more.

Claimant also attached a separate sheet of paper with his claim. He stated on that sheet, in part, as follows:

> In 1996, I was scheduled to receive surgery on my right knee but was released from DOC. So they said then I was on my own. It is in my file that surgery was scheduled. I did a lot of exercise on my knee to strengthen the muscles . Now I have re-injured this knee and due to my release again they said I will not receive any medical attention in time because of that release.

In his supplemental form on mobility, Claimant restated the allegations he set forth in his

initial claim. He reiterated that he had a bad knee when discharged in 1996. Claimant also stated that he re-injured his knee when he came back into DOC custody in December, 2003. Claimant attached to his supplemental form a number of medical records. Dr. Stark provided an orthopedic consultation on April 24, 1996 and stated that Claimant had "[b]ilateral ACL deficient knees." Dr. Stark recommended "arthroscopy and ACL reconstruction on this patient for his right knee." The medical record of Dr. Stark reflects that Claimant had injured his knee in a job related accident prior to coming into DOC custody. Medical records from 2004 reflect that the knee still had problems. One record from a physician's assistant reflected that the knee appeared to be better than it was in 1996.

Defendants' motion to dismiss is predicated on a belief that Claimant has failed to set forth sufficient allegations to allow the claim to be further adjudicated. Defendants did not submit any medical or other records for consideration by the Special Master.

### III.

Since Defendants have filed a motion to dismiss, all reasonable allegations of Claimant must be accepted as true. The Special Master also has the right to consider all records and other documents submitted by Claimant in support of his claim.

The Special Master must examine the allegations and evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, each claimed impairment or disability must be examined. Under the Settlement Agreement, Claimant must establish that he was disabled on or before August 27, 2003. It was on that date that the Settlement Agreement was approved by Judge Nottingham and the class was established.

Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." There are no allegations and no evidence that Claimant ever used a wheelchair while in DOC custody.

The evidence submitted also reflects that Claimant's knees were unstable in the 1990's, but there is no evidence in the file that Claimant was unable to walk. In fact, Dr. Stark noted that Claimant was doing some running. Occasionally the knee/s would go out when Claimant was running.

The Special Master may review the evidence submitted in this case to determined if Claimant could prevail at this time, if Defendants filed no evidence. The answer is no, as Claimant has not established that he was disabled, as defined by the Settlement Agreement, when he left DOC custody in 1996. He had bad knees but was able to run and walk. He had physical problems, but the knees did not create a mobility impairment as defined by the Settlement Agreement. Claimant did not meet

5

the definition of mobility impaired in 1996.

The Settlement Agreement requires that a claimant show that he was disabled on or before August 27, 2003. In addition, the Settlement Agreement requires that the claimant must have been the victim of discrimination prohibited by the ADA on or before that date. If a claimant can establish both, he may amend his claim to include discriminatory acts that occurred after August 27, 2003. Otherwise, a claimant may bring his own lawsuit for actions that occurred after August 27, 2003.

Based upon what has been submitted, Claimant cannot establish that he was disabled, as defined by the Settlement Agreement, on or before August 27, 2003. Therefore, he may not pursue his claim as to actions that occurred after that date. Claimant may bring a separate lawsuit seeking damages for any acts of discrimination after August 27, 2003.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** The answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant has alleged that he did not receive proper medical care. Claimant is concerned about his health, and this is not a frivolous concern. He has bad knees and other problems.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that Defendants' motion to dismiss is granted, and the claim of Michael Velasquez is dismissed; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before March 5, 2007.**

SIGNED this 29th day of November, 2006.

                                            BY THE COURT:

                                            */s/ Richard M. Borchers*

                                            _____
                                            Richard M. Borchers
                                            Special Master