IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 02-890
Category II
Claimant: Anthony Dickey, #58744
Address of Claimant: SCF, P.O. Box 6000, Sterling, CO 80751-6000

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER comes before the Special Master on the claim of Anthony Dickey (Claimant). Claimant is incarcerated in the Colorado Department of Corrections (DOC). He is presently housed at the Sterling Correctional Facility (SCF) in Sterling, Colorado.

This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of his claim. Defendants have filed a response to the claim. Claimant was given the opportunity to reply to the response of Defendants, but he has filed nothing further in support of his claim. Further argument will be waived.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>   A. COVERED DISABILITIES
>   The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>> 1. Is the claimant a disabled individual who is a member of the class?
>> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on March 20, 1987. It is unclear as to how many DOC facilities he has been housed in over the years. He presently is at SCF.

In his initial claim form, Claimant checked the boxes for vision and mobility impairment. Claimant stated, in part, as follows:

> I have cluster headaches. I was diagnosed with cluster headaches in 1980 by Dr. Burkhardt. Since then I have lost many jobs & been sentenced to prison twice because of cluster headaches. These headaches have also cost me two marriages. Cluster headaches is the worst pain known to man. This is according to the doctors in the emergency room at the University in Denver.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

> I have been asking DOC doctors to help me with these cluster headaches since 12-10-2001 at CTCF (Canon City) and also here at SCF (Sterling Corr. Fac.). I have shown the doctors documentation of cluster headaches that are dated 1980. Several DOC doctors have now said that I do not have cluster headaches. I have "bad eye sight." They are not treating me for cluster headaches. I have a referral from a neurologist to an ENT (ear, nose & throat) dated 10-2-2002. Dr. Sing refuses to send me to the ENT.

Claimant also stated as follows:

> I have been left in my cell numerous times suffering. Screaming, cursing and crying and asking for help. The guard comes over the intercom and says the nurse says "take an aspirin." I can't do anything for myself and medical has not helped me. Sometimes the headache is so severe that my body does into shock. I can't see, walk, or even think straight. When I am having this headache. After the headache is gone I am left debilitated for sometimes 2 or 3 hours.

In his supplemental forms, Claimant has reiterated what he set forth in his initial claim form. As to mobility impairment. Claimant stated that "problem stems from cluster headaches." As to his vision impairment, Claimant stated, in part, as follows:

> (Due to cluster headaches) my vision impairment is very similar to epilepsy. Pressure from the cluster headache pushes against the optic nerve in my eye and distorts my vision. I am unable to focus. Occasionally, it's so intense it's like looking directly into the sun.

Claimant attached several grievances that he filed concerning his request for treatment for his headaches. One of the responses reflects that on December 22, 2004 that it was noted that Claimant had reduced vision in his left eye and was in need of glasses.

On December 2, 2005, Claimant submitted a document entitled "motion containing exhibits in support of vision claim." In that document, Claimant stated that he had been referred for an MRI in December, 1987. It was determined that he had a right cerebellar venous malformation. A second MRI was taken on January 19, 1988. Claimant then notes that he was referred to a neurologist, Dr. Jarvis Ryals, in May, 2002 for headache treatment. Dr. Ryals thought the cluster headaches were the result of sinus problems. Dr. Ryals recommended a referral to an ENT specialist. Attached to this document were some medical records, including an MRI report and a report from Dr. Ryals.

Defendants have submitted a response to the claim. Attached to the response are many medical and other records concerning Claimant and his time in DOC. Defendants argue that Claimant has failed to establish his claim.

Claimant was given the opportunity to file a reply to the response of Defendants. Despite being given time to file a reply, Claimant has filed nothing further.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, each claimed impairment or disability must be examined. Under the Settlement Agreement, Claimant must establish that he was disabled on or before August 27, 2003. It was on that date that the Settlement Agreement was approved by Judge Nottingham and the class was established.

This is a Category II claim. Claimant is not entitled to a hearing. The claim must be adjudicated on what has been submitted by both sides. Claimant carries the burden of proof to establish that he was disabled on or before August 27, 2003.

**Mobility Impairment**: Claimant has alleged that his cluster headaches constitute a mobility impairment. He has alleged that there are times when he has a headache that he cannot walk.

Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." There is no evidence before the Special Master that Claimant has ever had to use a wheelchair while in DOC custody.

The evidence further reflects that Claimant's main concern is with headaches. He does not

have a permanent lower extremity impairment that substantially limits walking. The Special Master is bound by the provisions of the Settlement Agreement. Claimant has a condition that is not covered by the Settlement Agreement. His cluster headaches may constitute a disability covered by the ADA and Rehabilitation Act, but he may not pursue this condition through the claim process in this case. Claimant's remedy is to commence a separate lawsuit under the ADA related to his headaches.

**Vision Impairment**: A vision impairment likewise requires a showing of a permanent condition that cannot be corrected by glasses. Claimant has set forth allegations that his vision is impaired when he has a major cluster headache. It is a transient condition, depending upon the headaches.

Claimant was seen for his vision over a several year span. His vision was noted as being 20/20 in both eyes. *Exhibits I, J & K*. His vision worsened in his right eye in 2004. *Exhibits N & O*. No evidence has been presented that Claimant cannot see, read, or conduct the other activities of daily life. There is no indication that he cannot have his vision corrected with glasses.

Claimant's claim of vision problems is really an extension of his headaches. The vision claim is not a permanent condition, but rather details problems that relate to his headaches. As such, the vision claim cannot stand alone. Claimant may pursue his vision claim in conjunction with his headache claim in separate litigation.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** The answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant must establish that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003. If Claimant establishes that he was discriminated against during that period of time, then he may include acts of discrimination that post-date August 27, 2003 as part of his claim.

Claimant is concerned about his health, and this is not a frivolous concern. Claimant is upset about the medical care that he has received while incarcerated in DOC. He has concerns about the care provided, and his concerns may have some legitimacy.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement

Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

Claimant has not established that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act. Claimant may pursue his claim of improper medical care through a separate action in either federal or state court.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Anthony Dickey is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before March 12, 2007.**

SIGNED this 31st day of October, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master