IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

_____

Claim Number 03-295
Category III
Claimant: James Moulton, #55112
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

THIS MATTER came before the Special Master for hearing on November 11, 2006. This hearing was held at the Fort Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: James Moulton (Claimant); and Celia Randolph, attorney for Defendants.

Testimony was received from Claimant and Dr. Anita Bloor, M.D. Defendants' Exhibits A through D were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody in January, 1986. He has been incarcerated at a number of DOC facilities. He spent most of the last fifteen years at the Limon Correctional Facility (LCF) in Limon, Colorado. Claimant was transferred to FLCF in February, 2006.

In his initial claim form, Claimant checked all four boxes for disabilities. Claimant stated, in part, in his claim form:

> Mobility impaired. Depending what is occurring with my back that day I am not able to raise my arms without lots of pain. I have lots of problems going up and down stairs. Pains in lower back too. Lots of pain in neck some days. Just recently they're making me double bunk....
> I also, may of had a mild stroke or something because I woke up one day with right foot drop; problems with right had dropping thing and not sure. But I think that cause the right eye drift, or at least made it worse.

Claimant went on to state, in part, as follows:

> Hearing impaired affects my life. I'm hard of hearing and at times I like to take a class or something, but I misunderstand people and always asking people to repeat themselves. I hear tones that seem to confuse me, distract me and make it impossible to think clear or get anything done.
>
> Impaired vision affects my life, I have problems trying to read for any amount of time. My eyes do not hold on line....
>
> Diabetic disability affects my life. I have clubbed fingers and toes; when I cut my nails and due to shape of toes the nails cut into my other toes if nails are left sharp.

Claimant was provided supplemental forms to complete and file. He did file forms for each claimed disability. For vision, Claimant stated, in part, as follows:

> When my head is held level I see double. When I try to read my eyes do not hold on the line for long so I start and stop continuously, plus see blurred vision. I have right eye drift.

As for mobility impairment, Claimant stated, in part, as follows:

> Lower back problem that causes pain in back and down legs and weakness in legs. Upper and neck problems causing pain when raise arm certain other times

>depending what is moving can't turn neck. My legs tremble when I pull my legs up to swing them into bunk area due to steps in the way. Previously I've had medical for single cell, but I guess DOC feels you have anything coming when you're part of an ADA law suit.

As to his hearing impairment, Claimant provided, in part, as follows:

>If I could get to my medical file I could tell you where the hearing loss is. I have a real hard time trying to understand what people are saying when other noise is around.

As to his diabetes, Claimant sets forth, in part, as follows:

>Previously while being housed at Limon I could purchase the right size tennis shows from outside of DOC and emery boards from canteen. I have problems with feet; reeding, spooning, and club nails problem when nails are cut. Fresh cut nails have sharp edges that cut my other toes and causes infection problems....

Claimant noted that he was once able to secure tennis shoes from outside providers, but that has stopped. The same is true as to emery boards.

Claimant submitted a number of documents in support of his claim. One of those documents reflected the evaluation of Dr. Bloor at LCF.

>Dr. Bloor had sent us her screening before offender returned his release. Dr. Bloor found that he has double vision and is being followed by an eye specialist for possible surgery to correct. Offender reports a history of right leg weakness but says that he has no problem jogging; he has a single cell per mental health and requires no mobility accommodations at this time. Offender has worn hearing aids but has not been tested since 1997. Offender declined to be retested. He probably needs to sit in front of class, etc. but he has not requested that we look into accommodations for his hearing at this time. He is a diet-controlled diabetic.
>Dr. Bloor agrees that because of his diabetes he needs to maintain care of his feet however emery boards are not allowed at LCF. If he could smooth the edges of his nails enough, he would not need special shoes with the extra-wide toe box, however as an alternative there are brands available through canteen with wider width.

At the hearing, the Special Master received the testimony of two witnesses. Dr. Anita Bloor, M.D. is the facility physician at LCF and did remember Claimant. Dr. Bloor testified that accommodations were provided to Claimant. Dr. Bloor recalled the vision problems that persisted for Claimant. He experienced double vision and had been referred to a specialist for possible surgery. Dr. Bloor also recalled that Claimant had foot care issues. She had tried to get permission for Claimant to bring in shoes from the outside. Dr. Bloor noted that Claimant did have foot drop.

She also acknowledged that Claimant was a diagnosed diabetic but he was able to stabilize his blood sugar level through diet.

Claimant testified that he was diagnosed as a diabetic four or five years ago. This diagnosis was made after some blood testing. Claimant stated that he has Hepatitis C and a sleeping disorder. Claimant testified that his vision problem may be the result of stroke. He sees double and must maintain his head in a tilted fashion in order to minimize his vision problems. He has been referred to two specialists for possible surgery. Claimant testified that he was not comfortable with the eye surgeon in Pueblo. Claimant felt that he had been discriminated against in not receiving the surgery on his eye.

