IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 02-120
Category II
Claimant: Michael Bonds, #117317
Address of Claimant: 7166 KrisRelyn, West Jordan, Utah 84084

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Michael Bonds (Claimant). Claimant previously was incarcerated in the Colorado Department of Corrections (DOC). He was housed at the Fremont Correctional Facility (FCF) in Canon City, Colorado when he filed his claim.

This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of his claim. Defendants have filed a response to the claim. Claimant was given the opportunity to reply to the response of Defendants, but he has filed nothing further in support of his claim. Further argument will be waived.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]  Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> > 1. Is the claimant a disabled individual who is a member of the class?
> > 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> > 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> > 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on April 29, 2003. He was released on parole on September 30, 2003, but returned to custody for a violation on February 5, 2004. He has since discharged his sentence, having been released on September 12, 2005.

In his initial claim form, Claimant check the box for mobility impairment. Claimant stated, in part, as follows:

> My mobility disability is due to ankylosing spondylosis affecting cervical/thoracic vertebrae and degenerative joint disease affecting my left hip, cervical and lumbar vertebrae. The hip limits my walking, squatting and lifting. The DJD in my neck limits my range of movement in all directions. The hip and neck decrease the quality of my sleep. The thoracic problem limits upper torso flexibility such as putting on socks, shoes, tying shoes. Taken as a whole, I am no longer able to walk any distance, ride a bicycle which has been my primary mode of transportation since 1993. Nor am I able to participate in recreational activities I have enjoyed for years such as volleyball, tennis & softball. This lack of physical activity and the realization it will only grow worse as I age increases my depression for which I have been on SSDI since 1992.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

> The discrimination is generated by being given housing assignments requiring me to climb stairs. Also, I have not been given medical devices such as an appropriate mattress and/or pillow to relieve the pain in my hip and neck. I have regularly been denied pain medication adequate to achieve an acceptable level of comfort as was given to me outside DOC. Diagnostic tests such as HLA-B29 for AS and MRI for the hip and neck are not used in DOC. Even though Soc. Sec. has my documentation to prove my claims, DOC refuses to do anything other than x-rays. X-rays are inadequate to document the damage in this case.

Claimant was provided a supplemental form to complete. He filed that form and stated that his primary problem was degenerative joint disease (DJD). He expressed that he had difficulty in walking and that walking was necessary at DOC facilities. Claimant attached to his supplemental form several pages of medical records. An entry from May 1, 2003 reflected that need to undertake many tests, as there was concern about Claimant having other medical problems. He was provided vicodin for his knee and back. In May, 2003, Claimant was placed on lower bunk restriction, coupled with no heavy machinery, no intensive labor, no heavy lifting, and no prolonged standing. At some point, the pain medication was taken from Claimant and he then was required to buy his own Motrin from the canteen.

Defendants have submitted a response to the claim. Attached to the response are many medical and other records concerning Claimant and his time in DOC. Defendants argue that Claimant has failed to establish his claim.

Defendants acknowledge that Claimant has a mild case of DJD. An x-ray done in June, 2003 reflected DJD in the spine and possible sclerosis in the knees. *Exhibit D*. Defendants note that Claimant received appointments with specialists. *Exhibits E and F*. Defendants further argue that Claimant was granted a lower bunk restriction, but that he later rejected such a restriction.

Defendants further argue that Claimant requested and received further restrictions in 2004. He received lower bunk, lower tier, and no intensive labor, among other restrictions. Defendants further argue that Claimant has never been denied a job, service or program for which he was otherwise qualified.

Claimant was given the opportunity to file a reply to the response of Defendants. Despite being given time to file a reply, Claimant has filed nothing further.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, each claimed impairment or disability must be examined. Under the Settlement Agreement, Claimant must establish that he was disabled on or before August 27, 2003. It was on that date that the Settlement Agreement was approved by Judge Nottingham and the class was established.

This is a Category II claim. Claimant is not entitled to a hearing. The claim must be adjudicated on what has been submitted by both sides. Claimant carries the burden of proof to establish that he was disabled on or before August 27, 2003.

Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." There is no evidence before the Special Master that Claimant ever used a wheelchair during the time he was in DOC custody. In addition, Claimant's indication that he has problems with his upper back and shoulders cannot be resolved through this claim. Mobility impairment is limited to the definition cited, and back and shoulder problems re beyond the jurisdiction of the Special Master.

Claimant has discussed his DJD as it affects his left hip. The Special Master will find that the DJD in the left hip constitutes a mobility disability, as it appears to have affected Claimant's ability to walk.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** The answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons.

**3. Was the Claimant discriminated against by CDOC because of his or her disability?** Claimant must establish that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003. If Claimant establishes that he was discriminated against during that period of time, then he may include acts of discrimination that post-date August 27, 2003 as part of his claim.

Claimant came into DOC custody on April 29, 2003. The evidence submitted by both sides does not reflect that Claimant was discriminated against by DOC and its staff because of his mobility disability. Claimant bears the responsibility of establishing that he was treated differently because of the disability and that was in violation of the ADA and Rehabilitation Act. The evidence presented reflects that Claimant left on parole on September 30, 2003. Claimant was initially in custody for approximately five months. There is no evidence that Claimant was treated differently than other inmates who were not mobility impaired. There is no evidence before the Special Master that Claimant was denied access to any program, service or job offered by DOC.

Claimant is concerned about his health, and this is not a frivolous concern. Claimant is upset about the medical care that he has received while incarcerated in DOC. He has concerns about the care that was provided. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

Claimant has the burden of proof to establish that he was the victim of discrimination on or before August 27, 2003. He has not carried that burden. Events that occurred after he returned to DOC custody in February, 2004 cannot be acted upon by the Special Master.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Michael Bonds is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of

6

November 23, 2004.

      IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before March 12, 2007.**

      SIGNED this 8th day of December, 2006.

      BY THE COURT:

      */s/ Richard M. Borchers*

      _____
      Richard M. Borchers
      Special Master