IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-249
Category III
Claimant: Paul Hawkins, #46250
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on November 11, 2006. This hearing was held at the Fort Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Paul Hawkins (Claimant); and Celia Randolph, attorney for Defendants.

Claimant presented the following witnesses: Dr. Louis Cabiling, M.D.; Tania Garcia, and Claimant. Claimant offered into evidence Exhibits 1 through 15, and all were admitted. Defendants offered into evidence Exhibits A, C, D, and E. All were admitted into evidence.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

> The Settlement Agreement further provides, in part, as follows:
>
> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>   1. Is the claimant a disabled individual who is a member of the class?
>   2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>   3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>   4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

**II.**

Claimant came into DOC custody in May, 1992. He has been incarcerated at a number of DOC facilities. Claimant was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado in late 1999. He then was transferred to the Arrowhead Correctional Facility (ACF) in Canon City, Colorado in November, 2001. He subsequently was transferred to the Arkansas Valley Correctional Facility (AVCF) in August, 2002. He remained at AVCF until June 2, 2006. He was transferred to the Four Mile Correctional Complex (FMCC) in Canon City for two weeks. Claimant then was placed at FLCF in June, 2006.

In his initial claim form, Claimant checked the boxes for diabetes and vision impairment. Claimant stated, in part, in his claim form as follows:

> Diabetes has completely changed my life in that constant medication three times a day is necessary. Checking blood sugar, always hungry; but can't eat certain things. Constant stress, impaired vision (Can't see in the morning). Lose feeling in toes of feet, lack of prompt food digestion and elimination. Blood in stool, have been denied minimum, and MR level housing because of M4 classification.
> Hepatitis C virus, was diagnosed 4-19-99. Had to participate in intensive residential treatment (TC program) 12-10- to 70-31-02 in order to receive treatment for hepatitis. I believe the intensive stress and confrontive atmosphere at the TC Program exacerbated my disabilities.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

> I was discriminated against 4-19-99 when at FMCC I was denied being allowed to remain at Four Mile; but was regressed because of my diabetic and hepatitis diagnoses (M4 Classification). Also, after being regressed to level III facility (FCF) with a minimum classification (7 points) I was denied progressive movement when I asked to be put in for George West facility because of "medical needs." Moreover, the hostile environment at a Level III facility is an added safety discrimination against me.

Claimant was provided supplemental forms to complete and file. He did file forms for each claimed disability. As to diabetes, Claimant stated as follows:

> Complications I have suffered as a result of my diabetic disability go back as far as 1996, when un-diagnosed symptoms (blurred vision, unexplained falls, hip and ankle injuries), that I reported to the medical staff at FCF went un-responded to and untreated other than a pair of glasses and pain medication.
> There were no lower extremity x rays done when I reported the fall on 10-25-

4

> 96. At that time I was experiencing dizziness, blurred vision. The attached grievance form indicates my attempts to be examined. Not until 2-13-02 was I to receive a cursory exam for foot, ankle or hip injury. I reported in March or April 2000 a fall where ankle was fractured. Nothing done.

Claimant stated that he was diagnosed as diabetic in April, 1999 when examined by Dr. Cabiling.

As to vision impairment, Claimant stated in his supplemental form as follows:

> My vision impairment can be recounted to my recollection as far back as 1994, with blurred vision, unable to read, or see something in front of me. This condition has gotten progressive worse over the years.

At the hearing, Claimant called as his first witness Dr. Louis Cabiling. This individual has treated Claimant over the years and recalled that he had diagnosed Claimant as being diabetic. Once diagnosed as diabetic, Claimant was transferred from ACF to FCF. Dr. Cabiling testified that Claimant had to be at a facility with twenty-four medical care. FCF had such care, and ACF did not. Dr. Cabiling testified that a diabetic could remain at FMCC if his blood sugar levels were stable. An individual in an M-4 classification could not remain at FMCC. Dr. Cabiling testified that FCF had better medical services for inmates than ACF or FMCC.

Dr. Cabiling further stated in response to the questions of Claimant that an individual who is diabetic can be reduced in level of medical code, provided that blood sugar levels are stable. He believed at the present that Claimant could be at ACF with his medical conditions.

