IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 03-023
Category III
Claimant: Samuel J. Powers, #105003
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER came before the Special Master for hearing on March 16, 2006 and October 20, 2006 at the Ft. Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Samuel J. Powers (Claimant) and James Quinn, attorney for Defendants.

Claimant presented the following witnesses at the hearing on March 16, 2006: Lt. Robert Martinez; James Christensen; Dr. Orville Neufeld, D.O.; Cheryl Smith; Cathie Holst; Clarey Navarro; Dr. Patty Beecroft, M.D.; Major Curtis Robinette; and Claimant. At the continued hearing on October 20, 2006, Claimant presented the following witnesses: Dr. Louis Cabiling, M.D.; Sandra Ybarra; and Claimant. Defendants presented the following witnesses on October 20, 2006: Dr. Cary Shames; Claimant; and Cathie Holst. All documents submitted by both sides were admitted and accepted as evidence. Final closing arguments were presented. This case then was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for

Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility,

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

>hearing, and vision impairments and inmates with diabetes.
>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." This definition is controlling on all claims filed by individuals who believe that they have a mobility impairment.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>>1. Is the claimant a disabled individual who is a member of the class?
>>2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. The Special Master has considered all testimony presented, along with the documents submitted by both sides.

Claimant first came into the custody of DOC on June 7, 2000. Claimant was placed initially at the Denver Reception and Diagnostic Center (DRDC). He then was transferred to the Sterling Correctional Facility (SCF) in Sterling, Colorado. He was released on September 22, 2000. Claimant testified that he had no claim relating to his incarceration at DOC in 2000.

Claimant returned to DOC custody on October 29, 2001 as the result of a new conviction. Claimant again went to DRDC for evaluation and then was placed at the Four Mile Correctional

3

Complex (FMCC) in Canon City, Colorado. He was at FMCC for approximately four months. He then was placed at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. On September 9, 2002, Claimant was transferred to FLCF. He has been at FLCF ever since, but Claimant has notified the Special Master that he is to be granted parole within the next few weeks.

Claimant filed his initial claim form on April 9, 2004. In that form, Claimant checked the box for mobility impairment. Claimant stated, in part, as follows:

> I have a serious spinal condition which began in 1988 as the result of an injury from a fall. I fractured L1 & L5. I never fully recovered from this injury and my condition has progressively deteriorated. I have now been diagnosed with multiple spine related issues including: degenerative disk disease; significant loss of lumbar disk space; facet disease; Schmorls nodes; circumferential stenosis at L3-4; encroachment of nerve roots at L4-5; and osteoarthritis. These maladies cause constant severe pain in my low back and in both legs from the "pinched nerve" roots and the compression to the spinal cord. Surgery (nerve decompression and spinal fusion) was recommended by specialists but so far CDOC has not made this option possible. I've suffered increasing pain as well as loss of mobility. I am limited in the distance I can walk, and the length of time I can stand, sit or even lay down. As a result, every aspect of my life is adversely affected and my physical and mental welfare suffers proportionally.

In response to the question on the initial claim form concerning discrimination by DOC and its staff, Claimant stated as follows:

> I have been forced to wait for surgery for over a year and a half. No simple, inexpensive but practical alternatives to surgery or drugs have been provided even after medical appliance treatments were recommended and prescribed by specialists and the facility physicians as well. These items were denied by a non-medical staff administrator. Others with similar medical issues did have: extra mattress/pillows; back brace; therapy, etc. I was also seriously injured by the FLCF transport because of their refusal to accommodate me for my disability. I have grievances and various documents as proof.

Claimant was provided a supplemental form to complete and file. Claimant completed the form by providing a typewritten statement concerning his condition while in DOC custody. Claimant stated, in part, as follows:

> Because of the nature of my spinal condition, I am unable to sit, stand, to lie in one position, or to walk for any prolonged periods of time, or distances. My main medical abnormality is "spinal stenosis." (Pinched or trapped nerve roots and the spinal cord itself). Every position in all activities causes pain after remaining in a position for too long. This brings pain and numbness to my lower extremities, low back, mid back, neck, right shoulder and arm. I must walk with a cane for mobility

> and support and frequently I can only negotiate short distances. To travel long distances, (fifty yards or so) I must go slow and stop often to rest and stretch. One of my biggest problems is standing. To be forced to stand in long lines, or sometimes even short lines causes such severe and acute pain, stiffness, and numbness that I nearly pass out from the pain....

