IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 02-802
Category II
Claimant: David N. Hall, #112325
Address of Claimant: CCCF, 6564 State Highway 96, Olney Springs, CO 81062-8700

_____

## FINAL ORDER OF SPECIAL MASTER
_____

THIS MATTER comes before the Special Master on the claim of David N. Hall (Claimant). Claimant is incarcerated in the Colorado Department of Corrections (DOC). He is presently housed at the Crowley County Correctional Facility (CCCF) in Olney Springs, Colorado.

This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of his claim. Defendants have filed a response to the claim. Claimant has filed a reply to the response of Defendants. Further argument will be waived.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>    A. COVERED DISABILITIES
>    The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

> The Settlement Agreement further provides, in part, as follows:
>
> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on February 22, 2002. Claimant was placed initially at the Denver Reception and Diagnostic Center (DRDC). It is unclear as to all facilities in which Claimant has been placed. He was at the Arrowhead Correctional Complex (ACC) in Canon City, Colorado when he filed his claim. He later was transferred to CCCF.

In his initial claim form, Claimant checked the box for mobility impairment and vision impairment. Claimant stated, in part, as follows:

> I have had a disability in both of my knees. I have had a torn ACL in my left knee for years. I had an MRI performed in 2001 before I came to prison. I have talked with medical and the orthopedic surgeon. They refuse to correct the problem with my ACL even though I have an MRD of 2899. I am not able to play sports or do any weightlifting with my knees the way they are. I am unable to jog to that I can have a cardiovascular workout. I am in pain every day due to the uncorrected condition of my knees.
> 
> I have a much worse condition in my right knee. After 2 years of problems and 2 accidents at Fremont Correctional Facility and approximately one year of going through the grievance procedures, I was finally able to see the orthopedic surgeon. He immediately told me I would need surgery to correct the problem. Several months later I was taken to the hospital in Canon City to have the surgery completed. While still on meds after the surgery, the guards from Fremont took me out to the transportation van and made me climb into the van. I got out of my wheelchair and attempted to comply with their order. As soon as I put weight on my leg there was extreme pain and burning in the back of my leg. I screamed out and was put back in my wheelchair. One of the guards called back to the hospital staff and the doctor asked them, "who told you to take him back? I did not." I had to be given a shot of pain medication and to wait for a wheelchair accessible van to come get me. The result of this incident was that my hamstring tore and rolled back up my leg. I still have to deal with this condition today.....
> 
> In addition, I have a vision impairment in my right eye. I have had this problem for many years. I have been able to maintain my eyesight by proper preventive care. I have used viroptic ophthalmic solution for years to counter the attacks of herpes. After my incarceration at Fremont I requested my preventive medication. I was told I could not have preventive medication. I could only receive medication once I had active herpes in my eye. I explained the necessity of medication being available the moment the herpes became active. Later I had another herpes episode and I had to fly a kite to medical. I was told by unit officers that my condition was not an emergency. By the time I was allowed to see medical, my eyesight had deteriorated. I was seen by medical and told that I had lost over 20 percent of my cornea and that I would require glasses.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

> In the case of my right knee, I injured my knee at Fremont Correctional Facility. I was taken to medical where they documented my accident. I was discriminated against by FCC medical staff for over a year. They would not let me see an orthopedic surgeon for over a year. I had to go through grievance procedures and pay money to see medical many times. I also had to endure severe pain and additional blow-outs of my knee until I was finally allowed to see a specialist. The specialist immediately identified my knee as requiring surgical attention. Since the surgery and the tearing of my hamstring, I have seen the surgeon who performed the knee reconstruction. He told me it would only make my condition worse to go in and repair the damage done from being made to climb in the van. Had I been able to see an orthopedic specialist, I would be able to have the procedure done to repair my leg and improve the quality of my life.
>
> In the case of my left knee I had an MRI performed by Dr. Kindsfater of the Orthopedic Center of the Rockies in Fort Collins. He told me he would need to perform additional surgeries to repair my torn ACL. I was put in prison shortly after this diagnosis and have been discriminated against by DOC medical who has refused to address and correct my condition. This is contrary to what I was told by Dr. Kindsfater and contrary to the continued pain I must endure.
>
> I the case of the herpes in my right eye I am continually discriminated against. I cannot get relief from medical to keep the herpes inactive. In addition, I do not get a response from medical in time to prevent damage to prevent damage to my eye, as evidenced by the amount of corneal damage I have sustained. This is an issue that will affect me for the rest of my life.

Claimant was forwarded supplemental forms to complete and return. Claimant stated in his supplemental form as to mobility impairment, in part, as follows:

> I have mobility issues that include but are not limited to running, jogging, climbing, lifting heavy weights, stooping, kneeling, bending, and walking long distances.

In the supplemental form for vision impairment, Claimant states, in part, as follows:

> I have herpes in my right eye. I have lost over 20% of my vision in my right eye, due to cornea loss. The herpes episodes I must endure are debilitating, extremely painful, make work impossible and continue the deterioration of vision in my right eye.

Defendants have submitted a response to the claim. Attached to the response are many medical and other records concerning Claimant and his time in DOC. Defendants argue that

Claimant has failed to establish his claim.

Claimant has filed a reply to the response of Claimant. He has presented his own statements in rebuttal to what has been set forth by Defendants.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, each claimed impairment or disability must be examined. Under the Settlement Agreement, Claimant must establish that he was disabled on or before August 27, 2003. It was on that date that the Settlement Agreement was approved by Judge Nottingham and the class was established.

