IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 02-649
Category II
Claimant: Nathaniel Smith, #110744
Address of Claimant: 4410 Solar Drive, Pueblo, CO 81004

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Nathaniel Smith (Claimant). Claimant was incarcerated in the Colorado Department of Corrections (DOC) when he filed his claim. He was at the Fremont Correctional Facility (FCF) at that time. He has discharged his sentence and is living in Pueblo, Colorado.

This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of his claim. Defendants have filed a response to the claim. Claimant was given the opportunity to reply to the response of Defendants, but he has filed nothing further in support of his claim. Further argument will be waived.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>   A. COVERED DISABILITIES
>   The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

>The Settlement Agreement further provides, in part, as follows:
>
>>2. Permanent Hearing Impairments
>>Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
>>3. Permanent Vision Impairment
>>Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
>>4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
>>Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>>1. Is the claimant a disabled individual who is a member of the class?
>>2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant initially came into DOC custody on September 26, 2001. He was released in June, 2002. He returned to DOC custody on February 25, 2004 and was released in late 2004. Claimant initially was placed at the Denver Reception and Diagnostic Center (DRDC). He was placed later at the Delta Correctional Center (DCC) in Delta, Colorado. Later he was transferred to FCF.

In his initial claim form, Claimant checked the boxes for vision impairment and diabetes. Claimant stated, in part, as follows:

> I was diagnosed with diabetes Sept. 2001 in Delta Correctional Facility. My main source of income was CDL Driver over the road. Now I cannot pass a physical for CDL due to my conditions. My eyes are bad. My feet are bad. DOT will not allow me to get a CDL, due to insulin dependency, Therefore my main source of income has stopped.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

> In 2001 while at Delta Correctional Facility, I was not put on any diet. Yet they said I was borderline diabetic. It was very hard to get them to listen to my needs. By wearing DOC boots, my feet are bad. My eye is poor. It took 1 yr. to get glasses from the facility. They would not put me on any meds in 2004. DRDC had me on 1800 calorie diet. It was not a 1800 calorie diet. Some days I would get it some days not. I was in DRDC from 3-04 4-29-04 32 days, out of those days maybe 2 wks. of 1800 calorie diet. DRDC refused me soft sole shoes. FCF refused me soft sole shoes. Now my feet and knees are both bad. Pueblo, Colo. VA has all my medical records even from DOC. I came to FCF facility 4-04. I am still incarcerated until 9-9-04. I have put in a kite 4 times for diet meal and snack lunch for high sugar level. I have not received any yet they also refused me soft sole shoes, and I am waiting for eye exam. It has been 1 month since I put in for an exam.

Claimant was forwarded supplemental forms to complete and return. Those forms have never been filed. In addition, Claimant was provided the opportunity to submit medical and other records in support of his claim. He has submitted only the initial claim form.

Defendants have submitted a response to the claim. Attached to the response are many medical and other records concerning Claimant and his time in DOC. Defendants argue that Claimant has failed to establish his claim.

Claimant was given the opportunity to file a reply to the response of Defendants. Despite being given up to and including December 13, 2006, Claimant has filed nothing further.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to answer this question, each claimed impairment or disability must be examined. Under the Settlement Agreement, Claimant must establish that he was disabled on or before August 27, 2003. It was on that date that the Settlement Agreement was approved by Judge Nottingham and the class was established.

This is a Category II claim. Claimant is not entitled to a hearing. The claim must be adjudicated on what has been submitted by both sides. Claimant carries the burden of proof to establish that he was disabled on or before August 27, 2003. This means that Claimant must establish that he was disabled during the period of September, 2001 to June, 2002.

**Diabetes**: Claimant alleges that he was diagnosed as diabetic while at DCC in September, 2001. Claimant has submitted no medical records to document that such diagnosis was made. The medical records of Claimant submitted by Defendants reflect diagnosis as a Type 2 diabetic in 2003. *Exhibit A*. Claimant was not in DOC custody at that time.

A reasonable reading of the all documents on file would indicate that Claimant probably appeared to be borderline for a diagnosis as a diabetic during his first period of incarceration. It was only after he was released that the diabetes came to pass. It is unknown what treatment, if any, Claimant had during the months that he was out of DOC custody.

The medical records submitted by Defendants reflect further that Claimant was able to control his diabetes. He was prescribed glucophage and a diabetic diet.

The claim process established by the Settlement Agreement does not shift the burden of proof from Claimant. There has been insufficient evidence submitted by Claimant to establish that he was diabetic and disabled during the time period of September, 2001 to June, 2002. Since has not established that he was disabled during that period of time, he may not raise issues that occurred after August 27, 2003. He may pursue a separate lawsuit for anything that occurred after that date. Claimant is not part of the class as a diabetic.

**Vision**: Claimant also checked the box as vision impaired. As with his diabetes, Claimant submitted only his initial claim form. No supplemental vision form or medical records have been filed by Claimant in support of his claim.

Defendants have submitted a vision examination from March 19, 2004. *Exhibit D*. That examination reflected that Claimant had corrected vision of 20/20 in each eye. Claimant was prescribed glasses.

5

There is insufficient evidence to establish that Claimant had a vision impairment during the period of September, 2001 to June, 2002. Claimant is not part of the class as vision impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** The answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant has raised in his claim form concerns about the quality of medical care that he received while in DOC custody. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act.

To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care. Claimant has not established that he was subjected to discrimination prohibited by the ADA and Rehabilitation Act.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Nathaniel Smith is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before March 19, 2007.**

SIGNED this 29th day of December, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master