IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

___

Claim Number 03-094
Category III
Claimant: Claude Burton, #116306
Address of Claimant: FCF, P.O. Box 999, Canon City, CO 81215-0999

___

**FINAL ORDER OF SPECIAL MASTER**
___

THIS MATTER came before the Special Master for hearing on August 19, 2005 and December 15, 2006. The hearings were held at the Fremont Correctional Facility (FCF) in Canon City, Colorado. Present were the following: Claude Burton (Claimant) and Matthew Grove (8/19/05) and Scott Wilkonson (12/15/06), attorneys for Defendants.

Testimony was received from Claimant at both hearings. Defendants' Exhibit A was offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

>The Settlement Agreement further provides, in part, as follows:
>
>>2. Permanent Hearing Impairments
>>Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
>>3. Permanent Vision Impairment
>>Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
>>4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
>>Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>>1. Is the claimant a disabled individual who is a member of the class?
>>2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

3

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on January 27, 2003. He initially was placed at the Denver Reception and Diagnostic Center (DRDC). After spending about three weeks at DRDC, he was transferred to the Bent County Correctional Facility (BCCF) in Las Animas, Colorado. He then was transferred after three months to FCF. Claimant has remained at that facility since being transferred there in 2003.

Claimant was diagnosed in the late 1970's has being diabetic. He was treated with insulin at the onset of his diabetes. In the mid-1980's, Claimant began to receive newer medications and was able to reduce his dependence on insulin. He was receiving medication on a daily basis during the time period leading up to his incarceration. At one point, he began using an inhaler for his insulin dosages.

When Claimant arrived at DRDC, he received no medicine for his diabetes. He was not given insulin or other drugs that he had been using in the immediate past. When he arrived at BCCF, he began to receive finger sticks to determine his blood sugar levels and then began to receive medicine. He received insulin by shot and was placed on a diabetic diet.

Claimant was transferred to FCF in July, 2003. He arrived at that facility only to be advised that his medical records had not been transferred with him. He did not receive all of his medicines immediately. He started to receive finger sticks and then was placed back on insulin.

In November, 2004, Claimant was advised by staff at FCF that he was being taken off of the diabetic diet. When Claimant inquired as to why that was the case, he was advised that he had failed to go to some breakfasts. This was deemed a failure to eat a meal. As a result of the purported refusal to eat the diabetic breakfast, Claimant was directed to eat from the regular menu. Claimant testified that he had to take more medication due to the regular diet.

Claimant began to have problems while at FCF. His kidneys were acting up and appeared to have too high a protein level. Claimant was placed back on a diabetic diet. Claimant testified that he does have kidney problems, and he did not have those problems prior to entering into DOC custody.

Claimant went without some medicine for a period of time. When Claimant inquired as to the status of the drug, he was advised that the drug had been ordered. As to his work at FCF, Claimant testified that he worked initially in the kitchen and then in the metal shop.

On cross-examination, Claimant was asked about purchases from the canteen. He testified that he had to purchase some items due to lack of an evening snack.

### III.

This case had a twist after the hearing in August, 2005. On October 11, 2005, Claimant submitted a letter to the Special Master wanting to withdraw his claim. He based this request on what he said were threats made to him. He made specific reference to Captain John Hyatt.

Upon receipt of the letter from Claimant, the Special Master issued an order directing Class Counsel to conduct an investigation in the substance of the charge. The Special Masters have been concerned as to any allegations of retaliation as the result of the filing of a claim. Class Counsel submitted a letter indicating that there was no way to disprove that retaliation may have occurred. The recommendation was for a further investigation. The Special Master determined that a further hearing should be held dealing only with the issue of retaliation.

On December 15, 2006, the Special Master took testimony from Claimant and Captain John Hyatt. Based upon the testimony presented by both witnesses, the Special Master finds that no retaliation has been proven as to the claim filed in this case. Claimant acknowledged that he was struggling with many issues, including the overwhelming depression caused by having received a life sentence. He also was struggling with wanting to keep in contact with his ex-wife who had been writing to him. There was some confusion as to whether Claimant was precluded by a separate court order from having contact with his ex-wife and his children. Claimant also acknowledged that he filed two other lawsuits.

