IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-202
Category III
Claimant: Leonires Duran, #47085
Address of Claimant: HCCC, 304 Ray Sandoval Street, Walsenburg, CO 81089

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

THIS MATTER came before the Special Master for hearing on January 4, 2007. The hearing was held at the San Carlos Correctional Facility (SCCF) in Pueblo, Colorado. Present were the following: Leonires Duran (Claimant) and Celia Randolph, attorney for Defendants.

Testimony was received from Claimant. Defendants' Exhibits A through E were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>    A. COVERED DISABILITIES
>    The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

> The Settlement Agreement further provides, in part, as follows:
>
> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

3

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant first came into DOC custody in 1980. He was released in 1984, and then returned in March, 2003. Claimant has not made any allegations concerning care in the period of time of 1980 through 1984.

In January, 2002, Claimant was involved in a motor vehicle accident. Another car ran a red light and hit the vehicle he was riding in. As the result of the accident, Claimant alleges that he suffered a brain injury, conversion disorder, knee injuries, and ruptured blood vessels.

Upon his return in March, 2003, Claimant was placed at the Denver Reception and Diagnostic Center (DRDC). Claimant was in a wheelchair when he was at DRDC. The wheelchair was being used due to incidents of falling by Claimant. The period at DRDC extended to one month.

Claimant then was transferred to the Sterling Correctional Facility (SCF) in Sterling, Colorado. No wheelchair was provided to Claimant. According to his testimony, he continued to have falls and his entire right side would go numb on occasion. Claimant testified that he received little treatment and was hospitalized on one occasion. He was provided a cane.

Claimant stated that he slipped and fell on ice while at SCF. He was using his cane at the time. As a result of the fall, he claimed to have suffered a herniated disk.

Claimant then was placed at the Kit Carson Correctional Center (KCCC) in Burlington, Colorado. He arrived there on November 24, 2003. He left that facility in May, 2004.

On August 18, 2004, Claimant was transferred to the Huerfano County Correctional Center (HCCC) in Walsenburg, Colorado. Due to his medical condition, he was placed into a medically unassigned status. His only job at HCCC is to pick up trash in the yard. According to Claimant, he has received little medical attention. He believes that he needs a wheelchair. He has continued to have falls while at HCCC. As the result of one fall, Claimant suffered a broken ankle. Claimant also testified that there are virtually no programs at HCCC for inmates with medical conditions.

On cross-examination, Claimant acknowledged that he last used a wheelchair at DRDC. He has suffered back and other medical problems while in DOC custody. He stated that DOC has wanted him attend school programs, but he has not been interested. Claimant is been a farmer and rancher all of his life and will continue to do so when released.

## III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be discussed separately.

4

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant has alleged in his initial claim form that he is vision and mobility impaired. Each of these conditions must be examined individually.

**Vision**: Claimant has provided little evidence concerning this claimed condition. Basically, he has argued that his eyesight has worsened in DOC custody.

In order to establish a claim of vision impairment, a claimant must prove that he has suffered a decrease in vision that has affected his ability to carry on activities of daily life. Claimant did not provide any testimony or evidence to that effect. Claimant has failed to establish that he had a vision impairment on or before August 27, 2003.

**Mobility**: Claimant must establish that he was mobility impaired on or before August 27, 2003. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

There is little question that Claimant was involved in a motor vehicle accident in 2002. He suffered injuries to his neck and back. There have been incidents of falls while in DOC custody. There is a question as to whether Claimant's falls are result of unsteadiness due to his head injury or because of his legs and knees. Evidence provided by Defendants does reflect that Claimant did suffer a ankle fracture.

Though this is a close question, the Special Master will find Claimant had a mobility impairment as of August 27, 2003. He is a member of the class.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant in his pleadings and testimony has complained about the medical care that he has received. He has acknowledged that he was provided school programs but did not want to participate in those. He has not testified that he was denied entry into any specific program offered by DOC.

Claimant's concerns relate to medical care that he has been provided. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and

Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

In light of the *Fitzgerald* decision, a claimant must show that he was the subject of discrimination prohibited by the ADA and Rehabilitation Act. An example would be being placed into a facility that had no ramps for wheelchairs or not providing braille educational resources for a blind inmate. In this case, Claimant has raised no issues that reflect discriminatory conduct on the part of Defendants.

Claimant is not precluded from filing a separate lawsuit concerning his medical care while in DOC custody. He cannot litigate the quality of the care through his claim in light of the *Fitzgerald* decision.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Leonires Duran is denied, as Claimant has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before April 23, 2007.**

SIGNED this 16th day of January, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master