IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

___

Claim Number: 03-218 (formerly 02-209)
Category III
Claimant: Nathaniel Huguley, #55740
Address of Claimant: 1685 Colorado Blvd., Apt. 201, Denver, CO 80220

___

**FINAL ORDER OF SPECIAL MASTER**

___

THIS MATTER came before the Special Master for hearing on January 3, 2007. Previously, a hearing was scheduled for November 27, 2006. At that time, Claimant did not show. Shortly thereafter, Claimant contacted the Special Master's office and informed his assistant that Claimant had been hospitalized at the time of the hearing making him unable to attend. Noting the Claimant's serious health situation, the Special Master directed his assistant to coordinate a new hearing date as soon as possible with the Claimant and the Defendants. No formal paperwork was issued due to the blizzards, the holidays and the lack of mail delivery. Present were the following: Nathaniel Huguley, Claimant; Berina Ibrišagić from the Office of the Attorney General, for Defendants.

Testimony was received from the following witnesses: Claimant[1]; Orville G. Neufeld, Ph.D., D.O., for Defendants by affidavit. The following exhibits were offered into evidence and accepted:

---

[1] Due to the blizzards and his hospitalization, Claimant was unable to provide the Special Masters with a witness list. During the hearing, Claimant indicated that he would have called inmates Brandon Tyler, #85486, James Smith, #112593, Samuel Powers, #105003 and Charles Shepard, #99669 to testify. Claimant indicated that their testimony would be concerning the lack of medical care given to Claimant and that Claimant was unable to get around. The Special Master indicated that he would accept the testimony as to what each of these four witnesses would testify as an offer of proof and assumed that if present, they would testify similarly.

1

    Exhibit A:    Query Offender Programs for Nathaniel Huguley, dated 11/09/2006
    Exhibit B:    Affidavit of Doctor Orville G. Neufeld

This Order shall constitute the final action by the Special Master on this specific claim.

## I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I.    General inconvenience or nominal damages;
> II.    Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III.    Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV.    Damages due to severe physical injuries; and
> V.    Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

2

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

## II.  FINDINGS OF FACT

Being duly advised, the Special Master makes the following findings of fact:

1. Claimant submitted a claim which was originally assigned claim number 02-209 and the basis of his claim is a mobility impairment.

2. Claimant's claim was assigned to Category II pursuant to the Remedial Plan as set forth above.

3. On April 5, 2006, by his own motion, Special Master Borchers determined that Claimant's claim should be elevated and transferred the claim to Category III and reassigned the Claim as number 03-218.

4. Proper notice of the hearing was given and Claimant along with Defendants appeared. On the record, Claimant verified his address and phone number as follows:

> 1685 Colorado Blvd., Apt. 201
> Denver, CO 80220
> Phone:  720-276-1241

5. Claimant was under the jurisdiction of the Colorado Department of Corrections (CDOC) at various times between 1986 and 2006 when he discharged from Fort Lyon Correctional Facility (FLCF). According to the Offender Profile Record attached as Exhibit B to the Affidavit of Doctor Orville G. Neufeld (Exhibit B), Claimant was housed at FLCF, Colorado Territorial Correctional Facility (CTCF), Denver Reception and Diagnostic Center (DRDC), Fremont Correctional Facility (FCF), Sterling Correctional Facility (SCF) from when he re-entered CDOC jurisdiction in June, 2002 and until his 2006 discharge.

6. When Claimant entered CDOC custody, he had a bad back as a result of a previous work related accident. Shortly after entering CDOC custody, Claimant began suffering from a severely infected toe, which apparently did not respond to conventional treatment. Approximately 90 days after being placed in the custody of the CDOC, Claimant became wheelchair-bound and remained in a wheelchair from the remainder of his incarceration. Approximately 5 to 7 months prior to his release, he underwent surgery and the tip of his toe was removed.

7. Claimant testified that he has suffered from bad lungs and heart troubles for the past five years. He cannot walk twenty feet without his heart racing and his oxygen saturations plummeting. He had a heart attack while in CDOC custody. He has suffered blood clots as a result. He has been in and out of a wheelchair the last two years

and is now permanently wheelchair bound. Claimant was not assigned a pusher and other guys volunteered to push him. Claimant suffers from an incurable lung disease called Sarcoidosis. Claimant also has congestive heart failure.

8. While in CDOC, Claimant testified that he had three critical incidents while in CDOC which required him to have several weeks of hospitalization. Claimant testified that he had numerous slip and falls. On one occasion, he fell and it took five minutes for someone to come help him up although the person was five feet away. During the 10 minutes of open movement, Claimant couldn't make the move due to his health problems and he would get write-ups and grievances. He testified that his write-ups and grievances were never answered. At one time, Claimant was interviewed on television about CDOC and, twenty minutes later, he was hospitalized due to a blood clot. Prior to that, Claimant stated that he had to spit on the floor for the medical staff to see the blood that he was spitting up so that they would believe him that something was wrong.

