IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 02-162
Category II
Claimant: Spencer Quinn Whiteshirt, #95846
Address of Claimant: 7966 West 17th Avenue, Lakewood, CO 80214

_____

## FINAL ORDER OF SPECIAL MASTER
_____

THIS MATTER comes before the Special Master on the claim of Spencer Quinn Whiteshirt (Claimant). Claimant previously was incarcerated in the Colorado Department of Corrections (DOC). He now has been released from custody.

This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of his claim. Defendants have filed a response to the claim. Claimant was given the opportunity to file a reply to the response of Defendants, but he has filed no further documents. Further argument will be waived.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.¹   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>   A. COVERED DISABILITIES
>   The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

¹The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

> The Settlement Agreement further provides, in part, as follows:
>
>> 2. Permanent Hearing Impairments
>> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
>> 3. Permanent Vision Impairment
>> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
>> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
>> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>> 1. Is the claimant a disabled individual who is a member of the class?
>> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody initially in January, 1998. He was released in March, 2000. He returned to DOC custody in June, 2001. He was released in 2005. Claimant was placed initially at the Denver Reception and Diagnostic Center (DRDC). It is unclear as to all facilities in which Claimant was placed. He was at the Colorado State Penitentiary (CSP) in Canon City, Colorado when he filed his claim.

In his initial claim form, Claimant checked the box for vision impairment. He stated as follows:

> I am blind in my right eye. This is an injury I sustained when I was a toddler.

In response to the questions concerning discrimination by DOC and its staff, Claimant stated as follows:

> When I first requested to see an eye specialist in September 2002, I was ignored. Only when I was released into general population and the case manager seen the condition of my eye did I ever get to see medical staff and that was because he made the emergency appointment. I've been to see the opthamologist three times but he refuses to listen to what I have to say and ships me out within 5-10 minutes though I've told him my pain is worsening.
>
> I feel that DOC is not providing me adequate medical service as it pertains to my deteriorating blind eye. The opthamologist said eye removal was an option but when I said I wanted it removed because it's causing me too much pain he said he didn't want to do that but never prescribed an effective pain medication. As a result, I suffer from debilitating eye pain seven days a week. The eye needs to be removed.

Claimant was sent a supplemental form to complete and return. In that form, Claimant stated, in part, as follows:

> I lost the vision in my right eye when I was very young and it's been slowly deteriorating since.

Claimant further has stated that "[m]y eye started causing me serious pain in September 2002." Attached to the supplemental form are medical records which reflect that Claimant is blind in his right eye. A chart from July 28, 2003 reflects that Claimant was having pain in his right eye. Other documents reflect that Claimant was seen by a specialist on several occasions.

Defendants filed a response to the claim. Attached to the response is one page of Claimant's medical records. That page reflects an eye examination on September 28, 1998. The examination

4

revealed that Claimant was blind in his right eye and had 20/20 vision in his left eye. Defendants argue that Claimant is not disabled and not part of the class.

Claimant was granted up to and including January 16, 2007 in which to file a reply to the response of Defendants. Claimant has not filed a reply nor has he submitted any medical or other records in support of his claim.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. The burden is on a claimant to prove each of these four questions.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant has alleged that he has a vision impairment because of his right eye. He is blind in his right eye due to an accident when he was two years old. The accident obviously predated Claimant coming into DOC custody.

The ADA and Rehabilitation Act require a showing of a disability that is permanent and that affects activities of daily life. An example would be an individual who is permanently in a wheelchair and is unable to travel to a chow hall for meals. Under the Settlement Agreement, the burden is on Claimant to show that his activities of daily life have been affected by a vision impairment.

The evidence submitted by Claimant reflects an injury to his right eye. Claimant has provided no evidence that he cannot see with his left eye or that his ability to read and carrying on activities of daily life involving vision have been affected. The Settlement Agreement has been interpreted by the Special Masters to require a showing for a vision impairment that there is an inability to see. Claimant has an eye that is painful and causes headaches. He would like that eye removed because of the pain that it causes. When his left eye is included, his vision has not been alleged to be impaired to the point that he cannot read, see to move, etc.

Defendants have submitted medical records which reflect that Claimant has 20/20 vision in the left eye. *Exhibit A*. There is no question that Claimant is blind in his right eye.

The problem is that Claimant has not established that he has a vision disability. His statements reflect that he has an eye problem, which is different from vision. The right eye is very painful and perhaps should be removed. There is no evidence that Claimant cannot see with his left eye or that the essential activities of daily life have been affected by a vision problem. There is a difference between a physical eye problem, such as exists in this case, as contrasted to a vision problem. Claimant clearly has pain in the right eye. Claimant has not proven or established that he had a vision problem on or before August 27, 2003. Claimant is not part of the class.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the**

**benefits or services offered by DOC?** The answer to this question is yes. Nothing presented by Defendants reflected that Claimant could not participate in any programs or services due to other issues, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The answer to this question is no. There is no evidence that DOC staff have discriminated against Claimant due to a disability.

Claimant's concerns have to do with the quality of medical care that he has received. There is no question that he has received some care. This is not a case where care was denied due to the impairment of Claimant. The United States Court of Appeals for the Tenth Circuit ruled on April 11, 2005 that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). The ruling in *Fitzgerald* is now controlling law in this jurisdiction. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under either the ADA or Rehabilitation Act. All claims for substandard medical care must be brought under the Eighth Amendment or pursuant to state statutes.

Claimant has argued that his right eye should have been removed because of the pain that it was causing. The decision not to remove the eye was a medical decision. Claimant retains the right to pursue a separate lawsuit if he believes he was the victim of medical malpractice or denied proper medical care in violation of the Eighth Amendment.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Claimant is dismissed; and

IT IS FURTHER ORDERED that Claimant is advised that he may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before April 23, 2007.**

SIGNED this 23nd day of January, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master