IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

     Plaintiffs,

-vs.-

BILL OWENS, et al.

     Defendants.

---

Claim Number 03-130
Category III
Claimant: David G. Bryan, #59182
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on March 17, 2006, October 20, 2006, and January 11, 2007. The hearing was held at the Ft. Lyon Correctional Facility (FLCF) at Ft. Lyon, Colorado. Present were the following: David G. Bryan (Claimant) and James Quinn, attorney for Defendants.

Claimant presented the following witnesses during the hearing: Debra Howell (3/17/06); Allen Fistell (3/17/06); Warden Gary Watkins (3/17/06); Major Curtis Robinette (3/17/06); Warden Al Estep (3/17/06); Claimant David Bryan (3/17/06); Cathie Holst (10/20/06); Timothy Bennett (10/20/06). Claimant testified in rebuttal (1/11/06). Claimant offered into evidence Exhibit #1, and it was admitted. All documents previously submitted by both sides were admitted into evidence.

Defendants presented the following witnesses: Dr. Cary Shames, D.O. (10/20/06) and Cathie Holst (1/11/07). No additional exhibits were offered at the hearing by Defendants.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The

Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>   A. COVERED DISABILITIES

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

B. QUALIFIED INMATE

Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.

C. PERMANENT DISABILITY/IMPAIRMENT

A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." This definition is controlling on all claims filed by individuals who believe that they have a mobility impairment.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:

1. Is the claimant a disabled individual who is a member of the class?

2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?

3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)

4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

**II.**

The Settlement Agreement provides that all claims assigned to Category III are to receive a hearing. The Special Master has considered all testimony presented, along with the documents submitted by both sides.

Claimant came into DOC custody on September, 1993. He was placed initially at the Denver Reception and Diagnostic Center (DRDC) for evaluation. Claimant then was transferred to the Colorado Territorial Correctional Facility (CTCF) at Canon City, Colorado. He was at CTCF for one week, and then was transferred to the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado where he remained for one month. He then was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado. He remained at FCF until 2005 when he was transferred

to FLCF. He remains at that facility at this time.

Claimant filed his claim on June 8, 2004. He was in custody at FCF at that time. Claimant checked only the box for mobility impairment. In his initial claim form, Claimant stated, in part, as follows:

1) I'm 55 years old, 6'5" tall with a totally fused right hip. The leg is approximately 5/8" shorter than the Left. I have severely limited movement in the right knee with only a 35 degree flexibility. The right hip socket is totally fused causing me not to be able to bend at all at the hip. This presents a problem for me being able to put on my shoes, sox, and pants. I can't touch my leg from under the knee to my toes. I require a number of tools to assist me in dressing alone. When I sit in a chair I need to be able to sit on something with a straight back. When I do sit, my right leg sticks straight out.

2) I have drop foot which along with my straight leg will cause me to trip. My right leg is 5/8" shorter and I require a lift on the sole and heel. I also require tennis shoes with a special heal (sic) reinforcements and adaptions.

3) I have Anti Thrombosis III which is a blood disorder that causes blood clots which have resulted in a number of clots in my legs. I have developed severe edema in my lower legs that causes ulcerations and bleeding especially when required to stand for longer than 20 minutes.

4) I have had plastic skin surgery on my lower backbone at the junction of the pelvic which requires special bedding.

5) I have arthritis in my knee and hands requiring faucets with handles rather than buttons.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

1) I have not been able to fit in a bunk bed without modifications to the bed, etc. The ladder and T.V. tray needs to be in a different position than the standard cell arrangements. DOC, on more than one occasion, chose to ignore this which then caused me to sleep and rest on the floor of the cell. I slept on the floor for as long as 30+ days at one time.

2) When I was assigned a medical cell with some accommodations (but not all) I would then be moved to other cells ignoring medical Dr's recommendations for cell modifications.

3) I have had Dr's orders for a raised toilet in an ADA approved Cell with a standard wheelchair height seat for my cell. After being removed from a cell with a ADA approved height toilet I was given a temporary type toilet seat for my cell after being removed from an ADA approved height toilet. I have been using a temporary toilet seat for a permanent disability for the entire time I have not been in a "medical cell" with a proper toilet. I was also told that I didn't need handrails in my cell because the temporary toilet had grips on each side of it. They are unstable for use

in this matter as I'm 250 lb. And the legs are shakey at best.

4) I have been placed in cells with not enough sq. feet (ADA standards) clearance to accommodate me being able to properly dress myself. I had a single medical cell which had enough room for me to somewhat function, then DOC decided to double bunk medical cells that were not large enough for one person with disabilities in the first place at FCF. This has been an ongoing problem for over 6 years.

5) Writing table in cell (desk): At one point I was finally granted a table extension modification to the standard cell table. Tables are against the wall in cells and a stool is welded in the table. My leg will not allow me to sit at the table because it sticks out when I sit...thus I'm too far away from the table to write, type, and read like all other inmates. When I lost my single medical cell the table extension was removed. My medical conditions have not changed in regard to the leg and table issue and other issues. I have to read, write, and type in my bed laying on my side.

