IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number: 02-454
Category: II
Claimant: Roy W. Hagedorn, #61947
Address of Claimant: 5374 S. Huron, Littleton, CO 80120

---

# FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Claimant Roy Hagedorn. The Special Master has reviewed the claim and all documents filed by both sides. This Order shall constitute the final action of the Special Master on this specific claim.

## I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial Plan also created a mechanism for individual

1

inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III.  DEFINITIONS
>
>   A. COVERED DISABILITIES
>   The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
>
>   B. QUALIFIED INMATE
>   Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>
>   C. PERMANENT DISABILITY/IMPAIRMENT
>   A condition which is not expected to improve within six months.

2

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>
> > 1. Is the claimant a disabled individual who is a member of the class?
> > 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> > 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> > 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Hagedorn submitted a claim which was assigned claim number 02-454. The claim is premised on an alleged permanent mobility disability, an alleged vision disability and an alleged hearing disability.

2. Claimant's claim was assigned to Category II pursuant to the Remedial Plan as set forth above.

3. Claimant Hagedorn first entered CDOC custody in 1989. Although the record does not identify each of the facilities where he was housed, it appears that he was housed part or all of the time that he was in CDOC custody at the Limon Correctional Facility (LCF), the Kit Carson Correctional Center (KCCC) and the Fort Lyon Correctional Facility (FLCF).

4. Claimant suffers from nerve damage to his retinas as a result of glaucoma. This condition causes him to have eye strain, headaches and, on occasion, blurred vision. His eyes are particularly sensitive to light. Claimant has a medical restriction limiting his ability to be outside during daylight to 30-45 minutes per day. He states that he also has permanent nerve damage to his left hand, right arm and hand and lower back which results in pain, as well as in a loss of feeling, movement and strength. Claimant indicates that his lower-back problem causes him to experience frequent pain and sometimes a

3

slight loss of mobility and coordination. He limps when he walks. Finally, Claimant suffers from hearing loss which he describes as a 25 decibel loss in his left ear and a 20 decibel loss in his right ear. This hearing problem causes him to hear a "constant locust chirping sound" and a loss of background noise hearing. He states that he usually cannot hear the intercom paging system or the fire alarm when he is in his cell.

      5.    Claimant Hagedorn asserts that CDOC has improperly refused to provide him with a hearing aid, even though a doctor at Denver Health Medical Center told him that he needed one. He states that he has been told repeatedly by CDOC medical providers that CDOC won't provide him with a hearing aid unless he is almost completely deaf because of the cost. He indicates that he was also told by a CDOC doctor that a hearing aid would not help him. Claimant complains that in 2002, his eye medication (Xalatan) was discontinued and that he could not get the prescription reinstated until he filed a grievance. He further asserts that even when the prescription was reinstated, it took 75 days before he actually received it. Additionally, Claimant contends that CDOC has refused to provide him with prescription tinted glasses and that the clip-on glasses that can be purchased from the canteen have flaws in them that obscure his view. Finally, Claimant asserts that when he arrived at FLCF, all of his medical restrictions were removed, including work restrictions, lower bunk, lower tier, stairs and lifting no more than 35 pounds. All of his medications were also discontinued.

### III. CONCLUSIONS OF LAW

      1.    The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

      2.    The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical

disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C). As discussed in Section I above, the Remedial Plan further limits permanent mobility, hearing, vision, and diabetes disability/impairment to those that conform to the criteria of Section V, paragraph A of the Plan.

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

As is discussed more fully in paragraph 3 below, neither the ADA nor the Rehabilitation Act are designed to remedy alleged deficiencies or omissions in medical treatment provided to prisoners by CDOC. Rather, the ADA and Rehabilitation Act are designed to insure that those who have permanent disabilities that prevent them from engaging in one or more major life activities are not discriminated against because of their disabilities. The Remedial Plan, which defines the scope of the Special Master's authority, limits the disabilities for which damage claims can be asserted to those relating to mobility, vision, hearing, and diabetes.

First, the Special Master finds and concludes that Claimant has failed to sustain his burden of establishing by a preponderance of the evidence that he has a permanent mobility disability that is covered by the Remedial Plan. While the Remedial Plan states that it covers persons with "mobility impairments," *Remedial Plan* ¶ III(A), it does not generally define the term "mobility impairments." However, the references to "mobility impairment" in the Remedial Plan indicate that the parties intended the term to encompass diseases, injuries, and/or conditions involving the lower extremities that impose a substantial limitation on the major life activity of walking. *See, Remedial Plan* ¶ V(A)(1)(dealing with presumed need for special housing, and defining "permanent mobility impairment as "a permanent lower extremity mobility impairment that substantially limits walking."); *Remedial Plan* ¶ XVI(A)(identifying health care appliances as including "orthopedic prostheses, orthopedic braces or shoes, crutches, canes, walkers, wheelchairs . . . gloves for wheelchair use only," thereby strongly suggesting that "mobility impaired" inmates are those with diseases, injuries, and/or conditions involving their lower extremities).

