IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 02-685
Category II
Claimant: Amado Alvarez Benavidez, #91761
Address of Claimant: DCC, 4102 Sawmill Mesa Road, Delta, CO 81416

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Amado Alvarez Benavidez (Claimant). Claimant is incarcerated in the Colorado Department of Corrections (DOC). He presently is housed at the Delta Correctional Center (DCC) in Delta, Colorado.

The Special Master has reviewed the claim, supplemental forms, and response of Defendants. Claimant was granted the opportunity to file a reply to the response of Defendants, but he did not file a reply. This is a Category II claim. All Category II claims are to be resolved on the documents submitted by the parties. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they may exercise only the jurisdiction agreed upon by the parties.

>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." This definition controls as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals claiming mobility impairment.

The Settlement Agreement further provides, in part, as follows:

>2. Permanent Hearing Impairments
>Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
>3. Permanent Vision Impairment
>Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
>4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
>Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>>1. Is the claimant a disabled individual who is a member of the class?
>>2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

3

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on February 3, 1996. He has been placed at a number of institutions over the years. When he filed his claim, Claimant was placed at the Limon Correctional Facility (LCF) in Limon, Colorado. He then was transferred to DCC.

In his initial claim form, Claimant only checked the box for mobility impairment. Claimant stated, in part, as follows:

> I have unstable left and right knees. Depending on how cold or hot the weather is, depends on knee pain. I have had 2 surgeries on my left knee and my right knee still needs the first surgery. During my arrival at DRDC in Denver while I received a complete physical, the attending PA/NP diagnosed my knees as unstable and the need for surgery. I was given a permanent bottom bunk restriction at that time. I have received similar diagnosis from other physicians at other facilities.

In response to the questions concerning discrimination by DOC and its staff, Claimant stated as follows:

> The first time occurred at Sterling facility where I received a class II write-up for disobeying a lawful order to accept a top bunk assignment. I was put in segregation for 20 days. This write up was expunged later after investigation. The next time happened at Walsenburg CCA facility for same charges only this time I received 6 write-ups and spent 58 days in segregation. There were other punitive charges like loss of good time and each time my points went up to medium closed custody.

> Punitive segregation 78 days, mental and emotional stress, physical pain due to conditions at segregation, denied attendance religious services (sweat lodge/Native American), custody points amounted for every write-up every time, loss of privileges.

Claimant filed a supplemental claim form. On that form, Claimant stated, in part, as follows:

> At all facilities with control movement, the movement only lasts for approx.10 minutes. I have missed movements due to my mobility problem. If assigned to a private facility like CCA at Burlington - Kit Carson or CCA at Walsenburg - Huerfano County, these facilities don't have ladders to climb on top bunk, which makes getting on top bunk impossible for me.

Attached to this form are medical documents which reflect Claimant being hurt in 1999 trying to

4

climb onto a top bunk. The second document reflects a lower bunk restriction issued on April 28, 2000 at SCF.
Claimant later submitted additional medical records in support of his claim.

Defendants' response has attached to it several medical and other records. Defendants argue that Claimant is not mobility impaired.

Claimant was granted up to and including January 29, 2007 in which to file a reply to the response of Defendants. Claimant has filed nothing further in support of his claim.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** This is a Category II claim. There is no right to a hearing. The claim will be adjudicated solely on the written documents submitted by both sides.

Claimant must show that he was mobility impaired on or before August 27, 2003. That is the date on which the Settlement Agreement was approved by Judge Nottingham.

Both sides have submitted various documents from Claimant's medical file and working file. There is no question that Claimant has two knees that had significant problems on or before August 27, 2003. It is not disputed that Claimant has had surgery on his left knee. His right knee has had degenerative problems since his arrival in DOC. He has received restrictions for lower bunk and has received knee braces. There is no evidence Claimant is able to walk or run well. The evidence reflects that Claimant is in pain when he moves.

Reviewing the totality of the evidence presented by both sides, the Special Master determines that Claimant was mobility impaired on or before August 27, 2003. Claimant is a member of the class.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by CDOC?** Based upon the testimony provided by both sides, the answer to this question is yes. There does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by CDOC because of his or her disability?** Claimant has raised a issue that appears often. The documents that Claimant has submitted reflects that he had a lower bunk restriction on many occasions. When he first came into DOC custody, Claimant advised DOC medical staff that he had bad knees. He received early on a lower bunk restriction. That restriction came and went often on what appears to have been the mere whim and caprice of the facility or medical staff. One thing is clear, and that is the knees of Claimant have not

gotten better as time has gone on.

Claimant was discriminated against by DOC staff due to the rescinding and then re-issuance of lower bunk restrictions. Defendants argue that some restrictions expired or were not issued. Yet, there is no basis presented as to why Claimant was entitled to a restriction due to his knees at one point, but not another. Claimant has presented a credible showing that he was treated differently than others because he was forced to climb up and down to top bunks while not having to so at other times. He also was forced to disobey orders which led to a COPD conviction that was later expunged.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant has suffered mental and physical pain due to the discrimination. He is awarded $400.00 as damages due to the discrimination.

IT IS HEREBY ORDERED that the claim of Amado Alvarez Benavidez is granted, in part, and he is awarded $400.00 as damages: and

IT IS FURTHER ORDERED that the remainder of the claim is denied; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before May 14, 2007.**

SIGNED this 16th day of February, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master

6