IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 02-838
Category II
Claimant: Robert O'Dell, #54303
Address of Claimant: LCF, 49030 State Highway 71, Limon, CO 80826

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Robert O'Dell (Claimant). Claimant is incarcerated in the Colorado Department of Corrections (DOC). He presently is housed at the Limon Correctional Facility (LCF) in Limon, Colorado.

The Special Master has reviewed the claim, supplemental forms, and response of Defendants. Claimant was granted the opportunity to file a reply to the response of Defendants, but he did not file a reply. This is a Category II claim. All Category II claims are to be resolved on the documents submitted by the parties. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.¹   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

¹The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they may exercise only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." This definition controls as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals claiming mobility impairment.

> The Settlement Agreement further provides, in part, as follows:
>
> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant initially came into DOC custody in 1986. He was placed at a number of institutions over the years. He discharged that sentence on July 26, 1989.

Claimant returned to DOC custody on February 4, 1994. He was placed at the Denver Reception and Diagnostic Center (DRDC) for slightly in excess of one month. He then was transferred to the Limon Correctional Facility (LCF) in Limon, Colorado. Except for extremely short periods of time, Claimant has been at LCF since 1994.

Claimant checked the boxes for hearing impairment and vision impairment. Claimant stated, in part, as follows:

> Hearing - on a scale of 1-100 1= best, my left ear tested 90+ or total deafness. My right ear tested 35-34. I was told I need two hearing aids! Have only one because of foundation of facility not conducive to wearing of hearing aid. Often times don't hear orders when talked to. It's actually dangerous for other inmates believe I'm dissing them when talked to!!

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

> In any and all request's for eye exam, hearing test, head cold, etc., am being charged $5.00 to $10.00 per request. Naturally not having that kind of funds fail in asking to be seen!!

> Not receiving the medical care as a ward of the state!! Problems are chronic and will only get worse with time. Need reading glasses and regular glasses for eye sight that's failing. Told I can have one or the other, not both.

Claimant was provided two supplemental files to complete and return. He did file those supplemental claim forms. On the supplemental form for vision, Claimant stated, in part, as follows:

> Have recurring redness and pain in either or both of my eyes. Vision has been deteriorating gradually over the past two years.

Claimant alleged that he was fired from the garment factory as the result of his disabilities. As to his hearing impairment, Claimant restated in his supplemental form that he has had difficulty hearing. He expressed concerns about his well-being while in prison.

Claimant sent a letter in November, 2005 indicating he had received some testing at a facility in Pueblo, Colorado. He apparently received an audiology examination. He was advised that he qualified only for one hearing aid.

Defendants' response has attached to it several medical and other records. Defendants argue that Claimant is not vision or hearing disabled under the definitions in the Settlement Agreement.

Claimant was granted up to and including January 29, 2007 in which to file a reply to the response of Defendants. Claimant has filed nothing further in support of his claim.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** The claim form and supplemental forms will be considered as the testimony that Claimant would provide if there had been a hearing. The question is whether Claimant can prevail solely upon his statements, in light of the documents submitted by Defendants. Claimant must establish that he was vision impaired or hearing impaired on August 23, 2003. Each claimed disability will be taken separately.

**Vision Impairment:** Defendants have submitted a number of pages of medical records of Claimant. In 1994 when Claimant returned to DOC custody, there was no indication of any vision problem. *Exam of February 8, 1994*. In 1998, an examination indicated that he was 20/30 in the right eye and 20/70 in the left eye. *Exam of August 12, 1998*. An examination by an optometrist in July, 2003 reflected 20/40 in the right eye and 20/200 in the left eye, both uncorrected. *Exam of July 28, 2003*.

There is no evidence before the Special Master that Claimant had a vision disability that affected activities of daily life on or before August 27, 2003. His eye examinations are not abnormal. He is able to see with glasses. The Special Master has ruled on previously resolved claims that vision impairment essentially requires blindness. At the least, the condition must be such that a claimant really cannot see even for such activities as walking, reading, etc. That is not the case with Claimant. He has failed to establish that he has a vision impairment as set forth by the Settlement Agreement. Claimant is not part of the class as vision impaired.

**Hearing Impairment**: Claimant's medical records submitted by Defendants indicate that his hearing was evaluated as normal when he returned to DOC custody in 1994. *Exam of February 8, 1994*. The first indication of hearing problems arose in April, 2003. *Exam of April 23, 2003*. On May 21, 2003, an audiogram was performed and indicated hearing loss in both ears, with the left ear having more loss than the right. *Exam of May 21, 2003*. Claimant then received a hearing aid for his right ear, but was not provided two hearing aids.

Claimant received another audiogram in November, 2005. *Exam of November 8, 2005*. The

hearing loss was more profound, but Claimant was not determined to be in need of a second hearing aid. Claimant is able to recognize words and to converse with others.

As of August 27, 2003, Claimant did not have to communicate through use if signing, lip reading or written documents. Claimant was able to carry on activities of daily life at that time. Claimant must show that he was disabled on August 27, 2003. If he cannot establish that he was hearing impaired, he is not part of the class.

In this case, Claimant has not established that he was hearing impaired on August 27, 2003. The Special Master notes that the hearing of Claimant appears to have gotten worse. He may well be disabled at this date. His remedy is to pursue a separate lawsuit dealing with his condition at the present time, provided he believes that he has been discriminated against in violation of the ADA and Rehabilitation Act.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by CDOC?** Based upon the testimony provided by both sides, the answer to this question is yes. There does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by CDOC because of his or her disability?** There is no evidence that would lead to the conclusion that Claimant has been the victim of discrimination prohibited by the ADA or Rehabilitation Act. Claimant's concern is the quality of the medical care that he has received over the years. Specifically, he objects to the decision to limit him to only one hearing aid.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the case provided to him, that is beyond the jurisdiction of the Special Masters. Since the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law, Claimant may pursue separately any rights that he may have concerning the quality of his medical care.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Robert O'Dell is denied, as he had failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before May 14, 2007.**

SIGNED this 19th day of February, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master