IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 03-209
Category III
Claimant: Thomas Robinson, #84794
Address of Claimant: SCF, P.O. Box 6000, Sterling, CO 80751

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on February 8, 2007. This hearing was held at the Sterling Correctional Facility (SCF) in Sterling, Colorado. Present were the following: Thomas Robinson (Claimant); and Scott Wilkonson, attorney for Defendants.

Testimony was received from Claimant. Exhibits #1 and #2 were offered and accepted into evidence. Defendants presented the testimony of Dr. Cary Shames, D.O. Defendants' Exhibit A was offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

The claim remained open to allow Defendants to submit the signature page of the affidavit of Dr. Neufeld. This order shall constitute the final action by the Special Master on this specific claim.

## I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for

Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>    A. COVERED DISABILITIES
>    The persons covered by this Plan are individuals with mobility,

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

hearing, and vision impairments and inmates with diabetes.
B. QUALIFIED INMATE
Inmate with a permanent disability/impairment which substantially
limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

2. Permanent Hearing Impairments
Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
3. Permanent Vision Impairment
Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
1. Is the claimant a disabled individual who is a member of the class?
2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

3

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody in November, 1994. He was placed initially at the Denver Reception and Diagnostic Center (DRDC). He then was transferred to the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. He was sent then to a contract placement at the Bexar County Jail (Bexar) in San Antonio, Texas. He was at that facility for one year. Claimant was returned to Colorado and placed into the Bent County Correctional Facility (BCCF) in Las Animas, Colorado. He was at BCCF for two years.

In 1999, Claimant was transferred to SCF. He was at that facility until he left for a community placement. He then was granted intensive supervised parole, but that was not successful. Claimant was returned to DOC custody. He was placed initially at the Kit Carson Correctional Center (KCCC) in Burlington, Colorado. He returned to SCF in June, 2006. Claimant was at KCCC when he filed his claim. He checked only the box for diabetes.

Claimant was diagnosed as diabetic in February, 1989. He began receiving insulin in February, 1990. Claimant testified that he had significant problems when placed by DOC at the Bexar facility in Texas. That facility pulled the medical diet that Claimant had been receiving and took away diabetic snacks. Claimant testified that he had significant food allergies, and DOC staff were aware of those problems. No one at Bexar seemed to care concerning his diabetes and food allergies. He was often sick while there.

The bus trip back to Colorado from the Bexar facility took twenty-three hours. He had been receiving three shots of insulin per day prior to the trip. He received no insulin while on the trip, though he advised the officers present of his condition. He received his insulin only when he arrived at BCCC. Claimant testified further that he had spent many dollars through the canteen trying to control his blood sugar levels at Bexar. He would start to tremble physically because of his diabetes.

On cross-examination, Claimant stated that his body will dump sugar in the afternoon. Medical staff at SCF have been working with him. His levels have been out of control. He has frequent urination problems at SCF. He has not been able to have extended visitations due to his need to use the restroom more frequently that non-diabetic inmates. He also has been receiving only two shots of insulin per day at SCF, while he received three per day at KCCC.

Defendants presented the testimony of Dr. Cary Shames, D.O. He is the chief medical officer for DOC. He testified that there are two types of diabetics: Type I and Type II. Type I diabetics are normally on insulin. Some diabetics do not even know that they have the condition. Since diabetes has extreme complications, it is important to have blood sugar levels under control. On cross-examination, Dr. Shames testified that frequent urination is a side effect of diabetes.

## III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** The date which is important is August 27, 2003. It was on that date that Judge Nottingham approved the Settlement Agreement. In order to be a member of the class, a claimant must show that he or she was disabled in one of the four categories on or before that date. In addition, the claimant must prove that he or she was the victim of discrimination prohibited by the ADA and Rehabilitation Act.

There is no question that Claimant is diabetic. He is a member of the class as having diabetes.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** With the exception of three issues, the answer to this question is no. Claimant testified at length concerning his concerns about his health, and those are legitimate. He expressed concerns about the type of medical care that has been provided. He also acknowledged that some of the care has been good, which is how he described the care provided at BCCF when he returned from Texas.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability.  A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the case provided to him, that is beyond the jurisdiction of the Special Masters.

There are three instances in which Claimant did receive discriminatory treatment. Each will be taken separately:

**Bexar County Jail**: In the mid-1990's, DOC had too many prisoners and too few beds. This population crisis led to prisoners being placed outside of Colorado. Some prisoners went to Texas, some to Minnesota, and others to Mississippi. Like Claimant, all of the prisoners shipped out of state remained subject to the control of DOC.

The evidence presented by Claimant is accepted concerning his treatment as a diabetic while

5

in the Bexar County Jail. Claimant did not receive medical meals while at Bexar. He had trouble controlling his blood sugar levels. The Special Master finds that Claimant was the victim of discrimination due to his diabetes, because officials at Bexar did not provide him a proper diet and care. Claimant had a legitimate fear for his well-being while at Bexar. Claimant was not provided food items that he needed due to his condition. A person without diabetes had much less to worry about, and none of related to diet and blood sugar levels.

**Trip to Colorado:** Claimant testified that he received no insulin while on the bus trip back to Colorado from Bexar. Claimant remained in DOC custody at that time, and DOC was responsible for his care. The fear of catastrophic medical problems because of not receiving insulin was very real. There was nothing presented to justify what occurred on the trip. There was no reason for Claimant not to have received his necessary medication for his diabetes.

**Visitation:** Claimant testified that his visitations end when he has to use the restroom at SCF. Since members of his family must travel to SCF from Minnesota, the premature termination of a visitation is the result of the need to frequently urinate. As Dr. Shames acknowledged, frequent urination is a common side effect of diabetes.

An inmate who does not have diabetes is able to have a longer visit. Under the rules described at SCF (but not other facilities), a restroom break by the inmate leads to termination of the visit. The Special Master will grant that frequent urination can be a side effect of other medical conditions, but it is a fact of life for Claimant and others who are diabetic. They are treated differently from those who are not diabetic.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant is entitled to damages and affirmative relief for those instances of discrimination that have occurred over the years that he has been in DOC custody. First, Claimant is entitled to visitation that is as long as that for a non-diabetic inmate. The Special Master can appreciate that security concerns exist for visitation, but Claimant's unrebutted testimony indicates that other DOC facilities do not terminate visitation simply because an inmate must use a restroom. SCF and DOC will be accorded some latitude but Claimant is to have visitations that are the same as for a non-diabetic.

Second, the treatment that Claimant received at Bexar and on the trip back to Colorado was discriminatory. Claimant had a legitimate fear concerning his well-being. Claimant is entitled to compensation in the amount of $1,000 for what occurred.

IT IS HEREBY ORDERED that the claim of Thomas Robinson is granted to the extent noted herein, and Claimant shall be entitled to visitation of a comparable length to those inmates who do not have diabetes, and he is to receive compensation for his damages in the amount of $1,000; and

IT IS FURTHER ORDERED that the claim of Thomas Robinson is denied in all other aspects; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file

an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before May 21, 2007.**

SIGNED this 7th day of March, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master

7