IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

_____

Claim Number 03-103 (formerly 02-002)
Category III
Claimant: Trevor Howell, Sr., #108792
Address of Claimant: 9069 W. 95th Avenue, Westminster, CO 80031

_____

## FINAL ORDER OF SPECIAL MASTER

_____

THIS MATTER came before the Special Master for hearing on Monday, September 18, 2006 10:00a.m. at the office of Legal Resolution Center, Denver Corporate Center III, Suite 1100, 7900 East Union, Denver, Colorado. Present were the following: Trevor A. Howell, Sr., Claimant; Elizabeth Frost, girlfriend of Claimant and witness for Claimant; Scott A. Wilkonson from the Office of the Attorney General, for Defendants; Orville Neufeld, D.O., witness for the Defendants.

Testimony was received from the following witnesses: Claimant, Elizabeth Frost and Orville Neufeld, D.O. Defendants submitted Exhibit 1 marked "A" through "V" and Exhibits A and B as well.

At the conclusion of the hearing, the Special Master took the claim under advisement. This order shall constitute the final action by the Special Master on this specific claim.

## I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation

1

Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part as follows:

Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:

I. General inconvenience or nominal damages;
II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
IV. Damages due to severe physical injuries; and
V. Damages due to death.

Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following findings of fact:

1. Claimant submitted an initial claim on March 29, 2004 which was assigned claim number 02-002.

2. Claimant's claim was assigned to Category II pursuant to the Remedial Plan as set forth above.

3.     Shortly thereafter, the Special Master determined that this claim should be reassigned to Category III and, on his own motion, the Special Master reassigned the claim as number 03-147 and set the matter for a hearing.

4.     Proper notice of the hearing was given, and both Claimant and the Defendants appeared for the evidentiary hearing.

5.     Claimant was in the custody of the Colorado Department of Corrections (CDOC) from early 2001 until July of 2005 when he paroled to county jail where he was released on February 12, 2006.

6.     The basis of Claimant's claim is that he is mobility impaired.

7.     Claimant had arthroscopic knee surgery for degenerative knee disorder at the age of 13. From that point forward, he has always worn knee braces.

8.     When he entered county jail prior to CDOC, metal braces were not allowed. Claimant requested knee braces. They were denied, as they are not part of the administrative regulations. He was informed that he could purchase a neoprene brace from the canteen, but was told no.

9.     In 2003, while walking up hill on an incline at T-South Yard at Sterling Correctional Facility (SCF), he slipped and fell and was sent to the clinic. On 4/27/03 and 4/28/03 he was seen and given crutches and told no weight on his knee. On 4/29/03 he had a consult with Dr. Pullman and was ordered three weeks of crutches.

10.     In June, he was given a horseshoe permit for exercise to use the horseshoes to do leg lifts. He returned to the clinic in July for an MRI of his right knee. While working, his right knee had gone out and he had a large amount of swelling. The nurse gave him crutches and on 8/4/03, he was to see Dr. Pullman but was told that the paperwork was lost and he needed to reschedule. When he was finally seen by the doctor, Claimant testified that he was ordered a cane for 30 days. On 10/21/03 both knees were ordered to be scoped but CDOC allegedly did not have the MRI. On 11/25/03, Claimant testified that he was given knee braces for both of his knees.

11.     Claimant testified that he has an allergy to anesthetic and, at the age of 13, he spent 3 days in a coma. Claimant testified that as a result of the allergy, on 11/25/03 the surgery was postponed until the records could be obtained from St. Anthony's. Claimant's testimony was that Cathie Holst acknowledged an error in the file and a year later, he still had not had the surgery and surgery was never again ordered.

12.     On 7/29/06, Claimant testified that his knee went out again and that he went to St. Anthony North Hospital and incurred a $1,779.00 bill in the ER. In August 2006, he twisted his left ankle because the right knee forced extra pressure and he incurred $594.00 in medical bills.

13.     While incarcerated, Claimant testified that his cane was taken after it had been ordered because he allegedly failed to renew his cane permit. He was threatened with a write-up for having contraband (the cane) until such time as he was reissued the cane. The cane was reordered on 8/4/03 and was taken away from him on 2/11/04. He had nothing from 2001 until 2003. Claimant could not walk due to the pain and he blew out his knee on the way to the chow hall. He was given an ice pack and told to buy a neoprene brace off of the canteen. He testified that he could walk with braces but it is a slow process, and that he was only walking at the time of his hearing because of his own persistence. At the time of the hearing, Claimant testified that he can walk 50 to 60 feet without stopping and resting but that he doesn't do stairs.

