IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

———————————————————————————————————————

Claim Number 02-806
Category II
Claimant: Mark Allen Marler, #86756
Address of Claimant: 103 Shady Lane, Palisade, CO 81526

———————————————————————————————————————

## FINAL ORDER OF SPECIAL MASTER

———————————————————————————————————————

THIS MATTER comes before the Special Master on the claim of Mark Allen Marler (Claimant). Claimant previously was incarcerated in the Colorado Department of Corrections (DOC). He has been discharged from his sentence.

This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of his claim. Defendants have filed a response to the claim. Claimant was given the opportunity to reply to the response of Defendants. He had filed additional documents in support of his claim. Further argument will be waived.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

> The Settlement Agreement further provides, in part, as follows:
>
> > 2. Permanent Hearing Impairments
> > Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> > 3. Permanent Vision Impairment
> > Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> > 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> > Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> > 1. Is the claimant a disabled individual who is a member of the class?
> > 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> > 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> > 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant initially came into DOC custody on August 1, 1995, He was placed at the Denver Reception and Diagnostic Center (DRDC) for testing. He then was transferred to a number of facilities before being placed on parole in 1996. Claimant was returned to DOC custody in January, 1997.

Claimant was placed back on parole in November, 1997. He absconded from parole supervision. He was taken back into custody and placed at the Bent County Correctional Facility (BCCF) in Las Animas, Colorado. He discharged his sentence on November 2, 1999.

Claimant came back into DOC custody on a new sentence on September 24, 2004. He was placed at DRDC and then was transferred to the Sterling Correctional Facility (SCF) in Sterling, Colorado on November 30, 2004. Claimant remained at SCF until October, 2005 when he was transferred on a detainer to the State of Montana. Claimant has discharged his sentence in Colorado.

Claimant checked only the box for mobility impaired on his claim form. In response to the question concerning disabilities, he stated as follows:

> I broke my left ankle when on the streets. It needs surgery. It is 7.5 mm out of displacement. It has healed wrong. It needs to have pins and metal in it. Also in 2000 I was hit by an automobile and my right rotor cuff in shoulder is shot. I'm limited to lifting and overhead movement.

When asked in the same form as to acts of discrimination by DOC staff, Claimant stated as follows:

> I have a doctor on the streets who is a Colorado certified-aid for Needy Disabled "AND" who disabled me and was being paid a check by Social Services while awaiting a SSI determination. Dept. of Correct. disacknowledges my disability for working and has me working 40 hrs. a wk in the kitchen on my feet. If I don't work, I'm threatened with punitive segregation 23 hr. lockdown 3 loss of privileges and loss of good time which relates to a longer prison term.

In his supplemental form, Claimant elaborated on his condition.

> I am in constant pain at work and even when I am off work due to constant aggravation of being on my feet. We also have to walk a 1/4 mile to the chow hall that causes me pain.

Attached to the supplemental form is an x-ray report from the Montrose Memorial Hospital, dated June 27, 2003, that reflects that Claimant has a "fracture distal left fibula with lateral and dorsal subluxation of talus."

Defendants' answer to the claim denies that Claimant is a member of the class for mobility impairment. Attached to the answer are several documents, including some medical records.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant has checked only the box for mobility impaired. The question then is whether he meets the criteria as set by the Settlement Agreement.

The Settlement Agreement was approved by Judge Nottingham on August 27, 2003. It was on that date that the class was set. In order to file a claim, a claimant had to have been in DOC custody on or before August 27, 2003. In addition, a claimant had to have been disabled, as recognized by the Settlement Agreement, and have been the victim of discrimination prohibited by the ADA and Rehabilitation Act.

Claimant was in DOC custody on several brief occasions prior to August 27, 2003. He discharged his first sentence on November 2, 1999. Defendants correctly note that no specific allegations have been made concerning the time period up to November, 1999.

The Settlement Agreement provides a very narrow qualification for mobility impairment. Permanent mobility impairment is limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." There is no evidence that Claimant ever used a wheelchair full or part-time while in DOC custody. Claimant does not qualify as mobility impaired because of wheelchair usage.

Claimant submitted a copy of a medical report utilized in the State of Montana for a disability determination. Dr. Richard Hurd, M.D. examined Claimant on July 20, 2006. The examination by Dr. Hurd was not related to this case in any way. Dr. Hurd noted, in part, as follows:

> The claimant walked from the prerelease center down to the hospital today which is approximately three-quarters of a mile and he will walk back to the prerelease center after his x-rays are obtained. The claimant can stand at least an hour, can sit for "a long time" and he feels that he can safely lift 40 pounds. The claimant's ankle pain is described as a sharp pain, worst is 5/10, best is 2 to 3/10. The claimant has not had any adjunctive treatment for his ankles.
>
> The claimant lives in the prerelease center and will be released in September. He is able to do all activities of daily living. At the prerelease center, one of his main jobs is to mop the floor and clean the bathroom. Mr. Marler is capable of taking care of his personal hygiene, has no difficulty with hearing, speaking, tasting or smelling.

> He climbs up two flights of stairs at the prerelease center three or four times per day. This includes walking up and down the stairs four or five times a day......
>
> General Appearance and Pain Behaviors: I observed Mr. Marler walking into the clinic and also walked with him back to the examining room. My initial impression on observation of the claimant was that he looked quite comfortable in the upright position while walking into the exam room. He moved easily on and off the scale as well as onto and off the exam table. I also observed Mr. Marler bend over, untie his boots and take off his socks, flexing both of his hips one at a time when taking off his socks....I observed Mr. Marler walking out of the clinic and up to the hospital which was a rather steep grade and as I mentioned, he will be walking back to the prerelease center. He did not use any pain behaviors....
>
> Based upon the claimant's history today, my physical exam as well as my observation of the claimant, it is my professional opinion that this claimant is capable of working in the light to medium category of work six hours of an eight-hour day in a 40-hour week.

The Settlement Agreement provides two examples for mobility impairment. The first is a claimant who cannot walk one hundred yards without stopping. The second example is a claimant who cannot climb a flight of stairs without stopping. The medical report submitted by Claimant from Dr. Hurd indicates that Claimant does not meet either of the examples provided in the Settlement Agreement. Dr. Hurd's report reflects that Claimant is *not* mobility impaired, as required by the Settlement Agreement.

Based upon the information that he has provided, Claimant does not fall under the definition of mobility impairment. Claimant does not have a permanent lower extremity condition that substantially limits walking. Claimant is not a member of the class as mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** The answer to this question is yes. Nothing presented by Defendants reflected that Claimant could not participate in any programs or serves due to other issues, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The answer to this question is no. There is no evidence that DOC staff have discriminated against Claimant due to a disability.

Claimant's concern is with the quality of medical care that he has received. There is no question that he has received some care, but not what Claimant thinks may be helpful. The United States Court of Appeals for the Tenth Circuit ruled on April 11, 2005 that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). The ruling in *Fitzgerald* is now controlling law in this jurisdiction. The ADA and Rehabilitation Act are statutes that prevent

discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under either the ADA or Rehabilitation Act. All claims for substandard medical care must be brought under the Eighth Amendment or pursuant to state statutes.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #1 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Mark A. Marler is dismissed, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before May 23, 2007.**

SIGNED this 16th day of March, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master