IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

_____

Claim Number 02-841
Category II
Claimant: Michael D. Barry, #91323
Address of Claimant: CSP, P.O. Box 777, Canon City, CO 81215-0777

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

THIS MATTER comes before the Special Master on the claim of Michael D. Barry (Claimant). Claimant is incarcerated in the Colorado Department of Corrections (DOC). He presently is placed at the Colorado State Penitentiary (CSP) in Canon City, Colorado.

This claim has been assigned to Category II. Pursuant to the Remedial Plan, Claimant was not entitled to a hearing. Claimant has been given an opportunity to submit documents in support of his claim. Defendants have filed a response to the claim. Claimant has filed a reply to the response of Defendants.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

> The Settlement Agreement further provides, in part, as follows:
>
> > 2. Permanent Hearing Impairments
> > Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> > 3. Permanent Vision Impairment
> > Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> > 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> > Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> > 1. Is the claimant a disabled individual who is a member of the class?
> > 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> > 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> > 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant initially came into DOC custody on November 20, 1996. He was placed initially at the Denver Reception and Diagnostic Center (DRDC) in March, 1995. He was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado. He remained at FCF until April, 1999 when he went to the San Carlos Correctional Facility (SCCF) in Pueblo, Colorado. Claimant was paroled in March, 2000.

Parole was revoked, and Claimant returned to DOC custody on September 26, 2000. He discharged from his sentence on March 17, 2003. Claimant returned to DOC custody on a new sentence on November 4, 2003. He has remained in custody since that time. He came to CSP in November, 2004.

Claimant checked only the box for mobility impaired on his claim form. In response to the question concerning disabilities, he stated as follows:

> (1) Osteoperosis caused by (2001) medication DOC orders after determining extreme danger & not notifying me. Danger of breaking bones (calcium supplement refused) Top bunk/stairs are dangerous but not unable to access. (2) Mental (bi polar) severe issues preventing employment since 1988 on SSDI and SSI. Can't get along w/employees/employees/cellies other inmates, bottom bunk, bottom tier ordered by NP Connie Batson at FCF on 12/20/01. Due to danger of falling off bunk or falling down stairs, and likeliness to break bones (CT Scan (x3) done).

When asked in the same form as to acts of discrimination by DOC staff, Claimant stated as follows:

> (1) Punished for not working, forced (coerced) to work. (2) refused top bunk & tier restrictions at FCF, AVCF, SCCF, CSP. (3) denied diversion program which gave access to ½ way house. Denial stated to me in front of 3 witnesses & myself as to "program inaccessible to bottom bunk/bottom tier inmates." (By case manager at FCF). (4) bunk/tier restrictions ignored by FCF CH1 staff which resulted in fear for life and panic, and new case (5 yrs. + 3 parole).

In his supplemental form, Claimant elaborated on his condition.

> (1) related to danger of falling and likelihood of breaking bones due to osteoperosis. (2) Inability to work due to mental disability & related eye injuries (3) denial of appropriate treatment for osteoperosis (4) denial to remove from damage due to mental issues, 3rd tier.

Attached to the supplemental form are some records related to Claimant. Most of these are grievances that have been submitted to DOC personnel and various facilities. Claimant has requested

through grievances an examination of the calcium intake in his diet at various institutions. DOC records reflect indications of osteoporosis as early as October, 1999.

Claimant submitted additional medical records in support of his claim. Bone scans indicated osteoporosis in 1999, 2001 and 2003. The testing on January 9, 2003 at the Sterling Regional Medical Center indicated that osteoporosis was present ("Osteopenia, thus the patient is at mildly increased risk for hip fracture").

Defendants' answer to the claim denies that Claimant is a member of the class for mobility impairment. Attached to the answer are several documents, including some medical records. Defendants have attached the same imaging report from 2003 which reflects osteoporosis. *Exhibit B*. Claimant was prescribed Fosamax as early as January, 2001 for his condition. The records reflect that Claimant also had additional medications prescribed for him. Some of the records reflect that Claimant refused certain medications.

