IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-260
Category III
Claimant: Isidro Vega, #116758
Address of Claimant: BCCF, 11560 CR FF-75, Las Animas, CO 81054

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

THIS MATTER came before the Special Master for hearing on April 27, 2007. The hearing was held at the Bent County Correctional Facility (BCCF) in Las Animas, Colorado. Present were the following: Claimant Isidro Vega (Claimant) and Jennifer Fox, attorney for Defendants.

Claimant testified in his own behalf. Defendants submitted Exhibits A and B. The Special Master indicated that all documents previously submitted would be accepted and considered in resolving this claim. Closing arguments were provided by Claimant and counsel for Defendants. The case was taken under advisement.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections. The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge

Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they may exercise only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant first came into DOC custody on in March, 2003. He was placed initially at the Denver Reception and Diagnostic Center (DRDC). He then was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado. He was at FCF for four months. He then was transferred to BCCF and has been at that facility through the present time.

In the initial claim form, Claimant checked the box for diabetes. Claimant stated, in part, as follows in his initial claim form.

> Diabetes is a chronic disease I cannot get rid of. It does affect my life in general.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

> I was denied proper shoes. When I asked about it, I was told to buy my own. Unfortunately, $12.00 a month are not enough to cover for restitution, child support, etc., etc.

Claimant was sent a supplemental form to complete and return. In his supplemental form, Claimant stated, in part, as follows:

> During a visit to the N.P., I told her about the pain I have in the bottom of my feet. I also explained to her the problems with calluses on both of the little toes, and ingrown nails in the big toes. After that, she scheduled an appointment so I can come back to get the nails trim, once a month. Sometimes, I have to endure annoyance and pain until the schedule time to get some relief from the ingrown toe nails. Then I asked for help to get tennis shoes, and the N.P. was willing to help, but Lori, her boss, told me a few days later that it was not a medical necessity.
> I told them, how come some diabetics were issued tennis shoes and some did not? Lori said, "we no longer do that. You need to buy your own." I would if I had the money, but $12.00 a month hardly covers for restitution, child support and basic hygiene. Because of diabetes, I must exercise regularly but the hiking boots or tennis shoes available for use do not help. That is the main reason my feet hurt. In addition, the ingrown toe nails have not heal yet probably because of lack of professional care.

At the hearing, Claimant testified that he was diagnosed as diabetic while at DRDC. He began to receive medicine and insulin. He commenced use of finger sticks to check his blood sugar levels. He indicated that he continues to take insulin by shot, but is now on a 2400 calorie diet.

Claimant testified that he has been trying to get the right type of shoe. He has ingrown

toenails and a fungus. He requested tennis shoes, but was told he would have to buy those himself. Other inmates received tennis shoes without payment during that period of time. About one year after his request for tennis shoes, he did receive a pair. He indicated that he has larger size shoes now because of his toenails. He testified that he was not on a diabetic diet at times, even though ordered at DRDC when he came into custody.

On cross-examination, Claimant testified that his tennis shoes had worn out. They had not been replaced. He had received the tennis shoes in September, 2005. He stated that he did not have any ulcers on his feet. His problems were fungus and the toenails. He is a student in an electronics class. He has worked previously as a paraprofessional.

Defendants submitted the affidavit of Dr. Neufeld. Attached to that affidavit are copies of medical records of Claimant.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Claimant must establish that he was disabled on or before August 27, 2003. He must establish further that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** There is no dispute that Claimant was diagnosed as a diabetic when he came into DOC custody. He is a member of the class as a diabetic.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** No evidence has been presented that Claimant was unqualified for programs and services due to disciplinary or other problems.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** In order to prevail on his claim, Claimant must show that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act between March, 2003 and August 27, 2003. Claimant has not met his burden of proof as to this question.

In order to establish a violation of the ADA and Rehabilitation Act, a claimant must show that he was treated differently from a non-handicapped individual. In this case, Claimant must show that he was discriminated against because he is diabetic on or before August 27, 2003.

In his claim form, Claimant alleged as the sole act of discrimination by DOC and/or its staff that he did not receive proper shoes. There was and is no evidence to substantiate that Claimant needed such shoes on or before August 27, 2003. The medical records of Claimant do not indicate that soft soled shoes were essential to his health and that they were not provided. Claimant has acknowledged that he did receive a pair of tennis shoes without cost approximately one year after he requested them. There is no evidence of any other conduct by DOC or its staff that was

discriminatory due to Claimant's diabetes.

Claimant also appears to have some objection to some of the medical treatment that has been provided to him by DOC. The United States Court of Appeals for the Tenth Circuit has held that the ADA and Rehabilitation Act are not available to litigate claims of medical negligence or malpractice. *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005). To the extent that Claimant is alleging inadequate or improper medical care, he must pursue a separate action under the Eighth Amendment. The Special Masters are precluded from examining the quality of care provided by DOC staff to a claimant.

Claimant has not proven that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act. As a result, he cannot prevail on his claim.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Isidro Vega is dismissed, as Claimant has failed to prove that he was the victim of discriminatory conduct prohibited by the ADA and Rehabilitation Act on or before August 27, 2003; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before July 16, 2007.**

SIGNED this 2nd day of May, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

───────────────────────────────
Richard M. Borchers
Special Master