IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

───────────────────────────────────────────────

Claim Number 03-357
Category III
Claimant: Lee Filipiak, #109936
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

───────────────────────────────────────────────

## FINAL ORDER OF SPECIAL MASTER
───────────────────────────────────────────────

THIS MATTER came before the Special Master for hearing on April 27, 2006. This hearing was held at the Fort Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Lee Filipiak (Claimant); and Jennifer Fox, attorney for Defendants.

Testimony was received from Claimant. Defendants' Exhibits A through G were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

>   B. QUALIFIED INMATE
>   Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>   C. PERMANENT DISABILITY/IMPAIRMENT
>   A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

>   2. Permanent Hearing Impairments
>   Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
>   3. Permanent Vision Impairment
>   Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
>   4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
>   Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>   2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>   1. Is the claimant a disabled individual who is a member of the class?
>   2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>   3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>   4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody in December, 2000. He first went to the Denver Reception and Diagnostic Center (DRDC). He was there for about four weeks. He then was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado. He was at FCF for seven to eight months. He then was transferred to FLCF. He remains at that facility,

In his initial claim form, Claimant checked the boxes for mobility and vision impaired, as well as diabetes. Claimant stated, in part, in his claim form:

> In the year 2000, I had a motorcycle accident just before I was arrested. I have broken everything in my leg except my foot and have numerous pins, plates, rods from my femur down to my ankle. I have a very hard time walking and am in pain constantly.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated, in part, as follows:

> My right leg is shorter than the left and I need a medical lift on my right shoe and they took the one I had in a boot exchange. They told me that they would get me one and it's been over a year. When I ask it's always we will get to it to you at the end of the month and nothing yet. I can't walk without a cane and sometimes because of the pain I can't go to the yard even with my cane.
> Diabetes. The drugs that I am receiving are inadequate at best. They seem to switch brands of insulin at different times causing my sugar level to be erratic. It seems when I get it stable they switch and it messes me up get dizzy and sick to my stomach at times to the point that I can't eat and have a hard time sleeping.
>
> Vision. My eyes have been getting worse and worse since I have been locked up due to diabetes.
>
> Diabetic. I have continuously have been try to get shoes because my feet hurt and go numb due to the diabetes. And have been told that DOC does not supply these. I was diagnosed with diabetes while in DOC and DOC does not seem to care.

Claimant was provided supplemental forms to complete and return. He did complete forms for all three conditions. In his supplemental form for diabetes, he stated that he was fearful of his health condition and worried about blindness and other problems that arise from diabetes. In his vision supplemental form, he stated that "vision blurred when reading and same with reading at a distance." His mobility supplemental form reiterated what had been set forth in his initial claim.

In his testimony at the hearing, Claimant stated that he had been in a serious motorcycle accident in Connecticut before being sentenced. He was in a hospital in that state for over two months. His leg was broken in multiple places.

Claimant testified that he was diagnosed as having diabetes after coming into DOC custody. He began taking glucovance and glucophage. He also has to take insulin by shot two times per day. His blood sugar levels are monitored by twice daily finger sticks.

Claimant testified that he has been trying to get DOC medical staff to agree with him that he is mobility impaired. He applied for SSI prior to coming into custody and has been approved. He will receive no benefits until he is released from custody, but the administrative law judge determined that he was totally disabled due to his injuries. He has one leg shorter than the other and has difficulty walking. He cannot run or squat. He had an elevated shoe for a period of time but that was not replaced immediately when there was a boot exchange. He was on Vicodin for a period of time, but that was taken away. He has had to use aspirin and other over the counter pain medications. He was offered a wheelchair but declined use of it.

As to his vision, Claimant testified that he has been receiving yearly eye examinations. He received glasses from DOC. He has been worried about his vision due to his diabetes.

