IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-324
Category III
Claimant: Curtis Lee Robertson, #98668
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

_____

**FINAL ORDER OF SPECIAL MASTER**

_____

THIS MATTER came before the Special Master for hearing on April 26, 2007. This hearing was held at the Fort Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Curtis Lee Robertson(Claimant); and Celia Randolph, attorney for Defendants.

Testimony was received from Claimant and Richard Weems (by telephone). Defendants' Exhibits A and C were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>    A. COVERED DISABILITIES
>    The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

B. QUALIFIED INMATE
Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

2. Permanent Hearing Impairments
Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
3. Permanent Vision Impairment
Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
1. Is the claimant a disabled individual who is a member of the class?
2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody in October, 1998. He was placed initially at the Denver Reception and Diagnostic Unit (DRDC). He was transferred to the Crowley County Correctional Facility (CCCF) in Olney Springs, Colorado. He remained there until 2003 when he was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado. Claimant finally was transferred to FLCF in 2005 and has remained at that facility since his transfer.

In his initial claim form, Claimant checked the boxes for mobility and vision impairment. Claimant stated, in part, in his claim form:

> In May of 2003 I was given a confirmed diagnosis of (MS) Multiple Sclerosis. Multiple Sclerosis is a chronic, often disabling disease of the central nervous system. Symptoms may be mild such as numbness in the limbs or severe – paralysis or loss of vision.
> To start with, my MS has put me in a wheelchair and no longer to walk or run. I now have to live with constant numbness throughout my body that never goes away. I have to live with daily pain, sometimes it's easy to deal with and on some days the pain is so severe that I need to be taken to medical for some type of pain relief. My MS affects both bladder and bowel movements. MS also affects my vision a lot. It affects my cognitive thinking and I forget just average daily life things. My balance is affected in a manner when I try to walk I will fall down.

In response to the question in the claim form concerning discrimination by DOC and its staff, Claimant stated, in part, as follows:

> I was sent to Fremont Correctional Facility by Crowley Correctional Facility, a private facility, with them knowing I had a confirmed diagnosis of Multiple Sclerosis when the medical staff at Crowley told me they are sending me over to a medical facility because they are changing my medical status from an M-3 medical rating to an M-4 medical rating. With Fremont knowing this they moved me into building 1 which is far from being fit for the physically challenged inmates. I was then put on an unassigned status because I was unable to work. I stayed that way for a couple of months and I got bored and tried a job. I got a job in the dining hall wrapping flat-ware. I took the job on the assumption I could do it. I did this job for three months and ended up having to quit because of the weakness brought on by too much stress on my already weakening limbs so I just had to tell the staff I could no longer handle the work. So, Fremont put me back on unassigned status and had to be back on lock-down in my cell. I was at Fremont for 17 months and then moved to Fort Lyon.

Claimant stated that he had requested pain medications and had been refused. He stated further in

his claim form that FCF allowed unassigned inmates only one day per week access to the gym for exercise.

Claimant submitted supplemental claim forms for both vision and mobility impairments. In his supplemental form for mobility, Claimant noted that he had not been provided a shower chair. He was told to use another shower that was some distance from his cell. He was given an alternative of using a shower that had a seat but Claimant said it was not disinfected. He also stated that FCF had refused to put him on medically unassigned status.

At the hearing Claimant testified that MS was first suspected in 2000. The diagnosis finally was made in 2003 while he was at CCCF. Claimant was placed into a wheelchair in May, 2003. Claimant also testified that his vision had been affected by the MS. He had blurry vision at times and sometimes felt like he was looking out into a tunnel.

Claimant testified that he received appropriate care while at CCCF. He had major problems at FCF. He was unable to understand why he was ever sent to FCF, as he had been told it was a medical facility. He did not receive appropriate or compassionate care while at FCF. He was placed into a wet cell. He often fell and help was not easily accessible.

On cross-examination, Claimant testified that he was placed in a building at FCF that was a long way from the chow hall. He often fell down. He received derogatory comments from officers. He could not find a decent job at FCF, and the best he could do was wrapping flatware. He admitted that he had not sought other jobs after leaving the flatware wrapping position.

In lieu of live testimony, Defendants submitted the affidavit of Dr. Orville Neufeld, D.O.. That affidavits contains a number of documents from Claimant's medical records. Defendants also submitted other documents in support of their position.

**III.**

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

Claimant must show that on or before August 27, 2003 he had mobility and vision impairments that affected major life activities. Claimant must show further that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act that occurred on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Each disability must be examined separately.

**Mobility Impaired**: Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

As of May, 2003, Claimant permanently was in a wheelchair. Claimant's MS had progressed to the point that he could not longer walk, except for short stretches. Claimant was mobility impaired as of May, 2003 and is a member of the class.

**Vision Impaired**: Claimant's vision issues are related to his MS. The definition set forth in Settlement Agreement is as follows:

> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

The Special Masters have interpreted this definition as requiring a claimant to be virtually blind. Claimant is not blind. His vision issues come and go, and he is able to function with his eyesight most of the time.

The Special Master finds that Claimant was not vision impaired on August 23, 2003, as defined by the Settlement Agreement. Claimant is not part of the class as vision impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The answer to this question is generally no, but there are some exceptions. There was no question by early 2003 that Claimant had MS. This diagnosis was made at CCCF, and shortly thereafter Claimant was transferred to FCF. Purportedly, this transfer was made to what was designated as a medical facility. Claimant had to file a grievance in order to get a wheelchair. *Defendants' Exhibit C.* Prior to receiving a wheelchair, Claimant had been issued a cane.

Claimant testified that when he was transferred to FCF he was placed in a cell house that was some distance from the chow hall. He had difficulty walking to the chow hall and often fell. He was ridiculed by staff and ordered to get up and continue on. FCF also provided limited time for use of the gym by handicapped inmates. No evidence was presented by Defendants why Claimant was placed in a cell house that was some distance from where he had to go to eat. Defendants argued that Claimant was merely complaining that the correctional officers were not nice to him when he fell, but it was more than that. Claimant was placed at a disadvantage by FCF staff when he was not accommodated by placement in a cell house that was near to the chow hall.

Defendants also did not respond to Claimant's testimony concerning use of the gym at FCF by handicapped inmates. This was limited to one day per week. Claimant testified that this was less than what was provided to non-handicapped inmates. This is exactly what the ADA and Rehabilitation Act prohibit. No explanation was presented as to why there was a disparity in

treatment.

Claimant has raised also some issues concerning his medical care while in DOC. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability.  A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

The Special Master finds discrimination did take place at FCF. To the extent that Claimant has raised other issues, the Special Master determines that insufficient evidence has been presented to establish those issues.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant was not accommodated at FCF when he was placed at an extreme distance from the chow hall, even though initially using a cane and then a wheelchair. He fell and had difficulty getting back and forth. Claimant further was not granted equal opportunity to utilize the gym at FCF. Claimant will be compensated for his damages in the amount of $300.00.

IT IS HEREBY ORDERED that the claim of is granted, in part, and Claimant is entitled to the sum of $300.00 as damages; and

IT IS FURTHER NOTED that the remainder of the claim is denied, as Claimant he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before July 23, 2007.**

SIGNED this 7th day of May, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

_____

Richard M. Borchers
Special Master