IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-339
Category III
Claimant: Joseph H. Olmedo, #102737
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

_____

## FINAL ORDER OF SPECIAL MASTER
_____

      THIS MATTER came before the Special Master for hearing on April 26, 2007. This hearing was held at the Fort Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Joseph H. Olmedo(Claimant); and Celia Randolph, attorney for Defendants.

      Testimony was received from Claimant in person. Testimony from Sergeant Richard Ullman, and Captain Peter Pierce was taken by telephone. Defendants' Exhibits A through G were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

      After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

      This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>     A. COVERED DISABILITIES
>     The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

>The Settlement Agreement further provides, in part, as follows:
>
>>2. Permanent Hearing Impairments
>>Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
>>3. Permanent Vision Impairment
>>Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
>>4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
>>Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>>1. Is the claimant a disabled individual who is a member of the class?
>>2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on November 15, 1999. He was placed initially at the Denver Reception and Diagnostic Center (DRDC). He then was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado. He was at FCF for about two months.

Claimant then was placed at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. He was at CTCF for five years, and then was transferred to FLCF.

In his initial claim form, Claimant checked the box for mobility impairment. Claimant stated, in part, in his claim form:

> I am a paraplegic with a impaired respiratory system. I'm paralyzed from the armpits down. I can't walk or feel anything below my armpits. I rely entirely on my wheel chair. I rely on some one to wheel me around as I find this activity to be very hard on my lungs.

In response to the question in the claim form concerning discrimination by DOC and its staff, Claimant stated, in part, as follows:

> I live in a cell that is not handicapped accessible. I have a great deal of trouble getting in and out of bed and the handicap shower is far from my cell and barely large enough for a wheel chair. I have to travel across the compound to take a bath twice a week which is most hazardous in the winter and fall months. I find it very dangerous to maneuver my chair on the only ramp to visit.

> I have fallen out of my chair on many occasions try to transfer from my wheel chair to my shower chair. I have been dumped out of my while traveling to visits because the handicapped elevator does not work and I must traverse a steep obstacle type ramp.

In his testimony at the hearing, Claimant stated that he became a paraplegic in 1983. He has been in a wheelchair since that date and was in a wheelchair when he was committed to DOC custody. He testified further that his physical condition has required him to have a catheter and colostomy bag, as he has no control over bladder and bowel movements.

Claimant testified that he has been thrown out of classes because of the odor that exists due to his colostomy bag. He stated further that his clothes do not fit him. He believes that he is being denied parole because of his inability to finish classes.

While briefly at FCF, he was threatened by other inmates. The cells at FCF were not fully accessible for individuals in a wheelchair. The same situation was present at CTCF, and he was

required to go to the infirmary to take a shower.

Claimant stated further that it was impossible to use the lift elevator at CTCF for visitation. This elevator was outside of the building and was installed to allow individuals in wheelchairs to go between floors without having to use a ramp. Claimant testified that he was dumped out of his wheelchair on one occasion in 2002 when his assigned pusher did not take care in going down the ramp. Claimant further stated that it was necessary to get a staff member to operate the elevator, and that the staff member had to get a key. Claimant was often told that the key was lost. As a result, Claimant and others gave up trying to use the elevator.

Claimant testified that he had experienced problems after his transfer to FLCF in trying to empty and clean his colostomy bags. In early 2006 he was flipped out of his wheelchair while on a day trip because transportation staff forgot to properly belt him.

Defendants presented the affidavit of Dr. Neufeld which also contained several pages of medical records of Claimant. Defendants also presented the testimony of Sergeant Ullman and Captain Pierce. Sergeant Ullman testified that he worked at CTCF and knew Claimant when he was at that facility. Ullman testified that Claimant had two aides assigned to him during the day and two for the swing shift. The shower at CTCF was approximately fifty feet away from Claimant's cell. He also indicated that Claimant sometimes had refused to shower. Claimant did get bed sores and other physical problems related to his condition.

