IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-288
Category III
Claimant: William Esch, #56009
Address of Claimant: CCCF, 6564 State Highway 96, Olney Springs, CO 81062

_____

## FINAL ORDER OF SPECIAL MASTER
_____

THIS MATTER came before the Special Master for hearing on May 4, 2007. This hearing was held at the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. Present were the following: William Esch (Claimant); and Rob Huss, attorney for Defendants.

Testimony was received from Claimant. Defendants' Exhibits A through G were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

>   B. QUALIFIED INMATE
>   Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>   C. PERMANENT DISABILITY/IMPAIRMENT
>   A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

>   2. Permanent Hearing Impairments
>   Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
>   3. Permanent Vision Impairment
>   Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
>   4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
>   Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>   2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>   >   1. Is the claimant a disabled individual who is a member of the class?
>   >   2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>   >   3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>   >   4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

3

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody in February, 1987. He was placed at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. He remained at CTCF until 1996. He then was placed in a private facility in Texas. Claimant returned to Colorado in July, 1997 and was at the Bent County Correctional Facility (BCCF) in Las Animas, Colorado.

Claimant remained at BCCF until 2000 when he was transferred back to CTCF. He was at that facility to be near his wife who was dying from cancer. After her death, Claimant returned to BCCF on April 10, 2000. He remained at BCCF until August 18, 2006 when he was transferred to the Crowley County Correctional Facility (CCCF) in Olney Springs, Colorado.

In his initial claim form, Claimant checked only the box for diabetes. Claimant stated, in part, in his claim form:

> As a diabetic, I have to maintain a regimented life style. To maintain my blood sugar levels, I have to rise everyday at 5:45 a.m. so I can be in the medical dept. by the 6:10 a.m. count to test myself. I test again at 11:30 a.m. and 4:30 p.m. I have become a slave to the daily regiment of test, eat, test, eat, test, con't. If I break the regimentation, I will feel sickly and depressed. I am slowly losing the feeling in my feet and legs. My eyesight is getting worse. Small cuts and bruises are very slow to heal. BCCF makes no consideration as to cell mates for diabetics. Many cell mates create stressful situations that will increase my blood sugar levels. The higher blood sugar will harm internal organs.

In response to the question in the initial claim form concerning discrimination by DOC and its staff, Claimant stated as follows:

> A blood test taken in April 2000 showed that I was diabetic. However, my treatment for diabetes did not start until August 2002. I was allowed to keep my medication in my cell and turn in slips for renewal. On numerous occasions the medical unit does not have the replacement med cards as required. I have gone without medication for several days at a time. The canteen services does not provide dry foods for diabetics to purchase that are diabetic specific. They won't provide shoes for diabetics, as well as mattresses or other diabetic standard comforts.

At the hearing, Claimant testified that he believed that he was diagnosed as having diabetes in April, 2000. He was not placed on any medication at that time, as he also had gout and there was concern about getting that condition under control. On March 5, 2002, Claimant began receiving medication. He was given Glucophage at that time. He was placed also on a 2,400 calorie diet. He received increased dosages of the medicine as time went on. Claimant testified that often he was unable to get renewals of his medicine on four or five occasions because BCCF was out of the

medicine. He would have to wait several days to get additional medication. On one occasion, Claimant had to contact his parents who then contacted DOC medical staff at the headquarters in Colorado Springs, Colorado.

Claimant testified further than few canteen items are appropriate for diabetics. Non-diabetics are able to purchase dried foods that can be consumed in the cell. Noodles are an example of such foods, but the dried foods are not appropriate for those inmates with diabetes.

Claimant also testified that BCCF provide no training for diabetics. He had to learn from other inmates who were diabetic or obtain information on his own. Claimant stated that much of his adjustment to the medicine and diet was trial and error. Claimant also had great concern about the food provided for his snack when he was placed on the diabetic diet.

During the hearing Claimant indicated that he was having some vision problems. He believed the problems to be related to his diabetes. He vision will fade at times. There also is sudden blurriness which it probably when blood/sugar levels are out of control. Claimant asked for and received permission to add vision as part of his claim.

On cross-examination Claimant was asked what acts of discrimination occurred toward him. He related that he had not received an appropriate diet and proper medication. He stated that there were too many fried foods.

Claimant on rebuttal testified that there were few appropriate items for diabetics on the canteen list. He stated that he eats only about one-third of the meals prepared by DOC.

In lieu of live testimony, Defendants submitted the affidavit of Dr. Orville Neufeld, D.O. That affidavit contains a number of documents from Claimant's medical records. Defendants also submitted other documents in support of their position.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** Each disability must be examined separately.

**Diabetes**: According to Dr. Neufeld's affidavit, Claimant was diagnosed with diabetes in 2002. The Special Master finds that Claimant was diabetic before August 27, 2003 and is a member of the class as diabetic.

**Vision**: Claimant's testimony indicates that his vision problems are all of recent vintage. None of the vision issues were present when Claimant submitted his claim in June, 2004. The Settlement Agreement was approved on August 27, 2003. A claimant had to have been in DOC

custody on or before that date and had to have the conditions noted in the Settlement Agreement on that date. Claimant was diabetic on August 27, 2003 but he did not have vision problems. He may pursue a separate lawsuit concerning his vision problems but may not pursue those in the claim process.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** With two exceptions, the answer to this question is no. There was no evidence of general disparate treatment due to diabetes from 2000 to the present time.

Claimant has received medical care while in DOC custody. He has expressed concern about that medical care. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability.  A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning the quality of his medical care.

Claimant has established two points that are no disputed by Defendants. First, Claimant has established that diabetic inmates have few choices on the canteen list. Dried foods are available, but are not healthy for diabetics. Why such foods are also not available for diabetics is not clear. Claimant has established that diabetics, including himself, do not have similar options to those who are not afflicted with diabetes. The ADA and Rehabilitation Act provide for equal treatment and opportunities, and the canteen list at BCCF and CCCF do not provide equal items for diabetics.

The second point is the BCCF ran out of medicine for Claimant. A diabetic inmate does not have the option of going to a pharmacy and obtaining refills. It is unconscionable that any diabetic inmate would be faced with the prospect of no available medicine to insure his or her health. The evidence reflects that Claimant had to seek the intervention of his parents to obtain medicine. The ADA and Rehabilitation Act are violated when a diabetic inmate is left without medicine which is essential for his health, while a non-diabetic need not worry about receiving medicine. Claimant has proven that he was the victim of prohibited discrimination because BCCF had no medicine for him and took its time in getting the appropriate refills of his medicine.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant has established that he was the victim of discriminatory acts while at BCCF. He testified that he had concern and fear for his health as the result of the lack of medicine. In addition, he wanted the same opportunities to purchase items from the canteen, but only if those items were safe for a diabetic. Claimant is awarded $500.00 as damages.

IT IS HEREBY ORDERED that the claim of William Esch has been proven as noted, and Claimant is entitled to damages in the amount of $500.00; and

IT IS FURTHER ORDERED that the remainder of the claim is dismissed, as Claimant has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before July 30, 2007.**

SIGNED this 14th day of May, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

Richard M. Borchers
Special Master