IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-–870 (OES) (Consolidated for all purposes with Civil Action No.96-–343)

JESSE MONTEZ, et al.

 Plaintiffs,

-vs.-

BILL OWENS, et al.

 Defendants.

---

Claim Number 03-367
Category III
Claimant: Ricardo Campos, #69836
Address of Claimant: 4160 Behrens Road, Byers, CO 80103

---

## FINAL ORDER OF SPECIAL MASTER

---

 THIS MATTER came before the Special Master for hearing on February 23, 2007. The hearing was held in the Dominion Plaza Building in Denver, Colorado. Present were the following: Claimant Ricardo Campos (Claimant) and Berina Ibrisagic, attorney for Defendants.

 Claimant testified in his own behalf. Defendants submitted Exhibits A and B. The Special Master indicated that all documents previously submitted would be accepted and considered in resolving this claim.

 Claimant requested time to submit additional documents in support of his claim. He was granted up and including April 9, 2007 in which to submit additional documents. Claimant misunderstood the order of the Special Master and believed that a further hearing was to be held. Claimant was granted additional time in which to submit further documents, and he has submitted a document entitled "Motion to Proceed." Further argument will be waived.

### I.

 This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections. The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge

Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they may exercise only the jurisdiction agreed upon by the parties.

>    B. QUALIFIED INMATE
>    Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>    C. PERMANENT DISABILITY/IMPAIRMENT
>    A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

>    The Settlement Agreement further provides, in part, as follows:
>
>    2. Permanent Hearing Impairments
>    Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
>    3. Permanent Vision Impairment
>    Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
>    4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
>    Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>    2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>       1. Is the claimant a disabled individual who is a member of the class?
>       2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>       3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>       4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

3

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant first came into DOC custody on April 30, 1993. He was processed through the Denver Reception and Diagnostic Center (DRDC). He was placed in various facilities before being discharged on December 16, 1993.

Claimant returned to DOC custody on a new sentence on December 13, 1996. He was placed at DRDC and then transferred to the Skyline Correctional Center (SCC) in Canon City, Colorado. He then was transferred to the Buena Vista Correctional Facility (BVCF) in Buena Vista, Colorado on February 27, 1997. Claimant went into a community placement in late April, 1997. He discharged that sentence on April 10, 1999.

On August 17, 2001, Claimant returned to DOC custody. He again went to DRDC and then was placed at the Crowley County Correctional Facility (CCCF) in Olney Springs, Colorado. Claimant later was placed at the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. He was placed on parole on July 5, 2005 and has now discharged his sentence. He is living in Byers, Colorado with his children.

In the initial claim form, Claimant checked the box for mobility impaired. Claimant stated, in part, as follows in his initial claim form.

> I damaged my right knee 20 years ago in high school. The Doctor then, said "you can have it fixed now, or later." Because they denied a "bottom bunk" restriction to me here at AVCF. The top bunk has damaged my knee further. From climbing up and down the ladder and having to cross my legs more. The pain is worsening. The lower part of my femur and the upper part of my tibia/fibula have, almost, an unbearable ache. The ligaments on the inside of, and back of the knee are right. The rear swollen and it feels like the side ones are "running" like panty hose.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

> At Buena Vista - they gave me a bottom bunk restriction and cortisone shots. This alleviated the pain. Now, with no appropriate care, at AVCF, I have the same pains I had, yet doubled. Also now I have serious grinding sound in my knee. One PA here told me to exercise my leg for a weak quadriceps knee connection. I did his exercises which brought on this excruciating aching. My meniscus was crushed 20 years ago. Shouldn't the pieces be taken out.

Claimant was sent supplemental forms to complete and return. In his supplemental form on mobility impairment, Claimant stated, in part, as follows:

>  Because of the new pain in my knee joint, I am unable to walk without a limp. I am in constant pain. When I lie down the bottom half of my leg "goes that way." I have no stability at all.

In response to a question concerning accommodations, Claimant stated as follows:

>  Upon arrival at AVCF (here) I was denied a bottom bunk restriction. I've paid for numerous appointments all of which had no positive outcome. I have been denied adequate medical care even after a Step III Grievance. I am now waiting for a Step III Grievance answer.

