IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

_____

Claim Number 03-276
Category III
Claimant: Michael K. Tivis, #52378
Address of Claimant: AVCF, P.O. Box 1000, Crowley, CO 81034-1000

_____

# FINAL ORDER OF SPECIAL MASTER
_____

    THIS MATTER came before the Special Master for hearing on May 3, 2007. This hearing was held at the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. Present were the following: Michael K. Tivis (Claimant); and Rob Huss, attorney for Defendants.

    Testimony was received from Claimant. Defendants' Exhibits A through D were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

    After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

## I.

    This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>     A. COVERED DISABILITIES
>     The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

3

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody in 1998. He was placed initially at the Denver Reception and Diagnostic Center (DRDC). He then was transferred to AVCF.

In his initial claim form, Claimant checked the box for mobility impairment. Claimant stated, in part, in his claim form:

> In 1999-2000 I was having problems walking and running. After I was examined I was told I have degenerate joint disease (DJD). And that my hips would have to be replaced. Since then I walk with a cane and must limit my activities.

In response to the question in the claim form concerning discrimination by DOC and its staff, Claimant stated, in part, as follows:

> The Colorado Department of Corrections tells me I am only 43 years old. I am much too young for this operation even though it is a much needed one. Age should never be used as an excuse to avoid giving a person something needed to help a person live and enjoy a normal life. The doctor ordered soft sole shoes for me to walk in but DOC refused to give them to me. I was told to buy my own.
>
> Because DOC refuses to replace my hips, I am forced to take a variety of pain meds. These meds have affected my heart and now I'm taking nitroglycerin. I believe if the Colorado Department of Corrections would have given me the operation I wouldn't have spent the last 4 years on pain medications. That has done more harm than good.

Claimant was sent a supplemental form to complete and return. In his supplemental form, Claimant stated, in part, as follows:

> I used to weld here at AVCF but when I asked about getting medication for the pain in hips and lower back, P.A. Singh took my job. He explained if he gave me medication for pain I couldn't work.

Claimant also submitted some of his medical records. Those records do reflect that Claimant has Degenerative Joint Disease (DJD). One entry from November, 2003 reflects that Dr. Patterson, the orthopedic surgeon, wanted to wait on surgery. Claimant was receiving pain medications, including percocet, for his pain. Another entry in October, 2003 reflects that the DJD of the left hip is severe. An entry in 2004 reflects that medical staff at AVCF believe Claimant was too young for surgery.

In his testimony at the hearing, Claimant stated that he was playing basketball in 1999 when he became tired and sat down. He could not get back up. He had to be pulled up. He then went to

4

medical. He was in significant pain. He was referred to Dr. Patterson, an orthopedic surgeon who often provides care for DOC inmates. Dr. Patterson took x-rays and indicated that Claimant had DJD. He further stated to Claimant that he would have surgery at some point in his life to fix the hips. Dr. Patterson authorized a cane for Claimant.

Claimant testified further that he has been requesting surgery for the last six or seven years. Hip replacement surgery has been recommended by Dr. Go and Dr. Eckestrand. Claimant has been enduring extreme pain and had been required at times to buy his own Motrin for pain. Claimant can no longer receive a narcotic for his pain. He indicated that there is discrimination in not being able to get Motrin without charge.

Claimant stated that the DJD really has affected his mobility. He has days when he cannot walk well and is in severe pain. He has not been advised of any alternative to surgery. Claimant stated further than he has been advised by the specialists that his pain will require something more than Motrin. Claimant indicated that he would like to feel better and be able to able to move better, preferably without a cane. Claimant stated that he was aware that a hip replacement would only last a few years, and then there would have to be another replacement.

When asked about treatment, Claimant testified that he has received cortisone shots. They provide only temporary relief. He believed that the only remedy is a total hip replacement. Otherwise, he will continue to endure extreme pain. He believed that he was being tortured due to his on-going pain.

