IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-223
Category III
Claimant: Rocky York, #108025
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

      THIS MATTER came before the Special Master for hearing on January 12, 2007 and May 10, 2007. This hearing was held at the Ft. Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present at the hearing on January 12, 2007 were the following: Rocky York (Claimant); and Berina Ibrisagic, attorney for Defendants. At the hearing on May 10, 2007, Claimant was present along with Rob Huss, attorney for Defendants.

      Testimony was received from Claimant and Dr. Cabiling. Claimant offered Exhibit #1, and that was admitted. Defendants' Exhibits A through J were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

      After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

      This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for

Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility,

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

>hearing, and vision impairments and inmates with diabetes.
>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

>The Settlement Agreement further provides, in part, as follows:
>
>2. Permanent Hearing Impairments
>Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
>3. Permanent Vision Impairment
>Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
>4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
>Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>   1. Is the claimant a disabled individual who is a member of the class?
>   2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>   3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>   4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody in January, 1999. He was placed initially at the Denver Reception and Diagnostic Center (DRDC). He then was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado. He was at FCF for just a little over one year. He then was transferred to FLCF. He has remained at FLCF up to this point in time.

In his initial claim form, Claimant checked the box for mobility impairment. Claimant stated, in part, in his claim form:

> I have an artificial hip and narrowing of the spine, arthritis and spurs. It affects my life by constant pain and my right leg goes numb when I stand very long. I have asked for help and possibly an operation to help me get better but the medical staff won't even actually tell me what all is wrong. I asked for a CAT scan to see what the problem was and they refused it by saying they couldn't afford it and it was just going to get worse anyway.

In response to the question in the claim form concerning discrimination by DOC and its staff, Claimant stated, in part, as follows:

> I believe I have been discriminated against by the DOC medical department as they are showing a disregard for my medical problems and will not even find out the real cause of my suffering and will not supply enough medication to ease the constant pain.

> I am in constant pain and suffer. I was minimum security custody and they sent me to Fort Lyon claiming that this was a medical facility. This is the furtherest (sic) from a medical facility of any facility within the DOC. I was given better medical care at the Fremont Correctional Facility which is a level III facility than I am getting at this facility. This place nice living quarters but the medical is a joke.

Claimant was sent a supplemental form to complete and return. In his supplemental form, Claimant stated, in part, as follows:

> I had a hip replacement combined with back problems which causes constant pain. The injury suffered also affects my neck which brings about constant headaches due to pinched nerve. I cannot stand over 5 minutes without my Right Leg going numb. I complained to medical about these problems. I have muscle spasms after I'm up about two hours.

Claimant stated further:

> I am unable to do anything except lay in bed. I can't work, I can't exercise, I can't go places to programs like other inmates. I actually miss lots of meals because its too much pain and hurt to go to chow.
>
> I have asked medical for help with this and they did have an x-ray taken and they said it ain't that bad. I asked for a complete examination with a CT scan and they refused. I need something besides drugs to help get rid of this pain.
>
> I fell in the shower and tore the ligament in my knee because there is no proper handicapped rails in the showers. I am still barely able to walk now which compounded my other problems.

Claimant has submitted numerous documents in support of his claim. In response to his request for accommodation, Claimant received on December 7, 2004 an evaluation by Dr. Beecroft who checked the box for mobility impairment. The accommodation resolution issued on January 10, 2005 did not find Claimant to be mobility impaired. Claimant further submitted copies of other medical records, including a physical examination on entry into DOC. In his physical examination, he was rated as M4 and provided restrictions that included no top bunk and no squatting.

Claimant did submit a medical record that indicated that he was seen by medical staff on June 12, 2004 for a fall in the shower. The medical provider indicated that swelling was noted in the knee and wrist. He was prescribed ice for forty-eight hours. Claimant's medical records reflect a twisted knee on July 21, 2004. Claimant had tried to walk but fell.

On September 27, 2004, Claimant was seen by medical at FLCF. Claimant was noted to have a cane. An x-ray reflected some spurring and disc space narrowing. A radiologist report from September 12, 2003 reflected that Claimant had degenerative disc disease (DDD). A February 14, 2001 report reflects that Claimant had DDD throughout most of his spine.

This claim was originally assigned to Category II. Defendants filed a response to the claim on February 6, 2006. Attached to the response were a number of Claimant's medical records. Dr. Jacob Patterson, M.D., an orthopedic surgeon in Pueblo, examined Claimant on May 16, 2001. Dr. Patterson stated, in part, as follows:

> Examination: Shows he uses a cane. He walks with a slight limp. Examination of his hip shows he has a range of motion which is full bilaterally, leg length is equal. Good circulation. Normal motor and sensory function. Some diffuse spinal tenderness and loss of motion in the head and neck. No long track signs, muscle or sensory findings noted.
> Review of x-rays of the spine are available and appear unremarkable. I have ordered some T-spine films and x-rays of his hip show his hip replacement is in good position. No evidence of loosening or problems and no signs of arthritis on the right.
> Impression: Doing well with regard to the hips. Follow-up prn. I have ordered

      some T spine x-rays on his back.

