IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-404
Category III
Claimant: Marcus Fowler, #55461
Address of Claimant: HCCF, 304 Ray Sandoval Street, Walsenburg, CO 81089

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

      THIS MATTER came before the Special Master for hearing on June 1, 2007. This hearing was held at the Huerfano County Correctional Facility (HCCF) in Walsenburg, Colorado. Present were the following: Marcus Fowler (Claimant); and Rob Huss, attorney for Defendants.

      Testimony was received from Claimant and Dr. McClintock. Defendants' Exhibits A through J were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

      After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

      This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

>The Settlement Agreement further provides, in part, as follows:
>
>>2. Permanent Hearing Impairments
>>Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
>>3. Permanent Vision Impairment
>>Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
>>4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
>>Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>>1. Is the claimant a disabled individual who is a member of the class?
>>2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

3

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on September 30, 1986. He was placed at a number of different DOC facilities over the years. In 1995, Claimant was placed into a half-way house in Denver. He walked away from that facility and returned to DOC custody in 1996. He was placed into the Limon Correctional Facility (LCF) in Limon, Colorado in April, 1996. He remained at LCF until he was paroled in December, 1998.

Claimant had his parole revoked and was returned to DOC custody in July, 1999. Claimant was placed at the Buena Vista Correctional Facility (BVCF) in Buena Vista, Colorado in August, 1999. Claimant was granted parole again in June, 2000. Claimant returned from parole to DOC custody in January, 2001. He was processed at the Denver Reception and Diagnostic Center (DRDC) and then placed at the Four Mile Correctional Center (FMCC) at Canon City, Colorado in February, 2001. He was transferred to a community placement in July, 2001. Claimant discharged his sentence on December 15, 2001.

Claimant returned to DOC custody on a new sentence on December 16, 2003. After being processed at DRDC, he was transferred to HCCF. Claimant was placed on parole on March 15, 2006. Parole was revoked, and Claimant returned to DOC custody on July 13, 2006. After processing at DRDC, Claimant returned to HCCF.

In his initial claim form, Claimant checked the box for mobility impaired. Claimant stated, in part, in his claim form:

> 1) Severe spinal damage in C-3, C-4, C-5, C-6.
> 2) Swelling and numbness in arms, sharp pain in stemming from spinal injury.
> 3. Cannot hold objects in hands without dropping them.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated as follows:

> Continued procrastination for the need of surgery while injury is continually getting worse & affecting other issues of health.
>
> When the injury first occurred, it was just numbness in my right arm, then in my left arm, then swelling, then pain, then not being able to hold objects in my hands.

Claimant was sent a supplemental form to complete and return. Claimant completed and returned the supplemental form. He stated, in part, as follows:
> As will be shown by evidence, as to parts of the claimant's medical record,

that the claimant has a degenerative condition that has plagued him since 1998.

Claimant noted that he received an MRI in 2005 which reflected abnormal conditions in his spine. He attached to his supplemental form a copy of the 2005 MRI report from Dr. Ballenger. Claimant was diagnosed as having degenerative disk disease (DDD) and spinal stenosis. Claimant further noted that a 2003 MRI reflected the same findings concerning his spine.

Claimant submitted additional documents over the months leading up to the hearing. In November, 2005, Claimant sent a set of medical records that included a report from a cardiologist. Claimant was seen in Salida by a cardiologist who found some indications of heart disease. He also was experiencing knee pain.

This claim was originally assigned to Category II, and Defendants did file a response to the claim. Attached to the response were several pages of medical records of Claimant. One record was from January 25, 1990 and reflected that Claimant had an injury to his neck and back while playing basketball. He also began to experience pain in his left knee. Medical staff diagnosed the condition as a knee sprain. In 1994, an x-ray of the right ankle reflected some degenerative arthritis. Additional records reflected on-going ankle pain and problems with his left knee. An x-ray taken in January, 2000 indicated degenerative conditions in both knees. Claimant also began to be examined for heart disease. He was placed on certain restrictions to ease the stress on his knees, including lower bunk and no intensive labor.  In June, 2001, medical staff recommended two braces for his knees.

