IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

  Plaintiffs,

-vs.-

BILL OWENS, et al.

  Defendants.

───────────────────────────────────────────────

Claim Number 03-375
Category III
Claimant: Alphonso Greer, Jr., #67494
Address of Claimant: HCCF, 304 Ray Sandoval Street, Walsenburg, CO 81089

───────────────────────────────────────────────

**FINAL ORDER OF SPECIAL MASTER**
───────────────────────────────────────────────

THIS MATTER came before the Special Master for hearing on June 1, 2007. This hearing was held at the Huerfano County Correctional Facility (HCCF) in Walsenburg, Colorado. Present were the following: Alphonso Greer (Claimant); and Rob Huss, attorney for Defendants.

Testimony was received from Claimant. Defendants' Exhibits A through B-F were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on April 3, 1992. He was placed into the Denver Reception and Diagnostic Center (DRDC). He then was transferred to the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. He remained at CTCF until May 13, 1993 when he was transferred to the Four Mile Correctional Facility (FMCF) in Canon City, Colorado. He was placed into a community corrections placement and discharged his sentence on December 27, 1994.

Claimant returned to DOC custody on November 5, 1997. He was taken to DRDC and then transferred to CTCF on December 1, 2007. He remained at CTCF until he was paroled on May 18, 2000. He absconded from parole in January, 2001. He returned to DOC custody on August 30, 2002. He was transferred back to CTCF on September 30, 2002. He remained at CTCF until he was transferred to HCCF on August 6, 2003. He has remained at HCCC for the most part since that date.

In his initial claim form, Claimant checked the boxes for mobility impaired, vision impaired, and diabetes. Claimant stated, in part, in his claim form:

> Mobility: I have degenerative foot condition in my feet which causes excruciating pain in excess in feet, and causes other joints such as ankles, knees, hips, back, and neck to also be affected, making walking, standing, painful task, and exercise being a problem to which the rest of my health is affected. Diabetes, hypertension, heart life in a whole at jeopardy.
> Diabetes is a serious concern for me during incarceration because of the lack of control I have over my medical care, and diet during incarceration.
> Vision fades in and out. I so far have only been diagnosed with early signs of glaucoma. Also I have Meibomianittis/dry eye syndrome/blephartiis = I am keeping this brief at this time.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated as follows:

> The issue of mobility is further allowing a already degenerative condition to progress and affect other areas of health such as diabetes, heart, and kidneys, joints, etc. Rendering me a cripple and keeping me from the work force where I am a truck driver semi, so it is affect my livelihood. Exercise and weight control are affected and all are intertwined. Diabetes, hypertension, heart, kidneys, mobility, vision, limiting my quality & quantity of life.

As this claim was originally assigned to Category II, Defendants filed a response to the claim. Attached to the response were several pages of Claimant's medical records, as well as other DOC forms and reports. The records reflect that Claimant was seen for degenerative foot problems

4

in 1993. He was prescribed orthotics and received those for his shoes. He was wearing black tennis shoes at that time.

Claimant had continued foot problems when he came back into DOC custody in 1997. He injured a knee playing softball in June, 1999. He was provided crutches and a wheelchair for a short period of time. Claimant received arthrosporic surgery on his knee in late 1999. In 2000, Claimant was provided new shoes and a cane. He then was placed on parole.

When he returned to DOC custody in 2002, Claimant was given bottom bunk and bottom tier restrictions. He was still having foot pain. He was advised to buy soft soled shoes from the canteen.

Defendants' response acknowledges that Claimant has Type II diabetes. The records attached to Defendants' response indicate that the first diagnosis for diabetes was in 1998. He was placed on a special diet, but was not compliant with that diet. He was provided a snack and glucose tablets. When Claimant returned to DOC custody, he started to receive a special diet. He was noncompliant with the diet. The medical records reflect that he has continued to receive medical care.

Defendants' response also contains medical records reflecting eye examinations over the years. The examination in September, 2002 did not reflect any glaucoma. *Exhibits CCC and DDD*. The medical records reflect that the first mention of dry eye problems came in 2005. *Exhibit HHH*.

At the hearing, Claimant testified that he was first diagnosed with diabetes in March, 2000. He was at CTCF at the time. He was placed on medication (Glucophage) and received a special diet. He was not required to receive insulin by shot.

When he discharged his sentence, Claimant was able to receive care for his diabetes through the Veterans Administration. He received medication and education concerning the disease. With exercise and diet, Claimant was able to work his way off of the medications.

When Claimant returned to DOC custody, he was placed back on medication and a special diet. Claimant testified that the meals at HCCF are poorly prepared. He also stated that HCCF discontinued his diabetic snack. He has had to watch his food intake due to weight concerns.

Claimant testified that he had heart surgery in September, 2000. He had an arrhythmia problem. Claimant also stated that he has other medical issues, including lupus and Hepatitis C.

Claimant testified further that his eyesight is changing. He is not blind, but he has cataracts. He was seen by a specialist and then placed on eye drops. The eye drops prescribed for him were not provided, but rather he was given a generic drop which has not alleviated the condition.

