IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92—870 (OES) (Consolidated for all purposes with Civil Action No.96—343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 03-365
Category III
Claimant: Frederick Province, #96295
Address of Claimant: BCCF, 11560 CR FF-75, Las Animas, CO 81054-9573

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on April 27, 2007. The hearing was held at the Bent County Correctional Facility (BCCF) at Las Animas, Colorado. Present were the following: Claimant Frederick Province (Claimant) and Jennifer Fox, attorney for Defendants.

Claimant testified in his own behalf. Defendants submitted Exhibits A through G. The Special Master indicated that all documents previously submitted would be accepted and considered in resolving this claim. After closing arguments, the case was taken under advisement. Further argument will be waived.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections. The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1]

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they may

Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp. 28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.

---

exercise only the jurisdiction agreed upon by the parties.

2

### C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A.* Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

The Settlement Agreement further provides, in part, as follows:

> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A.* These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant first came into DOC custody on February 22, 1998. He was placed initially at the Denver Reception and Diagnostic Center (DRDC). He was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado. In October, 2004, he was transferred to the Huerfano County Correctional Center (HCCC) in Walsenburg, Colorado. In January, 2005, he was transferred to BCCF and has remained at that facility to the present date.

In the initial claim form, Claimant checked the boxes for hearing impaired and diabetes. Claimant stated, in part, as follows in his initial claim form.

> Diabetic, hearing impaired, have a problem understanding what people are saying especially direct orders. Hard to learn if I can't hear.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

> Hearing impaired; I requested a hearing test and a request for a hearing aid. I did not get either. I still am having a hearing problem and it is not getting any better.
> Diabetic: DOC saw my blood sugar tests but never said I was a diabetic. In 2003 after leaving DOC facility and moved to a CCA facility I was told that I am a diabetic.

> Because of hard of hearing I had trouble in getting a job where hearing was needed, metal products and school.
> Because of a lack of medication at the outset I know it could have been taken care of and not have progressed.

Claimant was sent supplemental forms to complete and return. In his supplemental form on diabetes, Claimant stated, in part, as follows:

> I was not put on any medication or any restrictions until 7 years later. I am on medication now but I still do not know if it is under control. The people here can't keep the medication on hand. They have not furnished information on levels or how to arrive at these levels. I have had to find my own levels. I am still concerned about the long term effects. I understand a diabetic can lose a leg if the diabetic does not keep a firm control on the diet and medication.

In his supplemental form on hearing impairment, Claimant stated, in part as follows:

> When I had a hearing test about 7 years ago, at the time I had a 40 to 60% loss. I was told that DOC would not furnish any hearing aids.

At the hearing, Claimant testified that he was diagnosed as a borderline diabetic while at FCF. He began taking medication for his diabetes in December, 2003. He is now on Glucophage. He has not had to take insulin by shot to this point. Claimant testified that at HCCC the facility will run out of medicine. It is two or more days before additional medicine is obtained. Once he had to wait one month for his Glucophage.

Claimant further testified that he began losing his hearing in late 1999 or early 2000. He has received two tests of his hearing by audiologists and has been recommended to receive a hearing aid. Claimant stated that he has been denied a hearing aid to this point. He believes that this denial is predicated on his release date being in 2008.

Claimant testified that in 2003 he was told he could not answer questions because of his inability to hear them. He has had to be very careful about jobs and other things due to his hearing loss. He presently is in computer school which allows him to see things on the screen, rather than having to listen to a lecture.

Claimant is taking vitamins for his foot which is having problems. He does walk for exercise and his health. He stated that his feet are alright.

On cross-examination, Claimant testified that he has received two audiology tests while at BCCF. He indicated that he believed he was excluded from the SOTP program because of his hearing problem. He has worked in food service and other jobs in the past.

Defendants presented the affidavit of Dr. Orville Neufeld, Ph.D., D.O. in lieu of his testimony. Attached to the affidavit are several pages of medical records of Claimant.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Claimant must establish that he was disabled on or before August 27, 2003 and that he fell into the two claimed categories on or before that date. He must establish further that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Each disability must be taken separately.

*Diabetes*: There is no question that Claimant has been diagnosed as having diabetes. The question becomes one of when he was diagnosed as having the condition.

