IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

_____

Claim Number 03-336
Category III
Claimant: Gerry D. Kelly, #59265
Address of Claimant: BVCF, P.O. Box 2017, Buena Vista, CO 81211

_____

## FINAL ORDER OF SPECIAL MASTER
_____

THIS MATTER came before the Special Master for hearing on June 22, 2007. This hearing was held at the Buena Vista Correctional Facility (BVCF) in Buena Vista, Colorado. Present were the following: Gerry D. Kelly (Claimant); and Rob Huss, attorney for Defendants.

Testimony was received from Claimant, and he offered into evidence Exhibits 1 through 5. All were admitted. Defendants' Exhibits A through E were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

The Settlement Agreement further goes on to discuss categories and criteria for special placement. *Settlement Agreement, Section V, Paragraph A*. Permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

> The Settlement Agreement further provides, in part, as follows:
>
> 2. Permanent Hearing Impairments
> Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.
> 3. Permanent Vision Impairment
> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.
> 4. Permanent Diabetics: Insulin or Non Insulin Dependent Diabetic
> Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

*Settlement Agreement, Section V, Paragraph A*. These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any

claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on January 18, 1997. He initially was placed at the Denver Reception and Diagnostic Center (DRDC). He was there for approximately three weeks. He then transferred to the Centennial Correctional Facility (CCF) in Canon City, Colorado. He remained at CCF until 2002.

Claimant transferred to the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado in 2002. He remained at that facility until 2005 when he was placed at the Limon Correctional Facility (LCF) in Limon, Colorado. He was at LCF for five to six months and then was transferred to BVCF in May, 2006.

In his initial claim form, Claimant checked the boxes for vision impaired, mobility impaired and diabetes. Claimant stated, in part, in his claim form:

> I've been a diabetic since May, 2000. Since then my eyes have gotten worse and the neuropathy in my legs and feet are getting worse. Being here where I'm at is a hard place to be, being a diabetic. We are going up and down stairs for everything we do. Having problems in my legs and feet, and my vision being bad, this is not a good place to be treated for any type of handicap.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated, in part, as follows:

> Since I've been here, they put me on the bottom floor and I'm going up and down stairs which is not good for me. When I go to the library it's on the second floor. To me this is discrimination, because staff know about what is wrong with me.

Claimant was sent supplemental forms to complete and return. Claimant completed the supplemental form for diabetes. He stated, in part, as follows:

> Since becoming a diabetic, I feel DOC made my condition worse by not telling me, or showing me how to keep this illness under control, and explain to me how I got it.

As to mobility impairment, Claimant stated, in part:

> The neuropathy in my legs and feet are getting worse. Being here is a hard place to be being a diabetic. We are going up and down stairs for most everything we do.  So having problems in my legs and feet, this is not a good place.

As to his vision impairment, Claimant stated, in part:

> Since becoming a diabetic, my vision has gotten worse, and my eyes are very sensitive to light and sunlight.

Attached to his supplemental forms are various documents from his personnel file and medical records. Included are documents reflecting COPD convictions.

At the hearing, Claimant testified that he was diagnosed with diabetes in 2000. He began to receive insulin. He was placed on a special diabetic diet. He testified that his insulin usage will vary depending on his blood/sugar levels.

Claimant stated that he has been having vision problems. His last eye examination was more than a year before the hearing. He has noticed that his blood/sugar levels will affect his vision. He stated that he should not have to wait for an eye examination. Claimant indicated that he has nerve damage in his left leg. He receives pain pills for his leg. Often his leg will go numb. He is concerned about his physical condition, as it appears that DOC medical staff do not fully understand what is going on with his health. He has had problems with his feet which are flat. He had soft sided shoes prior to arriving at BVCF. He was told that his shoes were lost by the property division at BVCF. He was told to buy shoes from the canteen, but he does not have the money. He also was advised to purchase arch supports from the canteen, but finances make that impossible.

Claimant has problems going up and down steps with his leg being numb. Claimant testified further that he wants to be able to control his diabetes. He stated on cross-examination that he tries to exercise through use of callisthenics. He noted that he was given medical tennis shoes while at CCF in Canon City, Colorado. These shoes were helpful to him and eased the pain.

In lieu of live testimony, Defendants submitted the affidavit of Dr. Orville Neufeld, Ph.D., D.O. That affidavit contains a number of documents from Claimant's medical records. Defendants also submitted other documents in support of their position.

In rebuttal, Claimant testified that he did not trust DOC medical staff when he was first diagnosed as diabetic. He became compliant with dietary and medical requirements. He further testified that he has no arch in his feet. Boots issued by DOC do not accommodate his feet and cause pain.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** Each disability must be examined separately. A claimant must show that he had a listed disability on or before August 27, 2003.

**Diabetes**: According to Dr. Neufeld's affidavit, Claimant was diagnosed with diabetes in

by April, 2001. The Special Master finds that Claimant had diabetes before August 27, 2003 and is a member of the class as diabetic.

**Vision**: The medical records attached to Dr. Neufeld's affidavit reflect that Claimant has had regular eye examinations. He has been provided eye glasses.

The Special Masters have interpreted vision impairment as requiring almost blindness. In the case of Claimant, he is able to function and do his activities of daily life. Claimant is not vision impaired as defined by the Settlement Agreement.

**Mobility:** Claimant has had problems with his feet and numbness in his legs. He has been diagnosed with flat feet or "pes planus." Claimant also testified that he has experienced neuropathy from his diabetes. Claimant testified that he has experienced some problems in walking. This is a close case, but Claimant will be given the benefit of the doubt and will be determined to have a mobility impairment.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The answer to this question is no, with one exception. Claimant has received medical care while in DOC custody. He has expressed concern about that medical care.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

Claimant received tennis shoes in the past to help him with his foot problems. These shoes also were provided to help with his diabetic neuropathy. At times, these shoes were taken away from him. In addition, he was told to purchase tennis shoes from the canteen. Claimant testified that he does not have the money to purchase tennis shoes and arch supports. The Special Master notes that tennis shoes were deemed important enough in 2001 to be authorized. Yet, the shoes have not been

provided on a consistent basis. Claimant noted that his health is compromised due to his financial condition. Claimant faces health issues that a non-mobility impaired inmate does not. Claimant is entitled to shoes that protect his health.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant has suffered the harm of not being able to afford soft sided shoes and not having those shoes provided by DOC. Claimant is entitled to compensation in order that he might purchases shoes and arch supports. He will be awarded $150.00 as damages.

IT IS HEREBY ORDERED that the claim of Gerry Kelly is granted, in part, and he is awarded $150.00 in damages; and

IT IS FURTHER ORDERED that the remainder of the claim of Gerry Kelly is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before September 24, 2007.**

SIGNED this 9th day of July, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

Richard M. Borchers
Special Master