IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number: 03-215 (formerly 02-236)
Category III
Claimant: Gordon Raymond Reuell, II, #80544
Address of Claimant: CTCF, P.O. Box 1010, Canon City, CO 81215-1010

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on June 30, 2006. Present were the following: Gordon Reuell, Claimant; Brooke Meyer, from the office of the Attorney General, counsel for Defendants; Dr. Orville Neufeld, witness for Defendants.

Testimony was received from the following witnesses: Claimant; Dr. Orville Neufeld; Rebecca Rodenbeck; Yvette Brown (by telephone). Exhibits A through F were offered into evidence by Claimant and Exhibits 1 through 3 were entered by Defendants. Attached as part of this order is a comprehensive Appendix of Exhibits listing each exhibit admitted into evidence and each exhibit not admitted into evidence. At the conclusion of the hearing, the claim was taken under advisement. This Order shall constitute the final action by the Special Master on this specific claim.

### I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been

1

reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Settlement Agreement provides the following definitions:

> III. DEFINITIONS
>
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
>
> B. QUALIFIED INMATE

2

> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>
>> 1. Is the claimant a disabled individual who is a member of the class?
>> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Reuell submitted a claim that was assigned claim number 02-236. The claim is premised on an alleged mobility disability, vision disability and disability due to diabetes.

2. Claimant's claim was assigned to Category II pursuant to the Remedial Plan as set forth above.

3. On March 31, 2006, Special Master Richard M. Borchers reassigned Mr. Reuell's claim to Category III, at which time it was also assigned a new claim number 03-215.

4. Claimant Reuell entered CDOC custody in April of 1993. He was housed at Freemont Correctional Facility (FCF) until November 1993. He was transferred to Limon Correctional Facility (LCF) in February 1997. Later in 1997, Reuell was transferred to Colorado Territorial Correctional Facility (CTCF), where he has remained to the present time.

5. Claimant asserts that he has a permanent mobility disability. He weighs 360 lbs. and suffers from degenerative joint disease. His mobility problems began prior to entering CDOC custody. In 2001, Reuell broke his left foot and began using a wheelchair. He has been wheelchair-bound since that time. He cannot walk 100 yards and cannot ambulate up or down stairs. He has medical restrictions of no stairs, lower bunk, lower tier, no physical exercise, no prolonged standing and no squatting. These have been in place since he entered CDOC custody. Defendants concede that Reuell has a permanent mobility disability that meets the requirements of the Remedial Plan.

6. Claimant Reuell also suffers from diabetes, which was diagnosed in April or May of 2006. He is currently taking Lantus, an insulin medication.

7. Claimant further testified that his vision is deteriorating and that he suffers from a lazy right eye. He has worn corrective lenses since 1990 and currently wears bifocals.

8. Reuell testified that he has not been denied access to any services, programs or facilities due to either his diabetes or vision problems. With respect to his diabetes, Reuell's complaint is that he was not diagnosed until May of 2006, when his kidneys started to fail. He contends that he should have been diagnosed earlier, because has had high blood sugar since entering CDOC custody. He further asserts that he currently suffers from kidney failure because his diabetes was not timely diagnosed. As is the case with respect to his diabetes disability claim, Reuell does not contend that he has been unable to take advantage of the facilities, programs and/or services offered by the CDOC as a result of his vision problem. Rather, he asserts that under CDOC policy, eye examinations are provided once every three years. He believes that proper medical care requires examinations and new prescriptions every year.

9. The primary thrust of Reuell's *Montez* claim relates to his mobility disability. He contends that surgery should have been performed on his foot in 2001 and that he is a candidate for knee replacement surgery. His medical providers, however, refused to perform surgery on his foot and have indicated that knee replacement surgery is not appropriate for him at the present time because of his weight.

Reuell testified that the CDOC has not accommodated his mobility disability with respect to use of the gym and cafeteria. He indicated that up until 2005, CTCF had specific time set aside in the gym for mobility handicapped inmates. According to Reuell, this special gym time for mobility handicapped inmates was eliminated in 2005. As a result, by the time he is able to get to the gym in his wheelchair, the equipment and games are already in use.

4

Reuell described a similar situation in the dining hall. He stated that prior to 2005, handicapped inmates were allowed to go to the dining hall first, and that this worked well. Reuell testified that this procedure was eliminated in 2005. Since then, he claims that often, by the time he is able to get to the dining hall, there is no room at the one handicapped table.

