IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number: 03-393
Category III
Claimant: Daniel Balazs # 66528
Address of Claimant: CTCF, P.O. Box 1010, Canon City, CO. 81215

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Claimant Edgar Lloyd Balazs. The Special Master has reviewed the claim and all documents filed by both sides. This Order shall constitute the final action of the Special Master on this specific claim.

## I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial Plan also created a mechanism for individual

1

inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I.   General inconvenience or nominal damages;
> II.  Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV.  Damages due to severe physical injuries; and
> V.   Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III. DEFINITIONS
>
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
>
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

2

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>
>> 1. Is the claimant a disabled individual who is a member of the class?
>> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Balazs submitted a claim on July 13, 2004, which was assigned claim number 02-613. The claim is premised on alleged permanent disability due to a mobility impairment, a vision impairment, and a hearing impairment.

2. Claimant's claim was originally assigned to Category II pursuant to the Remedial Plan as set forth above. On February 12, 2007, Mr. Balazs's claim was reassigned to Category III and renumbered to 03-393.

3. Claimant Balazs entered CDOC custody in 1991. He has been in and out of CDOC custody several times since then, and has been housed at Arkansas Valley Correctional Facility, Four Mile Correctional Facility, Freemont Correctional Facility, Sterling Correctional Facility, San Carlos Correctional Facility, and the Colorado Territorial Correctional Facility. His current release date is 2011.

4. In April of 1997, Claimant developed paraplegia secondary to transverse myelitis. The transverse myelitis was apparently the result of an earlier viral infection. He underwent physical therapy and was provided with numerous medical restrictions. These included no assignment over 8000 ft., first tier, lower bunk, no assignment to camps, no vigorous exercise, no intensive labor, no prolonged standing, and a left crutch. Claimant was released later in 1997, but he returned to CDOC custody shortly thereafter..

By June of 1998, his mobility had improved to the point that he was ambulatory with a cane for long distances and a right sided AFO brace as necessary. In 1999, Claimant's lower bunk, lower tier restrictions were renewed, and he was given permission to purchase tennis shoes from the canteen. From 1998 to 2004, Claimant was generally able to negotiate stairs with the use of his cane. Claimant was mobile until the beginning of 2004, when he began suffering from inflammation in his knees. His mobility began to deteriorate significantly, until after a period of time, he was unable to walk. At times he was provided with a wheel chair, although at other times a wheelchair was not provided. His knees became infected, and multiple surgical procedures and antibiotics over a five-month period in early 2005 failed to resolve these problems. In June of 2005, both of Claimant's legs were amputated. Subsequent to the amputations, Claimant has been relegated to a wheelchair.

     5. Claimant also suffers from Crohn's Disease. He had an ileostomy when he was a teenager. He has had multiple problems, including stricture repair in 1997. In 1998, his ileostomy prolapsed, and he underwent emergency surgery to reduce the prolapse.

     6. Claimant also suffers from vision difficulties which appear to be related to his Crohn's disease, as well as to cataracts. Although the testimony and Claimant's medical records give an incomplete picture of his vision impairment, it is clear that from approximately 1997 until 2003, Claimant's vision deteriorated. He had difficulty reading and writing, although he could read to some extent without glasses. An eye test in July of 2001 showed an uncorrected visual acuity for distance of 20/50 in his left eye and 20/200 in his right eye. In May of 2003, his uncorrected visual acuity was 20/200 and 20/80, and his corrected visual acuity was 20/200 and 20/60. Claimant states that in 2003, he could not see to read or write, and that he could not see well enough to participate in classes. Subsequently, Claimant's cataracts were removed, and he says that presently he can see with the use of prescription glasses. In 2004, Claimant suffered a retinal detachment, which was surgically corrected.

