IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-206
Category III
Claimant: Dean Ross Denton, #108801
Address of Claimant: 2701 Robinson Street, Lot B-6, Colorado Springs, CO 80904

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

      THIS MATTER came before the Special Master for hearing on July 6, 2007. The hearing was held at the office of Legal Resolution Center in Colorado Springs, Colorado. Present were the following: Dean Ross Denton (Claimant); Mr. Denton's father; Dr. Cary Shames, D.O.; and Jennifer Fox, attorney for Defendants.

      Prior to his own testimony, Claimant called the following employees of the Department of Corrections to testify: Dr. Cary Shames, D.O.(former Chief Medical Officer of the Department of Corrections); Dr. Timothy Creany, M.D., physician at Fremont Correctional Facility (FCF); Kenneth Thompson, Claimant's case manager at Sterling Correctional Facility (SCF); Dr. Michael Aasen, M.D., physician at Arrowhead Correctional Facility (ACF); Dolores Montoya, Clinical Team Leader at ACF; Samuel Michael Dunlap, team leader of Phase II Sex Offender T.C. at ACF; Cathie Holst, ADA Inmate Coordinator (AIC); and Alan Cain, computer class instructor at the Colorado Territorial Correctional Facility (CTCF).

      Claimant's Exhibits 1-21 were offered and admitted into evidence. Defendants called no witnesses, but submitted a nine-page affidavit from Dr. Orville G. Neufeld, D.O. Defendants' Exhibits A through H were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. The Special Master has reviewed the claim and all documents filed by both sides. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document[1]. Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Settlement Agreement was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class. The Settlement Agreement did not provide for an opt out provision for any individual but set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe

---

[1] The Special Masters also were not involved in the negotiation of the Remedial Plan (Settlement Agreement). The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

       physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

       The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>     A. COVERED DISABILITIES
>     The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
>     B. QUALIFIED INMATE
>     Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>     C. PERMANENT DISABILITY/IMPAIRMENT
>     A condition which is not expected to improve within six months.

       On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>     1. Is the claimant a disabled individual who is a member of the class?
>     2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>     3. Was the claimant discriminated against by DOC because of his or her disability?(e.g., were accommodations requested and denied because of the disability?)
>     4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

**II.**

       Claimant came into DOC custody on April 12, 2001. He was placed at the Denver Reception and Diagnostic Center (DRDC) for eighteen days for evaluation. Claimant had serious documented medical issues when he entered into DOC custody. Medical restrictions and limitations were imposed at DRDC. These restrictions were "first tier, lower bunk, no stairs, no vigorous exercise, no intensive labor, no bending, no squatting, no heavy lifting over 10 (ten) pounds and no sitting for more than one hour." *Defendants' Exhibit A.* Claimant was also to receive a single cell as of April 20, 2001. *Claimant's Exhibits 16 and B.*

Claimant was transferred to Limon Correctional Facility on April 30, 2001. LCF also imposed medical restrictions consistent with those imposed at DRDC. Claimant was transferred from LCF to Arkansas Valley Correctional Facility (AVCF) in October, 2001. In October, 2002, he was transferred from AVCF to CTCF where he remained for three years. In October, 2005 Claimant was transferred from CTCF to ACF to begin participation in Phase II of the Sex Offender Program. ACF is the only DOC facility that offers Phase II. In March, 2006, Claimant was transferred from ACF to FCF because his medical classification changed from M-3 to M-4. According to Defendants, Claimant's medical condition precluded him from remaining at ACF to complete his sex offender program. Claimant remained at FCF until November, 2006 when he was moved to Sterling Correctional Facility (SCF).[2] He remained there until March, 2007. Claimant was paroled on April 16, 2007.

In May, 2004 Claimant filed his initial claim alleging that he was mobility impaired. Twenty-nine exhibits were attached to the supplemental form filed by Claimant. Often multiple documents were contained within an individual exhibit. During the processing of the claim, Claimant filed additional documents labeled as Exhibits A-Z and AA-GG. Again, multiple documents are contained in each exhibit. At the hearing, Claimant offered twenty-one exhibits. All were admitted into evidence. In addition to reviewing hundreds of documents, the Special Master has reviewed four file folders of pleadings, one each for the years 2004 through 2007.

