IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number: 03-399
Category III
Claimant: Felix Olguin #76704
Address of Claimant: CSP, P.O. Box 777, Canon City, CO 81215

---

# FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Claimant Felix Olguin. The Special Master has reviewed the claim and all documents filed by both sides. This Order shall constitute the final action of the Special Master on this specific claim.

## I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial Plan also created a mechanism for individual

1

inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III. DEFINITIONS
>
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
>
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

2

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>
>> 1. Is the claimant a disabled individual who is a member of the class?
>> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Olguin submitted a *Montez* claim, which was assigned claim number 02-129. The claim is premised on an alleged permanent disability due to a vision impairment.

2. Claimant's claim was originally assigned to Category II pursuant to the Remedial Plan as set forth above. Mr. Olguin's claim was reassigned to Category III and renumbered to 03-399.

3. Claimant Olguin entered CDOC custody in April of 1977. It appears that he was paroled in June of 1981; he was almost immediately re-arrested; and then he was paroled again in 1982. He re-entered CDOC custody in 1987. He has remained in CDOC custody since 1987, and his current release date is 2032. While in CDOC custody, Claimant Olguin has been housed at a number of facilities, including but not limited to Centennial Correctional Facility, Freemont Correctional Facility, Shadow Mountain Correctional Facility, Colorado Territorial Correctional Facility, San Carlos Correctional Facility, and the Colorado State Penitentiary.

4. Claimant has a vision impairment that requires him to wear eyeglasses. He indicates that without glasses, his vision is poor and that it is difficult for him to read because the words keep fading. He testified that he can watch television without glasses,

3

but that when he tries to do legal work, the page becomes distorted. He also has trouble walking straight without his glasses.

5. Claimant asserts that he was involved in an automobile accident in 1985. His glasses were broken during the accident. Mr. Olguin contends that when he re-entered CDOC custody, his glasses still had not been replaced, and that even after he went into CDOC custody, it took over two years before he received a new set of eyeglasses.

6. Claimant Olguin also contends that even with the eyeglasses provided by CDOC, his vision is blurred and objects tend to fade away. When he watches television with his glasses, his eyes burn. Claimant asserts that CDOC has discriminated against him by failing to properly treat his vision impairment, and by failing to provide him with the correct prescription eyeglasses. He further argues that CDOC medical providers accused him of not being honest in responding to questions during eye examinations, and told him that there was nothing wrong with his eyes. Mr. Olguin testified that in 2006, CDOC finally arranged for him to see an opthalmologist in Canon City, who informed him that he was suffering from an eye disease that had affected him from birth. According to the Claimant, from 1977 to 2006, CDOC medical providers completely failed to diagnose his eye disease.

### III. CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical

disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

The Special Master finds and concludes that Claimant Olguin suffers from impaired vision. However, the Special Master further finds and concludes that Claimant has failed to prove by a preponderance of the evidence that his vision impairment constitutes a "disability," within the meaning of the ADA and/or the Rehabilitation Act. Claimant's medical records demonstrate that he was given a visual acuity test when he re-entered CDOC custody in January of 1987. The test showed an uncorrected visual acuity of 20/50 in his left eye and 20/100 in his right eye. He was provided with a pair of prescription eyeglasses on March 4, 1987. Claimant received a new pair of eyeglasses in 1989 and again in 1997. In April of 2006, he was given a visual acuity test, which showed that his corrected vision was 20/20. Another visual acuity test in July of 2006 indicated a corrected visual acuity of 20/25 in the left eye and 40/50 in the right eye.

The fact that Claimant wears corrective lenses certainly does not demonstrate that he suffers from a vision disability. Additionally, there is no basis for concluding that Claimant is disabled where, as here, the evidentiary record indicates that his visual acuity is close to normal with corrective lenses. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999). Claimant acknowledged that he can watch television and can read. The fact that his vision is somewhat blurry and that his eyes burn and water, does not, in itself, demonstrate that he is substantially limited in his ability to engage in one or more major life activities.

The Special Master also finds and concludes that Claimant Olguin has failed to prove by a preponderance of the evidence that CDOC discriminated against him because of his vision impairment. Although Claimant asserts that CDOC failed to provide him with corrective eyeglasses for over two years (from the time he was arrested in 1985 after a car accident until sometime in 1987), Claimant's records do not support his contention. The records show that although Claimant was arrested in 1985 after absconding, he did not re-enter CDOC custody until 1987. Claimant was given an eye examination almost immediately upon re-entering CDOC custody in 1987, and was provided with a pair of prescription eyeglasses less than two months later. In short, the evidence is insufficient to support a finding that CDOC unreasonably delayed in providing Claimant with prescription eyeglasses in 1987.

Although the medical records relating to Mr. Olguin's vision impairment are sketchy, there is an indication that in 2006, CDOC was having difficulty obtaining eyeglasses with the correct prescription. Additionally, the records of Mr. Olguin's

opthalmology consult in 2006 indicates that he suffers from exophoria, but that this condition is not noted in any of his other medical records. Perhaps this is the condition that Claimant was referring to when he testified that the opthalmologist diagnosed a condition that had not been found during his prior CDOC eye examinations. Nevertheless, claims of negligent medical care and/or failure to properly diagnose medical conditions, in and of themselves, do not give rise to claims under the ADA and/or the Rehabilitation Act. Such issues may well form the basis for a legal claim of deliberate indifference to medical needs under the Eighth and Fourteenth Amendments to the United States Constitution, but both our Circuit and others have clearly stated that deliberate indifference to medical needs does not give rise to a claim under either the ADA or the Rehabilitation Act, nor do claims of negligent medical treatment fall within the ambit of either of these statutes. *See Fitzgerald v. Corrections Corp. of America,* 403 F.3d 1134 (10th Cir. 2005). *See also Kiman v. New Hampshire Dept. of Corrections,* 451 F.3d 274 (1st Cir. 2006); *Burger v. Bloomberg,* 418 F.3d 882 (8th Cir. 2005); *Schiavo ex rel. Schindler v. Schiavo,* 403 F.3d 1289 (11th Cir. 2005); *United States v. University Hospital,* 729 F.2d 144 (2nd Cir. 1984). Furthermore, a claim for deliberate indifferent to medical needs is not cognizable under the Remedial Plan unless it is tied to a showing of discrimination because of a disability. As stated above, no such showing has been made here.

For all of the foregoing reasons, Mr. Olguin's *Montez* Claim must be denied.

## IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment be entered in favor of Defendants and against Claimant dismissing Claimant Olguin's *Montez* Claim with prejudice. To the extent that Claimant has asserted other claims which do not fall within the *Montez* Remedial Plan, they are dismissed for lack of jurisdiction.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before January 7, 2008** with the Clerk of the United States District Court at the following address:

> 901 19th Street
> Denver, CO 80294.

SIGNED this 22 day of October, 2007

> BY THE COURT:
>
> /s/ Bruce D. Pringle
> _____
> Bruce D. Pringle,
> Special Master

## CERTIFICATE OF MAILING

      I hereby certify that I have mailed a copy of the foregoing Final Order of Special Master this 22nd day of October, 2007 to the following:

Mr. Felix Olguin
# 76704
P.O. Box 777
Canon City, CO  81215

Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO  80203

                                          /s/ Susan L. Carter