IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number: 02-606
Category II
Claimant: Ricky Gonzales # 116667
Address of Claimant: 4511 East 46th Avenue, Denver, CO  80216

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Claimant Ricky Gonzales. The Special Master has reviewed the claim and all documents filed by both sides. This Order shall constitute the final action of the Special Master on this specific claim.

### I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial Plan also created a mechanism for individual

1

inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III. DEFINITIONS
>
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
>
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

2

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>
>> 1. Is the claimant a disabled individual who is a member of the class?
>> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Ricky Gonzales submitted a claim on July 9, 2004, which was assigned claim number 02-606. The claim is premised on alleged permanent disability due to a mobility impairment.

2. Claimant's claim was or assigned to Category II pursuant to the Remedial Plan as set forth above.

3. Claimant Gonzales entered CDOC custody in March of 2002. He was paroled in October of 2003. Although the record is not entirely clear, Claimant was returned to CDOC custody sometime in the spring of 2004. He was released in October of 2006. While in CDOC custody, Claimant was housed at the Sterling Correctional Facility and Fort Lyons Correctional Facility.

4. Claimant states that he has herniated discs at C-5 and C-6 which will require surgery in the future. He indicates that this condition impairs his mobility and range of motion in his neck and right arm. Additionally, Mr. Gonzales states that he suffers from herniated discs at L-5 and L-6 which substantially limit his ability to walk and to work. He generally uses a cane to assist him in walking. Claimant fell while at Fort Lyons Correctional Facility in May of 2003. Although he received injections in his lower back,

the impairment of his lower extremities continued to get worse. For a period of time at Ft. Lyons, claimant utilized a wheelchair. At other times, he utilized a walker or a cane.

     5. Claimant was paroled in October of 2003. While on parole, his medical providers determined that he had a blood clot in his right leg and that he had suffered nerve damage which resulted in bowel and urinary problems. Because his mobility impairment had grown more severe, it was recommended that he utilize a wheelchair. Claimant indicates that his parole officer did not believe that he needed a wheelchair. Claimant states that he was unable to walk or work during his parole. He re-entered CDOC custody in April of 2004.

     6. Claimant asserts that CDOC failed to provide proper medical treatment after his fall in May of 2003, thereby causing his lower mobility problem to become worse. He also asserts that while he was utilizing a wheelchair, Claimant also asserts that for a period of time while he was at Ft. Lyons, he was denied a cell in Building 4 which was wheelchair accessible, and was housed in Building 7, where he was required to utilize the stairs. However, the record does not reflect when this housing situation arose or for how long it lasted before he was transferred to Building 4. He complains that CDOC refused to provide him with transportation from Ft. Lyons to Denver when he was paroled, even though the pain in his lower extremities prevented him from riding for long periods of time in a bus. As a result, his father had to drive from Texas to pick Claimant up and transport him. Claimant further contends that while on parole, his parole officer refused to abide by the recommendations of his medical providers and insisted that Claimant did not need a wheelchair and that Claimant could work. As a result, Claimant was forced to utilize a walker. He alleges that although the medications he was taking made him dizzy and disoriented, his parole office accused him of being drunk and this resulted in his return to CDOC custody. Finally, Claimant contends that he slipped and fell on a wet floor in September of 2004, and that CDOC personnel refused to send him to medical for 45 minutes.

     Neither Claimant nor the Defendants have submitted any medical records for the period of time from March of 2002 through July of 2003. The earliest record regarding Claimant's medical condition is a grievance filed on August 27, 2003, which complains that he was supposed to see a physical therapist, but an appointment had not be set, and that he was interested in having surgery if it would relieve his pain and lack of mobility. There is also an indication in the grievance that Claimant was using a wheelchair. The response to the grievance indicates that Gonzales was seen by a physical therapist on August 28, 2003, and that it was recommended that with an exercise regime, he could progress off of a walker to the point where no assistive devices would be necessary.

     7. Medical records from November of 2004, after a fall that apparently occurred in October of 2004, indicate that Claimant had been utilizing a wheelchair for about three weeks, and that he was going to the gym and riding a bicycle for an hour every day. It further notes that he was pushing the wheelchair with his pusher in it. The attending physician stated that Claimant no longer needed the wheelchair, and that he could stand and walk using a cane. Records from 2005 note that Claimant had pain and swelling in

his leg and was receiving pain medication. There is no indication that Claimant was unable to ambulate.

### III. CONCLUSIONS OF LAW

1.  The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2.  The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

The Special Master finds and concludes that although Claimant suffers from a mobility impairment, it does rise to the level of a "permanent mobility disability," within the meaning of the ADA and/or the Rehabilitation Act. Whether an impairment constitutes a substantial limitation on a major life activity depends on, among other things, the duration of its limiting effects. *E.g., EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001)("To hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA

beyond all bounds."). Medical conditions or illnesses that only sporadically limit one's ability to engage in major life activities generally do not constitute permanent disabilities under the ADA and/or Rehabilitation Act. *E.g., Rohan v. Networks Presentations LLC*, 375 F.3d 266, 276 (4th Cir. 2004).

