IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

   Plaintiffs,

-vs.-

BILL OWENS, et al.,

   Defendants.

_____

Claim Number: 03-296
Category: III
Claimant: Ronald Mestas, #100583
Address of Claimant: 441 W. County Road 16, Loveland, CO 80537

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

THIS MATTER comes before the Special Master on the claim of Claimant Ronald Mestas. The hearing was held at the Kit Carson County Center (KCCC) in Burlington, Colorado on May 8, 2006 before Richard C. Davidson, Special Master. Mr. Mestas appeared pro se. Defendants were represented by Jennifer Fox, Esq.

Claimant requested additional time in which to submit other documents in support of his claim. Claimant did submit a rebuttal to the affidavit of Dr. Neufeld.

The Special Master has reviewed the testimony and all documents filed by both sides. This Order shall constitute the final action of the Special Master on this specific claim.

### I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to

Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

2

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Ronald Mestas submitted a claim on May 13, 2004 which was assigned claim number 02-360. The claim alleged that Claimant had mobility and vision impairments.

2. Claimant's claim was reassigned to Category III pursuant to the Remedial Plan as set forth above. A new claim number of 03-296 was assigned to the claim.

3. Claimant Mestas first entered CDOC custody on April 28, 1999. He was evaluated at the Denver Reception and Diagnostic Center (DRDC). He then was transferred to the Sterling Correctional Facility (SCF) in Sterling, Colorado. He remained at SCF until he was granted parole on July 4, 2001. He returned to custody on February 17, 2004. He was in custody at KCCC when the hearing was held on May 8, 2007. He has been granted parole since that date and is living in the Loveland, Colorado area.

4. Claimant is a dwarf, weighing 90 lbs. and standing 4 foot tall. Claimant had physical problems with his knees before coming into DOC custody.

5. While Claimant was on parole in 2002, he had both of his knees replaced.

6. Claimant had difficulty during his periods of incarceration in receiving the correct sized

3

shoes and clothing. Since Claimant is a dwarf, he has feet that are smaller in size than carried as a matter of course by DOC.

7. Claimant stated that his vision problems relate to his ability to see things because they are at a higher level than his height.

8. Claimant was able to walk and run while in custody from 1999 to 2001. This was with pain and discomfort, as the boots given too him were too large.

9. Claimant was able to work and participate in educational programs while in custody.

### III. CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and ( c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

3. The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III( c). As discussed in Section I above, the Remedial Plan further limits permanent mobility, hearing, vision, and diabetes disability/impairment to those that conform to the criteria of Section V, paragraph A of the Plan.

4. Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

4

5. As is discussed more fully in paragraph 3 below, neither the ADA nor the Rehabilitation Act are designed to remedy alleged deficiencies or omissions in medical treatment provided to prisoners by CDOC. Rather, the ADA and Rehabilitation Act are designed to insure that those who have permanent disabilities that prevent them from engaging in one or more major life activities are not discriminated against because of their disabilities. The Remedial Plan, which defines the scope of the Special Master's authority, limits the disabilities for which damage claims can be asserted to those relating to mobility, vision, hearing, and diabetes.

6. The Special Master finds and concludes that Claimant Ronald Mestas was not mobility impaired on or before August 27, 2003. Claimant did have problems with the physical structures of various DOC facilities, but this was the result of being a dwarf with a height of four feet. Claimant was able to walk, work, and exercise prior to his release on parole on July 4, 2001. Claimant did not have a mobility impairment that affected his ability to carry on activities of daily life.

The Special Master finds and concludes further that Claimant Ronald Mestas was not vision impaired on or before August 27, 2003. During the time from 1999 to 2001, Claimant had vision that was correctable to 20/20 in both eyes. He did have glasses. Claimant did not have a vision problem that affected any activity of daily life.

7. The next question which must be answered is whether Claimant was qualified to participate in the programs or to receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs, or activities because of disciplinary reasons, health reasons, or other valid penal justifications. *Miller v. King,* 384 F.3d 1248, 1266 (11th Cir. 2004). It appears to be undisputed that Claimant was qualified to participate in the programs, benefits, and services offered by the DOC.

8. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America,* 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant's concerns relate to the quality of medical care he received in DOC custody, that is beyond the jurisdiction of the Special Master.

8. Claimant has not proven that he was the victim of discrimination on or before August 27, 2003. Under the Settlement Agreement, Claimant must establish that he had a recognized disability on or before August 27, 2003. Claimant must also establish that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003.

Claimant had legitimate concerns about clothing and shoes that were too large in size. The concerns raised by Claimant, including mirrors and shelves being too tall, related to his status as a dwarf, not due to mobility or vision impairments.

5

Since Claimant has not established that he was discriminated against by DOC and its staff on or before July 4, 2001, the Special Master cannot consider any incidents that occurred after the cut-off date. Claimant may pursue any claimed discrimination after August 27, 2003 through a separate lawsuit.

### IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, that the claims of Claimant Ronald Mestas are denied and dismissed.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before February 29, 2008** with the Clerk of the United States District Court at the following address:

>  901 19th Street
>  Denver, CO 80294.

SIGNED this 3rd day of December, 2007.

> BY THE COURT:
>
> */s/ Richard C. Davidson*
>
> _____
>
> Richard C. Davidson
> Special Master