# KING & GREISEN, LLP
### ATTORNEYS AT LAW

Diane S. King  
Paula Greisen

1670 YORK STREET  
DENVER, COLORADO 80206

Alison Butler Daniels  
Laura E. Schwartz  
Jason Cobb  
Jennifer W. Riddle

October 20, 2007

**VIA FACSIMILE AND EMAIL**  
Elizabeth McCann, Esq.  
Office of the Attorney General  
1525 Sherman Street, 5th Floor  
Denver, CO 80203  
Facsimile: (303) 866-5443

Re: Ft. Lyon Correctional Facility Compliance with *Montez v. Owens*

Dear Beth,

As you know, we recently met with our class members at the Ft. Lyon Correctional Facility. We are deeply disturbed by some of the information we received regarding the state of compliance with the Montez case. The overwhelmingly consistent problem voiced by our class members was the attitude of the correctional staff, either exhibiting extreme disregard for the needs of our class members or express disdain for this case and the inmates involved.

The most disturbing information we received concerned the tasering of Jontah Taylor, a diabetic class member. We have been informed that on the morning of September 20, 2007, Mr. Taylor had a high blood sugar reading, of approximately 280, and informed the nursing staff he was in need of insulin. He was told to come back at 8:00 a.m. for his regular insulin shot. When he reported back at 8:00, we understand his insulin was then over 500. Mr. Taylor received a shot of insulin at 9:00 a.m. However, by noon, his blood sugars had risen to around 230. We are unclear whether he subsequently had another insulin shot around that time.

In any event, by around 5:00 p.m., two other inmates took Mr. Taylor to the med line because he was experiencing extremely low blood sugars, and had become hypoglycemic. We were told the Mr. Taylor was agitated, nervous and kept yelling that he needed to see a doctor. We understand that a nurse and a guard, Sgt. Newman, were attending to Mr. Taylor and trying to calm him and possibly trying to give him some glucose pills. When he was told to sit down, Mr. Taylor would sit down but would then stand up again demanding to see a doctor and was obviously agitated by the hypoglycemia – which can typically make a person very confused, nervous, shaky, and disoriented. Sgt. Newman then, either because he simply does not understand the physical manifestations of hypoglycemia or because he simply became tired of dealing with Mr. Taylor, decided to resolve the situation by tasering Mr. Taylor three to four

---

TELEPHONE: (303) 298-9878 ✧ FACSIMILE: (303) 298-9879 ✧ E-MAIL: greisen@kinggreisen.com

Beth McCann
October 19, 2007
Page 2 of 3

times. The witnesses to this incident uniformly described that Sgt. Newman tasered Mr. Taylor, who is very slight of build, 5"4' and 130 lbs, once while Mr. Taylor sat in his chair, then at least two to three more times after Mr. Taylor fell on the floor. We were informed that Mr. Taylor was then hog tied and taken to segregation.

We held numerous meetings with class members with diabetes and the same story was told to us on each occasion – by different witnesses at different times. On every occasion, the witnesses verified that at no time was Mr. Taylor combative or posing any threat to the custodial or medical staff. There is too much similarity between the stories to dismiss this as just an exaggeration by disgruntled inmates. Importantly, the class members were noticeably affected by what happened to Mr. Taylor and routinely expressed fear that this would happen to them if they became hypoglycemic.

We consider this an extremely serious incident and accordingly, request that we immediately be provided copies of all the incident reports regarding this matter, as well as a copy of Mr. Taylor's medical file. We have enclosed a release from Mr. Taylor for this information. Moreover, we understand that there should be security tapes of this incident and request that we be provided copies of those tapes immediately. Finally, we request a copy of any investigations into this incident, information concerning the use of tasers at any other time during the past year and the reason for that use, as well as the facilities' policy regarding the use of tasers.

Another incident that causes us concern involves Raymond Stuart, a mobility impaired class member who is confined to a wheelchair. As it is not uncommon for people confined to wheelchairs, Mr. Stuart often had problems with constipation. Although he did not like to use laxatives, he was ordered to take laxatives by the nursing staff. Recently, because of effect of the laxatives, Mr. Stuart was unable to get to a bathroom in time and had an accident while he was at his job working in the kitchen. Needless to say, this was very humiliating for Mr. Stuart. Nevertheless, one of the custodial staff members, Sgt. Newholt[*], became very irate with Mr. Stuart, started cussing at him, and belittled him for having the accident. Apparently, Sgt. Newholt's tirade was so embarrassing that the other inmates felt very sorry for Mr. Stuart and even offered to help clean up. We understand that Sgt Newholt yelled at Mr. Stuart to return to his cell and then fired him from his job in the kitchen because of the accident.

