IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

    Plaintiffs,

-vs.-

BILL OWENS, et al.,

    Defendants.

---

Claim Number: 03-337
Category: III
Claimant: Danny Copp, # 109656
Address of Claimant: SCC, P.O. Box 800, Canon City, CO 81215

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Claimant Danny Copp. This Hearing was held in Canon City, Colorado on September 10, 2007 before Richard C. Davidson, Special Master. Mr. Copp appeared Pro Se. Defendants were represented by Robert Huss, Esq. Claimant and Orville Neufeld, D.O. were called, sworn and testified. The Special Master has reviewed the testimony and all documents filed by both sides. This Order shall constitute the final action of the Special Master on this specific claim.

### I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file

claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9*.

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims

2

submitted in this case by considering the following questions:

> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Danny Copp submitted a claim which was assigned claim number 02-839. After being reviewed, the claim was elevated and assigned claim number 03-337. The claim was originally premised on alleged permanent mobility, vision and diabetic disabilities. At the hearing, Mr. Copp waived the claims for vision and diabetic disabilities.

2. Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

3. Claimant Copp first entered CDOC custody in 2001. Claimant has been housed at FMCC, LCF, BCCF, and Camp George West.

4. Claimant was injured in a motorcycle accident prior to entering CDOC custody. Doctor Neufeld testified that Claimant suffered "massive trauma" to his foot. He had undergone several surgeries before coming into custody. In 2002, while at LCF, he had additional surgeries on his foot. Claimant testified that CDOC refused to give him a plastic bag to cover his cast in the shower resulting in the cast becoming wet and his foot becoming infected. However it occurred, Claimant ultimately contracted a MRSA bone infection. Although attempts were made to save the foot and leg, it finally had to be amputated below the knee. He was given a wheelchair after surgery and six months later was fitted with a prosthetic leg. He had to learn to walk with the prostheses but now is able to walk long distances. He is able to climb stairs. He generally functions very well but while at BCCF fell in the shower because of a wheeled shower chair.

5. Claimant says he has been shuffled around to different facilities. At one time he was put

into community corrections but then was regressed. He says his medical code was changed to move him to different facilities. He was able to work at Camp George West and made $100.00 per month. At FMCC his job as a porter only earns $.60 per day. No explanation was offered by CDOC in the medical records or testimony to justify the M Code change from 2 to 4 and thus disqualify Claimant from being at Camp George West. Interestingly, this M Code was changed <u>after</u> Claimant had successfully appealed a conviction for a community corrections violation.

6. Claimant testified that he walks up to 5-7 miles per day for exercise in order to control his diabetes. This has been successful. However, his prosthetic leg is not well maintained. A doctor told medical that his prosthesis needed adjustment as soon as possible several months before the hearing. At the time of the hearing, the leg had not been repaired. A CDOC nurse had contacted Abilities Unlimited, the prosthetic provider, but had not been successful in getting repairs made. Evidently, since Abilities Unlimited has to travel to Canon City from Denver, the trips are very infrequent.

### III. CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

3. The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

4. Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision

4

impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

5. It must be noted that neither the ADA nor the Rehabilitation Act are designed to remedy alleged deficiencies or omissions in medical treatment provided to prisoners by CDOC. Rather, the ADA and Rehabilitation Act are designed to insure that those who have permanent disabilities that prevent them from engaging in one or more major life activities are not discriminated against because of their disabilities. The Remedial Plan, which defines the scope of the Special Master's authority, limits the disabilities for which damage claims can be asserted to those relating to mobility, vision, hearing, and diabetes.

6. The Special Master finds and concludes that Claimant is a mobility disabled person under the terms of the remedial plan. It is apparent that CDOC also considers him disabled since he was found to be mobility disabled by a CDOC physician in December, 2004. Claimant has lost a portion of his lower leg and his foot. He is permanently and totally reliant on his prosthesis to be able to walk. While the evidence shows that Claimant is mobile and able to ambulate with his prosthesis, he is totally immobilized without it. Consequently, unless the prosthesis is properly maintained he is substantially limited in the major life activity of walking.

7. The next question which must be answered is whether Claimant was qualified to participate in the programs or to receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs, or activities because of disciplinary reasons, health reasons, or other valid penal justifications. *Miller v. King,* 384 F.3d 1248, 1266 (11th Cir. 2004). It appears to be undisputed that Claimant was qualified to participate in the programs, benefits, and services offered by the DOC.

8. Of course, the key issue is whether Claimant was discriminated against by CDOC because of his mobility disability. The records show that Claimant's prosthesis wears out and needs adjustment from time to time. CDOC has failed to promptly maintain his prosthesis thereby causing him to be unable to walk properly. Claimant has attempted to compensate by changing the way he walks with limited success. What is needed is prompt and proper maintenance. CDOC has argued that the reason the prosthesis has gone without repairs is because Abilities Unlimited is unwilling to come to Canon City. This is outside the control of Claimant. CDOC has the responsibility to maintain the prosthesis and they have not always done this.

9. The Special Master also concludes that Claimant has been discriminated against by having his medical code changed without a valid reason. It appears that the reason for such change was to force a move of Claimant out of a particular facility rather than to recognize a valid medical change in Claimant's condition. This is discrimination because of Claimant's disability.

10. While the Claimant presented no evidence as to the monetary amount of his damages, it is clear that to prevent the discrimination arising from the the non-repair of his prosthesis, CDOC must timely and properly maintain it. In addition, the medical code should be reassessed and properly assigned. In addition, the Special Master concludes that Claimant should be awarded the

sum of $500.00.

## IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment be entered in favor of Claimant Danny Copp and against Defendants ordering DOC to repair and maintain Claimant's prosthesis and to accurately assign his medical code to reflect his abilities and limitations. In addition, Claimant is awarded the sum of $500.00 in damages.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before March 13, 2008** with the Clerk of the United States District Court at the following address:

> 901 19th Street
> Denver, CO 80294.

SIGNED this 19th day of December, 2007

BY THE COURT:

*/s/ Richard C. Davidson*

—————————————————
Richard C. Davidson
Special Master