IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-427
Category III
Claimant: Angela Denise Thomas, #91631
Address of Claimant: LVCF, 1401 W. 17th Street, Pueblo, CO 81003

---

**FINAL ORDER OF SPECIAL MASTER**

---

THIS MATTER came before the Special Master for hearing on November 30, 2007. This hearing was held at the La Vista Correctional Facility (LVCF) in Pueblo, Colorado. Present were the following: Angela Denise Thomas (Claimant); and Chris Alber, attorney for Defendants.

Testimony was received from Claimant and Dr. Orville Neufeld, D.O. Claimant offered into evidence Exhibit 1, and it was accepted. Defendants' Exhibits A through AD were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>> 1. Is the claimant a disabled individual who is a member of the class?
>> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on November 15, 1996. Claimant was placed initially at the Denver Reception and Diagnostic Center (DRDC). She remained there until June 8, 1998 when she was transferred to the Colorado Women's Correctional Facility (CWCF) in Canon City, Colorado. Claimant remained at CWCF until August 13, 1998 when she was transferred to the Denver Women's Correctional Facility (DWCF).

Claimant remained at DWCF until August 2, 2005 when she was moved to the High Plains Correctional Facility (HPCF) in Brush, Colorado. She remained at that facility until February 16, 2006 when she returned to DWCF. Claimant was transferred to LVCF on October 27, 2006 and has remained at that facility.

In her initial claim form, Claimant checked only the box for mobility impairment. Claimant stated, in part, as follows:

> I incurred an upper (right) back injury, in the USAF, as a firefighter. Since then, I've experienced constant pain when performing repetitive movement, lifting

3

heavy objects, during illnesses, stress, at the start of non-existent periods (hysterectomy) during activities and while sleeping. I experience daily morning stiffness and sometimes constant dull aching which is painful when breathing deeply. The spasms in my back last several days, causing limited movement, tenderness, and swelling to the point of my not being able function normally.

>Lower back injury - limited movement, pain & stiffness every morning upon awakening, loss of sleep, fatigue, irritability, stress, muscle spasms, lasting for several days with pain radiating down my left leg and partial paralysis when walking. Daily tingling, numbness and pain, sometimes coming on unexpectedly when moving around. Knee injured while incarcerated - can't straighten knee, daily pain, disfigurement, pain when walking and sleeping at night. Causes stumbling and doesn't bend.

When answering the question concerning discrimination against her by DOC and its staff, Claimant stated as follows:

>The Dept. of Corrections were aware of the pre-existing permanent injuries prior to my incarceration, but during the diagnostic processing, I was processed as a normal 100% functioning inmate and forced to do manual labor for 8 hrs. a day, and the intensive labor over the years aggravated the pre-existing back injuries causing constant pain and spasms. I was given bad evaluations, harassed and fired from several jobs for not being able to perform daily. I was deprived of good time/earned time because of physical limitations. I was threatened through the years by officers who weren't aware of my medical limitations. Forced to wear black boots which caused knee & back pain.

Claimant also noted in her initial form that she injured her knee on the ladder of a bunk bed at HPCF. Since that occurrence, she has been unable to straighten her knee. In 2006, she suffered two broken fingers due to a malfunctioning door at DWCF.

In support of her claim, Claimant filed a number of documents, including some pages of her medical records and copies of grievances that she had filed. One of the documents is an MRI report from June, 2006 on Claimant's left knee. There was a loose body in the knee. The knee also had other problems, including osteoarthritis. Surgery was recommended on the left knee but was denied as a non-essential procedure. A report from a specialist in January, 2006 reflected that there were problems with the left knee ("Her knee clearly has degenerative joint disease and there may be some internal derangement since this injury as well").

In further support of her claim, Claimant filed several documents with essentially the history of her custody in DOC. She stated in one document that when she arrived at CWCF in 1998 she was advised by her case manager that she would not be able to obtain a job because that person was unable to accommodate anyone with a pre-existing injury.

At the hearing, Claimant testified that she had problems with her back when she entered into DOC custody. This was the result of the injury while on active duty with the USAF. That injury left

her with a herniated disk in her back. Arthritis has set in over the years, making the injury more difficult to deal with. Her back is very painful in the morning and muscles in her back will swell up.

In 1998, she fell into a hole in the yard. She began experiencing knee problems. In 1999, she was transferred to work at the Youth Offender System (YOS) facility in Pueblo, Colorado. She had difficulty working in the kitchen at YOS.

In October, 2005, Claimant testified that she tore the meniscus in her knee. She has not been able to straighten her knee since that occurrence. Her knee is unstable, and she has fallen on several occasions.

Claimant testified that she had been provided restrictions by DOC staff in the past. She was limited to a lower bunk, no prolonged standing or sitting, no stooping and no intensive labor. All of the restrictions were eliminated by Dr. Wermers at LVCF on August 16, 2007 according to Claimant. She has been given no reason why that occurred, but she speculates that it is a form of punishment.

As to discrimination over the years, Claimant testified that she had been rated as an M-4 when provided restrictions. She claims to have been forced over the years to do heavy lifting and stooping despite her restrictions. She also testified that she had been threatened with loss of potential community placements and parole.

Claimant stated that she has received no accommodations since her restrictions were removed. At DWCF, Claimant was provided a special chair and was able to work within her restrictions. She was able also to use an elevator at that facility.

