IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 03-210
Category III
Claimant: Ed Collie, #00907
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on August 2, 2007. This hearing was held at the Ft. Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Ed Collie (Claimant); and Jennifer Huss, f/k/a Jennifer Fox, attorney for Defendants.

Claimant presented the following witnesses at the hearing: Cheryl Smith; Lou Archuleta; Donnie Brittain; Kathy Holt; Dr. Joseph Wermers, MD.; Kelly Wasko; Curtis Robinette; and Claimant. Plaintiff offered into evidence Exhibits 1 through 12, and all were admitted. Defendants called Cheryl Smith as a witness. Defendants offered into evidence Exhibits A thru G, and all were admitted.

The case was kept open to allow closing arguments to be presented by telephone. The telephone conference was on September 25, 2007. After final closing arguments, the case was kept open for each side to file additional documents. Further argument now will be waived. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the

Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp. 28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

### III. DEFINITIONS

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>> 1. Is the claimant a disabled individual who is a member of the class?
>> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on June 4, 1997. He was placed initially at the Denver Reception and Diagnostic Center (DRDC). He then was transferred to the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado where he remained for one week. He was transferred then to the Fremont Correctional facility (FCF) in Canon City, Colorado. He remained at FCF for five and one-half years. Claimant was transferred to FLCF on November 7, 2002. He has remained at FLCF since his transfer.

In his initial claim form, Claimant checked the boxes for mobility impairment, vision impairment, and hearing impairment. Claimant stated, in part, as follows:

> Left foot: This foot has been broken in (6) areas, other areas's (sic) have been broken also, also heel spurs, and calcium deposits and arthritis. Because I am not provided adequate shoes for the above mentioned condition, I cannot walk because of the chronic pain, thus I'm forced into a wheelchair, as one of the many reasons I can't walk. 2.) Unknown environment (contamination) resulting in inability to

achieve the ability to walk again; I was housed in an area of confinement that was noxious that has left me wheelchair bound. I have been denied any and all access to an evaluation for this condition and I'm forced to live my life in a wheelchair and I'm unable to participate in "minimal life activities" resulting in depression and mental, emotional, psychological anguish.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated as follows:

> Denied access to competent doctors, and second opinion to doctors and general access to doctors for; above back problems, hearing problems, stroke evaluation and treatment; feet/foot, proper minimal standards of life necessities regarding adequate showers and sink shoes, dining hall seat and access to buildings, awareness to intercom activities spoken to the general inmate population because I can't hear what's being said, inadequate rooms in that there is no desk for writing on and placing a lamp and other items on, theft of money when requesting to be evaluated by PA and Doctor and denied medical care because the care is not available due to cost.

Claimant was asked to describe what harm had been caused as the result of the discrimination. He stated:

> From denial of basic, general and mandatory medical care and treatment, I've lost 80 percent of my life force ability leaving me infirmed and impotent and fear of death where I find myself depressed, hopelessness, emotionally, mentally, physically and psychologically tortured and forced into this condition as a form of oppression from abuse of badge of authority from all of the above allegations. I'm in physical, emotional, mental and psychological pain at all times and denied any and all access to medical care that's effective and meaningful.

Claimant was provided a supplemental forms to complete. He did submit forms for hearing impairment and mobility impairment. As to hearing impairment, Claimant stated, in part, as follows:

> I have degenerative hearing loss due to loud noises in my workplace in past years.

> Due to lack of medical attention to my hearing (lack of) issues, I can't hear meal announcements, medical appointments, officer directives, and on one particular occasion I was unable to hear a fire drill, also unable to hear threats or violent situations, which has caused harm.

> On numerous occasions I have informed the medical department of my need for medical attention to my lack of hearing issues. In the past five years, particularly in the last 22 months I have not been evaluated or even seen to help with my lack of

hearing issues.

In his supplemental form for mobility impairment, Claimant stated, in part:

> In the past 10 years I've suffered from, arthritis in my legs, hips, knees and back. I have had several broken bones in my left foot and ankle and have had special shoes for several years before my incarceration. I am still weak from 6 months and two days of housing where the air was bad. I suffered a stroke on April 30, 2003 and am still numb on rt.
>
> I am unable to go to meals and medical unless I am pushed in my wheelchair. In cases of emergency I am unable to respond in a safe and timely manner. DOC destroyed my medical shoes 34 months ago and I still don't have adequate footwear to help the pain subside and allow me to participate in any rehabilitative treatments. Due to severe pain I have been unable to wear a shoe on my left foot. Even after many requests by me and doctors DOC still refuses to replace my medical shoes. They only give me shots of cortisone which is mostly useless or temporary the way it is given here.

