IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

      Plaintiffs,

-vs.-

BILL OWENS, et al.,

      Defendants.

---

Claim Number: 03-272
Category: III
Claimant: Roy Jack Pollard, #94894
Address of Claimant: CTCF, P.O. Box 1010, Canon City, CO 81215-1010

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Claimant Roy J. Pollard. This hearing was held at CTCF on March 27, 2007 before Richard C. Davidson, Special Master. Mr. Pollard appeared Pro Se. Defendants were represented by Celia Randolph, Esq. Claimant and Orville Neufeld, D.O. were called, sworn and testified. The Special Master has reviewed the testimony and all documents filed by both sides. The letters submitted by Claimant after the hearing have also been reviewed. This Order shall constitute the final action of the Special Master on this specific claim.

### I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial

Plan also created a mechanism for individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2

2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:

1. Is the claimant a disabled individual who is a member of the class?
2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Pollard submitted a claim which was assigned claim number 02-424. After review, the claim was elevated and assigned claim number 03-272. The claim is premised on alleged permanent mobility, hearing, vision and diabetic disabilities.

2. Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

3. Claimant Pollard first entered CDOC custody in 1997. Claimant has been housed at CTCF, LCF and FCF.

4. When Claimant first came into custody in 1997 he was able to walk without difficulty although he was suffering from chest pain and some heart problems. He was given restrictions when he entered CDOC custody, based upon his age and condition, including lower bunk, lower tier, no assignment to camps, no intensive labor, no vigorous exercise and no heavy lifting. In 2001 Claimant complained of left knee pain. The records show that x-rays were taken which showed degenerative joint disease with some spurring. He was given crutches at that time. Plaintiff had a left knee arthroscopy performed on August 1, 2001. Following surgery he progressed from using crutches to using a cane. In 2003, Claimant began to receive left knee steroid injections for pain. He was given a wedge pillow and knee high support hose to wear. In November 2005 he was given a walker to assist him in ambulation. His knees continued to deteriorate and he was issued a wheelchair in December, 2005. On August 24, 2006 Claimant had left knee replacement surgery. He has healed from this surgery but still has severe arthritic changes in his right knee. Claimant

3

testified that he is now only able to walk if he has something to hold onto. He continues to use a cane.

5. Claimant has a family history of hearing loss. The records show that before incarceration he wore hearing aids. He says that in 1997 his hearing aids were taken away when he entered CDOC custody. In December, 1999, Claimant was given an audiometric evaluation. The assessment was made that he had a bilateral sensory neural hearing loss. The Audiologist wrote "It is felt that it is imperative that this gentleman should be using amplification." Almost a year later on November 30, 2000, Claimant was given another audiometric exam. Colorado Access was contacted for authority to issue hearing aids. Three years later, Claimant had still not received hearing aids. He then had a third audiometric exam on December 24, 2003. Finally on February 25, 2004 he was issued a hearing aid for the right ear. He was also issued batteries and testified that he has no problem getting batteries. He testified that he still has problems hearing and understanding announcements.

6. Claimant says that he is vision impaired. A review of the records shows that Claimant entered custody with very good vision. He was issued glasses for reading. In 2000 he was examined and his uncorrected vision was still very good. He was issued new prescription glasses which turned out to be the wrong glasses and they were replaced. Claimant had additional exams but it was not until 2005 when any damage to his eyes was found. At that time he was found to have some macular changes with diabetic retinopathy. He has been issued new prescription glasses since then which correct his vision. Claimant has testified that his eyes are "ok."

7. Claimant was first diagnosed with type II diabetes in September 2000. He was given prescription medications and was put on an ADA diet with evening snacks. His A1C levels have been routinely checked and have ranged from 5.4 to 7.5 indicating good control of his blood sugars. The only consequence of his diabetes has been some diabetic retinopathy. Other than that, Claimant only suffers inconvenience because of his diabetes.

