IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

_____

Claim Number 03-220
Category III
Claimant: Lawrence E. Beeman, #42894
Address of Claimant: SCF, P.O. Box 6000, Sterling, CO 80751

_____

## FINAL ORDER OF SPECIAL MASTER
_____

THIS MATTER came before the Special Master for hearing on December 20, 2007. This hearing was held at the Sterling Correctional Facility (SCF) in Sterling, Colorado. Present were the following: Lawrence E. Beeman (Claimant), and Willow Arnold, attorney for Defendants.

Testimony was received from Claimant and Dr. Orville Neufeld, D.O. Plaintiff offered Exhibit 1, and it was accepted. Defendants' Exhibits A through KK were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]  Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>> 1. Is the claimant a disabled individual who is a member of the class?
>> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on January 24, 1977. He was placed at various DOC facilities before he was discharged on August 28, 1989.[2] Claimant returned to DOC custody on June 29, 2000. Claimant was placed initially at the Denver Reception and Diagnostic Center (DRDC). He was at that facility for approximately two weeks.

Claimant was transferred to the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado on December 31, 2001. Claimant was placed at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado on March 14, 2002 and remained there until transferred back to AVCF on December 22, 2005. He was transferred back to CTCF and then to SCF on November 7, 2006.

---

[2] Claimant presented no testimony concerning his treatment while in DOC up through discharge in 1989. As a practical matter, anything from 1989 or earlier would be beyond the statute of limitations.

In his initial claim form, Claimant checked the boxes for diabetes and mobility impairment. Claimant stated, in part, in his claim form:

> The diabetes is, at this point, no more than an inconvenience. I have been diagnosed with cardio-vascular disease, requiring two arterial bypass surgeries (double iliac & carotid), to date. This has caused pain calves and hips when exertion is beyond very moderate, along with cramps. Some arthritis in lower spine no doubt contributes to this. Due mostly to over 40 years of heavy smoking, I have COPD (emphysema) which results in frequent, serious shortness of breath during exertion. Last test on 1-7-04 showed lungs equivalent to those of 124-year-old man. Combination of the foregoing keeps me from walking very far or very fast, and frequent climbing is extremely difficult, strenuous and uncomfortable. Because of these limitations, medical personnel in DRDC gave me bottom-bunk, bottom-tier housing restrictions, reviewable annually. Those restrictions are presently in force and are being honored, after being reinstated. Also have high blood pressure.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated, in part, as follows:

> While imprisoned at AVCF in 2001, the facility physician, Dr. Wermers, removed my bottom-tier housing restriction in March of that year. This was done without any improvement in my medical condition, without any medical examination or notice to me, and before the July 2001 review date set by policy. I later learned of this action, when I was ordered by housing unit staff to move to a cell on third (highest) tier. I was told by a medical staffer that Dr. Wermers' action was taken arbitrarily in retaliation for my well-founded refusal to go on a medical trip (appointment) he had arranged. He had to have known that removal of the restriction would make me vulnerable to exactly what ultimately occurred...
>
> Subsequent to the improper removal of my housing restriction, on 13 June 2001, Unit 3 staff ordered me to move from my bottom-tier cell to one on the third tier. I protested and refused, based on my medical condition and restrictions. My property was physically moved by staff to the new cell. I received a disciplinary report for disobedience. During the 12 days I was kept on third tier, I experienced serious and frequent pulmonary distress, fatigue, leg and lower back pain that required medication. My fatigue caused me to fall down the top flight of stairs to the second-tier landing, landing, painfully but temporarily injuring my right knee.

Claimant submitted his supplemental forms and included several other documents. Claimant stated, in part, in his supplemental form as follows

> I am unable to be considered for any honor camp assignment, despite my past successful performance in an honor camp. I am barred from jobs that require physical labor, such as the license tag plant, most of which are the better-paying jobs of the relatively few available. Also, in light of my job options being limited, if I am unable

to get a job (which is supposedly my responsibility) I am subject to having my privileges drastically restricted, without any disciplinary violation by me.

Claimant attached to his form a copy of a printout from DRDC reflecting restrictions of no honor camp and lower bunk.

