IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

-vs.-

BILL OWENS, et al.,

Defendants.

---

Claim Number: 03-350
Category: III
Claimant: Charles R. Stroud, #48629
Address of Claimant: CTCF, P.O. Box 1010, Canon City, CO 81215-1010

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Claimant Charles Stroud. This hearing was held at CTCF on February 28, 2007 before Richard C. Davidson, Special Master. Mr. Stroud appeared pro se. Defendants were represented by Celia Randolph, Esq. The following witnesses were called, sworn and testified: Claimant; Lt. Larry Trujillo; Sgt. Emig; Case Manager John Evans; Inmate Ken Parris; and Orville Neufeld, D.O. The Special Master has reviewed the testimony and all documents filed by both sides. This Order shall constitute the final action of the Special Master on this specific claim.

### I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial

Plan also created a mechanism for individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2

        2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:

        1. Is the claimant a disabled individual who is a member of the class?
        2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
        3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
        4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Charles R. Stroud submitted a claim which was assigned claim number 02-750. After review the case was elevated and assigned claim number 03-350. The claim is premised on an alleged permanent mobility disability.

2. Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

3. Claimant Stroud entered CDOC custody on December 6, 1990. Claimant has been housed at CTCF, AVCF, CSP, in Minnesota, at CSP, and at BCCF.

4. Claimant was injured in an accident where he suffered chemical burns to his lower legs and feet, worse on the right. During 1970 to 1972, he had a series of reconstruction surgeries. Parts of his bones were shaved, skin grafts were placed, and a tendon repositioned to replace the damaged tendon and muscle. The surgeries left him with skin covering bone with no muscle over his ankle and foot. Claimant needs padding for his ankle and foot. State issued boots do not have enough padding to enable him to be comfortable and to avoid the breakdown of the skin. He was given permission to obtain his own padded boots in 1991. In 1992, 1993 and 1994 he was given tennis shoes to wear. In January 1995, he was issued a pair of high top lace up boots. In December, 1996, he was issued a new pair of boots which turned out to be different sizes. According to the records, these were replaced in May 1997. Claimant denies that he received replacement boots and while in Minnesota he bought a pair of used boots to wear despite the fact that they were too large. He evidently retained and wore these boots for several years. In December 2004, as a result of a

3

disability screening, special boots were deemed not to be necessary. In 2005 a request for Red Wing boots was denied. Instead, he was given moleskin and duoderm to pad his regular boots.

5. Because of not having boots, Claimant says he is no longer able to participate in full activities. He says he bought tennis shoes until CDOC stopped carrying them. He says he can no longer participate in sweat lodge activities or use the yard for exercise. He can't use the hobby shop because of fatigue. When his leg becomes fatigued, he trips and falls. Case Manager Evans testified that Claimant limps when he walks and that his limp is worse when he is coming home from work.

6. Doctor Neufeld testified that he does not believe that Claimant needs special medical boots. However, he also stated in his affidavit "State issued boots may not have adequate padding for the affected areas."

### III. CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

3. The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

4. Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

5. It must be noted that neither the ADA nor the Rehabilitation Act are designed to remedy alleged deficiencies or omissions in medical treatment provided to prisoners by CDOC. Rather, the ADA and Rehabilitation Act are designed to insure that those who have permanent disabilities that prevent them from engaging in one or more major life activities are not discriminated against because of their disabilities. The Remedial Plan, which defines the scope of the Special Master's authority, limits the disabilities for which damage claims can be asserted to those relating to mobility, vision, hearing, and diabetes.

6. The Special Master finds and concludes that Claimant Stroud does have a mobility disorder pursuant to the terms of the remedial plan. His condition is permanent. The condition does cause him to be impaired and it substantially limits him in the major life activity of walking. It is apparent that CDOC once believed that he needed special accommodations for his disability since he was provided special boots and tennis shoes on more than one occasion. There is nothing that explains why it was necessary for CDOC to issue special boots to Claimant prior to 2004 but not after that time. The condition that caused the need before that time still exists.

7. The next question which must be answered is whether Claimant was qualified to participate in the programs or to receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs, or activities because of disciplinary reasons, health reasons, or other valid penal justifications. *Miller v. King,* 384 F.3d 1248, 1266 (11th Cir. 2004). It appears to be undisputed that Claimant was qualified to participate in the programs, benefits, and services offered by the DOC.

8. Of course, the key issue is whether Claimant was discriminated against by CDOC because of his mobility disability. Claimant Stroud has testified that the taking of his previously issued special boots had a substantial impact on his ability to utilize the services provided by the facility and his ability to walk. Defendant has offered no explanation as to the reasons for no longer providing boots. The Special Master concludes that Claimant has been discriminated against by being deprived of the special boots previously provided to him by CDOC.

9. While the Claimant presented no evidence as to the monetary amount of his damages, the Special Master concludes that Claimant should be awarded the sum of $500.00.

### IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment be entered in favor of Claimant Stroud and against Defendants awarding Claimant the sum of $500.00.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before April 14, 2008** with the Clerk of the United States District Court at the following address:

901 19th Street
Denver, CO 80294.

SIGNED this 14th day of January, 2008.

BY THE COURT:

/s/ Richard C. Davidson
_____
Richard C. Davidson
Special Master