IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

___

Claim Number: 05-008
Category V
Claimants: Clifford K. and Margarite M. Moore, parents of Steven Richard Marquiz (Deceased)
Address of Claimant: 101 Saturn Circle, Radcliff, KY 40160-2661

___

**FINAL ORDER OF SPECIAL MASTER**

___

    THIS MATTER came before the Special Master for hearing on December 13, 2007. The hearing was held at the office of Legal Resolution Center, 600 17th Street, Suite 2800-South, Denver, Colorado. Present were the following: Dr. Orville Neufeld, D.O. and Jess Dance, attorney for Defendants. Margarite M. Moore, mother of Steven Richard Marquiz, provided a statement by telephone.

    At the beginning of the hearing, the Special Master telephoned the Moores in Kentucky and spoke to Mrs. Moore. She stated, on behalf of her son, that she did not have any testimony to offer in addition to the claims and medical records that she and her husband had filed previously. Mrs. Moore stated that she and her husband are elderly and in poor health. The only witness she would have called died on March 10, 2005. Mrs. Moore declined to testify or to remain on the telephone for the rest of the hearing. She indicated that she did not want to cross-examine Dr. Neufeld, D.O. Mrs. Moore agreed to submit the claim on the record.

    The Special Master has reviewed the initial and supplemental claims submitted by the Moores, as well as all other documents filed, including medical records. All documentation previously submitted by both sides was accepted. Defendants' Exhibits A and B were offered and admitted into evidence.

    After final closing argument, the case was taken under advisement. The Special Master has

reviewed the claim and all documents filed by both sides. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101 (ADA)*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the Remedial Plan[1]. Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class. The Remedial Plan did not provide for an opt out provision for any individual but set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Remedial Plan provides the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

---

[1] The Special Masters also were not involved in the negotiation of the Remedial Plan. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

*Remedial Plan, pp.28-29.* Pursuant to this provision, the Moores filed their claim and requested that the Special Master award appropriate damages or relief.

The Remedial Plan in Section III provides the following definitions:

> III. DEFINITIONS
>     A. COVERED DISABILITIES
>     The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
>     B. QUALIFIED INMATE
>     Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>     C. PERMANENT DISABILITY/IMPAIRMENT
>     A condition which is not expected to improve within six months.

The Remedial Plan further goes on to discuss categories and criteria for special placement. *Remedial Plan, Section V, Paragraph A, pp.4-5.*

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>     1. Is the claimant a disabled individual who is a member of the class?
>     2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>     3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>     4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant or their representatives must establish by a preponderance of evidence each of the four criteria.

## II.

According to DOC records, Steven Marquiz came into custody on July 12, 1982. Mr. Marquiz died on September 4, 2003 at the CTCF infirmary from cirrhosis of the liver. Mr. Marquiz had chronic Hepatitis C which resulted in irreparable injury to his liver and eventually his death. *(12/1/05 documents, death certificate, pp.43-47).* Mr. Marquiz knew that he had cirrhosis of the liver based upon liver biopsies in 1996, 1999 and 2000. He knew his prognosis was not good. *(12/1/05 documents, pp.43-47).* Mr. Marquiz's parents, Clifford and Margarite Moore, filed an initial claim on behalf of their son on September 21, 2004. They alleged he was mobility, hearing and vision impaired, as well as diabetic. They added a fifth category of: "Hypertension/CHF". The Moores filed

a supplemental form on March 25, 2005 alleging that DOC's failure to accommodate the documented mobility, hearing, vision and diabetic disabilities of their son led to his death on September 4, 2003.

Dr. Orville Neufeld, D.O. testified for Defendants. He was qualified as an expert and testified that he had reviewed Marquiz's medical file and all documents submitted by the Moores. Defendants assert that Mr. Marquiz had no qualifying mobility disability, hearing impairment or vision impairment as defined by the ADA, Rehabilitation Act, or the Remedial Plan. Furthermore, Defendants state that Mr. Marquiz was never diagnosed with diabetes while in DOC custody. Therefore, they assert that Mr. Marquiz was not a member of the *Montez* class and his parents are not entitled to any relief under the Remedial Plan.

