IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 03-141
Category III
Claimant: William J. Destro, #117638
Address of Claimant: DRDC, P.O. Box 392004, Denver, CO 80239

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on January 17, 2008. This hearing was held at the Denver Women's Correctional Facility (DWCF) in Denver, Colorado. The hearing was held at DWCF due to construction at the Denver Reception and Diagnostic Center (DRDC).

Present were the following: William J. Destro (Claimant); and Willow Arnold, attorney for Defendants. Testimony was received from Claimant. Defendants presented the testimony of Dr. Orville Neufeld, D.O. Defendants' Exhibits 1 through 15 were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

## I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for

Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1]  Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility,

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

hearing, and vision impairments and inmates with diabetes.
B. QUALIFIED INMATE
Inmate with a permanent disability/impairment which substantially
limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
1. Is the claimant a disabled individual who is a member of the class?
2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on May 23, 2003. Claimant was evaluated at the DRDC and then placed at the Ft. Lyon Correctional Facility (FLCF) at Ft. Lyon, Colorado. Claimant then was transferred to the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. Claimant was placed into the infirmary at CTCF when it was discovered that he had lung cancer. Claimant was transferred temporarily to DRDC to receive radiation therapy and other treatment for the cancer.

In his initial claim form, Claimant checked the boxes for hearing impairment and mobility impairment. Claimant stated, in part, in his claim form:

Disability (A); I suffer from a disease known as Meniere's Disease which is a progressive disease affecting the inner ear and nervous system. The effects are deafness from distortion of sound, periodic nausea and dizziness and frequent loss of balance due to the additional damage of the equilibrium. For the total period of incarceration to date, the CDOC has withheld all treatments, medication, and/or special hearing assistance for the deaf. Disability (B). I suffer from numerous skin infections on arms and legs which were diagnosed as probable skin cancer. These are a constant irritation and pain to me. I was promised surgery to have them removed

3

in March, 2003 by CDOC. To date all treatment has been denied. Disability (C) In May, 2004, I injured myself lifting my storage locker box resulting in pain in lower abdomen. The injury has been diagnosed as a hernia. I was told surgery would be scheduled "someday" and that in meantime a hernia belt was needed. However, the medical staff stated none was available.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated, in part, as follows:

The withholding of any type of hearing impaired equipment. There's no signals to announce count time, there has been no effort to treat any of my illnesses, there is no provision for American sign language resulting in inability to communicate. Denied the medical treatment for skin cancer and now as well as for hernia.

I completed school and because there was no hearing impaired instructor, I was denied the grades necessary to qualify for a pell grant even though I managed to pass the GED. I scored high in English but barely passed math and science due to no instruction understanding. Damaged due to any possibility of occupational training has been denied to me as well as certain placements like camp status due to hearing problems. The damage on the skin cancer results in shortening my life span as the cancers are getting worse and spreading. Concerning the hernia, failure to treat results in life threatening situation.

Claimant was provided supplemental forms to complete and return. In his supplemental form for hearing impairment, Claimant stated, in part, as follows:

(2) Meniere's disease affects my life in DOC first, in that I am unable to hear or clearly understand commands, orders, or directions given over the P.A. system which controls the movements and activities of all inmates. Additionally, I am unable to understand most direct orders given to me in person so I must rely on "lip reading" and guesswork as to what I'm being ordered to do. This distortion of sound and hearing impairment not only determines the prison staff's opinion of me as being cooperative or un-cooperative, but in many cases, determines my actual safety from day to day. Further, I am unable to hear or understand church services and/or bible studies which have always been a very important part of my life. The only bright point in life in DOC came when I earned my high school diploma at Fort Lyon, However, graduating was only possible by studying three to four times more intensely that other students and relying on other inmates at night to help me study because there was, and still is, no hearing impaired equipment and no instructors qualified to teach the deaf....

