IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

     Plaintiffs,

-vs.-

BILL OWENS, et al.,

     Defendants.

_____

Claim Number: 03-191
Category: III
Claimant: John J. Derwin, #68798
Address of Claimant: FLCF, P.O. Box 1000, Fort Lyon, CO 81038

_____

## FINAL ORDER OF SPECIAL MASTER
_____

THIS MATTER came before the Special Master on the claim of Claimant John J. Derwin. The hearing on this claim began with a site visit to the FT. Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. The site visit was made by the Special Master and counsel for defendant, Chris Alber, Esq. on September 27, 2007. Also present for the suite visit was Paula Greisen, Esq., counsel for the class, Mr. Peter Orleans an architect, and CDOC officials. Immediately following the site visit, a brief hearing was held with Mr. Derwin raising issues of non- ADA bathrooms. Mr. Orleans was sworn and testified about the condition of the facility. Claimant.appeared pro se, as Ms. Greisen did not make an appearance on his behalf.

The formal hearing was held at FLCF on November 27, 2007 before Richard C. Davidson, Special Master. Defendants were again represented by Chris Alber, Esq. Claimant John Derwin, Lt. Robert Smotherman, Cathie Holst, Esq., Sgt. Stephen Harbison, Sgt. Joseph Singleton, Sgt. James Boone, Ms. Wendy Grover, and Orville Neufeld, D.O. were called, sworn and testified. Claimant had requested Kathy Holt, Larry Reed, Dr. Wermers, Paul Lastrella, Case Manager Roberts, Dr. Franz, Associate Warden Cheryll Smith, and inmate Dave Bryan to testify. The Attorney General's office had made arrangements for these people to testify, but Claimant waived their testimony during the hearing. The Special Master has reviewed the testimony and all documents filed by both sides. This Order shall constitute the final action of the Special Master on this claim.

## I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:

I.      General inconvenience or nominal damages;
II.     Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
III.    Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
IV.     Damages due to severe physical injuries; and
V.      Damages due to death.

Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

III.    DEFINITIONS
        A. COVERED DISABILITIES
        The persons covered by this Plan are individuals with
        mobility, hearing, and vision impairments and inmates

with diabetes.
B.  QUALIFIED INMATE
Inmate with a permanent disability/impairment which
substantially limits his or her ability to perform a major
life activity.
C.  PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six
months.

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim.  They stated, in part, as follows:

2.  The Special Masters shall evaluate individual damage claims
submitted in this case by considering the following questions:
1.  Is the claimant a disabled individual who is a member
of the class?
2.  Was the claimant otherwise qualified to participate in
the programs or receive the benefits or services offered by
DOC?
3.  Was the claimant discriminated against by DOC because
of his or her disability? (e.g., were accommodations requested
and denied because of the disability?)
4.  Did this conduct cause the claimant harm and if so, what is
an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters.  A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II.  FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant John Derwin submitted a claim which was assigned claim number 02-244.  After review, the claim was elevated and assigned claim number 03-191. The claim is premised on an alleged permanent mobility disability.

2. Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

3. Claimant Derwin first entered CDOC custody in 1992. He was briefly paroled in 1996 but was returned to CDOC custody that same year.  Claimant has been housed at CTCF, FCF, LCF, DRDC, BVCF, SCF, CSP and FLCF.

4. Claimant suffered a gunshot wound to the back in 1992, when he was shot by a Canon City police officer. The injury was to the T6 vertebrae. This injury resulted in the loss of control of his lower extremities, and his bladder and bowel functions. Claimant also suffers from severe neuropathy with hypersensitivity in his legs and feet. He walks with the aid of Canadian crutches and wears hinged lower leg braces with attached boots.

5. Claimant has been given accommodations by CDOC. He has been given an egg crate mattress, a wedge pillow, a wheelchair, crutches, leg braces and pain medications. He is restricted to bottom bunk, bottom tier, and depending upon the facility, to a toilet cell.

6. When Claimant was sent to CSP, all his medical devices and bedding were taken away. He was placed in a handicapped cell. Since he was in Administrative Segregation at CSP, most of these items were considered unnecessary or were disallowed. He was issued a wheelchair. Unfortunately, the cell at CSP was not equipped with railings and Claimant fell several times, once into the toilet. He also says that he did not receive adequate medical care while at CSP. His medications were taken away and there were no physical therapy facilities there. When he was transferred out of CSP he was given his crutches and leg braces back. He has also received his other accommodations again.

7. When he was moved from CSP, he was taken to the transport bus in a wheelchair and told to get on the bus himself. In order to do so, he was forced to crawl onto the bus backwards. He was transported to AVCF but was refused there because he was in a wheelchair. He was sent to CTCF and then to LCF. On every transport he was forced to crawl onto the bus without help. A handicap van was not offered. While at CTCF, he had to go up and down stairs constantly. He was housed on the first level but the showers, medical department, case manager and other facilities were upstairs. On September 5, 2005, he fell down the stairs and was taken to the hospital. He testified that he broke his wrist and arm. The next day he was transferred to LCF with his arm in a splint. LCF did not have handicap cells so on December 30, 2005 he was transported to FLCF where he remains.

