IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

-vs.-

BILL OWENS, et al.,

Defendants.

---

Claim Number: 03-240
Category: III
Claimant: Michael L. Johnson, #60930
Address of Claimant: c/o Veronica McKnight, 3345 Calaveras. Colorado Springs, CO 80910

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master on the claim of Claimant Michael L. Johnson. The hearing was held at the Colorado Territorial Correctional Facility (CTCF), Canon City, Colorado on June 4, 2007 before Richard C. Davidson, Special Master. Mr. Johnson appeared Pro Se. Defendants were represented by Jennifer Fox, Esq. Claimant and Orville Neufeld, D.O. were called, sworn and testified. The Special Master has reviewed the testimony and all documents filed by both sides. This Order shall constitute the final action of the Special Master on this specific claim.

Claimant has been discharged from the custody of the Colorado Department of Corrections. He has failed to provide an updated address at which he may be reached by mail. The address listed above is for Claimant's sister.

### I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

2

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Michael L. Johnson submitted a claim which was assigned claim number 03-240. The claim is premised on an alleged permanent mobility disability.

2. Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

3. Claimant Johnson first entered CDOC custody in 1992. Claimant has been housed at CCCF, CTCF, AVCF and ACC.

4. Claimant lost his left leg to bone cancer prior to entering CDOC custody. He had an above knee amputation and wears a prosthetic leg. When he entered custody, he brought two prosthetics, one for walking and one for use in the shower. The shower prosthesis was an old walking prosthesis that had worn out. The prosthesis no longer functioned for walking as it did not bend and the stump cupping was torn. Claimant's walking prosthesis allowed him to move about the facility. Without the prosthesis, Claimant would be confined to a wheelchair.

5. From time to time, Claimant's walking prosthesis needed repairs. These repairs normally required the person from Abilities Unlimited to take the prosthesis for a few days to make the repairs. On July 10, 2003 a representative of Abilities Unlimited took the walking prosthesis to make repairs. Until it was returned, Claimant wore the shower prosthesis which allowed him some

limited mobility. The prosthesis was returned on July 29, 2003 when it was shipped to the warehouse at the facility. It was delivered to medical early the next morning. Nearly two weeks later on August 12, 2003, Claimant discovered that the prosthesis had been returned and inquired about it. Medical was unable to locate the prosthesis. Over the next several months, Claimant filed grievances and continued to wear his shower prosthesis. CDOC ordered a new prosthesis which was finally issued with proper footwear on January 22, 2004.

6. During the time Claimant was without a functional walking prosthesis, he was forced to wear the non-functional shower prosthesis. This leg required some sort of footwear but he says he was not allowed to have any. The foot of this prosthesis was cracked and was not safe. Claimant was forced to wear a shower shoe on his foot while wearing the shower prosthesis despite the fact that he had to go outside to reach the chow hall. Because of the poor condition of the leg he was forced to walk with a painful gait and his back and stump were injured. When the replacement prosthesis was delivered it did not have footwear on it. During the time without the walking prosthesis, Claimant had very little mobility. CDOC offered him a wheelchair but he refused because of fears of his condition deteriorating. He did accept a cane. He was offered a medical cell but this was also refused. He requested to go into administrative segregation until he received his new prosthesis but this was refused.

7. Claimant was unable to participate in the benefits and services provided by CDOC while he was without his walking prosthesis. He says that because he was unable to stand, he lost his job in the library. Despite his limitations, he was still required to go outside to reach the chow hall even while wearing his shower prosthesis and a shower shoe on his right foot.

### III. CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

3. The Remedial Plan limits the class of persons who might otherwise have a disability under

4

the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

4. Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

5. It must be noted that neither the ADA nor the Rehabilitation Act are designed to remedy alleged deficiencies or omissions in medical treatment provided to prisoners by CDOC. Rather, the ADA and Rehabilitation Act are designed to insure that those who have permanent disabilities that prevent them from engaging in one or more major life activities are not discriminated against because of their disabilities. The Remedial Plan, which defines the scope of the Special Master's authority, limits the disabilities for which damage claims can be asserted to those relating to mobility, vision, hearing, and diabetes.

6. The Special Master finds and concludes that Claimant Johnson is a mobility disabled person under the terms of the remedial plan. His left leg has been amputated. In order to compensate for his disability, CDOC issued prosthetic devices to him and provided repairs when needed. With his walking prosthesis, Claimant is able to ambulate to some extent. Without it he is unable to walk. This clearly demonstrates a substantial limitation on the major life activity of walking.

7. The next question which must be answered is whether Claimant was qualified to participate in the programs or to receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs, or activities because of disciplinary reasons, health reasons, or other valid penal justifications. *Miller v. King,* 384 F.3d 1248, 1266 (11th Cir. 2004). It appears to be undisputed that Claimant was qualified to participate in the programs, benefits, and services offered by CDOC except when he was being disciplined.

8. Of course, the key issue is whether Claimant was discriminated against by DOC because of his mobility disability. It appears that CDOC accommodated Claimant with restrictions on his activities and by furnishing him with prosthetic devices. However, the losing of his prosthesis without explanation and the long period of time taken to replace the prosthesis both combined to cause Claimant inconvenience and harm. He was unable to participate in the services, programs and activities provided by CDOC. The problems he suffered were caused by CDOC in losing his prosthesis and in not timely replacing it. The Special Master concludes that CDOC did discriminate against Claimant.

5

9. It is recognized that the discrimination against Claimant occurred shortly after the effective date of the Montez Remedial Plan. However, Claimant was disabled long before that date. CDOC was well aware of Claimant's problems and still allowed the discrimination to occur.

10. While the Claimant presented no evidence as to the monetary amount of his damages, it is clear that he suffered mental and physical pain and anguish. The Special Master concludes that Claimant should be awarded the sum of $750.00.

### IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment be entered in favor of Claimant Johnson and against Defendants awarding to Claimant the sum of $750.00.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before May 12, 2008** with the Clerk of the United States District Court at the following address:

> 901 19th Street
> Denver, CO 80294.

SIGNED this 6th day of February, 2008.

> BY THE COURT:
>
> /s/ Richard C. Davidson
> _____
> Richard C. Davidson
> Special Master