IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 03-282
Category III
Claimant: Billy Herod, #64087
Address of Claimant: 515 Sunset Road, #6, Colorado Springs, CO 80909

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on January 25, 2008. This hearing was held at the offices of Legal Resolution Center, Colorado Springs, Colorado. Present were the following: Billy Herod (Claimant); and Willow Arnold, attorney for Defendants.

Claimant testified in his own behalf and offered into evidence Exhibit #1 which was admitted. Defendants presented the testimony of Dr. Orville Neufeld, D.O. and offered into evidence Exhibits A through II. All were admitted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed her claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>> 1. Is the claimant a disabled individual who is a member of the class?
>> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant initially came into DOC custody on May 20, 1991. Claimant was evaluated at the Denver Reception and Diagnostic Center (DRDC). He then was placed in various facilities before he was released on parole on October 27, 1993. Parole failed, and Claimant came back to DOC custody on January 4, 1996. Claimant remain at DRDC until May 15, 1996 when he was transferred to the Four Mile Correctional Complex (FMCC) in Canon City, Colorado.

Claimant was granted parole on January 15, 1997. He remained on parole until returning to DOC custody on January 7, 1999. Claimant discharged his initial sentence on January 22, 1999.

Claimant came back to DOC custody on a new conviction on February 26, 2002. He was evaluated again at DRDC and remained at that facility for almost a month. He then was placed in various facilities before being placed at the Bent County Correctional Facility (BCCF) in Las Animas, Colorado on August 12, 2002. He remained at BCCF until transferred to FMCC on November 11, 2003. A subsequent transfer took him to the Arrowhead Correctional Complex (ACC) in Canon City, Colorado. Claimant then was transferred back to DRDC and FMCC before being placed at the Buena Vista Correctional Facility (BVCF) in Buena Vista, Colorado on December 26, 2006. Claimant was released on parole on March 15, 2007. He now has discharged his sentence and is living in Colorado Springs, Colorado.

In his initial claim form, Claimant checked the box for mobility impairment. Claimant stated, in part, in his claim form:

> Neck - spinal cord injury (Bone fusion) that causes - spinal stenosis, arm neuropathy, clonis in both legs - lower back pain, leg pain, pain walking - bending -lifting - squatting - climbing - can't run - can't sit for over 30 min. Have been M3 with limited to 30 min for standing - sitting. No squatting - bending, climbing - lst floor lower bunk res. Chronic meds - can't lift over 10 lbs.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated, in part, as follows:

> Have been made to climb to top bunk to 2nd floors. Not given good enough medications for pain, etc. Not given proper med treatment for the last 2 ½ years. Denied surgery. Neurological apps not followed through with app canceled Oct. Then have to start over on the list. Was convicted of Class 1 write-up for refusal to submit to UA time limits when med fac for 17 mos. Because of this unable to go to min. fac. because of med line meds. Not being able to advance through system parole setback.
> Unnecessary pain - suffering - unable to receive due process in advancing not given access to neurosurgeons not given surgery.

Claimant was provided a supplemental form to complete and return. In his supplemental form, Claimant stated, in part, as follows:

> Not given right medical attention - constant pain been in DOC for 2½ yrs. And can't get surgeries that MRI's show on cervical and lower lumber that neuro surgery says need to be done. DOC keeps giving the run around for over 2½ yrs. So far. Not being able to progress to lower sec. Level due to medication. No med. Given at min facility period.

At the hearing, Claimant testified that he worked at the Wild Horse Program in Canon City when he came into DOC custody. He had grown up on a ranch in Oklahoma and had worked with horses. Claimant described the job as being very hard, and that he received injuries as a result. He had cervical surgery and was worried about possible paralysis and long-term pain. The surgeries that he had were all related to the wild horse work.

Claimant testified that he did not receive much physical therapy after his surgeries. He was given steel rods in his back and neck as the result of his injuries. At the time of the hearing, Claimant indicated that he is on full disability as he is not able to do anything due to his injuries.

In his testimony, Claimant indicated that he returned to the horse program when reassigned to FMCC. He knew the work and enjoyed dealing with the horses. He received some accommodations for his back, including extra mattresses. Then the accommodations were canceled

for no reason. Claimant remained in the horse program despite his physical condition because he did not want to go back to what he described as "regular prison."

Claimant indicated that he believed that medical had dragged on his care. He needed surgeries and those were not provided. He believed that medical care should be provided to him. "I think they are responsible for my injuries."

