IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-415
Category III
Claimant: Ramona Raymore, a/k/a Monique Scaggs, #50927
Address of Claimant: 15774 East Colorado Avenue, Aurora, CO 80017

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on January 11, 2008. This hearing was held at office of Legal Resolution Center, 600 17th Street, Denver, Colorado.

Present were the following: Ramona Raymore (Claimant); and Willow Arnold, attorney for Defendants. Testimony was received from Claimant. Defendants presented the testimony of Dr. Orville Neufeld, D.O. Defendants' Exhibits A through AA were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed her claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>>1. Is the claimant a disabled individual who is a member of the class?
>>2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant initially came into DOC custody on October 31, 1983. Claimant discharged that sentence on June 3, 1985. Claimant returned to DOC custody on April 12, 1990 and was placed at the Colorado Women's Correctional Facility (CWCF) in Canon City, Colorado. Claimant discharged that sentence on September 20, 1992.

On September 15, 1993, Claimant returned to the custody of DOC. She was placed for evaluation at the Denver Reception and Diagnostic Center (DRDC). She was transferred to CWCF in Canon City on September 24, 1993. Claimant then was transferred to the Pueblo Minimum Center (PMC) on March 20, 1995. Claimant remained at PMC but was transferred for medical reasons to DRDC in 1996. Claimant was placed on parole on February 19, 1998. Claimant's parole was revoked on July 10, 1998. She was placed at the Denver Women's Correctional Facility (DWCF) on August 8, 1998. She was granted parole again on December 12, 1998. Parole was revoked and she returned to DOC custody on May 27, 1999. Claimant returned to DWCF.

On September 5, 2001, Claimant was granted parole. She came back to DOC custody after a revocation of parole on May 30, 2002. Claimant discharged that sentence on August 10, 2002. On December 8, 2004, Claimant returned to DOC custody. She was placed back at DWCF and remained there for the most part until granted parole on October 17, 2006. The most recent sentence has been discharged. Claimant is now living in Aurora, Colorado.

In her initial claim form, Claimant checked the boxes for vision impairment and mobility impairment, as well as the box for diabetes. Claimant stated, in part, in her claim form:

> I had a knot come up in my neck around July, 1997 on the left side. I went to medical. The doctor said he would let the P.A. know. When the P.A. came back off vacation, I saw her. For the next 5 months, I was taking meds. Nothing happened. It got bigger and real sore to touch or lay on. I told them since you can not tell me what this is send me to some one who can. I was then sent to the State Hospital in Pueblo. I was told it's nothing to worry about. Men get these all the time on their Adams apple or around cars. Women get them in the lymph nodes. I asked for a biopsy to be done for cancer. One in a million cancer I was told. December 15, 97 I went for day surgery....Tests came out positive for cancer.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated, in part, that she was denied treatment for what turned out to be cancer. Claimant stated that no one listened to her and she felt that this was discriminatory.

Claimant was provided supplemental forms to complete and return. In her supplemental form for diabetes, Claimant stated, in part, as follows:

> I go to finger sticks 2 times a day. I don't know why all I have been told is I have a high and a low. No one will tell me what is going on. Had a lot of blood work done. No answers on what came back.

In her supplemental form for mobility impairment, Claimant stated, in part, as follows:

> I have a lot of nerve damage on both sides of my body. My fingers, legs, feet, toes are numb.....

Concerning her vision impairment, Claimant stated, in part:

> I am almost blind. I'm suppose to get a contact lens for my left eye along with glasses. It's very hard for me to see clear and distance. I have the starting of glaucoma.

At the hearing, Claimant testified that she has been fighting cancer since 1997. She believed that her cancer was not treated appropriately and that it has continued to come back. She testified that she has been battling cancer in her mouth. She has been receiving treatment since she was released.

Claimant testified that she had requested treatment but had not received it while in DOC custody. She claims that DOC medical staff advised her once that she had diabetes and then told her that she did not have it. Claimant did not submit any medical records at the hearing or before concerning her medical conditions.

4

Defendants presented the testimony of Dr. Orville Neufeld, D.O. He testified that Claimant has had cancer, with an initial diagnosis of cancer in a lump on her neck and in one tonsil. She has had recurrences of cancer since the initial surgery in 1997.

Dr. Neufeld testified that there is no indication in Claimant's medical records that she is diabetic. Testing was undertaken in 2004 and she was not found to be diabetic. Concerning vision impairment, Claimant previously had a corneal transplant. She has had cataracts and some macular degeneration. Testing of her eyes reflected that she has correctable sight. She does not have glaucoma, as it is not noted in any medical records. Several pages of Claimant's medical records were offered into evidence and admitted.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

A claimant must establish that she was disabled, as defined by the ADA and Settlement Agreement, on or before August 27, 2003 and had been a victim of discrimination on or before that date. If that is established, then a claimant may amend her claim to include alleged discriminatory acts that occurred after that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Each disability must be examined separately.

**Diabetes:** There is no evidence that Claimant was ever diagnosed as having diabetes on or before August 27, 2003. Claimant maintains that she was advised that she was a diabetic, but that is not reflected in her medical records. No records were presented from non-DOC medical sources that she has been diagnosed as having the disease. *Defendants' Exhibit J*.

**Vision Impairment**: Review of all of the evidence indicates that Claimant has had some issues with her vision in the past. Claimant has been provided with contact lenses in the past by DOC. *Defendants' Exhibit C; Exhibit F*. Claimant was able to carry on her activities of daily life while in DOC custody. Claimant has failed to establish that she was vision impaired on or before August 27, 2003.

**Mobility Impaired**: The evidence presented by both sides reflects that Claimant has numerous medical problems. Her main concern is the cancer that she continues to battle. She testified at the hearing that she believed DOC did not promptly find the cancer and did not treat it correctly. She believes that her cancer would not have returned had she received proper treatment.

As to mobility and Claimant's ability to walk, there is no evidence that Claimant was not able to carry on activities of daily life prior to August 27, 2003. Under the ADA and Rehabilitation Act, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3)

5

being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

Claimant has significant health issues, but she has failed to prove that she was mobility impaired on or before August 27, 2003. The Special Master may only deal with the four conditions set forth in the Settlement Agreement. To the extent Claimant may have been disabled solely because of her cancer, that is beyond the jurisdiction of the Special Master.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant made very clear at the hearing that her real concern is with the care she received for her cancer while in DOC custody. In essence, she believes that she was the victim of medical malpractice by DOC.

The United States Court of Appeals for the Tenth Circuit has held that the ADA and Rehabilitation Act are not available to litigate claims of medical negligence or malpractice. *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005). Claimant's concerns about the quality of the medical care she received are beyond the limits of what may be considered in this case. The evidence presented by both sides reflects that Claimant did receive medical care while in DOC custody. Claimant's concern about that care is understandable, but the Special Master may not litigate a claim of medical malpractice in light of the *Fitzgerald* decision.

Claimant has failed to establish that she was the victim of discrimination on or before August 27, 2003. Claimant may pursue by separate lawsuit her claims of medical malpractice.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Ramona Raymore is denied, as Claimant has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before May 12, 2008.**

SIGNED this 31th day of January, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master