IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

___

Claim Number 03-433
Category III
Claimant: Debbie J. Gillon, #60340
Address of Claimant: LVCF, 1401 W. 17th Street, Pueblo, CO 81003

___

**FINAL ORDER OF SPECIAL MASTER**
___

THIS MATTER came before the Special Master for hearing on January 25, 2008. This hearing was held at the La Vista Correctional Facility (LVCF) in Pueblo, Colorado. Present were the following: Claimant Debbie Gillon (Claimant); and Willow Arnold, attorney for Defendants.

Claimant testified in her own behalf and offered into evidence Exhibits #1 through 13. All were admitted. Defendants presented the testimony of Dr. Orville Neufeld, D.O. and offered into evidence Exhibits A through M. All were admitted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed her claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

>B. QUALIFIED INMATE
>Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>C. PERMANENT DISABILITY/IMPAIRMENT
>A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

>2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>>1. Is the claimant a disabled individual who is a member of the class?
>>2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>>3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>>4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant initially came into DOC custody on May 2, 1989. She was placed at that time at the Colorado Women's Correctional Facility (CWCF) in Canon City, Colorado. Claimant was placed on parole in 1990, but that later was revoked. Claimant was returned to CWCF. Claimant was granted parole on several additional occasions, but each was unsuccessful. Claimant discharged her initial sentence on June 12, 1998.

Claimant came back into DOC custody on September 24, 2001. Claimant was evaluated at the Denver Reception and Diagnostic Center (DRDC). She then was placed at the Denver Women's Correctional Facility (DWCF). Claimant was granted parole on July 16, 2003. Parole was revoked, and Claimant returned to DOC custody on March 8, 2004. Claimant was placed back at DWCF. She was granted parole again on June 12, 2004. Parole was revoked, but that sentence was discharged on December 20, 2006.

On May 31, 2007, Claimant returned to DOC custody on a new conviction. She was placed back at DWCF. Claimant then was transferred to LVCF on June 29, 2007 The hearing was held at LVCF, and Claimant remains at that facility at this time.

In her initial claim form, Claimant checked the box for mobility impairment. Claimant stated, in part, in her claim form:

3

> 1983 - car accident, head & rgt hand and knee. 1998 assaulted, caused severe back and sciatica nerve damage, 2001-03 rgt arm nerve and neck spinal damage. 2005 paralysis from neck down, could not even walk, sciatica, no long standing - sitting, lifting, very limited mobility, have had to use walker and wheel chair, no climbing, jumping, running, or walking on uneven ground or pavement. Also have PTSD due to the trauma of the assault and paralysis. Degenerative bone disease and osteoporosis causes much pain.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated, in part, as follows:

> All my lower bunk, lower tier restrictions have been taken away. I have been denied x-rays and recent MRI to enable proof of paralysis. Medical has also taken away all medication for pain and refuse to treat permanent medical condition or recognize disability.
>
> Chronic pain on entire right side from bottom of foot to base of neck. I have limited movement of neck and spine. Sometimes I can't get out of a chair or bed due to pain. I am denied "non-narcotic" pain relief that gives me just a little bit easier mobility. I cannot participate in sports, work out.

Claimant was provided a supplemental form to complete and return. In her supplemental form, Claimant stated, in part, as follows:

> Approximately 1998, was the beginning of my mobility problems as I was assaulted and left for dead and the mobility problems stem from this attack. I also have PTSD meaning (post traumatic stress disorder) when the pain get so bad I can't take it, I get flashbacks of this assault. I have suffered paralysis and mobility problems ever since.
> I have continue to have light duty, no heavy lifting, standing for long periods of time, sitting on hard surfaces, no running, jogging or anything that would jar my spine. I came to this facility (LVCF) June 4, 2007. I finally saw Dr. Wermer on Oct. 01, 07 concerning my restrictions and he discontinued <u>all</u> my restrictions, leaving me with a good possibility to moved to a top bunk and tier...

At the hearing, Claimant testified concerning her injuries in the past, particularly the assault. She nearly died in the assault, and received restrictions when she came back into DOC custody in September, 2001. She described her problems with sciatica and osteoporosis.

Claimant testified that she was transferred to LVCF in during June, 2007. She had received lower bunk, lower tier restrictions at DWCF when she came back into the system on May 31, 2007. After arriving at LVCF, Claimant was examined by Dr. Joseph Wermers, M.D. who terminated all of Claimant's restrictions and all of her pain medications. Claimant described the problems that she has had with her knees.

On cross-examination, Claimant testified that she does a lot of walking. She had been very sick while in New Mexico on parole. She testified that she was paralyzed from the neck down and was bed ridden for months. She was back walking in February, 2007. Claimant testified that it has been difficult to relearn to walk and that stairs are very difficult for her.

Defendants presented the testimony of Dr. Orville Neufeld, D.O. In his testimony, Dr. Neufeld acknowledged that Dr. Wermers had terminated all restrictions and all medications for pain. An MRI taken of the spine in November, 2001 reflected degenerative disk disease and narrowing of the disks. There was no indication of nerve impingement. *Defendants' Exhibit H*. Dr. Neufeld further indicated that Claimant did have x-rays taken of her knees, but those were negative. *Defendants' Exhibit I*.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

A claimant must establish that she was disabled, as defined by the ADA and Settlement Agreement, on or before August 27, 2003 and had been a victim of discrimination on or before that date. If that is established, then a claimant may amend her claim to include alleged discriminatory acts that occurred after that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant has been and out of DOC custody over the past nineteen years. The Settlement Agreement requires that a claimant show that a disability existed on or before August 27, 2003. Only if such a disability is proven can a claim be amended to include acts that occurred after August 27, 2003.

Claimant's testimony reflected long-term complaints about her physical condition. The most serious act in the past was the assault in 1998. She indicates that she has PTSD from that incident, and that is understandable. PTSD is not a condition that is covered by the Settlement Agreement.

The evidence presented by Claimant indicated that she was able to carry on her activities of daily life prior to August 27, 2003. She was able to walk, work, and take care of herself. Under the ADA and Rehabilitation Act, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

5

Claimant has health concerns at the present time, but she has failed to prove that she was mobility impaired on or before August 27, 2003. Claimant was not part of the class on that date for the reasons noted.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant testified that the act of discrimination that occurred was when Dr. Wermers removed her restrictions and her pain medications. This occurred in 2007 after being transferred to LVCF. In order to establish a claim, a claimant must establish the she was the victim of discriminatory acts by DOC and its staff on or before August 27, 2003. Claimant has not provided any evidence that she was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003.

In addition, Claimant's complaint is with the removal of the restrictions provided to her at different DOC facilities. The removal of the restrictions by Dr. Wermers was part of his medical care of Claimant. The United States Court of Appeals for the Tenth Circuit has held that the ADA and Rehabilitation Act are not available to litigate claims of medical negligence or malpractice. *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005). Claimant's concerns about the quality of the medical care she received are beyond the limits of what may be considered in this case. The evidence presented by both sides reflects that Claimant did receive medical care while in DOC custody. Claimant's concern about that care is understandable, but the Special Master may not litigate a claim of medical malpractice in light of the *Fitzgerald* decision.

Claimant has failed to establish that she was the victim of discrimination on or before August 27, 2003. Claimant may pursue by separate lawsuit her claims of medical malpractice or negligence.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Debbie J. Gillon is denied, as Claimant has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before May 12, 2008.**

SIGNED this 8th day of February, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master