IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

___

Claim Number 03-038
Category III
Claimant: Ben Padilla, #82114
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

___

**FINAL ORDER OF SPECIAL MASTER**
___

THIS MATTER came before the Special Master for hearing on June 5, 2005, May 25, 2007, and February 14, 2008. The hearing was held at the Ft. Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Ben Padilla (Claimant) and Donald Drew (inmate assistant); Jess Dance, attorney for Defendants (June 5, 2005); Jennifer Huss f/k/a Jennifer Fox, attorney for Defendants (May 25, 2007) and Willow Arnold, attorney for Defendants (February 14, 2008).

In addition to himself, Claimant presented the following witnesses during the hearing: Lt. Nona O'Malley; Cpt. Felix Scott; Lt. Robert Martinez; Betty Zurek; Cathie Holst;; Gerald Lucas; Sgt. Shad Draper; Lt. Robert Smotherman; Cpt. Daniel Barbero; Lt. Randy Maudlin; and Donald Drew. Claimant did not formally submit any exhibits at the hearing, but requested that all documents previously filed with the Special Master be considered.

Defendants did not call any witnesses at the hearing. Defendants offered into evidence Exhibits A through T, and all were admitted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on December 7, 1993. Claimant was placed at the Denver Reception and Diagnostic Center (DRDC) for testing. Claimant was then transferred to the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado on January 7, 1994. Claimant remained at CTCF until March 9, 1999 when he was transferred to the Limon Correctional Facility (LCF) in Limon, Colorado. That placement was short-lived due to security concerns, and Claimant was transferred back to CTCF April 8, 1999.

On October 15, 2004, Claimant was transferred to FLCF. Other than a few brief trips to DRDC, Claimant has remained at FLCF up to the present. Claimant has a mandatory discharge date of March 20, 2019.

In his initial claim form, Claimant checked the boxes for vision impairment and hearing impairment. Claimant stated, in part, as follows:

> Hearing impaired - I am not able to hear the normal day-to-day sounds that occur around me and this keeps me from responding when necessary and in some cases has compromised my safety. I am not able to hear all orders or count time notices and this leaves me open to write-ups and disciplinary actions, possibly resulting in loss of good-time and/or my cell living.
> Vision impaired - I have been legally blind since December 31, 1980. My job opportunities in prison are very limited and my mobility is also impacted. I also cannot participate in any recreational activities so staying physically fit is not possible. Also, CDOC will not allow me to have or use my prosthetic eye which causes me to have severe headaches and my eye socket is susceptible to infections. Since I have not been able to wear my prosthetic eye for years, I will have to have a new one made.

When answering the question concerning discrimination against him by DOC and its staff, Claimant stated as follows:

> CDOC medical has issued me a permit to be housed on either the 1st or 2nd tier of cell-houses, but, due to my blindness, cell-house staff has forced me to move and live on the first tier.
>
> Given my forced movement to the 1st tier I was put into circumstances that caused me to be physically assaulted by an AIDS infected inmate. CDOC took no action to either investigate or discipline the guilty party. Also, a fellow inmate over heard CDOC staff tell the inmate that had assaulted me not to worry about it because, "they were just going to sweep it under the rug."

Claimant filed supplemental forms for each of his claimed disabilities. Concerning his claim of hearing impairment, Claimant stated, in part, as follows:

> I wear one hearing aid in my left ear, but suffer hearing loss in both ears. DOC provided me with hearing tests by the same nurse, I question her qualifications and the test environment provided, but DOC maintains the records and results. I know that my hearing is deteriorating with the passage of time.
> I cannot hear announcements from the PA system, so I miss chow calls, medical calls, and count notifications as well as general facility announcements. Not hearing announcements has resulted in disciplinary actions such as punitive actions and loss of good-time. I'm at risk of injury when out of my cell-house because of vehicle movements or recreational area activities.
> I have only received one hearing aid to date yet test(s) results would indicate my need for another. I did not receive my hearing aid in a timely manner.

4

As to his vision impairment, Claimant set forth the following:

> I am completely blind. My right eye is missing and requires a prosthetic. My left eye has zero vision and since being in prison is no longer centered and is worsening.
> ....I am unable to exercise my right to due process for the following reasons: the law library does not have books or documents in braille; there is no "braille" equipment available; and I cannot be helped by others because it is against DOC regulations.
> I requested proper eye wear but was told to purchase same from the canteen. I applied for work at the TAB plant but was denied.

Claimant went on to state:

> The facility (CTCF) does not offer any rehabilitational programs for blind persons because they are not equipped to handle this. This extends into job availability as I mentioned in Item #3 concerning the TAB plant.

