IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870(OES)(Consolidated for all purposes with
Civil Action No. 96-N-343).

JESSE (JESUS) MONTEZ, et al.,

    Plaintiffs,

-vs.-

BILL OWENS, et al.,

    Defendants.

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAR 21 2008

GREGORY C. LANGHAM
CLERK

---

Claim No. 03-177
Category III
Claimant: Robert P. Fry #110724
Address of Claimant: LCF, 49030 State Hwy. 71, Limon, Colorado 80826

## CLAIMANTS APPEAL

**COMES NOW**, The Claimant Robert P. Fry, pro se litigant and pursuant to Fed.R.Civ. Proc. 53(g)(2) appealing the "Final order of the Special Masters", hereinafter, S/M. dated 11-20-07. This appeal is timely filed pursuant to this court granting Claimant's motion for time extension on 2-12-08. The Claimant respectfully contends that the "conclusions of law" as determined by the S/M in this case are in error resulting in a deficient and/or otherwise unjust ruling.

### SUMMARY OF THE CLAIM

This claim was initiated because the CDOC violated both the remedial plan and the ADA by terminating the claimant on the basis of his vision disability without making a reasonable accomodation which he requested several times through different DOC supervisors.

The Claimant is indisputably totally, completely, and in fact "permanently" blind in the left eye and there is absolutely no medical or scientific procedure available which could possibly restore and/or in any way correct the sight in the left eye to 20/200 or better.

The S/M (see pg. 5 at #6, of final order) has incorrectly concluded that the above stated permanent blindness does not constitute a valid disability within the meaning of ADA or the **MONTEZ** Remedial plan. As a direct consequence, the S/M ruled in the defendant's favor stating the Claimant has not satisfied the first requirement as described by Judge Kane's order of 11-23- 03. i.e. "Is the Claimant a disabled individual who is a member of the class?"

## ARGUMENT

<u>I.</u>     Is the Claimant a disabled individual who is a member of the class?

Contrary to the S/M finding and conclusions on page 5 at #6 of the final order, the Claimant [is] indeed an individual with a disability within the meaning of ADA....because, he is permanently blind in the left eye, and suffers deteriorating eyesight in the right eye which "substantially limits" the major life activity of seeing. The manner in which the Claimant must sense depth and use peripheral vision is significantly different from the manner in which an average two-eyed person performs the same visual activity.

Whatsmore, the vision in the (left) blind eye **cannot** ever be corrected to 20/200 by any means known to modern science. This vision impairment stems not merely from poor eyesight, but from total blind-

2

ness in one eye which significantly restricts the manner in which the Claimant performs the major life activity of "seeing". Therefore, the Claimant is most certainly a person with a valid disability who is entitled to the ADA protections.

In 1998, the tenth circuit court determined that this particular vision impairment (blind in **one** eye) does qualify as a "disability" within the meaning of ADA. See, **Horsewood v. Kids R Us,** 27 F.Supp. 1279 (D. Kansas, 10th cir. 1998) Holding:

> "Former employee was "substantially limited" in her ability to see, within the meaning of ADA, where she was permanently blind in her left eye and suffered partial vision loss in her right eye, and where her vision loss impaired not only her visual acuity, but also her depth perception and peripheral vision as well". ADA 1990,(3)(2), 42 U.S.C.A. 12102(2); 29 C.F.R. 1630.2 (i)(j)(1,2).

In this instant appeal, the Claimant suffers the exact same impairment as described in **Horsewood**, i.e. permanently blind in the left eye, thus affecting his depth perception and peripheral vision too.

According to the American Medical Association (AMA); The loss of vision in one eye constitutes a 25% disability of the visual system and a24% whole body impairment, totaling a 49% disability within the meaning of ADA.

The ADA defines a disability as a "physical or mental impairment that substantially limits one or more of the major life activities of a individual" or having "a record of such impairment" or when an individual is "regarded as" having such an impairment. And that which is not expected to improve within six months. 42 U.S.C.

3

12102 (2).

In this instant appeal, the defendant's do not and indeed cannot deny the Claimant does have this physical (vision) impairment of being permanently blind in the left eye, of which can never be corrected or improved in his lifetime, let alone six months. There are in fact plenty of their own **records** of such impairment, and also Claimant is "regarded as" having such impairment. The defendant's whole argument is that the Claimant does have a vision impairment but, not a "disability".

