**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action, File No. 92-N-870(OES)(Consolidated for all purposes with Civil
(To be supplied by the Court)   Action No. 96-N-343)

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAR 27 2008

GREGORY C. LANGHAM
CLERK

JESSE MONTEZ, et al.   , Plaintiff(s)

Claim No. 03-220

V.

BILL OWENS, et al.   ,Defendant(s)

---

CLAIMANT'S OBJECTIONS TO
FINAL ORDER OF SPECIAL MASTER

---

The Claimant, pro se, respectfully submits the following objections to the Final Order of the Special Master, entered in this case on 7 January 2008:

Introduction:

1. The initial claim herein was filed on 4 May 2004 and was designated as a Category II claim and assigned Claim No. 02-228.

2. Subsequently, the Special Master determined that the designation should be changed to Category III and, on 10 April 2006, ordered the change and gave a new, replacement Claim No. 03-220.

3. Hearing on the merits was originally set for 17 August 2006; however, due to various delays, hearing did not occur until 20 December 2007.

4. The above-cited Final Order requires all parties to file their objections on or before 31 March 2008; therefore, this pleading is timely filed.

5. Claimant has no objection to the portion of the Final Order which requires the Defendants to pay the Claimant $264.00 for short-paying him during the period 19 April 2002 through 19 February 2003.

6. Other orders and factual findings in the Final Order, as described below, are respectfully objected-to as being inadequately supported by the record, contradicted by the evidence and/or inconsistent with other parts of the Final Order.

First Objection:

7. The Special Master has acknowledged, principally on page 9 of the Final Order, that the Claimant was short-paid while employed in a "handicapped" job at Colorado Territorial Correctional Facility (CTCF) and has ordered that he be compensated therefor.

8. He has also acknowledged that the Claimant was/is qualified to handle many of the higher-paying jobs otherwise available in DOC but denied to Claimant due to his medical restrictions. This appears on page 9, particularly in footnote 3, and in the words of the last sentence of the first paragraph on page 8, to the effect that Claimant was not "...provided a job that paid the same as a non-handicapped inmate."

9. However, the Special Master has apparently overlooked the period from the end of his "handicapped" job on 19 February 2003 until his transfer from CTCF on 7 November 2006, during which the Claimant had no job whatsoever because of his medical restrictions, and the Special Master has failed to decide and order fair compensation for that period.

10. It should be noted, please, that while the Claimant could not provide any specific figures for compensation for the noted period of total unemployment, he did testify to the unemployment during the 20 December 2007 hearing and that testimony was not disputed by the Defendants.

11. It should also be noted that, during the period of unemployment, Claimant repeatedly applied for and was repeatedly denied various jobs in the license tag plant for which he was otherwise qualified. Daily pay and periodic bonuses for license tag plant employees usually exceeded $100/month during the period.

12. However, because such bonuses are based on specific job, seniority, etc., it would be impossible to accurately calculate an exact amount of compensation that would be fair to all parties, the Claimant requests and suggests that he be compensated in the amount of $1958, in addition to the $264 already ordered.

13. This figure is an arbitrary one, representing payment of $2/day over 22 workdays per month, for three years, eight and one-half months. It is believed that this figure is fair, in light of the fact that, during the period, the maximum non-industry pay was cut to $0.60/day on the one hand, and the Claimant might have earned about $4450 during the period if he had been hired for one of the tag plant jobs, on the other hand.

14. Alternatively, the Claimant would respectfully request that the Court calculate a compensation figure it believes to be fair, bearing in mind, please, that the Claimant was denied <u>three</u> separate tag plant jobs for which he was qualified, ostensibly due to his having medical restrictions that would not have hampered his ability to perform those jobs.

Second Objection:

15. More important than any monetary considerations, though, is the total absence in the Final Order of any provision for the protection of disabled people from the arbitrary and dangerous removal of their housing restrictions, work restrictions and/or deprivation of needed medical appliances (braces, wheelchairs, etc.), without thorough examination and determination by non-DOC personnel that those restrictions/devices are no longer needed. Estelle v. Gamble, 429 US 94 (1976)

16. The record shows that the incident that prompted the claim in this instance was the arbitrary removal of the Claimant's bottom-tier housing restriction by Dr. Joseph Wermers in March 2001, in retaliation for the Claimant's refusal to go on a medical trip that would have placed his life at risk.

17. Such medically groundless deprivations and denials are common throughout the Colorado DOC and routinely place individual prisoners' lives and wellbeing in danger, as is detailed in the Claimant's sworn statement, dated 31 July 2001, and attached to the Claimant's Supplemental Form for Claimants who are Claiming Damages due to Mobility Impairment.

