# IN THE UNITED STATES DISTRIC COURT FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343).

JESSE MONTEZ, et al.

Plantiffs

- V.S. -

BILL OWENS, et al.

Defendants

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

APR 01 2008

GREGORY C. LANGHAM
CLERK

---

Claim Number: 03-430
Category: III.
Claimant: James P. Wylie
Addres of Claimant: P.O. Box 6000, Sterling, CO. 80751

---

# MOTION TO APPEAL IN PART AND CLARIFICATION OF FINAL ORDER OF SPECIAL MASTER

# I. BACKGROUND

Prior to entering Colorado Department of Corrections (C.D.O.C.) I was in Texas Child Care Protective Services (T.C.C.P.S.). I came into C.D.O.C. custody on July 25th, 2002 I was placed initially at the Denver Reception and Diagnostic Center (D.R.D.C.). On August 9th, 2002 I was transferred to the Colorado Territorial Correctional Facility (C.T.C.F.). On August 12th, 2002 I was transferred to the Centennial Correctional Facility (C.C.F.). On May 1st, 2003 I was transferred to Colorado State Penitentiary (C.S.P.). I was at C.S.P. for about four and one-half years. I was then transferred to Sterling Correctional Facility (S.C.F.) and have been there to date.

While in T.C.C.P.S. I was screened and diagnosed with Scotopic Sensitivity Syndrome (S.S.S.), Attention Deficit Disorder (A.D.D.) and Dyslexia. When I arrived at D.R.D.C. I advised staff members of my condition, including S.S.S. and my special glasses were confiscated because they had colored lenses and were perceived to violate C.D.O.C. policy. Upon entering C.C.F. I was evaluated by Mental Health, Dr. Mark Diamond and diagnosed with Bipolar I. and Anit-Social Personality Disorder (A.S.P.D.). When I was at C.S.P. I was evaluated by Special Education, Dr. David V. Griffard and diagnosed with S.S.S. and Attention Deficet and Hyper Disorder (A.D.H.D.).

I have made numerous attempts to get accommodations for my know diabilities. Cathie Holst finally gave a response denying any and all accommodations sayin I do not have a disability and/or meet Americans with Disabilities Act (A.D.A.) standards. I was informed by Mental health of the Montez Remedial Plan (M.R.P.). I made numerous attempts to complete the application per M.R.P. . It was not until my last months at C.S.P. and having numerous Code of Penal Discipline (C.O.P.D) write-ups that Warden Larry E. Reid ordered Lt. Hunter to assist me with the application and I was able to mail the application to the special Master.

Upon entering S.C.F. Lt. B. Scott and Sgt. J. Dorcy have been assisting me with reading and spelling. Now Lt. B. Scott and Sgt. J. Dorcy have been informed by Warden Kevin Milyala that I will not be ▬▬ assisted with reading or spelling period per Cathie Holst.

I had a hearing on December 20th, 2007. This hearing was held at S.C.F. . Present were the following : Richard M. Borchers, Special Master, for the Court and Willow Arnold, Attorney for Defendants. Final order by Richard M. Borchers, Special Master on January 9th, 2008 granted in part denied in part.

# II. IS THE CLAIMANT A DISABLED INDIVIDUAL WHO IS A MEMBER OF THE CLASS?

I meet all the criteria set forth in Toyota Motor Mfg., Kentucky, Inc. -vs- Williams, 534 U.S. 184 (2002) and M.R.P. .

FIRST, an individual must show the presence of a physical or mental impairment: I have been diagnosed with S.S.S. (see exhibit A.,C.). I have been diagnosed with A.D.H.D. (see exhibit A., D. page 6.). I have been diagnosed with Dyslexia (see exhibit C., E.). I have been diagnosed with Bipolar I. (see exhibit C., E., O.).

SECOND, the individual must show that the impairment affects a "major life activity": S.S.S. affects spelling, reading, writing, academic, work performance, behavior, attention and concentration (see exhibit B. page 1.). A.D.H.D. affects academic, behavior, work performance and attention. Dyslexia affects spelling, reading and academic. Bipolar I. affects behavior and work performance.

THIRD, the individual must show that the impairment "substantially limits" that major life activity: I am illiterate in reading and spelling becuse of S.S.S., A.D.H.D. and

dyslexia.

UNDER THE M.R.P., there is a further limitation to the listed conditions (hearing, vision, mobility and diabetes): I am a member of the class as vision impaired S.S.S. is a vision impaired (see exhibit B. page 1., D. page 8.).

## III. WAS THE CLAIMANT OTHERWISE QUALIFIED TO PARTICIPATE IN THE PROGRAMS OR RECEIVE THE BENEFITS OR SERVICES OFFERED BY C.D.O.C. ?

Yes I am eligible to receive all the benefits and services that are available to all other offenders in Administrative Segregation (Ad. Seg.) despite all the C.O.P.D. convictions I have gotten since I entered into C.D.O.C..Such as: General Library - three books per week, Law Library - ten loaner items per week, Passive Recreation - crossword puzzles and sudokus, Classification Appeals, C.O.P.D. Appeals , Medical/Dental Care and Court Access etc..

