IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

   Plaintiffs,

-vs.-

BILL OWENS, et al.,

   Defendants.

---

Claim Number: 03-421
Category: III
Claimant: Jared Whorlow, #112523
Address of Claimant: SCF, P.O. Box 6000, Sterling, CO 80751

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Claimant Jared Whorlow. The hearing was held at the offices of Legal Resolution Center at Dominion Plaza, 600 17th Street, Suite 2800-South, Denver, Colorado before Richard C. Davidson, Special Master. Mr. Whorlow appeared pro se. Defendants were represented by Chris Alber, Esq. Claimant Jared Whorlow and Orville Neufeld, D.O., were called, sworn and testified. The Special Master has reviewed the testimony and all documents filed by both sides. This Order shall constitute the final action of the Special Master on this specific claim.

### I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial

Plan also created a mechanism for individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2

    2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:

> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Jared Whorlow submitted a claim which was assigned claim number 02-062. After review, the claim was elevated and assigned claim number 03-421. The claim is premised on an alleged permanent mobility disability.

2. Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

3. Claimant Whorlow first entered CDOC custody in 2002. Over time, he has been on parole and has been brought back into custody twice. Claimant has been housed at DRDC, SCF, DCC, BVCF, and KCCC.

4. Claimant injured his right knee prior to coming into custody. He had a meniscus tear repaired surgically in 1999. While at SCF on April 14, 2002, his knee "popped." He was placed into a knee immobilizer. He was given crutches to aid his mobility. In May, the knee immobilizer was taken away because of security concerns. An MRI was performed which showed the need for surgery. However, he was housed on the bottom bunk on the second tier. On August 30, 2002 he had arthroscopic surgery to repair his knee. Evidentially, the surgery did not have a good result. Claimant testified that he was still in pain and the knee continued to be swollen. He could feel a grinding in his knee and suffered increasing pain. He used crutches for mobility assistance for two months after surgery.

5. The knee did not get better and on September 10, 2003 Claimant had a second

3

arthroscopic surgery on the knee. This was a lateral release and a smoothing of chondromalacia. Following this Claimant was briefly in a wheelchair and then on crutches. He progressed and said his knee felt better. He was able to walk and by December 2003 all his restrictions were removed. He was able to walk around the track without difficulty, approximately one quarter mile. He was still housed on the second tier and was able to climb stairs.

6. Claimant was paroled in 2004. During his parole he had another knee surgery, this time a micro fracture procedure. He returned to custody in January 2006. At that time he was using a knee brace but it was taken from him. He filed grievances and the knee brace was returned. While at BVCF, he fell on snow while not wearing his brace and re-injured the knee. He had some swelling and pain. He was still able to walk and to work in the kitchen but had to walk slowly because of pain. He says that medical examined his knee but did not treat it. He complains of "deliberate indifference" on the part of CDOC medical.

### III. CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

3. The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

4. Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially

limited one or more of his or her major life activities.

5. It must be noted that neither the ADA nor the Rehabilitation Act are designed to remedy alleged deficiencies or omissions in medical treatment provided to prisoners by CDOC. Rather, the ADA and Rehabilitation Act are designed to insure that those who have permanent disabilities that prevent them from engaging in one or more major life activities are not discriminated against because of their disabilities. The Remedial Plan, which defines the scope of the Special Master's authority, limits the disabilities for which damage claims can be asserted to those relating to mobility, vision, hearing, and diabetes.

6. The Special Master finds and concludes that Claimant Jared Whorlow is not permanently disabled pursuant to the Montez criteria. The evidence is clear that Claimant has a bad knee and at times, he has been temporarily disabled. There is no question that Claimant is impaired because of his knee problems. However, in order to prove that he is disabled, he must prove that his knee impairment is permanent, and that it is serious enough to substantially limit one or more of his major life activities such as walking. The evidence shows that after his second surgery in 2003 he was able to walk and climb stairs without difficulty. The disability he had prior to and following his surgeries was only temporary. When he returned to custody he was able to walk without difficulty. This is shown by the fact that he was walking in snow without his brace when he fell. Even after his re-injury, he was still able to walk and climb stairs. Thus, he was not disabled according to the Montez criteria.

7. Claimant is most concerned with what he perceives as "deliberate indifference" on the part of CDOC medical staff. While the medical records show no evidence of indifference, it should be noted that complaints about deficiencies or failures in medical care are not part of this case as stated above in paragraph 5. Rather, this case is concerned with whether Claimant is disabled and has suffered discrimination because of such disability. Having concluded that Claimant is not disabled, there is no reason to consider any claims of discrimination. Claimant has not proven that he is a member of the Montez class and is, therefore, not entitled to recover in this case.

### IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment shall be entered in favor of Defendant and against Claimant dismissing his claims in this action.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before June 9, 2008** with the Clerk of the United States District Court at the following address:

> 901 19th Street
> Denver, CO 80294.

SIGNED this 24th day of March, 2008.

        BY THE COURT:

        /s/ Richard C. Davidson

        _____

        Richard C. Davidson,
        Special Master