IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

      Plaintiffs,

-vs.-

BILL OWENS, et al.,

      Defendants.

_____

Claim Number: 05-013
Category: III
Claimant: Rose Carlson, for Gary Carlson, #66242, Deceased.
Address of Claimant: 2122 East Woodman Road, Colorado Springs, CO 80920

_____

## FINAL ORDER OF SPECIAL MASTER

_____

THIS MATTER comes before the Special Master on the claim of Claimant Rose Carlson representing her son Gary Carlson, deceased. This hearing was held at the Holly Sugar Building at 2 North Cascade, Suite 1100, Colorado Springs, CO 80901 on February 25, 2008, before Richard C. Davidson, Special Master. Claimant Rose Carlson appeared pro se. Defendants were represented by Ms. Willow Arnold, Esq. Claimant Rose Carlson and Orville Neufeld, D.O. were called, sworn and testified. The Special Master has reviewed the testimony and all documents filed by both sides. This Order shall constitute the final action of the Special Master on this specific claim.

## I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial

Plan also created a mechanism for individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I.    General inconvenience or nominal damages;
> II.   Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III.  Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV.   Damages due to severe physical injuries; and
> V.    Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed her claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III.  DEFINITIONS
> A.  COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B.  QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C.  PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2.  The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:

1.  Is the claimant a disabled individual who is a member of the class?
2.  Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
3.  Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
4.  Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II.  FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1.  Claimant Rose Carlson submitted a claim on behalf of her son Gary Carlson, deceased, which was assigned claim number 05-013. The claim is premised on the death of Gary Carlson while in custody on April 25, 2005.

2.  Claimant's claim was assigned to Category V pursuant to the Remedial Plan as set forth above.

3.  Gary Carlson first entered CDOC custody in 1991. He was released on parole in 1996 but was brought back into custody in 1999. Claimant was housed at DRDC, FMCC, KCCC, AHCC, AVCF, and CTCF where he died.

4.  When Gary Carlson entered CDOC custody he was suffering from Hepatitis C. He also had a history of narcotic drug use and had been convicted of drug abuse. At the time of his incarceration, he had some early liver damage from his Hepatitis C. At that time it was not severe enough to require treatment. He also had a low back injury which started in 1996.

5.  Mr. Carlson re-injured his back in August 2000 while lifting railroad ties at the Limon Correctional Facility. As a result of his back injury, he had decompression surgery at L5-S1 in June 2001. Specifically, he had a "partial left L5 laminectomy with partial left L5-S1 foraminotomy and excision of the L5-S1 disk." Subsequent to the surgery, he developed scar tissue and resulting sciatic nerve pain. He did not have any nerve function impairment. His pain was treated with a TENS unit and with narcotic and non-narcotic pain medications as needed and as deemed appropriate by CDOC medical staff. It was preferred that he not be given narcotics because of his drug history. According to the medical records, Mr. Carlson was constantly engaged in trying to obtain prescription narcotics while incarcerated. He even enlisted his family to aid in his attempts to obtain drugs by telling them that CDOC was ignoring his needs.

6. In late 2002, Mr. Carlson was diagnosed with chronic Lymphocitic Leukemia. While not severe enough to threaten his life, it did compromise his immune system and lungs. Since narcotic pain medications can interfere with lung function, this was an additional reason that CDOC avoided prescribing narcotics. He was instead prescribed Elavil and Neurontin. In January, 2005, Mr. Carlson contracted severe pneumonia and collapsed. He was hallucinating and had a temperature of 104 degrees. He was hospitalized, had surgery to drain his lung, and spent time in ICU before being returned to his unit. On February 13, 2005 he was caught trying to take percocet from the med line without himself taking it as prescribed. On April 25, 2005, Mr. Carlson died from an overdose of methadone.

## III.  CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources:  (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2. The first issue before the Special Master is whether Mr. Carlson was a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

3. The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C).

4. Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

5. It must be noted that neither the ADA nor the Rehabilitation Act are designed to remedy alleged deficiencies or omissions in medical treatment provided to prisoners by CDOC. Rather, the ADA and Rehabilitation Act are designed to insure that those who have permanent disabilities that prevent them from engaging in one or more major life activities are not discriminated against

because of their disabilities. The Remedial Plan, which defines the scope of the Special Master's authority, limits the disabilities for which damage claims can be asserted to those relating to mobility, vision, hearing, and diabetes.

6. The Remedial Plan also authorizes recovery of "Damages due to death." under section XXXII. However, this does not mean that if an inmate dies in prison that damages are automatically granted. Rather, it must be shown that the deceased inmate suffered death through some fault or neglect by CDOC. The evidence presented in this case fails to show any such fault or neglect. First, Mr. Carlson was not disabled in any way while in custody. He did suffer from health problems but nothing indicates that he had any mobility, vision, and hearing disabilities or a disability caused by diabetes. Second, the medical records clearly demonstrate that he received adequate medical care for his medical problems. He was given pain medications, including narcotic medications, when such medications were needed. Even so, he manipulated the system in an attempt to obtain more narcotic medication. On at least one occasion, he was caught trying to take his prescribed narcotic medication away from the medical line without himself taking it. Third, his death was caused by an overdose of methadone which was not given to him by CDOC. Rather, he obtained the methadone himself from unknown sources and voluntarily ingested it.

7. Mrs. Carlson has argued that her son's suicide was caused by the neglect of CDOC in properly addressing his pain issues. However, the Special Master has concluded that CDOC provided adequate medical care for his pain. Gary Carlson's death was not caused in any way by the actions or inactions of CDOC. As a result, the claim of Mrs. Carlson must be denied.

## IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment shall be entered in favor of Defendants and against Claimant dismissing her claims in this action.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before June 9, 2008** with the Clerk of the United States District Court at the following address:

901 19th Street
Denver, CO 80294.

SIGNED this 24th day of March, 2008.

BY THE COURT:

/s/ Richard C. Davidson

_____
Richard C. Davidson,
Special Master