IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-148
Category III
Claimant: Mark McCafferty, #90789
Address of Claimant: 2701 California, #E-5, Pueblo, CO 81004

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on January 25, 2008. This hearing was held at the Minnequa Medicenter in Pueblo, Colorado. Present were the following: Mark McCafferty (Claimant); and Willow Arnold, attorney for Defendants.

Testimony was received from Claimant. Defendants presented the testimony of Dr. Orville Neufeld, D.O. Defendants' Exhibits A1 through A40 were offered and admitted into evidence. All documentation previously submitted by both sides was accepted. After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp. 28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
1. Is the claimant a disabled individual who is a member of the class?
2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on December 13, 1996. He was evaluated at the Denver Reception and Diagnostic Center (DRDC). He was placed at the Rifle Correctional Facility (RCF) in Rifle, Colorado on January 24, 1997. He then was placed into a community placement. He returned to DOC custody on February 26, 1999 when he was placed into the Kit Carson Correctional Center (KCCC) in Burlington, Colorado. He was transferred to the Sterling Correctional Facility (SCF) on September 8, 1999.

Claimant again was placed into a community program on May 15, 2000. That placement was unsuccessful, and Claimant returned to KCCC on November 9, 2000. Claimant was granted parole on March 7, 2002. Parole was revoked, and Claimant was placed at the Bent County Correctional Facility (BCCF) in Las Animas, Colorado on July 12, 2002. He was transferred to the Buena Vista Correctional Facility (BVCF) in Buena Vista, Colorado on April 17, 2003. He was granted parole on March 24, 2004. Parole was revoked, and Claimant returned to custody at BCCF on April 19, 2005. Claimant was transferred to DRDC and then placed at the Ft. Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado on May 20, 2005. Claimant was released on parole on October 19, 2005. Claimant now has discharged his sentence.

In his initial claim form, Claimant checked the boxes for mobility impairment and vision impairment. Claimant stated, in part, in his claim form as follows:

3

> I had below the knee amputation performed 11/19/04..... I had eye surgery 10/12/01 with tear ducts put in my eyes which decreased my vision. I'm still being to be measured for prosthetic leg...and being denied wheel chair which I believe my rights are being violated. And also my right leg was infected because of DRDC forced me to walk on one leg. Now I'm in a wheel chair with further complications. I am in severe pain due to me being confined to a wheel chair.

Concerning discrimination by DOC and its staff, Claimant stated, in part, as follows:

> I was discriminated by the DOC because they said that my condition did not require a wheel chair. I'm in severe pain at this time. All proper medications were stripped from myself. All staff keep condemning my disability. I have been denied all procedures that are to be performed on me. No meds/being denied wheel chair/rights being violated/therapy process being denied.

> Department of Corr. caused bodily harm to my left leg and right leg and no therapy lack of proper medications and violated all my rights that are supported by ADA.

The hearing on this claim was held at the Minnequa Medicenter in Pueblo, Colorado. This facility is a nursing home, and Claimant has been a resident at the facility for some time. The Special Master held the hearing at this facility, as it was doubtful that Claimant would be able to travel to Colorado Springs, Colorado for the hearing. Claimant has had both legs amputated above the knee and is using a wheelchair. He will be relocating to a different facility in mid-February, 2008.

At the hearing, Claimant testified that his parole was revoked and that he was placed back into DOC custody for what was described as a "180-day turnaround." As described to the Special Master, parole would be reinstated at the end of this period, provided no major problems arose during his incarceration. Claimant indicated that he was at FLCF during the turnaround period.

Claimant testified at the hearing that he developed a sore on a toe. He sought medical care at DOC but all that was done was to soak his foot in water that had some iodine. Claimant stated that he requested an examination by a hospital, but that was denied. When he was released on parole, Claimant did seek medical attention on his own at Parkview Medical Center in Pueblo, Colorado. An examination there indicated that the infection was gangrene, and Claimant had his toe amputated. The infection continued, and he underwent an amputation of his leg below the knee. He has continued to have recurring infections, and his legs have been amputated above both knees.

Claimant stated further that he blames DOC for his present condition. He believes that he should have received better and different treatment. He stated that he is convinced that his legs would have been healed but for the failure to have proper medical care while incarcerated. Claimant testified that he is continuing to have medical problems with infection.

