IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

     Plaintiffs,

-vs.-

BILL OWENS, et al.

     Defendants.

---

Claim Number 03-407
Category III
Claimant: Phillip Johnson, Jr. (Deceased), #61588
Address of Claimant: Heir - Phillip Johnson, Sr., 1525 E. 22nd Avenue, Denver, CO 80205

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on April 11, 2008. This hearing was held at the office of Legal Resolution Center, 600 17th Street, #2800-South, Denver, Colorado. Present were the following: Phillip Johnson, Sr. (Father); and Willow Arnold, attorney for Defendants.

Father testified on his own behalf. Defendants called Dr. Orville Neufeld, D.O. Defendants offered into evidence Exhibits A thru UU, and all were admitted.

Each side presented closing arguments, and further argument will be waived. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>> 1. Is the claimant a disabled individual who is a member of the class?
>> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Phillip Johnson, Jr. (Claimant) came into DOC custody on October 5, 1989. He was incarcerated primarily at the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. Claimant was released on parole on August 6, 1990. Parole failed, and he returned to DOC custody on November 28, 1990. Claimant was placed at several facilities before he discharged his sentence on January 16, 1992.

Claimant returned to DOC custody on January 24, 1994. He was placed initially at the Denver Reception and Diagnostic Center (DRDC). He then was placed into a community program and discharged this sentence on July 26, 1994.

Claimant next returned to DOC custody on January 10, 1995. He was placed back at DRDC and then went onto ISP supervision. Claimant returned to physical custody in DOC on January 26, 1997. He discharged this sentence on January 21, 1998.

On September 11, 1998, Claimant was placed again into DOC custody. He went back to DRDC and then went to the Fremont Correctional Facility (FCF) in Canon City, Colorado. He arrived at FCF on November 25, 1998. Claimant went back on parole on February 17, 1999. Parole was violated, and Claimant came back to DOC on July 13, 1999. Claimant was transferred to the Huerfano County Correctional Center (HCCC) in Walsenburg, Colorado. He remained at that

facility until he was transferred back to FCF on September 8, 2000. He discharged this sentence on April 22, 2001.

Claimant returned to DOC custody on October 22, 2004. He was placed for evaluation at DRDC and then returned to FCF. Claimant remained at that facility until March 8, 2005 when he was transferred to the Limon Correctional Facility (LCF) in Limon, Colorado. Claimant was placed into a community program in Denver on February 15, 2006. Claimant returned to DOC custody after the community placement failed. He was placed back at LCF on June 30, 2006. Claimant was granted parole on August 2, 2007. Claimant passed away in November 2007.

Claimant filed a claim that was received by the office of the Special Masters on January 3, 2005. In his initial claim form, Claimant checked only the box for mobility impairment. Claimant stated, in part, as follows:

> I have been examined and noted by James Gremillion, DPM that I have ples planus deformity. I have congenital lack of distant phalaux and hallus nail bilaterally. I pronate excessively directly after heel contact. I also have some extensus in the hallices which certainly can and have caused problems of irritation across the dorum of the remainder of the hallux. As of now I can not walk on my right feet but the medical got me working - but they have me as M-3. No standing and I'm hurting bad.
> I must wear a orthotic device. Every time I come to DOC the medical staff do not look at this as a problem. But now my back & neck hurts all the time without orthotic devices, I cannot work, go to gym, run, nor stand for a long time.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated follows:

> Because of my disability I was put on unassigned, with doing so I cannot go to the gym, yard, library, law-library, as well as other programs. I also had to keep paying the co-payment charge $5.00 and if it is outside the sick call it is $10.00 and being an M-3, you don't make but $.30 a day and that is only $4.20 per month. So when I get sick I cannot put a kite in knowing I don't have the money.

Claimant was provided a supplemental form to complete. In his supplemental form, Claimant stated that "[n]ow my back, neck, knees & hips hurt all the time, and this did not happen when wearing orthotics." Also submitted were copies of medical records, kites, and grievances. One of the medical records reflected a consultation with Dr. James Gremillion, DPM on October 20, 1999. Dr. Gremillion noted that surgery was not necessary and that Claimant needed orthotics. Also included was a medical record reflecting that Claimant was unable to keep his orthotics when he returned to DOC custody in 2004. The medical record also reflects that Claimant had extremely small feet and that he had been required to send his orthotics out of the facility to his ex-wife.

