IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

---

Claim Number 03-335
Category III
Claimant: Keith Schwinaman, #105240
Address of Claimant: CTCF, P.O. Box 1010, Canon City, CO 81215-1010

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on March 13, 2008. This hearing was held at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. Present were the following: Keith Schwinaman (Claimant); and Willow Arnold, attorney for Defendants.

Claimant presented the following witnesses: Mark Rudnik, R.N.; Case Manager Rick Burford; and Claimant. Also offered and admitted into evidence were Claimant's Exhibits #1 through #28. Defendants presented the testimony of Dr. Orville Neufeld, D.O. Defendants' Exhibits A through BB were offered and admitted into evidence. All documentation previously submitted by both sides was accepted. Both sides were granted additional time up to and including April 28, 2008 in which to submit documents for consideration by the Special Master. No additional documents have been received from either side.

This claim has been taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the

Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29*. Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

>        III. DEFINITIONS
>                A. COVERED DISABILITIES
>                The persons covered by this Plan are individuals with mobility,
>                hearing, and vision impairments and inmates with diabetes.
>                B. QUALIFIED INMATE
>                Inmate with a permanent disability/impairment which substantially
>                limits his or her ability to perform a major life activity.
>                C. PERMANENT DISABILITY/IMPAIRMENT
>                A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>    1. Is the claimant a disabled individual who is a member of the class?
>    2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>    3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>    4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on June 20, 2000. Claimant was placed initially at the Denver Reception and Diagnostic Center (DRDC). He then was transferred to the Buena Vista Correctional Facility (BVCF) in Buena Vista, Colorado. Claimant was granted parole on March 13, 2001.

Parole failed and Claimant returned to DOC custody on February 19, 2002. He was evaluated again at DRDC and then transferred to CTCF. Other than some brief periods of time when he was temporarily placed at DRDC, Claimant has remained at CTCF.

In his initial claim form, Claimant checked the boxes for vision impairment and diabetes. Claimant stated, in part, in his claim form:

> Diabetes: I have had this disease since I was 14 years old. I am now 39 years old; I take two shots of insulin per day. It affects me a lot if either B/S is high or low; when it's high also known as diabetic hyperosmolar syndrome; around 600 or higher

3

my cells can not absorb this much sugar so the sugar passes from my blood to urine; this causes rapid dehydration. This can also be brought on by an infection, illness, or stress; or failure to take insulin dose.....

In response to the question in the claim form concerning discrimination by DOC and its staff, Claimant stated as follows:

> I believe that I was discriminated by the Colorado Department of Corrections in the following ways:
> 1. Upon arrival at DRDC After being assigned a cell to live in I had severe cases of low blood sugar due to not being permitted to possess anything that I could use in case I was to have low blood sugar while locked in my cell. Due to the amount of time it would take for the order for a diabetic snack to be forwarded to the kitchen and the rule against taking any food from the chow-hall to your cell such as sugar.
> 2. By not helping a diabetic by either giving him glucose tabs or sugar until he gets to medical [a diabetic has to wait for staff to call medical to advise and for staff to delegate which staff is going to escort inmate; if medical wishes to see inmate].
> 3. By prison staff not understanding the symptom of all diabetics and the urgency for treatment when blood sugar is low. Since people who have been diabetics longer may not exhibit any symptoms of low blood sugar until they need rapid treatment. They may still at first glance appear poised.
> 4. By not permitting a diabetic to possess sugar or glucose tablets in their cells or on their person.
> 5. By not permitting a diabetic to have or wear shoes ordered by medical for the inmate.
> 6. By not allowing a diabetic to have any input about food or insulin dosage even if this diabetic clearly has an understanding of his disease.
> 7. By not providing or delaying eye care to a diabetic, that is specific eye-care that is needed for a diabetic.
> 8. By being refused work at the Prison [BCFC] because it would be too inconvenient for medical staff to come in the case of a diabetic needing help for his diabetic symptoms.
> 9. By not providing any room for error if for whatever reason an insulin dependent diabetic either misses an insulin injection or does not make it to med-line in time for said injection and making diabetics to wait sometimes 12 hours for the next injection. During which time diabetic had to suffer with no food or high blood sugar symptoms.
> 10. By either delaying or not providing any help to a diabetic because staff believes that "you look alright to me"; depending on staff or correctional officer.
> 11. By not providing any diabetic specific items on the prison canteen.
> 12. By not providing an area where a diabetic can inject their insulin without having to only use two of several injection sites and suffer ridicule from non-diabetic inmates if a diabetic injects insulin either in their leg or buttocks.

