IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-149
Category III
Claimant: Charles Parrish, #111079
Address of Claimant: CTCF, P.O. Box 1010, Canon City, CO 81215-1010

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on May 8, 2008. This hearing was held at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. Present were the following: Charles Parrish (Claimant); and Willow Arnold, attorney for Defendants.

Claimant called the following witnesses: Dale Douglas; James Sorenson; Lieutenant Mark Anthony; Sergeant Jeremiah Cone; Correctional Officer Cruz; Sergeant C. Meigs; and Claimant. Claimant offered into evidence Exhibits 1 and 2, and both were admitted. Defendants presented the testimony of Dr. Timothy Creany, M.D. Defendants' Exhibits A through QQ were offered and admitted into evidence. All documentation previously submitted by both sides was accepted. After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

B. QUALIFIED INMATE
Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
1. Is the claimant a disabled individual who is a member of the class?
2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant was committed to what was then the Colorado Department of Institutions (DOI) after he was found not guilty by reason of insanity in 1981. Claimant was placed at what is now known as the Colorado Mental Health Institute at Pueblo (CMHIP). Claimant's commitment is potentially for the rest of his life or until unconditionally released as the result of a court order. The name of DOI has been changed to the Colorado Department of Human Services (DHS).

Claimant came into DOC custody on November 13, 2001. This was the result of a criminal conviction in Pueblo County. The case was not resolved by a finding of not guilty by insanity, and Claimant was committed by the court in Pueblo County to DOC.

Claimant arrived in DOC custody on November 13, 2001. He was placed at the Denver Reception and Diagnostic Center (DRDC) for testing and evaluation. Claimant was transferred to CTCF on December 3, 2001. Claimant remained at CTCF until he was transferred to the Limon Correctional Facility (LCF) in Limon, Colorado on October 8, 2003. Claimant was transferred to the Ft. Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado on November 4, 2004. Claimant returned to LCF on September 6, 2005.

Claimant then was transferred to the Sterling Correctional Facility (SCF) in Sterling, Colorado on October 16, 2006. Claimant returned to CTCF on November 6, 2007.

3

In his initial claim form, Claimant checked the boxes for diabetes, vision impairment, and mobility impairment. Claimant set forth a detailed history of his medical and mental health problems dating back to his childhood. These included bi-polar disorder, anti-social personality, schizophrenia and post-traumatic stress disorder (PTSD). Claimant also noted that he has epilepsy.

Claimant stated in his claim form that he has vision problems that are the result of a hole near the cornea of his right eye. He also has photophobia. Claimant also states that "...Inmate Parrish suffers from hypoglycemia - an abnormally low concentration of sugar in the blood."

Claimant also alleged in his initial claim form that he has a degenerative condition in his spine. He also alleged that he has arthritis, phlebitis and hypertension. Claimant stated, in part:

> Inmate Parrish was in a wheelchair from Nov. 2001 to Sept. 2003. Forced to walk and drag left (knee) leg by DOC on and before August 27, 2003.

Claimant alleged in his claim that he had restrictions for first tier, lower bunk, and no honor camps. He alleges that he has been denied certain jobs for which he has been trained.

Claimant submitted many documents in support of his claim. Those documents reflect other health problems facing Claimant. He included pages from his medical file which reflected falling on several occasions.

Claimant was sent supplemental forms to complete. In the supplemental form for diabetes, Claimant stated, in part, as follows:

> Unlike "hyperglycemia," which is an abnormally high concentration of sugar in the blood - chronic excessive secretion of insulin from the pancreas. I suffer from hypoglycemia - an abnormally low concentration of sugar in the blood - which in time usually turns into diabetes - I am obese over 300 lbs. And with the high amount of foods served in DOC to create a high concentration of carbs that turn into sugar - i.e., potatoes, rice and pasta and breads - the chances that I too will soon become insulin dependent, my father is a diabetic, my mother died December 12, 2003 due to diabetes and a heart condition, which I too suffer from.

