IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

___

Claim Number 03-306
Category III
Claimant: Brandon Baxter Tyler, #85486
Address of Claimant: CCCF, 6564 State Highway 96, Olney Springs, CO 81062-8700

___

# FINAL ORDER OF SPECIAL MASTER
___

THIS MATTER came before the Special Master for hearing on December 7, 2007. This hearing was held at the Crowley County Correctional Facility (CCCF) in Olney Springs, Colorado. Present were the following: Brandon Baxter Tyler (Claimant); and Chris Alber, attorney for Defendants.

Testimony was received from Claimant and Dr. Orville Neufeld, D.O. Defendants' Exhibits A through Z were offered and admitted into evidence. All documentation previously submitted by both sides was accepted. Claimant was granted additional time up to and including May 5, 2008 in which to submit additional documents for consideration by the Special Master.

This claim has been taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

## I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794.* During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for

Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility,

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

hearing, and vision impairments and inmates with diabetes.
B. QUALIFIED INMATE
Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on February 3, 1995. He was placed initially at the Denver Reception and Diagnostic Center (DRDC). He then was transferred to the Limon Correctional Facility (LCF) in Limon, Colorado on March 14, 1995. Claimant remained at LCF until transferred to the Ft. Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado on October 18, 2002. During the period of time Claimant was at LCF, there were short placements at medical facilities.

Claimant was later transferred to the Bent County Correctional Facility (BCCF) in Las Animas, Colorado. He then was placed at the North Fork Correctional Facility (NFCF) in Sayre, Oklahoma, but was returned to Colorado for his hearing. He has been placed at the CCCF for the last few months.

In his initial claim form, Claimant checked only the box for mobility impairment. Claimant stated, in part, in his claim form:

> Spinal Deformation at: C-1, 2, 3, 4, 5, T-5, 6, 7, L-1, 2, 3. Disc injury at L-1, 2, 3; Reconstruction of Left knee ACL; & Cartilage, Right knee damage to cartilage; Deformed Right and Left Feet with feature's of Bunions and Flat Feet (abnormality); Dislocated Left Shoulder AC Joint. (1) Spinal injury to disc at L-1, 2, 3, is at all

3

times very painful at a pain level on a scale of 1 to 10 my pain is always at 8. I am unable to sleep more than two (2) hours at a time at night or any other time. I have pressure on nerve roots in the spinal canal in which is caused by Osteoarthritis (facet joint degeneration, spondyloysis), also I have Spinal Stenosis and I have spinal deformities, including curvature problems such as scoliosis, and Deformities or defects in parts of the vertebrae that has caused one vertebra to slip forward on top of the one below it, resulting in misalignment of the bones of the spine (spondylolisthesis) I suffer this condition throughout my whole spinal column. I fear of falling and injuring myself at any moment without notice as I've done many times before.

In response to the question in the claim form concerning discrimination by DOC and its staff, Claimant stated, in part, as follows:

In 1996 after reconstructive surgery on my left knee I was denied adequate pain medication once in the custody of CDOC. I was kicked out of the after care unit, i.e., the infirmary and forced into general population with elevated temperature of 103 degrees endangering my life in contracting "pneumonia." One day after surgery I found myself in Cell House 5 forced to climb three (3) flights of stairs to reach medical line to obtain medication and take a shower. Forced to walk over 100 yards to the chow hall in mid winter with snow on the ground and raining. I made it to the chow hall and collapsed violently to the floor and rendered unconscious reinjuring my operated on knee. I was taken back to the infirmary and placed into the segregation unit and given the necessary medications for pain relief after going to the x-ray room to check for injury of the operated knee. After two days in the segregation infirmary room I was placed back into the room I was kicked out of and eventually returned to the facility I was housed ten (10) days later. I was punished for asking for pain relief medication. The medication the doctor ordered for me was changed and it was inadequate. Even after I was returned to the infirmary after being kicked out I was never given adequate pain management and I feared for my life as to what they might do again if I complained about the pain I was in. My knee is still destroyed from the fall and I was never given after care rehabilitation for the leg resulting in deformity and pain and suffering to this day in which I need another surgery, but I fear for my life and out right don't trust any doctor anywhere....

Claimant filed a supplemental form concerning his mobility impairment. Claimant set forth, in part, the following:

I'm losing control of my legs. I can't sit more than 5 minutes without pain and emotional distress. I can't stand more than three minutes without pain and emotional distress. I'm only able to sleep or lay on my right side no longer than twenty (20) minutes...

