RE: OBSTRUCTION & CRIMINAL CONTEMPT, INTENTIONAL MURDER

CASE: 92-N-870 / 96-N-343   MONTEZ V. OWENS   CLAIMANT #03-138 KEVIN BRETZ #46584

Dear Honorable Judge Kane Jr.

Dear Sir, Please excuse my informal letter today, but my case manager & attorney have asked me to write you to address the issues you'll find enclosed below.

I need to make you fully aware of the systematic abuse of C.D.O.C. & the Medical Department. On 05/08/08 I'm told I'm terminal & my federal court order will NEVER be honored. I'll be dead before C.D.O.C. has to be in court.

On 07/23/07 Honorable Judge Davidson issued an order that expressed a language to read "Promptly Treat - Outside Orthopedic & Neurosurgery Specialists — as the specialists direct."

This language is clear & absolute, but C.D.O.C. & its medical dictator Dr. Franz / P.A. Webster / P.A. Stock & Rev. Dowis have decided to manipulate this & alter as they wish, at will.

On 11/01/07 (Promptly? Not) I had X-rays done, which showed I've been forced to walk on a broken leg. My ACL is not normal, the bone/cap are crushed. My Fibular? bone is broken from my knee & ankle, stabbing my calf & pushing out with every step.

On 11/02/07 I seen a long term associate doctor connected to Dr. Franz & Sterling Corr. Fac., not an outside independant - bias orthopedic specialist. Dr. Darrel Fenton D of 1405 S. 8th Ave., ste #101 Sterling, Co. 80751 seen me & he ordered pain medication, leg, ankle, knee braces, cane, ortho shoes.

Nothing was (to date) complied with, in Dec. 05th 2007 I was advised Dr. Franz & P.A. Webster, P.A. Stock, had a phone conference with Dr. Fenton D.O. & his order's that had been ignored totally for (2) two months had re-wrote my orders to meet Dr. Franz specific wants & endangers my health & places my life at risk now of death...

Dr. Fenton had ordered medication "Oxycotin" 20mg as such because of my advanced liver cancer (Hep-C) issue. He had stated he did not want Sterling to change that as before on others.

Dr. Franz did so, she ignored the order over 2 months, then she changed it to Vicoden. This medication under special warnings outline I should not take this, nor is it safe & put my life at risk now, risk for death.

On 05/08/08 P.A. Webster told me my liver is shutting down, my cancer is so advanced I have maybe 1 to 2 years left to live. That without a liver transplant I will not live more than 4 years max. In CDOC I will not receive a liver transplant.

Also because of my terminal status now, I will never receive my knee replacement, or federal orders. I will be dead before the courts could enforce such an order now.

I'm asking you today, to order & enforce some new medical treatments. I would like to be taken to Aurora South Hospital in Denver, so that all my medical needs are met, per their independant doctors dictate, feel are my needs.

Second, I would like an order for CDOC to transfer me to Fort Lyons Medical Facility, where I can receive long/short term care & needs can be met. Fort Lyons is the ONLY facility in CDOC that would meet my needs for care, medications. My case manager said he has & would support this humanitarian move, but he feels it will need to be a federal court order...

HE SAID HE WOULD ALSO HAVE NO TROUBLE TALKING TO A FEDERAL JUDGE SHOULD ONE CONTACT HIM HERE ON AN OFFICIAL LEVEL SUNDAY THRU THURSDAY IN CELL HOUSE 4 HERE. HIS NAME IS MR./LT. MANNING PHONE # 970-521-5010. #8419

IN THE FIRST WEEK OF JANUARY I WAS TRANSFERED TO D.R.D.C. & THEN TO C.T.C.F. INFIRMARY TO AWAIT AN APPOINTMENT WITH DR. DEXTER D. KOONS M.D. P.C. OF 400 WEST 17TH ST. PUEBLO, CO. 81003 (719)296-6872. AT THAT TIME THE DOCTOR HAD NO MRI RESULTS FROM STERLING CORR. FAC. MEDICAL. HE ASK WHAT WAS WRONG, I TOLD HIM L4-L5-S1 DISC's & SEVER PAIN. WE TALKED FOR 1 MINUTE & HE LEFT TELLING ME HE CAN DO AN EPIDURAL FOR PAIN & LOOK AT SURGERY NEXT APPOINTMENT. NOTHING DONE, NO EPIDURAL, P.A. WEBSTER WOULD NOT AUTHORIZE BY PHONE.

ON 03/25/08 I WAS ONCE AGAIN SENT TO D.R.D.C. THEN TO C.T.C.F. INFIRMARY WHERE I STAYED OVER 3 WEEKS TO SEE DR. KOONS ON MY BACK SURGERY ISSUE. IN THE 4TH WEEK I WAS TAKEN TO HIS OFFICE & TOLD DR. FRANZ / P.A. WEBSTER HAD DISCUSSED MY NEEDS & THEY AGREED TO 3 EPIDURALS A YEAR FOR 2 YEARS, NO SURGERY ON BACK TO FIX THE DAMAGE.

