IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-377
Category III
Claimant: Ronald Cordova, #57350
Address of Claimant: AVCF, P.O. Box 1000, Crowley, CO 81034-1000

---

# FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on January 24, 2008. This hearing was held at the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. Present were the following: Ronald Cordova (Claimant); and Willow Arnold, attorney for Defendants.

Claimant presented the following witnesses at the hearing: PA Ted Laurence; Sergeant Terry Jones; Stacy Buford; Case Manager Joe Vigil; and Claimant. Defendants called Dr. Orville Neufeld, D.O. Defendants offered into evidence Exhibits A thru AA, and all were admitted.

The hearing was resumed on May 12, 2008. Claimant called Cathie Holst as a witness. Each side then presented closing arguments. The case was taken under advisement. Claimant and Defendants were granted up to and including June 23, 2008 in which to submit additional documents for consideration. This order shall constitute the final action by the Special Master on this specific claim.

## I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During

the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

III. DEFINITIONS

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
>> 1. Is the claimant a disabled individual who is a member of the class?
>> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
>> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
>> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on October 15, 1987. He was a placed initially at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. On November 10, 1987, Claimant was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado. Claimant was released from that sentence on April 22, 1992 as the result of a reversal of his conviction.

Claimant returned to DOC custody on December 16, 1992 after another trial. He was placed at the Denver Reception and Diagnostic Center (DRDC) for evaluation and testing. He then was placed at AVCF on February 16, 1993. Except for temporary placements, Claimant has remained at AVCF since 1993.

In his initial claim form, Claimant checked only the boxes for mobility impairment and vision impairment. Claimant stated, in part, as follows:

> (Health History) I have injured or broke both of my legs in the knee and ankle. The first time was back in 1963 when I got out of the Navy. And I broke my

left leg again working at Colorado Prestress Company, 5801 Pecos St., Denver, Colorado. Over the years I have reinjured both knees or tore the ligaments, as to cause a disability. The doctor that was treating me at a clinic in Denver. The address was 18th Gaylord St. That is all I can remember. The Doctor said I have a permanent disability and recommended to State Compensation. But the State only gave 15% disability. I tried to get records from Colorado Prestress Co., by writing to them, but I never got a response back. I wrote a letter to State Compensation trying to get my records. They said they were lost or could not be located because of the injury was too old. I don't believe that, and I wrote back asking a supervisor to look into my case. But I never got back a response.....

   Over the years my injuries to my legs or knees continued to get worse. And I was going to have arthroscopy surgery because the cartilage or ligaments needed to be repaired, that is what I was told by doctors. Most of them I can't remember their names because they were company doctors. (Surgery was supposed to be done back in 1985). But I did not have surgery because of several deaths in my family at that time. My crime took place in May 1986 and I was found guilty. When I got sentenced in 1987 and sent to Colorado DOC, I explained my medical history to the doctors at the diagnostic unit in Cell House 5. I told them about my disability and the pain I suffer from the injuries. I was told I would get follow-up treatment at the facility I was sent to. This never happened. My convictions were reversed in 1991 and I got a new trial for the guilt phase, and found guilty again. I was sent back to prison, but this time I went through the new diagnostic center in Denver. I was seen by Medical PA's at the diagnostic center, they gave me blue neoprene knee braces until I was to get at a permanent facility and received follow-up care, treatment or surgery. The knee braces were approved by a doctor.

   .....On November 14, 2001 I was finally seen by a Doctor Patterson. I explained my medical history and told him I had been suffering and waiting all these years (at least 12) for follow-up treatment. He examined my legs, and told me it's too late to have surgery.

   The blue neoprene knee braces that were issued to me in 1993, were taken away by Officer Jones in a cell shake-down.....The knee braces were the only treatment I got for 18 years since I have been locked in prison, now they are gone and I can't bear the pain caused by arthritis and the cold we are subjected to.....

As to his vision impairment, Claimant stated, in part:

   My eyes have continued to get worse over the years. According to my eye exams, I have a problem with meibomian inspisations/infarus, myopia/presbyopia. Which I have no idea what that means, only that I never received any follow-up care or treatment.....I continue to get eye infections and see spots in my eyes that never go away. My eyes are very sensitive to sunlight and any bright light. That is why my personal doctor over the years prescribed prescription sun glasses.....Now Colorado DOC is trying to take away my prescription sunglasses and anti-reflective lenses.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated follows:

> I believe by DOC Medical Department failure to give me follow-up treatment for my legs, knees and ankles. I now have a permanent disability as to where no surgery would help. And because of the failure to give me follow-up care and treatment I now suffer with degenerative arthritis which has nearly crippled me. There are days I can't even walk because of the pain in both knees. The DOC has also kept the living units so cold, that it exacerbates the injuries. I have complained for years about the cold air in the cells and nothing has been done to help my condition. Plus over 14 years in delayed treatment has not helped my situation. I have to take a hot shower before I can really walk normal.

