IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

  Plaintiffs,

-vs.-

BILL OWENS, et al.

  Defendants.

_____

Claim Number 03-391
Category III
Claimant: Michael N. Collins, #101218
Address of Claimant: CTCF, P.O. Box 1010, Canon City, CO 81215-1010

_____

**FINAL ORDER OF SPECIAL MASTER**
_____

  THIS MATTER came before the Special Master for hearing on March 6, 2008 and May 8, 2008 at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. Present were the following: Michael N. Collins (Claimant) and Willow Arnold, counsel for Defendants.

  Claimant testified at the hearing on both dates. Defendants presented Dr. Orville Neufeld, D.O. as an expert witness. Defendants offered into evidence Exhibits A through II, and all were admitted.

  Claimant requested that the case remain open. Claimant has filed additional letters with the Special Master. Claimant was granted up to and including June 16, 2008 in which to submit additional documents in support of his claim.

  Each side presented closing arguments on the second day of the hearing. Further argument will be waived. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

  This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the

Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

III. DEFINITIONS
    A. COVERED DISABILITIES
    The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
    B. QUALIFIED INMATE
    Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
    C. PERMANENT DISABILITY/IMPAIRMENT
    A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

    2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
        1. Is the claimant a disabled individual who is a member of the class?
        2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
        3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
        4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on July 13, 1999. He was placed initially at the Denver Reception and Diagnostic Center (DRDC). He was transferred on July 29, 1999 to the Crowley County Correctional Facility (CCCF) in Olney Springs, Colorado. Claimant remained at CCCF until he was released on probation on December 14, 1999.

On June 23, 2000, Claimant returned to DOC custody. He returned to DRDC for intake and on July 6, 2006 was placed at the Sterling Correctional Facility (SCF) in Sterling, Colorado. Claimant returned to CCCF on February 12, 2001. He was transferred on April 17, 2001 to the Kit Carson Correctional Center (KCCC) in Burlington, Colorado. On June 14, 2001, Claimant was moved to the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado.

On February 5, 2002, Claimant transferred to the Buena Vista Correctional Facility (BVCF) in Buena Vista, Colorado. He remained at BVCF until March 5, 2002 when he was moved to the Fremont Correctional Facility (FCF) in Canon City, Colorado. Claimant basically remained at FCF until February 23, 2004 when he was transferred back to CCCF. On September 23, 2004, he was

moved back to BVCF. On May 3, 2005, Claimant was placed at CTCF. On November 6, 2006, he returned to AVCF. Claimant was transferred to SCF on November 28, 2006. He returned to CTCF on July 20, 2007.

In his initial claim form, Claimant checked only the boxes for diabetes and mobility impairment.[2] Claimant stated, in part, as follows:

> (1) While imprisoned at AVCF (Ordway) I was attacked which resulted in my left arm being broken. It was not initially properly diagnosed as being broken. It was not immobilized. The swelling took place in the cast. The cast put on by P.A. Singh disintegrated. The fiberglass strips were too narrow. I was not moved to another prison. I was "jumped" & attacked again. I had to use my left arm & fist before they were properly healed to defend myself. This drove the bones of my left hand back into my wrist & arm. What was an initial broken arm became catastrophic. P.A. Singh did not initially properly diagnose my left arm as being broken. PA Singh then did not properly immobilize my left arm, set, & put it in a proper cast. Ths happened again & again. Not just in my case, but every person that I have talked to throughout DOC. PA Singh has a reputation for being a bungling incompetent that should not be practicing medicine. After sometime, of PA. Singh's many "ineptitudes," I became really concerned about losing my arm. Dr. Eskestrand, an orthopedic MD & surgeon, then operated on me. A metal plate, five smaller screws, three larger screws, & 2 pins were put into my arm & bone from my left hip was implanted. A cast was applied & then removed. I always asked that handcuffs be put on "easy" my left arm; however, one CO purposely "cranked them down" severing a tendon. Dr. Eskestrand replaced the severed tendon in my left thumb with one from my left index finger. I do not have a full use & feeling in my left fingers, thumb, hand & arm. I have numbness of feeling in them alternating with sharp jabs of pain. Dr. Sutton described this as "neuropathy." I have dull pain alternating with sharp pain in my left hip & leg where the bone was removed to implant in my left arm. Dr. Sutton described my nerve damage as the result of my arm being torn up so many times & all of my surgeries.
>
> (2) My medications have never been properly prescribed the whole time that I have been at DOC. I cannot now go to finger sticks & get insulin when I need it because of threats against my life. Every DOC is out of control. I have suffered permanent internal organ damage that affects my life.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated follows:

