IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 05-001
Category V
Claimant: Kenneth Garcia, Sr. (Deceased) through his next of kin, Kenneth Garcia, Jr., #82819
Address of Claimant: BVCF, P.O. Box 2017, Buena Vista, CO 81211-2017

---

## FINAL ORDER OF SPECIAL MASTER
---

    THIS MATTER comes before the Special Master on the claim filed by Kenneth G. Garcia, Jr. (Claimant). This claim was filed concerning the Claimant's father, Kenneth G. Garcia, Sr. (Father).

    The hearing was held on March 10, 2006 at the Colorado State Penitentiary (CSP) in Canon City, Colorado. Claimant is an inmate in the Colorado Department of Corrections (DOC). As a result, the hearing on this claim was held at a correctional facility.

    Present at the hearing on March 10, 2006 were the following: Claimant; Jess Dance, attorney for Defendants; and Dr. Cary Shames, D.O. Claimant presented the following witnesses: Claimant; Sam Cardona; and Kathy Romero. Defendants presented the following witnesses: Dr. Shames and Daryll Vigil.

    After the hearing was concluded, Claimant wished to review the working file of Father. Initially, Dino Valente was appointed to screen the working file, as Defendants had concerns about the content in certain documents in the working file. Due to problems beyond the control of the Special Master, Mr. Valente was unable to complete the review of the documents. Randall J. Davis was appointed to review the records again, and that was done. Claimant was given the opportunity to review those documents to which Defendants had no objections. Claimant requested not to resume the hearing, but to have the Special Master adjudicate the claim based on the 2006 hearing and

documents that have been filed since. Further argument will be waived.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Remedial Plan also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Remedial Plan provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Remedial Plan in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant submitted the initial claim in April 2004. In that claim, Claimant stated that he was filing as the heir of his Father. Claimant checked the boxes for mobility impairment, vision impairment, and diabetes.

In response to a question concerning disabilities, Claimant stated, in part, the following:

> Kenneth G. Garcia, Sr, with a date of birth of 11-7-47 and a DOC # of 01472 suffered from diabetes the entire (22) years he was incarcerated.
> Due to that disease he was gradually losing his mobility skills because of a lack of circulations of blood to his legs and feet which caused swelling and clotting.

3

He also suffered from glaucoma which required treatment which he never adequately received. Even after the advice of numerous specialists.

Due to his diabetes he required dialysis which DOC denied him because it was deemed too costly.

He also suffered from Hepatitis (C) though that specific disease was not listed part of the lawsuit, it also severely affected his life.

Individually each disease had its own personal hardships but in a totality they made life for my father very difficult and at times unbearable. Because he often lived with an enormous amount of pain.

He was discriminated against by both DOC and the inmate population alike because none of which wanted to associate with death.

In response to the question concerning discrimination by DOC and its staff, Claimant stated as follows:

Due to my Father's diseases he was unable to gain employment because he was often sick, bed ridden, coughing, too weak or needed his insulin to regulate his blood sugar level.

Due to the fact that he was gradually losing his motor skills he was often unable to physically walk himself to the chow hall to eat meals or walk to medical or to med line to receive his medication. He was often forced to miss doctor's appointments because he was unable to get out of bed by himself. He was often in pain that caused him to stay in bed constantly.

While at CTCF he was unable to participate in tournaments or other social gatherings because he was unable to walk the necessary stairs to reach the facility auditorium. Also while he was assigned to that facility they had yet to install ramps or handrails in the showers or steps and or ladders ro reach the top bunks in the cells.

While at LCF and FCF he was often placed in cells and or pods, dayhalls, or buildings that required him to have to climb stairs or sleep on the top bunk.

While at CSP he was forced to use a shower that had no non-slip tile or rails to prevent falling. He was also forced to walk to and from everywhere in handcuffs and shackles on his feet which caused him on numerous occasions to fall because of his depleted motor skills.

He was further discriminated against because he was unable to work or fully participate in programs which prolonged his stay in DOC because he lost out on his ability to gain good time and earned time credits.

He was also severely discriminated against by clinical services who were either derelict, negligent or incapable of acting in good faith due to poor training or monetary restraints placed on them by the Department of Corrections.

He was often misdiagnosed or given medication which had adverse and harmful side effects that caused rashes, skin peeling, severe headaches, insomnia, decreased appetite, weight loss, and depression.

He was forced to be prodded and probed by DOC constantly changing doctors and/or PAs. Constantly being changed from one medication to another

because of the changes in doctors. He was never allow to see specialists because of their cost to the facility.

Lastly constantly having to fight DOC at every turn for humane treatment and medication necessary to prolong one's life span and earthly existence was a discrimination in itself.

Claimant was sent a supplemental form concerning the death of the Father. In that form, Claimant indicated that he was the sole heir. In response to the question concerning DOC involvement in the death of Father, Claimant stated:

I on behalf of my father am alleging that DOC was negligent and malicious in constantly denying the necessary required medical attention and accommodations that my father, a diabetic with glaucoma and severe mobility problems, needed. Because they failed to address his deteriorating health early in his incarceration the neglect escalated to at first an imminent threat of death then to actual death itself because they failed to address his health and constantly denied him treatment and medication necessary to increase his life span.

