IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96–N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

_____

Claim Number 03-254
Category III
Claimant: Ralph Valdez, #45226
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

_____

## AMENDED FINAL ORDER OF SPECIAL MASTER
_____

THIS MATTER came before the Special Master for hearing on February 14, 2008. This hearing was held at the Ft. Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Ralph Valdez (Claimant); and Willow Arnold, attorney for Defendants.

Testimony was received from Claimant and Dr. Orville Neufeld, D.O. Claimant's Exhibit #1 was offered and received into evidence. Defendants' Exhibits A through X were offered and admitted into evidence. All documentation previously submitted by both sides was accepted. Claimant was granted additional time in which to submit documents for consideration by the Special Master. Claimant requested and was granted up to July 14, 2008 in which to submit any additional documents for consideration. No additional documents were submitted by Claimant.

This claim has been taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The

Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provided the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29*. Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>     A. COVERED DISABILITIES

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody on March 8, 1979. He was placed at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. He then was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado on July 31, 1979. He was placed into the Skyline Correctional Center (SCC) in Canon City, Colorado on October 9, 1979. Claimant was paroled on January 19, 1981. He discharged that sentence on December 10, 1984.

Claimant returned to DOC custody on November 7, 1985. Claimant was placed at various facilities and then was granted parole on July 16, 1987. He discharged this sentence on March 20, 1989.

On May 31, 2001, Claimant returned to DOC custody. He was placed at the Denver Reception and Diagnostic Center (DRDC) for evaluation and testing. He was transferred to the Sterling Correctional Facility (SCF) in Sterling, Colorado on July 17, 2001. He was transferred briefly to the infirmary at DRDC. He was transferred to FCF on August 16, 2002. He was transferred to the Bent County Correctional Facility (BCCF) on June 30, 2005. He was placed at the Cheyenne Mountain Re-Entry Center (CMRC) on October 27, 2006. He remained at CMRC until he was transferred to CTCF on July 25, 2007. He subsequently was moved to the Arrowhead Correctional

Center (ACC) in Canon City, Colorado where remained until he was transferred to FLCF on August 9, 2007.

In his initial claim form, Claimant checked the boxes for vision impairment, hearing impairment, mobility impairment, and diabetes. Claimant stated, in part, in his claim form:

> Mobility impaired: that deprives my normal ability to exercise for my therapy recuperation related to my previous open heart surgeries. Diabetic: condition that creates an unwarranted medical dependence. Vision impaired: that limits my ability to read and write. Hearing impaired: that limits my ability to communicate.

In response to the question in the claim form concerning discrimination by DOC and its staff, Claimant stated, in part, as follows:

> On about May, 2002, medical staff under DOC directives subjected me to discrimination by denial of competent medical treatment, specifically, a Pig's organ was used to replace my heart valve, such implant was rejected by my immune system, and I almost died. Two more open heart surgeries were required to eventually implant a medical device to replace the Pig's organ.
>
> The herein referred questionable practice, further damaged my brain and lungs, with symptoms that include disassociation or memory, mental blackouts, disorientation, uncoordination to perform manual tasks or walk, and psychological fear of death.

Claimant submitted supplemental forms for three of the claimed impairments. In his supplemental form for diabetes, Claimant stated, in part, as follows:

> When DOC failed to treat my heart failure condition my diabetic condition became worse. I had significant trouble trying to control my blood sugar levels. My heart condition was not only not treated properly it aggravated my existing diabetic condition. DOC failed to take these conditions seriously until I had a full heart failure.

Concerning his hearing impairment, Claimant stated in section #1 of his supplemental report:

> I have suffered about 10 to 20% hearing loss that came as a result of both my heart failure and diabetic condition. I have significant problems trying to communicate with people because I cannot hear them.

As to his mobility impairment claim, Claimant stated as follows in #1 of his supplemental report:
> I have a heart condition after I had to have open heart surgery to replace a heart valve. I cannot walk up and down stairs, run, or walk any long distances. In

addition to this, I have a diabetic condition, which also limits my mobility.

Claimant included some of his medical records when he filed his supplemental forms. These included copies of records from the University of Colorado Health Sciences Center and Denver Health and Hospitals.

At the hearing, Claimant testified concerning his various health issues. He noted that there had been three heart surgeries. He has a mechanical value in his heart at the present time. He testified further that he could barely walk when he was at FCF. He requested a wheelchair but that was denied. He had trouble with his medications. He could not walk long distances, as his legs would swell up. For a period of time, he would bleed from his nose when he tried to exercise. Claimant expressed a fear that he would die in prison.

Claimant stated that his legs swell and he has had to use a cane to get around. He has suffered hearing loss in his left ear which came about after the surgeries. He cannot hear the intercom very well and misses important messages. He has been attempting to get his GED, but cannot pass the test. He cannot walk up stairs, as he becomes dizzy. He had constant pain before the heart surgeries. He has been advised that he will have to have another surgery in about ten years.

On cross-examination, Claimant testified that he last received eye glasses from DOC about three years ago. He stated that he has blurry vision as the result of the medications. He reiterated that he will start bleeding when he exercises. He has attempted to use a treadmill but that did not work well. He is able to walk around the yard somewhat. He can walk to chow, but the building is next to his cell house.

