IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

BILL OWENS, et al.,

Defendants.

---

Claim Number: 03-359
Category: III
Claimant: Thomas T. Valdez, #68556
Address of Claimant: LCF

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Claimant Thomas T. Valdez, #68566. This Hearing was held at the Limon Correctional Facility (LCF) in Limon, Colorado on May 19, 2008, before Richard C. Davidson, Special Master. Mr. Valdez appeared *pro se*. Defendants were represented by Ms. Willow Arnold, Esq. Claimant Thomas T. Valdez and Thomas Fischer, M.D. were called, sworn and testified. The Special Master has reviewed the testimony and all documents filed by both sides. This Order shall constitute the final action of the Special Master on this specific claim.

### I. BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to

1

Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt-out provision for class members. The Remedial Plan also created a mechanism for individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

2

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters. A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II. FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1. Claimant Thomas Valdez submitted a claim which was assigned claim number 02-749. After review, the claim was elevated and assigned claim number 03-359. The claim is premised on alleged permanent mobility and vision disabilities.

2. Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

3. Claimant Valdez first entered CDOC custody in 1992. During this time, Claimant was housed at DRDC, FCF, AVCF, KCCC, HCCC, CCF and LCF.

4. Claimant has had three low back surgical procedures. In 1981, he had a fusion from L2-L5. He still has pain which radiates down both legs and both legs become numb sometimes. In approximately 1997, Claimant tore his knee ligaments and was placed on crutches temporarily. In 2004 he had surgery to repair his ACL, MCL and meniscus. He continued to suffer pain in his knee. He was afraid to put weight on his knee for fear it would fail. Claimant testified that his knee problems were the result of inadequate rehabilitation after his surgery. In 2007, Claimant re-injured his knee while pushing a cart. He now wears a knee brace full time and also uses a cane. He has been told that he has again torn his meniscus and that his cartilage is bad.

3

5. Claimant says that he can only walk short distances without his cane. He testified that he can walk around the track once, a distance of two-tenths of a mile, and that it takes him 15 minutes. Claimant says he cannot go up or down a full flight of stairs and can only climb 3 or 4 stairs at a time. He is lower bunk, lower tier restricted. He has difficulty sitting more than 15 or 20 minutes at a time. He is unable to stand more than 30 to 45 minutes. He is restricted from lifting more than 30 pounds and has been told not to carry things. He is able, however, to carry his food tray and coffee.

6. The medical testimony and records show that Claimant was put on restrictions because of his low back surgery. He has suffered with back problems over time. CDOC has tried to accommodate Claimant by furnishing him with a cane, with crutches, with a knee brace and by giving him medical treatment including knee surgery in 2004. Neuropathy and back weakness have not been found by medical. According to Dr. Fischer, Claimant does not have a permanent need for a cane. Neither does his condition warrant the use of a back brace. Dr. Fischer would restrict Claimant from prolonged standing, over 3 or 4 hours, and from heavy lifting. However, Dr. Fischer would not put any restrictions on his activities. Interestingly, an Ambulatory Health Record dated May 2, 2007 shows Claimant injured his knee while playing handball.

7. Claimant suffered a head injury in 1972 when he was hit on the head with a metal flashlight 18 to 20 times. He testified that he was put into a medically induced coma because he had a skull fracture and brain swelling. As a result of this injury, Claimant says his eyes are very light sensitive. He needs dark glasses. When he came into custody in 1992, he was allowed to have dark glasses. In 1998, while at KCCC, he was given a permit for the dark glasses. He says that in 2002 a new head of security came on and started causing Claimant problems because of his dark glasses. Ultimately, he lost his permit because this was a "security issue." He says that a prison doctor told him to wear his dark glasses. When he did so, he was charged with fraud for using a false or expired permit and was placed in segregation. Later, he was cleared of this charge and was allowed to keep the dark glasses. When tested, he says he was given a recommendation for 40% tint plus a prism correction. These glasses were later confiscated. Claimant says this confiscation was retaliation toward him.

8. Claimant says that he suffers from migraine headaches and seizures when he is not allowed to wear his dark glasses. He testified to a seizure he had in 1994 or 1995 while playing softball. According to the medical testimony and records, Claimant has had very good vision. He was tested at 20/20 in 1992. He has had several eye exams over the time of his incarceration. It was not until December 2007 that he needed prescription glasses. At that time he tested 20/50 in one eye and 20/100 in the other. He was given a prescription with tinted lenses. Dr. Fischer testified that the claims of light causing Claimant to have seizures, is not documented in Claimant's medical records. One record shows that Claimant was found on the floor of the visiting unit and that he claimed to have had a seizure.

### III. CONCLUSIONS OF LAW

4

1. The legal standards applicable to this claim are derived from three sources: (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

3. The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C). As discussed in Section I above, the Remedial Plan further limits permanent mobility, hearing, vision, and diabetes disability/impairment to those that conform to the criteria of Section V, paragraph A of the Plan.

4. Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

5. It must be noted that neither the ADA nor the Rehabilitation Act are designed to remedy alleged deficiencies or omissions in medical treatment provided to prisoners by CDOC. Rather, the ADA and Rehabilitation Act are designed to insure that those who have permanent disabilities that prevent them from engaging in one or more major life activities are not discriminated against because of their disabilities. The Remedial Plan, which defines the scope of the Special Master's authority, limits the disabilities for which damage claims can be asserted to those relating to mobility, vision, hearing, and diabetes.

6. The Special Master finds and concludes that Claimant Thomas Valdez is NOT a mobility disabled person under the terms of the remedial plan. There is no question that Claimant has had

extensive surgery on his low back and continues to suffer from that. In fact, restrictions recognizing his condition have been placed on him. While Claimant continues to suffer from some back pain, the question is whether he is limited in one or more of his major life activities because of his back condition. The evidence fails to prove that he is limited by this. In fact, the medical records show that Claimant is active and is able to play handball despite his problems.

7. The evidence also fails to show that Claimant has a vision disability. Again, in order to show a vision disability, Claimant must prove that his condition substantially limits him from a major life activity. The records show that Claimant has had very good vision until recently. His complaints are that he suffers from photophobia. However, he has been given accommodations with tinted prescription lenses. The records also show that he has been encouraged to purchase tinted lenses from the canteen. While Claimant has been in conflict with CDOC because of his photophobia, the evidence does not show that this condition substantially limits him from any major life activity.

8. The next question which must be answered is whether Claimant was qualified to participate in the programs or to receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs, or activities because of disciplinary reasons, health reasons, or other valid penal justifications. *Miller v. King,* 384 F.3d 1248, 1266 (11th Cir. 2004). It appears to be undisputed that Claimant was qualified to participate in the programs, benefits, and services offered by CDOC except during the times he was under discipline.

9. Of course, the key issue is whether Claimant was discriminated against by CDOC because of his medical condition. The evidence shows that Claimant's problems were recognized by CDOC and were addressed. His needs were accommodated. The Special Master concludes that no discrimination has been shown.

### IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment shall be entered in favor of Defendant and against Claimant dismissing his claims in this action.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before September 22, 2008** with the Clerk of the United States District Court at the following address:

> 901 19th Street
> Denver, CO 80294.

SIGNED this 21st day of July, 2008.

BY THE COURT:

/s/ Richard C. Davidson

———————————————————
Richard C. Davidson,
Special Master