IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-136
Category III
Claimant: Mark Garner, #117591
Address of Claimant: 11844 Cochise Circle, Conifer, CO 81003

_____

## FINAL ORDER OF SPECIAL MASTER
_____

THIS MATTER came before the Special Master for hearing on July 11, 2008. This hearing was held at the offices of Legal Resolution Center in Denver, Colorado. Present were the following: Mark Garner (Claimant); and Willow Arnold, attorney for Defendants.

Claimant called the following witnesses: Karen Bradshaw and Claimant. Exhibits 1 and 2 were offered by Claimant and accepted into evidence. Defendants called Dr. Timothy Creany, M.D. as a witness. Defendants' Exhibits A through X were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provides the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

        B. QUALIFIED INMATE
        Inmate with a permanent disability/impairment which substantially
        limits his or her ability to perform a major life activity.
        C. PERMANENT DISABILITY/IMPAIRMENT
        A condition which is not expected to improve within six months.

These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

      On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

      2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
        1. Is the claimant a disabled individual who is a member of the class?
        2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
        3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
        4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant initially came into DOC custody on May 20, 2003. He was placed at the Denver Reception and Diagnostic Center (DRDC). On June 12, 2003, Claimant was transferred to the Buena Vista Correctional Facility (BVCF) in Buena Vista, Colorado. Claimant remained at BVCF until he was transferred to the Crowley County Correctional Facility (CCCF) in Olney Springs, Colorado on April 20, 2005.

On September 6, 2005, Claimant was transferred to the Limon Correctional Facility (LCF) in Limon, Colorado. On November 9, 2005, Claimant was placed at the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. On March 2, 2006, Claimant was transferred to the Cheyenne Mountain Re-Entry Center (CMRC) in Colorado Springs, Colorado. Claimant was granted parole on August 23, 2006. He remains on parole at the present time.

In his initial claim form, Claimant checked only the box for mobility impairment. In his claim form, Claimant stated, in part, as follows:

1) Describe each disability and how it affects your life.

3

I was diagnosed with scoliosis of the spine by DRDC in May 2003, due to my left femur being 2-1/4" shorter than my right femur. This makes it difficult for me to stand for long periods of time, especially on hard surfaces, and it causes me to have severe back pain in the lower left side of my back. I also have ACL/MCL/meniscus damage in my left knee. I had a torn ACL repaired in 1998 and I re-injured the same knee climbing the stairs at DRDC to the second level holding cells in Unit 1. My knee is unstable and buckles from time to time causing extreme immediate pain, swelling, and intense lingering pain. My ability to move from side to side is affected and walking on uneven surfaces and stairs or turning and bending is painful.

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated, in part:

2) Describe how you believe you were discriminated against.

I believe I have been discriminated against by being denied medical attention for my injured knee and by having treatment delayed for my scoliosis for over a year. Treatment was finally received only after raising the possibility of legal action with the medical staff. I was informed at DRDC that I would receive attention for both conditions when I reached a regular facility. When I arrived at BVCC medium facility, I went to the medical department and told them about my knee and the scoliosis and back pain. The doctor said there was nothing wrong with my knee and prescribed Motrin for pain and a shoe lift to straighten my spine, but he did not measure my legs to determine the height of the lift. That visit was followed by several others when my knee buckled while working in the welding shop. My knee was swollen and painful. The doctor continued to tell me there was nothing wrong with my knee. When I asked for a brace, which I had seen other inmates wearing, I was given an ace bandage instead. When I asked for something stronger for the pain, my request was denied. I requested a thicker mattress or two mattresses to make resting comfortable and was refused. I requested a lower bunk and was initially refused, but was finally granted a lower bunk restriction. When the shoe with the lift finally arrived in early Fall 2003, it was 4 or 5" high, far greater than I needed or could wear as a result of no measurements being taken. The doctor said he would reorder a smaller lift, but again didn't measure me. In April 2004 I was moved to BVCC minimum facility. I again had to request a lower bunk and was initially denied. I twisted my knee climbing to my bunk and returned to the doctor again with pain and swelling, but it wasn't until I mentioned that I was talking with an attorney about possible legal action, that I finally received attention. I was given a lower bunk and finally in July 2004, over a year after my arrival at BVCC, received a shoe lift that fits. In August, Dr. McLaughlin offered to prescribe another medication for pain, Elavil. Because I had not taken Elavil before, I did some investigation and learned it is not recommended for anyone with liver damage, and since the medical staff has diagnosed me with and treated me for Hepatitis, I have concerns about taking this prescription. I also researched Motrin and learned that it is not recommended for

people with liver problems.

Claimant also forwarded several pages of his medical records.

At the hearing, Claimant testified that his left leg is approximately 2 ½ inches shorter than his right leg. This was the result of an automobile accident in the late 1970's. Claimant had a shortening of his leg because of the way it had been placed into a cast after the accident. Claimant had surgery on his knee back in the mid-1990's.

Claimant was received into DOC custody on May 20, 2003. He was placed into DRDC for evaluation and testing. Claimant was given an entry physical on May 21, 2003. *Exhibit G*. Claimant advised medical staff that he had surgery on his left knee for ACL and MCL repair. He advised staff that occasionally his knee would go out. The entry note reflected lower back pain, scoliosis, left leg length discrepancy, probably hypoglycemia, and left knee pain. Two days later, Claimant underwent a cardiopulmonary exercise test. *Exhibit H*. Claimant walked on a treadmill for six and one-half minutes without major problems. In July 2003, x-rays were taken of the left knee and spine. *Exhibit I*. The left knee was noted to have had an ACL reconstruction, but no major problem was noted in the knee. Overall, the x-rays reflected mild to moderate problems.

