1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 92-N-870
3  JESSE (JESUS) MONTEZ, et al.,

4      Plaintiffs,

5  Vs.

6  BILL OWENS, et al.,

7      Defendants.
   _____
8
                    REPORTER'S TRANSCRIPT
9                    STATUS CONFERENCE
   _____
10
           Proceedings before the HONORABLE EDWARD W.
11 NOTTINGHAM, Judge, United States District Court for the
   District of Colorado, commencing at 9:02 a.m., on the 14th day
12 of September, 2007, in Courtroom A-201, United States
   Courthouse, Denver, Colorado.
13
                        APPEARANCES
14
   For the Plaintiffs          PAULA GREISEN, ESQ.
15                              King & Greisen
                                1670 York Street
16                              Denver, Colorado
                                EDWARD T. RAMEY, ESQ.
17                              Isaacson Rosenbaum
                                633 17th Street
18                              Denver, Colorado
                                TERRANCE DAVID CARROLL, ESQ.
19                              Greenberg Traurig
                                1200 17th Street
20                              Denver, Colorado
   For the Defendants          ELIZABETH H. MCCANN, ESQ.
21                              JAMES X. QUINN, ESQ.
                                JESS DANCE, ESQ.
22                              Colorado Attorney General's Office
                                Litigation Section
23                              Denver, Colorado

24          THERESE LINDBLOM, Official Reporter
         901 19th Street, Denver, Colorado 80294
25       Proceedings Reported by Mechanical Stenography
            Transcription Produced via Computer

```
 1                      P R O C E E D I N G S

 2          THE COURT:  Case 92-cv-870, Montez v. -- I guess it

 3   now should be amended to read Ritter.

 4          I'll take the appearances of counsel.

 5          MS. GREISEN:  Good morning, Your Honor.  Paula Greisen

 6   and Ed Ramey, as well as Terrance Carroll, who is also joining

 7   us on this case for the plaintiffs.

 8          (Defense entered courtroom.)

 9          MS. McCANN:  Sorry, Judge.

10          THE COURT:  Go ahead and enter your appearance,

11   Ms. McCann.

12          MS. McCANN:  Yes, Your Honor.  Beth McCann, Jim Quinn

13   and Jess Dance on behalf of the defendants from the Colorado

14   Attorney General's Office.  I apologize.  Didn't realize that

15   it was already after 9:00.  We took the bus.

16          THE COURT:  All right.  This matter comes before the

17   Court in part for a status conference because there seems to be

18   some confusion at least in some minds as to which judge is

19   handling which claims.

20          I've talked to Judge Kane.  And at his suggestion, I

21   will be handling the plaintiff class's motion for clarification

22   on standards used to determine disability status.  That's

23   Document No. 2245.  And I will also decide the plaintiff

24   class's motion regarding legality of the DOC's medical co-pay

25   program and the underlying colorado co-pay statute, which is
```

1   Document 2234.

2        And I realize there is some overlap.  And arguably,

3   either of those motions could go to him.  His suggestion was

4   that he was reviewing Special Master's orders and did not think

5   that substantive rulings on the overall standards should be

6   decided by him.  And after considering the matter, I agree.

7        I understand, particularly with respect to the motion

8   for clarification, 2245, that he has already decided in

9   individual damage cases that the DOC is not misapplying or not

10  committing errors of law, or more precisely, the Special

11  Masters are not committing errors of law in their adjudication

12  of individual damages claims.

13       I'm not going to revisit anything that he's done.  In

14  other words, if he had said, there is no error of law in damage

15  claims or in the Special Master's adjudication of the damages

16  claims, I'm not going to throw that process into chaos, his

17  rulings will remain the law of the case in individual damages

18  claims.

19       Now, I do have questions and invite sort of a modified

20  argument on some of these issues.

21       Both motions were filed nearly a year ago.  And with

22  respect to the class motion for clarification of standards, the

23  Court has read the materials and looked at the cases,

24  particularly the *Sutton* case.  And the only thing that concerns

25  the Court about what DOC is doing, frankly, is the sort of

4

1    catch 22 that the plaintiffs class counsel alludes to, where an

2    inmate, for example, has vision which is correctable with

3    corrective lenses.  And under the *Sutton* case, it would seem

4    that such an inmate is not disabled if with the correction he

5    has 22 vision.  That means that he has to have the correction

6    in order not to be disabled.

7          And unlike people who are not incarcerated, he cannot

8    go down to the drug store or go to his optometrist or

9    ophthalmologist and get a pair of glasses whenever he wants to.

10         Now, the defendants sort of pass that off as a

11   problem, but a problem they're working on.  And if it still

12   remains a problem, they're going to work on it quicker.

13         What I'm going to do is declare that there is a class

14   of individuals that the defendants have to create who are not

15   disabled with corrective devices, but who would be disabled

16   absent those corrective devices.  And as to those people, the

17   AIC is to make sure that there are expedited procedures

18   followed to get them the corrective devices.

