**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. 92-cv-00870-EWN

JESSE MONTEZ, et al.,

    Plaintiffs,

v.

BILL OWENS, et al.,

    Defendants.

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUL 31 2008

GREGORY C. LANGHAM
                  CLERK

---

Claim Number 03-327
Claimant: Michael R. Ingram, DOC #43629
Address of Claimant: SCF, POB 6000, Sterling, CO 80751

---

### CLAIMANT'S OBJECTION TO FINAL ORDER OF SPECIAL MASTER

---

### I. MOBILITY CLAIMS

Claimant ("C.") maintains that he has three mobility disabilities: (a) Heel Deformities, (b) Knee Pain, and (c) Back Pain.

    A. HEEL DEFORMITIES

    1. C. has deformed heels, i.e., bony protuberances. After walking for a short time in prison-issue shoes, blistering and abrasions develop on and around the protuberances. If C. continues to walk some pain is experienced. The distance easily exceeds 100 yards. However, the next day C. experiences "substantial limits" when he performs the major life activitiy of walking because aggravating the blisters and abrasions cause pain with each step. The blistering and abrasions create a high risk of infection.

    2. Mitigation Attempts: When available, C. has lined the heels with a layer of moleskin which allows for a longer time before blistering and abrasions develop. Several layers of moleskin will virtually eliminate or minimize the blistering and abrasions; however, this pushes C's feet so far forward that his feet ache and burn, especially the arches, and blistering and abrasions on the toes develop. Once again, this exceeds 100 yards' however, the next day C. experiences "substantial limits" when he walks because of the constant ache and burn, as well as the blistering and abrasions on the toes. After a few days, the burning and ache is constant whether walking, standing, or at rest.

    3. The Special Master ("Master") made the following erroneous findings in § II.4:

> ...C. also has bad feet due to deformed heels and bony protuberances. His feet cause him pain when he walks. Because of the condition of his feet, state issued boots cause him blisters. As a result he wears tennis shoes and generally has been allowed to wear them instead of state boots.

The Master erred when he found "deformed heels and bony protuberances." The bony protuberance is the deformity. The Master also erred when he found that "state issued boots cause him blisters." Actually, the boots cause blisters and abrasions (raw bloody spots). The Master further erred when he found that C. "generally has been allowed to wear [tennis shoes] instead of state boots." In certain areas, and during inter-facility transfers C. must wear state issue boots.

4. Discrimination: DOC has ignored standars that require medically-issued tennis shoes because C. has establihsed a significant anatomical condition that cannot be accomodated by routinely issued footwear. C. Has purchased many pair of tennis shoes at his own expense instead of DOC bearing the costs as required by the Constitutions, State law, and regulations.

DOC requires C. to wear state boots during transfers which cause painful blistering and abrasions. Usually a transfer includes a layover, lasting a week or more, at CTCF, where C. is not allowed to wear tennis shoes. Certain jobs require state boots.

5. Conclusion: The average person does not suffer the pain of blistering and abrasions, or the risk of infection. C. has established that he suffers from an impairment that significantly limits a major life activity, walking. Any other conclusion relies upon the absurd conclusion that C. should only walk for a very short distance each day, and no more, or after developing blisters and abrasions, not walk again until completely healed, and so on, to avoid pain and the risk of infection.

B. KNEE PAIN

1. C. has experienced knee pain that has progressivley increased since approximately age 14 when the first of many injuries occurred. His request for an accomodation that he not be required to perform labor that would exacerbate his knee pain has not been granted. Prolonged walking or standing is a problem. Repetitive lifting or heavy lifting can cause pain.

2. Discrimination: The letter to Gov Owens explained tht all it takes is a corrupt Case Manager to ignore the work restrictions and apply penalties when C. refuses to work. C. has not sought Assigned status because of the possibility of knee pan and because of Unassigned status he has not received good time.

3. The Master made the following erroneous finding in ¶ II.4: "...In 2002, Claimant complained of knee pain, on exam, noting was found to explain his complaints."

During the hearing, C. testified that Dr. Bloor related his knee pain was

caused by arthritis. C. asked why his knees hurt when he was told his knee X-Rays were normal.

