IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-444
Category III
Claimant: Robert Whitaker, #88805
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on August 25, 2008. This hearing was held at the Ft. Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: Robert Whitaker (Claimant), and Willow Arnold, attorney for Defendants.

Claimant called himself as a witness. Plaintiffs Exhibits #1 through #4 were offered and admitted into evidence. Defendants called Dr. Timothy Creany, M.D. as a witness. Defendants' Exhibits A through M were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provides the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

B. QUALIFIED INMATE
Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
1. Is the claimant a disabled individual who is a member of the class?
2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant initially came into DOC custody on February 8, 1996. Claimant was placed into the Denver Reception and Diagnostic Center (DRDC) for evaluation and testing. Claimant remained at DRDC until February 21, 1996 when he was transferred to the Four Mile Correctional Center (FMCC) in Canon City, Colorado. Claimant then was transferred to the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. Claimant remained at CTCF until he was paroled on September 30, 1996.

Claimant returned to DOC custody on April 1, 1998 at DRDC. He was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado on April 9, 1998. He remained at FCF until he was transferred to the San Carlos Correctional Facility (SCCF) in Pueblo, Colorado. On June 29, 1999, Claimant was transferred to the Buena Vista Correctional Facility (BVCF) in Buena Vista, Colorado. He returned to FMCC on August 24, 2000.

On September 9, 2000, Claimant was transferred to the Arrowhead Correctional Center (ACC) in Canon City, Colorado. He remained at that facility until he was transferred to the Bent County Correctional Facility (BCCF) in Las Animas, Colorado on March 26, 2001. Claimant

discharged his initial sentence on September 30, 2001.

Claimant returned to DOC custody on a new sentence on December 8, 2004. He was placed initially at DRDC. He was transferred to the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado on January 3, 2005. Claimant was granted parole on July 7, 2005. Parole was revoked, and Claimant returned to DOC custody at DRDC on September 18, 2006. He was transferred to BVCF on September 28, 2006. Claimant was transferred to FMCC on June 18, 2007. Claimant then was transferred to FLCF on July 26, 2007. Claimant has remained at FLCF since that date.

In his claim form, Claimant checked the boxes for mobility impairment and vision impairment. Claimant stated, in part, in his claim form as follows:

> I have ortho arthritis in my R knee, I've had surgery on it by VAMC. I've got our family doc, 2 orthopedic surgeons that worked on my R knee for yrs. The second one ordered a $900.00 leg brace for when I am working or walking to support my leg. I also have a vision problem w/out glasses my eyes are 20/400. I am not able to see or read w/out them, even w/them its hard for me to see to read anything. I also have heart disease, lung cancer in my L lung and asthma. I also have 3 cracked vertebrae in the middle of my back.

When asked about alleged discrimination by DOC and its staff, Claimant stated as follows in his claim form:

> I put in for ADA for my R knee, saying that I've got arthritis in it, but they say there's nothing wrong w/ my leg even when they've got papers in my med. files that state that I do have problems w/ it. There's times that my R knee will give out on me or lock up on my where I cannot bend it and they still say there's nothing wrong w/ my leg. I had to go to the hosp. last Sat 31 May for my heart. I was there for 6 hrs. Then last Mon I was called into med. saying that there is not anything wrong w/ my heart. The so called NP says she found where my doc at home sent them papers that said otherwise.

At the hearing at FLCF, Claimant testified that he has had problems with his right knee for an extended period of time. He testified that he had been advised that he had arthritis in his right knee. He stated that he had surgery on the knee in the past by VA doctors.

Claimant testified that he has asthma that affects his ability to move. When Claimant came to FLCF he was on crutches. He had a leg brace while on the streets, but that was taken from him when he came into DOC custody. He testified that he had received lower bunk and lower tier restrictions. Claimant testified that he never received an elastic knee brace to his knowledge.

Claimant also testified that he had three crushed vertebrae in his back. Claimant did take

4

issue with the notation in his medical records that he had double hernia surgery. He stated that surgery had not taken place. He did testify that he was in a VA facility for three weeks for surgery on his knee.

Concerning his eyes, Claimant stated that his eyesight is worse than 20/400. He has received DOC glasses, but does not like them. He testified that he had filed an application for ADA accommodations, but the request was denied. He has seen an "eye doctor" only once since coming back into DOC custody.

