IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-N-870 (OES) (Consolidated for all purposes with Civil Action No. 96-N-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-348
Category III
Claimant: Dexter Millican, #86568
Address of Claimant: ACDC, 150 N. 19th Avenue, Brighton, CO 80601

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on June 23, 2008. This hearing was held at the Adams County Detention Center (ACDC) in Brighton, Colorado. Present were the following: Dexter Millican (Claimant), and Willow Arnold, attorney for Defendants.

Claimant testified in his behalf. Defendants called Dr. Timothy Creany, M.D. as a witness. Defendants' Exhibits A through X were offered and admitted into evidence. All documentation previously submitted by both sides was accepted.

After final closing arguments, the case was taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

### I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provides the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp. 28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

Inmate with a permanent disability/impairment which substantially
limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant initially came into DOC custody on July 12, 1995. Claimant was placed at the Denver Reception and Diagnostic Center (DRDC). He then was transferred to the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. Claimant discharged this sentence on September 15, 1995.

Claimant returned to DOC custody on November 8, 1995. He was placed back at DRDC. He then went to the Arrowhead Correctional Facility (ACF) in Canon City, Colorado on December 4, 1995. Claimant was placed on parole on January 10, 1996. Parole failed, and Claimant returned to DOC custody on June 17, 1996. He was placed at DRDC and transferred to the Four Mile Correctional Facility (FMCC) in Canon City, Colorado on July 1, 1996. Parole was again granted on March 4, 1997. Parole failed again, and on October 10, 1997 Claimant returned to DOC custody. He went back to DRDC and then the Bent County Correctional Facility(BCCF) in Las Animas, Colorado. Claimant discharged this sentence on July 20, 1998.

On April 24, 2002, Claimant returned to DOC custody at DRDC. He was transferred to the Huerfano County Correctional Facility (HCCF) in Walsenburg, Colorado on May 7, 2002. He was

3

transferred to the Trinidad Correctional Facility (TCF) in Trinidad, Colorado on May 29, 2002. Claimant was granted parole on December 4, 2003. Parole was revoked, and Claimant came back into DOC custody on February 12, 2004 at DRDC. He was placed a few days later at the Sterling Correctional Facility (SCF) in Sterling, Colorado. Claimant was granted parole on April 21, 2004. After parole failed, Claimant returned to DRDC on September 29, 2004. Claimant was transferred to the Ft. Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado on October 21, 2004. Parole was granted to Claimant on February 27, 2005. On February 14, 2006, Claimant returned to DOC custody at DRDC. He returned to FLCF on March 9, 2006. He was replaced at SCF on August 31, 2007 and then was discharged in May 2008.

Claimant is in custody at the ACDC on a case that is unrelated to his claim. Claimant is not in DOC custody at this time.

In his initial claim form, Claimant checked the box for mobility impairment. Claimant stated, in part, in his claim form as follows:

> Athletic injuries & operations to both knees, both ankles and Achilles heel, along with right shoulder rotator cuff damage and degenerative arthritis in all my joints at age 59 makes mobility, standing, walking, sitting, climbing , stooping, kneeling, crouching, crawling, reaching, and lifting very difficult! I've had a hole in my left ear drum since I was 10 years old! I've worn prescription eye glasses since 1958 and I've been without glasses for three months now (11/23/04). I've filled out necessary forms for eyeglasses but no response. DRDC medical department said it was an emergency on 10/1/04!

In response to the question concerning discriminatory acts by the DOC and its staff, Claimant stated:

> (1) I broke my left ankle in December of 1995 at Arrowhead Correctional Facility and they would not put a cast on my ankle, causing the ankle bone to become deformed. I need an operation today, and there are chip bones in the joint of that ankle. (2) I tore the tendons in my right shoulder rotator cuff lifting milk crates in the kitchen of the food service department at Trinidad Correctional Facility on October 10, 2002 and the only thing they did after x-rays proved the damage was to give me one pain relieving shot. (3) I fell while trying to climb to the top bunk (I have lower bunk restrictions and they, the correctional officers knew of my restrictions) and fell on my neck and head causing damage to my neck and I had a mild stroke while laying on the floor; this was at approx. 9:30 p.m. 10/5/04.

