IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-870-CMA-OES

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

vs.

BILL OWENS, et al.,

Defendants.

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JAN 20 2009

GREGORY C. LANGHAM
CLERK

---

Claim #: 03-420
Catagory: III
Claimant: Santos Romero, DOC# 48563
Address: KCCC-CCA, 49777 Country Rd.V, Box 2000, Burlington, Colorado 80807

---

OBJECTION TO THE FINAL ORDER OF THE SPECIAL MASTER
Pursuant to Federal Rule of Civil Procedure 53 (g)(2)

---

COMES NOW, Plaintiff/Claimant,  SANTOS ROMERO , pro se, and respectfully submit the following objection to final order of special master, with updated supporting documents. And with these combined impairments Claimant meets the qualified guidelines of the (agreed upon) Montez Remediel Plan under Section IV, Mobility Impaired. Mr. Romero has submitted the required paperwork to the masters, being the "Initial and Supplemental Claim Forms". Ofwhich, is in the prossesion of the masters, for the courts review. Since early proceedings did not allow any requirements of allowable amounts of copies. So at that time I did not have the monies for payment of more than 10 sheets. So Plaintiff comes only with his "Reply To Defendants Response To Claimant With Supporting Documents", for available access for the courts review. And I ask the court to please add to this objection, because I was found by the masters to not have a disability, it was not reviewed. I also ask the court to note comments added in Claimants "Appendix".

**AFFIDAVIT OF TRUTH:**

"Indeed, no more than (Affidavits) is necessary to make the prima ficie."
United States v. Kas., 658 F.2nd, 526, 536 (7th Cir. 1981); cert. denied, 50
U.S.L.W. 2169; S. Ct. March 22, 1982.


    That I SANTOS ROMERO, being duty sworn, declare by my signature the foll-
owing facts presented in my claim # __03-420__ , are true, correct and
complete to the best of my knowledge and belief.



_Santos Romero_

Santos Romero #48563
Kit Carson Corr. Center
P.O. Box 2000, Unit BB   208B
Burlington, Colorado
            80807

COUNTY: KIT CARSON          SIGNED 16TH DAY JANUARY 2009
STATE: COLORADO             BY SANTOS ROMERO


Notary stamp:

ROBERT E. SPARKS JR
Notary Public
State of Colorado

My Commission Expires 11/30/2010

Notary signature: _____

2

Plaintiff first addresses the 4-prong requirements listed in the Montez Remediel Plan to qualify as a member of the Montez class.

I - Is Claimant disabled and member of the class? "Claimant answers yes".

1) Left Foot -Crushed foot injury

A) Hammer Toes - Since the toes claw inward the toe joints on the 2nd, 3rd & 4th toes, stick up. Causing them to rub on footwear. This pushing down effect adds pressure to the surgical scarring over the crown of the foot. This causes unexpected pain and unstable footing.

B) Pivot Area

Again, with the clawing of the toes the bone sticks out more in this area. Which lessons the cushioning from the skin and negates the obsorbsion of trama from walking, standing or climbing (wrungs on a ladder).

C) Surgical Scarring Area

This is the area were severe pain can come unexpectedly if not cushioned right. Calcium bulit-up causes sharp pain to ocur even with soft shoes. Hard leather causes this area problems from pinching. It even causes the foot to feel missing and  can't stand on it for a moment and limping more. An example of sensitivity: I dropped a key on this area from about knee hight. my boss (Tom Ornelas) asked why I was limping. I explained and he wide-eyed me and shook his head. This was Juanita Novak's brother, ex-wardon of AVCF Ordway/CTCF Canon City.  It can be varified but I have no access to those that can varify it.

II) Left Ankle Laxity  ( cog-wheel)

Twists easy. Hurts when active or cold. Sore espicially with worn shoes. Wabbly and unstable when exerting use. Surgery should have been done. And the sad thing about it,DOC wanted it done not for my health, but to save money. So instead, to save, they took the shoes away. And at my ADA re-screening, I noticed the doctors concern while checking the ankle. When I asked what, he shook his head to indacate nothing.

## III Left Calf Area

This is where the muscle moves on the bone. And where the last of the severe pain doctor Tiona finally relieved. But it can flare up quickly. At its worse, I can't lift my leg. I informed the doctor (Tiona) of it still hurting and she has put me on a med for nerve damage which seems to help (after 10/14/08).

## IV Scoliosis - Top & Bottom

Eather area can cause the other to wretch. The top actually feels like a slipping line like off a clift (sputtering pain). The bottom like it's going to break (lightening bolt pain). Breathing becomes difficult and movement also. I can tell it's getting worse, and doctor Tiona said it's not going to get any better. Braces seem to help get in balanced or in line if feeling ackward. I'm starting to stumble more, especially in the morning.

### A) Degenerative Lumbar Area

The small curve is located in this area. Turning stretching or trying to get comfortable can cause sharp pain. I was in more pain for longer periods when I didn't have the braces or cushion for sitting.

### B) Left Side Strain

It's like a neck strain but it's from the neck to the left big toe. This is what happens while coming off a top bunk. I wait till it sub sides until I can function (from 5 to 10 minutes).

I told Sterling (SCF) medical when this first started, but they didn't seem concerned. My room mate talked the sargent into giving me his bottom bunk.

### C) Sciatica (on the left side)

From the glute (lumbar), thigh, calf, out to the big toe. Standing, sitting, or walking to much flare it up. Worse if I've had a bad night. The back braces can help. But it can also stop normal blood flow. Adding to it flaring.

## IV Bi-Carpal Tunnel Syndrome

When back or left side is on the fritz, it stresses my neck and causes circulation problems. And that's exactly what causes this syndrome. Swelling is

much the reguler when first awaking. So grabbing nor holding is done with any assuredness .Things like writing, typing, crafting or holding a book to read, can and will cause my ability to use them once awaking. They also have a problem of numbing while asleep.

One thing the surgen made clear, is if I got the surgery I would not be able to lift weights. But I came to realize, it also meant lifting myself.

At my last medical appointment (10/14/08), doctor Tiona  scheduled an x-ray for my neck. She said my hands hurting bad enough to wake me up may be coming from my neck. Claimant had his neck listed in his first paperwork. But he dropped that issue because he felt it didn't meet ADA guidelines. But I'm thinking, maybe it does? And a new development with this syndrome, is that since doing all the writing and typing,Claimant has now caused imflamation in his wrist. And he can't even lift his hot pot with a few cups of water without having to lift it with both his hands.

V   Good Right Foot - Overly Stressed

Since the ortho-shoes have been taken, Claimant has had to use his right side more often. This has caused him to shift limping from one side to the other because of the extra stress, and soreness of both feet when active. And has caused its own forced-upon problems. The right heel has seemed to suffer the most, because it has developed heel spurring type of pain.

I presented evidence at my hearing October 2007. I showed the effect of this extra usage by allowing view of the first State issue boot/shoe I have ever been able to wear. I pulled the right boot off so the court could see it had actually broken before and after the arch. It seemed eminently reasonable to me it showed over use from my type of foot impairment.

The left boot is completely intact.

## CASE LAW

- Sutton v. United Airlines, Inc., 130 F.3d 893, 904 (10th Cir. 1997) aff'd, 527 U.S. 471, 119 S. Ct. 2139, 144 L.Ed. 2d 450 (1999)

- At 902, Some impairments may be disabling for particular individuals but not for others. Depending on the stage of the disease or disorder, the presence of other impairments that combine to make the impairment disabling or any numer of other factors. 29 C.F.R. scc. 1630, App. scc. 1630.2 (j) para 1-2 (emphases added).

  "This is what Claimant has tried to emphasize throughout his claim. His "combined impairments" (degenerated scoliosis, degenerated lumbar, sciatica, calf disorder, ankle laxity (cogwheel giveway), and injured crushed foot, not to mention my good side, right hip and foot tramatized, and bi-carpal tunnel syndrome and maybe even to reclassify my neck as a qualified impairment, atwhich, doctor Tiona's future x-rays has implied, (after 10/14/08)."

  Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996)

- At 447, [3,4] In order to establish a prima facie case of discrimination in violation of the ADA, the Plaintiff must prove the (1) She had a disability; (2) She is qualified individual; and (3) She was subject to unlawful discrimination because of her disability. See Tyndall v. National Educ. Ctrs., 31 F. 3d 209,212 (4th Cir. 1994).

- Bultemeyer v. Fort Wayn Community Sch., 100 F.3d 1281, 1285 (7th Cir. 1996)

- At 1283, Claim alleges facts which, if proven, could directly establish a violation of the ADA. If it is true that FWCS should have reasonalble accommodated Bultemeyer's disability and did not, FWCS has discriminated against him. There is no need for direct proof or burden shifting.

  "Claimant feels this is what has happened with him. And will show more proof in his other case law and evidence found in his Appendix of missing files brought to light from defendant's Exhibits."

- At 1285, A simple adjustment of his duties was enough of and accommodation to enable him to work there. But (or by) this time, we do not know what might have happened, because FWCS was unwilling to engage in the interactive process and communicate with him.

  "This is all Claimant was asking for when he approached case manager Fred Courtney. And had also tried mendical to act in kind to inform case management to help me with this. But no one cared to engage in the interactive process. Or like the Remendial Plan states a "proactive approach"."

6

- At 1285, III [3] An employee's request for reasonalble acommodations requires
a great deal of communication between  the emplyee and employer. We recogni-
zed this in Beck, where we held that both parties bear responsability to det-
ermine what accommocation is necessary. Beck 75 F.3d at 1135. We further expl-
ain that no hard and fast rule will suffice, because neither party should be
able to cause a break down in the process for the purpose of either avoiding
or inflicting liability. Rather, courts should look for signs of failure to
particapate in good faith or falilure by  one of the parties to help the other
party that obstructs or delays the  interactive process is not acting in good
faith.  Beck 75, F.3d at 1135.

"With every try, Claimant was unable to get any response from defendants but
was always ignored and avoided by defendants. There was no good faith in their
aproach."*And denying disability is Avbidence.*

- At 1285, III [3] FWCS blames Bultemeyer for the breadkown in the interactive
process because he did not specifically request a reasonable accommodation.
Bultemeyer may have thought it was futile to ask, after Ms. Singkton told him
that he would not receive anymore special treatment.

"Claimant experienced the same thing when only three months were only given
him on the bottom bunk restrictions. Eventhough his impairments are permanent."

- At 1285-1286, The employer has to meet the employee half-way, and if it appears
that the  employee may need an  accommodation but doesn't know how to ask for
it, the employer should do what it can to help. "[T]he employer must make a
reasonable effort to determine the appropriate accommodation. The appropriate
reasonable accommodation is best determined through a flexable interactive
process that involves both the employer and [employee] with a disability. 29
C.F.R. pt 1630, app.; Beck, 75 F.3d at 1135.

"That's what the Claimant only wanted, is to have the defendants meet him half
-way. And Claimant was unaware of what accommodation could help him. If only
there was a flexable process. But there was no such thing."

- At 1286, yet the district court and FWCS treated him as though he was suf-
fering from a miner or physical limitation and being stuborn.
We understand that the irrationality of these fears may be frustrating to FWCS,
but as Bultemeyer's employer, FWCS had a duty to engage in the interactive
process and find a reasonalble way for him to work dispite his fear. But FWCS

made no inquiry about what Bultemeyer found stressful at Northrop.

Instead, FWCS "failed] to communicate, by way of initiation or response." Beck, 75 F.3d at 1135, and the interactive process breakdown.

Another example of the breakdown in the interactive process is FWCS' failure simply to inquire of Bultemeyer of his pschiatrist about what he needed to be able to work.

This whole incidant may not have happened if someone at FWCS had merely had the patience to sit down .......  and asked him what the problem was.

As the federal regulations implementing the ADA states, "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal interactive process with the qualified individual with a disability in need of the accommodation." 29 C.F.R. scc. 1630.2 (0)(3) 1995; Beck, 75 F.3d 430, 1135.

But viewing the facts in the light most favorable to Bultemeyer, it appears that FWCS stopped short of its responsabilities.

"DOC medical just looked at what they thought it should be not what it might be. They even had an  opportunity to communicate with Mental Health about Mr. Romero, but didn't take the time to. Nor, did case manager Courtney do any inquiring or would they initiate an informal interactive process."

Athough, things were happening  with me, they  didn't care to realize it.

- Beck v. University of Wisconsin  BD. of Regent's, 75 F.3d 1130 (7th Cir. 1996)
- At 1135, By the statuary language "reasonable accommodations" is limited by the employer's knowledge of the disability. see Helberg v. Indiana Bell Tel. Co., 47 F.3d 928 (7th Cir. 1995). Whether it is also limited by employer's knowledge of the reasonable accommodation is a trickier question. An "accommodation" within the meaning of the ADA is not some vage ill-defined remedy.

"The Claimant feels the assignment of a bottom bunk         for only 3 months was a vage ill-defined remedy.

- Toyota Moter v. William, 122 S. Ct. 681, 691 (2002)
- At  691, [5, 6] suggests "considerable" or to a large degree."

"This is refuring to defining disability as being substatually limiting. Atwhich, Claimant feels describes his disability because of the number of his impairments."

- Also at 469, [11] the impairments' impact must also be permanent or long term.
    " Ofwhich, Claimant's impairments are."

— And at 691,[12, 13] to prove a disability by offering evidence of their own experience.

"Claimant feels DOC is causing his impairments to be more limited, because of how they "require", through their rules and procedures, Plaintiff is having to do things that are harmful to his condition(s)".

— Also at 692,[14, 15] An individualized assessment to the effect of an impairment is particulary necessary when the  impairment is one whose symptoms very widely from person to person' and carpal tunnel syndrome is such a condition. American Disability Act of 1990, scc. 3 (2)(a), 42 U.S.C.A. scc. 1202 (2)(A).

"And respondent's impariment(s) is just such a condition. Times two (bi-carpal tunnel syndrome)."

— Again at 692,[16] A class of manual activities must be implicated for an impairment to substantially limit the major life activity of perfoming manual tasks.

"Claimant feels his combined impairments does limit him from doing a "class" of activities as it states. These activities effect him in his work, living unit and programs, (standing, walking, sitting, lifting, reaching, climbing, ("a ladder")."

• Pack v. Kmart Corp., 166 F.3d 1304-05 (10th Cir. 1999)

— At 1304,[4] (B) a record of such an impairment; or (C) being regarded as having such an impairment.

— At 1305, A. Major Life Activity

[6] Major life activity include, but not limited to "functions such as ... walking and working." 29 C.F.R. scc. 1630.2 (j); Sutton 130 F.3d at 900. See 29 C.F.R. Part 1630 App. scc. 1630.2 (i) (including sitting, standing, lifting and reaching).

— And at 1305, "[t]he touchstome for determining an activity's inclusion under the statutary rubic is it's  significance. Brydon v. Abbott, ____ U.S. 540 (1998).

"Claimant has records submitted in his claim Showing "being regarded as having such an impairment."  Claimant also has functions listed in this case. And signif-

icantly, is what climbing a ladder to go to sleep and assending to begin his day."

● Roth v. Luthern, Cen. Hosp., 57 F.3d 1446, 1454 (7th Cir. 1995)

─   At 1454, [6, 7] The determination of whether a condition constitutes an impairment, or the extent to which the impairment limits the individual's major life activities must be made without regard to the availability of mitigating measures such as medicines, or assistive or prosthetic devices. see 29 C.F.R. pt.1630 App. scc. 1630.2 (h)(j).

