IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-CV-870 - CMA (Consolidated for all purposes with Civil Action No. 96-CV-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

___

Claim Number 03-451
Category III
Claimant: Clinton J. Baskall, #87151
Address of Claimant: 1865 Eaton Street, #201, Lakewood, CO 80214

___

## FINAL ORDER OF SPECIAL MASTER

___

      THIS MATTER came before the Special Master for hearing on October 20, 2008 at the Sterling Correctional Facility (SCF) in Sterling, Colorado. Present were the following: Clinton J. Baskall (Claimant) and Willow Arnold, attorney for Defendants.

      Claimant called the following witnesses: Katherine Lovell, R.N.; Beverly Dowis; Sergeant Ivis Christian; Clarence Van Dyke; and Claimant. Defendants called Dr. Thomas Fisher, M.D. as an expert witness. Defendants offered into evidence Exhibits A through ZZ, and all were admitted.

      Claimant requested that the case remain open, as he wanted to present the testimony of Brian Webster, a physician's assistant at SCF. On October 20, 2008, Mr. Webster was ill and unavailable for testimony. The request was granted. The hearing was set to be completed on January 8, 2009. The Special Master was advised by Claimant's wife prior to this date that Claimant was being released on parole and would be required to leave the facility. As a result, the hearing date set for January 8, 2009 was vacated.

      The hearing was rescheduled for February 6, 2009 at 9:00 a.m. at the offices of the Special Master located at 600 17th Street, #2800-South, Denver, Colorado. On that date, Rob Huss appeared as counsel for Defendants. Claimant did not appear and did not contact the office of the Special Master. Mr. Huss contacted his office and was advised by DOC staff that Claimant had absconded from parole supervision on February 3, 2009 and that a warrant was outstanding for his arrest.

The Special Master finds that Claimant failed to appear for the renewed hearing. As a result, he has waived his right to present any additional testimony from Mr. Webster, Dr. Fisher or himself. The claim will be resolved on what has been presented prior to February 6, 2009.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provides the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant initially came into DOC custody in 1995. He was seen first at the Denver Reception and Diagnostic Center (DRDC). Claimant was transferred to the Buena Vista Correctional Facility(BVCF) in Buena Vista, Colorado. He remained at BVCF until he was granted parole in

3

December 1998.

Parole was not successful, and Claimant returned to DOC custody on October 25, 1999. Claimant was evaluated at DRDC and then transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado. Claimant discharged his sentence on December 19, 2000.

Claimant returned to DOC custody on March 11, 2003. He was placed back at DRDC and then transferred to BVCF on April 24, 2003. Claimant was granted parole on June 8, 2005. Parole was revoked, with Claimant returning to DOC custody on April 26, 2006. Claimant was placed then at the Bent County Correctional Facility (BCCF) in Las Animas, Colorado. He was transferred to the Limon Correctional Facility (LCF) in Limon, Colorado on December 4, 2007. He remained at LCF until May 23, 2008 when he was placed at SCF. Claimant was released on parole on January 8, 2009.

In his claim form, Claimant checked the box for mobility impairment. Claimant stated, in part, as follows:

> Knee (right) has had 3 surgeries. A Don Joy brace was issued for life use by Dr. Patterson M.D. in Canon City, Colorado in Dec. 97/Jan. 98. Dr. Patterson did all 3 surgeries and my knee brace was issued for life use in 1998. I've had my knee brace at CDOC facilities under medical/security authorization at Fremont Corr. Fac./Bent County Corr./ Limon Corr. Fac. & now at Sterling Corr. Fac. Sterling Corr. Fac. Medical staff confiscated my "Don Joy" brace per Major/P.A. Webster & Beverly David, Dr. Franz "Medical Dir.," which is now causing long term damage excessive pain that has limited my walking, limping & an extreme cramping & clicking in my knee now. I'm forced to walk over 2 miles a day on my bad knee in order to eat-med-line then return to cell house. Leg locks and dislocates where was seen by Sterling Hospital emergency room on June 13th 08, leg locked & SCF medical could not treat.

