IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-CV-870 - CMA (Consolidated for all purposes with Civil Action No. 96-CV-343)

JESSE MONTEZ, et al.

    Plaintiffs,

-vs.-

BILL OWENS, et al.

    Defendants.

---

Claim Number 03-449
Category III
Claimant: April Pope, #69820
Address of Claimant: LVCF, 1401W. 17th Street, Pueblo, CO 81003

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on January 14, 2009. This hearing was held at the La Vista Correctional Facility (LVCF) in Pueblo, Colorado. Present were the following: April Pope (Claimant) and Jennifer Huss, attorney for Defendants.

Claimant called herself as a witness. Defendants called Dr. Timothy Creany, M.D. as a witness. Defendants offered into evidence Exhibits A through C, and all were admitted. Claimant requested time to review her medical records and submit additional documents. That request was granted. Nothing further has been filed.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1] Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provides the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1] The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

2

> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant initially came into DOC custody on February 11, 1993. Claimant was evaluated at the Denver Reception and Diagnostic Center (DRDC) and placed at the Colorado Women's Correctional Facility (CWCF) in Canon City, Colorado. Claimant was granted parole on December 20, 1993. Parole was revoked, and Claimant returned to DOC custody on November 4, 1994. Claimant was placed at CWCF and then was transferred in February 1995 to the Pueblo Minimum Center (PMC) in Pueblo, Colorado. Claimant discharged her initial sentence to DOC on November 26, 1995.

Claimant returned to DOC custody on April 17, 2000. Claimant returned to DRDC and then was placed at CWCF on April 27, 2000. On November 8, 2000, Claimant was placed back at PMC. Claimant was placed into a community placement and then granted parole on September 17, 2001. Claimant's second commitment to DOC was discharged on November 6, 2004.

Claimant was convicted and returned to DOC custody on October 1, 2007. Claimant was placed at the Denver Women's Correctional Facility (DWCF) and then transferred to LVCF on November 2, 2007. Claimant has remained at LVCF since that date.

In her claim form, Claimant checked the boxes for mobility impairment and vision impairment. Claimant stated, in part, as follows:

> Spine damage, disc rupture, scoliosis, degenerative discs, bad circulation, blood clots, breathing due to back pressure, poor eye glasses required non-working thyroid. Spine damage affects my everyday life, walking, standing, sitting, can't do for more than 15 minutes at a time. Pain all the time. No exercise machines, running, dancing anymore. Can't enjoy full life can't do the work I used to do with the degenerative discs. The bad circulation arms, legs, feet swell, can't ever seem to get comfortable always cold feet and hands. Hurts very bad .....

In response to the question concerning discrimination, Claimant stated, in part, as follows:

> Denied medical attention for severe chest pains, blood clots, denied medication coumadin for life threatening blood clotting disorder (Factor V Leiden)...Denied all medications prescribed by even DWCF (synthroid) for non-working thyroid. Denied medical appts., dental appts, waiting until Dental, after 9 months pulled teeth ....verbal assault, negligence by med. staff.

Attached to Claimant's form are letters and affidavits from her civilian attorneys and others.

Claimant submitted supplemental forms for both mobility impairment and vision impairment. As to mobility impairment, Claimant stated, in part, as follows:

> Don't get any medical attention whatsoever, for my thyroid or for Factor V Leiden. Can't walk a lot due to clots now in legs from CDOC stopping coumadin. I am extremely limited as to doing any exercise machines in the gym due to my back mobility problems. No one in gym has any therapy knowledge as to what to do on machines w/certain mobility impairments. I'm in prison but CDOC keeps me in medical prison.

Claimant further stated that she requested certain accommodations, including a bottom bunk restriction, coumadin, and a special diet.

As to her vision impairment, Claimant stated in her supplemental form:

> Vision near sighted. Migraines w/o eye glasses. Astigmatism bad in right eye, as well as blurred vision.

At the hearing Claimant testified that was released on parole on September 17, 2001. She did not return to DOC control until October 1, 2007. She stated that she had an on-the-job injury while living in Colorado Springs and before she returned to DOC custody.

As to her vision condition, Claimant testified that she wore contact lenses while living in the

4

community. She was not able to bring her contacts into DOC facilities and had to wear glasses. She testified that she received the wrong prescription at first. The glasses that were provided to her by DOC were almost impossible to wear. She had migraine headaches when she wore the glasses, and the glasses upset her balance.

Claimant testified further that she had brought her medical records with her to DOC. She received medication before she returned in late 2007. At DWCF, she received coumadin and a special diet. After arrival at LVCF, she was pulled off of her medications by Dr. Wermers. She has been ill at LVCF and believes that she has clots in her legs. She experiences excruciating pain and has trouble regaining her strength.

