IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-CV-870-CMA (Consolidated for all purposes with Civil Action No. 96-CV-343)

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL OWENS, et al.

      Defendants.

_____

Claim Number 03-445
Category III
Claimant: Raymond D. Goodloe, #51437
Address of Claimant: BCCF, 11560 CR FF-75, Las Animas, CO 81054
_____

**FINAL ORDER OF SPECIAL MASTER**
_____

THIS MATTER came before the Special Master for hearing on December 29, 2008. This hearing was held at the Bent County Correctional Facility (BCCF) in Las Animas, Colorado. Present were the following: Raymond D. Goodloe (Claimant) and Christopher Alber, attorney for Defendants.

Claimant called himself as a witness. Claimant also called Kathy Holt, NP, and Tajinder Singh, PA-C as witnesses. Defendants requested time in which to submit an affidavit of a physician. That request was granted. That affidavit has been received and reviewed. Claimant has submitted a detailed rebuttal to the affidavit of the physician. Also submitted were several pages of Claimant's medical records. All documentation previously submitted by both sides was accepted.

This case has been taken under advisement. This order shall constitute the final action by the Special Master on this specific claim.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The

Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provides the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
>         A. COVERED DISABILITIES

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
B. QUALIFIED INMATE
Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
1. Is the claimant a disabled individual who is a member of the class?
2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody in March 1984. He was placed initially at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado. He then was transferred to the Buena Vista Correctional Facility (BVCF) in Buena Vista, Colorado on April 2, 1984. Claimant discharged his first sentence on May 4, 1984.

Claimant returned to DOC custody on July 15, 1988. He went first to CTCF for evaluation and then was placed into a community setting. Claimant was in and out of a number of facilities until he discharged his second sentence on November 10, 1992.

On October 14, 1994, Claimant was incarcerated on his third sentence. He was placed at the Denver Reception and Diagnostic Center (DRDC) and then was transferred on November 14, 1994 to BVCF. On March 11, 1996, DOC moved Claimant to the Centennial Correctional Facility (CCF) in Canon City, Colorado. He then was transferred to the Four Mile Correctional Complex (FMCC) in Canon City, Colorado on May 12, 1997. He remained at FMCC until November 6, 1997 when

he was placed at the Fremont Correctional Facility (FCF) in Canon City, Colorado. He was granted parole on March 5, 1998. Parole was revoked, and Claimant returned to DOC custody on February 19, 1999. After being processed at DRDC, Claimant was transferred to FMCC. In November 1999, Claimant was transferred to BCCF in Las Animas, Colorado.

From June 1, 2000 on, Claimant was placed in a number of community placements and was granted parole on two occasions. Claimant returned to DOC on December 6, 2002 and was re-evaluated at DRDC. He then was placed at the Fort Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Claimant went back out on parole on June 26, 2003 and discharged that sentence on July 17, 2003.

On February 3, 2006, Claimant returned to DOC custody. He processed through DRDC and then was sent to BVCF on March 14, 2006. Claimant was sent to the Ft. Lyon Correctional Facility (FLCF) on August 17, 2006. On July 11, 2007, Claimant was transferred to the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. He remained at that facility until being transferred to BCCF on August 7, 2008.

In his claim form, Claimant checked the box for mobility impairment. Claimant stated, in part, as follows:

> 1993 ankle injury, which was a result of jumping out of third story window during a house fire. Crushing injury to right ankle and tibia bone, exploding the joint leaving no cartilage in bearing service of tibia in the joint. This injury has and the pain it causes has progressively gotten worse over time and the pain while walking or standing has increased dramatically since the date of injury. Currently, I am unable to participate in any recreational activities and can no longer work for the recreation Dept. of CDOC......

In response to the question concerning discrimination, Claimant stated, in part, as follows:

> I am no longer able to perform the requirements of my vocation in society, which is construction/subcontractor. This all due to the lack of adequate medical care concerning this injury and the deliberate indifference exhibited by the medical depart and staff here are AVCF and throughout CDOC....

At the hearing Claimant testified that he has had problems with walking and being on his feet since his injury in 1993. He testified that this has affecting the type of work that he has been able to do from 1993 to the present.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. A claimant must establish that he was disabled, as set forth in the Remedial Plan, on or before August 27, 2003. In addition, a

claimant must establish that he was the victim of discrimination on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant must establish that he was disabled by his mobility impairment on or before August 27, 2003. If he so establishes that he was disabled on or before August 27, 2003, then he may amend his claim and raise incidents that have occurred since that date to the present.

Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

There is no question that Claimant suffered a major crush injury to his ankle in 1993. An evaluation by Dr. Jacob Patterson in August 1995 noted that the right ankle had post-traumatic and degenerative changes. He recommended soft soled shoes. *Exhibit C.* A follow-up evaluation in September 1996 reflected that Claimant had degenerative joint disease. *Exhibit D.* A 1997 evaluation by Dr. Thomas Eskestrand found post-traumatic arthritis in the right ankle. Dr. Eskestrand noted that Claimant was unable to run at all or walk more than one mile. A recommendation was made at that time for a lace up ankle support and surgery to fuse the ankle. The evidence presented by both sides confirms that Claimant did have a significant injury to his right ankle that continues to cause daily problems for him.

The question that exists is whether Claimant's injury rendered him mobility impaired as defined by the ADA and Rehabilitation Act on or before August 27, 2003. The evidence presented by both sides reflects that Claimant has had difficulties over the years walking and working at any job that keeps him on his feet. Claimant has testified that he has gained weight because he cannot run and cannot walk but a short distance. Walking is a major activity of daily life that has been substantially limited. The evidence reflects that Claimant has carried on work and other activities, but with significant limitations.

The Special Master determines that Claimant was mobility impaired on or before August 27, 2003. The Special Master further determines that Claimant's mobility impairment remains today and that Claimant is disabled as defined by the ADA and Rehabilitation Act.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** No evidence was presented that Claimant was otherwise unqualified to participate in DOC programs or to receive DOC services.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** The ADA and Rehabilitation Act are designed to prevent discrimination based upon a disability. In order to establish a violation of these acts, there must be evidence that an individual has been treated differently due to his disability. An example would be scheduling recreation at the same time that diabetics are to receive insulin from medical. Another example would be the placing of a wheelchair-bound inmate on a third tier with no access to an elevator.

Claimant testified that he did not receive appropriate medical care over the years. The evidence is clear that Claimant did receive some medical care, including examination by non-DOC specialists. Claimant has taken issue with some of that care, believing that he should have had surgery to fuse his ankle some time ago.

On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Settlement Agreement. In addition, the Special Masters have no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. The Special Master would note that the issue of whether surgery should have been performed in the past is not something that is subject to evaluation by the Special Master. If Claimant believes that he has been the victim of medical malpractice or negligence, he may pursue separately any rights that he may have concerning that care.

Claimant has established a pattern of conduct that is troublesome. Dr. Patterson, Dr. Eskestrand, and other medical providers have recommended soft soled shoes and a lace ankle support. Claimant notes that he had soft soled shoes shipped to him in 1994, because they would have provided support for his ankle. The shoes were not allowed because of a security concern which has been undisclosed in testimony or exhibits. Claimant did attempt to follow the recommendations of the physicians and provide his own footwear. No evidence has been presented by either side reflecting that Claimant ever was granted permission to receive his own soft soled footwear.

Claimant has spent several periods of time in DOC custody. He testified that he attempted to obtain appropriate shoes from outside the department, but that was denied. The early recommendations were not followed by DOC staff. No reasons have been presented to indicate why the recommendations of Dr. Patterson and Dr. Eskestrand were ignored. The Special Master will not presume that any valid reason existed for not allowing soft soled shoes. Just because a security issue is raised does not mean that it has any validity or that it is anything more than a pretext to deny appropriate care.

During the times that Claimant has been in custody, he has not been able to come and go from his facilities. He could not secure appropriate footwear on his own. Indeed, he tried but was denied the opportunity. The Special Master determines that Claimant was denied the ability to secure soft soled shows and ankle supports, even though recommended by specialists, and that no appropriate and supported reason was provided why the shoes were not allowed in 1994 and over the years. Stated simply, Claimant was denied items that would have allowed him to reduce the effects of his mobility impairment.

The Special Master determines that there has been a violation of the ADA and Rehabilitation Act commencing in 1994 involving denial of soft soled shoes and ankle brace. The Special Master specifically determines that any additional issues involving review of medical care, including recommended surgery, are covered by *Fitzgerald* and cannot be resolved in this case.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** The Special Master determines that Claimant should be compensated for the denial of appropriate shoes and ankle brace over the years in the amount of $300.00. The Special Master further determines that appropriate soft soled shoes and an ankle brace shall be provided to Claimant by Defendants.

IT IS HEREBY ORDERED that the claim of Raymond D. Goodloe is granted to the extent noted, and Claimant is to be compensated in the amount of $300.00 and to be provided appropriate soft soled shoes and an ankle brace while in DOC custody; and

IT IS FURTHER ORDERED that the remainder of the claim of Raymond D. Goodloe is not sustained and will be dismissed; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before May 18, 2009.**

SIGNED this 6th day of March, 2009.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master