IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-CV-870-CMA

JESSE (JESUS) MONTEZ, et al.,

      Plaintiffs,

-vs.-.

BILL OWENS, et al.,

      Defendants.

---

Claim Number: 03-447
Category:  III
Claimant:  Brenda Mumford. #89345
Address of Claimant: High Plains Correctional Facility, Brush, CO 80723

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER comes before the Special Master on the claim of Claimant Brenda Mumford.  A hearing was held at High Plains Correctional Facility (HPCF) in Brush, Colorado on February 27, 2009 before Richard C. Davidson, Special Master.  Ms. Mumford appeared pro se. Defendants were represented by Ms. Jennifer Huss, Esq.  Claimant Brenda Mumford and Dr. Timothy Creaney were called, sworn and testified.  The Special Master has reviewed the testimony and all documents filed by both sides.  This Order shall constitute the final action of the Special Master on this specific claim.

## I.  BACKGROUND

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (CDOC).  The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*.  During the summer of 2003, the parties began the process of trying to reach a settlement of all issues.  The Court was advised that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (a.k.a. Settlement Agreement) was presented to Judge Nottingham.  After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved.  That approval established the class and did not provide for an opt-out provision for class members.  The Remedial

Plan also created a mechanism for individual inmates, former inmates or their representatives to file claims seeking damages or other remedies available in court.

Section XXXII of the Remedial Plan provided the following basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
>
> I.     General inconvenience or nominal damages;
> II.    Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III.   Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV.    Damages due to severe physical injuries; and
> V.     Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as Category III. *Remedial Plan, pp. 28-9.*

Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages for relief.

Section III of the Remedial Plan provides the following definitions:

> III.   DEFINITIONS
>        A. COVERED DISABILITIES
>        The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
>        B. QUALIFIED INMATE
>        Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
>        C. PERMANENT DISABILITY/IMPAIRMENT
>        A condition which is not expected to improve within six months.

On November 23, 2004, Judges Nottingham and Kane issued an Order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2

2.   The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:

> 1.   Is the claimant a disabled individual who is a member of the class?
> 2.   Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3.   Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4.   Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This Order controls the adjudication of all claims and must be followed by the Special Masters.  A claimant must establish by a preponderance of the evidence each of the above four criteria.

## II.  FINDINGS OF FACT

Being duly advised, the Special Master makes the following Findings of Fact:

1.   Claimant Brenda Mumford submitted a claim which was assigned claim number X-269, as untimely filed.  After review, the claim was elevated and assigned claim number 03-447.  The claim is premised on an alleged permanent mobility disability.

2.   Claimant's claim was assigned to Category III pursuant to the Remedial Plan as set forth above.

3.   Claimant Mumford first entered CDOC custody in 1996. Over time, she has been on parole and has been brought back into custody several times.  During her time in custody, Claimant has been housed at DRDC, CWCF, DWCF, PMC, LVCF and HPCF.

4.   Claimant suffers from osteoporosis and rheumatoid arthritis.  Her left ankle is "getting bad" and she says she sometimes falls.  She testified that there are no shower rails and she is afraid of falling.  She wishes to have a cane issued to her to aid her mobility.  Claimant also complains of right shoulder pain and intermittent swollen hands.  She had a TENS unit for her shoulder pain but this was taken from her by CDOC.  When her hands swell, she is unable to feed herself.

5.   Claimant testified that she had a full hysterectomy in 1976 and that her osteoporosis developed after that time.  She testified that her mobility problems began while she was at the La Vista facility in 2008.  Her hand became a problem in 2007 or 2008.  Prior to this time, in 2004 to 2005 she was physically active and was a participant in volleyball, softball and aerobics.  The first request for accommodations was in 2007.

3

6. Claimant is now on restrictions to avoid any lifting over 10 pounds and to avoid long term standing. She is employed to fill chemical bottles. She has worked in housekeeping and in food service in the past.

7. Dr. Creaney testified that his review of the records confirms that Claimant has osteoporosis. The first mention in the medical records was in 2000. Osteoporosis does not affect mobility unless a fracture occurs. Claimant's ankle was examined by x-ray and by CT scan in 2000 but no fracture was found. In 2001, a bone scan was normal except for her ankle. In 2004 he testified that she was positive for osteopenia. A medical record from September 5, 2007 states that Claimant "Is ambulatory, capable of all ADL-plays volleyball per staff observations."

### III.  CONCLUSIONS OF LAW

1. The legal standards applicable to this claim are derived from three sources:  (a) the Remedial Plan; (b) the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and (c) the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*

2. The first issue before the Special Master is whether Claimant is a disabled individual who is a member of the class. Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i).

3. The Remedial Plan limits the class of persons who might otherwise have a disability under the Rehabilitation Act and the ADA to those with mobility, hearing, vision disabilities, and those with disabilities due to diabetes. *Remedial Plan* ¶ III(A). Additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. *Remedial Plan* ¶ III(B). A permanent disability/impairment is a condition which is not expected to improve within six months. *Remedial Plan* ¶ III(C). As discussed in Section I above, the Remedial Plan further limits permanent mobility, hearing, vision, and diabetes disability/impairment to those that conform to the criteria of Section V, paragraph A of the Plan.

4. Based on the criteria established by the Rehabilitation Act, the ADA, and the Remedial Plan, a claimant is a disabled individual who is a member of the class if, while an inmate in a facility under the control of the CDOC, he or she (a) had a permanent physical mobility, hearing, or vision impairment, as defined in the Remedial Plan, or was a diabetic; and (b) this condition substantially limited one or more of his or her major life activities.

5.  It must be noted that neither the ADA nor the Rehabilitation Act are designed to remedy alleged deficiencies or omissions in medical treatment provided to prisoners by CDOC.  Rather, the ADA and Rehabilitation Act are designed to insure that those who have permanent disabilities that prevent them from engaging in one or more major life activities are not discriminated against because of their disabilities.  The Remedial Plan, which defines the scope of the Special Master's authority, limits the disabilities for which damage claims can be asserted to those relating to mobility, vision, hearing, and diabetes.

6.  The Special Master finds and concludes that Claimant Brenda Mumford was not a mobility disabled person, under the terms of the remedial plan, during the period of time covered by the plan.  The Remedial Plan was approved and became effective on August 27, 2003.  It covers all inmates with qualifying disabilities that existed before that time.  By her own admission, Claimant began to have mobility problems in 2007, long after the effective date of the plan.  Since any disability she may have falls well outside the time for a qualifying disability, Claimant is not able to qualify as a member of the Montez class.

### IV. ORDER

IT IS ORDERED that, based upon the foregoing Findings of Fact and Conclusions of Law, Judgment shall be entered in favor of Defendant and against Claimant dismissing her claims in this action.

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Final Order of Special Master pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed **on or before June 29, 2009** with the Clerk of the United States District Court at the following address:

900 19th Street
Denver, CO 80294.

SIGNED this 15th day of May, 2009

BY THE COURT:

*/s/ Richard C. Davidson*

_____

Richard C. Davidson,
Special Master

5