IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-JLK-OES

JESSE F. MONTEZ, et al.,

     Plaintiffs,

vs.

BILL OWENS, et al.,

     Defendants.

_____

REPORTER'S TRANSCRIPT
STATUS CONFERENCE/HEARING

_____

          Proceedings before the HONORABLE JOHN L. KANE,
JR., Senior Judge, United States District Court for the
District of Colorado, commencing at 9:14 a.m., on the 1st day
of September, 2009, in Courtroom A802, Alfred A. Arraj United
States Courthouse, Denver, Colorado.

Proceeding Reported by Mechanical Stenography, Transcription
Produced via Computer by Kara Spitler, RMR, CRR,
901 19th Street, Denver, CO, 80294, (303) 623-3080

APPEARANCES

PAULA GREISEN and JENNIFER RIDDLE, King & Greisen, LLP, 1670 York Street, CO  80206; BLAIN MYHRE, EDWARD RAMEY, and LARA MARKS, Isaacson Rosenbaum, P.C., 633 17th Street, Suite 2200, CO  80202, for plaintiffs.

ELIZABETH McCANN and JAMES QUINN, Colorado Attorney General's Office, 1525 Sherman Street, 7th Floor, CO  80203, for defendants.

P R O C E E D I N G S

(In open court at 9:14 a.m.)

THE COURT:  Thank you all.  Good morning, and be seated, please.

You don't need to know this, but for the record, this is Montez vs. Romer, 92-cv-870.

This case is one of those that, where a judge makes it extraordinarily tempting to think of Alexander the Great solving the problem of the Gordian knot and I wish I had a scimitar that I could simply take care of this forthwith, but I can't.

I don't think that any of you need to know, but because this is a hearing and there's a -- who knows if it's ever going to be subject to review, I think it's important to point out that this case was assigned to Judge Nottingham and Judge Nottingham presided at the time that the parties reached a settlement.  Within the proposed consent decree was a

1  provision that I would be designated to handle the individual

2  damage claims by reviewing the decisions of special masters

3  appointed to hear them, and that review would be on the

4  standard of abuse of discretion.

5      There were times when the relative jurisdiction or

6  responsibility -- not jurisdiction -- the relative

7  responsibilities in the case between Judge Nottingham and me

8  became confused and we had a couple of hearings with both of us

9  on the bench because the, essentially the class action and

10  issues outside of the individual class members' claims, those

11  issues which related to the structure of the case, were

12  appropriately or properly matters for Judge Nottingham to

13  consider.

14      Now, for reasons which the Court of Appeals is already

15  more familiar with than need be repeated, Judge Nottingham

16  resigned from the bench and in the period of time prior to his

17  resignation, I think he had other concerns and did not pay

18  attention to, to this case and the -- and to the degree that,

19  without his other concerns, he would have.  And he certainly

20  demonstrated his ability over the years to handle cases of

21  considerable complexity with distinction.  Nevertheless, this

22  case slipped.

23      And I found myself being called upon to do more than I

24  could do under the consent decree or wanted to do based upon my

25  own burgeoning caseload, which was complicated by my being gone

1    from the bench for six months because I had cancer.  And so

2    with that and with other complicating factors, the trial of a

3    six-month long toxic tort class action, this case did not

4    receive the kind of attention that I give to my morning

5    prayers, which is scant to begin with.  So I just didn't have

6    that.

7            And I also know that there's a considerable amount of

8    frustration on the part of both the members of the class and

9    the officials in the state Department of Corrections.  I'm

10   keenly aware of the fact that all governments in this country,

11   and the state of Colorado being no exception, are under severe

12   financial restraints, many of which are beyond the power of

13   anyone to deal with.  Well, they weren't, but they weren't

14   dealt with, so we had an economy that cratered.  But there's

15   also some of the state of Colorado that are of their own

16   making.

17           And the people who, I think, have struggled greatly in

18   this case trying to do something are the special masters,

19   particularly magistrate judge -- Special Master Borchers, and

20   then he has had the assistance of Special Master Pringle and

21   Special Master Davidson.

22           Judge Nottingham did not consult me, I didn't realize

23   that there was another special master in the case who was

24   appointed from the Judicial Arbiter Group to handle the

25   question of attorneys' fees.  I'm very grateful there was

1  because I can't think of anything I'd rather not do than that.

2       But at any rate the problems were all there when

3  Judge Nottingham resigned and the case was then reassigned to

4  Judge Arguello, who is a person appointed with no previous

5  judicial experience, although extensive experience as a lawyer,

6  and who at one time had been on the attorney general's staff.

7  I think she felt a great discomfort in having been on the

8  attorney general's staff and then being asked to take over this

9  case and I also think that her lack of experience as a judge

10 was such that when she looked at the file, diligently tried to

11 sort out everything going on, she came up with what I'm

12 beginning to believe is a characteristic brilliant decision of

13 hers.  It was brilliant in the sense that it certainly cleared

14 her docket and she asked me if I -- she said, in very practical

15 terms, she said, you've been involved in this longer than I

16 have, and I don't see the sense of my trying to tool up and go

17 through all this if you already are there.  And she winked and

18 blinked.  She's very persuasive.

19      Anyway, I said, trying to get out of it, that, gee, I

20 think I've been involved in settlement and it wouldn't be

21 appropriate for me to do this, without the consent of the

22 parties.  So I had crossed my fingers and hoped that somebody

23 would look at my previous rulings in this case and say that's

24 the last thing in the world we want; but unfortunately, I was

25 wrong.  And I want counsel to know, you disappointed me in this

1    respect.

2         So I have this case and a Gordian knot is a good way

3    to describe it; a can of worms is another way.  But I did send

4    out a notice about today's hearing and tried as best I can to

5    get rid of or at least get a sense of the heft and feel of it.

6    I've asked Special Master Borchers to be here, and he is here,

7    available for us.  And I'm grateful for his coming in.

8         In reviewing, we found some things that haven't been

9    decided, that I think we can take care of, and I want to do

10   that just to clear the record first.

11        There is a recommended award of attorney fees and

12   costs, document 1614, filed December 29, 2005, by the special

13   master I didn't know was here, Robbie Barr, and I think our

14   records would indicate that this should be moot, mooted.

15        MS. GREISEN:  Yes, Judge, that's correct.

16        THE COURT:  All right.  All right.

17        That document is moot.

18        The next one is her award of attorney fees and costs,

19   document no. 1641, filed February 15, 2006, and I believe,

20   likewise, that that should be denied as moot.  That it's been

21   mooted.

22        MS. GREISEN:  I believe that's correct, Judge.

23        THE COURT:  Okay.  All right.

24        So, see, we've done something.  We've accomplished

25   more today than the U.S. Senate has in the last . . . .

1          All right.  Now, the order that I sent out, I think

2     what I want to do today is bifurcate these issues.  The first

3     dealing with the special master and the claims of the

4     individual inmates, and I want to make it very clear as to how

5     these are to be handled.  Judge Nottingham had agreed and it

6     was incorporated, I believe, into the consent decree, that the

7     plaintiffs' class counsel would not handle the individual class

8     members' claims.  And that was acceptable; I certainly went

9     along with that.  So I didn't realize what a problem it

10    creates.

11         It creates, generally speaking, this problem: that

12    people are filing claims and they may or may not be

13    legitimately recognized as class members.  Those claims go to

14    the special master.  The special master was limited in

15    authority to decide the validity and the amount, et cetera, of

16    claims; but this jurisdictional question was really not one

17    over which the special masters had authority.  And so I issued

18    an expanded order, after consulting very briefly with

19    Judge Nottingham -- and I have to say, in all candor, that was

20    during the time when his attention was not focused on this case

21    or any others, really -- and the decision was made that I would

22    issue this order that if there were these problems, the special

23    master could determine whether they fell within the class or

24    not.

25         Now, this, on reflection, was not a wise thing to do.

1  Because when you have individual claimants in the class who are

2  saying that they didn't get their hearing aids or that the

3  wheels on their wheelchairs are flat or that they're not

4  getting their insulin when they're supposed to, whatever the

5  various kinds of claims that they have, that's one.  But for

6  them to appeal to me and say that, that the special master

7  abused his discretion, they can argue their own facts.

8         But when you ask them to argue questions of

9  jurisdiction that give lawyers difficulty and that gives the

10 special master, trained judges, difficulty in deciding whether

11 they fit within the class or not, it really doesn't work, that

12 process.  And there are a number of those cases in which

13 recommendations have been made that are pending.  And those

14 need to be cleared up.  And I need to -- now that I don't have

15 to have consultations with other judges, I can just be

16 imperious about a lot of things, and I feel more comfortable

17 being imperious than collegial.  So I need to resolve that

18 issue.  I need to figure out a way that we can resolve that

19 problem and get rid of the backlog and then see that it doesn't

20 happen anymore because eventually we're not going to have these

21 special masters.  Eventually all of this has to be cleared up.

22         Now, I say "eventually," and I don't mean that like a

23 property lawyer means future interests.  I mean "eventually"

24 like a litigator that this thing's got to die sometime.  And

25 the sooner, the better that we reach a final solution.  A term

1  I'm not particularly fond of, but nevertheless, that's what we

2  have to do.

3          So what I want you to address yourselves to is this:

4  first of all, I want to make it very clear, the consent

5  decree -- this has already been argued and briefed, and the

6  consent decree provided for an objection to be filed to the

7  magistrate -- the special masters' rulings on individual claims

8  and that was subject to review by me on an "abuse of

9  discretion" standard.  That was the -- and the, the consent

10  decree says it and that's it.  There is no right of appeal from

11  a denial of my decision on the "abuse of discretion" review to

12  the Tenth Circuit.  And we will not issue any certificates of

13  appealability on that issue.  If a pro se class member wants to

14  challenge that, they're free to do so, but we're -- I think

15  that's final.

16          The other problem is this: if a decision is made by a

17  special master that a person does not fall within the

18  classification of the class to proceed with the claim, the --

19  that individual claimant will be advised that the claim is

20  denied because he's without -- without prejudice because he's

21  not a class member, and he will be directed to -- or she -- to

22  proceed through the Prison Litigation Reform Act.  And start

23  that process, if they're not in this class, their individual

24  claims are up to them.

25          We're not going to give them any further legal advice,

1    and if they -- if plaintiffs' class counsel thinks they need to

2    provide them with any further advice about proceeding, you're

3    free to do so, without entering an appearance and being

4    responsible for all of them.  But we can't proceed any further

5    than what we do with any kind of prisoner claim, and that's

6    just to send them a letter with the forms attached and say, you

7    haven't complied with the Prisoner Litigation Reform Act, your

8    case is not accepted, and you have to go through that process.

9    So I think we can clear that up in a hurry.

10           But new filings is another matter.  And new filings

11   that come in, if there is a question by the State of whether

12   the person falls within the class ambit, then I'm going to --

13   I'm ordering that the State will send notice to class counsel.

14   If class counsel -- and this is not representing -- I want to

15   make this clear -- I'm not asking you to represent individual

16   claimants; I'm asking to maintain the integrity of the class.

17           So if you're saying that person, that claimant, is not

18   within the class, you notify class counsel.  If class counsel

19   disagrees, they can file an objection with the special master

20   to the denial of qualification.  If they agree, then they

21   should notify the claimant and tell them to go through the PLRA

22   and you can either provide them with the forms they need, or

23   you can have the court do that.  The clerk's office will get

24   the name and send it on.  That's the only way I know to clear

25   this up.

1      So the special master will clear up the pending

2  matters as I've indicated, and then we'll let counsel proceed

3  on that basis.  So when the claim is filed, the special master

4  or the clerks of court will notify, as they do anyway, I think,

5  the attorney general's office.  The attorney general's office

6  looks at the claim, it's up to you to screen it, they're either

7  in the class or they're not.  We're not expanding the class.

8  The class, the claims for the class should be fairly dwindling

9  at this point.

10      Now, there's one other matter that's been briefed that

11  I want to hear about today, and I'll rule on it.  And that is

12  the question of who is a qualified member of the class whose

13  injuries occur after the class filing period.  And there aren't

14  many of those, but there are some, who I think may have been,

15  as an example, diabetic but not required anything for their

16  diabetes other than diet, and then later require medication and

17  it becomes worse and they need additional treatment.  That's

18  one example.  Maybe somebody that's for other reasons.

19      So I want to hear this and I want to hear about that.

20  And then I'll make a decision right now, once I hear from you,

21  about how to handle those people.  If there's anything else

22  dealing with the individual members of the class and their

23  claims, I want to handle all of that today first, before doing

24  anything else.

25      Then we get, once that's done, magistrate -- or

1   special master -- I keep calling him magistrate -- Special

2   Master Borchers can leave if he wishes because the class-member

3   claims issues will be done.  We'll take a recess so that, so

4   that that's clear to everybody.

5          And then the other thing I -- we need to do is to get

6   into this question of compliance.  And I did set three weeks

7   aside to hear this matter, because nobody could tell me how

8   long it was going to take, and I wanted to make sure that we

9   had all the time that you needed.  But since that time, we,

10  we've had, we've had to chew off pieces of that three weeks

11  because of Speedy Trial Act considerations in other cases,

12  where they have to be tried within 70 days.  So I'm going to

13  have to carve out a new time to try the case, when you people

14  can tell me how much time it takes.

15         We've all been easy on this compliance matter, hoping

16  that it could be done without, without further court action.  I

17  am not -- and I don't want anybody here to think that I'm

18  trying to be critical of either the plaintiffs or their counsel

19  or the defendants or their counsel -- but for lots of reasons

20  this consent decree has not worked the way that it should.  We

21  haven't gotten to the point where there's complete compliance.

22  And I've been saying take some more time if that's what you

23  need; and I think plaintiffs' counsel has done the same on

24  this.  I don't know where we are on compliance at this point.

25  I've said from the past from the evidence that I heard that I

1  thought there was a good-faith attempt and effort on the part

2  of the defendant to do this, but I don't know where we are.

3       The other thing before we begin on this that I want

4  you to know is that I said this in the order, that if we can't

5  come to grips with this and have what we will have to do for

6  the compliance hearing is have a pretrial order and set it down

7  for the amount of time that it needs in court to determine

8  whether there's been compliance or not.  But there's not going

9  to be any more easy kind of let's just wait and see in another

10  six months and a status report.  I just can't do that.  This

11  case should not have -- this case has been mismanaged.  I think

12  that's the bottom line.  And I'm trying to pick it up, the

13  various pieces, and put it into a clear management form.

14       So we will, today, decide whether we're going to have

15  these compliance hearings; and if so, we're going to make

16  certain that there's a pretrial order, that the necessary

17  witnesses are listed, the issues to be tried, just like a

18  regular, good ol', garden variety, dare I say, pretrial order,

19  and we'll set it for trial, and that's what we'll do.  If we

20  can't do that, I can vacate the consent decree, and we'll set

21  it down for trial, the whole thing, just start from jump

22  street, if that's what's necessary.  But I don't think anybody

23  really wants, wants to see that happen.

24       The next thing is -- and I -- this came up many years

25  ago in Ramos vs. Lamm, and I understand, I understand the

1   pressures that the attorney general's office is under in this

2   regard, that the state does have a government, the state has a

3   joint budget committee, the state -- it's not up to me to

4   decide its fiscal policies, and I'm not about to.  But I'm not

5   going to be dictated to in terms of enforcing the Constitution

6   and laws of the United States by fiscal constraints.

