IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-CV-870-JLK

JESSE MONTEZ, et al.

      Plaintiffs,

-vs.-

BILL RITTER, et al.

      Defendants.

---

Claim Number 03-470
Category III
Claimant: John E. Mosier, #51614
Address of Claimant: FLCF, P.O. Box 1000, Ft. Lyon, CO 81038-1000

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on October 16, 2009. This hearing was held at the Ft. Lyon Correctional Facility (FLCF) in Ft. Lyon, Colorado. Present were the following: John E. Mosier (Claimant) and Robert Huss, attorney for Defendants.

Claimant called the following witnesses at the hearing: Wesley Safford and Lillian Nowinsky. Claimant also testified in his own behalf. Defendants called Dr. Tim Creany, M.D. as a witness. Defendants offered into evidence Exhibits A-1 through A-3, and B-1 through B-23, and all were admitted. The case was taken under advisement after closing arguments.

## I.

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794*. During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Then-Judge Nottingham was not involved in the negotiation of the provisions of the

settlement document.[1]    Once the provisions and terms of the settlement were agreed upon by counsel for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Remedial Plan should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Remedial Plan also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Remedial Plan provides the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.

> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Remedial Plan, pp.28-29.* Pursuant to this provision, Claimant filed his claim and requested that the Special Master award appropriate damages or relief.

The Remedial Plan in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.

---

[1]The Special Masters also were not involved in the negotiation of the Remedial Plan. The Special Masters are bound by the provisions of that agreement, as they have only the jurisdiction agreed upon by the parties.

B. QUALIFIED INMATE
Inmate with a permanent disability/impairment which substantially
limits his or her ability to perform a major life activity.
C. PERMANENT DISABILITY/IMPAIRMENT
A condition which is not expected to improve within six months.

These definitions control as to implementation of the Remedial Plan and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
1. Is the claimant a disabled individual who is a member of the class?
2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

## II.

Claimant came into DOC custody initially on April 30, 1984. Claimant discharged that sentence on January 1, 1987. No claim has been made concerning discrimination during the initial incarceration of Claimant. The time period ending in January, 1987 would be barred by the statute of limitations.

Claimant returned to DOC custody on October 1, 1999. Claimant was placed into the Denver Reception and Diagnostic Center (DRDC). On January 6, 2000, Claimant was transferred to the Fremont Correctional Facility (FCF) in Canon City, Colorado. He remained at FCF until August 17, 2001. Claimant then was placed at the Arkansas Valley Correctional Facility (AVCF) in Crowley, Colorado. Claimant returned to DRDC on March 6, 2003 and remained there until August 4, 2003. Claimant then returned to AVCF. He was transferred to FLCF on October 29, 2004. Other than temporary placements at the infirmary at Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado, Claimant has remained at FLCF.

Claimant filed a claim on July 11, 2009 under Article XXXII of the Remedial Plan. Claimant checked all four boxes for disabilities. In his claim form, Claimant stated, in part, as follows:

3

I have suffered two (2) major strokes and an unknown number of Transient Ischemic Attacks (T.I.A.s). My first stroke was October 5th or 6th, 1999. My second stroke was in August or September of 2005. My second stroke caused me to be incontinent as well as having the use of only my right arm and leg.

As to his hearing impairment claim, Claimant stated, in part:

I entered the Denver Regional Diagnostic Center (DRDC) on October 1, 1999 and my hearing aids were taken from me to be sent home. The hearing aids never arrived at my home, a loss of about $3,000.00.

I was told that my hearing aids would be replaced when I got to my permanent facility. I was without hearing aids and being able to hearing what was going on around me for almost ten (10) years. In December of 2008 a revised Accommodation Resolution stated that I do not require hearing aids, however in April of 2009 I was tested by an audiologist who determined that I require two (2) hearing aids and I was provided with two hearing aids on May 11, 2009.

