```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
    Civil Action No. 92-cv-00870-JLK-OES
 3
    JESSE F. MONTEZ, et al.,
 4
         Plaintiffs,
 5
    vs.
 6
    BILL OWENS, et al.,
 7
         Defendants.
 8
    _____
 9
                        REPORTER'S TRANSCRIPT
10   Excerpt of Hearing on Criteria for Disability Determinations,
                              Day 2
11                         Court's Ruling

12  _____

13            Proceedings before the HONORABLE JOHN L. KANE,

14  JR., Senior Judge, United States District Court for the

15  District of Colorado, commencing at 10:06 a.m., on the 13th day

16  of November, 2009, in Courtroom A802, Alfred A. Arraj United

17  States Courthouse, Denver, Colorado.

18                            APPEARANCES

19         PAULA GREISEN and JENNIFER RIDDLE, King & Greisen,

20  LLP, 1670 York Street, CO  80206; for plaintiffs.

21         ELIZABETH McCANN, JAMES QUINN and BERINA IBRISAGIC,

22  Colorado Attorney General's Office, 1525 Sherman Street, 7th

23  Floor, CO  80203, for defendants.

24  Proceeding Reported by Mechanical Stenography, Transcription
             Produced via Computer by Kara Spitler, RMR, CRR,
25        901 19th Street, Denver, CO, 80294, (303) 623-3080
```

1              P R O C E E D I N G S

2        (Proceedings were had which were not requested

3   transcribed.)

4           THE COURT:  All right.  Thank you.

5           Well, the special needs and requirements of

6   corrections are such that it's -- we wouldn't be here if there

7   were some standards by the correctional health committee -- the

8   name of it escapes me at the moment -- but that sets a standard

9   that takes into consideration the needs of an institution.  And

10  the state is in a -- and the plaintiffs as well -- in a

11  difficult position in this case because that particular kind of

12  study, applying these various principles and desires of

13  technology and science to the prison situation, is not present.

14  The standard which I have to apply is not the same as, as the

15  discretionary area that the institution itself has.

16          Now, I have to say, as overall comment, I'm very

17  impressed by Dr. Teter and his testimony, and I think he

18  clearly knows more about this subject than anybody I've

19  encountered in this case or otherwise; but it isn't -- we're

20  not dealing with a requirement for the state-of-the-art, for

21  the best treatment that is available.  There are,

22  unfortunately, a number of other factors that have to be

23  considered by those that are making these decisions.

24          And there was mention made -- and an interest of

25  mine -- that the average age of the inmates is increasing and

1  that in addition to that, hearing loss is a, an increasing --
2  is progressive.  And I think we brought this up in other
3  hearings as well.  There's an aging prison population, and
4  there are some policy decisions that are not appropriate for a
5  court to make, that the state has to start paying attention,
6  they're not already paying attention; but the aging population,
7  there are simply a lot of people, not just in the Colorado
8  Department of Corrections, but throughout this nation, a lot of
9  people that just don't belong there anymore.  And there are
10 places where, such as the state of Louisiana, where some
11 institutions have really just been converted into nursing
12 homes, where there's even more care that is needed and the
13 prudence of having this kind of institution is, again, not a
14 matter for me to decide here.
15          I give you another example.  The state of New Mexico
16 is presently giving all inmates an fMRI brain test.  They're
17 doing this with nontaxpayer funds, but every single inmate's
18 getting it.  I think that's probably one of the best things
19 happening in corrections today, and they're being able to
20 identify psychopaths, for example.  They're able to increase
21 the safety of the institutions by this kind of examination.
22          But I don't know that it would even be appropriate to
23 consider that in a case.  I mean, a judge has no business
24 ordering it.  It's an excellent idea.  There are a lot of
25 things that can be done and with not so much money, but just by

1  looking at these problems a little differently.

2  What we're concerned with here is the, under the ADA,
3  is a major life activity and what is the major life activity
4  that we're talking about with respect to people who are
5  involuntarily confined. The primary consideration for this
6  life activity is safety: being able to hear or having some kind
7  of provision for learning of matters such as fires, violence,
8  things that, where the person's safety is at issue.

9  The second, which is a more difficult one to deal
10 with, which we've talked about at not only this particular
11 hearing but many others, is the, the subjecting of inmates to
12 arbitrary and capricious discipline, and whether a person can
13 hear what a direction is from a correctional officer is of
14 pivotal importance in terms of if they don't hear and then
15 they're punished for not having heard. That's not acceptable.
16 And there has to be those factors taken into consideration in
17 what standards are applied.

