IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-JLK
 (Consolidated for all purposes with Civil Action No. 96-cv-00343)

JESSE (JESUS) MONTEZ, *et. al.*

Plaintiffs,

v.

BILL OWENS, *et al.,*

Defendants.

---

## MOTION TO COMPEL DISCOVERY RESPONSES
---

Plaintiffs, by and through their counsel, Paula Greisen and Jennifer W. Riddle of KING & GREISEN, LLP, and Edward T. Ramey, Lara E. Marks and Blaine D. Myhre of ISAACSON ROSENBAUM, PC, hereby file this Motion to Compel Discovery Responses.  The grounds for this motion are as follows:

### SUMMARY

This case was filed by Plaintiffs against the Colorado Department of Corrections ("DOC" or "Defendants") in 1992 under 42 U.S.C. §1983 for violations under the eighth amendment and under Title II of the Americans with Disabilities Act, and the Rehabilitation Act of 1973 for disability discrimination.

From the inception of this case, a critical issue has been the care and management of inmates with diabetes.  In past compliance hearings, Plaintiffs have obtained and presented evidence that Defendants' protocol and procedures for the treatment and care of diabetes and

diabetes-related conditions were deficient and demonstrated Defendants' deliberate indifference to the serious medical needs of inmates with diabetes. To the same effect, Plaintiffs have also shown that due to these systemic deficiencies, Defendants failed to provide inmates with diabetes reasonable accommodations, in violation of federal law. There is a deep concern that as a result of deficiencies in these practices and procedures and the resulting failure to provide reasonable accommodations, inmates with diabetes continue to be subjected to discrimination and the risk of serious diabetes-related complications, including death, is increased.

At the previous compliance hearing, Plaintiffs' expert on diabetic care issues, Linda Edwards, RN, MHS, CDE, testified extensively on the problems with the standards of care employed by DOC to inmates with diabetes and the lack of appropriate quality improvement reports. During the past year, in an effort to assist DOC with these issues, Ms. Edwards participated in discussions with DOC's clinical staff and other personnel regarding systemic standards of care provided to inmates with diabetes. In so doing, Ms. Edwards reviewed and discussed with these individuals changes to the Quality Management Program ("QMP") instituted by DOC to address the diabetic care issue and Quality Assurance ("QA") reports.

In preparation for the upcoming compliance hearings, Plaintiffs served discovery requests on Defendants asking for information concerning DOC's QMP and its own assessment of the quality of care it has provided to inmates with diabetes. Specifically, Plaintiffs have requested internal QA reports, investigations or analysis, documentation regarding the QMP, peer review forms regarding diabetic care and records of hospitalizations of inmates with diabetes. Plaintiffs also requested information regarding the investigation and resulting reports of a Hepatitis-C contamination which occurred during the dispensing of insulin at the Fremont Correctional

Facility in April of 2009 as well as specific information and investigative reports regarding the recent hospitalization of a diabetic Class member.

It is noted that similar issues have previously been addressed in this case.  In 2001, Plaintiffs sought similar documents regarding inmates who had died and were granted their request by Magistrate Judge Schlatter.  After a hearing on the issue, Magistrate Judge Schlatter granted Plaintiffs' motion to compel such records over the same objections Defendants argue here, and ordered the Defendants to "provide the medical files and any subsequent post investigation records of those class members who have died."  *See* Order dated October 22, 2001, p. 2, [Docket No. 397] attached hereto as Exhibit 1.  Defendants filed an objection to the Order [Docket No. 400] and Plaintiffs countered Defendants' Objection with a Response. [Docket No. 404].  The objection was never ruled upon by the Honorable Judge Nottingham prior to the settlement of the case in 2003.

Despite the fact that these issues have been addressed throughout this case and DOC's previous production of earlier versions of some of the requested documents to Ms. Edwards, Defendants now object to providing any of the requested information on the grounds that it is covered by state statutory privileges and/or that the requested information "is not relevant to this case or likely to lead to the discovery of relevant evidence."

