IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-870-JLK

JESSE MONTEZ et al.,

Plaintiffs,

v.

BILL RITTER, et al.,

Defendants.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY RESPONSES**

Defendants, through the Colorado Attorney General, respectfully submit their Response to Plaintiff's Motion to Compel Discovery Responses [Doc. # 4207].

**PRELIMINARY STATEMENT**

Plaintiffs brought this class action seeking damages and declaratory and injunctive relief against the Governor, the Colorado Department of Corrections ("CDOC"), the Executive Director of that department, and a long list of prison officials, all based on § 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the ADA, 42 U.S.C. § § 12131 - 34.  All individuals were sued in their individual as well as official capacities to obtain damages from the Defendants under 42 U.S.C. § 1983.  Plaintiffs contended that Defendants violated the above statutes which prohibit discrimination based on one's disabilities.

After extensive briefing, the Court dismissed Plaintiffs' Rehabilitation Act, ADA and § 1983 claims against the individual Defendants in their individual capacities.  The Court also dismissed Plaintiffs' § 1983 claims against the

1

Defendants in their official capacities.[1]  Finally, the individual Defendants in their individual capacities were entitled to qualified immunity with respect to the § 1983 claims based on the Rehabilitation Act and the ADA.  These claims were also dismissed.  The Order granting the Defendants Motion to Dismiss in part provides:

> Defendants' motion is GRANTED with respect to plaintiffs' Rehabilitation Act and Disability Act claims against the individual defendants in their individual capacities. Those claims are hereby dismissed.
>
> Defendants' motion is GRANTED with respect to plaintiffs' section 1983 claims against the individual defendants in their official capacities, insofar as plaintiffs seek compensatory monetary damages and prospective injunctive relief which would have an impact on the state treasury. Such claims are hereby dismissed.
>
> The individual defendants in their individual capacities are entitled to qualified immunity with respect to plaintiffs' section 1983 claims insofar as they are based on the Rehabilitation Act and the Disability Act.
>
> All section 1983 claims against the individual defendants in their individual capacities under the Rehabilitation Act and the Disability Act are hereby dismissed.

*Montez v. Romer,* 32 F.Supp.2d 1235, 1243 (D. Colo. 1999). The Court did not dismiss the §1983 claim based upon the Eighth Amendment against the individual defendants in their individual capacities.[2]  The parties settled the remaining claims by entering into the Remedial Plan on August 27, 2003.

---

[1] The § 1983 claim was not asserted, nor could it have been against the state or the CDOC. Accordingly, the § 1983 claim was only asserted against the individuals named in the "Second Amended Complaint – Class Action."

[2] The Remedial Plan is a document designed to provide for injunctive type relief for the entire CDOC prison system.  The only remaining Eighth Amendment claim was asserted against individual capacity defendants.  Thus, there is essentially no Eighth Amendment claim remaining in this case as it relates to the CDOC's compliance with the Remedial Plan.  *See Smith v. Plati,* 56 F.Supp.2d 1195, 1203 (D.Colo.1999) (dismissing claims against state official in his individual capacity because the relief plaintiff requested could only be obtained against the defendant in his official capacity).

2

**BASIS OF PLAINTIFFS' MOTION**

Plaintiffs take issue with the Defendants' assertion that their requests for information concerning the quality of medical care provided to inmates with diabetes is not reasonably calculated to lead to the discovery of admissible evidence and is protected from discovery.  Specifically, Plaintiffs requested internal quality assurance reports, investigations or analysis, documentation regarding the CDOC medical department's Quality Management Program, peer review forms regarding diabetic care and records of hospitalizations of inmates with diabetes ("Quality Assurance Documents").  Plaintiffs also requested information regarding the investigation and resulting reports of a Hepatitis-C contamination which occurred during the dispensing of insulin at the Fremont Correctional Facility in April of 2009, as well as specific information and investigative reports regarding the recent hospitalization of a diabetic Class member.

**RESPONSE TO SUMMARY AND BACKGROUND**

Contrary to Plaintiffs' assertion in their Motion, the CDOC has turned over all audits of the diabetic program. In the original discovery responses, the CDOC provided an audit performed in June 2008 as well as the Clinical Standards regarding diabetic treatment in response to Request No. 27.  In response to this same Request, Defendants provided a copy of an audit conducted in March 2009 as well as a summary of diabetic issues 1/1/08 – 7/14/09.  These documents are extensive and contain detailed analysis of diabetic issues. These were provided as an overview of diabetic care at the CDOC and to provide Plaintiffs with all

information they need to address ADA issues related to diabetes, rather than medical treatment issues of individual diabetics which are not a part of this case.

