IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-JLK
(Consolidated for all purposes with Civil Action No. 96-cv-00343)

JESSE (JESUS) MONTEZ, *et. al.*

Plaintiffs,

v.

BILL RITTER, *et al.,*

Defendants.

_____

**PLAINTIFFS' RESPONSE TO THE COURT'S MINUTE ORDER
RE DECEMBER 22, 2008 ORDER OF THE SPECIAL MASTER AND RELATED
FILINGS [Docket No. 4339]**
_____

Plaintiffs, through counsel for the Class, Paula Greisen and Jennifer W. Riddle of KING & GREISEN, LLP, and Edward T. Ramey, Lara E. Marks and Blain D. Myhre of ISAACSON ROSENBAUM, PC, hereby file this Response to the Court's Minute Order regarding Ronald Cordova's Objection/Appeal of the Special Master's December 22, 2008 Order [Doc. 3856] and the related filings, as follows:

Mr. Cordova has filed numerous complaints with the Special Masters concerning his personal glasses and the impact of the 2008 Stipulation Regarding Status of Compliance by the Colorado Department of Corrections with the Montez Remedial Plan (hereinafter "2008 Stipulation" [Doc. 3326]) upon those who wear glasses. [Docs. 3483, 3484, 3857 and 4031] Initially, Mr. Cordova complained that the 2008 Stipulation required individuals who were in custody to "give up" their personal glasses, which he contends violated the protections provided

in the Remedial Plan. [Doc. 3484] In response, the Special Master found that the 2008 Stipulation did not "expand the class of those who are vision impaired" and that, since Mr. Cordova was not a member of the vision impaired class, he did not have standing to raise this issue. [Doc. 3856]

In response, Mr. Cordova argues that the portion of the 2008 Stipulation regarding the removal of glasses did not limit its application to vision impaired class members. [Doc. 3857] He further complains that two pairs of his personal glasses were taken from him when he was moved from Arkansas Valley Correctional Facility ("AVCF") to Sterling Correctional Facility ("SCF") in violation of the Remedial Plan. [Doc. 3857] In response, the Special Master issued an order posing two questions: "1) how can class counsel enter into a stipulation that binds all inmates who wear glasses but are not vision impaired in light of the *Sutton* decision; and 2) what effects, if any, do the 2008 amendments to the ADA have on Claimant's situation and are all inmates who now wear glasses part of the class." [Doc. 4026] Class counsel responds to Mr. Cordova's complaints and the issues raised by the Special Master as follows:

1. <u>The Remedial Plan Dictates that Mr. Cordova is Entitled to the Immediate Return of his Personal Glasses.</u>

The issue of whether Mr. Cordova, who is a member of the mobility impaired class, is entitled to his personal glasses is a matter readily resolved by Section V of the Remedial Plan, without regard to the 2008 Stipulation. The Remedial Plan clearly prohibits the confiscation of personal property when an inmate is transferred to a designated facility *because* of his or her disability. In pertinent part, Section V of the Remedial Plan provides:

> Inmates who are currently in DOC and are moved to a designated facility because of a disability and pursuant to this agreement will have the same privileges and property rights as they possess in their current placement.

*Id*. at p. 4.

2

In June 2008, the Special Master found that Mr. Cordova, a 68 year-old, long-time inmate in the Colorado Department of Corrections ("DOC"), was a member of the *mobility* impaired class. [Doc. 3478] At that time, Mr. Cordova was housed at AVCF, which is not a designated facility for mobility impairments under the Remedial Plan. Because of his designation as a member of the mobility class, Mr. Cordova was moved to SCF – which is a designated facility for those with mobility impairments under the Remedial Plan. [Doc. 3857, ¶ 4] At the time of his move, Mr. Cordova possessed two pairs of personal glasses, which he was allowed to have at AVCF. In fact, Mr. Cordova has represented that throughout his entire period of incarceration at DOC, he has been allowed to have his own glasses which he purchases through an outside source.[1]

Because Mr. Cordova had his personal glasses as part of his property rights at AVCF, the Remedial Plan prohibits the removal of these items from him when he was moved to a designated facility because of his mobility disability. Mr. Cordova's personal glasses were taken from him when he was transferred to SCF in February, 2009 and it appears that they have never been returned. This is a direct violation of the Remedial Plan and should be remedied by the immediate return of his glasses.[2]

2) The Effect of the 2008 Stipulation regarding Eyeglasses[3]

The question of whether the provision in the 2008 Stipulation regarding the replacement of glasses "expands" the class to all inmates who wear glasses is somewhat of a red-herring. The 2008 Stipulation was entered into by the parties as a sanction for DOC's failure to once again

---

[1] In his recent filing, Doc. 4364, Mr. Cordova states that he has been in DOC for 18 years.
[2] If Mr. Cordova's glasses were destroyed, DOC should be required to replace those exact glasses, rather than merely provide him with inferior replacement glasses.
[3] This section is responsive to the two questions raised by the Special Master in Doc. 4026.

