page 1

US DISTRICT COURT
901--19 th Street
Denver, Co 80294

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAY 06 2010

GREGORY C. LANGHAM
CLERK

JESSE MONTEZ
VS
BILL OWENS, ET AL

CASE NUMBER 92 cv 870-EWN-OES and 96-N-343

Party without attorney
Jill Coit #86530
LVCF unit 5 claim No 03-129
1401 West 17th Street
Pueblo, Co 81003

---

RESPONSE TO ORDER OF SPECIAL MASTER DATED MARCH 26, 2010

---

Comes Now, Jill Coit pro se and does hereby submit her response under Order of Special Master , Mr. Richard M. Borchers (Judge) which allowed her to file facts under hearing impaired (Doc 4111.)

Coit submitts the following affidavits from former cell mates and (exhibit 2) inmates that have known of her hearing impairment. Facts:

1. Coit has been wearing hearing aids for at least 20 years prior to incarceration and can not believe that all her hearing specilist in the free world could be wrong. Coit is hearing impaired when back ground noise is present. This is not unusual for a woman/person that is 65 years old. Coit entered CDOC at age 50 and was denied her hearing aids until 2001. It took CWCF/CDOC until 6-8-01 to finally allow her to be tested for hearing impairment that was for not being able to hear when background noise is present. See attached Hearing Aids exhibit 1 for a chronological listing of hearing test.

2. When Coit appeared before Judge Pringle in October 2005 she had her hearing aids and therefore could hear. There was the issue of her not being able to get hearing aid batteries but after the Montez hearing, DWCF provided hearing aid batteries. It is amazing what a hearing before this Court produces.

3. It is important to remember that Coit having hearing aids cost CDOC nothing except for her hearing aid batteries which is a small price to pay for an inmate to be able to hear. Prison is a dangerous place and not being able to hear present a danger to the inmate and others.

4. Not being able to hear over head anouncements means that Coit is subjected to disciplinary-COPD actions that take away her property and job (employment in classes and programs) because she cannot hear when it is time to move. Besides getting a COPD violation for Rule 30 Unauthorized Absent. prevents you from getting into a program or School.

5. Coit was allowed to have her own hearing aids sent into DWCF after DWCF sent her to Denver Hospital Hearing Clinic on 8-22-01 for hearing impairment when back ground noise was present. This is important because from the begining, CDOC recognized that Coit could not hear when back ground noise was present. Unfortunately when Coit sees a doctor at DWCF or LVCF she is in small room where she is less than 2 feet from the doctor at all times. The room is no more than 10 feet wide or longer than 10 feet so very small area. IT is quiet so Coit can hear. Not like when she is in the facility. where there are at least 10 people talking at once.

3-24-09

6. Coit was taken to Denver Hospital Hearing Clinic and put in a dark quiet room where headphones were placed on her ears. Not in her ear canal but over her whole ear. This is important because apparently Coit has an unusual shapped ear canal which makes testing with item put in her ear difficult.

7. At Denver Hospital her hearing aids were cleaned and repaired and given back to her. 2008. — permit granted 2-13-06 exhibit 9

8. It is important to note that Denver Health Audiologist wrote, "THERE IS NO CLINICAL REASON TO REMOVE HEARING AIDS FROM PATIENT AT THIS TIME." dated 3-24-09 exhibit 3

I was told that the test they gave me recorded that my brain heard a sound that it did not record if I could understand the sound just that my brain heard a sound in a totally quiet room with no distractions or other outside influences to interfear with sound.

9. I understand CDOC stating that hearing loss must be below 25 decibals but that does not work for the elderly with natural hearing loss when back ground noise is present.

CDOC doesn't allow for the elderly inmates who can not hear anounements because the overhead speakers are not clear, Prison ages a person more quickly!

10 As one ages it is only natural that there is some hearing loss.

11. According to AR 700-01 Colorado Department of Corrections Clinical Services Mission and Philosophy Statement,

"IT is the mission of the Colorado Department of Corrections Clinical Services to deliver cost effective, quality health care, comparable to that of the community and consistent with the ethical obligations of the medical, dental, nursing and mental health professions. Clinical Services will establish standards of care and practice, policies and procedures; and provide optimal health care without compromising professional etheical beliefs , instutional security or public safety." exhibit 8

12. How does allowing me to keep my own hearing aids that I was cleared for years ago violate or compromisse institutional secuity or public safety?

13. How is having hearing aids for loss of ability to hear when back ground noise is present NOT comparable to that of the community?

