IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-JLK-OES

JESSE F. MONTEZ, et al.,

    Plaintiffs,

vs.

BILL OWENS, et al.,

    Defendants.

_____

REPORTER'S TRANSCRIPT
Compliance Hearing to Court, Day 22

_____

        Proceedings before the HONORABLE JOHN L. KANE,

JR., Senior Judge, United States District Court for the

District of Colorado, commencing at 9:18 a.m., on the 9th day

of July, 2010, in Courtroom A802, Alfred A. Arraj United States

Courthouse, Denver, Colorado.

                        APPEARANCES

        PAULA GREISEN and JENNIFER RIDDLE, King & Greisen,

LLP, 1670 York Street, CO  80206, for plaintiffs.

        ELIZABETH McCANN and JAMES QUINN, Colorado Attorney

General's Office, 1525 Sherman Street, 7th Floor, CO  80203,

for defendants.


Proceeding Reported by Mechanical Stenography, Transcription
        Produced via Computer by Kara Spitler, RMR, CRR,
        901 19th Street, Denver, CO, 80294, (303) 623-3080

```
 1                 P R O C E E D I N G S

 2      (In open court at 9:18 a.m.)

 3           THE COURT:  Thank you.  Good morning, and be seated,

 4  everyone.

 5           MS. GREISEN:  Good morning.

 6           THE COURT:  Good morning.

 7      (Joan Shoemaker was recalled to the stand.)

 8                 CROSS-EXAMINATION CONTINUED

 9  BY MS. GREISEN:

10  Q    You ready?

11  A    Absolutely.

12  Q    Okay.

13           THE COURT:  I'm plugged in.

14           MS. GREISEN:  Okay.

15  BY MS. GREISEN:

16  Q    Okay.

17           When we left yesterday, we were talking about the

18  standardized job descriptions and the standardized job process

19  that you testified about Miss McCann.

20           Now, the process that you outlined, coming up with the

21  standardized job process, that was a result of one of the

22  stipulations entered into this case in April of 2008, right?

23  A    That's correct.

24  Q    And in fact, the stipulation required the Department of

25  Corrections to . . . sorry, I thought I had the stipulation.
```

Joan Shoemaker - Cross

1    Well, it required the Department of Corrections to

2    establish a consistent standardized procedure for inmates to

3    obtain jobs and that it also required that all inmates

4    considered for a job opening and the decision-making process

5    for the inmate selected for the jobs shall be documented,

6    right?

7  A    That's correct.

8  Q    And the stipulation, which is no. 21 on the April 2008

9    stipulations, also mandated that the standardized job process

10   shall be implemented no later than July 1 of 2008.  Right?

11 A    That's correct.

12 Q    Now, your -- you testified that your target date was

13   originally January of '09, but you moved that up to December of

14   2008, correct?

15 A    The January date was not a date that I had selected but the

16   group of people I had working on converting to the standardized

17   job descriptions.

18 Q    So the standardized job descriptions, which would become a

19   part of the new job process, were to be implemented originally

20   by January of 2009?

21 A    The target that the group I had working on that MPS

22   conversion had selected January.

23 Q    Okay.

24       And then you moved that date back to December of 2008?

25 A    I did.

Joan Shoemaker - Cross                                           4

1   Q    Now, but as of December of 2008, the only training that had

2   been done was the training that you already testified about

3   which was the training that occurred in August of 2008,

4   correct?

5   A    No.

6   Q    What other training had been done by December of 2008 other

7   than the training that occurred in August of 2008?

8   A    There was training the first part of November.  Around the

9   conversion process.

10  Q    Again, we're talking about the MPS conversion to

11  standardize the job description, right?

12  A    It was the conversion of the -- what existed in the MPS

13  system to the standardized descriptions.  And began to

14  implement the change in the classification committee making the

15  decisions.

16  Q    What do you mean by "began to implement the change in the

17  classification committee making the decisions"?

18  A    Well, yesterday we looked at the document from the

19  beginning of August that talked about the work supervisor still

20  selecting the offender, that the classification committee was

21  referring.

22  Q    Right.

23  A    And we had talked about earlier that ultimately it resulted

24  in the, the process is now that the classification committee is

25  assigning the offender.

Joan Shoemaker - Cross                                    5

1  Q    So when did that start?  When did the classification

2  committee start assigning the offenders to jobs?

3  A    The classification committee started assigning offenders at

4  the same time that we transitioned to the standardized offender

5  job descriptions.

6  Q    What was the date of that?

7  A    Well, it happened in November and December.

8  Q    So as of November and December of 2009 (sic), the

9  classification committee started making the job assignments?

10 A    Yes.

11 Q    And that was, again, with respect to all jobs, including CI

12 jobs?

13 A    That's correct.

14 Q    Well, let's look at Exhibit W3.

15       I think you have the 3s up there.

16 A    I do.

17 Q    And do you recall this is a exhibit that you testified

18 about with respect to the dog program at Fort Lyons?

19 A    I do.

20 Q    And this is a memo from the warden at Fort Lyons to

21 yourself about the dog program, correct?

22 A    That's correct.

23 Q    Now, if you look at the bottom of the first paragraph of

24 that exhibit, it reads -- it's talking about Deb Stevens; it's

25 Deb Stevens is the supervisor of the job program, correct?

Joan Shoemaker - Cross

6

1  A    Correct.

2  Q    And Mr., I think it's Cozzetto, the warden?

3  A    Cozzetto.

4  Q    Cozzetto?

5        Is informing you that Miss Stevens receives all

6  offender inquiries about the program from case management,

7  right?

8  A    That's what this memo says.

9  Q    Job board approvals are reviewed, interviews conducted, and

10 selections are made solely by Miss Stevens.  Correct.

11       That's what it says?

12 A    That is what it says.

13 Q    So the warden at Fort Lyons is informing you that as of

14 March 23, 2009, the supervisor of the dog program is

15 determining who is selected for that program, right?

16 A    That's what this memo says.

17 Q    So the committee that you just talked about was not making

18 job assignments, at least with respect to the CI jobs at Fort

19 Lyon as of March 2009, right?

20 A    I see what this memo says.  I would have to go back and

21 look at the notes from the classifications -- classification

22 committee.

23 Q    Well, you --

24 A    I do realize what the warden said.

25 Q    Right.  And you don't have any reason to think the warden

Joan Shoemaker - Cross

1   is not being accurate, correct?

2   A   Without looking at -- I don't have any reason to believe he

3   didn't believe that was the process.

4   Q   Well, and when you got this memo in March of 2009, you

5   apparently didn't do anything to investigate that issue,

6   correct?

7   A   I don't remember that I looked at it at the time.  That's

8   correct.

9   Q   Now, we've talked about the standardized job descriptions

10  already.  Let's look -- go back to Exhibit R3, which is the one

11  I think we have to pull up on the screen.

12          Now, you said -- while we're waiting for this to get

13  up, you testified that a consultant worked with you on

14  preparing these standardized job descriptions; is that correct?

15          I think it was Jana Copelan?

16  A   That's correct.

17  Q   And I take it that Miss Copelan assisted you in preparing

18  all aspects of the standardized job descriptions, the criteria,

19  eligibility, essential functions portion, right?

20  A   Miss Copelan helped us take the documents -- the job

21  descriptions for offenders are like other job descriptions in

22  that there is often transition.  And we had drafted all of the,

23  the job descriptions were out and being utilized; and in

24  discussions with the AIC staff and to make sure that we had

25  clearly defined what the essential functions were, we met with

8

Joan Shoemaker - Cross

1    Miss Copelan and went through several, took her advice,

2    modified them.  She did a couple of examples for us.  And --

3    but she didn't look at every single job description.  And that

4    was, that was probably early in 2009.  So the job descriptions

5    went through several transformations.

6    Q   Okay.

7           Well, you testified that the job descriptions that we

8    see in R3 were completed in early 2009; do you recall that?

9    A   This -- the current version that you have, yes.

10   Q   Okay.

11          Well, let's look at -- let's just look at the first

12   one, which is the -- looks like the apprentice job.  Do you see

13   that?

14   A   I do.

15   Q   I just wanted to make sure it's on the screen for you.

16          MS. GREISEN:  Can you make it a little smaller?

17          I just wanted to make sure we could -- okay.

18   BY MS. GREISEN:

19   Q   The --

20          MS. GREISEN:  Is there something, if you scroll down

21   the page?

22          Okay.  Go back up.

23          That is interesting because that's slightly different

24   than the version that I printed out.

25          MS. MOOL:  That could be the CI jobs.  There's an

Joan Shoemaker - Cross

1   apprentice one and the CI jobs as well.

2          MS. GREISEN:  No, it's not the CI job.  It's just the

3   standard DOC.

4          Okay.  I don't think it's going to matter --

5          THE WITNESS:  This --

6   BY MS. GREISEN:

7   Q   I don't think it matters --

8          MS. GREISEN:  Yeah, go to that one.

9   BY MS. GREISEN:

10  Q   And you can look at any one, it doesn't really matter.

11         Animal caretaker is fine.

12         Well, the animal caretaker, isn't that a CI job?

13         Yeah, those are the CI jobs.  Can you go back to the

14  other ones.  The folders appear to be misnamed.

15         Okay.

16         That's fine, just pull up any one.  It doesn't matter.

17  BY MS. GREISEN:

18  Q   Okay.

19         So under the apprentice, which is the first page --

20  we've gone through this before -- there's qualifications at the

21  top.  Then if you scroll down, essential functions, assignment

22  duties, and then on the second page.

23         There is the, what appear to be the physical

24  requirements or also it looks like what it's -- what the

25  physical requirements of the job, right?

Joan Shoemaker - Cross

1  A   Yes.  This second page had the requirements.

2  Q   Okay.

3        MS. GREISEN:  If you could scroll down just a little

4  bit more.

5        Go ahead, stop right there.

6  BY MS. GREISEN:

7  Q   You can see on the bottom of the second page, the forms

8  themselves say they were revised in June of 2009.  Right?

9  A   This does say that.

10 Q   Well, and I'm happy to give you the printout of the entire

11 exhibit, and I'll show it to you and you can look through to

12 see that all the forms are in fact dated revised in June of

13 '09.

14       MS. GREISEN:  I'm happy to show the witness this

15 exhibit.

16 BY MS. GREISEN:

17 Q   It's R3.  So if you want to browse through that.

18       MS. GREISEN:  Why don't you just scroll down, Laurie,

19 as she's looking at them on the second page of each.

20       THE WITNESS:  I know they say June 8.

21       MS. GREISEN:  Okay.

22 BY MS. GREISEN:

23 Q   So all of these job descriptions were not finalized until

24 June of 2009, which was after the compliance date, right?

25 A   No.  I disagree with that.  These -- I would submit to you

Joan Shoemaker - Cross

1    that these documents, whatever version that you see, is the

2    version that we're using at the time.  But these, like most

3    documents, that's why it has a revision date on the bottom, so

4    that you can track the last time it was revised.

5             If you remember, in our monthly meetings, you received

6    a disk that had job descriptions on it, I believe in March.

7    And then this was another document that was produced with

8    revisions between March and June.

9    Q   The job descriptions themselves were not finalized until

10   June of 2009.

11   A   The job descriptions were finalized in October.  Then they

12   were revised.  And they were revised again.  And currently they

13   get reviewed and there could be revisions.

14   Q   So are they still in progress?  Are you still revising them

15   now?

16   A   There will always be some that change as we learn, if

17   there's a new job duty that's added, if the second page needs

18   to be revised --

19   Q   I'm not talking about minor revisions.  What I'm

20   establishing is that the substantive revisions to the job

21   descriptions were not completed until June of 2009.

22            MS. McCANN:  Your Honor, I'm going to object.  She's

23   already answered this question.

24            THE COURT:  No.  Overruled.

25            THE WITNESS:  If you look at the structure of these

Joan Shoemaker - Cross

1  job descriptions, the qualifications, the essential functions,

2  the duties, the second page, have always been a part of the job

3  description since we began this process.  We have rearranged

4  the front.  We've tried to improve to make sure that it's clear

5  what the essential functions are versus the job duties.  So

6  these -- this format of the jobs were -- that format has always

7  been used on the jobs.

8  BY MS. GREISEN:

9  Q    Well, I'm not talking about the format.  I'm talking about

10  the content.  The content, the final content, of these job

11  descriptions overall were not completed until January -- until

12  June of 2009.  Correct?

13  A    The revision -- the set that you have right here has a

14  revision date of June of '08.  I disagree with the way that you

15  are saying what that means.

16  Q    Well, let's look at a few of them.  Just because we've

17  talked so much about the condiment flatware one, let's just

18  look at that briefly.

19         And if you just look at the first page of it, that's a

20  job that has no qualifications that are required in order to do

21  the job, right?

22  A    That's correct.

23  Q    Now, we also talked, I think we've talked a lot about the

24  individual who had a job dusting bars in the cell.  In the cell

25  houses.  Do you recall that?

Joan Shoemaker – Cross

1    A    I recall hearing about that.

2    Q    Now, I don't see a dusting-bar job on the front page.  So

3    I'm just curious which job title that would fall under.  Would

4    that be a custodian job?  And we can go back to the job titles,

5    which is the very first page, if you want to look through them.

6    A    Will you scroll down.

7    Q    Actually, there's a page with all the job titles on them.

8    It should be the first page.

9    A    I believe it would be a custodian.

10   Q    Okay.

11          So somebody could have a job like -- entitled

12   "custodian" but may very well have a very narrow range of

13   duties such as dusting cell bars within that job, right?

14   A    There are a number of job duties a custodian does -- excuse

15   me.

16          A custodian would do a variety of job functions.  They

17   would be mopping and could be buffing floors; they would be --

18   it's general cleaning.  So --

19   Q    Right, I understand that a custodian could be a range of

20   duties.  What I'm trying to get at is a person could be titled

21   a custodian, but their only custodian job would be the job of,

22   for instance, dusting bars in the cell house, right?

23   A    What I don't know is at the time that that person had that

24   assignment, when that was in relationship to the standardized

25   job descriptions.

Joan Shoemaker - Cross

14

1  Q   I appreciate that.  I'm just asking generally, even with

2  standardized jobs descriptions, that situation could occur.

3  A   There are within jobs, depending on what the ADA status is

4  and the person's ability, there may -- they may not do every

5  job that's listed on a job description.

6  Q   Okay.

7        One other job description I just want to look at

8  briefly is the job called the dining room job.

9        Now, this job, if you go down to the essential

10 functions, it appears that this job, one of the duties of this

11 job is to assist disabled offenders; and I'm assuming that

12 means with food, food trays or beverages, or those kinds of

13 things in the dining room, right?

14 A   That's correct.

15 Q   Now, this job differs from an OCA job because typically if

16 you're an OCA 1 or a OCA 2, you're assigned to a specific

17 person, right?

18 A   That's correct.

19 Q   The dining room jobs are the pool concept that we talked

20 about with Miss Holst where you have a group of people in the

21 dining area whose job description is to, maybe to help people

22 with their food trays, right?

23 A   This particular assignment, as you can see, it says,

24 Perform sanitation duties, so they're cleaning tables and those

25 kinds of things.

Joan Shoemaker - Cross

1   Q    Right.

2   A    They are also -- they also are to assist a disabled

3   offender or the guy who sprained his ankle in the gym last

4   night and is on crutches.

5   Q    Sure.

6   A    So that there is someone there that can -- that is, as a

7   part of their job assignment, it's their responsibility to

8   carry a tray --

9   Q    And there may be more than one of those people in the

10  dining hall, right?

11  A    There is, even in a very small facility, there's more --

12  there's at least two because you're trying to clean tables and

13  keep people moving.

14  Q    Sure.

15  A    So, yeah, there would be more than one, and it's -- it

16  really is designed to make sure that we have someone whose job

17  that is to get the tray from one location to another.

18  Q    So what I -- my question was, this is again kind of the

19  pool concept of people who help individuals with disabilities

20  in the dining room that we talked about with Miss Holst

21  earlier, right?

22  A    Correct.

23  Q    Now, you testified that, previously, that case managers are

24  given both pages of the job descriptions to review, right?

25  A    They're available on the share drive.

Joan Shoemaker - Cross

16

1   Q   Okay.

2           And that -- we probably didn't get to this.

3           The second page --

4           MS. GREISEN:  And if you could just pull up a second

5  page, Laurie.

6  BY MS. GREISEN:

7   Q  And it's kind of hard to read on the screen.  But I'm

8  assuming that you're familiar enough with them to answer the

9  question.  If not, I'll hand you the hard copy of the exhibit

10  back.

11          But it's fair to say, isn't it, that the requirements

12  of this position for, I think almost every job description in

13  this packet requires somebody being able to perform some level

14  of seeing, hearing, standing, bending, that sort of a physical

15  activity, right?

16  A  I think that's accurate.

17  Q  Now, let's look back at Exhibit O3, and I think I have put

18  the 3s on the bench there.

19          O3 is again the AR, the administrative regulation,

20  that you implemented April 20 of 2009, with respect to the

21  standardized job process, and I'd like you to turn to page 5.

22  And under -- on page 5, under subsection E, that's the section

23  that is entitled "referral," right?

24  A  That's correct.

25  Q  That's the section that explains to the case managers how

Joan Shoemaker - Cross

1    they are supposed to refer an inmate for a job to the

2    classification committee, the process that is gone through,

3    right?

4    A    Correct.

5    Q    Now, it says under 1C that the case managers -- well, I'm

6    sorry, going back to 1B, it first says that prior to referral,

7    case managers will ensure offenders meet the minimum

8    requirements before referring an offender to an assignment.

9    Right?

10   A    That's what it does say.

11   Q    And it also, under C -- well, let me start with B first.

12        The minimum requirements, that language is not used in

13   the three different sections of the job description, correct?

14        The first section says "qualifications," right?

15   A    Correct.

16   Q    The second section says "essential functions," right?

17   A    Correct.

18   Q    And then the third section is basically a

19   physical-requirement list, right?

20   A    So a better term in this AR, instead of minimum

21   requirements should be minimum quals --

22   Q    Well, that might be a better term, but my point is that in

23   looking at the AR, it would be, it would appear that the AR

24   directs the case manager to look at all three of these criteria

25   to determine whether or not somebody in fact should be in fact

Joan Shoemaker - Cross

1    be referred for an assignment, correct?

2    A    I don't -- I understand what your concern is, and you're

3    correct that we shouldn't have used "requirements," we should

4    have used "quals."  However --

5    Q    Let me just have you answer my question first.

6            It's fair to say that the way it's written, it's fair

7    to suggest that all three of the criteria should be referred

8    when making a referral, right?

9    A    No.  If you look at the end of the statement, where it says

10    e.g., food handler, high school, food-handler certificates.

11    Q    And then it says "et cetera"?

12    A    I believe that gives directions to the case managers to

13    look at the quals.

14    Q    And then it says "et cetera"?

15    A    It does say "et cetera."

16    Q    And then the next paragraph says, Case manager will review

17    offender requests for assignments to ensure that, quote,

18    established assignment criteria are met prior to referral.  Do

19    you see that?

20    A    I do.

21    Q    Again, it does not say what the established assignment

22    criteria refers to.  In the AR, right?

