IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-JLK
(Consolidated for all purposes with Civil Action No. 96-cv-00343)

JESSE (JESUS) MONTEZ, *et. al.*

Plaintiffs,

v.

BILL RITTER, *et al.,*

Defendants.

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR A FINDING OF
SUBSTANTIAL COMPLIANCE IN AREAS IN WHICH PLAINTIFFS HAVE NOT
INTRODUCED EVIDENCE OF LACK OF SUBSTANTIAL COMPLIANCE AT THE
CONCLUSION OF THEIR CASE**

---

Plaintiffs, by and through their counsel, Paula Greisen and Jennifer W. Riddle of KING

& GREISEN, LLP, and Edward T. Ramey, Lara E. Marks, and Blain D. Myhre of ISAACSON

ROSENBAUM, PC, hereby file this Response to Defendants' "Motion For a Finding of

Substantial Compliance in Areas in Which Plaintiffs Have Not Introduced Evidence of Lack of

Substantial Compliance at the Conclusion of Their Case" (hereafter "Defendants' Motion")

[Doc. No. 4728].

I. **Standard**

Although Defendants request that this Court enter findings of substantial compliance on

certain aspects of the Remedial Plan and the Stipulations in this case, they have not provided any

authority for granting the requested relief.  The only arguable authority for the relief requested

would appear to be Fed.R.Civ.P. 52(c) which provides:

> **Judgment on Partial Findings**.  If a party has been fully heard on an issue during a nonjury trial and the court finds against a party on that issue, the court may enter judgment against the party on *a claim or defense* that, under controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a). (Emphasis added.)

This Rule, however, applies to the entry of judgment on a claim or defense and is  applied when

a party has not carried its burden of proof with respect to an element of the claim at issue.  See

*TransWestern Publ'g Co. LP v. Multimedia Mktg. Assocs.*, 133 F.3d 773 (10th Cir. 1998) (Rule

52( c) motion granted when plaintiff did not establish an element of claim).

### a.   <u>Rule 52(c) is not Applicable to the Consent Decree</u>

In this case, however, the components of the Remedial Plan are not individual "claims" –

but rather are parts of an integrated and comprehensive scheme to remedy disability

discrimination at the Colorado Department of Corrections ("CDOC").  In other words, the

Remedial Plan is not just "the sum of its parts" – the efficacy of the Plan relies on the integration

of its various components and the numerous departments within the CDOC working together.

The overall goal of the Remedial Plan was to ensure that the CDOC properly and timely

identifies inmates with the relevant disabilities and then to ensure that those individuals are

provided access to the programs, services and benefits of the CDOC on a non-discriminatory

basis.  Thus, the starting point in evaluating substantial compliance is whether inmates with

qualifying disabilities have in fact been timely and properly identified as such.  Otherwise, the

portions of the Plan which detail the services to be provided to these individuals have little

meaning.  For instance, Defendants seek a finding of "substantial compliance" on Section XVII "Library Equipment," which mandates that certain auxiliary aides be provided to inmates with disabilities in the CDOC libraries and Section XXI  "Count," which requires that inmates who cannot stand for count be accommodated.  Although the Defendant may have stocked its library with all the resources required by the Remedial Plan, those resources are only allowed to be used by individuals who have been formally identified as inmates with disabilities and who are documented as needing those accommodations on their Accommodation Resolution forms.[1] However, if that identification has not occurred, and, as discussed below, Plaintiffs contend that it has not, then those resources are meaningless because class members have no access to them. Similarly, although a policy may have been developed that accommodates inmates who have been verified with a mobility disability during count – if the disability verification has not occurred, the policy is meaningless.

Presumably, CDOC wants a finding of "substantial compliance" in these areas so that it does not have to continue to provide such accommodations after the two year monitoring period expires.  However, such piecemeal findings as suggested by the CDOC could lead to absurd results, such as ending the requirement of providing the service or benefit before the beneficiary of those services are even identified and allowed access to them.  Accordingly, as the sections of the Remedial Plan are not the type of unique claims contemplated by Rule 52(c), the provisions of that Rule should not be applied to grant partial judgment with respect to individual portions of the Remedial Plan.

---

[1] As the Court is aware, these forms are only issued to an inmate once a disability has been verified and confirmed by the AIC.

**b. "Substantial Compliance" Review does not Apply to the Stipulations and the Stipulations are not "Claims" within Rule 52(c)**

Rule 52(c) is also inapplicable to the 2006 and 2008 Stipulations entered in this case against CDOC. As the Court is aware, the Stipulations at issue were entered as sanctions against CDOC for its continued non-compliance with the Remedial Plan. In its motion, Defendants conflate the requirements of the Stipulations with the Remedial Plan when it requests that the Court find "substantial compliance as of May 1, 2009" with sections of the 2006 and 2008 Stipulations. [Doc. #4728, p. 4]. There is no "substantial compliance" review of the stipulations.

First, each of the requirements of the Stipulations must be "fully" complied with by Defendants, as sanctions entered by this Court. Second, many of the stipulations had specific times within which the dictates of that stipulation must be meet – rather than the May 1, 2009 deadline for substantial compliance with the Remedial Plan. For instance, the 2008 Stipulation entered in April 2008 [Doc. No. 3326] had requirements such as the CDOC would "immediately" adhere to the Special Master's determinations, [Id. at # 4], shall "immediately" provide vibrating watches to all inmates with hearing disabilities, [Id. at # 18], had to offer SOTMP Phase II classes at a designated facility within 90 days of the entry of the stipulation [Id. at #19], and implement a standardized job procedure "no later than July 1, 2008." [Id. at # 21].

Finally, some of the stipulations are not even relevant to the concept of "substantial compliance" with the Remedial Plan. For instance, the Defendant requests that the Court find "substantial compliance" with certain Stipulations in the 2008 Stipulation, such as the one that required posting of the Stipulations in the CDOC (Defendant's Motion, p. 4; 2008 Stipulation #

32), and another that stated that a letter from class counsel would be delivered to class members regarding the stipulations. (Defendants' Motion, p. 4, Stip. #33). In its motion, Defendants also request a finding of substantial compliance with certain stipulations in the 2006 Amended Stipulation (Defendants' Motion, p. 5-6), such as the requirement that CDOC obtain additional funding to implement the Remedial Plan (2006 Stip. #1), the stipulation that this Court would make expedited rulings on certain disability criteria (2006 Stip. #7), and the required reimbursement for certain of class counsel's costs. (2006 Stip. #9). These stipulations simply have no relation to the concept of "substantial compliance" with the Remedial Plan.

  c. **A Rule 52(c) Motion is Premature**

   Even assuming *arguendo* that Rule 52(c) is held to apply to the provisions of the Remedial Plan and the Stipulations, any such ruling at this time would be premature as there are no transcripts available to make the detailed findings of facts required by the Rule. Fed.R.Civ. P Rule 52(c); *Nieto v. Kapoor*, 268 F.3d 1208, 1217 (10th Cir. N.M. 2001).

