1    IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLORADO

2

3    Civil Action No. 92-CV-00870-JLK

     JESSE MONTEZ, ET AL.,

4

         Plaintiffs,

5

     vs.

6

     BILL OWENS, ET AL.,

7

         Defendants.

8    _____

9

                        **REPORTER'S TRANSCRIPT**
10                    Trial Preparation Conference

11   _____

12

13           Proceedings before the HONORABLE JOHN L. KANE, JR.,

14   Judge, United States District Court for the District of

15   Colorado, commencing at 10:07 a.m., on the 26th day of May,

16   2010, in Courtroom A802, United States Courthouse, Denver,

17   Colorado.

18

19

20

21

22

                    TRACY WEIR, Official Reporter
23                   901 19th Street, Room A258
                     Denver, Colorado, 80294
24                        (303) 298-1207

25           Proceedings Reported by Mechanical Stenography
                 Transcription Produced via Computer

1
2

**APPEARANCES**

3   For the Plaintiffs          PAULA GREISEN
                               JENNIFER RIDDLE
4                              King & Greisen, LLP
                               1670 York Street
5                              Denver, Colorado 80206

6   For the Plaintiffs          EDWARD RAMEY
                               BLAIN MYHRE
7                              LARA MARKS
                               Isaacson Rosenbaum, P.C.
8                              1001 17th Street, Suite 1800
                               Denver, Colorado 80202

9

10  For the Defendants          ELIZABETH MCCANN
                               JAMES QUINN
11                             BERINA IBRISAGIC
                               Attorney General's Office
12                             1525 Sherman Street, 7th Floor
                               Denver, Colorado 80203

13  For the Defendants          GILLIAN DALE
                               THOMAS LYONS
14                             Hall & Evans, LLC
                               1125 17th Street, Suite 600
15                             Denver, Colorado 80202

16

17

18

19

20

21

22

23

24

25

1                          *   *   *   *   *

2                              **PROCEEDINGS**

3          *THE COURT:*  Thank you all.  Be seated and good

4     morning.  I had a fantasy that I woke up this morning and said,

5     "I recuse myself."

6          *MS. GREISEN:*  So did I.

7          *THE COURT:*  Okay.  Well, we're here.  We're going to

8     go ahead to trial on the dates scheduled.  I have a few things

9     I want to go over with you.  I need to hear the positions on

10    Dr. Bardwell.  I've read the pleadings.  I will permit him to

11    testify, but I need to have some reasonable accommodations made

12    to both sides in that regard.  Then I have some other matters I

13    want to go over with you from the pretrial order and otherwise.

14          The first is that I want you all to be prepared, as I

15    do in matters that last longer -- well, let me back up.  First

16    of all, this is a bench trial, and the basic distinction

17    between that and a jury trial for purposes of presenting

18    evidence is that you certainly may observe -- and I understand

19    the distinction between what's admissible evidence and what

20    isn't.  I have to rule on it so I will know what's admissible

21    and you won't keep that from me.  I think I can separate wheat

22    from chaff.  If I can't, the Court of Appeals will tell me.

23          Okay.  With that in mind, I do want the parties to

24    provide me with the interrogatories and answers to

25    interrogatories that are referred to in the pretrial order that

1    the defendants asked for, and they received the answers just

2    this past week, I think it was.  I want to be able to review

3    those before the trial begins.  So if you can get those to me

4    by close of business tomorrow, Thursday.

5            MR. RAMEY:  Your Honor, I think we want to be clear

6    which set we're talking about.  We're happy to do this.

7            THE COURT:  I was looking at the pretrial order for

8    it.  Let me -- I'll spell it out for you.  Mr. Quinn.

9            MR. QUINN:  No.  I was going to say I could have those

10   delivered to your chambers.

11           MR. RAMEY:  He may know what they are.

12           THE COURT:  I'm going to get to the specifics of it

13   here.  Thank you for your stipulations.  I'm going to make some

14   more notes -- more comments about that in a moment.  The

15   stipulation is already achieved.  Here it is on page 5 of the

16   pretrial order under section 6(A)(2), and the statement is

17   "Defendants reserve the right to supplement this list."  Well,

18   you all have that right.  Let's just put this stuff to rest

19   right now.  This pretrial order is a work in progress, and

20   things that you couldn't anticipate we'll take up.  The whole

21   idea is to get it to be fair to both sides, with notice and an

22   opportunity to be heard, and to make sense out of it to me,

23   which is going to be your daunting task.  So if we need to

24   change it, we're going to.  I want everybody to be on notice

25   that this is how we're going to proceed.

1          It goes on to say this, "On November 4, 2009,

2    defendants served their first set of compliance interrogatories

3    and request for production of documents upon the plaintiffs.

4    The discovery request sought basic information related to this

5    case.  Specifically, the discovery request sought information

6    regarding what aspects of the remedial plan plaintiffs contend

7    that the CDOC is not compliant, the documents and witnesses

8    intended to utilize at the compliance hearing and for each such

9    witness a statement of the subject matter of such witness's

10   knowledgeable and expected testimony of each such witnesses."

