1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 92-CV-00870-JLK
3
   JESSE MONTEZ, ET AL.,
4
        Plaintiffs,
5
   vs.
6
   BILL OWENS, ET AL.,
7
        Defendants.
8  _____

9
                    **REPORTER'S TRANSCRIPT**
10              Trial Preparation Conference

11 _____

12

13         Proceedings before the HONORABLE JOHN L. KANE, JR.,

14 Judge, United States District Court for the District of

15 Colorado, commencing at 2:00 p.m., on the 16th day of

16 September, 2010, in Courtroom A802, United States Courthouse,

17 Denver, Colorado.

18

19

20

21

22
                 TRACY WEIR, Official Reporter
23              901 19th Street, Room A258
                 Denver, Colorado, 80294
24                   (303) 298-1207

25      Proceedings Reported by Mechanical Stenography
            Transcription Produced via Computer

1

**APPEARANCES**

2

3     For the Plaintiffs          PAULA GREISEN
                                   JENNIFER RIDDLE
                                   King & Greisen, LLP
4                                  1670 York Street
                                   Denver, Colorado 80206
5

      For the Plaintiffs          EDWARD RAMEY
6                                  BLAIN MYHRE
                                   LARA MARKS
7                                  Isaacson Rosenbaum, P.C.
                                   1001 17th Street, Suite 1800
8                                  Denver, Colorado 80202

9

      For the Defendants          ELIZABETH MCCANN
10                                 JAMES QUINN
                                   BERINA IBRISAGIC
11                                 Attorney General's Office
                                   1525 Sherman Street, 7th Floor
12                                 Denver, Colorado 80203

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              *   *   *   *   *

2                              PROCEEDINGS

3              *THE COURT:*  Thank you.  Be seated, please.  This is

4      92-cv-870, Jesse Jesus Montez, et al., versus Bill Owens, et

5      al.  That's the original name of the case.  I have some

6      extended comments to make before proceeding any further.  These

7      comments concern the pending issues and the overall purpose of

8      these hearings, which I believe have been unnecessarily

9      prolonged and minimally productive.

10             I note, first and foremost, that this case was

11     scheduled for a conference to plan the rest of the hearings and

12     that counsel and the Court were together, and I advised that I

13     wanted to have lists of witnesses, the names of people to be

14     called, how long it would take to testify, the subject matter

15     of their testimony, and estimates as to the amount of

16     cross-examination.

17             Counsel called the Court and advised that such a

18     session was unnecessary because counsel were working things

19     out.  At the close of the last hearings in July, I stated quite

20     clearly what I wanted, particularly with regard to the names of

21     the witnesses, the issues that each witness would address, and

22     counsel's best estimate of the time for both direct and

23     cross-examination.  As you know, or should know, such

24     identification of specific witnesses and issues is essential to

25     intelligent case planning and, as the saying goes, it is not

1    rocket science.

2            Instead, what counsel have submitted is two pages of

3    glittering generalities, which are of no use at all.  What

4    amounts to an egregious and insouciant response to my directive

5    is a general reference stating, quote, "Witnesses that will be

6    called and the nature of their testimony are listed in the

7    pretrial order, document 4619."  Indeed, they are not.  The

8    statement concludes, quote, "Exhibits that will be introduced

9    and the witnesses through whom they will be introduced are

10   listed in the pretrial order, document 4619."  No such listing

11   is there.

12           Reference is made in the pretrial order to attached

13   lists.  In the present submission, no effort at all has been

14   made to call those lists so that only the witnesses to be

15   called in subsequent hearings are listed and cross-referenced

16   to the exhibits about which each witness will testify and the

17   estimated time for that testimony on direct and

18   cross-examination.  No effort has been made to separate those

19   exhibits which have already been admitted from those to be

20   admitted and whether there are any new exhibits that cannot be

21   admitted by stipulation.  Presumably, nearly all exhibits are

22   from the official records of the defendants, and their

23   authenticity would not, in the same world, be subject to

24   objection.

