IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-JLK-OES

JESSE F. MONTEZ, et al.,

    Plaintiffs,

vs.

BILL OWENS, et al.,

    Defendants.

_____

REPORTER'S TRANSCRIPT
STATUS CONFERENCE

_____

         Proceedings before the HONORABLE JOHN L. KANE,
JR., Senior Judge, United States District Court for the
District of Colorado, commencing at 9:06 a.m., on the 29th day
of September, 2010, in Courtroom A802, Alfred A. Arraj United
States Courthouse, Denver, Colorado.

Proceeding Reported by Mechanical Stenography, Transcription
Produced via Computer by Kara Spitler, RMR, CRR,
901 19th Street, Denver, CO, 80294, (303) 623-3080

```
 1                        APPEARANCES

 2          PAULA GREISEN and JENNIFER RIDDLE, King & Greisen,

 3   LLP, 1670 York Street, CO  80206; BLAIN MYHRE, Isaacson

 4   Rosenbaum, P.C., 633 17th Street, Suite 2200, CO  80202, for

 5   plaintiffs.

 6          ELIZABETH McCANN, JAMES QUINN and BERINA IBRISAGIC,

 7   Colorado Attorney General's Office, 1525 Sherman Street, 7th

 8   Floor, CO  80203, for defendants.

 9                   P R O C E E D I N G S

10      (In open court at 9:06 a.m.)

11          THE COURT:  Thank you.  Good morning, and be seated,

12   everyone.

13          This is civil action 92-cv-870, Jesse Montez, et al.

14   vs. Bill Owens, et al.; and I think the name of the case has

15   changed since then, has it?  We call it Ritter now.

16          MS. McCANN:  Yes.  Bill Ritter.

17          THE COURT:  For a while.

18          MS. McCANN:  For a while.

19          THE COURT:  The matter is set today for pretrial

20   conference and the consideration of the amended pretrial order

21   which was filed on September 22 pursuant to my order, and I

22   think that the parties have made considerable progress, but I

23   still perceive a fundamental misconception of what we're doing.

24   And that is that this is not an action at law.  This is not a

25   trial.  And it can't be.  And none of the cases support that
```

1    view.

2           One of the issues that's raised in the amended

3    pretrial order is this question of who has the burden of proof.

4    There isn't one.  If I spoke and said something to the

5    contrary, I was wrong.  But I think when I look at the

6    transcript, it was in context.  I was trying to explain

7    something, that when somebody says something, they need to

8    establish it with some evidence.  And that's the basic idea of

9    a burden of proof is that the person or the party that asserts

10   is the one that has to say something.  That's why we began with

11   the plaintiffs going first on this question of whether or not

12   there has been substantial compliance with the, with the

13   consent decree, so that we could focus on the issues.  Now, I

14   think the amended pretrial order does a better job of that, but

15   there are a few things I want to go over.

16          And I just have to say that this is not a formal

17   adjudication in the sense of burdens and rules of evidence.  It

18   is a determination and it is not a matter of, as most lawsuits,

19   with case law and statutes forming the basis for, for why we're

20   here.  It's a determination under section 32 of the plan that

21   was approved by Judge Nottingham as to whether the Department

22   of Corrections is in substantial compliance with the terms of

23   the parties' contractual agreement.

24          Now, I have spent some time reviewing and I would --

25   to the extent that you have the time and the, the academic

interest perhaps of looking at this, of going back through the Keyes vs. School District litigation. That's really what we're doing is essentially the same sort of thing that after the determination of liability in that case, after the Supreme Court and then trying to implement a plan. And that's what we're trying to do. It requires lawyers to step out of the adversarial role and become problem solvers. It's not a he-said/she-said sort of thing; it's what's the practical solution that we can have.

Now, one of the issues that I do want to go over is that there are, in the, in the defendant's proposed testimony, it relates in many instances to things that are stipulated. There's stipulation, we don't need it, and we can cut down significantly on that.

The question is if, if the defendant is not in compliance, how do we get it there. That's what we're talking about. Not who's at fault, what happened; how do we get it there. It is -- well, I repeat myself. It's not like a tort case. We're trying to look at something and in fact the agreement looks at this and says that the parties are supposed to do this, and if they can't, then I'm supposed to be doing it in the sense of being a special master to come out with some proposed solutions if the parties can't agree upon. And that's really all I'm interested in doing, is trying to put this issue to rest.

