Rebuttal to Diabetes Summary Report submitted by Linda Edwards, RN, MHS, CDE

**General Diabetes Care**

Diabetic Flow Sheet:  The diabetic flow sheet is a tool that was created to help aid the clinical staff to monitor the status of diabetic patients.  The use of a flow sheet can reduce the length of clinic visits by enabling the provider to more easily find the information they need to monitor a diabetic patient.  Although I personally prefer to use flow sheets in my own clinical practice, not all providers find flow sheets to be useful.  This individuality among providers is not unique to corrections as a number of providers in private practice also do not find the use of flow sheets to be helpful.  I encourage providers to use the flow sheets at every chance, but I do not believe that I can discipline a provider for not using the flow sheet if the chart review shows the provider is providing adequate diabetic care with attention to diabetic control, screening for complications, development of a management plan, etc.  There is no unique information on the flow sheet that can't be found elsewhere in the medical record, and this is the primary reason that some providers choose to not use the flow sheet.  If the provider does not use the flow sheet, then that provider simply has to turn to other sections of the chart to find the most recent lab results, foot exam, eye exam, etc.

Colorado Dept. of Corrections (CDOC) performs audits of every diabetic offender in the system.  This audit collects information about the type of care that is being provided to diabetic offenders state wide.  The audit is performed manually, with the actual medical record being reviewed to collect the data.  If the diabetic flow sheet is used, the collection of the data is more efficient and can progress more rapidly.  If the diabetic flow sheet is not used, it requires the auditor to spend more time performing the audit as the auditor will then have to scan the chart to find the correct data for the audit.  Although the flow sheet can make the audit easier, the completion of the flow sheet is not essential to performing the audit.

The diabetic flow sheet is attached to the clinical standard for diabetes care.  Clinical standards, including the attachments, are reviewed annually and updated as needed.  The diabetic flow sheet has been updated annually for a period of approximately 3 years.  The changes that were made to the diabetic flow sheet were driven for a number of reasons.  One of the primary reasons to change the flow sheet was because of what we learned as a department just by doing the audits.  With time, we learned that some items on the flow sheet either weren't clear or they measured something other than what we intended. One significant change to the flow sheet was to make the flow sheet more closely mirror the items identified as important by the American Diabetes Association. Items were also added to gather data on how prevalent some of the issues were that Linda Edwards said were rampant in our system.  Each time the flow sheet was updated with the clinical standard, the clinics and providers would be instructed to use the new flow sheet.  At no time, would I expect a provider or nurse, or any staff for that matter, to spend time transcribing data from the old flow sheet to the new flow sheet.  The clinic

should place the new flow sheet on top of the old one and continue with their care of the offender.

## Diabetes Management

The CDOC clinical standard for the management of diabetes indicates that good control is an A1C under 7.0%. This is in agreement with the recommendations of the American Diabetes Association. Ms. Edwards is correct in observing that the March 2009 audit defined good control as equal to or less than 7.0%. That means that the cutoff for the March 2009 audit was one tenth of a percent above where it was intended to be. The effect on the total number of patients in good control would be expected to be fairly small given the difference between 7.0 and 7.1 %.

With the March 2009 audit, CDOC reported that 48% of offenders had an A1C of 7.0 or less. This measure compares well with the performance of health care in the private sector and nationwide. The National Committee for Quality Assurance has created a data base called the Healthcare Effectiveness Data and Information Set (HEDIS)that allows commercial insurers, Medicare, and Medicaid to report their statistics regarding diabetes management. The HEDIS data set is used to measure performance on indicators of healthcare by  over 90% of American's Health plans, including commercial insurance carriers, Medicare, and Medicaid. The database is available to health care providers to allow them to gauge their performance. While CDOC reported that 48% of offenders had an A1C of 7.0% or less, Medicare reported that 45.9% of its patients had an A1C with good control, commercial insurance nation wide reported 41.8% had good control, and Medicaid reported only 30.2% had good control. CDOC is competitive with private national healthcare in control of blood sugars as estimated by the A1C.

