# Report by Paula Franz MD for rebuttal of testimony in the Montez hearing October 5, 2010

## Ashby, Michael  #140164

*Issue*:  Offender claims he can't go to any minimum facility other than Sterling.

*Source*:  AIC testimony as presented by class counsel

*Summary*:  On intake (Feb. 12, 2008), this offender was identified as having insulin dependent diabetes.  The offender used insulin twice a day.  His M-code was made an M3, which was appropriate given the provider didn't yet know the results of the hemoglobin A1C.

The AIC made a note on 3-21-08 that until the stability of the diabetes was known, the offender needed to be housed at Sterling Correctional Facility instead of Arrowhead Correctional Facility.

The offender arrived at Sterling Correctional Facility on March 26, 2008 and was admitted into unit 1.  This is a lockdown unit and is used for most new intakes to the Sterling Correctional Facility.  Offenders remain in this unit for two to four days to allow custody staff to observe general behavior and custody issues.  Additionally, offenders may be moved to unit 1 on the day prior to a transfer to minimize escape risk.

 His initial hemoglobin A1C was 9.8. This lab result alone indicates the M-code should be an M4.   When this offender arrived at Sterling Correctional Facility, he subsequently was moved in and out of the facility on three different occasions for court appearances. The out to court times ranged from seven to ten days duration.   This would impact his chronic care at the facility because his appointments could end up being cancelled or delayed due to his absence. When he was at Sterling Correctional Facility for any length of time, he appears to have been housed in the northeast yard (minimum restricted).   The offender was in segregation for 20 days in November 2008 due to behavior and COPD issues.  When he came out of segregation, he went to unit 3 and then unit 2. At this point in time the offender was classified as close custody. He moved to the minimum restricted yard on December 9, 2009.  He re-classed to minimum status on December 9, 2009 and was subsequently moved to the minimum yard on December 17, 2009.  The offender remained in the minimum yard until he progressed to community corrections on March 4, 2010.  According to Paul Hollenbeck, the offender scored minimum restricted when he first went to Sterling, so that would explain why he was placed in the minimum restricted yard at Sterling.  That would also explain why he was not eligible to go to a minimum camp regardless of his M code or health status. According to Paul Hollenbeck, the offender's behavior changed his classification and placement, not his diabetes.

Review of the offender's medical record shows that the offender's diabetes remained out of control until just prior to release to community corrections.  All of the offender's hemoglobin A1C results were over 9 until the test done on January 11, 2010.
August 8, 2008  Hemoglobin A1C = 9.8 %
December 16, 2008 Hemoglobin A1C = 10.6%

1

April 1, 2009 Hemoglobin A1C = 10.8%
July 27, 2009 Hemoglobin A1C = 9.5%
January 11, 2010 Hemoglobin A1C = 8.8%
February 3, 2010 Hemoglobin A1C = 8.3%

If an offender has diabetes that is in poor control, the only minimum yard that can accommodate the offender in terms of access to clinical services is Sterling. Most minimum restricted facilities, to include Arrowhead and Buena Vista Minimum Center will accept diabetics that have good to fair control of diabetes as indicated by an A1C test result under 9%. Poorly controlled diabetics will occasionally be granted a waiver to be placed at Arrowhead and Delta Correctional Facilities if those facilities are necessary for programmatic needs of the offender. This is because of the clinical services and staff available at these facilities is less than many of the other facilities. Offenders who require insulin (or offenders on any med line only medication) can't go to Camp George or Skyline because there are no med lines. Insulin also does not go to the Rifle Correctional Facility because nursing staff is present only five days a week so there is no access to insulin on the two days that clinical staff is not present. Insulin is restricted to med-line only because it requires refrigeration with strict temperature controls and because it requires administration with a syringe and needle.

## Baxter, Willie  #68784

*Issue:* Bathroom breaks
Offender claims he does not get his medications

*Source:* Offender testimony

*Summary:* The policy for bathroom breaks was established by the director of prisons. Prior to that policy, I met with a provider at the Barbara Davis Center for Diabetes. I specifically asked her how long a person with diabetes should be able to go without having to urinate due to their diabetes. Her response was that a person should be able to go 1 ½ to 2 hours without a bathroom break. If someone with diabetes has to go more frequently, the person should be medically evaluated because that person may be dangerously high on their sugars and may be starting to have issues (severe hyperglycemia, diabetic ketoacidosis, etc). That became my recommendation to Joanie Shoemaker regarding bathroom policy and I believe that is the information that the Director used to determine the system wide policy on bathroom breaks.

My understanding of bathroom policies is that facilities that have controlled movement allow bathroom breaks every hour for programs. Visitation allows bathroom breaks every 1 ½ to 2 hours. Offenders with diabetes should be able to manage with this bathroom break policy according to the information that I was given by the provider at the Barbara Davis Center. The Barbara Davis Center for Diabetes is a nationally recognized program for treatment of diabetes.

Baxter testified that because of the incident in March 2009 that he no longer took diuretic medications yet Baxter picked up new cards of hydrochlorthiazide diuretic on April 11, 2010 and on May 25, 2010. Either he is taking the diuretic medication or he is misusing it and giving it to other offenders.

2

Regarding medications:  I pulled his Electronic Medication Administration Record, his kite log, and had pharmacy run a report of all prescription refills for this offender.  I then compiled this information into one report.  Because of the size, and because I had to do most of this by hand, I did not do all of his medications, just the ones that are diabetic related or hypertension related.  I assumed that what I found on these would be representative.

The data shows that his kite requests for refills/renewals were processed timely.  There are many times where the offender did not submit a kite for refill/renewal until after the prescription had expired.  His kite dated December 7, 2008 even stated that his meds are getting ready to expire and many already have.  There are several times where cards were available in the med-line and the offender simply did not pick them up.  There are also times where the offender refused his meds.

**Beeman, Jeffrey  #145339**

*Issue:*  Hearing disability

*Source:*  Email from med records technician indicates offender has history of otosclerosis and a middle ear implant.  She indicates that the intake screen stated the offender had no identified hearing disability which she has a difficulty believing.  The OAE result read refer bilaterally.  Dr. Fisher requested an audiology consult.

*Summary:*  The day 1 intake exam completed on March 17, 2009 by Sally Parkhill RN documents she was unable to find any evidence that the offender had a hearing disability.  He did not have hearing aids and did not have difficulty communicating.  On March 24, 2009, the offender completed a self reported medical history and marked "no" to deaf/signs/lip reads.  On May 14, 2009, as a part of the intake review when the offender arrived at BVCF, the provider requested the offender be evaluated in clinic.  The provider evaluated the offender in clinic and as a result ordered an audiogram.  It is interesting that at this appointment, the offender told the provider that he relied on lip reading.  This is inconsistent with the information the offender provided at intake. May 27, 2009 staff observations show no observed difficulties with hearing.  June 16, 2009 an audiogram was done.  Average hearing loss in the right ear was 25 dB, left ear was 66  dB.  The offender did not qualify for a hearing disability based upon the criteria established by mutual agreement between class counsel and the CDOC.  June 22, 2009, drug and alcohol notes document offender had good participation in group.  There is no indication the offender had difficulty communicating in group.  I also note that although this offender had surgery on his right ear in 1991, there is no evidence that he used a hearing aid on the outside prior to his incarceration.

**Bueno, Marty #50565**

*Issue:*  Providers not wanting to complete screening

*Source:* Email

*Summary:*  The initial electronic screening form had a question at the beginning of each section that read "does the offender have issues with vision", or "does the offender have mobility

issues".  The providers would ask the offender directly, and if the offender said "no", then that is what the provider entered in the box.  This defaulted the finding for disability to "no disability" for that particular issue.  This question was changed to "does the offender need to be screened for vision" etc so that the provider was compelled to go by what the offender wrote on the RFA and not by what the offender told the provider when the offender arrived for his appointment.

It is not unusual for the offender to complete a Request for Accommodation  and describe terrible issues with vision, hearing or mobility, but when they see the provider they will deny any of those issues.  It is not uncommon for the offender to completely deny even filling out the Request for Accommodation!

Traditional medical training teaches that the provider is to obtain their own patient history directly from the patient by questioning face to face.  It would be consistent with how we, as physicians and mid-level providers are trained, to see that an offender marked a disability on a paper form, and then ask the patient directly during the encounter what, if any, issues they had with that particular disability.  If the offender said "none", then the provider would indicate no issues with that disability and move on.  This was determined by the AIC to be inadequate, so the question on the form was changed and providers were instructed that once an offender had marked a disability on the request for accommodation form, the complete exam would have to be performed even if the offender then denied having those issues.

I have found the providers to be more than willing to do necessary Montez exams.  A complete mobility exam will require 2 to 2 ½ hours at a minimum for an uncomplicated patient.  This time requirement can easily extend to 3 to 4 hours if there are true limitations to function.  There have been many instances where offenders have requested to be re-screened as soon as an accommodation resolution was generated that did not find for disability or that did not give every accommodation the offender requested.  Because the exams require substantial time, the providers do have a legitimate interest in minimizing repeat mobility exams or exams where it is obvious the offender marked the incorrect disability on the request for accommodation form.  In spite of this concern, the providers have been instructed that the AIC has the final decision on who gets re-screened and if the AIC now requests a re-screen, the exam will be done.  If a provider tries to protest, my assistant will deal with it and compel the provider to do the exam.  If that doesn't get the exam done, then I step in and at that point there is no further argument.  It is now seldom that a provider makes an argument for not doing an exam.  Occasionally I see cases where I believe the exam should be postponed.  These typically involve an offender who has recently had surgery, hospitalization, or an acute injury.  In those rare instances, I don't believe a provider can accurately screen for permanent disability and then I recommend to the AIC that the exam be postponed for six to eight weeks to allow recovery from the acute situation.  In some cases the AIC will agree with me and in others the AIC does not agree.  Regardless, the decision of the AIC prevails.  Always.

**<u>Chacon, Michael #76129</u>**

*Issue*:  delay in getting a hearing aid

*Source*:  Testimony on June 15, 2010.  Class counsel in questioning Cathie Holst.

*Summary*:  Offender was originally screened for hearing and was found to be DNQ on August 16, 2007.  On June 19, 2008 offender submitted another RFA for hearing.  This screening was requested by the AIC on June 26, 2008.  On August 27, 2008, the audiologist at Denver Health recommended Ear Nose Throat (ENT) consult rather than fitting for hearing aids.  According to our agreement with Denver Health, Denver Health should have submitted the request for referral to ENT to Physician Health Partners, but did not.  On January 7, 2009 the facility emailed the AIC asking about a hearing aid for the offender.  The AIC asked the facility clinic to look into the hearing aid issue.  This led to contact with Denver Health to get Denver Health to enter the consult.  Denver Health did not get the consult entered until Feb 3, 2009.  His appointment with ENT occurred on February18, 2009. The ENT department cleared the offender for hearing aids on February 18, 2009.  I requested he be fitted for hearing aids on February 24, 2009.  ENT wanted a CT scan which they requested on March 5, 2009.  The CT occurred on March 16, 2009.  On April 9, 2009 the offender had an audiology appointment to have his impression taken.  His hearing aid was dispensed to him on May 5, 2009.

So, audiology would not fit for hearing aid until evaluated by ENT.  Denver Health audiology should have entered consult for ENT referral but did not.  Once this occurred on February 3, 2009, his care progressed appropriately and as directed by ENT/audiology.

This is one more example of why we arranged to use an audiology dept other than that of Denver Health.

## Conkleton, Keyasha #145349

*Issue:*  Hearing aid.

*Source:*  Email from Jamie Harrelson dated March 25, 2009.

*Summary:*

Regarding this offender's hearing aids:  Offender came into DOC on March 19, 2009.  She was identified as having a hearing disability on intake.  Offender has been deaf since infancy and relies on sign language for communication.  On March 25, 2009 the provider performing her intake physical exam noted the offender had a hearing aid at home but it was broken and the patient did not get it repaired.  Patient came to DOC without a hearing aid.  I did ask the provider to try to get the hearing aid from home and we would have it evaluated for repair or replacement.  On May 14, 2009 the provider documents the offender has been unable to contact a family member to get them to send in her hearing aid.  The provider requested an audiology consult with Denver Health.  On this consult, the provider documents that the offender stated the hearing aid allows her to hear loud noises.   This appointment was scheduled for June 29, 2009.  This appointment had to be cancelled because the transport van broke down.  The patient paroled on July 1, 2009.  The offender returned to CDOC on September 16, 2009.  Her intake physical was done on September 24, 2009 and the provider entered another consult for audiology at Denver Health. This appointment was scheduled for November 17, 2009.  The audiogram demonstrated the offender qualified for two hearing aids.  The audiologist took impression for the left ear.  The right ear is anacusic and would not benefit from a hearing aid.  The offender was transported to Denver Health on December 13, 2009 to get her hearing aid.  Her Accommodation Resolution

5

states she qualified for two hearing aids, which is true by the hearing criteria.  The audiologist has determined that the right ear would not benefit from a hearing aid.

## Corbin, Edwin #114258

*Issue:*  bathroom breaks

*Source:*  Class counsel testimony when questioning Cathie Holst

*Summary:*  This offender has known multiple sclerosis.  The offender claims this causes him to have to urinate more frequently.  The provider at Fort Lyon Correctional Facility has evaluated the offender multiple times for his complaint of urinary frequency.  The provider has documented researching the issue of multiple sclerosis and urinary incontinence and that some of the recommendations include bladder training and scheduled bathroom breaks where the patient has to resist the urge to urinate in order to retrain the bladder.  Medications are also recommended.  The patient claims the medications do not help and won't take any more.  When the provider discussed bladder training with him rather than allowing unlimited bathroom access (which is what the offender wanted) the offender became angry and walked out of the clinic.  It is noted he threw his walker across the hall so that it slammed into the wall next to the front desk.  With multiple sclerosis, the urinary incontinence can progress to the point that it is treated with either a catheter or by using disposable undergarments.  This offender has been offered urologic evaluation and possible placement of a suprapubic catheter, but the offender has refused that several times.  Offender is confined to a wheelchair most of the time (has minimal residual ambulatory ability with walker) because of his multiple sclerosis.  It is clinically appropriate to offer a suprapubic catheter or a condom catheter as this is the treatment that would be offered in the private medical community.  The provider ambulatory dated February 19, 2010 clearly states the offender has urinary incontinence.  The provider discussed with the offender the potential to use a condom catheter or a urology consult for other options and the offender agreed to a urology consult.    I believe the staff have appropriately evaluated the offender and offered clinically appropriate treatment and accommodation.  Bathroom breaks are not the correct course of action for this offender.

## Creeden, Neil  #127412

*Issue:*  I sent this evaluation back to the provider for more information to clarify if the offender really needed a wheelchair vs a walker.  The provider responded that this offender had probably been made disabled because of prolonged wheelchair use.

*Source:*  e-mail from Kathy Holt to Lisa Sanchez dated April 16, 2009.

*Summary:*  I think the e-mail is self explanatory.  The exam revealed that the offender had good muscle strength and range of motion and it did not make sense to me that the offender would need a wheelchair.  The offender refused to attempt any of the functional testing, but the provider documented the offender was ambulatory with a walker.  The provider responded back that the offender had been in a wheelchair since 2006 and probably would not be ambulatory without extensive therapy.  The provider documents the offender was given a wheelchair in 2006 because of complaint of back pain.  The providers are very hesitant to remove or deny any

durable medical equipment from offenders because of the lawsuit.  Offenders frequently request wheelchairs even when it is not appropriate, and it requires a very strong provider to say no.

## Derwin, John #68789

*Issue:*  Offender was changed to "no disability" with re-screen and durable medical equipment was removed. I think that is the issue.  The class counsel exhibit did not say.

