2868

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-CV-00870-JLK

JESSE MONTEZ, ET AL.,

    Plaintiffs,

vs.

BILL OWENS, ET AL.,

    Defendants.

---

**REPORTER'S TRANSCRIPT**
Court Trial - Volume XXI

---

      Proceedings before the HONORABLE JOHN L. KANE, JR.,
Judge, United States District Court for the District of
Colorado, commencing at 9:03 a.m., on the 8th day of July,
2010, in Courtroom A802, United States Courthouse, Denver,
Colorado.

TRACY WEIR, Official Reporter
901 19th Street, Room A258
Denver, Colorado, 80294
(303) 298-1207

Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer


Montez v. Ritter
92-CV-870-JLK
Exhibit

JOAN SHOEMAKER - Cross

1    requiring the knives be tethered to the tables.

2    *Q*   When you request a variance, does it have to be signed off

3    by Mr. Zavaras?

4    *A*   In this case, if it's a prison operations, it has to be

5    signed off by the Director of Prisons.

6    *Q*   Does Mr. Zavaras have any involvement with the granting or

7    denial of variances?

8    *A*   There is not a requirement that Mr. Zavaras' signature is

9    on the variance, but I'm sure those things are discussed with

10   him.

11   *Q*   You know that because you've been in such meetings?

12   *A*   I've not been in any meetings, but my knowledge of the

13   players involved would lead me to, more than assumption, know

14   that that discussion goes on.

15        *MS. GREISEN:*  Your Honor, just so you're aware,

16   Ms. McCann and I have talked about the fact I still am going to

17   get some documents, with respect to one of the exhibits that

18   the Court ordered be produced to me yesterday.   And

19   Ms. Shoemaker will be subject to recall after I receive those

20   documents.

21        *THE COURT:*  All right.

22   Q    (By Ms. Greisen) Let's look back at Exhibit M-12, which

23   was one of the documents you talked with Ms. McCann about

24   yesterday.   Do you have that one in front of me?

25   *A*   I do.   You're talking about the e-mail regarding the North

2962

JOAN SHOEMAKER - Cross

1  Fork offenders?

2  Q   I am.  Thank you.  This was discussed with Ms. McCann.  The

3  issue was whether or not individuals with disabilities were

4  being transferred to a non-DOC facility, the North Fork

5  facility in Oklahoma, that wasn't governed by the remedial

6  plan.  Do you recall this issue?

7  A   Yes.

8  Q   Ms. McCann showed you Exhibit M-12, and that exhibit talks

9  about four of the individuals with disabilities who were

10  transferred to North Fork during the pendency of this case, in

11  the last compliance hearing, correct?

12  A   Correct.

13  Q   Hey, it's been, what, 20 days.  I'm not all quite here.

14  Bear with me.  It appears that you actually had sent an e-mail

15  to one of your assistants, to gather information about four of

16  these inmates, and she's e-mailed you back, right?

17  A   That's right.

18  Q   Let's go through this a little bit more thoroughly.  Now,

19  she tells you -- and I believe you testified consistently --

20  that none of the four individuals, that you were inquiring

21  about were ADA when they were at North Fork, right?

22  A   Correct.

23  Q   Let's start with Mr. Martinez.  I'm going to hand you two

24  exhibits.  Mr. Martinez' AIC sheets, marked Exhibit 692 and the

25  final order of the special master marked Exhibit 698.  Now, if

2963

JOAN SHOEMAKER - Cross

1    you see the final order of the special master on Mr. Martinez

2    was filed January 2006, right?  You can either look at the top

3    of the first page, or any of the pages, or on the bottom of

4    page 6.  You'll see the special master signed his final order

5    in January of 2006.  Do you see that on Exhibit 698?

6    A   I see a filed date at the very top of the document that

7    says January 30th, '06.

8    Q   Correct.

9    A   Is that what you're referring to?

10   Q   Well, that's right.  I'm just showing this special master's

11   final order was filed in January of '06, and it was also signed

12   by the special master in January 2006, correct?

13   A   On page 6, it shows the date when it was signed.

14   Q   January of 2006, right?

15   A   Correct.

16   Q   Now, on page 5, you also see that the special master

17   determined Mr. Martinez had a mobility disability, right?  Do

18   you see under the second paragraph of No. 1, on page 5, that

19   he's determined to have a mobility disability?

20   A   Not reading these everyday, I need to look at this for a

21   minute.

22   Q   Sure.

23   A   Under the second paragraph under No. 1, it says claimant

24   will be given the benefit of the doubt and be determined part

25   of the class for mobility impairment.

