IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-JLK-OES

JESSE F. MONTEZ, et al.,

    Plaintiffs,

vs.

BILL OWENS, et al.,

    Defendants.

_____

REPORTER'S TRANSCRIPT
Compliance Hearing to Court, Day 25

_____

        Proceedings before the HONORABLE JOHN L. KANE,

JR., Senior Judge, United States District Court for the

District of Colorado, commencing at 9:03 a.m., on the 20th day

of October, 2010, in Courtroom A802, Alfred A. Arraj United

States Courthouse, Denver, Colorado.

Proceeding Reported by Mechanical Stenography, Transcription
Produced via Computer by Kara Spitler, RMR, CRR,
901 19th Street, Denver, CO, 80294, (303) 623-3080

APPEARANCES

PAULA GREISEN and JENNIFER RIDDLE, King & Greisen, LLP, 1670 York Street, CO  80206; BLAIN MYHRE and LARA MARKS, Isaacson Rosenbaum, P.C., 633 17th Street, Suite 2200, CO 80202, for plaintiffs.

ELIZABETH McCANN, JAMES QUINN and BERINA IBRISAGIC, Colorado Attorney General's Office, 1525 Sherman Street, 7th Floor, CO  80203, for defendants.

P R O C E E D I N G S

(In open court at 9:03 a.m.)

THE COURT:  Thank you.  Good morning.  And please be seated.

MS. IBRISAGIC:  Good morning.

THE COURT:  Good morning.

MS. IBRISAGIC:  We'd like to call Sue Ellen Grisenti.

THE COURT:  Please come forward.

THE COURTROOM DEPUTY:  Raise your right hand.

(**SUE ELLEN GRISENTI, DEFENDANT'S WITNESS, SWORN**)

THE COURTROOM DEPUTY:  Please be seated.

State your full name for the record and spell your last name.

THE WITNESS:  My name is Sue Ellen Grisenti.  My last name is spelled G-R-I-S as in Sam E-N-T-I.

**DIRECT EXAMINATION**

BY MS. IBRISAGIC:

Sue Ellen Grisenti – Direct

3477

1  Q   Good morning, Miss Grisenti.  Are you currently employed?

2  A   No, I am not.  I'm retired from the DOC.

3  Q   What time did you retire?

4  A   December 1 of 2009.

5  Q   And at the time of your retirement, who was your employer?

6  You just said, I'm sorry?

7  A   The Department of Corrections.

8  Q   How long have you worked for DOC?

9  A   Eleven years.

10  Q   In what capacity?

11  A   I was the coordinator for the inmate phone system.

12  Q   The entire eleven years?

13  A   Yes.

14  Q   And what were your job duties as the phone system

15  coordinator?

16  A   I was in charge of the day-to-day operations of the phone

17  system for the state and installation of new facilities,

18  expansion, to include the TTY kiosks.

19  Q   I'd like to focus on the TTY kiosks.

20          Can you look at the Exhibit A3, please.

21          THE COURTROOM DEPUTY:  I'm sorry.

22          MS. IBRISAGIC:  She just needs A3.

23          THE WITNESS:  I have it.

24  BY MS. IBRISAGIC:

25  Q   Can you please identify that document?

Sue Ellen Grisenti - Direct

3478

1    A    This is the administrative regulation concerning the

2    telephone regulation for our vendors.

3    Q    What is the number of that AR?

4    A    850-12.

5    Q    And what is the effective date of that AR?

6    A    December 15 of 2008.

7    Q    Do you know if that AR is still in effect today?

8    A    No, it has been superseded by a more current one.

9    Q    Now, what type of telephone system do offenders use at DOC

10   that can hear properly?

11   A    It's a controlled inmate phone system.  It controls the

12   length of the calls, the numbers that they can call, and all

13   calls are subject to monitoring and recording except for

14   attorney calls.  And calls can be placed debit or collect.

15   Q    Do the CIPS phones also have volume amplifications on them?

16   A    Yes, all the phones do have a volume control.

17   Q    Now, if a CIPS phone were to break down, how would you go

18   about fixing it?

19   A    All of the phones belong to the contractor, the inmate

20   phone system; and they provide technician, we notify them, we

21   open a ticket, they respond with the facility, and either

22   repair or replace the phone.

23   Q    How do you find out if a phone is broken?

24   A    Normally we get reports.  The offenders will make complaint

25   to the someone in their cell house and they notify us.

Sue Ellen Grisenti - Direct

1  Occasionally someone on the outside that they talk to, they'll

2  call in and make a complaint about a call, that there was

3  static or cut off.  And they also monitor the phones.  So --

4  Q   When you say "they"?

5  A   Contractor.  They have a support center and also

6  technicians monitor.  If they see the phones are not in use,

7  then they have a follow-up to see if the facility is in

8  lockdown or if there's some other reason.

9  Q   How many technicians do you have?

10  A   When I retired, there were three.

11  Q   Okay.

12      And then the support system that monitors, how often

13  do they monitor?

14  A   They're 24/7.

15  Q   Now, how quickly do they respond to fix a phone, the

16  technicians?

17  A   It depends on the service impact.  If it is the only phone

18  or all the phones in a cell house, then it's, I think by the

19  contract, it has to be done within 72 hours if it's the only

20  phone; all the phones are down, then, I think it's within eight

21  hours, maybe less, but I'm thinking eight.

22  Q   Okay.

23      Would a phone ever been broken for a month without

24  being fixed?

25  A   Not if we were notified, no.

Sue Ellen Grisenti - Direct

3480

1    Q    What are TTY kiosks that you just mentioned?

2    A    TTY kiosks, the kiosk is really the metal enclosure that

3    goes on the wall.  And TTY is a thin client P.C. inside that

4    the offenders use that thin client P.C., it goes through the

5    network to the phone system and then places their outside call.

6    So they do all the typing just like on a regular TTY except

7    it's in an enclosure.

8    Q    What's the difference between a regular TTY and the kiosk?

9    A    A regular TTY is it's fairly portable, sort of like a

10   phone, and it has to be attached to a regular phone line, an

11   analogue phone line going out.

12   Q    How do general guidelines for usage of TTY phone kiosks

13   differ from the general guidelines?

14   A    The general guidelines are the same.

15   Q    Can you tell me what the guidelines are?

16   A    Not the length of the call because it is longer on the TTY,

17   but they have to fill out the phone list, they can only call

18   numbers on that list, they can place them debit or collect.

19   They can't lie on the phone list.  Just the general security

20   issues and the actual filling out of the phone list, approval

21   of the phone list.

22   Q    Who can use a TTY?

23   A    That's determined by legal services.  We get a list or

24   notification that a person is eligible, and then we do the

25   training and set them up in the system to use.

Sue Ellen Grisenti - Direct                     3481

1   Q   And how long are the inmates allowed to use the phones?

2   A   On the regular CIPS phone, the maximum length of the call

3   is 20 minutes.  On the TTY, it's 45 minutes.

4   Q   So they finish after 20 minutes, can they make another call

5   after that?

6   A   Yes, if they're not under any facility restrictions, how

7   many calls they can make and they have money or the people can

8   accept a collect call, they can redial as many times as they

9   like.

10  Q   If a hearing-disabled inmate is allowed to use, you just

11  said 45 minutes as opposed to 20 minutes?

12  A   Yes.

13  Q   Are they charged for the full 45 minutes or are they

14  charged for the 20?

15  A   They're charged for the 20.  The system cannot charge

16  beyond 20.  It's a systemic thing, and it just can't do it.  It

17  stops charging at 20 minutes.

18  Q   Why is that?

19  A   The contractor had told me that in order to prevent

20  overcharges because occasionally on offender will hang up a

21  phone and the hook switch won't hang up, and so instead of

22  leaving it open and overcharging, it will stop at 20 minutes.

23  Q   And that's the same --

24  A   For the TTY as well, the kiosks.

25  Q   Let's take a look at Exhibit D3, please.

Sue Ellen Grisenti - Direct                                    3482

1   A   D3?

2   Q   D as in David.

3   A   Okay.

4   Q   Can you identify that exhibit, please?

5   A   Yes, this is a TTY kiosk at Territorial.

6   Q   How do you know it's at Territorial?

7   A   Because of the wrought iron on the side of the picture.

8   Q   And let's also look at Exhibit E3.

9   A   Okay.

10  Q   Can you identify that exhibit, please.

11  A   Yes.  This is the schematic that was provided by the

12  company that makes the kiosks so the maintenance staff would

13  know where to drill the hole, where to bring up the power and

14  the lines into the kiosk.

15  Q   Now, where did you find these kiosks?

16  A   They were actually found by the IT part of DOC, Business

17  Technologies.

18          I'm going to have to get a drink.

19  Q   Go ahead.

20  A   They were given the direction to find a resolution to the

21  problem.  They came up with the plan, what they needed it to

22  do, how they wanted it to appear, and they found a company

23  which built them.

24  Q   When you say the company had to build them, were they not

25  available before that?

Sue Ellen Grisenti – Direct                    3483

1  A   No.  As far as I know, there is no other DOC, state or

2  federal or county, that does this type of TTY in a kiosk in the

3  actual cell house, and so they had to come up with a plan, give

4  it to this company, who then worked with them to design it and

5  they came up with it.

6  Q   So how did they know what to build?

7  A   At BT apparently had an idea, and I'm sure they'd done some

8  research on kiosks in airports and other places as to what you

9  needed the box to be, to be secure.  And then because they are

10  software people, they knew what they needed to be in the

11  software in order to be able to work to place a phone call.

12  Q   Let's look at Exhibit F3.

13          Can you please identify that exhibit?

14  A   This is a report that I did that I sent to legal services.

15  It's a final report of all the kiosks.  The far left column,

16  that's the site name.  And, for example, Pueblo is site 7,

17  although it has three facilities, so that's how we set up our

18  install schedule is by site, and they would go and do all three

19  facilities --

20  Q   Let me go and interrupt, just to back up a little bit.

21  When you say "final report of all the kiosks," you mean all the

22  kiosks that were installed?

23  A   All the ones that were done for the May 1 deadline.

24  Q   Okay.

25          Have any kiosks been installed before this report?

Sue Ellen Grisenti – Direct

3484

1  A    Prior to this, there were, it's eight or nine of them were

2  installed at Territorial.

3  Q    When was that done?

4  A    It was in 2008, August, I believe.

5  Q    Okay.

6        And so these are -- when were these installed?

7  A    These were installed at the end of April in 2009, the

8  latter part of April.

9  Q    Okay.

10       And then you started explaining what the columns mean.

11  Sorry, go ahead.

12  A    Yeah.  And then the site name, which would be the facility.

13  Kiosk is the number of the kiosk that were installed at that

14  facility.  And kiosks installed, that's the date that they were

15  installed and tested and functional.

16  Q    And what is the box below that?

17  A    The box below that, those are additional kiosks that, in a

18  sense they were kind of spares.  Additional ones were ordered.

19  And to make sure -- once -- once the whole thing was in to make

20  sure that we didn't need one here or need one there.  So there

21  were these additional ones and these are for the DOC thought

22  that they would be needed.  They were not installed by the time

23  I retired, so I don't know.

24  Q    Why would they have to order them ahead of time?  Could

25  they not just order them when they need them?

Sue Ellen Grisenti - Direct

1  A   Well, the company -- they're custom-made.  They're not off

2  the shelf.  So every time one is needed, they build it,

3  actually that specific one.  And so whenever the company calls

4  and they say we need one or we need five, then the company

5  builds one and sends it.

6  Q   Now, how do offenders know how to use these TTY kiosks?

7  A   We have instructions that once we see their phone list and

8  we enter it and set them up for the kiosk, then when we send

9  their list back, we send the instruction and then we also

10  provide them with training.  It can be better to do the

11  training right at the kiosk where you sit down and they can see

12  it.  Sometimes if you have a larger group, it -- we also do

13  regular like sort of a classroom type of training.

14  Q   Okay.

15      Let's just back up for a second.

16      Did you have any decision-making -- were you part of

17  the decision-making process as to how many TTY kiosks would be

18  installed or where?

19  A   No.  No.  We were just told when and where.  And how many.

20  Q   Who makes that decision?

21  A   I think -- I know it's the one above my level.  I think

22  possibly it's a deputy director; I'm not sure.  It's in the AR.

23  Q   Okay.

24      Let's go back to the training.  You can take a look at

25  the Exhibit B3, as in boy.

1   A    Okay.

2   Q    Can you identify that exhibit, please.

3   A    This is a PowerPoint program that the CIPS technician and I

4   worked on in order to provide the classroom-type training for

5   the offenders because I found in the -- with the offenders at

6   Territorial, that it wasn't just that they needed to learn the

7   kiosk, they needed to learn how to use the phone system because

8   they never had used the phones.  So we knew that we needed

9   something visual for them to see and also something that could

10  become a lesson plan that could be shared statewide.

11  Q    And who taught these lessons plans?

12  A    I taught Territorial, and then at the outlying facilities,

13  there's a, what we call a CIPS operator.  It's a CIPS person

14  assigned to that facility.  They're the ones who did the

15  training.

16  Q    How did you communicate with deaf offenders during these

17  trainings?

18  A    If necessary, we had the interpreters, the sign-language

19  people, came.

20  Q    And let's look at the Exhibit C3.

21       Can you identify that exhibit, please.

22  A    These are e-mails concerning training, some refusals for

23  training from offenders, and completed training logs where

24  offenders signed off that they had had the training.

25  Q    Do you know if the offenders actually used the TTY kiosks?

Sue Ellen Grisenti – Direct

1   A    I can say definitely the ones at Territorial, who are, they

2   are profoundly deaf, they have no other option, so they do use

3   it a lot and consistently.  At the other outlying facilities,

4   I -- by the time I left, I had not noticed that much use.  I

5   don't know if they weren't used to them or they just didn't

6   like them.

7   Q    Thank you.

8         MS. IBRISAGIC:  I don't have anything further.  Just

9   for housekeeping matters, I would like to move Exhibits A3, B3,

10  C3, D3, E3, and F3 into evidence.

11        MS. RIDDLE:  No objection.

12        THE COURT:  They're admitted.

13     (Exhibit A3 admitted.)

14     (Exhibit B3 admitted.)

15     (Exhibit C3 admitted.)

16     (Exhibit D3 admitted.)

17     (Exhibit E3 admitted.)

18     (Exhibit F3 admitted.)

19                     **CROSS-EXAMINATION**

20  BY MS. RIDDLE:

21  Q    Good morning, Miss Grisenti.

22  A    Hello.

23  Q    I'm Jennifer Riddle.  We met briefly when I came in this

24  morning, but I'm one of the plaintiffs' counsel, and I'm just

25  going to follow up with a few questions with regard,

Sue Ellen Grisenti - Cross

1  particularly, to the TTY kiosk installation.

2          Are you familiar with the 2008 stipulation that was

3  entered in April of 2008?

4  A    Yes.

5  Q    And the stipulation 11 which was with regard to making TTY

6  machines accessible?

7  A    Yes.

8  Q    Okay.

9          And that specifically that stipulation required that

10 TTY machines be maintained in an accessible area that

11 eliminated case-manager involvement?

12 A    Yes.

13 Q    Okay.

14         When did you become involved with the project to

15 implement the requirements of stipulation 11?

16 A    Towards the end of the installation at Territorial.  BT

17 initially was doing the kiosks at Territorial, and they got

18 them and they got them installed; and then once they were

19 installed, they did have to be able to communicate with the

20 inmate phone system.  They had to be able to pull the phone

21 numbers, check their balance, create the reports, and things

22 like that.  So at that point I became involved.  And the

23 contractor became involved so that they would actually be part

24 of the inmate phone system.

25 Q    And who was it that you were working with?  Who enlisted

Sue Ellen Grisenti - Cross

1  your help, or how did you become involved?

2  A   I think that . . . I don't know if I was directly told by

3  BT or if it was my supervisor.  'Cause my area had been moved

4  from BT to Correctional Industries earlier that year.  And so I

5  think -- I think it was my supervisor who told me that BT had

6  reached that point, that they needed to be brought on with the

7  system.

8  Q   And that was with regard to the TTY kiosks that had been

9  set up at CTCF?

10 A   Yes.  Yes.

11 Q   Okay.

12        Do you recall having contacted Cathie Holst, the AIC,

13 with regard to the installation process?

14 A   Oh, I talked to Cathie quite a bit.

15 Q   Okay.

16        Do you recall that the first time that you contacted

17 her was perhaps in the spring of 2009?

18 A   No, I know I had talked to her earlier, after the time that

19 the stipulation came out, that she and I had had conversations

20 about what would have to be done.

21 Q   Okay.

22        Was it your understanding that Miss Holst is

23 ultimately, as the AIC, responsible for the implementation and

24 enforcement of the remedial plan and the stipulations?

25 A   I guess, yes.

Sue Ellen Grisenti - Cross

1    Q    Are you aware that it was Miss Holst's opinion that TTY

2    kiosks should be placed -- the number of TTY kiosks that should

3    be placed at the facility was based on population and whether

4    they could be mixed or not?

5    A    No.

6    Q    You're not aware of that?

7    A    I didn't know the criteria.

8    Q    And you testified that the deputy direct -- it was your

9    understanding that it was the deputy director that was -- that

10   determined the number of kiosks that would be placed at

11   facilities?

12   A    I think.

13   Q    Okay.

14        And is that based on administrative regulation 850-12?

15   A    I believe it is in the regulation.

16   Q    Okay.

17        If we could look at that regulation.  That's Exhibit

18   A3.

19        And I'm going to have you turn to page 10 of that AR.

20        And under section O, this is where it indicates, it

21   says, Director of prisons or designee shall establish by

22   implementation adjustment of the facility TTY.

23   A    Yes.

24   Q    And the position having responsibility for instructing

25   other DOC employees in its use.

Sue Ellen Grisenti - Cross

1   A    Yes.

2   Q    Okay.

3          Are you aware of the implementation adjustments that

4   were established pursuant to this AR establishing those

5   positions for instructing DOC employees on the use of the TTY?

6   A    I'm sorry, I don't understand the question.

7   Q    Are you aware that facilities, pursuant to this

8   administrative regulation, created implementation adjustments

9   to establish who was responsible for training DOC employees on

10  the use of the TTY?

11  A    No.

12  Q    And you testified that you were initially responsible for

13  creating the training materials for the inmates.

14  A    Yes.

15  Q    Okay.

16          And did you train the staff on how to conduct the

17  trainings with the inmates?

18  A    Yes.

19  Q    But you didn't conduct all the trainings at the outlying

20  facilities?

21  A    No.  No, I did not.

22  Q    Do you recall training Ivonne Sargent or Jacqueline Riffe

23  at DWCF?

24  A    Yes.

25  Q    Okay.

Sue Ellen Grisenti – Cross

 1              I'm going to have you look at Exhibit C3.

 2              And there is an e-mail, it's towards the back of the

 3    exhibit, there's an e-mail dated 4-22-2009.

 4    A    I think I have it here.  From James Falk.

 5    Q    Yes.

 6    A    Okay.  I have it.

 7    Q    And do you see that that inmate indicates that the Denver

 8    complex had not received or installed a kiosk as of that date?

 9    A    Yes.

10    Q    And that there were inmates there that were going to

11    require training on the use of the kiosks?

12    A    Yes.

13    Q    And then based on Exhibit F3, it appears as though a kiosk

14    was installed on April 30, 2009.

15    A    Yes.

16    Q    And you testified that where necessary, sign-language

17    interpreters were brought in to conduct the training with

18    inmates who relied on American sign language interpretation?

19    A    Yes.

20    Q    Are you aware that there were instances that sign-language

21    interpreters were not brought in for the training for inmates

22    that required a interpreter?

23    A    The facility determined that, the liaison person for the

24    AIC there and their training people and the case manager.  I

25    think they asked the offenders did they need a sign-language

Sue Ellen Grisenti - Cross

3493

1   interpreter there.  But it was not up to the CIPS person to do

2   that.  They just provided the training.  The facility would

3   make sure that the offender was there and whatever the offender

4   needed in order to get the training.

5   Q   Okay.

6        So you were never contacted by a Captain Avant at DWCF

7   on May 1, 2009?

8   A   I'm sorry, what was the name?

9   Q   Captain Avant at DWCF?

10  A   Possibly.  I don't remember the name.

11  Q   Okay.

12       Were you ever contacted with regard to a question

13  about training of a inmate named Kaiesh Conkleton at DWCF?

14  A   Not that I remember.

15  Q   Okay.

16       Just a few more questions about AR 850-12.  And you

17  testified that the administrative regulation was effective

18  December 2008.

19  A   Yes.

20  Q   And you testified that it was superseded by a more current

21  one.

22  A   Yes.

23  Q   Correct?

24       But that new administrative regulation with regard to

25  offender telephone regulation was not implemented before May 1,

Sue Ellen Grisenti - Cross

1    2009, correct?

2    A    No.

3    Q    Okay.

4         So this AR is the administrative regulation that was

5    effective during the compliance, the relevant compliance period

6    of 2,000 -- April 2008 to May 2009?

7    A    I believe so.

8    Q    And if we look at -- back to that section O on

9    page 10 . . . actually, have you look at page 11.

10        Do you see under section A, where it says, The TTY

11   will be connected to a DOC employee phone or DOC employee

12   analogue telephone line?

13   A    Yes.

14   Q    And under C, where it says, To place a debit TTY call,

15   prior to the call being placed, a DOC employee placing the call

16   must verify the offender's case manager that they have funding

17   for the call?

18   A    Yes.

19   Q    And do you see under section F, where it says, Offenders

20   wishing to place a TTY call shall make the request to their

21   case manager?

22   A    Yes.

23   Q    So the purpose of -- is it your understanding the purpose

24   of the stipulation 11 was to make TTY accessible, you

25   testified, to make it accessible to inmates without

Sue Ellen Grisenti - Cross

1  case-manager involvement.

2  A    Yes.

3  Q    Okay.

4        So this, and I understand that this is with regard to

5  the TTY phones, not the TTY kiosks, right?

6  A    Yes.

7  Q    But is it your testimony and based on this exhibit F3, that

8  the kiosks were not actually fully installed other than at CTCF

9  until April 30 of 2009?

10 A    Yes.

11 Q    Okay.

12       So during the relevant compliance period, inmates who

13 did not have access to those TTY kiosks, at the outlying

14 facilities other than CTCF, were limited to the regulations set

15 forth in AR 850-12?

16 A    Yes.

17 Q    Effective December 2008.

18       Okay.

19       I don't have any further questions.

20       MS. IBRISAGIC:  Can I just have one more second, Your

21 Honor?

22       I just have a few more questions.

23                    **REDIRECT EXAMINATION**

24 BY MS. IBRISAGIC:

25 Q    When did BT contact you about the installation of the TTY

Sue Ellen Grisenti - Redirect

1  kiosks at CTCF?

2  A    I would think probably July or August 2008.

3  Q    And you said they were installed in August of 2008?

4  A    Yes.

5  Q    And why were they first installed at CTCF?

6  A    I don't know.

7  Q    What facility has most of the hearing-disabled --

8  A    Territorial.  And Territorial certainly has those who are

9  not hearing-impaired, but they are deaf.

10  Q    And those deaf inmates at Territorial, were they using the

11  TTYs?

12  A    Yes.  They were.

13  Q    And prior to installation of the kiosks, were the inmates

14  given an opportunity to use phones, what type of phones were

15  they using?

16  A    At Territorial, they had actually set up something to

17  actually make it easier for the offender and the case managers.

18  They had a room set up with two desks with the essentially TTY,

19  portable TTYs, mounted in them and so that it did not require

20  that the case manager had to leave their office or stand there

21  while the offender made their phone call.  It actually gave the

22  offender a little, a little better access.  It was not equal

23  access, but it was better access.  And that's what they used at

24  Territorial where those offenders were.

25  Q    Were those portable phones available at other facilities

Sue Ellen Grisenti - Redirect

1    until the installation of the kiosks as well?

2    A    Yes.  Every facility had at least one.  Some of them more

3    than one.  And I think they normally were kept in case

4    managers -- I don't know what you call them, the head case

5    manager.

6    Q    And you said you trained the inmates at Territorial on the

7    usage of the TTY kiosks?

8    A    Yes.

9    Q    When did you do that?

10   A    In August of 2008.

11   Q    Was there ever a complaint from -- to you from someone who

12   didn't know how to use TTY kiosk after you trained them?

13   A    I never, I never got any complaints.  Sometimes they shared

14   information.  You know, something that they had found or

15   learned as they were doing, which I had asked them to do.  If

16   they needed -- I told them, if you -- because it's new for us

17   as well, it's new for corrections, period.  If they could let

18   us know if they found anything that would make the instructions

19   better or would help them better.

20          And one of the things that they asked for was a

21   privacy screen because they said when they were doing their

22   conversation, that if other offenders were around, they could

23   read their conversations.  So when we -- the contractor bought

24   the additional ones, they ordered them with privacy screen in

25   them, and then they retrofitted the ones at Territorial,

Sue Ellen Grisenti - Redirect                          3498

1  because that was a valid issue.

2          MS. IBRISAGIC:  Thank you.  I have nothing further.

3          THE COURT:  Thank you very much.  You may stand down.

4          Next, please.

5          MR. QUINN:  We would call Dave Allen.

6          THE COURT:  Mr. Allen, come forward, please.

7             (**DAVE ALLEN, DEFENDANT'S WITNESS, SWORN**)

8          THE COURTROOM DEPUTY:  Please be seated.

9          THE WITNESS:  Thank you.

10          THE COURTROOM DEPUTY:  State your full name for the

11  record and spell your last name.

12          THE WITNESS:  Dave Allen, A-L-L-E-N.

13                    **DIRECT EXAMINATION**

14  BY MR. QUINN:

15  Q   Good morning, Mr. Allen.

16  A   Good morning.

17  Q   Can you tell the Court what your current position is with

18  the Department of Corrections?

19  A   I am the programs manager at La Vista and San Carlos in

20  Pueblo.

21  Q   Let's go through your history with the Department.  When

22  did you start with the Department of Corrections?

23  A   July of 1993.  As a correctional officer 1.

24  Q   And from there?

25  A   I promoted to sergeant at Territorial in '96.  I promoted

Dave Allen - Direct

1  to case manager 1 at the minimum centers in '99.  I promoted to

2  case manager supervisor at Territorial in December of 2007.

3  And then to programs manager in May of 2010.

4  Q   I want to focus on your career with the DOC from 2007 to

5  2010.

