IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-CV-870 - JLK

JESSE MONTEZ, et al.,

       Plaintiffs,

  -vs.-

BILL RITTER, et al.,

       Defendants.

---

Claim Number: 03-510
Category III
Claimant: Elaine M Chavez, #66940
Address of Claimant: 12860 Trenton Street, Thornton, CO 80602

---

## FINAL ORDER OF SPECIAL MASTER

---

THIS MATTER came before the Special Master for hearing on January 3, 2011. This hearing was held at the Denver Women's Correctional Facility (DWCF) in Denver, Colorado. Present were the following: Elaine Chavez (Claimant) and Deann Conroy, attorney for Defendants.

Claimant testified in support of her claim. At the conclusion of the hearing, the Special Master allowed the case to remain open to allow each side the opportunity to present additional exhibits in support of their positions. Further argument will be waived.

**I.**

This litigation was commenced in 1992 against then-Governor Roy Romer and various officials of the Colorado Department of Corrections (DOC). The case was brought under the Americans with Disabilities Act, *42 U.S.C. §12101*, and Rehabilitation Act, *29 U.S.C. §794.* During the summer of 2003, the parties began the process of trying to reach a settlement of all issues. The Remedial Plan was the end result of negotiations between counsel for the Class and counsel for Defendants. Then-Judge Nottingham was not involved in the negotiation of the provisions of the settlement document.[1]   Once the provisions and terms of the settlement were agreed upon by counsel

---

[1]The Special Masters also were not involved in the negotiation of the Settlement Agreement. The Special Masters are bound by the provisions of that agreement, as they have

for the Class and counsel for Defendants, the Court was notified that a settlement had been reached between members of the class and Defendants. Judge Nottingham set the case for a fairness hearing.

On August 27, 2003, the Remedial Plan (Settlement Agreement) was presented to Judge Nottingham. After consideration of objections that had been filed by various individuals, Judge Nottingham determined that the Settlement Agreement should be approved. That approval established the class and did not provide for an opt out provision for any individual. The Settlement Agreement also set up a mechanism for individual inmates, former inmates, or their representatives to file a claim seeking damages or some other remedy available in court.

Section XXXII of the Settlement Agreement provides the basis for the filing of claims for damages and/or for other relief. This section states, in part, as follows:

> Claim forms will then be sent to the Special Master. The Special Master shall then determine which of the following five categories of damages shall apply to each class member:
> I. General inconvenience or nominal damages;
> II. Damages due to loss of good time, earned time, access to programs or services that have not resulted in physical injury;
> III. Damages due to actual non-severe physical injuries or non-nominal emotional injuries (such as the fear of death);
> IV. Damages due to severe physical injuries; and
> V. Damages due to death.
>
> Only one of the above categories may be applied to each class member. For instance, a class member with both inconvenience damages and non-severe physical injuries will be designated as a Category 3.

*Settlement Agreement, pp.28-29.* Pursuant to this provision, Claimant filed her claim and requested that the Special Master award appropriate damages or relief.

The Settlement Agreement in Section III provides the following definitions:

> III. DEFINITIONS
> A. COVERED DISABILITIES
> The persons covered by this Plan are individuals with mobility, hearing, and vision impairments and inmates with diabetes.
> B. QUALIFIED INMATE
> Inmate with a permanent disability/impairment which substantially limits his or her ability to perform a major life activity.
> C. PERMANENT DISABILITY/IMPAIRMENT
> A condition which is not expected to improve within six months.

---

only the jurisdiction agreed upon by the parties.

These definitions control as to implementation of the Settlement Agreement and adjudication of all claims filed by individuals.

On November 23, 2004, Judges Nottingham and Kane issued an order that set forth the criteria that must be utilized in adjudicating a claim. They stated, in part, as follows:

> 2. The Special Masters shall evaluate individual damage claims submitted in this case by considering the following questions:
> 1. Is the claimant a disabled individual who is a member of the class?
> 2. Was the claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?
> 3. Was the claimant discriminated against by DOC because of his or her disability? (e.g., were accommodations requested and denied because of the disability?)
> 4. Did this conduct cause the claimant harm and if so, what is an appropriate remedy?

This order controls the adjudication of all claims and must be followed by the Special Masters. Any claimant must establish by a preponderance of evidence each of the four criteria.

In addition, Judge Kane issued an order on March 23, 2010 which further clarified the claim process. That order established some limitations on that process established by Article XXXII of the Remedial Plan. Judge Kane limited claims to the following individuals: (1) inmates who were in DOC custody on or before August 27, 2003; (2) inmates who were disabled, as defined by the Remedial Plan, on or before August 27, 2003; and (3) inmates who were the victims of discrimination on or before August 27, 2003. Unless each of these three requirements is established, a claimant cannot prevail on her claim.

## II.

Claimant initially came into DOC custody on January 14, 1992. She was placed initially at the Denver Reception and Diagnostic Center (DRDC). Claimant was transferred on February 18, 1992 to the Colorado Women's Correctional Facility (CWCF) in Canon City, Colorado. She remained at CWCF until September 4, 1992 when she was placed into a community corrections program. Claimant returned to DOC custody on August 4, 1993 and was placed back into CWCF. Claimant again was placed into a community corrections facility on August 24, 1994. She discharged her initial sentence on February 23, 1995.

Claimant returned to DOC on a second conviction on March 9, 2000. She was incarcerated at DWCF on March 3, 2000. On March 20, 2000, Claimant was transferred to the Pueblo Minimum Center (PMC). On September 22, 2000, Claimant was released to a community corrections program. Claimant remained in a community setting or on parole until her sentence was discharged on July 21, 2004.

