IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-JLK
(Consolidated for all purposes with Civil Action No. 96-cv-00343)

JESSE (JESUS) MONTEZ, *et. al.*

Plaintiffs,

v.

BILL RITTER, *et al.,*

Defendants.

---

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING STATUS OF COMPLIANCE WITH THE REMEDIAL PLAN AS OF MAY 1, 2009**

---

# TABLE OF CONTENTS

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. SUMMARY OF THE EVIDENCE . . . . . . . . . . . . . . . . . 3

III.    RELEVANT PROCEDURAL BACKGROUND . . . . . . . . . . 9

IV. STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . 12

V.  FINDINGS OF SUBSTANTIAL COMPLIANCE . . . . . . . . . 17

VI. FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 18

    A.  Background Evidence . . . . . . . . . . . . . . . . . . . . . 18

    B.  Core Purpose One:  The Role of the AIC . . . . . . . . . . . 21

    C.  Core Purpose Two:  Proper Identification
         of Inmates with Disabilities  . . . . . . . . . . . . . . . . . 51

    D.  Core Purpose Three: Proper placement of
         Inmates with Disabilities in Designated Facilities . . . . . . . . 76

    E.  Core Purpose Four:  Reasonable Accommodations
         and Healthcare Appliances  . . . . . . . . . . . . . . . . . 79

    F.   Core Purpose Five: Access to Benefits, Programs
         and Services of DOC on a Non-Discriminatory Basis . . . . . . 119

    G.  Core Purpose Six: Notification to Class Members of
         Rights Under the Remedial Plan . . . . . . . . . . . . . . . 189

VII.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 191

APPENDICES

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-JLK
(Consolidated for all purposes with Civil Action No. 96-cv-00343)

JESSE (JESUS) MONTEZ, *et. al.*

Plaintiffs,

v.

BILL RITTER, *et al.,*

Defendants.

---

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING STATUS OF COMPLIANCE WITH THE REMEDIAL PLAN AS OF MAY 1, 2009**

---

Plaintiffs, through counsel for the Class, Paula Greisen and Jennifer W. Riddle of

KING & GREISEN, LLP, and Edward T. Ramey, Lara E. Marks and Blain D. Myhre of

ISAACSON ROSENBAUM, PC, hereby file Plaintiffs' Proposed Findings of Fact and

Conclusions of Law Regarding Status of Compliance with the Remedial Plan as of May

1, 2009.

## I. INTRODUCTION

This disability rights case commenced in 1992 and brought claims under the

American with Disabilities Act ("ADA") 42 U.S.C. § 12132, § 504 of the Rehabilitation

Act ("Rehab Act"), 29 U.S.C. § 794(a), and the Eighth Amendment.  The case alleged that inmates with disabilities were denied access to the programs, services and benefits of the DOC, including necessary medical care, solely on the basis of disability.  The case was certified as a class action covering four disabilities:  mobility, hearing, vision, and diabetes.

After over a decade of hard fought litigation, the parties entered into an agreement, known as the Remedial Plan ("RP")[1], to remedy disability discrimination in DOC.  The RP was entered by the court after a fairness hearing in August 2003.  The RP provided that DOC shall have no more than two years within which to come into substantial compliance with its terms.  After substantial compliance was achieved, then a two-year monitoring period would commence to ensure that compliance was maintained.  For all purposes, the RP is a consent decree subject to the continuing jurisdiction of this Court.

The RP is a detailed document, thirty-one (31) pages in length, which sets out a comprehensive scheme for ensuring that inmates with disabilities are not denied access to the programs, services and benefits of the DOC on the basis of disability.  For purposes of evaluating substantial compliance, Plaintiffs have organized the RP into six (6) essential purposes – which are termed "core purposes" herein, and then identified the criteria stipulated to in the RP which are "material" to each of those purposes.

---

[1] A Glossary of Terms and Abbreviations has been provided as Appendix 1.

## II.  SUMMARY OF THE EVIDENCE

After a lengthy compliance hearing in 2010, the evidence showed that the DOC has still not achieved substantial compliance with the RP.  Although there are a multitude of institutional and bureaucratic reasons for DOC's failure, the basic framework for success was never achieved for at least three major reasons:   1) the ADA Inmate Coordinator ("AIC") was never given the necessary authority or resources to implement the RP; 2) the class members were not identified by the end of the compliance period, and 3) there was a failure to develop the necessary systems to implement, monitor and track the required information.

First, as shown by the evidence below, the AIC, Cathie Holst ("Holst"), was given all of the responsibility of implementing the RP but none of the authority.  The evidence was clear that Holst was allowed to write policies to implement the RP, and did so, but had no ability to ensure that they were enforced by the facilities or the DOC staff. Although it was critical that the AIC work with the other major DOC departments to coordinate the identification, placement and tracking of the inmates with disabilities, she had no authority to require that those departments be responsive to her demands or requests.  In fact, the evidence showed that there was a pervasive failure to communicate information regarding inmates with disabilities to the AIC, including such basic information as where they were housed, when they were being transferred, when they became disabled or lost limbs, or when they needed assistive devices.   Although

communication between the AIC and Clinical Services was critical in order to implement the RP – it was consistently lacking in fundamental respects.  Although the RP mandates that Clinical Services consult with the AIC regarding the care and treatment provided to inmates with disabilities, the Clinical Services regulations governing the coordination of treatment of these individuals did not even mention the AIC.  In essence, as the AIC, Holst was the proverbial Sisyphus[2] –  striving in utmost good-faith to push the rock of compliance up the hill, only to have it pushed back down by the institutionalized forces resistant to change.

The AIC was never provided sufficient resources to perform her required duties.  Although testimony was offered that the DOC obtained over $2.4 million in additional funding as a result of the 2006 Stipulation to implement the RP, there was no evidence produced regarding where these monies were spent other than the AIC received "additional staffing."   Despite the DOC's Executive Director's testimony that implementing the RP was one of the DOC's highest priorities, the evidence shows to the contrary.  In fact, the Executive Director himself testified that he knew almost nothing with respect to the implementation of the decree or DOC's compliance, or lack thereof, with subsequent orders in this case.  The fact that the Executive Director never once initiated a meeting with the AIC to discuss the status of compliance with the RP, and was unaware at the time of the compliance hearing as to the AIC's own conclusions regarding

---

[2] As opposed to Sisyphus, however, Holst had no culpability.

the problems of implementing the RP, is indicative of the level of priority that was truly placed on DOC's implementation of the RP.

Second, it is impossible to evaluate any level of compliance in this case because the class members had not been identified by the end of the relevant compliance date. The testimony established that until the AIC office issued an Accommodation Resolution ("AR") form for an inmate, neither the inmate nor the facilities knew whether the inmate was considered a class member and what, if any accommodations would be provided. Although there had been prior completed screening by DOC, Ms. Holst admitted that those screenings were flawed because the criteria used were too stringent. DOC then made the decision to start the *entire* screening process over.[3] As a result of this decision, as of the end of the compliance date, ARs had not been completed for approximately 95% of the inmates being screened for mobility disabilities, and at least one half of the inmates being screened for vision or hearing disabilities. Without the final results, Plaintiffs had no ability to analyze whether the proper screening methods were being used – or review the final determinations. Moreover, it is axiomatic that in order to determine whether class members are being provided the services, benefits and programs of the DOC without regard to their disability – it would first be necessary to know the identity of the class members.

---

[3] DOC decided to re-do all the screenings rather than just rescreen those individuals who were excluded from the class using the more stringent criteria.

Third, the evidence was overwhelming that DOC never implemented comprehensive, reliable systems to implement the RP or to allow the tracking of inmates with disabilities and provide the AIC with critical information about their housing, accommodations, jobs and program assignments, and other relevant information. The DOC computer system, the "DCIS" system, upon which staff was expected to rely for basic information such as disability status and accommodations contained so many errors regarding the disability information that the AIC testified she would not rely on it. The evidence in the case was replete with examples of how information maintained by the facilities and the DCIS system regarding inmates with disabilities, what accommodations they had, where they were housed, and who was helping them – was completely unreliable, riddled with erroneous and contradictory information.

The failure to implement even basic reporting systems in almost any aspect of the RP has made any systematic review of compliance almost impossible because there is no compiled or organized data to review. For instance, the 2008 stipulations expressly required that DOC immediately establish a position to ensure the timely repairs and replacements of assistive devices and regularly communicate this information to the AIC. Following this mandate, it would presumably have been a matter of reviewing the reports prepared as a result of this stipulation to determine if, in fact, timely repairs and replacement of assistive devices were being done. However, no organized system was

ever put into place to track the repairs or replacements and no such reports were ever provided to the AIC.

Similarly, the 2008 Stipulations mandated that DOC implement a standardized job procedure that documented the inmate job application and hiring process, no later than July 1, 2008. However, a standardized job process was not implemented until the week before the end of the compliance date and scant documentation was produced regarding the actual hiring of inmates. The AIC testified the new process was confusing and needed to be completely redone. Although DOC produced a computerized report which purported to show the job assignments of inmates with disabilities, the disability designations did not match those compiled by the AIC. Despite expert testimony that it would have been very simple to develop a computer system to track the job and program assignments for inmates with disabilities as identified by the AIC – it was never done.

It is a basic tenet of the RP that inmates with disabilities would be allowed to progress through the DOC systems to the minimum level facilities and that the facilities that were designated to house inmates with disabilities have comparable programs and services. However, no audits were ever performed by DOC on this requirement and no evidence was produced by DOC to show that inmates with disabilities were actually allowed to progress through the DOC security levels. To the contrary, the overwhelming evidence was that inmates with disabilities were not allowed to progress to the lowest security level facilities because of DOC's medical coding process. The only evidence

produced regarding whether the designated facilities had comparable programming and services to the other facilities was the evidence that the lowest security facilities, which are all "designated" facilities, had a plethora of unique and highly desirable vocational rehabilitational jobs and programs not available at the other facilities.  Of course, since inmates with disabilities were not placed at these facilities, these jobs and programs were not available to them.

Given the dearth of reliable recording systems, there is virtually no way to affirmatively monitor the programs, benefits and services provided to inmates with disabilities other than to review the thousands and thousands of individual AIC files for relevant information.  During the compliance hearing, Plaintiffs attempted to put forth examples of problems when they evidenced a pattern of a consistent failure to implement the RP, and attempt to establish such patterns in the findings below.

The evidence also shows there was also a failure to coordinate with Plaintiffs' diabetes management expert to implement appropriate training to ensure that inmates with diabetes were provided proper care and treatment for diabetes.  Instead, the evidence shows that there continue to be profound deficiencies in this care and accommodations to these inmates, especially at the facility that houses the majority of inmates with diabetes.

In sum, although there were some improvements in implementing certain accommodations, such as the provision of sign language interpreters, when viewed as a whole, DOC has failed to achieve substantial compliance with the RP.

### III.  RELEVANT PROCEDURAL BACKGROUND

In August 2005, Plaintiffs filed a Notice of Non-Compliance [Doc. #1028] alleging that the DOC had not achieved substantial compliance with the terms of the RP within the required two years as required, except that Plaintiffs did agree that there was substantial compliance with the architectural-physical plant provisions of the RP.  A compliance hearing commenced in April 2006, and after two days of hearings, DOC stipulated to non-compliance with the remainder of the terms of the RP.  [See Doc. #2228].  In August 2006, sanctions for the non-compliance were agreed to by the parties and approved by the Court.  2006 Amended Stipulation and Order Regarding Status of Compliance by DOC with Remedial Plan ("2006 Stipulation") [Doc. #2228].  Pursuant to that stipulation, the compliance period was extended for all aspects of the RP until July 2007, except that the parties agreed that the monitoring period would immediately commence on the one area that compliance had been achieved - the architectural-physical plant requirements.

The 2006 Stipulation also imposed a number of sanctions on the DOC, some of which should have directly assisted the DOC in achieving compliance.  For instance, DOC was required to obtain over $2.4 million in additional funding, which included funding for additional staffing and to implement an automated inmate tracking system. *Id.* at B.1.  The stipulation also required DOC to eliminate the "ADA" and "handicapped" jobs which paid lower wages than the regular inmate age scale.

9

In July 2007, Plaintiffs again asserted that DOC was not in substantial compliance with the RP.  Hearings on that issue commenced in March 2008.  [*See* Doc. ##2876, 3185].  After a one-day hearing, DOC again stipulated that it was not in substantial compliance with the RP by July 2007, except the architectural plan provisions. Thereafter, on April 4, 2008, the Court entered additional sanctions against the DOC. *See* 2008 "Stipulation Regarding Status of Compliance by the Colorado Department of Corrections with the Montez Remedial Plan, (hereafter "2008 Stipulations"), [Doc. #3326].[4]

The 2008 Stipulations expressly provided that the remedies contained in the stipulation were "not intended to serve as a checklist for substantial compliance but rather as a sanction for CDOC's non-compliance." *Id*.  Nevertheless, many of the imposed sanctions were designed to assist DOC with achieving substantial compliance – and for measuring that compliance.  For instance, these stipulations required immediate adherence to the orders of the Special Masters, *Id*. at ¶ 4, required DOC to provide sign language interpreters for medical visits, *Id*. at ¶ 6, required repairs of auxiliary aides to be completed within 60 days, *Id*. at ¶ 9, and required that a position was to be established to coordinate, administer and/or oversee the scheduling of those repairs and replacement of assistive devices.  *Id*. at ¶ 28.  The stipulations also required inmates with hypoglycemia to be given the right to be immediately relocated to a cell with call buttons, *Id*. at ¶ 14,

---

[4] Although the Order was entitled a "Stipulation," many of the sanctions imposed were ordered by the Court after the parties were unable to agree on the appropriate remedies.

required inmates with diabetes to be recognized class members and that the accommodations to be provided to these individuals shall be determined by the AIC, *Id.* at ¶ 25, and required DOC to establish a consistent, standardized procedure for inmates to obtain jobs no later than July 1, 2008. *Id.* at ¶ 21. The 2008 Stipulation also required DOC to conduct disability screenings based on criteria that was mutually acceptable to the parties and rescreen inmates on those new criteria as appropriate. *Id.* at ¶ 3. If the parties could not agree on the disability criteria, the Court would establish the criteria. *Id.*

The 2008 Stipulations also provided that the compliance period would be extended until May 1, 2009. *Id.* at C. The monitoring period for the architectural issues would be deemed terminated as of July 2007, except that the specific architectural deficiencies noted in the 2008 Stipulations would be addressed. *Id.* at B.

After the entry of the 2008 Stipulations, the parties conferred and agreed upon screening criteria for inmates with mobility and vision disabilities. The parties were not able to agree on screening criteria for the hearing disabled.[5] Accordingly, after hearings in November 2009, this Court determined the criteria for hearing disability. Of course, as the new hearing criteria was not determined until after May 1, 2009, these criteria were not implemented by DOC during the relevant compliance period.

During the remainder of 2008 and the beginning of 2009, the parties met on a monthly basis to discuss solutions to outstanding issues. Despite these attempts, there

---

[5] As all inmates with diabetes were to be designated as class members under ¶ 25 of the 2008 Stipulation, there was no need to address the screening criteria for this group.

was still no agreement as to whether substantial compliance had been achieved as the deadline, May 1, 2009.  Accordingly, the compliance hearings were held in 2010.

## IV.  STANDARD OF REVIEW

"A district court must look to the specific terms of a consent decree in determining whether and when to terminate supervision or jurisdiction over it."  *R.C.  et. al v. Walley*, 475 F. Supp. 2d 1118, 1124 (M.D. Ala 2007), (quoting *Gonzales v. Galvin*, 151 F.3d 526, 531 (6th Cir. 1998)).  In this case, the RP provides that "[t]he DOC shall have no more than two years within which to come into substantial compliance with the terms of this Remedial Plan, hereafter the "Compliance Period."  RP Section XXXI.  If the parties disagreed with respect to whether substantial compliance had been achieved, the dispute would be submitted to this Court for a final determination.  Once it has been determined that substantial compliance with the RP has been achieved, a two-year "Monitoring Period" would commence.  At the conclusion of the monitoring period, the RP would no longer be in effect unless there was an objection filed alleging non-compliance prior to the monitoring period.  *Id.*

Thus, the RP states that the Compliance Period shall not terminate until there has been "substantial compliance" with the terms of the RP.  The RP, however, does not define "substantial compliance."  As explained by the Tenth Circuit, "the term of 'substantial compliance' is not susceptible of a mathematically precise definition." *Joseph A. ex rel Wolfe v. New Mexico Dept. of Human Resources*, 69 F.3d 1081, 1085

(10th Cir. 1995). Rather, " 'substantiality' must depend on the circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest." *Fortin v. Comm'r of the Mass. Dept. of Public Welfare*, 692 F.2d 790, 795 (1st Cir. 1982).

In *Wolfe,* the Court further explained that:

> Justice Cardozo, in the seminal substantial compliance case of *Jacob & Youngs, Inc. v. Kent*, concluded that performance of a contract will not be considered in substantial compliance of the contract if the deviation from the contract requirements . . . "in any real substantial measure . . . frustrates the purpose of the contract." 230 N.Y. 239, 129 N.E. 889, 891 (N.Y. 1921). Thus, the touchstone of the substantial compliance inquiry is whether Defendants frustrated the purpose of the consent decree--*i.e.* its essential requirements.

> *Wolfe* at 1086.

Thus, while select instances of non-compliance with the decree may not defeat a finding of substantial compliance, it must be explained how such evidence is "'selective' and aberrational rather than indicative of broader problems in the system as a whole." *Id.* at 1088. The *Wolfe* court also noted that the substantial compliance analysis should focus not only on the purpose of the decree, but also on "the institutionalization of procedures to accomplish those ends." *Id*. at 1086.

In *Clark v. California*, 739 F. Supp. 2d 1168 (N.D. Cal. 2010), the court reviewed a remedial plan similar to the one at issue here in that it was designed to protect California inmates with developmental disabilities from discrimination on the basis of their disability. In that case, the court relied heavily on the report of a court-appointed

expert who conducted over 150 inmate interviews, reviewed extensive documentation and conducted 29 staff interviews at seven prisons that housed a majority of class members.  *Id*. at 1188.  In addition to the findings of that expert, the court also cited to evidence from the testifying class members about individual examples of decree violations that showed a pattern of violations.  *See id*. at 1197,¶ 120; 1198-1199, ¶128; 1202, ¶ 140.  In refusing to terminate the decree, the court noted that the defendants' trial exhibits consisted for the most part of written policies and procedures, and training materials.  *Id*. at 1225, ¶ 248.  The court discounted this evidence, stating that "such documents do not prove that the policies contained within are followed or that the training is provided appropriately or is adequate to ensure that the rights of the plaintiff class are respected."  *Id*.  The *Clark* court also held that testimony from a handful of staff at individual prisons that they work to meet the needs of the inmates at issue does not necessarily prove systematic compliance.  *Id*. at 1223, ¶ 239.  In addition, substantial "noncompliance" has also been found when the group charged with monitoring the services provided pursuant to a consent decree did not have the requisite authority to force compliance. *See Halderman v. Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 323 (3rd Cir. Pa. 1990)(Holding that the lack of authority to force counties to comply when they are not, placed the county in substantial non-compliance with its monitoring obligations).

In another case involving a substantial compliance determination, *Walley, supra*, the Court reviewed a consent decree which governed the reformation of the Alabama Department of Human Resources' ("DHR") child protective services and foster care systems.  Under the terms of that decree, each of the sixty-seven counties had to implement a system of care which was governed by specific guidelines under an Implementation Plan.  *Id*. at 1124.  In order to terminate the decree, the court had to determine whether DHR was in substantial compliance with the requirements of the Decree and the Implementation Plan, and would remain in substantial compliance after termination of the decree.  *Id*. at 1125.  The *Walley* court noted that the substantial compliance determination should be made on a system-wide basis, and was "not necessarily dependent upon every county demonstrating sustained substantial compliance."[6]  Id. at 1127.  In that case, just as in the present case, the consent decree did not "specify the precise means for accomplishing its ends,"  but rather laid out a set of "operating principles" or "standards" and directed the defendant to comply with those principles and standards.  *Walley*, at 1126 (citation omitted).  Accordingly, the *Walley* Court distilled the goals or operating principles into five "core purposes" and then determined whether there was substantial compliance with the criteria that was required by the consent decrees and subsequent orders to fulfill each purpose.  *Id*.  at 1139-1177.

The burden of proof in these compliance hearings is appropriately placed on the defendant.  In *Joseph A. ex rel Wolfe v. New Mexico Dept. of Human Resources*, 69 F.3d

1081 (10th Cir. 1995), it was clear that that the burden of proving compliance rests with the party who seeks to terminate the decree in question.  In *Wolfe*, the court stated that "[i]n order to comply substantially with the decree, Defendants needed to satisfy the essential requirements of each of the basic goals of the decree . . ."  The court went on to note that in that case, the Special Master "failed adequately to address whether Defendants satisfied [one of the] mandates of the decree."  In remanding the case, the court again reiterated that it must first be determined "whether Defendants satisfied the essential purpose of the decree . . .."  *Id*. at 1089.

A review of cases concerning "substantial compliance" with a consent decree similar to the type at issue in this case shows that the burden has always been placed on the party seeking to terminate the decree to prove compliance.  *See Allen v. Alabama State Bd. of Educ*., 164 F.3d 1347, 1350, n 14 (11th Cir. 1999) ("[T]he party seeking termination of the [consent] decree must show that the basic purposes of the decree have been fully achieved and that there is no significant likelihood of recurring violations of federal law once the decree has been lifted") (*citing Board of Educ. v. Dowell*, 498 U.S. 237, 246-250 (1991)(holding that the court must decide whether the School Board made a sufficient showing of compliance with a desegregation decree));  *R.C. v. Walley*, 390 F.Supp.2d 1030, 1033 (M.D. Ala. 2005)("Defendant has not submitted evidence sufficient to sustain his burden of demonstrating that  [the defendant] 'is' and 'will remain' in substantial compliance with the terms of the Consent Decree and of the

Implementation Plan as required for termination of said Decree.").  As the Defendants in this case admittedly did not achieve substantial compliance at either of the two previous compliance hearings, there should not be a presumption that the CDOC has done so for this compliance hearing.

## V.  FINDINGS OF SUBSTANTIAL COMPLIANCE

Pursuant to Fed.R.Civ.P. 52(a), in making a determination of substantial compliance, the court should first determine the essential purposes of the consent decree as well as the specific steps outlined in the decree by which those purposes are to be satisfied.  *Wolfe* at 1086.  The court should then analyze whether the failure to meet any stipulated criteria has a material adverse impact on the overall implementation of the consent decree.  *Id*.  The court should then "specify the subsidiary factual findings and reasoning necessary to support its judgment as to Defendants' compliance with each of the overall goals and enumerated criteria in the decree."  *Id*. at 1089.

**Essential Purpose of the RP**

The essential purpose of the RP is embodied in the "Policy" statement which provides:

> It is the policy of the DOC to provide inmates with disabilities, with or without reasonable accommodations, access to its programs and services consistent with legitimate penological interests.  No qualified inmate with a disability, as defined in Title 42 of the United States Code, Section 12102, shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities of the DOC or be subjected to discrimination.

17

> All facilities designated to house inmates with disabilities will provide comparable programs, services and benefits available throughout comparable DOC facilities to ensure that inmates with disabilities are not discriminated against because of their disability.
>
> RP Section I.

For purposes of determining substantial compliance, Plaintiffs have adopted the approach used in *Walley* and organized this general principle into six (6) "core purposes" as follows:

1) The Role of the AIC;

2)  Proper Identification of Inmates with Disabilities;

3) Proper Placement of Inmates with Disabilities;

4)  The Timely and Proper Provision of Accommodations and Assistive Devices;

5)  Ensuring Access to Benefits, Programs and Services of DOC on a Non-Discriminatory Basis; and

6)  Notification to Class Members of Rights Under the RP.

Plaintiffs then determined which of the enumerated criteria contained in the RP are material to the implementation of each core purpose (hereafter the "material criteria") and thereafter analyze the evidence submitted for each criteria.  *See Wolfe, supra.*

## VI.  FINDINGS OF FACT

### A.  Background Evidence

During the relevant compliance period, the Colorado Department of Corrections comprised a total of 28 facilities, 23 public facilities and 5 privately-contracted facilities.

*See* Exhibit 706 for the full list of facilities. Under private management are: Bent County ("BCCF"), Crowley County ("CCCF"), Kit Carson ("KCCF"), High Plains ("HPCF") and Cheyenne Mountain Reentry Center ("CMRC").  *See* Exhibit 706, Table 30.  As of June 2009, of the total 22,961 total inmates in the Colorado prison system, 5,383 were housed in private facilities, 2,940 in community corrections, parole or intensive supervision, and the remaining 14,638 were in public facilities.  *See* Exhibit 706, Table 30.[7]  Of the total prison population, 90% of inmates were male (20,719) and 10% female (2242).  *See* Exhibit 706, Table 30.  Caucasians were approximately 45% of the total DOC population, 32% were Hispanic, 20% were African-American, and 4% were Native American or Asian.  During the compliance period, 95% of inmates were between the ages of 20-59 and 3% were 60 years of age or over.  *See* Exhibit 706, Table 31.  Ft. Lyon Correctional Facility (FLCF) had the largest population of older inmates aged 60 years or older, with 12% of its population being in that category.

The compliance hearing in this case lasted 32 days and 481 exhibits were entered by the parties.  The testimony submitted at the hearing by the Plaintiffs consisted of: 1) expert opinion on hearing and deaf issues by Larissa McClung; 2) expert testimony on the care and treatment of diabetes by Linda Edwards; 3) an expert statistician, Andy Bardwell, to evaluate the impact of disability on job and program assignments at DOC; 4)

---

[7] The total number of inmates in the state operated facilities in Table 30 (in Exhibit 706) is 14,638, which conflicts with the total number of inmates in Table 5 (in Exhibit 706) of 14,485, despite the fact that both Tables purport to provide the data as of June 30, 2009.

the testimony of the AIC, Cathie Holst; 5) DOC employee Paul Engstrom; 6) DOC Ricky Gilmore, the Life Safety Officer at Ft. Lyon Correctional facility; and 7) thirteen DOC inmates with disabilities.

DOC submitted testimony through the following witnesses:  an economic expert, Dr. Jeffrey Zax; the Executive Director of the DOC, Ari Zavaras; the Director of Clinical Services, Joanie Shoemaker; the Chief Medical Officer, Dr. Paula Frantz as an expert in diabetes and as a fact witness; Richard Weems, the associate Director of Facility Management Services; four case managers at different facilities: Deb Ahlin, Dave Allen, Randy Malden and Frank Oritz; the former ADA Litigation supervisor at DRDC, Jim Falk;  Peggy Heil regarding the sex offender treatment program; Pamela Ploughe, Warden at CTCF;  a witness on ACA accreditation; a witness on the TTY kiosks;  DOC trainer, Amber Autobee; diabetic trainer, Sharon Wallick; a DOC employee who monitors private prisons; the quality improvement administrator, Renae Jordan; a transport supervisor;  a computer systems trainer for Clinical Services; and a legal assistant in the Office of the AIC, Adrienne Jacobson.

Before the hearings, Plaintiffs stipulated that the DOC has sufficiently met the requirements of the following sections of the Remedial Plan: VIII(A) Special Placement Housing; XVII Library Equipment; XXI Count;  XXII Restraints; XXIII Searches; XXVII Removal of Health Care Appliances in ASU/PSU; XXX Parole Field Operations. Plaintiffs contend that these sections are independent or collateral conditions to the core

purposes of the Remedial Plan and thus not dispositive to the issue of "substantial compliance" with the Remedial Plan.  Plaintiffs also stipulated that DOC complied with certain portions of the 2006 and 2008 Stipulations, as listed in Appendix 2.

**B.  Core Purpose One:  The Role of the AIC**

The RP was designed so that there would be a central position, the ADA Inmate Coordinator (AIC), that would be primarily responsible and accountable for its implementation.  Because the AIC plays a pivotal role in the implementation of the RP, the performance of the AIC is a core purpose of the RP.  Although the functions of the AIC touch almost every aspect of the RP, Plaintiffs have identified four material criteria essential to the performance of the AIC duties as follows:

1)  The AIC shall be responsible for ensuring that specific policies and procedures are developed and implemented that provide specific guidelines on the methods to be employed to assure nondiscrimination against inmates with disabilities.

2)  The AIC shall be ultimately responsible for determining who is disabled under the RP and the accommodations/assistive devices that shall be provided to those individuals, as ordered by the Court.

3)  The AIC shall be responsible for tracking of all inmates with disabilities throughout DOC, for ensuring that they are not denied access to programs, services or benefits of the DOC because of their disability and coordinating the placement and treatment decisions regarding inmates with disabilities with appropriate personnel as identified in the RP, and;

4)  The AIC shall be responsible for implementing the ADA Grievance Procedure through which IWDs may resolve issues related to their disability and have grievances responded to within 25 days as required by RP Section XII.

**1)  The ADA Inmate Coordinator ("AIC") shall be responsible for ensuring that specific policies and procedures are developed and implemented that provide specific guidelines on the methods to be employed to assure nondiscrimination against inmates with disabilities.  RP Section II.**

The RP expressly provides that a position, the AIC, would be created within the DOC to implement the RP to ensure the nondiscriminatory treatment of inmates with disabilities.  The RP directs the AIC to develop and implement appropriate policies and procedures, providing specific guidelines to ensure nondiscriminatory treatment, to track all inmates with disabilities to ensure that they are not denied access to programs, services and benefits because of their disability, and to coordinate placement and treatment decisions with appropriate DOC personnel.  RP Section II.  The RP expressly provides that Cathie Holst ("Holst") would be appointed as the AIC when the RP became effective in 2003.  Holst remained in that position through the end of the relevant compliance period.  31:2-10.[8]

As the AIC duties are pivotal to the implementation of the RP, it is essential that the AIC be provided sufficient authority and resources to fulfill these functions. Although Holst was given all the responsibility of implementing the RP at the DOC, she was not given the authority to implement the necessary changes.  35:3-8; 44:13-18.  For instance, she did not have the authority to: (1) enforce the policies she developed for compliance with the RP, 36:23-37:8; (2) to discipline anyone or take any action against

---

[8] Citations to the hearing transcripts are formatted as page cite: line cite.

any DOC facilities that failed to follow those policies,[9] 2397:8-21; 2398:5-9; (3) to make "high-level" decisions concerning the implementation of the RP, 43:1-5; or (4) to change a policy that was not in compliance with the mandates of the RP. 36:7-14.  Holst agreed that the fact that there was a written DOC policy did not guarantee that the policy was followed, 65:16-21, and did not guarantee substantial compliance with that aspect of the Remedial Plan, 67:2-6, and, in fact, policies created by the AIC to implement the RP were not always followed, 66:21-25, and on many occasions when Holst tried to address a problem, her calls were not returned or her recommendations were not followed. 36:23-37:8.  Other DOC employees were given authority over aspects of the AIC's job and Holst could not override decisions made by those persons with which she did not agree. 37:9-18.

In addition, Holst was not provided the necessary resources to perform the AIC functions.  When Holst assumed the AIC duties, she also was the Director of Legal Services and was responsible for managing all of the DOC non-employment related litigation, among other responsibilities. 31:15-23.  Because none of her existing duties were eliminated when she became the AIC, she was expected to perform two full-time jobs, 2358:13-2359:6, which required her to work between 60 to 80 hours a week. 32:3-5.  Holst testified that she needed more time to perform her duties as the AIC. 32:13-15.

---

[9] For example, the Huerfano County Correctional Facility reported that it did not follow the DOC administrative regulation which required facilities to comply with the ADA and the Remedial Plan. 2398:14-2399:16.   Holst had no authority to take any action regarding the facility's refusal to comply with the AR. 2399:19-23.

