IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-JLK-OES

JESSE (JESUS) MONTEZ, *et al.*,

Plaintiffs,

v.

JOHN HICKENLOOPER, *et al.*,

Defendants.

## DEFENDANTS' FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

THIS MATTER comes before the Court for ruling on Defendants' substantial compliance with the terms of the Remedial Plan approved by this Court in this class action lawsuit. The Court conducted a lengthy eight week compliance hearing relating to the issue of substantial compliance. Having reviewed the evidence presented at the hearing, and being otherwise fully advised in the premises, the Court issues the following Findings of Fact, Conclusions of Law, and Order.

## FINDINGS OF FACT

The Remedial Plan contains 36 separate sections which outline various obligations on the part of the Colorado Department of Corrections (CDOC or DOC). The overall purpose of the Remedial Plan is to provide its disabled offenders access to CDOC programs, benefits, and services consistent with legitimate penological interests. Along these lines, all CDOC facilities designated to house offenders with disabilities are required to provide comparable programs, services and benefits to those available throughout comparable CDOC facilities to ensure that offenders with disabilities are not

discriminated against because of their disability. The evidence presented at the Compliance Hearing established the following with respect to each section of the Remedial Plan:

### I.  Policy

The Court finds that this section of the Remedials Plan sets forth the overall objective of the Remedial Plan - to provide its disabled offenders access to CDOC programs, benefits, and services consistent with legitimate penological interests, and to ensure that offenders with disabilities are not discriminated against because of their disability.

The evidence presented first established the overall structure of the CDOC and its multiple prisons, custody levels and inmate population.  **Exhibit Q-12** is the Organization Chart for the CDOC at the time of the compliance deadline.   This exhibit outlined the organizational structure of executive staff at the CDOC.  It lists Mr. Zavaras as the executive director with three directors as his direct reports.  There is also a chart for prison operations, and a chart for clinical services.[1]  There are twenty-two (22) state prisons and four (4) private prisons where the offenders are housed in Colorado.[2]  During the compliance hearing, in July of 2010, there were 19,914 male offenders and 1995 female offenders incarcerated at within the CDOC, which was slightly less than average.  In addition, at any given time, there are between 10,000 and 12,000 offenders under jurisdiction on the parole side, either in Community Corrections or on parole.[3]  **Exhibit J-12** is the monthly population capacity report, issued at the end of May of 2010.  The report breaks down all of the facilities that house the offenders, along with each

---

[1] Shoemaker, p.2806.
[2] Shoemaker, p.2741.
[3] Shoemaker, p.2740, 2765.

facility's custody designation. **Exhibit K-12** breaks out the institutions at the statutory

security levels, levels 1 through 5.  Colorado uses four classification designations:

minimum, minimum R, medium, and close.[4]  Several of the facilities, such as Sterling,

have offenders at every custody level.  Sterling is the largest state facility, with the

capacity to house 2,564 offenders, and statutorily is at level 5.  By design, Sterling is

supposed to house offenders of all custody levels.  It is split up between east and west

sides.  One side is the low side of the institution, housing minimum and minimum R

offenders, and the high side of the institution houses medium, close, and some of the

administrative segregation offenders.  Most medium facilities have offenders at several

levels.[5]

Mr. Aristedes Zavaras, the executive director of the CDOC testified as with

respect to the efforts of CDOC management staff as it pertains to overall compliance with

the Remedial Plan and its policy.  As the executive director, he has direct oversight of the

Department of Corrections, which encompasses all the prison facilities, as well as parole

and community.

Upon taking over the role as the Executive Director for CDOC in 2007, Mr.

Zavaras was specifically briefed about the Montez lawsuit and the Remedial Plan

requirements.  Mr. Zavaras' intention was to comply with all aspects of the Remedial

Plan, as it was a priority for him.  Upon taking office, Mr. Zavaras and his then director

of Prisons, Mr. Gary Golder, traveled to every facility in the state in the Spring of 2008

for meetings with the management team of each and every facility.  The sole purpose of

the meetings was to discuss the importance of compliance with the Remedial Plan.  As

---

[4] Shoemaker, p.2743.
[5] Shoemaker, p.2744.

stated by Mr. Zavaras, it was one of the CDOC's highest priorities. The management staff at the facilities was very receptive at the meetings during which Mr. Zavaras emphasized to them the importance of overall compliance.[6]

In addition, Mr. Zavaras communicated the priority of compliance to the staff at the CDOC in various other ways. He had regular directors meetings with executive staff. This staff included three division directors: the Director of Prisons, Bob Cantwell; the Director of Parole, Community and the Youth Offender System, Jennine Miller; and the Director of Administration and Financial Services, Karl Spiecker. The fourth person involved in those meetings was the inspector general, Jim Welton. The director of Prisons had three deputies. The deputy in charge of clinical services was Joanie Shoemaker. In addition the two prison deputies split responsibility for the various CDOC facilities throughout the state. One was Lou Archuleta, and the other was Tony Carochi.[7] Those three deputies were in the facilities and meeting with line staff continuously. Compliance with the Remedial Plan was a regular topic of discussion among that group, as well as at monthly team staff meetings. The three directors kept Mr. Zavaras apprised of the progress of compliance with the Remedial Plan. They were very aware of his expectations of adhering to each and every aspect of the Remedial Plan and its Stipulations. If there were any pressing issues that required his involvement, he would get involved.[8]

Ms. Tammi Williams also testified about CDOC's overall compliance with the ADA through the American Correctional Association (ACA) accreditation process. Ms.

---

[6] Zavaras, pp. 2723-26.
[7] Exhibit Q-12 – organization chart for the CDOC.
[8] Zavaras, pp.2722-2727, 3190, 3194, 3246.

Williams is the accreditation administrator for the CDOC. She has worked for the CDOC for over 20 years as a policy coordinator and administrator for the CDOC. She currently manages the entire ACA accreditation process for the entire CDOC.[9]

The ACA is the largest organization that provides accreditation for correctional entities including jails, community corrections and parole. Currently, forty one states and Puerto Rico participate in the ACA accreditation process. The process is lengthy a laborious process. It includes both internal and national audits.[10]

Every year the CDOC undergoes an internal audit by an audit team consisting of correctional employees that have gone through a certification program. This is done to prepare the facilities for the national audits conducted by the ACA. The internal team consists of a medical person, a life safety person, and a security specialist. The audit team spends anywhere from three to four days at a facility observing, interviewing staff, and interviewing offenders. The team reviews all of the ACA standards, many of which relate to the ADA and Rehabilitation Act. Each standard has a folder which is required to demonstrate compliance in both policy and practice. There is then an out-briefing with the warden and his staff to let them know the team's findings. A report is created and if

---

[9] Williams, p. 3724.
[10] Williams, pp. 3726-34

there is an area of non-compliance, the particular facility must develop a plan of action demonstrating how the facility is going to correct the noncompliance.[11]

As part of the accreditation process a significant amount of data is collected and analyzed including what are known as "outcome measures".  This includes medical information and data, as well as an incident summary encompassing security information such as how many assaults, how many times a chemical agent was utilized, how many grievances were substantiated, and how many deaths occurred. This data gives the CDOC an idea of how well the medical clinics are operating, how well they are treating communicable diseases and chronic care conditions such as diabetes, hypertension. There is also a review the number of specialty consults – how many offenders where referred outside the institution for specialty medical examinations and treatment.  This allows the CDOC to analyze trends and identifies areas that need improvement.[12]

Ms. Williams also testified at length regarding the national audit process and accreditation process which is conducted every three years.  The national audit is conducted by three or four auditors, from the ACA.  At least one of those auditors is a medical professional. Approximately four weeks prior to the audit, an ACA poster is posted throughout the facility.  It notifies staff and offenders of the upcoming ACA audit and the dates the auditors will be there. It also gives staff and offenders an address, so

---

[11] Williams, pp. 3726-28.
[12] Williams, p. 3728.

that offenders and staff can write to ACA with any concerns.  Before the auditors arrive,

they review incident summaries, litigation summaries, including disclosure of any

pending litigation involving the particular facility or department, and outcome measures.

Upon arrival, the national auditors receive a tour during which they focus on

talking confidentially with both offenders and staff.  If the ACA received letters from

staff or offenders, the auditors may ask to speak with the offender privately. At the

conclusion, the auditors may go through the ACA files.[13]

There are 527 standards associated with the audit. Of those, 61 are mandatory. In

order to be ACA accredited, the CDOC must be 100% compliant with all mandatory

standards, and at least 90% compliant with the remaining 466 standards.  The auditors

make sure the CDOC has both policy and practice that meets ACA standards.[14] They

review three years worth of records and documentation.  They also randomly review

medical, mental health and offender department files.  Typical questions of offenders are,

"Do you feel safe" or, "Do you know how to access medical care?"[15]

The national audit process is generally three days for a facility, two days for

headquarters, two days for Correctional Industries, three days for parole and community

corrections, and two days for therapeutic communities.  At the conclusion of the audit,

---

[13] Williams, pp. 3729-33.
[14] Williams, pp. 3727, 3732-33, 3744,
[15] Williams, p. 3733

the auditors provide findings. They complete a report, and if anything is found not compliant, the CDOC must complete a response to noncompliance, and either do a plan of action to correct it, ask for a waiver, or appeal the finding. After that, at the ACA conference, the CDOC must appear before the ACA commissioners for a panel hearing. The audit team makes recommendations to that panel, and the panel can award that accreditation.[16]

As it pertains to compliance with the Remedial plan, Williams discussed **Exhibit R-12** which is a rendition prepared by Williams of ACA standards that encompass Remedial Plan and ADA issues. Williams testified that the CDOC has been 100% compliant with these standards since she became the ACA coordinator in 2006. Examples of the standards include: Written policy, procedure, and practice provide that single occupancy cells/rooms shall be available, when indicated, for inmates with severe medical disabilities; a requirement that inmates with disabilities are housed in a manner that provides for their safety and security and that housing for inmates with disabilities is designed for their use and provide for integration with other inmates; a requirement that programs and services are accessible to inmates with disabilities who reside in the facility; written policy, procedure, and practice that provides for the assignment of appropriately trained individuals to assist disabled offenders who cannot otherwise perform basic life functions; written policy, procedure, and practice that provides

---

[16] Williams, pp. 3733-34.

education, equipment and facilities, and the support necessary for inmates with

disabilities to perform self-care and personal hygiene in a reasonable private

environment; written policy, procedure, and practice that prohibits discrimination based

on an inmate's disability; written policy, procedure, and practice that provides for

identification of special needs inmates; a requirement that medical and dental adaptive

devices (eyeglasses, hearing aids, dentures, wheelchairs, or other prosthetic devices) are

provided when the health of the offender would otherwise be adversely affected; a

requirement that there is consultation between the facility and program administrator (or

a designee) and the responsible health care practitioner (or designee) prior to taking

action regarding chronically ill, physically disabled, geriatric, seriously mentally ill, or

developmentally disabled offenders concerning housing assignments, program

assignments, disciplinary measures and transfers to other facilities; written policy,

procedure, and practice prohibiting discrimination on the basis of disability in the

provision of services, programs, and activities administered for program beneficiaries and

participants; written policy, procedure, and practice provide for staff and offender access

to an appropriate trained and qualified individual who is educated in the problems and

challenges faced by offenders with physical and/or mental impairments, programs

designed to educate and assist disabled offenders, and all legal requirements for the

protection of offenders with disabilities; a requirement that inmate work plans provide for

employment for inmates with disabilities; a requirement that provision is made to meet

the educational and vocational needs of inmates who require special placement because of physical, mental, emotional or learning disabilities; a written policy, procedure, and practice that provides for a system of two-way communications between all levels of staff and inmates; a written policy, procedure, and practice provide that new inmates receive written orientation materials and/or translations in their own language; a requirement that upon arrival at the facility, all offenders are informed about how to access health services and the grievance system and that this information is communicated orally and in writing, and is conveyed in a language that is easily understood by each offender; a transportation system that assures timely access to services that are only available outside the correctional facility;  a written plan for access to 24 hour emergency medical, dental, and mental health services availability including on-site emergency first aid and crisis intervention, emergency evacuation of the offender from the facility, use of an emergency medical vehicle, use of one or more designated hospital emergency rooms or other appropriate health facilities, emergency on-call or available 24 hours per day, physician, dentist, and mental health professional services when the emergency health facility is not located in a nearby community, and security procedures providing for the immediate transfer of offenders, when appropriate, a requirement that there is a plan for the treatment of offenders with chronic conditions such as hypertension, diabetes, and other diseases that require periodic care and treatment which addresses the monitoring of medications, laboratory testing, the use of chronic care clinics, health record forms, and

the frequency of specialist consultation and review; a requirement that exercise areas are available to meet exercise and physical therapy requirements of individual offender treatment plans; a requirement that the facility provides a variety of work assignments that afford inmates an opportunity to learn job skills and develop good work habits and attitudes that they can apply to jobs after they are released; a written policy, procedure, and practice that provides that inmates with hearing and/or speech disabilities, and inmates who wish to communicate with parties who have such disabilities, are afforded access to a Telecommunications Device for the deaf (TDD), or comparable equipment, and that public telephones with volume control are made available to inmates with hearing impairment.[17]

Both Mr. Zavaras and Ms. Williams testified that the CDOC is one of fourteen states that received the "Eagle Award" which is the highest award that ACA gives to an agency when the entire agency, all components of it, are accredited. Ms. Shoemaker also testified concerning ACA accreditation. She is a national auditor for the ACA and has audited other states' prison systems. None of the states that Ms. Shoemaker audited have as extensive a system concerning the identification and handling of disabled offenders, as is available in the CDOC. Additionally, in Ms. Shoemaker's review of other states as it pertains to identification and treatment of disabled offenders, the CDOC has one of the most progressive systems she has seen.[18]

**II.    ADA Inmate Coordinator**

---

[17] Exhibit R-12, Williams, pp. 3743-51.
[18] Shoemaker, pp.2900-2901; Zavaras, p.2727; Williams at p. 3751.

This section of the Remedial Plan requires that the CDOC establish a position entitled the "ADA Inmate Coordinator" (AIC) who is responsible for ensuring that specific policies and procedures are developed and implemented by CDOC to assure nondiscrimination against all offenders who have disabilities. The AIC is responsible for tracking of disabled offenders throughout the CDOC; for ensuring that they are not denied access to programs, services and benefits offered by CDOC because of their disability; and coordinating the placement and treatment decisions regarding offenders with disabilities with appropriate personnel throughout the CDOC as defined in the Remedial Plan. This section also requires that the AIC receive medical training relevant to the four disabilities encompassed within this litigation.

The CDOC designated Ms. Cathie Holst as the AIC. Ms. Holst testified at length regarding her involvement in the negotiation of the Remedial Plan**, Exhibit A**, as well as its implementation in the CDOC.

Before the Remedial Plan went into effect, Ms. Holst managed all of the litigation for the CDOC. She also managed legal assistants at each law library at all CDOC correctional facilities. After the Remedial Plan was signed, Ms. Holst began implementing its provisions and notifying all offenders about the plan. To begin the implementation of the Remedial Plan, Ms. Holst organized a meeting with CDOC information technologies or computer personnel, the head of the clinical services, and the chief medical officer in order to inform them about the plan and discuss its implementation.[19]

When the Remedial Plan was first signed, the AIC's office consisted of Ms. Holst and one part-time employee. An additional full time position was added to the AIC's

---

[19] Holst, pp.31-32, 1067-1069; Exhibit A.

office a short time later.  Additional funds were requested from the legislature, and the AIC's office hired five more legal assistants, and additional administrative support.  Over the years since the implementation of the Remedial Plan, the AIC's staff has substantially increased and as of the compliance deadline consisted of five legal assistants in addition to Ms. Holst and administrative support to deal exclusively with disabled offender issues. As a result, the conditions for disabled offenders in the CDOC improved substantially since the Remedial Plan was implemented. It is undisputed that compliance with the Remedial Plan was Ms. Holst's number one priority.[20]  Ms. Shoemaker, the Director of Clinical Services and Deputy Director of Prisons, testified that the recommendations from the AIC's Office carries considerable weight with the Director of Prisons with respect to implementation of the Remedial Plan.[21]

Ms. Holst, as the AIC, was instrumental in drafting and revising the CDOC Administrative Regulations (AR) pertaining to disabled offenders.  **Exhibit C,** AR 750-04, outlines the policy concerning disabled offenders in the CDOC.  It provides CDOC staff directives relating to what is expected of them pertaining to disabled offenders and compliance with the Remedial Plan.  The Regulation also has several attachments, A through E.  Attachment A is the form that the AIC developed, called the Request for Accommodations.  An offender completes this form and submits it to the AIC's office if he or she feels the need for disability accommodations.  Attachment B is the medical release the offender is required to sign.  Attachment C is the functional ability questionnaire that the offender completes.  This form provides the AIC's office with information as to the offender's functional ability which helps the AIC's office in

---

[20] Holst, pp.1081-1082, 1754, 2592.
[21] Shoemaker, p. 3181.

determining what accommodations, if any, a particular offender should receive. Additionally, this questionnaire aids medical staff in the medical screening process. Attachment D is a form that allows offenders to opt out placement in an ADA designated facility.  Attachment E is Implementation/Adjustments form that allows specific facilities to tailor implementation of the AR to facility specific conditions. [22]

Ms. Holst initiated the development by information technologies staff of a database and tracking system for all the disabled offenders.  She also initiated development of various forms that offenders could use in order to contact the AIC's office and request accommodations.  She set up a database that the AIC's office used to track all communications received from offenders.  The Remedial Plan provides that the AIC's office is responsible for tracking of disabled offenders and coordinating their placement and treatment decisions.  The evidence established compliance with these obligations.  See Section IX, Tracking.

Ms. Holst, as the AIC, received medical training regarding the four disabilities. Upon signing of the Remedial Plan, Ms. Holst attended a one-day training on diabetes with class counsel's diabetic expert, Linda Edwards, a one-day training on hearing with class counsel's hearing expert, Larissa McClung, and a three day long training on vision at the Denver School for Deaf and Blind.  **Exhibit F** is Ms. Holst's training record that shows in July and August of 2004, she had three days of training on vision disabilities, three days of training on deaf individuals, and eight (8) hours on July 26, 2004, of diabetic training with Linda Edwards.  Ms. Holst also received yearly Montez refresher

---

[22] Holst, pp.1088-1092; Exhibit C.

training and presented a training session for case managers and legal assistants on

Montez case management in November of 2008.[23]

III.     **Definitions**

    N/A.

IV.     **DRDC: Reception Center Processing**

    This section of the Remedial Plan requires that new disabled offenders be

processed in a timely manner through the Denver Reception and Diagnostic Center

(DRDC).  It also requires that offenders be initially screened for disability at intake, that

they be accommodated through the intake process that they are provided with information

concerning their rights as individuals with disabilities, the ADA grievance process and

with contact information for the AIC.  The section further provides for disability

designation for disabilities arising after intake and offenders already in the CDOC system

that are disabled.

    Jim Falk testified with respect to the CDOC intake process as it pertains to

disabled offenders. He is the Administrative Services Manager for the Denver Complex.

The Denver complex consists of the Denver Reception and Diagnostic Center (DRDC),

Colorado Correctional Center, and Denver Women's Correctional Facility.  DRDC is the

CDOC intake facility.  All offenders that are sentenced to the CDOC from the court

systems are processed through DRDC and appropriately assessed and classified for

---

[23] Holst, pp.1095-1096; Exhibit F.

assignment into permanent facilities.[24]  DRDC processes approximately 11,400 offenders per year.[25]

Ms. Holst, Ms. Shoemaker and Mr. Falk testified that upon arrival at DRDC, an offender's paperwork is verified, and the offender is moved to a holding cell.  The offender is given thorough information about the CDOC and is required to fill out documents regarding his or her history.  In that holding cell there is a video stream of an ADA video.  **Exhibit I**.  The video addresses all aspects of the Remedial Plan, the ADA, the ADA grievance procedure, how an offender requests to be screened for disability, how an offender can request accommodations for his or her disability through the AIC. The video is closed captioned and signed by class counsels' hearing expert, Larissa McClung.[26]

If a foreign language translator is needed, that is communicated to CDOC staff and it is arranged and staff schedules a translator to come in to go over the entire intake process with that offender.  The translator comes in for the full day to go over everything from intake assessment to medical orientation for that offender. This occurs for any type of foreign dialect.[27]

The Denver complex also has an orientation handbook or written material that is available to offenders in each housing unit that provides information regarding the facilities in the Denver Complex.  With regard to intake, the CDOC presented **Exhibit Q**, the Offender Reception and Orientation Implementation Adjustment 850-7, which

---

[24] Falk, pp. 3277-78.
[25] Falk, p. 3313.
[26] Shoemaker, p.2768-69; Holst, pp. 148-149; Falk, p. 3280.
[27] Falk, pp. 3280-81.

describes the intake process for all offenders.[28]  Offenders are assessed at the inception of

the intake process for disabilities.  If an offender has a disability, the disability is

identified on a self-reported medical history for the offender.  Intake clinic employees

then generate form 300-104RD"C", temporary offender accommodations, describing and

identifying any ADA accommodations and/or approved medical appliances.  Intake and

clinical employees coordinate with each other to ensure the necessary accommodations

are identified.  The temporary offender accommodation form is generated and completed

by the medical professional assigned to intake who makes notations of the disability of an

offender and the recommendations to manage that offender at DRDC. These are known

as temporary accommodations based upon offender self reporting, staff observation,

durable medical equipment that comes in with the offender, and any documents that are

transferred from the county regarding medical concerns for the offender**.  Exhibit J** is the

temporary offender accommodation that the intake nurse completes. This document is

immediately sent in electronic form from medical and intake unit to the AIC and medical

files, and in paper format to the offender's the working file and to a "High Profile

Offender" packet.  A high-profile offender alert is a document utilized by the CDOC to

manage high-profile offenders, or offenders that have certain needs during their intake

and assessment and classification. It is a document that allows the employees at the

Denver Complex to staff each offender individually to document a disabled offender's

needs in order to ensure a safe and secure environment, and to meet the needs of that

---

[28] Falk explained the difference between Administrative Regulations (A/R) and Implementation Adjustments (I/A).  A/R's govern the whole Department of Corrections. I/A sheets are guidance from that administrative regulation specific to a particular facility.  It provides further information regarding processes or operations specific to a particular facility for implementation of the Administrative Regulation at that specific facility.  An I/A cannot contradict an AR. Falk, p. 3282.

offender.   All high profile alerts, including all offenders with disabilities, are discussed with the administrative services manager, the health services administrator, and the custody and control manager for management of that offender, and then also with the appointing authority or warden and management staff at roll call.  After roll call, a staffing occurs on how a particular offender will be managed.[29]

Exhibit H is the document that is utilized by the intake correctional staff to complete the assessment of an offender during the intake process. It is filled out on day one by the intake nurse after the offender is seen. The document specifically asks "does this offender have mobility, hearing, or visual impairment? Yes or no."[30]  In the event of a positive response staff provides details and sign the form at the bottom, along with the offender.  This document is completed to aid staff during the full intake assessment classification process which is done later.  After the document is generated by the intake nurse, the temporary accommodation form becomes part of the 300-104 document which provides how the CDOC is going to manage that offender after he or she is processed through intake into the housing unit.  The information is sent to the housing units, and provides housing staff with information regarding how a disabled offender will be managed during the intake and assessment process.  The intake supervisor also contacts the assigned living unit employee to communicate necessary accommodations for the offender.[31]  In the late afternoon of day one of orientation, staff meets with all the new arrivals.  Staff conducts an orientation that covers the rules, offender responsibilities, and the function and the programs of the institution.  The orientation also addresses expected behavior of the offenders.  Exhibit K is the hard copy of the orientation that occurs with the offenders on day one into the evening of day one.  It provides an overview of how the

---

[29] Falk, pp. 3282-88.
[30] Falk, p. 3286.
[31] Falk, pp. 3287-88.

CDOC functions and the processes offenders need to follow.  Offenders can ask questions to seek clarification through that intake process.  It encompasses everything from mental health, medical, the department operations, the policies that guide the operations of the institution. It includes offender grievances, recreational time, day room time, showers, counts, offender resources, the expectations of offender behavior, and all aspects of operations and expected behavior and what is going to occur during their stay. It also provides an overview of the assessment classification process and that assignments to permanent facilities will be made by offender services after orientation is completed. It also has a ADA aspect and discusses disability determination, how the disability will be verified, and that offenders with disabilities will be provided audible information regarding their rights with disabilities, accommodations can be provided relative to their disability, the process in which to apply for an accommodation, and that offenders will not be denied access to programs and benefits simply because of their disability.  The last page of **Exhibit K**, contains a section captioned "nondiscrimination policy" which states "In compliance with Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975, it is the policy of the Colorado Department of Corrections to provide employment, benefits, and/or services to employees, offenders and the public without regard to race, color, national origin, handicap, age, sex, religion or sexual orientation.  Accordingly, the CDOC shall not discriminate on the basis of these factors in its employment practices or in admission or access to treatment, programs, and/or services.  Offenders who feel they have been discriminated against on the basis of any of the prohibited factors may file a grievance in accordance with the provisions of administrative regulation 850-4 Offender Grievance System."[32]

---

[32] Falk, pp. 3302-05, 3313-15.

On day two, there are two components of orientation.  There is a testing phase of the offender population - psychological screening tests, a substance abuse test, a mental health follow-up, an educational interview, and then a mental health orientation on communicable disease.  Before this, the diagnostic programmer makes an entry into the offender's case management tracking system chronology stating whether the offender's temporary accommodations were received.  The diagnostic programmer enters the temporary accommodations in the admissions data summary alert comments area of the Admission Data Summary in the PCDCIS (the CDOC internal data system) and the case manager tracking system chronological notes.  In addition, intake personnel notify the assessment and classification testing supervisor of the need for an interpreter, translator or possible accommodation for testing and programming.  Programmers and/or supervisors take steps necessary to obtain services on a timely basis to program offenders assigned to their caseload.  Case manager take steps to arrange for those services on after approval by AIC or administrative head/or designee.[33]

Day three of orientation starts in the morning with an extensive medical examination conducted by a medical provider.  There is a full medical screening including a physical examination, urinalysis, DNA, and a mental health evaluation with a psychiatrist. There is also a dental examination.  At that time the doctor or physician's assistant providing the exam reviews the temporary accommodations provided to the offender on day one.   The temporary accommodation and related information and forms are available for them to either validate or make changes to the accommodations.  Updated information is entered into the PCDCIS and updated form 300-104DC is generated.  The AIC automatically receives notification electronically if the medical provider makes any changes to the temporary accommodations.  This updated form is

[33] Falk, pp. 3294-95,  3292-93, 3299.

also e-mailed to the Denver complex ADA group. The Group includes all individuals who is going to see the offender or have interactions with him or her within the complex that need that information in order to successfully manage ADA offenders, including all intake staff, the medical Health Services Administrator, the nurse III, nurse II, nurse I, and the custody and control supervisors ranging from lieutenants to captains and also sergeants.  Depending on what time the offender is finished at orientation, the offender may begin the diagnostic interview with the correctional officer and the specialist programmer to assess programmatic needs.[34]

On day four, staff completes all documentation, puts the files together, clinical and any remaining interviews with mental health, drugs, and sex offender personnel are completed.   Follow up is conducted to validate any issues prior to closing out the offender's file and assigning them a classification code so the offender can be assigned to a permanent facility.  After completion of that process the offender remains at DRDC for anywhere from 10 days to 30 days depending upon on their classification, bed spaces, and offender needs.[35]

A computerized system for the intake process was developed for the CDOC for the Montez intake process.  Ms. Linda Caudill testified that she worked with the CDOC computer technicians for the last five years to develop these programs known as the CDOC Encounter Program.  She also trains the clinical services staff on how to use the intake computer system applications.  They are trained on how to actually log onto the system and the ADA Montez intake screen, along with how to navigate their way through the application and between different pages and data.  Once the intake nurse enters all the

---

[34] Falk, pp. 3295-300.
[35] Falk at p. 3297.

necessary data on the application, the temporary accommodations, if any, are automatically created in a word document for the nurse to save and print out for distribution to different housing units.  This is **Exhibit T**.  Ms. Caudill also developed the Montez follow-up entry medical encounter and another manual to use to train the providers on how to enter the data into the application.  Again, just like with the intake form, the providers are trained on how to enter the data relating to the ADA screening that occurs on day three into the encounter program.  This is **Exhibit U**.  As noted above, on day three, the providers follow-up with what the intake nurses did on day one.  They review the information from the nurses and either agree with it, or if they disagree, make changes in the computer.  This follow-up encounter also creates a word document with the temporary accommodations that are posted in cell houses and distributed to various locations, until the permanent accommodations are made. Ms. Caudell testified that training for the intake nurses was completed by one-on-one on location due to the fact that there are very few intake nurses.  If new providers or nurses are hired on staff at DOC, Ms. Caudill trains them remotely on a one-on-one basis.[36]

Finally, Ms. Caudill also assisted with the creation and training associated with the computer programming pertaining to requests for screening and accommodations by offenders who are already in the system and not identified during the intake process.  Ms. Caudill, Ms. Hay, and another CDOC computer specialist created a manual for purposes of training with respect to this application as well, **Exhibit V**.  This training and the manual show the providers how to log into the PCDCIS system, and how to get into the Request for Accommodation application. Ms. Caudell walks the providers through the application from entering the screening form and the evaluation forms, to how to save the record.  At the end of the screening, the findings are automatically sent to the Chief

---

[36] Caudill, pp.3948-3949, 3951-3958, 3975; Exhibit T-Exhibit W.

Medical Officer, who reviews them and makes her recommendations as to the offenders'
disability and accommodations.  After the CMO completes her review, her findings are
automatically routed to the AIC's office for final determination and the issuance of a
permanent Accommodation Resolution.  **Exhibit W** contains the training  rosters for the
follow-up screening as well as application training relating to the program associated
with offenders already in the CDOC system that are screened.[37]

As previously discussed, AR 750-04 is the overall global policy for the
Department relating to the ADA.  **Exhibit P** is Implementation Adjustment (I/A) 750-4.
This document is an implementation adjustment of the administrative regulation that
implements the Administrative Regulation as it pertains to the Denver Complex and
documents the processes described above.   The exhibit states that the administrative
services manager will serve as the ADA coordinator for the Denver Complex. Section IV
outlines the intake procedures.[38]

**Exhibit N** was identified by Mr. Falk as an example of a memo to a case manager
regarding an Accommodation Resolution of a new offender demonstrating how staff
follow up after the AIC issues an Accommodation Resolution. This one is dated February
3, 2009.  The exhibit is an example of a memorandum generated from Falk to the custody
control manager of the area where the offender is housed, and to the offender's assigned
case manager.  This was to document that the ADA Accommodation Resolutions that
were sent by the AIC were given to that offender, signed by that offender, and put in the
offender's working file.  Mr. Falk also identified **Exhibit O** which is a sample
confirmation form to a case manager confirming that the offender has received all

---

[37] Caudill, p.3948-3949, 3951-3958, 3975; Exhibit T-Exhibit W.
[38] Falk, pp. 3297-3300.

required accommodations.  Staff is required to sign the form and return it to the facility ADA coordinator, who was Mr. Falk in this case. Generally the forms verify that the offender received his or her durable medical equipment such as a cane or oxygenator.  Once staff validate that that an offender has his or her DME, the information is entered in the AIC database confirming offender receipt of the DME.[39]

Mr. Falk identified **Exhibit Z**, as the Denver Complex IA regarding offender property.  On page 2 there are directives relating to healthcare appliances or denial of healthcare appliances.  "Denial of healthcare appliances is documented on DNC form 8506I, Medical Recommendation for Inmate to Retain Personal Property."  This documentation includes any accommodations that will take the place of denied healthcare appliance.  For example, if an offender comes in with a cane that is hollow, which creates a security issue within the institutional setting, the cane is removed, and it is replaced with an approved CDO C cane.  Mr. Falk testified that personal healthcare appliances that pose a threat to the security of the facility are replaced with a like item already in CDOC stock.  Once an offender has been issued DME, custody and control marks the item by etching it with the offender's CDOC number and gives it a tracking number.  It is then the offender's permanent property and is put on the offender's property list.  CDOC staff utilize the property list for comparison when the offender is moved to make sure the offender has all items that he or she was assigned.  Ms. Shoemaker, the Director of Clinical Services, also testified about **Exhibit Z**.  She pointed out that Clinical Services must give a reason if they deny a particular DME.  Property that moves with the offender is placed in plastic bags and documented on the property list.[40]  The property remains with the offender throughout the duration of incarceration, and the offender retains the

---

[39] Falk, pp. 3300-3303.
[40] Shoemaker at pp. 2780-82.

property when he or she discharges.  For example, if an offender comes into DRDC without a wheelchair, and at some point during the incarceration is issued a CDOC wheelchair, when the offender discharges, he or she retains that wheelchair.  This is true for all DME issued by the CDOC including not only wheelchairs, but braces, hearing aids, etc.  Mr. Falk testified that this policy, although expensive, was adopted in order to help offenders be successful on the outside, to meet their needs on the outside, and to assist them in that transition rather than taking this property.[41]

**Exhibit M** is the Colorado Correctional Center (Camp George West) offender orientation information.  Camp George West is a minimum work camp that houses approximately 150 offenders. It is also a transfer facility for offenders that are paroling, going to community corrections, or discharging their sentences.  Accordingly, offenders often are sent there for one day in order to parole, discharge or be placed in a halfway house in the Denver metropolitan area.  The orientation materials in **Exhibit M** contain an ADA Montez section which states: "At the beginning of the intake process, it will be determined whether the offender has a disability. If so, the disability will be identified on the offender verification form. Offenders with disabilities will be provided written and/or audible information regarding their rights as individuals with disabilities, the accommodations that can be provided relative to their disability, and inform them that they will not be denied access to programs, benefits, and services simply because of their disability."  It goes on to state, "When offenders are evaluated and coded, offenders will be assigned by offender services to those facilities which meet their physical needs." It also informs offenders that "A copy of the Montez Remedial Plan is available in the general library."[42]

---

[41] Falk, pp. 3316-19.
[42] Falk, pp. 3319-21.

Mr. Falk explained that **Exhibit Q** evidences that all orientation materials, **Exhibits K** and **Exhibit M**, are provided in both oral and written form.  Attachment C to **Exhibit Q** is the certificate of orientation which lists the information that is covered during the orientation of an offender.  The offenders sign the document which states: "I certify that I received an orientation and applicable written orientation materials in which their purpose and instructions were explained to me."  The document contains approximately 39 different categories including COPD, grievances, counts, and the Americans with Disabilities Act.[43]

Mr. Engstrom identified **Exhibit R** which is a list of inmates admitted to DRDC from May 1, 2008 to May 1, 2009, showing movement of the offenders from DRDC within 60 days, another requirement of this section of the Remedial Plan.[44]

The Remedial Plan sets out a few ways that the AIC may be notified of an offender's disability after the intake process.  Clinical services may contact the AIC or a family member may contact CDOC personnel. If any staff or contract employees become aware of an offender's possible need for accommodation, they notify the AIC via e-mail with a copy to the facility ADA coordinator and offender's assigned case manager.  Generally, any offender who felt that he or she needed accommodations for a disability would contact the AIC.  The offender fills out a form called Request for Accommodations (RFA), and a medical release.  The process is similar to that an individual would follow when requesting SSI or veteran's benefits.  Offenders fill out the proper paperwork and are screened for disabilities before they can benefit from the process.

---

[43] Falk, pp. 3321-22.
[44] Engtrom, pp. 1832-33

The RFA is a very simple form that requires the offenders to describe problems they are having, which of their major life activities are affected, and what accommodations they believed they need.  In addition to the form, they had to fill out the medical release and a functional ability questionnaire that asked the offenders about what activities they could and could not do in relation to their alleged disabilities.  After appropriate paperwork is received, the AIC refers the offenders to clinical services to have a doctor screen the offender to determine whether or not he or she is in fact disabled.  The doctors decide, based upon established criteria and their screening of the offender, whether or not that particular individual is disabled.  The finding is reviewed by the Chief Medical Officer (CMO).  The CMO then contacts the AIC about the decision and the AIC completes an Accommodation Resolution form.  Both the AIC and the CMO sign the Accommodation Resolution, which is sent to the offender and the facility.[45]

Dr. Paula Frantz, the CDOC Chief Medical Officer, testified about the CDOC screening process at length.  She confirmed that Ms. Holst's (the AIC's) description of the screening process, including the RFA, medical release and functional ability questionnaire.  When the AIC receives a request for accommodation and the appropriate paperwork, the AIC notifies the Chief Medical Officer's assistant that the request has been received and the offender needs to be scheduled for a screening.  The CMO's office then works with the clinic where the offender is housed to get the offender scheduled for screening.  Dr. Frantz testified about the close working relationship between clinical and the AIC, including monthly meetings and daily interaction relating to individual offender accommodations.[46]

---

[45] Holst, pp.1074-1076.
[46] Frantz, pp. 4321-22, 4730-31.

In order to determine if an offender is mobility disabled, clinical staff completes a mobility evaluation, which measures range of motion, muscle strength, observation of ADL activities, as well as functional testing.  Once that exam is completed, the offender is scheduled back again in approximately two weeks with the same provider, if possible, to repeat the same mobility exam. The second exam is completed to detect malingering. The mobility exam takes a great deal of time, and it is very resource intensive. The screenings for hearing, vision, and diabetes are typically accomplished in a single appointment.[47]

Once the provider has completed the exam, he or she completes the electronic screening forms.  For mobility, there is also a paper documentation of the exam.  The provider forwards all information and documentation to the CMO who reviews and evaluates the information and makes a recommendation for or against disability status, and suggests basic accommodations that address clinical services. If the CMO needs more information, for example an audiology or an ophthalmology exam or more testing, she ends the evaluation back to the provider, and her assistant schedules and requests whatever information the CMO needs.   The CMO's recommendations are sent to the office of the AIC. The AIC receives the CMO recommendation and makes a disability determination.  There are rarely discrepancies between the CMO and the AIC.  If there is a discrepancy, the AIC determination prevails.[48]

Ms. Shoemaker testified regarding the fact that the CDOC contracts with an audiologist to do hearing screenings when needed.  The audiologist now comes to DRDC

---

[47] Frantz, pp. 4320-23,
[48] Frantz, pp. 4320-4323

to conduct screenings to test offenders that fail the initial OAE screening test. This streamlines the process if an offender needs a hearing aid.[49]

**V-VI.  Placement; and Designated Facilities**

Section V of the Remedial Plan requires that all offenders verified to have a disability be placed in a designated facility and those with mobility impairments will be placed in handicapped accessible cells.  Section VI requires that the CDOC have designated facilities at each security level and that disabled offenders not be housed at higher security facilities solely because of their disability.

