IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-JLK
(Consolidated for all purposes with Civil Action No. 96-cv-00343)

JESSE (JESUS) MONTEZ, *et. al.*

Plaintiffs,

v.

JOHN HICKENLOOPER, *et al.,*

Defendants.

_____

**PLAINTIFFS' RESPONSE TO DEFENDANTS' FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND ORDER**
_____

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

    I.    Policy ............................................................................................................... 1

    II.    ADA Inmate Coordinator ............................................................................... 7

    III.    Definitions ..................................................................................................... 7

    IV.    DRDC:  Reception Center Processing ........................................................ 7

    V.    Placement..................................................................................................... 11

    VI.    Designated Facilities.................................................................................... 11

    VII.    Structural Compliance / Physical Plant Changes................................. 14

    VIII.    Special Placement Housing.................................................................. 14

    IX.    Tracking ................................................................................................. 16

    X.    Reasonable Accommodations............................................................... 19

    XI.    Justification for Denial of Requests for Reasonable Accommodation..................... 22

    XII.    ADA Grievance Procedure .................................................................. 22

    XIII.    Inmate Programs, Activities, and Work Assignments ......................... 23

    XIV.    Everyday Living Assistance.................................................................. 29

    XV.    Training ................................................................................................. 30

    XVI.    Health Care Appliances........................................................................ 33

    XVII.    Library Equipment ............................................................................... 35

    XVIII.    Institution Procedures ...................................................................... 35

    XIX.    Special Identification ........................................................................... 36

    XX.    Evacuation / Emergency Procedures.................................................... 37

    XXI.    Count ..................................................................................................... 39

    XXII.    Restraints.............................................................................................. 39

    XXIII.    Searches ............................................................................................ 39

    XXIV.    Transportation................................................................................... 39

    XXV.    Visiting.................................................................................................. 40

    XXVI.    Health Care Status Determination ...................................................... 40

    XXVII.    Removal of Health Care Appliances in ASU/PSU Disciplinary

        Detention Units.................................................................................... 42

    XXVIII.    Parole Hearings Accommodation Plan ........................................... 43

XXIX.      Community Correctional Facilities ................................................................... 43

XXX.    Parole Field Operations ......................................................................................... 43

XXXI - XXXIV:    Compliance and Monitoring Periods, Damages, Attorneys'

Fees and Costs, and Misc. Provisions .................................................. 43

**2008 STIPULATIONS ........................................................................................................ 43**

#2 – Hearing Aid Batteries .............................................................................. 43

#3 – Disability Screening Criteria. ................................................................. 45

#4 – Compliance with Special Master's Orders ........................................... 47

#8 – Annual Employee Training....................................................................... 49

#9 – Auxiliary Aid Repairs completed within 60 Days.................................. 50

#11 – TTY Machines Installed ......................................................................... 50

#12 – Bathroom Breaks .................................................................................... 50

#13 – Diabetic Kit Training .............................................................................. 51

#14 – Cells with Call Buttons for Inmates with History of Hypoglycemia .................. 51

#15 – Dog Program Accessible to ADA Inmates ........................................... 51

#16 – Hearing Criteria ...................................................................................... 51

#19 – SOTMP Phase II at a Designated Facility ........................................... 52

#21 – Standardized Job Procedures ................................................................ 52

#25 – 8 Accommodations for Diabetics. ......................................................... 53

#26 – AICs Final Word and can Override the CMO or CDOC Employees.................. 56

#28 – Clinical Services Position to Coordinate and Oversee Repairs and Replacements
of DME ................................................................................................................. 59

Plaintiffs, through counsel for the Class, Paula Greisen and Jennifer W. Riddle of KING & GREISEN, LLP, Edward T. Ramey of HEIZER, PAUL, GRUESKIN, LLP, Lara E. Marks of FOSTER, GRAHAM, MILSTEIN & CALISHER, LLP, and Blain D. Myhre of BLAIN MYHRE LLC, hereby file the Plaintiffs' Response to Defendants' Findings of Fact, Conclusions of Law, and Order as follows:

## I.  INTRODUCTION

In this briefing, Plaintiffs will only respond to those portions of Defendants' Findings of Fact, Conclusions of Law and Order [Doc. # 5069] (hereinafter "DFOF") which were not specifically addressed in Plaintiffs' Proposed Findings of Fact and Conclusions of Law [Doc. # 5068] (hereafter "PFOF").  For the convenience of the Court, Plaintiffs will follow the structure of the Defendants' brief in this response, stating whether the section addressed relates to a core purpose as defined in PFOF.

### I.       Policy

Under the "Policy" section of the Remedial Plan (hereinafter "RP"), Defendants cite to the involvement of its then Executive Director, Ari Zavaras, and its accreditation under the American Correctional Association ("ACA") as evidence of compliance with the Policy of the RP.  Plaintiffs' addressed the role played by Mr. Zavaras in Core Purpose One, PFOF, pp. 25-28, and will not repeat that evidence.  Defendants' suggestion that accreditation by the ACA is evidence of compliance with the RP is misguided.

1

First, as the Court is aware, the RP mandates compliance with very specific procedures to ensure non-discrimination against inmates with disabilities ("IWDs").  On the other hand, the ACA standards provide only very general policy statements regarding prison operations.  In its brief, Defendants state that Exhibit R-12 is a rendition of the ACA standards that "encompass Remedial Plan and ADA issues."  DFOF, p. 8.  Tamara Williams, DOC's accreditation administrator, prepared Exhibit R-12 and testified that it contains the ACA standards that she believed related to disability and/or discrimination, but that she did not know which standards the ACA has determined were related to disability or discrimination protocols.  3739:1 - 3740:8.  However, the majority of the ACA standards listed in Exhibit R-12 appear to have little to no direct relation to the treatment of IWDs, but are protocols for the prison population in general.  For example, 4-4016 requires written policy, procedure and practice provide for two-way communication between staff and inmates, Ex. R-12 at 2; 4-4097 states that inmate time must be accurately computed and recorded, *Id.*; 4-4156 requires space for visiting and screening visitors; 4-4158 addresses dining space and time to dine; 4-4187 relates to physically counting inmates; 4-4192 concerns contraband; 4-4194 relates to visual inspections of body cavities by same gender; 4-221 discusses fire evacuation plans; 4-4292 through 4-4294 relate to control of personal property and funds of inmates; 4-4499 addresses physical contact permitted during visiting; and 4-4505, 4-4507, and 4-4511 concern various library services and library jobs.  *Id.* at 3-5.

Although Ms. Williams testified that all of DOC's facilities have complied with the ACA standards that she determined were relevant to disabled inmates and disability discrimination, 3744:22 – 3749:8, 3750:20-25, she did not provide any evidence that compliance with ACA standards equates to compliance with the specific mandates of the RP – or that DOC provided evidence to the ACA that would satisfy the RP's mandates. For instance, Williams testified that Defendants were compliant with ACA Standard 4-4450 which states that "[T]he inmate work plan provides for employment with inmates with disabilities."  Although she was unable to identify any specific documentation that was provided to the ACA on this requirement, she thought that, other than a policy statement, facilities would have submitted signed job descriptions, photos of disabled inmates working, diagrams showing accessibility of worksites or possibly a request from an inmate to work in a certain area that was accepted, but she could not provide an example when the latter was provided.  3756:4 - 3757:10, Ex. R-12, p. 2, 4-4450.  There is no evidence that the ACA was provided any information that IWDs were provided *comparable* jobs or that the designated facilities had a range of programs and services comparable to the non-designated facilities, as required by the RP.  3756:4 – 3757:10. Although Williams testified that DOC was compliant with ACA standards that related to Offender Care Aides ("OCAs"), 4-4143, 4-4144, and 4-4393, when asked what specific evidence would have been submitted to the ACA to prove that an inmate with a disability had actually been provided a properly trained OCA, she testified that she thought that a

signed copy of the OCA's job description would list the disabled inmate assigned to that OCA, but she had never looked at such evidence to verify her belief.  3759:6-22.  In fact, although Williams testified that DOC did have a list of all the documents that were provided to the ACA in support of compliance with its standards, DOC failed to submit that list as evidence.  3755:6-18.

Moreover, there was no evidence that any of the ACA standards equaled the mandates of the RP, except in very general policy language.  For example, the RP requires that:  the ADA Inmate Coordinator (hereinafter "AIC") is ultimately responsible for identifying and tracking inmates, RP § IX; requires the implementation of an ADA grievance process with a specific time for responding to such grievances, RP § XII; an inmate's request for accommodations due to disability shall be decided within 30 days, RP § X(A); that healthcare appliances be ordered by Clinical Services within 7 working days after it is determined necessary, RP § XVI(D); that specific training be provided on diabetes to medical and non-medical staff; and that IWDs will be allowed to progress through the system in a non-discriminatory manner, RP § XV(B).  No ACA standards were cited that would require compliance with these mandates.[1]  Moreover, at least one of the ACA standards is directly contrary to the requirements of the RP.  Specifically, ACA Standard 4-4375 requires that certain accommodations, such as hearing aids,

---

[1] Similarly, there was no evidence that the ACA standards addressed any of the specific stipulations previously entered into in this lawsuit, such as the requirement that the DOC had to implement a consistent, standardized job procedure no later than July 1, 2008, 2008 Stip. # 21, or that inmates with diabetes must be provided certain enumerated accommodations.  2008 Stip. # 25.

wheelchairs, or other prosthetic devices, need *only* need be provided "when the health of the offender would otherwise be adversely affected" as determined by the responsible physician—as compared to the mandate of the RP that these assistive devices be provided when determined necessary under the ADA.  See Ex. R-12, p. 1, Standard 4-4375.

Significantly, none of the evidence gathered by the AIC for the audits conducted to determine the status of  compliance with the RP was provided to the ACA (despite the fact that Williams was aware of the AIC's audits), and the ACA teams never spoke with the AIC regarding the status of compliance with the RP.  3773:13 - 3774:7.  In fact, there was no evidence presented that the ACA was even provided with a copy of the RP.

The record does reflect, however, that many of the DOC facilities failed to accurately provide the ACA auditors with basic information regarding this lawsuit, the history of non-compliance with the RP, and the resulting sanctions entered by this Court. When showed the results of the nine audits that were provided to Plaintiffs in discovery, Ms. Williams admitted that the ACA reports reflected that the DOC correctional facilities in Arkansas Valley, Bent County, Sterling, Fremont, and the three DOC minimum facilities had all reported that over the last three years their facilities had zero consent decrees, zero class action lawsuits, and zero adverse judgments.  3762:18 – 3765:1, 3767:13-21.  Two of the nine facilities—Delta and Rifle—acknowledged the existence of the Montez case, but because of the mission of those facilities, they reported that it had little effect on those facilities,  3766:9 - 3767:12, despite the testimony by the AIC that

inmates with diabetes could be placed at any DOC facility.  747:25 – 748:7.  The ACA

report for the Centennial facility contained the inaccurate information that the facility was

in compliance with the 2003 settlement in Montez.  3768:23 - 3769:9.  There was no

evidence submitted that Ms. Williams, or anyone else, had ever informed the ACA team

that, in fact, Centennial has never been found in compliance with the Montez settlement,

3770:1-9, hat DOC had taken any steps to correct the erroneous information provided to

the ACA about the existence and status of this litigation, or the entry of sanctions for

non-compliance with the RP.  3770:10 - 3772:15.

