IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92 N 00870 - JLK-OES

JESSE (JESUS) MONTEZ, *et. al.*

Plaintiffs,

v.

JOHN HICKENLOOPER, *et al.,*

Defendants.

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING STATUS OF COMPLIANCE WITH REMEDIAL PLAN AS OF MAY 1, 2009**

---

Defendants, through counsel, the Colorado Attorney General's office, hereby file their response to Plaintiffs' proposed findings of fact and conclusions of law.

## I.      Standard of Review

Plaintiffs agree with Defendants that the determination of substantial compliance with a consent decree is "whether Defendants frustrated the purpose of the consent decree - - *i.e.* its essential requirements." *Wolfe v. New Mexico Dept. of Human Services,* 69 F.3d 1081, 1086 (10th Cir. 1995). In *Wolfe* the Tenth Circuit considered the dissolution of a consent decree governing the New Mexico foster care system and whether the New Mexico Department of Human Services had substantially and continuously complied with the decree. The Court in *Wolfe* concluded that the "touchstone of the substantial compliance inquiry is whether Defendants frustrated the purpose of the consent decree--*i.e.* its essential requirements." *Wolfe* at 1086.

The Court in *Wolfe* referenced a quote from John D. Calmari & Joseph M. Perillo, *The Law of Contracts § 11-15, a*t 454 (3d ed. 1987) "("If a party has substantially performed, it

1

follows that any breach he may have committed is immaterial.")"  *Wolfe*, 69 F.3d at 1086

quoted in *Peckham v. Gem State Mut.*, 964 F.2d 1043, 1052 (10th Cir. 1992).  The Court also

quoted Judge Cardozo in *Jacob & Youngs Inc. v. Kent,* 230 N.Y. 239, 243, 129 N.E. 889, 891

(1921) in stating that the inquiry is whether any deviation from the contract requirements  "in

any real or substantial measure. . . frustrates[s] the purpose of the contract."  *Wolfe* at 1086.

In the present instance, the purpose of the contract is stated in the Remedial Plan, Exhibit A

[hereinafter RP] Section I. Policy: "It is the policy of the Colorado Department of Corrections to provide

inmates with disabilities, with or without reasonable accommodation, access to its programs and

services consistent with legitimate penological interests." The policy goes on to state: "No qualified

inmate with a disability . . . shall, because of that disability, be excluded from participation in or denied

the benefits of services, programs or activities of the DOC or be subjected to discrimination."

The focus of this Court's determination is whether the Colorado Department of

Corrections [DOC] is providing disabled inmates, with or without accommodations, the

opportunity to participate in services and programs consistent with legitimate penological

interests, rather than discriminating against them because of their disabilities and whether

actions of the DOC are frustrating the essential requirements of the Plan.  Incidents of failures

that pertain to specific inmates do not suffice to demonstrate a failure to achieve substantial

compliance, particularly since any such incidents fail to demonstrate that the Defendants

frustrated the purpose of the decree, *i.e.,* its essential requirements, in any real substantive

measure.  This Court itself in one of the pretrial conferences, Sept. 16, 2010, referenced the

standard established in *Wolfe*.

Instead of reviewing every individual particular circumstance in an effort to determine

the existence of substantial compliance, a court must look at the essential purposes of a consent

decree, as well as the specific steps set forth in that decree by which the purposes may be

satisfied.  The Tenth Circuit in *Wolfe* noted that "The phrase 'substantial compliance' is not susceptible of a mathematically precise definition." *Wolfe* at 1085. Put another way, the Courts recognize substantial compliance as a concept that can be satisfied in the absence of proof that every applicable criteria was met in a perfect manner, but rather on the basis of a broader and more systemic approach.

Further, in a case considering the compensability of post-decree monitoring, the Tenth Circuit noted, "The fruit of the Decree is the proper functioning [of enforcement mechanisms]." As in any large bureaucracy, violations of the standards will occur; but if the enforcement mechanisms function properly to prevent, detect, and remedy violations, the Decree is serving its purpose" citing footnote 7: " 'Proper' functioning does not mean 'perfect' functioning.  No system works perfectly.  Mistakes are inevitable and, inevitably, some individual cases of mistreatment will not be adequately redressed.  Occasional errors do not necessarily establish systemic failure or deprive the class of the fruits of the decree." *Johnson v. City of Tulsa*, 489 F.3d 1089, 1110 n.7 (10th Cir. 2007); *see also Wyatt v. Rogers*, 985 F. Supp. 1356, 1388 (M.D. Ala. 1997) (evidence that, over a period of time, there may have been isolated instances of patient abuse would not necessarily preclude a finding of good-faith full compliance with mental-illness standards within a consent decree).

In *Wyatt v. Rogers*, 985 F. Supp. 1356 (M.D. Ala. 1997), the Court considered termination of a consent decree regarding the conditions in the Alabama Mental Health and Mental Retardation System and residents' rights therein. The District Court observed that substantial compliance is something less than 100 percent compliance, stating that regarding decree requirements that are "complex and greatly subjective, and that require a substantial commitment of time and resources. . . I[i]t would be impractical, and thus unreasonable, to

3

expect 100% compliance 100% of the time." *Id* at 1388. The Court noted that evidence of isolated incidents over a period of time would not necessarily preclude a finding of good-faith full compliance.

The Court in *The Alabama Disabilities Advocacy Program v. Walley,* 475 F. Supp.2d. 1118 (M.D. Ala, 2007), referenced this quote from the *Wyatt* case, in considering termination of a consent decree regarding the state's child welfare system for emotionally disturbed or abused children. The Court did terminate the decree noting: "There admittedly are weaknesses in the system, as articulated herein. The court, however, finds that the present shortcomings are shortcomings which are inherent in any organization of this type and size." *Id.* at 1184. The Court then quoted from *Wyatt:* "[W]ithout question, close scrutiny of any state institution of the magnitude presented here will inevitably reveal numerous deficiencies." *Id.* at 1185. *See also Johnson*, 489 F.3d at 1110 n.7. The *Walley* court, in terminating the decree, noted that the class of children which the decree protected was no longer in danger of harm due to widespread constitutional deficiencies that once plagued the system, and that the decree had served its useful and critical purpose. There was no reason presented for the court to think that DHR would revert to its prior ways if court oversight ended. "In light of the evidence which the court finds equates systemwide substantial compliance, the court finds that retention of judicial control is not necessary or practical and that to accept Plaintiffs' invitation to further delay termination of this Consent Decree would be tantamount to inviting the proverbial elephant into the parlour." *Id.* at 1184.

The Eighth Circuit's rationale in *McDonald v. Carnahan,* 109 F.3d 1319, 1322-23 (8th Cir. 1997), is a further demonstration of judicial reluctance to interpret substantial compliance as requiring absolute compliance.  In *McDonald,* the Eighth Circuit found the termination of a

prisoner class action consent decree proper.  The *McDonald* court excused "shortfalls [delays in access to medical services and in obtaining prescription medicines and scattering of offenders' legal materials] in the state's compliance with the decree's provisions", in affirming the termination of the decree, as these "shortfalls" were deemed not to be the result of defendants' bad faith, not retaliatory, and not an impediment to court access or a demonstration of deliberate indifference to medical claims.  *See Id.* at 1322.  The Court found that the state did substantially comply with the decree, despite some provisions of the decree not being completely fulfilled and concluded that there was no likelihood the defendants would impose unconstitutional conditions on the prisoners if the decree were vacated.  *Id.*

The focus of the determination of substantial compliance should be correction of systemic violations of law, not whether every problem was corrected.  *See R.C. v. Walley*, 475 F. Supp. 2d 1118, 1144 (M.D. Ala. 2007) (considering system-wide compliance rather than isolated occurrences).  The Court in *R.C.* specifically stated that: "the court must remain mindful that the standard for termination of consent decrees in governmental institutional reform litigation must be 'flexible.'" *Id.* at 1127. The Court went on to find that DHR was in substantial compliance and would remain in substantial compliance with the decree. "There admittedly are weaknesses in the system, as articulated herein. The court, however, finds that the present shortcomings are shortcomings which are inherent in any organization of this type and size." *Id* at 1184.   This approach properly upholds the separation of powers, as "[i]t is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996).

In a Sixth Circuit case, inmates appealed a district court finding of substantial compliance by the Kentucky correctional department and alleged that some provisions of a consent decree were not met.  The appeals court referenced *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974) in noting that the complexities involved in administering prisons are peculiarly within the province of the legislative and executive branches of government, and  the Court stated "in the context of the instant case, this 'policy of minimum intrusion' demands that judicial supervision over the Kentucky prison system should be as limited as possible and terminated as quickly as possible once it is determined that the likelihood of future violations has ceased." *Smith v. Bland*, 856 F.2d 196 (6th Cir. 1988) (unpublished decision attached hereto as Appendix A). The Court noted that "the problems of prisons in America are complex and intractable . . .Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. . .Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities." *Id.* at  p.3. *See also Taylor v. Sterrett*, 600 F.2d 1135 (5th Cir.1979).

Decisions of the Tenth Circuit and other jurisdictions establish that in determining substantial compliance with a consent decree, courts should focus on the underlying policy of the decree and whether the Defendants frustrated the purpose of the decree, *i.e.,* its essential requirements.  To the extent that criteria in the decree have not been met, the court should examine the materiality of those areas in relation to the overall objectives and underlying policy of the decree, *i.e*., did the failure have a material adverse impact upon the overall policy of non-discrimination toward disabled offenders in DOC? *Wolfe,* p. 1086. This is not a mathematical inquiry but rather one that asks: did the defendants "satisfy the essential requirements of each

of the basic goals of the decree?" *Wolfe* at 1085. The Court in *Wolfe* noted that if any stipulated criteria had not been met, the court should then look at whether it had a material adverse impact on the overall purpose of the decree. Such issues as the duration of the consent decree, the financial impacts of the decree, and the public policies underlying court monitoring of state agency functioning may also be considered in the Court's analysis.

The procedural posture of this case is different than most of the cases cited by both Plaintiffs and Defendants. In the instant case, it is important to remember that even after a finding of substantial compliance by the Court, the Remedial Plan provides for a two year monitoring period during which the Court will continue to monitor the DOC's actions with respect to disabled inmates, and Plaintiffs' counsel will be able to bring areas of deficiency to the Court's attention. More than two years have passed since the date on which the Court must determine substantial compliance (May 1, 2009) in this hearing so, in reality, if the Court finds substantial compliance with the plan, the monitoring period began to run on that day and is now over, pursuant to the Remedial Plan. The Court could make that finding and conclude that the case should be dismissed as of the date of the Court's order.

However, given the time lapse, the Court may determine that the DOC was in substantial compliance with the Remedial Plan on May 1, 2009, and although the compliance period ended on that date, the monitoring period should begin on the date of the Court's decision regarding substantial compliance. In that scenario, this Court is not being asked as a result of the substantial compliance hearing to terminate the Remedial Plan, as was the case in *Wolfe* and *Clark v. California,* 739 F.Supp.2d 1168 (N.D. Cal. 2010), cited by the Plaintiffs, and most of the other cases, but rather simply to find that the Department of Corrections had substantially complied with the essential requirements of the plan as of May 1, 2009. The Court would

continue to have jurisdiction over the DOC's compliance during the monitoring period. Thus, if the Court is inclined to start the monitoring period after the Court decides the issues presented, the consequences of the Court finding substantial compliance are less final than those being considered in cited cases in which the Court is considering termination of a decree. Here the Court would continue to exercise supervision and would have a later opportunity to consider termination of the Remedial Plan. The Court can also direct the DOC to address certain issues during the monitoring period and file periodic reports concerning same.

The Defendants submit that the evidence has clearly demonstrated that the Colorado Department of Corrections (DOC) has substantially complied with the Remedial Plan and the two year monitoring period is either over or it should begin as of the Court's ruling finding substantial compliance.

In the Standard of Review section of the Plaintiffs' proposed findings of fact and conclusions of law, they state that the Defendants bear the burden of proof in this hearing. That is in direct contradiction to the position Plaintiffs' counsel has taken in the past in this case, and the Court has ruled on twice. As Plaintiffs' counsel knows, they have argued in the past that they have the burden of proof so they could present evidence first, and the Court so ruled. At the hearing on December 21, 2009, Defendants requested to proceed first in the hearing to show compliance; the Court initially agreed, then Ms. Greisen stated: "We've addressed this at the previous hearings. We prepared our case. You previously ruled that we have the burden and we go first. . ." (transcript Dec. 21, 2009, p. 12, ln.5-7, attached hereto as Appendix B). The Court stated at that hearing: "When we get to a hearing, it's your [Plaintiffs'] burden." (transcript Dec. 21, 2009, p. 12 ln. 13-14, App. B). Later, the Court reiterated: "but when we go to trial, the plaintiffs have the burden of proof. They have to show there hasn't been compliance and you

[Defendants] have to – you have to respond to that." (transcript Dec. 21, 2009, p. 13 ln.6-8, App. B). The Court was responding to the fact that Plaintiffs' counsel had argued previously that they had the burden of proof, and they wanted to present evidence of non- compliance first.

However, at the Sept. 16, 2010 hearing, the Court noted that the Plan called for the Court to determine substantial compliance in the Court's appointed capacity as arbiter or overseer of disputes under the plan and not as the Article III judge. As such, the Court noted: "While plaintiffs have been given the lead in marshaling the evidence necessary to this determination, they do not have the burden of proof regarding substantial compliance as the defendants' motion implies. It is only at the conclusion of the compliance period, after an initial finding of substantial compliance, that a monitoring period begins, and, with it, the actual shifting of the burden of proof with regard to compliance to the plaintiffs." (transcript Sept. 16, 2010,  p. 6 ln. 21- 25, p. 7 ln.1-3. App. C)

At a later conference, the Court clarified that there really isn't a burden of proof since this proceeding was neither a trial nor an action at law. The Court stated: "One of the issues that's raised in the amended pretrial order is this question of who has the burden of proof. There isn't one. If I spoke and said something to the contrary, I was wrong. . . I was trying to explain something, that when somebody says something, they need to establish it with some evidence." (transcript of Sept. 29, 2010 hearing, p. 3 ln. 2-8, attached hereto as App. D). The Court went on to state that this is not a formal adjudication in the sense of burdens and rules of evidence. "It is a determination under section 32 of the plan . . . as to whether the Department of Corrections is in substantial compliance with the terms of the parties' contractual agreement." (transcript, Sept. 29, 2010, p. 3, ln.16-23. App. D).

Thus, Defendants do not bear the burden of proof but each side must substantiate its position with evidence. However, at any rate, the Defendants have satisfied the burden of proof, if it is their burden, by presenting evidence proving that they have substantially complied with the basic purposes and essential functions of the RP, and there is no significant likelihood of recurring violations. *R.C. Id* at 1185.

## II.      Summary of the Evidence

In determining if DOC is in substantial compliance with the Remedial Plan, the Court must determine if DOC is fulfilling the purpose of the Plan – its essential requirements. The Plaintiffs identify six core purposes of the Plan. Defendants submit that the essential requirements of the plan are not complicated; they can be boiled down to three basic concepts or core purposes: 1) DOC must set up a procedure by which disabled offenders can be identified, request accommodation, and be accommodated; 2) DOC needs to ensure disabled offenders are housed appropriately; and 3) DOC must provide disabled offenders access to programs and services, with or without accommodations, and not exclude them from programs, services, and activities because of their disabilities.

DOC proved to the Court during the hearing that it was, indeed, in substantial compliance with the essential requirements of the Remedial Plan as of May 1, 2009, and that its actions have not frustrated the purpose of the Plan. The evidence has shown that employees of the DOC, from the highest level down, are very aware of the importance of compliance with the Remedial Plan and have worked hard to make sure its provisions have been implemented. The Executive Director, Mr. Zavaras, testified that he, along with his top deputy, visited the management teams at all of the facilities to emphasize the importance of compliance.[1] Other top deputies of his staff attended roll calls to explain to the correctional officers the importance of compliance with the

---
[1] Zavaras, p. 2725, p. 3194

plan.[2] He communicated the priority of compliance with the Plan at his directors' meetings and team staff meetings.[3] Compliance with the RP has been a high priority for him.[4] DOC management and staff certainly have not frustrated the essential requirements of the Plan.[5]

Overall, the evidence established that as soon as the RP was signed, DOC established a process for identification of disabled offenders and a mechanism for them to request accommodation through the office of the ADA Inmate Coordinator [AIC]. Once the forms were completed, offenders were seen by medical personnel to assess their disability status and any need accommodations. If an offender was found to be disabled, an Accommodation Resolution was issued, signed by the AIC and the Chief Medical Officer [CMO]. The resolution identified any accommodations needed. The AIC office kept, and keeps, a very detailed database on all offenders that contact the office and worked with the DOC computer division to establish a system that flags the record of a disabled offender so that the offender is not moved without contact with the AIC office. Staff at all the facilities had and have access to the Accommodation Resolutions, and ADA coordinators at each facility are available to assist with any questions.

Well prior to May 1, 2009, disabled offenders were housed at facilities designated in the RP in cells appropriate for their disability. Movement of disabled offenders was and is coordinated through the AIC office. Extensive training was in place prior to May 1, 2009 for all staff members regarding various disabilities that offenders might have, what to look for with disabled offenders, and how to respond to situations.

The evidence proved that disabled offenders were provided equal access to programs and employment opportunities throughout DOC as was provided to non-disabled offenders as of

---

[2] Zavaras, p. 3194, ln. 9-14
[3] Zavaras, p. 2724, 3192-93, 3200, 3243, 3236
[4] Zavaras, p. 3246
[5] Zavaras, p. 2726-27

May 1, 2009. Necessary accommodations were provided if needed. If offenders had issues, they could file an ADA grievance which would be considered through the ADA grievance procedure established as required by the RP. They could also contact the AIC office and explain their concerns. There were at least four, and generally five, full time administrative and legal assistants in the AIC office who worked full time on issues regarding disabled offenders as of May 1, 2009. The entire department was well aware of the RP and the importance of its implementation.

Defendants will address the three core purposes of the Plan in the context of responding to the points raised by Plaintiffs in their argument concerning the six core purposes they identified as the evidence proving compliance with the Defendants' three core purposes is the same as that used to refute Plaintiffs' arguments that substantial compliance has not been met in six areas. The evidence presented proved substantial compliance with the Remedial Plan and satisfaction of its essential purpose: to identify, house, and provide opportunities for disabled offenders in a non-discriminatory fashion.

### III.     Response to Plaintiffs' Findings of Fact

#### A.  Objection to New Submissions

Defendants object to several of the Appendices submitted by the Plaintiffs in their Proposed FOF/COL's:

I.      **Appendix 1** – Glossary - no objection

II.     **Appendix 2** – Stipulations by Plaintiffs to the 2006 and 2008 Stipulations – no objection

III.    **Appendix 3** – transcript of Court proceeding on March 25th 2007 – no objection

IV.    **Appendix 4** – this appears to be a compilation that someone put together from CDC data regarding diabetics in comparison to DOC diabetics which includes someone's extrapolation of data. There is no identification as to who prepared this compilation, from what data it was taken, its authenticity, etc. This should have been introduced as an exhibit through plaintiff's diabetic expert with proper authentication and opportunity for cross examination. Defendants object to the Court considering it on the grounds of lack of foundation and authentication.

