IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **92-cv-00870-JLK**

**JESSE MONTEZ, et al.**

      Plaintiffs, on behalf of themselves and all others in the *Montez* Remedial Plan class,

v.

**JOHN HICKENLOOPER,** in his official capacity as the governor of the State of Colorado, et al.,

      Defendants.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW re PHASE I
OF CLASS ACTION SETTLEMENT (Doc. 441) - WHETHER
DEFENDANTS HAVE "SUBSTANTIALLY COMPLIED" WITH
MONTEZ REMEDIAL PLAN**

---

Kane, J.

This twenty-year old case began as a civil rights class action alleging institution-wide discrimination against disabled inmates housed in Colorado Department of Corrections ("DOC") facilities. After eleven years of proceedings before two judges and multiple magistrate judges, the parties agreed in 2003 to settle the case by entering into a Remedial Plan (the "Plan") for the improvement of facilities and resources for disabled inmates that would be developed and implemented over a two-year period. *See* Plan (Doc. 441). In addition, the Plan prescribed a claims process through which individual class members would be entitled to seek specific and limited remedies, including small damage awards, for demonstrated instances of past discrimination.

As approved by former Chief Judge Nottingham on August 28, 2003 (Doc. 528), the Plan called for the appointment of an ADA Inmate Coordinator to ensure that specific policies and procedures were developed and implemented to assure nondiscrimination

against disabled inmates and to identify and track disabled inmates throughout DOC to facilitate their access to DOC programs, services, and benefits. (Plan § II.) Plan Sections identifying approximately 30 action items or areas of agreement followed, including requirements for the designation of specific facilities for the placement or housing of disabled inmates (Plan §§ V-VI, VIII); for structural/physical changes to bring those facilities into ADA compliance (§ VII); for the provision of reasonable accommodations and access to programs, services, and benefits comparable to those available to non-disabled inmates (§§ X, XIII, XVII); for the establishment of an ADA grievance procedure (§ XII); for staff training on ADA and Plan compliance issues (§ XV); the availability of prescribed health care appliances (wheelchairs, hearing aids, etc.) (§ XVI); and special accommodations/requirements for the disabled related to safety and order, such as evacuation plans, notifications and alarms, searches, restraints, transportation, visits, parole hearings and field operations, and community correction opportunities (§§ XVIII - XXX).

      The Plan provided for an initial two-year period for the Department of Corrections ("DOC") to come into "Substantial Compliance" with the Plan, followed by a two-year "Monitoring Period" in which class counsel would monitor continued compliance. (*Id.* § XXXI.) The Plan called for the lawsuit to be "administratively closed" through the duration of the compliance and monitoring periods, after which it would be dismissed, *sua sponte*, with prejudice. (§ XXXVI.B.)[1]  It is the initial "Substantial Compliance" determination that concerns us at this stage of the proceedings.

---

[1] This case has been administratively closed under § XXXVI.B since September 2003.

Under the agreed-upon terms of the Plan, the DOC's compliance was intended to be largely self-executing. The DOC would have two years after the August 2003 Plan execution date to come into "substantial compliance," with any disputes arising during the initial compliance or monitoring periods being resolved, "expeditiously and in good faith," by the parties themselves. (Plan § XXXI.) If the parties could not reach agreement on a particular issue, "Judge Kane" was designated in the Plan to assist. *Id.* Once the Monitoring Period ran its course, the Plan was to expire by its own terms and "no longer [be] in effect." *Id*.

