IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-CMA

JESSE MONTEZ, et al.

      Plaintiffs,

v.

JOHN HICKENLOOPER, et al.

      Defendants.

---

## PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RESPONSES

---

Attorneys for the Plaintiff Class, Paula Greisen and Jennifer Weiser Bezoza of KING & GREISEN, LLP; Edward T. Ramey of HEIZER PAUL GRUESKIN, LLP; Lara E. Marks of FOSTER GRAHAM MILSTEIN & CALISHER, LLP; and Blain D. Myhre, hereby submit their Reply to Defendants' Response to Class Counsels' Motion to Compel Discovery ("Defendants' Response") [Doc. 5448], and in support thereof state as follows:

### INTRODUCTION

Defendants' Response is predicated on the faulty notion that a complex state prison system that serves over 3000 class members in twenty-four facilities can be effectively monitored for substantial compliance with a comprehensive Remedial Plan that covers twenty-eight broad issues *solely* by bi-annual attorney visits with class members. Yet, Defendants themselves acknowledge that "this [monitoring] period relates to the 'big-picture' as opposed to . . . individual offender experiences" and that

"anecdotal, one-off exceptions" provided by inmates, without more, may be insufficient to prove systemic non-compliance with the Remedial Plan.  11/8/13 Letter from Fredericks to Greisen, Ex 1 to Plaintiffs' Reply to Defendants' Response to Plaintiffs' Motion to Compel Discovery Responses ("Plaintiffs' Reply"); Defendants' Response at 10, n.8.  As Judge Kane recognized, Class Counsel cannot extrapolate from the experiences of a handful of inmates that a non-compliance problem is systemic without examining system-wide data and information on that issue.  *See Findings of Fact and Conclusions of Law re Phase I of Class Action Settlement* at 9, 13 [Doc. 5314] (finding "anecdotes and incidents collected and catalogued by Plaintiffs" are insufficient to demonstrate non-compliance).

Indeed, the only way for Class Counsel to monitor whether the Colorado Department of Corrections ("DOC") continues to be in substantial compliance with the Remedial Plan is to look at the *systems* that Defendants have put in place to comply with the Remedial Plan (many of which have been implemented *after* the compliance hearing and/or determination of substantial compliance by Judge Kane) and how those systems are *currently* being implemented at the different facilities.  In other words, to determine whether the system is still in compliance with the Remedial Plan, Class Counsel must be able to examine the system itself.

The vast majority of information "voluntarily" provided by Defendants provides little to no substantive information about whether there is substantial compliance with the Remedial Plan.  For instance, the few summary charts and graphs provided by Defendants merely give the number of requests for screening and accommodations

received by DOC during one three-month period, without any of the underlying substantive information regarding the nature of the requests, whether they were granted or denied, and the basis for any denial.  *See* Quarterly Report for April-June 2013, Ex. 2 to Plaintiffs' Reply.  Likewise, the myriad of documents containing policy statements (also known as Administrative Regulations or "ARs") do not provide any verification of how those policies are actually being implemented.  On the contrary, the history of this case demonstrates that just because a policy exists on the books does not mean it is being implemented on the ground.  Simply put, in order to monitor substantial compliance, Class Counsel must be given access to discovery regarding how Defendants' systems for compliance (*e.g.,* systems for screening inmates, providing accommodations, maintaining and replacing durable medical equipment, making job assignments, and resolving grievances) are operating.

In an attempt to understand what systems Defendants have implemented to track substantial compliance, Class Counsel served their First Set of "Monitoring Period Interrogatories and Request for Production" ("Plaintiffs' First Discovery Requests") on Defendants in May 2013.  Class Counsel still need answers to many of the basic questions posed in that discovery request -- namely, the categories and types of records and/or databases currently maintained by Defendants regarding inmates with disabilities.  Despite ten months of correspondence, phone conversations, and in-person meetings with Defendants' Counsel, Class Counsel still do not have a comprehensive answer to this very simple question.

Class Counsel have been trying unsuccessfully to resolve these issues of access

to information during the Monitoring Period since January 2013.  Over one year into the two-year Monitoring Period, Class Counsel have received little to no helpful information from Defendants' Counsel regarding the status of Defendants' continued compliance with the Remedial Plan.  Moreover, Defendants' Counsel continue to argue that Class Counsel are not entitled to *any* discovery during the Monitoring Period, which is the fundamental issue before this Court, despite the myriad of cases cited by Class Counsel in which discovery was permitted during the monitoring phase of systemic reform litigation in the prison and other contexts.

In order for Class Counsel to effectively discharge our monitoring responsibilities under the Remedial Plan, we need reasonable access to our clients and DOC facilities, *as well as* information maintained by DOC pertaining to the areas we are charged with monitoring.  Class Counsel therefore ask the Court to order Defendants' Counsel to respond to Plaintiffs' First Discovery Requests and Plaintiffs' Second Set of "Monitoring Period" Requests for Production of Documents to Defendants ("Plaintiffs' Second Discovery Requests") (served concurrently with this Reply and attached herein as Ex. 3) and to generally provide discovery relevant to whether Defendants continue to be in substantial compliance with the Remedial Plan.

