## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 92-cv-00870-CMA

JESSE MONTEZ, et al.

      Plaintiffs,

v.

JOHN HICKENLOOPER, et al.

      Defendants.

---

## PLAINTIFFS' MOTION TO COMPEL DEFENDANTS' RESPONSES TO PLAINTIFFS' SECOND SET OF "MONITORING PERIOD" DISCOVERY REQUESTS AND PLAINTIFFS' REQUEST FOR EXPEDITED HEARING

---

Attorneys for the Plaintiff Class, Paula Greisen and Jennifer Weiser Bezoza of KING & GREISEN, LLP; Edward T. Ramey of HEIZER PAUL GRUESKIN, LLP; Lara E. Marks of FOSTER GRAHAM MILSTEIN & CALISHER, LLP; and Blain D. Myhre, hereby submit their Motion to Compel Defendants' Responses to Plaintiff's Second Set of "Monitoring Period" Discovery Requests ("Second Motion to Compel") pursuant to § XXXVI(A) of the Remedial Plan [Doc. 441] and Fed.R.Civ.P. 37(a), and in support thereof state as follows:

## I.     INTRODUCTION

There are now less than four months left to the two-year Monitoring Period, and the Colorado Department of Corrections ("DOC") has yet to provide *any* meaningful, system-wide data and information about whether Defendants remain in substantial compliance with the Remedial Plan.  As with Plaintiffs' First Set of Monitoring Period

Discovery Requests, Defendants have failed to fully respond—either formally or informally—to Plaintiffs' Second Set of Monitoring Period Interrogatories and Requests for Production of Documents ("Plaintiffs' Second Monitoring Period Discovery Requests").

Instead, Defendants have "voluntarily" provided a few charts, graphs, and spreadsheets that provide little to no substantive information regarding the status of Defendants' continued compliance with the Remedial Plan.  Moreover, Defendants' Counsel continue to argue that Class Counsel are not entitled to *any* discovery during the Monitoring Period, despite the myriad of cases cited by Class Counsel in their Motion to Compel Defendants' Responses to Plaintiffs' First Set of Discovery Requests During the Monitoring Period ("Plaintiffs' First Motion to Compel") [Doc. 5407] and their Reply to Defendants' Response to Plaintiffs' First Motion to Compel Discovery Responses ("Plaintiffs' Reply") [Doc. 5448], in which discovery was permitted during the monitoring phase of systemic reform litigation in the prison and other contexts.

In order to monitor substantial compliance, Class Counsel *must* be given access to discovery regarding how Defendants' systems for compliance (*e.g.,* systems for screening inmates, providing accommodations, maintaining and replacing durable medical equipment, making job assignments, and resolving grievances)—many of which have changed substantially since the 2010 compliance hearings—are *currently* operating and being implemented at the different facilities.  In other words, Class Counsel cannot effectively discharge our monitoring responsibilities under the Remedial Plan without information maintained by DOC pertaining to the areas we are charged

with monitoring.  We therefore respectfully request an expedited hearing regarding Class Counsel's right to discovery during the Monitoring Period and Defendants' obligation to respond to the two pending discovery requests.

## II.    PROCEDURAL HISTORY

Compliance hearings were held in this case in June to October 2010 before Judge Kane after extensive discovery on all aspects of the Remedial Plan.[1]  For those hearings, Defendants produced information up through April 30, 2009.  Judge Kane issued his ruling finding substantial compliance on September 11, 2012.  [Doc. 5314]  The Monitoring Period began on October 1, 2012, and is scheduled to conclude on October 1, 2014, if substantial compliance has been maintained.

In mid-April 2013, after three months of failed attempts to obtain from Defendants basic information regarding the types of information now maintained by DOC so that Plaintiffs could tailor their discovery requests during the Monitoring Period, Class Counsel propounded limited formal discovery asking primarily for Defendants to identify the records and databases presently maintained by DOC.  *See* Plaintiffs' First Set of "Monitoring Period" Interrogatories and Requests for Production of Documents ("Plaintiffs' First Monitoring Period Discovery Requests"), Ex. 1 to Plaintiffs' Second Motion to Compel**.**  Defendants' Counsel did not respond to Class Counsel's requests, asserting the position that Plaintiffs are not entitled to *any* discovery during the Monitoring Period beyond touring designated facilities.  *See* 6/11/13 Letter from Fredericks to Greisen, Ex. 2 to Plaintiffs' Second Motion to Compel.  Defendants did

---

[1] Substantial compliance was achieved prior to 2010 with respect to architectural barriers.

offer to engage in "some voluntary disclosure" of information, *see id.*, but did not identify the information it would provide or produce the promised information for another several months.  Thus, on August 30, 2013, *eight* months after Plaintiffs began asking informally for basic information relevant to Class Counsel's monitoring responsibilities, Class Counsel filed a Motion to Compel [Doc. 5407].

A few days after Plaintiffs filed their First Motion to Compel, Defendants provided Class Counsel with a CD of "voluntary disclosures" that were of little value to Class Counsel's monitoring efforts, as explained in detail in Plaintiffs' Reply [Doc. 5448].  *See* Plaintiffs' Reply at 18-25.  In that pleading, Class Counsel explained the numerous types of additional information needed in order to evaluate Defendants' continued compliance with the Remedial Plan.  *See id.* at 25-28.  Thus, contemporaneous with the filing of Plaintiffs' Reply, on November 22, 2013, Class Counsel served on Defendants a second set of discovery requests that were tailored to information Class Counsel had learned from class members and that were limited in time to after the last compliance hearing or November 1, 2010.  *See* Plaintiffs' Second Set of "Monitoring Period" Interrogatories and Requests for Production of Documents to Defendants ("Plaintiffs' Second Monitoring Period Discovery Requests"), Ex. 3 to Plaintiffs' Second Motion to Compel.

To date, Defendants have *not* fully responded to Plaintiffs' Second Monitoring Period Discovery Requests and have provided very little meaningful discovery.  On January 17, 2014, Defendants reiterated their position that there is no formal discovery during the Monitoring Period and provided some additional "voluntary" information that

is both unresponsive and of little probative value to Class Counsel's monitoring obligations, as explained *infra* at 5-31.  *See* 1/17/14 Letter from Fredericks to Greisen ("1/17/14 Letter"), Ex. 4 to Plaintiffs' Second Motion to Compel.