Claimant testified that he had pain in his lower back. He had thought about having a fusion if that would alleviate the pain. There is a weakness in his legs. He has foot drop and has difficulty walking up and down steps. He testified that he feels like he is going to fall when on stairs. He discussed his pain and weakness with medical staff but was told he had to put up with it. Claimant believed that he was discriminated against because he had not received much in the way of treatment. He thought he might have M.S., but no one had tested him for it.

As to his hearing issues, Claimant testified that he has two hearing aids. He has tried to use them, but the background noise is too great. He denied that he had declined to be tested for hearing loss. As to his diabetes, Claimant has declined the 2400 diabetic diet, as it was too fatty. He was now taking Glucophage for his diabetes. He had no received extra-wide tennis shoes, though they were recommended by Dr. Bloor and other medical staff.

In lieu of live testimony, Defendants submitted the affidavit of Dr. Orville Neufeld, D.O. That affidavits contains a number of documents from Claimant's medical records. Defendants also submitted other documents in support of their position.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** Each disability must be examined separately.

**Hearing Impairment**: Claimant has presented evidence that he has some hearing loss. He has two hearing aids, but he has not used these regularly over the last few years. The definition in the Settlement Agreement requires that a claimant be deaf or have to rely upon signing, written communication or lip reading. Claimant's hearing loss does not approach that level.

In addition, Claimant admits that he has been provided two hearing aids. Those hearing aids have been maintained over the years by DOC. *Exhibit A-8*. The Special Master finds that Claimant has not pursued retesting for his hearing loss and, therefore, has not established that he is hearing

impaired.

**Mobility Impaired**: Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." There is no evidence that Claimant ever used a wheelchair while in DOC custody.

Claimant has testified that he has mobility issues surrounding his drop foot and leg numbness. Claimant testified also that he has difficulty climbing stairs. The problem is that he also acknowledges that he has been able to jog several miles. Claimant has not established that he meets the criteria of mobility impaired, as set forth in the Settlement Agreement. The Special Master finds that Claimant is not mobility impaired.

**Diabetes**: Claimant was diagnosed with diabetes in 2002 or 2003. He has only recently begun taking oral medication for this condition. The Special Master finds that Claimant was diabetic before August 27, 2003 and is a member of the class as diabetic.

**Vision Impaired**: Claimant has double vision, and that is not disputed. He is a possible surgical candidate to repair the condition known as strabismus. Defendants maintain that no cause has been found for this condition. M.S. has been ruled out by DOC medical staff, though that conclusion had not been accepted by Claimant as correct.

This issue is a close call under the Settlement Agreement. The definition set forth in document is as follows:

> 3. Permanent Vision Impairment
>    Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

Claimant does not meet this definition, as he is not blind. The double vision affects Claimant dramatically and has led a head tilt. The question is whether his condition meets the criteria negotiated by class counsel for vision impaired.

The Special Master finds that Claimant's condition of double vision is not covered by the Settlement Agreement. Claimant is not blind and is able to see. His sight is double for part of his field of vision. The Special Master does not find that the Settlement Agreement encompasses this type of vision problem. Claimant is not part of the class as vision impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?**
With one exception, the answer to this question is no. Claimant has received medical care. He has not agreed with some of the care he has received. Likewise, Claimant generally has received access to programs in DOC over the years.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

The Special Master finds that one area of discrimination has existed since Claimant was diagnosed as diabetic. Claimant has had concerns over his foot care due to his diabetes. Dr. Bloor recognized that he needed tennis shoes and attempted to secure those for him from an outside source. The problem with cut toenails is real and one that causes concern to Claimant. The response of DOC is that he may have tennis shoes, but only if he buys them through the canteen. In other words, Claimant is acknowledged to have a foot problem related to his diabetes but he must spend his money on tennis shoes or use state issued boots that non-diabetic inmates are provided. Claimant is provided a choice that is discriminatory because it is based solely on his diabetic condition. Non-diabetic inmates do not have to pay for their boots, but Claimant does if he wants to insure that he does not have foot problems that lead to infections.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**
Defendants placed Claimant into a position that was untenable and which placed him in fear of his well-being. Claimant is entitled to $150.00 as damages for the discrimination that has occurred relating to the tennis shoes; and

IT IS HEREBY ORDERED that the claim of James Moulton is granted, in part, and Claimant is entitled to the sum of $150.00 as damages; and

IT IS FURTHER NOTED that the remainder of the claim is denied, as Claimant he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294

**on or before March 12, 2007.**

SIGNED this 6th day of December, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master