Ms. Tania Garcia testified as the second witness for Claimant. Ms. Garcia is the manager of the Therapeutic Community (TC) program in Canon City, Colorado. This program has been established to allow inmates to begin the transition back to the community. Ms. Garcia testified that accommodations are made for disabled inmates, and many have completed the TC program. Ms. Garcia was asked by Claimant if his expulsion was the result of his being disabled, and she testified that was not the case. Ms. Garcia stated that Claimant was resistant to treatment. A decision was made that Claimant could not benefit from the TC program. Ms. Garcia acknowledged that the TC program confronted members of the group concerning their thinking and was intense. Ms. Garcia noted that Claimant had completed the contract but then went back to old behaviors.

Ms. Garcia testified concerning a memo from December 18, 2001. She stated that no one is coerced into participating in TC. She did not believe any medical issues affected Claimant's ability to participate in the TC program. Ms. Garcia admitted that completion of the TC program would normally allow an individual a progressive move to a less restrictive facility.

Claimant testified that he was diagnosed as diabetic in April, 1999. He indicated that he had been suffering from the symptoms of diabetes since 1996. Claimant explained that he believed that he had been the victim of discrimination since 1996. He had made complaints to medical staff, but no treatment or testing had taken place.

5

Claimant testified that he was moved out of his single cell when he was diagnosed as diabetic. He was moved then from the facility. He disputed that FCF had better medical care than ACF. He further testified that he did not need twenty-four hour care.

Claimant stated that he was classified as minimum before he was diagnosed as diabetic. His health has gotten worse. He had three serious falls in 1996. He believed that his injuries were discounted and disregarded. He testified that there had been a refusal to accommodate him while in DOC. He also believed that he was expelled from the TC program because of diabetes. As a result, he was denied earned time.

On cross-examination, Claimant testified that he was not given regular eye examinations. He was worried about his eyesight, as diabetes can lead to significant vision problems. He started to see white spots in 2004. He would black out with a loss of vision for a period of time. He last saw an optometrist in 2003. Claimant reiterated that he did not believe that he was receiving proper medical care. He needed transition sensitive glasses but was not allowed to have them.

As to his diabetes, Claimant testified that he was moved to FCF after his diagnosis. This was a transfer to a higher security facility than ACF. He again stated that his termination from the TC program he believed was health related. He also was denied orthopedic shoes. He does have tennis shoes, but has had to secure those himself. He stated in response to a question that he had been diagnosed with Hepatitis C at the same time it was determined that he was diabetic. He admitted that it would be unlikely that he could complete the TC program because of health issues.

Claimant testified that he had difficulty walking now. He cannot climb a flight of steps without stopping. He had a fractured ankle in 2001. He tries to conserve energy. He requested a cane in 2004. He has been forced to stand for hours in DOC. He further testified that he has arthritis in his hip and ankle. He stated that he had not received proper medical care for any of his medical needs.

During his rebuttal presentation, Claimant testified that he was receiving interferon treatment in 2003. He was trying to get help for his Hepatitis C. With this medication, he was getting false readings on his blood sugar levels. He further believed that the diabetes diagnosis was used as a means to discriminate against him. He had to wait much longer at FCF for the diabetic diet than if he ate the regular diet. The same was true at AVCF, as he had to stand in line longer to receive the proper diet.

Defendants offered into evidence four exhibits, and all were admitted. Exhibit A is an affidavit from Dr. Orville Neufeld, D.O. Attached to that affidavit are various documents from Claimant's medical file. Dr. Neufeld acknowledged that Claimant was diagnosed with diabetes on April 13,1999. Claimant was started on insulin and a 2400 calorie diet in order to get his blood sugars under control. Claimant was diagnosed in 1999 with Hepatitis C and received interferon. That treatment ended as not working. Dr. Neufeld indicated that symptoms such as blurry vision, weakness, fatigue and diarrhea are the result of use of interferon. Dr. Neufeld also opined that Claimant had been receiving appropriate medical care during the time he has been in DOC custody.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** Each disability must be examined separately.

**Diabetes**: Claimant was diagnosed with diabetes in 1999. Defendants acknowledge that he is diabetic. Claimant is a member of the class as a diabetic.

**Vision Impaired**: Claimant has claimed that he has a vision disability. Defendants dispute that he meets the criteria of the Settlement Agreement.

The only definition for vision impairment set forth in the Settlement Agreement states as follows:

> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

Claimant does not meet this definition, as he is not blind nor does he had a vision condition that is not correctable to 20/200 or better. There is no evidence that the vision of Claimant is not correctable to 20/200 or better. There is no evidence that Claimant has not received periodic vision examinations.