Claimant stated further in his supplemental form that he began to request special accommodations as early as November, 2001. He had not received any accommodations prior to the time his supplemental form was filed.

Claimant also stated, in part, as follows:

> On April 5, 2004, I was injured by a fall from a transport bus because FLCF transport officers refused to accommodate me for my disability requirements. I injured my neck and back in a serious sprain/strain type of injury which was caused because of both hands/wrists were restrained in a "black-box" which negated my ability to utilize a cane for support. I also sprained my right wrist and bloodied both knees by falling from the top step of the transport vehicle down to the pavement. This accident would have been prevented by simply allowing one hand to be free to balance with and support myself with my cane while loading and unloading. This simple precaution was ignored.

Since filing his supplemental form, Claimant has continued to file additional documents and pleadings. A number of those are medical records. Many of the documents submitted substantiate that Claimant has significant back problems in his lumbar spine. He does have stenosis at L4-5. Epidural injections were done in December, 2004 and made the pain worse, providing no relief to Claimant. Surgery for decompression of the spine has been recommended by a number of medical care providers.

The hearing on this claim began on March 16, 2006. It was adjourned at the request of Defendants and was completed on October 20, 2006. A brief synopsis will be provided as to each witness called by the parties.

Lt. Robert Martinez was called as Claimant's first witness. He was asked if he recalled the incident of falling on April 5, 2004, and he stated that he did not. He knew whom Claimant was but did not remember any fall from a transport bus.

James Christiansen is a DOC inmate. He was being transported with Claimant to the Arkansas Valley Correctional Facility (AVCF) to obtain x-rays. He remembered that he had his arms placed in a "black box," as did Claimant. When they arrived at AVCF, Claimant was the first off the bus and was required to exit with the "black box" still in place. Claimant fell, as neither transport officer made any attempt to help Claimant. Mr. Christiansen noted that Claimant had brought a cane with him, but that it was impossible to use a cane with both arms in the "black box." He also stated that he had complained, along with Claimant, concerning use of the "black box" for those with

disabilities.

Claimant called as his third witness Dr. Orville Neufeld, D.O. Dr. Neufeld had worked for approximately ten years for DOC in its medical staff and was doing consulting work for the department. He evaluated Claimant on May 24, 2005 at the request of DOC. This evaluation was the result of concern over extensive use of narcotics for pain control. Dr. Neufeld testified that he professionally believed that long-term use of narcotics was not appropriate. He testified that Claimant did not meet the criteria for surgery and it was not going to be performed. Dr. Neufeld acknowledged that several physicians had recommended surgery on Claimant's back. Dr. Neufeld further believed that Claimant was not disabled and should be able to improve his medical condition through exercise and conditioning. He believed that Claimant had been too sedentary. On cross-examination, Dr. Neufeld testified that surgery was not a panacea and that there were risks. The end result of surgery could be a condition no better than the present situation or worse.

Cheryl Smith is the associate warden at FLCF. She was called as a witness by Claimant. She is an RN by training and was the HSA at FLCF before the promotion to her present position. She testified that she had no authority to override the order of a physician and had not done so. She did not believe that Claimant needed an extra mattress. In her present position she does review ADA accommodations that are provided to inmates at FLCF.

Claimant called Cathie Holst as his next witness. Ms. Holst is the AIC for DOC. She is responsible for implementing the changes adopted by the Settlement Agreement and to review and approve requests for accommodations under the ADA. Ms. Holst testified that medical staff make the determination if an individual meets the criteria for a disability through the evaluation process. She did not know if any transportation regulations were in place in April, 2004 when Claimant fell from the bus at AVCF. Her review of the records submitted indicated that surgery on Claimant's back was not indicated. She also testified that there are no specific jobs for disabled inmates. Claimant's initial request for an accommodation came on April 8, 2004. Ms. Holst acknowledged that Claimant has filed a number of grievances concerning treatment that he has received. Included in the grievances were concerns about the lack of a shower chair and the need for a wheelchair.