This is a Category II claim. Claimant is not entitled to a hearing. The claim must be adjudicated on what has been submitted by both sides. Claimant carries the burden of proof to establish that he was disabled on or before August 27, 2003.

**Mobility Impairment**: The Special Master is bound by the definitions set forth in the Settlement Agreement. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The evidence reflects that Claimant did have surgery on the ACL of his left knee on September 9, 1998. This reconstruction was performed by Dr. Kindsfater in Ft. Collins. *Exhibit A*. Claimant had injured his knee playing sports. In May, 2001, Claimant saw Dr. Kindsfater for a review of his leg. Dr. Kindsfater in his report stated, in part, as follows:

> David is about three years out from ACL reconstruction on the left. He did have an injury to his knee after his initial reconstruction where I felt he probably had a partial retear of the ligament. He has done fairly well since, but he does like to do martial arts and is fairly active, and does have pivot shift episodes. It has been particularly bothersome to him since he hurt his right leg and has been in a cast boot for some tendinitis in the right lower extremity....
> IMPRESSION: David has an unstable left knee. He requires revision of his ACL. We would use a contralateral graft. However, his right leg is now in a cast boot and he needs to get out of this before we do anything....

*Exhibit B*.

On February 2, 2002, Claimant came into DOC custody. On August 14, 2002, Claimant was

taken to medical for examination of his knee. He was encourage to rest his knee and to be careful when he played contact sports. *Exhibit C*. This condition arose while Claimant was playing volleyball. On May 21, 2003, Claimant was injured while playing softball. His knee had popped in and out again. *Exhibit D*. On June 10, 2003, another sports injury occurred as his knee popped. *Exhibit E*.
On June 21, 2003, Claimant was taken to medical because he had hurt his leg while running. He was wearing a knee brace at the time. *Exhibit F*. He was given a recommendation not to play sports because of the knee injury. Recreation was notified that he was precluded from playing sports for a period of time. *Exhibit G*.

In August, 2003, a referral was made to a specialist to examine Claimant's right knee. Dr. Patterson did reconstruct the ACL on October 24, 2003. *Exhibit I*. Claimant was examined after the surgery, and his medical records reflect that his condition was improved. He later fell on a wet floor in early December, 2003. *Exhibit L*. He did suffer a hamstring injury. Claimant was offered physical therapy in early February, 2004 but turned that down on the basis that he had received instructions from Dr. Patterson. *Exhibit N*.

The definition for mobility impairment has two different parts. Part one allows a claimant to show that he was in a wheelchair full or part-time due to a permanent disability. The evidence in this case reflects that Claimant was in a wheelchair only when he left St. Thomas More Hospital in October, 2003. As Claimant has stated, he understood the hospital procedure to require every person to leave in a wheelchair if that person had undergone surgery. There is no evidence that use of a wheelchair extended past that day.

The second part requires a showing that a claimant on or before August 27, 2003 had a "permanent lower extremity mobility impairment that substantially limits walking...." The problem here is that the evidence presented by both sides reflects that Claimant was very active. His injuries resulted from sports activities, such as playing softball, playing volleyball, and running. Such evidence does not substantiate a permanent lower extremity condition that limited walking. The Settlement Agreement provides as examples of mobility impairment the inability to walk for one hundred yards without stopping and the inability to climb a flight of stairs with pausing. There is no evidence that on or before August 27, 2003 Claimant was unable to walk or climb stairs. Just the opposite is the case.

Claimant was not mobility impaired, as defined by the Settlement Agreement, on or before August 27, 2003. He cannot, therefore, raise mobility issues that arose after August 27, 2003.[2]

---

[2] Claimant should be commended for attempting to be as active as possible. The Special Master has seen many claimants who have given up trying to maintain their health because of a medical issue. Claimant also has a right to be upset concerning the treatment he received by the transport officers in October, 2003. He may be able to obtain relief through a separate lawsuit concerning their actions.

**Vision Impairment**: Claimant told medical staff in May, 2002 that he had herpes virus in his eye. The report done at that time reflected that Claimant was able to see and had vision that was 20/20. *Exhibit V*. In late 2002, medical tried to remove a foreign object from his right eye. *Exhibit Y*. Not all of it could be excised. In February, 2004, medical staff noted a history of corneal herpes but indicated that Claimant was experiencing no immediate problem.

Claimant has had eye examinations during the years that he has been in DOC custody. None of those examinations indicated any major impairment of sight. Under the ADA and Rehabilitation Act, a disability must substantially limit a major life activity. *Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999). Claimant has concerns about his medical care, but there is insufficient evidence to indicate that he has a vision impairment that limits a major life activity. Claimant is not part of the class as vision impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** The answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant must establish that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003. If Claimant establishes that he was discriminated against during that period of time, then he may include acts of discrimination that post-date August 27, 2003 as part of his claim.

Claimant is concerned about his health, and this is not a frivolous concern. Claimant is upset about the medical care that he has received while incarcerated in DOC. He has concerns about the quality of the care provided, and his concerns may have some legitimacy.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

Claimant has failed to establish that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act. His concerns about the medical care he has received cannot be resolved in this claim process

pursuant to the *Fitzgerald* opinion. Claimant does have the right to pursue a separate lawsuit concerning the quality of his medical care while in DOC custody.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of David Hall is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before March 19, 2007.**

SIGNED this 14th day of December, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master