In examining the evidence presented by Claimant, it is clear that all of his litigation and involvement in the judicial system had become intertwined at the point he wrote to the Special Master. Claimant stated that he wanted to proceed with his claim. Claimant also described Captain Hyatt as an "old school" correctional officer who did not take any guff from anyone. The Special Master has evaluated Captain Hyatt's testimony and agrees with Claimant. Captain Hyatt does run a tight ship, as he is responsible for the safety of Claimant and others who may be under his charge. The Special Master finds specifically that Captain Hyatt did not retaliate or threaten Claimant concerning the claim that was filed in this case.

### IV.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** There is no question that Claimant has diabetes. He was diabetic before he came into DOC custody. Claimant is a member of the class as a diabetic.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary

convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?**
The Special Master finds that Claimant was the victim of discrimination in two areas. To the extent that Claimant has raised other issues and areas of concern, the Special Master finds that those have not be established.

Many of Claimant's concerns relate to medical care that he has been provided. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

In light of the *Fitzgerald* decision, a claimant must show that he was the subject of discrimination prohibited by the ADA and Rehabilitation Act. An example would be being placed into a facility that had no ramps for wheelchairs or not providing braille educational resources for a blind inmate. In this case, Claimant has raised two significant issues that reflect discriminatory conduct on the part of Defendants.

Claimant was diabetic long before he came into DOC custody. Despite a long-term usage of insulin and other medications for diabetes, such as Glucophage, Claimant was not given medications for several days while at DRDC. In addition, Claimant was transferred from BCCF to FCF and his medical records did not accompany him. He was without medication for a period of time, despite having a need as a diabetic for such medicine. Claimant described his concerns and anxiety concerning the lack of medication.

The second area is one that has troubled the Special Master for some period of time. Claimant was placed on a 2400 calorie diabetic diet. He was removed from that diet because he missed a number of breakfasts. Once removed from the diabetic diet, Claimant began to have problems with his blood sugar levels. He ultimately was placed back on the diabetic diet. In essence, an inmate with an advanced case of diabetes is disciplined for missing meals by having the diabetic diet removed from him. The fact that this might lead, as in the case, to immediate health issues seems not to trouble anyone at DOC, but it is discriminatory. In over one thousand four hundred claims processed and reviewed by this Special Master, no claimant who has submitted a claim for mobility impairment, vision impairment or hearing impairment has received a similar punishment of being denied a meal because of a failure to attend some breakfasts. In this case, Claimant's blood

sugar levels began to fluctuate because of the loss of the diabetic diet.

Claimant has a chronic condition that will be with him the rest of his life. Basic medical care is a program and service in the prison setting. Under the ADA and Rehabilitation Act, services, programs and activities can be very basic. *Crawford v. Indiana Dept. of Corrections*, 115 F.3d 481 (7th Cir. 1997); *Schmidt v. Odell*, 64 F.Supp.2d 1014 (D.Kan.1999); *Kaufman v. Carter*, 952F.Supp. 520 (W.D.Mich.1996). Services may be as basic as being provided medicine or other medical treatment. This Special Master has written in the past that failure to provide insulin and other medicines for diabetes because of lost medical records is unconscionable. In this case, Claimant was concerned that no insulin and other medicine was available because his medical records did not accompany him. The loss of the diabetic diet was punishment that affected his blood sugar levels.

On and before August 27, 2003, Claimant was treated differently due to his diabetes as noted. The remaining issues have not been proven by a preponderance of the evidence or reflect a medical decision governed by *Fitzpatrick*.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Defendants placed Claimant into a position that was untenable and which placed him in fear of his well-being. Claimant is entitled to $250.00 as damages for the discrimination that occurred while in DOC custody.

IT IS HEREBY ORDERED that the claim of Claude Burton is granted, in part, and Claimant is entitled to the sum of $250.00 as damages; and

IT IS FURTHER ORDERED that the remainder of the claim is denied, as Claimant has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before March 26, 2007.**

SIGNED this 27th day of December, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*
_____
Richard M. Borchers
Special Master