9. Claimant testified that after becoming wheelchair dependent, after a trip to DRDC, his wheelchair was not returned to him when he returned to FLCF. He was three months without the chair and he could not get around, walk, work, etc. and he was forced to remain in his cell where his oxygen concentrator was and that he had to go through a long process to regain his wheelchair.

10. Claimant testified that he has been on oxygen for six to seven years and presently is on six liters of oxygen. While in CDOC, Claimant testified that he received inadequate oxygen while incarcerated. He received several write-ups for asking for oxygen. He was put in the hole. At FLCF, he was allowed three canisters per day. At the time, he was using four to five liters. He could not participate in programs because of the amount of oxygen supplied at FLCF. Typically, one tank would last Claimant less than two-and-a-half hours. At one time, Claimant was taken to the hospital from FLCF with only one tank of oxygen and ran out of oxygen in transit. Claimant also testified that nurses told him to stay in his room without oxygen and that he was unable to sit in the day room. He testified that his blood clots came from the lack of oxygen in his blood stream causing his heart to pump harder.

11. Defendants presented evidence that Claimant has participated in a few programs but that he was also unassigned quite a bit during his last years of incarceration.

12. Claimant testified that he was released from CDOC custody on June 16, 2006 and on June 17, 2006, he was hospitalized with pneumonia. When Claimant was hospitalized during his first scheduled hearing in November, he was advised to seek Hospice care. Claimant testified that he is "glad he didn't die in DOC."

### III.  CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794, *et seq.;* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the DOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

The Special Master finds and concludes that Claimant is a disabled individual who is a member of the class. During his incarceration beginning in 2002, Claimant had a permanent physical mobility impairment that substantially limited the major life activities of walking. He suffers from Sarcoidosis, is wheelchair bound, oxygen dependent, suffers from heart problems. During the last two years of his incarceration, Claimant was relegated to the use of a wheelchair on a full-time basis.

3. The next question which must be answered is whether Claimant was qualified to participate in the programs or to receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs or activities because of disciplinary reasons, health reasons or other valid penal justifications. *Miller v. King,* 384 F.3d 1248, 1266 (11th Cir. 2004). Based on

the evidence, it appears that Claimant was otherwise qualified to participate in the Computer Information Systems class, the Drug and Alcohol class, the Mental Health class and the GED program.

The key issue is whether Claimant was discriminated against because of his disability during the time covered by the Remedial Plan. A portion of Claimant's discrimination claim is predicated on an alleged lack of proper medical care during his incarceration. Such claims do not fall within the ambit of the ADA or the Rehabilitation Act. *Fitzgerald v. Corrections Corp. of America,* 403 F.3d 1134 (10th Cir. 2005); *United States v. University Hospital,* 729 F.2d 144 (2nd Cir. 1984). Nevertheless, there is a substantial part of the claim that relates to the CDOC's alleged failure to accommodate Claimant's mobility disability by providing him with enough oxygen so that he could spend time in the day room, change locations during open movement and participate in programs. Under the ADA and Rehabilitation Act, services, programs and activities can be very basic. *Crawford v. Indiana Dept. of Corrections,* 115 F.3d 481 (7th Cir. 1997); *Schmidt v. Odell*, 64 F.Supp.2d 1014 (D. Kan. 1999); *Kaufman v. Carter, 952 F.Supp. 520 (W.D. Mich. 1996).* Defendants', in arguing that Claimant was not disabled rely upon the affidavit of Orville G. Neufeld who does not believe that Claimant is mobility disabled as recently as 2006. The Special Master resolves this dispute in favor of the Claimant, finding and concluding that Defendants failed reasonably to accommodate Claimant's mobility disability by not providing to Claimant adequate oxygen at all times.

4. The Special Master finds and concludes that as a result of Defendants' failure to accommodate Claimant's mobility disability, Claimant was unable to avail himself of more programs and resources at the various facilities. Claimant was unable to leave his cell at times due to the lack of adequate oxygen. The lack of oxygen led to blood clots and other medical complications. The Special Master finds and concludes that the sum of $1,000.00 is appropriate compensation for these non-economic damages.

### IV. ORDER

IT IS HEREBY ORDERED that based upon the foregoing Findings of Fact and Conclusions of Law, with respect to the mobility claim, Claimant has met his burden and proved his claim by a preponderance of the evidence and judgment should be entered in favor of the Claimant and against Defendants in the amount of $1,000.00; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be file on or before **March 12, 2007** with the Clerk of the United States District Court at the following address:

>   901 19th Street
>   Denver, CO 80294.

SIGNED this 12th day of January, 2007.

BY THE COURT:

/s/ Richard C. Davidson

_____
Richard C. Davidson,
Special Master

## CERTIFICATE OF MAILING

      I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this 12th day of January, 2007 to the following:

Mr. Nathaniel Huguley, #55740
1685 Colorado Blvd., Apt. 201
Denver, CO 80220

Ms. Berina Ibrišagić
Mr. Jess A. Dance
Mr. James X. Quinn
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

                                                                                     _____
                                                                                      Susan L. Carter