6) I have had ongoing problems concerning eating in the chow hall. I was issued a permit to use a chair with a straight back when in the chow hall. It was then taken away and I was told to sit at a table against a pillar wall. Then I was told to carry a chair every day from the cell house to the chow hall and back. I've been verbally abused by staff; required to stand to eat; or been kicked out of the chow hall because I did not sit when told to sit on a stool even though it is impossible to sit on just any stool, without the above mentioned pillar.

7) I have not been able to sit in a transport van in some cases because my straight leg had no place to be put. I have not had access to the special transport van except for one time in 10 years and over twenty trips. I have even had to lay on the floor in the transport vans at times just to get to medical appointment.

8) When the chow hall was moved to its present location inmates were required to traverse a dirt field without a concrete sidewalk. When walking across the field I tripped and fell causing my tooth to be punched through my mouth requiring stitches. I should have not been required to walk where it was hazardous to me by not having a proper sidewalk ready at the time of opening of the new chow hall.

9) Because I must wear special shoes I have been denied to work at the job I had been working at, or any job in Industries, trade schools, and maintenance for which I'm well trained for. I have lost good time due to not being able to work and a change to earn more money ie. "Industries" like other inmates. DOC staff member Cathie Holst (AIC) will not address the issue because she requires an unreasonable medical release before the matter is addressed. I gave her a medical release that allowed her to do what was necessary. She has delayed my ADA processing because she states that "...your proposal that offenders be included in each and every discussion that takes place with respect to a request for accommodation is an operational impossibility." The medical release I gave her states in part "...is limited to written summaries of my disabilities and medical needs, with a extra copy given to David Bryan simultaneously." Also, "...A conference telephone communication is authorized only when in the presents (sic) of inmate David Bryan."

5

Since the submission of his initial claim, Claimant has filed numerous documents with the Special Masters. This claim now fills two expandable file folders. The testimony presented at the hearing was voluminous. A great deal of what has been submitted is irrelevant to the claim process as established by Article XXXII of the Settlement Agreement.

The easiest way to sort out what is germane to this claim is to examine the testimony of Claimant. He came into DOC custody in 1993. He had a fused hip and related mobility problems before he began serving his sentence. After being evaluated at DRDC, Claimant was placed by Defendants at AVCF. That facility was not able to meet the needs of Claimant nor was it ADA-compliant. Claimant testified that there were no raised toilets, no handrails, and no appropriate bunk beds. Claimant was not able to gain entrance into any programs because of his disabilities. DOC officials determined that AVCF was not an appropriate placement. He was transferred to FCF after a one month stay at AVCF.

After arriving at FCF, Claimant began to experience other problems. Trips to medical appointments or for other reasons were difficult. Transport vans had plastic seats bolted to the floor, which meant that Claimant could not maneuver his leg into the area in front of the seat. Claimant sometimes would sit on the floor rather than attempt to get into a seat.

While at FCF, a new dining facility was built. In order for inmates to get to this facility initially, they were required to utilize a dirt path. There was no sidewalk. Claimant and other inmates with mobility impairments had to walk over the dirt in order to get to the chow hall. On one occasion, Claimant fell and suffered an injury to his lip.

As of August 27, 2003, Claimant was only able to walk slowly. Prior to that date, he had used a wheelchair on occasion. He was in a cell house at FCF in 2003 that had no handicapped cells or raised toilets. There were no handrails for the toilets. Some bunk beds made it impossible for him to enter for purposes of sleeping. He slept on the floor on several occasions. The problem with eating was the lack of tables that had chairs with a back. Claimant was unable to find a chair next to a wall or pillar to lean on. As a result, he often would stand and eat his food. He carried a chair to the chow hall for a period of time. He also broke a toe on his foot locker as he was not able to see it and move around it.

Claimant was transferred to FLCF in 2005. Claimant testified that conditions at FLCF are better and that it is an appropriate place for him.

Claimant presented Allen Fistell as a witness. Mr. Fistell is a fellow inmate who has known Claimant for over eleven years. Mr. Fistell was at FCF with Claimant. He verified that Claimant often had to stand to eat his food at the chow hall. Security staff would not move other inmates from chairs that would have provided back support for Claimant.

Claimant has testified that he needed tennis shoes to wear. Warden Watkins at FCF testified that such shoes provide a security problem and that individuals may not wear tennis shoes to work at a job outside the fence. To the extent that an individual might need tennis shoes, the security

concerns of the facility would have to override other concerns. Those security concerns about shoes also applied at FLCF, according to the testimony of Timothy Bennett.

Defendants presented Dr. Cary Shames, D.O. as a witness in their case in chief. Dr. Shames is the chief medical officer for DOC. In his testimony, he indicated that he had reviewed Claimant's medical records. The hip fusion and knee fusion took place in 1988. He admitted that Claimant is mobility disabled as defined by the Settlement Agreement. He also acknowledged that Claimant has a condition called DVT which has produced the clots about which Claimant testified. The medical records reflected Claimant had fallen at FCF in 1995 while walking to the chow hall.