In short, there is no indication in the Remedial Plan that its coverage of inmates with "mobility impairments" extends beyond those who are substantially limited in their major life activity of walking because of diseases, injuries and/or conditions involving their lower extremities. There is no evidence that Claimant Hagedorn's arm or hand problems involve his lower extremities or substantially limit his ability to engage in the major life activity of walking. With respect to his lower back problem, Hagedorn himself acknowledges that it only slightly impacts his mobility. The fact that he walks with a limp is insufficient to establish a substantial limitation on the major life activity of

walking. *E.g., Talk v. Delta Airlines, Inc.*, 165 F.3d 102 (5th Cir. 1999); *Kelly v. Drexel University*, 94 F.3d 102 (3d Cir. 1996); *Graver v. Nat'l Eng'g Co.*, 1995 WL 44344 (N.D. Ill., July 25, 1995).

The Special Master also finds and concludes that Claimant has failed to prove by a preponderance of the evidence that his vision problem rises to the level of a substantial limitation on a major life activity. To be sure, he suffers from glaucoma. However, Claimant's diagnosis of glaucoma by itself is insufficient. *Albertson's v. Kirkingburg*, 527 U.S. 555, 566-67 (1999) (existence of substantial limitation on major life activity requires case-by-case assessment); *Bancale v. Cox Lumber Co.*, 1998 WL 469863, at *5 (M.D. Fla. May 18, 1998)(proffer of diagnoses and labels insufficient to show how visual impairments affect Claimant's activities of daily life), *aff'd*, 170 F.3d 188 (11th Cir. 1999). The only evidence presented regarding the effect of his glaucoma on his ability to engage in major life activities is (a) he has headaches and occasionally has blurred vision; and (b) he cannot be outside during daylight for more than 30 to 45 minutes at a time. These difficulties do not substantially limit any major life activity.

The Special Master finds and concludes that Claimant Hagedorn has presented sufficient evidence to establish that he suffers from a hearing disability. He has stated that his diminished hearing prevented him from hearing the fire alarm and the intercom announcements from his jail cell. This is sufficient to demonstrate a substantial limitation on the major life activity of hearing. It should be noted that Defendants have presented absolutely no evidence in rebuttal to Hagedorn's Claim. While they have submitted a Response, it contains nothing that specifically relates to Hagedorn. It merely contains a generalized legal argument. As a result, Hagedorn's Claim and supporting documentation is uncontroverted.

3.   The next question which must be answered is whether Claimant was qualified to participate in the programs or to receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs, or activities because of disciplinary reasons, health reasons, or other valid penal justifications. *Miller v. King*, 384 F.3d 1248, 1266 (11th Cir. 2004). It appears to be undisputed that Claimant was qualified to participate in the programs, benefits, and services offered by the DOC.

4.   Of course, the key issue is whether Claimant was discriminated against by CDOC because of his hearing disability. Issues relating to the propriety of medical care and treatment or the failure to provide necessary medical care and treatment generally give rise to claims under either the ADA or the Rehabilitation Act. *See Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005). *See also Kiman v. New Hampshire Dept. of Corrections*, 451 F.3d 274 (1st Cir. 2006); *Burger v. Bloomberg*, 418 F.3d 882 (8th Cir. 2005); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289 (11th Cir. 2005); *United States v. University Hospital*, 729 F.2d 144 (2nd Cir. 1984). However, the situation is somewhat different here. Hagedorn has stated that the failure of CDOC to supply him with the accommodation of a hearing aid had a substantial impact on his ability to utilize the service provided by the facility's intercom announcements and to

enjoy the protection of the facility's fire alarm. This service and protection was made available to non-hearing disabled inmates and could have been made available to Claimant through the accommodation of a hearing aid. While there was apparently some disagreement among the medical experts as to the efficacy of a hearing aid, the Special Master finds that the conclusion of the outside medical provider is more credible. Again, Defendants presented no evidence whatsoever on this matter, nor did they take issue with Hagedorn's description of the information provided by his treating medical personnel.

5. Claimant has presented no evidence regarding any economic loss sustained as a result of not being provided with a hearing aid. Nor does it appear that he suffered any other damage other than perhaps some emotional distress. Considering the totality of the evidence, the Special Master finds and concludes that the sum of $200.00 is fair and reasonable compensation for the Defendant's failure to accommodate Claimant's hearing disability.

## IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment be entered in favor of Claimant Hagedorn and against Defendants in the amount of $200.00; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before April 5, 2007** with the Clerk of the United States District Court at the following address:

901 19th Street
Denver, CO 80294.

SIGNED this 5th day of February, 2007

BY THE COURT:

/s/ Bruce D. Pringle
_____
Bruce D. Pringle,
Special Master

7

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this 5th day of February, 2007 to the following:

Mr. Roy W. Hagedorn, #61947
5374 S. Huron
Littleton, CO 80120

Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

/s/ Susan L. Carter
Susan L. Carter