14.     Claimant testified that during his incarceration he was in upstairs housing and he was denied a bottom tier request until he was injured and then he was given a permit. He was threatened with write-ups because he was late to chow and because he was slow walking and with stairs.

15.     Claimant's testimony additionally indicated that he was denied placement in the Camp George West facility and that for two years he was denied a family hardship for the transfer. Once he got it approved, ten days later he was classified to Level 4 because he has high cholesterol and had had two asthma attacks within the previous year. He also has chronic back pain, multiple food allergies, bilateral knee pain/subluxation of the patellas and is not a surgery candidate for those reasons. The reasoning, therefore, was that he was not safe medically to be at Camp George West and he was ultimately moved because of his disabilities.

16.     As a result of his asthma and knees, no jobs were available to him because when he walks a distance his asthma flares up.

17.     On cross examination, Claimant testified that he did have jobs at CDOC including GED parapro for approximately two years and graphic arts class for approximately two years. Claimant did spend a brief period of time at Camp George West where he did have a cane.

18.     Claimant's girlfriend, Elizabeth Frost, testified that she met him after his time in the county jail. She has seen him suffer and he has difficulty walking and can't grocery shop without having to stop. He wakes up in the middle of the night needing to go to the ER because of pain.

19.     Doctor Neufeld testified in rebuttal that Claimant has had an arthroscopic procedure to clean out his knees. Claimant has patella fibril syndrome where his knee slides off and doesn't track as well as it could and Claimant does have periodic flare-ups. On cross examination, Doctor Neufeld agreed with Claimant that surgery is a preferred treatment for the ACL and that a brace would need to be metal hinged to be effective. However, no evidence of ACL damage could be found in the record.

20.    Claimant also testified that he was able to participate in recreation, walked to the chow hall and back, played horseshoes, cards, was a scorekeeping umpire for the softball team.  In 2001, Claimant played volleyball two times per month.  In 2004, Claimant testified that he was nearly back to healthy status and he could run for exercise; but he denies playing handball.

## III.  CONCLUSIONS OF LAW

1.    The legal standards applicable to this claim are derived from three sources:  (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and (c) the Americans with Disabilities Act.(ADA), 42 U.S.C. § 12101 *et seq.*

2.    The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class.  Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment."  42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B).  The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.  29 C.F.R. § 1630.2(j)(1).  "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes.  *Remedial Plan* ¶ III(A).  Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments.  *Remedial Plan* ¶ III(B).  A permanent disability/impairment is a condition which is not expected to improve within six months.  *Remedial Plan* ¶ III(C).

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, the Special Master finds and concludes that a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

The Special Master finds and concludes that Claimant is not a disabled individual who is a member of the class.  Claimant, while he has problems, testified that he was able to participate in sports.  The evidence also indicated that Claimant had refused a lower bunk, bottom tier restriction that he was to be given.

3.      It should be noted that most of Claimant's complaints really are about the quality of his medical care and about his treatment by staff in their efforts to have him work.  These claims are not cognizable under the Rehabilitation Act, the ADA or the Remedial Plan.  *Fitzgerald v. Corrections Corp. of America,* 403 F.3d 1134 (10th Cir. 2005).

4.      Since Claimant cannot prove that he was a disabled member of the class, the analysis need not go further.

## IV. ORDER

WHEREFORE, based upon the foregoing Findings of Fact and Conclusions of Law, Claimant has not met his burden of proving his claim by a preponderance of the evidence and, therefore, his claim in this matter is DENIED.

IT IS FURTHER ORDERED that that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before May 16, 2007** with the Clerk of the United States District Court at the following address:

901 19th Street
Denver, CO 80294.

.

SIGNED this 16th day of March, 2007

BY THE COURT:

/s/ Richard C. Davidson

_____

Richard C. Davidson,
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this 16th day of March, 2006 to the following:

Mr. Trevor A. Howell, Sr.
9069 W. 95th Avenue
Westminster, CO 80031

Mr. Scott A. Wilkonson
Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

/s/ Susan L. Carter

_____

Susan L. Carter