In his reply to the response of Defendants, Claimant takes issue with some of the statements set forth in his medical records. He notes that he did submit to two thyroid tests and that the results reflect no need for medication. He also states that allegations that he did not take medications are false. He has requested additional calcium for his osteoporosis. He is concerned about his health and the possibility of future medical issues due to his bones being brittle.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

Claimant has discussed in his initial claim form, as well as subsequent documents, that he has been diagnosed with bi-polar disorder. The Settlement Agreement only deals with the four conditions that are set forth in Section I of this order. Mental illness is not covered by the Settlement Agreement. Claimant has the right to bring a separate lawsuit concerning his disability which arises from mental illness and that he was discriminated against because of that in violation of the ADA and Rehabilitation Act. The Special Masters have no jurisdiction to deal with any disability that is not covered by the Settlement Agreement.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant has checked only the box for mobility impaired. He also may be raising an issue of vision impairment. The question then is whether he meets the criteria as set by the Settlement Agreement.

The Settlement Agreement was approved by Judge Nottingham on August 27, 2003. It was on that date that the class was set. In order to file a claim, a claimant had to have been in DOC custody on or before August 27, 2003. In addition, a claimant had to have been disabled, as recognized by the Settlement Agreement, and have been the victim of discrimination prohibited by the ADA and Rehabilitation Act.

**Vision Impairment**: Claimant has alluded to vision issues, primarily as the result of stress. Claimant has not submitted any documentation that substantiates that a vision impairment existed on or before August 27, 2003.

Defendants have provided reports of two vision examinations. The first was done in April, 1997 and Defendant had 20/20 vision in both eyes without any need for corrective lenses. *Exhibit F*. In January, 2006 another examination was done and reflected that Claimant needed corrective lenses, as his eyes were 20/50 and 20/60. *Exhibit G.* Defendants note that Claimant is not blind and that his vision is subject to correction through eyeglasses.

Claimant has not alleged that any activity of daily life is substantially impaired due to his eyes. Claimant has established that he had a need for eyeglasses, but that does not rise to the level of a vision disability as set forth in the Settlement Agreement.

**Mobility Impairment**: The Settlement Agreement provides a very narrow qualification for mobility impairment. Permanent mobility impairment is limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." There is no evidence that Claimant ever used a wheelchair full or part-time while in DOC custody. Claimant does not qualify as mobility impaired because of wheelchair usage.

There is no dispute that Claimant has osteoporosis. Defendants so acknowledged as early as January, 2001. Claimant is legitimately concerned about his condition and what the future may hold. The question is whether osteoporosis meets the criteria for mobility impairment.

The Settlement Agreement requires a showing of a permanent lower extremity mobility impairment. Two examples are provided in the Settlement Agreement. The first example is where a claimant cannot walk one hundred yards without stopping. The second example is where a claimant cannot climb a flight of stairs without stopping. In both examples, the ability to walk has been seriously limited due to a lower extremity condition.

Accepting as true what has been set forth, Claimant has not alleged that he is unable to walk or climb stairs. He has alleged that he is at risk for the future, and he is correct in that assessment. Claimant has not alleged or provided documentation that he has a lower extremity mobility impairment that substantially limits walking.

Based upon the information that he has provided, Claimant does not fall under the definition of mobility impairment. Claimant does not have a permanent lower extremity condition that substantially limits walking. Claimant is not a member of the class as mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Though Claimant has a number of disciplinary convictions, the answer to this question remains yes. Nothing presented by Defendants reflected that Claimant could not participate in any programs or services due to other issues, such as disciplinary

convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?**
The answer to this question is no. There is no evidence that DOC staff have discriminated against Claimant due to a disability.

Claimant's concern is with the quality of medical care that he has received. There is no question that he has received some care, but not what Claimant thinks may be helpful. The United States Court of Appeals for the Tenth Circuit ruled on April 11, 2005 that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). The ruling in *Fitzgerald* is now controlling law in this jurisdiction. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under either the ADA or Rehabilitation Act. All claims for substandard medical care must be brought under the Eighth Amendment or pursuant to state statutes.

Claimant may pursue a separate lawsuit under the Eighth Amendment if he believes that the medical care that he has received has been constitutionally deficient. In light of the *Fitzgerald* decision, Claimant may not utilize the ADA and Rehabilitation Act to seek damages for the quality of medical care received.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**
Since the answer to Question #1 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Michael D. Barry is dismissed, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before May 23, 2007.**

SIGNED this 19th day of March, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*
_____
Richard M. Borchers
Special Master