Claimant testified that he had problems for a period of time in obtaining glucose tablets. These were not given to him, even though he needed to have access to them when his blood sugar levels were extremely low. When he went to medical to obtain glucose tablets, he was charged for an emergency visit. That procedure changed, and he has been able to get glucose tablets on the medical line.

On cross-examination, Claimant testified that he has seen Dr. Patterson, an outside orthopedic consultant. He indicated that Dr. Patterson has provided good care to him. Claimant also testified that he had sought a wheelchair at one point. He was offered one that was old and questionably safe. He also indicated that he did not want to have someone pushing his wheelchair.

Claimant asked for diabetic shoes, but was not provided any. He was told to order sneakers from the canteen. He did buy a pair. Claimant testified further that he had been reading up on diabetes and was watching the food that he was eating.

Claimant is medically unassigned at the present time. He has had access to various classes and work. He stated that he is not able to do much at the present time. Claimant has been provided a cane and elevated shoes. He has had lower tier, lower bunk restrictions for some period of time. Claimant testified that he is not on a diabetic diet but does receive snacks.

On cross-examination, Claimant testified that he has received some cortisone shots for his knee. He probably could walk one hundred yards but it would be painful. He will use his cane for the rest of his life.

5

In lieu of live testimony, Defendants submitted the affidavit of Dr. Orville Neufeld, D.O.. That affidavits contains a number of documents from Claimant's medical records. Defendants also submitted other documents in support of their position.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

Claimant must show that he was disabled on or before August 27, 2003, the day the Settlement Agreement was approved by Judge Nottingham. In addition, Claimant must show that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Each disability must be examined separately.

**Mobility Impaired**: Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." There is no evidence that Claimant ever used a wheelchair while in DOC custody. He has been offered a wheelchair, but instead uses a cane.

The evidence is in dispute concerning the residual effects of the motorcycle accident. Claimant testified that he has difficulty walking and climbing stairs. The Special Master will error on the side of caution and will find that Claimant is mobility impaired.

**Diabetes**: Claimant was diagnosed with diabetes soon after he arrived in DOC custody. The Special Master finds that Claimant was diabetic before August 27, 2003 and is a member of the class as a diabetic.

**Vision Impaired**: Claimant has claimed vision problems. He has indicated that he cannot see as well as he did some years ago.

The definition set forth in document is as follows:

> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

Claimant does not meet this definition, as he is not blind and does not have eyesight that is uncorrectable to 20/20. He does not have to use braille or rely on alternative means of communication. Claimant does not meet the criteria in the Settlement Agreement for vision impairment.

6

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** With one exception, the answer to this question is no. Claimant has not shown that he was the victim of discrimination due to his mobility impairment or diabetes. Claimant has received medical care. He has not agreed with some of the care he has received. Likewise, Claimant generally has received access to programs in DOC over the years. Claimant is concerned about his health, and rightfully so. There is no evidence that Claimant generally was treated differently than an individual who did not have diabetes. Claimant has received medical care and has been granted access to programs and services.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

The testimony of Claimant is accepted as to the lack of availability of glucose tablets. In order to obtain a tablet when his blood sugar level was low, Claimant had to go to the medical line and was then charged for an emergency visit. Claimant had no alternative but to seek a glucose tablet because of his diabetes. An individual without diabetes did not have to go to the medical line and was not charged. The Special Master understands that FLCF no longer charges a medical fee for a visit to obtain a glucose tablet. The action in charging to obtain a tablet was clearly discriminatory and violated the ADA and Rehabilitation Act.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant is entitled to damages in the amount of $75.00.

IT IS HEREBY ORDERED that the claim of Lee Filipiak is granted to the extent noted in this order as to the issue of glucose tablets; and

IT IS FURTHER ORDERED that the remainder of the claim is denied, as Claimant has

7

failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

IT IS FURTHER ORDERED that Claimant is awarded damages in the amount of $75.00; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before July 16, 2007.**

SIGNED this 2nd day of May, 2006.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master