Captain Pierce has been at CTCF for twenty-five months. He does not know Claimant, as Claimant was transferred before he was assigned as the maintenance captain at CTCF. He testified that he was responsible for maintenance at CTCF and noted that the lift elevator was installed in 2002. It was installed to allow transfer of inmates in wheelchairs and was outside of the building. The procedure for use was to request a staff member to get the key and then the staff member would run the elevator. No repairs had ever been ordered on the elevator. Captain Pierce testified that he had never observed the elevator being used by an inmate. He acknowledged on cross-examination that the outside ramp to visiting could be hazardous.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

Claimant must show that on or before August 27, 2003 he had a mobility impairment that affected major life activities. Claimant must show further that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act that occurred on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** The only box checked on the claim form was for mobility impairment. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility

5

impairment that substantially limits walking...."

Claimant came into DOC as a paraplegic. He always has been in a wheelchair while in DOC custody. Claimant is mobility impaired because he is in a wheelchair and has a lower extremity condition that precludes walking.

The Special Master would note that Claimant presented testimony concerning problems with his colostomy bag and catheter. The lack of control over bladder and bowel movements may form the basis for an action under the ADA and Rehabilitation Act, but such conditions are not part of the Settlement Agreement. The Special Masters are bound by the limits of the Settlement Agreement. No action will be taken on the issues related to the colostomy bag and catheter. These may form the basis for a separate action, but cannot be pursued under the claim process established by the Settlement Agreement.

There is no question that Claimant is permanently in a wheelchair. He is a member of the class as mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The answer to this question is generally no, but there are two exceptions. As mentioned previously, no action can or will be taken on the issues relating to the colostomy bag and catheter.

Claimant has proven his case as to two issues. First, Claimant testified that he was not able to use the outside lift elevator to go to the visiting room. The result was the use of a ramp that was hazardous. He was dumped out of his wheelchair on one trip down the ramp and was fearful on other trips to the visiting room.

The evidence reflects that the lift elevator was installed at CTCF in 2002 in order to safely transport wheelchair bound inmates to the visiting room. It was installed because the ramp was hazardous, especially in inclement weather. The procedure required an inmate or pusher to secure the help of a staff member. That staff member would have to go to the control room and get the key and then return to operate the elevator. What transpired after its installation was a frequent comment from staff that the key had been misplaced. Captain Pierce testified that the elevator was never unusable because of needed repairs. He acknowledged that the key had to be secured through a staff member. Captain Pierce stated that he had never seen the elevator used in twenty-five months. What is puzzling is why he never followed up to determine why it wasn't used. The evidence establishes that staff made the process of using the elevator so onerous and time consuming that inmates and pushers simply gave up. CTCF is a facility with several wheelchair bound inmates, and the lift elevator was installed for a reason. Claimant has established that he was denied use of the elevator

by actions of CTCF in making the process so onerous that inmates would take their chances on the ramp.

Second, Claimant was not properly secured in his wheelchair when he went on a day trip in Spring 2006. As a result, he was flipped out of his wheelchair and suffered some bruising. As Claimant noted, he is not in a position due to his physical condition to belt himself in. A mobility disabled inmate is entitled to the same safety considerations that a non-handicapped inmate would have through that inmate's own actions of putting on a seat belt.

The Special Master finds discrimination did occur over the last few years as noted. To the extent that Claimant has raised other issues, the Special Master determines that insufficient evidence has been presented to establish those issues. As to any issues related to the colostomy bag and catheter, those will need to be pursued in a separate action.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant was placed in danger and suffered as a result because of the lack of opportunity to use the lift elevator. He suffered injuries and psychological trauma as the result of falling out of his wheelchair when he was not properly belted in. Claimant will be compensated for his damages in the amount of $500.00.

IT IS HEREBY ORDERED that the claim of is granted, in part, and Claimant Joseph H. Olmedo is entitled the sum of $500.00 as damages; and

IT IS FURTHER NOTED that the remainder of the claim is denied, as Claimant he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before July 23, 2007.**

SIGNED this 7th day of May, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

———————————————————
Richard M. Borchers
Special Master