At the hearing, Claimant testified that has had problems for years with pain in his knee. His knee caused him sufficient problems that he did received bottom bunk restrictions and received further a medical cell while at CCCF. At BCCF he had a bottom bunk restriction and received cortisone shots. It was only when he arrived at AVCF on August 9, 2004 that he had his bottom bunk restriction taken from him.

Claimant testified that his knee started to grind after arriving at AVCF. He received ibuprofen only for pain. He asked for a cane, but did not receive one. He was able to obtain a knee brace. It was painful to walk to the medical line to receive his prescribed drugs.

Claimant testified that he is a mason by trade. He has returned to that work, but was injured in January, 2007. He had an MRI done of his knee, and there are arthritic changes. There is no meniscus left in the knee. He now takes Ultram and Vicoden to handle the pain.

On cross-examination, Claimant indicated that his left knee has now started to bother him. He had received various accommodations at certain DOC facilities. He lost his bottom bunk restriction at AVCF. He testified that he needed surgery on his knee.

Claimant submitted medical records from treatment he has recently received. Dr. Mark S. Failinger, M.D. saw Claimant on February 14, 2007. Dr. Failinger is an orthopedic specialist. His report states, in part, as follows:

>  Rick comes in with the MRI and there is no major ligamentous damage or meniscal damage. Minimal sprain of the medial collateral ligament. There is no meniscal tear. There is no cruciate ligament tear. There is no significant increased fluid. There is some chondromalacia of the patella which is expected.
>  Rick tells me that he had a cortisone injection a couple of years ago in Buena Vista and it really helped his pain. So, it sure sounds like he has had an ongoing bout with chondromalacia.
>  .....
>  I told Rick that the option at this point are limited and I would recommend therapy and time. I think the odds of an arthroscopy helping are about 50% at best......

5

Claimant also submitted a copy of the MRI report which confirms Dr. Failinger's thoughts.

Defendants submitted the affidavit of Dr. Neufeld. Attached to that affidavit are copies of medical records of Claimant. The first is a diagnostic report from Dr. Fleming reflecting that no significant abnormality was found as the result of an examination on December 31, 2002. Other documents reflect that medical examinations were conducted of the knees on various dates.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Claimant must establish that he was disabled on or before August 27, 2003. He must establish further that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** The Special Master has reviewed the testimony of Claimant and medical records submitted by both sides. There is a difference of opinion in this case as to whether there is a reason for the pain that Claimant is experiencing. The medical documents submitted by Claimant reflect a strain in his knee, but no tear to the medial collateral ligament. There is chondromalacia present. Dr. Failinger's report does not indicate major knee damage.

The Special Master will give the benefit of any doubt to Claimant. The Special Master finds that Claimant is mobility impaired under the Settlement Agreement.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** No evidence has been presented that Claimant was unqualified for programs and services due to disciplinary or other problems.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** In order to prevail on his claim, Claimant must show that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003. Claimant has not met his burden of proof as to this question.

In order to establish a violation of the ADA and Rehabilitation Act, a claimant must show that he was treated differently from a non-handicapped individual. In this case, there was and is a difference of medical opinion as to what has been or is appropriate treatment for the knee. There is no evidence that Claimant received treatment that was different solely because of his mobility impairment. Though he had his bottom bunk restriction revoked, that has not been shown to have been the result of a discriminatory act.

Claimant's main argument is that he has received inadequate medical treatment. There is no question that he received some care while in DOC custody. He has continued to receive care in the civilian community since his discharge. Claimant does not believe that he received appropriate care while in DOC custody. The United States Court of Appeals for the Tenth Circuit has held that the

ADA and Rehabilitation Act are not available to litigate claims of medical negligence or malpractice. *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005). To the extent that Claimant is alleging inadequate or improper medical care, he must pursue a separate action under the Eighth Amendment. The Special Masters are precluded from examining the quality of care provided by DOC staff to a claimant.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Ricardo Campos is dismissed, as Claimant has failed to prove each that he was the victim of discriminatory conduct prohibited by the ADA and Rehabilitation Act; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before July 30, 2007.**

SIGNED this 14th day of May, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

———————————————————————
Richard M. Borchers
Special Master