On cross-examination, Claimant testified that his main concern was that he was being denied medical treatment. He acknowledged Dr. Patterson thought he was too young for hip replacement surgery. He stated that he had received one Lidocaine injection. It has provided only temporary relief. In response to a question about employment, Claimant testified that he is doing a CAD job at the present time. He has been a welder in the past. He has not been able to exercise. He is presently forty-seven years old.

In rebuttal, Claimant testified that he did not think it was appropriate to deny medical treatment. Claimant has had to shower with his cane. Claimant did have a hernia that required repair. His present condition does not allow him to stand in line. Claimant stated that he would have received surgery if he had been out of custody and on the streets.

Defendants submitted the affidavit of Dr. Orville Neufeld, Ph.D., D.O. Attached to that affidavit were several pages of Claimant's medical files. Dr, Neufeld stated in his affidavit that joint replacement surgery is normally not done on someone who is in their mid to late 40's.

## III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

Claimant must show that on or before August 27, 2003 he had a mobility impairment that affected major life activities. Claimant must show further that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act that occurred on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** The only box checked on the claim form was for mobility impairment. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." Claimant did not use a wheelchair at any time prior to August 27, 2003, nor has he since used a wheelchair.

There is no question that Claimant has DJD. It has caused Claimant severe pain in his hips and back. Claimant testified that his ability to walk had been affected. Claimant will be given the benefit of the doubt and will be determined to be mobility impaired. He is part of the class as mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The answer to this question is generally no, but there are two exceptions. Claimant throughout his pleadings and throughout his testimony raised issues concerning the quality of medical care that he has received in DOC. He wants hip replacement surgery to hopefully eliminate or alleviate the pain he has been experiencing. He also wants better quality medicines.

Claimant has received medical care while in DOC custody. He has expressed concern about that medical care. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning the quality of his medical care.

Claimant states with sincerity that he is in extreme pain and simply wants to feel better. The problem is that there is a legitimate disagreement as to when the hip replacement surgery should take

place. Several medical providers believe the surgery should take place as far down the road as possible, since artificial hips last only ten to twelve years. There has been no showing that this medical disagreement is discriminatory. Under *Fitzgerald*, the Special Master does not have the jurisdiction to evaluate the quality of medical care being received by Claimant.

Claimant has pointed to two issues that appear discriminatory. First, Dr. Patterson recommended several years ago that Claimant receive soft soled shoes. Claimant was told to purchase these from the canteen at his own expense. Review of Claimant's medical records reflect that he is in pain. Despite a couple of entries that appear almost gratuitous, the overwhelming number of entries reflect that Claimant has a very real problem that will lead to surgery at some point. The soft soled shoes reflect one way of trying to alleviate the pain Claimant is suffering. Despite the medical need for these shoes, Claimant has been directed to buy them himself. As this Special Master has held previously, the discrimination that exists is that Claimant is required to use his own limited funds to secure something that a qualified specialist has deemed appropriate. An inmate without DJD may voluntarily buy such shoes, but only as a matter of personal choice. Claimant needs them in order to feel somewhat better. That is especially true since the replacement surgery is not on the horizon and cannot be ordered by the Special Master.

Second, Claimant has had to purchase some Motrin on his own from the canteen. Review of Claimant's medical records reflect instances when Claimant was provided various pain medications at state expense, including Motrin. In a couple of other instances, he has been required to buy his Motrin. It is difficult to fathom how DOC can determine on some instances when to pay for the pain medications and on other occasions not to do so. Claimant is entitled to Motrin without charge, as he clearly is in pain.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant has endured additional pain that would have been alleviate with soft soled shoes. He has experienced financial costs for Motrin. Claimant is entitled to damages of $180.00.

IT IS HEREBY ORDERED that the claim of Michael K. Tivis is granted, in part, and he is awarded damages in the amount of $180.00; and

IT IS FURTHER ORDERED that the remainder of the claim of Michael K. Tivis is denied for the reasons noted;  and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before July 30, 2007.**

SIGNED this 16th day of May, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master