A progress assessment summary issued on August 5, 2002 reflected that Claimant had significant restrictions, including no vigorous exercise, no intensive labor, lower bunk, and first tier.

      On October 30, 2002, Claimant was brought to medical after he was found lying on the ground. He had fallen in the yard. On November 4, 2002, Claimant returned to medical. His left knee was swollen and discolored. On November 25, 2002, he has his restrictions renewed that included first tier, cane, and lower bunk. On June 14, 2004, he was seen at medical and had a swollen knee that was discolored. Claimant later slipped and fell again in a shower on March 21, 2006. He suffered a left humeral head fracture and left distal femur fracture at the knee.

      At the hearing, Claimant testified that he received an artificial hip in 1992. He had continued to experience problems with his hip and had lower back pain. He also had problems with his knees. He had used a wheelchair after his fall which led to the fracture of his femur. He has fallen on occasions and does not trust his knees any more.

      Claimant testified that he has had mobility problems since he arrived at DOC. He has had to be careful in winter because of his concern about falling. Standing in line is difficult and he cannot walk long distances. He has never been employed while in DOC custody. He has had significant restrictions over the years. He has been able to take classes, but he noted that he has a learning disability. He has had shoulder surgery and has to do exercises for his shoulder. Claimant also testified that when he stands for any length of time that his leg and knee go numb.

      At the hearing, both Claimant and Defendants offered additional documents into evidence. Claimant present an accommodation screening that had been done by Dr. Cabiling on September 19, 2006 and reflected that professional did not believe that Claimant had a disability. On a staff observation form, there was a note that Claimant did not climb stairs and was using a wheelchair and cane. The form also reflected that Claimant had problems walking. The form also noted that Claimant could not walk more than one hundred yards or climb a flight of stairs without stopping.

      At the previous hearing, the testimony of Dr. Cabiling had been received. He testified that he had examined Claimant on two occasions for an accommodation evaluation. The second time was on September 19, 2006. This was after the fall in the shower. He believed Claimant did not meet the criteria and that walking would be helpful to his leg as it continued to mend.

      Defendants submitted an affidavit from Dr. Neufeld. Attached to that affidavit were several pages of Claimant's medical records. Defendants acknowledge that Claimant had a total hip replacement in 1992. They further acknowledge that he has had significant restrictions over the years, including lower bunk, first tier, no bending, no vigorous exercise, no intensive labor, and no prolonged standing. He was issued a cane in March, 2001.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

Claimant must show that on or before August 27, 2003 he had a mobility impairment that affected major life activities. Claimant must show further that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act that occurred on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** The only box checked on the claim form was for mobility impairment. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

Claimant has had a full hip replacement. He has had in place significant restrictions since he came into DOC custody. He has been issued a cane for the entire time he has been in DOC custody and has used a wheelchair part of that time. The evidence is conflicting, but the Special Master determines that Claimant cannot walk one hundred yards or climb a flight of stairs without stopping. He is mobility impaired as defined by the Settlement Agreement. Claimant is part of the class as mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant in his initial claim form stated that he had been the victim of discrimination by DOC and its staff because they had not provided proper medical treatment and would not allow him sufficient medication to ease his constant pain. In his supplemental form, Claimant stated that he wanted a CT scan and proper care.

Claimant has received medical care while in DOC custody. He has expressed concern about that medical care. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning the quality of his medical care.

Claimant did mention in his documents a fall that occurred in a shower that lacked handrails. Based upon a review of all documents submitted and the evidence presented, that fall occurred in 2004, after the approval of the Settlement Agreement by Judge Nottingham.

Under the Settlement Agreement, Claimant carries the burden to show that he was mobility impaired on or before August 27, 2003. He further carries the burden to show that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003. Under the *Fitzgerald* decision, Claimant may not pursue his claim on the basis of substandard medical care. Rather, Claimant must show that there was disparate treatment based upon his mobility impairment. Claimant has not shown that he was the victim of discrimination on or before August 27, 2003. His complaints are about medical care, and the Special Masters lack jurisdiction to deal with that. The fall in the shower in 2004 would appear to have been actionable under the ADA, but that will have to be pursued under a separate action since it is after August 27, 2003.

This case is a difficult one. Claimant clearly has significant medical problems. The Special Master has found that he meets the definition of mobility impairment. There simply has been no evidence presented that has established any actionable discrimination on or before August 27, 2003. Under the Settlement Agreement, Claimant would have the right through his claim to raise issues, such as the falls in the showers, but only if he can establish a covered discriminatory act that occurred on or before August 27, 2003. In light of the *Fitzgerald* case, Claimant has not done that. Claimant does have the right to file a separate lawsuit concerning the quality of medical care under the Eighth Amendment or to file a separate lawsuit concerning any alleged discriminatory acts that occurred after August 27, 2003.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Rocky York is denied as he has failed to answer affirmatively all four questions set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before August 20, 2007.**

SIGNED this 29th day of May, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

Richard M. Borchers
Special Master

9