In 2004, medical staff examined Claimant and noted numbness in his hands. He was placed on several medications and received several restrictions. He was to avoid heavy lifting and strenuous labor, as well as being prohibited from going to the weight pile.

In his testimony at the hearing, Claimant stated that he received parole in 2000. He returned to DOC custody in January, 2001 and was placed in July, 2001 at a half-way house. He discharged his first sentence while at the half-way house. In response to a question from the Special Master, Claimant stated that he was making no claim as to any impairment that existed prior to his release to the half-way house in 2001.

When Claimant returned to DOC custody at DRDC in December, 2003, Claimant was experiencing numbness in his hands. While in county jail custody, Claimant was seen by a neurologist. It was recommended that he receive follow-up care.

Claimant testified that he was concerned about the medical care that he received when he arrived back in DOC custody. He received multiple MRI's, and all reflected that Claimant had DDD. Claimant believed that he should have seen a neurosurgeon earlier. His hands were numb and he had pain that was difficult to deal with. Claimant testified that he was not provided prescribed medication.

On cross-examination, Claimant testified that he has difficulty if he stands for too long a

period of time. He believed that he was the victim of discrimination because of the delay in treatment for his back and neck. He also believed that he had been discriminated against because he had been denied a job. He also stated that he wanted to see a neurosurgeon when he first arrived at HCCC, but that did not happen for some period of time.

Claimant called Dr. Kevin McClintock, M.D. as a witness. Dr. McClintock is the physician at HCCF and has provided care since Claimant arrived at the facility. Claimant had been referred to a neurosurgeon and has received surgery. Dr. McClintock testified that Claimant has significant DDD. Claimant has herniated disks and received a fusion in his cervical spine. Claimant has chronic pain in his back and legs.

In lieu of live testimony, Defendants submitted the affidavit of Dr. Orville Neufeld, Ph.D., D.O. That affidavit contains a number of documents from Claimant's medical records. The attached medical records reflect complaints of numbness and tingling in the hands from December, 2003 forward. MRI's were taken and reflected DDD. Claimant received surgery in August, 2005. This involved a fusion at C4-5 and C5-6. An x-ray in November, 2006 reflected that the fusion was holding.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to be a member of the class, a claimant must have had an impairment, as recognized by the Settlement Agreement, on or before August 27, 2003. It was on that date that the Settlement Agreement was approved by Judge Nottingham. In other words, absent a showing of an impairment on or before that date, a claimant may not pursue his claim.

In this case, Claimant was released from DOC custody in mid-2001 and discharged his sentence. He returned to DOC custody in December, 2003. When specifically asked by the Special Master at the hearing if a claim was being made for anything that had occurred on or before the release to the half-way house in 2001, Claimant stated no. Thus, there is no evidence of any mobility impairment existing on or before August 27, 2003.

Everything that occurred after Claimant's return on December 16, 2003 to DOC custody is not subject to the claim process. Claimant has the right to pursue a separate civil lawsuit in federal or state court, but he cannot pursue his claim. The Special Masters have only the jurisdiction provided by the Settlement Agreement, and that requires a showing that a claimant was disabled on or before August 27, 2003. Claimant's own testimony reflects that he was not.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any

disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?**
Assuming that Claimant had been disabled on or before August 27, 2003, the answer to this question is no. Claimant is upset with the delay that occurred in receiving medical care. Claimant testified that there was no valid reason for the delay in receiving surgery to his neck.

The evidence presented by both sides reflects that Claimant did receive medical care after he returned to DOC custody in December, 2003. Claimant questions the promptness and appropriateness of treatment. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

Claimant has the right to pursue a separate lawsuit concerning the quality of medical care that he has received. He may not pursue his claim for the reasons noted.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**
Since Question #1 has been answered in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Marcus Fowler is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before August 20, 2007.**

SIGNED this 7th day of June, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master