As to mobility impairment, Claimant testified that he has problems with his feet. He was seen by a podiatrist and given orthotics. When he was released from custody, VA provided a newer set of orthotics. Claimant brought those orthotics back with him to DOC custody, but they were lost at some point. Claimant has had to rely upon his old set of orthotics. Claimant also received tennis

shoes while in a county jail but those were taken from him at DRDC.

Claimant testified that he has been in immense pain. Some days he never leaves his cell and simply remains in bed. Claimant testified that he would like to receive new orthotics and shoes.

On cross-examination, Claimant testified that he is using his old set of orthotics and does not need assistance when walking. Claimant is on the Halal diet. He would like to receive his diabetic snack back. When asked about DOC discrimination, Claimant testified that he has not received proper treatment and his condition has worsened. He stated that he had not been denied any jobs, but has not been permitted to use the weight pile. He felt further acts of discrimination included discontinuance of the diabetic snack and that the food was not prepared properly.

On redirect testimony, Claimant stated that he was concerned about his health. He was not able to walk the track, but might be able to build up to it.

On rebuttal, Claimant testified that he suffered a knee injury in 1999. He received surgery for a meniscus tear and then had a knee brace. He has neuropathy in his feet at the present time. He has been prescribed Neurontin for his condition. He also has edema. He has been trying to lose weight. He is tired of being in pain all the time. He finds it difficult to get in an out of a chair and on and off a toilet.

In lieu of live testimony, Defendants submitted the affidavit of Dr. Cary Shames, D.O. That affidavit also contains a number of documents from Claimant's medical records. One of the medical records from July 29, 1999 reflects that Claimant was in a wheelchair when he was examined by Dr. Patterson, an orthopedic expert. He was diagnosed as having a locked knee with medial meniscus tear. *Exhibit A*. He has surgery to repair the knee. *Exhibit P*.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** Each of the three categories must be examined separately. Claimant must show that he was a member of the class on or before August 27, 2003 for each category.

**Diabetes**: Claimant was diabetic before August 27, 2003. He is a member of the class as diabetic.

**Vision**: The Special Masters have interpreted vision impaired to require almost blindness. The evidence presented indicated that Claimant has received eye examinations. He is able to see with corrective lenses, and his eyes were 20/30 in 2004. Claimant is not vision impaired as defined by the Settlement Agreement.

**Mobility:** Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...." The evidence presented by both sides indicates that Claimant had to use a wheelchair for part of 1999. Claimant falls within the definition of mobility impaired because of the wheelchair usage, albeit for a limited period of time.

The medical records further indicate that Claimant has had significant foot and knee problems dating back to the earlier 1990's. Claimant has had difficulty walking. Though it is not clear, it does appear that Claimant has had periods of time prior to August 27, 2003 when he was not able to walk more than one hundred yards without stopping. Claimant will be accorded the benefit of any doubt and will be determined to be mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The answer to this question is generally no. There are two exceptions that will be discussed later in this order.

Claimant has concerns with the medical care that he has received. There is no question that Claimant has received medical over the years. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

The first exception deals with tennis shoes. The medical documentation provided by both sides reflects Claimant was provided tennis shoes for his foot condition in the 1990's. Those shoes were deemed necessary for Claimant's health. As with many other claimants, DOC decided to change its policies and standards, finding that tennis shoes were not necessary. Inmates were advised then to purchase tennis shoes from the canteen. *Defendants' Exhibit A-G*. An inmate who had a need for tennis shoes immediately faced the dilemma of using limited funds for hygiene items or buying tennis or soft-sided shoes for his well-being. Claimant was discriminated against when he was not provided tennis shoes, as the mere change of a definition does not avoid the discriminatory effect

of the policy.

The second exception deals with the diabetic diet provided to Claimant. He was pulled off of this diet in 2003 because he missed several meals. The policy was at the time to deny inmates a diabetic diet if they missed a certain number of meals, despite the fact that they had diabetes and needed the diet. In other words, Claimant and other diabetics were punished by DOC staff for missing certain meals. The punishment was denial of the diabetic diet. No evidence has been presented in this case, or any other case, that a non-diabetic inmate is punished in any way for missing a certain number of meals. The non-diabetic inmate does not go hungry as punishment. The end result is that Claimant was treated in a discriminatory fashion through loss of his diabetic diet.

As mentioned previously, many of the claims in this case relate to the quality of medical care provided to Claimant. The Special Masters have no jurisdiction over such claims in light of the *Fitzgerald* decision. Claimant has the right to pursue a separate lawsuit concerning the quality of medical care that he has received.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant has suffered a harm in having to spend his own money on tennis shoes and having his diabetic diet taken from him. Claimant will be awarded damages of $150.00.

IT IS HEREBY ORDERED that the claim of Alphonso Greer, Jr. is granted, in part, and he is awarded $150.00 as damages; and

IT IS FURTHER ORDERED that the remainder of the claim is denied, as Claimant has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before August 27, 2007.**

SIGNED this 11th day of June, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*
_____
Richard M. Borchers
Special Master