The medical records reflect that Claimant was evaluated as early as 1998 for possible diabetes. *Exhibit A-1; Exhibit A-2*. Based upon all testing done, Claimant was not viewed as being a diabetic at that time. Claimant was not put on any medications. He was encouraged to watch his

diet and engage in appropriate exercise.

The evidence reflects that medical staff in February, 2002 wanted Claimant to undergo a glucose tolerance test. Claimant refused to participate in that test. *Exhibit A-8*. After being transferred to HCCC, he was diagnosed as being diabetic. He then was placed on Glucophage. Claimant is continuing to be treated for diabetes at this time.

The Settlement Agreement requires that a claimant have a disability on or before August 27, 2003. In this case, Claimant was not diagnosed as being a diabetic until March, 2004. Claimant may well have some concerns about the type of medical testing and care that he received leading up to March, 2004. That will be discussed later in this order. The problem is that the diagnosis was not made until after the date of approval of the Settlement Agreement. Claimant is presently diagnosed with diabetes, but he was not and is not part of the class as diabetic as of August 27, 2003.

*Hearing*: The Special Masters have interpreted the Settlement Agreement as to hearing impaired as requiring almost deafness. The only definition in the Settlement Agreement concerning deafness is as follows:

> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

The Special Masters have followed this definition in examining whether an individual is hearing impaired and disabled.

There is no question that Claimant has suffered some hearing loss. The first hearing test given to Claimant was in September, 1998. That reflected moderate hearing loss. *Exhibit A-22*. A second test was given in March, 2004. *Exhibit A-10*. Claimant was tested in late 2004. *Exhibit A-24*. A recommendation was made after that exam for a hearing aid.

Claimant had moderate hearing loss on August 27, 2003. He still has a moderate loss. This has affected some aspects of his life, but not all. The ADA requires a showing of an impact on major life activities. The evidence does not reflect that Claimant was unable to carry conversations or understand orders of staff. He had to request some individuals to repeat themselves. His hearing loss did not constitute an impairment as defined by the Settlement Agreement. Claimant is not part of the class as hearing impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** No evidence has been presented that Claimant was unqualified for programs and services due to disciplinary or other problems.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** In

order to prevail on his claim, Claimant must show that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003. A claimant must show that he was treated differently from a non-handicapped individual. There was no evidence presented at the hearing that any such discriminatory act took place before August 27, 2003.

Claimant testified that after he was diagnosed as being diabetic and placed at HCCC and BCCF that the facilities would run out of medicine. He was without Glucophage for two to thirty days. This Special Master has held that running out of medicine is unconscionable and a violation of the ADA and Rehabilitation Act. A diabetic in prison has no option to seek appropriate medication on his own or through non-prison sources. To deny a diabetic needed medication is to treat that individual differently, as the non-diabetic does not need Glucophage or insulin to keep on living. Accommodation for the diabetic is to insure that he or she has access to appropriate medications. That did not occur here. The problem is that such actions occurred in 2004 and later, after Claimant was diagnosed as diabetic. Claimant has the right to bring his own lawsuit to remedy this situation, but he cannot pursue it through his claim.

Claimant has raised also some issues concerning his medical care while in DOC. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may have a legitimate concern about testing that was done by DOC staff that did not lead to an earlier diagnosis of diabetes. He also may have a concern as to the decision not to provide a hearing aid. These are medical actions and decisions that may have been improper in light of the Eighth Amendment. Claimant may pursue separately any rights that he may have concerning the quality of his medical care.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**
Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Frederick Province is dismissed, as Claimant has failed to prove each of the four questions set forth by Judges Nottingham and Kane and that he was the victim of discriminatory conduct prohibited by the ADA and Rehabilitation Act after August 27, 2003; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file

an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before July 30, 2007.**

SIGNED this 9th day of May, 2007.

BY THE COURT:

Richard M. Borchers
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this 9 day of May, 2007 to the following:

Mr. Frederick Province
#96295
BCCF
11560 CR FF-75
Las Animas, CO 81054-9573

Mr. James Quinn
Mr. Jess Dance
Office of the Attorney General
1525 Sherman Street
Denver, CO 80203