Finally, Claimant testified that he is a paralegal and that he applied for a job as a clerk in the law library in February of 2005. The job description for the position indicated that it involved climbing stairs and lifting but Reuell noted that this was an old job description and that there are no longer any stairs to negotiate. He testified that he actually worked part-time as a clerk in the law library in 2005 and still helps out there on occasion. The law clerk position was not filled; and the institution began re-interviewing candidates in 2006. Reuell testified that of the five candidates selected for a re-interview, four dropped out of the process, leaving only himself. Although the final results of the interview had not been disclosed at the time of the hearing, Reuell stated that he was told that one of the interviewers, Yvette Brown, said that Reuell should not be given the job.

10.   Reuell also asserts that he has been discriminated against for filing a *Montez* claim and for pursuing legal proceedings attacking his criminal conviction. He testified that in February 2006, he was moved from his single cell to a double cell on a Saturday -- in violation of CTCF policies -- and that all of his legal papers, legal books and photo albums were confiscated, allegedly because the volume of materials exceeded the three cubic foot limit imposed by the CDOC. Reuell stated that he has never been given the opportunity to go through and cull the confiscated materials so that he can obtain return of those that fall within the volume limitation.

11.   In contradiction to Reuell's testimony regarding discrimination due to his mobility disability, Dr. Neufeld indicated that Reuell's medical records show that the fracture in Reuell's foot healed satisfactorily by 2002. Dr. Neufeld also noted that Reuell's medical providers declined to consider knee replacement surgery for him until he had lost at least 100 pounds.

With respect to Reuell's claimed vision disability, Dr. Neufeld testified that based on vision tests performed while Reuell has been in CDOC custody, his corrected vision is 20/80 in the right eye and 20/20 in the left eye. On February 1, 2006, Reuell was given a vision test which indicated a corrected vision of 20/20. As to his diabetes, Dr. Neufeld indicated that a review of Reuell's medical and canteen records established that he has not complied with a diabetic diet.

Finally, Dr. Neufeld testified that Reuell's medical records show no medical restriction that would require him to have a single cell.

12.   Also, in contradiction of Claimant's testimony, Rebecca Rodenbeck, the administrative officer at CTCF since 1997, testified that the special time for handicapped inmates to utilize the gym was not eliminated in 2005 and, in fact, remains in place from

1500-1600 hours on a daily basis. Rodenbeck also stated that there are four separate handicapped tables in the dining room. One of these tables seats eight and each of the other three seats four. Inmates in wheelchairs are not required to go through the chow line. Instead, catering is provided, so that they order their food at the table and it is then brought to them.

13.    Additionally, Reuell's testimony regarding the law clerk job was disputed by Yvette Brown. Brown testified that Reuell has been interviewed for the legal assistant position, which had not yet been filled at the time of the hearing. She stated that one of the requirements for the position is a high school diploma or a GED and that she has been unable to verify that Reuell has either of these. She flatly denied that Reuell's mobility disability would have any impact on her decision with respect to filling the position.

### III. CONCLUSIONS OF LAW

1.    The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2.    The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C). As discussed in Section I above, the Remedial Plan further limits permanent mobility, hearing, vision, and diabetes disability/impairment to those that conform to the criteria of Section V, paragraph A of the Plan.

Based on the criteria established by the Rehabilitation Act, the ADA and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while

an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

The Special Master finds and concludes that Claimant Reuell does have a permanent mobility disability within the meaning of the ADA, the Rehabilitation Act and the Remedial Plan. Indeed, Defendants have conceded that this is the case. On the other hand, the Special Master finds and concludes that Reuell does not have a permanent vision disability under the Remedial Plan. Reuell's visual acuity of 20/20 with corrective lenses falls far short of meeting any definition of a vision disability under the ADA or the Rehabilitation Act and clearly does not meet the criteria set out in the Remedial Plan. The Special Master further finds and concludes that Reuell has not sustained his claim that he is permanently disabled due to diabetes. While Reuell has been recently diagnosed with diabetes, the evidence fails to establish that his diabetes substantially limits his ability to engage in any major life activity.

3. The next question which must be answered is whether Claimant was qualified to participate in the programs or receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs, or activities because of disciplinary reasons, health reasons, or other valid penal justifications. *Miller v. King*, 384 F.3d 1248, 1266 (11th Cir. 2004). It appears to be undisputed that Claimant was qualified to participate in the programs, benefits, and offered by the CDOC.