     7. Claimant Balazs asserts that CDOC failed to properly and timely treat the infections in his knees. Specifically, he claims that he saw CDOC medical personnel on many occasions and they refused to aspirate his knees. He indicates that finally, in 2005, he was taken to surgery where his knees were cleaned out and a drain tube was installed. Claimant testified that he underwent nine surgeries between the beginning of 2005 and June of 2005, when his legs were amputated.

     8. Claimant further contends that CDOC has failed to provide proper and timely medical treatment for his vision problems. He states that CDOC refused to perform cataract surgery until November of 2003, and that the surgery should have been performed years earlier. Claimant indicates that he has gotten into trouble and received discipline because he couldn't see to sign his name to a form. Claimant also testified that he cannot be transferred to a lower security facility because of his medical conditions, that he cannot go to camps, and that community corrections facilities are unavailable to him.

9. While in CDOC custody, Claimant has taken health, victims' awareness, and computer classes. He testified that he tried to take a janitorial class, but could not complete it because by 2004 he needed a wheelchair. The evidence shows that Claimant presently has a job as a janitorial clerk. The job was modified for him due to his current mobility disability.

### III. CONCLUSIONS OF LAW

1.     The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2.     The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

It is uncontroverted that Claimant has suffered from a mobility disability within the meaning of the ADA and/or Rehabilitation Act since July 2005, when his legs were amputated. It is likely that Claimant's mobility disability predated the amputation by several months. For purposes of a damage claim under the *Montez* Remedial Plan,

5

however, the critical inquiry is whether the Claimant was disabled prior to August of 2003.

The Remedial Plan was signed on August 27, 2003. Although the Remedial Plan fails expressly to address the issue of damage claims that might arise after its execution date, there is nothing in the Remedial Plan that would suggest that paragraph XXXII thereof, authorizing the recovery of damages and establishing claims procedures was intended to apply to claims for damages that had not yet arisen. The Special Master finds and concludes that the damages that may be awarded under the Remedial Plan are limited to those resulting from violations of the ADA cognizable under the Remedial Plan and occurring prior to August 27, 2003. While post-August 27, 2003 discrimination may be taken into account, there must be a showing that Claimant did in fact suffer discrimination through a failure to accommodate his disability prior to the execution of the Remedial Plan.

The Special Master finds and concludes that Claimant has failed to prove by a preponderance of the evidence that he suffered from a permanent mobility disability prior to August 27, 2003. While Claimant testified that he was unable to ambulate for a short period of time when he was in CDOC custody in 1997, the evidentiary record demonstrates that from 1998 until sometime in 2004, Claimant was able to walk with the use of a cane. Claimant himself confirmed that during this period of time, he was walking with the assistance of a cane and was working out.

The Special Master further finds and concludes that Claimant's Crohn's Disease, in itself, does not constitute a permanent disability that can be considered under the *Montez* Remedial Plan. While the ADA and/or Rehabilitation Act are significantly broader in scope, the *Montez* Remedial Plan only covers mobility, vision, and hearing disabilities, and permanent disabilities due to diabetes. To the extent that Claimant's Crohn's Disease impacts his eyesight, it is considered in the following paragraph. However, the effects of Claimant's Crohn's Disease have not rendered him mobility or hearing impaired, nor does Claimant suffer from diabetes.

The Special Master finds and concludes that Claimant has proved that during the period 2001 through 2003, he had a permanent vision disability. Claimant indicates that during this time period, he was unable to see to read or write. Claimant's visual acuity tests during the same period reflect significant vision impairment, even with the use of corrective lenses. CDOC medical records state that Claimant's vision impairment was due to a combination of the effects of his Crohn's Disease and cataracts. Claimant's vision did not begin to improve until the cataracts were removed in November of 2003.