The sheer number of documents has made it difficult for the Special Master to sort out what might be a cognizable claim under the Settlement Agreement, the ADA and the Rehabilitation Act. It would be fair to say that Mr. Denton's approach to his grievances while in DOC custody was always confrontational, often threatening and never in the spirit of collaboration. Even the documents submitted by Claimant himself demonstrate his inability or unwillingness to accept a different point of view, other than his own, regarding the conditions of his incarceration.[3]

Defendants argue that Claimant does not have a mobility impairment that would constitute a disability under the Settlement Agreement and, therefore, he is not a member of the *Montez* class. They argue that his claims assert substandard medical care, not discrimination based upon a disability. Defendants also claim that Claimant was appropriately treated for chronic pain, despite his "drug seeking behavior" and that DOC followed all of Claimant's medical restrictions. *See, Dr. Neufeld's affidavit, Defendants' Exhibit A.*

---

[2]During the six years that Claimant was in DOC custody, he was transferred six times. Defendants offered no testimony or documentation for the criteria used to transfer an inmate from one facility to another. Claimant's testified that he was transferred frequently because he was a "multiple grievance filer".

[3]The hostility, aggression and derisive comments that Mr. Denton openly expressed towards virtually everyone permeates the record. It would be fair to say that during his DOC incarceration, Mr. Denton's actions and statements were often unnecessarily confrontational and threatening. Such behavior is hardly ever constructive.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

*I. Permanent Mobility Impairment:*

**1. Is the Claimant a disabled individual who is a member of the class?**

*A. Receipt of Social Security benefits in 1996 is not sufficient evidence to establish that Claimant is a disabled individual who is a member of the Montez class.*

Claimant has advanced several reasons why he should be considered a member of the *Montez* class. First, Claimant that the Social Security Administration finding that he was totally disabled in 1996 is conclusive as to the issue of what constitutes a permanent lower extremity impairment within the meaning of the Settlement Agreement and according to the ADA and Rehabilitation Act. In direct examination of Dr. Cary Shames, Claimant attempted multiple times, without success, to elicit from that witness that a SSA finding of "total disability" was sufficient to establish that he had a qualifying mobility impairment as defined in the *Montez* Settlement Agreement. The Special Master specifically finds that Claimant's receipt of SSI benefits did not, and could not, automatically qualify him as a disabled individual and member of the *Montez* class.

*B. Claimant is not a disabled member of the Montez class based on his allegations that his lower extremity disability was made worse by DOC's failure to provide him with adequate pain medication.*

Claimant's second argument appears to be that he is a member of the *Montez* class because DOC did not properly manage his chronic pain, and this exacerbated his permanent lower extremity disability. The issue of the adequacy of the pain medication prescribed for Mr. Denton while he was incarcerated in DOC is the insistent, strident theme of Claimant's claim. Claimant filed grievance after grievance stating that DOC disregarded the recommendations of pain specialists. *See, Exhibits attached to Claimant's supplemental form and Claimant's Exhibits A-Z and AA-GG*.

The dispute between Claimant and DOC was over the advisability of prescribing and the efficacy in treating chronic pain with Methadone. Up until November, 2004, when the policy at DOC was changed so that all narcotic pain medications were eliminated, Claimant received Methadone. Claimant does not deny that he received Methadone until November, 2004. But, Mr. Denton vociferously and often nastily contests the amount and frequency he was dispensed narcotic medication. The Special Master notes that during the time that Claimant received Methadone there was considerable disagreement among the pain management specialists who Claimant saw as to the advisability of prescribing Methadone and its efficacy in treating his chronic pain. *See, 4/22/98 report of Dr. Thomas Stark, M.D. at the orthopaedic clinic at Colorado Health Institute at Pueblo stating: "I would certainly stay away from Oxycontin or Methadone in this patient.Defendants' Exhibit A-2,*