Claimant's impairments relating to his neck and arm are not within the scope of the *Montez* Remedial Plan. While the Remedial Plan states that it covers persons with "mobility impairments," Plan ¶ III(A), it does not generally define the term "mobility impairments." However, the references to "mobility impairment" in the Plan indicate that the parties intended the term to encompass diseases, injuries, and/or conditions involving the lower extremities that impose a substantial limitation on the major life activity of walking. *See* Plan ¶ V(A)(1)(dealing with presumed need for special housing, and defining "permanent mobility impairment as "a permanent lower extremity mobility impairment that substantially limits walking."); Plan ¶ XVI(A)(identifying health care appliances as including "orthopedic prostheses, orthopedic braces or shoes, crutches, canes, walkers, wheelchairs . . . gloves for wheelchair use only," thereby strongly suggesting that "mobility impaired" inmates are those with diseases, injuries, and/or conditions involving their lower extremities). In short, there is no indication in the Remedial Plan that its coverage of inmates with "mobility impairments" extends beyond those who are substantially limited in their major life activities of walking, standing, or negotiating stairs because of diseases, injuries, and/or conditions involving their lower extremities.

While the record clearly establishes that Claimant has some impairment of his lower extremities, the Special Master finds and concludes that at least during the time period covered by the *Montez* Remedial Plan, this impairment did not rise to the level of a "disability" within the meaning of the ADA and/or the Rehabilitation Act. The very sparse record before the Special Master indicates that although Claimant was utilizing a wheelchair for a short period of time after his fall in May of 2003, his condition improved to the extent that he was able to ambulate with the use of a cane, which was provided by CDOC. There is also some indication that Claimant had utilized a wheelchair for approximately three weeks in August of 2003, but that whatever had caused his inability to ambulate had been resolved to the point where he was able to walk with a walker by the end of August. These brief periods of wheelchair use in 2003 are insufficient to demonstrate that Claimant was had a permanent disability. *See Aldrich v. Boeing Co.*, 146 F.3d 1265, 1270 (10th Cir. 1998)(condition must be long term or potentially long term to constitute a disability under the ADA). *See also Hein v. All Am. Plywood Co.*, 232 F.3d 482, 487 (6th Cir. 2000)(short-term temporary restrictions on major life activities are generally not disabilities under the ADA).

All of Claimant's other contentions regarding his alleged mobility disability relate to time periods after the end of August 2003. The Remedial Plan was signed on August 27, 2003. Although the Remedial Plan fails expressly to address the issue of damage claims that might arise after its execution date, there is nothing in the Remedial Plan that would suggest that paragraph XXXII thereof, authorizing the recovery of damages and establishing claims procedures was intended to apply to claims for damages that had not

yet arisen. The Special Master finds and concludes that the damages that may be awarded under the Remedial Plan are limited to those resulting from violations of the ADA cognizable under the Remedial Plan and occurring prior to August 27, 2003. While post-August 27, 2003 discrimination may be taken into account, there must be a showing that Claimant did in fact suffer from a disability and was discriminated against through a failure to accommodate his disability prior to the execution of the Remedial Plan.

Additionally, even if Claimant suffered from a mobility disability prior to August of 2003, virtually all of Claimant's contentions of discrimination that occurred within this time period relate to failures to provide adequate medical care. While such issues may well form the basis for a legal claim of deliberate indifference to medical needs under the Eighth and Fourteenth Amendments to the United States Constitution, both our Circuit and others have clearly stated that deliberate indifference to medical needs does not give rise to a claim under either the ADA or the Rehabilitation Act, nor do claims of negligent medical treatment fall within the ambit of either of these statutes. *See Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005). *See also Kiman v. New Hampshire Dept. of Corrections*, 451 F.3d 274 (1st Cir. 2006); *Burger v. Bloomberg*, 418 F.3d 882 (8th Cir. 2005); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289 (11th Cir. 2005); *United States v. University Hospital*, 729 F.2d 144 (2nd Cir. 1984). Furthermore, a claim for deliberate indifferent to medical needs is not cognizable under the Remedial Plan unless it is tied to a showing of discrimination because of a disability. As stated above, no such showing has been made here.

Finally, even assuming that the *Montez* Remedial Plan covers discrimination occurring while a Claimant was on parole, all of Claimant's assertions of discrimination by his parole officer and during his subsequent return to CDOC custody post-date August 27, 2003. For the reasons discussed above, claims relating to disabilities and discrimination arising or occurring after August 27, 2003 are not within the ambit of the *Montez* Remedial Plan damage provisions and must be pursued in a separate suit.

For the foregoing reasons, the Special Master finds and concludes that the claim of Mr. Gonzales must be denied.

## IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment be entered in favor of Defendants and against Claimant dismissing Claimant Gonzales' *Montez* Claim with prejudice; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before January 14, 2008** with the Clerk of the United States District Court at the following address: 901 19th Street, Denver, CO 80294.

SIGNED this 29th day of October, 2007

7

BY THE COURT:

/s/ Bruce D. Pringle
_____
Bruce D. Pringle,
Special Master

## CERTIFICATE OF MAILING

   I hereby certify that I have mailed a copy of the foregoing Final Order of Special Master this 29th day of October, 2007 to the following:


Mr. Ricky Gonzales
# 116667
4511 East 46th Avenue
Denver, CO  80216


Mr. James X. Quinn
Mr. Jess A. Dance
Office of the Attorney General
Litigation Section
1525 Sherman Street, 5th Floor
Denver, CO  80203


                /s/Susan L. Carter