This display of anger and aggression toward a wheel-chair bound individual who has little to no control over bowel movements is emblematic of the hostility that we fear is expressed toward class members on a routine basis. There can simply be no justification for Sgt Newholt's conduct. Although we are told that another staff member did tell Sgt. Newholt that her reaction to the incident was inappropriate, we do not believe she faced any discipline. Perhaps more importantly, we simply cannot understand why Mr. Stuart would lose his job over what was clearly an accident. Given that there are a disproportionately high number of Montez class members at Ft. Lyon and that there are very few jobs available at that facility,

---

[*] We believe this to be the name of the Sgt., however, the spelling of the name may not be accurate.

TELEPHONE: (303) 298-9878 ✧ FACSIMILE: (303) 298-9879 ✧ E-MAIL: greisen@kinggreisen.com

getting a job at all is an enormous achievement. To have it taken away under these circumstances seems clearly discriminatory and frankly, just wrong. Accordingly, we are again asking for copies of all incident reports regarding this matter, a well as all records showing why Mr. Stuart was removed from his job in the kitchen, and what, if any, discipline Sgt. Newholt faced regarding her conduct.

Lastly, although it is not as serious as the two above incidents, I will mention one other event that happened during our visit to Ft. Lyon as I think it also demonstrates an attitude by the staff that is alarming. On one of the mornings while I was waiting for my team members, I was standing in the hall area just beyond the front check-in at the facility. There was an inmate there, Paul Bobb, who was shining shoes. As I was standing there waiting, Mr. Bobb asked me if I received the packet of information that he sent me. I told him that another attorney in our office, Jennifer Riddle, was receiving the mail and I would ask her when she got there if she had seen his letter. That afternoon, I was again waiting in the same area and Mr. Bobb was standing in the front check-in area. Ms. Riddle came in and was started checking in. At that time, I said to Mr. Bobb that Ms. Riddle was here and I would ask her if she got his letter. I then spoke to Ms. Riddle, asking if she got his letter. Ms. Riddle asked him when he sent the letter and Mr. Bobb responded. Wendy Glover, the litigation assistant who has been assisting arranging the group meetings, was standing in the control area in front of me and heard the conversation. She then looked at Mr. Bobb and said "Mr. Bobb, if you want to talk to these attorneys you can write them a letter." – or words to that effect. Not wanting Mr. Bobb to get in trouble, I turned to Ms. Glover and told her that Mr. Bobb was just responding to a question we asked of him. At that point, Ms. Glover became visibly angry and stated that it was now time that Mr. Bobb return to his cell. I asked if this was his regular time to return to his cell. Obviously irritated and with pursed lips, Ms. Glover responded to me that "It is now." As a result of responding to a question we asked him, Mr. Bobb was immediately ordered back to his cell.

The fact that Mr. Bobb was punished for merely responding to our question clearly implies that the staff does not hesitate to retaliate against any inmate who appears to be involved in this case. I was surprised that this hostility was so openly expressed in my presence. This attitude appears to be pervasive at Ft. Lyon and indicative of the type of problems that Judge Kane addressed at our last hearing.

We believe these matters need to be addressed immediately and look forward to your client's response. Of course, please do not hesitate to call if you have any questions.

Sincerely,

Paula Greisen

PG\gc

TELEPHONE: (303) 298-9878 ✧ FACSIMILE: (303) 298-9879 ✧ E-MAIL: greisen@kinggreisen.com

I  Jontah Taylor , # 94633  hereby authorize all of my medical records to be released to the law firm of

KING & GREISEN, LLP.

Signed: Jontah Taylor

Witness: Y. DIAZ-M

Date: 09-26-07

# KING & GREISEN, LLP
ATTORNEYS AT LAW

Diane S. King  
Paula Greisen

1670 YORK STREET  
DENVER, COLORADO 80206

Alison Butler Daniels  
Laura E. Schwartz  
Jason Cobb  
Jennifer W. Riddle

November 29, 2007

**VIA FACSIMILE AND EMAIL**  
Elizabeth McCann, Esq.  
Office of the Attorney General  
1525 Sherman Street, 5th Floor  
Denver, CO 80203  
Facsimile: (303) 866-5443

Re:   Ft. Lyon Correctional Facility Compliance with *Montez v. Owens*

Dear Beth,

I am writing because I am growing increasingly concerned about the attitude taken toward class counsel and this case by certain members of the staff at Ft. Lyon. As you may know, last week several member of the plaintiff's team returned to Ft. Lyon to finish meetings with Montez class members, including attorneys Jennifer Riddle and Lara Marks, our vision expert Julie Deden, and our hearing impaired expert Larissa McClung. Apparently, Ms. McClung got lost on the way to the facility and therefore did not arrive by 9:00 am. Ms. Grover gave Ms. Marks the option of waiting for Ms. McClung or proceeding with the meeting as scheduled. Ms. Marks requested that Ms. McClung be escorted to the meeting when she arrived. Ms. Grover curtly informed Ms. Marks that they could not escort people back and forth and that we were "really disrupting their operations." When Ms. McClung arrived, approximately one hour late, Ms. Grover refused to escort Ms. McClung to the on-going meeting with the hearing impaired class members, telling Ms. McClung that she would not be allowed to meet with the class members until the scheduled afternoon meeting.