Claimant testified that the worst time for her has been at LVCF. She received a new case manager who has been able to assist her. She indicated that LVCF has not worked with her. She would like to get her knees repaired.

On cross-examination, Claimant testified that she did not abide by her restrictions all the time, as she tried to perform the jobs that she was given. She has tried to exercise as much as possible. She occasionally will play volleyball, but she does not dive for balls. Claimant testified that she hurts when she wakes up in the morning. She stated that "I feel like the Tin Man without oil." Due to pain she experiences, she does not go to meals but rather eats items purchased from the canteen.

Claimant further testified that she has other health issues, including high blood pressure and high cholesterol. She indicated that there are few healthy choices on the canteen list. She believed that LVCF was not willing to work with people with disabilities.

Defendants called Dr. Orville Neufeld, D.O. to testify as an expert witness. He testified that he had reviewed all of Claimant's medical records. He testified that a torn meniscus can cause pain. He testified further than Claimant should be able to climb stairs if she can play volleyball.

5

**III.**

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to be a member of the class, Claimant must establish that she was disabled on or before August 27, 2003. The Special Master may consider matters that post-date August 27, 2003 only if there is establishment of a disability prior to that date. In addition, Claimant must establish that she was the victim of discrimination prohibited by the ADA and Rehabilitation Act prior to that date.

This particular claim presents some nuances not regularly seen. The medical records provided by Defendants reflect that Claimant was treated for significant medical problems right from the start of her incarceration. On December 27, 1996, DOC medical staff noted that she had a laminectomy in the past and had arthritis. *Exhibit A*. She did have restrictions that were described as permanent. *Exhibit B*; *Exhibit D*. She was diagnosed with degenerative joint disease in 1998. *Exhibit H*. Her restrictions were renewed in 1999. *Exhibit I*. In April, 2001, Claimant had x-rays on her knees that reflected "mild to moderate bony degenerative changes of the knees." *Exhibit N; see also Exhibit Q*.

In July, 2006 Claimant was seen by medical staff and surgery was recommended on her knees. That surgery was rejected by DOC medical hierarchy as not being necessary or effective.

The evidence reflects that Claimant has had mobility problems over the years. She is not in a wheelchair but has had difficulty walking. It is clear that DOC medical staff perceived Claimant as having sufficient medical problems to receive "permanent" restrictions. These restrictions were in place until she arrived at LVCF. The Special Master finds that Claimant was a member of the class as mobility impaired on or before August 27, 2003.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant must show that she was the victim of discrimination prohibited by the ADA on or before August 27, 2003. Only if she can establish this may she seek relief for something that occurred after that date.

Many of Claimant's complaints relate to her medical care while in DOC custody. She has expressed concern about that medical care. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of

substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to her, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that she may have concerning the quality of her medical care.

There are several troublesome aspects to this case. The first deals with the fact that DOC medical staff for years found that Claimant had health issues that warranted "permanent" restrictions. These included no intensive labor and no stooping. Upon Claimant's arrival at LVCF, she was determined not to be in need of any restrictions. Somehow, her medical condition dramatically improved to the point that she was able to climb stairs, walk long distances, and do intensive work. Nothing was presented to the Special Master to justify this radical change in medical condition. To argue that each facility may make its own medical evaluations is to invite the next class action lawsuit. It also runs counter to the implementation of the ADA evaluations that are to provide a benchmark for all DOC facilities. The Special Master does not find that the removal of restrictions was the result of retaliation against Claimant, but it may well have been. Claimant is an articulate woman who probably does upset those in charge of LVCF. Retaliation under any statute prohibiting discrimination is forbidden.

Second, Claimant was perceived as having a disability as the result of her knees and back. That is why she had an extensive list of restrictions that were labeled as "permanent" in several of her medical records. Those medical conditions did affect her ability to work and to walk. In the late 1990's, Claimant was provided accommodations except by her case manager at CWCF who stated that no accommodations would be made for any inmate who had a disability. Claimant did not have work for a short period of time because of the actions of this case manager. This was a violation of the ADA and Rehabilitation Act.

The testimony of Claimant reflected that most DOC staff did work with her to accommodate her physical problems. The exceptions were the case manager at CWCF and the staff at LVCF. The *Fitzgerald* decision prohibits examination under the ADA and Rehabilitation Act concerning the quality of medical provided by DOC and its staff. Claimant certainly may take that up in a separate lawsuit. The Special Master determines that the only clear cut case of discrimination relates to the case manager at CWCF who would not help find Claimant a job due to her having and being perceived as having a disability.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**
The Special Master finds that Claimant did suffer harm while at CWCF when the case manager refused to help her find a job. Claimant wanted to work but was unable to do so for a period of time. The Special Master determines that Claimant should receive damages of $225.00 for this period of

time. The Special Master specifically finds that insufficient evidence has been presented that would allow any other relief (good time, earned time, etc.).

      IT IS HEREBY ORDERED that the claim of Angela Denise Thomas is sustained as set forth in this Final Order; and

      IT IS FURTHER ORDERED that Angela Denise Thomas is awarded $225.00 in damages from Defendants; and

      IT IS FURTHER ORDERED that the remainder of the claim is dismissed, as Claimant has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

      IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before March 10, 2008.**

      SIGNED this 12th day of December, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master