Claimant submitted a number of documents in support of his claim. These includes several pages of medical records. Those records reflect that Claimant, now age seventy-five, has significant health problems. He had a stroke on April 30, 2003. He has been treated on more than one occasion for skin cancer. He has had prostate problems which necessitated a biopsy. He developed a significant infection as the result of that biopsy. He had colon cancer in the past, with on-going bowel problems.

The documents submitted by both sides reflect that Claimant has been in a wheelchair for most of the last seven years. Medical record entries question whether Claimant needs to be in a wheelchair and reflect that Claimant has made little attempt to do physical therapy or otherwise do exercises that might allow him to use his legs and not have to use a wheelchair.

Claimant called a number of witnesses at the hearing. A brief resume of the testimony of each would be appropriate. Mr. Lou Archuleta, former warden at FLCF, was asked if he recalled any incident in December, 2006. Mr. Archuleta recalled no incident and remembered Claimant only vaguely. Dr. Joseph Wermers, M.D. was asked if he recalled treating Claimant. Dr. Wermers testified that he did not recall who Claimant was and remembered nothing concerning treatment.

Lt. Donnie Brittain testified that Claimant made requests for art supplies. The requests included materials that could not be provided. On cross-examination, Lt. Brittain testified that there is no hobby shop at FLCF. Art supplies are used in the inmate's cell. There is no accountability for art supplies, and this means a limitation on what can be provided in the way of art supplies. Lt. Brittain was in charge of hobby supplies. He testified in response to a question from Defendants' counsel that he had never seen Claimant walk.

Major Curtis Robinette was called by Claimant as a witness. He is the program manager at FLCF. He testified as to the limitations that exist for art supplies, and all have to be approved before an inmate may receive them. Major Robinette remembered that Claimant had requested acrylic paints. He was aware that Claimant was vision impaired and was supposed to have a reader. He testified that FLCF does not have a hobby shop, and that inmates must use hobby materials in their own cells.

Kelly Wasko is the Health Services Administrator (HSA) at AVCF. She used to be at FLCF and recalled Claimant from when she was at FLCF. She testified that she authorized tennis shoes for Claimant. She was aware that his feet were swollen in 2004. She had nothing to do with the selection of his cell. On cross-examination, Ms. Wasko stated that she had been at FLCF from June, 2004 to June, 2006. Claimant was in a wheelchair during that period of time. She was aware that he would walk occasionally. He has used tennis shoes previously. Claimant's foot problems came and went over time.

Ms. Kelly Holt, NP, is a nurse practitioner at FLCF. She testified that she was not familiar with Claimant's vision loss. She remembered the skin cancer and foot problems. On cross-examination, Ms. Holt remembered that Claimant had wanted tennis shoes, but those had been denied by DOC. She was aware that special shoes could be made for Claimant. Ms. Holt has been at FLCF for a brief period of time.

Ms. Cheryl Smith is the associate warden at FLCF. Ms. Smith was aware that Claimant had been authorized a hat at FCF. She did not recall any incidents involving Claimant. She had not treated Claimant in any medical setting. Ms. Smith was recalled as a witness during Defendants' case. She testified that Claimant had been in a non-ADA cell for a period of time, but that had been rectified. For transportation, all inmates must be in special boots. She has observed Claimant walk.

Claimant testified in support of his own case. He indicated that he has been in a wheelchair since May 8, 2000. He had a stroke on April 30, 2003. His vision has been deteriorating for years. The back of his left eye ruptured. It had to be repaired. On December 15, 2006, Claimant underwent a biopsy of his prostate. He had significant problems with an infection that followed the biopsy.

Claimant stated further that he cannot read very well. His vision blurred, probably as the result of medication he was taking. He was seen by Dr. Greenlee in Pueblo who advised Claimant that he is legally blind. Claimant is not working and basically lays in bed during the day. Claimant testified that Dr. Patterson, an orthopedic physician who consults for DOC, had recommended medical shoes for him.

When Claimant came into DOC custody, he was using Imodium for his bowel problems. He had special medical shoes when he came into DOC, but those were taken from him. He had requested a new wheelchair, as his was wearing out. That was not provided to him. He testified that he was moved from cell to cell at FLCF and told that he should not have filed a *Montez* claim. Claimant testified that he does not have a job at FLCF. He is listed as "medically unassigned."

Claimant testified that he has to be careful if out in sunlight. This is due to his skin cancer problems. He had received permission to obtain tennis shoes. Claimant testified that he has problems hearing and seeing. Claimant testified that he is requesting proper medical care, as he does not want to just be a "potted plant." Claimant testified that he believed discrimination had occurred as the result of not receiving some items that were available at other facilities.