### III. CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person

4

in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

3. The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C). As discussed in Section I above, the Remedial Plan further limits permanent mobility, hearing, vision, and diabetes disability/impairment to those that conform to the criteria of Section V, paragraph A of the Plan.

4. Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

5. It must be noted that neither the ADA nor the Rehabilitation Act are designed to remedy alleged deficiencies or omissions in medical treatment provided to prisoners by CDOC. Rather, the ADA and Rehabilitation Act are designed to insure that those who have permanent disabilities that prevent them from engaging in one or more major life activities are not discriminated against because of their disabilities. The Remedial Plan, which defines the scope of the Special Master's authority, limits the disabilities for which damage claims can be asserted to those relating to mobility, vision, hearing, and diabetes.

6. After reviewing the evidence, the Special Master concludes that Claimant is not disabled because of vision or diabetes. There is no question that Claimant has diabetes. However, his diabetes has caused very little damage to him. What damage he does have is some diabetic retinopathy. This has not progressed to cause him any impairment and thus he is not disabled in either vision or because of his diabetes.

7. The Special Master concludes that he does suffer from a hearing and mobility disability. Claimant has suffered from hearing loss for many years so, obviously, his hearing loss is permanent. He testified that CDOC took his hearing aids when he entered custody in 1997. From 1997 until 2004, CDOC failed to issue him a hearing aid despite his having three audiometric exams showing his need for hearing assistance. Even now, he testified that he has trouble hearing and understanding announcements. Claimant has proven that his hearing impairment substantially interferes with the major life activity of hearing.

8. Claimant is mobility impaired. After he entered custody, his impairment, caused by degenerating knees, has progressively gotten worse. He had an arthroscopic surgery on his left knee

5

and ultimately it was replaced. His right knee continues to deteriorate. He testified that he can only walk now if he has something to hold onto. This rises to the level of a substantial limitation on the major life activity of walking.

9. The next question which must be answered is whether Claimant was qualified to participate in the programs or to receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs, or activities because of disciplinary reasons, health reasons, or other valid penal justifications. *Miller v. King,* 384 F.3d 1248, 1266 (11th Cir. 2004). It appears to be undisputed that Claimant was qualified to participate in the programs, benefits, and services offered by the DOC.

10. Of course, the key issue is whether Claimant was discriminated against by DOC because of his hearing or mobility disability. The evidence shows that Claimant was given extensive accommodations for his mobility disability. Claimant complains that he needs a right knee replacement. CDOC has not yet found that he needs this surgery. The failure to offer a surgery to Claimant when medical does not believe it is medically necessary does not constitute discrimination. Claimant has offered no real evidence to prove any discrimination because of his mobility disability.

11. However, from 1997 when Claimant first came into custody, CDOC has known that Claimant had a hearing impairment. This conclusion is inescapable since CDOC took Claimant's hearing aids when he entered custody. He was examined on three separate occasions and the conclusion each time was that he needed hearing aids. Yet, he was forced to wait seven years before CDOC finally issued one for him. Whether as a result of the delay or not, Claimant still cannot hear and understand properly. CDOC's failure to issue a hearing aid to Claimant for seven years constitutes discrimination.

12. While the Claimant presented no evidence as to the monetary amount of his damages, the Special Master concludes that he should be awarded the sum of $700.00 for the inconvenience of not being able to hear for seven years.

13. Claimant has raised other matters in this action that are not within the jurisdiction of the Special Master. Should Claimant feel that he has grounds for additional litigation based upon these matters, he must bring those issues in a separate filing. The Montez criteria give no jurisdiction for including these matters.

### IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment be entered in favor of Claimant Roy Jack Pollard and against Defendants awarding Claimant the sum of $700.00 in damages.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure

53(g)(2), but said objection must be filed **on or before March 17, 2008** with the Clerk of the United States District Court at the following address:

> 901 19th Street
> Denver, CO 80294.

SIGNED this 26th day of December, 2007.

> BY THE COURT:
>
> /s/ Richard C. Davidson
> _____
> Richard C. Davidson
> Special Master