Claimant was seen by Dr. Greg Bowman in Pueblo, Colorado in 2002. Dr. Bowman noted, in part, as follows:

> Lawrence Beeman was seen in the office for evaluation of peripheral vascular disease. He has one block claudication, which is worse in the right leg than the left. His lower extremity noninvasive arterial testing suggests significant bilateral peripheral vascular disease below the inguinal ligaments.
> On examination his only distal pulse is the left dorsalis pedis. I discussed the problem with Mr. Beeman and he feels as though his claudication is significantly disabling, and I recommend that he have an arteriogram with whatever reconstructive surgery is necessary to follow. He incidentally has a rather significant ventral hernia and I would strongly recommend he be seen by a general surgeon for ultimate repair of this problem.

Claimant also included a copy of an arteriogram. That test reflected blockage in his lower extremities.

At the hearing, Claimant testified that he was diagnosed as a borderline diabetic in 1998 at the Veterans Administration Hospital in Grand Junction, Colorado. When he arrived at AVCF, he was placed on Glucophage, a medicine for diabetes. He has not been placed on insulin at any time. He did not receive a special diet but had to careful of what he ate. He has had few problems with his diabetes.

Claimant stated that he had a handicapped job at AVCF and earned less pay than inmates without disabilities. He estimated that he had lost $264.00 because he did not receive pay equal to those in non-handicapped jobs.

Claimant has developed Chronic Obstructed Pulmonary Disease (COPD) which has affected his ability to move. At SCF the chow hall and medical unit are a long way from the cellhouse in which Claimant lives. Claimant also testified concerning his cardio-vascular condition. This has affected his ability to move. According to Claimant, he has arthritis in his wrists, knees and hips. He had a wrist brace at one point, but that was taken by staff.

Claimant testified that he had restrictions granted by medical staff for bottom bunk and bottom tier. These restrictions were taken away by Dr. Wermers as retaliation for refusing a trip, according to Claimant. Shortly after his restrictions were taken away, Claimant suffered what he described as a minor heart attack. He also was charged with a disciplinary infraction which he maintains was part of the retaliation by DOC staff.

Claimant had been granted a restriction which was to keep him in Canon City facilities. This was done due to his medical conditions, as he would be close to a hospital. Claimant also maintained that he needed to be away from what he described as "eastern slope water."

Claimant stated that he had been scheduled for a couple of medical procedures that he refused. He testified that these procedures were to be done at Denver General or at the Colorado Mental Health Institute in Pueblo (CMHIP) and that he had no faith or trust in the medical staffs at either place. He understood at one point that his surgery was to be done at the Parkview Medical Center in Pueblo, Colorado, and that was acceptable to him.

Since being transferred to SCF, Claimant claims that he has experienced additional problems because of the distances that must be walked and that the temperature is colder than at Canon City.

On cross-examination, Claimant testified that he has exercised in the past. He has passed out on one occasion because of having to walk to medical at SCF. He acknowledged that he is able to walk to the chow hall, though with some difficulties. Claimant testified further that he was not able to secure work in the tag plant at CTCF because of his medical restrictions. He was told he would not get a job because of his medical restrictions.

Defendants called Dr. Orville Neufeld, D.O. as a witness. He testified that Claimant does have medical issues but is not disabled. The diabetes is extremely mild according to Dr. Neufeld and does not affect Claimant's activities of daily living (ADL).

Defendants also submitted exhibits in support of their position. Included in those documents is a letter from Dr. Greg Bowman, M.D., dated August 21, 2002. In that letter, Dr. Bowman states, in part, as follows:

> Lawrence Beeman was seen in the office for follow up of peripheral vascular disease. I have reviewed his arteriogram and there is no significant arterial occlusive disease on the arteriogram to explain his leg symptoms. He has several areas where there is low-grade stenoses, but nothing significant. I am at a loss to explain his markedly abnormal exercise arterial Dopplers. I really can't offer anything more at this time other than certainly he needs to be followed up in six months with more noninvasive testing and if he is worse, I would have to re-arteriogram him. Sorry I can't be more helpful with this problem.

*Defendants' Exhibit H*. Other medical records reflect other conditions, including falls. *Defendants' Exhibit L*. The records further reflect that there are a number of medications prescribed for him. His ventral hernia is in need of repair. His cardio-vascular problems remain, as reflected in medical records from 2006.

**III.**

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. A claimant must establish that he was disabled, as set forth in the Settlement Agreement, on or before August 27, 2003. In addition, a claimant must establish that he was the victim of discrimination on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Each disability must be examined separately.