### III.

Mr. Marquiz was very ill for a very long time. The last four years of his life he spent in and out of the hospital and DOC infirmaries. *(Defendants' Exhibit A)*. One can track the ravages of chronic Hepatitis C and cirrhosis by reading Mr. Marquiz's medical records. He had chronic bronchitis and used a nebulizer multiple times per day. He had trouble walking and used a cane or walker and eventually a wheelchair. As the scarring in his liver progressed, Mr. Marquiz had trouble eating, and he often vomited blood. It would be fair to say that the last four years of Mr. Marquiz's life were horrifying. None of these facts have been overlooked by the Special Master.

Many of the Moores' claims revolve around the quality of medical care provided to their son while in DOC custody. The first claim regarding medical care is not alleged until 1999, seventeen years after their son came into DOC custody. *(12/1/05 documents, pp.22-27)*.

The Moores have raised issues about their son's medical care that implicate the Eighth Amendment by asserting that DOC was "deliberately indifferent" to his medical needs. Even assuming that Mr. Marquiz's individual Eighth Amendment claims survive his death, the Special Masters are bound by the provisions of the Remedial Plan. Individual Eighth Amendment claims are not contemplated by the Remedial Plan unless those claims meet the four criteria set forth in the District Court's order of November 23, 2004. Based upon the evidence presented, the Special Master finds that the Moores have not sustained their burden of proof.

In addition, claims alleging substandard medical care are not contemplated by the Remedial Plan. The Moores may pursue separately any rights that their son may have had concerning medical care. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act, as both are statutes that prevent discrimination that is premised upon a disability. *Fitzgerald v. Corrections Corporation of America,* 403 F.3d 1134 (10th Cir. 2005).

### IV.

This is a Category V case presented by the heirs of a former inmate. Although some of the documents filed are signed by Mr. Marquiz, he did not file the initial or supplemental claim forms.

His parents did after his death. The Moores are not represented by an attorney. Therefore, the Special Master will review the claim as if it were a *pro se* pleading.

In order to prevail under the Remedial Plan, the Moores must prove by a preponderance of the evidence that prior to August 27, 2003,(the date the *Montez* class was formed), their son had a permanent disability due to one or more of the following: mobility impairment, hearing impairment, vision impairment, and/or diabetes. For each of these alleged disabilities, the Moores must demonstrate by a preponderance of the evidence that the named disability was not expected to improve within six months and substantially limited their son's ability to perform a major life activity. The Moores must show further that prior to August 27, 2003, their son was the victim of discrimination prohibited by the ADA, the Rehabilitation Act and the terms of the Remedial Plan.

### *I. Permanent Mobility Impairment:*

**1. Was Mr. Marquiz a disabled individual who was a member of the class?**

All of the medical records submitted in this case were provided by the Moores. Although Dr. Neufeld testified that he reviewed volumes of Mr. Marquiz's DOC medical records, none of those documents were offered or admitted into evidence. Defendants' Exhibit A, identified as an "offender profile", reflects the various DOC facilities Mr. Marquiz was housed in during his twenty-one years in custody. Defendants' Exhibit B, identified as an "offender programs query", lists the programs that Mr. Marquiz participated in and the jobs he held from 1993-2003.

Medical records and other documents were submitted by the Moores on December 1, 2005. Mr. Marquiz had a deformity in the bones of his heels as documented by DOC in June, 1999. *(12/1/05 documents, pp. 25, 31, 32)*. He had difficulty walking in a "normal and correct fashion." ( *p.31)*. The podiatric specialist recommended that Mr. Marquiz receive athletic shoes fitted with orthotics to prevent him from "walking on the outside of his feet." *(p.25)*. Mr. Marquiz claims that he received "prosthesis medical tennis shoes" in July, 1999, but they were "lost" in October, 2000 by security at CCF when he was transferred for surgery outside of the facility. *( p.33)*. On 2/24/01 in response to a grievance filed by Mr. Marquiz requesting replacement of these medical tennis shoes, he was told that the shoes would arrive in 4 to 8 weeks. *( p.34)*. According to Mr. Marquiz, he never received the medical tennis shoes. None of these statements are disputed by Defendants. Mr. Marquiz further claimed that because of DOC's failure to properly treat the medical problem he had with his feet in 2001 through 2003, his legs became "bowed out" and permanently deformed. *(pp. 39 and 40)*. None of these allegations are disputed by Defendants.