Attached to the supplemental forms are copies of medical records and other documents. A letter from Dr. Richard L. Cundy, M.D., an ENT specialist, stated:

Mr. Destro has had Meniere's disease for 25 years. He gets congestion and pressure in his ear. He occasionally will have vertigo spells. He gets tinnitus in the ears and he has severe hearing loss bilaterally. He had not obtained hearing aids when I saw him in September 2002. He was put on Diamox to take for when the pressure increases.

Meniere's disease is a chronic condition of the inner ears in which hearing loss, tinnitus, and vertigo are the main symptoms. It is not a curable disease. He does have significant communication problems, which makes it difficult for him.

I sincerely hope that he can get a hearing aid because otherwise, he will not be able to communicate or follow instructions in any type of situation, especially in jail, where there is a lot of ambient noise.

The attached documents also reflect other on-going health problems, including chronic obstructed pulmonary disease.

Claimant also submitted a copy of the DOC accommodation resolution which is dated September 6, 2007. The resolution acknowledges that Claimant has a hearing disability pursuant to the ADA and Rehabilitation Act.

In attendance for the hearing was a real time court reporter. As she typed on her stenographic machine, the words were printed onto a computer screen. Claimant had requested a real time reporter, as he had been provided one by the Denver District Court for his trial.

At the hearing, Claimant testified that he has complete sound distortion caused by Meniere's Disease. He has to reply upon lip reading in order to communicate. Claimant testified that sometimes he is reduced to trying to guess what a person may have said. He also testified that he has trouble with dizziness. Dr. Cundy had indicated in the past that surgery on the inner might improve his balance and reduce the dizziness, but Claimant testified that he was terrified about the surgery because of a fear of dying.

Claimant testified that he has been taunted by guards while in DOC custody. He has found it impossible to understand orders over a loudspeaker. He has had difficulty in getting up on time and was provided a special watch at FLCF that shook when it was time to get up. That watch was taken from him when he arrived at CTCF. Claimant testified that it is a safety issue in prison when a person has to ask another inmate to repeat what he has said. Sometimes, the other inmate believes that the person was not paying attention to what had been said.

On cross-examination, Claimant acknowledged that he had received a strobe light in his cell at CTCF. He testified that he had not had a strobe light in any cell at FLCF. He has not studied nor does he use American Sign Language. In response to a question of how he carried on his business before being sentenced to DOC, Claimant stated that he was never alone and had to reply on others to help him in business situations. He indicated that a hearing aid would not help, as he has distorted sound. A hearing aid only would increase the level of distortion. Claimant testified that he was advised at FLCF that there were no programs for the deaf in DOC. He struggled to complete his

GED while at FLCF.

Claimant testified that he presently is in a wheelchair and on continuous oxygen. He can get from his bunk to the toilet and to his wheel chair. Beyond that, he cannot walk. He has not been housed in a handicapped cell at DOC. He reiterated that he cannot understand what is said on the speaker in his cell.

Defendants presented the testimony of Dr. Orville Neufeld, D.O. Dr. Neufeld had reviewed the medical records of Claimant. He testified that the mobility issues of Claimant have arisen only over the last two years. Claimant does have Meniere's disease and significant hearing loss. Dr. Neufeld acknowledged that Claimant falls into the category of hearing impaired.

## III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

A claimant must establish that he was disabled, as defined by the ADA and Settlement Agreement, on or before August 27, 2003 and had been a victim of discrimination on or before that date. If that is established, then a claimant may amend his claim to include alleged discriminatory acts that occurred after that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Each disability must be examined separately.

**Hearing Impairment**: Defendants concede that Claimant was hearing impaired on August 27, 2003. Defendants have argued that Claimant was not really disabled on that date.

The evidence is overwhelming that Claimant was hearing impaired and disabled on August 27, 2003. Claimant's hearing loss affected his ability to communicate with other individuals and to understand orders issued over loudspeakers. Claimant is a member of the class as hearing impaired.