8. Claimant testified that the rooms at FLCF have inadequate handrails and are improperly configured. On August 9, 2006, he fell into his locker box, re-injured his arm and had to be splinted. He fell into his locker box three times before he was finally given a locker box stand. He claims he is treated badly just like other inmates at FLCF. He complains about the lack of handrails and mirrors in the rooms. He complained of other defects in the facility as well. However, this case is concerned about whether or not Claimant is being discriminated against because of his disability. General conditions of the facility confronting everyone do not constitute discrimination against Claimant so long as the facilities meet ADA requirements. On cross-examination, Claimant admitted that the ADA does not require handrails everywhere that he would like them to be.

9. Mr. Orleans testified that the rooms were "substantially compliant with the settlement agreement." He testified that the handrails were in compliance with the ADA. He admitted, however, that there were no handrails outside the showers and no benches there either.

4

10. Claimant testified that he uses crutches 99% of the time. If he goes very far without his crutches he will fall. Sometimes he uses just one crutch and other times he will use just one. With his crutches, he can go up and down stairs but must be careful and go slowly. He said he can't work, can't sit or stand very long. He has had jobs during his incarceration. He tried to get his M code lowered and his stair restriction removed so that he could work in 1997.

11. Lt. Smotherman testified that he has observed Claimant walking about the facility. He has seen Claimant when he was unsteady. Claimant always uses his crutches. He testified that Claimant's general mobility is good with his crutches. Claimant is able to do most things that other inmates can do. Sgt. Boone testified that has seen Claimant walking around the facility without his crutches and without his braces. He testified that when Claimant is discovered, he quickly grabs a crutch.

12. Ms. Wendy Grover, a DOC employee, presented video from surveillance cameras showing Claimant moving around without difficulty with either one or two crutches. He was observed using one crutch with his right hand and carrying things in his left hand. She testified that she has observed Claimant in person doing this same behavior.

13. Dr. Orville Neufeld testified that not only did he review the medical records of Claimant but that he has also treated Claimant personally. The medical records show that early in his incarceration, Claimant had very good mobility even without any assistive devices.. In July 1993, he suffered an injury to his knee when he was hit by a baseball during a game. In 1994, while he was working, he was struck in the back by a forklift. He was found to have tightness and a mild loss of strength in the left ankle. It was concluded by the doctors that Claimant had no new injuries from this accident that he did not already have. On May 9, 1997 he requested that his stair restriction be removed so he could work. This request was granted. In March, 2003, while at CSP, despite not having his assistive devices, he was ambulating in his cell. He was observed walking from his wheelchair to the shower and returning to the chair. In 2006, he was observed walking in the hallway without his crutches or braces. He was also observed in the mess hall carrying his own food tray without using his crutches.

### III. CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly

restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

3. The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

4. Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

5. It must be noted that neither the ADA nor the Rehabilitation Act are designed to remedy alleged deficiencies or omissions in medical treatment provided to prisoners by CDOC. Rather, the ADA and Rehabilitation Act are designed to insure that those who have permanent disabilities that prevent them from engaging in one or more major life activities are not discriminated against because of their disabilities. The Remedial Plan, which defines the scope of the Special Master's authority, limits the disabilities for which damage claims can be asserted to those relating to mobility, vision, hearing, and diabetes.

6. The threshold question in this case is whether or not Claimant qualifies as a member of the Montez class. In order to qualify, the Claimant must prove that he is disabled under the Remedial Plan. The Special Master finds and concludes that Claimant is mobility *impaired* because of his gunshot injury. However, in order to prove that he is *disabled*, Claimant must prove, not only that he has a permanent impairment, but must also prove that his condition substantially limits one or more of his major life activities. In this case, Claimant says that he cannot walk without his braces and crutches. The evidence shows that Claimant is able to walk short distances without any assistive devices and is able to walk much longer distances with the aid of his crutches and braces. He is able to walk short distances with his braces but without his crutches and is able to carry a food tray. He is able to walk around using only one crutch while he carries other items. The important question is not whether Claimant is able to walk without his assistive devices but whether Claimant is able to walk and function with his assistive devices. The evidence shows that he is able to do this without much limitation. Because of this, the Special Master concludes that Claimant is not mobility disabled as he claims. Since he is not mobility disabled, Claimant does not meet the threshold for being a member of the class.

7. Claimant has raised issues of improper treatment by CDOC employees in forcing him to

climb onto non-handicap buses.  Such conduct is not acceptable and very well may constitute discrimination.  However, without proof that Claimant is disabled, the Special Master is unable to consider this evidence.  Claimant has also raised issues of inadequate medical care.  This evidence cannot be considered for the same reason as well as the reasons stated in paragraph 5, above.

8. Claimant has suffered falls and injury because of his impairment.  He claims that the presence of handrails and a locker box stand would have prevented these falls.  That may be true. However, again, because of the failure to prove disability, the Special Master is unable to consider this evidence.  In addition, the question of whether prison facilities are adequate and meet ADA standards is outside this case without proof of disability.

## IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment shall be entered in favor of Defendant and against Claimant dismissing his claims in this action.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before May 12, 2008** with the Clerk of the United States District Court at the following address:

901 19th Street
Denver, CO 80294.

SIGNED this 8th day of February, 2008.

BY THE COURT:

/s/ Richard C. Davidson

_____

Richard C. Davidson
Special Master