On cross-examination, Claimant testified that he used a cane after his initial surgeries. He acknowledged that his issues with care are neurological. He believed that he should have had a cane, but canes were disallowed at several facilities. A cane was needed for walking problems that he experienced in the past.

Defendants presented the testimony of Dr. Orville Neufeld, D.O. In his testimony, Dr. Neufeld stated Claimant has had surgeries on his cervical spine, as well as his lower back. Claimant had a laminectomy in 1996. Claimant had pain issues. Claimant has developed foot drop as the result of his conditions.

Dr. Neufeld also testified that Claimant had a recent MRI which reflected degenerative conditions in all of his back. *Claimant's Exhibit #1*. A herniated disk was also noted, but this is a new finding since that last MRI. There is a loss of the lumbar curvature. Dr. Neufeld testified further that physical therapy is not needed for the cervical spine. Claimant had received back and knee braces. Claimant has received a wedge pillow and extra mattress at FMCC.

On rebuttal, Claimant testified that he is aware that doctors do not like to do surgery again on the same areas of the spine. He acknowledged that surgery may not be an option now. His cervical problems have affected his legs.

## III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

A claimant must establish that he was disabled, as defined by the ADA and Settlement Agreement, on or before August 27, 2003 and had been a victim of discrimination on or before that date. If that is established, then a claimant may amend his claim to include alleged discriminatory acts that occurred after that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant testified concerning two main complaints that he had while in DOC custody. The first is that he was not provided compensation when hurt at the horse program. Second, Claimant believes that he was not provided appropriate medical care while in DOC custody.

In order to establish a claim, a claimant must show that he was disabled on or before August 27, 2003 and that the disability substantially affected a major activity of daily life. Under the ADA

5

and Rehabilitation Act, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

Dr. Neufeld testified that Claimant has the condition of foot drop. In review of all of Claimant's records, the Special Master does note that there have been surgeries and on-going medical problems dealing with his back and neck. Though it is a close case, Claimant will be given the benefit of the doubt and is determined to be a member of the class as mobility impaired. Claimant suffered injuries that affected his ability to walk, a major activity of daily life.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant has expressed concern over the medical treatment that he received while in DOC custody. In his testimony, Claimant testified that he should have received additional surgeries on his spine because of the injuries that he suffered.

It is clear that a number of decisions made over the years concerning Claimant arose from his medical care. There is no dispute that Claimant received medical care while in DOC custody. The question raised by Claimant concerns the quality of that care. The United States Court of Appeals for the Tenth Circuit has held that the ADA and Rehabilitation Act are not available to litigate claims of medical negligence or malpractice. *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005). Claimant's concerns about the quality of the medical care he received are beyond the limits of what may be considered in this case. The evidence presented by both sides reflects that Claimant did receive medical care while in DOC custody. Claimant's concern about that care is understandable, but the Special Master may not litigate a claim of medical malpractice in light of the *Fitzgerald* decision.

Claimant's concerns are understandable and legitimate. Claimant received significant injuries and medical conditions as the result of working with the horse program. Claimant stated clearly that he thought DOC should be responsible for the injuries that he received while working the horse program. Certainly, an individual working in a private or non-prison public job would be entitled

to workmen's compensation . This would include medical care and some compensation for the injuries without regard to fault. The Special Master is aware that workmen's compensation does not apply in the prison or jail setting. The Special Master is not aware of any provision of the law that provides compensation for injuries incurred in employment by inmates within the prison setting. If such a provision exists in the law, it is not germane to the discussion in this case. The Special Master is limited to resolving alleged acts of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003. Claimant retains the right to seek compensation through other legal provisions that may exist.

The Special Master has limited jurisdiction under the Settlement Agreement. The Special Master may not order compensation except for acts of discrimination based upon the recognized disability. The Special Master may not question a medical judgment in light of the *Fitzgerald* decision.

It is clear that Claimant received accommodations while in DOC. He has a cane, extra mattress and wedge pillow. Claimant testified that these made a difference for him. Other than supposition, there was no evidence presented as to why the cane was taken from Claimant. The Special Master finds that Claimant was discriminated against when his cane, pillow and mattress were taken from him.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** The Special Master determines that the actions of DOC through its staff led to pain and suffering for Claimant, especially when his cane was removed from him. Claimant is entitled to damages in the amount of $225.00.

IT IS HEREBY ORDERED that the claim of Billy Herod has been proven to the extent noted, and Claimant is awarded $225.00 as damages; and

IT IS FURTHER ORDERED that the remainder of the claim is denied, as Claimant has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before May 12, 2008.**

SIGNED this 8th day of February, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master