Claimant has submitted several pages of his medical records. A number of these records go back to the time prior to Claimant's DOC incarceration. A letter dated August 29, 1989 from Dr. John Kirk, M.D. indicated the following:

> Benny Padilla is a 27 year old Spanish-American male who presented at University Hospital with a gunshot wound to the head on December 31, 1980. As a result of this injury, both optic nerves were severed, and he has no vision in either eye. In addition, the right eye has been enucleated.

Medical records prepared contemporaneously with Claimant's injury reflect that he has been blind since December 31, 1980. There is no question that the right eye was destroyed as the result of the gun shot.

The hearing in this case stretched over three days during a two and one-half year span. The Special Master will provide a summary concerning the testimony of each witness called by Claimant.

*Lt. Robert Martinez*: Lt. Martinez is assigned to FLCF. He was asked about an incident that took place on September 12, 2006. He recalled the incident. It was alleged that Claimant ran into him. Lt. Martinez testified that he believed Claimant was attempting to hit him. On cross-examination, Martinez said that he rarely has contact with Claimant since the incident. He acknowledged that Claimant uses his cane, but occasionally walks without it.

*Lt. Randy Maudlin*: Lt. Maudlin is assigned to FLCF. He was asked about an incident when Claimant ran into a desk. He remembered some of what occurred Ms. Graham was present and asked Claimant to take a seat. On cross-examination, Lt. Maudlin testified that Ms. Graham was the case

manager for Claimant.

*Lt. Robert Smotherman*: Lt. Smotherman is assigned to FLCF. He testified that he has been the disciplinary officer at the facility. He had advised Claimant that not all write-ups had been pursued against him. He advised Claimant that he did not keep archives of COPD hearings.

*Sgt. Shad Draper*: Sgt. Draper is assigned to FLCF. He recalled an incident in 2005. Sgt. Draper had held the door open for Claimant and an aide. Sgt. Draper indicated that Claimant ran into him and then stepped on his feet. Sgt. Draper advised Claimant never to touch him again. Sgt. Draper testified on cross-examination that he observed Claimant run into other correctional officers.

*Gerald Lucas*: Inmate Lucas testified that he observed in September, 2007 that a correctional officer got in the way of Claimant who was attempting to walk a hall with his cane.

*Donald Drew*: Inmate Drew was passing by the chow hall when he overheard Cpt. Barbero. The Captain said that Claimant was not to be given anything special.

*Cpt. Felix Scott*: Cpt. Scott is assigned to YOS in Pueblo, Colorado. He previously was at CTCF and recalled Claimant. Cpt. Scott was assigned to CTCF for three years. He acknowledged that the less physically able were placed on the 1st tier. On recross examination, Claimant testified that DOC determines where an inmate is to be housed. Inmate preferences are not given any weight.

*Lt. Nona O'Malley*: Lt. O'Malley is a case manager at CTCF. She did not recall that Claimant had been assaulted while at CTCF. She did not recall the problems surrounding the prosthetic eye. She testified that she believed that Claimant was blind. She had been his case manager for several years.

*Betty Zurek*: Ms. Zurek is the sister of Claimant. She stated that the gunshot incident had occurred in late December, 1980. Claimant was eighteen years of age at that time. His right eye was enucleated. She said that he needs a new prosthetic eye. She testified that her brother is totally blind. He also has problems with his ears and back. She expressed concerned about the extent and quality of medical care.

*Cathie Holst*: Ms. Holst is the AIC for DOC. She testified that she had no independent recollection of Claimant's request for accommodation. She literally has hundreds of requests pending. She testified that there are no Braille classes or Braille cards available from Canteen. She testified that attempts are made to accommodate those with disabilities. No machine is available at FLCF to help vision-impaired inmates.

*Cpt. Daniel Barbaro*: Cpt. Barbaro is assigned to FLCF. He recalled an incident in which Claimant ran into Lt. Martinez on September 12, 2006. He observed that and pulled Claimant aside to talk with him. Claimant was removed from general population for a period of time. He advised Claimant not to touch any correctional officers. Cpt. Barbero testified that Claimant has a reputation for bumping into people.

*Claimant*: Claimant testified that he came into DOC custody on December 6, 1993. He has been totally blind since December 31, 1980. He had not learned Braille after being blinded in 1980. He has no way to learn Braille in DOC, as resources are not available to him or others. He had learned the Braille alphabet on his own. Claimant testified that there were 4 or 5 vision impaired inmates at CTCF when he was most recently there. There are other vision impaired inmates at FLCF. No classes were offered in Braille for vision impaired inmates. He also stated that there are no Braille cards or dominos. Likewise, there are no board games or crafts for vision impaired inmates.