## CONCLUSION

Because of all the medical records submitted to the court along with witness testimony on May 9, 2007 at the hearing with the S/M, and the above cited case law in support of Claimant's position, the Claimant believes he has sufficiently provided this court with genuine issues of material facts proving he is an individual with a disability within the meaning of ADA. Thus showing good cause for the S/M adverse ruling to be reversed and this court to review this case a new. Since the S/M improperly determined Claimant was not a member of the class, he did not rule on the other requirements for relief, with the exception of the "qualification" issue.

## QUALIFICATION

**II.** **Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services of DOC?**

See Final order, page 5 at #8; "It appears to be undisputed that the Claimant **was** qualified to participate in the programs, benefits, and services offered by the CDOC". (The Claimant agrees with this proper determination).

## DISCRIMINATION

**III.** **Was the Claimant discriminated against by DOC because of his disability? (e.g., Were accomodations requested and denied because of the disability?)**

See the Final order on page 5 at #8, the S/M did not rule on this key issue as a consequence of the initial error. However, at the hearing, the Claimant provided live testimony from his immediate supervisor of five months, DOC staff member Hal VanDruff. This witness informed the court that the Claimant did in fact advise him of his vision disability. The Claimant explained he could not see well enough, due to poor depth perception to operate the sewing machines safely and requested a reasonable accomodation, which was to be left at his then current position on the folding tables.

This staff member testified that he himself went to the upper management, John Reilly and Mike Kelly, and personally informed them of the situation and requested the accomodation be granted. However, they "refused". This fact is further evidenced by the written response of John reilly in the original grievance filed in September of 2003, wherein Reilly does not address the written claim detailing the disability, but instead, he simply quotes his

5

"policy" to cross train as many inmates in as many different jobs as possible. As the S/M noted in the finding of facts, (pages 3-4 at # 5) both Reilly and Kelly testified the Claimant did not inform them of his vision problem. However, there are two important factors which belie their untruthfulness. (1) Their own co-worker, Mr. VanDruff, testified that they **were informed** by him personally. (2) The Claimant's vision problem is very "obvious" to anyone he comes into contact with, including the S/M at the hearing. The Claimant was stabbed in the left eye with a sharp/jagged piece of kindling wood at a young age of four, which instantly destroyed completely the normal appearance of the eye along with the vision. (The cataract and glaucoma in that eye add significantly to the distorted appearance).

When the Claimant questioned Reilly at the hearing concerning the "obviousness" of the injured eye, incredibly, Reilly stated he had never once "looked the the Claimant in the eye" throughout the five months of Claimant's employment with numerous face to face discussions and personal encounters. He further testified that he (1) never read the remedial plan so as to be informed of the mandate concerning "reasonable accomodations", (2) has never been through any training to ensure he deals appropiately with inmates with disabilities, (3) did not know 'what' an **AIC** was, and (4) had no clue who Cathie Holst is. Reilly is a member of the LCF **management team** and as such is obligated by the remedial plan to be familiar with all the above criteria.

6

The Claimant relies on the holdings of Judge Kane concerning this issue of discrimination. It should be noted that the Claimant wanted to introduce the following statement at the May 9th hearing but, the S/M declined to allow it to be entered on the record. See, **U.S. v. City and County of Denver,** 49 F.Supp. 1233 (1999) Holding:

> "Under the ADA, if the employee request an accomodation or an employer knows of a disability of a qualified individual, then the employer has the obligation to participate in the interactive process of determining an accomodation". (ADA 1990, 101(8), 42 U.S.C.A. 12111(8), 29 C.F.R. 1630.9.).
>
> The employer knows an employee has a disability, so as to invoke his obligation to reasonably accomodate, **when the employee tells the employer about his condition, such as through a third party, or by observation,** the employer need only know the underlying facts, not the legal significance of those facts in order to know the employee has a disability.
>
> "Accordingly, whether a defendant knows that a physical impairment is considered a disability is of no consequence. **It suffices if the defendant knows the physical impairment exist".**

In this instant appeal, DOC records prove unequivocally, that the defendant's "knew" and in fact have **always known** that the Claimant's physical impairment does exist. The sworn testimony of DOC staff member Hal VanDruff proves that the Claimant did in fact inform the employer of his impairment, and then Mr. VanDruff went and **informed upper management** (Reilly and Kelly) who then intentionally refused to abide with the ADA and remedial plan mandates to make an reasonable accomodation.