18. The Special Master's discussion of this appears on page 8 of the Final Order and indicates the Special Master's confusion over this series of events and the evidence presented as well as exactly what the Claimant has alleged:

    a. It should be made clear that the Claimant has alleged that Dr. Wermers' retaliatory action was not in response to any legal action taken by the Claimant, particularly not in response to his Montez claim, as it was the action that caused the claim, not the claim that caused the retaliation, as explained in 16, above.

    b. The Court's attention is invited to the copies of grievances attached with the Claimant's above-mentioned sworn statement to the Supplemental Form, all of which provide detailed information regarding Dr. Wermers' actions, his attempts to avoid scrutiny of superiors by having his subordinates answer subsequent steps of the grievance process, and his falsification of official documents (Defendants' Exhibits P & Q), upon which the Special Master has relied unduly.

    c. Because the matter is so complicated and involves numerous false statements by Dr. Wermers in Exhibits P & Q and by his subordinates in their responses to the Claimant's related grievance steps, and because of the great weight given Dr. Wermers' statements by the Special Master, a hearing de novo is requested to give the Claimant ample opportunity to dismantle the structure of falsehoods built by these individuals.

19. In the event a de novo hearing is not granted, the Claimant respectfully offers the following examples of the Special Master's over-haste to accept the claims in Exhibits P & Q as truthful and of their actual untruthfulness and misleading character:

    a. Despite Dr. Wermers' claimed "facts" from Claimant's pre-DOC medical file and despite the Claimant's unrefuted allegation that Wermers' writings were for the sole purpose of attempting to justify and cover up his inappropriate

cancellation of the Claimant's protective housing restriction, the Special Master failed to check the accuracy/inaccuracy of Wermers' claims against the actual Veterans' Administration Hospital files.

    b.    Additionally, in light of Wermers' claim that the Claimant had refused to allow anyone to evaluate his cardio-vascular disease since 1997 - three years before he came into DOC - the Special Master failed to consider that Claimant had undergone extensive physical examination upon entry into DOC, while at DRDC, which included cardio-vascular examination. The only part of that evaluation that was not completed (mislabeled elsewhere as a <u>refusal</u> by the Claimant) was the stress test, which was attempted on a stationary bicycle at DRDC but had to be terminated due to Claimant's inadequate lung capacity.

    c.    Related to the above, a chemical stress test was later scheduled and successfully completed, which fact the Special Master apparently overlooked in the medical files, or he simply did not have the files reviewed. While the stress test was completed after the events involving Wermers, the fact that Claimant fully cooperated in that and in all tests/evaluations conducted at DRDC in 2000, tends to belie Wermers' claim that Claimant avoided such evaluation. Further proof of the falseness of Wermers' claims is found in the excerpts quoted in the Final Order from Dr. Bowman's reports of evaluations done on Claimant on 5 March 2002 and 21 August 2002. (See Final Order, pages 5 & 6)

    d.    The refusal of the medical trip on 14 March 2001, which directly led to Wermers' cancellation of bottom-tier housing restriction, was thoroughly detailed at hearing. But, briefly stated, the refusal was due only to security staff's adamant refusal to handcuff and shackle the Claimant in any way other than one that would prevent his accessing the nitroglycerine pills he was prescribed to take in case of chest pains, thus risking Claimant's life needlessly.

    e.    The fact that Claimant was prescribed nitroglycerine pills to counter possible heart attacks, as the record of medical care shows, is proof that far more than one medical specialist saw evidence of serious cardio-vascular problems, as they were originally prescribed by the Grand Junction VA Hospital in 1997, continued by the Mesa County Jail medical staff while Claimant was held there from 16 November 1999 until 29 June 2000, then represcribed by DRDC medical staff and, later, by Dr. Wermers' own AVCF medical department in July and August 2000. It must be rhetorically asked: If Wermers was convinced there were no heart problems, why did he have the Claimant on nitroglycerine pills, prior to, during, and after both his cancellation of Claimant's restrictions in March 2001 and his attempted justification thereof in July 2001, which is in Exhibits P & Q?

    f.    The Special Master has concluded, apparently solely from Exhibits P & Q, that Wermers' cancellation of Claimant's bottom-tier housing restriction was <u>not</u> a retaliatory action for Claimant's refusal of a medical trip (described in d, above), but <u>was</u> a considered medical judgment, as the Special Master stated on page 8 of the Final Order. If that is the case, then it must also be asked: Why did Wermers not document his "medical judgment" in the Claimant's medical file in March 2001, when the cancellation was effected, and why did he wait until 24 July 2001, after the Claimant had begun the grievance process against Wermers' cancellation action, to do so?

  g. Also, if Wermers' action was, in fact, a medical judgment-based action, why, after Claimant had been moved to third tier and complained via grievance procedure, did Wermers effectively reverse his "medical judgment" and order on Exhibit P (upper-right corner), "No third tier" as his order #7? The Special Master appears to have missed this and the significance of Wermers' reversing his action in the same medical file entry in which he seeks to justify it!

  h. Finally, if Wermers' cancellation of the Claimant's housing restriction was, in fact, his prerogative in spite of its granting for one year by DRDC medical staff (the year would have expired in July 2001), as attested by Dr. Neufeld, and if the restriction was, in fact, unwarranted, why did Wermers not cancel the restriction when the Claimant first arrived at AVCF in late July/early August 2000, instead of waiting until March 2001, nearly a year later?

  i. The Special Master seems to have overlooked all of this, which clearly shows not only the retaliation which prompted the Claimant's initial claim, but it also is a prime example of the cavalier manner in which the Defendants and their employees disregard, arbitrarily cancel and arbitrarily deprive prisoners' medically necessary housing restrictions, work restrictions and medical appliances.