## IV. WAS THE CLAIMANT DISCRIMINATED AGAINST BY C.D.O.C. BECAUSE OF HIS DISABILITY ?

FIRST, I was discriminated against by C.D.O.C. confiscating my S.S.S. glasses.

SECOND, by C.D.O.C. refusing and continuing to refuse for over five years to provide me reasonable accommodations for my known disabilities I have not been able to get relief from the court in numerous issues such as when I was assualted by a inmate and received first and second degree burns throughout my face and left shoulder and get releif form C.O.P.D. convietions etc. .

## V. DID THIS CONDUCT CAUSE THE CLAIMANT HARM AND IF SO, WHAT IS AN APPROPRIATE REMEDY?

FIRST, in the ability to produce written documents and/or read written documents pertaining to all C.D.O.C. services, programs, and benefits.

SECOND, missing C.O.P.D./grievences appeals and courts deadlines.

THIRD, undue stress, anxiety, and Bipolar I. episodes.

REMEDY, to follow the M.R.P. as it says in sections X. and XVII.. says in part,

"Inmates who have disabilities as defined herein shall be provided reasonable accommodations to ensure that they have access to comparable programs, services and benefits provided to non-disabled inmates. Examples of reasonable accommodations include providing special equipment, such as readers, providing inmate or staff assistance."

"Electronic equipment, such as audio equipment, tape recorders, and computers will be available for use and when appropriate, to be checked out, in the general library and other areas where appriate, for use by inmates with disabilities, such as book-on-tape and inter-library loan programs."

## VI. WHAT I WANT TO APPEAL AND WHAT I WOULD LIKE CLARIFICATION OF IN THE FINAL ORDER OF SPECIAL AND WHY.

I would like to appeal the fact that no order for assistance in reading or spelling was ordered. I need assistance in reading and spelling for day to day activities (see exhibit D. page 6.).

I would clarification of time-frame that C.D.O.C. has to follow the court order. To date C.P.O.C. has not follow the Final Order of Special Master dateed January 9th, 2008.

## VII. WHAT I WOULD LIKE ORDERED AND WHY.

FIRST, that I have S.S.S. glasses provided. So I can see better.

SECOND, that I be provided the oral book's program for the general and law libraries. So I can part-icipate in the general and law libraries programs.

THIRD, that I have adequate assistance in reading and spelling. So I can meet all C.D.O.C. policies and /or court deadlines.

# VIII. PLEASE NOTE

C.D.O.C. knows of my multiple disabilities and refuses to provide reasonable accommodations and C.D.O.C. ask why I have problems with day to day living. I know that I have disabilities that are not covered in the M.R.P. But I think S.S.S. is more than sufficient for the reasonable accommodations that I ask for (see exhibit B. page 1.) and I am trying to do a prisoner complaint packet for the other disabilities. But Cathie Holst has said that I will not have accommodations in reading or spelling because the court did not order it. And I had to get permission from Warden Kevin Milyard to get assistance with this appeal and Warden Kevin Milyard said this one time only.

Sincerely: James P. Wylie
J.P. Wylie #114060

# STATE OF COLORADO

**COLORADO DEPARTMENT OF CORRECTIONS**

Fremont Correctional Facility
P. O. Box 999
Cañon City, CO 81215-0999
Phone: (719) 269-5002
Fax: (719)269-5020



Bill Owens
Governor

Joe Ortiz
Executive Director

## MEMORANDUM

**TO:   Mr. Joseph Solano, Teacher 1, CSP**

**From:   David V. Griffard, Ed.D, Director, Special Education, Colorado Department of Corrections**

**Subject:  Offender Wiley, DOC #114060**

At your request, I conducted an assessment of offender Wiley, #114060 on 12/12/05. The assessment was conducted in the contact visiting room of Colorado State Penitentiary.   The purpose of the assessment was to determine the presence and severity of Irlen Scotopic Sensitivity Syndrome in Mr. Wiley.  A secondary assessment on distractibility was also included in the meeting.

### Summary

Mr. Wiley presented as a 26 year old white, well nourished male.  He was interested and cooperative during the testing, although easily distracted by activities in the general area.  He was symptomatic of ADHD and had to be re-focused several times, but returned to task with only slight verbal prompts. Glasses were worn throughout the testing process.  While the ideal lighting circumstances would include some natural light, this assessment was done under the soft, slightly yellow glow of fluorescent lighting.

The assessment for the Scotopic Syndrome is done by a certified Irlen Scotopic Screener and involves the administration of the Irlen Differential Perceptual Schedule (IDPS). The cost of this assessment if done outside CDOC is $200.00, plus the costs of the overlays (approximately $5.00ea.)

To begin the IDPS testing, the subject's preferred reading distance is determined and all further work is done at this distance.  Mr. Wiley's preferred reading distance was approximately 14" from the eye, slightly below chin level.  The subject is then sequentially views figures of varying shapes and forms.

*EXHIBIT*

*A*

For each figure, the subject is asked 16 questions about perceived blur, jiggle, float, brightness, movement, confusion, etc. that occurred during the task. The number of positive responses is totaled for each figure and recorded on the IDPS form. Extra points are given if the subject squinted, blinked excessively, didn't pay attention, moved the page closer or farther away, or did other things that indicated significant difficulty with the task.