4

On cross-examination, Claimant testified that he had requested to go to Parkview Medical Center for an examination. That was denied by DOC medical staff. Claimant indicated that he had been unable to complete his GED while in custody. He thought he might try to train to work in massage.

Claimant indicated that he had vision issues also while in DOC custody. He does not wear glasses. He had surgery on his tear ducts in 2001. He continues to have discharge from his eyes. He is trying to seek care for his eyes.

Defendants presented the testimony of Dr. Orville Neufeld, D.O. as an expert witness. Dr. Neufeld testified that Claimant has peripheral vascular disease. That condition was probably the result of smoking. Claimant's body was not able to get enough blood to the site of infections, leading to the gangrene. He testified further that Claimant's first problems arose in late 2004. When his parole was revoked, Plaintiff returned to DOC with one leg having been amputated.

Defendants admitted a number of documents into evidence. Some of these documents are medical records of Claimant for periods of time when he was not in DOC custody.

Claimant came into the Emergency Room at Parkview Medical Center on October 23, 2004. The request for admission was listed as "cellulitis of the left foot." *Exhibit A-1*. In that document, Dr. Onyejekwe stated, in part, as follows:

> The patient is a 52 year old gentleman who presented to the emergency department as the result of a painful left foot with swelling. The patient states that he was landscaping and had a piece of rock somehow end up in his left great toe. He noticed some swelling of the left toe and poured peroxide on it. Subsequent to that he has been having swelling and pain of his left foot.

Claimant had been paroled on March 24, 2004 and was listed as an absconder. *Exhibit A-41*. Subsequent to his admission into Parkview Medical Center, Claimant had an amputation of his left leg below the knee. *Exhibit A-2*. Claimant returned to DOC custody on January 13, 2005.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Claimant must show that on or before August 27, 2003 he had disability. Claimant must show further that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act that occurred on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Each claimed disability will be taken separately.

**Mobility Impairment:** Reviewing all of the evidence indicates that Claimant's problems

5

with his left big toe and foot occurred in 2004. There is no evidence that Claimant had any problems with his legs on or before August 27, 2003.

There is no question that Claimant would qualify as mobility impaired from November, 2004 to the present time. The problem is that he was able to use both legs on August 27, 2003 and was fully mobile. This is a difficult case, as Claimant really has had to struggle with his health issues. The Settlement Agreement provides the only jurisdiction for the Special Masters, and it may not be expanded.

Claimant has established that his mobility problems began in late 2004. Claimant is not a member of the class as mobility impaired. Claimant retains the right to pursue a separate lawsuit concerning anything that occurred after August 27, 2003.

**Vision Impairment**: Claimant presented evidence that he has had physiological eye issues in the past. He has had trouble with his tear ducts, and surgery was performed in late 2001 and plugs were put in.

Claimant has had continuing problems with irritative conjunctivitis. He has a white discharge from his eyes. *Exhibit A-21; Exhibit A-22.* The medical records admitted into evidence reflect that Claimant was able to see, with the white discharge from his eyes being an irritant.

The evidence does not reflect that Claimant was unable to carry on activities of daily life due to his eye condition. Under the ADA and Rehabilitation Act, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

Claimant's eye problems did not substantially limit a major life activity on or before August 27, 2003. Claimant is not part of the class as vision impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

6

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant believes that he was the victim of medical malpractice. He stated on more than one occasion that DOC could have prevented the loss of his legs.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement.

Claimant did not establish that he was victim of any discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003. No relief can be provided to Claimant because he did not fall into the required time period.

If Claimant believes that he was the victim of medical malpractice while in DOC, then he should be consulting with an attorney immediately. Claimant may be facing statutes of limitation and should be consulting with a lawyer now about any rights that he may have to pursue a case under the Eighth Amendment or appropriate statute.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #1 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Mark McCafferty is denied, as Claimant has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 as to other issues; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before May 12, 2008.**

SIGNED this 4th day of February, 2008.

BY THE COURT:

Richard M. Borchers
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this 4th day of February, 2008 to the following:

Mr. Mark McCafferty
2701 California Street, #E-5
Pueblo, CO 81004

Mr. James Quinn
Mr. Jess Dance
Office of the Attorney General
1525 Sherman Street
Denver, CO 80203

*Susan L. Carter*