Claimant forwarded additional medical records and other documents. These reflected on-

4

going problems with his feet and shoes. Claimant made several attempts to obtain foot care without much success.

At the hearing, Father testified briefly as to contacts that he had with Claimant. He stated that Claimant died on November 11, 2007, but he has not been told what the cause of death was. On cross-examination, Father indicated that Claimant had many problems with his feet.

Defendants presented the testimony of Dr. Orville Neufeld, D.O. as an expert witness. He had reviewed the medical records of Claimant. He noted that he had fallen arches and other problems. Also admitted into evidence were several pages of Claimant's medical records.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to be a member of the class, a claimant must have had an impairment, as recognized by the Settlement Agreement, on or before August 27, 2003. It was on that date that the Settlement Agreement was approved by Judge Nottingham. In other words, absent a showing of an impairment on or before that date, a claimant may not pursue his claim.

In this case, Claimant has passed away. Father has substituted himself as the heir of Claimant. Father did not ask for this claim to be elevated to Category V which would require proof that his son died as the result of a discriminatory act by DOC and its staff. Father has chosen to allow the claim to remain in Category III, and he simply takes over the claim of his son. There is no necessity for Father to establish how his son died. Father need only show that Claimant had a disability on or before August 27, 2003 and was subjected to discriminatory conduct.

This case is a classic representation of the inconsistent policies of DOC over the years. Claimant had extremely small feet. He needed small boots and shoes. Dr. Gremillion, a podiatrist, saw Claimant many times in the 1990's and commented on the medical problems Claimant was facing. Dr. Gremillion noted that Claimant would not need surgery if he could obtain orthotics and properly sized shoes. At some point in the 1990's, Claimant received his orthotics and he was able to walk more comfortably. When Claimant was transferred to a new facility, he had to beg to get his orthotics back. This was a common problem over the last decade of Claimant's life. The orthotics were taken at various facilities, even though they had been provided before and were necessary for Claimant's health.

Dr. Anita Bloor saw Claimant on July 27, 2006 for an ADA evaluation. Dr. Bloor's note is cryptic and to the point: "(1) Pt is mobility impaired & would benefit from his previous restrictions." *Exhibit TT*. A letter to DOC staff member Teresa Reynolds also reflects a checkered history of providing appropriate shoes and orthotics to Claimant. *Exhibit RR*. Claimant's feet were a mess, and they did not get any better as the result of DOC actions. Many dollars were spent on consultations

5

with Dr. Gremillion and others, but those recommendations were not followed. This is not a matter of medical judgment. It was a conscious decision to try to save the cost of orthotics. Dr. Bloor's note reflected what was present for years.

Claimant had significant problems with his feet on or before August 27, 2003. He was a member of the class on that date as mobility impaired. The actions of DOC concerning his feet continued after August 27, 2003 and will be included in this order.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** There was no evidence presented that indicated that Claimant was disqualified from DOC programs and services for reasons such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** This is not a case controlled by *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Claimant clearly struggled over the years in getting appropriate footwear and orthotics. Once he received the orthotics, he had to struggle to keep them. A careful reading of everything filed in this case reflects a callous disregard of the health of Claimant's feet. No compelling evidence was presented that Claimant's orthotics were a security threat. No evidence was presented that Claimant had to be denied orthotics and proper footwear.

The Special Master determines that Claimant was subjected to discriminatory actions by the seizure of his orthotics when transferring facilities and when he returned to DOC custody in 2004. Claimant did suffer as the result of these action.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** If Claimant were alive, he would be awarded $250.00. That amount is ordered to be paid to Father as the heir of Claimant.

IT IS HEREBY ORDERED that the claim of Claimant Phillip Johnson, Jr. is granted to the extent noted, and Defendants are to pay to Phillip Johnson, Sr., as heir of Claimant, the sum of $250.00; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before July 7, 2008.**

SIGNED this 21st day of April, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master