      13. By not putting any priorities on a diabetic's requests for sick call if the sick call notifies them that they are having any of the following problems: such as repeated cases of high, low blood sugar, vision problems or foot wounds; ulcerated wounds anywhere on their body; or problems with getting snacks.

      14. By not providing diabetic inmates a night snack for their first 3-4 days while in cellhouse or DRDC.

      15. By delaying the time that a diabetic is permitted to go to lunch due to staff's rotation or what cell house goes first or lunch is called late, or delayed for whatever reason by staff. Regardless of a diabetic's insulin peaking at a certain time.

      16. By not stocking officer's work station with glucose tablets, candy and or sugar in the case a diabetic needs such items to prevent serious injury potential from low blood sugar.

      17. By a diabetic being denied help while housed in cell house 5. Regardless of telling staff that they were having low blood sugar.

      18. By having staff refuse to give me glucose tablets the last three months because of their decision to deem them contraband.

      19. By staff of Colorado Department of Corrections to cause me to fear for my life; by locking me up in a variety of locations with no access to sugar or glucose tablets or immediate medical treatment for low blood sugar. Such as at DRDC, Cell House 5, on the transport bus, and segregation and in my current location.

      20. By medical staff not feeling that a seizure by a diabetic is an emergency unless the diabetic has two seizures.

      21. By Colorado Department of Corrections creating an environment of high anxiety for a diabetic due to their treatment and lack of treatment towards same.

      22. By making a diabetic to feel as though they are being punished more because they are a diabetic.

Claimant submitted a number of documents in support of his claim. These included copies of medical records and grievances. Included in the documents was a DOC medical form reflecting a hypoglycemic reaction on June 28, 2004. Additional records reflected that Claimant has a hypothyroid condition and other medical conditions. Other medical records indicated that Claimant had not eaten lunch on occasion. A medical entry reflected a possible seizure on August 5, 2000.

As this claim was originally assigned to Category II, Defendants filed a response to the claim that included several pages of Claimant's medical records. An entry on June 16, 2005 reflected that Claimant had Type I diabetes that was uncontrolled. *Exhibit A*. Glucose tablets were prescribed for him at that time. Additional pages of medical records reflect that Claimant has had to deal with his diabetes over the years that he has been in DOC custody.

At the hearing, Claimant presented two witnesses during his case. Mark Rudnik, R.N. testified that he is aware that Claimant is diabetic. Claimant has been frustrated in trying to control his disease. Mr. Rudnik stated that Claimant is very consistent in taking care of himself. Claimant has expressed concerns to him about the time it takes to receive medications. Mr. Rudnik was asked about special shoes but testified that was not part of his job and he had no opinion on whether

special shoes were necessary. On cross-examination, Mr. Rudnik testified the delay in receiving neurontin was because it was a non-formulary drug in DOC. Mr. Rudnik responded that neurontin was a necessary drug for Claimant, but not as necessary as insulin. Mr. Rudnik testified that Claimant has some neuropathy as the result of his diabetes.

In response to a question from the Special Master, Mr. Rudnik testified that he had been at CTCF since August, 2005. Claimant has diabetes that is well managed and Claimant is compliant with his care. On redirect, Mr. Rudnik indicated that neurontin is not a narcotic, but is used as pain medication for Claimant's feet. He acknowledged that Claimant has had high blood sugar levels on occasion.