In his supplemental form on mobility impairment, Claimant stated that he has deep venous thrombosis in his right leg, arthritis in his ankles and knee, and degeneration of the spine. He also alleged that he has been diagnosed with "border-line muscular dystrophy." He stated that there was no handicapped seating at LCF and that doors were extremely difficult to open. He alleged further that showers at LCF were not safe for wheelchair inmates.

In his supplemental form for vision impairment, Claimant stated, in part, as follows:

> In 1964 I was shot in the right eye by a B-B gun. The following year a paper wad shot from a rubber band got the left eye. Since then my eyesight has gotten

4

worse, to the point of near blindness. I now suffer from photophobia - an abnormal
sensitivity to light.

He also stated that he has cataracts and hemeralopia which is a condition caused by a defect in the eye. As the result of the bb gun incident, Claimant has a hole in his right eye.

In response to a question concerning discrimination by DOC and its staff, Claimant stated, in part, as follows:

> I feel DOC's conduct does not care nor understand the pain and misery of not being able to see in the bright daylight or other bright lights....
> Because of my physical and mental and visual limitations, I have been denied jobs that I'm trained to do (even with the limitations - there are no handicap seating in either dining hall at LCF - there are no activities for handicapped inmates to do at LCF - without fear of loss of life.

Claimant has submitted numerous copies of his medical records and other documents. This includes grievances that he has filed seeking some form of relief. In June 2005, a grievance was answered with the acknowledgment that Claimant had received the wrong medication from staff.

At the hearing, Claimant presented a number of witnesses. Dale Douglas is an inmate who is assigned to help Claimant. Mr. Douglas helps push Claimant around in his wheelchair. Mr. Douglas testified that Claimant does need assistance and can only walk a little. He stated that he tries to get Claimant to walk as much as possible. He stated that Claimant forgets to do certain things and appears to be out of it on occasion. He suggested that Claimant might be able to walk more if he had physical therapy. On cross-examination, Mr. Douglas testified that there are days when Claimant cannot get out of his wheelchair at all. Mr. Douglas has observed Claimant fall and hurt himself.

James Sorenson is a fellow inmate who has known Claimant since 2003. He has observed Claimant trying to walk but with great difficulty. Mr. Sorenson is aware that Claimant has significant medical problems, including significant mental health issues. Mr. Sorenson has observed Claimant fall in the chow hall. Claimant's legs just went out from underneath him. Mr. Sorenson has observed Claimant on days when he cannot walk at all. On cross-examination, Mr. Sorenson testified that Claimant worked rolling plastic ware in napkins for the kitchen but does not have that job at the present time.

Claimant called Lt. Mark Anthony as a witness. Lt. Anthony had been Claimant's case manager at LCF. He testified that had not seen any falls by Claimant. He recalled taking Claimant to Aurora for medical care due to blood clots in the leg. He was aware of Claimant's health issues through discussions with Claimant. On cross-examination, Lt. Anthony testified that LCF does have programs for disabled inmates. Claimant had acceptable evaluations while he was at LCF. Lt. Anthony testified further that Claimant had been able to work and be involved in programs at LCF.

Sergeant Jeremiah Cone is employed by DOC at SCF. He testified that he had not observed directly any falls by Claimant. He had responded to one fall after it had occurred and provided assistance. Sgt. Cone stated that Claimant was not in a handicapped cell while at SCF. On cross-examination, Sgt. Cone stated that he had observed Claimant moving but very slowly. He had supervised the administrative segregation unit when Claimant was in that unit. He stated that it took time for Claimant to get to the door of his cell.

Correctional Officer Cruz was called as a witness by Claimant. She testified that she is employed at CTCF. She discussed when inmates are locked down on the living unit. She stated that officers are to make rounds to check on inmates on an hourly or more frequent basis. On cross-examination, she stated that an emergency condition would be brought to the attention of correctional staff.

Sergeant Meigs was asked by Claimant if he had observed any of Claimant's falls. Sgt. Meigs said that he had not recalled a fall but remembered Claimant slipping on oil. He described it as not a hard fall.