Physical, mental, emotional and psychological pain and suffering because I'm

4

denied access to doctors that can prescribe proper treatment for all my problems. I'm suffering because I'm denied medications that the doctors do prescribe to me by the Insurance Company, this is brought about by design of Colorado Access (HMO) I'm informed of by medical staff. I've even asked if my family could send in medications etc., and still denied access to basic medical care resulting in major depression.

At the hearing, Claimant testified that he tore his ACL while in custody at the Arapahoe County Jail. He could not get any medical help at that facility. When he arrived at DRDC, he advised DOC staff of his knee condition. Surgery was performed in 1996 to repair his left knee.

After the surgery was completed, Claimant testified that his medication was switched. The new medications that were given to him for pain did not work. Claimant complained about the medications but nothing was changed. Claimant believed that actions were taken against him because of his complaints.

Claimant testified that he was unable to put his leg down and was given a bottom tier restriction. Despite this restriction, he was forced to climb a flight of stairs in order to obtain his medications. He also had to walk to the chow hall. At one point, a Lieutenant advised two other inmates not to assist Claimant. It was difficult for Claimant to get to chow because of his knee and physical condition. Claimant fell going to the chow hall and ended up back in the infirmary.

Claimant testified that the staples placed into his knee during the surgery were not removed. He developed an infection. He was sent back to see Dr. Patterson for further treatment. Dr. Patterson provided an ACL brace. No rehabilitation was provided by DOC. Claimant testified that he had difficulty moving. He had a fall and tore his meniscus again. Claimant was referred back to Dr. Patterson. It was recommended by Dr. Patterson that another surgery be performed. Claimant testified that he did not want surgery performed by DOC medical staff or contractors. Claimant testified that he needs surgery on both knees. Claimant testified that he did what he could at that time to get well. His knees continue to bother him.

Concerning his back, Claimant testified that on one morning he could not get out of bed. He was given medications and a shot in his back. He could not walk for three weeks. Claimant was taken to Denver General Hospital for an evaluation. He received an MRI which he indicated reflected problems in his back at L-4, L-5 and S-1. He was told that he had bulging disks. He also was advised that he had spinal stenosis and arthritis. Claimant testified that he was able to get the feeling back in his back and was able to walk again.

Claimant stated that he began doing his own rehabilitation. His back went out again, and he was sent to a specialist. He received shots in his back. After he transferred to FLCF, his back went out again. Claimant testified that he was given a wheelchair for a brief period of time. Claimant testified that he had to crawl out of the door to get to the medical line. Claimant stated that he cannot walk for a period of time after his back goes out. While at LCF, Claimant had requested a wheelchair, but that request initially was denied. He has had to crawl on several occasions. He has received a temporary wheelchair to use on a few occasions.

Concerning his feet, Claimant testified that he had to buy his own tennis shoes because of his large size (15eeee). He also was advised that his size of shoe was difficult to find even for state boots. Claimant indicated that he has to change tennis shoes every sixty to ninety days. The tennis shoes have not been allowed in all facilities. Claimant also stated that it was difficult for him to travel because he would lose leg functions.

At one point, Claimant had an egg crate mattress and extra pillows. According to Claimant, these were taken from him for no reason.

On cross-examination, Claimant indicated that he does yoga for exercise and plays a little basketball. He tries to get to the gym and does lift weights. Claimant testified that his back condition comes and goes.

In response to a question concerning work in DOC, Claimant stated that he was a pusher during the time period of 2003 to 2006. His knee has not been fully rehabilitated. He acknowledged that he would never have surgery again in DOC. He also indicated that he needs a handrail in the shower for protection from falls. His knee continues to create problems for him.

Claimant indicated further that he had hurt his back after a fall in 1996-97. He cannot play handball anymore. Claimant testified that he can play basketball to the extent of shooting baskets. He cannot climb stairs, but can walk to the chow hall. He stated that he is in pain when he walks. His shoulder also hurts from being dislocated, but he will not have surgery while in DOC custody. Claimant stated that he really is in need of three separate surgeries but will not allow these to be done while in DOC custody.

Defendants presented Dr. Orville Neufeld, D.O. as an expert witness. Dr. Neufeld testified that Claimant has a very large shoe size. Tennis shoes were not medically necessary in his opinion. Claimant has been given insoles for his shoes. Claimant does have bunions and flat feet.

Dr. Neufeld testified that there are back problems that come and go. Claimant will continue to have problems with his back. He does have degenerative disk disease and arthritis. His knee will continue to cause problems.