I TOLD HIM I WANTED TO REVIEW THE M.R.I. REPORTS & TALK OVER (LONG TERM) SURGERY. I GAVE HIM THE COURT ORDER & HE COPIED IT, BUT TOLD ME HE & STERLING HAVE DECIDED ON TREATMENT & HE WORKS FOR STERLING NOT ME OR COURT ORDER. HE'S A LONG TIME CDOC SPECIALIST & THEY DICTATE MY MEDICAL NEEDS. HE WILL NOT DISCUSS MY MEDICAL ISSUES HE & DR. FRANZ HAVE SETTLED ON A PLAN FOR 2 YEARS. THAT IS NOT PER COURT ORDER...

C.D.O.C. & DR. FRANZ, P.A. STOCK, P.A. WEBSTER & OTHERS ENCLUDING DR. FENTON, DR. KOONS, HAVE IGNORED SPECIFIC LANGUAGE OF JUDGE DAVIDSON & THE COURT ORDER SCOPE. I'M THE CLIENT, NOT DR. FRANZ OR C.D.O.C., THEY HAVE ALREADY BEEN REMOVED FOR ABUSE IN

-4-

my previous care & medical treatment. Hence outside specialists & directions of specialists. To remove them from any involvement or control, abuse.

Upon my return P.A. Webster tells me my HEP-C is so advanced I have 1 to 2 years to live. Thus meaning for Dr. Koons comment 3 epidurals over the next 2 years only. C.D.O.C. & their doctors of choice have decided a bandaid of care until death of myself release them of obligations of court order...

I'm told my "Motion to Compel" has not yet been set to here. The Assist. Attn. General has until 06/08/08 to answer. I'm sure they will file fabricated LIES as before. My motion for contempt, obstruction, false documents has NEVER been heard. There over 2 years old now on facts. Four staff got on the stand & lied, I proved such & yet nothing has been done to make CDOC staff held accountable. Two staff intentionally went out of their call of duty to obstruct a court order & to date this court has ignored my motions to hold a hearing & charge them per-statute.

C.D.O.C. know with past experience with this court, they get a free pass or slap on the wrist. They are rarely held accountable individually & the CDOC will fight for years at whatever action is taken.

Judge, I was crippled by their neglect, I'm now a terminally ill prisoner by their neglect. I was awarded a $1500.00 compensation for malpractice/treatment that in its self is extreamly light. I'm forced to walk on a broken leg, my fibula bone is broken in 2 places, knee & ankle now. I've had to suffer extreme pain where suicide was one of my thoughts to find relief, so $1500.00 for a broken leg seems silly...

I dont wish to sound ungreatful, but I find the lack of compliance extremely sever & high now. CDOC refuse to honor the courts orders. They no doubt have an excuse or fabricated paper trail to show something. But the facts are very clear.

Therefore I ask for a formal (in person) hearing before this court to address my case & court order. Id also like to ask the courts to review the enclosed docu-ment & consider the below requests.

Respectfully Submitted
Kevin M. Bietz

Request Orders

1. Taken to Aurora South Hospital by S.C.F. transport to address all medical needs. That Im retained at Aurora South Hospital for such treatment/care/surgery.

2. That S.C.F. transfer me to Fort Lyons Medical Facility where Ill remain until my death.

3. That S.C.F. follow any & all medications per orders, without interference or obstructions. Or this court hold every party responcible for such.

4. That this order read immediately & remove the CDOC & S.C.F. from involvement except arrangements of appointments. "For security reasons". And damages, increased to an amount fair to this pain & suffering.

*Brand name:*

# Vicodin

*Pronounced: VY-koe-din*
*Generic ingredients: Hydrocodone bitartrate, Acetaminophen*
*Other brand names: Anexsia, Co-Gesic, Hydrocet, Lorcet, Lortab, Zydone*

## Why is this drug prescribed?

Vicodin combines a narcotic analgesic (painkiller) and cough reliever with a non-narcotic analgesic for the relief of moderate to moderately severe pain.

## Most important fact about this drug

Vicodin can be habit-forming. If you take this drug over a long period of time, you can become mentally and physically dependent on it, and you may find the drug no longer works for you at the prescribed dosage.

## How should you take this medication?

Take Vicodin exactly as prescribed. Do not increase the amount you take or the frequency without your doctor's approval. Do not take this drug for any reason other than the one prescribed.

Do not give this drug to others who may have similar symptoms.

- *If you miss a dose...*
  If you take Vicodin regularly, take the forgotten dose as soon as you remember. If it is almost time for your next dose, skip the one you missed and go back to your regular schedule. Do not take 2 doses at once.
- *Storage instructions...*
  Store at room temperature in a tightly closed container, away from light.

## What side effects may occur?

Side effects cannot be anticipated. If any develop or change in intensity, inform your doctor as soon as possible. Only your doctor can determine if it is safe for you to continue taking Vicodin.

- *More common side effects may include:*
  Dizziness, light-headedness, nausea, sedation, vomiting

If these side effects occur, it may help if you lie down after taking the medication.