Claimant was provided supplemental forms to complete. In his supplemental form on mobility impairment, Claimant stated, in part:

> I am crippled because of the deliberate indifference DOC Medical has denied me over 10 years ago. There are times I must get in the hot shower before I can walk normal because of the pain....

In his supplemental form on vision impairment, Claimant restated his need for prescription sunglasses that have anti-glare protection. Claimant also attached to his supplemental forms several pages of his medical records. Dr. Jacob Patterson, M.D., an orthopedic surgeon, evaluated Claimant on November 15, 2001. His report states, in part:

> Impression: Longstanding ACL deficient left knee. I suspect he has some cartilage damage as well.
> Recommendation: Arthroscopy. Would not proceed to reconstruction because of age. I have explained that in detail to him. He does need an off-the-shelf hinged brace to manage his instability on the long-term on the left knee which will be permanent.

Claimant called a number of witnesses during the hearing. Ted Laurence is a physician's assistant at AVCF. He has worked at that facility since 2000. Mr. Laurence testified that he had not reviewed recently Claimant's medical chart. He was aware that Claimant has been seen by Dr. Patterson and that arthroscopic surgery had been recommended. Mr. Laurence testified that he had done an ADA evaluation of Claimant and found that he had knee problems. He was aware that Dr. Patterson had recommended a knee brace for Claimant. Mr. Laurence was aware also that Claimant had a knee brace but that had been taken from him.

In response concerning his vision issues, Mr. Laurence testified that photo gray or tinted glasses are prohibited in DOC facilities. He did not believe any macular degeneration was found in Claimant's eyes.

On cross-examination, Mr. Laurence indicated that Claimant was too old for a knee replacement. Claimant was never prescribed a wheelchair. Mr. Laurence did not believe that Claimant was ADA qualified. Any brace would have security issues. Claimant last had an eye exam in July 2007 and was determined to have 20/25 correctable vision in both eyes. Mr. Laurence did not believe that Claimant was visually disabled.

Sergeant Terry Jones is employed by DOC at AVCF. Sergeant Jones indicated that he had written up Claimant on several occasions for rule infractions. He had taken many things from Claimant over the years. He specifically recalled confiscating knee braces. He did not recall ever returning the knee braces.

Joe Vigil testified that he is the case manager for Claimant at AVCF. Claimant is not a management problem, with only four COPD convictions for the total time he has been in DOC custody.

Claimant called Stacy Buford as a witness. Ms. Buford is a correctional officer employed by DOC. She recalled dealing with Claimant and that he had complained about a back problem. She described Claimant as having a bad attitude. CO Buford stated that Claimant had worked in the kitchen cleaning tables. Claimant always had excuses and said he could not work because of his medical condition. CO Buford observed Claimant walking without any noticeable problems.

Claimant testified in his own behalf. He described the problems that he has had over the years with his knees and legs. He returned to Colorado in 1965 after serving in the United States Navy. He then began working at various jobs in the state. He injured both legs at work. He had his legs casted to allow them to heal. He had done physical therapy at various stages.

Claimant testified that he had vision problems for some time. He was seen by a physician who diagnosed him with macular degeneration. He had to give up welding due to the bright light from the arc and flame. Glare creates significant problems for him, and he has had to wear sunglasses over the years. When he arrived in DOC custody, he had dark glasses. At that time, DOC regulations allowed for inmates to order prescription glasses from an outside vendor.

Claimant described the dark glasses as necessary for medical purposes. He indicated that no knee braces were available at the time of the first hearing. He had received knee braces in the past. His knees will pop in and out. He has to walk carefully.

On cross-examination, Claimant testified that he watches television but really sees only the big picture with his glasses. He does do some exercises and tries to walk in the yard. He stated that he has difficulty going up and down stairs. He had requested a cane but had not been provided one. He has not had money to buy braces or sunglasses from the canteen. He indicated that clip on sunglasses do not provide sufficient protection for his eyes.