---

[2] Claimant has written all of his documents in longhand. His writing is small and difficult to read at times. The Special Master has made every effort to carefully review every document submitted by Claimant. The process of doing that has been long and not easy.

(1) Any human being is entitled to the very minimal of acceptable medical care. The medical care is not only grossly substandard at DOC medical, but openly hostile. I had a simple broken arm; however, it turned into a catastrophic disaster with PA as my primary medical provider. PA's (physicians assistants) are supposed to operate under & at the direction of medical doctors. DOC is in massive overload & this does not happen. In actual fact, PAs are essentially autonomous & practice medicine without any oversight at all. Because of PA Singh's total & complete incompetence & ineptitude, my simple broken arm that should have been easily healed turned into a catastrophic disaster. Every time that PA Singh got near me, my arm only became more "messed up" (again & again). PA Singh at first believed that my arm was not broken when it was. My arm continued to swell inside of a "soft cast." He never properly set, immobilized & pinned the arm. The fiberglass strips that he used were too thin & the cast disintegrated. I should have been removed from AVCF (Ordway). However, I was jumped (again & again). I had to fight with arm that had not been allowed to properly heal (again & again) to defend myself. This drove the bones in my left hand & wrist up into my arm. This necessitated Dr. Eskestrand repositioning the bones in my left hand, wrist forearm by operating on me. During the surgery, Dr. Eskestrand inserted a metal plate, five smaller screws, three larger screws & two pins. I've always asked correctional officers to not "crank down" the handcuffs because of the metal in my arm. This happened on two occasions: (a) when Lt. Fehey went off on me. This resulted in a tendon in my left arm being severed. (B) When I was being transported Nurse Dawn told a transport officer that the pins had been removed from my arm, omitting the fact that the metal plate & screws were still in my arm. She purposely told him that so he would "crank" the handcuffs down. Several CO's purposely ignored my medical permit that the handcuffs be put on loosely. Some even telling me that they would purposely put them on tight as they could. Some CO's told me that they wanted to use "rusty, barbed wire handcuffs, broken glass, etc. instead of going easy on the cuffs.

(2) My diabetes, high blood pressure, high cholesterol has all be aggravated by the open hostility of DOC medical. I have had what has been described to me as minor strokes & heart attacks several times. I have been told by several medical doctors that I have angina pectoria, a heart condition. Mike Le Vote (sic) (a/k/a the dead, grinning bug), the medical director at Fremont CF, had my nitroglycerin pills taken from me. I have since not been allowed to have nitroglycerin pills "legally" at DOC. I have had to get nitroglycerin pills from other inmates to stay alive. This is criminal malfeasance. I was issued self medications but went to the hole for "abuse of medications." The nurses more often than not were issuing pills incorrectly at med lines.

Claimant was provided supplemental forms to complete. He did not complete or return those forms, but sent in several letters and accompanying documents. Included with one letter were several statements by some of his children concerning his innocence. Claimant maintained at his hearing that he was improperly imprisoned. The Special Master advised the Claimant that issues related to his underlying conviction were well beyond the jurisdiction granted to the Special Masters by the

Settlement Agreement.

This claim was originally assigned to Category II which did not provide for a hearing. Defendants provided a response to the initial claim of Claimant. Defendants attached a number of medical records which reflected Claimant had refused medical care on occasion. *Exhibits F through P*. Claimant refused insulin on more than one occasion. *Exhibits Q through S*.