At the hearing on March 10, 2006, a number of witnesses testified. Kathy Romero was called as a witness by Claimant. Ms. Romero was a sister of Father. She was aware that Father was diabetic and had glaucoma. Father was in constant pain and had concerns about the medical treatment that he received. She had observed open sores on his feet.

Claimant called Sam Cardona as a witness. He testified that he had known Father for ten to fifteen years. They had been fellow inmates and lived in the same unit at Fremont Correctional Facility (FCF) in Canon City, Colorado. Mr. Cardona was aware that Father was diabetic. Father had difficulty walking and sleeping. He had observed lesions on the feet and back of Father. A walker or wheelchair were not provided to Father. Mr. Cardona observed Father fall and experience problems walking caused by dizziness. Father was in pain all of the time. Mr. Cardona testified further that cells at FCF did not have handrails. This witness had helped Father get to the chow hall to eat and had done other favors for him.

On cross-examination, Mr. Cardona testified that he had been a cell mate of Father at FCF commencing in January 1998. Father was in a computer program at the time that they were cell mates. Father had a bottom bunk at FCF.

Claimant testified that Father had not prepared a will before his death. Father had to complete serving an Oklahoma sentence and transferred back to that state on March 7, 2002. According to Claimant's testimony, Father had completed his Colorado sentence in 1993.

Claimant further testified that Father had escaped from DOC custody in 1977 while he was placed at Camp George West in Golden, Colorado. He was on escape status when he committed the offense which led to his Oklahoma conviction. He was in the custody of Oklahoma when he died.

Claimant testified that Father had a constant battle to obtain medical care for his health conditions. According to Claimant, Father was told by medical staff that he did not meet certain criteria for types of treatment. Father asked for a single cell, as well as other accommodations. Claimant testified that he was advised by Father that he had not met certain criteria for treatment. Claimant indicated that Father passed away as the result of two brain aneurisms.

On cross-examination, Claimant testified that Father had not received proper and correct medical care. Father had been forced to buy tennis shoes, even though he needed soft sided shoes. Father had requested an egg crate mattress in late 1997, and that was provided to him. Father began experiencing shoulder problems. Later he began having problems with his legs. According to Claimant, Father was diagnosed as having diabetes in 1986. Claimant stated that he had fifteen contacts with Father prior to Claimant's incarceration in 1990. After being incarcerated again in DOC, he had telephone contact on a monthly basis from 1994 to 1997. He corresponded with Father by mail after 1997. There was no telephone or direct contact.

Dr. Shames was called as an expert witness by Defendants. At the time of his testimony, Dr. Shames was the chief medical officer for DOC. He had reviewed the medical records of Father.[2] Dr. Shames testified that Father had a long history of diabetes. He also suffered from vascular disease which came about due to the diabetes. Father was insulin dependant and was a poorly compliant patient. As a result, Dr. Shames believed that the diabetes was poorly controlled.

Dr. Shames testified further that Father had received a diabetic diet. He developed neuropathy. Father received continual medical care and did see specialists for his various medical issues. Dr. Shames indicated that Father's medical condition continued to worsen. He had kidney failure and eye problems. Father had refused to see specialists and would take a regular diet meal in the chow hall. According to Dr. Shames, Father often would refuse to come to the medical department for treatment.

By 2000, Father was receiving narcotic pain killers due to his pain. Father remained ambulatory according to the medical records and never was provided a wheelchair. Dr. Shames testified that DOC provided medical care for Father but sometimes that care was refused. Dialysis was ordered in 2001 because of the progressive nature of renal disease. Dr. Shames indicated that the records reflected that Father had not refused dialysis except on one occasion. Canteen records reflected a lot of inappropriate foods being ordered.

Dr. Shames indicated that glaucoma was diagnosed in Father in 1994. He received treatment for this condition. Father was seen for eye examinations on a regular basis. The last exam was in 2000 and reflected 20/100 in one eye and 20/200 in the other. According to Dr. Shames, Father had significant visual problems. The medical records reflect that Claimant was seeing specialists every month. Father sought a single cell in 1999 but that was denied as medically unnecessary.

---

[2] Claimant had eight volumes of medical records at the time he was transferred to Oklahoma.

Dr. Shames testified that Father's medical records reflected that he was deteriorating at the end. Father did not need tennis shoes, as there was no indication that these were medically necessary. There are medical records reflecting Father had taken falls.

On cross-examination, Dr. Shames testified that Father had hypertension. Father was diagnosed as having Hepatitis C in 1995. There was a period of time when a question arose as to a bone infection. Father did have pain as his body deteriorated. Dr. Shames testified further that there were accommodations provided to Father, including an egg crate mattress and a TENS unit.

Defendants also called as a witness Darryl Vigil. Mr. Vigil is the classification supervisor for DOC. Mr. Vigil testified that Father's Colorado sentence was discharged on December 8, 1993. Father remained in DOC custody under the Interstate Compact. Father was not denied any earned time.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

**1. Is the Claimant a disabled individual who is a member of the class?** Each disability must be examined separately. A claimant must show that there was a listed disability on or before August 27, 2003.