When asked about discrimination, Claimant stated that it occurred at FCF. He indicated that staff at FLCF had helped him a lot. He further testified that he would like to get some accommodations. He believes that his legs need to be examined by a specialist. He would like some help to pass the GED test.

Defendants called Dr. Orville Neufeld, D.O. as an expert witness. Dr. Neufeld confirmed that there had been several surgeries for Claimant over the last few years. Based upon a review of Claimant's medical records, Dr. Neufeld testified that Claimant is not a diabetic. He does have some issues with his vision as the result of the medications that he must take. Claimant is on a blood thinner and will be for the rest of his life. Dr. Neufeld did not see any indication that Claimant could not carry on his activities of daily living.

Dr. Neufeld acknowledged that Claimant has significant cardio-vascular problems. He does have a significant hearing loss. His vision is correctable to 20/20.

In rebuttal, Claimant testified that he believes that he is disabled. His feet hurt a lot and he has had to buy soft sided shoes from the canteen. He reiterated that he cannot hear well.

Both sides offered exhibits at the hearing. Claimant's Exhibit #1 reflected that Claimant has

chronic Hepatitis C and cirrhosis of the liver. He also has been diagnosed as having asthma. Claimant is on Coumadin and Warfarin, as well as other medicines. Defendants' Exhibit K is a list of all of Claimant's medical issues, including allergies to certain medicines.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. Each will be taken separately.

Claimant must show that on or before August 27, 2003 he had a recognized impairment as set forth in the Settlement Agreement. Claimant must show further that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act that occurred on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant has been in DOC custody on three occasions. The second sentence led to incarceration in November 1985. Parole was granted in 1987 and the sentence was discharged on May 20, 1989. There was no evidence presented by Claimant that he was disabled before being placed on parole on July 16, 1987. Only the period of time from May 31, 2001 and after will be considered by the Special Master.

Claimant checked all of the boxes on the claim form. As a result, each claimed disability must be examined separately.

**Diabetes:** The evidence presented by Claimant and Defendants does not establish that Claimant is a diabetic. Claimant is not a member of the class as a diabetic.

**Vision:** Claimant's blurry vision and other vision problems appear to relate to the medicines that he must take as the result of his heart surgeries. Dr. Neufeld concurred that there are vision issues, though he believed that Claimant is able to carry out his activities of daily life.

Claimant will be given the benefit of the doubt. Claimant is determined to be a member of the class as vision impaired.

**Hearing**: Claimant has testified that he has significant hearing loss, particularly in his left ear. This may be the result of the heart surgeries or medicine. Dr. Neufeld acknowledged that there appears to be a significant hearing loss. Claimant will be given the benefit of the doubt and is found to be a member of the class as hearing impaired.

**Mobility**: Claimant has testified that he had great difficulty walking before his heart surgeries. A reasonable and fair examination of the evidence would indicate that Claimant was mobility impaired for a period of time since there were significant heart problems that made walking problematic. The surgeries took place in 2002. The Special Master finds that Claimant was mobility impaired in 2002 due to his heart problems.

The Special Master does not find that Claimant is mobility impaired at the present time.

Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I). Claimant has not established that his activities of daily life are affected at the present time as the result of any mobility impairment. Claimant is determined to be a class member as mobility impaired. That impairment ended in 2003.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** There is no evidence that Claimant was not qualified to receive services and benefits from DOC. As an example, Claimant was not disqualified due to disciplinary convictions.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant's allegations of discrimination relate to his medical care. In his initial claim form, Claimant stated:

> On about May, 2002, medical staff under DOC directives subjected me to discrimination by denial of competent medical treatment, specifically, a Pig's organ was used to replace my heart valve, such implant was rejected by my immune system, and I almost died. Two more open heart surgeries were required to eventually implant a medical device to replace the Pig's organ.
> The herein referred questionable practice, further damaged my brain and lungs, with symptoms that include disassociation or memory, mental blackouts, disorientation, uncoordination to perform manual tasks or walk, and psychological fear of death.

Claimant did receive medical care, but he questions the propriety and skill of that care. He believes that he has suffered harm as the result of the care provided, particularly as related to the pig heart valve.

The evidence does reflect that Claimant did receive medical care while in DOC custody. He received major heart surgery. The quality of the care is questioned by Claimant. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability.

A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

The *Fitzgerald* case binds the hands of the Special Master, as well as the Court. The overwhelming number of concerns of Claimant relate to his medical care. The quality of that care must be examined in a different proceeding. It cannot be examined in a case brought under the ADA and Rehabilitation Act.

Claimant has not established that he was the victim of discrimination that is actionable under the ADA and Rehabilitation Act. Claimant clearly has health issues that affect his life. Claimant's fear of mortality while in DOC custody is understandable. The problem is that Claimant has not established that he was the victim of discrimination based upon a disability recognized by the Settlement Agreement. Claimant may pursue a separate lawsuit under the Eighth Amendment concerning the quality of the medical care provided. Under *Fitzgerald*, Claimant is precluded from litigating the quality of his medical care through this claim.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Claimant Ralph Valdez is dismissed, as Claimant has failed to prove each of the four questions set forth by Judges Nottingham and Kane and that he was the victim of discriminatory conduct prohibited by the ADA and Rehabilitation Act after August 27, 2003; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before September 29, 2008.**

SIGNED this 18th day of July, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

Richard M. Borchers
Special Master