Claimant remained at DRDC until June 5, 2003 when he was taken ultimately to BVCF. During the period of time Claimant was at DRDC, he slipped and fell going up the stairs to a second floor. Claimant testified that he hurt his left knee. He began to seek medical help for his knee, but without any success. He also began to request shoes with a proper lift. Claimant testified that he was advised that he would receive the proper shoes and medical care when he arrived at BVCF. It took until mid-2004 to obtain the right sized shoes with a lift. Claimant described the work that he did in the welding shop that required standing on his feet a lot.[2]

Claimant testified that when he was transferred to BVCF he initially lost his lower bunk restriction. He was able to get that back. He indicated that he was allowed to sit while welding. His left knee continued to bother him, and he believed that he needed additional surgery. He had to buy tennis shoes from the canteen. He testified that he was not allowed to keep orthopedic shoes.

Claimant testified that he attended a meeting concerning the *Montez* case in mid-2004. He believed that he was under the protection of the Remedial Plan and filed a claim. He felt as time went on that DOC paid little or no attention to that Plan. He continued to be transferred to other facilities. He testified that he injured his foot while at LCF.

On cross-examination, Claimant testified that he was limited in what he could do after the knee injury in 2003. He had trouble walking because of the pain. The initial shoes from DOC were

---

[2] Claimant submitted a statement from Mr. Ed Benesch, his former welding instructor at BVCF. Mr. Benesch had retired before the hearing. He indicated that Claimant had been a good student.

not the proper size, and he could not wear them. Initially, no official took measurements of the discrepancy in the length of his left leg.

Claimant stated that he was able to get around despite his leg problems. There were some activities that he could not participate in. He also stated that he was seeking an inside lift for his left shoe. He testified that he is limited in the work and exercise that he can undertake.

Claimant called his wife, Karen Bradshaw, as a witness. Ms. Bradshaw testified that she had been with Claimant for over fourteen years. She noted that Claimant is disabled, both because of his knee and his scoliosis. She noted that Claimant had not received appropriate shoes from DOC. Claimant received surgery on his knee once he was placed on parole, but from a doctor at Kaiser Permanente.

Defendants called Dr. Timothy Creany, M.D. as an expert witness. Dr. Creany had reviewed Claimant's medical records. He noted that Claimant had some scoliosis when he came into DOC custody, along with the left leg length discrepancy. Dr. Creany noted that Claimant was not found to be disabled when he was given an ADA screening. Dr. Creany did not believe that Claimant was *Montez* qualified. He did not believe that Claimant had required any special accommodations prior to his release on parole.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. A claimant must establish that he was disabled, as set forth in the Remedial Plan, on or before August 27, 2003. In addition, a claimant must establish that he was the victim of discrimination on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant must establish that he was disabled on or before August 27, 2003. If he so establishes that he was disabled on or before August 27, 2003, then he may amend his claim and raises issues that have occurred since that date up to the present.

Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

6

The key period of time is between May 20, 2003 and August 27, 2003. The evidence presented by Claimant indicated that he had a shorter left leg when he arrived into DOC custody. There was no evidence that Claimant's leg or knee affected his ability to carry on major life activities. *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184 (2002). Based upon his own testimony, Claimant was experiencing pain in his knee and back from the time of the injury to the knee at DRDC until his departure on parole. The evidence reflects, though, that Claimant was able to work and to take advantage of other programs while in DOC custody. *Exhibit D*.

The ADA and Rehabilitation Act require more than just a diagnosis of an impairment. *Toyota Motor Manufacturing v. Williams, supra*. In this case, Claimant had impairments as of May 20, 2003 but was not disabled. As of August 27, 2003, Claimant also was not disabled, as defined by the ADA and Rehabilitation Act. Whether Claimant became disabled after August 27, 2003 is a different question that will not be reached in this order. Claimant has the right to pursue his own lawsuit for anything that occurred after August 27, 2003. Claimant does not have the right to pursue his claim, as he was not disabled under the law on or before August 27, 2003.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** No evidence was presented that Claimant was otherwise unqualified to participate in DOC programs or to receive DOC services.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** In order to prevail on his claim, Claimant also would have to prove that, on or before August 27, 2003, he was the victim of discrimination prohibited by the ADA and Rehabilitation Act.

Claimant in his claim form and other documents details the concerns he has had about the quality of medical care received while in DOC custody. Indeed, his overwhelming complaint is that he was denied proper medical care. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning her medical care.

The *Fitzgerald* case binds the hands of the Special Master, as well as the Court. The overwhelming number of concerns of Claimant relate to his medical care. The quality of that care must be examined in a different proceeding. It cannot be examined in a case brought under the ADA and Rehabilitation Act.

Save for allegations concerning his medical care, Claimant did not provide any evidence that

7

he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003. The Special Master will make no findings concerning anything that may have occurred after that date. Claimant may pursue his own lawsuit for anything that transpired after August 27, 2003.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** This question does not need to be answered in light of the negative answers to Question #1 and Question #3.

IT IS HEREBY ORDERED that the claim of Mark Garner is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before September 30, 2008.**

SIGNED this 25th day of July, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master