19         In other words, as I understand the essence of the

20   plaintiffs' grievance, it is that if an inmate needs glasses,

21   for example, and is not treated as disabled, then he's treated

22   as an ordinary inmate and he has to go through the entire

23   cumbersome delayed process for getting glasses.  In the

24   meantime, he can't see.

25         The Court will not tolerate that.  It will not

1    tolerate treating that inmate as a person who is completely

2    undisabled.  He's conditionally undisabled, and that's a class

3    that the defendants are going to have to create.

4           As to those people, the procedures of the remedial

5    plan apply to the extent that the AIC has to adopt procedures

6    to expedite their keeping or getting the devices that enable

7    them to fall within the category of not being disabled.

8           So the motion for clarification is granted.

9           And the Court has attempted to clarify two aspects of

10   the case.  Number one, as to money damages, I'm not doing

11   anything.  Those cases are being determined by the Special

12   Master.  Judge Kane has on review also determined evidently

13   that there is no error of law, or if he thinks there is an

14   error of law, of course, he's taken that position.

15          As to the ongoing issue of how this is to be

16   administered, I've ruled on the creation of a class of

17   individuals that are not disabled with devices under *Sutton* but

18   that would be disabled absent the devices, and they are to

19   receive special treatment under the remedial plan.

20          Ms. Greisen.

21          *MS. GREISEN:*  Would you like me to go to the podium,

22   Judge?

23          *THE COURT:*  Please.

24          *MS. GREISEN:*  Judge, if I can just for clarification.

25   That answers the Special Master's issue and the issues where

1   people need assistive devices or accommodations.

2          The one area that we need assistance on is the

3   diabetic area, because the diabetics don't necessarily need

4   assistive devices per se, it's more of the type of

5   accommodations that they need.

6          What has happened at the DOC, we had recently gotten a

7   list of all the diabetics and how they've been classified.

8   There is not one diabetic right now in the DOC classified as

9   disabled.  They're all classified as not disabled or confirmed

10  diabetic but not given disability status.

11         THE COURT:  I intended to include them within this

12  class -- I'll call it a special class that DOC has to deal

13  with.  And I -- diabetics seem to me to be sui generis because,

14  you know, some of them require only minor accommodation.

15         MS. GREISEN:  True.

16         THE COURT:  Others of them have major problems,

17  depending on the seriousness of their disease.  And I don't --

18  this court is not going to create a class of diabetics per se

19  and say, they're disabled or they're not disabled.

20         MS. GREISEN:  Right.

21         THE COURT:  But they should fall within this category

22  of people that the AIC watches over.

23         MS. GREISEN:  I agree.  I mean, our premise is that

24  they do have the protections of the remedial plan.  I just

25  wanted to make sure --

1          THE COURT:  That's the Court's ruling.

2          MS. GREISEN:  Okay.

3          THE COURT:  The diabetics are included within that.

4    If they require -- you know, it depends on whether they would

5    be disabled without the accommodation.

6          MS. GREISEN:  Sure.  And it's on a day-by-day basis,

7    because on a day-by-day basis you have to time food with

8    insulin, on a day-by-day basis you have to do these things.  So

9    it's -- as opposed to losing a battery or a hearing aid or

10   something like that, it's a day by day, and it could be a life

11   threatening day by day.  It's a little different than hearing

12   aids or the eyeglasses because of the possible repercussions.

13         THE COURT:  Well, I want to -- I'm qualifying my

14   agreement with the plaintiffs' class.  A diabetic is not -- let

15   me back up a second.  The class that I'm directing the

16   defendants to create is a class of people who would be disabled

17   without the accommodations, whatever the accommodation is, but

18   who would be disabled without the accommodation.

19         Now, you can have a diabetic that wouldn't be disabled

20   even without the accommodation.

21         MS. GREISEN:  I think by their nature, all diabetics

22   if they don't time their medication with their food are going

23   to be disabled.

24         THE COURT:  I don't think that's necessarily true.  I

25   think it has to be done on a case-by-case basis.

1      *MS. GREISEN:*  I don't disagree with you.  I guess -- I

2  guess what I'm saying, if you do have to time -- if you do have

3  a person where you do have to time their food with their

4  insulin, I guess that's the question we need resolved, whether

5  or not that means if you don't do that, that person is --

6      *THE COURT:*  The person -- if the person is disabled,

7  then they fall within this special class that I'm telling the

8  defendants to create.

9      *MS. GREISEN:*  Okay.

10      *THE COURT:*  And I can't do that, I think, as to all --

11  as to the class of diabetics, nor can I do it as to a

12  particular subclass of diabetics.  I think each case needs to

13  be determined on its own merits.

14      *MS. GREISEN:*  I don't disagree, Judge.  I don't

15  disagree with that.