3. Conclusion: The average person does not experience knee pain because of prolonged standing, walking, repetitive lifting, or heavy lifiting. C. has established that he suffers from an impairment that significatnly limits major life activities: Standing, walking, lifting, carrying out day-to day activities, as wellas working.

C. BACK PAIN

1. As a result of being stuc k by a vehicle, C. suffers significant lower-back pain and painful spasms. In 1988 a state hospital doctor, after several questions asked C. to lay down, placed his hand in C's. left, lower-lumbar area, asked C. to raise both legs, detected spasms, and diagnosed Probable Lumbar Disc Syndrome. C. can only raise both legs together to a certain height. The higher the leg-raise, the more intense the spasms and greater the pain.

In 1996, a state prison doctor, after intense questioning and the most rigorous physical exam ever administered, diagnosed Hypertensive Back Pain.

In any event, C's records reflect the following work restrictions: "No heavy lifting of objects over 20 lbs, no vigorous exercise, and no intensive labor. He suffers from hypertensive back and knee pain.

2. Mitigation Attempts: Whenever possible, C. avoids repetitive torso-twisting and bending, heavy lifting, prolonged standing and sitting to minimize spasms and pain. Home-made hot packs have not been an option since 1996. C. minimizes mounting and dismounting the bunk and using the stairs. Nothing mitigates the extremely painful spasms and left, lower-lumbar pain, and pain in the left buttock caused by intra- and interfacility transfers. Inter-facility are worse and take much longer to recover from because of lifting the heavy duffle-bag and heavy legal box, and repetitive torso twisting and bending in-volved in moving belongings six to eight times during a period of one week or so.

3. The Master made the following erroneous findings in ¶ 4:

> Claimant was injured in 1975 when he was hit by a car. This caused injury to his back and caused a concussion. Since that time, he has had back pain, back spasms, and sciatic pain. He uses hot packs to help with the back pain. Despite his pain he is not restricted to the bottom bunk or bottom tier. He is limited to no lifting over 20 pounds. He is able to walk and climb stairs but does so with pain.

The nature and extent of the injury is not clearly understood by stating that C. was hit by a car. The headlight on the snowplow set-up struck the left, lower lumbar area. Abrasion scars on the back of the arms below the elbows, on the left wrist, below the left nostril, and on the left cheekbone, along with laceration scars above and below the left eye, and elsewhere on the face and scalp, are a testament to the forces involved when I landed, bounced, and then skidded across the pavement. The abrasion scar on the left wrist occurred becuase the metal wrist watch dug a hole in the wrist while skidding across the pavement. See ¶ 5 in the letter to the Governor.

3

As stated under C.2, Mitigation, hot packs are not available.

C. has never requested a bottom bunk, bottom tier restriction. The absence of such restrictions does not mean C. is disabled.

4. Discrimination: C. has requested accomodations so that his legal files and property are stored in smaller parcels instead of a 2 cubic-foot box and a 3.5 cubic-foot locker or duffle bag  so he can minimize heavy lifting. These accomodations have not been granted.

C. has requested exclusion from labor that causes pain. Without this accomodation, the work restrictions will continue to be meaningless.

C's. back pain, while sitting, causes shallow breathing which eventually causes some dizziness and "groggy-like" headaches. C's requests for half-time assignments have been denied.

5. Conclusion: The average person does not suffer painful back spasms and back pain as a result of routine activities like sitting for 2 hours, walking, performing day-to-day tasks, repetitive torso-twisting and bending, lifting more than 20 pounds, reaching up, or working. C. has established that he suffers from a back condition that limits many major life activities.

## II.   VISION CLAIM

1. Also as a result of being struck by a vehicle, C. has a light-sensitivity. The cumulative impact of normal lighting causes eye strain, fatigue, and debilitating headaches, accompanied by nausea.

Several times a day the cumulative impact of light, whether or not reading, writing, or studying is involved requires resting or a recupertive nap. Each rest period becomes longer and the interstice between rest periods becomes shorter. The fatigue is tantamount to that experienced when reading a book late at night and while trying to finish it, you awaken when the book slips from your grasp.