In response to questions concerning the period of time ending in 2001, Claimant testified that he could not climb stairs very well and fell when his knee went out. Winter weather makes the knee hurt more. He described how he had used crutches in the past. He sometimes has to pull out his leg to make it function. He recalled in 1996 being given a knee brace, but that was taken from him at DRDC. Claimant testified that DOC staff have told him continuously that he has no problems with his knees.

Claimant stated that he has PTSD from his days in the service. He has taken Trazadone for his PTSD condition.

On cross-examination, Claimant testified that he had not filed a claim earlier because he was not aware of the claim process. Claimant was out of custody when the Remedial Plan was approved.

Claimant testified that he received his present set of glasses in early 2008. He previously had used glasses that he brought in from outside DOC. Those glasses were taken from him and have not been returned. He stated that he has to watch television up close to the screen.

As to his mobility problems, Claimant testified that he is not able to exercise. He still has trouble getting up and down stairs. He has been late for movement at the facilities where he has been placed. When asked concerning his present job at FLCF, Claimant stated that he is a pusher for a wheelchair bound inmate. He had worked previously as a cook. He stated that he has had knee problems since 1971. He has begun to have muscle cramps in his legs.

Claimant stated that his family physician diagnosed him as having a mild case of asthma. He used an inhaler. He claimed to have had a heart attack in 1995 and a second attack in 1996. He has had chest pains since returning to DOC custody. He also stated that he believed that he has lung cancer.

Claimant responded to one question by indicating that he had been denied the opportunity to see a physician. He noted that he has athlete's foot. Claimant noted that he had been a volunteer paramedic in his home county before he returned to DOC custody.

On redirect examination, Claimant testified that his leg is in bad shape. He really needed a leg brace. He claims that he has arthritis in his back.

Defendants called as an expert witness Dr. Timothy Creany, M.D. He had reviewed the medical records of Claimant but had not treated or examined him. Dr. Creany noted that Claimant had complained of lower back pain and knee pain for some time. There were no entries in his medical records concerning possible coronary disease until 2006. Testing did not reveal any plaque in arteries.

An MRI on June 1, 2001 indicated small disc bulges. These bulges did not appear to be disabling. Claimant has been offered a CT scan for his lungs, and Claimant has chosen not to have that test. Claimant has been seen by outside physicians and has been taken to local hospitals. There is no evidence that Claimant has had a heart attack. Claimant refused to do laboratory tests in early June 2008.

Dr. Creany did not see any medical evidence of any impact on Claimant's mobility. Claimant's vision problems are corrected with glasses. Dr. Creany did not believe that Claimant was disabled.

Defendants submitted a number of medical records concerning Claimant. On June 7, 2005, Claimant was seen by Dr. James Sbarboro, M.D. at St. Mary-Corwin Hospital in Pueblo. Dr. Sbarboro indicated:

> CARDIAC: Cardiac examination did not show neck vein distension or peripheral edema. Heart tones are normal. No murmurs, gallops, clicks or rubs are present.
> IMPRESSION: My impression is that Mr. Whitaker's chest pain is of uncertain origin. We will use aspirin, beta blocker, nitroglycerin and I agree with Lipitor as well. I suspect the only way to proceed here is going to be a repeat coronary angiogram which I have scheduled for tomorrow morning.

*Exhibit E*. An x-ray of the lungs on September 22, 2006 showed no mass in either lung. *Exhibit F*. Examinations by x-ray did not indicate any right knee issues. *Exhibit H*.

In rebuttal, Claimant testified that he has a mass in his lungs. He has never received a back brace for his cracked vertebrae. His back contains bulging disks.

Claimant tendered a number of documents at the end of his hearing. These were received but not read at the time. The documents consist primarily of grievances and responses, as well as some pages of his medical records. None of the grievances are relevant to this order, as all post-date August 27, 2003.

Some of the documents that were submitted by Claimant should be reviewed. On April 25, 1996, Claimant received medical care for a twisted left knee. He was given a crutch and Ace bandage, and was allowed a lay in for five days in his cell. On April 9, 1996, Claimant requested a back brace due to back pain. An x-rays did not find any physical problem with the back. Claimant also indicated to medical staff in 2000 that he was having back problems.