Claimant submitted a number of documents in support of his claim. Included were medical records. One record reflects medical care being provided on October 7, 2004 and a notation that Claimant has degenerative joint disease (DJD). Also included was an x-ray report from June 28, 2002 a normal lumbar spine but an old fracture at C5-6 with "post-traumatic arthritis." An x-ray report from April 1998 reflected an "[o]ld healed fracture of the ankle."

4

At the hearing, Claimant testified in his own behalf. He indicated initially that he did not want to pursue any claims of vision impairment or hearing impairment. The Special Master made an inquiry to insure that such decision had not been coerced.

Claimant testified that he broke his ankle while at ACC in the 1990's. No cast was placed on the ankle, and it became deformed. He testified that he really needs an operation on the ankle, as there are bone chips inside it. He also has had problems with his tendons and muscles. His knee and ankle will become numb.

Claimant stated that he had to use shower shoes at DRDC. He had requested low cut shoes, but was not provided those. He received a bottom bunk restriction at one point. He was told to take an upper bunk, even though he advised staff that he had a restriction. He had to walk barefoot on some occasions because he did not have the right shoes.

He believes that he has not received proper medical care. He was prescribed a cane for stability in 1998. He is concerned that his medical condition will deteriorate with his ankle. He also believes that he needs knee replacements. He fell at TCF and had a shoulder separation.

On cross-examination, Claimant testified that he tried to exercise while in DOC custody. He would walk as much as possible at FLCF and SCF. He stated that "I can't go steady for a long time." He also indicated that the fall from the bunk was October 5, 2004.

Dr. Timothy Creany, M.D. was called as a witness for Claimant. He had reviewed Claimant's medical records and was requested to provide expert testimony. He noted that Claimant does have arthritis in his neck and other joints. Claimant also has high cholesterol and high blood pressure. The medical records reflect that Claimant has been able to do his activities of daily living. The ankle problem led to a mild deformity, and the medical records do not indicate that the ankle is a major problem. An operation on the ankle is not necessary.

Dr. Creany indicated that there is evidence of mild degenerative conditions. Claimant was referred to the hospital in October 2004 as the result of the fall from the upper bunk and a self report of a heart attack. Claimant may need a knee replacement. Claimant can purchase tennis shoes from the canteen.

On rebuttal, Claimant reiterated that he had not received a cast when his ankle was broken in 1996. He has continuing problems with his tendons and muscles.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. A claimant must establish that he was disabled, as set forth in the Remedial Plan, on or before August 27, 2003. In addition, a claimant must establish that he was the victim of discrimination on or before that date.

5

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant must establish that he was disabled by his mobility impairment on or before August 27, 2003. If he so establishes that he was disabled on or before August 27, 2003, then he may amend his claim and raises issues that have occurred since that date up to the present.

Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

The evidence presented by Claimant does not establish that, on or before August 27, 2003, his ankle and knee problems created a impairment that substantially limited a major life activity. Client testified that he could walk, albeit with some pain. Claimant was mobile, and there was no major impairment on walking.

Claimant has not met the criteria provided by the ADA and Rehabilitation Act. Claimant was not mobility impaired on or before August 27, 2003. Claimant has the right to commence his own lawsuit for anything that may have occurred after August 27, 2003.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** No evidence was presented that Claimant was otherwise unqualified to participate in DOC programs or to receive DOC services.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The overwhelming complaint of Claimant related to the quality of medical care that he received in DOC custody. Claimant specifically testified that DOC had not placed his foot into a cast in 1996 and had not provided the operations that had been promised.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement

Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that he may have concerning his medical care.

The *Fitzgerald* case binds the hands of the Special Master, as well as the Court. The overwhelming number of concerns of Claimant relate to his medical care. The quality of that care must be examined in a different proceeding. It cannot be examined in a case brought under the ADA and Rehabilitation Act. No act of discrimination was established by Claimant.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** This question does not need to be answered in light of the negative answer to Question #3.

IT IS HEREBY ORDERED that the claim of Dexter Millican is denied, as he has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before September 30, 2008.**

SIGNED this 30th day of June, 2008.

BY THE COURT:

Richard M. Borchers
Special Master

## CERTIFICATE OF MAILING

I hereby certify that I have mailed a copy of the foregoing Order of Special Master this 30th day of June, 2008 to the following:

Mr. Dexter Millican
#86568
ACDC
150 N. 19th Avenue
Brighton, CO 80601

Mr. James Quinn
Mr. Jess Dance
Office of the Attorney General
1525 Sherman Street
Denver, CO 80203

*Susan L. Carter*