"Although Claimant has been assisted with mitigating measures he still becomes more substantially limited in his major life activities when he over does it. And his medication (Indomethacin) causes him to become sleepy and having to nap sometimes. And even with his back braces, he still has symptoms from his impairments (stop to bend over to releive pain). The bending is what judge Davidson saw. And nothing helps, other than doing this  or lying down flat on my back."

● Steele v. Thiokol Corp., 241 F.3d 1248, 1252-53 (10th Cir. 2001)

─   At 1254, In determining whether any of Mr. Steele's major life activity have been affected, the ADA regulations counsel that a court should also consider the following factors:

(i) The  nature and severity of the impairment'

(ii) The duration or expected duration of the impairment' and

(iii) The permanent or long term impact, or the expected permanet or long term impact of or resulting from the impairment.

29 C.F.R. scc. 1630.2.

"Claimant feels all 3 factors applies to him. And (ii), (iii) are shown in the medical files presented in Plaintiff's claim. For (i), this equals what is listed in Plaintiff's 4-prong area in this appeal and found in the evidence given in Claimant's comments on the first prong in this area."

● McAlindin v. County of San Diego, 192 F.3d 1226, 1234-35 (9th Cir. 1999) cert.

denied, 530 U.S. 1243, 120 S.Ct. 2689, 1476 L. Ed. 2d 961 (2000)

At 1234,[6] Moreover, sleeping is indispensable to the maintenance of personal health (suggesting that sleeping is a major life activity).

"In Claimant's last medical appointment, I reminded her of my arthritis and the whiplash it incurred in a car accident. My sleep is effected because my hands hurt so bad it wakes me up."

At 1236, The Supreme Court recognized however, that in some cases the use of medication may not eradicate the effects of illness, and a disability may remain either due to symptoms of the condition itself which persist despite the effect. See Sutton, 119 S. Ct. at 2149. In his declaration, Mc Alindin states that he was discribing how his condition affected him "[d]espite the medications." The record reflects the existance of a ginuine issue of material fact as to whether even with medication and other treatment, Mc Alindin's manual impairment substantually limits his major life activities discussed above. Thus, while the ultimate disability determination in this case may be more complex than cases not involving mitigating treatment, the facts alleged by Mc Alindin, if true, brings his case within the catagory discribed in Sutton.

"Claimant has been discribing the same as this case states, because of his medications. This has been commented on from the Roth reference at 1454."

Lowe v Angelo's Italian Foods, Inc., 87 F.2d 1170, 1174 (10th Cir. 1996)

At 1173, The term "substantually limits" "means" [s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activiry as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. scc. 1630.2 (j)(1)(ii).

"Claimant knows that the  average person can do everything longer and better than he can. Who can't sit for 1/2 a day, stand for an hour, walk 1 hour,

11

lift 20 lbs. more than 5 times, climb up and down a ladder 3 times, reach and hold onto something a few times, work 20 minutes, lift their body weight (a bit), or be able to    spontaniously grab, twist, or catch themselves, without having a problem, causing pain or hurting themselves. And, none of them will get physically bad enough to need some kind of help. And the Claimant will, if anything is done past his limitations (consistantly on a regular basis)."

~    At 1174,[4, 5]  Lifting is a magor life activity.

"As stated in all my claim, I have this problem."

● Holland v. Jefferson Nat. Life Inc. Co.,   883 F.2d 1307, 1313 (7th Cir. 1989)

~    At 1316, n. 6. see Rucker, 669 Fcd at 1182 ("it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case.")

"Claimant has  stated. that CDOC has always shown bad faith and what Claimant feels he has also shown DOC's unreasonableness throughout his claim."

● Knapp v.  Northwestern University, 101 F.3d 473(7th Cir. 1996)

~    At 479 [6] "The court must act on whether the particular impairment constitutes for the particular person a significant barrier to [a major life activity].'"

Byrne, 979 F2d at 565 (quoting Forris v. Bowen, 794 F.2d 931, 933, (4th Cir. 1986).

"Claimant feels his significant barriers, 24/7 on concrete, required to find a job in 10 days, assigned to a top bunk or tier, sitting on metal/concrete, medication making him sleepy ect., has not been considered in how it effects his particular impairment'(s). So DOC medical did not use reason and rationality and without full regard to possible and reasonable accommodations."

● Reeves v. Johnson Control World Servs., Inc., 140 F.3d 151 (2d Cir. 1998)

~    At  150,[6] "Major [l]ife [a]ctivities means functions such as caring for

one self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. scc. 1630.2 (i). As the word "such as" suggest, this list of major activities is meant to be illustrative and not exclusive. See Ryan, 135 F.3d at 870 ("The listed activities are' examples only ....'")

At 151, [9, 10] ("[A]n activity qualifies under the statuary definition as one of the major life activities contemplated by the ADA if it is relitively more significant or important than otherr life activities."); Abbott, 107 F.3d at 940

"Claimant activities are his own for his environment. And is relitively significant and important than other life activities. Inthat, they are "more" because of the prison environment and are subject to more restrictive measures."

At 151, [11] ("The determination whether and impairment 'substatialy limits' a major life activity is fact specific ....") (citing Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 59 (4th Cir. 1995);

"Fact specific is exactly what Claimant has been trying to express in his claim, because it being in a prison environment. And as stated above, measures for not doing an activity (a top bunk assignment) is, and has been, for the defendant, disciplinary for not doing. And has caused him to lose out on more freedom and what that lack of more freedom intails (losing out on what the normal population has available to them)."

At 152, An ADA plaintiff could consideraly lesson the burden of making an individualized showing of a substantial limitation were he able to define the major life activity as narrowly as possible, with an eye toward conforming the definition to the particular facts of his own case.

"Claimant hopes that he has done this for the court.

Beck v University of Wisconson BD. of Regent's , 75 F.3d 1130 (7th Cir. 1996)

At 1136, - 29 C.F.R.. pt. 1630, app. Whether the missing information is of the type that can only be provided by one of the parties, failure to provide the information, may be the cause of the breakdown and the party with-holding the information may be found to have obstructed the process.

"Claimant still professes that CDOC held his older files from him, while he was at the Sterling Correctional Faciity (SCF). And, as I was at my medical appointment, (10/14/08), I noticed my medical files were thicker, I asked if my 1982 files were there. And of corse, the answer was a yes. And as Claimant has stated in his claim, he would have had full information if all of his files were available to him (of importance: see Appendix #3,4,5,7 )."

Ralf v. Lucent Techs., Inc., 135, F.3d 166, 172 (1th Cir. 1998)

At 170, [3] "Though mistakes of law is a rubic that requires no elaboration, a-buse of discretion is a fuzzier concept. That inquiry is case-specific, see Weaver [v. Henderson], 984 F.2d [11] at 13 [(1st Cir. 1993)], and a finding of abuse usually entails proof that the nisi prius court, in making the challenged ruling, ignord pertinent elements deserving significant weight, considered improper crit-eria, or, though assessing all approriate and no inappropriate factors, plainly errored in balancing them. see [Independent Oil and Chem. Workers of Quincy, Inc., v.] Procter & Gamble Mfg. Co., 864 F.2d [927] at 929 (1st Cir. 1988)."

"Claimant feels that the Masters Final Order, ignord pertinent elements of weight. And errored in balancing the weight of evidence even found in the defendants own Exhibits (see Claimant's Appendix #3,4,5,7 ). And also ignord my case-specific fac-tors (Master Davidson seeing me hurting, right shoe damage because of favoring, and information from CDOC's ADA re-screening of cogwheel giveway and scoliosis degener-ation )."

"Claimant has established by the preponderance of the evidence all criterias utilized and setforth Nov. 23, 2004 by judges Kane and Nottingham.

14

A P P E N D I X

Defendant's
Exhibit
Listing          Discription
_____

F          1) Colo. Dpt. of Corr./Ambulatory Health Record    (08/30/85) CCF
           "Mary Cordell actually said the orto-shoes hadn't come in. But I
           saw them. Even after the judge in the Ramos v. Lamm case told
           them to get them for me."