In response to the question concerning discrimination, Claimant stated, in part:

> Sterling Corr. Fac. A CDOC prison in conjunction with the medical dept. Dr. Franz, Cathy Holtz, Major/P.A. Brian Webster, Beverly Dowis have denied-approved-denied my brace. I've had the brace taken twice at SCF even after orders. Now I'm told Dr. Patterson's orders & the previous orders of 3 facilities & orthopedic surgeons are not authorized at Sterling.....

In his supplemental form, Claimant reiterated the problems that he has had with his right knee. Concerning the effect his disability had on him, Claimant stated:

> I can't do proper exercises that I need to stay in shape. I need a lower bunk restriction and they refuse to do it. I have chronic pain in my knee all the time. I am unable to do some job duties due to the restrictions of my knee. I am constantly

4

afraid of doing more damage to my knee cause it can twist and lock just by me turning around.

Claimant further stated that he had problems obtaining the necessary surgeries when he first came into DOC custody. He detailed problems that he had in getting a brace for his knee and then being able to keep it.

At the hearing, Claimant called a number of witnesses. Katherine Lovell, R.N. is a nurse at the medical department at SCF. She testified that Claimant had a knee brace taken from him on May 22, 2008. She stated that she did not have authority to order the return of the brace to Claimant. She acknowledged that Claimant had been referred to the local hospital in Sterling for a consultation due to knee problems. On August 6, 2008, the knee brace was returned to Claimant. She stated that Claimant had the knee brace before arriving at SCF. On cross-examination, Ms. Lovell indicated that each facility will make its own medical evaluation when an inmate arrives.

Beverly Dowis also is a member of the medical department at SCF. She testified that the knee brace was taken from Claimant at the facility. She was aware that Claimant had to go to the hospital for care for his knee. On cross-examination, Ms. Dowis testified that any durable medical equipment must be evaluated by staff before it may be used by an inmate.

Sergeant Ivis Christian is a property sergeant at SCF. She recalled that on June 9, 2008 Claimant was in possession of a knee brace. Sergeant Christian contacted the medical department at SCF to see if the brace should remain in Claimant's possession. Sergeant Christian recalled telling Claimant to fill out a mail form so the brace could be mailed out of the facility. The brace was returned to Claimant. Clarence Van Dyke testified that he works at SCF. He was aware that the knee brace was taken and later returned.

Claimant testified that he has been in and out of DOC custody since 1995. He had problems with his knee before being incarcerated. He was impaired when he entered into custody. He testified that he did not have proper medical care when he was first in DOC custody. He was denied a bottom bunk restriction and certain jobs because of his knee. Claimant testified that he was scheduled for surgery, but that it was delayed for a period of time. Claimant had a problem with the knee locking and also grinding. According to Claimant, he had a torn meniscus. He notified DOC staff when he came into custody that he had a bad knee.

Claimant did have surgery in 1996 on his knee. The surgery was done by Dr. Jacob Patterson, M.D. According to Claimant, Dr. Patterson recommended rehabilitation for the knee, but that was not authorized by DOC staff. He was told to do his rehabilitation on his own.

After the surgery, Claimant stepped in a hole in the yard, causing additional problems for his knee. Claimant requested first tier and lower bunk restrictions, but those were denied. He was able to work but did not get great jobs. His knee continued to create problems for him.

When Claimant returned to DOC custody in 2003, his knee was still locking and causing

pain. Dr. Patterson had ordered a knee brace, but that kept being taken from him. When he had his brace, he was able to function. When Claimant returned in 2006, he advised medical staff of the on-going problems with his knee. The brace was returned to Claimant at BVCF. When he arrived at SCF, the brace was first allowed and then taken from him. It was later returned. Claimant acknowledged that he was injured in June 2008 while playing handball.

On cross-examination, Claimant acknowledged that the only thing creating a mobility impairment is his right knee. The knee problem was the result of a motorcycle accident. Claimant stated that he has had fewer problems when he has been able to use his knee brace. When asked about the discrimination toward him, Claimant stated that he has had negligent medical treatment and has not been provided a permanent lower bunk restriction. His knee is unstable, but the brace helps provide support for the right knee. Claimant testified that he should have had surgery years ago. He further stated that the surgery should have been done right the first time.