Claimant stated that she believed she was not getting appropriate medical treatment. She would like to obtain care outside of DOC and was willing to fund that care. She stated that she has gained eighty pounds since arriving back in DOC custody. She stated that she has commenced a separate lawsuit concerning her medical care. She stated that she is at high risk for clots.

On cross-examination, Claimant testified that she had come to LVCF in 2007. She is not working and is on transitional status. She previously worked in maintenance and as a server in the kitchen. She stated that she walks the yard as carefully as possible. As to her vision issues, Claimant stated that she has glasses but they are too small to use. She gets migraine headaches and does not read as the result of those headaches.

Defendants called Dr. Timothy Creany, M.D. as an expert witness. Dr. Creany is a DOC physician assigned to the Fremont Correctional Facility in Canon City, Colorado. Dr. Creany stated that he had never treated Claimant, but had only reviewed her medical records dating back to 1993. He indicated that he was familiar with the condition known as Factor V Leiden which is a genetic factor that causes a higher incidence of blood clots for an individual.

Dr. Creany testified that Claimant was on coumadin when she came back to DOC custody in 2007. He noted that Dr. Wermers had made a medical judgment to terminate the coumadin. There was no indication that Claimant had mobility issues as the result of clots. According to Dr. Creany, Claimant was less at risk for clots when she was active and mobile. Claimant had reported knee problems and had a fall in a shower in 1993.

As to vision issues, Dr. Creany testified that Claimant had glasses that corrected her vision. Based upon a review of her records, Dr. Creany did not believe that Claimant was either vision or mobility impaired. On cross-examination, Dr. Creany said that all he could find in the way of outside records were letters and other documents from her attorneys.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. A claimant must establish that she was disabled, as set forth in the Remedial Plan, on or before August 27, 2003. In addition, a

claimant must establish that she was the victim of discrimination on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant must establish that she was disabled by her mobility or vision impairments on or before August 27, 2003. If she so establishes that she was disabled on or before August 27, 2003, then she may amend her claim and raise incidents that have occurred since that date to the present.

Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

Claimant left DOC custody on March 30, 2001 when she went to a community placement. She returned to custody on October 1, 2007. Thus, Claimant must establish that she was disabled on or before March 30, 2001. If she can do so, then the incidents that have occurred in 2007 through the present may be considered by the Special Master.

*Vision Impairment*: Claimant was not blind on March 30, 2001 and had correctable vision through the use of contact lenses and glasses. No evidence was presented that Claimant's activities of daily living were significantly affected by her vision problems when she was previously in DOC custody.

Claimant has not carried the burden of proof that she was vision impaired on or before August 23, 2003. Claimant may pursue a separate lawsuit for what may have transpired since 2007, but she may not pursue her claim for vision impairment.

*Mobility Impairment*: Claimant also has the burden of showing that she was mobility impaired on or before August 27, 2003. The medical records reflect that Claimant had previous falls and lower back problems. There was no evidence that these problems affected Claimant's ability to carry on daily activities in the time period ending on March 30, 2001.

Claimant spent a great deal of time discussing her medical issues since returning to DOC on October 1, 2007. Claimant testified that the condition of Factor V Leiden was triggered by an industrial accident that occurred in 2003. This condition has caused great concern on Claimant's part and with legitimacy. There is no question that she is at risk to have clots and possibly have additional medical issues. The problem is that this condition arose after Claimant's release in 2001. Claimant was not mobility impaired, as defined by the ADA and Rehabilitation Act, on or before

her release to a community placement in her second commitment to DOC. Claimant may pursue her claims in a separate lawsuit, but cannot do so through the use of her claim.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** No evidence was presented that Claimant was otherwise unqualified to participate in DOC programs or to receive DOC services.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant's testimony overwhelmingly concerned the medical care provided to her by DOC since she returned in 2007. She was upset at Dr. Wermers for discontinuing her use of coumadin. She had requested to obtain outside medical care, but that request had been denied.

Claimant's concerns relate to her medical care that she has received while in DOC custody. The United States Court of Appeals for the Tenth Circuit has ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act.[2]

Claimant has not established that she was mobility impaired, as defined by the ADA and Rehabilitation Act, on or before March 30, 2001 when she left DOC custody and went to a community setting. Claimant may pursue a separate lawsuit for anything that may have occurred since her return in 2007 to DOC custody.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Since the answer to Question #3 is in the negative, this question does not need to be answered.

IT IS HEREBY ORDERED that the claim of April Pope is denied and dismissed, as Claimant has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before April 20, 2009.**

SIGNED this 23rd day of February, 2009.

---

[2] Claimant testified she had brought already a separate case concerning the lack of proper medical care. Her claims relating to the Factor V Leiden condition would be better brought in the other lawsuit.

BY THE COURT:

/s/ Richard M. Borchers

_____
Richard M. Borchers
Special Master