7           One of the single largest problems we have in the

8   United States today is the aging prison population.  It is

9   something that more than the effort given to it in the past has

10  to be done from here on out.  The various states and the

11  federal government involved in corrections are the -- have

12  professional people doing that; and I don't pretend, by any

13  means, to have that kind of expertise.  But I will not accept

14  that there just isn't enough money to do something.  Because if

15  that's the case, then the doors are going to open to a lot of

16  prisoners.  And I think if you read the papers, you can see,

17  California is setting a lot of people out on the street.

18          Now, it boils down to this: if people in government in

19  their desire to protect the public believe that people should

20  be incarcerated, they pass laws in compliance with the

21  Constitution and they have the authority to do that.  What they

22  do not, what no government has the authority to do, is to

23  ignore the Constitution.  And if constitutional rights are

24  being violated, they will cease.  And how that's done is --

25  there's many ways of stopping it.  But one thing is it will not

1    be just acquiesced in by this Court.

2         So if there's not enough money, then you have to have

3    fewer prisoners.  You have to make some hard choices.  Or the

4    state has to grasp the nettles and get more money, instead of

5    worrying about the voters not wanting taxes.  It gets down to a

6    question of do they not want taxes, and part of that is having

7    a lot of people on the streets that they don't want to see on

8    the streets.  And I hate to use these old trite expressions,

9    but -- cliches, but it's just like a, if you want to dance, you

10   got to pay the piper.  And if you don't pay the piper, there's

11   not going to be any music.  The same thing is true here.

12        So I don't want to hear those arguments, either, about

13   the governor doesn't want to set people out on the street.

14   Well, I don't blame him.  But those are the decisions -- I

15   didn't run for that office.  Those are his decisions to make.

16   And the legislative, joint budget committee, has to make those

17   decisions.  And if they think that, well, our hands are tied,

18   because there's a TABOR amendment, then you're going to have to

19   get rid of it; I don't know, it's not up to me.

20        But what is up to me is to see that the Eighth

21   Amendment is not violated.  And that means that sick prisoners

22   cannot get sicker because they're in prison.  That's Estelle

23   vs. Gamble.  That means that humane treatment must be provided

24   to them.  That means that a safe environment must be provided

25   to them.  That is what the law is, and that's what will be

1   enforced.

2          Now, I say, I have a great deal of sympathy for those

3   people who are under the gun and responsible.  Mr. Zavaras is

4   here, and I think it's not inappropriate to say that I consider

5   him a friend and I am an admirer of his and I understand the

6   gun that he's under and I understand Ms. McCann and Mr. Quinn

7   and all the people that are with you, that have to go before

8   these various committees and so on.  But I can't be held

9   accountable for that.  My job, my oath tells me to enforce the

10  Constitution, and that's what I intend to do.

11         So if there's not enough money to have the kind of

12  prison architects make the plans and then get the funds for the

13  construction and do it, it just simply isn't going to be a

14  facility, then there isn't going to be anybody in the facility

15  because it does not exist, and they're not going to be held

16  under inhumane conditions.  So I want to be very firm when we

17  start of understanding where that is.  This is the brick wall.

18         As for the plaintiffs, again, I appreciate the

19  monumental amount of work and dedication that counsel have done

20  in this case and the team that you've assembled to do it, but

21  this is a class action, not a government institution.  This

22  class action has its limits, and we're going to stick within

23  those limits.  The class is defined, the responsibilities that

24  the law places upon the defendants; and anything more that the

25  law does not require, I don't want to listen to.  If both sides

 1    can sit down and agree to something, I don't care what it is,

 2    as long as it isn't keeping me on this case longer; but

 3    that's -- if you think that there are other ways of doing

 4    things, that's fine.

 5         Strictly as an amateur, but there's all kinds of other

 6    avenues of handling these things than the ones that we have.

 7    I've read in the paper, just recently, an ongoing thing about

 8    how many juvenile offenders are incarcerated who -- there's

 9    some sort of state agency, committee, commission, that's

10    supposed to be looking at them, and that nothing's been done

11    about that.  That's a political issue, not a legal issue.  But

12    that's a way of reducing the prison population.  Another way,

13    obviously, is to look at nonviolent crimes and see whether or

14    not people really need to be in prison and reduce it that way.

15    And one way that we have to consider in here, that I do have

16    something to say about, are these, these disabled people that

17    are there serving time for what purpose.

18         Now, again, those are decisions, the discrete decision

19    as to each and every one of them is something that I, I have no

20    intention of interfering with.  If somebody wants to share

21    experiences along those lines, I don't mind doing that.  I can

22    tell you that in the last year, that I have, on other cases for

23    federal crimes, have sentenced people confined in wheelchairs

24    to home confinement.  I mean, that's an alternative.  I did it

25    for different reasons.  The federal prisons have room,

1   apparently, not that the people should be there all, but they

2   have plenty of room.

3          I think if you're in Congress, you automatically get

4   probation, but other than that, that's -- I'm being cynical.

5   I'm sorry.

6          Okay.  That's where I want to start, is with the

7   special masters and we'll cut that and then we'll get to the

8   consent decree.

9          And if you disagree with what I said, I happy to --

10   you know, you'll let me know.  I know that none of you are shy,

11   and I don't hold grudges.  Well, except for the English

12   invading Ireland, but that's different.

13          MS. GREISEN:  Would you like me to start, Judge?

14          THE COURT:  I think you have to.  The ball's in your

15   court.

16          MS. GREISEN:  Thank you.

17          Judge, I did take literally your comment in the order

18   that you would be open to persuasion here today, and I would

19   like to address the jurisdiction of the special masters, I

20   guess, in a more broad sense, both on behalf of claims by

21   people who were not in the Department of Corrections' custody

22   as of August 2003 as well as those who were.

23          I understand the Court's position on this and I am

24   very sympathetic to the reasons underlying not talking about

25   damage claims beyond August of 2003.  And I'd like to preface

1    my comments with, Judge, I don't think any of us in this room

2    anticipated that six years after the Court entered the remedial

3    plan that we would be standing here talking about these issues.

4    And frankly, I think the fact that nobody did contemplate that

5    is why we have some very complicated issues now with respect to

6    those damage claims.

7            So I understand what the Court has said and Court's

8    permission and maybe a little bit of indulgence, I would like

9    to take just a little bit of time, if the Court will grant me,

10   to talk about the claims of people who were not in custody as

11   of 2003, if I may.

12           THE COURT:  Whatever you want to say, please go ahead.

13   I was -- hope you understand that when I tell you these things

14   in advance, it's 'cause that's what I'm concerned about and

15   that's what I want you to address.  But you've never been shy

16   before, and I don't expect you to be shy now.

17           MS. GREISEN:  No, I've been called a lot of things,

18   and shy isn't usually the first word that springs to people's

19   mind.

20           THE COURT:  That's fair.

21           MS. GREISEN:  I wanted to tell the Court that the

22   reason why we have advanced the position that people who were

23   not in DOC custody in 2003 should be entitled to take advantage

24   of the damage-claim process.  The first thing, Judge, is that

25   the remedial plan, itself, does not limit class members to

1  those who were in Department of Corrections' custody as of

2  2003.  When this class was certified, back in -- let's see, I

3  think it was, I think it was 2004.  Let me see.  I'll look at

4  the date.

5       I'm sorry, 1995.  It was certified as a class action

6  of plaintiffs consisting of all persons with physical

7  disabilities who are or will be confined in the Department of

8  Corrections.

9       The second amendment -- amended complaint in fact says

10 the complaint was brought on behalf of future people -- people

11 currently incarcerated and in the future who will be

12 incarcerated.  The remedial plan itself, if you look at those,

13 the definition, defines a class member as those with current

14 disabilities, on page 3, or those who will develop disabilities

15 after intake.  That's also on page 3 of the remedial plan under

16 disability arising after DRDC intake.

17      On page 1 of the remedial plan, under "definitions,"

18 it states, Covered disabilities, the persons covered by this

19 plan are individuals with mobility, hearing, and vision

20 impairments, and inmates with diabetes.

21      There is no suggestion in the remedial plan that class

22 members would be only those people in custody as of August of

23 2003.  The damage-claim process on page 28, again, does not

24 limit people who are entitled to use the damage-claim process

25 as those in custody as of August of 2003.  In fact, it

1    specifically states on line 6 of paragraph 22, under "damages,"

2    quote, Inmates who have ongoing claims for damages may submit

3    claims for future damages.

4            On page 29, the next-to-last paragraph, under the

5    damage section, the second sentence says, If a claim arises

6    during the compliance period, then an inmate may amend his or

7    her claim to request compensation for additional damages.

8            It then goes on to say, No additional claims for

9    damages will be allowed during the monitoring period.  Which we

10   have not yet reached.  But any individual who has a claim for

11   damages which arises after the compliance period may bring

12   their claim in any court of competent jurisdiction regardless

13   of the ongoing jurisdiction exercised by the federal court in

14   this case.

15           Clearly the remedial plan indicates that damage claims

16   would continue during the compliance period and that after the

17   compliance period was over and the monitoring period began,

18   anybody at that point in time would then have a right to file a

19   *pro se* pleading, their own 1983 or 88 pleading in federal

20   court, regardless of the ongoing case, and pursue that claim

21   separately.

22           THE COURT:  Well, okay.

23           Now, let's go over that, okay?  When the monitoring

24   period is over, that's the end of these claims, the end of the

25   special master.

1           MS. GREISEN:  Actually, I think once the compliance

2     period is over, once substantial compliance has been achieved,

3     then any damage claims arising after substantial compliance has

4     been found, they have to file their own case at that time.  So

5     I think it's even sooner than what the Court is saying.

6           THE COURT:  All right.

7           MS. GREISEN:  It's at the close, once this Court finds

8     substantial compliance, I believe that's when the remedial plan

9     cuts off any damages that arise after that date have to be

10    pursued separately, in a separate action.

11          I think in addition to what this -- I'm sorry, Judge,

12    give me just a second.

13          I think the -- one of the problems created is that the

14    remedial plan, since it does not give this August 2003 date, is

15    we have people who are class members who the plan clearly

16    defines as class members, who have relied on this plan, who may

17    not have filed PLRA proceedings, exhausted PLRA requirements,

18    in reliance on this plan and reliance on the damage-claim

19    process in this plan.  And to say now -- I'm not sure where --

20    there's never been a formal adjudication by this Court of this

21    August 2003 magic date.  I know that we have argued it back and

22    forth a lot, but it's never been -- my understanding is that

23    there's never been any formal agreement on that.  It's just

24    something that we keep hearing being said because that was the

25    date the remedial plan was entered into.

1        I think further complicating all these issues, Judge,

2   as if we needed it to be any more complicated, is that there

3   have been two sets of what are essentially sanctions, entitled

4   "stipulations," entered into against the Department of

5   Corrections for noncompliance, entered as court orders in

6   August of 2006 and April of 2008.  These stipulations gave

7   additional rights to class members.  Clearly, I mean just on

8   the face of the stipulation, such as the waiver of copays in

9   the first stipulation of 2006.  The 2008 stipulation created

10   many additional rights regarding when hearing aids would be

11   provided, damages for delay in repairing wheelchairs and

12   auxiliary aid.  There were a host of additional rights created

13   by those stipulations, and certainly it was our intent that DOC

14   would be held responsible to the inmate if they failed to

15   comply with the individual rights that were created in the

16   stipulations.

17        These stipulations certainly gave the impression that

18   rights were created to the inmates when they were given to the

19   inmates.  We certainly didn't intend to say, here are your

20   rights, but you have no remedies for them.  Now, the report,

21   the two examples, two of the examples cited --

22        THE COURT:  I'm sorry, I'm -- I don't mean to

23   interrupt you, but I just received word that one of my longest

24   and dearest friends, Dan Hoffman, just died.

25        I'd like to take a recess.

```
 1        (Recess at 10 a.m.)

 2        (Reconvened at 10:33 a.m.)

 3            THE COURT:  Thank you very much.  Be seated.

 4            I appreciate your patience.

 5            Go ahead, please.

 6            MS. GREISEN:  Okay.

 7            Judge, if I could just briefly recap where I've

 8   been --

 9            THE COURT:  Yes.

10            MS. GREISEN:  -- I would appreciate it.

11            In discussing the fact that the remedial plan does not

12   in any way indicate that class membership is cut off as of

13   August 23, I have gone through the definition of the covered

14   disabilities of who, who is in a -- who is a class member under

15   covered disabilities on page 1.

16            I also pointed out that the, on page 3, the remedial

17   plan clearly anticipates that people who develop disabilities

18   once they get into DRD -- into DOC will be class members even

19   if their disability arises later, on page 3.  That the

20   damage-claim process pointing to paragraph title 23 -- I'm

21   sorry, 22, under "damages," clearly anticipates ongoing claims

22   for damages during the compliance period and that it

23   contemplates that once the monitoring period has started -- in

24   other words, after substantial compliance has been found and

25   the monitoring period starts -- any damage claims arising after
```

a finding of substantial compliance, those individuals under

the plan would then be allowed to file their own 1983 or 88

claims in federal court *pro se* regardless of this ongoing case.

And then I was moving toward the fact that not only

does the remedial plan give inmates with disabilities an

expectation that they're going to be covered by the

damage-claim process, we created in this case two additional

rounds of sanctions or stipulations that were entered into in

August of 2006 and April of 2008.  And both of those sanctions

also created additional rights and gave the inmates such things

as you're entitled to certain compensation if your repairs to

your wheelchair or your hearing aid is not made within a

certain period of time.

It was our expectation that when we created those

rights, that there would be a vehicle within which then to

remedy, if their rights were violated.  If we say, if you have

to wait more than 60 days for wheelchair report -- repair,

you're going to get $10, but by the way, you can't file any

kind of complaint in this case to actually get that money,

that's not what we had anticipated.

In the special master's report and recommendation that

was filed on October of 2008, two of the people mentioned in

that report were individuals who were actually not in the

Department of Corrections' custody as of August of 2003 but who

have voiced complaints regarding DOC's failure to comply with

1    the first and second round of stipulations.  Those individuals,

2    as specified in the special master's report, are Mr. Kregan and

3    Mr. Kryger.

4           Mr. Kregan -- Creeden, I'm sorry, complained regarding

5    the fact that the 2008 stipulation, no. 9, which provided

6    damages to inmates who did not have timely repairs of their

7    auxiliary aids, he complained that -- he wrote a letter to the

8    special master and stated that he wanted the damages as

9    promised in that stipulation.

10          Mr. Kryger, Mr. Kryger is a confirmed person with a

11   hearing disability, he also wrote to the special master

12   complaining about noncompliance with the 2008 stipulations,

13   no. 2 and no. 9.  He complained about the fact that he was not

14   getting replacement of his hearing aid batteries in a timely

15   manner as required by the stipulation.

16          The position that the Department of Corrections has

17   taken is, if they weren't in custody as of August of 2003,

18   they're not class members for purposes of the damage claim and

19   therefore they're not entitled to individual relief under the

20   remedial plan.

21          At the same time, the Department of Corrections

22   recognizes these individuals as class members in this case.

23   They're clearly covered by the remedial plan.  Just not for

24   damage-claim purposes.  And thus according to the arguments

25   that have been advanced, because they are technically class

1    members, under the McNeal line of cases, they cannot file

2    *pro se* pleadings in a separate action in federal court.  They

3    state that Mr. Creeden and Mr. Kryger's, and others like them,

4    their only recourse for noncompliance with the stipulations is

5    to file an action seeking intervention in this case --

6            THE COURT:  Didn't McNeal say that they couldn't ask

7    for injunctive relief?  Isn't it limited to that?