As to his diabetes, Claimant stated that "the Colorado Department of Corrections has been doing a competent job in managing my diabetic condition." Concerning his vision impairment, Claimant stated in his claim form:

My last stroke has left me with double vision. Dr. Richtor at the State Hospital said that corrective lenses would not fix this problem, as the left eye wonders but not constantly. I now have tri-focals, so I am able to read by keeping one eye closed. I then close the other eye for awhile.

The Special Master requested additional information from Claimant. The Special Master asked why Claimant had waited to file his claim:

The reason for not filing a damage claim under paragraph XXXII of the Remedial Plan is simply I did not know and/or understand that I am eligible due to having my hearing aids taken from me on October 1, 1999 and the trouble with my vision and being able to see regular print, I could not read much after my stroke in 1999.

At the hearing, Claimant presented two witnesses. Lillian Nowinsky testified by telephone that she and her husband were long-time friends of Claimant. She was aware that Claimant had been using two hearing aids when he went into DOC custody in 1999. She testified that she never received the hearing aids, even though they had been sent by Claimant to her home address.

Wesley Safford testified that he is in the custody of DOC and has known Claimant since April, 2007. His present job is to be the assistant to Claimant. He testified that Claimant has been in a wheelchair for the time that he has known him. Mr. Safford tries to get Claimant to walk a little using crutches, but it is difficult. Claimant has stumbled on occasion. Most of the time, Claimant

remains in his wheelchair, and Mr. Safford has to push it. He also testified concerning other problems that Claimant has including his incontinence.

Claimant testified that he was diagnosed as having diabetes in October, 1999. He received insulin for a period of time. He now is on glucophage and must watch what he eats. Claimant testified that he recently received new glasses from DOC. He has been struggling with double vision since his second stroke in 2005. He has trouble focusing on printing. He has been provided books on tape which had helped him.

Claimant testified that he had been prescribed a hearing aid in the mid-1980's. He received one hearing aid when he was in DOC custody the first time. When he was on the streets in the late 1990's, Claimant had two hearing aids. These were taken from him at DRDC and not returned. He did not receive any hearing aids until early 2009. Claimant testified that life in prison without the hearing aids was difficult. He had pulled himself into a shell. He testified that he could hear little without the hearing aids. Claimant said that he needs to be able to learn how to function when he is released from prison or placed on parole.

As to his mobility impairment, Claimant testified that he has been in a wheelchair since 1999. He has had two strokes to the best of his knowledge. The second stroke left him paralyzed on his left side. He testified that he also had several TIA's. He has had to rely on his pusher to get around the facility.

On cross-examination, Claimant testified that he has his diabetes under control. The double vision began after the second stroke in 2005. He has been receiving books on tape since 2006. Claimant stated that he has a special wheelchair that allows some movement with use of only his right hand.

Defendants present Dr. Tim Creany, M.D. as an expert witness. He had reviewed the medical records of Claimant. Dr. Creany testified that there had been several different sets of criteria for hearing impairment over the years. He noted that Claimant's hearing was sufficiently impaired to require two hearing aids. *Exhibit B-20.*

Dr. Creany testified that Claimant does have a vision problem but not a disability. Claimant's vision can be corrected with glasses. Prescriptions may change, but Claimant is able to obtain appropriate glasses from DOC. Dr. Creany testified that Claimant is diabetic, but that it is under control.

As to Claimant's mobility impairment claim, Dr. Creany said that there had been reported strokes, but that there appeared to be no physical findings that major strokes had occurred. Dr. Creany noted that various providers had found nothing to support the diagnosis of stroke. Some had mentioned that the left-sided paralysis appeared to be psychogenic. *Exhibit B-6.* Under normal testing procedures, a stroke would show up on a scan. Nothing appeared in scans done of Claimant. Dr. Creany also noted that Claimant's left arm showed no atrophy which would be consistent with a stroke. Dr. Creany did testify that Claimant's concerns about pressure sores were legitimate. He

also noted that it would be difficult for Claimant to use Canadian crutches if he had been the victim of a stroke.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. A claimant must establish that he was disabled, as set forth in the Remedial Plan, on or before August 27, 2003. In addition, a claimant must establish that he was the victim of discrimination on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant must establish that he was disabled by his mobility, vision and hearing impairments, as well as diabetes, on or before August 27, 2003. If he so establishes that he was disabled on or before August 27, 2003 and the victim of discrimination, then he may amend his claim and raise incidents that have occurred since that date to the present.

Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B).  The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

**Mobility Impairment**: From all of the evidence presented, Claimant was experiencing significant mobility issues prior to August 27, 2003. Though Defendants offered evidence that Claimant may not have had two strokes and TIA's, the evidence reflects that Claimant was using a wheelchair and having difficulty walking on and before August 27, 2003. The Special Master determines that Claimant was a member of the class as mobility impaired on August 27, 2003.

**Diabetes**: Claimant was diagnosed as having diabetes in October, 1999. Claimant was a member of the class as diabetic on August 27, 2003.

**Hearing Impairment**: Claimant has had hearing problems for several years. Claimant's testimony is accepted that he had one hearing aid when he was in DOC custody in the mid-1980's. He came to DRDC in 1999 with two hearing aids, and both were taken from him. No replacements were provided to Claimant until earlier this year. His hearing condition is such that he must use two hearing aids. The Special Master determines that Claimant was hearing impaired on August 27, 2003.

**Vision Impairment**: Claimant testified that he has worn glasses over the years. His vision problems arose in 2005 after his second stroke. Claimant testified that is when he started having double vision. Prior to the stroke, Claimant's vision was correctable with glasses. Under the then-controlling law, corrective measures had to be analyzed to determine if a vision impairment substantially limited a major life activity. *Sutton v. United Air Lines,* 527 U.S. 471 (1999). The Special Master determines that Claimant was not vision impaired on August 27, 2003.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** No evidence was presented that Claimant was otherwise unqualified to participate in DOC programs or to receive DOC services.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant has to establish that he was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003. In this case, Claimant has proven partially his claim of discrimination.

**Diabetes:** Claimant's testimony concerning his diabetes indicated that he has been receiving appropriate medical care. No evidence was presented by either party that Claimant had been the victim of discrimination due to diabetes.

**Mobility Impairment:** The testimony of Claimant indicated that he has received medical care and accommodations over the years that he has been in DOC custody. Even though a number of medical care providers have questioned whether strokes have occurred, Claimant has received treatment for his condition.

Some of Claimant's complaints relate to his concerns about the medical care he has received. On April 11, 2005, the United States Court of Appeals for the Tenth Circuit ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. To the extent that Claimant is questioning the care provided to him, that is beyond the jurisdiction of the Special Masters as set forth in the Remedial Plan.

**Hearing Impairment:** The Special Master has been provided no evidence as to why Claimant had his hearing aids taken from him at DRDC in 1999. Those hearing aids were purportedly shipped out of the facility but did not arrive at the home of Mr. and Mrs. Nowinsky. Why Claimant had to wait years to receive hearing aids is unclear.

The testimony of Dr. Creany did not establish any reason for denying Claimant a hearing aid. Dr. Creany testified that the criteria for hearing aids had change over the years. That may be true, but Claimant arrived at DRDC with two aids that he had purchased in order to be able to hear. No evidence was presented by Defendants that Claimant did not need, at least, one hearing aid in 1999. The evaluation of Claimant earlier this year reflected the need for two hearing aids.

Claimant had no control over the actions of DOC officials in 1999 at DRDC and later. Claimant was denied hearing aids for reasons that are unstated. Claimant was the victim of discrimination prohibited by the ADA and Rehabilitation Act.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** Claimant went for almost ten years without hearing aids. Claimant is entitled to compensation for this discrimination in the amount of $750.00.

IT IS HEREBY ORDERED that the claim of John Mosier is granted, in part, as the Special Master determines that Claimant was denied use of hearing aids for almost ten years, and Claimant is entitled to compensation in the amount of $750.00; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before December 28, 2009.**

SIGNED this 30th day of October, 2009.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master

8