18 But this is not -- the evidence that I heard -- the
19 Department of Corrections is taking action and it's not a
20 question of neglect. The difficulty I have is in trying to
21 assess what, what sort of standard is appropriate. In the best
22 of all possible worlds, I'd say just do what Dr. Teter tells
23 you to do; he knows, and it's a gold standard that he has
24 presented. But that's not the legal standard. And that's
25 where we get involved in the minutia of these things that I

1  have listened to this; and I can tell you, these are going to
2  be the, as best as I can determine, what has to be appropriate,
3  and that is, first of all, the Department of Corrections needs
4  to cease and desist from using the "finger snap" and "whispered
5  voice" screen for hearing loss and develop and use a more
6  acceptable standard.
7         The next thing is -- and I only saw this in the moving
8  papers and in Dr. Teter's report -- but the idea that if a
9  prisoner comes in wearing hearing aids in both ears, that he
10 has to remove one is utterly arbitrary and capricious, and that
11 will cease.  Somebody has their own hearing aids, of course
12 they can be examined to see that they don't contain contraband,
13 but to deny somebody what they already have under those
14 circumstances is capricious and it shall cease.
15        The next thing is that I gather that there's some sort
16 of requirement that the prisoners have to wear their hearing
17 aids when they are sleeping -- at least that's in Dr. Teter's
18 report.
19        MS. McCANN:  That's not the case.
20        THE COURT:  Okay.  Then we don't need to worry about
21 that.
22        MS. GREISEN:  I think that changed during the course
23 of our discussions.
24        THE COURT:  Okay.  But that's contained in his report
25 and obviously it's a -- people need to take those things out to

1  avoid --

2          MS. GREISEN:  But I think that would be helpful if you

3  made that the order, that that practice shall not be tolerated.

4          THE COURT:  I don't know why I would make an order if

5  it's not the case.

6          MS. GREISEN:  Only because some things go away and

7  come back and go away and come back.

8          THE COURT:  The evidence is very clear that that sort

9  of thing can cause serious damage and so it's not to happen.

10         The recommendation, again, that Dr. Teter made, I

11 think certainly they're on page 5 of document 4168-2 filed

12 October 20, 2009, there are five recommendations, and I'm not

13 going to order those, but I think that they're certainly worth

14 pursuing.

15         MS. McCANN:  Which -- I'm sorry, but which date?

16         THE COURT:  This is his report, but it's attached to

17 the plaintiffs' position regarding hearing criteria for

18 disability determinations.

19         MS. McCANN:  He made four reports.

20         MS. RIDDLE:  It's his report dated January 4, 2009.

21         THE COURT:  It's his report, let me see, May 13, 2008,

22 in a letter to Ms. Riddle.  And unfortunately pages aren't

23 numbered in that letter, but it's actually on page 4.  Of his

24 letter of May 13.  I recommend that those be looked at and it

25 seems to me to be an objective which should be considered.

1       Now, as I indicated, I'm not dealing with the
2  state-of-the-art, and I think that reasonably and legally the
3  state Department of Corrections is entitled to establish a
4  standard -- a standard which is in existence and is being used,
5  and the standard for commercial driver's license and employment
6  by the Department of Transportation is a legally recognizable
7  standard.  Perhaps shouldn't say this, but Dr. Teter's comments
8  about federal regulations certainly fuel my libertarian
9  proclivities.  I spend a great deal of my life dealing with
10  absurdities that are government regulations, but when
11  organizations have to function, they have to use something, and
12  there is a reliance that is permissible, however imprudent I
13  might think it is.
14       It seems to me that the best standard to use as a goal
15  is the international organizations' standards on these matters.
16  I have looked at the written submissions and will say right now
17  that the World Health Organization standards are not
18  acceptable.  They are clearly written for developing countries,
19  and even though the state of Colorado ranks 49th in education
20  right now, it is not recognized as a developing country.  But
21  those standards are simply not to be used here.  They don't
22  meet any rational test for applying them to a state
23  institutional organization such as the Department of
24  Corrections.
25       So then we get to the, the specifics of these things.