## BACKGROUND

At the previous compliance hearing before this Court in 2006, Plaintiffs' expert on diabetic care issues, Linda Edwards, testified to systemic problems related to the care and treatment of diabetes within the DOC.  Ms. Edwards' expert report, which was submitted to the Court at the compliance hearings in 2008, detailed these systemic problems.  *See* Expert Report,

3

attached hereto as Exhibit 2.  The problems specified in her testimony and report included, but were not limited to:

- Lack of adequate medical charting;
- Lack of routine medical examinations, known as "chronic care" visits required for proper monitoring of diabetic care;
- Lapses in refilling critical medication resulting in inmates with diabetes being denied necessary medication, including insulin;
- Lack of knowledge by clinical services regarding proper treatment of Type I diabetes;
- Lack of blood glucose monitoring;
- Inconsistent standards of diabetic care between DOC facilities.

In her report, Ms. Edwards noted that although the DOC Continuous Quality Improvement ("CQI") reports she reviewed did indicate increasing attention to standards of care, there were deficiencies in indentifying how compliance was measured and that some of the results achieved were "at the cost of significant and pervasive hypoglycemia."  *See* Expert Report, pp. 3-4, Exhibit 2.  After that compliance hearing, DOC enlisted Ms. Edwards' assistance in the development and implementation of quality control processes at DOC.  *See* Email Correspondence from DOC to Linda Edwards dated June 24, 2008 with regard to a meeting to discuss quality assurance reports, attached hereto as Exhibit 3.

In preparation for the upcoming compliance hearing, Ms. Edwards requested that Class counsel obtain certain records to enable her to review the status of DOC's compliance regarding the care and treatment provided to inmates with diabetes and the standards of care employed by DOC to address and accommodate the needs of diabetic inmates.  Pursuant to her request, Plaintiffs served discovery on Defendants for the following information[1]:

---

[1] *See* Defendants' Responses to Plaintiffs' First Interrogatories and Request for Production of Documents, attached hereto as Exhibit 4.

- Documentation related to the implementation of the Quality Management Program instituted by DOC. (Request for Production No. 27).

- Quality improvement reports or analysis prepared or conducted by the Defendant from January 2008 to the present regarding the care and treatment of diabetes. (Request for Production No. 27).

- Internal quality assurance documents, reports, analysis or investigations conducted after the death of any Class member since January 1, 2008. (Request for Production No. 28).

- Records of hospitalizations of any inmate with diabetes since January 1, 2008. (Request for Production No. 29).

- Peer review forms regarding the medical services that have been provided to inmates with disabilities since January 1, 2008. (Request for Production No. 35).

- Quality management investigations or reports that have been conducted on inmates with diabetes since January 1, 2008. (Request for Production No. 36)

Plaintiffs also seek specific information regarding two situations where investigations were conducted and QA reports were or should have been generated. These requests were submitted in Plaintiffs' second set of discovery requests and a supplemental request and are as follows:

- Documentation prepared by DOC regarding the Hepatitis-C contamination that occurred at Fremont in April of 2009 during the routine dispensing of insulin. (Request for Production No. 22).[2]

- Quality investigative reports and any other documentation generated as a result of an investigation by DOC personnel or others into the circumstances of and surrounding the death of a confirmed diabetic inmate at the Limon Correctional Facility, including surveillance video or sound recordings. (Request for Production Nos. 3, 6 and 7).[3]

All of the requested information is relevant to the issues of whether DOC has implemented appropriate standards of care for the treatment of diabetes and diabetic-related conditions and whether inmates with diabetes are being provided appropriate accommodations for their disabilities, as explained below.

---

[2] *See* Defendants' Response to Plaintiffs' Second Set of Interrogatories and Request for Production of Documents, attached hereto as Exhibit 5.

[3] *See* Defendants' Response to Supplement to Plaintiffs' Second Set of Interrogatories and Requests for Production, attached hereto as Exhibit 6.