Also contrary to Plaintiffs' assertions, the CDOC has provided considerable information regarding the incident at Fremont Correctional Facility in which a nurse made a mistake in using a vial of insulin that was possibly exposed to Hepatitis C in administering insulin to other inmates. The nurse was disciplined as an internal disciplinary matter. The CDOC provided Plaintiffs with a copy of the Performance Documentation Form about this incident, a memorandum of May 8, 2009 regarding follow up about this, a copy of CDOC Clinical Standards and Procedures regarding medication administration, a copy of Clinical Standards and Procedures regarding infectious disease management, a copy of Clinical standards for quality occurrence reporting, and a three page letter from the nurse expressing her regret for her negligence.

This incident was also reported to the Colorado Department of Health by the CDOC as required by law.  The CDOC engaged in laboratory testing of all 19 inmates involved.  Plaintiffs state that the inmates were told they had hepatitis C. That is totally incorrect. None of those who did not have Hepatitis C before the testing have tested positive for Hepatitis C.  Testing will occur again in 6 months. These lab reports are confidential pursuant to C.R.S. § 25-1-122(4) and Health Department Regulation 6 CCR 1009-1. The nurse involved has been counseled. This is not an area covered by this lawsuit.  This is a medical negligence incident not an ADA violation.

4

With respect to the incident at Limon when an inmate had a stroke, Defendants provided Plaintiffs copies of the CDOC incident reports regarding this occurrence. This was a medical incident that was handled appropriately. The inmate was rushed to the hospital and cared for at the hospital and recovered. Again, this incident was unrelated to the ADA but was simply a medical emergency in which the inmate was treated medically. Even though there is no relevance of this incident to this case, the CDOC provided Plaintiffs with investigative reports concerning the situation.

Defendants acknowledge that the CDOC employees worked with the Plaintiffs' expert, Linda Edwards, R.N., to develop training on diabetic care and to review the audits of diabetic care in general at the CDOC (these audits have been provided to the Plaintiffs' counsel). This is no way means that CDOC agrees that this case involves questions of clinical/medical treatment provided to CDOC inmates. Ms. Edwards assisted with reviewing and developing overall training for CDOC staff in understanding the symptoms of diabetes and proper steps for staff to take in the event of a diabetic episode. She was not involved in medical training regarding the clinical care of diabetics. She also met with the Quality Management staff who explained the overall system of quality management review for diabetic care. This in no way indicates medical treatment decisions made by medical staff regarding treatment of individual inmates are relevant to this case.

# ARGUMENT

I.  **The Requested Documents Are Not Reasonably Calculated to Lead to the Discovery of Admissible Evidence.**

   A. **This case does not involve a class of individuals asserting Eighth Amendment Claims.**

Following settlement, neither the parties nor the Court intended for Eighth Amendment claims to remain. Indeed, nowhere in the Remedial Plan is the Eighth Amendment or 42 U.S.C. §1983 even mentioned. The Remedial Plan addresses specific issues to be resolved in order the "provide inmates with disabilities, with or without reasonable accommodations, access to its programs and services consistent with legitimate penological interests….All facilities designed to house inmates with disabilities will provide comparable programs, services and benefits available throughout comparable DOC facilities to ensure that inmates with disabilities are not discriminated against because of their disability." (**Exhibit A**, Remedial Plan at Section I). This policy statement, contained in the very first section of the Remedial Plan, reflects that this case is an ADA - Rehabilitation Act case, not a case relating to the Eighth Amendment.

An agreement to settle a federal lawsuit is a contract, governed by the principles of contract law. *See Jeff D. v. Andrus,* 899 F.2d 753, 759 (9th Cir. 1989). The goal of the Remedial Plan was to bring CDOC into compliance with the requirements of the ADA and Rehabilitation Act, and to allow class members to file individual damages claims for alleged disability discrimination. While a narrow § 1983 claim may have remained prior to settlement, the Remedial Plan represents a full integration and resolution of the parties' dispute, and extinguishes the

6

complaint, the answer, and other pleadings predating it. The Remedial Plan did not address quality of medical care issues and did not preserve any Eighth Amendment claims. Simply put, the claims and defenses asserted in the pleadings are exchanged for the legal rights detailed in the agreement. *Jeff D.*, 899 F.2d at 759. Plaintiffs forfeited any Eighth Amendment claim by settling and not preserving that claim in the Remedial Plan.