3

come into compliance with the Remedial Plan.  The relevant portion of the 2008 Stipulation reads as follows:

> Inmates will be permitted to retain possession of their personal glasses until CDOC issues a replacement pair of glasses.  Unless it is determined that the inmate intentionally broke his/her own glasses, CDOC will replace damaged or broken glasses free of charge on an as needed basis.  If the preponderance of the evidence shows that the inmate intentionally broke his/her glasses in any particular year, he/she will be responsible for the replacement costs of those glasses.

2008 Stipulation, ¶ 1.

The impetus for this provision was the numerous complaints received by class counsel from inmates who had their personal glasses taken away by DOC, without timely replacement. Without their prescription glasses, these inmates became substantially limited in their daily life activities – but DOC refused to recognize them as members of the vision impaired class because *hypothetically*, if they had their glasses, they were not so limited.

Although it is correct that the ADA amendments specifically provide that "[t]he ameliorative effects of the mitigating measures of ordinary eyeglass . . . shall be considered in determining whether an impairment substantially limits a major life activity,"  42 USC §12102(4)(E)(ii),[4] such ameliorative effects can only be taken into account if a person *actually* has the right to possess those mitigating measures.  In a prison context, where DOC alone controls the rights and ability of inmates to possess eyeglasses, DOC cannot be allowed to circumvent the clear intent of the ADA by refusing to allow the mitigating measure and then

---

[4] In general, the recent ADA amendments were meant to overturn the overall holding of *Sutton v. United Air Lines*, 527 U.S. 471 (1999).  Class counsel acknowledges, however, that the portion of *Sutton* which allows the actual mitigating effects of eyeglasses to be taken into account in determining disability status has been codified by the amendments.

4

claim that the above statutory language insulates it from providing disability status.[5]  This would be the quintessential situation of "having your cake and eating it too."

During discussions between the parties on this issue, class counsel took (and still takes) the position that DOC cannot have it both ways – it cannot remove the necessary mitigating measure of eye glasses that allowed an inmate to perform his daily life activities and also argue that the inmate is not disabled because, if the mitigating measures were provided, he would not be impaired.  It was class counsels' position that if an inmate had his or her prescription glasses removed, then the DOC would have to recognize that inmate as a member of the vision impaired class.  Pursuant to that discussion, the parties agreed to the stipulation at issue in order to <u>prevent</u> the expansion of the class by the denial of glasses to those who depend on eyeglasses to perform their daily life activities.  As such, the stipulation was directly aimed at <u>all</u> inmates who wear glasses to "save" DOC from having to recognize these individuals as members of the vision disabled class when their glasses were removed and not timely replaced.  Thus, the stipulation was designed to prevent the expansion of the vision impaired class, which was to DOC's benefit, as well as to the benefit of those inmates who wore glasses.[6]

Mr. Cordova is a perfect example of what was *not* supposed to happen.  First, as argued above, Mr. Cordova's glasses should never have been taken from him when he was transferred to a designated facility because of his mobility impairment.  Moreover, even if he had not been protected by the removal of his property due to a disability-related transfer, the 2008 Stipulation specifically prohibited DOC from removing his glasses until it issued a replacement pair.

---

[5] In its response, DOC oversimplifies this statutory provision, claiming that 'the recent amendments . . . excluded individuals who merely wear glasses as being defined as disabled."  [Doc. 4337, fn. 1.]

[6] In response to the question posed by the Special Master regarding whether the stipulation "binds all inmates who wear glasses," it is class counsel's position that the stipulation provision does not "bind" any inmate.  Rather, it simply dictates that *if* DOC confiscates an inmate's glasses, then those glasses must be immediately replaced.  Whether the removal of the glasses is appropriate, such as with Mr. Cordova, is a different issue.

5

The fact that DOC chose to remove his glasses and then failed to replace them should have automatically qualified Mr. Cordova for membership in the class of vision impaired. While it is true that the Special Master previously found that Mr. Cordova was not a member of the vision impaired class, he did so because "he [Mr. Cordova] can carry on his activities of daily life with his eyeglasses." [Doc. 3856, p. 5] At the time of his damage claim hearing, Mr. Cordova had his glasses because he was still at AVCF. When the mitigating measures were taken away from when him when he was transferred to SCF because of his mobility disability, he could no longer perform those daily life activities related to his vision. Mr. Cordova states that without his glasses, his vision is blurred and he has daily headaches because "everything is blurry." [Doc. 4031, p. 2] At his damage claim hearing, Dr. Neufeld, a DOC doctor, testified that Mr. Cordova is able to see and read *with his glasses*, but that he may need bifocals. [Doc. 3478, p. 7] DOC's removal of Mr. Cordova's glasses and refusing to replace resulted in Mr. Cordova becoming substantially limited in his daily life activities. As such, DOC should have immediately recognized Mr. Cordova, and other similarly situated inmates, as members of the vision impaired class. This was the very problem that the 2008 stipulation provision was designed to prevent.