14. Ethically isn't it resonable to allow elderly inmates/people the right to be able to hear anouncements, and what is said in programs when all that is needed is for them to have their hearing aids.

I would think it would be morally wrong to deny a person the right to be able to hear the things younger people are allowed.

IT cost pennies for batteries so she can hear. Then there is the safety issue. Prison is dangerous for the elder and hearing impaired. Not just in case someone attacts them but to be able to get out of the way when others are fighting, etc.

Cure-NY. exhibit 6. "Prisoners over the age of 55 have been found to be physically seven years older than their calendar age and suffer from an average of three chronic illnesses. Coit would Be 72 years old.

15. Coit filed a grievance on not being able to hear at her job because of background noise. She has to have inmates repeat or guess what they are saying. Actually she is very good at guessing what is being said when she just catches a word or two. Coit is employed in the LA Vista library as a clerk and her main job is to assist inmates in checking in and out books, and shelfing books (which is very painful for her to do because she must bend and neal down) It is also very difficult for her to see some of the labels on the books that she needs to shelf. Coit has problems hearing during library meetings and does not always hear every thing said.

16. Coit is very lucky she has two great bosses in the library. They both allow her to sit down often and when she is tired or can't see very well she is allowed to rest. Because of her impairments she is allowed to rest and do easier activities.Coit appreciates the fact that she is allowed employment because if she was not employed she would be sent back to DWCF where she is not safe and her disability needs due to facility structure does not accommodate her impairments as well as LVCF does.

17. Coit's hearing aids were removed on 5-5-09 - Exhibit 4. which has created a whole bunch of problems for Coit. She can not attend programs that are offered in the gym (outside people and programs come into the prison and put on different programs) because she can not hear what is said. When she had her hearing aids she could attend all programs offerred becasue she could hear.

Exhibit 4

18. There was NO LEGITIMATE PENOLOGICAL REASON TO REMOVE Coit's hearing aids. Coit's hearing aids were deemed contraband & she was ordered to send them out.

19. Coit turned over her hearing aids to DWCF property as required but never got a miswithdawal slip back for postage sent out. According CDOC/DWCF contraband rules contraband may be mailed out and Coit put all proper pay work into propgerty. The property officer and Coit has Had many problems, Coit reported her for denying her, her kosher meals on transport. For being an homosexual and doing improper strip out and harassing her. Sgt. Lasso was the property sgt. she reported to CID.

20. According to AR 850-06 Offender Property,property of value must be accounted for . Coit filed a grievance on her hearing aids not reaching her mother and was told basically tuff. To date Coit has not received accountablity as to where her hearing aids are.

21. Coit wants her hearing aids back to wear. They cost over $1,500 when purchased and have a special adaptive that filters out background noise. They were the top of the line when she purchase them in 1992.

22. Coit met the deadline by bringher hearing problems before this Court. when coit was not getting hearing aid bateries that lasted more than two or three days. The court solved that problem merely because Coit brought that issue forward.

Judge Pringle see no. 2 reference.

It is interesting that the AIC ordered the removal of my hearing aids rather than the chief medical officer. The officers (DWCF) told me and wrote on my shake down slip per Holst who was the AIC coordinator.

Exhibit 2 - Inmates affidavit of hearing loss - having to repeat speech to Coit.

page 4

In defendants" motion to file amended response to claimant's denial of hearing aid battgeries that work and refusal to repair hearing aids"dated Janaury 14,2009 they quoted case Sutton v United States 119 S.CT 2139, 527 U.S. 471 (1999). their page 2 number 3, "The Final Order of the Special Master indicates that Coit's hearing aids may have been taken into consideration as a corrective and mitigating measrue, pursuant to Sutton V United Airlines,Inc. 527 U.S. 471 (1999) in the determiniatioin that she did not have a hearing disability. (See Final Order of Speical Master , Claim No 03-129 p.6.)

What page 6 of Final Order of Special Masters says is," The Special Master finds and conculdes that Claimant ahs not usbstain her claim that she has a hearing disability within the means of ADA and/or the Remedial Plan. It is uncontroverted that Claimant is not 'permanntly deaf' and does not have 'a permanent hearing impairment so sever that she must rely on written communication, lip readig or signing because her residual hearing, with aids does not enable her either to communicate effectively or hear an emergency warning. Remeadial Plan v (A)(2)." by Roberts.

If you notice it say with aids, that means with my hearing aids which were taken from me.