23    A    It does not say it in this section.

24    Q    The reading of this could easily be read to mean that all

25    three of the sections that we've just talked about would be the

Joan Shoemaker - Cross

1  established assignment criteria.  Correct?

2          MS. McCANN:  Objection, Your Honor.  Calls for

3  speculation.

4          THE COURT:  Sustained.

5  BY MS. GREISEN:

6  Q   There is no place in the job, two-page job description

7  where an established assignment criteria is indicated, right?

8  A   The established assignment criteria does not refer to the

9  job description.  It refers to the manual that allows

10  facilities to establish criteria for assignments.

11  Q   Well, that's not what it says in EC.  It doesn't refer to a

12  manual in E1C, does it?

13  A   It does not refer -- I think you're taking out of context

14  established assignment criteria.  That's defined in this AR,

15  and facilities have a process where you have to meet certain

16  things before you're eligible to apply for another job.  I

17  would describe that as established assignment criteria.

18  Q   Well, I'm looking under the definition section of this AR,

19  and established assignment criteria is not under the definition

20  section of the AR.  Correct?

21  A   It is not a definition.

22  Q   And in fact, section E1C does not refer the case managers

23  to any job manual in determining what the established

24  assignment criteria should be, correct?

25  A   That's correct.  However, if you look at page 4, 3C, it

Joan Shoemaker - Cross

1    describes the assignment manual and requirements for specific

2    first assignments such as food service or labor crew will be

3    included in the manual.

4          So this --

5    Q    I'm sorry, where are you referring to?

6    A    Page 4.

7    Q    Uh-huh?

8    A    3C.

9    Q    Okay.

10         Well, that talks about the fact that every facility

11   will have an assignment manual available in the general

12   library, right?

13   A    And the first assignment criteria facilities can establish

14   a process so you might have to be on a, in food service or on a

15   labor crew, that's the established assignment criteria.

16   Q    Well, that's, that's not what that says.  The term

17   "established assignment criteria" is nowhere in section 3C that

18   you just referred to.  Correct?

19   A    The words are not the same on both pages, you're correct.

20   Q    And there's nowhere in the instructions to the case

21   manual -- case managers that they are to refer to an assignment

22   manual which contains the facility quota report to determine

23   what the established assignment criteria are for the job,

24   correct?

25   A    You are correct that it does not list it in the E1A through

Joan Shoemaker - Cross

1   C.

2   Q   Now, E1C also references the MPS code 13 which you

3   testified about with Miss McCann.  Do you remember that?

4   A   I do.

5   Q   And I believe it was in August of 2008 the memo stated as

6   of that time the case managers were to immediately start using

7   code 13.  Correct?

8   A   Correct.

9   Q   Now, code 13 was designed so that if an inmate wanted a

10  specific job but didn't get that job because they were not

11  qualified, case managers were to detail in the computer under

12  this code the reasons why an inmate was not referred for that

13  job, right?

14  A   Correct.

15  Q   And if used correctly, you could pull reports for all the

16  code 13 entries and you could -- that report could assist DOC

17  in monitoring job referrals to make sure that they were

18  nondiscriminatory, right?

19  A   The code 13 would give you the information about why they

20  were -- that they didn't meet the qualifications for the job.

21  Q   Right.  It would let you see exactly what case managers are

22  looking at to determine whether an inmate should get a job that

23  they're asking for, right?

24  A   Correct.

25  Q   To make sure that they are in fact looking at the right

1  criteria and that they're referring for jobs in a

2  nondiscriminatory manner, right?

3  A   That they're looking at the right qualifications, that's

4  correct.

5  Q   Right.

6       But no such reports have ever been pulled by yourself

7  or given to the AIC to look at whether or not case managers are

8  in fact using the criteria, correct?

9  A   I have not pulled a report off of the code 13 for a while.

10  When we first started using it, I was reviewing it to assure

11  that they were beginning to implement it.

12  Q   Well, at the end of the compliance period, did you pull any

13  kind of reports on code 13 so you could produce to the Court to

14  show the Court that case managers were making referrals for

15  jobs in a nondiscriminatory manner?

16  A   I did not.

17  Q   Now, in fact, by the end of the compliance period, the case

18  managers were not uniformly putting the required information

19  into that code 13 entry in the data field, correct?

20  A   Without having pulled a report, I can't answer that

21  question.

22  Q   Okay.  Well --

23  A   There is a problem with the code 13 because it's only going

24  to give you the things that they were ineligible for.  If

25  they've used the code 13 and they are hired, the entries into

Joan Shoemaker - Cross

1  the code 13 go away.  Which is a problem with our system.

2  Q    Well, if somebody said, I wanted to work in the canine

3  program and the case managers said, well, this person's

4  ineligible for that program, the case manager is required to

5  put a code 13 into the computer and explain the reasons why

6  that person was not eligible for that program, right?

7  A    That's correct.

8  Q    So you could print out a report to see what in fact

9  criteria the case manager used to make that decision, right?

10 A    You could see if they reviewed the qualifications for the

11 position, that's correct.

12 Q    And such reports could have been pulled but were not,

13 correct?

14 A    I did not pull them.

15 Q    Now, you said that audits were done by Mr. Harlan and his

16 team.  I wasn't sure who was on the team.  But is it fair to

17 say that Mr. Harlan was conducting audits of the facilities to

18 see whether or not they were using the standardized or some of

19 the standardized job processes that had been trained on?

20 A    That's correct.

21 Q    And you testified that that audit occurred in January and

22 February of 2009, correct?

23 A    Yes, I believe it did.

24 Q    Now, let's look at the audit itself.

25           It's Exhibit J4.  I think you have the 4s up there.

1        Now, this is an exhibit that you talked about with

2   Miss McCann.  These -- this exhibit contains the audits that

3   were produced by the defense and are marked as Exhibit J4.

4   These are the audits that you just testified about, right?

5   A    That's correct.

6   Q    Now, not all of the audits are dated, but in fact, if we

7   look at the ones that are, you'll see the first one is for Four

8   Mile, and on the second page, it has a date of March 16 of

9   2009, right?

10  A    It does.

11  Q    And the second one, I don't -- the second one doesn't have

12  a date.  But the third one also of Skyline has a date of

13  March 16 of 2009.

14  A    The second one for Arrowhead has the same date, March 16.

15  Q    Okay.

16        And I think you'll see the same date on Skyline.

17        These aren't Bates numbered or I would direct you to a

18  Bates.  But Skyline is again on the MPS form.  For Skyline has

19  a date.

20        It's the fourth from the last document in the Skyline

21  audit.

22  A    Skyline, March 16.

23  Q    And we're not going to go through all of them, but the last

24  one -- the next one, Sterling, actually that audit wasn't done

25  until the 23d of March.  That's on the sixth page of that

Joan Shoemaker - Cross

1    audit.

2            Is that correct?

3    A    That's correct.

4    Q    So it appears that -- and you can look through the rest of

5    them.  It appears that the audits were actually done mid March

6    to -- in the March 2009 time period, right?

7    A    I obviously had my months incorrect.

8    Q    Now, I looked through these audits, and there are eleven

9    audits here.

10   A    Well, if you just counted the staples.  There are a

11   couple -- there are more facilities than that, because some of

12   the different facilities got stapled together.

13   Q    Well, there are, you testified, 22 state facilities and

14   five private facilities.  Do you recall that?

15   A    Yes.

16   Q    And the audits for all of those facilities are not included

17   in this exhibit, right?

18   A    That's correct.  For --

19   Q    In fact, there are no audits of any of the private

20   facilities in this exhibit, right?

21   A    I don't believe there are.

22   Q    Well, let's look at some of the results of the audit.

23           Would you agree, Miss Shoemaker, that the audits of

24   pretty much across the board indicated that the facility staff

25   needed more training and education on the job process?

Joan Shoemaker - Cross

1  A    I believe that they found missteps in the process and

2  worked with the people when they were doing the --

3  Q    Do you agree that the audits pretty much across the board

4  shows that facility staff needed more education in the job

5  process?

6  A    That's probably a fair statement.

7  Q    And that the audit also found that the standardized job

8  descriptions were not always being used?

9  A    As I remember the review, they were used, but they weren't

10  always signed or filled out completely.

11  Q    Well, let's look at some of the audits, then.  We'll go

12  through some of them.  Not all of them.

13        Four Mile.  Do you see on the first page, under the

14  conclusion section, the conclusion stated, quote, We found that

15  most staff did not know exactly what documentation were needed

16  or they did not know what to do in some cases, so as we

17  proceeded to educate them through the process, wherever we

18  went, to the best of our knowledge, right?

19  A    That's what it says.

20  Q    And if we go and look at the audit comments section at the

21  back, the second page of the audit comments section, no. 7.

22        There's a comment that after discussion and review, we

23  could not find an offender that has been staffed for assignment

24  based on an accommodation.  The process was gone over with

25  staff as to process if this would occur, right?

Joan Shoemaker - Cross

1  A   It does make that comment.

2  Q   And that means that there has not been an inmate with a

3  disability who has gone through the standardized job process

4  that you've talked about at Four Mile as of the date of the

5  audit, right?

6  A   It means they didn't find anyone that had documentation of

7  a conversation with the AIC.

8  Q   Well, it says, After discussion and review, we could not

9  find an offender that has been staffed for an assignment based

10 on an accommodation, right?

11 A   Right.  But they had not been staffed.

12 Q   Right.

13       Which means that there has not been an inmate with a

14 disability who has gone through the job process at Four Mile,

15 the new standardized job process, and staffed with an

16 accommodation, correct?

17 A   It means they have not been staffed for the accommodation.

18 Q   So the answer --

19 A   Doesn't mean that they haven't been assigned.  But they

20 didn't complete the process, I would agree with you on that,

21 that that's what that comment means.

22 Q   Well, it means that they haven't been assigned according to

23 the now job process that you've testified extensively about in

24 this case, right?

25 A   I can't make an assumption from this comment that they

Joan Shoemaker - Cross

1   weren't assigned.  I can make an assumption from the comment

2   that they did not complete the process, including talking to

3   the AIC staff.

4   Q   Which is a required part of the new job process that you've

5   testified about.

6   A   That's correct.

7   Q   Right?

8          Let's look at Fremont.

9          And again, if you look at the conclusion section of

10  Fremont, on the second page, again it states . . . Fremont is

11  the next audit.  Do you see it?

12  A   I have Arrowhead as the next audit.

13  Q   Well, mine is Fremont, so can you look at Fremont?

14  A   I certainly can.

15  Q   Okay.

16  A   All right.  I have Fremont.

17  Q   All right.

18         The second page of Fremont states under the conclusion

19  on the second page, third sentence, quote, It seems that

20  education of what is needed is the issue at this facility as

21  well as the others that so far have been visited, right?

22  A   That's correct.

23  Q   And if you look at Limon, which is the next audit in my

24  book.

25  A   Okay.

Joan Shoemaker - Cross

1   Q   Under no. 5 on the first page, in reference to the hobby

2   shop, the audit team stated, Relief staff in the shop

3   apparently have no idea of job descriptions and/or Montez.  Do

4   you see that?

5   A   I do.

6   Q   The second page, the last two paragraphs says, quote, Code

7   13 is not being used correctly.  There were very few completed

8   in DCIS, and they were only being completed when denied a work

9   assignment by work supervisors.

10          Do you see that?

11  A   I do.

12  Q   And it goes on to say there was no documentation of

13  assignment-related accommodations.  However, there was a

14  hearing being completed between classification, work

15  supervisor, inmate, and AIC on the day the audit was completed,

16  right?

17  A   I see that.

18  Q   Now, we don't know what date this is because this audit

19  does not have a date on it.  Correct?

20  A   That's correct.

21  Q   My next audit is Skyline.

22  A   Okay.

23  Q   Second page of the audit, The food services portion of

24  Skyline was not using standardized job descriptions.  Do you

25  see that?

Joan Shoemaker - Cross

1    A    The comment about food services was that they looked

2    different but they thought it was because of a printer.

3    Q    Do you see on page 2 of the Skyline --

4    A    I do see --

5    Q    -- it says using standardized job description, the entry

6    was no?

7    A    I do see that.

8    Q    And you're referring to the description on the first page

9    that suggests there may be a computer problem?

10   A    I believe it's saying that they thought they looked

11   different because of the printer that they were using.

12   Q    You're referring to the sentence, It could be the printer

13   was set different or something.  Right?

14   A    Right.

15        And we looked into it and were able to print off good

16   job descriptions.  And the staff will make a better copy of the

17   form and utilize it.  So.

18   Q    And then on page 4, again item no. 7 under comments, We

19   again see that the staff indicated there were no offenders that

20   had yet to be staffed for work accommodation, right?

21   A    However, the rest of the comment says, The ADA offenders,

22   mostly diabetics, are no issue for them at Skyline.

23   Q    Well, Skyline also has work crews, right?

24   A    They do have work crews.

25   Q    And work crews sometimes go beyond the fence, right?

Joan Shoemaker - Cross

1    A    Yes.

2    Q    And you understand that when you have a diabetic who is

3    going beyond the fence, accommodations may need to be provided

4    for that diabetic so that they can work beyond the perimeter,

5    right?

6    A    They're beyond the perimeter, but they're still on the

7    campus of the East Cañon complex.

8    Q    My question is if they're beyond the perimeter, there may

9    need to be accommodations provided to diabetics to engage in

10   that work, right?

11   A    You're correct except that Skyline is on the East Cañon

12   complex, and they're not going off the prison grounds.  So it's

13   much easier to manage it at Skyline than it is at Buena Vista

14   when they're hours away from the institution.

15   Q    Sure it, it may very well be.  But they may need the

16   accommodation of coming back for an insulin shot, right?

17           MS. McCANN:  Objection, Your Honor, speculation.

18           THE COURT:  Overruled.

19           THE WITNESS:  Skyline would not have insulin-dependent

20   diabetics.

21   BY MS. GREISEN:

22   Q    Skyline doesn't have any insulin-dependent diabetics?

23   A    I don't believe so.  Because they don't have a clinic on

24   site.

25   Q    So no inmates on insulin are allowed to be placed at

Joan Shoemaker - Cross

1   Skyline?

2   A   That's correct.

3   Q   But Skyline is a designated facility in this case, right?

4   A   I don't remember what Sky -- I'm sure you're right.  I just

5   don't remember offhand what Skyline's designation is.

6   Q   Well, Skyline is a level 1 designated facility, along with

7   Camp George West, Sterling, Fort Lyon, and Boot Camp, right?

8   Do you need to see the remedial plan?

9   A   I believe that you're accurately reading it.  I'm happy to

10  look at it, but I just didn't remember what kind of offenders

11  could be assigned at Skyline as far as ADA.

12  Q   I want to make sure I understand this.

13          It also your testimony that insulin-dependent

14  diabetics can't be placed at Camp George West?

15  A   That's correct.

16  Q   Are there any level 1 facilities in which you believe

17  insulin-dependent diabetics can be placed?

18  A   Delta.

19  Q   Is that the only one?

20  A   I'm missing a level 1.  Skyline, Colorado Correctional

21  Center, Delta . . . Rifle.

22          So Delta.  Is the only level 1 that insulin-dependent

23  diabetics can be housed at.

24  Q   And has that been the policy throughout the last compliance

25  period?

Joan Shoemaker - Cross

1   A    It's -- yes.

2   Q    All right.

3         We'll talk -- we may talk some more about that later.

4         Let me get back -- before we get off track, the issue

5   that we were talking about.

6         Even if an inmate doesn't need an accommodation of

7   getting an insulin shot, a inmate with diabetes may need

8   another accommodation to work off -- while they're working off

9   grounds, such as bathroom privileges, right?

10  A    They may need an accommodation.  But I've never had an

11  issue with bathroom privileges around an outside work crew.

12  Q    Well, and I don't really mean to center on what the

13  accommodation is.  The point is that simply because they're a

14  diabetic doesn't mean that they're not going to need

15  accommodations to do a job, correct?

16  A    It doesn't mean that they need accommodations and just

17  because they're diabetic doesn't mean that they always need

18  them.  So you're correct that they may or may not need any

19  accommodations to be able to work.

20  Q    What are the daily job change reports?

21  A    A daily job change report is a report that goes out for

22  offenders and staff to know what inmates may have moved and are

23  not going to be at their assigned assignment the next day or in

24  the event of a large facility, the classification committee may

25  be making assignments on a daily basis.

Joan Shoemaker - Cross

1   Q    Now, at Sterling -- you have the Sterling -- can you look

2   at the Sterling audit?

3   A    I have it.

4   Q    Were there -- and I'm not going to go through all of it

5   because it's a long audit.  But I do want to talk about the

6   conclusion at the end.

7         It's a conclusion at the -- which is on the fourth

8   page.

9   A    I have it.

10  Q    About a little over halfway down, under the conclusions.

11  Do you see the sentence that reads, quote, There is no job

12  board that is conducted at this facility?

13  A    I see that.

14  Q    So what that is saying is that this classification

15  committee that has been established to independently review an

16  assigned, assign jobs to inmates apparently is not operating at

17  Sterling, correct?

18  A    That's what this says.

19  Q    And we have a date on this audit, again, as of the 23d of

20  March of 2009, correct?

21  A    Correct.

22  Q    And again, if you look under the comment section, back to

23  that section 7, again it's being reported that at Sterling,

24  there is no -- there has not been any inmate staffed by the AIC

25  for a work assignment as of the date of the audit, right?

1  A    That's correct.

2          THE COURT:  Let's take a break now.

3      (Recess at 10:17 a.m.)

4      (Reconvened at 10:39 a.m.)

5          THE COURT:  Thank you.  Be seated, please.

6          Go ahead.

7  BY MS. GREISEN:

8  Q    I believe we were at the Sterling audit when we left.  Do

9  you still have that in front of you, Miss Shoemaker?

10 A    Yes.

11 Q    I want to move on to the TCF audit, which is -- that's

12 Trinidad, right?

13 A    It is.  And it happens to be the next one in my book.

14 Q    Okay.

15         Well, we'll just look at a couple of issues at

16 Trinidad.  Again, if you just look at the second page of the

17 audit, under the conclusions.  Again, the auditors are noting

18 that education is what is needed at Trinidad, right?

19 A    That's correct.

20 Q    And in fact, again if we look at the comments section 7, we

21 again see that no inmates with disabilities had been staffed at

22 Trinidad that needed verification of assignment-related

23 accommodation to date, correct?

24 A    That's the comment.

25 Q    And again, look at the next one, which is AVCF, Arkansas

Joan Shoemaker - Cross

1  Valley.

2          If you look under the conclusion on the second page,

3  the auditor states, quote, I believe with more education

4  throughout the Department on Montez and MPS, will become part

5  of the daily functions in DOC, right?

6  A   That's correct.

7  Q   If we look at Arrowhead.

8          Under the conclusion section on the first page.  Again

9  the auditor indicates, The staff seemed to me to be educated.

10 Right?

11 A   That's correct.

12 Q   In fact, just one other thing of note on Arrowhead, if you

13 look under the canteen section on the first page, the auditor

14 also noted that, quote, An issue that was brought up by staff

15 was that they employ an offender with diabetes and he has on

16 occasion issue with his sugar level.  They had asked for a

17 diabetic kit but was denied by medical.  Do you see that?