  As this Court is painfully aware, there was approximately five weeks of evidence submitted by Plaintiffs during their case-in-chief regarding compliance issues. At the time of the filing of this response, only three days of those transcripts have been prepared. As such, undersigned counsel has to rely on their (often cryptic) notes and memory of the evidence presented at trial to prepare this response. Without a transcript of the hearing, it is impossible for counsel to completely and accurately recite all the evidence in support of the Plaintiffs' case. Accordingly, if the Court determines that Rule 52(c) is applicable, Plaintiffs respectfully request that this Court reserve ruling on these issues until the close of the evidence, as allowed by Rule 52(c). At that point, the parties will submit findings of fact and conclusions of law with the aide of the

hearing transcripts and Plaintiffs will be able to provide a clearer and more concise recitation of the evidence which supports their position.

## II.   The Remedial Plan Should Be Evaluated as a Comprehensive and Integrated Scheme in Determining Substantial Compliance.

In the event that this Court finds that it is appropriate to apply Rule 52(c) at this point in the proceedings, Plaintiffs will address Defendants' specific contentions that it has achieved substantial compliance with certain portions of the Remedial Plan and the relevant Stipulations. However, as it is the Plaintiffs' contention that the Remedial Plan must be viewed as a comprehensive and integrated scheme, it is important to review the evidence regarding several key provisions of the Remedial Plan, as those provisions necessarily interact with the sections cited by the defense.

As stated above, the overall goal of the Remedial Plan was to require CDOC to timely and properly identify inmates with the relevant disabilities and to provide the programs, services and benefits to those inmates on a non-discriminatory basis.  Thus, the linchpin of the Plan was to first timely and properly identify inmates with disabilities as required by Section IV of the Remedial Plan.  Failure to comply with this provision alone results in non-compliance with the other essential provisions of the Remedial Plan.  Other key provisions of the Remedial Plan include:

- **Sections V and VI**, which require the proper placement of inmates with disabilities in designated facilities and progression through the system in a manner consistent with that of inmates without disabilities;

- **Section IX**, which requires CDOC to track inmates with disabilities with regard to placement, transport and accommodations;

- **Section X**, which requires CDOC to provide inmates with reasonable accommodations, including effective communication, to ensure participation in comparable programs and access to services; and

- **Section XIII**, which requires CDOC to establish comparable programs, activities and work assignments at the designated facilities where inmates with disabilities are housed and  that the AIC evaluate placement and participation to ensure that inmates with disabilities are not denied opportunities on the basis of their disability.

- **Section XV**, which requires CDOC to train staff on the unique needs of inmates with disabilities and training specific to the special requirements of diabetics.  CDOC is also required to train case managers to ensure that inmates with disabilities are not discriminated against with respect to placement in programs and jobs.

- **Section XVI**, which requires CDOC to timely provide, maintain and replace healthcare appliances, also known as durable medical equipment ("DME"), as needed to accommodate inmates with disabilities.  CDOC is required to maintain and replace DME as soon as a repair or replacement has been verified as needed.

The evidence provided by Plaintiffs of CDOC's non-compliance with these essential sections of the Remedial Plan is summarized as follows:

a. **Lack of Timely and Proper Identification of Inmates with Disabilities- Section IV**

Section IV of the Remedial Plan requires that inmates with disabilities be identified upon intake at the DRDC within 60 days of entry into the system, and provided accommodations at that time.  For inmates who develop a disability after intake, the section requires the case managers to refer the inmate for verification of the disability to the AIC and Chief Medical Officer.  The disability determination shall be made within 60 days.  The section also provides that inmates with disabilities who are currently in CDOC "will be identified by Clinical Services staff" and that staff shall notify the AIC of the disability.  (Remedial Plan, p. 3).

Since the entry of the Remedial Plan, there has been an on-going dispute regarding the correct criteria to determine disability.  As a result of its continued non-compliance with the

Remedial Plan, in April 2008, as a result of the 2008 Stipulation, the Defendants were required to implement new less-stringent criteria for making disability determinations, in consultation with class counsel.[1]  In addition, the Defendants agreed that all diabetics would be designated as "class members" in this case and given certain accommodations.[2]

Despite the mandates of the Remedial Plan and the 2008 Stipulation, the overwhelming evidence showed that CDOC consistently failed to adhere to the 60 day time period for making disability determinations, even under the old criteria, and that the majority of disability determinations were still pending as of the end of the compliance period.

Specifically, the ADA Inmate Coordinator ("AIC"), Cathie Holst, testified as follows:

- A final determination of disability status is not in effect until both the AIC and the CMO have signed the inmate's Accommodation Resolution form and that form has been issued to the facility and the inmate.  Until the Accommodation resolution is issued, that inmate is not entitled to accommodations or rights under the Remedial Plan.

- At least 94% of the mobility disability determinations (out of 1038 inmates) had not been completed as of May 1, 2009;

- As the Court did not issue final orders with respect to the hearing criteria to be used prior to May 1, 2009, none of the inmates needed to be screened for hearing disabilities had been screened under this criteria.  Under the prior criteria being used by CDOC as of May 1, 2009, of the 401 inmates needing determinations, 57% of the disability determinations had not been completed in this category.

- Of the 435 inmates being screened for vision disabilities, 53% of the determinations had not been completed as of May 1, 2009.

- Recurring problems existed with CDOC's identification of inmates with disabilities upon intake up to and through the end of the compliance date, including numerous examples of inmates not being identified as disabled, including an inmate in a wheelchair and deaf inmates.

---

[1] This was required by the 2008 Stipulation # 3.
[2] 2008 Stipulation #25.

- The mistakes made at intake were "voluminous and occur daily,"  the temporary Accommodation Resolution forms being prepared were incorrect in "99% of  the cases," and that the issue has been addressed with the intake staff at DRDC on numerous occasions and to date the problems continue."  Exhibit 422.

Ms. Holst further testified that clinical services routinely failed to notify the AIC of

important information regarding the status of disabled inmates.  For example:

- Clinical Services was not notifying the AIC of inmates with confirmed diabetes, resulting in the AIC of being unaware of 30-35% of the diabetic inmates at certain facilities.  Exhibits 668, 135, and 384.