11          Plaintiffs responded to the discovery request on

12   April 1, 2010.  Additionally, plaintiff supplemented their

13   witness and exhibit designations in the discovery responses on

14   May 5, 2010.  That's the discovery I want to review.  If

15   there's some additional discovery matters that you want to add

16   to that, that's fine.  That's really what I want to see.

17          *MS. GREISEN:*  Judge, we also supplemented on

18   May 11th as well.

19          *THE COURT:*  Well, then I want those, too.  All right.

20          *MS. GREISEN:*  Just for clarity, Judge, you also want

21   the documents that were included in that or just the written

22   interrogatory and production?

23          *MR. QUINN:*  Your Honor, I don't think there were any

24   documents submitted with the responses.

25          *MR. RAMEY:*  I think it listed them.

1        *THE COURT:*  All right.  Eventually -- I want to get a

2   sense and feel of what's going on.

3        Now, there's a few other pending matters, other than

4   the Bardwell motion, that I need to go over with you.  These

5   are really for our record.  You already can well imagine it

6   doesn't require anything from you.  I need to do this.  The

7   document numbers are 4106, Motion for Order, a motion filed on

8   September 10, 2009.  I'm not sure by whom.  4107, the Motion

9   for Order filed by Debbie Gillon, G-i-l-l-o-n, filed

10  September 10, 2009.  4111, Motion for Order, motion filed

11  September 16, 2009, by Jill Coit; document 4164, Motion for

12  Leave to file an Amended Complaint, motion filed October 19,

13  2009, filed by Lawrence William Fitzgerald; and document 4167,

14  Motion for Order filed October 20, 2009, by Eldridge Griffin;

15  and a response document, 4316, Appeal of Magistrate Judge

16  Decision to District Court regarding document 4142 by

17  defendants.  These are the pro se things we kept getting.  It's

18  by a list of various defendants.  That was filed February 17,

19  2010, and filed by Bill Boggs, Bill Bokros, Cooper and others.

20  I'm not going to get into it.  All of those are denied.  All of

21  those motions are denied.

22        Then document 4509, Objection/Appeal by Raymond A.

23  Price dated 2010, that is overruled.  There is no basis for

24  this appeal.  The same thing is true for document 4560, another

25  objection filed May 7, 2010, and, for the same reason, it's

1  overruled.  4561, the Objection/Appeal Magistrate Judge

2  Decision regarding document 4384, filed May 11, 2010, and

3  denied -- or overruled, rather, for the same reason.

4       Now, the motion that I want to hear from both sides on

5  is document No. 4618, Motion to Supplement Expert Report of

6  Robert A. Bardwell in Light of Newly Discovered Information.

7  That was filed by class counsel on May 25, 2010.  So I do want

8  to hear on that.

9       Before getting to that motion, here are some of the

10 ground rules that I want.  Every day of trial the testimony

11 will stop at 4:00 and each side will be required to state what

12 is on for the following day and specific terms and witnesses to

13 be called, the nature of the testimony, and the exhibits to be

14 used.  That's so that I and my staff can gather the necessary

15 information for the following day and have it in order and on

16 the bench.  It's also probably something you would be doing

17 anyway, but we're going to share that information.

18      This is something you may not be used to, but I find

19 it's very helpful in extended matters; that is, on each Friday

20 we will stop taking testimony at 3:30 and from 3:30 to 4:40,

21 with each side having an equal amount of time, each side will

22 make a summary statement of what has been accomplished during

23 that week and what will occur in the next week.

24      For your reference, I strongly suggest that you read

25 the article that I wrote that was published in the winter issue

1    2010 of *Litigation Magazine* entitled, "Riding Jury Instructions

2    to Victory" because it contains an explanation of why I do

3    that.  It will make sense to you.  The reason I think you might

4    want to read that article -- other than you'll be amazed at the

5    eloquence of it.  Other than that, I think there's a good

6    reason to read it.  It's hard to say these things and sound

7    humble.  Then, as a judge, you can't be humble.

8            Anyway, the reason is this.  I used this in the Rocky

9    Flats toxic tort class action that lasted for five and a half

10   months.  I made an error in describing what I was looking for

11   as saying mini closings, m-i-n-i, closings.  That's exactly

12   what I got.  That's not what I'm interested in.  I'm not

13   interested in arguing the merits of the case.  I'm interested

14   in helping me analyze and understand the facts and the issues

15   that have been presented so that I want somebody to not be

16   argumentative but just make summaries.  This past week, we did

17   this.  We called these people.  We think we established this.

18   Next week we're calling these people, and the other side, when

19   they don't have witnesses and they will be called out of

20   turn -- and I will permit people to go into their own case, if

21   they wish, with the witnesses.  So you'll have that.  You can

22   also point out this is what we were aiming at on

23   cross-examination.  We think this witness was impeached or this

24   document is not credible for the following reasons.  It just

25   helps me to put things in order.  That's why I want it.

1    I really don't want a closing argument with
2 impassioned rhetoric and all of that.  So please look at that
3 article.  I think it will help you to understand my
4 idiosyncratic view of the trial.

5    The next thing is that there has been a request in the
6 pretrial order to file the -- the plaintiff class wants to file
7 a response brief to the defendants' brief that was filed.  It's
8 really not necessary because, at the close of the evidence, I
9 will make some general findings.  Then I will direct -- and you
10 need to know this to begin with -- I will direct each side to
11 prepare and submit proposed findings of fact and conclusions of
12 law.  So that will necessarily take care of the briefs.  You
13 need not file trial briefs.  You need not file a response to
14 the other brief because this is what I'm going to use.