25           The parties have failed to make any effort to

1   streamline the process of this case.  Most of this work is

2   properly and within the province of a paralegal assistant, and

3   I wish to advise counsel that this not a category in which I

4   find any comfort in being assigned.

5          In sum, the existing pretrial order is not an adequate

6   basis for continuing hearings in this case, and no further

7   hearings will be held until the work I requested is completed

8   in an acceptable manner.

9          I will now proceed to some cleanup.  I previously

10  advised that defendants' motion for finding substantial

11  compliance in areas plaintiffs have not introduced evidence of

12  lack of substantial compliance, document 4728, could be filed

13  but that I saw no basis for it in the Federal Rules of Civil

14  Procedure, and some authority would have to be shown.  The

15  motion was filed, no authority was shown, and the motion is

16  denied.

17         Let me explain.  As an initial matter, the confession

18  of judgment defendants suggest turns on a Rule 52 analysis, and

19  burden of proof allegation simply does not apply in a

20  substantial compliance with an issue decreed case.  The fact

21  plaintiffs did not offer affirmative evidence of non compliance

22  in certain areas of the remedial plan, which is the core of the

23  consent decree, does not compel a finding of substantial

24  compliance with respect to those areas.

25         The plan requires a determination based on a review of

1   substantial compliance.  The review and determination are

2   supposed to be made by counsel, but because the parties could

3   not agree, it is left to me.  For reference, see plan Section

4   XXI.  I note the plan calls for me to make this determination

5   in my appointed capacity as arbiter, or overseer, of disputes

6   under the plan and not as the Article III judge to whom the

7   case was assigned when the plan was approved.  The provision

8   may have an impact on the nature and appealability and

9   appellate standard of review of my findings and conclusions.

10          The plan specifically eschewed any Article III type

11  oversight or decision making by Judge Nottingham and called for

12  the administrative closure of the case during the compliance

13  and monitoring periods.  It further provided for all disputes

14  to be resolved by the parties in the first instance and if the

15  parties could not agree by, quote, Judge Kane, as I was named,

16  and if Judge Kane were unable to hear disputes arising under

17  the plan, then by an individual agreed upon by the parties, and

18  if the parties could not agree on an individual, then by

19  another person appointed by Judge Nottingham.  That's in plan

20  Section XXXVI.

21          While plaintiffs have been given the lead in

22  marshaling the evidence necessary to this determination, they

23  do not have the burden of proof regarding substantial

24  compliance as the defendants' motion implies.  It is only at

25  the conclusion of the compliance period, after an initial

7

1   finding of substantial compliance, that a monitoring period

2   begins, and, with it, the actual shifting of the burden of

3   proof with regard to compliance to the plaintiffs.  See plan

4   Section XXXI, which provides that once it has been determined

5   that the Department of Corrections is in compliance with this

6   remedial plan, then a two-year monitoring period commences

7   during which class counsel will monitor the designated

8   facilities to ensure compliance is maintained and must file a

9   timely objection alleging non compliance to toll or extend the

10  monitoring period until a final determination on the merits of

11  the objection can be made.  We are nowhere near that place in

12  this litigation.

13         Defendants' motion is an attempt to invoke a

14  presumption of compliance that does not exist in law.  The fact

15  plaintiffs have declined to present affirmative evidence of non

16  compliance on certain issues does not compel a finding of

17  compliance.  The plan is, in effect, an integrated document

18  that is synergistic, meaning that the sum of its parts, meaning

19  that it's more than the sum of its parts.  Substantial

20  compliance is the overarching essential of the remedial plan,

21  which is a contract that overarching determination and term

22  must wait until the close of the evidence.

23         Having said that, however, does not mean that

24  defendants' attempt to discern what plan areas exactly

25  plaintiffs are having problems with is a futile or meritless

1    exercise.  I wonder about it myself.