1        Now, once there is substantial compliance after that,

2   then we go into an entirely different phase of monitoring and

3   under the agreement at that point, if there is a failure to

4   comply, then the plaintiffs have the burden under the agreement

5   to establish, in a monitoring phase; but we're not there.  And

6   I think that there's been a, a misconception or misapprehension

7   of where we are in this case.

8        So let's just go through this, to the extent we can.

9   The plaintiffs now have the statement of issues.  I'm very

10  grateful for that.  I wish we'd had it earlier, but it's here

11  and it's something to work with.

12       Then let's go to the stipulations under 4A.  The

13  plaintiffs agree that this Court has already determined that

14  the Colorado Department of Corrections is in substantial

15  compliance with the architectural modifications required under

16  the standards.  It says here -- and I don't recall what ADAAG

17  means, but whatever -- those are the standards of the design

18  facilities, and the monitoring period for that issue is closed.

19  We don't need anything more about that.  It's done.

20       We don't need anything else on some of these discrete

21  issues of procedures.  As an example, under section 17 of the

22  agreement, institution procedures, there is a stipulation with

23  regard to the institutional procedures, particularly as affects

24  the library and access to the library and all these other

25  matters that are stipulated to.  So we don't need to go into

1    those.

2           What do we need to go into?  I guess that's really the

3    question.  Well, let's go on here to, to the witnesses that are

4    listed by the defense that you want to call.

5           I'm not sure what Executive Director Zavaras is going

6    to testify to.  If he testifies only to what he's already

7    testified to, he's -- it doesn't help.  He's a nice guy and

8    he's the executive director, and I appreciate that; but, you

9    know, as I said earlier in one of these hearings, that, you

10   know, if these standards of the American Corrections

11   Association, where they get the award for, I need to know what

12   they are and how they got them.  Is it a merit badge from the

13   Chamber of Commerce, or is it a substantive examination, and if

14   so, who did the examination.  I think it's nice that he said,

15   we got it and we're very proud of it and I know that he's

16   visited every one of these institutions, and I also know from

17   the evidence from Cathie Holst and from the prisoners

18   themselves that there are serious attitudinal problems on the

19   part of corrections staff that we still haven't addressed.

20   He's tried, I know that.

21           MS. McCANN:  Your Honor, he's only listed because the

22   plaintiffs did not have an opportunity to cross-examine him.

23           THE COURT:  You really need four hours for that?

24           MS. GREISEN:  Well, we put down three hours.  That's

25   about what she took on her direct, and then the other one hour

1   was the, they listed for redirect, Judge.  So.

2          THE COURT:  Well, you got his transcript.  I think you

3   can narrow that down.

4          MS. GREISEN:  I'll try, Your Honor.

5          THE COURT:  Can't -- the next one, the physical plant

6   director is Richard Weems, and can we limit this to section 15

7   compliance?  Structural compliance.  I don't know what else

8   he's going to testify to, as to the physical plant, that really

9   matters to us.  But you only have him for an hour.  But I want

10  to narrow his testimony down.

11         MR. QUINN:  Yes, Your Honor.  I think he's going to

12  testify, in addition to -- well, the physical plant stuff is of

13  course out, but he's going to testify about the call-button

14  issue that was raised by the plaintiffs and then some of the

15  training for physical plant managers that was provided and some

16  of the other issues that was raised as part of the plaintiffs'

17  case.

18         THE COURT:  Okay.  You got my point.  I want to cut it

19  down to what is really necessary.

20         MR. QUINN:  Yes, Your Honor.

21         THE COURT:  I'm not going to prevent you from calling

22  him, but I want to narrow the focus.

23         Okay.  Now, on witness 7, on I think page 12, although

24  the pages are unnumbered, you have former case manager Dave

25  Allen for an hour and a half; and then under 8, you have case

1  manager Randy Malden for an hour and a half, and they want to

2  talk about, among other things, the section 17 institution

3  procedures.  The library equipment is already stipulated to, so

4  we don't need to go into that.