Interestingly, CDOC has reported as high as 57% and 54% of diabetic offenders with good control. These figures are compatible with the numbers achieved by some providers at the Barbara Davis Center for Diabetes in Denver. To achieve statistics comparable to this group of nationally recognized experts is an achievement indeed. When those figures were reported, Ms. Edwards was critical of the care provided by CDOC. In that instance, Ms. Edwards said those numbers meant that hypoglycemia was rampant.  It is well established in the diabetic community, that increased glycemic control increases the risk and occurrence of hypoglycemia. Because of Ms. Edwards criticism in her previous report, the providers were cautioned to carefully balance glycemic control with the risk of hypoglycemia. Not surprisingly, the percentage of offenders with good control declined as the providers responded to that criticism. The change in statistics strongly suggests that the CDOC providers understand very well how to achieve glycemic control and are adept at manipulating glycemic control.

I appreciate Ms. Edwards insistence on treating to target A1C of under 7%, however, this is not always appropriate. There are many patients for whom tight control and A1C under 7% is not clinically prudent. Patients who might be in this group include those who have had severe or profound hypoglycemia, brittle or difficult to control diabetics

who react somewhat erratically to insulin doses, elderly, those who have advanced micro or macro vascular disease, and others.  CDOC has a number of patients in each of these categories and they represent a significant group in which it may be inappropriate to push the A1C below 7%.  In a number of these patients, it may be more appropriate to have a target A1C of 7.5% or even 8%.  This is not just my opinion.  It is the recommendation of the American Diabetes Association for glycemic control.

Other factors that must be considered when interpreting the results of the CDOC diabetic audit is that the audit includes every diabetic offender we have at the time the audit is conducted, regardless of how long we have had the offender under our care.  The overwhelming majority of diabetic offenders enter our system with A1Cs well above 7%.  It is unusual to receive a diabetic offender into our system with their diabetes in good control.  This would be supported by the national data bank previously described that shows that Medicaid reports only 30.2% of its patients have A1C under 7.0%.

## Hypoglycemia

All facilities that house diabetic offenders have implemented diabetic glucose test kits.  These test kits allow offenders to test after normal clinic hours when they think they may be having hypoglycemia.  Each kit contains appropriate testing supplies, glucose tablets, and snack crackers.  The snacks provided have been approved by the CDOC dietician as providing adequate protein and carbohydrate to prevent recurrent hypoglycemia.  Education has been provided to CDOC staff statewide on how to use the kits and when to give glucose tablets and/or snacks.  Instructions are included in each kit to facilitate appropriate use of the kits.  The test kits are located in different locations depending upon the needs of the facility.  Locations may include but are not limited to:  living units, control centers, recreation, work crew transport vans, and other locations where offenders may be working outside the perimeter fence of the facility.  During normal clinic hours, I prefer that offenders be evaluated in the clinic if they believe they are having hypoglycemia, and the offender has access to the clinic (i.e. offender is not outside the perimeter fence).  This facilitates real-time adjustment of medications and provider evaluation if necessary.

In addition, many diabetic offenders who are on insulin or who have had hypoglycemia are prescribed snacks anywhere from once to three times daily, depending on clinical need.  All diabetic offenders have adequate access to fingerstick sugar testing, glucose, and snacks as appropriate for their conditions.  In the March 2009 diabetic audit, 156 out of 824 diabetic offenders reported having the symptoms of hypoglycemia.  113 offenders had documented hypoglycemia as evidenced by fingerstick sugars.  The audit did not measure if both groups represent unique offenders or if there is overlap.  What is noteworthy is that with the reports of hypoglycemia, there have been no offender deaths due to hypoglycemia, nor have any offenders required evaluation in a hospital emergency room due to hypoglycemia.  This would suggest that the CDOC protocol for hypoglycemia is effective.

It has been long held wisdom within the medical community that the more intensely diabetes is controlled, the greater the incidence of hypoglycemia. Several large, well designed studies have looked at the incidence of hypoglycemia based on control. The Action to Control Cardiovascular Risk in Diabetes (ACCORD) study reported 16.2% of patients who were intensively controlled (A1C <6.0%) and 5.1% in patients who were in the standard control arm (A1C of 7.0 – 7.9%) experience hypoglycemia. The Veterans Affairs Diabetes Trial (VADT) reported hypoglycemia in 21.2% of patients who achieved A1C of 6.9% or lower.   These studies would suggest that the rates of hypoglycemia among diabetic offenders in CDOC are similar to those in the private sector.