*Source:*  Class counsel exhibit 588.

*Summary:*   Offender claims partial paralysis from chest down related to gun shot wound to level of T6 in 1992.  The offender was initially screened and found to have a mobility disability on November 17, 2006.  At various times the offender has indicated he needs a wheelchair, ankle braces, Canadian crutches, and a cane to name a few.  By January 2007, there was the appearance of some inconsistencies regarding this offenders observed ability and what he was claiming in his complaints to various people.  Offender began to demand many more things including a handicap accessible table.  A handicap accessible table is for offenders in wheelchairs as the seats have been removed to allow the wheelchair to be placed at the table.

This offender was re-screened in March 2009 using the new exam.  This exam demonstrated many inconsistencies in the exam that ultimately suggested the offender's physical exam did not reflect his actual ability.  He had equal stride length.  Muscle strength is documented as 2/5, 1/5, and 3/5 bilaterally in many places.  There is no muscle atrophy and the offender exhibited intermittent resistance and giveway.  The muscle strength as documented would not allow weight bearing, much less ambulation even with assistive devices.  The latter are strong indicators that the offender is not showing his actual ability and is manipulating the exam.  His activities of daily living observations also suggested that his ability was greater than he was showing.  He did not do most of the functional testing.  I discussed this offender with the AIC and we viewed video of the offender related to a fall the offender had filed a complaint on.  The video did not support the offender's claims regarding the fall.  The AIC and I mutually agreed this offender was not disabled.  The provider also documented that there were instances of the offender carrying his crutches while walking.  Since then, we were given a photo of the offender as he was getting ready to play baseball.  He is standing in the yard with other offenders, a baseball mitt is on his hand, and the offender has one leg flexed at the knee, the other is full weight bearing and the still shot looks like completely normal posture.  I have also viewed video of this offender walking with a walker.  His posture is normal; his gait shows equal stride length and weight bearing.  He moves easily, with no evidence of difficulty.  The walker is moved easily, the offender never transfers weight to the walker and in some of the clips, and the offender continues walking while the walker is picked up so that it does not touch the ground.  We were given notice that the special master dismissed the offender's claim.  I continue to believe that this offender is not disabled and has far greater function than he claims.

## Dole, Luis #109864

*Issue:*  PHP denied consult

*Summary:*  Offender was evaluated by optometrist Dr. Greenlee for follow-up on diabetic retinopathy.  The offender went to the CDOC provider and indicated he was not satisfied

with Dr. Greenlee's care and requested to see another specialist for a second opinion. The provider entered this consult clearly as a second opinion at offender request. CDOC policy does not allow this. If an offender wants a second opinion, per AR 700-21 the offender is financially responsible for any second opinions or outside health care. CDOC's policy for diabetic eye exams is to have the contract optometrist perform the annual exams. If the optometrist believes the offender requires further treatment by an ophthalmologist, then they recommend a consult and the consult will be entered. In this case, Dr. Greenlee did not believe that further treatment was needed at the time. Physcian Health Partners was correct to deny this consult.

**Fistell, Allen #63253**

    *Issue:* removal of durable medical equipment and need for special shoes.

    *Source:* Offender testimony

    *Summary:* Offender has a history of chronic back pain. He has had extensive medical therapy as the offender allows but offender has refused physical therapy. He has also refused a functional capacity exam (there is no evidence the offender was transported to the wrong office) and he has refused repeat electromyograms to provide diagnostic information although initial electromyogram from 1996 was normal. He has also refused physical therapy as ordered by his provider. The offender had all of his durable medical equipment upon arrival to Fort Lyon Correctional Facility.

    The offender was initially found to have a mobility disability (the provider said mobility impairment but not disability) based on his evaluation done in November 2008. The medical record shows that the provider was beginning to question if the offender was malingering in October 2008. The offender complained of pain after routine physical exams, and requested narcotics frequently. On October 10, 2008 he complained of pain that ran straight down the back of his legs to his heel. This is not a physiologic pain pattern and is a major indicator of malingering. The provider documented that even though the offender appeared to be walking more slowly than usual, he got up on the exam table quickly. He had intact muscle strength but exhibited giveway. The Fremont provider also notes that the offender requested to be made medically unassigned but the provider felt that the offender was capable of working.

    On January 5, 2009, the Fort Lyon Correctional Facility provider did an intake chart review and noted a lot of property without having restrictions entered in the computer. She documented that she would need to do an extensive chart review to try to find out the need for these multiple items.

    He was re-screened in March 2009 and based on that evaluation and video, the offender was determined to not be disabled. Dr. Wermers did an extensive two day chart review and performed exams on the offender. There are many inconsistencies throughout the offender's record and exams. The offender continues to complain of back pain and that he at times is unable to walk, yet CT myelogram of the thoracic and lumbar spine in April 2009 show no evidence of thecal encroachment and no nerve impingement. His physical exam did not support the need for a special mattress, heating pad, special shoes, or a back brace. A special mattress is required if a patient is bed bound or has profoundly limited mobility such as quadriplegia. A

heating pad can actually be dangerous by causing muscle injury and should never be used for any long term process. The offender does not have any type of foot deformity therefore he does not qualify for special shoes. It is noted in his medical record that he wanted special shoes because of heel pain. A back brace is not indicated and I do not find a recommendation for it in any of the recent neurosurgical consults. Use of a back brace would be of minimal benefit in terms of relieving pain. It may actually cause muscle weakening and thereby lead to greater pain. After his extensive evaluation, the offender had multiple pieces of medical equipment removed because they were not felt to be medically indicated. The offender's physical exam showed adequate range of motion. Muscle strength was documented as 2/5 in some areas and this is not consistent with the offender's ability to ambulate. Dr. Wermers also documented that the offender was able to bend over and pick his cane up off the floor without any difficulty. He also documented that when the offender walked with his cane the cane tip did not touch the floor. Dr. Wermers documented that the offender's gait distinctly changed when he knew he was being observed as opposed to when he did not know.

On September 17, 2009 the AIC documents that the video confirms my impression and agreed that the offender is not mobility disabled. I continue to believe that this offender is seeking secondary gain.

The offender claimed that he did not refuse the functional capacity exam, but that he was taken to the wrong place. This is not true. On March 11, 2009 the provider documents the offender told him the CT myelogram was done in the wrong place (the hospital performed a cervical CT myelogram but should have done a lumbar CT myelogram). The offender signed a refusal for the functional capacity exam on December 19, 2006. The reason for the refusal was that the offender stated "I don't believe I need to be tested. The x-rays, MRI is there and nothing has changed."

During his testimony, Offender Fistell indicated that he would have periods where his back pain was so bad that he couldn't make it to chow for a week at a time. I checked his employment records and his work supervisor indicates the offender never had attendance concerns for his work. He had one three day lay in. Otherwise there were no absences other than for religious services. I also checked his missed meal report which goes back to 2005. It is readily apparent looking at the missed meal report that Offender Fistell rarely goes to breakfast. It is also apparent that Offender Fistell rarely if ever eats more than two meals a day in chow, but appears that he gets snacks three times a day. On the days that he did go to chow for breakfast, he missed one of the meals later in the day. There are only nine days between June 2010 and January 1, 2009 where it shows he went to chow for all three meals. I found four times on the entire report where he missed all three meals. Three of those times were Saturdays so I don't know if that has anything to do with religious practice. On the rare days that he missed two meals, it appears that he picked up two or more of his snacks for those days.

**Fortino, Joseph #133014**

*Issue:* hearing aids, 6 month delay in getting hearing aids

*Source:* Testimony-class counsel questioning of Cathie Holst

*Summary:* Offender had a mastoidectomy of the left ear on August 11, 2008. This offender was followed by ENT appropriately for post-op follow-up. He had an audiogram on September 25, 2008 to follow up on hearing post-operatively. This audiogram showed that his hearing was improved. The offender was not cleared by ENT for a hearing aid until January, 2009. At that point, Denver Health should have requested referral to the audiologist but did not. March 30, 2009, the office of the AIC inquires of facility if offender has hearing aids. It was discovered that he did not. The CDOC provider then entered a consult for hearing aids on April 2, 2009. This appointment was scheduled for April 24, 2009. The offender was not scheduled back to pick up hearing aids until July 22, 2009. Again, Denver Health should have requested the follow-up appointment for the hearing aid fitting but did not do so. Our provider detected that the offender had not been issued his hearing aids and requested the follow-up on July 2, 2009.

This again highlights the issues we have had with Denver Health audiology department. As noted previously, we are attempting to completely minimize our utilization of Denver Health audiology limiting our utilization to emergencies only. We now have Dr. Martino going to Denver to conduct a clinic at the Denver complex. Because she only goes there once a month, I expect there will be some delays by virtue of having only one clinic a month in Denver, but overall service will be improved as we should not have issues with offenders being dropped by the specialist.

### Garcia, Steve  #111141

*Issue*: M-code changes, difficulty getting medications (offender stated that 80% of the time his meds are not on time), not able to go to a minimum camp because of diabetes.

*Source*: Offender testimony

*Summary*: 1. Medications: I merged 3 databases to look at how long it took from the time offender kited for a refill until the med was filled and he picked up the medication. The medications I looked at were aspirin, lisinopril, and simvastatin for the time frame of January 2008 to May 2010.

Documented kite requests for refills:   Aspirin – 22 kites. 16 were filled by the pharmacy on the day of the kite. 4 were filled 1 day later, 1 was filled 2 days later, 1 was filled 6 days later (this one required a new prescription). I believe this occurred over a holiday weekend.

Lisinopril – 20 kites. 11 filled by the pharmacy on the day of the kite, 4 filled 1 day later, 3 filled 2 days later, 1 filled 5 days later, 1 filled 11 days later.

Simvastatin- 18 kites. 13 were filled by the pharmacy on the same day as the kite, 3 filled 1 day later, 1 filled 5 days later, 1 filled 12 days later.

Total: 60 definite kited refills. 40 (67%) were filled by the pharmacy on the same day of the request. 11 filled 1 day later. 4 filled 2 days later. 2 filled 5 days later. 1 filled 6 days later, 1 filled 11 days later, 1 filled 12 days later. (92%) were filled within 2 days. The offender's statement that 80% of the time his medications are not on time is simply not true. We experienced several shortages of simvastatin due to manufacturing outages. Several of the

cholesterol lowering medications have had similar situations.   During the last two years there have been a number of medications that have been unavailable or available only in limited quantity due to manufacturing issues.  Initially these present as difficulty in getting the medication from the distributor and then the medication will simply be unavailable.  Although there are other similar medications available, the outage of the one drug will cause increased demand on the remaining medications in that class throughout the nation and can result in a relative shortage of other medications.  When outages or shortages of medications occur, we make every effort to find alternative medications from any source possible.  In spite of these efforts there may still be occasions where there are delays in medications that are in short supply on a national scale.  The drug outages appear to have resolved and we have not had problems with this for several months.

The offender also testified that he didn't have a med card while he was in segregation.  That is true.  Offenders are typically not allowed to keep self med cards while in segregation.  They will receive medications through a cell side medication pass.  Offender stated that he was in segregation for twenty days and then went to unit 1.  The offender stated that when he moved out of segregation he did not get his cards.   The Electronic Medications Administration Record clearly shows that he received his self med cards on April 8, 2010 which is the date he moved from segregation to unit 1.

  M-codes:  the m-codes are driven by the clinical standard for M-codes.  The guideline isn't all inclusive and can't be.  It is intended to give guidance to the provider to help establish the correct M-code by giving examples of conditions that would be assigned a certain M-code.  This offender stated during testimony that his M-code was changed to fit the custody rating at Fort Lyon Correctional Facility.  This is an incorrect statement.  M-codes have nothing to do with custody rating.  Fort Lyon Correctional Facility takes all M-codes (M1 – M5).  Almost all facilities take M1 – M3 except Camp George, Skyline, and Rifle.  These three facilities do not have the same clinical capability as the remainder of the facilities.  M codes are assigned to indicate the approximate level of clinical services the offender requires, i.e. med lines, specialty consults, and other clinical services.  The M-code is completely independent of the custody rating.  This offender also stated "Most people who aren't diabetic can go to the camps".  This is untrue.  Any offender who is M4 or greater will be prohibited from the camps (Skyline, Camp George, and Rifle).  Most M3 patients will not be allowed to go to camps (Camp George, Skyline, Rifle) because of the clinical capability of those three facilities. This includes offenders with heart disease, lung disease, cancer, inflammatory bowel disease, autoimmune disease, seizure disorder, or who are on hepatitis C treatment. Any patient on psychotropic meds can't go to a camp because all psychotropic medications are med line only for patient safety reasons. Camp George and Skyline do not have med lines.  Rifle has nursing staff present only five days out of the week and med lines are not available at Rifle on weekends.  In addition, Camp George, Skyline, and Rifle have limited staffing with provider staff.  Patients whose medical condition requires closer monitoring are not housed at these three facilities.

Changes to this offender's M-code:  This offender was an M3, appropriately based on hemoglobin A1C at the time of his first move to Arrowhead Correctional Complex.  The Arrowhead Correctional Complex provider changed his M-code to M4 after

approximately two weeks.  The offender came on insulin three times daily.  The provider attempted to change the insulin to twice daily as at the time that facility did not have the capacity for insulin three times daily. This  would require a third medication line which significantly changes the staffing of a clinic.  This change in insulin did not work for this offender, so the provider changed his M code to M4.  The M code is meant to show the intensity of clinical services required.  It is difficult to argue with the change to M4 due to the requirement of a medication that requires med line administration three times a day. The offender is currently an M3. This is a case where an argument could be made that either M4 or M3 is the correct code.

Here are my concerns on this offender's diabetes control.  This is a scary patient.  It is documented in the chart at least 2 times that this offender admits he manipulates his fingerstick sugars or does not tell the nurse what his actual sugar reading is (see encounters dated August 29, 2008 and November 26, 2007)  This offender places orange juice on his finger to make his sugar test read higher.  This offender had some history of hypoglycemia while at Fort Lyon Correctional Faciltiy, but once he got to Arrowhead Correctional Complex, this offender began a pattern of behavior of massive exercise resulting in profound hypoglycemia, to the point of unresponsiveness.  When the providers decreased the dose of  insulin, the offender would skip meals, sometimes for 24 hours, in an attempt to keep his sugars lower.  On one day, the offender had an insulin reaction at 1:30 PM, was treated successfully and advised to return to his cell and rest for the remainder of the day.  Instead, the offender immediately pursued another aggressive physical workout and had a subsequent hypoglycemic episode at 18:30 on the same day. This behavior continued time after time.  It was clearly inappropriate to keep this offender at Arrowhead Correctional Complex with the lower level of clinical staffing therefore his move to Sterling seems appropriate.  There is very good documentation in the medical record that the clinical providers were trying to work with the offender and provide education about his sugars, insulin, and exercise.  There is no indication the offender ever heeded any of the clinical advise.  Even with his move to Sterling, this offender continues to have many low blood sugars but refuses treatment.  He has a history at Arkansas Valley Correctional Facility of refusing treatment for symptomatic low sugars unless he is given insulin before the glucose tabs.  =

## Goetz, Justin #114949

*Issue*:  Allegedly denied job at Sterling Correctional Facility because he is insulin dependent diabetic

Unable to move to the level 1 yard at Sterling Correctional Facility because of his M-code

*Source*:  Offender testimony

*Summary*:  This offender's M-code would not keep him from moving to the level I yard at Sterling.  Sterling was my facility and I specifically worked the east clinic.  My clinic served both the level I and the level II yards.  There was no difference in M-codes between the two

yards.  I took all offenders who were M-1 through M-4.  I took two M-5 (the highest rating) with a waiver and those two offenders were on the level I yard.