2964

JOAN SHOEMAKER - Cross

1   Q    Are you aware the special master used the word "impairment"

2   instead of "disabilities" in his determinations?

3   A    No, I don't.

4   Q    Look at the entry for January 26th, 2010.  You see that

5   entry states, quote, mobility disability is based on SMFO.  You

6   understand SMFO to be the special master's final order,

7   correct?

8   A    That makes sense, that's an abbreviation they are using.

9   Q    The AIC's office has recognized that, in fact, the special

10  master determined Mr. Martinez to be disabled -- mobility

11  disabled, right?

12  A    By order of the special master.

13  Q    Right.  If you look on the worksheet, the AIC's office was

14  informed of the special master's final order on

15  February 13th, 2006, right?

16  A    That's the first entry on this worksheet.

17  Q    So as of February 2006, the AIC was informed that the

18  special master had determined him mobility disabled and, yet,

19  Mr. Martinez was moved to North Fork, apparently, in January of

20  2007, right?

21  A    This shows he was at North Fork on January 17th, '07.

22  Q    He was moved to North Fork about a year after the special

23  master found him mobility disabled, correct?

24  A    Yes.

25  Q    So, in fact, Mr. Martinez was ADA when he was moved to

2965

JOAN SHOEMAKER - Cross

1   North Fork, right?

2   A   Yes.

3   Q   And let's look at Mr. Albo.   Now, again, the report says

4   that Mr. Albo was moved to North Fork in January of '07, right?

5   A   Correct.

6   Q   And, again, that he was not ADA when he was moved to North

7   Fork, right?   The report says that none of these people were

8   ADA when they were moved to North Fork, right?

9   A   That's correct.

10   Q   Let's look at Mr. Albo's AIC worksheet, which is

11   Plaintiffs' 691.   Now, you see on Mr. Albo's worksheet, there

12   does not appear to be any intake through DRDC, right, or no

13   notation of it?   The first entry starts with, "Received

14   updated."   Do you see that?

15   A   I do.

16   Q   No entry prior to that, showing any DRDC intake, right?

17   A   There's nothing before this December 30th, '08, entry.

18   Q   Right.   Now -- but on the December '08 entry, the AIC's

19   office, it states, received an outdated request for

20   accommodation form, an outdated medical release form from

21   Mr. Albo who claims -- it appears he claims he has polio,

22   right?

23   A   Correct.

24   Q   The signs of polio, you know, are usually visible, correct?

25   A   Depends on the severity of the case.

2966

JOAN SHOEMAKER - Cross

1   Q   Now, apparently, if you go down to 5-27-09, in fact, it is

2   confirmed that Mr. Albo does have a mobility disability, as

3   well as an upper extremity disability, right?

4   A   Correct.

5   Q   If he, in fact, has mobility disability and an upper

6   extremity disability, it would appear -- it would likely be

7   that Mr. Albo had a visible disability?

8        MS. McCANN:   I object on the grounds of speculation.

9        THE COURT:   Sustained.

10  Q   (By Ms. Greisen) Are you familiar with Mr. Albo?

11  A   No.

12  Q   The disability determination is not made until Mr. Albo is

13  transferred back from North Fork, right?

14  A   It looks like to me, the evaluation was done starting in

15  '09.

16  Q   Right, which was after he was transferred back from North

17  Fork, right?

18  A   That's correct.

19  Q   It doesn't appear there was any screening or any

20  information on Mr. Albo, prior to him going to the North Fork

21  facility, right?

22  A   The start of this worksheet is December 30th, '08,

23  which is after he returned from North Fork.

24  Q   I only have one copy of this because Mr. Quinn handed it to

25  me as we came into court this morning.  I'm going to hand you

2967

JOAN SHOEMAKER - Cross

1    the copy -- we don't need to mark it as an exhibit -- to have

2    you verify his movement.  You see that Mr. Albo came in to DRDC

3    in 2005, right?

4    A    That's correct.

5    Q    So intake screening with respect to his disability should

6    have occurred in 2005, correct?

7    A    He would have been reviewed in 2005.

8    Q    Mr. Albo was sent to Crowley.  Do you see that?

9    A    I do.

10   Q    Crowley is one of the private facilities we've been talking

11   about, right?

12   A    That's correct.

13   Q    And then after Crowley, he's then shipped to the North Fork

14   facility in Oklahoma, right?