6          What was your position at that time?

7  A   I supervised case managers at Territorial, and I was the

8  chairman of classification at Territorial.

9  Q   Is that commonly referred to as case manager 3?

10 A   Case manager 3.  Case manager supervisor, correct.

11 Q   And how many case managers did you supervise?

12 A   I supervised ten case manager 1s and one case manager 2.

13 Which is the lead worker for the case manager 1s.

14 Q   Can you describe your job duties as a case manager 3 or

15 case manager supervisor?

16 A   Absolutely.  I obviously supervised case manager 1s.  The

17 chairman of classification, which involved program work

18 assignments for the offenders, movement outside of the

19 facility.  I oversaw administrative segregation, and all other

20 aspects of classification and case management.

21 Q   Can you describe generally a case manager's duties?  What

22 does a case manager in the facility do on a day-to-day basis?

23 A   They're the liaison for the offender and basically

24 headquarters and the outside, community.  Case managers

25 orientate offenders on the case-management function, including

Dave Allen - Direct

1   program work assignments.  They do assessments on the offenders

2   to see what program needs they have.  They oversee community

3   correction referrals and presentations to the parole board.

4   They do earned time.  Answer questions, orientate the offender,

5   assessment, those type of things.

6   Q   Now, you referred to the case manager as the liaison

7   between the inmate and DOC, the outside world, and I think you

8   mentioned a couple of others.  Can you describe the types of

9   issues that case managers deal with on a day-to-day basis?

10  A   You know, it may be issues within the facility, operational

11  issues.  It may be questions about community referrals, about

12  parole board, about getting into programs, both vocational,

13  educational, rehabilitative, obviously work assignment,

14  processes within the department.  Case manager 1s traditionally

15  have a great amount of knowledge when it comes to overall

16  Department operations because they have to deal with so many

17  different aspects of what's going on in the facility and how it

18  relates to the offender.

19  Q   Do they have any involvement in the grievance procedure?

20  A   Absolutely.

21  Q   What is their involvement in the grievance procedure?

22  A   Normally the case manager quite often is the first point of

23  contact.  They try to resolve those at the lowest level, which

24  means if an inmate has an issue, they'll traditionally take it

25  to the case manager, and the case manager will try to resolve

Dave Allen - Direct

1    it informally, which means within the facility and not having

2    to go through the process outlined in 850-4.

3         At Territorial, we made the -- we mandated that the

4    case managers documented that informal process.  So whatever

5    they did, if they made a phone call to this person to try to

6    resolve this situation, they had to document that, and that was

7    the first line of trying to resolve this issue.  They actually

8    gave the case manager -- or the offenders the grievances, the

9    attachment to 850-4.  And they explained to the offender the

10   process for filling out that grievance and the steps and the

11   process that's involved.

12   Q   Now, when an offender fills out a grievance, who does he

13   give it to?

14   A   Normally it's receipted in by the case manager.

15   Q   Now, I want to talk to you a little bit about disabled

16   offenders.  I mean, that's why we're here.  And I want to

17   start, I guess, with the orientation process for new arrivals

18   at Territorial.

19        Can you look at Exhibit U6.

20        At the time that you were at CTCF, what did the

21   orientation process include?

22        Well, let me back up.

23        Who provided the orientation?

24   A   Well, there's many different orientations at Territorial.

25   I think that needs to be cleared up.  There's the initial

Dave Allen - Direct                3502

1    orientation and assessment that takes place in cell house 5.

2    Q    Okay.

3    A    Which orientates the offenders on the services that

4    Territorial provides, if you're talking specifically with

5    disabilities.  And hopefully to answer some questions, maybe

6    alleviate some confusion on the offenders' part about their

7    disability and how the facility relates, can deal with some of

8    those issues.

9         But after the inmate goes from cell house 5 to a

10   permanent cell house, there's another orientation that cell

11   house staff do that's about the inner workings of the cell

12   house and then case manager, as far as my area, we do our own

13   orientation, you know, the case manager is going to meet with

14   the offender and discuss the things that we just talked about

15   as far as the case-management function.  And part of that is

16   their work restriction, their medical restrictions, or their

17   accommodation, so there's numerous orientations.  There's not

18   just this one orientation that's tell-all/end-all that takes

19   place in transportation.

20        But if that's the one you're talking about, that is

21   the initial orientation process.

22   Q    Let's start with the initial orientation process.

23   A    Okay.

24   Q    Can you look at Exhibit U6.

25   A    Okay.

Dave Allen - Direct

3503

1    Q    And what is that document, the first page of that document?

2    A    It looks like it's a new-arrival inmate orientation check

3    list, and it's attached to the IA 850-7.

4    Q    Now, is this part of the initial orientation that you

5    talked about?

6    A    Absolutely.

7    Q    And during this orientation, is -- are disabilities

8    discussed?

9    A    Yes, they are.

10   Q    And is the Montez case discussed?

11   A    Yes, it is.

12   Q    And what is the purpose of this form?

13   A    It documents that the orientation took place and some of

14   the subject matter that was discussed in that orientation.

15   Q    Is this fairly typical of a document an offender would

16   receive during this initial orientation?

17   A    Absolutely.

18   Q    And does the offender sign this document?

19   A    Yes, they do.

20   Q    Who else signs the document?

21   A    It looks like the staff member that provides the

22   orientation.

23   Q    I'd like you to look at -- there's a laundry list here of

24   orientation briefing.  What does no. 35 indicate?

25   A    Inmates with disabilities.

Dave Allen – Direct

1   Q   And after the list of orientation, there's an

2   acknowledgment.  Can you read that, please?

3   A   I acknowledge that I have been oriented to the above-listed

4   subjects or have viewed the file and have been provided and

5   have read the CTCF inmate handbook.

6   Q   Now, if an inmate needs assistance getting through the

7   orientation process, because of the disability, what generally

8   happens?

9   A   What type of assistance?  Like an interpreter.

10   Q   Yes, there's a good example.

11   A   We were fortunate at Territorial that we had interpreters

12   show up at the facility at least once a week for staffings with

13   the hearing-impaired.  But any staff member at Territorial

14   could request a hearing-impaired interpreter through the

15   administrative services manager.  So it wouldn't be that we

16   weren't able to supply the offender with that type of

17   interpreter.  We do have a list of other types of interpreters,

18   such as Spanish-speaking staff, that can assist for inmates

19   that don't, you know, that don't speak English.

20   Q   How are these orientation -- well, let me back up.

21        Is there a notation on this form whether assistance

22   was provided to an inmate with respect to a disability at the

23   time of orientation?

24   A   Absolutely.  On the bottom line.  There's a yes, no section

25   where they can check if assistance was provided.

Dave Allen - Direct

1   Q   And then there's a notation that says "type."  What would

2   that mean?

3   A   I believe, like you said, if there was a, for instance, if

4   they needed a interpreter because they were hearing-impaired,

5   they might put that in there; or if they were given a -- if

6   they had to have assistance with understanding the ADA Montez

7   handbook, they would make a notation on that line, justifying

8   the type of assistance.

9   Q   And are there written materials provided during this

10  orientation?

11  A   I'm sorry?

12  Q   Are there written materials provided during this initial

13  orientation?

14  A   Absolutely.

15  Q   Are those delivered in an accessible format for disabled

16  individuals?

17  A   I believe so.  The staff have been trained -- the cell

18  house staff actually do the orientation.  And I believe they've

19  been trained at a high level on how to deliver that material.

20  There's case managers directly in cell house 5 that are officed

21  in there to assist, if need.

22  Q   What are the ways that the written materials could be

23  provided in an accessible format?

24  A   Well, it could -- obviously verbally or in writing.  And

25  with staff assistance, if needed.  Or through interpreters, if

Dave Allen - Direct                                              3506

1    needed.

2    Q    Now, previously you had referenced a Montez handbook?

3    A    Okay.

4    Q    When you testified a few minutes ago.  What is the Montez

5    handbook?

6    A    It's part of the orientation process.  And it's attached to

7    750-4 implementation adjustment, and basically what it is is it

8    orientates the offender on these services, I believe, that

9    Territorial provides related to their disability.  And like I

10   said before, I think it helps, in my opinion, to answer any

11   questions or alleviate any concerns that the offender might

12   have.

13   Q    Let me ask you -- that raises another question.

14   A    Okay.

15   Q    This orientation process, is this an interactive process?

16   Are inmates allowed to ask questions, or do they just sit there

17   and listen?

18   A    No, absolutely.  They can ask questions.  We want to make

19   sure that they understand the process.  And we want to make

20   sure before they sign for the check list that they have been --

21   you know, we don't force them to sign.  We want to make sure

22   that they understand the processes that we have in place.

23   Q    I want you to turn to page 2 of Exhibit U6.

24        What is that document?

25   A    Are we talking about the ADA Montez facility orientation

Dave Allen - Direct

1   handbook?

2   Q   Yes.

3   A   Okay.

4   Q   Is that what that is?

5   A   That is what that is, correct.

6   Q   And what is the date on that document?

7   A   December 10, 2008.

8   Q   And there's a signature on the bottom of that.  Whose

9   signature is that?

10  A   That is the warden of Colorado Territorial Correctional

11  Facility, and her name is Pam Ploughe.

12  Q   If you turn to the next page, there is a number of sections

13  in this document, correct?

14  A   Correct.

15  Q   And I want to go through those.  Let's start with the

16  forward section.  Can you read that -- you're familiar with

17  this document, correct?

18  A   Yes.

19  Q   How many times have you seen it?

20  A   In three years, numerous.

21  Q   Okay.

22  A   I'd say.

23  Q   I want you to read the first section.

24  A   Okay.  Inmates who have disabilities shall be provided

25  reasonable accommodations to ensure that they have access to

Dave Allen - Direct                                     3508

1    comparable programs, services, and benefits provided to

2    nondisabled inmates in CTCF.  This handbook is intended to

3    provide inmates with disabilities the information needed to

4    successfully and safely function in a correctional setting and

5    is supplemental to the complete facility new-arrival inmate

6    orientation handbook.

7    Q    What is the purpose of that paragraph?

8    A    I think it provides, like I said, a statement that

9    Territorial provides services for the disabled.  And then it

10   kind of goes into listing some of those services with -- for

11   sight, hearing-impaired, the kiosk, interpreters, and so on.

12   Q    Now, the next paragraph, can you read that paragraph?

13   A    An inmate with a disability may submit a request for

14   accommodation available from any DOC employee for access to

15   benefits, programs, or services directed to the ADA inmate

16   coordinator, AIC, at DOC central office by intrafacility mail

17   and may attach one additional page, if necessary.  Inmates may

18   request assistance from their case manager to complete the

19   request for accommodation, medical release form, and

20   functional-ability questionnaire.

21   Q    And what is the purpose of that paragraph?

22   A    I believe it's to inform the inmates on the process to

23   request an accommodation.  In a brief paragraph, how to go

24   about doing that.

25   Q    Now, following that general statement and the information

Dave Allen - Direct                                  3509

1  relating to requesting accommodations, there are a number of

2  paragraphs after that.  What -- let me back up.

3          What is the next section?

4  A    Excuse me.

5          The next section discusses communication for sight-

6  and hearing-impaired.

7  Q    And what kind of accommodations are provided at CTCF to

8  ensure communication for sight- and hearing-impaired?

9  A    Well, obviously we have the kiosk system.  We have

10  interpreters available for different services, which we went --

11  I feel we went far beyond what we had to do in that aspect.  A

12  lot of times we provided interpreters for, you know, Christmas

13  plays, if the chaplain requested it and they had a

14  hearing-impaired offender, that there would be staff available

15  to talk about schedules, movement schedules, they'd have OCAs

16  provided in the cell houses if needed.  So there was many

17  different avenues that we attempted to try to provide adequate

18  communication.

19  Q    Now, does this paragraph inform the inmates of what sort of

20  accommodations may be provided?

21  A    Absolutely.  In a general statement.

22  Q    And what are those accommodations?

23  A    It says here, Qualified interpreters on a scheduled basis,

24  hearing aids, close-captioned televisions, videos, talking

25  book, library access, and other material available in the

Dave Allen - Direct

1  general library.

2  Q   It references qualified interpreters on a scheduled basis.

3  To your knowledge, what was that schedule?

4  A   As I recall, the hearing-impaired offenders would meet once

5  a week.  I had one of my case managers actually oversee that

6  process.  And they'd meet once a week with the interpreters to

7  discuss different issues within the facility.

8  Q   And we'll get back to that.

9         The next section, and you had mentioned this

10 previously, is the TTY kiosks, and we just heard some testimony

11 about those.

12        What is the purpose of this paragraph, as it pertains

13 to the orientation of offenders?

14 A   It's a statement that basically says that kiosks will be

15 available to hearing-impaired offenders; they will have proper

16 instructions on how to use them, and if for some reason the

17 kiosk system is not available due to a maintenance issue, that

18 we will provide and did provide the TTYs as a backup.

19 Q   And you had already touched on the next section, which is

20 interpreters.  And I think you had testified that interpreters

21 were provided on a scheduled basis.  What was the purpose of

22 that scheduled interpreter availability?

23 A   Information sharing, I believe.  If you're talking about

24 the weekly meetings with the hearing-impaired.

25 Q   Yes.

Dave Allen - Direct

1  A   It was an information-sharing meeting.

2       They had an opportunity to talk about different issues

3  or concerns that were going on within the facility.  As related

4  probably to their disability.

5  Q   So it was more of a group meeting?

6  A   Yes.

7  Q   As opposed to an individual?

8  A   I believe it was.

9  Q   Were interpreters provided on an individual basis?

10 A   Absolutely.

11 Q   And when were those interpreters provided on individual

12 bases?

13 A   It could be a wide variety of various things that happened.

14 It could be a meeting with medical.  It could be a disciplinary

15 hearing, it could be a meeting with mental health.  It could be

16 a program, like I said, even a Christmas play.  We had the

17 ability at Territorial, was a process in place, that staff

18 could request a interpreter for the hearing-impaired.  It was a

19 form that you filled out, and it was submitted to the

20 administrative services manager.  And I believe she consulted

21 with the AIC, and so a lot of those things that were maybe out

22 of the ordinary we still tried to provide interpretation for

23 those offenders.

24 Q   You had talked about, you know, COPD hearings and medical

25 meetings.  Were interpreters provided for programmatic access?

Dave Allen - Direct

1   A    Religious services, absolutely.

2   Q    Aside from religious, say a deaf offender is in a alcohol

3   program or a sex-offender program.  Were interpreters provided

4   for those types of program?

5   A    Yeah, mental-health group, any meetings, sex-offender

6   treatment, drug and alcohol, those were all things that we, we

7   provided, the state provided interpreters for.

8   Q    And you had testified a little bit about interpreters

9   available for religious services?

10  A    Absolutely.

11  Q    How often did something like that occur?

12  A    You know, I would hate to comment on that 'cause I really

13  don't know.  I know, I recall there was a few instances where

14  interpreters were requested for religious services.  And the

15  ones that comes to mind is the one I told you about, a

16  Christmas play, a chaplain was putting on Christmas play, and

17  they wanted interpreters there because it was obviously going

18  to be some offenders watching that that had that disability.

19  Q    Now, the next section of the orientation deals with

20  housing.  Does CTCF have a ADA accessible cell?

21  A    Yes, they do.

22  Q    And what is the purpose of this paragraph as it pertains

23  to, to the orienting the inmates?

24  A    I believe it makes a statement informing the offender that

25  we do have the ability to house mobility-impaired offenders in

Dave Allen - Direct

1    accessible cells, and we do have strobe-equipped cells for the

2    hearing-impaired, and it goes on to state what cell houses

3    those accessible cells are in.

4    Q    And turning to the next page, after cells is inmate counts.

5    What is an inmate count?

6    A    It's exactly what it is.  It accounts for the offenders

7    that are there to make sure that obviously there hasn't been

8    any, an escape and all the inmates are healthy and accounted

9    for.

10   Q    How often does that occur?

11   A    It depends on the facility.  Normally it's four times

12   within the 24-hour period.

13   Q    And with respect to disabled offenders, how are they

14   accommodated with respect to inmate count?

15   A    As far as?

16   Q    Well, the accommodations provided so that they know that

17   there's an inmate count or when they're to be counted, what

18   does this document advise me?

19   A    It does say that counts, meal times, and controlled

20   movement will be by . . . that hearing-impaired offenders will

21   be notified by flashing cell lights and notification of formal

22   counts will be five minutes prior.  Physically challenged

23   inmates who are unable to stand up for formal counts -- 'cause

24   we do have counts where inmates are mandated to stand --

25   they'll be able to remain in wheelchairs or sitting in the

Dave Allen – Direct

1    upright position.  And inmates that have other disabilities

2    where they cannot stand will be reasonably accommodated.

3    Q    And did that occur at Territorial?

4    A    Absolutely.  In fact, we had numerous systems.  The unique

5    thing about Territorial is we have the greatest, most diverse

6    inmate offender population in the state.  So oftentimes one

7    system that would work at a traditional facility unfortunately

8    wouldn't work at Territorial.  So we had to sometimes put

9    numerous systems.  And this is a good example of we not only

10   used the flashing lights, the intercom system, OCAs were placed

11   in different wings to assist in this process of notification,

12   and we had staff members designated to those wings to oversee

13   that process.

14   Q    And we'll get to the verbal -- well, okay.

15         The next section is mail, laundry, canteen procedures.

16   And can you just tell the Court what the general purpose of

17   this section is?

18   A    It's a statement advising the offender of the postings for

19   mail and laundry, where they'll be posted for pick-up, and it

20   also has a schedule for mail, laundry, canteen distribution,

21   and toilet paper distribution.

22   Q    Now, is that a set schedule, occurring at the same time in

23   any given week or day?

24   A    Absolutely.

25         Barring some type of emergency.

Dave Allen - Direct

1   Q   Now, the next section is encaptioned "verbal announcement,

2   alarms."  And it says, Inmates with disabilities will receive

3   special assistance regarding notifications, PA announcement, PA

4   announcements, and alarms.  Is there a distinction between this

5   type of announcement or alarm and the count you had previously

6   discussed?

7   A   For example, like a fire alarm?

8   Q   No.  It says -- let's say a PA announcement.

9   A   Okay.

10  Q   What's the difference between just a PA announcement and

11  count?  Let me ask the question this way.  Are PA announcements

12  given to general, the inmate population in general, or are they

13  given to specific inmates or both?

14  A   Both.  I mean, it could be an announcement that goes

15  facility-wide.  It could be an announcement that's only heard

16  in a specific cell house for a specific offender to, that

17  they're needed at, say, medical, or case manager.

18  Q   Okay.

19        Let's use that example.

20  A   Okay.

21  Q   Say an inmate with a hearing disability is needed in

22  medical.  How would he be advised to go to medical?

23  A   We have OCAs assigned.  There's actually three different

24  types of OCAs at Territorial.  There's OCA messages, an OCA 1

25  and OCA 2.  And the hearing-impaired offenders that qualified

Dave Allen - Direct

1    were assigned offender care aide in instances like that.  Staff

2    was also a resource.  Like I said, we were fortunate at

3    Territorial to have a correctional officer assigned in each

4    wing along with the case manager that assisted in that process.

5    Q    Appointments in medical.  Is a verbal announcement the only

6    way an inmate is advised to go to medical or that he has an

7    appointment in medical?

8    A    They're posted.

9    Q    When you say "posted," what does that mean?

10   A    They're posted in the units, the schedules for medical

11   appointments.  And that's part of the OCA's responsibilities, I

12   believe, within the cell house, along with staff, is to assist

13   that, those offenders with disabilities and make sure that they

14   know if they have those type of appointments coming up.

15   Q    Now, the next section is subcaptioned "emergency evacuation

16   procedures."  Can you read that section.

17   A    In emergencies the evacuation of inmates with disabilities

18   will be the primary responsibility of designated correctional

19   staff.  If there is insufficient correctional staff to

20   accompany inmates with disabilities during an emergency,

21   additional facility staff will respond.  At no time will the

22   evacuation of inmates with disabilities be designated to other

23   inmates.

24   Q    And to your knowledge, did that occur in Territorial when

25   there were emergency evacuations?

Dave Allen - Direct

1   A   The staff had the ultimate responsibility to evacuate all

2   offenders within the cell house.

3   Q   The next part of the orientation deals with work programs,

4   assignments, and access.  And we're going to talk about the job

5   and programmatic access issues after we get through the

6   orientation issues.

7          But I guess what is the purpose of providing the

8   inmate with this information at orientation?

9   A   It's a statement that tells the offenders with disabilities

10  that we do have programs and assignments that they can

11  participate in and that including, and then it lists the

12  different working program assignments; and also that we do have

13  accessibility to different areas throughout the facility for

14  offenders that may be mobility-impaired.

15  Q   Now, when you referenced, you said that we have programs

16  and jobs that inmates with disabilities can participate in.

17  Are those programs and jobs any different than any other inmate

18  would be -- any nondisabled inmate would be permitted?

19         In other words, are there separate programs for

20  disabled inmates and nondisabled inmates?

21  A   No, I wouldn't -- I wouldn't go as far to say that.  An

22  inmate that has a disability can request any work or program

23  assignment.  There's a process in 850-3 that's outlined where

24  the supervisor of that program or assignments communicates with

25  the AIC and the offender and they decide if an accommodation

Dave Allen - Direct

1  can be made for that inmate to be placed in that work or

2  program assignment.

3           On the other hand, like I said, any inmate, regardless

4  of disability, can request any work or program assignment at

5  Territorial.

6  Q   The next section deals with recreation.  And what does this

7  inform the ADA Montez offenders of with respect to recreation

8  at Territorial?

9  A   It's a statement that informs the offender of the

10 opportunities for participation within recreation.  It also

11 states that there is a time slot reserved for mobility-,

12 sight-, and hearing-impaired, and inmates over the age of 50.

13 Q   For recreation?

14 A   For recreation.

15 Q   Why don't you look at Exhibit L3.  We'll come back to this.

16 But I want you to look at Exhibit L3.

17           Can you identify that document?

18 A   It's a recreation calendar for the month of January 2009.

19 Q   And on every day pretty much there's a notation, 3 to

20 4 p.m. 50 plus slash mobility-impaired slash DD.  What does

21 that mean?

22 A   That's the activity that's geared toward that segment of

23 the population, 50 plus or mobility-impaired, and that's what

24 they have scheduled for that day for that group.

25 Q   So from three to four, pretty much every day, the

Dave Allen - Direct

1  recreation area is reserved for 50 plus, mobility-impaired and

2  DD?

3  A   Absolutely.

4  Q   And what is DD?

5  A   It's developmentally disabled.

6  Q   Let me ask you this.  Are other general population inmates

7  that are not 50 plus, mobility-impaired or DD allowed in the

8  recreation area during this time?

9  A   No.

10        If I can clarify, though.  That doesn't mean that,

11  just so we're not confused, that doesn't mean that this segment

12  can't participate in other recreational times.

13  Q   Okay.

14  A   You understand what I mean?  If you're DD, it doesn't mean

15  that you have to go at this time.  You can go with general

16  population recreation.  We're not eliminating that from the DD

17  offenders or the mobility-impaired or the plus 50.  What we're

18  saying is you have this time set aside, if you want to access.

19  Q   Okay.

20        So these particular offenders, the 50 plus, mobility,

21  and impaired, can go to recreation at any time any general

22  population inmate can go to recreation?

23  A   Absolutely.  We're not restricting them from going to

24  recreation activities with general population.  What we're

25  saying is we have this time set up if you want to use it.

Dave Allen - Direct                    3520

1   Q    And that's exclusively for their use?

2   A    It's exclusively for their use.

3   Q    Why do you have that set up?

4   A    Well, oftentimes, in a correctional setting, general

5   population offenders, especially ones that lift a lot of

6   weights or participate in a lot of physical activities,

7   sometimes try to monopolize certain things.  You might have one

8   group that may try to monopolize the weight pile or try to

9   monopolize the basketball court, and it's difficult,

10  intimidating sometimes for some of those offenders to get the

11  equal access or to feel comfortable getting the access they

12  need or desire.  So we set up that time just to make sure that

13  those things aren't happening and that they do have not only

14  equal access but a little more access, just in case.

15  Q    Now, do you ever get any feedback from the inmates about

16  this?

17  A    Absolutely.

18  Q    And what was that feedback?

19            MR. MYHRE:  Objection, hearsay.

20            THE COURT:  Overruled.

21            THE WITNESS:  You know, there was some discussion, and

22  I can't tell you the time, about we reviewed this process with

23  possibly eliminating that time.  And the inmates kind of got

24  together and said they really needed it.  That it was important

25  to them, it gave them the opportunity to have their own period

Dave Allen - Direct

1    of time.  So we ended up keeping that in our schedule.

2           THE COURT:  Let's take the break now for about 15

3    minutes, please.

4        (Recess at 10:18 a.m.)

5        (Reconvened at 10:39 a.m.)

6           THE COURT:  Thank you all.  And be seated, please.

7           Go ahead, please.

8    BY MR. QUINN:

9    Q   Now, Mr. Allen, I want you to go back to Exhibit U6.

10          Again, this is the orientation materials provided to

11   disabled offenders at Territorial.  Could you turn to page 4.

12          And the orientation provides some information with

13   respect to food service.  What are inmates told when they

14   arrive at Territorial with respect to food service?

15   A   There's a statement here that informs the inmates that the

16   first three rows of the tables in the north dining, dining

17   room, as well as some first-row seats in the south end of the

18   room are reserved for physically challenged inmates and seating

19   in this area is restricted to those individuals who are unable

20   to obtain trays, beverages without assistance.  The OCA or

21   food-service worker will assist physically challenged inmates

22   as needed with trays, et cetera.

23   Q   So at Territorial there are two dining halls?

24   A   It is.  There's a dining hall that's split north and south.

25   Q   And how are these three rows of tables or the rows of

Dave Allen – Direct

1  tables referenced in this paragraph, how are they different

2  from the other tables in the dining room?

3  A   A traditional table is just a metal table with benches.

4  It's all one unit.  These tables are just a table.  So some of

5  them don't have those seats, so a wheelchair-bound offender can

6  push himself in there.  Some other ones might have a swivel

7  chair where they're not confined so close to the table.

8  Q   And the next section deals with diabetic accommodations.

9  What information are inmates provided with respect to diabetic

10  accommodations at CTCF?