On July 27, 2009, Claimant returned to DOC custody as the result of a new conviction. She was placed at DWCF. Claimant was granted parole on January 22, 2011. Claimant will remain on parole until 2013 when the sentence will be discharged.

Claimant filed a letter with the Special Master on April 17, 2010. Claimant had not filed a claim previously, and her letter was treated as a claim. A formal claim form was filed on June 5, 2010. In her claim form, Claimant alleged that she was mobility impaired and diabetic. As to discrimination by DOC staff, Claimant alleged, in part, as follows:

> In March 2000 medical gave me the wrong insulin, caused me to bottom out causing heart to nearly stop. I was taken to clinic, for observation didn't go to hospital to evaluate damages. Each time in (CDOC) I don't receive proper care, rehabilitation, of that care.

Claimant also alleged that she did not receive appropriate medical care for her diabetes and now has other medical conditions.

At the hearing, Claimant testified that she had been in DOC custody on three occasions. She was diabetic when she entered into DOC custody in 1991. She became mobility impaired in 2005. Claimant testified, and it is not disputed, that she has lost a lower leg to complications from diabetes.

Claimant stated that she was controlling her diabetes by oral medications during her incarceration in 1991-1993. During that period of time, she indicated that she had not been denied access to programs because of her diabetes. She believed that she should have received a special diet.

On her return to DOC custody in 2000, she was taking insulin to control her diabetes. She believed that she should have received special shoes. She indicated that she had not received what she believed to be proper medical treatment.

On cross–examination, Claimant acknowledged that she also had a thyroid condition for which she was receiving medication. She also stated that she had received a wheelchair after the amputation of her lower leg.

### III.

The Special Master must examine the evidence in light of the four questions set forth by Judges Nottingham and Kane in their order of November 23, 2004. A claimant must establish that he was disabled, as set forth in the Remedial Plan, on or before August 27, 2003. In addition, a claimant must establish that she was the victim of discrimination on or before that date.

**1. Is the Claimant a disabled individual who is a member of the class?** Claimant must establish that she was disabled by her impairments on or before August 27, 2003. If she so establishes that she was disabled on or before August 27, 2003, then she may amend her claim and raise incidents that have occurred since that date to the present.

Under the Rehabilitation Act and the ADA, the term "disability" means "(1) a physical or

mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. 29 U.S.C. § 794(d); 29 U.S.C. § 705(9)(B). The term "substantially limits" refers to disabilities that make an individual unable to perform a major life activity that the average person in the general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(I).

**Diabetes:** There is no dispute of fact that Claimant was diabetic when she arrived at DOC in 1991. She has remained diabetic throughout the intervening years. Claimant has established that she was disabled as diabetic on or before August 27, 2003. She was and is a member of the class as a diabetic.

**Mobility Impairment**: Claimant alleged that her mobility disability began in 2005. There is no question that she is mobility impaired at the present time. She was not mobility impaired, as defined by the Remedial Plan, on or before August 27, 2003. She is not a member of the class as mobility impaired.

**2. Was the Claimant otherwise qualified to participate in the programs or receive the benefits or services offered by DOC?** No evidence was presented that Claimant was otherwise unqualified to participate in DOC programs or to receive DOC services.

**3. Was the Claimant discriminated against by DOC because of his or her disability?** Claimant has to establish that she was the victim of discrimination prohibited by the ADA and Rehabilitation Act on or before August 27, 2003. Claimant has failed to provide such proof.

Claimant carries the burden of showing that she was the victim of discrimination prohibited by the ADA and Rehabilitation Act. Claimant must establish that such discrimination occurred *on or before* August 27, 2003. If such a showing is made, then the Special Master may consider evidence after that date if the discrimination was on-going. Claimant left DOC custody in September, 2000. Claimant's pleadings and testimony are vague concerning alleged discrimination before September, 2000. Claimant may well have been the victim of discrimination under the ADA and Rehabilitation Act, but she simply has not proven that fact. The Special Master can appreciate that what happened in 2001 is a long past historical event. Article XXXII places upon Claimant the proof to establish her claim, and she has not carried her burden of proof.

As to issues of medical care, the United States Court of Appeals for the Tenth Circuit has ruled that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. *Fitzgerald v. Corrections Corporation of America*, 403 F.3d 1134, 1143 (10th Cir. 2005). Cases involving substandard care or medical negligence must be brought under the Eighth Amendment or pursuant to state statutes. The ADA and Rehabilitation Act are statutes that prevent

5

discrimination that is premised upon a disability. A dispute about the scope and quality of medical care cannot be resolved under the ADA and Rehabilitation Act. Claimant has alleged substandard medical care throughout her time in DOC custody. That issue is beyond the jurisdiction of the Special Master as set forth in the Settlement Agreement. In addition, the Special Master has no jurisdiction over Eighth Amendment claims of medical malpractice or medical negligence under state law. Claimant may pursue separately any rights that she may have concerning her medical care.

**4. Did this conduct cause the Claimant harm and if so, what is an appropriate remedy?** In light of the answer to Question #3, there is no need to answer this question.

IT IS HEREBY ORDERED that the claim of Elaine Chavez is denied, as she has failed to prove by a preponderance of the evidence each of the four criteria set forth in the Order of November 23, 2004 and has failed to establish that she was the victim of discrimination under the ADA and Rehabilitation Act on or before August 27, 2003; and

IT IS FURTHER ORDERED that Claimant and Defendants are advised that they may file an objection to this Order pursuant to Federal Rule of Civil Procedure 53(g)(2), but said objection must be filed with the Clerk of the United States District Court, 901 19th Street, Denver, CO 80294 **on or before May 9, 2011.**

SIGNED this 4th day of February, 2011.

BY THE COURT:

*/s/ Richard M. Borchers*

_____
Richard M. Borchers
Special Master