During the relevant compliance period, the AIC office had chronic insufficient staffing, 346:20-24, and it was impossible to get the required work done in a timely manner. 349:15-18.  Holst informed the DOC executive staff about not having enough resources and it was well known that the AIC office was struggling.  2362:15-2363:6.  When asked about the additional $2.4 million in funding that the DOC had to obtain from the legislature as a result of the 2006 Stipulation to implement the RP, *see* 2006 Stipulation, B.1., Holst testified that was able to hire "additional staff."  1746:9-17.  However, she did not specify how many such staff she was allowed to hire and, in fact, there was no evidence produced by DOC as to what that $2.4 million was used for, other than "additional staff."

The constant delays in getting the AIC work done was caused by a variety of factors, including the fact that the AIC did not have the authority to make a call and demand that something get done.  345:25-346:19.  Holst testified that she felt there were individuals in the DOC who were simply tired of her and tired of "Montez" and that it was not an isolated event that she felt she was a *persona non gratis*, even from members of the executive staff. 48:9-49:8.  One of the reasons that Holst retired in September 2009 was because she was frustrated and tired of dealing with the RP.  64:10-23.

Holst complained about having insufficient resources to conduct the AIC duties to DOC executive staff, including: the Deputy Director of Prisons and Director of Clinical Services, Joanie Shoemaker ("Shoemaker"); Director of Prisons, Gary Golder ("Golder")

and his successor, Bob Cantwell ("Cantwell"); and Director of Administration and Finance, Karl Spieker ("Spieker").  2361:19-2363:2.  Although it was the responsibility of Cantwell, Golder, and Spieker to keep the Executive Director of the DOC, Ari Zavaras ("Zavaras"), informed about the progress with the RP, Zavaras was never informed of Holst's complaints.  3192:19-25; 3194:25-3195:5.

In fact, Zavaras knew very little, if anything, about the status of compliance with the Remedial Plan.  Although he testified that compliance with the RP was one of the DOC's "highest priorities," 3191:7-13, and that it was a regular topic of discussion at his director meetings with Golder, Cantwell, and Spiecker, the evidence shows that Zavaras was not even marginally informed about the status of compliance and made little to no effort to inquire about these matters.  For instance, there were no regular meetings with executive staff where the focus of the meetings was compliance with the RP, and Zavaras never initiated a meeting with Holst about the status of compliance.  49:23-50:4; 63:3-8; 3237:20-3238:3.  Zavaras testified that he was never informed that there were any problems about the status of compliance, 3194:20-24, that he was unaware that the AIC office was delinquent on responding to grievances, 3213:2-6, that there were staff shortages in the AIC office, 3217:15-19, and that he was not aware of the magnitude of the workload on the office of the AIC and as a result, the AIC was having problems getting the work done. 3213:10-22.  Zavaras was also unaware that approximately 95% of the mobility determinations, and over one-half of the vision and hearing

determinations had not been finalized by the end of the compliance period.  3219:3-9;

3220:5-14.  He testified that he had never seen any reports regarding equivalent jobs and

services between the designated and non-designated facilities as required by the RP.

3216:24-3217:9; RP Section XIII(A).

At the end of the compliance period, Holst conducted an audit of all DOC prisons

to obtain information about the status of compliance with the RP.  50:5-15; Exhibit 129.

After reviewing the results of the audit, Holst informed Cantwell, Speiker, and

Shoemaker, among others, of her concern that DOC was not in substantial compliance

with certain aspects of the RP. 53:8-54:21.  Although Zavaras testified he was aware that

the AIC had conducted this audit, he was not aware of the findings of that audit or the

conclusions made by the AIC that there were significant problems concerning

compliance.  3220:20-3221:15; 3222;17-3224:13.

The only meeting Zavaras had with Holst prior to the end of the relevant

compliance period occurred at the initiation of Holst when she raised her concerns about

implementation of the TTY kiosks.  57:7-15.  At that meeting, Holst also expressed her

concern about the problems with the implementation of the new job process required by

the 2008 Stipulation.  59:5-61:9.  When she raised this issue,  Zavaras became very upset

so she did not discuss her other concerns about the status of compliance and the meeting

ended.  63:9-24.  Zavaras did not recall this meeting.  3238:10-3240:4.

At the end of the last compliance period, Holst prepared a report concerning compliance with the Special Master's Orders.  Exhibit 350.  In that report, she stated that DOC had not complied with Special Master's Orders regarding the appropriate accommodations to be provided to inmates unless the DOC medical staff found those accommodations "medically necessary."[10]  She stated that 204 cases would need to be reviewed to determine whether a "problem exists" with the failure to provide the accommodation deemed necessary by the Special Master.  347:1-349:18; Exhibit 350; Bates 2010-AIC-D-IR-000063-64.  She went on to note, however, that because of the workload in the AIC office, she could not undertake review of those cases until after the end of the compliance period because her office was overburdened with projects, was attempting to catch up on ADA grievances and correspondence that were "horribly delinquent," had a myriad of other tasks related to the compliance with the RP, and could not complete work on any other projects any time soon.  *Id.*

Zavaras was present when this Court admonished the DOC in March 2008 that the failure to adhere to the Special Masters' Orders would result in contempt findings and sanctions of $10,000 to $20,000, and testified that he took the Court's warning very seriously.  3199:3-3200:15; *See* Appendix 3, p. 117-118. [11]  However, he could not recall

---

[10] Zavaras admitted that DOC was obligated to provide the accommodations determined necessary under the ADA by the Special Masters.  3206:15-25.

[11] Although the cover page for the Reporter's transcript for this hearing shows the date of March 25, 2007, the first page of the transcript shows the accurate hearing date of March 23, 2008.

any specific steps he took to ensure that DOC was in compliance with the Special Masters' orders other than reiterating to the directors the importance of adhering to the lawsuit and sanctions.  3200:16-3201:2.  Zavaras never talked to Holst, Golder, Cantwell, or Spieker about the status of compliance with the Special Masters' order,  3201:25-3203:10, and was not aware that over a year after the 2008 Stipulation entered mandating compliance with the Special Master's order, that DOC was still not in compliance with determinations by the Special Masters.  3203:21 – 3205:3; Exhibit 349.

Zavaras also testified that he was aware that this Court ordered at the March 2008 hearing that whether an accommodation needed to be provided to an inmate was determined by the law under the ADA and the determination of the Special Master, and was not a medical determination.  Zavaras said he believed that DOC was complying with that mandate despite the fact that Ms. Holst reported that the denied accommodations that served as a basis of a Special Master's award would not be provided unless DOC determined they were "medically necessary."  3207:8-3210:24; Exhibit 350, Bates 2010-AIC-D-IR-000063.

The evidence showed that the current AIC, Julie Russell, who was appointed by the agreement of the parties, has even less authority than did Holst.  Zavaras testified that DOC has put its in-house counsel, Keith Nordell, in charge of the Office of Legal Services (aka "Legal Access"), Ms. Holst's prior position.  3244:16-25.  Although he does not have the AIC title, he appears to have all the duties and responsibilities of the

AIC (although he was not agreed to by class counsel),[12] Now, all of the AIC staff report directly to Mr. Nordell, rather than to Ms. Russell. 2904:18-21. During the compliance hearing, Zavaras could not confirm whether Ms. Russell has any authority to manage anyone in the AIC office. 3248:16-22. Ms. Russell also reports to Nordell, rather than to the Director of Prisons to whom Ms. Holst reported. 3250:7-15; 2905:15-18. Just like Holst, Ms. Russell has no authority to discipline anyone with respect to the failure to comply with the RP. 3249:4-9. In fact, neither Holst nor Zavaras could identify any DOC employee who had been disciplined as a result of the failure to follow the RP. 2397:22-2398:4; 3250:16-22.

2) **The AIC shall also be responsible for making final disability and accommodation determinations.**

In addition to developing policies and procedures to implement the RP, the AIC was charged with the ultimate responsibility for determining which individuals are disabled under the terms of the RP. While discussing the failure to follow the Special Master's orders at the March 25, 2008 hearing in this case, this Court stated "If Ms. Holst says that something is covered, it is covered. They can take up the disputes all they want. But if she says it is covered, it is covered, period." Appendix 3, p. 118:16-19. The Court continued;

---

[12] Class counsel would not have agreed to Mr. Nordell because since he is an attorney, there are issues regarding what information may be covered by the attorney-client or work-product privileges and because he is ethically-bound to serve as an advocate for his client, the DOC, as opposed to inmates with disabilities.

> "As to diabetics, the decision as to whether somebody with diabetes is disabled or not is not a medical determination. Ms. Holst determines, and that is because it does come in most instances where she is going to say that it comes within the American with Disabilities Act.  If there is impairment, there is a failure to provide medication to keep the impairment from happening, that is not purely a medical problem.  Now, the standard of what is a medical necessity is not determined by any sort of national standards.  It is determined by the law under the American with Disabilities Act."  *Id*. at 119:11-22.

Zavaras testified that he understood that the Court was ordering that whether an accommodation would be provided to an inmate was a determination to be made by the AIC under the ADA, not a medical necessity standard.  3209:5-10.

Nevertheless, it is clear that disability determinations or accommodations were not granted unless the Chief Medical Officer ("CMO") approved of the determination and found a "medical necessity" for the accommodation requested.  The system established by the DOC for disability determinations consisted of requiring every inmate who requested such a determination to go through a screening process by Clinical Services.  1074:5-1076:12.  This process entailed having the inmate complete forms identifying the disability and accommodations requested. *Id.*  After the forms were completed, the AIC notified Clinical Services that the inmate was ready for screening, and the inmate was then examined by the facility provider to make an initial determination and recommend what, if any accommodations should be granted.  *Id.*  The determination by the provider was then reviewed by the CMO would have the "final say" regarding the determination

30

or accommodations that were to be provided.  After the CMO made a determination, the AIC office would then prepare the Accommodation Resolution (AR) form consistent with the CMO's decision, which listed the inmate's disabilities, if any, and the appropriate accommodations to be provided.  1076: 5-21.  This was often a lengthy process and well exceeded the time limits imposed by the RP.  *See* Core purpose Two, *infra* at page 52.

Despite this Court's ruling that the AIC was to be the final decision maker with respect to these determinations, the evidence was clear that it was the medical staff who made disability determinations and only approved accommodations that were deemed "medically necessary."  Plaintiffs certainly acknowledge that Clinical Services should have assisted the AIC in making disability determinations and necessary accommodations.  However, the bureaucracy that was established mandated that every decision be made by Clinical Services, even when commonsense determinations could clearly have been made by the AIC without the prolonged delays created by the screening process.

For instance, as shown in Exhibit 329, an inmate was determined by a provider to be blind in one eye and vision disabled and in need of an Offender Care Aide ("OCA"), yet that decision was overturned by the CMO.  Exhibit 329, Accommodation Worksheet, 7/2/08 entry.  On August 7, 2008, the AIC office prepared an AR based on the CMO's determination that there was no disability.  One year later, the AIC office learned that the

inmate was determined legally blind by an eye doctor.  Exhibit 329, Bates 2010-AIC-D-KG-2880.  Yet, the AIC office would not change the inmate's disability status and would not provide any accommodations to him at that time, stating that medical could refer the inmate for another screening.  Exhibit 329, Bates 2010-AIC-D-KG- 2881.  Holst confirmed this was the standard process.  2408:12 – 2409:23.  Even after the inmate was finally screened and received his revised AR verifying his disability almost five months later, there was no listing on the AR for the OCA that was recommended in July 2008.  When the inmate requested the AIC to provide an OCA, the AIC turned the decision over to the CMO to decide whether the accommodation was necessary.  Exhibit 682, entries 3/23/10, 4/8/10.

Even inmates who were known by Clinical Services to have diabetes had to go through the medical screening process to obtain disability status.  Clinical Services at the facilities did not provide the AIC with a list of known diabetics.  125:4-9.  Although Clinical Services could have provided the AIC with a list of all inmates known to have disabilities, it did not.  2369:2-15.  There was no credible explanation offered as to why Clinical Services did not provide information to the AIC about inmates known to have disabilities as required by the RP, Section IV, "Inmates with Disabilities Currently in DOC," so that disability determinations could have been made by the AIC in a streamlined fashion.

Even when the evidence before the AIC was overwhelming that an accommodation should be provided, it was not provided until Clinical Services determined it was necessary.  For example, in June 2008, Mr. Weigand informed the AIC that he had a mobility disability and needed handrails in the shower or a shower chair. Exhibit 585, Bates 2010-AIC-D-KG-2456.  Although the staff verified that he needed handrails in the shower in July 2008, *Id*. at Bates 2430, entry 7/15/08, and the provider confirmed he had spina bifida and had leg weakness and poor balance in July and August 2008, *Id*. at Bates 2451, 2452, this accommodation was not included in his AR and which Weigand did not receive until almost nine months after his request for disability status. *Id*. at  Bates 2439; 2454.  When he filed a grievance asking why he had not received the handrails and/or shower chair on his accommodation resolution, his grievance was denied.  At that time, he was told that he would be rescreened based on new screening criteria and *"[i]f the Chief Medical Officer determines* a shower chair is necessary, it will be added to your Accommodation Resolution."  *Id*. at Bates 2010-AIC-D-KG-2439, 2440 (emphasis added).

Even such matters as whether to allow an inmate was allowed a bathroom break was turned over to Clinical Services to be decided.  Thus, though the 2008 Stipulation #25 provided that all inmates with diabetes were to be additional bathroom breaks when possible, they were not allow to have these breaks unless Clinical Services determined they were medically necessary.  866:24-867:19.

Holst testified that unless the Chief Medical Officer determined that an accommodation was necessary, her office did not provide that accommodation.  Thus, even if the Special Master determined that an inmate with diabetes had been discriminated against by DOC's failure to provided soft-soled shoes, the AIC would not grant those shoes to the inmate unless the CMO determined they were medically necessary.  250:12-251:18.  Exhibit 350, Bates No. 2010-AIC-D-IR-000063.

Holst testified this was the standard procedure:

> [I]f the provider during the screening and/or the chief medical officer did not address the need for [an] accommodation that the offender identified, then we would have to send them back and have it looked at.  Sometimes they had to go through another screening to have it determined, or we could send them directly to the CMO and simply ask her if she could make that determination based off of the information that they already had either in the medical records or the screening information.  2394:17-2395:4.

The fact that Clinical Services, and not the AIC, controlled the disability process is further exemplified by the fact that even when the AIC office wanted to have an inmate screened, or re-screened for a disability, Clinical Services could refuse to do so.  2468:6-14.

In 2008, Director of Prisons Golder, informed Holst that Director of Clinical Services Shoemaker had been put in charge of ensuring compliance with the RP.  42:8-44:23.  Yet, as discussed below, many of the systemic problems in this case occurred

because of the lack of communication and cooperation between the AIC and Clinical Services.

### 3) Tracking and Monitoring Inmates with Disabilities

The RP provides that the AIC is also responsible for the tracking of all inmates with disabilities through DOC for ensuring that they are not denied access to programs, services and benefits because of disability, and coordinating their placement and treatment decisions with appropriate personnel.  RP, Section II.  Ultimately, however, it was impossible for the AIC to fulfill these responsibilities because of the lack of reliable systems of information and the lack of effective communication with Clinical Services and other DOC departments.

### a)      Numerous DOC computer systems containing inaccurate and conflicting disability information.

The DOC had many databases. 73:23.  The AIC office has a stand- alone disability database that is not networked with other DOC databases.  67:10-16.  The "DSIC" system is a computer system that is used throughout DOC and it generates different reports containing disability information.  604:7-10; 1778:9-25.  One such report, the "QT Profile" is pulled from the DCIS database and provides information about each inmate, including whether there is an "ADA alert" on that inmate,  the status of the inmate's disability screening, whether the inmate has been determined to be disabled and what accommodations have been granted.  77:2-78:3; 78:25-79:3.

The facilities are supposed to be able to rely on the DCIS system and the QT Profile report to see if there is an ADA alert on an inmate, 78:4-6, or whether accommodations have been granted.  78:25-79:3.  An "ADA alert" is placed on an inmate's profile at intake if there is any indication that the person has a disability and would be entitled to any accommodations.  The alert is supposed to stay on unless the person is determined to not be disabled.  If there is no ADA alert, then no disability accommodations need to be provided to that individual.  78:12-24; 79:19-80.7.  This "ADA alert" information was added to the DOC web page at a later date.  1430:12-13.

However, the DCIS system has inaccurate data and thus, the QT profile reports have considerable problems.  80:23-25.  In 2008, Holst noted that much of the disability-related information in the QT profile reports was not accurate.  81:1-82:4; Exhibit 438.  In February 2009, Ms. Holst again expressed concern that her office often found that the disability information on the QT Profile report is not accurate.  82:15-83:10: Exhibit 426.

As of May 1, 2009, the end of the compliance period, the information in the DCIS system that generated the QT Profile reports still had numerous inaccuracies regarding disability information, including that it did not list inmates with disabilities correctly.  83:11-21; Exhibit 164.

In mid-2008, the AR forms, which were prepared by the AIC concerning disability status and accommodations granted, were made available to the public prisons via the "R drive" on the DOC computer network.  The private facilities, however, did not have

access to that network,  69:4-22, and later the ARs were put on the DOC web page for the private facilities to access.

In addition to the information on the DCIS system, and the AR information on DOC's R drive, facilities were also keeping their own disability databases.  The AIC office did not audit those databases to ensure the information was consistent with that kept or distributed by the AIC office. 71:7-73:3;  Exhibit 436.

The ADA coordinator at Sterling, Mr. May, reported that there are four different places that staff at that facility can look to for disability information:  the facility ADA database which he maintained, the ADA daily roster (which is generated off of the DCIS system 744:7-11), the disability information found on DOCNET (which is the DCIS system 741:12-14), and the bed rosters that contain disability information.  752:5-12; Exhibit 304.

Mr. May reported that the ADA rosters at that facility do not contain information about diabetics,  749:13-750:13, and that he does not update the list that he generates from his ADA database on a daily basis. 750:14-22.

The Denver Complex also maintains a separate ADA database to record all ADA offenders.  This database does not directly communicate with the AIC database.  There has never been an audit to clean-up discrepancies between the various databases. 3332:21-3335:21; Exhibit G.

In fact, all facilities have three or four or more options where they can access disability information.  752:17-20.  The AIC has no control over which of these different sources of information is used by DOC staff.  747:6-11.  The AIC does not have any control over the individual facility ADA databases and has no way of checking the accuracy of that information.  746:24-747:5.  How often the facility coordinators update their ADA databases and distribute that information varies from facility to facility. 740:23-741:2.

As will be discussed throughout this brief, the fact that there were so many different sources of information, some of which were very unreliable, made it virtually impossible for the AIC to accurately track and monitor the inmates with disabilities and identify the programs, services or benefits they were, or were not, being proved.

*Tracking of Jobs Assignments:*

The unreliability of the DOC's main computer data system, which contains the information about inmate job assignments, vividly illustrates this point.

The RP provides that "[t]he AIC shall review educational, vocational, and work programs available to inmates with disabilities to ensure that the assignment of the inmates is nondiscriminatory."  RP Section VIII(D).

To the knowledge of Paul Engstrom – the DOC Office of Emergency Management administrative officer charged with preparing a report to facilitate a system-wide comparison of job and program assignments for disabled and non-disabled inmates

specifically for use at the compliance hearing – the DOC had never prepared a report that attempted to show both job/program assignments *and* disability determinations for inmates in the same report.  1794:19-1795:6; 1812:11-1813:15; 1825:14-22.  Indeed, Mr. Engstrom had never interacted with the AIC office prior to the May 1, 2009 compliance deadline.  1776:15-19; 1779:12-1780:2.

No one ever provided or offered to provide the AIC a report like Exhibit 357 – the report ultimately prepared by Mr. Engstrom showing both job/program assignments and disability determinations for inmates in the same report.  1878:9-18.  This is despite the fact that the DOC maintains an up-to-date daily database of job and program assignments for all inmates in the system.  1792:9-1793.5.

The AIC office maintains a database identifying inmates with disabilities separate and independent from the database maintained for that purpose in the DOC's "enterprise" or DCIS system (the DCIS "Montez" database).  1803:24-1804:10.  To Mr. Engstrom's knowledge, no one has ever compared the DCIS "Montez" database with the separately maintained AIC database.  1804:19-1805:12; 1826:11-1827:4.

The DOC has never developed a computer system that allowed the AIC office to integrate with the DOC system to track inmates with disabilities.  2372:12-19.

In preparation for the compliance hearing, Mr. Engstrom prepared Exhibit 357 (Vol. 1) and 357 (Vol. 2).  1789:25-1790:12; 1792:7-8.  Exhibit 357 (Vol. 1) compared the DCIS database of job/program assignments of all inmates in the system on April 30,

2009, with the DCIS "Montez" database of inmates with disabilities; Exhibit 357 (Vol. 2) compared the DCIS database of job/program assignments for all inmates in the system on April 30, 2009, with a report generated by the AIC's office from its separate database of inmates with disabilities.  1804:11-18; Exhibit 357 (Vol. 1) and Exhibit 357 (Vol. 2).  Mr. Engstrom had never seen a list from the AIC office of confirmed diabetics and inmates determined to have mobility, vision, or hearing disabilities prior to receiving Exhibit 668B (Def. Exhibit E-1) in the spring of 2010.  1784:15-788:5.

Mr. Engstrom's reports were not consistent in terms of identifying whether a listed inmate had a disability, as the DCIS "Montez" database was not consistent with the report from the separate AIC database regarding this information.  1801:13-1804:3.

Exhibit 668B (Def. Exhibit E-1) – upon which Mr. Engstrom's Exhibit 357 (Vol. 2) was based – was prepared by Adrienne Jacobson, the "primary database person" in the AIC's office.  4034:13.  It is a listing of all inmates in the AIC database who were disabled or confirmed diabetics and who had received a final AR form within what Ms. Jacobson calls "the compliance period" of 5/1/2008 through 4/30/2009 (the 12 months leading up to the compliance deadline); Ms. Jacobson *excluded* all inmates who were "pending for screening" during that one-year period, as well as over 200 known diabetic inmates who had not affirmatively sought assistance from the AIC office, and any inmate whose accommodation resolution was revised after 4/30/2009 to reflect a Special Master Order.  3989:12-3990:24; 4037:10-4038:21; 4039:9-4040:21.

In excluding from Exhibit 668B (Def. Exhibit E-1) all inmates who did not receive a final accommodation resolution approved by both the AIC and Chief Medical Officer between 5/1/2008 and 4/30/2009, Ms. Jacobson excluded inmates who may have been determined by the DOC to be disabled or confirmed as diabetic and had received an accommodation resolution so stating at any time prior or subsequent to this one-year "compliance" period.  4028:10-22; 3991:5-17; 3993:14-3994:15; 4001:5-4003:22; 4025:5-4026:18.

Plaintiffs' statistical expert, Dr. Robert Bardwell, noted that both Exhibit 357 (Vol. 1) and Exhibit 357 (Vol. 2) significantly undercounted *and misclassified* the numbers of inmates in the system on April 30, 2009 determined to have vision, hearing, and mobility disabilities (as reflected in the DOC's disability screening results reported in Exhibit 662). The undercounts and misclassifications appear to have been largely the result of incomplete disability screenings (73% incomplete total – 93% incomplete for mobility screenings) as of April 30, 2009 (the day before the compliance deadline of May 1, 2009).  2197:24-2200:21; Exhibit 675, pp. 7-9; Exhibit 662.

Based upon determinations ultimately reached in the context of the screening processes that remained pending on April 30, 2009, *at least 35% of the disabled population was mis-classified as non-disabled in Ms. Jacobson's report*, and therefore also in Mr. Engstrom's report and the analysis of Defendants' expert Dr. Jeffrey Zax.

Hearing disabled inmates were mis-classified as non-disabled at the level of 53%.

Exhibit 675, p. 9.

Dr. Bardwell also noted that the DOC's count of diabetic inmates in the system on April 30, 2009, varied in the DOC's data between 404 (Exhibit 357 Vol. 1 – drawn from the DCIS "Montez" database) and 592 (Ex. 357 Vol. 2 – drawn from AIC database), while the DOC's March 2009 diabetic audit reported 824 diabetic inmates.  2196:2-2197:4; Exhibit 357 (Vol. 1), Exhibit 357 (Vol. 2), Exhibit 562.  When asked if she thought that the number of 1191 shown in Exhibit 668B (Def. Exhibit E-1) as the total number of inmates with disabilities  was too high, too low, or correct, Holst testified that she thought the number was low as of April 30, 2009.  1867:8-23.

In analyzing the data he was given by the DOC to discern system-wide or facility based patterns of discrimination in job and program assignments, Dr. Zax did not know or consider how many inmates ultimately determined to *have* a disability were classified in his data as *not having* a disability due to uncompleted screenings or re-screenings. 4109:25-4110:7; 4124:6-9.  Dr. Zax acknowledges, and agrees with Dr. Bardwell, that inmates who did not actually receive a final disability determination during the "slice of time" of Ms. Jacobson's 12-month "compliance period" (5/1/2008 through 4/30/2009) would all be classified for purposes of Mr. Engstrom's report (and Dr. Zax's own analysis) as non-disabled on the "snapshot" date of April 30, 2009, even though they may have been determined to be disabled or diabetic *prior to* that 12 month "compliance

period" or were ultimately determined to have been disabled on April 30, 2009, through later receipt of a final accommodation resolution resulting from a screening or rescreening or other adjustment pending as of that date.   4110:8-4112:15; 4122: 23-4123:6; 4126:25-4127:14; 4129:9-4130:5; 4131:15-4132:11; 4132:24-4133:7.

Dr. Bardwell stated that, in his experience, "if the Department were to construct, essentially, the inmate table [Exhibit 357], and if they did it accurately and contemporaneously, so they were able to track placement of disabled inmates, and they had a tool to identify statistically significant disparities, they would identify many more areas that needed to be improved."[13]  2224:7-12.

The AIC's office did not keep track of the kind of job assignments to see whether or not discriminatory assignments were being made.   973:13-24.  According to Dr. Bardwell, the AIC would not be able to perform the task required by Section VIII(D) of the Remedial Plan – to "review educational, vocational, and work programs available to inmates with disabilities to ensure that the assignment of the inmates is nondiscriminatory" – with the quality of the data presented at the compliance hearing. 2231:11-2232:23; Exhibit 675, p. 12.

Prior to preparing Exhibit 668B (Def. Exhibit E-1) in 2010 (almost a year after the compliance deadline), Ms. Jacobson had never prepared a report created specifically for use in evaluating job and program assignments for disabled as compared with non-

_____

[13] Dr. Bardwell's finding about what the data did show will be discussed in Core Purpose Five.

disabled inmates.  4026:19-4027:1.  The only similar exercise Ms. Jacobson had engaged in was to conduct a telephone survey in 2007, in preparation for an anticipated compliance hearing at that time, of inmates who had received disability determinations during the preceding 12 months "to confirm what their employment was and whether they had any issues or needed accommodation."  4035:13-4037:9.

Ms. Jacobson had never seen an analysis prepared previously for or by the DOC similar to those prepared by Dr. Bardwell and Dr. Zax in connection with the compliance hearing.  4042:10- 4043:18.  Ms. Jacobson believes such a report would be helpful to the AIC office in assuring that each facility was doing what it was supposed to be doing to assure nondiscriminatory treatment of inmates.  4043:19-4044:12.

According to Mr. Engstrom, it would take only minutes, and milliseconds of computer time, to generate a report from accurate data showing both (1) inmate job and program assignments and (2) whether or not the inmate had a disability and what the disability was.  1827:5-23.

According to Dr. Bardwell, it would be a "relatively trivial" technological exercise to create a very simple spreadsheet that would compute impact ratios (and the statistical significance of the chi-square test) that would allow the DOC – with accurate data – to evaluate on a periodic basis whether discriminatory conditions existed with regard to job and program assignments and to monitor progress toward a goal of remediating discrimination. 2206:12-2208:5.

According to Dr. Zax, given reports designed similarly to Mr. Engstrom's, an analysis similar to his own report could be generated "routinely" (within two hours) and a computer program could easily be designed to provide alerts to the presence of disparities suggesting possible discrimination.  4152:5-4154:11.

> **b)**   **A Pervasive Lack of Communication Between the AIC and Clinical Services Made it Impossible for the AIC to Accurately Track and Monitor Inmates with Disabilities.**

It was essential that there be good communication between the AIC and Clinical Services in order to implement the RP.  2907:3-6.  Despite this fact, the evidence was replete with examples where that communication was non-existent in major aspects, including but not limited to, failing to identify inmates with disabilities to the AIC; failing to inform the AIC when significant issues arose with an IWD, such as the loss of a limb; not informing the AIC when an IWD needed or was provided an assistive device; or when an IWD was transferred to a new facility.

Although examples of each of these areas are discussed fully in the Core Purpose related to that particular issue, the following is illustrative of this problem:

The AIC did not receive routine reports from the facilities regarding the identity of the inmates with diabetes. 125:8-9.  The number of diabetics known to Clinical Services was much greater than the number identified to the AIC.  124:5-11.  For instance,  thirty-five percent of the diabetics on the Clinical Services list from the CCCF do not appear on the AIC database – meaning that the AIC had never had contact with these individuals

and was never informed by Clinical Services of their diabetic status.  125:17-128:12; Exhibit 135: Bates No. 3348; 130:22-131:1.  Eight of the 26 inmates, around thirty percent, listed by Clinical Services as confirmed diabetics at KCCF did not appear on the AIC database and thus had no contact with her office, 129:7-130:21, and there were eleven inmates known to be diabetics by Clinical Services at Arkansas Valley Correctional Facility ("AVCF") who had never been identified by Clinical Services to the AIC.  Exhibit 135, bates No. 3138; Exhibit 668.

There were also numerous incidents where issues with IWDs should have been reported by Clinical Services to the AIC and were not.  For instance, Inmate Williams, a diabetic inmate, got a toenail infection under DOC care and as a result, had his leg amputated.  134:7-12.  Williams then had his other leg amputated in late 2008/early 2009 while in DOC care.  The AIC was not informed of his hospitalization or amputations. 133:14-134:6; 136:21-137:1; Exhibit 169.  Holst complained that Williams was another example of the AIC not being kept informed about developments with ADA inmates. Exhibit 168; 137:2-6.

In December 2008, the AIC office was informed by Steven May, the ADA litigation coordinator at SCF, that three inmates at his facility were in wheelchairs (Rhoades, Alley, and Castello) and needed pushers, but the DCIS system did not show that they had wheelchairs listed as an accommodation, and showed that two of them are not even members of the mobility disabled class and yet have had wheelchairs for

significant periods of time.  153:7-154:5; Exhibit 186.  The AIC complained that the lack of communication about this issue is "a continuing problem system wide."  154:6-15; Exhibit 186.

There are multiple examples of these ongoing communication issues between Clinical Services and the office of the AIC.  For example, the AIC office was provided inaccurate or incomplete information by Clinical Services regarding Inmate Linda Treiber's use of a wheelchair (161:7-162:6; Exhibit 194); Inmate Moulton's bilateral hearing aids (161:20-162:6;  Exhibit 204); and Inmate Martin's hearing aids and mobility accommodations (178:7-179:8; Exhibit 46; 179:3-23; 181:3-21).  The AIC office is not even notified when an inmate with a disability dies.  4505:18-24.

Dr. Frantz, DOC's Chief Medical Officer, was not aware of any formal protocols within the Department that would require medical staff to communicate with the office of the AIC on any issue.  4505:4-17.

The failure to communicate with the AIC was not isolated to the Clinical Services department.  As discussed throughout this brief, several of DOC departments failed to communicate important information about IWDs to the AIC.  For instance, although the AIC was supposed to be contacted when an inmate's position changed or he was terminated from a job or program, the AIC testified that did not happen very often. Generally, the way the AIC became aware of it was when the inmate grieved the issue. 934:15-24.  In addition, although the AIC needed to be aware of when a disabled inmate

was moved from one cell to another within the same facility to ensure proper housing and accommodations had been provided, that information was rarely provided to the AIC. 2405:19-2406:20.  Another example was in placement of IWDs.  Although the majority of diabetics were being housed at SCF, 4500:17-20, the AIC was unaware of this fact and assumed they would be placed throughout all the designated and non-designated facilities.  She would have objected to clustering them at SCF because it would have caused problems.  747:22-748:12.