Ms. Shoemaker and testified that upon entry into the CDOC, and throughout incarceration, offenders are evaluated and given a custody level based upon security issues.  Each CDOC facility also has a designated custody level. There are five different levels of facilities, the lowest being level 1 facility, which is minimum, going up to minimum R (restrictive), medium, close, maximum, administrative segregation, which is level 5 or the highest.  The offenders can work their way through the system from the highest to lowest or other way around. The offenders' specific custody level is based on many different factors.  Their case managers assess the offender and give them so many points for each different area that they evaluate.  Based on the total scores of those evaluations, an offender is given his or her specific custody level and therefore placed at facility appropriate for their custody level.  **Exhibit A-2,** identified by Joanie Shoemaker, is Administrative Regulation 600-01 which outlines offender classification by explaining the classification instrument as well as the requirements on how often offenders have to be classified and reclassified.  Ms. Shoemaker testified that offenders reclassified at least

---

[49] Shoemaker,  pp. 3137-38.

every six months for custody classification and such classifications can be done more frequently if an offender receives Code of Penal Discipline violation, or if the offender has a new court case, or other issues occur that would affect classification rating.

There is also the Youth Offender System.  However, YOS placement is a direct sentence by the court and DOC cannot send someone into YOS voluntarily. [50]

The Remedial Plan sets forth the criteria for special placement in section V, A.

1.    Permanent Mobility Impairments

a) Permanent Wheelchair: Inmates who use wheelchairs full or part time due to a permanent disability.

b) Permanent Mobility Impairment (non-wheelchair): Inmates who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking: i.e., an inmate who cannot walk 100 yards on a level surface or climb a flight of stairs without a pause.  Such impairment may require use of a cane, prosthesis, or walker, or other assistive devices.

2.    Permanent Hearing Impairments

Inmates who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

3.    Permanent Vision Impairment

Inmates who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

4.    Permanent Diabetics:  Insulin or Non Insulin Dependent Diabetics

Inmates who are diabetic and who are or are not dependent on insulin for regulation and require accessible housing to accommodate their disabilities.

---

[50] Holst, pp. 1121-1123.

Offenders must meet the criteria specifically outlined in the Remedial Plan in order to be placed at a designated facility.  If an offender is found to be disabled but is not placed at a designated facility, the AIC contacts CDOC Offender Services to have that particular offender moved to a designated facility that has available bed space and that most suits that offender's custody level, programmatic and job needs.  Offender Services also evaluates any custody issues such a gang or staff issues.  Similarly, when Offender Services needed to move a disabled offender from one facility to another, Offender Services checks the QT profile on DCIS system for that particular offender to see if he or she has an ADA alert – if they do, they first call the AIC's office to see if the new facility they were planning to move the offender to was suitable for his or her disability; if the facility was not designated, then they would look for a bed at a different facility and run it by the AIC's office again for approval.[51] The AIC's office would approve or disapprove the facility move, by checking the offender's current employment, program enrollment, what accommodations that particular offender would need and whether or not the new facility was suitable for that offender.[52]

The Remedial Plan does not allow disabled offenders (or any offender for that matter) to choose at which facility they will be housed.  There are jobs and programs available at all custody levels and facilities that provide the same wages and the same earned time.[53]

`          Ms. Holst and other witnesses testified about "work camps."  The term "work camp" is a relatively old term used to describe level 1 facilities, because that was their original purpose when they were built.  By the time the offender reached work camp

---

[51] Holst, pp.1097-1098.
[52] Holst, p.1097.
[53] Holst, p.1118-1122, 1126-1127.

placement, he or she would have completed most of their incarceration, programming, and the education necessary.  The original purpose of it was to be a camp that does work, often in a community setting.  All of the level 1 facilities today, CCC, Delta, Rifle, and Skyline are still a type of work camp, since the offenders have generally finished all of the other requirements that they had, as far as their incarceration plan with education or treatment is concerned, and now they are a work force.  Statutorily, the offender has to be within eighteen (18) months of his or her parole eligibility date in order to qualify for a minimum, level 1, facility placement.

At any given time, about half of the CDOC population has either minimum or minimum restricted classification.  The structure and the management of level 1 and 2 facilities are fairly similar.  The population at both levels is quite transient because by that point in their incarceration, they are being submitted for Community Corrections placements and parole.  There are not many additional privileges that one would get from going to level 1 or 2 facilities.  The off grounds work assignment at level 1 is beneficial, but most of the level 2 facilities have off grounds work assignments as well.  Generally, there are a smaller amount of programs at the level 1 than at the level 2 facilities, since the offenders are supposed to have those completed by the time they get to level 1.  All facilities, regardless of their classification, have to have a work plan that employs at least 85% of their eligible offender population. Some of those level 1 facilities have crews that go off grounds for a number of days and some that go for just a day.  The daily crews take sack lunches, along with diabetic oral medications.  Diabetics are able to check blood sugar levels in the middle of the day and staff is instructed in detail on what to do if the blood glucose level is at a certain point in time.  The diabetics are allowed to work on

those crews, as long as they meet the security classification and the other issues that they are screened for just like any other offender, before they are given a gate pass. [54]  None of the level 1 facilities have 24 hour a day clinical staff so insulin dependant diabetics, like any other offender with extensive medical needs are allowed to stay at these facilities. The CDOC must evaluate placement keeping in mind the particular offender's safety and physical location of the facility. [55]

Ms. Shoemaker testified about **Exhibit B-2** which contains pictures of handicapped cells.  There are structural differences between a handicapped and non-handicapped cell.  The first picture in **Exhibit B-2** shows that the desk surface does not have a stool mounted onto the floor in front of it, as in regular cells, so that a wheelchair can wheel underneath the desk.  There are a number of requirements for writing surfaces in any cell.  This particular surface meets the ACA standards around what is needed in the room, as well as the accommodations for the disabled offenders.  The intercom system is also located lower than in regular cells, the way that door opens is different between the cells, as well as the width of the cell door to accommodate the wheelchairs. The toilet is also modified in the handicapped cells.  The regular cells use a stainless steel combo unit that has a sink and the toilet in one unit.  The handicapped cell in **Exhibit B-2** has the metal toilet, but without the sink attachment.  It has the grab bar to aid someone with mobility disability. [56]

Ms. Shoemaker testified that pursuant to the Remedial Plan, Section V, offenders who are moved from one facility to another due to their disabilities shall have the same privileges and property rights as they possessed at their former facility.  To comply with

---

[54] Shoemaker, p.2749-2755.
[55] Shoemaker, pp. 2782-84.
[56] Shoemaker, p.2772; Exhibit B-2.

that provision, the CDOC standardized the property list procedures throughout the Department.  Ms. Shoemaker testified about the **Exhibit Y**, Administrative Regulation 850-06, which governs the property that offenders may have in their possession.  There may be some differences, in part due to the assignment to a particular level of facility. There could be a hobby craft items allowed at level 1 facility, but unavailable at a level 4 facility.  The property is however, governed by policy with standardized property rights.[57] As noted above, healthcare appliances or durable medical equipment that the offender may have at the time of a move are considered offender property.  Clinical staff at intake at the receiving facility review the DME, make sure it is working properly and that it is still needed by the offender.  DME cannot be taken away from the offender without clinical staff's approval.[58]  The regulation at page 5, subsection E, 1, 2, and 6, explains how the offender property is transferred between facilities.  Whenever an offender is transferring facilities, all of their property is inventoried in the presence of the offender at their current facility, and then again at the new facility, when it's returned to them, to make sure everything got from facility A to facility B.  Page 7, subsection F3 of the AR, further dictates that if the offender needs their DME to go with them on a trip, it goes with them.  Similarly and as noted above, Page 7, subsection H1 of the AR dictates that when an offender goes out on parole, to Community Corrections, or discharges, they keep their DME or healthcare appliances.[59]  Attachment A to the AR is the inventory list that designates the number of items an offender can have in their possession.  It is also the form used when the offenders are transferring between facilities that verifies the transport of their property.  Attachment B to the AR is the actual list of items that DOC

---

[57] Shoemaker, p.2773, Exhibit Y.
[58] Shoemaker, p.2773, ln.18-25; p.2774; Exhibit Y.
[59] Shoemaker, pp.2776-77, Exhibit Y.

allows offenders to keep.  There is a letter that is annually sent to the sheriffs of the local jails, to remind them of what property is accepted at DRDC, so that the offenders only bring with them from county jail property that they are allowed to retain.  Once the offender moves to a permanent facility, they are allowed to keep more and different types of property.[60]

With respect to placement decisions, both Ms. Shoemaker and CMO Dr. Frantz testified at length regarding the CDOC M Code system.  M code stands for medical code. It is a designation that clinical services assigns to all offenders upon admission into the CDOC system that is a reflection of the approximate intensity of clinical services that an offender is going to require. The levels range from M1 through M5, 1 being virtually no need for clinical services.  M5s are people who are very complex, typically needing dialysis or end of life care.[61]

Dr. Frantz identified **Exhibit D-2,** which are the Clinical Standards and Procedures for Medical Code Classifications. This document is made available to all of clinical services, so that nursing staff and medical providers can access it as they assign medical codes to offenders.  It establishes the guidelines for determining the appropriate M code. M-Codes are initially assigned at intake when the offender arrives in the system. The provider who conducts their exam uses **Exhibit D-2** as the guideline as well as information they glean from the offender's history and the medical exam to assign the M code.  The providers reassess the M code during offender chronic care visits or any medical encounter.  Accordingly, the codes can change over time and often do change.  If

---

[60] Shoemaker, pp.2778-2779; Frantz, p. 4332; Exhibit Y.
[61] Shoemaker at pp. 2783-84; Frantz , p. 4332.

there is a disagreement between providers relating to an M-Code for a particular offender, the CMO designates the M-Code.[62]

Dr. Frantz's testimony and **Exhibit D-2** provided the Court with examples of conditions for certain M-Codes. M5 would include congestive heart failure, cardiopulmonary disease, AIDS, end stage renal disease to include dialysis, and oncology care, other high medical needs. These are very high medical needs patients including high-risk pregnancies, quadriplegia, Huntington's disease, advanced Parkinson's, Muscular Dystrophy with significant advanced functional needs, Multiple Sclerosis and any oncologic diagnosis undergoing active chemotherapy and/or radiation therapy, and any terminal illness where the provider believes the patient has less than six months to live.[63]

Conditions that would draw an M4 code are new diagnoses or diagnoses that have shown instability recently. Examples are a patient who was started on anticoagulation therapy with Coumadin in the prior three months or if they require injectable anticoagulation or a patient with chronic congestive heart failure that requires three or more medications to control. Others include poorly controlled angina, a coronary artery bypass graft in the previous six months, or a heart attack in the previous six months, a cardiac stent placed within the three months, diabetes with complications, diabetes with a hemoglobin A1C equal or greater to 9, profound anemia with a hemoglobin less than 8, low platelets less than 20,000, hepatitis C that would be actively treated with Interferon therapy, a new diagnosis of HIV, Crohn's Disease or rheumatoid arthritis that will be treated with long term injection biologic agents, musculoskeletal

---

[62] Frantz, pp. 4332-4335.
[63] Frantz, pp. 4335-36.

36

dysfunction requiring assistance with back surgery within the prior six months, paraplegia, neurologic diseases that affects the ability to perform activities of daily living, a stroke with profound residual deficit, profound Huntington's chorea, Muscular Dystrophy, and seizures not controlled with seizure activity in the prior six months.  A new onset diabetic who is insulin dependent will remain an M4 until he or she is controlled for a minimum of three months.  This is because such a diabetic can require very frequent appointments, very frequent monitoring, frequent lab checks, and aggressive intervention to get them controlled and keep them out of the hospital.[64]

M3s are typically chronic conditions that are currently controlled and stable. Examples would be diabetic patients on insulin or on oral medications with a hemoglobin A1C below 9, patients with hepatitis with compensated cirrhosis not on Interferon, or patients with neurologic diseases that are not significantly affecting the ability to do activities of daily living.[65]

M2 is a step down from M3. These may be chronic diseases that are typically very well controlled on minimum medications or minimal therapies. Examples would be controlled hypertension with a blood pressure of less than 240/90, diabetes that is diet controlled with a hemoglobin A1C less than 7, hepatitis that is stable with no evidence of cirrhosis, HIV positive but completely normal cell counts and not requiring HIV medications, seizure free for over a year without medications, a patient who has a prosthetic who requires no assistance with their activities of daily living.[66]

---

[64] Frantz, pp. 4336-38.
[65] Frantz, pp. 4338-39.
[66] Frantz, pp. 4339-40.

M1 patients are expected to be healthy with virtually no limitations and no chronic medications.  They may have acute conditions that are easily treated on an outpatient temporary basis only.[67]

The overall purpose of the M code process is to help ensure the offender is placed in a facility that has the clinical services and the clinical capability to most appropriately address the needs of the offender.  This is because certain facilities are better equipped to handle certain medical issues, or provide 24 hour care if necessary.  Housing and work restrictions are not based on the M code. They are based on the offender's ability to work.[68]

Ms. Holst became aware of some providers, particularly at Arrowhead Correctional Facility who were changing the M codes of disabled offenders, particularly diabetics, to a higher number, once the offenders were moved to a lower security level facility or work camp.[69]  Offenders housed at these facilities are required to work.  For example, the Canon Minimum Centers (CMC) is a work camp where all offenders are required to work.  It houses approximately 1242 offenders and has approximately 1300 jobs.[70]

Ms. Holst testified about working with Cheryl Smith, Dr. Paula Frantz, and Ms. Shoemaker about placement of diabetics at Arrowhead.  Ms. Shoemaker testified that there was a lot of work done between clinical services and the AIC's office to ensure that the offenders' M codes were not being raised once they arrived to Arrowhead, so that

---

[67] Frantz, p. 4340.
[68] Frantz, pp. 4340-41.
[69] Holst, p.2599.
[70] Ortiz, p. 3633.

they would have to be sent to a different facility.  Arrowhead has both a sex offender treatment program, as well as the drug and alcohol therapeutic community on site.  It is important that offenders have access to those programs, so she wanted to ensure that Arrowhead was taking M3s and M4s.  Ms. Holst spoke with Ms Shoemaker and Mr. Golder, as well as Dr. Frantz about this issue.  Each time this happened, the AIC staff notified Ms. Shoemaker, Cheryl Smith or Dr. Frantz in clinical services and they would also address it with facilities directly to see why the M code was changed.  It was a high priority for Dr. Frantz and Ms. Shoemaker to address and correct this issue.  The issue diminished over the years and was resolved prior to the compliance deadline.  Specifically, the AIC and clinical services developed a system to address the issue.  AIC staff would immediately notify Dr. Frantz and Cheryl Smith when they observed a change in an offender's M code upon movement the change would be evaluated and usually changed back to its original number thus allowing the offender to stay at the lower level facility.  There were also many instances where the offender's M code was appropriately changed since it was actually wrong to begin with.  In these cases the AIC and clinical services would obtain a waiver of the M code for those particular offenders, so that they could stay at those lower custody facilities. [71]  According to the Remedial Plan, the disabled offenders had an option to opt out from placement at designated facilities, as well as opt back into the designated facility.[72]  They contact their case managers if they wish to do so who would give them a form to fill out that the AIC's office developed so and send it to the AIC.[73]  There were some disabled offenders that did opt out of placement at designated facilities.[74]

---

[71] Holst, pp.1422-1423, 2599-2600; Frantz, pp. 4430-4472; Exhibit N-12.
[72] Holst, p.1424, ln.3-6.
[73] Holst, p.1424, ln.9-15.
[74] Holst, p.1424, ln.16-17.

## VII.    Structural Compliance/ Physical Plant Changes

<u>Stipulation</u> – *in compliance – pre-trial order, Doc. No., p.7, [4853].*

It was stipulated that the Department is architecturally compliant with the Remedial Plan and that the monitoring period has been completed.  At the hearing, Richard Weems, the Associate Director with Facility Management Services testified.   He and his staff are responsible for the physical plant, the buildings, infrastructure, utilities, and architectural issues for the CDOC.[75]  Weems testified that the CDOC spent approximately between 2 and 3 million dollars on architectural changes to comply with the Remedial Plan, and continues to spend additional maintaining architectural compliance.   As part of the Remedial Plan, the CDOC is required to provide a certain number of handicapped accessible cells in the system.  The CDOC has more than the requisite number.  This was done whenever the CDOC had opportunities to make improvements or upgrades.[76]

## VIII.   Special Placement Housing

This section of the Remedial Plan requires that the CDOC provide accessible housing in administrative and punitive segregations units.  When an offender with a disability affecting placement is housed in an infirmary for long term placement due to health care needs, the offender should be afforded the same type of programs provided to similarly situated offenders without disabilities.

---

[75] Weems, p. 3251.
[76] Weems, pp. 3251-53, 3257.

Administrative segregation is a classification process where the offenders are in longer term lockup. It is a result of multiple violations of the code of penal discipline and it results in a longer term, 23-hour lockdown situation for the offender. Punitive segregation means that due to some event in the institution, the offenders are locked up for 23-hours in a day. They can be removed from the population for 72 hours, but at the end of that time, they have to either be charged with a violation of the code of penal discipline ("COPD"), or they have to be let back into the general population. If they are charged with a COPD violation, the offenders have to go through a process, a COPD hearing and conviction to get to punitive segregation. It is not a long-term placement. Plaintiffs stipulated that Defendants are in substantial compliance with subsection A relating to accessible housing in its Administrative and Punitive Segregation Units.[77]

With respect to subsection B, Cathie Holst testified that there is no long-term placement of disabled offenders in infirmaries due to healthcare reasons. Placement in an infirmary is a temporary assignment, whether an offender is disabled or not. Therefore, no offender, regardless of their disability, has access to comparable programs, benefits and services that are offered in general population facilities while temporarily housed in an infirmary. Offenders are admitted for medical treatment or are recovering from surgery or related medical treatment, and then go back to their permanent facility. Disabled offenders are treated no differently than inmates who are not disabled and temporarily admitted to an infirmary for medical treatment or to recover from a medical procedure.[78]

---

[77] Pre-trial order, p.7, Doc.No. [4853].
[78] Holst, p.912-913.

IX.     **Tracking**

The Remedial Plan provides that the AIC office is responsible for tracking disabled inmates to ensure equal access to programs, services and benefits offered at DOC. Further, the Plan directs the office to monitor the placement of disabled inmates in appropriate designated facilities. The AIC may grant temporary accommodations pending verification of disability. The evidence has proved that the DOC is in substantial compliance with these provisions in several ways.

Tracking of disabled inmates throughout the DOC system is performed and coordinated by the AIC office pursuant to Sections II and IX of the Remedial Plan.  Ms. Holst testified that one of the first things she accomplished in order to implement the plan was to develop a set of forms that offenders could use in order to contact the AIC's office and request accommodations.[79]  She developed an internal database that the AIC's office used which tracked all communication received from the offenders. This database with a legend was introduced as **Exhibit E**.[80]

The AIC database tracks absolutely everything:  when the offender puts in a request for accommodations, when the AIC sends a request for screening to clinical services, when a delay memo is sent if more information was needed and the process was going to be delayed, when the provider sends the screening results to the CMO for review, when the CMO makes a determination, when the CMO sends the forms to the AIC, when the AIC makes a determination, when the accommodation resolution is completed, when the resolution is sent to Ms. Holst as the AIC for her signature, when it

---

[79] Holst, p.1070,  ln.3-8.
[80] Holst, pp. 1391-1392.

is sent to the facility, when it is delivered to the offender, when an offender files a grievance, when an offender sends the AIC a letter, when the AIC receives a phone call or e-mail in regard to a specific offender; everything is tracked.[81]  The database that Ms. Holst set up went through numerous revisions over the years which expanded and improved it, as she learned more about what needed to be tracked.[82]  Information such as offender grievances, when DME was sent to the offenders, offenders' movements between facilities, co-pay refunds, issuance of magni-pages, backpacks, and vibrating watches began to be recorded.[83]  These were tracked in separate excel databases.[84] Yet another database was set up by the AIC to track and try to eliminate loss of any DMEs during transfers.[85]  The AIC staff would notify the ADA coordinator at a facility and tell him/her the inmate was coming so the coordinator could check and make sure all DME arrived with the inmate and that information was entered into the database.[86]  Once the offender arrives at the new facility, the ADA coordinator at that facility looks at their accommodation resolution sheet to make sure that he or she has arrived at the new facility with all the DME that he or she has on the AR.[87]  The ADA coordinator notes in the database that the offender arrived at the new facility, what DMEs he or she has and if there is anything missing, the AIC can then track it immediately and give the offender the accommodations they need.[88]

An example of how individual facilities tracked disabled inmates is in **Exhibit D**, an operational memo from Ft. Lyon (OM750-04 p. 3).  At that time, Ft. Lyon required

---

[81] Holst, p.1077, ln.5-17.
[82] Holst, p.1070, ln.19-24.
[83] Holst, p.1077. ln.17-23.
[84] Holst, p. 1398, ln.21-20
[85] Holst  p.1131, ln.21-23.
[86] Holst, p. 1398, ln.18-25, p. 1399, l.1-4
[87] Holst, pp.1131-1132.
[88] Holst, pp.1131-1132.

that each cell house retain a three-ring notebook that contained the yellow copies of the accommodation resolutions for each cell house in the cell house office. It also stated that the resolutions were available on DOCNET and the Q drive. The disabilities were to be put on the bed rosters as well.[89]

The AIC database is maintained in the AIC internal computer system as an access spreadsheet.  Ms. Jacobson testified regarding the extensive database maintained in the AIC office. When an offender contacts the office to request a screening, the data is entered. A new entry is made on a separate line any time there is a change; prior entries are not updated.[90]  The AIC database contains information on any inmate who has ever had any contact with the AIC office regardless of whether they were found to be disabled and includes those who are no longer in the system.[91]  **Exhibit 141** is a snapshot in time of the database that the AIC's office uses which reflects the multiple entries for various offenders with certain columns displayed.**[92]**  **Exhibit E** has been filtered to remove individual entries for a single inmate so it just reflects one entry for each inmate who has contacted the office in order to demonstrate the total number of inmates who had contacted the office as of May 1, 2009: 4,285.[93]  The database includes many columns in which various data is reflected such as the offender's disability, contact dates, dates that notices of the need for more information or accommodation resolutions were sent, dates various documents were received, dates of referral for screenings by clinical staff, dates the evaluations were received, dates the Accommodation Resolutions were sent out,  and

---

[89] Holst, pp. 1399-1400;  Exhibit D
[90] Jacobson, pp.3996, 1079
[91] Jacobson, pp. 3997, 4031; Holst, p. 2587.
[92] Holst  pp.1077-1078.
[93] Holst, pp. 1392-1393.

so forth.[94]  There was also a section for notes.[95]  The AIC office could pull various reports from the database depending on what information was needed.[96]

Ms Holst testified that she thought during her time as the AIC, her office had a contact with about 6,000 plus offenders.[97]  All of those offenders were not necessarily disabled, some may have just filed a grievance with the AIC or written a letter; in other instances a family member contacted the AIC on behalf of the offender.[98]  As of May 1, 2009, when newly admitted potential disabled inmates came through DRDC, the AIC office was notified through an electronic system. An inmate who was already incarcerated could also request accommodations, and the AIC office started the process. The office also asked case managers to notify the AIC office if they had anyone on their caseload who might have a disability.[99]  Clinical staff would notify the AIC electronically when they suspected a disabled inmate.[100] The AIC office would send an offender a memo three times telling the offender what information he or she still needed to submit to receive accommodations. After the third time, the AIC office did not contact them further.  This information was reflected in the database.[101]

The AIC database can be accessed from all facilities through the ADA coordinator at the facility.  The coordinators can get information about an offender's disability and accommodations through accessing the database.[102]  In addition, the AIC office had a physical file on each individual who contacted the office and an ongoing

---

[94] Holst, pp.1079-1080, 1393-95.
[95] Holst, p. 1395.
[96] Holst, p. 2592.
[97] Holst, p.1081, ln.9-12.
[98] Holst, p.1081, ln.13-18.
[99] Holst, p.2590, ln.21-25, p. 2591, ln.1-13.
[100] Holst, p. 16-25.
[101] Holst, p.1399.
[102] Jacobson, p. 3997, ln.15-25.

worksheet which was a working document with a synopsis of what occurred with each contact, like a cheat sheet. That way, if the person managing that inmate were to leave the AIC office, the person who took over that file would have a summary.[103] Ms. Holst felt that she should keep a log of everything that went on with respect to disabled offenders, so that her staff could have a global picture of what was happening on a daily basis.[104] The AIC's office lost some staff in the very beginning, before the AIC worksheets were kept, and it was difficult for a new person to step in right away and know what is going on with those files.[105] To prevent that from happening again, Ms. Holst required everyone in the AIC office to log all events, good or bad, regarding any given offender on the AIC worksheet.[106] The worksheets were kept on every offender with whom the AIC's office had any type of contact, even if they never submitted a request for accommodations.[107]

Another CDOC database which tracks disabled offenders is the ADA Montez system which is contained in the DOC DCIS system.[108] Mr. Paul Engstrom set up that system. The DCIS system is the one that contains the ADA alert for each offender.[109] When a request for accommodations is received, AIC staff enter it into the ADA Montez system as well as the AIC internal system. That entry populates the ADA alert that DOC staff throughout the department can access.[110] AIC staff and some clinical staff (intake staff) can enter data into ADA Montez.[111] The QT profile is a query to DCIS to pull an

---

[103] Holst, pp.1397, 1082-1084.
[104] Holst, p.1082.
[105] Holst, p.1082, ln.24-25; p.1083, ln.1-3.
[106] Holst, p.1083.
[107] Holst, p.1083.
[108] Holst, p.1129.
[109] Holst, p.1129.
[110] Jacobson, p. 3999; Holst pp. 2593, 1129.
[111] Jacobson, p. 3998.

offender's profile. It includes the ADA information.[112]  There is an alert placed on the QT profile to indicate ADA status.  It is a "D" at the top part of the screen and a "Y" in the lower part.  A staff member can click on the "Y" and get specific accommodation information on that offender. If he or she move the cursor over to the "Y" and hits the F7 key, information pops up such as the accommodation screen.[113]

All facilities have access to the ADA alerts.[114]  The ADA alert stays with a person the entire time he or she is being screened and for 60 days after their final disability determination has been made, whether the offender was found disabled or not.[115]  If the offender is determined to be not disabled, the alert expires after 60 days.[116]  The fact that the ADA alert stays on for 60 days is a benefit to the offender so the offender has the ability to file a grievance if he or she is unhappy with the disability screening determination.  The alert stays on during that time.[117]  The office of the AIC can remove the ADA alert if the offender is found not to be disabled and he or she can then be placed at any facility.[118]

In addition to these databases, Ms. Holst testified that the AIC staff scanned in all of the most current Accommodation Resolutions for each disabled offender, and put them on the DOC's intranet, R drive, so that anyone in the DOC could look there for an offender's accommodations.[119]  The private facilities' staff did not have access to the R drive, so these documents were put on the webpage, so that well before May 1, 2009, all

---

[112] Engstrom, p. 1830.
[113] Engstrom, p. 1831.
[114] Holst,  p.1129, ln.14-17.
[115] Holst, pp.1129-31.
[116] Jacobson, p.3999.
[117] Holst, p.1131.
[118] Holst, p.1425.
[119] Holst, pp.1127-1128.

CDOC and private facilities had access to these documents.[120]  There were no historical documents on the CDOC's intranet, only the latest and most current Accommodation Resolutions, so that it would be very clear to staff what was in effect at that time and there was no confusion.[121]

Once the job process was implemented, the AIC had a separate document developed that enumerated the offender's accommodations as they related to their specific jobs or programs.[122]  The offenders tend to change their jobs and programs often, so it was much easier for the AIC office to keep the other accommodations separate from the job/ programs accommodations, so that the AIC would not have to redo the offenders' accommodation resolutions each and every time they changed a job or a program and go through the entire process of gathering all the signatures for the ARs.[123]  Those two documents were accessible for staff to view on the intranet, and the AIC always advised the staff to look at those documents and ask the AIC for clarification if there were any questions or confusion.[124]

**Exhibit J-2** is a memo that Cheryl Martin sent in an e-mail, on Cathie Holst's behalf, to all staff at DOC, on August 12, 2008, advising them that the offenders' Accommodation Resolutions were available on the DOC's R drive. She explained their arrangement and that they are continually revised and updated, so that staff needed to check back often to make sure they had the latest version.[125]  This procedure relieved the housing staff of having to keep a physical notebook of all of the accommodation

---

[120] Holst, pp.1128, ln.25;.1129, ln.1-8.
[121] Holst, p.1128, ln.4-7.
[122] Holst, p.1128, ln.7-11.
[123] Holst, p.1128, ln.11-16.
[124] Holst, p.1128, ln.16-21.
[125] Holst, pp.1430-32.

resolutions at each housing unit, since they were now available on R drive.  The memo

also explained to staff that there was no HIPAA violation if they reviewed the

Accommodation Resolutions on the computer. [126]  The memo gave instructions to staff

on what to do in various situations.[127]  An offender could have an ADA alert on the

system but not yet have an Accommodation Resolution for various reasons that were

explained, and the staff was instructed to always call the AIC office in those situations.[128]

For example, an offender could be in the process of getting screened, so he or she would

have the ADA alert but no permanent accommodations.[129]  An offender in such a

situation would often have temporary accommodations, which were available for staff to

view on the R drive as well.[130]

        In addition, Mr. Engstrom, at Cathie Holst's request, set up a system in the

database for CDOC that would prepare daily movement reports for disabled inmates. It

runs every night automatically at 10:32 p.m. It's **Exhibit F-2**.[131]  It provides the AIC

office with a daily movement report, showing every offender with an ADA alert that is

moved each day within the DOC. [132] The reports were being utilized for some time prior

to May 1, 2009.[133] The purpose of the report was to alert the ADA coordinator at the new

facility of an offender with an ADA alert being moved there, so that they could ensure

that this offender was properly accommodated for his or her disability per the

Accommodation Resolution, that he or she had all necessary DMEs, and that he or she

---

[126] Holst, p.1431, ln.1-5.
[127] Holst, p.1431, ln.5.
[128] Holst, p.1431, ln.5-9.
[129] Holst, p.1431, ln.9-15.
[130] Holst, p.1431, ln.16-19.
[131] Engstrom, p. 1834.
[132] Holst, p.1425, ln.20-25, p 1131, ln.4-9, 14-16.
[133] Holst, p.1426, ln.3-7.

was placed properly and had an offender care aide, if necessary.[134]  A designated person at the AIC office checks the daily movement sheet on a daily basis, logs the move on the AIC's worksheets, and notifies the facilities of the disabled offender's move to their facility so that they can prepare.[135]  The AIC also created a computer screen where the ADA coordinators completed information on those newly arrived offenders for the AIC's office so the AIC could ensure the offender was properly accommodated, as well as to ensure that DME was properly transported with the offender from one facility to the other.[136]  For example, if you look at John Huebschmann, **Exhibit F-2** shows what time he arrived at what facility and from what facility he was transferred.[137]  The program looks for the offender alert flag populated by the ADA Montez system.  If the flag is on the offender's record and the offender is moved, the offender shows up in this daily movement report.[138]  Cathie Holst had Cheryl Martin send out a memorandum, **Exhibit G-2,** in an e-mail on October 2, 2008 to all staff at CDOC, informing them that the daily movement report would be immediately available on the DOC's R drive instead of the AIC office e-mailing it to facilities on a daily basis.[139]  It further explained the ADA coordinator's obligations at the facility level and the need to complete the AIC forms also available on the R drive that tracked offender's DME after inter-facility moves.[140]

The AIC had some issues with Offender Services to ensure the proper placement of the disabled offenders.[141]  They worked closely together to resolve the issues, and that problem was drastically improved as they moved along in this process where Offender

---

[134] Holst  p. 1426,ln.8-25; p. 1427, ln.1.
[135] Holst, p. 1131, ln.16-19.
[136] Holst, p. 1427, ln.1-8.
[137] Engstrom, p. 1835, ln.5-16
[138] Engstrom, p. 1835, ln.17-25
[139] Holst, p. 1427, ln.9-24, p.1428, ln.6-15.
[140] Holst, p. 1428, ln.15-21.
[141] Holst, p. 1424, ln.18-25.

Services understood what the process was and what their responsibilities were and that they needed to contact the AIC before moves.[142]  Ms. Holst testified that particular problem was not totally eliminated but, certainly, it was not what it once was.[143]  Ms. Holst developed **Exhibit E-2,** a corresponding memorandum that was sent to all facility wardens, the deputy director of parole, ADA coordinators, and case managers with specific information and instruction on the same day the October 2, 2008 e-mail referenced above was sent.[144]  In the memo, Ms. Holst explained to them what needed to be done in order to come into compliance with the Remedial Plan.[145]  Ms. Holst explained the reports that Mr. Engstrom was creating and putting on CDOC's R drive for all staff access.[146] Ms. Holst further explained in the memo that Mr. Engstrom was providing the AIC's office with daily movement reports of offenders with ADA alerts between facilities.[147]  Ms. Holst noted in this memo that the AIC office would continue to e-mail the daily movement reports to private facilities, as they did not have access to DOC's R drive.[148]  It explained that the daily ADA rosters and Accommodation Resolutions were there to replace the notebooks in housing units where the hard copies were previously kept.[149]  It told the ADA coordinators what their responsibilities were at the facility level and explained how the accommodations tracking movement system worked to ensure the proper DME transport between facilities.[150]  It explained that offenders often had temporary accommodations pending completion of the screening

---

[142] Holst, p.1425.
[143] Holst, p.1425.
[144] Holst, p.1428,1432, 1433.
[145] Holst, p.1433.
[146] Holst, p.1433.
[147] Holst, p.1433.
[148] Holst, p.1429.
[149] Holst, p.1433.
[150] Holst  p.1433.

process.  It was important for the offenders to have their temporary accommodations available on the R drive until their screening process was finalized so staff could ensure they were properly accommodated during that time.[151]  The memo explained that the AIC was in the process of moving all of the information that was on the R drive, such as accommodation resolutions, daily ADA alert movement sheets, and such, to the website, so that the private facilities had access to them as well, instead of having the AIC e-mail it to them on a daily basis.[152]  Other information such as proposed changes to the grievance procedures in AR 850-04 were explained and that staff was welcome to give comments to the AIC's office or call them with any questions and/ or concerns.[153]  The memo also gave the contact information, name, and phone number for the appropriate person in the AIC office in case staff had any questions or concerns about a particular offender, and encouraging the staff not to hesitate to contact the AIC's staff if needed.[154]

Another report, **Exhibit H-2**, is the ADA daily roster. It is generated every morning about 12:32 a.m., and it goes to the shared drive so all staff can access it. It reflects all offenders in every facility by living unit and by pod who have been designated as disabled in ADA Montez. All staff have access to the shared drive where they can click on Montez, the ADA daily roster, and the date.[155]  It includes mobility, hearing, vision disabled and diabetics.[156]  A staff member can call this up and see the living unit and the pod within that unit for the disabled offender.[157]  All staff could see this on

---

[151] Holst, p.1434.
[152] Holst, pp.1434.
[153] Holst, pp.1434.
[154] Holst, pp.1429.
[155] Engstrom, p. 1836.
[156] Engstrom, p. 1837.
[157] Engstrom, p. 1837.

DOC's R drive.[158]  This daily roster was put on the website well before May 1, 2009, so that both DOC staff and the private prisons could have access to it.[159]  The roster listed offenders' names, DOC numbers, their living units, pods, and their facilities.[160]  Once the daily ADA rosters were being sent out, the ADA coordinators at each facility were required to track, as part of the database, when each disabled offender left and arrived at which facility, whether the offender arrived with everything that was on his or her accommodation resolution form as far as the DME, in case it was missing during transport, so it could be located right away.[161]

The property officers were required to track, as part of the database, when they received the DME, when they gave it to the offender, if they had to put batteries in it or if it was ever sent out for repair.[162]

In summary, the AIC office tracked disabled inmates in several ways. The ADA alert was used by Offender Services to coordinate with the AIC office any movement of a disabled inmate. In order to check on the status of an offender who was in the system as of May 1, 2009, staff had several options:

> 1) they could look on DCIS for the ADA alert in the QT profile and click on the alert for more information;
> 2) they could look on the R drive at the daily movement report or at the Accommodation Resolutions; these were emailed to private facilities prior to their availability on the website;
> 3) they could check the ADA daily roster report that goes out every morning on the R Drive; before May 1, 2009, the daily roster was on the AIC website as well so both DOC and private facilities could access it;
> 4) they could look on DOCNET (DOC intranet) under legal services and look at the actual accommodation resolutions by name or DOC number, or

---

[158] Holst pp.1429-1430.
[159] Holst  p.1430.
[160] Holst, p.1429.
[161] Holst, pp.1077-1078.
[162] Holst, p.1078.

5) they could contact the ADA coordinator at the facility or the AIC office.[163]

Private facilities have ADA coordinators who have access to the AIC data base. They receive the ADA daily roster report and have access to Accommodation Resolutions through DOCNET on the AIC website.[164]  Private facilities can also contact the AIC office by phone or email.[165]

## X.    Reasonable Accommodations

This section requires that offenders with disabilities be provided reasonable accommodations to ensure that they have access to comparable programs, services and benefits provided to non-disabled offenders.  Examples of reasonable accommodations as listed in this section include "special equipment (such as readers, sound amplification devices, or Braille materials), proving offender or staff assistance, qualified sign language interpreters, or modifying work or program schedules."

As outlined throughout these findings and Order, CDOC offenders are generally accommodated in multiple ways depending upon their disabilities. The individual sections explain the accommodations specific to those sections. Overall, they are generally accommodated through the Office of the AIC as explained in Section II, which has developed regulations and procedures for offenders with disabilities to be identified and accommodated.  In addition, offenders are accommodated through the intake process – section IV; are accommodated with respect to placement in designated and accessible facilities – sections V, VI, VII, and VIII; are tracked and monitored to insure they have appropriate assistive devices, are placed in appropriate facilities and are not denied access to programs, services and benefits; are provided with reasonable accommodations

---

[163] Jacobson, pp. 4003-04; Engstrom, p.  1838.
[164] Jacobson, p. 4014; Engstrom, p. 1837.
[165] Jacobson, p. 4014.

including special equipment – section X; have access to an ADA Grievance Procedure – section XII; are offered a range of programming, jobs, and vocational opportunities similar to those at non designated facilities – section XIII; are provided with everyday living assistance – section XIV; are provided with health care appliances – section XVI; are provided with appropriate library equipment for their disabilities; are accommodated through institutional procedures relating to orientation, notices, alarms and announcements – section XVIII; are accommodated during an evacuation – section XX; are accommodated during count – XXI; are accommodated when being restrained – section XXII; are accommodated when searched – section XXIII; are accommodated during transport – section XXIV; are accommodated during visitation; are accommodated when health care appliances are removed – section XXVII; are provided with accommodations for parole hearings – section XXVIII; are not excluded from community corrections – section XXIX; and are accommodated on parole - section XXX.