There was also evidence that several facilities failed to comply with ACA

standards which would relate or impact inmates with disabilities, but were not included in

Exhibit R-12.  For instance, Sterling was criticized by the ACA for not being compliant

with the ACA noise standards in 35 out of its 36 living units, 3765:7-22, a violation of

which could clearly impact inmates with hearing disabilities.  Delta was cited by the

ACA because there was no documentation that the facility physician received any of the

ACA mandated medical training in the past three years, 3765:24 - 3766:3; Rifle was cited

because there was no documentation that its physician had received any of the required

40 hours of medical training required by the ACA.  3766:4-8.  Although both of these

ACA standards would relate to whether the medical staff was receiving the required

medical training for the care and treatment of diabetes as required by the RP § XV(B),

these ACA standards were not included in the exhibit created by Ms. Williams.  *See* Ex. R-12.

Thus, given that there is no evidence that the ACA standards mirror the mandates of the RP, Defendants' failure to produce the evidence it submitted to the ACA in support of accreditation on the relevant standards, Defendants' failure to produce the actual ACA audits in support of Williams' testimony, and the erroneous information that was provided by several of the facilities to the ACA regarding the status of compliance in this case and its application to the individual facilities, the evidence of DOC's accreditation by the ACA has scant, if any, probative value in determining substantive compliance with the RP.

## II.     ADA Inmate Coordinator

*See PFOF, Core Purpose One.*

## III.    Definitions

*No rebuttal necessary.*

## IV.    DRDC:  Reception Center Processing  (*See* PFOF, Core Purpose Two, pp. 51-54, 57-72.)

DOC's approach to compliance appears to be the motto: "The implementation of a written internal policy—in and of itself—reflects compliance with the RP."  Throughout the course of the hearing and now in their briefing, DOC went to great lengths to define their internal regulations. Each witness explained the process as outlined in his or her respective Administrative Regulations, but collectively failed in most sections of the RP

7

to provide evidence that their policies were indeed implemented ***and executed*** in accordance with the mandates of the RP.  Rarely was documentary evidence provided to reflect that the policies were implemented, followed, or found to be effective as each related to particular areas of compliance.  The evidence provided with regard to the proper and timely identification of inmates with disabilities was just as scant.

As of May 1, 2009, DOC had not identified who comprised the class of disabled inmates under the RP.  As discussed at length in the Plaintiffs' Findings, that fact alone precludes compliance with the RP.  Yet, DOC's Findings do not address their failure to properly and timely identify IWDs, and therefore, the Montez class.  Instead, their Findings merely describe at length the general processes to identify and provide temporary accommodations.  DOC's Findings are supported solely by the conclusory statements of those DOC employees whose job it was to achieve compliance that they, of course, believed they were in compliance.

DOC's Findings state:

1. "Intake and clinical employees coordinate with each other to ensure the necessary accommodations are identified."  DFOF, p.17.

2. "Exhibit J is the temporary offender accommodation that the intake nurse completes.  This document is *immediately* sent in electronic form from medical and intake unit to the AIC and medical files and in paper format to the offender's working files."  DFOF, p. 17.

8

3. "AIC automatically receives notification electronically if the medical provider makes any changes to the temporary accommodations."  DFOF, p. 20.

4. "Dr. Frantz testified about the close working relationship between clinical and the AIC, including monthly meetings and daily interaction relating to individual offender accommodations."  DFOF, p. 27.

These assertions were refuted by DOC's *own* witness, Cathie Holst.  103:17 - 104:16. Ms. Holst stated with regard to DRDC intake processing, "The mistakes are voluminous and occur daily.  We can say without hesitation that the temporary [accommodation resolutions] are incorrect in 99 % of the cases.  This has been addressed with staff at DRDC intake on numerous occasions and to date the problems continue." Again, the claim of constant and effective communication between departments was refuted by Cathie Holst who stated, "Clinical Services failed to ever provide a comprehensive list to the AIC identifying [IWDs]."  120:22 - 121:12.

DOC cites to Mr. Falk's testimony about the training of clinical services staff on the intake computer system applications.  Specifically, DOC notes his statement that the computerized system allows nurses and other staff to get into the Montez accounts and print out the temporary Accommodation Resolutions (hereinafter "ARs") for the different housing units.  DFOF, pp. 21-22.  Again, merely having a computerized database which permits the entry of temporary accommodations into the system for inmates with disabilities does not reflect that the inmates were properly or timely identified, or that the

9

accommodations were actually input into the system.  Cathie Holst's testimony reflects that neither happened with regularity or accuracy.  160: 10-19; 665:1-3.  Though DOC cites to Mr. Falk's explanation of the extensive training and capacity of their "Encounter" system, no reports from Encounter were offered into evidence to demonstrate Encounter's effectiveness, such as tracking the inmates identified during intake (or otherwise), who required temporary accommodations, to whom the request for accommodation was sent (i.e. housing unit or clinical staff), and/or justifications for housing assignments.

DOC cites to Dr. Frantz's testimony that there are "rarely discrepancies between the CMO and the AIC.  If there is a discrepancy, the AIC determination prevails."  The Special Masters' Orders and the testimony of Cathie Holst refute such a claim.  PFOF, pp. 27, 31.  Despite DOC's reference to Ms. Shoemaker's testimony that durable medical equipment ("DME") and property remains with the offender throughout the duration of their incarceration, the testimony was refuted by Ms. Holst and the testimony provided by the inmates.  Ms. Holst testified that it was a recurring problem for offenders to either: (1) not have their temporary accommodations properly listed in the system resulting in the removal of their DME, or (2) have their DME taken away or lost during transport.  2952:11-22.

DOC cites to Ex. M, which is the Camp George West offender orientation information.  DOC provided the orientation as an example of the offender orientation

materials, which "contain an ADA Montez section," required by the RP.  DOC failed to provide as evidence copies of the offender orientation materials for each facility.  In fact, as discussed in Plaintiffs' Findings, evidence was presented during the compliance hearing to show blatant non-compliance with the requirements of the RP regarding orientation materials at various facilities that house IWDs.  *See* PFOF, Core Purpose Six, pp. 89-190.  The AIC testified that DOC did not have a standardized packet for orientation.  *Id.*

As the Plaintiffs discussed at length in their Findings, Core Purpose Two, the screening process was significantly delayed and mismanaged, taking months for inmates to be screened, and ultimately rescreened.  DFOF, pp. 55-58.  Final disability determinations had not been made for the vast majority of inmates by the end of the compliance period, as recognized by DOC's own witnesses.  To state that "[t]he screenings for hearing, vision, and diabetes are typically accomplished in a single appointment" is grossly inadequate.

**V.    Placement**

*See PFOF, Core Purpose Three, p.76.*

**VI.    Designated Facilities**  (*See* PFOF, Core Purpose Three, p. 76, and Material Criteria One and Two of Core Purpose Five, p. 120.)

DOC's Findings with regard to the placement of inmates in designated facilities was again an effort to suggest that because a DOC regulation existed for the process, DOC had complied with the mandates of the RP.  Little evidence was provided to reflect

11

that, in fact, their policies with regard to placement and designated facilities were indeed *executed* in accordance with the mandates of the RP.

Through Ms. Shoemaker, DOC submitted pictures of handicapped cells, describing that the special cells met "ACA standards."  However, the evidence presented during the compliance hearing demonstrated that inmates with disabilities were placed at non-designated facilities.  PFOF, p. 77.  The fact that DOC may have had handicapped accessible cells at particular facilities did not benefit IWDs who were placed at non-designated facilities, or at out-of-state facilities such as North Fork.  PFOF, p. 77. Further, the evidence showed that the designated facilities which housed the greatest number of disabled inmates did not have the appropriate number of ADA accessible cells. PFOF, pp. 77-78. As a result, inmates with disabilities were being housed in infirmaries with restricted access to benefits, a problem which was not resolved by the end of the compliance period.  DOC failed to provide any evidence, beyond pictures of a few cells and an administrative regulation, that they were in compliance with mandates of the RP requiring that IWDs be placed at designated facilities.

Ms. Shoemaker's testimony that inmates who are moved from one facility to another retain their privileges and property rights possessed at the previous facility is also refuted by the evidence.  Unlike inmates in the general population, IWDs that are moved to an infirmary or out-of-state do not retain access to the rights and accommodations provided under the Montez RP.  It was clear throughout the hearing—as testified to by

Ms. Holst—that property would consistently be taken either on transport, upon intake into DOC, or upon transfer to another facility, and never returned to the IWDs.  Plaintiffs recognize that DOC has a significant interest in ensuring the safety of all inmates in its ward, but the security concerns became a subterfuge for mere mismanagement and apathy when it came down to protecting the right of an inmate to keep his own contact lenses, for example.  697: 6–10.  Again, the generalized regulation to which DOC cites for allowing offenders to have certain property in their possession does not tell the story.  The story comes through the evidence presented by Plaintiffs' experts, inmate witnesses, and Ms. Holst herself.  *See* PFOF, pp. 83-92.  Further, Ms. Shoemaker's assertion that DME cannot be taken away from the offender without the clinical staff's approval is simply belied by the evidence.  DME were taken away from IWDs on transport and during shakedowns by DOC staff when DME was either erroneously documented or not documented as authorized at all.  *See* PFOF, pp. 90-92.  Often the problem, as Ms. Holst testified, was that the DME was frequently not listed on the IWDs' temporary accommodations, resulting in the removal of DME granted by clinical or the AIC.  PFOF, pp. 88-89.

Defendants next assert that the "overall purpose of the M code process is to help ensure the offender is placed in a facility that has the clinical services and the clinical capability to most appropriately address the needs of the offender.  This is because certain facilities are better equipped to handle certain medical issues, or provide 24-hour

care if necessary." DFOF, p. 38. Defendants fail to address, however, their wholesale exclusion of inmates with M-codes of 3 or greater from certain facilities. PFOF, p. 120-124. Diabetics on insulin or diabetic medications are automatically classified as M3 or higher. Ex. D-2, pp. 8-9; 4568:13-23; 4689:19-22. Defendants' own medical classification policies and practices discriminate against class members by excluding them from certain facilities, particularly the coveted work camps. *See* PFOF, p. 120-140 (addressing Material Criteria 1 and 2 of Core Purpose 5 of the RP). Such exclusion violates Section VI of the RP, as class members are excluded from these lower level, designated facilities solely because of their medical codes, and thus denied the right to progress through the system without regard to disability.