V.    **Appendices 5-13** – these appendices appear to be compilations of alleged deficiencies by DOC with respect to various aspects of the Remedial Plan. Defendants object to these compilations which should have been prepared and introduced as exhibits through a witness at the hearing or if they are intended as summaries or demonstrative evidence of a witness's testimony, they should have been used in court with an opportunity for Defendants to respond. Defendants have not been provided with these documents previously and did not have an opportunity to respond to these during the hearing. Defendants object to the introduction of these as appendices to the proposed Findings of Fact/Conclusions of Law [FOF/COL] since they were not part of the evidence nor used as demonstrative evidence during the hearing. Defendants object on the grounds of lack of foundation and failure to provide an opportunity for cross examination or rebuttal.

VI.    **Appendix 13** – transcript of court proceeding – no objection

**Response to Plaintiffs' Arguments**

Plaintiffs have made their arguments for non-compliance under six "core purposes" of the Remedial Plan:

1)  The role of the AIC

2)  Proper Identification of Inmates with Disabilities

3)  Proper Placement of Inmates with Disabilities

4)  The timely and proper provision of accommodations and assistive devices

5)  Ensuring access to benefits, programs, and services of DOC on a non-discriminatory basis

6)  Notification to class members of rights under the Remedial Plan

In their summary of the evidence, Plaintiffs claim there are three reasons the DOC has not achieved substantial compliance:

1.  Plaintiffs contend that the AIC was not given the necessary authority nor resources to implement the Remedial Plan;

2.  Class members were not identified by the end of the compliance period;

3.  Systems were not developed to implement, monitor and track required information.

These are woven throughout their proposed findings and conclusions and will be addressed under the six core purposes outlined by the Plaintiffs.  Defendants will address arguments made under each section but will try not to repeat arguments already made in the Defendants' Proposed FOL/COL.

**1.  <u>The Role of the AIC</u>**

The evidence presented by DOC and outlined in Defendant's Proposed Findings of Fact/Conclusions of Law [FOF/COL] established that as soon as the Remedial Plan was signed, the ADA Inmate Coordinator [AIC], Ms. Holst, met with all those who would be involved in

implementation.[6] She established a process to identify and closely track disabled offenders throughout the system.[7] She developed forms and worked with the Chief Medical Officer to set up a procedure for Clinical Services to evaluate offenders to determine disability.[8] Her office clearly had the authority to refer offenders for screenings by Clinical Services and to track the offenders.[9]  She worked with the DOC computer office to set up an alert system in the DOC database that would flag an individual who was identified as disabled.[10] She worked with Offender Services to ensure that disabled offenders were identified and tracked as they moved through the system.[11] Her office kept, and still keeps, an extensive, detailed database of all contacts with those who seek to be found disabled or who are considered disabled.[12]  The database has grown over the years to include more information such as grievances, Durable Medical Equipment [DME], co-pay refunds, offender movements, and so forth.[13] As of May 1, 2009, she and her staff monitored these offenders very closely, recording every contact they had with them.[14]  The AIC office also maintained AIC worksheets and physical files on every offender that contacted the office for any reason.[15] They had, and have, a database that tracks inter-facility movements of disabled offenders. When an offender is moved, the AIC office is notified and notifies the ADA coordinator at both the receiving and sending facility to ensure proper accommodation during transport and DME transfer.[16]

---

[6] Holst, p.  1069,  ln. 17-25
[7] Holst, p. 1070,  ln.3-8
[8] Holst, p. 1069, ln. 17-25, p. 1070, ln. 3-5; Exhibit H-3
[9] Holst, p. 1069, ln. 17-25, p. 1070, ln. 3-5
[10] Holst, p. 1070, ln. 1-5, 25, p. 1071, ln. 1-4
[11] Exhibit E, Holst, p. 1070, ln. 12-19, p. 1582,  ln.9-16, p. 1076, ln. 22-25
[12] Exhibit E, Holst, p. 1079, ln. 8-25, p. 1080, ln. 1-25, p. 1081, ln. 1-3, p. 1391, l. 19-25, p. 1392, l. 1-12
[13] Exhibit E, Exhibit 141, Holst, pp. 1077, ln. 17-23
[14] Holst, p. 1070, ln. 19-24, p. 1077 ln. 5-17, p. 2587 , l.16-21; Jacobson, p. 3996 l. 4-12
[15] Holst, p. 1082, ln.16-24, p. 1083, ln. 10-25, p. 1084, ln. 1-13; p. 1397, ln 14-24
[16] Holst, p. 1582, ln. 1-19

Ms. Holst developed the policies pertaining to the ADA and assisted in developing training to ensure that staff members were aware of the RP and its requirements, including the overall policy regarding disabled offenders.[17] She herself received training from outside vendors in the specific disabilities covered by the case.[18] She was known throughout the department as the person, along with her staff, who was to be contacted whenever there was a question about a disabled offender or one who might be disabled. She also facilitated notices being posted throughout the DOC informing offenders of their right to ask for accommodations and the availability of a copy of the plan in the libraries. A copy of the plan was provided to offenders upon request.

Plaintiffs contend that the AIC was not given the authority nor resources to implement the RP. This is simply not the case. The AIC reported directly to Gary Golder, the Director of Prisons, who reported directly to the Executive Director. When her office recommended a change in an Administrative Regulation, it was reviewed and generally adopted; she wrote the Administrative Regulations concerning disabled offenders. Once these Administrative Regulations were signed by the Executive Director, they became the policies that had to be followed throughout the department.[19]

When Ms. Holst requested additional help, the DOC went to the General Assembly and received over $2,000,000 in supplemental funding. She was given the funding and authority to hire four additional people to work exclusively on ADA issues.[20]  As a result, she then supervised five legal assistants, plus administrative support, reflecting a substantial increase in

---

[17] Holst, p. 1088, ln. 20-25, p. 1089. p. 1090, 1-10, See Exhibit C, A.R. 750-04
[18] Holst, p. 1095, ln. 14-25, p. 1096, ln. 1-17, Exhibit F
[19] Holst, p. 1088, ln . 20-25, p. 1089, ln. 1-23
[20] Holst, p. 1082, ln. 6-8

the staff of her office.[21]  The primary job responsibility of these individuals was to handle offenders' requests for accommodations and grievances and respond to the needs of disabled offenders throughout the department.[22]  As of May 1, 2009 her office employed five full time staff plus administrative support to work exclusively on issues related to disabled offenders.[23] Ms. Holst testified that her staff as well as many others in DOC worked very hard to respond to the needs of disabled offenders. Compliance with the Remedial Plan was her number one priority, and her staff did not in any way try to impede or frustrate the purpose of the RP. [24]

When Offender Services needed to move a disabled offender, they called the AIC office whose staff could approve or disapprove the move based on his/her accommodation needs. [25] Frank Ortiz, the case manager supervisor at the Canon Minimum Centers, was very clear in his testimony in response to whether the AIC recommendation is given little or great weight when he stated that "If the AIC says that they [offenders] can work at that job, they'll work at that job."[26]

Ms. Holst is very hard on herself; she underestimates her accomplishments. Major changes in the operations of DOC were made after the RP was signed under her leadership. The status and conditions of disabled offenders improved substantially.[27] Her office provided individual attention to thousands of offenders and interceded daily on their behalf with staff and clinical services staff at the facilities. The amount of individual attention provided to disabled offenders versus non-disabled offenders was immense. An entire office staff worked every day to address issues that arose and to assist disabled offenders in the system. Her staff was not hesitant to

---

[21] Holst, p. 1082, ln. 9-16, p. 2592, ln. 1-11
[22] Holst, p. 1753, ln. 12-19
[23] Holst, p. 1082, ln. 9-16
[24] Holst, p. 1753, ln. 12-25, p. 1754, ln. 1-24, p. 1755, ln. 5-8
[25] Holst, p. 1097, ln. 2-11, 25, p. 1098
[26] Ortiz, p. 3648 ln. 22-25
[27] Holst, p. 1754, ln. 5-6, 14-19

follow up in a situation when they felt something needed to be done.[28]  The testimony was replete with examples of the effectiveness of her office in resolving issues that arose with respect to disabled offenders. An example was Exhibit 642, which contains reference to correspondence from a disabled offender, Mr. Bush, who lost his hobby permit when his case manager changed his status from "medically unassigned" to "unassigned." The AIC office got involved and spoke to the case manager and the hobby permit was returned.[29] Another example relates to Mr. Weigand, cited by plaintiffs. When the AIC office learned that he had been placed in a facility that could not accommodate him, they intervened and had him moved immediately.[30] The AIC office also got involved in getting Mr. Tenorio, a diabetic, a job at the green house.[31] These types of individual interventions occurred every week.

Ms. Holst worked with the Training Academy to develop training for the correctional officers and personally trained case managers regarding requirements of the Remedial Plan.[32] She also had the authority to, and in fact, did, send out two extensive audits to the designated facilities requiring them to respond to every detailed request, which they did. [33]

Although Ms. Holst did not attend the top management meetings, she certainly had direct access to upper management. Ms. Shoemaker testified that her office worked closely with the AIC office regarding implementation of the RP.[34] Ms. Holst testified that once Ms. Shoemaker became the head of clinical services, there was "a remarkable difference" in communication between clinical services and the AIC.[35] Ms. Holst testified that she believed Ms. Shoemaker had the authority to "get things done" and solve problems and that's why Mr. Golder asked her

---

[28] Holst, p. 1099, ln. 3-11
[29] Exh. 642, Holst, pp. 1664-65.
[30] Holst, p. 194-5.
[31] Holst, p. 467, ln.15-19
[32] Holst, p. 460, ln. 11-24; p. 895, ln. 5-8, 17-25, p. 896, ln. 1-16
[33] Holst, p. 1099, ln. 24-25, p. 1100, ln. 1-5, p. 1751, ln. 5-19, pp. 1741, ln. 19-15, p. 1742, ln. 1-12
[34] Shoemaker, p. 2757, ln. 1-17
[35] Holst, p. 46, ln. 18-24

to become more involved.[36] Clinical Staff called the AIC office on a daily basis if they had

questions about a disabled offender. The AIC office was in constant communication with other

parts of the Department discussing ways to accommodate offenders and implement policies that

would effectuate the Remedial Plan.[37] Once the 2008 Stipulations were signed, Ms. Holst had

the authority to override any decision of the Chief Medical Officer regarding an offender's

disability.[38] Although she was overworked, she never complained that she could not fulfill her

responsibilities as AIC because of all of her responsibilities.[39]

Warden Ploughe from CTCF explained that the DOC wardens meet on a regular basis and

that Ms. Holst attended several meetings and briefed the wardens about the ADA and RP

requirements. She also mentioned that Ms. Holst gave them a great a deal of information about

the Montez case. She testified that whenever they had a question about an ADA issues, she or

CTCF's ADA coordinator would contact Ms. Holst or her office and there are good and open

lines of communication between CTCF and the AIC office. She further testified that at any

given time, about 20-25% of the CTCF population is disabled,[40]and she and her staff always

follow the instructions and guidance given by the AIC office.[41]

**Special Master Orders**

In this section of their argument, plaintiffs claim that because of the AIC workload, the AIC

office was not able to complete the Special Master [SM] project until after May 1, 2009 and was

thus not in compliance with the Stipulations. However, plaintiffs are mistaken and only cite one

portion of the transcript. In fact, Ms. Holst testified that although her office was very busy, they

---

[36] Holst, p. 45, ln. 13-19
[37] Shoemaker, p. 2757, p. 2758, 1n. 1-4
[38] Holst, p. 1099, ln. 16-23
[39] Holst. P. 33, ln. 1-3
[40] Ploughe, p. 3703-05
[41] Ploughe, pp. 3699-3703

did complete this project by May 1, 2009 and she explained the process.[42] Ms. Jacobson confirmed this as well.[43]

Ms. Holst testified that, initially, if the SM found someone disabled but Clinical Services did not find him or her disabled or the offender did not ask the AIC to get involved, DOC did not consider the person disabled but did provide whatever aids or money was ordered by the SM. As soon as the AIC office found out an offender had been determined to be disabled by the SM and that offender had not contacted the AIC office previously or had refused to cooperate, the staff sent the offender forms to complete to ask for a screening and accommodations. They sent the forms to the offender three times. If the offender did not take personal responsibility and return the forms and never requested a finding of disability or an accommodation, the AIC did not designate him or her as disabled initially, but once the Stipulations were signed, they did consider the offender disabled and provided whatever the SM ordered.[44]

As the case progressed and certainly after the stipulations in 2008, the AIC office reviewed the cases in which the Special Master found a disability and compared them with the AIC records. If the person was not considered disabled in the AIC system, his or her status was changed to disabled (unless there had been a substantial change in their condition) so that all of offenders found disabled by the Special Masters were marked disabled in the AIC system by May 1, 2009.[45]

Examples offered by the Plaintiffs did not support their argument that the Special Master's orders were not being enforced. For example, a final order for Michael Tivis orderd that DOC pay him $180 because he should have had special shoes; however the Special Master

---

[42] Holst, p. 1677 ln. 18-25, 1679-1680 ln. 1-17; Exh. X-7
[43] Jacobson, p. 4034, ln. 12-20
[44] Holst, p. 1680, ln. 16-25, p. 1681, ln. 1-15
[45] Holst, p. 1677, ln. 18-25, pl 1678-1680; Exhibit X-7

did not order that DOC give him shoes. In this type of situation, initially, the DOC paid the $180, but if their medical providers found no need for the shoes, they would not have provided them. However, after the Court's order and the Stipulations, the AIC explained to the staff where he was housed that he needed to get the shoes pursuant to the Special Master order even though he refused a screening.[46]

Another situation involved Raymond Stevens. The Special Master ruled that he was to get colored overlays and a screening for colored glasses due to a syndrome he had. There was some delay in the AIC office and it took some time for DOC to get him the overlays due to the fact that only a specialist could prescribe the overlays, but the offender received his specialized overlays and glasses. [47]

Another offender's situation raised by the Plaintiffs is that of Mr. Cook. He was found by the Special Master to be both vision and mobility disabled. The AIC office completed an updated Accommodation Resolution for him reflecting these disabilities.[48] Since he had paroled, the resolution stated the accommodations that would apply should he come back into custody. [49]

Plaintiffs raise the case of Mr. Cordova. The AIC office changed Mr. Cordova's Accommodation Resolution to reflect the Special Master order once they received it.[50] Further, one of the AIC staff members, Marshall Griffith, wrote in a memo regarding Mr. Cordova that "DOC will respect the final order of the special master, regardless of the outcome of the rescreening process."[51]

---

[46] Exh. 578, Holst pp. 1682-83
[47] Exh. I-11, Holst, pp. 1684-90
[48] Exh. 596, Holst pp. 1690-91
[49] Exh. 596, Holst pp. 2663-64
[50] Exh. 616, Holst p. 1693
[51] Exh. 616, Holst p. 2666

In the AIC record with respect to James Smith, a memo around the date of June 26, 2008, states that "If the offender refuses to cooperate, he is only entitled to what is in the final order [of the Special Master] and standardized accommodations" [52] This was the policy in the AIC office as of June 2008 and thereafter.  This was the case even when an offender refused to cooperate with the process; he or she was given what was ordered by the Special Master and standard accommodations for that disability.

**AIC Final Say**

Plaintiffs argue that the AIC is still not the final say in determining disability as required by the Stipulations and the Court. However Ms. Holst specifically testified that she overrode the CMO at times after discussion.[53] Dr. Frantz testified to this as well ("the AIC prevails.")[54] Dr. Frantz testified that if she has a case where it was a struggle to find out what was going on, she will typically go to the AIC office and she and the AIC will review the case together and go over documents and generally reach a consensus.[55] Exhibit O-8 contains the report of situations in which the AIC and CMO disagreed. Ms. Holst stated there were few disagreements and when there were, she talked with Dr. Frantz, but they both knew that Ms. Holst's determination was final.[56] An example of the AIC overriding the CMO with respect to accommodations is offender Price. An entry in his AIC file of Oct. 28, 2008 states that the AIC would give him special shoes despite the CMO saying he did not need them.[57]

**Referral to Clinical Services**

---

[52] Exh. 516, Holst  p. 2667
[53] Holst, p. 1099, ln. 12-15; p. 1733ln. 12-25, p. 1734, ln. 8-14; p. 1758, ln. 18-25, p. 1759, p. 1760, ln.1-11
[54] Frantz, p.4323, ln. 16-23
[55] Frantz, p. 4323, ln. 3-15
[56] Holst, p. 1734, ln. 10-12; Exhibit O-8
[57] Holst, p. 2672 -73

It was Ms. Holst who set up the procedure for Clinical Services to make the initial

determination of disability; she required this for every offender as she needed the input of

medical personnel in making the final decisions.[58] Plaintiffs seem to be critical of the fact that

Ms. Holst wanted offenders to be seen by medical personnel before she made a finding of

disability. Plaintiffs are correct that Ms. Holst required offenders who were suspected of having

a disability to go through a screening at Clinical Services. She felt this was the best way to

determine a disability and its extent.[59]  That does not negate the fact that she recognized that she

made the final determination in cases of disagreement. The examples offered by the Plaintiffs of

instances in which the offender was referred to Clinical Services for evaluation were simply

situations in which the AIC was seeking the expert opinion of the medical personnel. There is

nothing in the RP which prohibits that procedure; in fact, the RP states that the CMO is an

integral part of the process: "If an inmate claims to have a disability and clinical staff disagrees,

the Chief Medical Officer . . .will review the situation and make a determination" Exhibit A, RP

p. 3. The Plan also provides that if an inmate develops a disability that might affect placement,

the inmate shall be referred to the AIC and the CMO for verification of the disability. Exhibit A,

RP p. 3. Thus, Ms. Holst viewed the involvement of the Clinical staff as an important part of her

determination of disability and rightly so. Ms. Holst testified that Dr. Frantz worked tirelessly

and was very receptive to the AIC and her staff about specific offenders.[60]

**Tracking**

In this section, plaintiffs also argue that the AIC did not track offenders with disabilities.