Suffice it to say that after nine years and countless disputes, noncompliance findings, Plan amendments, stipulations, conferences, and court hearings – the parties' 2003 asseverations of self-executing compliance within two years' time evince Caesar's adage that "men freely believe that which they desire."[2]

Nevertheless, here we are. In light of continued and unresolved disagreements regarding "substantial compliance," the parties were called to present their cases so that I might resolve the issue for them. In June, July and October, 2010, I presided over 32 days of hearing comprised of anecdotes, lay opinion, and workmanlike recitations of graphs and data. That record – together with reams of post-hearing briefing on proposed findings of fact and conclusions of law – inform my decision today. Having considered all of the testimony, evidence, and briefing before me, I conclude the DOC has met its burden of demonstrating substantial compliance with the terms of the Remedial Plan for purposes of § XXXVI. I make this determination notwithstanding Plaintiffs' evidence that compliance has and continues to fail individual inmates in certain areas on certain

---

[2] Julius Caesar, Commentarii de Bello Gallico, bk. III.

occasions, and notwithstanding the fact that Inmate Coordinator Cathie Holst was never, in my view, given adequate authority or resources to perform her duties under the Plan to maximal effect.

I note that I make these findings in my capacity as the arbiter of disputes under § XXXVI of the Plan, rather than as the article III judge overseeing the class action proper, although those roles became conflated after Judge Nottingham resigned and the case was reassigned to me.[3]  This distinction may have implications for an appeal which, in my view, does not lie for dispute resolutions under § XXXVI of the Plan. I leave consideration of that issue for another day and a different judge. Nevertheless, I have attempted to conform my findings to the requirements of Fed. R. Civ. P. Rule 52(a) in order to permit review by the Tenth Circuit Court of Appeals, should that court have the opportunity to review my determination and deem it proper to do so. *See Joseph A. by Wolfe v. New Mexico Dept. of Human Servs.*, 69 F.3d 1081, 1089 (10th Cir. 1995) (remanding substantial compliance inquiry where district court had "failed to make the specific and clear findings required" by Rule 52(a)).  The two-year Monitoring Period triggered by a finding of "Substantial Compliance" shall commence on October 1, 2012, after which the Plan will go gently into its good night and the case dismissed.

For this two-year Monitoring Period, however, I exercise my prerogative as a Senior Judge and decline further participation. I return the case to Judge Arguello, from whom I agreed to take the case after it was reassigned to her in the wake of Judge

---

[3] Again, the Remedial Plan approved by Judge Nottingham eschewed any article III-type oversight over compliance and monitoring issues, calling for the administrative closure of the case during the compliance and monitoring periods and for disputes regarding obligations under the Plan or Plan interpretation to be left to informal resolution between the parties or determination by "Judge Kane," or "another person appointed by Judge Nottingham." *See* Plan §§ XXXI and XXXVI.

Nottingham's resignation.

## LEGAL STANDARD

"Substantive compliance" is neither a neologism nor unique to the Montez Plan. It is a substantive legal standard, a doctrine of contract law that aims to aid courts in determining if contract-based conduct is in compliance with the contract's terms. *Joseph A. ex rel. Wolfe v. New Mexico Dep't of Human Servs.*, 69 F.3d 1081 (10th Cir. 1995) (citing *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 (1975)(consent decrees have "many of the attributes of ordinary contracts [and] ... should be construed basically as contracts")). Substantial performance is not a rigid standard and does not require mathematical precision or perfection. *Id.* at 1085-86. It is "'simply a doctrine to assist the court in determining whether conduct should, in reality, be considered the equivalent of compliance under the contract.'"*Id.* at 1086 (quoting *Peckham v. Gem State Mut.*, 964 F.2d 1043, 1052 (10th Cir. 1992)).

If a party has substantially performed, "it follows that any breach he may have committed is immaterial." *Joseph A.* at 1086 (citing John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 11-15, at 454 (3d ed 1987)). Accordingly, anecdotal or ad hoc evidence that a party deviated or breached specific terms of a consent decree will not, by itself, preclude a finding of substantial compliance. Quoting Judge Cardozo "in the seminal substantial compliance case of *Jacob & Youngs, Inc. v. Kent*," the Tenth Circuit in *Joseph A.* stated that performance fails the substantial compliance test only where deviations from contract requirements "'"in any real substantial measure ... frustrate the purpose of the contract.'" 69 F.3d at 1086 (quoting *Jacob & Youngs*, 230 N.Y. 239, __, 129 N.E. 889, 891 (1921)). The touchstone of the substantial compliance inquiry,

then, "is whether Defendants frustrated the purpose of the consent decree – i.e. its essential requirements." *Id.*