## ARGUMENT

## I.   Class Counsel Conferred in Good Faith with Defendants' Counsel Prior to and After Filing Their Motion to Compel

A. **Plaintiffs' Counsel Conferred with Defendants' Counsel For Almost Eight Months Prior to Filing the Instant Motion**

As set forth in great detail in Plaintiffs' Motion to Compel Defendants' Responses to Plaintiffs' First Set of Discovery Requests During the Monitoring Period ("Plaintiffs' Motion to Compel") [Doc. 5407], Class Counsel worked in good faith with Defendants' Counsel for almost *eight* months, attempting to ascertain what types of information are maintained by Defendants so that Class Counsel could narrowly tailor their discovery requests, before filing their Motion to Compel.  *See* Plaintiffs' Motion to Compel at 3-7. In summary, Class Counsel first tried in January 2013 to obtain the information informally through a meeting, which Counsel for Defendants, First Assistant Attorney General James Quinn, declined.  *See* 1/22/13 Email from Greisen to Quinn *et al.*, Ex. 1 to Plaintiffs' Motion to Compel; 2/7/13 Email from Quinn to Greisen, Ex. 2 to Plaintiffs' Motion to Compel.  When that failed, Class Counsel attempted to obtain informally from Defendants basic data regarding inmate screenings.  These efforts were also unsuccessful.

In mid-April 2013, after three months of failed attempts to obtain basic information relevant to Class Counsel's monitoring responsibilities, Class Counsel propounded limited formal discovery asking primarily for Defendants to identify the records and databases presently maintained by DOC.  *See* Plaintiffs' First Discovery Requests, Ex. 5 to Plaintiffs' Motion to Compel.  Once again, Defendants' Counsel did not respond to Class Counsel's requests, asserting the position that Plaintiffs are not entitled to *any* discovery beyond touring designated facilities.  *See* 6/11/13 Letter from Fredericks to Greisen, Ex. 6 to Plaintiffs' Motion to Compel (emphasis added).  Despite

Defendants' Counsel's position on formal discovery, Defendants offered to engage in "some voluntary disclosure" of information.  *See id.*

Class Counsel then spent almost three months trying to obtain the unspecified "voluntary disclosures" promised by Defendants, without knowing what those disclosures would contain.  Ed Ramey, one of the attorneys for the Plaintiff Class, made multiple attempts by email and phone to ascertain what would be provided by Defendants and when.  *See* Plaintiffs' Motion to Compel at 5-7 (detailing communications with Defendants).  *See also* Exs. 7-10 to Plaintiffs' Motion to Compel. Each inquiry was met with excuses as to why the information was not forthcoming, including that Counsel for Defendants, Jacquelynn N. Rich Fredericks, had to consult with the Director of Legal Affairs for DOC; the CD was not properly formatted; the Information Technology ("IT") department lost the initial request; and "additional technical issues."  With each excuse, Mr. Ramey graciously agreed to give Defendants more time.

By August 30, 2013, two and a half months after Ms. Fredericks promised "voluntary disclosures" and four and a half months after Class Counsel propounded their First Discovery Requests, Mr. Ramey informed Ms. Fredericks by email that Class Counsel would be filing a Motion to Compel.  *See* 8/30/13 Email from Ramey to Fredericks, Ex. 10 to Plaintiffs' Motion to Compel.  While it is true the *final* notification of Plaintiffs' intent to file the instant motion occurred the day it was filed, *see* Defendants' Response at 2-3, there was nearly eight months of unsuccessful conferral between the Parties prior to its filing.

**B.**     **Class Counsel Continued to Confer with Defendants' Counsel After Plaintiffs' Motion to Compel was Filed**

A few days after Plaintiffs' Motion to Compel was filed, Defendants provided Class Counsel with a CD with the long-promised "voluntary disclosures," which when printed fit in a banker's box.  In a call with Mr. Ramey on September 29, 2013, Ms. Fredericks acknowledged that Defendants still had not answered in writing Class Counsel's questions about the types of records and databases being maintained by DOC, but claimed that the information on the CDs was responsive "by way of example." Class Counsel agreed to review the information provided and to again confer in good faith with Defendants to try to resolve the issues before the Court without further briefing or Court intervention.  Class Counsel further agreed to two extensions of time for Defendants to respond to Plaintiffs' Motion to Compel so that the Parties could try to reach agreement.  Unfortunately, the extensions of time proved fruitless because Defendants continued their refusal to respond fully to Class Counsel's requests.

Once Class Counsel reviewed the information contained on the CDs, it was clear that the "voluntary disclosures" did not answer their questions about the types of records and databases maintained by Defendants, as promised.  On the contrary, the information provided was so confusing and incomplete that Class Counsel had even more questions about DOC's record keeping.  Thus, on October 2, 2013, Mr. Ramey requested by email a meeting with Defendants' Counsel and "an appropriate DOC representative" so that Defendants could "assist [Class Counsel] in our review of the database and documents that were recently produced."  10/2/13 Email from Ramey to Fredericks, Ex. 4 to Plaintiffs' Reply.  Mr. Ramey gave examples of some of Class

Counsel's questions and repeated three times Class Counsel's request that someone from DOC be present at the meeting to answer Class Counsel's highly technical and specific questions about the information provided.  *See id.*  In addition, Mr. Ramey requested to schedule a time for Class Counsel to review the ADA Inmate Coordinator ("AIC") files at DOC headquarters, as was done in past years.  *See id.*

It took another two weeks for Ms. Fredericks to schedule the requested meeting. *See* 10/16/13 Email from Fredericks to Ramey, Ex. 5 to Plaintiffs' Reply (proposing that a one hour meeting take place on October 25, 2013).  On October 17, 2013, Mr. Ramey confirmed the October 25th meeting and again reiterated Class Counsel's expectation that DOC would "make available the appropriate people to attend" the meeting. 10/17/13 Email from Ramey to Fredericks, Ex. 6 to Plaintiffs' Reply.