## III.   CERTIFICATION PURSUANT TO D.C.COLO.L.Civ.R. 7.1(A)

On June 10, 2014, Plaintiffs' Counsel Jennifer Bezoza sent a detailed email to Ms. Fredericks (with a CC to James Quinn) outlining Plaintiffs' Counsel's concerns with DOC's responses to Plaintiffs' Second Monitoring Period Discovery Requests.  *See* 6/10/14 Email from Bezoza to Fredericks, Ex. 5 to Plaintiffs' Second Motion to Compel. Ms. Bezoza requested that Ms. Fredericks respond by the end of the week (June 13, 2014) with her availability to discuss these issues.  When Ms. Bezoza received an out of office message from Ms. Fredericks in response, indicating that Ms. Fredericks is currently on leave, Ms. Bezoza forwarded the 7.1 conferral message to Darlene Hill, as instructed by Ms. Fredericks in the out of office message.  *See* 6/11/14 Email from Bezoza to Hill, Ex. 6 to Plaintiffs' Second Motion to Compel.

On June 17, 2014, Ms. Bezoza received an email from Mr. Quinn stating that "[a]dditional time is required" to evaluate Class Counsel's requests for additional information and reiterating Defendants' positions on Plaintiffs' right to discovery during the Monitoring Period and the scope of any such discovery.  *See* 6/17/14 Email from Quinn to Bezoza, Ex. 7 to Plaintiffs' Second Motion to Compel.  Mr. Quinn requested that Class Counsel articulate the need for responses to all of Plaintiffs' discovery requests.  Thus, that same day, Ms. Bezoza responded by providing Plaintiffs' draft motion to compel and requested that Defendants let Plaintiffs know by June 20, 2014,

what additional responses/information Defendants are willing to provide.  *See* 6/17/14

Email from Bezoza to Quinn, Ex. 8 to Plaintiffs' Second Motion to Compel.  Plaintiffs

have received no response to their June 17th request.

## ARGUMENT

### A.  Defendants' Voluntary Disclosures are of Little Value to Class Counsel's Monitoring Efforts.

Defendants' second "voluntary" production, which consists of no more than two

binders of documents, is not helpful to Class Counsel's monitoring efforts for the same

reasons that the first "voluntary" production was useless.  For the most part, Defendants

referenced general policies called Administrative Regulations ("AR"s) on DOC's

website, without providing any information about how those policies are being

implemented.  However, throughout the over two decades of this case, the evidence

has shown that Defendants have failed to actually implement their written policies.

Thus, it is impossible for Class Counsel to assess from only the policies whether DOC is

substantially complying with the Remedial Plan.  Defendants also failed to provide

facilities' I/As (Implementation/Adjustments), which is how individual facilities implement

and modify DOC policies.  The policies alone simply do not provide useful information

about whether there is actual on-the-ground compliance with these policies or the

Remedial Plan.

Defendants also provided a number of general charts and graphs regarding

inmates' requests for accommodations, such as requests for an Offender Care Aide

("OCA"), medical shoes, or a sign language interpreter, that lack any specific

information about the nature of the inmates' requests for accommodation, their disabilities, and the reasons for any denials of their requests.  Without specific information about who made the request for the accommodation, what the request was for, and the reasons it was granted or denied, a chart showing only how *many* inmates requested a particular accommodation is useless to Class Counsel's monitoring efforts. Class Counsel cannot assess whether the inmates' requests for accommodations were handled appropriately without more information about the exact nature of the requests and DOC's responses to those requests.

Most importantly, Defendants continue to deny Class Counsel access to the information in three of the four new DOC databases that contain information relevant to compliance with the Remedial Plan.  That is, Defendants have refused to provide access to the actual grievances and information related to those grievances in the Grievance Tracking System ("GTS Database"), to most of the accommodations data and information in the Accommodations Tracking System ("ATS Database"), and to individual inmates' electronic files although *all* of this information has been provided to Class Counsel in the past in this case and is easily accessible.[2]  The specific information in these three databases is critical to Class Counsel's monitoring efforts for the reasons explained below.  *See infra* at 19-20, 22, 26-28, 30-31.

---

[2] Defendants suggest that what was once feasible to produce has now become unduly burdensome because of their new systems for collecting and organizing information relevant to the Remedial Plan. The Court should not be sympathetic to this argument.  Defendants have been on notice for the last five years that Class Counsel would need this information to discharge our monitoring responsibilities.  If they voluntarily changed their systems to make production of information relevant to this case more difficult, it is their responsibility to figure out how to get us that information.  They cannot now hide behind their own technical decisions to shirk their discovery obligations.

Defendants continue to attempt to justify their refusal to provide this information by claiming that the one database from which they have provided some limited information – the AIC Database – is the most relevant to Class Counsel's monitoring obligations, yet the information in that database is primarily historical and outdated. Moreover, this claim is belied by a training manual produced by Defendants, which stresses the importance of the ADA/Montez accommodations information contained in *other* databases that have not been produced.  *See* Americans with Disabilities (ADA) Act in a Correctional Setting April 2013 ("April 2013 ADA Training") at 32-35, Ex. 9 to Plaintiffs' Second Motion to Compel (discussing accommodations information available in the ATS Database, DOCNET, and offenders' profiles in the Offender Portal).

Lastly, Defendants argue that they should only be required to provide information from the start of the Monitoring Period, which was October 1, 2012.  Plaintiffs have requested information from November 1, 2010, which represents the end of the compliance hearings before Judge Kane[3] although Class Counsel did not receive any information in discovery related to those hearings after April 30, 2009.  Class Counsel need information that predates Judge Kane's decision because we have reason to believe that DOC began changing its policies and procedures for compliance with the Remedial Plan *at least* as early as the last compliance hearing, but possibly before.

Although Defendants argue throughout their second discovery responses that the time period for their "disclosures" should be limited to the Monitoring Period, they have provided some information from before then, thereby undermining their argument that it

---

[3] There were thirty-two days of compliance hearings in June, July, and October 2012.

would be unduly burdensome to provide that information.  Indeed, they can easily enter

an earlier date into their databases when running the reports they provided.