Claimant has vision issues. Those issues may be related to his Hepatitis C or perhaps to his diabetes. The Special Master determines that Claimant has not established that he was vision impaired on or before August 27, 2003. Claimant is not part of the class as vision impaired.

**Mobility Impaired**: During the course of the hearing, it became apparent that Claimant also was claiming that he was mobility impaired. Defendants noted an objection, as the initial claim form had never been amended and they were not on notice that a mobility impairment was being claimed.

Claimant has fallen on several occasions. Three of those occurred in 1996. Claimant indicated that he broke his ankle in 2001. He also has stated that he has arthritis in his hip and ankle.

Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." There is no evidence before the Special Master that Claimant has used a wheelchair while in DOC custody, either on a full or part-time basis. There is likewise insufficient evidence that Claimant has a lower mobility disability that "substantially limits walking." The Settlement Agreement provides as an

example whether an individual can walk more than one hundred yards without stopping.

Claimant has arthritis and other orthopedic issues. He does not meet the strict criteria of the Settlement Agreement for mobility impairment. He is not part of the class as mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Claimant presented evidence that reflects that he was terminated from the TC program for reasons other than health or disability issues. Ms. Garcia's testimony reflects that Claimant was unwilling to change some of his life patterns and was not able to adapt to the program's requirements. The Special Master specifically finds that the expulsion from the TC programs was unrelated to any claimed health issue.

Claimant was not disqualified from programs for other reasons. The evidence is clear that Claimant did not have COPD convictions or other similar problems that would have led to regression.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** With three exceptions, the answer to this question is no. Claimant has received medical care throughout his stay at DOC. He has not agreed with some of the care he has received. He certainly has not agreed that the medical care at one facility was better than at another facility. Likewise, Claimant generally has received access to programs in DOC over the years. The termination from the TC program has been determined to be unrelated to health issues.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

Three types of instances have been presented that the Special Master finds troublesome. First, Claimant was terminated from his single cell status contemporaneously with his being diagnosed as diabetic. Claimant has submitted a grievance which provides an alleged rationale that construction was taking place and that there were fewer cells. *Exhibit #12*. A more realistic explanation is that Claimant was going to be transferred because of his diagnosis and this was a way to free up a single cell. The Special Master finds that the loss of the single cell was the result of his

being diagnosed as diabetic.[2] That decision was discriminatory, as it punished Claimant for having a medical condition.

Second, Claimant has testified that he was required to stand in line longer to receive an ADA approved diet. This issue was not refuted by Defendants. Claimant testified that this had occurred at both FCF and AVCF. Claimant was entitled to equal treatment, and that includes not being placed into a food line that takes substantially longer than the regular food line for non-diabetics.

Third, the evidence reflects that Claimant has been required to buy tennis shoes through the canteen. In Exhibit #8, it is acknowledged that "[h]e may purchase soft soled shoes from canteen to alleviate blistering and other foot problems however he does not require orthopedic shoes." Claimant has foot problems related to his diabetes but he must spend his money on tennis shoes or use state issued boots that non-diabetic inmates are provided. Claimant is provided a choice that is discriminatory because it is based solely on his diabetic condition. Non-diabetic inmates do not have to pay for their boots, but Claimant does if he wants to insure that he does not have foot problems that lead to infections.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Defendants placed Claimant into positions that were and are untenable. Claimant has expressed concern for his well-being. Claimant is entitled to $400.00 as damages for the discrimination that has occurred over the years, as determined in this order.

IT IS HEREBY ORDERED that the claim of Paul Hawkins is granted, in part, and Claimant is entitled to the sum of $400.00 as damages; and

IT IS FURTHER NOTED that the remainder of the claim is denied, as Claimant he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before March 12, 2007.**

SIGNED this 8th day of December, 2006.

---

[2] There is an issue that need not be resolved concerning the equality of medical care provided at various correctional facilities. Claimant has made various claims that he believed medical care at FCF was the same as at ACF. The Special Master finds that the transfer to FCF was made as a medical judgment call because of the instability of Claimant's blood sugar levels. The Special Master does not find that the transfer was for alternative or improper motives. In light of Claimant's medical condition, DOC placed him at a facility that had twenty-four hour case. That decision will not be second-guessed by the Special Master.

BY THE COURT:

*/s/ Richard M. Borchers*

_____

Richard M. Borchers
Special Master