Clarey Navarro, a counselor and teacher, was called as a witness by Claimant. This individual had had limited contact with Claimant and remembered a kite being forwarded to medical. Claimant wanted to be in one of Ms. Navarro's classes. Claimant talked with her but wanted to remain medically unassigned.

Dr. Patty Beecroft, M.D. testified that she was assigned to FLCF for a period of time. A number of medical tests were run on Claimant in 2004 including an MRI. Claimant does have degenerative disk disease and is experiencing pain. Dr. Beecroft had requested a neurosurgery consultation. When she first began treating Claimant, no authorization for a wheelchair had been granted. That changed after a period of time. Claimant was receiving pain relievers that were narcotics, but those were discontinued after a period of time. Dr. Beecroft testified that surgery would not necessarily resolve all pain issues and could leave other problems. She acknowledged that Claimant could not fake the MRI and x-ray results.

Major Curtis Robinette testified that he is the program manager at FLCF. He discussed programs that exist at FLCF. He further discussed the correctional industries positions available at FLCF. He stated that Claimant never applied for a job or program with him.

Claimant testified in direct examination that he had been forced to work in intensive labor when he returned to DOC custody in 2001. He was threatened with a COPD charge if he failed to work. His medical level was raised to M-4. Claimant had been determined to be medically unassignable at SCF when he was there. He was initially referred to Dr. Lilly for an evaluation. Dr. Lilly recommended surgery to resolve the pain complaints that existed.

Claimant ultimately was provided a wheelchair. At one point, Mr. Ron Peterson, a nurse practitioner at FLCF, cancelled the wheelchair based upon reports that Claimant had been smuggling food back to his cell house using the wheelchair. Claimant testified that his pain was constant and that he had been able to function through use of various painkillers. Those were ultimately discontinued.[2]

In December, 2002, Dr. Perez issued an order that allowed Claimant to have a cane. Claimant was unable to use his cane during the April 5, 2004 transport in which he fell exiting the bus at AVCF.

Claimant was referred to Denver Health Medical for an evaluation in September, 2004. That evaluation indicated that surgery would be necessary at some point to relieve the pain that Claimant was experiencing. Claimant testified further that he was evaluated by Dr. Neufeld in May, 2005. Shortly thereafter, he was taken off of narcotic pain killers.

On cross-examination, Claimant stated that he could not climb a flight of stairs without stopping. He testified further that he had received appropriate medicines for his pain while at SCF in 2000.

When the hearing resumed on October 20, 2006, Claimant called additional witnesses. Dr. Louis Cabiling, M.D. testified that he was the physician in charge at the Arrowhead Correctional Complex (ACC). Dr. Cabiling was aware that Claimant had applied for entry into the Therapeutic Community (TC) program which is held at ACC. He had been turned down, according to Dr. Cabiling, because he was on narcotic painkillers.

Ms. Sandra Ybarra was called by Claimant. She is the drug abuse coordinator at FLCF. She discussed the TC program and indicated that Claimant was not eligible because he was on narcotic pain killers. She was unaware of the severity of Claimant's injuries.

---

[2] The Special Master is aware from other hearings that DOC in 2004-2005 discontinued virtually all narcotic painkillers for inmates who had been receiving them. Instead, inmates were transferred to OTC drugs such as Advil and Motrin.

7

Claimant testified at the resumed hearing that he had been turned down for the TC program. He also testified that he had requested a shower chair for use at FLCF. No chair was available, only a bench. Claimant did not believe the bench to be safe. At the time the hearing resumed on October 20, 2006, Claimant was in a wheelchair and was assigned a pusher/aide. His use of the wheelchair had been terminated on two occasions.