Dr. Shames testified on cross-examination that DVT was not itself a condition covered by the Settlement Agreement. He stated that DVT, if untreated, can lead to a separate disability. Dr. Shames acknowledged that Claimant has medical issues. He stated that DOC policy now is to prescribe over the counter medicines, such as Motrin, for pain. Inmates are directed to purchase such pain medications from the canteen.

## III.

A claimant must establish that he was a member of the class as of August 27, 2003 and had been subjected to discrimination prohibited by the ADA and Rehabilitation Act on or before that date. If a claimant establishes these requirements, then acts of discrimination after August 27, 2003 may be considered as part of the claim process.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?**  Dr. Shames testified that Claimant has a mobility impairment. Claimant is a member of the class as mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides and as related to the date of August 27, 2003, the answer to this question is yes. Other than health issues on that date, there does not appear to have been any disqualification from programs, benefits, or services. Claimant has had no major disciplinary problems.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** In order to establish this point, a claimant must prove that he was denied programs or services because of his disability. In other words, there must be a showing of disparate treatment. An example could be a showing that a claimant who is wheelchair bound was placed into a facility that was unsuitable for such inmates and he was denied the opportunity to participate in programs that were available to non-wheelchair bound inmates.

7

Claimant's case, as well as others alleging inadequate or substandard medical care, was affected by the decision in *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). The United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant has argued that he has been denied appropriate medical care or has been the victim of medical malpractice, he may pursue a separate lawsuit pursuant to the Eighth Amendment or state statute.

*Time Period Prior to August 27, 2003*: The evidence presented by both sides reflects that Claimant did not receive appropriate accommodations in the period from September 1993 to August 27, 2003. Claimant's placement at AVCF was ill-founded. Claimant was placed into a cell in which he could not use the lower bunk bed and could not get around. This lasted one month, and then he was transferred to FCF.

The testimony of Claimant is accepted concerning his stay at FCF. He was placed into cells that were not appropriate for his condition. He was forced on occasion to sleep on the floor. He had extreme difficulty utilizing toilets because they were not raised and had no handrails. Claimant had difficulty walking and fell in 1995 when required to negotiate a dirt path to the chow hall. Claimant was not allowed use of a handicapped accessible cell for most of the time he was at FCF. Claimant was granted a single medical cell for a period of time and then that was taken from him. No reason was provided to him for that decision.

Claimant has established also that his trips to medical appointments and for other reasons were in vans that were not handicapped accessible. His testimony is accepted that he sometimes had to sit on the floor because it simply was not possible to maneuver his leg into the area in front of the seat.

Claimant has established that he was not provided appropriate accommodations while at AVCF and FCF. Claimant is entitled to compensation for his damages for this period of time.[2]

*Post-August 27, 2003*: Claimant has provided copies of many grievances filed since the Settlement Agreement was approved. Claimant has argued that many things that have occurred since the settlement have been in violation of the ADA and Rehabilitation Act.

---

[2] The issue concerning tennis shoes and work at an industries job at FCF raised some concern on the part of the Special Master. Claimant did not rebut the security considerations related to use of boots. As a result, this issue has not been proven by Claimant. The Special Master also would note that under the Settlement Agreement FCF was not intended to be a facility that would house inmates with disabilities. Claimant was going to be transferred as the result of the Settlement Agreement's approval.

In fairness to Claimant, his stay at FCF continued until February, 2005. Some of the problems that were occurring prior to the settlement continued. Claimant did not receive proper accommodations in the chow hall. It is not disputed that he had to stand and eat some meals because of the lack of proper seating for him and others with disabilities.

Claimant has attempted to portray most every decision as being discriminatory. The Special Master does not find that to be the case. The issue of the guitar is one that does not involve the ADA and Rehabilitation Act. Claimant acknowledged that his transfer to FLCF was appropriate. FLCF is the right fit for him.

The Special Master finds that the problems that existed at FCF continued past August 27, 2003. Claimant is entitled to some compensation for the discrimination that occurred toward him due to his disability.

*Continuing Issues*: Many of the documents recently submitted by Claimant relate to grievances that have been filed concerning something that did or did not happen related to Claimant's treatment by DOC and its staff. The Special Masters have no jurisdiction outside of Article XXXII and are unable to resolve any disputes concerning implementation of the Settlement Agreement.

The Special Master specifically notes that the resolution of this claim is based solely on what has been set forth in this order. To the extent some issue has not been touched on, it is deemed unproven and dismissed. To the extent that Claimant may be seeking a review of the Settlement Agreement beyond adjudication of his claim, the Special Master has no power to do such a review.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** The answer to this question is yes. Claimant has detailed the problems that he endured, including sleeping on the floor and having to stand up while eating meals. Claimant is entitled to compensation for his established damages in the amount of $2,000.

IT IS HEREBY ORDERED that the claim of David G. Bryan is proven, as set forth herein, and he is awarded damages in the amount of $2,000; and

IT FURTHER ORDERED that the remainder of the claim of Claimant is dismissed with prejudice.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before May14, 2007.**

SIGNED this 7th day of February, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

_____

Richard M. Borchers
Special Master