4. The key issue is whether Claimant was discriminated against because of his mobility disability. Claimant asserts that he was indeed discriminated against because of his disability with respect to his use of the gym and the dining room and his application for the law clerk job. After considering the totality of the evidence, the Special Master finds and concludes that Reuell has not sustained his claim. Based on the testimony of Ms. Rodenbeck, the Special Master finds and concludes that CTCF has provided adequate accommodation for wheelchair-bound inmates to utilize the gym by allowing them special access to the gym for one hour each day. Contrary to Claimant Reuell's testimony, Ms. Rodenbeck stated that this special gym time for wheelchair bound inmates has not been eliminated. The Special Master finds Ms. Rodenbeck's testimony more persuasive in this regard. Furthermore, based on Ms. Rodenbeck's testimony, the Special Master finds and concludes that mobility impaired inmates such as Mr. Reuell have been given adequate accommodation in the dining hall by being provided with (a) four handicapped tables and (b) a catering service so that they are not required to go through the cafeteria line. Finally, the Special Master finds and concludes that Reuell has failed to sustain his contention with respect to the law clerk position by a preponderance of the evidence. The testimony reveals that the position had not been filled and that the qualification at issue with respect to Mr. Reuell's application is the lack of any verification that he has a high school diploma or GED. This educational requirement is unrelated to any mobility disability or impairment.

5.  Claimant also contends that he did not receive proper medical treatment for his broken foot; that he is a medically qualified candidate for knee replacement surgery; that his diabetes was not diagnosed in a timely fashion; and that he has not been given eye examinations on a yearly basis. Evidence relating substandard medical care, lack of medical care and/or failure of the CDOC to properly treat Claimant's medical conditions does not establish a violation of the ADA or the Rehabilitation Act. While such actions or failures to act may give rise to claims for deliberate indifference to medical needs, the courts have held that substandard medical care or failure to properly treat a medical condition or disability does not constitute discrimination because of a disability, within the meaning of either the ADA or the Rehabilitation Act. *Fitzgerald v. Corrections Corporation*, 403 F.3d 1134, 1144 (10th Cir. 2005); *United States v. University Hospital*, 729 F.2d 144 (2nd Cir. 1984).

6.  Additionally, the Special Master notes that several of the events which Claimant relies upon in support of his claim, including the those surrounding his application for a law clerk position and his allegations regarding the elimination of gym time and early dining room call for mobility impaired inmates, even if true, occurred after August 27, 2003. The Remedial Plan was signed on August 27, 2003. Although the Remedial Plan fails expressly to address the issue of damage claims that might arise after its execution date, there is nothing in the Remedial Plan that would suggest that paragraph XXXII thereof, authorizing the recovery of damages and establishing claims procedures was intended to apply to claims for damages that had not yet arisen. The Special Master finds and concludes that the damages that may be awarded under the Remedial Plan are limited to those resulting from violations of the ADA cognizable under the Remedial Plan and occurring prior to August 27, 2003.

7.  Finally, Claimant's assertion that he has been retaliated against because of his *Montez* claim is not cognizable by the Special Master pursuant to paragraph XXXII of the Remedial Plan. Such a claim must be pursued in an independent legal action.

## IV. ORDER

IT IS HEREBY ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment be entered in favor of Defendants and against Claimant dismissing Claimant Reuell's claim with prejudice; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before October 3, 2007** with the Clerk of the United States District Court at the following address:

901 19th Street
Denver, CO 80294.

SIGNED this 3rd day of August, 2007.

BY THE COURT:

/s/ Bruce D. Pringle
_____
Bruce D. Pringle,
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this 3rd day of August to the following:

Mr. Gordon Raymond Reuell, II, #80544
CTCF
P.O. Box 1010
Canon City, CO 81215-1010

Ms. Brooke Meyer
Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

/s/ Susan L. Carter
_____
Susan L. Carter

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number: 03-215 (formerly 02-236)
Category III
Claimant: Gordon Raymond Reuell, II, #80544
Address of Claimant: CTCF, P.O. Box 1010, Canon City, CO 81215-1010

---

## APPENDIX OF EXHIBITS

---

The following is a list of Exhibits introduced by CLAIMANT and ADMITTED into evidence in the above referenced claim:

| | | |
|---|---|---|
| EXHIBIT A: | 1 page | Lab Assessment, 2006. |
| EXHIBIT B: | 1 page | Exam report from 5/3/06 for Gordon Reuell. |
| EXHIBIT C: | 1 page | Message from Medical, 05/21/06 for Gordon Reuell. |
| EXHIBIT D: | 1 page | Message from Medical, 03/29/06 for Gordon Reuell. |
| EXHIBIT E: | 1 page | Legal Access Program Denial Form for Reuell, Apr. 24, 2006. |
| EXHIBIT F: | 1 page | Property to Be Shipped memo for Gordon Reuell from Sgt. Storm, Cell House 7, 25 February 2006. |

---

The following is a list of Exhibits introduced by Defendants and ADMITTED into evidence in the above referenced claim:

EXHIBIT 1:   11 pages   Canteen Items Issued to Gordon Reuell, 01/01/2003 to 06/22/2006.

EXHIBIT 2:   3 pages    Colorado Department of Corrections Progress Assessment Summary for Gordon Reuell, 03/23/2004.