Claimant asserts that CDOC discriminated against him because of his vision disability by not allowing him to transfer to a lower security facility, to attend camps, or go to a community corrections facility. The Special Master finds and concludes that Claimant has failed to establish by a preponderance of the evidence that he was otherwise qualified for transfer to a lower security facility, or to go to a community corrections facility. More importantly, there is no evidence in the record that even if otherwise

qualified, Claimant's vision disability prevented him from being housed in a minimum security facility, or to go to camps or to community corrections. As noted above, to the extent that Claimant's current mobility disability prevents his from attending camps or being housed in lower security facilities or community corrections, the *Montez* Remedial Plan does not cover such a claim.

The Special Master further finds and concludes that Claimant's assertion that he was disciplined as a result of his vision disability does not support a claim under the ADA, the Rehabilitation Act, or the *Montez* Remedial Plan. To the extent that Claimant Balazs takes issue with his CPOD and other disciplinary convictions, such claims cannot be pursued under the ADA until and unless his disciplinary convictions or adverse administrative actions are overturned. *See Heck v. Humphrey*, 512 U.S. 477 (1994); *Daniel v. Fields*, 1995 WL 539008 at fn. 2 (10th Cir. 1995)(unpublished); *Deatherage v. Stice*, Civ. 05-91-F (W.D. Okla, Dec. 29, 2005)(unpublished). Furthermore, the Special Master finds and concludes that Claimant has failed to establish by a preponderance of the evidence that the discipline he received was proximately related to his vision disability.

Claimant Balazs asserts that the CDOC discriminated against him by failing to provide proper and timely care for his vision disability. While such issues may well form the basis for a legal claim of deliberate indifference to medical needs under the Eighth and Fourteenth Amendments to the United States Constitution, both our Circuit and others have clearly stated that deliberate indifference to medical needs does not give rise to a claim under either the ADA or the Rehabilitation Act, nor do claims of negligent medical treatment fall within the ambit of either of these statutes. *See Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005). *See also Kiman v. New Hampshire Dept. of Corrections*, 451 F.3d 274 (1st Cir. 2006); *Burger v. Bloomberg*, 418 F.3d 882 (8th Cir. 2005); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289 (11th Cir. 2005); *United States v. University Hospital*, 729 F.2d 144 (2nd Cir. 1984).

Furthermore, even if a claim of failure to timely and proper medical treatment for a disability could form the basis for an action under the ADA, the Rehabilitation Act, and/or the *Montez* Remedial Plan, an evidentiary showing would have to be made that the medical care actually provided was indeed inadequate or was unreasonably delayed. The evidentiary record before the Special Master is insufficient to support such a conclusion. The record reveals that Claimant received continuing medical care for his vision problems. Claimant's contentions regarding the adequacy of his medical care is supported only by his own belief that his care was untimely or insufficient. No support for his position is offered by the medical records, and is contrary to the testimony of Defendants' expert Dr. Neufeld.

The Special Master notes that Plaintiff's inability to meet his burden of proving that CDOC's medical treatment was inadequate and/or untimely may well be due to the fact that the *Montez* Remedial Plan does not provide claimants' with the ability to obtain medical experts or counsel. Nevertheless, the Special Master is bound by the Remedial Plan, regardless of its inherent deficiencies

7

For the foregoing reasons, the Special Master finds and concludes that the claim of Mr. Balazs must be denied.

## IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment be entered in favor of Defendants and against Claimant dismissing Claimant Balazs's *Montez* Claim with prejudice; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before December 10, 2007** with the Clerk of the United States District Court at the following address:

901 19th Street
Denver, CO 80294.

SIGNED this      day of September, 2007

BY THE COURT:

/s/ Bruce D. Pringle

―――――――――――――――――――
Bruce D. Pringle,
Special Master

## CERTIFICATE OF MAILING

      I hereby certify that I have mailed a copy of the foregoing FINAL ORDER OF SPECIAL MASTER this _____ day of September, 2007 to the following:

Mr. Daniel Balazs
# 66528
CTCF
P.O. Box 1010
Canon City, CO 81215


Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO 80203

 

                                        /s/ Susan L. Carter