*pp. 5-6 ; 4/16/02 report of Dr. Lindsay Lilly, M.D., expressing concern about Mr. Denton's "rapid narcotic tolerance Claimant's Exhibit 2, Defendants' Exhibit A-8; 7/16/03 DOC ambulatory health record stating "Dr. Fine does not want inmate on Methadone. His recommendation is inmate [to be] put on Celebrex. Defendants' Exhibit A-12.*

The documents submitted by both sides indicate that DOC had a legitimate concern in closely monitoring and attempting to reduce the amount of narcotic pain medication, including Methadone, that was being prescribed for and taken by Mr. Denton. The Special Master finds that Claimant is not a disabled individual who is a member of the *Montez* because he disagreed with medical decisions made by DOC physicians regarding pain management.

*C. Any claims made by Claimant alleging substandard medical care are not cognizable under the ADA and Rehabilitation Act.*

Most of Mr. Denton's grievances revolve around the quality of medical care provided to him while in DOC custody. *Fitzgerald v. Corrections Corporation of America,* 403 F.3d 1134, 1143 (10th Cir. 2005) specifically states that the ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act.

Any claims that Claimant has that assert substandard medical care must be brought under the Eighth Amendment or pursuant to state statutes. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.[4]

*D. Claimant is a disabled individual who is a member of the Montez class based upon the medical restrictions imposed by DOC in April, 2001.*

Claimant argues that he had a documented permanent lower extremity disability when he entered DOC.[5] Medical restrictions were imposed at DRDC in April, 2001 but Claimant claims that they were not adhered to by other DOC facilities. The extent of Claimant's wrist, shoulder, neck and back injuries are not disputed by Defendants. *Defendants' Exhibit A, Dr. Neufeld's affidavit.* In his

---

[4]Claimant's individual Eighth Amendment claims are not contemplated by the settlement agreement, unless those claims meet the four criteria set forth in the District Court's order of November 23, 2004. Based upon the evidence presented, the Special Master finds that Claimant has not sustained his burden of proof.

[5]From 1996 to 2001, Claimant was incarcerated at the El Paso County Jail. It is unclear what treatment, if any, Claimant received during those five years. The documents submitted by both sides either pre-date 1996 or post-date 2001.

6

initial and supplemental claim, Mr. Denton states that the injuries he sustained in a fall from a scaffold in 1989 make it difficult if not impossible to bend, lift, walk, climb stairs or sit for any extended period of time. Defendants do not dispute the catastrophic nature of Claimant's injuries or the medical restrictions imposed in 2001, 2002 and 2004. *Defendants' Exhibit A.*

Under the ADA and Rehabilitation Act, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. § 794(d); 29 U.S.C. §705(9)(B). The definition of a permanent lower extremity impairment is further defined in the Settlement Agreement. Three criteria must be met: (1) Claimant's ability to walk has to be substantially limited by his lower extremity impairment; (2) the lower extremity impairment has to substantially limit Claimant's ability to perform a major life activity; and (3) the lower extremity impairment is not expected to improve within six months.

The Special Master finds that the medical restrictions imposed by DOC in April, 2001 through 2004 meet the definition of "disability" under the ADA and Rehabilitation Act. "Major life activities" are not specifically defined in the Settlement Agreement, but are in the regulations enacted to implement the ADA and Rehabilitation Act . "Major life activities" are basic functions, "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *29 C.F.R. § 1630.2(h)(2)(I).* The Special Master finds that the medical restrictions imposed by DOC in 2001, 2002 and 2004 indicate that DOC believed Claimant had a permanent lower extremity mobility disability that substantially limited his ability to move, bend, lift heavy objects, walk, climb stairs or sit for long periods of times. *Claimant's initial and supplemental claim form.*