Certainly, we understand the importance of having everyone arrive at the facilities on time. On the other hand, Ft. Lyon is a remotely located facility that Ms. McClung had not previously visited. Although I understand that Ms. Grover may feel this case is an inconvenience, it simply is not acceptable to treat one of our experts with such disrespect. Certainly, there have been times when the DOC staff has made errors in scheduling our meetings. We have always taken the position that mistakes will happen and have been flexible in accommodating human errors. As I am sure you understand, we expect the same courtesy will be extended to class counsel and our experts by DOC staff.

TELEPHONE: (303) 298-9878 ✧ FACSIMILE: (303) 298-9879 ✧ E-MAIL: greisen@kinggreisen.com

Beth McCann
November 29, 2007
Page 2 of 3

Even more concerning, however, is the information we received at Ft. Lyon about Mr. Bobb, the class member whom Ms. Grover subjected to discipline after he spoke to us during our last trip to Ft. Lyon. First, you should be aware that despite assertions in the report from the Warden of Ft. Lyon regarding the incident we reported, Mr. Bobb *most certainly is* a Montez class member and has been confirmed to have a vision impairment by the DOC. It is concerning that neither the Warden, nor Ms. Grover, who is the "litigation coordinator" for the facility and oversees all of the class counsel's meetings with class members, appear to be unaware of Mr. Bobb's disability.

In fact, we know that Ms. Grover is aware of his disability status because last week when Ms. Riddle went to the facility to meet with the vision impaired class members, Ms. Grover explained that Mr. Bobb was not being allowed to attend the meeting because he was in segregation. At Ms. Riddle's insistence, Ms. Grover brought Mr. Bobb to a non-contact visiting room to meet with Ms. Riddle and Ms. Marks. At that time, they learned that on October 22, 2007, the very day Ms. Grover wrote her "incident report form" in response to the incident we raised in our letter, Mr. Bobb was fired from his job and put into segregation. Apparently, after Ms. Grover spoke to one of the nurses, Mr. Bobb was then accused of making an inappropriate remark to a nurse – an accusation that would be impossible for him to disprove and which he adamantly denies.

As punishment for this alleged statement, on October 31, 2007, Mr. Bobb was sentenced to twenty (20) days in segregation, with credit for the eight (8) days he had already served. Mr. Bobb should have been released from segregation between November 11 and November 13 – however was still in segregation at the time on Ms. Riddle's visit on November 20, 2007. In addition, Mr. Bobb has been told that he has become "unmanageable" at Ft. Lyon will therefore be moved, most likely to the Centennial Correctional Facility, which is non-designated facility. When Mr. Bobb expressed his concerns about being transferred to a non-designated facility, he was told he would "manage."

We are extremely concerned about this series of events. At a minimum, the actions taken toward Mr. Bobb by the Ft. Lyon staff appear retaliatory. We are greatly dismayed by the attitude expressed by Ms. Grover during our visits, toward our expert, and in her report in this matter. According to Ms. Grover's report, there has been a directive issued that "only offenders on the list provided by legal services were to be allowed to speak to Plaintiff's counsel." We certainly want a copy of all such guidelines that have been communicated to DOC staff. We have never been made aware of any such directive and have on numerous occasions spoken to a variety of inmates in passing during our visits, never to have this type of response. Frankly, inmates who do not have disabilities have often provided us valuable information about the care and treatment of inmates with disabilities. As the law clearly protects those who complain about discrimination against others, I cannot imagine that DOC's policy would be to punish any non-class member who communicates with class counsel in this case.

    We believe the situation with Mr. Bobb poses very serious concerns and thus request immediate discovery regarding his recent COPD conviction as well as a copy of his working file. We also request a full explanation of why Mr. Bobb has been held in segregation beyond the 20 days of his sentence. Given the attitude we have personally experienced, we think there are strong reasons to believe that the actions taken against Mr. Bobb are retaliatory. Therefore, request that you immediately inform us if Mr. Bobb continues to be held in segregation or if he is transferred to another facility. If either is true, we will ask the Court to hold a forthwith hearing regarding this matter.

    Please let me know when you receive a response to this matter and the tape concerning the tasering of Mr. Taylor as soon as possible. As always, I appreciate your assistance in this matter. Please do not hesitate to call me if you want to discuss these issues further.

Sincerely,

Paula Greisen