On cross-examination, Claimant stated that his feet bother him all the time. His feet have not improved. He had medical shoes until they were confiscated at AVCF. He indicated that he cannot wear the state issued boots.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to be a member of the class, a claimant must have had an impairment, as recognized by the Settlement Agreement, on or before August 27, 2003. It was on that date that the Settlement Agreement was approved by Judge Nottingham. In other words, absent a showing of an impairment on or before that date, a claimant may not pursue his claim.

**Mobility**: The Settlement Agreement states that permanent mobility impairments are limited to "[i]nmates who use wheelchairs full or part time due to a permanent disability" or "[i]nmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking...."

It is undisputed that Claimant has been using a wheelchair almost full-time since 2000. The evidence also indicates that Claimant has lower extremity problems. Claimant is found to be a member of the class as mobility impaired.

**Vision**: The evidence presented at the hearing indicated that Claimant presently has a vision impairment. The question is when his vision started to fail.

Attached to the affidavit of Dr. Neufeld are many pages of Claimant's medical records. Claimant was given an examination on May 8, 1998 by an optometrist. *Exhibit A-1*. He was found to have 20/20 eyesight without correction. A further examination in May, 1999 did not reflect any major vision loss, as his eyesight could be corrected to 20/20. On December 17, 2003, Claimant advised the optometrist that he could not read typed or printed words. He was provided with bi-focals.

In June, 2005, Claimant did have an eye infection. Examinations after the infection reflected that his eyesight could be corrected. An examination was undertaken at the Rocky Mountain Eye Center in Pueblo, Colorado and reflected that his vision was correctable. No further examination

results have been presented by either side.

The Settlement Agreement places the burden upon a claimant to establish by evidence that he had a disability on or before August 27, 2003. In this case, the Special Master finds that Claimant does have present, on-going vision issues. The Special Master does not find that sufficient evidence has been presented to reflect that a vision disability existed on or before August 27, 2003. Claimant is not a member of the class as vision impaired. Claimant may pursue by separate lawsuit his vision issues that post-date August 27, 2003.

**Hearing Impairment**: Claimant had audiograms in 1997 and 1998. These did not reflect any major hearing loss. Claimant has failed to establish that he had a hearing impairment, as defined by the Settlement Agreement, on or before August 27, 2003. Claimant is not a member of the class as hearing impaired.

**Other Conditions**: Claimant has struggled with other health issues. He testified concerning his skin cancer and being denied a hat. The Special Masters are limited to consideration of only the four conditions listed in the settlement agreement (vision; hearing; mobility; and diabetes). A number of other conditions may fall under the broader protection of the ADA. Claimant may have some legitimate issues concerning actions taken by DOC and its staff. Claimant will have to pursue other conditions through a separate lawsuit.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** A claimant must prove by a preponderance of the evidence that he was subjected to discriminatory conduct on or before August 27, 2003. This discrimination must be based on a claimant's recognized disability, not on other factors such as race, age, etc. An example would be placement of a wheelchair-bound inmate on the third floor of a building with no working elevators.

In this case, Claimant's primary concerns are with his medical and related care. His testimony was directed for the most part to the medical care that he has been receiving since coming into DOC custody. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement

Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

Claimant has established that he was subjected to discrimination concerning his shoes. The evidence established that Claimant had special shoes when he came into DOC custody. Those were confiscated and he was directed to wear state-issued boots. He did receive permission to wear tennis shoes at one point. He has made requests for medical shoes to help to provide care to his feet. The irony is that many DOC medical entries question why Claimant should be in a wheelchair in the first place. One would think that providing proper medical shoes would go some way to help improve Claimant's life and make it possible for him to start walking full-time again. The shoe issue continues to arise in many claims, and it does not make much sense. Claimant has foot problems, but he has not had proper shoes provided to him. Providing Claimant with medical shoes would alleviate one excuse concerning his inability to walk. The record reflects that Claimant was treated differently in that he was not provided shoes that could be an accommodation for him and allow him to begin to walk again.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant came to DOC custody with medical shoes. Those were taken from him. Despite medical recommendations and personal requests, Claimant never received equivalent shoes. Claimant is entitled to damages in the amount of $200.00.

IT IS HEREBY ORDERED that the claim of Ed Collie is granted, in part, and he is awarded $200.00 as damages; and

IT IS FURTHER ORDERED that all other parts of the claim are denied and dismissed; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before December 17, 2007.**

SIGNED this 22nd day of October, 2007.

BY THE COURT:

Richard M. Borchers
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this 22 day of October, 2007 to the following:

Mr. Ed Collie
#00907
FLCF
P.O. Box 1000
Ft. Lyon, CO 81038

Mr. James Quinn
Mr. Jess Dance
Office of the Attorney General
1525 Sherman Street
Denver, CO 80203