**Diabetes**: Claimant has acknowledged that his diabetes is more of an inconvenience that a major problem. He has not taken insulin and has relied upon Glucophage and diet to control his blood-sugar levels.

In order to determine if an individual meets the requirements of the ADA and Rehabilitation, there must be an analysis using a three-part test. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184(2002). First, an individual must show the presence of a physical or mental impairment. Second, the individual must show that the impairment affects a "major life activity." *Id*. Third, the individual must show that the impairment "substantially limits" that major life activity. *Id.* Under the Settlement Agreement, there is a further limitation to the four listed conditions (hearing, vision, mobility, and diabetes).

Claimant's diabetes does not affect a major life activity. That is clear from his own testimony. As a result, Claimant is not a member of the class as a diabetic.

**Mobility**: Claimant has significant medical problems. The totality of these affect his ability to walk. The Special Master would note that Defendants have on other claims acknowledged that COPD may affect mobility and be the cause for a mobility impairment.

Based upon all of the evidence presented, the Special Master finds that Claimant's conditions created a mobility impairment on or before August 27, 2003. Claimant is a member of the class as mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant testified that he had been subjected to discriminatory conduct by DOC and its staff since he came into the system. From Claimant's point of view, everything that has been done has been either due to his medical conditions or in retaliation for Claimant exercising his rights to be part of this case. The evidence is not as clear as represented by Claimant.

The evidence in this case presented by both sides reflects that Claimant did come to DOC

custody with significant medical issues. He was perceived as having a disability, and that is why he received restrictions which included lower tier and lower bunk. Claimant also was placed in a job that reflected a belief that he was handicapped. Claimant's testimony is accepted that he could not obtain a job that paid an equal amount. Defendants' response to this testimony was to argue that Claimant did not meet the criteria for certain jobs, but there was no foundation to this argument. The Special Master finds that for a period of time Claimant did not receive the opportunity to be accommodated or provided a job that paid the same as a non-handicapped inmate.

The evidence also reflects that Claimant has over the years chosen what treatments he would receive. He testified that he would not allow anyone at Denver General Hospital to touch him because of what he described as a history of botched operations on inmates. One thing is clear, and that is DOC has provided medical care to Claimant. It is clear that he has had concerns about such care, refusing medical treatment procedures on more than one occasion.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. With the exception noted earlier in this section, Claimant has basically argued about the quality of medical care that he has received. That is beyond the scope of the claim process and must be pursued as a separate case under the Eighth Amendment.

Claimant has raised the issue of retaliation. He was specifically upset at the actions of Dr. Wermers in rescinding his restrictions. The key medical document is the note from June 26, 2001 written by Dr. Wermers. *Defendants' Exhibits P & Q*. In those notes, Dr. Wermers states that Claimant had refused to allow anyone at DOC test him concerning his cardio-vascular disease. The note further reflects that testing was attempted by civilian medical staff prior to Claimant coming into DOC, and that was not successful from 1997 on. As a result, Dr. Wermers did not believe that there was sufficient evidence to find problems warranting continuation of restrictions.

The Special Master cannot find from the evidence presented that any retaliation took place through the actions of Dr. Wermers or others. The evidence does reflect that the decision of Dr. Wermers in 2001 was based upon a medical judgment that he made and which has backup in the medical records. The decisions are based upon medical judgment, even if possibly flawed. Those decisions are controlled by the *Fitzgerald* decision. As such, those decisions must be evaluated under the Eighth Amendment and in a different case.

Claimant has established that from his entry into DOC and through 2001 he was perceived to have a disability and was accommodated. He has proven that he did not receive pay equal to what a non-handicapped worked was earning. There was no evidence that Claimant did not have the

abilities to handle some or all of the jobs that provided higher pay.[3]

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant was harmed by not receiving equal pay for a period of time. His calculations are accepted, and he will be awarded damages of $264.00.

IT IS HEREBY ORDERED that the claim of Lawrence Beeman is granted to the extent noted in this Order, and Claimant is awarded damages of $264.00; and

IT IS FURTHER ORDERED that the remainder of the claim is denied, as Claimant has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before March 31, 2008.**

SIGNED this 7th day of January, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master

---

[3] Claimant testified that he had three years of college education. During the course of the hearing, it became evidence that Claimant had more education than a number of inmates. His testimony that he was qualified to handle non-handicapped jobs is accepted and found to be true.