Under the ADA and Rehabilitation Act, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. § 794(d); 29 U.S.C. §705(9)(B). The definition of a permanent lower extremity impairment is further defined in the Remedial Plan. Three criteria must be met: 1] Claimant's ability to walk has to be substantially limited by his lower extremity impairment; 2] the lower extremity impairment has to substantially limit Claimant's ability to perform a major life activity; and 3] the

5

lower extremity impairment is not expected to improve within six months.

"Major life activities" are not specifically defined in the Remedial Plan, but are in the regulations enacted to implement the ADA and Rehabilitation Act. "Major life activities" are basic functions, "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *29 C.F.R. § 1630.2(h)(2)(I)*. The Special Master finds that Mr. Marquiz had a permanent lower extremity mobility impairment that existed prior to August 27, 2003 and the impairment substantially limited his ability to walk properly.

DOC acknowledged this mobility impairment in 1999 by giving Mr. Marquiz a pair of medical shoes. In 2000, these shoes were "lost" by DOC. They were never replaced. For three years Mr. Marquiz had to wear shoes that DOC specialists stated were not adequate for the deformities in his feet.

**2. Was Mr. Marquiz otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?**

The answer to this question is yes. The Special Master can find nothing in the record that excluded Mr. Marquiz from participating in DOC programs and receiving the services offered by DOC.

**3. Was the Claimant discriminated against by DOC because of his or her disability?**

The answer to this question is yes. Defendants offer no reason why Mr. Marquiz's medical shoes were taken from him in 2000 and never returned. In 1999, DOC recognized that Mr. Marquiz had a permanent mobility disability and accommodated that disability with a pair of medical shoes. DOC determined that medical shoes were a basic service to be provided to Mr. Marquiz for his documented disability. If DOC accommodated Mr. Marquiz's mobility disability with medical shoes in 1999, that accommodation should have continued.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**

DOC's decision to take away and not replace Mr. Marquiz's medical shoes in 2000 exacerbated the difficulties he was already experiencing in walking. Although this case was filed under Category V - Damages due to death, the Special Master finds that DOC's conduct in not replacing the medical shoes was not the cause of Mr. Marquiz's death. Mr. Marquiz died from complications resulting from chronic hepatitis C.

However, all cases involving the death of an inmate were assigned to Category V by the Special Master. Since the Remedial Plan requires that the highest category be designated for each class member, any case involving death was assigned to Category V without specific reference to the damages alleged. One of the purposes in having the Special Master assign categories was to determine which category of cases afforded class members the right to a hearing. Under the Remedial Plan, class members were only entitled to a hearing in cases designated as category 3, 4 and 5.

*(Remedial Plan, pp. 28 and 29).*

The only reasonable interpretation of the Remedial Plan is that a designation of Category V provides for all of the damages referred to in other categories. The Special Master finds that the damages available in Category V cases were never intended to exclude the damages available in other categories if the evidence presented met the burden of proof required by the District Court's order of November 23, 2004.

Although the Moores have not proven that DOC's failure to continue to provide medical shoes caused their son's death, they have proven by a preponderance of the evidence that their son had
a permanent mobility disability within the meaning of the ADA and Rehabilitation Act. Consistent with other monetary awards imposed by the Special Master for findings of discrimination based upon a disability, the Moores are awarded $200.00 in damages. This is the amount Mr. Marquiz would have been awarded were he alive.

### *II. Permanent Hearing Impairment:*

**Was Mr. Marquiz a disabled individual who was a member of the class?**

In their initial claim form dated September 21, 2004, the Moores allege that their son had "permanent hearing problems." In the supplemental claim form dated March 25, 2005, they allege that a health record from DOC "shows he has sensory neural hearing loss." The Special Master has been unable to find any document submitted by the Moores that references their son had a hearing impairment except their statement that he received new hearing aids on 2/13/03. *(Supplemental claim, p.6)*. In the documents filled out by their son, he also claimed a disability due to a hearing impairment. *(12/1/05 documents, pp.22-27)*. However, Mr. Marquiz makes no further reference to a hearing impairment in any of the subsequent documents that were submitted on his behalf by his parents. The Special Master finds that the Moores have failed to demonstrate by a preponderance of the evidence that their son had a permanent hearing impairment as defined by the ADA and Rehabilitation Act.