**Mobility Impaired**: The evidence presented by Claimant does not establish that he was mobility disabled on or before August 27, 2003. His mobility issues during that period of time did not substantially impair his activities of daily life. There is no question that Claimant is mobility impaired at the present time. Claimant cannot amend his claim concerning mobility impairment, as he was not mobility impaired and disabled on August 27, 2003. Claimant is not part of the class as mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?**
From May, 2003 to the present, there have been acts of discrimination against Claimant due to his hearing impairment. Most of these have been systemic in nature, rather than specifically directed at him.

Evidence presented over the last four years reflects that DOC has struggled in the past with inmates who were profoundly vision or hearing impaired. Though a number of claimants have alleged that they had hearing loss, most of those claims involved the normal process of aging. Those individuals did not need hearing aids and were able to carry on their activities of daily life. Profoundly hearing impaired inmates, like Claimant, have struggled to survive in a system that relies upon the spoken word, either directly or from public address system announcements.

Claimant could not understand loud speaker announcements when he came into custody. He was and is unable to understand many direct orders given to him. As he acknowledges, he must rely upon lip reading to communicate. Prior to August 27, 2003, Claimant had received virtually no accommodations for his hearing loss. Claimant was asked to carry on his life activities as if he were an individual with full hearing. Claimant could not do that, as evidenced by his testimony.

Claimant was placed into a GED education class, but without any assistance. Claimant testified, and the Special Master so finds, that he had to seek help from fellow inmates to survive in the GED class, as there was no way for him to understand fully what was being said by the instructor. To be on an equal footing, Claimant needed assistance in the form of some visual presentation of what was being said.

Claimant also testified that he was placed in cells at FLCF that had no strobe light to advise him of any emergency. Upon transfer to CTCF, he was placed into a cell with a strobe light.

Claimant testified that he received few accommodations until up to the last few months. The Special Master finds that to be the case. DOC has few profoundly hearing impaired inmates, and DOC has not been able to fully provide services for those inmates.[2] It is true that services for profoundly hearing impaired and vision impaired inmates can and will cost many dollars. The problem is that the DOC system relies so heavily on oral communication for mass movements. Claimant was not able to respond as promptly as some would have liked because of his hearing impairment.

Finally, the confiscation of the vibrating watch at CTCF makes no sense. This watch had

---

[2] The issue of American Sign Language arose during the hearing. Claimant does not know and has not studied ASL. From previous hearings, the Special Master is aware that DOC has not had any ASL instruction available for inmates. There also has been expressed a great fear that ASL would be used improperly and become a security concern. No one has ever explained to this Special Master how ASL presents any more of a security issue than use of the Spanish, Russian or Korean language (languages of previous claimants).

been provided to Claimant by Cheryl Smith while he was at FLCF. Ms. Smith is now an assistant warden but was the Health Services Administrator at FLCF before he promotion. Her decision to provide the vibrating watch had a medical basis to it because of Claimant's need to get up for various programs and work. The confiscation of the watch was based apparently on some undefined security issue which was not explained. The concept of each DOC facility evaluating anew the needs of each disabled inmate will only lead to additional litigation.

Claimant was discriminated against in violation of the ADA and Rehabilitation Act. This question is answered in the affirmative.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant testified that he had significant concerns as the result of the treatment he received. He always was at risk because of the inability to hear commands. He was concerned about his safety.

Claimant made the comment that the claim process was awarding too little money to successful inmates. He argued that DOC will only change when significant awards are made. The Special Master would disagree. To the extent that problems continue under the Remedial Plan, resolution will only come through continued work by DOC and its staff to comply with that document and any sanctions that may be imposed by the District Judges, if there is lack of compliance. That is beyond the scope of the jurisdiction of the claim process. Claimant is entitled to $1,000 as damages.

IT IS HEREBY ORDERED that the claim of William J. Destro is granted, in part, and Claimant is entitled to the sum of $1,000.00 as damages for violations of the ADA and Rehabilitation Act due to Claimant's hearing impairment; and

IT IS FURTHER NOTED that the remainder of the claim is denied; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before May 12, 2008.**

SIGNED this 30th day of January, 2008.

BY THE COURT:

/s/ Richard M. Borchers

_____
Richard M. Borchers
Special Master