Claimant testified that he has been experiencing headaches since he was no longer able to use his prosthetic eye. He had requested a new prosthetic eye but that had been denied on the basis that it was purely cosmetic.

While at CTCF, Claimant was employed as an individual who wrapped plastic ware for meals. He had run into a truck that he did not hear or was not alerted to. He applied for other jobs but was not able to obtain any employment except for the job mentioned.

Claimant testified that there are no Braille books at the CTCF library. He was provided books on tape, but had to buy his own tape player. Claimant described his brief transfer to LCF as being chaotic. There were no jobs at LCF for vision impaired inmates and no one to help him. He was kept in administrative segregation until moved out of LCF. He returned to CTCF.

After his return to CTCF, he again asked for his prosthetic eye. He also requested a hearing aid. The hearing aid was eventually provided to him.

Claimant testified he requested a single cell at CTCF because of personal security issues. He broke a toe over a locker box. He has had items stolen and otherwise has been victimized.

On cross-examination on May 25, 2007, Claimant testified that he had not been assigned an aide when he broke his toe on the locker box. He had been denied jobs through Colorado Correctional Industries. He indicated that he had wanted to study Braille at CTCF but no classes were offered. He had to buy his own tape player through the canteen, along with headphones. Bingo cards are not available in Braille. He has had a problem with headaches as the result of not having the prosthetic eye.

During the hearing on February 14, 2008, Claimant testified that his left eye was removed by surgery on June 29, 2007 due to the pain that it was causing. He has requested a second prosthetic eye.

Defendants did not offer any live witnesses. Affidavits were submitted from Cheryl Martin, Dr. Cary Shames, D.O. and Dr. Orville Neufeld, D.O. In the affidavit of Ms. Martin, she indicated that she is the lead worker for the Legal Access Program. She stated that she is aware of what is to be available at a DOC law library. She is aware that no law library has Braille materials for blind inmates. She did indicate that inmates with vision impairment may request assistance in using the law libraries.

7

Dr. Shames affidavit states that Claimant has vision loss, though there was a question as to what he could see with his remaining eye. He indicated further that Claimant does not have a hearing impairment, as he has been provided a hearing aid and is able to function in his daily activities.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to be a member of the class, Claimant must establish that he was disabled on or before August 27, 2003. The Special Master may consider matters that post-date August 27, 2003 only if there is establishment of a disability prior to that date. In addition, Claimant must establish that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act prior to that date.

Claimant has alleged two conditions that he believes have become impairments. Each will be discussed separately:

**Hearing Impairment:** Claimant has alleged that he is hearing impaired. He argues further that he has become disabled in his daily activities as the result of the hearing loss.

Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

The evidence presented by both sides is that Claimant does have some diminution in his hearing. He has been provided a hearing aid which he often uses. During the course of the hearing on February 14, 2008, Claimant did not have his hearing aid. He was able to orally communicate during the three segments of his hearing.

The key under the ADA and Rehabilitation Act is whether a disability affects a major life activity. The Special Master would acknowledge that there is a dividing line between someone who is hearing impaired and someone who is not. This Special Master has required a showing that the loss of hearing has made activities of daily life very difficult. In the case of Claimant, his vision impairment overwhelms what loss of hearing there has been. The Special Master cannot find that Claimant was hearing impaired, as defined by the ADA and Rehabilitation Act, on or before August

27, 2003. Claimant is not a member of the class as hearing impaired.

**Vision Impairment:** Defendants' response to this issue has been interesting. Testimony was elicited from various DOC witnesses who believed that Claimant wasn't really blind. They believed that he intentionally ran into correctional officers, particularly females, because he had some residual sight in his remaining left eye. This belief is pure fantasy.

The medical records submitted by Claimant from University Hospital reflect instantaneous blindness on December 31, 1980. Claimant lost his right eye immediately and lost the sight in the remaining eye at the same time. Claimant is lucky to have survived the incident without greater damage. One need only review those records, along with others, to know that any belief that Claimant had any residual, useful eyesight was an expression of hope, not fact. *Defendant's Exhibit #10.*

Claimant has been vision disabled, as defined by the ADA and Rehabilitation Act, since December 31, 1980. He is a member of the class as vision impaired since August 27, 2003.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant must show that he was the victim of discrimination prohibited by the ADA on or before August 27, 2003. Only if he can establish this may he seek relief for something that occurred after that date.