To further prove this issue of discrimination, the court needs to review the transcript (or listen to CD) of the May 9th hearing in connection with the Claimant's work performance record.

7

As well as Claimant's exemplary behavior record. In the final order page 4 at #5, the S/M correctly states the Claimant was terminated for what the defendant's considered "disruptive behavior", i.e. "talking to other inmates on the work site". **This is a pretextual excuse made by the defendant's.** First of all, as Reilly himself testified, it is not against the rules for any of the inmates to converse with one another. As this occurs in every workplace in America, and too, every inmate in the garment factory speaks to other inmates on a daily basis without being fired. That is to say, inmates who have not asked for any "reasonable accomodation".

This fact stands to show the different treatment of similarly situated inmate employee's who do not have disabilities. It was testified by Reilly and Kelly both, that on the day the Claimant was fired for "talking to co-workers"...they themselves called the Claimant into the office alone to discuss the problem of operating the machines. They did this in plain view of all the other inmates as the office is not exactly a private enclosure. In other words, the office walls are plexi-glass windows all the way around, so that every inmate in the proximity can **see for themselves** who is in the office. Here in prison, the unwritten but longstanding and strictly enforced rule of the inmate population mandates that any inmate who is seen alone in a office with the police must divulge the reason for being alone with the police. The other inmates do demand to know "what" was the topic of your conversation, "why" did the police want you alone ...and so on, etc. Reilly and Kelly are both experienced staff member's who know about this prisoner

'third degree rule' and so it should stand to show that they themselves created the situation which in turn put the Claimant in a precarious position of "must speak" to other inmates...So they then illicitly fired the Claimant who did nothing wrong in the first place. In that particular situation, no inmate coming out of that office dares say to the other inmates, "mind your own business"... the one who does that ends up with a phony "snitch jacket" and is found sometime later severly beaten or worse.

Therefore the question is begged of this court, can the defendant's legally ignore a qualified inmate with a disability when he request a reasonable accomodation, and instead of making the accomodation, create an adverse and/or potentially hostile situation which could quite possibly cause the inmate serious bodily injury? Only to then fire the inmate for engaging in the conduct they themselves set him up for in the first place.

This is of course on top of the defendant's other admission of disparate treatment of this Claimant as well. Both Reilly and Kelly admitted at the hearing that there are several other inmates working in the garment factory, some for many years, who, even though they do not have any disabilities, have never been forced to operate the sewing machines. This shows that John Reilly's "policy" to cross train as many inmates in as many job positions possible...is arbitrarily enforced. It also shows there was no real or valid legitimate reason to deny this Claimant the accomodation he asked for,

which was simply not to be forced to operate a machine he was then and still is today medically restricted from operating.

The Claimant would also ask this honorable court to consider the additional evidence which was submitted to the S/M at the hearing, evidence that shows the defendant's, throughout the administrative process of this claim have been "tampering with the grievance system" (see fax cover sheet from Tammie Engle) and evidence that LCF's own Dr. Bloor, has been altering the Claimant's medical records by changing what the specialist recommended in writing. i.e. the specialist (Dr. R. Foerster) wrote Claimant **should not operate machinery** due to poor depth perception. Whereas Dr. Bloor entered into the records, "Claimant should not **work around** "**heavy machinery**".

The Claimant also believes the defendant's have by their own actions demonstrated further discrimination by means of "retaliation". Claimant sought to be re-hired in the garment factory in October of 2005, through the filing of proper papers to the AIC (Cathie Holst) however, this request was completely ignored, and in fact has not been addressed by that office to this very day. While **numerous** other inmates without disabilities who have been fired for various different reasons **are re-hired.** These are however, inmates who have not filed a **MONTEZ** CLAIM AGAINST the LCF. It is this instant claim which precludes the Claimant from being employed in the Colorado corr. Industries (CCI) program.