20. In light of the foregoing, it is requested that the Court require the Defendants to implement adequate safeguards, overseen and controlled by non-DOC employees/contractors, to prevent the cancellation of medical restrictions and/or the deprivation of medical appliances, without clear evidence after complete medical examination that the disabilities/diseases which originally caused the need for the restrictions or appliances have been cured or are in remission or have been satisfactorily surgically repaired.

Third Objection:

21. The Special Master has effectively dismissed out of hand the Claimant's allegations of retaliation against him for his efforts to pursue his claims via this legal action and within the DOC grievance system. This dismissal appears principally based upon the Special Master's unquestioning reliance upon Wermers' version of events as protrayed in Exhibits P & Q and perhaps his subordinates' equally distorted offerings in their Responses to the Claimant's grievances, which are attached to the Claimant's Supplemental Form, filed 3 June 2004 under the original Claim No. 02-228.

22. Nevertheless, now that the Claimant has hopefully-successfully demonstrated the falsity of Joseph Wermers' statements and is fully prepared to show the same regarding his subordinates' claims as well as the general perfidious conduct of the DOC throughout these proceedings (if granted a de novo hearing), it is respectfully submitted that the Claimant's claims of retaliation have gained credibility by comparison, at the very least. Further, the Court is already familiar with the Defendants' past attempts to obfuscate, delay, conceal, twist and misrepresent the facts of this case in areas other than those specifically related to this Claim.

23. In light of this and of the fact that, obviously, the Claimant cannot conclusively prove each and every allegation of retaliation he has made, the Court

is respectfully invited to consider the following facts and "coincidences" as possible grounds for deciding that retaliation has, in fact, been carried out against the Claimant:

   a.   As attested at hearing, one of the nurses assigned to AVCF told the Claimant in confidence that Joseph Wermers had cancelled Claimant's housing restriction in retaliation for Claimant's refusal to go on a medical trip that Wermers had arranged, as described in 19.d, above.  The identity of the nurse will be revealed for verification purposes, once the Claimant is certain that she has left DOC-connected employment and cannot be retaliated against herself.

   b.   Further retaliation occurred in February 2002, when Claimant was falsely accused under the Code of Penal Discipline (DOC AR 150-01) of Assault on Staff, denied a meanigful hearing, and convicted of the offense, which conviction has had repercussions for the Claimant to this day.  It should be noted that the Claimant has no history of violent behavior in prison, even going back as far as 1957 in Pennsylvania.  It should also be noted that the assault charge was brought within three months after the Step III Grievance Officer had denied the Claimant his last opportunity for in-house relief against Wermers, during a period when the Claimant made no secret of his intention to seek relief in the courts.  The conviction in this matter was used as a reason to transfer the Claimant out of AVCF, thus removing an embarrassment for Wermers.

   c.   The rest of the allegations of retaliation have been detailed in various pleadings already part of the record, and they need not be repeated here.  It is requested that the Court review those pleadings and allegations with great care, paying particular attention to the respective proximities of retaliatory actions taken against the Claimant, following his filings of pleadings, grievances, and his other actions taken toward obtaining relief.  These should also include as retaliatory the repeated, continuing DOC efforts to deny the Claimant rightful housing restrictions and its repeated efforts to sabotage the Claimant's efforts to obtain needed surgeries and other treatments and protections.  As the record shows, the DOC's more recent efforts to accomplish these ends against the Claimant have been largely successful and are ongoing.

24.  The Claimant would be pleased to receive compensation for the wrongs done him as already described, whether in monetary form, the form of corrective orders as requested in the Motion to Amend and Amendment of Claim, filed 4 September 2007, or in any other form the Court may deem appropriate.  The Claimant specifically requests the mentioned corrective orders and some form of protection against future similar retaliation against any prisoner.

Conclusion:   In light of the foregoing, the Claimant believes that the oversights of the Special Master and his willingness to accept as truth the falsehoods presented by the Defendants, it would be appropriate for the Court to conduct a review of this matter and to grant a de novo hearing.  Additional relief also is urged as appropriate.

   Respectfully submitted this 25th day of March 2008,

                                            _____
                                            Lawrence E. Beeman, pro se

## CERTIFICATE OF SERVICE

    I hereby certify that a true and complete copy of the attached Claimant's Objections to Final Order of Special Master has been furnished to the Defendants by mailing said copy on this date, postage prepaid, to Counsel for the Defendants, the Colorado Attorney General, at 1525 Sherman Street, Denver, Colorado 80203.

Date: 3-25-08

Lawrence E. Beeman - 42894
Box 6000 - Unit 4B
Sterling, CO   80751