Mr. Wiley was awarded additional points for his performance moving him from Moderate to High profile.

The most difficult for Mr. Wily was the musical score segment. Three short score segments arranged horizontally on the page are presented. While fixating a 4mm dot in the center of the central score segment, the subject is asked to respond to 11 questions about straightness, flicker, float, changes in white space in the central score segment. Mr. Wiley was then asked the same 11 questions about the appearance of the musical score segments to the left and right of the central score.

In all tests given, Mr. Wiley scored in the upper "high" range, indicating a significant presence of Scotopic Syndrome. The next phase of the assessment involved determining the color of an overlay that produced the most improvement in Mr. Wiley's reading ability.

## Conclusion

Mr. Wiley scored in the extremely high range in the IDPS profile sheet. Even higher on individual tests because of the additional points added for distractibility. Through the final process, Mr. Wiley reported that using the purple overlay provided the most comfort and least physical symptoms, such as watery eyes, blurred vision etc. The purple overlay was given to the instructor for logging into the property list and Mr. Wiley was instructed to use the overlay for all reading. Mr. Wiley should also use the overlay for any testing, including the Test of Adult Basic Education (TABE) and any GED batteries.

Questions regarding this assessment or for further information regarding the Irlen Scotopic Syndrome should be addressed to me at 269-5302.

David V. Griffard, Ed.D.
Director, Special Education
Colorado Department of Corrections

CC: Mr. L. Reid, Warden, CSP

| Overview | Self Tests | Q&A | Solutions | Symptoms | Distortions |
|----------|-----------|-----|-----------|----------|-------------|

# IRLEN SYNDROME/SCOTOPIC SENSITIVITY

### A PIECE OF THE PUZZLE FOR
### READING PROBLEMS, LEARNING DIFFICULTIES, AD/HD,
### DYSLEXIA, HEADACHES AND OTHER PHYSICAL SYMPTOMS
### THROUGH THE USE OF COLOUR

## WHAT IS IRLEN SYNDROME?

The Irlen Method has helped children and adults worldwide become successful rather than continue to experience enormous difficulties. This method has received international acclaim and Helen Irlen's work has been included in professional journals, textbooks, *National Geographic*, TV shows such as *60 Minutes* and *Good Morning America*, *ABC World News With Peter Jennings*, *NBC News* and has been the subject of many news broadcasts by the BBC and news shows in Ireland, Hong Kong, Netherlands, New Zealand, and Australia including their *60 Minutes*.

The Irlen Method provides a unique service for children and adults with reading, attention, and learning difficulties. But even good readers and gifted students can be helped. At least two million Americans are identified as learning disabled. Many more are labeled as "not trying hard enough" at school for a variety of reasons, including lack of motivation, attention deficit disorder, reading problems, or discipline problems.

The Irlen Method expands upon current standardized testing by exploring a wide range of reasons for poor school and work performance. The standard tests frequently fail to identify all the reasons for problems because they look at only part of the puzzle.

Irlen Syndrome, also known as, Scotopic Sensitivity Syndrome (SSS) is a type of visual perceptual problem. It is not an optical problem. It is a problem with how the nervous system encodes and decodes visual information. Academic and work performance, behavior, attention, ability to sit still and concentration can be affected. Individuals with this problem see the printed page differently, although they may not realize that they do. Having Irlen Syndrome keeps many people from reading effectively, efficiently, or even at all. Until now, it has baffled educators and medical scientists because it is undetected by standard visual, educational and medical tests.

Individuals with Irlen Syndrome see the printed page differently from those with normal vision and must constantly adapt to distortions appearing on the printed page. They may be slow or inefficient readers, exhibit poor comprehension, suffer from strain, fatigue or headaches. It can affect their attention-span, energy-level, motivation, handwriting, depth-perception and, ultimately, self-esteem. Irlen syndrome sufferers may be labeled as underachievers with behavioural, attitudinal, or motivational problems. It is a complex and variable condition sometimes found to co-exist with other learning-disabilities.

## THE IRLEN METHOD OF TREATMENT.

Irlen Syndrome was first identified by Educational Psychologist, Helen Irlen, while she was working with adult-learners in California in the early 1980s. She observed that some of her students read with greater ease when they covered a page of print with a Coloured overlay.

*EXHIBIT B*

IRLEN SYNDROME/SCOTOPIC SENSITIVITY COLORED OVERLAYS                     Page 2 of 3

The patented treatment-method uses specially formulated, coloured overlays or coloured lenses worn as glasses or contact lenses to reduce or eliminate perception-difficulties.

APPROACH.

In a comfortable and informal setting, professionals work to identify key factors which are affecting learning progress. Family members participate in the evaluation process and a multidisciplinary assessment helps to find all the pieces of the puzzle. The program is designed to serve the needs of individuals with learning difficulties, attention deficit, autism, and other problems which interfere with adequate functioning in the classroom, workplace, and socially.

## WHAT ARE THE SYMPTOMS?

A variety of problems can result from seeing a distorted page of words, numbers or musical notes or perceiving your environment in a distorted fashion. It can affect reading, writing, spelling, math, copying, reading music, working on a computer, night driving, driving, sports performance, comfort under fluorescent lights, and other areas of a person's life.