Claimant called Rick Burford who is his case manager. Mr. Burford testified that he had worked at CTCF for twenty-four years. He was aware that Claimant was frustrated with his medical care. Mr. Burford had provided grievance forms to Claimant. He testified that Claimant had few disciplinary issues during the time he has been in DOC custody. Mr. Burford indicated that diabetic inmates can work at CTCF. Mr. Burford acknowledged that he has diabetes. Mr. Burford was aware that Claimant had a medical code of M-4. This precluded him from being in any work position that involved heavy labor or equipment usage.

On cross-examination, Mr. Burford testified that Claimant is employed at CTCF. He is aware that Claimant has worked consistently while in DOC custody. Claimant has told him that he had some trouble with his vision. Mr. Burford stated that he and Claimant have discussed diabetic care, as both have the disease. Claimant had advised him that on occasion he would miss meals. Mr. Burford was Claimant's case manager for two years. Mr. Burford testified that Claimant had received a COPD conviction and that he then was terminated from the tag plant as a result.

Claimant testified that he was diagnosed as having diabetes when he was twelve years old. He has been diabetic since, taking insulin by shot. Claimant expressed his fear that he would die in prison due to his diabetes. Claimant has trouble with hypoglycemic reactions that lead to low blood sugar levels. He testified that he had been provided glucose tablets for those occasions when he might need some sugar. Claimant testified that he sometimes will "fall out" due to a low blood sugar level. When that occurs, he needs sugar to help stabilize his blood sugar levels. He expressed his concerns about medical staff not reacting quickly enough. He has purchased candy to have, but had glucose tablets removed from him. He was convicted of unauthorized possession of the glucose tablets.

Claimant testified that he has needed soft sided shoes, but has been told to buy those from the canteen. He has had open wounds on his feet. Claimant stated that he had not received frequent vision testing and that the cuffing procedure for inmates created problems due to his diabetes. Claimant stated that he is a brittle diabetic. He has to take insulin and other medicines prior to breakfast. Claimant testified that he did not receive enough insulin while at BVCF. Claimant has been placed into chronic care status. He testified that he is precluded from taking any sweets or food when he goes to the yard for exercise. Claimant testified that glucose tablets work more quickly to stabilize blood sugar levels. Claimant testified that he would like to have diabetic footwear and

glucose tablets. Claimant wants to be able to go to the yard.

On cross-examination, Claimant testified that he has two pair of glasses, with one pair for reading. Claimant testified that he has been advised that he has retinopathy in both eyes. Claimant did not have any foot sores at the time of the hearing. He has had to wear boots which has been hard for him. Claimant stated that his legs will go numb at times.

Defendants presented Dr. Orville Neufeld, D.O. as an expert witness. He had reviewed the medical records of Claimant. Dr. Neufeld testified that Claimant has juvenile or Type I diabetes. When Claimant was at DRDC, his diabetes was not under control. Claimant had been able to control his diabetes until about two years ago. Now there are vision and kidney problems that have arisen. Recent medical examinations have indicated some retinopathy was present. Claimant has kept his blood sugar levels under control.

Dr. Neufeld testified that glucose tablets are limited because alcohol had been made by inmates over the years. Inmates are to be limited to two tablets at any one time. He testified that the neurontin was not an essential medicine. It can be used to control pain. It is not a single, stand alone drug. Claimant's present restrictions and medical code of M-4 are appropriate. Claimant should be receiving three snacks per day. Dr. Neufeld stated that a diabetic will probably always feel hungry. Claimant does have some depression.

On cross-examination, Dr. Neufeld testified that Claimant need only pay $5.00 every six months as his co-pay for diabetic care. Dr. Neufeld was aware that Claimant had sent kites to medical seeking medical attention.