Claimant testified that he came into state custody in 1981 after being found not guilty by reason of insanity. He was placed at CMHIP in Pueblo on a one day to life commitment. Claimant testified that he was diagnosed as having hypoglycemia while at CMHIP. He testified that he was shot in the right eye with a bb gun when he was young. This left a hole in his eye. In 2006, Claimant had cataract surgery. He had difficulty getting appropriate prescription glasses. Claimant stated that he has requested books on tape in the past, but with no success in being provided any recorded books. Claimant stated that he really needs special reading glasses.

Claimant testified that he has been in a wheelchair since February of this year. He previously was in a wheelchair starting in 2001. His lower back and legs limit his mobility. Claimant testified that he had been diagnosed with MS. He has had problems with deep venous thrombosis (DVT) or clots. He has to elevate his legs. Claimant stated that he has had problems with his left knee. He was referred to Dr. Patterson, an orthopedic expert, who diagnosed torn ligaments in the knee. He did not recommend surgery. Dr. Patterson recommended a cane and hinged brace.

In May, 2003, a new wheelchair was ordered for Claimant. He is concerned about falling, as he states that he has no control over his legs. Claimant testified that he has a dual commitment. He was to receive mental health help at CMHIP, but he has received little such help while in DOC custody. Claimant indicated that he had not received any physical therapy nor appropriate medicines.

Claimant received a knee brace but that was taken from him at LCF. No reason was given for it being taken. On cross-examination, Claimant testified that he had been injured by various falls. Claimant stated that he has had trouble with his knee since 2001. He was in a wheelchair in 2001 due to his knee and other problems. He returned to the wheelchair in 2003. Claimant testified that he will use a wheelchair occasionally as support and will walk behind it trying to get some exercise. Claimant stated that he has trouble with his equilibrium.

On further cross-examination, Claimant testified that he watches very little television. He has extreme difficulty seeing and often needs help to write letters. Tinted glasses would help.

On redirect, Claimant testified that he believes part of his medical records are missing. He has long-term problems with blood clots.

Defendants called Dr. Timothy Creany, M.D. as an expert witness. Dr. Creany testified that he had reviewed Claimant's medical records, but he has not physically examined Claimant. Dr. Creany stated that Claimant has degenerative disk disease (DDD) and DVT in the left leg. The medical records make no clear diagnosis of diabetes. He stated that Claimant has a torn ACL in the left knee that cannot be fixed through surgery. Claimant was provided a cane and was given an ADA evaluation.

Dr. Creany stated that the medical records reflected seizure activity that was self-reported but not witnessed. Dr. Creany has some reservations concerning the breadth of Claimant's mobility issues. There is no clear cut diagnosis of MS. Dr. Creany testified that a knee brace was helpful for Claimant. He acknowledged that Claimant is susceptible to future DVT problems because he has had them in the past. He noted no indication of any shoulder problems in the medical records. Dr. Creany believed that Claimant needed to be periodically re-evaluated concerning the necessity for a wheelchair.

The medical records reflected some arthritis and edema, as well as DVT. There is limited evidence of other conditions. Dr. Creany believed that Claimant could perform his activities of daily life.

In rebuttal, Claimant testified that he never had to pay for medical care at CMHIP but had to at DOC facilities. He believed that he had not received proper treatment while at DOC. He stated that he is scared to death of falling. He stated that he had tried to commit suicide on occasion. He has to take coumidin for his DVT, as well as mental health medications. He cannot take pain pills because it will interfere with the coumidin. Claimant stated that his goal is to return to CMHIP. He stated that he was aware that he may never be released from CMHIP. He also stated that he has no teeth and must rely on dentures.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Claimant must show that on or before August 27, 2003 he had disability. Claimant must show further that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act that occurred on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Each claimed impairment or condition will be examined separately. As noted previously, any condition covered by the Settlement Agreement must have existed on or before August 27, 2003.

**Diabetes**: Claimant testified, and his medical records reflect, that he has hypoglycemia. There is no evidence from any source that Claimant had diabetes on or before August 27, 2003.

Hypoglycemia may be related to diabetes, but sometimes it is not.