Defendants also submitted a number of pages of Claimant's medical records. His initial intake sheet from February 6, 1995 at DRDC indicated knee and foot problems. *Exhibit B*. Claimant had restrictions for lower tier and lower bunk. *Exhibit C*. Other medical records reflected the on-going knee problems that Claimant was facing. *Exhibit D; M*. No surgical notes were included, but post–operative notes reflect that surgery was completed on the knee. *Exhibits T;V*. The medical records also reflected foot problems. *Exhibits K; O; X; Y*.

The medical records confirmed that Claimant again had injured his knee. *Exhibit AM*. Claimant refused further surgery on his left knee, and that was reflected in his records. *Exhibit AO*. The records also reflect that Claimant did hurt his shoulder. *Exhibit AS*. This occurred while playing basketball.

**III.**

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

Claimant must show that on or before August 27, 2003 he had a recognized impairment as set forth in the Settlement Agreement. Claimant must show further that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act that occurred on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant filed his claim form and checked only the box for mobility impairment. The evidence presented by Claimant dealt with his claim of mobility impairment.

During the hearing, both Claimant and Defendants spent an extraordinary amount of time discussing Claimant's present condition. There was limited evidence presented concerning the period of time from 1995 to August 27, 2003. Absent proving by a preponderance of the evidence that a disability existed on or before August 27, 2003, Claimant is precluded from raising any allegations concerning post-August 2003 conduct by DOC staff.

In order to determine whether Claimant was or is disabled, an examination must be made under the appropriate statutes. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

The evidence in this case falls into two time periods. The first time period encompasses Claimant's entry into DOC custody in 1995 up to the time of his recovery from his knee surgery. The second time period relates to the period from roughly late 1997 to the present. Though Claimant was somewhat vague about the events during the first time period, the documentary evidence indicates that Claimant did have significant problems with his left knee. He had difficulty walking and was in pain. Surgery was performed on the left knee, and Claimant improved to the point that he was able to exercise and play some basketball.

Claimant reinjured his knee in 1999, and he advised DOC medical staff that this was as a result of playing basketball. Claimant has had further surgery recommended to him, but he has declined further surgery while in DOC custody. That is Claimant's right, and he expressed his

concerns about further surgery while in DOC care. The problem is that it precludes Claimant from being able to improve his mobility. The evidence does reflect that Claimant has fallen on occasion, and this appears to be related to his knee instability. The Special Master would note that Claimant has expressed concern about his back condition, but the Special Master does not find that his back has affected his activities of daily living. The same is true concerning his foot conditions relating to flat feet and bunions.

The evidence establishes that Claimant was mobility impaired during the period of 1995-1997. This is the period of pre-surgery on the left knee until completion of rehabilitation. The evidence does not establish that he remains mobility impaired. Further, there is no basis for claiming mobility impairment if surgery would repair the torn meniscus and allow Claimant to ambulate better.[2] The knee injury in 1999 may be repairable by surgery. Claimant has elected not to have any further surgeries.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** There is no evidence that Claimant was not qualified to receive services and benefits from DOC. As an example, Claimant was not disqualified due to disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The vast majority of Claimant's complaints relate to the medical care that he has received over the years in DOC custody. Claimant has no faith in such care and has been unwilling to put himself at any risk with further surgery by DOC medical staff or contractors.

The evidence does reflect that Claimant did receive medical care while in DOC custody. That is particularly true for the period of 1995 to 2000. The quality of the care is disputed by Claimant. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care, including claims related to lack of proper pain killing medicines.

---

[2] The Special Master would note that medical records reflect that Claimant has continued to play some basketball. This has not been denied by Claimant, but has been commented upon as just going to the gym. The ADA does not contemplate someone being mobility disabled when they can play some basketball.

This is an extremely close case. Claimant has discussed problems that he had during the period of 1995 through 1997. He had restrictions, was unable to obtain a wheelchair, and had to walk to various locations in DOC facilities while recuperating. Neither side has presented with any historical clarity what truly happened. The Special Master does find that during that period Claimant was denied some services and was not given appropriate treatment. Claimant has proven his case for this discrete time period.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant suffered in the time period of 1995 to 1997 anxiety and pain. He will be awarded damages in the amount of $250.00.

IT IS HEREBY ORDERED that the claim of Claimant Brandon Baxter Tyler is granted, in part, and he is awarded damages in the amount of $250.00; and

IT IS FURTHER ORDERED that the remainder of the claim of Claimant is dismissed, as Claimant has failed to prove each of the four questions set forth by Judges Nottingham and Kane and that he was the victim of discriminatory conduct prohibited by the ADA and Rehabilitation Act after August 27, 2003; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before July 21, 2008.**

SIGNED this 12th day of May, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

Richard M. Borchers
Special Master