- *Less common or rare side effects may include:*
  Allergic reactions, anxiety, blood disorders, constipation, decreased mental and physical capability, difficulty urinating, drowsiness, fear, itching, mental clouding, mood changes, restlessness, skin rash, slowed breathing, sluggishness

## Why should this drug not be prescribed?

If you are sensitive to or have ever had an allergic reaction to hydrocodone or acetaminophen (Tylenol), you should not take this medication. Make sure your doctor is aware of any drug reactions you have experienced.

## Special warnings about this medication

Vicodin may make you drowsy, less alert, or unable to function well physically. Do not drive a car, operate machinery, or perform any other potentially dangerous activities until you know how this drug affects you.

Use caution in taking Vicodin if you have a head injury. Narcotics tend to increase the pressure of the fluid within the skull, and this effect may be exaggerated by head injuries. Side effects of narcotics can interfere in the treatment of people with head injuries.

Use Vicodin with caution if you have a severe liver or kidney disorder, an underactive thyroid gland, Addison's disease (a disease of the adrenal glands), an enlarged prostate, or urethral stricture (narrowing of the tube carrying urine from the bladder).

Older adults and those in a weakened condition should be careful using this drug, since it contains a narcotic.

Narcotics such as Vicodin may interfere with the diagnosis and treatment of people with abdominal conditions.

Hydrocodone suppresses the cough reflex; therefore, be careful using Vicodin after an operation or if you have a lung disease.

High doses of hydrocodone may produce slowed breathing; if you are sensitive to this drug, you are more likely to experience this effect.

## Possible food and drug interactions when taking this medication

Hydrocodone slows the nervous system. Alcohol can intensify this effect.

If hydrocodone is taken with certain other drugs, the effects of either may be increased, decreased, or

altered. It is especially important to check with your doctor before combining Vicodin with the following:

Antianxiety drugs such as Valium and Librium
Antidepressants such as Elavil, Nardil, and Tofranil
Antihistamines such as Tavist
Major tranquilizers such as Thorazine and Haldol
Other narcotic analgesics such as Demerol
Other central nervous system depressants such as Halcion and Restoril

### Special information if you are pregnant or breastfeeding

The effects of Vicodin in pregnancy have not been adequately studied. Do not take this drug if you are pregnant or plan to become pregnant unless you are directed to do so by your doctor. Drug dependence occurs in newborns when the mother has taken this drug regularly prior to delivery. If you take it shortly before delivery, the baby's breathing may be slowed. Acetaminophen does, and hydrocodone may, appear in breast milk and could affect a nursing infant. If this medication is essential to your health, your doctor may advise you to discontinue breastfeeding your baby until your treatment is finished.

### Recommended dosage

ADULTS

Your doctor will adjust the dosage according to the severity of the pain and the way the medication affects you.

The dosages given below are for Vicodin and Vicodin ES only. If your doctor prescribes other brands, your daily dose may vary.

The usual dose is 1 or 2 tablets every 4 to 6 hours as needed for pain. Take no more than 8 tablets of Vicodin per day. For Vicodin ES, the maximum is 5 tablets per day.

CHILDREN

The safety and effectiveness of Vicodin have not been established in children.

### Overdosage

Any medication taken in excess can have serious consequences. A severe overdose of Vicodin can be fatal. If you suspect an overdose, seek emergency medical treatment immediately.

■ *Symptoms of a Vicodin overdose include:*
Blood disorders, bluish tinge to skin, cold and clammy skin, extreme sleepiness progressing to a state of unresponsiveness or coma, general feeling of bodily discomfort, heart problems, heavy perspiration, kidney problems, limp muscles, liver failure, low blood pressure, nausea, slow heartbeat, troubled or slowed breathing, vomiting

*Brand name:*

## Vicoprofen

*Pronounced: VY-koe-pro-fen*
*Generic ingredients: Hydrocodone bitartrate, Ibuprofen*

### Why is this drug prescribed?

Vicoprofen is a chemical cousin of the well-known painkiller Vicodin. Both products contain the prescription pain medication hydrocodone. However, while Vicodin also includes acetaminophen (the active ingredient in Tylenol), Vicoprofen replaces it with ibuprofen (the active ingredient in Advil).

Vicoprofen relieves acute pain. It is generally prescribed for less than 10 days, and cannot be used in the long-term treatment of osteoarthritis or rheumatoid arthritis.

### Most important fact about this drug

Vicoprofen can be habit-forming. If you take this drug over a long period of time, you can become both mentally and physically dependent on it, and you may find that it no longer works for you at the prescribed dose.

### How should you take this medication?

Take Vicoprofen exactly as prescribed. Do not increase the amount you take or the number of doses per day without your doctor's approval. Vicoprofen should be used only for pain—and only as needed.

■ *If you miss a dose...*
Take it as soon as you remember. If it is almost time for your next dose, skip the one you missed and go back to your regular schedule. Never take 2 doses at the same time.

■ *Storage instructions...*
Store at room temperature in a tightly sealed, light-resistant container.

# Secrets behind bars

## Case files reveal gangs, drugs, possible liaison

**By Sara Burnett**
ROCKY MOUNTAIN NEWS

A guard at Limon Correctional Facility who had a "more than just professional" relationship with an inmate tipped him off to an upcoming drug bust — information that later got him killed, authorities say.