Defendants called as expert witness Dr. Orville Neufeld, D.O. He had reviewed Claimant's medical records. Dr. Neufeld noted that Claimant had an old left knee injury. The ACL had been

torn, but not completely. Claimant is able to walk, but does have difficulty going up and down stairs. Dr. Neufeld stated that the knee is probably painful. There is no prohibition for lifting, but that he should avoid heavy lifting and knee bends. There was no indication of any falls in the medical records. The last x-ray of the knee reflected that the bones appeared normal. Part of Claimant's present situation is due to the normal aging process.

Dr. Neufeld stated that Claimant could secure a neoprene brace from the canteen at his own expense. Hinged braces contain metal and are a possible security issue. Surgery will not work on Claimant's injury which is now several years old. Dr. Neufeld indicated that only the left knee needed a brace. The need for a brace for the knee has been re-evaluated over the years. There is some arthritis in the knees. He stated that Claimant had not been provided a cane or wheelchair over the years. Dr. Neufeld did not believe that Claimant was mobility impaired under the Settlement Agreement.

Dr. Neufeld testified further concerning the claim of vision impairment. According to Dr. Neufeld, the medical and optometry records reflect that Claimant is able to see and read with his glasses. He may need bifocals. Exams done recently reflect normal eyes, with tests for glaucoma being normal. Claimant's vision with glasses is corrected to 20/25 in each eye. Dr. Neufeld stated that his opinion was that Claimant had not presented a medical necessity for sunglasses. Dr. Neufeld did not believe that Claimant is vision impaired under the Settlement Agreement.

When the hearing resumed on May 12, 2008, Claimant was allowed to call Cathie Holst as a witness. Ms Holst testified that she has received training concerning the four disabilities set forth in the Settlement Agreement. She stated that Claimant has filed many grievances. Claimant may not have been screened in the past for an ADA evaluation. He was screened in 2007. The ADA evaluation was done by PA Ted Laurence. Ms. Holst stated that Claimant does not have any condition that rises to the level of a disability.

During the closing argument of Claimant, he advised that he now has diabetes. He had been so advised by medical staff on April 14, 2008. He stated that he has had side effects from diabetes. Claimant believed that he has been diabetic for several years.

## III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to be a member of the class, a claimant must have had an impairment, as recognized by the Settlement Agreement, on or before August 27, 2003. It was on that date that the Settlement Agreement was approved by Judge Nottingham. In other words, absent a showing of an impairment on or before that date, a claimant may not pursue his claim. In addition, each claimed disability must be examined separately.

**Mobility Impairment**: The initial question is one of whether he was mobility impaired on or before August 27, 2003. The evidence from both sides reflects that Claimant has lower extremity issues, as well as back pain.

Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

Claimant will be given the benefit of the doubt. The evidence reflects that he has trouble walking. This is determined to be a major activity of daily life. Claimant is a member of the class as mobility impaired.

**Diabetes:** There is insufficient evidence to establish that Claimant was diabetic on or before August 27, 2003. Claimant was diagnosed as having diabetes on April 14, 2008. Anything prior to that date concerning diabetes involves conjecture and speculation. Further, there is no evidence that Defendants ever considered Claimant to be diabetic and, therefore, no discrimination can be premised upon a belief that he was a diabetic. Claimant is not part of the class as a diabetic.

**Vision Impairment:** Claimant has argued that he is vision impaired because he needs photo-gray glasses. The evidence reflects that Claimant has been able to carry on his activities of daily living. Claimant is not a member of the class as vision impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** There was no evidence presented that indicated that Claimant was disqualified from DOC programs and services for reasons such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant has argued for the most part that he has received inadequate medical care. It is clear that he has received some care, but Claimant believes that it is inappropriate or deficient.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination

that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

The *Fitzgerald* case binds the hands of the Special Master, as well as the Court. The overwhelming number of concerns of Claimant relate to his medical care. The quality of that care must be examined in a different proceeding. It cannot be examined in a case brought under the ADA and Rehabilitation Act.

Claimant has not established that he was the victim of discrimination due to his mobility impairment. His concerns related mostly to the quality of medical care. He also has failed to prove that he was the victim of treatment that was different from that provided to others. As an example, Claimant indicated that there was cold air in his cells over the years. There is no indication or evidence that other cells in which non-impaired inmates were housed were warmer.

Claimant has the right to pursue his claims of medical malpractice and negligence through a separate lawsuit. Due to the *Fiztgerald* decision, he may not pursue those allegations through his claim.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Claimant Ronald Cordova is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before September 30, 2008.**

SIGNED this 25th day of June, 2007.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master