Claimant submitted a letter in December 2007 which reported a fall on an ice walkway at CTCF. Claimant was taken to medical after the fall. He complained in the letter concerning his medical treatment that he was mocked. He finally refused any further treatment.

Claimant had forwarded other letters to the Special Master that described overcrowding at correctional facilities. Claimant has described DOC medical care as filled with ineptitude and incompetence.

At the hearing, Defendants offered into evidence a number of documents. All were admitted. One document reflected that since August 10, 2000 Claimant had been convicted of over thirty violations of the Code of Penal Discipline.

Claimant testified at the hearing at he came into DOC custody in 1999. He was diagnosed as having diabetes before he came into DOC custody. He began taking insulin, along with other medications. Claimant stated that he has high blood pressure. He also has had heart problems and uses nitroglycerin pills on occasion. He has been in a couple of automobile accidents and suffered injuries from those accidents.

Claimant testified that he has been retaliated against because of grievances that he has filed. He also believes that he has been the victim of retaliation as the result of his participation in this case. He stated that physician's assistants provide most of the care for DOC inmates and that he rarely saw a physician. He testified that PA Singh at AVCF had malpracticed on his arm, necessitating surgery by Dr. Eskestrand.

Claimant described having a green tag placed on his clothing that reflected that he was disabled. He felt that this led him to be singled out by other inmates. He acknowledged that the green tag issue had been resolved. He has been accused by DOC staff of being a whiner and complainer. He described his eight years in DOC custody as being "tough."

On cross-examination, Claimant stated that he has bad knees and a bad left leg. He testified that his left arm and hand are still hurting. He acknowledged that he is able to exercise, and that exercise had been recommended by Dr. Eskestrand. He stated that he can do a lap in the yard and then he will stop. In response to one question, Claimant stated that he can do his activities of daily living.

On redirect examination, Claimant stated that he has been seeking "adequate, competent medical care." He indicated further that he has stayed away from the medical line, as he believed

it was to0 dangerous for him.

Defendants presented Dr. Orville Neufeld, D.O. as an expert witness. Dr. Neufeld had reviewed Claimant's medical records. Dr. Neufeld testified that Claimant is diabetic but has no diabetic neuropathy. Claimant had diabetes before he came into DOC custody.

There was a bone graft after the assault, but that has healed. He testified that Claimant is overweight and has significant mental health issues. According to Dr. Neufeld, Claimant can walk and do some exercises. In his opinion, Claimant is not disabled due to his diabetes. There is some indication of potential kidney damage. Dr. Neufeld testified that Claimant is not insulin dependent at the present time but needs oral medications. Claimant has refused medical treatment.

On rebuttal, Claimant testified that he has been arrested for signing refusals of treatment. Though he purchased candy bars from the canteen, these were for friends. He stated that he has no flexation in his left leg. Claimant further testified that he has heart issues. He requested to be transferred to the Ft. Lyon Correctional Facility (FLCF).

In his most recent letter to the Special Master and warden at CTCF, Claimant has indicated that he has been attacked and threatened by Aryan Brotherhood members. He states that he is at risk at CTCF and requests a transfer to FLCF. Claimant states in the letter that he cannot go to the gym or to the yard because of the fear of being assaulted.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** In order to be a member of the class, a claimant must have had an impairment, as recognized by the Settlement Agreement, on or before August 27, 2003. It was on that date that the Settlement Agreement was approved by Judge Nottingham. In other words, absent a showing of an impairment on or before that date, a claimant may not pursue his claim.

**Diabetes**: Claimant had been diagnosed with diabetes before he came into DOC custody. On March 31, 2008, counsel for the Class and Defendants presented to Judge Kane a stipulation that dealt with many aspects of the case. Judge Kane approved the stipulation on April 4, 2008.