**Diabetes**: The evidence presented by Defendants reflects that Father was diagnosed as having diabetes in 1986. DOC records reflect that Father was diabetic on or before August 27, 2003. The records further reflect that the diabetes did affect activities of daily life.

Father died on June 18, 2002. On and before that date, Father was diabetic and that diabetes affected his activities of daily living (ADL's). Father was a member of the class that was formalized with the approval of the Remedial Plan by Judge Nottingham on August 27, 2003.

**Vision**: Father had glaucoma and diabetic neuropathy. There is some question as to how well he could see shortly before his death. There is no question that he was having problems with his vision. The benefit of the doubt will be granted to Claimant, and Father is found to have been vision impaired on June 18, 2002.

**Mobility:** The evidence is conflicting concerning Father's mobility in the last years of his life. Claimant's testimony was hearsay, as he had not observed or had personal contact with Father for years. Mr. Cardona testified that Father had difficulty ambulating and suffered numerous falls. The benefit of doubt will be granted to Claimant. Father is found to have been mobility impaired on June 18, 2002.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC.?** Based upon the testimony provided by both sides, the

7

answer to this question is yes. Other than health issues, there does not appear to have been any disqualification from programs, benefits, or services for other reasons, such as disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?**
This claim is unique. A total of sixteen Category V claims have been filed. Some of those claims involved transfers from other categories, as the claimant passed away before the claim could be adjudicated. This claim was filed by Claimant initially, as Father passed away long before the Remedial Plan was approved by Judge Nottingham on August 27, 2003. All other claims filed by heirs for inmates who passed away before August 27, 2003 were resolved by settlement.

The Remedial Plan provides, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

Category V claims require a showing that an inmate or former inmate died as the result of discrimination on the part of DOC or its staff that was prohibited by the ADA and Rehabilitation Act. In other words, the death must be the result of an act or acts of discrimination.

The ADA and Rehabilitation Act are not substitutes for a separate wrongful death action. Nor are these statutes substitutes for a civil rights action brought under 42 U.S.C. §1983. Even when an action is brought by an individual, little survives under the ADA and Rehabilitation Act after the death of the plaintiff. *Rosenblum v. Colorado Department of Health*, 878 F.Supp. 1404 (D.Colo. 1994).

In his brief in support of his claim, Claimant stated as to Question #3, in part, as follows:

> The claimant contends that Kenneth was discriminated against because of his disability in roughly (  ) areas throughout his incarceration. That his medical condition was well documented and he had requested accommodations from DOC

8

and was routinely denied.
>The claimant also contends that accommodations should have been given to Kenneth just because of his condition without asking him....

In discussing Question #4, Claimant stated, in part, as follows:

> "Did this conduct cause the claimant harm."
> I contend that it did. That DOC had an obligation to accommodate all disabled inmates with the necessities they needed to function in DOC in an acceptable fashion. That would prolong a chronically ill patient's life, or ease their pain so they may live longer in a less stressful impacted manner.

Under the Remedial Plan submitted by the parties, Category V claims are virtually impossible to prove, absent significant expert testimony. The Plan requires a showing that death was the result of an act or acts of discrimination in violation of the ADA and Rehabilitation Act. Claimant has not presented substantive evidence establishing the causal connection. It should be noted that the medical record from OU Medical Center in Oklahoma City reflected that Father died as the result of cerebral edema. The record reflects massive bleeding and swelling of the brain. Cerebral edema is not a condition covered by the Remedial Plan. No evidence has been presented from any source that reflects that the diabetes led to the cerebral edema. Claimant's beliefs that a causal connection exists are not evidence. Under the Remedial Plan, Claimant had no chance to establish this claim, absent sophisticated medical testimony. In other words, Claimant was doomed to failure before he even filed the claim, as he did not have the resources to secure expert testimony.

In addition, a great deal of the material submitted by Claimant related to medical care that had been provided to Father. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. All Eighth Amendment claims were dismissed by Judge Nottingham prior to the approval of the Settlement Agreement. To the extent that Claimant is questioning the care provided to Father, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. The documents submitted by both sides reflect that Father received medical care. The dispute as to the quality of that care cannot be adjudicated through this claim.

In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical practice or medical negligence under state law. Claimant may pursue separately any rights that he may have as the heir concerning Father's medical care.

The evidence reflects that Father was extremely ill for many years. He was returned to Oklahoma after he began dialysis. Claimant states that the move was the result of DOC not wanting

to pay for any dialysis. That may be true, but Father was serving solely an Oklahoma sentence at the time of his death. His conditions also included many illness or medical problems outside of the four categories in the Remedial Plan. Claimant retains the right as heir to pursue any §1983 claims that may exist.

Claimant failed to establish by competent evidence that Father's death was the result of an act or acts of discrimination by DOC or its staff. As result, the claim must be dismissed.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** In light of the answer to Question #3, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Kenneth Garcia, Jr. is dismissed; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before September 12, 2008.**

SIGNED this 14th day of July, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

———————————————————
Richard M. Borchers
Special Master