16      *THE COURT:*  Okay.

17      Now, I really am more puzzled by the legality -- the

18  medical co-pay statute, and I may not be able to rule on that

19  this morning.

20      Assuming that this subclass is created -- and I guess

21  I'm misnaming it when I call it a subclass.  Assuming this

22  special class of people is created and -- well, let me put the

23  question this way:  Assuming the class is created, what

24  implications does that have for the medical co-pay program?

25      *MR. RAMEY:*  Your Honor, this one has fallen in my lap,

1    I guess, even though I'm fairly new in the case.

2             THE COURT:  All right.

3             MR. RAMEY:  Let me try to explain, I guess -- I mean,

4    the situation as we're seeing it, also equally important what

5    we're not seeking in terms of relief from the Court, because --

6    maybe I should even start with that.

7             THE COURT:  All right.

8             MR. RAMEY:  We are not attempting to challenge the

9    co-pay system generally.  We're not challenging the statute.

10   We're not challenging the discretion vested upon the Department

11   of Corrections to institute co-pays, determine the amounts.

12   The fact there is a significant disparity between the co-pays

13   and the amount that inmate or offender, I guess is the

14   proper -- I'm told the proper term these days, politically

15   correct term, earns and therefore can apply, I'm putting all of

16   those issues aside.

17            The difficulty with the diabetics, which is a group

18   that is recognized as protected under the remedial plan, is

19   that they have some special situations.  Number one, it's a

20   chronic illness.  They're already subjected to a co-pay, as I

21   understand it -- under the system that the DOC has in place,

22   already subjected to a co-pay on a semi-annual basis of $5, I

23   believe in addition to --

24            THE COURT:  They have to pay $5 every six months?

25            MR. RAMEY:  That's sort of a base that -- having a

1    chronic illness that they're required to pay.

2         Two other things principally can happen, as I

3    understand it, with regard to diabetics.  Number one is, they

4    need to get insulin.  They need to go in and get prescriptions

5    refilled for insulin., every time they do that, there is a

6    co-pay.

7         Secondly, every time they go in on a self-declared

8    emergency, which means blood sugar has gone down, they're

9    crashing, whatever the case may be and for whatever reason that

10   may be happening, one of which reasons may well be what has

11   been a significant delay between -- historically has been a

12   significant delay between the time they would be administered

13   their insulin and have access to a meal, if they go in and

14   declare an emergency, that results in a co-pay.  It's $5

15   co-pay, if I understand it, if the emergency is confirmed by

16   the clinical officials.  It is a $10 co-pay if it's not

17   confirmed.

18        What that does is incentivize these people who have a

19   greater than normal compared to other inmates or offenders, it

20   incentivizes them not to seek the assistance of the clinical

21   services that are available so that they don't drive their

22   account down because, like anybody else, they'd like to have

23   the funds available to purchase other things.

24        The co-pay system itself, as I understand it, is

25   designed both as a program to avoid abuse of the clinical

1    programs and services by inmates or offenders, and also as a

2    vehicle for rehabilitating or training inmates or offenders to

3    manage money, if you will, their accounts, all which is fine.

4         But there is a heightened need here for these

5    particular -- these particular persons whose are covered by the

6    remedial plan, by stipulation, that if they need to go in and

7    get insulin, and in fact, if they are suffering due to the

8    conditions in the facility where they're incarcerated, if they

9    are suffering a need to go in and get help, they are

10   disincentivized by the system for doing so.

11        So all we're asking here is that in situations where

12   they are seeking to add -- access clinical services for those

13   reasons, related to that particular illness, that they not have

14   a separate co-pay over and above the chronic condition co-pay

15   they're already being required to pay.

16        THE COURT:  So their chronic co-pay is 5 bucks every

17   six months?

18        MR. RAMEY:  I understand it is, subject to correction.

19   I'm new enough that I may be getting a number wrong.  As I

20   understand the current program, it's $5 every 183 days.

21        THE COURT:  And so you're asking that they not have to

22   co-pay every time they get insulin and/or every time they go in

23   for emergency treatment?

24        MR. RAMEY:  That they --

25        THE COURT:  What if it's determined not to be an

1    emergency?  In other words -- I see this as a serious problem,

2    because I've watched in the two years the remedial plan has

3    been going, some of these folks seem to think that they can

4    bypass the ordinary system by becoming a part of the Montez

5    class.  And what I'm concerned about in an analogous manner

6    here is, if you're a diabetic, can you self-declare an

7    emergency and avoid it entirely?

8         MR. RAMEY:  Well, Your Honor, first on the other side

9    of that.  I do want to answer what you just said, but the other

10   side of that, of course, is second-guessing an inmate's

11   evaluation of whether they're legitimately suffering an

12   emergency condition or not.

13        THE COURT:  Well, I've got to tell you, I'm not

14   bothered by the institution's second-guessing that, because

15   these folks are not the most social people in the world.