The letter to Gov Owens more-fully explains the accomodations that have been denied. A single-cell would allow me  to rest and utilize recuperative naps that are not possible in a shared-cell because oa cellmate's lighting use and activities. Continuous video presentations of educational, vocational, and other programs thru the facility TV system would allow me to participate at my own speed. The light-sensitivity limits C's. activities that others readily accomplish. Typing, which is much easier than writing, would permit C. to do more. Accordingly, C. has requested that he be allowed to purchase typing supplies, including some not carried by the Canteen, from outside vendors because using only what is available from the Canteen is prohibitively expensive. All these accomodations have been denied.

July 13, 2005 C. started a half-time computer class. It wiped me out daily, taking several hours each day to recuperate, which obviously precluded other activities enjoyed by others. Unfortunately, November 24, 2006, an inflexible rule required full time attendance. July 11, 2008 C. completed

4

the course. C. was granted an extension beyond the alloted 18 months because of his impairments and medication side-effects. This long-term participation caused me to suffer considerably because DOC will not grant the video presentation accomodation.

The stress of participating in the computer class exacerbated the arthritis in C's. neck, causing increased neck pain and limiting the range of neck motion to the right, left, and up. Finally numbness developed in the thumb and index finger in both hands.

Shortly after the May 30, 2007 hearing which was approximately 22 months of computer class ( 16 of which was half-time), intermittent numbness developed in the thumb & index finger, right hand. By November 2007 the numbness was constant in the thumb & index finger, both hands. February 29, 2008, after an X-ray confirmed the neck arthritis, a muscle relaxer was prescribed for six months  Over a period of weeks, lidocaine mixed with an inflammatory drug was injected into several muscles in the neck and shoulders. (In 2005, shortly after transferred to Sterling, a series of the same shots were administered. The letter to Gov Owens describes the deleterious effects on C's health when double-bunked and Unassigned.)

2. Mitigation Efforts: Outside of prison C. switches between 3 pairs of sunglasses with heavy, medium, and light light-blocking to get by. In prison, theonly mitigation is wearing a baseball cap to block overhead natural and artificial light and wearing some lightly-tinted state-issue prescription glasses that are too weak to be used for reading, wristing, and typing. At the hearing C. testified that the prescription was too weak. These measures, only slightly helpful, obviously do not prevent the siginficant limitations described herein.

3. Discrimination: The denial of the requested accomodations is discrimnatory because C. cannot enjoy the day-to-day activities that others enjoy.

4. The Master made the following erroneous findings in ¶4:

"[C.] offered no evidence to show any limitation on his daily activities because of vision defects."

The preceding establishes a vision defect, a light-sensitivity, uncorrectable by prescritpion lenses, that limits C's. daily activities.

5. Conclusion: The average person does not suffer the deleterious effects described herein as the result of engaging in routine activities, such as reading, writing, typing, other routine activities, and working when exposed to normal lighting. C. has established that he has an impairment that substantially limits many major life activities.

### III.  PRAYER FOR RELIEF

Based on the foregoing, C. requests that this Court enter a Judgment in favor of C. granting the requested accomodations. It is furhter requested that this Court maintain continuing jurisdiction to issue such other and further

Orders as may be necessary to accomplish meaningful accomodations.

Respectfully submitted this 27th day of July, 2008.

*Michael R Ingram*

Michael R. Ingram. DOC # 43629

### ADDENDUM

Add the following paragraph to the end of ¶1.A.4:

I have not sought prison jobs because I would be required to wear state boots that cause painful blistering and abrasions. Thus, I have been Unassigned and do not receive good time.

### CERTIFICATE OF MAILING

I hereby certify that on the 27th day of July, 2008, I deposited the foregoing Claimant's Objection To Final Order of Special Master in the U.S. mail, postage prepaid, and logged it in the facility legal mail log addressed to:

Clerk of the United States District Court
901 19th Street
Denver Co 80294

Offcie of Attorney General
1525 Sherman Street  5th Floor
Denver Co 80203

*M Ingram*