Two pages of medical documents are puzzling. The first is a post-operative report prepared by Dr. William Hahn, M.D. who carried out a bilateral inguinal hernia surgery on March 11, 1999. Claimant testified that this surgery never occurred and the entry of the document was in error. The same is true concerning a entry by Dr. Robert McCurry, D.O. who indicated that Claimant had a history of a gunshot wound to the right abdomen. Claimant states that this also was in error.

On September 27, 2000, Claimant received a back brace from his wife. A number of other medical entries relate to conditions not covered by the Settlement Agreement.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. A claimant must establish that he was disabled, as set forth in the Remedial Plan, on or before August 27, 2003. In addition, a claimant must establish that he was the victim of discrimination on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant must establish that he was disabled by his mobility and vision impairments on or before August 27, 2003. If he so establishes that he was disabled on or before August 27, 2003, then he may amend his claim and raise incidents that have occurred since that date to the present.

Claimant left DOC custody on September 30, 2001. He returned on December 8, 2004, which is after the date of the approval of the Settlement Agreement. Claimant must establish that he was disabled, as defined by the Settlement Agreement, on or before September 30, 2001.

Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

**Vision Impairment**: Claimant maintains that he is vision impaired. Specifically, he argues that he is 20/400 in each eye on an uncorrected basis. It is not disputed that Claimant has been provided glasses, though he has concerns about them.
The documents presented by Claimant reflect that his eyesight was 20/400 in each eye as of March 16, 2000. The optometrist noted that Claimant's eyesight was correctable to 20/20 in each eye with glasses. The documents presented by Claimant reflect that as of June 1, 2001 he received glasses at DOC expense that corrected his vision.

7

Claimant has argued that he is vision impaired, even though his eyesight is correctable to 20/20 in each eye. Such argument has been rejected by the United States Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999). The Supreme Court held that corrective and mitigating measures had to be considered under the ADA. Stated simply, an individual with a vision impairment that could be corrected with glasses is not disabled under the ADA. The plaintiffs in that case were able to see just as well as others, provided plaintiffs used their eyeglasses.

In this case, *Sutton* controls and precludes any finding of a vision disability. Claimant is able to see with corrected vision of 20/20 with the use of eyeglasses. Claimant does not qualify as vision impaired due to his correctable vision with use of eyeglasses. Claimant was not vision impaired on or before September 30, 2001. He is not a member of the class as vision impaired.

**Mobility Impairment**: Claimant has stated continually since coming into DOC that he has had knee problems and lower back pain. Claimant must prove that he was mobility impaired on or before September 1, 2001. This Claimant has not done.

The evidence presented by both sides reflects that Claimant was able to carry on the activities of daily living from February 8, 1996 to September 30, 2001 while in DOC custody. The ADA requires that there be "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." That was not established by Claimant for the time period that ended on September 30, 2001.

Since Claimant has not established that he was disabled prior to August 27, 2003, he may not amend his claim to include incidents or actions that occurred after his return to DOC custody on December 8, 2004. Claimant may pursue a separate lawsuit concerning the time period from that date forward. Claimant was not a member of the class as mobility impaired on or before September 30, 2001.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** No evidence was presented that Claimant was otherwise unqualified to participate in DOC programs or to receive DOC services.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Even assuming Claimant was mobility impaired or vision impaired on or before August 27, 2003, he has not shown any act of discrimination under the ADA and Rehabilitation Act. The Settlement Agreement requires that a showing be made of such discrimination.

As to his claimed vision impairment, Claimant did not establish that he was the victim of any discriminatory action on or before September 30, 2001. Claimant did not request accommodations on or before that date and was not refused glasses. The evidence reflects that Claimant was allowed to utilize glasses he had before his incarceration. There simply is no evidence of any discrimination concerning vision impairment on or before August 27, 2003.

The same is true as to mobility impairment. Claimant had some problems with his right knee

8

and back. He was able to carry on his activities of daily living. Many of Claimant's concerns relate to medical care that he received over the years while in DOC custody. The United States Court of Appeals for the Tenth Circuit has ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act.

Claimant acknowledged in his own testimony that he had received lower bunk and lower tier restrictions while in DOC custody. There simply is no evidence that he was treated differently because of a mobility impairment on or before September 30, 2001.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** In light of the answers to Questions #1 and #3, there is no need to answer this question.

IT IS HEREBY ORDERED that the claim of Robert Whitaker is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before November 17, 2008.**

SIGNED this 5th of September, 2008.

BY THE COURT:

*/s/ Richard M. Borchers*

---
Richard M. Borchers
Special Master