L          2) Colo. Dpt. of Corr./Ambulatory Health Record    (02/17/88 AVCF
           Difficult breathing – shoulder, upper back spasims – ankle pain –
           point tenderness @ palpation problems.

M          3) Colo. Dpt. of Corr./Ambulatory Health Record    (02/19/88) AVCF
           "I was told I was to get an ortho-shoe with ankle support, but I
           never received them."

P          4) Colo. Dpt. of Corr./Ambulatory Health Record    (03/01/88 &
           03/10/88 AVCF
           " Shows for the first time recognition of the "Ankle Laxity"."

AB         5) Podiatric Progress Note                          (03/23/00  SCCF
           "This is one of the important files I was interested in for evi-
           dence to my claim.

AN         6) Dpt. of Corr. Ambulatory Health Record           (08/09/06  KCCC
           "Top discribes what judge Davidson saw me doing after leaving the
           chow hall to go to med-line. This was right before my hearing
           of Oct. 2007."

AS         7.) Dpt. of Corr. Ambulatory Health Records         (08/16/07)  KCCC
           ADA re-screening - Department Mandated – DOC request
           Mil lateral curvature is noted on inspection of the T-spine

           "This was visually noticed. And ofwhich, I did not have available
           when I did my "Reply Motion" 04/30/07."

AU         8 ) Offender Track ==== Offender Profile ==== 10/17/07
           "Notice when put in Unit 3A 05/06/04 until leaving SCF at
           11/14/05. A few days  in seg. And Unit 21, Unit 1 twice because
           bed space. Plus, 3 months at KCCC, Unit A 11/14/05 through

           02/02/06. A total of 1 yr. and 10 months in lockdown. And a
           total of 10 months mis-calculation previously in my paperwork.
           This form was not available to me. So I had gotten my lock-
           down time and how long I was in constint pain, mixed up.

           9) State of Colorado Department of Corrections Notice of Charge(s)
           Facility KCCC 06/17/08

           Disobeying A Lawful Order

           "I had refused to be placed on a top bunk because of my impair-
           ments,"

15

WHITE – Medical Record
CANARY – Pharmacy
PINK – Data Collection

1

## COLORADO DEPARTMENT OF CORRECTIONS / AMBULATORY HEALTH RECORD

PRICARE CODE NO.      NAME Romero, J      INMATE NO. 48563      LIVING UNIT CCF-A

SUBJECTIVE:
Talked c̄ M. Cardell re shoes,
pt has been to Thorton ortho,
Results of x-ray told to pt.

DATE 30 Aug 85      TIME 1015

PROBLEM  1  2

OBJECTIVE: Temp. _____ Pulse _____ Resp. _____ B/P _____ / _____

PLAN / ORDERS
✓ on shoes c̄ Joe
Lippis

SIGNATURE:
NURSE: LC Uchsinner
P.E.: Hendricks N.P.

ASSESSMENT:

PHYSICIAN:
Rx NO.

---

PRICARE CODE NO.      NAME Romero, J      INMATE NO. 48563      LIVING UNIT CCF

SUBJECTIVE:

DATE 8/28/85      TIME

PROBLEM  1  2

OBJECTIVE: Temp. _____ Pulse _____ Resp. _____ B/P _____ / _____

PLAN / ORDERS
Refer to PA for
routine sick call &
Chart eval

Regress from
8MCF
on no meds

SIGNATURE:
NURSE: Olene Ln
P.E.:

ASSESSMENT:

28 Aug 85: Reviewed Hendricks N.P.

ALWAYS BEGIN AT BOTTOM WORKING TO THE TOP OF THE SHEET.

PHYSICIAN:
Rx NO.

EXHIBIT
F

16

OC Form 78 (82) / Old No. 2635
WHITE – Medical Record
CANARY – Pharmacy
PINK – Data Collection

## COLORADO DEPARTMENT OF CORRECTIONS / AMBULATORY HEALTH RECORD

**PRICARE CODE NO.** | **NAME** Romero Santos | **INMATE NO.** 48563 | **LIVING UNIT** AVCF2

**DATE** 2/17/88    **TIME** 0820

**SUBJECTIVE:** ① C/o nose cartilage coming through from auto accident 1976 ② no accident in 1970 toe bones of ® foot crushed 2. for orthopedic shoes ③ Shoulder pain X1 day p̄ lifting large box 70

**PROBLEM** 1  2

**PLAN / ORDERS**

**OBJECTIVE** Temp. ____ Pulse ____ Resp. 90 B/P ____

① deviated septum c̄ ↑ palpation pain & ↑ difficulty breathing. Requests ENT eval for straightening ② fracture & time standing c̄ change in facility. ↑ ankle & foot pain in evening ③ Pressure area — ☉ gd resolution

O) WO, WD, A+O x3 ⑦ ↑ DAD

Nares – deviated septum c̄ mild injection of mucosa 3 noted difficulty breathing

MS – 1) Shoulder – full ROM c̄ mod difficulty c̄ spasm, deformity or crepitus

**ASSESSMENT:** 2) Ankle – full ROM + stability head of fibula. Scar dorsum of foot dis tibi + reflexes ↓ sensation around scar + toes. Point tenderness c̄ palpation post

① ENT Consult
② Parafon Forte ↑ Q10 x 5 d
③ RTC to document about foot surgery so new Ortho shoes/surgery consult can be decided if warranted

**SIGNATURE:**
**NURSE:**

**P.E.** 1) shoulder strain 2) foot problems → shoes 3) deviated septum

**PHYSICIAN:**
**Rx NO.**

---

**PRICARE CODE NO.** | **NAME** Romero Santos Jr | **INMATE NO.** 48563 | **LIVING UNIT** AVCF 2A

**DATE** 11/18/87    **TIME** 10⁰⁹a

**SUBJECTIVE:** Cold Symptoms

**PROBLEM** 1  2

**PLAN / ORDERS**

**OBJECTIVE:** Temp. ____ Pulse ____ Resp. ____ B/P ____/____

① Dimetapp Coricidin tabs ↑↑ Q4H for 7 days only —

**ASSESSMENT:** Acute Coryza

ALWAYS BEGIN AT BOTTOM WORKING TO THE TOP OF THE SHEET.

**SIGNATURE**
**NURSE:** Griswold RN
**P.E.:**
**PHYSICIAN:**
**Rx NO.**

EXHIBIT

L

17

DC Form 78 (82) / Old No. 2635
WHITE — Medical Record
CANARY — Pharmacy
PINK — Data Collection

## COLORADO DEPARTMENT OF CORRECTIONS / AMBULATORY HEALTH RECORD

| PRICARE CODE NO. | NAME | INMATE NO. | LIVING UNIT |
|---|---|---|---|
| | Romero Santos | 48563 | AVCF 2 |

**SUBJECTIVE:**
Has become frustrated about care &
his destiny. Again developed sleep
& appetite disturbance, dysphoric

DATE 2/22/88    TIME 1030

PROBLEM 1 2
PLAN / ORDERS

**OBJECTIVE:** Temp. ___ Pulse ___ Resp. ___ B/P ___ / ___

Responded ⊕ to Norpramin
two years ago. a 10 year
hx of recurrent depression
& alcohol abuse

1) Norpramin 100 mg
   q hs x 30 d
2) RTC ī wks or ō
   PRN

**ASSESSMENT:**

Major Depression evolving

SIGNATURE:
NURSE: J.E. Simpleen
P.E.:
PHYSICIAN:
Rx NO.

---

| PRICARE CODE NO. | NAME | INMATE NO. | LIVING UNIT |
|---|---|---|---|
| | Romero Santos | 48563 | AVCF 2 |

**SUBJECTIVE:** See note of 2/17/88. Desires
shoes that are more supportive of
ankles. — States that he was told
by podiatry (PA) that he would be
fitted for full orthopedic
shoes (above) ankle. Currently
gone through 2 pairs of Thorton
orthopedic shoes

DATE 19 Feb 88    TIME 210

PROBLEM 1 2
PLAN / ORDERS

**OBJECTIVE:** Temp. ___ Pulse ___ B/P ___ / ___

1) Ortho / Podiatry
   Clinic Consult.
2) Bilat X-rays of
   Feet & Ankles to be
   sent ī Ortho Appt.