Defendants called Dr. Thomas Fisher, M.D. as a witness. Dr. Fisher is a physician working with DOC. He reviewed Claimant's medical records but did not examine him. Dr. Fisher noted that the medical records reflected that Dr. Patterson had authorized a knee brace for Claimant. Based upon the review of the records, Claimant has been able to remain active over the years while in DOC custody. The medical records do not reflect any arthritic changes in the knee. The first surgery on the knee took place in May 1996. Dr. Patterson did the surgery and saw Claimant on several occasions. Dr. Fisher noted that recommendations of specialists are not orders to DOC, but only recommendations to be evaluated.

Dr. Fisher noted that the records he reviewed only indicated two surgeries. Dr. Fisher also stated that the knee brace could not have been issued for life, as there was a necessity to review the need for the brace over the years. Dr. Fisher acknowledged that the brace could have prevented other problems with the knee. The ACL reconstruction seems to be stable. Dr. Fisher did not believe that Claimant was mobility impaired. On cross-examination, Dr. Fisher stated that an x-ray will not show a meniscus tear.

Both sides have submitted medical records dating back to 1995. A medical note from Dr. Brian Haas on January 17, 1995 stated that Claimant had an anterior cruciate ligament tear, old medial collateral ligament tear, and probable medical meniscal pathology. Claimant was scheduled for surgery, but that did not occur due to Claimant's incarceration. Claimant last saw Dr. Haas on April 26, 1995, and it was noted then that "[h]e now presents with continued pain and uses a knee immobilizer most of the time because of severe pain."

After Claimant was sentenced to DOC, he was seen by medical staff who acknowledged a right knee problem on September 1, 1995. An orthopedic consultation was requested. Dr. Jacob Patterson, M.D., an orthopedic specialist, evaluated Claimant on December 13, 1995 and noted that Claimant had an "ACL tear with a very unstable knee, with meniscus pathology." Dr. Patterson recommended surgery, and that was performed in 1996.

Claimant twisted his knee in early fall 1997. He saw Dr. Patterson on October 8, 1997 and

6

Dr. Patterson believed that no serious injury had occurred to the knee. He recommended gradual return to full activity. Claimant's medical records reflect continuing problems with the right knee. Claimant sometimes was placed on crutches and was given a knee brace that he used through his departure from DOC custody in late 2000.

When Claimant returned to DOC custody on March 2003, the intake form noted continuing problems with the right knee. He was referred to Dr. Patterson for an evaluation. Dr. Patterson noted that Claimant's knee brace had been taken from him ("He says that on readmission to the Department of Corrections, he lost a brace which he had worn with good results for several years while he was not incarcerated."). Dr. Patterson recommended a knee sleeve and exercises for the knee. An additional DOC form reflected that approval would be sought for an "off the shelf hinged knee brace." That brace was ordered for Claimant while he was at FCF.

Finally, an orthopedic referral to Dr. Darrel Fenton, D.O. occurred while Claimant was at SCF. Dr. Fenton suspected a meniscal tear. He further wanted an MRI done to determine the status of the previous surgeries. He recommend that "the patient may have his Don Joy brace returned to wear."

**III.**

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. A claimant must establish that he was disabled, as set forth in the Remedial Plan, on or before August 27, 2003. In addition, a claimant must establish that he was the victim of discrimination on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant must establish that he was disabled by his mobility impairment on or before August 27, 2003. If he so establishes that he was disabled on or before August 27, 2003, then he may amend his claim and raise incidents that have occurred since that date to the present.

Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

This case reflects a problem that has been recurring over the last couple of years. Approval of the Settlement Agreement on August 27, 2003 placed into motion the provisions of Paragraph

XXXII. The intent of class counsel and Defendants was to provide a simplified procedure for inmates and former inmates to seek damages or other relief for incidents that occurred before August 27, 2003. Approval by the Court of the Settlement Agreement occurred almost 5 ½ years ago. Most claimants over the past two to three years have not understood the absolute necessity to prove that the disability existed prior to the approval of the Settlement Agreement and that a discriminatory act or acts occurred during that same period of time. In other words, a claimant must establish what are now historical events, as the consideration of present events is only permissible under Paragraph XXXII if those prior events are proven.

In this case, Claimant called witnesses who dealt with incidents in 2008. Claimant spent most of his time in testimony dealing with events that have taken place since his return to custody in April 2006.