8            MS. GREISEN:  What McNeal says is -- and there is some

9    confusion.  McNeal says that there are only two circumstances

10   under which a class member, a current class member can file a

11   separate *pro se* pleading.  The footnote 4 in McNeal says that

12   class members may bring individual suits only under two sets of

13   circumstances.  First, class members may bring individual

14   actions for equitable relief when their claims are not being

15   litigated within the boundaries of the class action.  Second,

16   class members may bring individual actions when they seek money

17   damages.

18           So it certainly has been our position that -- first

19   it's our position that there is a damage-claim process in this

20   case.  But if this Court finds that they're seeking either

21   equitable relief, not specifically addressed in this case, or

22   money damages, we don't believe that McNeal does preclude them

23   from filing their own 1983 or 88 separate action.

24           I think the problem that we're going to run into,

25   quite honestly, with doing that, is that you're going to have

1    an inmate who is going to file an 1983 or an 88, based on a

2    stipulation that's been entered by this Court.  And I think

3    ultimately what's going to happen is it's going to come full

4    circle back around to this Court.  Because it's either going to

5    be filed as a related case or any judge that gets it is going

6    to send it back here saying that they are going to defer to

7    this Court's interpretation of what that stipulation was

8    required to do.

9        But that, essentially the position that the Department

10   of Corrections is taking is that despite the fact that this

11   case has gone on for six years without a finding of substantial

12   compliance, there's essentially no remedy.  If you were unlucky

13   enough in some ways to get into -- to have been disabled and in

14   the Department of Corrections as of August 27 of 2003, you get

15   a damage-claim process.  But for everybody else, I mean, I know

16   nobody in here has an intention to let this case linger in

17   noncompliance; but going on six years, for all that period of

18   time, their position has been, for those six years, you're just

19   out of luck.  You can't file it under McNeal as a *pro se*

20   pleading, and I think that's what the Tenth Circuit was

21   alluding to in its remand order.  And you're not entitled to

22   the damage-claim process.

23       We believe that these individuals relied on the

24   wording of the remedial plan and had a right to rely on the

25   remedial plan and the subsequent stipulations that we've

1  entered in this case to give them rights that can be

2  adjudicated and determined within the confines of this case.

3       At a minimum, we believe that the individuals who have

4  a claim for individual damages as a result of noncompliance

5  with the stipulations entered by the court in 2006 and 2008

6  should be able to address these -- to address these claims

7  within the confines of this case.

8       We certainly think that under McNeal -- and Spears is

9  the other case cited by McNeal for both the first and second

10  propositions -- the McNeal court specifically stated that the

11  district court should make a determination whether such

12  individual claims should be filed separately.  In other words,

13  it states that this Court should make a determination whether

14  or not an inmate's *pro se* pleadings are, are covered by this

15  case and if not, then they can proceed individually.  And the

16  McNeal case actually talks about the fact that this Court can

17  appoint a special master to make recommendations with respect

18  to whether or not a person's claims are covered by this case.

19       And if in fact -- actually, the McNeal case also says

20  this Court could simply make a standing order as to which cases

21  will and will not be heard within the confines of this case.

22       The Spears court found in that circumstance an

23  inmate -- class action was going on, an inmate filed a *pro se*

24  damage claims, the Spears court said, no, that damage claim was

25  not being litigated in the case, so you can proceed; but then

1  the Spears court came back and said, but the court that is

2  issuing these orders and is in charge of the class action is

3  really the court that should be hearing the inmates' *pro se*

4  complaints.  And sent it over to that court.  And I don't know

5  whether it sent it to that specific judge, but it sent it back

6  to the middle district, I think it was in Alabama.

7          So it's kind of a circular argument in that if this --

8  if the Court determines that these people who were not in

9  custody as of August 27 of 2003, have to go file their own

10  pleadings -- and I think right now from the special master's

11  report, the latest one, there were 60 of those that are

12  pending, either because of compliance with the stipulation

13  issues or they were disabled after -- and I'm sure Special

14  Master Borchers will correct me; there were 60 that had not

15  been adjudicated so far -- but if in fact those people are told

16  to file their own *pro se* pleadings, the question is, do those

17  end up back in front of this Court in any event because they

18  deal with the subject matter of the orders of this Court.

19          But it would be fundamentally unfair for the position

20  of the Department of Corrections to be adopted where these

21  people are left without any remedies.  They did not exhaust

22  PLRA because they relied on the stipulations and they relied on

23  the remedial plan; under the attorney general's position

24  regarding McNeal, these people essentially can't file their own

25  *pro se* pleadings and they're not entitled to participate in the

1    damage claim.  Their position is that they can either intervene

2    in this case or challenge the adequacy of class counsel.  And

3    if that's the case, then class counsel has no choice but to

4    take all of these claims and file an intervening class action

5    and then we're kind of right back where we started from in any

6    event.

7         I think the ultimate question here, Judge, for us, is

8    who should bear the burden of the six years of noncompliance

9    and the fact that these difficulties have arisen and the fact

10   that there're continuing to be claims.  And of course it's our

11   position that, that that should fall within -- with the

12   Department of Corrections.

13        The -- that is generally our position with regard to

14   why people who were in the Department of Corrections, who came

15   into the Department of Corrections after August 27 of 2003,

16   should be entitled to the damage-claim process.  The arguments

17   are very similar for those who were in the Department of

18   Corrections as of 2,000 -- August of 2003 but were not yet

19   disabled at that time.

20        The example in the special master's report is

21   Mr. Fleming.  Mr. Fleming came into custody in 1999.

22   Mr. Fleming is a mobility-impaired individual.  He developed

23   his disability in September of 2005.  He has complained that --

24   he's in a -- from 2006 to 2008, Mr. Fleming was confined to a

25   wheelchair.  And he had -- I mean, there was no question that

1   he was confined to a wheelchair.

2          He was written up and given -- lost 20 days of earned

3   time because he could not stand during count.  He had just come

4   from one facility, Fort Lyon, where they never made people in

5   wheelchairs stand during count, moved to another facility, out

6   to Limon, where they insisted that he stand during count.  He

7   essentially explained to them that he was disabled, had a

8   wheelchair, could not stand, and they charged him with not only

9   failing to disobey (sic) an order but fraud for telling them

10  that he could not stand.

11         And on that basis, he wrote to the special masters and

12  asked for an equitable relief.  He wanted 20 days restored,

13  because he thought that was unfair.  He had a right to rely on

14  the promises in the remedial plan and the stipulations that

15  this Court has entered.  Just as the people who came into the

16  Department of Corrections after 2003.

17         Because of that reliance, again, Mr. Fleming and

18  others like him did not believe they had to exhaust PLRA

19  remedies because they had a reasonable belief that they were

20  entitled to rely on the damage-claim process created in this

21  case.

22         We again, for the reasons stated before, believe that

23  in equity, this Court should allow the individuals who are

24  class members throughout the compliance period of this case to

25  file their damage claim within the confines of the damage-claim

1    process that's been set up in this case.

2          And I completely understand that there is a desire to

3    end the damage claims.  I can understand the special master's

4    desire to bring that process to an end.  I can understand the

5    Department of Corrections' desire as well as I can understand

6    our, our, our class members' and our desire.  But it's not what

7    is -- what's convenient for us at this point.  We have ongoing

8    damages.  To say at this point, regardless of what this plan

9    says, file all of your separate actions, is unfair and,

10   frankly, at the end of the day not a good resource of judicial

11   economy ultimately.  Ultimately I think those claims will end

12   up back here for this Court to interpret its own -- the orders

13   that it has entered.

14         So unless you have any questions, Your Honor, I think

15   that that's -- those are the reasons why we believe that both

16   for people before -- that were in the custody before 2003 as

17   well as those after 2003 at this point should be allowed to use

18   the process that's been established until this Court has made a

19   finding of substantial compliance.

20         THE COURT:  Thank you.

21         MS. McCANN:  Good morning, Your Honor.

22         THE COURT:  Good morning.

23         MS. McCANN:  Would you like me to identify the people

24   at the table for purposes of the record?

25         THE COURT:  Well, I have a list here, but if you want

1  to for the record, that's probably a good idea.

2         MS. McCANN:  All right.  Thank you.

3         Here today with me from the attorney general's office

4  is Jim Quinn, who's been on the case for a long time, longer

5  than I have.  And from the Department of Corrections is the

6  executive director, Ari Zavaras; the director of prisons,

7  Robert Cantwell; the deputy director and director of clinical

8  services, Joanie Shoemaker; and other director of legal

9  services, Kathy Holst, and the inmate coordinator for the

10 Department of Corrections, the disabled inmate coordinator, ADA

11 coordinator.  And we have some observing as well.

12        Your Honor, I think this is getting a little more

13 confusing than it really needs to be.  At the time we signed

14 the remedial plan, the contemplation was clearly that those

15 individuals who were part of the class at that time, August of

16 2003, would have the ability to seek individual damage claims.

17 If they felt they had been discriminated against by the

18 Department of Correction, based on their disability up to that

19 time, we set up a process for them to file individual damage

20 claims.  And the process was outlined very clearly.

21        We talked to Special Master Borchers about taking on

22 this obligation.  He agreed -- he may be regretting that now --

23 but he did agree at that time.  And we developed a damage-claim

24 form.  And the remedial plan states very clearly, damage claims

25 must be filed within 90 days of receipt by the inmate of the

1    damage-claims form.  However, if a claim arises during the

2    compliance period, then the inmate may amend, may amend, not

3    file a new claim, may amend his or her claim to request

4    compensation for additional damages.

5          And then it goes on to say, the special master may

6    only extend the time limits for filing a damage claim upon a

7    showing that the class member was prevented from or incapable

8    of filing within the specified time period.

9          Now, those damage claim forms went out in 2004, Your

10   Honor; and we had over a thousand inmates respond.  What seems

11   to have happened is then there's some confusion about whether

12   people who come into the system after that time frame, who

13   clearly are protected by the ADA and have the rights guaranteed

14   to them under the ADA, are still entitled to file individual

15   damage-claim forms.  And the answer is no.

16         This was set up to provide a mechanism to handle those

17   inmates who were part of the class when this case was settled.

18   There's a separate piece to this action, and that is the

19   injunctive piece.  And that's the compliance issue.  DOC agreed

20   to do a number of things, a number of -- make a number of

21   changes in their procedures in order to comply with the ADA,

22   which they have to do, regardless of this lawsuit.

23         So there are, yes, everyone who was admitted to DOC

24   after August 27 of 2003, is technically a class member for the

25   injunctive compliance part of this case.  They're really two

1    completely separate parts.  So those individuals who are

2    disabled, who are seeking to be found disabled, when they come

3    into DOC in 2005 or 2006, or those who come in today, are

4    entitled to the protections of the remedial plan and the ADA,

5    which involve the process that DOC goes through to identify

6    them as disabled, to track them, to provide them with

7    opportunities for programs and services, to provide them with

8    insulin or to provide them with a wheelchair, to provide them

9    with whatever accommodation is appropriate for their

10   disability.  That obligation continues and will continue after

11   this case is over because the DOC is governed by the ADA and

12   the rehabilitation act.

13          But --

14          THE COURT:  Excuse me.  Do we know how many people

15   relied upon this and didn't use the, their own individual claim

16   filings under PLRA?  How many relied upon this case to handle

17   it, that are not members of the class?

18          MS. McCANN:  Well, you mean that weren't in custody --

19          THE COURT:  Yeah.

20          MS. McCANN:  -- on August 27, 2003?

21          THE COURT:  Yes.

22          MS. McCANN:  Well, there shouldn't be any of them.

23          THE COURT:  No, but there are claims that have been

24   filed and there are people who -- what Miss Greisen has just

25   said is that there are people who relied upon this to file and

1  then they missed a filing date or a statute of limitations.

2  How many of those are there?

3       MS. McCANN:  There shouldn't be any because the

4  remedial plan is very clear that their remedies -- they have

5  remedies.  They can -- what they first need to do is contact

6  the office of the inmate -- ADA inmate coordinator and request

7  a screening to be found to be disabled.  If they are found

8  disabled, they get an accommodation resolution, which outlines

9  what accommodations will be made for them.  They also have the

10  ability to file a grievance under the ADA alleging that their

11  accommodations -- that they are disabled and that they are not

12  getting accommodation.  They also have the right to file an

13  individual lawsuit, and they have been so informed in many of

14  the decisions that Judge Borchers and Judge Pringle have

15  issued.  They specifically state in there, you have the right

16  to bring a separate lawsuit.

17       Many of these people have not followed the process,

18  Your Honor, that is provided by the compliance agreement, that

19  they have to go through the office of the ADA to ask -- or the

20  AIC to ask to be found disabled.  If they are found disabled,

21  then they have a set of accommodations that can be provided to

22  them.

23       They can also, at any time, contact class counsel.

24  Class counsel could be advising them all the way along that

25  they don't have the right to file an individual damage claim

1  under this settlement but they certainly can bring a lawsuit,

2  separate lawsuit.  And McNeal says that.  It says specifically

3  that that's one of the remedies that class members have if they

4  feel that they have been wronged, they have -- class members

5  may bring individual actions when they seek money damages.

6       So there should be none who relied on this agreement

7  because the agreement is very clear.  You had 90 days -- and

8  the damage-claim form says that.  You have 90 days to file this

9  action.  And a thousand of them, or more, took advantage of

10 that and filed their individual damage claims.

11      It's not that these prisoners are -- don't have any

12 remedies.  They have the whole process that we set up under

13 this remedial plan to address individuals who feel they are

14 disabled and who need accommodation.  And that's what the

15 Department of Corrections has been doing from day 1, really, is

16 they have set up an office where these inmates submit their

17 request to be found to be disabled and then suggest

18 accommodations for them.

19      So there are really two separate parts to this case.

20 There's the damages-claim process, which in our opinion, is

21 over.  The claims that are still pending should be dismissed

22 and those individuals can be referred to class counsel for

23 compliance issues.  If someone doesn't -- has flat tires on

24 their wheelchair or if someone isn't getting their insulin or

25 if someone isn't getting admitted to a job or a class, there

1   are procedures in place at the Department of Corrections to

2   address that as part of the injunctive piece of this lawsuit.

3           THE COURT:  Okay.

4           So that does complicate the matter because what you're

5   saying is that there has been partial compliance with the

6   consent decree and on the basis of what has been complied with,

7   the procedures are established.

8           MS. McCANN:  Yes, we think DOC is in substantial

9   compliance.

10          THE COURT:  I understand that.  But let's not mince

11  that one right now.

12          MS. McCANN:  All right.

13          THE COURT:  But just on the basis is -- what you're

14  saying is, as I understand it, is that you're in full

15  compliance with the remedies that are available for the class,

16  and you have been for some period of time.

17          MS. McCANN:  We're in compliance with the procedure

18  for individuals to file a request with the ADA coordinator to

19  be found disabled.

20          THE COURT:  How long has that been in place?

21          MS. McCANN:  That was started fairly -- pretty much

22  right after the settlement.  I mean, it took a while to get it

23  up and running, but Miss Holst --

24          THE COURT:  Can you provide me with that date?

25          MS. McCANN:  Well, you know, Miss Holst is the one who

1  is the coordinator.

2          THE COURT:  Can she provide it to you and you provide

3  it to me, not today, but sometime.

4          MS. McCANN:  Sure, we can get you a date when her

5  office was set up.