1  I'm pretty much convinced that, wearing them, myself, that two
2  hearing aids are necessary, but I don't think that that's a
3  requirement with the existing standards that exist.  The other
4  aspect, though, I do think is, by Dr. Teter that doesn't
5  require any expenditure of funds, time, or reference, is to
6  cease and desist from using average rather than weighted
7  average.  I mean, that's just, that's just fundamental
8  arithmetic, that using just the averages themselves is not an
9  appropriate means of ascertaining certainly hearing loss with
10 the exponential progression that takes place.
11         So if you use weighted average, it's all right.  They
12 can come up with a program that takes into consideration his
13 criticism using these averages, that's fine.  Mean would be
14 better.  It's not that hard to figure out.  But it's a test
15 which is arbitrary, to just use the averages.
16         Okay.  I'm not requiring the two hearing aids.  I
17 think it's advisable, but I think that's beyond the business of
18 this Court to do.
19         The standard that's being used meets a legal
20 requirement here, and I think it meets the ADA requirements
21 regarding how to treat hearing loss regarding a major life
22 activity even though I do think the international standards
23 should be the goal that's used.
24         I guess what I'm saying in another way is that we, we
25 are, all of us, the Department of Corrections, the plaintiff

1  class, the Court, we're harnessed to a utilitarian calculus and
2  it's constrained by budgets, by the availability of
3  information, the need to rely upon studies that perhaps that
4  could -- not perhaps, definitely could be better, but we have
5  to work in that utilitarian notion that decisions are made on
6  the basis, the basis of generalizations.  I know I'm not too
7  clear on this.  Let me try again.
8          Decisions are based on the norms, normative criteria,
9  including statistics when the individual instance does not
10 necessarily meet those criteria.  I mentioned this to Dr. Teter
11 at the recess yesterday, that bears repeating, I think.  There
12 was an Indian writer named Nirad Chowdry that said that he had
13 a friend and his friend had an elephant and they both drowned
14 in a river having an average depth of 5 inches, and that's one
15 of the problems that we always face.  The courts frequently are
16 criticized because legislation is passed on the utilitarian
17 calculus, and then individuals come in for adjudication, and
18 that's what we have to look at.
19         So I look at these individual people that are
20 described in these exhibits with their hearing losses; and as
21 an individual claim, one would look at the individual claim as
22 to how these regulations and so on are affecting this
23 particular person in this particular instance.  But this is a
24 class action, and that doesn't apply.  I can't make that kind
25 of a judgment.  That's one of the reasons why the individual

1 claims in this case were bifurcated, so that the individual
2 claimants could receive individual attention. But as a general
3 policy matter, I have to be very careful of not trying to be
4 the, the head of the Department of Corrections. Or the
5 governor, or the legislature. I have to leave an ambit there.
6 Would I personally prefer to see that two hearing aids for
7 anybody with any hearing loss; yes, I have them, myself. But I
8 don't think that that's the legal standard.
9       MS. GREISEN: May I ask a question, Your Honor?
10       THE COURT: Yes, of course.
11       MS. GREISEN: I want to make sure, if I could just
12 clarify the Court's ruling on one issue. Because as the Court
13 knows, in the last stipulation that we entered, sanctions or
14 stipulation, whatever you want to call it, one of them was the
15 Department of Corrections shall provide two hearing aids to
16 inmates with hearing impairments who meet the criteria mutually
17 agreed by the parties or by this Court.
18       So the way I interpret your ruling is that they can
19 keep the 50-decibel loss for that criteria --
20       THE COURT: That's correct.
21       MS. GREISEN: -- as long as the 50 is not an average
22 reading.
23       THE COURT: Yeah.
24       MS. GREISEN: Okay.
25       THE COURT: They have to change the average to use

1  weighted average or mean, some statistically recognizable and
2  valid approach.
3              MS. GREISEN:  Okay.
4              THE COURT:  But the same standard will apply.
5              MS. GREISEN:  Okay.  I just wanted to make sure that
6  that was --
7              MS. McCANN:  Your Honor, I have a question, too.
8              THE COURT:  Yeah.
9              MS. McCANN:  I don't think there is any way to --
10 there's no standard of doing that.  The only way averages are
11 used is is the average.  And I think that's what Dr. Teter
12 acknowledged, that -- and even in his latest report, if you
13 look at his January report, which is his latest one, he
14 acknowledges on the last page, he says, If the level of dB HDL
15 for the four-frequency average exceeds 40 in either ear, then
16 that ear should be amplified.
17             So even he has agreed -- and I thought that's what he
18 said on the stand -- there isn't a way -- he doesn't even
19 advocate a way to, at least in his report and I don't think
20 we --
21             THE COURT:  I thought he did in his testimony.
22             MS. GREISEN:  He did, Judge.
23             MS. McCANN:  We don't know how to do that.
24             THE COURT:  I think he can do that.
25             MS. GREISEN:  The audiologist can do it.