**Documentation regarding the implementation of the Quality Management Program**

DOC's Quality Management Program ("QMP") for Clinical Services is a system designed to ensure the evaluation and improvement of patient care to inmates.  *See* Administrative Regulation 700-10, attached hereto as Exhibit 7.  The QMP is managed by a multidisciplinary committee, which analyzes quality management data in areas selected for focus to compare it to desired standards and desired outcomes.  Quality management data is compiled through chart review, review of prescribing practices and administration of medication practices, systemic investigation of complaints and grievances, review of corrective action plans, and review of facility CQI program results.

The management of inmates with diabetes has been an area selected for focus by DOC's QMP for the past several years.  As discussed above, Ms. Edwards has been included in discussions with DOC specific to its QMP and the quality assurance reports that are analyzed by the QMP committee.  Plaintiffs seek documentation regarding the implementation of the QMP as it relates to the focus area of diabetes.  (Request for Production No. 27).

**Quality assurance reports and investigations**

Plaintiffs seek internal quality assurance ("QA") reports prepared by DOC in three specific areas: QA reports regarding the care and treatment of inmates with diabetes, (Request for Production No. 27), QA reports relating to the death of any Class member, (Request for Production No. 28), and quality management investigations or reports that have been conducted on inmates with diabetes, (Request for Production No. 36).  Although DOC produced an audit report on diabetic care from June of 2008, no other audit reports have been produced, as requested.  The documents provided to Plaintiffs indicate that a subsequent diabetes audit was conducted in 2009, but a 2009 audit report has not been produced to Plaintiffs.

### *QA Reports and investigations regarding the care and treatment of diabetes*

Plaintiffs requested QA reports and quality management investigations regarding the care and treatment of diabetes.  (Request for Production Nos. 27 and 36).  These reports and investigations are the cornerstone of accountability, the contents of which, according to Ms. Edwards, reveal whether DOC is identifying quality of care standards provided to inmates by DOC Clinical Services, whether DOC is investigating adverse events such as hospitalizations and deaths related to diabetes, whether DOC is monitoring the adequacy of and results of the investigations into adverse events, whether DOC has developed processes to correct problems, and whether DOC has established a system for monitoring the implementation of the processes developed to correct the problems.

### *QA reports regarding the death of any inmate with diabetes*

Plaintiffs also requested internal QA reports relating to the death of any Class member. (Request for Production No. 28).  Results of the investigations conducted in diabetes-related deaths are documented in QA reports and, as discussed above, are crucial to determine whether DOC is investigating these matters and whether DOC has processes in place to implement remedial measures to correct the problems identified during the investigation.

### *QA reports and documentation of specific incidences relating to the care and treatment of diabetes and accommodations provided to diabetic inmates*

Plaintiffs seek information regarding two specific incidences that relate to the standards of care and accommodations provided by DOC to inmates with diabetes.  The first incident regards a possible Hepatitis-C contamination to which inmates with diabetes were exposed at the Fremont Correctional Facility ("FCF") in April 2009 during the routine dispensing of insulin. The possible contamination incident at FCF has been reported as follows:  While dispensing insulin to a diabetic inmate who is also infected with the Hepatitis-C virus, a nurse produced a

7

needle and syringe to the inmate, inserted the needle into his arm before discovering that the syringe did not contain any insulin.  The needle was removed and the nurse inserted the same needle back into the bottle of insulin to fill the syringe, thereby possibly contaminating the entire bottle of insulin with Hepatitis-C.  The same bottle of insulin was then used on the remaining diabetic inmates in the med line.  According to Ms. Edwards, acceptable standards of care would never allow for the insertion of a used needle into an insulin bottle used by other patients.

Class counsel was notified that after the incident described above, several inmates with diabetes were informed for the first time that they were infected with Hepatitis-C. Understandably, there is a grave concern that this incident was the cause of the Hepatitis-C infection in these inmates.