This Court has repeatedly indicated that this case is no longer an Eighth Amendment case. During the October 27, 2004 status conference, the Court clarified that it never intended to certify the class as to an Eighth Amendment claim.

> Judge Nottingham: . . . **I don't think there are any Eighth Amendment claims in here**. There are claims under the – **this has been – the class was a class of disabled people; it was not a class of people that had Eighth Amendment claims**. . . . **But I don't think this is an Eighth Amendment case, the way you've structured it**. Now, you say at the time it was certified, it was an Eighth Amendment case. And I agree with that; it was. There – you know, very little had been decided substantively when the case was certified. **But the way the settlement was structured, it – you know, every prisoner has an Eighth Amendment case. I've got cases independent of this one where they're presenting Eighth Amendment claims. If they could all come into the class, we'd have a great mess here.**

(**Exhibit B**, Transcript of 10/27/04 Status Conference, p. 41, line 13 – p. 42, line 6) (emphasis added). During the same hearing, Judge Nottingham noted that

> "when this class was certified, the representatives were disabled persons. And I think [class counsel] purported to represent a class of disabled persons . . . You did not purport to represent all persons in the penal system who had an Eighth Amendment claim."

(**Exhibit B**, Transcript, p. 46, lines 4-11). This case is only a class action as to the ADA and Rehabilitation Act claims, not the Eighth Amendment claim. As further

7

noted by this Court, "[t]he centerpiece of this case — certainly since the class was certified on January 15, 1996, and the Second Amended Complaint was filed on January 25, 1996 — has been an allegation that the Colorado prison system systemically discriminated against prisoners because of their disability. The class certified consisted of 'persons with disabilities who are, have been or will be confined at the Colorado Department of Corrections . . . and who have been, are or will be **discriminated against solely on the basis of their disabilities** in receiving the rights and privileges accorded other inmates.'" (Emphasis in original) (**Exhibit C**, Doc. # 2216 – August 22, 2006 Court Order at pp. 5-6 *quoting* Plaintiff's Second Amended Complaint].

> The case at all times remained essentially a claim of disability discrimination, not a claim that Defendants were deliberately indifferent to the varying medical needs of class members. The gravamen of the Remedial Plan, consistent with the Second Amended Complaint, is resolution of the class claims of disability discrimination based on the ADA and the Rehabilitation Act. The bulk of the Remedial Plan — twenty nine out of thirty one pages — prospectively details the changes which Defendants promised to make to resolve the claims for injunctive and declaratory relief.

[Doc. # 2216, Court's Order at p. 6]. This was again confirmed in this Court's November 23, 2004, Order dealing with individual damage claims which states: "Individual Eighth Amendment medical malpractice claims are not contemplated by the Remedial Plan." (**Exhibit D**, November 23, 2004 Order at ¶ 5). Accordingly, because there is no longer an Eighth Amendment component to this case, Plaintiffs' requests for the Quality Assurance Documents and any related medical documents are not relevant nor reasonably calculated to lead to the discovery of admissible evidence.

8

### B. The Tenth Circuit has concluded that Eighth Amendment is inapplicable to disability discrimination cases.

The Tenth Circuit has made clear that allegations of improper medical care cannot meet the requirements of an ADA or Rehabilitation Act claim. In *Fitzgerald v. Corrections Corporation of America,* 403 F.3d 1134 (10th Cir. 2005), the Tenth Circuit explained that Fitzgerald would not have been 'otherwise qualified' for such treatment in the absence of his alleged disability—his alleged disability in this case was the reason why Fitzgerald was seeking medical treatment. These are the sort of purely medical decisions that we have held do not ordinarily fall within the scope of the ADA or Rehab Act. *Id.* at 1144. In *Johnson*, 971 F.2d at 1493-94, the Tenth Circuit concluded that medical malpractice claims can rarely, if ever, meet the requirements of the ADA and Rehabilitation Act. Put simply, "The ADA does not create a remedy for medical malpractice." *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996). Even apart from the prison setting it would be extremely odd to suppose that disabled persons, whose disability is treated negligently, have a federal malpractice claim by virtue of the ADA or Rehabilitation Act, whereas a sick or injured but not disabled person must be content with the remedy that the state law of medical malpractice provides.