DOC's position on this issue is unsupported. DOC argues that the protections offered in the 2008 Stipulation and Remedial Plan which allows inmates to keep their personal eyeglasses *only* applies those inmates who are "newly incarcerated to DOC." [Doc. 4337, p. 4-5][7] However, nowhere in the 2008 Stipulation does it limit the protections of the eyeglass issue to those inmates who are "newly incarcerated." The plan language of the Remedial Plan that is

---

[7] On page 4 of its response, DOC states the 2008 Stipulation "would benefit Mr. Cordova also if he was a newly incarcerated inmate by Doc and that "[i]f he were to enter DOC today and he had tinted and wire rim glasses, he would be allowed to keep them, until he needed replacement glasses." On page 5 of its responses, DOC asserts "only incoming new inmates are allowed to keep their own glasses, until a replacement pair is needed."

6

cited by DOC in support of this position specifically provides that "[n]o inmate shall be deprived of a health care appliance that was in the inmate's possession upon entry into the DOC system *or was properly obtained while in DOC custody . . ..*" Section XVI(c) of the Remedial Plan. Mr. Cordova had personal prescription glasses which he properly obtained from an outside vendor -- and had been doing so for many years. In fact, for almost 18 years, there was never any problem with Mr. Cordova having his glasses until after his damage claim hearing when he was adjudicated as a member of the mobility class and then transferred to a mobility designated facility.

In summary, the relevant stipulation was intended to apply to all DOC inmates who wear glasses. This stipulation was specifically designed to prevent the removal of these mitigating devices, which would result in the expansion of the vision impaired class under the Remedial Plan. As DOC agreed to this sanction as a remedy for its non-compliance, it should not be allowed now to limit its application.[8]

3) Conflict of Interest with the ADA Inmate Coordinator ("AIC")

Finally, the Special Master also addressed Mr. Cordova's concern that because the AIC, Cathie Holst, is a DOC employee, that she has a conflict of interest in performing her duties to the class members in this case. This legitimate concern was discussed extensively at the fairness hearing and at subsequent hearings before this Court.

Class counsel understands Mr. Cordova's concerns and has always remained sensitive to the potential conflict of interest that may occur by having a DOC employee serve as the AIC. However, after the many years of the existence of this consent decree, class counsel is confident

---

[8] Mr. Cordova raised another argument regarding the fact that DOC was issuing replacement glasses that did not have appropriate UVA, UVB or anti-glare protections. It is Class counsel's position that if an inmate was still substantially limited in his or her major life activities because the glasses that were issued were inadequate, then the inmate would still be entitled to membership in the vision impaired class.

that Cathie Holst has taken her duties under the Remedial Plan with purpose and integrity, even if the parties do not always agree.

Despite Defendants' contention that the issue is moot because Ms. Holst has retired, the issue remains as Ms. Holst's former assistant and DOC employee, Ms. Kathleen Baxter, is now the AIC. Class Counsel is equally confident that Ms. Baxter will perform her duties under the Remedial Plan with integrity.

Respectfully submitted this 11th day of March 2010.

>KING & GREISEN, LLP
>
>*/s Paula Greisen*
>Paula Greisen
>Jennifer W. Riddle
>1670 York St.
>Denver, CO 80206
>greisen@kinggreisen.com
>riddle@kinggreisen.com
>
>Edward T. Ramey
>Lara E. Marks
>Blain D. Myhre
>Isaacson Rosenbaum, PC
>633 17th St. #2200
>Denver, Co. 80202
>eramey@ir-law.com
>lmarks@ir-law.com
>bmyhre@ir-law.com
>
>Attorneys for Plaintiff Class

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on the 11th day of March, 2010, I served the attached PLAINTIFFS' RESPONSE TO THE COURT'S MINUTE ORDER
RE DECEMBER 22, 2008 ORDER OF THE SPECIAL MASTER AND RELATED FILINGS [Docket No. 4339] with the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Elizabeth H. McCann

James X. Quinn
Berina Ibrisagic
Attorneys for Defendants
Colorado Attorney General's Office
1525 Sherman St.
Denver, Co. 80203
303-866-3261
Fax: 303-866-5443
beth.mccann@state.co.us
james.quinn@state.co.us
berina.ibrisagic@state.co.us

                                                       */s Laurie Mool*