I can not hear an anouncement if it was to tell me to go to a certain area or door to escape a fire or emergence without my hearing aids. YES I could hear the fire alarm but not the over head anuncements telling dirsections therefore for safety sake I need my hearing aids. In all fairness I could at least here at LVCF, due to how the buildings are constructed, if I was sitting in the day room or class rooms at least know there was an anouncement going on, I couldnot understand what the anouncement was but could tell there was one. AT DWCF I could not even tell there was an anouncment, their overhead anouncement system (PA System is very bad) Most of the time you just hear static. A very dangerous situation for the hearing impaired.

IT is important to remember that when coit had her Montez, She hearing had her hearing aids, so she was not disabled, however once her hearing aids were removed for no legitimate penological reason and against specialist orders of Denver health, coit became hearing impaired. In a totally quiet small room if a person speaks normally she can usually tell what they are saying even if she does not hear every word of their speach. Coit according to CDOC evaluation is above normal intelligence, what ever that means. Prior to CDOC coit was an exceptional student and business woman however she has been wearing hearing aids for the 35 years so hearing was an issue even when she was young.

Because CDOC is not in complaince Coit is allowed to adddress her hearing impairment especially since CDOC removed her means of hearing.

Coit is substantially limited in her ability to hear without her hearing aids. I do not know why defendants are arguing this , it seems like a waste of this Courts time, Coit is entitled to be able to hear especially since it is so easily remedied. Being able to hear is important to job placement, safety,ability to communicate with those around her and the public as well as family. Who would deny a 65 year old disabled woman the privilege of being able to hear. Coit is regarded as hearing impaired by her peers who must constantly repeat themselves or get her attention before speaking. Not being able to hear leads to depression and feel less safe as well as useless. All jobs and programs require you to hear to take instruction as well as follow instructions.

Coit filed grievance No. D-LV-09-10-133

Continue from page 20 MRP C., last paragraph fifth line down, "No inmate shall be deprived of a health care appliance that was in the inmates possession upon entry into the DOC system or was properly obtained while in DOC custody , unless for documented safety or security reasons or the Chief Medical Officer determines that the applaince is no longer medically necessary or appropriate.

This sentence says it all.

This court might look at Taylor v Leidig at 484 f. Supp 1330 which states,"...On motion of defendants to dismiss first and third claims for relief, the District Court, Carrigan, J., Held taht alleged confiscated of plaintiffs' personal belongs may have amounted to an unjustified misappropriate of personal property by defendant prison officals and hence, a dprivation of federally secured rights under 14th and 5th amendments to be free from unreasonable searches and seizures and from seizrures without due process.

This part of the MRP clearly states I am entitled to my hearing aids because I came into CDOC with hearing adis. The fact that it took CDOC 6 years to take her to specialist does not really matter except for the fact to show that they were deliberately indifferent to her serious medical needs.

Wherefore Coit prays this court will recognize the fact that besides needing her hearing aids for safety and to be able to take part in programs, services and benefits, not having her Hearing aids makes her subject to great bodily harm, because She is dizy and falls often. Her equilibrium is off and she could easily fall and break a hip or bone at her age. Since it cost CDOC nothing to return her hearing aids and it would make her safer there is not any legitimate penological reason for her to be denied them. According to the case defendants quoted in Sutton V United Airlines, Inc 119 S.ct. 2139, page 2144- three paragraphs from the bottom second column, "(C) being regarded as having such an impairment 12102(2). This is an amendment to her Original filing since CDOC is not in compliance per stipulations . Coit also request an hearing and damages.

Please Order DOC to return her hearing aids immediately!

Respectfully,

J. Coit

Jill Coit #86530

[signature] 5-2-10 dated.

[illegible]

See Back of Exhibits for petition to amend Claim Under Montez.

8 of 6

# AFFIDAVIT

I Lou Ann Rael, of Lawful age, upon oath states as followes.

that I was the cell mate of Jill Coit for several months in the La Vista Corrections Facility.

1. Ms. Coit had problems hearing unless you would get very close up to her and make her aware that you were speaking to her or if you would get in front of her and wave your hand in front of her.

2. Ms. Coit had a hard time hearing when it was count time or when things were being announced on the over head speaker I always had to let her Know when they were doing count or when they would announce movements on the over head speaker. there are times when Ms. Coit would get so startled by me when she was lying down and I would let her Know when it was count time cause she had a terrible time hearing things

3. I never realized how Visually impared Ms. Coit was there were times that she would trip over things or bang her toes when there was stuff on floor there were lots of time that I needed to read normal sized print to her mostly legal research or out of legal books that she had.

4. Ms. Coit is a very brilliant Woman and can usually remember things once she is told the first time even though she has imparements that make it difficult for her to do certain things.