18 A   I do.

19 Q   Let's also look on the comment section under no. 7 for

20 Arrowhead.  And again, we find out that there's not been an

21 inmate with a disability who has been staffed for an assignment

22 for an accommodation at Arrowhead, right?

23         Under no. 7?

24 A   It does say that.  Yet there's also a reference to Four

25 Mile.

Joan Shoemaker - Cross

1  Q   That's true.  It makes a reference to Four Mile, so we

2  don't know whether this actually goes with Arrowhead or not,

3  right?

4  A   Correct.

5  Q   The next one that's actually attached to Arrowhead is Buena

6  Vista.  And it appears that that audit was done in April of

7  2009.

8  A   So --

9  Q   Do you see that?

10  A   Are you looking at BVCF or BVMC?

11  Q   There's a BVMC that's entitled, the first page of that is

12  entitled MPS slash ADA job description audit form?

13  A   Right.

14  Q   Dated 4-11 of 2009?

15  A   That's correct.

16  Q   Okay.

17      I was going to go to BVCF.  If you then turn to BVCF,

18  which was the Buena Vista Correctional Facility, right?

19  A   Correct.

20  Q   It appears that the living units, the east living units and

21  south living units, were apparently not using standardized job

22  descriptions at that facility, correct?

23  A   That's what the table says.

24  Q   Let's go on to Territorial.

25      And if you could look on page 3, the conclusions

1   section?

2   A   Okay.

3   Q   And the second sentence states, Safety documentation needed

4   to be worked on as the staff did not really know what they

5   needed.  So the staff needs to be educated to what is needed as

6   this seems to be the case across all the facilities.  Right?

7   A   Talking about the safety documentation.

8   Q   That's what -- I quoted accurately what this sentence said;

9   is that correct?

10  A   Uh-huh.  That's correct.

11  Q   Now, on page -- the comment section under 7, again at

12  Territorial, where you know a significant number of individuals

13  with disabilities are housed, right?

14  A   That's correct.

15  Q   But again, on no. 7, it notes that there was no

16  accommodations that were staffed by the AIC on job site

17  conditions according to staff.  At Territorial, correct?

18  A   That's correct.

19  Q   The Four Mile is the next one I have.  I'm sorry, not Four

20  Mile.  Fort Lyon Correctional Facility is the next audit that I

21  have.  And the last audit.

22  A   I have it.

23  Q   And it appears that, on building 5, the first entry notes,

24  No quota reports were being posted, right?

25          The last sentence.

Joan Shoemaker - Cross

1   A   That's what it said.

2   Q   Building 4, going down to no. 4, also indicates the daily

3   job sheet was not posted and in the area on any bulletin board,

4   right?

5   A   It does say that.

6   Q   And if you look on the conclusions on page 2, it stated,

7   quote, The areas that were discussed needed direction and I

8   felt that they received direction that guided down the road to

9   a level of document compliance that has been relayed to the

10  audit team, right?

11  A   That's correct.

12  Q   And then if you go to the comments about Fort Lyon and

13  again turn to no. 7, again Fort Lyon, a facility that houses a

14  significant number of individuals with disabilities, right?

15          Correct?

16  A   Fort Lyon does house offenders with disabilities.

17  Q   Well, not just some, but a significant number, correct?

18          A large number?

19  A   Percentage-wise for the population, yes.

20  Q   And in fact, again the audit indicates that Fort Lyon

21  indicated that they had not staffed any offender thus far with

22  the AIC.  Do you see that?

23  A   I do.

24  Q   And it goes on to say that they have one now that

25  apparently they're going to present to the job board, right?

1   A    That's correct.

2   Q    So -- and this audit is as of the 11th of March 2009,

3   right?

4   A    Correct.

5   Q    Now, going back to Exhibit O3, and you probably still have

6   it in front of you; you may not need to look at it to answer my

7   question, but feel free to do so.

8        We talked about the classification committee as -- I

9   think you've described it, it was designed to be an impartial

10  way for job assignments to be made, right?

11  A    Correct.

12  Q    This group, I think you said, of about three individuals,

13  would not be looking at the inmate; they would simply be given

14  information about the inmate and make job assignments based on

15  objective criteria.  Right?

16  A    That's correct.

17  Q    Now, if we look on -- I don't know if you have it in front

18  of you -- the AR itself states that the activities and

19  decisions that are made by the classification committee

20  regarding who gets what job has to be recorded and archived,

21  right?

22  A    That's correct.

23  Q    And this would in fact be another very good tool for the

24  Department to use to analyze whether inmates with disabilities

25  were getting job assignments in a nondiscriminatory manner,

Joan Shoemaker - Cross

1   right?

2   A    Correct.

3   Q    And in fact -- however, none of those records of how the

4   classification committee is assigning jobs have been produced

5   to class counsel in this case.  Correct?

6   A    That's correct.

7   Q    And you have never set down and conducted any reviews or

8   generated any reports of those classification committee

9   documents to ensure that in fact jobs were being assigned in a

10  discriminatory (sic) manner, right?

11  A    I have not reviewed the classification committee minutes.

12  Q    And to your knowledge, nobody has ever given the AIC's

13  office any of those documents which describe how the

14  classification committees are actually making job assignments,

15  correct?

16  A    I have no knowledge one way or the other.

17  Q    Now, I believe you testified before when you were talking

18  about the MPS system, that an inmate's name goes into the MPS

19  system along with their job and the pay code.  All that

20  information is contained in the MPS system, right?

21  A    The pay codes are part of the business rules for the

22  system.

23  Q    Okay.

24  A    So when you enter certain kinds of jobs, it -- the system,

25  the computer, knows what to pay those individuals.

Joan Shoemaker - Cross

1    Q    Okay.

2           And that's how, in fact, individuals are paid, right?

3    They use the information on the MPS system to determine how

4    much to pay an inmate every time they get paid, right?

5    A    It's the only way that inmates are paid.

6    Q    Okay.

7           So if the inmate is not on the MPS system, the inmate

8    is not going to get paid, right?

9    A    There are payroll sheets have to be entered that show how

10   many days the offender was at work and those kinds of things.

11   So there's a monthly, there's a monthly payroll get done for

12   offenders that are getting paid, just like you and I would.

13   Q    And it's fair to say now that the inmate would have to have

14   one of the standardized job descriptions assigned to him or her

15   in order to get this -- their payroll, correct?

16   A    They have to have -- they have to be put into the MPS

17   system to get paid.

18   Q    And they would have to be put into the MPS system under one

19   of the standardized job descriptions or in one of the

20   unassigned categories, right?

21   A    Right.  I don't know if the MPS system offhand looks at the

22   program description.  Because there are not very many pay

23   grades in our system, it's -- it may or may not be based on the

24   individual job description.  Because if you work full-time, you

25   get 60 cents a day.

Joan Shoemaker - Cross

1    Q    Okay.

2    A    But, yes, it gets paid, that's why there's a payroll sheet,

3    because if there's incentive pay or bonus bay, that has to be

4    put on a monthly system.

5    Q    Does the system allow the inmate to be put in and given

6    something other than the standardized job descriptions or

7    program descriptions when they are put into the MPS system?

8    A    No.  You have to use the programs that were available in

9    the MPS system.

10   Q    Okay.

11          And for jobs, the programs that are in the MPS system

12   are the ones that we just looked at in Exhibit R3, right?

13   A    Yes.

14   Q    Okay.

15          And you also testified that there are jobs at every

16   facility?

17   A    That's correct.

18   Q    And that inmates, if they perform a job or work in a

19   program, they are to be paid, right?

20          Or DOC pays them?

21   A    If they are entered into the MPS system, there is a, there

22   is pay associated with that.

23   Q    Let's look at Exhibit S3.

24          Laurie's pulling that up, so while we're waiting on

25   her, let's look at Exhibit K.

Joan Shoemaker - Cross

1       Now, if you -- do you have Exhibit K in front of you?

2    A   I do.

3    Q   If you turn to page 19.

4        Under work programs.

5    A   Yes.

6    Q   Now, Exhibit K is the DRDC orientation manual for inmates,

7    right?

8    A   That's correct.

9    Q   And the -- under "work programs," the third paragraph

10   states, All able-bodied offenders are required to work unless

11   assigned to an approved education or training program.

12   Handicapped offenders will be allowed to work on

13   special-project assignments.  Right?

14   A   That's what the document says.

15   Q   Well, let's see.

16       MS. GREISEN:  Do we have S3 pulled up yet?

17   BY MS. GREISEN:

18   Q   S3 is the printout that Miss McCann put into evidence

19   showing the job and programs at each facility.

20       MS. GREISEN:  I'd like to go down to the DRDC section

21   of this exhibit.

22       So go all the way down.  You might have to make it a

23   little smaller.

24       Whoops.  Go back just a little bit.

25       It's after -- okay, there you go.

Joan Shoemaker - Cross

45

BY MS. GREISEN:

Q   Now, these are all of the jobs and programs listed for
DRDC.  Do you see those?

A   I do.

Q   And it does not appear on this list that there are any jobs
listed for DRDC, right?

A   The only offenders who have assignments at DRDC are the
small number of inmates that I would describe as permanent
party.  So diagnostic inmates, because they're going through
the diagnostic process, do not have an assignment.

Q   My question to you is there are no jobs at DRDC, correct?

A   The jobs at DRDC are covered under Denver Women's because
the work force that is at DRDC is from the women's facility
side.

Q   Well, the special-project assignments that are listed in
DRDC's orientation manual, where would they appear, under what
category would they appear in the DRDC program listing?

A   I don't have an explanation for you why this says that.
And what appears on this screen.

Q   Well, the fact is, Miss Shoemaker, that inmates with
disabilities at DRDC are given special assignments, but they
are actually not paid money to do those jobs, correct?

A   Without looking at the report, without pulling information
out of MPS, I can't answer your question right now about that.

Q   Well, as the prior warden of the Denver complex, which

Joan Shoemaker - Cross

1  includes DRDC, are you not aware that the inmates with

2  disabilities who work on special-project assignments at DRDC

3  are not paid money to work in those positions?

4  A   When I was the warden in the Denver complex, the

5  permanent-party offenders had job assignments.  Most of them

6  were part-time.  And they were highly specialized, but I don't

7  have an explanation for you about why this screen does not show

8  that.

9        This information was pulled after I left the complex.

10  I can tell you, when I was there, they were paid.

11  Q   So sitting here today, you don't know one way or another

12  whether or not the special-assignment projects that show up on

13  this are paid positions at DRDC, right?

14  A   I don't see a correlation between what is in this

15  orientation document and what's on the screen right here.  The

16  education that shows up on this screen and the mental-health

17  anger management program and the student job title I believe

18  are the, what I would call permanent-party offenders because we

19  did have programs and a few job assignments for those

20  offenders.

21  Q   Well, and it says, Able-bodied offenders are required to

22  work unless assigned to an approved education or training

23  program.  And the education program and training program would

24  appear to be the two education mental-health programs listed

25  here, right?

Joan Shoemaker - Cross

A    But, again, the only offenders who have an assignment at

the Denver reception and diagnostic unit are that small cadre

of 15 to 20 offenders who are there for dialysis, and they did

take educational classes.  In fact, while I was warden, one of

our dialysis inmates actually attended the graduation

ceremonies that we had on the women's side because he was the

only one that had completed courses and it, it turned out fine,

everyone had a good time, but the women thought it was very

interesting that we had one male offender participating in

their graduation.

Q    Well, the fact is, whether it's ten, 15, 20, or 25, the

majority of people who are permanently housed at DRDC are

inmates with disabilities, correct?

A    They are.

Q    All right.

Let's look -- and I wanted to come back to a concept

that you had talked about earlier; and I can't remember whether

it was with me or -- I think it might have been with

Miss McCann.

You talked about the fact that early on you, as well

as some other people, sat down and made some revisions to the

ARs because of use of the term "able-bodied offenders" did not

accurately reflect the DOC's position that eligible -- people

should be looked at in terms of their eligibility and not in

terms of whether or not they were, quote, unquote, able-bodied

Joan Shoemaker - Cross

1    or not?

2    A    Correct.

3    Q    Able-bodied in and of itself is a term that implies that

4    people with disabilities are not able-bodied, right?

5    A    Correct.

6    Q    It's a discriminatory -- has a discriminatory context, that

7    term, right?

8    A    It gives you a picture of what that person's functioning

9    is.

10   Q    Well, in a kind of discriminatory context, right?

11          MS. McCANN:  Well, Your Honor, that's really asking

12   for a legal conclusion, and I'm going to object.

13          THE COURT:  I don't know what you call somebody with

14   no legs and one arm.  It's descriptive.  You're getting into

15   political correctness, which I've never been able to

16   understand.

17          MS. GREISEN:  Well, she made the point on the

18   examination with Miss Holst.  They brought it up originally, so

19   I'm just following up on what was discussed.

20          THE COURT:  Okay.  Go ahead.

21   BY MS. GREISEN:

22   Q    That carryover wasn't apparently worked into the verbiage

23   at DRDC's orientation unit, right, the concepts that you were

24   talking about?

25   A    The context of our discussion was around an ACA standard

1    where we changed "able-bodied" to "eligible."

2            I don't know why it's in the DRDC orientation manual.

3    Or orientation document.

4    Q   Well, since we're on -- we're still on jobs, let's talk

5    about the dog program that you talked about with Miss McCann.

6    You testified about the canine program at Fort Lyon?

7    A   I did.

8    Q   And you recall on initial examination or initial testimony

9    with Miss Holst, I had brought up the fact that there was an

10   individual at Fort Lyon by the name of Mr. Colley who was in a

11   wheelchair who wanted to get into the dog program.  Do you

12   recall that?

13   A   I do.

14   Q   And in fact, he was not accepted into the dog program and

15   the AIC's office intervened on his behalf to try to find out

16   why Mr. Colley was not admitted into the program.  Do you

17   recall that?

18   A   I do.

19   Q   Now, and if you want to look at his AIC sheet to refresh

20   your memory on all this, just let me know.

21           But it was testified about that the AIC office

22   questioned the supervisor as to why Mr. Colley was not let into

23   that program.  Do you recall that?

24   A   I do.

25   Q   And in fact, the supervisor didn't respond to the AIC's

Joan Shoemaker - Cross

1  inquiries about why a person with no disability was hired over

2  Mr. Colley.  Right?

3  A    Right.

4  Q    And then a couple weeks later, we learned that the canine

5  program was then closed.  At Fort Lyon.  I mean at -- yeah, at

6  Fort Lyon.  Do you recall that?

7  A    Correct.

8  Q    So you offered an explanation with Miss McCann that the

9  Fort Lyon dog program was closed because there was an argument

10  between the supervisor and the warden, correct?

11  A    Correct.

12  Q    And the argument centered around, I guess, where

13  Miss Stevens, the supervisor, wanted to park her car, right?

14  A    Correct.

15  Q    Now, that's, however, was not consistent with what class

16  counsel was told in our monthly meetings, that in fact the dog

17  program was closed because of budget reasons.  Do you recall

18  that?

19  A    I think the term was "business."  Reasons.

20  Q    Well, let's look at Exhibit 439.

21       And that is in stip 15.

22  A    The exhibit number is?

23  Q    439.

24       Exhibit 439 is an e-mail from the supervisor, Deb

25  Stevens, of the dog program, to the office of the AIC.  Right?

Joan Shoemaker - Cross

1  A    That's correct.

2  Q    And in that e-mail, in the first two sentences, she informs

3  the AIC that the dog program at Fort Lyon has closed

4  completely, quote, we can no longer afford the expense.  Of

5  supporting this program, right?

6  A    That is correct.

7  Q    So the explanation that you testified about with respect

8  with Miss McCann is in fact very different or is different than

9  the explanation that was offered by Miss Stevens to the AIC

10  office, right?

11  A    That's correct.

12  Q    So for whatever reason it actually closed, we do know from

13  prior testimony that Mr. Colley was not hired even when the

14  program was reopened two months later, right?

15  A    I don't remember what the dates were on -- I know there was

16  discussion about he wasn't hired, but I don't honestly remember

17  the dates.

18  Q    Well, you remember that he wasn't hired when the dog

19  program was reopened two months later?

20  A    Again, I remember that he wasn't hired.  But I don't

21  remember if it was -- if that issue was before or after the

22  program was restarted.

23  Q    You don't know whether the issue of him wanting to be in

24  the program was right before the program closed or not?

25  A    I know that we had discussion about Mr. Colley wanting to

Joan Shoemaker - Cross

1    be in the dog program.

2    Q    Right.

3    A    I don't remember if it corresponded with these dates.

4    Q    Okay.

5         Well, why don't you look at the AIC sheet.

6    A    Okay.

7    Q    And that would be Exhibit.

8         MS. MOOL:  238.

9    BY MS. GREISEN:

10   Q    238.

11   A    Is it in this same notebook?

12        It is.  238?

13   Q    Uh-huh.

14        And if you look at the entry on 9-9-08, you'll see

15   that right before the dog program closed in October of 2008,

16   Mr. Colley was requesting to be placed into that program,

17   right?

18   A    That's correct.

19   Q    Now, let's look at the exhibit that Miss McCann talked with

20   you about with respect to the dog program.

21        MS. GREISEN:  And, Your Honor, I didn't know if we

22   were still breaking at eleven today.

23        THE COURT:  No.

24        MS. GREISEN:  Or not.

25        THE COURT:  No.  We're not.  Go to noon.

Joan Shoemaker - Cross

1          MS. GREISEN:  Okay.

2    BY MS. GREISEN:

3    Q   Exhibit B3, I think you should have up there.

4          MS. McCANN:  Did you say B or V?

5    BY MS. GREISEN:

6    Q   V as in victor.

7    A   V3 is a disk.

8    Q   V as in victor?

9    A   V as in victor.

10         MS. GREISEN:  Can we pull that up on the screen,

11   Laurie.

12         I'm sorry, I had all mine printed out.

13         Do we have a disk?

14         Okay.

15         I don't know if you can make it a little smaller or

16   not.

17         All right.  We'll -- I keep saying "bigger."  You

18   can't make it any bigger, fill the screen.

19         All right.  That's fine?

20   BY MS. GREISEN:

21   Q   We'll just kind of scroll down this list.

22         This document was produced to plaintiffs' counsel in

23   response to our discovery request, interrogatory no. 9, which

24   asked the Department of Corrections to provide a list of the

25   inmates who participated in the dog program at Fort Lyon since

Joan Shoemaker - Cross

1    its inception, specifying whether any of the inmates who had

2    participated was an inmate with a disability under the terms of

3    this case and if so, when this inmate was admitted into the

4    program.

5              Now, it does not appear -- and I'm happy to show this

6    to you, but, Miss Shoemaker, you signed off affirming that the

7    answer to this interrogatory was true and correct.

8              Do you need to see your verification on that?

9    A    No.

10   Q    Okay.

11             Now, the document lists the facility name.  I don't

12   know if you can see that on the far left-hand side.  The DOC

13   number; the inmate's name; what, if any, disability they had;

14   it indicates that they are in the canine program.

15             Do you see that?

16   A    I do.

17   Q    Now, there's no indication anywhere on this as to the date

18   the inmate was accepted into the program.  Do you know what

19   date the canine program at Fort Lyon started?