- Clinical Services routinely did not notify the AIC when inmates became disabled or were given wheelchairs, hearing aids, or other assistive devices.  Voluminous examples of situations where inmates with disabilities were discovered to have assistive that were not recorded on their Accommodation Resolution ("AR") form. Assistive devices not documented on ARs could be and often were removed by clinical services.  Exhibits 169, 402, 186, 194, 137, 275, 195, 216, 276, 204, 205.

- Clinical services did not provide a list to the AIC identifying inmates with disabilities at each facility and there were no audits conducted to determine whether clinical services was maintaining any record of inmates with disabilities in the system.  Ms. Holst testified that at some point during the compliance period, she did receive a list of diabetics from clinical services, however, the list was not consistent with the information maintained by the office of the AIC.

Ms. Holst offered testimony of significant problems with regard to the identification of

inmates with diabetes and the timely provision of accommodations.

- Ms. Holst confirmed that there were significant delays in the process of revising Accommodation Resolution forms for inmates with diabetes.  The revised forms were to include a designation of the inmate as a member of the class and the eight accommodations required by the 2008 Stipulation (#25).  However, there were substantial delays, often up to a year before diabetic inmates received revised Accommodation Resolution forms granting them required accommodations.  The vast majority of inmates with diabetes did not receive a revised Accommodation Resolution form until the eve of the end of the compliance period.

- Ms. Holst also testified that the eight accommodations required by the 2008 Stipulation (#25) were not appearing on temporary Accommodation Resolution forms

9

prepared upon intake and there was no verification that this problem had been corrected by the end of the compliance period.

Plaintiffs produced evidence demonstrating CDOC's failure to properly identify inmates as disabled in compliance with Orders of the Special Masters.

- The Special Masters issued a significant number of Orders in which claimants in the damage claim process were determined to have qualifying disabilities under the Remedial Plan.  However, CDOC admittedly did not comply with the disability determinations in the bulk of those Orders.  Ms. Holst testified that CDOC was not in compliance with 60 Orders of the Special Masters and may have not been in compliance with at least 200 more.  Exhibits 349, 143, 330, 353, 354, 355, 568, 569, 570, 616.

**b.  Placement of Individuals at Designated facilities –Sections V and VI**

The purpose of these sections of the Remedial Plan is to ensure that after proper and timely identification of disabilities, inmates with disabilities are placed in designated facilities and that they are allowed to progress through the system in the same manner as inmates without disabilities.

- Numerous examples where inmates with pronounced disabilities, including severe hearing loss, were  not properly identified during the intake process and were transferred to non-designated facilities before the AIC could coordinate proper placement.  Exhibits 43, 657, 585.

- Ms. Holst testified to the problem of inmates with disabilities being transferred to facilities without first confirming whether ADA accessible cells were available.  When there is a shortage of ADA accessible cells, inmates with disabilities were placed in the infirmaries and intake units until an accessible cell became available.  Ms. Holst testified that privileges in the infirmaries and intake units are more restrictive than those in general population and that placement of inmates with disabilities in the infirmaries and intake units under these circumstances is a violation of the Remedial Plan.  Exhibit 456.

- Ms. Holst testifed that inmates with mobility restrictions were being placed in Cell House 1 at the Colorado Territorial Correctional Facility, despite the acknowledgement that "Per Montez settlement they cannot be housed in Cell House 1."  Exhibit 453.

- Ms. Holst also testified that inmates with qualifying disabilities were transferred out of the state to the North Fork facility, which is not a designated facility. Exhibits 698, 693, 671, 695, 700, 701, 702, 703.

- Ms. Holst also testified that inmates with mobility disabilities were transferred to La Vista Correctional Facility and acknowledged that personnel at that facility did not understand that La Vista was, in fact, a designated facility for inmates with mobility disabilities pursuant to the agreement between the parties in this case.

- Evidence was presented to demonstrate that diabetics and other inmates with disabilities were not being placed at Level I facilities on the basis of their disability and were therefore not progressing through the system as required. Cathie Holst testified that not one individual with diabetes was placed at honor or boot camps between January of 2008 and May of 2009.  If an inmate with diabetes happens to be referred to a Level I facility or camp, he is immediately transferred out of the lower level facilities within days of arrival and most often that very same day.  Exhibit 40.

c.   **Tracking of Inmates with Disabilities –Section IX**

DOC is required to track inmates with disabilities with regard to placement, transport and accommodations.  Substantial evidence was introduced to show significant discrepancies between two primary databases used by CDOC demonstrating CDOC's inability to confirm, at any given time, which inmates in the system are disabled, where any particular disabled inmate is housed, when that inmate is moved or transferred, and what accommodations are required by any particular disabled inmate.  A breakdown of those databases and the discrepancies between the two were presented as follows:

- Evidence was presented showing that Exhibits 357A and 357B, two voluminous reports generated by the CDOC in an effort to track inmate job and program assignments and disability status in a single composite report, contain substantial inconsistencies though purporting to represent the same inmate population as of the same point in time.  Both reports were further shown to be largely incomplete and inaccurate due to the incomplete status of disability screenings and re-screenings as of the compliance date.  Finally, Paul Engstrom, the CDOC employee who generated the reports testified that-- notwithstanding the potential value of accurate reports of this nature and the ease with which they could be generated literally on a daily basis –

no
effort has been made by the CDOC to produce such reports or track such data before
or since.

- A comparison of the AIC database representing inmates identified for mobility
  disability rescreens and the status of their disability determinations, (Exhibit 667),
  with the database containing data on all inmates in custody and their
  disability/diabetes designations (357 A) exposed the same discrepancies described
  above.  Many inmates appearing in the database maintained by the AIC appeared in
  the second database with either a conflicting disability designation or did not appear
  at all.  Exhibits 667 and 357 A.

- Ms. Holst testified that the QT Profile report, which is a report from one of the main
  CDOC databases upon which the facilities were to rely for information about an
  inmates' disability, consistently contained erroneous data and that the office of the
  AIC did not rely on the data in that report.'

- Ms. Holst testified that there were several different databases from which facilities
  could obtain information regarding inmates with disabilities but that many of them
  contained inaccurate data or data that was not verified by the Office of the AIC.

- Ms. Holst also testified that the AIC should have been notified before an inmate was
  moved to a new facility so that the AIC could ensure proper accommodations during
  transport.  However, the AIC was routinely not notified when inmates were moved
  until after the move occurred, if at all.  Ms. Holst also testified that the AIC was not
  notified of intra-facility moves.

- Ms. Holst testified that there were continuing problems system-wide with clinical
  services either not being informed of the need for proper communication with the
  AIC's office, or refusing to do so, which impacted the ability of the AIC's office to
  adequately track inmates with disabilities and what, if any, accommodations were
  needed by those individuals.