15    You're doing a good job.  I understand you're under a
16 lot of stress with this case.  A lot of work is involved.  It's
17 difficult, but I do -- I've already mentioned this briefly.
18 Each side is expected, by me, to provide full and fair notice
19 of witnesses to be called and their anticipated testimony so
20 the people can be prepared and we don't waste a lot of time.

21    As always, I encourage stipulations, and I do not want
22 counsel to perseverate about the obvious.  If we have something
23 that's done, let's just do it.  You know the old story, you ask
24 a lawyer what time it is, and he wants to tell you how to build
25 a clock.  I don't want the clock.  Just tell me what time it

1   is.  Let's get on with it.  And the other thing you've done a

2   good job on, a few rough spots here and there, but be clear, be

3   concise, be objective, and be respectful of one another.  I

4   think we can all get through this with a lot less stress that

5   way.

6          Now, as to the pretrial order, it's accepted.  There's

7   some objections and things that have been filed in here that I

8   want to go over with you.  There's not many, thank heaven.  The

9   question of whether counsel for the defense does not give the

10  addresses and locations for Ms. Holst and Ms. Baxter, that's

11  discoverable information.  The request is granted.  Now, you

12  have to give them their addresses.  Here's what I'm going to do

13  with respect to Ms. Holst and Ms. Baxter.  When you need

14  them -- they'll be on call so they don't have to be here all

15  day cooling their jets.  When you need them and you know a day

16  ahead of time, you can make the arrangements.  They don't

17  necessarily have to be subpoenaed because neither one are

18  continuing employees of the DOC.

19         Also, because I have this familiarity so far with this

20  case, Ms. Holst is essential.  She's going to have to be on

21  call.  I will leave it to both sides to use your judgment about

22  how much she's going to have to be here.  I understand she's

23  probably the key to the whole thing.  All right.

24         Now, the plaintiffs anticipate wanting to divvy up

25  their examinations, and the defendants object to this.  I'm

1   going to permit it.  I think it makes for a more smoothe

2   operation and administration of the case.  I'm going to permit

3   it for both sides.  So either side can.  I want to tell you

4   right now that I do not want, without sufficient specific

5   reasons for it -- that is to say, as the law requires, there

6   will be a direct, a cross, and a redirect.  It won't be back

7   and forth, back and forth afterwards of surcross, surredirect

8   and all that other stuff.

9           If something brand new comes out on the redirect, you

10  can move to open for that limited purpose of a surcross or

11  something of that nature, but we're not going to go back and

12  forth ad nauseam with these examinations.  So I will adhere to

13  that strongly.

14          Okay.  Next is on page 9 with respect to the telephone

15  contact with the defendants.  I understand this takes a lot of

16  time and trouble, but this is your choice.  You either do that

17  or you bring them up here to testify.  If you bring them up

18  here to testify, I want them here a day and night in advance of

19  the day they're going to testify.  If you want to arrange the

20  phone conferences to cut down on the cost to the State of

21  transporting them and all the extra guards and things you need,

22  I encourage that practice, but I'm not going to cut off the

23  plaintiff class from calling class members to testify.

24          In that regard, one other thing, too, is that I think

25  you should consider -- I would expect that some of these people

1   create security risks.  Otherwise, they wouldn't be your

2   guests.  As a consequence, it's probably a good idea to have

3   them by video conferencing or arrange for the phone calls in

4   advance.  I'm not enthralled with the notion of having them

5   here.  Yes.

6          *MS. MCCANN:*  Thank you, Judge.  I think it's a little

7   confusing.  What the plaintiffs have requested is that they be

8   allowed to have phone calls with the witnesses between now and

9   the start of the hearing.  We are planning to do the testimony

10  by video conferencing.

11         *THE COURT:*  Well, they can talk to them before the

12  video conferencing.  I want them -- you'll either have to have

13  them here one day in advance so one of the counsel can go where

14  they are here at the courthouse and talk with them at night,

15  that evening.  So they'll have to be here overnight.  Or you

16  can arrange for a phone call so they can talk to them

17  beforehand.  It's one thing or the other.  How you do is it up

18  you to.  Mr. Quinn.

19         *MR. QUINN:*  Your Honor, I guess one of the logistical

20  problems is if we can get a time limit on the phone

21  conferences.  Setting these up are difficult to do.  If they're

22  ten-minute telephone calls to the inmate, that's fine.  If

23  they're two hours and three hours, that's something else.

24         *THE COURT:*  I can't tell you how long a piece of

25  string is.  It might be a critical witness that takes more

1  time.  It might be one that takes less.  I think we have to go

2  with that.

3          MR. QUINN:  If maybe --

4          THE COURT:  They can tell you, as much as they can

5  anticipate it, ahead of time when you're making the

6  arrangements and say, this is a lengthy one or this is a brief

7  one.

8          MR. QUINN:  That would be helpful.

9          THE COURT:  The other thing is, when we have these

10 lists of the witnesses and when they're going to testify,

11 that's going to give you some notion as well.  Okay?