2          In the pretrial order, for example, plaintiffs

3    stipulate that there is, quote, "Sufficient evidence to show

4    that the Department of Corrections is providing appropriate

5    sign language interpreters and American Sign Language classes

6    to members of the class with hearing disabilities pursuant to

7    the 2008 stipulation requirement No. 5; that the Department of

8    Corrections has conducted the wheelchair clinics required by

9    the 2008 stipulation No. 10; that the Department of Corrections

10   is in compliance with the remedial plan Sections XVII,

11   regarding library equipment, and Section XXX, parole field

12   operations.  I assumed those discrete issues are off the table.

13   But what about plan Section VII, structural compliance/

14   physical plant changes?  Defendants contend that in 2006, the

15   parties stipulated and the Court concluded that the Department

16   of Corrections was in substantial compliance with Section VII

17   of the remedial plan, structural compliance/physical plant

18   changes.  That's at pretrial order, page 3.  The plaintiffs say

19   they won't put on evidence in this area but will not admit

20   substantial compliance.  So what is it?  Have the architectural

21   changes requirements described in Section VII been

22   substantially achieved or not?  What about Section VIII(A),

23   special placement housing administrative segregation, or XI,

24   justification for denial of requests for reasonable

25   accommodation, or XV, training structural accessibility, or

1  XVII, library equipment, or XXI, standing during count, or

2  XXII, restraints, XXIII, searches, and XXVII, removal of

3  healthcare appliances in ASU/PSU disciplinary detention units?

4       Plaintiffs in the pretrial order stipulated that they

5  would not be submitting affirmative evidence regarding

6  compliance in these planned areas but simultaneously state they

7  are, quote, "Not stipulating that the failure to introduce

8  evidence on these issues is an admission of substantial

9  compliance with the remedial plan."  Again, at page 3 of the

10 pretrial order.

11      Parenthetically, and something I will comment about in

12 further detail in a few minutes, this entire rigmarole of

13 admissions illustrates that neither side has an understanding

14 of precisely what compliance hearings are concerned with.

15 Might I suggest an ancient dichotomy that will possibly shed

16 light on the matter and, thereby, eliminate much of the

17 confusion.  Even though they have been merged, we're not

18 dealing with an action at law.  We are dealing with equities.

19      Is it that plaintiffs are not admitting overall

20 substantial compliance or not admitting compliance with the

21 aforementioned specific plan areas?  Is compliance with these

22 areas in dispute?  If so, what are the essential requirements

23 of these plan areas that are not being met?  What specific

24 evidence points to these facts?  Anecdotal evidence.  The bulk

25 of plaintiffs' presentation so far is of no help in this

1   regard.  Is it not possible, as defendants appear to be asking,

2   that plaintiffs simply stipulate that the Department of

3   Corrections has substantially complied with these plan sections

4   and, thus, put the overarching issue of substantial compliance

5   with the plan itself in its entirety on a more intelligible

6   footing?

7          As is crystal clear, I am not now, nor have I been for

8   a long time, happy with the parties' lack of clarity and

9   unwillingness or inability to present the issues of substantial

10   compliance in a fact-based and frank manner.  At one point I

11   asked with shock and wonderment why experts have not been

12   called to appraise the viability of the institutions and

13   overall compliance with the plan.  The question was never

14   answered.

15          Mr. Zavaras testified that the Department of

16   Corrections had received coveted awards for meeting some

17   national standards, but what are the standards?  How was the

18   award determined?  What investigation was undertaken?  What

19   could the plaintiffs offer to show what is specifically lacking

20   in those standards or in the data submitted to support the

21   awards?  At this point, we are dealing only with advertising

22   and not with evidence.