5          MR. QUINN:  No, Your Honor.  I don't think we will.  I

6  think the main focus of the case managers at these major

7  facilities, the case manager supervisors is to talk about the

8  offender job access AR and how that is functioning at their --

9  at the facilities.

10          THE COURT:  Okay.

11          MS. McCANN:  Your Honor, I might just raise one issue.

12  Did you receive the revised amended pretrial order?  We filed

13  one on Monday.

14          THE COURT:  You know, I have the amended pretrial

15  order.

16          MS. McCANN:  We filed one on Monday that was a revised

17  amended pretrial order.  And that's where we talk about the

18  burden of proof, so you must have seen --

19          THE COURT:  Yeah, I've got two different --

20          MS. McCANN:  The revised one is the one that breaks

21  out the direct and the cross.

22          THE COURT:  Let's go to that.

23          MS. McCANN:  It's the same witnesses.  There weren't

24  many changes.  But it just might make it a little clearer to

25  you, the timing.

1            THE COURT:  All right.

2            Tell me more about Jeffrey Zax.

3            MS. McCANN:  Yes, Your Honor.  He is an economist who

4    will testify about the distribution of jobs and programs among

5    the inmates throughout the system and then also among the

6    inmates who've been identified as disabled and how -- what

7    percentage they're represented throughout the system in the

8    various jobs and programs and in the various facilities.  So

9    he's, he's going to testify also about the issues that were

10   raised by Dr. Bardwell, about the overrepresentation or

11   underrepresentation of disabled inmates in various categories.

12           THE COURT:  Okay.  He's got an Exhibit P4 which is his

13   expert report.  I'd like to see that before the testimony.

14           MS. McCANN:  All right.

15           THE COURT:  And have that available, so I can read it

16   ahead of time and be more familiar.

17           MS. McCANN:  Definitely.  We'll get that to you.

18           THE COURT:  Okay.

19           Well, I guess there's not much that I can do about the

20   Dr. Frantz; a day and a half is a lot of testimony.  But

21   there's a lot that she's apparently going to go over.  Is there

22   any report from her that I can read in advance to speed it up?

23           MR. QUINN:  Judge, there was a report prepared by her

24   in response to the plaintiffs' diabetic expert, Linda Evans, so

25   she did prepare a report on that.  She was also in the

1  courtroom during the testimony, a lot of the presentation of

2  plaintiffs' case.

3          THE COURT:  Right.

4          MR. QUINN:  And what she has done is she has gone

5  through and they referenced a lot of inmates and the treatment

6  that was provided to those inmates and insulin cards not being

7  picked up and whatnot.  What she's done is she's done --

8          THE COURT:  That's her summary exhibit on the prisoner

9  treatment.

10         MR. QUINN:  She's done a chart review of all those

11  prisoners and has done a chart summary.

12         THE COURT:  Let me see that ahead of time.

13         MR. QUINN:  Yes, Your Honor.

14         THE COURT:  Is there anything else we can do to have

15  me aware of them ahead of time?

16         MR. QUINN:  I don't believe, Your Honor, other than

17  the diabetic expert report and the summary.

18         THE COURT:  All right.  I'll look at those.

19         MS. GREISEN:  With respect to Dr. Frantz's report, we

20  previously, a couple months ago, asked for all the underlying

21  data that was cited in that report and we have still not gotten

22  it.  I've never seen this summary rebuttal exhibit.  In fact,

23  didn't even know about it until I saw about the pretrial --

24         THE COURT:  When did you get it to her?

25         MR. QUINN:  Judge, I believe I handed her the backup

1  data when we were in court.

2       MS. GREISEN:  All I got were some articles on

3  diabetes.  She cites all sorts of databases, all sorts of stats

4  and I don't have any of the information that she cites in that

5  report.

6       MR. QUINN:  My understanding --

7       THE COURT:  There's two reports we're talking about.

8  Are you talking about the diabetic report, you gave her the

9  information; are you talking about the same report or the

10  summary?

11      MS. GREISEN:  I only have one report right now, that's

12  the original report; and I did not get all the backup data for

13  that.  These other two items, inmate records, I have no idea

14  what they're talking about or the summary rebuttal.

15      THE COURT:  Let's make arrangements for her to see

16  that ahead of time.