## Blood Glucose Monitoring

Providers and clinic staff have been instructed repeatedly to  provide appropriate fingerstick sugars, even if an order is not on the medical chart.  Most providers order fingerstick sugars to correlate with the timing of insulin.  When an offender presents to the diabetic med line, a fingerstick sugar is to be performed and the results are recorded in the vital signs portion of the electronic medial record.  It is very easy to print a report of vital signs to see if and when an offender does or does not do fingersticks.  Offenders have the right to refuse fingerstick sugars, and many do so.  Refusing to do fingersticks makes it more difficult for the provider to appropriately adjust insulin or oral medication doses.  I have defined non-compliance with fingerstick monitoring as missing more than 50% of the ordered fingerstick sugars. By this definition, an offender is not labeled as non-compliant by missing an occasional fingerstick.   According to the March 2009 diabetic audit, 38% of offenders system wide have missed more than half of their ordered fingerstick sugars.  When there is a paucity of fingerstick sugars, yet the A1C is above target, it is difficult at best to decide which insulin dose or type requires adjustment.

CDOC has made appropriate changes to address offender complaints about waiting in line for insulin.  System wide, diabetic med lines have been instituted for general population diabetic offenders.  The diabetic med line is only for diabetic offenders (rare exceptions may be made for other conditions that would require special medication administration) and is for the purpose of performing fingerstick sugars and insulin administration.   This has streamlined the process of fingerstick sugars and administration of insulin to the extent possible within the confines of a secure setting.  Segregation offenders do not have med lines; fingerstick sugars and insulin administration is performed cell side.

In addition to the fingerstick testing offered at diabetic med line, diabetic test kits have been made available as previously described in the diabetes clinical standard.  Offenders who believe they are having hypoglycemia during normal clinic hours will be taken to clinical services for testing and treatment.

It would be unusual for an offender to be charged under the Code of Penal Discipline (COPD) for having a normal fingerstick on testing.  I am not aware of an offender who has been charged with this.  If an offender repeatedly tested outside of established med

lines, with all sugars being normal, it would raise the suspicion that secondary gain was involved and COPD charges might be considered if there was enough evidence to support a claim of abuse of clinical services.

I have no way to refute Ms. Edwards statement that offenders are told to kite if they think their sugar is low as it is virtually impossible for staff to document what they don't say. Having offender's kite for low sugars would be completely inconsistent with CDOC policy and staff training. CDOC staff are provided education on a routine and ongoing basis about the importance of prompt diagnosis of hypoglycemia. There is good documentation system wide that offenders are accessing diabetic test kits after hours as evidenced by the incident reports written by the officers when the test kits are used. I have spent a great deal of time in different clinics and it is not unusual to see an offender being evaluated in the clinic for hypoglycemia without benefit of an appointment. Again, I would point to the absence of offender death by hypoglycemia or hospital admission for hypoglycemia as evidence that the CDOC policy is having the desired outcome.

Ms. Edwards expresses concern that of the incident reports she reviewed, four of the sugars were close to normal and could reflect a rapid drop in blood glucose levels. What Ms. Edwards does not state is that the diabetic test kit protocol in effect at the time required all offenders to be given a snack regardless of what their blood sugar result. Even if the sugar were in fact trending downward, the offender would have received the necessary treatment to prevent decompensation. The protocol changed in July 2009 to a more sophisticated procedure that requires offenders who test with a normal or high sugar will be observed and testing repeated to insure that the sugar is not dropping precipitously.

## Nutrition

The food service menu is supervised by the CDOC dietician. The menu consists of a six week cycle of menus. The menus are created to meet the recommended daily allowances of protein, carbohydrate, fat, calcium, micronutrients, and calories. Most menus consist of a main entrée (with the option of a meat free alternative), vegetables, and fruit. When available, fresh fruit and vegetables are used. I have certainly walked through the yard many times to see offenders carrying an apple or an orange back to their cell. If an item has to be substituted due to lack of availability, the food manager has to submit a food substitution report to the dietician so that nutritional integrity is maintained. Given that balanced nutritional recommendations for all offenders drive the menus, it is apparent that the menus are much more than a simple food service issue.

There is a process in place to allow offenders to express concerns about the quality of food preparation. This involves contacting the food service manager and can involve the dietician.