**Gonzales, Phillip #43794**

    *Issue*:  Denied hearing aid

    *Source:*  email

    *Summary*:  This offender had an audiogram on February 2, 2009 that demonstrated the offender would qualify for 2 hearing aids.  The request for hearing aids was denied because the offender had short time to mandatory release date.  Mandatory release date was May 2009 and he paroled on April 3, 2009.

    It is CDOC policy to deny most consults when the offender is close to mandatory release date unless the services being requested are essential to prevent poor medical outcome.  For example, if the offender has clinical evidence that he needs to be evaluated for unstable heart disease or cancer, we will proceed regardless of mandatory release date.  If a consult is for durable medical equipment and the offender is close to release date, approval or denial will depend on what the medical equipment is.  If the request is for a wheelchair because the offender is non-ambulatory, then of course the wheelchair would be approved.  If it is for prosthesis, it is unlikely to be approved because the prosthesis couldn't even be completed prior to discharge.  We have actually had situations where hearing aids were made and the offender discharged or paroled prior to the final fitting and the hearing aids couldn't be given to the offender (either couldn't find the offender, the offender couldn't get to the audiologist, or the audiologist didn't want to see the offender once he was discharged.)

**Hager, David  #121517**

    *Issue:* M code change based on accommodation resolution and not on medical condition.

    *Source*:  email from Marshall Griffith to me dated October 1, 2008

    *Summary*:  My review of the medical record shows that on April 11, 2008, Dr. McLaughlin changed the offender's M code from M3 to M2 at the request of the offender.  Dr. McLaughlin stated that the offender had good control of diabetes.  This is incorrect.  The hemoglobin A1C was 8.3%. This certainly doesn't constitute good diabetes control.  The correct M code was M3.  M codes should never be changed based solely on offender request.  On September 27, 2008, Dr. Fisher correctly documents in the medical record that this offender is not an M2.  The offender is on oral medication for diabetes and the clinical standard for M-codes clearly indicates that an offender with diabetes will be an M2 only if they are diet controlled.  Dr. Fisher changed the offender's M code to M3.   Any change in this offender's M-code was made entirely due to his clinical condition and not related to his accommodation resolution.

    I did ask the AIC to let met know when they became aware of claims that offender moves were due to M code changes so that I could investigate and make sure that from a clinical standpoint, the correct M code was assigned.

**Hamilton, Robert # 118006**

*Issue*:  Delay in repairing prosthetic leg

*Source*:  Testimony.  Class counsel questioning of Cathie Holst.  Exhibit 176

*Summary*:  Offender had intake physical at Denver Reception and Diagnostic Center on July 22, 2008.  The provider noted the offender had his prosthesis and appeared to be knowledgeable regarding his prosthesis.  On July 25, 2008, there is a clinical encounter that specifically indicated the offender was questioned if there were any unmet needs that clinical needed to address.  The offender indicated he had no needs.  The offender is moved to Fort Lyon Correctional Facility on July 31, 2008.  On August 12, 2008, the clinical record shows the offender came to the clinic to inform staff his prosthesis was broken.  The nurse documents that the strap and hook is broken.  The nurse issues a temporary wheelchair until Canadian canes are available or the prosthesis is repaired.  August 13, 2008, the provider entered a consult to get the prosthesis repaired.  This consult with Abilities Unlimited was approved by Physcian Health Partners on August 14, 2008.  The appointment was scheduled for September 4, 2008.  The provider confirms that the offender was evaluated by Abilities Unlimited on September 4, 2008.  Abilities Unlimited recommended and ordered new body stump socks but they were not yet available on September 23, 2008. Abilities Unlimited indicated they would be mailed to the facility as soon as they were available.  On October 15, 2008 the provider contacted Abilities Unlimited again to ask about the stump socks.  Abilities Unlimited indicated the socks had to be custom made and they had not yet received them from the maker but were expecting them soon.  On March 19, 2009, the provider documents the offender is in clinic indicating his prosthesis is not fitting correctly.  Offender has gained weight.  The provider placed a consult for Abilities Unlimted the same day and it was approved by Physican Health Partners on March 23, 2009.  The appointment was scheduled for April 2, 2009.   Abilities Unlimited evaluated the prosthesis on April 2 and requested repairs.  We (CDOC and Physican Health Partners) had been having increasing concerns about the service and quality that we were receiving from Abilities Unlimited.  In addition, Physicians Health Partners felt that the prices being submitted by Abilities Unlimited were escalating at an unjustifiable rate.  I discussed the issue with Physicians Health Partners and asked that invoices from Abilities Unlimited that were over $5,000 be sent for a second bid.  Because of that, this offender was scheduled with Hanger Prosthetics to have his prosthesis evaluated on April 30, 2009. During that evaluation, Hanger noted several issues with the prosthesis.  The only part that was broken was a strap on the suspension.  The concerning part was that Hanger felt the  fit was not appropriate and did not engage the offender's iliac crest therefore the prosthesis would always have unacceptable slippage.   On May 5, 2009 the offender notifies clinical staff he needs new stump socks.  The provider requested a consult for new stump socks on that day and Physicians Health Partners approved acquisition of new stump socks through Hanger on May 11, 2009.   On May 12, 2009, Physicians Health Partners approved the fitting and manufacture of a new prosthesis for the offender through Hanger.   Hanger saw the patient and began the right hip socket process on July 31, 2009.  They saw him again on September 11, 2009 for testing of the socket and his new socket was delivered to him on September 25, 2009.

At this time it appears that he initially had a repair done in 2008.  This appears to have been done in a timely fashion.  In April 2009 the offender sent a kite indicating he needed to have his

14

prosthesis refit.  This process was started in a timely fashion.  Because of concerns that we had with Abilities Unlimited, we requested a second opinion on the prosthesis.  This did create some delay in delivering a new prosthesis to the offender.  I attempted to get copies of Abilities Unlimited notes from 2008 however they would not release the records to CDOC so I can't see what Abilities did to the prosthesis in 2008.  I know that Abilities Unlimited did not request further repairs from Physicians Health Partners.

Prior to moving from Abilities Unlimited to Hanger, I and Physicians Health Partners met with Abilities Unlimited at least three times to discuss quality and pricing.  We made some changes to our system to try to assist Abilities Unlimited.  When we discussed timeliness with Abilities, we were able to get Abilities to see some patients in their office; as well they agreed to set up a clinic at Colorado Territorial Correctional Facility.  There continued to be issues with timeliness in terms of getting the actual work done and the item delivered to the offender.   We did inform them that we were going to start getting second opinions and that if we found a substantial difference in price we were going to start utilizing a different prosthetist.  That ended up being the case.  It did take a little time to get Hanger trained on the correct authorization process.  I believe that we now have better service for our offenders, both in terms of quality and timeliness.

### Hardway, Carl #112285

*Issue:*  Hearing aid, either repair or replacement of

*Source:*  During testimony of Cathie Holst on questioning by class counsel

*Summary:*  According to the AIC worksheet, the Health Services Administrator for the facility, Colorado Territorial Correctional Facility, emailed the AIC to notify them that as of January 22, 2009 the offender's hearing aid was not working.  The provider entered a consult for the hearing aid repair on February 5, 2009.  The appointment occurred on March 9, 2009.  The notes from the audiologist state "There are three problems.  First, the battery is in upside down.  Second the battery is dead.  Third the earmold is plugged with wax/debris of some kind. After cleaning and battery replacement, the hearing aid is working well.  Mr. Hardway is given a box with storage space and cleaning tools."  The move sheet confirms that Mr. Hardway traveled to Pueblo on March 9, 2009 so he received his hearing aid the day the audiologist cleaned it.   I believe the time from clinical being made aware until the aid was evaluated and returned to the offender is well within the 60 days required by the 2008 stipulation.  I would like to point out also that there is reason to suspect what this offender is doing with his medical equipment.  The AIC worksheet shows on January 21, 2009 that the vibrating watch appears to have been tampered with, with the motor being removed.  I find it interesting that the audiologist noted the earmold was plugged with wax/*debris of some kind.*

### Hassler, Craig #84141

*Issue:*  doesn't get meds.  Didn't get meds while in general population and while in general population at Denver Reception and Diagnostic Center.

*Source:*  Offender testimony.  Class counsel comments during testimony of other witnesses.

*Summary:* I pulled his Electronic Medications Administration Record and combined it with his kite log and the pharmacy database that shows when prescriptions are filled. The pharmacy fills the overwhelming majority of prescriptions on the same day the refills are requested. If the order is received prior to 11 AM, the prescription will be packaged and shipped to the facility the same day of the order. Orders are shipped via FedEx overnight delivery. If the order is received after 11 AM, the order will be shipped the next business day. The pharmacy is not open on weekends or on holidays, so orders placed on a weekend or holiday may have a gap of three days prior to filling. When I researched this offender's medications, I found only one prescription that went over three days from the time of the offender kite to pharmacy filling the prescription and this was a medication that required a new prescription by the provider. This particular refill took six days from kite to fill and was in 2008. There were a few instances where the nursing staff noted that the offender submitted his kite for a refill too early so the nurses had to hold the refill and then enter it when it was within the ten day window. When the offender was transferred emergently from Limon Correctional Facility to the hospital, his self med cards should have been packaged in with his property. That means his cards should have been available to him when he went back to Limon Correctional Facility. The offender testified that he did not get his diabetic and anti-hypertensive medications when he went to general population at Denver Reception and Diagnostic Center. The offender's Electronic Medications Administration Record shows this is not the case. There does not appear to be any disruption in his medications. The Denver Reception and Diagnostic Center complex has most of our formulary medications in stock since it is a facility that is med line only for all medications. If an offender is on a non-formulary medication, the card will have to move with the offender or the Denver Reception and Diagnostic Center provider will have to enter a new request for a non-formulary medication and that will have to be approved and then shipped to the complex. This offender's medications continued from the Denver Reception and Diagnostic Center infirmary to general population because Denver Reception and Diagnostic Center is all med line only. No self med cards are allowed at this particular facility. I did find seven days of rosuvastatin where the drug was not available when the offender moved to Denver Reception and Diagnostic Center infirmary from the hospital. This medication is a non-formulary medication and requires a special authorization and process to procure. That is because we have zocor and lipitor on our formulary for treating cholesterol. I also found the same situation in early April 2009. I assume this is because a new prescription had to be written so it had to be re-approved. I have streamlined the non-formulary process for chronic ongoing medications so that the pharmacy can approve these in a timely fashion. This medication would also not be considered an essential medication and missing this medication for six days would have absolutely no impact on clinical outcome. Cholesterol lowering medications requires weeks if not months to have a therapeutic effect to lower cholesterol. Missing this medication for six days simply does not have the same clinical impact as would be seen with hypertensive medications or diabetic medications. The offender also testified that he did not get his medications at Denver Reception and Diagnostic Center when he went back from Limon. Again, the Electronic Medications Administration Record shows this is not true.

This offender testified that he had a bleed in his brain in September 2009. It is correct that this offender had a pontine hemorrhage in September 2009. The offender testified that he first had symptoms starting at approximately 10:30 in the evening. That is the first time I have heard anything of the offender having symptoms at 10:30 in the evening. Everything that I have seen documented is that offender first had symptoms starting around 1:30 in the morning. The

documentation I reviewed showed that staff responded promptly and the offender was promptly transported via ambulance to the hospital.  The offender has had an exceptional recovery.  I found no evidence that the offenders medical care contributed to his hemorrhage.  The offender's hemoglobin A1C was 6.1 in June prior to his stroke and he had been well controlled for some time.  His blood pressure was controlled at 129/71.  Other blood pressure readings were even better.   The offender was on both aspirin and Plavix at the recommendation of the cardiovascular specialist following a hospital admission for coronary artery disease (history of Coronary Artery Bypass Graft and mitral valve replacement per patient).  His medical care appeared to be good.  Linda Edwards testified that controlling sugars would remove the risk for complications of diabetes.  This offender's case shows that statement is not true.

## Harms, Amber # 130207

*Issue:* Hearing aid, hearing evaluation. Maybe delay in getting accommodation resolution to patient.

*Source:*   Testimony of Cathie Holst under questioning by class counsel.

*Summary:*   This offender came into CDOC for the second time on February 23, 2009.  The intake nurse did not appreciate hearing difficulty.  I note that there is no evidence that the offender reported hearing difficulty during her prior incarceration.  The offender's diagnostic narrative summary that was completed in March 2006 specifically notes the offender denies any history of medical problems or surgery.  There is absolutely no mention made of hearing problems on the diagnostic summary from 2006.  During intake for the second incarceration in 2009, the provider documents the offender has been deaf since childhood and has had multiple surgeries.  The provider documents that the offender reported using hearing aids at one time on the outside but has not had for some time due to lack of insurance.  On April 1, 2009, the offender saw both audiology and ENT.  ENT cleared the offender for amplification.  The offender received her hearing aids on April 28, 2009.  She received temporary accommodations by the provider of American Sign Language classes, close-captioning, seating in front of the class, and a vibrating watch.

I completed my portion of the offender's disability evaluation on May 8, 2009 even though I did not have a copy of the audiogram that demonstrated the offender's hearing threshold.  I am responsible for some delay in the evaluation due to the massive number of evaluations I was having to review from the time of March 2009 until December 2009 during the re-screen process.  I would note that at the time that I completed the evaluation, the Accommodation Resolution was not due until May 16, 2009.

## Herrera, Rocendo #120930

*Issue:*  handicap cell, screening

*Source:*  email from Julie Russell to me dated April 20, 2009

*Summary:*  The email notes that the offender is claiming he can't go to class and that offender has a mobility disability.  The email also notes that Cathy at Sterling Correctional Facility clinic instructed the offender was to have a handicap cell.  On investigation, at the time

of the email the offender indeed had previously been found to have a mobility disability. Cathy instructed the offender was to have a handicap cell because of the Accommodation Resolution that was in effect at the time for this offender. At the time of the email, this offender was in the process of being re-screened. I felt there was conflicting information on the evaluation so I pended it for video. I was able to view the video and felt that it demonstrated the offender was not mobility disabled and that there did not appear to be justification to the offender's claim that he could not attend class. The offender had a new Accommodation Resolution on June 17, 2009 which showed no accommodations.

**Hinojos, Fermin # 93300**

   *Issue:*  Information not getting entered into the electronic screening system.

   *Source*:  Email from Lisa Sanchez to Joseph Wermers dated April 20, 2009.

   *Summary:*  Dr. Wermers screened this offender on February 10, 2009 but did not get the information entered into the electronic system. Although Dr. Wermers forgot to enter the electronic information, he did proceed correctly in referring to audiology. This was discovered by Lisa on April 20, 2009. It should be noted that the offender was re-screened on March 5 and March 20, 2009 per the stipulation agreement. The offender was found to have a hearing disability and had his audiogram on February 25, 2009. He received his hearing aid on March 16, 2009.

**Huebschmann, John  #113704**

   *Issue:*  hearing aids, hearing aid repairs. There were also apparently issues with the AIC not being notified when the offender was moved back and forth across the state.

   *Source:*  testimony of Cathie Holst on exam by class counsel

   *Summary:*  Here is the timeline for his hearing aids. The data shows that his care was appropriate and consults and appointments were scheduled timely.