15   A    Correct.

16   Q    Then with respect to Mr. Hogue, who is also listed as

17   hearing disabled, I'm going to share his AIC worksheet marked

18   Plaintiffs' Exhibit 690.  Now, again, with Mr. Hogue we don't

19   have any information about any disability determination at

20   DRDC, right?

21   A    That's correct.

22   Q    The first entry on his AIC sheet is an entry on 5-29-08,

23   with respect to a grievance that he files, right?

24   A    That's correct.

25   Q    And, apparently, he's grieving the removal of healthcare

2968

JOAN SHOEMAKER - Cross

1  appliances, that occurred when he was transferred from North

2  Fork back to the Colorado prison system, right?

3  A   He's grieving the removal of healthcare appliances before

4  transfer back to Colorado.

5  Q   I'm assuming he had healthcare appliances taken from North

6  Fork, before he was transferred back to Colorado.  Would that

7  be your understanding?

8  A   I think the grievance is around what happened at North

9  Fork, that's correct.

10  Q   That he had, apparently, DMEs, or healthcare appliances,

11  taken away from him, correct?

12  A   Right.

13  Q   Apparently, if you look down on 7-15-08, apparently,

14  Mr. Hogue wears a hearing aid, right?

15  A   That's the entry on July 15th.

16  Q   I'm going to assume because of the fact that entry is

17  July 15th, '08, that he didn't get that hearing aid from

18  the Department of Corrections.  At least there's no indication

19  he did, based on this AIC worksheet, right?

20  A   I have no idea where he got his hearing aid.

21  Q   Right.  He could have had it before he went to North Fork

22  or he could have gotten it at North Fork, right?

23  A   Again, I have no indication where he got his hearing aid.

24  Q   I understand that.  It would have to be either before he

25  went to North Fork or at North Fork that he had a hearing aid,

2969

JOAN SHOEMAKER - Cross

1  right?

2  A   The entry on the 15th of July says he has a hearing

3  aid.

4  Q   There's no indication he received a hearing aid in the

5  month and a half -- actually, less than that.  You see 6-16-08,

6  he got back to the DOC facility 6-4-08, right?

7  A   Right.

8  Q   So it would be very unlikely, for DOC to give him a hearing

9  aid, between 6-4-08, and 7-15-08, right?

10 A   I don't know where he got his hearing aid.

11 Q   I appreciate, that Ms. Shoemaker.  I'm asking you a

12 question.  It would be unlikely that DOC would have given him a

13 hearing aid between 6-4-08, and 7-15-08, correct?

14         MS. MCCANN:  Objection, Your Honor.  Speculation.

15         THE COURT:  Overruled.

16         THE WITNESS:   Without looking at other information, I

17 can't adequately answer your question.

18 Q   (By Ms. Greisen) For somebody to get a hearing aid, they

19 need to have an audiologist visit, right?

20 A   Correct.

21 Q   And a hearing aid has to be made?

22 A   Correct.

23 Q   We've been through how long it takes to get hearing aids,

24 ad nauseam, in this case.  We're talking here, slightly over a

25 month.  Wouldn't you agree, it typically takes an individual

2970

JOAN SHOEMAKER - Cross

1   more than a month, in the Department of Corrections to get

2   tested for and fitted for hearing aids?

3   A   It probably does.  I don't honestly know how long it takes

4   between the time they see the audiologist and the hearing aid.

5   Q   Okay.  Well, there's no indication on the AIC worksheet

6   he's being screened for hearing -- he's ever been screened for

7   hearing disability as of 7-15-08, correct?

8   A   That's correct.

9   Q   And, in fact, it appears that, in fact, on 4-30-09,

10  Mr. Hogue, actually, did finally get the testing and was

11  determined to qualify for two hearing aids, right?

12  A   You said 4-30-09?

13  Q   Yes.  It is 61 dBs and 82 dBs in the left ear.  Do you

14  see that?

15  A   I do.

16  Q   You understand that means an individual, even under the old

17  standards, would qualify somebody for two hearing aids within

18  the Department of Corrections?

19  A   I do.  The difficulty I was having was the decibels are

20  recorded there.  It doesn't mention hearing aids.  We are

21  assuming that he got two because of the decibel ratings listed

22  here.  That's what I was struggling with.

23  Q   Okay.  You understand that would qualify him for two

24  hearing aids, right?

25  A   I do.

JOAN SHOEMAKER - Cross

1    *Q*   The fact is we don't know what DOC knew about Mr. Hogue and

2    his hearing aid capacities -- strike.  I'll rephrase that.

3    There is no evidence -- strike that.  The memo that we're

4    referring to states that Mr. Hogue was not ADA at the time he

5    was transferred to North Fork, right?