11  A   That the offenders will be provided training, including

12  written information, that complies with the American Diabetes

13  Association guidelines that medical care appropriate to the

14  individual be available from health-care providers.  All

15  questions will be answered by clinical-services staff.  Finger

16  sticks and insulin med lines will be held twice daily in

17  accordance with our movement schedule, 355A.  And that inmates

18  are permitted to take six glucose tablets outside their cell to

19  their work assignment or recreational activity or religious

20  activity, any activity outside of the cell house.

21  Q   Next page advises inmates health-care appliances.

22        Can you summarize what the inmates are oriented on

23  with respect to health-care appliances?

24  A   There's a statement that kind of tells that the health-care

25  appliances have to be prescribed by -- and approved by clinical

Dave Allen - Direct

1   services.  There's some general definitions of what health-care

2   appliances include, that they should be documented on the

3   property inventory.  And whenever they're in need of repair or

4   replacement, inmates should utilize the approved procedures and

5   processes notifying clinical-services staff.  And that they're

6   financially responsible for damage to appliances, if it's

7   negligent.

8   Q   So are they responsible for normal wear and tear?

9   A   No.  Only if it's some type of -- it's deemed negligent.

10  Misuse.

11  Q   And would that include wheelchairs?

12  A   Exclusive to wheelchairs is what it says.

13  Q   Now, the final section is captioned "ADA grievance

14  procedure."

15          What does that advise the new-coming offenders of?

16  A   The processes in regulation 750-4 that case manager will

17  assist them with preparation of that grievance if needed.  And

18  if we're unable to resolve it, their issue related to their

19  disability, that they can utilize this process.

20  Q   I want to move now and talk to you a bit about the job

21  procedures.  Job access at Territorial.

22          What was your involvement in the job process at

23  Territorial?

24  A   I was chairman of the classification committee.  Facilities

25  use a generic term called the job board, but it is the

Dave Allen – Direct

1    classification committee, so I oversaw that process.

2    Q    Can you look at Exhibit O3.

3            What is that document?

4    A    It is the administrative regulation regarding offender

5    assignment and pay, 850-3.

6    Q    And there are a number of definitions in here.  You just

7    mentioned the classification committee and that you were the

8    chair of that committee.  Can you tell the Court what the

9    classification committee is.

10   A    This committee oversees classification functions within a

11   particular facility.  It may be assignment of offenders to a

12   program or work system.  It may be overseeing movement inside

13   the facility or externally, and it may oversee the processes of

14   administrative segregation.

15   Q    And who, I guess, is on the classification committee?  How

16   many members are there?

17   A    It varies per facility.  But at Territorial, there were

18   four members.  I was the chairman.  The custody and control

19   manager, the programs manager, and the facility intelligence

20   officer.

21   Q    And on the next page, it references a -- references master

22   program schedule.  Can you tell the Court what that is?

23   A    It's a data system that the Department utilizes through

24   DCIS that's used to refer, assign, evaluate, and pay offenders

25   for paid work program assignments.

Dave Allen - Direct

1  Q   And if you look down a little further, there's a definition

2  regarding reasonable accommodations.

3        Can you read that?

4  A   Absolutely.

5        Provision of special equipment, a assistive device, or

6  a modification to a structure, program, policy, practice, or

7  procedure which enables an otherwise qualified offender with a

8  verified disability to participate in a program or service

9  despite their disability.

10 Q   I want you to turn to page 3 of AR 850-03.

11       Starting at the bottom there's a letter C, offender

12 assignments.  And then turning to the next page, no. 3.

13       Can you read no. 3, please.

14 A   Every assignment will have a title, specific duties, and

15 essential functions to include physical requirement associated

16 with the assignment.  Electronic versions of the approved

17 offender assignment descriptions are located on the DOC share

18 drive.  The most current revision date is documented on each

19 assignment description.  Facilities units wishing to create new

20 or additional offender assignments shall submit the

21 recommendation and justification in writing to the offender

22 assignment committee for review and approval slash denial.

23 Q   Is this what's commonly referred to as the standardized job

24 descriptions?

25 A   Absolutely.

Dave Allen - Direct

1  Q   And moving down to 3B, can you tell me what that paragraph

2  says?

3  A   Offenders with verified disabilities shall be provided

4  reasonable accommodations to ensure that they have access to

5  comparable programs, services, and benefits provided to

6  nondisabled offenders.  And then they list the ADA standard.

7  Q   And let me back up here.  What is the purpose of this

8  regulation?

9  A   It outlines a systemic process for all facilities to follow

10  when they assign an offender to a work or program assignment.

11  Q   Now, the next letter down, 3C, references an assignment

12  manual.  What is that?

13  A   It's a book that's located in the general library that has

14  a list of all the assignments at a respective facility,

15  program, and/or work.  It also contains a job-assignment roster

16  that shows the number of jobs in each category, such as

17  education and their percentages, how many, how many jobs are

18  actually there and how many inmates are assigned.

19  Q   So does that list available jobs or all jobs?

20  A   It has all jobs.

21  Q   Okay.

22  A   It has all jobs.

23  Q   And the next paragraphs referenced an MPS pay quota report.

24  What is that?

25  A   That was what I was talking about, the assignment sheet,

Dave Allen - Direct                                              3527

1   the quota report that's pulled off of DCIS that the database,

2   and it has list of all the assignments within a facility, how

3   many inmates are assigned, total assignments, percentages.

4   Referrals, if there's anyone referred or anyone wait-listed to

5   that particular assignment.

6   Q    Now, in addition to jobs, are there programs at CTCF?

7   A    Absolutely.

8   Q    Are inmates paid to attend those programs?

9   A    Absolutely.

10  Q    Now, I want you to look at the next page, and starting with

11  Roman numeral E -- not Roman numeral, but letter E, titled

12  "referral."

13         Now, and I want to talk to you about the whole process

14  or procedure when an inmate wants a job, how does he go about

15  getting that job?

16  A    At Territorial, it was initiated through case management.

17  The offender would meet with their respective case manager and

18  discuss job options, what the inmate -- what skills he'd like

19  to acquire while he was there, or what skills he had.  It was

20  an interactive discussion.

21         If the offender met the criteria -- and let me clarify

22  on criteria.

23         There's certain criteria for certain jobs throughout

24  the Department, offender jobs.  For example, to go outside the

25  secure perimeter and work on a outside labor crew, you have to

Dave Allen - Direct

1  be within a certain amount of time of release.  So if an

2  offender came in and was interviewed and he had a significant

3  amount of time, he may not meet the criteria for that

4  particular job.  Based on length of sentence.

5  Q   Okay.

6  A   So those are the type of things that were discussed.  Did

7  the offender meet the criteria that was listed in the job

8  description and/or policy.  It was an interactive discussion.

9  The case manager would then fill out some documents, along with

10 the working file, and bring it to what we call job order.

11 Which in most facilities -- at Territorial, happened once a

12 week.

13 Q   Now, this letter E in 850-03, does that basically codify

14 the procedure you just talked about?

15 A   Except they do mention code 13s.  Now, if an offender does

16 not meet the criteria for a specific job, similar to the

17 example I gave with too much time to go outside the secure

18 perimeter, we would document that through the code 13 system.

19 Q   Okay.

20         We'll get to that.

21         No. 1 under E says, Case managers are responsible for

22 coordinating assignments for offenders and MPS.  How do they go

23 about doing that?

24 A   The process at Territorial was the case manager actually

25 brought them to job board.  The job board, we had overall

Dave Allen - Direct

1   authority on where the inmates, what program or work assignment

2   they would go to.  The case manager would bring them in.  If

3   job board approved the assignment or assigned them another

4   place, at that time the referral was made through MPS.

5   Q   Okay.

6   A   So what we did is we, at Territorial, a case manager

7   wasn't -- didn't have the authority to refer anyone to any job

8   without going through the job board.

9   Q   Now, when you say "at Territorial," we're discussing an

10  administrative regulation 850-03.  Does the administrative

11  regulation apply systemwide or just to Territorial?

12  A   Well, as we --

13          MR. MYHRE:  Objection, lack of foundation.

14          THE COURT:  Overruled.

15          THE WITNESS:  As we know, regulations are guidelines,

16  and some facilities, based on staffing, may not have the

17  ability to have a true classification committee.  There may be

18  facilities, Delta and Rifle, that may have just a

19  classification chairmen.  So these are, ARs are guidelines, and

20  we implemented them at Territorial within those guidelines.

21          Does that answer your question?

22  Q   My question is Exhibit 03 is an administrative regulation

23  correct?

24  A   Exactly.

25  Q   And that would apply systemwide?

Dave Allen - Direct                                                    3530

1   A    And it would.  It would.

2   Q    Now, under letter E, 1A.  It talks about what a case

3   manager does initially.  Can you go ahead and tell the Court

4   what the case manager does.  When the inmate comes to him and

5   says, I would like a job.

6   A    That's when that interactive interview is going to take

7   place.  And, you know, the case manager is going to look at the

8   reasoning behind why he wants a job.  If it will provide skills

9   for that offender, if the offender has skills in that area.

10  And do they meet the criteria for that individual assignment

11  based on policy or the job description.

12  Q    Now, what else would the case manager look at, other than

13  just interviewing the offender?

14  A    Diagnostic needs, programmic needs.  If an inmate comes in

15  and requests a work assignment, say, for example, a computer

16  program assignment that part of that criteria is a GED, you

17  know, the case manager may say, diagnostically,

18  programmatically, we need to get you into GED to help better

19  your chances of success.

20  Q    Okay.

21       And moving down, letter B.  States that prior to

22  referral, case manager will assure that offenders meet the

23  minimum requirements before referring an offender to an

24  assignment.  E.g., food handler certificate, high school, GED

25  diploma, comma, vocational certificates, et cetera.

Dave Allen - Direct

1    Is this the code 13 you were referring to before?

2  A    Absolutely.

3  Q    Assuming there are no -- well, let me ask you about code

4  13.  Is a disability considered a code 13?

5  A    No, it is not.

6  Q    Can you give -- you gave an example of certain number of

7  time till your release date.  Are there -- what other examples

8  of code 13s can you give?

9  A    Well, the other example I gave was if an offender wanted to

10  be involved in a program, a lot of vocational programs will

11  require a GED.  If they do not have a GED, that would be a

12  reason for a code 13.  If an offender wanted to cook in the

13  food-service department and they could not get a food-handler

14  certificate, because of, for example, if they had infectious

15  disease, that would be an example of a code 13.  Where they

16  just do not meet the criteria based on policy or the job

17  description.

18  Q    And paragraph C talks further about the code 13.  And they

19  refer to it as an eligibility review.  What does the case

20  manager do with the code 13 information?

21    Assuming an inmate has a code 13, wants access to the

22  kitchen and doesn't have a food-handler certificate; is that a

23  code 13?

24  A    It could be.  Correct.

25  Q    And what, what would happen then?

3532

1  A   The offend -- we would look for a -- possibly another work

2  or program assignment.

3  Q   And after the offender meets with his case manager and they

4  come up with, with a program or a job and there is no code 13

5  issue, what happens next?

6  A   The paperwork is filled out, job-assessment form and the

7  working file are brought to job board.

8  Q   Now, when you said job board, that --

9  A   That classification committee.  Like I said, that's generic

10  term that's been coined for many years to kind of simplify the

11  process in staff and offenders' minds.

12  Q   Now, moving down under letter E to no. 2, is that what,

13  what you just referred to?

14  A   Absolutely.

15  Q   And what does the classification committee do when the case

16  manager and the offender appear before the classification

17  committee?

18  A   The case manager brings in the material, the working file

19  and the appropriate forms; and we review it, we review the

20  job-assessment form and the working file.  And basically we're

21  looking for public safety and security issues, violence, drugs,

22  escape history, disciplinary conviction, length of sentence,

23  STG affiliation, and we have that multidisciplinary committee

24  set up that reviews this information.  We get some feedback

25  from the case manager.  And we make a determination for

Dave Allen – Direct

1   appropriate placement in a work or program assignment.

2   Q   Now, moving down to letter B, can you read that, please?

3   A   Prior to assignment, the classification committee is

4   expected to review the totality of an inmate's behavior,

5   working file, and any other relevant and available information.

6   Clearances may be denied based on failure to meet established

7   criteria or any other information, behavior the classification

8   committee deems relevant, except the offender's disability

9   status.

10  Q   So is the offender's disability status considered by the

11  classification committee in making an assignment?

12  A   Absolutely not.

13  Q   What happens next, after the classification committee

14  reviews all of the materials in front of them, what do they do?

15  A   We look at if the job is available -- and that's what you

16  were talking about when you, when you asked about the quota

17  report, we do have one of those in classification to determine

18  the available vacancies within the particular work or program

19  assignment.

20       After that, the inmates are referred to the work

21  supervisor where the classification committee assigned them.

22  Q   And are there any forms generated by the classification

23  committee before they send it to the work supervisor?

24  A   Yeah, there is a form that we all have to sign off on that

25  has all the information, relevant information, security

Dave Allen - Direct

 1    information.  There's even a section where the inmate can

 2    request, if he wants a specific job within the facility, that's

 3    all generated by the case manager 1 and brought to job board.

 4    We make the assignment on that form.  We have signatures on

 5    that form.  The referral process, then the referral is made

 6    by -- through MPS to the work supervisor, and that's when the

 7    whole interview process takes place in coordination with the

 8    AIC; if an accommodation is being requested, that's all done by

 9    the work supervisor.

10    Q    Okay.

11         When is the inmate provided with information

12    concerning the job description and the physical requirements of

13    the job or the essential functions of the job, when does the

14    inmate receive that information?

15    A    They can look at it at any time.  That's the documents that

16    are kept in the general library that we discussed earlier, a

17    list of all the job description, all the available jobs and

18    descriptions, criteria is kept in the general library for

19    viewing.  They can also get that information from the case

20    managers 'cause it is on the Department's database.

21    Q    Now, you testified that then the inmate meets with the

22    supervisor.  What occurs at that level?  Does the inmate have

23    the job at that point?

24    A    Does he have the job.  Unless there's a reason that he

25    cannot do the job.

Dave Allen - Direct

1   Q   Okay.

2           Let's talk about that process.  What happens there?

3   The inmate is referred to the supervisor; what occurs?

4   A   If it's a non-ADA offender or an ADA offender.  The process

5   is a little bit different.

6   Q   Let's do both.  Let's talk about a non-ADA offender.

7   A   Okay.  The work supervisor will meet with the offender and

8   go over expectations.  There's also going to be some paperwork

9   to fill out if non-ADA, the job description to make sure that

10  the offender knows that this is the description, this is the

11  requirements.  Any type of safety orientation will be done by

12  the work supervisor.  And other than that, maybe some internal

13  question and answer between the work supervisor and the

14  offender.  After this paperwork is signed, the offender is

15  picked up officially through MPS by the work supervisor, and

16  report dates and all that are determined.

17  Q   Okay.

18          You said there's paperwork involved.  Is an inmate

19  required to sign anything?

20  A   Yes, they are.

21  Q   And what specifically would they be required to sign?

22  A   The job description.

23          And any type of safety orientation that may be

24  involved with the work supervisor and the offender, if they

25  have to go over, maybe not the first day, but before they get

Dave Allen – Direct

1   involved in the job assignment, they'll go over the safety

2   orientations, especially if it's a maintenance job or they're

3   expected to run some type of equipment.

4   Q   You said they were required to sign the job description.

5   What does that job description include?

6   A   It has a basic description of what their duties will be, as

7   I recall, and the criteria that must be met for that particular

8   assignment.

9   Q   Now, let's talk about if an offender does have an ADA

10   disability, what occurs?  I think this is codified on page 6 of

11   the Exhibit 850-03.  Can you look at no. 4.

12          And can you look at subparagraph A.  And can you read

13   that, please.

14   A   If the offender does have an ADA alert and is not

15   requesting any accommodation, the work supervisor must call to

16   inform the AIC designee if, if accommodation is not being

17   requested, AIC designee will enter "no accommodations

18   requested" on the back of the assignment description.

19   Q   So regardless of whether an accommodation is requested, the

20   AIC office is contacted?

21   A   Absolutely.

22   Q   Now, moving down, paragraph B, why don't you go ahead and

23   read that.

24   A   In claims he slash she is unable to perform the essential

25   functions or meet the physical requirements of the assignment,

Dave Allen - Direct

1    the work supervisor must call the AIC designee to discuss what

2    reasonable accommodation, if any, can be provided.

3    Q    So if the offender does have an ADA letter and says I can't

4    perform these essential functions, the AIC is contacted?

5    A    Yeah, in either case, whether they say they can or they say

6    they cannot, the work supervisors are mandated to notify the

7    AIC.

8    Q    And what type of discussion occurs at that level, with the

9    AIC?

10   A    You know, I've never actually sat in one of those

11   interviews, but I would imagine it's --

12            MR. MYHRE:  Your Honor, I'm going to object.

13            THE COURT:  Sustained.

14            THE WITNESS:  Okay.

15   BY MR. QUINN:

16   Q    Now, moving down to no. 5, it references in all cases what

17   the work supervisor is required to do.  Can you read that,

18   please.

19   A    Print the assignment description and sign it along with the

20   offender, keep a copy of the signed assignment description on

21   file until the offender changes assignments.  When the

22   assignment ends, the work supervisor will forward the copy to

23   the case manager for inclusion in the offender working file.

24   The original will be forwarded along with the accommodation

25   verification form to the classification committee.

Dave Allen – Direct

1   Q   And to your knowledge, was that occurring at Territorial?

2   A   It was.  There's a -- there's a section on the

3   accommodation verification form that I believe has to be

4   signed.  By member of the classification committee.

5   Q   Now, on page 7 of this regulation, there's a reference to

6   when an offender gets into a job and needs a change in

7   accommodations.  I want you to look at paragraph F2C.

8        What happens in that situation?

9   A   The work supervisor is mandated to, once again, contact the

10   AIC and discuss requested change in accommodation.

11   Q   And I want to back up, I guess, just a minute.

12        Can you turn to attachment B that's attached to this

13   regulation.

14        What is that document?

15   A   Accommodation verification form.

16   Q   And what is the purpose of this document?

17   A   It's basically for the work supervisor to document that

18   they did talk to the offender and they did place the call to

19   the AIC, and it has a place for the work supervisor to sign and

20   for the offender to sign.

21   Q   The upper half of that document indicates that there's a

22   box that says, able to perform all essential function for

23   specific assignment.

24        When would that be checked?

25   A   After the call was made to the AIC.

Dave Allen - Direct

1   Q   And then there's another box that says, Unable to perform

2   all essential function for specific assignment referral is

3   listed.  I assume that's checked before or after contacting the

4   AIC?

5   A   Absolutely.

6   Q   When would that be checked?

7   A   After -- both of these would be checked after conferring

8   with the AIC.

9   Q   And then there's a box that says, Call placed to the AIC

10  designee, date and employee contacted, and then a blank line.

11          Correct?

12  A   Correct.

13  Q   And then the bottom half, there's a signature line.  Well,

14  there's a signature line for the work supervisor for the

15  offender, on the upper half?

16  A   Correct.

17  Q   And then there's a -- the bottom half says, Classification

18  committee use only below this line.  And there's a signature

19  line for committee signature.  Do you receive this document

20  after the AIC is contacted?

21  A   During this, this process.  Now, this process may have

22  changed with the changes in regulation.  But at the time I did

23  receive these.  And I did sign off that I had received them and

24  that process was initiated with sending them to the AIC.

25  Q   Now, if you go back to page 9 of the AR, letter J.

Dave Allen - Direct                                      3540

1          What happens if an offender with an ADA letter is

2    terminated from a job?

3    A    The supervisor must contact the AIC or designee within one

4    business day.

5    Q    And that's just not if an offender is terminated.  Can you

6    read that paragraph?

7    A    An offender who leaves an assignment for any reason, IG

8    (sic) facility transfer, poor work performance, poor work

9    behavior, will be terminated MPS immediately.  When an offender

10   with an ADA alert is terminated, the supervisor must contact

11   the AIC designee by the next business day.

12   Q    And to your knowledge, was that occurring --

13   A    It was.

14   Q    -- at Territorial.

15          Now, we've talked a lot about the procedures for

16   inmate jobs as contained in this AR.  To your knowledge, were

17   those procedures occurring at Territorial in May of 2009?

18   A    Absolutely.

19          MR. QUINN:  No further questions.

20                        **CROSS-EXAMINATION**

21   BY MR. MYHRE:

22   Q    Good morning, Mr. Allen.  My name is Blain Myhre; I'm one

23   of the plaintiffs' attorneys.

24          The last question Mr. Quinn asked you was were these

25   processes, that you talked about at length, in place in

Dave Allen - Cross

1    May 2009; is that correct?

2    A    Correct.

3    Q    And you answered that they were in fact in place in

4    May 2009, correct?

5    A    Correct.

6    Q    In fact, they, this AR went into effect April 20, 2009,

7    correct?

8    A    Effective date, 4-20 of '09.

9    Q    Right.  And that's Exhibit O, AR 850-03.

10          So the compliance period ended May 1 -- May 1, 2009,

11    and this went into effect ten days before, correct?

12    A    Correct.

13    Q    So you basically had ten days to implement this change, get

14    this program in place, and get everyone fully trained in its

15    operation in ten days, correct?

16    A    Officially, correct.

17    Q    Okay.

18          I'd like you to take a look at the AR itself.  And

19    forgive my ignorance, but I notice there's some language in

20    here that's in bold.  Do you know why there's language that's

21    in bold?

22    A    On which page?

23    Q    I'm sorry.  I'm looking at the first page.  And there's

24    bold throughout the document.  But I'm just wondering if you

25    know why that there's some language that's in bold and other

Dave Allen - Cross

1   that is not.

2   A   Those are, the bold designates that it's an ADA standard.

3   There's a standard number after that statement.

4   Q   Okay.

5           So it doesn't mean that the -- the bold doesn't mean

6   this is new stuff that was added, correct?

7   A   No, absolutely not.

8   Q   Okay.

9           So, in fact, the whole policy was new as of April 20,

10  2009.

11  A   I don't know whether it was a total rewrite or they left

12  some stuff from the old policy.  I'm not sure.

13  Q   Do you have Exhibit Q in front of you, Q3?

14  A   Yes, I do.

15  Q   Now, Exhibit Q3 is an IA, implementation adjustment, for

16  the Territorial facility for AR 300-23, correct?

17  A   Correct.

18  Q   Are you familiar with that IA?

19  A   I am.

20  Q   In fact, that was what you used -- that was in fact titled

21  "offender work program," with the subject of that was offender

22  work program, correct?

23  A   Correct.

24  Q   And that was effective in August of 2008, correct?

25  A   Correct.

Dave Allen - Cross

1  Q   All right.

2          So was it this document, Q3, the IA that was in effect

3  up until the change on April 20, 2009?

4  A   I'm not sure I can answer that, and the reason is is

5  because there's another IA that -- AR and IA that covered

6  offender assignment and pay.  So there was some duplicity with

7  300-23 and 850-3, and I'd have to look at 850-3 and the

8  substance of that IA to determine exactly when verbiage was

9  moved around from 300-23 to 850-3.

10 Q   So in your role as case manager, were you often required to

11 sort of juggle the different administrative regulations and IAs

12 to figure out exactly what you were supposed to do?

13 A   It was determined -- the guidelines were set within the

14 administrative regulation.  We wrote these implementation

15 adjustments to implement that system within the individual

16 facilities.  If that answers your question.

17 Q   Go back a little bit.  And forgive me if you've already

18 answered this.

19          You said you're no longer a case manager at

20 Territorial, case manager supervisor at Territorial.  What's

21 your current title?

22 A   I'm the program manager at La Vista and San Carlos.

23 Q   Okay.

24          And how long have you been in that position?

25 A   I reported down there on May 15 of this year.

Dave Allen - Cross

1  Q   May 15 this year.

2          So you had one year, give or take, in which you were

3  involved in implementing regulation 850-03, the one that was

4  effective April 2009.

5  A   Correct.

6  Q   Did you participate or were you asked to give any

7  information in connection with an audit of the jobs program

8  down at Territorial?

9  A   There was an audit.

10 Q   Okay.

11         And can you tell me what your involvement -- when the

12 audit was?

13 A   I apologize.  I don't recall the exact time of that audit.

14 Q   Did you provide information for that audit?

15 A   We did.  We took the auditors around to different work and

16 program supervisor locations and they outlined kind of the

17 process that was going to be mandated through policy as to the

18 documentation that was to be archived by the work supervisor

19 and the process for interviewing offenders and the process of

20 contacting -- having contact with the AIC.

21 Q   And isn't it in fact true that prior to AR 850-03 on

22 April 20, 2009, that your facility did not routinely contact

23 the AIC office about assignments for disabled inmates?

24 A   I wouldn't say that.  The AIC has always been a resource

25 for all facilities.  I can't determine a number of times prior

Dave Allen - Cross

3545

1  to this AR that we contacted them or did not contact them.

2  Q   Okay.

3       But prior to this AR, there was no set, standard

4  procedure whereby you had to contact them in each case of a

5  disabled inmate, correct?

6  A   Without seeing the verbiage in the AR that preceded this, I

7  really can't answer that.  I mean, I don't know what the AR

8  prior to this date said.

9  Q   Okay.

10      Well, you were involved, were you not, with inmate

11  assignments prior to April 20, 2009.  Correct?

12  A   Correct.

13  Q   Okay.

14      So you had experience, did you not, with inmates with

15  disabilities and how they got assigned to facility -- or job

16  assignments and programs.

17  A   Correct.

18  Q   And your -- is your testimony that you don't recall whether

19  there was a process in place to contact the AIC prior to this

20  administrative regulation or not?

21  A   If the regulation at the time mandated that we contact the

22  AIC, then we were contacting the AIC.

23  Q   Okay.

24      But Mr. Quinn did not show you an administrative

25  regulation that predates this 850-03 that has that language in

Dave Allen - Cross

1  it, did he?

2  A   I didn't see a regulation at all on 850-3 that preceded

3  that date.

4  Q   Okay.

5       Do you know who Cathie Holst is?

6  A   I do.

7  Q   Did you ever speak to her about the implementation of

8  regulation 850-03?

9  A   I don't know if I spoke to her directly.  I spoke to her

10  office.

11  Q   Spoke to her office.

12       Were you aware that she was of the opinion that the

13  processes outlined in this administrative regulation are

14  complicated and unclear to the facilities?

15  A   I was not.

16  Q   Were you aware that she thought entire regulation should be

17  revised?