### 4)  The ADA Grievance Procedure

The RP provides that there shall be a specific grievance procedure established to address the needs and concerns of inmates with disabilities.  RP Section XII.  Under the RP, responses to Step 1 ADA grievances must be provided within 25 days of receipt by the AIC office.  793:18-20.  Between April 1, 2008 and May 1, 2009, responses to 34.52% of Step 1 grievances (377 of 1092) were an average of 14 days late. 798:3-11; Exhibit 37, 000141-000160.

Under the Remedial Plan, responses to Step 2 ADA grievances must be provided within 25 days of receipt by the Step 2 Grievance Officer (Director of Prisons).  794:16-795:2.  Between April 1, 2008 and May 1, 2009, responses to 23.33% of Step 2 grievances (70 of 300) were an average of 5 days late.  Exhibit 37, 000161-000166. 798:12-799:5.

Under the RP, responses to Step 3 ADA grievances must be provided within 45 days of receipt by the Step 3 Grievance Officer.  795:3-17.  Between April 1, 2008 and May 1, 2009, responses to 19.66% of Step 3 grievances (35 of 178) were an average of 6 days late.  Exhibit 37, 000167-000170.  799:6-14.[14]

The primary cause of the untimely responses to ADA grievances at all three levels was a lack of sufficient staff resources necessary to conduct a timely investigation of the grievance and prepare a timely response.  799:25-801:15; 1478:21-1479:18.

From 2009 until two weeks prior to the compliance date, the office of the AIC experienced pattern of repeated delays in responding timely to ADA grievances. 2479:21-25.  These patterns were cyclical due to work load and staffing issues.  2481:14-16.

The eligibility criteria for filing an ADA grievance requires an inmate to have an "ADA alert," which is referenced on the QT profile system.  2477:18-23; Exhibit I-3.

During the year immediately prior to May 2009, the AIC office discovered that the ADA grievance process then in effect would effectively prevent an inmate whose ADA alert had been removed from filing an ADA grievance – even if the inmate believed himself to be disabled and was attempting to timely grieve the Accommodation

---

[14] Prior to April 1, 2008, the timeliness of ADA grievance responses were not tracked.  796:12-797:11.

Resolution which had determined him not to be disabled (and had thereby resulted in the immediate removal of his ADA alert).  801:16-810:2; Exhibit 226; Bates No. 126.

*Conclusion for Core Purpose One:*

The AIC did not have the appropriate authority or resources to properly perform the AIC duties.  Plagued by insufficient staffing, overwhelming workloads, and no authority to force compliance, the role of the AIC was frustrated to make the necessary changes to implement the RP.  The AIC did not have the authority to make disability or accommodation determinations, absent approval by clinical services.  Every disability related determination was subjected to the medical screening process and disability status was only granted if clinical services determined the existence of a disability at the conclusion of this process.  Accommodations were only granted when they were determined medically necessary by clinical services, despite this Court's order that accommodations were to be determined by disability standards, not medical standards.

Because the information maintained by DOC in its various computer systems was unreliable, contradictory and sometimes completely non-existent, the AIC could not review educational, vocational, and work programs available to IWDs to ensure that the assignments were made on a nondiscriminatory basis, nor could she ensure that IWDs were not otherwise denied access to programs, services, and benefits.  While an effort was made to assemble data for this purpose *after* the compliance deadline and for use

specifically at the compliance hearing, the data and resulting reports were deeply flawed, inconsistent, incomplete, and of little use.

Further frustrating the ability of the AIC to track and monitor IWDs was the ineffective and unreliable nature of communication from Clinical Services with the AIC regarding disabilities issues.  DOC failed to implement an effective chain of command through the AIC regarding the care and treatment of IWDs.

Finally, because DOC did not commit appropriate resources to the AIC, substantial compliance with the ADA grievance procedures set forth by the RP was not achieved.

### C.  Core Purpose Two:  Proper Identification of Inmates with Disabilities

A core purpose of the RP is that DOC properly identify inmates with disabilities. Plaintiffs have identified two material criteria essential to achieving this Core Purpose:

(1) Timely and proper identification of IWDs;

(2) Proper identification of IWDs for Staff awareness;

### 1.  Timely and proper identification of IWDs

Section IV of the Remedial Plan requires that disability determinations be performed by properly trained and appropriate medical staff.  Determinations shall be completed within 60 days after an inmate enters the DOC system or within 60 days after notification to the AIC of a request for disability verification.  For IWDs already in DOC, the RP required Clinical Services to notify the AIC of an inmate's disability status.

The 2008 Stipulation required DOC to conduct disability screenings based upon mutually acceptable criteria. *See* 2008 Stipulation #3.  The parties agreed on new criteria for mobility and vision disabilities in the fall of 2008.  The prior disability determinations were flawed because the former criteria that was used was too narrow.  225:25-226:3. DOC, over the objection of Class Counsel, determined it was necessary to rescreen each and every inmate who had ever requested such a screening, regardless of whether the inmate had already been determined to have a disability.  213:9-20. As a result, as of May 1, 2009, neither the inmates nor DOC knew who was in the class of disabled inmates. 219:11-16.  It follows that if the class of disabled inmates was not identified, then there is no way to verify that inmates with disabilities were being provided necessary accommodations for their disability, 219:17-21.  Until inmates are confirmed by the DOC process that he or she is disabled, they are not entitled to accommodations.  220:3-17.

DOC failed to address the most basic question during the compliance hearing: If DOC did not know which inmates were members of the Montez class on May 1, 2009, how could substantial compliance be achieved?  The evidence was significant that neither DOC nor the inmates themselves had any clear sense of who was deemed disabled and/or entitled to accommodations on the date of compliance.

### a)  Identification of Disability During Intake

When an inmate enters the Department of Corrections, he or she begins his journey through intake processing at the Denver Diagnostic and Reception Center

("DRDC").  At the time of intake, a number of forms are completed and assessments done.  Simply put, the RP mandate is to quickly identify disabled inmates so they may be properly accommodated and, if necessary, ultimately placed at a designated Montez facility.  2942:4-17.  In certain circumstances, DOC decided to make a temporary disability determination for an inmate during intake.  In those situations, DOC is required to provide temporary accommodations until the inmate is sent to a permanent facility, at which point the screening process for a final disability determination begins.  2942:18-2943:1.  In any event, final determinations were to be made within 60 days.

There were a myriad of problems with the proper identification of inmates with disabilities during the intake process. Those problems continued throughout the last compliance period. 96:2-13.  As the Court is aware, an inmate is not entitled to an ADA accommodation unless the accommodation is listed on their AR.  112:12-15.  The AIC confirmed that the failure to timely provide inmates with their ARs was a recurring problem, particularly at Colorado Territorial Correctional Facility ("CTCF").  160:10-19; Exhibit 585.  Holst conceded that improper identification at intake was also a recurring problem with respect to returning parolees.  98: 4-7.

Holst testified with regard to the problems with intake that:

> "[T]he mistakes are voluminous and occur daily.  We can say without hesitation that the temporary ARs are incorrect in 99% of the cases.  This

has been addressed with staff at DRDC intake on numerous occasions and to date the problems continue."

103:17-104:16.

Examples of the types of mistakes being made included only being given three of the required eight accommodations for diabetics, the forms were not being scanned into the database so that disability screenings could be timely done, there were operator and programming errors, the inmate's durable medical equipment (DME) were not being added to the ARs and thus could be taken away by Clinical Services, providers were shortcutting the screening forms and not addressing the disability claimed by the inmate, there was inconsistency with inmates who returned to the system being screened, and there was confusion at DRDC about the staff's responsibilities and proper notification to the AIC about disabled inmates.  104:17-108:23; Exhibit 422.

**b)  Identification of Disability Arising after Intake**

Section IV of the Remedial Plan also sets forth the process for an inmate who appears to have or develop a disability that arises after the DRDC intake process.  It requires that the inmate's case manager refer the inmate for verification of the disability to the ADA Inmate Coordinator and the Chief Medical Officer to verify the disability within sixty days.  Although Clinical Services is responsible for conducting the screenings, the evidence presented indicated that Clinical Services failed to *ever* provide a comprehensive list to the AIC identifying the inmates with disabilities. 120:22-121:12.

The only exception being shortly after the RP was entered in 2003, when Clinical Services sent the AIC a list of known diabetics for a discrete period of time.  2367:8-2368:7.  Holst testified that it had not happened since, though it would have been possible for Clinical Services to do.  2369:2-15.

### c)  Disability Screens and Re-screens

As of February 2009, there were at least 1600 inmates that needed to be rescreened for disability determination and the training for the providers was to start on February 23, 2009.  221:2-22; Exhibit 342.  In March 2009, providers were reporting that they were refusing to do any more screenings until they got clarification about the process they were to follow.  222:10-21; Exhibit 338.  As of March 4, 2009, the private prison facilities were not made aware that they needed to conduct rescreening on the hearing and vision disabilities. 224:7-12; Exhibit 343.  The DOC liaison with the private prisons reported that DOC did not have any means to compel the private prisons to participate in the rescreening process and was getting resistance from at least one of them.  224:15-225:8; Exhibit 344.  On March 18, 2009, it was reported that it "seems a lot of the providers are still unaware that they need to be doing the hearing and vision rescreening where applicable."  223:19-224:1; Exhibit 340.  The undertaking was so mismanaged, DOC had not issued the final accommodation resolutions of disability to the vast majority of inmates by the end of the compliance period.  215:24-216:3, 216:8-217:17; Exhibit 36.

The statistics tell the story.  As of June 2009, there were a total of 1,038 inmates who were listed as needing determination on their mobility disability status under the criteria established in the 2008 Stipulation.  2376:7-2380:1.  Of those 1,038, DOC had finalized the disability determinations of only 58 inmates, approximately 5%, as of that date.  2376:7-2380:1.  Accordingly, the disability determination process had not been completed on approximately 94% of the inmates undergoing mobility screening as of June 2009. 2376:7-2380:1.

As of June 2009, there were 401 inmates in the process of being screened for a hearing disability.  2380:2-24.  Of those, only 172 had received a final disability determination.  2380:2-24.  Thus, 57% of the inmates listed had not received their final disability determinations as of June 2009.  2380:2-24.  The inmates who did have final hearing disability determinations were screened under the old criteria.  2382:4-7.  None of the inmates had yet been screened under the new hearing disability criteria which was not established by the Court until November 2009.  2382:24-2383:3.

As of June 2009, there were 435 inmates who were being screened for a vision disability and over one-half of those individuals were still awaiting their final disability determinations.  2380:25-2581:16.

Holst cited several reasons underlying the delay in screening individuals for disabilities.  Those included doctors being back-logged, delays with outside specialists, and Clinical Services failing to enter consults as required.  2474:21-2475:6.  Most

importantly, the number of rescreens that the DOC decided to undertake created an enormous backlog in the system and imposed a significant burden on the office of the AIC and the CMO.  215:7-16.  DOC's ill-advised approach to rescreen the entire population in the database required DOC to rescreen 956 inmates in the mobility disability category alone.  213:18-25.  Holst did not believe that the number of 590 diabetics as shown on Exhibit 357, Vol. II, was an accurate count of the number of inmates with diabetes in DOC as of May 1, 2009.  122:1-7.

Importantly, until an AR is issued, neither inmates nor the facilities know whether an inmate is disabled and in need of accommodations. 219:4-10.  Sometimes an inmate would wait six or eight months to get a disability screening and determination, only to be told by DOC that he or she was going to be screened again within a few months.  2364:9-14.  Exhibit 667, two printouts with "P" (Pending) information, was prepared by the AIC on June 25, 2009 showing the disability screenings that were pending as of that date. 2374:5; Exhibit 667.

During the relevant compliance period, DRDC did not have an optometrist on staff to perform vision exams,  2945:20-22, or an audiologist to perform the hearing disability determinations.  2944:6-8.  After the compliance deadline, in the Spring of 2010, DOC did retain an audiologist to come to the Denver Complex and it turned out to be more cost effective than having to send inmates out to see an audiologist.  DOC could have brought in an audiologist several years prior.  2943:21-2945:19.  If an inmate needed an outside

consult for a disability determination, such as with an optometrist or an audiologist, then the providers were holding the screening forms and the disability determinations were not being made within the 60 days required by the RP.  115:4-116:3; Exhibit 395. Shoemaker testified that it would be "chaotic" for the optometrist to do a vision screening at DRDC and then forward the prescriptions to the inmates' permanent locations.  The logic of the "chaos theory" was never entirely clear during the course of the compliance hearing.  DOC did concede, however, that the optometrist could do the formal screening for those inmates staying permanently at DRDC.  2945:20 - 2947:9.

Beyond the failure to properly screen through an audiologist for hearing loss, DOC was in violation of the 2008 Stipulation and this Court's order in refusing to provide hearing aids based on a denial from DOC's insurance company for coverage.  The testimony reflected that even when inmates were confirmed to have hearing loss, DOC would deny a hearing aid because PHP (the third- party insurance provider) refused payment for the device.  186:22-187:4; Exhibit 216; Bates No. 2631.

As summarized below, Plaintiffs presented numerous examples of disabled inmates not being properly identified during intake or afterward:

### i.  Diabetes

The Department of Corrections has failed to adequately identify or diagnose diabetics within the inmate population.  Based on national statistics about the incidence

of diabetes in the American population, DOC grossly under diagnosed and underreported the prevalence of diabetes within its inmate population.

The Center for Disease Control's ("CDC") National Estimates on Diabetes (2007) lists 23.6 million people in the United States with diabetes. *See* Exhibit 725. Of those 23.6 million, 5.7 million are undiagnosed and 17.9 million are diagnosed. Thus, 75.85% of diabetes cases are diagnosed. Because the CDC data does not break down diagnosed versus undiagnosed for the gender-specific or 60 and over categories, but instead simply lists all cases, the 75.85% figure has been used to calculate the cases of diagnosed diabetes for those groups. For groups broken down by ethnicity, the CDC data do contain percentages of diagnosed diabetics in the listed groups. DOC did not break down its diabetic data by ethnicity, so no data is available to know the reported incidence of diagnosed diabetes among the ethnic groups in DOC.

Based on the CDC statistics for the "Prevalence of diagnosed and undiagnosed in the United States," compared to the 824 diagnosed diabetics in the DOC as shown on Exhibit O-5, there should be 2,132 diabetics in DOC in all age groups over the age of twenty. Thus, DOC has only properly diagnosed 38.7% of the DOC inmate population. If gender is taken into account, there should be 2,042 diabetic males and 172 females age 20 and over, for a total of 2,214 diabetic inmates. Using these statistics, only 37.2% of the DOC diabetics have been properly diagnosed. Taking ethnicity into account, there should be at least 846 Caucasians and 577 African Americans, for a total of 1,423 in just

these two categories alone.  Yet, the total number of Caucasians and African Americans in DOC is less than one-half of DOC's total inmate population.  *See* Appendix 4.

Based on the CDC statistics for the prevalence of diagnosed diabetes, DOC has only properly diagnosed about 50% of the total inmates with diabetes over the age of twenty.  CDC provided information on the prevalence of diabetes in certain minority groups: Caucasian, African American, Hispanic, Native American and Asian.  Adding up the number of expected diabetics in each group shows that there should be at least 1,811 diabetics in DOC in these groups alone.  *See* Appendix 4.  Thus, using these minority categories, DOC has only properly diagnosed 45.5% of its population.

DOC's Quality Improvement Administrator explained that the population of inmates with diabetes inside and outside of corrections is comparable as far as percentages goes.  She testified that the fact that the prison diabetic population was similar to the outside diabetic population helped the DOC when they are analyzing the care that DOC is providing.  4275:8-16.  Furthermore, the average age of inmates in the total DOC population is 37 years of age and the median age of Americans in the 2009 United States Census was 36.8.  Exhibits 706 and 742; 4778:2-21.  Thus, regardless of which statistical analysis is used, it is clear that DOC has failed to diagnose a significant portion of the inmates with diabetes under its care.  As discussed below in Core Purpose Five, one of the reasons underlying the failure to properly diagnose inmates with diabetes

is the fact that the DOC clinical standards do not prescribe when inmates should be tested for diabetes after intake into DOC.

One hundred fifty-eight inmates with diabetes came into the DOC system between May 2008 and April 2009.  3123:16-19; Exhibit R.  An example of the problems with screening for diabetics was evidenced by the case of Inmate Morris.  Morris entered DOC on February 5, 2009 and requested screening for diabetes on February 9, 2009.  242:24-243:9; Exhibit 50.  As of July 2009, there was no determination by the AIC confirming her status as a diabetic.  245:16-24; Exhibit 50; Bates # 2930.  Morris filed a grievance complaining about the denial of finger sticks after being given insulin, as required by the 2008 stipulation.  243:15-244:7; Exhibit 50; Bates # 2932.  Her grievance was denied by the AIC in July 2009 because she had not been confirmed as a diabetic by the AIC. 244:8-13.

### ii.  Hearing

(1)     Inmate Harms, born deaf, was not identified as such upon intake at DRDC, and was placed in a non-designated facility.  99:2-24; Exhibit 43.  Harms' DCIS profile and QTADs both have N for "no" next to ADA.  99:25-100:3.

(2)     On May 14, 2009, 13 days after the compliance deadline, an inmate with a middle ear prosthesis, congenital defects in both ears, and who reads lips, was processed through intake without being found to have any hearing disability.  100:9-20; Exhibit 201.

(3)     Inmate Vasquez-Gonzales, who was born deaf and needed a sign language interpreter, went through intake on June 14, 2009 and no one noted that he had any hearing issues.  101:3-102:8; Exhibit 657.

(4)     In March 2008 an audiologist recommended bilateral hearing aids for Inmate Perez-Soto.  187:5-8.  In June 2008, a provider also recommended that Perez-Soto receive hearing aids.  182:7-13.  At some point thereafter, Perez-Soto was given a  single hearing aid even though he had been listed as "DNQ" for a hearing disability.  DOC discovered the hearing aid in a DME sweep on January 14, 2009. The AIC office was unaware that he was given a hearing aid.  184:25-185:6.  The AR issued to Perez-Soto in January 2009 states he did not qualify for a hearing disability and the AIC "can't determine whether he requires hearing accommodations."  189:16- 22; Bates No. 2630. In March 2009, PHP denied coverage for the hearing aids, so another outside consult was done. 187:18-21.  As of May 1, 2009, Perez-Soto was not verified as hearing disabled by AIC despite knowledge that he had a hearing aid.  185:7-10.  In August 2009 Perez-Soto filed a grievance saying his hearing aid has been broken since March 2009 and had not gotten repaired.  185:12-16.  The AIC denied his grievance, saying the AIC was unable to determine whether he required hearing accommodations and claiming he failed to notify Clinical Services that hearing aid needed to be repaired. 185:17-25.  In response to the grievance filed by Perez-Soto, the AIC responded "Per screening June 2008 and your AR dated January '09, you were determined to not have a qualifying hearing disability."

188:3-189:3; Exhibit 216, Bates No. 2630.  Despite having been determined to need two hearing aids since March of 2008, as of September 2009, Perez-Soto was still not recognized by the AIC as a person with a hearing disability.  189:7-11.

(5)     In 2006, Inmate Dole was provided a hearing aid.  209:4-6; Exhibit 626. Dole also had a cane but was determined in August 2007 to not have a hearing or mobility disability,  207:1-13; Exhibit 626.  In August 2008, Dole requested a new hearing aid battery.  Prior to that request, the AIC office had never been informed that he wore a hearing aid.  208:7-23; Exhibit 626.  In 2008, Dole had a job wrapping silverware. 207:14-19; Exhibit 626.  In September of 2008, a DOC nurse determined that Dole's diabetes and related vision condition warranted a visit to an outside consult, but PHP denied it.  209:13-16; Exhibit 626.  No evidence was presented to show that Dole ever received the consult.  211:2-8; Exhibit 626.  In November 2008, the CMO determined that Dole was hearing disabled, but the AIC disagreed, asking the CMO to reconsider. The CMO, per the AIC's request, changed her mind and found that Dole is not disabled. There is no evidence that Dole ever had an audiologist examination.  209:22-211:1; Exhibit 626.

(6)     Inmate Thurston was screened by an audiologist in November 2008 and determined to have bilateral hearing loss.  Despite the audiologist report, he was determined to not be hearing disabled.  393:12-394:5; Exhibit 611

(7)    In November 2007, a DOC provider determined that Inmate Ontiveros had a hearing impairment and diabetes, but the CMO disagreed and determined that Ontiveros was not hearing impaired.  394:18-395:5; Exhibit 324.  In April 2009, Ontiveros was rescreened by an audiologist for a hearing disability and determined to need a hearing aid.  Three months later, in July 2009, he was informed that the disability determination remained delayed because the CMO wanted more testing and was unable to determine if he is hearing disabled.  396:2-397:5.

(8)    Inmate Mosier requested hearing aids in July 2008 and by the end of the compliance period, May 1, 2009, there had still not been a hearing determination or screening or audiologist consult on him. 408:6-409:10.

(9)    Inmate Arellano requested a hearing aid in June 2008, was confirmed to need an hearing aid, but his AR was not issued until November 2008, after he had discharged his sentence.  He never got the hearing aid for which he was qualified. 2411:18-2413:7; Exhibit 680.

### iii.  Mobility

(1)    Inmate Ellis' initial screening at DRDC indicated "no disabilities," followed by a temporary accommodation stating that he had a vision disability, followed by a request for accommodation for a mobility disability, for which a cane issued.  Ellis was then transferred from DRDC to Arkansas Valley Correctional Facility ("AVCF") (a facility not designated to house inmates with vision or mobility disabilities).  This

indicated a failure in activation of the disability alert system at DRDC.  3364:24-3365:23; Exhibit J; 3366:7-15.

(2)     In July of 2006, Inmate Windsor was determined to not have a mobility disability.  192:15-23; Exhibit 587.  He asked to be rescreened in December 2007. 192:24-25; Exhibit 587.  In May 2008, after getting MRI results, Dr. Darrow determined that Windsor has spinal stenosis causing his legs to give out, that his condition will worsen and that he could end up in a wheelchair.  Exhibit 587.  In July of 2008, an AR issued for Windsor stating that he is "mobility impaired and he uses a cane and wheelchair and requires special considerations."  194:1-14; Exhibit 587.  On September 24, 2008, Windsor sent a letter to the AIC complaining that he still had not gotten his AR. He also complained that the cane provided to him was too short and the wheelchair was unsafe because there are no leg rests.  194:21-195:5; Exhibit 587.  DOC confirmed that there was a problem with the cane and wheelchair.  195:6-10; Exhibit 587.  The provider noted that Windsor should have a pusher for his wheelchair.  195:18-23; Exhibit 587. The doctor believed that on bad days, Windsor was in so much pain that he could not get around and would need a wheelchair and a pusher and that Windsor could be immobilized at any moment based on his MRI results.  196:6-14; Exhibit 587.  Windsor remained without wheelchair while it was being repaired.  195:25-196:5; Exhibit 587. There was a significant delay in getting Windsor his AR because the facility ADA coordinator did not understand procedure and the urgency in providing these forms to the

inmates.  196:15-197:5; Exhibit 587.  Although the doctor stated that Windsor has good days where he can walk, the Health Services administrator determined that Windsor did not require a cane or wheelchair because she saw him walking in video footage.  197:16-23.  Windsor used a cane in a portion of the video. 199:14-16; Exhibit 587.  Based on that video, the CMO and AIC determined that Windsor was not mobility disabled and did not require a cane or wheelchair.  197:24-198:10; Exhibit 587.  As a result, the specially designed wheelchair and the cane were taken away from Windsor.  198:11-199:3; Exhibit 587.

(3)     In May 2008, the AIC determined that Inmate Hocker, who used a cane, had a mobility "impairment" correctable by the use of a cane and thus was not disabled. 200:1-201:14; Exhibit 155.  Because he was not disabled, the cane could be taken away by Clinical Services.  201:17-19; Exhibit 155.  In January 2009, despite the enactment of the ADA amendments that mandated that disability determinations be made without regard to mitigating assistive devices, Hocker received a new AR that again stated he was not disabled, but only had a mobility impairment because the cane mitigated his disability.  201:20-202:10; Exhibit 155.  Hocker's new disability screening was still pending as of the end of the compliance period. 204:9-17; Exhibit 155.

(4)  Inmate Moreno used a cane and was given a temporary accommodation of a mobility disability in 2007.  Because his disability is "correctable" by the use of a cane, he was determined not disabled.  He was submitted for rescreening in March 2009 and

was not completed as of the end of the compliance period.  204:18-205:9; Exhibit 664.

Clinical Services could take away the cane he has had for the last two years because he

has not been determined to be disabled.  205:17-20; Exhibit 664.

     5)    In 2007, Inmate Valverde asked for mobility and diabetic disability status;

although the provider agreed, he was ultimately only determined to be a diabetic by the

CMO.  137:7-138:2; Exhibit 402.  On April 17, 2008, the AIC asked for rescreening

because Valverde has cerebral palsy and his feet were in bad shape because of

uncontrolled diabetes.  138:25-139:8; Exhibit 402; Bates No. 1023.  In May 2008, the

AIC learned for the first time that Valverde was in a wheelchair and needed an aide. The

provider determined he had a mobility disability, a vision "impairment" and has diabetes.

139:9-16; Exhibit 402; Bates No. 1023.  Later that May, AIC also learned for first time

that Valverde had leg braces.  139:17-21.  In June 2008, the AIC stated that Valverde was

not entitled to any mobility accommodations for his disability because he had not yet

gone through the screening process to determine whether he is mobility disabled.  140:8-

15; Exhibit 402.  There were serious concerns by AIC staff about the fact that he had

been disqualified for mobility for more than a year, given that he had cerebral palsy and

open wounds on his feet from diabetes. 140:16-141-1; Exhibit 442.  In July 2008,

Valverde died from a seizure due to a diabetic episode. 141:7-9.  On July 24, 2008, DOC

confirmed Valverde as mobility disabled with diabetes. 141:2-23.  There is no evidence

that Valverde was ever given a revised AR with the accommodations required to be given

to all diabetics per the 2008 Stipulations.  Valverde did not receive his AR identifying his mobility disability and diabetes until after his death. 143:8-10.  The AIC tried to get the autopsy report but was refused, and was not entitled to internal investigation reports when a diabetic class member dies. 143:18-144:23.

(6)     In June 2008, Inmate Weigand completed ADA forms, stated he already used a cane, and requested handicapped seating, a second hearing aid, a vibrating watch and other accommodations for a hearing disability.  Weigand was housed at the Buena Vista Correctional Facility ("BVCF"), which was not a designated facility for a person with a hearing or mobility disability. 155:23-156:17; Exhibit 585.  Although he had a hearing aid, Clinical Services had never identified Weigand to the AIC as having an ADA issue.  157:7-10; Exhibit 585.  In July 2008, staff reported to the AIC that Weigand could not walk more than a hundred yards due to his leg going numb, that he required handrails in the shower, and used a hearing aid and trifocals.  157:11-16; Exhibit 585.  One month later, the medical provider determined Weigand needed two hearing aids and a cane.  157:17-20; Exhibit 585.  In September 2008, Weigand complained that the screening was taking too long as it had already been beyond the 60 day limit in the RP to complete screenings, and he needed a vibrating watch.  The AIC response was that the screening was still pending and he would get a watch if determined hearing disabled.  167:21-158:8; Exhibit 585.  In November 2008, Weigand filed a grievance complaining that his disability determination was taking too long, as it had now been about five

months since he requested the disability determination.  158:14-23 ; Exhibit 585; Bates

No. 2445.  On February 3, 2009, an AR was prepared confirming his mobility and

hearing disability and was sent to his facility– seven months after he requested the

screening.  This AR was not given to Mr. Weigand until March 23, 2009.  160:10-14;

Exhibit 585.  Weigand should have been identified by Clinical Services to the AIC as a

mobility disabled inmate prior to June 2008.  He asked for accommodations in June 2008,

but did not get his AR for almost nine months - in March 2009.  160:20-161:5; Exhibit

585.  In April, 2009 Weigand filed an emergency grievance complaining that he is

required to go to up the stairs to the upper tier, saying that he cannot do stairs because he

has to catheterize himself up to eight times a day and cannot manage his cane, his

supplies and the stairs; his case manager (Trujillo) confirmed he was struggling with this

and going very slow.  162:21-163:1, 18-24; Exhibit 585; Bates No. 2441, Entry 4/6/09.

Despite the medical provider's recommendation that Weigand be housed on the lower

tier, this accommodation was not placed on his AR so it was taken away by Clinical

Services when the AR was issued and he was moved to an upper tier. 163:8-17, 162:13-

163:24; Exhibit 585; Bates No. 2445,  Entry 4/6/09.  Weigand's grievance was denied but

the AIC indicated that he would be rescreened and he could take his grievance up with

medical.  163:25-1464:6; Exhibit 585.  The AIC's reason for the denial of his emergency

grievance was that a lower tier accommodation was not on his AR, but that his "rescreen

is pending and this may change." Exhibit 585.  Within a few days, the AIC was informed

that Weigand fell while attempting to use the stairs, injured himself and was put in a wheelchair. Exhibit 585; Bates No. 2433. As a result, he had to be moved to the bottom tier. 164:17-165:1. On April 26, 2009, the AIC responded to a letter sent by Weigand in January 2009 complaining that he has still not received his AR. 159:22-160:9; Exhibit 585. Weigand again filed a grievance in April of 2009 because in June 2008 he asked to be housed in an area with handrails, a shower stool and bench because of his mobility disability none of those accommodations were listed on his AR. The records show that the provider confirmed that Mr. Weigand has leg weakness, poor balance, numbness in legs, was unable to rise from a chair without using a cane, has spina bifida, as well as multi-level DDD, kyphosis and scoliosis. 167:22-168:3. The staff also confirmed that he needed handrails in the shower. 169:8-11. The response to his grievance was that he does not get those accommodations because he is not in a wheelchair and he will be rescreened. 169:18-170:1; Exhibit 585. Weigand also requested a vibrating watch in June of 2008. Because his hearing screening was not completed, the final AR was not issued until March 2009. He did not receive his vibrating watch until April 21, 2009. 171:7-173:7; Exhibit 585; Bates No. 2449.

(7)     Inmate Busby was determined to have mobility "impairment" that was correctable by the use of an AFO brace in 2008 but was never submitted for a mobility rescreen. 226:22-228:4; Exhibit 210. Thus, she has never been determined to be mobility disabled by DOC.

(8)      Inmate Adams had a mobility disability and had medical approval for tennis shoes to use with his Canadian crutches.  In March 2008, he filed a grievance that he had needed new medical shoes since February 2008 to walk with his AFO brace.  The consult for the shoes was never placed.  Although the AIC granted his grievance and revised his AR to reflect his need for the medically necessary shoes, there is no evidence that he received those shoes by the end of April 2009 compliance period.   2424:6-2428:6; Exhibit 681.

### iv.  Vision

(1)      In June 2008, Inmate Lyons filed a request for accommodation, indicating that he has a vision disability, is blind in one eye and losing vision in the other, and requesting a walking stick and Braille classes.  190:1-6; Exhibit 329.  On July 2, 2008, a provider confirmed that Lyons is vision disabled, recommended an Offender Care Aide ("OCA"), use of a magnifier, and Braille.  190:7-10; Exhibit 329.  As of August 7, 2008, the CMO determined Lyons does not have vision disability and his ADA alert should have been removed from the DOC system.  190:11-21; Exhibit 329.  Lyons was then placed in a facility that is not designated for those with vision disabilities. 191:7-17; Exhibit 329.  In August 2009, the AIC office received a report that an eye doctor had determined Mr. Lyons to be legally blind and there was an inquiry into the ADA accommodations he is to receive.  191: 2-6; Exhibit 329.  The AIC's response was that he could be rescreened by medical, but would not receive any accommodations because his

last AR said he did not have a vision disability. 191:18-192:2; Exhibit 329.  Despite

being informed that Lyons is legally blind, no accommodations were granted because he

had not gone through the screening process required by the policy.  192:5-9; Exhibit 329.