Offenders are provided offender specific accommodations by way of offender specific Accommodation Resolutions. At the bottom of each Accommodation Resolution is a legend stating who should receive a copy of the Resolution. In addition to the offender, who gets two copies, a copy goes to the offender's working file, medical file, mental health file, to the facility ADA coordinator, the warden, case manager, any other CDOC or contract employee, such as a work supervisor or a teacher. The ADA coordinators report the date the Accommodation Resolution is delivered to the offender to the AIC so it can be tracked in the data base. **Exhibit H-3** contains demonstrative Accommodation Resolutions issued by the AIC's office over time. These include

Resolutions issued to diabetic, non diabetic as well as Accommodation Resolutions for hearing, vision, and mobility disabled offenders.[166]

An example of reasonable accommodations was demonstrated through evidence pertaining to hearing disabled offenders housed at CTCF.  Many of the hearing disabled offenders are housed at CTCF and assigned to work with the case manager Aubrey Bell, in cell house 7.  With respect to the hearing disabled offenders, Mr. Bell was required to ensure that he was aware of which cell house housed hearing disabled offenders or any other kind of disabled offender as well.  He became very familiar with offenders who had serious hearing issues or were hearing disabled, and he was able to offer them, in Ms. Holst's opinion, a level of assistance that other case managers were maybe not able to give them, due to their unfamiliarity with hearing disabled individuals, who have some unique and special characteristics that one has to know when communicating with them.[167]

**Exhibit M-2**, identified by Ms. Holst, is the CDOC Administrative Regulation pertaining to effective communication.  It states that a sign language interpreter is to be provided to an offender whose primary means of communications is sign language for any important medical appointments or discussions, or any due process hearings, as well as for assistance during orientation at facilities.[168]  Plaintiffs stipulated that the CDOC is in compliance with 2008 Stipulation numbers 5 and 6 which require that the CDOC provide offenders with sign language classes, and with sign language interpreters.[169]

---

[166] Holst, pp.1437-1442; Exhibit H-3.
[167] Holst, p.1581.
[168] Holst, pp.1445-1446; Exhibit M-2.
[169] [Doc. No. 4853], Pre-trial order, p.7,

The undisputed evidence is that the CDOC has gone above and beyond the requirements of the Remedial Plan providing interpreters for CDOC expended considerable sums with respect to sign language interpreters.  Interpreters show up at CTCF, which is the CDOC facility that houses most deaf offenders, at least once a week for staffing with the hearing-impaired.[170]  Interpreters are also provided on individual bases for meetings with medical, disciplinary hearings, meetings with mental health, and programs including alcohol or sex offender treatment, and religious services.  In this context, staff requests an interpreter for the hearing-impaired.  If an interpreter was needed, staff would fill out a form and submit it to the administrative services manager, who would consult with the AIC, to provide interpretation for those offenders.[171]  The evidence indicated that the CDOC expended approximately $160,000 on interpreters during fiscal year 2008-2009. **Exhibits O-2**, **P-2**, **Q-2**, and **R-2**, evidence the substantial sums spent accommodation the hearing disabled for interpreters, real time court reporters for special master hearings, educational classes, weekly meetings, and even religious services.[172]

Starting early on after the Remedial Plan was signed in 2003/2004, Ms. Holst worked with Diana Reese, who is in charge of library materials at DOC, to supply and maintain the DDOC libraries with materials, such as sound amplification, magnifying glasses, large print materials, tape recorders, specialized ear buds, or Braille typewriters, that will assist offenders with disabilities in reading library materials.  If one facility did not have particular equipment, the staff could borrow it from another facility, although there were rarely such requests and there was never anyone at CDOC who actually read

---

[170] Allen, p. 3504.
[171] Allen, pp. 3504, 3510-12.
[172] Holst, pp. 1448-53.

Braille, other than Mr. Padilla.  There was one other offender who requested to learn how to read Braille, and the Special Master ordered it.  However, after setting everything up, buying all the materials and providing the offender with it, he returned it all three weeks later, after deciding he did not want to learn it.[173]

All television sets at facilities also have closed captioning on at all times for hearing disabled offenders, which was also referenced in the offenders' Accommodation Resolutions as one of the accommodations.[174]  In addition, the CDOC developed and had manufactured TTY kiosks so that hearing impaired offenders have telephone access identical to that provided to nondisabled offenders.  **Exhibit A-3** is Administrative Regulation 850-12, dated December 15, 2008.  This defines a TTY phone and states that regular CIPS phones with volume amplification devices are accessible to offenders in all locations where hearing disabled offenders are housed.  Another section of the AR is specific to the TTY phones and ensures that they are available for hearing disabled offenders when communicating with someone on the outside, and it outlines all the policies and procedures on the use of the TTY phone, how a call is placed, who they can call, and how they are charged.[175]  Additional evidence presented with respect to the TTY is located under 2008 Stipulation number 11.

The AIC's office provided vibrating watches to the hearing impaired and vision disabled offenders, so that they had a way to follow regular, routine schedules, such as waking up in the morning, getting to their jobs, or going to medline and chow.  A vibrating watch can be set to vibrate at a certain time to announce to the offenders the

---

[173] Holst, pp.1443-1444.
[174] Holst, p.1452.
[175] Holst, p.1467; Exhibit A-3.

regular movement times or appointments.  **Exhibit G-3** is the database that the AIC's office maintained with respect to distribution of vibrating watches.  The data base reflects when a watch was issued to an offender, what facility it went to, what the watch number was, and the date the watch was added to the offender's property list.  The AIC also distributed talking watches for blind offenders.[176]

By way of example demonstrating how individual facilities accommodate disabled offenders, Ms. Pamela Ploughe testified regarding the accommodations that are provided to disabled offenders at CTCF as of May 1, 2009.  Ms. Ploughe testified that she has been with the Department for 24 years.  She has been the Associate Warden at CTCF since 2007, and in November of 2008, she was promoted to Warden for CTCF.  As a warden for CTCF, she is extremely familiar with the ADA Montez case and accommodations for disabled offenders, since a large part of CTCF's population are ADA offenders.  Warden Ploughe testified that CDOC wardens meet on a regular basis where they frequently receive briefings or status updates.  The AIC, Cathie Holst, attended those meetings and briefed them about Montez updates.  The Deputy Director, Joanie Shoemaker, attended several times with some Montez updates as well.  Warden Ploughe remembers Ms. Holst giving them a lot of information about Montez and the ADA process.  In addition to the meetings, the wardens are given status e-mail updates, briefings, and trainings.  Warden Ploughe further testified that she or CTCF's ADA coordinator would contact Ms. Holst and the AIC office whenever they had an issue or needed clarification on anything.  Warden Ploughe also testified that CTCF always follows the guidance and instructions given to them by Ms. Holst and her office.[177]  She

---

[176] Holst, p.1464-1465,  p.1595; Exhibit G-3.
[177] Plough, pp.3699-.3703.

stated that they still contact the AIC's office for guidance, even after Ms. Holst's retirement and that there are very good and open lines of communication and coordination between CTCF and the AIC office.  As the warden at CTCF, she deals with Montez issues on a daily basis.  Warden Ploughe has definitely made Montez and ADA offenders a focus on every decision she makes about the facility.  She also always gives consideration to ADA offenders, including access to programs and such, and any operational decisions she makes.  She also ensured and trained her staff to always look at the Accommodation Resolutions for the offenders that are available on DOCNET. Warden Plough provided examples of the numerous accommodations available at CTCF. Vision disabled offenders at CTCF are given various accommodations, including large print books in the library, Braille publications, Braille reader, magnifying sheets, and access to the talking library, amongst others. Mobility disabled are accommodated with wheelchairs, canes, crutches, walkers, shoe lifts, special shoes, they do not have to stand during count, handicapped accessible cells, first tier, lower bunk housing assignments, aides, and wheelchair clinics, among other accommodations.  The wheelchair clinics are for the offenders who need their wheelchairs either repaired or replaced.  The offenders' ADA orientation handbook at CTCF states that the first three rows at food services are reserved for wheelchair offenders.  Warden Ploughe testified that their aides are also allowed to sit with them.  The first three rows accommodate both the wheelchairs and permanent stools.  The hearing disabled are accommodated with hearing aids, batteries, assignments to cells with a strobe alarm, TTY kiosks, sign language interpreters, and ASL classes.  A bi-weekly meeting is also held with the hearing disabled offenders with sign language interpreters present and representatives from all areas of operations

present, to address any issues they might have.  The TTY kiosks were installed in the summer of 2008 at cell house 3, cell house 7, cell house 5, and the infirmary.  Strobe lights are used to announce routine movements.  Routine movements happen on a daily basis for count time, medline, dining, and similar things.  They flash the lights in the cell house, by turning the lights on for five seconds and off for five seconds twice.  If the offender is in the cell house, when the announcement comes, the control staff notifies the officers in the day hall to notify the offender who comes to the control center to retrieve his message.  There are post orders, a list of duties for that particular post, at every cell house, instructing the staff on how to inform the offenders of PA announcements.  If the offender is in a program or school or any of the other areas, the work or class supervisor notifies the offender of those announcements specific to that offender.  Diabetics were being accommodated with finger sticks that they receive at medline.  If they have an issue outside of the regular medline hours, they could contact a staff member who would either take them to the clinic or infirmary, depending on what time of the day or night it is. They are also given insulin twice a day, unless the doctor has it ordered for an additional third time a day.  The CTCF ADA handbook states that the insulin is given out twice a day during medline, morning and afternoon.  Medlines coincide with controlled movement, as well as with offenders' meals, so that their insulin is timed with their meals.  If there is a third insulin shot required and prescribed by the doctor, then that one is given during the noon medline to coincide with lunch time.  During the orientation process at CTCF, the offenders meet with a nurse or medical staff, during which time they are given a traditional handbook, as well as the ADA orientation handbook, if necessary.  During the offenders' medical and mental health assessment part of the

orientation, they are asked about their medications and health issues.  At this time the offender's insulin intake would be set up for two or three times a day, depending on the need.  In the event of an emergency, the CTCF staff pay particular attention to the fact that there are diabetic, insulin dependent offenders, and if the meals are going to be delayed due to an emergencies, those offenders must be accommodated.  Diabetics at CTCF are also given diabetic education and training, as part of their accommodations.  Additionally, there are two cell houses at CTCF that do not allow offenders independent egress.  So in cell house 3, there is a call button system in place with intercom for diabetics to call during emergencies.  In cell house 5, the transient unit, diabetics are issued pendants with call buttons on them, which they keep temporarily while housed there. Diabetics receive chronic care at the clinic, for which they are not charged co-pays.  There are no diabetic kits available at CTCF, because there is a 24-hour medical assistant on the grounds.  However, the diabetic kit training is still provided twice a year, in January and July, so if the staff transfer to another facility, they would have received the training.[178]

## XI.      Justification for Denial of Requests for Reasonable Accommodation

N/A – never been done, see pre-trial order, *Doc. No., p.7, [4853]*.

## XII.     ADA Grievance Procedure

This section of the Remedial Plan requires the CDOC to set up an ADA grievance procedure.

The undisputed evidence established that there is a separate and distinct grievance procedure established for disabled offenders.[179]  **Exhibit I-3** is Administrative Regulation

---

[178]Plough, pp.3705-3711, 3721-23; Exhibit U-6.
[179] Holst, pp. 3958-3959.

850-03 – Grievance procedure.  Ms. Holst added specific language added to this Regulation under Section F, to create a separate process for ADA grievances, and explain how they differ from regular grievances.  No. 7 of this AR lays out wardens' responsibilities to ensure that there are policies and procedures in place to make sure that the offenders are receiving two copies of their grievances, as required by 2008 Stipulation, #30.  It outlines the three steps of the ADA grievance procedure.  Offenders can initiate the grievance process by filing a step 1 grievance within 30 days of the issue, but they can also write a letter directly to the AIC's office if they have an issue with something relating to their disability.[180]  The office of the AIC responds to step 1 grievances.  The AIC office has 25 days from the date it receives the step 1 grievance to respond.  The offenders, in most cases, get the step 1 grievance forms from their case managers.  They give the form back to their case manager who gives it to the grievance coordinator to log the grievance and assign it a number and put in the system, so it can be tracked.  It takes five days to get to the AIC's office from the date the case manager gets it.  If an offender is dissatisfied with step 1 grievance response from the AIC's office, the offender can file a step 2 grievance within five days.  If the offender does not receive a timely response from the AIC's office, they can automatically file a step 2 grievance. The Director of Prisons answers step 2 grievances within 25 days.  If the Director of Prisons does not respond timely to a step 2 grievance or if the offender is dissatisfied with the step 2 grievance response, the offender can file a step 3 grievance.  It goes to the CDOC Step 3 Grievance Officer who has 45 days to respond.  If the offender is

---

[180] Holst, p. 791.

dissatisfied with the step 3 grievance response, he or she has exhausted administrative remedies and can file a lawsuit.[181]

Between April 1, 2008 and May 1, 2009, the AIC's office developed a database to track timeliness of the grievance responses.  The AIC's office was able to track the timeliness of grievances through the general DOC system, but this particular database was created for class counsel at their request.  **Exhibit J-3** is the grievance database.  As of May 1, 2009, the AIC's office improved significantly and almost all of the grievances were answered in a timely fashion.[182]  The exhibit shows that by May 1, 2009, almost all of the grievances were handled in a timely manner.  From the sheer number of the ADA grievances the AIC's office received from the offenders, Ms. Holst believed that they knew and were aware of the process.[183]  The AIC's office did not receive any complaints from offenders, complaining that they did not know how to file an ADA grievance.[184]

## XIII.        Inmate Programs, Activities and Work Assignments

Section XIII of the Remedial Plan requires the CDOC to offer disabled inmates a range of programs and jobs equivalent to those available at non-designated facilities and to offer access to disabled inmates to jobs and programs dependent on the inmate's ability to perform essential functions of the position. Otherwise qualified inmates with disabilities are not to be denied access to jobs or programs solely because of a disability. Reasonable accommodations shall be offered as appropriate. There should be a variety of jobs in every pay scale available to disabled inmates comparable to nondisabled inmates.

---

[181] Holst, pp. 791-795.
[182] Holst, pp.1475-1476; Exhibit I-3 – Exhibit J-3.
[183]Holst, p.1482.
[184]Holst, p.1482.

This section also states that a disabled offender shall not be penalized with respect to earned time or other benefits such as yard time because of failure to participate in these programs. Evaluation of removal from a program assignment will be done on a case by case basis and offenders may file grievances.

The testimony of several witnesses proved that the DOC was in substantial compliance with this section of the Remedial Plan as of May 1, 2009. Several witnesses testified regarding the efforts that were made over the years to bring CDOC into compliance in this area. An expert witness conducted a detailed statistical analysis of the representation of disabled offenders in the various programs and jobs and concluded that they were represented in the same or similar proportions to non-disabled offenders in these categories.

Cathie Holst, the AIC, testified that when her office became aware of an issue with a disabled inmate in employment or education, they set out to rectify it. They would call whoever needed to be called and get information they needed to find out whether the situation was being relayed accurately, check records, read working files, read medical files, call work supervisors, program supervisors, and wardens. They would do whatever it took by way of research to make sure they had accurate information, assess what the problem was, and, if there was a problem, then they would set out to fix it. [185]

Both Cathie Holst and Adrienne Jacobson testified that the AIC office conducted an employment survey in 2007. [186] The staff pulled up employment history for offenders and interviewed individual disabled offenders and their supervisors to inquire about

---

[185] Holst p.1482, ln.8-25.
[186] Jacobson, p. 4035, ln. 16-25, p. 4036, ln. 1-9

discrimination based on disability.[187]  They found that offenders were employed to the extent they wanted to be employed and none indicated experiencing discrimination or requesting accommodations they were not already receiving.[188] Some expressed interest in other jobs they would like to have.  Most of them were satisfied with what they were doing and most did not receive accommodations. [189] Further, Ms. Holst testified that her staff would talk to the offender before they prepared an accommodation resolution to determine if there were accommodations that were needed for employment. [190] Ms. Holst testified that the Remedial Plan doesn't require that inmates receive certain jobs. It requires that they be allowed the opportunity to apply for all jobs and not be discriminated against based solely on a disability.[191]

Ms. Holst testified that the plan says that an evaluation will be made of the inmate's removal from a program on a case-by-case basis and her office did that. The plan also says ADA inmates can file a grievance if they're denied a job or access to programs, and inmates did file grievances and her office responded to those grievances.[192]

Ms. Holst testified that before the new jobs Administrative Regulation was signed in April of 2009, the AIC's office practice was to call each and every disabled offender and their case manager and interview them on the phone to determine whether the offender was in a job or program and whether he or she needed accommodations and what the accommodations should be.  These interviews occurred prior to issuance of the

---

[187] Jacobson, p. 4046, ln. 23-25, p. 4047, ln. 1-12
[188] Jacobson, p. 4046,  ln. 17-20
[189] Holst  p. 1482
[190] Holst p.1485.
[191] Holst, p.1522.
[192] Holst, p.1544.

offender's Accommodation Resolution so it could include job and programmatic accommodations.  They sometimes discovered that offenders were already being accommodated in their jobs and programs without AIC involvement.[193]  If problems arose, the AIC worked with case managers to resolve issues an offender might have getting into a program or job, or being accommodated.[194] At that time, it was a requirement that AIC staff talk with an offender before an Accommodation Resolution was prepared.[195]

Ms. Holst testified that overall in relation to the complaints that her office received from disabled inmates, the complaints they received about jobs or assignments were very small.[196]

Ms. Joanie Shoemaker, Director of Clinical Services, was responsible for the development of the standardized job descriptions throughout the department and for establishing a new process for assignment of inmates to jobs and/or programs in 2008. She testified generally that DOC has a variety of programs and job assignments available for offenders that are intended to provide the offenders with educational or job skill training that will assist them in effective reintegration and reentry back into the community. The educational programs include both adult basic education and GED programs. There are also a variety of vocational programs ranging from janitorial programs to computer aided drafting and graphic arts. There are paid and nonpaid assignments which include both educational programs and job assignments. An offender

---

[193] Holst, pp. 924, 933.
[194] Holst, pp. 933; 1442.
[195] Holst, p. 1442.
[196] Holst, 2675, ln.1-8.

gets paid to go to an educational program. [197] DOC has the same pay rates throughout any assignment, 60 cents a day for full-time work or attendance at a program. [198]

Ms. Shoemaker testified that the Correctional Industries program at DOC is a statutorily mandated cash funded program, meaning that all of their employee positions and any buildings, supplies, equipment that they have, must be supported with the funds they generate through the industries program.[199]   Correctional Industries assignments are done in exactly the same way as all other assignments. They are desirable positions and many offenders throughout DOC seek these positions. They are paid at the same rate, at 60 cents a day. [200]   However, Correctional Industries pays bonuses. The bonuses are paid per shop, so it's not on an individual performance basis; the same bonus is paid to anyone who's employed in that industry.  Most inmates, able-bodied and disabled, would want to be assigned to Correctional Industries.[201]

When Ms. Shoemaker became involved in the implementation of the Remedial Plan after the stipulations were signed, she testified that she looked at the area of jobs and programs throughout the Department and it became an area of focus for her. As a warden before that, she was aware of assignments in her facility, and the programs are similar throughout the Department. [202]

Standardization of job descriptions

Ms. Shoemaker testified about the standardization of job descriptions throughout the CDOC.  Ms. Shoemaker began gathering the job descriptions about a year before the

---

[197] Shoemaker p. 2797.
[198] Shoemaker pp. 2796-2797.
[199] Shoemaker p. 2799.
[200] Shoemaker p. 2839.
[201] Shoemaker p. 2840.
[202] Shoemaker  p. 2798.

stipulation agreement was signed in the spring of 2008, and they were finalized after the stipulations were signed. The stipulations dealt with standardizing the job descriptions and assignment process throughout the Department.  Ms. Shoemaker had several working groups that helped look at the process. She recruited several people who had been intimately involved with the job computer program throughout their careers with the Department.  She had representatives from various institutions including Sterling, which is a very large facility, and the Canon Minimum Centers (Arrowhead, Four Mile, and Skyline). She wanted to tweak the system to make sure it would be something that was manageable and would apply to all institutions.[203]

The standardized job descriptions were adopted for several reasons including: consistency throughout the department in expectations of the requirements of a job; determination of physical requirements; ease for the AIC staff and supervisors to understand the requirements of a job and any accommodations that might be necessary.[204]

Ms. Shoemaker testified that they came up with several drafts of job descriptions internally, and she consulted with an outside consultant to help determine if they had really defined what the essential functions of the jobs were. Jenna Burke helped them filter through qualifications, essential functions, and the tasks of the positions so that they really did have the essential functions listed on the job.  Ms. Burke is employed by an organization that assists disabled people complete employment and educational programs.  They asked her to review a number of job descriptions in a joint meeting

---

[203] Shoemaker  p. 2804.
[204] Shoemaker, p. 3168

which included Ms. Holst and Ms. Baxter.[205]  **Exhibit R-3** is a copy of the standardized job descriptions on a computer disc.  An example of the kind of standardization they did is in the area of cooks in food service.  Previous to standardizing job descriptions, most institutions had three kinds of cooks: a regular cook, a kosher cook, a diet cook. So they standardized the job description and now have one job description that every institution uses for cooks.  In **Exhibit R-3,** each job description outlines necessary qualifications and essential functions of the job. The second page of every job description contains the physical requirements of the job.  At the bottom, there is a section for the supervisor and offender to sign indicating they have discussed the essential functions of the job and noting any accommodations. The third page is a form developed later by the AIC staff to complete so the accommodations are noted on that page.[206]  Initially, there was not a third page; Ms. Holst testified that her staff put accommodations and their comments on the bottom of the second page. Then her office developed a separate form that would reflect these accommodations rather than putting them on the second page. That was called the offender assignment accommodation form which is the form the AIC office used to formally record what an offender's accommodations should be. This is the new form that was put in place as opposed to putting the information at the bottom of the essential functions page. [207]

The standardization of job descriptions has helped CDOC determine the essential functions of a job and whether accommodations can be made for the disabled.  The standardized job descriptions were available for viewing for staff to give feedback on Oct. 30, 2008. Ms. Shoemaker testified that she wanted feedback to make sure they had

---

[205] Shoemaker pp. 2802-03
[206] Shoemaker pp. 2809-10
[207] Holst, p.1535.

correctly captured what the essential functions of a job were and all the necessary job titles.[208]  The combinations of jobs and titles and corresponding changes in the MPS program were to be completed by the end of December 2008.[209] The private facilities had not adopted them by May 1, 2009 but were following the new job assignment process. [210]

Ms. Shoemaker explained that the "unassigned" category means that an offender is waiting an assignment or between assignments and the offender has the same level of privileges as an offender in a job or program. [211] However, they are not paid until they are assigned. "Medically unassigned" is an old term that was used by some facilities and has been discontinued. [212]  "ADA unassigned" is not a job category and does not appear in the MPS system. It is a determination made by AIC staff and is part of an accommodation.  By policy, an offender with ADA unassigned designation receives unassigned pay, which is 23 cents a day.[213]

Change in job assignment process

In addition to standardizing job descriptions, Ms. Shoemaker testified about the changes she and others made in the process for how inmates get assigned to jobs or programs. She testified that for a number of years, beginning in the mid 1990, the Department had a system called master program scheduling, referred to as MPS. That system was developed to assign, evaluate, and pay offenders for assignments. In the process of evaluating and working with different groups in the Department, they took that existing system and made some modifications to be compliant with her understanding of

---

[208] Shoemaker pp.2811, 2989.
[209] Shoemaker p. 2989
[210] Shoemaker p. 2990-1
[211] Shoemaker p. 3001
[212] Shoemaker pp. 2831, 3001, 3180.
[213] Shoemaker pp. 2872,  2831

the 2008 stipulations. Ms. Shoemaker asked Associate Warden Richard Harlan to assist with changes to the MPS system.[214] He was instrumental in originally setting up the MPS program for the Department. She wanted someone who was very knowledgeable about how the MPS system worked and what changes could make in it to meet the Plan requirements. She also had several discussions with Ms. Holst about what might help with accommodating offenders in assignments. Ms. Shoemaker believed that it would be helpful for the AIC to determine accommodations if the offender had already been given an assignment without regard to disability. [215]

The way the assignment process had been working previously gave the work supervisors the ability to select offenders for their assignments. Some work supervisors would interview inmates and tell the classification committee who they wanted to be assigned to their job or program. Ms. Shoemaker wanted to implement a more objective process that only considered if the offender met the basic qualifications and would give everyone the same opportunity for assignment. She didn't want the work supervisors preselecting what offenders they wanted in their program. So, the new procedure was that the classification committee would do the hiring, not the work supervisor. The classification committee is only to consider the qualifications to get the job so the subjective evaluation of the work supervisor or assignment supervisor was out of the picture.  Also, the new process requires that the offender continue an assignment for at least 60 days unless some unusual situation occurs.[216]

The major change was that responsibility for assigning an inmate to a job or program was changed to the classification committee rather than the work supervisor. So

---

[214] Shoemaker p. 2804.
[215] Shoemaker p. 2800
[216] Shoemaker, pp. 2833-34.

an offender was assigned and then the supervisor and offender could discuss the need for accommodations. The AIC office would also be contacted to discuss appropriate accommodations after assignment.[217] Ms. Holst also testified regarding the new job procedure and confirmed this new procedure.  After the offender is assigned a position by the committee, the supervisor and the offender discuss the need for accommodations, then contact the AIC's office to discuss the employment.  AIC staff completes a form indicating necessary accommodations.  Staff then issues a separate Accommodation Resolution regarding job accommodations.[218]

Ms. Shoemaker testified that the first step in the new process is the eligibility review done by the case managers. Case managers are responsible for trying to place offenders in assignments. If an offender goes to his or her case manager and requests an assignment, the case manager will review the qualifications for that assignment.[219]  A particular vocational program might require a GED; if the offender doesn't have a GED, he or she is not otherwise qualified to go into the vocational program.  The eligibility review was a way to have that first screening process for criteria that an offender must have obtained before they could be considered for the assignment.  For example, an offender at Sterling who wanted an assignment would first talk with the case manager, and the case manager would do the eligibility review. If the offender wanted one of five jobs:  outside crew; gym; an industries job; or certain vocational programs, the case manager would go through and look at the criteria for each such as the need for a GED. For example, the Departmental policy is not to allow people who are convicted of a sex

---

[217] Shoemaker pp. 2800-2801, 2814-15, 2832.
[218] Holst, pp. 947-954.
[219] Shoemaker, p.2813.

offense to go on an outside crew.[220]   So a sex offender would not be eligible for that outside crew job based on criminal history.

Code 13 was used by the case managers when an offender did not meet the qualifications for a position. Code 13 was designed so that if an inmate wanted a specific job but didn't get that job because they were not qualified, case managers were to use Code 13 and write the reasons why an inmate was not referred for that job. Code 13 is a program code that DOC created to enter into the system as a reason for any offender who does not meet the criteria for a specific job referral. [221]   Once the case manager determines an offender's eligibility for assignments, the case manager refers the inmate's file to the classification committee at each facility which then makes the assignment. The classification committee can see what the case manager did as far as the eligibility review through the electronic master programming schedule and then they make the assignments.[222]

The classification committee is at least a three –member committee generally including the case management supervisor, the programs manager and the custody control manager at each facility.  It can have more members. The committee looks at where there are vacancies throughout the facility. They meet at least weekly to make assignments. [223]   Ms. Shoemaker testified that she believed having the classification committee make the assignments was a more objective process than having the work supervisors pick their offenders.  The classification committee could see the review by the case manager, they know the pool of offenders available for assignment and what

---

[220] Shoemaker, p.2815.
[221] Caudill, p.3958, ln.6-25.
[222] Shoemaker, p. 2815.
[223] Shoemaker, pp. 2814-15

assignments are available so they make an objective assignment. [224] This change to the classification committee making the assignments began in November and December 2008. [225] When the classification committee assigns the offender, the members look only at page 1 of the job description. They look at the qualifications and the essential functions.

Once the offender has met the eligibility requirements and the classification committee has assigned him/her to a job, he or she talks to the work or program supervisor. The supervisor goes through the assignment description with the offender and discusses the requirements and essential functions of the job and asks whether the offender is disabled and if so, what accommodations might be needed.[226] For example, the offender might need a diabetic snack or the offender has a hearing impairment and might need to face the person that's talking to him or her. If the offender is a student with a hearing disability, the offender might need to sit in the front of the classroom, If the job requires standing, and the offender can't stand for a long time, then the accommodation might be certain break periods or a stool so that he/she can fulfill the essential functions of the job. A job might be shared between two people, or if the offender can't reach high things, then the accommodation is someone to help with those activities that require reach.[227] The work supervisors are to take the job description that has the highest level of physical requirements on it for that job, and use that as the one to discuss with the AIC what accommodations might be necessary.  If the accommodations were made for that, then the other job descriptions, that had fewer physical requirements, would still be easily

---

[224] Shoemaker, pp. 2814, 2815
[225] Shoemaker,  p. 3009
[226] Shoemaker, p. 2816.
[227] Shoemaker,  p. 2817,  3168-69.

met.[228]  The supervisor and the offender are to contact the AIC to discuss accommodations.

Ms. Shoemaker testified that they also revised and simplified the quota report as part of this process. The quota report is a report of the MPS program that was established at the inception of the program, and the quota report lists what assignments are currently available at each facility. [229] **Exhibit K-4** is a memo from Ms. Shoemaker about the MPS quota report.  It is dated February 5th of 2009, which corresponds to the implementation of the updated MPS quota report.  This memo tells the facilities where, at a minimum, the quota report must be posted and that it was to be dated and signed when it was posted and that it was to be posted weekly in the facility library. It also asked the facilities to archive those reports. The memo also stated that a job/assignment manual was to be available in the general library for offender review. [230]

Ms. Shoemaker identified **Exhibit L-4** which is a message dated March 3, 2009 that went out to all areas of the Department. [231]  The DOCALL at the top means it went out to every computer in the system. It informed them that an updated and simplified MPS quota report had been developed and instructed them to start posting.[232]  **Exhibit M-4** is a sample of the quota report which was simplified. This was in use as of March 2009.  The original form was difficult for people to understand so they simplified it. [233] **Exhibit M-4** is the MPS quota report for Denver Women's Correctional Facility dated March 4, 2009.   The first entry on the report is "computer applications" which is an

---

[228] Shoemaker,  p.2836, ln.24-25.
[229] Shoemaker,  p. 2828, ln.2-5.
[230] Shoemaker,  p.2828, ln.9-21.
[231] Shoemaker, p.2828, ln.25.
[232] Shoemaker,  p.2829, ln.1-3.
[233] Shoemaker,  p. 2993

available assignment. The report states that this assignment is a Monday through Friday assignment with a reporting time of 7:00 to 3:30.  The report contains the quota, the number of people that can be assigned in that position and how many open positions there are: in this case one assignment with one open position.  This report would be posted in the general library.[234]  An inmate who is interested in computer applications would go to the library and could look at the quota report and see there is an open position in computer applications.  Then the inmate would go to his/her case manager and tell the manager that he/she wants to be in this class. [235]

As of May 1, 2009, the private prisons also had job manuals in the libraries and they posted the quota reports which listed available jobs in facilities.  However they were not yet using the standardized job descriptions.  So the privates had more job descriptions than the DOC facilities at that time but the jobs were similar.  However, the process for assignment to a job or program was the same as the new one implemented in the DOC facilities.[236]   After the compliance hearing recessed in July 2010, Ms. Shoemaker asked the private prison monitor unit to ensure that the standardized job descriptions were being used by the privates and that was done prior to resumption of the hearing in October 2010. [237]

Training for the new job process

There were several training sessions regarding the standardized job descriptions, the eligibility review process, and the new job referral process. The training records presented prove substantial compliance with the requirements of Section XIII of the

---

[234] Shoemaker,  p.2829, ln.5-25.
[235] Shoemaker,  p.2830, ln.1-8.
[236] Shoemaker,  pp. 3154-55
[237] Shoemaker,  p. 3156

Remedial Plan and prove that compliance occurred prior to May 1 2009.  Linda Caudill works in the IT Department at DOC and does the training and testing for clinical services applications.[238]   In addition to Ms. Shoemaker, she testified about Section XIII of the Remedial Plan, as it relates to testing the new job conversion project and the training of the DOC staff on Code 13 and how to use this specific application.[239]  Ms. Shoemaker and Ms. Caudill identified an e-mail from Susan Hay dated August 7, 2008, **Exhibit A-4.** Ms. Hay was a Business Technology computer person that worked in the clinical services area and was Ms. Caudill's supervisor at the time.[240]  Ms. Hay was one of the staff that implemented MPS when it first began in the mid 1990s.  She sent this **Exhibit A-4** prior to training in August 2008 to Karl Gilge and all the MPS coordinators on August 7, 2008, explaining that the new eligibility review, code  13, was going to be available as of August 7, 2008.  The memo explained that Code 13 was to be used by work supervisors when the offender did not meet the criteria for referral. It listed new codes that were being added for non-acceptance such as criminal history, institutional behavior; new termination codes; and some termination codes that were being inactivated.[241] One of the termination codes being inactivated was "medically unable to participate."[242]  Ms. Shoemaker testified this code was not very descriptive and in discussions, they felt that designation was not clear and was not a reason to terminate an offender from an assignment.[243]  So they removed the access for supervisors to be able to code an offender and terminate him/her using that code.

---

[238] Caudill, p. 3949
[239] Caudill, p. 3959
[240] Caudill, p. 3962, 2963, Exhibit I-4
[241] Shoemaker, p.2870, ln.16-25.
[242] Caudill, p. 3959; Exhibit A-4.
[243] Shoemaker, p. 2871.

Ms. Shoemaker identified **Exhibit X-3** as a document she generated dated August 5, 2008, that outlined the new offender assignment process. It described the changes that were taking place and standardized some of the things that were inconsistent throughout facilities. For example, all facilities had some kind of assignment plan, but not all of them were located in the library. This new process required all facilities to put a notebook in the library. They could have it in other locations in the facility as well. The notebook had to contain a list of all of the assignments that were available in the institution whether or not there was a vacancy. The memo also instructed the facilities that they must post an MPS quota report which lists the different assignment settings in a facility in which there are vacancies.[244] Ms. Shoemaker testified that this memo was the beginning of the process of revising the job process. As it became clear that the assignment process could be more objective, they moved to the new process of the work supervisor discussing accommodations and the work supervisor not being able to refuse to accept an offender.[245] **Exhibit X-3** contains language that was still under the old procedures in that it provided that the classification committee rather than the work supervisor would discuss the need for ADA accommodations with the AIC. It also stated that the work supervisor, rather than the case manager, would enter a denial code if the offender was not accepted.

Ms. Shoemaker identified **Exhibit Y-3** as the training regarding the eligibility review that was finalized on August 26, 2008. The exhibit is a screen shot of what eligibility review looks like on the computer. This training was done for case management supervisors who then trained their case managers to be able to use the

---

[244] Shomaker, pp.2812-13.
[245] Shoemaker, p. 3177-78

eligibility review screens. [246]  Ms. Shoemaker conducted this training during a meeting on August 28, 2008 she had with the programs managers and case manager supervisors from the facilities.  At this meeting, she reviewed the changes made to the MPS program and the eligibility review so they would know what the expectations were.[247]  **Exhibit Z-3** is a copy of the minutes from that meeting of August 28, 2008. It contains a list of staff in attendance and the topics that were covered.  The meeting was attended by case manager IIIs or case manager supervisors, programs managers, members of offender services and a variety of other staff listed from various facilities.[248]  The minutes clearly show that those present were instructed not only regarding eligibility review but also regarding the new standardized job descriptions and the new system of job assignments. Pages 2 and 3 reflect that the attendees were told about the assignment manuals to be available in the library and the MPS quota reports to be posted weekly.  It also reflects the discussion outlining that the case managers would interview the offender regarding assignments and only the case managers could enter a code 13 finding as to why an offender was not referred for a particular job.  The minutes further reflect the discussion of the fact that the job board (classification committee) was to review qualifications only for referral, not physical requirements. After referral, if a supervisor or case manager noted limitations, the facility was to contact the AIC office to determine accommodations. The minutes further reflect discussion of common questions and any areas of confusion.[249]

      **Exhibit B-4** is a memo Mr. Harlan sent to Ms. Shoemaker on October 8, 2008, about a second larger training meeting that they conducted on October 8, 2008,

---

[246] Shoemaker, p.2817, ln.23-25.
[247] Shoemaker, pp.2818-2819.
[248] Shoemaker, p.2818, ln.14-25.
[249] Exhibit Z-3

concerning the changes to the MPS program for the standardized job descriptions. In the memo, Mr. Harlan noted that the standardized job descriptions would be available for viewing on the shared drive on Oct. 30, 2008 for all MPS coordinators, case manager III, wardens, and other designees.  The goal was for the facilities to review the standardized job descriptions and begin the process of matching the new descriptions to existing positions.  The memo **Exhibit B-4** mentioned that there would be a training session on Nov. 5, 2008 regarding the transition to the new job descriptions.  Also, it mentioned that teams would meet with each facility to train and answer questions so the changes would be successfully implemented.  It noted that merging existing job descriptions into the standardized job descriptions could be made during these meetings. Since all existing job descriptions in each facility needed to be merged into the standardized ones, the computer staff would help with this process. Some facilities would have unique jobs that would have to have new job descriptions built and added. The memo was to assure that the implementation was consistent and to help facilities make this transition and outlined the process that was going to happen over the next few months to make those changes in the MPS system[250]  This memo suggests January 31 2009 as the completion date for transition to standardized job descriptions.  Ms. Shoemaker changed the completion date to the end of December of 2008.[251]  A memo from Mr. Gary Golder, Director of Prisons, dated October 23, 2008, **Exhibit C-4** confirms the completion date of December 31, 2008.  This exhibit also confirms that the standardized job descriptions would be available for review on the shared drive on October 30, 2008. The conversion process would begin Nov. 5, 2008, with a target completion date of Dec. 31, 2008.  The memo

---

[250] Shoemaker, p. 2805.
[251] Shoemaker, p. 2820.

notes that there would be mandatory training on November 5, 2008, for case manager supervisors and facility MPS coordinators to prepare everyone for the final implementation phase.  The memo also noted that staff teams would be visiting each facility to assist in the merger of an existing facility job description into a standardized job description.[252]  Ms. Shoemaker testified that if there was something in the MPS system that had not been anticipated, as far as a job title, the staff who understood what the goal was would be able to assist that individual institution in making a change.[253]

  **Exhibit D-4** is the agenda from a wardens and directors meeting on October 30, 2008.  At this meeting, Ms. Shoemaker instructed the group about the standardization of the job descriptions, and she encouraged them to view the new job descriptions on the shared drive. If their facility had a unique job, they should work with Cheryl Smith in Clinical Services to add jobs. She also confirmed the goal of completion of Dec. 31, 2008.[254]

  Ms. Caudill also participated in creating the materials and training all the MPS coordinators and case managers at all facilities on the new job description conversion project.  Ms. Susan Hay and Ms. Caudill created a power point in October of 2008 through which the staff was trained on the conversion project which was admitted as **Exhibit E-4.** [255]  The power point explains exactly what the MPS coordinators, along with the case managers, needed to do to convert all of the hundreds of job descriptions throughout the system into standardized job descriptions.  This required that the MPS coordinator in each facility work with case managers and work supervisors to move all

---

[252] Shoemaker p. 2820;  Exhibit C-4
[253] Shoemaker, p. 2819.
[254] Shoemaker, p.2821, ln.1-16.
[255] Caudill, p.3959-60; Exhibit E-4.

paid positions into these job descriptions.  The power point is quite thorough and explains in detail the steps that have to be followed in the computer system to accomplish these changes. **Exhibit E-4** also contains an outline created for the MPS coordinators to ensure that they were doing the new job descriptions correctly and how they could run different reports to ensure that the data was being entered correctly in the computer.  MPS coordinators or case managers could call Ms. Caudill or Ms. Hay at any time they had questions about entering the data into the system.[256]

The training using **Exhibit E-4** was conducted on Nov. 5, 2008, by Ms. Caudill and Ms. Hay. **Exhibit F-4** is a roster of all the attendees at the training including MPS coordinators and case managers at all the facilities.[257]  The MPS coordinators and case managers at each facility decided who would attend this training. Once they were trained, they presented the same training to the rest of the MPS coordinators and the case managers at each of their facilities.[258]  Whoever attended from each facility went back to the facility and trained the other case managers.[259]  Ms. Holst and AIC staff  attended that meeting as well. The private facilities were included in this training. [260]

As mentioned, Mr. Harlan and a team of staff followed up with the facilities to assist them and see how they were doing with respect to implementation of the new job process. **Exhibit E-4** contains calendars of when staff will go to which facilities although these were revised when the implementation date was changed.[261]  The staff working with Mr. Harlan were case management supervisors or staff that had been involved in the

---

[256] Caudill, p. 3960; Exhibit E-4, Shoemaker, p. 2821.
[257] Caudill, p. 3960-1, p. 3987,Shoemaker p. 2821; Exhibit F-4
[258] Caudill, p. 3987.
[259] Caudill, p. 3987
[260] Shoemaker,  pp. 3151-2
[261] Shoemaker , p. 2822

MPS program for a long time.  Two of the people had helped implement MPS. Ms. Shoemaker wanted to assure the facilities had appropriate resources to help with the changes being made in the MPS program.[262]  **Exhibit G-4** is an email from Susan Hay dated November 7, 2008, reminding the staff before they visit the facilities to contact the MPS Coordinators.  Attached to the email is a list of the MPS coordinators' phone contacts at each facility including the private facilities.[263]  Ms. Hay sent another e-mail, **Exhibit H-4**, on November 18, 2008 to the team, with additional instructions regarding the job description conversion at each facility.  The email contained a reminder on how to run the MPS roster to ensure that the job conversions were done correctly.[264] Ms. Hay sent another e-mail on December 1, 2008, to all the MPS coordinators, advising them on the steps to take, in case an offender refused to sign the job description. This is **Exhibit I-4**.[265]

Ms. Shoemaker identified **Exhibit J-4** which is a collection of reports/audits that were completed by the staff who went to the individual facilities and reviewed the changes that they had done to the MPS program and the job assignment process and how it was working for the individual facilities.  These visits were done in March and April of 2009 and included reviews of the new job assignment process. The first page is a written summary of some of the areas that they visited and discussions they had with the staff with some conclusions. The second page contains more details.[266]  The remainder of the pages are comments by the reviewer.  The teams and the documents went back to Mr.