## VII.   Structural Compliance / Physical Plant Changes

*No rebuttal necessary.*

## VIII.   Special Placement Housing  (*See* PFOF, Core Purpose Three, p. 76.)

In Defendants' brief, they state that this section requires that "[w]hen an offender with a disability affecting placement is housed in an infirmary for long term placement due to health care needs, the offender should be afforded the same type of programs *provided to similarly situated offenders without disabilities*." DFOF, p. 40 (emphasis added). That is a misstatement of the RP. In fact, the RP states that when such inmates are housed in an infirmary, the inmate "will not be denied access to programs, benefits, and services comparable to those at the designated facilities." RP § VIII.

14

This distinction is important because DOC then defends the fact that it does not provide access to programs, services or benefits to inmates with disabilities housed in infirmaries by asserting that, because other inmates housed in the infirmary are also denied these programs and services, there is nothing discriminatory about failing to provide these benefits to inmates with disabilities, DFOF, p. 41, in keeping with how they phrased the RP requirement.  Defendants also claim that since housing in the infirmary is always a temporary assignment, there is no requirement to provide such services.  No documentary evidence was submitted by DOC to support this assertion.  Moreover, during the compliance hearing, the AIC admitted that as of February 2009, inmates with disabilities were being housed in the infirmary at CTCF because of the lack of accessible cells at the facility, and she did not know if the problem had been rectified by the end of the compliance period.  PFOF, pp. 77-78; Ex. 456.  There was at least one other inmate, Mr. Williams, who is a double amputee confined to a wheelchair, who was being permanently housed in the infirmary at CTCF only because there was no other accessible housing available at that facility.  599:18-601:7.

Thus, rather than attempting to show that it has followed the mandates of this section of the RP, DOC attempts to argue that it does not have to do so—despite the evidence that it is housing inmates with disabilities in infirmaries because of its lack of accessible housing—a situation which is likely to be exacerbated by the upcoming closure of the Ft. Lyon facility, as will be discussed below.

**IX.    Tracking**  (*See* PFOF, Core Purpose One, p. 35.)

Section IX of the RP states that the "AIC will be responsible for tracking each inmate designated as having a disability . . . throughout the inmate's incarceration to ensure that the individual is not denied access to programs, services and benefits offered by DOC because of his/her disability."  There is no question that Cathie Holst, during her tenure as the AIC, went to extraordinary efforts to try to satisfy this section of the RP.

The problem was that the AIC received very little support or cooperation in these efforts from the rest of the DOC.  While the AIC created her own database that sought to track "absolutely everything," DFOF, p. 42, the DOC as a whole utilized a separate non-integrated DCIS database ("ADA Montez") with substantial inaccuracies at least up through the May 1, 2009 compliance date.  This system in turn was the basis for inaccurate reports such as the QT profile.  79:19 – 83:21.  Individual facilities were also maintaining their own non-integrated databases which were incomplete and neither controlled by, nor audited for, accuracy by the AIC.  PFOF, pp. 37-38.  The DOC never attempted to integrate any of these systems with the AIC's own database, PFOF, p. 39; 2372:12-19,  nor, prior to the compliance hearing, had anyone apparently made the effort to compare the two principal databases (the AIC's separate database and the DCIS "ADA Montez" database) for consistency and accuracy.  PFOF, p. 39; 1804:19 – 1805:12; 1826:11 – 1827:4.

As important as the discrepancies among databases and reports purporting to identify inmates with disabilities was the complete absence of any effort by anyone outside the AIC's office to assist the AIC in developing systems to track compliance with the nondiscrimination requirements of the RP—*i.e.*, ensuring that inmates with disabilities were not intentionally or unintentionally denied access to jobs, programs, services, and other benefits, either system-wide or on a facility-specific basis.

While the DOC routinely maintained an up-to-date daily database of job and program assignments for all inmates in the system (primarily for payroll purposes), PFOF, p. 39; 1792:9, 1793:5,  no one, prior to preparation for the compliance hearing itself, had ever attempted to generate a report showing both job/program assignments *and* disability status, thus facilitating comparison.  PFOF, p. 39; 1878:9-18.  No one had ever developed a computerized report that would allow the AIC office to integrate with the DOC's data system to track the assignments of inmates with disabilities. PFOF, pp. 39, 43-44; 2372:12-19; 4026:19 - 4027:1.  The first person who apparently attempted to do anything like this—Paul Engstrom, long after the compliance deadline and under the direction of the AG in preparation for the compliance hearing—had never interacted with the AIC office prior to the May 1, 2009 compliance deadline.  PFOF, p. 39; 1776:15-19; 1779:12 – 1780:2.

Both Plaintiffs' and Defendants' experts (Dr. Bardwell and Dr. Zax) testified that a report integrating job/program assignment data and disability status data would be an

extremely valuable tool for tracking discriminatory patterns in job and program assignments.  PFOF, pp. 43, 45; 2224:7-12; 4152:5 – 4154:11.  Mr. Engstrom testified that it would take only minutes, and milliseconds of computer time, to generate daily contemporaneous reports showing both job/program assignments and disability status. PFOF, p. 44; 1827:5-23.  From such reports, it would be a "relatively trivial" technological exercise (per Dr. Bardwell) to generate statistical ratios that would detect discriminatory patterns and monitor remediation progress.  PFOF, p. 44; 2206:12 – 2208:5.  Dr. Zax agreed that such reports could be generated "routinely" and a program could easily be designed to provide alerts to the presence of statistical disparities indicative of discrimination.  PFOF, p. 45; 4152:5 – 4154:11.  Yet no effort was made within the DOC to do this.  While the AIC went to extraordinary efforts to provide information to other departments and facilities within the DOC to enable them to provide accommodations to disabled inmates, the rest of the DOC did little to provide her with the support and information she needed to fulfill the responsibilities assigned to her.

The internal difficulties faced by the AIC were exacerbated by a pervasive lack of communication between her office and other departments and DOC facilities, especially Clinical Services.  The AIC did not receive routine reports from the facilities regarding the identity of inmates with diabetes, and the number of diabetics known to Clinical Services far exceeded the number communicated to the AIC.  PFOF, pp. 45-46; 124:5 – 131:1.  Job or program terminations for inmates with disabilities were not routinely

reported to the AIC.  PFOF, p. 47; 934:15-24.  There was no protocol for the medical staff to report anything to the AIC.  PFOF, p. 47; 4505:4-17.  Hospitalizations, amputations, and deaths involving inmates with disabilities were not reported to the AIC.  PFOF, pp. 46-47; 133:14 – 134:6; 136:21 – 137:1; 4505:18-24.  The DCIS "ADA Montez" database did not accurately identify inmates who had been assigned wheelchairs.  PFOF, p. 47; 153:7 -154:15.  Information regarding inmates with disabilities tended to flow primarily in one direction—from the AIC to the rest of the DOC.  The feedback and information necessary to enable the AIC to perform her tracking and compliance monitoring responsibilities was non-routine, incomplete, spotty, and inaccurate at best, and non-existent at worst.

## X.   Reasonable Accommodations  (*See* PFOF, Core Purpose Four, p. 79.)

The bulk of Defendants' Findings in this section relates to the testimony of the Warden of CTCF submitted to show that CTCF provides reasonable accommodations to inmates with disabilities.  The remainder of Defendants' briefing on this issue has already been addressed by Plaintiffs in their opening brief and will not be repeated.[2]

In support of its assertion that it provided reasonable accommodations to inmates with disabilities, Defendants offer the testimony of the warden of Colorado Territorial

---

[2] In this section, Defendants cite evidence of compliance related to the provision of sign language interpreters and library equipment at CTCF, both of which Plaintiffs stipulated were areas in which the DOC had reached compliance.  One other area the Defendants cited was the availability of close captioned television for hearing impaired inmates, stating "[a]ll television sets at facilities also have close captioning on at all times for hearing disabled offenders."  DFOF, p. 58.  Plaintiffs did not list this accommodation as a material criteria for this Core Purpose.  Nevertheless, Plaintiff point out that Holst testified that she was aware of complaints that close captioning was turned off by DOC staff, and was told by a case manager that it was turned off because other inmates found the captioning "irritating"  2470:4 - 2471:9.  Again, this appears to be an example where policy and practice conflict.

Correctional Facility, Pamela Plough, who stated that she and the CTCF staff had numerous meetings and discussions with the AIC and that, "CTCF always follows the guidance and instructions given to them by Ms. Holst and her office."  DFOF, p. 59. Most of the testimony submitted by Warden Plough consisted of statements that the CTCF followed RP policies and inmates with disabilities were always accommodated, without providing any documentary evidence of these broad assertions.  Despite her general statements of compliance, however, the record shows numerous instances where CTCF failed to comply with the AIC's policies and the requirements of the RP.

For instance, in violation of the RP, CTCF, the facility which houses a majority of the inmates with severe hearing disabilities, 564:21-25, 690:10-12, did not properly inform deaf inmates of public announcements during the compliance period.  174:10 - 175:11; Ex. 585.  Instead, CTCF's policy was to inform hearing disabled inmates only of *unusual* announcements, while the Plan requires deaf inmates be informed of *all* PA announcements.  *Id.*  The AIC confirmed that CTCF's policy for notifying hearing disabled inmates of announcements was incorrect, 890:8-13; 891:5-15, and Ploughe herself testified that she was aware that CTCF was not following the proper procedures for notifying deaf inmates of announcements during the relevant compliance period. 3717:2-5.  IWDs filed ADA grievances specifically addressing the fact that they were not being notified of announcements, including grievances by IWD Ayotte, 889:7-17; Ex.

20

292; and IWD Wiegand, 889:18 - 890:7; Ex. 585.  CTCF continued to provide deaf

inmates with inadequate notifications at least until April 30, 2009.  174:10-175:11.

CTCF also failed to properly document DMEs that had been provided to IWDs by

the DOC or were the inmate's property, and to report the DMEs to the AIC, as required

by the Section XVI(C) of the RP.  660:15-24; 661:17 - 678:11; *see* Appx. 8 to PFOF.  A

"DME Sweep" to inventory all DMEs at CTCF in April 2009 revealed at least fourteen

instances where a DME was found but not documented properly on the inmate's

Accommodation Resolution Form.  *Id.*  If a DME is not documented as an inmate's

property, it can be removed from the inmate.  672:23 - 673:3. If a DME is not

documented or reported to the AIC, the IWD may be deprived of other accommodations

for the disability.  674:8-18.

Other evidence of noncompliance with the RP include the fact that inmates with

disabilities were being housed in Cell House 1 at CTCF, despite the fact that the RP

expressly forbids the housing of disabled inmates in this location, 309:9-310:14, Ex. 453,

RP §VII at 8; that the infirmary at CTCF did not provide programs and services as

required by the RP, 306:18 – 308:25, 911:25 – 913:16, Ex. 152; and that the Offender

Care Aides at CTCF had convictions for sexual assault, murder and kidnapping, which

was expressly prohibited by the RP.  PFOF, p. 94; RP § XIV.  In fact, the CTCF ADA

Coordinator did not understand the procedure and the importance of promptly providing

inmates with their final disability determinations.  194:1 – 197:5.  (Almost three months delay between the date the AR was sent to CTCF and then given to inmate.)