That is not the case. The AIC office had, and has, an extensive database which tracks not only

those found to be disabled but all of those who request screening or accommodations. Every

---

[58] Holst, p. 1075, ln. 10-15, p. 1069 ln.23=25; p. 1070, ln. 3-5
[59] Holst, p. 1437, ln. 14-19
[60] Holst, p. 1437, ln. 23-25; Frantz, p. 4323, ln. 3-15

time an offender contacts the AIC office, an entry is made in the offender's AIC worksheet and in the database and results are shown in the database.[61]  The other tracking methods are described in detail in the Defendants' Proposed FOF/COL. They include the QT profile alert (flag) which allows the user to get more information by clicking on the "Yes",[62] the ADA daily roster, the ADA movement report,[63] the DOCNET system which contains the Accommodation Resolutions, the AIC website which also contains the Accommodation Resolutions, and contact with the AIC office or the ADA coordinator at each facility.  There was considerable testimony about the various tracking systems and the ability of staff throughout the DOC and at the private facilities to verify the disability status of an offender.[64]  The bottom line is that as of May 1, 2009, the Accommodation Resolutions were available on the system wide data base and all staff were able to call the AIC office if they had any questions. The AIC files are full of documentation of communication between members of the AIC staff and staff throughout the department about individual offenders.[65]  The AIC database could be accessed from all facilities and through their ADA coordinator. [66]

     Plaintiffs also cite a "pervasive lack of communication" between the AIC and Clinical Services. Plaintiffs argue that lack of communication between Clinical Services and the AIC made it impossible for the AIC to track offenders accurately. This is not consistent with the evidence. Ms. Holst testified that the CMO, Dr. Frantz, was very receptive to the AIC staff about specific situations with offenders.[67] Dr. Frantz testified that they try to have meetings once a month between Clinical Services and the AIC. She testified that the AIC office is one of the

---

[61] Jacobson, p. 3996, ln.4-12; Holst, p. 2587, l. 16-21
[62] Jacobson, p. 3999 l. 2-18; Holst, p. 2593, l. 9-20
[63] Engstrom, p. 1830, k, 18-25; p. 1831, l. 4-22, p. 1834, l. 2-20; p. 1836, l. 25; 1837, ln. 1-17; Exhibit F-2; Exhibit H-2
[64] Jacobson p. 4003, l. 24-25, p.  4004, l. 1-3 p 4014, l. 4-13, 19-23; Engstrom, p. 1838, ln. 1-9, p. 1837, ln. 13, 14
[65] Holst, p. 1398, ln. 1-20; Jacobson, p. 3997, l. 5-16; p. 4031, l. 8-24
[66] Jaconson, p. 3997, l. 115-25
[67] Holst, p. 1437, ln. 23-25

places she walks through and asks if there are issues or if there are questions unanswered. "We talk on the phone, we communicate by e-mail, and we really communicate, it feels like, virtually all the time. Certainly it is a daily occurrence that we communicate."[68]

The AIC files introduced by Plaintiffs contain hundreds of communications between the AIC office and the Clinical staff. When AIC staff had a question, they simply picked up the phone and called whoever they needed to call to get answers. There were certainly instances in which the clinical staff forgot to inform the AIC when they gave an offender a medical device. Plaintiffs imply that this was some sort of nefarious scheme to keep the AIC office out of the loop. On the contrary, it was more likely that clinical personnel saw the need to provide an assistive device to an offender who needed it for medical treatment and considered this part of medical care rather than an ADA accommodation. The line between the two is less than precise. The bottom line is that the offender was being treated (or accommodated, if he or she had a disability). Thus, the purpose of the RP, which is to assist disabled offenders and provide them with accommodations, if necessary, was fulfilled – certainly not frustrated. The RP is to serve the disabled offenders and if Clinical Services provided an assistive device but neglected to inform the AIC, the disabled offender's needs were still being addressed. The fact that a clinical person takes it upon him or herself to meet the needs of an offender but neglects to tell the AIC is not an indication of failure of substantial compliance with the Plan. The fact that certain medical care is ordered for a patient is not something that the AIC needs to know unless the offender needs a permanent accommodation.

**ADA Grievance Procedure**

Ms. Holst established an ADA grievance procedure as required by the RP. It has been used by disabled offenders. Plaintiffs claim some ADA grievances were not responded to within the

---

[68] Frantz, p. 4730, ln.12-25, p. 4731, ln.1-5

time frames in the RP. That is the case, but the percentages and delays were small. As the Court

can see from Exhibit 37, the AIC receives many complaints and tracks the timeliness of

responses. Although there were some delays in some of the responses, overall, the responses

were provided at all three step levels in a timely manner. Ms. Holst testified that there were

periods of time when she didn't have her full staff available. For example, one staff member had

a baby and took maternity leave; another was in a car accident. These types of situations are

common in any work place, and work may be delayed as a result. By the date of May 1, 2009,

the exhibit reflects that responses were generally provided in a timely manner. Certainly any

deviation does not rise to the level of frustrating the essential purpose of the plan – to make sure

disabled inmates were not discriminated against by the Department.

2. **Proper Identification of Inmates with Disabilities**

Plaintiffs claim that DOC did not adequately identify disabled offenders by May 1, 2009 and

thus were not in substantial compliance with the RP. The evidence showed there are several

ways disabled offenders are identified and tracked.

**Screening**

Both Joanie Shoemaker and Jim Falk, former administrative services manager at the Denver

Complex (Diagnostic Reception and Diagnostic Center, Denver Women's, Colorado

Correctional Center (Camp George West)),  testified to the detailed and extensive procedure

followed at the Denver Diagnostic and Reception Center [DRDC] to identify disabled offenders.

All offenders go through DRDC and are screened for disabilities by medical personnel within

the first three days.[69]  DOC has established detailed forms to be completed by medical staff

regarding any disabilities, and offenders are provided with temporary accommodations if needed

---

[69] Holst, p. 1102, ln.12-25; Shoemaker  pp. 2758-2760; Falk p. 3284, ln. 8-18p.3286, ln.. 9-21; Exhibit H

at that time. [70]  The AIC office is notified if temporary accommodations are provided or an offender is identified as disabled. [71]

The forms which were completed by staff at DRDC were automatically electronically transmitted to the AIC office so that the AIC office was immediately informed of an offender who needed temporary accommodations.[72]  This offender was immediately put into the AIC database, identified with an alert on the DOC DCIS system, and could be followed on the AIC database and on the system wide data base.[73] The offenders are entered into the PCDCIS data system as well.[74]

At DRDC, offenders are given the OAE test which triggers a referral for an audiology examination if the offender fails the test. [75] Their vision is also tested and referrals made as necessary.[76]

The Denver complex includes a "Denver complex ADA group" who communicate pertinent information regarding disabled offenders to those who need it to manage the offender successfully.[77] Staff would contact the ADA coordinator if they had questions.[78] Forms were used to communicate information about disabled offenders in the Denver Complex.[79]

The case managers are responsible for arranging for any accommodations needed for the DRDC intake process.[80] The AIC and the Denver complex ADA group are also notified if there

---

[70] Holst, p. 110, l. 25; 111 ln. 1-3; p.1103 ln. 4-18;p. 1115, ln. 15-21; Shoemaker,  pp. 2758-60; Falk, **p.** 3284 ln. 10-25, p. 3285 – 3288 kb, 6-18**;**   Exhibit J; Exhibit Q
[71] Holst, p. 1103,
[72] Falk, p. 3298 ln. 18-25
[73] Falk, p. 3292, ln. 1-11, Falk, p. 3298, ln. 11-17
[74] Falk, p. 3292, ln. 1-11
[75] Shoemaker, p. 2761
[76] Shoemaker, p. 2761
[77] Falk, p. 3299, ln. 7-19; Exhibit N; Exhibit O
[78] Falk , p. 3300  ln. 3-17
[79] Falk p. 3301, ln10-25, p. 3302 ln. 1-25
[80] Falk, p. 3293, ln.7-12

is any change in temporary accommodations on day three. [81] Mr. Falk testified that when an offender is identified as disabled, a staffing occurs regarding how to manage the offender and a supervisor reviews the accommodations.[82] The temporary accommodations are communicated to the housing staff.[83] The offender is also provided with information about his/her rights as a disabled person if he/she is assigned to a Denver complex facility. [84]

Plaintiffs are critical of the fact  that the AIC did not get a list of diabetics from the Clinical Services. This is not a frustration of the essential purpose of the RP. The medical treatment of diabetics is handled by medical personnel in clinical services. Many diabetics do not consider themselves disabled and have no need of accommodations. Therefore, they really have no interest in contacting the AIC or in having the AIC contact them. If they feel the need for accommodations, they are certainly free to contact the AIC and request them.

Plaintiffs raise the point that the screening process as initially developed was cumbersome, and the criteria were not well defined. The process of implementing the Remedial Plan has been a learning process for DOC, and those in charge have responded to suggestions and made changes as time has progressed.[85] This has been true with the ADA as a whole; its implementation nationwide has evolved. Congress recently amended it to reflect some of the things that were learned as various institutions have tried to implement it fairly. Prior to the RP, there was no process at DOC for disabled offenders to be identified and tracked as such so the progress has been considerable.  The screening process is detailed but this is necessary in order to identify disabled offenders, prevent manipulation, and to deliver appropriate

---

[81] Falk, p. Exhibit P
[82] Falk, p. 3287, ln. 15-25, p. 3288 ln. 1-5, ln.19-25, p. 3290 ln.17-25, p. 3291, ln 1-19; Exhibit Q; Exhibit H; Exhibits N and O (staff  followup  after an Accommodation Resolution is issued);
[83] Falk, p. 3288 ln. 21-15,
[84] Exhibit K, Exhibit M, (Camp George West orientation); Exhibit Q (certificate of orientation)
[85] Holst, p. 1077 ln. 17-23

accommodations. The offenders themselves are responsible for completing various forms which the AIC office provides, just as they would have to complete forms for SSI or veteran's benefits if they were not incarcerated.[86] Several witnesses testified and exhibits were introduced as outlined in the Defendants' proposed FOF/COL that show that DOC is fulfilling the essential requirement of the Plan to identify and track disabled inmates.

Plaintiffs have demonstrated that there are occasions when a disabled offender may slip through diagnostics without being identified. However, even those offenders who slip through are generally identified as they are assigned to permanent facilities and begin to work with case managers and staff as was the case with Jeffrey Beeman and Amber Harms.[87]  Given that approximately 11,400 offenders pass through DRDC  in one year, an average of 40-45 or so a day,[88] it is not unusual that a few might slip through without identification as a disabled offender. There were sometimes delays in the processing, but these were not the result of intent to frustrate the purpose of the plan or to discriminate, they were caused by workload or compliance with procedure. They were corrected when they became known.

In the individual instances cited by Plaintiff, the offenders were subsequently identified and screened if requested. In addition, the offender always has the option of identifying a disability and asking for a screening at any time during incarceration (unless they have been screened within a year and there are no changes in condition). [89] Offenders who are already in the system have the opportunity to ask for a finding of disability at any time.[90] Case managers have been

---

[86] Holst, p. 1074, ln. 1-25, p. 1075, ln. 1-9, see Exhibit C, with attached forms
[87] Frantz, p. 4432, ln. 18-25, p. 4433, ln. 1-24 (Jeffrey Beeman); p. 4457, ln. 24-25, p. 4458, p. 4459 ln. 1-6 (Amber Harms)
[88] Falk, p. 3313, ln. 3-14
[89] Holst, p. 2590, l. 21-15; p. 2591, ln. 1-13
[90] Holst, p. 1072, ln.13-19

trained and know how to contact the AIC office if they suspect that an offender is disabled.[91]

Offenders could self report at any time and did so.

Ms. Caudell from the DOC IT Department for Clinical Services testified in depth about the

testing she did on the computer applications for the DRDC staff and the training she did

regarding entering the data on the forms when offenders go through DRDC. She helped develop

the training manual so all clinical staff at DRDC enter the data in a uniform fashion.[92] She also

testified that she helped create the manual for how providers could get the completed Request

for Accommodations from the system and send it to the CMO. [93] Rosters were kept of the

attendance at the training and she did on line training as well.[94]

**Identification of Diabetics**

Plaintiffs also raise the issue regarding identification of diabetics in DOC. Diabetics are

identified just as they would be outside of prison – by a medical professional during an

examination. If there are those who are not identified, they certainly have the right and ability to

explain symptoms to their doctor and request an evaluation for diabetes. Testimony established

that some diabetics who receive medical treatment for diabetes do not seek, need, nor want

ADA accommodations.[95] They do not need any ADA accommodations; they need medical

treatment and monitoring.

Ms. Holst explained why the AIC office does not routinely receive a list of diabetic

offenders. When this was done in the beginning of compliance, offenders became very upset

that someone other than medical personnel knew they were diabetic, and they did not want to be

---

[91] Holst, p. 2590, ln. 21-15, p. 2591, ln. 9-20
[92] Caudell, p. 3951, 3952, 3954, 3955, Exhibit T, U, V.
[93] Caudell, p. 3956-7, Exhibit V
[94] Caudell, p. 3957, Exhibit W
[95] Holst, p. 1073, ln.3-17

involved in the Montez litigation.[96] They did not want to request accommodations, and they didn't like having someone else know their medical condition.[97] These individuals are treated like any other offender with a chronic condition, such as asthma or eczema, through medical treatment. DOC requests that all chronic care patients see medical staff every six months. Medical personnel are trained to treat diabetics, and this is done through medical care just as is the case outside of prison.[98]

Plaintiffs continue to express the view that because all of the rescreenings using the new criteria were not completed by May 1, 2009, that this overshadows all else and proves non-compliance with the Remedial Plan. Nothing could be further from the truth. Plaintiffs completely miss the boat on this issue. The testimony and exhibits showed that screenings began as soon as the Remedial Plan was signed and notice was given to all offenders about the Plan. Ms. Holst testified her office began receiving requests for accommodations right away, and they referred the offenders to Clinical Services for a determination of disability.[99] This process went on continuously and continues to this day. Offenders were being identified as disabled and accommodated from 2004 onward. There was a period of time during which some offenders were found to be "impaired" rather than disabled because they were not disabled with an assistive device. Judge Nottingham confirmed this practice when he ordered a category of "impaired."[100] At a later time, the "impaired" designation was eliminated reflecting Congress's amendments to the ADA to clarify that a person would be considered disabled if he or she was disabled without the assistive device (except for glasses and contact lenses).[101]

---

[96] Holst, p. 123, ln 21015, p. 124, 125, ln. 1-9; 131, ln. 5-7, 23-25; p. 132  ln. 1-9
[97] Holst, p. 1072, ln. 22-25, p. 1073, ln. 1-19, p. 1084, ln. 20-25, p. 1085, ln. 1-11
[98] Holst, p. 1088, ln 9-15
[99] Holst, p. 1067, ln. 25; p. 1068, ln. 1-3; 1069, ln. 17-25; 1070, ln. 3-5
[100] Holst, p. 1588, 1589 ln.1-10; **Jacoboson, p.**
[101] Holst, p. 1588, p. 1589, ln. 1-10

Plaintiffs say that the criteria previously used were too stringent. That is not necessarily the case. The Special Masters were using more limiting criteria but the DOC was allowing providers more discretion. At any rate, when the parties agreed on criteria regarding mobility and vision disabled offenders, and the Court ruled on criteria for hearing disabilities, the AIC determined that all offenders who had requested accommodations in the past who were still in the system should be rescreened to be fair to all.[102] Dr. Frantz agreed with her that this would be the best procedure.[103] Plaintiffs fail to acknowledge that all of those offenders who were found disabled prior to their rescreens continued to be disabled in the system and continued to be accommodated as they had been previously during the rescreening process. So, the situation remained the same for all offenders until such time as the rescreening was complete and a new Accommodation Resolution was ordered. Both Ms. Jacobson and Ms. Holst testified that accommodations continued while the rescreens were pending.[104]

As a result, it is totally inaccurate to state that DOC had not identified the class members as of May 1, 2009. If anything, DOC erred on the side of considering someone disabled who may not have been. As soon as someone was identified as needing screening or rescreening, the ADA alert was put on the offender's profile so he or she was identified as someone who might be disabled and need accommodations during the time the screening was taking place. As of May 1, 2009, hundreds of offenders were identified as disabled and had been issued Accommodation Resolutions which were in full force and effect. The fact that they were being rescreened had no effect on the accommodations they already had. [105]

---

[102] Holst, p. 212, ln. 12-25;p. 225 ln. 19025; p. 226, ln. 1-7; Jacobson, p. 4012, ln 2-17, p. 4021, ln. 1-7**;** Frantz, p. 4326, ln. 1-15
[103] Frantz, p. 4326, ln. 1-15
[104] Holst, p. 2586, l. 18-25; Jacobson, p. 4013, l. 12-22
[105] Holst, p. 2586, l. 18-25; Jacobson, p. 4013, l. 12-22

Plaintiffs are correct that not all of the new Accommodation Resolutions had been sent out as of May 1, 2009 although almost all of the rescreenings had been completed after a herculean amount of work by the providers and the CMO.[106] Dr. Frantz testified that after the training regarding mobility disability screenings took place in late February 2009, clinics suspended most of their normal activities to do disability screenings. "It was an incredible workload and [Dr. Frantz] worked almost nonstop for the rest of the year."[107] Dr. Frantz personally trained all medical providers regarding how to conduct the testing under the new criteria starting in Febuary 2009. She went on the road to the facilities and conducted extensive eight hour trainings to make sure providers understood how to conduct and report the testing. The providers had to pass a test after they had received the training.[108]

However, this has no bearing on the fact that DOC had identified and accommodated hundreds of disabled offenders prior to this time and continued to accommodate them while the results of the rescreenings were pending.[109] Screenings were taking place all the time and those who were disabled were already being accommodated.[110]     The fact that not all of the Accommodation Resolutions had gone out to disabled offenders who were rescreened under the new criteria by May 1, 2009 is not important. As previously explained, those who had been previously identified and been found to be disabled continued to be accommodated pursuant to their Accommodation Resolutions while they waited for a rescreen and a new Accommodation Resolution. In fact the plaintiffs' attorneys have met with these offenders on several occasions during the pendency of this lawsuit, have known who they are, and considered them to be class

---

[106] Holst, p. 1672, ln. 19-25,p. 1673, ln. 1-4; Jacobson, p. 4020, l. -17; Exhibit W-7; Frantz, p. 4327, ln. 5-13,
[107] Frantz, p. 4328, ln.2-19
[108] Frantz, p. 4328 ln. 19-25, p.4367, ln. 6-25, pp. 4368-73, pp. 4375, ln. 13-25, pp. 4376-85, ln. 1-8; Exhibits R-5, S-5, T-5
[109] Frantz, p. 4328, ln. 20-25, p. 4329 ln. 1-5
[110] Frantz, p. 4326, ln. 20-25, p.4327, ln. 1-4

members. Plaintiffs argue that because all of the Accommodation Resolutions as a result of the rescreenings had not been issued, somehow DOC did not know what inmates were disabled. This is simply not the case. There were multiple systems in place to track the information. These have been covered in the original Findings of Fact but, in short, any staff member knew how to get information about the disabled offenders through the daily report, the movement report, the DOC data base, the AIC website, contacting the AIC office, or contacting the ADA coordinator at the facility.[111] The bottom line is that the disabled offenders were being properly identified and tracked through multiple means as of May 1, 2009.

More importantly, neither the Plan nor the Stipulations require that all rescreenings and Accommodation Resolutions be completed by May 1, 2009.[112] The 2008 Stipulations state: "3. CDOC will conduct disability screenings based upon mutually acceptable criteria and will re-screen inmates as appropriate." (2008 Stipulations, #3). There is no mention of when the rescreenings were to be completed. The parties were meeting during this time and had employed experts to develop screening criteria. The process of deciding on screening took longer than expected but as soon as the parties agreed on the criteria, rescreenings began.[113]

Considerable evidence was introduced which demonstrated that DOC is identifying offenders with disabilities constantly and has been since 2004. Thousands of potential class members have been evaluated for disabilities and hundreds have been identified and accommodated.