Under the Tenth Circuit's rubric in *Joseph A.*, the substantial compliance analysis begins with the essential purposes of the consent decree which, in that case, were set forth in the decree's preamble. 69 F.3d at 1086. It proceeds with consideration of the specific steps set forth in the decree by which those purposes were to be satisfied. If a stipulated criterion was not met, it is for the court to determine whether that failure was "immaterial to the overall objectives or, on the other hand, whether it had a material adverse impact on the decree's overall [purpose]." 69 F.3d at 1086. The overall burden is on the defendant to demonstrate that a deviation or failure did not frustrate the decree's overall purpose. *See id.* (where consent decree set forth specific criteria to be met in placing children into permanent homes, "those criteria must be respected unless a deviation can be shown not to have a material effect upon the [Department's] overall performance [of that goal]"). The determination of "substantial compliance" shall be based on specific, non-conclusory factual findings in accordance with the requirements of Fed. R. Civ. P. 52(a). *Id.* at 1087.

## FINDINGS AND CONCLUSIONS

*The Montez Plan's Essential Purposes.*

The Montez Plan's essential purposes are to provide disabled inmates with access to programs and services, and to protect them from discrimination on the basis of their disabilit(ies). This overarching purpose is set forth in § I of the Plan:

> **I.   POLICY**
>
> It is the policy of the Colorado Department of Corrections (DOC) to provide inmates with disabilities, with or without reasonable accommodation, access to its programs and services consistent with

> legitimate penological interests.  No qualified inmate with a disability, as defined in Title 42 of the United States Cod, Section 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities of the DOC or be subjected to discrimination.  All facilities designated to house inmates with disabilities will provide comparable programs, services and benefits available throughout comparable DOC facilities to ensure that inmates with disabilities are not discriminated against because of their disability.

Montez Remedial Plan, § 1.  The provisions that follow in Plan Sections II - XXXVI are the specific, agreed-upon means to achieve these essential purposes.  While each is an expected criterion for compliance, deviations affect "substantial compliance" only if they frustrate the Plan's overarching or essential purposes of providing disabled inmates "access to programs and services"; protection from "exclusion" or the "denial" of benefits on the basis of disability; and the provision of comparable programs, services and benefits throughout comparable DOC facilities.  Even if the DOC has deviated from or failed to perform some of these performance criteria, it may still be found to be in "substantial compliance" if it demonstrates that none of the deviations or failures, individually or as a whole, materially adversely affected, or frustrated, the Plan's essential purposes.  While the burdens are more those of production rather than proof to any legal or evidentiary standard, out of an abundance of caution I held Defendants to the ultimate burden of demonstrating compliance, including meeting Plaintiffs' evidence of noncompliance with evidence in rebuttal.

*Substantial Compliance*

The focus of my determination is whether the Colorado Department of Corrections has performed its obligations under the Montez Remedial Plan in a manner that hews to – and does not frustrate – the Plan's overall purposes of providing disabled inmates access

to DOC services and programs and protections against discrimination on the basis of their disability.

Certain performance areas are not in dispute. Plaintiffs agree that all architectural issues contained in the Remedial Plan have been completed and that the monitoring period for that issue has closed. Plaintiffs also stipulate that DOC has sufficiently met the requirements of the following sections of the Remedial Plan: VIII(A) Special Placement Housing; XVII Library Equipment; XXI Count; XXII Restraints; XXIII Searches; XXVII Removal of Health Care Appliances in ASU/PSU; and XXX Parole Field Operations. Am. Pretrial Order (Doc. 4841) at p. 7 of 26. Plaintiffs also agree that the DOC has complied with many of the specific provisions of Stipulations reached in 2006 and 2008 to augment and implement the Montez Plan.[4]