On October 23, 2013, Ms. Greisen responded to Ms. Fredericks' request that Class Counsel provide "conversational topics" in advance of the October 25th meeting. Ms. Greisen's email began with the same general questions Class Counsel had been asking since January 2013:  "In general, what we need is someone who can explain the various databases and information that you have provided us . . . We also need to know what other databases are maintained other than what we have been given."  10/23/13 Email from Greisen to Fredericks, Ex. 7 to Plaintiffs' Reply.  Ms. Greisen then posed five paragraphs of specific questions regarding the content and source of information in particular reports, graphs, and charts provided by Defendants; the fields in the AIC database; the frequency with which certain information in the database is updated; the location of hard copies of the information entered into the database; and the contents

and location of the AIC individual inmate files.  *See id.*  Ms. Greisen made clear that one area of particular interest to Class Counsel is where the information in the graphs and charts comes from given that the AIC Database provided to Class Counsel does not have current information in those areas.  *See id.*  Lastly, Ms. Greisen suggested that Julie Russell (the AIC) is "probably the best person to have at the meeting because she has such in-depth knowledge about all this stuff."  *Id.*

The night before the meeting, Ms. Fredericks sent an email informing Class Counsel for the first time that she would be the only person attending the meeting for Defendants.  *See* 10/24/13 Email from Fredericks to Greisen *et al.*, Ex. 8 to Plaintiffs' Reply.   Not only did Ms. Fredericks fail to bring someone from DOC to the meeting to answer Class Counsel's highly specific and technical questions, as Class Counsel requested numerous times, she attended the meeting without lead counsel who has significantly greater historical and institutional knowledge regarding the information maintained by DOC and previously produced to Plaintiffs.[1]

The October 25th meeting went as Class Counsel feared it would with no one from DOC present.  Class Counsel learned *some* new -- but limited -- general information about DOC's record-keeping and databases that would have been helpful to know last Winter when Class Counsel first asked about Defendants' information systems.  But for the most part, Class Counsel posed specific questions for over two hours, to which Ms. Fredericks did not know the answers and promised to consult with DOC and get back to Class Counsel.  Many of the questions and variations thereof

---

[1] Ms. Fredericks entered her appearance in this case after the compliance hearing in 2010.

were contained in Ms. Greisen's October 23, 2013 email, as well as Plaintiffs' First Discovery Requests, and thus should not have surprised Ms. Fredericks.[2]

In particular, Class Counsel learned at the meeting that, in addition to the AIC Database provided to Plaintiffs with Defendants' "voluntary disclosures", Defendants maintain at least two additional databases that contain information highly relevant to the issues Class Counsel are charged with monitoring.  Those databases are the Accommodations Tracking System ("ATS" Database) and the Grievance Tracking System ("GTS" Database).  Apparently, the ATS Database contains, among other things, information regarding accommodations granted since 2012 and the results of the re-screenings of the Plaintiff class members, most of which were completed after the 2010 compliance hearing.  The GTS database contains all grievances filed since June 2011, including the scanned grievance forms and all of DOC's responses thereto. None of this information has been produced to Class Counsel.

Some examples of the information requested at the meeting that Ms. Fredericks did not know include:

- who enters information into the AIC Database (*e.g.,* Can an ADA site coordinator scan information into the database?);

- why there is no data beyond 2011 in the ADA Accommodation Tracking table provided to Class Counsel;

- the fields of the ATS database;

- the fields of the GTS database;

---

[2] Ms. Fredericks never indicated in advance of the October 25th meeting that only "pre-submitted questions" would be addressed, as she now suggests in her letter of November 8, 2013.  *See* 11/8/13 Letter from Fredericks to Greisen, Ex. 1 to Plaintiffs' Reply.  In any event, Ms. Fredericks did not answer many of the questions submitted by Ms. Greisen two days *before* the meeting.

- whether copies of paper requests from inmates (*e.g.,* kites) go to the AIC and/or ADA site coordinators;

- whether the ATS Database contains or is linked to inmates' individual electronic files;

- whether inmate requests and correspondence are scanned into the inmates' AIC individual electronic files;

- what types of documents are contained in the inmates' individual AIC electronic files;

- whether inmates are being told the accommodations they have been approved to receive and, if so, how; and

- why accommodations are no longer reflected on the new Accommodation Resolution ("AR") forms, now called ADA Litigation Resolution Forms, given to inmates and when that change was made.

On October 29, 2013, Ms. Greisen sent Ms. Fredericks a follow-up email, expressing her disappointment that a DOC representative did not attend the meeting and outlining some of the outstanding questions Ms. Fredericks promised to answer by November 1, 2013, including whether Defendants will give Class Counsel access to class members' individual electronic files and to the information in the ATS and GTS Databases regarding members of the Plaintiff class.  *See* 10/29/13 Email from Greisen to Fredericks, Ex. 9 to Plaintiffs' Reply.

Finally, on November 8, 2013, Ms. Fredericks responded to *some* of Class Counsel's outstanding questions, yet denied Class Counsel's requests for access to class members' individual electronic files and to the ATS and GTS Databases.  *See* 11/8/13 Letter from Fredericks to Greisen at 5, Ex. 1 to Plaintiffs' Reply.  Moreover, Defendants' Counsel still has not fully responded to Plaintiffs' First Discovery Requests.

Thus, Class Counsel seek this Court's assistance to resolve the ongoing dispute among the Parties regarding Plaintiffs' entitlement to discovery during the Monitoring Period.