### B. Defendants Have Not Fully or Meaningfully Responded to Plaintiffs' Second Discovery Requests.

#### 1. Interrogatories

**Interrogatory 2:**  Interrogatory 2 requests DOC to describe in detail DOC's new

informal grievance policy (ie., the policy that now requires inmates to seek informal

resolution of grievances before proceeding to Step 1 of the formal grievance process).

Class members have informed class counsel that they are routinely being denied the

ability to file formal ADA grievances because they are not receiving responses to their

"informal grievances" within the required time frame for filing a Step 1 grievance.  Thus,

Class Counsel need to evaluate how this new informal grievance policy is impacting

inmates' ability to grieve ADA issues.[4]

In response to this Interrogatory, Defendants provided only a citation to the

administrative regulation governing DOC's grievance procedure.  The regulation does

not indicate—and Defendants have not provided—information indicating how the

number of Step 1 grievances filed by *Montez* class members has changed in the twelve

months prior to and after the informal grievance policy was adopted, as requested by

Plaintiffs.  Without such information, Class Counsel cannot assess how the new

procedure has impacted class members' access to the grievance process, which is a

---

[4] The Remedial Plan requires an ADA grievance process.  *See* Remedial Plan at XII [Doc. 441].  It is our understanding that DOC recently conflated the two grievance processes, such that there is no longer an ADA-specific grievance procedure.

critical means of evaluating whether DOC is meeting the accommodation needs of class members.

**Interrogatory 4/Request for Production ("RFP") 20:**  Interrogatory 4 requests Defendants to identify the number of diabetic test kits contained at each facility and the location of each kit within each facility.  RFP 20 requests the rosters on the use of diabetic test kits at each facility since November 1, 2010.  This information is necessary for Class Counsel to assess whether there are sufficient test kits readily available to class members at each facility and the extent to which those kits are being used. Defendants provided the Clinical Standards and Procedures related to Diabetes, which generally discuss diabetic test kits, but did not provide the specific information requested regarding the number and location of test kits at each facility.  Defendants also failed to provide *any* specific information regarding inmates' use of diabetic test kits at each facility, despite admitting that DOC maintains "information regarding when kits are used and replenished" and can generate incident reports regarding such use. 1/17/14 Letter at 2, Ex. 4 to Plaintiffs' Second Motion to Compel.

**Interrogatory 5:**  Interrogatory 5 asks for specific information about requests for diabetic medical shoes (soft sole shoes) made from November 1, 2010 to present.  This information is needed so that Class Counsel can ascertain whether medical shoes are being provided, as required by the ADA and Remedial Plan as a necessary accommodation.  Defendants provided charts starting in December 20, 2011 (an arbitrary date) that indicate who requested medical shoes, when, and whether the request was approved or denied.  Defendants have not provided any of the substantive

information underlying those decisions, such as the reasons why the inmate claimed medical shoes were needed as a reasonable accommodation and the basis for DOC's denial of the request.  Without such information, Class Counsel cannot ascertain whether the denials were appropriate and in compliance with the Remedial Plan.

**Interrogatory 6:**  Interrogatory 6 requests specific information about requests for Offender Care Aids ("OCAs") made from November 1, 2010 to present, such as the reasons for any denials of requests, the names and levels of the OCAs assigned to class members, the training the OCAs received to be OCAs, and any restrictions on the help OCAs can provide to class members.[5]  Class Counsel need this information to assess whether OCAs are being appropriately assigned and trained, and whether they are available and permitted to assist as needed, as required by the Remedial Plan.  *See* Remedial Plan at XIV [Doc. 441].

Defendants provided charts beginning January 20, 2012, that indicate only who requested Level I or II OCAs, when the requests were made, and whether the requests were granted or denied.  The charts do not indicate the identity and level of the OCAs that were assigned or what help those OCAs were permitted to provide.  Nor do the charts indicate the reason(s) for any denials.  In addition, the charts have *no* information regarding Level III OCAs.  Defendants additionally provided slides from two OCA trainings, but have not indicated which OCAs or how many OCAs participated in such trainings.  Without such information, Class Counsel cannot adequately assess whether

---

[5] OCAs are inmates whose jobs it is to assist disabled inmates with the performance of activities of daily living, such as showering, dressing, or eating.  There are three levels of OCAs (I-III); the higher the level, the more duties the OCA is expected to perform and the more training he or she is supposed to receive.

class members are getting the help they need from OCAs and whether their OCAs are sufficiently trained.

**Interrogatory 7:**  Interrogatory 7 asks for the number of cells with strobe lights and/or strobe alarms and for information regarding requests for cells with strobe lights and/or strobe alarms from November 1, 2010 to present.  Class Counsel need this information to determine whether there are currently a sufficient number of cells with strobe lights and whether hearing-impaired inmates' requests for those cells are being appropriately and timely handled.  Defendants have refused to provide *any* information with respect to this request arguing that "all physical plant issues were previously determined compliant and are not thus, an issue for monitoring."  1/17/14 Letter at 6, Ex. 4 to Plaintiffs' Second Motion to Compel.

This position lacks merit for a number of reasons.  First, the issue of the number of cells with strobe alarms and the availability of those cells is within the scope of the *current* Monitoring Period.  The 2008 Stipulation excludes from the current Monitoring Period *some* architectural plant provisions for which compliance occurred much earlier (by August 27, 2005) and for which the monitoring period concluded on July 27, 2007.  The issue of strobe lights was specifically exempted from that exclusion because compliance on that issue had not been achieved by the entry of the 2008 Stipulation.

The 2008 Stipulation clearly states, "[T]he monitoring period for the architectural-physical plant requirements shall have ended effective July 27, 2007 *except as provided below*."  2008 Stipulation at B (emphasis added) [Doc. 3326].  Below there is a paragraph that addresses the precise issue covered by Plaintiffs' Interrogatory No. 7—

the number of cells with strobe alarms and their availability to hearing impaired inmates. This provision of the Stipulation requires, among other things, that DOC provide hearing impaired inmates with "the same proportional number of singles cells with strobe alarms as is available to inmates without hearing impairments."  2008 Stipulation at ¶17 [Doc. 3326].  Thus, because compliance on strobe lights was not achieved by August 27, 2005, it was part of the 2008 Stipulation and 2010 compliance hearings before Judge Kane and accordingly, is part of the current Monitoring Period.