Defendants called Dr. Cary Shames, D.O. as a witness. He is the Chief Medical Officer for DOC. Dr. Shames testified that review of Claimant's medical records reflected that he has received an MRI that indicated spinal stenosis. There was evidence of nerve impingement. Claimant had requested and received a cane and then a wheelchair. The records reflected long-term use of narcotic painkillers, but those have been terminated. Dr. Shames testified that the narcotics had to be terminated because of the long-term addiction problems that could result.[3]

On cross-examination, Claimant asked Dr. Shames concerning a referral to a Dr. Moore. That referral was based upon the intense pain that Claimant had been experiencing. Dr. Moore is a pain specialist and indicated that spinal surgery might not lead to cessation of pain. Dr. Shames in response to another question indicated that the TC program could not admit any individual who was on narcotic pain medicines.

Defendants also recalled Cathie Holst as a witness. Ms. Holst testified that accommodations had been provided to Claimant. Medical equipment, such as a TENS unit, could not be provided by her, as that was outside of her authority.

### III.

A claimant must establish that he was a member of the class as of August 27, 2003 and had been subjected to discrimination prohibited by the ADA and Rehabilitation Act on or before that date. If a claimant establishes these requirements, then acts of discrimination after August 27, 2003 may be considered as part of the claim process.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** The most important question is whether a claimant is a member of the class. The Special Master is bound by the Settlement Agreement and its definitions.

Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." There is no evidence that Claimant was using a wheelchair prior to August 27, 2003. There is evidence that he

---

[3] Claimant's sentence is the result of a felony conviction for drug abuse.

made a request for a wheelchair. Claimant technically does not meet the first prong of mobility impairment as set forth in the Settlement Agreement.

The Special Master specifically finds that Claimant was mobility impaired on and before August 27, 2003. Particularly telling are medical record entries in 2000 when Claimant was in DOC for his first sentence. Dr. Philbin at SCF saw Claimant on July 28, 2000 and August 10, 2000. Claimant was placed on unassigned medical status because of his physical condition. As of the year 2000, DOC medical staff believed that Claimant had significant medical problems.

The 2000 medical record entries are only part of the picture. Other medical records reflect x-rays, MRI's and other tests which corroborated that Claimant has physical problems in his back and neck. Those problems also affect his legs and limit his ability to walk. Though there may have been some attempt to question Claimant's veracity, the Special Master finds that the objective test results reflect that there is a permanent lower extremity impairment that substantially affects walking. [4] Claimant is a member of the class as mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides and as related to the date of August 27, 2003, the answer to this question is yes. Other than health issues on that date, there does not appear to have been any disqualification from programs, benefits, or services. Claimant has had no major disciplinary problems.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant must show that he was the victim of discrimination on or before August 27, 2003. If he establishes that he was a victim of discrimination prohibited by the ADA and Rehabilitation Act on or before that date, he may then amend his claim to include discriminatory acts that occurred after August 27, 2003.

Claimant is a prolific writer of grievances and pleadings. The file as to this claim is almost twelve inches high. He has filed multitudes of grievances since he arrived back in DOC custody. Claimant apparently believes that filing voluminous pleadings somehow will strengthen his claim. In fact, just the opposite can be the result. Page after page of detail often clouds the real issues that exist. To a certain extent that may have happened here. The Special Master has reviewed every single document submitted by Claimant. Some of those documents border on being absurd. Claimant has provided a chronology of documents for every month he has been in DOC custody. The chronology is backed up with various documents. The chronology is in such minute detail that there is listed an entry that states "***assaulted by squirrels*** broke nose, black eyes, bruises!" What

---

[4] A number of medical consultants recommend surgery on Claimant's spine. Arguably, that surgery would reduce the intense pain he is experiencing and allow him to walk without limitations. The decision has been made by DOC not to provide surgery. Therefore, the lower extremity condition is permanent, because Claimant has no way to resolve that condition on his own volition.

this entry and supporting documents have to do with a claim under the ADA and Rehabilitation Act absolutely escapes this Special Master.[5]

Claimant also believes that the claim process involves considerations of the Eighth Amendment. A common theme in Claimant's pleadings is that there has been deliberative indifference to his medical needs. The Special Master is bound by the decision in *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). The United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. Claimant retains the right to pursue his claims of medical malpractice or deliberate indifference under the Eighth Amendment through a separate lawsuit.[6]