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?**

Claimant's medical restrictions for 2001, 2002 and 2004 have been submitted as part of the record by both Defendants and Claimant. The following limitations were imposed on April 20, 2001 at DRDC: "First tier, lower bunk, no stairs, no vigorous exercise, no intensive labor, no bending, no squatting, no heavy lifting over 10 pounds, and no sitting for more than one hour." *Defendants' Exhibit A.* Defendants' Exhibit A-3 reiterates some of the same restrictions. Apparently these restrictions were followed from April through October, 2001 during Claimant's incarceration at LCF. Claimant submitted a document from DOC stating his medical restrictions in 2001 and 2002. *Exhibit (16) attached to Claimant's supplemental claim.* In addition to the restrictions noted above, Claimant was to receive a single cell as of April 20, 2001. *Claimant's Exhibit B.*

In a July 25, 2002 staffing in which Claimant was present, the Warden at AVCF stated that Dr. Wermers determined in 2002, that Claimant no longer required a single cell for psychiatric reasons. *Claimant's Exhibit F.* The Special Master cannot reconcile that statement with DOC's own documents setting forth Claimant's medical restrictions as of April, 2001. DOC's documents clearly show that none of the medical restrictions imposed in April, 2001 were changed by DOC while Claimant was at AVCF. In addition, Dr. Neufeld's affidavit states that as of June, 2002, all of Mr.

7

Denton's restrictions from April, 20, 2001 were still in place. *Defendants' Exhibit A, paragraph j.*

The record also supports Claimant's assertion that once he arrived at AVCF, his medical restrictions were eliminated or not adhered to. The most compelling evidence for this finding comes from a memo dated July 25, 2002 from Warden Soares at AVCF. *Claimant's Exhibits (1) through (6) attached to the supplemental claim form and Claimant's Exhibit F.* In these documents Defendants agree that Claimant had medical restrictions in place on February 26, 2002 that limited his work as a "food handler." On March 3, 2002, Mr. Denton claims that he was injured while working in the bakery. Defendants do not contest Claimant's assertion that he was forced to lift one hundred pound bags of flour in spite of his medical restrictions. Defendants relied on a 2/12/02 food handler's certificate that did not indicate any medical restrictions. A food handler's certificate dated 2/26/02 subsequently "appeared" listing all of Claimants medical restrictions as of April, 2001. Despite the existence of the 2/26/02 certificate with restrictions noted, Denton was charged with and convicted of a COPD violation on March 22, 2002 for "failure to work" in the kitchen where he was assigned on March 4, 5, and 6, 2002. Claimant's appeal of his conviction was denied on April 15, 2002. On July 25, 2002, "[a]fter review of the facts, Warden Soares expunged the report (COPD conviction) due to Offender Denton's restrictions which prohibited him from being assigned to the kitchen." The expungement order also restored the penalties that had been imposed from the COPD conviction -10 days loss of good time and 30 days of loss of privileges." [6]

The Special Master finds that during his incarceration at AVCF from October, 2001 through October, 2002 DOC did not comply with Claimant's medical restrictions despite his permanent lower extremity disability. Medical restrictions set in place by DOC in 2001 were benefits or services offered by DOC to Claimant. The medical restrictions imposed were "accommodations" that DOC provided to Claimant based on DOC's own record of Claimant's impairment. DOC did not comply with its own restrictions during the one year that Claimant was incarcerated at AVCF.

The Special Master also finds that DOC did not comply with its own medical restrictions from October, 2002 through November, 2004. For example, since 2001 Claimant made continuous requests for an eggcrate mattress and wedge pillow. In 9/01 Claimant was denied an eggcrate mattress because he did not meet the medical criteria for one. *Defendants' Exhibit A-5.* DOC sent Claimant to see a pain specialist, Dr. Jeffrey Fine, M.D., on 7/23/02, 5/1/03 and 8/25/03. Dr. Fine recommended an egg-crate mattress on 8/25/03. *Claimant's Exhibit G.* That recommendation was not followed. An egg-crate mattress was approved on 5/5/04 and then taken away without explanation on 5/19/04. *Defendants' Exhibit A-13, pp.1-5.* In 1/02, Claimant's restrictions reflected that he was to receive a wedge pillow. On 7/11/02 Claimant was denied a wedge pillow, but given one in November, 2002. *Defendants' Exhibit A-10 and A-11.* No reasons were given for the denial or the retraction of the denial.