### *III. Permanent vision impairment:*

**Was Mr. Marquiz a disabled individual who was a member of the class?**

In the initial and supplemental claim forms and the documents filed December 1, 2005, the Moores base their allegation of their son's permanent vision impairment on several facts which have not been disputed by Defendants. Mr. Marquiz had an eye exam in mid-1998 while he was incarcerated at CTCF. New glasses were ordered at that time, but Mr. Marquiz did not receive them. In January, 1999, Mr. Marquiz was transferred from CTCF to CCF. *(Defendants' Exhibit A)*. At CCF, Mr. Marquiz had two additional eye exams: one in April, 1999 and the second in June, 1999. After each exam, new glasses were ordered but were never received. Mr. Marquiz did not receive his glasses until December, 1999, more than a year after they were first ordered. *(Initial and*

*supplemental claim forms and pp. 13-19 of 12/1/05 documents).*

The Moores allege that DOC intentionally withheld their son's eye glasses in retaliation for his involvement in the *Montez* lawsuit. *(12/1/05 documents, p.58)*. Under the ADA, the Rehabilitation Act, and the Remedial Plan, Mr. Marquiz could only be considered disabled due to a vision impairment if the impairment substantially limited one or more of his major life activities. *42 U.S.C. §12102(2); 29 U.S.C. §§ 705(9)(B) and 794(d)*. Although the Special Master notes that having to wait a year to receive new eyeglasses can only be viewed as excessive, the Moores have failed to prove by a preponderance of the evidence that wearing the old prescription substantially limited their son's ability to participate in major life activities. Mr. Marquiz was able to see and read as evidenced by the documents he prepared himself. He communicated in writing with others outside of DOC and carried on activities of daily life. Simply alleging that his eyes were getting worse does not meet the burden of proof. *(12/1/05 documents, pp. 13-19)*. The Special Master finds that the Moores have failed to prove by a preponderance of the evidence that their son was disabled due to a permanent vision impairment within the meaning of the ADA, Rehabilitation Act and the terms of the Remedial Plan.

### *IV. Diabetes*

**Was Mr. Marquiz a disabled individual who was a member of the class?**

First, the Moores must demonstrate by a preponderance of the evidence that their son had insulin or non-insulin dependent diabetes on or before August 27, 2003 and his diabetes substantially limited his ability to perform a major life activity. The Special Master can only find three references to diabetes in the 12/1/05 documents submitted by the Moores. The death certificate lists "non-insulin dependent diabetes, hypertension and CHF" as other significant medical conditions contributing to, but not the immediate cause of death. *(12/1/05 documents, p. 4a)*. In the documents filled out by Mr. Marquiz on June 9, 2003, he also claimed to be diabetic. The Special Master can find no further mention of diabetes in the pages that follow. *(12/1/05 documents, pp.22-27)*. The final reference to diabetes is made by the Moores. They allege that their son had a "medical diet" that was changed at whim by the medical staff. The Moores allege that sometimes their son did not get enough to eat and his only remedy was to request and pay for a new doctor's appointment to have his diet changed. *(12/1/05 documents, p.63)*.

The Special Master has reviewed the medical records submitted with the 12/1/05 documents. One ambulatory health record from 3/03 recommends a "low salt diet" *(12/1/05 documents, p. 51)*. Another record dated 5/03 under the heading "dietary" states "I see no need for special modifications." *(12/1/05 documents, p.29)*. The Special Master finds that the Moores have failed to prove by a preponderance of the evidence that their son was diabetic prior to August 27, 2003. Therefore, Mr. Marquiz is not a member of the *Montez* class and is not entitled to any relief under the
Remedial Plan.

IT IS HEREBY ORDERED that the Moores' claim of discrimination based upon a permanent

lower extremity mobility impairment is granted for the three years their son was denied the accommodation of medical shoes that DOC documented he needed,
and they are awarded the sum of $200.00 for the reasons noted in this Order; and

IT IS FURTHER ORDERED that the claims of discrimination based on hearing and vision impairments, as well as diabetes, are dismissed, and

IT IS FURTHER ORDERED that any other aspects of the claim not explicitly addressed are deemed dismissed; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before April 7, 2008.**

SIGNED this 11th day of January, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master