This Special Master has reviewed every claim that has been filed since late March, 2004. A number of claimants have alleged hearing impairments and vision impairments. Out of the approximately one thousand five hundred claims filed, fewer than five have been determined to have a hearing impairment that affects activities of daily life. At this point, only Claimant has been determined to be totally blind and, therefore, classified as vision impaired to the point of affecting activities of daily life.

One thing is clear from processing and adjudicating claims, DOC is ill-prepared to deal with truly blind and truly deaf inmates. In many respects, the deaf inmate or profoundly hearing impaired inmate is better able to receive services from DOC than the blind inmate.

There have been several points in time when Claimant has been the victim of discrimination prohibited by the ADA and Rehabilitation Act. The Special Master will detail some of the issues raised by Claimant:

*Lack of Materials and Resources for the Vision Impaired*: Claimant testified that he had

9

purchased his own tape recorder and headphones from the canteen in order to hear books on tape. A sighted inmate is able to check a book out of the library and not have to use any intervening medium to read the book. All blind inmates are entitled to the same opportunities as those who go to the library. There is no reason that an individual must secure his own tape recorder to have equal access to the same books, though in a recorded format.

Claimant testified that he has been unable to learn Braille since arriving in DOC custody. No Braille materials are available in libraries. An inmate who arrives in DOC custody and does not speak English is given the opportunity to learn it as a second language. The same opportunity should be accorded to a blind inmate who did not learn Braille before entering into DOC custody. For better or worse, Braille is the *lingua franca* for those who are blind.

The Special Master would note that the Fifth Circuit dealt with a similar case in an unpublished opinion in *Cole v. Velasquez,* 67 Fed.Appx.252 (5th Cir. 2003). The court noted that the ADA claim filed by plaintiff was cognizable.

> A public entity "shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity. *28 C.F.R. §35.160(b)(1).* "In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities." *28 C.F.R. §35.160(b)(2).* "Auxiliary aids and services" are defined by the ADA to include "qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments." *42 U.S.C. §12101(1)(B).*

Claimant has not been offered the opportunity to learn Braille. The Special Master has no power to order systemic changes. Therefore, Claimant is to be given the opportunity to learn Braille.

*Transfer to Limon*: The Special Master has no power to direct placement of any inmate in any facility. That power is reserved to DOC and its staff. Review of the few documents that exist concerning the transfer to LCF in March-April, 1999 reflect that a huge mistake was made by DOC that did not take into account Claimant's vision disability.

Claimant was at risk and was placed into a facility that had no ability to provide services to him. The decision to transfer him to LCF was a mistake that created significant anxiety and fear in Claimant. He also spent several days in administrative segregation through no fault of his own. The decision to transfer Claimant to LCF was in disregard of his visual limitations and violated the ADA and Rehabilitation Act.

*Disciplinary Actions by DOC*: Claimant has discussed in his pleadings and testimony his concern about COPD convictions that have occurred. Claimant believes that these convictions were improper due to his vision impairment.

The United States Supreme Court has held that prison disciplinary convictions cannot be attacked through an action under 42 U.S.C. §1983. *Heck v. Humphrey,* 512 U.S. 477 (1994); *Edwards v. Balisok,* 520 U.S. 641 (1997). There is no basis for believing that the ADA and Rehabilitation Act are any different from §1983. The Special Master has no jurisdiction to examine the propriety of any COPD conviction.

*Prosthetic Eyes and Other Issues*: Claimant testified at length concerning the headaches that he has had over the last few years. He believes the headaches are the result of not being able to use his prosthetic eye. He now requests two prosthetic eyes. The Special Master may deal only with vision impairment. By definition, there is no vision with a prosthetic eye. The issue raised by Claimant is legitimate and involves his health. The issue of denial of the prosthetic eye is outside the parameters of the Settlement Agreement. Claimant may pursue this issue by a separate lawsuit, but not through the claim process.

To the extent that other issues have been raised by Claimant, the Special Master finds that they have not been established by a preponderance of the evidence.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant was placed in an unsafe location through the transfer to LCF. He is entitled to damages in the amount of $1,500 as a result of that experience.

Claimant is entitled to receive instruction so that he might learn Braille. DOC is to provide instruction to him that will facilitate him learning Braille.

IT IS HEREBY ORDERED that the claim of Ben Padilla is granted to the extent noted, and Claimant is to receive instruction in Braille and damages in the amount of $1,500; and

IT IS FURTHER ORDERED as to any remaining issues in the claim of Ben Padilla are denied, as he has failed to prove each of the four elements required by the Order of November 23, 2004 as to each remaining issue; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before June 2, 2008.**

SIGNED this 17th day of March, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

───────────────────────────────
Richard M. Borchers
Special Master