## CONCLUSION

The Claimant believes he has sufficiently submitted genuine

10

issues of material fact that proves he was illegally discriminated against by the defendant's refusal to comply with the ADA and the remedial plan regarding the reasonable accomodation clause.

## HARM/REMEDY

**IV.** **Did this conduct cause the Claimant harm and if so, what is an appropiate remedy?**

**(This issue was never addressed by the Special Master)**

As the Claimant explained to the S/M, working in the (CCI program) garment factory is the highest paying job any inmate, with or without a disability can aquire and maintain. The Claimant feels he had as much right to this program as any other inmate who still works there without a disability, and who has never been forced to change positions. The men working on the folding tables alone are earning $65.00-90.00 per month. DOC records show the Claimant has never been fired from any job assignment since the termination at bar, and there is no reason to believe that had it not been for the discrimination he ever would have been fired from that position up to the present day. All inmates not employed in the CCI program can earn not more than $13.20 per month, which is what the Claimant has been earning since December of 2003.

Because of the defendant's discrimination against the Claimant, he has suffered the loss of approximately $70.00 per month multiplied by fifty five months to date, (September 2003 - December 2003 = 4 months) (From 2004 - 2007 = 48 months) (January through April

11

of 2008 = 4 months) totalling an actual monetary loss of approximately $ 3,920.00. Plus the Claimant lost his "single cell" priveledge for one year which, being doubled up, caused a tremendous amount of undue stress and mental anguish. The Claimant also lost his recreation priveledges (no fresh air) weight lifting, jogging etc. for two straight months. DOC records show the Claimant has and always maintains an exemplary "work" and bhavior standard.since 2001 and into the present 2008 year.

The ADA provides that the title VII remedies apply to any person alleging discrimination on the basis of a disability. 42 U.S.C. 12117 (a). Once the Plaintiff proves that an unlawful motive played some part in the employment decision, See, 42 U.S.C. 2000e-2(m) The plaintiff [is] entitled to relief, including compensatory damages, declatory judgement, and injunctive relief. Id. 2000e-5(g)(2)(b) **Pedigo v. P.A.M. Transport inc.**,60 F.3d 1300,1301, (8th cir. 1995).

When this claim was first initiated in September of 2003, the Claimant was asking for his job to be reinstated, all back wages, and bonuses to be reimbursed and injunctive relief prohibiting any wanton retaliation by DOC staff. He also sought $ 25.00 per day for punitive damages.

Since that time, it is clear that the Claimant cannot return to what would only be a hostile work environment due to this present litigation. Therefore the Claimant is seeking all back-pay of $3,920.00 as listed above, and has mitigated the punitive damages down to $10.00 per day multiplied by the fifty five months to date.

12

Calculated at the twenty one "working days" for a total of $11,550.00. While the Claimant understands this appears to be a rather large number, he does not believe the ten dollars per day is unreasonable.

This present litigation and many others as well, is in fact caused by the defendant's own obstinate refusal to "willingly" come into compliance with the remedial plan. The Claimant simply requested due to his well documented vision disability, not to be forced to operate the machinery he was then and still is today medically restricted from operating.

The defendant's have been habitually and intentionally denying disability status to almost all inmates across the board, many of whom have qualifying disabilities. They are using unqualified Doctor's to overrule a "specialist" determination to effectuate this illicit practice.

## CONCLUSION

**Wherefore,** the Claimant ask this honorable court, for the good cause and valid reasons shown, along with previously submitted evidence and live testimony to grant the Claimant's requested relief of all back-pay in the sum of $3,920.00, plus punitive damages of $11,550.00 making a total sum of $15,470.00.

The Claimant also seeks injunctive relief precluding the defendant's from any further wanton retaliation.

3-19-08
Date

Robert P. Fry #110724

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the attached **APPEAL BRIEF** for MONTEZ claim No. 03-177, was properly addressed, first class postage prepaid, and placed in the U.S.MAil on this 19th day of March, 2008. Sent to:

Attorney General's Office
Montez litigation section 7th floor
1525 Sherman Street
Denver, Colorado, 80203

3-19-08
Date

Robert P. Fry #110724