### LIGHT SENSITIVITY

Bothered by glare, sunlight, headlights or streetlights. Discomfort or difficulty concentrating or working under bright lights or fluorescent lights. Some individuals become tired, others experience headaches, mood change, fidgety or an inability to stay focused with bright or fluorescent lights.

### PROBLEMS WITH WHITE HIGH GLOSS MATERIAL

Some individuals find that they cannot read as long or with as good comprehension when material is on white paper. The white may be glarey or compete with the black print, making the letters less readable. The same problems can occur with numbers on math pages and musical pages.

### INEFFICIENT READING

Difficulty reading print, numbers or musical notes. Problems may include print that shifts, shakes, blurs, moves, runs together, disappears or becomes difficult to perceive.

### SLOW READING RATE

Inability to read groups of letters, number or words at the same time. This results in problems tracking, slow reading rate, word-byword reading, or an inability to skim and speed-read. Individuals often use their finger or a marker when reading.

### ATTENTION DEFICIT

Problems in concentration while reading ,writing,or working on the computer. May have difficulty staying on task, take frequent breaks, become restless, fidgety or tired.

### STRAIN OR FATIGUE

Feeling strain, tension, tired, sleepy, or even getting headaches with reading and other perceptual activities. Strain can interfere with the ease of reading, studying, or even listening.

### POOR DEPTH-PERCEPTION

Problem judging distance and spatial relationships accurately. May be unsure or have difficulty with such things as escalators, stairs, ball sports, or driving..

## WHAT TO LOOK FOR:

### SIGNS IN READING

IRLEN SYNDROME/SCOTOPIC SENSITIVITY COLORED OVERLAYS                    Page 3 of 3

- Poor comprehension
- Misreads words
- Reads in dim light
- *Skips words or lines*
- Reads slowly or hesitantly
- Takes breaks
- Loses place
- Avoids reading

### COMPLAINTS WHILE READING

- Strain and fatigue
- Tired or sleepy
- Headaches or nausea
- Fidgety or restless

### WRITING CHARACTERISTICS

- Trouble copying
- Unequal spacing
- Writing up or downhill
- Inconsistent spelling

### OTHER CHARACTERISTICS

- Strain or fatigue from computer use
- Difficulty reading music
- Sloppy, careless math errors
- Misaligned numbers in columns
- Ineffective use of study time
- Lack of motivation
- Grades do not reflect the amount of effort

### DEPTH PERCEPTION

- Clumsiness
- Difficulty catching balls
- Difficulty judging distances
- Additional caution necessary while driving

## WHERE TO GO FOR HELP:

Professional educators and psychologists who have been trained in this patented method are located worldwide. To find a certified Irlen specialist, click here.

Colored lenses provided by optometrists and vision specialists to treat dyslexia and reading problems are NOT the same as the Irlen Method. Others do not have the right colors, or diagnostic process for color selection. Inaccurate colour selection can result in headaches, eye strain, and fragmented brain processing resulting in more distortions and reading problems.

| Overview | Self Tests | Q&A | Solutions | Symptoms | Distortions |
|----------|-----------|-----|-----------|----------|-------------|

12-03-07   14:37   FROM-COLORADO DEPARTMENT OF LAW          3038665443          T-954   P.18/38   F-087

# COLORADO DEPARTMENT OF CORRECTIONS
## ACTIVE PROBLEM LIST
### DOC#: 114060 - Name: WYLIE, JAMES

| ICD Code | PROBLEM Description | Acuity | Incident | Provider |
|---|---|---|---|---|
| 564.00 | UNSPECIFIED CONSTIPATION | Chronic | 02/28/2007 | STOCK, JO ANN |
| **Comments:** COMPLIANCE ISSUES | | | | |
| E959 | LATE EFFECTS OF SELF-INFLICTED INJURY | Chronic | 12/16/2006 | BOYD, KATHLEEN |
| **Comments:** HEAD BANGING | | | | |
| 910.0 | FCE NCK&SCLP NO EYE ABRAS/FRIC BURN W/O INF | Chronic | 10/19/2006 | BOYD, KATHLEEN |
| **Comments:** MID FOREHEAD SCAR | | | | |
| 784.61 | ALEXIA AND DYSLEXIA | Chronic | 10/10/2006 | WERMERS, JOSEPH |
| **Comments:** | | | | |
| 368.9 | UNSPECIFIED VISUAL DISTURBANCE | Chronic | 10/10/2006 | WERMERS, JOSEPH |
| **Comments:** SCOTOPIA, ASTIGMATISM | | | | |
| 296.7 | BIPOLAR I DISORDER MOST RECENT EPISODE UNSPEC | Chronic | 02/02/2006 | WATERS, TRAVIS P |
| **Comments:** | | | | |



Functional Ability
Questionnaire



EXHIBIT
C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 03-430
Category III
Claimant: James P. Wylie, #114060
Address of Claimant: SCF, P.O. Box 6000, Sterling, CO 80751

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on December 20, 2007. This hearing was held at the Sterling Correctional Facility (SCF) in Sterling, Colorado. Present were the following: James P. Wylie (Claimant), and Willow Arnold, attorney for Defendants.