In rebuttal testimony, Claimant testified that he has to manage his own conditions. He stated that he had never abused glucose tablets.

## III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

Claimant must show that on or before August 27, 2003 he had a recognized impairment as set forth in the Settlement Agreement. Claimant must show further that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act that occurred on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Each claimed disability must be examined separately.
**Diabetes:** There is no question or dispute that Claimant was diagnosed with diabetes long before he arrived in DOC custody. Claimant has remained diabetic and is a member of the class as a diabetic.

**Vision Impairment**: The evidence presented by both sides reflects that Claimant's vision

7

problems commenced about two years ago. He does have some diabetic retinopathy.

Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I). Claimant has failed to show that on or before August 27, 2003 vision problems existed to the extent that they substantially affected activities of daily life.

The Settlement Agreement requires that a disability be established as existing on or before August 27, 2003. There is insufficient evidence to establish that Claimant had a vision impairment on or before that date. Claimant is not part of the class as vision impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** There is no evidence that Claimant was not qualified to receive services and benefits from DOC. As an example, Claimant was not disqualified due to disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant raises a number of concerns. Many of those concerns deal with the type and quality of medical care that has been received since coming into DOC custody.

The evidence reflects that Claimant has received medical care while in DOC custody. The quality of that care is questioned by Claimant. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

One concern of Claimant does appear to be a violation of the ADA and Rehabilitation Act. Claimant has testified that he was provided glucose tablets early on when he came into DOC

custody. These were later taken from him when concern arose that alcohol was being made from tablets by some inmates. The Special Master has handled and reviewed hundreds of claims involving diabetes. Claimant is a brittle diabetic and has had low blood sugar levels that needed glucose tablets or candy. Claimant's concerns about wildly fluctuating blood sugar levels is legitimate. Claimant thus was treated differently from the non-diabetic inmate who does not face possible low blood sugar levels. There was and is no evidence that Claimant ever used glucose tablets to make alcohol.

A common theme by Defendants on claims of diabetes is that the individual claimant must take care of himself. In this case, Claimant is very knowledgeable concerning the disease and does actively participate in his care. That is why he was and is concerned that glucose tablets are needed at times to maintain his health. The evidence presented by Defendants as to why Claimant did not need to have glucose tablets or hard candy in his possession was unconvincing.

The *Fitzgerald* case binds the hands of the Special Master, as well as the Court. The overwhelming number of concerns of Claimant relate to his medical care. The quality of that care must be examined in a different proceeding. It cannot be examined in a case brought under the ADA and Rehabilitation Act. The issue of the lack of glucose tablets or some equivalent can be resolved in this claim.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant expressed great fear about dying in prison. The lack of available glucose tablets caused emotional trauma which is understandable.

DOC will be required to provide to Claimant glucose tablets on a regular basis. If medical and security staff determine that hard candy would alleviate low blood sugar levels and be less of a security risk, then hard candy may be provided to Claimant. In addition, Claimant is to have the tablets or candy on his person so he might be able to utilize the yard and other facilities.

Claimant needs to understand that any abuse of the tablets or candy will be grounds for taking them away from him. Claimant has testified that he has never abused glucose tablets, and that testimony is accepted. Claimant also is awarded $200.00 for the emotional trauma of having the tablets taken from him.

IT IS HEREBY ORDERED that the claim of Claimant Keith Schwinaman is granted, in part, and Claimant has established that he should be provided glucose tablets or hard candy as provided in this Order; and

IT IS FURTHER ORDERED that Claimant is awarded $200.00 as damages for the emotional trauma and fear that he experienced; and

IT IS FURTHER ORDERED that the remainder of the claim is dismissed due to failure to prove each of the four questions set forth by Judges Nottingham and Kane; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file

an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before August 4, 2008.**

SIGNED this 2nd day of May, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

———————————————————
Richard M. Borchers
Special Master