> Low blood sugar, or hypoglycemia, is a condition in which the levels of glucose in the blood stream drop too low to fuel the body's activity.
> It most often occurs as a complication of the treatment of diabetes. Your dose of insulin or diabetes pills may be too great or you may have delayed or skipped a meal. Not all diabetes pills cause hypoglycemia; it is mainly a problem with the meglitinides and sulfonylurea drugs.
> Less commonly, hypoglycemia occurs in the early months of pregnancy or is caused by prolonged fasting, strenuous exercise (which lowers sugar), or tumors of the pancreas.

*Harvard Medical School Family Health Guide*, Free Press, 2005, p.843. Under the Settlement Agreement, there are four recognized conditions, one of which is diabetes. Hypoglycemia is not a recognized condition. The Special Masters only have jurisdiction over the four stated conditions. There is no jurisdiction over a claim of hypoglycemia that is unrelated to any diabetes. Claimant is not part of the class as a diabetic.

**Mobility Impaired**: Off and on from November 2001 to August 27, 2003, Claimant was in a wheelchair. He has a multitude of health issues, with many affecting mobility. *Exhibit Y*. Examination of all evidence leads to the conclusion that Claimant's mobility was impaired on and before August 27, 2003. Claimant is a member of the class as mobility impaired.[2]

**Vision Impaired**: There is no question that Claimant suffered an injury to his eye when he was young as the result of a bb shot. *Exhibit X*. There is also no question that he has had cataracts and had surgery. *Exhibit H*. This is a close case, but the Special Master finds that Claimant's vision condition is such that it affected his ability to read on or before August 27, 2003. Claimant is a member of the class as vision impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** Based upon the testimony provided by both sides, the answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant has expressed his concern in writing and at the hearing that he has been denied proper

---

[2] The issue of whether Claimant has MS arose during the hearing. At least one health care provider noted that Claimant has a "history of probable MS." *Exhibit KK*.

medical care while in DOC custody. He alleges that his overall health has worsened due to this care.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

Claimant also has raised some substantial issues concerning his mental illness and the treatment that he believes he should be receiving. He specifically raised the applicability of *C.R.S. §17-23-103*. The Special Master has reviewed that section along with the letter Claimant received from CMHIP which is dated September 25, 2003. In that letter, Mabel Walker, a records custodian responding to Claimant's letter to the CMHIP superintendent, relates that Claimant's mental health commitment remains in effect as a detainer pending completion of the DOC sentence. The question then is what mental health treatment has Claimant received while in DOC custody. The Special Master has no jurisdiction over mental health issues, as they were not included in the Settlement Agreement presented to Judge Nottingham in August 2003. Claimant may pursue his concerns about mental health issues separately. Claimant correctly noted in his pleadings that the ADA and Rehabilitation Act do encompass mental health issues. These cannot be pursued through this claim. He may wish to contact Class Counsel for further advice and recommendations.

The Special Master has reviewed carefully everything that has been presented by both sides. Claimant has received some accommodations since November 2001. Claimant testified that LCF did not provide handicapped cells or handicapped locations for eating. Claimant first went to LCF on October 8, 2003. Claimant also testified that SCF did not have proper cells or showers for handicapped inmates. Claimant arrived at SCF on October 16, 2006. The Special Master finds Claimant's testimony to be credible, but the problems arose after August 23, 2007.

As the Special Master has noted, a claimant must establish that he was disabled on or before August 27, 2003 *and* prove that he was discriminated against in violation of the ADA and Rehabilitation Act on or before that date. Medical care issues are outside the scope of the jurisdiction of the Special Masters in light of the *Fitzgerald* decision. This Special Master has reviewed thoroughly the documents and testimony submitted and cannot find that any discriminatory act was established in violation of the ADA and Rehabilitation Act that falls into the jurisdiction granted by the Settlement Agreement.

Claimant has presented issues that cannot be dealt with by the Special Masters. The evidence fails to support any finding of a violation of the ADA and Rehabilitation Act for mobility or vision

impairments on or before August 27, 2003. As a result, Claimant has not established his case that he was the victim of discrimination for these two conditions.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since Question #3 has been answered in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Charles Parrish has not been proven and the claim is dismissed; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before August 18, 2008.**

SIGNED this 19th day of May, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

———————————————————
Richard M. Borchers
Special Master