Now two men are facing the death penalty in the 2004 killing of inmate Jeffrey S. Heird, who prosecutors say was stabbed 20 to 30 times because he didn't warn gang members about the bust.



**Heird, a prison inmate, was stabbed to death in 2004.**

The guard, Gina Kirkland, 30, denied the relationship when she took the witness stand in a preliminary hearing last year. She also said she never leaked information to Heird. Reached by phone this week, she declined to comment.

Department of Corrections spokeswoman Katherine Sanguinetti said that Kirkland was moved to another position while an internal investigation was conducted, but that Kirkland "is no longer with us."

The possible relationship between the married guard and an inmate serving time for kidnapping and murder is just one revelation contained in the case files of accused murderers David Bueno and Alejandro Perez.

The documents, filed in Lincoln County court, paint a picture of a prison occupied by more than 170 gangs, where contraband was regularly coming in and the drug trade lucrative enough that a disruption of business may be reason to kill.

### Different stories

Heird was convicted of kidnapping and killing a gas station attendant in Cortez in 1991.

In prison, he was a power weight lifter who worked for a while as the facility's plumber. He met Kirkland when he went to the visiting area to do plumbing work, she testified during a 2006 hearing for Bueno and Perez.

Kirkland, whose husband still works in the prison's transportation department, conducted background checks on visitors and from time to time, monitored phone calls and visits, she said.

Kirkland testified that she knew Heird for about a year and a half before he came to work as one of her porters in the visiting area. She also said they never had a sexual or more than professional relationship.

Taking the witness stand immediately after Kirkland, Heird's mother, Mary Foote, testified she spoke with her son twice a week while he was in Limon, and that they talked about his relationship with Kirkland.

She said the two had a relationship for one or two years. She didn't think the relationship was ever sexual, but said it was "more than an employee-inmate relationship."

Heird and Kirkland had "deep discussions," including one about Heird wanting Kirkland to have his child, Foote said, according to a transcript of the proceeding. She also said she was troubled by the relationship because if prison authorities found out about it, her son would be in trouble.

"It's like if they had gotten caught having sex or something, then (Heird) — they could have hollered rape and (Heird) would have faced charges," Foote said.

### Keeping a secret

In January 2004, Heird told Michael Snyder, his friend and fellow inmate, that he had learned from Kirkland that one of their friends was going to be arrested, Snyder testified. Heird was afraid because he didn't want to get Kirkland in trouble, Snyder said.

Asked by an attorney why Heird was worried about his boss, Snyder replied, "Probably because she wasn't supposed to be relaying information like that to any inmates."

Kirkland testified that she never told Heird anything. She speculated that he may have overheard her talking to other prison staff about the impending bust.

"I think he put two and two together," she said.

The investigation involved white supremacists accused of using a pickup truck that frequently entered the facility to smuggle drugs inside, said Lt. Timothy Smelser, a prison gang investigator.

A group of supremacists, along with other gangs, "owned" parts of the truck. The supremacists stashed their drugs inside the tailgate section, Smelser said.

He also said Heird was a member of the Aryan Brotherhood, which was aligned with the supremacists.

Both Snyder and Heird kept the information to themselves, opting not to warn their friend or any of his associates, Snyder testified. A few days later, three men — two of them supremacists — were arrested, Smelser said.

The bust hurt drug business inside the prison because it put an end to a source of supply, prosecutors say.

So when Snyder let it slip in March 2004 that he and Heird knew about the bust before it happened — and didn't alert anyone — other inmates were angry.

Prosecutors say that was the motive behind Heird's death.

On March 28, 2004, guards found the 38-year-old Heird face-down on his bed inside his cell. He had been stabbed with a heavy-gauge wire resembling an ice pick, authorities said.

He was one of four inmates murdered in Colorado prisons that year.



ROCKY MOUNTAIN NEWS

### Limon Correctional Facility

- **Opened:** April 1991
- **Cost:** $51.4 million
- **Inmates:** 953
- **Staff:** 315
- **Security:** Level 4, second highest (Level 5 is the highest level of security in Colorado prisons).

Sources: Colorado Department of Corrections, Rocky Mountain News archive

### Inmate deaths in Colorado prisons

**MURDER/HOMICIDE**
| Year | |
|---|---|
| 2002 | 1 |
| 2003 | 1 |
| 2004 | 4 |
| 2005* | 2 |

**SUICIDE**
| Year | |
|---|---|
| 2002 | 8 |
| 2003 | 5 |
| 2004 | 4 |
| 2005 | 6 |

**NATURAL/ACCIDENTAL**
| Year | |
|---|---|
| 2002 | 48 |
| 2003 | 45 |
| 2004 | 37 |
| 2005 | 58 |

Source: Colorado Department of Corrections
*Most recent year for which data are available

Sanguinetti, the Department of Corrections spokeswoman, said staff "work 24-seven" to keep prisons safe for visitors, employees and inmates. But she said it is not unusual for contraband — such as drugs — to be smuggled inside.

"Unfortunately, yes, it does occur," Sanguinetti said.