Paragraph #25 states, in part, that "[a]ll inmates with diabetes will be designated as 'class members' (rather than IMP or D) and the language about whether they are disabled or not will be removed from Accommodation Resolution forms." Since this has been approved by the Court, this standard will also be used for adjudication of claims. Claimant was diagnosed as being diabetic on or before August 27, 2003 and, therefore, is a member of the class as a diabetic.

**Mobility Impairment**: Claimant has alleged that he is mobility impaired. In his initial claim

7

form, Claimant discusses an assault that occurred at AVCF and led to a broken arm. Though Claimant has not indicated the exact date of this assault, it would have occurred sometime after Claimant's arrival at AVCF on June 14, 2001. Claimant was transferred out on January 31, 2002.

Claimant has detailed his concerns about the medical treatment he received at AVCF after this assault. He has alleged that a physician's assistant improperly treated him and that led to what has been described as a "catastrophic" situation with his arm. Claimant has since received surgery to repair his arm. As a result, he received plates and screws in his arm.

In order to determine if an individual meets the requirements of the ADA and Rehabilitation Act, there must be an analysis using a three-part test. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184(2002). First, an individual must show the presence of a physical or mental impairment. Second, the individual must show that the impairment affects a "major life activity." *Id*. Third, the individual must show that the impairment "substantially limits" that major life activity. *Id.* This analysis must be applied to the claim of mobility impairment.

Claimant has not provided any evidence that he is unable to move or carry on his daily activities of life (ADLs). Claimant has sent numerous documents to the Special Master concerning conditions at various DOC facilities, but he has not detailed how his mobility impairment has affected his ADL's. The evidence is that Claimant is able to work and exercise. The category of mobility impairment has historically included lower extremity conditions only. In this case, there is no evidence that Claimant cannot walk or otherwise move in daily activities.

Even if the arm is examined individually, the evidence does not reflect that Claimant cannot use his arm. He has residual problems from the assault and what he has alleged as improper medical care to repair the arm. There is no evidence that Claimant's ADLs have been "substantially limited" because of his arm.

Claimant has not established that he was mobility impaired on or before August 27, 2003. He has not shown that his arm meets the test in the *Toyota* case.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** There was no evidence presented that indicated that Claimant was disqualified from DOC programs and services for reasons such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant has raised claimed a number of acts of discrimination. He also has alleged that he has been the victim of retaliation for participating in this case.

The Settlement Agreement requires that a claimant establish the he was discriminated against in violation of the ADA and Rehabilitation Act on or before August 27, 2003. That discrimination must be premised upon disparate treatment due to one of the four recognized conditions in the Settlement Agreement.

Claimant discussed at length at the hearing, as well as in his pleadings, his belief that he has been the victim of incompetent medical care. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care. *Fitzgerald* precludes any adjudication concerning the quality of medical care provided.

The evidence presented by both sides does not reflect any specific act of prohibited discrimination during the time period ending on August 27, 2003. Issues of medical care must be resolved through a separate lawsuit under the Eighth Amendment. All of Claimant's concerns relate to medical care that he believes was improper. *Fitzgerald* prohibits consideration of those issues, as it is clear that he did receive care. The fact that the care may have been substandard is precluded by *Fitzgerald*.

One final comment will be made concerning claims of retaliation. Claimant has alleged that he has been treated differently because of his participation in this case through the claim process. The evidence presented by both sides does not support such a finding. It is clear that Claimant is upset about being incarcerated. That is understandable. He clearly has struggled with other issues over the years. Those issues have led to friction with staff and other inmates. Claimant has not alleged that he was assaulted by other inmates because of discrimination based upon a mobility impairment. On the contrary, the evidence presented, as well as reasonable deductions from that evidence, reflects that Claimant has chosen not to follow the rules that are applicable to all and to not place himself in harms way with other inmates. Claimant has set forth a picture of his being victimized, and that may well be true. Such victimization has not been proven to be the result of any discriminatory act by DOC or its staff related to his mobility impairment.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Claimant of Michael N. Collins is dismissed, as he has failed to establish the necessary elements set forth in the Court's order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before September 15, 2008.**

SIGNED this 18th day of June, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master