16   That's why they're in prison.  And I think that the system is

17   very easily subjected to abuse if there is not some kind of

18   check on it.  And that's regardless of whether the inmate is

19   diabetic or not.

20        MR. RAMEY:  Your Honor, I wouldn't quibble

21   philosophically with what you're saying.  I don't think -- I'm

22   going to limit my request here.  I don't think there is

23   evidence before the Court that this particular class of people

24   we're talking about, as opposed to inmates in general, but this

25   particular class of diabetics, is exhibiting a material amount

 1   of abuse such as you're describing.  It may be --

 2        THE COURT:  I'm not saying any more or any less.  I'm

 3   not saying they exhibit more abuse.  I'm just saying it is

 4   subject to abuse.

 5        Evidently a list of diabetics has been created.  How

 6   many are there in the system?

 7        MR. RAMEY:  Yes.  I'll defer to Ms. Greisen.  I don't

 8   have the number.

 9        MS. GREISEN:  We were given the list.  I haven't

10   counted.  It's the largest class, without doubt.  I don't know

11   if DOC has a number or not, but there are hundreds.  I don't

12   know specifically what the number is at this point.  We're just

13   now starting to do discovery on the compliance to see what the

14   current state of that is.

15        Judge, if I can.  If there is abuse, there is a COPD

16   method, and they've used it before, to punish somebody for

17   abuse.

18        THE COURT:  What's that?

19        MS. GREISEN:  There is actually a regulation, COPD

20   regulation that says they're abusing medical services.  I've

21   seen it once in the 14 years in this case where a prisoner has

22   been charged with it, and we specifically --

23        THE COURT:  It's a disciplinary infraction?

24        MS. GREISEN:  Yes.  When we went into the stipulation,

25   we agreed that if somebody was abusing the system, that the

1    COPD could be -- they could use that to halt that.  And we have

2    not heard of any abuses in the year and a half or about year

3    since the stipulation has been in effect and waive the co-pays,

4    just for the Court's knowledge.

5         *MR. RAMEY:*  Your Honor, that was a piece of

6    information I did not have, and I appreciate it.

7         Even so, again, I guess I was reminded -- my concern

8    is the effect is incentivizing.  If there is a way to handle

9    abuse, we would have no objection to -- but to disincentivize

10   somebody who in their own mind really does legitimately need

11   these services, whether ultimately determined to need them or

12   not by a medical professional, given the conditions

13   particularly of these facilities as we -- as certainly they

14   existed, and as far as we know, still exist --

15        *THE COURT:*  Well, I think it's very difficult to

16   distinguish a case where an inmate in his own mind in good

17   faith believes that he may be having an insulin shock, or

18   whatever the condition is, and an inmate who really is seeking

19   to game the system in some way.  That's very difficult to

20   determine, I would think, particularly if the DOC has an entire

21   list of inmates that they think are diabetics.

22        I mean, a diabetic can game the system just as well as

23   a non-diabetic, and it's difficult to distinguish that person

24   from a person who really does think he's having insulin shock.

25        *MR. RAMEY:*  Well, Your Honor, to some degree, they're

1    doing it now.  Because the system now is that if emergency

2    services are sought and they're confirmed, the co-pay is $5.

3    If they're not confirmed by the medical staff, co-pay is $10.

4    So they're doing -- they're exercising that judgment in some

5    regard at this point.  My emphasis --

6         THE COURT:  I'm sorry to interrupt you.  So you're

7    essentially asking that they not have to co-pay every time they

8    order insulin and that they not have to pay the $5 co-pay

9    whenever they go in for an emergency and the treating doctor or

10   physician's assistant or whatever agrees that there is an

11   emergency?

12        MR. RAMEY:  Well, Your Honor, almost.  My request goes

13   slightly farther than that.  And that is that if an inmate

14   self-declares an emergency, who does fall within this diabetic

15   class as defined by the remedial plan, that they not be

16   subjected to a co-pay irrespective of the confirmation process

17   that may take place.

18        Having said that, I would not certainly object,

19   following up on Ms. Greisen's comments, to discipline being

20   administered against an inmate --

21        THE COURT:  Discipline is at the far end.  I mean,

22   discipline -- prison discipline is a pretty serious thing, and

23   I don't know that prison discipline is what we want to fall

24   back on to prevent gaming of the system.  It seems to me if

25   there is an -- if somebody declares an emergency and the

1   medical expert says there is no emergency, that person is

2   properly subject to a co-pay to make sure that the system is

3   not abused.

4           I understand your point.  If the medical provider

5   agrees that there is an emergency that required the inmate to

6   be seen, then arguably the $5 co-pay should not apply to that

7   situation, and it shouldn't apply to the continuous provision

8   of insulin for a chronic diabetic.