**ASSESSMENT:** Clarify need for Ortho
shoes & further tx for
chronic pain syndrome

SIGNATURE:
NURSE: A. Fedder RN
P.E.: Marie E. Bragg NP
PHYSICIAN:
Rx NO.

ALWAYS BEGIN AT BOTTOM WORKING TO THE TOP OF THE SHEET.

18

EXHIBIT
M
PENGAD 800-631-6989

DC Form 78 (82) / Old No. 2635

WHITE — Medical Record
CANARY — Pharmacy
PINK — Data Collection

## COLORADO DEPARTMENT OF CORRECTIONS / AMBULATORY HEALTH RECORD

| PRICARE CODE NO. | NAME Romero Santos | INMATE NO. 48563 | LIVING UNIT AVCF2 |
|---|---|---|---|

SUBJECTIVE:

DATE: 10 Mar 88    TIME: 1630

PROBLEM 1  2

PLAN / ORDERS

OBJECTIVE: Temp. _____ Pulse _____ Resp. _____ B/P _____ /

1) Schedule flu appt
c Ortho / Dr Shoyer
May 3rd, 1988
2) Ankle evaluation

ASSESSMENT: 1) ® Ankle laxity

SIGNATURE:
NURSE: R Fedde RN
P.E.: Marie K. Brad
PHYSICIAN:
Rx NO.

---

| PRICARE CODE NO. | NAME Romero Santos | INMATE NO. 48563 | LIVING UNIT AVCF 2 |
|---|---|---|---|

SUBJECTIVE:

DATE: 3-1-88    TIME: 11 20/A

PROBLEM 1  2

PLAN / ORDERS

OBJECTIVE: Temp. _____ Pulse _____ Resp. _____ B/P _____ /

Given an elastic ankle support,
for left foot. Has instructions
for care and washing of support.

Seen by MD - to be
scheduled for surgery for
laxity. Expresses some fear +
questions, Discussed + will
Dr Shoyer to clarify

ASSESSMENT: ® Ligament Laxity

ALWAYS BEGIN AT BOTTOM WORKING TO THE TOP OF THE SHEET.

SIGNATURE:
NURSE: GE Zinpler RN
P.E.: Phyllis Rummn RN
PHYSICIAN: Marie K. Brad HA
Rx NO.

19

EXHIBIT
P



**FOR FEET**

Podiatric Medicine/ Foot Surgery

2928 W. 10th St. Greeley, CO 80634 (970) 351-8820

RECEIVED

MAR 2 6 2000

SAN CARLOS CORRECTIONAL FACILITY

## *PODIATRIC PROGRESS NOTE*

**PATIENT NAME.** Santos Romero
48563

**DATE.** 3/23/00

**[SUBJECTIVE].** Patient is complaining of tenderness across the top of his left foot. Patient states that he was involved in a motor vehicle accident in 1971, which precipitated an emergency surgery. At that time, he had wires placed in his foot for fractures. Subsequent to this accident, he always has worn a soft leather shoe for comfort. He has found that since being incarcerated and wearing the state boots, he has a great deal of difficulty with pinching on the top of the foot. He received some good quality soft leather shoes from a private prison, but was brought back into a Colorado institution and is concerned about the possibility of losing this footwear He states that he used to get orthopedic shoes, early in his incarceration. He states that he thinks that compensatory pain is starting in the right foot especially in the ball portion due to the pain present in the left foot. He is also starting to suffer from left hip and back pain from limping.

**[OBJECTIVE].** A transverse scar across the dorsal midfoot is present as well as multiple longitudinal scars along the medial metatarsal regions. There is a particularly painful spot on the medial aspect of the incision over the first metatarsal cuneiform joint. There is a palpable bony mass in this region. His foot seem to be tender to palpation though the patient may have been exaggerating the symptoms during this examination. There is bilateral forefoot valgus deformity but especially on the left foot that was previously injured. He is wearing a very good quality Rockport shoe which should accommodate his deformity nicely.

**[IMPRESSIONS/DISCUSSION].** No gross deformity is present necessitating special or custom shoes. However, there is evidence of malunion from fracture, which will make it extremely difficult to be comfortable in the state boots as result of a strip of leather present at the most distal aspect of the throat of the shoe.

**[TREATMENT PLAN].** It is recommended that this inmate wear sneakers as much as possible to accommodate for this discomfort. It is certainly not necessary for the medical department to purchase any special shoes, as those available on care team are quite appropriate for his purposes. He states that he is indigent and unable to afford the shoes and should be referred to this case worker to solve this problem.

*Howard Krieger*

Howard Krieger, D.P.M.
HBK/drd

EXHIBIT

A B

# DEPARTMENT OF CORRECTION
## AMBULATORY HEALTH RECORD

FOLLOW-UP

Page 1 of 1

Printed By: TIONA, SUSAN M
Printed at: 08/09/2006 14:02:49
Encounter#: 1253186 @ KF

| 48563 | ROMERO, SANTOS | Facility: | KF | LU: | KIT/UNIT C | CB | 1 | 117 | B |

### SUBJECTIVE

I/M is here for F/U on left leg pain. He was able to get a TENS unit and that has helped a lot. His leg pain is better from the hip to the knee, but he still gets pain with ambulation in the lower leg (outside upper calf). This causes weakness, and he has to stop and stretch the leg and his lower back, and rest for a while before he can go on. He is doing his exercises as prescribed by PT. I/M requests a cane--will hold off on that for now.

| Temperature: | 98.4 | Pulse: | 60 | Weight: | 180 |
| Respiratory: | 18 | BP: | 110 / 80 | | |

### OBJECTIVE

I/M able to walk on toes and heels at this time (but he reports that the pain and weakness is intermittent). His reflexes are 3+ and symmetric at quads and achilles tendons. Previous x-ray shows benign cyst in left tibia, but not likely to be causing pain. No palpable abnormality in the muscle tissue of the left lower leg.

### PLANS / ORDERS

Allergies: No Known Allergies

☒ Robaxin 1000mg po QPM x 30 days

☒ Increase Indocin to 75mg po BID x 30 days

☒ F/U with me 3 weeks.

### ASSESSMENT

729.5 - PAIN IN SOFT TISSUES OF LIMB
724.3 - SCIATICA
99213 - OFFICE OUTPT EST 15 MIN

Datetime:
08/09/2006 13:55

Providers: TIONA, S

EXHIBIT
A N

PA/NP/RD _____

Datetime: 08/09/2006 13:55

PHYSICIAN _Ann Tiona M.D._

Provider: TIONA, SUSAN M

NURSE _KRDowd RN_

DateTime _8-9-06  1730_

21

# DEPARTMENT OF CORRECTIONS
## AMBULATORY HEALTH RECORD

Printed By: GROSS, DAVID R
Printed at: 08/16/2007 11:19:24

Encounter#: 1491522 @ KF

| 48563 | ROMERO, SANTOS | Facility: | KF | LU: | KIT/UNIT B | BB | 1 | 113 | B |

| Temperature: | | Pulse: | | Weight: | |
| Respiratory: | | BP: | / | | |

## SUBJECTIVE

EXAM COMPLETED 8/15/07 - ENCOUNTER COMPLETED 8/16/07

IM is seen today for ADA re-screening. His original filing was in June of 2004 and was based on mobility. Re-screen is a DOC request. His right to refuse the re-screening is explained to him and he decides to complete the re-screen.

He states he has had back problems since the 8th grade that he was told were a product of his scoliosis. Now he gets occasional L leg pain and numbness.