The evidence relating to what transpired prior to August 27, 2003 is not crystal clear. Claimant has provided copies of his medical records, and those help provide some historical perspective to this claim. There is no question that Claimant had a damaged right knee when he came into DOC custody in 1995. DOC officials were aware of Claimant's condition and did provide treatment and some restrictions. Claimant has taken issue with some of that treatment, but that will be discussed later. The medical records reflect that the knee required surgery by Dr. Patterson. The surgery was performed in mid-1996. The records further reflect that the surgery did correct most of the problems facing Claimant.

Claimant injured his knee in 1997 while playing football. He stepped into a hole in the prison yard. Dr. Patterson saw Claimant on October 8, 1997 and stated that Claimant "does not appear to have a serious injury to his operative knee." It appears from the medical records that an additional injury occurred in late 1999 as the result of playing soccer.

A fair review of all of the evidence reflects that Claimant was mobility impaired when he entered into DOC custody in 1995. He had trouble walking and was not able to do things that other inmates were able to do. The knee was repaired in 1996. The evidence presented from both sides reflects that Claimant was able to play football and soccer up to and including his departure from DOC custody in October 2000. The Special Master finds that Claimant was mobility impaired from 1995 through the surgery in1996. The Special Master does not find that Claimant was mobility impaired thereafter because of his ability to engage in sports. This is not to say that his knee was well, because it was not. It simply means that the requirement of showing a substantial impairment to a daily activity has not been met for the time period of 1996 through 2000.

Claimant returned to DOC custody in March 2003. In his medical intake form, he stated that he believed he had a torn ACL and torn MCL in his right knee. A request for an evaluation was made, and Dr. Patterson saw Claimant again on July 23, 2003. Dr. Patterson noted that Claimant had a "[r]elatively stable ACL with some early arthritic change." Dr. Patterson recommended a knee sleeve and exercises. The evidence presented by both sides reflected that in 2003 Claimant was able to carry on his life activities.

The Special Master specifically finds that the evidence presented does not reflect that Claimant was mobility impaired on August 27, 2003. As noted previously, he was mobility impaired up to the time of his first surgery. Since the evidence does not reflect mobility impairment on August 27, 2003, Claimant may not amend his claim to include incidents happening thereafter. The Special Master makes no findings as to Claimant's present status and whether he is mobility impaired as defined by the ADA. Claimant may pursue a separate lawsuit for anything that may have occurred after August 27, 2003.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** No evidence was presented that Claimant was otherwise unqualified to participate in DOC programs or to receive DOC services.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** In order to prevail on his claim, Claimant must establish that he was treated differently because of his mobility impairment. This is a requirement of the ADA and must be proven by each claimant.

Claimant spent an extraordinary amount of time discussing his medical care while in DOC. He testified that he did not receive surgery soon enough when he came into custody the first time. He claimed that the surgery was not performed correctly by Dr. Patterson, but relied solely on his own testimony for this assertion. As with other claimants who have preceded him, Claimant believes that mediocre medical treatment or outright malpractice may be raised in this case. That is precluded by court decision. The United States Court of Appeals for the Tenth Circuit has ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. Thus, there is no jurisdiction in this case to determine whether the medical care provided to Claimant was substandard.

Claimant has not established that he was the victim of discrimination prohibited by the ADA on or before August 27, 2003. Claimant has received medical and other care while in DOC custody. Claimant further has not established that he was treated differently due to his claimed mobility impairment. Claimant spent much time discussing the seizure of his knee brace at various times that appear to post-date August 27, 2003. The medical records reflect that not every medical care provider professionally believed that the hinged knee brace was necessary. Claimant may well be correct that the brace provided support for his knee, but DOC officials did not violate the ADA when it was removed. As noted previously, Dr. Patterson did not recommend the hinged brace in July 2003.

The ADA and Rehabilitation Act require proof of discriminatory conduct based upon an impairment. An example would be the conscious decision to place a wheelchair bound inmate on the third floor of a cellhouse that had no elevator. A further example would be expecting an inmate who is totally deaf to respond to verbal commands over a loudspeaker by DOC staff. Claimant

9

testified that his right knee continues to bother him. That would appear to be the truth. The medical care which Claimant questions cannot be examined in light of *Fitzgerald*. Claimant simply has not proven that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of Clinton Baskall is denied and dismissed, as Claimant has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before April 20, 2009.**

SIGNED this 13th day of February, 2009.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master