6          THE COURT:  All right.

7          MS. McCANN:  But it was certainly by 2004.

8          THE COURT:  Well, I want to know when it was off and

9  running, as the saying goes.

10         MS. McCANN:  All right.

11         I guess what I'm trying to get across is that I

12  think -- and you can see this reflected in the special master's

13  orders that have come down through the past several years -- if

14  people were not in custody or were not discriminated against

15  because of a disability before August 27 of 2003, their claims

16  are dismissed.  Under this remedial plan.  They do not have the

17  ability to file additional claims.  Unless they've already

18  filed a valid claim.

19         But new people who come into the Department of

20  Corrections, albeit class members for injunctive purposes,

21  because DOC has to comply with the ADA, they cannot go back,

22  because -- they cannot go back and file a damage claims for

23  damages.  It's just -- it defeats the whole purpose of the

24  damage-claim process that we set up.

25         And it's been a source of frustration, I think, for

1    our office that the special masters continue to allow people to

2    file claims when they don't make these showings that are

3    required by the remedial plan.  The remedial plan says you can

4    file a claim late, but only if you were incapable of filing it

5    on time, or if you were prevented from filing it on time.

6         And I just want to point out also that plaintiffs'

7    counsel mentioned that there was -- she quoted a couple of

8    lines from the remedial plan.  If you look at those, yes, class

9    members are -- or damage claims may be amended to allege

10   ongoing actions.  But that's an amendment to a claim that's

11   already filed.  It's not a new claim.

12        And we, as a matter of fact, had a conference with the

13   special masters a while ago suggesting that they make these

14   findings that someone either was incapable or was -- had good

15   cause for not filing a timely claim.  Because at this point,

16   this claim process should be over.  There really should be no

17   more claims filed or accepted, and that's exactly what the

18   McNeal case says.  It says, the district court must have a

19   procedure for handling *pro se* filings.  Individual suits for

20   injunctive and equitable relief from alleged unconstitutional

21   prison conditions cannot be brought where there is an existing

22   class action.  Claims for equitable relief must be made through

23   the class representative until the class action is over.

24        Which is exactly what the special masters have been

25   doing is saying these are compliance issues.  You need to go

1    through class counsel.  So like I was saying, if someone

2    doesn't have -- has a flat wheelchair wheel, that should be

3    considered -- they can go through the ADA process, grievance

4    process, with the AIC's office.  They can also bring it to the

5    attention of class counsel and say this is something that

6    should be addressed during the compliance hearing, which we

7    acknowledge.

8         I mean, if we -- if there are these situations where

9    people are -- we are not complying with the agreement in the

10   remedial plan, then those can be raised in the context of the

11   injunctive relief which is part of the compliance issue.  It's

12   not a damages issue.  It's are we complying.  And if

13   individuals have these complaints, you know, we get copies of a

14   lot of these and they range from things like I didn't get my

15   hearing aid battery to I wasn't allowed to attend a class or

16   something of that sort.  Those should go to class counsel as

17   part of the compliance issue, and they can raise them when we

18   have the compliance hearing.

19        But they're not individual damage claims.  Those are

20   done.  We set up a procedure to handle those, what we thought

21   would be in a relatively expeditious manner, and it just

22   continues to go on and on.

23        So I think it's very clear in the remedial plan that

24   this, this applies -- the damage-claim process applies to

25   individual class members at that time.  And they have a certain

1   amount of time to file it, it gets resolved, and then we're

2   done with those.  I mean, if you follow the plaintiffs' logic,

3   this case will never end because there will always be claims.

4   There will always be individuals who feel that they're not

5   being treated as well as they could be under the ADA.

6          So -- I mean, plaintiffs' counsel says it's unfair to

7   the inmates, but they have a process.  Several processes.  They

8   can go through the DOC process, they can file a separate

9   lawsuit, they can go through class counsel and say please raise

10  this during the compliance period.  But it's unfair to DOC to

11  allow these to continue *ad nauseam* when we're going to have a

12  compliance hearing and the Court will decide whether or not we

13  are in substantial compliance.

14         Now, counsel also raised this question about the

15  stipulations.  But if you read the stipulation, they do not

16  deal with the damage-claim process.  Those are compliance

17  issues.  And DOC agreed to do some specific things in those

18  stipulations as a sanction, if you will, for not being in

19  substantial compliance.  And again, those are issues that

20  should be raised in the context of the compliance hearing.  So

21  if there is an allegation that DOC has not complied with one of

22  the conditions in the stipulations, that's an issue the Court

23  can address during the compliance hearing.  And that's, to us,

24  the appropriate way for that to be addressed.

25         Letters alleging general compliance issues should go

1    to class counsel.  Or, as McNeal says, the special master can

2    continue -- you know, McNeal does say you can have a special

3    master to decide whether or not it's an issue that's included

4    in the class and that's essentially what the special masters

5    have been doing.  They've been sending the letters to class

6    counsel if they are compliance issues, which we believe they

7    are.  And that's what McNeal says.  You can either do it,

8    yourself, or you can have -- you can just tell the inmate to

9    file directly with class counsel.

10            So let me see if I've covered everything here.

11            So our feeling is that all claims for individual

12   damages that are currently pending should be dismissed unless

13   the inmate was in custody on August 27, 2003, and can show that

14   he was prevented from filing or incapable of filing a

15   damage-claim form.  All others should be considered issues

16   relating to the injunctive part of the settlement which

17   encompasses the compliance issues.

18            And I think the McNeal case points out precisely why

19   we don't want to continue to allow damage claims because

20   it's -- in a class action you don't have individuals seeking

21   individual claims relating to the compliance issues, the

22   injunctive issues, that's what McNeal says.  If it's an

23   equitable resolution, it's an injunctive issue, those go to

24   class counsel because those are compliance issues, not damages

25   issues.

1          And I think that's really pretty much all I have to

2     say unless the Court has some other questions.

3          THE COURT:  No.  I don't at this point.  Thank you.

4          I do want to hear from Miss Greisen, and I want to

5     know how many of these people that she thinks relied on this

6     process that weren't part of the class.  According to the

7     strict definition.

8          MS. GREISEN:  It's a good question.  I don't have an

9     exact number.  I can tell you that of the 60 claims, there are,

10    I believe, 16 claims that were filed with the special master

11    that were dismissed for lack of jurisdiction.  Another 44 that

12    have been pending or have been stayed resolution.  Right now I

13    know of 60 individuals who believed that they could file

14    through the damage-claim process.  I actually think the number

15    that was dismissed for lack of jurisdiction is higher than

16    that.  I'll -- let me grab the report from the -- what I was

17    looking at, Judge, was the special master's most frequent (sic)

18    report that gave us a breakdown of category of claims.

19         THE COURT:  That's fine.

20         MS. GREISEN:  It's going to be hard to know.  It looks

21    like --

22         THE COURT:  Well, I can tell you right now, I'm going

23    to do something; I know the rules says that the master files a

24    report and it's subject to examination by both sides, but I'm

25    going to try and clear this up to the extent I can.  I'm going

1   to talk with the special master and see what's going on.  And

2   then eventually I'll issue an order.  But I'm going to do that.

3   I think you all ought to know.

4        MS. GREISEN:  I do think it's important --

5        THE COURT:  I need to spend some time sitting down

6   with him with our sleeves rolled up.

7        MS. GREISEN:  I do think it's important for the Court

8   to know that we adamantly and fundamentally do not believe that

9   there's a sufficient process in place to identify and resolve

10  the complaints that we're hearing.  And I'm not exactly sure

11  which process Miss McCann was referring to, and I know we'll

12  get to this later this afternoon when we talk generally about

13  compliance issues; but I can't say it strong enough, that, that

14  we think there are fundamental flaws and to tell somebody -- I

15  was talking to someone last week who told me he had been

16  without insulin for two weeks because his prescription ran out.

17  To say, oh, Miss Greisen can tell the Court that in the

18  compliance hearing is not a very adequate remedy at the end of

19  the day.  And I do think it would be fundamentally unfair to

20  say what they can do at this point is they can tell us and we

21  can tell the Court and that's really what their equitable

22  remedy is at this point.

23        So I -- and I'm not going to get off on a discussion

24  as to whether or not there's substantial compliance, but I

25  think that that ultimately would be a very unfair result, to

1  tell these people that if they lost earned time or went without

2  medication or went without important auxiliary aids, that their

3  remedy at this point is to tell us so we can bring it to your

4  attention six months later or a year later when the compliance

5  period is held.

6       Did you have any further questions for me?

7       THE COURT:  No.  I need to find out if there is a

8  place where they can make a complaint immediately and get

9  redress under the procedures which have been established as a

10 result of the consent decree.

11      MS. GREISEN:  There is something called an ADA

12 grievance process.

13      THE COURT:  Yeah.

14      MS. GREISEN:  The problem has been with that process

15 is that for significant periods of times, they run late in

16 responding to those grievances.  They get up to date, and then

17 they run late again because of other demands in their office.

18 Sometimes those ADA grievances do not get routed to the correct

19 people.  They get routed to people in the normal ADA grievance

20 process.

21      And sometimes, it's our position -- one of the

22 problems in the case right now that we have is that final

23 disability determinations have not been made, at least as of

24 May 1, 2009, on over 98 percent of the mobility class.  If you

25 don't have a final determination as to who is disabled, then

1  it's -- you don't know whether that person has a right to file

2  an ADA grievance.  It's a domino effect, and we intend to talk

3  about that this afternoon.

4        But there are some basic problems in what's happened.

5  So they can have a procedure on paper; and they do have a

6  procedure on paper, Judge.  There's no doubt about that.  We're

7  not questioning that.  And I also don't question Kathy Holst

8  and her office and Teresa Reynolds' good-faith efforts to

9  answer those grievances when they get them timely and

10  correctly.  If there's anybody in this case who I think does a

11  herculean job, it's Kathy Holst and Teresa Reynolds and the

12  people in her office.

13        But having that procedure on paper does not mean it's

14  working in a way to address our clients' serious concerns.  And

15  so I guess to some extent we need to talk about the bigger

16  issues of compliance because I think reliance to say, oh, well,

17  there's a grievance process set up, so these people have an

18  avenue to turn to would basically, it's a chicken and an egg,

19  is it not?

20        THE COURT:  No, it's more a question of the tail

21  wagging the dog.

22        MS. GREISEN:  That's better analogy.  Thank you,

23  Judge.

24        THE COURT:  Have you -- is there anything more you

25  want to add on this issue of these damage claims that we've

 1  been, with the special master?

 2          MS. McCANN:  Thank you, Your Honor.

 3          I would just make sure I want to emphasize that when

 4  the special masters have been denying claims, they have always

 5  put in the bottom that this person has the right to file a

 6  separate lawsuit.  I mean, I don't think that we can say -- I

 7  don't think the plaintiffs' lawyer can say that someone didn't

 8  file a separate lawsuit because they were relying on this

 9  damage claim.

10          THE COURT:  No, what I think she's saying is that

11  somebody that didn't have their insulin for two weeks because

12  the prescription has ran out is in need of the insulin and

13  needs an immediate thing, not a new lawsuit.  I think that's

14  what she said.

15          MS. McCANN:  Well, there is also, anyone who is

16  seeking medical attention can file a kite and ask for medical

17  personnel to respond.  Or they can go to the infirmary or to

18  the clinic.  I don't know the specifics of what she's

19  discussing.  We found that sometimes the inmates make claims

20  and it turns out that what they said is not true.  I don't know

21  in this case.

22          THE COURT:  You don't mean that.  Miss McCann, I'm --

23  a prisoner would not tell the truth?

24          MS. GREISEN:  Shocking.

25          MS. McCANN:  Can you believe that.

1          THE COURT:  Shocking.

2          MS. GREISEN:  Shocking.

3          MS. McCANN:  So, I don't know the specific case.  But

4   I do know that when these matters are brought to either my

5   attention or to Kathy Holst' attention, we do respond quickly.

6   Now, I'm sure there are people who fall through.  There's --

7   I'm sure that happens.

8          But the point is, that's not the kind of thing you

9   file a damage claim for.  Those are over.  What these are are

10  compliance issues.  As Miss Greisen just acknowledged herself,

11  these are issues she wants to talk about in terms of

12  compliance.  That's fine.  We understand that there are issues

13  about compliance.  And we understand someone not getting their

14  insulin is a serious and life-threatening circumstance and we

15  should -- DOC should be responding immediately.  And if we

16  don't have the right process set up, DOC will -- wants to take

17  care of that.

18          But that's not a damage claim; that's a compliance

19  issue.  Wheelchair clinics are compliance issues.  All of these

20  issues that these inmates are raising, at least in the context

21  of this lawsuit, are compliance issues.  That's not to say they

22  can't file a separate lawsuit.  But for purposes of this Court

23  and this decision that the Judge needs -- that you need to

24  make, the damage-claim process for actual money damages under

25  the remedial plan is finished.  We've handled those, we're

1  finished with those.  Now we need to move on to the compliance

2  issues, which we're happy to do.

3          THE COURT:  Well, we need to clean up whatever there

4  is there that hasn't been done.  That's an enormous task.

5          MS. McCANN:  Well, actually, there are only, I think,

6  44, as I read the latest report, there are 44 claims that are

7  being on this jurisdictional issue.  It's our position that

8  those claims should be dismissed.

9          THE COURT:  I know that.  Okay.

10          MS. McCANN:  All right.  Thank you.

11          THE COURT:  Let's come back at one-thirty and we'll

12  come back with the compliance issues at that time.

13          We'll be in recess.

14      (Recess at 11:23 a.m.)

15      (Reconvened at 1:35 p.m.)

16          THE COURT:  Thank you.  Good afternoon and be seated,

17  please.

18          Okay.  I'm thinking in terms of some kind of an

19  omnibus ruling on everything that's pending.  Which will

20  require me to get a number of things -- I had a brief

21  conversation with, with the special master after our recess,

22  and he advised me that he had a number of orders that were all

23  ready to go, but he didn't know exactly what to do.  So I told

24  him without, without formally issuing them, just to send them

25  to me so that I could see what they are and what they're about.

1    And probably will tell him to go ahead, whatever they are, and

2    then -- they're on this jurisdictional issue.  I'm sorry, I'm

3    not being too clear.  They're on the jurisdictional question,

4    should they be in front of him or not.  So I told him to let me

5    see what he was doing.  And he's got Special Master Bruce

6    Pringle as well, who just had a death in his family, and the

7    other one, Davidson, is recovering from surgery.  So he's going

8    to try and get those things together and get them to me and

9    I'll look over them.

10          And then probably will send out a, a memo to counsel

11   advising them of what I have in mind to try and put all of this

12   together.  But I think an omnibus kind of ruling to take care

13   of everything I can makes sense rather than what I'm doing now,

14   which is grasping at nettles everywhere.

15          Then we do need to get to what I think is still

16   supposed to be the central gravamen of this case, and that's

17   the, the class issues and the compliance matters.  And I don't

18   know which of you wants to start first.

19          MS. McCANN:  Your Honor, if I might, before we move to

20   the compliance issue, there were a couple of items that came to

21   my attention over the break that I'd like to mention to the

22   Court.

23          THE COURT:  Okay.

24          MS. McCANN:  I've just given copies to plaintiffs'

25   counsel.

1           THE COURT:  Okay.

2           MS. McCANN:  One is in your docket file no. 806.  And

3   I do have a copy of it if the Court would like me to hand you a

4   copy.