1         THE COURT: Yeah, the audiologist can come out with a
2    formula for you.
3         MS. McCANN: So if it's 40 at any of those four; is
4    that what you're saying?
5         THE COURT: No, I'm saying that you can't use an
6    average unless you come up with some means of showing -- I'm
7    not a statistician, but the increase is exponential.  And so
8    what is necessary at one decibel level is not necessary at
9    another.  And I'm saying you have to take that into
10   consideration.  He's saying, don't even use averages.  I'm not
11   saying you can't.  You need a diagnostic screening, but I'm
12   saying a audiologist can come forward with a formula for you to
13   use.  That isn't the one that's being presently used.
14        MS. McCANN: Even though --
15        THE COURT: What you're doing, when I look at these
16   individual cases, there are people with significant hearing
17   losses that are falling throughout cracks.
18        MS. McCANN: Well, I guess the whole point of coming
19   up with criteria, specific objective criteria, was so the
20   Department could have a standard that was -- that they could
21   apply across the board.  I don't understand what you're
22   suggesting that they should --
23        THE COURT: I'm saying that you need a new standard
24   and that the average is not the standard to use.  If you want
25   to come up with a different one, it has to meet some kind of

1  organizational standard such as the -- was it the international

2  standards certificate.  It has to be -- if there's no standard

3  that's with the Department of Transportation's rules and

4  regulations on licensing drivers, then you're going to have to

5  come up with another one.

6          MS. McCANN:  But what I --

7          THE COURT:  But it doesn't make any sense.

8          MS. McCANN:  But what I'm saying is that even

9  Dr. Teter acknowledged there is no international standard that

10 does what you're suggesting.

11         THE COURT:  Then you'll have to make one.

12         MS. McCANN:  Well, I thought --

13         THE COURT:  It's not a hard thing to do.  I think

14 Miss Greisen -- you just said that an audiologist can do this.

15 I think that's what I heard Dr. Teter say, that you can come up

16 with a screening device that doesn't require a known

17 inaccuracy.

18         MS. McCANN:  Okay.

19         But the level is still at 40 decibels, is the level

20 that we'll be using?

21         THE COURT:  If you can arrive at 40 decibels without

22 coming up with an average from zero to 80, yes.

23         MS. McCANN:  Well, I thought you said that the

24 standard that DOC is using meets the legal requirements and

25 meets the ADA.

1            THE COURT: Except for that averaging thing. That's
2    just plain wrong.
3            MS. McCANN: But that's the way everyone does this.
4            THE COURT: Well, you know, everyone thought the world
5    was flat, too, but it wasn't. And this isn't right. I deal in
6    the peripheries of statistics in countless cases --
7            MS. McCANN: I understand --
8            THE COURT: -- and I can tell you right now that this
9    idea of average is not an appropriate screening system.
10   Somebody can have deafness, hearing loss, hearing impairment,
11   whatever the politically correct term is, at a certain level
12   and they require having some kind of hearing aid. It may not
13   be at the average, and it probably isn't. I know, the
14   difficulty is, I'm trying to separate my own personal
15   experience from, but the testimony confirmed, there are some
16   ranges in which people can't hear.
17           MS. McCANN: I guess my experience legally is that if
18   you are meeting the legally accepted standard, then you are
19   meeting the legally accepted standard. And I --
20           THE COURT: I guess if that's the way you think of it.
21   But I don't think that's a legal standard because I think it's
22   arbitrary.
23           MS. McCANN: Okay. But you're saying we do meet the
24   legally accepted standard under the ADA.
25           THE COURT: I'm saying that you -- that as long as the