This is exactly the type of incident which would be addressed by the QMP committee to determine, based on the investigative reports generated after the incident, whether DOC adhered to the established DOC standards of care, and what, if any, systems are in place to correct and avoid similar incidences in the future.  As such, Plaintiffs requested documentation from DOC specific to this incident, including investigations, reports, and course of action plans related to this specific incident.  (Request for Production No. 22).

Moreover, the Remedial Plan and subsequent stipulations require DOC to provide training to all staff with regard to Montez related issues, particularly those related to the care and treatment of diabetes.  This incident highlights a compliance issue of whether DOC is providing appropriate and effective training to staff and health care providers, and suggests that it is not.

The second specific incident for which Plaintiffs have requested discovery is with regards to the recent hospitalization of a Class member, Craig Hassler, DOC # 84141, who DOC

identifies as a "confirmed diabetic."[4]  Class counsel was recently informed that while housed at the Limon Correctional Facility ("LCF"), Mr. Hassler experienced medical distress related to his diabetes and desperately sought medical attention for a prolonged period of time before he was assisted by correctional staff.  Class members reported that this individual was taken away by ambulance and believed that the inmate had died.  Accordingly, Plaintiffs served discovery requests to obtain the QA reports and investigative documentation generated as a result of the specific incident involving Mr. Hassler.  (Request for Production Nos. 3, and 7).  Class counsel has received numerous complaints from inmates with diabetes that calls for help during times of medical distress, including using emergency call buttons, are not responded to in a timely or appropriate manner.  In fact, this issue was repeatedly raised during the last compliance period and resulted in a Court order requiring DOC to provide inmates with hypoglycemia cells outfitted with emergency call buttons.  *See* 2008 Stipulation Regarding Status of Compliance, p. 2 [Doc. No. 3326].

Plaintiffs also seek surveillance video and recordings documenting the event involving Mr. Hassler in order to determine whether DOC staff responded to Mr. Hassler's calls for help in an appropriate and timely manner (Request for Production No. 6).

This particular incident involving a confirmed diabetic presents the issues of whether he was provided reasonable accommodations for his diabetes and whether DOC responded appropriately to his needs as a diabetic.

## Peer review forms

Plaintiffs also seek discovery of peer review forms regarding medical services provided to inmates with disabilities.  (Request for Production No. 35).  These reviews contain information regarding the directives given by DOC with respect to inmates with disabilities as

---

[4] Class counsel was informed of this incident by Class members, who, at the time, believed Mr. Hassler had died.

well as whether providers are adhering to DOC's standards for the care and management of inmates with disabilities, including those with diabetes.

### Records of hospitalizations

Additionally, Plaintiffs seek hospitalization records for inmates with diabetes who have been hospitalized for diabetes-related conditions. (Request for Production No. 29).  Ms. Edwards has specifically requested these records as a critical source of information regarding whether appropriate standards of care have been implemented by DOC and whether DOC's failure to provide appropriate accommodations has resulted in the hospitalization of inmates with diabetes due to diabetes-related complications.

### ARGUMENT

In their objections to Plaintiffs' discovery requests, Defendants argue that the contents of the documents Plaintiffs seek are protected by Colorado state statues and therefore are not discoverable.  *See* e.g. Exhibit 4.[5]  Defendants also base their objections on the grounds of relevancy, stating that "This is not a medical malpractice case."  *See* e.g. Exhibit 4.[6]  Defendants' analysis of the law is flawed and the relevancy argument misses the mark entirely.

First, as this Court is aware, discovery in federal courts is determined by the Federal Rules of Civil Procedure, not by state statutes.  See *Everitt v. Brezzel, et al*., 750 F. Supp. 1063, 1065-1066 (D. Colo. 1990) (citations omitted), which was recently reiterated by the Honorable Judge W. Daniels in *Cisneros v. Town of Ctr.,* 2009 U.S. Dist. LEXIS 80806 (D. Colo. 2009) (holding federal common law governs the existence of privilege).