The goal of the ADA, Rehabilitation Act and the Remedial Plan is to ensure that disabled individuals receive the same access to jobs, programs, services, and benefits as non-disabled individuals. Regarding prison medical treatment, an ADA or Rehabilitation Act violation only occurs if healthy, non-disabled inmates received access to medical care that disabled inmates did not. "Without a showing that the non-handicapped received the treatment denied to the 'otherwise qualified'

9

handicap, the [claimant] cannot assert that a violation of the [Rehabilitation Act] has occurred." *Johnson*, 971 F.2d at 1494. If a non-disabled inmate would not be entitled to a specific medical treatment or device, then the issue is beyond the scope of the ADA or Rehabilitation Act. Accordingly, the key issue is **access** to medical care, not the quality or type of case provided.

This Court also concluded that *Fitzgerald* is fully consistent with the way it has interpreted and applied the Remedial Plan, even if Fitzgerald had not been decided. "Indeed, the decision [*Fitzgerald*] aptly underscored the fallacy in Plaintiffs' apparent position that, once a claimant proves himself disabled, he is entitled under the Remedial Plan to damages for every condition or injury, even if the damage or injury has nothing whatsoever to do with his disability…." (**Exhibit C**, Doc. # 2216, August Order 22, 2006 Order at p. 9). As noted in *Fitzgerald*:

> Under either the ADA or the Rehabilitation Act, Fitzgerald is obligated to show that he was "otherwise qualified" for the benefits he sought and that he was denied those "solely by reason of disability." [Citation omitted.] Further, we have held that "the term *otherwise qualified* cannot ordinarily be applied 'in the comparatively fluid context of medical treatment decisions without distorting its plain meaning.' " *Johnson [by Johnson v. Thompson]*, 971 F.2d 1487, . . . 149394 (10th Cir. 1992). As to whether treatment was denied "solely" by reason of disability, the Second Circuit has stated: "Where the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say ... that a particular decision was 'discriminatory.'" *United States v. University Hospital,* 729 F.2d 144, 157 (2nd Cir.1984) (Rehabilitation Act).
> . . . .
> Fitzgerald would not have been "otherwise qualified" for such treatment in the absence of his alleged disability — his alleged disability in this case was the reason why Fitzgerald was seeking medical treatment. These are the sort of purely medical decisions that we have held do not ordinarily fall within the scope of the ADA or the Rehabilitation Act.

10

*Fitzgerald,* 403 F3d at 1144.

Plaintiffs are seeking to unnecessarily and exponentially expand these proceedings to encompass a class of inmates alleging denial of adequate medical care. The Requests are not reasonably calculated to lead to discovery of admissible evidence. Plaintiffs' assertions to the contrary are erroneous. Long before the Parties executed the Remedial Plan, and while an Eighth Amendment claim was still contemplated as part of this case, on October 18, 2001, Magistrate Schlatter held a hearing relating to the discovery of the requested documents. Magistrate Schlatter entered an Order associated with those motions on October 22, 2001. Defendants objected to the Order. The objection was never ruled upon by the Honorable Judge Nottingham prior to the settlement of the case in 2003. At that time, prior to the settlement of this case and execution of the Remedial Plain, the requested documents were arguably reasonably calculated to lead to the discovery of admissible evidence. However, as delineated above, as a result of the settlement and execution of the Remedial Plan, there is no argument whatsoever that the requested documents are pertinent to these remedial Plan compliance proceedings.

**II.     The Requested Documents are Protected from Discovery.**

**A. Disclosure of the documents is contrary to federal law.**

The Federal Government has enacted confidentiality provisions associated with discovery of quality assurance documents relating to skilled nursing facilities. 42 U.S.C. §§ 1395i-3(b)(1)(B) and 1396r(b)(1)(B).