Signed and Acknowledged

[signature] April, 16, 2010

STATE OF COLORADO)

COUNTY OF PUEBLO)

Subscribed & acknowledged before me this 15th day of April, 2010.

~~Given under my hand and seal~~
my commission expires 11-20-2010

[signature] Valerie [illegible]
NOTARY PUBLIC

exhibit 2



pg 7



# DENVER HEALTH

## AUDIOLOGICAL EVALUATION

3/4/09

Name # Pat#, DOB
113946560
03/24/09 HSC: AUD
COIT ,JILL
2098863 F 06/11/1944
G08 DVR: Y
1: 2: RX: IP:
PCP:
PHN: (719)583-5840

Date:

IDX2 tj (staff initials)

The patient's medical record and/or referral has been reviewed. ☑ The patient requested a medication record. ☐ Yes ☑ No

Primary Language: ☑ English ☐ Spanish ☐ Other ____

Do you wish to have an interpreter: ☐ Yes ☐ No ☑ NA Interpreter: ____ (name) ☐ AT&T Language Line Used

☐ Patient requests to have significant other/family member or friend interpret. ____ (name)

Impairment: ☐ Physical ☐ Cognitive ☑ WNL Cultural Needs: ☐ Yes ☑ No ____

STANDARD ☐ PLAY CONDITIONING ☐ VRA ☐

**RIGHT EAR** Frequency (Hz.) 250 500 1000 2000 4000 8000; 0–110 dB

ABR with latency series completed.

**LEFT EAR** Frequency (Hz.) 250 500 1000 2000 4000 8000; 0–110 dB

ABR with latency series completed

**TYMPANOGRAM** -400 -300 -200 -100 0 +100 +200; 0–10

P.V. R ____ P.V. L ____

**CONTRALATERAL ACOUSTIC REFLEX TEST**

**STIMULUS - LEFT EAR**

| 500 | 1000 | 2000 | 4000 |
|---|---|---|---|
| | | | |

Reflex decay 500 Hz ____
1000 Hz ____

**STIMULUS - RIGHT EAR**

| 500 | 1000 | 2000 | 4000 |
|---|---|---|---|
| | | | |

Reflex decay 500 Hz ____
1000 Hz ____

**IPSILATERAL REFLEX SCREEN**

R. ____ L. ____

PTA (.5, 1, 2 KHz) ____ dB
SRT ____ dB PBMax. ____ % 30 dB SL
SRT/BC ____ dB

PTA (.5, 1, 2 KHz) ____ dB
SRT ____ dB PBMax. ____ % 30 dB SL
SRT/BC ____ dB

OTOACOUSTIC EMISSIONS SCREEN
RIGHT - PASS FAIL
LEFT - PASS FAIL
Mode:

PB ROLLOVER R L
40dB SL ____ %
50dB SL ____ %
60dB SL ____ %

**Patient/Family Education:** ☑ Verbal ☐ Written ☑ Understands

**History:** Previous borderline hearing loss. Need to rule out significant change in hearing.

**Results:** ABR with intensity latency series completed. Results showed responses at 25dB in the mid to high frequency range to a broadband click. These results are compatible with responses to air conduction under headphones obtained on 2-14-05.

**Recommendations:** There is no clinical reason to remove hearing aids from patient at this time.

F50-514 (6/06) Page 1 of 2

116434 Trudy Fredericks

Trudy Fredericks, MS 116434
Audiologist Signature/Title/Date (mm/dd/yy) (Provider #)

186

**Hearing Aids**

6-8-01 Denver General Hospital Audiologist – Audiometrics are consistent with moderate sensory neural hearing loss. Amplification was discussed on an informal basis. It is felt that she should receive an ENT consult and medical clearance prior to trial use of amplification. DX moderate hearing loss.

8-22- 01 Denver General Hospital Auto clinic- Patient may wear earphones while watching TV. She is cleared for hearing aids. Follow up with ENT on a prn basis.
DX: sensory hearing loss.

10-22-01 Dr. Pook MD, DWCF- No need for hearing aid until hearing test results arrive. (she did not even look in file, I told her I had been cleared for hearing aids)

1—3-01 CWCF Mary Kay Cater- Seen by Dr. Howe, ENT at CMHIP "will await dictated notes, to see if pt meets DOC criteria for hearing aids.
Ok to wear earplugs, Ok for learning Aids (X1)

7-15-02 Note from Pat V RN II "Please come to the clinic on Saturday, July 20th, at 0900. You are going to be fit for hearing aids. Thank you Pat V.