20   A    Originally?

21   Q    Yeah.

22   A    I don't offhand.

23   Q    Okay.

24   A    Could you scroll back over on the screen?

25   Q    Sure.

1          MS. GREISEN:  Go all the way to the right.

2          The -- I want you to -- can we go back to the middle,

3   please, where it shows the disabilities.

4   BY MS. GREISEN:

5   Q   You see that next to some individuals' names, they have

6   either Ns or Ys under the columns for disabilities, right?

7   A   Correct.

8   Q   Now, on this page, it indicates that there is,

9   apparently . . . I'm sorry, I'm looking at it because what's

10  coming up on the screen is different than my printed version of

11  this document.

12          All right.

13          Well, it appears that Mr. Hamilton is an individual

14  with a mobility disability, right?

15          And let's scroll down and see if there's anybody --

16  anybody else on this list with a mobility disability.

17          MS. GREISEN:  Keep going.

18          It that the end of the document?

19          MS. MOOL:  Yes.

20  BY MS. GREISEN:

21  Q   So you see out of all of the people listed --

22  A   So, would you go back to the first one that said Y?  It was

23  above Mr. Hamilton.

24  Q   Sure.

25          Are you talking about Mr. Steven Walker?

Joan Shoemaker - Cross

1    A    Yes.

2    Q    He has a Y in the hearing category, right?

3    A    That's correct.

4    Q    So the only individual with mobility disability apparently

5    since the inception of the dog program at Fort Lyon has been a

6    Mr. Hamilton, right?

7    A    That's what this document is showing.

8    Q    For you, apparently the only other person throughout the

9    duration of this program who has a disability was Mr. Walker,

10   who has a hearing disability, right?

11   A    Can you scroll down through the document again?

12   Q    Sure.

13   A    Okay.  Wait a minute.  Go back up.

14         Okay.

15         I was losing track that the Ys were Mr. Hamilton.

16         Now the next block that has a lot of those letters.

17   Could you stop it there?

18         So it looks, it appears to me that there is a Y

19   Dossette.

20   Q    And if you go up to the top, you'll see those are Ys for

21   ADA.

22         And if you go all the way over to the right, you'll

23   see that indicates diabetes.  Right.

24         So Mr. Dossette an individual with diabetes, who is

25   apparently in the canine program.

Joan Shoemaker - Cross

1           Right?

2  A   Correct.

3  Q   So there's one hearing, one mobility, and one person with

4  diabetes; is that right?

5  A   Is that the end of the document?

6  Q   Go ahead all the way down to the end.

7  A   Okay.

8           That's correct.

9  Q   All right.

10          So Mr. Hamilton -- let's look at Mr. Hamilton.

11          MS. GREISEN:  And I'm going to offer his accommodation

12  work sheet, which I have marked as Exhibit 683.

13  BY MS. GREISEN:

14  Q   Now, it appears from the exhibit that Mr. Hamilton looks

15  like he's been in the dog program on three different occasions.

16          Is that how you read those entries?

17  A   He's listed three times.  I don't know why he's listed

18  three times.  Because I thought this report had assignment

19  dates on it.  So . . . .

20          I assume that anytime he appeared . . . .

21  Q   Okay.

22          Well, let's look at -- the old -- in the new one, but

23  if you look at the entry on the new work sheet, on August 2 of

24  2006, we see that Mr. Hamilton is in fact in the dog program.

25  It indicates that he uses his crutches most of the time for

Joan Shoemaker - Cross

1    training his dog, that he rarely uses the wheelchair, he's very

2    capable of getting around by himself, has a single wet cell,

3    does not even require a handicap cell.  In fact, he leaves his

4    wheelchair outside the door, right?

5    A    That's correct.

6    Q    So again, it appears on 12-1 of '08, that he apparently is,

7    again, being referred to the dog program and in fact, despite

8    his mobility impairments, Mr. Hamilton is a person who needs no

9    accommodations to work in the dog program, right?

10          MS. McCANN:  Which entry are you on?

11          MS. GREISEN:  12-1 of '08.

12          THE WITNESS:  That's correct.

13   BY MS. GREISEN:

14   Q    Now, Mr. . . . let's see.  The other one . . . .

15          Well, let's look at the next exhibit on this -- or the

16   next printout on this exhibit, which is a list of all the

17   inmates who apparently were denied for jobs as a worker or

18   employment in the canine group.  This is also V3, it's just the

19   second set of documents in V3.

20          Now, this is the -- like I said, the group of

21   documents or the document that shows everybody that applied for

22   but was not accepted into the canine program, and if you scroll

23   over to the right, we see the reason why they were not accepted

24   into the program.

25          MS. GREISEN:  I don't know if there's a way to make

Joan Shoemaker - Cross

1   this a little smaller, Laurie, so we can see it all on one

2   page.

3          MS. MOOL:  Huh-uh.

4          MS. GREISEN:  No?  'Cause it's going to be a little

5   hard to track.

6          You know, Judge, I don't -- I think it's going to be

7   too hard for Miss Shoemaker to track my questions on this.  I'm

8   wondering if we could take an earlier lunch and then let me

9   make some hard copies of this and just come back earlier as

10  well so I can finish up with Miss Shoemaker because I'm not

11  sure --

12         THE COURT:  All right.

13         MS. GREISEN:  -- I'm not sure it's going to work on

14  the computer screen.

15         THE COURT:  All right.

16         We'll come back at 12:45.  Is that okay?

17         MS. GREISEN:  Yeah, that's fine.  Thank you.

18         THE COURT:  All right.

19      (Recess at 11:29 a.m.)

20      (Reconvened at 12:54 p.m.)

21         THE COURT:  Thank you all, and be seated, please.

22         MS. GREISEN:  Okay, thank you, Judge.  My apologies

23  for having to break early, but we do have a printout now of

24  this exhibit, and I've put a copy in front of Miss Shoemaker.

25  It's been marked as V3A, just because there are two printouts

Joan Shoemaker - Cross

1    in this exhibit.

2    BY MS. GREISEN:

3    Q    So do you have V3A in front of you, Miss Shoemaker?

4    A    I do have V3.

5    Q    V as in victor?

6    A    Yes.

7    Q    It could be, again, going back to my East Coast heritage

8    that my words are letters aren't sounding exactly like they

9    should.

10            Okay.

11            This exhibit is the printout that was put into

12   evidence by the defense that shows every person, inmate, who

13   applied for the dog program, it appears since 2006, but was not

14   hired and the reasons given for them not being hired.

15            Now, again, we see that no Colley was considered in

16   the job program, right?

17   A    Mr. Colley is not on this list.

18   Q    Now, the only other person with a mobility disability on

19   this list -- and by the way, you understand that it was class

20   counsel's concern that people with mobility disabilities,

21   particularly people in wheelchairs, were not getting CI jobs in

22   what we -- what we characterize as some of the more favorable

23   jobs, right?

24   A    I understand that.

25   Q    All right.

Joan Shoemaker - Cross

61

1    So the only other person with a mobility disability on

2    this list is Mr. Edward Spoor.  If we look at the 2009, the

3    relevant time period for this compliance hearing, the only

4    other person listed with a mobility disability who was not

5    accepted was Mr. Spoor.  Do you see that?

6    A    I do.

7    Q    Now, the reason given for Mr. Spoor not being accepted was

8    that the program was not hiring at this time.  Right?

9    A    That's what's on this document.

10   Q    I'm going to hand you what's been marked as Plaintiffs'

11   Exhibit 686.

12       You recognize that as the accommodation work sheet for

13   Mr. Spoor?

14   A    That's what it says at the top of the page.

15   Q    All right.

16       Well, let's look through some of the entries for

17   Mr. Spoor.  And we'll start on 6-18 of '08.  And you'll see

18   that in June of 2008, apparently Mr. Spoor was moved into the

19   SMNU unit at Fort Lyon.

20   A    That's correct.

21   Q    And that entry indicates that his current disability

22   determination is incorrect as he has been in a wheelchair for

23   quite sometime, including since he has been in DOC, right?

24       Do you see that?

25   A    That's correct.

Joan Shoemaker - Cross

1    Q    Now, apparently there is discussion also about whether he

2    needs an electric wheelchair as well, correct?

3    A    That's correct.

4    Q    And in fact, apparently he is upset about not getting one

5    on the entry of July 7 of '08, he states he's miserable without

6    his electric wheelchair pusher, right, that he says he's had

7    since 2005?

8    A    July 7 of '08?  Is that what you said?

9    Q    Yeah.

10   A    There's two.  Wait just a second.

11   Q    The second one, he's complaining that he doesn't have his

12   electric wheelchair?

13   A    He is complaining about not having his electric wheelchair.

14   Q    Okay.

15        And then the entry on 7-21 of '08, the AIC has

16   received an e-mail regarding the dog program and apparently

17   Mr. Spoor applied for the dog program.  Do you see that?

18        And it goes on to say that the response from Deb

19   Stevens, again, the supervisor of the dog program, discussing

20   the application of ADA offenders and rewriting the OM for the

21   dog program as it relates to ADA offenders, and she apparently

22   says she's going to be in touch with the office about

23   Mr. Spoor's application, right?

24   A    That's correct.

25   Q    But if you look, going down, just scanning several entries,

Joan Shoemaker - Cross

1    there's again no indication in the next, oh, six-month period

2    that in fact he was ever placed in the dog program in July of

3    2008, correct?

4           And maybe we can make this a little quicker for you by

5    looking on the exhibit which lists everybody that was accepted

6    into the dog program, so you can review it to see that

7    Mr. Spoor's name is not on that list?

8           MS. MOOL:  Can I get a signal?

9           THE WITNESS:  So what you have to know about this

10   report --

11   BY MS. GREISEN:

12   Q    I just want you to answer the question right now, to verify

13   that in 2008, Mr. Spoor appears -- does not appear that

14   Mr. Spoor was hired for the dog program in 2008 when he was

15   apparently in a wheelchair.

16   A    I don't see any reference to him being hired in the dog

17   program in 2008.

18   Q    In fact, Laurie is scanning through.

19          MS. GREISEN:  If you could start at the top, Laurie,

20   just so Miss Shoemaker could verify, using Exhibit, again, V3,

21   you can just tell her when to move the cursor down to show that

22   Mr. Spoor in fact was not listed by the Department of

23   Corrections as ever being hired in the dog program.

24          THE WITNESS:  You can move the document.

25          Go ahead.

Joan Shoemaker - Cross

1          I don't see his name.

2    BY MS. GREISEN:

3    Q    Okay.

4          And that's the -- you don't see his name on the

5    exhibit which lists everybody that was accepted into the dog

6    program, correct?

7    A    That's correct.

8    Q    Now, but we do know in July of 2008, according to the

9    exhibit in front of you, he applied for the dog program, right?

10   A    That notation is in the accommodation work sheet.

11   Q    But if you look on Defendant's Exhibit V3A which lists

12   everybody that applied but was not accepted, there's no

13   indication on that document that Mr. Spoor applied for the dog

14   program in 2008 anywhere.  Correct?

15   A    That's correct.  But you have to understand this document,

16   because the eligibility review was put into place in August of

17   '08, so when he applied in July of '08, the only way that he

18   would show up on this report is if the supervisor had not

19   accepted him.  So all of these dates that are '06 are notes

20   that are done by the assignment supervisor.  The ones beginning

21   June of '09 is then reflective of the code 13 eligibility

22   review information.

23   Q    Where does code 13 come up on this document anywhere?

24   A    It doesn't come up on the document.  But they searched for

25   nonacceptance and the reason why.  So you've got this entire

Joan Shoemaker - Cross

1    list.

2    Q   Well, what difference would it make?  This list contains --

3    and going back again to the interrogatory question that this is

4    responsive to, the question asked, and you verified that this

5    was a true response, of everybody who applied for and was not

6    accepted into the dog program at Fort Lyon, correct?

7         Do you want me to put the interrogatory question in

8    front of you, Miss Shoemaker?

9    A   No, ma'am.  I'm just trying to explain to you why he

10   doesn't appear on this list.

11   Q   Well, the question was the information requested in the

12   interrogatory was to tell us everybody who applied and did not

13   be -- and was not accepted into the dog program, correct?

14        Do you recall that?

15   A   And this does show who was not accepted, but there's two

16   definitions to that.

17   Q   Well, it does not show that Mr. Spoor was not accepted in

18   2008, correct?

19   A   That's correct.

20   Q   Now, looking at -- continuing to look at Mr. Spoor's AIC

21   work sheet.  Mr. Spoor as of 2008, as we've already discussed,

22   is apparently in a wheelchair, right?

23        Do you see the entry on 6-18-08, that we just talked

24   about, that he was in a wheelchair as of that time?

25   A   He was in a wheelchair on 6-18 of '08.

Joan Shoemaker - Cross

1  Q   Now, apparently when we go down to the three months -- down

2  to 9-26-08, we find out that the -- he has now been determined

3  not mobility disabled, right, that he is transitioning out of

4  his wheelchair?  Do you see that?

5  A   What date are you looking at?

6  Q   9-26-08.

7  A   That's correct.

8  Q   But apparently -- and he complains because his wheelchair

9  is being taken away on October 1 of '08, right?

10  A   That's correct.

11  Q   Now, on 10-28-08, it's clear that the AIC's office has

12  received information that the executive director of Colorado

13  Cross Disability Coalition has informed DOC that Mr. Spoor is

14  severely disabled and that an electric wheelchair was purchased

15  for him through Medicare and Medicaid because he has reflex

16  sympathetic dystrophy that causes him severe pain.  Do you see

17  that?

18  A   I see it.

19  Q   And then apparently there's a request for the Department of

20  Corrections to allow him to use his electric wheelchair from

21  the executive director of Colorado Cross Disability Coalition,

22  correct?

23  A   That's correct.

24  Q   So apparently, then, there's a rescreening done, based on

25  this information, in the next entry and second paragraph of the

Joan Shoemaker - Cross

1    entry on 10-30-08, indicates a rescreening is going to be done

2    and the AIC office was asking for documentation to explain why

3    in fact Mr. Spoor was in the SMNU unit if he's not disabled,

4    right?

5         Do you see that?

6    A    I need to read this note.

7    Q    Sure.

8    A    Ask me your question again.

9    Q    Sure.

10        I was pointing you to the portion of the entry of

11   10-30-08, in which it indicates that Mr. Spoor is going to be

12   rescreened for a disability and the AIC office asks for

13   documentation to explain why Mr. Spoor would be in the SMNU

14   unit if he is not disabled.  Do you see that?

15   A    I do.

16   Q    Okay.

17        And then we find out the next day, 10-31-08, the

18   second entry, that in fact he is getting a temporary

19   accommodation resolution which gives him a wheelchair and

20   full-time aide and pushing and that he has a mobility

21   disability and an upper extremity disability, right?

22   A    Yes.

23   Q    Now, if we go down to 12-5-08, going down to about two

24   months later, a little less than two months, the second entry

25   for 12-5-08, states that the, apparently the -- there is a

Joan Shoemaker - Cross

1  telephone conference between members of the AIC office and

2  members with medical staff at Fort Lyon about whether or not

3  Mr. Spoor should remain in the SMU unit.  Do you see that

4  portion of the entry?

5          It's the first and second sentence in that entry.

6  A   I see it.

7  Q   In fact, it goes on to state that it was decided that

8  Mr. Spoor will remain on the SMNU until the new accommodation

9  resolution is issued because his current temporary one provides

10  an aide 2 and are there none in GP, meaning general population,

11  right?

12  A   That's what this note says.

13  Q   And it says that medical apparently wants to move him out

14  of SMNU but had him remain in building 5 as soon as possible,

15  right?

16  A   That's what the note says.

17  Q   So now we go down to 12-18-08, where it discusses the dog

18  program.

19          And 12-18-08, states that the AIC's office got a call

20  from Deb Stevens, supervisor of the dog program, and apparently

21  Mr. Spoor was recommended for the dog program at Fort Lyon.  Do

22  you see that ALJ is making the entries on the AIC work sheet?

23  A   I do.

24  Q   Okay.

25          And you know that to be a person that works in the AIC

Joan Shoemaker - Cross                                                        69

1   office, right?  Miss Jacobson?

2   A   I believe that's correct.

3   Q   Okay.

4           Miss Jacobson indicates, quote, My hunch is that this

5   was an attempt -- talking about the referral to the dog

6   program -- my hunch is that this was an attempt by the facility

7   to have the offender moved out of the SMNU.  Deb interviewed

8   offender and was concerned that he has had over a hundred

9   incidents in six months and seems to be a management issue.

10          Do you see that?

11  A   I do.

12  Q   She states that she would not hire an able-bodied offender

13  with such a history.  Miss Jacobson then advised Deb that the

14  purpose of the ADA is not to provide preferential treatment for

15  disabled offenders and that if an otherwise qualified

16  able-bodied offender would not be hired with a similar history,

17  that she didn't have to hire him simply because he was

18  disabled, right?

19  A   That's what it says.

20  Q   Miss Jacobson goes on to state, I have doubts that he could

21  perform the job functions, anyway, if he is fully upper- and

22  lower-extremity disabled, right?

23  A   That's what the document says.

24  Q   Now, do you know what is being referred to with respect to

25  the hundred incidents in six months?

Joan Shoemaker - Cross

1  A   I do not.

2  Q   So it's fair to say from this entry, we can't tell whether

3  or not these are medical issues or inappropriate-conduct

4  issues, right?

5  A   Well, I believe we can, that they draw the conclusion that

6  it's behavioral issues because it says seems to be a management

7  issue.  But I don't know if they are charges or incident

8  reports or what.

9  Q   So you would assume from this that he had behavior that

10 would disqualify him from the program?

11 A   Correct.

12 Q   But if we look on Exhibit V3A, the reason stated for not

13 hiring Mr. Spoor after interviewing him for the position was

14 that he was, quote -- was that, quote, They're not hiring at

15 this time.

16         Do you see that?

17 A   And that is as of June 16 of '09.

18 Q   Right.  Which is the only -- which would be the only time

19 in the -- on the exhibit that I provided you that would

20 correlate to this 12-18-08 entry, right?

21 A   It --

22 Q   Otherwise, the interview on 12-18-08, the fact that he

23 wasn't hired is also simply just not reflected on Exhibit V3A.

24 Right?

25 A   It is not reflected on V3A.

Joan Shoemaker - Cross

1  Q   So is it your belief that apparently he then tried to get

2  in a third time for the job program and the entry on V3A

3  indicates on the third time he tried to get into the job

4  program, he was not hired because the program was simply not

5  hiring at that time?

6  A   I believe the entry in June of '09 was done by a case

7  manager and that the program -- that there were no slots

8  available in the program at that time.

9  Q   And you're basing that based on simply what the exhibit

10  says.  Right?

11  A   That's correct.

12  Q   And so from your testimony, then, the second time he did

13  interview for the job program and was not hired is simply not

14  recorded anywhere on Defense Exhibit V3A, correct?

15  A   Correct.

16  Q   So we -- I just want to point out a couple of more things

17  on this exhibit.

18          4-24-09, it appears that Mr. Spoor was verified to

19  have a mobility disability, right?