### d.  Reasonable Accommodations-  Section X

CDOC is required to provide reasonable accommodations, including effective

communication, to inmates with disabilities to ensure participation in comparable programs and

access to services provided by CDOC.  Plaintiffs presented extensive evidence to show that

CDOC is not in compliance with this essential section of the Remedial Plan.

- With respect to CDOC's failure to provide accommodations to inmates with diabetes, Plaintiffs' expert on diabetes, Linda Edwards, testified to the ongoing systemic failure to properly accommodate inmates with diabetes, including, but not limited to: foot and nail care, the timing of meals and insulin, and monitoring of blood sugars.  Ms. Edwards testified that CDOC has failed to provide inmates with diabetes with appropriate foot wear and there are serious lapses in the provision of diabetic medications.  Exhibits 33, 355.

- As discussed above, Ms. Holst testified that CDOC failed to timely provide diabetic inmates with revised Accommodation Resolution forms, which would have entitled them to at least 8 standard accommodations specific to the needs of diabetics.

- With respect to CDOC's failure to provide reasonable accommodations to inmates with hearing disabilities, Plaintiffs' expert, Lariisa McClung testified that inmates were not being properly notified of overhead announcements, were not being assisted by "Offender Care Aides" when appropriate, and were not timely provided with necessary assistive devices including hearing aids, hearing aid batteries and vibrating watches (discussed in detail in section (g) below).  Additional evidence was presented to show that facilities, including CTCF, which houses the majority of hearing disabled inmates, were not notifying inmates with hearing disabilities with respect to communicating overhead announcements to the hearing disabled, as required. Exhibits 32, 585 and 651.

- Regarding inmates with mobility disabilities, evidence was presented showing that ADA accessible cells were not always available when needed, that CDOC had failed to provide "Offender Care Aides" to inmates who need assistance with everyday living activities, that these inmates were being denied non-discriminatory participation in jobs and programs, and that CDOC failed to timely provide, repair and/or replace necessary assistive devices, including, but not limited to wheelchairs, canes, medical shoes, braces, and prosthetic limbs (discussed in more detail below in Section II (g) of this response). Exhibits 254, 253, 593.

### e.  Programs and Work Assignments –Section XIII

The Remedial Plan requires CDOC to establish comparable programs, activities and work assignments at the designated facilities and that the AIC evaluate placement and participation to ensure that inmates with disabilities are not discriminated against.

- As discussed above, Plaintiffs presented evidence that CDOC does not have a functioning method by which inmates with disabilities are identified and tracked in the system. Because CDOC does not have an accurate accounting of which inmates in its custody are disabled, it does not know consistently where all inmates with disabilities are housed, it does not know what accommodations are necessary for inmates with disabilities during transport, and it cannot identify the job and program assignments that have been given to

inmates with disabilities.

- To address the ongoing systemic problem of non-compliance with this section of the Remedial Plan, a Stipulation was entered that required CDOC to establish a standardized procedure for jobs and program assignments to ensure non-discrimination against inmates with disabilities no later than July 1, 2008.

    o Cathie Holst testified that the AIC did not have the authority to implement the new process and that as of the compliance date, the Administrative Regulation with respect to this process was not implemented.  Ms. Holst also testified that sufficient training on the process had not been completed.  Exhibits 470, 427, and 262.

    o At the end of the compliance period 1,800 CDOC staff members had yet to be trained on the new job process and it was reported that job supervisors were unaware of what to do with respect to job placement procedures for inmates with disabilities.  Ms. Holst testified that the AIC legal assistants and faculty staff were not sufficiently informed about how to implement the new process.  Exhibits 262, 470, 427.

- Ms. Holst testified that CDOC did not know whether there were comparable programs between designated and non-designated facilities because an audit of the database containing data on job assignments had never been conducted by the AIC to make that determination.  Ms. Holst testified that she had never conducted a comprehensive review with case managers assigned to inmates with disabilities to evaluate their placement opportunities in educations, vocational or work programs as required by the Remedial Plan.

- As discussed above, the database compiled by CDOC regarding which jobs were assigned to inmates did not contain correct information about the disability status of inmates.

- Plaintiffs' expert, Andrew Bardwell, testified that the mobility disabled population is represented in the "unassigned" category approximately twice the level of the non-disabled population, which is statistically significant, and that a disproportionate number of these inmates were assigned to the silverware wrapping job.  Dr. Bardwell agreed that CDOC's data itself was so flawed it was unreliable.

- Evidence was also presented to show that the ability to see, hear, and stand were still considered to be required as essential qualifications for the majority of jobs available to inmates.  Evidence also showed that CDOC maintains policies that exclude inmates that require alternative footwear as an accommodation from placement in certain jobs, including jobs in Correctional Industries.  Job information for the Denver Complex

indicates that the policy that inmates must wear *work boots* in order to maintain a job in Correctional Industries is strictly enforced, which has a discriminatory impact on inmates with disabilities who require soft-soled shoes.  Similarly, at CTCF *state issued boots* are required for outside maintenance jobs.  Exhibits P-3, Q-3, R-3.

f.  **Training – Section XV**

CDOC is required to provide training to staff on the unique needs of inmates with disabilities and the special requirements of diabetics.  CDOC is also required to train case managers to ensure that inmates with disabilities are not discriminated against with respect to placement in programs and jobs.

Plaintiffs produced evidence demonstrating that the training procedures implemented by CDOC are ineffective.  Staff may have received training on the specific needs of inmates with disabilities and diabetes, but evidence that the training simply occurred is not sufficient to show compliance with this requirement.  Evidence of the lack of effective training speaks for itself when looking at overall issues of non-compliance with the Remedial Plan.  Plaintiffs presented evidence to show the ineffectiveness of training on the needs of inmates with disabilities and diabetes including, but not limited to:

- The testimony of Plaintiffs' expert on diabetes, Linda Edwards that the training on the special requirements of diabetes was seriously deficient as evidenced by the multitude of problems with the care and treatment of diabetics.  For example, evidence was presented showing that a mid-level provider, who had received diabetes training in March of 2008, did not know how to manage accommodations specific to an inmate with diabetes, including the timing of meals with insulin, medical shoes, and access to after-hours blood sugar testing.  Exhibit 33, 630.

- Cathie Holst testified that the office of the AIC never received documentation that training on the use of emergency diabetic test kits was occurring at each facility.

- Ms. Holst testified that training on the requirements of the Montez Remedial Plan and the specific needs of inmates with diabetes was not conducted at the private facilities, where CDOC admittedly places diabetic inmates. Exhibit C-5.