12         MR. QUINN:  Thank you, Your Honor.

13         MS. MCCANN:  Your Honor, part of the frustration that

14 we have is they've listed 30 inmate witnesses.  They have not

15 told us which ones are going to be long or short, and they

16 haven't told us when they want them scheduled.  It usually

17 takes a couple of weeks for the Department to be able to set up

18 the video conferencing.  We were hoping that today you would

19 put some parameters around us so we can have an efficient --

20         THE COURT:  I think that's a fair request.  You have

21 to give at least five days' notice of when the teleconferencing

22 witness is going to be called.

23         MS. MCCANN:  Can you give us a time limit on these

24 phone calls?  I mean, Judge --

25         THE COURT:  I can't.  I don't know how long it will

1    take.

2         *MS. McCANN:*  They could have done it months ago.

3    They're doing it a week and a half before trial.

4         *THE COURT:*  I understand that.  That's a frustration.

5    I can't help that.  I can't arbitrarily cut off time when they

6    may have one witness that's going on the witness stand for

7    three days or something.  I don't know.  I have no idea.

8    You're asking me to make a ruling on the basis of no knowledge.

9    I can't do that.

10        *MS. McCANN:*  I guess I'm asking you to put a time

11   limit on it.

12        *THE COURT:*  I'm not going to be arbitrary and put a

13   time limit on it.  I'm asking them to be reasonable and tell

14   you five days in advance who they're calling and how long the

15   testimony is going to take or how long the telephone call

16   requires.  That's as much as I can do.

17        *MS. McCANN:*  Is it acceptable to you if we arrange the

18   phone call the day before the witness is going to testify?  If

19   that's the only way we can do this in the time that's left...

20        *MS. GREISEN:*  Judge, some of these phone calls may

21   eliminate witnesses.  If we have to tell them five days

22   beforehand who the witness is going to be -- our interest is in

23   setting up these phone calls as soon as possible and providing

24   them as soon as possible.

25        *THE COURT:*  Neither one of you understood what I said.

 1    You have you to give notice five days in advance when you want

 2    the phone call, not when the witness is going to be called.

 3    You make that advanced notice.  That gives you time to arrange

 4    the phone call, and then we will know by the other information

 5    as to when that witness is going to be called.

 6              MS. GREISEN:  Okay.

 7              THE COURT:  I'm sorry I didn't make myself clear.

 8              Okay.  Let's hear about Dr. Bardwell.  Let's start

 9    with --

10              MS. GREISEN:  I'm going to punt.

11              THE COURT:  Mr. Ramey.

12              MR. RAMEY:  I'll do this one.

13              THE COURT:  All right.

14              MR. RAMEY:  Your Honor, very briefly -- I'm not going

15    to repeat what was written in the motions because I know you've

16    read those.  On Monday afternoon -- well, let me back up a

17    little bit.  An expert report was submitted by Dr. Bardwell on

18    the 17th of this month.  A portion of that expert report,

19    which counsel has seen but Your Honor, of course, has not seen,

20    involves a comparison between two, I'll call them, sets of

21    databases.  They, essentially, are lists of inmates that were

22    produced initially last year in 2009, in July -- I'm sorry --

23    in July and October, I believe, and were updated this March.

24              One of the things that we asked Dr. Bardwell to do --

25    I should say our understanding of these lists, on the one hand,

1   is a database that shows the job and program assignments of

2   virtually all inmates in the system as of the compliance date.

3   Both members of our class and everybody else.  What we were

4   hoping to do with this list -- and this list is amenable to

5   that analysis -- is determine whether there were any levels of

6   discrimination in terms of job assignment either --

7   irrespective of why.  There is another list, which is referred

8   to as AIC database.  I won't even attempt to explain where it

9   comes from.  It's a different database that is maintained, I

10  believe, by the AIC office.  It lists all the members of our

11  class.

12          We asked our expert to do a comparison.  Actually, we

13  in our office did an initial comparison to make sure that

14  everybody that was listed in the AIC database was, in fact -- I

15  am repeating what I said.  I apologize.  I'm doing what I said

16  I wouldn't do.  It was accounted for in the other list so that

17  we didn't have unaccounted for inmates.  That analysis was done

18  and came up with a huge shortfall of names from the AIC

19  database in the jobs and programs database.

20          When the supplemental list came out, or updated list,

21  as they were called, in March, that continued to be the case.

22  Dr. Bardwell has a piece of his report where he addresses that.

23  Basically, there's a third of the inmates that are reportedly

24  in a class that don't even show up on this other list which

25  makes it difficult to do any kind of statistical analysis.

1          On Monday afternoon we discovered -- it was after we

2    served our expert report.  Counsel candidly advised us in the

3    meeting that Your Honor directed that the reason for that AIC

4    database, the one that had names that the other database didn't

5    have, included a lot of people who no longer are in the system

6    as of the compliance date, reaching back years, people that had

7    died, been released, gone wherever, Community Corrections,

8    whatever, dating back to 2003 or so.  This was news to us.

9          Now, we can get into some finger pointing here.  I

10   don't want to do this -- I prefer not -- as to whether we

11   should have thought about this earlier and asked the question

12   earlier or whether we appropriately relied on the transmittal

13   description that came to us, which is all discussed, and we

14   could do a snake dance about that, which is kind of water under

15   the bridge at this point.