23          My purpose in calling this status pretrial conference

24   today is to force the parties to address the issues and compel

25   the identification and articulation of the specific issues that

1  remain in dispute, to identify with the same specificity those

2  issues that are not in dispute.  Moreover, to require the

3  normal lawyerly practice of specifically identifying which

4  witnesses will be called, the subject matter of each witness's

5  testimony, the exhibits that each witness will refer to, and

6  the length of time each witness is expected to testify on both

7  direct and cross-examination.  Minimal preparation in any case

8  by any attorney should not make this an onerous task.

9         My concern and frustration with the plaintiffs' phase

10  of these hearings was the treatment of the, quote, "substantial

11  compliance" as though it was some sort of neologism, proveable

12  only through an amalgam of anecdotal information and ipse

13  dixit.  It is no such thing.  Substantial compliance is a

14  substantive legal standard, the doctrine of contract law that

15  aims to aid courts in determining if a contract-based conduct

16  is in compliance with the contract's terms.

17         The Tenth Circuit has addressed the concept and the

18  evidentiary basis for applying it, as have other courts.  In

19  *Joseph A. ex rel Wolfe versus New Mexico Department of Human*

20  *Resources*, 69 F.3d 1081, the Tenth Circuit held that

21  substantial compliance means the purpose of the consent decree;

22  that is, its essential requirements, have been satisfied.  The

23  application of *Wolfe* suggests that an agreement as to what the

24  essential requirements of the contract are is a necessary

25  starting point, as is an agreement as to what evidence is

1   necessary to demonstrate that those requirements have or have

2   not been met.

3            A Court must hear evidence presented in a manner

4   organized around these essential requirements to evaluate

5   whether substantial compliance has been achieved.  The issue,

6   again, is the overall purpose of the contract.  Deviations are

7   to be expected.  The appropriate inquiry is whether these

8   deviations -- and I quote from *Wolfe* -- in any real substantial

9   measure frustrate the purpose of the contract.  There is no

10  formulate standard for determining whether a party has

11  substantially complied with the consent decree, but the

12  purpose, essential requirements of the decree have to be

13  articulated in a context or rubric that permits evaluation, and

14  the facts have to be presented in a manner that relates to that

15  rubric.

16           So far, this has not been achieved.  If -- let me

17  ask -- this matter were tried to a jury, what would the

18  instructions say?  What would the verdict form look like?  What

19  would you tell jurors the overarching purpose of the remedial

20  plan is?  What would you tell them are the essential

21  requirements of each plan section necessary to effect that

22  purpose?  Here, in this case, there is no jury, just me, and,

23  try as I might, I have been unable to get all of you or any one

24  of you to tell me or even to articulate what specifically you

25  do not agree on that constitutes the essential elements of

1   compliance.  What is truly at issue?  What is not at issue?

2   What does compliance look like?  The plaintiffs need to answer

3   these questions.

4         In the end of all of this litigation, if you achieve

5   your goals, what does substantial compliance with the specific

6   negotiated elements of the Montez remedial plan look like?  How

7   quickly are inmates evaluated for disabilities and given

8   appropriate housing and medical care assignments?  What kind of

9   diabetic testing is in place?  What specific quality controls

10  are essential?  What specifically would have been achieved in

11  each of the compliance areas for you to agree that the

12  Department of Corrections has come into substantial compliance

13  with the overall plan?  Are there any areas of substantial

14  compliance you can agree do not need further development?  Can

15  we tailor or inquire to areas that are legitimate and not petty

16  dispute?

17        The defendants need to answer my questions as well.

18  Are there any areas where, in your view, substantial compliance

19  is not and never will be achievable?  Are there any areas where

20  specific steps can be taken to achieve substantial compliance

21  that does not presently exist?  Can you stipulate to areas of

22  non compliance?  What facts and from what witnesses are you

23  ready to present to establish compliance in each elemental

24  area?

25        Both sides need to answer this question: is it time to

1   modify this plan, to reduce it to a more tailored or achievable

2   form?  A modification could do much to address those aspects of

3   the plan no longer being challenged or not reasonably

4   achievable under the facts and circumstances as they have been

5   shown over the years to exist.