17      MR. QUINN:  Dr. Frantz is finalizing her summary.  And

18  I'm meeting with Dr. Frantz.  As far as the backup medical

19  records, she has all the medical records already on the

20  offenders that she requested throughout the discovery.  And

21  it's based on the evidence they presented during their case.

22      MS. GREISEN:  If Your Honor remembers, when

23  Miss Edwards testified, she had prepared a summary exhibit of

24  the inmate records that she reviewed, and they objected to that

25  and it was not admitted into evidence.  She was not allowed to

1  go into those individual files.

2       So I'm a little confused as to now how they're

3  creating a summary on these individual files when that

4  testimony wasn't admitted.  We have hundreds of inmate medical

5  records --

6       THE COURT:  Well, if you can identify which inmate

7  belongs to which file, or which file belongs to which inmate,

8  can you?

9       MS. GREISEN:  Sure.  I just need to know which ones

10 they're talking about.

11      THE COURT:  Tell them which one she's talking about.

12      MR. QUINN:  They will be in the summary and it's based

13 on not only the diabetic but all the records.

14      THE COURT:  List the people so she can go to them and

15 find out which one it is.

16      MR. QUINN:  Yes, Your Honor.

17      THE COURT:  All right.

18      Okay.  Under the witnesses who may be called, do we

19 really need the head librarian, Diana Reese?

20      MS. McCANN:  No.  Your Honor, I apologize.  We didn't

21 get their stipulations until pretty quickly we had to file, and

22 we'll go through and eliminate.  We can eliminate the ones on

23 the search and restraints, the library, the ones they

24 stipulated to.

25      THE COURT:  Okay.  Go over those and make sure.  We'll

cut it down.  I'll leave it at that.

Let's go to section 9, the settlement issues here.

As I read what you're saying in this first paragraph, in plaintiffs' statement, you want me to go ahead and make these findings before you talk about settlement; it's going to be too late because I'm going to do it.  There's things that you can agree upon and live with, I'm going to be very receptive to that.  But the idea of waiting until after I make my findings, I'm not going to do that.  It's just, you're asking me to do things and then forget it.  And I can't do that.

So if you reach some agreements on this, you don't have to have all of it modified, you're willing to have some of it modified, and you're willing to agree and go along with that, it's fine.

One of the things the plaintiffs have mentioned, using Miss Holst to advise you, I got this thing from Judge Borchers that I think he missed the point entirely, but I can understand he didn't want to get involved in that, that's all right.  But what's the problem with Miss Holst doing it?

MS. McCANN:  Well, she's no longer an employee. And --

THE COURT:  Well, why don't I appoint her?

MS. McCANN:  Well, I would have to discuss with the Department.  They have now a new person who is head of the

1  legal services, and I think it might be more appropriate for --

2  to have him involved in the discussions.  It might be a little

3  awkward for a former employee to be in a position of acting as

4  special master.  But, you know, I can discuss --

5          THE COURT:  Well, that's kind of what I am, and I need

6  some help.

7          MS. McCANN:  We thought you were the Judge.

8          THE COURT:  I thought she was really pretty good at

9  understanding the background.

10          MS. McCANN:  Uh-huh.

11          THE COURT:  Now, I -- certainly the current head of

12  legal services can participate in all of this, but I'm just

13  saying, if we call her in to make changes and modification, the

14  plaintiffs are receptive to that, and that doesn't say that I'm

15  beating you over the head with it or forcing you to do it.

16          MS. McCANN:  Well, I think -- here's kind of the

17  dilemma, the way we see it.  We have this -- they have this

18  plan and we have -- we had a compliance date of May 1, 2009;

19  and we believe that overall, the Department is in substantial

20  compliance.  There are certainly some areas, you know, which

21  the Court has discussed where there can be improvements.  But

22  we do think that overall there's substantial compliance.  And

23  the plaintiffs obviously disagree.

24          The Court hasn't yet heard our side of the case.

25          THE COURT:  That's right.  I haven't heard your side

1 and I'm withholding judgment on that.  I can tell you what my

2 present impression is.  I think there's been substantial effort

3 on the part of the Department of Corrections.  I don't think

4 that effort equals compliance.