## Education

Diabetic education is offered to all diabetic offenders annually.  This formal training program is conducted by a registered dietician, and recently by a certified diabetic educator.  This education is offered in a group setting.  During this training, the educator presents specific curricular information and also addresses questions from the offenders.  The curriculum has been reviewed by me for appropriateness prior to presentation.  Offenders do have the right to refuse this education and it should be noted that every year a number of offenders refuse.

In addition, CDOC has developed a series of posters and titler messages to serve as public service announcements for the offender population.  The posters all deal with diabetic issues.  A new poster/ titler message is posted every two weeks.   I have personally observed the posters in different facilities I have visited.

The diabetic audit reflects that CDOC providers serve as a significant source of diabetic education with 84% of all diabetic records showing evidence of provider education.  This type of education in particular tends to be ongoing and valuable in reinforcing the training from other sources.

The diabetic education that is presented to the offenders is relevant, clinically accurate, and ongoing.

## Complications

Hypertension is one of the most frequent conditions associated with diabetes.   In Type I diabetes, hypertension is thought to be caused by diabetic nephropathy that predates the hypertension.  In Type II diabetes, hypertension tends to be present before the diagnosis of diabetes or nephropathy and is more closely associated with obesity and other cardiovascular risk factors.  The target blood pressure recommended by the American Diabetes Association is systolic blood pressure less than 130 mm Hg and diastolic blood pressure less than 80 mm Hg.  Ms. Edwards dismisses the hypertension information provided by the diabetic audit as "unacceptable and of no value in monitoring quality".  I disagree with Ms. Edwards opinion.  Clinically, systolic hypertension is not the same as diastolic hypertension and the response to medical intervention will be different based on the type of hypertension treated.  It provides valuable clinical information to the clinicians to be able to see the difference between systolic and diastolic hypertension.  The overall purpose of the diabetic audit is not just to be a quality measurement tool that can be used for a self serving pat on the back.  The overall purpose of the diabetic audit should be to provide clinically relevant data to the clinicians that can help them pinpoint areas of care for improvement.  In response to discussion with providers, the decision was made to split the systolic and diastolic readings for the audit.

Hypertension in existence with diabetes can be difficult to treat and control is often elusive, even with the use of multi-drug regimens.  It is not unusual for control to require the use of three or more antihypertensive classes.  Factors that are overlooked by Ms.

Edwards include the lack of hypertensive control upon admission to CDOC, gender, race, and patient motivation.  All factors play a significant role in interpretation of the diabetic audit.  In addition, it is clinically appropriate to treat hypertension, even with the presence of diabetes, in a step wise fashion, to include starting with lifestyle modification and progressing to one medication, with additional medications added in a step wise fashion.  At any given time, a number of offenders may still have pressures out of the target range, but the provider may be taking very appropriate steps to treat the blood pressure.   It must be remembered what the audit does not measure.  *It does not measure provider response to abnormal data, it only measures if the response was successful.*

Lipids:  The CDOC clinical standard for diabetes control indicates that lipid profiles should be assessed annually.  It would be clinically appropriate to increase this interval to two years in diabetics who have at least two sequential normal lipid profiles without benefit of lipid lowering medication.  According to the March 2009 diabetic audit, 58% of diabetic offenders meet the target for LDL cholesterol.  This compares very favorably with the data available from the national databank with Anthem HMO reporting 53% at target.  All other entities were well below the performance of CDOC.

There are a number of factors that must be considered when evaluating lipid control.  Other medical conditions may limit the prescription of lipid lowering medications, with the most obvious example being hepatitis C.  Hepatitis C is one of the most common health issues for incarcerated individuals, with 25% of offenders testing positive to hepatitis C antibody on admission.  In the presence of hepatitis C, or any other liver disease, the ability to prescribe anti-cholesterol medications to desired therapeutic effect must be tempered by liver function.

Renal function:  The CDOC clinical standard dictates routine monitoring of kidney function.  The diabetic audit reflects that as a general rule, the providers are following the clinical standard.  Although Ms. Edwards expresses concern that the providers are not documenting the stage of chronic renal disease, I believe the more important point is that the providers clearly appear to be aware of the presence of nephropathy and appear to be taking appropriate action to minimize the progression of renal disease.