   7-22-08 – had ADA exam, referred for audiogram
   8-11-08 – underwent audiogram
   9-15-08 – received hearing aids
   10-08-08 – reported hearing aid was making an odd noise and was uncomfortable to wear to Limon Correctional Facility clinic. Hearing aid repair requested.
   11-12-08 – went to Professional Hearing Solutions for hearing aid repair
   1-06-09 – reported to Limon Correctional Facility clinic that right hearing aid was broken, said in kite that aid fell to the ground "and exploded". Hearing aid repair requested.
   2-02-09 – went to Professional hearing Solutions for hearing aid repair.
   7-14-09 – reported to Limon Correctional Facility clinic that he sat on his left hearing aid and broke it; hearing aid repair requested.
   8-18-09 – seen for hearing aid repair at Denver Health Audiology but the offender did not take his broken hearing aid with him. So audiology did an audiogram on him instead. Dr. Bloor consulted with Dr. Wright regarding the findings of the

audiogram.  Dr. Wright felt there were some inconsistencies between this audiogram and his previous audiograms and he recommended a repeat audiogram. Dr. Wright is an otologist that specializes in hearing loss.

10-26-09 – Offender has appointment at Denver Health audiology to repeat the audiogram.

11-23-09 – offender is scheduled to receive his hearing aids.  This appointment was cancelled due to a transport issue. Appointment is rescheduled for 11-24-09.

11-24-09 – Offender moved to community corrections.

## Martinez, Jesse #143973

*Issue:*  Change in M-code

*Source:*  Testimony when I was not in the courtroom

*Summary:*  Encounter dated January 20, 2009 documents that offender is a newly diagnosed diabetic with unknown hemoglobin A1C and fingerstick sugars of 530.  The provider correctly noted that the M-code should be an M4 and not M3.  Newly diagnosed diabetes is an M4 per clinical standard.  This person is relatively unstable and needs to have interventions taken before this person would be considered stable and appropriate for  M3 status.  This was done while at Four Mile.  The provider left the offender at that facility because there was only a week left before the offender would parole.  The M-code shows that the offender came back to CDOC on March 9, 2009 and was coded an M3 at Denver Reception and Diagnostic Center. This may be because there was no information available on hemoglobin A1C given the very short time of prior admission.  The offender moved to Four Mile again on March 25, 2009.  The provider doing the intake review there noted the Hemoglobin A1C was 10.6.  Per clinical standard, this makes this offender an M4.  The change in M code was completely appropriate and in keeping with the CDOC clinical standard.  I do not know when the A1C lab result was available to the Denver Reception and Diagnostic Center clinical staff.  I investigated and responded to Julie that I believed the Denver Reception and Diagnostic Center staff coded him incorrectly.  That assessment was made not knowing if Denver Reception and Diagnostic Center staff had his A1C result.  I also discussed with the intake providers the need to code correctly.

## Moore, Theodore #81494

*Issue:*  Offender didn't get hearing aids in a timely fashion

*Source:*  Testimony of Cathie Holst under questioning by class counsel

*Summary:*  According to testimony, it was discovered that the offender didn't have his hearing aids that were listed on his accommodation resolution.  This was discovered during a durable medical equipment sweep at this facility.

On October 9, 2007 the offender had an audiogram done and hearing aids were requested. This consult was denied.  The audiologist did recommend a follow-up audiogram in six months according to documentation from the CDOC provider.  On April 9, 2008, the CDOC provider requested a repeat audiogram.  This consult was scheduled for May 20, 2008 but ended up being cancelled because the tech that would perform the test was out of the office. This appointment

was rescheduled for June 2, 2008.   I am unable  to find evidence that the offender actually had this appointment.

On December 12, 2008, the Colorado Territorial Correctional Facility  provider noted that the offender had an Accommodation Resolution that stated the offender should have hearing aids but did not.  She entered a consult for audiology.  On January 12, 2009, the provider saw the offender back in follow-up on the audiology consult.  The provider checked the consult and saw that it had not been scheduled or approved yet.  She called Physicians Health Partners and they advised her that they never received the faxed consult request.  She re-faxed the consult that morning and Physicians Health Partners quickly approved the consult and the appointment was scheduled for February 2, 2009.  The audiologist determined the offender did qualify for hearing aids and the offender was issued his hearing aids on March 9, 2009.  By the time the durable medical equipment sweep was done, the provider already knew the offender did not have his hearing aids and had already started the process to have the offender fitted for hearing aids.

We do try to monitor consults in the scheduling unit to make sure they don't get dropped. I wish I knew why this consult got dropped in June 2008.  I do know that it was either late January or early February 08 when our audiologist died unexpectedly.  It took about two months to have a new audiologist contracted and trained to see offenders.  I don't know if that change could have had any impact on this case.

I do not understand why the offender did not notify clinical that he didn't have his hearing aids.  There is no evidence the offender let anyone know that he didn't have his aids.

## Mosier, John #51614

*Issue:*  hearing screening and hearing aids and hearing aid batteries

*Source:*  testimony of Cathie Holst on questioning by class counsel and offender testimony.

*Summary:*  On October 7, 2007 the offender was screened for mobility, vision, and hearing disability.  He was found to have a mobility disability, vision impairment, and no hearing disability.  On July 8, 2008, the offender wrote a letter to the AIC asking for a hearing aid and a vibrating watch.  On September 11, 2008, the AIC responded to the offender that he needed to be re-screened for hearing.  The AIC indicated that new paperwork needed to be submitted to start the re-screen and included the forms with her response.  In March 2009, the AIC submitted the offender for re-screening using the new criteria for determining hearing disability.  On March 26, 2009 I reviewed the hearing screening and determined that more information was needed so the evaluation was pended for an audiogram.  The audiogram was completed on April 24, 2009 and the offender qualified for two hearing aids.  The offender received his hearing aids on May 11, 2009.  I completed my review of the hearing disability screening on June 2, 2009 and sent the evaluation on to the AIC.  The AIC completed her review of the hearing evaluation on June 9, 2009.

The offender testified that he had to wait eight months to be screened for hearing disability.  It is important to note that the offender did not complete and submit the paperwork in September 2008 as instructed by the AIC.  It has been the policy of the AIC that offenders who

do not submit the paperwork are not entitled to accommodations through the office of the AIC. This offender never did submit the paperwork. The offender was re-screened only as a result of the 2008 stipulations. Once he was re-screened, his audiology consult happened in a timely fashion and his hearing aids were dispensed very quickly. I did create a delay in that once I had to send the evaluation back for more information (the audiogram) I was not able to review the evaluation again until June 2009. I normally process ADA evaluations in a timely manner, but from March 2009 until approximately December 2009, the volume of screens to be reviewed simply exceeded my capacity to do so in a timely fashion.

The offender testified that he can't get batteries for his hearing aids. I have checked repeatedly with the facilities. All facilities keep all hearing aid batteries in stock. All facilities have been instructed that should they run out, they are authorized to use their purchase card (credit card) to purchase a battery locally to cover the offender until more batteries can be shipped from the vendor. We do have battery testers at the medlines to check batteries. Fort Lyon replaces any battery that tests less than 60% of its power. We are not waiting until batteries barely have any power as suggested by class counsel. I checked with the facility on the day of the offender testimony. The clinic HSA found that the offender came to medline on June 1, 2010 for hearing aid batteries. One battery was good, the other was not. The nurse gave the offender one new battery. The offender became upset and left the new battery on the medline counter and left medline. He last received batteries on May 14, 2010. When an offender requests a new battery, the old battery will be checked and will be replaced if less than 60%. This procedure was developed on recommendation of our audiologist. I believe the audiologist said that these batteries were good until at least 50% if not lower. According to our audiologist and the otologist that I consulted, the zinc air batteries have steady, consistent energy output until the chemical reaction has consumed the reagents for the reaction.

## Moulton, James #55112

*Issue:* Hearing aids don't work right, problems with accommodation resolution, offender claimed he needed special shoes.

*Source:* Offender testimony,

*Summary:* Hearing aids – Offender was evaluated on April 24, 2009 with an audiogram and determined to qualify for one hearing aid. He was fitted for his hearing aid on May 11, 2009. On June 29, 2009 the offender complained to the CDOC provider that he didn't think his hearing aid was working correctly. Staff tried replacing the battery first but it did not resolve the problem. The provider entered a consult for hearing aid repair. This appointment was on July 27, 2009. The audiologist note states "hearing aid is assessed for correct function and is found to need a factory repair. Repair will be completed under warranty. Will need to see Mr. Moulton back when the hearing aid comes back from repair." On August 11, 2009, the audiologist sees Mr. Moulton to return the repaired hearing aid to the offender and documents the hearing aid is reprogrammed to the offender's satisfaction. On October 26, 2009 the offender is evaluated again by the audiologist because he complains of distortion with his hearing aid. The audiologist documents she attempted to reprogram the hearing aid but this did not correct the problem. She then exchanged his hearing aid with one from her stock and he reported that it was better. She did some filing on the aid and documents the offender stated the hearing aid was much better but

the distortion is not completely gone.  She goes on to document "there are no further adjustments that can be made to the hearing aid to improve this issue."

It appears that DOC has made every attempt to address this offender's hearing concerns.

The offender does not meet the clinical standard for special shoes.  His exams show no evidence of neuropathy or ulcers on his feet.  Based on the exams documented by the provider there is not a compelling reason for me to override the clinical standard for special shoes.

## O'Donnell, Carl #76752

*Issue:*  diabetic and claims need for special shoes.

*Source:*  Class counsel submitted testimony that offender had been requesting special shoes for diabetes but was not given shoes.  Then in May 2009, case manager indicated the offender had lost a toenail and it appeared to be infected.

*Summary:*  Diabeticshoe issue

December 14, 2006:  AIC sends forms to offender for completion.  Offender does     not return forms. Offender can't be screened and AIC can't give accommodations.

May 31, 2007:  AIC sends the offender a notice of inactivation.  This is because offender has not completed and returned any of the paperwork to be screened.

May 23, 2008:  Offender files an ADA grievance claiming to need special shoes.

June 4, 2008:  Grievance is denied because offender has not cooperated with the screening process and has not been screened.  Offender is advised to work through clinical services as alternative since the AIC can't give accommodations at this point in time for this case.

May 6, 2009:  AIC receives a phone call from the case manager at the facility.  The case manager indicates the offender has lost a toe nail and the toe appears to be infected.  The AIC advised that the offender should be seen in medical.

May 7, 2009:  The offender is evaluated in clinical services.  The provider documents that the offender stated his state issue boots were not the correct size, that he currently had a 10-D but needed a 9 ½ E.  The provider exam documents that the nail is missing from the right great toe.  The nail bed appears healthy and there is no sign of infection.  The offender was given a cast shoe to wear until the nail bed healed.  The provider indicated the offender should go to laundry to get new state boots of the size the offender indicated was correct.  The provider documents in the diagnosis that the offender removed his nail.  Typically in order to cause the nail to come off, the shoe would need to be too short, not too narrow. Otherwise, the shoe would not cause the mechanical forces to cause the nail to lift off the nail bed.  It is interesting to note the offender actually requests a shorter shoe.  In all of my years of clinical practice, I think the only time I have

ever seen a toenail off of the digit is in the setting of massive trauma such as huge crush injury, stubbing the toe in a big way, or when I have surgically removed the nail.

June 25, 2009:  The offender is evaluated in clinic to follow-up on feet and shoes, and to follow-up on chronic care issues.  The provider notes "He got new boots, size 9 ½ -E which rub on his right great toe causing blister, callous and pain."  The provider now orders medical tennis shoes.

The provider was completely appropriate to do a trial of a different size shoe for the offender.  It appears that the offender still felt that his boots were not the correct size. The provider then gave the offender special shoes, but in my clinical opinion, the offender did not meet the clinical criteria for special shoes.  I think the offender needed to be measured for state boots and given the correct size.   I also question the mechanism for the toe nail removal.

## Ontiveros, Ray # 113005

*Issue:*  hearing aids, possible delay in accommodation resolution

*Source:*  Testimony of Cathie Holst on questioning by class counsel

*Summary:*  Offender was screened by the provider for hearing disability on March 19, 2009.  I evaluated the screening on June 4, 2009 and determined that I needed a copy of the audiogram.  The offender had his audiogram on April 24, 2009 and received his hearing aid on May 11, 2009.  He qualified for one hearing aid.  The audiogram was available to me on June 12, 2009 and I reviewed it on June 22, 2009.  At that time, I completed my evaluation of his hearing however the offender also had a mobility screening on the same Request For Accommodations. I did not get the mobility evaluation completed until July 28, 2009 and moved the Request For Accommodation forward to the AIC.   The AIC completed their review on September 28, 2009.

As noted previously, I take full responsibility for significant delays in my review of the disability evaluation.  This delay was created by the number of disability screens that I had to review and evaluate.  Once the re-screens started in late February, early March 2009, I was behind on ADA evaluations until early this year.

## Ornelashart, Donald  #133256

*Issue:*  delay in repairing or replacing prosthetic leg

*Source:*  Testimony of Cathie Holst on questioning by class counsel

*Summary:*  On March 24, 2008, the Fort Lyon Correctional Facility provider performed an ADA evaluation for this offender.  She noted that his prosthetic legs were in poor condition and submitted a consult to get them replaced.  This consult was approved but does not appear to have been scheduled.  I note the offender went out to court on April 8, 2008 and did not return

until April 11, 2008.  I do not know if the out to court occurred when he was scheduled.  If so, it could have caused issues with the consult process that would be difficult to pick up.

On June 25, 2008 the provider again entered a consult for new lower extremity prostheses (bilateral).  The provider documented that the old prostheses were unstable and being held together with electrical tape.  This appointment was scheduled for July 3, 2008.  Abilities Unlimited saw the patient on July 3, 2008, August 7, 2008, August 27, 2008, October 8, 2008, and October 31, 2008.  The purchase of the prostheses was approved on August 4, 2008.  The medical record shows the offender received his new legs on December 18, 2008 and was to begin wearing them for  a few hours a day to begin breaking in the new prostheses.  The offender had the new legs for about 40 minutes when he came back to clinic and changed the feet back to his old pair because he felt the new pair needed too much altering.  The offender was scheduled for an appointment with Abilities Unlimited for these adjustments on February 5, 2009 but the offender refused to go to the appointment and he signed a refusal.  The offender paroled on April 7, 2009. CDOC  purchased two new prosthetic legs for this offender which he then never used and he refused the transport to get the legs adjusted.

The process of obtaining prosthetic legs can require a number of appointments with the prosthetist.  Each prosthesis is custom made and molded for the patient.  I have had meetings with Bill Teague, one of the prosthetists at Abilities Unlimited and he advised that six to eight weeks is the minimum amount of time to get a prosthesis made and that it may take longer. The process usually involves making a test socket and then adjusting this socket until it fits the patient correctly.  Then the permanent socket is made and again this will require adjustment and fitting.  In addition, there are other components of the leg including the foot, etc which require adjustment.  The provider also documents the offender had weight gain which can affect the fitting.  Edema in the stump can affect the fitting process and in some instances, a patient may need to wear shrinkers on the stump for several months before the fitting can be finished.

I understand that the 2008 stipulations require that repairs have to be completed within 60 days.  In this situation, I have to defer to the judgment of the specialist as to the manufacture of the new devices.  I do believe the frequency of the appointments indicates CDOC was trying to facilitate the fitting process to the greatest extent possible.

## Padilla, Benny #82114

*Issue:*  delay in repairing hearing aids

*Source:*  testimony of Cathie Holst on questioning by class counsel

*Summary:*  On April 3, 2008, a consult was entered at my direction to get hearing aids for this offender.  The appointment was scheduled for May 13, 2008.  Based on the results of the audiogram completed on that date, the offender qualified for two hearing aids.  The audiologist should have requested approval for payment of the hearing aids from Physician Health Partners, but it does not appear that they did so.  The provider at Fort Lyon Correctional Facility investigated after the offender notified her that he should have his hearing aids.  She correctly noted on July 11, 2008 that the audiologist needed to submit the request to Physician Health

Partners.  The provider even documented on the consult that she called the Davis Hearing Center to advise them that they needed to submit the consult for the hearing aids to Physician Health Partners.  It appears that the vendor did not request authorization for the hearing aids until September 3, 2008.  The appointment to dispense the hearing aids occurred on September. 8, 2008.