6    *A*   That's what it states.

7    *Q*   The fact is, there's no evidence in this record to suggest

8    that Mr. Hogue did or did not have his hearing aid when he was

9    transferred to North Fork, right?

10   *A*   This record does not reflect whether he had his hearing

11   aid.  What it does reflect is that the offender's first contact

12   with the AIC was this grievance April 29th, '08.

13   *Q*   Now, I'm going to show you another report that Mr. Quinn

14   handed me with respect to Mr. Hogue's history in the Department

15   of Corrections.  Again, I'm not going to mark it as an exhibit.

16   I just want to show you his transfer history.  You'll see

17   Mr. Hogue came into the Department of Corrections sometime in

18   2002, right?

19   *A*   He came into DRDC on August 12th, 2002.

20   *Q*   And after he stayed at DRDC he was sent to Huerfano,

21   correct?

22   *A*   On September 18th, 2002.

23   *Q*   Huerfano, again, is one of the private facilities, right?

24   *A*   It is.

25   *Q*   He stayed there until 2006, right?

2972

JOAN SHOEMAKER - Cross

1   A   He went to Fremont segregation on February 22nd, '06.

2   Q   Looks like he was at Fremont for about a month in

3   segregation, right?

4   A   Actually, it's shorter than that.  He was in segregation a

5   short period of time and then was in living unit 5 and living

6   unit 7.

7   Q   He was at Fremont for roughly about a month, right?

8   A   He was at Fremont from February until August 21st, '06,

9   when he went to Kit Carson.

10   Q   Kit Carson is another private facility, right?

11   A   It is.

12   Q   He stayed at Kit Carson until he was transferred to the

13   North Fork facility, right?

14   A   That's correct.

15   Q   I'm going to hand you the AIC worksheet for the last person

16   on this memo, Mr. Henderson, which I have marked as Exhibit

17   693.  Again, the first entry on his AIC worksheet is 9-18-08,

18   right?

19   A   That's correct.

20   Q   There is no indication of any assessment of Mr. Henderson

21   at DRDC, right?

22   A   There's no mention of DRDC on this worksheet.

23   Q   The first entry is that the AIC's office received his

24   request for accommodation, medical release, and questionnaire

25   dated 7-21-08, and he's claiming a mobility, vision, and

JOAN SHOEMAKER - Cross

1    hearing disability requesting hearing aids, a cane, glasses,

2    bottom bunk bottom tier?

3    A   That's correct.

4    Q   And, apparently, Mr. Henderson is also indicating that his

5    request is late.  His ADA forms are late because of property

6    packed due to surgery, right?

7    A   That's what's on the worksheet.

8    Q   Apparently he's indicated he had a hearing test and was

9    informed he needs two hearing aids, right?

10   A   Again, that's what's on the sheet.

11   Q   It appears that, in fact, on 12-12-08 Mr. Henderson does,

12   in fact, have one of the two hearing aids in use as of December

13   of '08, right?

14   A   It does state he has two hearing aids.

15   Q   It's clear from the AIC worksheet that Mr. Henderson is, in

16   fact, hearing disabled, right?  Do you see they've offered him

17   sign language classes, right, sent him a vibrating watch?

18   A   I do see the reference to the vibrating watch.  I don't

19   know that I'm seeing a sign language class.

20   Q   Well, that's 12-18-08.

21   A   Down further in the document, yes.

22   Q   In fact, he qualifies for TTY if you look on 4-6-09?

23   A   There is a note to that entry.

24   Q   We can't tell, in fact, when Mr. Henderson received his

25   hearing aid from this information, right?

2974

JOAN SHOEMAKER - Cross

1    A   That's correct.

2    Q   So we, in fact, don't know whether Mr. Henderson was

3    hearing disabled, or not, at the time he was placed at the

4    North Fork facility, right?

5    A   We don't know if he had his hearing aid.  His first contact

6    with the AIC staff was September 18th, '08.

7    Q   We don't know if he was hearing disabled, or not, when he

8    was moved to North Fork, right?

9    A   Since the AIC staff is the staff who determined that and he

10   had no contact before this worksheet started, I wouldn't agree

11   that he was hearing disabled.

12   Q   Well, apparently, somebody gave Mr. Henderson a hearing

13   aid, right?

14   A   By all indications, that's correct.

15   Q   Well, I'm assuming that if, in fact, Mr. Henderson didn't

16   need a hearing aid, that it would have been taken away from him

17   by clinical services, right?