18  A   I was not.

19  Q   At the time you were a case manager down at Territorial,

20  was this administrative regulation revised prior to your going

21  to La Vista and San Carlos?

22  A   Honestly, I can't recall.  I know there's been some

23  revisions to it.  I don't know the exact -- nor do I recall the

24  exact dates.

25  Q   Now, the classification committee contacts the AIC office

Dave Allen - Cross

1   under this regulation after the assignment has been made,

2   correct?

3   A   Can you repeat that?

4   Q   The classification committee, the job board that you were a

5   part of, in fact you were chairman of, contacts the AIC office

6   only after an assignment has been made, correct?

7   A   Incorrect.  Actually, the work supervisor contacts the AIC

8   when they do the initial interview.

9   Q   Okay.

10          Is that after it comes to the job board?

11  A   Correct.

12  Q   So the job board does not have -- it doesn't look at the

13  inmate's disability status one way or the other when it's doing

14  the intake before referral to the work supervisor.

15  A   Correct.  If -- when the case manager presents the file and

16  the appropriate forms to the classification committee, we do

17  not look at disability of an offender one way or another.  We

18  assign them.  The work supervisor, the process is the work

19  supervisor, along with the offender and the AIC, they discuss

20  accommodations.  That's not decided in classification.

21  Q   The work -- sorry, not the work supervisor -- the case

22  manager, then, is the initial person who has the contact with

23  the offender, who brings the inmate to the board with a request

24  to be appointed to job X, correct?

25  A   Absolutely.

Dave Allen - Cross

1  Q    Okay.

2        So the case manager is the gatekeeper who decides

3  whether the case manager will bring the inmate to the job board

4  for possible placement, correct?

5  A    Case managers present to the classification committee for

6  all program and work assignments.

7  Q    I'd like to have you look at Exhibit Q3, which is the, the

8  IA 300-23 that we have discussed a little bit.

9        Now, this was in effect when you were a case-manager

10  supervisor at Territorial, and this in fact has, if you look on

11  the first page of Q3, under definitions, section 3B, job board.

12  Basically defines that the classification committee is the job

13  board, correct?

14  A    Correct.

15  Q    So the job board -- and forgive me, 'cause I'm not familiar

16  with all this procedure -- the job board is in effect -- or was

17  in effect prior to AR 850-03, correct?

18  A    Correct.

19  Q    And the job -- was the job board in place when you came on

20  board at Territorial in 2007?

21  A    It was.

22  Q    All right.

23        If you look under procedures of -- on the first page

24  there, under Roman numeral four, subsection A1C, it says that

25  all inmate work assignments will be based upon security and

Dave Allen - Cross

1  facility needs and will be at the total discretion of the job

2  board, correct?

3  A    Correct.

4  Q    So the job board at that time had complete discretion on

5  whether to give an inmate a work assignment or not, correct?

6  A    Correct.

7  Q    And in fact, under the AR 850-03, the classification

8  committee still had that role in determining whether to place

9  somebody in assignment or not, correct?

10 A    Correct.

11 Q    I'd like you to turn on Exhibit Q3 to page 3.

12       I want to look at a few provisions on this page 3, X3.

13 Subsection K4.  Excuse me.  Inmate program assignment,

14 reassignments, made by the facility job board.

15       It says, After assignment and prior to a start date,

16 the case manager will discuss the need for ADA accommodations

17 for work program assignments with the AIC, correct?

18 A    Correct.

19 Q    Okay.

20       So as I read this, what happens is the assignment is

21 made, and then the case manager determines to discuss -- or

22 then has the opportunity to discuss the need for accommodations

23 with the AIC, correct?

24 A    At the time of the effective date of this implementation

25 adjustment.

Dave Allen - Cross

1  Q    Right.  And that's what I mean.

2  A    That was the process.  Is it the process now, probably not.

3  Q    Well, but the -- but as you testified, the assignment is

4  still made before the AIC office is contacted, correct?

5  A    The referral to the work supervisor, which means we approve

6  the assignment.  If the work supervisor, the offender, and the

7  AIC can reach an agreement on accommodations, if needed.

8  Q    Right.  But there's no requirement -- the only requirement

9  to contact the AIC is after the initial assignment is made,

10 correct?

11 A    Maybe I need to clarify the process.  And I apologize.

12 Q    Let me just -- I think what I heard you testify is you were

13 asked whether you take into account or whether the

14 classification committee takes into account an inmate's

15 disability in making the referral for assignment.  And you said

16 absolutely not; is that correct?

17 A    That is correct.

18 Q    Okay.

19       Now, I want -- I want to look now at K7.  K7 reads,

20 Clearances may be denied based on the failure to meet the job

21 description and gate-pass criteria or any other information,

22 behavior, that the job board deems relevant.

23       What are the gate-pass criteria?

24 A    The last time I checked, it is a criteria set

25 Department-wide for inmates to work outside the secure

Dave Allen - Cross

1   perimeter.

2   Q   Okay.

3        Does the gate-pass criteria address the type of

4   clothing, apparel that an inmate can wear outside the facility?

5   A   I don't know if it's specifically addressed in the

6   criteria.  I'm sure it's addressed in a Department policy.  The

7   criteria goes into length of sentence, offense, sex offenders,

8   they may have something about a sex offender is not allowed to

9   go outside to obtain a gate pass.  Detainers.  More safety and

10  security issues.

11  Q   Okay.

12       Well, let's look, then, at item N.  Further down that

13  page 3 of Exhibit Q3.  It says, Inmates assigned to outside

14  ground maintenance crews, work crews, will wear orange

15  jumpsuit, state-issued boots, white tag T-shirt, underwear, and

16  socks.  Correct?

17  A   It does say that, correct.

18  Q   Okay.

19       So an inmate going outside the grounds is required to

20  wear state-issued boots, according to this item, correct?

21  A   At the time of this IA.

22  Q   Right.  At the time of this IA?

23  A   At the time of this IA.

24  Q   So if you don't wear the state-issued boots, you don't go

25  outside the grounds, correct?

Dave Allen - Cross

1    A    Incorrect.

2    Q    Well, what -- I mean, this says you will wear state-issued

3    boots, correct?

4    A    Territorial has a -- all facilities have a process now of

5    notching boots, whether it be state-issued, medical, or even

6    tennis shoes, as long as the soles are notched and there is a

7    photograph or photocopy of the sole.  And the appropriate staff

8    know which pair of shoes belong to which offender.

9    Q    But this, this IA here --

10   A    It does state that, correct, it does state that.

11   Q    Well, it doesn't say anything about notching other shoes or

12   anything except state-issued boots, correct?

13   A    In this policy, correct.

14   Q    Now, it also says in this policy, and I'm looking at page 4

15   of Exhibit Q3, termination from inmate work assignment.  It

16   says, If an ADA inmate is released or terminated from the work

17   program assignment, the case manager will contact the AIC to

18   communicate specific details of the action, correct?

19   A    Correct, it does say that.

20   Q    So under this policy, the AIC is contacted after the

21   termination decision occurs, correct?

22   A    Correct.

23   Q    I would like you to look now back at Exhibit O3 which is

24   the AR 850-03.  And I'd like you to look at page 9 of that,

25   which you and Mr. Quinn discussed a little while ago.

Dave Allen - Cross

3553

1    And under this provision -- I'm looking at subsection

2 J, under termination -- again, which is item 1 under section J,

3 an offender who leaves an assignment for any reason, and I

4 think you clarified that it's not just terminations, but an

5 offender leaves for any reason -- will be -- that that offender

6 will be terminated in MPS immediately.  I think you described

7 what the MPS system is.

8    I'm sorry, do you still need to find it?

9 A   I'm here now.  Go ahead.

10 Q   And I apologize for jumping around.

11    I'm looking at "termination," the first paragraph

12 under that.  It says, When an offender with an ADA alert is

13 terminated, the supervisor must contact the AIC designee the

14 next business day, correct?

15 A   Correct.

16 Q   So again, the offender with the ADA alert is terminated

17 first and then the supervisor, the work supervisor, who I

18 assume has terminated the individual, contacts the AIC office

19 afterwards, correct?

20 A   Correct.

21 Q   I did want to ask a little bit -- I know I might be jumping

22 around a bit, and I apologize for that.

23    I want to ask a little bit about this handbook, the

24 orientation handbook that we had.  It's Exhibit U6.  Do you

25 still have that in front of you?

1           Do you have it?

2    A    I do.

3    Q    Okay.

4           As we discussed -- as you discussed with Mr. Quinn,

5    the first page is something that's given to the inmate, kind of

6    lists the orientation items that they go over, an

7    acknowledgment that the offender has been appropriately

8    oriented to whatever the briefing oriented into.  And then you

9    said that this ADA Montez facility orientation handbook is

10   given to the inmate, correct?

11   A    Correct.

12   Q    Is it given to all inmates, or just to the ones with an ADA

13   alert on the system?

14   A    It's a supplemental to the facility orientation handbook.

15   Q    I guess my question is do all inmates get it regardless of

16   whether they're disabled or not?

17   A    I couldn't answer that.

18   Q    Okay.

19           So you're not sure whether inmates who are nondisabled

20   get this handbook or not?

21   A    Correct.

22   Q    I want to go over some of the specifics in this Exhibit U6,

23   the orientation handbook.

24           I wanted to look at the diabetic accommodation, which

25   is on page 4 of Exhibit O3 -- excuse me, U6.

Dave Allen - Cross

1    Now, it says in the diabetic accommodations, it says

2  in the diabetic accommodations, and I think you read through

3  most of it, finger sticks and insulin med line are held twice a

4  day in accordance with the CTCF operations schedule.  Correct?

5  A    Correct.

6  Q    What is the operations schedule, just in general terms?

7  A    It's a movement schedule.  That outlines the day's

8  movement, counts, chow, food service, things like that.

9  Q    Okay.

10    So according to that operations schedule, then, the

11  diabetics, insulin-dependent diabetics would be sent at, twice

12  a day to insulin line and finger sticks, and that would be in

13  the schedule?

14  A    Correct.

15  Q    Okay.

16    Are you familiar with the 2008 stipulation in this

17  case?

18  A    I am not.

19  Q    You're not aware of it?

20    Are you aware of the standard accommodations that

21  diabetics are entitled to in their accommodation resolution?

22  A    I've read it.  It's been a while.

23  Q    Okay.

24    So you've seen the yellow accommodation-resolution

25  accommodation form for diabetics, which list, you're diabetic,

Dave Allen - Cross

3556

1  you are entitled to be followed --

2  A   I have.

3  Q   Do you recall that one of those, in fact the first one on

4  the list, is that diabetics are entitled to access to finger

5  sticks upon request?

6  A   Correct.

7  Q   Okay.

8        So it's not just -- according to this policy, this

9  handbook, finger sticks are held twice a day.  But it doesn't

10  inform the diabetic offenders that in fact they're entitled to

11  finger sticks upon request, does it?

12  A   Not in this orientation.

13  Q   Right.  Okay.

14  A   Like I said, there are several orientations that occur

15  within Territorial.  We do have 24-hour medical that's provided

16  to all offenders.

17  Q   Right.  You have an infirmary there, correct?

18  A   Absolutely.

19  Q   Right.  One of the few facilities that does.

20        It says insulin med lines are held twice a day,

21  correct?

22  A   According to this document, correct.

23  Q   Don't you have insulin-dependent diabetics at Territorial

24  who require insulin three times a day?

25  A   I think medical would probably be more qualified to answer

 1  that question than I would.

 2  Q   Okay.

 3       So that would be up to someone else to advise them

 4  about that accommodation, that you're entitled to whatever

 5  insulin you need every day?

 6  A   What I can tell you is having the benefit of 24-hour

 7  medical, anytime an offender, regardless of a disability or

 8  nondisability, needed access to medical, that was the benefit

 9  of having the infirmary there.

10  Q   Hmm.

11  A   And we could see them in a speedy and efficient manner.

12  Q   Okay.

13       And how many facilities have an infirmary, 24-hour

14  infirmary?

15  A   I believe Territorial and Denver.

16  Q   Now, in terms of this ADA Montez facility orientation

17  handbook, how does the case manager -- or who does the

18  orientation?  Is it the case manager that does this orientation

19  with the inmate on the Montez handbook?

20  A   The case manager is trained how to do this orientation.

21  The primary person who oversees this process is the unit staff

22  in the transportation unit, in cell house 5.

23  Q   Okay.

24       But whoever does the orientation, how do they know

25  which inmates are disabled and which are not?

Dave Allen - Cross

3558

1  A    That are coming in?

2  Q    Yeah.

3  A    The staff in charge of movement is fully aware, like many

4  other people within the facility, who's coming in that may

5  need -- that may have a disability.

6  Q    I guess I'm looking for something a little more specific.

7  Is there a sheet of paper that you get that has everybody's

8  names, DOC numbers, and a ADA alert, yes-or-no box, something

9  like that?

10 A    You can pull up the move screen on DCIS, and it will have

11 individuals that are flagged as having some type of restriction

12 or accommodation.  So -- I'm sorry.

13 Q    Is there a standard procedure, though, when you get a new

14 bus load of inmates coming from DRDC to Territorial -- and they

15 come to cell house 5 first, correct?

16 A    Normally.

17 Q    Let's take the normal situation.

18 A    Okay.

19 Q    Bus load comes from DRDC to cell house 5, and inmates get

20 off.  How do you know who has an ADA alert?

21 A    They're fully aware of who has and ADA alert prior to them

22 arriving, we have to be.  Because if an inmate has a mobility

23 and we bring him down to cell house 5 and we have no accessible

24 cell, what do we do?  We know 24 hours and 48 hours prior to

25 them arriving who's coming in with a disability because we have

Dave Allen - Cross

3559

1  to be prepared to make those accommodations at Territorial.

2  Q   Okay.

3       I guess my question is how does that information get

4  conveyed to you?  Is there a list, do you pull -- do you pull a

5  roster?  I'm just trying to figure out, you know, mechanically,

6  how do you get the information that, you know, 17482 is

7  wheelchair or is diabetic, more importantly, one that's not

8  visible?

9  A   There is a move screen that is on DCIS, the Department's

10 database, that shows all the offenders that are leaving a

11 particular facility or coming in.  Next to those names there

12 will be an indication, next to those names, it will be flagged,

13 if those people have any type of disability or restriction.

14      So prior to the bus showing up, within 24 hours,

15 sometimes 48 hours, we have a staff member designated in that

16 unit to check that move screen.  That's their responsibility.

17 So Territorial we know exactly who's coming in.  We have to.

18 Because like I said, if offender services, there's some

19 confusion and they put a person with a mobility disability on

20 the road to Territorial and we don't have a cell for them, that

21 could create some problems.  So we try to stay ahead based on

22 that process.

23      Does that answer your question?

24 Q   Yeah.  Yeah.  That makes sense.  That's what I was looking

25 for.  It comes from DCIS?

Dave Allen - Cross

3560

1    A    Okay.

2    Q    And the ADA alert on the DCIS system, that's placed on the

3    system at DRDC, correct?

4    A    I believe so.  Unless an offender at a facility initiates

5    the process to request an accommodation and it's generated at

6    that particular facility, which they can do.  But it still is

7    coordinated through headquarters and AIC.

8    Q    Okay.

9         You talked a little bit about medical appointments and

10   medical appointments being posted.  When and where are medical

11   appointments posted for the inmates?

12   A    They are posted -- I know in the cell houses they're

13   posted.  I don't know if it's at the beginning of the week or

14   daily.  I think probably a cell house supervisor may be more

15   qualified to answer that question than me.

16   Q    I think you also talked about the, I think it was the three

17   rows of tables or the first three rows of tables where -- that

18   are wheelchair-accessible, don't have benches, so that inmates

19   with disabilities, and I suspect particularly mobility

20   disabilities, can get assistance getting their food; is that

21   correct?

22   A    Correct.

23   Q    Now, inmates in wheelchairs and some other inmates have

24   offender care aides, do they not?

25   A    Correct.

Dave Allen - Cross

1   Q   Can an offender care aide sit with them at those tables?

2   A   I believe an arrangement could be made if they needed that

3   offender care aide -- are you saying to help them feed, is that

4   what I'm assuming you're asking?

5   Q   For whatever assistance they may need, whether it's being

6   fed or, you know, having, having them be able to, you know,

7   take them away when they're finished or take their tray away or

8   to or from.

9   A   There are tables that are set up that are slotted half and

10  with some benches on there, so that is -- that could be

11  accommodated.

12  Q   Okay.

13          But there's no requirement that an offender care aide

14  be allowed to sit with his charge if there's no seats available

15  on that bench.

16  A   No.  But I couldn't see us denying that request, either.

17  Q   Again on U6, you talked a little the bit about health-care

18  appliances.

19          And I think you testified that health-care appliances

20  have to be prescribed and approved by clinical services,

21  correct?

22  A   Correct.  That's what it says.

23  Q   That's page 5 of the, of the health-care -- of the Montez

24  orientation packet.

25          Are you aware that under the 2008 stipulation, that

Dave Allen - Cross

1  the office of the AIC has the authority to override a decision

2  of the chief medical officer?

3  A    Correct.

4  Q    Okay.

5         But it doesn't say anything about the AIC in this

6  paragraph on health-care appliances, does it?

7  A    It does not.

8  Q    Okay.

9         And I have just one more item.  Let's look back again

10 at the previous page on U6.  On diabetic accommodations.  It

11 talked a little bit about the finger sticks.  Again, this also

12 does not list any -- does not discuss anything about bathroom

13 breaks being allowed as an accommodation, does it?

14 A    No, it does not.

15 Q    It also doesn't mention anything about call buttons for

16 hypoglycemics in locked cells, does it?

17 A    It does not.

18         MR. MYHRE:  I have nothing further.

19         THE COURT:  Thank you.

20         Should we wait till after lunch for your redirect, or

21 is it going to take a while?

22         MR. QUINN:  We can start, Your Honor.  I don't think

23 I'll be finished before noon.

24         THE COURT:  Well, why don't you go ahead.  I have a

25 judges' meeting that starts at 12:15.  So I need to recess

Dave Allen - Cross

1    promptly at noon.

2           Why don't you go ahead.

3           MR. QUINN:  To the court reporter's frustration, I'll

4    speak as quickly as I can.

5           THE REPORTER:  And I'll stop you if I'm not getting

6    it.

7                    **REDIRECT EXAMINATION**

8    BY MR. QUINN:

9    Q   Mr. Allen, we'll see if we can get you out of here prior to

10   noon.  I don't know if that's going to happen.

11   A   Appreciate it.

12   Q   You were asked a little bit about how staff at CTCF know

13   when a disabled offender is arriving.  And you referenced

14   something known as a move sheet.  Can you tell the Court what

15   that is?

16   A   All moves from any facility are -- there's a coordination

17   of things that happen.  But when moves are finalized, the

18   inmates are placed on a move screen that's available to all

19   staff that have access to our data system, DCIS.  And when you

20   pull up that move screen, you can put in the facility, from

21   Denver to Territorial, from Territorial to, you can get every

22   inmate coming into the facility or every, pull up every inmate

23   leaving the facility on a particular day.

24          Next to those offenders is a flag that tells us that

25   they have medical disability accommodations, so we can query

Dave Allen - Redirect

 1   that and see everybody that's coming in that we may have to pay

 2   special attention.

 3   Q   And you're not just receiving offenders from DRDC; they're

 4   coming from everywhere?

 5   A   Yeah, you can default it to all, to CT, which means every

 6   facility in the state, it will show up who's coming in tomorrow

 7   or the next day or the next day.

 8   Q   And you talked a little bit about a QT profile.  And an ADA

 9   alert on a QT profile.  Would a staff member need to pull up

10   the QT profile to know a disabled offender is coming?

11   A   They can access it that way.  I mean, there's -- the

12   Department's set up numerous systems within DCIS and even on

13   Doc net, but on DCIS, there's numerous ways you can pull up an

14   offender's, not only his disability, but maybe temporary

15   medical restrictions he might have, QT profile, diagnostic

16   summary on DCIS.  You don't need a working file nor communicate

17   with the AIC in that aspect to find out who has what going on.

18   So there's numerous systems within DCIS to get that

19   information.

20   Q   But you wouldn't need to pull up a QT profile on a

21   particular inmate to know that inmate was arriving with a

22   particular disability.  That would be on the move sheet?

23   A   It is.  The move sheets are now flagged where it will tell

24   you if they have a disability coming in.  So facilities could

25   be better prepared for their arrival.

Dave Allen - Redirect

1    Q   You testified a little bit about the effective date of AR

2    850-03.  And the effective date is April 20, 2009.

3          Is -- I guess I'm curious about changing, the process

4    of changing an administrative regulation.  Is that a lengthy

5    process, or is that something that just happens on a day?

6    A   It's a lengthy process.  They set up multidisciplinary

7    committees that look into all aspects of the AR and how it

8    effects other operational areas and what the statute said.

9    It's not something that can be implemented or written

10   overnight.  Especially with something as complex as the subject

11   we're dealing with.

12   Q   So were you aware of this AR or the changes to it prior to

13   April 20 of 2009?

14   A   You know, we'd had numerous meetings with the AIC,

15   Department-wide, case managers met several times at the

16   training academy.  I can't recall the exact dates.  We were in

17   constant contact and given constant direction from the AIC on

18   what we needed to do, even prior to the effective date of this

19   AR.

20         So every change that came about, every improvement was

21   communicated to us so we could make our implementations at the

22   facility level.  And I apologize if there was any confusion

23   on --

24   Q   Oh, no, you don't need to apologize.

25         So you knew this was coming?

Dave Allen - Redirect                                    3566

1  A   Everyone in the state of Colorado that worked for the

2  Department of Corrections had dealt with the adjustments

3  leading up to that final signatured AR.

4  Q   You were asked about some audits regarding the job

5  processes.

6  A   Correct.

7  Q   Can you look at Exhibit J4.

8          And when you get there, can you turn to the section

9  dealing with comments on individual areas at CTCF.

10         Are you there?

11         Can you turn to the fourth page of that document.

12         Let me back up.  Is this the audit materials from the

13  job, job audit on the new AR?

14  A   Correct.

15  Q   Now, on page 4 of that document, there's a matrix.

16  Correct?

17  A   Correct.

18  Q   Is there a date on that?

19  A   3-19 of 2009.

20  Q   Does that refresh your recollection as to when the audit

21  occurred on the new job process?

22  A   Yes.

23  Q   You were also asked about Exhibit Q3.  And I think you

24  testified that this was the former procedure before the new AR

25  went into effect.

Dave Allen - Redirect

3567

1           The former IA that encompassed the offender work

2     program.

3     A    Correct.

4     Q    Is this still the process used at CTCF?

5     A    It was not when I left.

6     Q    You were also asked about gate-pass criteria.  What types

7     of jobs are outside the grounds at CTCF?

8     A    The jobs that are outside our secure perimeter, so it would

9     be culinary arts, any type of porter jobs, outside that

10    perimeter, labor jobs.

11    Q    What about the tab plant?

12    A    From eight o'clock to five o'clock that is not deemed

13    outside the secure perimeter because there's actually a tower

14    that oversees that.

15    Q    And the tag plant?

16    A    Same.

17    Q    And you also testified about notching of shoes?

18    A    Correct.

19    Q    How long has that been going on?

20    A    Notching of?

21    Q    Notching of medical or tennis shoes?

22    A    I can't recall the exact date of when that's happened.

23    It's been quite a while.

24    Q    While you were there?

25    A    Absolutely.

Dave Allen – Redirect

1    Q    Prior to May of 2009?

2    A    Yeah.  And that process was in place where they

3    photographed the sole and notched and the proper documentation

4    was kept on hand.

5              MR. QUINN:  I have no further questions.

6              THE COURT:  Thank you very much.  We'll stand in

7    recess until -- let's try to be back at 1:20.

8         (Recess at 12:07 p.m.)

9         (Reconvened at 1:35 p.m.)

10             THE COURT:  Thank you, and be seated.

11             I'm sorry for the delay.  I know this will come as a

12   great shock to you, but I would rather be here than in a

13   judges' meeting.

14        (Discussion off the record)

15             THE COURT:  Okay.  Call your next witness, please.

16             MR. QUINN:  Your Honor, we would call Deb Ahlin.

17             And before she testifies, Your Honor, I would like to

18   move to admit U6, L3.  And O3.

19             MR. MYHRE:  No objection.

20             THE COURT:  They're admitted.

21        (Exhibit U6 admitted.)

22        (Exhibit L3 admitted.)

23        (Exhibit O3 admitted.)

24             (**DEBORAH AHLIN, DEFENDANT'S WITNESS, SWORN**)

25             THE COURTROOM DEPUTY:  Please be seated.

1          State your full name for the record and spell your

2    last name.

3          THE WITNESS:  Deborah Marie Ahlin, A-H-L-I-N.

4    D-E-B-O-R-A-H.

5                        **DIRECT EXAMINATION**

6    BY MR. QUINN:

7    Q    Good afternoon, Miss Ahlin.

8          Can you tell Court what your current job is with the

9    Department of Corrections?

10   A    I'm case-manager supervisor for the Denver complex.

11   Q    And how long have you worked for the Department of

12   Corrections?

13   A    I began working for the Department of Corrections in 1989.

14   At the Territorial Correctional Facility.  As a diagnostic

15   programmer.  They called me -- my official title was clinical

16   behavioral specialist 2.

17   Q    And where did you go from there?

18   A    The diagnostic unit closed at Territorial and DRDC opened

19   up in 1991.  So I moved -- my position moved to Denver, to the

20   diagnostic unit in 1991.

21   Q    19?

22   A    '91.

23   Q    '91?

24   A    Yes.

25   Q    And what did you do at the DRDC, at the beginning of 1991?

Deborah Ahlin - Direct

1   A    I continued in my role as a diagnostic programmer, clinical

2   behavioral specialist.  I cross-certified as a correctional

3   officer 3.  And began to focus my career as a security threat

4   group coordinator, an intelligence officer.  The names have

5   changed over the years.  I continued working at DRDC up until

6   about 1997.  And then was asked to go to work at offender

7   services in headquarters in Colorado Springs.

8   Q    And when was that?

9   A    About 1997.

10  Q    And how long were with you offender services at

11  headquarters?

12  A    I remained with offender services from 1997 to 2004.

13  Q    Where did you go in 2004?

14  A    I came to Denver, to work for the Denver complex as a case

15  manager 2.

16  Q    And when did you become a case manager 3?

17  A    Approximately 2006, 2007; I'm not sure on the dates, but I

18  promoted on or around that time.