No evidence indicated that Lyons was moved from the non-designated facility when AIC

received information that he was legally blind, even as a temporary accommodation.

192:10-14; Exhibit 320.

### 2.  Proper identification of IWDs for Staff awareness

Section XIX of the RP requires that custody staff in housing units be made aware

of IWDs and how to accommodate the special needs of those inmates.

To implement this RP mandate, designated facilities are required to maintain, in a

central location, a list of the cell assignments for each inmate who had a temporary or

permanent accommodation due to a disability, and to have a system in place to identify

diabetic inmates within a housing unit.   739:18-740:6.  Such rosters provide staff quick

access to disability information about a particular inmate.  746:10-12.  The problem,

however, as discussed in Core Purpose One under Material Criteria Three, is that there

are numerous places that staff can look to determine disability status to generate these

cell rosters, many of which contain inaccurate data.

The problem created by having multiple, often conflicting, sources of information

regarding disabilities is exemplified by the unit/bed rosters at FLCF.  FLCF, a facility

that houses a significant number of inmates with disabilities, produced copies of its April

2009 list of cell assignments which purported to identify those inmates with disabilities. 765:14-766:3; Exhibit 161.  Keeping bed rosters was a policy at FLCF as a means for identifying IWDs.  2407:21-24.  However, these rosters show a pattern of misidentifying IWDs.  2407:9-13.  A comparison of the FCLF cell assignment information to the AIC data base shows that FLCF routinely incorrectly designated inmates with disabilities on cell assignments, often not designating inmates who had disabilities or giving them the wrong disability designation.  *See* Appendix 5.

Furthermore, when IWDs at FLCF were moved between living units, their disability designations erroneously changed or disappeared from the rosters.  780:18-785:23; Exhibit 162.  Individuals who were disabled but not designated as such after being moved included:  Spohr and Kim, who lost their diabetic designation when moved, 781:4-785:13; White lost his designation of mobility disability when moved, 784:23-785:2; and Schaal, who lost his diabetic designation when moved, 785:3-23.

In response to the audit conducted by the AIC, the following facilities submitted information confirming non-compliance with the requirements of the RP that staff be made aware of IWDs and their needs:

As of March 2009, RCC admitted that it did not maintain a record of the inmates in the housing units who have diabetes or hypoglycemia.  754:4-16; Exhibit 305.  In March 2009, Rifle implemented a policy that stated that its own medical staff would

determine who had a disability and any necessary accommodations, without reference to any involvement with the AIC.  754:21–756:21.

The quality assurance manager at BCCF informed the AIC in March 2009 that the facility had not received an updated ADA daily roster since October 2008 and asked if they should still be getting these.  757:15-24; Exhibit 414.  From October 2008 through March 2009, BCCF did not know where the ADA rosters were available.  750:3-6.

The Colorado Minimum Centers – ACC, FMCC and SCC, admitted that they did not have a system in place to identify the diabetic inmates within the housing unit as of April 30, 2009.  759:7-16; Exhibit 497.

Neither La Vista Correctional Facility[15] nor San Carlos Correctional Facility, both of which are designated facilities for inmates with disabilities, had policies that addressed a system to ensure that unit staff is aware of any accommodations that had been granted to inmates with disabilities.  760:25-761:10; Exhibit 502.

Buena Vista Minimum Center ("BVMC") is a designated facility for inmates with hearing disabilities and those with diabetes.   764:18-765:2.  As of March 2009, BVMC admitted that its cell assignment list did not identify inmates with disabilities or their accommodations.  765:3-8; Exhibit 508.

---

[15] LVCF is the former YOS facility.  When the RP was entered, YOS was a designated facility.  When YOS moved out of that facility, it was agreed that because of the accessible nature of the building, LVCF would be included as a facility designated for housing IWDs. 762:12-23.

After review of the information submitted by the facilities in response to the audit

conducted by the AIC, with respect to the issue of staff awareness, the AIC concluded:

> (1) additional training is necessary for facility line staff on this issue, (2) the Administrative Regulation 750-04 needs to be revised to add information regarding this requirement, and (3) "system changes to the ADA Montez database are required as there are numerous problems in that the information is not accurate, staff are confused and do not understand how to use it, temporary accommodations are not removed when disability determinations are made because the Encounter system and ADA Montez do not talk to one another.

> 491:5-492:3.

With respect to the mandate that each facility was required to maintain a list of the

cell assignments for each disabled inmate, the AIC opined:

> A consistent method for maintaining these lists must be developed at the facility level. Facilities are inconsistent in utilizing the report sent by Paul Engstrom who pulls the report and where the report is kept. The ADA roster report does not give cell assignments. Facilities still have to track cell assignments on their own or through DCIS. Once outlined [sic] this process should be outlined in an AR and implemented through facilities I/As.

> 785:24 -786:19.

Regarding the mandate that each facility shall have a system in place to identify

any diabetic inmates within the housing unit, the AIC opined: "the facilities were using a

combination of the diabetic report provided by Clinical Services staff, the ADA roster

report generated by Paul Engstrom, and looking at the resolutions on the AIC website,"

787:17-23, but that "the accuracy of information provided by Clinical Services and the

consistency of staff utilization of these lists are questionable."  788:3-7.

Finally, with respect to the mandate that required the facilities to have a system in place to ensure that unit staff were aware of any accommodations that had been granted to disabled inmates, the AIC opined that additional training was necessary for facility line staff and that:

> Administration regulation 750-04 needs to be revised to add information regarding this requirement. System changes to the ADA Montez database are required as there are numerous problems and that the information is not accurate. Staff are confused and do not understand how to use it. Temporary accommodations are not removed when a disability determination is made because the Encounter system and ADA Montez do not talk to one another.

> 786:20-787:16.

*Conclusion for Core Purpose Two:*

The evidence presented during the course of the compliance hearing makes clear that DOC failed to complete disability determinations within 60 days, as required by the RP.  By May 1, 2009, a substantial majority of inmates had either not yet been screened or were awaiting a disability determination.  As a result of DOC's failure to properly identify IWDs, custody staff was not able to verify IWDs and their accommodations, as required by the RP.

**D.  Core Purpose Three: Proper Placement of Inmates with Disabilities in Designated Facilities**

Section V of the RP requires DOC to place all inmates verified to have a disability in a facility designated to house IWDs.  An IWD is to be placed at "designated" facilities which have been determined to meet the physical and structural needs of the IWD as well

as necessary program and educational requirements.  For instance, DOC is required to place inmates with mobility disabilities in ADA accessible cells and inmates with hearing or vision disabilities in cells that accommodate their disabilities.  As specified in Section IV of the RP, when determining placement assignments, the Office of Offender Services is required to cooperate with the AIC.

During the relevant compliance period, IWDs were placed at non-designated facilities.  For example, eight inmates confirmed by the AIC as diabetics, one inmate with a mobility disability and one inmate with a hearing disability were transferred out-of-state to the North Fork Facility in 2009.  313:3-15:13; Exhibit 671.[16]  The North Fork facility is in Oklahoma, is not a DOC facility, and, as such, is not covered by the RP.  2978:17 – 2980:2; Exhibit M-12.  The AIC was never given any responsibility with respect to the North Fork facility, 312:24- 313:2; Exhibit 671, and the AIC had no input into the North Fork facility procedures or operations.  312:15-17.  It is not a designated prison for inmates with disabilities. 316:11-14; Exhibit 671.

Also during the relevant compliance period, there were issues with designated facilities not having the appropriate number of ADA accessible cells to properly house IWDs.  Both CTCF and FLCF encountered issued with having insufficient handicap

---

[16] Testimony and exhibits confirming the disability status of these inmates can be found at: 2962:23-2965:2; Exhibits 692, 698, 2965:10-2967:15, Exhibit 691, 2967:16-2972:14, Exhibit 690.  2972:15-2975:13, Exhibit 693, 2977: 2- 2978:16, Exhibit M-12, Exhibit 695, 2980:3-2981:8, Exhibits 699 and 671, 2981:9-2982:3, Exhibits 671 and 700, 2982:4- 2982:22, Exhibits 671 and 702, 2984:22 -2985:6, Exhibits 671, 703.

accessible cells.  306:8-14. As of February 2009, there were eight inmates at CTCF who, because they required accessible cells, were being housed in the infirmary or the intake unit.  Privileges for the inmates are more restrictive in these units.  306:18-307:10; 308:12-14; Exhibit 456.  The AIC did not know whether this problem was solved as of the end of the compliance period, 309: 1-5, and did not know how long these inmates with disabilities were confined to the restrictive housing because of their disabilities. 308:15-20.  Housing disabled inmates in such restricted locations because of their disability is a violation of the Remedial Plan.  308:21-25.

DWCF experienced a similar problem when in February 2009, it was running out of accessible cells in the restrictive/lockdown unit.  310:17-21.  Although mobility disabled women could be placed at LVCF, that facility was resistant to taking these inmates.  311:2-11. Although LVCF is designated to house IWDs with mobility disabilities, the administrative services manager responded to the AIC audit by stating that it is not a designated facility for inmates with mobility disabilities.  762:6-763:2; Exhibit 502.  There was no evidence that anything was done to alleviate this housing problem.  311:12-15.

In addition to the IWDs placed at the North Fork facility and the examples of IWDs Harms, Ellis, Weigand, and Lyons, [17] being placed at non-designated facilities as

---

[17]  Testimony for which cited above at: 99:2-24; Exhibit 43, 3364:24-3365:23, 155:23-156:17; Exhibit 585, and 191:7-17; Exhibit 329

discussed above in Core Purpose Two, additional examples demonstrating DOC's failure to properly place IWDs at designated facilities are discussed throughout this brief.

     *Conclusion for Core Purpose Three:*

     During the relevant compliance period, DOC placed IWDs at non-designated facilities in violation of the RP. Due to insufficient ADA accessible housing at designated facilities, DOC also placed IWDs in units with more restricted privileges, also a violation of the RP. Based on these findings, DOC did not achieve the requirements of this Core Purpose.

### E.  Core Purpose Four:  Reasonable Accommodations and Healthcare Appliances

     To ensure access to comparable programs, services, and benefits provided by DOC as well as effective communication, Section X of the Remedial Plan requires that DOC provide inmates with disabilities reasonable accommodations, including, but not limited to: auxiliary aids (health care appliances or "DME"), inmate or staff assistance, sign language interpreters, and telecommunication devices for the deaf.[18] Section XVI of the RP and 2008 Stipulations require that DOC provide, repair and replace healthcare

---

[18] Plaintiffs stipulated that DOC was in compliance with Sections XXI, XXII, XXIII, and XXVII of the RP, which require DOC to accommodate IWDs during count, use of restraints, during searches, and when removing DME in Administrative and Punitive Segregation Units. Plaintiffs also stipulated to the provision of sign language interpreters, ASL classes, and the wheelchair clinics required by the 2008 Stipulations ##5, 6, and 10. These elements are not, however, material to this Core Purpose. Evidence of compliance with these discreet elements does not achieve compliance with the overall Core Purpose.

appliances within certain timeframes.  Stipulations were entered in 2008 to ensure specific accommodations were provided to inmates with diabetes.

As a prerequisite to complying with Sections X and XVI of the Remedial Plan, DOC must first have properly and timely identified individuals as disabled under Section IV of the Remedial Plan, discussed in detail under Core Purpose 2 above.  Compliance with the requirements of Sections X and XVI of the RP depends upon whether the inmate in need of the accommodation has been properly identified by DOC as a person with a disability who specifically needs the accommodation at issue.  The evidence submitted above under Core Purpose 2 shows that DOC failed to make those final disability determinations with respect to more than half of the potential class members.  Accordingly, it has failed to ensure that accommodations were properly provided to inmates with disabilities.

With respect to inmates that have been identified by DOC as IWDs, Plaintiffs have identified five material criteria that must be satisfied in order to achieve compliance with Core Purpose Four:

> (1) Provide Reasonable accommodations within requisite timeframes and pursuant to Orders of the Special Masters;
>
> (2) Providing IWDs in need of assistance with daily life activities appropriately and effectively trained aides;
>
> (3) Provide appropriate accommodations to inmates with diabetes;

(4) Provide appropriate accommodations to inmates with hearing disabilities to ensure effective communication; and

(5) Provide accommodations to IWDs during transport.

**1. Provide Reasonable accommodations within requisite timeframes and pursuant to Orders of the Special Masters.**

    **a. Responding to requests for accommodations and Court orders for accommodations within requisite timeframes.**

Section X(A) of the RP requires that requests for accommodations made by an inmate shall be decided by the case manager and the AIC within 30 days.   However, during the compliance period, inmates experienced significant delays in receiving responses to requests made for accommodations due to the inefficient disability screening process discussed under Core Purpose Two.  Furthermore, if an inmate requested an accommodation but the CMO did not address the need for the accommodation when the inmate was screened, the process required that the inmate go through another screening process to determine whether the accommodation was necessary.  2394:18-23.

For example, as explained in detail in Core Purpose Two, Inmate Weigand waited nine months to receive an AR form to include accommodations specific to his mobility disability.  However, when Weigand finally received his AR, the accommodations were omitted.  When he grieved the issue, he was told he was told he would have to be rescreened to determine whether they were necessary.  167:6-170:1, Exhibit 585.   The AIC confirmed that this type of situation was standard procedure.  Specifically, "[I]f the provider during the screening and/or the chief medical officer did not address the need for

[an] accommodation that the offender identified, then we would have to send them back and have it looked at." 2394:17-2395:4.

In addition to failing to respond to inmate requests for accommodations within the requisite thirty (30) day timeframe, DOC did not provide accommodations specifically ordered by the Special Masters. The 2008 Stipulation required DOC to immediately adhere to and implement any Court Order or Special Master Order determining the disability classification of a Class member. In addition to the disability determinations made by the Special Masters in their Orders, the Special Masters often ordered accommodations to remedy the underlying cause of disability discrimination.

At the end of the compliance period, the AIC prepared a report concerning compliance with the Special Master's Orders. Exhibit 350. As a result of the report, the AIC determined that DOC had not complied with Special Master's Orders regarding the appropriate accommodations to be provided to inmates. 347:1-349:18. Upon the "advice of Counsel," DOC did not revise accommodation resolution forms to include accommodations ordered by the Special Masters. 250:21-251:6; Exhibit 349; Exhibit 350. As of the compliance date, it was undetermined as to whether 204 Accommodation Resolution Forms were consistent with the Orders of the Special Master. 252:17- 253:13; Exhibit 349.

As explained in Core Purpose One, one reason that accommodations ordered by the Special Master were not provided was because the Chief Medical Officer's

determination as to whether an accommodation was medically necessary took precedence over the Special Master's Order of an accommodation.  251:7-18.  Unless an accommodation ordered by the Special Master as a basis for an award of damages was determined by Clinical Services to be medically necessary, DOC did not grant the accommodation.  252:3-8.  Another reason for not providing accommodations ordered by the Special Master was because there is no written procedure in the DOC regarding notifications of Special Master Orders.  4523:10-18.

Because DOC did not comply with Orders of the Special Masters with regard to disability determinations and accommodations, some Class members were not provided accommodations for over two years.  Exhibit 350.  In addition to non-compliance with the Special Masters Orders identified in the AIC's report, thirteen additional examples of non-compliance were presented.  *See* Appendix 6.

### b.  Purchase and provision of and repair/replacement of accommodations/DME within requisite timeframes

Section XVI(D) of the Remedial Plan requires that healthcare appliances be ordered by Clinical Services within (7) working days after it is determined that is it necessary.  During the compliance period, DOC consistently failed to meet these requirements resulting in delays ranging between four and eight months before inmates with disabilities received their required DME, as demonstrated in Appendix 7.

Additionally, pursuant to the 2008 Stipulation, DOC is required to repair DME and auxiliary aids within sixty (60) days after it is reported that the DME is in need of

repair.  There were consistent recurring problems with the repair and replacement of DME for inmates with disabilities during the compliance period.  736:21-25.  At least twenty-five examples were presented to demonstrate delays ranging between two months and 1 year for the repair or replacement of DME.  According to the AIC, the requirement that DME be repaired or replaced within 60 days is rarely complied with and is not complied with where there is a need for prosthetics.  4527:6-4527:16; 4731:22-4732:23. *See* Appendix 7.

### c.   Reasons for delay in provision of or repair/replacement of DME

There were many identifiable causes for the delay in the repair and replacement of DME.  One issue was that the AIC was not provided automatic notifications when a DME replacement or repair was not proceeding in a timely fashion.  4534:17-25.  It was important that the AIC be informed when assistive devices were broken so that temporary accommodations could be provided in the interim.  873:10-17.

Another cause for the delays was the denial of coverage for DME by DOC's third party administrator for insurance coverage, PHP.  The 2008 Stipulation requires that in the event of a denial by PHP, DOC is required to provide assistive devices at its own expense.  However, during the compliance period, when PHP denied coverage for DME, the process of getting the assistive device for the inmate was delayed. 3096:10-15.  An example of such a delay was presented to show a six (6) month delay in providing a

hearing aid, for which DOC had approved, after PHP denied coverage.  2475:19-2477:5;

Exhibit 673.

Furthermore, during the compliance period, PHP employed a standard policy to

deny requests for DMEs for any inmate within six (6) months of discharged or approved

parole.  3095:20-23.  This policy included replacement of prosthetic devices.  4529:25-

4530:5.  Withholding an assistive device because an inmate is within six (6) months of

parole is a violation of the Remedial Plan.  384:5-8.  An example of such a denial was

presented to show that an IWD that had been approved by DOC for two hearing aids was

denied coverage by PHP because he was within 6 months of his mandatory release date.

381:8-382:18; Exhibit 203.

Also identified as a cause for the delay in providing, repairing or replacing DME

were issues arising from the failure to properly coordinate and monitor consults with

outside providers.  When an IWD is referred for a consult with a specialist or outside

provider, the consults have to be entered into a computer system by either a provider or a

specialist.  Delays occurred when outside providers or specialists failed to enter their own

consults.  4710:13-15.  If a consult is not entered, Clinical Services (Scheduling) had no

way to monitor whether the appointment is made.  4712:12-14.  For example, as a result

of an outside provider's failure to enter follow-up consult appointments, an IWD

experienced a nine-month delay in receiving his hearing aids between the time he was

first evaluated until he received the aids.  4709:24-4710:6.  This was not an isolated event due to problems with the Denver Health audiology department.  4713:19-4714:5.

Delays also occurred because outside providers failed to request authorization from PHP to provide services.  When such requests are not made, the services are not provided and the DME for which the inmate may have been approved is not dispensed.  4716:13-17.  For example, an  IWD  did not receive new hearing aids for six months because the audiologist did not submit the paperwork and seek authorization from PHP to dispense the hearing aids.  4714:15-16, 4715:12-13.  Because DOC does not have a tracking mechanism for requests made by outside providers for authorization to provide services, this was a recurring problem.  4715:21-23.

Although delays in the provision of accommodations may have been the result of an outside provider's failure to enter a consult or referral or delays caused by an outside vendor, DOC is ultimately responsible for ensuring that inmates are scheduled for appointments and the recommended assistive device is provided.  4711:17-4712:1.  Dr. Frantz conducted an investigation of DME consults from 2007 to 2010, however, she did not prepare a report of the investigation or reduce any of her findings to writing.  4548:9-24.

### d.  Proper documentation and tracking of DME

As discussed above, DOC is required to order and repair or replace necessary DME within certain timeframes.  As a method to improve the problems involving delays

in the provision of DME, the 2008 Stipulation required Clinical Services to immediately establish a position designated to coordinate, administer and/or oversee the scheduling of all repairs and replacements of assistive devices at the facilities.  This position was to regularly communicate with the AIC to ensure that devices were properly and timely repaired and replaced and that the appropriate accommodations were provided in the interim.  2565:5-15.

According to Shoemaker, during the compliance period, the position designated to coordinate, administer, and oversee the scheduling and replacement of DME resided with Anna Marie Campbell.  Randy Smith was also "on point" with part of that position. 3093:18-22.  Although this position was to be managed by Clinical Services, with respect to DMEs, Shoemaker did not receive regular reports from Smith, or anyone else, on scheduling repairs or replacements of assistive devices, besides occasional updates regarding wheelchairs and wheelchair repairs.  3094:2-24.

Despite the requirement that this position regularly communicate with the AIC, the AIC did not receive regular reports from Anna Marie Campbell or Randy Smith with respect to the repairs and replacements of DME.  2565:19-2.  Because this position was not coordinating with the AIC, there was no way to determine whether assistive devices were being timely repaired and replaced.  There was no means of consistently tracking when a repair was needed, when a repair was completed, and when an assistive device was provided to an inmate.  2567:4-20.

Section XVI(C) of the Remedial Plan requires that DOC document health care appliances as property of the inmate or DOC.  The AIC identified that during the compliance period, the failure to properly record DME as inmate property was a problem. 681:3-8.  In addition to DME not being properly documented, the AIC recognized that there was a problem with inmates having DME of which the AIC was unaware.  665:1-3. This was a result of Clinical Services failing to notify the AIC that DME had been provided and also failing to notify the AIC when inmates were identified as having a disability.  671:3-9.  It was the responsibility of Clinical Services to notify the AIC when DME was provided to an IWD.  2951:10-17.  Clinical Services' failure to communicate with the AIC was a pervasive problem, as discussed in Core Purpose One, Material Criteria Three (B).

When DME is issued to an IWD, it is also the responsibility of Clinical Services to notify the property officer at the facility who, in turn, is required to update the property list to include the new DME.  2951:10-17.  Property officers at each facility are responsible for entering and recording information about inmate property including DME.  Property officers receive specific training as to these procedures.  678 12-21.  The AIC provided a three-page set of instructions to the property officers, wardens, and ADA coordinators at each facility as to how the system would work and it was the property officers' obligation to record the property in the formal system in DCIS.  680:1-6.

Despite the specific instructions provided by the AIC, individual facilities deviated from the process.  For example, the Litigation Coordinator at Sterling, admitted that it was he, not the Property Officer, who made the entries into the database with regard to property.  680:7-13.  Litigation coordinators were not trained to enter information about property into the database.  680:14-17.

When DME is not properly documented as the property of an inmate, there is a risk that it can be removed.  672:23-673:3.  Furthermore, when the AIC is not notified that an inmate has a particular DME or when the AIC is not notified of the inmate's disability, the inmate may not be provided with other accommodations associated with the disability.  674:8-18.

During the compliance period, certain DOC facilities conducted "DME Sweeps," which was a special project outlined by Clinical Services.  The purpose of the DME sweep project was to do an inventory at all the designated facilities so that the DOC would know what DME inmates did, in fact, have.  665: 3-7.  The DME sweep project was not completed before the end of the compliance period.  672:18-22.

Despite the importance of the AIC knowing when DME had been provided to an IWD, the AIC was not involved in the "DME Sweep" project.  660:12-21.  The AIC needed the inventory reports from the facility DME sweeps so that the AIC could log the DME on the inmate's Accommodation Resolution Form and otherwise remedy the

discrepancies.  672:13-17.  The AIC did not receive reports regarding the results of the DME sweeps from all the facilities where they were conducted.  661:1-6.

As evidence of the problem with properly documenting DME as property of inmates, the results of the DME sweep conducted at CTCF in April 2009 revealed at least fourteen instances where DME was found but not documented properly on the IWD's Accommodation Resolution Form.  *See* Appendix 8.

Section XVI(C) also provides that inmates shall not be deprived of a healthcare appliance that was in the inmate's possession upon entry to DOC or was properly obtained while in DOC custody.  Despite the requirements of the RP and DOC's own policy that custody staff would not remove DME that was prescribed by Clinical Services, during the compliance period, custody staff did, in fact, remove DME from IWDs.  2952:4-10.  Upon transfer to a new facility, DME was removed by custody staff at the receiving facility if the particular DME was not permitted at the facility or if DME was not properly listed on property records.  2952:11-22.  For example, upon transfer from SCF to CTCF, IWD Adams had his medical tennis shoes removed from his possession.  2953:23 - 2954:12; Exhibit 681.  IWD Mounts had his heating pad and knee brace removed upon transfer from AVCF to SCF.  694:10-18.  IWD Dixon had his contact lenses removed by custody staff.  697:6-10.  Both IWDs Maxfield and Velarde had the batteries removed from their hearing aids by transport staff. 681:15-19, 682:13-683:6; Exhibit 278, and 686:9-14; Exhibit 607.

DME was also removed during transport.  In response to a complaint about hearing aid batteries being removed during transport, the AIC acknowledged that batteries should not be removed during transport.  681:15-19, 682:13-683:6.  Exhibit 278. The AIC concluded  that removal of DME on transport and the failure of custody staff to look at Accommodation Resolution Forms prior to conducting cell shakedowns was an increasing problem resulting in DME being lost, stolen or destroyed.  684:25-685:13. Exhibit 196.

Additionally, if there is a security concern with respect to DME, the RP requires that the CMO or licensed physician be consulted to determine what accommodations are necessary for the inmate if their DME is removed.  659:12-17.  During the compliance period, this did not always occur.  For example, when an IWD had his hearing aid confiscated from him when he was placed in administrative segregation in mid-November of 2008, 688:1-6. Exhibit 277, neither the AIC nor the Chief Medical Officer or other licensed provider were consulted.  688:9-25.  As a result, the IWD did not have his hearing aids returned to him for over two months.  687:17-22.

As discussed above, the AIC was not notified of matters relating to the provision of or the repair of DME.  Her office was also not given notice when DME was removed and would first learn of the removal through a grievance filed by an inmate.  673:4-11. The AIC facility audit required facilities to produce information when inmates were denied access to DME.  689:7-9, Exhibit 129.  The audit indicated that there was no

formal tracking of DME confiscations.  692:1.  Furthermore, Clinical Services admitted that it did not track the removal of DME.  691:15-22, 692:2-5, Exhibit 287.

    2.  **Providing IWDs in need of assistance with daily life activities appropriately and effectively trained aides.**

Pursuant to Section XIV of the RP, DOC is required to provide IWDs who require assistance with everyday activities appropriate and effectively trained aides, who are accountable for the performance of this service. [19]   The AIC is required to track the assignments of all inmate aides assigned to any IWD and Clinical Services shall report to the AIC upon learning of any IWD in need of such assistance.  DOC is required to provide appropriate training to inmates designated as aides.  Inmates with histories of violent behavior or theft will not be designated as inmate aides.

As with any individual with a disability, inmates with disabilities present different levels of need for accommodation with respect to performing daily life activities.  To address the unique nature of the daily life activities, the population, and security concerns within the correctional setting, Section XIV of the RP provides for a process whereby IWDs who cannot perform daily life activities will be provided assistance by other inmates so that they too may function in their daily life activities.

To meet the varying needs of IWDs, three levels of OCAs were established.  OCA I, OCA II and OCA III.  493:4-6.  The job description for OCA I essentially

---

[19] DOC has adopted the term "Offender Care Aide" or "OCA" to inmates that are assigned in this capacity.  493:1-3.

requires pushing inmates in wheelchairs and some wheelchair maintenance.  493: 18-25,

494:3-5; Exhibit 425.  The job description for OCA II requires assistance with not only

pushing wheelchairs, but also assistance with recreational activities or required programs,

help with obtaining food, laundry linen change, assistance at med line and count.  494:6-

18, 495:3-7.  Also included in the OCA II position is assisting inmates with vision and

hearing disabilities.  495:10-12.  The job description for OCA III includes hygiene duties

such as cleaning cells, cleaning and disinfecting bed pans and urinals, assisting in

hygiene, transferring in and out of a wheelchair, identifying safety issues with DME, 495:

18-25, 496:1-2 and Exhibit 253.  OCA III assist the most severely disabled inmates.

496:6-10

### a.  History of Violence or Theft

To protect IWDs from being victimized, the RP specifies that those serving as

OCAs cannot have convictions involving violent behavior or theft.  497:5-7.  However,

there was a significant problem finding and training a sufficient number of qualified

inmates to perform the jobs of OCAs.  496:15-18.  This problem was not resolved as of

the end of the compliance period.  497:24-25.

According to the AIC, it is virtually impossible to find offenders in DOC that fit

the categories described by the RP to be OCAs.  496:19-20.  In an effort to meet the need

for OCAs during the last compliance period, the AIC proposed alternative criteria.  The

AIC proposed that rather than use the criminal behavior criteria, inmates would only be

excluded from OCA jobs if they had a Class 1 or 2 COPD conviction within a two year

period.  2514:1-15.  These parameters were included as qualifications in the job

descriptions.  2515:2516:3.

Despite the fact that the AIC's proposed qualifications were included in the job

descriptions for OCAs, this alternative criteria was not followed by DOC.  Instead, there

was a pattern of placing inmates with COPD convictions within a two-year period of time

in OCA jobs as of the compliance date.  2519:8-12, 2520:4-7.  In addition to not using the

criteria proposed by the AIC, DOC did not follow the requirements set forth by the RP to

exclude from OCAs those with convictions involving violent behavior or theft.  497:13-

17.  During the compliance hearing, DOC stipulated that many inmates designated as

OCAs had a history of violent behavior or theft.  500:2-5.  Specifically, inmates with

criminal histories of assault, sex assault, murder and kidnapping were designated as

OCAs and assigned to assist IWDs.  499:9-11; Exhibit 254, Bates No. 2060, 499:12-14;

Exhibit 254, 2096, 499:15-16; Exhibit 254, Bates No. 2111, 499:17-18, Exhibit 254, Bates

No. 2117, 499:19-20; Exhibit 254, Bates No. 2123, 499:21-25; Exhibit 254, Bates No. 2053,

5:00:12-16; Exhibit 254, Bates Nos. 2245, 2248.

### b.  Failure to track OCA assignments

During the compliance period, DOC did not maintain an accurate method by

which OCA assignments were tracked.  The importance of tracking such assignments is

to ensure both that IWDs receive assistance on a consistent basis, and that the proper

level of OCA is assigned to meet the needs of the IWD.  DOC maintained a list of OCA

assignments, referred to as a "Historical" list; Exhibit 254.  In addition, each facility maintained "Cell House" lists, which also documented OCA assignments.  Exhibits 253, 255, and 257.  A comparison of the Cell House Lists maintained by facilities and the Historical List maintained by DOC demonstrates significant discrepancies in the records.  During the compliance hearing, the AIC confirmed these discrepancies.  561:22-562:1.

A comparison of DOC's "Historical" list with the "Cell House" lists provided by SCF and FLCF, where most of the severely disabled inmates in DOC are placed, demonstrates that IWDs are shown to have been assisted by conflicting OCAs during the same time periods.  Others are shown to have been assisted by an OCA on one list and not assisted by an OCA on the other list.  Similarly, IWDs listed as requiring assistance from an OCA on one list are not identified as receiving the same assistance on the other list.  *See* Appendix 9.

A comparison of FLCF's "Cell House" list with DOC's "Historical" list demonstrates significant discrepancies between those identified as needing assistance from an OCA by FLCF and those documented by DOC as needing the same assistance. A sample of fifteen  (15) IWDs recorded as needing OCA assistance by FLCF do not appear at all on DOC's "Historical" list.  523:13-18.  Similarly, a comparison of Cell House lists provided by CTCF demonstrates discrepancies between IWDs in wheelchairs that were reported to have received assistance from an OCA in March of 2009 but not

reported as having received the same assistance in April of 2009. 579:10-15. *See* Appendix 10.

Finally, a comparison of the Cell House lists provided by FLCF, SCF and CTCF demonstrate problems with documenting OCA designations.  A sample of twenty-seven (27) inmates designated by the facilities as OCAs are not documented as such on DOC's "Historical" list. *See* Appendix 11.

The discrepancies exhibited between DOC's "Historical" list and the "Cell House" lists of three designated facilities demonstrate that DOC could not verify whether an IWD was actually receiving assistance from an OCA, who the OCA was, and the time frame in which the OCA was designated, if at all, to the IWD in need of assistance.  This issue is also demonstrative of the lack of communication between the office of the AIC and the individual facilities, discussed in detail under Core Purpose One.