---

[262] Shoemaker, pp. 2822-23.
[263] Shoemaker  p. 3152; Caudill p. 3962; Exhibit G-4
[264] Caudill, p. 3962; Exhibit H-4.
[265] Caudill, p. 3962-63; Exhibit I-4.
[266] Shoemaker,  p. 2823.

Harlan who reviewed them, addressed issues, looked for commonalities, and gave feedback to individual facilities on questions they had.[267]

The teams that went out visited with the staff at the facilities about the new jobs process and educated them in areas in which they had questions. For example, the staff at the minimum center in Canon City (Four Mile, Arrowhead, and Skyline) was using the newer job descriptions but they weren't filling them out completely.  Sometimes they were missing a program title or the signatures.  At Skyline, there was a notation that the new food service job description was not being used but all others were at Skyline. The Buena Vista Minimum Center report indicated that the staff was using the standardized job descriptions. Generally, the facilities were using the new job descriptions, but there were some issues requiring staff education.  Those were addressed on the spot with the facility staff. The reviewers found that sometimes one program area was not using the updated job descriptions. For example, at Sterling, one out of twenty-seven program areas was not using them. Ft. Lyon Correctional Facility had fully implemented the standardized job descriptions. In one area, substance abuse treatment was missing signatures. At Ft. Lyon, the staff was very receptive to the reviewers and showed a great deal of interest in resolving any problems.[268]  In some instances, safety documentation was missing which is simply a description of any safety information that an offender might need based on the job duties. This has no relationship to ADA status.[269]  The reports from the various facilities generally reflected that the facilities were using the new standardized job descriptions, posting the quota reports, and providing the assignment manuals in the libraries. There were minor omissions.  When the reviewers found

---

[267] Shoemaker, p. 2824.
[268] Shoemaker p. 3157-60 , 3164-67
[269] Shoemaker p. 3170

problems they educated the staff about proper procedures.[270] Ms. Shoemaker testified that she was pretty pleased with the progress of implementation of the job process when she reviewed the audits the teams had performed. The gap that she saw was in not consistently calling the AIC office and that was a major reason for the work supervisor training in April.[271]

Ms. Shoemaker testified that she conducted training for the work supervisors in April of 2009. She had received feedback from the AIC staff, Ms. Holst, and from areas of the Department that work supervisors were not clear about their responsibilities in this job process. The assignment supervisor or the work supervisor is the individual who supervises the offenders in the classroom or on the job site. They were to call the AIC office when they had a disabled offender assigned. Ms. Shoemaker was pleased that they were calling instead of making an assumption about what they thought. The fact they knew they ought to be calling the AIC was a positive sign when they were dealing with disabled offenders.[272] Training was developed with staff from the training academy and Mr. Harlan to assure that work supervisors understood what they needed to be doing as a part of this process.[273] Ms. Shoemaker obtained the supervisor list from the MPS system and this training was given to 1800 staff.  The training was conducted via the computer and included a test that they had to successfully complete. The Department is moving to more computer-based training in a lot of different applications and doing the training by computer allowed them to reach all supervisors throughout the Department, and it

---

[270] Shoemaker , p. 3160-65.
[271] Shoemaker,  p. 3171
[272] Shoemaker,  p.2837.
[273] Shoemaker,  p.2824.

provided written documentation of their completion of the program.[274] **Exhibit N-4** is a copy of the work supervisor training. The computer folks were able to set up a notification on PCDCIS which notified a supervisor when he/she logged in if he or she hadn't completed the training. The first sheet is from the computer folks that tells the supervisor what they have to do. The rest of the exhibit is the actual training which goes through a series of screens. So when they logged in, they got the prompt to go to the training. They were required to check the boxes where they could move to the next part of the training. They had to review the Accommodation Resolution and say, yes, they reviewed it. Once they did that, it would move them to the training materials.[275] If a person did not successfully complete the test after three attempts, the computer told them they must review the AR 850-03, Offender Assignment, and verify they had reviewed it. It required them to review the training materials that were available after which it gave them the test.[276] The private facilities were included in this training.[277]

Ms. Shoemaker also identified **Exhibit O-4** which contains the results of the tests of the training in April 2009 by facility. For example, on the second page, the exhibit shows that at Arkansas Valley, 101 passed and three had not taken the training.[278] The private prison supervisors are included on the list.[279] In addition, Ms. Shoemaker conducted phone conferences that all facilities could join to review AR 850-03, the Administrative Regulation (**Exhibit O-3**) describing the offender assignment process. This was after it had been revised to reflect the new job process. Representatives from the

---

[274] Shoemaker, p. 2825.
[275] Shoemaker, p. 2827.
[276] Shoemaker, p. 2826.
[277] Shoemaker, p. 3152.
[278] Shoemaker, p. 2827.
[279] Shoemaker, p. 3153

private prisons participated. [280]  Ms. Holst testified that all the training for jobs/programs was complete by May of 2009.[281]

> Other requirements of this section

Section XIII E of the Remedial Plan states that an offender should not be penalized for failure to participate in programs with respect to being able to earn time. Ms. Shoemaker identified **Exhibit Q-4** which is Administrative Regulation 550-12 concerning earned time.  Earned time is time by which an offender's sentence can be reduced based on his/her participation in educational programming, work, and institutional behavior.  It results in a reduction in their incarceration time and allows them to progress to the community at an earlier time, than if they do day-for-day on their sentence. [282]  On page 3, subsection (H)(1), the last sentence of that paragraph states that offenders who are unassigned, either due to being a new arrival or on  medical restrictions, are eligible for earned time, as long as they have not refused an assignment.[283]

Ms. Shoemaker identified **Exhibit R-4** which is a copy of a computer document that is the progress assessment summary of an offender. These are completed by case managers on individual offenders.  It documents program status and results in the awarding of earned time.  They are completed at least every six months, with the reclassification document.  For the most part, they are done more frequently than that.  It is a road map, if you will, of what is going on with an offender during incarceration.[284] This particular example documents the GED completion and job progress.  This is a

---

[280] Shoemaker, pp. 3153-4
[281] Holst, p. 61.
[282] Shoemaker,  p. 2837, ln.17-25.
[283] Shoemaker,  p. 2838, ln.1-7.
[284] Shoemaker,  p. 2838, ln.11-25.

record of whether the offender has been program compliant, and if they have COPD violations. There is a notation of medical level as "temporary" which means that the offender is being screened.[285]

Ms. Shoemaker testified about an issue raised by Plaintiffs' counsel regarding employment in the tag/tab plant which is run by Correctional Industries.  The tag plant refers to the manufacture of license plates which are shipped to the counties.  The tab area involves stuffing envelopes with the little decals that come with license plates that have the month and year in them.[286]  The question that was raised concerned whether the tag/tab plant had a quota for disabled employees. Ms. Shoemaker explained that during the implementation of the Remedial Plan, there has been a lot of growth in the awareness and willingness of DOC staff to understand what the ADA means, and what it requires in an assignment process.  Ms. Shoemaker testified that there was a point in time when facilities designated certain things such as ADA jobs.  Ms. Shoemaker explained that thinking has changed, and people understand they cannot have a quota, and if an offender is otherwise qualified they must determine if there are things that can be done to provide accommodations that will make him/her successful in that assignment. She stated that if there was a quota it was, in some ways, a well-intended effort to recognize offenders who might not be able to do certain things and to give them opportunities. It was misguided, and she thinks that culture and thinking has changed.[287]

There was also significant evidence that the new job process that was implemented is well understood by case managers who have implemented the new procedure.  **Exhibit O-3,** Administrative Regulation 850-03 Offender Assignment and

---

[285] Shoemaker,  p.2839, ln.1-11.
[286] Shoemaker,  p.2834, ln.11-23.
[287] Shoemaker,  p.2835, ln.1-20.

Pay, was identified by Ms. Shoemaker as the Administrative Regulation that outlines in detail the new procedure for assignment to jobs/programs. The effective date is April 20th, 2009.  Ms. Shoemaker testified that the draft administrative regulation was posted throughout the process of revising the procedures which had started many months earlier. This was the final version that contained language that had been changed in draft form several times along the way.[288]  On page 5, the process regarding the eligibility review that case managers are responsible for and the referral to the classification committee is outlined.  Later in the document it outlines the responsibilities of the classification committee.  It further explains the responsibilities of the work supervisor to review the assignment description with the offender to determine if he/she can perform the essential functions and physical requirements of the assignment and how to proceed if the offender requests accommodations.   Page 4, subsection (C)(3)(b) of **Exhibit O-3** contains the ACA standard that provides for reasonable accommodations to assure that disabled offenders have access to programs.  The standards are set by the American Correctional Association, and they are revised periodically, and agencies can submit suggested revisions to standards.   On page 3, (C)(1) the Administrative Regulations states: "All facilities shall maintain a comprehensive written plan for full-time work and/or program assignments for all eligible offenders in the general population."  The ACA standard previously contained "able-bodied" when describing offenders.  CDOC submitted a suggested standards revision changing that from "able-bodied" to "eligible", because able-bodied denotes a certain type of inmate. Ms. Shoemaker testified that facilities should have a plan for all offenders to have access to full-time work or programs. So at CDOC's request, and in a review with the ACA standards committee in 2005 this

---

[288] Shoemaker,  p.2830; Exhibit O-3

language was changed.  So now, this national ACA standard uses the term "eligible"
offenders, which has a different meaning than "able-bodied."[289]  In **Exhibit O-3,** age 5,
subsection 5 provides that an ADA unassigned offender will be paid at pay rate 1, which
is 23-cent a day and that he/she shall not be penalized with respect to earned time or
placement issues. They are to have the same privileges as other offenders, including but
not limited to yard time and activities.

Section XIII of the Plan addresses programs available to disabled inmates. Ms.
Shoemaker also testified about offender recreation. She identified **Exhibit K-3,**
Administrative Regulation 1000-01 concerning offender recreation. Language in the
policy statement quotes the ACA standard and CDOC follows the ACA standard.  This
regulation requires that all offenders, including those with disabilities, be able to
participate in recreational activities that are offered throughout the Department.[290]  The
Administrative Regulation states the intent of CDOC "to encourage all offenders,
including those with disabilities to participate in activities that develop physical and
mental well-being and constructive use of leisure time."  The administrative regulation
includes a definition of disability which refers to the Americans with Disability Act and
defines disability consistent with the ADA definition.[291]  Both Warden Plough and Case
Manager Allen identified **Exhibit L-3,** the recreation calendar for CTCF.  At CTCF there
are daily dedicated periods for disabled offenders to use the gym. These offenders like
having a separate exercise period in addition to regular general population recreation
times.[292]

---

[289] Shoemaker,  p. 2873,  ln.1-24.
[290] Shoemaker,  p. 2794,  ln.18-25.
[291] Shoemaker,  p.2795,  ln.1-15; Exhibit K-3
[292] Plough, pp. 3712-13.

Ms. Shoemaker identified **Exhibit M-3,** AR 1050-01, another Administrative Regulation, which defines training opportunities in career and technical education for offenders.  On page 3 (J), the regulations states that provisions will be made to meet the education and vocational needs of offenders who require special placement because of physical, mental, emotional, or learning disabilities.[293]  **Exhibit N-3 is** Administrative Regulation 500-01 which defines the offender educational system within the Department. It states that CDOC educational programs must meet the needs of offenders who require special placement because of physical, mental, emotional, or learning disabilities. (page 6,(H)(3)) [294]   An example of facility implementation of the new job process was introduced as **Exhibit Q-3,** the Implementation/Adjustment (IA) from Colorado Territorial Correctional Facility (CTCF).  It provides in (K) that case managers will refer inmate forms to the Job Board who will then make the assignment. After the assignment, the work supervisor will discuss the need for ADA accommodations with the AIC. The MPS system will be used for job placement. Section (P) provides that MPS quota reports will be posted in common areas and the general library weekly. The job description/assignment manual will be available in the library for inmates to review. Section (W) states that if an inmate's medical condition changes such as to require a change in accommodations, the work supervisor is to contact the AIC to discuss modifications. If an ADA inmate is terminated from an assignment, the case manager is to contact the AIC to communicate details.  This IA was in effect as of August 1, 2008.[295]

---

[293] Shoemaker,  p.2796,  ln.1-4; Exhibit M-4
[294] Exhibit N-3
[295] Exhibit Q-3

Case manager testimony regarding implementation of the job process

The CDOC also called four case manager supervisors: Dave Allen, the former Case Manager Supervisor, and Chairman of Classification at the Colorado Territorial Correctional Facility from 2007 to May of 2010; Randy Malden, the case-management supervisor at Fort Lyon Correctional Facility; Deb Ahlin, case-manager supervisor for the Denver complex; and Mr. Frank Ortiz, the case-management supervisor at the Cañon Minimum Centers. All of these individuals supervised or currently supervise the case managers at their respective facilities and acted or act as chairpersons of the classification committee at their facilities.[296]

All of the case manager supervisors testified consistently concerning what the case managers under their supervision do on a day-to-day basis and that the new job and program regulations were implemented before the compliance deadline and are being followed in the CDOC facilities. Case managers generally act as the liaison between the offender, headquarters, and the outside community. Case managers orientate offenders on the case management function, including program and work assignments. They do assessments on the offenders to determine program needs. They meet with offenders and discuss programs, including vocational, educational, and rehabilitative. They oversee community correction referrals and presentations to the parole board. They calculate earned time, answer offender questions, and orientate the offender to the facility. They also serve as the offender's first point of contact for the CDOC grievance procedure. They provide offenders with grievance forms and explain to the offender the process for filling out the grievance forms and the steps and process involved. They receive completed grievance forms and route them to appropriate channels. They try to resolve

---

[296] Allen, Malden, Ahlin, Ortiz, pp. 3498-3660.

offender grievances at the lowest level; the case manager will try to resolve it

informally.[297]


The case manager supervisors, who are also the chairs of the classification

committees at their facilities, oversee the job process.  They all testified at length

regarding the inmate job process and how the new process as explained by Ms.

Shoemaker works at the facility level. They confirmed her description of the new

procedures and indicated that they have been following the process since before May 1 of

2009.   They are familiar with **Exhibit O3,** the CDOC Administrative Regulation 850-3,

regarding offender assignment and pay. This regulation contains the procedure for inmate

job access throughout the entire CDOC.  It outlines a systemic process for all facilities to

follow when they assign an offender to a work or program assignment.  A classification

committee oversees classification functions within a particular facility, including

assignment of offenders to a program or work system.  The committee also oversees

movement inside the facility and externally, as well as the administrative segregation

process.  The committee generally consists of the custody and control manager, the

programs manager, and the facility intelligence officer. They discussed the master

program schedule, the data system that the CDOC utilizes through DCIS to refer, assign,

evaluate, and pay offenders for paid assignments.  Included within the definition section

of this regulation is a definition for "reasonable accommodations" which states:

"Provision of special equipment, an assistive device, or a modification to a structure,

program, policy, practice, or procedure which enables an otherwise qualified offender

with a verified disability to participate in a program or service despite their disability."

---

[297] Allen, pp. 3499-3501; Ahlin, pp. 3571-3573; Malden, pp. 3598-99; Ortiz, pp. 3629-30.

The job process as set forth in the regulation was described in detail by all of the case managers.  Every assignment has a title, specific duties, and essential functions to include physical requirements associated with the assignment. Electronic versions of the approved offender assignment descriptions are located on the CDOC shared drive. The most current revision date is documented on each assignment description. Facilities wishing to create new or additional standardized offender assignments must submit the recommendation and justification in writing to the offender assignment committee for review and approval or denial.  The Regulation dictates that "Offenders with verified disabilities shall be provided reasonable accommodations to ensure that they have access to comparable programs, services, and benefits provided to nondisabled offenders."  The case managers confirmed, as testified to by Ms. Shoemaker, that each facility has an assignment manual located in the general library that has a list of all assignments at a respective facility, including both programmatic and work assignments. It also includes information concerning the job description and the physical requirements of the job or the essential functions of the job. It also contains a job-assignment roster, the quota report, that shows the number of jobs in each category, such as education and their percentages, how many jobs are actually there and how many inmates are assigned.

The managers confirmed that to obtain an assignment, an offender  meets with his or her respective case manager in an interactive discussion to discuss job options, what skills the offender would like to acquire while he or she is incarcerated, what skills he or she had prior to incarceration. An offender must meet the criteria for the job he or she desires.  For example, an offender must meet security clearance criteria to go outside the

secure perimeter and work on an outside labor crew.  An offender must be within a certain amount of time of release.  If an offender came in and was interviewed and had a significant amount of time, he may not meet the criteria or be "otherwise qualified" for that particular job based on length of sentence.  Certain jobs also require prior certifications such as a food handler certificate, high school, GED, diploma, or a vocational certificate.  The review of the criteria for the job is called a code 13.   A disability is not a code 13.  If the offender does not meet the criteria, a code 13 is entered with an explanation. The case manager also looks at the diagnostic and programmatic needs of the offender.  If an offender is seeking a work assignment as a computer program assignment, part of the criteria for that job is a GED.  Accordingly, the case manager would encourage the offender to get into a GED program to better the offender's chances of access to the computer program.  If a code 13 issue exists, the case manager would look for another work or program assignment for the offender.  If the offender meets the criteria, or is otherwise qualified, irrespective of disability, the case manager fills out the job assessment form, and along with the working file, brings it to the classification committee (job board) which meets once a week. The committee reviews the materials for issues relating to public safety or security, violence, drugs, escape history, disciplinary convictions, length of sentence, and gang affiliation.  An offender's disability status is not considered by the classification committee in making an assignment.

    If the classification committee approves the assignment or assigns the offender to another assignment, a referral is made.  The offenders are referred to the work

supervisors.   If the offender is not an ADA offender, the work supervisor meets with the offender and discusses expectations. Paperwork is filled out and signed documenting that the offender understands the job description and knows the requirements for the job.  If the offender has an ADA disability and is not requesting any accommodation for performance of the job, the work supervisor calls the AIC designee to inform him/her that an accommodation is not being requested. The AIC designee enters "no accommodations requested" on the back of the assignment description. The upper half of that document has a box that indicates the offender is able to perform all essential functions for a specific assignment.  If the offender claims he or she is unable to perform the essential functions or meet the physical requirements of the assignment, a box that says "unable to perform all essential function for specific assignment" is checked.  The work supervisor then calls the AIC designee to discuss what reasonable accommodation, if any, can be provided so that the offender can have the job.  Any accommodations are listed on the accommodation form.  The form is to be signed by the offender and the work supervisor. There is a line on the form confirming the call to the AIC which states "Call placed to the AIC designee, date and employee contacted," and then a blank line.  If an offender with an ADA designation is terminated from a job, or leaves a job for any reason, the supervisor must contact the AIC or designee within one business day. [298]

The case managers confirmed that although the effective date of the amended Regulation 850-03, **Exhibit O-3**, is April 20, 2009, discussions concerning the changes that were implemented by the new process began in November or December of 2008. They confirmed that there were extensive meetings with many of the Case Manager

---

[298] Allen, pp. 3524-3540; Ahlin, pp.3573-3586; Malden, pp. 3600-3612; Ortiz, pp. 3632-3648.

Supervisors as well as offender services to discuss policy options.  These discussions centered around tracking offender jobs and standardizing job descriptions.  They confirmed that in March of 2009, there were audit teams that went to various facilities to audit the revised job processes implemented in **Exhibit O-3** to determine how facilities were progressing toward utilization of the standard job descriptions and the classification committee process.   The audits demonstrated to Malden that the facilities were operating in accordance with the amended processes.  The evidence further demonstrated that the procedures associated with the standardized job descriptions and the classification committee processes were implemented before the effective date of the Administrative Regulation and before the compliance deadline.  Moreover, the evidence demonstrated that even before this process was implemented inmates with disabilities were accommodated with respect to their jobs.[299]

    In addition, all case managers testified concerning the diverse jobs and programs available at their particular facilities and provided examples of accommodations made for the disabled.  For example, Deb Ahlin testified that in addition to food services, laundry, custodial and maintenance, DWCF has Correctional Industry jobs, including a print shop that prints state forms for the entire state of Colorado, prints booklets, and prepare banners.  DWCF also has a sewing shop that makes shirts and jumpsuits, duffel bags and other items as well as a cosmetology program, labor programs, a carpentry-construction technology class, a graphics design class, computer aided drafting classes, and computer classes.  DWCF also has canteen which processes orders and bags the items that an

---

[299] Allen, p. 3540; Malden,  pp. 3608-10, 3624-25, Ortiz, pp. 3656-57.

offender purchases and then ships to other facilities.[300]  Ms. Ahlin provided specific

examples of accommodations such as a diabetic offender who worked outside the facility

and needed to come back into the facility twice a day for insulin. The canteen work

supervisor would physically walk her back and forth to medical to accommodate her

needs. Another offender needed to wear tennis shoes outside the facility because she was

diabetic and she was accommodated.  Another mobility disabled offender was

accommodated in the dog program by being provided with a helper to assist in carrying

dog food, which is part of the duty of those in the canine unit.[301]

Mr. Malden provided similar examples at Fort Lyon.  He cited specific examples

of disabled offender access to Correctional Industries jobs.  Specifically, he referenced

offender Strowbridge, a triple amputee assigned to Correctional Industries operating lawn

mowers mowing the grass at Fort Lyon. As part of his accommodations he was provided

with special work boots which were over-nighted to the facility so that Strowbridge

could work in his requested job.  Strowbridge has three prosthetic devices, he has one

good hand, and the lawn mowers are hand-controlled, and foot-controlled.  Riding lawn

mowers allow Strowbridge to operate the mowers with his disability. He also referenced

an amputee named Hannifen that participated in the dog program at Fort Lyon.   He

testified about general accommodations provided such as pulling inmates early for

recreation and work providing them with extra time to ambulate.[302]

---

[300] Ahlin, pp. 3576-3578.
[301] Ahlin, pp. 3584-86.
[302] Malden, pp. 3604-07.

Malden also testified concerning the Special Medical Needs Unit (SMNU) at Fort Lyon. The SMNU houses approximately 20 to 24 offenders that have special needs that require hospice and 24 hour nursing care.  These offenders are provided access and services through recreation aides that would play cards, help read newspapers, play video games, and participate in other activities with the inmates housed in the SMNU.[303]

Mr. Ortiz testified about similar accommodations at the Canon Minimum Centers. CMC is a work camp where are all offenders are required to work. It houses approximately 1242 offenders and has approximately 1300 jobs.  At this facility, treatment programs are not considered a job, offenders must have a job, and  they attend their treatment and other programs as well.  Ortiz testified about the variety of programs and jobs available at CMC, including the WHIP or wild horse program  in which the CDOC obtains wild horses from BLM, and offenders train the horses and put them up for adoption.  There is a fully functioning dairy encompassing everything from clerks to animal care takers to people that are birthing calves and assisting in the milking.  The program provides the Department and other state agencies with milk.  There is a heavy equipment program in which offenders assist in the construction of prisons, dirt work, fencing, painting, and digging of drainage ditches.  The facility also supplies the maximum security facility with food-service, laundry and janitorial workers. There is a vocational culinary arts program, a Swift program which is the inmate wildfire crew, a vineyard where inmates raise grapes for an abbey to make wine, farm crews, an orchard program, a recycling program, transportation program which goes into the community, commercial driver's license program, a goat dairy program that makes goat cheese and goat milk, a tilapia fish hatchery and processing, and a service station that maintains all

---

[303] Malden, pp. 3607-08.

of the fleet vehicles that certifies offenders as ASE mechanics. In any given week, anywhere from sixty to a hundred offenders are placed in jobs at CMC. Out of those, approximately 5 to 10 of these offenders are ADA offenders. The percentage of ADA offenders placed in jobs at CMC is consistent with the population in the CDOC.[304]

The CDOC also called an expert witness who testified that the numerical distribution of disabled offenders in jobs and programs is comparable to their representation in the CDOC population as a whole, and that they are being provided access to jobs and programs comparable to those offered to nondisabled offenders. Dr. Jeffrey Zax was asked to perform an analysis of the distribution of offenders in the jobs and educational programs in DOC as of May 1, 2009, and was asked to look at the allocation of disabled and nondisabled offenders across the various occupational and educational opportunities.[305] His report concluded that disabled inmates were represented in each CDOC pay code and job classification in the same or similar proportion to their representation in the inmate population as a whole as of May 1, 2009, the end of the compliance period. It was his conclusion that those inmates found to be disabled between May 1, 2008 and April 30, 2009 were generally treated commensurately with respect to job and education assignments and pay codes with those inmates not found to be disabled.[306]

Dr. Zax is a professor of economics at the University of Colorado at Boulder. He received an undergraduate and doctorate in economics from Harvard University. He was

---

[304] Ortiz, pp. 3641-3646.
[305] Zax, p. 4059, ln. 15-23
[306] Zax, p. 4068, ln. 24-25, p. 4069.

qualified as an expert in this case in economics with special skills in applied statistical analysis.[307]  **Exhibit P-4**.  Dr. Zax took a list of all inmates in CDOC as of May 1, 2009 and combined it with a list of all jobs in the system, pay codes, and whether the inmates were eligible for bonuses. He identified the occupational and pay status of each inmate. He separated the inmates into disabled and non-disabled and looked at the kinds of occupations and compensation schemes in which they were involved. This included educational programs.[308]  Dr. Zax used a report prepared by Paul Engstrom, **Exhibit U-3,** which is a list of all inmates in the correctional system as of May 1, 2009 and the assignments of both disabled and nondisabled inmates.[309]  He combined that with **Exhibit S-3** which is a spread sheet of the jobs and educational programs, pay codes and eligibility for bonuses of each job or program in DOC also prepared by Paul Engstrom.[310]  Mr. Engstrom also prepared **Exhibit J-11** which is the pay code key reflecting the wages for each of the codes except the last one which is on S-3.[311]

Exhibit U-3 contains a designation of whether an inmate had been found to be disabled.[312]  Mr. Engstrom entered those designations based on a list of inmates who had been found to be disabled between the dates of May 1, 2008 and April 30, 2009 prepared by Adrienne Jacobson of the AIC office, **Exhibit E-1**.  This list reflects only those offenders in the AIC database who were confirmed disabled **and** had an accommodation resolution issued within the time frame of May 1, 2008 and April 30, 2009. She only

---

[307] Zax, pp. 4049, ln.16-17; p. 4050, ln.18-10;  p. 4057, ln.20-22, p. 4059, ln.11
[308] Zax, p. 4060, ln.2-22
[309] Zax. p. 4060, ln.2-8, p. 4061, ln.1-6; Engstrom p. 1841, ln.24-25,  p. 1842, ln.1-23; Engstrom,  p. 1845, ln. 25, p. 1846,  ln.1-11
[310] Zax, p. 4064-65; Engstrom, p. 1840, ln. 14-24
[311] Engstrom, p. 1843.
[312] Zax p. 4061, ln.15-18; Engstrom,  p. 1842, ln.9-10

included those who had been issued an Accommodation Resolution during that time with a finding of disability.[313]

In addition to his review of the system as a whole, Dr. Zax examined ten individual facilities in which there were more than 15 disabled offenders.[314]  **Exhibit P-4** is his report.  He found that the representation of disabled inmates system-wide in the various pay codes was virtually identical to the representation of nondisabled inmates. The same was true with respect to eligibility for bonuses.[315]  Dr. Zax testified that he found no important discrepancies.  There were discrepancies from perfect representation in some categories and some subcategories but they were small in substantive terms.  It is important to recall that any discrepancies he might have found could be explained in terms of differences in the ability to accommodate disabled workers or differences in assignments from different security needs.[316]  Sometimes the number of disabled inmates was so small, one disabled inmate made a very large difference in the percentages.[317] With respect to representation of disabled offenders in the work force in all facilities he found in the lowest pay grade (volunteer, no pay), their representation was identical to their proportion in the population; in the second pay grade ($0.23 unassigned), it is slightly lower.  In the third pay grade ($0.30 half day – or $0.60 full day – assigned), it is exactly the same as their proportion in the population, in the fourth ($0.80 full day offender care aide I) and fifth pay grades ($1.20 full day offender care aide II), it is much higher than the proportion of the population. In the sixth pay grade ($2.00 full day

---

[313] Jacobson,  pp. 3989-91; p. 4028, ln.10-18
[314] Zax, p. 4066, ln.25, p. 4067, ln.1-3
[315] Zax, p. 4067, ln.15-18
[316] Zax, p. 4067, ln.18-25,  p. 4068, ln.1-5
[317] Zax, p. 4068, ln.6-19

offender care aid III), it is lower.  There are only 102 inmates in the entire system in the 4th, 5th, and 6th pay grades.  The lowest pay grade is small also, only 130.[318]  The report reflects 3.8% of the total population of DOC inmates as being disabled.[319]  Disabled inmates were in positions in which they were eligible for bonuses at the rate of 4.1% so they are slightly over-represented in the eligibility for bonuses and there is no evidence of underrepresentation.[320]

Table 6 of his report looks at the 12 program codes in CDOC including education, facility work assignment and other types of programs. This table reflects that in each of the three broad categories in which more than 80% of the disabled inmates appear (education, facility work assignment, and unassigned), the representation of disabled inmates was identical to or very similar to the representation of disabled inmates in the entire population. The three categories reflected that disabled inmates were 3.8% of the population and 3.8% of the more than 8000 inmates in facility work assignments. They were 3.6% of the more than 4000 inmates who were unassigned, and they were 4.1% among the nearly 4000 inmates assigned to education.[321]  He also found a large overrepresentation for disabled inmates in the sex offender treatment plan; they were 10.5% of the population in that category.[322]

Table 8 looks at distribution in pay codes in the ten facilities which housed the vast majority of disabled inmates. In those facilities, disabled inmates were 5.4 % of the

---

[318] Zax, p. 4156, ln.4-25, p. 4157, ln.1-2
[319] Zax, p. 4071, ln.2-4
[320] Zax, p. 4071, ln.15-23
[321] Zax, p. 4072, ln.24-25, p. 4073, ln.1-7
[322] Zax, p. 4073, ln.10-15

population and were 5.6% of pay grade 2 (23 cents unassigned), and 5.3% in pay grade 3

(30 cents, half-day or 60 cents full day – this includes education and work programs).

Essentially their representation in those two pay grades, which represents more than 90%

of the inmates was indistinguishable from their representation in the population as a

whole.[323]  They are overrepresented in the top three pay codes (offender aides) and in the

lowest pay code.   However, these pay codes employ very few inmates so he doesn't

think this is important to understand the general treatment of disabled and nondisabled

inmates.[324]   Table 9 shows that within the 10 facilities, disabled inmates represent 5.7%

of inmates eligible for bonuses compared to their 5.4% representation in the general

population.[325]  Table 10 reflects that within the program codes in the 10 facilities,

disabled inmates are represented generally in the same proportion as they appear in the

overall population as a whole.[326]  After doing the individual analyses of the 10 facilities,

Dr. Zax concluded that the disabled representation in the various pay grades was similar

to their representation in the inmate populations as a whole, both for the entire system

and for the 10 facilities with more than 15 disabled inmates.  He also found that the

representation of inmates across the broad occupational assignment classes was similar to

their proportion of representation in the population as a whole, both among the entire

system and within the 10 facilities having more than 15 disabled inmates.  Looking at the

individual facilities, he found a broad pattern in which disabled inmates were represented

in proportions similar to their proportions within the facility in most large categories of

pay, bonus eligibility, and occupation.  There were discrepancies between the proportions

---

[323] Zax, p. 4075, ln.13-20
[324] Zax, p. 4075, ln.24-25, p. 4076, ln.1-10
[325] Zax, p. 4076, ln.13-23
[326] Zax, p. 4077, ln.1-12

of disabled inmates in a particular facility and the proportion of inmates in narrowly defined assignments, especially in those assignments and categories with relatively few inmates overall.  The discrepancies are, in part, attributable to the small numbers. They may be attributable to differences across assignments and pay grades and bonus eligibility in the ability of the facility to accommodate disabled workers, and, also, in the security needs.[327]  Dr. Zax concluded that there is no systematic evidence that disabled inmates are assigned to pay grades, bonus eligibility or broad occupational categories in ways that are disproportionate or noticeably different from the assignments accorded to nondisabled inmates.[328]  A report such as his is informative to show how the department was performing as of May 1, 2009.   He testified that "If we look back at the flow of inmates into disability status for the year from May 1, 2008, to April 30, 2009, the correctional system seems to be allocating those disabled inmates appropriately to the various opportunities available to them."[329]   He is confident that the data he ultimately used was produced in good faith with the highest degree of competence, and he is comfortable using it as the foundation of his conclusions.[330]  Dr. Zax is not troubled by the fact that people were omitted from Ms. Jacobson's report given to Mr. Engstrom and on which Mr. Engstrom relied to denote disabled inmates, because Mr. Engstrom's report is accurate and appropriate for the designations that were available as of May 1, 2009 and his report demonstrated to Dr. Zax's satisfaction that of those, their allocation to opportunities in the system was essentially proportional to their representation in the system. He has no reason to think those who were designated as disabled later were

---

[327] Zax, p.4089, ln.6-25; p. 4090, ln.1-8
[328] Zax, p. 4090, ln.8-13
[329] Zax, p. 4099, ln.20-24
[330] Zax, p. 4103, ln.10-13

treated less fairly than those who were so designated earlier.[331]  If those who were designated prior to May 1, 2009 were being assigned appropriately, then the expectation would be that those designated later would be treated at least as appropriately, if not more so.[332]  He is comfortable extrapolating from what he found based on what he understood of how the process was evolving.  His sense is that the procedures for assigning inmates to positions were becoming more sensitive to the need to ensure that disabled inmates were offered as many opportunities as were reasonably possible for assignment within the system.[333]  So, he is hopeful that however disabled inmates were being treated prior to May 1, 2009, they were being treated at least as well subsequently.[334]  As a peripheral observer, he had a generalized sense there was a fair amount of energy going into making this process more effective and fairer for disabled inmates.[335]

Dr. Zax also prepared a report reflecting employment at the tag plant at CTCF as of May 1 2009, **Exhibit A-13.** His report reflected that the percentage of disabled inmates at the facility was 13.3%. At that time, the tag plant employed 75 inmates, 10 of whom were disabled – 13.3% - exactly the same percentage.[336]  He concluded there was clearly no underrepresentation of the disabled workers in the tag plant at this facility as of May 1, 2009.[337]

---

[331] Zax, p. 4116, ln.22-25, p. 4117, ln.1-18
[332] Zax, p. 4117, ln.22-25, p. 4118, ln.1-4
[333] Zax, p.4135,  ln.14 -15, p. 4136, ln.2-6
[334] Zax, p. 4136, ln.9-16
[335] Zax, p. 4137, ln.3-6
[336] Zax, p. 4092, ln.4-9
[337] Zax, p. 4092, ln.13-14

The Plaintiffs' expert witness, Dr. Bardwell, only looked at one job classification, that of flatware/condiments and one program code, Code 11, unassigned.  He found an overrepresentation of disabled inmates in those areas.  However, even he acknowledged that he only looked at one job classification and not the other 570 or so, and he has no reason to dispute Dr. Zax's conclusions with respect to the other 569 descriptions other than his contention that the data both he and Dr. Zax relied on is unreliable.[338]  Dr. Zax concluded that there are 570 different jobs and a finding with respect to one out of 570 is not noteworthy nor statistically valid.[339]  Dr. Bardwell did not find statistically significant differences in program code 11 for hearing, vision or diabetics – only mobility disabled inmates particularly wheelchair mobility disabled.[340]  Dr. Zax testified there is no reason to distinguish mobility disabled wheelchair inmates from any other type of disabled inmate.  All disabled inmates are entitled to the same type of care and accommodation in terms of assignment.  Some other category of disabled inmate may show misrepresentation in the other direction.  Based on valid statistical examination, a finding of one disproportionate category is not worthy of concern to Zax.[341]

Thus, based on the statistical analysis performed by Dr. Zax and his report, **Exhibit P-4,** the Department of Corrections was clearly in substantial compliance with Section XIII of the Plan. Inmates with disabilities were employed or in educational programs in the same percentages as they appeared in the entire inmate population.

---

[338] Bardwell, p. 2230, ln.25 – p. 2231, ln.1- 2
[339] Zax, p. 4096,  ln.1-18
[340] Bardwell, p. 2229, ln. 2-14
[341] Zax, p. 4096, ln.19-15, p. 4097, ln.1-25, p. 4098,  ln.1-6

**XIV.   Everyday Living Assistance**

This section of the Remedial Plan provides that disabled offenders who require assistance with the performance of everyday activities shall be provided with an offender aide to assist the offender. Offender aides are to be screened to ensure that they do not have exhibited tendencies to victimize other offenders and that they are compatible with the care-giving skills required.  Offenders who have a history of violent behavior or a history of theft are not to be designated as offender aides.