The testimony of Warden Ploughe was similar to the type of testimony addressed by the court in *Clark v. California*, 739 F. Supp. 2d 1168 (N.D. Cal. 2010), in which it stated that  testimony from a handful of staff at individual prisons that they work to meet the needs of the inmates at issue does not necessarily prove systematic compliance. *Id*. at 1223, ¶ 239.  Warden Plough's generalized statements that she believed her staff complied with the mandates of the RP, without documentary support, is not sufficient evidence to carry Defendants' burden of proving substantial compliance.

### XI.    Justification for Denial of Requests for Reasonable Accommodation

*No rebuttal necessary.*

### XII.   ADA Grievance Procedure  (*See* PFOF, Core Purpose One, p. 48.)

Section XII of the RP establishes the parameters for an ADA grievance process. As recited at pages 62-64 of the DFOF, the DOC adopted Administrative Regulations for this process, and the AIC developed her own database to track compliance with the timelines established by the RP for responding to ADA grievances at each of the three required levels.  Per the AIC's tracking, during the 12 months immediately preceding the compliance deadline, over 34% of the Step 1 responses, over 23% of the Step 2 responses, and over 19% of the Step 3 responses were late.  PFOF, pp. 48-49; 798:11 – 799:14.  The primary cause of the untimely responses at all three levels was a lack of sufficient staff resources to conduct timely investigations of the grievances and prepare

timely responses.  PFOF, p. 49; 799:25 – 801:15; 1478:21 – 1479:18.  Again, though the RP's requirements were adopted by the DOC as formal policy, the Defendants declined to provide the resources to the AIC necessary to assure timely implementation.

### XIII.  Inmate Programs, Activities, and Work Assignments  (*See* PFOF, Core Purpose Five, p. 119.)

Defendants assert that the "testimony of several witnesses proved that the DOC was in substantial compliance with this section of the RP as of May 1, 2009," DFOF, p. 65, while simply ignoring the evidence that showed to the contrary.  First, DOC's policy to prohibit inmates with an M-code of M3 or higher from certain facilities excludes disabled inmates from programs available at those facilities.  PFOF, p. 121-25.  Diabetic inmates on any kind of medication are automatically rated M3, and may be rated higher.  Thus, DOC excludes diabetics from some designated facilities, particularly the work camps.  *Id.*  DOC touts the types of jobs available at the Canon Minimum Centers, such as the wild horse program, the dairy program, and the heavy equipment program.  DFOF, p. 100.  However, because of DOC's M-code policy, disabled offenders are excluded from or at least less likely to be able to participate in such programs.  One of the work camps, Camp George West (Colorado Correctional Center), is the most sought after assignment in the DOC because it does not subject its inmates to controlled movement and it offers more job assignments that are off grounds.  PFOF, p. 122.  Exclusion of diabetics from Camp George West, and other camps and facilities, discriminates against

those inmates on the basis of their disabilities.  For that reason alone, DOC is not in substantial compliance with Section XIII of the RP.

Second, DOC has failed to properly identify or track diabetic inmates.  PFOF, p. 58-61 (addressing Material Criteria One of Core Purpose Two).  Therefore, DOC cannot carry its burden of proving that diabetic inmates are not being discriminated against in jobs or programs, and in fact DOC has no way to know what jobs or programs are provided to diabetic inmates whom DOC has failed to identify.

With regard to the process for assigning an inmate to a job or program, DOC noted that the process was changed so that assignments are now made by a classification committee rather than the work supervisor.  DFOF, p. 72-73.  DOC asserts that "*[a]fter* the offender is assigned a position by the committee, the supervisor and the offender discuss the need for accommodations, then contact the AIC's office to discuss the employment." *Id.* at 72-73 (emphasis added).  Thus, under the current procedure, the AIC is only contacted, if at all, after an assignment has been made, and case managers are responsible for trying to place inmates in any assignment.  *See id.* at 73.

DOC relies on the testimony of four case manager supervisors to support its position that it was in substantial compliance.  *See id.* at 93-101.  But the AIC testified that the new job process created confusion in the facilities among staff, and that case managers did not know what they were supposed to do when a disabled inmate wanted to apply for a job.  PFOF, p. 142.  While DOC implies that the AIC office is fully part of the

new jobs process, DFOF, p. 72-73, the record shows a fundamental lack of coordination with the AIC office.  DOC notes that under the new process, the work "supervisor and the offender are to contact the AIC to discuss accommodations." *Id.* at 76.  Thus, whether the AIC office is even contacted at all rests on the work supervisor (absent a grievance from the offender).   The AIC was not included in the referral or selection process for jobs. The AIC was not contacted by job supervisors until an inmate had been accepted into the position to determine what accommodations were required. 2504:15-25.  The AIC was not informed of the jobs for which inmates applied, but only for those in which they were accepted. 2505:8-11.  The role of the AIC office in the process is confusing, and case managers do not know what they were supposed to do when a disabled inmate applied for a job.  943:2-20.  Simply put, the new jobs process does not ensure that inmates with disabilities are afforded the same opportunities as non-disabled inmates, and the process utterly fails to ensure the involvement of the AIC office in the process. PFOF, p. 141-44 (addressing Material Criterion Two of Core Purpose Five).  Moreover, the facility audits failed to show that as of March 2009 (when the audits were conducted) that *any* inmate with a disability had actually been placed in a job under the new job process.  *See id.* at 144.

Defendants spend pages discussing the adequacy of training on the new jobs process.  DFOF, p. 77-88.  They assert that the training records prove substantial compliance with Section XIII by the May 1, 2009 compliance deadline.  To the AIC's

knowledge, however, no training was done on the job process by April 2009.  946:3-7.

Training done in August 2008 concerned a different policy than the one implemented in

April 2009.  2995:11-15.  By the end of the compliance period, 1,800 staff members still

had to be trained on the new procedures.  947:15-19. DOC thus has failed to demonstrate

that training on the new jobs process was adequate to comply with Section XIII of the

RP.  In addition, DOC failed to demonstrate at all that the private prisons had

implemented the new job process by the compliance deadline.  PFOF, p. 147-48.  DOC

has failed to comply with Section XIII of the RP.  Thus, while a new jobs process may

have been developed on the eve of the compliance deadline, DOC has failed to

demonstrate that the process complies with Section XIII of the RP, or that its policy was

effectively implemented.

At pages 101-108 of their proposed Findings, the Defendants place considerable

reliance upon the expert reports and testimony of Dr. Jeffrey Zax to support their

assertion that they are in compliance with the RP's requirement that all designated

facilities offer inmates with disabilities a range of programming, jobs, and vocational

opportunities equivalent to that available at non-designated facilities—and that the AIC

shall review the educational, vocational, and work programs to ensure that the assignment

of inmates is nondiscriminatory.

As noted by the Defendants at p. 102 of their proposed Findings, Dr. Zax's

analysis was based upon a report prepared by Paul Engstrom, setting forth the

job/program assignments for all inmates within the system on a single day (the day before the compliance deadline of May 1, 2009) together with each inmate's reported disability status.

The first concern is that Mr. Engstrom's report was apparently the first of its kind ever produced by the DOC—in preparation for the compliance hearing and almost a year after the compliance deadline.  The AIC was never provided this kind of resource, let alone the sort of derivative analysis performed by Defendants' expert Dr. Zax or Plaintiffs' expert Dr. Bardwell, prior to the compliance deadline to enable her to perform her responsibilities to ensure the absence of discrimination—despite the ease with which such reports and analyses could have been generated.  See the discussion above in connection with Section IX of the RP.  PFOF, p. 39, 44-45; 1878:9-18; 2206:12 – 2208:5; 4152:5 – 4154:11.

The second concern is that Mr. Engstrom's report, upon which Dr. Zax's analysis was based, was itself based upon a thoroughly mis-designed (under whose instructions it is not clear and does not matter) and inaccurate report prepared by Adrienne Jacobson in the AIC's office.  PFOF, p. 40; 4034:13.  In attempting to provide a listing of all inmates with disabilities in the DOC system as of the compliance date, Ms. Jacobson included only those inmates who had formally received a final Accommodation Resolution within the 12 month period immediately preceding the compliance deadline (a timeframe Ms. Jacobson referred to as "the compliance period").  PFOF, p. 40.  By design, this report

*excluded* all inmates who were "pending for screening" during that one-year period and had not received a final Accommodation Resolution prior to the compliance deadline, together with over 200 known diabetics who had not affirmatively sought assistance from the AIC, and any inmate whose Accommodation Resolution was revised after the compliance deadline to reflect a Special Master order entered before that deadline. PFOF, p. 40; 3989:12 – 3990:24; 4037:10 – 4038:21; 4039:9 – 4040:21.  Making matter worse, Mr. Engstrom's report affirmatively classified all of these excluded inmates as *non-disabled* for purposes of comparing job and program assignments of disabled versus non-disabled inmates.  PFOF, p. 41.

In excluding all inmates "pending for screening" from the "disabled" category, Ms. Jacobson gave no consideration to whether they had been determined to be disabled and provided an Accommodation Resolution *prior* to the artificial 12 month "compliance period"—and were simply "pending for screening" as a part of the massive rescreening process undertaken by the DOC of all inmates claiming or previously identified to have one or more disabilities—or whether they were ultimately determined or re-determined to have a disability through the rescreening process but did not receive a formal Accommodation Resolution so stating until *after* the compliance deadline.  PFOF, p. 41; 4028:10-22; 3991:5-17; 3993:14 – 3994:15; 4001:5 – 4003:22; 4025:5 – 4026:18.  As of the compliance deadline, the rescreening process was 73% *incomplete* (93% incomplete for mobility rescreenings).  PFOF, p. 41; 2197:24 – 2200:21; Ex. 675, pp. 7-9; Ex. 662.

Accordingly to Dr. Bardwell, based upon the DOC's own eventual final disability determinations, this resulted in *at least 35%* of the already known and/or ultimately confirmed disabled population being omitted from Ms. Jacobson's report and, therefore, being *misclassified as non-disabled* in Mr. Engstrom's derivative report.  And this did not include the apparent substantial undercounting of the DOC's large diabetic population. PFOF, p. 42.  The analysis ultimately performed by Dr. Zax was based completely and apparently unquestioningly upon Mr. Engstrom's report.  PFOF, pp. 41-42; Ex. 675, p. 9.

With an undisputed error rate (based upon the DOC's own ultimate disability determinations) in the underlying classifications of at least 35%, it is more than a stretch to ask this Court to place any value upon analyses based upon that data.  In the end, neither the DOC nor its experts (nor the Plaintiffs or their experts for that matter) have any way of knowing what levels or patterns of discrimination may exist system-wide or on a facility-specific basis with regard to job and program assignments based upon this kind of data and reporting.  Nor is there any way the AIC could effectively have met her responsibilities to assure that inmate assignments were nondiscriminatory in practice.

**XIV.  Everyday Living Assistance**  (*See* PFOF, Core Purpose Four, pp. 92-97.)

In its Finding's, Defendants assert that because it was impossible to find inmates who were qualified under the RP's criteria for inmate aides, they decided to implement new criteria which was less stringent, DFOF, p. 110, allowing inmates to serve as OCAs as long as they did not have a COPD (Code of Penal Discipline) conviction for the two

29

year period prior to hiring.  As stated in Plaintiffs' findings, even assuming this new

criteria would have been acceptable to Plaintiffs, the evidence showed that DOC did not

follow this new criteria.[3]  Instead, there was a pattern of placing inmates with COPD

convictions within a two-year period of time in OCA jobs as of the compliance date.