**Tracking**

Plaintiffs are also critical of the tracking of disabled offenders by DOC. However, there are many systems in place to provide DOC staff with information about disabled offenders.

---

[111] Holst, p. 740-745,  p. 1656, 1657, 1658 ln. 1-18
[112] Jacobson, p. 4011, l. 24-25, p. 4012, l. 1
[113] Holst, p. 1671, ln. 17-25, p. 1672, ln. 1-18

Once the offender is identified as possibly being disabled either at DRDC or later, an ADA alert is placed on his/her QT profile in the DOC systemwide database. This alert notifies Offender Services that he or she is not to be moved without conferring with the AIC office and that the offender may need accommodations.[114]

Ms. Holst testified that as of May 1, 2009, her office was scanning the most current Accommodation Resolutions in the R drive which was available to all staff. At that time, the private facilities did not have access to the R drive so these were put on a web page. No historical data was included so staff would not be confused. [115] All facilities had access to the ADA alerts and the ADA daily movement report.[116] The AIC office staff reviewed the ADA daily movement sheet which was in place well before May 1, 2009, and notified the facilities of the movement of disabled offenders. The ADA coordinator at the facilities would check to make sure accommodations were provided and DME accompanied the offender.[117]  This information was recorded by the AIC staff. [118]  Exhibit G- 2 is a memorandum from Ms. Holst on Oct. 2, 2008 to all DOC staff about the daily movement report. Exhibit E-2 is a detailed memo from Ms. Holst to the ADA coordinators and wardens explaining how to access information about disabled offenders. Exhibit J-2 is Ms. Holst's memorandum on August 12, 2008 to all staff about the availability of the Accommodation Resolutions on DOC's R drive. Ms. Holst testified that once daily ADA rosters were sent out, the ADA coordinators at each facility were required to track when each disabled offender left and arrived at a facility and whether the offender had all of his or her DME.[119]

---

[114] Engstrom, p. 1831, l. 4-22; 1834, l. 2-20
[115] Holst, p. 1127, ln. 17-25, p. 1128, ln. 4-11, p. 1128, ln. 22-24
[116] Holst, p. 740, ln. 17-22, p. 742, p. 742 ln. 24—25, p. 743, ln. 1-16
[117] Holst, p. 1131, ln. 16-25, p. 1132, ln. 1-6; p. 1425, ln. 20-25, p. 1426, ln. 8-25, p. 1427, ln. 1-8; Exhibit F-2, G-2
[118] Holst p. 1427, ln. 1-8, F-2
[119] Holst, p. 1077, ln. 23-25, p. 1078, ln. 1-12; p. 1426, p. 1427  ln. 1-8; Exhibit F-2

A staff member can click on the QT profile and get more information about an offender, he/she can read the Accommodation Resolutions on the DOC R drive, and he or she can check the AIC website or call the AIC office for the specifics of the disabilities and any accommodations. Staff can also check with a facility ADA coordinator for more information. The ways that a staff person can check the status of an offender were explained in detail in the Tracking Section of the Defendants' proposed Findings of Fact/Conclusions of Law [FOF/COL] and will not be reiterated in detail here. Suffice it to say that offenders are given multiple opportunities to be identified, and staff have multiple ways to check their status.[120]

Ms. Holst gave the example of the ADA coordinator at FLCF, Wendy Grover. As Plaintiffs point out, the bed rosters at FLCF may not have always had accurate information regarding a specific disability of an offender, but that does not mean the offender was not being accommodated. As Ms. Holst noted, "there were other ways that staff would know that an offender was disabled. It wasn't dependent on what was on the bed roster."[121] She went on to describe Ms. Grover as being on top of things every day and making a sincere effort to make sure people were being accommodated and going "way above the call of duty in trying to make sure her facility was compliant."[122]

Another example of the fact that staff at the various facilities was aware of disabled offenders in their facility was a memo regarding the La Vista Correctional Facility staff's ability to track disabled offenders: "La Vista staff [like staff at every DOC and private facility] has

---

[120] Engstrom, p. 1830, ln. 18-25; p.1831, ln 4-22; p. 1834, l. 2-20' 1835, l. 5-16; p. 1838, l. 1-9; Jacobson,, p. 4003, l. 24-25; p. 4004, ln. 1-3
[121] Holst, p. 2596
[122] Holst p. 2597

access to the R drive and DOCNET and can query any offenders for accommodations if needed."[123]

Plaintiffs also raise the issue that sometimes the information that is reflected in the DOC system wide data base is inconsistent with information in the AIC database. However, there are multiple ways for staff to confirm the accuracy of data as outlined above. Any inconsistency actually works in the offender's favor, at any rate, because the ADA alert goes on immediately when the person requests screening, is identified as needing screening, or is identified at DRDC and if the person is found not to be disabled, it remains on the DOC system for 60 days in order to allow the offender to file a grievance. During this entire time, the offender is identified as disabled in the data system so staff will know that he or she is one who may need to be accommodated.[124]  It is important to point out that DOC staff work with these offenders on a daily basis; they know which ones need assistance and which ones should be sent through the process in order to receive accommodations.

Plaintiffs also argue that designated facilities are required to maintain a list of cell assignments for any inmate with accommodations. However, that is not what is required by the RP. Section XIX of the plan provides that custody staff in housing units will be made aware of disabled offenders and any accommodations necessary. The Plan does not specify how staff will be informed. The systems in place in DOC as identified in the Tracking section of the Defendants' proposed Findings of Fact outline the many ways in which custody staff are informed about an offender's disability status and any accommodations.

---

[123] Exh. 502, Holst, p. 1741, ln. 1-7
[124] Holst, p. 77, ln. 20-25, p. 78, ln. 1-20

### 3.  Proper placement of inmates with disabilities in designated facilities

There are DOC facilities that are designated to house disabled offenders. DOC made substantial investments in renovating physical facilities to provide for accommodating disabled offenders and spent between $2,000,000 and $3,000,000 to ensure the physical plant was ADA compliant and continues to make necessary repairs and improvements.[125]

The testimony of witnesses and exhibits introduced prove substantial compliance with this essential requirement of the Plan. As soon as an offender requests accommodations or is identified as possibly being disabled, the ADA alert goes on his/her DOC profile in the DOC database.[126] As a result, Offender Services knows to contact the AIC office before moving the offender to make sure he/she is moved to an appropriate facility.[127] The offender must be moved to a facility that can accommodate his/her needs, including any medical needs.[128] Ms. Holst testified that there had been some issues with Offender Services over the years, but she worked closely with that department to resolve the issues and the situation improved drastically. [129]

Mr. Dave Allen, former case manager supervisor at Colorado Territorial Correctional Facility (CTCF) testified that at CTCF prior to May 1, 2009, a move screen available to all staff listed every inmate coming into or leaving the facility on a particular day. Next to the name is a flag that indicates if the offender has a disability. Staff can query to see what preparations might be needed for a disabled offender. [130] The ADA daily movement report lets facilities know when a disabled offender will be coming to the facililty.

---

[125] Weems, p. 3253, ln.2-10
[126] Jacobson, p. 3999 ln.2-18; Holst, p. 2593, l. 9-20
[127] Holst, p. 1391, l. 19-25, 1392 l. 1-12, p. 2593, l. 9-20; Jacobson, p. 3999, l. 2-7
[128] Holst.p. 1119, ln. 17-25, p. 1120, ln. 1-14
[129] Holst, p. 1424, ln.. 18-25, p. 1425, ln. 1-6
[130] Allen, p. 3559, ln. 9-22, p. 3563, ln. 16-25, p. 3564, ln. 1-7, 20-25

Plaintiffs cite the placement of a small number of disabled offenders at the North Fork facility in Oklahoma as evidence of blanket failure on the part of DOC to place disabled offenders in designated facilities. However, Ms. Shoemaker had staff research the situation with these eight offenders, and she found the eight individuals who were placed at North Fork were not disabled at the time they were placed. Either they had not requested screening and/or accommodations or a determination had not been made.[131]  All of these offenders had been returned to the DOC well before May 1, 2009.

There have been times when offenders at CTCF were housed in the infirmary which is clearly accessible rather then put them in non accessible settings due to overcrowding. However, their stay in the infirmary was short and there was no evidence of anyone being denied access to a program or benefit because of housing in the infirmary. There was no anecdotal evidence presented that disabled offenders were being placed in inappropriate housing. On the contrary, the evidence proved that DOC is very sensitive to the requirement that disabled offenders who meet the placement criteria must be placed in designated facilities.

### 4. __Reasonable Accommodations and Healthcare Appliances__

Plaintiffs again make the tired argument that DOC failed to identify disabled offenders by May 1, 2009. As noted, this is simply not the case. DOC had identified hundreds of disabled offenders by May 1, 2009 and was accommodating all of those who had been found to be disabled, and continued to do so even as to those who were being rescreened. The voluminous AIC files kept on every individual who contacted the AIC office and the extensive records of contacts and accommodations confirm this.

Plaintiffs complain that offenders were sent back to Clinical Services for further testing if a specific alleged accommodation was not addressed by the disability screening. The AIC did

---

[131] Shoemaker, p. 2792, ln. 1-17, 22-25, p. 2793, p. 2794 ln. 1-5, Exhibit M-12

this because she believed that it was important to get medical/clinical input regarding the need for an accommodation.[132] There is nothing in this procedure that is a violation of the RP or frustrates its purpose in any way.

**Compliance with Special Master orders**

Plaintiffs also argue again that the DOC did not comply with the Special Master orders. As previously explained, that is simply not true. Initially the AIC did not list an offender as disabled if the offender had not requested accommodations or the DOC Chief Medical Officer had not so found. The AIC office opened a file on the offender and sent out request packages asking for the offender to complete the necessary forms. They sent these out three times.[133] However, any DME or financial remuneration ordered by the Special Masters was provided. After the Court ruled on this issue and the stipulations were signed, as demonstrated in Exhibit X-7, the AIC office went back and reviewed every single Special Master order finding disability, pulled the Accommodation Resolutions for each offender, and changed designations to "disabled" if a designation was not so marked for offenders found disabled by the Special Masters. They also made sure that any accommodations ordered by the Special Master were provided.[134]  Even if the Special Master did not order a particular item, if he gave the offender money for DOC's failure to provide an item, DOC gave the offender the item.[135] The AIC office was able to revise all of the Accommodation Resolutions prior to May 1, 2009.[136]

Dr. Frantz identified Exhibit E-6 which was the clinical standard for DME in effect prior to May 1, 2009 and pointed out that "it specifically states that items ordered by a special master of

---

[132] Holst, p. 1437, ln. 14-19
[133] Jacobson, p 4005, l. 12-25
[134] Jacobson, p. 4008. l. 1-22; p. 4039, l. 9-20, Exhibit X-7
[135] Holst, p. 1681, ln. 1-17; Jacobson, p. 4010, l. 23-25, p. 4011, l. 1-15; Exhibit X-7
[136] Jacobson, p. 4009, l. 7-14, p. 4010, l.. 17-19, Exhibit X-7

the Court will be provided." [137] In reviewing Plaintiffs' Appendix 6 (to which Defendants object as previously explained), it is clear that the items ordered by the SM were provided prior to May 1, 2009 in almost every case.

**Provision of DME**

Plaintiffs also raise the issue of delays in obtaining or repairing Durable Medical Equipment [DME]. Testimony established that DOC uses a third party administrator, CHP, formerly PHP, to handle negotiation and payment for outside medical referrals and DME's that are specialized to individual offenders.[138] Joanie Shoemaker testified that CHP very rarely denies a request. When it does, the DOC has the ability to override that decision.[139] Dr. Frantz testified that since 2007 approximately 92% of all initial consults for DME orders are completed within 60 days from the time the provider requests it. Out of 4100 consults for DME, there were about 190 denials. Of these, only 35, or less than 1%, were ultimately denied.[140] Overall for all consults (not just for DME and not just for disabled) the DOC denial rate averages 14% which is comparable to public sector insurance company denials.[141] The process of approval sometimes results in delays in getting the repairs completed, but the fact that there are delays that are based on legitimate reasons certainly does not frustrate the purpose of the plan.

With respect to hearing aid batteries, DOC moved to zinc air batteries which last longer.[142] These are stocked at the facilities and distributed at medline.[143] Exhibit I-6 shows when

---

[137] Frantz, p. 4386, ln. 19-25, p. 4387, ln. 17-20
[138] Shoemaker, p. 2857, ln. 8-25, p. 2858; Frantz, p.4298,  ln. 6-25, p. 4299, ln. 1-14 p. 4387, ln.24-25, p. 4388, ln. 1-25
[139] Shoemaker, p. 3096, ln. 1-9
[140] Frantz, p. 4303, ln. 18-25, p. 4304, ln. 1-25, p. 4305, ln. 1-2
[141] Frantz, p. 4305, ln. 5-13
[142] Shoemaker, p. 2853, ln. 24-25, p. 2854, p. 2855. ln. 1-7, Exhibit H-6
[143] Shoemaker, p. 2859, ln. 22-25, p. 2860, ln. 1-7

offenders picked up their batteries and Exhibit J-6 is a report regarding the number and cost of DOC's hearing aid battery purchases.[144]

Recognizing that there were delays in getting hearing aids, DOC contracted with a new audiologist well prior to the May 1, 2009 deadline. The audiologist had input into the hearing criteria and now goes to DRDC quarterly to test offenders in an effort to reduce delays.

There are sometimes delays regarding the construction of prosthetic devices. However, this is because these have to be custom fit, and it takes time to construct them. Ms. Shoemaker testified that DOC has also changed its contract for prosthetic devices to another company that has a quicker turnaround time.[145]  This was done before the May 1, 2009 deadline as well. The DOC is paying offenders pursuant to the 2008 Stipulations if repairs are not concluded within 60 days.[146]  Exhibit Z-7 is a database set up by the AIC office to track the repair and replacement claims and the payments that were made when repairs were delayed.[147]

Ms. Shoemaker designated one of her staff, Anna Marie Campbell, to oversee the provision of DME.[148]  Ms. Shoemaker also testified regarding the procedure for the property officer at each facility to be notified regarding an offender's DME.[149] The AIC provided instructions to the property officers regarding the need to put DME on an offender's property list.[150]

It is important to point out that there is no requirement in the RP that DME be tracked by the AIC office[151] despite plaintiffs' counsel's criticism of the failure to track it. It is to be listed on

---

[144] Shoemaker, p. 2860, ln. 11-25, p. 2861, ln. 1-25, Exhibit I-6; Exhibit J-6
[145] Shoemaker, p. 2878, l. 5-7
[146] Exh. Z-7
[147] Holst, p. 1702,l. 9-25; Exhibit X-7
[148] Shoemaker p. 3093, ln. 18-23
[149] Shoemaker, p. 2773, ln. 9-17
[150] Holst, p. 679, l. 1, p. 680, ln.1-6
[151] Holst, p. 1742  ln. 11-12

the property log of the offender.[152] Nevertheless, at CTCF, they developed a database to track DME equipment and repairs. The issuance of hearing aid batteries at CTCF is documented on a medication administration record.[153]

There were instances when Clinical Services provided DME to an offender in connection with his or her medical condition. This information was not always communicated to the AIC office because the condition might be temporary (not covered by the RP) or not be as the result of a disability but rather a medical need (*i.e*., after surgery, an offender might need a sling or a cane or crutches).[154] Thus, the decision regarding the period of time such an assistive device would be needed is a medical decision, not an accommodation decision involving the AIC. The DOC was addressing the needs of individual offenders and not discriminating against disabled offenders.

Plaintiffs cite the fact that DME sweeps revealed DME that was not always on the Accommodation Resolutions of offenders. Ms. Holst and Ms. Shoemaker testified that DME sweeps were conducted to help Clinical Services track and document DME.[155] This is good practice by the Department to manage DME distribution. The fact that offenders had more DME than is documented actually worked to the benefit of the offenders and is certainly not an effort to frustrate the purposes of the Remedial Plan. DME was not taken from the offenders.[156] Again, DME might be ordered by clinical services not as an accommodation but as medical reatment.[157] If so, it would not appear on the Accommodation Resolution.[158]

---

[152] Holst, p. 680, ln. 1-6
[153] Exhibit 283, Holst, p. 1607-08
[154] Holst, p. 1583, ln. 21-15, p. 1584; Shoemaker, p. 2861, ln. 10-25, p. 2862, ln. 2-8
[155] Holst, p. 664, ln. 17-232, p. 665 ln. 1-7
[156] Holst, p. 665 ln. 1-7
[157] Holst, p. 674 ln. 4-7, p. 1583, ln. 21-15, p. 1584, ln. 1-5
[158] Holst, p.1584, ln. 18-25, p. 2585, ln. 1-5

Ms. Shoemaker and Ms. Holst also testified that property officers are trained regarding documenting DME and recording it on the offenders' property lists.[159] DME cannot be taken from an offender without approval from clinical services.[160] Mr. Falk testified regarding the Denver complex procedure involving entry on the property list of DME and etching it with the DOC number of the offender so it stays with the offender. When the offender comes in from a county jail with DME, the intake nurse evaluates the need initially and on day three, the medical provider also evaluates it and if they conclude the offender needs the DME, it is etched with the DOC number and noted on the offender's property list.[161]

When an offender transfers, property is listed on an inventory list and is to go with the offender.[162] Matt Winden, the supervisor of DOC central transportation, testified that the transport officers look at the property lists and check DCIS before transport, and they are trained to transport DME with the offender.[163] They are not to remove hearing aid batteries.[164] Offenders are allowed to keep DME when they discharge or move to parole or Community Corrections.[165]

**Offender Care Aides**

Under this heading, Plaintiffs also address the issue of Offender Care Aides [OCA's]. As noted in the Defendants' proposed FOF/COL, Ms Holst explained to the court that it was not possible to comply with the requirements of the RP concerning the qualifications of OCA's.[166] The Plan states that inmates with a history of violent behavior or theft will not be aides. (RP XIV, p. 17). Ms. Holst's staff pulled the backgrounds of all the OCA's and found that very few

---

[159] Shoemaker, p. 2773, ln. 9-17; Exhibit Y; Holst, p. 678, ln. 12-23
[160] Shoemaker, p. 2773, ln. 18-25, p. 2862, ln. 9-14 Exhibit Y
[161] Falk, p. 3317, ln. 13-25, p. 3318, ln. 1-23; p. 3319, ln. 5-12
[162] Shoemaker, p. 2780-2782, Exhibit Z
[163] Winden, p. 3668, oln. 14-21, p. 3669, ln 11-20
[164] Winden, p. 3699, ln. 8-12
[165] Shoemaker, p. 2776-77, Exhibit Y
[166] Holst, p. 496, ln. 18-21, p. 497, ln. 15-23

actually qualified.[167] Ms. Holst testified that given the offender population, these requirements were too restrictive, and the Department could not find enough offenders to qualify as OCA's.[168] One of the initial problems with implementation of the RP was that some of the disabled offenders who had OCA's had become attached to and dependent on them and even though the matter for which they were incarcerated was violent, the disabled offender did not want to lose the OCA. When the ADA coordinator at FLCF terminated OCA's who did not meet the requirements, offenders became very upset.[169] Ms. Holst testified about an offender at Sterling who wanted to continue to have his aide regardless of the fact that the aide had a theft conviction. However, it was not possible given the language in the Remedial Plan.[170]

Ms. Holst noted that wardens were giving waivers to current OCA's who did not meet the requirements because the offenders the OCA's were assisting wanted to keep the aides who had helping them, often for a long period of time.[171] As a result, she recommended that the OCA qualifications be based on the offender's behavior for a two year period while incarcerated rather than the behavior before incarceration. This criteria was adopted in order to provide OCA's to those in need and to have an objective system.[172]

The DOC recognizes that it is not in compliance with the qualification requirements of OCA's as outlined in the RP. Given the impossibility of compliance, the DOC is hopeful that the Court will approve the modification as outlined by Ms. Holst. The DOC also concedes that there were discrepancies demonstrated between some cell house lists and the AIC lists regarding assignments of OCA's. However, once again, this should not overshadow the fact that the needs

---

[167] Holst, p. 2654, ln. 10-19,p. 2655 ln. 20-25, p. 2656  ln. 1-3
[168] Holst, p. 497, ln. 15-23
[169] Holst, p. 2657, ln. 12-17
[170] Holst pp. 2673-74
[171] Holst, p. 608-09 p. 610, ln. 1-18
[172] Holst, p. 2514, 2515; Shoemaker 2845, ln. 6-25, p. 2846, ln. 1-12

of the disabled offenders were being met.  The DOC wants to provide appropriate care for its own benefit; there is no reason the DOC would seek to frustrate the purpose of the RP with respect to training and providing OCA's.