---

[4] In 2006 and again in 2008, the parties appeared before me on specific complaints of noncompliance, resulting in the entry of a series of stipulated agreements to take specific corrective action (the 2006 and 2008 Stipulations). Plaintiffs agree that the following corrective actions were taken:

**2006 Stipulation**
1. Additional funding was provided to DOC to meet Plan requirements.
3. Individual inmates were given one copy of the Plan free of charge.
4. DOC posted notice in all facilities that the Montez compliance period had been extended and outlining the agreements and remedies set forth in the Stipulation.
5. DOC distributed a letter from class counsel to all inmates in the AIC database outlining the 2006 Stipulation.
6. DOC eliminated "ADA" or "handicapped" jobs that paid less than the regular inmate wage scale.
8. DOC refunded charges assessed inmates for copies made for Plan § XXXII damage claim hearings.
9. Defendants reimbursed Plaintiffs' counsel for out-of-pocket costs incurred since August 2005 in preparation for compliance hearing.

**2008 Stipulation**

5. DOC implemented American Sign Language classes as a program.
6. Sign Language Interpreters were provided for non-routine medical visits.
7. ADA grievances denied or denied as moot since July 1, 2006 were re-evaluated by the ADA Inmate Coordinator.

Nevertheless, Plaintiffs presented testimony and documentary evidence throughout the months-long compliance hearing detailing individual accommodation failures and problems with funding and support of medical and other staff necessary to implement that Plan. Plaintiffs argue "substantial compliance" with the Montez Remedial Plan continues to elude Defendants, and attribute this to three principal failures: (1) ADA Inmate Coordinator Cathie Holst was never given the necessary authority or resources to implement the Plan; (2) class members were not identified by the end of the compliance period, and (3) there was a failure to develop the necessary systems to implement, monitor and track information necessary to determine Plan compliance. In evaluating all of the evidence presented, I find the anecdotes and incidents collected and catalogued by Plaintiffs do not support an inference of less than "substantial compliance" with the

---

10. Wheelchair clinics were conducted.

17. Inmates with hearing impairments at Colorado's Territorial Correctional Facility were housed in cells with strobe alarms.

20. Copies of Accommodation Resolutions are provided at no cost to inmates.

22. DOC bears the burden of costs for a medical provider's or specialist's recommendations for testing or assistive devices.

23. DOC implemented the recommendations made in certain expert reports.

27. DOC remedied the problems and/or deficiencies noted in expert report re architectural compliance.

29. Accountings of requests for co-pay refunds are now maintained and reported to ADA Inmate Coordinator.

30. Inmates are provided two copies of ADA grievances when filed.

31. DOC no longer takes monies from § XXXII damage claim settlement other than those required for repayment to victim assistance funds.

32. Notice re further extension of Montez compliance period posted.

33. Montez class counsel letter outlining 2008 Stipulation provisions distributed.

34. Defendants reimbursed class counsel for attorney fees and costs incurred to the date of the Stipulation.

Am. Pretrial Order (Doc. 4841) at 6-8.

overall purposes of the Montez Plan.

Defendants' evidence clearly established that the DOC took its obligations under the Plan seriously and engaged in a global, good faith effort to institute and implement the changes to which they had agreed. These efforts included actions taken straight from the top, including the appointment of Cathie Holst as the Plan's ADA Inmate Coordinator. Holst reported to Gary Golder, the Director of Prisons, who in turn reported directly to Aristedes Zavaras, DOC's then-Executive Director. Ms. Holst's testimony (tr. pp. 1082 ff.) was particularly compelling, as she described meeting immediately with all of those who would be involved in implementation and her development of processes to identify and track disabled offenders throughout the DOC prison system. During her tenure as Inmate Coordinator under the Plan Ms. Holst requested and received $2,000,000 in supplemental funding from the Colorado General Assembly. She hired additional staff to work exclusively on ADA issues, grievances, and requests for accommodation. She wrote the Administrative Regulations concerning disabled offenders, which became mandatory policies of the DOC once signed by the Executive Director.