## II.     Plaintiffs Are Entitled to Discovery During the Monitoring Period

Despite having provided some limited information to Class Counsel, Defendants continue to argue that Plaintiffs are not entitled to *any* discovery during the Monitoring Period.  *See* Defendants' Response at 5-9.  However, Defendants' Counsel cite *no* cases in which formal discovery during the monitoring phase of complex institutional reform litigation, in the prison contest or otherwise, was denied by a court.

Defendants' Counsel do cite a case, *Brown v. Plata,* 131 S. Ct. 1910 (U.S. 2011), that they suggest stands for the proposition that discovery may be cut off at some point during the remedial phase of a case.  *See* Defendants' Response at 6, ¶ 15.  However, this case says no such thing.  On the contrary, the United States Supreme Court made clear in *Brown v. Plata* that "extensive" documentary evidence of current prison conditions was admitted into evidence at the compliance trial during the remedial phase of the case.  131 S. Ct. at 1935.  In fact, the only limits placed on discovery in this case were a cut-off date and the requirement that discovery relate to current conditions during the remedial phase – not the merits of the underlying constitutional violation.

Rather than substantively address the many cases cited in Plaintiffs' Motion to Compel in which formal discovery of the type sought by Class Counsel was granted during the monitoring period, *see* Plaintiffs' Motion to Compel at 9-11, Defendants' Counsel attempt to analogize to a request by a judgment creditor for post-judgment discovery regarding a spendthrift trust's assets.  S*ee* Defendants Response at 6, ¶ 16

(discussing post-judgment discovery under Fed. R. Civ. P. 69(a)(2)).  There is no need to analogize to a completely different procedural posture in a completely different type of case when there are cases in our circuit and others directly on point.  In any event, in the one totally inapposite case cited by Defendants' Counsel for this proposition, *Hartford Fire Ins. Co. v. P & H Cattle Co.,* No. 05-2001-DJW, 2009 U.S. Dist. LEXIS 82667, at *20 (D. Kan. Sept. 10, 2009), discovery was granted.

Defendants' Counsel also surprisingly cite due process cases regarding the *Goldberg v. Kelly,* 397 U.S. 254 (1970), right to a hearing to argue against Plaintiffs' clear right to discovery at this stage of the case.  *See* Defendants' Response at 7, ¶ 17 (citing *Miller v. Cudahy Co.,* 656 F. Supp. 316, 334 (D. Kan. 1987), which discusses the due process right to a meaningful opportunity to be heard). *See also id.* at 8, ¶ 18 (citing a non-relevant Fourth Circuit case discussing the scope of the right to an evidentiary hearing prior to the termination of a consent decree).  Due process analysis simply is not relevant here.

As set forth in Plaintiffs' Motion to Compel, there are many courts in this circuit and elsewhere that have permitted discovery during the monitoring period in prisoner class action litigation, recognizing the need for discovery to effectively monitor compliance.  *See, e.g., Skinner v. Uphoff,* 410 F. Supp. 2d 1104, 1111 (D. Wyo. 2006) (granting plaintiffs leave to engage in formal discovery so that they can "fully understand and monitor" Defendants' compliance with the Remedial Plan); *Ginest v. Bd. of Cnty. Commr's,* 295 F. Supp. 2d 1274, 1275-76 (D. Wyo. 2004) (permitting plaintiffs to engage in discovery prior to evidentiary hearing on defendants' motion for termination of

consent decree); *Regan v. Cnty. of Salt Lake,* No. 2:80-CV-131, 2006 U.S. Dist. LEXIS 89472, at *11-*12 (D. Utah Dec. 11, 2006) (acknowledging that plaintiffs had opportunity to discover evidence of current and ongoing violations of their federal rights prior to the termination of consent decree).

Expansive discovery is also consistently permitted during the monitoring phase of other types of institutional reform litigation. *See, e.g., R.C. v. Walley,* 270 Fed. Appx. 989, 991 (11th Cir. 2008) (allowing plaintiffs to take three depositions and obtain more than 50,000 documents to defend against motion to terminate consent decree in twenty-year class action institutional reform case challenging child welfare system); *Young v. Pierce,* 640 F. Supp. 1476, 1477-78 (E.D. Tex. 1986), *vacated on other grounds,* 822 F.2d 1368 (5th Cir. 1987) (granting monitor "complete and unrestricted access" to defendant's records and relevant documents to monitor defendant's remedial efforts to comply with housing desegregation order).

Defendants' Counsel's minimal efforts to distinguish some of these cases in a footnote are unavailing. *See* Defendants' Response at 7, n.7. The Remedial Plan in this case does not provide for "automatic" termination without providing Plaintiffs an opportunity to present evidence of non-compliance, as Defendants' Counsel contend. *See id.* On the contrary, to the extent that Class Counsel find during the Monitoring Period that Defendants are no longer in substantial compliance with the Remedial Plan, Class Counsel may file an objection alleging non-compliance prior to the completion of the Monitoring Period, which would extend the Monitoring Period at least until the objection is adjudicated. *See* Remedial Plan § XXXI [Doc 441] (providing that, if an

objection alleging non-compliance is filed, the monitoring period will be extended until there is a final determination on the merits of the objection).  In order to be able to present such an objection, Class Counsel will need evidence of non-compliance beyond the anecdotal stories of some members of the Plaintiff Class.  It is for this reason that the Remedial Plan expressly states that, in addition to visiting designated facilities, "class counsel may spend the time and resources reasonably necessary to monitor compliance . . ." *Id.*[3]  These court-approved provisions of the consent decree are meaningless if Plaintiffs are not afforded the right during the Monitoring Period to discover relevant information and records regarding whether Defendants are currently complying with the Remedial Plan.