Second, to the extent that additional cells have been added, Plaintiffs have a right to information about those cells to assess whether they comply with accessibility requirements.  The appropriate discovery standard is whether that information is "relevant to the claim or defense of any party."  F.R.C.P. 26(b)(1).  It is not whether that information is likely to prove non-compliance.

Third, Plaintiffs' Interrogatory requests information regarding the disposition of requests for cells with strobe lights as a reasonable accommodation, which Defendants have not – and cannot – contend is an inappropriate subject for monitoring.  Class Counsel need information regarding who made the request; when it was made; whether it was granted and if so, when; and why it was denied, if applicable.  Without such information, Class Counsel cannot assess whether these requests are being handled appropriately.

**Interrogatories 8 and 9/Request for Production 21**:  Interrogatories 8 and 9 ask for specific information regarding requests for sign language interpreters since November 1, 2010.  RFP 21 requests the invoices for all sign language interpreter

services provided to Montez class members from November 1, 2010 to present. Defendants provided invoices and information regarding requests and denials for sign language interpreters from January 2012 to December 2013.  Importantly, Defendants have failed to identify all current inmates determined to need the assistance of a sign language interpreter to communicate, as requested, making it impossible for Class Counsel to compare DOC's records of sign language interpreter requests to the individuals determined to need sign language interpreter services.  Defendants have also failed to provide the reasons the class members made the sign language interpreter requests (e.g., parole hearing or medical appointment), as requested, thereby precluding Class Counsel from determining if sign language interpreter services are being provided as required by the Remedial Plan.

**Interrogatory 10:**  Interrogatory 10 requests information regarding requests for durable medical equipment ("DME") or replacement/maintenance of DME from November 1, 2010 to present.  This information is essential to Class Counsel's monitoring efforts because we have reason to believe that DOC is not appropriately providing or replacing DME, which are necessary accommodations required by the Remedial Plan and the ADA, on a timely basis.  Defendants have refused to respond to this request, claiming that the information is not "separately tracked" and that it would be too time-consuming and burdensome for clinical services to compile this information.

It is hard to believe that this information is not compiled in some manner as the 2008 Stipulation *requires* DOC to compensate inmates for certain delays in the repair or replacement of some DME, and Defendants produced in response to Plaintiffs' First

Monitoring Period Discovery Requests a list of inmates who requested compensation for delays in the provision of DME during one particular quarter.  Moreover, in the past, Plaintiffs have received extensive information from Defendants regarding the DME requested by and provided to class members because Defendants know that this is a critical area for determining compliance with the Remedial Plan.  Without specific information regarding whether these accommodations are being provided, and being provided on a timely basis, it is impossible for Class Counsel to determine whether there continues to be substantial compliance with the Remedial Plan.

**Interrogatories 11-13:**  Interrogatory 11 requests identification of all procedures and systems in place to ensure that class members know what accommodations, durable medical equipment, health care appliances, and/or restrictions have been granted to them.  Interrogatory 12 requests identification of how DOC staff can obtain such information about class members.  Interrogatory 13 asks how such information is verified.  These Interrogatories are important because class members are complaining that they do not know what they have been approved to receive and/or that employees at the facilities do not know or have current information about what they have been approved to receive.  Class Counsel therefore need to assess how such information is being collected, maintained, disseminated, and verified for accuracy.  Defendants refused to answer any of these Interrogatories, claiming that such information has already been provided to Class Counsel.  However, as discussed in detail in Plaintiffs' Reply, Class Counsel do not know how DOC is collecting, maintaining, and verifying

information related to its obligations under the Remedial Plan.  *See* Plaintiffs' Reply at 16-18 [Doc. 5453].

**Interrogatories 14:**  Interrogatory 14 requests identification of all steps taken by the AIC since November 2010 to ensure that class members are not denied jobs because of their disabilities.  This information is critically important to Class Counsel's assessment of whether class members currently have equal access to jobs and the accommodations they need to perform those jobs.  Defendants have referenced a number of policies that prohibit discrimination in the assignment of jobs and permit inmates to file a grievance if they feel they have been discriminated against in the job process, but have provided *no* information regarding their affirmative efforts to prevent discrimination in this critical area, as requested.

**Interrogatories 15 and 16:**  Interrogatories 15 and 16 request specific information about class members that have requested a job since November 2012 and/or accommodations to perform that job.  This information is critical to assess whether class members are being given equal access to jobs, including Correctional Industries ("CI") jobs,[6] and the accommodations necessary to perform those jobs.

Defendants referenced DOC policies regarding job assignments and accommodations, but provided none of the requested information regarding what jobs were requested by class members, when the requests were made, the results of those requests, and the reasons for any denials, as requested by Plaintiffs.  Without this information, Class Counsel cannot assess whether class members have equal access

---

[6] CI jobs are the highest paying, most desirable jobs at DOC.

to comparable jobs, as required to monitor continued compliance with the Remedial Plan.

      With respect to job accommodations, Defendants provided a spreadsheet listing the inmates who have requested accommodations since January 1, 2012, but did not indicate what accommodations were requested by each inmate, whether the requested accommodations were provided, and if not, why the requests were denied.  Without this information, Class Counsel cannot assess whether job accommodations are being provided to class members, as required to assess compliance with the Remedial Plan.

      **Interrogatory 17:**  Interrogatory 17 requests identification of all Correctional Industries ("CI") jobs at private and public DOC facilities since November 2010. Defendants provided a report indicating the CI jobs available at each facility as of November 2013.  It does not provide *any* information about available jobs before then. Nor did Defendants provide discernible information about the pay, benefits, and/or bonuses associated with those jobs, making it impossible for Class Counsel to assess whether class members have equal access to the more coveted, higher paying jobs.

      **Interrogatory 18**:  Interrogatory 18 requests a detailed explanation of the "clinic and medical devices" not within the ADA Inmate Coordinator's ("AIC's") authority to grant a class member as an accommodation.  This information is important because class members have told us that requests that were previously granted as reasonable accommodations are now being denied as requiring "clinical or medical treatment" or constituting "clinical or medical equipment."