Claimant has established that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act. First, DOC was on notice as of 2000 during the first sentence that Claimant had significant spinal problems that also affected his legs. When Claimant returned in 2001, he went for a period of time without appropriate accommodations. These include a delay in receiving a cane, wheelchair, and in being required to do intense labor and stand in lines while physically unable to do so. Second, Claimant was denied entry into the TC program because he was on narcotic painkillers. These were prescribed for him by DOC medical staff because of his physical condition. The narcotic painkillers were terminated in 2005, but Claimant apparently has not been reconsidered for entry into the program. In other words, Claimant was penalized because he had a disability that required him to take medication to carry on his daily activities. Those individuals who had no disability were treated differently. On its face, it would appear to make sense to preclude inmates from entry into the program if they are on narcotic drugs. It simply sets up a discriminatory process that was not rectified in this case when Claimant was removed from narcotics and placed on Motrin.

Third, the actions of Ron Peterson in discontinuing the use of the wheelchair on June 17, 2004 border on outrageous. The entry in the medical chart simply states, in part, as follows:

---

[5] For five and one-half years, this Special Master was assigned as the United States Magistrate Judge to review every prisoner petition filed in the Court. These cases included actions brought under 42 U.S.C. §1983 and *Bivens*, as well as habeas corpus petitions and motions filed under 28 U.S.C. §2255. The Special Master has seen meritorious and non-meritorious pleadings. Nothing diminishes the effectiveness of a pleading more than placing something totally irrelevant to the case in such a pleading. The assault by the squirrels falls into that category.

[6] Deliberate indifference as to improper medical care almost always will require expert testimony for a plaintiff. Though Claimant presented a number of witnesses, none testified that there was deliberate indifference in the medical care provided to Claimant.

> Reports from cellhouse that Mr. Powers has been smuggling food in w/c. Called Mr. Powers over & told him that the w/c would be discontinued due to these reports.

Smuggling of food would lead to COPD charges, but also would require some proof at a hearing. Mr. Peterson simply thought that it would be easier to punish Claimant by taking his wheelchair from him.[7] An inmate who was not disabled but was alleged to have smuggled food to the cellhouse would be treated differently through the COPD process.

Fourth, the fall exiting the transport van at AVCF in April, 2004 also defies logic. Security is a legitimate concern at any penal institution, but some knowledge of the individuals being transported from FLCF would seem important. That is especially true since Claimant brought a cane with him. In the informal resolution form, Claimant was advised as follows:

> I have spoken with both of the transporting officers and yourself, and find that neither officer was made aware of the fact that you had any problem balancing or walking with your hands restrained in a "black box." It is common practice to accommodate inmates with disabilities and/or handicaps within the security guidelines of the Department of Corrections.

It is difficult to believe that transport officers at FLCF would not inquire as to disabilities that may exist in individuals being transported from that facility. It is also difficult to believe that those officers would not have inquired concerning balance and stability when Claimant had a cane.

These are the incidents that have been proven by Claimant. To the extent that the Special Master has not discussed others, they are deemed not have been proven. The Special Master specifically does not make any ruling as to those issues related to the quality of medical care. Those issues will have to be resolved in a different proceeding.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** The Special Master has determined that discriminatory acts did take place over the time that Claimant has been in DOC. Claimant suffered physical injuries as the result of his fall, and emotional trauma as a result of the other incidents which have been discussed in this order.

Claimant submitted a list of purported damages. To say the least, that list has no relevance to this claim or the damages that Claimant has suffered. That list also diminishes Claimant's credibility.

The Special Master finds that Claimant has suffered damages as the result of the violations of the ADA and Rehabilitation Act. Claimant is awarded $2,000 as compensation.

---

[7] Mr. Peterson is no longer employed by DOC and did not testify at the hearing.

IT IS HEREBY ORDERED that the claim of Samuel Powers is granted, in part, and he is awarded $2,000 as damages for the violations of the ADA and Rehabilitation Act that he has proven; and

IT IS FURTHER ORDERED that all other claims of Samuel Powers are deemed dismissed; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before March 19, 2007.**

SIGNED this 11th day of December, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

---
Richard M. Borchers
Special Master