---

[6]Although the Special Master understands that 10 days loss of good time can be reinstated electronically, it is unclear to the Special Master how the COPD penalty of 30 days of loss of privileges can be "undone."

Since 2001, Claimant also made repeated requests to have the restriction of a single cell reinstated. Claimant was given a single cell on 4/20/01 at DRDC and apparently had one until he was transferred to AVCF in October, 2001. At some point after that, he was not allowed to have a single cell, although the DOC's medical restriction of a single cell was never removed. On 9/8/04, the restriction of single cell appears again. *(Claimant's Exhibit B).*

The only evidence presented by Defendants was Dr. Neufelds' affidavit and attached exhibits. The attached exhibits do not comprise the entire medical record at least to the extent that Claimant has submitted numerous medical records not included by Defendants. Claimant testified during the hearing that he did not receive a single cell from September, 2001 through November, 2004. The Special Master's finding that Defendants did not adhere to the medical restrictions they put in place for him from October, 2001 to November-2004 is supported by Claimant's record of these events and the documents he submitted. As to this issue, Claimant's record is more complete and more credible.

In November, 2004, DOC discontinued dispensing all narcotic pain medication to inmates. Most of Claimant's grievances in 2005 were expressions, sometimes tirades, of dissatisfaction with this state-wide policy decision of the Chief Medical Officer of DOC. As noted previously, issues of substandard medical care cannot be addressed under the ADA and Rehabilitation Act. For the period of November, 2004 through Claimant's parole date of April 16, 2007, Claimant has failed to prove by a preponderance of the evidence that he was a disabled individual and member of the *Montez* class. After November, 2004, the ambulatory health records submitted by Defendants and not refuted by Claimant demonstrate that Claimant was able to ambulate normally with or without a cane. *Defendants' exhibits A-14 through A-20.*

### 3. Was the Claimant discriminated against by DOC because of his or her disability?

The Special Master finds that Claimant was discriminated against by DOC because he had a permanent lower extremity impairment during his incarceration from October, 2001 through November, 2004. Claimant's medical restrictions were meant to accommodate his disability. Defendants admit that the restrictions were not followed. DOC's admitted failure to comply with the medical restrictions in place during that time are discriminatory acts.

The Special Master has previously determined that Claimant has not proven by a preponderance of the evidence that he had a permanent lower extremity disability after 2004. Therefore, the issue of continuing discrimination after 2004 will not be addressed.

### 4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?

DOC's conduct from October, 2001 until November, 2004 did harm Claimant physically and emotionally. The record supports Claimant's assertions that for the period of three years DOC required that he live and work in conditions that did not adhere to DOC's own medical restrictions. As a result of an erroneous COPD conviction, Claimant lost all of his privileges for one month.

Because Claimant is now on parole, the only remedy that the Special Master can order is monetary compensation. Consistent with other monetary awards imposed by the Special Master for findings of discrimination in other similar cases, Claimant is awarded the sum of $750.00.

  IT IS HEREBY ORDERED that the claim of Dean Ross Denton as to discrimination based upon a permanent lower extremity mobility impairment is granted for his three years of incarceration between October, 2001 to November, 2004, as Claimant has proven by a preponderance of the evidence each of the four criteria set forth in the District Court's Order of November 23, 2004 for that period of time; and

  IT IS FURTHER ORDERED that Claimant is to receive compensation in the amount of $750.00; and

  IT IS FURTHER ORDERED that the all other aspects of the claim of Dean Ross Denton are dismissed; and

  IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before December 19, 2007.**

  SIGNED this 26th day of September, 2007.

              BY THE COURT:

              */s/ Richard M. Borchers*

              _____
              Richard M. Borchers
              Special Master