Claimant called the following witnesses: Dr. David Griffard, Ed.D; Lt. Ronald Carpenter; Lt. Bernadette Scott; Joseph Solano; Warden Larry Reid; and Claimant. Plaintiff offered Exhibit 1, and it was accepted. Defendants called Dr. Orville Neufeld, D.O. as a witness. Defendants' Exhibits A through Z were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

## I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The

EXHIBIT
D

Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1]  Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provides the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp. 28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility,

_____

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

hearing, and vision impairments and inmates with diabetes.

B. QUALIFIED INMATE

Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.

C. PERMANENT DISABILITY/IMPAIRMENT

A condition which is not expected to improve within six months.

These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>
> 1. Is the claimant a disabled individual who is a member of the class?
>
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on July 25, 2002. He was placed initially at the Denver Reception and Diagnostic Center (DRDC). On August 9, 2002, he was transferred to the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. He remained at that prison for three days.

On August 12, 2002, Claimant was transferred to the Centennial Correctional Facility (CCF) in Canon City, Colorado. On May 1, 2003, DOC placed Claimant at the Colorado State Penitentiary (CSP) in Canon City, Colorado. Claimant was at CSP for about four and one-half years. He then was transferred to SCF on February 2, 2007.

In his initial claim form, Claimant checked the box for vision impairment. Claimant stated, in part, in his claim form as follows:

I have scotopia that requires a colored lay-over in order to read.

3

I have dyslexia that prohibits me in pronouncing or spelling words correctly. Note: these two disabilities have resulted in my being illiterate in reading and spelling.

On the very top of the claim form, it states that "Lt. J. Hunter and C/O A. Weaver assisted me in filling out this form."

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated:

I have not been able to obtain assistance regarding access to programs and services that requires reading and spelling and my right to due process regarding COPD appeals, classification appeals and access to the courts, etc.
No access to programs and services, emotional injuries and my right to due process, etc.

After the claim was reviewed, a show cause order was issued to Claimant concerning the late filing of his claim. Claimant responded, and the show cause order was discharged. The claim was assigned initially to Category II. Claimant was granted time to submit additional documents in support of his claim.

In his supplemental claim form for vision impairment, Claimant set forth the following:

When I look at a piece of paper it looks like its rotating on a record player and it jumps back and forth and I lose track of lines. I have been informed by a specialist that its called Scotopia.
It hinders me in performing all regular functions in the kite system, programs, religious, education, recreation, etc.

When asked in the supplemental form for what accommodations he had sought, Claimant stated as follows:

I requested assistance in reading and spelling and was told DOC does not provide this accommodation. After 2 years of complaining and attempting to get assistance, a mental health employee informed me of the Montez application. After months complaining that I couldn't fill out the application, Warden instructed the case manager to assist me. Upon receiving the information back from Kathy Holtz, I was denied because they claimed it could be resolved at a lower level and its evident that most employees do not recognize this.

Claimant further stated in another section as follows:

I have missed grievance deadlines, COPD deadlines resulting in not being

4

able to get relief. I have been caused stress, anxiety, depression, etc.

Claimant submitted additional information in support of his claim. One document was an evaluation conducted by Dr. David Griffard, Ed.D on December 12, 2005. In that report, Dr. Griffard indicated that Claimant has a condition known as "Scotopic Sensitivity Syndrome (SSS)." Dr. Griffard in his report found that Claimant did suffer from SSS and also was easily distracted. Dr. Griffard is the special education director for DOC.

Claimant also submitted internet documents that he had obtained from some unknown source. The one document dealt with SSS and was authored by the Irlen Institute. The document states, in part, as follows:

Irlen Syndrome, also known as Scotopic Sensitivity Syndrome (SSS), is a type of visual perception problem. It is not an optical problem. It is a problem with how the nervous system encodes and decodes visual information. Academic and work performance, behavior, attention, ability to sit still and concentration can be affected. Individuals with this problem see the printed page differently, although they may not realize that they do. Having Irlen Syndrome keeps many people from reading effectively, efficiently, or even at all. Until now, it has baffled educators and medical scientists because it is undetected by standard visual, educational and medical tests.

At the hearing, Claimant testified that he grew up in the Texas welfare system. He had educational problems from the start and struggled in school. While still in school, he was diagnosed with dyslexia and scotopia. He was provided special tinted lenses for his glasses. The glasses helped him see better.

When Claimant arrived at DRDC, he advised staff members of his conditions, including scotopia. At DRDC, his special glasses were confiscated because they had colored lenses and were perceived to violate DOC policy on glasses.

Claimant testified that he had made significant efforts to seek accommodations, including return of his glasses and receiving assistance in reading and writing. Claimant testified that he was never accommodated. He developed an aversion to lighting which makes it difficult to see. He further testified that he began to develop headaches after his glasses were taken from him. Claimant testified that the filtered glasses helped him to see and read.

Claimant testified that he had received a purple overlay which helped when he read a book or newspaper. The overlay will not help with some books because the overlay cannot lie flat. Claimant testified that he has had difficulty in adjusting to prison life. He has racked up two hundred and fifteen Code of Penal Discipline (COPD) convictions since he came into DOC custody.