### Strict racial lines

Bueno and Perez were indicted for the killing in December 2005. In October 2006, District Attorney Carol Chambers announced her office was seeking the death penalty.

Prosecutors allege Bueno and Perez are members of a Hispanic gang who were dealing drugs in the prison, and that they killed Heird because he didn't protect their business. In another court filing, they said the supremacists enlisted other gang members to help "clean up their ranks."

Bueno and Perez have pleaded not guilty. Their attorneys argue that prosecutors' theory of the crime doesn't make sense because several witnesses testified that it's rare for violence to occur across racial lines in prison.

Hispanics don't attack blacks or whites, for example, and if a white person needs to be taught a lesson, it's another white person who does the job, witnesses said. So it's most likely that other white supremacists — not the Hispanic defendants — committed the killing, defense attorneys argue.

The lawyers also say evidence against their clients is weak, particularly since much of it relies on witnesses with criminal records who are motivated to say what prosecutors want to get a better prison assignment or a lighter sentence.

Prosecutors counter that after the killing, Bueno and Perez tried to get witnesses killed — a charge defense attorneys deny, but one prosecutors say shows their guilt.

MEDICAL

DC FORM 850-4A (10/04)

## COLORADO DEPARTMENT OF CORRECTIONS OFFENDER GRIEVANCE FORM

Grievance Number C-SF07/08-451   STEP (Circle One) (1) 2 3   ADA? Yes ☐ No ☒

NAME: BRETZ, KEVIN MARK   DOC NO. 46584   FACILITY: SCF

Instructions:
1. FILL OUT IDENTIFYING DATA LEGIBLY IN SPACE PROVIDED;
2. CLEARLY STATE BASIS FOR GRIEVANCE OR GRIEVANCE APPEAL;
3. STATE SPECIFICALLY WHAT REMEDY YOU ARE REQUESTING;
4. ATTACH A COPY OF PRIOR STEP(S) AND RESPONSES IN GRIEVANCE PROCESS.

Subject of Grievance and Requested Remedy: THIS IS AGAINST DR. FRANTZ, DR. NEUFELD, BEVERLY DOWIS, P.A. SITE, P.A. WEBSTER, MEDICAL CLERK WILSON & S.C.F. MEDICAL DEPT. STAFF, NURSES. FOR CRIMINAL CONTEM OBSTRUCTION OF A U.S. DISTRICT COURT ORDER UNDER MONTEZ CASE ISSUED 07/23/07 BY JUDGE DAVIDSON. (SEE ORDER). SCF/CDOC/MEDICAL WERE ORDERED TO GET ME OUTSIDE INDEPENDANT MEDICAL FOR ORTHO/NEURO, THEY WERE ORDERED TO FOLLOW THEIR ORDERS IN TREATMENT & IN PAIN MEDICATIONS AS PERSCRIBED. SCF HAVE NOT COMPLIED WITH DR. D.T. FENTON ORDERS FOR 20mg. OXYCOTIN 2× PER 12 hr. × 30 DAYS, NOR HAVE THEY SET UP ORTHO FITTINGS PER ORDER NOR HAVE YOUR MEDICAL DEPT. SET UP NEURO YET. ORDER (CDOC IS ORDERED TO SEND MR. BRETZ TO OUTSIDE ORTHOPEDIC & NEUROSURGERY SPECIALISTS FOR EXAMINATION & TO PROMPLY TREAT MR. BRE AS THE SPECIALISTS DIRECT.
S.C.F. & ABOVE STAFF HAVE REFUSED TO COMPLY TO DATE, THEREFORE I HAVE FILED NOT TO JUDGE & ASKED EACH OF THE ABOVE BE ARRESTED & CHARGED WITH CRIMINAL CONTEMPT COURT & OBSTRUCTION OF FEDERAL COURT ORDER BY NON-COMPLIANCE TO MEDICATION ORDER "OXYCOTIN 20mg 1 of 12 hrs. #30 AS ORDERED.
REMEDY: COMPLY WITH EXACT ORDERS, REMOVE ABOVE NAMED STAFF FROM CDOC OR I WILL SEEK MORE DAMAGES & CRIMINAL CHARGES AGAINST EACH STAFF MEMBER NAMED ABOVE.

DATE: 12/05/07   OFFENDER SIGNATURE: Kevin Mark Bretz #46584

DATE RECEIVED: 12/11/07   RESPONDING STAFF SIGNATURE & ID: JoAnn Stock #9314

RESPONSE:
All of your requests which have been forwarded to DOC have been followed. The consults have been made, the ortho devices ordered. We cannot control the schedules on the specialists, and have to wait for them to be able to work you in. You were scheduled for a CT on 10/24/07 which was canceled due to transport issues, then done on 11/01/07 along with x-rays. You were also scheduled on 10/24/07 for a Neuro consult which is scheduled but has not happened yet which is up to the Neurologist. You saw the Ortho doctor on 11/02/07 and meds were ordered. You are scheduled for two MRIs soon, and a lace up ankle brace has been ordered for you. Your care has been appropriate. Grievance denied.

THEY IGNORED MED'S 2 MONTHS THEN CHANGED THEM 12/06/07 TO VICODIN.