9           I'll hear from the defendants.

10          MS. McCANN:  Your Honor, it's my understanding that

11  the --

12          THE COURT:  Ms. McCann -- before you get started, let

13  me back up to the other motion and make sure that the

14  defendants are clear on what it is the Court is ordering the

15  defendants to do.

16          MS. McCANN:  My understanding is you're asking that we

17  create a separate class that will be people who are -- would be

18  disabled without their remedial measure or their accommodation,

19  subject as glasses or hearing aid, even though if they have

20  those devices, they are no longer disabled.  But we would have

21  a class that would be -- a separate class that the AIC would

22  monitor to make sure that they are provided what they need in

23  order to not be disabled.

24          THE COURT:  That's correct.  And it includes

25  diabetics.  You have to determine with the diabetics, whether

1    they would be -- what remedial measures they need to be not

2    disabled on a case-by-case basis.

3           MS. McCANN:  Yes.  And I think we can do that.

4           In fact, it's already being done to some extent.  We

5    have now a person who is in charge of making sure that inmates

6    get the accommodations such as hearing aids and glasses when

7    they're ordered.

8           What has happened sometimes in the past is the medical

9    staff has ordered someone to have a hearing aid, and then in

10   the process it takes a long time for the hearing aid to

11   actually get provided, or new batteries for a hearing aid.  And

12   we agree with the Court, that's really unacceptable.  And so

13   DOC now has a person that is tasked with follow-up on those

14   orders.

15          THE COURT:  All right.

16          MS. McCANN:  And also the AIC is now adding to her

17   accommodation resolution a statement that if hearing aid or

18   eyeglasses are -- need repair or are destroyed, that the person

19   is then considered disabled during that time period and there

20   needs to be expedited attention.  So I think we're already

21   doing it.

22          THE COURT:  All right.

23          MS. McCANN:  The one that is -- I think has caused us

24   the most confusion and difficulty are the diabetics, because

25   there are a lot of diabetics in DOC.  And the AIC has viewed

1    their treatment as really a medical issue.  And she has pretty

2    much deferred to the medical staff, the clinical staff, for

3    things such as, do they need insulin?  How often?  And the

4    diabetics, most -- the DOC folks believe that most of the

5    diabetics are controlled at DOC, either through diet or through

6    insulin.  There are really not diabetic -- many diabetics who

7    are uncontrolled, at least that's the position that DOC tells

8    us.

9         THE COURT:  Well, you know, one of the things that has

10   come up -- claims asserted, for example, is that they're not

11   regulating the timing of meals very well.

12        MS. McCANN:  Yes, that's been brought to our

13   attention.  And my understanding is that DOC has focused on

14   that, and now the diabetics are being given access to the chow

15   earlier.  They're supposed to be going first.  And that that is

16   coordinated with their insulin -- those who get insulin, it is

17   coordinated with the need to have the timing correct.

18        THE COURT:  All right.

19        MS. McCANN:  There has been a big effort in the

20   diabetic area, thanks to a great extent to the plaintiffs and

21   their expert in helping establish with DOC what diabetics need.

22        But it's a complicated question, because many of them

23   don't consider themselves disabled.  And, you know, they are

24   compliant with their diet, they're compliant with their medical

25   treatment, and so they don't really want to be identified as a

 1    separate disabled person.

 2         But I think with the Court's ruling, I think we can

 3    focus a little more on the whole issue of, are they disabled

 4    without an accommodation?

 5         I guess -- DOC doesn't view insulin and medical

 6    treatment as an accommodation under the ADA.  That's just

 7    medical care.  We have other chronic care inmates.  We have

 8    quite a bit with Hepatitis C, other categories of hepatitis.

 9    We have quite a few asthmatics.  And those are chronic diseases

10    also, but we don't consider them disabled.  We would just

11    consider them needing more medical care, and that's kind where

12    the confusion arises.

13         THE COURT:  Well, it would depend -- the remedial

14    plan's definition and the ruling that Judge Kane and I jointly

15    did a year or so ago answers that question, it seems to me.  If

16    a condition, whether it's asthma or hepatitis or HIV or

17    diabetes, substantially limits an inmate in his or her major

18    life activities, then that's the definition of disabled.

19         MS. McCANN:  And I think we can -- I think we can work

20    within the Court's ruling.

21         THE COURT:  Okay.

22         MS. McCANN:  In that regard.

23         THE COURT:  All right.  Then go ahead and address the

24    medical co-pay.

25         MS. McCANN:  Okay.  Well, I'm glad to hear that there

1   is no longer a challenge to the constitutionality of the

2   statute, because that was in the brief, asking the Court to

3   find that statute was unconstitutional.

4           But I'll move on to the issue of what's going on now.

5           The payment for the chronic co-pay, the chronic co-pay

6   is a result of a visit.  Every six months those with chronic

7   diseases in DOC are seen by a medical person, and so they pay a

8   $5 co-pay twice a year for those two visits.