He suffered a crush injury to his L metatarsals and continues to have pain in this area, both with ambulation and when at rest. currently intermittent.

He describes bilateral carpal tunnel surgery in 1982 and he denies any problems in this area at this time.

In his original filing he alleged rotator cuff problems bilaterally but does not raise them at this time.

He feels that all of these problems when taken cumulatively make him disabled and in need of accommodation. He denies having difficulty with normal daily activities such as feeding and clothing himself and is able to get around the facility without assistance. He does say he has trouble with gripping on occasion (see exam below).

## OBJECTIVE

This is a well-developed, well-nourished 53 YOHM who ambulates without hesitation into the exam room and has no difficulty climbing onto and off the exam table. He hears and understands commands and is responsive and cooperative.

HEENT - nc, eomi, perrla,, fundi without hemorrhage or av nicking, csclera clear, conjunctiva normal, ears externally normal with no inflammation or drainage, TM's pearly grey, +LR, and normal landmarks.

Heart - rrr, no m/g/r, no bruits.

Lungs - cta-b, +bs all fields, good excursion without accessory muscle use.

Abd. - firm, flat, +bs x 4, normal to percussion, central liver dimension 7 cm., no mass or organomegaly.

GU - waived by IM.

Ext. - good color, cap refill < 2 swc., no edema noted, scars about 4-6 cm. long noted on the volar surface of both wrists and consistent with carpal tunnel surgery.

MS - He demonstrates normal ROM actively in every major articulation bilaterally,  pain is generated with lateral bending at waist,  mils lateral curvature in noted on inspection of the T-spine, no tenderness in lower back, hips or knees.

Neuro - CN 2-12 intact, peripherals:  strength 5/5 B and symm. except there is cogwheel giving way when L ankle is tested, reflexes 2+/4 B and symm., negative SLR B, negative Tinel's at both wrists.

## ASSESSMENT

786.2 - COUGH
521.00 - UNSPECIFIED DENTAL CARIES
722.52 - DEGEN LUMB/LUMBOSAC INTERVERT DISC
300.4 - DYSTHYMIC DISORDER
729.5 - PAIN IN SOFT TISSUES OF LIMB
724.3 - SCIATICA
719.46 - PAIN IN JOINT, LOWER LEG
719.40 - PAIN IN JOINT, SITE UNSPECIFIED
564.00 - UNSPECIFIED CONSTIPATION

### PLANS / ORDERS

Allergies: No Known Allergies

No orders.

Medical Level: Changed from: 3 Qualifier: PERMANENT to 3 Qualifier: PERMANENT

Datetime:
08/16/2007 10:33

Providers: GROSS,

EXHIBIT

A S

PENGAD 800-631-6989

PA/NP/RD _____ PHYSICIAN _____ NURSE _____

Datetime: 08/16/2007 10:33     Provider: GROSS, DAVID R     DateTime

```
= OFFENDER TRACK ========= OFFENDER PROFILE ============ 10/17/2007 = Page  1
Doc No: 48563   Name: ROMERO JR, SANTOS                    KIT/UNIT B PRES FACIL
==============================================================================
   FBI No.:
 Birthdate: 03/11/1954 53        SID No: 464858          Inmate Class: MINIMUM
     Sex: MALE                   S.S.N.: 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      Admit Type: NEW CT COM
  Height: 509                    Ethnicity: HISPANIC      Admit Date: 03/10/1982
  Weight: 175                    Complexion: SWARTHY        Par Elig: 03/08/2001
    Eyes: BROWN                  Pre Co Incr: 0           Inst Disch: LIFE
    Hair: BLACK                  Detain/Warr: NO          Act Par Date:
 Birthplace: GREELEY             Nxt Par Hrg: 2010-04      Par Disch:
  Alerts:   RR                            CO            Case Mgr/Par Off: BEHRENDSON, DEBB
```

| Crime | # D | Min-Max | ST | County | Docket | Fac/Lvg | Location | Date |
|-------|-----|---------|----|--------|--------|---------|----------|------|
| Y MURDER | 2A | LIFE | IN | LARIMER | 81CR183 | KIT/UNIT B | PRES FAC | 05/09/07 + |
| Y SEX ASSAULT | A | 0Y-10Y | IN | LARIMER | 81CR183 | KIT/UNIT A | PRES FAC | 04/26/07 + |
| | | | | | | KIT/UNIT C | PRES FAC | 02/06/06 + |
| | | | | | | KIT/UNIT A | PRES FAC | 11/14/05 + |
| | | | | | | SCF/INTAKE | PRES FAC | 11/14/05 + |
| | | | | | | SCF/UNIT03 | PRES FAC | 06/05/04 + |
| | | | | | | SCF/UNIT01 | PRES FAC | 05/30/04 + |
| | | | | | | SCF/SEG | PRES FAC | 05/25/04 + |
| | | | | | | SCF/UNIT03 | PRES FAC | 05/08/04 + |
| | | | | | | SCF/UNIT01 | PRES FAC | 05/07/04 + |
| | | | | | | SCF/UNIT21 | PRES FAC | 05/07/04 + |
| | | | | | | SCF/UNIT03 | PRES FAC | 04/06/04 + |
| | | | | | | SCF/UNIT01 | PRES FAC | 04/01/04 + |
| | | | | | | SCF/UNIT21 | PRES FAC | 10/07/03 + |
| | | | | | | SCF/UNIT25 | PRES FAC | 06/26/03 + |
| | | | | | | SCF/UNIT01 | PRES FAC | 06/19/03 + |
| | | | | | | SCF/INTAKE | PRES FAC | 06/19/03 |
| | | | | | | DRDC/INTAK | PRES FAC | 06/19/03 |
| | | | | | | DRDC/UNIT3 | PRES FAC | 06/18/03 + |
| | | | | | | DRDC/INTAK | PRES FAC | 06/18/03 |
| | | | | | | SCCF/INTAK | PRES FAC | 06/18/03 |
| | | | | | | SCCF/1RGHT | PRES FAC | 06/29/00 |
| | | | | | | SCCF/2RGHT | PRES FAC | 02/28/00 + |
| | | | | | | SCCF/2LEFT | PRES FAC | 01/25/00 + |
| | | | | | | SCCF/3LEFT | PRES FAC | 11/19/99 + |
| | | | | | | SCCF/4RGHT | PRES FAC | 10/07/99 + |
| | | | | | | CRLY/UNIT2 | PRES FAC | 01/12/99 + |
| | | | | | | CRLY/UNIT1 | PRES FAC | 10/16/98 |
| | | | | | | MPCF/GEN | PRES FAC | 04/26/97 |
| | | | | | | AVCF/UNIT2 | PRES FAC | 09/11/89 + |
| | | | | | | AVCF/UNIT2 | CSH/GEN | 01/24/89 |
| | | | | | | AVCF/UNIT2 | PRES FAC | 03/29/88 |
| | | | | | | AVCF/UNIT2 | CSH/GEN | 03/21/88 |
| | | | | | | AVCF/UNIT2 | PRES FAC | 03/09/88 |
| | | | | | | AVCF/UNIT2 | CSH/GEN | 03/09/88 |
| | | | | | | AVCF/UNIT2 | PRES FAC | 07/28/87 |
| | | | | | | CTCF/CH7 | PRES FAC | 04/29/87 |
| | | | | | | CTCF/CH3 | PRES FAC | 04/16/87 |
| | | | | | | CCF/UNIT3F | PRES FAC | 03/21/86 |
| | | | | | | CCF/UNIT3G | PRES FAC | 10/04/85 |