5           THE COURT:  Sure.

6           Thank you.

7           MS. McCANN:  This is an order that Special

8   Master Borchers entered on February 17 of 2005.  And if the

9   Court could refer to the second page.  Of course, you can read

10  the whole thing, also.  But specifically I was noting that

11  Judge Borchers himself ordered that all completed claim forms

12  related to what occurred on or before August 27, 2003, must be

13  filed with the office of the special masters on or before

14  April 14, 2005.  And he also ordered that no completed claim

15  form will be accepted after April 14, 2005, unless a claimant

16  details why he or she was prevented from or incapable of filing

17  in the specified time period.

18          THE COURT:  Okay.

19          MS. McCANN:  So at least as of '05, Judge Borchers

20  himself believed there was an end point to these claim forms.

21          And also, Your Honor, we have prepared a list of the

22  hearings that are currently scheduled.  There are seven

23  hearings scheduled on claims.  And I'd be happy to give this to

24  the Court as well.

25          THE COURT:  Sure.

1           MS. McCANN:  The reason I think it's important, it

2    will demonstrate that several of these people were in custody

3    prior to August 27, 2003, and yet did not file a claim form as

4    they were required to by the remedial plan.  So again, we feel

5    that the special masters have opened up this process when in

6    fact it really was designed to be completed several years ago.

7           So I'll hand that to --

8           THE COURT:  Sure.  That's fine, thanks.

9           MS. McCANN:  Thank you.

10          MS. GREISEN:  May I respond?

11          THE COURT:  Of course.

12          MS. GREISEN:  Judge, with respect to the information

13   that Miss McCann just gave you -- and she did provide us a copy

14   of this -- you know, I guess on first impression, I would note

15   that this order was entered in February of 2005 at which time

16   the parties had no idea when the first round of substantial

17   compliance would have been achieved, which was August of 2005.

18   The special master I don't think intended in February of 2005

19   to answer the question about what would happen when this case

20   goes on for four more years.

21          And I don't think the special master has the, with all

22   due respect, the jurisdiction in this case to determine that

23   issue.  This was related to, as he says in the paragraph that

24   Miss McCann referred to, talking about the claim forms that

25   were distributed to DOC in 2000 -- appears to be 2004.

1    So certainly for people that got claim forms in 2004,

2   there were time limits.  I don't dispute that.  The question is

3   what about all the people that did not get claim forms and

4   therefore never had an opportunity to discuss their damages.

5    We also found a document that I would like to share

6   with the Court or a for-instance that I would like to share

7   with the Court about one case that made its way through the

8   special masters and then a *pro se* filing so I can give the

9   Court what I think is going to be an example of the

10  complications that arise in a case like this when we tell

11  people to file their own *pro se* pleadings.

12      THE COURT:  Okay.

13      MS. GREISEN:  Mr. Wellman Gibson is an inmate in the

14  Colorado Department of Corrections, and he filed a damage-claim

15  form alleging, I believe it was mobility and hearing.  I

16  don't -- I apologize, I don't have his original claim form with

17  me.  We were somewhat limited in the documents that we could

18  find over the recess.

19      To make a long story shorter, Mr. Gibson also filed --

20  I was looking to see if the special master was here -- at some

21  point in time, Mr. Gibson filed a claim with the special

22  master.  He had access to books on tapes for quite some time,

23  and a lot of these were religious books.  During the

24  determination process early on in the case, he was determined

25  not to have a mobility impairment.  He had a -- he has a

1   problem with his hand.

2           He told the special masters that he thought his books

3   on tape were being taken away from him after many -- after a

4   long period of time of having them in retaliation for his

5   participation in the Montez case.

6           Special masters then ordered plaintiffs' counsel to

7   investigate that claim.  And this was a couple of years ago, so

8   I'm going to do the best as I can with my memory.  We then

9   contacted Kathy Holst of the AIC office for information about

10  why Mr. Gibson's books on tape were all of the sudden being

11  taken away.  And we submitted a report to the special master

12  that we did think there was validity to his claim that all of a

13  sudden his books on tape were being taken away after he

14  participated in the Montez case.

15          Now, it's my memory and belief that the special master

16  never actually issued an order in response to that.  Initially

17  the special master had issued an order requiring the Department

18  of Corrections to return the books on tape.  At some point in

19  time, I know that the attorney general's office argued that his

20  manual dexterity was not a mobility impairment and based on

21  that, the final order was amended to say, yes, that's not a

22  mobility impairment, therefore your claims are denied.

23          Never specifically answered the issue of whether he

24  was retaliated.  Mr. Gibson in turn, frustrated by no response

25  in the retaliation, sought to file a 1983 action in this court,

1    and he filed that docket number, and I have the -- that docket

2    number was filed -- let's see.  Well, it's not a docket number

3    in the Montez case.  It was not filed as a Montez case.

4           Anyway, he filed a complaint, and in that complaint he

5    again talked about his religious books on tape being taken

6    away.

7           THE COURT:  Does it have a U.S. district court docket

8    filing number or anything?

9           MS. GREISEN:  It does.  It is 09-cv-000983-ZLW.  And

10   his complaint is docket no. 3.

11          That complaint, again, went back to, okay, I'm not a

12   party to Montez, that's fine, I still have a problem because my

13   religious material books on tape are being taken away.

14          Judge Weinshienk dismisses, outright dismisses, his

15   case on the grounds that it's a frivolous claim because he

16   raised the claim in the Montez claim and that that was

17   determined -- his claim was determined by the final order

18   issued by the special master.  And that is docket no. 7 in that

19   case.  And she says that his claim was duplicative of the one

20   in Montez, that it was dismissed as frivolous or malicious

21   under 28 U.S.C. 1915.

22          Mr. Gibson writes a reply to that order basically

23   saying, I'm confused, I don't know what else to do.  That's

24   docket no. 9 in that case.  And the court issued another order

25   denying the motion to reconsider, again saying, quote, the

1    court dismissed the action because Mr. Wellman's claims were

2    repetitive of the claims he raised in Montez vs. Owens.

3            THE COURT:  What's that document, no. 9?

4            MS. GREISEN:  It's docket -- no, the no. 9 was his

5    response, and I printed this out downstairs, Your Honor.

6            THE COURT:  Okay.  Well, I'll find it.

7            MS. GREISEN:  It's gobbledygook.  It's order denying

8    motion to reconsider.  Filed June 18, 2009.

9            THE COURT:  Okay.  I'll pull those things up.

10           MS. GREISEN:  So I think that's an example of the

11   problems that we face.  And I think that's enough said.

12           THE COURT:  All right.  Thank you.

13           MS. McCANN:  Your Honor, could I just respond to that

14   very briefly?

15           THE COURT:  Sure.

16           MS. McCANN:  In my impulsive way from memory, as best

17   I remember, Mr. Gibson had two different hearings, I think in

18   front of special masters, because he asked for a

19   reconsideration.  At first he was denied and then he asked for

20   reconsideration, and I think there was a second hearing in

21   front of Judge Davidson in which testimony was given and video

22   was played.  And Judge Davidson concluded that he did not have

23   a disability, as I recall.  So Mr. Gibson went through the

24   process.  I don't remember if he appealed that decision to this

25   Court.  But that certainly would have been his option, was to

1    appeal to yourself under the damage-claim process.

2           And the other point I wanted to make is, again this is

3    an issue that class counsel can bring up in terms of compliance

4    when we're talking about compliance.  But it's not --

5    Mr. Gibson had a full airing of his complaints during the

6    damage-claim process.  He had at least one hearing, and I think

7    he had two.  So his situation was aired through the regular

8    damage-claim process.

9           THE COURT:  Okay.

10           MS. McCANN:  Oh, and I also wanted to let the Court

11   know, I did have an opportunity to talk to Miss Holst about

12   when her office had the process in place.  And we concluded

13   that, well, she basically started as soon as the settlement

14   agreement was reached.  But she didn't really have staff for

15   several months.  And we concluded it was probably around the

16   beginning of 2004 that she had a system in place that was able

17   to take requests in for screenings and begin to set up that

18   screening process for those who sought disability status.

19           THE COURT:  Okay.

20           MS. McCANN:  And then of course it did develop through

21   the years.  It's gotten more efficient.

22           THE COURT:  Somewhat what?

23           MS. McCANN:  More efficient.  She's had additional

24   staff and has been able to streamline the process a little bit.

25           THE COURT:  That's an achievement.  Usually as things

1   go on, they get more confused.  It's quite an achievement.

2   Congratulations.

3         MS. McCANN:  I think when you, you know, when you are

4   considering the compliance issue, you will be amazed at the

5   efforts that have been made in that regard.

6         THE COURT:  Okay.

7         You ready on compliance matters?

8         MS. GREISEN:  I know the Court wants us to take a

9   big-picture look at compliance.  At this point in time the

10  deadline for compliance for the Department of Corrections was

11  May 1, 2009.  Pursuant to the last stipulation.  And class

12  counsel, pursuant to your recommendation, did meet with counsel

13  for the Department of Corrections and the Department of

14  Corrections' representatives throughout 2008, into early 2009

15  to discuss compliance issues.  Certainly I believe that the

16  parties around that table worked hard and in good faith to

17  resolve outstanding compliance issues.

18        One of the critical issues right now is the issue that

19  I alluded to earlier this morning, Your Honor.  And that is

20  the -- what we consider the crux of this case.  For years the

21  parties have had an ongoing dispute regarding what criteria

22  would be used to determine whether or not a person was

23  disabled.  The process outlined in the remedial plan is that

24  the Department of Corrections would first determine who is

25  disabled under the ADA and then if a person is determined

1    disabled, they get what's called an AR, an "accommodation

2    resolution" form.  This is a form that they are required to

3    carry with them.  It identifies which disability they have.

4    And it lists all the accommodations that a person must be given

5    by the Department of Corrections.  As I said, the inmates are

6    actually required to carry these with them so that they can

7    show at any given time what accommodations they're entitled to.

8            The stipulation required the department -- the last

9    stipulation required the parties to reach final agreement on

10   that criteria or put the issue before this Court.  After

11   good-faith effort on both sides, we were able to agree on some

12   screening tools that would be used to assist in making

13   disability determinations.  We agreed on tools for vision and

14   mobility impairments.  The one set of criteria that we did not

15   agree on was the hearing criteria.  And we've put that issue

16   before this Court which needs resolution so that those

17   determinations can be made.

18           Once the parties had agreed on this criteria, this new

19   vision and mobility tool, to help assess disability, we, class

20   counsel, urged the Department of Corrections to only rescreen

21   those inmates that were previously found to not have been

22   disabled in order to ensure that the Department of Corrections

23   would meet the May 1 deadline, would get all those

24   determinations done, and then we could review the correctness

25   of those determinations and see if the system was in fact

1    working.

2         Rather than limit the rescreening to those

3    individuals, DOC decided to rescreen everybody.  For whatever

4    reason.  And by all accounts, the Department of Corrections did

5    engage in a good-faith effort to get those rescreens done.  The

6    problem is they weren't done by May 1.  In fact, the only

7    data -- we provided the Department of Corrections a first round

8    of discovery responses, interrogatory and production requests,

9    a month before the compliance date so they could see what we

10   wanted and what we needed in order to review compliance.  The

11   only data that we got about the status of that rescreening was

12   a document from Kathy Holts, the AIC, and I would like to

13   submit that document as an exhibit, if I may, Judge.

14        MS. McCANN:  Your Honor, are we going to have a

15   compliance hearing today?  I thought we were just going to

16   discuss the need to have a compliance hearing.  I mean, I also

17   have a list that I have given plaintiffs' counsel of all the

18   screenings that have been done, et cetera; but I didn't think

19   we were going to be doing evidentiary hearings today.  I

20   thought we were going to be discussing the need to have a

21   compliance hearing.

22        THE COURT:  I think all she's doing is trying to show

23   me what the need is.

24        MS. McCANN:  I think we acknowledge that we're going

25   to have to have a compliance hearing because there's a

1    fundamental disagreement as to whether the Department of

2    Corrections is in substantial compliance.  I mean, I think

3    we're in agreement on that issue.  So it seems to me that what

4    we should be doing now is setting a date and getting ready for

5    a compliance hearing, not -- I don't know what the purpose of

6    this is.  I mean, we acknowledge there's a disagreement about

7    what, what DOC has done and not done and whether or not that

8    constitutes substantial --

9         THE COURT:  Let her respond.

10        MS. GREISEN:  Judge, I'm doing what this Court asked

11   us to do.  I have two exhibits.  I'm not planning on

12   introducing witnesses today, I have no intention of putting on

13   a full compliance hearing.  But there are some threshold issues

14   this Court should be aware of.

15        THE COURT:  That's fine.  It can be the same thing as

16   your statements.  It's just helping me to understand what's

17   going on.  I need all the help I can get.  I don't want to be

18   chasing every rabbit down every hole.

19        MS. GREISEN:  I appreciate that, Judge.  I'm not

20   intending to do that.

21        This was the data that was provided to my office on

22   June 25, 2009, through the office of the AIC in an e-mail

23   saying this information is definitely accurate up to May 1.

24        This document shows there is actually three different

25   groups of documents in here.  The first is mobility.  The

1    second is the hearing, and the last is the vision.

2            THE COURT:  You're going to have to help me a minute.

3    It says everything's in initials, and I don't know what they

4    mean.

5            MS. GREISEN:  I will decipher that.

6            THE COURT:  It says RFA, all of them do on the first

7    page.  And then mobility is P or IR.

8            MS. GREISEN:  P means pending.  P means that the

9    screening on this individual is pending.

10           THE COURT:  Okay.  What does IR mean?

11           MS. GREISEN:  IR means an inmate refusal.  In other

12   words, there is an issue whether or not the inmate refused to

13   participate in the rescreening.

14           Another thing that you might see is DQ, which is

15   determination that they did not qualify.

16           There are --

17           THE COURT:  Well, there's none on this, but DQ means

18   disqualified.

19           MS. GREISEN:  DNQ, that's correct.

20           Now, what -- on some of these, you also have the

21   first --

22           THE COURT:  What does RFA mean?

23           MS. GREISEN:  They made a request for an

24   accommodation.  I didn't bring my key -- oh, well, I did,

25   actually.  I do have my key with me.  Laurie has my key.

1           THE COURT:  It's okay.

2           MS. GREISEN:  And so there certainly are some, if you

3    thumb through here, under the hearing group, which shows that

4    some of the individuals have completed screening.  And you can

5    see whether or not they got a DNQ, and the last column is the

6    date the AR e-mailed the facility.  That's really the final

7    step.

8           THE COURT:  What does D mean?  Not DNQ, but just a D.

9           MS. GREISEN:  D means that they are found to be

10   disabled.

11          THE COURT:  Okay.

12          MS. GREISEN:  And P means they haven't made a final

13   determination one way or the other.  The date the AR is

14   e-mailed to the facility is kind of the final step in the

15   process.  They've made a determination with respect to

16   disability, they've formalized that determination with an AR,

17   and the AR has actually been sent to the inmate.

18          What the evidence shows is that less than 2 percent of

19   those in the mobility, that requested accommodations, requested

20   screening, needed to be rescreened.  Of the 1,038 people on

21   those mobility lists, 16 of them had their completed ARs.

22   Which by my calculations is 1.5 percent.

23          The next group is the hearing group.  It identifies

24   401 people that needed to be rescreened and have a disability

25   determination made.  Of those 401, 116 were completed.  Which

1    is just under 30 percent.

2           The vision group is slightly higher.  Of the 435

3    people need to be rescreened, 35 percent had been completed.