1  standards are such that a major life activity is not impaired,
2  you're meeting the standard.  Now, does that mean that you're
3  meeting it at 40?  I think you have the Department of
4  Transportation commercial licenses criteria to meet that, and
5  you can say yes.
6            But when it comes to saying I'm going to determine
7  that particular number by the average, you can't.  Now, how you
8  do that, I don't have enough, enough information to do.  But
9  there was testimony and it's in the record that audiologists do
10 this all the time.  I can call my own audiologist and find out.
11 There are certain ranges in which there is hearing impairment,
12 certain ranges when there isn't for individuals.  And that can
13 be screened.  It doesn't all come in to the same number.
14           MS. McCANN:  But then we're back to the subjective,
15 okay, if -- the problem --
16           THE COURT:  You're using objective criteria, but
17 you're applying it to individual subjects.
18           MS. McCANN:  But we don't know at what level there is
19 this impairment under the ADA.  That's the problem is you're --
20           THE COURT:  When it interferes with a major life
21 activity.
22           MS. McCANN:  Right.
23           THE COURT:  If for instance, somebody can hear
24 everything in the world except the public address system -- and
25 I'm trying very hard not to be sexist -- there's a female voice

```
 1  on the public address system and they can't hear it.  They
 2  could hear the male voice.  I don't know what you're going to
 3  do to change that.  There's lots of things you can do.  You can
 4  either give them hearing aids that are adjusted to that
 5  voice -- that's what I did in my own case, not voluntarily, I
 6  might add -- and on the other hand, you might just say we're
 7  not going to use a female voice because there are too many
 8  people adversely affected by it.  I don't know.  I'm not trying
 9  to run your institution.  I'm just saying that you can't come
10  out and say all people meet this standard because it's an
11  average.
12            MS. McCANN:  All right.
13            THE COURT:  Okay?
14            MS. McCANN:  Well, the stipulation that we agreed to
15  if the parties can't agree, the Judge is going to decide what
16  the standard is.
17            THE COURT:  All right.  I'm telling you to use a
18  weighted average.
19            MS. McCANN:  At 40 or at --
20            THE COURT:  Yeah.  I don't care about that.  What I
21  care about is how you get there.
22            MS. McCANN:  But you're leaving it up to a -- an
23  individual determination which is exactly what we were trying
24  to get away from by having an objective criteria.
25            THE COURT:  Are you going to -- let me just give you a
```

1 hypothetical. If you have a clinic and somebody comes in with
2 an acute appendicitis, are you going to say that they have to
3 meet a standard that says that all people get their
4 appendectomies on a certain day of the month?
5            MS. McCANN: No, but I think there's a medical
6 standard of when you would refer somebody for an appendectomy,
7 to have a appendectomy based on what their test levels are and
8 if they meet criteria.
9            THE COURT: And if the test is wrong, then you get rid
10 of that test. That's all I'm saying. Don't use that averaging
11 process to get to the number that you want. I'm not going to
12 quarrel with that number. But I am going to quarrel with how
13 you get it.
14            MS. McCANN: All right.
15            THE COURT: And I'm saying use weighted average.
16 That's an easy thing for anybody to do that has any training at
17 all in statistics.
18            MS. McCANN: Okay. I understand what you're saying
19 about using weighted average. But then we don't know what, at
20 what level we are supposed to consider them hearing disabled.
21            THE COURT: Why not?
22            MS. McCANN: And that's what we were here to decide.
23            THE COURT: I'm pretty thick on this. But I don't
24 know why. We're using the same, 40. Or 45. I think it's 40,
25 is it not?

1  MS. McCANN: I guess we can come back to you, because
2  I can guarantee that we're not going to come to agreement on
3  this.
4  THE COURT: I would hope that you wouldn't guarantee
5  that. I think the best thing for you to do is to talk to some
6  audiologists and say what's the best way to do this so that we
7  don't have instances of a female prisoner down there that can't
8  hear anything. We don't have instances of somebody that's deaf
9  in one ear and just say, well, we average it together and it
10 didn't really matter. Now, how do you do that, one of the ways
11 you do that is to stop using averages. That's all I'm saying.
12 Make it work. If you can't, come back, I'll be happy
13 to talk to you about it.
14 MS. McCANN: All right.
15 THE COURT: Okay?
16 (Proceedings were had which were not requested
17 transcribed.)
18 REPORTER'S CERTIFICATE
19 I certify that the foregoing is a correct transcript
20 from the record of proceedings in the above-entitled matter.
21 Dated at Denver, Colorado, this 19th day of November, 2009.
22
23 s/KaraSpitler_____
   Kara Spitler
24
25