The benchmark for determining whether matters are discoverable is Rule 26 of the Federal Rules of Civil Procedure, which provides in pertinent part, "[p]arties may obtain

---

[5] Defendants cite C.R.S. §25-3-109 and §12-36.5-101 *et. seq.* on the grounds of relevance and not being calculated to lead to the discovery of admissible evidence.
[6] Defendants' Objection to Plaintiffs' First Interrogatories and Request for Production of documents No. 29.

discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action," and the information sought must appear "reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  There is no doubt that the present request for the QA reports and related documents regarding DOC's management of diabetic inmates and those who have died from diabetes-related illness while in the custody of DOC satisfies the broad relevancy standard embodied in Rule 26.  Accordingly, the remaining question is whether the discovery requests cover "privileged" information.  *See Everitt, supra.*

In an analogous case, this Court provided a thorough analysis of the standards to be applied in determining whether or not the internal documents of a government agency are subject to disclosure.  As this Court explained in *Everitt,* "[w]here federal law provides the governing substantive law in a lawsuit, the federal common law of privileges will govern."  *Id*. at 1066 (*citing Kelly v. City of San Jose*, 114 F.R.D. 653, 655 (N.D. Cal. 1987) ("At the outset it is important to emphasize that in a civil rights case brought under federal statutes questions of privileges are resolved by federal law.").

In *Everitt,* this Court utilized the balancing test set out in *Frankenhauser v. Rizzo*, 59 F.R.D. 339 (E.D. Pa. 1973), to determine whether government files were protected under the "official information privilege."[7]  In order to balance "the public interest in the confidentiality of governmental information against the need of a litigant to obtain data, not otherwise available to him, with which to pursue a non-frivolous cause of action," the *Frankenhauser* Court provided ten factors to be considered in deciding whether the files of a government entity are protected by the privilege:

---

[7] *Everitt* explains that there are several different names used for the type of "self critical analysis privilege" privilege Defendants use in this case, including the term "official information privilege."  These terms have the same meaning – the government's privilege to prevent disclosure of information whose disclosure would be contrary to the public interest.  *Everitt, supra* at 1066.

(1)     the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information;

(2)     the impact upon persons who have given information of having their identities disclosed;

(3)     the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure;

(4)     whether the information sought is factual data or evaluative summary;

(5)     whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question;

(6)     whether the [government] investigation has been completed;

(7)     whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation;

(8)     whether the plaintiff's suit is non-frivolous and brought in good faith;

(9)     whether the information sought is available through other discovery or from other sources; and

(10)    the importance of the information sought to the plaintiff's case.

*Everitt*, 750 F. Supp. at 1066-67 (citing *Frankenhauser*, 59 F.R.D. at 344).

In balancing these factors, the court should err on the side of disclosure, keeping in mind that "federal courts narrowly construe all privileges, whether of constitutional, common-law, or statutory origin." *Everitt*, 750 F. Supp at 1066.  See also *Univ. of Pa. v. EEOC,* 493 U.S. 182, 189, 107 L. Ed. 2d 571, 110 S. Ct. 577 (U.S. 1990) (evidentiary privileges to be strictly construed) citing *Trammel v. United States*, 445 U.S. 40, 51, 100 S. Ct. 906, 912, 63 L. Ed. 2d 186 (1980) (evidentiary privilege should not be recognized or applied unless it "promotes sufficiently important interests to outweigh the need for probative evidence . . . ."); *Memorial Hospital for McHenry County v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981) ("because evidentiary privileges operate to exclude relevant evidence and thereby block the judicial fact-finding function, they are not favored and, where recognized, mush be narrowly construed.").

In the present case, the ten factors adopted by this Court in *Everitt* clearly weigh in favor of production:

> The extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information

With respect to the first factor, there is no risk that disclosure will "thwart governmental processes by discouraging citizens from giving the government information," as DOC's Quality Management Program does not rely on any public comment.  Thus, this factor weighs in favor of disclosure.