> A skilled nursing facility must maintain a quality assessment and assurance committee, consisting of the director of nursing

11

> services, a physician designated by the facility, and at least 3 other members of the facility's staff, which (i) meets at least quarterly to identify issues with respect to which quality assessment and assurance activities are necessary and (ii) develops and implements appropriate plans of action to correct identified quality deficiencies. **A State or the Secretary may not require disclosure of the records of such committee except insofar as such disclosure is related to the compliance of such committee with the requirements of this subparagraph.**

(Emphasis added.)  In addition, peer review documents associated with medical services provided under the Medicare program are similarly protected.

> No patient record in the possession of an organization having a contract with the Secretary under this part shall be subject to subpoena or discovery proceedings in a civil action. No document or other information produced by such an organization in connection with its deliberations in making determinations under section 1320c-3(a)(1)(B) or 1320c-5(a)(2) of this title shall be subject to subpoena or discovery in any administrative or civil proceeding; except that such an organization shall provide, upon request of a practitioner or other person adversely affected by such a determination, a summary of the organization's findings and conclusions in making the determination.

42 U.S.C.A. § 1320c-9; *see also Armstrong v. Dwyer,* 155 F.3d 211 (3rd Cir. 1998) (Patient who brought malpractice action could not compel production of documents related to investigation into surgeon's treatment of patient by peer review organization that had contract with Medicare program).

Similar to nursing homes and Medicare programs, in order for the CDOC to engage in self-criticism in a way that will actually improve the quality of health care, it must be able to candidly conduct critical review of inmate care without the fear that such self-critical comments will be disclosed during litigation.  Experts in quality of care "almost universally agree that an important predicate to quality improvement is for providers themselves to identify medical errors and other quality problems

12

through data analysis and the generation of self-critical quality of care information. Once deficient care is identified and analyzed, systemic solutions can be developed to prevent recurrence of such quality problems in the future." Jason M. Healy, William M. Altman & Thomas C. Fox, *Confidentiality of Health Care Provider Quality of Care Information*, 40 Brandeis L. J. 595, 596 (Spring 2002). These experts further caution that in order for the quality of care to actually improve, health care providers must be able to identify problems and implement solutions without fear of litigation. *Id.* at 596. Requiring disclosure of the Quality Assurance Records will, without a doubt, make the conversation less open and forthright, thus obliterating the goal of quality assurance programs to investigate adverse incidents, devise ways to prevent future errors, and create policies and systems to improve the quality care delivered to inmates. Disclosure of these documents will defeat their very purpose, to raise the quality of care in the CDOC prisons.

**B. Disclosure of the documents is contrary to state law.**

The CDOC maintains a quality management program for clinical services. This program evaluates and improves patient care provided in the CDOC facilities. (See **Exhibit E**, CDOC Administrative Regulation 700-10). CDOC's clinical services are licensed with the Colorado Department of Health and its Quality Management Program is on file with the Colorado Department of Health.

Colo. Rev. Stat. § 25-3-109 provides as follows:

> **Quality management functions--confidentiality and immunity**
>
> (1) The general assembly hereby finds and declares that the implementation of **quality management functions to evaluate and improve patient and resident care is essential to the operation of health care facilities** licensed or certified by the

13

department of public health and environment pursuant to section 25-1-107(1)(l).  For this purpose, **it is necessary that the collection of information and data by such licensed or certified health care facilities be reasonably unfettered so a complete and thorough evaluation and improvement of the quality of patient and resident care can be accomplished.  To this end, quality management information relating to the evaluation or improvement of the quality of health care services shall be confidential,** subject to the provisions of subsection (4) of this section, and persons performing such functions shall be granted qualified immunity.  It is the intent of the general assembly that nothing in this section revise, amend, or alter article 36 or part 1 of article 36.5 of title 12, C.R.S.

.   .   .   .   .   .

(3) Except as otherwise provided in this section, **any records, reports, or other information of a licensed or certified health care facility that are part of a quality management program designed to identify, evaluate, and reduce the risk of patient or resident injury associated with care or to improve the quality of patient care shall be confidential information**; except that such information shall be subject to the provisions of subsection (4) of this section.

(4) **The records, reports, and other information described in subsection (3) of this section shall not be subject to subpoena or discoverable or admissible as evidence in any civil or administrative proceeding.**  No person who participates in the reporting, collection, evaluation, or use of such quality management information with regard to a specific circumstance shall testify thereon in any civil or administrative proceeding.  However, this subsection (4) shall not apply to:

.   .   .   .   .

Colo. Rev. Stat. § 25-3-109.