7-20-02 Pueblo Hearing Aid Center In Woman's of Denver w/p Otoscopic Rxx (?) shows both tanals cliar. Took Bin impressions to recast hearing aids. Pt states her hearing is rapidly deteriorating and experiences pain. Ent Evaluation may be necessary.

11-28-02 Pueblo Hearing Aid Center "In DWCF-w/pt-fit audibel hearing aids.
Lt. Sn : 0201400694
Rt. Sn : 0201400693 Warranty expires 10-1-04
Pt has difficulty understanding in back ground noise
Pt needs #312 Hearing aid batteries

1-18-03 Pueblo Hearing Aid Center In DWCF w/p –right hearing aid hurts ear-will remake.

3-25-03 Dr. Razzaghi- " given hearing aids, discussed shoes/ braces for ms. ???? insider/ sweats- CTZ as follow up-with Ms. Coit to review ?????

1-25-05 Someone wrote informational in my chart without putting their name on it.
" Im had officer call medical at 1725 requesting hearing aid batteries because of several things going on Im was told to come down after med line. We had just finished nurse sick call. It would not have been a problem at that time of nurse sick call. IM did not come down for batteries with med line or even inquire about them. Batteries are in medical. (Med line ended after 10 :30 count cleared-so I waited till next day to get them)

1-25-05 Dr. Razzaghi again ordered hearing replacement batteries for the hearing aids. 2. Has not been able to get batteries for hearing aid for a long time per pharmacy records however, batteries have been sent on 12-30-04. will ask nursing to supply.

2-01-05 New RX 1877485 Drug brand Name Batts DA 312 4/pk –NA Alternate : hearing Aid Bat 312 Rx date 02-01-05 Dis Date 1-27-06 RX instructions as directed.

2-14-05 Department of Corrections Consultation Report Form- Diagnosis/Health Complaint Pt with subacute Worsening of hearing in left ear, TM Dull, no improvement with ABX and Decongestants and NS washes. ? Chronic effusion Vs Cholesteotoma . Need Audiogram "see audiogram border line normal hearing R & L with slight notecch at 4k Hz bilat

2-28-05 Dr. Razzaghi saw me, " Left ear wax build up-throat slightly red- humibid/DM 600/30 mg "

6-24-05 Inmate wrote letter to Denver General Audiology regarding her wearing her hearing aids during test. Dr. Razzaghi telephoned audiologist at Denver General for reply to letter. She wrote, " Talked to Pam Hammond at Audiology Dept. at DH she stated that although this would be a first time in her 30 year experience but she can not 100% be sure that patient did not insert a small hearing aid after she checked the ear canals. She is willing to repeat the test if needed. Razzaghi MD.

page 10.

**SHAKEDOWN LIST** DC 300-6A

DATE 5/5/09

OFFICER CAPT. KOLATII

Offender Name and Number COIT 86530

2 HEARING AIDES TAKEN TO PROPERTY FOR DISPOSITION

20002 (R7/02)

Exhibit 4

No testimony or documentary evidence was presented regarding Claimant's vision acuity[1]. *Remedial Plan* ¶ V(A)(3).

The Special Master finds and concludes that Claimant has not sustained her claim that she has a hearing disability within the meaning of the ADA and/or the Remedial Plan. It is uncontroverted that Claimant is not "permanently deaf" and does not have "a permanent hearing impairment so severe that [she] must rely on written communication, lip reading, or signing because [her] residual hearing, with aids, does not enable [her] either to communicate effectively or hear an emergency warning." *Remedial Plan* ¶ V(A)(2).

Claimant has also presented testimony regarding shoulder, arm and hand problems and allergies to clothing. The Special Master need not consider whether these conditions might constitute a disability under the ADA because they are not disabilities covered by the Remedial Plan. Consequently, the Special Master finds and concludes that the *Montez* Remedial Plan claim procedures to not apply to Claimant's shoulder, arm, hand and allergy conditions. Further, any allegations of failure to accommodate these conditions so that Coit could participate in various programs also do not fall within the ambit of the Remedial Plan.

Finally, Claimant asserts damage claims based upon threats and retaliation. Again, regardless of whether or not these claims might be viable under the ADA and/or Rehabilitation Act, they do not fall within the scope of the Special Master's responsibilities under the Remedial Plan. *See* Order In Response to Report and Recommendation of the Special Masters to Judge John L. Kane, Nov. 23, 2004 at ¶¶ 2 and 3.