20          A final determination.

21          Do you see that entry?

22  A   What date are you on?

23  Q   4-24-09, quote, CMO made final determination.  Goes on to

24  say, Mobility disability with accommodations.

25  A   Yes.

Joan Shoemaker - Cross

1    Q    And the next entry on 4-24-09, apparently the AIC's office

2    is responding to a grievance because Mr. Spoor is grieving the

3    fact that he is being moved out of the SMNU, that staff won't

4    assist him with his brace and with showering, also that he

5    sleeps on the floor due to urine-soiled beds.  And the

6    grievance is denied as Mr. Spoor has not been determined to

7    have a mobility disability; therefore, is not entitled to

8    accommodations that he mentions.  Do you see that?

9    A    That's what is on this piece of paper.

10   Q    And if we look at the third entry for 4-24-09, the second

11   paragraph we see again that there is another complaint from

12   Mr. Spoor, he complains of health issues, getting a job with

13   the canine program, and being in general population, issues

14   causing him to be, quote, stressed to the max.  Do you see

15   that?

16   A    I do.

17   Q    Now, if we turn to Exhibit W3, which should be in that

18   same -- if you kind of hold your . . . yeah, let's look at

19   Exhibit W3.

20           MS. GREISEN:  Could you put that back up on the screen

21   again.

22           MS. MOOL:  Uh-huh.  The first one?

23           MS. GREISEN:  Yes, please.

24   BY MS. GREISEN:

25   Q    Do you have W3?

Joan Shoemaker - Cross

73

1   A    I do.

2   Q    W3, going back to it, again, is the memo from the warden of

3   Fort Lyon to you on March 23, 2009, about the canine program

4   being reinstated at Fort Lyon on December 1 of 2008, right?

5   A    That's correct.

6   Q    Then he reports to you that this Miss Stevens, since

7   December 1 of 2008, Miss Stevens, the supervisor, has hired

8   eleven handlers, four of whom he represents are ADA.   Right?

9   A    That's correct.

10  Q    Now, the first one he lists is Mr. Loquist.

11          MS. GREISEN:   And if we could scroll down on Exhibit

12  V3 to Mr. Loquist's name.

13          He's on the second page, about -- not quite half the

14  way down.

15          Just passed it.   It's hard to see.

16          There he is.

17  BY MS. GREISEN:

18  Q    Now, we see Mr. Loquist is listed on Defense Exhibit V3 who

19  does not have any disability, right?

20  A    That's what's showing on the document.

21  Q    And the next individual, Mr. Boyd, that the warden says was

22  an ADA individual who is hired?

23          MS. GREISEN:   If you could go to Mr. Boyd's name.

24          THE WITNESS:   He's at the top.

25          MS. GREISEN:   He's at the top.

Joan Shoemaker - Cross

74

1          THE WITNESS:  Of the screen.

2     BY MS. GREISEN:

3     Q    Do you see that Mr. Boyd is also listed as an individual

4     who does not have any disability, right?

5     A    That's correct.

6     Q    In fact, just so you can verify, I'm going to hand you

7     Mr. Boyd's accommodation work sheet, Exhibit 687.

8          And in fact, if you look at the entry on 11-19-07;

9     you'll see that -- well, probably a better place to look is

10    12-18-07.  It's verified that Mr. Boyd does not have a

11    disability.

12         Do you see that?

13         Do you need me to read the entry, Miss Shoemaker?

14    A    What date?

15    Q    12-18-07.  Do you see that it states, In response to a

16    grievance, quote, per Dr. Frantz, the offender does not have a

17    disability.  Do you see that?

18    A    Just a minute.

19         12-7?

20         Oh, wait a minute.

21         12-18-07?

22    Q    12-18-07.

23    A    Got it.

24    Q    That there is no indication or that Dr. Frantz, the chief

25    medical officer, determined that he does not have a disability,

Joan Shoemaker - Cross

75

1  right?

2  A    That's correct.

3  Q    And from 12-18-07, down to the end of the work sheet, which

4  is April of 2009, there's no indication that he has ever,

5  during that time period, been given any kind of disability

6  determination.  Correct?

7  A    There's no indication on this document.

8  Q    Now, apparently at one time in the past, Mr. Boyd was in a

9  wheelchair.  If you look on the entry of 4-30-07.

10         And that's on the 4-30-07, you'll see that he was

11  given Velcro shoes and a wheelchair.

12  A    That he claimed that's what he was given, yes.

13  Q    Well, if you keep reading the entry, you'll see that in

14  fact the AIC confirms that he was using a wheelchair and a

15  cane.  He apparently is doing some sort of therapy.

16  A    He, yes, he was participating in restorative therapy.

17  Q    So we do know that in 2007 Mr. Boyd applied for the dog

18  program.  If you look at the entry on 8-14-07.

19         Do you see that on 8-14-07, there is a discussion with

20  the case manager and a discussion about him -- apparently a

21  discussion with Lieutenant Mills about the canine program, and

22  it states that he was referred to that program.  Do you see?

23  A    I do see it.

24  Q    And the entry states, Spoke with Lieutenant Mills about the

25  canine program, offender was referred.  There are certain

Joan Shoemaker - Cross

1   restrictions to participate in dog program such as lifting,

2   running, squatting, going out in inclement weather, lifting

3   requirements, et cetera.  He applied but there were several

4   requirements he could not meet.  According to her, he did not

5   meet any of the qualifications.

6           And then two sentences down it states or states,

7   quote, The dogs they train require that he be able to stand,

8   run, squat, et cetera.

9   A   I see that.

10  Q   Right?

11          So that certainly indicates that Lieutenant Mills did

12  not believe that somebody in a wheelchair could actually

13  participate in the dog program.  Correct?

14          MS. McCANN:  Object on the grounds of speculation,

15  Your Honor, there's no reference to --

16          THE COURT:  Sustained.

17  BY MS. GREISEN:

18  Q   Well, the preceding sentence said, according to her, he did

19  not meet any of the qualifications, right?

20          MS. McCANN:  Again, Your Honor, this calls for -- it's

21  really like triple hearsay.

22          THE COURT:  It's trying to interpret what somebody

23  else said.  The words speak for themselves.  Go ahead,

24  objection sustained.

25          MS. GREISEN:  I'm just trying to say what the exact

1    words say.

2           THE COURT:  She doesn't need to interpret it.

3           MS. GREISEN:  That's correct.  It said in the

4    preceding sentence, she said --

5           THE COURT:  I ruled on the objection that was made, so

6    you can go ahead.

7           MS. GREISEN:  I'm sorry, Judge, can she answer the

8    question?

9           THE COURT:  Next question.

10   BY MS. GREISEN:

11   Q   The entry on 8-14-07, indicates that he was not qualified

12   because he was in a wheelchair to attend the dog program,

13   correct?

14          MS. McCANN:  I'm not sure, Your Honor, if we could

15   have a reference to the specific line.  I don't see that in

16   here.

17          We haven't seen this exhibit before, so --

18          THE COURT:  Do you have a line for it?

19          MS. GREISEN:  Yeah, it's the line I just quoted.  The

20   line that said, quote, According to her, he did not meet any of

21   the qualifications.

22          MS. McCANN:  There's no reference to a wheelchair in

23   there.  So I would object to the form of the question.

24          THE COURT:  Overruled.

25          THE WITNESS:  I believe the qualifications, if you

Joan Shoemaker - Cross

1    read the entire note that she's talking about, is that

2    offenders can't have anger-management issues, can't have any

3    write-ups in the last six months.  The note does document that

4    he has had write-ups.  So I would believe that the

5    qualifications refers to that piece and really does not have

6    anything to do with his disability status.  Or lack thereof.

7    BY MS. GREISEN:

8    Q    So the fact that -- I'm sorry, go ahead.

9    A    Disability status or lack thereof.

10   Q    So prior to getting to the section that you referenced,

11   after the sentence I just read, According to her he did not

12   meet any of the qualifications, the entry reads, Miss Stevens,

13   manager of the canine program, told him if there was an area he

14   could work in, she would let him know, quote, the dogs they

15   train require that he be able to stand, run, and squat,

16   et cetera, right?

17   A    It does state that.

18   Q    And in fact, the entry on 9-28-07, the AIC's office got a

19   letter from Mr. Boyd, and he's complaining that he was denied

20   employment in the dog program based solely on his disability;

21   and the AIC, Miss Baxter, responds to him, quote, in my

22   previous correspondence to him, I advised him that he could not

23   meet the physical requirements of the job and had to be

24   write-up-free for six months, right?

25   A    That's what this says.

Joan Shoemaker - Cross

1    Q    Right.

2          And he claimed that he had been write-up-free for

3    eight months at that time, right?

4    A    That's what he claimed.

5    Q    Now, going back to where this all started, which was the

6    warden's letter to you on March 23 of 2009, where he lists four

7    ADA individuals, Loquist, Mr. Boyd, and Mr. Jordan and now

8    Mr. Jordan, again, if you look on the Exhibit V3 that is

9    listed -- that is on the computer screen, you'll see that

10   Mr. Jordan --

11          MS. GREISEN:  Did you find his name?

12          MS. MOOL:  I'm looking.

13   BY MS. GREISEN:

14   Q    Again, he's not listed by the Department of Corrections as

15   a person with a disability, right?

16   A    That's correct.

17   Q    On the V3 exhibit on the screen?

18   A    That's correct.

19   Q    And I'll hand you Plaintiffs' Exhibit 688.

20          Which is Mr. Jordan's AIC work sheet so you can

21   confirm that in fact in January of '09, Mr. Jordan was

22   determined not to have a disability.  Correct?

23   A    The date of the entry you were looking at was January 21 of

24   '09?

25   Q    January 21, '09, reads, Complete and in system for offender

Joan Shoemaker – Cross

80

1  who is determined DNQ for mobility, correct?

2  A    That is correct.

3  Q    And in fact, that appears to be the only disability that

4  Mr. Jordan was screened for at the Department of Corrections,

5  right?

6  A    This is talking about mobility.  I don't know if he was

7  screened for others.

8  Q    Well, you can see on the very first entry, he's being

9  screened for mobility disability and it does not indicate he's

10 ever been screened for any other disability.  Correct?

11 A    What I can see is that that, that that's correct, he was

12 screened for mobility.

13 Q    And prior to the date of the warden's memo to you,

14 Mr. Jordan wasn't found to be a not-disabled inmate in the

15 Department of Corrections, right?

16 A    That's correct.

17 Q    Okay.

18      Let's finish up on jobs.  You talked with

19 Miss Holst -- with Miss Holst -- with Miss McCann --

20 A    Yes, I did talk with Miss Holst.

21 Q    Right.

22      -- about CI jobs, the Correctional Industry jobs, and

23 those jobs are, not always, but often beyond the perimeter of

24 the gate at the facility, right?

25 A    It depends on the facility that you're talking about.

Joan Shoemaker - Cross

1  Q    Sure.

2         Well, okay, some CI jobs are beyond the perimeter of

3  the gate if in fact it's a gated facility, right?

4  A    Not all Correctional Industries are outside the gate.  In

5  facilities.

6  Q    I appreciate that.  Some are and some aren't, right?

7  A    That's true.

8  Q    Okay.

9         Now, if you're going to go outside of the gate, an

10  inmate would need what's called a gate pass, right?

11  A    That's correct.

12  Q    And by "gate" I'm talking about the wire fencing that are

13  around the facilities.  You understand what I'm referring to

14  there?

15  A    Right.  A gate pass refers to being allowed to go outside

16  of the perimeter fence.

17  Q    Okay.

18         Now, let's look at Exhibit P3.  Which I think you

19  still should have in front of you.

20  A    I have it.

21  Q    There is an attachment that's the -- I think it's called

22  the offender job manual.

23         I'm sorry, it's called offender job orientation,

24  attachment F.

25  A    I see it.

Joan Shoemaker - Cross

1  Q    Now, this is the, again, just to identify this exhibit, it

2  is the AR for the Denver complex, Denver Women's, Camp George

3  West, and DRDC, right?

4  A    This is for the Denver complex.

5  Q    Right.

6        And the offender job orientation is a document that

7  talks about or gives information to the inmates with respect to

8  what's expected of them if they have a CI job, right?

9        Do you see that it's titled, Offender job orientation?

10  A    Right.

11  Q    And the first sentence is, Upon being selected for a CI

12  position.  And it goes on to list the procedures that will be

13  strictly followed and enforced, right?

14  A    Right.

15  Q    And in fact, the word -- it says, These procedures will be

16  strictly followed, and the word "strictly" is in capital and

17  bold letters, right?

18  A    That's correct.

19  Q    And no. 6 under the offender job orientation is that the

20  fact that a -- they may only wear state-issued stocking caps,

21  green baseball caps, and personal work boots, right?

22        MS. McCANN:  Objection, Your Honor, that is not what

23  the -- what this says.  So I'm going to object to the form of

24  the question.  It does not say "you may only."  It says "you

25  may wear."

Joan Shoemaker - Cross

1           THE COURT:  All right.  Sustained.

2  BY MS. GREISEN:

3  Q   I'll cite it verbatim for you.

4          No. 6 says, You may wear green issued stocking caps,

5  green baseball caps and personal work boots, right?

6  A   Right.

7          And this orientation is used for offenders at CCC --

8  Q   Well, it says at the top, Colorado Department of

9  Corrections, Denver complex, DRDC, W -- DWCF, and CCC, right?

10  A   You are correct that it says that.  However, building 17 is

11  the only building 17 in the Denver complex is on grounds at

12  CCC.

13  Q   Okay.

14          CCC is Camp George West, right?

15  A   Yes.

16  Q   Okay.

17          We'll talk about Camp George West.  So these rules

18  apply at Camp George West, right?

19  A   That's correct.

20  Q   And there's no indication whatsoever that an accommodation

21  would be provided to say an inmate with diabetes who wears

22  soft-soled shoes to work in the CI position.  In that

23  orientation, right?

24  A   It doesn't say one way or the other.

25  Q   Well, there's no indication in this job orientation

Joan Shoemaker - Cross

1    attachment that there will be any accommodations provided to

2    the offender at all.  Right?

3    A    I don't see the word "accommodation" on this document.

4    Q    Well, in fact, the first sentence of this document says,

5    These procedures will be strictly followed.  Right?

6    A    It does say that.

7    Q    If you look at Exhibit Q3; the next one over, this is

8    Territorial and IAOM at Territorial, correct?

9    A    That's correct.

10   Q    And it's the IA for the offender work program, right?

11   A    Offender work program 300-23.

12   Q    Right.

13         And if you again look on page 3 of this document under

14   section N, it again states, quote, Inmates assigned to outside

15   grounds maintenance work crews will wear orange jumpsuits,

16   state-issued boots, white-tagged T-shirts, underwear, and

17   socks, right?

18         Do you see that, Miss Shoemaker?

19   A    I have not found it on the document.  I apologize.

20   Q    It's paragraph N on page 3.

21   A    I found it.

22   Q    Did I quote that correctly?

23   A    You did.

24   Q    And again, there's no indication that any accommodations

25   such as soft-soled shoes for diabetics will be allowed for

1  outside grounds maintenance work, correct?

2  A   It does not discuss soft-soled shoes.

3  Q   All right.

4        Let's turn to the issue of the OCA briefly that you

5  testified about with Miss McCann.

6        You talked about Exhibit S4.  I don't think we need to

7  look at it right now.  It's the exhibit where the -- there were

8  two different versions of the ADL and OCA job assignments.

9  Were provided.

10  A   Yes.

11  Q   And we went on to talk about training to become an OCA 1

12  and an OCA 2, and that's in Exhibit T4.  You have that in front

13  of you?

14  A   I do.

15  Q   So T4, again, is the training that's provided to OCA 1s and

16  OCA 2s; is that correct?

17  A   That's correct.

18  Q   Now, you testified that the training for OCA 1s and OCA 2s

19  are being done on the same day, correct?

20  A   In most cases.  As far as I know, yes.

21  Q   So this entire exhibit that's, I think, 157 pages long, the

22  inmates are being trained on all of this material in one day?

23  A   That's correct.

24  Q   And do you know if they're actually passing when they're

25  trained on all of this material in one day?

Joan Shoemaker - Cross

1    A    They do not receive a certificate unless they pass the

2    test.

3    Q    And do you know how long that test is?

4    A    It's a -- it's attached to this.  I don't know how long it

5    takes the offenders to take the test.  If you -- this document

6    does look large.  However, when you go through it, there are

7    portions where they go -- a certain amount of information is

8    presented and then there's a summary slide to remind them about

9    what was presented and then it goes through some more things

10   and then another summary slide.

11   Q    Now, the ADL descriptions that were provided on Exhibit S4,

12   the first offender care aide, I think you testified was called

13   and ADL instead of an OCA, correct?

14   A    That's correct.

15   Q    So the first description that was written for that position

16   is the first document in there, right?

17   A    Correct.

18   Q    Now, the requirements for the first description for an ADL

19   in fact did not comply with the mandates of the remedial plan,

20   right?

21   A    I believe only in one area.  Must not have a conviction

22   against elderly or at-risk person.

23   Q    Right.

24        Well, the remedial plan specifically stated that

25   inmate assistants could not have a history of violence or

Joan Shoemaker - Cross

1    theft, right?

2    A    That's correct.

3    Q    So the ADL carves out a few of those such as sexual

4    assaults or convictions against elderly or at risk, but it

5    doesn't generally prohibit other crimes of violence or of

6    theft, right?

7    A    That's correct.

8    Q    Now, when the new OCA description was written, the

9    requirement that the individual not have a conviction against

10   the elderly or at-risk person in fact was taken out, right?

11   A    That's correct.

12   Q    You talked with Miss McCann about the diabetic posters, and

13   you went through an exhibit with respect to diabetic posters.

14   Do you recall that?

15   A    I do.

16   Q    Now, you are aware that the AIC issued a report with

17   respect to the facility audits and in that the AIC's office

18   stated, quote, facilities do not have permanent postings

19   regarding the availability of diabetic testing kits.  Correct?

20   A    I don't remember that phrase.

21   Q    Well, I'll put my copy in front of you so you can verify

22   what I've read.

23          MS. GREISEN:  If I can approach?

24   BY MS. GREISEN:

25   Q    Do you see on Bates no. 3407, under Roman numeral 3.8 of

Joan Shoemaker - Cross

1  the facility audit summary prepared by the AIC office, that in

2  fact the AIC office reported, quote, facilities do not have

3  permanent postings regarding the availability of diabetic

4  testing kits?

5  A   That's what the document says.

6        MS. GREISEN:  Can I get that back.

7  BY MS. GREISEN:

8  Q   So is it your testimony, Miss Shoemaker, that you simply

9  agree with -- disagree with the AIC's conclusion on that issue?

10 A   I would agree that there are no signs that I'm aware of

11 that's posted all the time that says anything about diabetic

12 kits.

13 Q   I'm sorry.  Could you repeat that?

14 A   Well, the diabetic-kit information is contained as one of

15 the posters that runs periodically.  There is information that

16 runs on the titler periodically.  But I'm not aware of a sign

17 that stays up permanently around the diabetic kits.

18 Q   So you agree with the AIC's conclusion with respect to that

19 issue?

20 A   I think that's factual.

21 Q   Okay.

22        Now, Miss McCann also talked with you about the

23 purchase of, and repairs of DMEs, the durable medical

24 equipment, in this case.