- As discussed in detail above, Plaintiffs produced evidence demonstrating that CDOC had failed to properly train case managers to ensure non-discrimination in job and program assignments.  Exhibits 262, 470, 427.

Evidence was also submitted demonstrating inadequate training of medical providers with regard to the requirements of the disability re-screening process.

- As of March 10, 2009, many providers were refusing to do the rescreens because they were unaware of the proper procedures.  Evidence was also presented that as of April 2, 2009, private facilities were not complying with the re-screen requirement, and that leading up to the eve of the compliance date, CDOC faced issues with medical providers not understanding the re-screen procedures.  Plaintiffs presented evidence showing that as a result of the issues with the rescreen process, inmates experienced delays of over one year in receiving their Accommodation Resolution forms Exhibits 338, 342, 340, 344, 343 and 44.

### g.  Health Care Appliances- Section XVI

DOC is required to provide health care appliances, also known as durable medical equipment ("DME"), to inmates that requires such an accommodation and it is required to do so within 7 days after the need for the DME is determined.  CDOC is also required to maintain and replace DME as soon as the need for repair or replacement has been verified.  All DME is to be documented as property of the inmate to whom it has been provided.

Plaintiffs presented numerous examples demonstrating non-compliance with this section of the Remedial Plan, including, but not limited to:

- The testimony of Cathie Holst that on a frequent and recurring basis, inmates with disabilities experienced significant delays while awaiting new DME, as well as repairs to or replacement of DME.  Evidence was submitted that such delays could last over a year for repair or replacement of DME including hearing aids, wheelchairs and prosthetic limbs.  Additionally, evidence was submitted that clinical services and facilities did not track requests for repairs to DME, which interfered with the inmates' ability to seek compensation for delays pursuant to the Stipulation entered in 2008.[1] Exhibits 489, 520, 621, 622, 649, 650, 651, 652, 653, 656, 153, 147, 216, 232, 283.

- Ms. Holst testified that on a recurring basis, CDOC failed to properly document DME

---

[1] 2008 Stipulation # 9.

as property of inmates.  Numerous examples were provided where DME was not listed on Accommodation Resolution forms, including but not limited to: hearing aids, orthotics, canes, wheelchairs, and prosthetic limbs.  Ms. Holst also testified that facilities deviated from the procedures established by the AIC for entering DME as property in the database.  Evidence was presented that during DME sweeps, many inmates were found to have DME that was not properly recorded as property and/or not listed on their Accommodation Resolution forms.  The failure to include DME on an inmate's AR allowed clinical services to confiscate the DME – examples of such occurrences were submitted.  Furthermore, evidence was submitted that clinical services generally did not track or document DME confiscations.  Exhibits 195, 204, 205, 275, 276.

- Ms. Holst testified that on a consistent basis, clinical services failed to notify the AIC when inmates were determined to be disabled and provided with DME.  Numerous examples of these occurrences were presented.  Exhibits 169, 402, 186, 194.

- Ms. Holst testified to the recurring problem of DME, including hearing aids and hearing aid batteries, being removed from inmates during transport, and that DME was lost during transport.  Inmates that were subjected to the removal of DME during transport then experience delays in having their DME returned to them.  Exhibits 607 and 650.

**III. "Substantial Compliance" should not be found on any one Section of the Remedial Plan**

Defendants urge this Court to issue a finding of substantial compliance on several sections of the Remedial Plan and the Stipulations under several different theories.  Plaintiffs address those arguments below in the order submitted by the Defendants.

A.   Defendants first state that Plaintiffs stipulated in the Pretrial Order to "substantial compliance" with respect to Section XVII – Library Equipment, Section XXX – Parole Field Operations, and 2008 Stipulation # 10 – Wheelchair Clinics. (Def.s' Motion, p. 2) The Pretrial Order [Doc. No. 4610 ] shows, however, that Plaintiffs did not stipulate to "substantial compliance" of these areas, but rather stipulated that there was sufficient evidence to show that the requirements of the Remedial Plan and relevant Stipulation were being followed in

these areas.[1]  As explained above, while it may be true that CDOC libraries have the auxiliary aids required by the Remedial Plan, that does not mean that inmates with disabilities have been given proper access to these accommodations.

In addition, as explained above, the concept of "substantial compliance" does not apply to the Stipulations.  In the Pretrial Order, Plaintiffs simply agreed that the wheelchair clinics that were required by the 2008 Stipulation were in fact conducted by the CDOC.

Defendants admit that Plaintiffs did not stipulate to substantial compliance with respect to providing sign language interpreters and American Sign Language classes to all members of class of inmates with hearing disabilities.  It is unclear what Defendants are proposing with respect to this issue.

B.   Defendants also argue that because Plaintiffs did not produce affirmative evidence concerning certain areas of the Remedial Plan, that this Court should enter a finding of substantial compliance with respect to all of those areas.  For the reasons previously stated, this approach is flawed.

First, as the Court is aware, substantial compliance on the architectural/structural issues was stipulated to by the parties several years ago and the monitoring period has already expired on that issue – so it is concededly not an issue in this compliance hearing.  Next, Section IX – "Justification for Denial of Request for Reasonable Accommodation," is a section that provides a defense to the CDOC from making an accommodation if it would pose a risk to the security of the institution or it would pose an undue financial burden.  CDOC has never interposed this

---

[1] In fact, under Section 4(A) of the Pretrial Order, Plaintiffs expressly stated that they were not stipulating to "substantial compliance" of Section XVII – Library services.

section as a defense to its actions.  There is no "substantial compliance" issue related to this section.

With respect to the five other sections listed by Defendants, while it is true that Plaintiffs stipulated that they would not be producing affirmative evidence on the listed  issues – that does not mandate, as Defendants urge, a finding of "substantial compliance" on those issues.  Each one of the sections listed in this area by the Defendants provides that certain accommodations will be provided to inmates with the disabilities at issue in this case.  Again, whether the accommodations provided for in each of the remaining sections is actually provided depends on whether the inmate in need of the accommodation has been properly identified by the CDOC as a person with a disability who specifically needs the accommodation at issue.  The evidence submitted shows that CDOC has failed to make those final disability determinations with respect to more than half of the potential class members, it has failed to ensure that these accommodations are properly being provided.

C.  Defendants next argue that Plaintiffs "have not introduced evidence of lack of substantial compliance" with respect to sixteen sections of the Remedial Plan (Def.s' Motion, p. 3).  Defendants appear to request that as a result, the Court should enter a finding of substantial compliance in each area listed.  However, for the reasons similar to those stated above, as well as the substantial evidence that was submitted on several of these sections, this request should be denied.