16         Literally and candidly and honestly, it came as a

17   surprise to us.  All we want to do is have Dr. Bardwell do two

18   things.  One, this is new information to him.  Have him look at

19   it and say, now we're told -- and we'll verify this in some

20   fashion, which is our problem.  We want him to verify that

21   information and revise his analysis that the third of the data

22   is not just on the moon.  There's an explanation for it, now we

23   know.

24         Secondly, this may give rise going deeper into other

25   areas.  I don't know what they would be at this point.  Asking

1    some questions about the data that he does have that he didn't

2    ask because he couldn't ask because he -- it appeared that a

3    third of the inmates were completely unaccounted for.

4         So those are the two things we want to do.  We want to

5    give him an opportunity to correct his report and tell both us

6    and defense counsel what he plans to do so we don't have to go

7    through this exercise in court where he is very effectively

8    cross-examined on something he didn't know about and that

9    cross-examination is incorrect.

10        *THE COURT:*  When do you intend to call him?

11        *MR. RAMEY:*  When?

12        *THE COURT:*  When in the course of the trial?

13        *MR. RAMEY:*  I don't -- not right away.

14        *MS. GREISEN:*  We can be flexible.

15        *MR. RAMEY:*  I don't think we're locked into that.  Not

16   at the inception.  We won't start with him.  We are flexible.

17   I realize we have tensions of sort here that we're working

18   through.  We'll accommodate everybody on that, obviously.  We

19   have to accommodate him.

20        *THE COURT:*  Thank you.

21        *MS. MCCANN:*  Thank you, Your Honor.  I think the Court

22   has already ruled that you are planning to allow Dr. Bardwell

23   to testify.

24        *THE COURT:*  I will.

25        *MS. MCCANN:*  Then, in that case, I would prefer that

1    he be allowed to use the -- that he be allowed to understand

2    what the data is.  I think he -- personally, I think he should

3    have asked us about the data if he didn't understand what they

4    were.  Be that as it may, I would prefer he have an accurate

5    report than one that is based on misunderstanding of what the

6    data is.

7            If the Court is going to allow him to testify, I think

8    we would prefer that he use the new information.  I just this

9    morning received -- I asked one of the employees of the AIC to

10   go through and identify what the status is of those that were

11   on the list but have paroled or are --

12           THE COURT:  So he does not have the information yet.

13   Is that correct?

14           MS. McCANN:  Well, he has the information.  He will

15   now have a precise listing of where all those inmates are.

16           THE COURT:  How long will that take?

17           MS. McCANN:  I have it now.  I'll e-mail it to them

18   this afternoon, today.

19           THE COURT:  Okay.  How long is he going to need to

20   have to go over that?

21           MR. RAMEY:  We need a floating microphone.  I know

22   he's out of town today because I saw an e-mail from somebody in

23   his office trying to track him down out of town.  I don't know.

24   I'm guessing not too long.

25           THE COURT:  Okay.  Here's the thing.  I'm going to

1   allow the defense to take his deposition before he testifies.

2   You're going to have to notify the defense and then give him an

3   opportunity to do it, maybe, on a weekend.  I don't know.

4   You'll have to get it done so that they have a fair opportunity

5   to know before he testifies what he's going to testify about.

6           MR. RAMEY:  Your Honor, what we want to do is

7   provide -- not a surprise.  We want to provide a supplemental

8   report to tell them.

9           THE COURT:  Yes.  He needs to file a report before he

10  is deposed so they can depose him on the basis of the report.

11          MR. RAMEY:  I'm not sure they'll want to.  If they do,

12  that works.  We'll have the report in as quickly as we can get

13  it.  We'll keep them posted on that.  I don't want them

14  surprised three weeks from now.

15          THE COURT:  All right.  I'm curious.  Is this

16  Dr. Bardwell related to Dr. George Bardwell, who was the

17  statistician that was on the *Keyes versus School District* case

18  and all of that in the early '60s?  Is he the son of that Dr.

19  Bardwell?

20          MS. GREISEN:  I don't know that, Judge.  We will ask

21  him.

22          THE COURT:  I'm just curious about it.  There was a

23  Dr. George Bardwell who was a statistician.

24          MS. GREISEN:  For the plaintiff or defense?

25          THE COURT:  I think he was for the plaintiffs.  He was

 1    a professor at the University of Denver in statistics.  He

 2    taught me a lot and it hurt.  Mr. Quinn.

 3         *MR. QUINN:*  I have a couple issues.

 4         *THE COURT:*  Yes, sir.

 5         *MR. QUINN:*  I would like to get a ruling from the

 6    Court on a timeline to give a sufficient time to depose him

 7    from the time they give us their report.  Between the time they

 8    give us his report and the time he testifies.

 9         *THE COURT:*  How much time -- do you know now, before

10    you see the report, how much time you'll need?

11         *MR. QUINN:*  I want sufficient notice between the time

12    we get the report to the time he testifies.

13         *THE COURT:*  You're entitled to that.  I think it's a

14    good idea to look at the report first and see how much time you

15    need.  You'll want to confer with your expert.  I understand

16    that.  Probably be a week or so.  It might be that you can do

17    it earlier or it may take more.  I don't know.  I'm not going

18    to let you be sandbagged on it.  You'll have an opportunity.