6        Both sides need to be completely familiar with *Rufo*

7   *versus Inmates of Suffolk County Jail* at 502 U.S. 367.  When I

8   say "completely," I mean the opinion by Justice White, the

9   concurring opinion, which makes more sense, by Justice

10  O'Connor, and the dissent by Justice Stevens.  This case

11  provides a template for the parties to consider the question of

12  modification.  Modification can be warranted when changed

13  factual conditions made compliance with the decree

14  substantially more onerous, when the decree proves to be

15  unworkable because of unforeseen obstacles, or when enforcement

16  of the decree without modification would be detrimental to the

17  public interest.  Indeed, if the number of correctional

18  institutions and personnel levels have changed, modification

19  may not even be an option but, rather, a necessity.

20        Now, in response to the remedial plan, which was

21  drafted as the parties' version of the compliance decree,

22  Cathie Holst was appointed as the ADA inmate coordinator and

23  was charged with aiding the institution in coming into

24  compliance with the remedial plan.  A great deal of the

25  testimony we have had thus far has involved Ms. Holst and her

1  position as the AIC.  It has been my impression that Ms. Holst
2  was charged with aiding the system, yet not given the authority
3  to make changes she felt were necessary, if not imperative, in
4  order for the DOC to be considered in compliance with the
5  remedial plan.

6      Communications from Ms. Holst to her supervisors were
7  offered as exhibits by the plaintiffs and frequently expressed
8  Ms. Holst's concerns regarding DOC's level of compliance with
9  the plan.  Specifically, the e-mails documented her concerns
10 with the number and location of telephone accommodations for
11 the deaf, the information tracking system the DOC had
12 implemented.  Ms. Holst testified she often found information
13 in the system was inaccurate or missing altogether.  System
14 glitches.  Inmates with disabilities automatically were
15 labeled, quote, no assignment to camps in the system.  The
16 Youth Offender System has not had an offender with disabilities
17 placed, although Ms. Holst couldn't recall the youth offender
18 requesting an accommodation.  Placement and transfer of inmates
19 based on their disability.  The evidence showed the diabetics
20 placed at Camp George West were transferred out the same day to
21 a different facility and diabetics were transferred solely
22 because of the frequency for which insulin treatments were
23 required.

24     Ms. Holst also notified her superiors that the failure
25 to correctly identify ADA inmates was a recurring problem and

1    that no comprehensive list of disabled inmates was ever

2    provided to the AIC.  I again noted Ms. Holst's lack of

3    authority to implement any of the charges she identified and

4    deemed as imperative.

5         The non conformity by the medical staff is also an

6    issue when they don't agree with Ms. Holst or make their own

7    determinations, regardless of her instruction.  The defense

8    addressed this problem and highlighted the difficulty in

9    obtaining inmate information as many inmates did not provide

10   accurate health information or submit accommodation requests,

11   and DOC staff was worried about violating HIPAA regulations.

12   But what proposals are made in order to get rid of the staff

13   concern about HIPAA regulations which probably don't apply

14   anyway?

15        Inmate testimony and other evidence shed light on the

16   conditions in the prison system for an inmate with a disability

17   but do not address class-wide issues of compliance.  Most of

18   the remainder of plaintiffs' evidence is anecdotal and, as

19   such, does not reach the systemic issues of substantial

20   compliance.

21        For example, Mr. Williams was an inmate who suffered

22   an amputation and underwent a second amputation while in the

23   DOC as a diabetic and improperly treated toenail infection was

24   aggravated to the extent necessitating the second amputation.

25   The defense acknowledged this incident but views it as an

1   extreme circumstance and reminds the Court that a single

2   incident is not to be considered non compliance.  That is,

3   indeed, the law, and it's also a matter of logic that one

4   cannot go from the specific to the general.