5   MS. McCANN:  Well, again, you know, we do anticipate

6 presenting some evidence about certainly a large part of the

7 plan that we think we are in compliance with.  And I think it's

8 difficult for us to talk about modification until we know

9 precisely what areas the Court feels there is an issue.  And we

10 don't really think the Court can make that decision until the

11 Court hears the evidence.

12   THE COURT:  Well, I can't.

13   MS. McCANN:  Right.

14   THE COURT:  That's right.  But what I'm saying is if

15 you believe that there are places where you have substantial

16 compliance, you can talk to the plaintiffs; and if you agree to

17 that, then I don't have to make findings on it.  We don't have

18 to spend time with witnesses if they're in agreement there's

19 been substantial compliance with certain areas.

20   Now, I realize you've got clients that don't want to

21 give an inch and she has clients that don't want to give an

22 inch, they, I understand that.  But what we're trying to do is

23 solve the problems.

24   MS. McCANN:  I absolutely agree, and I think our

25 clients have given -- I mean, we, we have met with -- the

1    plaintiffs' lawyers have been cooperative in meeting with us.

2    We met over a year monthly.  And our clients felt that they

3    were demonstrating compliance.  The plaintiffs didn't agree.

4    And so we're, we're looking for some guidance from the Court

5    after --

6            THE COURT:  I'll give you some guidance right now.

7    When the person who is in charge of implementing this plan can

8    be overruled by other people down there, you're not going to be

9    in compliance.  And that's what you have.  And that's got to

10   change.  Where -- no matter what I listen to.  Miss Holst has

11   testified to that and others have testified and the

12   documentation is replete.  Every time that the -- whoever it

13   is, whether -- it was Miss Holst, now it's somebody else, every

14   time they're overruled by somebody else, that is, that's an

15   open door to noncompliance.  You have to have a czar in there.

16           MS. McCANN:  I agree.

17           THE COURT:  And you don't have one now.

18           MS. McCANN:  It's being -- I mean, we have discussed

19   this with the Department.

20           THE COURT:  Well, I think you can discuss it with them

21   on the basis of what I just told you.

22           MS. McCANN:  I appreciate that, and we will.

23           THE COURT:  I think that would make a substantial

24   shift in everything that we're trying to do.

25           MS. McCANN:  I don't disagree.  We will have this

1   conversation.  And it will be helpful that we will have had

2   this guidance from the Court.

3          THE COURT:  Well, it's not guidance.  It's a warning.

4   Okay.

5          I mean, I really -- I think that a lot of these people

6   are trying hard.  But also there's evidence in there that the

7   corrections officers don't want to do something, they don't.

8   Where's the discipline.  Haven't seen any indication that any

9   single employee in the Department of Corrections has ever been

10  disciplined for failing to pursue what the consent decree is.

11  It should be just as much a part of their job duties and

12  descriptions as they relate to this as punching their time

13  clock on time.  As following the directions of their

14  supervisor.  If they're given an order to implement this plan

15  and they don't, there's got to be some -- there's got to be

16  some -- I was going to say come to Jesus, but I guess I'm not

17  supposed to do that.

18          There's got to be some reality to it, to the orders.

19          Okay?

20          All right.  I do think you've done a good job of

21  getting this so that we can.  Now, when are we going to start

22  this again?

23          MS. McCANN:  October 18.

24          THE COURT:  October 18.  Okay.

25          What else do you have from the plaintiffs?

1          MS. GREISEN:  I have nothing.

2          THE COURT:  All right.  Try and meet with them and be

3   agreeable on some things, will you?

4          MS. GREISEN:  Judge, I thought we went pretty far in

5   making the stipulations.

6          THE COURT:  I think you have.  I want more.

7          Now, anything more from the defense?

8          MS. McCANN:  No, Your Honor.

9          THE COURT:  All right.

10          This isn't really before me, but I -- in fact, what

11   I'll do, if you just wait a minute after we recess, I'll get

12   each one of you a copy of an article from a recent issue of the

13   *Atlantic Monthly*.  That would, as I say, it's not really before

14   me; but one of the things that would have a significant effect

15   on this case would be to out-place some of these inmates; and

16   the article I'll give you talks in terms of electronic

17   monitoring that is advanced way beyond anything happening in

18   Colorado today.  We have -- and it's both the state and the

19   federal system -- we have people who are on bond that wear

20   ankle bracelets.  If you saw what, as this article discloses,

21   what they're doing in Hawaii, what they're doing in Ohio and

22   elsewhere in the country, I think there are some nonviolent

23   prisoners that maybe I'm addressing the legislator rather than

24   the lawyer in this case.