Retinopathy:  Ms. Edwards states that in many cases, retinopathy was not documented. I am not sure how she is interpreting the diabetic audit, but it is perhaps important to know how the eye exams are conducted.  All diabetic offenders in CDOC will be offered annual eye exams by a licensed optometrist.  If diabetic retinopathy is detected on this exam, the offender will be referred to ophthalmology for management of retinopathy.  The audit indicates there were approximately 40 offenders where the eye exam was conducted but the optometrist did not make a comment about retinopathy.  I would assume that if the optometrist did not diagnose retinopathy, or did not refer to the ophthalmologist, then retinopathy was not present.  I do place some level of trust in the integrity of the optometrists conducting the eye exams.

**Foot Care**

The CDOC clinical standard indicates that comprehensive foot exams will be done twice yearly for diabetic offenders.  The American Diabetes Association recommends a comprehensive foot exam annually.  CDOC exceeds the American Diabetes Association regarding this standard.  In addition, the CDOC clinical standard indicates that diabetic offenders who have neuropathy should have a visual exam of the feet done at every routine clinic visit to assess for skin integrity. That is why Ms. Edwards noted that in some visit notes only a visual inspection was documented.   This is in accord with the recommendations of the American Diabetes Association.

Ms. Edwards notes that the foot diagrams are used, but notes that sensation testing is "documented incompletely or if documented, no documentation of neuropathy, pulses or deformity".  The foot diagram is a fairly new tool to improve our diabetic care.  Training has been provided on the foot exam and how to document the foot exam using the foot diagram, but like any new tool, it still requires time and persistence to fully implement the tool to its maximum benefit.  According to the March 2009 audit, 71% of the offender had a comprehensive foot exam performed in the prior six months.

Ms. Edwards also notes that on one exam, neuropathy may be documented, but on subsequent exams, sensation may be reported as normal.  It is important to remember that the screening for neuropathy is entirely subjective.  This means the examiner relies entirely upon a response from the offender.  If at one exam the offender reports he did not feel any of the test, the examiner has to document such.  If on subsequent exams, the offender reports feeling the test, the examiner has to document this, even if it conflicts with prior tests.  The examiner can only document what the offender reports.  To do otherwise, would create a tidy, but false medical record.

Soft shoes, or tennis shoes, will be provided to diabetic offenders who have neuropathy and the presence of ulcers (or history of) or an anatomic deformity that precludes fitting with a state issue boot.  Not all offenders who wear tennis shoes have medically issued tennis shoes.  Not all medically issued tennis shoes were issued for diabetic neuropathy.  Orders for medical tennis shoes are fulfilled by providing canteen supplied tennis shoes to the offender at the expense of clinical services.  The offenders who are required to purchase their own tennis shoes are those who do not meet the clinical standard for a clinically supplied tennis shoe.  I review hundreds of charts on an annual basis, and I am not aware of problems with providers under-prescribing tennis shoes.  In fact, I have found the opposite to be true, that shoes are prescribed when the offender did not meet the clinical criteria.

Ms. Edwards notes that many charts document state boots in "disintegrating condition".  Maintenance of state boots are really not a clinical issue.  If the offender has boots that are wearing out, the offender should kite laundry for replacement.  I would also have to say that in my routine review of hundreds of charts, I have not seen documentation of

boots in "disintegrating condition". Boots do wear out, and there is a process through the laundry service for maintenance and replacement of state issue boots.

Amputations: Ms. Edwards remarks that severe neuropathy and peripheral vascular disease appear to be on the increase, and that charts were reviewed which documented the absence of neuropathy on admission, but progressing to severe neuropathy and foot infections. She then interprets this to mean a lack of monitoring and timely treatment.

The March 2009 diabetic audit shows that 28% of CDOC diabetics have neuropathy. Previous audits did not measure the prevalence of neuropathy, only the performance of foot exams so it is impossible to make a statement that neuropathy is on the rise in CDOC offenders. According to UpToDate, it is estimated that at least 50% of patients who have diabetes will eventually develop neuropathy. Neuropathy is thought to be the most prevalent complication of diabetes. Neuropathy is progressive and once present, glycemic control may slow the progression of neuropathy, but it will not reverse the neuropathy. The statistics would show that CDOC has a lower incidence of neuropathy than predicted. This may be because the CDOC performs well in the area of diabetic control. Our rate of amputations is low, with only 0.2% of diabetic offenders requiring amputation due to diabetes during the two year time frame of 2008 and 2009. Even though I find any amputation to be unacceptable, the data continues to suggest the CDOC providers are performing at an acceptable, even admirable level.