I find the delay in obtaining Mr. Padilla's hearing aids unacceptable.  We had previously contracted with Mr. Ty Squires for audiological services.  Unfortunately Mr. Squires died unexpectedly in either late January 2008 or early Feb 2008.  We struggled to find an audiologist who would agree to provide care for our patients.  We utilized the Davis Hearing Center for a few offenders while working out a new contract.  I think it is apparent that the service provided was not adequate.  Fortunately, we were able to contract with Dr. Martino of Professional Hearing Solutions who has provided exceptional service to our patients.  As an example, the provider requested another audiology evaluation for Mr. Padilla on August 11, 2009.  The appointment for the evaluation occurred on September. 1, 2009.  Dr. Martino felt that the hearing aids that had previously been dispensed to Mr. Padilla were too strong.  She requested authorization for new hearing aids, which were approved.  On Oct 2, 2009, Dr. Martino dispensed two new hearing aids to Mr. Padilla.

Without question, there were issues with the hearing evaluations and the provision of audiological services to our offenders prior to May 2008.  Now that Dr. Martino has been providing services (late April to early May 2009), I believe the care has been prompt and professional.

### Penrose, Evan # 142519

*Issue:*  Alleged delay in screening or delay in getting the Accommodation Resolution  to offender

*Source:*  Testimony of Cathie Holst on questioning by class counsel

*Summary:*  On August 7, 2008, Offender Penrose had his initial disability screen done on intake to Denver Reception and Diagnostic Center.  The nurse completing the intake screen clearly noted that the offender did not have problems with hearing, vision, mobility or diabetes.  This offender was admitted directly to the infirmary on intake because he had a diagnosis of stage IV colon cancer and was due to start chemotherapy and radiation therapy.  His treatments started promptly and his move sheet shows a move pattern that is consistent with chemotherapy and radiation therapy beginning on August 8, 2008.

On Nov 23, 2009, the office of the AIC received a request for accommodation from the offender.  The request was entered into the system and forwarded for scheduling.  The offender was housed at Sterling Correctional Facility at this time. Sterling scheduled the offender for his exams on December 10, 2009 and December 24, 2009.  The offender was admitted to the hospital (Denver Health Medical) on December 7, 2009.  He discharged from the hospital to the Denver infirmary on December 24, 2009.  He was again admitted to the hospital on January 11, 2010 where he remained until January 21, 2010.  Therapy for his cancer was exhausted without

response.  The offender continued to decline physically.  On January 22, 2010 he was discharged back to the Denver infirmary and then he moved to the Territorial infirmary on January 25, 2010 for end of life care.  Mr. Penrose died of his colon cancer on March 4, 2010.

Although class counsel indicated there was a delay in screening Mr. Penrose, there was no evidence of a disability that was covered by the Montez lawsuit on intake into corrections. The offender did not submit a Request for Accommodation until November 2009.   We were unable to complete his screening because he was in the hospital when he was scheduled.  When he discharged from the hospital, he was very ill and dying.  It is difficult to screen a patient that is dying.  He was in the infirmary where he received 24 hour nursing care and medications as appropriate for comfort.

### Ramos, Fidel #41238

*Issue:*  M-code change, Moved from Four Mile Correctional Facility to Sterling Correctional Facility because M code changed to M3.  Implied he gets the wrong meds at DRDC (states he doesn't know what meds he gets when at Denver Reception and Diagnostic Center because they do not come from his own med cards), did not get meds at Sterling Correctional Facility.

*Source:*  Offender testimony

*Summary:*  M-codes: - Offender was an M3 at Arrowhead Correctional Facility on December 7, 2006.  This is a correct M code given that he had reasonable glycemic control with oral agents only.  His M code was reduced to M2 on February 8, 2007.  On that date, the provider changed his M-code but gave no justification.  This M-code is incorrect given his oral medications for diabetes.  On April 3, 2008, his M-code was put back to M3 while he was housed at Four Mile.  He has remained an M3 since.  According to the clinical standard, the M3 is correct.  The provider documents clearly on the April 3, 2008 encounter that he discussed concerns about the offender's control as well as the fact the offender did not come to clinic for blood pressure checks as ordered.  The offender was not moved to Sterling Correctional Facility until November 28, 2008.  His M code did not change at Sterling Correctional Facility between the time he moved to Sterling Correctional Facility and September 4, 2009 (the cut off date for the copy of the medical record that I have to review).  I do not know the reason why this offender moved from Four Mile Correctional Facility to Sterling Correctional Facility.  Four Mile Correctional Faciltiy takes M3 diabetic offenders and it accepts diabetic offenders on insulin. It does not appear from a review of the medical record that the offender's clinical status was the reason for the offender move.   I disagree with the assignment of M2 for this offender as this would be in violation of the clinical standard for M-codes.

Meds at Denver Reception and Diagnostic Center:  Denver Reception and Diagnostic Center does not allow self meds.  It is a lock down facility.  When offenders are at Denver Reception and Diagnostic Center, they go to med line to receive their medications.  Denver Reception and Diagnostic Center keeps almost all of the formulary medications as stock medications and offenders who come to med line will receive their medications from stock

supplies rather than from their own self med cards.  During a move from one facility to another, self med cards are typically packed with the offender's property.

Meds at Sterling Correctional Facility :  The offender arrived at Sterling Correctional Facility on November 28, 2008.  I asked Business Technologies to pull his archived Electronic Medications Administration Record, kite log, and active prescription databases.  I then manually combined the three to try to get a clear picture of what has truly happened with this offender's medications since I believe the testimony so far from class counsel and from the offender do not match what actually happened.  I asked Sterling Correctional Facility how new arrivals are handled with self med cards.  When offenders arrive at Sterling Correctional Facility intake, self med cards are typically in the offender property.  Occasionally they will be with the offender's medical record bag.  The officer in intake will separate the med cards from the rest of the property.  All of the med cards will be given to the intake nurse to verify the cards are correct and active.  The cards are redistributed to the offender that same day once they get to their housing unit.  Mr. Ramos went to unit 1.  New intakes that go to unit 1 are allowed to keep their self med cards.  If they arrive without med cards, then they will be given their medications from med line which is conducted cell to cell.  If the offender arrives with out a critical medication, then the clinic is authorized to obtain a small supply from a local pharmacy if the clinic does not have a stock supply.

When I reviewed Mr. Ramos records, he should have arrived at Sterling Correctional Facility with self med cards for his Glucovance as he picked up a card of 120 tablets on November 1, 2008.  This is a 40 day supply of Glucovance for this offender as he is supposed to take one tablet in the morning and two tablets in the evening.  These cards should have lasted until December 10, 2008.  The Electronic Medication Administration Record shows that the offender received Glucovance from med line one time on Nov 28 and 29, 2008, and two times on Nov 30 and December 1.  The offender moved to general population on December 2, 2008.  He went to the evening med line on December 2, 2008 and was given a dose of medication.  On December. 3, 2008 he picked up 120 tablets (a 40 day supply) from med line.  So he missed one dose on Nov 28 and Nov 29, 2008.  He should have had his self med cards during that time and should have been able to use them.  He definitely would have been expected to use his self med cards when he went to general population on December. 2, 2008.  The offender received another 120 tablets (40 days) on January 8, 2009.  This should have lasted until Feb 21, 2009.  I found no evidence that the offender kited to clinic to refill his medications.  The offender stated that he didn't know he had to kite to refill, but he signed the self med contract and the self med contract makes it clear that the offender has to kite to refill meds.  On February 26, 2009, the office of the AIC received a grievance in which the offender states he is not getting his meds.  The AIC contacted the facility and a new prescription was entered that day, without benefit of an appointment or a kite.  The prescription was filled by the pharmacy on February 27, 2009 and shipped over night to the facility.  Since February 27, 2009 was a Friday, the order should have been available at the facility on Monday, March 2, 2009.  The offender states he was without his medications for 3 weeks, but the offender did not go to med line to pick up his meds until March 17, 2009.  There is no evidence that the offender submitted a kite to renew or refill his medications in March.  There is documentation of the rest of his kites, but no kite is found for February.  There is no documentation that he made any attempt to notify clinical services that he was out of medication on February 21, 2009.  Although this offender generally was good about

sending a kite in a timely fashion, there were times where he did not submit the kites until after a prescription had expired or lapsed.  This is documented on March 10, 2008 when the provider writes "call from Tammy at Four Mile;  this patient's Glucovance expired yesterday, he just submitted a kite for renewal; no providers on site at FMCC today; see order" and the provider then ordered Glucovance for another 3 months.  The pharmacy filled that order on March 10, 2008 (Monday).  The order was entered at 10:17 AM so the pharmacy should have shipped it that day to FMCC and it should have been available either that evening or the next day for the offender to pick up on Tuesday.  The offender did not pick up the medication until March 12, 2008.  The remainder of the records show this offender has had adequate quantity of medication dispensed in a timely fashion.  In August 2009, the offender had a refill triggered by the nurse on August 11, 2009. The offender picked up these cards on August 15, 2009.   Because the prescription was about to expire, the nurse gave the chart to the provider who entered a new prescription on August 19, 2009.  The new prescription also triggered new cards which were filled on August 21, 2009 by the pharmacy so this offender had extra self med cards waiting for him in med line.  The offender picked up his med cards on September 24, 2009 (a 30 day supply) but then did not pick up more until Oct 26, 2009.  The pharmacy filled additional cards of Glucovance in October, but I am unable to see the date.  The offender did not pick up Glucovance from med line until Oct 26, 2009 at which point he picked up 120 tablets (40 day supply).  This would be the extra set from August and part of the set filled in October.  Essentially, if that offender felt he was out of medication, he only had to check medline to see if they had more cards for him.  I see no other time this offender was deprived of his medication other than the two doses in November 2008.  Even for those two doses, he should have had self med cards to use.  I also see no evidence that the offender attempted to notify clinical services that he was out of his medication.  I do see many times where the kite that was completed by the offender indicates a need for a refill of only one of his medications but the evidence shows the nurses were checking his other meds at the same time and requesting refills at the same time, even though the offender did not request them.  Overall, I think there is strong evidence that the clinic staff and pharmacy were making a strong effort to keep this offender with his medications.

| Pharmacy fill date | Patient pick up date | Days supply issued |
|---|---|---|
| 8-19-08 | 8-21-08 | 40 |
| 9-26-08 | 10-01-08 | 40 |
| 10-28-08 | 11-01-08 | 40 |
| 12-01-08 | 12-03-08 | 40 |
| 1-06-09 | 1-12-09 | 40 |
| 2-27-09 | 4-17-09 | 30 |
| 3-15-09 | 5-18-09 | 30 |
| 4-13-09 | 6-17-09 | 30 |
| 5-14-09 | 7-20-09 | 30 |
| 6-12-09 | 8-24-09 | 30 |
| 7-14-09 | | 30 |
| 8-11-09 | | 30 |

        In the time span from August 19, 2008 until August 11, 2009, pharmacy dispensed 410 days worth of Glucovance in patient specific cards for this offender.  The patient only picked up

350 days worth of medication.  On one kite the nurse even wrote that there were already cards in med line waiting for the patient.  This kite would have then been sent back to the offender.

The offender stated in testimony that medical should have informed him that his prescriptions were about to expire.  The expiration date is printed on the pharmacy label that is printed to dispense the medication.  All of the information printed on the pharmacy label is the same as what is printed in private practice.  This information is standard and required by state pharmacy regulations.  This includes the patient name, RX number, date RX is filled, date of expiration, name of drug, strength of drug, and dosing instructions.  Self meds are packed in a blister card usually with one pill per blister.  The blisters are numbered and when the offender gets to the last week of medication, the card states in big letters "PLEASE REORDER" and the background color of the paper changes to a deep blue color.  At this point, there are six days of medication left.  The offender should submit a kite to renew or refill.  On the last day of the card, when the offender takes the last pill, he should go to med-line to pick up his new cards.  In order to get a new card, the offender has to turn in an empty card.  This offender had been provided the expiration date based on the prescription label.

In addition, the offender testified he did not know he needed to submit a kite for refills/renewals and had never had to do so before he got to Sterling Correctional Facility.  The kite log clearly shows that the offender submitted kites for refills dating back to January 7, 2008 which is as far back as I went in pulling records.  These kites occurred while the offender was housed at Four Mile.  The offender signed the self med contract which clearly states how the offender is to go about getting refills of a prescription.  In fact, Mr. Ramos signed a new self med contract at Sterling Correctional Facility on November 28, 2008.  He should have known he needed to submit a kite for a renewal.  I never heard the offender testify that he in fact submitted a kite for renewal of his Glucovance in February 2009.  Instead he said he didn't know he needed to submit a kite and that someone should have told him that the prescription was about to expire.  There is no documentation in the medical records to show that this offender ever submitted a kite to refill/renew his Glucovance in February 2009.

Also, this offender testified that he is given a twenty day supply of his medication.  Currently he gets ninety tables or a thirty day supply.  In 2008, he received one hundred twenty tablets which would have been a forty day supply.

## Reed, Seth # 108549

**Issue:**  M-code changed from M 3 to M4 because of his sugars being elevated.  Deprived of a job because he requires insulin TID(three injections daily).  Indicates he should be housed at BVMC instead of BVCF.  States he has had several hypoglycemic episodes and the hypoglycemic protocol is a joke.  Claims insulin was reduced prior to move to BVMC because of anticipated increase in physical activity.

**Source:**  Offender testimony

**Summary:**  My review of the medical record shows this offender has very frequent hypoglycemic episodes.  It is not unusual for this offender to refuse treatment for his

hypoglycemia. It is documented in the medical record that he will state he doesn't believe the result on the glucometer. Nursing documented on one encounter using two different glucometers yet the offender continued to assert that the glucometer was wrong. It is clearly documented in the medical record that the offender has had numerous hypoglycemic events while exercising or shortly after exercising. There have been attempts made to adjust the insulin dose to avoid the episodes of hypoglycemia however the offender continues to have several hypoglycemic events. It is also documented in the medical record that the offender refused a call button in 2008 shortly after the stipulation agreement. The offender's diabetes is not well controlled with his hemoglobin A1C on June 24, 2009 being 10.9. Hemoglobin A1C remained elevated in 2010 and the provider documents on May 12, 2010 that the A1C is now 9.6 %. Given the results of the A1C it is appropriate that the offender's M-code be M4.

In my investigation of the claim that he was denied jobs due to insulin need, I found that his claim was not true. According to case management at Buena Vista Correctional Facility, this offender was denied a job that required a gate pass. The offender was not eligible for a gate pass because he is a violent offender and according to case management, violent offenders at Buena Vista Correctional Facility are not eligible for a gate pass. Therefore, the offender's insulin requirement had no bearing on his job eligibility.

## Richardson, Allen #82239

*Issue:* Offender requested to have Prilosec as a self-med because he claims he can't stand in med line.

*Source:* Testimony during hearing in June/July 2010. Also e-mail from Nancy Goldsberry to Teresa Reynolds that states the offender has filed a grievance requesting Prilosec as a self med because the offender states he can't stand in line that long.