18   A   There's no indication on this sheet.  I assume that he

19   qualified for a hearing aid.

20   Q   Right.  And he would have been considered hearing disabled

21   at the time that he received a hearing aid, right?

22   A   We're probably splitting hairs here, but the AIC would be

23   the one who determined hearing disability.  It's clear he had

24   the hearing aid.

25   Q   Somebody from clinical services, I'm assuming, would have

JOAN SHOEMAKER - Cross

1   known that Mr. Henderson had a hearing aid.  If he had it

2   before he went to North Fork, they would have known that,

3   right?

4   A   I would believe that's correct.

5   Q   So if they -- if he had it before he went to North Fork,

6   clinical services did not inform the AIC that, in fact, he was

7   given a hearing aid, right?

8   A   There's no indication on this worksheet that clinical

9   services informed the AIC he had a hearing aid.

10  Q   If he would have gotten it at North Fork, he would have

11  been hearing disabled when he was at North Fork?

12  A   If he would have had hearing aids at North Fork, he would

13  have gotten them while he was there.

14  Q   Those are the four individuals listed on the memo.  The

15  fact is when we talked about this issue in my examination of

16  Ms. Holst, we actually were looking at an exhibit, Exhibit 671,

17  that started this whole chain of events.  I'm going to have you

18  look at Exhibit 671, which is Section V.

19  A   What was the number?

20  Q   671.

21  A   6 what?

22  Q   671.  Do you have that?

23  A   I do.  I'm sorry.

24  Q   That's okay.  This is the exhibit that started this whole

25  line of questioning.  It's the exhibit that lists all of the

2976

JOAN SHOEMAKER - Cross

1    inmates that were transferred to the North Fork facility in

2    Oklahoma.   Do you recall that?

3    A    I do.

4    Q    And it appears that you had -- when you started the e-mail

5    on Exhibit M-12, you picked out four of these individuals to

6    find out what their ADA status was, and that was the memo that

7    generated your prior testimony, right?

8    A    Correct.

9    Q    In fact, on 671, there are several more inmates who have

10   disabilities under the Montez remedial plan than just the four

11   you talked about in your memo, right?

12   A    This document list confirmed diabetics.

13   Q    That's right.   Diabetics are a group of disability class

14   members under the Montez plan, and they are included in the

15   group that was transferred to North Fork, correct?

16   A    That's correct.

17   Q    It appears from the memo this all started in January of

18   2007, from Exhibit M-12.   Do you see that?

19   A    The dates on all the transfers are January 17th.

20   Q    At that point in time, was there a new contract that

21   started up with North Fork that generated a transfer of inmates

22   from DOC?

23   A    I don't know if -- I believe that there was more than one

24   move to North Fork.   I don't know if this date reflects the

25   first one, but it certainly reflects a move date, and we would

2977

JOAN SHOEMAKER - Cross

1   have moved a group of offenders.

2   Q   Let's look at a few of them.  I don't have them in order.

3   I'll go through some of these.  Mr. Frazier, who you'll see on

4   the list, was transferred to North Fork and, in fact,

5   Mr. Frazier was a confirmed diabetic, right.  Do you see that

6   on the second page?

7   A   Yes.

8   Q   In fact, it says on the second page Mr. Frazier wasn't

9   confirmed by DOC as a diabetic until January 22nd, 2009,

10  right?

11  A   That's the AIC evaluation date.

12  Q   Correct.

13  A   That you're referring to.

14  Q   Right.  The column that says whether the AIC confirms the

15  disability or denies it, right?

16  A   Right.

17  Q   So Mr. Frazier, the AIC confirmed him a diabetic

18  January 22nd, 2009, correct?

19  A   Correct.

20  Q   I'll show you what's been marked Plaintiffs' Exhibit 695.

21  If you would turn to page 6 of the final order of the special

22  master with respect to Mr. Frazier, you'll see under the

23  heading of diabetes that, in fact, the special master

24  determined Mr. Frazier to be a diabetic.  Do you see that,

25  quote, there's no question that claimant is diabetic?

2978

JOAN SHOEMAKER - Cross

1   A   I do.

2   Q   That order was issued in July of 2006, right?

3   A   Correct.

4   Q   So that would have been prior to Mr. Frazier being

5   transferred to North Fork, right?

6   A   That's correct.

7   Q   So the Department of Corrections transferred him to North

8   Fork despite the fact that he was known to be a class member in

9   this case, right?

10  A   That's correct.  However, diabetics can be placed at

11  private facilities.