19  Q    So how long have you been a case manager 3 or a

20  case-manager supervisor?

21  A    Since about 2006, 2007.  Early 2007.

22  Q    Can you describe your duties as a case manager 3?

23  A    I directly supervise 19 individuals, two administrative

24  assistants, two case manager 2s, and 15 case managers, between

25  DRDC and DWCF.  I'm not personally involved in case-management

Deborah Ahlin - Direct

3571

1    supervision for Colorado correctional facility, even though

2    it's up under the title of the Denver complex.

3    Q    Do you have any other responsibilities other than just

4    supervising case management?

5    A    I chair the classification committee.  I conduct

6    administrative segregation hearings in both facilities.

7    Investigate grievance issues when they reach a step 2 level,

8    answer appeals, answer inmate complaints, answer family

9    complaints, public complaints.

10   Q    Now, before you were a case manager 3, you were a case

11   manager 2?

12   A    Yes.

13   Q    What did you do as a case manager 2?

14   A    I had a caseload when I first moved to the Denver complex;

15   my caseload was the administrative segregation unit.

16         And I also oversaw a small group of case managers,

17   but, again, we didn't have a case manager 3 there, so I didn't

18   have ultimate decision-making on everyone.

19   Q    Can you generally describe the duties of a case manager?

20   A    Again, case manager acts as a liaison between parole and

21   community, between the facility and the offender.  They answer

22   questions.  They address complaints.  They look into matters

23   that may arise in concern from the inmate.  On their case

24   loads.  They're involved in the classification-committee

25   process, also.

Deborah Ahlin - Direct

1  Q    Are they involved in the grievance process?

2  A    Yes.

3  Q    What do they do with respect to grievances?

4  A    Again, they, according to policy, they are required to

5  informally resolve the grievance by meeting with the offender,

6  making sure that any grievance that can be resolved at the

7  lowest level, we make every attempt to do so.  If not, the

8  paperwork is turned in and it is submitted to the grievance

9  coordinator at the facility.

10 Q    Now, we're here today in this case involving disabled

11 offenders.  What are the involvement of a case manager as it

12 relates to disabled offenders?

13 A    On a day-to-day basis, they meet with their caseload,

14 they're required to meet with everyone on their caseload at

15 least once a month, see them face to face.  So they do make a

16 concerted effort to see these individuals, address their

17 concerns, prepare parole paperwork, serve detainers, process

18 the grievances.  If they -- if an offender comes into their

19 office, for example, and complains that they're disabled but

20 they seem to -- the accommodations are not quite fitting right,

21 they don't seem to be working or something, there is a problem,

22 the case manager would probably, more than not, call the AIC to

23 make sure that the accommodations are appropriate.  They'll

24 check with medical on occasion to make sure that medical's

25 aware of their concerns.  They'll check with work supervisors.

Deborah Ahlin - Direct

3573

 1   They'll communicate with work supervisors almost daily to see

 2   if there are any problems on the work site.

 3   Q   And I want to move to that area of disabled offenders.  I

 4   want to talk about the job procedure.

 5   A   Uh-huh.

 6   Q   What is your involvement with the job procedure at the

 7   Denver complex?

 8           Well, let me back up.  DRDC is a transition facility,

 9   correct?

10   A   Yes.

11   Q   Are there many offender jobs there?

12   A   The facility itself is serviced by female offenders.  The

13   jobs that are located at DRDC include food service which is

14   manned by the female offenders.  The laundry is also

15   utilized -- they also utilize female offenders.  So there's a

16   small group of what we call LTMOs.  These are the offenders who

17   are disabled or on dialysis who are permanent party there at

18   DRDC.  And at present, they're involved in unit porter work or

19   recreation custodial work.

20   Q   Are you saying that the offenders that are housed at Denver

21   Women's work at DRDC?

22   A   Yes.

23   Q   And I want to talk about the job process in general.  Can

24   you turn to Exhibit O3.

25           Can you tell me what that exhibit is?

Deborah Ahlin - Direct

1  A   This is a 50-03, the offender's assignment and pay,

2  effective date, April 20, 2009.

3  Q   And I don't want to go into the level of detail that we've

4  already gone into, but I want you to generally tell the Court

5  about the job process as outlined in this AR.  An offender

6  wants a job.  What does he or she do?

7  A   The DWCF facility is a level 5 facility.  And we're also

8  the diagnostic unit for the female population.  So we have a

9  small group of females who are unassigned and not what we call

10  EAO to the Denver complex.  They're moving towards La Vista at

11  the present time.  In the past, they moved towards High Plains

12  Correctional Facility or Women's when it was open.  So we are

13  the feeder for the other facilities.  Right now, the only other

14  facility we have is La Vista Correctional Facility.

15       So we have small group of female offenders who are

16  EAO, executive assignment order, to La Vista.  They are waiting

17  to be transferred to La Vista.

18       For the population that is EAO to the Denver Women's

19  Correctional Facility, they meet with their case manager.

20  They're assigned a case manager.  And they meet with that case

21  manager.  The case manager reviews their file, looks at the

22  diagnostic summary, and that whole process, which is part of

23  the working file, they'll look at prior work history, they'll

24  look at their skills, they'll look at their education, and

25  determine what type of job is most suited for them.

Deborah Ahlin – Direct

1    Now, we do have facility needs, and those facilities

2   needs are we have to feed the women, we have to make sure that

3   their laundry is clean.  We have OCAs that we are required to

4   provide.  So we have facility needs such as OCAs, laundry

5   workers, maintenance workers, gate-pass workers, and

6   food-service workers.  That we're required to meet the quota

7   for, or a minimum standard.

8    So a large majority of the time, those offenders go

9   into those jobs if there are significant openings.  They could

10  request a job change after they've done a specific period of

11  time.

12  Q   Okay.

13   So initially you talked about DWCF being the intake

14  facility for female population.

15  A   Yes.

16  Q   So some of those offenders are getting, are there, similar

17  to offenders, male offenders, who are at DRDC?

18  A   Yes.

19  Q   And they are going out to another facility?

20  A   Yes.

21  Q   For the women who remain at DWCF as a permanent

22  placement --

23  A   Yes.

24  Q   -- they would go to their case manager to discuss jobs.

25  A   Yes.

Deborah Ahlin - Direct

1    Q    And what jobs are generally new arrivals given?

2    A    Again, we look at the quota report to ensure that the OCAs

3    are filled; and if they meet the criteria for an OCA, that

4    seems to be our biggest challenge.  If we need food-service

5    workers and they're down a significant amount -- let me back up

6    a little bit and explain to you that we have more jobs than we

7    have female offenders, so we have -- we are continually trying

8    to fill, keep key positions to maintain facility needs, to keep

9    the facility operational.

10   Q    Okay.

11        So the offender meets with her case manager?

12   A    Uh-huh.

13   Q    And the case manager looks at what?

14   A    They look at their skills, they look at their education,

15   they'll look at their qualifications, whether they meet the

16   guidelines for particular jobs.  They'll look at -- they'll

17   listen to the offender, and if the offender says I have an

18   interest in cosmetology, for example, they'll look to see if

19   they meet the criteria for entering into the cosmetology

20   program.

21   Q    More along those lines, can you give the Court an idea of

22   what kinds of jobs are available at DWCF.  I mean, you talked

23   about food services and maintenance.  What other jobs and

24   programs are available at Denver Women's?

25   A    We have Correctional Industry jobs.  We have the print

Deborah Ahlin – Direct

3577

1   shop.  They do printing of state forms.  For the entire state

2   of Colorado.  They have special print shops that they do

3   booklets and they prepare banners, any number of things.  It's

4   a full functioning print shop.  It used to be housed in another

5   correctional facility.

6          We have a sewing shop, and they sew shirts and

7   jumpsuits and you name it, they sew it.  Duffel bags.  It's

8   a -- quite a production, and they're constantly in the

9   production mode.

10          We have cosmetology.  We have two cosmetology

11  teachers.

12          We have labor programs.  We have a carpentry,

13  construction technology class, teaches carpentry skills.

14          We have a graphics design class.  That teaches that.

15          We have computer aided drafting classes and computer

16  classes.

17          Again, I mentioned food service.  I mentioned laundry.

18  We have custodians in the, in the units that they clean the

19  showers or clean the floors.  We have custodians that work in

20  the administration area that service the wardens' offices or

21  the administrative offices.

22          What else.

23          We have canteen, which is an internal, on-grounds CI

24  job, Correctional Industries job.  And they service the

25  northern canteen operations.  They bag the commissary that an

Deborah Ahlin - Direct

1    offender would purchase and then they ship it to Limon or

2    Sterling or they'll ship in-house to the facility there.

3              We have a small group of women who work in the

4    warehouse.  And then we have about six, last I counted, 67

5    offenders working on gate passes on internal, on grounds crews,

6    of maintenance or warehouse or the canteen.

7    Q    Now, are you -- you've opened up to Exhibit O3.

8    A    Uh-huh.

9    Q    Are you familiar with that AR?

10   A    Yes, sir.

11   Q    On page 4 of that AR, at the top of the page, it references

12   that every assignment will have a title, specific duty, and

13   essential functions, to include physical requirements.

14             Is that sometimes referred to as standardized job

15   description?

16   A    Yes, sir.

17   Q    And do you have those at Denver Women's?

18   A    Yes, sir.  They're standard across the state.  We use the

19   standard job descriptions that have been established by the

20   AIC.

21   Q    Do you know why those were established systemwide?

22   A    Possibly Montez mandate.

23   Q    Now, on the next page of the AR, it kind of describes the

24   whole process.  And you've talked about the initial process,

25   the offender goes and meets with the case manager and they

Deborah Ahlin - Direct

1  review a whole host of things and decide where the offender

2  goes or what jobs are suited for that offender.

3  A    Uh-huh.

4  Q    What happens next?

5  A    Again, the case manager will review the file, meet with the

6  offender.  We have, we have what we call job board

7  classification once a week.  We've had it ever since I got to

8  the complex.  In 2004, we've had job-board classification every

9  Wednesday.  We've changed the times, but it's been occurring on

10  a regular basis for the last several years.

11       The meeting -- they'll bring the information to the

12  meeting and the classification committee, which encompasses --

13  well, I can tell you who came to the last meeting; two intel

14  officers, all housing captains, we had two or three work

15  supervisors, we had people from our therapeutic community.  We

16  had all our case managers.  We had several people.  We have up

17  to sometimes 30 people at these meetings.

18  Q    And what is the purpose of the meeting?

19  A    It's the classification committee to determine where the

20  offenders go and what job they're best suited for.

21  Q    And what happens?  The case manager brings the offender to

22  the meeting, and what occurs?

23  A    The forms are reviewed, whether they -- it was the

24  accommodation verification form or the current form being used

25  as the assignment form.

Deborah Ahlin - Direct

1    Q    Okay.

2         Now, you referenced the offender accommodation

3    verification form.  Is that attached to the AR?

4    A    Yeah.  Yes, sir.

5         That's sent also -- it's sent electronically -- it was

6    sent electronically to the board supervisor.

7    Q    And what does this form encompass?

8    A    It encompasses information, the offender would -- excuse

9    me.  The case manager would plug in the date, the job

10   description.  We wouldn't necessarily know which work

11   supervisor it might be, but it was sent to one -- one area can

12   have several work supervisors.  So we established a contact

13   point where we would send these electronically.  But these

14   would be completed by the case manager.  Run through the job

15   board, and then sent to the, the work supervisor.

16   Q    Okay.

17        So going back, the offender and case manager bring

18   this form to the classification committee; is that what

19   happens?

20   A    They would bring the information to the classification

21   committee.  The job changes.  If an offender came into their

22   office and said, I've been working in the kitchen for 60 days,

23   I'd like to go to the cosmetology class, they would bring that

24   information.

25        We had in our IA a job-change form that they would

Deborah Ahlin – Direct                                    3581

1    complete and bring that to classification.

2    Q   And what happens then?

3    A   It would be brought up in the classification, discussed,

4    any intel issues that might arise from an intel standpoint

5    would be discussed.  We would look at the job quota report to

6    see if there was a need or if there was anybody waiting to be

7    picked up, but generally there wasn't.  Because of the issues

8    of more jobs than female offenders.

9    Q   Now, you talked about issues, disqualifying issues.  Is

10   that commonly called a code 13?

11   A   Yes, sir.

12   Q   And where is that referenced on Exhibit 850 -- or Exhibit

13   O3?

14   A   In the referral process, EC.

15   Q   And what is a code 13?

16   A   If the offender did not meet the guidelines, for example,

17   an internal on-grounds gate pass is what we called it, if they

18   did not meet the qualifications because of time or they had a

19   felony detainer or they were medium security, because the

20   policy says that they need to be minimum or minimum R.

21   Q   Does a code 13 encompass any issues relating to a

22   disability or an offender's ability to perform physical

23   functions of the job?

24   A   No, sir.

25   Q   So after the classification committee meets, what happens

Deborah Ahlin - Direct

1  next?

2  A   The -- again, at this time, when this policy was in effect,

3  that verification would go electronically to the work

4  supervisor who would pull it off the e-mail note, and then in

5  order to go to the job description of that work site, pull off

6  the job description.  He would meet, he or she would meet with

7  the offender, go over the job description, go over the safety

8  issues or any other things that were required of the job.  And

9  then it got into the process of whether they were ADA or not.

10  Q   Okay.

11       And what happens if an -- if an offender is not an ADA

12  offender?

13  A   If they meet the essential functions of the work site or

14  the job description, they would be placed in that job.  They

15  would sign the job description.  They would sign the

16  accommodation verification form.  And then forward -- keep the

17  copy for themselves on the work site and they would keep,

18  keep -- send a copy to the case manager and I would get the

19  original.

20  Q   Now, what happens if an offender is an ADA offender?

21  A   According to policy at that point in time, they were,

22  again, they pulled the paperwork off the computer.  They would

23  review it with the offender.  If the offender said, no, I don't

24  need any accommodations, there's a, I think it's one line at

25  the bottom of the page.  When it prints off the computer, it

Deborah Ahlin - Direct

1   prints off in three parts.

2   Q   Let me back up.  When you say review the paperwork, what

3   paperwork are you referring to?

4   A   The job description.  The functions of the job, what

5   they're required to do in the job.

6   Q   The physical tasks associated with the job?

7   A   Yes.  Yes.

8   Q   So if there's an ADA offender, they would do that with the

9   supervisor, and what happens then?

10  A   The offender would say, no, I don't need any accommodation,

11  the work supervisor would know to call the AIC.  If the

12  offender said, no, I have these -- I need these accommodations,

13  I need to have two extra hours because I, you know, I'm having

14  problems with my arm, they would still call the AIC.

15  Q   And what occurs -- there's a discussion with the AIC and

16  what happens?

17  A   There's a discussion between the offender, the work

18  supervisor, and the AIC.  It's documented what type of

19  accommodations or not, no accommodation are given at that point

20  in time.  Then the AIC would prepare the third page of the job

21  description.  It -- and elaborate on what accommodations needed

22  to be given by the work supervisor so that the offender could

23  do the job.

24  Q   And does that occur?

25  A   Yes.

Deborah Ahlin - Direct                                        3584

1   Q    Fairly regularly?

2   A    Yes.

3   Q    Now, you talked about DWCF, are there jobs available

4   outside of the fence?

5   A    We call them internal on-grounds.  They're still in the

6   perimeter, within the perimeter of the complex.  They are

7   technically outside of the fence, but they're still on the

8   perimeter.  So there's a difference between internal on-grounds

9   gate passes and external off-grounds gate passes.  And we do

10  not have the latter.  We do not have the external off-grounds

11  gate passes at the Denver complex for DWCF.

12  Q    Do inmates with disabilities qualify for these jobs?

13  A    Yes.

14  Q    And what jobs are -- the jobs you just discussed, within

15  the perimeter but you need a gate pass, what jobs are those?

16  A    Primarily right now we have about 67 gate passes that go

17  internal off -- or internally out to the canteen, to the

18  warehouse, or to physical plant.  Out of that 67, my last

19  count, approximately seven, or 10 percent, were ADA.

20  Q    So about 10 percent of those gate passes were ADA

21  offenders?

22  A    Yeah.  That's as of last week.

23  Q    Are you aware of any specific examples of ADA offenders

24  working out -- with a gate pass working out of the --

25  A    Uh-huh.  All kinds.

Deborah Ahlin - Direct

1        We have, we have one individual, I'm not sure if she's

2    still working out there, I've lost track of her.  They come and

3    go, they parole, they go to community.  But she was diabetic

4    and she needed to come in twice a day.  The canteen work

5    supervisor would physically walk her back and forth to medical

6    to accommodate her needs.

7        We have -- we had one individual who needed special

8    shoes out there.  She needed her tennis shoes because, again, I

9    believe she was diabetic.  And so she was accommodated with

10   having those shoes.

11       We do have gate passes on the canine unit, for the

12   canine unit because you're required to go out to get dog food

13   out of the van to bring into the unit.

14   Q   You have any specific recollection of inmates with

15   disabilities in the dog program?

16   A   Yes.  We had one individual who -- again, our dog program

17   is on the second floor of one of our units.  And that

18   individual was accommodated by being given a helper.  I

19   wouldn't call it an OCAA, but a helper, someone in the dog

20   program already that could help her carry the dog food up,

21   which is part of the duty of a canine unit.

22   Q   Now, what was her disability?

23   A   I believe it was mobility.

24   Q   It was?

25   A   Mobility.

Deborah Ahlin - Direct

 1   Q   Okay.

 2        And she was provided with a helper?

 3   A   Yes.

 4        She was able to physically get up stairs very slowly,

 5   but she was not able to physically carry the dog food and other

 6   items up the stairs.  And I believe that her helper assisted

 7   with some dogs, taking them upstairs.

 8        MR. QUINN:  I have no further questions.

 9                    **CROSS-EXAMINATION**

10   BY MR. MYHRE:

11   Q   Good afternoon; is it Ahlin?

12   A   Yes.

13   Q   Ms. Ahlin, you are a case manager at -- case manager 3 at

14   the Denver complex, but you don't handle supervision of case

15   managers at Camp George West, correct?

16   A   Yes.

17   Q   Okay.

18        So your familiarity with the proceeding -- procedures

19   are based on your experience at the Denver complex, correct?

20   A   Yes.

21   Q   So you've never been a case-manager supervisor at any

22   facility other than the Denver complex.

23   A   No, sir.

24   Q   Okay.

25        So you wouldn't be able to comment on how other

Deborah Ahlin - Cross

1  facilities implement AR 850-03?

2  A   No, sir.

3  Q   Now, if you look at Exhibit 03, which is the AR that

4  you've -- Mr. Quinn were discussing, that was effective

5  April 20, 2009, correct?

6  A   Yes, sir.

7  Q   And were you present this morning for Mr. Allen's

8  testimony?

9  A   Yes, I was.

10  Q   And so what, what AR did you use for the offender

11  assignment and pay before April 20, 2009?

12  A   Policies are reviewed every year, as are the IAs and the

13  OMs in facility.  So I would take an educated guess that in

14  April of 2008 or somewhere around that date, that that policy

15  was possibly revised.  Or sooner.  It can be revised at any

16  point in time with a executive directive or with, to me the

17  needs of the current trends.

18  Q   Do you have personal knowledge sitting here today whether

19  AR 850-03, in a previous version before this one was the one

20  that was in effect and that defined the process for offender

21  pay and assignment at the Denver complex?

22  A   No, I don't.

23  Q   Would you look at Exhibit P3.

24       Do you have that in front of you?

25  A   Yes, sir.

Deborah Ahlin - Cross

1  Q   This is, I'll represent to you, an implementation

2  adjustment for the Denver complex.  And it's referenced at AR

3  no. 300-23, effective August 1, 2008.

4        Are you familiar with this document?

5  A   I've seen it, yes.

6  Q   Do you know -- could you tell me what it is?

7  A   It's the offender work program.  It's an implemented

8  adjustment, an IA.

9  Q   So does that refresh your recollection as to whether this

10 document, this Exhibit P3, was the implementing document that

11 you used for the offender work program at the Denver complex?

12 A   I can't say.

13 Q   You don't recall?

14 A   I don't keep track of the dates that they're revised or

15 updated.

16 Q   Okay.

17        So when AR 850-03 was put into effect, you had ten

18 days to fully implement it by the end of the compliance period

19 on May 1, 2009, correct?

20 A   From my recollection, sir, we began discussing ADA issues

21 several months before that.

22 Q   Right.  But you didn't have a policy until April 20, 2009.

23 A   No, sir, we did not have that policy.

24 Q   And you wouldn't implement a policy that wasn't effective

25 yet, would you?

Deborah Ahlin - Cross

1   A    No, sir.

2   Q    Now, you mentioned in your discussion with Mr. Quinn that

3   filling the OCA positions was the biggest challenge.  Why is

4   that the biggest challenge for you at the Denver complex?

5   A    Again, there's specific criteria for the job description,

6   one being they have to be institutionalized, they have to be in

7   the institution for two years.  Our population is ever

8   changing, and with the current mission where we're processing

9   more out to community, more people are paroling, so we, we,

10  especially with the female population, you know, we try to

11  maintain 25 as a quota for the OCAs, that seems to be a

12  comfortable number of OCAs, but that can be adjusted up or down

13  to suit the needs.  But 25 is our current quota.

14  Q    And you said you have a hard time filling that?

15  A    On occasion, yes.

16  Q    But I think you described it as your biggest challenge?

17  A    Yes.  And again, when we have those deficits in our quota,

18  if we go down one person, we have our case managers look at

19  their caseload, and we try to fill as soon as possible.

20  Q    Okay.

21  A    If we need to remove somebody out of the kitchen or from

22  laundry or maybe possibly pull them off of a gate pass, we will

23  do so.

24  Q    Okay.

25          And that's all part of utilizing the case managers to

Deborah Ahlin - Cross

3590

1  manage work assignment, correct?

2  A    Yes.

3  Q    And in fact, it's the case managers who are the primary

4  responsibility for getting the inmate into the assignment

5  process.

6  A    Yes.

7  Q    Okay.

8        So, and you sit on the classification committee,

9  correct?

10 A    Yes, sir.

11 Q    And I think your system was a little different in that you

12 said you had up to 30 people at these various meetings?

13 A    At present we do, yes.

14 Q    Okay.

15       But unless a case manager brings an inmate to your

16 attention, you don't know whether that inmate wants a different

17 assignment or a new assignment.

18 A    On the MPS system, they have -- we have a designation

19 called "unassigned."  Case managers are required to keep the

20 offender population moving.  And so as I review the quota

21 report and look at the deficits of where I need to fill the

22 positions, I also look at the unassigneds and encourage the

23 case managers very sternly that they have to keep these who are

24 unassigned working at all possible, if at all possible.  There

25 is a checks and balance.

Deborah Ahlin - Cross

3591

1   Q   Right.

2           So the charge is to get all the able-bodied offenders

3   working, right?

4   A   Right.

5   Q   And that falls upon the case managers to make sure that

6   they're bringing them to you, correct?

7   A   Yes, sir.

8   Q   And if they don't, you try to get on them to the extent

9   you're aware of the problem.

10  A   Yes, sir.

11  Q   But if that inmate's already assigned to a job or to a

12  program, you wouldn't be aware of them desiring a change unless

13  the case manager brings that to you?

14  A   Normally they would go to their case manager requesting a

15  change.

16  Q   Okay.

17  A   That happens more than not.  If they've done 60 shifts in

18  the kitchen, policy suggests that they can move to another

19  position, if they're -- if at all possible.  Again --

20  Q   And that's -- is I there a standard rule that they have to

21  spend 60 days in the kitchen?

22  A   I believe it's one of the policies, sir.

23  Q   You talked a little bit with Mr. Quinn about an attachment

24  to Exhibit O.  Actually, it's an attachment to the AR that is a

25  part of Exhibit O3, the accommodation verification form?

Deborah Ahlin - Cross

1  A   Yes.

2  Q   And I want you to look at that, if you will.

3          I believe it's attachment B.  So it's just a few pages

4  from the end of the exhibit.

5  A   Yes.

6  Q   And I'm just looking down this, and there's a, about, I

7  don't know, a third of the way down, a line that says ADA

8  alert, yes or no.  And I wasn't clear on where that information

9  comes from?

10 A   The case manager.  They can possibly check it or the work

11 supervisor can check it.

12 Q   And where would they check it?

13 A   They would look at the profile, and if there is a line next

14 to the, in the profile, they would know to call the AIC.

15 Q   Okay.

16          So that's the QT profile.

17 A   Yes, sir.

18 Q   And the QT profile, and I think I'm starting to get this,

19 is part of the DCIS system?

20 A   Yes, sir.

21 Q   Okay.

22 A   We also have the accommodations on DOC net.

23 Q   And DOC net is a database DOC-wide?

24 A   Yes, it's a separate database where you can go and look at

25 the accommodation, accommodations that are granted to the

Deborah Ahlin - Cross                                            3593

1   offenders throughout the system.

2   Q    And you also talked about pulling paperwork off of the

3   computer.  And is that what you're referring to when you're

4   talking about pulling paperwork off of the computer in

5   reference to an inmate with a recognized disability?

6   A    What I was talking about was this form and also the job

7   description, which is the standardized job description set

8   forth.

9   Q    And where does the standardized job description reside on

10  the DOC databases?

11  A    It's on the LAN system.  I believe it's the R drive.

12  Q    Now, I think you said you have 67 gate passes at the Denver

13  complex.  And you said 10 percent of them are ADA inmates.  And

14  I think you add, as of last week, correct?

15  A    Yes, sir.

16  Q    How many of those were ADA gate passes -- or what

17  percentage were ADA inmates who had those gate passes as of

18  April 21, 2009?

19  A    I don't recall, sir.

20  Q    I think you also said that there was a diabetic inmate who

21  had a gate pass and was escorted back and forth to medical as

22  needed, as part of her accommodation; is that correct?

23  A    Yes, sir.

24  Q    Okay.

25           And the Denver complex has a 24-hour fully staffed

Deborah Ahlin - Cross

1    infirmary, correct?

2    A    Yes, sir.

3    Q    And you also, I think, mentioned briefly the dog program,

4    that there was an offender who could walk but it was difficult

5    and couldn't carry the dog food up the stairs to get to the

6    second floor for the dog program, correct?

7    A    Yes, sir.

8    Q    Are there any wheelchair-bound inmates in that second floor

9    dog program?