### c.  Inadequate training

The RP requires DOC to provide appropriate training to inmates before designating them as an OCA and placing them in an OCA assignment.  However, in some cases, inmates requiring assistance with daily life activities were not assigned OCAs with the appropriate training or certificate.  For example, IWD Manka is mobility disabled, has an upper extremity disability and requires a full-time pusher aide to assist with writing, activities of daily living, and pushing.  543:11-18; Exhibit 407.  Manka requires an OCA II but was assigned Martin, who is an OCA I.  543:19-23.  Exhibit 254.

IWD Salazar, who requires assistance from an OCA II, was being assisted by inmate Flores, who had not even received training for OCA I.  606:8-17, Exhibit 259.  IWD Gilley is in a wheelchair and requires assistance from a level III OCA, however, he was assigned Adams, who only has a certificate for OCA 1.  585:20-22, 587:7-21, Exhibit 254.  IWD Salazar, who is vision impaired and requires assistance from an OCA II, was assisted by Quezada, who was not trained as an OCA.  594:2-16, Exhibit 266.  IWD Culp, also vision impaired and requiring assistance from an OCA II, was assigned Spinks, who only has the OCA I certification.  596:12-597:12.  IWD Williams, a double amputee in a wheelchair, requires assistance from an OCA III, however, he was assigned Stevenson, who is only an OCA I. 599:18-20, 600:9-11, 601:11-17, Exhibit 254.

Inmates are required to complete a four (4) hour training and receive both certificates for OCA Levels I and II prior to being designated as an OCA III.  During the compliance period, inmates were given training certificates for OCA level III without having first received training certificates for OCA levels I and II.  For example, inmates Mercado, Robbins, Jackson, and Edmonds all received training certificates for OCA III without first having received certificates for OCA I and OCA II. 563:4-7, 563:20-564:8.

The AIC acknowledged a systemic problem in providing IWDs with aides that are qualified and trained and that the problem has existed since the RP was signed and it has not been resolved.  607:12-19, Exhibit 258.  The office of the AIC received many complaints and grievances, from inmates and staff, regarding OCAs.  618:18-20.

**3. DOC shall provide appropriate accommodations to inmates with diabetes to ensure access to comparable programs, services, and benefits provided by DOC.** [20]

The 2008 Stipulation required that DOC designate all inmates with diabetes as "class members."  Accommodation Resolution forms were to be revised to indicate that inmates with diabetes would receive the following "accommodations as needed":

   a.  Access to fingersticks upon request;
   b.  Timing of meals with insulin;
   c.  Where hypoglycemia or occurrence of a hypoglycemic event is documented, access to housing in a cell with a call button if the lock on the cell the inmate is currently housed in is controlled by CDOC.
   d.  When possible, access to bathroom breaks during visitation and during programs and/or alternative methods to accommodate such need;
   e.  No co-payments related to treatment for diabetes or diabetes-related conditions excluding the annual $5.00 annual charge assessed to all CDOC inmates;
   f.  Access to after-hour testing kits; and
   g.  Access to all benefits, services and programs offered at CDOC, regardless of diabetes, including progression to lower level security facilities; and
   h.  Annual education on diabetes.

*See* 2008 Stipulation #25.

In November of 2008, a ninth standard accommodation was added by the AIC. 422:8-17.  The AIC added  that diabetics would be provided appropriate medications, as determined necessary by medical services.  95:2-22.

As of the compliance date, ARs had not been revised to include these accommodations.  Inmates with diabetes did not receive revised AR forms with the

---

[20] The treatment and care of inmates with diabetes and the underlying medical data to support the need for these accommodations is discussed in detail under Core Purpose 4.

accommodations required by the Stipulation for over a year after the Stipulation was entered.  472:9-474:4, 233:6-18; Exhibit 44.

Importantly, until an AR is issued, neither inmates nor the facilities know whether an inmate is disabled and in need of accommodations.  219:4-10.  Notably, it was a recurring problem that these accommodations were not provided to inmates during the intake process, as required.  94:6-12.  The AIC never received verification that this problem had been resolved before the end of the compliance period.  95:2-22. Accordingly, during the relevant compliance period, DOC failed to provide reasonable accommodations to inmates with diabetes.

Plaintiffs expert, Linda Edwards stated in her report that there were still problems relating to accommodations for inmates with diabetes, including 1) the timing of food with medication, 1920:13-1923:4, 2)  access to glucose tabs or food to treat hypoglycemia, 1925: 2- 1926:19, 3) a lack of appropriate foot care and shoes for diabetic inmates with neuropathy, 4) emergency call buttons and blood glucose monitoring for those with frequent and severe hypoglycemia, 1949:14-1950:5,  5) medical lines and food lines that were reasonable in length, 1920:13-1923:4, and 6) lapses in the renewal of prescribed medication and obtaining them when transferred.  1950:7-1952:25; Exhibit 33, p. 1-2.  Examples of these deficiencies are outlined below:

### a. **Shoes**

According to the AIC, complaints from diabetics about not receiving soft-soled shoes as an accommodation was the "No. 1" complaint that her office received. 422:23-423:13.  Ms. Edwards stated that the issue of appropriate foot care and shoes for diabetics with neuropathy was the most dominant issue in every facility that she interviewed inmates, 1927:15-21.

The AR regulating property requires that healthcare appliances are ordered and approved by Clinical Services; it does not mention the AIC.  2957:12-2958:1; Exhibit Y. However, the AIC would have authority to order medical tennis shoes for diabetics. 2959:1-4.  The AIC would not grant those shoes to the inmate unless the CMO determined they were medically necessary.  250:12-251:18.  Exhibit 350.  The medical standard for shoes is ulcers or a history of ulcers or a deformed foot.  427:9-12. Illustrative of DOC's problems with diabetic foot care are the following examples:

1)   Jose Romero is a diabetic with ongoing problems with his feet.  Over a four-month period of time, DOC documented problems with his feet, including, but not limited to: dry superficial scaling and dried blood in some areas, 4781:2-5, an area on the lateral side of the right heel that was cracked open and bleeding, 4781:6-13, open areas less than 1 centimeter, the skin appeared to have been taken off in an area 2 cm in circumference and a fluid-filled lesion and blisters on the heel. 4781:14-21, 2 abraded ulcers of approximately 2-3 centimeters, 4781:12-17.

Exhibit 736.  Despite the fact that Mr. Romero had had ulcers, which would meet the medical standard for requiring special shoes, DOC records noted "Scheduled staffing as in ADA, no money, no soft shoes."  The records also note, "He does to wear both shoes at lateral margins.  He is ADA.  Explain to inmate medical is not in the shoe business."  4783:4-9, 4783:23-4784:4.

After Mr. Romero was denied shoes, the condition of his feet continued to deteriorate.  4785:1-16.  Four months after Mr. Romero complained about his feet, DOC records for May 4, 2009 indicate, "Checked patient's bank account.  He does not have any source of money coming in from the community.  We'll see if we can purchase him some shoes downtown in order to get his feet to heal up."  4785:17-21; 4786:7-20.  On May 18, 2009, Romero still had bleeding from his ulcers, and he said the Vaseline, gauze dressing pulled off the skin when he takes off the dressing for showers.  4786:21-25.  Finally, on May 29, 2009, he received a pair of soft-soled shoes.  4787:18-22.

2) Inmate O'Donnell filed repeated grievances beginning in June of 2008 addressing the fact that he had not been provided appropriate shoes.  In his grievances, he specifically identified the problems he was having with his feet including bone spurs and neuropathy.  424:20-25; Exhibit 400; Bates No. 1059.  His grievance was denied because a formal determination of his screening had not been completed by the AIC office.  He was instructed to "address his needs with

Clinical Services." 426:2-8; Exhibit 400. In response to his grievance filed with Clinical Services, O'Donnell was told "unless there is a Montez accommodation, medical does not provide shoes." 426:17-21; Exhibit 400. In response to his step 2 grievance in which he described the condition of his feet, Clinical Services responded that by clinical standards he did "not meet or have evidence of medical criteria to authorize shoes," but had the option to purchase tennis shoes from canteen. 426:23-427:8; Exhibit 400.

3) Charles Russell is an insulin-dependent diabetic, who receives three shots of insulin a day. 1292:5-12. He has diabetic neuropathy, which affects his feet. 1293:11-20. Every 3 or 4 months, the toenail on his right foot comes off completely and the toe bleeds for 3-4 days. He has not been provided shoes for his diabetic condition. 1293:21-1294:1.

4) Charles Simpson is an insulin-dependent diabetic who takes two shots of insulin a day. He also takes Glucophage and medications to stave off complications of diabetes. 1486:4-16. In April of 2008, Simpson was identified at DRDC as needing medical shoes for his diabetes, but did not receive them at DRDC. He did not receive his medical shoes until five-and-a-half months later after he moved from DRDC to Arrowhead to Fremont to Sterling. 1487:10-25.

### b.  Timing of meals with insulin

DOC has not implemented a system to ensure that the timing of meals with the administering of insulin meets the needs of inmates with diabetes.  If a diabetic is on short-acting insulin (regular insulin) it starts working in 30 minutes, and peaks two to four hours later.  If there is a significant delay in between the insulin injection and having access to food, hypoglycemia can occur.  (This does depend on where the diabetics' blood sugar starts when they get their insulin.)  Fast-acting insulin starts working in 15 minutes and peaks about an hour later, so diabetics on that type of insulin need to eat very quickly.  1922:20-1923:4.

Ms. Edwards testified that inmates had indicated to her that the time between getting medications and being able to eat would be as much as 2 hours.  This was happening at more than one facility.  1919:16 -1920:21.   At some facilities, diabetics on insulin would be called to med line first.  This could mean they were waiting the longest to go eat, or they were actually sent back to their cells before they could eat.  1921:2-14. Inmates waited as much as 30-60 minutes in the med lines 1921:15-19.  Often times, after long durations in med line, inmates would not have enough time to eat once they reached chow.  1922:8-12.

The clinical standards for DOC do not contain a policy or procedure for providing insulin or diabetic medications or food during lockdown periods at facilities.  4608:12-16; Exhibit 560. In June of 2009 there was a lockdown at CTCF.  3105:25.  Although

inmates with diabetes are supposed to be given the accommodation of "timing of meals with insulin," during the lockdown, one diabetic was given insulin but then had to wait five hours before he was given a meal.  During the same lock down, he had to wait another three hours between his insulin and meal. 3106:1-3107:15.  The inmate's grievance with respect to this situation was denied because "no emergency was suffered." 3107:21-25; Exhibit 696.  A delay in five hours between insulin and food does, in fact, create an emergency situation.  3109:21-23**.**

### c.  <u>Lapses in prescription medications</u>

With respect to the issue of lapses of medication or the failure to receive medication when transferred, Ms. Edwards explained that this was a complaint that she heard at almost every facility visit that she made to speak with the inmates.  1950:13-1951:9.  The AIC also received a fair number of complaints about the fact that insulin dependent inmates were forced to go without medications for periods of time because either their prescriptions had lapsed or the facility was out of their insulin.  454:19-455:1.

### d.  <u>Call buttons</u>

Pursuant to the 2008 Stipulation, an inmate with a documented history of hypoglycemia who is in a cell that locks is entitled to a call button in that cell.  If such an inmate is in a locked cell without a call button he is supposed to be offered the right to be immediately relocated.  3268:19-3269:2.

In the fall of 2008, Gary Golder advised Richard Weems, Associate Director for Facility Management Services, that there was a "problem" and that some of the housing units did not have intercom systems.  3259:5-18.  It was discovered that there were cells without intercoms at Centennial, Buena Vista, and Territorial.  3260:5-7.  He knew that they had an issue with diabetics and certain facilities where they did not have intercoms.  3261:18-19.

Mr. Weems testified that there was a delay in getting the systems up and implemented and running.  3264:8-10.  He first became aware of the call button problem in the fall 2008.  3267:18-21.  The inmates did not receive their call buttons until after March 2, 2009.  3268:1-7.  It was close to six months from the time  Mr. Weems was first involved until the actual call buttons were received.  3271:4-7.

To illustrate the problems caused by the delay in the installation of call buttons, testimony with respect to Juan Maldonado (DOC #81249), an insulin-dependent diabetic with a history of hypoglycemic episodes was presented.  318:3-16; Exhibit 157.  Maldonado was transferred to Centennial Correctional Facility, a non-designated facility, in August 2008.  318:17-25.  He was placed in a cell with no call button, and grieved that placement due to his history of hypoglycemia.  The AIC office received his grievance on September 17, 2008.  319:9-18.  As of September 18, 2008, the AIC office knew that Maldonado had a history of hypoglycemic episodes.  320:21-24.  Maldonado filed a grievance on September 16, 2008, noting that on September 14, 2008 he "had a diabetic

episode, fell out, and hit" his head.  He again complained about the lack of a call button in his cell.  321:5-18; Exhibit 157.

On October 22, 2008, the AIC office granted Maldonado's grievance, and noted that the call button issue was "currently being addressed" and that the AIC office was "awaiting the guidance of executive staff regarding the implementing of this stipulation." 323:3-13; Exhibit 157.  The AIC office was awaiting Mr. Golder or Mr. Weems' further actions.  At the time, Golder was Director of Prisons and was Cathie Holsts's supervisor. Mr. Weems is the head of Facility Management Services.  322:11-21; 323:14-19.

Under the 2008 stipulation, Maldonado had the right to be immediately relocated, but he was never offered the option to move to a different facility.  324:4-12.  The AIC office's hands were tied by the fact that it had to wait for executive staff to take further steps before something could be rectified.  The AIC office had no ability to make a purchase order to get him a call button.  324:13-25.

On January 8, 2009, the AIC office received another grievance from Maldonado, which was signed on December 22, 2008 and said, "I have been in CCF since August 26, '08.  Due to Montez versus Owens, I am entitled to be moved to a cell with a call button since I have a history of hypo-hyperglycemic episodes."  326:8-17; Exhibit 157.  His situation had not been remedied in the previous four months.  326:18-22.

Maldonado submitted a fourth grievance on January 25, 2009, which was received by the AIC office on February 4, 2009.  330:11-16; Exhibit 157l.  In that grievance, he

noted that "on 1-17-09 I fell out again and hurt my neck.  This is the second time I have lost consciousness due to my diabetes.  I awoke in a pool of my own blood.  I called or shouted several times for several minutes until an officer heard me to come to help.  I do not know or understand your policy at CCF and why I am not in a cell with a call button." 330:17-331:1; Exhibit 157.

The AIC acknowledged that Maldonado could have been moved during the five month period during which he did not have a call button.  334:14-22.  But as of February 2009 there were still no call buttons and it did not appear that there was a date when the issue would be "sorted out."  335:19-22.

On April 17, 2009, seven months after the AIC office first learned of the problem and nearly eight months after Maldonado first requested a call button, Maldonado finally received his call button.  340:17-20; 344:18-345:4.

**e.  <u>Diabetes education for inmates</u>**

Both the RP and the 2008 Stipulation requires that inmates with diabetes receive education on the management of diabetes.   The diabetes education provided to inmates during the compliance period was deficient. Sharon Wallick, a diabetic educator charged with providing this training, testified that she was responsible for providing an annual one-hour presentation to inmates with diabetes.  3863:17-25.  Ms. Wallick testified that the one hour she was allotted to teach diabetes education to the inmates was not a sufficient amount of time.  3891:6-20.   Despite the importance of the requirements of the

RP and the Stipulation, the AIC was not involved with and did not monitor the diabetic education provided to inmates.  1088:18.

4. **Provide appropriate accommodations to inmates with hearing disabilities to ensure effective communication.**

DOC is required to provide appropriate accommodations for inmates with hearing disabilities including the adoption and implementation of policies that ensure IWDs will be provided effective communication with respect to public service announcements and reporting instructions and appropriate access to telecommunication devices for the deaf. RP Section X (B).

a. **Assistance with public address announcements and reporting instructions**

Section XVIII (B)(2) of the RP requires that each facility adopt an Implementation/Adjustment (I/A) or Operational Memorandum (O/M) that identifies a position that is responsible for ensuring that effective communication is made with inmates with disabilities regarding public address announcements and reporting instructions.  In the opinion of the AIC, DOC's public address announcements are "garbled and bad."  They are especially difficult to understand when in a large auditorium, the cafeteria, and during activities where there are a lot of people.  885:13-21. The AIC further acknowledged that even if an IWD has been determined to need two hearing aids and their Accommodation Resolution Form includes an accommodation for

assistance with announcements, the IWD may not actually be provided assistance.  873:5-17.

Responses from the facilities to the AIC audit requesting information with respect to this requirement revealed that facilities were not in compliance with the mandates of Section XVIII (B)(2).  In general, facilities did not identify any one particular position, as required by the Remedial Plan.  Rather, facilities designated general categories of staff such as "housing staff" or "job supervisors."  Accordingly, the issue of accountability from not specifying a position was prevalent.  876:2-8, 877:8-10.  The AIC identified that there were problems with the lack of formal policies at the facility level as well as with DOC's ability to provide actual documentation that offender care aides and staff were actually providing assistance in a meaningful way.  892:9-15.

After reviewing the AIC audit completed by the facilities, the AIC determined that some facilities did not submit any policies that required staff or case managers to assist hearing disabled inmates.  420:20-421:21; Exhibit 487. The AIC received a large number of complaints regarding effective communication from the hearing disabled inmates.  892:12-15.  These included complaints regarding the messengers and public address announcements.  891:24-892:7.

CTCF houses a large majority of deaf inmates.  889:3-6. During the compliance period, CTCF was not properly informing the deaf inmates of all public announcements as required. 174:10-175:11; Exhibit 585; Bates No. 2434.  The AIC confirmed that the

policy at CTCF with respect to notification of announcements to hearing disabled inmates was incorrect because it only provided that inmates would be informed of unusual announcements rather than all announcements.  890:8-13, 891:5-15.  Furthermore, the policy utilized by CTCF for informing inmates of PA announcements was unclear because it did not identify one particular position, as required by the RP, to fulfill the responsibility, thus making accountability difficult to establish.  2552:16-21; Exhibit 236. As of the compliance date, informing inmates with hearing disabilities about PA announcements was not a traditional part of the case manager job.  2553:13-20.

As a result of CTCF's failure to comply with the RP, inmates with hearing disabilities filed ADA grievances specifically addressing the fact that they were not receiving notice of announcements.  These included grievances filed by Inmate Ayotte because he was not receiving sufficient notice of the PA announcements in the gym at CTCF.  889:2-17; Exhibit 292, and Inmate Wiegand addressing the fact that inmates with hearing disabilities were not being informed of all the announcements over the PA at CTCF.  889:18-890:7; Exhibit 585.

In response to the facility audit conducted by AIC, SCF admitted that it did not identify one position responsible for providing information to individuals with hearing impairments about public announcements, alarms, public address and reporting instructions   878:1-7; Exhibit 291; Bates No. 18852.  Sterling was operating under the policy that inmates in need of assistance with communication should only be notified in

events of extraordinary circumstances, emergencies, or abnormal announcements. 881:13-16; Exhibit 651.  The AIC agreed that this was an improper policy.  888:21-889:1.

SCF further suggested that there were not any hearing disabled inmates that required an OCA for the duties of providing hearing communication.  878:8-12; Exhibit 291; Bates No. 18854.  However, during the same timeframe, Inmate Marsh, identified as being hearing disabled, was at SCF with inoperable hearing aids.  Inmate Allgyer was at SCF and had not been provided the two hearing aids for which he qualified.  Allgyer complained about not having received his aids and it had not been determined whether he needed assistance with announcements.  883:4-25, 884:21-885:10; Exhibit 649.  Finally, Inmate Boldin was at SCF and was determined to require two hearing aids.  Boldin experienced a five (5) month delay in receiving his hearing aids (referenced on Appendix 7).  During this time, he did not receive any accommodation of assistance with announcements.  886:17-887:1, 887:23-888:5; Exhibit 656.

SCF also admitted that it did not identify any one position concerning the identification of inmates with difficulty reading and/or communicating in writing being provided with reasonable access to forms and procedures.  875:11-22; Exhibit 291; Bates No. 18848.

In response to the AIC Audit, the La Vista Correctional Facility and the San Carlos Correctional Facility admitted that they did not have a policy in place to address

persons responsible for providing assistance and equipment necessary to those who may need assistance with written communication.  873:22-874:9; Exhibit 550.

Plaintiffs' expert, Larissa McClung, testified that inmates were not being properly notified of overhead announcements and were not being assisted by "Offender Care Aides" when appropriate.  2098:21-2100:4, 2100:14-2101:16, 2328:3-2329:5.

### b.  Access to telecommunication devices for the deaf and telephones

As a reasonable accommodation for inmates with hearing disabilities, Section X(B)(2) of the Remedial Plan requires that telecommunication devices for the deaf and telephones be made available to all inmates designated within the class of hearing/speech impaired inmates.  The 2008 Stipulation required that TTY machines be maintained in an accessible area that eliminated case manager involvement in accessing the TTY machine. 2008 Stipulation #11.  The Stipulation was entered because there was a problem with inmates with hearing disabilities not having equal access to telephone services.  1060:13-22.  While inmates that were not hearing disabled had access to the regular CIPS telephones, inmates with hearing disabilities could not access a telephone without coordinating use of a TTY machine through their case managers.

DOC intended to accomplish the requirements of Stipulation 11 by installing TTY kiosks at facilities, which would allow for independent access to a telephone for inmates that require such an accommodation. 1021:13-20.  Stipulation 11 could not be accomplished without the installation of TTY kiosks.  1030:19-22.

The AIC was not initially responsible for the implementation of Stipulation 11 but took it upon herself towards the end of the compliance period because she became concerned that the installation of TTY kiosks would not be completed on time.  1022:14-20.  The AIC recommended that TTY kiosks be placed in each living unit and in other areas where inmates are housed to avoid issues security issues in facilities where certain populations cannot mix.  1022:21-1023:11.

The AIC expressed her concerns about the status of the TTY kiosk project to Shoemaker and Golder and documented her concerns in an email sent in March of 2009.  1025:4-14; Exhibit 363. Although the AIC had recommended placing TTY kiosks in each living unit, Shoemaker and Golder were reluctant to do so and DOC did not proceed with the installation of the TTY kiosks in accordance with the AIC's recommendation.  1023:23-1024:4, 1025:18-19.  The AIC also met with Zavaras and specifically told him about her concerns regarding the TTY kiosk project.  1028:13-16.

In March of 2009, the AIC was receiving emails from facilities with concerns that there were not an adequate number of TTY kiosks.  Specifically, there were problems at SCF, YOS, LVF, SCCF, and more.  1026:20-1027:3; Exhibit 363.

As of April 24, 2009, training on the use of the TTY kiosks had not been provided to all inmates with hearing disabilities entitled to the accommodation.  1037:7-23.  Sign language interpreters were supposed to be provided to inmates that use ASL as a means of communication for the training on use of the TTY kiosks.  However, DOC conducted

training without an interpreter for an inmate that specifically required an interpreter for services.  1058:19-22.

Also as of April 24, 2009, there were approximately 160 inmates in the process of being screened for final determination of disability.  1038:11-13. These inmates may have been waiting a significant period of time for their disability determination.  1038:23-1039:2; Exhibit 178.  As of the same date, at least 14  inmates had been determined hearing disabled but did not have access to the TTY kiosks. 1040:6-1044:3; Exhibit 178. Some of these inmates also experienced significant delays in the repair and replacement of their hearing aids.  While without their hearing aids, these individuals only had access to the regular CIPS phones because they were not provided the accommodation of access to the TTY.  1048:9-22.

TTY kiosks were not fully installed, other than at CTCF, until April 30, 2009. 3495:7-10; Exhibit F3.  During the relevant compliance period, inmates who did not have access to TTY Kiosks at facilities other than CTCF were limited to use of the TTY phones, the use of which had to be scheduled with case managers, prescribed by the regulations set forth in AR-850-12.  3495:12-16.  AR 850-12 stated that a TTY will be connected to a DOC employee phone, funding for the call must be verified with the offender's case manager, and inmates wishing to place a TTY call had to rely on their case manager to make arrangements.  3494:10-22; Exhibit A3.

During the relevant compliance period, facilities designated to house inmates with hearing disabilities continued to operate under AR 850-12 and facility I/As that did not comply with the requirements of Stipulation 11. Those facilities included SCF, the Canon Minimum Centers, LVCF, SCCF, and BVMC.

In response to the AIC audit, Sterling provided AR 850-12, effective in 2007, as the policy utilized for access to TTY. 1032:18-1033:8; Exhibit 178. Under this regulation, hearing disabled inmates at SCF are required to contact their case manager or a staff member in order to place a call using the TTY. 1033:24-1034:3. Inmates without hearing disabilities at SCF have access to a regular CIPS phone without having to seek case manager assistance. 1034:4-6.

In response to the AIC audit, the Canon Minimum Centers indicated that TTY machines are available for use through an offender's case manager and that as of April 30, 2009, TTY kiosks had not been installed at any of the minimum center facilities. 1035:3-15; Exhibit 496.

In response to the AIC audit, the San Carlos and La Vista Correctional Facilities produced an Implementation Adjustment for AR 850-12 indicating that the TTY is stored in the shift commander's office. 1035:16-1036:6; Exhibit 501. The Buena Vista Minimum Center provided a response indicating that the TTY machine is maintained in a secure area in the BVCC business office. There is no explanation as to how an inmate would access the BVCC business office with or without staff involvement. 1036:13-24;

Exhibit 507. Thus, access to the phones for the hearing disabled at these facilities was not offered on the same basis as to those without disabilities.

### 5. Provide accommodations to IWDs during transport

The special needs of inmates with disabilities shall be accommodated during transport and special health care aids and appliances shall accompany the inmate upon transfer. RP Section XXIV.

According to the Central Transportation Unit ("CTU") supervisor, 41,000 inmates are transported in any given year. However, no records are maintained to document the transport of IWDs. 3680:20-3681:2.

DOC has two Administrative Regulations with respect to transportation. One AR is for the facilities to regulate operations for coordinating their own emergency transports and unscheduled transports when CTU is not available. 3682:21-3683:3-22. CTU does not oversee these types of transports. 3684:2-4. The other AR regulates CTU operations. Exhibits H-7 and I-7.

Section IX(A) of the RP requires that the AIC be made aware of and consulted prior to the transfer of an IWD to a different DOC facility in order to ensure that the inmate has appropriate assistive devices for the transfer and that appropriate transfer methods are employed. However, there is no requirement in the ARs regulating transport that the facilities or CTU communicate with the office of the AIC prior to transporting an inmate to determine whether they need any particular or special accommodation.

3686:2-10; Exhibits H-7 and I-7.  For example, IWD Huebschmann, who is hearing disabled in both ears, was transported on at least five occasions from September 2008 through February 2009 without the AIC being notified of his movement.  404:9-407:5; Exhibit 153.  There is also no requirement in the ARs that CTU contact the office of the AIC if an incident occurs while transporting a disabled inmate. 3686:7-10.  CTU does not maintain a log to document transports.  If, however, a report is generated, it is not transmitted to the office of the AIC.  3686:13-19.

The AIC did not have control of transport of inmates with disabilities, except to ensure that they are transported in appropriate vehicles.  2459:23-25.  In a two (2) year period of time, the CTU supervisor only spoke with the AIC six (6) times to notify her of a transport and to seek clarification on cuffing an IWD.  3682:7-20.

The ARs do not address considerations about transporting inmates with disabilities, including those  in wheelchairs, diabetics that require insulin or have the need to urinate more frequently, or those that require accommodations for vision or hearing disabilities. 3687:2-8; 3690:13-21. 3689:9-14.  The ARs do not address the need to inventory DME prior to transport or the need to transport IWDs with their AIC files. 3686:21-3687:1, 3689: 4-8.  AR forms do not specifically provide for accommodations for diabetics during transport.  2496:22-2497:2; Exhibit X-10.

During transport, inmates with hearing disabilities had their hearing aids and hearing aid batteries taken from them.  391:23-392:7.  This occurred throughout the

compliance period and was not an isolated problem. 392:8-393:1. The AIC identified that

the removal of inmates' healthcare appliances and accommodations during transport was

a recurring problem and that DME would be missing when IWDs arrived at the location

to which they were transported.  825:11-18. The AIC acknowledged that this continued to

be a problem through May 1, 2009.

The failure to provide reasonable accommodation during transport may have

occurred more frequently because training with respect to the requirements of the RP

regarding the transport of IWDs never occurred.  The AIC brought this issue to the

attention of Golder and Shoemaker many times. 840:1-9.

The American Diabetes Association standards for diabetic management in

correctional institutions states that for all transfers between prison facilities, inmates with

diabetes should have their supplies and medications accompany them during the transfer.

That standard, however, is not found in DOC's clinical care standards or procedures for

transferring a diabetic inmate.  4607:20-4608:11; Exhibit 560.  Diabetic inmates on

transport from Canon City to Denver, which can last up to six hours, were not provided

any bathroom breaks.  1321:20-1322:1.

*Conclusion for Core Purpose Four:*

DOC failed to timely provide, repair and replace DME, failed to provide

accommodations in accordance with Orders of the Special Master, and failed to properly

document and track DME.  Furthermore, DOC failed to provide IWDs who require

assistance with everyday activities with appropriate and effectively trained OCAs.  OCA assignments and designations were not properly tracked, and inmates with histories of violent behavior or theft were designated as OCAs.

DOC also failed to provide appropriate accommodations to inmates with diabetes as required by the RP and the 2008 Stipulation to ensure access to comparable programs, services, and benefits provided by DOC.  Similarly, DOC failed to provide appropriate accommodations to IWDs with hearing disabilities to ensure effective communication, including the implementation of policies with respect to public service announcements and appropriate access to telecommunication devices for the deaf.

Finally, during the compliance period, DOC failed to take into consideration the special needs of inmates with disabilities during transport.  The AIC was not routinely notified when IWDs were transported and could not, therefore, ensure that they were properly accommodated.

**F.  Core Purpose Five:  Access to Benefits, Programs and Services of DOC on a Non-Discriminatory Basis**

Core purpose Five of the RP is focused on ensuring that inmates with disabilities have access to the programs, services and benefits of the DOC without regard to disability.  Plaintiffs submit that there are six material criteria provided in the RP that are required to satisfy this core purpose:

1. Ensuring that IWDs are allowed to progress through the prison system in the same manner as non-disabled inmates;

2. Providing jobs and programs at the designated facilities that are comparable to those at the non-designated facilities and ensuring that IWDs have non-discriminatory access to those jobs;

3. Providing proper medical care and treatment to inmates with diabetes;

4. Provide safe and effective evacuation procedures for IWDs.

5. Providing access to programs and services to inmates housed in an infirmary for long term placement, and;

6. Implementation of policies to ensure non-discriminatory access for inmates with disabilities to the Sex Offender Treatment and Monitoring Program ("SOTMP") offered by DOC.

**1. Inmates with disabilities shall be allowed to progress through the system in a manner consistent with that of inmates without disabilities and shall not be housed at higher security facilities solely because of their disability. Remedial Plan Sections V and VI.**

Since the inception of the Remedial Plan, and throughout the last compliance period, inmates with disabilities were not permanently housed at the lowest security level, minimum or minimum restricted, facilities.  If inmates with disabilities were allowed to progress to one of those facilities, their medical codes were raised causing them to be moved out of the facility. 350:8-17.  The AIC admitted this was a recurring situation. 363:6-9.

Pursuant to DOC policy, inmates with certain medical codes are ineligible to be housed at certain facilities, *including facilities specifically designated for inmates with disabilities under the Remedial Plan.*  Specifically, inmates with medical codes of M3 or

higher are automatically excluded from being housed in the lowest security work camps. These inmates are not allowed to progress through the DOC security levels because DOC has failed to provide sufficient medical staffing and services at these lower level facilities to allow the progression of inmates with disabilities.