Cathie Holst testified about the difficulties encountered with respect to this provision of the Remedial Plan because it was difficult to find offenders in the CDOC with these qualifications.[342]  Specifically, the Remedial Plan's requirement that the Offender Care Aides (OCA) not have convictions involving violent behavior or theft was impossible to implement.   It was difficult to find offenders with no history of violence or theft.  After pulling all records and evaluating all existing OCA's it was discovered that there simply were not, are not, and never will be a number of offenders required in the correctional setting that can qualify for OCAs under the criteria of the Remedial Plan who do not have a history of violence or theft.[343]  History of violence or theft is usually intertwined with any type of crime they have committed, even drug offenses.  In Fort Lyon, for example, once the ADA coordinator, Ms. Grover, found out the results of the AIC's investigation into OCAs qualifications, they had all of their OCAs who did not qualify per the Remedial Plan, terminate from their employment,

---

[342] Holst, p. 496.
[343] Holst, p. 496.

leaving a lot of offenders without their OCAs.[344]  Moreover, the provision proved

problematic because many disabled offenders who had been in prison for quite some

time had assigned OCAs for quite some time. They liked their aides, trusted them, and

had developed a good symbiotic relationship with the aide.  These disabled offenders

became very upset as a result of losing their OCA.   As a result, the disabled offenders

complained to the AIC and became very upset after they were told that the OCAs did not

qualify for their positions.  Some of them had a long-time relationship with their OCAs,

and wanted to keep as their aides. After talking with her staff and others, Ms. Holst

determined that when evaluating the qualifications of OCAs, they would look at the

offender's institutional behavior, rather than their underlying conviction.  The

implemented standard was that no offender would qualify to be an OCA for the first two

years of incarceration regardless of their crime or if they are a first time offender, a re-

offender, or a parole violator.  If an offender has any class 1 or 2 COPD convictions

during those first two years, then he or she is not qualified for the OCA position, making

it very objective.  If, at any time, an OCA receives a COPD conviction, then that OCA is

terminated and would be eligible again if he or she has no COPD convictions for the

following two years before becoming eligible for the position again.  If an OCA is

convicted of any violation in which he or she victimized the person they were assisting,

then he or she would be terminated immediately and for good, and would never be

eligible to work as an OCA again.  This was an effort by Ms. Holst to come up with a

very black and white system, a very objective system, that did not discriminate against

anyone and that would comply with the requirements of the Remedial Plan, while

making it operationally feasible.  These parameters were written in as qualifications on

---

[344] Holst, p. 2656.

the job descriptions.  Ms. Shoemaker was the one who actually implemented these requirements for OCAs by changing the job descriptions. [345]

**Exhibit S-4** is the initial job description for the offender care aide I, II, and III, and the final version of those descriptions.  The original name for the offender care aide, or the OCA, was assisted daily living tech (ADL), so many documents contain both ADLs and OCAs, as CDOC was transitioning between the two names.  The description of OCAs I and II changed during the time the job descriptions were being standardized to ensure that the essential functions of the assignment were clear and concise. As of May 1, 2009, the OCA I offenders were expected to assist the mobility disabled offenders to get from point A to point B, to assist them with various tasks, such as laundry exchange.  The OCA II is the level that assists with more complex daily living activities, such as dressing or hygiene care that the disabled offender may not be able to do on their own.  There was an in-between version of the job description for the OCAs, but the final version was finalized early in 2009, and the initial changes started in the fall of 2008.  Initially, one of the requirements for an OCA II was to first be an OCA I for three months, but that requirement was dropped in the final version, because offenders were being trained for both OCAs I and II at the same time, and because there was no benefit of doing the OCA I work for three months if they were interested in being an OCA II.  The revised job descriptions are consistent with the qualifications recommended by Ms. Holst.  Ms. Shoemaker was very supportive of Ms. Holst's suggestions. [346]

---

[345] Holst, p.496, ln.18-20; p.497, ln .4-23; pp.608-610; pp.2514-15; pp.2653-57; Shoemaker, pp.2845-46.
[346] Shoemaker, pp. 245-46.

Randy Smith, who reports directly to Ms. Shoemaker conducts the trainings for both OCA I and II throughout the CDOC. **Exhibit T-4** includes the training materials developed by Mr. Smith, in concert with Ms. Shoemaker and Anna Marie Campbell. The training for both levels is performed on the same day, one in the morning, the other in the afternoon, and at the end of the training the offenders take a test to ensure that they understood the training and that they are capable of fulfilling their job obligations. **Exhibit U-4** contains the tests provided at the end of their training to ensure that the offenders understood the material and are ready to perform their job. **Exhibit V-4** is the certificate of completion provided to offenders completing the training and testing satisfactorily.[347]

OCA III's are used to provide care in the special medical needs unit (SMNU), which is currently only available at FLCF. OCA IIIs are not assigned to a specific offender, but are rather assigned to that housing unit by clinical staff and they provide services to any offender housed there. OCA IIIs work with the nursing staff on a daily basis to find out their daily assignments. The OCA IIIs are trained for work only at an infirmary setting or the SMNU.[348]

## XV.   Training

This section of the Remedial Plan requires that all CDOC staff receive training regarding the unique needs of offenders with disabilities, including disability cultural issues, special needs, assistive devices and training regarding how and when reasonable accommodations are to be provided, training with respect to ADA grievance procedures, the unique vulnerability of offenders with disabilities to crime from other offenders and

---

[347] Shoemaker, p.2840-45; Exhibit S-4-Exhibit V-4.
[348] Shoemaker, p.2874-75.

staff, and the protocols to be employed with offenders with disabilities during evacuation

and emergency procedures.  There is also specific training pertaining to diabetes training,

training regarding hearing and vision impairments, accessibility training, and structural

accessibility training.  The Plan further requires documentation of the training as to who

received the training and when it was provided.  The Plan requires that Linda Edwards

assist in developing diabetic training.

Amber Autobee, a lieutenant and trainer at the CDOC training academy testified

at length regarding the in depth training provided to all CDOC employees with respect to

disabilities.  Ms. Autobee is one of the five CDOC employees that oversee all of the

training that every employee that comes into the Department receives.  She oversees all

of the ADA training and ensures that all of the Montez ADA training is up to date with

policy and procedure. She described the initial training, a four and a half hour class, and

the three different aspects of the training: Introduction to the Montez Case;

Fundamentals of Diabetes; Deaf Awareness; and Blind Awareness. All staff are required

to take these classes.[349]

**Exhibit Y-4** is the PowerPoint and lesson plan cover page for the basic training

classes called "Understanding the Physically Disabled and Diabetic Offender."  Section 1

of that training is "Introduction to the Montez Settlement."  The performance objective

with respect to this training is to provide staff with a better understanding of the policies

and procedures surrounding the Montez settlement, and a better understanding of the

issues and concerns of physically disabled and diabetic offenders.  The training is an

interactive, dialogue training including group discussions, activities, and guided practice

---

[349] Autobee, pp. 3777-79.

scenarios.  The first part of the training is designed to give the students the basic

understanding of the Montez case.  The first thing discussed is that the CDOC recognizes

all types of disabilities, not just the four listed in the Montez settlement. All offenders

with all types of disabilities are accommodated and offenders will be provided programs

regardless of their disabilities.   The Policy Statement with respect to the training

provides: "It is the policy of the Colorado Department of Corrections to provide

individuals with disabilities, with or without reasonable accommodations, access to our

programs and services consistent with legitimate penological interest" and "No qualified

offender with a disability as defined in Title 42 of the United States Code shall be

because of that disability excluded from participation in or denied benefits of services,

programs, or activities in DOC or be subjected to discrimination." It is explained to new

employees that this is CDOC policy.  Staff is instructed as to the basic Montez process,

including the DRDC process and orientation and the procedure an offender follows to

request accommodations.   The training discusses some specific issues such as obtaining

qualified interpreters to come in and speak to an offender, and that durable medical

equipment does not count towards the $300 limitation for property at one time or the

cubic feet limitation for offender property.  Instruction is provided regarding reasonable

accommodations when an offender is in segregation or removal from population status.

There is also a discussion noting that disabled offenders can be victim prone, how to

protect victim prone offenders, and the red flags that indicate an offender is being

victimized.  The training notes that every facility has access to accommodations readily

available to offenders, like Braille readers, amplification devices, things the offenders can

check out at their facilities and use and that case managers or cell house staff can assist

offenders in obtaining these items.  Instruction is provided with respect to the ADA

grievance procedure and an explanation of the differences between an ADA grievance

and a non ADA grievance.  Instruction is also provided with respect to offender work

programs and activities, including that with proper training, guidance, and orientation

disabled offenders, regardless of their disability, can be trained and be able to do any type

of job.  Training pertaining to housing of a disabled offender is also provided.  Instruction

is also provided as to how to locate an ADA alert on an offender profile, including what

disabilities a particular offender has, what DME have been issued to the offender, and

what accommodations are to be provided to the offender.  Training is provided with

respect to emergency and evacuation procedures and that staff is responsible for ensuring

the evacuation of all offenders getting out of their housing units. The training also

discusses restraining and searching disabled offenders and that all staff have direct access

to the office of the AIC if they have any questions concerning a disability issue.[350]

The next section in **Exhibit Y-4** is the specific training dealing with cultural

awareness of blindness and visual impairment.  This training was developed by Julie

Deden with the Colorado Center for the Blind. The purpose of this section of the training

is to develop an understanding of the issues and concerns surrounding blindness and

visual impairment. As part of the training for trainers, CDOC trainers took classes at the

Center for the Blind.  Staff is instructed on ways in which the visual impaired and blind

offenders can be integrated into the correctional system, and how various tasks are

accomplished by the blind or visually impaired offender.  Ms. Autobee described the

interactive nature of the training by example including a demonstration providing staff

---

[350] Autobee, pp. 3779-83.

with an understanding of the anxiety and fear a disabled offender would feel when coming to prison. Staff is instructed on methods to reduce the paranoia and anxiety that these offenders might be experiencing. Instruction is also provided regarding Braille and cultural awareness of blind offenders. Examples include how to accommodate offenders in the process of losing their sight, activities that can assist the offenders as they lose their sight, giving vision impaired offenders specific directions describing in detail tasks so that a blind offender can complete the task. Staff is provided information relating to the blind offenders' day to day activities including travel and navigating around the facility, using the long white cane and the importance to the staff that the cane is needed and a necessary accommodation to blind offenders, and the importance of allowing blind offenders to explore their environment and count steps to allow them to navigate.[351]

The deaf awareness portion of the training was developed by Larissa McClung of Sign on Sign, the Plaintiffs' expert witness. The performance objectives with this portion of the training are to identify different causes of hearing loss and different expressions of it. There is a discussion about big D deaf, little d deaf and hard of hearing offenders. Big D individuals have been deaf since birth; little d offenders lost their hearing at some point in their life; and hard of hearing offenders have a residual hearing loss to some degree. Training is provided with respect to safety issues and strategies to overcome those. Training also concerns cultural issues such as housing big D deaf offenders with little d deaf offenders and includes the essentials of communicating within the environment of deaf offenders and being able to assist them in everyday housing issues. Examples are provided of security issues that can arise for the deaf in a corrections environment and

---

[351] Autobee, pp. 3800-3808.

how to effectively communicate with the deaf offender.  The training includes how to go about getting an interpreter and the use of TTY machines.[352]  Finally, Larissa McClung, class counsel's hearing expert, testified that the CDOC is in compliance with training required by the Remedial Plan, as it relates to the hearing disabled offenders.  Ms. McClung became involved with the Montez case in 2004, when she was approached by Nancy Photos from the DOC's training academy, as referred to her by the Sign Language Network to write a curriculum on how to work with deaf and hard of hearing offenders, what would be appropriate accommodations and how to train their staff.  She wrote the curriculum and trained the trainers at CDOC, who then later on trained the rest of the CDOC staff on hearing disabled offenders.[353]

The last section of the training is "Fundamentals of Diabetes", which was developed by Linda Edwards, Plaintiffs' Expert.  The performance objectives with respect to this training are for staff to understand the differences between type 1 and type 2 diabetes and identify the importance of providing emergency medical care if needed during a diabetic emergency, providing accommodations necessary for people with diabetes, identifying signs and symptoms of hypo and hyperglycemic and ketoacidosis. The training also includes what to do when hypoglycemia is suspected, and an understanding of special requirements of diabetes, including the importance of access to water and diabetic snacks, and timing of meals with that medication.[354]

---

[352] Autobee, pp. 3808-12.
[353] McClung, pp.2090; pp.2124.
[354] Autobee, pp. 3812-13.

All staff is tested with respect to the basic training and must receive a passing score of 70%.[355]

All staff is also required to take Montez "refresher" training on an annual basis. **Exhibit Z-4** is the refresher training that all staff receives.  It is a condensed version of the basic training.  Staff is also tested with respect to the refresher training and must receive a passing score of 70%.  If they do not pass they must take another different exam covering the same material.  If they fail again, they are required to repeat the four and a half hour basic training and test a third time.  If they fail again they are subject to discipline.[356]

In addition, the CDOC provides "diabetic kit training."  The diabetic kit is a red box that contains a glucometer, test strips, and food supplements, such as crackers, to be able to check and control a diabetic's blood sugar levels it was introduced as **Exhibit E-5**.  Diabetic kits are placed in housing units so that an offender can test their blood sugar levels, when they feel it is low.  The kit also contains specific instructions for the staff on what to do after the blood sugar levels are obtained.  Training relating to the use of the kits is required training for all correctional staff in January and July of each year and is presented during roll call. It is also presented in the annual refresher training, and it is a portion of the basic training.   The purpose of this training is to educate staff that the kits are present throughout the facilities and that diabetic kit is a tool to be utilized if an

---

[355] Autobee, pp. 3814-16.
[356] Autobee, pp. 3816-17.

offender, for whatever reason, needs to check the glucose levels for himself or herself.

**Exhibit D-5** is a copy of the lesson plan that is used during the diabetic kit roll call training that lasts about fifteen (15) minutes and is performed by clinical staff and/or the shift commander who is running the roll calls.  Even the diabetics who are not identified by the AIC have access to diabetic kits and the clinical staff treats them, clinically, for their diabetes.[357]

The Defendants presented **Exhibit F-5** which is a database that tracks training for all employees with respect to the basic training, annual refresher training and the diabetic kit training.[358]

Defendants also presented **Exhibit Y-5**, a memo from Autobee to private prison staff August 27, 2008, relating to ADA Montez training as well as Montez training for clinical staff dated.  All Montez training is provided to all staff at the private facilities that house CDOC offenders.[359]  Mr. Travis Brubaker presented evidence relating to training of private prison staff.  He was employed in the CDOC Private Prison Monitoring Unit as a contract monitor ensuring contract obligations were met through the State of Colorado and private prisons.   Included within his responsibilities, he acted as the training liaison for the private prisons, ensuring that all Montez and ADA training was provided in the private prisons.  He testified that the identical lesson plans regarding

---

[357] Shoemaker, p.2847-48; p.2884-85; Autobee, p. 3814; Exhibit D-5.
[358] Autobee, pp. 3816-18.
[359] Autobee, pp. 3818-19.

Montez training including the initial four and a half hour class, the annual refresher, diabetic emergency kit, classification by case managers, and some clinical services training was provided to the private facilities that house CDOC offenders.[360]

**Exhibit B-6** contains rosters of ADA training for the private facilities and contains a memo of the training log from Fred Nelson at Cheyenne Mountain Reentry Center, regarding the required training and contract obligations stating that "CMRC conducts the initial ADA training for every basic orientation class. This is for all staff hired at CMRC. The basic orientation is conducted when necessary. ADA refresher is conducted annually for all CMRC staff.  Diabetic kit training is conducted in January and July for all line staff.  Training is documented on attendance rosters and individual training records. Behind the memo are training rosters with staff signatures confirming that they attended that particular training.  Similar evidence is contained in the exhibit evidencing that all applicable training was also completed at the Bent County Correctional Facility, the Crowley County Correctional Facility, the High Plains Correctional Facility, and the Kit Carson Correctional Facility.[361]  **Exhibit A-6** further demonstrates compliance with the training requirements contained in the Remedial Plan. It is a database that was provided from all the private facilities that document the test taken, the name, the facility, the date the test was administered, and scores.[362]

---

[360] Brubaker, pp. 3928-3934.
[361] Brubaker, pp. 3929-3933.
[362] Brubaker, p. 3938.

Evidence presented through Dr. Frantz demonstrated extensive training provided to CDOC medical providers with respect to diabetes training.  **Exhibit B-5** is the lesson plan cover page for a lesson entitled "Team Management of Diabetes" for the Colorado Department of Corrections training academy.  The training was developed by Plaintiffs' expert, Linda Edwards, a certified diabetic educator.  The purpose of the training is to describe the current standards of care for diabetes, discuss the targets for A1C, blood pressure, and cholesterol, discuss the role of nutrition and activity in blood glucose control, identify appropriate use of oral diabetes medications for patients with type 2 diabetes, describe the process for designing an insulin plan for patients with type 1 diabetes, discuss the role of blood glucose monitoring in evaluating diabetes control, define population management as a strategy, and identify ways to integrate patient education into daily practice. The training is basic and is below the level of what a physician would receive in training, but a little more than what most RNs would receive. Dr. Frantz made some modest changes to the training materials in order to keep current with recent American Diabetes Association recommendations. Although clinical staff enter the CDOC with their prior medical education, credentials and licensure, this training is provided to clinical staff through the training academy when the provider is hired.[363]  The Defendants also presented **Exhibit C-5,** a memo from Nancy Photos, training supervisor to Anna Marie Campbell of clinical services.  The memo is a report to

---

[363] Frantz, pp. 4341-4345.

show those staff members that have received "Team Management of Diabetes" training, which is the training for medical personnel.

In addition, Dr. Frantz testified about the training she gave to medical providers when the new screening criteria was developed in 2008 and early 2009.  This training instructed medical providers on how to conduct screening.  **Exhibits Q-5**, **R-5**, **S-5**, and **T-5** are the training, tests, and test results.[364]

In addition to staff training, Dr. Frantz and Ms. Shoemaker testified about diabetic education and training provided to offenders.  **Exhibit L-5** is a series of 24 educational posters that were developed to be posted in the clinics and around the facilities in common areas, living units and cafeterias. In addition, the text of the posters is scrolled as a titler message on the offenders' TVs.  They are very brief public service announcements about diabetes care and things that a patient with diabetes can do to take responsibility for their own health status and to have control over their diabetes. Dr. Frantz developed the text content of the posters and the actual graphic design and the pictures were designed by offenders programs in one of the print communications shops. One of the posters is captioned "Diabetic Test Kits."  It advises offenders that they can test their blood sugars at any time.  It states that diabetic test kits are located in all cell houses and master control.  They are available for use when the clinic is closed, and it

---

[364] Frantz, pp. 4378-4386.

advises offenders to come to the clinic or medical during clinic hours for finger sticks. Another one discusses the importance of vaccinations.  The poster messages are also run as titler messages across the bottom of all TVs in the institution.  They are set up to run periodically, throughout the day.  Generally, the posters depict topics that are directly related to diabetics and care that DOC would like them to do for themselves.[365]

Dr. Frantz also testified concerning **Exhibit M-5** which is a patient education sheet that is available to be reviewed with offenders who have had a hypoglycemic episode or reaction.   It informs diabetic offenders what a diabetic reaction is and describes the symptoms such as, dizziness, lightheadedness, irritability, feeling uncoordinated, shaking, sweating, nausea, vomiting, and advises the offender what they can do to help prevent hypoglycemic reactions. It encourages offenders to eat three meals a day, to monitor their glucose level so they will know when they need to add more carbohydrates and when the blood glucose level is going too low and  to follow their exercise prescription as given to them by their provider to maintain good hydration.[366]

The Defendants also presented the testimony of Ms. Sherrie Wallick, the diabetic educator for all CDOC facilities in the state as well as all private facilities. **Exhibit H-5** is her curriculum vitae.  She has a bachelor's degree in community medical dietetics, she is a registered dietitian, and has a bachelor's of science in psychology. She designs and

---

[365] Shoemaker, p.2848-50; Frantz, pp. 4345-4359; Exhibit L-5.
[366] Frantz, pp. 4359-4360.

outlines strategies to deliver comprehensive diabetes and nutrition education classes to offenders and teaches yearly diabetes education classes for offenders with diabetes for all CDOC and private prison facilities offering a yearly one hour class to all offenders in the CDOC.[367]  She presented **Exhibit J-5,** the diabetes education materials for offenders from 5-1-08 to 12-31-08.  This is the yearly diabetes education class for the offenders. The performance objectives with respect to the class is to provide the offenders with education so that he or she will be able to describe diabetes in basic terms, be able to identify one food related change to improve blood glucose control, be able to distinguish between low and high carbohydrate canteen choices, and be able to discuss benefits of daily activity to improve blood glucose control.   The class further provides information about how diabetes is treated, through three components - nutrition, exercise, and medication. Offenders are instructed on blood sugar control, signs of low blood sugar, what to do blood sugar gets low, signs of high blood sugar, what to do when blood sugar gets high, and that diabetes can damage different parts of your body.  Offenders are educated concerning when to request a sick call visit,  foot care, about cutting toenails, wearing socks, wearing shoes,  what not to eat, what to eat.  They are instructed about diet consistency the importance of breakfast, carbohydrate counting, including use of the CDOC menu which lists carbohydrates and for the different food item choices on the menu.   They are instructed that for diabetes control, it is recommended that individual

---

[367] Wallick, pp. 3863-65.

exercise about 150 minutes a week.[368]  Wallick identified **Exhibit I-5**, a DVD presented to the offenders discussing carbohydrates and making choices within their meals which is also available in the facility libraries.[369]  **Exhibit K-5** is the documentation of the yearly diabetic education from 5-1-08 to 4-30-09.  The exhibit evidences and tracks diabetic offenders at each facility, and then a signature page upon attendance or a refusal if they decided they did not want to stay for the educational class.[370]

In addition to the above, Ms. Wallick oversees the diabetic menus.  She works at each of the facilities to develop a relationship with the medical providers, and provides individual consults for offenders relating to diabetes education.  She also meets with individual offenders to answer questions and provide education, responds to nutritional consultations regarding diabetes, and diabetes education from providers.  Finally, she develops and updates diabetes nutrition education materials that are provided to offenders and monitors and updates diabetes educational material in the food service areas of CDOC facilities.[371]

The Remedial Plan requires that CDOC case managers receive training regarding their responsibility to ensure that offenders with disabilities are not discriminated against in their participation in programs, jobs, vocational programs and other services and

---

[368] Wallick, pp. 3873-3880.
[369] Wallick, pp. 3872-73.
[370] Wallick, pp. 3880-81.
[371] Wallick, pp. 3868-72

benefits at DOC because of their disability.  Ms. Holst did two training sessions with case managers, grievance coordinators, facility ADA coordinators, ADA litigation coordinators, and anyone else who wanted to attend.  One was done in November of 2008 and the other around February 2009.  The first training was done at the training academy and the second one at headquarters to everyone. [372]  The training was mandatory.  Ms. Holst identified **Exhibit V-5** which is an email to the staff mentioned above that there was a mandatory training scheduled for November 7, 2008, on Montez issues.  She identified **Exhibit W-5**, the training she developed and presented on November 7, 2008, and **Exhibit X-5**, the training roster identifying all who attended the training.  It was a large group, as was the group attending in February, 2009. [373]  Finally, there was training relating to the job process which was completed by May of 2009. [374]

The Remedial Plan states that Plant managers and staff involved in the physical plant maintenance be trained with respect to structural accessibility standards and ADAAG guidelines regarding the care and maintenance of the physical plants.  Mr. Weems testified about the training provided to the physical plant managers of the facilities for architectural aspect of compliance.  Peter Orleans, the expert utilized by both parties in this case, worked with the Rocky Mountain ADA Center to develop training for CDOC's physical plant managers and key maintenance staff.  **Exhibit D-6** is the training

---

[372] Holst, p.460.
[373] Holst, pp. 1569-72.
[374] Holst, p.61, ln. 19-23.

materials developed and utilized.  The plant managers, architectural staff from facility services, some of the general maintenance staff, some of the lieutenants, some of the managers within the general maintenance department attended the training and were tested after the training.  This was done both in 2005 and again in 2009.[375]

Finally, Mr. Winden, the supervisor for the CDOC central transportation unit, testified that in addition to the mandatory *Montez* training, the transport unit implemented training specific to the operation of CDOC's multiple wheelchair vehicles.  The training included specific training relating to how to strap and lock wheelchairs down, how to safely seatbelt offenders, as well as other considerations for disabled offenders during transport.[376]

## XVI.   Health Care Appliances

(A) Defininitions.

Ms. Shoemaker testified about **Exhibit G-6**, the AR 700-02 that deals with the medical scope of services at DOC.  It outlines the basic level of services that the DOC expects to provide to offenders for their medical care.  Page 5c of the AR states that medical or dental adaptive equipment of any type, such as prosthetic devices, will be provided to offenders as medically necessary.[377]

---

[375] Weems, at pp. 3253-3256.
[376] Winden, p. 3697.
[377] Shoemaker, p.2738-39; p.2853; Exhibit G-6.

(B) Prescription and approval.

This section of the Remedial Plan provides that health care appliances or DME be prescribed and approved for eligible offenders by licensed health care providers, subject to medical necessity, safety, and security; and that if custody staff denies it the DME to the offender for safety or security reasons, the Chief Medical Officer be consulted immediately to determine appropriate action to accommodate the offender's needs. The clinical staff can provide the Durable medical equipment (DME) as part of medical treatment regardless of whether the offender goes through the AIC process. This has been true for many years, at least for the last twenty-four (24) years, While Ms. Shoemaker has been with the DOC. Custody staff may not take away DME given to offenders by clinical staff, without first discussing the issue with clinical staff. If an offender is moved to administrative segregation, the situation is reviewed to determine what the offender may need in the administrative segregation. Both the clinical staff and the AIC's office review the situation and make the determination.[378]

Dr. Frantz testified about **Exhibit E-6**, the CDOC clinical standard and procedure for DME. The purpose of this standard is to define a manner in which a patient may obtain DME and supplies that are determined to be medically necessary. The standard unequivocally states that items ordered by the Montez special master in the damage claim hearings will be provided. The standard outlines the process of how to obtain DME, and

---

[378] Shoemaker, pp.2861-62; p.2875; Exhibit J-6.

that notes that most DME is obtained through a CDOC contracted supplier. If an item is not a covered benefit is requested, the provider must show medical necessity and receive approval by the utilization management committee. Some items considered benefits must still meet criteria established by the CMO and be authorized prior to purchase by the utilization management committee.[379]  The CDOC uses a third-party administrator, CHP (formerly PHP) to review requests for DME and place orders with outside vendors. If a provider believes that certain DME is necessary, he or she must get an authorization from CHP, the CDOC's third party administrator.  CHP negotiates contracts for DOC and makes sure that they have a network of providers who are willing to provide care for the offenders.  They also set up CDOC's DME contracts.  There are certain things that CDOC can purchase directly for the clinics, such as a canes, so those canes are available in clinics and can be issued at any time.  In addition, facility health services administrators can order DME that does not require prior authorization such as hearing aid batteries, braces, walkers, crutches, shower chairs, and wheelchairs for temporary use.[380]

For DME that has to be custom fit, there are orthotics groups who do that type of work.  CHP authorizes the claims based on the contract with the vendor.  For example, after a hospitalization, the hospital bills go to CHP, not CDOC.  CHP reviews the claims and bills, since they have the expertise to know if the CDOC was charged appropriately. The authorization process can adjust testing, so that the offender is getting the best care possible.  In the DME authorization process, CHP considers appliances that are durable,

---

[379] Frantz, pp. 4386-4388.
[380] Frantz, pp. 4387-4388

as cost effective as they can be made, and that they meet the offenders' needs.  CHP may deny an authorization for several reasons, one of the primary ones being that they do not have enough information to make a determination.  Another reason may be the state of the offender's incarceration.  If the offender is within six (6) months of paroling, a better alternative will be requested.  The parole eligibility date is reviewed because the CDOC needs to be able to complete a course of treatment before the offender's parole, which may be interrupted by the parole.  However, there are exceptions.  For example if an offender is diagnosed with a certain type of illness, the CDOC will take care of that offender as long as they are in CDOC.  There have been offenders who suffered a heart attack the week before the left CDOC and they were obviously taken care of while in CDOC.  The six months from the parole eligibility date is looked at as a benchmark, so that the course of treatment can be completed prior to the offender paroling out of CDOC.[381]  If CHP denies a request fro DME, the CDOC Chief Medical Officer reviews the situation with the provider.  If either one believes it is necessary, the claim is authorized.[382]

(C) Posession of health care appliances

This section provides that health care appliances be documented as property of the offender or CDOC and appropriately identified in accordance with departmental and institutional policy and that such property not be included in the volume limit for personal property established for an offender.  Ms. Shoemaker testified that the CMO is consulted if DME is taken away.  DME issued to an offender is assigned as property and

---

[381] Shoemaker, pp.2857-59, 3172-73.
[382] Shoemaker, p. 3173.

etched with the offender's CDOC number.  The manufacturer imprints the offender's

CDOC number hearing aids.  Property officers are specifically trained in putting the

offender property, including the DME, on the offender's property list.  They enter it into

the DCIS database system and know it does not count toward personal property limits.[383]

      (D) Purchase of Health Care Appliances.


      The Remedial Plan states that health care appliances deemed necessary shall be

ordered by medical no more than 7 working days after it is determined the offender is in

need of the appliance and the appliance shall be provided as expeditiously as possible.

When medical staff receives the appliance, it shall be evaluated to determine that the

appliance meets the individual's needs.  If the appliance is to be attached to the offender's

body, such as a prosthetic leg or arm, then personnel specifically trained in the fitting of

such application shall fit the device to the offender to ensure proper working order.

Clinical services staff recommended whether or not an offender needs a particular

healthcare appliance, or DME such as wheelchairs, canes, walkers, oxygen concentrators,

Canadian crutches, hearing aids and such.  If DME was recommended as part of a

disabled offender's accommodation, that DME would appear on his or her

Accommodation Resolution.  Clinical staff could also give DMEs to offenders as part of

medical treatment.  If staff gave that DME to an individual, even a disabled individual,

that would not be required for longer than six (6) month period, then that particular DME

would be considered a medical restriction, rather than an accommodation and it would

not be added to an Accommodation Resolution.  In the same fashion, clinical staff could

put in restrictions for an offender for lower bunk/ lower tier for medical necessity, not to

exceed six (6) months.  If the clinical staff ordered a certain type of DME for an offender,

---

[383] Holst, p.678, ln. 12-23.

staff would have to check with the clinical before removing such assistive device who
would make a decision if it could or could not be removed from the offender.[384]

Most DME, but not all, requires a consult in order to get it. Since 2007, CDOC
medical personnel completed approximately 4100 consults for DME.  Dr. Frantz
reviewed the data concerning these consults and when the DME was provided to
offenders.  She presented evidence that approximately 92% of the orders for DME are
completed within 60 days from the time the provider requests it at the initial appointment.
She further presented evidence that out of that 4100 consults for DME there were
approximately 190 denials.  Of these denials, almost half were denied because the
consults did not need to be entered into the CDOC tracking system because the item was
stock equipment within CDOC's canteen or internal vendor.  A number of the remaining
denials were consults that were duplicates, wherein the duplicate was denied.  Of all of
the denials, only 35 of the 4100 DME consults, or less than 1%, were actually denied.
She further testified that CDOC's overall denial rate for all consults, regardless of
specialty, is similar to the public sector rate for consult denials.[385]

(E) Maintenance and repair of health care appliances.

This provision provides that whenever an appliance, exclusive of wheelchairs, is
in need of repair or replacement, the offender shall utilize approved CDOC procedures
for notifying health care staff of health care needs.  Health care staff shall schedule the
offender for an appointment and evaluate the condition of the appliance.  Once the need
for repair or replacement is verified, the offender shall be issued an appropriate appliance

---

[384] Holst, pp. 674, 1583-1584.
[385] Frantz, pp. 4303-05.

132

or accommodation as soon as possible.  This procedure applies to replacement of batteries for hearing aids and other appliances. Repair or replacement will not be delayed because of an inmate's financial situation.

Ms. Shoemaker testified that in the event DME needs to be repaired, the offenders are required to notify the medical department through the offender kite system. However, a majority of offenders simply notify a staff member who then calls the clinic. After notification, the provider or nursing staff look at the condition of the DME.  If it is a simple replacement of repair such as crutch tips, cane tips, cleaning the wheels on wheelchairs, staff repairs or replaces the item immediately.  If it is more complicated, staff puts in a consult to get the item repaired by an appropriate repair person.  The clinical staff have wheelchairs available, if necessary, for temporary movements or temporary assignments within the facilities.  There are a number of pieces of DME that clinics have, such as wheelchairs and crutches.  There are times when an offender has a medical injury and needs a temporary accommodation provided to them by clinical services to deal with the injury.[386]

Ms. Shoemaker identified **Exhibit H-6**, the minutes from the health services administrator meeting held on May 29, 2008.  During the meeting staff were informed that that CDOC was moving from alkaline batteries to zinc air batteries for hearing aids. The zinc air batteries have a more stable duration of use due to the amount energy produced, so that they last longer than alkaline batteries which gradually decline over time.  Therefore, DOC switched to zinc air batteries because they were better product than the alkaline batteries.  Hearing aid batteries are purchased by the individual clinics.

---

[386] Shoemaker, p.2862, ln. 2-8.

The facilities are required to stock different levels of batteries used throughout the CDOC.  The facility clinics purchase and store them.  They are administered to offenders during medline and are recorded on the administration record.  During this meeting it was emphasized to the health service administrators that any items ordered by the Special Masters were to be obtained for the offender. [387]

Ms. Shoemaker also testified about the **Exhibit I-6**, which is the printout from the pharmacy system that shows when offenders came and picked up their hearing batteries at various facilities.  The print out is in the alphabetical order by the offender, for the period of time from June 2008 through April 30, 2009.  The exhibit itself reflects when the offender's prescription date was, when they were ordered, and the administration date.  It also lists all of the state facilities in the DOC who distributed the hearing aid batteries for this period of time.[388]

Ms. Shoemaker also testified about the **Exhibit J-6**, which is the report from McKesson Medical Supply of the facilities' hearing aid batteries purchase.  It reflects the quantity and cost of purchased hearing aid batteries, with each giving a certain number of batteries per pack.[389]

(F)  Maintenance and repair of wheelchairs

This section states that all state-issued wheelchairs will comply at least with minimum federal standards.  A state-issued wheelchair in need of repair shall be

---

[387] Shoemaker, pp.2853-55; p.2859-60; Exhibit H-6.
[388] Shoemaker, pp.2860-61; Exhibit I-6.
[389] Shoemaker, p. 2861; Exhibit J-6.

exchanged for one in good working condition. When a personal wheelchair is submitted for repair, the offender shall be loaned another for the duration of the repair.  The offender shall be financially responsible for damage or repairs to the wheelchair caused by the offender's negligence.  Expenses for other repairs or replacements needed as a result of normal wear and tear are covered by the facility.  Wheelchairs are sent to the medical department for repairs.

The unrebutted evidence showed that the CDOC has "wheelchair clinics" every six months.  Notification of the wheelchair clinics is posted with the medical appointments.  Permanently assigned wheelchairs are inspected every six months at which time the wheelchairs are "tuned up" and minor repairs are completed. If there is a more extensive repair that needs to be done, staff gets authorization from CHP to purchase the parts or the replacement chair and makes arrangements for the repair provider to come to the facility to repair the wheelchair.  Similarly, with respect to prosthetic limbs, if an offender needs replacement or repair, medical staff ask have the offender come to medical to determine what the issue is. Issues can vary from a new liner, a new sock, broken components on the prosthesis, or is the prosthesis not fitting properly because of a weight change in the offender which altered the fit may require a new prosthesis. The provider then puts in a consult to get the prosthesis repaired. Depending on the prosthesis and the nature of the repair needed, the offender may be able

to continue to use the prostheses until the repair appointment. If not, the offender is issues

crutches or wheelchair if needed until the repair occurs.[390]


Jim Falk testified that DME issued to an offender remains with the offender

throughout the duration of incarceration and the offender retains the property even when

they discharge.  For example, if an offender comes into DRDC without a wheelchair, and

at some point during the incarceration is issued a CDOC wheelchair, when the offender

discharges, he or she retains that wheelchair.  This is true for all DME issued by the

CDOC including not only wheelchairs, but braces, hearing aids, etc.  Falk testified that

this policy, although expensive, was adopted in order to help offenders be successful on

the outside, to meet their needs on the outside, and to assist them in that transition.[391]

## XVII.  Library Equipment

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance

with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853].

## XVIII. Institution Procedures

This section requires that when a disabled offender initially arrives at a new

facility, the case manager assigned to the offender shall ensure that during the orientation

process, the offender is provided relevant information regarding the accommodations

and/or assistive devices that will be made available to that offender to accommodate

his/her needs.