2519:8-12, 2520:4-7.  *See* PFOF, pp. 93-94.

It is also concerning that Defendants decided to unilaterally change the OCA

eligibility requirements, without seeking Plaintiffs' or this Court's approval.  The inmate

aides have a very important and sensitive responsibility to ensure that the inmates with

the most severe disabilities—and thus the most vulnerable class members—are properly

assisted in their daily life activities of eating, hygiene and bathroom needs, mobility, and

communication with staff, other inmates, class counsel, and this Court.  Given the

extremely important and sensitive nature of the work of the OCAs, Defendants failure to

ensure proper selection of these inmates is a critical failure in achieving substantial

compliance.

**XV.   Training**  (*See* PFOF, Core Purpose Five, Material Criterion Three, p. 149.)

Defendants assert that they are in compliance with the training requirements of the

RP (Section XV).  The record shows otherwise.

---

[3] This criteria would not have been agreed to by class counsel because it does not provide any protection against known sexual predators from serving as OCAs.  If an inmate has a conviction of sexual assault by a person in a position of trust, the mere fact that the person may not have any COPD convictions in a two-year period should not automatically make that personal qualified to perform OCA duties, expecially for the most vulnerable inmates with severe disabilities.

Defendants note that the training "Fundamentals of Diabetes" has performance objectives that include "identifying signs of symptoms of hypo and hypergycemic [sic] and ketoacidosis." DFOF, p. 117. But Amber Autobee, who "oversees all of the ADA training" for DOC, testified that she did not know what ketoacidosis is. 2836:4-5. That fact illustrates a problem with DOC's training, namely, that the training is handled in a rote fashion by DOC personnel that lack the knowledge necessary to properly train other DOC personnel.

As part of the RP, diabetic training was to be developed by Linda Edwards in cooperation with DOC medical staff. RP, § XV(B). While Ms. Edwards did develop the training initially, DOC changed her training curriculum to remove the requirement that there be some form of verification that the staff taking the training actually understood the information and were performing in compliance with the training. 1892:5 - 1893:1. In 2006, Ms. Edwards did not believe the diabetic training being provided was sufficient. 1894:18 - 1895:14. In late 2006 she worked with Dr. Shames and Debra Foster to develop the team management of diabetes training. 1895:15 - 1896:8. Her last contact with them was in March or April of 2007. 1896:14 - 1897:3. Since that time, DOC has essentially excluded Ms. Edwards from its diabetes training efforts, despite the mandate of the RP.

The *Montez* refresher training is an annual one-hour refresher course included in an 8 or 16-hour training class. 3813:10-18. All staff have to do to successfully complete

that training is to pass a 10-question multiple choice test with a 70% score.  3814:25 - 3815:11; 3851:11-25.  Despite that lax requirement, the record does not indicate that personnel at the private facilities have passed such training.  Defendants assert that the database from the private facilities documented "the test taken, the name, the facility, the date the test was administered, and scores."  DFOF, p. 120.  But as Defendants' witness Travis Brubaker testified, the evidence on training in the private facilities failed to demonstrate whether all personnel in those facilities passed the test or even took the training.  3936:12-3938:7.

Diabetic education for the inmates is also inadequate.  Sherrie Wallick is the diabetic educator for all DOC facilities.  DFOF, p. 123.  She provides diabetic education to inmates but conceded that in order to do a thorough training, more than the one hour of time allotted for the is needed.  3891:14-20.

Thus, the record demonstrates that while DOC has engaged in training, it has failed to ensure that its training personnel are qualified to give the training, that the training is accurate or adequate, and that the training is effective.  *See* PFOF, p. 173-78 (addressing Material Criterion Three of Core Purpose Five of the RP).  DOC therefore has failed to comply with the training obligations of Section XV of the RP.

**XVI.   Health Care Appliances**  (*See* PFOF, Core Purpose Four, pp. 83-92.)

Despite the adoption of procedures and protocols as recited by the Defendants, the provision and maintenance of DME fell consistently short in practice of the requirements of Section XVI of the RP.

Pursuant to Section XVI(D), health care appliances deemed necessary for an inmate shall be ordered within 7 working days.  The DOC consistently experienced delays running as long as 4 to 8 months.  PFOF, p. 83; Appx. 7.  Pursuant to the 2008 Stipulation, DME and auxiliary aids were to be repaired within 60 days—a deadline rarely complied with and sometimes, *e.g*., with prosthetics, simply ignored.  PFOF, pp. 83-84.  The DOC's third party insurance administrator (PHP) denied DME requests as a standard policy for any inmates within 6 months of discharge or approved parole.  PFOF, p. 85; 3095:20-23; 381:8 – 382:18.  Consults with outside providers and specialists were not consistently coordinated and monitored.  PFOF, pp. 85-86; 4710:13-15; 4709:24 – 4710:6; 4713:19 – 4714:5.  Notwithstanding the requirement in No. 28 of the 2008 Stipulation providing for appointment of an officer to coordinate, administer, and oversee the scheduling of repairs and replacements of assistive devices, the persons variously assigned that responsibility did not report on a regular basis to either the Director of Clinical Services or the AIC, making it impossible for either to track compliance with the RP's and Stipulation's deadlines.  PFOF, pp. 86-87; 2565:5-20; 3094:2-24; 2567:4-20.

Section XVI(C) of the RP requires health care appliances to be documented as property of an inmate or the DOC.  The AIC was unable to monitor compliance with this requirement due, in significant part, to a lack of communication from Clinical Services regarding which inmates had been issued what assistive devices.  PFOF, p. 88; 665:1-3; 671:3-9.  The AIC was not included in the "DME Sweeps" at each designated facility, nor was the AIC provided reports from each facility that conducted such an inventory sweep.  PFOF, pp. 89-90; 660:12-21; 661:1-6.

Notwithstanding Section XVI(C) of the RP and DOC policies to the contrary, DOC custody staff would remove DME from inmates without the involvement of medical or clinical personnel, particularly upon transfer of an inmate to a new facility, during transport, and upon placement in administrative segregation.  PFOF, pp. 90-91.  These removals were not always reported to the office of the AIC, which would learn about the removal for the first time in the context of a grievance.  PFOF, pp. 91-92; 673:4-11.  Nor did Clinical Services track the removal of DME.  PFOF, p. 92; 691:15-22; 692:2-5; Ex. 287.  As in other areas discussed in this Response, the people principally responsible for ensuring compliance with the requirements of the RP (primarily the AIC) were not provided the information and tools necessary to carry out this responsibility, despite their best efforts, and despite the proliferation of written policies addressing those requirements.

**XVII. Library Equipment**

*No rebuttal necessary.*

**XVIII.  Institution Procedures**  (*See* PFOF, Core Purpose Six, pp. 189-190.)

Section XVIII(A) of the RP requires the DOC to provide inmates with disabilities arriving at a new facility relevant information regarding accommodations, assistive devices, the availability of the AIC for assistance with programs, services, and benefits, and the ADA grievance process.  The Defendants go to some length at pp. 137–142 of their proposed findings to describe the efforts at one particular facility (Colorado Territorial Correctional Facility) to meet these requirements.  Yet, the AIC conceded that not all facilities were in compliance as of the deadline of May 1, 2009.  863:15 – 864:4. The AIC further concluded that information about the role of the AIC, and the ADA grievance process, was not uniformly presented in all facility orientation packets, nor was there evidence that inmates who required orientation packets in accessible formats were provided such materials.  PFOF, p. 190; 864:5-20.  The AIC's own conclusions are supported by the enumeration of deficiencies in orientation materials contained in Appx. 12 to PFOF.

Section XVIII(B) of the RP requires the DOC to ensure effective communication with inmates with disabilities regarding public address announcements and reporting instructions.  In the opinion of the AIC, the DOC's public address announcements are "garbled and bad."  PFOF, p. 108; 885:13-21.  In general, facilities were not complying with the requirement to "identif[y] a position" that will be responsible (and accountable)

35

for effective communication with disabled inmates.  PFOF, p. 109: 876:2-8; 877:8-10.

Some facilities had no policies that required staff or case managers to assist hearing

disabled inmates.  PFOF, p. 109; 420:20 – 421:21; Ex. 487.  Colorado Territorial

Correctional Facility and Sterling Correctional Facility improperly limited the types of

announcements for which hearing impaired inmates would be informed (*e.g.*,

extraordinary circumstances and emergencies).  PFOF, pp. 110-11.  The AIC agreed that

these policies were improper.  PFOF, p. 111; 888:21 – 889:1.  Again, the AIC was not

provided the support necessary to enable her to assure and enforce compliance with the

RP.

### XIX.    Special Identification

In this section of Defendants' brief, Defendants state that "there there are several

different places that staff at facilities can look at to determine whether or not an inmate is

disabled," DFOF, p. 133—and therein lies the problem.  As explained in PFOF, p.335-38,

there were numerous, material inconsistencies between these different sources of

information that resulted in inmate with disabilities being misidentified.  It is notable that

Defendants did not attempt to address the problems created by the inconsistencies of the

numerous sources of information provided to DOC staff.  Cell rosters (aka "bed rosters"),

in particular, did not contain the same information on disabilities and accommodations as

the AIC database. 746:10-23.  Ms. Holst testified to a pattern, especially at Ft. Lyon, of

the bed rosters misidentifying individuals with disabilities. 2407:9-13. Yet the bed rosters

were the most convenient place for an employee in the unit to identify an individual with a disability. 2407:21-2408:8.  Ms. Holst had no access to the separate databases kept by the ADA coordinators at the various facilities and no way to check their accuracy, 746:24-747:5, and no audits were conducted to remedy the discrepancies between the various databases at DOC. 3332:21-3335:21.

The requirement that the AIC be able to track inmates with disabilities, and that DOC staff be able to identify inmates with disabilities and their accommodations, is so important to the the RP that it is addressed in two places in PFOF:  Core Purpose One under Material Criteria Three, and Core Purpose Two under  Material Criteria Two. These sections chronicle the problems with the various, conflicting databases operated by DOC, and the resulting inconsistent information that is provided to DOC staff.  The failure of DOC to develop a comprehensive, system-wide database to track and identify inmates with disabilities is emblematic of the overall failure of DOC to coordinate a consistent, effective approach to implement the RP.

## XX.     Evacuation / Emergency Procedures  (*See* PFOF, Core Purpose Five, p. 182.)

Defendants note that Plaintiffs' primary concern with the evacuation and emergency procedures necessary to ensure the safety of inmates with disabilities focuses on Fort Lyon Correctional Facility.  That focus, however, is a critical one – addressing a very serious and very real danger that existed on the compliance deadline (and continues to exist at the present time despite public announcements that Fort Lyon will be closed).