**Accommodations for Diabetics**

Plaintiffs also raise the issue of accommodations for diabetics. Testimony and exhibits proved that diabetics were being accommodated as needed prior to May 1, 2009. The initial and annual refresher training for staff includes instruction about how to recognize a diabetic incident and what action to take.[173] Clinical services staff are also instructed about diabetic treatment. Testimony established that all the DOC facilities that have diabetics have diabetic kits available at all times to test blood sugar levels, and that staff are trained at roll call regarding how to use the kit.[174]  If a diabetic offender requests a finger stick, he or she may use the diabetic kit to determine blood sugar levels. Warden Ploughe from CTCF testified that diabetics are given meals timed with insulin.[175]

Richard Weems, from facilities management, testified regarding the research he and his staff did regarding obtaining intercom systems or call buttons and pendants for diabetic (and hearing disabled) offenders to use if they needed assistance.[176] He explained that there was a delay in getting the call buttons offenders wear around their necks to be used in cells that did not have call buttons. This delay was due to delays in delivery and in testing.[177] As Plaintiffs point out, there was a delay in getting Mr. Maldonado his call button at CTCF, but it was provided prior to

---

[173] Autobee,. p. 3778 – 3813 ln.20-25, ; Exhibit Y-4
[174] Shoemaker, p. 2847, ln 4-25, p. 2848, ln. 1-9; p. 2884, ln. 6-24
[175] **Ploughe,** Exhibit N-8; Shoemaker, p.2987, ln. 24-25, p. 2898, ln. 1-14
[176] Weems, p. 3259- 3264 ln,. 1-6.; Exhibit B-8
[177] Weems, p. 3264, ln8-25, 2365, ln. 1-13

May 1, 2009. [178] Strobe alarms and horns were installed at CTCF to assist hearing disabled inmates.[179]

Generally bathroom breaks are given every hour to hour and a half during programs. During visitation, offenders are given bathroom breaks either every hour and a half or two hours. Signs are posted at every visiting area informing offenders of this fact, and undergarments are available for them if they request.[180] Ms. Shoemaker explained that bathroom breaks cannot be given more frequently during visitation because of security concerns including those about contraband.[181]

In addition, no co-payments are collected for visits relating to diabetes except for the $5 chronic care charge. If an offender is charged for a visit inappropriately, he or she can petition for return of the money. Clinical staff sends the requests directly to the AIC office which researches and issues refunds as necessary.

Diabetic offenders also receive specific training regarding diabetes as well as what foods to eat and not eat to help manage the disease. DOC hired a diabetic educator, Sharon Wallick, who testified that she works with each offender regarding appropriate diet.[182]  There are signs and posters explaining what foods are appropriate for diabetics. This information is similar to that a diabetic receives outside of prison.

The plaintiffs raised some individual situations in which diabetics did not receive insulin in a timely manner. These were isolated incidents and do not demonstrate a pattern by Clinical Services. DOC agrees that insulin must be provided in a timely fashion. Plaintiffs also raise the

---

[178] Holst, p 337, ln. 8-25, 338, ln. 15-17, p. 344, ln. 18-19; Shoemaker, p. 2886, ln. 1-14
[179] Weems, p.3266, ln. 1-25
[180] Holst, p. 431, ln.17-20; p. 434, ln. 24-25, p. 435, ln. 1-14; p. 439, ln. 14-25,p. 440, ln. 1-8;Shoemaker, p.2882-3
[181] Shoemaker, pp. 2880-2882
[182] Wallick, p. 3873, 14-15, p. 3874, p. 3875-79

issue of special shoes for diabetics. Several diabetics have been provided with soft soled shoes. These are medical treatment issues that are determined by trained medical personnel. As Dr. Frantz testified, DOC uses the same standard recommended by the American Diabetes Association for soft soled shoes: if the person has a history of ulcers, is developing ulcers on his/her feet or has a deformed foot, clinical staff will approve a special shoe for that person, and it is provided at DOC expense.

With respect to assistance understanding announcements, Warden Ploughe testified that offenders were given notice of announcements that pertained to them either by the control center staff or by a work supervisor at CTCF. Dave Allen, former case manager supervisor at CTCF, testified that OCA's advise offenders of appointments, staff may advise, and medical appointments are posted in the cell house. [183] Both Warden Ploughe and Dave Allen testified that offenders are notified of routine movements through flashing of lights.[184] There is a case manager, Mr. Bell, at CTCF to whom most hearing disabled offenders are assigned, and he is available to help those who need help understanding announcements or in other ways. Ms. Holst testified that because of Mr. Bell's familiarity with hearing disabled offenders, he is able to provide them a level of assistance that other case managers may not be able to provide.[185] In addition, sign language interpreters come to CTCF every other week to meet with hearing disabled or impaired individuals.[186] This meeting gives the hearing disabled offenders the chance to express any difficulties they are having. Representatives from all areas of CTCF operations are there.[187] Staff may request a sign language interpreter for individual meetings.[188]

---

[183] Allen, p. 3514, ln. 3-13; p. 3509, ln. 14-18; p. 3515, ln. 21-25, p. 3516, ln. 1-14
[184] Ploughe, p. 3707, ln.22-25, p. 3708, ln. 1-14; Allen  p. 19-22
[185] Holst, p. 1581, ln. 1-24; Allen, p. 3516, ln.1-4
[186] Ploughe, p. 3707, ln. 9-13; Allen, p. 3510 ln. 4-7, ln. 19-25, p. 3511, ln. 1-6
[187] Ploughe, p. 3707, ln 12-13
[188] Allen, p. 3511, ln. 9-25; p. 3512, ln. 1-18

Another issue raised by Plaintiffs concerns access to TTY machines. DOC produced testimony and exhibits which proved that it has worked very hard to provide access to TTY machines for hearing disabled offenders. DOC was the first prison system in the country to place TTY kiosks in facilities so offenders had easy and private access to the phones.[189] DOC allows hearing disabled offenders to use 45 minutes on the TTY machines but only charges the offenders for 20 minutes, comparable to the time charged non hearing disabled offenders.[190] The TTY kiosks at CTCF, which houses most hearing disabled offenders, were installed in August 2008.[191]  In other facilities they were installed by May 1, 2009.[192] It is important to note that prior to the installation of the kiosks, offenders in all facilities that housed hearing disabled offenders had access to TTY machines in case managers' offices and there are volume controls on the phones throughout the department (the phone system is called CIPS).[193]

Ms. Sue Grisenti testified that prior to installation of the kiosks, CTCF set up a room with two desks and portable TTY machines to make it easier on offenders and case managers to provide TTY phones to hearing disabled offenders.[194] Technicians respond when the phones need repair within 72 hours unless all phones are down when they respond within 8 hours.[195] Ms. Grisenti or a CIPS operator trained offenders on the use of the phones.[196] When offenders requested privacy screens, they were added.[197]

Ms. Holst testified about the research that her office conducted regarding the use of the TTY kiosks by reviewing the files of each hearing disabled offender as well as his/her phone

---

[189] Holst, p. 1459, ln. 2-7; Grisenti, p.3477, ln. 1-18, p. 3482; Exhibit D-3, E-3
[190] Grisenti, p. 3480, ln. 15-25; p. 3481, ln. 1-24; Exhibit A-3
[191] Holst, p 1459 l. 15-23, Grisenti, p. 3484, l. 1-6, p. 3495, ln. 25, p. 3496, ln. 1-12
[192] Exhibit F-3; Exhibit Q-11
[193] Holst, p. 1459, ln. 1-20; p. 1060, l. 4-8
[194] Grisenti, p.3496, l. 13-25, p. 3497, l. 1-5
[195] Grisenti, p. 3478, ln. 17-25, p. 3479, ln. 1-25
[196] Grisenti, p. 3485, l. 6-13, p. 3486, l. 1-19; Exhibit B-3, Exhibit C-3
[197] Holst, p. 1461, l. 6-15; Grisenti, p. 3486, ln. 1-19

records in April 2009. They also interviewed the offenders to determine they used or wanted to use the TTY kiosks to determine which offenders would receive TTY kiosk use as an accommodation,.[198] Ms. Holst testified that even after the TTY kiosks were installed, many hearing disabled offenders did not actually use them, preferring instead to turn up the volume on the CIPS phones. [199]

In their discussion of transportation of disabled offenders, Plaintiffs cite Section IX Tracking as requiring notification to the AIC if a disabled offender is moved to a different facility. This requirement relates to notification by Offender Services to the AIC when a move is being made; it is not a requirement that the Central Transportation Unit notify the AIC office any time a disabled offender is being transported. That explains why there is no requirement in the Administrative Regulation that CTU notify the AIC of movement of a disabled offender.

Mr. Winden testified that he developed specific mandatory training for his central transportation unit regarding considerations for transporting disabled offenders.[200] His officers also have the initial and annual Montez training.[201] DOC has twelve handicapped accessible vans used to transport disabled offenders. Mr. Winden is quite familiar with the AIC office and has spoken to the office when he had questions about an offender who had an ADA alert on the screen.[202] He also testified that after there was an incident in which a wheelchair offender was injured, he reviewed the practice and procedure manual and changed some things to better reflect how to transport wheelchair offenders. He made sure his staff were all trained on the procedure.[203]

---

[198] Holst, p. 411, l.1-24, p. 413, l. 9-10, p. 415, l. 13-17, p. 416, l. 3-8,15-20, p. 1046, l. 1-10, p. 1714, l. 22-25, p. 1715, l. 1-7
[199] Holst, p. 1463, l. 1-16, p. 1713, l. 3-21; p. 1715, l. 8-25, p. 1716, l. 1; p. 1032, l. 6-17; Grisenti, p. 3487, l. 1-6
[200] Winden, p. 3667, ln. 21-15
[201] Winden, p. 3692 ln. 25, 3693, ln. 1-6, p. 3697, ln. 11-15
[202] Winden, p. 3682
[203] Winden, p. 3695, ln. 18-25, p. 3696 ln. 1

Mr. Winden also testified that after the incident in which an offender was injured, he disciplined the officers involved for failure to secure the offender with a seat belt.[204]

**5)   <u>Access to Benefits, Programs and Services of DOC on a Non-Discriminatory Basis</u>**

**Movement through the system**

There are facilities that are designated for housing offenders with various types of disabilities. Plaintiffs argue that disabled offenders are not allowed to progress to the minimum facility work camps and this is a violation of the RP. The RP does not provide for offenders, disabled or otherwise, to select their facility placements. The RP outlines certain designated facilities that are available for placement of disabled offenders who need designated placement because of the nature of their disability. The DOC has followed this placement procedure throughout the implementation of this plan by making sure that a disabled offender is placed in a suitable environment in which his or her disability can be accommodated.

The primary issue raised by the Plaintiffs with respect to housing concerns whether offenders with disabilities were allowed to move to the lower level facilities. Offenders are assigned a custody level based on a complete evaluation of the offender and are placed at a facility consistent with the custody level and medical codes.[205] Offenders cannot choose their facility, regardless of disability.[206] Both Dr. Frantz and Ms. Shoemaker testified that disabled offenders were housed at lower level facilities unless their medical conditions made it unsafe to house them in these facilities which do not have regular clinics or 24 hour medical staff. This is the case with any offender who has a serious medical condition that requires extra attention from medical staff or who could have a negative reaction and need immediate medical care regardless

---

[204] Winden, p. 3696, ln. 25, p. 2697, ln. 1-6
[205] Shoemaker, p. 2750, ln. 4-15; Shoemaker, p. 2752-54
[206] Holst, p. 1121, ln. 10-17

of whether or not they are disabled.[207]  For example, an offender with sickle cell anemia will not

be placed at Buena Vista because of the altitude.[208]  Because some facilities do not have medical

clinics, the DOC does not house offenders who have need of immediate and appropriate medical

care at those facilities.[209] For example, an insulin dependent diabetic is housed in a facility that

has the medical staff to administer insulin and to respond to emergencies.[210] As a result, certain

offenders with medical needs are not housed in the minimum centers, whether they qualify as

disabled or not.

   Disabled offenders are placed in housing based on a number of factors, just as are all

offenders.  When offenders are housed in DOC, they are assigned an M-Code (medical code) by

Clinical Services. M-Codes range from 5, indicating a very high medical need offender to 1,

indicating a healthy offender with no medical needs.[211] A diabetic would be considered an M4 if

he/she had a hemoglobin A1C equal to or greater than 9, or is a new onset diabetic who is

insulin-dependent until he/she has been controlled for three months or an

unstable diabetic.[212] M3 diabetics would be on insulin or on oral medications with a hemoglobin

A1C below 9.[213] As previously discussed, insulin dependent diabetics are not generally placed at

Level 1 facilities because of concern regarding medical needs.

   Ms. Shoemaker discussed the fact that for a period of time, M codes were being increased at

lower security facilities when diabetic offenders were transferred there. As a result, some

diabetic offenders were being moved back to their previous placement.[214] Dr. Frantz and Ms.

---

[207] Shoemaker, p. 2751, ln. 8-25, p. 2753, 2754, ln. 1-5
[208]  Shoemaker, p. 2752-53,
[209] Shoemaker, p. 2750-53
[210] Shoemaker, p. 2753, ln. 19-25, p. 2754, ln. 1-5
[211] Frantz, p. 4332, ln. 13-25, p. 4333-4340, ln.1-21; Exhibit D-2(clinical standard for medical codes)
[212] Frantz. P. 4336, ln.13-14, 22-25
[213] Frantz, p. 4438, ln. 23-24
[214] Shoemaker, p. 2599, ln. 17-21

Holst acknowledged that this was a problem that was discovered and remedied. [215] The AIC brought this matter to the attention of Ms. Shoemaker and the Chief Medical Officer, Dr. Frantz, and they testified that they made sure that when an M Code was changed in this type of situation, that they were notified.[216]  Dr. Frantz personally reviewed any change in M Code and reversed the change when appropriate. As of May 1, 2009, any time an M Code was changed to a higher level, the Chief Medical Officer was to be informed and she reviewed the situation and usually changed the M Code back to the level at which it was when the offender was housed at the previous facility.[217] A waiver was also sometimes granted to allow the offender to stay at the lower level facility.[218] Exhibit N-12 shows that diabetic M3's and M4's were placed at Arrowhead and did receive waivers.

     This is an excellent example of action that was taken by DOC to remedy a situation when the AIC raised the issue with those in the administration. Ms. Holst and Ms. Shoemaker, along with the Chief Medical Officer, discussed the problem and it was resolved.[219] Ms. Holst testified that correcting this issue was a very high priority for Dr. Frantz and Ms. Shoemaker.[220] If the AIC raised issues prior to May 1 2009, they were taken seriously and addressed. There may be isolated incidents in which this still occurs but the Dept. has addressed this concern. Also, the practice at DOC as well as the written policy is that an offender can be placed at a facility when his or her M Code is too high for that facility by receiving a waiver.

     The level 1 facilities (Delta, Colorado Correctional Center [CCC], Rifle, Skyline) have smaller capacities than the Level 2  facilities (Arrowhead, Four Mile, Trinidad) so they do not

---

[215] Holst, p. 2599, ln. 22-25, p. 2600, ln. 1-4, p. 1422, ln. 5-11
[216] Shoemaker, p. 2599, ln. 22-25, p. 2600, ln. 1-4, p. 1422, ln. 5-11,p. 1423, ln. 15-19; p. 2787, ln. 21-25, p. 2788; Exhibit N-12
[217] Holst, p. 2600, ln. 11-24, p. 1423, ln. 23-25
[218] Holst, p. 1423, ln. 1-13, 2600, ln. 24-25, p. 2601, ln. 1-5; Frantz, p. 4474, ln.. 10-15
[219] Holst, p. 2600ln. 11-24, p. 1423, ln. 23-25
[220] Holst, p. 1423, ln. 15-19

house as many offenders, disabled or not. [221]  Plaintiffs argue that the lowest security facilities have more desirable jobs and programs than other facilities. Ms. Shoemaker testified that offenders in the Minimum R facilities have access to comparable programs to those in minimum facilities.[222]  Even if they aren't housed at the lowest security level facility, disabled inmates are given the opportunity to obtain comparable employment and participate in programs at the facilities in which they are housed.

It is not necessary for an offender to go to a minimum facility in order to be granted parole.[223] Offenders parole out from all levels of DOC and it is not necessary for an offender to go through a level 1 or 2 program to be granted parole.[224] Consideration for parole release is not based on where an offender is housed but on factors such as behavior while incarcerated, the nature of the crime, input from a victim, and dangerousness to the community.[225] Offenders parole from level 2 facilities regularly.[226]

Ms. Shoemaker testified that the privileges and benefits of a level 1 minimum facility are essentially the same as those at a level 2 minimum facility.[227]  There is nothing in the Remedial Plan or Stipulations that would require DOC to place offenders in facilities that are not equipped to handle their medical needs. This would be a deviation from the standard practice of its medical personnel to be cognizant of the medical risks associated with certain conditions. This practice is the same regardless of whether an offender is disabled or not and is not a violation of the ADA or Rehabilitation Act.

---

[221] Shoemaker, p. 2746, ln. 8-19, Exhibit K-12
[222] Shoemaker, p. 2751, ln. 5-17
[223] Shoemaker, p. 2751, ln. 7-17
[224] Shoemaker, p. 3149, ln.13-24
[225] Shoemaker, p. 3149, ln. 10-24
[226] Shoemaker, p. 2751, ln. 7-17
[227] Shoemaker, p. 2751, ln. 7-17, 2752, ln.1-7

Plaintiffs also point out that disabled offenders who are transferred to CCC (Camp George West) are often transferred out the same day or the next day. Mr. Falk explained that CCC is a transfer location for offenders who are transitioning to Community Corrections or parole so many offenders only stay at CGW for one day.[228]  Most of the offenders who transfer there are transferred out quickly regardless of their level of disability.