I found Ms. Holst impressive and an entirely credible witness. She testified she and her staff worked hard to respond to the needs of disabled inmates while simultaneously developing new procedures and means for achieving the essential goals of the Remedial Plan. She and her staff oversaw an Academy that developed and trained correctional officers and case managers on the requirements of the Remedial Plan. They audited individual facilities for compliance. The evidence established Ms. Holst's orders and recommendations carried weight at DOC, and yielded results. *See* Tr. at 4323 (Dr. Frantz testifying that when the AIC office (Ms. Holst) and medical staff disagree with

regard to a disability determination, "the AIC prevails"). The ADA grievance procedure required under the Plan was established. Major changes in DOC operations were achieved under her leadership.

That is not to say Ms. Holst was satisfied or that the AIC office's performance was not hampered at times by inadequate support, funding shortfalls, and stubborn resistance from some DOC employees. There were instances where Ms. Holst's recommendations were not heeded and where she was not given the authority she needed to accomplish all of her tasks. In the aggregate, however, I find Defendants adequately refuted Plaintiffs' suggestion that these obstacles frustrated the enterprise. For example, evidence presented to demonstrate that Ms. Holst's office was too understaffed to track disabled inmates or to incorporate disability determinations made by the Special Masters under Plan § XXXII was refuted by testimony, ultimately uncontradicted, that as time went on Special Master disability determinations were successfully incorporated into the AIC system. *See* Tr. at 1677-80 (Holst test.).

Individual examples of instances in which Special Master orders for damages or other remedies under Plan § XXXII were not enforced by the Inmate Coordinator's office were also refuted and do not support a conclusion that problems in the AIC office were so rampant that the overall purposes of the Plan or even Plan § XXXII were thwarted. Ms. Holst's office handled myriad individual claims and Plan § XXXII orders from the Special Masters. After the 2008 Stipulation in particular, the coordination of information between the Special Master's office and Ms. Holst's office improved. The evidence as a whole supports a finding that Ms. Holst's office implemented Special Master orders and functioned well, if imperfectly. No more is required under the "substantial compliance"

rubric of *Joseph A*.

  The second and third categories of material noncompliance alleged by Plaintiffs relate to the Plan's requirement that disabled inmates be identified and tracked throughout the DOC system.  Without proper identification and tracking, Plaintiffs argue DOC cannot be in compliance with the Remedial Plan's overarching purposes of ensuring access and protecting against discrimination on the basis of disability.  The evidence presented at the compliance hearing supports a finding that DOC has done an enormous amount of work to develop a system of screening and identifying inmates for disabilities.  Before the consent decree, there was no system at all.  Evidence presented during the compliance hearing established that in the Denver area alone well over 10,000 inmates per year come through a diagnostic/intake reception center for screening.  When an inmate is identified as disabled, a staffing occurs regarding how to manage the offender and a supervisor reviews the accommodations.  Accommodations are communicated to housing staff, and the offender is provided with information about his or her rights as a disabled person.  Tr. at 3287-90 (testimony of Jim Falk, former administrative services manager at Denver Diagnostic Reception and Diagnostic Center (DRCD)).

  Plaintiffs' evidence clearly established incidents where disabled offenders slipped through the cracks and were not identified.  Plaintiffs also established that AIC's failure to keep a formal or comprehensive list of diabetic inmates created communication and tracking problems for those inmates.  Neither of these showings amounted to a demonstration that the essential purposes of the Plan were frustrated.  The number of inmates falling through the cracks was minimal compared to the number identified and served.  More often than not, the falling is more aptly described as a delay, because

ultimately the particular inmate was properly identified.  Evidence also established that inmates have additional opportunity once in the system to ask for screenings, and case managers are trained to know how to contact the AIC office if they suspect a particular inmate is or has become disabled.