Defendants' Counsel's argument that the differences between the Compliance and Monitoring Periods justify a radically different approach to discovery is also unpersuasive.  *See* Defendants' Response at 8, ¶¶ 19-20.  First, the Remedial Plan makes no distinction between the two periods with respect to the information that Plaintiffs are entitled to in order to challenge substantial compliance.  Second, although the purposes of the two periods may vary *slightly* (*ie.,* determine whether substantial compliance has been achieved versus monitor whether substantial compliance has been maintained), the information needed to evaluate substantial compliance is the

---

[3] Defendants' Counsel wrongly contend that this sentence does not apply to the Monitoring Period.  *See* Defendants' Response at 5, n.5.  The first paragraph of Section XXXI of the Remedial Plan discusses the Compliance Period, laying out the timeline and procedures for a determination of substantial compliance. *See* Remedial Plan § XXXI [Doc. 441].  The second paragraph of Section XXXI addresses the Monitoring Period, again laying out the timeline and procedures for this phase of the case.  *See id.*  The sentence in question comes in the middle of the paragraph regarding the Monitoring Period and clearly relates to the Monitoring Period despite the mistaken use of the words "Compliance Period" at the end of the sentence. Any other reading would render this paragraph incomprehensible.

same.  Just as Class Counsel needed extensive information and records about Defendants' systems for compliance with the Remedial Plan prior to the compliance hearing, Class Counsel now need similar information about Defendants' current systems (which we have reason to believe have changed substantially in the last two years) to assess whether Defendants are currently in substantial compliance with the Remedial Plan.

While the types of information needed during the two periods are similar, Class Counsel do not anticipate seeking the same volume of documents that were produced during the Compliance Period.  It is for this reason that Class Counsel began the discovery process during the Monitoring Period with a narrow request about the types of information collected and maintained by Defendants.  Class Counsel intended to use this information to tailor their subsequent discovery requests.

## III.  Defendants Have Not Fully or Meaningfully Responded to Plaintiffs' First Discovery Requests.

### A.    Plaintiffs' Motion to Compel is Not Moot

Despite the almost ten months of back and forth between Class Counsel and Defendants' Counsel regarding Plaintiffs' request for information about Defendants' records, described *supra* at 4-11, Defendants' Counsel have yet to fully reply to Plaintiffs' First Discovery Requests – either formally or informally.  For instance, Plaintiffs' Interrogatories two and three ask for "a general description of the categories and types of records and/or databases" currently maintained by the ADA Inmate Coordinator and by Defendants, respectively, regarding inmates with disabilities.  *See* Plaintiffs' First Discovery Requests at 4-5, Ex. 5 to Plaintiffs' Motion to Compel.  Each

Interrogatory gives a non-exhaustive list of the types of information requested, including the fields in each of the databases, the frequency with which the information is updated, and the accessibility of the information contained in the database.  *See id.*

While Defendants' Counsel finally provided *some* of this information in Ms. Fredericks' November 8, 2013 letter, Defendants have yet to identify *all* of the relevant records and databases they maintain and to provide a comprehensive list of the information contained in each of the identified databases.  For example, in the documents provided by Defendants, there is a reference to an "Offender Portal System," but Class Counsel do not know what types of information are contained in that system, who has access to it, or how often it is updated.  Defendants' documents also refer to the "DocNet," database, but provide no information about how that system is used in relation to this case or what relevant information is contained in it.  Similarly, Defendants produced a memo mentioning the "OStrack File Review System," but provided no details regarding how this system is used in relation to the placement of inmates with disabilities or their housing restrictions.

Moreover, Defendants have admitted that *only* the staff of the AIC's office has access to the AIC database.  *See* 11/8/13 Letter from Fredericks to Greisen at 4, Ex. 1 to Plaintiffs' Reply.  If that is the case, then where does the rest of the DOC staff look to determine if an inmate is disabled or the accommodations to which she is entitled?  Clearly, in order to sustain substantial compliance with the Remedial Plan, DOC must have implemented some other systems that contain this information to which DOC staff have access.  Thus, questions relating to what those systems are and who

maintains and verifies those systems are all relevant to the issue of continued substantial compliance.

Defendants have also failed to fully respond to Interrogatory four, which asks Defendants to provide a general description of the records they maintain regarding inmates who have contacted the AIC for any reason, inmates who have been determined not to qualify for a disability accommodation, and/or inmates for whom a disability determination is still pending.  *See* Plaintiffs' First Discovery Requests at 5-6, Ex. 5 to Plaintiffs' Motion to Compel.

The fact that Defendants' Counsel have "voluntarily" given Class Counsel some paper does not mean that they have answered the questions posed in Plaintiffs' Interrogatories.  As explained *infra* at 17-24, most of the paper provided by Defendants is useless to Class Counsel's monitoring efforts and unresponsive to Plaintiffs' very specific and narrow First Discovery Requests.  Accordingly, Plaintiffs request that Defendants fully respond to Plaintiffs' First Discovery Requests.

**B.    Defendants' Voluntary Disclosures Are of Little Value To Class Counsel's Monitoring Efforts**

In September 2013, Defendants finally gave Class Counsel some documents related to disabled inmates and DOC's ADA related policies, but the vast majority of the information provided is simply useless.

The one database given to Class Counsel as part of Defendants' "voluntary disclosures" is the AIC Database, which Ms. Fredericks claims "is the database which houses Montez-specific information."  11/8/13 Letter from Fredericks to Greisen at 3, Ex. 1 to Plaintiffs' Reply.  However, Class Counsel now know -- ten

months after they began this inquiry -- that the AIC Database is not the *only* database with information relevant to Class Counsel's monitoring responsibilities.  There are at least two additional databases that have highly relevant information -- the ATS Database and the GTS Database, from which Class Counsel were given no substantive information.[4]  There may also be other databases that Class Counsel do not know about because of Defendants' failure to respond to their Interrogatories.