In his previous orders, the Honorable Judge Kane told DOC that disability determinations and accommodations required by the ADA are to be determined by the AIC—*not* clinical services.  *See* 3/25/07 Transcript of Compliance Hearing at 119, Ex. 10 to Plaintiffs' Second Motion to Compel.  In other words, Defendants could not deny a reasonable accommodation because it was not mandated by its clinical policies.  Nevertheless, Defendants have clearly now adopted new policies that defer ADA accommodation issues to clinical services personnel, eviscerating Judge Kane's prior rulings on this topic.

In response to this Interrogatory, Defendants referred Class Counsel to DOC's policies regarding accommodations and health care appliances and to the clinical standard regarding the provision of health care appliances.  Defendants did not identify for each item considered a "clinical or medical device," which DOC personnel have the authority to grant the device or whether that decision can be overturned by any other DOC personnel, as requested by Plaintiffs.  Without this information, Class Counsel cannot assess whether accommodations and/or "clinical and medical equipment" are being appropriately provided to class members.

**Interrogatory 19:**  Interrogatory 19 requests identification of every occasion since November 2010 when DOC's insurance provider has refused to pay for an accommodation or a "clinical or medical device" for a class member.  Given that DOC has recently changed its policies to reclassify requests that were formerly treated as accommodations as "medical issues," such as bottom bunk restrictions and medical shoes, it is critical that Class Counsel review insurance information related to these and

other "medical" issues.  Defendants declined to answer this Interrogatory, claiming that "ADA *accommodations* are not paid for by [DOC's insurance provider]."  1/17/14 Letter at 4 (emphasis added), Ex. 4 to Plaintiffs' Second Motion to Compel.  With respect to clinical and medical devices, which clearly fall within the purview of DOC's insurer, Defendants claim this request is unduly burdensome and too broad and vague.  *See id.* However, Defendants admit that they have lists of the clinical services and medical devices that inmates are receiving.  Surely, redaction of those lists to remove non-class members is not overly burdensome, as it is routinely done in cases like this.

**Interrogatory 21**:  Interrogatory 21 requests a list of all inmates who have participated in or requested to participate in the incentive program at Colorado Territorial Correctional Facility ("CTCF").  Class Counsel need this information because we have heard complaints from class members that they do not have equal access to this program due, in part, to the fact that the program is limited to certain housing areas that are not ADA accessible and accordingly cannot house certain class members. Defendants provided a heavily redacted chart showing only which class members were enrolled in this program on one specific date—January 17, 2014.  This chart is insufficient because it does not show who participated in this program at other times, who sought to participate but was denied, why they were denied, what percentage of the participants are class members, or how long the class members had to wait to participate.  Without such information, Class Counsel cannot assess whether this program is equally accessible to class members.

**Interrogatory 22:**  Interrogatory 22 requests a list of all programs and jobs available at DRDC and La Vista Correctional Facilities that provides specific information about the participation of class members in such programs and jobs.  Class Counsel need this information to assess whether class members have equal access to the programs and jobs at these two facilities, about which we have heard complaints. Defendants provided lists of participants in the programs/jobs at those two facilities, but their lists do not indicate which participants are class members, when the requests to participate were made, when the inmates began participating, and why any requests for participation were denied, as requested by Plaintiffs.  Without such information, Class Counsel cannot assess whether class members are being afforded equal access to the programs and jobs at these two facilities.

### 2.      Requests for Production of Documents

**Request for Production 2**:  RFP 2 requests the AIC electronic data files, including the AIC worksheets, of all inmates that have requested class member status from November 1, 2010 to present.  This information is critical in order to assess the identity of current class members; the accommodations they require and have been granted or denied; and what, if any, complaints class members have lodged regarding DOC's accommodation of their disabilities.

After many months of asking Defendants' counsel about the contents of individual class members' electronic data files, Class Counsel learned in November 2013 that these files contain "[a]ll documents received regarding ADA/litigation matters," including some information on screening, all accommodation determinations, and all

offender correspondence.  11/8/13 Letter from Fredericks to Greisen ("11/8/13 Letter")

at 3, Ex. 11 to Plaintiffs' Second Motion to Compel.  The files also contain

"Accommodation Worksheets," which note all ADA-related files and activity with regard

to that inmate.  *Id.*  The individual electronic data files therefore contain the most

comprehensive information about an inmate's ADA accommodation history.

Defendants have refused to provide Class Counsel with inmates' individual

electronic files, arguing that such information is "overly broad and unduly burdensome,"

*see* 1/17/14 Letter at 5, Ex. 4 to Plaintiffs' Second Motion to Compel, goes "beyond the

scope of what would be permissible discovery were formal discovery at hand," *see id.*,

and "does not pertain to the purpose of monitoring systemic compliance," 11/8/13 Letter

at 5, Ex. 11 to Plaintiffs' Second Motion to Compel.  First, the identical information that

Class Counsel seek—inmates' individual files—has been produced in discovery since

the *inception* of this *case* in paper form (before the files were computerized).  Clearly, it

is less burdensome to produce this information now that it is electronic.

Second, the only way to determine if a problem is systemic is by looking at how

many individuals it impacts.  It is now clear that DOC's databases contain only summary

notation of the resolution of requests.  Thus, the *only* way to understand the nature of a

request and how it was resolved is to look at the underlying correspondence and

documentation, which is contained only in the individual inmates' files.  Class Counsel

seek this information not to present anecdotal exceptions to compliance, but rather to

determine which, if any, of the anecdotal issues raised by class members rise to the

level of substantial compliance problems.  This information is critical to assessing

whether Defendants remain in substantial compliance with the Remedial Plan and there is no legitimate justification for Defendants' refusal to provide this basic information.

**Request for Production 3**:  RFP 3 requests all orientation handbooks from each of the public and private facilities.  Class Counsel need this information to assess what information new inmates are receiving about their rights under the ADA and under the Remedial Plan.  Defendants referenced an administrative regulation that provides the procedures for reception and orientation, including inmates will be given "written orientation materials," but have not provided any of those written materials.  In response to Plaintiffs' First Monitoring Period Discovery Requests, Defendants provided the orientation materials for only one facility (Denver Reception and Diagnostic Center) out of twenty-four.  Without the other orientation handbooks, Class Counsel cannot determine what, if any, information inmates are getting at the specific facilities about their *Montez* rights.