Claimant stated that he needs assistance with everything written. He has to seek the help of staff members or others to read his mail and help him prepare kites, grievances, and appeals.

5

On cross-examination, Claimant stated that he had a difficult time at the DOC facilities at which he was placed. Claimant testified that he was diagnosed with scotopia when he was in eighth grade. He advised DRDC staff of his conditions and why he needed his filtered glasses. In response to one question, he indicated that he can watch television only for forty-five minutes to one hour maximum. Claimant testified that the overlays help him with reading written pages but not as well as with his special glasses that he had in the past.

Claimant stated that he had received regular glasses from DOC. He had received regular examinations by an optometrist. He was first tested for scotopia by Dr. Griffard in DOC in late 2005. The colored overlays were ordered shortly thereafter.

Claimant presented several witnesses in support of his claim. The testimony from two of these witnesses will be examined. Dr. David Griffard, Ed.D examined Claimant in late 2005. Dr. Griffard found that Claimant had SSS. Dr. Griffard noted that SSS will affect spelling, reading, and all aspects of life. There is no way to determine how Claimant acquired SSS. Dr. Griffard testified that two basic means of treatment have been developed. The first is to allow the individual to use a colored overlay or filtered glasses for reading. The second is to educate the individual how to utilize special strategies for reading. Dr. Griffard indicated that he could not confirm that Claimant also has dyslexia. He does have ADHD, which requires special work to keep Claimant focused on his task.

Lieutenant Bernadette Scott is the officer in charge of the administrative segregation unit at SCF. She testified that she has observed Claimant and believes that he has significant problems seeing and processing information. She testified that Claimant cannot fill out a kite or grievance without assistance. She indicated that she and her staff have had to assist Claimant so he would not miss deadlines for appeals and to seek help through submission of kites. She has never seen Claimant read without his overlay. She acknowledged on cross-examination that Claimant has many behavior problems and a terrible track record with the prison disciplinary system. On redirect, Lt. Scott testified that Claimant had difficulty accessing materials from the law library.

Defendants presented the testimony of Dr. Orville Neufeld, D.O. His testimony questioned whether SSS really existed. He equated SSS to "junk science", with no basis in medical science. Dr. Neufeld acknowledged that Claimant probably has dyslexia, which is a learning disorder.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. A claimant must establish that he was disabled, as set forth in the Remedial Plan, on or before August 27, 2003. In addition, a claimant must establish that he was the victim of discrimination on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** This claim is unique. It raises several questions that have not arisen in the several hundred claims that have been

6

adjudicated to date.

When Judge Nottingham approved the Remedial Plan on August 27, 2003, it contained three definitions. Those definitions were and are as follows:

> DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months

*Remedial Plan, Section III, p.1.* There were no definitions as to any of the covered disabilities.

The Remedial Plan did provide definitions for purposes of placement. The criteria for vision provided as follows:

> Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

*Remedial Plan, Section V, p.5.* This criteria, along with criteria for the other covered conditions, was utilized by the Special Masters in adjudicating claims. After approximately two and one-half years, counsel for the class raised the issue of whether use of this criteria, as well as the others, was appropriate. The parties stipulated that the general requirements of the ADA and Rehabilitation Act should be used by the Special Masters, rather than the criteria in the Remedial Plan. The Special Masters are obligated to abide by this stipulation.[2]

The end result is that there are no definitions in the Remedial Plan that may be relied upon to determine if any individual falls into one of the four categories. The covered disability for this Claimant is "vision impairment." In light of the stipulation in mid-2007 between the parties, the underlying statutes must be examined to determine if this Claimant is covered.

In order to determine if an individual meets the requirements of the ADA and Rehabilitation Act, there must be an analysis using a three-part test. *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184(2002). First, an individual must show the presence of a physical or mental impairment. Second, the individual must show that the impairment affects a "major life activity." *Id.* Third, the

---

[2] The stipulation meant that claimants who are diabetic would have to show much more than just being afflicted by the disease. They would have to prove that the disease substantially affected activities of daily living.

individual must show that the impairment "substantially limits" that major life activity. *Id.* Under the Remedial Plan, there is a further limitation to the four listed conditions (hearing, vision, mobility, and diabetes).

Defendants' approach to this issue is to dismiss SSS as a creation of a far-away institute. Claimant correctly noted that many now-accepted conditions and treatments were rejected in the past upon the same reasoning advanced by Defendants. In this case, two reasons exist for not rejecting the diagnosis of SSS. First, Dr. Griffard is the head of DOC's special education program. He tested and found that Claimant has SSS. Further, he noted improvement when Claimant was provided a colored overlay to use when reading. Second, Lt. Scott's testimony is very compelling. She is a seasoned correctional professional who has had to help Claimant with basic tasks that others take for granted. These include filling out kites and grievances, and just carrying on daily prison life. It would be easy to dismiss Claimant as a prison disciplinary problem, but Lt. Scott is convinced that there is something more basic than that going on.

The Special Master finds from the testimony of these two witnesses that Claimant is suffering from SSS. The Special Master further finds that SSS is a visual processing problem, and that it falls under the provisions of the Remedial Plan.