If you are dissatisfied with the response to this grievance, you may obtain further review by submitting the next step to the appropriate individual.

DATE: 12/18/07   SIGNATURE/PRINT NAME & STAFF ID #: JoAnn Stock PA-C JoANN STOCK #9314

RECEIPT: I acknowledge receipt this date of a complaint from the above offender in regard to the following subject:
DATE: 12/6/07   SIGNATURE/PRINT NAME & STAFF ID #: M. Stephens M. Stephens 13055

RECEIPT: I acknowledge receipt this date of a response from the Department of Corrections, to this grievance.
DATE: 12/25/07   OFFENDER SIGNATURE/PRINT NAME & DOC #: Kevin Bretz KEVIN BRETZ #46584

Original: Department File/AIC   Copies: Working File, Administrative Head, Offender, Clinical Chart (clinical and ADA only)

Attachment "A"
Page 1 of 1

NO MED'S UNTIL 12/06/07, WHY?

Medical

DC FORM 850-4A (10/04)

# COLORADO DEPARTMENT OF CORRECTIONS OFFENDER GRIEVANCE FORM

Grievance Number C-SF07/08-451    STEP (Circle One) 1 (2) 3    ADA? Yes ☐ No ☒

NAME: BRETZ, KEVIN MARK    DOC NO. #46584    FACILITY: SCF

Instructions:
1. FILL OUT IDENTIFYING DATA LEGIBLY IN SPACE PROVIDED;
2. CLEARLY STATE BASIS FOR GRIEVANCE OR GRIEVANCE APPEAL;
3. STATE SPECIFICALLY WHAT REMEDY YOU ARE REQUESTING;
4. ATTACH A COPY OF PRIOR STEP(S) AND RESPONSES IN GRIEVANCE PROCESS.

Subject of Grievance and Requested Remedy: THIS IS AGAINST DR. FRANTZ, DR. NEUFELD, P.A. JOANN STOCK, P.A. WEBSTER, BEVERLY DOWIS, CLERK WILSON & S.C.F. MEDICAL DEPT. ON 12/25/07 C/M MANNING GAVE ME THE STEP I ON THIS ISSUE, THE RESPONSE AVOIDS ISSUES, FACTS, TRUTHS, THEY ARE MISLEADING, VAUGE & DONT ADDRESS FACTS WHICH SHOULD BE STRUCTURED IN A PROFESSIONAL RESPONSE. P.A. JOANN STOCK IS A MEMBER OF THE GRIEVANCE COMPLAINT & CANNOT BE IMPARTIAL. SHE HAS INTENTIONALLY IN A MALICIOUS FORM/FASHION DENIED, IGNORED, MEDICAL ORDERS (ENFORCED) BY FEDERAL COURT JUDGE DAVIDSON ON 07/23/07 WHICH OUTLINED SPECIFIC DIRECTIONS AS STRUCTURED IN STEP 1.
SHE HAS IGNORED DR. FENTON'S ORDER IN EVERY POSSIBLE FORM & ALTERED TO HER CHOICE OF VIEW. I HAVE NOT TO DATE RECEIVED PAIN MEDICATION OXYCOTIN 20MG. AS PERSCRIBED. I HAVE NOT BEEN FITTED FOR (KNEE) BRACE, BOTH (ANKLE) BRACES, ORTHO SHOES/BOOTS OR CANE. DR. FENTON NEVER ORDERED A (LACE-UP ANKLE BRACE) IN FACT HE SAID LACE-UP WOULD NOT MEET MY NEEDS.
AGAIN I HAVE NOT SEEN A NEURO SURGEON OR SPECIALIST OR DR. FENTON AFTER THE 30 DAYS AS HE HAD EXPRESSED ON 11-02-07 (FOLLOW-UP). TO ADDRESS ORDERS & NEEDS. P.A. STOCK HAS ONCE AGAIN VIOLATED MY FEDERAL COURT ORDER OR NEEDS. SHE HAS ALSO IN HER PROFESSIONAL FORM COMMITTED CRIMINAL CONTEMP & OBSTRUCTION OF A FEDERAL COURT ORDER & NOW FALSIFIED MEDICAL/GRIEVANCE RECORDS BY HER MIS-LEADING FALSEHOODS IN STEP 1 & DELIBERATELY LIED TO CLAIMANT & THE FEDERAL COURTS IN HER RESPONSE & SCOPE OF ANSWER IN STEP 1.
REMEDY: TO COMPLY WITH U.S. DIST. COURT ORDERS, MEDICAL NEEDS, PAIN MEDICATIONS PERSCRIBED BY DR. FENTON, BRACES, CANE & NEURO SPECIALIST & REMOVAL OF P.A. JOANN STOCK FROM SCF.