9           THE COURT:  That's diabetics and --

10          MS. McCANN:  Asthmatics, hepatitis, AIDS.  And the

11  idea of that is, DOC is trying to be a little more proactive

12  with chronic care and do a little better job of monitoring

13  those who have chronic care, so they've set up this chronic

14  care program.  That's what that co-pay concerns.

15          And my understanding is that with insulin, when they

16  go in, have their chronic care visit, they're given a

17  prescription for insulin, and that is not a separate charge.

18          Now, it may be that if there is a change in their

19  medication during the six-month period, that they do get

20  charged another co-pay if they go in and have a change in their

21  insulin, just like you or I pay the doctor if we have to go

22  have a visit for our prescriptions.

23          THE COURT:  So -- so if an inmate starts out -- has a

24  six-month visit, he or she is prescribed six months' worth of

25  insulin to deal with the current state of his diabetes?

 1          *MS. McCANN:*  That's my understanding.  But the AIC

 2    happened to be on vacation this week, so I haven't been able to

 3    confirm with her prior to this hearing exactly how that's

 4    working.  But my understanding is, they get a prescription that

 5    will take them through until the next chronic care visit.

 6          *THE COURT:*  So it's only if their condition worsens --

 7          *MS. McCANN:*  Yes, or they go back and say, I -- this

 8    isn't working, I need more.

 9          *THE COURT:*  All right.

10          *MS. McCANN:*  Visits that are --

11          *THE COURT:*  That's a serious discrepancy in what the

12    facts are.

13          *MS. McCANN:*  Right.

14          *THE COURT:*  Because the representation of the facts

15    from the plaintiffs' side is that -- at least I take it that

16    you're implying they do not get their six months' worth of

17    insulin when they go in to visit initially, they get a

18    prescription for insulin, then they go in periodically to renew

19    that prescription, and every time they go in to renew that

20    prescription it is a separate co-pay charge.

21          *MS. McCANN:*  And we can, perhaps, give you a

22    supplemental affidavit or something of that sort that would

23    answer that question.

24          What's going on right now is that because of the

25    stipulation last year, we -- the that DOC is not charging the

 1    co-pay for diabetics.

 2            *THE COURT:*  It isn't?

 3        *MS. McCANN:*  No.  We -- as part of the extension of

 4    the compliance period, we stipulated that during this -- and

 5    that happened last June or July, a year ago, DOC stipulated it

 6    would no longer charge a medical co-pay pending the Court's

 7    ruling on this issue.

 8            *THE COURT:*  Now, pending the Court's ruling, which

 9    Court?

10        *MS. McCANN:*  Well --

11            *THE COURT:*  Judge Kane, I know, has a conference later

12    this morning.  And I looked at your status report for his

13    conference, and there is -- it's really unclear to me what it

14    is that you think he's deciding and what it is he thinks he's

15    deciding.

16        *MS. McCANN:*  Well, originally I think we both thought

17    Judge Kane was going to be ruling on the co-pay issue.

18            *THE COURT:*  Right.  I gathered as much.

19        *MS. McCANN:*  It's fine, you know, for you to rule on

20    that is fine.  But as part of our stipulation on the compliance

21    period, we agree -- DOC agreed not to charge co-pays for

22    diabetics for these kind of finger stick appointments and if

23    there is an insulin issue.  So that's been the case for the

24    last year.

25            My understanding from the DOC folks is they are going

1    to the legislature this year to get -- try to get the statute

2    changed to give them a little bit more discretion about the

3    whole medical co-pay situation, because right now they view it

4    as a mandatory -- the statute says "shall" charge a co-pay for

5    medical care.  So they're trying to get a little more

6    discretion in the executive director as far as what kinds of

7    things have to have a co-pay attached.

8         And so I haven't had a chance to talk to the executive

9    director about what his inclination is with co-pays.  But it

10   is -- as the Court has pointed out, it's a delicate balance

11   between wanting to provide medical care but not subjecting the

12   medical staff to constant visits from people who shouldn't be

13   there.

14        THE COURT:  Well -- go ahead.

15        MS. McCANN:  Our position in response to the

16   plaintiffs' motion is that DOC has -- has to charge for medical

17   care, that's what the statute says.  And they have been doing

18   what they think is appropriate in terms of charging for visits

19   every time someone comes, just like a person on the outside

20   pays for a doctor visit.  And the idea is to discourage people

21   abusing the system.

22        So DOC's position is that this court should order or

23   stay state -- rule that DOC has the authority to charge a

24   co-pay for any medical visit, and that that is a statutory

25   requirement.

1      So that's our position.

2      Having said that, as I said, I think DOC is looking at

3 the whole co-pay situation in an effort to make sure they're

4 applying it.

5      THE COURT:  Well, at the moment, if I understood what

6 you just said, no co-pays are being charged to diabetics.  And

7 diabetics are the driver of this issue, are they not?