*Handwritten annotation:* Shows Lockdown Units/Pods

```
CCF/UNIT2C CSH/GEN  03/12/85
CCF/UNIT2C PRES FAC 10/18/84
CCF/UNIT2C CSH/GEN  10/15/84
CCF/UNIT2C PRES FAC 09/13/84
CCF/UNIT2C CSH/GEN  09/13/84
CCF/UNIT2C PRES FAC 09/11/84
CCF/UNIT2C CSH/GEN  09/11/84
CCF/UNIT2C PRES FAC 08/20/84
CCF/UNIT2C CSH/GEN  08/20/84
CCF/UNIT2C PRES FAC 08/14/84
CCF/UNIT2C CSH/GEN  08/08/84
CCF/UNIT2C PRES FAC 07/31/84
CCF/UNIT2C CSH/GEN  07/31/84
CCF/UNIT2C PRES FAC 03/14/84
CTCF/INFR  PRES FAC 03/14/84
CCF/UNIT2C PRES FAC 05/27/83
CCF/UNIT2D PRES FAC 03/25/82
CTCF/DIAG  PRES FAC 03/10/82
```

```
CCF/UNIT3F PRES FAC 10/04/85
CCF/UNIT1A PRES FAC 08/28/85
SMCF/LU 1  PRES FAC 08/19/85
SMCF/LU 2  PRES FAC 05/03/85
SMCF/LU 1  PRES FAC 04/04/85
CCF/UNIT2C PRES FAC 03/12/85
```

EXHIBIT
A U
PENGAD 800-631-6989

DC Form 150-1A

**STATE OF COLORADO
DEPARTMENT OF CORRECTIONS
NOTICE OF CHARGE(S)**

FACILITY_____KCCC_____          CASE NO. ___08-264___

| 1. OFFENDER NAME   ROMERO JR, SANTOS | DOC NUMBER   48563 |
|---|---|
| CURRENT HOUSING UNIT   SEG225 | CURRENT CUSTODY DESIGNATION   MINIUMUM |

2. **ALLEGED CHARGES** Date ___06/17/08___ Time ___1200___ Location ___CHARLIE ALPHA___

| Class | Rule | Specific Charge (Code of Penal Discipline) Use extra sheets if necessary |
|---|---|---|
| 2 | 25 | DISOBEYING A LAWFUL ORDER |

3. **SUMMARY** (Factual Reporting, including who, what, when, where, and how).

On 06/17/08 while completing moves for the faith pod Inmate Romero #48563 approached me in the rotunda of Charlie Unit. He was pushing a black cart and told me that if we can't move him to the bottom bunk then I might as well take him to segregation. He reported that this was due to a medical restriction. I check the computer and found out he has no medical restrictions. I attempted to calm the inmate down but he was very agigitated. I advised the inmate if he would give me some time I would see if I would be able to accomadate him. The inmate advised me to forget it I might as well take him to segregation.

Inmate is being charged with Disobeying a lawful order for refusing housing assignment.

4. **CONTRABAND:** (Description and disposition. Also including same type information as required in number 3 if not listed.)

5. **NAMES OF WITNESSES TO VIOLATION:** (Including employees)

I certify that aforementioned charges and summary are true and correct to my knowledge. The date of my signature reflects the discovery date of the violation.

S/ _____ _____
Initiating Employee                           Date
UNIT MANAGER COOPER

S/ _____ 6/18/08
Reviewing Supervisor                      Date
UNIT MANAGER SPARKS

6. **INVESTIGATIONS/PHARMACY REPORT** (when required)   Date _____

Signature _____   Comment(s) _____

7. **Hearing Schedule:** This case is scheduled for: __6-20-8__ at: __After 0800 hrs__
                                                        Date                          Time

Formal Hearing ☒    Informal Conference ☐

8. **SERVING EMPLOYEE:** You are hereby served with a copy of alleged charges this __18__ day of __June__ 20__08__ at __1510__ (am) (pm). If you desire witnesses, in accordance with the Code of Penal Discipline, please notify the Reviewing Supervisor as soon as possible, but no later than 24 hours prior to scheduled hearing, to avoid a continuance.

Signature _____   Date _____

9. I do ☐ do not ☒ desire an offender representative. Name of representative _____

OFFENDER ACKNOWLEDGEMENT. I acknowledge receipt of a copy of the Notice of Charge.

Signature _____   Date __6/18/08__

20046 (R 11/02)   DISTRIBUTION:   WHITE-Department File   CANARY-Working File   PINK-Superintendent/Director   GOLD-Offender

Continuing with the four prong requirements of the Montez Remediel Plan, the second is not in question. So Claimant follows with number three. Did DOC discriminate and /or accommodations requested and denied because of the disability?

Claimant answers yes to both inquiries of DOC's lack of responsabilities. And that, SCF case manager Fred Courtney did not follow procedures of the Remedeil Plan. (see Remediel Plan page 3 - Disability Arising after DRDC Intake). So Claimant was not given the chance for any accommodation so he could continue to work. And Claimant asked the case manager to write on the "Refusal to Work" form that I was in pain from my impairments. And had asked for a copy of this form for my files. But was never given a copy eventhough, it was normal policy to do so. And to this date, this form can not be found.

And SCF medical has not recognized Claimants' qualified permanet impairments. And accommodations were requested and denied. And the AIC vagely gave only a 3 month accommodation for a bottom bunk. Eventhough, Claimant's impairment(s) were not going to get better within 6 months. And were at their severest when accommodations were needed the most. (see Remediel Plan page 26, B).

And SCF medical tried to insist I only had the smaller two files I'd gone through. So I asked, "What about the other facilities I've been to?" So she rechecked, and came back and told me they must be in the archives. And I would have to pay for them if I wanted them. Archives are for inactiveness.

And just because those files discussed were at my hearing, doesn't mean/prove they were available to me. Matter a fact, defendants exhibits show different. Because four of their exhibit pages were exactly what I had been looking for. These being, defendant's  exhibit: 1) (M) - my request for an ankle support ortho-shoe.; 2) exhibit (P) - Shows my ankle laxtivity ofwhich, I was scheduled for surgery but it was never carried out.

So their final decision was to take the footwear away. Their problem solved! But added to my problem. Exhibit 3) (AB) - Podiatric Progress Note

[Impression/Discussion] which states: evidence of malunion fracture, which will make it extremely difficult to be comfortable in the state boots as a result of a strip of leather present at the most distal aspect of the throat of the shoe. "Exactly why I can't wear them! Why? Because it hurts. Now I understand why SCCF medical didn't want me to have access to this report. (by Judy Martin)

All three of these pages are very important in proving my claim. So why were they not in all my paperwork already presented in my claim? Because they were in my large medical files I was denied access."

"And why is it that DOC can just take my ortho-shoes away? Especially since they had already been told through the Ramos v. Lamm case, that they needed to provide me them because of my injured left foot. And as an ADA issue, shouldn't it be more so? Since my back has gotten worse, and a shock obsorbent footwear can be accommodating to my back. And Claimant has had to purchase and supply his own footwear. Something I don't beleive anybody else has had to do."

Plaintiff also has had his injured left foot stiffen more, causing added complications with arthritis. Proper movement of his foot has been lacking because of the type of footwear he has had to wear.

What has confused the Plaintiff is, why would someone tell a person with a foot problem that a broken boot is what he's stuck with?

"And as for KCCC medical, isn't it retalliation discrimination when I'm told I could only have my x-ray report, once they had gotten mad at me.?"

"Because I was on medical to get me needed copies for this class action. And adding to this discriminating fire, commenting 'If my attorney has enough pull, he can get them for you.'"

Moving on to the fourth prong requirement. Did defendant's cause Claimant harm? If so, what is a proper remedy?

Proof of harm has been depositted in several ways. Of importance:

I) Security: Losing lower security status and advancing  to a higher security level. (see Offender Track and Profile sheet). Which show the location and time spent in the designated lock-down pods in each facility. (for over 1½ years).

Anything that causes an individual to sustain a higher level of points because of a write-up, can cause that person to be placed  in harms way  in a prison setting. Even if nothing physical happens, the tention alone can wear on the psyche daily. Especially if one has any impairments. And has less of an ability to protect himself. Claimant was in the process of being moved back to MR.