4           Although the parties agreed that everyone with

5    diabetes -- this was in the last stipulation, if the Court

6    remembers, the 2008 stipulation -- that everyone with diabetes

7    would be given a new "accommodation resolution" form stating

8    that they are disabled, we have not yet, still, received any

9    final count as to how many of those individuals have had their

10   final "accommodation resolution" form as of May 1.  We have

11   been touring the facilities.  And I can certainly represent

12   that many of the people that I have talked to have not.  The

13   diabetic groups have not, and I believe that is in part because

14   their other disability screens are pending.

15          But regardless of the state of the actual medical

16   screening, Your Honor, as the Court is aware, at the last

17   compliance hearing, the Court said to the parties that at the

18   end of the day, the person responsible for determining whether

19   a person had a disability was not -- this was not a pure

20   medical decision.  This was an ADA decision to be made by Kathy

21   Holst, the ADA inmate coordinator.

22          But for whatever reason, the vast majority of those

23   determinations simply have not been made and not been

24   memorialized into the ARs as of May 1, 2009.

25          And again, I want to be very clear, that I am not

1   criticizing Kathy Holst or her office.  I think consistently I

2   can say that her office and Ms. Holst have bent over backwards

3   and used extraordinary efforts to do everything in their power

4   to achieve the mandates given to that office; and given their

5   limited resources, they are to be applauded for their efforts.

6          THE COURT:  So this is a major issue to be decided at

7   a compliance hearing?

8          MS. GREISEN:  Well, what I think the bigger issue that

9   we have, Your Honor, is that if the first step of the process

10  was not completed by May 1, and we're getting the AIC files,

11  we're getting, you know, we're getting the screenings, the

12  failure to have that determination means that we don't know

13  who's in the class.  And if we can't identify who's in the

14  class as of May 1, that has a domino effect on our ability to

15  determine whether our class members are provided the services

16  and programs and benefits by the Department of Corrections.

17         Without the ARs, the time for determination, class

18  members don't know what accommodations they're entitled to.

19  Without those final determinations, we can't evaluate whether

20  or not people are inappropriately excluded from the class.  We

21  don't know if class members are at designated facilities.  We

22  don't know if they are given appropriate auxiliary aids.  We

23  don't know if they're given appropriate access to sign language

24  interpreters, help with everyday assistance, extra time for

25  movement.  We can't review the data that we're given to

1    determine whether or not our class members have access to jobs

2    because we don't know who our class members are.  We can't give

3    the determinations to our experts to say, are they making the

4    right determinations.  Because there aren't determinations in

5    the files that we received as of May 1, 2009.

6         We can't evaluate whether the ADA grievances are being

7    evaluated appropriately because only class members have access

8    to those grievances.  We can't evaluate whether our class

9    members are progressing through the system and kept at security

10   levels commensurate with their security classification rather

11   than their disability.  We can't evaluate whether their

12   transport needs are being met.  There's a litany of examples

13   that we simply can't analyze for purposes of compliance if we

14   don't know who DOC considered to be in the class as of May 1.

15        And even more importantly, as of May 1, if we don't

16   know who's in the class as of that day and the Department of

17   Corrections doesn't know who is in the class as of that date,

18   there's no reasonable, realistic method that DOC can analyze

19   whether class members have access to programs and services.

20        So good-faith efforts aside, and we've been told,

21   well, we're continuing to work on it.  In fact, Miss McCann

22   gave me a printout this morning at the earlier session, a new

23   printout showing of who has ARs now.  Well, now is four months

24   later.  At the last compliance hearing, this Court was very

25   clear, that compliance will be judged as of the date of the

 1   compliance.  It's not a moving target.

 2          And I'm not talking about a week or two or three after

 3   the compliance date.  We are reviewing the AIC files that we

 4   have been given, the determinations that we've been given as of

 5   May 1, and our hands are tied.  When we have 98 percent of our

 6   potential mobility class members who don't have a

 7   determination, I'm at a loss for how to make that assessment.

 8   And I don't think that simply because it does take time for us

 9   to do a compliance review, that that means that DOC can

10   continue to produce evidence throughout the four, five, six,

11   seven, eight months that it takes us to do a compliance review.

12   I think the Court's previous order that compliance has to be

13   judged as of May 1 is the only fair way to conduct that

14   compliance review.  And as the vast majority of that very

15   initial, critical starting point was not completed, I don't

16   know how to conduct a compliance review.

17          I expressed some of these concerns in a letter to

18   Miss McCann and Mr. Quinn in March of 2009 and in that

19   letter -- and I'm providing the Court with a copy of it.

20          THE COURT:  Thank you.

21          MS. GREISEN:  I expressed class counsel's concern with

22   numerous issues that had been discussed during our monthly

23   meetings.  And I specifically said, in the next-to-last

24   paragraph, that it was now my understanding that DOC intended

25   to rescreen all class members with new criteria involving

1   literally thousands of very time-consuming medical reviews and

2   my concern that that was not going to be completed by the May 1

3   deadline.

4        There are many other concerns I have, but I think that

5   is most appropriate.  We obviously do have very different

6   positions with regard to whether or not substantial compliance

7   can be shown without that very critical piece of evidence.  And

8   it's our position, Your Honor, that if the disability, the very

9   starting point of this case, if the disability determinations

10  were not made as of May 1, 2009, we are completely unable to

11  assess the Department's compliance as of that date.

12       If I could step back for a minute, I understand the

13  broader issue I think that this Court was trying to raise in

14  its order.  I don't know if now is the right time to talk about

15  it or not, but I can simply state that class counsel has

16  discussed on numerous occasions amongst itself what to do at

17  this point.  We -- and obviously that hinges upon what this

18  Court decides to do with regard to substantial compliance, so I

19  may be getting over my shoes a little bit on this.

20       But it certainly is our intention that if in fact we

21  go through another compliance hearing -- and frankly, Judge, I

22  think it would be helpful if we resolved this issue up front,

23  to determine whether a compliance hearing is necessary; but

24  regardless of that, if in fact the Court does determine that

25  there is not substantial compliance, it has been our belief at

1    that point that we needed to come to the Court with more than

2    just a list of stipulations and sanctions, that we needed to

3    come to the Court with a more comprehensive approach on how to

4    remedy the problem.  And we accept that.  We've been talking

5    with our experts about that.  And we are certainly prepared to

6    do that in terms of what a big picture may need to look like in

7    order to get a final compliance achieved.

8            Unless you have any questions, Judge, I think I'll sit

9    down at this point.

10           THE COURT:  Okay.  Thank you.

11           MS. McCANN:  Your Honor, I think that presentation is

12    very misleading as to what has been going on at the Department

13    of Corrections.  In the beginning -- let me give you a little

14    historical background because in the beginning, we had

15    criteria; all of these inmates who applied to be screened were

16    screened.  Under criteria that we later determined was perhaps

17    a little bit too narrow.

18           So the Department of Corrections then rescreened all

19    of these individuals again under the more general standard of

20    does the disability or does the condition substantially

21    interfere with a major life activity.  All these inmates that

22    Miss Greisen is talking about have been screened, were screened

23    well before May 1 of 2009.  She knew and she obtained thousands

24    of AIC files which they went through for our last compliance

25    hearing.

1    So most of these inmates have been screened and a

2    determination made about disability.  She is certainly capable

3    of determining whether those inmates -- whether DOC has

4    accommodated those inmates.

5         THE COURT:  Do they have their ARs?

6         MS. McCANN:  Yes, they have them from those initial

7    two screenings.

8         Now, what happened was, when we started meeting with

9    plaintiffs' counsel about compliance issues, they were not

10   satisfied with the disability criteria; and as counsel pointed

11   out, we agreed in the last set of stipulations that we would

12   agree on a set of criteria for another screening of these

13   individuals.

14        So it took us until February 26 of '09, for their

15   expert and our doctor to agree on mobility-screening criteria.

16   It was a long, difficult process.  They wanted to have two

17   experts, so they had two experts, and we had our doctor.  And,

18   you know, to their credit, after many months, they were able to

19   hammer out agreement on not just one screening test, but two.

20        So what happened now is that when an individual

21   applies for mobility screening, they are referred to clinical.

22   The doctor does a fairly extensive test.  And we will be

23   prepared to show you at the compliance hearing, and then they

24   do the same test on the same individual two weeks later because

25   their expert felt that that needed to be done in order to make

1    sure the person wasn't faking their disability.

2            Now, what happens -- so from February 26 until

3    April 30, the Department of Corrections rescreened, with two

4    tests, the vast majority of those mobility-disabled or people

5    who wanted to be screened for disability.  It is true that the

6    AR, the accommodation resolution, was not issued on many of

7    those.

8            The document that Miss Greisen gave you is not

9    complete, and I have a more complete one that I gave to her

10   this morning that shows which ones had also had a -- there's a

11   process.  So they do one screening with a doctor, they do a

12   second screening with a doctor.  Then the chief medical officer

13   has to review and sign off.  Then it goes to the AIC office for

14   accommodation resolution.

15           THE COURT:  Is all of that necessary?

16           MS. McCANN:  Well, yes, I think it is under the

17   remedial plan.

18           THE COURT:  Sounds like the Army.

19           MS. McCANN:  Well, we didn't necessarily think they

20   needed to have two physical tests, exact same test, but we

21   agreed to do it because their expert felt that was what we

22   needed to do.  And we've been trying to be very accommodating

23   to their experts.

24           So the Department did an enormous effort.  Those are

25   doctors who are seeing patients also, and the physician

1    assistants that are trying to see the inmates at the same time

2    that they're doing these extensive disability tests.  So the

3    document that I will submit will show you that many of them had

4    all of the process completed except the AR, the accommodation

5    resolution, and some of them have that.  And many of them --

6    most of them have it by now.  So when she's going out and

7    visiting her inmates, they should have their accommodation

8    resolutions.  There are some who don't.  Maybe a couple hundred

9    out of a thousand or more.

10          But my point is they have known for years which

11    inmates have requested to be found to be disabled and which

12    ones have been screened in the past.  So it's not as though

13    they're going out to a brand-new bunch of people who have never

14    been in the system.  It's only been the -- and several of those

15    were found disabled previously.  So, yes, there are going to be

16    a few new people who are found disabled under this new

17    screening that we're doing.

18          But given the time constraints that DOC was under

19    because the group as a whole didn't come to an agreement until

20    February 26 of '09, I think DOC has done an amazing effort to

21    get all those screenings done within two months, basically.

22    And so these are the kinds of things that we will be showing

23    you during the compliance hearing.

24          But I totally disagree that they are not able to

25    evaluate the situation of these inmates.  Now, like I said,

1   there are some that don't have their ARs, but they are getting

2   them very quickly, and we should be finished that process very

3   soon.  But they certainly have known for many years about many

4   of these inmates, and they've been provided thousands of AIC

5   files.  I mean, we have copied thousands and thousands of these

6   files over the course of the years.  And the old ARs remained

7   effective until there was a rescreening.

8          So if an accommodation was made based on the initial

9   screening, which we thought was adequate, not the initial one,

10  the second one, which was the doctor's determining if there was

11  a limitation on a substantial major life activity, those ARs

12  remained effective until the rescreens that were done recently.

13  So to make it sound as though these folks have not been

14  screened at all or there hasn't been a determination made over

15  the course of these several years is just not accurate.

16         So anyway, I think that what we need to do at this

17  point is set a hearing.  We think that there are several areas,

18  and we hope the plaintiffs will agree, but we haven't actually

19  been able to sit down and talk about specific areas.  We

20  believe where there has been -- I don't think there will be a

21  disagreement there is substantial compliance.  At least that is

22  what DOC is hoping.  And there will be some areas where we're

23  going continue to have disagreement and we're going to need the

24  Court's guidance to say are we in substantial compliance, and

25  if we're not, give us a time frame to get into substantial

1   compliance.

2          There is one other issue, too.  We haven't agreed on

3   the hearing criteria.  And the latest stipulation says if the

4   parties are unable to agree, the Court would appoint its own

5   expert.  So I don't know if the Court -- I think each side has

6   an expert on the hearing, so I don't know if the Court wants to

7   resolve the hearing issue before we have a compliance hearing

8   and do it separately.

9          THE COURT:  I think it's best each have their own

10  expert.  I'll do it on the basis of what the experts say and

11  determine.

12         MS. McCANN:  Okay.  Do you want to do that in the

13  context of the compliance hearing?

14         THE COURT:  Yes.

15         MS. McCANN:  We'll have that issue as well.  We don't

16  have the final tests on.  The testing have been done, but we

17  haven't been able to agree whether someone gets two hearing

18  aids or one hearing aid, things like that.

19         THE COURT:  Okay.

20         MS. McCANN:  So that's our position.

21         THE COURT:  Is this all on compliance?

22         MS. McCANN:  Yes.

23         THE COURT:  The last hearing that I had, we were, the

24  architecture was a matter.

25         MS. McCANN:  No.

1          THE COURT:  The doorways, the elevators.

2          MS. McCANN:  Your Honor, that has all been resolved

3    and you, I think this Court or maybe it was Judge Nottingham,

4    found that DOC not only is in substantial compliance, the

5    monitoring period is over, we're done completely with

6    architecture.

7          THE COURT:  That's something he must have done.

8          MS. GREISEN:  I think that was in the 2008

9    stipulation, if my memory is right.

10         2006 stipulation, I think the parties stipulated at

11   that point in time that the architectural changes had been

12   made.

13         THE COURT:  All right.  And so this is the one area

14   that we need to worry about, then, is this, the class --

15         MS. GREISEN:  The rest of the implementation of the

16   remedial plan, right.

17         THE COURT:  Okay.

18         MS. GREISEN:  I would like just a moment to respond.

19         THE COURT:  Sure.

20         MS. GREISEN:  The concept that there are previous ARs

21   out there settles this issue, I can tell you it does not.  The

22   reason it does not is because the prior screening criteria that

23   was used was wrong.  Both parties set down and agreed in a

24   stipulation that they would come up with acceptable criteria

25   'cause that criteria was bad.  So if you have a prior

1   screening, using the wrong criteria, it means nothing.  Most --

2   although it may very well be true that the inmates were

3   previously screened, they were screened under bad criteria.

4        The two screening tests that Miss McCann is referring

5   to, she's absolutely right, the experts did sit down.  It was

6   certainly not our expert that asked for a second round of tests

7   in case the inmates were faking.  Paula France, the chief

8   medical officer, insisted on the second round of tests.

9   Obviously we support our class members.

10        The more concerning thing, though, Judge, is that in

11   the few that I have reviewed, there are people that were

12   previously found to be disabled, in the prior reports, who have

13   now been determined not disabled.  I can't make a determination

14   about who's in the class based on old ARs that are inaccurate

15   and that may or may not change.

16        So again, we come back to this issue of how we're

17   going to determine overall compliance given the state of the

18   record as of May 1, 2009.  And because the class change has

19   continued to change beyond that date and has not been

20   determined by that date, I again don't know how we conduct a

21   compliance review.  If we're given a list of jobs, how do we

22   know that the people on that list are even our class members.

23   And so again, we're back at how do we determine substantial

24   compliance.  It is going to be an issue that placing any

25   compliance hearing --

1          THE COURT:  It sounds -- excuse me for interrupting.

2          But it sounds to me like the first thing we have to do

3     is to establish the criteria that are to be used or that have

4     been used, whatever that is; and then I'm going to have to

5     order the defendants to present evidence to show those -- how

6     those people have been classified under the criteria that is

7     ordered or agreed upon.