> The impact upon persons who have given information of having their identities disclosed

As this Court explained in *Everitt*, in light of the potentially severe ramifications of an internal investigation, it would be unsupported speculation to presume that an actor's candor in internal proceedings against a co-worker might be affected by the knowledge that his name could later be disclosed in civil litigation.  *Everitt*, 750 F. Supp. at 1070.  Thus, this factor weighs in favor of disclosure.

> The degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure

As to the third factor, there is no reason to believe that disclosure of the documents requested in this case will negatively impact programmatic improvement in DOC.  Again, it would be sheer speculation to assume that medical practitioners, who take an oath to provide ethical medical care, will not be candid with reviewing the issues concerning an individual's serious medical needs because of the isolated disclosure of these records in this case.

Moreover, the third factor is predicated upon the belief that self-evaluation and consequent program improvement is a positive activity that society wants to encourage because it brings about improved government program or activity.  Since the original compliance date in

2005, Plaintiffs have shown and Defendants have stipulated to non-compliance with the Remedial Plan – including the areas relating to diabetic care and accommodations. Plaintiffs argue that failure to provide the proper treatment and care for diabetes and diabetes-related conditions and the failure to provide appropriate accommodations is customary at DOC. Plaintiffs have argued that there has not been a showing of programmatic improvement with regard to treating and accommodating inmates with diabetes in the past few years. QA reports and investigative documents will demonstrate whether Defendants have adequately remedied systemic deficiencies in the management of inmate with diabetes. Thus a potential chilling effect is not substantial enough to weigh against the disclosure.

<u>Whether the information sought is factual data or evaluative summary</u>

With regard to the fourth factor, Plaintiffs believe that the information sought falls within both categories.

<u>Whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question</u>

To the best of undersigned counsel's knowledge, none of the Class members are potential defendants in any criminal proceedings relating to the incidents under investigation.

<u>Whether the [government] investigation has been completed</u>

As to the sixth factor, it is Plaintiffs' understanding that the investigations and reports in question have been completed and Defendants have not indicated to the contrary. This factor weighs in favor of production.

<u>Whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation</u>

The seventh factor also militates in favor of disclosure. Plaintiffs have not been informed that there are any disciplinary or possible disciplinary actions arising out of the

investigations.  Of course, at this time this information is solely within possession of Defendants.  As previously stated, Defendants do not voluntarily disclose the deaths of Class members – Plaintiffs' counsel learns of the deaths through independent sources so have limited information regarding DOC's actions as a result of the investigations.

> Whether the plaintiff's suit is non-frivolous and brought in good faith

As to the eighth factor, this case was originally filed in 1992, withstood numerous dispositive motions, and was settled in 2003.  There is no doubt that this is a non-frivolous action brought in good faith.  Plaintiffs' position on Defendants' failure to comply with the Remedial Plan is stated in good faith and Plaintiffs' discovery requests with respect to the compliance component of this case are in furtherance of that position.

> Whether the information sought is available through other discovery or from other sources

With respect to the ninth factor, the Defendants are the exclusive source of the information sought.

> The importance of the information sought to the plaintiff's case

Finally, information regarding DOC's standards and practices with respect to the care and management of inmates with diabetes and diabetes-related conditions, as well as information regarding the deaths of Class members while in the care of the Defendants is at the heart of the §1983 and ADA issues addressed in this case.  Indeed, the information sought may conclusively show Defendants' failure to provide reasonable accommodations and care to diabetic Class members, the dismissive attitude of supervisors and health care providers towards the ADA with respect to diabetic care, and DOC's failure to provide appropriate education and training to staff and heath care providers.

Moreover, as discussed above, this litigation addresses critical civil rights issues that may impact thousands of diabetic inmates for decades to come.  Even assuming arguendo that there may be some value to confidentiality in the Defendants' internal investigations, it is surely outweighed by the importance of the information sought in ascertaining whether the Plaintiffs' civil rights were violated in this case, and in ameliorating such discrimination in the future.  *See University of Pennsylvania v. EEOC*, 493 U.S. 182, 193, 107 L. Ed. 2d 571, 110 S. Ct. 577 (1990) (acknowledging importance of confidentiality in peer review process, but finding that ferreting out discrimination is of greater importance).