The information at issue is precisely the type of information to be protected by the above referenced peer review statute and should not be disclosed in discovery.  See *Nalder v. West Park Hosp.* 254 F.3d 1168, 1180 (10th Cir. 2001) (Tenth Circuit decision upholding district court decision denying motion to compel peer review documents in medical malpractice case under Wyoming peer review statute).  If medical malpractice plaintiffs are permitted access to institutionally self-

critical analysis, then the self-critical analysis and attendant improvements of medical services will cease to exist. Moreover, prisoner civil rights cases based upon Eighth Amendment asserting that doctors failed to provide adequate medical care are the federal equivalent of state medical malpractice suits (with the caveat that liability in such suits depends on a showing of intentional or reckless disregard of the prisoner's rights). These suits are the very object of the state statutes which create the peer review privilege.  In Colorado, like virtually every other state, the documents of a peer review committee are protected from civil discovery.  As such, it is appropriate in this context to recognize and apply a peer review privilege which prevents discovery of peer review materials in §1983 cases.  Peer review of medical performance is important in any institution and has added importance to public health care of a prison population.  *Hadix v. Caruso*, 2006 WL 2925270, 2 -3 (W.D.Mich. 2006) (Applying Michigan peer review confidentiality statute to an inmate §1983 claim).

In addition, where as here, Congress has recognized a privilege for quality assurance and peer review documents, federal courts should consider state privilege law in determining whether the state privilege should be recognized.  "A strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy."  *Mem'l Hosp. v. Shadur*, 664 F.2d 1058, 1061, *citing, United States v. King*, 73 F.R.D. 103, 105 (E.D.N.Y. 1976) and 3 *Weinstein's Federal Evidence* § 501.03[b] (1999).

"The initial determination is whether application of the state law would be inconsistent with federal law." *United States v. QHG of Indiana, Inc.*, 1998 U.S. Dist. LEXIS 23512 *7 (N.D. Ind. 1998), *quoting, Pagano v. Oroville Hosp.*, 145 F.R.D. 683, 688 (E.D. Cal. 1993). The policy decisions made by the states bear on the question of whether "federal courts should recognize a new privilege or amend the coverage of an existing one." *Jaffee v. Redmond*, 518 U.S. 1, 12-13 (1996).  In considering whether to afford comity to a state privilege, a court needs to balance "the need for truth against the importance of the relationship or policy to be furthered by the privilege, and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case." *Mem'l Hosp. v. Shadur*, 664 F.2d at 1061-1062.  As set forth above, application of the privilege is consistent with federal law relating to discoverability of quality assurance documents associated with nursing homes and Medicare provided health care.  In addition, because there is no longer an Eighth Amendment claim relating to this case the "need for the truth" is nonexistent because the compliance with the Remedial Plan encompasses disabled inmate **access** to appropriate medical care, not quality of the care provided.

### C. Disclosure is contrary to the Self-Critical Analysis Privilege.

It is indisputable that both the state and federal legislatures have enacted a self-critical review privilege to encourage meaningful peer review by assuring the confidentiality of all proceedings conducted by a medical review committee. The purposes of the statutes are to encourage doctors to evaluate their peers without fear of disclosure.  That purpose would be destroyed by public release of these

16

records. Indeed, the danger of inhibiting honest professional peer review exists by the mere potential for disclosure.

> Any possibility that proceedings or the results thereof might be discoverable at a future date in some unrelated patient suit presents a risk that a doctor will be reluctant to provide the meaningful peer review contemplated by the statute. The overriding importance of these review committees to the medical profession and the public requires that doctors have unfettered freedom to evaluate their peers in an atmosphere of complete confidentiality. No chilling effect can be tolerated if the committees are to function effectively.