3. The next question which must be answered is whether Claimant was qualified to participate in the programs or to receive the benefits or services offered by the CDOC. A prisoner may not be "qualified" under the ADA to participate in various services, programs or activities because of disciplinary reasons, health reasons or other valid penal justifications. *Miller v. King*, 384 F.3d 1248, 1266 (11th Cir. 2004). It appears to be undisputed that Claimant was qualified to participate in the programs, benefits and services offered by the CDOC.

4. The key issue is whether Claimant was discriminated against because of her disability during the time covered by the Remedial Plan. The Remedial Plan was signed on August 27, 2003. Although the Remedial Plan fails expressly to address the issue of damage claims that might arise after its execution date, there is nothing in the Remedial Plan that would suggest that paragraph XXXII thereof, authorizing the recovery of damages and establishing claims procedures was intended to apply to claims for damages that had not yet arisen. The Special Master finds and concludes that the damages that may be awarded under the Remedial Plan are limited to those resulting from violations of the ADA cognizable under the Remedial Plan and occurring prior to

[1] Claimant, by her own admission, agreed that her vision was corrected within the meaning of the Remedial Plan and that she cold not overcome the burden.

P-Sory 102
Katonah, N.Y. - 10536



# *Elderly Prisoners*

*Excerpts from criminal justice issues of the NYS Catholic Conference*
http://www.nyscatholic.org/pages/home/home.asp

There are a growing number of old, feeble and very sick prisoners currently incarcerated in the New York State correctional system. These inmates experience additional suffering as a result of their physical deterioration, and are an extraordinary drain on state resources because of their special needs and medical expenses. Careful screening and release under supervision in the community would insure that those released pose minimal or no risk to public safety. Compassion and fiscal economy are advanced by the practical accommodation of earlier but controlled release to the community.

Geriatric parole, electronic detention, and supervised nursing care are the desired humane alternatives for the old, sick and physically disabled prisoners who no longer pose a threat to society. The lives and dignity of those convicted of crimes must be respected. Our treatment of those convicted of crimes must always be humane, and compassionate release represents the humane option for a number of the state's elderly or infirmed inmates.

With the near doubling of many sentences in the past decades, and the "truth in sentencing" policies that guide parole releases, the average age of the New York State prison population has steadily increased. Prison also ages a person more quickly. Prisoners over the age of 55 have been found to be physically seven years older than their calendar age and suffer from an average of three chronic illnesses. At the same time the cost of housing older prisoners has been found to be about twice that of younger prisoners.

These are, for the most part, low risk offenders. One of the best predictors of recidivism is age. As we get older, we become less dangerous. After age 35, the inclination or ability to commit major crime decreases. Between 55 and 80, the recidivist inclination is very low indeed.

After a review process that considered all relevant factors, including prison disciplinary and rehabilitation records, criminal history, and community or family support, candidates could be scheduled for early geriatric or elderly prisoner release. Length of time served and degree of impairment and suffering should also be considered.

The early release system should be tailored to the needs of the low risk geriatric and older prisoner. Some could be released outright to routine parole monitoring, others could be assigned to electronic home detention program, and still others could be transferred to secure nursing homes or veterans to veteran hospitals where appropriate.

***Editor's comment:*** Beside the primary issues of compassion and fairness, there are potential cost savings in this time of budget deficits. New York State now probably has more than a thousand prisoners that are over the age of 55, and that number is steadily increasing. It is estimated that each of these prisoners costs the state in the neighborhood of $64,000 per year.[1] If, for example, only 500 of these were given geriatric parole, and if the savings were only 50%, the state would save about $16 million per year of reduced incarceration. Some school could use that.

**Many states have recognized this situation by providing for early consideration by a parole board. New York State has considered this possibility for years but, as yet, has taken no action. It is time now to do so.**

# The Violation of NYS Law?

*By a prisoner at Otisville Correctional Facility*

*Since 1995*, there has been a sharp decline in parole release for violent felons from about 51% in 1994 to 30% in 1997. *Since 1995* the Governor has called for "the elimination of parole."

*The Court* sets the range of sentence within the range set by the legislature. [Many in] the prison population began their sentence prior to Gov. Pataki's election into office. [However,] the Parole Board received their marching orders in 1995 that a certain class of and/or groups of inmates should not be released. **This group is now being unlawfully re-sentenced.**

Governor Pataki has done what the judicial system and the legislature have not approved. **By subverting the law** and using the Administrative body he appointed, he has set parole policy that is consistent with his *political agenda*, to end discretionary release on parole for all violent felons.