25 A   Yes.

Joan Shoemaker - Cross

1   Q    Now, you're aware that stipulation 28 in the April 2008

2   sanctions against the Department of Corrections requires that

3   clinical services shall immediately establish a position

4   designated to coordinate, administer, and/or oversee the

5   scheduling of all repairs and/or replacement of assistive

6   devices at the facility, right?

7   A    I'm aware of the stipulation.

8   Q    And that this stipulation will regularly communicate the

9   status of these repairs and replacements with the AIC, right?

10  A    Yes.

11  Q    And will coordinate with the office of the AIC to ensure

12  that the devices are properly and timely repaired slash

13  replaced, right?

14  A    Yes.

15  Q    And that appropriate accommodations are provided in the

16  interim.   Correct?

17  A    That's correct.

18  Q    Now, is the person who has been designated to coordinate,

19  administer, and oversee the scheduling and replacement of

20  assistive devices, is that Ann Marie Campbell?

21  A    It resides with Anna Marie.   Mr. Randy Smith is on point

22  with part of that.   But the two of them work together to assure

23  that we are more timely with repairs.

24  Q    Well, what was the position that was established to

25  coordinate, administer and oversee the scheduling of all

Joan Shoemaker - Cross

1  repairs?

2  A   I believe that the, the information regarding repair is on

3  Mr. Smith's PDQ.

4  Q   And so have you been provided reports from Mr. Smith

5  regarding the status and repairs and replacements with, with

6  the assistive devices at all the facilities?

7  A   Not all of the devices.

8  Q   Not all of the devices?

9  A   Correct.

10 Q   Does that mean that Mr. Smith -- well, let me ask you.

11          Is Mr. Smith providing you regular reports with

12 respect to the status of repairs and replacement of assistive

13 devices at all facilities?

14 A   The reports that I have seen predominantly dealt with

15 wheelchairs and wheelchair repairs.

16 Q   So with respect to all the other DMEs, it's fair to say

17 that you're not getting such reports from Mr. Smith or anyone

18 else with respect to whether or not -- with respect to the

19 scheduling of repairs and/or replacement of assistive devices,

20 correct?

21 A   That's correct.

22 Q   And in fact, you are aware that no such reports have been

23 provided to the AIC office.  Correct?

24 A   I think that's correct.

25 Q   And in fact, the physician, whether it's Mr. Smith or

Joan Shoemaker - Cross

1  Miss Campbell, is in fact not coordinating with the AIC office

2  to ensure that the devices have been properly and timely

3  repaired or replaced, correct?

4  A   I don't think that we have formalized that as much as we

5  need to, that's correct.

6  Q   So . . . you also talked with Miss McCann about PHP, the --

7  I don't remember exactly what you called it.  I referred to it

8  as your insurance company.  Is that an accurate description?

9  A   I believe I called it the third-party administrator.

10  Q   Okay.

11      Which is akin to an insurance company.

12  A   In some ways that's true, it does look like that.

13  Q   Now, it's, it's true that PHP denies assistive devices to

14  anybody who is in -- within six months of their

15  parole-eligibility date.  Correct?

16  A   The criteria that we have asked them to screen with is

17  there is a review of when the person's parole-eligibility date

18  is.  And so that is a screening that's -- that is used.

19  Q   Well, it's not just a screening that's ruled -- that's

20  used.  PHP has a standard policy that if an inmate is within

21  six months of the parole-eligibility date, PHP denies the DME

22  request, right?

23  A   Yes, initially.

24  Q   And when PHP denies coverage for a DME, I understand that

25  DOC can still pay for that DME, right?

Joan Shoemaker - Cross

1  A    When PHP denies something, including DME, it goes back to

2  the provider and that is reviewed based on a number of factors;

3  and if it's an outside provider, they can file an appeal.  If

4  it's one of our providers, it's often discussed with

5  Dr. Frantz.  So the way that we pay all of our health-care

6  bills is through PHP.

7         If they have denied care that we believe needs to

8  happen, we ask them to authorize it, which they do, and the

9  claim is paid, but it's still paid through PHP.

10 Q    Well, I guess my point really was that when PHP denies

11 somebody because, whether it's because they're within six

12 months of their mandatory eligibility -- eligible parole date,

13 or for any other reason, the process of actually getting that

14 person the assistive device gets delayed, right?

15 A    There is a delay.

16 Q    And sometimes it can cause a substantial delay.

17 A    I don't believe that it's a substantial delay.

18 Q    And you haven't seen any evidence of a substantial delay in

19 this case with respect to a PHP denial of an assistive device?

20 A    I'm trying to remember denial reports that I have seen.

21 And I guess it's -- I don't know.  I guess it depends on how

22 you define "substantial."

23 Q    Well, more than a month.  More than two months.

24 A    Without looking at the denial reports, I really don't know.

25 The denial process is pretty seamless.  And frankly, especially

Joan Shoemaker - Cross

1    around DME and offenders who might be ADA, we've changed a

2    number of processes to be able to flag those individuals for

3    PHP in order to reduce the, the timeliness of all of those

4    actions.

5              So if -- it would be my belief that if we had a DME

6    request on an ADA offender that was denied, it would be less

7    than -- it's not a substantial delay and it's pretty seamless.

8    I think it probably happens within about a week that that

9    denial is reviewed.

10   Q   You testified previously that because of denial of DMEs,

11   apparently you've worked with PHP to change some providers that

12   are providing DOC with some DMEs; is that correct?

13   A   The -- my discussion about changing vendors was not related

14   to denials but related to timeliness of being able to obtain

15   appointments and fittings and issuing of DME.

16   Q   Okay.

17             Well, just can you tell me when that occurred, when

18   there was a discussion with PHP and pursuant to that

19   discussion, providers were changed.

20   A   So, for example, predominantly a lot of our prosthetic

21   devices --

22   Q   I just want to know when it occurred.  When did PHP change

23   providers that are providing assistive devices to DOC.

24   A   The prosthetics vendor was changed as of April of 2009.

25   Q   And that's changed from ambulatories -- ambulatories'

Joan Shoemaker - Cross

94

1  unlimited?

2  A   Abilities Unlimited.

3  Q   Thank you.

4  A   To a vendor by the name of Hanger.

5  Q   And that happened in, I'm sorry, April or May of 09?

6  A   April.  We had our first clinic on site at Territorial in

7  early April of '09.

8  Q   So that happened at or around the end of the compliance

9  period in this case.

10  A   Correct.

11  Q   Now, we -- you talked with Miss McCann about the unassigned

12  and the medically unassigned code, and I don't know if you want

13  to look at the exhibit again.  You're certainly welcome to.

14  But it was a list of everybody who was listed as medically

15  unassigned in the Department.  Do you recall that?

16  A   I do.

17  Q   And you actually testified that you had deactivated the

18  code for being medically unassigned.  I believe you said in

19  2005.  Is that correct?

20  A   No.  It wouldn't have been 2005 because --

21  Q   Okay.  Well, my handwriting is pretty sloppy.  So what year

22  did you deactivate the code?

23  A   In 2005, I didn't have -- I was a warden then.  I didn't

24  have the authority to do that.

25  Q   Okay, fair enough.

Joan Shoemaker - Cross

1   A    I believe it was in 2008.

2   Q    2008.

3        But we saw on that list people still being assigned

4   that code into 2009.  Right?

5   A    That's correct.

6   Q    Now, that's an example of where a policy was implemented,

7   that that code is not going to be used anymore; but in fact the

8   staff were not following the policy, right?

9   A    It's an example of an error in computer programming because

10  when that list was ran, even the computer programmers were

11  surprised to find anyone on the list.  So the code was still

12  visible for providers.

13  Q    And they were choosing that --

14  A    And they were choosing it.

15  Q    Well, I'm assuming when you sent around the code, you sent

16  a memo or something to tell the providers that they were not

17  supposed to use that code anymore, right?

18  A    It was discussed at a providers' meeting.

19  Q    Now, you've -- we've seen in several different places that

20  you went through with Miss McCann the -- there's several ARs

21  that have been written that state that an individual can keep

22  their state-issued glasses until they're replaced, right?

23  A    That's correct.

24  Q    In fact, that was specifically as a result of the first

25  stipulation in the set of 2008 sanctions that in fact inmates

Joan Shoemaker - Cross

96

1  would be permitted to retain possession of their personal

2  glasses until DOC issues a replacement pair of glasses, right?

3  A   That was a stipulation.  And the language in the AR is

4  certainly reflective of that.

5  Q   Okay.

6       But if we look at Exhibit K again.

7       You have Exhibit K?

8  A   I do.

9  Q   And you recognize that as the -- again, the DRDC

10  orientation manual that is given to inmates when they arrive at

11  DRDC.  Right?

12  A   Yes.

13  Q   And if you look on page 18, it in fact tells the inmates

14  that if they have personal glasses that do not meet security

15  standards or contact lenses, they will be asked to send them

16  out after the diagnostic process has been completed.  Right?

17  A   Yes, I do.

18       And this document was updated in August of '08.

19  Q   Well, this is a defense exhibit, and I don't see any update

20  that was provided in this exhibit.  So you're saying this

21  exhibit itself was updated 8 of '08?

22  A   Well, if you look at the front cover, it says updated

23  August of '08.

24  Q   Right.  So this would be, I assume, the most current

25  document through the compliance period.  Right?

Joan Shoemaker - Cross

1   A   My -- correct.

2   Q   Now, you also talked about TTY phones with Miss McCann.

3   And you made a comment I just wanted to follow up on.  You

4   said, because there was discussion about the fact that when

5   inmates use the CIPS phone, there is a profit that's generated,

6   and you explained that apparently they buy a card to use the

7   CIPS phone from the canteen and the canteen generates a profit.

8   Do you recall that?

9   A   They purchase a phone card, correct.

10  Q   Right.  And the canteen profit, you said, was required to

11  be used for the benefit of the inmates, right?

12  A   That's correct.

13  Q   What is the annual profits that DOC makes on a canteen?

14  A   I don't know.

15  Q   You don't have any idea?

16  A   I really don't.

17  Q   So you participate in budget meetings.

18          MS. McCANN:  Your Honor, this is really irrelevant to

19  the issues in this case.  So I'm going to object.

20          THE COURT:  Sustained.

21          MS. GREISEN:  Well, if I can explain, Your Honor.  I

22  think the relevance is that there is a reason for inmates to be

23  denied TTY and being forced to use the CIPS phones because of

24  the profit that's generated from the canteen.  And that's the

25  purpose of this line of questioning.  In fact, this was

Joan Shoemaker - Cross

98

1   Miss McCann's line of questioning with Miss Shoemaker.

2          THE COURT:  If there's -- what difference does it make

3   if there is a profit motive?

4          MS. GREISEN:  Well, I think it goes to show that

5   there's a reason why that certain individuals are being forced

6   to use the CIPS phone as opposed to being given access to the

7   TTY phone.

8          THE COURT:  But either way, the hearing-impaired are

9   having access, right?

10         MS. GREISEN:  No, I don't think they are.  Number one,

11  it's our position that they are not being given equal access

12  because they're not able to use the CIPS phone because of their

13  hearing impairment, and number two, that the denial of the TTY

14  phone is based on other reasons other than need.

15         THE COURT:  Well, the other reasons are irrelevant.

16  But go ahead, you can pursue the point if you want.

17  BY MS. GREISEN:

18  Q   Well, I'm not going to belabor this issue.  I'm just asking

19  whether it's my understandings that you attend budget meetings

20  with the Department of Corrections?

21  A   I do.

22  Q   And during those budget meetings, the profit margin

23  generated by the Department of Corrections from its canteen is

24  discussed?

25  A   There is a canteen report.

Joan Shoemaker - Cross

1  Q   And despite participating in those discussion, you don't

2  have any concept or any estimate as to the kind of annual

3  profit DOC makes off the canteen?

4  A   I don't remember what the last canteen balance sheet

5  showed.  I spend a lot of time looking at my own budget.  I

6  know they make a profit.  But I really -- it's not -- it

7  doesn't come high on my radar.

8  Q   Well, didn't you say it supported two positions in clinical

9  services, or two or three positions?

10  A   No.  The copay dollars that we collect supports -- the

11  Department can use dollars up to -- that would fund three

12  positions.

13  Q   That's from the copay services?

14  A   In the clinical services.  But that's copay and not

15  canteen.

16  Q   Okay.

17      Now, with respect to the stipulation that requires the

18  Department of Corrections to give inmates with diabetes

19  bathroom breaks, you testified that there was concern that if

20  an inmate needed a bathroom break more than every hour and a

21  half or so, that that person may not be in good control of

22  their diabetes.

23  A   Correct.

24  Q   But you also know that individuals with diabetes can be on

25  diuretics, correct?

Joan Shoemaker - Cross

100

1   A    That's correct.

2   Q    And that may cause them to use the rest room more often

3   than every hour and a half and they still may be in control of

4   their diabetes, correct?

5   A    I don't believe even diuretics would cause a person to need

6   to use the rest room more than an hour to and hour and a half.

7   Q    So the policy that has been implemented at the Department

8   of Corrections is that other than the scheduled bathroom breaks

9   at visiting, there will not be any other bathroom breaks

10  provided to inmates with diabetics regardless of their -- let

11  me rephrase that.

12          The policy at the Department of Corrections is that

13  individuals with diabetes will not be provided any more

14  bathroom breaks during visitation other than those scheduled

15  breaks; is that correct?

16  A    That's correct.

17  Q    Now, you talked with Miss McCann about some of the diabetic

18  stipulations, and I wanted to ask you about the situation at

19  Territorial that occurred in January -- I mean in June of 2009

20  where there was a lockdown that occurred.  Are you familiar

21  with that incident?

22  A    Not without more details.

23  Q    Okay.

24          I'm going to hand you what's been marked as

25  Plaintiffs' Exhibit 696.

Joan Shoemaker - Cross

1    Exhibit 696, the first three pages are a grievance

2  filed by an inmate, Larry Morris.  And I'm certainly -- take

3  all the time you need to read those three pages.  I'm going to

4  paraphrase them and you can read them, and I'm just going to

5  start.  Let's go page by page.

6    MS. McCANN:  Your Honor, before we start into this

7  exhibit, we haven't seen this exhibit before, and it doesn't

8  appear that it's -- it's an AIC file, which if we were going to

9  go into this, would have been appropriate with Miss Holst

10  because her name is on it.  But there's no connection to this

11  witness.  And I don't believe it is a rebuttal exhibit, as far

12  as I can tell.  Of course, I haven't seen it, so I haven't read

13  it.  But it appears to be a grievance filed with the AIC

14  office.

15    MS. GREISEN:  It is a grievance, Your Honor.  It's a

16  grievance about the fact of the lack of timing of insulin with

17  food, which Miss Shoemaker talked with Miss McCann about on

18  direct, and that's the nature of this --

19    THE COURT:  The objection is overruled.

20    Go ahead, please.

21  BY MS. GREISEN:

22  Q   Now, this is a grievance that is -- the first page that

23  we're talking about right now, and all three pages, I'll

24  represent to you, have to do with the same incident, was a

25  lockdown incident in Territorial on June 4 of 2009.  And you'll

Joan Shoemaker - Cross

1    see on the first page, Mr. Morris has filed a grievance stating

2    that he gets an accommodation that my facility has to time

3    meals with insulin.  He goes on to state that today on June 4

4    of '09, I got my incident -- insulin at twelve o'clock and

5    right now it's 3:37 in the afternoon and I still have not

6    gotten my lunch yet.

7              You see that?

8    A    I do.

9    Q    He then goes on to say he reports this to the sergeant and

10   the lieutenant and they told me there was nothing they could

11   do.

12             The next sentence is that he says it's now about five

13   o'clock on the same day and he just got his lunch.

14             You see that?

15   A    I do.

16   Q    And apparently he, on the same day, right on page 2, again

17   is writing complaints about what's happening and he again

18   states that on the 4th of June, he was in a lockdown and they

19   fed him dinner at about eight o'clock and right now it's -- and

20   I can't read that.  So I think we'll get to it later on.  But

21   he says, I've still not gotten my insulin.  The insulin I get

22   from medical is all I get.  He goes on to say, I need it to

23   survive.  My dinner insulin is my main shot of insulin.  Right

24   now I feel really sick because my sugar is really high.  I need

25   my shot.

Joan Shoemaker - Cross

103

1      And apparently he states that somebody called medical

2  on him around eight-thirty.  Do you see that?

3  A    I do.

4  Q    So he then reports that at 11:50 that night is when he got

5  his insulin and his blood sugar was 559.

6      Do you see that?

7  A    Well, again, it's -- I can't really tell what that first

8  number is.

9  Q    Well, if you go down a couple of lines, you can see that he

10  also says, My blood sugar was 559?

11  A    I see that.

12  Q    And apparently, again, he's reiterating that he did not get

13  his insulin for three hours and 48 minutes after he ate.

14  Right?

15  A    He says that.

16  Q    Now, the third page is more of the same except he's talking

17  about apparently that during this time period he asked for a

18  finger stick and refused.

19      Do you see that generally?

20  A    He says that, yes.

21  Q    Now, the next page is that the response from the AIC office

22  denying the grievance and under section -- do you see that,

23  following a thorough investigation into your allegations, the

24  AIC office says the medications were administered according to

25  clinical standards, no emergency was suffered, medications are

Joan Shoemaker - Cross

1  provided as soon as the emergency is resolved.

2          Do you see that?

3  A   I do.

4  Q   Now, do you -- does this refresh your recollection at all

5  as to what the emergency was at CTCF in June of 2009?

6  A   No.

7  Q   Now, if in fact -- I mean, let's accept for purposes of

8  discussion Mr. Morris's allegations as true.  If in fact

9  somebody had a blood sugar of 559, in your opinion, as head of

10 clinical services, would that constitute an emergency?

11 A   The -- it's certainly a high blood sugar.  And would need

12 to be assessed, but it may not be a critical emergency.

13 Q   What about the fact assuming that he got his insulin at

14 noon and had to wait until five o'clock to eat.  Do you think

15 that that would be according to DOC protocol?  Or health

16 standards protocol.

17 A   Insulin and meals should be timed together.

18 Q   Well, I understand that generally.

19          Under any circumstances, should anybody ever, a inmate

20 ever in the Department of Corrections be required to wait five

21 hours after their insulin before being provided a meal?

22 A   Even in lockdown situations, we try to time insulin and

23 feeding of meals together.  I'm not sure -- the first grievance

24 is saying he got his insulin at 12 noon and was fed at 3:37.

25 Which would not be five hours.

Joan Shoemaker - Cross

1  Q   I think if you read that, you would say at 3:37 he's still

2  not gotten my lunch, and in the next paragraph, he says at five

3  o'clock, I just got my lunch.

4  A   He does say that.

5  Q   So let's assume that it was five hours.  Would that create

6  a emergency situation, in your opinion, as head of clinical

7  services?

8  A   Again, even in lockdown situation, I would hope that

9  insulin and meals can be timed together.

10 Q   Well, my question to you was if an individual had to wait

11 for five hours before they ate after they were given insulin,

12 in your opinion, as head of clinical services, would that

13 create an emergency situation?