First, some of the areas in this portion of Defendants' motion do not implicate a "substantial compliance" review.  For instance, Section III "Definitions," Section XXXI regarding the periods established for the compliance and monitoring phases of this case, and

Sections XXXII, XXXIII and XXXVI, which pertain to damages, attorney fees and miscellaneous provisions dealing with administrative details of the case – are all administrative and/or procedural provisions that have no relevance to the issue of "substantial compliance" in this hearing.

Contrary to Defendants' arguments, Plaintiffs submitted significant evidence of non-compliance with the following sections of the Remedial Plan included in Defendants' Motion:

**Section I - Policy**

Defendants suggest that this court should find substantial compliance with Section I of the Remedial Plan, which is a general policy statement at the beginning of the Remedial Plan that the CDOC shall not discriminated against inmate with disabilities.  Obviously, whether CDOC has complied with this policy is the crux of these compliance hearings and Plaintiffs submit that almost every piece of evidence they have submitted during the almost six weeks of trial in this case supports the contention that there is not substantial compliance with this policy. Some of the evidence which supports a finding of non-compliance has been outlined above in Section II of this response, clearly precluding entry of a finding of substantial compliance on this issue.

**Section II: ADA Inmate Coordinator**

The Montez Remedial Plan specifically directs authority to the ADA Inmate Coordinator (the "AIC) to ensure compliance with the policies and procedures developed and implemented by CDOC to assure nondiscrimination against inmates with disabilities.

The AIC is also responsible for the tracking of all inmates with disabilities, for ensuring that they are not denied access to programs, services and benefits offered by CDOC because of

their disability, and coordinating the placement and treatment decisions regarding inmates with disabilities with appropriate personnel.  Section II of the Remedial Plan also requires that the AIC is notified when an inmate has been identified as an inmate with a disability.

Plaintiffs have presented significant evidence to show that aside from designating an AIC, CDOC has otherwise failed to comply with Section II of the Remedial Plan.  This evidence includes, but is not limited to the following testimony by Cathie Holst, the AIC designee:

- That she was not given the authority to implement the Remedial Plan, but rather could make recommendations regarding policies.  Those recommendations, however, were not always followed.

- That as the AIC, she has implemented procedures with respect to the Remedial Plan that have not been followed by CDOC wardens and staff.

- That CDOC employees were not held accountable for not performing the duties of their jobs in accordance with the requirements of the Remedial Plan.

- That during the compliance period, she was notified by Gary Golder, her supervisor at the time, that Joanie Shoemaker, Deputy Director of Prisons and Clinical Services, was in responsible for ensuring compliance with the Remedial Plan.  As such, Ms. Shoemaker was given authority over aspects of Ms. Holst's job as AIC.  Ms. Holst testified that if there was a disagreement over a policy or procedure, she did not have the authority to implement what she thought was most appropriate pursuant to the Remedial Plan.

- That the AIC did not have the authority over the disability re-screen process and where the re-screenings should be conducted, which had an effect in the sixty (60) day timeframe for disability screenings required by the Remedial Plan.  Exhibits 394, 395.

- Ms. Holst testified that she did not have the authority to implement the new process for ensuring non-discrimination in job assignments.  Ms. Holst testified that as of the compliance date, the Administrative Regulation with respect to this process was not implemented and that sufficient training on the process had not been completed.  Supporting exhibits include 470, 427, and 262.

- Ms. Holst also testified that the AIC was not always notified by Offender Services when an inmate with a disability was transferred and placed at a different facility.

- That the Office of the AIC suffered chronic staff and resources shortages that negatively impacted her ability to perform her job.  Ms. Holst testified that during the relevant compliance period, her office was responsible for: completing the project to revise all the diabetic inmates' ARs; getting current on delinquent responses to grievances and correspondence; processing the mobility re-screens and preparing new ARs for 956 inmates and additional ARs for those re-screened for vision and hearing disabilities; the review of, analysis of, logging of , and preparation of reports on the audit materials received from facilities; processing requests for accommodations and ongoing grievances and communications; gathering and logging information and creating monthly reports on compliance issues;  completing the "Special Master Project" and revising ARs to comply with Orders of the Special Masters; completing additional case manger training; attendance at frequently held meetings; and completing projects related to compliance including, but not limited to installation of TTY kiosks, inmate training, and developing new databases to track grievance information.  Exhibit 350.

- That she complained on numerous occasions to her supervisors and to CDOC executive staff that she did not have sufficient resources and time to properly perform her AIC duties, despite the fact that she was working nights and weekends.

- That she was frustrated in her role as the AIC because there were many occasions where her recommendations were not followed or she was unable to get a response from CDOC personnel about problems brought to their attention.

- That on a consistent basis, clinical services failed to notify the AIC of inmates determined to be disabled, detailed in Section II(a) of this response on page 7 above.

- That the AIC was not able to track inmates with disabilities to ensure proper placement at designated facilities and that accommodations were provided during transport and upon arrival at the transferring facilities, detailed in Sections II(b) and II(c) of this response on pages 10 and 11above.

**Section VIII(B): Special Placement Housing**

With respect to inmates with disabilities that are housed in an infirmary for long term placement due to health care needs, CDOC is required to provide those inmates access to the programs, benefits, and services comparable to those at the designated facilities.  Ms. Holst

testified that access to programs and services in the infirmaries was restricted and that inmates placed in infirmaries, including those permanently housed at Denver Diagnostic and Reception Center ("DRDC"), do not have access to the range of comparable programs and services as required by Section VIII(B) of the Remedial Plan.  In fact, the orientation manual for DRDC, states that "handicapped will be allowed to work on special projects," rather than the jobs held by other inmates.  Exhibit K.  See also 152 and 686.

**Section XV: Training** – Evidence presented with respect to training issues is discussed in detail above in Section II(f) of this response on page 15.

**Section XVI: Health Care Appliances** – Evidence presented with respect to health care appliances is discussed in detail above in Section II(g) of this response on page 16.

**Section XX: Evacuation/Emergency Procedures**

Each institution/facility is required to ensure the safe and effective evacuation of inmates with disabilities and required to employ evacuation procedures specifically to deal with the evacuation of inmates with disabilities.  Evidence was presented to show issues with the evacuation procedures at FLCF.  There are 110 inmates housed in cell house 5 at FLCF, including geriatric and disabled inmates, including those confined to wheelchairs.  The majority of inmates with disabilities are housed on the upper levels of the cell house.  The cell house is equipped with two elevators, which are heavily relied upon during evacuations.  Plaintiffs presented evidence demonstrating that for three weeks, one of the elevators in cell house 5 was not operational.  Further, at the time of a non-simulated evacuation of cell house 5 in August 2009, both elevators were rendered non-operative and it required over thirty minutes for trained responders to evacuate the building -- a period of time acknowledged by the life safety office as

posing a danger to the non-ambulatory inmates.  Exhibit 4.