19         *MR. QUINN:*  That's all I'm interested in, Your Honor.

20    The only other question is, the Court referenced we would be

21    breaking at 3:30 on Fridays.  My understanding is we were not

22    conducting the hearing on Friday.

23         *THE COURT:*  Is that what I said?  I think I probably

24    did.  That's usually when I'm giving your colleagues in

25    Florence -- guests.  Okay.  Let's just switch that to Thursday.

1   I didn't think clearly about that.  Thank you.  So that gives

2   you Fridays to take depositions and do other things.

3           Okay.  What's next?

4           MS. McCANN:  I have a few issues also.

5           THE COURT:  Okay.

6           MS. McCANN:  Judge, the purpose of the hearing really

7   is to determine if the Department was in substantial compliance

8   with the remedial plan as of May 1, 2009.  I just want to be

9   real clear about that.  Several of the exhibits and some of the

10  witnesses that the plaintiffs have endorsed relate to events

11  that occurred after May 1st, 2009.  I want to make sure

12  that I'm correct in my understanding that we will only be

13  addressing issues pre-May 1st, and if the Court wants to

14  hear about things that have taken place since May 1st --

15          THE COURT:  I will hear about things that have taken

16  place since then if they relate to or have some bearing upon

17  the issues before.

18          MS. McCANN:  That was not my understanding.  We have

19  kind of structured all of our exhibits toward -- I think you

20  previously told us it was pre-May 1, 2009.

21          THE COURT:  Yes.  Pre-May 1.  I said that's fine if

22  there was something that came up later that related to the

23  pre-May 1st issues.  I wasn't going to exclude it because

24  it came up later, but I'm not going to make any findings on

25  compliance on conditions after May 1st.

1          MS. McCANN:  I guess what we understood you to say is

2     you would have a separate hearing later if you decided --

3          THE COURT:  If you want that, I'll give it to you.

4          MS. McCANN:  The way I envisioned this is, we present

5     evidence of substantial compliance up to May 1, 2009, and then

6     the Court will determine substantial compliance as of that

7     date.

8          THE COURT:  Yes.

9          MS. McCANN:  And if the Court finds there's a

10    particular area that there is not substantial compliance under

11    one section of the plan, the Court would want to hear evidence

12    of how we've addressed that since May 1st.

13         THE COURT:  Let me give you an example.  I try not to

14    be obtuse about this.  Let's say we have an inmate who has

15    diabetes and has had an amputation and the prosthesis hasn't

16    come in and that is alleged to be a failure to conform by not

17    providing that person with this.  You say, well, we ordered it

18    and it didn't work out so we sent a new one and it came in in

19    June or July.  I'm going to admit that kind of evidence to show

20    that it mitigates whatever the failure to comply was.

21         MS. McCANN:  You want to do that at this hearing?

22         THE COURT:  Sure.  If somebody -- on the other hand --

23    speaking of amputations, if the shoe is on the other foot --

24    let's just say, for example, that an inmate has complained

25    about not having a job he says he was qualified for and you

24

 1   gave him the job and then a week after the deadline he quits.

 2   I think that's relevant.

 3           MS. MCCANN:   Okay.   Here's an example of what we're

 4   looking at.   There was an incident at Ft. Lyon that occurred in

 5   August 2009, which, first of all, we don't think it was

 6   relevant anyway.   It was a medical issue.   The plaintiffs

 7   have -- are attempting to introduce that as an exhibit of us --

 8   of DOC not being in compliance as of May of 2009.   So we don't

 9   think that should be introduced in this hearing.   They've also

10   listed a fire drill incident that took place, I think, in

11   September of '09 and, again, we don't think that is relevant in

12   this hearing as to whether or not DOC was in substantial

13   compliance.

14           THE COURT:   The fire drill was in September after the

15   May?

16           MS. MCCANN:   Yes.

17           THE COURT:   The question automatically arises, were

18   the plans in place and in effect in May.

19           MS. MCCANN:   Yes.   That's --

20           THE COURT:   I would have to -- I think that they would

21   be able to say, well, if there were plans, nobody read them.

22   Don't you see what I'm saying?

23           MS. MCCANN:   Not really.

24           THE COURT:   All right.   Let's just say you're talking

25   about a fire drill and you had to have, according to the

1   consent, plans that took care of these disabled prisoners

2   during a fire drill.  You are saying those plans were in effect

3   by May 1, the cut-off date.  I think that it's only fair for

4   the plaintiffs to be able to come back and say, well, they may

5   have been there, but nobody used them.  We can show that nobody

6   used them.

7       MS. MCCANN:  We have examples pre-May of '09 of how

8   the plans work and how the fire drills were conducted.  So I

9   think that's what we are --

10      THE COURT:  That would be clearly --

11      MS. MCCANN:  That's what we're supposed to show.  If

12  the Court allows the plaintiffs to bring in everything that's

13  happened since then, then we need to bring in everything that's

14  happened since then.