5         An inmate who was paralyzed was assigned a wheelchair

6   that was missing foot supports and was, therefore, unusable.

7   Mr. Maldonado was not given the diabetic call button in his

8   cell causing him to suffer a diabetic episode without adequate

9   means to request aid.  Only after five months of waiting was

10  the inmate given a call button.

11        An inmate who is completely blind; in fact, has no

12  eyeballs, was without hearing aids as they were in need of

13  repair for over a year.  A diabetic inmate suffered toenail

14  infection and was forced to purchase medical shoes for himself

15  in order to avoid infection and possible amputation.

16        Inmates who are forced to wear diapers as an

17  accommodation for frequent urination, which affects some

18  diabetics.  The safety issue necessitating the diapers was

19  again highlighted here as inmates are not permitted to use the

20  restroom during visitation to cut down on contraband.

21        Additionally, I'm very unimpressed with the

22  plaintiffs' assertion that the use of these diapers is

23  humiliating for the prisoners.  That isn't any more humiliating

24  than it is for any of the hundreds of lawyers practicing law

25  who have had prostatectomies and wear them, or any of the

1    thousands of people in old-age homes who wear them on a daily

2    basis, or any of the post-natal women who wear them for a

3    period of time.

4          There was inmate Fistell who was found to have a

5    mobility disability and given a back brace, which was later

6    taken as an accommodation for sciatic nerve damage.  The

7    defense, in trying to disprove his need for this accommodation,

8    questioned his ability to sit for, now, 45 minutes as he had

9    during his testimony to which he responded that the chair he

10   was currently in had a back and many of the chairs in the

11   Department of Corrections do not have backs to support the

12   back.

13         Mr. Moulton was given an accommodation for shoes and

14   foot care.  The accommodation was never met, and he purchased

15   his own shoes for anywhere from $18 to $65.  Mr. Mosier had

16   hearing aids prior to his conviction.  However, upon arrival at

17   DOC, the hearing aids were sent home.  Mr. Hassler testified he

18   is a diabetic, has gone without adequate medication when his

19   prescriptions are not refilled in a timely matter.

20         Mr. Baxter was a diabetic inmate who was treated with

21   water pills to decrease inflammation and swelling.  However,

22   the pills caused more frequent urination, and, on one occasion,

23   he was denied bathroom access and resorted to urinating on the

24   floor, for which he was punished.

25         The procedure necessary to file a grievance requires

1    three steps.  Step 1 gives 25 days from the date of receipt for

2    the DOC to respond.  If a response is received, step 2 allows

3    five to ten days to file a grievance, and so on.  However,

4    there was no system for tracking the response times until the

5    final year of the compliance period.  I chalk this up to the

6    DOC's attempt to comply with the consent decree without getting

7    outside experts to set up a system in the first place.

8         The only time that the DOC used experts was for the

9    physical and architectural changes required by the remedial

10   plan, which I am led to believe are in compliance with the

11   remedial plan at this time.

12        As I stated previously, Mr. Zavaras, the director of

13   the DOC, testified there have been substantial gains within the

14   system to be in compliance with the plan.  He noted the DOC has

15   received the Eagle Award for accreditation, and it's only been

16   given to 14 other states and serves to acknowledge the high

17   standards met by the DOC, including life safety, and issues

18   involving the disabled, but, what they are, has not been

19   presented.

20        He also asserted that compliance with the plan was a

21   priority for him, but, as I mentioned earlier, the specifics

22   are lacking.  Joanie Shoemaker, supervisor for Cathie Holst,

23   also testified that many facilities do not have 24-hour

24   clinical services due to funding constraints, and many

25   prisoners are transferred to facilities that do not have more

1   frequent clinical services should they need them.

2           Ms. Shoemaker testified that a continuous loop video

3   runs for inmates to view while awaiting intake, informing them

4   of their rights and accommodations which may be available,

5   including those in the Montez case.