25          MS. McCANN:  I'm listening.

 1          THE COURT:  But there are significant things that

 2    could be done.

 3          And what's happened to Fort Lyon?

 4          MS. McCANN:  You know, I was thinking about that the

 5    other day.  I haven't heard anything.  Have you, Jim?

 6          THE COURT:  I haven't heard anything since we had that

 7    meeting.

 8          MS. McCANN:  So it may be that it's not happening.

 9    We'll ask, 'cause I was wondering, myself.

10          THE COURT:  Okay.

11          I think in terms of trying to reach the postcompliance

12    monitoring stage in this case, it is beyond the purview of the

13    consent decree.  There's no question about that.  But I'm

14    thinking that if you look at these things, there may be a way

15    of improving the overall situation for everybody.  And I

16    certainly am not going to order that.  But if you look at this

17    article and see, one of the interesting things is that the

18    company, the largest operator of these various kinds of -- they

19    have GPS that they can take, as an example, sex offenders and

20    they have immediate monitoring that they can't -- where there

21    are schools.  And if they go into this school area, you know,

22    the red light turns on.

23          There are things like that that may, may be able to

24    function and make things a lot less expensive for the state and

25    more efficient and indeed the plaintiffs would be interested

1  and more humane.  I'm sure you are, too, but I think that's

2  their top priority, and the state has to be concerned with the

3  fiscal issues.  There's ways of doing this.

4       There's some legislation pending now that I think it's

5  in, under study or something with the state of Colorado, that

6  we've been doing in the federal courts with criminal cases for

7  years and years.  And that is to figure out and have the judge

8  be aware of the costs of incarceration at the time that the

9  sentence is being imposed.  Every single sentencing I have,

10  that's included.

11       Oh, here's that article.  Good.  Good.

12       Somebody was listening.

13       MS. McCANN:  So in the federal system, you actually

14  get the cost?

15       THE COURT:  Yeah.

16       MS. McCANN:  Because it is being discussed.

17       THE COURT:  We have it.  I can show you any

18  presentence report, and it just says, this is what the cost is

19  of a prisoner, this is what the cost is for probation.  And it

20  just lists those costs.

21       MS. McCANN:  Hmm.  Interesting.

22       THE COURT:  Now, we have a, what I would refer to as a

23  tectonic shift.  We've got rid of the idiocy of mandatory

24  Guidelines.  I mean, that's an oxymoron; only Washington could

25  have come up with that.  But the Supreme Court ruled in the

sentencing in federal cases with three significant decisions

that the Guidelines are no longer mandatory.  The Guidelines,

when they were mandatory, essentially eliminated probation.  It

reduced it from 40 percent of criminal cases down to about 2.

So now that they're advisory, we're going back into probation,

so that the probation officers are going to be actually

probation officers instead of parole officers.  But that was a

huge conversion that took place, and it lasted for about 20

years.

          And getting the probation department and the U.S.

attorney's office and the defense bar understanding this, this

shift is something that we're dealing with now.  But the fact

is is that, that if you put somebody on probation, the costs

are a tenth of what it is or if not a tenth, at least a fifth,

of what it is to have somebody behind bars, and of course the

cost for maximum security are much greater than the cost for

minimum security, et cetera.

          This kind of cost management can be done, but what,

what generally happens with legislators is that they say, oh,

that's great, and then they don't increase the number of

probation officers.  And you have to have more if you're going

to give more people probation.

          But then -- oh, I was meaning to say to you, that the

primary purveyor of this kind of GPS monitoring of prisoners,

it has its headquarters in Boulder, and it's not used in

1   Colorado.  So read the article.

2          I think -- and I want you people, the plaintiffs'

3   lawyers, to look at this.  I think that your client class, the

4   members of your client class, many of them would be better off

5   if they weren't kept in custody all the time if it isn't

6   necessary.  Now, some of them belong behind bars forever.  But

7   not all of them.  And those kind of discrete decisions could be

8   made which would make this a lot easier for everybody, if

9   you're worried about budget constraints, for example.  On the

10  medication and treatment of these prisoners.  If they're out,

11  maybe somebody else will handle it.  And if you've got the

12  security of the public taken care of, then why not.