Regardless, once diagnosed, neuropathy tends to be progressive. A point that Ms. Edwards ignores is the fact the most diabetic offenders are poorly controlled at the time of admission to CDOC. Even if CDOC manages to get control of an offender's blood sugars, years of neglect prior to incarceration can not be undone by CDOC clinical staff. The damage has already been done. This is true of all of the complications of diabetes. In addition, Ms. Edwards completely ignores the fact that glycemic control and risk factor control can be pristine, yet the patient can still suffer multiple, progressive complications of diabetes. This indicates to me there is still much the professional community does not understand about diabetes.

There are many other factors that play a role in the development of complications. Research shows that African Americans and Hispanics in the private community have a much higher incidence of diabetic complications. What is not known is if this is due to lack of access to health care, socioeconomic status, prejudice in the application of health care standards, or actual genetic differences that would predispose to the development of complications. What matters about this research is that African Americans and Hispanics are disproportionately represented in the incarcerated population.

## **Quality Management**

Ms. Edwards comments on several quality incidents.

In particular, Ms. Edwards focused on an incident where an insulin vial was contaminated and then used to treat several other offenders. The initial offender had hepatitis C and he observed the vial being used to treat other offenders. Fortunately, the

offender reported the incident so that it could be investigated appropriately.  The incident was appropriately investigated through the quality management system.  All offenders who were exposed were informed of the exposure and all had appropriate follow-up and biohazard exposure testing.  To date, there have been no conversions to hepatitis C due to this exposure.  The investigation revealed this was not a systems error, but instead was a personnel issue and it was dealt with as such.  The documentation would support that CDOC took the incident very seriously and acted appropriately.

Ms. Edwards is critical of the use of lantus insulin in combination with metformin, without the use of short acting insulin to cover meals.  CDOC diabetics are overwhelmingly type II diabetics.  The American Diabetes Association has clearly recommended metformin as an initial therapy in virtually all type II diabetics.  This is because of the pathogenesis of type II diabetes as opposed to type I.  Part of the pathogenesis of type II diabetes is insulin resistance, and metformin works to improve insulin sensitivity.  If the use of metformin, along with lifestyle modification, exercise, and weight loss do not result in glycemic control after 3 months, it is appropriate to add ether a sulfonylurea or basal insulin, such as lantus, to the metformin.  A substantial number of diabetics will be controlled following these treatment recommendations.  Insulin therapy should only be intensified to include short acting meal time coverage if the prior steps fail to achieve glycemic control.  I have cut and pasted a copy of the treatment algorithm recommended by the American Diabetes Association, as published in UpToDate, Initial Management of Type II Diabetes Mellitus, algorithm 1, accessed June 7, 2010 at http://www.uptodate.com.  This is a paid service and is accessible only to subscribers.  CDOC pays for provider access to UpToDate.

Ms. Edwards also notes that she found only one offender who was on fast acting insulin.  As I typed this, I queried the pharmacy system for all of the prescriptions for regular insulin or humalog insulin.  There are currently 224 offenders who have at least one prescription for either regular or humalog insulin.  In the March 2009 diabetic audit, There were only 57 type I diabetics, and 767 type II diabetics.  There were 302 diabetics on insulin.  Given that currently 224 offenders have active prescriptions for regular or humalog, the majority of offenders have mealtime coverage.  Given that most of the diabetics in CDOC are type II, and given the recommendations of the American Diabetes Association, the numbers of prescriptions for regular or humalog insulin seems appropriate.

Sliding Scale Insulin:  Ms. Edwards is critical of the use of sliding scale insulin.  The CDOC clinical standard indicates that sliding scale insulin should only be used for acute adjustments only.  Although sliding scale insulin is not my personally preferred method to treat diabetes, it is still a valuable tool in the management of diabetes.  It can be used for new arrivals for whom information is lacking about usual insulin doses, acutely ill offenders (being treated for other health conditions), or in the presence of other temporary medications that may increase hyperglycemia.  Again, this stance is supported by the American Diabetes Association.   I have been working with the providers to decrease the use of sliding scale insulin and I believe my efforts have been worthwhile.  Denver Women's used to have a high number of offenders on sliding scale insulin.  After

intensive education by me, that facility now has only two offenders on sliding scale insulin. That is an acceptable number. Currently, there are 73 prescriptions in the entire system for sliding scale insulin. The majority were at either Denver Reception and Diagnostic Center or at Sterling Correctional Facility. Many facilities now have no or only one offender on sliding scale insulin. I believe there is evidence that the providers have made substantial changes in their prescriptive practice and have greatly changed their use of sliding scale insulin. I will continue my educational efforts in this regard. Even with my own personal preference, I still have to respect the professional practice style of the individual provider