*Summary:* Prilosec was removed from the self-med list by the CDOC Pharmacy and Therapeutics Committee. The reason for removal was concern about growing state wide abuse/misuse of the medication. Additional concerns for the Pharmacy and Therapeutics Committee was the growing body of medical literature that demonstrated an increase risk of osteoporosis, fracture of the hip, and community acquired pneumonia with prolonged use of this class of medications. (The class is proton pump inhibitors.) This offender is housed at Fort Lyon Correctional Facility. The Master Control Shift Report was accessed to discern exactly how much time an offender would have to stand in med line at this facility. General population at this facility is released one unit at a time to go to med line and the dining hall. The subsequent cell house is called as soon as the previous cell house has vacated the dining area. All offenders who have med line only medications will rotate through the med line during this time. On three different days, the morning med line lasted sixty-three minutes, sixty-two minutes, and fifty-seven minutes. Six cell houses rotated through the med line during that time. The evening med line lasted seventy-eight minutes, seventy-one minutes, and fifty-eight minutes. The average time for each cell house to be in the med line is approximately ten minutes for the morning med line and thirteen minutes for the evening med line. Those times would indicate that there is very little standing in med line and offenders move through the med line in a fairly brisk fashion. There is a noon med line that is typically reserved for diabetic offenders and

others who require medication three times a day.  The provider wrote for the Prilosec to be given at noon instead of the morning or evening med line.  The noon med line is a thirty minute timed med line so the time that an offender would be "standing" in the noon med line is even less than that estimated for the morning or evening med line.  The Electronic Medication Administration Record for this offender reveals that from June 1, 2009 to June 1, 2010, this offender did not go to med line for Prilosec twenty-four times for an average of two times per month. This is fairly good medication adherence to prescribed medication.   This would indicate that in fact the offender is able to attend med line.   It appears that this offender, even with his mobility disability, should be able to access all three med lines without additional accommodations.  His current accommodations include a cane, lower bunk, lower tier, a raised locker box stand, and the standard accommodations regarding cuffing and emergencies that are given to all mobility disabled offenders.  In review of this offender's case, the evidence did not seem compelling enough to override the decision of the Pharmacy and Therapeutics Committee.

**Sanchez, Adolfo # 118788**

*Issue:*  Change in M-code

*Source:* Testimony of Cathie Holst

*Summary:*  On January 21, 2009 offender's medical record was reviewed by the provider at Arrowhead Correctional Facility because of the offender being a new intake at the facility.  The provider correctly noted that the offender's correct M code should be M4 because the January 12, 2009 hemoglobin A1C was 9.8%.  The offender was assigned an M3 on intake at Denver Reception and Diagnostic Center.  The provider at Denver Reception and Diagnostic Center would not have known the results of the A1C until after the intake physical.  I do not know if the provider at Denver Reception and Diagnostic Center intake was able to review the A1C prior to the offender move to Arrowhead Correctional Facility.  Anytime an offender transfers from one facility to another, a provider reviews the medical record to make sure prescriptions are correct and current, to schedule the patient into chronic care clinics if needed and to make sure the M code is correct.  The provider at Arrowhead Correctional Facility was simply doing her job when she corrected the M code for this offender.  Arrowhead will take insulin dependent diabetic offenders, however an M4 requires a waiver and typically is given only if the offender needs to be at Arrowhead Correctional Facility for Therapeutic Community treatment. I have no indication that the offender needed to be at Arrowhead Correctional Facility for Therapeutic Community.  It appears by the AIC worksheet that the AIC was aware of the M code change and the need to move the offender.

**Simpson, Charles #118549**

*Issue:* Toenail/foot injury that would not heal, foot care, MRSA infection in toe that offender claims was caused by CDOC.
Need for special shoes
Not getting medications (specifically stated it took two weeks to get glucophage)
Did not receive insulin for parole
J-pay card given on parole did not work so offender had no money to

purchase insulin on parole

*Source:* Offender testimony

*Summary:*

Foot care:  Offender arrived at Denver Reception and Diagnostic Center on May 20, 2008.  At the time of arrival the offender was already on antibiotics for an infection in his toe. The nurse continued the same antibiotic that the county jail had started.  On May 22, 2008 the offender was evaluated in the clinic by a provider for his toe infection.  The provider documented the offender had already been on antibiotics for thirteen days without any improvement.  The exam documented is consistent with an infected ingrown toenail.  The provider orders a culture of the wound.  This culture returns as Methicillin Resistant Staphylococcus Aureus (MRSA) as the infecting agent.  The offender had the infected toe at the time of admission to CDOC, and the lack of response to the antibiotic prescribed in the county jail strongly indicates the offender had MRSA in his toe prior to arrival in CDOC.  On June 4, 2008 the provider performed incision and drainage of the infected toe.  Per the Center for Disease control, localized abscesses due to MRSA should be incised and drained and many times, this is the only treatment needed for MRSA.  On June 6, 2008 the offender was evaluated by nursing staff and the offender indicated his state boots were too tight with the dressing on his toe.  The nurse ordered the offender to use a shower shoe in the unit. The nurse also ordered a size 17 state boot for the offender.  The offender was cleared to have antibiotic ointment in his cell so that he could perform self care on his toe.  The offender moved to Arrowhead Correctional Complex on June 17, 2008 and on June 18, 2008 the provider started Bactrim antibiotic to treat the MRSA because the offender's toe was not healing.  The provider also documents the offender is wearing a size 17, low cut, brown suede soft heeled boot.  On June 29, 2008 nursing staff was attempting to soak and treat his infected toe per provider order.  Nursing documents "IM refused to allow me to dress his left big toe and refused further treatment of his left big toe. Stated he should be at another facility and will just get treatment there.  Put his sock and boot back on and walked out of clinic with security escort." On July 31, 2008 the provider documents the toe appears to be healed with no evidence of infection.  On August 18, 2008 the provider documents the offender's foot has no lesions and has intact sensation in his feet. Review of the medical record indicates the offender received appropriate treatment for his infected ingrown toenail.

Special shoes:  During the intake process at Denver Reception and Diagnostic Center, the provider ordered special shoes for the offender because of the infected ingrown toenail.  I disagreed with giving special shoes as an accommodation due to the ingrown toenail.  Ingrown toenails occur when the corner of the nail punctures the soft tissue of the nail fold.  This is caused because the nail is cut too short, torn short, or shoes are too tight.  There is no benefit for a soft soled shoe.  Since the ingrown toenail was present upon admission to CDOC, no argument can be made that the state boots caused the ingrown toenail.  It is important that the shoes be sized correctly, but no special shoe is required to either treat or prevent ingrown toenails.  In addition, this offender did not have loss of sensation on his feet so special shoes were not warranted per the clinical standard.  In spite of this, the offender was given special shoes on

September 23, 2008 and July 16, 2009.  I continue to assert that this offender does not meet the criteria for special shoes.  He has sensation in his feet and no history of ulceration.

The CDOC clinical criteria for special shoes for offenders with diabetes is taken directly from the American Diabetes Association guidelines for special shoes in correctional institutions. The guidelines/clinical criteria are that neuropathy must be present in addition to a history of prior ulceration or current ulcer of the foot.  The only benefit of special shoes in the diabetic patient is to reduce the likelihood of ulceration which would be a source for infection.  The risk for ulceration is small until the patient has neuropathy.  When neuropathy is present the patient may be unable to feel when an injury has occurred or a sore is present thus increasing the likelihood the ulcer/sore can progress to an infected state without the patient ever being aware. Testimony was given by class counsel's diabetes expert that a tennis shoe is less likely to cause an infection and will somehow have fewer bacteria than the state issue boots.  This is clinically an incorrect statement.  Research in the emergency medicine field and research for the National Institute of Health has long established that puncture wounds into the foot through any foot wear can cause infections but a puncture wound through a tennis shoe is much more likely to result in infection with pseudomonas species compared to other foot coverings.   This offender does not meet the CDOC clinical criteria (or the American Diabetes Association Guidelines recommendations) for special shoes.  I found nothing in this offender's case that would compel me to override the clinical standard.  I would also point out that when the offender appeared in court, he was not wearing special shoes.  Indeed, the offender was wearing low cut men's dress shoes with a thin, hard sole.

I did not hear a specific date that Offender stated he was not able to get his glucophage. It was my understanding that the offender was referring to the time he was at Sterling Correctional Facility.  I checked the kite log for the offender and found a total of only five kites in the system for medication refills.  One of the kites was for insulin, one was for zocor, one was for glucophage, and two were not specific.  One of the non-specific kites had a nursing note that it is too early to refill.  The one specific kite for glucophage was dated October 28, 2009.   The electronic medication administration record shows the offender picked up cards of glucophage from the med line on July 1, 2008 (116 tablets), August 20, 2008 (120 tablets), July 28, 2009 (60 tablets), and October 31, 2009 (120 tablets).  It does not appear that the offender was submitting kites to get refills of glucophage.  In addition, on August 6, 2009, the provider wrote a memo to the offender to  let him know that he has cards in the med line that he needs to pick up.  The provider documents in the encounter that the offender has not been taking any of the medications that have been ordered.  I would note that the offender generally went to med line to get his insulin but there are times that the offender did not go to med line to get his insulin.  There are thirteen days from July 3, 2008 until January 10, 2009 that the offender did not go to med line to get insulin.  During this time, the offender was housed in unit 31 at Sterling.  This means the offender would not require an officer's permission to go to diabetic med line.  He would have simply stopped at med line on his way to the evening meal (the offender was on lantus which he took every evening).  These thirteen days represent days the offender simply did not go to med line.  In the time from June 16, 2009 until November 17, 2009 the offender did not go to med line five times.  Of note, the offender testified that he was not given insulin the day before he left for community.  On November 16, 2009 the nurse documented that the offender refused his evening dose of insulin.  Because his insulin was prescribed to be given at night, the offender

would not have been given insulin on November 17, 2009 prior to leaving since he left in the morning.

Parole medications:   The offender claimed that he was not given medications at parole.  The pharmacy records indicate that a 30 day supply of community corrections meds was requested and filled on January 23, 2009.  The Sterling Correctional Facility was able to produce the medication tracking log to show that the offender's community medications were taken to the shift commander to be given to the offender.   The offender went to community on January 27, 2009.  Offenders can move to community corrections with very little notice to the facility and in some cases the clinic has only a twenty-four hour notice.  This would not allow the community meds to be filled by the CDOC pharmacy.  In the event of short notice for a community move, the clinic would purchase the community medications from a local pharmacy to be sent with the offender.  In the event that the medication does not go with the offender, the medications are shipped to the community center or the parole office.

A ten day supply of parole medications was requested and filled on November 3, 2009. The offender paroled on November 17, 2009 so those medications should have been given to the offender.  In fact, the offender signed the Offender Check Out Form acknowledging that he received his medications for parole.

J-pay card:  The offender claimed his J-pay card that he was given when he paroled was not good and he couldn't use it.  The cashier's office for J-pay confirmed that the offender activated his J-pay card on November 17, 2009.  The offender used the full value of his J-pay card.  The cashier's office provided me with a spreadsheet that listed every transaction the offender made on the J-pay card.

**Smith, David # 140348**

*Issue-* Change in M-code

*Source:*  Email from Meghan Reed to Cathie Holst dated Feb 12, 2009

*Summary:*  During intake at Denver Reception and Diagnostic Center, this offender was coded as an M4 due to multiple sclerosis.  Dr. Darrow changed the M-code to M2 while the offender was at Colorado Territorial Correctional Facility however there is no explanation on the ambulatory encounter as to why he reduced the M-code.  The offender was moved to Arrowhead Correctional Facility where the provider felt the correct code was M4 on Feb 19, 2009.  The provider documented "MS, recent exacerbation; apparently worsening in general despite betaseron qod; ataxic gait; KAFO LLE: unable to hold objects L hand; double vision; urinary hesitancy vs retention".  Per clinical standard, this offender's correct M code clearly is M4.  The provider questioned how safe the offender would be at Arrowhead Correctional Facility due to his weakness and risk for falls.  Patient did fall and suffered a fracture to his radial head.  The offender was subsequently moved to Colorado Territorial Correctional Facility.  This offender clearly needed to be in a facility that had greater medical capacity than what can be provided at Arrowhead Correctional Facility.   A designated facility is designated based on accessibility of the physical plant only.  Medical needs are not a component of being a designated facility, yet

34

medical needs clearly can affect where an offender is housed based on the clinical capability that is at each facility.

## Smith, James #112593

*Issue:*  Hand rails at Fort Lyon Correctional Facility CH 4

*Source:*  Multiple emails in 2008

*Summary:*  Offender is in a wheelchair.  He had been housed in CH 5 at Fort Lyon Correctional Facility which apparently had what the offender called handrails.  The offender was moved to CH 4 where there are no handrails.  The offender claimed that the handrails were removed thereby making it impossible for the offender to attempt to walk.  The facility indicated that the "handrails" were not actually handrails but rather bumpers.  The bumpers in CH 4 were removed in 2006, well before the offender was moved to CH4.  The reason for the removal was because they were not actually handrails and were not in the correct position to function as handrails, the bumpers were in poor condition, and the offenders were hiding contraband in the bumpers.  The offender was found to be disabled by the Special Master, but the offender did not actually consent to screening until 2009.  This would affect the accommodations that are given and when they are given.  Until the offender consented to screening, the only accommodations that could be given were those, if any, that were ordered by the Special Master.   The offender should not need handrails.  He uses a wheelchair for ambulation.  Given that the offender is wheelchair dependent, if he wants to attempt to walk, he should do so in the rehab program at Fort Lyon Correctional Facility where he can be supervised in the event of any problems.  A wheelchair offender should not be using handrails to propel his/her wheelchair, they should be using the correct technique with the wheels.  Incorrect use potentially exposes the offender to risk of injury.  The offender also apparently had an issue about needing a shower chair and claimed that one was not available.  According to staff at Fort Lyon Correctional Facility, shower chairs are kept in all housing units and are available for use based on accommodation resolution or on offender request.  The exception would be an exceptionally large offender who would need a special, custom ordered shower chair.

## Strobridge, Harold #84844

*Issue:*  Alleged delay in repair of prosthesis.

*Source:*  Class counsel testimony.  Class counsel indicates that the offender went from September 25, 2007 until August 27, 2008 without needed repairs to his prosthesis.  Class counsel also presented testimony that the offender went from October 2008 until January 2009 without needed repairs to prosthesis.

*Summary:*  This offender has a history of sustaining severe frostbite on December 17, 2000 (not incarcerated at the time) after he overdosed on drugs and then fell asleep in his truck. He apparently fell out of the truck after the door opened and was not found (unresponsive) until after he had severe frostbite injury.  He initially had amputation of the left leg and the right

forearm.  He then had to have the right leg amputated in 2001 due to longstanding complications from the frostbite injury.

On April 11, 2007 the CDOC provider requested an evaluation by Abilities Unlimited because the offender was complaining that his right socket did not fit well since he had a stump revision in October 2006.  On July 5, 2007, the offender was evaluated by Abilities Unlimited.  Abilities Unlimited recommended new Spectra socks to reduce noise from the prosthesis.  In addition, Abilities Unlimited noted that the socket still fit snugly at the proximal end but the distal end was loose.  The prosthetist noted that he believe that additional padding in the distal socket would correct the fit.  The consult notes that these repairs will be provided pending approval by Physicians Health Partners.

On August 2, 2007, the offender is again evaluated by Abilities Unlimited.  I do not have the date that Physicians Health Partners approved the above recommendations, however on the note dated August 2, 2007 the prosthetist notes "He states that the socket adjustments were satisfactory and he is also satisfied with the Spectra socks that were provided to eliminate the noise in his foot."  The prosthetist documents adding pads to the socket for fit adjustment.  He notes he is taking the upper extremity prosthesis with him back to his Colorado Springs office for repairs and will ship back to the offender at Ft. Lyon Correctional Facility once the repairs are completed.