12  Q   Well, diabetics can be placed at private facilities as long

13  as those private facilities follow the Montez remedial plan

14  with respect to what accommodations they're going to be

15  granted, correct?

16  A   That's correct.

17  Q   And North Fork is not under the Montez remedial plan,

18  right?

19  A   North Fork would have been a contracted facility by the

20  Department and would be held to the same requirements as the

21  private facilities that were located in Colorado.

22  Q   Well, you know that when the AIC sent out the audit, North

23  Fork wasn't included in the audit, right?

24  A   I am not sure that we had inmates at North Fork at the time

25  the AIC sent out the audit.

JOAN SHOEMAKER - Cross

1  Q   Have you ever seen any I/As or O/Ms or any piece of
2  paper whatsoever to show that North Fork has complied with the
3  Montez remedial plan?
4  A   I have not reviewed any documentation from North Fork.
5  Q   You didn't do any training or talk to anybody about
6  training of any of the staff at North Fork, right?
7  A   I didn't.
8  Q   And none of the training rosters in this case have
9  indicated that North Fork staff participated in any of the
10  Montez training, correct?
11  A   I don't believe I've seen any documentation from North
12  Fork.
13  Q   And no documentation that indicates staff at North Fork has
14  ever been trained on any aspect of the Montez remedial plan,
15  right?
16  A   Again, I've not seen it.
17  Q   Well, and you've never worked with clinical services at
18  North Fork to ensure that clinical services follows the same
19  quality of care and the eight or nine accommodations that are
20  required in this case to be provided to diabetics, right?
21  A   I personally have not had any conversation -- I did not
22  have any conversations with North Fork around clinical care
23  while we had offenders there.
24  Q   So sitting here today, you have absolutely no evidence, and
25  no information whatsoever, that North Fork has ever followed

2980

JOAN SHOEMAKER - Cross

1   any of the requirements of the Montez remedial plan, right?

2   A   I personally do not have any information.

3   Q   Now, going back to Exhibit 671, let's look at another --

4   Mr. Casados.  You see on page 1 Mr. Casados is listed as a

5   diabetic?

6   A   Confirmed by the AIC staff on August 18th, '08.

7   Q   Right.  I'm going to show you what's been marked

8   Plaintiffs' Exhibit 699.  Now, if Mr. Casados, we actually have

9   two accommodation worksheets.  There's the old one, which is on

10  top, and the new one, which is a new form that was created in

11  February 2006.  Do you see both his old and new AIC worksheets?

12  A   I see two different worksheets.

13  Q   Okay.  Let's start with the first one.  The accommodation

14  worksheet on the top.  There is a request for accommodation and

15  medical release received from Mr. Casados in October 2005.

16  A   I do.

17  Q   In fact, he wants diabetic medication adjusted, a cell with

18  a bathroom and more frequent eye exams, right?

19  A   That's correct.

20  Q   If you go down the verification by the provider -- on

21  12-12-05, shows, in fact, Mr. Casados is a diabetic, right?

22  A   Yes.

23  Q   In fact, the CMO agreed that he is a diabetic and

24  accommodation resolution was given to Mr. Casados, apparently

25  signed in January 2006.  Do you see that?

2981

JOAN SHOEMAKER - Cross

1   A   I do.

2   Q   So Mr. Casados was known to be a diabetic at the time that

3   he was transferred to North Fork, right?

4   A   Correct.

5   Q   It wasn't on the date indicated on this exhibit of 8-18-08,

6   but, in fact, it was at least -- or, around two years before

7   that -- when Mr. Casados was known to be a diabetic, right?

8   A   Correct.

9   Q   Another entry on Exhibit 671 is Mr. Costill.  Do you see

10  that Mr. Costill was a confirmed diabetic on the AIC worksheet

11  and, again, it, apparently, shows he wasn't confirmed by the

12  AIC until 8-15-08.  Do you see that?

13  A   Yes, I do.

14  Q   Let me hand you his AIC worksheet, which I've marked as

15  Exhibit 700.  You will see that, in fact, Mr. Costill was

16  recognized as a diabetic with the Department of Corrections by

17  9-26-07, right?

18  A   That's correct.

19  Q   Now, there's no indication on his AIC worksheet as to where

20  he was before he was at North Fork, but as of 9-25-07, we

21  see -- it appears that North Fork has sent the screening to

22  confirm he's a diabetic, right?

23  A   Correct.

24  Q   But knowing that he's a diabetic, it does not appear that

25  DOC -- there's no indication on here that DOC has, in fact,

2982

JOAN SHOEMAKER - Cross

1   moved him from North Fork until April of 2008, if you look on

2   the entry of April 22nd, 2008.