10   A    No, sir.

11         MR. MYHRE:  I have nothing further.

12                    **REDIRECT EXAMINATION**

13   BY MR. QUINN:

14   Q    Very briefly, did regulation 850-03 exist prior to April 20

15   of 2009?

16   A    Yes, sir.

17   Q    Now, Mr. Myhre had asked you some questions about all

18   able-bodied offenders are working.  And you had testified

19   previously that at DW, you have more jobs than you do bodies,

20   correct?

21   A    Yes.  Yes.

22   Q    Are non-able-bodied offenders working at DWCF as well?

23   A    Any offender that a case manager runs across, whether there

24   be a question of whether they can work or not, generally they

25   will call the AIC for guidance.  We do have several offenders

Deborah Ahlin - Redirect                    3595

1   who are over the age of 50 that have some, I don't know if

2   they're disabilities, but generally on those types of persons,

3   they, the case managers, will call the AIC to get guidance on

4   whether or not they feel that they can work.  If they can and

5   they can be accommodated, they'll be put to work.

6           MR. QUINN:  No further questions.

7           THE COURT:  Thank you very much.

8           THE WITNESS:  Thank you, sir.

9           THE COURT:  Next, please.

10          MS. GREISEN:  Your Honor, may I make just a record on

11  a general objection, before the next witness is called, very

12  briefly.

13          THE COURT:  If you go up to the mike where I can hear

14  you.

15          MS. GREISEN:  I just wondered if I could make a very

16  brief general objection on the record before the next witness

17  is called.

18          THE COURT:  Yes.

19          MS. GREISEN:  I wanted to reiterate the objection.  As

20  this Court knows, we asked for supplemental discovery after

21  May 1, 2009.  The defendants refused to supplement their

22  discovery to us with information after that day so, again, I'm

23  reiterating the objection that they are now calling witnesses

24  to talk about events that occurred after that date, but our

25  hands are tied in cross-examining these witnesses because we've

1    been refused the discovery to effectively cross-examine them.

2         And so I just wanted to put that objection on the

3    record.

4         THE COURT:  All right.

5         MS. GREISEN:  At this time.

6         THE COURT:  Okay.

7         MS. McCANN:  Do you want a response?

8         THE COURT:  If you want.  It's your record, too.

9         MS. McCANN:  Yes.

10        Your Honor, we did provide extensive discovery up to

11   May 1 of 2009.  And then we have, once the Court indicated

12   wanting to hear some subsequent information, we have been

13   asking witnesses, a few witnesses about subsequent information.

14   If Court prefers, we can simply limit it to May 1 of 2009; and

15   then if the Court wants to hear additional information, you

16   know, ask those questions.  But we're trying to sort of do it

17   efficiently.

18        THE COURT:  I made a ruling a long time ago that if

19   matters happened after the May 1 of 2009 period that related

20   back to the time before May 1, 2009, it would be admissible and

21   that that's all I know about.  If you provided them with that

22   information, then you're entitled to go ahead with it.

23        MS. McCANN:  All right.

24        MS. GREISEN:  Well, that's the problem, Your Honor.

25   We haven't been provided the supplemental discovery.  We don't

 1   specifically know other than very general areas, what these

 2   witnesses are called on.  We certainly have had no discovery

 3   whatsoever in this case about the status of the job process

 4   after May 1 of 2009, since we're talking about that issue.

 5            THE COURT:  All right.

 6            I'll sustain the objection.

 7            Next witness, please.

 8            MR. QUINN:  Your Honor, we would call Randy Malden.

 9            THE COURTROOM DEPUTY:  Raise your right hand.

10            (**RANDOLPH MALDEN, DEFENDANT'S WITNESS, SWORN**)

11            THE COURTROOM DEPUTY:  Please be seated.

12            State your full name for the record and spell your

13   last name.

14            THE WITNESS:  Randolph Warren Malden, last name is

15   M-A-L-D-E-N.

16            My date of birth is January 20, 1964.

17                       **DIRECT EXAMINATION**

18   BY MR. QUINN:

19   Q    Good afternoon, Mr. Malden.

20   A    Good afternoon.

21   Q    What is your current job with the Department of

22   Corrections?

23   A    I'm currently a case-management supervisor at Fort Lyon

24   Correctional Facility.

25   Q    And can you briefly describe your history with the

Randolph Malden – Direct

1  Department of Corrections?

2  A   I started with the Department in 1990, in Cañon City at

3  Arrowhead Correctional Center.  Worked there for approximately

4  two years.  And I transferred to Ark Valley Correctional

5  Facility, where I worked for approximately nine years.  Seven

6  of that was as a cell house supervisor.  I also promoted there

7  to case-management supervisor in 1990 -- I'm sorry, case

8  manager 1 in 1998.  Approximately 2000, 2001, I guess it was, I

9  transferred over to Fort Lyon Correctional Facility.

10  Subsequently promoted there to case manager 2, and then to

11  case-management supervisor about six months after that.

12  Q   So approximately what year were you appointed or promoted

13  to a case manager 3?

14  A   Case manager 3 was about two, two and a half years ago.

15  Q   And can you describe your duties as a case manager 3?

16  A   I supervise six case managers.  I also chair the job board

17  or the classification process, as we now call it.  I supervise

18  all classifications actions as to which facility offenders are

19  transferred to.  And I back up the programs manager during

20  their absences.

21  Q   And can you generally describe -- you supervise six case

22  managers?

23  A   That's correct.

24  Q   Can you generally describe what they do?

25  A   They do case manager 1-level work.  They do the orientation

Randolph Malden – Direct

1  process when offenders arrive at the facility.  They bring

2  offender cases to the classification committee for review and

3  assignment.  They subsequently do parole planning, parole

4  actions, I'm sorry, parole planning, parole actions with the

5  parole board.  They just basically anything and everything an

6  offender needs.  They're the initial point of contact for

7  medical needs.  Sometimes -- not initial, but we'll give them

8  that orientation as to how to do those.  Assist them with those

9  problems that they have when they come up.  They do

10  record-keeping and maintain the working files of the offender.

11  Q   You had mentioned that they assist in the job procedure.

12  A   Classification procedure for assignment, yes, for jobs.

13  Q   Can you describe how that process works at Fort Lyon?

14  A   At Fort Lyon, when an offender first arrives, they go

15  through the orientation process --

16       MS. GREISEN:  Can I have a time frame as to the

17  procedure that he is testifying to.

18       THE COURT:  Yes.

19       THE WITNESS:  As a CM3, the time frame?  Or just in

20  general?

21       MR. QUINN:  Let me rephrase the question.

22  BY MR. QUINN:

23  Q   Prior to May 1 of 2009 --

24  A   Okay.

25       Prior to May 1 of 2009, it was largely the same

Randolph Malden - Direct

3600

1    process.  An offender would arrive at the facility.  He would

2    do the intake process.  The offender would then -- offenders

3    would then move to our A and O process in building A, which is

4    about a week long, so we can do further evaluation.  Evaluate

5    security threat group activities.  Upon that time, an offender

6    would meet with his case manager, at least temporarily assigned

7    to the building that he moved to.  They would review the file,

8    the offender would ask for whichever assignments or work with

9    the case manager towards assignments.  Then it would also, even

10   at that time, come to a -- it wasn't as formal back then, but

11   it was a job process that we had developed to review offenders'

12   first assignment.

13   Q   Okay.

14        And if you could look at Exhibit O3.

15   A   Okay.

16   Q   Can you identify that document?

17   A   That's 850-03, the offender assignment and pay.

18        Is that correct?

19   Q   I want to talk about the processes for offender job

20   placement prior to May of '09.  Can you describe that process

21   generally from the time the offender goes to meet with his case

22   manager until he gets the job?

23   A   In a large part, it's similar to what we're doing today.

24   Back then, I believe it was AR 300-23, if I'm -- I hope I'm not

25   misspeaking.  I believe it was AR 300-23.  That was driving

Randolph Malden – Direct

1    that.  And that was offender work assignment and offender pay.

2    That drove that.

3    Q   Can you describe the process?

4          Well, let me back up.

5          AR 850-03, Exhibit O3, is dated April 20 of 2009,

6    correct?

7    A   I'm sorry.  Could you repeat that?

8    Q   What's the effective date of Exhibit O3?

9    A   The one I'm looking at is April 20, '09.

10   Q   Can you describe the job procedure as set forth in this AR

11   at this time, prior to May of '09, and how an inmate would

12   obtain a job at Fort Lyon?

13   A   Right.  Prior to this AR.

14   Q   No.

15         Okay.  Under this AR.  Let's talk about governing,

16   being governed by the terms of this AR, how does an offender

17   get a job?

18         MS. GREISEN:  Again, I'm going to object to testimony

19   about anything after May 1, 2009.

20         THE COURT:  Well, everything that he's testifying to

21   is prior to May 1 of 2009, unless otherwise indicated.

22         Go ahead.

23   BY MR. QUINN:

24   Q   Can you describe the procedures for and inmate to obtain

25   employment at Fort Lyon?

1  A   The offender would meet with his case manager.  The case

2  manager would discuss whether he's wanting work.  If the

3  offender, say, as an example, wanted to work for Correctional

4  Industries or for some particular assignment, he would -- the

5  case manager would review that with what would be considered

6  the criteria kind of at that time was how long to MRDs, PEDs,

7  are they -- I'm drawing blanks here, I'm sorry.

8          I'm trying to think back what I was originally

9  thinking.  MRDs, PEDs, criminal history, code of conduct that

10  they'd received while they were in the Department, things like

11  that were reviewed.  If it was an acceptable for whichever

12  security level he was going to, the referral would be made on

13  him in the system for the work supervisor who would sign to

14  accept or deny.

15  Q   So from what you're telling me, the offender meets with his

16  case manager, discusses --

17          MS. GREISEN:  Object to leading.

18          THE COURT:  Overruled.

19  BY MR. QUINN:

20  Q   Discusses possibilities, and what happens next?

21  A   At that time they either made those referrals, if it was

22  appropriate, or they brought them to -- we'd meet on Tuesday

23  afternoons.  They'd bring to us that job board or

24  classification.  That's why I keep going back between the two

25  because at one time they called it something different.  It was

1    job board.  Now it's job classification.  Or classification

2    committee.  They would bring it there.  I would review it along

3    with them, programs manager, for assignment.

4    Q    Who was on the classification committee?

5    A    Myself, programs manager, case manager, security intel

6    officer.

7    Q    And what would happen after you would review it?

8    A    We'd, we'd just make a decision there as a group, if the

9    referral is appropriate.  And then we'd make the referral to

10   the work supervisor.

11   Q    And what would happen when the inmate -- after the

12   placement was referred to the work supervisor?

13   A    The work supervisor would meet with the offender.  They

14   would review -- the job descriptions were there.  At that

15   particular time those were all kind of evolving.  They'd review

16   the essential functions of the job.  The job qualifications

17   that were in the job form.  And then they would determine if

18   there was a job available.  If there was an issue, they would

19   call us generally to try to resolve whatever medical issues

20   versus ADA issues.

21   Q    And what would happen if it was an ADA issue?

22   A    If it was an ADA issue, they would work with AIC to

23   determine if there was any type of accommodation or what the

24   offender needed to complete the job.

25   Q    Were those accommodations regularly given?

Randolph Malden - Direct

 1  A    Yes.

 2  Q    I want to talk a little bit about outside work crews.

 3  A    Okay.

 4  Q    Do you have those at Fort Lyon?

 5  A    Yes, we do.

 6  Q    Are ADA offenders eligible for those jobs?

 7  A    Yes, they are.

 8  Q    Are you aware of ADA offenders that have worked in those

 9  jobs?

10  A    Yes, sir.

11  Q    Any specific examples?

12  A    Specific example would be an offender by the name of --

13          MS. GREISEN:  Again, I'm going to specifically request

14  that, that there can only be information prior to May 1 of

15  2009.

16          THE COURT:  I've already made a ruling.  This is prior

17  to May 1.

18          Is that correct?

19          THE WITNESS:  Yes.

20          THE COURT:  All right.  Go ahead.

21          THE WITNESS:  An offender Strowbridge that was

22  assigned to Correctional Industries and he's been there for at

23  least two years or better was a triple amputee.

24  BY MR. QUINN:

25  Q    And what did he do for Correctional Industries?

Randolph Malden - Direct

1    A    He ran lawn mowers and stuff, mowing the grass and stuff

2    outside of the facility to -- it was part of the issue, part of

3    the accommodation that he needed for that was different set of

4    work boots because without only one hand, he was having

5    difficulty tying his shoes.  Well, for the work outside, you

6    had to have work boots, so we overnighted a special pair of

7    boots in to accommodate him.

8    Q    And he, he mowed lawns?

9    A    Yes.

10   Q    How did he do that?

11   A    Well, though he's a triple amputee, also has three

12   prosthetic devices, he has one good hand, and the lawn mowers

13   are hand-controlled, foot-controlled, and he's able to operate

14   those.

15   Q    Riding lawn mower?

16   A    Yes.

17   Q    Any other examples that come to mind prior to May of '09?

18   A    That's hard.

19        It's hard simply because of the date of '09.  Trying

20   to think back.

21        There was an offender that worked for the dog program

22   internally for the dog program at that time, that was an

23   amputee.  As well.

24        I believe his name was Hannifen.

25   Q    Now, prior to May of '09, were there any other general

Randolph Malden - Direct

1  accommodations given to disabled offenders?

2  A   General accommodation, I'm not sure what a general

3  accommodation would be.  In our facility because of the nature,

4  a lot of things we assume are general because we have

5  elevators, there was a ramp put in in front of cell house 4,

6  which was where the dog program was, so offenders would not

7  have to utilize stairs.  They could use the ramp.

8  Q   Other than architectural issues.  I'm talking about policy

9  or general procedures.

10          THE COURT:  There's something wrong with the computer;

11  we'll just take a short recess.

12      (Recess at 2:35 p.m.)

13      (Reconvened at 2:48 p.m.)

14          THE COURT:  Thank you.  And be seated.

15          Because of that break, why don't we just try and go

16  right on through until four-thirty or so, okay?

17          MR. QUINN:  Yes, Your Honor.

18          THE COURT:  All right.

19          Go ahead.

20  BY MR. QUINN:

21  Q   I think when we broke, Mr. Malden, we were talking about

22  other general accommodations offered at Fort Lyon.

23  A   That's correct.

24  Q   And can you give the Court some examples of those?

25  A   Some of the examples of before '09 would have been, we had

Randolph Malden - Direct

3607

1  offender, general job descriptions, we had, we had offenders

2  that would scoot butter balls in the kitchen or --

3  Q   I'm not talking about offender jobs.  I'm talking about

4  general procedural or policy accommodations for disabled

5  offenders generally in the facility.

6  A   Boy, I'm just drawing a total blank 'cause I'm trying to go

7  back prior, prior to that date you're asking.

8  Q   Prior to May of '09, was there a early pull for disabled

9  offenders?

10  A   Yes.

11  Q   That's the kind of stuff I'm asking about, those general

12  types of accommodations.  Can you think of anything others?

13  A   We also pull inmates early for recreation.  We would give

14  them extra time to ambulate from their work areas to whatever

15  job sites or recreation so they would get pulled a little bit

16  earlier, have a little bit extra time.

17        That was a variance to policy because we have an

18  offender-movement window where the general population is

19  allowed ten minutes.  Well, an offender that may be slow

20  walking or something might need 15, 12, somewhere in there, so

21  he'd be given extra time to do that.  There's quite a few

22  things like that that we would do.

23  Q   Now, Fort Lyon also has the special medical needs unit.

24  A   That's correct.

25  Q   And what is that unit specifically?

Randolph Malden - Direct

1    A    That's a medical unit that we have that's approximately 20

2    to 24 offenders that are -- that have special needs that they

3    don't really fit into general population or hospice, but some

4    of them are bedridden or they're very elderly.  They have

5    memory problems, different ailments that are going on that need

6    nursing care, around the clock.

7    Q    Now, what types of activities are available for those

8    inmates?

9    A    Those offenders, we've hired, prior to the date in

10   question, we had recreation aides up there that would go around

11   and play cards, help read newspapers, play video games, deals

12   like that, things like that.

13   Q    Now, I want to talk about Exhibit O3, which is 850-03.

14        Now, the effective date of that is April 20, 2009.

15   A    Correct.

16   Q    Are you aware of the changes in policy that were made in

17   this exhibit?

18   A    Correct.  I believe so, yes.

19   Q    When did you start discussing the policy changes that are

20   encompassed within this exhibit?

21   A    I'm going to say we started discussing that in November or

22   December of 2008.

23   Q    And let's talk about those discussions.  In what context

24   did those occur?

25   A    It was many of the CM 3s and various people were pulled to

Randolph Malden - Direct

1   offender services to discuss policy options.  Prior, or during

2   that period of time we used one AR which was 300-23, so we were

3   looking at separating those, some of the issues in that AR into

4   two separate ARs.

5           We were looking also at how do we, when an offender

6   asks a case manager for a job, we had no real tracking method

7   that that job or that interaction occurred.  So if an offender

8   was told, well, I'm sorry, you can't work for CI, whether he's

9   disabled or not, the answer back to the offender, there in the

10  case manager mind is, well, you got 25-year sentence, I can't

11  get you that clearance to go out there.  We had no way of

12  really tracking that.

13  Q   And were part of these discussions in November of 2008

14  designed at remedying that?

15  A   Yes.

16  Q   Were standardized job descriptions talked about?

17  A   Yes.  Well, I don't know that they were actually talked

18  about at that particular meeting.  But standardized job

19  descriptions came in probably three or four months after that

20  or talked to that.

21  Q   So before the effective date of this AR, how long were you

22  involved in the process of, of amending this AR?

23  A   Probably about a year, maybe year and a half.

24  Q   And along the lines of, of the changes in the April 20,

25  2009 AR, did you participate in some audits?

Randolph Malden - Direct

3610

1   A   Yes, I did.

2   Q   And when did those occur?

3   A   Those occurred, I believe it was in March of 2009.

4   Q   And what was the purpose of the audits?

5   A   The purpose of those audits was to see how well did

6   everybody -- or the various facilities are progressing towards

7   some of those issues being identified such as utilization of

8   the standard job description, the job-board process that they

9   were using in each facility.

10  Q   Let me stop you there.

11  A   Okay.

12  Q   The job-board process or classification-committee process,

13  how long has there been a job board?

14  A   I'm going to say probably close to two years or better.

15  Q   There's been a job board for only two years?

16  A   Well, there's -- there's been the classification -- 'cause

17  I keep going back to the date, so I'm trying to --

18  Q   Prior to May of '09, was there a job board?

19  A   Prior to that date, I was doing a classification or

20  job-board process to review some of these issues or issues in

21  general, I'm going to say at least a year and a half before the

22  date in question.

23  Q   Now, you testified, and I interrupted you, I apologize,

24  what was the purpose of the audits?

25  A   The purpose of the audits was to get a view of where

Randolph Malden – Direct

 1    everybody's at in the process of moving forward.  And that was

 2    basically based on some of our informal discussions, if you

 3    will, prior to the 2009 date.

 4    Q    Any other reasons for the audit?

 5    A    No.  It was just to see if we were getting to doing the

 6    right thing.

 7    Q    Now, you conducted some of these audits, and you did some

 8    of them at Four Mile and some of the minimum centers, correct?

 9    A    That's correct.

10    Q    And who did you meet with at the minimum centers, when you

11    conducted the audits?

12    A    Met with the case-management supervisor, Frank Ortiz.

13    Q    And he's the case manager 3 for the Cañon Minimum Centers?

14    A    Yes, I believe so.

15    Q    And what were your discussions with him, with respect to

16    these audits?

17    A    In general overall, where they were at, what we were

18    looking at with the audit instrument, and then we proceeded to

19    the various facilities.  Both at Four Mile, Arrowhead, Skyline,

20    we were looking at job descriptions to see if they had been

21    followed to, to a point.

22    Q    Was part of this an educational process?

23    A    Yes.

24    Q    And what were you trying to do with -- as that aspect of

25    the audit process?

Randolph Malden - Direct

1  A   We were trying to get to a, a standard where all

2  facilities -- 'cause facilities are spread out.  Over time it

3  had gotten into different ways of functioning.  We were trying

4  to bring that back into line, so we were all kind of on the

5  same page, going forward.

6  Q   With respect to the, the AR dated April 20, 2000 --

7           MS. GREISEN:  Object to leading, Judge.

8           THE COURT:  Sustained.

9  BY MR. QUINN:

10  Q   Get on the same page with respect to what?

11  A   To the upcoming of this document.  850-03.

12           MR. QUINN:  No further questions.

13                        **CROSS-EXAMINATION**

14  BY MS. GREISEN:

15  Q   Good afternoon, Mr. Malden.  I'm Paula Greisen.  I'm one of

16  the plaintiffs' attorneys in this case.  I have a few

17  questions, follow-up questions, for you with regard to what

18  Mr. Quinn asked you.

19           At Fort Lyon, I'm curious, you said that you supervise

20  six case managers; is that right?

21  A   That's correct.

22  Q   Can you give me an idea of how many inmates a case manager

23  at Fort Lyon is charged to supervise?

24  A   Approximately 84 to 85 offenders.

25  Q   And we heard previously that they're required to meet with

Randolph Malden - Cross

1  an inmate at least once a month.  Is that true at Fort Lyon as

2  well?

3  A   That's correct.

4  Q   Okay.

5        Now, I believe you said -- and correct me if I'm

6  wrong -- are you -- you supervise all the classification at

7  Fort Lyon; is that right?

8  A   That's correct.

9  Q   And that means that you supervise all the job placement for

10  inmates at Fort Lyon as well?

11  A   As part of that board, yes.

12  Q   As part of the job board?

13  A   Yes.

14  Q   So has -- to your knowledge, fair to say that as of May 1,

15  2009, the job board or classification committee at Fort Lyon

16  has never conducted any kind of overall audits at the facility

17  to look to see the comparison of the assignments given to

18  inmates with disabilities compared to other inmates; is that

19  correct?

20  A   I'm not sure I quite understand that question.  Assignments

21  or job duties and stuff are general.  They're the same for

22  offender whether they're able-bodied or would be disabled.

23  Q   Well, what I'm asking about is whether or not, to your

24  knowledge, the job board or in your position as the supervisor

25  of classification, you have ever performed any audit where you

Randolph Malden - Cross

1  have looked at all the records with respect to inmate job

2  assignments to determine whether or not there has been any

3  evidence of discrimination with respect to the assignment of

4  jobs based on disability at Fort Lyon.

5  A    I'd say that's correct.

6  Q    Okay.

7        Now, prior to May 1 of 2009, Fort Lyon was following

8  the offender work program outlined in AR 300-23, correct?

9        I believe you just testified to that, correct?

10 A    Yeah, I believe that that's correct.

11 Q    I'm going to hand you Exhibit 723.

12       Can you tell us what Exhibit 723 is?

13 A    This is offender work program.

14 Q    And this is AR 300-23, correct?

15 A    That's correct.

16 Q    This is the AR that you testified was followed at Fort Lyon

17 prior to May 1, 2009, correct?

18 A    That's correct.

19 Q    Now, the -- I want to go through a few things on this AR.

20 The AR on the first page defines under Roman numeral 3A an

21 able-bodied offender as an individual in the custody of DOC who

22 is cleared medically and is physically able to participate in a

23 work program unless otherwise specified.  Right?

24 A    That's correct.

25 Q    Now, and then if you turn to the second page, under Roman

Randolph Malden - Cross

3615

1    numeral 3M, according to this AR, work program is defined as in

2    accordance with C.R.S. 17-29-103, a program made up of

3    able-bodied offenders who have been assigned to the reclamation

4    of state property and other projects, and I don't think I need

5    to go further.  But do you see that?

6    A    That's correct, yes, I see that.

7    Q    And again, if we look at the next page under Roman numeral

8    four, procedures.

9    A    Uh-huh.  Yes.

10   Q    Under B of that section of this AR, it states, All

11   able-bodied offenders are required to work unless assigned to

12   approved education or training program.  Correct?

13   A    That's correct.

14   Q    Now, nowhere in this AR is there any mention of the work

15   supervisors calling the AIC to discuss what accommodations

16   would be provided to inmates with disabilities, correct?

17   A    Yes, that's correct.

18   Q    And in fact, you testified that in, prior to May 1, '09,

19   the case managers reviewed the essential function, the job

20   qualifications of the jobs.  The term "essential functions and

21   job qualifications" are nowhere mentioned in this AR, itself,

22   correct?

23   A    That would be correct, yes.

24   Q    So that was not part of the formal process that existed

25   prior to May 1 of 2009, correct?

Randolph Malden - Cross

 1  A    That would not have been part of the official process at

 2  that time.  Like I say, I'm having a hard time with the dates

 3  because a lot of what we were doing was, was developing these

 4  things.

 5  Q    Well, correct.  But you would not implement an AR until it

 6  became effective, correct?

 7  A    We wouldn't -- well, that's correct.

 8  Q    Okay.

 9  A    Of course, but we could still work towards a general

10  process, at least on paper and through reviews and stuff to

11  develop the --

12  Q    And I'm not talking about development of a process.  I'm

13  talking about implementation, what was actually happening.  So

14  prior to May 1, 2009, that process that you testified about was

15  a process that was in development but had not yet been

16  implemented, correct?

17  A    I would say it was in development and had been tested.

18  Q    It had not yet been implemented.

19  A    But not yet been put into the AR, I would say that that

20  would be true.

21  Q    Okay.

22            And in addition, it had not yet been implemented.

23  Correct?

24  A    I guess correct, yes.

25  Q    Now, prior to this new AR being implemented, the fact was

1  that work supervisors actually had a lot of say who got into

2  their jobs.  Right?

3          That was one of the things the new AR sought to

4  change.

5          Correct?

6  A   No, I wouldn't say that's correct.

7  Q   Well, this CI, the supervisors running the CI programs at

8  Fort Lyon were determining who was getting into their program,

9  correct?

10  A   Not solely, no.

11  Q   Prior to May 1, 2009, there was no policy that took away a

12  work supervisor's ability to decide whether or not to let an

13  individual into their program, correct?

14  A   I'm not sure.

15  Q   Well, you certainly know that Deb Stevens, who is -- as you

16  know, Deb Stevens is the supervisor of the dog program at Fort

17  Lyon, right?

18  A   Certainly do, yes.

19  Q   Okay.

20          And you were aware, weren't you, that Ms. Stevens was

21  making decisions about who would get into the dog program prior

22  to May 1 of 2009, weren't you?