Exhibit 697, Attachment A, is the matrix used by DOC for determining the medical codes, known as M-codes, that each facility will accept. In the matrix, if a "Y" is indicated, the facility accepts that M-code. If a "W" is indicated, inmates with that M-code can only go to that facility if they can convince Clinical Services to grant them a waiver. If there is a blank indicated, then the inmate with that M-code cannot go to that facility. 4559:7-4560:10. For example, BVMC [Buena Vista Minimum Center] is blank for M-codes 4 and 5, meaning inmates with those medical codes cannot be placed at that facility. 4560:7-10. Any inmate in a wheelchair or walker, who requires assistance with daily life activities, or is blind, is automatically assigned a M4 code. 4565:20-4566:13; Exhibit D-2, p. 5-7. Thus, none of those inmates may be housed at BVMC.

According to the DOC policy, if an inmate must receive a medication through med line, he will automatically have an M3 rating. Exhibit D-2, p.8-9 Thus, any diabetic on oral medication and any insulin-dependent diabetics are automatically assigned at least an M3 code. 4568:13-23; 4689:19-22. The camps—Camp George, Skyline, and Rifle—do not have med lines, 4569:1-6, thus, diabetics on any medication will not be placed at any of the camps. 4569:10-12; 4572:5-7. According to Dr. Frantz, an inmate with an M4

code cannot be placed at a work camp because "you just don't have the Clinical Services there because you anticipate that people are going to be healthy as a requirement to go there." 4743:19-4744:11. She testified that being at the Rifle work camp "didn't even feel like I was in prison." 4744:1-3. Although Dr. Frantz testified that inmates with an M3 code could be placed at a work camp if they get a waiver from Clinical Services, 4748:10-14, she also testified that inmates with a M3 code should not be able to go to a work camp, especially one like Skyline which does not have a medical clinic. 4685:15-4686:7. Although none of the level 1 facilities have clinical staff 24 hours a day, 2752:10-11, Shoemaker agreed that there are a number of available hospital emergency services in the vicinity of CCC and Skyline, another level I facility. 2938:12-2939:16. On the other hand, Sterling, which houses a majority of the inmates with diabetes, 4228:20-4229:1, also does not have a twenty-four hour medical care clinic. 2908:2-5.

Camp George West (CCC), a level 1 facility, is a coveted assignment for male inmates. 2930:14-18. The perimeter of CCC is not enclosed by razor wire. 2931:23-25. At CCC, inmates are not subject to controlled movement and have freedom of choice with respect to their activities. 2932: 6-9, 2933:8-10. CCC is the most sought after assignment in the DOC and inmates want to get to that lower classification because there are more job assignments that are off grounds. 2750:20-24. The good performance of an inmate while having the privilege of working on an off ground work crew is a factor taken into favorable consideration by the parole board. 2934:25-2935:4. 2751:11-13.

Although CCC is a designated facility for inmates with diabetes, a diabetic on medication cannot be placed at CCC without a waiver from Clinical Services.[21]  2936:23-2937:10; Exhibit 697.  In fact, during the last compliance period, every inmate with diabetes who was moved to Camp George West (CCC) was transferred out of that facility on the same day.  92:10-13; 90:24-91:10; Exhibit 140.  Exhibit 140 also shows that inmates with diabetes either do not get housed at the other Level 1 minimum facilities of Skyline, Rifle, Delta, or boot camp, or if they do, they get immediately transferred out of those facilities.  93:7-15.  In addition, no inmates with diabetes had ever been assigned to boot camp,  92:22-24; Exhibit 140, or have ever been placed in Youth Offender Services (YOS).  90:1-12; Exhibit 475.

Skyline, a level 1 facility located in the CMC complex, is a designated facility under the RP for each of the four disabilities.  4566:23-4567:3.  Pursuant to the clinical standards, Skyline will not accept an inmate with a M4 code.  4567:4-12.  Thus, an inmate with a disability who is in a wheelchair or a walker, is blind or has complications related to diabetes, may not be placed at Skyline.  4567:13-16; Exhibit D-2, p. 5-7.

Four Mile and Arrowhead, the other two level 2 facilities in the CMC complex, are also designated facilities under the RP for inmates with mobility, hearing, or vision disabilities, and those with diabetes.  4567:17-20.  Pursuant to DOC policy, however, M4s are not  allowed to be placed at Four Mile.  4567:24-4568:1.  Arrowhead can only

_____

[21] Diabetics can be placed at every DOC public and private facility.  995:2-5.

house inmates with an M4 code if the inmate receives a waiver from Clinical Services. 4568:2-12.  Arrowhead, however, does not have a med line three times a day.  4687:12-4688:1; Exhibit 154 (last page of exhibit).  Thus, an insulin-dependent diabetic who needed insulin three times a day could not be housed at Arrowhead.  4688:2-5.  Although Arrowhead is specifically designated as a facility for mobility disabled inmates, it is not equipped to house inmates in wheelchairs.  See below regarding Inmate Smith (Clinical staff informed AIC that ACC cannot house Smith, who is in a wheelchair, because he "has too many accommodations and they do not have offender aids to help him; that [ACC] is a work camp and not appropriate for somebody with MS in a wheelchair." 351:25-352:7.)

Throughout the relevant compliance period, it was DOC policy that insulin-dependent inmates could not be placed at any work camp other than the Delta Correctional facility.  3036:16-3037:2.  However, the Delta facility made it clear that it could not house insulin dependent inmates.  See below regarding Inmate Tenorio (Clinical staff at Delta informed the AIC that Delta does not house insulin dependent inmates and requested that Tenorio be moved.  464:2-20.)

In fact, to ensure that inmates with disabilities were not assigned to the lowest security facilities, the computerized intake system at DRDC was set up so that if an accommodation for a disability was listed for an inmate, the computer system automatically displayed "no assignment to camps."   86:8-88:1; Exhibit 480.

The evidence in this case is replete with examples of disabled inmates being excluded or moved from lowest security level facilities because of their disabilities:

Inmate Goetz, an insulin-dependent diabetic, has zero classification points, which makes him minimum custody level and eligible for the camps (Skyline, CCC, or Rifle). 1300:13-1301:3.  However, as a result of his medical needs related to his diabetes, if he were offered a position at Camp George West, he would not be able to go. 4688:14-4689:6.

Goetz is a digital fiber optic 3 technician.  He's an HVAC certified technician, holds a refrigerant's license, and is currently working on an electrical apprenticeship. 1302:1-4.  In November 2009, Goetz's case manager advised him that there was an opening for an electrician at Camp George West.  His case manager contacted the maintenance staff at Camp George West and they determined that Goetz met the qualifications for the position.  But Goetz was denied the position because he's insulin-dependent.  1302:5-18.  Goetz applied for, but was denied a position at Sterling as an HVAC technician because he needed a gate pass and was unable to get one because he is insulin-dependent.  1302:23-1303:8.  In 2007, Goetz asked to move to a minimum facility and was moved to Sterling minimum.  However, because of his medical code, he was put in the level 2 yard instead of the level 1 yard.  1303:13-18.  Goetz's reclassification sheet showed that because of his insulin dependence and his M-code, the only minimum facility at which he could be housed was Sterling minimum.  1303:19-23.  Exhibit 119,

Goetz's reclassification sheet from May 2007 showed Goetz with one point, which made him minimum eligible.  The Offender Services box in that form noted "Lateral to another level 2, M3."  A level 2 facility is a minimum-restricted facility, which is more restricted than a minimum facility.  1308:14-1309:12.  The case manager handling Mr. Goetz's reclassification stated that because Goetz was an insulin dependent diabetic, he could not be placed at any minimum facility other than Sterling.

Inmate Hager takes oral medications for diabetes.  Accordingly, he should be classified as an M3.  As an M3, he too would be excluded from camps.  4689:7-25.

Adolfo Sanchez is an insulin-dependent diabetic who was poor control (A1C of 9.8%). He was moved to ACC, a Level II, minimum restrictive facility, on January 9, 2009.  The next day, ACC staff informed the AIC that his M code should be raised and he should be moved out.  On January 27, 2009, his M code was raised to an M4 and he was moved to Sterling.  366:23-368:2.

Inmate Smith has MS and is confined to a wheelchair.  350:18-351:13; Exhibit 598.  In February 2009,  Mr. Smith was eligible for a move to ACC, which is a Level II, minimum restrictive facility that is designated for inmates with mobility disabilities, 352:11-13,  but the clinical staff stated that ACC could not house him because he "has too many accommodations and they do not have offender aids to help him; that [ACC] is a work camp and not appropriate for somebody with MS in a wheelchair."  Clinical also reported that ACC "only [has] one wheelchair that they keep in medical."  351:14-352:7.

Although the AIC authorized Mr. Smith's move to ACC, shortly after he arrived, ACC wanted him moved out because there were no offender aids and Mr. Smith had fallen. Mr. Smith was then moved to CTCF.  353:17-355:1. The AIC acknowledged that there were "issues" with not having aides at ACC and that she was unaware that ACC only had one wheelchair that was kept in medical.  355:6-17; 356:4-6.

Inmate Rhodes, a diabetic, was transferred to ACC in January 2009.  ACC almost immediately increased his medical code to an "M4" and wanted him transferred out of the facility. He was then moved to Sterling.  Mr. Rhodes had never been given an M4 code at DOC until he was sent to ACC.  Approximately 2 months after he was transferred to Sterling, he was assigned an M2 code.  360:8-362:24.

Inmate Jewell, a member of the hearing disabled class, qualified for a minimum level facility and his case manager stated that a lateral transfer to ACC "could be easily accomplished" or a progressive move to SCC could be made if Mr. Jewell got a waiver from the facility to take his M3 medical code or got his medical code lowered.  363:10-364:22; 366:1-6.  Instead of being moved to ACC or SCC, he was moved to Sterling. 366:16-18.

Inmate Martinez, a diabetic, was moved to Four Mile Correctional Facility (Minimum-R) on March 24, 2009.  The next day, Four Mile increased his M Code to a M4 and he was moved to Sterling.  368:12-369:4.

In October 2008, Camp George West automatically increased Inmate Cline's medical code when Clinical Services reviewed his Accommodation Resolution, without even a physical exam.  When his M code was increased, he was no longer eligible for placement at that facility.  369:12-370:7; Exhibit 148.

Although Mr. Ashby, a diabetic, qualified for ACC, he was placed at Sterling after being received at DRDC because they did not know his A1C numbers and did not know if he was controlled.  DOC could have taken a blood draw at DRDC to determine his A1Cs, but instead just placed him at Sterling.  The AIC office did not have any contact with Mr. Ashby after January 2009 when he suffered a "diabetic incident" requiring the use of a diabetic emergency kit.  370:8-371:25; Exhibit 325.

On October 21, 2008, diabetic Inmate Tenorio asked if he could be moved to CCC.  455:6-23; Exhibit 401.  Offender services responded that because his medical code was M3, Tenorio could not go to CCC, but could go to Delta.  455:24-456:6.  In December 2008, Tenorio was going to be moved to Delta, but Delta didn't want him because he was an M3.  462:8-20.  Tenorio filed a grievance in April 2009 about not being able to progress through the system due to the fact that he's insulin-dependent.  462:18-463:1.  He was moved to Delta for only a week, then returned to ACC due to his diabetes.  463:1-10.  In April 2009, when asked  why Tenorio was not allowed to move to Delta, Clinical Services said "he can't stay there because he's unstable."  But Ms. Reed (from the AIC office) indicated that she did not find any medical records indicating that

he was unstable.  In fact, the previous September, a provider had indicated that Tenorio was "well controlled."  463:11-20.  On April 17, 2009, Anna Cooper of the AIC office contacted Delta's Clinical Services and was informed that Delta does not have insulin-dependent diabetics there and that Delta's Clinical Services felt that they didn't have the medical staff to deal with that situation.  464:2-20.

Inmate Russell, an insulin dependent diabetic with classification points at 4, was eligible for a minimum facility.  He has not had the opportunity to go to a minimum facility and was told that he could not go to a minimum facility because he was an insulin-dependent diabetic.  1294:14-1295:6.

Inmate Reed, an insulin-dependent diabetic, receives insulin shots three times a day.  1371:15-23.  In February 2010, Reed was moved from the Buena Vista Correctional Facility to Buena Vista Minimum Center, because his points dropped to seven, which made him "minimum-eligible."  At that time, his medical code was M3.  1372:16-1373:6. On May 12, 2010, Reed was moved back to the Buena Vista Correctional Facility from the Buena Vista Minimum Center because his medical code was raised from M3 to M4. 1373:7-14.  During his time at the minimum center he had no disciplinary actions or write-ups and his classification points did not increase.  1373:18-23.  While at the minimum center, Reed was receiving all his insulin shots, and they were given by the same medical personnel as at the Buena Vista Correctional Facility.  1373:24-1374:8.

When Reed was moved back to the Buena Vista Correctional Facility in May 2010, he did not receive the same housing and other privileges he had when he was moved from the correctional facility to the minimum center in February 2010.  He lost his third tier designation, which gave him more free time, cell-to-cell visitation, the ability to go first to chow, and his place as first on the list to go to the dorms in another unit. 1374:9-22.  He previously had a job in the recreation department, which he did not get back.  1374:20-1375:4.

Inmate Simpson, a diabetic who suffers from neuropathy, went to Arrowhead in late May or June 2008.  1486:3-1488:8.  He spent only seven days there.  He first saw his case manager on the sixth day.  Simpson told his case manager about his foot condition and his case manager told him that if he was unable to work that he could not be at that facility.  By the next day, he was moved out of Arrowhead.  1488:1-25.  Simpson went from Arrowhead to Fremont where he spent four days.  He was then sent to Sterling. 1489:1-6.

**2. The designated facilities must offer a range of programming, jobs and vocational opportunities equivalent to that available at the non-designated facilities. Inmates shall not be denied access to educational, vocational and work programs based solely on a disability, and there shall be a comparable variety of jobs in every pay scale available to qualified IWDs.  RP Section XIII(A).  No later than July 1, 2008, the DOC shall implement a consistent, standardized procedure for inmates to obtain jobs within the DOC, and that all inmates considered for a job opening and the decision-making process for the inmate selected for the job shall be documented.  2008 Stipulation # 21.**

### a. Individuals with disabilities are not provided access to comparable jobs in a manner similar to non-disabled inmates.

The Remedial Plan requires DOC to offer inmates with disabilities placed in designated facilities a range of program, job, and vocational opportunities equivalent to those made available at the non-designated facilities.  It also requires that DOC not deny access to such programs based solely on disability.

First, DOC never conducted any audits to confirm that the designated facilities offered a range of program, job, and vocational opportunities equivalent to those at the non-designated facilities.  The AIC testified that she had never saw such an audit,  936:2-5, and DOC produced no evidence at the hearings to verify compliance with this requirement of the RP.

The AIC testified that she is aware that one of the Plaintiffs' concerns for years has been that inmates with disabilities are given menial jobs, such as the condiment flatware jobs, rather than the jobs that have vocational training.   936:19-937:18.  As a result of that concern, one of the sanctions imposed for non-compliance in prior years was the requirement that a standardized job procedure be implemented.  937:10-23.

As previously discussed in Core Purpose One of this brief, DOC produced an exhibit purporting to show non-discriminatory job assignments to inmates with disabilities.  However, as explained by Plaintiff's expert, Dr. Bardwell, the information contained in that exhibit was seriously flawed and did not establish non discrimination in job assignments.  Moreover, Dr. Bardwell determined through a chi-square statistical

analysis that (1) disabled inmates were disproportionately overrepresented in assignments to "condiment/flatware" jobs, and (2) mobility disabled inmates – and particularly wheelchair-confined mobility disabled inmates – were disproportionately overrepresented in assignments to "Program Code 11" ("Unassigned") at the lowest pay level (excluding inmates designated as "medically unassigned").  Dr. Bardwell concluded that the "adverse impact ratio" based upon this data was "indicative of possible discrimination." 2200:22-2205:3; Exhibit 675, pp. 9-11.  In fact, based on the data he reviewed, Dr. Bardwell opined that if DOC produced an accurate report of job placements, there would be many more areas in which job placement needed to be improved. 2224:7-12.

Despite the mandate of the RP that the AIC review the vocation and job assignments to ensure non-discriminatory placement under RP Section XIII(D), the AIC testified that she had never conducted or reviewed any such audit.  935:14-20. Furthermore, although the RP requires that the AIC and case managers work together to evaluate inmate placement opportunities based on disabilities as it related to educational, vocational or work programs, no such meetings were ever scheduled.  933:18-25.  As discussed below, the evidence shows that DOC continues to discriminate against inmates with disabilities in vocational and job assignments because of DOC policies regarding where inmates with disabilities are housed and the lack of accommodations provided to these individuals.

### i. Disabled inmates are excluded from coveted Correctional Industries programs.

The RP designates certain prison facilities at each security level for those inmates who have disabilities that require special placement. RP Section VI. There was no evidence produced by DOC that the designated facilities offer a range of programming, jobs and vocational opportunities equivalent to those offered at the non-designated facilities. The AIC never conducted an audit to determine whether the programming, jobs or vocational opportunities between the designated and non-designated facilities was comparable. 935:1-20. The evidence did establish, however, that the most coveted DOC jobs, those in Correctional Industries ("CI") were offered primarily at the Cañon Minimum Centers ("CMC") complex, a cluster of minimum (level I) and minimum restricted (Level II) facilities which includes Skyline, Arrowhead and Four Mile correctional facilities. Although these are all designated facilities, they are the very facilities from which inmates with disabilities are routinely excluded, as discussed above. *See* Remedial Plan, Section VI.

DOC's Correctional Industries developed and implemented a separate offender pay plan that includes jobs paying minimum wage or prevailing wage payments, as well as incentive bonuses. 3000:9-15. All CI jobs pay $0.60 a day with a bonus, depending on job site. 3000:18-19. Bonuses can be $200 to $300 a month which is a huge amount for an inmate, most of whom earn $0.60 a day. 3561:7-19. In addition, the CI jobs through the Prison Industry Enterprise that compete with the private sector are required to

pay inmates minimum wage, as opposed to the standard inmate pay.  3000:18-22.   Thus, the CI jobs and programs are coveted among the inmates.  Some of these programs also have vocational credits and give apprenticeships, and the inmate is learning a skill that can translate to a job upon release.  3651:24-3652:13.

On the other hand, inmates who do not have jobs are listed as "unassigned" or "ADA unassigned" and are paid $0.23 a day.  2999:21-23, 3000:3-5; Exhibit N-4. A previously used designation, the "medically unassigned" designation, became inactive as of January 2009 (admitted by way of stipulation from Counsel for Defendants, Elizabeth McCann).  916:6-24.  Medically unassigned was a program code for people who could not work, 918:7-13, and had a  pay  of $.23 per day.   930:18-20.  The "ADA unassigned" code  was enacted in late April 2009.   919:9 - 920:8.

A majority of the CI jobs are located in the CMC.  CMC facilities are work camps, with 1242 inmates and approximately 1300 jobs.  3633:17-21.  CMC is unique at DOC because it has the most CI jobs within the state, with a large variety of vocational jobs. CMC has the most CI jobs because the facilities at CMC are level 1 and level 2 facilities. 3652:14-21.

The CI jobs at Four Mile include a vocational culinary arts program, a wild horse program where the horses are trained and put up for adoption, a heavy equipment program which does a variety of jobs including assisting in the building of CSP2, dirt work, fencing, painting, and digging drainage ditches, and inmate wildfire crew program.

Four Mile also has a dairy program which includes a functional dairy that has everything from clerks to animal caretakers who do everything from calf birthing to milking, and the milk is then sold to the public.  Four Mile also has inmates that work at other facilities doing food-services and janitorial work.  3641:17-3643:14.

The CI programs at Skyline include a vineyard program which cultivates grapes for wine making, has four farm crews that grow produce and irrigates the land, has CI transportation which, among other things, prepares inmates to get a Commercial Driver's License (CDL) for truck driving, has the DOC recycling program, a goat dairy program, a fish hatchery, as well as inside work crews to support the facility.  3643:23-3645:11.

The CI programs at Arrowhead include a canteen which services almost all the DOC facilities state-wide, a service station program which maintains the fleet vehicles and where inmates can obtain their ASE certification to be mechanics, a fish processing program, 3645:13-3646:6, a vocational welding program, a greenhouse program where flowers and plants are sold to local markets, and includes a fly fishing rod program that allows inmates to build fly rods and sell them to the public.  3649:6-25.  Some of the fly rods are priced at up to $1200 and CI gives the inmates a bonus pay based on production. This type of bonus pay applies to CI jobs across the board.  3650:10-3651:6.

In 2008, Frank Ortiz became the case manager supervisor at the CMC.  In this capacity, he supervises all the case managers, is the chairperson of the classification committee which is the job board, and follows all inmate movement in and out of CMC.

3629:15-3630:6.  Although Mr. Ortiz testified that disabled offenders are placed in CI jobs, 3646:9-10, he could not recall any blind inmate placed at CMC during the relevant compliance period.  He knows that a couple of years ago, there was a deaf inmate who was periodically placed at CMC, but doesn't recall the inmate's name.  3658:19-3659:12. As discussed above, an inmate in a wheelchair or who is blind are automatically given an M4 code.  4565:20-4566:13; Exhibit D-2.  Thus, despite the fact that all of these facilities are designated under the RP to house inmates with disabilities, inmates in a wheelchair or that are blind cannot be placed at Four Mile or Skyline, and can only be placed at Arrowhead if they receive a waiver from Clinical Services.  Exhibit 697, Attachment A.

Despite the mandate of the RP, the AIC did not track whether or not inmates with disabilities were obtaining CI jobs.  2508:23-25.  And, despite the 2006 Stipulations requiring the AIC to notify Class Counsel of all claims related to discrimination in job assignments, the AIC did not investigate job discrimination complaints that were reported in employment surveys.  2512:22-2513:5.

*Disabled inmates were excluded from the dog program at Fort Lyons.*

As an example of the exclusion of inmates with disabilities from the coveted CI programs is the exclusions of these inmates from the dog program at FLCF.  Several DOC facilities have a dog program in which the inmates train dogs and are allowed to keep them in their cellhouses.  986:1-19.  The inmates like this program.  *Id.*  Ft. Lyon had such a program in 2008, 986:20-22, but IWDs were not being accepted into the

program.  987:1-3.  Since the inception of the dog program at FLCF in 2006, the only

disabled inmate who was hired was Inmate Hamilton,  3060:4-7, who is mobility

impaired but who could use crutches while training his dog  3061:25-3062:1; Exhibit

439, and needed no accommodations to participate in the program.  3062:6-12.

When the AIC learned that Inmate Collie, who is in a wheelchair, was not

accepted into the program, she began to press for answers as to why he was not hired, but

a non-disabled inmate was accepted.  She was told that Lt. Mills, who ran the program,

"does not wish" to hire Collie, that another inmate who did not require accommodations

was hired, and that CI did the hiring for that program. 987:7-988:19.   Within two weeks

of the AIC office exerting pressure to determine why Collie was not placed into the

program, the AIC was informed that Ft. Lyon had closed the dog program in October

2008.  989:2-16.  Although the supervisor of the dog program told the AIC that it was

closed due to the expense of the program, Shoemaker testified it was closed due to an

argument between the program supervisor and the warden.  3054:8-3055:11.

When the program started again in December 2008, 990:13-20, Collie was not

offered a job.  3064:3-17.  Although DOC produced a list of everyone who had applied

for and been turned down or the dog program,  Collie's name is not on the list, despite the

fact that there were positions open.   992:22-993:18.  Similarly, other IWDs who had

applied to the FLCF dog program but were denied were also not included on the list

produced by DOC.  For example, Inmate Spoor, who is in a wheelchair, requested to be

admitted to the dog program on three different occasions and was denied each time, although DOC did not have a record of two of his requests for admission into the program.  3065:1-3076:16

    Although the FLCF Warden represented that four of eleven dogs handlers hired by the program after December 2008 were "ADA," three of the four were not, in fact, inmates with disabilities.[22]  3077:2-3084:17, Exhibit W-3, V-3.  Inmates Loquist, Boyd, and Jordan were listed as disabled but were not disabled at the time of hiring.  When Mr. Boyd was in a wheelchair in 2007, he applied for the dog program and was told that he did not meet the qualifications because "the dogs they train require that he be able to stand, run, squat, *et cetera*."  3079:8-3082:17; Exhibit 687.

    As of March 23, 2009, the supervisor of the dog program at FLCF, Deb Stevens, made the decisions regarding who was selected for the program, rather than the classification committee as required by the new standardized job process.  3010:13-16; Exhibit W-3.  After being notified that the new job process was not being followed at FLCF, Shoemaker did not investigate the issue.  3011:4-8.

    The AIC admitted that as of the end of the compliance period, the staff at facilities had not grasped the concept that inmates with disabilities should be placed or referred for jobs regardless of their disability.  2506:18-22.  She also testified that she could not

---

[22] The fourth individual was Mr. Hamilton, who had previously been in the program.

confirm whether staff were actually trained that they were not to deny inmates with disabilities a job because of their disability.  459:2-18.

### ii.  Accommodations Denied for CI jobs

CI jobs are often beyond the perimeter of the facility gates,  3085:2-7, and  an inmate must obtain  a gate pass  to go outside the perimeter.  3085:9-16.  The "Offender Job Orientation" manual, which is the AR for the Denver Complex, lists the procedures that will be "strictly followed,"  including the fact that for CI jobs, inmates must wear state-issued boots.  There is no indication that an accommodation would be provided to an inmate with diabetes who wears soft-soled shoes to work in a CI position.  3086:1-3087:4-24; Exhibits P-3.  The administrative regulation for CTCF, I/A 300-23, requires that inmates assigned to outside grounds maintenance work crew will wear, amongst other things, "state issued boots."  3088:7-23.  There is no indication that any accommodations, such as soft-soled shoes for diabetics would be permitted for outside grounds maintenance work.  3088:24-3089:2; Exhibit Q-3.

The record contains examples of inmates who were denied jobs outside the perimeter because of their disabilities.  For example, Inmate Simpson is an ASE certified mechanic.  He applied for a job in the motor pool at Sterling but was denied the job.  The motor pool is located outside the facility fence and requires a gate pass.  Simpson applied for a gate pass but was denied one because he is an insulin-dependent diabetic.  1494:12-1495:15.

Similarly, Inmate Reed has been unable to participate in certain jobs because of his diabetes.  He wears soft-soled tennis shoes, which the facility will not permit him to wear outside the security checkpoint, where some of the jobs are located.  1375:15-1376:18.

Inmate Tenorio, an insulin-dependent diabetic, was refused a job in the canteen at Four Mile, which is outside the perimeter of the facility, because he has an accommodation for soft-soled shoes.  The case manager denied the job because he was concerned that Tenorio would wear his soft-soled shoes, even though Tenorio usually wore his state boots.  455:2-456:25.  In October 2008, Tenorio was denied a job in the greenhouse and it required the involvement of the AIC to inform the staff that  he could not be denied a job because of his disability.  457:5-9.

### b.  DOC did not implement a standardized job process during the compliance period.

As a result of the DOC's failure to achieve substantial compliance since 2003, the 2008 Stipulations required that no later than July 1, 2008, the DOC shall implement a consistent, standardized procedure for inmates to obtain jobs within the DOC, and that all inmates considered for a job opening and the decision-making process for the inmate selected for the job shall be documented.  2008 Stipulation # 21.  This stipulation was designed to implement and ensure the RP's mandate that inmates with disabilities be provided non-discriminatory job assignments.  RP Section XIII.  The evidence was clear that a standardized procedure was not implemented by July 21, 2008.  In fact, the new job

process did not even become effective until the eve of the compliance deadline, April 20, 2009, when the corresponding administrative regulation, AR 850-03, went into effect. 938:19-939:2; 3588:17-23.

Shoemaker was put in charge of implementing the new standardized job procedure. 2798:15-23. To the AIC's knowledge, no training was done on the standardized job process by April 2009. 946:3-7. As of the end of the compliance period, 1800 staff members still had to be trained on the new job procedures. 947:15-19. Although there was training conducted on a job procedure in August 2008, that training concerned a policy that was different that the one actually implemented by DOC in April 2009. This training did not incorporate a critical aspect of the implemented policy – that it would be the classification committee that determined which inmate was placed in which job, rather than the work supervisors. 2995:11-15. That training was also not consistent with the final Administrative Regulation with respect to the job process. 2995:25-2996:5; Exhibit X-3. Although Shoemaker testified that training on the new procedures was provided to the supervisors in April of 2009, 2997:10-12, no other training with respect to the implementation of the new job process was provided after that date to any other staff or case managers. 2998:5-8.

The AR that was actually implemented in April 2009 required case managers to determine whether inmates met "minimum requirements" and "established assignment

criteria" before referring an inmate for a job, but did not explain what those criteria were or where they could be found.  3020:19-3023:25; Exhibit O-3.

The AIC testified that the new job process created confusion in the facilities among the staff, 943:2-5, that case managers did not know what they were supposed to do when they had an IWD who wanted to apply for a job, 943:6-12, and were not given enough guidance about how they were supposed to refer an inmate to the job board and the role of the office of AIC was confusing.  943:13-20.  Holst reiterated her concern when she complained that the draft AR about job processes needed to have additional changes, and that case managers and job supervisors need detailed training on the process.  944:1-19. Moreover, the AIC's own legal assistant did not know what she was supposed to be doing.  945:12-17.

The new job process required that, all inmates considered for a job and the decision-making process would be documented.  938:8-11.  An inmate would apply for a job, and if he met the required qualifications (*i.e.* GED, license, etc.), then his application would be considered by the job board / classification committee.  948:1-21; 2504:25-2505:7.  The AIC had no idea how the classification committee would determine who got the job.  948:22-25.  The classification committee was supposed to keep minutes of their decision making processes, but those were never provided to the AIC,  949:7-13; 2504:8-11, nor were they submitted by DOC as evidence during the compliance hearing.

The AIC was not included in the referral or selection process for jobs.  The AIC was not contacted by job supervisors until an inmate had been accepted into the position to determine what accommodations were required.  2504:15-25.  The AIC was not informed of the jobs for which inmates applied but only for those in which they were accepted.  2505:8-11.

Under the new job process, there was a designation called "Code 13" where case managers were to detail the reasons why an inmate was not referred for a specific job.  3025:9-14.  Although a  Code 13 report could assist in ensuring that case managers were using the right criteria and that they were referring jobs in a non-discriminatory manner, 3025:15-3026:5,  Shoemaker did not pull a Code 13 report at the end of the compliance period, nor had she done so in "a while." 3026:9-16.  No such report was produced as evidence by DOC to show non-discriminatory assignments.

The new job process also required that the activities and decisions made by the classification committee regarding job placement were be recorded and archived.  3044:17-22.  Such records could be used to analyze whether inmates with disabilities were getting jobs in a non-discriminatory manner.  3044:23-3045:2.  Shoemaker, however, never conducted any reviews or generated any reports of classification committee documents to ensure that jobs were being assigned in a nondiscriminatory manner, nor did she know of any reports having been given to AIC.  3045:7 -11.  None of

the records of how the classification committee was assigning jobs were produced to Class Counsel.  3045:3-6.

Audits were conducted to determine whether facilities were utilizing the standardized job processes in March of 2009.  3029:5-7; Exhibit J-4. However, only fifteen of the facilities were audited, many of the audits were incomplete, and no audits were done at the private facilities.  3029:19-21; Exhibit J-4. As of March 2009, the audits across the board showed that facility staff needed more education and training in the job process. 3030:6-6, Exhibit J-4 (Audits conducted in March 2009).  Importantly, none of the audits verified that any inmate with a disability had yet been placed with a job under the new job process at the time of the audits.  Exhibit J-7, Comment 7 for each audit.  The audits for the facilities housing the largest number of inmates with disabilities, Ft. Lyon, CTCF, and Sterling, each specifically noted that no inmates with disabilities had been placed in a job using the new job process at the time of the audit.  See Exhibit J-7, Comment 7 for each facility.

The audits revealed significant problems at a number of facilities, as shown in below:

Four Mile – Staff did not know that of the documentation was needed or the process that was required, and there was one comment stated in the audit that "not one inmate had been staffed for assignment based on accommodation."  Staff did not complete the process, including communicating with AIC staff.  3030:13-3032:6.