In addition to the orientation provided at DRDC upon intake, several case

managers testified concerning the orientation received by an offender upon arrival at the

---

[390] Frantz, pp. 4389-91.
[391] Falk, pp. 3318-19.

offender's permanent facility.  When an offender comes into the facility, they are given their orientation.[392]  They are usually put in an admission and orientation unit for a couple of days where they are evaluated and it is determined if the offender has any special needs, and where he or she would function best within the facility.[393]  The offender gets orientated at that time, some facilities use videos for orientation as well.[394]

For example, Case Manager Supervisor Dave Allen testified about the orientation process for new arrivals at CTCF.  He explained that there are many different orientations at Territorial.  The initial orientation and assessment takes place in cell house 5.  This provides information to offenders concerning the services that CTCF provides, and answers offender questions to alleviate confusion on the offenders' part about their disability and how the facility can deal with the offender's issues.[395]

After the initial orientation, and the offender moves from cell house 5 to a permanent cell house where an additional orientation occurs that relates to the inner workings of the cell house.  Finally, an offender's case manager does an orientation to case management function including work restrictions, offender medical restrictions, and accommodations.[396]

Mr. Allen identified **Exhibit U-6**, orientation materials provided at CTCF.  The first page of that document is a new-arrival offender orientation check list, which is part of I/A 850-7.  It is a laundry list of issues discussed at orientation.  Number 35 unequivocally provides for the discussion of offender disabilities and the Montez case as

---

[392] Holst, p.1636, ln. 6-9.
[393] Holst, p.1636, ln. 9-14.
[394] Holst, p.1636, ln. 14-17.
[395] Allen, pp. 3501-02.
[396] Allen, p. 3502.

part of this orientation.  Both the offender and the staff member that provided the orientation sign the document, and the offender acknowledges that he has "been oriented to the above-listed subjects or have viewed the file and have been provided and have read the CTCF offender handbook."  If an offender needs assistance getting through the orientation process because of the disability, assistance is provided.  There is a notation on the form indicating whether assistance was provided to an offender with respect to a disability at the time of orientation.  On the bottom line there is a yes, no section where they can check if assistance was provided. For example, Allen testified that if an interpreter in needed, one is provided.  Indeed, interpreters show up at CTCF, which is the CDOC facility that houses most deaf offenders, at least once a week for staffings with the hearing-impaired.   But any staff member at CTCF can request a hearing-impaired interpreter through the administrative services manager. In addition, written materials are provided during this initial orientation and are delivered in an accessible format for disabled individuals.[397]

As part of this orientation, offenders are provided with a Montez handbook.   A The handbook is attached to I/A 750-04, **Exhibit U-6** and orientates the offenders on services provided at CTCF pertaining to disabilities.  It further helps to answer any questions or alleviate any concerns that the offender might have.  The orientation process is an interactive process during which offenders ask questions so that they understand the process.  Staff wants to ensure that before an offender signs off on the orientation, that he or she understands the processes that are in place.  Page 2 of **Exhibit U-6** is the ADA Montez facility orientation handbook dated December 10, 2008.  The handbook contains

---

[397] Allen, pp. 3502-05.

a number of sections.  Section one states that "Inmates who have disabilities shall be

provided reasonable accommodations to ensure that they have access to comparable

programs, services, and benefits provided to nondisabled inmates in CTCF.  This

handbook is intended to provide inmates with disabilities the information needed to

successfully and safely function in a correctional setting and is supplemental to the

complete facility new-arrival inmate orientation handbook."  The Handbook then lists

some of those services provided for the disabled.  The next section provides offenders

with an overview of the AIC office, and how a disabled offender can request

accommodations.  It states that an "inmate with a disability may submit a request for

accommodation available from any DOC employee for access to benefits, programs, or

services directed to the ADA inmate coordinator, AIC, at DOC central office by intra-

facility mail and may attach one additional page, if necessary. Inmates may request

assistance from their case manager to complete the request for accommodation, medical

release form, and functional-ability questionnaire."  The next section discusses

communication for sight- and hearing-impaired and some of the accommodations that are

provided at CTCF to ensure communication for sight-and hearing-impaired, the TTY

kiosk phone system, availability of interpreters for different services, hearing aids, close-

captioned televisions, videos, talking book, library access, and other material available in

the general library.[398]


       The orientation also encompasses offender housing in which offenders are

advised that CTCF has ADA accessible cells.  It informs the offenders that CTCF has the

ability to house mobility-impaired offenders in accessible cells, and has strobe alarm-

---

[398] Allen, pp. 3506-3518.

equipped cells for the hearing-impaired.  It also notifies offenders that disabled offenders are accommodated for inmate count and movement including  notification of hearing-impaired offenders by flashing cell lights five minutes prior to the movement of count.  It states that if physically challenged inmates are unable to stand up for formal counts, they will be able to remain in wheelchairs or sitting in the upright position.[399]

The orientation process also contains a section dealing with mail, laundry, and canteen procedures advising offenders of the postings for mail and laundry, where the postings are placed, along with the schedule for mail, laundry, canteen distribution, and toilet paper distribution. These services are provided on a set schedule, occurring at the same time in any given week or day.

Offenders are also oriented with respect to work programs and assignments. Offenders with disabilities are advised that CTCF makes accommodations so that an offender has access to different work program assignments.  There are not separate programs for disabled inmates and nondisabled inmates; any inmate, regardless of disability, can request any work or program assignment at CTCF.[400]

The orientation also advises ADA Montez offenders of the opportunities for participation within recreation at CTCF.  There is a time slot specifically reserved for mobility-, sight-, and hearing-impaired, and inmates over the age of 50.  **Exhibit L-3** is a recreation calendar for the month of January 2009, noting that on every day from 3 to 4

---

[399] Allen, pp. 3512-14.
[400] Allen, pp. 3517-18.

p.m. 50 plus / mobility-impaired, and developmental disabled offenders have unfettered access to the gymnasium.  Other offenders are not permitted recreation at this time.  50 plus / mobility-impaired, and developmental disabled offenders are also permitted access to the gymnasium participate in other recreational times with general population recreation.  Allen testified that the purpose for this exclusive recreation time because often the non-disabled and younger offenders, especially ones that lift weights or participate in a lot of physical activities, try to monopolize certain equipment.  These groups try to monopolize the weight pile and the basketball court, making it difficult and intimidating for disabled offenders to get the equal access or to feel comfortable getting the access they need or desire.  CTCF reviewed this process and discussed eliminating that time.  The 50 plus / mobility-impaired, and developmental disabled offenders said they really needed the exclusive gym time and that it was important to them.  As a result, the exclusive time was maintained in the schedule.[401]

Next, the orientation provides information with respect to food service. There is a statement that informs offenders that the first three rows of the tables in the north dining, dining room, as well as some first-row seats in the south end of the room, are reserved for physically challenged inmates, and seating in these areas is restricted to those individuals who are unable to obtain food trays and beverages without assistance. There are OCA's and food-service workers who assist physically challenged inmates as needed with dining and their food trays.[402]

---

[401] Allen, pp. 3518-21.
[402] Allen, pp. 3521-22.

Diabetic offenders at CTCF are advised that they will be provided training, including written information, which complies with the American Diabetes Association guidelines and that medical care appropriate to the individual is available from health-care providers.  Finger sticks and insulin med lines are held twice daily in accordance with movement schedules, and inmates are permitted to take six glucose tablets outside their cell to their work assignment or recreational activity or religious activity, any activity outside of the cell house.[403]

Inmates with health-care appliances are advised during orientation that health-care appliances have to be prescribed and approved by clinical services, and that such appliances should be documented on their property inventory.  They are told that whenever a health care appliance is in need of repair or replacement, offenders should utilize the approved procedures notifying clinical-services staff, and finally, that they are financially responsible for damage to appliances relating to misuse, not for normal wear and tear.[404]

Offenders are again advised at this orientation about the ADA grievance procedure.  They are advised that if they are unable to resolve an issue related to their disability, that their case manager will assist them with preparation of an ADA grievance if needed.[405]

---

[403] Allen, p. 3522.
[404] Allen, pp. 3522-23.
[405] Allen, p. 3523.

Ms. Holst testified that there were no complaints, or not enough complaints for

Ms. Holst to recognize it as an issue, from the offenders about lack of information

available at DOC concerning the Montez Remedial Plan.[406]

Section XVIII also requires that printed and recorded materials are accessible to

disabled offenders and that effective communication is made with offenders with

disabilities.  CDOC's compliance with this section has been covered in some of the

previous sections, but as an example of how that is being implemented, Mr. Allen

testified about multiple systems utilized to ensure effective communication with the

disabled including flashing lights, the intercom system, OCAs placed in different wings

to assist in the process of notification, and staff members designated to those certain

wings to oversee the accommodation process.  There is also a section captioned "verbal

announcement, alarms" in the orientation materials which provides that "Inmates with

disabilities will receive special assistance regarding notifications, PA announcement, PA

announcements, and alarms."  PA announcements can be general, or inmate specific.  For

example, if an inmate with a hearing disability is needed in medical, there are multiple

ways in which such inmate would be advised.  The offender may have an OCA assigned

who would advise him or her, staff may advise the offender, and, in addition, scheduled

medical appointments are posted in the cell house.  There is also a section in the

orientation captioned "emergency evacuation procedures" which states: "In emergencies

the evacuation of inmates with disabilities will be the primary responsibility of

designated correctional staff. If there is insufficient correctional staff to accompany

inmates with disabilities during an emergency, additional facility staff will respond. At no

---

[406] Holst, p.1711, ln. 5-15.

time will the evacuation of inmates with disabilities be designated to other inmates." Allen testified that his procedure was adhered to at CTCF and that staff had ultimate responsibility to evacuate all offenders within a cell house.[407]

Ms. Holst testified that while some facilities did not specify a particular "position" that was responsible for communications with disabled offenders, different positions within the cell house were utilized, such as housing staff.  So any member of the housing staff might assist in communicating with a disabled offender.  At CTCF, which houses most of the hearing disabled offenders, Case Manager  Aubrey Bell was often involved in making sure hearing disabled offenders were kept informed (see Section X, Reasonable Accommodations).[408]

## XIX.   Special Identification

This section provides that custody staff for each housing unit to which disabled offenders are assigned are made aware of the inmate's disabilities and how to accommodate the special needs of those inmates.

Ms. Holst, as well as multiple other witnesses, testified that there are several different places that staff at facilities can look at to determine whether or not an inmate is disabled.[409]  The testimony and exhibits are outlined in detail under Section IX, Tracking. Mr. Engstrom produces the ADA Daily Rosters which are automatically sent to all the facilities daily on the CDOC R drive.  They are also available on the AIC website which

---

[407] Allen, pp. 3513-17.
[408] Holst, pp. 876-77, 1656
[409] Holst, p.740, ln. 13-16.

is accessible to all CDOC staff and the private prisons.[410]  **Exhibit H-2** is a sample of the daily roster which is broken out by facility, and lists disabled offenders by living unit, pod, including those pending ADA screening.  As of October of 2008, all CDOC facility staff have access to this "Daily ADA Roster".  The AIC also receives a daily report that enumerates all ADA inter-facility moves, **Exhibit F-2**.   Every morning the AIC's office notifies both the ADA coordinators at both the sending and receiving facilities of the move and the ADA coordinators at the facilities complete the movement tracking screen in the AIC Montez tracking database.  **Exhibit E-2 and G-2.**  In addition, staff can also look on an offender's QT Profile for an ADA alert.[411]  All staff have access to scanned copies of Accommodation Resolutions on the CDOC DOCNET system.

As to individual facilities, several facilities use rosters with offenders' names and designation of M, V, H, or D for their disabilities.[412]  Others use white boards with this same information, which Ms. Holst has personally seen in the facilities.[413]  These rosters or white boards are kept in the control centers or the housing units for staff to use.[414] Facility staff could, and frequently did, contact the AIC office with respect to any issue involving a disabled offender.  Facilities also have their own ADA coordinators who assist in identification of disabled offenders.  Since each facility is staffed differently, with their own unique needs, it was not important to Ms. Holst to know what system the facilities used to locate disabled offenders, as long as they knew what cell they were in. *Id.*

---

[410] Holst,, pp.742, ln.24-25; pp.743, ln.1-16.
[411] Holst, p.743, ln.23-25.
[412] Holst, p.745, ln.14-20
[413] Holst, p.746, ln.8-9.
[414] Holst, p.746, 2-4.

**XX.      Evacuation/ Emergency Procedures**

Section XX of the Remedial Plan addresses Evacuation and Emergency

Procedures. [415]   Class counsel stipulated that the CDOC is in compliance with the Section

XX of the Remedial Plan with respect to all issues save one - the conditions of the

confinement of inmates on the second and third floor of building 5 at Ft. Lyon, which is

dependent upon elevators for timely evacuation.  Aside from this issue, Plaintiffs

stipulated that each institution/ facility ensured safe and effective evacuation of inmates

with disabilities and have developed procedures specifically to deal with the evacuation

of inmates with disabilities; that custody staff are specifically trained on the evacuation of

inmates with disabilities and their unique responsibilities during emergencies; and that

the evacuation of disabled offenders was not designated to other offenders.

Plaintiffs' issue with respect to cell house five arose from an incident that

occurred on August 19, 2009.  Plaintiffs called Rick Gilmore, a former life safety officer

at FLCF.  On that day, one of the elevators in cell house five was under repair.  Certain

parts needed to be ordered and replaced. [416]   The other elevator was operational at the

beginning of the day.  It became inoperable when an offender kicked it out of its track. [417]

An offender, Raymond Stuart, then pulled the fire alarm.  The cell house evacuation took

place.  Once everyone realized that both elevators were down, the disabled offenders

were evacuated from building five, using the evac-u-chairs located in the stairwells. [418]

---

[415] Exhibit A, pp.23-24.
[416] Gilmore, p.2716-17; Exhibit 4.
[417] Gilmore, p.2695-96.
[418] Gilmore, p.2706, l.1-7; p.2708, ln.14-18.

The stairwells are considered safe zones during an evacuation that give two hours of protection.[419]

Mr. Gilmore realized that there was no real fire within the first few minutes into the evacuation, but decided to proceed with the evacuation as if there was a real fire.[420] The staff was not aware that this was not a real emergency.  The evacuation of the entire building took 30 minutes to complete, only 10 more minutes than if they were using elevators.[421]  A video, **Exhibit 6**, was shown which documented an organized evacuation. Life and Safety Officer Ricky Gilmore stated that he was very impressed with how well trained the staff and offenders were during this evacuation and how well the evacuation went.[422]  There were no injuries to staff or offenders reported during this evacuation.[423] Mr. Gilmore testified that Ft. Lyon specifically had a backup plan in place with respect to the issue, and that the plan, as implemented, was approved by the local fire department.[424]

All inmates with disabilities are provided with evacuation/ emergency procedures in accessible format during orientation, and routine evacuation/ emergency drills at the facility incorporate these procedures.  Inmates with vision impairments are provided a tape recording containing this information.

## XXI.   Count

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853].

---

[419] Gilmore, p.2715, ln.20-24; p.2715, l.20-24.
[420] Gilmore, p.2706, ln.11-25; p.1707, l.1-5.
[421] Gilmore, p.2715, ln.25, p.2716, l.1-5.
[422] Gilmore, p.2709, ln.14-25, p.2719, l.1-8.
[423] Gilmore, p. 2716, ln.6-7.
[424] Gilmore, p.2714-15.

## XXII.  Restraints

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853].

## XXIII. Searches

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853].

## XXIV. Transportation

The Remedial Plan requires that "[t]he special needs of inmates with disabilities shall be accommodated during transport. An inmate's special healthcare aids and appliances shall accompany the inmate upon transfer." The Remedial Plan further requires that "[a]ccessible vehicles shall be used to transport inmates in wheelchairs and those whose disability necessitates specialized transportation."  The evidence presented establishes that the CDOC is compliant with the transportation requirements of the Remedial Plan as of May 1, 2009.

The supervisor for the central transportation unit, Matt Winden, testified at length regarding the CDOC's transportation equipment and policies.  Mr. Winden oversees all of the day-to-day operations for medical, court, and mass transports of offenders.[425]  He supervises 44 staff as part of the transportation unit.  In 2008, the transportation unit transported approximately 41,000 offenders, which averages about 166 offenders per day.[426]

---

[425] Winden, p. 3665.
[426] Winden, p. 3677.

Mr. Winden described the different types of transports conducted on a daily basis. Mass transports are facility transports. These are generally done as large-scale operations by bus or several vans.  These offenders are regressing or reclassifying to a lower custody designation and as a result are moved from one prison to another based on their classification.  Medical transports are scheduled medical transports for the Canon and Pueblo area.  Court transports are to and from court.[427]

Mr. Winden testified that the CDOC maintains approximately 12 handicapped transport or wheelchair vans throughout the state.  **Exhibit H-7**, Administrative regulation 300-37RD, defines a wheelchair van as; "A vehicle specifically equipped with a lift capable of raising and lowering a wheelchair."  Once the wheelchair is in the van, if the offender is able to get out of the wheelchair, staff places the offender in a standard seat and set belts the offender in because it is safer.  If the offender cannot get out of his or her wheelchair, the wheelchair is strapped down to four points in the vehicle and the offender is seat- belted in.  Mr. Winden identified **Exhibit J-7** which consists of pictures of the various transport vehicles utilized by the CDOC.  The first pages contain pictures of a standard mass transport bus.  The CDOC has eight of these vehicles. Page 4 o f **Exhibit J-7** has photos of CDOC wheelchair vans.  The next page contains pictures of a high security van that is typically used to transport maximum security offenders.  Mr. Winden testified that if a maximum security offender in a wheelchair needed to be transported, that offender is transported in a wheelchair accessible vehicle.[428]

---

[427] Winden, pp. 3666-67.
[428] Winden, pp. 3673, 3676-77.

Mr. Winden testified that prior to any transport, the transport unit completes a background check or history of each offender.  That background check consists of time left on the offender's sentence, any ADA or medical limitations that the offender has, any custody issues that the offender has within the Department, and, also, any security threat group issues that offender may have. During that background check, the transport unit utilizes PCDCIS and DCIS systems.  If a Y code appears on the offender's reception and diagnostic or QT profiles, there is an immediate indicator to query that offender's accommodations and limitations. The unit will then check the accommodations and limitations. If there are transport-specific accommodations, they print that sheet and attach it to the trip leader's paperwork so he knows the accommodations that those offenders have.[429]

If the offender has an ADA diabetic alert, Mr. Winden testified when they pick the offender up, the offender will advise that he or she is diabetic and needs to take insulin.  Normally, it is not an issue because the offender receives his or her insulin before the transport. However, Mr. Winden did testify that on rare occasions, the transport did take insulin. **Exhibit H-7**, page 3, letter E, is styled "transportation consideration."  This Regulation dictates that "Medication requirements should be completed prior to transportation."  Accordingly, the facility medical departments ensure that if an offender has medications to take prior to transport, they take them.  If the offender has medications that need to be taken with them on transport, the medications are prepared and packaged appropriately.  If medications are transported with the offender, they are either in the bay of the bus with the medical files or in the front of the cab with the officer.  Medical files of the offender are transported with the offender.  In

---

[429] Winden, p. 3668.

addition, the transport team will verify the necessity of diabetic snacks and take the snack with the offender.  All durable medical equipment is transported with the offender.  DME is accounted for at the intake and receiving of both the sending and receiving facilities.

If the is capable of transporting in a standard van, such as if the offender has a cane and is able to walk, standard transport protocol is to place the offender in a standard transport van and the cane goes with the offender. These offenders also generally have ADA accommodations listed that include assistance when being cuffed or shackled, in addition to the cane. This gives the transport officers a clue that when the offenders are placed in restraints, they need more attention than those who do not have a cane and these offenders are appropriately assisted.[430]

When restraining disabled offenders during a transport, the evidence demonstrated that appropriate accommodations are made.  Mr. Winden testified that if the offender has a prosthetic, the prosthetic is not restrained.  Generally, a belly chain is utilized for transport with wrist restraints.  If an offender needs access to medications during transport, transport staff ensures that there is a shirt pocket and if the offender has a respiratory  inhaler, nitro pills, glucose tabs, or other medications the offender may need access to during the transport, the officer will ensure it is in the pocket and make sure the offender can reach the item before placing the offender in the vehicle.[431]

With respect to deaf offenders, transport is informed and the offender has a notebook in his or her pocket so the offender can write if he or she cannot read lips.  For offenders that require sign language interpreters, the CDOC utilizes a special set of

---

[430] Winden, pp. 3669-72, 3675.
[431] Winden, pp. 3666-67.

restraints called universal restraint systems. It allows for mobility of the offenders hands so the offender can utilize their hands for communicating.[432]

Visually impaired offenders are identified on the trip master sheet.  Transport officers spend additional time with these offenders in order  to be bit clearer with the instructions.[433]

Mr. Winden identified **Exhibit I-7**, which is Administrative Regulation 300-45RD, transportation of offenders.  This requires that for each transport, staff is required to "Ensure an executive assignment order, offender working file, medical/mental health files, and personal property are transported with the offenders during inter-facility transfers." The same regulation requires that staff "Ensure that the working file, medical/mental file, and Request for and Transport Authorization are obtained when offenders are being transported for admission to a DOC medical facility, such as Colorado Territorial Correctional Facility (CTCF) infirmary." As a result, trip leaders are tasked with ensuring that all that information is checked prior to transport and then signed for on the reception of the receiving facility.[434]

## XXV.  Visiting

This section requires that reasonable accommodations be afforded inmates with disabilities to facilitate their full participation in visiting.   It was stipulated that the CDOC is structurally compliant with the Remedial Plan.  Accordingly, it is undisputed that all facilities have architecturally accessible visiting rooms, both contact and no contact visiting booths which are accessible for inmates with disabilities.

---

[432] Winden, pp. 3670-72.
[433] Winden, p. 3672 .
[434] Winden, pp. 3674-75.

In addition, the evidence demonstrated that, consistent with ensuring the safety and security of staff, inmates, or the public, inmates with disabilities are provided with necessary accommodations for them to participate in the contact visiting program. The only issue with respect to visitation appeared to be more frequent bathroom breaks for diabetic offenders. This issue is discussed in detail under 2008 Stipulation # 12, Bathroom breaks.

**XXVI.         Health Care Status Determination**

This section of the Remedial Plan provides that if an offender's disability limits the offender's ability to participate in work, educational or other programs, Clinical Services staff evaluate the offender's ability to participate in work, educational and other programs and document the nature and severity of the offender's limitations in cooperation with the AIC. When the offender's documented limitations are such that the inmate, even with reasonable accommodation, is unable to perform the essential functions of any work, educational or other such program, the inmate will be designated as MEDICALLY UNASSIGNED (or some other equivalent code). Offenders with this designation cannot be housed in higher security facilities or denied access to educational, vocational, and work programs solely because of their disability and cannot be denied earned time or parole because they are not eligible to participate in educational or vocational programs or work assignments because of their disability.

The CDOC had an old housing restriction that was called medically unassigned. It was a restriction given by a provider at a clinic usually based on offender request. The problem the CDOC discovered with the classification was that the whole purpose of ADA is to try to accommodate people rather than to say they cannot work. This

designation was put on by clinical services staff in the med-houser system.  CDOC staff were confused when they would encounter an offender that had a medically unassigned housing restriction while issuing accommodation resolutions and trying to work with the work supervisor and accommodate an offender.[435]  Accordingly, the CDOC eliminated the medically unassigned housing restriction in January of 2009.  The CDOC inactivated the medically unassigned code as of January 28, 2009.[436]  That code was replaced by "ADA unassigned" code and only the AIC's office could put it on an individual who was so disabled that he or she could not work or participate in a program.[437]  The ADA unassigned designation was reserved for those individuals who just could not work or participate in a program, such as individuals in a hospice, or those who were going to be in an infirmary long term, which was very, very rare.[438]  Ms. Holst testified that before an offender can be designated as unassigned for either a clinical condition or disability, the office of the AIC would make every attempt to try to accommodate the offender in their workplace.  The AIC and CMO then developed a process relating to offenders that could not be accommodated.  Specifically, if such an offender were encountered, the CMO is notified and reviews the medical record to determine, from a medical standpoint, whether the offender truly would not be able to work. To date the CDOC has had only five cases where the AIC has consulted with the CMO and there has been a determination that an offender cannot be accommodated in their workplace.  These offenders have been given the designation as "ADA unassigned" which still permits the offenders to receive inmate

---

[435] Frantz, pp. 4330-31.
[436] Holst, p.916, ln.14-24; Shoemaker, p. 2838, Exhibit Q-4.
[437] Holst, p.919, ln.9-25; Holst, p.1664, ln.8-10.
[438] Holst, p.1664, ln.1-7.

pay and related time credits, including earned time.[439]  Ms. Shoemaker identified **Exhibit Q-4** which is A/R 550-12 which states that offenders who are "ADA unassigned" will have the same privileges, including earned time, as other offenders.  They are also paid 23 cents per day, as opposed to offenders who are "unassigned" who do not get paid.

Ms. Shoemaker identified **Exhibit N-7** which shows that there is a six-month review of all offenders who are rated at M4.  The reclassification can happen more frequently than every six months, but it has to happen at least every six months.  If the offender remains COPD violation free, then the offender is reclassified every six months for their custody rating.  This mandatory six-month custody rating review is a point system, which allows them to progress through the system to the minimum custody rating.

XXVII.      **Removal of Health Care Appliances in ASU/PSU Disciplinary Detention Units**

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853].

XXVIII.      **Parole Hearings Accommodation Plan**

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853].

XXIX.      **Community Correctional Facilities**

This section of the Remedial Plan provides that offenders with disabilities cannot be excluded from referral to the Community Corrections program (CC) based solely on their disability.  Offenders are referred to community corrections based on their sentence,

---

[439] Shoemaker, p. 2837; Frantz, pp. 4331-32; Exhibit Q-4.

institutional performance, ability to integrate into the community.  They are not excluded based on disability.

When an offender moves to Community Corrections or to Parole, they are given, depending on their medication, either a ten (10) day or a thirty (30) day supply of medications.[440]  If the it is psychotropic medication or insulin, any major medication, then the offenders are given a thirty (30) day supply when they leave DOC.[441]  This policy applies the same way for disabled and able-bodied offenders.[442]  DOC generally does not send out narcotics, but most of all other medications sent to the offenders in Community Corrections or out on Parole are either ten (10) or a thirty (30) day supply.[443] Once the offenders leave DOC and enter Community Corrections or Parole, DOC is no longer responsible for any portion of their health care and they do not have any responsibility to supply with medications beyond the initial ten (10) or thirty (30) day supply.[444]

## XXX.      Parole Field Operations

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853].

## XXXII.      Damages

The determination of substantial compliance is the subject of this hearing. The Special Masters have considered over 1400 individual class member claims.  As of last year, the Special Masters have been paid approximately 1.3 million dollars for their work

---

[440] Shoemaker, p.2755, ln.14-21.
[441] Shoemaker, p.2755, ln.21-24.
[442] Shoemaker, p.2755, ln.25; p.2756, ln.1-2.
[443] Shoemaker, p.2756, ln.2-5.
[444] Shoemaker, p.2756, ln.6-12.

on the damage claims.  The damage claim process is winding down and should be completed in the fall of 2011.

## XXXIII.        Attorneys' Fees and Costs

The State of Colorado has been paying Plaintiffs' attorneys for approximately ten years.

## XXXVI.        Misc. Provisions

The bulk of this section relates to dispute resolution pertaining to interpretation of the Remedial Plan as well as administrative closure and dismissal of the underlying case. Subsection C of this provision requires that disabled offenders be informed of the Remedial Plan and where they may obtain a copy.  It also requires that the CDOC post notices regarding the Remedial Plan and its availability.

Cathie Holst testified that a copy of the Remedial Plan is kept at all general libraries at each facility.[445]  The offenders are allowed to receive a copy of the Remedial Plan if they request one and the AIC kept track of those requests.[446]  There was also testimony relating to the large yellow Montez posters in all designated facilities. **Exhibit T-8** confirms the posting.   The posters specifically advise where instructions and forms can be obtained.  **Exhibit T-7** is an example of the poster.  An additional posting advised offenders that if they had not already received a copy of the Remedial, they could obtain a free copy from the AIC. **Exhibit T-7** at p. 2; **Exhibit X-8** contains confirmations from the facilities that the posters were posted.  In addition, Travis Brubaker of the CDOC

---

[445] Holst, p.1670, ln.14-19.
[446] Holst, p.1670, ln.20-22.

Private Prison Monitoring Unit Brubaker also testified that whenever he was in the private prisons, he observed the large yellow Montez posters in the facilities.[447]

**2006 STIPULATIONS**

**#1 – Additional Funding for CDOC**

      Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853].

**#2 – Waiver of all Medical Co-Pays for Diabetics**

      Stipulation number 2 mandates CDOC to waive all medical co-pays for treatment or visits related to diabetic care (including but not limited to finger sticks, emergencies and prescription refills) for all diabetics in the system.  It further mandates DOC to reimburse the offender accounts of any offender who was charged for medical visits related to diabetic medical care (other than the chronic care visits). Any offender who believed they had been wrongly charged a co-pay could file an ADA grievance with the AIC.

      A standard practice at DOC is to charge co-pays for medical appointments.  The offenders were originally charged five ($5) dollars co-pay per visit, which was later reduced to three ($3) dollars per visit.  They are charged ten ($10) dollars for an emergency visit.[448]

      The AIC's office addressed every single situation in where the medical co-pays were not waived for diabetics, regardless of whether the offenders contacted them by a

---

[447] Brubaker, pp. 3933-3934.
[448] Stipulation 2006, p.2, #2, Doc. No. [2228]; Holst, p.1736, ln.13-24.

letter, note, or an actual grievance, as required by this Stipulation.  If the refund was related to their diabetic or any of the other three disabilities, then the AIC would have the money refunded to the offender.   The AIC's office also confirmed with the banking system that the money was placed into the offender's account, requiring written proof.

The AIC staff tracked and logged these refunds in the diabetic co-pay database, depicted in **Exhibit P-8**, which Ms. Holst identified.  This documents all co-pay refunds from June of 2006.  The co-pay refund project was assigned initially to Teresa Reynolds in the legal department, because the other legal assistants were already too busy.  Ms. Reynolds started a database and used it exclusively until other legal assistants in the AIC's office could take it over again.  Ms. Reynolds exclusively used this database from June of 2006 through May of 2008, at which time another database was established as seen in **Exhibit P-8**.[449]  **Exhibit P-8** and the database are proof that CDOC refunded any diabetic offenders who were accidently or wrongly charged a co-pay for their visits, other than the chronic care. CDOC is in substantial compliance with the 2006 Stipulation, #2.

### #3 – Additional Copy of Remedial Plan during the compliance hearing – free

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 8.

### #4 – DOC will post notice about extension of compliance period

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at pp. 8-9.

### #5 – DOC will deliver class counsels' letter to inmates

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 9.

---

[449] Holst, p.1735, ln.24-25; p.1736, ln.1-12; p.1737, ln.3-20; Exhibit P-8.

**#6 – DOC will eliminate ADA jobs that pay less; inmate can file notice with AIC**

<u>Stipulation</u> – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 9.

**#7 – Judge Kane will rule on certain issues**

N/A.

**#8 – Inmate May File for Reimbursement for First 10 Pages of DOC Records or Charge in Excess of $0.25**

<u>Stipulation</u> – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 9.

**#9 – Plaintiffs' Counsel Will Be Reimbursed for Cost**

<u>Stipulation</u> – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 9.

**2008 STIPULATIONS**

**#1 – Personal Glasses**

Stipulation number 1 provides that the CDOC allow offenders to retain their personal glasses until CDOC issues a replacement pair of glasses.  The stipulation further requires replacement of an offender's damaged or broken glasses, unless the offender intentionally broke them, in which case offender would pay for the replacement.  Ms. Shoemaker, Dr. Frantz and James Falk testified about this stipulation.

Ms. Shoemaker identified **Exhibit Y**, Administrative Regulation 850-06 regarding offender property.  Subsection Q1 states that offenders who arrive at CDOC through intake at DRDC are allowed to keep their personal eyewear, whether it is glasses or contacts, until state-issued glasses can be provided to them.

Ms. Shoemaker also identified **Exhibit U-7** which is Administrative Regulation 700-05. Subsection B7 states that "Offenders entering DOC may obtain personal glasses only until they can be replaced by State issued glasses." Personal glasses are not taken from an offender before state issued glasses are provided. Pursuant to this same policy, diabetic offenders receive a retinal exam annually.[450]

**#2 – Hearing Aid Batteries**

This stipulation dictated DOC to provide long-lasting batteries for hearing aids to offenders. Ms. Shoemaker and Dr. Frantz testified about this stipulation. Hearing aid batteries in all of the sizes that are used are stocked at all facilities that have med-lines. The facilities generally report having usually a 60 day supply of batteries on hand at any given time. Batteries are purchased through the CDOC contract medical supply vendor, and the clinics simply order those directly from the medical vendor. Most of the batteries purchased and used by the offenders are zinc air because they have been shown to maintain the most consistent electrical output as opposed to alkaline batteries where the output tends to decline over time. The offenders receive the hearing aid batteries during med-lines, which is recorded each time on the administration record kept in the pharmacy system, **Exhibit I-6**. This alphabetical list of offenders shows when each offender came and picked up hearing aid batteries, date and time, as well as the date when their prescription was ordered. CDOC receives hearing aid batteries, from McKesson Medical Supply Company. They issue reports, depicted in **Exhibit J-6**, regarding the facilities' purchases of hearing aid batteries, their quantities in the eight packs, as well as the cost. As part of medical treatment, regardless of whether an offender goes through the AIC process or not, the clinical staff can and has always provided the offenders with DMEs,

---

[450] Shoemaker, p.2877, ln.1-15; Frantz, p. 4393; Falk, pp. 3315-16; Exhibit Y; Exhibit U-7.

such as hearing aid batteries, for many, many years, at least as long as Ms. Shoemaker's 23-year long tenure with the Department.[451] (See Section XVI, Health Care Appliances)

**#3 – Disability Screening Criteria**

  This stipulation provides that CDOC conduct disability screenings based upon the parties' mutually acceptable criteria and re-screening of offenders as appropriate.  Ms. Holst, Ms. Jacobsen, Ms. Shoemaker and Dr. Frantz testified about this stipulation.

  In developing the disability criteria the CMO, Dr. Frantz, the AIC, Ms. Holst, and Ms. Shoemaker participated in numerous meetings with class counsel and their experts to come up with mutually agreeable evaluation criteria to the extent possible.  With respect to the vision criteria, the parties were able an agreement fairly quickly in the early fall of 2008.  The CMO started utilizing the new criteria immediately, and for offenders who were screened under the old criteria, the CDOC immediately started to bring them in for rescreening under the new criteria.[452]

  Both the parties hired hearing experts to evaluate appropriate criteria for a finding of hearing disability.  The parties were unable to agree, particularly on the criteria for two hearing aids.  The issue was litigated before Judge Kane who made a final determination in November of 2009, after the compliance deadline of May 1, 2009.  The criteria ordered by the Court and implemented by the CDOC involve determining the average hearing loss in each ear.  The average is determined by using the hearing thresholds at 500 HZ, 1000Hz, 2000 Hz, and 4000 Hz.  If the threshold for 1 to 3 of the frequencies is over 40 dB, that threshold value will be multiplied by 1.15 and the resulting value will be used in the calculation of the average.  A designation of hearing disability is an average hearing loss greater than or equal to 40 Db in the BETTER ear.  CDOC policy is that one hearing

---

[451] Frantz, p. 4304-05, 4387-88; Shoemaker, p.2859 – p. 2861; Exhibit I-6; Exhibit J-6.
[452] Frantz, pp. 4323-25.

aid will be provided if the average hearing loss in the better ear is between 40 and 49 Db. Two hearings aids will be provided if the average hearing loss in the better ear is 50 Db or greater.  The CDOC uses a weighted average approach based upon the Court's order.[453]

The parties reached an agreement with respect to the mobility criteria in late November of 2008.  The CMO worked with the IT department within the CDOC to develop a computerized method for documenting the screening examination results.  In February of 2009, the CMO was advised that an appropriate computer program could not be developed, so she developed a paper screening methodology in late February of 2009.[454]

After this, the CMO developed a training program for all of the medical providers on the new criteria to include vision, hearing, and mobility, and what the mobility exam would be, and in the last week of February went to four different locations and trained all of the medical providers with respect to the new criteria, the rescreening process, the forms to be completed, and how to conduct the screening examinations. All providers were required to attend the training which lasted eight hours.  The training included education regarding the intake process.  The training also encompassed specific screening processes for vision, hearing, and mobility. Diabetes is clear cut and based on the diagnosis of diabetes. The vision disability screening is completed using an electronic screening form and consists of a physical exam that is an examination of the eyes, the pupils, extraocular muscles, do they have a prosthetic eye, what is their visual acuity, and the visual acuity is to be documented both corrected and uncorrected if the offender has

---

[453] Frantz, pp. 4372-74, 4325.
[454] Holst, p.1671; Frantz, p. 4325.

glasses with him, and then they are to perform a vision field test by confrontation. The disability criteria is best corrected visual acuity that is equal to or worse than 20/60 in the better eye will meet the criteria for a vision disability, or if the vision field is equal to or less than 20 degrees in the better eye, the offender meets the criteria for a vision disability.[455]

The training provided for hearing instructs the providers to first look for observations that would reflect hearing disability. Observation screens includes things like if the offender was able to hear his name being called, hear directions or speech coming from back of him, did the offender have to ask "what" several times during the encounter, just general observations that may indicate someone is having difficulty hearing your speech. Then the rest of the screening includes a physical exam, which is an inspection of the ears, to look at the tympanic membranes, and to look at the ossicles to make sure things look normal. Then they conduct a test using the acoustic emissions screen, which is a little machine that fits inside a patient's ear. It emits a tiny sound, and when the cochlea registers that sound, it emits a little noise back. This machine actually picks up that sound that the cochlea makes. When that machine picks noise up, the cochlea is intact and is functioning, which in the overwhelming majority of people means their hearing is intact. If there is one available the provider will review an audiogram.

The mobility training went through every component of the mobility evaluation and gave detailed instruction on what all of the components were, and the four basic components of the screening. There is a physical exam. There are observations of activities of daily living, there is functional testing, and then there is a summary component.  The providers are instructed that they must complete all four parts. The

---

[455] Frantz, pp. 4322-4325; 4366-85.

entire exam includes all four parts completed twice, with the second exam being two weeks later, completed by the same provider, if possible.  The provider then completes the electronic screening form in the ADA system.  The providers received detailed instruction on the actual physical exam, the ADL observations, as well as the functional testing. They were given time to ask questions. There was interactive practice time for the physical exam, and it was fairly comprehensive. **Exhibit Q-5** is the set of instructions on how to perform the functional testing that is a part of the ADA disability evaluation for mobility.  It includes a script for the provider, outlining instructions for how to perform a short physical performance battery step by step, and then how to score that test, instructions for the short physical performance battery which consists of three different components: balance testing, gait speed testing, and chair stance, a gait speed test, the chair stand, a physical exam that encompasses gait stance, range of motion, muscle strength, is there evidence of atrophy of the muscles, external condition of the skin,  skin color, appendages, leg length, observations of activities of daily living, observations of how the offender walked coming into the clinic and leaving the clinic, observation of the offender walking in the yard or cell house, range of motion associated with getting dressed and undressed, removing and putting on their shoes. Then there is functional testing, such as the timed up and go test.[456]

Evidence of the training was presented in **Exhibit R-5**, the training rosters for the providers who attended the disability evaluation training.   **Exhibit P-5** is the test that the providers are required to take after they completed their training for the ADA disability evaluations.  Providers had to score 80% or better in order to pass. If they scored under 80%, they had to sit through that eight hour training with the CMO and retest.  **Exhibit S-**

---

[456] Frantz, pp. 4378-84

**5** is the test with the answers.  Finally, **Exhibit T-5** is a summary of the test scores the providers received on the test.[457]

After the providers were trained, the AIC put all of the offenders in their database into the system again to be rescreened under the new criteria, except diabetics.  Most of the offenders who were being rescreened had already been screened at least once before. Diabetics were obviously not rescreened, since there would be no new criteria for them. All offenders that had previously requested an accommodation or disability status, whether they were found to be disabled or not, were rescreened. While this created an enormous amount of work, both the CMO and the AIC believed it was necessary in order to maintain consistency and to be fair to all offenders.  Accordingly, the CDOC rescreened all offenders so that they would be screened under the same criteria.[458]

After everyone was put in the system for a rescreen, clinical services scheduled the appointments with a provider.  The provider would do their screening and send the results to the Chief Medical Officer, Dr. Frantz.  Dr. Frantz would review and send her findings to the AIC's office, unless she needed more information, in which case she would go back to the provider.  The AIC's office would review all of the forms from the rescreen, the staff observation forms and all other relevant documents, as needed and make a determination of whether the offender was disabled.  The AIC staff would look at all of the information together, what the offender requested at the time of their original screening, what the provider and CMO found, and what the staff observations were prior to making a decision on what accommodations to provide to the offender.  The AIC staff

---

[457] Frantz, pp. 4385-86.
[458] Holst, pp. 1671-73; Frantz, p. 4326.

would then prepare the Accommodation Resolution sheet for Dr. Frantz, the CMO, and Ms. Holst's, the AIC, signatures.  Once both of them signed off on the AR, it would be e-mailed to the facilities' ADA coordinators, where it was printed for the required files and it was distributed to the offender as well.  The process did take some time to complete from beginning to the end.  Almost all actual rescreens by medical staff were completed as of May 1, 2009, but the Accommodation Resolutions were not finalized and sent to the offender by that date.[459]

Plaintiffs assert that because <u>all</u> re-screenings were not completed by the compliance deadline of May 1, 2009, that this requires a finding of non compliance.  The Court finds nothing in the Remedial Plan, or any Stipulation requiring that the re-screenings under the new criteria occur before, or the new Accommodation Resolution forms be issued, before the compliance deadline.  The stipulation merely says that CDOC will conduct the re-screenings.  Indeed, the screening and rescreening process in never-ending.  Offenders are screened, and rescreened on a daily basis.  A rescreen will occur if the offender requests it or he or she makes a case that their condition has worsened, or CDOC staff advise that an offender has declined or struggles to function in the facility, at which point the AIC will request that the CMO rescreen the offender.  Accordingly, Plaintiffs' assertion that all re-screenings needed to be done before April 30, 2009, is not correct.  Despite this, the CMO and the AIC both presented evidence that the overwhelming majority of the exams were actually completed before the deadline.  The CMO testified at length regarding the herculean efforts of CDOC medical providers with respect to the rescreening process.  The mobility rescreen forms were completed in the

---

[459] Frantz, p. 4327,

last week of February 2009, so the mobility rescreens took place between February and the end of April 2009.  During this time period the CMO averaged about four hours of sleep a night. Moreover, if an offender had been previously determined to be disabled under the old criteria, during the rescreening process, his or her accommodations remained in effect until the rescreening process was completed and a new accommodation resolution issued.[460]

**Exhibit W-7** is a report taken from the AIC database, as it relates to hearing, mobility, and vision rescreens. This report shows all individuals that were submitted for rescreening in each category, regardless of whether or not they were initially found disabled, even previous refusals, with offender's name, DOC number, type of screening they were getting, their current disability status, the date the request was sent to clinical for rescreening, due date for CMO's findings, actual date of CMO's findings, date the AIC evaluated all the information, the date AR goes to CMO for her signature, and the date the AR was e-mailed to the facility.[461]

**Exhibit 667** reflects screening data and includes rescreens of those who were already in the system and were rescreened under new criteria and also new admittees or those who had never previously requested screenings. The ones who were not part of the rescreening process are denoted by "RFA", Request for Accommodations."[462]  The evidence presented demonstrated that the CDOC did establish new criteria and did rescreen all offenders in the AIC system using this criteria.