Fort Lyon, located 95 miles east of Pueblo and 25 miles west of the nearest non-volunteer fire department, was assigned the mission of housing a particularly large concentration of geriatric, chronically ill, and physically disabled (including wheelchair bound) inmates.  PFOF, p. 182: 2678:8 – 2679:5; 2679:10-16.  Many of those inmates, including the occupants of the facility's Special Medical Needs Unit (SMNU) and administrative segregation (adseg) unit, have been housed on the second and third floors of Cell House 5.  PFOF, p. 182; 2681:6-19; 2694:15-18; 2685:7-12; 2680:10-23.  Cell House 5 is serviced by two elevators with backup generators.  PFOF, p. 183; 2685:13-17; 2686:18-23.

On August 19, 2009, both of Cell House 5's elevators were rendered inoperable (one had been inoperable for three weeks).  PFOF, p. 183; 2695:16 – 2696:6; 2688:25 – 2691:10.  In an effort to get assistance in accessing a locked restroom, an inmate pulled a fire alarm, triggering an unplanned, non-simulated evacuation of the building.  PFOF, p. 183: 2696:13-21.  Without the use of either elevator—albeit with the involvement of a full contingent of highly trained and proficient responders, and under conditions not involving real smoke or fire—it took approximately 30 minutes to evacuate the building.  PFOF, p. 184; 2693:20-22.  The evacuation was documented and recorded on video (which was shown to the Court) and is described at pp. 183-85 of PFOF.  The Life Safety Officer at Fort Lyon at that time agreed that losing access to both elevators was "a very

real possibility," and that 30 minutes could be "a significant period of time" to complete an evacuation, depending upon the nature of the emergency.  PFOF, p. 184; 2712:13-19.

What happened at Fort Lyon is not a critique of the DOC's general evacuation procedures and preparedness.  It is, however, a warning of the presence of an extremely dangerous situation which the DOC allowed to exist, and in which it placed its most severely disabled and physically dependent inmates, up to and beyond the compliance date of May 1, 2009.  It is a dangerous condition not remedied by otherwise well formulated evacuation procedures.  No amount of training and skill on the part of responders can compensate for the creation of such a housing condition.  And the existence of such a condition cannot be consistent with substantial compliance with the terms and intent of the RP and the safety of the most dependent and vulnerable inmates in the custody of the DOC.

**XXI.    Count**

*No rebuttal necessary.*

**XXII.   Restraints**

*No rebuttal necessary.*

**XXIII.  Searches**

*No rebuttal necessary.*

**XXIV.  Transportation**  (*See* PFOF, Core Purpose Four, pp. 116-118.)

The Defendants' Findings with regard to Transportation ignore the evidence presented during the cross-examination Matt Winden and the testimony of Cathie Holst.

*See* PFOF, pp. 116-118.  Instead, DOC again focuses on the general presentation of basic structural issues, regardless of whether they are used properly to comply with the RP. For example, DOC did present evidence that they have handicapped vans, though their mere existence is not indicative of compliance.  DOC conceded to episodes where IWDs were injured as a result of failure to use the vans and equipment properly to protect IWDs during transport.  The evidence also showed there is no requirement that the transportation unit contact the office of the AIC if an incident occurs while transporting a disabled inmate.  3686:7-10. Furthermore, the Transportation regulations do not address considerations of transporting inmates with disabilities.  *See* 2454:5 – 2461:21, Exs. 314 and 678 (wheelchair bound inmate fell out of wheelchair during transport and fractured hip.  Transportation Unit policy is that no offenders are seat belted during transport.)  It proved problematic, as indicated by the AIC who testified that the problem of losing DME or medical accommodations during transport was a consistent problem beyond the end of the compliance period.  825: 11-18.

## XXV.   Visiting

*See Response to 2008 Stipulation #25, p. 52.*

## XXVI.   Health Care Status Determination

This primary purpose of this section of the RP was to ensure that inmates with disabilities were not automatically labeled as "unassigned," and thus precluded from access to jobs and programs, and denied benefits at DOC because of a disability. Requiring the AIC to be involved with any such designation ensured that the proper

attempts at accommodation occurred prior to an inmate being labeled as "unassigned" and suffered the loss of rights typically associated with such a designation.  In its brief, Defendants state that a new code, "ADA unassigned," was enacted in January of 2009 to alleviate this problem and ensure the proper consultation with the AIC.  DFOF, p. 154. Although Plaintiffs did not specifically list this section of the RP as a material criteria of any Core Purpose, we address this issue as it is another example of where a policy was enacted, but not followed in practice.

According to the testimony of Dr. Frantz, DOC decided to eliminate the "medically unassigned" designation and, "before an offender could be designated as unassigned for either a clinical condition or disability, that the office of the AIC would have to make every attempt to try to accommodate the offender in the workplace." 4330:20-25.  Dr. Frantz testified that  she educated the providers that "we were going to be getting rid of that restriction, and to review their offenders that they had on that restriction.  There were not a large number, but there were a few, and that if they felt there was something compelling that this offender really should not be able to work, they should contact either me of the office of the AIC.  To my knowledge, nobody ever came forward.  None of the providers identified anybody they felt really truly could not be accommodated."  4331:1-9.  Although Dr. Frantz testified that the "medically unassigned code was deactivated in January of 2009, 4331:24-25,  Ms. Shoemaker testified that this code was eliminated one year before the June 26, 2009 report, so in the summer of 2008.

2865:5-1.  Despite this testimony, Ex. M-7 (also Ex. 318) shows that as of June 26, 2009, 79 inmates were still listed as "medically unassigned," and seven of these individuals were given this designation after the code was allegedly inactive in January of 2009, as testified to by Dr. Frantz.  Ex. M-7; 4331:22-25.  Ms. Shoemaker explained that she was surprised that there were still so many inmates on the medically unassigned list and explained that the providers had found a "backdoor" method of continuing to make this designation.  2864:19-2865:17.

When questioned about her office's involvement with the "medically unassigned" or "ADA unassigned" designations, Ms. Holst testified that clinical services was not regularly contacting her office to consult prior to making a "medically unassigned" designation, 930:8-13, and had no memory of her office having any contact with clinical services regarding the seven individuals given the "ADA unassigned" designation between January and June, 2009. 920:17-921:17.  The AIC had no idea whether those inmates were reclassified  and no recollection that her office was ever informed of any reclassifications of those inmates.  921:9-922:3.

Of note is the fact that Defendants failed to submit any documentary evidence showing that the new "ADA unassigned" designation was given to *any* disabled inmate prior to the end of the compliance period on May 1, 2009.

## XXVII.   Removal of Health Care Appliances in ASU/PSU Disciplinary Detention Units

*No rebuttal necessary.*

42

### XXVIII.  Parole Hearings Accommodation Plan

*No rebuttal necessary.*

### XXIX.  Community Correctional Facilities

*See PFOF, Core Purpose Five.*

### XXX.    Parole Field Operations

*No rebuttal necessary.*

### XXXI - XXXIV: Compliance and Monitoring Periods, Damages, Attorneys' Fees and Costs, and Misc. Provisions

The Court determined that the "Damages" section is not part of the determination of "substantial compliance" with the Remedial Plan, 1669:13-1670:6 and Plaintiffs submit that these other sections are also not relevant to the "substantial compliance" determination.

## 2008 STIPULATIONS

### #2 – Hearing Aid Batteries

2008 Stip. # 2 required that DOC provide long-lasting batteries for hearing aids, that such batteries would be kept in stock, and that DOC would identify upon intake the type of batteries an inmate needed.  Obviously, one of the intents underlying this stipulation was to ensure that inmates with hearing aids would not be prevented from using these assistive devices because of the inability to obtain new batteries.  This stipulation was not specifically addressed in the PFOF, but would fall generally under Core Purpose Four, Material Criteria Four.  The problems with the removal of hearing aid

batteries from the inmates during transports were discussed under Core Purpose Four, Material Criteria One and Four. PFOF, pps. 90-91 and 117-118, respectively. We address this stipulation as it was raised by the Defendants and it again shows that although a policy may have been created to cure the deficiency, additional staff training is needed to effectively implement the policy.

In its brief, DOC states that it did obtain long-lasting batteries, the "zinc air" batteries, and that it dispenses these batteries through its med-lines. The main problem identified by Plaintiffs at the compliance hearing was that inmates were being refused new batteries until their current batteries registered completely "dead" on DOC's battery testing devices. As explained by Larissa McClung, Plaintiffs' expert on hearing issues, she met with numerous inmates at various facilities and reviewed reports on this issue. Inmates at all the facilities she visited consistently reported that DOC does not replace any hearing aid battery until it is completely dead, and if the inmate brings it in sooner, the old battery is returned to the inmate and a new one refused. 2108:4-18, 2290:12-19. As a result of a low battery, the hearing aids begin to emit an annoying beep indicating it was time to replace the battery. When the battery gets low, the aid loses a lot of function. 2108:19 - 2109:9. There was also testimony from Inmate John Mosier who wears two hearing aids and is housed at FLCF. 1187:11-12; 1189:11-12. Mr. Mosier testified that "at least a dozen times" he tried to get hearing aid batteries and was refused a battery because the old one had a little power left in it. 1195:3-7. He explained that a battery

would not have enough energy to turn on his hearing aid, but because it did not register completely "dead," he would not be issued a new battery.  1198:22-25.  When DOC refused to replace one hearing aid battery but replaced the other, the hearing aid with the weak battery would not turn on, so he could only hear from one side.  1195:1-2.

Ms. McClung also testified that Ft. Lyons had "run out of batteries" for hearing aids and inmates had to go to a particular staff member to get batteries, but could not get them from med-line.  McClung testified that the purchasing and dispensing logs of hearing aid batteries from Ft. Lyon supported what the inmates had reported.  With the exception of one inmate, very few hearing aid batteries were dispensed at Ft. Lyon. 2109:11 - 2111:7; Exs. 485, 486.  She testified that she met with about 20 inmates with hearing disabilities and that about 90% of those inmates had hearing aids. 2111:8-21.