Plaintiffs also complain that no disabled offender has been placed in the Youth Offender System. However that placement must be a sentence from a judge not an internal placement by the Department.[229]

Plaintiffs point out that many diabetics are housed at Sterling Correctional Facility, the largest DOC facility. Sterling houses all custody levels including minimum level offenders who are housed on one side of the facility while higher custody level offenders are housed on another side. [230] Diabetic offenders who meet the qualifications for minimum security are housed on the minimum side.

Plaintiffs point to the wording "no assignment to camps" in some of the screen shots used to train intake nurses at DRDC as indicating discrimination against the disabled. Ms. Shoemaker explained that this code has been inactivated and removed from restrictions since 2007 but the screen shots in the exhibits were taken prior to the inactivation.[231] Linda Caudill, an IT trainer at DOC, testified that the screen shots in the manual used for training  had not been updated because the manual is updated only when the process of how to enter information changes; the screen shots are just examples for training purposes to train people how to enter data. Some restrictions such as "no assignment to camps" and "nonsmoking cell" are still in the manual but

---

[228] Falk, p. 3320, ln. 3-9
[229] Holst, p. 1122, ln. 18-25, p. 1123, l. 1
[230] Holst, p.371, ln. 17-18, Shoemaker, p. 2744, ln. 5-16
[231] Shoemaker, p. 2768 ln. 1-14

they are no longer in use and had not been used for at least five years prior to the compliance deadline.[232]

**Educational/Vocational opportunities for disabled offenders**

One of the essential purposes of the Remedial Plan is to provide disabled offenders access to DOC programs, jobs, and services comparable to those offered to non-disabled offenders. Dr. Jeffrey Zax, a Harvard trained economics professor at the University of Colorado and statistical expert, testified that his review of DOC employment/job statistics show that as of May 1, 2009, disabled offenders were in DOC jobs and programs in a similar proportion to their representation in the DOC offender population, just as were non-disabled offenders. As much as plaintiffs would like to cloud the issue with smokescreens, the bottom line remains: disabled offenders were employed and were in programs throughout the DOC in the same proportion as they were represented in the offender population generally as of May 1, 2009. As of May 1, 2009, even though the new job program was just starting, the DOC was complying with the RP by employing and teaching disabled individuals just as they did non-disabled individuals.

Contrary to Plaintiffs' assertions about disabled inmates not having comparable access to Correctional Industries jobs, Dr. Zax's research showed that disabled offenders were represented in Correctional Industries jobs in the same proportion as they were represented in the general population.

Dr. Zax's research and testimony was very compelling with respect to access to jobs and programs provided to disabled offenders *vis a vis* the offender population at large. He analyzed the distribution of disabled and nondisabled offenders across the jobs and programs in DOC[233]. His report, Exhibit P4, very clearly shows that throughout DOC, and also in the 10 facilities that

---

[232] Caudell, 3951, 3952,  3970, Exhibits T, V
[233] Zax, p. 4059,  ln. 15-23; Exhibit P-4

house the most disabled inmates, disabled inmates are employed and in educational programs in the same proportion ("virtually identical") that they appear in the offender population at large.[234] He analyzed all job and program categories and this was true across the board with a few exceptions when very small numbers of offenders were involved.[235] In fact, he found over-representation in the Sex Offender treatment program, one of the very programs about which Plaintiffs complain.[236] Disabled offenders were slightly overrepresented in positions eligible for bonuses.[237]

Dr. Zax found that in the categories in which over 80% of the disabled offenders appear, disabled offenders were 3.8% of the population and 3.8% of the more than 8000 offenders in facility work assignments. They were 3.6% of the unassigned offenders and 4.1% of those assigned to education.[238] His analysis of employment at the CTCF tag plant as of May 1, 2009, showed that disabled offenders were employed at the tag plant in exact proportion to their representation in the offender population at CTCF. He also noted that as a peripheral observer, he had a sense that there was a fair amount of energy going into making this process more effective and fairer for disabled offenders.[239] "If you look back at the flow of inmates into disability status for the year from May 1, 2008 to April 30, 2009, the correctional system seems to be allocating those disabled inmates appropriately to the various opportunities available to them."[240]

Plaintiffs' own expert, Dr. Bardwell, stated that he had no reason to question Dr. Zax's conclusions concerning all job and employment descriptions (other than that he did not think the

[234] Zax, p. 4067,ln. 15-18; pl 4089, ln. 6-25, p.4090, ln. 1-13; Exhibit P-4
[235] Zax, p. 4067, 4068, ln. 1-19; o, 4089, ln. 6-25; p. 4090 ln. 1-8; Exhibit P-4
[236] Zax, p. 4073, ln. 10-15; Exhibit P-4
[237] Zax, p. 4071, ln. 15-23
[238] Zax, p. 4072, ln. 24-25; p. 4073, ln. 1-7; Exhibit P-4
[239] Zax, p. 4137, ln. 3-6
[240] Zax, p. 4099, ln. 20-24

underlying data was reliable).[241] He stated that any differences he found between the number of inmates and certain programs, jobs or pay codes other than the two he mentioned (flatware and unassigned) were very slight and his key findings would be the same as Dr. Zax's figures.[242] His only conclusions were that disabled offenders were overrepresented in the job category of Condiments/Flatware and that members of a new category of disabled which he added, wheelchair mobility disabled, and mobility disabled, were overrepresented in the unassigned category.[243] Dr. Bardwell did not find any other statistically significant discrepancies based on the data analyzed.[244] Dr. Zax testified that one disparity in out of 570 jobs is not noteworthy nor statistically valid not is there a separate disability category for wheelchair mobility offenders.[245]

Ms. Adrienne Jacobson, an employee of the AIC office, testified that the data that was given to Dr. Zax was reliable and came from the AIC data base. It included those offenders who had been found to be disabled and had received an Accommodation Resolution during the one year period prior to May 1, 2009. Dr. Zax testified as an expert in analysis of statistical data that he was comfortable with the data reflecting those offenders formally found to be disabled during the preceding year, and he has no reason to think those found disabled before or after the time in question were treated less appropriately.[246]  He further testified that in his research he has found that when you have a lot of rich data, it is not unusual to have to revisit data collected once you get far enough along to understand it. The fact that two reports were prepared in his case is "mundane and not disturbing." [247] He is confident that the data he used was produced in good

---

[241] Bardwell, p. 2230l. 25, p. 2231, ln. 1,2
[242] Bardwell, p. 2208 l. 21-15, p. 2209 l. 1-3
[243] Bardwell, p. 2202, ln. 18-23, p. 2204, ln. 1-10 p. 2212 l. 3-21, p. 2213, ln. 1-8, p. 2219, l. 11-25, p. 2220, ln.1-4, p. 2221, ln. 3-23, p. 2229, ln. 2-14
[244] Bardwell, p. 2212, ln. 8-9, p. 2213, ln.7-8
[245] Zax, p. 4096, ln. 1-18
[246] Zax, p. 4106, ln. 16-24, p. 4116, ln. 22-25, p. 4117, ln. 1-18, 22-25, p. 4118, ln. 1-4
[247] Zax. P. 4102  l. 16-25, p. 4103 l. 1-18

faith with the highest degree of competence, and he is comfortable using it as the foundation for his conclusions.[248]

The evidence was clear that for many years after the RP was signed, disabled inmates were employed and were attending programs. Both Ms. Holst and Ms. Jacobson testified that when they were considering appropriate accommodations for disabled offenders, they discussed employment options and possible accommodations with the offender. Ms. Holst required that the staff call offenders' case managers and set appointments with the managers and the offenders before the accommodation resolutions were prepared and that they discuss the job/program situation and whether accommodations were needed. [249] They conducted an employment survey in 2007 and found that the majority of disabled offenders were satisfied with their work or program situations.[250]

Testimony and exhibits were introduced that proved that disabled inmates are not denied benefits when they are not working. Those who are "ADA unassigned" because of inability to work continue to receive 23 cents a day even though those who are "unassigned" for other reasons do not receive pay. Disabled inmates who are ADA unassigned continue to receive earned pay and other benefits such as yard time.

Plaintiffs are critical of the new job process, contending it was not functioning as of the May 1, 2009 deadline. Pursuant to the 2008 stipulations, Ms. Shoemaker spearheaded the standardization of job descriptions throughout the Department. This was a massive undertaking as each facility had to review its job descriptions and figure out where they would fit in the new descriptions and convert them into the new descriptions. These descriptions contain physical

---

[248] Zax, p. 4103, ln. 10-13
[249] Holst, p. 1442, .ln 19-25, p. 1443, ln. 1-10
[250] Jacobson, p. 4035 ln. 16-25, p. 4036 , p. 4037 l. 1-12

requirements and essential functions for each job. This project began in the summer/fall of 2008 and was completed by May 1, 2009.[251]

As summarized in the Defendants' proposed FOF/COL, the DOC also changed the procedure for assigning an offender to a job. The new procedure as of May 1, 2009 was that the classification committee made the assignment to a job after the offender's case manager verified that the offender met the qualifications for the position. The work supervisor and the offender then discussed the need for accommodations if any. The work supervisor contacted the AIC office to review the accommodations. Ms. Shoemaker testified that this process was more objective and minimized the possibility of an offender being rejected from a placement because of a disability. [252]Admittedly, there was some initial confusion as this transition was made; it took a while for the staff to understand and implement the new procedure fully.

Understanding that there might be some confusion, Ms. Shoemaker and others sent out teams in March and April 2009 to visit with staff at the various facilities to discuss the new procedures, answer questions, and provide guidance on implementation.[253] Contrary to Plaintiffs' assertions, the reviews that were done, Exhibit J-4, demonstrate that the misunderstandings were minimal: there might be one unit at one facility that wasn't using the new standardized job descriptions, sometimes forms were not fully completed, at one facility, relief staff (not the regular staff) wasn't familiar with the new job descriptions, and that type of thing.

Ms. Shoemaker testified about all of the preparation and training that occurred in relation to the standardization of the job descriptions and the hiring process. This testimony is outlined in detail in the Defendants' original proposed FOF/COL and won't be repeated here. Suffice it to

---

[251] Shoemaker, p. 2804, ln. 1-19, p. 2802-3, p. 2809-10, p. 2811, p. 2989
[252] Shoemaker, p. 2833-34
[253] Shoemaker, p. 2823, ln. 9-25, p. 2824, ln. 1-11

say, there was considerable training and effort put into the new job process by May 1, 2009. Her testimony was echoed by four case managers from different facilities who testified that they were familiar with the new hiring process and that it was being followed at their facilities and by a DOC training employee who assisted with training regarding the new procedure.

Ms. Linda Caudill testified that she and another staff member developed training materials in August 2008 and in October 2008 about the new standardized job conversion project. Training on various aspects took place in August and November 2008.[254] She went out to the facilities between November 2008 and January 2009 to train MPS coordinators and case managers.[255]

Mr. Dave Allen, former case manager supervisor at CTCF, described the process at CTCF prior to May 1, 2009 which followed Administrative Regulation 850-03, Exhibit O-3 which outlined the new job procedure.[256] Mr. Allen and Randy Malden, case management supervisor at FLCF and chair of the classification committee, testified that the case managers at CTCF and FLCF meet with their offenders when they discuss possible work assignments. If the offender qualifies for a position, he or she is referred to the classification committee or job board which makes the work referral. The work supervisor goes over the essential functions of the position with the offender and whether there are any ADA issues. If there are, the supervisor works with the AIC office to determine accommodations which were regularly given.[257] These procedures were being followed prior to May 1, 2009.[258]

---

[254] Caudill, p. 3958, 3959; Exhibit Y-3,  E-4; p. 3961, Exhibit F-4
[255] Caudill, p. 3962; Exhbit G-4, H-4
[256] Allen, p. 3517,  ln. 21-25, p. 3519, ln. 1-5; p. 3523, ln.22-25, p. 3524-3540
[257] Allen, p. 3536, ln. 9-25, p. 3537, ln. 1-7, p. 3538, ln. 5-25, p. 3539, ln. 1-16; p. 3547, ln. 7-20; Malden, p. 3601, ln. 24-25, p. 3603
[258] Allen, p. 3540, ln. 15-18, Malden, p. 3601, ln. 10-22

Ms. Ahlin, the case manager supervisor for the Denver complex and chair of its classification committee, also testified that disabled offenders are accommodated in work situations. She testified consistently with the other case manager supervisors regarding the process of initial meeting with a case manager, referral to the classification committee that makes the assignment without regard to disability, and the meeting with the work supervisor to discuss any needed accommodations.[259] If an offender appears in the office with a disability or accommodation issue, they call the AIC office, check with work supervisors, and check with clinical services depending on the issue.[260] She testified that 10% of the gate passes issued at the Denver complex were for disabled offenders.[261] Ms. Ahlin also testified that she encourages the case managers at the complex to keep any offenders who are unassigned working if at all possible. Case managers are required to keep the population moving.[262]

Mr. Ortiz is the case management supervisor at the Canon Minimum Centers [CMC]. His testimony was consistent with the other case manager supervisors regarding the process of job assignment.[263] He testified that this process was being followed at CMC even prior to the Administrative Regulation in April 2009.[264] He testified that the number of disabled offenders in jobs at CMC is consistent with their overall representation at CMC.[265]

Mr. Malden testified that the policy changes regarding standardized job descriptions and the job process were discussed in November and December 2008.[266] In order to assist the facilities in implementing the new job procedure, teams of folks visited various facilities in March and April 2009 to discuss the implementation of the standardized job descriptions and

---

[259] Ahlin, p. 3574, ln. 18-25, p. 3576, ln, 13-20; p. 3579, ln. 5-25, p. 3580-3583
[260] Ahlin, p. 3572, ln. 13-25, p. 3573, ln. 1-2
[261] Ahlin, p. 3593, ln., 12-15
[262] Ahlin, p. 3590, ln 18-25
[263] Ortiz, p. 3634 – 3638, p. 3639, ln. 1
[264] Ortiz, p. 3639, ln. 2-9, p. 3640,  ln. 5-7
[265] Ortiz, p. 3646,  ln. 16-20
[266] Malden, p. 3608, ln. 13-22

see how the facilities were doing with the new procedures. [267]Mr. Malden testified that the audits demonstrated that the facilities were generally operating in accordance with the new processes.[268]  The results of these audits were introduced as Exhibit J-7. There were minor issues reported at the facilities such as the fact that only one unit of a facility was unsure of how to implement the plan or in one area the top part of the form was not being completed fully, but overall, the staff was aware of the new job descriptions and were using the descriptions.  As noted, offenders were certainly being accommodated in work situations before this new procedure.[269]

  An example came from one of Plaintiffs' offender witnesses, Mr. Fistell. He testified on direct examination that the AIC office did not approve accommodations for his job. However, Exhibt G-11 is an accommodation verification form under the new jobs procedure that indicates the work supervisor contacted Mr. Griffith in the AIC office and the accommodations were all approved. It lists the accommodations. It is dated May 18 ,2009 so it is a few days after the compliance deadline but it demonstrates that this work supervisor understood and followed the new job procedure.[270]

 Mr. Randy Malden from FLCF discussed the fact that disabled offenders are eligible for jobs on outside work crews. He described offender Stowbridge, a triple amputee who works for Correctional Industries, operating lawn mowers at Ft. Lyon. As part of his accommodations, he was provided with special work boots so that he could work the job. He has three prosthetic devices, and the lawn mowers are hand and foot controlled lawn mowers which he can

---

[267] Malden, p. 3610,  ln. 5-9, 23-25. p. 3611, ln. 1-6
[268] Malden, p. 3626, ln.20-24
[269] Malden, p. 3624, ln.18-25, p. 3625, ln. 1-8; p. 3627, ln. 6-8;
[270] Exhibit G-11, Holst pp. 1698-99

operate.[271] Mr. Malden also discussed offender Hannifan who is an amputee that participated in the dog program.[272] He also discussed general accommodations such as pulling offenders early for recreation and work and providing extra time to ambulate.[273] Mr. Malden testified that for offenders in the Special Medical Needs Unit at FLCF, aides play cards and video games with them and help read newspapers and written material[274]

     Ms. Ahlin also provided examples of accommodations such as a diabetic offender who worked outside the Denver Women's facility and needed to come back twice a day for insulin. The work supervisor walked with the offender to accommodate her needs.[275] Another diabetic offender was provided tennis shoes so she could work out of the facility.[276] A helper was assigned to carry food for a mobility disabled offender so she could participate in the dog program.[277]

    Prior to the new job Administrative Regulation being signed, Ms. Holst testified that the AIC's practice was to call each offender and his/her case manager and interview the offender about jobs and programs and any necessary accommodations. These interviews were completed before the Accommodation Resolution was completed so the Resolution could include job or program accommodations. Sometimes the offenders were being accommodated without AIC involvement.[278]

    Ms. Holst also testified that the informal survey she and her office conducted in 2007 regarding the employment/program situation of offenders resulted in a general finding that most

---

[271] Malden, p. 3604, ln. 21-15, p. 3605, ln. 1-16
[272] Malden, p. 3605, ln.21-23
[273] Malden, p. 3607, ln.8-22; p. 3620,  lh. 8-25, p. 3621, ln. 1-19
[274] Malden, p. 3607, ln. 23-25, p. 3608, ln. 1-12
[275] Ahlin, p. 3583, ln. 1-6
[276] Ahlin, p. 3583,  ln. 7-10
[277] Ahlin, p. 3583, ln. 16-25, p. 3584 ln.1-7
[278] Holst, p. 924, ln. 5-17. P. 933, ln. 1-5, 10-17

were satisfied with their placement. She testified that the number of complaints her office received about employment situations was very small.

Plaintiffs argue that the fact that a report outlining offenders' jobs and programs had not been prepared prior to the report prepared for this hearing somehow proves that Defendants are not in substantial compliance with the Plan. Interestingly, the report provided shows just the opposite: that DOC was in compliance with the plan on May 1, 2009. The fact that a report regarding the distribution of disabled *vis a vis* non-disabled offenders in various work and educational assignments throughout the department had not been prepared prior to the end of the compliance period is not relevant to the determination the Court is called upon to make. The Court must determine if the DOC was in substantial compliance with the RP as of May 1, 2009. That is the date reflected in the detailed report prepared by Dr. Zax in Exhibit P-4. That work proves that DOC was in substantial compliance with the RP in terms of work and educational assignments of offenders as of May 1, 2009.