Plaintiffs also spent considerable time at the compliance hearing pointing out examples where information reflected in the DOC inmate database is inconsistent with information in the AIC database.  As long as an inmate is identified as disabled in the AIC database, he or she will be flagged and tracked for accommodation.  The problem would be if a significant number of inmates who are actually disabled are not included on either list.  Plaintiffs did not present evidence of this sort of omission.

As for diabetic inmates, Ms. Holst explained why the AIC office does not routinely receive a list of diabetic offenders.  Many inmates do not want to be identified as diabetics and do not self-report or present as disabled in the ADA diagnostic screenings.  Diabetic inmates, like others with chronic medical conditions like asthma, are treated by medical personnel and may not need or request accommodation of any kind.

Plaintiffs' remaining laundry list of specific noncompliance issues includes individual problems with placing disabled inmates in designated facilities, accommodating requests and enforcing orders related to healthcare appliances, and accommodations for diabetic inmates.  These individualized problems were most often raised by inmates themselves in claims filed with the Special Masters under Plan § XXXII.  I am familiar with these claims by virtue of my role as the reviewing officer for appeals of final awards and enforcement orders of the Special Masters.  While there have been problems with specifically-ordered accommodations – such as payment of

remuneration, the provision of soft-soled shoes, prosthetics, or batteries for hearing aids – being forthcoming, these problems were almost always resolved.  My overall view based on the record in this case and the evidence presented at the hearing is that the DOC strived to comply with the Special Masters' orders, and nothing presented by Plaintiffs during the compliance hearing compels a contrary conclusion.  More to the point of a substantial compliance determination, however, is that Plaintiffs' lists and examples were accompanied by no expert or other opinion ascribing any generalizable statistical significance to them.  They were but lists.

With regard to stipulated or ordered accommodations for diabetic inmates, Richard Weems testified compellingly as to efforts by facilities management to get intercom systems or call buttons installed, and to secure individualized pendants for use in medical emergencies.  Tr. 3259-66.  There were delays due to delivery and in testing, but ultimately, the items were provided.  Strobe alarms and horns were installed at the DOC facility housing hearing disabled inmates.  *Id.* at 3266.  Also installed were TTY kiosks permitting hearing disabled inmates access to telephones.  All of this occurred as a result of the consent decree.

In sum, tremendous good has come of Plaintiffs' perseverance on behalf of disabled Colorado prison inmates and the DOC's work to honor its commitments under the Remedial Plan.  Performance has not been perfect, and my findings should permit no lessening of effort on the part of the State to maintain and improve the ADA compliance systems that have been put into place as a result of the Remedial Plan.

Finally, and while not amounting to a failure to achieve substantial compliance, the fault in the consent decree itself (to which the parties agreed) is that the ADA Inmate

Coordinator was not given enforcement authority equal to or independent of the Director of Prisons.  The consequence of this is that corrections officials such as wardens were not obligated – or did not perceive themselves to be obligated in all instances – to comply with the Inmate Coordinator's directives.  While most directives were heeded, there were instances in which some were ignored or rejected.  It would have been better, in my view, if the Inmate Coordinator were to have reported directly to the DOC Executive Director and placed on a level of authority at least equal to that of the Director of Prisons so that the critical phrase in Plan § 1 " . . . consistent with legitimate penological interests" could have been more objectively addressed by the person having ultimate responsibility for the Department.  Such, however, is a matter of contract for the parties and not a principle of juristic application.

     I conclude Defendants have established substantial compliance in accordance with the Remedial Plan and that the two-year "Monitoring Period" should now unfold.  However, I decline to participate further in this case – either as the presiding judge or as the reviewing entity under Plan § XXXI.  I direct the Clerk of the Court to return this case for all purposes to the judge to whom it was originally assigned.

Dated September 11, 2012.

                                                  **s/John L. Kane**
                                                  SENIOR U.S. DISTRICT JUDGE