We also now know that the AIC Database, the only database provided to Plaintiffs, has primarily historical/archival information.  *See id.* at 4.  According to Ms. Fredericks' most recent letter, there are only *two* sections of the AIC Database that are updated regularly:  "Montez Screening Information" and "Copay/DME Refund Information."  *Id.* at 4.  The "Montez Screening Information" tracks only *four* types of information:  "initial contacts, DRDC/intake temporary accommodations, class member/screening and AR [Accommodation Resolution] status."  Defendants' Response at 12.  That information is contained in one summary screen per inmate that allows only for the entry of dates or codes reflecting DOC's ultimate determination.  For example, although the database might contain information that an inmate was given a temporary accommodation ("TA"), it does not provide any indication as to what the accommodation was, what the inmate requested, or what permanent accommodations, if any, were granted to the inmate.  Similarly, although the database may reflect a "DNQ" for "Did not qualify as a disabled class member,"  the codes do not provide any information about the basis for DOC's determination or whether DOC followed

established criteria for making that determination.  *See* AIC Montez Database Entries, Ex. 10 to Plaintiffs' Reply.

Ms. Fredericks also claims that Class Counsel are being provided with "Quarterly Reports" that "speak directly to the systemic monitoring goals of this time period." Defendants' Response at 10.  On the contrary, Defendants provided Class Counsel *one* Quarterly Report for April-June 2013 that contains only the *numbers* of requests for accommodations, requests for screenings, correspondence, and grievances received during a single three-month period.  *See* Quarterly Report for April-June 2013, Ex. 2 to Plaintiffs' Reply.  The total number of accommodations requested in a particular month is meaningless without additional information about the nature of the requests, the disabilities of the inmates making the requests, how long the requests were pending, whether they were granted, and the reasons for any denials.  Likewise, the number of letters the AIC received from inmates in one particular month is not helpful in the absence of information about what the correspondence related to and how the issues raised therein were addressed.  Similarly, the number of requests for screenings in a selected month is useless without information about the disabilities of the inmates requesting the screenings, how the screenings were conducted, when the screenings were conducted, whether the inmates were determined to be disabled, whether accommodations were granted, and why any requests were denied.

Defendants' Counsel additionally provided Class Counsel with many templates and forms, without providing the information entered into those documents.  For

---

[4] Defendants' Counsel produced the User Guide to the ATS Database, but none of the information

example, Defendants produced the ADA Litigation Resolution Forms for each of the four disability categories, which give a list of the health care appliances and restrictions for which an inmate *may* qualify, but did not produce any information about the appliances and restrictions that were actually requested, approved, and provided to class members.  *See* ADA Litigation Resolution Forms, Ex. 11 to Plaintiffs' Reply.  Without that information, it is impossible for Class Counsel to monitor whether appliances and restrictions are being appropriately and timely provided.

Similarly, Defendants' Counsel claim to have provided "[c]opies of recent ADA related audits."  Defendants' Response at 11.  First, it should be clarified that the information provided related not to the ADA audits that DOC previously conducted, but instead to American Correctional Association ("ACA") audits that have some ADA components.  In any event, *none* of the actual audits were produced.  Instead, the only information that was provided was a schedule of upcoming ACA audits and templates with the ACA standards.  *See* Standards Review Sheet--Audit Tool v.3 11-12, Ex. 12 to Plaintiffs' Reply.

Defendants' Counsel also produced some hand-picked samples of several categories of documents, which are useless in a vacuum.  For example, although Defendants' Counsel claim to have provided "offender orientation materials," Defendants' Response at 11, they provided the orientation materials for only *one* facility (Denver Reception and Diagnostic Center) out of twenty-four.  Similarly, Defendants' Counsel provided only *one* Provider ADA Screening Form per disability group.  *See*

_____

contained in that system.

Provider ADA Screening Form, Ex. 13 to Plaintiffs' Reply.  With only one form per disability, it is impossible to analyze whether the screenings for disability determinations are being done in accordance with the required criteria.[5]  Defendants' Counsel additionally provided photographs of some assistive devices that *could* be given to inmates, which tell Class Counsel nothing about who received such devices, how many class members requested them, and how many such requests were denied.  *See* Photo of Vibrating Watch, Ex. 15 to Plaintiffs' Reply.  The documentation of five class members' visits to a wheelchair clinic is equally uninformative as it indicates nothing about how many class members have visited wheelchair clinics, how often the wheelchair clinics are occurring, or whether class members' wheelchair issues are being resolved at the clinics.  *See, e.g.,* Wheelchair Maintenance Appointment Checklist, Ex. 16 to Plaintiffs' Reply.[6]

Similarly, although DOC produced receipts for sign language interpreter services provided to some inmates from April 2013-July 2013, Class Counsel have no information about the provision of interpreters during the rest of the Monitoring Period or whether the other deaf inmates in DOC custody have received sign language interpreter services, as needed.  In short, it is impossible from such small sample sizes for Class

---

[5] Defendants' Counsel similarly provided Sample Intake Forms for only one to two inmates per disability group.  *See* Follow-up Intake ADA Screening Form, Ex. 14 to Plaintiffs' Reply.
[6] Interestingly, the sample documentation selected by Defendants' Counsel is incomplete.  It shows that the size of the wheelchair provided to class member Ben Salazar is "not appropriate" and that Colorado DOC sent a memo to Utah DOC in June 2013 requesting review.  There are no documents reflecting whether Utah DOC authorized a new wheelchair.  (The inmate has told us that he is still in a wheelchair that is too small for him).  Thus, Class Counsel cannot even tell the status of this sample request from the documents provided by Defendants' Counsel.