**Request for Production 4:**  RFP 4 requests all ADA related policies, procedures, rules, regulations, any related Implementation/Adjustments ("I/As") or Operations Manuals ("OMs") that have been enacted or implemented since November 1, 2010.  In order to monitor compliance, Class Counsel need to know all the relevant policies and procedures currently in place across DOC.  Defendants merely informed Class Counsel how to access the administrative regulations (ARs) on DOC's website, which Class Counsel obviously know how to do.  They provided none of the specific IAs or OMs that pertain to those ARs.  Nor have they provided any ADA policies, procedures rules, or regulations system-wide or institution-specific that are not

embodied in ARs.  This request is not overly broad or vague, as Defendants suggest, because it is limited both by subject matter and by time to newly enacted ADA policies and procedures.  Without such information, Class Counsel cannot get an accurate understanding of the changes that DOC has made regarding compliance with the Remedial Plan and whether those changes affect substantial compliance.

**Request for Production 5:**  RFP 5 requests all ADA kites submitted by class members since November 1, 2010, and documentation concerning the responses to those kites.  Kites are inmates' internal written correspondence requesting services, such as accommodations, to meet their needs under the ADA.  Class Counsel need to review class members' ADA kites in order to understand what they are asking for and how their requests are being addressed.  Defendants have not provided *any* information regarding this request, nor have they provided a specific reason for their lack of response.

**Requests for Production 6 and 7:**  RFPs 6 and 7 seek all information in the Accommodations Tracking System ("ATS Database") regarding class members' requests for accommodations since November 1, 2010, including the "actual hard cop[y]" requests and responses to those requests.  Class Counsel need to see the "actual" requests and responses, whether in paper or electronic format, so that they can ascertain whether the requests are being appropriately handled.  All Defendants provided are summary charts listing inmates whose accommodation requests were approved or denied since January 1, 2012.  *See, e.g.,* Denied Requests for Class Members 1-1-12 to Current, Ex. 12 to Plaintiffs' Second Motion to Compel.  The charts

provide no information regarding the inmates' disabilities, accommodation needs and requests, and the reason(s) for any denials.  Without such information, Class Counsel cannot assess how DOC is currently handling accommodation requests, which is critical to assessing whether Defendants are maintaining compliance with the Remedial Plan.

　　　**Request for Production 8:**  RFP 8 requests all ADA Litigation Resolution forms (formerly known as Accommodation Resolutions) since November 1, 2010.  These forms "serve[] as notice to the offender and staff of the offender's class member status, benefits of the Remedial Plan, including any disability-related prescribed health care appliances, housing and placement restrictions, and to alert staff of orders of the court." April 2013 ADA Training at 33, Ex. 9 to Plaintiffs' Second Motion to Compel (sample ADA Litigation Resolution).  In response to Plaintiffs' First Monitoring Period Discovery Requests, Defendants provided the blank template forms for each of the four disability groups covered by the Remedial Plan, but no forms with inmate-specific information. *See* ADA Litigation Resolutions, Ex. 13 to Plaintiffs' Second Motion to Compel.  Class Counsel need class members' actual ADA Litigation Resolution forms in order to understand the scope of what is currently being provided to them to meet their disability needs.  Such information cannot be gleaned from summary charts indicating only that a request for accommodations was granted or denied.  In fact, DOC's own training manual states, "The ATS information and forms do not replace, but should be viewed *in conjunction with,* the offender's ADA Litigation Resolution."  April 2013 ADA Training at 33 (emphasis changed), Ex. 9 to Plaintiffs' Second Motion to Compel.  Defendants have refused to provide this information and have given no explanation for the refusal.  These

forms have *always* been produced in the past (in their earlier iteration) and were critical to Class Counsel's assessment of compliance.

**Request for Production 9:**  RFP 9 requests all documents reflecting the findings of any ADA-related audits since November 1, 2010.  The results of any independent audits related to DOC's compliance with the ADA is essential to Class Counsel's monitoring efforts, particularly given Defendants' lack of cooperation with Plaintiffs' discovery efforts.  Defendants refuse to provide such information, claiming the request "exceeds the monitoring period" and is "overly broad and unduly burdensome."  1/17/14 Letter at 7, Ex. 4 to Plaintiffs' Second Motion to Compel.  It is hard to believe that there have been that many audits on the narrow issue of ADA compliance in the last four years to make this request overly burdensome.  In any event, such audits have been routinely produced to Plaintiffs throughout this case and are clearly highly relevant to the issue of substantial compliance.

**Request for Production 10:**  RFP 10 requests all Approve/Deny Reports since November 1, 2010.  "Request Approved/Denied Reports" are inmate-specific reports that reflect DOC's decision regarding a particular request and the reasons for that decision.  *See* April 2013 ADA Training at 32, Ex. 9 to Plaintiffs' Second Motion to Compel (sample Request/Approved Denied Report).  These forms are critical to Class Counsel's monitoring efforts because they provide an explanation for Defendants' accommodation decisions, which will enable Class Counsel to assess whether decisions are being appropriately made.  Defendants have not provided *any* of these forms.  Defendants provided only summary Approved/Denied reports from January

2012 to December 2013 that have none of the detail contained on the individual forms that Plaintiffs requested, such as what accommodation was requested and the reason it was provided or denied.  *See* Denied Requests for Class Members 1-1-12 to Current, Ex. 12 to Plaintiffs' Second Motion to Compel.  Without more specific information about the nature of the inmates' requests, these summary reports are worthless to Class Counsel's monitoring efforts.

**Request for Production 11:**  RFP 11 requests all "Offender Accommodations Reports" since November 1, 2010.  "Offender Accommodations Reports" are newly created DOC forms that contain "a running list of all current and approved accommodations [for an inmate] over time" and are purportedly given to each inmate. April 2013 ADA Training at 32, Ex. 9 to Plaintiffs' Second Motion to Compel (sample Offender Accommodations form).  Class members have told us that they do not know what accommodations have been approved for them.  Thus, Class Counsel need these reports to assess the extent to which accommodations are being provided to class members and the manner in which those accommodations are being communicated to inmates.  This information is apparently also available on inmates' profiles in the Offender Portal, which were not provided to Plaintiffs.  *See id.*  This information was previously contained in inmates' Accommodation Resolution forms, which were provided to Class Counsel in discovery in the past.  There is no legitimate reason for Defendants' refusal to provide this critical information.