As the witnesses noted at the hearing, activities of daily life in prison can be very basic. DOC operates at its basic level requiring inmates to submit kites to seek medical care and other services or programs. An individual who cannot process written materials due to a vision impairment is unable to obtain the most rudimentary of services and programs. In this case, Claimant is at a tremendous disadvantage because he cannot access those services and programs.

Claimant is a member of the class as vision impaired. He has an impairment that substantially affects reading and writing, which in turn limits his ability to seek medical, mental health and other care. Claimant meets the criteria set forth in *Toyota Motors.*

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** By his own admission, Claimant has received two hundred and fifteen COPD convictions since coming into DOC custody. Claimant clearly is not entitled to access to many programs and services because of these convictions.[3] Claimant has not and cannot blame anyone for his deplorable conduct but himself.

As described previously, there are basic services that Claimant must have access to, despite his conduct. These would include access to food, medical care, legal advice, and religious worship. All of these are accessed primarily through use of kites. Claimant's vision impairment limits his access to those basic services. The Special Master specifically finds that Claimant is eligible for access to the basic services noted.

---

[3] No prior claimant has had this many COPD convictions while in DOC custody. The previous high was 162 stretched over almost thirty years of confinement.

**3. Was the Claimant discriminated against by DOC because of his or her disability?**
The uniqueness of the facts surrounding this claim lead to the conclusion that Claimant has been discriminated against in one particular way. Claimant came to DOC on July 25, 2002. At DRDC, Claimant advised DOC staff that he had been diagnosed with SSS. DRDC staff confiscated his filtered glasses because they were colored and not DOC issued. It is clear that the glasses were confiscated because that is what is done. No one inquired further at that time if there were any vision reasons why Claimant might have had the glasses.

Claimant went for over three years before he was tested by Dr. Griffard and diagnosed with SSS. During that period of time, Claimant imploded and became a disciplinary nightmare for DOC and himself. There may be no connection between the vision impairment and disciplinary record, but Claimant will have to make certain choices in his life. The Special Master determines that Claimant was discriminated against when his filtered glasses were taken from him and not returned. The colored overlays were provided in 2005 and gave him some help. The overlays were not the same as the filtered glasses.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?**
The harm to Claimant has been in his inability to see and process various written documents. As equally important has been Claimant's inability to generate the documents needed to carry on basic prison life. As Claimant noted correctly, Lt. Scott and her two sergeants have attempted to assist him with basic necessities of prison life, including preparing kites and grievances.

Claimant has earned his way into Administrative Segregation. He will have to work his way out. Claimant came into the DOC system with a pair of filtered glasses that should not have been taken from him. Claimant is entitled to a pair of filtered glasses for his vision impairment. That is the only relief that Claimant is entitled to due to his disciplinary problems. Claimant is specifically not entitled to any monetary damages. The Special Master would note that glasses fall under the definition of a health care appliance. *Remedial Plan, Section XVI, p.20.* Health care appliances are to be provided to those with a covered disability.

Claimant is advised that filtered glasses are to be entrusted to him. If he throws a temper tantrum and breaks the glasses, then they need not be replaced. If they are treated with care, then they are to be replaced in the same fashion as allowed for others in DOC.

Once Claimant receives his filtered glasses, he then will have to make choices as to how he wishes to conduct himself. He will not be able to fall back on any vision impairment as an excuse. He acknowledged making bad decisions to this point. Claimant has the ability to make better choices. The decision as to those choices will be his alone from this point forward.

IT IS HEREBY ORDERED that the claim of James P. Wylie is granted to the extent noted in this Order, and Defendants are to provide Claimant with a pair of filtered glasses to correct his SSS; and)

9

IT IS FURTHER ORDERED that the claim of James P. Wylie is denied as to all other aspects; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before March 31, 2008.**

SIGNED this 9th day of January, 2008.

BY THE COURT:

Richard M. Borchers
Special Master

10

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this 9th day of January, 2008 to the following:

Mr. James P. Wylie
#114060
SCF
P.O. Box 6000
Sterling, CO 80751

Mr. James Quinn
Mr. Jess Dance
Office of the Attorney General
1525 Sherman Street
Denver, CO 80203

12-03-07  14:37   FROM-COLORADO DEPARTMENT OF LAW      3038665443        T-954  P.20/38  F-087

**114060  WYLIE, JAMES**

| | | |
|---|---|---|
| **Facility:** | CS | **Living Unit:** CSP/UNIT D |

**SUBJECTIVE**
Active Medication(s): COGENTIN - 1 MG; HALDOL - 1 MG; LACTULOSE SYR - 10GGM/15ML; TEGRETOL - 200 MG. Stopped his meds because they made his jaw tight. Denies symptoms and has given up on then meds. 25 yo cauc male from Denver Co with s. assault child. He is originally from Texas and speaks with a heavy accent. Unable to spell the name of the town that he is from ( Molin?). He was Dx ADD as a child and placed on Ritalin which helped. Also has severe case of dyslexia which makes him appear slow and MR in his speech. Uses TV to calm himself. Sleep has been poor lately...frequently can't sleep which doesn't bother him...reports lately the longest he has gone without sleep is 3 and a half days. Refuses to discuss his AH/VH but as I mentioned it later in the discussion he did not correct me or deny it. Had been on Lithium before and he had to go on IV's and liquid diet for two weeks. Discussed Abilify and the benefits and side effects.