DATE: 1/1/08    OFFENDER SIGNATURE: Kevin Mark Bretz #46584  4-B-107

DATE RECEIVED: 2/19/08    RESPONDING STAFF SIGNATURE & ID: Horn RN 9013

RESPONSE:

Mr. Bretz- I have reviewed your medical chart and your step I grievance. On 11/2/07 Dr. Fenton, Orthopedic, gave you a consultation. He states in his plan, "At this time, a peroneal tendon stabilizing brace at the fibula would be considered and/or lace up type bracing with lace up boots". This brace was ordered, however when it was received it did not fit. Dr. Fenton also made a recommendation for OxyContin 20mg every 12 hours. This is not a medication that is available to inmates at SCF. On 12/6/07 Dr. Frantz met with Dr. Fenton and Dr. Fenton agreed that Vicodin would be an appropriate substitute for pain management because it would be temporary pending a neurosurgical evaluation. You were seen by Dr. Koons, neurosurgery, at which time an epidural injection was discussed. DR. FENTON TOLD ME I COULD NOT TAKE VICODIN......
Dr. Fenton requested to see you after the consultation with neuro.
This is all documented in your medical chart.
Per AR 850-04 Remedy: DOC employee, contract worker, or volunteer discipline/reprimand, damages for pain and suffering, and exemplary or punitive damages are not remedies available to offenders. This is not the venue to ask for a staff member to be dismissed.
I will ask a medical provider to examine your chart to determine if a cane is required and to find your medical shoes.

[Margin notes: ORDERED, NOT A RECOMMENDATION, AN ORDER...  NOT BIAS! NOT PER ORDER.]

If you are dissatisfied with the response to this grievance, you may obtain further review by submitting the next step to the appropriate individual.

DATE: 2/19/08    SIGNATURE/PRINT NAME & STAFF ID #: RN 9013 Holter

RECEIPT: I acknowledge receipt this date of a complaint from the above offender in regard to the following subject:
DATE: 1/8/08    SIGNATURE/PRINT NAME & STAFF ID #: M. Stephens M. Stephens 13055

RECEIPT: I acknowledge receipt this date of a response from the Department of Corrections, to this grievance.
DATE:    OFFENDER SIGNATURE/ PRINT NAME & DOC #

Original: Department File/AIC    Copies: Working File, Administrative Head, Offender, Clinical Chart (clinical and ADA only)

Attachment "A"
Page 1 of 1

# ACCOMMODATION RESOLUTION

| NAME | BRETZ, KEVIN | DOC # | 46584 |
|---|---|---|---|

| Qualifying Disability pursuant to the ADA/Rehabilitation Acts as determined by a medical provider & Chief Medical Officer | **NONE** |
|---|---|

**NO ACCOMMODATIONS NECESSARY AT THIS TIME**

A DOC medical provider and the Chief Medical Officer have **determined** that you do not have a qualifying **hearing, vision or mobility disability; you are not diabetic nor does your current medical condition rise to the level of a disability** pursuant to the mandates of the Americans With Disabilities/Rehabilitation Acts (ADA); therefore you are not entitled to accommodations.

If your condition(s) worsens and you feel you require accommodations to access programs, services & benefits, please complete and submit a new Request for Accommodation to the AIC.

To the extent you require clinical attention such as medication, assistive devices, restrictions, medical care or special clothing, your requests should be directed to Clinical Services where they will be evaluated for medical need. **The AIC is neither responsible for nor qualified to make recommendations related to clinical care.**

You have 30 days from the date this document is served upon you to file a grievance on any matter addressed in this Resolution.

Signature: Chief Medical Officer         Date: 11/7/07

Signature: AIC         Date: 11-13-07

Prepared: November 5, 2007

Original – AIC
Copies: 1-Warden
   7-Warden for distribution to the following:
   1-Working File, 1-Mental Health File, 1-Clinical Services File, 1-HSA, 1-Housing Unit Supervisor
   2 –Offender
   AIC will distribute 1-Department File, 1 – Chief Medical Officer

Revised 5-1-06

# STATE OF COLORADO

**COLORADO DEPARTMENT OF CORRECTIONS**

Office of Correctional Legal Services
2862 South Circle Drive, Suite 152
Colorado Springs, CO 80906-4195
Phone:   719.226.4245
Fax:      719.226.4249

Office of ADA Inmate Coordinator (AIC)



Bill Ritter, Jr.
Governor

Aristedes W. Zavaras
Executive Director

## MEMORANDUM

TO:        Offender Kevin Bretz, #46584
           SCF

FROM:  Cathie Holst, AIC  C Hoyhm

RE:        Accommodation Resolution

DATE:   November 14, 2007

*NEVER BEEN SEEN...*

You have been screened for a disability and our findings have been reduced to writing in an Accommodation Resolution. This has been signed by the AIC and the Chief Medical Officer (or designee) and represents the final determination of your disability status and any accommodations to which you may be entitled.

Enclosed with this memo are two copies of your Accommodation Resolution. These are **your copies for which you alone are responsible.** It will be necessary that you keep **one copy with you at all times so that you are able to document your need for any accommodations to which you are now entitled to any staff person requesting verification.** I suggest that you maintain the other copy in a safe place among your possessions. If either of these documents is in need of replacement due to loss, destruction, or wear and tear, there will be a $.25 (25 cents) charge for its replacement, payable to the Office of the AIC.

*Charging for copies of MED' Money of MED Records? Legal!*

Any attempt to alter the contents of your Accommodation Resolution will result in COPD charges against you.