8      MS. McCANN:  Except the chronic co-pays.  They still

9 are charged the six-month -- the $10.

10      THE COURT:  But they're not -- I don't think the

11 plaintiffs are challenging the chronic co-pay.

12      MS. McCANN:  I don't think so.

13      THE COURT:  Every six months.  It's the continual

14 revisiting that they don't like and that there is a factual

15 dispute on.

16      Well, what -- you know, I know you're in front of

17 Judge Kane in 20 minutes.  What do you think that he's going to

18 decide?  What issues are before him?

19      MS. McCANN:  The only real issue in front of Judge

20 Kane right now is whether the plaintiffs are going to be

21 entitled to take depositions in preparation for compliance

22 hearing.

23      THE COURT:  And he held a compliance hearing some time

24 ago, didn't he, last year?

25      MS. McCANN:  Last April.  And we recessed that

1    compliance hearing when the parties arrived at a stipulation.

2         THE COURT:  Right.

3         MS. McCANN:  To extend the compliance period until

4    this past July.  And we've been unable to come to an agreement

5    about whether DOC is in compliance now, so we're going to

6    schedule another compliance hearing.

7         THE COURT:  All right.  So remind me or call my

8    attention to the provision of the remedial plan that says he

9    monitors the compliance.  I think it's in there; I just can't

10   remember what it is.

11        MS. McCANN:  I think it is.

12        I believe it's in -- on page 30 in Section 36, the

13   resolution of dispute.

14        MS. GREISEN:  Actually, there is a little bit more

15   specific provision on page 26 at paragraph 31, compliance and

16   monitoring periods.  At the end of the first paragraph, it says

17   the parties -- if the parties disagree as to whether

18   substantial compliance has been achieved, the dispute shall be

19   submitted to Judge Kane for final determination.

20        THE COURT:  Where are you reading from, Ms. Greisen?

21        MS. GREISEN:  Under paragraph 31, compliance and

22   monitoring periods, page 26.  There is a -- first full

23   paragraph --

24        THE COURT:  In my copy --

25        MS. McCANN:  It's page 28.  I think she said page 26.

 1          *MS. GREISEN:*  I guess I have a different -- maybe I

 2    don't have the court copy.

 3          *THE COURT:*  On page 28, 31 -- I see the compliance and

 4    monitoring periods section.

 5          *MS. GREISEN:*  The last sentence in the first

 6    paragraph.

 7          *THE COURT:*  All right.  So he has jurisdiction to

 8    determine disputes concerning whether substantial compliance

 9    with the plan has been achieved, right?  That's -- I guess the

10    ambiguity in that is probably what is creating these problems

11    and who is deciding what.

12          You know, I'm inclined, having talked to both of you,

13    to say that in light of your stipulation, the medical -- the

14    issue concerning the medical co-pay program is currently moot.

15    Now, it may be presented again if and when the DOC decides that

16    the stipulation has expired and it is no longer going to abide

17    by the stipulation.  And at which time, you could renew the

18    motion.

19          *MS. McCANN:*  Well, the stipulation was arrived at with

20    the understanding that both sides would brief this issue, and

21    the stipulation would only be in effect on that issue until the

22    Court decided.

23          *THE COURT:*  Oh.

24          *MS. McCANN:*  So it isn't really moot.  Sorry.

25          The idea was, DOC agreed to waive pending a ruling by

1   the Court.

2          THE COURT:  All right.  Well, the factual issue it

3   seems to me that we need to get decided is, what happens if an

4   inmate gets insulin and then his condition changes so that he

5   has to get a different insulin prescription, or is that

6   happening?  The plaintiffs seem to be saying, he gets enough

7   insulin for a month, then has to go in for the next month and

8   then next month, and each time he gets charged a co-pay.  The

9   defendants are saying, he goes in every six months, and he has

10  this chronic co-pay charge, which the plaintiffs don't appear

11  to be challenging.  He gets enough insulin until his next

12  chronic co-pay appointment, and only if his condition worsens

13  does he go in.

14         MS. McCANN:  I think there is a factual disagreement

15  there.

16         THE COURT:  How fast can you get that issue before the

17  Court?

18         MS. McCANN:  Well, the AIC will be back on Monday.  So

19  I should be able to get something to you next week.

20         THE COURT:  All right.  Well, your affidavit will be

21  helpful, but they may dispute it.

22         MR. RAMEY:  Your Honor, can I just address this

23  briefly?  And I don't want to turn this into an evidentiary

24  hearing.  It isn't one, and we don't have time for one anyway.

25         I'm looking at a deposition where the chief medical

1    officer, I believe, sometime in the past, so we're not talking

2    today, was acknowledging the response to the questions that

3    every time that an inmate went in for a new prescription, they

4    call it a kite, I guess, they were charged a co-pay.  Certainly

5    whenever the prescription is changing for whatever reason,

6    they're charged a co-pay.  This may simply not be the case

7    under the current protocols that the department would follow

8    were it not for -- even for the temporary stipulation, I don't

9    know.