And while waiting for a bed space to open (authorized by the A.W.), to return to MR, Claimant fell into the hands of case manager Fred Courtney. Although, case manager Courtney had the nature and habit of causing inmates problems, didn't give him the right to ignore an  ADA/Remediel Plan scenario.

And with Claimant's recent ADA senario here at KCCC, he could have been placed in seg until a bottom bunk was available.

Instead, I was written up for "Disobeying A Lawful Order" (DLO), for refusing housing assignment.

Claimant eventually surcame to his own impairment's wear-and-tare (Oct. 2003). When Plaintiff started to have severe pain, which would end up lasting almost 3 years without any help to releave this pain by DOC.

DOC also informed this facility and the medical department directly, that anything given while at this facility, can not be taken with me once I leave. So everything doctor Tiona has given me are really not an ADA accommodation discribed in the ADA. And are basically, an appeasement. And I feel since they are an appeasement, they are in fact an accommodation that is vage. A process that is not excepted by the ADA.

I feel it is sad that DOC has been allowed to use my medical experience here with doctor Tiona, as a smokescreen.

And for the proper remedies? Above and formost, recognition of my impairments equaling a disability. Return of my ortho-footwear, medical mattress, is

sue of a cane to help support when impairments are bad and even walking is difficult. Continued treatment received from Doctor Tiona. Review of ankle surgery need, and a bone density test. Living unit accommodations (bottom bunk restrictions, assistance with property when moved to different area, especially if not assigned to the bottom tier. Working schedule adjustment apliable to my conditions (light work ect.) Proper access to medical files, allowable access to two pairs of shoes to allow for braking in of the stiffness of the new shoe. Progressive treatment of aging impairments and pain medicine if needed. No more start-up examinations (having to run the medical gamut) when moved to another facility. And any other items that can help with my impairments (new technology ect.), accommodation/assistance.

Being completely frustrated with the problems facing Claimants' impairments, Claimant had requested an amount of moneys in the extremes. And was really hoping defendants would come to see how their help is needed. But Claimant has come to realize, no one can force anyone to wake up and realize what they ethically should be doing. So that decision is in your honors hands. I just wished I had my own money to take care of myself, since defendants have refused to do so ( I requested $100,000 per past, present & future).

Plaintiff's impairments do not shut on and off. I know that as a fact, because I have to live with them. So for example, I'm not walking, standing, climbing, sitting, lifting, grabbing, stretching/reaching to any extent that my impairments are negatively effected. Doesn't mean I'm not disabled. It only means I'm taking part in an accommodation(s), of say not doing (schedules, limitations set) for a duration of a time. So that my impairments are not stopping me from functioning as adequately as possible. So if I'm not made to, or pushing the limit myself, I can actually look like (to some extent) I'm not suffering from any

28

type of impairment(s). And being in a prison environment, the Claimant is not in the habit of letting anybody take notice of his physical problems, if he can help it. But once I pass over my capabilities with my combined distinctive impairments (even if I don't want it showing), I will begin to show how disabiling my impairments really can be. Because every one of my impairments are in a state of unstability, or not any different than a so-called trick-knee. Even simple things like changes of surfaces, and going from worn shoes to new, can and do , cause problems with both my bad foot and back.

Even I, at times, feel no need for concern. But, my inpairments will remind me of their incapabilities and put me in my so-called place. I have no choice in my impairments unabilities. But I do have a choice of some of my impairments abilities,  limited as they may be. That's if I regulate (accommodate) them well. And ofwhich, I've been asking the defentdants (my keepers), and now the courts, to allow me, no help me, to do exactly that.

Even doctor Tiona, here at KCCC, had asked why they (DOC) wasn't allowing me any accommodations, when they have been allowing them for other inmates. I just told her I must have pissed somebody off. And if any paperwork I had sent to the Montez attornies, were read by DOC, I'm sure that may be my problem. Doctor Tiona always acts as if she can't understand why I am being treated this way. But I think she may know more than she will say. Maybe someone with the right caring authority needs to corner her to ask her what's really going on.

And what worries the Claimant, is how his left ankle, locks up while raising his toes toward his shin. A normal foot movement while climbing a  ladder. And the only way to  unlock it is with the use of a hand. This symptom has gotten worse since 2000.

So if Claimants situation continues as is, it is going to only put him in a "Disobeying a Lawful Order set-up". Because his impairments are not recognized

29

by the DOC. And ramifications of him standing up for his rights will continue to haunt him.

I would like to give the court a view of what I feel is a good ADA prison senario. We were to be moved to the newly built section of the facility in May 2008. And at a medical appointment before being moved, doctor Tiona asked if I was moving she wanted to make sure I had my bottom bunk restrictions inacted. Especially since, the bunks would have no ladders.

Then in the middle of July, the faith pod that I moved to, was moving back to the old section again. That's when I found out through the case manager I was to be assigned to a top bunk. At which time I informed her of my restrictions. So she went to tell the unit manager of my situation. So the manager asked to speak with me. He told me that there was nothing listed, but that I could go to C unit and the unit manager there should have open bunks for her to accommodate me.

As I arrived there, I explained my situation. But she would not budge from a top bunk assignment.

I was almost at the seg door, when the manager ordered me to stop. So I obeyed. I just happened to stop right in front of the assistant warden and two captians. The manager explained and they backed her up. So I said, let's go to seg. Because I was not going to put up with this issue anymore. I was under the impression that DOC was in on this because of the decision from the masters.

Captian Gelindo got frustrated with me so he took me to a holding cell in recieving. After about half an hour or more, the captian came back and took me to medical for a required check-up before going to seg.

While at medical, captian asked me if this was what I really wanted. I told him I had no choice because I couldn't manuvior safely up and down the top bunks.

He offered me a chair, of which, I already had authorization to have. And I told him they don't understand my condition.

All he did is to offer me a chair again. I asked him three times, "What if I hurt myself?" But he wouldn't answer. And Claimant didn't understand why nobody would take the time to look in my files. So I was taken to seg.

Later while in seg, captian Gelindo brought me my bedding. He instructed me to kneel on the bed facing the wall. I was about to doze off to sleep right before he arrived. And as I got up to do as he said, he asked me if I was alright. So I just explained to him that my balance wasn't good while first getting up.

On my second day in seg, while the guards were taking me to shower (cuffed and shackled), they noticed how I was having problems walking down the stairs between them. So I went through my spill about my conditions. So they moved me to the bottom tier.

Then five days later while being but on suicide watch, a nurse took the time and trouble-shot my situation and looked through my medical files. She found out my bottom bunk restrictions should have been renewed three weeks before. But with the inmates returning from Oklahoma, it slowed up the reguler appointments. And since doctor Tiona hadn't reafirmed my restrictions as I thought she was going to do. So the nurse spoke with the captian, since I thought it was to late, and I might lose my crafts and faith pod assignment because of the write-up. So the captian agreed to let me keep my crafts permit and return me to the faith pod with my bottom bunk restrictions back (the faith pod move wasn't reinstated).

So while being taken back to segregation CO. Pena asked me if I was alright, because of the hard time I was having while walking. Again, I explained everything to him about my conditions.

Mr. Romero's symptoms from his impairments may have gone from severe to less severe. But the problem from his impairments are here to stay.

31

## CERTIFICATE OF MAILING

I, _SANTOS ROMERO_ , hereby certify that on this _16th_ day of

_JANUARY_ , 2009, a true copy of the foregoing document was logged

and Pre-paid  and addressed to the following:

Clerk of the United States District Court
for the District of Colorado
901  19th Street
Denver, Colorado      80294

_PlEASE Copy and SEND to :_

Mr. James Quinn

Mr. Jess Dance
Office of the Attorney General
1525  Sherman Street
Denver, Colorado      80203


_Santos Romero_ , Pro-se.
Santos Romero, DOC# 48563
KCCC/CCA   Inmate Legal Mail
P.O. Box  2000
49777 County Road V
Burlington, Colorado   80807

32