8          Does that make sense?

9          MS. GREISEN:  I agree, Judge, but as of the date of

10    May 1, 2009, that doesn't exist.  You have the document in

11    front of you that shows that as of that date, that information

12    did not exist.

13         THE COURT:  Okay.  So they're not in compliance.  So

14    what do I do then?  I have to get people in compliance, right?

15         MS. GREISEN:  Absolutely.  I think we first have to

16    resolve the issue, if there's not substantial compliance,

17    what's the next step?

18         THE COURT:  The next step is that we find the

19    appropriate criteria and that becomes, the criteria becomes an

20    order of court and then I give a reasonable amount of time to

21    show that they're in compliance.  That's the only thing I know

22    what to do.

23         MS. GREISEN:  Well, I guess differ from that slightly.

24    I think if the Court makes another finding of nonsubstantial

25    compliance in 2009, I guess I would fundamentally disagree that

1    the only next step is to say, well, let's see what they're

2    doing now, in eight, nine, ten months, a year later, and see

3    whether that does it.  I think there has to be, and maybe I

4    misspoke in assuming that's what --

5              THE COURT:  I'm not saying eight or nine or ten

6    months.  I can't begin to tell you how much I want this case to

7    go away.

8              MS. GREISEN:  I hear you.  I have two children I'd

9    much rather spend the night with rather than down in

10   Las Animas.

11             THE COURT:  And I knew you before they were even here

12   in this case.

13             MS. GREISEN:  You did.

14             THE COURT:  They're going to graduate college before

15   this is over at this rate.

16             MS. GREISEN:  I hear you.

17             THE COURT:  Let's do this.  I want to approach this in

18   a fair and efficient manner, and it seems to me that what both

19   sides have to get together and prepare a pretrial order for a

20   compliance hearing.  And if you haven't agreed upon the

21   criteria that are going to be used for determining these

22   disabilities and issuing these ARs, then I will.  And then give

23   an amount of time to complete that.  And if they're not done by

24   that time, which won't be very long, then there will have to be

25   sanctions imposed.  But at this juncture, I don't know what

1    else I can do.

2           It's like coming into an orgy after everybody's had

3    their fun.

4           MS. GREISEN:  I'm not sure I would use that

5    description.

6           THE COURT:  I don't know what I'm doing in this case.

7    I'm trying to figure out, you know, what's -- not only what's

8    happened but what hasn't happened, and it's just not making a

9    whole lot of sense, so I have to have it make sense to me.  And

10   the way for it to make sense to me is, is to have you come in

11   here and try the issues that are contested and give me an

12   assignment to do as a judge to render a decision, is there

13   compliance or isn't there.  If there isn't compliance, what

14   criteria are needed.  If the criteria are needed, what are

15   they.  If the parties don't come up with it, I do.  Then I have

16   to give a reasonable time to comply with that order.  I don't

17   know what that reasonable time is.  But I have to approach it

18   with some kind of method.

19          You're telling me that you don't know who's in your

20   class.

21          MS. GREISEN:  I would suggest --

22          THE COURT:  If you don't know who's in your class, how

23   do I know?

24          MS. GREISEN:  I agree.  And I think if the Court makes

25   the finding that those determinations were not completed as of

1    May 1, 2009, then the Court needs to determine whether or not

2    there was substantial compliance as of May 1, 2009.  What we do

3    afterwards, I agree, we have to figure that out and part of it

4    may be at that point that we have to then set another date to

5    determine whether or not at that next date there is substantial

6    compliance and what the parties need to do.

7         But I don't think it's appropriate to kind of moosh

8    all this together and say, well, if there's not compliance as

9    of May 1, maybe there's some compliance as of some future date

10   and we'll get together and think about that.

11        THE COURT:  Let's just assume arguendo, because they

12   disagree, let's assume if we have a hearing to determine

13   whether or not there was compliance as of May -- May 1, right,

14   that's the date?

15        MS. GREISEN:  Right.

16        THE COURT:  And find that there wasn't compliance.

17   And by this time, we're into October or November of 2009.

18        MS. GREISEN:  Unless you want to make that finding

19   today.  That's right.

20        THE COURT:  And I can't do that if they're denying it.

21        MS. GREISEN:  Well, I don't think that they're denying

22   that the ARs were not done as of May 1.

23        THE COURT:  If I make that finding, what do you want

24   me to do other than to set down a hearing to show -- so they

25   then have the burden of showing how they're going to comply?

1   That's all I'm asking for now.

2           MS. GREISEN:  I think what we do -- frankly, I don't

3   think they're disputing that the ARs were in existence as of

4   May 1.  What I would suggest is that if that is the state of

5   the record as of May 1, that we do have a finding of

6   noncompliance and at that point, the parties sit down and

7   figure out if they can come up with another date and

8   agreed-upon method to review.  I mean, we're going to have to

9   start all of our, essentially most of our discovery at this

10  point.  We have reviewed, already reviewed, massive amount of

11  files as of May 1.

12          If what you're now saying is let's sit down and review

13  them as of September 1 or October 1, then there's no way we can

14  come to hearing in this case in mid to late October given,

15  given reconducting that review.  I don't doubt that that needs

16  to be done, Your Honor.  I'm simply saying that it's not in the

17  context of a compliance hearing that it's done.  It's in the

18  complex -- it's in the context of what is the next stage and

19  whether the parties can come to an agreement on how to remedy

20  these overall issues.

21          It's going to take our experts a considerable amount

22  of time, given that this is now September 1, to review all of

23  the new determinations that we're going to have to get from

24  them to see whether or not whatever new determinations they're

25  making are correct or not.  And that can't be done in a matter

1  of a couple of weeks.

2       So that is the structure that I would suggest, that

3  the Court -- if the Court says you don't need those disability

4  determinations as of May 1, go forth with your compliance case,

5  I'm not going to make a finding that --

6       THE COURT:  Well, I'm certainly not going to have them

7  go back and make those determinations as of May 1 that haven't

8  been made now.  I mean, that doesn't make any sense, to

9  reconstruct it.  Is that what you're asking?

10       MS. GREISEN:  I'm not sure --

11       THE COURT:  A reconstruction of the disability ratings

12  that weren't done on May 1 and then to go back and do them.

13       MS. GREISEN:  We already have -- I mean, we have --

14       THE COURT:  You have an updated list.

15       MS. GREISEN:  We have the ones that weren't done as of

16  May 1.  No, that's fine.  For purposes of our discovery, that's

17  fine.  I'll stand on the record as it stood as of June 25.  Or

18  Kathy Holst represented that that's what the record was as of

19  May 1, and that's --

20       THE COURT:  So this shows that there's not compliance

21  as of May 1, right?

22       MS. GREISEN:  That's our belief.

23       MS. McCANN:  If Your Honor -- can you hand him the

24  more update.

25       That list was incomplete.  That was not a discovery

1   response -- official discovery response.  That was simply a

2   list that Miss Holst gave to plaintiffs --

3           THE COURT:  Does this list that you have that's just

4   been handed to me as Defendant's Exhibit A show that you were

5   in compliance as of May 1?

6           MS. McCANN:  In our opinion --

7           THE COURT:  Or does it show that you weren't as far in

8   noncompliance?

9           MS. McCANN:  In our opinion, we were in substantial

10  compliance.

11          THE COURT:  Then I have to have a hearing to determine

12  whether you're in substantial compliance or not.

13          MS. McCANN:  Right.

14          THE COURT:  As of May.

15          How long is that going to take to try?

16          MS. McCANN:  Well, if we're looking at the entire

17  remedial plan, it will take several weeks.

18          THE COURT:  No, I'm looking at whether you're in

19  compliance or not and then we have to go through, it's in

20  compliance with the orders and deadline of May 1.

21          MS. GREISEN:  Well, that essentially will be the

22  entire remedial plan will be what typically is what we have had

23  encompassed on the --

24          THE COURT:  You have the experts on the hearing.  I

25  have to listen to them.

1    MS. GREISEN:  Experts on diabetics, experts on

2    everything, right.

3    MS. McCANN:  But there are also other issues, like

4    we -- the remedial plan requires certain trainings, and we

5    believe that we have accomplished those.  It requires certain

6    like accommodations for people in wheelchairs.  We've complied

7    with those.  There are other issues that are in the remedial

8    plan, and our tracking system and, you know, all of that is all

9    part of our substantial compliance.

10   THE COURT:  Let me be wistful.  Is it possible for the

11   two sides to get together and say what are the issues in this

12   case?  That you agree that there has been substantial

13   compliance with A, B, C; you disagree whether there has been

14   with issue D and issue E?

15   MS. McCANN:  We've been asking for that for quite a

16   while.

17   THE COURT:  Can you do that?

18   MS. GREISEN:  You know, Judge, we've tried.  The

19   problem is we can say, okay, there's a tracking system in

20   place.  But how do we know if it works if we don't know who the

21   class members are.  We can say, yes, you've come up with a jobs

22   and programs list, but if we don't know who our class members

23   to see if they are in placement, how can we see if that's

24   working or not.

25   THE COURT:  If they have the programs in place, that's

1  the first step.

2          MS. GREISEN:  Well, you would think.  But whether or

3  not those programs are being used correctly, whether people are

4  communicating correctly.

5          THE COURT:  Let's take that after we find out if we've

6  got them in place or not.

7          MS. GREISEN:  Sure.  Sure.  We can sit down and come

8  up with some things.  But I think it will be a relatively small

9  list in terms of --

10          THE COURT:  Well, I would hope so.

11          MS. GREISEN:  -- in terms of what we would have to

12  take out of the compliance hearing.

13          THE COURT:  What we need to do is have you two agree

14  on what it is you disagree about at this point.  Where has

15  there been compliance and where not.  Where there has not been

16  compliance or at least there's a disagreement, then that needs

17  to be listed in a pretrial order so I can try it.  I need to

18  know who's going to testify about it.  I need to know

19  approximately how much time it's going to take, and we'll limit

20  the hearing to those issues.  Once we find that out, whatever

21  it is, and we're going to resolve whatever things people can't

22  agree upon -- I'm becoming something of an expert in hearing

23  loss, myself, but I'm not going to make decisions on that

24  basis; I'll listen to the experts and I'll try and come -- if

25  there is no agreement on it, then I'll decide that.

1              Okay?

2              MS. GREISEN:  And so this is the compliance hearing

3    with respect to the May 1 deadline.

4              THE COURT:  Yes.

5              MS. GREISEN:  Is that correct?

6              THE COURT:  Yes.  That's what -- and Ms. McCann says

7    that there is compliance.  You say there isn't.  So that's what

8    I need to know.

9              MS. GREISEN:  Okay.

10             THE COURT:  Then what we'll do is after we find out if

11   there's compliance or not, then we'll take the next step.

12             MS. GREISEN:  Okay.

13             THE COURT:  Okay?

14             And as I say, by the time your kids are ready for

15   college, we may have this done.

16             MS. GREISEN:  I think I'll be dead by then, Judge.

17             THE COURT:  I now have grandchildren in college, I

18   want you to know.

19             MS. McCANN:  I have a 17-year-old who wasn't born when

20   this case was filed.

21             But, Your Honor --

22             THE COURT:  You know what they always say, let's not

23   make a federal case out of it; now you know.

24             MS. McCANN:  Just for purposes of our preparation and

25   clarification.  We understand the deadline is May 1.  However,

1    since May 1, a lot of these ARs have been issued.  So those are

2    clients of the plaintiff or members of the class that they are

3    visiting with.  So I guess we will be prepared, if the Court

4    wants to hear, to demonstrate what has been done up to the time

5    of the hearing, because if you're going to issue an order that

6    we're going to have to do something --

7              THE COURT:  That will be admissible for that purpose.

8    You'll have to show that to the other side.  But I'm not going

9    to reopen discovery for depositions and all of that stuff.  You

10   should have enough information and the reports should be there.

11             MS. GREISEN:  Well, just so I understand, are you

12   saying that the measures that they've taken since May 1, 2009,

13   is going to come into evidence?

14             THE COURT:  Yes.  If I make a finding that there was

15   not compliance and then I have to issue orders to how to get

16   them into compliance, it becomes relevant as to what they've

17   done in the interim, to see what the progress is, how long it's

18   taken, what problems they have, and what to do about it.

19             MS. GREISEN:  Okay.  Well, we will need discovery

20   because that is a pretty massive amount of material that we

21   would have to get --

22             THE COURT:  All right.  Can you do that without formal

23   discovery?

24             MS. GREISEN:  We actually -- I don't think there's

25   been a lot of problems in getting discovery back and forth.

1   And we even, I mean, we have set up a process last time where

2   we took -- we took the deposition of Kathy Holst beforehand to

3   help narrow the issues for the compliance hearing, and I think

4   that was pretty effective, an effective tool to narrow, to

5   narrow the issues.

6           THE COURT:  I should think by this time, you could

7   just call her on the phone and ask her.

8           MS. GREISEN:  Well, for this little issue about class,

9   or defense counsel wanting to be present.

10          THE COURT:  That's a conference call.  I'm thinking,

11  can you do this as informally as possible.

12          MS. GREISEN:  Well, last time, the deposition -- it

13  took three days, and it really helped narrow the issues.

14          THE COURT:  If you have to do it, do it.  What I want

15  you to do is meet and confer and prepare an order, submit it to

16  me, that tells me how much time you need and what we're going

17  to cover at those issues.  And if you need discovery to get to

18  that point, there's something, it will be limited on that basis

19  for the compliance hearing and the remedy.

20          MS. GREISEN:  Right.

21          THE COURT:  I don't want you to get your skivvies in a

22  knot over this.

23          MS. McCANN:  Well, Your Honor, we're already -- we've

24  already provided boxes and boxes and boxes of discovery, and

25  they're already going and visiting all the facilities again, so

1   we're already in the midst of that.

2         MS. GREISEN:  Oh, yeah, it's been going on since May.

3         THE COURT:  How long do you think it will take you to

4   come up with a pretrial order?  And in the meantime, I'll try

5   to get to work on these "special master" issues.

6         MS. GREISEN:  I guess it's, again, a domino effect.  I

7   don't know how long it's going to take to get the extra

8   discovery to us.  We haven't finished all the discovery we

9   have, and frankly, Judge, there's been some problems with the

10  scheduling of the visits with our class members, which we were

11  supposed to have finished with August, but now September is

12  filling up as well with those visits because of problems

13  getting scheduling done.  It's getting pushed back.  Frankly, I

14  don't know at this point what date the Court actually has

15  scheduled the compliance hearing to start.

16        THE COURT:  That's why I'm asking.

17        MS. GREISEN:  Okay.

18        THE COURT:  I have some time scheduled now, but I

19  think I'm going to have to reschedule.

20        MS. GREISEN:  I think it's going to take a while for

21  us to finish reviewing -- we're still waiting on production

22  requests, our initial production requests.  So I don't think

23  there's any way in the next two months we can --

24        THE COURT:  That's what I needed to know.  Because the

25  time that I had reserved here in October, November, I will, I

1  will fill it up with other cases.

2        MS. GREISEN:  All right.

3        MS. McCANN:  Well, Your Honor, there isn't that much

4  more discovery.  In fact, the sheet I gave her today, I mean,

5  we have that up until -- we have that up to now, current.

6        THE COURT:  I know.  But you've just said that you've

7  given them boxes and boxes and boxes.  They have to go through

8  that.