In sum, the ten factors set forth in *Frankenhauser*, 59 F.R.D. at 344, and adopted by this Court in *Everitt*, clearly militate in favor of the production of the QA reports and quality management investigations sought by the Plaintiffs in this case.

Second, Defendants' objections on the grounds of relevancy are misplaced.  This case is about systemic problems resulting in violations of the Eighth Amendment and the ADA. Plaintiffs have not sought the information described above in an effort to evaluate individual medical malpractice issues.  Rather, the information Plaintiffs seek demonstrates whether DOC has taken appropriate steps to remedy systemic problems by evaluating issues on a case by case basis.  In a class action lawsuit involving over 4,000 Class members, the review of QA reports and investigations generated in response to a specific incident or individual will reflect how DOC systemically addresses problems.

For example, in Plaintiffs' discovery requests directed to the recent medical emergency involving Mr. Hassler, Plaintiffs sought information including investigative reports, witness statements, and surveillance video and recordings.  Plaintiffs requested this information to evaluate whether DOC had in place the proper protocol and procedures to

appropriately respond to this situation and, based on that information, whether DOC acted in accordance with those procedures.

In their responses to these requests, Defendants clarified that Mr. Hassler did not die, however, admit that Mr. Hassler was hospitalized. Defendants argue that this incident was unrelated to any ADA issue.

Contrary to Defendants' argument, this incident, much like other medical emergencies involving inmates with diabetes, is undeniably related to the ADA and specifically this case. Plaintiffs have repeatedly expressed concern over DOC's failure to appropriately respond to the medical needs of inmates with diabetes and DOC's failure to provide inmates with diabetes appropriate accommodations, which include, but are not limited to: emergency call buttons in cells and proper medication.

Defendants also state that "it does not appear that there are quality investigative reports" regarding this particular incident and in response to Plaintiffs' request for surveillance media, that "it is Defendants' understanding that there are no recordings responsive to this request." These responses are concerning to Plaintiffs because they are either demonstrative of DOC's continued failure to generate QA reports into *adverse events* such as the one presented by Mr. Hassler, or, in the alternative, demonstrative of Defendants' failure to fulfill their duty of making a reasonable inquiry into the existence and availability of the requested documents as required by Rule 26(g)(1) of the Federal Rules of Civil Procedure.

Defendants' relevancy argument is also ineffective as stated in response to Plaintiffs' request for information regarding the Hepatitis-C contamination at the Fremont Correctional Facility. Although Defendants produced a "Performance Documentation Form" describing the incident and the nurse's apologetic statement, Defendants object to producing the specific

documentation requested by Plaintiffs and state that the only other documents that exist regarding this incident are lab reports on blood draws and meeting notes from the Infectious Disease Committee.[8]  Counsel for the Class is aware, however, that an investigation was, in fact, conducted, as it was referenced by the nurse in her statement, *see* Statement, attached hereto as Exhibit 8, as well as having been notified by Class members that they were contacted during the course of the investigation.  This situation is related to ADA issues.  Plaintiffs' requests are premised upon whether, in this instance, DOC adhered to the established DOC standards of care, whether it provided a diabetic inmate with reasonable accommodations, and what, if any, systems are in place to correct and avoid similar incidences in the future.