*Morse v. Gerity*, 520 F. Supp. 470, 472 (D. Conn. 1981). Accordingly, federal courts throughout the country recognize the self critical analysis privilege. *See e.g. Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C.1970), *aff'd without opin.*, 479 F.2d 920 (D.C.Cir.1973) (seminal federal case recognizing the self-critical or self-evaluative privilege in the context of a hospital peer review conference on the care and treatment of patients); *Balk v. Dunlap*, 163 F.R.D. 360, 363) (D.Kan.1995) (finding minutes of OB/GYN meeting called to discuss the quality of patient care protected under Kansas medical peer review statutes); *Brem v. DeCarlo, Lyon, Hearn & Pazourek, P.A.*, 162 F.R.D. 94, 98-99 (D.Md.1995) (magistrate, in federal question case, recognizing application of Maryland state statutory medical peer review privilege and noting privilege in other jurisdictions); *Spinks v. Children's Hospital National Medical Center,* 124 F.R.D. 9, 12 (D.D.C.1989) (denying motion to compel production of morbidity and mortality conference and finding such materials subject to District of Columbia's statutory privilege); *Utterback v. Yoon*, 121 F.R.D. 297 (W.D.Ky.1987) (finding Board of Investigation memorandum and Veterans Administration quality assurance records confidential and free from discovery in Federal Tort Claims Act medical malpractice claim against the United

17

States); *Gillman v. United States,* 53 F.R.D. 316, 318-19 (S.D.N.Y.1971) (citing *Bredice*, 51 F.R.D. 187, and holding Plaintiff not entitled to reports of a hospital's Board of Inquiry investigating suicide.). The Court in *Weekoty v. U.S.*, 30 F. Supp. 2d 1343 (D.N.M. 1998) held:

> The Court agrees with Dr. Kessler that if these review sessions were open to discovery and public rebuke, physicians would not be as frank or candid and the goal of improving medical care would be substantially undermined. It is precisely for this reason that the privilege was first recognized in the federal courts: 'As doctors have a responsibility for life and death decisions, the most up-to-date information and techniques must be available to them. There is an overwhelming public interest in having [morbidity and mortality review meetings] held on a confidential basis so that the flow of ideas and advice can continue unimpeded.... These ... meetings being retrospective with the purpose of self-improvement, are entitled to a qualified privilege on the basis of this overwhelming public interest.' *Bredice*, 50 F.R.D. at 251. To open these meetings to public scrutiny would completely undermine the public good produced by ensuring confidentiality. 'Constructive professional criticism cannot occur in an atmosphere of apprehension that one doctor's suggestion will be used as a denunciation of a colleague's conduct in a malpractice suit.'

*Weekoty v. U.S.*, 30 F.Supp.2d 1343, 1346, *quoting Bredice*.

Courts have used a balancing test to determine whether to apply the self-critical analysis privilege. In general, courts have required the following: the information resulted from a critical self-analysis undertaken by the party seeking protection; the public has a strong interest in preserving the free flow of the information sought; the information is of the type whose flow would be curtailed if discovery were allowed; the documents were prepared with the expectation that they would be kept confidential; and that the documents were kept confidential. See *Dowling v. Am. Hawaii Cruises, Inc.*, 971 F.2d 423, 426 (9th Cir. 1992). All of these criteria have been met in this case. The CDOC has a quality assurance program.

Through this program, self-critical information was created. The public has a strong interest in protecting the free flow of information to protect quality assurance materials.  The CDOC prepared quality assurance materials with the expectation that they would remain confidential.

Confidentiality of the Quality Assurance Documents is important to facilitate the free exchange of opinions, ideas and criticisms that can help in developing and maintaining quality health care. Because of the proliferation of inmate litigation which often encompasses frivolous litigation against CDOC medical providers relating to medical care within the CDOC, allowing discovery of the Quality Assurance Documents would have a chilling effect on self-critical analysis because of the legitimate fear that these documents will be discoverable and used against the CDOC at some date in the future.  As a result, the CDOC will conduct a less forthright and rigorous review of the care it provides out of fear that such information will be used against it. Compelling disclosure of the Quality Assurance Documents is contrary to all of the above.  Therefore, the Court should find that the Quality Assurance Documents and the related medical documents are protected by the self-critical analysis privilege.

DATED this 16th day of December, 2009.

JOHN W. SUTHERS
Attorney General

s/ James X. Quinn
JAMES X. QUINN
Assistant Attorney General
Civil Litigation and Employment Law Section
Attorneys for Defendants
1525 Sherman Street, 5th Floor
Denver, Colorado  80203
Telephone: (303) 866-4307
FAX: (303) 866-5443
*Counsel of Record

## CERTIFICATE OF SERVICE

I certify that on December 16, 2009, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Paula Greisen
Jennifer W. Riddle
greisen@kinggreisen.com
riddle@kinggreisen.com

Edward T. Ramey
Lara E. Marks
eramey@ir-law.com
lmarks@ir-law.com

s/ James X. Quinn