# A Democratic Right?

*Thoughts of Bryant Brown at Ray Brook FCI*

Criminals are predominantly poor, mentally ill, drug addicted, destitute, uneducated, unskilled, and coming from undeveloped communities, drug infested environments and most importantly dysfunctional families. Incarceration can lead to institutionalization and insanity, which becomes a mentally engraved state of mind that can extinguish morals, knowledge and growth.

[Nevertheless, to counter all that] all deserve the sort of education which fits them for a life of political freedom. .... [This] tests the sincerity of what we call "democracy." No other form of government has a comparable burden, for no other calls all people to citizenship!

[1] Pelosi, A. "Age of Innocence: A Glut of Geriatric Jailbirds," The New Republic, 216, 15-18, May 5, 1997.

Exhibit

page 13

20-24 (4/86) A1124643

FROM: Jill Coit 86530 (5-7-09)
P.O.Box 392005
Denver, Co 80239

TO: MS. Juanita Billiot apt 1804
STREET: 16500 Yellow Sage street
CITY: Pflugerville PHONE: texas
STATE: texas ZIP: 78660-5762

PLEASE PRINT CLEARLY – DO NOT USE FELT-TIP PEN

**PARCEL POST CONTENTS MERCHANDISE – RETURN REQUESTED**

1 pair of hearing aids to be sent in an envelope with bubble wrap on them. Nothing else to be included in this shippling.

Insure for $25.00

NAME: Jill Coit NUMBER: 86530
UNIT: 3A INSURED FOR: $ $25.00

**SHIPPING BLANK**

White Canary Pink Goldenrod

0054

**DEPARTMENT OF CORRECTIONS**

DC 200-2C

**MISC. WITHDRAWAL TICKET**

DATE 5-7-09

AMOUNT

OFFENDER NO. 86530 FAC. dwcf UNIT 3a

OFFENDER NAME Jill Coit

REASON FOR TRANSACTION ~~only 1 pair of hearing aids~~ in envelope with bubble wrap – ~~[illegible]~~ for thickness of envelope not to exceed 3/4 inch. (Insured for $25.00)

I hereby authorize this amount to be deducted from my account.

Authorized by

Offender Signature Jill Coit

20003(R.5/01)

**Colorado Department Of Corrections**

Name Jill Coit
Register Number 86530
Unit 3A
Box Number 392005
City, State, Zip Denver, Co 80239

Hand Stamp Please

Ms. Juanita Billiot
16500 Yellow Sage Street
apt 1804
Pflugerville, Texas 78660-5762

Exhibit H

page 14

AR Form 700-01A (10/15/07)

# COLORADO DEPARTMENT OF CORRECTIONS
## CLINICAL SERVICES
## MISSION AND PHILOSOPHY STATEMENT

It is the mission of the Colorado Department of Corrections' Clinical Services to deliver cost effective, quality health care, comparable to that of the community and consistent with the ethical obligations of the medical, dental, nursing and mental health professions. Clinical Services will establish standards of care and practice, policies and procedures; and provide optimal health care without compromising professional ethical beliefs, institutional security or public safety.

We believe that health care professionals in correctional settings require educational opportunities to maintain job knowledge within their clinical practice area.

We believe that there is often pressure on correctional health care professionals to expand their scope of practice to meet new needs and demands in the environment. Correctional health care professionals need to practice within their legal parameters.

We believe incarcerated patients have basic rights and responsibilities regarding their health care. They should be active participants in their own health care and take responsibility for their own actions.

We believe that an important function for correctional health care professionals is to provide health education for the incarcerated patient and facilitate his/her active participation. Correctional health care professionals encourage and assist these individuals to assume responsibility for their own health and maintain a maximal level of wellness to the best of their ability.

We believe that it is inappropriate for health care DOC employees and contract workers to participate in disciplinary decisions or committees or to participate directly or indirectly in executions by lethal injection.

We believe that security regulations that apply to facility DOC employees and contract workers also apply to health care professionals and that there should be a spirit of cooperation between security and health care DOC employees and contract workers in the delivery of health care to the incarcerated patient. Routinely, all health care DOC employees and contract workers are expected to be responsible for ensuring security in the delivery of healthcare services to include counting syringes, instruments, sharps, needles, and narcotics. In emergency situations, health care DOC employees and contract workers will first deliver medically necessary health care and are then expected to participate in indirect activities to support the correctional process such as assisting in the laundry and the kitchen. Health care DOC employees and contract workers should not participate in activities that are solely correctional in nature such as pat downs, shakedowns, and counts.

We believe that it is not only possible, but imperative, that all facets of health care delivery meet community standards and that the same standards apply regardless of the location of the correctional facility.