14 A   If someone was waiting five hours, I would want to know

15 what the blood sugar.  I don't believe we know the blood

16 sugar -- the blood sugar that's listed is at night.  If this is

17 true, it should not have happened, that the insulin and the

18 meal should be timed together, even in lockdown situations.

19 Q   Well, I'm not -- I appreciate that.  That's not really my

20 question.  I'm asking you, in your opinion as head of clinical

21 services, would the delay of five hours between the granting of

22 insulin and food create, in your opinion, emergency situation?

23 A   It would be an emergent situation, certainly.  I don't have

24 enough information to say it was an emergency situation.

25 Q   Well, it's certainly a situation in which clinical services

Joan Shoemaker - Cross

1  should have assessed this individual -- taking his allegations

2  as true -- should have assessed him in that time period.

3  Correct?

4  A   Correct.

5  Q   Have you ever been aware of complaints from inmates,

6  diabetics, who have been in situations where they are

7  complaining, because of lockdowns, of not receiving their

8  insulin and food together at a timely -- timely receiving

9  insulin and food?

10 A   I don't recall any issues in a lockdown situation.

11 Q   So you're not aware of any of the grievances that were

12 filed with -- at Territorial with respect to the June 2009

13 lockdown?

14 A   Not unless they -- these would have -- these were filed

15 with the AIC.  I would not have seen them.

16 Q   Are you routinely kept appraised of the grievances that are

17 filed against clinical services?

18 A   If they come to my office, yes.  But not routinely, no.

19 Q   Okay.

20      So when you say "if they come to my office," I suppose

21 that means if somebody points them out to you.  But as a matter

22 of routine, you're not aware of what grievances are filed in

23 clinical services?

24 A   I look at the numbers of grievances and what the resolution

25 was.  But I don't have specific information about the topics

Joan Shoemaker - Cross

 1  necessarily.

 2  Q   So you don't track whether or not one topic is grieved --

 3  how often one topic is grieved; is that correct?

 4  A   We, we track part of our quality-assurance program is to

 5  look at grievances, but they're broad categories.  If a number

 6  of grievances came up on a specific topic, we would be

 7  reviewing that.  But I'm not aware that we've had a large

 8  number of grievances filed about insulin and lockdown

 9  situations.

10  Q   Are you aware of any grievances at all filed against

11  clinical services with respect to the June 2009 lockdown?

12  A   Not that I know of.

13  Q   Okay.

14          Let's look at Defendant's Exhibit R.

15          Do you have that in front of you?

16  A   I do.

17  Q   This is, as you can see on the top of the exhibit, the list

18  of inmates admitted to DRDC from May 1, 2008, through April 30

19  of 2009.

20  A   Right.  That's what the top of the document says, that's

21  correct.

22  Q   And this is a defense exhibit.  Have you seen this exhibit

23  before?

24  A   Not that I recall.

25  Q   Okay.

Joan Shoemaker - Cross

1        Well, it does list on this exhibit the type of

2   disability that an inmate has, if any, right?

3   A   Yes.

4   Q   Now, I counted and maybe rather than take up court time

5   counting, I'll ask you to verify it over the break and you can

6   come back and tell me if you disagree with my numbers, but I

7   counted 152 inmates with diabetes that came into the system

8   during this one-year time period.  Does that sound about right

9   to you, on an average basis?

10  A   Well, at this point in the day, not being able to do very

11  much math in my head, I'd have to do some figuring, frankly.

12  Q   You'd have to do what?

13  A   Well, there's a percentage that we expect to come in.  I'd

14  have to do the math.  I'm not doubting your ability to count.

15  Q   You can certainly count them over a break and then you can

16  go back on the record and answer that question.

17       So I'll represent to you I counted and there's

18  actually 152 diabetics on here.  And it's fair to say, isn't

19  it, that this is generally representative of the volume of

20  diabetics that come into the system on an annual basis?

21       You don't have any reason to think that May of 2008

22  through April of 2009 was a bizarre year where you got -- DOC

23  got flooded with diabetics, right?

24  A   I would assume that that's probably a pretty accurate

25  number.

Joan Shoemaker - Cross

1  Q    Okay.

2         Now -- all right.  That's all I -- that's all I wanted

3  with that exhibit.

4         We -- we've talked about numerous times that the DOC

5  facilities -- all DOC facilities can house diabetics, right?

6  A    That's correct.

7  Q    Now, clinical services at all the facilities, medical

8  staff, the clinical staff, all have diabetes medical training,

9  right?

10 A    Correct.

11 Q    All the medical staff -- and by "medical staff," I'm

12 talking about from the nurse to the doctor -- would have a

13 basic understanding of the care and treatment of diabetes,

14 right?

15 A    That's correct.

16 Q    And that would include such areas as including like the use

17 of insulin, hypoglycemic reactions, and neuropathy issues,

18 right?

19 A    Some of the people that you have listed would have varying

20 levels of education and information on the topics.  But in

21 general, yes.

22 Q    Well, I'm going to assume that the doctors and midlevel

23 providers also would have a basic understanding of the care and

24 treatment of diabetes including the items that are on the

25 eight -- the eight accommodation items that are listed on the

1    accommodation resolution forms for diabetics, right?

2    A    I believe the answer is yes.

3    Q    Well, and in other words, the doctors and midlevel

4    providers would understand concepts like the timing of meals

5    with insulin, right?

6    A    Correct.

7    Q    And they would understand concepts that the fact that

8    medical shoes for diabetics are usually going to mean tennis

9    shoes, right?

10   A    Correct.

11   Q    And such things that if a person had hypoglycemic

12   reactions, that they would be -- might be eligible for a call

13   button in their cell, right?

14   A    Correct.

15   Q    And certainly they would be aware of these things after the

16   training that DOC provides them.  Right?

17   A    Correct.

18   Q    Now, I think that as head of clinical services, you're

19   responsible for ensuring that your providers have the required

20   training under the remedial plan, right?

21   A    That's correct.

22   Q    And that you're also responsible for ensuring that your

23   providers understand the basic accommodations granted under the

24   remedial plan and the stipulation, right?

25   A    Correct.

Joan Shoemaker - Cross

1   Q    Now, the -- it's my understanding that the providers, the

2   doctors and midlevel providers receive annual training of the

3   Team Management of Diabetes course; is that right?

4   A    That's, I believe that's true.

5   Q    And that training has actually been given at DOC for

6   several years, hasn't it?

7   A    I believe that that training corresponds with the signing

8   of the remedial plan.

9   Q    Okay.

10        So training to the providers, midlevel providers, had

11  been provided to medical staff for several years at DOC, right?

12  A    Yes.

13        MS. GREISEN:  Can we look at C5.

14  BY MS. GREISEN:

15  Q    Now.  Do you have Exhibit C5?

16  A    I do.

17  Q    Exhibit C5 is actually a memo from Anna Marie Campbell --

18  I'm sorry, from Nancy Photos to Anna Marie Campbell in clinical

19  services attaching a summary of the staff that have completed

20  the Team Management of Diabetes, right?

21  A    That's what the memo says, yes.

22  Q    Well, in fact, according to this memo, the summary of staff

23  that have completed the Team Management of Diabetes is from its

24  inception in December of 2007, right?

25  A    Correct.

Joan Shoemaker - Cross

1  Q   So that corroborates your previous testimony that it's been

2  going on for a couple of years, right?

3  A   Right.

4  Q   Now, just so I understand, let's just look at the first

5  one.  On page 2.  The first person listed is Constance **Batson**,

6  right?

7  A   That's correct.

8  Q   And I think I've seen her name before as Connie; is that

9  right?

10 A   That's correct.

11 Q   And Miss Batson is a midlevel provider.  Do you know what

12 her certification is?

13 A   I believe she's a nurse practitioner, advanced practice

14 nurse.

15 Q   Okay.

16         Has she -- she's been with the Department for several

17 years, hasn't she?

18 A   I don't know how long she was.  She was a provider when I

19 assumed the clinical area.  In April of '07.

20 Q   Okay.

21         So we know she's been there at least since April of

22 2007.

23 A   Correct.

24 Q   Now, I take it from -- tell me if I'm correct, from this

25 document, it appears that Miss Batson is a midlevel provider

Joan Shoemaker - Cross

1   who would have had the Team Management of Diabetes training

2   class in March of 2008.  Right?

3   A    That's correct.

4   Q    And I'm assuming that the Team Management of Diabetes class

5   also goes through all the things that we've just talked about,

6   the timing of meals with insulin, hypoglycemia, just the range

7   of the standard of diabetic care, right?

8   A    Yes.  Yeah, it's a broad -- it's kind of an overview of

9   diabetic management.

10   Q    Right.  And most people you would assume who are at a PA or

11   NA or doctor's level, I think you already testified to this,

12   have a basic understanding of what these concepts are already,

13   correct?

14   A    Absolutely.

15   Q    Let's look at Exhibit 630, which is the AIC work sheet for

16   Mr. Simpson.  I've -- it's already in your exhibit book, but

17   just for ease, I'm going to hand you a copy of it so we don't

18   have to dig through the notebooks.

19          Now, it appears from Exhibit C5 that Miss Batson is at

20   ACC.  Right, Arrowhead.

21   A    Yes.

22   Q    If you look on C5.

23          Do you see that?

24   A    Yes.  She . . . .

25   Q    I'm sorry?

Joan Shoemaker – Cross

1   A   She's at CMC, predominantly assigned at Arrowhead.

2   Q   Okay.

3         So according to C5, she receives the training on March

4   of 2008; and if you could look on Mr. Simpson's work sheet, on

5   June of 2008, which would be a little less than three months

6   after she receives the training, do you see that there's an

7   e-mail from provider **Batson** at ACC asking what is, quote,

8   after -- appears to be saying after hours restriction and does

9   this offender need a call button.  If so, he cannot be housed

10  at ACC.  And the AIC response was that they explain the new

11  diabetic stipulation, that an offender must have access to a

12  diabetic kit and does not require call button unless history of

13  hypo or hyper episodes and cannot get out of the cell.  Do you

14  see that?

15  A   I do.

16  Q   And if you look on the next day, apparently the AIC's

17  office gets a telephone call from Anna Marie Campbell at

18  clinical services, and she had a few questions regarding this

19  offender's accommodation resolution.  Right?

20        Do you see that?

21  A   I do.

22  Q   And the individual that we're talking about is Mr. Simpson

23  who is the individual that testified in this court about his

24  diabetic neuropathy issues.  Do you recall that?

25        Do you remember a gentleman who came in who was on

Joan Shoemaker - Cross

1  parole who talked with us about his diabetic neuropathy issues?

2  A   I think I've been absent two times during this hearing, and

3  that was one of them.  So I don't remember.  I know there was

4  an offender named Simpson who was going to testify.

5  Q   Okay.  That's fine.  It's not necessary for the purposes of

6  this examination.

7          Again, on the same entry, 6-18-08, it indicates

8  provider **Batson** did not understand the accommodation of timing

9  of meals with insulin.  Do you see that?

10  A   I do.

11  Q   And apparently the AIC office explained that offender would

12  need to receive his meal within a certain amount of time of

13  receiving his insulin if he is insulin-dependent.  Right?

14  A   I see that it says that.

15  Q   Apparently provider **Batson** also asked about shoes.  Do you

16  see that?

17  A   I do.

18  Q   Apparently this offender, it states, has some soft-soled

19  low-top suede boots which Miss Batson meets the description of

20  special medical shoes and wants to know if these will work.

21  Right?

22  A   That's correct.

23  Q   So it appears that Miss Batson is asking the AIC office

24  whether or not the medical shoes provided to Mr. Simpson are

25  acceptable.  Right?

Joan Shoemaker - Cross

1    A    That's correct.

2    Q    And Miss Baxter goes to know to say, quote, I explained to

3    her that I cannot make that decision, it needs to be made by

4    the medical provider, something they need to keep in mind is

5    that if the offender qualifies for a gate pass and a job

6    outside the gate, would need to make sure his, quote, special

7    medical shoes will allow him to go outside the gate.  Right?

8            You see that?

9    A    Yes, I do.

10   Q    And then the next entry is another e-mail from provider

11   **Batson** in which provider **Batson** asks, quote, what does medical

12   shoes mean.  Right?

13           Do you see that?

14   A    Yes.

15   Q    And apparently another individual from the AIC office

16   explained to the provider that this is a medical decision.

17   However, from my experience, it means tennis shoes.  And

18   informs provider **Batson** to contact Rajda Shepherd.  And you

19   understand that Rajda Shepherd was in fact a doctor that was

20   working with the Department of Corrections?

21   A    No.  Mr. Shepherd is a midlevel provider.

22   Q    He's a midlevel provider?

23   A    Yes.

24   Q    Apparently he made the recommendation, right?

25   A    From what is on here, that's what it looks like, yes.

Joan Shoemaker - Cross

1   Q   In fact, there was a e-mail from Mr. Shepherd explaining

2   his recommendation because Mr. Simpson has a history of

3   diabetic neuropathy, right?

4   A   That's correct.

5   Q   Also, a nursing request for tennis shoes, offender needs

6   appropriate shoes.  That was Mr. Shepherd's e-mail response,

7   right?

8   A   Correct.

9   Q   So apparently following the e-mail exchange between

10  Miss Batson and the AIC's office, there's a copy of an e-mail

11  to yourself, Miss Campbell, and miss -- Dr. Frantz from

12  provider **Batson** and apparently she feels that she has upset

13  individuals in the AIC office.  Right?

14  A   That's what this entry is describing.

15  Q   Does it surprise you to learn that one of your providers,

16  three months after their training on how to treat and care for

17  diabetes does not understand the concept such as the timing of

18  meals with insulin?

19  A   I, from these entries, I think she's talking about the

20  eight stipulations, and I believe she's asking questions to

21  hopefully assure that she's doing it in the correct way.  When

22  she took the training in March, the specific language around

23  what was going to appear on the accommodation resolution forms

24  would not have been discussed.  I think she's trying to assure

25  that she's doing the right thing.

Joan Shoemaker – Cross

1   Q   So on the entry of 6-18-08, where it says, quote, provider

2   **Batson** did not understand the accommodation of timing of meals

3   with insulin, that information doesn't concern you with respect

4   to whether or not your midlevel providers were adequately

5   trained upon the standards of care for diabetes?

6           MS. McCANN:  Your Honor, this question was just

7   answered, as I understand it; if I remember the previous

8   question, it was the same question.

9           MS. GREISEN:  Well, I don't think she actually

10  answered it, Judge.

11          THE COURT:  I think you're right.  The objection is

12  overruled.

13          You can answer.

14          THE WITNESS:  What I'm suggesting and believe to be

15  the point of the question was the eight standard accommodations

16  that would be placed on diabetics, I believe what provider

17  **Batson** is seeking is to make sure that she's understanding what

18  the timing of meals and insulin means as related to the

19  accommodation.  I don't think it means that she doesn't

20  understand the importance of insulin and meal times.  As a

21  provider.

22          THE COURT:  All right.

23          Let's take our break now, please.

24      (Recess at 2:49 p.m.)

25      (Reconvened at 3:14 p.m.)

Joan Shoemaker - Cross

1          THE COURT:  Thank you.  And be seated, please.

2    BY MS. GREISEN:

3    Q    Okay, Miss Shoemaker, did you have a chance to review --

4    sorry --

5          THE COURTROOM DEPUTY:  I wasn't drinking.

6          THE COURT:  What did you have to drink for lunch.

7          THE COURTROOM DEPUTY:  I just ate something really,

8    really fast.  Need to slow down.

9          MS. GREISEN:  You okay?

10         THE WITNESS:  That's okay.  There are several of us in

11   this courtroom that can administer first aid.

12         MS. GREISEN:  Actually, I thought you were going to

13   say there are several of us who might admit to drinking.

14   BY MS. GREISEN:

15   Q    Okay.  Back to the case at hand.  Did you have a chance

16   over the break, Miss Shoemaker, to count how many diabetics

17   there were listed on Exhibit R coming into the Department of

18   Corrections during that one-year period of time?

19   A    By my count and addition, it's 158.

20   Q    Okay.

21         And whether it's 100, 158, would you still agree that

22   generally that's a rough, or that is a general pattern of how

23   many diabetics come into the Department on an annual basis?

24   A    It makes sense to me that that's probably a reasonable

25   number.

Joan Shoemaker - Cross

1    Q    Okay.

2         Now, if we could go back to C5.  Do you still have

3    that in front of you?

4    A    I do.

5    Q    Now, we were looking at Miss Batson, and again, you see

6    that these are the training records of the staff that have

7    completed the Team Management of Diabetes, and it appears that

8    these are records that are printed out from December of 2007

9    till November of 2009.  Right?

10   A    That's correct.

11   Q    And it appears that since March 24 of 2008, Miss Batson has

12   not again undergone the team management of training -- Team

13   Management of Diabetes training through November of 2009,

14   correct?

15   A    I don't find her name.

16   Q    Which would indicate that she had not had any of the

17   training that we discussed from March of 2008 -- after March of

18   2008 through November 5 of 2009.  Right?

19   A    She's not had this course in the training academy.

20   Q    Which was the Team Management of Diabetes training.

21   A    That's correct.

22   Q    Which is the training which I believe you testified the

23   clinical staff received once a year at the Department of

24   Corrections, right?

25   A    It is supposed to be annually, that's correct.

Joan Shoemaker - Cross

1    Q    And in fact, if you look at the list at the Fort Lyon

2    facility, which is page 10 of this report, you see that there's

3    about, roughly around I counted 28 people on this list of

4    training who had received training on the Team Management of

5    Diabetes from January of 2007 through November of 2009, right?

6    A    It does list 28 employees.

7    Q    And it appears that all but maybe two of them, or maybe

8    three, had their training on Team Management of Diabetes in

9    January, February, or March of 2008.  Right?

10   A    There are several dates in February and -- or in January,

11   February.  There's a few in March.  There's a couple in August.

12   Q    Okay.

13         Well, let's just be clear on the record.  There are

14   three individuals who did not receive their training in either

15   January, February, or March of 2008, and that is Mr. Castanos,

16   the second name, right?

17   A    That's correct.

18   Q    Miss Hanks, correct.

19   A    Correct.

20   Q    And Mr. Schibbelhute, right?

21   A    Correct.

22   Q    Everybody else on that list received their training on the

23   Team Management of Diabetes in January, February, or March of

24   2008, right?

25   A    That's correct.

Joan Shoemaker - Cross

1    Q    And since that date, there's no indication that almost a

2    year and a half after that, through the end of November of

3    2009, that these individuals have received any subsequent

4    training on Team Management of Diabetes, correct?

5    A    There's no report in here to indicate they've had any other

6    team management training of diabetes.

7    Q    And in fact, on the cover sheet, it says that Anna Marie

8    Campbell is including a -- the computer summary of staff that

9    have completed the Team Management of Diabetes class but

10   there's no indication that any of the staff from any of the

11   private facilities have in fact received that training.  Right?

12   A    The private facilities, Miss Photos would not be able to

13   give Miss Campbell a report of the privates because they are

14   not in the departmental training system.  So you're correct

15   that there are no providers from the private facilities in this

16   document.