The Remedial Plan also requires that CDOC staff is responsible for assisting inmates with disabilities in the event of an emergency or evacuation.  However, Plaintiffs introduced substantial evidence, through the testimony of Ms. Holst, that facilities, most notably FLCF and CTCF, were not properly identifying inmates with disabilities in the housing units and on the cell house rosters.  Additional evidence was presented to show that facilities do not have adequate emergency and evacuation procedures included in their facility orientation manuals and/or in accessible formats.  Exhibits 291, 312, 495.

**Section XXV: Visiting**

The Remedial Plan requires that reasonable accommodations are afforded to inmates with disabilities to facilitate their full participation in visiting, whether contact, noncontact, or family visiting.  Plaintiffs produced evidence that the CDOC policy on the "Offender Visiting Program" does not provide for reasonable accommodations or alternatives for inmates with diabetes to use the restroom facilities.  Instead, the only accommodation provided is an adult diaper.  In violation of the 2008 Stipulation (#25), diabetic inmates that require the use of the restroom during visiting will have their visit terminated.  Exhibit L-7.

**Section XXVI: Health Care Status Determination**

This provision required clinical services, in cooperation with the AIC, to evaluate an inmate's ability to participate in work, education, and other programs when an inmate's disability appears to limit his or her ability to participate in these activities.  Cathie Holst testified that she never conducted any such reviews with clinical services and was not informed of their occurrences.  She also testified that she was unaware of the medical codes being used to

indicate that an inmate was unable to participate in activities, as those codes have been changed without her knowledge or input.

### Section XXVIII: Parole Hearings Accommodation Plan

This provision requires that CDOC ensures that that parole hearings are accessible to inmates with disabilities by providing reasonable accommodations as needed.  Plaintiffs submitted significant evidence of CDOC's failure to provide and/or repair or replace assistive devices to inmates with disabilities, particularly those with hearing disabilities that would specifically require accommodations to ensure effective communication is achieved. Compliance with this section of the Remedial Plan has not been achieved when inmates that require assistive devices as accommodations for communicating are deprived of such devices as a result of the extended delays discussed in detail above.

### Section XXIX: Community Correctional Facilities

This section requires that inmates with disabilities shall not be excluded from referral to the Community Corrections program (CC) based solely on their disability.  As discussed above, evidence was submitted that inmates with disabilities and diabetes are admittedly denied access to lower level security facilities and boot/honor camps.  Referral to a Community Corrections program is contingent upon the inmates' behavior and demonstrated success at the higher level security facilities.  Accordingly, CDOC is not in compliance with this requirement of the Remedial Plan as the majority of class members in this case cannot progress to the lowest level of programs.

D.  Defendants finally argue in the last two sections of its motion that this Court should find substantial compliance with many of the provisions of the 2006 and 2008 Stipulations.  As noted above, however, a "substantial compliance review" does not relate to the sanctions entered against CDOC for its non-compliance with the Remedial Plan.  Although many of the stipulations do relate to provisions of the Remedial Plan, compliance with the individual sanctions do not establish "substantial compliance" with the relevant sections of the Remedial Plan.  To the contrary, most of the stipulations that relate to the Remedial Plan address only portions of the related section at issue and set a minimum standard for when certain actions must be taken by the CDOC.

With respect to evidence presented by Plaintiffs on specific stipulations addressed by Defendants, Plaintiffs submit the following:

**2006 Stipulations:**

**Stipulation 2 –** Required CDOC to waive all medical co-pays for treatment related to diabetic care.  Cathie Holst testified that co-pays were charges to inmates with diabetes throughout the duration of the compliance period.

**2008 Stipulations:**

**Stipulation 1 – C**DOC is required to allow inmates to retain possession of their personal glasses until CDOC issues a replacement pair of glasses. Evidence was submitted that the intake procedures at the Denver Diagnostic Reception Center require that personal glasses are taken from the inmate upon intake, in violation of this Stipulation. Exhibit K.

**Stipulation 3 –** As discussed above in Section II(a) of this response on page 7.  CDOC was required to conduct disability screenings based upon mutually acceptable criteria and will re-screen inmates as appropriate.  The AIC testified that the vast majority of inmates rescreened, did not receive their Accommodation Resolution Forms as of May 1, 2009.  Evidence was presented that as of March 10, 2009, many providers were refusing to do the rescreens because they were unaware of the proper procedures.  Evidence was also presented that as of April 2, 2009, private facilities were not complying with the re-screen requirement, and that leading up to the eve of the compliance date, CDOC faced issues with medical providers not understanding the

re-screen procedures.  Plaintiffs presented evidence showing that as a result of the issues with the rescreen process, inmates experienced delays of over one year in receiving their Accommodation Resolution forms Exhibits 338, 342, 340, 344, 343 and 44.

**Stipulation 5** American Sign Language classes as a program available to inmates identified as hearing impaired or disabled.  CDOC has not achieved compliance with this stipulation due to the failure in  having properly identified inmates with qualifying disabilities, as discussed thoroughly in Section I(a) on pages 2-3 of this response.

**Stipulation 6** Sign Language Interpreters provided to inmates who use ASL as a means of communication for medical visits.  CDOC has not achieved compliance with this stipulation due to the failure in  having properly identified inmates with qualifying disabilities, as discussed thoroughly in Section I(a) on pages 2-3 of this response.

**Stipulation 8**- This Stipulation requires annual testing for all CDOC employees on the requirements of the Remedial Plan and that the content of the test and testing process be implemented by July 1, 2008.  Evidence presented on this issue is discussed in detail above in Section II(f) of this response on page 15 above.

**Stipulation 10** – CDOC was required to immediately arrange and conduct wheelchair clinics at which every inmate who uses a wheelchair may have his/her wheelchair evaluated by a wheelchair specialist for proper fit and to ensure the wheelchair is in good working condition. Plaintiffs agreed that this Stipulation has been satisfied.

**Stipulation 13** - CDOC is required to provide training to cell house and security staff every six (6) months on diabetic test kits available at each facility for use by the non-medical staff.  Evidence presented on this issue is discussed in detail above in Section II(e) of this response on page 13 above.

**Stipulation 16** - Provision of two hearing aids to inmates who meet the established criteria.  In addition to inmates that were denied this accommodation as a result of not being properly identified as disabled, warranting inclusion in this category, Plaintiffs presented evidence that inmates determined to qualify for two hearing aids did not receive the aids in a timely manner.  Evidence of such delays are discussed in detail above on page 16 under Section II(g) of this response.