15      THE COURT:  I don't know that for sure.  Let me tell

16  you what I'm concerned about because this is not the only

17  consent decree I've ever been involved with.  People,

18  parties -- I'm not making any aspersions to anybody here.  It

19  happens.  People involve themselves in a consent decree and say

20  they'll do things, do it a little bit, and quit.  It happens

21  with permanent injunctions, not all the time but, sadly,

22  sometimes, and then they have to come back in afterwards

23  because they've agreed to do certain things or they've been

24  ordered to do certain things and the time for appeal has run

25  and they're bound to do them and it sort of drifts.  I'll give

1    you an example of that, in very general terms.  A school

2    district that is required to do something about their tenure

3    problems and say they'll straighten it out and have agreements

4    that tenure only applies to a certain discipline a teacher has

5    and so on and they mix that up and they have to straighten out

6    and they say, yeah, and they agree to it and implement the plan

7    and 60 days later they forget about it.  That evidence is

8    admissible.

9           MS. MCCANN:  Well, Judge, we have a two-year

10   monitoring period after the compliance.

11          THE COURT:  I understand.

12          MS. MCCANN:  I guess -- I guess we have structured the

13   entire case around the May 1st date since that is the date

14   on which the Court said you would find substantial compliance.

15          THE COURT:  Right.

16          MS. MCCANN:  It doesn't seem that things -- I

17   understand what you're saying.  Certainly the Court is entitled

18   to know what the Department has done since then.  I don't think

19   that's relevant in this hearing.  Otherwise, we will never be

20   able to finish.  I don't think we'll finish it in a month

21   anyway.  We weren't anticipating bringing in evidence of all

22   the things that have taken place since May 1st because

23   there have been --

24          THE COURT:  I'm not looking for it.  If we need to

25   have an extra hearing, we will.  I don't know.  You're asking

1    me to call balls and strikes before there's a pitch thrown.  I

2    can't do that.  I will do my best, and I will make sure that

3    you are not required to do something you had no notice of.  I

4    will make certain of that, but I can't go further.  I don't

5    know.

6           MS. McCANN:  All right.  So a couple other things.  We

7    have an issue with -- I don't know how the Court wants to

8    handle this.  Since Ms. Holst retired, we have a new acting

9    AIC.  That's Ms. Julie Russell, who is here with us in the

10   courtroom.  The plan requires that the plaintiffs agree to

11   that.  So far we haven't figured out if they're going to do

12   that or not and if there's going to be a process or if the

13   Court wants to do that.  We do need to get a decision made

14   about who's going to be the AIC.  We can take it up at the

15   hearing or get some indication of what the plaintiffs' thoughts

16   are about how to address that.  We would like to get that

17   established so she can be --

18          THE COURT:  Have you talked to them about that?

19          MS. GREISEN:  Yes.  Ms. McCann did tell us Ms. Russell

20   was the acting AIC while we were in the middle of preparing for

21   the compliance hearing.  Our suggestion was let's get through

22   the compliance hearing.  Right now, no offense, Ms. Russell, we

23   don't know her very well.  We want to go through the compliance

24   hearing, see where we're at, and make a determination at that

25   time with respect to the AIC appointment.  We're not in a

 1  position right now to stipulate to that.

 2          THE COURT:  I'm not going to make a finding on this

 3  lady's position in this case as to whether or not it's

 4  compliance.  You have somebody acting in that capacity.  If you

 5  have to -- if we need a separate hearing about that, we will.

 6  I'm not going to interfere with a personal decision like that.

 7          MS. GREISEN:  I think that's something the parties can

 8  address after the compliance hearing.

 9          MS. MCCANN:  It sounds like this is not something you

10  would be interested in doing.  I was hopeful we could get some

11  time limits on each side so that we actually could try to get

12  through this in a month and not have to come back again.  It

13  doesn't sound like you're --

14          THE COURT:  You know, I've got some colleagues that

15  tell people -- and the rules provide -- you have a half hour on

16  cross-examination.  I don't know whether that's good or not.  I

17  know I've tried cases where the cross-examination was

18  absolutely devastating in two minutes, and I've seen others

19  that go on for a long time.  I think that this is -- I still

20  cling to the illusion that advocacy is an art.  I'm not going

21  to set time limits on anybody.  I will, if somebody is

22  mattering on and on, cut it off.  I'm not going to make these

23  procrustean decisions in advance, that you have 15 minutes.

24  I'm not the Court of Appeals.  I'm not that smart.  I need to

25  listen to people.  That's what I want to do.  When you start

1   repeating, I stop listening, and we'll put a stop to it.  You

2   would never do that, I know.

3           MS. MCCANN:  Then one other thing.  Maybe this isn't

4   the time to take it up, and maybe we should do it at the

5   hearing.  The special master continues to set hearings and

6   continues to give inmates the opportunity to object to the

7   dismissal of their claims.  The Court, I thought, was very

8   clear in its ruling that people who were not incarcerated and

9   did not have discrimination against them prior to August of

10  2003, those claims should be dismissed and that was it.  What

11  he's doing is dismissing them but then giving them until August

12  or September to file objections.  We think, you know, we need

13  to stop this.

14          THE COURT:  I don't know about this.  I'll check and

15  see.

16          MS. MCCANN:  Maybe we could give you some information.

17          THE COURT:  I would like that.  If you give me

18  information, I'll see what I can do.

19          MS. MCCANN:  We'll give you instances of what we see

20  happening and how we'd like you to rule.