6           The defense, on several occasions, was able to refute

7   inmate testimony as inmates had not filed grievances with

8   regard to the specific issue to which they were testifying.  I

9   also noted that many prisoners did not file grievances because

10  they were not getting the results and might have been

11  retaliated against in doing so.

12          Experts have testified in very limited circumstances

13  in this case, two aspects of the case thus far.  Larissa

14  McClung and Dr. Bardwell.  Ms. McClung has a background in sign

15  language, rehabilitation for deaf persons, and helped to write

16  the, quote, "train the trainers" curriculum at the DOC staff to

17  train staff.  She testified there were issues with the TTY

18  machines in both cost and locations of the machines, discerning

19  announcements over the PA system, inmate aides not having

20  access to provide for inmates due to a floor rule, which keeps

21  inmates on a certain floor at certain times.

22          Dr. Bardwell is a statistician who was asked to

23  evaluate the impact of disabilities on program and job

24  placement.  He found disparities between the able bodied and

25  disabled persons in the jobs of condiment and flatware wrapping

1    as well as in the unassigned category.  He also noted that the

2    data wasn't properly coded for disabled inmates.

3        The defense noted that although some jobs within the

4    system may be preferable to certain inmates, all available

5    inmate jobs are paid the same wage.  Also, inmates may be

6    exempt from jobs not because of their disability, but because

7    of terms of sentencing or punishment restrictions.

8        I was eager, eager to learn about statistical

9    significance in other areas, such as medical emergencies and

10   the efficacy in the treatment of protocols, but Dr. Bardwell

11   was not asked to study them and, therefore, did not testify

12   about them.

13       The ADA prohibits public entities from discriminating

14   against qualified disabled individuals by excluding them from

15   participation in or denying them the benefits of the services,

16   programs, or activities of the public entity.  Correctional

17   facilities qualify as public entities and are subject to

18   compliance with the ADA standards.

19       As disputes arise regarding compliance with the ADA

20   guidelines, the offending agency may be subject to a compliance

21   decree and must substantially comply with that decree.  That is

22   the force of the law upon which this case is based.

23   Substantial compliance, as I've stated, is a contract law

24   doctrine which aims to aid the Court in determining if conduct

25   is in compliance under the contract.  For reference, look at

1   *Calamari and Perillo*, the law of contract, sections 11 to 15

2   and 454, of the 1987 third edition.  And I might point out this

3   kind of compliance issue happens all the time with OSHA cases

4   and others where a government agency has placed a company under

5   some kind of control and to have a plan, not unlike this one.

6         I also looked to Judge -- then later Justice --

7   Cardozo's opinion in *Jacob & Youngs, Inc. versus Kent* at 129

8   N.E. 889, a 1921 case, in which Justice Cardozo said that

9   whether there is -- the appropriate inquiry is whether any

10   deviation from the contract in any, in his language, quote,

11   real substantial measure, frustrates the purpose of the

12   contract.  Additionally, the methodology used to fulfill the

13   decree as well as the facts necessary to support any

14   conclusions reached must be explained.  There is no set

15   standard toward determining whether a party has substantially

16   complied with a consent decree.

17         The First Circuit, for example, has noted that no

18   percentage of compliance can be a safe harbor figure.  That's

19   *Fortin versus Commissioner of Massachusetts Department of*

20   *Public Welfare* at 692 F.2d 790, a 1982 decision of the First

21   Circuit.  Further, substantiality is dependent on the

22   circumstances of the case, including the nature of the interest

23   at stake and the impact that non compliance has on that

24   interest.  Failure in an individual case is regarded as an

25   isolated occurrence and is not representative of a system-wide

1    failure.