13         So I guess what I'm suggesting to you is think beyond

14  the confines of this case.  That's what I'm trying to say.

15  Push the envelope, as ad people say.

16         Let's think in more global terms because the consent

17  decree itself is what's governing us right now; and has there

18  been substantial compliance, in some areas, yes.  Have there

19  been significant stipulations between the parties as to

20  compliance in some areas, yes.  Are there areas I need to hear

21  further evidence on to decide whether there's substantial

22  compliance, yes.

23         Is there still going to be something hanging out there

24  that tells me that it isn't going to be substantial compliance,

25  I think I've already said so.  And I think that that's evidence

1   that, while it was presented during the plaintiffs'

2   presentation of evidence, came from the defense.  And I'm not

3   suggesting that it isn't good faith.  But there's some -- I

4   brought this up long ago when I was just trying to be a

5   settlement good guy.  And I brought it up that attitude is

6   everything.  We can have all the rules and regulations we want,

7   but if we don't have a change in attitude, and I don't know how

8   you do that except by putting some discipline, some starch into

9   the authority.  That these people have to have in order to make

10  it work.

11      So get me that material and I guess read that article

12  and if you want to talk further, I'll make myself available.

13      MS. McCANN:  Your Honor, if I might.  There's one

14  thing that continually causes some, just inability to discuss

15  modification, and that is I believe, and certainly Miss Greisen

16  can speak to this better than I, but I believe that their

17  feeling is if there isn't substantial compliance, that there

18  needs to be some sort of sanction, and so that makes it very

19  difficult for us to discuss modification because it's sort of

20  like we're then admitting there's not substantial compliance

21  and then they feel that there should be some result of that.

22  And so it's hard for us to sit down and talk about it when we

23  don't have, you know, a ruling from the Court about how your

24  thinking is with respect to substantial compliance.

25      THE COURT:  My thinking is that I want to put a stop

1  to having to preside in this matter.  And I want to put an end

2  to the controversy.  I don't know why or what the sanction

3  might be.  I haven't even thought about a sanction.  What I'm

4  thinking about are modifications.

5          Now, those might be regarded as sanctions.  If I'm

6  telling you, as I just did, that I think you need to have some

7  sort of connection between performance and discipline of

8  Department of Corrections employees -- and I don't know how to

9  say this with any degree of grace -- but, you know, if a

10 corrections officer is letting somebody sit in his own sewage

11 in a cell, then there has to be some kind of accountability for

12 that.  If somebody is a diabetic and needs medication and a

13 corrections officer says I'll get around to letting him go

14 there when I get around to it, there has to be accountability.

15 So is that a sanction?  I think it might be regarded as such.

16         You've already agreed to pay the attorneys' fees, so

17 I'm not concerned about that.  But I think that, you know, I'm

18 not going to order you to spend money on things that I don't

19 think are going to get us to the point where there is

20 substantial compliance and then go into the monitoring phase.

21 I'm not trying to be punitive.  So that's as much as I can tell

22 you at this point.  I mean, certainly I'll hear from the

23 plaintiffs' counsel and I'll hear from you about this issue,

24 but I want to solve the problem.

25         I was -- this has really nothing to do with this case,

1  but maybe it illustrates the kind of person you have in me.

2  That I was talking to my sister on the phone the other day and

3  she recalled that in the fifth grade, I held the record at St.

4  Philomena school for staying after school more often than any

5  other person in the class.  Now, that is a sanction.  And it

6  didn't have a damn bit of good.  So perhaps that helps you

7  understand.  I'm not going to make anybody stay after school.

8          All right.  Let me know.

9          We'll be in recess.

10         And I really do want to thank you for coming back with

11  a lot more than you did before.

12     (Recess at 9:47 a.m.)

13                    REPORTER'S CERTIFICATE

14         I certify that the foregoing is a correct transcript

15  from the record of proceedings in the above-entitled matter.

16  Dated at Denver, Colorado, this 29th day of September, 2010.

17

18                              s/Kara Spitler_____
                                     Kara Spitler
19

20

21

22

23

24

25