## Continuous Quality Improvement

After much discussion, the decision was made to discard the December 2008 diabetic audit. This was because it was felt that the data reported for the audit was inaccurate and did not actually reflect the care being provided. When tabulating the data submitted for the diabetic audit, Mr. Hoffmann will randomly pull up an offender's medical record and compare the data reported by DOC number in the audit with what Mr. Hoffmann can find in the medical record. This is a check on inter-rater reliability, a very important aspect of any audit. With the December 2008 audit, Mr. Hoffmann felt that he found too many discrepancies between what was documented in the medical record and the data the facilities submitted during the diabetic audit. Mr. Hoffmann was not questioning the care documented in the medical record. He was questioning the accuracy of the data reported during the audit. Because of his concern, the data was discarded. Mr. Hoffmann began an educational campaign throughout all of the facilities on how to collect and report the data for the diabetic audit. The audit was then repeated in March 2009 after the educational campaign. Mr. Hoffmann felt that the data obtained for that audit did accurately reflect the care that was being provided in the clinics. This willingness to question our own data is a vital part of any quality improvement program. Mr. Hoffmann correctly identified a problem that was amenable to education about process and the result should be greater confidence that the diabetic audit reflects what is being done in the clinics.

Ms. Edwards believes that CDOC has under-reported diabetic offenders. In the March 2009 diabetic audit, clinical services reported 824 diabetic offenders. This is based on uniform, national diagnosis codes as entered into the electronic medical record. I don't know how to compare our numbers with numbers from a non-clinical data base such as maintained by the AIC. I don't know how accurately the AIC database adjusts for paroled or discharged offenders, or for offenders who were pending screening for diabetes who ultimately do not meet the diagnostic criteria for diabetes. The cases reported by the clinical services diabetic audit reflect confirmed diagnosis of diabetes, and does not include possible diabetes. If one assumed that at the time of the March 2009 audit, the total CDOC census was approximately 20,000 offenders, of which 824 had diabetes, that would equal 4.12% of the CDOC offender population with diabetes. Nationally, correctional statistics show that approximately 4% of the offender population has diabetes. This would indicate that CDOC is reflecting national correctional data and there is no reason to suspect the validity of the data submitted by clinical services

regarding total number of diabetic offenders.  Ms. Edwards states that our incidence is less than expected with an aging population.  I feel it is necessary to point out that the average age for the CDOC offender population is still 35 years.

Ms. Edwards indicates that offenders have had diabetes medications discontinued and told they no longer have diabetes.  In several instances this is correct.  When I investigated specific cases, I found that in most of those cases, the offender had been on an atypical anti-psychotic medication.  This class of medications can cause hyperglycemia and/or metabolic syndrome.  There is strong evidence that if the offending drug is stopped, the hyperglycemia resolves.  In all cases, the sugars did return to normal once the anti-psychotic medication was discontinued.    I would argue that those offenders do not have diabetes. In other instances, where offenders are not on diabetic medications, but report a history of diabetes, we have monitored fingerstick sugars and found that in a number of cases, the fingerstick sugars did not meet the diagnostic criteria for diabetes.  In some of those cases, the offenders were tested using a glucose tolerance test.  If that test returned as normal, then the offender truly did not meet the diagnostic criteria for diabetes.  The glucose tolerance test was not done to prove the offender did not have diabetes, but rather to correctly establish a diagnosis.   In other cases, the provider evaluating the offender found that the sugars or other diagnostic testing performed did not meet the diagnostic criteria (as established by the American Diabetes Association), but rather met the criteria for impaired fasting glucose or impaired glucose tolerance.  Although these conditions may be on the spectrum of glucose metabolic disorders, they are currently not viewed to be the same as diabetes and it is only appropriate to inform the offender of such and to proceed with correct treatment based on an accurate diagnosis.