On September 28, 2007 the provider at Ft. Lyon documented that the offender was complaining that the fit was not correct on his right prosthetic leg.  A consult was entered for Abilities Unlimited.  On December 20, 2007 the provider notes that she was unable to find her September consult in the system.  Scheduling was unable to find the consult and so the provider re-entered the consult in the system.  I do not know what happened to the consult that was entered in September 08.  I don't know if this was a programming glitch.  Once the consult was re-entered on December 20, 2007 Physicians Health Partners approved the consult on December 21, 2007.  The offender was evaluated by Abilities Unlimited on December 26, 2007.  The prosthetist determined that the socket for the leg needs to be replaced.  In addition, new liners were also needed.  Abilities Unlimited saw the offender on January 24, 2008 for measurements and cast impressions for the new socket.  On February 7, 2008 the offender has another appointment with Abilities Unlimited to try the test socket.  The offender does not like the fit of the test socket because he wants the socket snug enough that he does not have to wear prosthetic socks.  Abilities Unlimited noted that they will have to reduce the test socket to get a tighter fit.  On February 21, 2008 the offender is evaluated again by Abilities Unlimited to fit the test socket.  At this appointment the fit was determined to be appropriate and the plan was to proceed with fabrication of the final socket.  The socket was delivered to the offender on March 20, 2008 and the offender expressed satisfaction with the fit of the new socket.  It is very clear by the documentation from Abilities Unlimited that the prosthesis was left with the offender that day.  On May 2, 2008 Abilities Unlimited saw the patient again and notes that they switched out the feet on the prosthesis.  Abilities Unlimited also notes that the offender tested a new test socket, so it is unclear at this point if this is referring to the left leg or if they proceeded with yet another new socket on the right.  Abilities Unlimited notes that the socket and frame will be fabricated to the proper height and alignment and will be returned to the patient for trial on the next visit to Ft. Lyon Correctional Facility.  On July 3, 2008 the offender is evaluated by Abilities Unlimited and

they document that the offender states "the new right socket is comfortable and he is satisfied with the fit and function". There is some concern over the length of the pylon.  Abilities Unlimited also notes that the prosthetic foot on the left is now broken and needs to be replaced. The prosthetist notes "The final structural lamination will be applied on the socket and I will return in approximately 2 -3 weeks for redelivery."  On August 7, 2008 Abilities Unlimited refit the new right socket and replaced the broken left foot.  Adjustments were made to the prosthesis. Abilities Unlimited specifically notes the offender retained possession of his old prosthesis as a back-up if needed.  On August 27, 2008, Abilities Unlimited saw the patient again because the patient now felt that part of the socket was too tight.  Abilities Unlimited adjusted the socket the same day.

On October 30, 2008 the provider enters a new consult for Abilities Unlimited because the offender feels the fit is not correct on his right leg socket.  This consult was approved by Physicians Health Partners on November 7, 2008.  The patient was scheduled to see Abilities Unlimited on December 4, 2008.  At that appointment, the prosthetist notes the offender has gained 52 pounds and his current socket fits too tight.  The prosthetist notes that he will scheduled the offender to be seen in his Colorado Springs office rather than the facility for socket fit adjustment.

On January 14, 2009 the offender is seen by Abilities Unlimited in the Colorado Springs office for socket fitting.  The prosthetist documents making adjustments to the socket as well as delivering new liners for the offender.

On February 6, 2009 the provider requested another consult with Abilities Unlimited because the right foot has cracked (note the foot was new in May 2008).  The consult was faxed to Physicians Health Partners but never received.  The consult was refaxed to Physician Health Partners on March 5, 2009.  This was approved on March 10, 2009.
The offender was evaluated by Abilities Unlimited on March 5, 2009 and it was determined that the upper extremity prosthesis needed repair, both feet needed to be replaced, new shoes were needed, and the left leg socket needed to be replaced due to the 52 pound weight gain.  The offender was then seen by Abilities Unlimited on March 25, 2009, April 23, 2009, May 22, 2009, June 30, 2009, July 6, 2009, August 31, 2009, and September 15, 2009 all to repair/replace/ and fit his prostheses.

The offender was then evaluated by Hangar Prosthetics on October 23, 2009, November 17, 2009, November 30, 2009, December 15, 2009, February 2, 2010, February 19, 2010 and May 21, 2010.

It would appear to me that the care provided to this offender regarding his multiple prostheses was completely appropriate.  It appears that Abilities Unlimited was seeing the offender in a timely fashion and made multiple adjustments to the offender's prostheses (all of them).  In addition, in the time frame from April 2007 until September 2009, each lower leg prosthesis had been completely replaced, the feet had been replaced more than once, and the upper prosthesis had been adjusted and repaired.  It is well documented that the offender was provided with numerous liners and socks.  I believe I counted at least 23 times that the offender was evaluated by Abilities Unlimited over a 30 month time period.  The offender then had at

least 7 appointments with Hangar Prosthetics over an 8 month time frame.  Prosthetics can require multiple and ongoing adjustments to maintain fit and function.  Fitting a new socket can require multiple attempts, but this does not mean that care is inappropriate or is being deliberately or inappropriately delayed.  In my discussion with Abilities Unlimited, it is difficult to fit and manufacture a new prosthetic limb in 60 days time and is greatly affected by how easy or difficult the patient is to fit.  In addition, any changes in weight can affect the fit of the socket.  It is my opinion that this offender has required an unusually high number of visits with the prosthetist to maintain fit and function.  In addition he has required replacement of his prosthetics in an unusually short time frame compared to our other offenders who have prosthetic devices.

I reviewed the grievances answered by the office of the AIC.  I think it is very apparent that the person preparing the responses did not have copies of the notes from Abilities Unlimited as the timelines outlined in the grievance responses does not match  the medical records from Abilities Unlimited.

## Valverde, Paul #51675

*Issue:*  Class counsel stated that the offender had a diabetic episode on July 14, 2008 and implied the offender died because of the diabetic episode on July 15, 2008.

*Source:*  This was class counsel's own statement and no witness testified to this chain of events, however the gravity of the statement requires a response.

*Summary:*  My review of the medical records, incident reports, and the death certificate for this offender clearly shows that on July 11, 2008 the offender appears to suffer a seizure and was not responsive.  The officer confirmed that the offender was diabetic and was able to get a sugar tablet for the offender.  Once the gurney arrived the offender was transported to the clinic.  While he was enroute to the clinic, the offender began vomiting blood.  The offender was transported to St. Thomas More Hospital via AMR ambulance.  The offender was then transferred to Penrose Hosptial via Flight For Life.  The offender suffered multiple cardiac arrests and was placed on life support.  The hospital physicians consulted with the family because the hospital medical team believed the offender had sustained significant brain oxygen deprivation.  The offender's family signed a Do Not Resuscitate order and requested the offender be removed from life support.  The hospital proceeded according to the family requests and the offender was transported to Denver Reception and Diagnostic Center on July 14, 2008 with the anticipation that the offender's death was imminent.  The offender died on July 15, 2008.  The cause of death was determined by the Medical Examiner for the City and County of Denver to be a ruptured esophageal varicosity which was secondary to cirrhosis of the liver.  The ruptured esophageal varicosity was diagnosed at the hospital when an emergent upper endoscopy was performed in an attempt to control the bleeding.   The cause of death in this case had nothing to do with the offender's diabetes.
Although staff and the offender may have thought he could have low blood sugar due to his symptoms of seizure, light headedness, etc, this offender's symptoms were  due entirely to his massive esophageal bleed.  I was unable to find that a fingerstick sugar was done, and I would not necessarily expect one to be done given the fact that by the time the offender was in the

clinic he was clearly experiencing a catastrophic hemorrhage and the hemorrhage alone would explain the seizure and unresponsiveness.  My review of his records indicates that the staff acted appropriately and timely for this offender and that his medical care was appropriate.

Mr. Valverde was re-screened for mobility disability on May 12, 2008 (previously DNQ for mobility).  Dr. Darrow performed the evaluation and noted that the offender had recently had surgery on his foot and was not yet supposed to be weight bearing following his surgery.  The staff observations that were done at the time clearly indicated that although the offender was using a wheelchair, the offender did not use a wheelchair prior to his recent foot surgery.  I asked to delay the mobility screening until the offender had recovered adequately from his surgery to be able to appropriately determine disability status and appropriate accommodations.  The AIC did not agree with my recommendation so the screening  that was performed while the offender was recovering from foot surgery was allowed to stand.

It is my professional opinion that offenders should not be screened for permanent disability and permanent accommodations while recovering from acute injuries or surgeries as it is impossible to accurately determine what functional limitations, if any, are permanent until the patient has recovered from the acute injury/surgery.

### Vaughn, Anthony #116051

*Issue:*  Offender claimed he was not given insulin when moving from Fremont to Denver Reception and Diagnostic Center.  Offender also claimed that he was not allowed access to the bathroom during transport from Fremont to Denver Reception and Diagnostic Center.

*Source:*  Offender testimony

*Summary:*  This offender was admitted into the CDOC on January 14, 2003 through Denver Reception and Diagnostic Center.  The offender was housed at Buena Vista Correctional Facility on February 22, 2003 until November 12, 2003 when he was moved to Fremont Correctional Facility via Colorado Territorial Correctional Facility.  The offender has been housed at Fremont since December 11, 2003.  During the offender testimony the offender was asked if he had traveled to Denver Reception and Diagnostic Center and the offender answered yes.  The offender stated he had been at Denver Reception and Diagnostic center for approximately two weeks.  The offender stated he had missed medications for three to four days during the move and did not get insulin at Fremont the day prior to the move.  The offender also testified that he was not allowed access to a bathroom during the move.

The offender move sheet shows that this offender was moved from Fremont Correctional Facility to Denver Reception and Diagnostic Center on February 2, 2006  for an ENT appointment on February 3, 2006.  The offender was moved by ambulance on February 9, 2006 from Denver Reception and Diagnostic Center to Denver Health Medical for cardiac dysrhythmia.  The offender returned to Denver Reception and Diagnostic Center the same day after he had a negative cardiac evaluation.  The provider documented in an encounter that the patient had not received his meds for the previous five days.  The offender should have been able to go to medline and get his medications as his medications were stock meds with the exception

of Glucovance.   Glucovance is not a stock medication, however if the offender had gone to med line to get his medications, the nurse could have contacted the provider to get a verbal order to substitute glucophage and glyburide which are stock medications.  Glucovance is simply a combination of both of these drugs in one pill.   Denver Reception and Diagnostic Center does not allow self meds and all medications are med line only.  Because Denver Reception and Diagnostic Center is an intake facility, it has a greatly expanded list of stock medications and most of the medications on the CDOC formulary are stock at this particular facility.  The offender would not have needed new orders in order to continue his medications.  He only needed to go to the med line and he would have been given his medications. When the offender returned from Denver Health, he was admitted to the infirmary at the Denver complex and from that time until his move back to Fremont, his medications were delivered to his bedside and are documented on a paper medication administration record from the infirmary.   At the time, the offender was not on insulin.  The offender returned to Fremont Correctional Facility on February 16, 2006.  The same move occurred again on March 15, 2006 with return to Fremont Correctional Facility on March 16, 2006.  There is no evidence of moves from Fremont Correctional Facility to Denver Reception and Diagnostic Center at any other time.

On April 26, 2010 the offender was admitted to the infirmary at Colorado Territorial Correctional Facility after he failed conservative treatment for nausea and vomiting.  The offender did not get his insulin on the evening of April 25 and April 26, 2010 as the provider placed a hold on the insulin.  This is a correct action because the need for insulin may be dramatically altered in a type II diabetic in the setting of severe nausea and vomiting with no oral intake.

I accessed three databases, the kite log, the archived electronic administration record, and pharmacy fill data.  While it is difficult to combine these databases, I was able to match kite dates with pharmacy fill dates, and the date the offender picked the meds up from the med line. The time from submission of the kite requesting prescription refill until the pharmacy filled the prescription ranged from the same day to two days.  The time from pharmacy fill to offender pick up at med line ranged from one day to forty days.  There were not a large number of kites submitted by the offender for refill of diabetic medications, but all of the kites submitted appeared to have been filled on a timely basis.  There is strong evidence that the offender does not take his medications as prescribed and often does not take his medication. On two of the kites ( September 9, 2008 and December 3, 2008), the nurse documents that the medications are already in the med room waiting for offender pick up  It is important to note that I only evaluated actos and glucovance due to the amount of manual work involved to combine the three databases.

The claim regarding no access to the bathroom during transport to Denver Reception and Diagnostic Center had to occur in 2006 which predates the stipulations regarding bathroom breaks.

**<u>Velarde, Serena #138523</u>**

*Issue:*  Offender claimed hearing aids had been taken by custody staff during a shakedown.

*Source:* e-mails from Meghan Reed, office of the AIC

*Summary:* On April 9, 2008 offender Velarde reported to the provider at Colorado Women's Correctional Facility that she had hearing aids while in the Denver County Jail but that they were "lost during transition to DWCF". The offender had an audiogram performed on May 19, 2008 and was determined to benefit from hearing aids. The offender was fitted with bilateral hearing aids.

On October 27, 2008 the offender requested a hearing aid repair according to the medical record. The provider entered a consult for hearing aid repair. This repair was completed on November 26, 2008. On December 2, 2008 the provider saw the patient in the clinic and noted that the offender was not wearing her hearing aids at the time she was in the clinic.

On December 17, 2008 the provider at Denver Women's Correctional Facility indicated the offender told her that the officers took her hearing aid batteries out of the hearing aids during transport. I found no evidence to support this claim other than what the provider documents the offender told her. The provider replaced her hearing aid batteries.

On March 25, 2009 an e-mail from Glidewell, Case Manager at Denver Women's Correctional Facility indicates the offender is claiming that her hearing aids were taken during a facility shake down on March 2, 2009. The shake down list for her cell shows officers found an empty container, 2 oranges, an empty urine cup and nuisance contraband that was removed from the cell. There is no documentation that the officers ever saw her hearing aids during the shake down. On March 23, 2009 a second shake down was conducted on Offender Velarde's cell and this documented that no hearing aids could be found. I felt that given she had lost a set of hearing aids while transitioning to CDOC, and then the accusation that staff took her hearing aid batteries , for which I found no supporting evidence, and then this incident of hearing aids missing that a pattern seemed to be emerging that suggested this offender was not careful with her hearing aids. I was also concerned with the accusations toward staff, given that investigations did not bear out the offender's accusations. I believed that at this point, CDOC should not purchase new hearing aids for this offender and I really believed this offender should have been charged a COPD violation for not taking care of her hearing aids. The AIC worksheet has an entry dated July 9, 2009 which states "Email from James Falk regarding Offender. She filed a grievance regarding her missing hearing aids. She has since found them and apologizes for any inconvenience and hardships this may have caused anyone."

I believe this offender is not reliable. I believe that investigations need to be conducted of offender grievances and complaints, but I think caution needs to be exercised to not convict staff of wrongdoing if there is no evidence to support the offender's complaints. Incidentally, the offender moved to community corrections and is now on abscond status.

## Walker, Lee #46385

*Issue:* AIC concern that offender not flagged on intake as ADA offender and that offender required a wheelchair.

*Source:*  Accommodation Worksheet has the note that indicates the concern.

*Summary:*  The AIC note in the worksheet states "It appears offender did not receive an ADA flag at intake even though he was in a wheelchair.  Unsure why a file was not opened on the offender."  The initial intake ADA screening form clearly documents the offender has no apparent limitations with mobility and is not in a wheelchair.  The self reported history, completed by the offender on November 12, 2008 shows the offender denied issues with walking or stairs, denied backache or joint pain, and denied the use of a cane, crutch, or brace.  The intake physical exam completed on November 14, 2008 documents the offender has a normal gait.  In addition, examination of the spine, neurological system, extremities, and musculoskeletal systems were normal.  The provider indicated on the intake physical exam there were no limitations.

I am unclear where the AIC got the information that this offender was in a wheelchair on intake or that this offender needed to be flagged for ADA.  The intake records clearly shows this offender was ambulatory with a normal exam and no limitations.