3   A   That's correct.

4   Q   Again, Mr. Miller is indicated on 671 as being a diabetic.

5   Do you see that?

6   A   Are you referring to 122423?

7   Q   His DOC number is 122423.  Do you see him?

8   A   I do.

9   Q   It's indicated he's a diabetic and the AIC office didn't

10  confirm -- I guess confirmed him the first time in August '08.

11  Do you see that?

12  A   I do.  August 6th.

13  Q   I'll show you Plaintiffs' Exhibit 702.  I'm sorry.  This

14  Mr. Miller, DOC number 92802, the second Mr. Miller.  Do you

15  see on page 2 that Mr. Miller, under DOC 92802, was stated to

16  be a confirmed diabetic, and the first date we have listing him

17  as a confirmed diabetic is January of 2009.  Do you see that?

18  A   I do.

19  Q   But, in fact, on Exhibit 702, you see that Mr. Miller was

20  identified as a diabetic in the Department of Corrections by

21  November of 2005.

22  A   Correct.

23  Q   I wanted to talk about something else on Mr. Miller's AIC

24  sheet.  If you turn the page, there's another issue I want to

25  address with respect to Mr. Miller.  If you see the entry

2983

JOAN SHOEMAKER - Cross

1  11-14-06, you'll see that entry shows there were e-mails from

2  Paul Lastrella stating that Dr. Paz -- Dr. Paz is one of the

3  DOC doctors, right?  Ms. Shoemaker, do you recall him?

4  A   I'm sorry.  I don't know that name.  '06 would have been

5  before I was back in the clinical area.  It's not a name I

6  recognize.

7  Q   Okay.  Well, apparently, a Dr. Paz ordered medical shoes

8  for Mr. Miller's diabetic neuropathy, and, apparently,

9  Mr. Miller got those shoes, right?

10 A   That's correct.

11 Q   Apparently, a couple of months later or two months after he

12 got the shoes it looks like the nurse denied his --

13 Mr. Miller's request for replacement shoes, right?

14 A   So -- no.  The DOC medical provider decided the offender no

15 longer needed medical shoes.  I assume from that Dr. Paz is an

16 outside physician.  Again, I'm not familiar with that name.

17 When you read this in context, in August the DOC medical

18 provider decided that he didn't need the shoes.

19 Q   If you look down at the next entry, November 15th, it

20 identifies that it was Kathy Holt, who is the Ft. Lyon medical

21 provider, that decided Mr. Miller does not need shoes, right?

22 A   That's correct.

23 Q   Ms. Holt is -- what's her -- is she a PA or -- what's her

24 title?

25 A   I believe she's a practitioner.  She's a provider.

2984

JOAN SHOEMAKER - Cross

1    Q   The next entry on the e-mail is that the AIC's office was

2    asking why Dr. Paz ordered -- asking the individual at Ft. Lyon

3    if the doctor ordered medical shoes for diabetic neuropathy

4    since his October '05 screening.  And then there was an

5    accommodation resolution found that he did not need that

6    accommodation, why the nurse practitioner decided that

7    Mr. Miller does not need medical shoes.  She's, basically,

8    asking why a nurse practitioner was able to overrule a medical

9    decision of an M.D.  Do you see that?

10   A   I do.

11   Q   Apparently, according to your previous testimony, that

12   would not be a problem if, in fact, the nurse practitioner

13   decided that the medical shoes were no longer indicated.  Is

14   that correct?

15   A   That's correct.

16   Q   That would still be the policy today, right?

17   A   The recommendations from outside healthcare providers are

18   recommendations and are always reviewed by our DOC providers.

19   Q   This outside provider you're talking about, we know the

20   provider is a doctor, right?

21   A   That's correct.

22   Q   The last one we're going to go through is Mr. Brady.  Do

23   you see him on the exhibit?  On page 2 Mr. Brady, apparently,

24   was another confirmed diabetic, and this exhibit indicates that

25   Mr. Brady wasn't a confirmed diabetic with DOC until August of

2985

JOAN SHOEMAKER - Cross

1   '08, right?

2   A   That's what's on the document.

3   Q   Let me hand you what's been marked Exhibit 703.  You'll

4   see, in fact, as of July 28th, 2006, the Department of

5   Corrections was aware Mr. Brady was a diabetic, correct?

6   A   That's correct.

7   Q   Now, you talked with Ms. McCann at length about jobs and

8   programs.  So I want to move to that subject.