23  A   Yes.  And in conjunction with what referrals she gets from

24  our, from our process that we were working on.

25  Q   Right.  She could get a referral, but she wouldn't

Randolph Malden - Cross

1  necessarily have to accept the person who was referred to her,

2  correct?

3  A   That's correct.  But she would -- there would also be --

4  'cause we still would do the assignments or the approval of it

5  in the end.  We would still question her decision as well.

6  Q   Well, you may question it, but she had the final say,

7  right?

8  A   Not necessarily.

9  Q   Are you aware of any time when Miss Stevens was overruled

10  with respect to who was admitted into the program prior to

11  May 1, 2009?

12  A   No, I don't believe of any specific one that I can refer

13  to, no.

14  Q   In fact, in this -- in Exhibit 723, AR 300-23, there is no

15  mention anywhere in this offender work program AR which talks

16  or discusses the -- any accommodations that would be provided

17  to inmates with disabilities in performing or receiving job

18  assignments, correct?

19  A   That would be correct.

20  Q   Now, you talked about Mr. Strowbridge, I believe you talked

21  about him mowing lawns in the CI program at Fort Lyon?

22  A   Yes.

23  Q   Mr. Strowbridge is an individual that has a prosthetic leg,

24  do you recall that?

25  A   He has more than one, ma'am.  Uh-huh.

Randolph Malden - Cross

1    Q    Okay.  Sorry to hear that.

2         Well, I'm aware of Mr. Strowbridge's status prior to

3    May 1 of 2009.  You're aware, aren't you, that it took the

4    Department of Corrections over a year to get Mr. Strowbridge

5    the prosthetic leg that he needed; were you aware of that?

6    A    I'm not aware of that, ma'am, no.

7    Q    And were you aware that there was a lot of AIC involvement

8    with respect to Mr. Strowbridge because of this recurring issue

9    with respect to his prosthetic leg?

10        MR. QUINN:  I'm going to object, Your Honor.  It's

11   outside the scope.

12        THE COURT:  Overruled.

13        THE WITNESS:  No.

14        I'm sorry, would you repeat that question again?

15   Sorry.

16   BY MS. GREISEN:

17   Q    Sure.  I was asking you whether or not you were -- I think

18   it might be easier, Kara, would you just mind reading the

19   question back.

20        (The last full question was read.)

21        THE WITNESS:  No, was not.

22   BY MS. GREISEN:

23   Q    Well, were you aware that the AIC got involved, the office

24   of the AIC, got involved in ensuring that Mr. Strowbridge was

25   placed in that CI job?

Randolph Malden - Cross

1  A    Yeah.  Yes, I was.  Yes.  But it had nothing to do at that

2  time with prosthetics.

3  Q    Well, you were aware that it was shortly after he finally

4  got his prosthetic leg that the AIC got involved in, quote,

5  pushing for Mr. Strowbridge to be placed in that CI job, were

6  you aware of that?

7  A    I'm not aware of that at all, ma'am.

8  Q    Now, you also talked with Mr. Quinn about some general

9  accommodations you give to individuals at Fort Lyon.  You

10  mentioned they might get more time to walk around the facility;

11  is that right?

12  A    That's right.

13  Q    They only received those accommodation, the inmates only

14  received those accommodations if they were specifically

15  provided for in their "accommodation resolution" forms,

16  correct?

17  A    They would not necessarily be correct, no.  There were

18  practices that were being implemented proactively prior to some

19  of that involvement with AIC.

20  Q    Well, prior to May 1, 2009, it's fair to say, isn't it,

21  that simply because an inmate wanted more time to walk around

22  the facility, that doesn't mean they were given it, correct?

23  A    At Fort Lyon Correctional Facility, because we -- the

24  population that we do deal with and there are a lot of

25  offenders that are mobility-impaired and whatnot, there was

Randolph Malden - Cross

1   never a big push for an offender that didn't make it somewhere

2   within that time frame.

3   Q   Well, there's controlled movement at Fort Lyon, correct?

4   A   That's correct.

5   Q   Is it your testimony that the policy at Fort Lyon was that

6   if somebody didn't move within the controlled-movement time, it

7   was not a problem?

8   A   I won't say that that's the case.  But I would say that if

9   a, if a able-body offender, if you will, that does not have

10  disability at that time took 15 minutes, he would probably face

11  a disciplinary action.  But an offender that -- I think some of

12  the common sense amongst our staff would say, we understand

13  that.

14  Q   Well, I appreciate that.  But the rule was that if it

15  wasn't on -- the policy was if it's not on their "accommodation

16  resolution" form and they did not meet controlled movement,

17  they in fact could potentially face a COPD charge, correct?

18  A   They could.  But I'm not aware of any case where that was

19  such.

20  Q   You talked a little bit about the audits with Mr. Quinn.

21  As of May 1, 2009, there was no inmate with a disability at

22  Fort Lyon who had been staffed or given a job through the new

23  job process that we've talked about on AR 850, correct?

24  A   It would have been staffed through the process that we kind

25  of worked up under the current -- or the 300-23, and what we

Randolph Malden - Cross

1  had done is part of being part of the meeting 2008, I was

2  generally aware of the direction that we were attempting to go

3  and had implemented many of those things prior to the

4  implementation of the AR.

5  Q   My question to you was that as of May 1, 2009, there had

6  not been an inmate with a disability staffed according to the

7  policy outlined in the AR 850-03, correct?

8  A   All offender -- I would say yes because all offenders at

9  Fort Lyon are staffed, even prior to that date.

10 Q   That's not my question.  I understand when they get a job,

11 it's determined to be staffed.  I'm talking about staffed,

12 being put in a job, using the AR 850-03.

13         Prior to May 1, 2009, there had not been an inmate who

14 had gone through, an inmate with a disability, who had gone

15 through the job process that is outlined in that AR, correct?

16 A   Not with the -- not with the current one that's on as of

17 last year.  I'm not really tracking your question, I guess.

18 Q   All right.  Let me -- let me start over and see if I can do

19 a better job.

20         You talked with Mr. Quinn about the AR 850-03, right?

21 A   Yes.

22 Q   Prior to May 1 of 2009, there had not been an inmate with a

23 disability at Fort Lyon who had gone through the job process as

24 it is outlined in this AR as of that date, correct?

25 A   I'm going to say there was offenders that were viewed

Randolph Malden - Cross

1    through that process.

2    Q    They had been staffed as of --

3    A    At least from me and case manager and programs manager.  We

4    started working on some of that prior to the implementation of

5    the AR.

6    Q    Well, I appreciate that.  But you understand 850-03

7    outlines a very specific process for an inmate to obtain a job,

8    correct?

9    A    Yes.

10   Q    And that process was changed under that AR from the

11   previous process, correct?

12   A    I believe it made it official.  I won't say that it was

13   changed.  That was part of our, our practice that we were

14   trying to establish a good process to implement this across the

15   board.

16   Q    Can you tell me the identity of anybody who was staffed

17   prior to May 1, 2009, any, the identity of any inmate with a

18   disability who was staffed with this new job process prior to

19   May 1, 2009?

20   A    I couldn't right offhand, I couldn't give you a specific

21   like that because I haven't reviewed for anything like that.

22   Q    Well, certainly as of mid March 2009, there had been no

23   inmate with a disability who had been staffed through this new

24   AR 850-03, correct?

25   A    I would say that they were probably staffed but not

Randolph Malden - Cross

1    officially with the AR as it being finalized.

2    Q    Well, that's what I'm asking.  That's my question.  I'm

3    talking about an inmate with a disability who has gone through

4    the formal process outlined in 850-03.  It's true, isn't it,

5    Mr. Malden, that at least by mid March of 2009, there had not

6    been an inmate with a disability who had been staffed under

7    this new job process, correct?

8    A    I guess I'd have to kind of agree to that, yes.

9           MS. GREISEN:  I don't have anything further, Your

10   Honor.

11          THE COURT:  Thank you.

12          Any redirect?

13                    **REDIRECT EXAMINATION**

14   BY MR. QUINN:

15   Q    Mr. Malden, what is the effective date of Exhibit O3, AR

16   850-03?

17   A    April 20, 2009.

18   Q    Prior to that date, had you been implementing the processes

19   outlined in this AR?

20   A    Yes.

21   Q    At Fort Lyon?

22   A    Yes.

23   Q    And were inmates staffed in accordance with the processes

24   outlined in this AR prior to May of '09?

25   A    All offenders that came to Fort Lyon, at least as long as

Randolph Malden - Redirect                                    3625

 1  I've been the supervisor, were staffed, if you will, through

 2  this process, yes.

 3  Q    Prior to May of '09, were inmates with disabilities

 4  accommodated with respect to their jobs?

 5  A    Yes, they were.

 6  Q    And have inmates with disabilities been accommodated in

 7  their jobs as long as you've been at Fort Lyon?

 8  A    Yes, sir, they have been.

 9  Q    Ms. Greisen talked to you a little bit about inmate

10  Strowbridge?

11  A    Yes.

12  Q    You're aware of this inmate?

13  A    Yes, I am.

14  Q    Do you know how many times he saw a prosthesis, prosthetic

15  manufacturer?

16  A    I have no idea how many times he's seen a manufacturer.

17  Q    Do you know how many times he saw medical with respect to

18  the fitting of his prosthesis?

19  A    No, I don't.

20  Q    Do you have any idea or any knowledge of the reason for any

21  alleged delay in him getting his prosthetic?

22  A    Not that I -- no, not as far as getting his prosthetic, no.

23  Q    Now, you conducted the audits on the new job processes that

24  we had talked about, correct?

25  A    That's correct.

Randolph Malden - Redirect

1   Q   In general, the results of that audit, how would you --

2   would you view them as favorable, unfavorable?

3        MS. GREISEN:  Object.  Objection, Judge, on

4   foundation, relevance.

5        THE COURT:  Overruled.

6        THE WITNESS:  Can you repeat the question?

7   BY MR. QUINN:

8   Q   Well, the purpose of the audits was to -- and you

9   testified -- to get everybody on the same page with respect to

10  the new AR.

11  A   Correct.

12  Q   And you conducted these audits.

13  A   That's correct.

14  Q   And would you view the results of the audits that you

15  conducted in March of 2009 as favorable with respect to the

16  goal of getting everybody on the same page?

17       MS. GREISEN:  Object to leading, Your Honor.

18       THE COURT:  Sustained.

19  BY MR. QUINN:

20  Q   How would you view the results of the audits?

21  A   They -- I would review -- I would say that they were pretty

22  much on the mark as to my understanding, some of the issues

23  that we did see were issues that we had probably dealt with at

24  Fort Lyon a few months or weeks prior to that.

25  Q   Prior to the audits?

Randolph Malden - Redirect

1   A    Prior to the audit, yes.

2   Q    Now, you had testified under questioning by Ms. Greisen

3   that a lot of the processes outlined in this AR 850-03 were

4   implemented at Fort Lyon prior to May of '09.

5   A    That's correct.

6   Q    Were inmates evaluated under the processes outlined in this

7   AR prior to May of '09?

8   A    Yes, they were.

9   Q    And were they accommodated?

10  A    If there was a need, yes, they were.

11  Q    In accordance with the processes outlined in this AR?

12          MS. GREISEN:  I'm going to object to leading, Your

13  Honor.

14          THE COURT:  Sustained.

15  BY MR. QUINN:

16  Q    Were there inmates that were accommodated under this AR,

17  under the processes -- prior to May of '09 --

18          MS. GREISEN:  Same objection.

19          THE COURT:  Sustained.

20  BY MR. QUINN:

21  Q    Does the fact that an AR has not officially been

22  implemented preclude a facility from acting within the confines

23  of an existing AR but with a different sort of processes?

24          MS. GREISEN:  Objection.  Leading.

25          THE COURT:  It is leading.  Sustained.

1        MR. QUINN:  No further questions.

2        THE COURT:  Thank you.

3        You may stand down, sir.  Thank you.

4        THE WITNESS:  Thank you.

5        THE COURT:  Next witness, please.

6        MS. GREISEN:  For housekeeping I need to offer

7    Exhibit 723 and AR 300-23, which is AR 300-23.

8        MR. QUINN:  No objection.

9        THE COURT:  They're admitted.

10       (Exhibit 723 admitted.)

11       MR. QUINN:  Oh, I'm sorry.  You were typing, didn't

12   want to -- we would all Frank Ortiz.

13       THE COURT:  Mr. Ortiz, come forward, please.

14            (**FRANKLIN ORTIZ, DEFENDANT'S WITNESS, SWORN**)

15       THE COURTROOM DEPUTY:  Please be seated.

16       State your full name for the record and spell your

17   last name.

18       THE WITNESS:  It's Franklin James Ortiz, O-R-T-I-Z.

19                    **DIRECT EXAMINATION**

20   BY MR. QUINN:

21   Q   Good afternoon, Mr. Ortiz.

22   A   Afternoon.

23   Q   What is your current job with the Department of

24   Corrections?

25   A   I'm the case-management supervisor at the Cañon Minimum

Franklin Ortiz - Direct

1    Centers.

2    Q    And I want you to tell the Court a little bit about your

3    history within the DOC.

4    A    Okay.  I was hired in 1986 as a correctional officer at

5    Centennial Correctional Facility.  I got promoted to sergeant

6    in 1990 at the Arrowhead Correctional Center.  I went from

7    there I got promoted to lieutenant in '95 at pre-release

8    correctional center, worked as shift commander there.  I worked

9    as a disciplinary officer.  I worked as a hearings officer.

10   And I worked as a training coordinator.  2004, I went to case

11   manager 1 at Arrowhead Correctional Center.  And then in 2008,

12   I went to the case-management supervisor.

13   Q    In 2008?

14   A    Yes, sir.  8 July.  July of 2008.

15   Q    So since July of 2008, you've been the case manager through

16   your case-manager supervisor at the Cañon Minimum Center?

17   A    Yes, sir.

18   Q    I want you to describe briefly your job duties as a

19   case-management supervisor.

20   A    I supervise 15 case manager 1s, two case manager 2s, one

21   administrative assistant 3.  I'm also in charge of assisting

22   and helping with the current hearings officer and the current

23   disciplinary officer for Cañon Minimum Centers.

24   Q    And can you describe generally the duties of a case manager

25   at the Cañon Minimum Centers?

Franklin Ortiz - Direct

3630

```
 1  A   Well, at the Cañon Minimum Centers, we, as a supervisor, I
 2  make sure that PASs are done, reclasses are ruled,
 3  reclassification documents.  With my 1s, as well as my 2s.  I
 4  am the chairperson for the classification committee, which can
 5  also be job board and follows any type of movement in and out
 6  of the Cañon Minimum Centers.
 7          I do step 2 grievances.  I do step 1 grievances, if
 8  appropriate.  I deal with, at one point I was doing the legal
 9  phone calls and court hearings for the Cañon Minimum Centers.
10          That's about all I can think of.
11  Q   Okay.
12          Can you -- what does the classification committee do?
13  Let me ask you this.  Who's on the classification committee at
14  Fort Lyon?
15  A   CMC.
16  Q   Sorry, at CMC?
17  A   Currently or before May of '09.  'Cause I know that's going
18  to come up.
19          MS. GREISEN:  You got it.
20  BY MR. QUINN:
21  Q   Before May of '09.
22  A   Before May of '09, it was me, I would be the chairperson of
23  it.  We had the custody and control manager.  We had the
24  programs manager, and we comprised the board where there was
25  actually signatures.  Who's in the room is a different story.
```

Franklin Ortiz - Direct                    3631

1    Q    When you say "board," is that the job board?

2    A    Yeah.  They call it job board.

3    Q    Can you describe generally the duties of a case manager at

4    CMC?

5    A    Case managers prepare PASs, parole plans, the job-board

6    form.  They assist with offenders in applying for Social

7    Security, getting them their IDs, getting them their birth

8    certificates, ensuring that the inmates are placed in the

9    proper programming, whether that be work assignments or GED or

10   educational type of stuff.

11        They visit or they're mandated to see their offenders

12   at least once a month.  Per policy.  They write chrons on the

13   contacts that they have with the offenders.  They're in charge

14   of dealing with grievances, ensuring that the offender knows

15   the process of a grievance.  Dealing with it at the lowest

16   level and then giving him the paperwork if they want to proceed

17   to go higher.

18        We prepare court documents for the -- for any type of

19   court inquiries.  Allow the phone calls -- at CMC, we allow the

20   phone calls for the court hearings; if, if the court requires

21   them to be on the phone through a phone hearing, then the case

22   managers are responsible for ensuring that the offender is

23   there and that we have the phone ready for them.

24        These kind of, in a small microcosm of what we do.

25   Q    I want to talk a little bit about CMC.  CMC is comprised of

Franklin Ortiz - Direct

1  how many facilities?

2  A    Three facilities.  Arrowhead, Four Mile, and Skyline.

3  Q    I want to talk a little bit about the job procedures.  Can

4  you look at Exhibit O3, please.

5  A    Okay.

6  Q    What is that document?

7  A    That is the offender assignment and pay, 850-3.

8  Q    And was that in effect prior to May 1 of 2009?

9  A    Yes.  It has an effective date of April 20 of 2009.

10  Q    And it has a supersession date of 11-15 of 2008.  Now, I

11  want to talk a little bit about the process.  When you say

12  "supersession date," what does that mean?

13  A    That means that this document was -- if you look at the

14  back, towards the back, it will say what this document has been

15  in existence or whatever since October 15 of 2002.  If you look

16  at the history, which is on page 10.  And then it gets updated

17  every year.  You know, July 1, 2003; July 1, 2004, et cetera.

18        So the latest one that this document replaced was the

19  document of 11-15 of 2008.

20  Q    And I want to talk about -- you're familiar with this --

21  A    Yes.

22  Q    -- AR?

23  A    Yes, sir.

24  Q    I want to talk about the process established by this AR for

25  obtaining jobs for inmates at CMC.

Franklin Ortiz - Direct                                    3633

1    A    Okay.

2    Q    Can you generally describe the process?

3    A    The process prior to -- prior to the April 20 of 2009, or

4    the process --

5    Q    I want to do both.  I want to talk about the process as it

6    exists in this -- in this document.

7    A    Okay.

8    Q    Okay.

9    A    As far as an inmate getting a job?

10   Q    Yes.

11   A    Okay.

12        MS. GREISEN:  Your Honor, I'm just going to object on

13   cumulative grounds.  We've gone over the process outlined in

14   this AR about five or ten times.

15        THE COURT:  Different set of institutions.  Overruled.

16   BY MR. QUINN:

17   Q    Let me ask you about that.  CMC is a different type of

18   facility, isn't it?

19   A    Yes, sir, we are a work camp -- we call ourselves a work

20   camp.  Where our offenders work.  We have 1242 offenders,

21   approximately.  And I have approximately 1300 jobs.  That does

22   not include treatment.  Treatment is not considered a job.  In

23   our facilities.  They have to work.  They have to have a job,

24   and then they attend their treatment as well.  So --

25   Q    So if an offender is in a treatment program, the offender

Franklin Ortiz - Direct

3634

1   also has a job?

2   A   Yes, sir.  And also same thing with GED for the majority of

3   them.  Our GED classes are normally, the paid part of them are

4   normally low, the volunteer part of them is normally high due

5   to the fact that our offenders work.  They're required to have

6   a job.  Unless they're getting close to their MRD or they've

7   been tabled or they need something so that they could get their

8   GED prior to leaving, then we would put them into GED class.

9   Q   Now, I want you to describe the job processes, as outlined

10  in this AR and how that worked at CMC.

11  A   Okay.  When an offender came in, they would physically --

12  they could go up and talk to their case manager.  The case

13  managers are by unit, for the most part.  We have -- there's

14  one case manager at Arrowhead that's not in the unit.  And it's

15  kind of different than Arrowhead is different than Four Mile,

16  which is different than Skyline.

17       The process is pretty much the same, is that they

18  would go and talk to their case manager.  The case manager

19  would do an orientation, talking about what their work hours

20  were, open hours, what they call open hours, because an

21  offender can go and talking to a case manager during the day at

22  certain times.  They would talk about any issues that the

23  offender would have, they talked about emergency-contact

24  information, where they're going to parole to, what they're --

25  what they're going to go, if they have community referral

Franklin Ortiz - Direct

1    coming up, all that type of information.

2           And they would, at that point, they would start the

3    job-board assessment form.  The job-board assessment form, I

4    kind of want to point out, this form that they have on 850-3,

5    is, we've been working with that form since . . . as far as I

6    can remember, in 2000, they still were using, they were using

7    part of this form, this was our IA at that point.

8           But they would start filling out this form.  And it's

9    kind of changed a little bit, but majority of it's still the

10   same.  They would start filling out that form.  We have job

11   board on every Tuesday, except for parole board weeks when the

12   offender would go in and talk to his case manager.  They could

13   either request a specific job, like dairy or horse program or

14   canteen or whatever.

15          On those or on new arrivals, and then we would pull up

16   a quota sheet when we have our job board.  The case manager

17   would bring this job-board form and the inmate's working file

18   to the job board, and they would present that form to the job

19   board and then we would look at criteria 'cause, again, most of

20   our jobs are outside of the fence.  We do have some that are

21   in, but most of our jobs are outside the fence, so we also have

22   to give them gate pass, what we call gate-pass approval.

23          And then they would present them at job board, and

24   then job board would make that decision where they were going

25   to go work.  Sometimes they got the job that they were

Franklin Ortiz - Direct

1   requesting.  Sometimes they didn't, just based on quota.

2   Q   Now, you talked about a gate pass.  Is that similar to a

3   code 13?

4   A   No.  Gate passes are, are for offenders that are leaving

5   our perimeter fence and working, while they might be working in

6   the East Cañon complex, they're outside of our fence.  It's

7   kind of a misnomer for Skyline because Skyline doesn't have a

8   fence around it, but we call it gate-pass approval anyway.  So

9   we give them that.

10  Q   I assume if there's no fence, there's no gate?

11  A   There's no fence, there's no gate.  There's poles.  Yellow

12  poles, actually, and they're told they can't walk past them.

13  Skyline is a true minimum.  And it's different than the other

14  two, so our missions are kind of different.

15  Q   What is a code 13?

16  A   A code 13, when it came into effect was when an offender,

17  we, we predominantly used it for offenders that were requesting

18  a job, a job change, saying they wanted to work at -- they been

19  working at WHIP, and they wanted to go to dairy, dairy was

20  full, we would do a code 13 saying they weren't hiring at this

21  time.

22          Also, if the guy has a 2025 outdate, for example, he

23  would not qualify for a gate pass, so if they couldn't get a

24  gate pass, we would code 13, because they couldn't go outside

25  our fence, no matter what the job was.  So if they requested

Franklin Ortiz - Direct                                   3637

1    DARE or canteen or any of those jobs, then they would be code

2    13ed because they didn't meet the criteria for a gate pass.

3    Q    Now, after the inmate and the case manager meet with the

4    job board or classification committee, what occurs then?

5    A    Okay.  The inmate never really met with job board.

6    Q    Okay.

7    A    It's just a file.  We say we bring the inmate to the job

8    board, but we don't bring him physically, we bring the file and

9    we bring the form and then the case manager presents him.  And

10   what the case manager does is they go through the form and they

11   would tell us specific things and then if we had questions, we

12   would refer to the file for any additional information.  Then

13   would make a determination where we were going to assign this

14   individual.

15   Q    Now, under this procedure, is disability discussed?

16   A    Under this here?

17   Q    Yeah.  Under this AR, 850-03, was disability discussed by

18   the classification committee?

19   A    As far as whether or not they got a job or not?

20   Q    Yes.

21   A    No.  We work our offenders.

22   Q    After the --

23   A    Again, I do want to -- I hate to interrupt, but the other

24   thing is we don't -- if they have anything higher than a M3

25   code, then they are not, they wouldn't be at CMC.  So while

Franklin Ortiz – Direct

1    we're an ADA facility, most of those, most of the individuals

2    that we get are working.  I mean, we don't have issues with

3    them; we just work them.

4    Q   After the classification committee says, okay, this inmate

5    can have this job, what happens next?

6    A   We have our job board kind of at a table kind of like what

7    you guys have.  The job board will make a determination.  Off

8    to the side, we have a case manager 2 that's on the computer.

9    He refers them and assigns them to that unit to work, whether

10   it be dairy, WHIP, whatever, he assigns them to them.

11        By this, by this policy, what we, what they would do

12   is we would, once we assigned them to there, then actually it

13   didn't take effect until the next day, the work supervisor

14   would come and they could look it up and see who they have on

15   their crew through MPS.  They would do the job descriptions,

16   they would have them fill job descriptions out and the

17   accommodation verification forms, and then they could work

18   them.  They can't work them until the accommodation

19   verification and the job description forms were signed.

20   Q   Is the AIC contacted at all during that process?

21   A   If the offender cannot, if the offender states that he

22   cannot perform the work as according to the job description, if

23   he needs an accommodation, then the work supervisor, with the

24   offender, would call the AIC and they would work out an

25   accommodation, if they could work out an accommodation for

Franklin Ortiz - Direct

1  that.

2  Q   Now, prior to April 20, 2009, prior to the implementation

3  of this AR, was the procedure much different?

4  A   Not for us.  We've ran kind of basically the same job

5  work -- now, some of the wording is changed.  The job

6  descriptions, they recently, they had come out right around

7  that time, that time frame because before, I mean, job

8  descriptions were kind of, they were, they weren't, they

9  weren't systemwide.

10         I mean, you know, through MPS, you could do a -- you

11  could be a, I'm trying to figure out how to explain it.  Like

12  at dairy, now they're called animal caretaker 1s, where before

13  they were just a general labor type of position and there would

14  be a bunch of those.  So job descriptions when they came out,

15  they kind of changed everything, as far as how we did

16  everything.

17  Q   So part of this policy standardized the job description?

18  A   Yes.

19         MS. GREISEN:  Objection to leading.

20         THE COURT:  Sustained.

21  BY MR. QUINN:

22  Q   So you testified that you had been doing similar process

23  to --

24         MS. GREISEN:  Object to leading.

25         THE COURT:  He hasn't asked the question yet.  I

1  can't --

2          MS. GREISEN:  Sorry.

3          THE COURT:  Overruled.

4  BY MR. QUINN:

5  Q   Was the policy that you were following much different than

6  this policy prior to April 20, 2009?