Fremont –   Education on the process was needed.  3032:18-22.

Limon – Relief staff in the hobby shop apparently had no idea of job descriptions and/or Montez, Code 13 was not being used correctly, very few completed in DCIS, and there was no documentation of assignment-related accommodations. 3032:23-3033:20.

Skyline – Food services was not using standardized job description and no IWDs had been given a job under the new process. 3033:21-3034:22.

Sterling – There was no classification committee to independently review assigned jobs operation at Sterling, as of March 23, 2009. No IWDs had been given a job under the new process.  3038:14-3039:1.

Trinidad – Education on the process was needed and no IWDs had been given a job under the new process.  3039:15-24.

Arkansas Valley - More education on the process was needed. 3040:2-6.

Arrowhead - More education was needed, a request for a diabetic test kit for an inmate was denied by medical, and no IWDs had been given a job under the new process. 3040:12 -25.

Buena Vista - Certain living units were not using standardized job descriptions as of April 2009.  3041:17-23.

CTCF– Safety documentation needed improvement, staff needed education, and no IWDs had been given a job under the new process. 3042:3-18.

FLCF – Quota reports were not being posted, daily job sheets were not posted, and no IWDs had been given a job under the new process (with one pending). 3042:20-3044:5.

Shoemaker testified that she was "pleased" with the results of the audits performed regarding implementing the new jobs and programs procedure, but she admitted that there were no audits conducted of the private facilities on implementing this process and she is unaware of any other information to support her opinion other than the audits produced in Exhibit J-4, which she admitted were incomplete audits.  3185:19-3188:15; Exhibit J-4.  The private facilities did not adopt the standardized job descriptions by the end of the compliance period, 2991:12-14, and, as of July 2010, Ms. Shoemaker was not aware if the private facilities had ever adopted the standardized job descriptions. 2991:13-18.

Testimony from DOC personnel at the hearing revealed some of the problems with the standardization process:

Frank Ortiz of the Cañon Minimum Centers testified that he was not aware that the case manager training on the new job process did not include training on the procedures that were actually implemented in the new job AR. 3656:21 – 3657:1.  Although he testified that the new policy of placing inmates in jobs at CMC was not "much different" than the previous policy, 3640:5-7, he agreed that the new job AR, 850-03, was significantly different from the prior job process reflected in AR 300-23.  3658:12-14.

Case Management supervisor Randolph Malden supervises all classification at Ft. Lyons, including job placement as part of the job board.  3613:5-13.  Neither Mr. Malden nor the job board has ever conducted an overall review or audit to determine whether job placements were being assigned non-discriminatorily at Fort Lyon.  3613:23–3614:5.  In fact, the offender work program (AR 300-23) that Ft. Lyon was using as of May 2009 still stated that "able-bodied offenders" will have job assignments.  It does not mention the terms "essential functions and job qualifications," 3614:19-3616:4, nor does it discuss accommodations for workers with disabilities.  3618:14-19.

It is also clear that the new standardized job process was not implemented at the private DOC prisons.  By contract, private prisons are obligated to follow DOC's administrative regulations.  2917:1-2.  However, during the relevant compliance period, inmates were housed at Huerfano Correctional Facility (HCCF).  2917:10-12.  In response to the AIC Audit, HCCF stated that it does not follow DOC regulations and attached AR 750-04, which is the AR written by the AIC to implement the RP.  2917:22-25; Exhibit 241.

During the relevant compliance period, Shoemaker had between six to eight discussions about the Remedial Plan with the Executive Director.  2922:17-24.  During these meetings, Shoemaker never discussed what the private prisons were doing to implement the Remedial Plan.  2926:10-12.  In addition, during the compliance period, Shoemaker never expressed concerns to the individual responsible for the private prison

monitoring unit with respect to the implementation of the new job process.  2826:9-19.

Shoemaker did not know whether supervisors at the private facilities participated in the

training on the new job process in April 2009.  She was also unaware whether the private

facilities were included in the prior training about the eligibility code and the

standardized job descriptions.  2929:1-9.

After reviewing the AIC audit results concerning the job process, the AIC opined

that "[t]he processes outlined in 850-03, the AR for the new job process, are complicated

and unclear to the facilities, supervisors, case managers, ADA coordinators, classification

committee members, and the AIC office. The entire policy needs to be reviewed and

revised immediately to ensure more consistent application. Training for all staff is

required once this policy has been revised."  999:17-25.  The AIC survey results also

noted that "[s]ignificant issues remain regarding the application of administrative

regulation 850-03. The hiring and termination processes are difficult to understand, and

training regarding implementation of these methods was inadequate. Case managers, job

supervisors, offenders, and the AIC staff are all unclear as to what the appropriate

procedure is and application of the AR is inconsistent and time-consuming. A full

revision of this AR is recommended." 1000:1-11

**3. Inmates with diabetes shall be provided appropriate care and treatment at DOC. Medical and non-medical staff shall be trained on the care and treatment of inmates with diabetes and these inmates shall be provided appropriate education.**

One of the basic services provided by DOC is access to medical care and treatment. The RP specifically provides that the medical staff shall receive specific training regarding all aspects of the care and management of inmates with diabetes, that non-medical staff shall be trained on the special needs of inmates with diabetes, and that the inmates with diabetes will also be provided training on a regular basis regarding the care and management of diabetes. RP Section XV(B). The evidence is that DOC is not in substantial compliance with these crucial RP mandates.

Of great significance is DOC's failure to properly diagnose diabetes in its population, as discussed in Core Purpose Two of this brief. Obviously, the failure to properly diagnose the diabetic population means that those undiagnosed inmates are not receiving the treatment necessary to address the disease. Importantly, the DOC clinical standards for the care and treatment of inmates with diabetes do not direct the medical providers on when to test inmates for diabetes after an inmate has been admitted. See Exhibit 560. The failure to properly diagnose diabetes in DOC alone frustrates this important purpose of the RP.

a. **There are serious deficiencies in the care and treatment of diabetic inmates.**

    i. **Edward's Expert Opinion**

Linda Edwards, Plaintiffs' diabetes management expert, prepared a report regarding her findings on the diabetic care provided at DOC.  Exhibit 33.  In preparing her report, she reviewed the DOC Clinical Standards of Care (Exhibit 560), the American Diabetes Management January 2009 article on "Diabetes Management in Correctional Institutions," the Hoffman Memo regarding the December 2008 diabetic audit (Exhibit 561), and the June 2008 and March 2009 DOC Diabetic Audits (Exhibit N-5 and O-5), and reviewed the medical records for one hundred twenty-nine (129) inmates with diabetes from eleven different DOC prison facilities.  She also traveled to eleven different facilities and conducted all day meetings with inmates with disabilities, meeting with two groups of inmates per day that averaged between 10 and 20 inmates per group. 1926:20-1927:9.   Ms. Edwards testified that when obtaining information from the inmates, she asked questions that required detailed responses, rather than a yes or no answer, to ensure reliability, and looked for general themes in the complaints. 1950:18-1951:4.

Ms. Edwards testified that she has serious problems with the quality of care being provided.  1993:25-1994:2.

In her report and as discussed previously in this brief, Ms. Edwards stated that there were still problems relating to accommodations for inmates with diabetes, including

(1) the timing of food with medication, 1920:13-1923:4; (2)  access to glucose tabs or

food to treat hypoglycemia, 1925: 2-1926:19; (3) a lack of appropriate foot care and

shoes for diabetic inmates with neuropathy; (4) emergency call buttons and blood glucose

monitoring for those with frequent and severe hypoglycemia, 1949:14-1950:5; (5)

medical lines and food lines that were reasonable in length, 1920:13-1923:4; and (6)

lapses in the renewal of prescribed medication and obtaining them when transferred.

1950:7-1952:25;  Exhibit 33, p. 1-2.

She testified that all of these problems have been occurring since the beginning of

her involvement in this case in 2003.  1919:7-15.

Ms. Edwards stated that the issue of appropriate foot care and shoes for diabetics

with neuropathy was the most dominant issue in every facility where she interviewed

inmates, 1927:15-21, and problems with the feet of inmates with diabetes seems to have

increased in comparison to previous years.  1939:7-14.  The AIC also confirmed that the

complaints from diabetics about not receiving soft-soled shoes as an accommodation was

the "No. 1" complaint that her office received. 422:23-423:13.  The problem is that the

DOC-issued boots are very stiff and cause abrasions, cuts, blisters and sores on feet. They

do not breathe well, are very uncomfortable, and in some cases are painful.  1928:7-9;

1929:2-5; Exhibit 120 (pair of DOC boots).  This is a problem for diabetics because if

they have neuropathy, they are less likely to feel an injury should it occur.  Neuropathy is

nerve damage that is prominent in the foot and is prevalent in diabetics who have had

high blood sugars for an extended period of time. 1929:17-1930:1.  Any abrasion or opening in the skin of the feet would have a much greater chance of becoming infected if it were not discovered and treated early.  Also, someone with high blood sugar would have a harder time fighting infection. 1930:10-17.

If someone has neuropathy, abrasions or blisters may cause a serious infection that takes a long time and a lot of resources to heal.  If they have serious neuropathy, they may develop calluses on the balls of their feet, which would create high risk for ulcers. Foot ulcers can be very difficult to treat and heal; if they are not successfully treated, they can lead to bone infections and amputations. 1930:24-1931:9.  Amputations can range from toes to just below the knee, depending on the nerve damage.  1931:10-19.  Blisters are less likely to develop into a ulcer, but could if there is poor circulation and severe neuropathy.  1931:20-1932:1.

If an inmate has a foot deformity such as toes overlapping or bunions, it will increase the risk to damage on the feet in the inflexible boot.  1932:5-15.

Tennis shoes and soft-soled shoes help alleviate problems by reducing pressure points and abrasions and blisters.  They have a better ability to breathe and get air to the various areas of the foot.  If the foot cannot breathe, if can contribute to foot fungus, athlete's foot, and openings in the skin of the foot. 1932:13-24.

Edwards reviewed medical files and opined that the foot diagrams being used were not filled out completely and they were not consistent.  Diagrams would show neuropathy

at one appointment, and it would be gone the next. If neuropathy is moderately severe to severe it does not disappear.  1940:2-13.

In addition to what the patient tells the provider, a foot exam should also include checking the pulse to check circulation, and using a mono filament to test sensation. Providers should also do a visual inspection to look for deformities, signs of opening in the skin, and active infections.  1940:18-1942:7.  If neuropathy is present, there needs to be more attention to the shape, size, and fit of the shoe.  1942:23-1943:2.

In very severe neuropathy, there is a condition called Charcot foot, in which the neuropathy has caused the breakdown of the architectural structure of the foot by causing the arch to collapse.  1942:11-22.

DOC's standard of care with respect to foot care for diabetics has not been consistently followed.  1943:24-1944:8.  Reporting was inconsistent on whether inmates were receiving soft-soled shoes.  Sometimes people who had documented neuropathy were in State boots and some who had no neuropathy were in athletic shoes.  1943:3-23.

Some people at DOC who were subjected to amputations did not have a history of neuropathy when they were admitted to DOC.  This could mean that there was not early enough intervention about the foot issue and/or the blood sugar control was not adequate to keep the blood sugar at a close enough target level to promote healing and subsequent progression of the infection to the bone.  1944:10-1946:3.

DOC standards of care require a soft-soled shoe when people have a loss of sensory function in the feet and the presence of an anatomic abnormality, current foot ulcer, history of foot ulcer. Exhibit 560, p. 8, E.3.  Edwards opined that soft-soled shoes should be provided to inmates with anatomic abnormalities *or* neuropathy.  1937:10-1938:13.  Edwards' position is consistent with the standards for the provision of soft-soled shoes set forth by the American Diabetes Association, which state that persons with neuropathy *or* evidence of increased plantar pressure should be provided well fitting walking shoes or athletic shoes.  4602:14-4603:9.  DOC needs to address the guidelines that determine who can have soft-soled shoes or soft shoes in order to protect feet from abrasions and wounds and blisters.  DOC should look at resetting the guidelines for those inmates with neuropathy.  1998:9-1999:1.  Diabetic management focuses on preventative care; soft-soled shoes would go a long way in preventing opening in the skin.  It would cost substantially less to buy shoes than to treat the problems.  1938:17-23.

With respect to the issue of lapses of medication or the failure to receive medication when transferred, Ms. Edwards explained that this was a complaint that she heard at almost every facility visit that she made to speak with the inmates.  1950:13-1951:9.  There should be a quality improvement process in place to prevent any lapses in medication.  1952:21-25.

Edwards also criticized the DOC's use of "sliding-scale" insulin because the use of such insulin can cause hypo- or hyperglycemic episodes, and that it was being used for

a lot of patients on a regular basis.  1958:9-1962:8.  The training material written by Edwards warned that the use of sliding scale was outdated and was a potentially dangerous method of blood sugar control.  4574:6-18.  Dr. Frantz, DOC's Chief medical Officer, testified that she did not like the use of sliding scale insulin, that it can cause high and low blood sugars, and that the providers had been strongly encouraged to minimize their use of sliding scale.  4575:1-15.

Edwards opined that while eye exams are being done more consistently in the past, there is no documentation as to whether inmates did or did not have retinopathy.  If there was no retinopathy, the form should indicate diabetes without retinopathy, not just left blank.  1972:13–21.  Hoffman's May 2009 memo also stated that inmates were being reported as not having retinopathy even if they had not been examined for retinopathy.  This was an ongoing problem as of May 2009.  1972:22-1973:8.

Edwards was also critical that the DOC did not have a database with respect to the care and management of inmates with diabetes.  Such databases are important because it is easier to collect data to be able to evaluate the effectiveness of treatment and to identify people who are at high risk perhaps by virtue of the diabetes control.  A database gives important information on quality management and quality improvement and helps facilitate communication when individual moves from one facility to another.  1898:12-1899:6.   A database would also make collecting data easier and would assist in the management of high-risk cases.  High-risk case management can take advantage of a

database so that high risk patients can receive the benefit of additional or earlier intervention so those risks do no become catastrophic health events.  It is a proactive, rather than reactive, approach. 1899:16-1900:18.

Edwards also opined that the number of diabetics in the DOC system was not accurate because it was significantly less than the number of diabetics in the general population,  1985:3-22, and because there were discrepancies in the diabetic audit data concerning the number of diabetics at specific facilities.  1986:14-1987:16.

Edwards recommended that the diabetic management of DOC would be helped by independent oversight which could give an objective evaluation of consistency of care and provide oversight into the recommendation for improving care and improving the consistent standard of care throughout the organization targeted at specific facilities based on the information they provide.  1999:24-2000:10.

### ii.  The Role of the Office of Quality Management ("OQM") in Diabetic Care and Management

DOC's Office of Quality Management ("OQM") audits all areas of healthcare services provided by the DOC.  3902:9-17.  There were two employees in this office in the April 2008-May 2009 compliance period, Renae Jordan, the quality improvement administrator in the Division of Clinical Services, and Brian Hoffman, the quality improvement coordinator.  4162:14-25; 4177:21-25; 3901:6-8.

The OQM has various subcommittees, including the committee on morbidity and mortality that reviews all offender in-custody deaths to determine if there are quality of

care issues.  There are approximately five inmate deaths each month at DOC;  there have been approximately 150 deaths in the last 3 years.  4170:17-25.  The OQM does not track how many deaths are caused by diabetes.  4172:1-5.  The OQM has never determined how often diabetes has been a cause of, or contributed to, the death of an inmate.  4182:22-25.  The audits performed by DOC do not contain information about critical incidents or hospitalizations.  4183:1-11.

The OQM coordinates with each facility's Continuous Quality Improvement (CQI) program and committee, 4163:4-22 and investigates critical incidents.  4164:7-9.  Incidents reported to the OQM range in severity from 1 (minor, non-threatening injury) to 4 (death). 4164:12-4165:1.  Because there is no written standard, staff members have discretion on when they must submit a quality assurance report.  4167:13-4168:14.  For example, it would be discretionary whether to make a quality assurance report if an inmate had a hypoglycemic reaction and required hospitalization.  4168:19-23.

If an insulin-dependent inmate arrived at a facility without his insulin, it should be reported and would be a level 3 incident.  4173:3-6.  Jordan does not recall any time when this type of incident has occurred.  It is possible it has occurred and it was not reported.  She has never done an audit/investigation to determine if facilities are properly reporting incidents.  4173:10: - 4174:6.  She is not aware of any time when an insulin-dependent diabetic inmate has been transferred to a facility and there was a prolonged delay in receiving insulin.  4175:7-21.  This is surprising given that there is evidence that

one inmate, Tenorio, went between 24 and 31 hours without his insulin after being transferred to a new facility.  464:21-469:2.  The AIC called this incident a "debacle." 468:3.  It is clear that several Clinical Services personnel, including the head of Clinical Services, Shoemaker, were involved in investigating the situation.  *Id*.  Apparently, however, according to Ms. Jordan's testimony, the incident was never reported to the OQM.

Results of the case reviews from the OQM committees are not provided to the AIC, including information about the death of a diabetic inmate.  4179:2-15.  During Jordan's tenure, she has never released information to the AIC.  4181:12-14.

*Diabetic Audits:*

During the last compliance period, the OQM conducted three audits concerning the care and treatment of inmates with diabetes:  the first such audit was conducted in June 2008 (hereafter the "June 2008 Audit") Exhibit N-5; the second was conducted in December 2008 (hereafter the December 2008 Audit); and the third was conducted in March 2009 (hereafter the March 2009 Audit") Exhibit O-5.  Ms. Jordan is in charge of the diabetic audits.  4234:14-16.

*The Audit Procedures were Flawed:*

After the June 2008 diabetic audit, another audit was to be completed in December 2008. However, the results of that audit were never finalized because the data pulled for the audit could not be validated. 4192:13-4193:5. As detailed by Brian Hoffman in the "Hoffman Memo" regarding the December 2008 Audit, 4191:20-24, there were serious problems with the data pulled for the December 2008 audit. Exhibit 561. These errors included:

-facilities were not using diabetic flowcharts and thus information was not current and sometimes not correct;

-Type I diabetics were reported as type II diabetics and type II diabetics were reported as Type I;

-Type I diabetics were reported as not on insulin when all Type I diabetics are insulin-dependent;

-incorrect data was reported with respect to how many times inmates had chronic care visits, containing data other than diabetic chronic care visits that skewed the data;

-reporting that inmates had no retinopathy despite the fact that they had not been sent to an eye doctor for diagnosis, thereby skewing the incidents of retinopathy;

-reporting that inmates did not have neuropathy when no foot exam had occurred, thereby skewing the incidents of neuropathy, and;

-there was missing data and incorrectly answered dates, and some facilities were not reporting the correct lab results.  4193:6-4195:22; Exhibit 561.

As a result of the type and number of data problems, the December 2008 audit was scrapped.  4195:20-4196:1.

Jordan testified that "[g]enerally, the same people who pulled the data for the 2008 audits pulled the date for the 2009 audits."  4189:2-5.  However, when asked whether there was confusion with respect to how to gather data for the December 2008 audit, Jordan responded that the clinical staff gathering the audit information had performed previous audits so they should not have been confused about the instructions for the December 2008 audit, given that relatively the same information was being collected. She then went on to offer that a reason for the problems in the data gathering for the December 2008 audit could have been that there were "different people doing the audit." 4196:5-22.

There were only two different set of instructions given to the providers regarding how to gather data for the diabetic audits in 2008 and 2009:  the May 2008 instructions, Exhibit 726, and the March 2009 instructions entitled  "Diabetic Audit Tool," Exhibit 727.  4197:18-4198:19.   The parties stipulated that the instructions for the 2008 audits were the same as the instructions given for the March 2009 audit, except that in 2009 providers were instructed to look at the diabetic flow sheet for information and that the

2008 instructions told providers to report diastolic and systolic blood pressure readings separately, rather than a combined number.  4285:14-4286:5.

Thus, it is logical to assume that if the same providers were pulling data for the June 2008 audits as pulled the information for the December 2008 audit, and the instructions were the same for both audits, then the June 2008 audit likely suffers from the same inaccuracies as did the audit performed the following December – but was not detected by DOC.

Perhaps even more fundamental to the integrity of the audits is the veracity of the time period of the data gathered.  Ms. Jordan testified that the purpose of the audits was to take a snapshot in time of the care and treatment of diabetes at DOC, and then compare it to other audits to see how DOC was performing.  Thus, for each audit, DOC would have used data from the preceding six months.  4183:12-4184:4   It was important that each audit not contain data outside the relevant time period because to include such data would not give an accurate picture at the time the current audit was being conducted. 4184:12-23.

The evidence demonstrated, however, that the instructions given to the medical providers on how to pull data for the audits did not instruct them to only record data for the current audit period.  To the contrary, throughout the audit instructions, providers were repeatedly told to record data without regard to the date when the data was gathered. For instance, the 2008 and 2009 audits told the auditors to record the last A1C value

listed in the inmate's chart – without restricting the data gathering to a six-month time period.  4217:13-4219:17.  Jordan could not verify that the audits did not contain results for A1C data that was also used in previous audits. 4220:4-4222:15.  The auditors were also instructed to record the last five blood pressure readings, without specifying to record only those readings within the last 6 months,  4227:12–19, and directed the auditors to report serum creatinine values, without specifying that the data should only be reported if the screening occurred within the current audit period.  4236:20-4237:21.  This basic flaw in the process of gathering the audit data seriously undermines the audit results.

*2009 AUDIT RESULTS:*

The audit results pose serious concerns about the care and treatment of diabetes at DOC, especially at the DOC facility that houses a majority of the inmates with diabetes, the Sterling Correctional Facility.

The industry standards for the care and treatment of diabetes are the standards established by the American Diabetes Association.  4580:11-17.  The 2009 diabetic audit shows that some facilities are not meeting the standards outlined by the American Diabetes Association.  4581:14-22.

Importantly, as reported in the March 2009 audit, diabetes management in DOC has been declining since January 2008.  Specifically, diabetic patients in good control

declined, and there was a notable increase, from 14% to 23%, in the number of patients in poor diabetes control. 4216:3-23; Exhibit O-5, p. 11.

The 2009 Audit also showed decreased clinical performance in the testing of A1C levels and in monitoring nephropathy, a decrease in blood pressure control, a decrease in number of inmates with acceptable HDL levels, a high percentage of inmates with LDL values out of range who are not on medication, and a decrease in the number of required foot exams.  4250:2-4252:17.

Although DOC sought to show that its performance was favorable when compared with those of other health care comparators, Ms. Jordan testified that she did not know what standards were used by the other comparators in the audit.  4188: 5-9.

**A1Cs:**

A1C testing is one of the primary tools that measures glycemic control over a two to three month period.  4206:20-25.  As explained by Linda Edwards, obtaining an A1C test is a necessary and critical step in evaluating a person's diabetic status.  1969:13-16. A1C levels tell the relative risk of complications, particularly to eyes, kidneys and nerve damage.  The higher the A1C, the higher the risk.  A1C has become a very important management tool to address and evaluate overall diabetes control.  1953:1-1954:3.  The American Diabetes Association established the target for A1C to be under 7%.  A1C of 7% reflects an average glucose of 164.  Fluctuations should stay within a 30 point range.

Fluctuations of 70-80 put someone at a pretty high risk of low blood sugar. 1954:1-1954:22.

An A1C under 7% doesn't necessarily mean good control because someone with a frequent low blood sugar can have a lower A1C than someone whose blood control is stable but at a higher rate.  An A1C over 9 is bad control.  1955:8-16.

The American Diabetes Association states that A1C testing should be done upon intake of an inmate and at least quarterly for patients not meeting glycemic levels.  Ms. Jordan, DOC's quality improvement administrator, could not confirm that inmates are given A1C testing upon arrival to DOC.  DOC Clinical Standards do not instruct providers how often to perform A1C testing.   4207:1-4208:15.

DOC clinical standards of care require that diabetics with good control should have a chronic care visit every six months, those with fair control should be seen every three months, and those with poor control should be seen monthly. 4205:6-17;  Exhibit 729.  There is no information in the audit about how often those with poor glycemic control were receiving A1C testing.  4209:9-13. The question in the audit asked only whether A1Cs were ordered for patients in good control every 6 months and all others 3 months – Yes or no.  If the answer was no, there is no way to know if that was in reference to those for 6 months or 3 months.  4210:12-25.

Although over one-half of the diabetic inmates are in fair or poor control, the audit only requested information about whether inmates had a chronic care visits every 6

months.  Thus, the audit contains no evidence that DOC is meeting the clinical standard for a majority of diabetic patients.  4204:3-4206:1; Exhibit 727.  Twenty-one percent of diabetic inmates were not even getting a six month chronic care visit.  4206:8-11.

Only 8 of the 25 DOC facilities in the 2009 audit achieved full compliance with the proper ordering of A1Cs.  4209:25-4210:5.  The 2009 audit reported that 56% of facilities decreased their performance in ordering A1Cs as required since the 2008 audit.  4211:8-10.

Although the 2008 audit reported that 91% of A1Cs were being done according to standards, that audit also did not gather information about the three-month testing requirement, despite the fact that 45% of inmates with diabetes required testing every three months because they were not in good diabetic control.  4212:13-25, 4213:1-18; Exhibit N-5; Exhibit 726.

### Hypoglycemia:

As explained by Ms. Edwards, hypoglycemia occurs when blood sugar drops below 70, but symptoms can be identical if blood sugar drops quickly from 200 to 150.  1962:18-25.  If blood sugar levels get below 60, it impairs thinking and brain function.  People get irritable and combative.  They may be unable to respond to questions appropriately.  If it continues, they can have seizures and it could be fatal.  1908:1-11.  Edwards saw documented hypoglycemia at DOC with blood sugar levels in the 20s, 30s, 40s, and 50s.  Blood sugar levels of 20 or 30 are very serious because people with that

blood sugar level are not as likely to be able to help themselves or to articulate what's wrong so they can get the help they need.  A person in that level could slip into unconsciousness.  1963:1-13.

The 2009 Audit showed that almost 20% of inmates reported having hypoglycemia during the last audit period. 4223:13-15.  The audit also reports that 14% of inmates had a "documented" hypoglycemic event, but Jordan did not know if that number included the 20% number reported by the inmates.  4223:16-4224:6.  Jordan could not explain whether the numbers of hypoglycemia reported by the facilities were the number of patients who had hypoglycemic events or the number of just hypoglycemic events.  4224:17-4225:9.

The evidence was clear, however, that the audit was significantly underreporting the number of hypoglycemic episodes occurring at DOC.  The documentation of the emergency diabetic test kits at the facilities showed significantly more hypoglycemic incidents than reported in the audit:

- At CSP,  the 2009 audit showed four documented events of hypoglycemia. 4639:2-9.  However, according to Exhibit 737 there were eleven hypoglycemic episodes at CSP during the audit period (July 2008-March 2009).  4639:10-4642:23;

- At DWCF, the 2009 audit reported 3 hypoglycemic events.  4642:24-4643:3.  However, Exhibit 738 showed 10 hypoglycemic events from

August 2008 to the end of February 2009.  4643:4-4645:24.  (The audit covered a six-month period, while exhibit 738 covered a seven-month period.  4645:14-24);

- At DRDC, the audit reported 2 hypoglycemic events at DRDC during the audit period,  4659:21-4660:4, but Exhibit 739 indicated 20 unique offenders with hypoglycemic events at DRDC from July 2008 through the end of March 2009.  4658:19-4659:15.

- At Sterling, the audit reported 11 hypoglycemic events during the audit period.  4672:3-10.  Exhibit 740, the diabetic test kit incident reports indicated about 33 incidents from July 2008 through February 2009. 4671:20-4672:10.

In response to the evidence of inaccurate reporting of hypoglycemia in the audit, Dr. Frantz, DOC's Chief Medical Officer, stated "[c]learly, in terms of documented hypoglycemia, we missed the mark."  4764:18-22.

### Hypertension (High Blood pressure):

High blood pressure is a major risk for chronic vascular disease, eye kidney and nerve damage in diabetics.  4225:18-4226:1.  Diabetes and hypertension together create greater risks for strokes and heart attacks which is why controlling blood pressure is important.  1974:1-4. The leading cause of death for diabetics is heart disease, including heart attacks and strokes.  4692:21-4693:3.  About 60% of diabetics die of circulatory

problems.  4693:4-6.The blood pressure data reported by DOC in the 2009 audit "results" on page 3 listed systolic and diastolic measurements separately, and thus those results cannot be compared to the other comparator providers.  4226:2-17; Exhibit O-5.  It was clear, however, that less than 50% of the diabetic offenders had their blood pressure under control according to the 130/80 standard, which showed that blood pressure control again decreased from previous audits.  4226:22-4227:11.

**Lipids:**

Diabetes can cause high cholesterol and high triglycerides which can lead to coronary artery disease.  4232:14-19.  The ADA standards provided that lipid lowering medication should be prescribed if cholesterol is not controlled using diet and exercise. The audit states that there is a "high percentage" of diabetic inmates who are out of range on cholesterol, but who are not on lipid lowering medication.  4233:21-25. Approximately 62% of diabetic inmates are not within target on HDL cholesterol values and HDL control also continues to decrease.  4235:10-18.

**Kidney Damage:**

One of the first indicators for decreased kidney function is the microalbumin to creatinine ratio testing.  Protein in the urine, microalbuminuria with normal creatinine, is stage I kidney disease.  Once kidney damage has been found, there has already been a significant amount of damage.  It should be indicated on an inmate's problem list so

everyone can be aware of it and help work together to prevent the disease from advancing.  1979:20-1980:11.

The DOC standards are that every diabetic inmate should be tested annually on this indicator.  4238:17-24.  DOC is not meeting clinical standards on this testing as only about one-half of inmates with diabetes had this testing.  4238:25-4239:7.  Although the "results" used in the comparator data on page 3 of the 2009 audit shows monitoring nephropathy (microalbumin to creatinine ration) at 71%, page 28 shows it was actually at 51%.  4250:14-24; Exhibit O-5.

Serum creatinine is another measurement to determine if there is kidney damage or failure.  4236:14-19.  Although the 2009 audit states that 97% of diabetics had their serum creatinine screening completed, the instructions to the auditors only directed them to report the value for the serum creatinine – and did not specify that the data should only be reported if the screening occurred within the last audit period.  4236:20-4237:21.

**Retinopathy:**

Diabetes can cause blindness and determining whether nerve damage, retinopathy, has occurred is determined by retinal exams.  The ADA standards require documentation of whether retinopathy is found to exist or not after an eye exam.  Although the audit reported that 73% of inmates had an eye exam, 40 of the exams did not indicate whether retinopathy existed.  Thus, only about 68% of inmates received a proper exam, which would be a decrease from previous audits.  4239:8-4241:23.

**Foot Exams:**

Foot exams are important because they test for neuropathy, or nerve damage, to the feet.  If a diabetic develops neuropathy, it can lead to severe infections that could result in amputations of the toe, foot or leg.  4242:4-19. The Center for Disease Control ("CDC") estimates that 60-70% of people with diabetes have mild to severe forms of nervous system damage, and this is a major cause of lower extremity amputations. Comprehensive foot care can reduce amputations by 45-85%.  DOC standards are that foot exams should be performed every 6 months.  4242:4-4244:19; Exhibit 725.  There is no policy at DOC that amputations as a result of diabetes must be reported to the OQM. 4244:8-11.

The 2009 Diabetic Audit shows there has been a 10% decrease in the number of inmates who have gotten foot exams since the June 2008 audit.  The audit states that 587 inmates got foot exams and that 231 of those individuals have neuropathy.  4245:19-24. Thus, about 40% of those who had the exams have neuropathy, not the 28% figure reported in the audit.  4246: 15-18; Exhibit O-5, p. 33.

**Sterling Correctional Facility:**

The Sterling Correctional Facility houses the largest population of diabetic inmates in DOC.  4228:20-4229:1.  4599:17-20.  The 2009 audit for Sterling showed serious problems in the care and treatment of diabetics at that facility.