---

[460] Holst, pp.1670-75; Shoemaker, p.2758, ln.5-14; Jacobsen, pp.4011-13; pp.4020-21; Frantz, pp. 4326-28.
[461] Holst, pp.1674-77; Exhibit W-7.
[462] Holst, pp. 2584-87; pp.2594-95; Jacobsen, pp.4011-13; pp.4020-21; Exhibit 667.

**#4 – Implement Special Masters' Orders**

2008 Stipulation Number 4 mandated that CDOC adhere to and implement any Court Order or Special Master's Order determining the disability classification of a class member unless there is a documented and substantial change in the class member's condition to warrant a change in the classification.

Both Ms. Holst and Ms. Jacobsen testified about this stipulation.  Originally, if an inmate had a Special Master order finding disability, but the offender had not requested accommodations with the AIC office, they opened an AIC file for him/her but did not make a finding of disability. They sent out request packets to the offenders who filed claims with the Special Masters so that the offenders could be medically screened and evaluated.  They sent the form to these offenders three times.  If they did not return the forms, they were considered refusals.[463]

Ms. Holst testified that CDOC complied with this stipulation by implementing all of the Special Masters' Orders regarding offenders' disabilities to match CDOC's disability findings with the ones from the Special Masters, unless there was a substantial change in the condition of the offender as of April 30, 2009.[464]  Thus, the CDOC changed all of its disability findings so that its findings matched those of the Special Masters.

Ms. Holst testified that in order to comply with the Special Masters' orders, the AIC office requested a list from the Attorney General's Office of all offenders who received a Special Master order and created an EXCEL spreadsheet to keep track. They pulled the Accommodation Resolutions for the offenders and determined if the resolution

---

[463] Jacobson, p. 4005, ln.12-25
[464] Holst, p.1677, ln.18-25; p.1678, ln.1.

matched the Special Master's Order.  This required a review of 1256 AIC files.  If they did not match, the AIC revised the Accommodation Resolution to match what was ordered by the Special Master.[465]  **Exhibit X-7** is a list of Special Masters' orders prepared by the AIC office based on the list from the Attorney General's office.[466]  This Special Masters database contains the offender's name, the CDOC number, the Special Master's determination, the date of the Special Master's order, the date that the AIC's office prepared the Accommodation Resolution sheet for the offender, to see if the Accommodation Resolution was completed prior or after the Special Master's order was issued.  It was also important to see if a particular offender was ever screened for a disability, because there were a lot of Special Masters' orders on the offenders who had never even put in a request for accommodations or had previously refused to cooperate with the process.  Ms. Holst also wanted to know if the Accommodation Resolutions were consistent with the Special Masters' orders, where the offender was housed, when the revised Accommodation Resolution was done, and when it was sent.[467]

Prior to the 2008 stipulations, if an offender was awarded money by the Special Master but not an accommodation, he received his money and was offered the opportunity to complete the screening forms.  If he did not go through the process, he did not receive an Accommodation Resolution.  After the 2008 stipulations, if an offender received an order for money as a result of not having an item, but not an order for a particular item, CDOC gave the offender the item. This occurred prior to May 1, 2009.[468]  Additionally, prior to the 2008 stipulations, if an offender was found disabled by the

---

[465] Jacobson, p. 4007, ln.19-25, p.4008, ln.1-7; Exhibit X-7.
[466] Jacobson, p. 4008, ln. 1-22; p.4039, ln. 9-20; Exhibit X-7.
[467] Holst, p.1678, ln.5-25; Exhibit X-7.
[468] Jacobson, p. 4010, ln. 23-25, p. 4011, ln. 1-15; Holst, p.1681, ln.1-17; Exhibit X-7.

Special Master but the AIC and CMO did not find the offender disabled, the AIC issued an Accommodation Resolution stating that the offender was not disabled.  After the stipulation was entered, and prior to May 1, 2009, the AIC went back and changed all the disability determinations for those offenders, so they reflected Special Masters' findings.[469]

Similarly, if the special Master found an offender disabled who had refused to cooperate with the AIC's office or did not go through their screening process, the AIC went back and designated them as disabled, but the accommodations they were given were only those that the Special Master ordered and nothing more.  The AIC informed the offenders that this was the procedure if they refused to participate, but if they changed their mind and participated, they would be accommodated accordingly.[470]  They were able to revise all of the offenders' accommodation resolutions prior to May 1, 2009 to comply with the 2008 stipulation.[471]  An example is Mr. Bonds whose accommodation resolution was revised in April 2009.[472]

### #5 – ASL Classes Offered

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 7.

### #6 – Sign Language Interpreters

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 7.

---

[469] Holst, p.1679.
[470] Holst, p.1680.
[471] Jacobson, pp. 4009-10; Exhibit X-7.
[472] Jacobson, p. 4040, ln. 22-25; p. 4041, ln. 5-11.

**#7 – Review of ADA Grievances Denied as Moot**

<u>Stipulation</u> – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 7.

**#8 – Annual CDOC Employee Testing on Remedial Plan**

Stipulation number 8 required the CDOC to engage in annual testing for CDOC employees on the requirements of the Remedial Plan.  Ms. Autobee, and Mr. Brubaker's testimony regarding this stipulation is already contained in Section XV, Training.

**#9 – Auxiliary Aid Repairs Completed within 60 Days or Pay Refund**

Stipulation, number 9 required that all repairs needed to auxiliary aids be completed within sixty (60) days of the day that the offender reports the need for repair.  If there was a delay in repair in excess of the sixty (60) days, between August 27, 2005 and July 27, 2007, offenders could file a grievance with the AIC and receive compensation, if approved, of five dollars ($5.00) per thirty (30) day period.  From July 27, 2007 forward, the delays in repair in excess of sixty (60) days would allow for compensation of ten dollars ($10.00) per each thirty (30) day period.  The refund applied only to repairs done beyond 60 days, not to the delays for the initially issued DMEs.[473]  Both, Ms. Holst and Ms. Shoemaker testified about this stipulation.

In the beginning stages of the process, when the AIC would receive questions or complaints about any auxiliary aid repair delays, the AIC would review the clinical records and make a determination on how long it took for the repair to be completed.  If the repairs were not done within sixty (60) days of the day of the repair request, the AIC

---

[473] Holst, p.695, ln.18-25.

172

would refund the offender, per the stipulation.[474]  However, the AIC could only make refunds to those offenders who notified them of delays, who wrote to the AIC's office and requested a refund.[475]

Clinical staff did a number of things to try and assure that the repairs were being done within the sixty (60) day window, including a vendor change.  One of the vendors for prosthetic devices, in particular, was causing delays, so the CDOC requested that CHP look for a new contract vendor, which helped the CDOC to timely make those repairs.  The new vendor also has several offices, which allows them to make timely repairs but also, it is helpful that transport has more options where to take the offenders for those repairs, rather than one centralized office.  This vendor change enhanced DOC's ability to meet the sixty (60) day time frame for repairs of auxiliary aids.[476]

In order to comply with this stipulation, the AIC set up a database to track all the DME repair or replacement claims, depicted in **Exhibit Z-7**.[477]  The database had several columns including: the offender's name; the DOC number; whether the issue was related to a DME repair or a new DME issue; what type of issue it was; offenders' disability; the way the AIC was notified; the date the AIC was notified; a description of the issue; how long the offender alleged the delay in repair or replacement of the DME was; whether or not the claim was approved or denied; a comments field; and the amount of refund, if any.  The AIC also noted the date that money was put into offender's account upon verifying that their account was credited with the offender banking system.[478] The AIC

---

[474] Shoemaker, p.2878, l.3-5; Holst, p.1702, l.2-8.
[475] Holst, p.700, ln.18-25, p.701, ln.1.
[476] Shoemaker, p.2878, ln.5-17.
[477] Holst, p.1702, ln.9-12; Exhibit Z-7.
[478] Holst, p.1702, ln.13-25; Exhibit Z-7.

complied with this Stipulation for all of the claims they received up and until April 30, 2009.[479]

**#10 – Wheelchair Clinics**

      <u>Stipulation</u> – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 7.

**#11 – TTY Machines Installed**

      Stipulation number 11 required that the TTY machines be made available to offenders who require such an accommodation in the same manner the CIPS telephones are available to non-hearing impaired/disabled offenders, without involvement of the case managers.  Ms. Holst, Ms. Shoemaker, and Ms. Sue Grisenti testified about the implementation of the TTY kiosks at DOC.

      Ms. Holst testified that initially, there were TTY machines placed in various locations in the facilities, mainly in case managers' offices, where the hearing disabled offenders had access to them.  The regular phone system is called CIPS and those phones have an amplification system that allows the offender to turn the volume up or down.[480]  Ms. Grisenti testified that prior to the installation of the TTY kiosks, the offenders were given portable TTY phones to use.  At CTCF, they had set up a room with two desks and portable TTY phones, to make it easier on the offenders and the case managers.  This way, it did not require that the case manager to leave his or her office or stand there while the offender made their phone call.  It actually gave the offender a little better access.

---

[479] Holst, p.1703, ln.1-3.
[480] Holst, p.1459, ln.1-20.

Every other facility had at least one TTY phone, some more, which was stored in the head case manager's offices.[481]

Ms. Shoemaker testified that offenders purchase telephone time through the canteen program in DOC, and any monies generated as profit from sales in the canteen, by statute and legislatively approved, are to be used only for offender benefit.[482]  For example, a portion of those dollars are used to fund a couple of recreation positions, but are also used to build programs, buildings, or a variety of things that directly benefit the offenders.[483]

When the CDOC considered implement this stipulation, they realized that there are security issues involved with allowing offenders to have access to a TTY phone that was not stationary, one that is portable and can be taken all over the facility.[484]  Both Ms. Holst and Ms. Grisenti, who was the CDOC's coordinator for the offender phone system for eleven years prior to her retirement, testified that CDOC did a lot of research and checked out various options and companies on how to resolve the security issues.  Ms. Grisenti testified that the IT department at DOC, Business Technologies ("BT"), came up with the solution to build TTY kiosks.  They came up with the plan, what they needed it to do, how they wanted it to appear, and they found a company who could build them. The TTY kiosks were not available anywhere else before DOC had them built.  No other CDOC, county, state or federal, has this type of TTY in a kiosk format and readily available in the actual cell house.  That is the reason why DOC had to come up with a plan, give it to this company, and then the two worked together to design and build the

---

[481] Grisenti, p.3496, ln.13-25; p.3497, ln.1-5.
[482] Shoemaker, p.2879, ln.8-15; 21-24.
[483] Shoemaker, p.2879, ln.15-20.
[484] Holst, p.1459, ln.21-25; p.1460, ln.1-2.

TTY kiosks.  BT had the idea of what they would like to have, so they did research on kiosks in airports and other places to ensure that the kiosks would be secure when mounted on the wall, could not be tempered with or broken, in addition to knowing what they would need to have in terms of computer software in order to be able to place a phone call.[485]

Ms. Grisenti testified that **Exhibit D-3** is a picture of the TTY kiosk at CTCF; and that **Exhibit E-3** is the schematic of the TTY kiosks that the company that makes the kiosks provided to the maintenance staff, so they would know where to drill the hole and where to bring up the power and the lines into the kiosk, when installing them.[486]

Ms. Grisenti got involved with the TTY kiosk project toward the end of their installation at CTCF, in July or August of 2008, once there was need for inputting of the phone numbers, checking their offender banking balances, creating reports for use, and things of that nature.  The contractor got involved at that point as well, in order to connect the kiosks with the offender phone network.  Ms. Grisenti also testified that she communicated throughout this process with Ms. Holst 'quite a bit,' where they discussed regularly what needed to be done to implement the TTY kiosks and this stipulation.[487] As already stated, the first TTY kiosks were put at CTCF in August of 2008, because that is where almost all of the deaf offenders were housed and they wanted and needed to use the TTY phones.[488]  The other facilities could not have an unrestricted and unsupervised access to the TTY phones before the kiosks were installed, due to CDOC's security

---

[485] Holst, p.1459, ln.2-7; Grisenti, p.3477, ln.1-18; p.3482.
[486] Grisenti, p.3482, ln.1-14; Exhibit D-3; Exhibit E-3.
[487] Grisenti, p.3488, ln.14-25; p.3489, l.1-20.
[488] Holst, p.1459, ln.15-23; Grisenti, p.3484, ln.1-6; p.3495, ln.25; p.3496, ln.1-12.

concerns.[489]  Even if the TTY kiosks were not installed everywhere until April 2009, the

offenders still had access to the TTY phones at facilities, in case managers' offices, until

the TTY kiosk installation throughout DOC.[490]

     **Exhibit F-3** depicts the final report about TTY kiosks installation at all of the

facilities by May 1, 2009.  The far left column of this report has a site name, for example

Pueblo is site #7, although it has three facilities.  The installations were scheduled by site,

so if it was site #7 on schedule, all three facilities in Pueblo had TTY kiosks installed.

There is also a column for number of kiosks that were installed at each facility, as well as

a column of the installation date, meaning they were installed, tested, and functional.  The

box below the columns are additional kiosks that were spare ones ordered.  The DOC

ordered extra kiosks to make sure they had them available, if additional ones needed to be

installed.  Since the TTY kiosks are custom made, they are not just off the shelf, so every

time one is needed, it would take time to build a new one.  They are not just readily

available for purchase.  Ms. Grisenti's department was not a part of any decision-making

process on how many TTY kiosks should be installed and where.  Her office was just told

when, where, and how many kiosks should be installed.  The Deputy Director was the

one who decided where and how many kiosks should be installed.[491]

     Ms. Shoemaker testified about **Exhibit Q-11**, explaining that it is a list of all the

TTY kiosk locations throughout DOC and their IP addresses, divided by units and

facilities, installed as of May 1, 2009.[492]

---

[489] Holst, p.1030, ln.4-22.
[490] Holst, p.1060, ln.4-8.
[491] Grisenti, p.3483, ln.12-24; p.3484, ln.6-25; p.3485, ln.1-5; Exhibit F-3.
[492] Shoemaker, p.2879, ln.2-7; Exhibit Q-11.

A TTY kiosk is a metal enclosure that goes on the wall and contains a thin client P.C. that runs through the CDOC's network to the phone system that allows the offenders to place outside calls.  The difference between the kiosk and the regular TTY phone is that the kiosk is in an enclosure, and the regular TTY phone is fairly portable, like a regular phone, but it has to be attached to a regular phone line that places the outside call. The general guidelines for usage of TTY phones are the same as the guidelines to use the regular CIPS phones.  They are outlined in the Administrative Regulation 850-12, **Exhibit A-3**.

The Administrative Regulation explains that the offenders at CDOC use a controlled inmate phone system, called CIPS.  These phones control the length of the calls, the numbers that the offenders can call, and all of the phones are subject to monitoring and recording, except for the privileged attorney-client calls.  The calls can be placed debit or collect and all of the CIPS phones have a volume control on them.[493]

To use both phones, the offender must fill out the phone list and they can only call numbers on that list, debit or collect.  The offenders are not allowed to lie on the phone list in order for it to be approved.  The AIC's office determines who can use a TTY phone and then they notify Ms. Grisenti's office when an individual becomes eligible to use TTY kiosks, so that they can train them on how to use it and set them up in the system to use the TTY kiosks. The only difference is the length of the calls.  On the regular CIPS phones, the maximum length of the call is twenty (20) minutes at a time, and on the TTY kiosk, it is forty-five (45) minutes at a time.  Once the twenty or forty-five minutes expires, if the offender is not under any facility restrictions, they can make as many calls as they would like in a row, as long as they have enough money for it, or

---

[493] Grisenti, p.3480, ln.1-14; p.3478, ln.1-16; Exhibit A-3.

the other side is willing to accept collect calls.  Although the hearing disabled phone calls on TTY kiosks last forty-five (45) minutes, they are only charged for the twenty (20) minute calls.  The CIPS calls also stop charging at twenty (20) minutes.  The system is set up this way in order to prevent overcharges because occasionally an offender will hang up the phone and the hook switch would not hang up and it continues charging.  To prevent that, the calls automatically stop the charges at twenty (20) minutes.  It is the same for CIPS phones and TTY kiosks.[494]

All of the phones belong to the contractor who provides a technician to fix the phones, should they break.  If a phone breaks, the offender complains to the staff in the cell house, or occasionally someone on the outside with whom the offenders communicate on the phone will call Ms. Grisenti's office and complain about problems with the phones.  The staff then notifies Ms. Grisenti's office, which then opens a work ticket and notifies the technician about the problem with the phone.  The technicians respond to the facility and either repair or replace the broken phone.  The contractor has a support center and the technicians monitor who monitor the phones.  If they notice that the phones are not in use, the contractor follows up with the facility to see if they are in a lockdown or if there is some other reason why those particular phones are not being used.  At the time of Ms. Grisenti's retirement, the contractor had three technicians, in addition to the 24/7 support system that monitors the phones.  If only one phone is down in the cell house, the technicians must respond within 72 hours.  If all phones are down, they have to respond within 8 hours or less.  Ms. Grisenti also testified that if her office was notified of a broken phone, it would never be broken for a full month before fixing it.[495]

---

[494] Grisenti, p.3480, ln.15-25; p.3481, ln.1-24; Exhibit A-3.
[495] Grisenti, p.3478, ln.17-25; p.3479, ln.1-25.

Ms. Grisenti, in cooperation with the company that built the TTY kiosks and the CIPS technician, developed the curriculum and the lesson plan on how the kiosks are to be used.  The lesson plan gave deaf offenders a visual for their training, and it depicted the picture of the TTY kiosk.  Ms. Grisenti identified **Exhibit B-3** which is the lesson plan to train offenders on the use of the TTY.  Once Ms. Grisenti's office was told what offenders could use the TTY kiosks, they would enter those offenders' phone lists into the system and they would set them up for the use of TTY kiosks.  The offenders are then given instructions and training on how to use the actual TTY kiosks.

The training is usually done right at the kiosks, so that the offender can sit down and look at it as they are getting trained.  Ms. Grisenti's experience with the deaf offenders at CTCF had been that they not only needed to be trained on how to use the TTY kiosks, but also how to use the phone system, since they had never used the phones before.  She presented the very first training at CTCF in a classroom setting in August of 2008, and then at the outlying facilities, a CIPS operator assigned to each facility, did the trainings.  The sign language interpreters were also used during the trainings, if necessary.  The offenders would also express their wishes and needs for sign language interpreters.

There were no complaints from the offenders on lack of knowledge on how to use the TTY kiosks after their training.  The offenders also tend to share information among themselves.  Often, if one finds out something or learns how to do something, he or she would teach other offenders, which is what Ms. Grisenti also instructed them to do during her training.  Ms. Grisenti further told the offenders that since the TTY kiosks were brand new for correction settings, if they there was something that they find out would make the

instructions for future reference better or would be more helpful to the offenders, to let the CDOC know.  The offenders did do that, and one of the things that they asked for was a privacy screen, because during their conversations, other offenders could read their conversations.  It was a legitimate concern, so the contractor added the privacy screen to the TTY kiosks at CTCF and the other ones were now being built with the privacy screens.[496]

After the offenders were trained on how to use the TTY kiosks, the facilities sent Ms. Holst or an AIC staff member an e-mail, along with the training rosters, showing proof that the offenders were, in fact, trained.  **Exhibit C-3** contains these emails.  Ms. Holst required some type of verification on the training, as well as which offenders were provided sign language interpreters during these trainings, if necessary.  Some of the offenders actually refused to be trained, saying that they did not need or use the TTY kiosks, and that is also reflected in these e-mails to the AIC's office.  The offenders who refused the training on the TTY kiosks signed a refusal form.[497]

In late April of 2009, the AIC office did a TTY project where they wanted to determine if all of the individuals who were hearing disabled were actually using TTY kiosks, who wanted to use them, who did not, and who did or did not need them.  That way they could determine to the best of their abilities, how many offenders actually required or wanted to use the TTY kiosks.  It was also related to how many additional kiosks needed to be placed at each facility.[498]

Initially, the offenders who were determined to be hearing disabled would automatically get the accommodation of the TTY kiosk on their accommodation

---

[496] Holst, p.1461, ln.6-15; Grisenti, p.3485, ln.6-13; p.3486, ln.1-19; Exhibit B-3.
[497] Holst, p.1461, ln.16-25; p1462, ln.1-23; Grisenti, p.3486, ln.20-25; Exhibit C-3.
[498] Holst, p. 1463.

resolution, regardless of the fact whether or not they actually used it or needed it for communication.[499]

The results of this survey showed that, unless an individual was actually deaf or near deaf, they really preferred the use of the regular CIPS phones with amplification device as opposed to the TTY phones.  The reason for that preference is that the TTY phones or kiosks are much slower, since one has to type everything out and it is more cumbersome.  There is a delay in a response, it is not immediate and so one has to sit and wait for the response.  Connecting to the relay service is more time-consuming and tedious than dialing a number directly and talking to the other party.  The offenders preferred to use the CIPS phones, and Ms. Holst and her office found out that these offenders could hear well enough to carry a normal conversation on the phone.[500]

The CDOC records every offender's telephone conversations, other than the privileged calls.  Therefore, they have a way of pulling those records and listening to them at a later time.  The AIC actually pulled the phone records for all of the hearing disabled offenders and her office listened to their phone conversations to make sure that, in fact, they were carrying a normal conversation, because Ms. Holst thought it was odd for some of these individuals to prefer to use the CIPS phones over the TTYs, since their hearing was fairly bad.[501]   After talking to each offender personally about their TTY kiosk use, Ms. Holst talked to the CMO, Dr. Frantz about this issue.  Dr. Frantz talked to a hearing expert who told her that individuals with a hearing loss of more than 80 to 85 db in the better ear require the use of a TTY, but everything below that would not need it. They would be able to hear with the amplification devices on the regular phones.

---

[499] Holst, p.413, ln.14-20; p.414, ln.2-7.
[500] Holst, pp. 1463-64.
[501] Holst, p.1463; p.1464, ln.1-16; Holst, p.1713, ln.3-21; p.1715, ln.8-25; p.1716, ln.1.

The AIC then looked at the hearing loss of each individual and pulled their phone records to see whether or not they use or have ever used TTY machines.  In addition, the AIC brought down the hearing loss number from 80 to 85 db to 75db to err on the side of caution.  Her research showed that most of the offenders never even used TTY phones, they only used CIPS phones, even if they were almost deaf.  The AIC's office actually interviewed every single hearing disabled offender personally and asked them whether or not they used the TTYs or whether they wanted to continue to use them. They filled out a questionnaire about each offender's use of the TTY kiosks.  If the offender stated that he or she exclusively used the TTY kiosk and their hearing was less than 75db in the better ear, they still let the offender use the TTY kiosks, rather than take that accommodation away from them.  The project was done during the second part of April of 2009.[502]

Class counsel questioned Ms. Holst about examples of when the TTY kiosk accommodation was removed with certain offenders, but Ms. Holst explained that most of those people were in the 50db range even in the ear in which they are wearing a hearing aid, which indicated to her that their hearing loss is not significant.  Therefore, as Ms. Holst testified, it made sense that those people would not want nor would they use, if available, a communication device such as a TTY kiosk.[503]

After the survey, the AIC's office removed the use of TTY kiosks from some of the offenders' accommodation resolutions.[504]  If the offender did not have a hearing loss of 75db or more in the better ear, the TTY kiosk accommodation was removed.[505]

---

[502] Holst, p.411, ln.1-24; p.413, ln.9-10; p.415, ln.13-17; p.416, ln.3-8, ln.15-20; p.1046; p.1047, ln.1-10; p.1714, ln.22-25; p.1715, ln.1-7.
[503] Holst, p.1046, ln.14-20.
[504] Holst, p.1721, ln.6-9.
[505] Holst, p.413, ln.14-20; p.414, ln.2-7.

System wide, there were very few offenders that were classified as having hearing disabilities that actually preferred to use a TTY phone.  Only those that were completely deaf or almost deaf used them.  Otherwise, the offenders preferred to use the amplification system on the CIPS phone.[506]  The profoundly deaf offenders at CTCF definitely used the TTY kiosks, because they do not have any other option, so they used it a lot and consistently.  At the other facilities, Ms. Grisenti noticed prior to her retirement, there was not very much use of the TTY kiosks.  She was not sure if they were just not used to the kiosks, or they simply did not like them.[507]

**#12 – Bathroom Breaks**

Stipulation number 12 mandates that CDOC allow diabetics to use the restroom facilities on a more frequent basis during visitation and at other times than offenders without diabetes.  If the request cannot be granted, CDOC was to find alternative methods of accommodations, per the stipulation.  Both Ms. Holst and Ms. Shoemaker testified about bathroom breaks and accommodations for diabetics at DOC.

There are security issues with allowing offenders to take bathroom breaks during visitation at their leisure, the biggest one being introduction of contraband from the visitors to the offenders, into the correctional environment.  That is why the policy indicates that there will be structured times when any individual, disabled or not, is allowed to go to the restrooms.  This way the visitors and the offenders are separated during scheduled breaks, and the staff in the visiting area can observe what the offenders are doing.  Per policy, offenders are allowed breaks every hour and a half to two hours in visiting area in which they may use the restroom if they so choose.  If any individual feels

---

[506] Holst, p.1032, ln.6-17.
[507] Grisenti, p. 3487, ln.1-6.

that they cannot remain in the visiting area for that length of time without using the restroom, the policy requires that they have to be evaluated by clinical for alternative methods of accommodations, and if necessary, are offered the use of a disposable undergarments.[508]

The visiting rooms are staffed, but depending on the size of the facility, there could be one staff per visiting area, or maximum four staff members at a larger facility, trying to monitor 100 to 150 individuals and visitors.  Due to the large volume of individuals in the visiting area and a small number of staff monitoring the visits, this is normally the number one place where the contraband, mainly drugs and secondary cell phones, get introduced into the correctional system, so the CDOC staff has to be very diligent about what occurring during visitation.  States other than Colorado even had weapons introduced into the correctional setting through visitation, but in Colorado, drugs are the main concern.  The way the contraband gets transferred between visitors and offenders is that the visitors hide it somewhere on their body and then they go to the bathroom, remove it and hide it in the bathroom, and then go through the security.  After the visit starts, the visitor can go back to the bathroom, without going through security again; retrieve the contraband from its hiding place and can pass it to the offender in the visiting area, since contact visits are predominantly used throughout the CDOC.  The reason why the offenders have restricted bathroom use during visitation is to prevent the offender from going to the bathroom, retrieving the contraband, hiding it somewhere on their body, moving it back to the cell house.  When offenders go to the bathroom, a staff member must accompany them during visitation.  Depending on how many staff are available in the visiting room, they may not be able to accompany the individual offender

---

[508] Shoemaker, pp. 2880-83.

to the bathroom and leave the visiting area unattended. This is the reason why the offenders have designated bathroom breaks. If the offender cannot wait for the designated bathroom break, his or her visit must be terminated.

The issue is different in the programs areas. In many facilities, while offenders are in programs, they are allowed to use the restroom, depending on the program, location of the bathroom, and the security level of the facility. At higher security facilities, where they have controlled movement, offenders receive a ten-minute break every 50 minutes, separate and distinct from the every hour-and-a-half to two-hour break. A facility may add an additional scheduled break. Accordingly, offenders are allowed to use the restroom every 50 minutes or during other scheduled breaks. The timing of bathroom breaks varies from visiting to program and depends upon the custody level of the facility.[509]

The offenders are reminded with signs developed by Ms. Holst and posted all over the visiting area, to use the bathroom before they go in for a visit. The signs further advise that if a diabetic needs to use a bathroom more frequently than every hour and a half to two hours, to make an appointment to be seen by clinical, to determine if they are not in good control of their diabetes. A picture of the sign was admitted as **Exhibit K-12**. If they are not in good control of their diabetes, the clinical staff can write them an order for the visiting room to allow them to use disposable undergarments during visiting. The disposable undergarments are available in the offender area before the visiting room, or they can request it from staff.[510]

---

[509] Holst, p.434, ln.24-25; p.435, ln.1-14; p.439, ln.14-25; pp.440, ln.1-8; p.1731, ln.16-25; p.868, ln.22-25; p.869, ln.1-8; Shoemaker, p.2880; p.2881.
[510] Holst, p.431, ln.17-20; Shoemaker, p.2882; p.2883; Exhibit K-7.

**#13 – Diabetic Kit Training Every Six Months & Notice Posted of Kits Availability to the Offenders**

Stipulation number 13 required CDOC to provide training to cell house and security staff during roll call every six (6) months on diabetic test kits available at each facility for use by the non-medical staff.[511]  Ms. Shoemaker, Warden Ploughe, Dr. Frantz, Ms. Autobee and Mr. Brubaker testified about this stipulation.  Ms. Autobee and Mr. Brubaker's testimony regarding this stipulation is already contained in Section XV, Training.

Dr. Frantz and Ms. Shoemaker also testified concerning the diabetic test kits, which the CDOC utilizes throughout its facilities.  The diabetic test kit is a kit that includes a glucometer, testing supplies including alcohol swabs, lancets, and test strips, and glucose tablets and snacks. The kit also contains a record sheet so that offender's name, CDOC number, date, glucose results, and what action was taken when the kits are utilized can be recorded.  **Exhibit E-5** was an actual diabetic kit.  The kits allow offenders to test blood sugar levels after clinic hours if the offender thinks he or she is having a hypoglycemic event or their sugars are dropping too rapidly or getting too low. The kits contain basic step by step instructions for an officer on what they need to do to get the kit out to what they need to do with a specific glucose result.  There are instructions for retesting and for administering another set of glucose tablets, at what point the officer can give the offender the snacks that are included in the box, and at what point the offender can be sent back to his or her cell.  The kits are maintained throughout the CDOC facilities including master control, living units, and other locations throughout

---

[511] 2008 Stipulation no.13, p.4, Doc.No. [3326].

the particular facility depending on the size of the facility, the nature of the facility, and what activities are conducted by the offenders in that facility.[512]

A training regarding the use of diabetic kit rolls was instituted at roll calls every six months, in January and July of each year, to ensure that correctional staff who are accessing the kits understand the contents of the kit, how to assist the offender in using it, to understand what the offender is doing with the glucometer, and to understand the results.  The roll call for the DOC is done during the beginning of every shift change for the correctional staff.  There are three shifts during a 24-hour period.[513]

**Exhibit D-5** is a copy of the lesson plan that is used during the diabetic kit roll call training that lasts about fifteen (15) minutes and is performed by clinical staff and/or the shift commander who is running the roll calls.  Even the diabetics who are not identified by the AIC have access to diabetic kits and the clinical staff treats them, clinically, for their diabetes.[514]

### #14 – Cells with Call Buttons for Inmates with History of Hypoglycemia

The CDOC agreed that any offender who has a documented history of hypoglycemia or a hypoglycemic event shall be offered the right to be immediately relocated to a cell with a call button if the offender is currently housed in a cell that can be locked by CDOC. If the offender refuses the move, he/she shall indicate such refusal in writing.[515]  Ms. Holst, Ms. Shoemaker, and Mr. Richard Weems, the associate director for the facility management services, testified about this stipulation.

---

[512] Frantz, pp. 4404-07.
[513] Shoemaker, p.2847, ln.9-25; p.2848, ln.1-9; Exhibit E-5.
[514] Shoemaker, p.2884, ln.12-22; p.2885, ln.2-5; Exhibit D-5.
[515] 2008 Stipulation, no.14, p.4, Doc.No. [3326]; Holst, p.332, ln.24-25; p.333, ln.1-6.

To comply with this stipulation, the CDOC reviewed all level 3, 4, and 5 facilities to see which cells did not have an intercom system that is wired into the control center of the housing unit.  Ms. Shoemaker then worked with Mr. Weems to find a solution for the cells without the intercom system that would work within the hard construction of a prison facility.  The resolution was to purchase a notification device that was implemented within the CDOC to allow diabetic offenders with history of hypoglycemia or hyperglycemia to make some staff within that housing unit aware they may have an issue.  This was implemented in facilities that did not have intercom systems in the housing unit.  Accordingly, the CDOC purchased multiple receivers, pendants and strobe lights.  If the offender pushes the button on the pendant, it sends a signal to the master control center, staffed 24/7, that would set off an alarm and identify who pushed the button.  A strobe light and horn would sound and control center.  Once notified by the offender, the control center would send a staff member on the floor to check on that particular offender.  **Exhibit B-8** was identified by Richard Weems as the purchase requisition for caller care receivers, pendants, and strobes, as well as the specification that went along with that purchase requisition.[516]

Class counsel picked only one example from all the diabetics within CDOC, Mr. Maldonado, and extensively questioned Ms. Holst about his situation.  There were no other issues with the call buttons and class counsel certainly did not raise any other issues, other than Mr. Maldonado, out of hundreds of diabetics with potential histories of hypoglycemia.  Mr. Maldonado was housed at Centennial Correctional Facility during the time that DOC was purchasing the pendants for facilities that did not have the

---

[516] Shoemaker, p.2885, ln.16-20; p.2886, ln.1-14; Holst, p.335, ln.13-17; Holst, p.336, ln.1-10; Weems, p. 3258-664; Exhibit B-8.

intercom system.  Centennial and Buena Vista were the only facilities at that time that did not yet have the call buttons.  Ms. Holst and her team were aware of Mr. Maldonado's situation and they worked tirelessly and constantly to help him out, while he awaited his call button.  They told CCC staff to do extra welfare checks on Maldonado to make sure he was ok.  His welfare was of the highest priority due to his increased sugar blood levels.  As Ms. Holst explained, the call buttons do not stop the incidents themselves from occurring, but they give the offender an opportunity to press the button for help, instead of having to do it verbally.  Mr. Maldonado also could not be moved out of Centennial to another facility at that time due to his own protection.  The AIC looked into it, but he had some gang related issues system wide.  He received his call button prior to the compliance date, on April 17, 2009, although that was several months after he requested it.[517]

**#15 – Dog Program Accessible to ADA Inmates**

Stipulation number15 required CDOC to make all necessary modifications or changes to allow disabled offenders, who are otherwise qualified, to participate in the dog programs offered by DOC.[518]  Ms. Holst, Ms. Shoemaker, and Mr. Engstrom testified about this stipulation no.15.

The K-9 companion program is part of Correctional Industries and is currently available in eight (8) state facilities.  The program is designed to take dogs from animal shelters and train them as companion dogs for people to purchase them.  They also take dogs in to board and train.  The offenders not only learn dog obedience training

---

[517] Holst, p.323, ln.3-19; p.325, ln.18-25; p.326, ln.1-4; p.327, ln.15-19; p.331, ln.10-15; p.337, ln.8-25; p.338, ln.15-17; p.344, ln.18-19.
[518] 2008 Stipulation, no.15, p.4, Doc. No. [3326].

techniques, but they also learn grooming, basic dog care, and some business applications, which would allow them to possibly go into that type of business once they leave DOC. The K-9 companion program was discontinued for two-months at FLCF, in October and November of 2008.  The reason for it was the issue between the supervisor of the dog program and the warden.  The final straw to the controversy was when the dog program supervisor wanted to bring her private vehicle in through the sally port at the correctional facility, which upset the warden.  Departmental policy does not allow personal vehicles past the security perimeter of the fence.  This controversy resulted in the K-9 program being suspended for a two-month long period.  Ms. Holst was not involved in the dog program or its closure at Ft. Lyon.  She became aware of its closure in October of 2008. Ms. Shoemaker met with the warden and the dog program supervisor's supervisor from the Correctional Industries, and they worked out a plan to reinstitute the program at FLCF.  Disabled offenders are permitted to participate in the K-9 program.[519]

**Exhibit W-3** is a memorandum from Mr. Cozetto, then Warden at FLCF, dated March 23, 2009, addressed to Ms. Shoemaker, at her request, explaining the number of offenders they currently had assigned to the K-9 companion program, along with four disabled offenders.  The memo further addressed whether the program would be increased past the ten (10) assignment capacity that it had at that time.[520]

Paul Engstrom prepared **Exhibit V-3** about the K-9 program at Ft. Lyon. This report ties the master program schedule (work and program assignments) with the ADA Montez system. So this reflects inmates at Ft. Lyon in the Correctional Industries K-9

---

[519] Shoemaker, p.2886, ln.15-25; p.2887; p.2888, ln.1-7; Holst, p.989, ln.23-25; p.990, ln.1-5; p.991, ln.6-9;
[520] Shoemaker, p.2888, ln.11-25; p.2889, ln.1-2; Exhibit W-3.

program and it reflects the levels of dog trainers, Levels I, II, and III.[521]  **Exhibit V-3** reflects that there were some disabled inmates who participated in the dog program.[522] **For Exhibit V-3**, Mr. Engstrom drew the information on disabilities for this database from the ADA Montez tables from PCDCIS.  That is not the same as the updated AIC table.  This is the same as volume 1 of Exhibit 357.[523]

### #16 – Hearing Criteria – 2 hearing aids

Stipulation number 16 required the CDOC to provide two hearing aides to offenders with hearing impairments who meet the criteria mutually agreed upon by the parties.[524]  The hearing on this issue was held in November of 2009 before Judge Kane. Dr. Frantz testified about this stipulation.  The criteria ordered by the Court and implemented involve determining the average hearing loss in each ear.  The average is determined by using the hearing thresholds at 500 HZ, 1000Hz, 2000 Hz, and 4000 Hz. If the threshold for 1 to 3 of the frequencies is over 40 dB, that threshold value will be multiplied by 1.15 and the resulting value will be used in the calculation of the average. A designation of hearing disability is an average hearing loss greater than or equal to 40 Db in the BETTER ear.  CDOC policy is that one hearing aid will be provided if the average hearing loss in the better ear is between 40 and 49 Db.  Two hearings aids will be provided if the average hearing loss in the better ear is 50 Db or greater.  Dr. Frantz testified that the CDOC is following the new criteria.[525]

---

[521] Engstrom, p. 1838, ln.13-25, p. 1939, ln.1-23
[522] Engstrom, p. 1839 ln.24-25, p. 1840, ln.1-2
[523] Engstrom, p. 1847 ln.13-24; p. 1849 ln.14-23
[524] 2008 Stipulation, no.16, p.4, Doc.No. [3326].
[525] Frantz, p. 4373-74.