**#3 – Disability Screening Criteria.**  (*See* PFOF, Core Purpose Two, p. 54-58.)

At the end of the compliance period, final disability determinations had not been made completed for about 94% of the potential mobility disabled class, over one half of the potential vision disabled class, and no inmates had been screened under the new hearing disability criteria.  *See* PFOF, pp. 55-57.  During the discovery in this case, Defendants refused to provide Plaintiffs with any documents that were created after the May 1, 2009 compliance deadline on the stated grounds that such documents were not relevant to the compliance hearing.  Thus, when Defendants attempted to introduce such evidence at the hearing, class counsel objected and the court sustained that objection.  See

1403:6-1404:3; 1412:23-24.  Accordingly, although Defendants offered testimony as to what the policy was with respect to the new screening process, there was no documentary evidence submitted to support that these policies were actually followed because the final disability determinations resulting from those screenings had not been made by the end of the compliance period.  As a result, neither DOC, the inmates, nor class counsel knew who comprised the disability class by the end of the compliance period.[4]

Defendants assert, however, that there is nothing wrong with DOC's failure to complete the identification process because screening is a continuing process and there is no particular mandate that it be completed by the end of the compliance period.  While it is certainly correct that screenings occur on a continuing basis as new inmates arrive and inmates over time may develop disabilities, the failure of DOC to have made any substantial determination by the end of the compliance period of which inmates must be accorded the rights enumerated by the RP is a fundamental failure and mandates a finding of substantial non-compliance.  The basic tenet of the RP is that DOC must identify the inmates with disabilities in order that it can ensure those inmates are not subject to disability based discrimination.  Without that first step of identification, class counsel and this Court have no means by which to ensure that appropriate disability determinations

---

[4] Class members do not obtain the rights under the RP until they receive a disability determination.  For instance, the inmate who fell out of his wheelchair during transport because he was not properly secured filed an ADA grievance about the issue.  His grievance was denied because he had not yet received his AR finding him mobility disabled—despite the fact that he was in a wheelchair.  2454:5 – 2461:9.  Inmates without disability determinations will not get accommodations.  For example, an inmate who was in a wheelchair, had leg braces and a cane, and a doctor had determined him to have a mobility disability, was denied any mobility accommodations because there had been no final determination of his disability status.  This determination was made despite knowledge by the AIC's office that the inmate had cerebral palsy and open wounds on his feet from diabetes.  140:1 – 141:1.

have been made, that those individuals have been appropriately accommodated, provided

jobs and other programs and services without regard to disability, and that the orders of

the Special Masters have been followed.

**#4 – Compliance with Special Master's Orders** (*See* PFOF, Core Purpose One, p. 27-29, and Core Purpose Four, pp. 80-92.)

In Defendants' brief, they state that 2008 Stip. # 4 "mandated that CDOC adhere

to and implement any Court Order or Special Master's Order determining the disability

classification of a class member . . ."—leaving out the part of the express wording of the

mandate that they must do so *immediately*. *See* 2008 Stip. # 4. (CDOC will immediately

adhere to and implement any Court Order or Special Master's order . . .). The evidence

was overwhelming that many of the disability determinations by the Special Masters

were not implemented until almost one year after entry of the Stipulation. PFOF, p. 28.

The record is replete with numerous instances of long delays in compliance, or no

compliance at all. For instance, it took the AIC's office a year after the 2008 Stipulation,

until April 29, 2009, to comply with a Special Master's Order that changed Mr.

Christensen's status from mobility-disabled to not disabled. 253:19 - 255:18; Ex. 143.

Another inmate, Mr. Mount, never received the mobility disability status that the Special

Master ordered, because DOC did not agree that he was mobility impaired, and he was

never rescreened. 255:19 - 258:12; Ex. 330.

In the case of Mr. Alvarez-Benavidez, DOC took over two years after the Special

Master's Orders were issued, and over a year after the 2008 Stipulation was entered, to

prepare an AR form consistent with the Special Master's Orders.  258:13 - 259:16; Ex. 353.  Even as recently as September of 2009, a Special Master Order regarding Mr. Fistell was completely ignored by the DOC, and an AR issued stating he was not in the mobility disabled class.  260:2 - 261:6; Ex. 354.  Some nine months after the Special Master ordered that special shoes must be provided to Mr. Kelly in July of 2007, the shoes had finally been ordered, but his AR was not changed to reflect the need for special shoes.  261:7 - 263:1; Ex. 355.  Numerous additional examples of long delays and failure to comply with Special Master's Orders were presented at trial.  *See*, *e.g.*, 274-277 (Mr. Ates) (DOC failed to revise his AR for ten months after the Special Master ruling finding him mobility disabled, and other Special Master issues still not accommodated by April 2009); 278-284 (Mr. Bald Eagle) (Special Master determination in 2006 of mobility disabled and accommodations needed was still not complied with months after the 2008 Stipulation); 285-287 (Mr. Collie) (damages awarded by Special Master for failure to supply special shoes, but by October 2008 DOC finds special shoes "medically unnecessary"); 287-289 (Mr. Hawkins) (tennis shoes ordered by Special Master in December 2006 not part of AR until after the compliance date in 2009).

Defendants also misrepresent the evidence in this case when they assert in their brief that, "[a]fter the 2008 Stipulation, if an offender received an order for money as a result of not having an item, but not an order for a particular item, CDOC gave the offender the item."  DFOF, p. 170.  This issue was discussed in Core Purpose Four,

Material Criteria One of PFOF, p. 81-83.  The AIC issued a report on this matter and testified that, upon advice of counsel, she did not revise AR forms to include accommodations ordered by the Special Master.  250:21 - 251:6; Exs. 349, 350.  Despite this Court's clear instructions that accommodations were to be provided based on ADA criteria and not medical criteria, the AIC reported that, as of April 2009, unless the Chief Medical Officer determined that an assistive device or accommodation was necessary, it was not provided to the inmate, regardless of whether the Special Master had issued an order determining that the accommodation was required under the ADA, 247:24 - 248:4; 251:7 - 252:8; Exs. 349, 350.  The AIC reported that as of April 2009, her office would have to review 204 Special Master's Orders to determine if the ARs followed the Special Master's Orders in providing the assistive devices, and her office could not begin that project until after the end of the compliance period.  Exs. 349, 350.

In March 2008, this Court warned DOC that the failure to comply with the Special Master's orders would not be tolerated and the failure to implement those orders would be met with severe sanctions.  PFOF, Appx. 3, 135:6-10.  Despite those warning, throughout the majority of the compliance period, and even thereafter, DOC continued to ignore many of the Special Master's disability determinations and the ADA accommodations that were required by the Special Masters and this Court to be provided.

**#8 – Annual Employee Training**

Training of DOC employees, and the examples of the ineffectiveness of that training, is discussed in a number of areas in the PFOF.  *For example, see* Core Purpose

49

Four, pp. 86-92, and 116-118; Core Purpose Five, pp. 173-178.  The lack of effective

training is most evident in the overall lack of communication between clinical services

and the AIC, as discussed in Core Purpose One, pp. 45-48.  *See also* Section XV, p. 30

herein.

**#9 – Auxiliary Aid Repairs completed within 60 Days**  (*See* PFOF, Core Purpose Four,
pp. 83-84, and this Response, p. 33.)

**#11 – TTY Machines Installed**  (*See* PFOF, Core Purpose Four, pp. 112-116.)

**#12 – Bathroom Breaks**  (*See* PFOF, Core Purpose One, p. 33.)

Despite Stip. #12, policy at the facilities remain that if an inmate needs to use the

restroom at any time, other than regularly scheduled breaks, the visit will be terminated.

430:7 – 435:14, Ex. 179.  Rather than attempt to help individuals with diabetes, the standard

protocol is that they will receive a diaper, but only if clinical services has determined it is

necessary.  433:8 – 441:10.

In the March 2008 hearings regarding the sanctions that would be entered against

the DOC for its non-compliance, there was discussion about the accommodation of

allowing inmates with diabetes additional bathroom breaks.  At the time, this Court

suggested that providing diapers was one possible means to accommodate such

individuals if there was not sufficient staff to allow such breaks.  *See* Appx. 14,

Transcript of March 2008 hearing, pp. 108-112, 121-122.  This Court also stated,

however, that when staff can accommodate an additional break, they should do so.  *Id*. at

110:19 - 111:1024.  The Court stated that with respect to providing the diapers, "[i]f they

want to stay, and there isn't anything else to do, that shouldn't be the first thing to do, it shouldn't be the first choice, but it is certainly something that can be done without violating the order." *Id*. at 122:18-22.

Rather than adopt a policy that allowed the staffing and security issues at the individual facilities to be taken into account to determine whether additional breaks could be allowed, DOC adopted an across-the-board policy that no additional bathroom breaks would be allowed, and the diapers would be issued to anyone that clinical services determined needed such a break. Such policy is not in keeping with the Stipulation nor with the spirit of the Court's order.

## #13 – Diabetic Kit Training

*No Rebuttal Necessary.*

## #14 – Cells with Call Buttons for Inmates with History of Hypoglycemia  (*See* PFOF, Core Purpose Four, pp. 104-107, Core Purpose Five, pp. 150-151.)

## #15 – Dog Program Accessible to ADA Inmates  (*See* PFOF, Core Purpose Five, pp. 136-139.)

## #16 – Hearing Criteria

Because the criteria for determining a hearing disability was not determined by this Court until after the end of the relevant compliance period, Plaintiffs received no discovery on this issue. Other than testimony on the general policy statement, Defendants submitted no evidence on whether the criterion determined by the Court was actually implemented.

**#19 – SOTMP Phase II at a Designated Facility**  (*See* PFOF, Core Purpose Five, Material Criterion 6, pp. 186-188.)

DOC concedes that the Phase II group at CTCF began after the deadline required by Stip. # 19.  With respect to scheduling SOTMP at a designated facility, it seems to suggest that compliance was achieved despite missing the compliance deadline.  Their argument appears to be that because scheduling SOTMP at a designated facility took only 30 days longer than allowed by the Stipulation (because "a little bit more needs to be done with phase II group, rather than phase I"), they are compliant.  DFOF, pp. 194-195.

DOC focuses on the Parole Requirement for two pages of their Findings, but then summarizes by stating the parole requirements were irrelevant as it relates to Stip. # 19.  DFOF, p. 198.  The bottom line is that DOC failed to track the access to SOTMP Phase II for IWDs, despite the implementation of Stip. # 19.  It is another example of the failure of the AIC and clinical services to communicate the Montez requirements of the RP and Stipulations to those employees within DOC not otherwise involved in the litigation.  Peggy Heil was not instructed to track accessibility, nor did she ever generate a basic report to determine how many IWDs were sex offenders.  Again, DOC could not know whether they were in compliance with the stipulation if the director of the SOTMP program could not identify who the relevant offenders were that needed access.

**#21 – Standardized Job Procedures**  (*See* PFOF, Core Purpose Five, pp. 140-148, and this Response, pp. 3-4, 23-26.)

**#25 – 8 Accommodations for Diabetics**.  (*See* PFOF, Core Purpose Four, Material Criterion Three, p. 98, and Core Purpose Five, Material Criterion Three, p. 149.)

This stipulation required that all inmates with diabetes be provided revised ARs to include eight standard accommodations, including such accommodations as access to finger-sticks upon request, the timing of meals with insulin, and access to call buttons if an inmate was hypoglycemic.  Astonishingly, Defendants claim that "[t]he AIC's office complied with [the 2008 Stip. # 25]  within a few months of its filing with the Court," and then claimed that "all diabetics already had their Accommodations Resolutions with the eight (8) agreed upon accommodations at least as of November 2008, well before the compliance cut-off date."   DFOF, p. 205.  The record clearly shows otherwise.  Ex. M-8, a database that Ms. Holst created to track the when the mandatory changes were made to the diabetic ARs, 1729:1-7, shows that the vast majority of the diabetic ARs were not revised and sent to the inmates and facilities until 2009.  In fact, only 16 of the 497 ARs that needed to be revised were completed by November 2008, seven months after the stipulation entered, and over 81% were not completed until 2009, with the vast majority of those being completed in April 2009—one year after the entry of the Stipulation.[5] Ms. Holst testified that the revised ARs were not sent to the inmates if an inmate was being screened for another disability, so the ARs would only have to be revised once and

_____

[5] Ex. M-8 shows the following number of revised diabetic ARs completed in the following months to conform to the 2008 stipulation:  October 2008 – 13; November 2008 – 3; December 2008- 75; January 2009 – 94; February 2009 – 98; March 2009 – 32; April 2009 - 181.  Thus, over 36% of the revised diabetic ARs were not completed until one year after the Stipulation entered.

because of that, "there were some individuals who didn't get the new language on there as soon as it should have been done."  1731:10 - 1731:4.