Plaintiffs are correct that the private facilities were not using the new standardized job descriptions as of May 1, 2009. However, they were using the new procedure for hiring.[279] The only disabled inmates who went to private prisons were diabetics. There was no evidence presented that they were not being provided the opportunity to seek programs or employment because of disability.  Ms. Shoemaker testified in October 2010 that after the hearing recessed in July 2010, she went back to her office and made sure that the private prisons began using the standardized job descriptions.[280]

**Accommodations for Diabetics**

---

[279] Shoemaker, p.3154, ln.1-25, p. 3155, ln. 1-17
[280] Shoemaker, p. 3156, ln. 11-16

Plaintiffs in this section again raise their contention that the DOC has not identified all of the diabetics in the system, and that they are not provided adequate medical care. There are several reasons that this argument fails. Diagnosis of diabetes in an individual is made by medical personnel after an examination and appropriate testing. As is the case with any medical condition, a medical provider relies on the patient to explain any difficulties the patient is having. Laboratory tests are ordered that the provider believes are necessary for an examination.

Plaintiffs are critical of the fact that Clinical Services does not provide a list to the AIC office of diabetics. As noted, Cathie Holst testified that early on in the process of compliance, a list of diabetic offenders was provided to her office by Clinical Services. When her office contacted those on the list to see if they needed accommodations, she got several complaints from the offenders that were upset that the AIC office knew that they were diabetic. They did not want accommodations and they did not want the AIC office to know they were diabetic.[281] Obviously, they viewed their medical condition as information shared between them and the health care providers in order for them to receive appropriate medical care. They did not view themselves as disabled and did not want accommodations under the ADA.

Plaintiffs argue that DOC must have more diabetics than have been identified based on national statistics. That is pure speculation since there has been no data produced that quantifies the number of diabetics in prison settings. Those diabetic offenders who want accommodations have exactly the same access to the ADA process as any other disabled offender, or, for that matter, any offender who seeks identification and accommodation.

Dr. Frantz testified regarding the education of medical personnel in the Dept. regarding diagnosing and treating diabetes. All providers are trained through the Training Academy using

---

[281] Holst, p. 123, ln. 21-25, p. 124, pp. 125, ln. 1-9, p. 128 ln. 20-25, p. 131, ln. 5-7, 23-25, p. 132, ln. 1-19,

the lesson plan prepared by the Plaintiff's expert, Linda Edwards, "Team Management of Diabetes."[282] Clinical staff identify diabetics using clear cut diagnostic material.[283]

The medical treatment regime is not an issue in considering compliance with the Remedial Plan. Issues concerning the type or dosage of insulin ordered, the adequacy of a medical examination, and the medical treatment for a disease are not ADA issues.   The question is the extent to which a diabetic needs an accommodation under the ADA in order to have access to the programs and benefits of the DOC. For example, does an offender need to leave a program early in order to receive insulin? Does he or she need a special shoe in order to perform a job? Can an insulin-dependent diabetic leave the grounds of a facility for an entire day in order to hold a specific job? These are the appropriate types of questions to be asked in the context of the ADA with regard to diabetics.

The Tenth Circuit ruled in *Fitzgerald v. Corrections Corporation of America,* 403 F.3d 1134 (10th Cir. 2005), that the ADA and Rehabilitation Act are not available for claims of substandard medical treatment. These allegations must be brought under the Eighth Amendment or pursuant to state statutes. The Special Masters have acknowledged this time and time again in their orders regarding specific offender complaints. They note in all of their decision in which an offender seeks redress for medical care, that claims of substandard care or medical negligence cannot be resolved under the ADA and Rehabilitation Acts since such claims are beyond the jurisdiction of the Special Masters in this case because they are not ADA issues.

Regardless, the DOC has proved that it identifies and provides appropriate medical care and accommodations to disabled offenders.   DOC was in compliance with the requirements of the RP with respect to diabetics as of May 1, 2009 and had issued their updated Accommodation

---

[282] Frantz, p. 4341, ln.16-20; Exhibit B-5, p. 4343, ln. 7-15, p. 4344, ln. 22-25, p. 4345, ln. 1-17
[283] Frantz, p. 4322, ln. 14-16

Resolutions with the agreed upon accommodations well before May 1, 2009. Contrary to the plaintiffs' assertions, Ms. Holst testified that all diabetics received Accommodation Resolutions as of May 1, 2009 which included the eight accommodations that were stipulated to by the parties in the 2008 stipulations (#25).[284]  These were issued within a few months of the stipulations being signed in 2008.[285] Ms. Holst testified that she added a ninth accommodation that was not ordered by the Court nor contained in the stipulations to the accommodation resolutions for diabetics. The new resolutions with this ninth accommodation were not all delivered prior to May 1, 2009 but they were not part of the RP or the stipulations.[286]

Plaintiffs also raise the issue of when diabetics are provided soft soled shoes. Defendants introduced a standard issue boot.[287] The boot has an inner padding that is comfortable, and the boots are similar to the type that might be purchased outside the prison. The boots are specially made so that contraband cannot be placed in the soles which is a legitimate security interest for the DOC. They are also notched in such a way that footprints can be easily identified.[288] Dr. Frantz testified that medical personnel can and do order soft soled shoes for diabetic offenders when they are medically necessary.[289] Exhibit E-6 is the clinical standard for DME which states: "Diabetic offenders will qualify for soft shoes athletic type if they have documented peripheral neuropathy and a history of foot ulcers, current ulcers or an anatomic deformity that precludes a state boot."[290]  Dr. Frantz testified that this standard was taken directly from the American Diabetes Association guidelines.[291]  Tennis shoes are available for purchase in the canteen.

---

[284] Holst, p. 447, ln. 11-24 p. 1728,ln. 20-25; Exhibit M-8; Jacobsen,p. 4021, ln. 5-17
[285] Holst, p. 447, ln. 11-24; p. 1728, ln. 20-25
[286] Holst, p. 448, ln. 8-10, p. 1731, ln. 5-11
[287] Exhibit L-12
[288] Shoemaker, p. 2769, ln. 14-18, p. 2770-71; p. 2772, ln. 1-3; Exhibit L-12
[289] Frantz, p. 4389, ln. 15-25
[290] Exhibit E-6
[291] Frantz, p. 4389, ln. 22-25

The DOC recognizes that there are many diabetics in its system and has undertaken audits of the health care provided to diabetics in an effort to be pro-active. These are conducted twice a year to assist the medical staff at the facilities. Plaintiffs are critical of the fact that the audit to be completed in December 2008 had to be postponed because Mr. Hoffman, an employee in the Quality Management program, discovered that the underlying data might be flawed.[292]  The fact that Mr. Hoffman was careful to notice discrepancies is a positive development for DOC, not a negative one. This demonstrates that the Department is committed to developing reliable reports which can be used to improve treatment. Mr. Hoffman went through the data and the results manually from each facility and compared DOC facilities' performance with prior years and with the national data.[293]  Dr. Frantz testified that she talked with Mr. Hoffman about the data that was collected initially for the December 2008 audit, and she agreed that the data was not collected correctly so she agreed that it would be best to educate clinical staff about how to collect the data and get new data. The collection of the data had nothing to do with whether care was being provided to diabetics.[294]

Plaintiffs are very critical of the results of the diabetic audits performed regarding testing and treatment of diabetics in the DOC system. The very purpose of the audits is to monitor how well DOC Clinical Services is treating diabetics and improve care.[295] Overall, the audits showed that DOC's results are comparable or better to those measured at the national level.[296] Dr. Frantz noted that the national statistics DOC uses for comparison, HEDIS (Healthcare Effectiveness Data Information Set), in some cases measure slightly different data. For example, the HEDIS

---

[292] Jordan, p. 3916, ln.24-25, p. 3917, 3918,
[293] Jordan, p. 3915, ln. 5-22, p. 3925, ln. 13-25, p. 3926  ln. 1-8
[294] Frantz, p. 4424, ln. 15-25, p. 4425, ln. 1-5
[295] Jordan, p. 3902 ln. 23, p. 3903, ln. 1,2; Frantz, p. 4360, ln. 22-25, p. 4361, ln. 1-17
[296] Jordan, p. 3911,  ln. 20-25; p. 3912,  3913,  3914, ln. 1-20; p. 3921 ln.4-25, p. 3922, ln.22-25, p. 3923 ln. 10-25, p. 3924; Exhibit N-5, O-5; Frantz, p. 4399 ln, 12 -24,

figures do not include all diabetics whose hemoglobin A1C is under 7% whereas the DOC figures do include all.[297] There is nothing else in the private world as comprehensive as the HEDIS data set, and there is no correctional data set that looks at chronic disease management in prison, so these are the best statistics available for comparison.[298] The national figures show that there are many diabetics outside of prison who are not in good control of their diabetes despite having medical care available.[299] Effective treatment of diabetes requires that the patient take an active role in his/her care. Dr. Frantz and Brian Hoffman from DOC's Quality Improvement department follow up with the clinical staff at the facilities regarding any areas in which deficiencies are found.[300]

Plaintiffs' expert, Linda Edwards, testified that the National Committee for Quality Assurance evaluates healthcare organizations based on their adherence to the HEDIS measures.[301] They collect data from commercial insurers as well as Medicaid and Medicare. She further testified that these standards are used by 90% of America's health care plans including her own employer, Kaiser Permanente.[302]

The audits provide DOC with useful information regarding the status of diabetic offenders in the system. A comparison of the data from DOC with that collected for HEDIS shows that DOC treatment results compare favorably with national data relied upon by national diabetic organizations.[303] The percentage of persons who are not controlled is very similar to that reflected in the national data which measures those outside of prison. The results are comparable to health care providers who deal with the general population nationwide. Ms. Edwards agreed

---

[297] Frantz, p. 4362, ln. 16-25, p. 4363, ln. 4-20, p. 4366 ln. 6-15
[298] Frantz, p. 4363, ln. 6-20
[299] Frantz, p. 4412, ln. 17-25, p. 4413, ln.1-15
[300] Jordan, p. 3903 ln.20-25, p. 3904 ln. 1-7; Frantz, p. 4361, ln. 18-25, p. 4362, ln. 1-15
[301] Edwards, p. 2017 , ln. 4-9
[302] Edwards, p. 2018, ln. 2-5
[303] Edwards, p. 2023-2034; Exhibits O-5 and  N-5

that the results of the DOC audits demonstrate that the DOC measurements outperform or are equal to the diabetic measurements reflected for Medicare, Medicaid and commercial insurers in the HEDIS data.[304]

Dr. Frantz testified that in her opinion DOC provides a good standard of care for diabetic patients and that their services are consistent with the recommendations of the American Diabetes Association.[305]

With respect to retinopathy, the Plaintiffs state in their proposed findings that the American Diabetes Association standards require documentation of whether or not retinopathy is found to exist after an eye exam. However, the Plaintiffs fail to cite to any portion of American Diabetes Association standards  in which this requirement is listed.

Plaintiffs also question the staff training being provided regarding diabetes. However, the plaintiffs' expert, Linda Edwards, herself, wrote the initial training materials used by the DOC. Training records were admitted that demonstrate that staff throughout the department received the training regarding diabetes. Plaintiffs cite to one entry in one AIC record in which a nurse practitioner asked some questions of the AIC concerning a diabetic offender as an example of lack of training. This entry is an excellent demonstration of the fact that medical personnel as well as staff throughout the department knew to contact the AIC if they had questions about diabetic offenders. The nurse practitioner did exactly the right thing by getting more information before taking action.

Plaintiffs make an issue of the fact that the AIC was not specifically involved in the diabetic training implemented by DOC. There is no requirement in the RP nor the Stipulations that she be involved. The AIC office had multiple responsibilities regarding implementing the

---

[304] Edwards, p. 2023-2034
[305] Frantz, p. 4428 ln. 8-21

plan and other responsibilities were handled by other sections of the DOC. The Training

Academy staff handles all of the training for new hires as well as the annual training so it was

certainly appropriate for them to develop and administer the training regarding the ADA.

Plaintiffs cite the cases of four diabetic offenders to prove that there was a pattern at

DOC of failure to provide diabetics with medication in a timely manner. With respect to Ricky

Tenorio, the DOC has acknowledged that he should not have gone so long without insulin when

he was transferred to Delta. This was an error that was acknowledged by DOC.

 The circumstances surrounding Mr. Hassler's claims are in dispute. Mr. Hassler claims he

tried to get an officer's attention at 10:37 p.m. one evening because he was suffering a diabetic

episode. The Defendants introduced evidence that what Mr. Hassler says occurred at 10:37 p.m

did not occur. Ms. Shoemaker testified that she and her staff investigated the allegations made

by Hassler. There was no indication that anything happened before approximately 1:20 a.m. the

next day.[306] There are no entries in log books; there is no record of a call button being used.

When Mr. Hassler first pressed his call button for help around 1:20 a.m., he was immediately

helped by staff and an ambulance was called which subsequently took him to a hospital and he

was flown to Denver Health.[307]  He was found to have had a vascular hemorrhage (stroke)

unrelated to diabetes.[308]  His care at DOC was appropriate.[309]  Nothing in this scenario reflects a

violation of the RP.

Dr. Frantz addressed the allegations of the remaining offenders mentioned, Anthony

Vaughn, Charles Simpson and Hector Martinez-Jimenez in Exhibit S-12. That exhibit reflects

Dr. Frantz's review of the medical records of the many offenders about whom the plaintiffs

---

[306] Shoemaker, p.2850, ln.6-18; Frantz, p. 4456, p. 16-21
[307] Shoemaker, p. 2851 ln. 9-25, p. 2852, ln. 1-24
[308] Frantz, p. 4457 ln. 16-23
[309] Frantz, p. 4454, ln.18-25, p. 4455,  p. 4457, ln.11-15, ln.19-23

introduced evidence and outlines the actual records of their experiences at DOC. It refute the claims made by the offenders regarding appropriate care and treatment at DOC.[310]

   In summary, as noted throughout this response, the DOC has been very proactive in addressing the diabetic population. Among other things, DOC was doing the following as of May 1, 2009:

- The DOC had diabetic educators who worked with offenders to educate them about proper nutrition and exercise to help control the diabetes prior to May 1, 2009. Sherrie Wallick, a registered dietician, was hired in 2008 and testified about the training and education provided to diabetics in the system. She offers a presentation to all diabetic offenders once a year which includes information about carbohydrate consumption, food choices, life style choices, blood sugar control, signs of hypoglycemia and so forth.[311] She works with the facilities regarding a diabetic menu.[312] She develops and updates diabetes nutrition education material and develops strategies to deliver comprehensive diabetes and nutrition education classes. She provides individual consults to diabetic offenders.[313] She identified a DVD that is shown to offenders about carbohydrates and making choices within their meals.[314]

- The food service areas in the facilities had posters with the carbohydrate counting. [315]

- Exhibit L-5 is a series of 24 educational posters that provide information to offenders about diabetes that are displayed in living units, clinics and food service areas.[316] These were illustrated by offenders. This information is also scrolled as a titler message on the

---

[310] Exhibit 12
[311] Wallick, p. 3873, 14-15, p. 3874, p. 3875-79
[312] Wallick, p. 3863, ln. 23-25, p. 3864, ln. 1-4, p. 3868, ln. 20-25, p. 3869 ln. 1,2 p. 3869 ln. 3-16; Exhibit G-5
[313] Wallick, p 3864, ln. 3-10, p. 3869, ln.22-25; p. 3870, ln. 1-24; Exhibit I-5, J-5, K-5
[314] Wallick, p. 3872, ln. 20-25, p. 3873, ln.1-2; Exhibit I-5
[315] Wallick, p. 3871, ln. 10-16

offenders' TVs.[317] Dr. Frantz testified at length about the importance of the information on the posters and that the material is very useful for diabetics in helping them understand how to control the disease. These posters are in Spanish as well as English.[318] Exhibit M-5 is a patient education sheet that is reviewed with offenders who have had a hypoglycemic episode or reaction.[319]

- Offenders were not charged for medical visits related to diabetes or other disabling conditions. Those with chronic diseases such as diabetes are scheduled for chronic care visits every 6 months and only pay one $5 charge annually.[320] They were reimbursed if they are charged inappropriately.[321] Annual audits confirm that co-pays were being handled appropriately.[322]

- There were signs throughout all facilities regarding bathroom breaks during visitation and letting diabetic offenders know how often there are breaks. Undergarments are provided as well.

- Staff received initial and annual training that includes information about diabetics including the need for timing of meals with insulin, need for snacks, hypoglycemic reactions and so forth. [323]

- Facilities which house diabetics that do not have continuous medical care available had diabetic test kits which allow offenders to test their blood sugar level. Staff receives training on how to use these every 6 months at roll call.[324]

---

[316] Exhibit L-5; Frantz, p. 4346, ln. 3-25, p. 4347, ln. 1,2.
[317] Frantz, p. 4346, ln. 21-25, p. 4347, ln. 1-5
[318] Frantz, p. 4335, ln. 18-25, p.4346 – 4359, ln. 1-5
[319] Frantz, p.4359, ln. 6-25, p. 4360, ln. 1-14
[320] Holst, p. 1736, l. 21-24
[321] Holst, p. 235, ln. 7-23, p.1735, ln. 24-24, p. 1736, p. 1737, ln. 1-20; p. 1738, ln.18-25, p.1739 ln. 1-5; Exhibit K-8, Exhibit P-8; Q-8
[322] Shoemaker, p. 2896-97; Exhibit L-8
[323] Autobee, p.3778-3814, 3819, Exhibit Y-4; Frantz, p. 4341, ln. 14-25, p. 4343, ln, 6-15, p. 4344, ln. 5-25, p. 4345, ln. 1-17; Exhibit D-5

- Diabetic medline existed at designated facilities so diabetics on insulin could be released early to go to medline and then directly to the dining hall for meals.[325]

- Diabetic audits are conducted twice a year to monitor diabetic care in the facilities. Mr. Hoffman goes through the charts of diabetics when he is collecting the data for the audits. He contacts clinical services people directly when he has a question.[326]Dr Frantz testified that she reviews the diabetic audits and sits down with providers in the facilities in which issues are identified. They come up with an action plan that is then followed by the health care staff at that facility.[327]

**Evacuation procedures**

Plaintiffs also complain about evacuation procedures at Fort Lyon Correction Facility. However, the evidence was clear that Fort Lyon staff were able to evacuate all floors of Building 5 which houses many disabled and elderly offenders in 15 to 20 minutes, well within acceptable limits.[328] With respect to the specific day in question there was a period of time when one elevator was closed because the DOC was waiting for parts. The other elevator was rendered inoperable by an offender during that period of time, and another offender pulled the fire alarm.[329] Since the elevators were not usable, staff brought the offenders down either with the Evacu chair present in the stairwell or by assisting them in walking down the stairs. The entire evacuation was completed without incident and within 30 minutes.[330] It is also important to note that these buildings have fire walls that can be shut if there is really a fire. The video reflected well trained and competent staff moving disabled offenders out of the building in an

[324] Shoemaker, p. 2847, ln. 9-25, p. 2848, ln. 1-22, p. 2885, ln. 2-5; Autobee, p. 3814, ln. 7-20; Exhibit D-5
[325] Frantz, p. 4408 ln. 12-24; p. 4319, ln,. 13-25, p. 4320, ln. 1-4
[326] Jordan, p. 3905 ln.5-13
[327] Jordan, p. 3905, ln.16-25, p. 3906 ln. 15-23
[328] Gilmore, p. 2686, ln, 9-15
[329] Gilmore, p. 2716, ln, 16-25 p.2717, ln 1-9;p. 2695, l. 11-25, p. 2696, ln. 1-22;  Exhibit 4
[330] Gilmore, p. 2715, ln. 25, p. 2716, ln. 1-5

orderly but quick fashion. Ricky Gilmore, the former life safety office at FLCF, testified that he was very impressed with how well trained the staff was and how well the evacuation went.[331]

Plaintiffs argue that the concentration of disabled and elderly offenders at Ft. Lyon endangers the safety of the offenders if there is an emergency. Defendants do not agree with this analysis and Plaintiffs did not substantiate this. Ft. Lyon Correctional Facility will be closed by March 2012.