Counsel to analyze systemic compliance with respect to these important issues covered by the Remedial Plan.

With respect to other issues, Defendants' Counsel provided information for only a limited period of time.  For example, Defendants provided a list of inmates who requested compensation for delays in the provision of durable medical equipment ("DME") in the past quarter and a list of inmates who requested refunds for co-pays charged for clinic visits in the last quarter.  It is not clear why Defendants limited such information to one quarter of the year when Plaintiffs' Counsel need to monitor the provision of durable medical equipment and the inappropriate charging of co-pays at least since the beginning of the Monitoring Period.

Rather than provide the accommodation information housed in the ATS Database, Defendants' Counsel provided a list of all available accommodations that could be provided.  *See ATS Accommodations,* Ex. 17 to Plaintiffs' Reply.  Again, this list is meaningless without information about how often the accommodations on that list are granted.

Although DOC provided information from the AIC Database about the jobs held by inmates with disabilities (called the "Employment Tracking" report), the information produced was from 2007 to 2009.  Thus, the information is useless to determine whether inmates with disabilities are being granted jobs on a non-discriminatory basis during the Monitoring Period.  Clearly, Class Counsel need current information about whether inmates with disabilities are being allowed to participate in jobs on an equal basis with other inmates and are being granted the accommodations they need in order

to perform those jobs, but none of that information was provided.  The job descriptions provided by DOC are also useless for monitoring substantial compliance.

While it is true that DOC did provide a list of inmates that requested an Offender Care Aide ("OCA"), who assists inmates with the activities of daily living, DOC failed to provide any information about whether those inmates were granted their requests, who was assigned as their OCA, and the level of the OCA that was assigned.[7]  *See* List of OCAs Requested Since June 2011, Ex. 18 to Plaintiffs' Reply.  Again, the limited information provided is useless without further context.

Lastly, Defendants' Counsel produced many DOC policies or ARs, most of which are on DOC's public website and some of which are out-dated.[8]  Throughout the history of this case, the evidence has shown that the mere fact that DOC has a written policy on an issue does not mean that the policy is followed.  In addition, individual facilities can modify ARs by implementing an I/A (Implementation/Adjustment).  Thus, the policies standing alone simply do not provide useful evidence of whether there is actual on-the-ground compliance with the Remedial Plan.

In summary, it is disingenuous for Defendants' Counsel to argue that the information "voluntarily" provided by Defendants gives a "whole and complete portraiture of the processes and procedures CDOC has established . . . to ensure continued compliance with the ADA and the Remedial Plan," Defendants' Response at

---

[7] Defendants clearly track this information because data of this type from 2007-2009 is contained in the AIC Database provided to Class Counsel.  Class Counsel obviously need more current data in order to evaluate Defendants' continued compliance with the section in the Remedial Plan regarding work assignments.

4, ¶ 10, when Defendants have given Class Counsel information from only *one* of at least four databases that contain relevant information and virtually no information about how DOC's policies and procedures are actually being implemented.  Without information about how class members fare under the systems created by Defendants to comply with the Remedial Plan, Class Counsel cannot effectively monitor Defendants' continued compliance with the consent decree.

### C. Plaintiffs Need Additional Documents and Information From Defendants in Order to Monitor Continued Compliance with the Remedial Plan

In order to evaluate Defendants' continued compliance with the Remedial Plan, Class Counsel need additional relevant information beyond what was "voluntarily" provided by Defendants.  Thus, contemporaneous with this Reply, Class Counsel have served on Defendants a second set of discovery requests that is tailored based on information we have learned from class members to date.  *See* Plaintiffs' Second Discovery Requests, Ex. 3 to Plaintiffs' Reply.  We have also limited the requests in time, focusing on the time period since the last compliance hearing, which was November 2010.

In general, Class Counsel seek through these requests access to the ATS and GTS Databases, as well as access to individual inmates' electronic files.  As discussed *supra* at 9, information regarding accommodations granted since 2012 is contained only in the ATS Database -- not the AIC Database.  Thus, in order for Class Counsel to

---

[8] Interestingly, the grievance policy provided by Defendants' Counsel is one year and a half older than the grievance policy on DOC's website and does not contain DOC's new informal grievance policy, which may raise compliance issues.

analyze the types of requests for accommodations that are being granted and why other requests are being denied, Class Counsel need access to the accommodations data in the ATS Database.

Class Counsel also need access to the GTS Database, as that is the only place where substantive information about inmate grievances is currently stored.  Grievances are no longer saved in the individual inmates' electronic files.  *See* 11/8/13 Letter from Fredericks to Greisen at 3, Ex. 1 to Plaintiffs' Reply.  Ms. Fredericks argues, in her November 8, 2013 letter, that Class Counsel do not need access to the GTS Database because they are "currently being provided with Quarterly Reports," which include information regarding ADA grievance "trends."  *Id.* at 5.  First, Class Counsel have received only *one* Quarterly Report, making it impossible to analyze "trends."  Second, the Quarterly Grievance Report is useless because it does not indicate the subject matter of the grievances and/or how they were resolved.  Nor does it indicate how many informal grievances or Step III grievances were filed during that period.