**Request for Production 12:**  RFP 12 requests materials regarding the training of DOC staff at public and private facilities on the ADA, Montez, diabetes, the grievance

process, and emergency and evacuation procedures, and the training materials for diabetic class members.  This information is critical for Class Counsel to assess whether correctional staff is being appropriately trained on the rights of class members and the policies and procedures in place to uphold those rights.  Defendants provided two sets of training materials on the ADA, as well as a list of the mandatory training requirements in 2011-12 and a cover page for a lesson plan on the ADA.  It is clear that more training materials on Montez and the ADA exist because the slides provided state, "[m]ore information regarding disabilities and diabetes is available on Legal Services and clinical services pages on DOCNET," which Class Counsel presume is an internal intranet site, and "[a] training video regarding OCA eligibility is available on the Legal Services website."  April 2013 ADA Training at 20, 37, Ex. 9 to Plaintiffs' Second Motion to Compel (listing a number of resources available to staff that are responsive to Plaintiffs' request).  Defendants have not provided *any* specific information regarding training on the other issues requested by Plaintiffs – Montez, the grievance process, diabetes, and emergency procedures.  Nor have they provided rosters of who took the referenced or other trainings, the exams given, or the instructors' qualifications, as requested.  A single document noting that ADA training was mandatory in 2011-12 is meaningless to Class Counsel's efforts to determine whether such training is still required and the scope and quality of such training.

**Requests for Production 13-15**:  RFPs 13-15 seek all information contained in the Grievance Tracking System ("GTS Database") or elsewhere concerning any

grievances (informal or Steps I-III) filed by class members from November 1, 2010 to present, including copies of the grievances and all responses thereto.

In order to understand whether there are systemic issues with DOC's compliance with the Remedial Plan, Class Counsel need to understand what types of issues inmates are grieving and how those grievances are being handled, which can only be gleaned from the grievance forms themselves and the responses to those grievances. The GTS Database contains all grievances filed since June 2011, including the scanned grievance forms and DOC's responses, and is apparently the only place where substantive information about inmate grievances is currently stored.  Grievances are no longer saved in the individual inmates' electronic files.  *See* 11/8/13 Letter at 3, Ex. 11 to Plaintiffs' Second Motion to Compel.

Defendants have refused to provide copies of individual grievances, arguing that the Quarterly Reports they provided months ago with information about ADA grievance "trends" should be sufficient for monitoring.  *See* 11/8/13 Letter at 5, Ex. 11 to Plaintiffs' Second Motion to Compel.  First, Plaintiffs received only one Quarterly Report for April-June 2013, making it impossible to analyze "trends."  Second, the Quarterly Grievance Report is useless to Class Counsel's monitoring efforts because it shows only the number of Step I and Step II grievances filed in particular months.  It does not indicate the subject matter of the grievances and/or how they were resolved.  Nor does it indicate how many informal grievances or Step III grievances were filed during that period.  Essentially, the "charts" provided by Defendants are worthless in terms of monitoring compliance.

Defendants have additionally provided an ADA Montez grievance report from January 1, 2012 to present that indicates only the general subject matter of the grievance (ie., disagree with accommodations, assignment discrimination, clinical/care treatment) and the disposition (ie., denied, procedural denial, resolved, granted in part) for Step I and Step II grievances only.  *See* ADA-M Step 1 and 2 2012 - Current, Ex. 14 to Plaintiffs' Second Motion to Compel.  This summary chart is worthless because it does not provide any detail about the subject matter of the grievance for Class Counsel to ascertain the nature of class members' complaints or the reasons for DOC's denials, making it impossible for Class Counsel to assess whether the grievances were appropriately handled.

Lastly, Defendants provided ADA grievance bar graphs showing the number of Step I and II grievances received from 2003 to 2013.  *See* Office of the ADA Inmate Coordinator Bar Graphs, Ex. 15 to Plaintiffs' Second Motion to Compel.  The number of grievances filed in a particular period similarly does not tell Class Counsel what class members are complaining about and how DOC is responding to those complaints.  The only way for Class Counsel to ascertain that information is to review the actual grievances and the determinations on those grievances.

Defendants also argue that the request for "all" grievances filed by class members is overly broad because it seeks information not relevant to ADA issues.  *See* 1/17/14 Letter at 2, Ex. 4 to Plaintiffs' Second Motion to Compel.  Class Counsel did not limit this request to ADA-specific grievances because it is our understanding that Defendants no longer differentiate in their coding between ADA and other grievances,

making it difficult to sort the grievances by subject matter.  If there is an electronic way to separate out ADA grievances, Plaintiffs will gladly limit this request accordingly.

More importantly, from the inception of this case, Class Counsel has routinely requested and been provided discovery regarding all ADA grievances filed by class members in this case.  In fact, the Remedial Plan specifically requires Defendants to designate grievances as "ADA" and to track the handling of these grievances, as opposed to non-ADA grievances filed in their facilities.  *See* Remedial Plan at XII [Doc 441].  If Defendants made a decision to change their grievance tracking policies to make it more difficult to track ADA grievances, then they should not be allowed to now defeat discovery on this issue by claiming it is "too burdensome" to track and produce ADA grievances.

**Request for Production 16:**  RFP 16 requests copies of all written communications between Montez class members and the office of the ADA Inmate Coordinator ("AIC") from November 1, 2010 to present.  This information is critical because letters to the AIC are another way that inmates complain about their access to disability programs and services, particularly when they cannot access the grievance process.  Defendants contend that such communications have been provided through Quarterly Reports.  However, the few Quarterly Reports that Plaintiffs received contain one chart indicating only the *number* of letters that the AIC received from inmates during a three month period of time.  *See, e.g.,* April-June 2013 Quarterly Report, Ex. 16 to Plaintiffs' Second Motion to Compel.  The charts have *no* information about the nature of the correspondence or how the issues raised therein were addressed.  Thus, it is

impossible to assess from these bar graphs what class members are complaining about and how their complaints are being addressed by DOC.  In other words, the discovery Defendants have provided on this issue is worthless to monitor substantial compliance.