**OBJECTIVE**
Alert, slow responses, heavy southern accent, appears concrete but isn't, has average intelligence, passive, bl affect, appears fatigued. Ox4

**ASSESSMENT**

GENERAL PSYCHIATRIC EXAMINATION, OTH & N - BIPOLAR I DO, DYSLEXIA, PERSON DO NOS

/\

Functional Ability Questionnaire

| | | | | |
|---|---|---|---|---|
| **Temperature:** | | **Pulse:** | | **Weight:** |
| **Respiratory:** | | **BP:** | / | |

**PLANS / ORDERS**
Allergies: No Known Allergies

Tegretol level, ACP and CBC in 2 weeks

RTC 6 weeks

D/C - Rx#: 1805213  Drug Brand Name: HALDOL - 1 MG  Alternate Name: HALOPERIDOL  Rx Date: 08/09/2004  Disc Date: 10/14/2004  Rx Instructions: TWO TABLETS TWICE DAILY FOR 6 DAYS (THRU 8/13) THEN 5 TAB TWICE DAILY

D/C - Rx#: 1805214  Drug Brand Name: COGENTIN - 1 MG  Alternate Name: BENZTROPINE  Rx Date: 08/09/2004  Disc Date: 10/14/2004  Rx Instructions: ONE TABLET TWICE DAILY

D/C - Rx#: 1805219  Drug Brand Name: TEGRETOL - 200 MG  Alternate Name: CARBAMAZEPINE  Rx Date: 08/09/2004  Disc Date: 10/14/2004  Rx Instructions: ONE TABLET TWICE DAILY FOR 4 DAYS (THRU 8/12) THEN ONE TAB EACH MORNING AND TWO TAB AT NIGHTTIME

NEW - Rx#: 1833423  Drug Brand Name: TEGRETOL - 200 MG  Alternate Name: CARBAMAZEPINE  Rx Date: 10/14/2004  Disc Date: 05/12/2005  Rx Instructions: TWO TABLETS TWICE DAILY

NEW - Rx#: 1833425  Drug Brand Name: ABILIFY - 5MG  Alternate Name: ARIPIPRAZOLE 5MG  Rx Date: 10/14/2004  Disc Date: 05/12/2005  Rx Instructions: ONE TABLET EVERY MORNING

| | |
|---|---|
| **Datetime:** 10/14/2004 10:08 | **Providers:** GILLEY, LORRI T |

'A/NP _____ PHYSICIAN _____

**EXHIBIT E**

NURSE _____
DateTime 10-14°4 1340

**DEPARTMENT OF CORRECTIONS**
**PSYCHIATRIC INDIVIDUAL CONTACT**

Sec. 2, Psy. IC (Rev. 1/0)

**SUBJECTIVE**

Pt- c/o diarrhea "HA's" c̄ Eskalith
Otherwise, less depressed, sleeping better
occ. feels energetic at bedtime (re-defined his HA's)

Going to school, working on GED

Has diarrhea (loose stools) 1x everyday

**OBJECTIVE:** 1/6/03 (ACP-WNL
P.E.- No tremor     TFT's-WNL )
                    ( Li level = 0.7 )

O X4  Mood-level appropri. affects
⊕ S-I/H-I; No delusions noted
Speech -reg-rate and rhythm

**ASSESSMENT:** Bipolar disorder, depressed phase
PSA
ASPD
pedophillia

Functional Ability Questionnaire

**PLAN/ORDERS**

1. Imodium 2 mg po bid prn diarrhea X 3 mos
2. Eskalith 900 mg po qhs X 3 mos
3. Prozac 20 mg po qhs X 3 mos
4. Benadryl 50 mg po qhs X 3 mos
5. Crackers c̄ his dose of Prozac X 3 mos
6. RTC in 2 months
7.
8.
9.

**PHYSICIAN**

**NURSE** M Eggins RN 1/21/03 1230

| | | |
|---|---|---|
| Offender Name (Last, First, MI) | DOC # | FACILITY |
| Wylie, James | 114060 | CF |

| Clinician | Other Clinicians | | | Date |
|---|---|---|---|---|
| 203 | 248 | | | 01/21/03 |

| Type of Contact | Length of Session | Participation Level | Goal Attainment Scale | EXHIBIT |
|---|---|---|---|---|
| 40 | 02 | P3 | 99 | C |

Distribution:
31218 (R 1/00)    White - Medical    Canary - Pharmacy    Pink - Mental Health File    Goldenrod - Data Entry

# CERTIFICATE OF MAILING

I hereby certify that I (James P. Wylie D.O.C. No. 114060) have mailed a copy of the foregoing motion to appeal in part and clarification of final order of special master and exhibits A., B., C., D., E., and O. this 30th day of March, 2008 to the following:

Clerk of the United
States District Court
901 19th Street
Denver, CO. 80294

Office of the
Attorney General
1525 Sherman Street
Denver, CO. 80203

Sincerely: James P. Wylie
J. Wylie #114060