Should the contents of your Resolution need to be amended at a later date, you will be issued replacement documents at no charge.

Thank you for your cooperation.

cc: AIC file.

absolutely no excuse to deny needed medical care to him. Mr. Bretz is in the custody of the state. He is unable to provide his own medical care and CDOC is charged with the responsibility to provide reasonable medical care. In this case, this has not been done.

### IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment be entered in favor of Claimant Bretz and against Defendants ordering CDOC to provide proper medical care to Claimant. Because of the unique circumstances of this case, CDOC is ordered to send Mr. Bretz to outside orthopedic and neurosurgery specialists for examination and to promptly treat Mr. Bretz as the specialists direct. The examination shall include his back, leg and ankle conditions.

IT IS FURTHER ORDERED that Claimant shall be awarded the sum of $1,500.00 as compensation for his maltreatment.

IT IS FURTHER ORDERED that Claimant be moved to a facility where he can receive care and where his restrictions can be accommodated.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before September 23, 2007** with the Clerk of the United States District Court at the following address:

> 901 19th Street
> Denver, CO 80294.

SIGNED this 23rd day of July, 2007.

BY THE COURT:

/s/ Richard C. Davidson
Richard C. Davidson,
Special Master

*[Handwritten annotations:]*
DR. FENTON'S OWN HAND WRITING →

Darrel T. Fenton, DO
SRM Surgical Sepecialites
1405 S. 8th Avenue, Suite 101
Sterling Co. ~~80728~~ 80751

oxycodtin 20mg
1 q 12 hrs #30

[Stamp: 08:10 Am 11/1/07 ... b/p mine]

7

Diplomat, American Board of  
Neurological Surgery

Diplomat, American Board of  
Pain Medicine

Dexter D. Koons M.D., P.C.  
400 West 17th Street  
Pueblo, Co. 81003  
(719) 296-6872

## EPIDURAL STEROID INJECTIONS

An epidural steroid injection is the injection of a small quantity of Cortisone into the epidural space. The epidural space is the space outside of the sac, which contains the spinal fluid and nerves, but inside the bony canal. The purpose of this injection is to reduce inflammation within the spinal canal. These injections are often used as an alternative to surgery for treatment of a "pinched nerve". The cause of the pinched nerve may vary from one individual to another. It could be related to a slipped disc or to a bone spur pressing against a nerve, or it could be the result of scar tissue, which has formed after back surgery.

The results of these injections vary. Many people will obtain long term pain relief lasting months or years. Others have shorter periods of benefit, and some do not seem to benefit from it at all. The injections are usually given in a series of from one to three injections over a six-week period of time. The injections are given by having the patient lie on his or her side with the knees drawn up. The back is then cleansed with an antiseptic solution and the skin and tissues immediately beneath the skin are injected with Novocain. The injection of the Novocain produces a slight aching discomfort, which lasts for a few seconds. After this, the skin and tissues beneath it become numb. When the spinal needle is inserted, the patient usually only feels pressure. If pain is felt, more Novocain can be injected.

The needle is advanced until it enters the bony canal but stops short of penetrating the sac that contains the spinal fluid. Because the sac is not penetrated, headache is not usually a complication following this injection. Usually there is no discomfort felt with the injection of Cortisone itself. Occasionally this is not true, but the amount of discomfort can be controlled by the rate of injection.

Cortisone is a natural substance which is produced by the body and which helps the body to heal itself when it has been injured. It can be taken by mouth, by intramuscular injection or by specific injection into an area where inflammation is present Therefore, it is common for patients to receive Cortisone injections into their shoulders, knee, etc., to treat various conditions.

There are a number of concerns with regard to the use of Cortisone. There are side effects associated with an excessive amount of Cortisone. These include fluid retention, increase in blood pressure, swelling, and the development of excess body hair, thinning and cracking of the skin and blood vessels with resultant easy bruisability. The complications are all related to the amount of Cortisone, which is given, and are extremely rare with these infections. We attempt to control the total amount of Cortisone given with each injection and the period of time, which these injections are given. Because Cortisone is a natural substance produced by the human body there is a mechanism within the body for the breakdown and excretion of the Cortisone. Therefore, after a sufficent period of time has passed, all of the Cortisone given by this injection has left the body. Any side effects, which occur as a result of the Cortisone administration, are similarly reversible once the Cortisone has been stopped.

There have been reported complications with these injections in the medical literature. These complications include paralysis, allergic reaction, infection, and increased pain, both in the back and the legs. These complications are extremely rare.

In summary, epidural steroid injections are a useful way of treating back and leg discomfort related to inflammation within the spinal canal. As with most procedures in medicine, there is potential risk, but the actual incidence of side effects ad complications is extremely low. There are many alternatives for treating

low back pain, and you need to discuss with your doctor all of these options. The choice as to whether or not you receive epidural steroids is yours alone to make.

I have read the preceding information and have discussed it with Dr. Koons. I have no questions concerning the procedure. I understand that there are risks involved and there is no guarantee for success. I hereby consent to the performance of the procedure as outlined on the preceding page.

Name _____  Date _____