10         We can certainly get this affidavit and sort it out.

11   I'm guessing rather than -- I mean, we could present counter

12   affidavits and testimony and turn this into a real evidentiary

13   hearing.  I'm wondering if in consideration of what affidavit

14   the department itself might present, we could simply state to

15   the Court what appears to be acceptable or not, and Your Honor

16   could tailor any ruling you might make based upon what you want

17   to see happening so that we don't have to quibble for days in

18   here about whether it's actually going on or not.

19         *THE COURT:*  Well --

20         *MS. McCANN:*  The other thing I would like to do, Your

21   Honor, is, I would like to have a discussion with the executive

22   director about what his intention is with respect to this kind

23   of co-pay.  I mean, it may be --

24         *THE COURT:*  Is Zavaras the executive director?

25         *MS. McCANN:*  Yes.  I know they're looking at it.  It

1    may be that this is not a big issue for him, and he's willing

2    to continue the process of not charging for it.  I honestly

3    don't know what his position is right now.  So I think if I --

4    you know, if we could submit something to the Court in the

5    future, it might clarify.  And then truly would be moot.

6           THE COURT:  I would like to get the motion decided, of

7    course, by the end of the month, if I can, if I possibly can.

8    I didn't realize it was my motion until Judge Kane told me,

9    frankly, so I'm trying to work on it right now.

10          You can probably by next Wednesday, then, get in some

11   kind of affidavit, and you can also talk to the plaintiffs to

12   see if there is a factual dispute?

13          MS. GREISEN:  Judge, if I may.  I mean, the AIC that

14   she's referring to isn't -- we would really need to talk to the

15   head of clinical services about the issue, because it's also an

16   issue of -- DOC sometimes changes people's insulin, because

17   last year they changed -- decided department wide to put

18   everybody on a new type of insulin, so things happen.  There is

19   not one course of action.  It's like you were talking about

20   before, kind of happens on a case-by-case basis.  We would

21   probably put the evidence up in the compliance hearing as to

22   what people are charged because we're -- starting next week,

23   we're going to start touring the facilities and talking to our

24   clients about what is working and what is not as a part of the

25   compliance hearing in this case.

1          So an affidavit from the AIC would put us in the

2     position of -- I don't know how in a week I would be able to

3     get all the evidence from our clients to go against that.  I

4     mean, one thing we can do is, we're asking Judge Kane for

5     depositions.  One of the people we want to depose is the chief

6     of clinical services.  And maybe we just take her deposition

7     and do it.

8          But I think it's a little bit more complicated --

9     unless they're willing to stipulate this isn't an issue, it's a

10    little bit more complicated than just getting an affidavit.

11         *THE COURT:*  Why don't you talk to the executive

12    director, Mr. Zavaras, and see if he's willing to extend the

13    stipulation indefinitely, or whatever he's willing to do.  As

14    you point out, that might moot the co-pay issue either

15    permanently or moot it at least currently until something

16    further happens.  It may be that Judge Kane enters a ruling on

17    compliance that could affect co-pay.

18         I can see how you thought he should have this, because

19    it's an issue of compliance.  I tend to defer to him because

20    it's my case and he's, frankly, doing all of us a favor by

21    being involved.  And so if he suggests that I handle something,

22    I usually do it, because I don't like to shove the work off on

23    him.

24         *MS. McCANN:*  I just need to make one little clarifying

25    response, if I might, Judge.

 1          If the visit is asked for or instituted by DOC, for

 2    example, if they say, we're changing your insulin, you need to

 3    come in, there is no co-pay charged for that kind of visit.  If

 4    it's a scheduled visit that DOC requires, there is no co-pay.

 5    So -- just to clarify that.

 6          THE COURT:  Why don't you give me a status report,

 7    then, by next Wednesday.

 8          Will that give you time to talk to the executive

 9    director?

10          MS. McCANN:  I think so.

11          THE COURT:  And if he agrees to extend the present

12    policy indefinitely, at least until a ruling by Judge Kane on

13    compliance issues, then I think this motion may well be moot.

14          MS. McCANN:  All right.

15          THE COURT:  At least for now.  And could be renewed if

16    it becomes a problem.

17          MS. McCANN:  All right.

18          THE COURT:  All right.  Anything further?

19          MS. McCANN:  69 no, Your Honor.

20          THE COURT:  Court will be in recess.

21          (Hearing concluded at 9:51 a.m.)

22                      REPORTER'S CERTIFICATE
           I certify that the foregoing is a correct transcript from
23    the record of proceedings in the above-entitled matter.
           Dated at Denver, Colorado, this 7th day of July, 2008.
24                                  s/Therese Lindblom

25                      _____
                        Therese Lindblom,CSR,RMR,CRR