9        MS. McCANN:  That was a month or two ago.

10       THE COURT:  They're going to have to go through it.

11  She says they need a couple months, I'm not --

12       MS. GREISEN:  We're still waiting on boxes and boxes

13  and boxes.

14       MS. McCANN:  Just the AIC files.

15       THE COURT:  Can I count on -- can we say that in 20

16  days' time, which would be, what, that would be a Sunday.  When

17  the Broncos are not playing.  Can I say that on September the

18  21st, you will have a proposed pretrial scheduling order for

19  me?

20       MS. GREISEN:  I don't know how to make a pretrial

21  order without looking at the evidence.

22       THE COURT:  You know what the issues are or you

23  wouldn't know how to look at the evidence.  All I need to know

24  are the issues and who you're going to call about them.

25       MS. McCANN:  Your Honor, we can do that.  We've been

1    meeting every month for a year and a half.

2              THE COURT:  Well, I want you to meet more.

3              MS. McCANN:  I think we know the issues.

4              MS. GREISEN:  Well, part of what we do is we do call

5    our clients to testify because that gives them an opportunity

6    to be involved in this process, and we're still going out to

7    the facilities and have trips scheduled this entire month.  And

8    during those trips, we meet with our clients and determine

9    who's going to testify.  And then we get their working files

10   and then we get their AIC files and we have to review that to

11   make sure that they are witnesses that we want to put up.

12             So it's very time-consuming process for us, and I'm

13   really not trying to be obstructive, I'm just trying to be

14   reasonable that if I give you a pretrial order that didn't have

15   any of my inmate witnesses listed on it and I come back with 50

16   inmate witnesses later, that will be a problem.

17             THE COURT:  You're going out there this month,

18   September.  Can you tell me in October?

19             MS. GREISEN:  We will make an effort to do that,

20   Judge.  And if there, for whatever reason, if there are a

21   couple of people who we haven't yet confirmed, we will

22   certainly let the Court know.  It will expedite things if we

23   can get, once we identify a preliminary list, if we can get the

24   working files of these people quickly from Department of

25   Corrections before we finalize that list.  And if we can get

1    that information quickly from them, then we would be able to

2    comply with that.

3              THE COURT:  Okay.

4              MS. McCANN:  My only concern, Judge, is that we lose

5    dates.  Can we --

6              THE COURT:  You are losing dates.  Many of them are

7    already lost.  That's what I'm trying to work on right now.

8              MS. McCANN:  I'd like to try to get dates before

9    the --

10             THE COURT:  All right.

11             I'd like to get the proposed pretrial order in here by

12   Wednesday, October 14.

13             Can you do that?

14             MS. McCANN:  Yes.

15             THE COURT:  All right.  Then we will have a pretrial

16   conference on Monday, October 19.  And if I, if I could have

17   some idea of the time that you think it's going to take to do

18   this.  And I realize you can't give me any precise dates, but

19   I'm going to reserve January 11 for the following three weeks.

20             MS. McCANN:  Your Honor, I won't be available then.

21   If we could do it before the end of the year because I'm going

22   on legislative session.

23             THE COURT:  Okay.  I can't --

24             MS. McCANN:  That's why we reserved this time in

25   November.

1              THE COURT:  I can't do it then.  I just can't.  I have

2      criminal cases that are tied up.

3              MS. McCANN:  Well, we had reserved several weeks in

4      November.

5              THE COURT:  You reserved and I've got October 19, 20,

6      and 21 available now.  The next time I have is three weeks in

7      January.

8              I can't give it to you any sooner.

9              MS. McCANN:  Okay.  Then I'm -- we'll have to figure

10     it out.

11             THE COURT:  I'm sorry.  I really am.  If you could get

12     the Speedy Trial Act repealed, I would bless you every night.

13             MS. McCANN:  Well, I know, but we called like four

14     months ago to reserve these dates.

15             THE COURT:  I had it reserved.  And then I'm told

16     you're not ready.

17             MS. McCANN:  We are ready.  We want to go --

18             THE COURT:  They're not ready.  I don't have a

19     pretrial order.

20             MS. McCANN:  If we get the pretrial order in by

21     October 14, we can be ready by November --

22             THE COURT:  I can't do November.  I've got a murder

23     trial.

24             MS. McCANN:  Okay.

25             THE COURT:  From the other prison.  The federal one.

1          MS. McCANN:  Okay.

2          THE COURT:  Then I've got --

3          MS. McCANN:  Do you have any time in December?

4          THE COURT:  -- a stock-fraud case that's lined up.  I

5    might have some time in December.  But it would be the last two

6    weeks.

7          MS. McCANN:  Works for me.  If that's all we have.

8          THE COURT:  Are you going to take two weeks or longer?

9          MS. McCANN:  I don't know.

10         MS. GREISEN:  It will be longer.

11         THE COURT:  It will be longer.

12         I've got December 21, 22, 23, and 24, and December 28

13    and through the 31st.  And then we'd have to kick it over into

14    January anyway.

15         MS. McCANN:  Well, I guess we'll need to talk to our

16    witnesses.

17         THE COURT:  Yeah, your witnesses are not going to be

18    too happy with December 24, I realize that, and I'm not trying

19    to be snarky about it, really.

20         MS. McCANN:  Right.

21         THE COURT:  Mr. Zavaras won't care because that's not

22    Greek Christmas.

23         MR. ZAVARAS:  We have our own calendar, Your Honor.

24         MS. McCANN:  He never gets a holiday.

25         You know, I thought we had reserved the time, so I'm a

1    little surprised that we are not getting any time in October or

2    November or December because we were led to believe that those

3    dates will be --

4         THE COURT:  And I had to put in criminal cases that

5    Congress tells me I have to.  I'm sorry to disappoint you, but

6    they do a lot of things that disappoint me.

7         I'm getting this information piecemeal.  I can do

8    December 21, as I've said, through the 24th, the 28th

9    through the 31st, and January 4 through 7.  Then I have to

10   recess January the 8th.  And come back on the 11th.  Well,

11   that's not bad.  That's just one day.

12        MS. GREISEN:  Well, Judge, I'm going to tell you that

13   over Christmastime I'm going to have a real problem because

14   I've got child-care issues --

15        THE COURT:  Yeah.

16        MS. GREISEN:  -- during that period of time.

17        THE COURT:  And I think all these witnesses, too,

18   other than your inmate witnesses, but these other people have

19   other problems.

20        MS. McCANN:  Do you think there's any chance these

21   criminal cases will plead out?  Could we do a trailing docket?

22        THE COURT:  Now, Miss McCann, you have been a lawyer

23   long enough and you were a law clerk over here before that, and

24   you know as well as I do that criminal cases don't settle until

25   the day of trial, they never do.  Sometimes they make a deal,

1    but it takes them that long to get their paperwork ready.  And

2    then it's usually late anyway, but for some reason criminal

3    defense attorneys don't learn how to read and write.

4         MS. McCANN:  All right.  Well, those December dates

5    are fine with us.

6         THE COURT:  Which dates now?

7         MS. McCANN:  The ones that you said, December 14

8    through the 18th, right, or you don't start till the 21st.

9         THE COURT:  December 21.  Through the 24th.

10        MS. McCANN:  And then the 28th through the 1st.

11        THE COURT:  Right.  If we need to and if you -- things

12   are going better at that point and you want to knock off and

13   not have it on the 24th, that's fine because I did find out

14   that we've got these other dates, January 4 throughout 7.

15        MS. GREISEN:  Well, Judge, I can do the 21st and

16   22d, but I'm going to start having child-care issues starting

17   the 23rd and the week of the 28th because I don't have child

18   care and that's going to be a problem for me and my husband

19   travels out of town.

20        THE COURT:  Could I watch them and let -- I'd kind of

21   like this.

22        MS. GREISEN:  Typically our office is closed the week

23   of the 28th, and, you know, obviously we can work around

24   that, but I don't know how to work around my children.

25        THE COURT:  Here we go again.  It's like the Wizard of

1    Oz.

2           Okay.  We're going to take a recess to see if I can

3    move things around, check the Speedy Trial dates, and maybe

4    find another judge that might handle one of those criminal

5    cases.

6           MS. McCANN:  Thank you very much.

7           THE COURT:  We'll do our best.

8           We'll take a recess.

9           Don't file anything while I'm gone.

10       (Recess at 2:53 p.m.)

11       (Reconvened at 3:25 p.m.)

12           THE COURT:  Thank you.

13           Be seated, please.

14           Have we reached some resolution for this now, that we

15   can go onto the record and say what it is?

16           MS. GREISEN:  I'm happy to do so, Judge.

17           It's my understanding that the dates that we have

18   reserved for the compliance hearing, it begins on October 19.

19   We've reserved the 19th, 20th, and 21st of October.  We

20   have also reserved the week of November 2.  The 9th

21   and 10th of November, and the 12th and 13th of November.

22   We have also reserved December 21 and 22, and we have reserved

23   January 6 through the 22d, understanding that the 18th is a

24   court holiday.  We also understand that you have stated that if

25   plaintiff or class counsel is not ready to proceed on

1    November 2 because of discovery issues or that we feel we're

2    not able to proceed, that we have been ordered to tell this

3    Court by October 2 whether or not the November 2 trial dates

4    will proceed.

5           THE COURT:  And in that regard, if you figure that

6    there's some things that can be done, even though others can't,

7    because this is a bench trial, we can segment it.

8           MS. GREISEN:  Okay.

9           THE COURT:  All right?

10           MS. GREISEN:  That's fine, Judge.

11           THE COURT:  That it?

12           MS. GREISEN:  Judge, I think there were a few

13    housekeeping matters, I think, that I have, and I don't know if

14    Miss McCann has any or not.

15           And one was nowhere near as difficult to decide as all

16    the other issues in this case.

17           We've had several discussions about class counsel's

18    desire, for many reasons, to go to the infirmary in Fort Lyon.

19    At DRDC, we're allowed -- we have been allowed in the past to

20    go to the infirmary and talk to people.  During our visits at

21    Fort Lyon, we've been told by numerous people during our visits

22    that there are numerous people located in the infirmary that do

23    not feel well enough to come to our visits because our visits

24    are usually down in visiting rooms, they're outside of the

25    buildings as they stand.

1     As the Court may be aware, the chronic-care infirmary

2  at Fort Lyon are where the people in the worst conditions and

3  many of our clients are housed.  And it's a location where you

4  have to have, you have to give access through the elevators, we

5  went through the whole elevator issue.  We do have several more

6  trips back to Fort Lyon that we're going to have to make, and

7  what we want is an opportunity just to simply have class

8  counsel walk through and ask people, do you want to talk to us.

9  And if they say no, we leave.

10     And we've been denied that.  And we think it's very

11  important to make sure that if they do in fact want to see us.

12  We've been told that the Department of Corrections staff asks

13  them and then notes it whether or not they want to see us or

14  not, but we've been told by some people that there are people

15  refusing simply because they don't feel well enough and they

16  know they're going to have to come out of their bed to see us.

17     So for that reason, we would like the ability to go up

18  and see if they want to talk to us.

19     THE COURT:  What's the problem?

20     MS. McCANN:  Your Honor, it's, it's, it's a logistical

21  and security issue for the facility; but the facility is

22  willing to, if an inmate indicates they want to speak with

23  plaintiffs' attorney, the facility can get that inmate into a

24  room where they can do that.  They just don't want them walking

25  around --

1    THE COURT:  Well, why can't you have one lawyer -- if

2  I went down there to inspect, I'd walk anywhere I wanted

3  because I have the authority to do that.  Why can't you just

4  have one lawyer from the plaintiffs' side, with a guard,

5  whatever, go and stop at each bed or whatever, wherever they

6  are?

7    MS. McCANN:  Well, my understanding from the folks

8  there is they view that -- it's a security issue and also just

9  logistical issue.  It's not the infirmary, it's the special

10  medical needs unit and there are quite a few very sick people

11  there and they feel that it would be disruptive to have a

12  plaintiffs' attorney wandering around asking people if they

13  want to talk to them.

14        We have the list of people, and we did go have -- we

15  did have someone go and speak with them.  A couple of them

16  forgot to attend the meeting.  A couple of them say they don't

17  want to meet with the plaintiffs' attorney.  One of them has

18  dementia, and one of them -- a couple of them did attend

19  meetings with plaintiffs' attorney.  In fact, seven of them, I

20  think, did attend meetings with plaintiffs' attorney.  What DOC

21  has requested is to be able to, if these inmates indicate they

22  want to meet with the plaintiffs' attorney, then they will make

23  arrangements to get them to a room where they can meet with

24  them.

25        But, you know, some of them forgot the meeting.

1           THE COURT:  Well, I know.

2           MS. McCANN:  At some point you have to say "enough."

3    You know, the facilities make arrangements to reserve rooms and

4    they move --

5           THE COURT:  I don't think we need a room.  I don't

6    know that anything productive will come of this, but I'm going

7    to order that one lawyer representing the plaintiff class can

8    go in the -- with accompaniment of a guard or security officer

9    and go to these places and inquire if these people want to

10   meet.  And if they, if they say no, that's the end of it.  But

11   I think counsel has an obligation to verify that for

12   themselves.  They have to do that.  If they say yes, then you

13   can make other arrangements to put them into a different room

14   or what have you.

15          Okay?

16          MS. McCANN:  All right.

17          THE COURT:  All right.

18          MS. GREISEN:  The only other issue I know, Judge, that

19   will come up --

20          THE COURT:  I hate to be sexist about this, but I

21   think it ought to be a male from your office that does this.

22          MS. GREISEN:  I've been up to the special-needs unit

23   many times, but I appreciate what the Court is saying, and we

24   can accommodate that.

25          THE COURT:  Yeah.

1           MR. RAMEY:  Okay.

2           MS. GREISEN:  There's not much I haven't seen.

3           THE COURT:  I'm not worried about you.  I'm not trying

4    to be Victorian about it.  I'm concerned about safety.  If

5    somebody is going to get beat up, I hope it's a guy.

6           MS. GREISEN:  I think several people would prefer it

7    be me, Judge.

8           The one other issue that I wanted to raise only

9    because I know it's quickly going to become an issue, we did

10   submit interrogatory and discovery responses sometime ago on --

11   requesting information regarding quality-management programs

12   related to diabetic care.  These are programs that our expert,

13   Linda Edwards, has talked with DOC people about for years.

14   She's testified about it in every compliance hearing.

15   Quality-management reports, quality-assurance reports.  They

16   have objected to producing those records to us.

17          And we can certainly -- and we will -- brief this

18   issue for you, Judge, but this was actually an issue that was

19   addressed by Judge Schlatter.  He ordered back a million years

20   ago that we get them, and then of course when objections were

21   entered to that order, Judge Nottingham didn't rule and the

22   case settled.  But we are going to visit that issue with the

23   Court very quickly and need --

24          THE COURT:  File a motion and attach a memorandum to

25   it.

1          MS. GREISEN:  Okay.

2          THE COURT:  Give ten days to respond and we'll get it

3   done.

4          MS. McCANN:  We may be able to work it out informally.

5          THE COURT:  Okay.

6          MS. GREISEN:  That's all I have, Judge, thank you.

7          THE COURT:  That it?

8          Anything more?

9          MS. McCANN:  Nothing more.

10          THE COURT:  Thank you all very much.

11       (Recess at 3:34 p.m.)

12                     REPORTER'S CERTIFICATE

13          I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15   Dated at Denver, Colorado, this 15th day of September, 2009.

16

17                          s/KaraSpitler_____
                               Kara Spitler
18

19

20

21

22

23

24

25