Finally, with respect to the requested peer review forms, this Court rejected claims of a self-evaluation or peer review privilege and required the production of governmental files containing internal reviews.  *Atteberry v. Longmont United Hosp.,* 221 F.R.D. 664, 647 (D. Colo. 2004), ("Neither the United States Supreme Court nor the Tenth Circuit Court of Appeals has recognized a medical peer review or medical risk management privilege under federal common law.) Citing *Sonnino v. University of Kansas Hospital Authority*, 220 F.R.D. 633, 644 (D. Kan. 2004).  There are a number of jurisdictions in which this has been the trend.  *See e.g. Henderson v. Medical Ctr. Enter.*, 2006 U.S. Dist. LEXIS 57898 (M.D. Ala. 2006) (Eleventh Circuit declines to apply state peer review privileges in a federal question case.); *Rdzanek v. Hosp. Serv. Dist. #3*, 2003 U.S. Dist. LEXIS 19336 (E.D. La. 2003) (no peer review privilege under federal common law or statutory law.); *Marshall v. Spectrum Medical Group*, 198 F.R.D. 1 (D. Me. 2000) (rejecting argument that there is a "federal peer review privilege" and compelling disclosure of such documents); *Sabatier v. Barnes*, 2000 U.S. Dist. LEXIS 14891 (E.D. La.

---

[8] The Infectious Disease Committee is a sub-committee in DOC's Quality Management Program.

2000) (no peer review exists under federal common or statutory law in spite of state confidentiality statute.); *Syposs v. United States*, 63 F. Supp. 2d 301 (W.D.N.Y. 1999)("Medical peer reviews do not enjoy the historical or statutory support upon which other privileges have been recognized in federal law, and the Hospitals have failed to provide any reason to believe some physicians would not provide candid appraisals of their peers absent the asserted privilege."); *Burrows v. Redbud Community Hosp. Dist.*, 187 F.R.D. 606 (N.D. Cal. 1998) (finding that no federal peer review privilege applies in EMTALA action); (*Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 560-61 (S.D. N.Y. 1996) (finding no federal peer review privilege exists.); *LeMasters v. Christ Hosp.*, 791 F. Supp. 188 (S.D. Ohio 1991) (compelling production of peer review documents and, notwithstanding Ohio statutory privilege); *Memorial Hospital for McHenry County v. Shadur*, 664 F.2d 1058 (7th Cir. 1981) (compelling production of hospital peer review records, despite state statutory privilege).

## CONCLUSION

Plaintiffs respectfully request that this Court order Defendants to provide complete responses to the following discovery requests:

1) Request for Production Nos. 27, 28, 29, 35, and 36 as propounded in Plaintiff's Interrogatories and Request for Production of Documents to the Office of the ADA Inmate Coordinator.

2) Request for Production No. 22 as propounded in Plaintiffs' Second Set of Interrogatories and Requests for Production.

3) Request for Production Nos. 3, 6, 7 as propounded in Supplement to Plaintiffs' Second Set of Interrogatories and Requests for Production.

**CERTIFICATE OF COMPLIANCE WITH D.C.COLO.LCIVR 7.1(A)**

Undersigned counsel certifies that she "has in good faith conferred" with counsel for Defendants "in an effort to secure the information or material without court action." Specifically, Paula Greisen has communicated with Elizabeth McCann, counsel for Defendants, on several occasions, both by telephone as well as by electronic mail to discuss Defendants' objections to the above listed discovery requests.

DATED: December 1, 2009

Respectfully submitted,

KING & GREISEN, LLP

/s/ Paula Greisen

Paula Greisen
Jennifer W. Riddle
1670 York Street
Denver, CO 80206
(303) 298-9878
(303) 298-9879 (fax)
greisen@kinggreisen.com
riddle@kinggreisen.com

Edward T. Ramey
Lara E. Marks
Blaine D. Myhre
Isaacson Rosenbaum, PC
1001 17th St., Suite 1800
Denver, Co. 80202

Attorneys for Plaintiff Class

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 1st day of December, 2009, I electronically filed the foregoing MOTION TO COMPEL DISCOVERY RESPONSES with the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Elizabeth H. McCann
Attorney for Defendants
Colorado Attorney General's Office
1525 Sherman St.
Denver, Co. 80203
303-866-3261
Fax: 303-866-5443
beth.mccann@state.co.us

_/s_ /Laurie Mool