We believe in participating in an interdisciplinary team approach to the delivery of health care. The team involves medical providers, mental health professionals, dental providers, nursing DOC employees and contract workers, and correctional DOC employees and contract workers working together for the delivery of optimal health care to the incarcerated patient.



G Robert Jr

page 15

PHYSICIAN HEALTH PARTNERS
1515 Arapahoe St., Suite #300, Tower 1
Denver, CO 80202

UTILIZATION REVIEW
Phone: (866) 362-1374
Fax: (866) 362-1375

Reference #: 1302259
Plan Identifier: There are no Plan Identifiers for this Referral.

IPA: CDC
Elective ✓ Urgent
Date: 08/01/2006

Patient Name: JILL COIT
Patient Sex: F
DOB: 06/11/1944
Address: CDOCDENVER WOMENS CORRECTION
CANON CITY, CO 81212
Phone:
Priority: 1 MONTH
Doc Appt #: 77657

Health Plan: DEPARTMENT OF CORRECTIONS
Plan ID: 86530
Group: 4P
PCP Name: DENVER WOMENS CORRECTIONAL F
PCP Phone: (303)371-4804
Security: CLOSE

Requesting: DENVER WOMENS CORRECTIONAL FACILITY
Phone: (303)371-4804
Fax: (303)307-2607
Contact: DR. POLLACK
If this is not a PCP, has the PCP approval been obtained?
Yes ✓ No

Referred To: COLORADO MENTAL HEALTH INSTITU
Phone: (719)546-4381
Fax: (719)546-4472
Facility:
The following are for Surgical Requests Only
Surgical Assist: N
Anesthesiologist:

Request Type: OFFICE VISIT - AUDIOLOGY
ICD-9 Code Diagnosis:
389 HEARING LOSS

T/Procedure or Services:

Request DOS:

Past Treatments/Comments:
SEE NOTES. SL

EXHIBIT 9

Authorization Status: Pended
Reviewed by: SLamantia, U.R. SPECIALIST

Notification Date: 08/02/2006
Surgical Assist:
Admit Date:
Discharge Date:

Approved From:
Approved To:
Approved Units:

Approved LOS:
F/U Days:

Approval Specifications/Comments:
PLEASE FAX ATTENTION TO SUNSIRAY WE SHOW NO PREVIOUS APPROVAL IN OUR SYSTEM FOR A MAINTENANCE CONSULT FOR HEARING AIDS. SEND SUBJECTIVE & OBJECTIVE INFORMATION. WAS AN EXAM DONE? SEND ADDITIONAL INFO. TO FAX# 866-362-1375 BY 9/2/06. THANKS.

AUTH #1260706
FOR EVAL + REPAIR
02-13-06

AUG 0 3 2006

Dr. N Pollack, Phys II #34790
DWCF Clinical Services

*This referral is not a guarantee of payment. Coverage will be determined based on medical necessity, eligibility, policy provisions and availability of remaining benefits at the time of service.*

FIND CHART FOR DR. POLLACK

MRP Page 28 XXXI Compliance and Monitoring Period

"The DOC shall have no more than two years within which to come into substantial compliance with the terms of this Remedical Plan, hereafter 'the Complaince Period '.

That means since CDOC is not in compliance I can still file and amend my claims. There are several references where if condition gets worse we are allowed to bring it forward.

XXXXXXXXXXXXXXXXXXXXX

" Once it has been determined that DOC isin substantial compliance with this Remedial Plan, then a two year "Monitoring Period " commences during w which class counsel will monitor the designated facilities to ensure compliance is maintained during this period."

CDOC is not in complaince and I can still make claims.

XXXII Damages

"INMATES WHO HAVE ONGOING CLAIMS FOR DAMAGES MAY SUBMIT CLAIMS FOR FUTURE DAMAGES"

This gives Coit standing to submit future and ongoing damages which have not been resolved in the Accommodation Resolution as well CDOC not meeting her disability/impairments needs. All of Coits medical conditions that make her disabled/impaired have lasted more than 6 months and are permanent as medical records from CDOC medical shows.

On Page 29, third paragraph from the bottom second line,states,

" However, if a claim arises during the compliance period, then the inmate may amend his/her claim to request compensation for additional damages."

It clearly gives Coit permission to Amend her claims and get damages.

This Court has a record of how sincerely and earnestly Coit has tried to get her disability/impairment needs met by filing grievances. See grievances from CDOC AIC office, Coit does not have them and CDOC does not meet their deadlines or privide meaningful responses or even investigate her claims.