17   Q    And you yourself haven't reviewed the rosters from the

18   private -- the training of the private facilities clinical

19   staff to ensure whether or not in fact every year they are

20   receiving the annual training on diabetes, correct?

21   A    I have not reviewed their rosters.

22   Q    I'm just going to return to Mr. Simpson's AIC work sheet,

23   Exhibit 630, that we talked about a few minutes ago.

24   A    Yes.

25   Q    There's one other thing I want to talk with you about that,

Joan Shoemaker - Cross

1  and that's the entry on June 30 of '08.

2          Take a minute to read that, and I'll ask you my

3  question.

4  A    Okay.

5  Q    It appears that there's some discussion about whether

6  Mr. Simpson should in fact have soft-soled shoes as an

7  accommodation for his diabetic neuropathy, right?

8  A    I'm sorry, ask me again?

9  Q    It appears from the entry that this is a conversation

10 occurring about whether or not Mr. Simpson should have

11 soft-soled shoes for his diabetic neuropathy, right?

12 A    That's correct.

13 Q    And it apparently was Mr. Rajda Shepherd's opinion that

14 Mr. Simpson should have such shoes, right?

15 A    That's what this recommendation is saying.

16 Q    And in fact, it says that he called the AIC's office and

17 stated that he stands firm on his recommendation and states

18 that DOC does not have the proper tools or means of

19 diagnosing -- as diagnosing neuropathy is difficult and

20 oftentimes cannot be ruled out.  Right?

21 A    That's what this document states.

22 Q    And do you disagree with Mr. Shepherd's opinion as stated

23 in that document?

24 A    I would disagree with that statement based on the

25 conversations that I've had with Dr. Frantz.  I do not know how

1    to conduct an exam for neuropathy, so I have to rely on the

2    chief medical officer.

3    Q    Well, the next sentence that he states, quote, Prevention

4    and infection treatment, slash prevention is their best tool.

5    Do you agree with that statement?

6    A    Prevention is always a good tool.

7              MS. GREISEN:  I don't have anything further.

8              Oh, I'm sorry, I do need to move my exhibits.

9              THE COURT:  Okay.

10             MS. GREISEN:  And I've waited so long that I have a

11   long list.

12             Did you guys have anything else?

13             At this time I'm going to move for admission of

14   Exhibits 307, 690, 691, 692, 693, 695, 697, 698, 699, 700, 702,

15   703, 439, 683, 686, V-3A, 687 -- and that was V as in victor on

16   the previous one -- 687, 688, Q3, 696, C5, and 630.

17             THE COURTROOM DEPUTY:  You just said 63 or 630?

18             MS. GREISEN:  630.  630.

19             MS. McCANN:  Your Honor, there were a few of these

20   that I objected to during the course of the discussion, so I

21   would continue my objection to those.

22             THE COURT:  All right.

23             MS. McCANN:  Otherwise, we don't have any objection.

24             THE COURT:  All right.  They're admitted over

25   objection and admitted without objection, according to the

Joan Shoemaker - Cross

1   recitation.

2       (Exhibit 307 admitted.)

3       (Exhibit 690-693 admitted.)

4       (Exhibit 695-700 admitted.)

5       (Exhibit 702,703 admitted.)

6       (Exhibit 439 admitted.)

7       (Exhibit 683 admitted.)

8       (Exhibit 686-688 admitted.)

9       (Exhibit V3A admitted.)

10      (Exhibit Q3 admitted.)

11      (Exhibit C5 admitted.)

12      (Exhibit 630 admitted.)

13          THE COURT:  And we are going to recess at 3:45; is

14  that correct?

15          MS. McCANN:  Yes, Your Honor.

16          THE COURT:  Okay.

17          MS. McCANN:  We'll recess the hearing, but we do want

18  to have a conversation with you.

19          THE COURT:  That's what I meant.  For that reason.

20          MS. McCANN:  Yeah.

21          I also needed to move and think that I neglected to

22  move yesterday which was K12 -- I'm sorry, K7.  Which is the

23  pictures of the signs regarding the bathroom breaks.

24          MS. GREISEN:  No objection.

25          THE COURT:  Admitted.

Joan Shoemaker - Cross

1        (Exhibit K7 admitted.)

2            MS. McCANN:  And I think I offered O5 by mistake.  I

3    think I didn't refer to it, but I offered it.  I think that

4    particular exhibit's already in.  It's one of plaintiffs'

5    exhibits, but I'm not sure what the number is.  But I did

6    not -- I did not question about O5, so that was a mistake to

7    move that admission.

8            And also there was the minutes from day 17, July 1 of

9    '10 show that Exhibit I was admitted.  But we did not move for

10   the admission of I.

11           MS. GREISEN:  It may have been that we moved for it.

12   Do you know?

13           MS. McCANN:  No.

14           MS. GREISEN:  Apparently we didn't, either.

15           THE COURT:  Well, shall we expel it?

16           MS. McCANN:  I think it would probably be accurate not

17   to -- yeah, to say that it was not offered, Exhibit I was not

18   offered.

19           THE COURT:  You got that, Exhibit I was not offered.

20           MS. McCANN:  And Exhibit O5 is also not offered.  Or

21   it was offered, but I didn't use it in my examination.  So I'm

22   not sure what you want to do with that.

23           THE COURT:  Does it matter to you?

24           MS. McCANN:  No, it really doesn't, that much.

25           THE COURT:  How about to the plaintiffs, does it

Joan Shoemaker - Cross

1   matter?

2          MS. GREISEN:  You know, I'd have to see the exhibit,

3   so maybe we can do it during the recess and come back and clean

4   this up.

5          THE COURT:  Let's check on it.

6                    **REDIRECT EXAMINATION**

7   BY MS. McCANN:

8   Q    Good afternoon, Miss Shoemaker.

9   A    Good afternoon.

10  Q    Plaintiffs' counsel talked to you a little about the fact

11  that sometimes there are some vacancies in your clinical staff,

12  particularly doctors or providers.  How do you handle that kind

13  of situation?

14  A    The staffing at facilities, all of our -- the predominant

15  provider in the Department are midlevel providers.  And in most

16  facilities, we have both midlevels and physicians.  When we

17  have vacancies in either category, depending on the number of

18  vacancies, obviously if it's a facility that has one midlevel

19  provider, then we are providing coverage either from within our

20  existing resources or we're contracting and we have several per

21  diem contracts that are available so we have periodically there

22  are bids that are put out for companies that want to supply us

23  temporary staffing.  And it's for all disciplines.  Depending

24  on the contract, it's for multiple disciplines within the

25  Department.

Joan Shoemaker - Redirect

1   Q   And do you from time to time have difficulty filling

2   positions in the rural areas where you have facilities?

3   A   We do have difficulty filling some of our rural positions.

4   One of the positive things that we are experiencing as a result

5   of the current economic climate is that we have -- I actually

6   think it's twofold.  We've stabilized in some of our staffing

7   and even in the rural areas because of the economic downturn.

8   And I also believe it's the, the climate that we've developed

9   in our clinics that's more positive.

10  Q   Of the categories of disabled offenders included in the

11  Montez case, which, which are allowed to be placed at private

12  prisons?

13  A   Only the diabetic offenders can be housed in private

14  facilities.

15  Q   And you were involved in the diabetic kit training,

16  correct?

17  A   Correct.

18  Q   To your knowledge, was training provided to the staff at

19  private facilities?

20  A   The -- when we developed the training, it was distributed

21  to all DOC facilities and private facilities.  And they are

22  doing the roll call training, following the same course that we

23  do in our DOC facilities.

24  Q   I want to briefly touch on the issue of the M codes.  What

25  types of conditions might cause offenders to be coded M3?

Joan Shoemaker - Redirect

1   A    The -- as we've talked, the M codes are -- there's a set of

2   example diagnoses in the clinical standard on M codes, and

3   offenders could be an M3 because they have controlled

4   hypertension, they have heart disease, diabetic; there are a

5   variety of conditions which could make them an M3.

6   Q    And what about an M4?

7   A    The M4 is someone who has either more medical issues or,

8   for example, a person who has uncontrolled hypertension or high

9   blood pressure could be an M4.  The M4 category could also

10  include someone who has chronic lung disease.  There might be

11  cancer diagnoses.  There's a variety of diagnoses, but it's, it

12  is generally that they're more serious in nature than the M4 --

13  I mean the M3.  So, again, as you -- the higher the number, the

14  more severity there is involved in the diseases.

15  Q    And if a facility does not take M4s, that would be true of

16  any category of M4, not just insulin-dependent diabetics,

17  right?

18  A    That's correct.

19  Q    What is the concern about insulin-dependent diabetics being

20  placed at level 1 facilities?

21  A    The concern is that most of our level 1 facilities do not

22  have clinical staff on site routinely.  And it deals with

23  medication administration.  If you have -- we are authorized

24  statutorily to allow correctional officers to give -- to assist

25  an offender in taking medication, but those are really oral

Joan Shoemaker – Redirect

1   medications.  There are several meds that we wouldn't want in a

2   level 1 facility that require clinical judgment.  Insulin,

3   syringes need to be drawn up.  While we draw it up and give it

4   to the inmate to administer to themselves, the correctional

5   officers would be very hesitant to, to be able to verify that

6   an insulin-dependent diabetic had drawn up the correct insulin.

7   Most of our diabetics were diagnosed before they came to the

8   Department, so they probably understand how to do that.  But we

9   have an obligation to provide health care.  And so having the

10  offender draw their own without having a nurse be able to

11  verify that is beyond the reasonable care, from my perspective.

12  Q   So if I'm an insulin-dependent diabetic and I'm assigned to

13  a level 1 facility, such as Skyline, how -- if I were to be

14  assigned, is there any way I could get my insulin shots?

15  A   We don't store any medications at Skyline.  Because the --

16  there is a room at Skyline where a provider goes in and does

17  sick call periodically.  But there are no medications that are

18  stored there.  All of our med rooms are licensed by -- we have

19  two sets of licenses basically in our clinics.  One is a

20  community clinic license through the health department.  And

21  the other, the medication rooms are licensed by the board of

22  pharmacy as other outlets.

23          And so Skyline, because we don't have clinical staff

24  on site, Skyline isn't -- does not even have that license.  So

25  there are a number of requirements that would have to happen,

Joan Shoemaker – Redirect

1    and those are the reasons we don't store medications there,

2    because there's no nursing staff on site there.

3    Q    What about an insulin-dependent diabetic at a facility that

4    does have clinical staff, how do they get their insulin?

5    A    Insulin is administered through medication lines.  Often it

6    is the start of a med line or there's a specific insulin line

7    that's done, and the offender comes to the window.  The nurse

8    draws the insulin in front of the inmate at the time, the

9    inmate's handed the syringe, and they give themselves their own

10   insulin.

11   Q    But they're not allowed to take the syringe away from that

12   area?

13   A    That's correct.

14   Q    They return it when they finish?

15   A    In fact, it's very controlled.  Because insulin -- syringes

16   are a huge commodity in an institution because offenders would

17   like to have one to administer their illicit drugs that they've

18   obtained in some way.

19   Q    Now, let me talk with you a little bit about parole

20   considerations.  What kinds of considerations go into a

21   decision about whether an offender can get -- can be paroled?

22   A    Parole and community corrections are based on the

23   assessment of risk to the community, and they're based on

24   program completion, institutional behavior, time served in

25   their sentence, completion of programs that were recommended.

Joan Shoemaker – Redirect

1        So, for example, if an offender was recommended to

2    have substance abuse treatment, did they complete that during

3    their incarceration.  And community corrections requests are

4    based on, on those factors plus time to parole-eligibility

5    date.  So it's really based on institutional behavior and

6    completion of programs, not the level of institution that you

7    are housed at.

8    Q    So these -- would these considerations be the same

9    regardless of the facility where the inmate is housed?

10   A    That's very correct.

11   Q    Do inmates parole out of facilities at different levels?

12   A    Offenders parole out of all of our institutions.  If you

13   look at the two women's facilities that are currently in

14   operation, they are multicustody.  So there is no level 1

15   female facility.  And female offenders parole out of those

16   facilities at the same rates that they do at other places.

17   Q    And what about, for example, Sterling, would an inmate grow

18   out of parole out of Sterling?

19   A    Absolutely.

20   Q    Is there any penalty to obtaining parole if an offender

21   does not go to a level 1 facility?

22   A    No.  Parole decisions -- parole board decisions are really

23   based on the parole board's assessment of risk of the offender

24   out into the community.  And again, it's based on their

25   institutional behavior.  If they've completed programs, all of

Joan Shoemaker – Redirect

1   those factors that the board is looking at to make those

2   decisions.

3   Q    Speaking of level 1 facilities, are offenders free to come

4   and go as they please in a level 1 facility?

5   A    Well, obviously they need to stay beyond -- in the

6   institution.  They have -- they still are required to be in

7   certain locations at certain times.  Meals are served at a

8   specified time, there are count times.  There are a number of

9   requirements for management at whatever level of institution it

10  is.  Level 1s don't have controlled movement, but there are

11  still a number of factors that limit the offender's ability to

12  move around without restriction.

13  Q    Do they have count at level 1 facilities?

14  A    In fact, all institutions have count several times a day.

15  Q    You were asked a bit about DRDC and whether or not there

16  was an audiologist present.  If the audiologist comes

17  quarterly, what happens during the time that the audiologist is

18  not there with an inmate who might be suspected of being

19  hearing disabled?

20  A    When a diagnostic offender fails the test by the OAE, the

21  provider at diagnostics is submitting a consult to get the

22  audiologist appointment scheduled.

23  Q    And so where does that inmate -- when does that occur?  The

24  audiologist appointment?

25  A    It would be scheduled -- we have a centralized scheduling

Joan Shoemaker – Redirect

1  unit, and they would be scheduling appointments with the

2  audiologist.  And it would happen as soon as they could get it

3  scheduled.  Predominantly we're using one audiologist company

4  right now, so it might occur in Pueblo, it might occur back at

5  DRDC, but in the meantime, they might have gone to a permanent

6  facility and come back to the diagnostic unit.

7  Q   And what was the reason that you have decided to have an

8  audiologist come periodically to DRDC?

9  A   We did it for multiple reasons.  One was that we were

10  trying to utilize an audiologist who's been working very

11  closely with us, and we have been able to streamline the

12  processes for hearing aids, to obtain hearing aids.  The other

13  vendor that we were using has not been as responsive, and we've

14  had problems with --

15       It's set up now that because we know what the criteria

16  is for hearing aids, when the audiologist does the appointment

17  and gets the result of the audiology report, the audiogram, if

18  they meet the criteria, the hearing aid is fitted at the time

19  so that it's then two appointments instead of three.  And we

20  were not having the same luck or consistent practice with the

21  other audiology service we were using.  So we've centralized it

22  to the one because we've been able to streamline the process

23  and be more efficient with giving offenders hearing aids.

24  Q   Is there a problem tracking the tennis shoes that are

25  notched versus the boots that we have seen introduced here in

Joan Shoemaker - Redirect

1    testimony?

2    A    The tracking that I believe you're talking about is outside

3    the fence and while the tennis shoes are notched, it is not a

4    very significant notch because if you cut into the sole very

5    deeply of the tennis shoes, you destroy the integrity of the

6    sole.

7           The other problem is that even with the notch, because

8    it's a common sole that there might be multiple people in the

9    world who are wearing, it is more difficult to track during an

10   escape.

11          THE COURT:  Sorry.

12          THE WITNESS:  As long as it's you spilling water in

13   this courtroom and not me.

14          THE COURT:  First time in 30 years that I've done

15   that.

16          MS. McCANN:  We've driven you to spilling water now.

17          THE COURT:  Driven me to drink.

18          MS. McCANN:  Yeah.

19          At this point, Your Honor, I think that it's time that

20   we were going to recess.

21          THE COURT:  I didn't mean to do that to call the

22   recess.  I agree with you.

23          MS. McCANN:  That's all right.  I was ready to move

24   into a new area, so we'll wait.

25          I guess we'll finish this at another time.

1              THE COURT:  Okay.

2              MS. McCANN:  And, you know, Your Honor, while we're on

3    the record, I did want to see if it would be possible -- and I

4    have discussed this with plaintiffs' attorney -- to set a day

5    between now and when we continue this hearing, set it like a

6    morning or an afternoon where we could meet with special master

7    and discuss some of those concerns because there are continuing

8    to be a number of hearings set, and I think it would be of

9    benefit to all of us if we got some clarification and discussed

10   what it is the special masters are still doing or supposed to

11   be doing.  And at least with plaintiffs' counsel and

12   Judge Borchers' calendar, we did have the morning of the 28th

13   of July available, and at one time you had that week available,

14   but I don't know if it's still available.  But if you're

15   receptive to that, it might be a good time to do that.

16             THE COURT:  Yeah, I have the morning of 28th of July

17   available.

18             So you want that at what time?

19             MS. McCANN:  Whatever time is convenient --

20             THE COURT:  What about Judge Borchers?

21             MS. McCANN:  He said he had that morning available.

22   So I think he's available anytime.

23             MS. GREISEN:  How long, do you think, Beth?

24             MS. McCANN:  I don't think it should take more than a

25   couple of hours, if even that.  I was envisioning kind of just

1    a discussion, not a hearing as such, but kind of a discussion.

2    We could explain what our position is and we -- I think we'll

3    file something with the court showing kind of what hearings are

4    set and what --

5            THE COURT:  Yeah, if you file that and a statement of

6    what your concerns are, it's very difficult for me, trying to

7    at one time be the settlement judge, another time trying to

8    judge these things on the merits and then having the

9    magistrates where I've reviewed their individual decisions and

10   I've tried as a result to stay away from what they're doing so

11   that I can maintain the objectivity that I think is necessary.

12   So I am really, quite frankly, befuddled by it.  I'm not

13   befuddled by the individual objections to the magistrates'

14   orders that I look at, that's pretty clear.  But the rest of

15   it, I just don't know.

16           So I would like it if each side would give me a, just

17   a precis of what you want to do.

18           MS. McCANN:  Okay.  We can do that.

19           THE COURT:  All right.

20           MS. McCANN:  And I think it would be helpful to have

21   Judge Borchers to explain his thinking as well.

22           THE COURT:  Well, I agree.  That's a great idea.

23           MS. McCANN:  So what time would you like to do that?

24           THE COURT:  Nine o'clock on the 28th is fine.

25           MS. McCANN:  Thank you.

1           MS. GREISEN:  And, Judge, just so you know, it's

2    not -- I'm not quite sure what the issue is, either.  I'll

3    certainly respond to something, if they file it, but --

4           THE COURT:  Can't you just talk and figure out what

5    the issue is?

6           MS. McCANN:  Yeah.

7           MS. GREISEN:  Sure.

8           THE COURT:  Why don't you do that and then you can

9    file a joint statement.  Just tell me the things you want to

10   do.

11          MS. GREISEN:  All right.

12          THE COURT:  Otherwise, we sit there and I get tired of

13   sucking my thumb.

14          All right.  Let's be in recess.

15          Have a nice week.

16      (Recess at 3:48 p.m.)

17                    REPORTER'S CERTIFICATE

18          I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20   Dated at Denver, Colorado, this 11th day of August, 2010.

21

22                          s/Kara Spitler_____
                                  Kara Spitler
23

24

25