**Stipulation 17** - Housing all hearing impaired inmates at CTCF in cells equipped with strobe alarms.  CDOC has not achieved compliance with this stipulation due to the failure in having properly identified inmates with qualifying disabilities, as discussed thoroughly in Section I(a) on pages 2-3 of this response.

**Stipulation 18** Immediate provision of vibrating watches to all inmates with hearing impairments or disability.  In addition to inmates that were denied this accommodation as a

result of not being properly identified as disabled, warranting inclusion in this category, Plaintiffs presented evidence that inmates determined to qualify for a vibrating watch experienced delays exceeding five months in receiving a vibrating watches. Evidence of such delays are discussed in detail above on page 16 under Section II(g) of this response.

**Stipulation 19** - Pursuant to this Stipulation, CDOC was required to offer a SOTMP Phase II at a designated facility comparable to the program available at Arrowhead Correctional Facility by July 4, 2009 (90 days from the entry of the Order).  Plaintiffs produced evidence to show that a Phase II program was not established at a designated facility by the date Ordered and that once a program was eventually offered, there were significant delays in getting inmates with disabilities enrolled, including a year-long waitlist for the accessible program.

**Stipulation 25** – This Stipulation requires that all inmates with diabetes be designated as "class members" and that their Accommodation Resolution forms provide for eight standard accommodations available to all inmates with diabetes.  Plaintiffs' produced evidence of significant delays in revising accommodation resolution forms for diabetics and in providing required accommodations, detailed in Section II(a) on page 7 above.

**Stipulation 22** - CDOC is required to bear the burden of ensuring that testing is conducted and/or that assistive device are provided if PHP overrides a CDOC medical provider's or a specialists' recommendations for testing or assistive devices.  Plaintiffs submitted evidence, through the testimony of Cathie Holst that overrides by PHP were still occurring and that the provision of necessary DME, or the repair or replacement of DME, were often significantly delayed because of PHP denial of coverage.

**Stipulation 26 -** The conclusion of the ADA Inmate Coordinator is final in the case of a disagreement between the AIC and any other CDOC employee, medical provider or contractor concerning the disability status of an inmate and/or accommodations to be provided.  Ms. Holst testified that the providing of certain DME, usually the provision of soft-soled shoes to diabetics, was still being determined solely by clinical services based on its view of "medical necessity."

Finally, the Stipulations included in Defendants' Motion are not relevant to the issue of "substantial compliance" and Plaintiffs' concede that they are not issues in this compliance hearing:

**2006 Stipulations:**

**Stipulation 1 -** Required that additional funding be provided to CDOC to meet the requirements of the Remedial Plan.

**Stipulation 3 -** Provision of one free copy of the Remedial Plan to inmates upon request.

**Stipulation 4 -** Posting of a notice through the duration of the compliance period in all

facilities noting that the compliance period for the Montez case has been further extended.

**Stipulation 5 -** Distribution of a letter from Plaintiff's class counsel to the inmates in the AIC database outlining the terms of the Stipulation.

**Stipulation 7 -** Regarded the Court making an expedited ruling on matters before the Court in 2006.

**Stipulation 8 -** Reimbursement to inmates for copy charges incurred during the damage claim process.

**Stipulation 9 -** Reimbursement by Defendants to Plaintiff's counsel for attorney's fees and costs incurred up to the date that the sanctions were entered.

**Stipulation 10 -** The parties were required to brief, and did brief, the issue of co-pays charged to inmates and the issue of whether CDOC was permitted to take monies out of damage claim awards.

**2008 Stipulations:**

**Stipulation 7 -** The AIC was required to reevaluate ADA grievances that been denied or denied as moot since July 1, 2006 and in the event a grievance should have been granted, to, the AIC was required to explain that it was inappropriately denied and issue a new response acknowledging the error and what, if any steps, have been taken to address the grievance.

**Stipulation 20 -** Provision of replacement copies of damaged or lost Accommodation Resolution forms to inmates at no cost.

**Stipulation 23**- Implementation of the recommendations made in the expert reports submitted by the experts.

**Stipulation 27 -**DOC was required to remedy all problems and/or deficiencies noted in Peter Orleans' report and addendum on architectural compliance by July 4, 2008.

**Stipulation 29 -** The requirement that Clinical services maintain an accounting of every request for co-pay refunds made under the Amended Stipulation and Order.

**Stipulation 30 -**Provision of two (2) copies of ADA grievances when filed.

**Stipulation 31 -**The requirement that CDOC cease taking monies from Montez Damage Claim settlements or payments.

**Stipulation 32–** The posting of a notice through the duration of the compliance period in all facilities noting that the compliance period for the Montez case has been further extended. Testimony was, however, submitted by the AIC that the facility audits revealed that posters were not regularly maintained by the facilities and there was confusion about the posting requirements.

**Stipulation 33 -** Distribution of a letter from Plaintiff's class counsel to the inmates in the AIC database outlining the terms of the Stipulation.

**Stipulation 35 -** Reimbursement by Defendants to Plaintiff's counsel for attorney's fees and costs incurred up to the date that these sanctions are entered.

For all the above stated reasons, Plaintiffs respectfully request that Defendants' motion be denied.

KING & GREISEN, LLP

*/s  Paula Greisen*
Paula Greisen
Jennifer W. Riddle
1670 York Street
Denver, CO 80206
(303) 298-9878
(303) 298-9879 (fax)
greisen@kinggreisen.com
riddle@kinggreisen.com

Edward T. Ramey
Lara E. Marks
Blain D. Myhre
Isaacson Rosenbaum, PC
1001 17th St., Suite 1800
Denver, Co. 80202

Attorneys for Plaintiff Class

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 3rd day of September, 2010, I electronically filed the foregoing PLAINTIFFS' RESPONSE TO DEFENDANTS MOTION FOR A FINDING OF SUBSTANTIAL COMPLIANCE IN AREAS IN WHICH PLAINTIFFS HAVE NOT INTRODUCED EVIDENCE OF LACK OF SUBSTANTIAL COMPLIANCE AT THE CONCLUSION OF THEIR CASE with the Court using the CM/ECF system which will send

notification of such filing to the following e-mail addresses:


Elizabeth H. McCann
James X. Quinn
Berina Ibrisagic
Attorney for Defendants
Colorado Attorney General's Office
1525 Sherman St.
Denver, Co. 80203
303-866-3261
Fax: 303-866-5443
beth.mccann@state.co.us
james.quinn@state.co.us
Berina.ibrisagic@state.co.us


                              /s Laurie A. Mool