21          THE COURT:  Okay.

22          MS. MCCANN:  Let me see if there's anything else.  No.

23  I think that's all.  Wait.  One more.

24          Just to make sure, at the end of the week when we're

25  doing our summary, you want both sides to do that?

1       THE COURT:  Yes.  Just tell me where you've been and

2   where you're going.  That's what I need.

3           MS. MCCANN:  What was the magazine?

4       THE COURT:  **Litigation Magazine**.  I'm almost

5   certain -- if you need a copy, I can go back in chambers.  I

6   have a few.

7           MS. MCCANN:  We will do that, then.

8       THE COURT:  There's somebody behind you.

9           MS. HOLLAND:  May it please the Court, I'm Hillary

10  Holland.  I'm an attorney but here on behalf of the silent

11  special masters.  The information Ms. McCann is referring to,

12  in my opinion, is skewed a bit.  I have given her and

13  plaintiffs' counsel a memo from Judge Borchers that sets forth

14  the claims that were filed, claims that were dismissed.

15  Perhaps it would give the Court a better idea of what's really

16  happening.  With all due respect, Ms. McCann is not

17  representing what's going on correctly.

18      THE COURT:  Well, that's fine.  I would like you and

19  Ms. McCann and Ms. Greisen to get together and send me

20  something.

21          MS. HOLLAND:  I have it right here, Your Honor.

22      THE COURT:  I don't.  You're asking me in the middle

23  of another kind of hearing.  Whatever is going on with the

24  special master --

25          MS. HOLLAND:  Ms. Greisen says she'll get it to you.

1        THE COURT:  I'd still like the two of you to get

2   together and let me know what the situation is.  I clearly will

3   contact Judge Borchers and find out.  If I have his position, I

4   appreciate that.  Thank you.  I don't know about the rest of

5   it.  Okay.

6        MS. GREISEN:  I had one issue.  It's a similarly

7   related issue, Judge.  We have gotten -- when the files get

8   referred to us from the special master -- as you know, there

9   have been quite a few filings in the last two weeks.  Claims

10  that are dismissed are referred as declarations.  What happens

11  is when they get referred to class counsel, the pleading gets

12  referred to us, but then the special master's office also scans

13  in the documents related to that case and sends them over to

14  us.  We have about 50 that have come in in the past two weeks

15  that we have not looked at yet.  I don't anticipate --

16        THE COURT:  I don't know how you could look at them

17  and get ready for the compliance hearings at the same time.

18        MS. GREISEN:  Well, we couldn't.  I don't know if

19  there's going to be anything in those documents that we may

20  want to supplement with.  I think what we have done so far is

21  we have incorporated the special master -- the documents that

22  have been referred from the special masters we have

23  incorporated them into the pretrial order as best we can.  I

24  just wanted to alert the Court, and we have told this to

25  defense counsel as well, that we hope that we will get a chance

1   to review those additional files.  If there is anything -- I

2   don't anticipate there will be -- if there is anything, we'll

3   bring that to your attention and their attention as soon as

4   possible.

5       *THE COURT:*  I have really enough to do without

6   anticipating.  We'll just wait.  Anything else?

7       *MS. GREISEN:*  I don't think so.  No, Your Honor.

8       *THE COURT:*  Okay.  I appreciate all of your efforts.

9   I suppose I should tell you that -- it has -- well, it has

10  something to do with this case.  In the summertime we have --

11  I'm very fortunate to have student interns from various law

12  schools.  One of them is here.  We're going to have others

13  throughout.  They will be coming in and coming out.  They will

14  be working for me trying to help me get ready from one day to

15  the next and keep things in order.  If you have somebody that

16  comes up to you and says something and it's one of my interns,

17  I want you to treat them well but teach them well.  That's why

18  they're here.  I'm glad they're here.  That's what it's,

19  basically, for.

20      The intern who is going to report on June 1 is the one

21  who is principally assigned but she'll have other people

22  helping her.  It's Katherine Lyons.  She's from DePaul

23  University.  She'll do her best to learn and help me.

24      Now, this doesn't have anything to do with this case,

25  but you should know about it.  I have and may be interrupted --

1    I certainly am not trying to and I hope I'm not.  Even as we

2    speak, I have a four-defendant murder case from the federal

3    prison in Florence that I have to pay attention to that's going

4    to go to trial, one hopes, July or August.  So there may be

5    times when I say I have to recess and go back because I have to

6    deal with that.

7         The other is that I have the Dunlap habeas corpus

8    case, which is nearly older than you are, Mr. Quinn.

9    Nevertheless, it's coming to issue.  So I'll be working on

10   that.  I may be called for something on that.  I want you to

11   know I'm not trying to minimize this case.  Those two matters

12   are ones that I have to give some priority to.  That's what

13   we'll do.

14        All right.  Thank you very much.  We'll be in recess.

15        (Court stood in recess at 11:00.)

16                    **REPORTER'S CERTIFICATE**

17      I certify that the foregoing is a correct transcript from

18   the record of proceedings in the above-entitled matter.  Dated

19   at Denver, Colorado, this 21st day of September, 2010.

20

21                                _S/Tracy Weir_
                                  Tracy Weir
22

23

24

25