2           In *R.C. v. Wally* at 475 F. Supp.2d 1118, in the Middle

3    District of Alabama, the Court held the Alabama Department of

4    Human Resources had satisfied the necessary elements of the

5    consent decree allowing for termination of the decree, which

6    required that it reform the state's child welfare system for

7    abused children.  The Court held that by coming into

8    substantial compliance with the consent decree as well as

9    demonstrating that the Department of Human Resources will

10   remain in substantial compliance with the core purpose of the

11   consent decree.  The Court in *Wally* highlights the importance

12   of remaining in substantial compliance after it is deemed

13   appropriate to terminate the decree.  This concept was clearly

14   adopted by the parties in this case in Section XXXI of the

15   remedial plan calling, first, for a two-year compliance period,

16   and then a two-year monitoring period before the plan may be

17   terminated.

18           I must consider a number of things.  The possibility

19   of calling my own experts is one of them.  I must consider the

20   possibility of calling for a modification of the consent

21   decree, particularly if the parties could negotiate a

22   stipulated modification.  A modification could go far to

23   address those aspects of the plan no longer being challenged by

24   the class and tailoring the remaining aspects of the compliance

25   hearing to the true issues in dispute.

1          The Tenth Circuit found that instances exist where a

2     consent decree is in need of modification to facilitate

3     compliance.  Modification may be warranted when changed factual

4     conditions made compliance with the decree substantially more

5     onerous when the decree proves to be unworkable because of

6     unforeseen obstacles or when enforcement of the decree without

7     modification would be detrimental to the public interest.

8          At this point, I have only heard about two days of the

9     defense's case.  However, there are clear instances of inmate

10    neglect and disregard for accommodations.  The Department of

11    Corrections is charged with balancing the safety and security

12    of its employees and its inmates while ensuring the medical

13    safety and well-being of inmates in need of accommodation.

14         I have addressed the issue before, and I'll address it

15    one more time.  Any prison system tends to create

16    institutionalized personalities regarding both the inmates and

17    the staff.  At some point, however, a level of accountability

18    must be achieved, which will no longer allow for a guard who is

19    able to watch a prisoner suffer because he needs to urinate or

20    is experiencing a diabetic episode without exercising some

21    level of initiative and responsibility to ensure that

22    reasonable care is provided to that inmate.

23         I realize that the Department of Corrections is faced

24    with challenges.  Many inmates likely exaggerate their

25    circumstances to obtain accommodations, and some accommodations

1   desired by inmates may not be realistic as they are safety

2   concerns that have to be considered.  The Department of

3   Corrections cannot become so institutionalized itself, however,

4   that neglect and restriction of services becomes acceptable.

5          This type of attitudinal change needs to be

6   implemented from the top all the way down to the bottom for the

7   Department of Corrections to be truly in compliance with the

8   remedial plan.  And I would expect some evidence to come

9   forward to show that members of the staff who violate the terms

10  of the remedial plan are disciplined and that there is an

11  effort made to stop the attitudinal disregard of these orders.

12         Now, I don't expect you at this point, after having

13  heard what I said, to proceed to try and tell me you're ready

14  for trial because you're not.  I'm not going to hear this case

15  until you are.  So I'm continuing this hearing until

16  September 24 at 2:00 p.m.  We will, at that point -- I will

17  expect before that time, at least by Wednesday -- to have

18  received a joint submission showing the witnesses to be called,

19  the nature of their testimony, the exhibits they're going to

20  have, the estimate of the time that is going to be taken on

21  direct and cross-examination, and that, at the trial, the

22  exhibits that each witness is going to testify to will be ready

23  for that witness and for the Court.

24         Finally, I want you to know that if you don't look to

25  modification and try and come up with something right now, I'll

1   have to do it, and neither side will like what I do.  I can

2   assure you of that.  We'll be in recess.

3             (Court stood in recess at 2:39.)

4                   **REPORTER'S CERTIFICATE**

5        I certify that the foregoing is a correct transcript from

6   the record of proceedings in the above-entitled matter.  Dated

7   at Denver, Colorado, this 20th day of September, 2010.

8

9                                   *S/Tracy Weir*
                                    Tracy Weir
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25