Ms. Edwards states that CDOC is counting inmates based on documentation which has been shown to be flawed.  I find no evidence that the documentation of clinical services is flawed.  As stated earlier, you can not compare a clinical database that is based on confirmed diagnosis with a database that includes possible or suspected diagnosis.  They are simply not comparable.

Ms. Edward states that there are errors in the reports of number of offenders with diabetes and chronic care visits.  Examples for her are CSP and DCC.  Ms. Edwards states that CSP reports having 13 inmates with diabetes, this is correct based on the March 2009 diabetic audit.  She then states that 28 inmates at CSP have not had their diabetic chronic care visit.  The March 2009 audit reports the percentage of offenders who have had a chronic care appointment in the preceding six months.  For CSP, 85% of diabetic offenders had a chronic care appointment in the preceding six months.   Ms. Edwards states that DCC had 5 offenders with diabetes, this again is correct.   She then goes on to state that 21 patients have not had a chronic care visit.  This is not correct.  The March 2009 audit clearly shows that 100% of offenders at DCC had completed a chronic care visit in the prior six months.  I would refer the reader to page 8 of the March 2009 audit to confirm my numbers.  With the March 2009 audit I started a new process to pull out facility specific data to allow the providers to get more information that would be useful to them.  To accomplish this, I asked Mr. Hoffmann to tabulate data on a facility specific

page that I could then use in a facility specific meeting. These are the pages found at the back of the audit.  During these facility specific meeting, the providers as CSP and DCC pointed out that the figures for missed chronic care visits, as listed on these facility specific pages were incorrect.  Mr. Hoffmann and I noted the error.  The error was in Mr. Hoffmann's preparation of the facility specific pages that I used in training.  The error was not in the audit report itself.  It appears that Ms. Edwards is using these supplemental pages to determine the number of diabetic offenders, rather than the data from the audit.


Ms. Edwards is very critical of the performance of Sterling Correctional Facility with regard to performance on the diabetic audit.  I would agree that some of the Sterling data is concerning.  I also know that at the time of the audit, the Sterling facility was severely understaffed from a provider standpoint.  This would highlight that there is no substitute for provider driven health care.  Since the time of that audit, we have been able to hire one more full time provider for Sterling as well as contracting with a new contract physician.  That is the purpose of a quality management process such as the diabetic audit.  The system has to use that information to take a critical look at itself and see where changes need to be made, then make the changes, then check to see if the changes have been effective.  If not, the cycle starts over again.

Overall, I believe there is good data to show that system wide, CDOC is providing a standard of diabetic care that meets or exceeds that which is provided in the private community.  The CDOC clinical standard is based closely on the recommendations of the American Diabetes Association.  There is good evidence that the diabetic audit is being used as a tool for self evaluation and is providing valuable information that the system is utilizing to improve care.  The care of the diabetic patient is complex, and while guidelines exist that outline what the desirable targets should be, the reality of medical practice is that those targets oftentimes remain elusive.  This is true with the incarcerated population, but it is also true in the private world as well.  This has been amply documented by the American Diabetes Association.   At this time, there is no research to show what constitutes acceptable progress towards the targets and to the best of my knowledge, no professional associations have determined performance thresholds.  Given that, the best we, as a system can do is dare to compare ourselves to the performance of the private medical world and be willing to be self critical if we find ourselves lacking.  In the instance of diabetic care, we have compared ourselves to the private medical community and found that we are competitive.  We, as a system, have also determined that although our performance is good compared to the private community, we will not settle for a self-congratulatory pat on the back and become complacent.  Instead, we will continually strive to improve our care.  I far prefer to lead the pack than follow.

**Management type 2 diabetes**



Algorithm for the metabolic management of type 2 diabetes; Reinforce lifestyle interventions at every visit and check A1C every 3 months until A1C is <7 percent and then at least every 6 months. The interventions should be changed if A1C is ≥7 percent.

* Sulfonylureas other than glybenclamide (glyburide) or chlorpropamide.
• Insufficient clinical use to be confident regarding safety.

*Reproduced with permission from: Nathan, DM, Buse, JB, Davidson, MB, et al. Medical Management of Hyperglycemia in Type 2 Diabetes: A Consensus Algorithm for the Initiation and Adjustment of Therapy: A consensus statement of the American Diabetes Association and the European Association for the Study of Diabetes. Diabetes Care 2009; 32: 193-203. Copyright ©2009 American Diabetes.*

UpToDate.