## Watson, Dennis #143844

*Issue:*  knee brace

*Source:*  email from Yvette Pope to Meghan Reed and Paula Frantz dated March 17, 2009.

*Summary:*  The offender arrived at Denver Reception and Diagnostic Center on November 17, 2008.  At the time of arrival, the intake nurse identified that the offender had mobility issues and gave accommodations for a cane, a wheelchair, and a leg brace.  The offender arrived with all three items.  The cane was sent back home and the offender was given a DOC issued standard cane.  The wheelchair and leg brace were allowed to stay with the offender.  A recommendation to retain personal property was generated on November 17, 2008 and lists the wheelchair and leg brace.  According to email sent by the family (Gloria Riehemann), the brace was removed at intake because it had become muddy.  It appears that the brace was taken to be cleaned, but did not get returned to the offender for reasons that I do not know.  On March 5, 2009 a provider placed a consult for a new leg brace.  This consult was denied by Physicians Health Partners with instructions to purchase a brace from Schryver.  When I became aware of the family email on March 17, 2009, I contacted the facility to see if the brace could be located.  The AIC documented in their worksheet that on March 27, 2009 Gloria Barkey had located the brace at Denver Reception and Diagnostic Center and would have it returned to the offender at Colorado Territorial Correctional Facility by March 30, 2009.

Physicians Health Partners was correct to direct the clinic to purchase a brace directly from Schryver.

It should be noted that the offender was wheelchair bound upon arrival at Denver Reception and Diagnostic Center and in his own personal wheelchair.  The intake physical exam

documents that the offender reports he had been wheelchair bound since his stroke in 2001. It is somewhat of a puzzle why the offender would require a leg brace when he is essentially non-ambulatory. It is also a puzzle as to why the issue of the missing leg brace was not brought to the attention of clinical services long before February or March of 2009. It is very clear from the documentation in the medical record that there was never any intent to remove the brace. It appears that it was taken to be cleaned and became separated from the offender. It may have been that the brace was not yet labeled with the offender's name and number or the brace was simply misplaced. It appears that it did not take long for clinical staff at Denver Reception and Diagnostic Center to locate the brace once they were made aware of the problem. It would appear that the issue could have been resolved much more quickly if the medical record had been consulted where the documentation is very clear, and Denver Reception and Diagnostic Center consulted. I have spoken with custody/control staff at Denver Reception and Diagnostic Center and they are adamant they are not removing medical equipment on intake.

## Wiegand, Norman #58767

*Issue:* Offender claims he did not get a lower bunk/lower tier or wheelchair accommodation.

*Source:* Accommodation worksheet and offender Request for Accommodations.

*Summary:* The offender was screened for mobility disability in 2008 and was found to have a mobility disability. The offender was given a cane as one of his accommodations. On April 6, 2009 the offender submitted another Request for Accommodations and indicated he needed a lower bunk/lower tier and a wheelchair. Interestingly, in his Request for Accommodations, the offender requests a wheelchair but states he can't sit for longer than 30 minutes. A provider performed the ADA physical exam on March 12, 2009 and determined the offender was mobility disabled and recommended lower bunk/lower tier. I reviewed the evaluation on September 15, 2009 and felt there were many inconsistencies in the exam that raised serious doubts about the need for additional accommodations. I note that my delay in evaluating the evaluation was due to the massive back log created when every offender was re-screened in 2009. Because of the inconsistencies I requested video of the offender. The facility had difficulty getting video of the offender and this resulted in substantial delay. The first video that was sent was not properly recorded so the video was lost. The facility made another attempt to get video and this was completely unhelpful as the video simply showed the offender sitting in a wheelchair. I then made my recommendations based on my impression of the physical exam. My note on the ADA evaluation states "There are many inconsistencies in the exam. The provider documents that the offender has limited hip flexion and knee flexion, yet the offender was able to sit, rise from sitting, ambulate normally (ADL obs), put on and remove shoes/socks, and crossed one leg over the other at one point while addressing shoes/socks. All of these activities indicate that the range of motion of the hips and knees are greater than that reflected in the physical exam. Provider notes that offender has obesity. Offender has a weight of 272 pounds, height 74 inches with BMI of 34. This is class I obesity and does not rise to the level of a disability. The provider documents the offender had a limp on the first page of exam but the stride lengths are equal. There is other evidence of subjective component with positive ASLR (abducted straight leg raise). In addition, there is no muscular atrophy which would be expected

with global muscular weakness.  The muscle strength as measured is not consistent with ambulation with a cane since the weakness is bilateral as documented.  Staff obs (observations) from 2008 show offender was able to use stairs.  Offender would not attempt chair stands for functional testing."  The issue was not if the offender was disabled.  He had already been determined to be disabled.  The issue was if the offender needed additional accommodations.  Based on my interpretation of the physical exam and my comments regarding the exam, I do not believe a wheelchair is medically indicated or appropriate.  I also believe this offender has adequate function to be able to access stairs and upper bunk.

**Williams, Joseph #46010**

   *Issue:*  Diabetic Care.  AIC not informed of offender status.

   *Source:*  e-mail from Meghan Reed to Paula Frantz dated March 2, 2009.

   *Summary:*  Offender has a greater than thirty year history of diabetes complicated by neuropathy and nephropathy, peripheral vascular disease, coronary artery disease status post myocardial infarction, congestive heart failure, pulmonary hypertension, hepatitis C, hypothyroidism, deep vein thrombosis status post vena caval filter, and anemia.  This case has garnered a lot of attention because of the gravity of the outcome.

   On July 21, 2005 the offender was evaluated in chronic care clinic for diabetes.  The provider documented that the offender had obvious fungal infection in both great toe nails and performed a surgical procedure to remove the infected toenails.  On July 25, 2005 the provider documents the offender still has some oozing from the nail beds, but specifically notes that drainage from the right toe has a greenish color.  On August 16, 2005 the offender was evaluated emergently for complaint of vomiting, cough, anorexia, and fever.  At that point in time the right great toe appeared gangrenous.  The offender was emergently transported to St. Mary Corwin Hospital for evaluation and treatment.  He was quickly diagnosed with a gangrenous right great toe.  On August 19, 2005 the offender underwent amputation of the right great and second toes.  On August 23, 2005 a CT of the abdomen with runoff was performed to assess the vascular supply to the lower extremities as the surgical wound was not healing.  The study revealed significant atherosclerosis of the legs, in particular involving the small vessels thereby eliminating the possibility of angioplasty to improve outcome.  On August 29, 2005 the offender had amputation of the right leg below the knee because of failure to improve, progression of gangrene and lack of good blood supply to the leg due to the atherosclerosis.  The amputation site was very slow to heal, even though wound care specialists were involved in the care of the surgical site.  The right stump was not healed until March 7, 2006.  The long time to heal is most likely related to the atherosclerosis of the lower extremity vessels which affects the blood supply to the tissues of the leg.

   In June 2006, a request was submitted for a prosthesis for the right leg.  The prosthesis was denied by the Chief Medical Officer.  The Chief Medical Officer documented that the offender could be accommodated with a wheelchair and crutches.
In December 2007 the offender was screened for disability and because of the amputation he was clearly found to have a mobility disability.  When I reviewed the disability evaluation, I

contacted the provider at Limon Correctional Facility to inquire if the offender was interested in a prosthesis and if the provider believed the offender had adequate physical capacity to be ambulatory with a prosthesis.  In January 2008 the provider had discussion with the offender about a prosthesis and the offender was interested in proceeding with a prosthesis.  Appropriate consults were entered and the offender ultimately received a right trans-tibial prosthesis on June 12, 2008.  There was some delay in delivering the prosthesis to the offender due to his admission in April for cardiac issues.

In April 2008 the offender was sent to Denver Health MedCenter after developing fatigue, diaphoresis, and dyspnea.  The offender was admitted and diagnosed with myocardial infarction.  It should be noted the offender had a Persantine stress test in January 2008 to evaluate cardiac status and the test demonstrated normal ejection fraction and no evidence of ischemia.  The offender was discharged from Denver Health to the infirmary at the Denver Reception and Diagnostic Center on April 29, 2008.  On May 11, 2008 the offender was admitted to St. Thomas More for dyspnea and orthopnea most likely secondary to congestive heart failure.  He was treated for congestive heart failure and on May 15, 2008 the offender was discharged to the infirmary at Colorado Territorial Correctional Facility.  It was noted during the admission in the hospital the offender had significant edema of the left leg but no evidence of thrombosis or other acute pathology.
The offender remained in the infirmary at Colorado Territorial Correctional Facility until June 30, 2008.  At that point it was determined that the offender had recovered from his myocardial infarction and congestive heart failure to a point that he would be able to return to general population.

On June 7, 2008 the offender noticed a wound to his left great toe.  The nurse documents cleaning and dressing the wound.  The wound is described as superficial area that appeared consistent with dry skin peeling.  On June 21, 2008, the nurse documented the offender has a small blister on the left great toe.  The offender reported that he thought the blister started when he started wearing his special shoes he was given because of the right leg prosthesis.  On June 22, 2008 the offender refused to let nursing staff change the dressing on his toe.  On June 23, 2008 the nurse documents the left great toe now has a 0.5 cm open area.  The documentation shows the area did not appear infected but cultures were taken anyway and the patient was started on antibiotics.  Wound was cleaned and dressed.  Staff continued to assess the toe and provide treatment of cleaning and dressing.  On June 25, 2008 nursing staff documents that on three separate occasions the offender was observed with no dressing on his toe, even though the offender denied removing the dressing.  On June 26, 2008 the wound culture returns with Methicillin Resistant Staphylococcus Aureus (MRSA).  The antibiotic was changed to match susceptibility testing.  On June 27, 2008 the provider documents the toe is looking better.  On June 30, 2008 staff documents the wound on the toe appears to be resolving and on this day the offender returns to Limon.  On July 1, 2008 the Limon provider order daily wound checks.  On July 2, 2008 the Limon provider transferred the offender to the Colorado Mental health Institute in Pueblo for evaluation of the left great toe.  The consultant documents "The active infection is relatively recent.  This is not a pressure-related ulcer/sore; therefore, he may have fairly decent chance of clearing this up without amputation."  Intravenous antibiotics were prescribed.  On July 5, 2008 the attending physician documents the wound appears improved.  Because the wound was looking better and the CDOC infirmary had access to the current antibiotic the

45

hospital physician discharged the offender to the CDOC infirmary.  On July 8, 2008 the offender was transferred to Limon Correctional Facility.  On that date, the provider was concerned that some eschar was present on the tip of the toe and continued appropriate wound care.  On July 12, 2008 the offender refused to allow staff to change the dressing.  On July 16, 2008 the provider documents the eschar has been debrided through dressing changes and the toe is looking better. On July 19, 2008 cultures of the toe return as Pseudomonas aeruginosa and antibiotics are changed.  On July 25, 2008 the provider documents no further drainage from the toe and the toe appears to be responding favorably to treatment.  On August 5, 2008 the offender was transferred to the Denver Reception and Diagnostic Center infirmary for intravenous antibiotics.  On September 3, 2008 the offender was evaluated by podiatry and ortho ID with recommendation to discontinue antibiotics.  An MRI was ordered.  On September 18, 2008 the offender refused dressing change for his toe.  The MRI of the left foot was performed and *did not* show evidence of osteomyelitis although the fifth digit was not completely visualized.  Podiatry follow-up occurred on October 6, 2008 and even though the MRI did not show osteomyelitis, the presumed diagnosis was still osteomyelitis of the left great toe.  MRI was repeated on October 7, 2008 and clearly demonstrated osteomyelitis of the great toe and the fifth toe.  On October 9, 2008 the offender had trans-metatarsal amputation of the toes of the left foot.  On October 12, 2008 the offender was admitted to Denver Health Medical with MRSA bacteremia and discharged back to the infirmary on October 17, 2008.  He required readmission on October 19, 2008 when the offender began having fevers again.  Infectious disease was consulted along with podiatry who concurred that there was no evidence of ongoing infection and no further antibiotic treatment was needed.  On October 23, 2008 the offender was admitted yet again to Denver Health for ongoing fevers.  He was discharged back to the infirmary again on October 27, 2008 with no further changes in the treatment plan.  Denver Health specifically documented there were to be no further dressing changes to the foot outside of the podiatry clinic.  The offender was admitted again to Denver Health on October 29, 2008 and on November 2, 2008 the offender had amputation of the left lower leg, below the knee for ongoing osteomyelitis that failed all outpatient therapy.  On November 18, 2008 the offender was transferred to Colorado Mental Health Institute in Pueblo for convalescent care and rehabilitation.  The offender continued to have a less than optimal course and on December 31, 2008 the offender was again taken to the operating room for debridement of the left leg stump and MRSA infection.   On January 5, 2009 cultures now show Pseudomonas infection and on January 7, 2009 the offender returns to the operating room for an above the knee amputation.  In February 2009 the offender was stable enough to discharge to the Colorado Territorial Correctional Facility infirmary.

Although the offender then had slow progress in wound healing, his course continued to be rocky with increasing problems with congestive heart failure, acute on chronic renal failure, and recurrent thromboembolism with intolerance for anticoagulation.  The offender required several more admissions to the hospital to manage his very complicated care.  On June 12, 2009 the offender was finally stable in all aspects and he was transferred to Fort Lyon Correctional Facility.  The provider at Fort Lyon Correctional Facility contacted me to ask about new prosthetics for the offender.  The ensuing discussion revealed that the offender was very debilitated because of his difficult  medical course over the previous year.  I advised physical therapy and restorative therapy.  If the offender was able to progress with restorative therapy and the physical therapist felt the offender was a good candidate for prosthetics then we would proceed with prosthetics.

Review of the medical record shows the offender did not take his insulin consistently and typically would miss between two to four doses of evening insulin each month by not going to med line.  In addition, there are stretches where the offender refused doses of insulin.   The offender also refused many fingerstick sugars.  There is extensive documentation in the medical record by many different staff in several different facilities that staff were consistently trying to educate the offender on the importance of control of his sugars.  The offender's hemoglobin A1Cs typically reflected poor control by being greater than 9%.  In 2005 the offender briefly had A1Cs below 8% but the offender reported frequent symptoms of hypoglycemia and the remainder of the A1Cs were over 9%.  This is not just limited to the CDOC facilities.  Even when the offender is facing amputation of his left leg, the Denver Health physician documents the offender continues to assert that his diabetes has noting to do with what is happening to his leg, even though the physician documents efforts to educate otherwise.  In mid 2008 when the offender is admitted to Colorado Mental Health Institute in Pueblo early in the course of the left toe infection, it is well documented that the offender would refuse his insulin.  There is good documentation that the attending physician spent considerable effort to educate the offender about his illness.

The offender also had hypertension that generally was within target range, but even then the offender would tell the provider that he did not always take his medications as ordered. There are at least three no shows for scheduled chronic care appointments in 2009.  There are multiple entries in the infirmary records that the offender refused dressing changes.

This offender had a long history of diabetes with poor control.  He was at very high risk for complication and developed almost every complication to include neuropathy, nephropathy, peripheral vascular disease, cardiovascular disease, myocardial infarction, and lower extremity amputation.  The outcome is disturbing but it would be incorrect to assume that the outcome reflects poorly on the clinical staff of the Colorado Dept of Corrections.  Indeed, the staff made multiple attempts to adjust medications to control sugars, cholesterol, and renal function and multiple attempts by multiple individuals in different settings to engage the offender in his own health care (none appear to have been successful).  The events leading to the left leg amputation were dramatic, but the care was appropriate.  The offender had been provided special shoes because of his right amputation, and the offender felt that his special shoes contributed to his left great toe infection. The offender received appropriate antibiotics, cultures, and specialty consults.   The recommendations of the specialists were followed. Antibiotics were continued from hospital to infirmary without missing doses.