9          MS. GREISEN:  Before I start that, maybe it's a good

10  time to take our afternoon break.

11         THE COURT:  All right.  We'll be in recess.

12     (Recess taken from 3:07 to 3:31.)

13         THE COURT:  Thank you all.  Be seated, please.

14  Q   (By Ms. Greisen) Ms. Shoemaker, before we broke, I was --

15  I had put some exhibits in front of you.  I think I forgot to

16  ask the last follow-up question on 703, with respect to

17  Mr. Brady.  Do you still have that one in front of you?

18  A   703.  Okay.

19  Q   Okay.  My only point was -- I don't think I made this.  If

20  I did, I apologize.  We've established Mr. Brady was noted to

21  have diabetes prior to the time he was sent to the North Fork

22  facility, correct?

23  A   I believe we talked previously about -- that a

24  determination was 7-28-06.

25  Q   Right.  Which would have been prior to the transfer to the

2986

JOAN SHOEMAKER - Cross

1  North Fork facility, right?  You testified they were

2  transferred in 2007.

3  A   The ones I know about in the e-mail were in January.  I

4  don't remember when all of them went there.

5  Q   I thought your testimony was that the contract with North

6  Fork started in or around January 2007.  Is that correct?

7  A   I know that the date on the e-mail, for example, says

8  January 17th.  I know they would have gone in large groups.

9  I don't know when Mr. Brady went, because I'm sure it was

10  around that time.

11  Q   So it's fair to say, the Department of Corrections knew

12  Mr. Brady had diabetes at the time he was in the North Fork

13  facility?

14  A   That's correct.

15  Q   Going back to 690 with Mr. Hogue.  You should still have

16  that in front of you as well?

17  A   I do.

18  Q   There's a couple other entries on his worksheet -- since I

19  was just given these worksheets by your counsel -- if you look

20  at the entry on 7-30-09, July 30th, '09, do you see that

21  the AIC's office received an inquiry from Mr. Hogue asking --

22  if you recall, this is the individual who qualified for two

23  hearing aids.  Do you recall that, on 4-30-09?

24  A   Yes.

25  Q   So on July 30th, '09, he's asking for his vibrating

2987

JOAN SHOEMAKER - Cross

1  watch and, in addition, some glasses and an accommodation

2  providing physical results equal to those of a nondisabled

3  offender when using the recreational/workout equipment, as well

4  as an accommodation for the PA announcements to be interpreted

5  for him.  Do you see that?

6  A  I do.

7  Q  It appears that at the time he made this request with

8  respect to a PA announcement, he is at Territorial.  Do you see

9  that on the entry on 7-14-09?

10  A  It does say he was at Territorial 7-14-09.

11  Q  That's the only place -- we don't see him moved prior to

12  the entry on 7-30-09, right?

13  A  That's correct.

14  Q  Now, it appears that the AR, accommodation resolution, that

15  was prepared for Mr. Hogue with respect to his hearing

16  disability, it appears that was sent out June 22nd, '09.

17  Do you see that?

18  A  It says "scanned AR."

19  Q  That would be the accommodation resolution for Mr. Hogue,

20  right?

21  A  It is an accommodation resolution.  I would make the

22  assumption it's about hearing, but it doesn't say what the AR

23  was for.

24  Q  No, it doesn't.  The preceding entry is the entry in which

25  the CMO determined he qualified for two hearing aids, right?

2988

JOAN SHOEMAKER - Cross

1    A    That's correct.

2    Q    So the AR went out in June 2009.   If you see November 2009,

3    five months later, there's an entry that says Mr. Hogue is

4    complaining because he still has not received his vibrating

5    watch, right?

6    A    That's correct.

7    Q    And, in fact, there's a notation there that a watch needs

8    to be sent to him, right?

9    A    Correct.

10   Q    Again, on the next entry 11-24-09, we see that Mr. Hogue

11   has been assigned to be -- have his job as a flatware wrapper,

12   right?

13   A    That's correct.

14   Q    That's the condiment/silverware wrapper job we've already

15   talked about, right?

16   A    Correct.

17   Q    Let's go now to the job process that you talked about with

18   Ms. McCann.   All the facilities in the Department of

19   Corrections, every facility, has offender jobs, right?

20   A    Correct.

21   Q    And that includes DRDC, correct?

22   A    That's correct.

23   Q    Now, you talked about the standardized job description, and

24   you looked at them with Ms. McCann.   Do you remember that

25   exhibit with the -- all the standardized job descriptions?