7  A   No.

8  Q   And I want to talk to you a little bit about the nature of

9  CMC.  You have how many offenders there?

10 A   Approximately 1242.  Give or take.

11 Q   And how many jobs?

12 A   Approximately 1300.  Again, that's -- those -- that's kind

13 of a give-and-take thing, and if we're talking about prior to

14 May of '09, it could have been higher.  When I took over in

15 '08, there was a little discrepancy as far as quotas.  We kind

16 of tried to pare down our quotas a little bit, but there's a

17 reason for our quotas to be high in some areas.

18          That would be, you know, like the farm crews when they

19 have harvest and stuff, then we would, we kept their quotas

20 high because when they were going to harvest, they would need

21 more inmates, and we would assign more offenders to them,

22 without having to go into MPS and change our quotas, then the

23 quotas would have been off.  But they're fairly close now.

24 Q   Prior to May of '09, did you have disabled offenders that

25 went through this process?

3641

 1   A    Yes.

 2   Q    And were they placed in jobs?

 3   A    Yes.

 4   Q    You've made it pretty clear that offenders at CMC work?

 5   A    They work, or they don't stay there, sir.

 6   Q    I want to talk about the -- there was an audit done at CMC

 7   in March of 2009.  Do you recall that?

 8   A    Yes.

 9   Q    What was the purpose of that audit?

10   A    To my understanding, the purpose was to see, basically kind

11   of get a baseline for where everybody was at.  Our job-board

12   process was, has been kind of emulated throughout the system.

13   It started, it partially started at Buena Vista and when we got

14   it, we kind of revamped it, and I'm talking years ago.  So

15   everybody was kind of trying to get on the same page as kind of

16   went down before this came out.

17   Q    I want to talk a little bit about CMC is kind of a

18   different facility.  Can you tell the Court the variety of

19   programs that are available at CMC, and jobs.

20        You referenced a WHIP program or a WHIP job.  What is

21   that?

22   A    Okay.  Four Mile, Four Mile has vocational culinary arts.

23   They have WHIP program, which is a wild horse inmate program,

24   where they get wild horses from BLM.  There's an agreement with

25   BLM.  They bring in a bunch of wild horses.  I think they're at

Franklin Ortiz - Direct

1    3,000 or 5,000 head now.  They train the horses and they put

2    them up for adoption.  The offenders can work there.  We

3    have -- that's the WHIP program.

4         We have the dairy program over there.  We have the

5    heavy-equipment program over there.

6    Q    Let me back -- what does the dairy program do?

7    A    The dairy program is we have a functional dairy at Four

8    Mile Correctional Center, and what they do, they do everything

9    with the dairy.  They have everything from clerks to animal

10   care takers to people that are pulling the calves when they're

11   birthing to assisting in the milking.  Now, granted, they

12   physically don't do the milking, they have a machine that does

13   it, but they get the cows in there, they sterilize them, the

14   udders so they can attach the machine.  I mean, everything that

15   a dairy, everything that a dairy does, they do.

16   Q    What do they do with the milk?

17   A    Well, if you see the trucks that are on the highway that

18   say Got Milk on them, they fill up two of them a day.  They

19   also provide for the Department and other state agencies for

20   milk.

21   Q    What other programs?

22   A    They got the heavy-equipment program over there.

23   Q    What does that program do?

24   A    The heavy-equipment program, they, they do all sorts of

25   different stuff as far as recently they were assisting in

Franklin Ortiz - Direct                                    3643

 1   building CSP2, dirt work, fencing, painting, digging the

 2   drainage ditches.  They do all that type of stuff with the

 3   heavy equipment.

 4          Then they have -- we were supplying, prior to May of

 5   '09, they were supplying CSP1 with the food-service workers,

 6   with the vocational -- or not vocational -- the janitorial, I'm

 7   sorry.  With laundry workers.  We were supplying all that out

 8   of Four Mile as well.

 9          Let's see, what else.  Oh, they have vocational

10   culinary arts at Four Mile.

11   Q   Is there a Swift program?

12   A   Oh, yeah.  Yeah.  The Swift program, which is the inmate

13   wildfire crew.  If there's a wildfire in Colorado, they'll pull

14   those offenders to go work it in assistance with those workers.

15   Q   Is there a vineyard program?

16   A   That's out of Skyline, sir.

17   Q   Okay.  Well, I'm talking about CMC.

18   A   Okay.

19   Q   All the programs out of CMC.

20   A   Out of Skyline, it's easier if I break them down a little

21   bit.  Because there's so many.

22   Q   Okay.

23   A   Out of Skyline, you have the vineyard program, you have CM

24   transportation.

25   Q   What does the vineyard program do?

1  A   They raise grapes for abbey, the abbey in Cañon, and they

2  use those vineyards to make wine.  They, you know, they grow

3  it, they set it up, you know, they do all the cultivating and

4  do all that type of stuff.  Then you have farm crews and I

5  think there's four of them.  And they, they grow everything.

6  They have an orchard.  They grow corn for silage for the dairy,

7  which is in co-op.  They grow, you know, they're growing

8  peppers, they're growing chile peppers, it's a farm type of

9  thing.  They irrigate the land.  That's basically everything

10  out of that.

11  Q   What do they do with the product that they grow?

12  A   A lot of it goes back into the kitchen.  The orchards, you

13  know, it goes into the kitchen or they can sell it.  The same

14  thing with -- I'll get to Arrowhead in a second.

15  Q   Okay.

16  A   They have CI transportation.  They have DOC recycling.  CI

17  transportation is the people that are going out into the

18  community and they drive trucks, they work at the Pueblo dam,

19  if there's projects out there.  I mean, they do a multitude of

20  different things.  At one time prior to May of '09, I know that

21  they were doing the CDL program.  I don't think that that's

22  going on now, but prior they were doing that.

23  Q   What was the CDL program?

24  A   It's inmates, preparing inmates so they could have a CDL

25  license when they get out, then they have that truck driver

Franklin Ortiz - Direct

1    license so they can get a job.

2         They have the goat program over at Skyline, which is a

3    goat dairy program, so they have the goat cheese and the goat

4    milk and all that, all that type of stuff.

5         They have the fish hatchery, which is the tilapia fish

6    that they're doing and raising the tilapia and trout.  And

7    those are all just Industries jobs.

8         Skyline also has, you know, and Four Mile, they have

9    inside work crews that work for, you know, the unit porters,

10   the laundry.  They, they do everything that a facility would

11   need on the inside as well.

12   Q    Yeah?

13   A    Arrowhead, they have the canteen, which is kind of like the

14   offenders' Wal-Mart; they can -- we service that whole, we

15   service almost all of Colorado at this point.  Most of the

16   facilities, except for the one that's in Denver.  But we

17   provide packaging, anything that an offender orders, then they

18   can -- you know, it's designated by facility.  CSP only allows

19   so much stuff that they can order compared to CMC where they

20   can order, you know, almost anything, TVs, you know, that type

21   of stuff.  So that canteen program, we have that at Arrowhead.

22        We have the service station at Arrowhead which they,

23   they maintain all of the fleet vehicles.  They have a gas

24   station there.  They have a car wash there.  They also certify

25   offenders in ASE, give them their ASE certifications so they

Franklin Ortiz - Direct                                  3646

1   can be mechanics when they leave the Department.

2          Then you have the fish processing which is basically

3   taking what, basically taking what tilapia fish they're growing

4   out of Skyline and Arrowhead is growing them, theirself, and

5   they get fillets out of them and sell them throughout the

6   state.

7   Q    That gives a pretty good idea of -- a lot of jobs?

8   A    I don't think the Judge has enough time.

9   Q    Are disabled offenders placed in these jobs?

10  A    Yes, sir.

11  Q    Approximately how many disabled offenders are you placing

12  in any given week?

13  A    Well, our job board, it starts off at Arrowhead, then it

14  goes to Skyline, then it goes to Four Mile.  I have basically

15  two job boards in a day, it takes me pretty much to noon,

16  sometimes after.  We place, on any given week, we'll place

17  anywhere from 60 to a hundred offenders in job, and out of

18  that, probably 10 percent, 5, 10 percent of that is ADA

19  offenders.  And that's about what our population rate is for

20  ADA offenders for CMC as well.

21  Q    Now, there was some testimony earlier, were you here for

22  Mr. Allen's testimony?

23  A    Most of it.  I walked out a couple times, but most of it,

24  yes.

25  Q    Now, there was some testimony about when an offender, ADA

3647

1   offender, is terminated from a job?

2   A   Uh-huh.

3   Q   What happens when an offender is terminated from a job?

4   A   If a work supervisor wants to -- now, there's a difference

5   between termination and releasing.  If an offender wants to be

6   terminated or fired -- not wants to, but if a supervisor wants

7   to terminate or fire an offender, then they, according to our

8   policy, they have to write a report in P.C. DCIS and also on

9   MPS, they have to eval them out; and in the eval section, there

10   has to be notes as to why they were being terminated or fired.

11         Same thing with the release.  Now, the release doesn't

12   require a P.C. DCIS report, but it does require notes in the

13   MPS.  That in turn goes back to job board.  Nothing really

14   happens until job board affirms it or accepts it.  When it goes

15   back to our job board, say they want to terminate an offender,

16   we look at the notes, we look and make sure that they have a

17   report.

18         If those things aren't in the process, aren't

19   completed, then we no-accept them.  And basically what it does,

20   it puts the offender back into the program where they were and

21   we contact the work supervisor and we discuss what they need to

22   do if they're going to terminate them, what was the wrong with

23   the termination or we tell them, you can't terminate like that.

24   But we run the job board.

25   Q   Is the AIC ever contacted in that process?

Franklin Ortiz – Direct

3648

 1   A    Yes.  If an ADA offender is going to be terminated, then

 2   they are contacted.

 3             MR. QUINN:  I have no further questions.

 4             Maybe one more.

 5             THE WITNESS:  I would like to touch on being the

 6   released.

 7   BY MR. QUINN:

 8   Q    On what?

 9   A    On the released part.

10   Q    Okay.

11   A    If an offender goes out to a job, if we assign him to a job

12   and the AIC is contacted because he's an ADA offender and they

13   can't come up with an accommodation that will work for that

14   offender for that job, then the work supervisor can release

15   them; and when they release them, they don't have to give them

16   bad evals and they give them good evals, and they have to put

17   in the notes that the inmate was released per AIC and who they

18   talked to, accommodation could not be reached, but there has to

19   be notes there.  If an ADA offender is released and does not

20   have that in the notes, then it does not get past our job board

21   and they kick them back out to the work supervisor.

22   Q    Is the AIC recommendation given little weight, great

23   weight?

24   A    If the AIC says that they can work at that job, they'll

25   work at that job.

Franklin Ortiz – Direct

1          MR. QUINN:  No further questions.

2                     **CROSS–EXAMINATION**

3    BY MS. GREISEN:

4    Q    Good afternoon, Mr. Ortiz.

5    A    Good afternoon.

6    Q    Actually, I was enjoying hearing about all the types of

7    jobs at the Cañon Minimum Center, so I'd like you to continue

8    and tell us the other types of jobs that you haven't listed so

9    far, so please continue with your answer on that.

10   A    Okay.  We have vocational welding at Arrowhead.  Let's see,

11   what else?  I can't remember where I've left off.  We have the

12   greenhouse at Arrowhead.

13   Q    Can you explain the greenhouse a little bit?

14   A    The greenhouse is basically functional greenhouse.  They

15   raise flowers, they do arrangements, they do potted plants.

16   They do all sorts of stuff.  They sell it to the general

17   public.  They also sell it to City Market.  I don't think I'm

18   infringing on anything doing that.  But they sell it to all the

19   businesses like that, through CI, offenders work there.

20          They also have the fly-fishing rod program in the

21   greenhouse where offenders can build fly rods and then those

22   are sold to the community as well.

23   Q    Is that part of the greenhouse job, or is that a different

24   job?

25   A    It all falls under greenhouse.

Franklin Ortiz - Cross

1   Q   Okay.

2   A   What you're going to find at CMC is greenhouse is going to

3   be greenhouse and the fly-fishing thing.  And then you got like

4   Skyline, Skyline's going to say fish hatchery, but there's a

5   hatchery at Skyline, there's a hatchery at Arrowhead which

6   Skyline offenders work.  So they just kind of fall into

7   categories.

8   Q   Sure.

9        And are inmates actually taught how to build fly rods?

10  A   Yes.  And they do all sorts of different stuff with them.

11  They do inlays in them, I mean, they're not cheap, but they're,

12  you know, they're pretty sharp looking things.  I mean, we

13  have, you know, give them -- I seen a couple price tags the

14  other day when I was walking through, 450, $1200 type of

15  prices.

16  Q   Are the inmates actually allowed to sell them?

17  A   They build them for Industries and then Industries gives

18  them incentive pay for them.  Also, they build the flies, they

19  do fly-tying and stuff, too.  So.

20  Q   And so just generally, how does that work?  You said it's

21  incentive by a pay.  So if an inmate makes a fly rod that's,

22  you know, sold for $500, how does it work?  How does the inmate

23  get extra pay or does the inmate get an extra bonus of some

24  sort for the profit that he has helped generate?

25  A   Industries does regular pay, and then they do bonus payment

Franklin Ortiz - Cross

1    and it's based on production and I don't know what all their

2    other criteria is, because it goes across the board with dairy

3    and heavy equipment and external labor and so I don't know what

4    the exact formula is for it.  And I don't know exactly how much

5    they get, you know, for a $500 rods, you're going to get a

6    hundred bucks; I don't know anything of that.

7    Q    Can you give us just generally the range of, the upper

8    range of bonus pay that you see inmates in these different CI

9    jobs receive?

10   A    Most offenders work at 60 cents a day.

11   Q    Right.

12   A    However, some of the Industries, I've seen bonuses, and

13   granted, I really don't look very often --

14   Q    Sure.

15   A    -- but just through my career, I've seen bonuses of 200,

16   $300 in a month.

17   Q    So for an inmate, that is a huge amount, would you agree?

18   A    Yes.

19   Q    Okay.

20          So I take it these positions are very coveted

21   positions at DOC?

22   A    It depends on the -- you would be amazed at how many

23   inmates are afraid of horses and cows.

24   Q    Well, without specifying any particular program, the horse

25   or cow program, is it fair to say just across the board, these

Franklin Ortiz - Cross

1  type of programs you've been describing are coveted amongst the

2  inmates?

3  A   Pretty much, yes.

4  Q   I mean, the list that you've given us is a pretty amazing

5  list.  These are programs that actually are vocational

6  rehabilitation programs for the inmates, right?

7  A   Some of them do carry GED -- not GED, but they do carry

8  vocational credits and they give apprenticeship with them, like

9  they can do with food services as well.

10 Q   And you're actually teaching the inmate a skill that they

11 can then translate, hopefully to a job once they're released

12 from custody, right?

13 A   Yes, ma'am.

14 Q   And it's fair to say, isn't it, that the CMC facilities are

15 unique at CDOC in the range and variety of these type of

16 vocational jobs that they offer?

17 A   Yes.  We have, I think we have the most CI jobs within the

18 state.

19 Q   And that's because the facilities at CMC, they're level 1

20 and level 2 facilities, right?

21 A   Yes.

22 Q   Okay.

23     Okay.

24     Let me go back and ask you a few things that Mr. Quinn

25 was talking to you about.

Franklin Ortiz - Cross                    3653

1          You said that -- I'm going to try to hurry up so I get

2     you out of here by four-thirty.  You said that you supervised

3     15 case managers?

4     A    Yes, ma'am.

5     Q    Approximately how many inmates does each case manager have

6     assigned to them?

7     A    If we are fully staffed, it ranges between -- right around

8     75.

9     Q    75 inmates per case manager?

10    A    75, but we have -- our CM 2s also carry a caseload.

11    Q    Okay.

12         So does the CM 2 carry the same caseload as the CM 1?

13    A    No.  They are lead workers, so they carry a reduced

14    caseload.  And just, just because of the logistics of how CMC

15    is set up, my 2s, they do quite a bit more than just a

16    caseload.  They, you know, I -- if you look at proximity,

17    Arrowhead is, from my office, Arrowhead is probably 3 miles

18    from me.  So that, too, does a lot of different things to

19    assist.  So he has a reduced caseload.

20    Q    Give me a ballpark, what is your CM 2, how many inmates is

21    the CM 2 responsible for?

22    A    Approximately 35 to 40.  Depending on if we're fully

23    staffed or not.

24    Q    Now, you talked briefly this code 13 with Mr. Quinn.  And

25    as the supervisor of the Cañon Minimum Centers, have you ever

Franklin Ortiz - Cross                                    3654

1   done any audits of the three centers to review generally the

2   codes or the reasons being placed in code 13 for placement of

3   an inmate?

4   A   I know that they have pulled the code 13 report, but I

5   don't know, I don't know whatever -- I had heard that they were

6   pulling the code 13, but I don't know -- just to see if we were

7   using it and how effective it was, but I don't know the

8   results.  As a supervisor, no, I've never seen it.

9   Q   And you've never been told whether anyone specifically

10  looked at the information that was being put into code 13 to

11  conduct an audit on the placement of inmates, or the reasons

12  that inmates at CMC have been disqualified for jobs, correct?

13  A   No and I want to clarify that.  That's if the case manager

14  does it in their office.  A lot of times, they'll still bring

15  the offender to job board or bring the job-board form to the

16  job board or classification committee.  And if -- because they

17  don't know how soon it's going to fill up.

18        You know, if there's only two quota -- there's only

19  two openings at the dairy, every case manager's going to bring,

20  hoping that their offenders get at the dairy.  Well, we do it

21  in a rotational basis, so if you're second on the list or

22  you're last on the list, you're going to be doing some code

23  13s.  But we have, at that point the job board will say, code

24  13 that person and put down on there, not hiring.

25  Q   Okay.

Franklin Ortiz - Cross

```
 1          And there are a bunch of different codes you can put
 2   down at code 13, right?
 3   A   I'm pretty sure that it's kind of broke up like that.  My
 4   CM 2s do most of that work.
 5   Q   If somebody puts in that an individual is not qualified
 6   under code 13, is it your understanding that they also have to
 7   provide notes for the reasons that that individual is not
 8   qualified?
 9   A   It's my understanding, yes.
10   Q   Okay.
11          But again, you've never conducted any such audit and
12   you're not aware of any such audit around May 13 looking at the
13   reasons provided for why individuals were not qualified, right?
14   A   Not as an audit, no.
15   Q   Now, you testified with Mr. Quinn about the process
16   outlined in AR 850 and that process was implemented on
17   April 20, 2010, right?
18   A   That was the effective date of the AR, yes, ma'am.
19   Q   Now, case managers -- and I'm assuming you were part of
20   them, but you tell me, case managers were trained on AR 850
21   around the end of, sometime around the end of 2008.  Do you
22   recall that?
23   A   I recall there was some mandatory training, but I couldn't
24   remember the dates on that.
25   Q   Did you attend that training?
```

Franklin Ortiz - Cross

 1  A    I think I did.  But I also know that they did a -- where

 2  people were on vacation or gone.  Overall, I've attended the

 3  training.  I just don't know if it was on that date or not.

 4  Q    It was somewhere around the end of 2008; is that right?

 5  A    I couldn't tell you datewise.

 6  Q    Well, you're aware, aren't you, that the training provided

 7  to the case managers prior to the end of 2008 was on a

 8  procedure that differed from the procedure that was finally

 9  enacted in 850-03, aren't you?

10  A    You mean the one that's in front of me?

11  Q    Correct.

12  A    Can I have a second to look at it?

13  Q    Sure.

14  A    My understanding and what I was trained to was this AR.

15  Q    Well, you're aware that the case managers that you

16  supervise were trained on a procedure, procedure outlined under

17  850-03 which was different than the procedure that was actually

18  enacted, weren't you?

19  A    From looking, from looking at this procedure, from what I

20  remember, this is what I remember being trained on.

21  Q    I'm not asking about what you were trained on.  I'm asking

22  if you were aware that the case managers that you supervise at

23  these different facilities were given training on this AR on a

24  process that was different than the process that was actually

25  enacted on April 20 of 2009.

Franklin Ortiz - Cross

 1  A   I am not aware of that.

 2  Q   And so the process that you've testified with respect to

 3  how everything happened under 850-03, that process, it's your

 4  testimony, was fully implemented as of May 1, 2009; is that

 5  correct?

 6  A   The process that CMC followed this AR, yes, ma'am.

 7  Q   By May 1 of 2009?

 8  A   The effective date on this is 4-20, so, yes, I would assume

 9  so.

10  Q   So within ten days, all three facilities had fully

11  implemented 850-3; is that your testimony?

12  A   I would assume so, yes, ma'am.

13  Q   And I take it also, given your testimony, that there was no

14  confusion amongst your staff about the processes outlined in

15  850-03; is that correct?

16  A   I wouldn't say that there wasn't any confusion.

17  Q   Well, I'm not talking about minor confusion.  Would you

18  agree, Mr. Ortiz, that there was significant confusion?

19  A   I would --

20  Q   Let me, just a minute, let me finish.

21  A   I'm sorry.

22  Q   That there was significant confusion amongst the case

23  managers and the staff with respect to how to implement AR

24  850-3 as of May 1, 2009?

25  A   I wouldn't say it was significant.  But I would say that

1   there was confusion.  As far as wording and the actual process.

2   There was a little confusion, yes.

3   Q   Okay.

4        So, well, you eloquently outlined the process for

5   Mr. Quinn.  But it's fair to say that although you can

6   articulate the process very well now, a year and a half or --

7   later, that the process wasn't that clear to you on May 1,

8   2009; is that correct?

9   A   I would say that while we implemented the process, there

10  was questions.  But I think with any, any change of

11  significance on any AR, there's going to be questions.

12  Q   And there was a significant change between 850-03 and the

13  prior 300-23 that we looked at with Mr. Malden, correct?

14  A   From what I heard on the testimony, yes.

15  Q   Now, can you tell me, Mr. Ortiz, can you identify for me

16  every blind inmate who was at the CMC -- at the Colorado (sic)

17  minimum centers from May of 2008 through May 1 of 2009?

18  A   No.

19  Q   Can you tell me any blind person that was there during that

20  period of time?

21  A   Not off the top of my head.

22  Q   Can you tell me any deaf individual -- I'm not talking

23  about somebody that wears a hearing aid, I'm talking about an

24  inmate who was deaf, needed such accommodations as

25  sign-language interpreters, can you tell me the identity of the

Franklin Ortiz - Cross                                    3659

1   deaf inmates who were at CMC during that period of time?

2   A   I know of one, but I just know him because I've known him

3   for a long time, but I can't remember his name off the top of

4   my head.

5   Q   And when did that individual arrive at CMC?

6   A   I couldn't tell you.  He had been there a couple of times,

7   been there, got regressed, came back, got regressed, came back;

8   but I couldn't tell you specifically his name at this point.

9   Or what dates he was actually there.  I know it was a couple of

10  years ago.

11  Q   Okay.

12          MS. GREISEN:  I have nothing further.

13          Thank you, Mr. Ortiz.

14                    **REDIRECT EXAMINATION**

15  BY MS. McCANN 1:

16  Q   Very briefly, how is it that an inmate gets placed at CMC?

17  A   There's a -- they have to qualify as far as classification,

18  they have to have 16 or less points.  They have to be in P3 or

19  lower, which is a P3, P2, P1.  They have to be an M3, M2, or

20  M1.  They have to be within ten years -- or . . . it's all in

21  600-1, there's clear classifications, and without looking at

22  it, I mean, I would hate to misquote, but it's under the

23  classification record, 600-1.

24  Q   When you say they have to score certain number of points,

25  is that behavior driven?

Franklin Ortiz – Redirect

3660

 1  A    Yes.  And it goes to the crime that they're in here on,

 2  the -- like factor 1 is history of institutional violence.  You

 3  know, I mean, there's like 15 factors on it.  Lot of it depends

 4  on what they, what their case is now, what their charges were

 5  before, if they have priors, if they have detainers, I mean,

 6  it's a whole, it's a legal-sized paper with just everything

 7  that they're scored on.  And they have to come up with 16

 8  points or lower.

 9          MR. QUINN:  No further questions.

10          THE COURT:  Thank you, Mr. Ortiz.

11          Can we take a recess early today?

12          MR. QUINN:  That would be wonderful.

13          THE COURT:  All right.

14          MS. GREISEN:  Six minutes.

15          THE COURT:  I have an eight-thirty matter, and then

16  we'll start at nine on this.

17          MR. QUINN:  Thank you, Your Honor.

18      (Recess at 4:22 p.m.)

19                      REPORTER'S CERTIFICATE

20          I certify that the foregoing is a correct transcript

21  from the record of proceedings in the above-entitled matter.

22  Dated at Denver, Colorado, this 6th day of January, 2010.

23

24                              s/Kara Spitler_____
                                    Kara Spitler

25  WITNESSES

1    SUE ELLEN GRISENTI

2         Direct Examination By Ms. Ibrisagic          3476

3         Cross-examination By Ms. Riddle              3487

4         Redirect Examination By Ms. Ibrisagic        3495

5    DAVE ALLEN

6         Direct Examination By Mr. Quinn              3498

7         Cross-examination By Mr. Myhre               3540

8         Redirect Examination By Mr. Quinn            3563

9    DEBORAH AHLIN

10        Direct Examination By Mr. Quinn              3569

11        Cross-examination By Mr. Myhre               3586

12        Redirect Examination By Mr. Quinn            3594

13   RANDOLPH MALDEN

14        Direct Examination By Mr. Quinn              3597

15        Cross-examination By Ms. Greisen             3612

16        Redirect Examination By Mr. Quinn            3624

17   FRANKLIN ORTIZ

18        Direct Examination By Mr. Quinn              3628

19        Cross-examination By Ms. Greisen             3649

20        Redirect Examination By Ms. McCann 1         3659

21                    PLAINTIFF'S EXHIBITS

22   Exhibit     Offered  Received  Refused  Reserved  Withdrawn

23

24

25

| | | | |
|---|---|---|---|
| 1 | 723 | 3628 | 3628 |

DEFENDANT'S EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| A3 | 3487 | 3487 | | | |
| B3 | 3487 | 3487 | | | |
| C3 | 3487 | 3487 | | | |
| D3 | 3487 | 3487 | | | |
| E3 | 3487 | 3487 | | | |
| F3 | 3487 | 3487 | | | |
| L3 | 3568 | 3568 | | | |
| O3 | 3568 | 3568 | | | |
| U6 | 3568 | 3568 | | | |