As of the 2009 audit, Sterling (SCF) housed 139 diabetics.  Exhibit O-5, p. 6.  The diabetic audit results for Sterling are located in the alphabetical Attachments to Exhibit O-5.  The Sterling results show:

About 57.5 % (80 of 139) did not have an A1C test ordered as required by the clinical care standards.  4613:15-23;

Approximately 45% of the diabetic inmates did not have their chronic care visit within the past six months.  4613:1-5.

Only 48 % (67 of the 139) had their urine spot test (to test the microalbumin to creatinine ratio).  4614:6-10;

At least 60% of the diabetic inmates did not have proper blood pressure control.  4232:2-4.  These results for the Sterling portion of the audit should have highlighted in red the results for systolic and diastolic blood pressure data as they fell below the target of 70% compliance with the CDOC standards. 4229:23-4231:4.

36% (50 of 139) of the diabetic inmates did not have their GFRs (Glomerular Filtration Rates) done annually as required by the clinical standards.  4599:24-4600:9; 4597:16-19. GFR is a test that shows chronic kidney disease.  4597:23-25.

Only 51 (~37%) were given a foot exam in the previous six months.  Of those 51 tested, 19 had neuropathy, which is approximately 40% of the population.  1947:21-1949:5.

50% of inmates were in not in target range on their LDL values.  Of the 50% who were not in range, 72% of those were not on lipid lowering drugs, making them at risk for cardiac events.  4614:2-5.  Anyone with high lipid counts should be put on lipid lowering drugs.  1976:20-1978:1.

About 50% of inmates with diabetes did not receive an annual eye exam per clinical standards. 1992:1-10.

52%  of inmates with diabetes were not tested for kidney disease.  1991:8-25.

Only 44% of the diabetic inmates (62 of the 139) had their eye exam test as required by clinical standards.  4614:11-16.

Dr. Frantz admitted that Sterling was not performing at the level she would expect or want it to perform and that it had serious deficiencies in following DOC standards of care.  4615:9-17.  Sterling's percentages for A1C testing, eye exams, monitoring nephropathy were all below the comparators in the HEDIS standards.  4615:18-4616:21.

Likely contributing to the problems with the provision of diabetic care at DOC is the recurring shortages of medical providers at the facilities.  Since the entry of the Remedial Plan, DOC has suffered shortages of doctors and providers, especially in remote areas like Fort Lyons which houses the most ill, most seriously disabled inmates

in DOC.  773:19-22.  At times, a doctor would only get to Ft. Lyons once a month.

2911:6-24.  During the relevant compliance period, there has also been a shortage of

doctors at Sterling.  One of two physician positions at Sterling was vacant and continued

to be vacant at the time of the compliance hearings in July 2010.  2912:3-2912:19.

Edwards agreed with the recommendations in the March 2009 audit as to how to

improve quality of care, including the adoption of practice guidelines, automated

reminders, and an electronic database. 1995:13-1996:7.  Additionally, she opined that

there should be ongoing trainings regarding the standards of care and how they should be

implemented, there should be a system to track aggregate data, reduce variation in

treatment amongst providers, making sure glucose sources are available, and ensuring

appropriate timing of meals and meds. 1996:14-1997:14.  Competency training also

needed  to be done, including additional training for nurses.  For example, nurses could

be trained to do foot exams, properly document the results, and give those results to the

providers.  1997:17-1998:8.  Edwards has made all of these recommendations in the past.

1999:11-14.

**b.  Diabetic Training Issues**

> **i.  Medical staff shall receive specific training regarding all aspects of the care and management of inmates with diabetes. This training shall occur during the compliance period and during regular intervals thereafter.  Linda Edwards, in cooperation with DOC medical staff, shall design a plan and assist with the implementation of the training of medical and non-medical staff, and the inmates, regarding diabetes issues. RP Section XV(B).**

DOC failed in cooperating with Linda Edwards in designing and implementing appropriate diabetic training for medical staff.

Ms. Edwards wrote a program for nursing staff entitled "Team Management of Diabetes" and provided one training for nurse managers in January 2007.  She was to provide follow-up training with the DOC, but despite her efforts, she did not do the follow-up training.  1893:2-1894:6.  DOC never contacted her again about doing any training on those materials.  1894:7-9.

Edwards was not contacted to train any doctors or mid-level providers in 2005.  1894:10-15.  Prior to the 2006 compliance hearing, she was provided with materials being used to train medical providers.  She had concerns about the training because it was a program created by the makers of Lantus insulin essentially to promote the use of that insulin.  The program was not sufficient training for the medical staff which should have focused on standards of care, other treatment options, efficient and effective use of medications, detecting and handling chronic complications; in general, a more comprehensive provider program.  1895:1-14.

After the compliance hearing in 2006, Edwards worked with Dr. Shames and Debra Foster at DOC to create new training for providers.  The training material was designed to be presented by a professional with diabetes expertise.  1895:21-1896:18.  Discussions stopped with Dr. Shames and Debra Foster in March or April 2007, and

Edwards did not do any training or observe any training done with these materials. 1896:19-1897:3.

Dr. Frantz testified that the curriculum prepared by Edwards specifically for the doctors is not being provided at DOC.  4574:2-5.

Many providers did not, in fact, receive the diabetic training on an annual basis. 3124:10-19, 3125:7-12; Exhibit C-5.  The training records for the Team Management of Diabetes class do not indicate whether any staff at the private facilities received the training because the private facilities are not in the departmental training system.  3126:8-14.  Shoemaker did not review the rosters for the training of the private facilities clinical staff to ensure they received annual training on diabetes.  3126:17-21.An indication of the effectiveness of the training provided is that a nurse practitioner, who had completed the Team Management of Diabetes training in March of 2008, made inquiries to the AIC three months later, in June of 2008, with respect to accommodations for an inmate with diabetes at Arrowhead Correctional Facility.  The nurse practitioner did not understand the concept of timing insulin with meals, inquired as to whether an inmate needed a call button, and the meaning of the term "medical shoes" – which is the DOC term for soft soled shoes for diabetics.  3116:24-3117:3; Exhibit C-5, 3119:7-14, 3120:10-14; Exhibit 630.

> **ii. Specific training shall be provided to all staff who are involved in providing programs, benefits, and services to inmates regarding the need to be cognizant of the special requirements of diabetics, including their need for access to water and diabetic snacks, the need for meal timing, medication administration timing, as well as the symptoms related to diabetes-related complications and emergency procedures to taken with respect to these symptoms. Written material shall be provided to the staff regarding each topic.**

Despite the fact that the office of the AIC is integral to compliance with the Remedial Plan and the accommodation of disabled inmates, the AIC office was left out of the diabetic training implemented by DOC. The AIC testified that she had no involvement in diabetic training for staff, training on diabetic education provided to inmates with diabetes, or training on hearing or vision impairment issues. 896:17-897:2. The AIC office had no involvement in providing diabetic emergency kit training. 899:23-900:9.

Instead, training of staff was handled by DOC personnel, most recently by Amber Autobee. Autobee helped updated the training materials in June 2008, the date of the last revision. 3823:16-23. But the training materials themselves are deficient. For example, these training materials state that "Offenders who are diabetics are not automatically considered disabled." 3284:11-18; Exhibit Y-4, section 1, p. 10. That statement is contrary to 2008 Stipulation #25. Autobee acknowledged that this statement was incorrect, but despite the error, the information was given to trainees during training occurring in the compliance period. 3284:19-3285:3; Exhibit Y-4.

Ms. Edwards did develop training for non-medical staff regarding diabetes in 2004.  1891:3-23.  However, DOC changed her training curriculum and removed the requirement that there was some form of verification that the staff taking the training actually understood the information and were performing in compliance with the training. 1892:5-1893:1.

Perhaps most reflective of the inadequacy of the training of non-medical staff with respect to the needs of the inmates with diabetes is reflected in officer attitudes towards these inmates.  For example, the policy at SCF requires inmates to use the restroom before 10:15 am during programs.  1270:21-25.  One morning in April of 2009, Inmate Baxter, who is a confirmed diabetic, attempted to use the restroom at 10:10 am, however, the door was locked.  1272:4-15.  He asked a programs staff member to open the door, but was refused.  1272:17-1273:19.  He then asked security staff to open the door but that individual did not have a key.  1273:21-25.  Ultimately, Baxter was unable to hold his urine and was forced to urinate on the floor.  1274:1-7.  As a result, he received a COPD write-up, lost good time, and had to pay $35.22 for cleanup because they used a blood spill kit to clean up the urine.  His classification points also increased.  1275:6-14.  In May of 2009, another inmate with diabetes at SCF was denied access to use the restroom during a morning church program.  He was told by staff that he was "only there for 1 ½ hours and that he could hold it."  He was told that he would have to return to his unit to

use the restroom, thereby forfeiting participation in the service.  434:4-12; Exhibit 364;

Bates No. 2929.

> iii.  **Inmates with diabetes will also be provided training on a regular basis, including written information that complies with current American Diabetes Association guidelines, regarding the care and management of diabetes.**

The Remedial Plan and the 2008 Stipulation require that inmates with diabetes be

provided training regarding the care and management of diabetes.  *See* RP Section XV(B)

and 2008 Stipulation #25.  The evidence regarding this training was discussed in Core

Purpose 3, Material Criteria 3.  As stated in that section, the education provided to

inmates with diabetes during the relevant compliance period was insufficient and

ineffective.

**c.  Diabetic medications**

Though proper medication is fundamentally important to the care and treatment of

diabetics, DOC has failed to ensure that inmates with diabetes properly and timely

receive all their necessary medications.  There have been ongoing problems with

prescriptions not being timely refilled, with insulin not being appropriately timed with

meals, and with inmates not receiving medication when being transferred to other

facilities.  The AIC received a number of complaints from inmates with diabetes

addressing the issue of not receiving their insulin for periods of time because their

prescriptions had either lapsed or the facility was out of insulin.  454:19-455:1.

The AIC acknowledged that failing to provide medications during transport and failing to ensure that arrangements are made so that an insulin dependent diabetic is not without insulin for twenty-four hours is a serious violation of the RP.  465:13-18.  As previously discussed, Linda Edwards testified that she received complaints about lapses in medication at every facility she visited.  1951:7-9.  The testimony of inmates and DOC records corroborated these violations of the RP.

(1) Ricky Tenorio, an insulin dependent diabetic, arrived at the Delta facility clinic on December 24, 2008, 24 hours after he was transferred from Arrowhead.  He had not been provided insulin since he left Arrowhead.  464:21-465:3.  When the nurse in the clinic tested his blood sugar, it was so high that she could not even read it.  465:5-8.  Tenorio went a total of 31 hours without insulin.  467:1-6.  The AIC described this episode  as "a true debacle," and that it "was not handled correctly from beginning to end."  468:11-23.

Tenorio was subsequently placed in the therapeutic program at Crossroads Turning Point, a Community Corrections lockdown facility in January of 2010.  1383:9-13.  When he transferred to Crossroads, from Delta, he was provided a 30 day supply of insulin.  However, once the 30 day supply was used, DOC would not provide him with insulin or other medications thereafter.  1385:1-3,10-12.  Because Crossroads is a lockdown facility, Tenorio is not permitted to leave the facility,1384:12-14, and is not be able to seek employment for a six to nine month

period of time.  1384:21-24.  Because Tenorio is not permitted to work, and DOC will not provide him with insulin or other medications, he has been forced to borrow money from his family to pay for his insulin.  1385:22-24.  He also has cut back on his dosage and has experienced complications as a result.  1386:2-3.

(2) Craig Hassler was given a 30-day supply of the prescription medications Actos and Glyburide for his diabetes.  At the end of the 30-day period, he would turn in his prescription card for refill; however, the new prescription was not always available.  1212:12-1213:17.  As a result, Hassler would go days without his diabetes medication because it was not refilled timely.  1214:2-5.

On September 11, 2009 at 10:37 pm, Hassler became dizzy and disoriented while using the bathroom and sat down on his bunk.  1215:7-17.  He was dizzy and crawled to the door and pushed the call button.  He told the control center he thought he was having stroke.  1215:20-1216:4.  An officer came by, opened the door, said, "You're a fucking mess," and closed the door and walked away. 1216:11-16.  Hassler lost consciousness.  1216:1-4.  When Hassler regained consciousness at about 1:30 in the morning, he was on the floor of his cell.  He pushed the call button again for help.  1216:5-18.  He had a vague memory of somebody coming to the door.   He lost awareness of the situation.  1216:19-24. He regained consciousness several days later at University Hospital in Denver. 1217:6-14.  He had suffered a "brain bleed," a [hemorrhagic] stroke.  1214:13-19.

Following the stroke, Hassler spent time at DRDC.  While in the general population, he was told that the facility did not have his personal medication cards and that he would have to wait until they arrived from the pharmacy.  It took 4-6 days to receive all his medications.  1218:1-19.  Hassler also testified that inmates were normally not allowed to carry any medications with them during transport. 1219:14-16.

(3) Anthony Vaughn, an insulin-dependent diabetic, who also takes Glucovance and Actos twice a day, missed three or four days of those medications during a two-week stay at DRDC.  1321:4-8.  In addition, the day he was transported from Fremont to DRDC, he did not receive any insulin until the following day, and thus went an entire day without insulin.  1321:9-19.

(4) Charles Simpson, an insulin-dependent diabetic, experienced delays in having his prescription for Glucophage  filled while housed at SCF.  Even when he would submit a kite ten days prior to the expiration of his medications, he would not receive a refill for two weeks after he turned in the kite.  1492:24-1493:14.  When Simpson paroled in November 2009, he did not get any insulin the day before he left SCF or the day he left the facility.  He went 4-5 days without insulin.  1497:4-1498:9.

(5) In August of 2009, Hector Martinez-Jimenez, an insulin dependent diabetic, experienced a two (2) week lapse in his prescription for Lantus insulin.  4554:16-4555:6; Exhibit 735.  In addition, he experienced an eleven (11) day lapse in his regular insulin during the same time period.  4555:7-20; Exhibit 735.

## 4.  Provide safe and effective evacuation procedures for IWDs

Section XX(A) of the Remedial Plan requires that "[e]ach institution/facility shall ensure the safe and effective evacuation of inmates with disabilities" and shall develop evacuation procedures for that purpose.

Fort Lyon Correctional Facility is a 500 bed facility with one of its missions being to house geriatric, chronically ill, and physically disabled inmates.  2679:10-16.  Fort Lyon is located 93 miles east of the nearest large city (Pueblo) and 25 miles west of the nearest non-volunteer fire department (Lamar).  2678:8-2679:5.

Fort Lyon has three operational cell houses, one of which is Cell House 5, a four story building which houses about 100 to 110 inmates, including disabled and geriatric inmates.  2685:7-12; 2680:10-23.

Fort Lyon's infirmary/Special Medical Needs Unit (SMNU), housing ten to fifteen inmates at any time, as well as the facility's administrative segregation unit, are located on the third floor of Cell House 5.  2681:6-19; 2694:15-18.

Cell House 5 is equipped with two elevators, with backup generators. 2685:13-17; 2686:18-23. The elevators are located next to one another, and each can fit up to a maximum of four wheelchairs. 2685:18-2686:3.

Using the elevators, the Fort Lyon Life Safety Officer (Lt. Ricky Gilmore) estimates that it would take about 18 to 20 minutes to evacuate Cell House 5 in an emergency. 2686:9-12.

For three consecutive weeks in August 2009 (Aug. 3-24), one of the two elevators in Cell House 5 was inoperable for parts replacement or maintenance reasons. 2688:25-2691:10; Exhibit 4; Bates Nos. 6476, 6464-68.

The second Cell House 5 elevator was rendered inoperable on August 19, 2009, when the elevator door slammed shut on an inmate's wheelchair and a second inmate kicked the door to try to get it to fully open, thereby knocking the door of its track. 2695:16-2696:6; Exhibit 6 (Bates No. 6490). With *both elevators now inoperable*, an inmate pulled the fire alarm on the first floor in an effort to get someone's attention to be allowed access to a locked restroom. 2696:13-21; Exhibit 6; Bates No. 6494. This triggered an unplanned, non-simulated evacuation of the building, with no operable elevators. 2691:11-2693:15; Exhibit 6; Bates No. 6488.

Not knowing the cause of the alarm, ambulatory and wheelchair bound inmates on the upper floors of Cell House 5 proceeded, as trained, to the elevators. 2699:10-2700:5. Upon discovering that the elevators were inoperable, the inmates turned around and

proceeded in the opposite direction down the halls to the stairwells – with the ambulatory inmates exiting down the stairwells and the wheelchair bound inmates waiting for assistance by responders with evac-u-chairs.  2702:14-2703:18.  Staff assisted by holding open fire doors that would have been closed had smoke or fire been visible.  2703:2-10. As stairwells are locked (and automatically re-lock when closed), staff also had to unlock the stairwell doors to permit access even for ambulatory evacuees, as well as to provide access to the evac-u-chairs.  2704:11-15; 2704:24-25; 2705:6-11.

There is no procedure for evacuating older or more infirm inmates first.  2709:4-11.

It took approximately 20 minutes to evacuate the inmates located on the third floor of Cell House 5, excluding the inmates in administrative segregation (who were not evacuated).  2710:14-23.

Without the use of either elevator, it took highly trained and well performing responders – in a situation that actually involved no fire or smoke and posed no real danger – approximately 30 minutes to evacuate the entire Cell House 5 building. 2693:20-22; Exhibit 6; Bates No. 6488.

The Fort Lyon Life Safety Officer agrees that losing access to both elevators in Cell House 5 is "a very real possibility" and that a half hour could be "a significant period of time" to complete an evacuation depending upon the actual nature of the emergency. 2712:13-19.

The housing arrangements for the concentration of geriatric, chronically ill, and physically disabled inmates at Fort Lyon – even with the assistance of highly trained and well performing emergency responders – endangers the safety of these inmates in the event of an emergency.

### 5. Providing access to programs and services to inmates housed in an infirmary for long term placement.

Section VIII(B) of the Remedial Plan provides that inmates who are housed in an infirmary due to their long-term healthcare needs will not be denied access to the programs, benefits, and services comparable to those at designated facilities.  Remedial Plan; 911:1-9.  DOC has failed to comply with this provision.

The majority of people who are permanently placed at DRDC are inmates with diabetes who are undergoing dialysis.  2915:7-2916:18; 3051:12-14;  Exhibit K-12. Although the orientation materials for DRDC provide that special-project assignments will be made available to inmates with disabilities, there are no such jobs at DRDC for assignment.  3049:2-19; Exhibit S-3.

Like DRDC, CTCF does not provide programs or services to inmates housed in the infirmary, including academic or vocational opportunities.  912:3-913:12; Exhibit 152.  Despite this fact, IWDs were being housed in the infirmary at CTCF during the last compliance period because the facility did not have sufficient number of accessible cells in other housing units in which to place these inmates.  306:18-307:24, Exhibit 456.  The AIC did not know how long these inmates were housed in the infirmary because of the

lack of other accessible cells.  The AIC testified that DOC infirmaries did not provide

programs and services.  912:10-913:16.

### 6. Implementation of policies to ensure non-discriminatory access for inmates with disabilities to the Sex Offender Treatment and Monitoring Program ("SOTMP") offered by DOC.

Pursuant to the 2008 Stipulation, DOC was required to implement a SOTMP

Phase II program at a designated facility by July of 2008.  The program was to be

comparable to the SOTMP Phase II program offered at the Arrowhead Correctional

Center ("ACC").  The purpose of the Stipulation was to remedy the access issues for

inmates requiring such treatment but who could not progress to ACC due to their

disability.  *See 2008 Stipulation #19.  See also* Exhibit D-2, ACC cannot accept any

inmates with an Medical Code 4 without a waiver, thus excluding any inmate in a

wheelchair or a walker who requires assistance with daily life activities, is blind, or

requires diabetic medication.

Peggy Heil, Chief of Behavioral Health at DOC, testified that as of May 1, 2009,

there were a total of 5000 sex offenders in DOC.  3419:24-3420:3.  Although she could

not identify the precise number of sex offenders with disabilities, she testified that only a

small percentage of inmates with disabilities are in sex offender treatment.  3419:4-

3420:7.  Despite the requirement that DOC ensure access to SOTMP for inmates with

disabilities, Ms. Heil did not track the number of sex offenders that have disabilities.

3420:11-13.  Ms. Heil did not know how many sex offenders were in wheelchairs as of

May 2009, how many were hearing impaired as of May 2009, or how many were vision impaired as of May 2009.  3420:20-3421:18.  She also had minimal communication with the AIC between 2008 and 2009.  3424:17-21.

CTCF established SOTMP Phase II on August 14, 2008.  3426:7-11.  However, in spite of the Stipulation that required such a program to be implemented, CTCF did not track whether any inmates with disabilities were attending the sessions.  3426:18-19. Although such information could be retrieved, to Ms. Heil's knowledge, no one did so. 3427:16-25.

DOC restricted inmates from participating in SOTMP based on determinate sentencing and prioritization efforts.  The origination date of the Administrative Regulation that set forth prioritization guidelines was March 23, 2009, shortly before the May 1, 2009 compliance date.   3429:5-13; Exhibit D-8.  Prior to this date, there were no such guidelines established.  3430:6-11.

*Conclusion for Core Purpose Five:*

DOC failed ensure access to benefits, programs and services on a non-discriminatory basis.  In doing so, it to substantially comply with the  requirement that IWDs be allowed to progress through the system in a manner consistent with that of inmates without disabilities and that IWDs not be housed at higher security facilities solely because of their disabilities. During the compliance period, IWDs were consistently excluded from lower security facilities because of their disabilities.  DOC

failed to adequately staff lower security facilities to provide medical treatment to IWDs, and has used that failure to justify excluding inmates with disabilities from those lower security facilities.  DOC's failure is systemic and egregious.

DOC failed to implement a consistent, standardized procedure for IWDs to obtain jobs within the DOC and failed to properly include the AIC in the jobs process.  As a result, IWDs were excluded from coveted CI programs and other programs and jobs.

DOC did not substantially comply with the requirements of the RP the Stipulations regarding the care and treatment of diabetic inmates, including providing effective training for staff and education for inmates with diabetes and the proper provision of diabetic medications.  DOC has consistently and continuously failed to live up to the standards of care for the treatment of diabetes, and DOC's performance has declined rather than improved during the compliance period.

Neither the DOC as a whole, nor FLCF in particular, can ensure the safe and effective evacuation of inmates with disabilities collected and housed at that facility.  In view of the concentration of geriatric, chronically ill, and physically disabled inmates at FLCF – and in view of the excessive and permanent concentration of these vulnerable inmates on the upper floors of a cell house dependent upon two functioning elevators for safe and timely evacuation – this situation does not constitute substantial compliance with the requirements of Section XX(A) of the Remedial Plan.

DOC does not provide programs or services for IWDs housed in the infirmaries for long-term placement due to health care needs.  IWDs are more likely to be housed in the infirmaries long term due to their medical conditions.  DOC therefore failed to comply with its obligation to ensure that such inmates are not denied access to programs, benefits, and services comparable to those at designated facilities.

Finally, in administering SOTMP, DOC failed to implement policies to address the treatment of sex offenders with disabilities to ensure non-discriminatory treatment. DOC failed to adequately track or identify sex offenders with disabilities and therefore was unable to show substantial compliance with its obligation to administer SOTMP in a non-discriminatory manner and to provide reasonable accommodations to sex offenders with disabilities.

## G.  Core Purpose Six: Notification to Class Members of Rights Under the Remedial Plan

To ensure that IWDs have notice of their rights under the Montez case, Section XVIII of the RP requires that upon arrival at a DOC facility, inmates are provided relevant information regarding the accommodations and/or assistive devices that will be made available to accommodate disability needs.  The RP also requires that facilities provide information about the availability of the AIC and the ADA grievance procedure. These materials are to be provided in an accessible format.

Despite these requirements, as of May 1, 2009, facilities were not in compliance with providing the information required by the RP.  863:17-23.  As part of the facility

audit conducted by the office of the AIC, facilities were required to provide evidence that facility orientation materials are available in accessible formats, that inmates are notified that the RP exists and how to obtain a copy, and that the required information pertaining to the role of the AIC and the ADA grievance process is contained within the orientation materials.  Exhibit 129.  After review of the information provided by each facility, the AIC concluded that information about the role of the AIC and the ADA grievance procedure was not uniformly present in all facility orientation packets.  864:5-11.  Furthermore, where inmates required orientation in accessible formats, the AIC concluded that facilities lacked conclusive evidence that the offenders who require a specific format for the [orientation] material actually received materials in that format.  864:12-20.  Although the AIC recommended the development of a consistent Montez orientation packet to be provided to inmates at all the facilities, such a packet was not created by the compliance date of May 1, 2009.  863:23-864:4.

See Appendix 12, which supports the conclusions made by the AIC and shows specific facility deficiencies in orientation materials.

*Conclusion for Core Purpose Six:*

DOC facilities did not provide the requisite information regarding accommodations that will be made available, the role of the AIC, and the ADA grievance procedure in their orientation materials.

# VII.  CONCLUSION

The Remedial Plan represents a comprehensive scheme to remedy disability discrimination at the DOC.  As already recognized by this Court, the RP is "an integrated document that is synergistic . . . meaning that it's more than the sum of its parts."  Sept. 16, 2010 Trans., p. 7, attached as Appendix 13.  Thus, a determination of substantial compliance is not merely a checklist of whether there have been certain provisions of the RP that have been satisfied, but rather, when looking at the implementation of the RP as a whole, whether the intent of the RP has been satisfied.  In determining whether substantial compliance has been achieved, the Court must asses if there has been a deviation from the RP's requirements that serves to frustrate the purpose of the decree. *Wolfe*, at 1086, citing *Jacob & Youngs, Inc. v. Kent*, (citations omitted).

The overall goal of the RP is to ensure that DOC properly and timely identifies inmates with the relevant disabilities and provide those inmates with access to the programs, services and benefits of the DOC on a non-discriminatory basis.  DOC's failure to satisfy each of the six core purposes, as articulated herein, frustrates the purpose of the RP and reveals a lack of institutionalized procedures to accomplish its purposes. *See Wolfe* at 1086.

It is clear that the person charged with implementing the RP, the AIC, was never given the authority to force compliance - and this fact alone places the DOC in substantial non-compliance with its obligations under the RP.  *See Halderman v.*

*Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 323 (3rd Cir. Pa. 1990).  It is also axiomatic that in order to achieve the purpose of the decree, DOC has an obligation to timely and properly identify the inmates with the relevant disabilities, as discussed in Core Purpose Two.  Otherwise, the portions of the RP which detail the services, programs and benefits to be provided to these individuals have little meaning.

DOC's failure to identify the class prior to the compliance deadline frustrates the intent of the RP.  Proper identification of class members is one of the key interest at stake in this case and the failure to comply with that directive has a direct, material and adverse affect on implementing the entire RP.  *See Fortin, supra* at 795.  Thus, even assuming *arguendo* that the other core purposes were found to be satisfied, the failure to identify the class members alone would mandate a finding of substantial non-compliance.

As outlined in this brief, Plaintiffs submit that DOC has failed to satisfy the material criteria of all six core purposes of the RP.  Most significantly, there are still serious deficiencies in the provision of accommodations, and benefits, programs and services provided to inmates with disabilities.  Providing basic accommodations such as such as hearing aids, prosthetic devices, and Offender Care Aides are vital to IWDs to allow them to participate in daily life activities.   Although the Plaintiffs acknowledge that there was some evidence that DOC has improved access to certain accommodations, most notably in providing sign language interpreters for deaf inmates, the successes are isolated, and do not overall satisfy the core purposes of the RP.

The failure of DOC to allow IWDs to progress to the lower security level facilities and to ensure that these inmates have access to the desirable programs at the lower security facilities also frustrates the purpose of the RP, as outlined in Core Purpose Five. Good performance at these lower level facilities which have off ground crews increases an inmate's chance for parole. The opportunity to work at the myriad of vocational CI jobs at the lower level facilities also give inmates an opportunity to learn new skills, which can translate to job opportunities upon release from DOC. For the inmates and for society in general, rehabilitational opportunities are an important interest that IWDs are forced to forfeit when they do not have access to these programs.

Another area of heightened importance is the failure to provide proper care and treatment to inmates with diabetes, as explained in Core Purposes Two and Five. The failure to diagnose inmates with diabetes and to provide essential medical care for their disease can lead to increased and serious complications of the disease, including an increased risk of death. Thus, the interest at stake is of great importance, making the consequence of failure to comply very serious. *See Fortin, supra* at 795.

The bulk of the evidence submitted by Plaintiffs was the testimony of the AIC, who testified with great credibility. It is undisputed that the AIC and her staff worked hard to implement the RP and with the utmost good faith. Although Holst testified to the genuine efforts of her office and a few other DOC employees, much of the evidence showing non-compliance with the RP was submitted through her testimony. She testified

that the facility audits conducted by her office regarding compliance showed multiple, recurring problems with implementing the RP.

On the other hand, a good portion of DOC's evidence in this compliance hearing consisted of policies and procedures that were written with the intent to properly implement the RP, and high-level administrators to testify to these policies.  However, the mere fact that such policies and procedures exist do not prove that DOC acted in conformity with the mandates of the policies.  *See Clark v. California, supra* at 1225, ¶ 248.  Similarly, the fact that four of DOC's case managers and a former ADA Litigation Coordinator from one of the facilities testified on the steps that they took to implement the RP does not necessarily prove systemic compliance.  *Id*. at 1223, ¶ 239.

The failure of DOC to implement basic, reliable systems to track and monitor IWDs is fatal to achieving substantial compliance.  Even when DOC produced computerized evidence of its efforts, the records were shown to be replete with errors and contained information that contradicted the information provided by the AIC.  The examples were numerous:  several different computer systems containing disability information that were maintained by different individuals, including DOC's main database, the DCIS system upon which staff was expected to rely, but which contained inaccurate and conflicting information; the jobs/program computerized information contained inaccurate disability determinations and underestimated the number of IWDs in DOC;  the information provided from different sources regarding the identity and

placement of OCAs contained inaccurate and conflicting data; the disability data contained on cell house rosters was shown to be erroneous;  the information maintained by the AIC concerning disability status and accommodations granted often conflicted with the information known to Clinical Services and information regarding the assistive devices given to IWDs was not being properly recorded.  The overall failure to implement reliable systems to track material aspects of the RP prohibited the AIC from tracking and monitoring inmates with disabilities as required under the RP, and frustrated the purpose of the decree.

As outline in this brief, DOC failed to meet material criteria for each of the Core Purposes of the RP.  As such, DOC has not substantially complied with the RP.

WHEREFORE, Plaintiffs respectfully request that this Court grant a hearing on the remedies that should be granted and the appropriate procedures that should be implemented to achieve substantial compliance.

Respectfully submitted this 23rd  day of May, 2011.

*Attorneys for Plaintiffs*

*/s/ Paula Greisen*
Paula Greisen
Jennifer W. Riddle
KING & GREISEN, LLP
1670 York Street
Denver, CO  80206
(303) 298-9878
Fax: (303) 298-9879
greisen@kinggreisen.com
riddle@kinggreisen.com

Edward T. Ramey
Blain D. Myhre
Lara E. Marks
ISAACSON ROSENBAUM, P.C.
633 17th Street, Suite 2200
Denver, CO  80202
(303) 292-5656
ERamey@ir-law.com
BMyhre@ir-law.com
LMarks@ir-law.com

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 23rd  day of May, I electronically filed the foregoing **PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING STATUS OF COMPLIANCE WITH THE REMEDIAL PLAN AS OF MAY 1, 2009** with the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Elizabeth H. McCann
James X. Quinn
Jacquelynn N. Rich Fredericks
Colorado Attorney General's Office
1525 Sherman Street
Denver, CO  80203
(303) 866-3261
Fax: (303) 866-5443
beth.mccann@state.co.us
james.quinn@state.co.us
jacquelynn.fredericks@state.co.us

*Attorneys for Defendants*

*/s/ Laurie A. Mool*
Paralegal, King & Greisen, LLP

196