**#17 – Hearing Impaired at CTCF to be Housed in Cells with Strobe Alarms & Single Cells with Strobe Alarms**

  <u>Stipulation</u> – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 8.

**#18 – Vibrating Watches**

  Stipulation nunber18 states that the CDOC will provide vibrating watches to all hearing disabled offenders.[526] Ms. Holst testified that the AIC's office provided vibrating watches to the hearing impaired and disabled offenders, so that they had a way to follow routine schedules, such as waking up in the morning, getting to their jobs, movement time, or going to medline and chow. A vibrating watch can be set to vibrate at a certain time to announce to the offenders the regular movement times or appointments. The AIC's office, on their own initiative and idea, started giving the out the vibrating watches even prior to entering into the 2008 Stipulation, which they stopped doing for a while, and then started it up again after the Stipulation was signed, and prior to May 1, 2009.

  In addition to the vibrating watches, the AIC also distributed talking watches that they provided for blind offenders with a figurine on the watch that talks and tells the time, instead of vibrating at a certain time. The decision on whether or not to give a person a talking watch was usually dependent on how bad an offender's vision was.[527] The database that the AIC's office maintained about the vibrating and talking watches and their distribution is reflected in **Exhibit G-3**. It shows when a particular watch was issued to an offender, what facility it went to, what the watch number was, and the date the watch was added to the offender's property list. The AIC wanted to make sure that the watch was delivered to the offender, as they did have a few incidents where they tried

---

[526] 2008 Stipulation, no.18, p.4, Doc.No. [3326].
[527] Holst, p.1594, ln.9-18; ln.24-25; p.1595, ln.1-15.

to distribute a watch to an offender and they had paroled or left the DOC custody.  At times the AIC's office provided the vibrating watches to offenders even before they received their final screening determinations if it seemed that they would most likely be found hearing disabled.[528]

**#19 – SOTMP Phase II at a Designated Facility**

Stipulation, number19 requires the CDOC to offer a SOTMP Phase II class at a designated facility that is comparable to the program currently available at Arrowhead Correctional Facility, within ninety (90) days of the date of the Stipulation.  The Stipulation was signed on April 4, 2008.[529]

Cathie Holst, Joanie Shoemaker, and Peggy Heil testified about this Section.  Ms. Heil has been with the Department since 1983, but for a short period of time.  For the majority of her time with DOC, she has been the administrator of the sex offender treatment program ("SOTMP").  Her current title is the Chief of Behavioral Health, where she receives the clinical aspects of the mental health services, sex offender treatment, and the substance abuse treatment.[530]

It takes a couple of months to set up a new group at a facility, since people and resources from other facilities have to be pulled.  There is a little bit more that needs to be done with phase II group, rather than phase I, because there are more elements that are involved in that treatment, so it takes a little bit longer to set up phase II than phase I.  That is why it took a couple of months for CDOC to set up the phase II group at CTCF.  Ms. Heil is aware of a memorandum that Charles Ohlin wrote on June 12, 2008, where he was documenting what had happened at a meeting he had held with the warden and some

---

[528] Holst, p.1464, ln.18-25; p.1465, ln.1-4; p.1465, ln.5-25; p.1466, ln.1-15; Exhibit G-3.
[529] 2008 Stipulation, #19, p.4, Doc.No. [3326]; Holst, p.1007, ln.8-14.
[530] Heil, p.3390-91.

of the staff at CTCF.  In that memo Mr. Ohlin stated that there were three offenders who were identified for placement in this group at that time housed at CTCF, but they were also looking system-wide to see if there were other people that were unable to go to Arrowhead that needed to be transferred to CTCF, so they could enroll in SOTMP phase II group.  Ms. Heil further testified that the memo also stated that a screening process was being set up at CTCF that involves a committee that ensures appropriate enrollment in that group.[531]

Mr. Ohlin wrote another memorandum on July 14, 2008, notifying offender services and Ms. Holst that he was going to be starting a phase II group at CTCF in a couple weeks, so that people who needed to be moved to CTCF for that group were identified and accommodated properly.  That is **Exhibit F-8**.  The phase II group at CTCF stared on August 14, 2008, about a month later than what was required by the stipulation, #19.  DOC was working on starting the group, identifying and screening people for the group within the time frame of the stipulation #19, but the actual group started a month later than the agreement.  SOTMP, phase II, group is still offered at CTCF.  There are two different phase II groups:  one is for offenders with developmental disabilities and is two hours long, and the other one is for the offenders who may not be able to progress to Arrowhead and is three hours long.  Both groups meet once a week.[532]

Administrative Regulation 700-19, dated April 1, 2009, defines the scope and the limitations of the SOTMP program at DOC.  This is **Exhibit E-8**.  Ms. Heil wrote the original AR, which has since been revised.  Ms. Heil participated in the revisions of some of the more recent versions of this AR, including this particular version.  There are two

---

[531] Heil, pp.3401-03; pp.3425-26; Shoemaker, pp.2889-90.
[532] Heil, pp.3403-04; p.3426; Exhibit F-8.

phases of treatment.  An offender qualifies for the SOTMP class, phase I, if he or she is classified as a sex offender through CDOC's process and is within eight (8) years of parole eligibility date.  At that point, the offender is screened to see if he or she meets the participation requirements, such as whether he or she acknowledges commission of a sex offense, whether he or she is motivated to work on problems associated with the sex offending behavior, and whether he or she agrees to the conditions of group treatment.  If an offender meets all of the participation requirements, they are placed on a wait list for treatment in Phase I.  Their status on the waitlist depends on their parole eligibility date and how long they might have to wait to get into treatment.  It is set up based on the prioritization system unrelated to disability.  Successful completion of Phase I group and motivation for further treatment qualifies them for Phase II group.[533]

The first phase is time limited and it goes over all the common areas that the majority of sex offenders have.  Offenders go through that process in Phase I class and they start sorting through what is specifically relevant to them.  The second phase of treatment works on further developing skills, helping them change their lifestyle, and developing prevention plan.  Phase II group is open-ended.  There are certain tasks that the offenders are expected to complete, but they process those at their own pace.  Phase I is offered at CTCF, FCF, AVCF, LVCF, and YOS facilities.  In the past, it has been offered at SCF as well, but in 2008, due to difficulties with retaining staff for that program, that class got moved to AVCF.  Phase II is offered at CTCF, ACC, LVCF, YOS, and a modified Phase II program is available at FCF and AVCF.  The Colorado Sex Offender Management Board standards mandate fewer treatment criteria for the lifetime supervision offenders, who have less than six (6) years on their minimum

---

[533] Heil, p.3391-93; Exhibit E-8.

sentences, in order to qualify for parole.  Those offenders attend modified Phase II group

which has many of the same services as the regular Phase II group, but individuals can

progress through it more rapidly.  Per those same standards, for two therapists who teach

a class, only fourteen (14) offenders are allowed in a group.  If there is only one therapist

leading the group, only up to eight (8) individuals are allowed in treatment.  The

requirements are the same for both phases.[534]

Ms. Holst, when questioned by class counsel, testified that she thought that sex

offender treatment may be a requirement for parole, but that she was not sure of it, as she

is not an expert on this topic.  She testified that the program is certainly beneficial to the

inmates seeking parole.[535]  Ms. Shoemaker testified that DOC sends reports to the parole

board, recommending release of offenders from prison to the community, if they

successfully complete SOTMP treatment.[536]  Ms. Heil further explained that based on

offenders' earned and good time, and their sentence, they would be scheduled to meet the

parole board at a certain time.  Prior to that, Ms. Heil's office either communicates with

the case managers or provides information to the parole board about what the offender's

status in treatment is, whether they are successful in their treatment, if they are lifetime

supervision offenders waiting to progress to parole, or if they are on a wait list for the

treatment or if they are not interested in participating in treatment.  The DOC only

provides this information to the parole board, but they do not make recommendations to

the parole board on whether a particular sex offender should be paroled or not.  The

parole board also receives information about CDOC's resource issues.  By the time the

sex offenders reach their parole eligibility date and meet with the parole board, but had

---

[534] Heil, pp.2293-94; Shoemaker, p.2889.
[535] Holst, pp.1007, ln.18-25; p.1008, ln.1-13.
[536] Shoemaker, p.2889.

not had the chance to participate in the SOTMP treatment, the CDOC gives that information to the parole board, so that they can take that into consideration when they are making their parole decisions.[537]

Ms. Heil explained during her testimony that SOTMP class is not a requirement for parole, except for the life time supervision offenders charged under the Colorado Sex Offender Lifetime Supervision Act of 1998. None of the other sentences have that requirement. This means that sex offenders with determinate sentences would reach a point where, if the parole board had not paroled them, they would either discharge their sentence or have a mandatory release to parole. If they are on parole, the parole board generally adds a condition to their parole for them to participate in SOTMP treatment, while on parole. There have been some people, about five (5) of them, even under the Lifetime Supervision Act, who have been paroled without participating in treatment. The most recent one paroled about a year prior to Ms. Heil's testimony.[538]

Again, whether or not the sex offender treatment program is a requirement for parole is irrelevant to the fact of whether or not a class for Phase II was created at a designated facility, as required by Stipulation number 19. That was done.

Because CDOC does not have enough resources to place every single sex offender into a SOTMP group right away, they have to be placed on a waitlist first. The waitlist is prioritized with specific rules as well. When prioritizing the waiting lists, initially, they were only looking at sex offenders' parole eligibility date and the number of times they participated in treatment. This way, the people who had the most immediate parole eligibility date were placed first on the wait list. However, this system

---

[537] Heil, p.3395.
[538] Heil, pp.3395-96.

was not working well, and people who were getting into SOTMP groups were up to three years passed their eligibility date.  Realizing that their resources were limited, CDOC changed their prioritization system in February of 2009.  The new prioritization system first placed offenders into SOTMP groups who were sentenced under the Lifetime Supervision Act, over the offenders with determinate sentences. [539]

A clinical standard was also developed on March 23, 2009, that explains, in detail, how CDOC prioritizes individuals on the wait list for placement in SOTMP groups.  This is **Exhibit D-8**.  Ms. Heil, along with the sex offender treatment and monitoring program supervisors, Burl McCullar, Richard Lenz, Mike Dunlap, Charles Ohlin, and James Lander, created this clinical standard.[540]  The CDOC has been doing some type of prioritization for SOTMP groups, at least as far back as 2002.  They have always had a system in which they prioritized people for placement in treatment.[541]  Prioritzation has nothing to do with disability.  At the time of the hearing, no offenders with determinate sentences were being places in SOTMP groups due to limited resources.

Ms. Shoemaker also testified that in reality, the CDOC could use more sex offender treatment staff and that due to lack of resources, they have to prioritize on what offenders get to enroll in the SOTMP group first.  The indeterminate sentences imposed as a result of the Lifetime Supervision of Sex Offender statutes are open-ended sentences. They are prioritized first, so that they could have the opportunity to process to the community, which is a very important issue for the CDOC.[542]  If an individual who is about to be placed into treatment has special needs, such as a hearing disabled individual

---

[539] Heil, p.3396-97.
[540] Exhibit D-8.
[541] Heil, p.3430; p.3431; Shoemaker, p.2891; Exhibit E-8.
[542] Shoemaker, p.2890, ln.1-21.

needing a sign language interpreter, then the CDOC places that individual in a group at a location where they can attend treatment and where their needs can be accommodated, such as the SOTMP classes at CTCF.[543]

Class counsel questioned Ms. Holst mainly about certain offenders, specifically Gookins, Bailey, Cullivan, and Cordova, and their placement in the SOTMP program at CTCF, as well as possible video conferencing for offenders.  Ms. Heil testified that all examples used by class counsel referred to the offenders' eligibility to enroll in the Phase I, not Phase II SOTMP classes, who were not high on the prioritization list to be enrolled in a class and therefore could also not be video conferenced into the class.  Furthermore, whether or not these offenders were placed in a program is irrelevant to the fact of whether or not a Phase II class was created at a designated facility that is comparable to the program available at Arrowhead.[544]

## #20 – Accommodation Resolutions Replaced at No Cost to the Inmate

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 8.

## #21 – Standardized Job Procedures & Decision Making Process Documented

Stipulation, number 21 requires of CDOC to establish a consistent, standardized procedure for offenders to obtain jobs within CDOC.[545]  Ms. Holst, Ms. Shoemaker and the case manager supervisors testified about this particular stipulation, already addressed in Section XIII regarding Offender Programs, Activities, and Work Assignments.

---

[543] Heil, pp.3397-98; p.3400; p.3418; pp.3420-22; p.3426; Shoemaker, p.2891.
[544] Holst, p.1009, ln.9-25; p.1010, ln.1-23; p.1011, ln.5-25; Heil, pp.3404-17; p.3428; p.3341-42; Exhibit 376; Exhibit 595; Exhibit 661; Exhibit T-12 through Exhibit Y-12.
[545] 2008 Stipulation, no.21, p.3/4, Doc.No. [3326].

**#22 – CDOC Will Cover Cost of Assistive Devices if CHP Denies It**

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 8.

**#23 – Implementation of Recommendations from Expert Reports**

Stipulation – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 8.

**#24 – Medical Co-Pays Waived for Montez Disabilities and Diabetic Care**

Stipulation number 24 states that CDOC will waive all medical co-pays for any medical treatment related to the covered Montez disabilities and for medical treatment related to diabetic care, except for the newly implemented annual five dollar ($5.00) co-pay charge assessed to every DOC offender.  Ms. Holst and Ms. Shoemaker testified about compliance with this stipulation.

There are several reasons why the offenders are charged co-pays for medical visits.  One of them is the Colorado statutory requirement to do so.  The CDOC was able to get that statute changed so it could set the procedures for medical visit co-pays. Historically, the co-pays were charged as a way to make offenders realize what they were doing with their healthcare.[546]  When the co-pay was first introduced in CDOC, it resulted in a decreased number of visits to the clinical rea.  Once the offenders got used to the co-pay, there was no decrease in the number of visits.  It was also, in part, a way to teach the offenders that there are charges for these sorts of things, because when they progress to the community, they have to expect to have to pay for healthcare.  It also

---

[546] Shoemaker, p.2893.

encourages the offenders to schedule regular doctor appointments, as opposed to see a doctor after hours, unless it is a true emergency.[547]

Ms. Shoemaker testified about AR 700-30, **Exhibit K-8**, which is the offender healthcare co-pay program that outlines the co-pay procedures.  As a matter of policy, the offenders are never denied healthcare, regardless their ability to pay.  The CDOC's offender banking system normally does not allow the offenders to go into red or allow overdrafts on their accounts.  The only time where the overdrafts are permitted is for clinical services charges.  In fact, the clinical services never asks offenders about money.  If the offender comes to the clinic, healthcare is provided to them, and charges, if any, are done at a later time.  On page 3, of Administrative Regulation 700-30, unequivocally states that medical co-pays are waived for offenders with vision, hearing, mobility, and diabetic disabilities.  On page 4, the policy further explains that offenders are not charged for routine orders such as finger sticks or blood pressure checks.

The document attached to Regulation 700-03 is the patient, or offender, handbook.  All of the Regulations are published and available for offenders to view in general libraries at the facilities.  Page 3 of the handbook explains the clinical no-charge policy with respect to routine treatment orders.  On page 4 of the handbook, offenders are advised that if they believe that they have been charged incorrectly for a service, that they can request a co-pay refund.  Offenders are further advised about how to go about receiving that refund.  Clinical services can refund the co-pay charges for diabetics who did not go through the ADA process or refused to go through it.[548]  There have been a couple of revisions to the co-pay system in the clinical area.  In the first one, the CDOC

---

[547] Shoemaker, p.2894, ln.1-13.
[548] Shoemaker, pp.2894-96; p.2898; Exhibit K-8.

changed the fee structure:  emergency room visits charged to the offenders were reduced from $10 to $5, since the $10 charge did not seem proportional to their earnings of 60 cents a day.  The second, was to implement an electronic co-pay system.  The way the system was set up, it gave access to several people to charge the offender the co-pay.  The providers pick the appointment type and the rules programmed into the system, dictate that an offender is not charged for a chronic care visit or a follow up appointment.  Depending on what the provider picks as the appointment, the system knows whether to charge the offender.  The system was structured to meet the stipulation criteria and providers were educated on picking the appropriate appointment types when seeing an offender.  One thing that Ms. Shoemaker implemented was that the offenders did not have to file grievances for a co-pay refund due to errors, they could also just send a note to the clinic.  If a disabled offender sends a note to clinical, the health services administrator forwards it to the AIC's office so any co-pay refunds done for disabled offenders are done through the AIC's office.[549]

In addition, per policy, the CDOC has an annual internal audit done in August of each year.  The audits verify that the co-pays are being handled appropriately.  Ms. Shoemaker is in charge of those audits, so when they are done by the audit manager and his staff, Ms. Shoemaker receives reports of the final results.  The audit done during the last compliance year found that CDOC was in compliance with the statutes regarding the charges for their co-pay system.  The audit also addressed the ADA random encounters.  Out of 6000 ADA disability encounters, the audit randomly pulled 207 samples and looked at those in relationship to the offenders that had at least one ADA disability.  The audit concluded that the CDOC was in compliance with co-pay charges for them as well

---

[549] Shoemaker, p.2892-93.

in compliance with the stipulation.[550]  **Exhibit L-8** is a memo to Ms. Shoemaker from the internal auditors confirming this.  The AIC's office was already refunding medical co-pay charges for all diabetics who mistakenly got charged the fee since 2006.  The 2008 stipulation broadened that requirement to include a refund of any co-pay that was charged for a Montez related disability, hearing, vision, or mobility.[551]  Even an offender who refused to participate with the AIC's office, if they got charged a co-pay for diabetic medical treatment and they filed an ADA grievance, the AIC office responded and gave them a refund.[552]

To comply with this stipulation, the AIC created a database, **Exhibit Q-8**, to track co-pay refunds for all four disabilities under Montez, for which they were mistakenly charged.  It was kept by Ms. Holst's legal assistants.  The database reflects offender's name, CDOC number, the co-pay, the disability type, the issue, the way, and the date the AIC was notified of it, whether or not the refund was approved or denied, a comments field, the amount of the refund, and the date that the refund was deposited into offender's account.  Ms. Holsts believes that this database reflects the Department's compliance with the 2008 Stipulation number 24.[553]

**#25 – 8 Accommodations for Diabetics**

Stipulation number 25 requires the CDOC to designate all offenders with diabetes as "class members" and to remove the language about whether they are disabled or not from their Accommodation Resolution forms. Ms. Holst and Ms. Shoemaker testified about this stipulation.  Accommodation Resolution forms were updated to indicate all

---

[550] Shoemaker, pp.2896-97; Exhibit L-8.
[551] Holst, p.1738-39.
[552] Holst, p.235, ln.7-23.
[553] Holst, p.1739, ln.6-22; Exhibit Q-8.

diabetic offender's status as persons with diabetes and indicate that they will receive the following "accommodations as needed": 1) access to fingersticks upon request; 2) timing of meals with insulin; 3) where hypoglycemia or occurrence of a hypoglycemic event is documented, access to housing in a cell with a call button if the lock on the cell the offender is currently housed in is controlled by CDOC, as described in  number 15; 4) when possible, access to bathroom breaks during visitation and during programs and/or alternative methods to accommodate such need; 5) no co-payments related to treatment for diabetes or diabetes-related conditions excluding the annual $5.00 annual charge assessed to all CDOC offenders; 6) access to after-hour testing kits; 7) access to all benefits, services and programs offered at CDOC, regardless of diabetes, including progression to lower level security facilities; and 8) annual education on diabetes.

   The AIC's office complied with this stipulation within few months of its filing with the Court.  Ms. Holst decided to add a ninth accommodation to the eight (8) agreed upon in November of 2008, after the proposed new legislation was issued.  The ninth accommodation dealt with the diabetics' access to their medications.  Medical decided whether or not medications were medically necessary as well as the type and quantity that a diabetic should be taking.  This ninth accommodation was not a requirement under the stipulation.  Ms. Holst added it on her own initiative.  Therefore, all diabetics already had their Accommodation Resolutions with the eight (8) agreed upon accommodations at least as of November 2008, well before the compliance cut off date.[554]

   The AIC's office created a database, **Exhibit M-8**, to track that the diabetics were given new accommodation resolution forms with the eight (8) accommodations, pursuant to this stipulation.  The database lists the offender's name, the CDOC number, current

---

[554] Holst, pp.447-48; p.1731, ln.5-11.

facility, if they had any other disability besides diabetes, the date the accommodation resolution with the new required language was sent to the AIC for signature, the date the AIC returned it signed, the date it was sent to the CMO, the date the CMO returned it, and the date it was e-mailed to the facility for distribution to the offender.  The AIC was also able to complete this project and comply with this particular stipulation well before May 1, 2009.[555]  Diabetics were not rescreened after the 2008 stipulations but all of them were issued revised accommodation resolutions to comply with the 2008 stipulations.[556]

Dr. Frantz also testified concerning the difficulty in managing diabetic offender health care.  Audits relating to patient compliance as it relates to finger sticks were performed as part of the diabetic audits.  The audits looked at whether diabetic offenders showed up for at least half of their provider ordered finger sticks.  If offenders were performing less than half of ordered finger sticks, they were deemed noncompliant.  According to the March 2009 audit, 38% of offenders system wide missed more than half of their ordered finger sticks.[557]

System wide, the CDOC clinics have instituted diabetic medlines for general population offenders.  The diabetic medlines were designed so that offenders who need insulin or who need finger provider ordered sticks are called separately from the rest of the offenders.  Diabetic offenders are pulled early so that they can go through medline and get their finger stick and insulin and go directly to the cafeteria for their meals.  Diabetic medlines occur in the morning and evening, and coincide with meal times.   If an offender needs three times a day testing or they need new insulin, depending on the clinic, the offender may be brought to the clinic for that, or the facility would run an

---

[555] Holst,  p.1728-29; Exhibit M-8.
[556] Jacobson, p. 4021, ln. 5-17
[557] Frantz, pp. 4407-08.

abbreviated medline for those who test or take insulin at noon.  They do not wait in line for all of the other medications that are given other offenders.  Most CDOC facilities do not have a large number of diabetic offenders, so the lines are fairly short, and larger facilities that have a lot of diabetic offenders run four medlines.[558]

The CDOC maintains its own central pharmacy located in the Pueblo campus, right next to the Colorado Mental Health Institute in Pueblo.  The pharmacy fills an average of 24,000 prescriptions per month.  The CDOC pharmacy operates with the policy that prescriptions and refill requests received by 11:00 in the morning are filled that same day and shipped overnight to the facility. As the CDOC Chief Medical Officer, Dr. Frantz has prescription refill timelines to make sure that the pharmacy is meeting its obligations.  She also conducted studies specific to oral diabetic medications.  The CDOC averages around 10,000 prescriptions a year for oral diabetic medications.  The studies revealed that 98.5% of prescriptions for oral diabetic medications are filled and sent to the facilities within 48 hours of request.  Almost 83% of those prescriptions are filled, packaged, and shipped to the facility the same day that the prescription is received.  The balance of that 98.5% is done over the next 48 hours after the prescription request is received.[559]

**#26 – AIC's Final Word and Can Overrule the CMO or CDOC Employees**

Stipulation number 26 states that in the case of a disagreement between the AIC and any other CDOC employee, medical provider or contractor concerning the disability status of an offender and/or accommodations to be provided, the AIC's conclusion will

---

[558] Frantz, pp. 4708-09.
[559] Frantz, pp. 4305-07.

be final.[560]  Ms. Holst testified about this stipulation.  Ms. Holst, as the AIC, implemented this particular stipulation by having her legal assistants prepare the accommodation resolutions after reviewing all of the material and seeing the recommendation made by the CMO and giving it to Holst for her final determination and signature.  Upon reviewing everything in the file, Ms. Holst, as the AIC, would make the final determination about offenders' disability, by signing off on their accommodation resolution forms.   In cases where Ms. Holst did not agree with Dr. Frantz's disability findings, she would call her up and discuss the issue before signing anything.  If they could not agree on the issue, which was rare, Ms. Holst, as the AIC who had the final word in disability determinations, would change the accommodation resolution to reflect her opinion as to the offender's disability determination and accommodations needed.[561]  Those disagreements or reasons for the disagreements would not necessarily be noted on the individual's AIC worksheets, but it would be logged in the CDOC's system in the notes field.[562]   **Exhibit O-8** is a report of all times that Ms. Holst did not agree with and overrode Dr. Frantz's decision during 2008.  The various columns in the report reflect the offender's name, the CDOC number, the serial number, which is the internal tracking number in the database so all the documents can be matched back to one transaction, the CMO's evaluation, the AIC's evaluation, and the date of the final determination.  Ms. Holst testified that the CDOC is in compliance with this particular stipulation.[563]

---

[560] 2008 Stipulation, no.26, p.6, Doc.No. [3326]; Holst, p. 1099, l.12-15.
[561] Frantz, 4322-23.
[562] Holst, pp.1733-34; p.1758-60; p.2584-85.
[563] Holst, p.1734-35; p.2583, ln.6-8; Exhibit O-8.

**#27 – CDOC Remedy Problems in Peter Orleans' Report**

<u>Stipulation</u> – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 8.

**#28 – Clinical Services Position to Coordinate and Oversee Repairs and Replacements of DME**

Stipulation number 28 required CDOC clinical services to establish a position designated to coordinate, administer and/or oversee the scheduling of all repairs and/or replacements of assistive devices at all facilities to ensure that the devices are properly and timely repaired/replaced and that appropriate accommodations are provided in the interim.[564] Ms. Holst and Ms. Shoemaker testified about this stipulation.  Mr. Randy Smith, who was supervised by Anna Marie Campbell from clinical services was the designated person with the responsibility to coordinate, administer, and oversee the repair and replacement of durable medical equipment.  The AIC's office worked mainly with Ms. Campbell, whom they contacted if they needed any information about the repairs and replacements of DMEs.[565]

**#29 – Co-Pay Refunds**

<u>Stipulation</u> – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 8.

**#30 – 2 Copies of ADA Grievances**

<u>Stipulation</u> – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 8.

---

[564] 2008 Stipulation, no.28, p.6, Doc.No. [3326].
[565] Holst, p.1006, ln.13-16; p.2565, ln.5-23; Shoemaker, p.2898, ln.15-20.

**#31 – No Money taken from damage claim settlements/ payments except for restitution**

        <u>Stipulation</u> – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 8.

**#32 – Notice Posted – Yellow Posters**

        <u>Stipulation</u> – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 8.

**#33 – Class Counsel Letter Sent to Inmates**

        <u>Stipulation</u> – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 8.

**#34 – Defendants will Reimburse Plaintiffs for their Attorney Fees/Costs to Date**

        <u>Stipulation</u> – Plaintiffs stipulated that the CDOC was in substantial compliance with this section as of May 1, 2009, Amended Pre-trial Order [Doc. No. 4853] at p. 8.

## CONCLUSIONS OF LAW

The Tenth Circuit interprets the term "substantial compliance" in a consent decree contractually.  In *Wolfe v. New Mexico Dept. of Human Services*, 69 F.3d 1081, 1085 (10th Cir. 1995), the Court considered a class action consent decree regarding the New Mexico foster care system. The Tenth Circuit noted that it must treat the term "substantial compliance" as a contract term when it appears in a consent decree.  *See also United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236-38 (1975) (explaining that consent decrees "should be basically construed as contracts").  The Eleventh Circuit in *Reynolds v. McInnes*, 338 F.3d 1201, 1211 (11th Cir. 2003), similarly held that a Court must "apply the same rules that govern contract

interpretation when [it] interpret[s] a consent decree, because a consent decree is essentially a form of contract."

The Tenth Circuit in *Wolfe* went on to explain that the contract law doctrine of substantial compliance is "simply a doctrine to assist the court in determining whether conduct should, in reality, be considered the equivalent of compliance under the contract." *Wolfe*, 69 F.3d at 1085 (quoting *Peckham v. Gem State Mut.*, 964 F.2d 1043, 1052 (10th Cir. 1993)). The court also quoted Judge Cardozo in *Jacob & Youngs Inc. v. Kent,* 230 N.Y. 239, 129 N.E. 889, 891 (1921) in stating that the inquiry was whether any deviation from the contract requirements "in any real substantial measure. . . frustrates[s] the purpose of the contract." *Wolfe* at 1086. *Wolfe* concluded that the "touchstone of the substantial compliance inquiry is whether Defendants frustrated the purpose of the consent decree--i.e. its essential requirements." *Id.*

The Eighth Circuit's rationale in *McDonald v. Carnahan,* 109 F.3d 1319, 1322-23 (8th Cir. 1997), further demonstrates judicial reluctance to interpret substantial compliance as requiring one hundred percent compliance. In *McDonald,* the Eighth Circuit found the termination of a prisoner class action consent decree proper. The *McDonald* court excused "shortfalls in the state's compliance with the decree's provisions" in affirming the termination of the decree, including access to medical services and scattering of legal materials, as these "shortfalls" were deemed not to be the result of defendants' bad faith, not retaliatory, and not an impediment to court access or a demonstration of deliberate indifference to medical claims. *See id.* The court found that the state did substantially comply, despite some provisions of the decree not being completely fulfilled. In *Wyatt v. Rogers*, 985 F. Supp. 1356, 1388 (M.D. Ala.

1997), the district court observed that substantial compliance is something less than 100 percent compliance, stating "it would be impractical, and thus unreasonable, to expect 100% compliance 100% of the time" with respect to the complex requirements of a consent decree.  Instead, *Wyatt* recommended a case-specific analysis in examining whether the goal of substantial compliance was attained.  *Id.*; *see also Johnson*, 489 F.3d at 1110 n.7.   Similarly, in a Sixth Circuit case, inmates appealed a district court finding of substantial compliance and alleged that several provisions of a consent decree were not met.  *Smith v. Bland*, 856 F.2d 196 (6th Cir. 1988).  Although several provisions of the consent decree were apparently not met, the court stated "in the context of the instant case, this 'policy of minimum intrusion' demands that judicial supervision over the Kentucky prison system should be as limited as possible and terminated as quickly as possible once it is determined that the likelihood of future violations has ceased."  *Id.* at *10; *see also Battle v. Anderson*, 708 F.2d 1523 (10th Cir.1983); *Taylor v. Sterrett*, 600 F.2d 1135 (5th Cir.1979); *Campbell v. McGruder*, 580 F.2d 521 (D.C.Cir.1978).

In the present case, the Court finds that the CDOC has undertaken, and made, a cultural shift in the manner it treats its disabled offenders.  The evidence established compliance with each and every provision of the Remedial Plan.  The evidence established that since the inception of the Remedial Plan, the CDOC made wholesale changes to the way it identifies, treats, tracks, and accommodates its disabled offenders.  Prior to the implementation of the Remedial plan, there were no procedures or policies pertaining to accommodation of disabled offenders.  After it implementation, the CDOC made millions of dollars of architectural changes and developed countless policies and

procedures specifically designed to ensure that disabled offenders are accommodated and provided access to services, programs and activities. The CDOC established the office of the AIC which has grown from one employee to five full time CDOC employees exclusively devoted to accommodating disabled offenders on a daily basis.  The evidence demonstrated an incredible amount of individual attention given to these 4000 or so inmates who have contacted the AIC's office.  The CDOC developed multiple data and tracking systems at considerable expense and effort to ensure that disabled offenders are identified and accommodated in all aspects of their daily living including access to medical care, offender jobs, programs and services.  The CDOC developed criteria for the identification of disabled offenders.  The CDOC developed an entire grievance system devoted exclusively to addressing disabled offender grievances.  The CDOC revamped its entire job and program policies and regulations in order to better ensure access for disabled offenders.  The CDOC implemented extensive staff training programs exclusively devoted to accommodation of disabled offenders.  The entire staff of the CDOC has been trained (most several times) about disabilities and accommodations. New staff receives extensive training with respect to disabled offenders.  In addition, all current staff is required to attend annual refresher training. The CDOC devoted extensive resources to educating diabetic offenders with both group and individual sessions to aid diabetic offenders with their condition.  The Executive Director and his immediate deputies have all spoken countless times to gatherings of wardens and staff about the importance of compliance.  CDOC staff is very aware of the need to treat disabled employees fairly and not to discriminate against them.  Staff is also very aware that they have access to multiple data bases to determine offender disability status so that offenders

can be accommodated.  The AIC's office and its five full time employees serve as a centralized resource for all staff and offenders.  This office is exclusively devoted to accommodation of disabled offenders.  Accordingly, the evidence aptly demonstrated that there has been no frustration of the overall purpose of the Remedial Plan and its essential requirements - which is to ensure that disabled offenders, with or without accommodations, generally are being provided the opportunity to participate in services, programs, and activities of the CDOC, as opposed to being discriminated against because of their disabilities.

Plaintiffs based their case, for the most part, upon anecdotal evidence relating to specific inmate cases.  As noted by the Tenth Circuit, in evaluating substantial compliance with a consent decree, instead of reviewing every individual and isolated particular circumstance in an effort to determine the existence of substantial compliance, a court must look at the essential purposes of the consent decree, as well as the specific steps set forth in that decree by which the purposes may be satisfied.  The Tenth Circuit in *Wolfe* instructed: "The phrase 'substantial compliance' is not susceptible of a mathematically precise definition." With respect to the question of whether failure to comply with every specific provision of the consent decree bars a finding of substantial compliance, the Tenth Circuit in *Wolfe* held:

> To the extent that any stipulated criteria has not been met, the court must determine whether that failure is immaterial to the overall objectives or, on the other hand, whether it had a material adverse impact upon the **overall** processing and placement of children into permanent homes.

*Wolfe*, 69 F.3d at 1086.  Individual case studies reflecting instances where the system did not function properly do not mandate a finding of no substantial compliance where

those case studies are "'selective' and 'aberrational' rather than indicative of broader

problems in the system as a whole." *Id.* at 1088.

First, the Court finds that Plaintiffs evidence, was not based upon review of

medical and related records.  Rather, the evidence was based upon statements contained

in AIC worksheets and emails. Indeed, Plaintiff's did not even review pertinent medical

and related files before presenting the anecdotes.[566]   The assertions by Plaintiffs were not

supported by evidence.  Indeed, in response to the anecdotal evidence the CDOC Chief

Medical Officer, Dr. Paula Frantz, undertook a lengthy investigation with respect to the

issues raised by the Plaintiffs.  She was qualified as an expert in the areas of correctional

medicine and family practice.  She testified at length regarding the systemic diabetic and

medical care provided in the CDOC.  She also testified regarding issues raised by the

Plaintiff's relating to medical treatment provided to several class members.  In doing so

she undertook a lengthy review of the files associated with the class members and their

specific complaints.  Specifically, with respect to the individual cases raised by the

Plaintiffs, Dr. Frantz reviewed medical charts and records, pharmacy records, kite logs,

electronic medication administration records, case management records, information

from cashiers' offices information from health services administrators, and master control

logs, from several different logs that are kept within the custody control side of the

facility.  In this respect, her expert testimony was unrebutted.  She prepared a summary of

her findings which revealed inaccuracies and flaws in the Plaintiffs' anecdotal evidence.

**Exhibit S-12** is the report she wrote after her investigation the claims that were made

during the testimony, which summarized the class member complaint coupled with a

medical review of the pertinent records relating to the complaint.  Her findings revealed

---

[566] Transcript, October 18, 2010 at p. 3307.

that, for the most part, the complaints raised by the specific class members were unfounded.

In addition, the Court finds Plaintiff's anecdotal evidence unpersuasive as it pertains to overall compliance with the Remedial Plan. The anecdotes were not indicative of systemic noncompliance. The incidents of alleged failures presented by Plaintiffs were aberrational rather than systemic. The proffered anecdotes do not suffice to demonstrate a failure to achieve substantial compliance, particularly when any such incidents fail to reflect the overall circumstances and systems that exist within the CDOC pertaining to the identification and accommodation of disabled offenders, and do not demonstrate frustration of the purpose of the Remedial Plan and its essential requirements. In a case considering the compensability of post-decree monitoring, the Tenth Circuit noted, "'[p]roper functioning' [of enforcement mechanisms] does not mean 'perfect' functioning. No system works perfectly. Mistakes are inevitable and, inevitably, some individual cases of mistreatment will not be adequately redressed. Occasional errors do not necessarily establish systemic failure or deprive the class of the fruits of the decree." *Johnson v. City of Tulsa*, 489 F.3d 1089, 1110 n.7 (10th Cir. 2007); *see also Wyatt v. Rogers*, 985 F. Supp. 1356, 1388 (M.D. Ala. 1997) (evidence that, over a period of time, there may have been isolated instances of patient abuse would not necessarily preclude a finding of good-faith full compliance with mental-illness standards from consent decree). The focus should be correction of systemic violations of law, not whether every problem was corrected. *See R.C. v. Walley*, 475 F. Supp. 2d 1118, 1144 (M.D. Ala. 2007) (considering system-wide compliance rather than isolated occurrences). This approach properly upholds the separation of powers, as

"[i]t is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 350 (1996).  Absent the violation of a legal right, a plaintiff may not "invoke intervention of the courts" simply because, for example, the plaintiff is "being subject[ed] to a governmental institution that was not organized or managed properly." *Id.*

Decisions of the Tenth Circuit and other jurisdictions establish that in determining substantial compliance with a consent decree, the Court should focus on whether the Defendants frustrated the purpose of the decree, *i.e.,* its essential requirements.  If any deficiencies exist, courts examine the materiality of those areas in relation to the essential elements and underlying policy of the decree.  This is not a mathematical inquiry but rather one that asks: did the defendants "satisfy the essential requirements of each of the basic goals of the decree?" *Wolfe* at 1087.  Here, the Court concludes that the Defendants satisfied the essential requirements of the Remedial Plan and all stipulations prior to the compliance deadline of May 1, 2009.

## ORDER

The Defendants were in substantial compliance with the Remedial Plan and stipulations on or before the compliance deadline of May 1, 2009.  In accordance with Section XXXI of the Remedial Plan, the monitoring period commenced as of that date.

_____
JOHN L. KANE
Senior United States District Court Judge