The evidence was also that the inmates with diabetics coming through the intake process at DRDC were not getting the required eight accommodations listed on their ARs, and that 99% of the time the temporary ARs were incorrect, that the mistakes were voluminous, and occurred daily.  103:20 - 104:14; Ex. 422.  Also, as detailed in PFOF, the evidence is that a large number of diabetics have not been properly identified by DOC—and thus have never received an AR.  PFOF, p. 58-61.

Although it is not particularly relevant to this stipulation, Defendants also assert that only 38% of the diabetic inmates were non-compliant with their ordered finger-sticks, DFOF, p. 206—apparently suggesting that DOC's failures in the management of diabetes are attributable to the inmates.  However, Dr. Frantz admitted that DOC made no effort to track the reasons why inmates did not appear for ordered finger-sticks. Plaintiff's diabetic expert, Linda Edwards, testified that there may be many legitimate reasons why individuals did not show up for ordered finger-sticks.  1964:16 - 1965:10. Even Renae Jordan, DOC's Quality Improvement Administrator, admitted that inmates may miss finger-sticks for reasons beyond their control, such as not being at the facility, 4277:16-25.

In addition, the instructions for the 2009 audit which gathered this data only asked the auditors to answer the question:  "Has the patient missed more than 50% of the

finger-sticks as ordered?"—without limiting the question to the last six-month period as required to obtain valid data.  Ex. 727, p. 6.[6]  The 2009 audit did not inquire as to reasons underlying the failure to appear to finger stick testing.  See Ex. 727.  Similarly, although the 2009 audit also asked whether the patients had missed any diabetes related appointments, the question did not limit the inquiry to the last six months nor did it take into account whether the inmate had a justifiable reason for missing the appointment.  Ex. 727, p. 6; 4280:3-6.  What is also of note is two of the facilities, DCC and BCF, showed 100% non-compliance with finger-stick monitoring, and other facilities (LCF and BVCF) were also very high, close to 80% non-compliance.  Ex. O-5, p. 37.  On the other hand, there were some facilities where the inmates were almost 100% compliant with the ordered monitoring, such as CCCF, CCF, CWCF, SCC, and TCF.  *Id.*  Thus, it is at least questionable whether the issue of non-compliance is one that is really related to the inmates or whether it is a reflection on the clinical management at the facility itself.

Thus, while it may be true that prison population poses difficulties for the management of diabetes, that does not relieve the DOC from its obligation to present valid data if it is seeking to lay the fault on the inmates it labels as "non-compliant."

Ms. Edwards also testified that she was concerned that about one-half of the inmates with diabetes at Sterling, the facility that houses the largest number of inmates with diabetes, did not have current orders for finger-stick testing.  She testified that close

---

[6] The previous audit in May 2008 properly instructed the auditors only to record this data for the last six-month period.  Ex. 726, pp. 3-4.

to 100% of inmates with diabetes should have finger-stick orders, 1992:21 - 1993:18, which in fact occurs at several of the facilities.  *See* Ex. O-5, p. 36 (chart showing that nine of the DOC facilities do have active orders for finger-stick monitoring for 100% of the diabetic inmates at the facility).  Sterling, however, only shows that about 50% of its diabetic inmates have such orders.

DOC's also states that it has created special med-lines for inmates with diabetes to obtain their medication right before meal time, to comply with the accommodation of the timing of meals with insulin.  While it is true that such med-lines have been created, at some of the facilities these med-lines can be very long.  The problem arises when an inmate with diabetes has to wait in a lengthy med-line, and then stand in an equally lengthy meal line. As testified to by Ms. Edwards, some of the med-lines require waits of thirty to sixty minutes, and then a similar line for food.  If the inmate is on fast acting insulin, he needs to eat within 15 minutes of medication.  Other inmates reported problems with being sent back to their cellhouse before being allowed to eat and others being given very little time to eat before meal time is over and they are ordered to leave the dining area.  1920:21 - 1923:4.

## #26 – AICs Final Word and can Override the CMO or CDOC Employees

2008 Stip. # 26 was designed to ensure that the AIC would have the final determination with regard to the disability status and accommodations provided to inmates.  Plaintiffs addressed the lack of actual authority that was given to the AIC in Core Purpose One, Material Criteria Two, PFOF, p. 29-34.  Defendants, however, assert

that the AIC did have such authority and argue that Defendants' Ex. O-8 proves that the AIC overrode the decision of the Chief Medical Officer ("CMO") with respect to these determinations. This exhibit, however, contains so much inaccurate data it proves nothing.

The AIC testified that she did not create Ex. O-8, but rather someone named "Doogie" in the IT Section at DOC "[pulled] a report of all the times that [she] didn't agree with Dr. Frantz ." 1734:15-25. Ms. Holst admitted that she could not verify that the exhibit was accurate because she did not compare the information on the exhibit with the relevant AIC files. 1735:9-15. The information contained in the report was pulled from the DCIS database,[7] and not from the AIC database. The two databases do not relate or interact at all. 1756:11 - 1757:7.

Numerous instances of inaccuracies on Ex. O-8 were found by comparing it with inmates' actual AIC files. For instance, Ex. O-8 purports to list certain individuals as having been confirmed for a disability by the CMO, but which the AIC overrode and found no disability or the disability was "unconfirmed." Most of these entries on Ex. O-8 were incorrect. For instance, although Ex. O-8 states that the CMO determined that inmate Michael Cherry was "confirmed" as disabled, but was "unconfirmed" by the AIC, but Ms. Holst did not know what the term "unconfirmed" meant on Ex. O-8. 1760:15-19. In any event, Ms. Holst admitted that this information on the exhibit was wrong because

---

[7] Plaintiffs discussed the unreliability of the data on the DCIS database in PFOF, p. 36.

the CMO had never confirmed Mr. Cherry as disabled and the AIC had never made any determination with regard to his disability status.  1762:10-22.  Ex. O-8 shows that Mr. Espinoza was confirmed by the CMO as disabled and was "unconfirmed" by the AIC.  In fact, Mr. Espinoza's AIC worksheet showed that both the CMO and AIC confirmed him as disabled.  1762:23-1763:14.  Ex. O-8 was also inaccurate with respect to the entry regarding Mr. Mooney, because the evidence showed that both the CMO and the AIC determined that he did not have a disability on the date reported in the Exhibit.  1764:15 - 1765:21.  Similarly, Ms. Holst testified that the entries on Ex. O-8 for Mary Neff and William Rhoades were also inaccurate, as the AIC files for these individuals verified that there was no dispute between the AIC and the CMO regarding the disability determination.  1765:22 - 1767:25; 1768:1-23.

Ex. O-8 also purported to show that there were times when the CMO found that an inmate was not disabled, but that the AIC overrode this decision.  In fact, however, the vast majority of time when the AIC overrode the CMO's decision of not disabled, was when there was a Special Master's Order finding the inmate disabled.  1773:4 - 1775:12; *Compare* Ex. O-8 and Ex. 349, Special Master's Disability Determination.  Thus, these are examples of when the AIC was required to provide a disability determination—not when the AIC "disagreed" with, and thus override the decisionof, the CMO.

In its Findings, even the Defendants admit that it is the medical staff, not the AIC, that makes disability decisions:  "[t]he doctors decide . . . whether or not that particular

individual is disabled.  The finding is reviewed by the [CMO].  The CMO then contacts

the AIC about the decision and the AIC completes an [AR] form." DFOF, p. 27.  Given

that the AIC was never given actual authority by DOC to implement the RP, it is not

surprising that she did not truly have the authority to make the disability determinations.

**#28 – Clinical Services Position to Coordinate and Oversee Repairs and Replacements of DME**   (*See* PFOF, Core Purpose Four, pp. 83-86.)

## II. CONCLUSION

Although there have been gains made by the DOC, the evidence shows that there

continue to be significant areas in which it has fallen far short in achieving substantial

compliance with the RP.  Significantly, by the end of the last compliance period, almost

six years after entry of the decree, DOC had yet to ascertain the disability status of almost

two thirds of its potential class members, failed to provide the AIC with the proper

authority to implement key aspects of the RP, there continues to be a crippling lack of

communication between clinical services and the AIC which is essential to the proper

operation of the RP, and no coherent, system-wide computerized systems have been

developed to track inmates with disabilities and ensure that they are provided jobs,

benefits or other services without regard to disability.

Of particular concern is the fact that there has been a recent decision by the state

legislature to close the Ft. Lyon Correctional Facility, the DOC facility which houses a

large number of disabled, and severely-disabled inmates.  *See* SB11-214.  Given the

evidence produced at the compliance hearing that there was already a problem with the

lack of accessible housing during the compliance period, the closure of this facility will undoubtedly place increased strains to find such housing in the remaining facilities. Because this closure was only recently announced, no evidence of its effects were addressed during the compliance hearing, but it has ramifications concerning the proper placement of inmates with disabilities going forward in this case.

 In summary, the overall evidence does not support a finding of substantial compliance with the RP.

 Respectfully submitted this 22nd day of August, 2011.

<div style="margin-left:40%">

*/s/ Paula Greisen*
Paula Greisen
Jennifer W. Riddle
KING & GREISEN, LLP
1670 York Street
Denver, CO  80206
(303) 298-9878
Fax: (303) 298-9879
greisen@kinggreisen.com
riddle@kinggreisen.com

Edward T. Ramey
Heizer Paul Grueskin LLP
2401 15th Street, Suite 300
Denver, CO  80202
(303) 376-3712
eramey@hpgfirm.com

Blain D. Myhre
Blain Myhre LLC
P.O. Box 3600
Englewood, CO  80155
(303) 250-3932
blainmyhre@gmail.com

</div>

Lara E. Marks
Foster Graham Milstein & Calisher LLP
621 Seventeenth Street, 19th Floor
Denver, CO  80293
(303) 333-9810
lmarks@fostergraham.com

*Attorneys for Plaintiff Class*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 22nd day of August, 2011, I electronically filed the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS' FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** with the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Elizabeth H. McCann
James X. Quinn
Jacquelynn N. Rich Fredericks
Colorado Attorney General's Office
1525 Sherman Street
Denver, CO  80203
(303) 866-3261
Fax: (303) 866-5443
beth.mccann@state.co.us
james.quinn@state.co.us
jacquelynn.fredericks@state.co.us

*Attorneys for Defendants*

*/s/ Laurie A. Mool*
Paralegal, King & Greisen, LLP

61