**Access to programs in infirmaries**

Plaintiffs also complain of lack of access to programs and services in the infirmaries. However, Ms. Shoemaker testified that offenders in infirmaries have access to library materials, TV, and they can participate in some programs. The folks that were placed there at CTCF were placed there temporarily while in transport to another location or until accessible cells became available.

**Review of Programs by AIC**

In their proposed FOF/COL, plaintiffs cite to Section VIII(D) of the RP concerning review of programs available to inmates by the AIC. There is no Section VIII(D), presumably they are referring to Section XIII(D) . Be that as it may, the AIC testified that whenever there was a question about an offender's assignment, the AIC and her staff would track down those involved and find out what was occurring. Ms. Holst testified that the number of complaints her office received about jobs or educational programs was very small. When she and her staff conducted a survey of disabled offenders regarding work assignments in 2007, they found that most were satisfied with their placements.

**Access to Sex Offender Management Programs**

---

[331] Gilmore, p. 2709, ln, 14-25; p. 2719, ln. 1-8

Plaintiffs also complain about access to the Sex Offender Treatment program for disabled offenders. Peggy Heil, the director of sex offender treatment at the DOC, and Ms. Shoemaker explained that there are two phases of sex offender treatment, Phase I and Phase II.[332] Offenders have to qualify to be admitted to these programs. There is an extensive waiting list for this treatment because of the limited classes available. DOC has a prioritization protocol for determining who will be in the classes.[333] Disability status is not considered for eligibility for the program; if special needs are involved, DOC makes those arrangements.[334]

The Phase II program was primarily offered at Arrowhead prior to the 2008 Stipulations. Because of some of the restrictions regarding placement at the Arrowhead facility, and pursuant to the Stipulations, the DOC began a new SOTMP phase II program at CTCF in August of 2008.[335] Disabled offenders were able to participate in this program if they were high enough on the waiting list and if they qualified.

Plaintiffs' counsel questioned Ms. Holst about individual offenders and their ability to access the program at CTCF.  During Ms. Heil's testimony, she clarified that the four offenders about whom the Plaintiffs' attorneys had questions were seeking admission to Phase I of the sex offender program, not the Phase II program at CTCF which was the subject of the hearing.

Specifically, Mr. Gookins had a discharge date of June 21, 2008 which meant that regardless of his participation in SOTMP, he would discharge his sentence on that date. Since he had a determinate sentence, he fell into the second prioritization group, which had a lower level of priority for sex offender treatment than those who have sentences to life time supervision and need to get the treatment in order to be eligible for release. He was on the waiting list for Phase

---

[332] Heil, p. 3392, 3393; Shoemaker, p. 2889
[333] Heil p.3392, 3393, 3394, 3396, 3397, p. 3430-31; Shoemaker p. 2010, 2889, 2891; Exhibit D-8; Exhibit E-8
[334] Heil, p. 3397, 3398,3400, 3418, 3420, 3421-22, 3426; Shoemaker, p. 2891.
[335] Heil, p. 3401; Shoemaker, p. 2889, 2890

I, not Phase II. He was not video conferenced into the Phase I group at FLCF or moved to CTCF because he was not high enough on the waiting list.[336]

Another offender about whom Plaintiffs' counsel questioned Ms. Holst was Mr. Cullivan. Ms. Heil explained that Mr. Cullivan has a determinate sentence with a mandatory release date of May 9, 2012. Because he has a determinate sentence, he has lower priority for entering a class than those with indeterminate sentences. He was on the waiting list for Phase I but had not progressed far enough on the list to be placed in a class as of October 2010.[337] Thus, his situation is not relevant to the Phase II question raised by the Plaintiffs.

Another offender class counsel raised was Mr. Cordova. Ms. Heil testified that he also has a determinate sentence so he is not on the high priority list for SOMTP. He was placed on the waiting list for Phase I in April 2008. At the time a move was being contemplated for him to participate in the program in 2007, he did not qualify. He was still on the waiting list for Phase I as of October 2010.[338]

Class counsel also questioned Ms. Holst and Ms. Heil about video conferencing offenders for participation in SOMTP. Ms. Heil testified that this had been done for two offenders, Jay Bailey for Phase I and Walter Hanson for Phase II. This only occurs when an offender is next on the waiting list so that he is eligible but cannot be moved to a facility where the program is available for whatever reason. Permission has to be granted from the SOMTP Board. Mr. Bailey was terminated from the program due to non-compliance. Mr. Hanson participated in Phase II while he was housed at Fremont and when he was moved to FLCF, the video conference was established so he could continue treatment.[339]

---

[336] Heil, p. 3405-10, Exhibits 376, T-12,W-12.
[337] Heil, 3410-13, Exhibits 595, V-12, U-12
[338] Heil 3413-17, Exhibits 661, X-12, Y-12
[339] Heil, 3404-5, 3428 3431,3432.

Whether or not an offender was disabled does not bear on his or her access to SOMTP. Admission to this program is based on eligibility and release date which determine placement on an extensive waiting list. Accommodations were made, if necessary, for offenders to attend by video. In fact, Dr. Zax found that disabled offenders were overrepresented in the Sex Offender program as of May 1, 2009.[340]

**6) <u>Notification to Class Members of Rights Under the Remedial Plan</u>**

Testimony conclusively established that offenders are given thorough information about the procedures that are available to them in the event they believe they have a disability. They view a continuously running video at DRDC which is signed and closed captioned which explains their rights.[341] They also receive material about the Remedial Plan during orientation at DRDC. [342]

When they arrive at their permanent facility, offenders go through orientation. The process may differ at different facilities, but several witnesses testified that offenders are informed of their ability to request accommodations if they believe they are disabled.[343] Dave Allen, the former case manager supervisor at CTCF, testified that offender disabilities are discussed during orientation.[344] Assistance will be provided during the orientation if needed, such as a sign language interpreter. Offenders are provided with an ADA orientation handbook which explains the ADA procedures in detail.[345]

---

[340] Zax, p. 4073, ln. 1-7
[341] Exhibit I; Falk, p. 3279, ln. 10-18, p. 3280, ln. 13-17; Exhibit I
[342] Falk p. 3303, ln. 2-25, p.3304, p. 3305 ln.1-8; Exhibit Q, p.4; Exhibit K ; **Exhibit Z ;** Holst, p. 1648, ln. 3-25, p. 1649, ln. 1-7
[343] Falk p. 3294, ln. 6-21; p[. 3303, ln. 5-25, p. 3304,  p.3305, ln. 1-8; p. 3506 ln.1-25- 3518; p. 3320, ln. 10-25, p. 3321, ln. 1-20; p. 3322, ln 1-21;  Allen, p. 3503, ln. 4-22, p. 3506, ln 2-12, p. 3507 ln. 23-25, p. 3508 ln. 1-24; Exhibit K; Exhibit M; Exhibit Q; Exhibit U-6
[344] Allen, p. 3501-3518, p. 3521-23; Exhibit U-6
[345] Allen, p. 3506 ln, 23-25, p. 3507, 1-25; p. 3521, ln. 9-25, p. 3522,  p. 3523, ln. 1-19; Exhibit U-6

For example, Plaintiffs' Exhibit 297 is Delta's offender orientation handbook which states that the Montez Remedial Plan and Stipulations are available for viewing in the general library and informs offenders that they can contact the litigation coordinator to obtain a copy in a format compatible with a disability.[346] Exhibit 312 contains orientation materials from Sterling Correctional Facility which contains a sheet, "Information Regarding Disabilities", which is signed by the offender and the case manager regarding what an offender with a disability should do.[347] Exhibit 495 is the offender orientation handbook for the Canon minimum centers. It contains information for offenders with disabilities regarding the process for requesting accommodations and how to obtain copies of the RP as well as the fact that they can obtain necessary equipment in the law library. It also tells offenders where to view the evacuation process in a video and how to see it in a large print version and that posters are being developed to explain evacuation. [348]

After they arrive at a permanent facility, offenders meet with a case manager who explains the process at the facility. All case managers were trained by Ms. Holst in regarding the Montez case and the requirements of the Remedial Plan.[349] In addition, there are big yellow posters up throughout the facilities that explain offender rights under the Plan.[350] These are in the private prisons as well.[351]  Plaintiffs' counsel has sent at least three letters to potential and current class members explaining rights under the plan to explain the right to bring a claim for damages. A copy of the RP is in the libraries of facilities. [352]

---

[346] Exh. 297, Holst p. 1636-37.
[347] Exhibit 312, Holst p. 1641
[348] Exhibit 495, Holst p. 1644-45
[349] Exhibit W-5
[350] Holst, p. 1638-1639
[351] Brubaker, p. 1-9; Exhibit A-6
[352] Holst, p. 874; Holst, p. 1670, ln. 20-22

Plaintiffs' hearing expert, Larissa McClung, testified that DOC is communicating information about Montez to hearing disabled offenders. [353] There is a video offenders can watch on their personal TV's. The offenders with whom she met were familiar with and had copies of the RP and she saw the yellow posters in the facilities.[354] In fact, Ms. McClung mentioned a number of things that DOC is doing that are helpful to hearing disabled offenders.[355]

The number of ADA grievances received constantly by the AIC office belies any thought that offenders are not familiar with their right to file grievances. It also proves beyond any doubt that offenders not only know about these rights, but they exercise them. From the sheer number of ADA grievances received, Ms. Holst believed that they were very aware of the process.[356]

Offenders are not hesitant to contact counsel or the Court about this case judging by the volume of correspondence the Court and Special Masters receive. They also file hundreds of grievances with the AIC pertaining to disabilities.

Ms. Holst testified that there were very few complaints from offenders about lack of information available at DOC concerning the Remedial Plan; it was not an issue in her mind.[357] Ms. Holst testified that she did not think there was any way offenders do not know about the Montez case.

**Additional information**

The DOC was found by the well respected national correctional association, the American Correctional Association, to be in full compliance with all of the national correctional standards related to offenders with disabilities and was one of fourteen states to receive the Eagle Award

---

[353] McClung, p. 2311,ln. 19-25, p. 2312. Ln. 1-9
[354] McClung, p. 2311, ln. 19-15, p. 2312, ln. 1-19
[355] See #352
[356] Holst, p. 1480, ln. 24-25, p. 1481, ln.3-15, p. 1482, ln. 1-4
[357] Holst, p. 1711, ln. 5-15

in 2008.[358]  This is not just an award given to correctional systems without thorough evaluation. The audits that ACA conducts are extensive and detailed.[359]

Tami Williams is the accreditation administrator for the DOC. She testified at length about the process followed by DOC. It includes annual internal audits and national audits every three years. The annual audits are conducted by outside teams of experts and include surveys of offenders and staff. They include audits of medical services as well as operational issues.[360] Exhibit R-12 was prepared by Ms. Williams and lists all of the approximately forty-four ACA standards that relate to disabled offenders and RP issues. Ms. Williams testified that DOC has been 100% compliant with these standards since she became the ACA coordinator in 2006. [361]

Ms. Shoemaker is an accredited national auditor. She described the extensive efforts that go into the audits.  A national team of auditors visits the correctional system being audited for several days and also collects a myriad of information before the team arrives. They conduct interviews and have questionnaires filled out by offenders as well as staff. [362] The fact that DOC passed all of the ADA requirements as well as received the Eagle award for its overall compliance with all of the sections of the standards is a great honor for DOC. Ms. Shoemaker testified that DOC is one of the most progressive systems with respect to identifying disabled offenders.[363] The award is national recognition that DOC complies with all national standards for state correctional systems including those for handling disabled offenders.

There has been extensive training of all DOC employees regarding all types of disabilities, not just the Montez disabilities, starting with basic training and refresher training. Amber

[358] Zavaras, p. 2727
[359] Zavaras, p. 2727
[360] Williams p.
[361] Exhibit R-12, Williams, p.
[362] Shoemaker p. 2900 ln. 1-19
[363] Shoemaker, p. 2900. Ln. 24-25; p. 2901, ln. 1-11

Autobee from the Training Academy testified in great detail about the basic training which includes specific sections regarding vision and hearing disabled as well as mobility disabled.[364] This training was developed with outside experts: Linda Edwards regarding diabetes, Larissa McClung regarding hearing, and Julie Deden ,Colorado Center for the Blind, regarding vision disabled[365] The staff are tested on this material[366] and given an annual refresher[367]  Larissa McClung testified that DOC is in compliance with training required by RP as it relates to hearing disabled.[368] Exhibit B-5 is "Team Management of Diabetes" developed by Plaintiffs' expert, Linda Edwards for  new clinical providers.[369] Dr. Frantz testified about training she did to providers regarding the criteria for a finding of disability.[370] Diabetic kit training is also provided throughout DOC. [371]

Richard Weems testified that the physical plant managers were trained with materials prepared by the Plaintiffs' expert, Peter Orleans.[372]  Travis Brubaker testified that Montez training is provided to private prison employees including the basic and refresher courses as well as the diabetic kit training.[373]

The Court has questioned whether anyone was disciplined for violating the RP. Mr. Zavaras testified that if there is a violation of a provision of the plan, they are dealt with in the DOC disciplinary system.[374] For example, the officer would be disciplined for conduct unbecoming an officer or other violations that would fit the situation. As previously noted, Mr. Winden testified

---

[364] Autobee,  p. 3778 – 3813 ln.20-25, ; Exhibit Y-4
[365] Autobee, p. 3800, 3808, 3812
[366] Autobee, p. 3815
[367] Autobee, p. 3813- 14 Exhibit Z-4, F-5
[368] McClung, p. 2090, p. 2124, ln. 6-25
[369] Autobee, p.3819, ln. 21-25
[370] Frantz, Exh. P-5 (test), R-5 (rosters) T-5 (test scores)
[371]  Autobee, p. 3814 ln.7-20 Exhibit D-5

[372] Weems, p. 3253, ln 20-25, p. 3254- 3258 ln.1-18;
[373] Brubaker p. 3928, ln.20-2, p. 3929, ln. 1-22, p. 3930, 3931, 3932, 3933 ln. 1-18; Exhibits A-6, B-6, Y-5
[374] Zavaras, p. 3247

that he disciplined the officers who were involved in the incident that resulted in a disabled offender being injured in a transport.

The Defendants urge the Court to review Dr. Frantz's summary of the records of most of the offenders who were referenced in the Plaintiffs' case which is Exhibit S-12. Defendants did not go through all of those in this pleading but the exhibit was admitted into evidence and contains a great deal of information regarding the situations of the individuals. Just to make the record clear, Dr. Frantz was qualified as an expert in Correctional Medicine and Family Practice, not just in diabetics as stated by the Plaintiffs in their FOF/COL.

Finally, the words of Warden Ploughe, from CTCF, the population of which is about 25% disabled, are indicative of the approach the staff at DOC were taking to the RP before May 1, 2009. When asked how often she deals with Montez issues, she stated: "Every day. Since I've been the warden at Territorial, we have definitely made it a focus to make sure that the decisions we make, that we give consideration to ADA and to -- not only to access, but to programs or any other issues that we might be dealing with, operational decisions."[375] . . . at Territorial, we really do make ADA our focus. . . whenever we do anything, those are our considerations. . . I've made it a real focus of staff that they need to – if they have any questions or issues, then they need to make sure that they attach – that they look at the accommodation resolutions that are available on DOCNET." [376]

### Conclusion

The evidence presented during the many days of testimony and in the voluminous exhibits has proved that DOC is committed to implementation of the RP and that it has been implemented throughout its facilities. The Defendants submit that the evidence has clearly

---

[375] Ploughe, p. 3705, ln. 7-12
[376] Ploughe, p. 3711,ln. 21-25, p. 3712, ln. 1-6

demonstrated that DOC had substantially complied with the Remedial Plan as of May 1, 2009, and were not frustrating its essential purpose. The two year monitoring period is either over because it began on May 1, 2009, or it should begin as of the Court's ruling finding substantial compliance. DOC staff at all levels have spent countless hours implementing the many provision of the RP. Millions of dollars have been spent in the implementation of the RP. The implementation of this RP has been a top priority of the management team of DOC for many years. Although there are lapses from time to time involving individual offenders, the overall compliance is impressive and sincere. Defendants ask that the Court find DOC was in substantial compliance with the RP as of May 1, 2009.

If the Court concludes that, overall, the DOC was not in substantial compliance with the Remedial Plan as of May 1, 2009, Defendants request that the Court specify those sections of the Remedial Plan in which the Court concludes that the DOC was not in substantial compliance so that the compliance period will continue with respect to those sections but is concluded with respect to other areas, and the monitoring period will begin for those areas in which DOC is in substantial compliance. (This is the procedure that was followed with the architectural/physical plant changes.) The court in *Wyatt v. Rogers, Supra,* followed this type of procedure in finding that the defendants were in compliance with respect to most of the requirements of the decree and released them from supervision in those areas but asked the parties to submit a proposal for small compliance hearings that would focus on narrow aspects in which there were still concerns. A procedure of this type will also allow Defendants to focus their efforts on areas in which the Court has identified deficiencies.[377]

---

[377] Defendants also suggest that the Court establish a regular reporting period for the DOC to submit written reports regarding any areas in which substantial compliance is not found. For example, the Court could require that DOC submit a written report every quarter or six months to update the Court on progress in addressing any areas in which the Court has found a deficiency in substantial compliance.

Respectfully submitted this 22 day of  August, 2011


JOHN SUTHERS
Attorney General


 _/s/ Elizabeth H. McCann_____
ELIZABETH H. MCCANN 5834
Civil Litigation and Employment Law Section

JAMES X. QUINN, 21729
First Assistant Attorney General
Correction Unit
Civil Litigation and Employment Law Section

Attorneys for Defendants

1525 Sherman Street, 5th Floor
Denver, Colorado  80203
Telephone:  (303) 866-3261

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 22nd of August, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Paula Greisen
Jennifer Riddle
Counsel for the class
King and Greisen, LLP
1670 York St.
Denver, Co. 80206
303-2987-9878
greisen@kinggreisen.com
riddle@kinggreisen.com

Edward T. Ramey
Heizer Paul Grueskin LLP
2401 15th Street, Suite 300
Denver, CO 80202
Main:  303-595-4747
Direct:  303-376-3712
 eramey@hpgfirm.com

Lara E. Marks, Esq.
621 17th Street, Suite 1900
Denver, CO 80293
(303) 333-9810
lmarks@fostergraham.com

Blain Myhre
P.O. box 3600
Englewood, Co. 80555
(303) 250- 3932
blainmyrhe@gmail.com

s/ Elizabeth H. McCann_____

Elizabeth H. McCann