In order to understand whether there are systemic issues with DOC's compliance with the Remedial Plan, Class Counsel need to understand what types of issues inmates are grieving and how those grievances are being handled.  The number of grievances filed in a particular period, while of some interest, does not tell us what class members are complaining about and how DOC is responding to those complaints.  The only way to ascertain that information is to review the actual grievances and the determinations on those grievances.

Furthermore, Class Counsel need access to the individual class members'

electronic files, which contain "[a]ll documents received regarding ADA/litigation matters," including some information on screening, all accommodation determinations, and all offender correspondence.  11/8/13 Letter from Fredericks to Greisen at 3, Ex. 1 to Plaintiffs' Reply.  The files also contain "Accommodation Worksheets," which note all ADA-related files and activity with regard to that inmate.  *Id.*

The only way to determine if a problem is systemic is by looking at how many individuals it impacts.  The databases discussed above contain only summary notation of the resolution of requests.  The best way to understand the nature of a request and how it was resolved is to look at the underlying correspondence and documentation, which is contained only in the individual inmates' files.  Class Counsel seek this information not to present anecdotal exceptions to compliance, as Defendants' Counsel suggest, *see* Defendants' Response at 10, n.8, but rather to determine which, if any, of the anecdotal issues raised by class members rise to the level of substantial compliance problems.

At the October 25th meeting with Ms. Fredericks, Class Counsel were provided some preliminary information about what is retained in the AIC inmate electronic files, some of which conflicted with the information provided in Ms. Fredericks' subsequent letter.  In any event, it is still unclear whether certain information is retained in those electronic files (*e.g.*, an inmate's request for an accommodation is saved in the electronic file, but Doc's response to the request "may" or may not be in the file).  *See* 11/8/13 Letter from Fredericks to Greisen at 3, Ex. 1 to Plaintiffs' Reply).  A simple way to short-circuit this issue is for DOC simply to produce the AIC electronic files to Class

Counsel and let us review the contents of those files – but DOC has refused to do this.

Previously, Class Counsel received individual inmates' AIC files in paper form and a computer disc with Accommodation Worksheets for all the inmates in the AIC Database.  This information was particularly helpful in determining an inmate's accommodation history for purposes of analyzing trends and systemic issues.  There is no reason why, now that the information is computerized, it is too cumbersome for DOC to produce.

**IV.     The Monitoring Period Must Be Extended to Allow Class Counsel Time to Effectively Monitor Defendant's Compliance**

Class Counsel agree that this case has lasted much longer than it should have. The reason is largely because Defendants failed to come into substantial compliance until the Court's order in 2011 – not because of any wrongdoing by Plaintiffs.  Now, rather than freely provide information that could extinguish this case, Defendants have decided to stall and refused to respond to even the most basic requests.  Frankly, Class Counsel have tried for ten months to give DOC the benefit of the doubt to try to get answers and obtain information without seeking the Court's assistance.  Unfortunately, this approach did not work and Defendants continue to assert that Class Counsel are not entitled to any discovery beyond visiting their clients.

As a result, Class Counsel have been unable to fully discharge their monitoring responsibilities under the Remedial Plan.  While Class Counsel have met with many class members across the facilities, they have yet to review any meaningful data and information regarding DOC's systems for compliance with the Remedial Plan, which is a critical component of the Monitoring Period.

Class Counsel do not wish to prolong this case any more than necessary.  Nor do Class Counsel wish to "engage in an unstructured fishing expectation," as Defendants allege.  Defendants' Response at 15.  Class Counsel merely seek relevant discovery so that they can fulfill their obligations under the Remedial Plan to monitor whether DOC remains in substantial compliance with the consent decree.  In order to do so, Class Counsel require that the Monitoring Period be extended by the amount of time Defendants have delayed Plaintiffs' monitoring efforts by opposing discovery (i.e., the number of days between June 10, 2013 and the Court's order on Plaintiffs' Motion to Compel).

## CONCLUSION

For the foregoing reasons, Plaintiffs move this Court for an order directing that Plaintiffs are entitled to discovery of information, including written discovery, production of documents, and depositions, during the Monitoring Period relevant to whether Defendants continue to be in "substantial compliance" with the Remedial Plan.  Further, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion to Compel and order Defendants to respond to Plaintiffs' First and Second Sets of "Monitoring Period" Discovery Requests.  Plaintiffs also request that the Court extend the Monitoring Period and provide such further relief as the Court deems just and proper.

Respectfully submitted this 22nd day of November 2013.

KING & GREISEN, LLP

*s/ Paula Greisen*
Paula Greisen
Jennifer Weiser Bezoza
1670 York Street

Denver, CO  80206
(303) 298-9878 telephone
(303) 298-9879 facsimile
greisen@kinggreisen.com
bezoza@kinggreisen.com

Edward T. Ramey
Heizer Paul Grueskin, LLP
2401 15th Street, Suite 300
Denver, CO 80202
(303) 595-4747 telephone
(303) 595-4750 facsimile
eramey@hpgfirm.com

Lara E. Marks
Foster Graham Milstein & Calisher, LLP
360 S. Garfield Street, 6th Floor
Denver, CO  80209
(303) 333-9810 telephone
(303) 333-9786 facsimile
lmarks@fostergraham.com

Blain D. Myhre
P.O. Box 3600
Englewood, CO  80155
(303) 250-3932 telephone
blainmyhre@gmail.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2013, the foregoing **PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RESPONSES** was electronically filed, and emailed to the following:

James X. Quinn, Esq.
Jacquelynn Rich Fredericks, Esq.
First Assistant Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203
james.quinn@state.co.us
jacquelynn.richfredericks@state.co.us
*Attorneys for Defendants*

*s/ Laurie A. Mool*