**Requests for Production 17 and 18:**  RFP 17 requests all documentation submitted by any inmate in making a request for disability status related to this case since January 1, 2011.  RFP 18 requests documentation related to screening, screening results, and final disability determinations for inmates since January 1, 2011, including documentation explaining the reason(s) for any denials of class member status.  This information is critical because the screening criteria for class member status changed in 2008-09.  Most class members were re-screened under the new criteria during and after the 2010 compliance hearings.  As a result, Class Counsel have not yet had an opportunity to assess DOC's compliance with the new screening criteria.

According to a training manual provided by Defendants, the information Plaintiffs seek in RFP 17 is likely contained on one form—Form B, which is a request for ADA litigation class member status.  *See* April 2013 ADA Training at 16, Ex. 9 to Plaintiffs' Second Motion to Compel.  Nevertheless, Defendants have refused to provide any of this information, claiming the requests are overly broad and unduly burdensome. Defendants further claim that this information *may* be contained within the ADA Montez database previously provided to Class Counsel, which is simply not true.  Defendants previously provided only a bar graph indicating how many requests for class member screening were made during a three-month period (April to June 2013).  *See* April-June 2013 Quarterly Report, Ex. 16 to Plaintiffs' Second Motion to Compel.  This information

is useless without information about the disabilities of the inmates requesting the screenings, how the screenings were conducted, when the screenings were conducted, whether the inmates were determined to be disabled, and the reasons any inmates were found ineligible.

One of the critical aspects of this case is determining whether inmates with disabilities are being appropriately identified by Defendants.  Without this basic information about whether potential class members are being appropriately screened for disabilities, Class Counsel cannot determine whether the very foundation of the Remedial Plan—the appropriate identification of inmates with disabilities—is occurring.

**Request for Production 19:**  RFP 19 requests all information contained in the Accommodations Tracking System ("ATS Database") concerning class members since November 1, 2010.[7]  The ATS Database contains, among other things, information regarding all accommodations requested and granted since 2012.  According to a training manual provided by Defendants, a tracking report can be run easily from the ATS system and is a "helpful way to see which offenders at [each] facility have been approved for accommodations, as well as the different types of impairments or accommodations."  April 2013 ADA Training at 35, Ex. 9 to Plaintiffs' Second Motion to Compel.  The accommodations data in the ATS Database is critical for Class Counsel to analyze the types of requests for accommodations that are being granted and why other requests are being denied.

---

[7] Class Counsel have been informed by Defendants that the ATS system went live on January 1, 2012.  If no historical or archival information is contained in the database, Plaintiffs agree to limit the time period of this request to January 1, 2012 to present.

In response, Defendants have hand-picked a few selected documents from the ATS Database, claiming that the ADA Montez Database is "more appropriate as a resource for *Montez* class member information."  1/17/14 Letter at 7, Ex. 4 to Plaintiffs' Second Motion to Compel.  However, the ADA Montez (or "AIC") Database has primarily historical/archival information.  There are only two sections that are updated regularly and those sections contain only summary screens with dates reflecting when particular actions were taken (e.g., initial contact, packet sent, screening request, evaluation) and codes reflecting DOC's determination as to disability (e.g., disabled, disabled wheelchair, confirmed diabetic, did not qualify as a disabled class member). The database does *not* provide information as to what accommodations the inmate requested and what, if any, permanent accommodations were granted.  Thus, the discovery provided by Defendants is worthless to monitor substantial compliance.

While Defendants attempt to minimize the importance of the ATS Database, their training materials state that the ATS Database is "utilized to track requests, disseminate accommodations information, and to *manage ADA compliance*."  April 2013 ADA Training at 32 (emphasis added), Ex. 9 to Plaintiffs' Second Motion to Compel.  Thus, in order for Class Counsel to analyze the types of requests for accommodations that are being granted and why other requests are being denied, Class Counsel must have access to the accommodations data in the ATS Database.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs move this Court for an expedited hearing on Plaintiffs' right to discovery during the Monitoring Period or alternatively, for an order

directing that Plaintiffs are entitled to complete and thorough discovery of information during the Monitoring Period relevant to whether Defendants continue to be in "substantial compliance" with the Remedial Plan.  Further, Plaintiffs respectfully request that this Court enter an order compelling Defendants' responses to Plaintiffs' Second Discovery Requests.  Plaintiffs also request that this Court extend the Monitoring Period in this case by an amount of time equal to the number of days between December 22, 2013, and, if this Motion is granted, the date of such Order, and for such further relief as this Court deems just and proper.

Respectfully submitted this 23rd day of June 2014.

KING & GREISEN, LLP

*s/ Paula Greisen*
Paula Greisen
Jennifer Weiser Bezoza
1670 York Street
Denver, CO  80206
(303) 298-9878 telephone
(303) 298-9879 facsimile
greisen@kinggreisen.com
bezoza@kinggreisen.com

Edward T. Ramey
Heizer Paul Grueskin, LLP
2401 15th Street, Suite 300
Denver, CO 80202
(303) 595-4747 telephone
(303) 595-4750 facsimile
eramey@hpgfirm.com

Lara E. Marks
Foster Graham Milstein & Calisher, LLP
360 S. Garfield Street, 6th Floor
Denver, CO  80209
(303) 333-9810 telephone
(303) 333-9786 facsimile

lmarks@fostergraham.com

Blain D. Myhre
P.O. Box 3600
Englewood, CO  80155
(303) 250-3932 telephone
blainmyhre@gmail.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2014, the foregoing **PLAINTIFFS' MOTION TO COMPEL DEFENDANTS' RESPONSES TO PLAINTIFFS' SECOND SET OF "MONITORING PERIOD" DISCOVERY REQUESTS** was electronically filed, and a copy was emailed to the following:

James X. Quinn
Colorado Department of Law
james.quinn@state.co.us

Jacquelynn N. Rich Fredericks
Colorado Department of Law
jacquelynn.fredericks@state.co.us

*Attorney for Defendants*

                              *s/ Laurie A. Mool*