IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-CV-870-CMA

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

JOHN HICKENLOOPER, et al.,

Defendants.

---

## RESPONSE TO SECOND
## MOTION TO COMPEL DISCOVERY

---

Defendants, through the Colorado Attorney General, respectfully submit this Response to the Second Motion to Compel Discovery.

### BACKGROUND

1.      In September of 2012, Judge Kane found Defendants to be in Substantial Compliance with the Remedial Plan. Doc. 5314.

2.      The two-year Monitoring Period commenced October 1, 2012. *Id.* at p. 4.

3.      On August 30, 2013, Class Counsel filed their Motion to Compel Discovery. Doc. 5407.

4.      On June 23, 2014, Class Counsel filed their Second Motion to Compel Discovery. Doc. 5462.

## FACTS

1.      The only "discovery" the Remedial Plan contemplates during the Monitoring Period are *two* visits per facility by Class Counsel. *See* Remedial Plan, section XXXI (p. 28).

2.      CDOC invited Class Counsel to visit as often as necessary in order to accomplish their monitoring functions and meet with their class members. *See* Doc. 5448, **Exhibit A-1**, Letter, dated June 10, 2013.

3.      Between November of 2010 and mid-May of 2013 (approximately 2.5 years), Class Counsel did not visit or submit written requests for specific information.

4.       Between the September of 2012 finding of substantial compliance and mid-May of 2013 (a period of approximately eight months), Class Counsel failed to initiate a single monitoring visit.

5.      Beginning in May of 2013, Class Counsel visited the following facilities:

- AVCF: 9/16/13
- BCCF: 9/17/13
- BVCC:  8/26/13 & 5/22/14
- CCCF: no visit initiated
- CMC: 9/25/13
- CMRC:  7/20/13
- CTCF:  7/31/13
- DCC: 9/10/13
- RCC: no visit initiated
- DENVER COMPLEX:  5/9/13 (CCC only) 7/16/13 (DWCF & DRDC)
- FCF:  9/9/13
- KCCF:  8/27/13
- LCF:  8/28/13
- PUEBLO COMPLEX: 9/18/13 (SCCF/LVCF)
- SCF: 8/7/13
- TCF: 6/17/14

6.      During these visits, offenders are notified in advance of the opportunity to meet with counsel. Furthermore, the class members are excused from their jobs and/or

programming during the meetings in order to facilitate full and fair access. Moreover, staff is excluded from these meetings in order to foster open and honest communication between class members and Class Counsel(s).

7.      Prior to each of their facility visits, Class Counsel is provided with a "Daily Roster" of all offenders housed at that facility (and every CDOC facility) which includes information with respect to those individual class members' disability designations amongst the four categories. *See* Doc. 5448, **Exhibit A-4**, Example Daily Roster.

8.      Only two visits were undertaken during the 2014 calendar year.

9.      Only BVCC and CCC received more than one visit.

10.     Defendants have voluntarily prepared and provided *multiple* Quarterly Reports to Class Counsel.

11.     Each Quarterly Report contains systemic information and statistics pertaining to the number of offenders received at DOC intake, the number of new requests for litigation class member screenings, accommodation requests and litigation resolutions, correspondence and ADA grievances. Also included are samples of each offender class member group, copies of the DOC administrative Regulations pertaining directly to ADA compliance and plan monitoring, procedural hand books utilized by the AIC as well Clinical Services screening forms, the templates DOC continues to use for litigation resolutions and DOC ADA training, offender diabetic training and new facility orientation, and identification of all facility ADA coordinators as well as the daily ADA rosters for every class member offender identifying each class member by disability and facility location. In whole, this information provides an expansive overview of the policies, procedures and actual practices implemented by DOC documenting response

to offender accommodations, accessible housing assignments, transportation needs, access to medical health care appliances and restrictions for offender class members covered under lower mobility, hearing, vision and Diabetes. *See* Doc. 5448, **Exhibit A-3**, Example Quarterly Report; *see* **Exhibit A-1**, Disk (copy mailed to the Court) at First Quarterly Report 2014; *and see* **Exhibit A-6**, Quarterly Report(s) Table of Contents.

12.     Plaintiffs' First Set of "Monitoring Discovery" sought information regarding what systems were in place. Rather than merely list systems, Defendants went ahead and provided Class Counsel *several thousand pages* of information as voluntary disclosers in a good faith effort to help Plaintiffs' counsel(s) discharge their duties during the Monitoring Period. This information was organized by section and subsection of the Remedial Plan in order to facilitate ease of access and readability. Information and items disclosed included, but were not limited to, the following:

- Copies of current policies;
- Metrics regarding responsibilities for evaluation of class members;
- Reports articulating recent grievance activity and trends;
- Examples of intake forms for each of the four categories;
- Offender orientation materials;
- Staff training materials;
- Transcripts utilized by intake officers at DRDC when screening incoming offenders in both English and Spanish;
- An Excel spreadsheet with *over* 15,000 entries between July of 2008 and August of 2013, detailing the type of activity taken (new screening, revision, etc.), by whom (AIC, CMO, etc.) and type of disability which is further searchable by offender surname or CDOC inmate number;
- Information relevant to the process in place for tracking ADA offenders prior to movement between facilities;
- Copies of recent ADA related audits;
- A list of offenders who had made requests for/or received compensation for delays in provision of DME in the past quarter;
- A comprehensive breakdown of all class members by facility placement further identified by each of the four disability categories (with over 2,300 entries) for three different months;
- Examples of current ADA Litigation Resolution forms provided to offenders;

- Copies of provider forms used during screenings of each of the four categories;
- Photographs of assistive devices/products;
- Copies of purchase requisitions and invoices for sign language classes and interpreters;
- A list of all available accommodations;
- A copy of the ATS (accommodation tracking system) User Guide which describes that system's capabilities and process(es);
- Information regarding library services for disabled offenders;
- Dozens of offender job descriptions;
- Documentation regarding diabetic education training provided to offenders;
- Awareness training materials and examples of Power Point Presentations given to staff, including audio and video clips;
- Examples of receipts from wheelchair clinics;
- Examples of how housing restrictions are documented;
- Example requests for outside medical professional consultation;
- An Excel spreadsheet documenting refunds for co-pay clinic visits for offenders for the past quarter.

13.     Defendants provided Class Counsel(s) with their own copy of the AIC *Montez* Database. This database is an Access-based environment with approximately fifteen thousand recorded entries which contains current, relevant information regarding class members. *See* Doc. 5448, **Exhibit A-5**, Letter to Class Counsel, dated 11/8/13, p. 2. The AIC *Montez* Database tracks offenders' initial contacts, DRDC/intake temporary accommodations, class member/screening and AR status. Again, despite averments to the contrary, the database contains recent information relevant to the Monitoring Period. *Id*. The AIC uses this very database on a daily basis. *Id*. Moreover, Defendants recently provided an updated copy of this database, which further affirms that it is in fact continually utilized and updated. *See* **Exhibit A-8**, Disk #2.

14.     Defendants explained how to navigate this database to view the most current entries. *See* Doc. 5448, **Exhibit A-6**, Email to Class Counsel, dated 10/25/13.

15.     On October 25, 2013, Defendants' Counsel Rich Fredericks met in-person for approximately 2.5 hours with several of Plaintiffs' counsel(s). Prior to this meeting, undersigned counsel made numerous written and oral requests to Class Counsel for a list of any and all questions regarding current programming and systems related to the provision of accommodations and resources for ADA class members. *See* Doc. 5448, **Exhibit A-7**, Email(s) from J. Rich Fredericks.

16.     Despite these numerous requests, no formal list of questions was submitted in advance of the meeting. Shortly before the meeting, Ms. Greisen sent an email with a handful of broad questions. *See* Doc. 5448, **Exhibit A-8**, Email from P. Greisen. Accordingly, undersigned counsel met with her clients to prepare answers to be provided at the meeting.

17.     Class Counsel arrived at the meeting and disclosed that while they had a typed four-page list of questions in-hand, that they would not provide a copy to undersigned counsel. Unfortunately, it is *very* difficult to research and provide answers to un-posed questions.

18.     Subsequently, another short list of questions was remitted to undersigned. *See* Doc. 5448, **Exhibit A-9**, Email from P. Greisen. As a result, Defendants prepared a thorough response and included additional documentation as requested. *See* Doc. 5448, **Exhibit A-5**, Letter to Class Counsel, dated 11/8/13.

19.     On January 17, 2014, through counsel, Defendants provided numerous responses along with substantiating documentation to Plaintiffs' Second set of Monitoring "Discovery". *See* **Exhibit A-3**, Letter to Class Counsel, dated 1/17/14. An

electronic disk full of numerous folders containing hundreds of pages of information was further provided.

20.     On August 13, 2014, Defendants, through counsel, provided an updated version of the ADA Montez database which contains entries as recent as this very week. Furthermore, Defendants provided additional information and clarification as to their prior responses. Finally, this correspondence (**Exhibit A-5**, Letter to Class Counsel, dated 8/13/14) also included a disk rich with extensive information and documentation, a copy of that disk is being provided as **Exhibit A-1**, Disk, to this Response and has been mailed to the Court.

### ARGUMENT

I.      **Plaintiffs are *NOT* entitled to formal discovery under the contractual provision of the Remedial Plan and their Motion to Compel is improper.**

It goes without saying, that one may hardly compel another to produce that to which they are not entitled. Yet, Plaintiffs presently base their entire motion(s) to compel discovery upon the inherently flawed premise that they are entitled to formal written discovery. Throughout the lengthy history of this litigation, Plaintiffs have insisted, and the Court has consistently concluded, that the Remedial Plan should be interpreted as a **contract**. *See* Doc. 5314, p. 15 (Judge Kane noting issues between the Parties to be "a matter of contract."); *and see* Doc. 4224-2, p. 2, ln. 3 (Judge Nottingham stated, "[T]his was a settlement…") An agreement to settle a federal lawsuit is a contract, governed by the principles of contract law. *See Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989). As such, **both** parties are held strictly to the negotiated and codified provisions of the Remedial Plan. Pursuant to the plain language of the Remedial Plan, Class Counsels' oversight during the Monitoring Phase consists *only* of the following:

7

> … class counsel will monitor the designated facilities to ensure compliance is maintained during this period. During the **Monitoring Period, class counsel may tour each designated facility up to two times a year** to ensure compliance.[1]

Remedial Plan, p. 28, ¶ XXXI (emphasis added). Pursuant to that clear and unambiguous contractual language, Class Counsel can, and has been permitted to, visit their clients at designated facilities. If Plaintiffs desired further, formalized written discovery, they should have bargained for such during the negotiation of the Remedial Plan which governs this litigation. As discussed at length in Defendants' Response to the First Motion to Compel Discovery (Doc. 5448), which is incorporated by reference herein, formal discovery is **not** contemplated during the Monitoring Period. Therefore, Plaintiffs, through Class Counsel, simply cannot compel CDOC to produce that to which they lack a right.

The Monitoring Period is **not** the same as, or equivalent to, the Compliance Period. Accordingly, the exchange of information between the Parties during the two distinct phases should not, nor would it be anticipated to, look the same. Certainly, during the Compliance Period and leading up to the Compliance Hearings of 2010, discovery was needed to ascertain if CDOC had come into compliance with the Remedial Plan. The Honorable Judge Kane ruled that CDOC is in compliance with the Plan. Doc. 5314. Moving forward, the **limited** purpose of the twenty-four month Monitoring Period is simply that – to *monitor*. Systemic compliance monitoring is best accomplished through comprehensive charts, graphs, and information which summarize continued compliance efforts, as well as through sampling, rather than through

---

[1] The Parties are in the Monitoring Period. Class Counsel mistakenly relies upon the subsequent sentence which mentions "spend[ing] the time and resources reasonably necessary to monitor compliance ***during the Compliance Period***' specifically relates to the Compliance Period, **NOT** the Monitoring Period. *See* Remedial Plan, § XXXI (emphasis added).

overbroad reviews of all individual files and spelunking through each and every entry into numerous databases.

## II.     Formal discovery is inappropriate and unnecessary.

Defendants have provided and continue to provide Plaintiffs with a **wealth** of information designed specifically to aid them in their duty to monitor. The purpose of the Monitoring Period is to *monitor maintenance* of substantial compliance as determined by Judge Kane. *See* Doc. 5314. In light of the Court's September 11, 2012, Order finding substantial compliance, the present "discovery requests" propounded by Plaintiffs may be analogized to an improper request for post-judgment discovery. "At some point … discovery must come to an end." *Silverstein v. Federal Bureau of Prisons*, 2011 WL 588717, *3 (D.Colo. Feb. 10, 2011). It seems intuitive that discovery would be foreclosed in the post-judgment setting of the Monitoring Period. *See Brown v. Plata*, 131 S. Ct. 1910 (U.S. 2011) (Cutting off discovery and excluding evidence not pertinent is appropriate and within the court's sound discretion. Orderly trial management may require clean distinction between "litigation of the merits and the remedy.") There is simply nothing novel to "discover" as Class Counsel is tasked only with confirming that nothing has backtracked. This is a narrow purpose and the singular task of the Monitoring Period. "Due process does not require that parties be allowed to present any evidence that they want to, at any time, regarding any subject matter…" *Miller v. Cudahy Co.*, 656 F. Supp. 316, 334 (D. Kan. 1987); *and see Harvey v Schoen*, 245 F3d 718 (8th Cir. Minn. 2001) (denial of discovery re potential on-going violations not an abuse of discretion).

Plaintiffs should not be entitled to obtain limitless materials and information during this Monitoring Period, simply because they desire them. Moreover, this is not the first time that a desire for excessive discovery has overtaken this case. Indeed, in late 2009, Defendants were obliged to file a Motion to Stop Discovery Requests (Doc. 4186), because despite the provision of some 55,000 pages of documentation, Class Counsel still sought more and more. Defense Counsel Ms. McCann wrote, "The enormous amount of personnel and lawyer time and the extraordinary amount of money being spent on discovery in this case is outrageous. This is time and money that could be so much better spent on actually helping the disabled in prison, instead of going to lawyers… this has got to **STOP!**" *see* Doc. 4186, pp. 4, 9 (emphasis in the original). That motion was granted. *See* Doc. 4196, p. 2. In a subsequent January 28, 2010, hearing at which discovery was discussed, Judge Kane stated on the record, "Once we have that [substantial compliance], **I do not think it's going to be necessary to go through entire new waves of discovery** and keep this case going. God knows I don't want that." *See* Doc. 4272, p. 8, ln. 6-18 (transcript) (emphasis added).

Defendants are *not* Class Counsel(s) only source of information. Plaintiffs have other avenues through which to obtain some of the very information they presently seek to compel from Defendants. Indeed, in their present motion Plaintiffs repeatedly reference "information" they have gleaned from unnamed persons, ostentatiously through their facility visits with class members. Pursuant to these unnamed sources, there may be some issues. Yet, so armed with the names of specific offenders who allege specific instances of failed compliance, Class Counsel has never requested the pertinent information regarding any individual and their AIC file throughout the duration

of this Monitoring Period. Instead, they continue to simply request files for the masses. Perhaps requesting the single or handful of files (which CDOC would gladly provide and has previously offered to do so), would enable Class Counsel to investigate whether the purported class member's complaint is substantiated. Absent such substantiation, it hardly seems appropriate to request and dig through hundreds and hundreds of files for offenders who did not report any issues during their visit with Class Counsel.

Moreover, full and unfettered access to every correspondence, grievance or offender request for accommodation and class member screenings, computer databases for ADA Montez, Accommodation Tracking System (ATS) and the Grievance Tracking System (GTS) in addition to the files of over 5,000 offenders in search of individual examples of non-compliance with the Remedial Plan would amount to the same anecdotal and ad hoc evidence specifically refuted by the Court as being immaterial in showing whether or not DOC has maintained substantial compliance that has already been proven to this Court.

To-date, Class Counsel has not indicated to Defendants *any* specific area of concern regarding alleged non-compliance. If they were to do so, it would enable both Parties to work together to uncover the reality of Defendants' continued compliance. Such an open approach would alleviate imposition on the Court's time in reviewing an Objection by Plaintiffs at the cessation of the Monitoring Period and enable Defendants to skip right to the heart of the matter and simply address any concerns.

### III.   Plaintiffs possess comprehensive and appropriate informal "discovery" to discharge their duty.

Defendants provided Plaintiffs with a wealth of relevant and applicable information to enable them to affirm that compliance is being maintained. Again, despite

the inarguable reality that there is **no** provision for written discovery during the Monitoring Period provided for within the Remedial Plan, Defendants regularly and consistently provide significant and germane information along with documentation to substantiate their continued compliance. Thus, Plaintiffs have been provided "sufficient" relevant evidence. *See Regan v. County of Salt Lake*, 2006 U.S. Dist. LEXIS 89472 (D. Utah Dec. 11, 2006).

The argument that advancement is cause for concern is a red herring. Implementation of modern technology is evidence of CDOC's systemic transformation and commitment to the Remedial Plan and all ADA impacted offenders. That new technology evolved and was implemented, such that offender AIC files are now stored electronically, as opposed to in paper form, is hardly a "red flag" indicative of some sort of regression. Rather, the opposite is true, that such progress is an appropriate expansion and natural evolution in record keeping which is further demonstrative of CDOC's continual efforts to maintain compliance and utilize every available resource in order to provide consistency, accuracy, and the availability of information and access to disabled offenders across the CDOC.

The propounded "discovery" contains broad and random requests for excessive and unnecessary information. Class Counsel does not need unlimited access to each and every offender's electronic file. They have been informed, repeatedly, through the ample voluntary sharing of information by CDOC, over the past approximately eighteen months, that the new electronic files contain the same information which was previously found within a paper file. Indeed, "old" information has been scanned into this electronic form and new information is added in the same manner. CDOC has offered on multiple

12

occasions to provide a sampling of exemplar offender files to Class Counsel for their review or even to provide a reasonable number of specific individual files, if requested. To-date, Class Counsel has not taken CDOC up on this standing offer.[2] Instead, they continue to insist that they need **everything** for **everyone**. The Court's prior finding of substantial compliance was made absent systemic perfection, *See* Doc. 5314, p. 3, and clarified that occasional individual failures did not remove CDOC from overall systemic compliance.

Providing everything for each and every offender is unnecessary, burdensome, time-consuming, and would operate merely to perpetuate the expense of this litigation. Moreover, it is not merely the initial effort incumbent upon CDOC's resources in gathering information which such an overly broad request would burden but the time and attention reviewing such expansive and redundant information by Class Counsels – for which they continue to bill the State of Colorado – would surely be great. Moreover, the net result would inevitably be the discovery of the rare exception inherent in human error where a handful of individual files might lack a lone document here or there. Judge Kane previously ruled that such omissions do not foreclose substantial compliance.

## IV.   Defendants have adequately responded to Plaintiffs' propounded discovery requests.

As disclosed at length in the facts above, Defendants maintain their articulated commitment to voluntarily engage in informal disclosures with Class Counsel with the caveat that they are not willing to provide broad, unfettered access to irrelevant systems and databases pursuant to broad fishing expeditions which are unrelated to the

---

[2] Accordingly, in a show of good faith, CDOC selected a sampling of individual offender's files, based upon the CC list attached to Class Counsel's Motion to Compel (Doc. 5462), and have provided those individual's files to Plaintiffs.

narrowly tailored purpose of monitoring systemic compliance during the Monitoring Period. *Id.* at p. 5. Like the defendants in *Regan v. County of Salt Lake*, 2006 U.S. Dist. LEXIS 89472 (D. Utah Dec. 11, 2006), CDOC Defendants are cooperating with Plaintiffs, providing voluntary responsive information. Defendants have not impeded Class Counsel in meeting with their clients as provided by the Remedial Plan. Indeed, Class Counsel was invited to visit more frequently, an offer which they did not accept.

CDOC has voluntarily offered a quarterly report documenting all major areas of the Remedial Plan and Stipulation Orders from 2006 & 2008. In addition, the AIC has provided relevant policies and procedures along with supporting documentation verifying the DOC's adherence to the overall intent of the plan during the Monitoring Period. CDOC has also offered additional explanation and clarification to Plaintiff's upon request. Moreover, what Plaintiffs refer to as "a few charts, graphs and spreadsheets…" (Doc. 5462, p. 2), is actually a huge wealth of compiled information regarding systemic compliance and how each system of compliance is "currently" (Doc. 5462, p.2) operating, as opposed to the anecdotal exceptions which Judge Kane previously noted were both unpersuasive, as well as, not a bar to substantial compliance. As noted in Judge Kane's September 2012 order finding CDOC in substantial compliance "…If a party has substantially performed, "it follows that any breach he may have committed is immaterial." *Joseph A.* at 1086 (citing John D. Calamari & Joseph M. Perillo, The Law of Contracts § 11-15, at 454 (3d ed 1987)). Accordingly, anecdotal or ad hoc evidence that a party deviated or breached specific terms of a consent decree will not, by itself, preclude a finding of substantial compliance."

This information coupled with the responses provided through the Attorney General's Office is more than sufficient to substantiate continuity both prior to and during the Monitoring Period. Defendants additionally respond to each specific alleged deficiency as follows:

Interrogatory #2/RFP #16:

As an initial matter, there were, are, and **remain** separate channels and processes for ADA-specific Grievances. *See* AR 850-04 (IV)(E)(2). AR 850-04 was amended in December of 2012 in order to offer an informal resolution option to offenders. However, offenders are **NOT** required to complete an informal resolution prior to pursuing the formal three-step grievance process. In addition, AR 850-04 was recently amended in order to firmly clarify that offenders are **not** obliged to wait on an informal response to proceed to their Step I Grievance. Indeed, if any step is not responded to timely, an offender may proceed to the next step without awaiting response. *See* AR 850-04 (IV)(F)(1)(e). Furthermore, since the inclusion of the informal step, CDOC has not argued or considered that the absence of an informal grievance would foreclose proper exhaustion.

Plaintiffs already possess information sufficient to gauge how the introduction of the informal step impacted Step I behaviors, as they can compare the grievance charts provided as part of each Quarterly Report. *See* **Exhibit A-1**, Disk at First Quarterly Report 2014.

However, as a sign of good faith, CDOC recently prepared and disclosed a chart which shows the total number of Step I ADA Grievances filed annually between 2003 and 2014, a monthly break down of Step I's for 2012, and a monthly breakdown of Step

I's for 2013. *See* **Exhibit A-2**, ADA Step I Grievance charts. As the charts indicate,

there were 172 Step I ADA Grievances filed during the calendar year 2013, and there

have been 74 Step I ADA grievances filed to-date for the year 2014. Furthermore, as

the chart indicates there is continual ebb and flow regarding the number of Step I's

initiated in any particular month. For example, while April of 2012 yielded 56 Step I's,

and April of 2013 yielded fewer at 15 Step I's, September and October of 2012 yielded

22 and 20 Step I ADA Grievances respectively, while the same months for 2013

increased to 24 and 30 Step I's each. Defendants also provided a comprehensive Excel

spreadsheet pertaining to **ALL** ADA-M Grievances filed between November of 2010 and

June of 2014. *See* **Exhibit A-1**, Disk at All ADA-M Grieve.

Interrogatory #4/ Request for Production (RFP) #20:

Plaintiffs sought information regarding access to diabetic kits. Defendants

responded: "Information regarding diabetic testing kit(s) access is found on the disk at

sub-folder labeled "diabetes" which contains a copy of the relevant clinical standard.

This standard was last updated in August of 2013. On p. 11 (at Section "F") you will find

information specific to the diabetic testing kits, which are available at each facility.

Please note that "rosters of inmates" are not kept as sought. Rather, information

regarding when kits are used and replenished are maintained as discussed in the

disclosed policy. Incident reports may also be generated." *See* **Exhibit A-3**, Letter to

Class Counsel, dated 1/17/14.

Had Plaintiffs simply requested some exemplar incident reports from Defendants

*prior* to filing their Motion to Compel, Defendants would have been happy to provide

copies to Class Counsel. Indeed, copies have now been provided. *See* **Exhibit A-1;**

*and see* **Exhibit A-5.** In addition, a number of facilitates now have 24/7 nurse care available to the inmate population as opposed to merely relying on a diabetic testing kit.

Kits are available throughout facilities and may also be sent with work crews.

Defendants further respond as follows:

AVCF:  Has 24 hour nursing coverage.
DM kit located in Master Control.

BVCC:  Has 24 hour nursing coverage.
DM kit located in Master Control.

CCF:  Has 24 hour nursing coverage.
DM kits located in several locations throughout the facility. There have been no incidents where the kits needed to be accessed.

CMC:  (ACC, FMCC, SCC) Has 24 nursing coverage.
DM kits are located in every unit at FMCC and ACC. There are 2 kits in FMCC, ACC, and SCC Master Control. There are also 2 kits at ACC and FMCC gates. Recreation has one kit at FMCC and ACC. The dog program also has one kit.

CTCF:  Has 24 hour nursing coverage.
Diabetic kits are not kept at the facility due to the availability of 24 hour nursing coverage.

CSP:  Has 24 hour nursing coverage.
Several diabetic kits are also located throughout the facility.

DCC:  Clinic is open 7 am to 5 pm seven days per week. DM kits located at Master Control, Clinic, in the Man Down Bag, and an extra for work crews if they have a diabetic on crew.

DRDC:  Has 24 hour nursing coverage – 17 hours through the clinic from 5 am to 10 pm, thereafter the DRDC Infirmary covers. DM kits are located at Unit 1, 2, 3, 4, 5, and Master Control.

FCF:  Has 24 nursing coverage. Due to 24 hour coverage, there have been no incidents where the DM kits have needed to be accessed.

LCF:  Has 24 hour nursing coverage.
DM kits are located in Master Control and Seg only.

LVCF:  Clinic is open 16.5 hours per day.
DM kits are located in the Gym, Units 1, 2, 3, 4, 5, 6, 7, Master Control, Gym Control.

RCC:  Clinic is open 7 am to 5 pm seven days per week.
DM kits located at Master Control, Clinic, in the Man Down Bag, and an extra for work crews if they have a diabetic on crew.
**RCC rarely has diabetics and the ones placed there are only oral medication controlled, no insulin dependent diabetics have been placed at RCC. They have had no incidents where the kit was needed after hours in the past 3 years.

SCF:  Has 24 hour nursing coverage.

| | |
|---|---|
| | DM Kits are available in each living unit, at Master Control, and in the work crew vehicle. |
| TCF: | Clinic is open 13 hours, 20 minutes per day. |
| | DM kits located in each living unit, recreation, master control, 2 transport vans, and 2 work crew vans. |

Interrogatory #5:

Plaintiffs previously requested information regarding the provision of soft/medical shoes. Defendants responded: "Information regarding the provision of 'medical' (soft) shoes is on the disk [Disk Vol. Discl. #2] at 'medical shoes' sub-folder. The Excel chart therein shows ninety-one 'approved' requests and thirty-four 'denied' requests from fall 2011 to present (the Monitoring Period). Information is **not** provided for periods beyond the Monitoring Period. You can use this chart to glean and sort by the identity of the offender who made the request, when it was made, and whether the request was granted or denied. Please also find a copy of the relevant clinical standard, last updated in July of 2013, and a report broken down by facility which shows where each offender with such an item is housed. Please note that these shoes are not an ADA accommodation, rather, a clinical service medical provider determines whether soft 'medical' shoes are medically indicated and appropriate for an offender. (Int. #5)"

This response clearly indicates that medical/soft shoes **are** being provided as a necessary accommodation where required by offenders. As a courtesy, Defendants also provided a random sampling of offenders both approved and denied this accommodation including Offenders Lopeman, Baker, Garza, Martinez, Rivas, and Goddard. *See* **Exhibit A-1** at "shoes". Each example contains the original hand-written request by the inmate along with a copy of the corresponding approve/deny report. Defendants further reiterated to Plaintiffs that "[a]t any time you are more than welcome

to request information regarding *specific* offender's denials."  *See* **Exhibit A-5**.

Defendants also provided a 21 page medical report broken down by facility which

details all inmates with that accommodation, the corresponding clinical standard, and an

Excel chart detailing by inmate name and number 90 such approvals and 53 denials

including at which facility the decision was rendered and on what date. *See* **Exhibit A-1**

at "shoes".

Interrogatory #6:

Defendants previously provided information regarding use of OCAs. *See* **Exhibit**

**A-3**, Letter to Class Counsel, dated January 17, 2014. The AR explains in detail what

an OCA may provide/do for their patient/offender. Defendants also provided an Excel

document detailing offender class members' requests for OCA care. Plaintiffs *never*

followed up to request any more specific information regarding why any particular

offender was denied. Class Counsel was certainly free to inquire of their class members

during their facility visits why someone was been denied an OCA, or the name of the

class member's approved and assigned OCA. Defendants also provided copies of some

of the relevant trainings provided to OCAs.

Defendants recently also shared that OCA III trained offenders are assigned to

the CTCF infirmary, DRDC infirmary, and the SMNU. The training provided is more

extensive for an OCA III due to their area of assignment. Included in their training is

three days of trainer-supervised, hands-on experience in the infirmaries/SMNU. This

performance must be safe and satisfactory, to obtain the OCA III certification. *See*

**Exhibit A-5**, Letter to Class Counsel, dated 8/13/14. Copies of OCA I-III training

PowerPoint Presentations for 2012-the present, copies of some corresponding

attendance rosters for OCA trainings, and examples of the tests administered to OCAs have further been provided. *Id*; *and see* **Exhibit A-1**, Disk at "OCA".

Interrogatory #7:

The 2008 Stipulation referenced by Class Counsel pertains *solely* to the percentage of single-cells at **CTCF** equipped with strobe lights. *See* 2008 Stipulation (Doc. 3322-1 at point #17). It did not exempt the physical plant issue as to other facilities and strobe lights. Indeed, when quoting from the 2008 Stipulation, Plaintiffs failed to include the precatory language, "All hearing impaired inmates w**ho are housed at Colorado Territorial Correctional Facility**…"  Doc. 3322-1, p. 4 (emphasis added). Thus, Defendants position did *not* lack merit as Plaintiffs allege in their Motion to Compel and it is Plaintiffs who are mistaken in seeking information as to other facilities additions of strobe enabled cells.

To the extent Plaintiffs wish to inquire into the *narrow* matter of the number of single-cells equipped with strobe lights at **CTCF**: **the percentage of strobe equipped single-cells at CTCF is 73.9%**.

To the extent Plaintiffs seek information regarding the "accessibility requirements" (Doc. 5462, p. 13) of newly added cells, that specifically pertains to physical plant issues, no longer under review.

Requests for strobe-equipped cells are infrequent. It is likely because in a correctional environment, freedom of movement is restricted and when movement is permitted for evacuation or otherwise, staff are responsible to alert, engage, and control the movement. When AIC does receive this request from an offender, the AIC completes a case-by-case assessment, hearing testing is requested if necessary, and

the relevant criteria is applied.

In most cases, AIC or Clinical Services is *automatically* adding "Cell with strobe alarm when independent egress" as a housing restriction when indicated, without the offender even requesting it. However, it is an accommodation option in ATS and will be addressed when the offender requests it, but this is a rare request. It is otherwise considered a *housing restriction* since not all CDOC cells have a strobe nor are they required, so it has a "restrictive" effect as opposed to an accommodation or modification which fosters access and integration as required by the ADA, and is therefore reviewed carefully and generally documented/reflected in an offender's housing restriction. This restriction can be added by the AIC or Clinical Services. Any cell with strobe "approved" on the ATS Report is also reflected in the housing restriction reports. Any requests that were denied are because the offender did not meet the criteria as outlined in the "AIC orientation checklist & info" document. *See* **Exhibit A-1**.

The only designated facilities where offenders have free egress from cells are the following: *CTCF, SCF-Minimum, AVCF\*, CMC, BVMC, LVCF, CCC.* The names of offenders at each facility approved for cells with strobes have been provided. Despite the fact that only CTCF's strobe lighting in single-cells is at issue, Defendants have provided information regarding offenders at multiple facilities in single-cell's equipped with strobe lights and copies of exemplar requests and responses, a chart showing 17 approved requests and approximately 20 denials broken down by offenders name and CDOC number. *See* **Exhibit A-5** at "strobes" sub-folder.

Interrogatories #8-9/RFP #21:

As an initial matter, Plaintiffs seek information which is beyond the finite time frame of the Monitoring Period. Pursuant to Judge Kane's Order, the Monitoring Period commenced **October 1, 2012**. Doc. 5314, p. 4. Accordingly, there is no need to evaluate information from November 1, 2010, which pre-dates the commencement of the Monitoring Period. Despite this, Defendants previously provided information covering calendar year(s) 2012 and 2013. *See* **Exhibit A-3**, Letter to Class Counsel, dated 1/17/14.

Defendants replied: "Information regarding the usage of sign-language interpreters is found on the attached disk within the 'sign language' sub-folder.  Within an interior sub-folder you will find invoices for interpreter usage for both parole and CDOC for the period of January 2012 to present.  A second interior sub-folder contains copies of the approximately five ASL denials (six are shown but one denial was predicated upon the fact that the request was duplicative) and the reasons therefore, spanning the same, relevant, time period.  Defendants further provide an exemplar ATS report for Offender Gallegos to show ongoing use of interpreters and the number of requests (274) made for that individuals offender in a single year and to-date (364) as well as a comprehensive Excel chart which shows approximately 1,305 approvals for 2012 and 2013.  (Int. #8-9, RFP #21)  Please note that this request was very broad and voluminous but has been provided."

The below updated list of deaf offenders permits Plaintiffs to cross-reference the usage requests previously disclosed, with the updated list recently provided. *See* **Exhibit A-1**.

Current list of deaf offenders:

| DOC # | NAME |
|---|---|
| 139845 | ATKINS, ANDREW N |
| 126891 | AYOTTE, THOMAS G |
| 124604 | GALLEGOS, KERRY |
| 49293 | HEFFNER, MARK |
| 54940 | LEHMAN, JAMES R |
| 120983 | MARTINEZ, DANIEL |
| 143490 | MCDANIEL, HAROLD |
| 138526 | MERINO, GEORGE M |
| 164158 | RABINKOV, LEONID |
| 85286 | SMITH, HARDRICK |
| 114262 | ROBERTS, MICHAEL |
| 138024 | TREVITHICK, MARC |
| 158887 | SCOTT, MAJOR |
| 138526 | MERINO, GEORGE |

Furthermore, during Class Counsel's facility visits sign language interpreters were provided as needed.  Accordingly, counsel is *already aware* of which of their class members required such service as they bore personal witness thereto.  Moreover, the previously provided information indicated whether the usage related to parole or CDOC and gave dates of use. Thus, Plaintiffs are able to ascertain that services are provided and to whom on which dates from the 1,300+ entries on the provided Excel spreadsheet. *See* **Exhibit A-1**, Disk. So informed, they could further inquire of the individuals at issue, if they wanted more specific information. Moreover, a review of the receipts provided shows that service was for a range of activities, including "revocation hearing," "case manager meeting," treatment," etc. *See* **Exhibit A-7**, Example ASL; *see also* **Exhibit A-1**, Disk at ASL Use (several dozen receipt copies).

Interrogatory #10:

As an initial matter, it is unclear why Plaintiffs allege baldly without *any* supporting evidence that they "have reason to believe that DOC is not appropriately

providing or replacing DME." Doc. 5462. It would be helpful to know what items are allegedly not being replaced, or who is allegedly in need, so that an investigation could be undertaken and actually remedy any deficiency to ensure that each class member has their needed equipment. Instead, at *no point* have Class Counsel followed up on **any** class member's behalf with regard to such an alleged failure. Accordingly, it appears that there is neither smoke nor fire to this allegation.

Plaintiffs are **fully aware** that CDOC is actively compensating offenders for delays. Previously, a quarterly chart with precisely the type of specific information sought was provided documenting who reported a delay, when, regarding what items, the resulting investigation, and what sum of compensation was provided as remedy for any substantiated delays. This same chart is updated and provided with *each* quarterly report.  *See* **Exhibit A-10** Quarterly Report(s) Disk. Thus, it is completely disingenuous to suggest such information was not provided or was provided for *only* three months' time. However, in a demonstration of their continued good faith and fair dealing, Defendants provide a comprehensive chart detailing DME replacement delay refunds for June of 2008 through May of 2014. *See* **Exhibit A-1**, Disk at "DME Rep Ref."

Interrogatories #11-13:

Plaintiffs are *fully* aware of how CDOC is "collecting, maintaining, and verifying information related to its obligations under the Remedial Plan" during the Monitoring Period. Doc. 5453, p. 15-16. Indeed, every three months they are provided a summary of that exact information via a Quarterly Report. Moreover, they were provided information regarding what broader systems are utilized as a part of this process through CDOC's voluntary disclosures and responses to their numerous propounded

questions and document requests. *See* **Exhibit(s) A-1, A-3, A-5, A-6, A-8, A-9, and A-10.** However, to clear up any residual confusion, Defendants respond as follows:

**Response to Interrogatory 11**:  Offenders are provided a copy of their ADA Litigation Resolution identifying all health care appliances & medical restrictions they are authorized as a result of any class member screening. Offenders may already be in possession of the HCA and/or have previous authorization for restrictions through clinical that are identified on the offender's property (if permanent) and/or receipt of a medical pass depending upon each facility's operational needs.  Offenders will also receive a copy of their ADA Request Approved/Denied Report from the AIC through either the facility ADA coordinator or their case manager. Offenders may also contact the AIC directly to request a copy of either their litigation resolution (ALR) or ADA Request Approved/Denied Report.

**Response to Interrogatory 12**:  CDOC staff can obtain information about class member ADA accommodations & their resolution via the CDOC intranet (DOCnet) by signing into the Offender Portal and entering their CDOC identification number.  The offender's profile will then be populated. At this point staff can view their class member status along with any health care appliances and medical restrictions under the green Medical caduceus symbol and/or their ADA accommodations under the blue wheelchair icon.  Staff may also find the exact same information populated in the PCDCIS database under the Admission & Data Summary by either clicking on the offender's Medical/dental code (again for viewing class member status/HCA/Medical restrictions) and/or the ADA alert code (again for viewing ADA accommodations).  Because ATS is a relatively new system that began Jan. 1, 2012 and the implementation of the Offender Portal system in February 2012, the AIC provided additional training for *all* staff to locate the ADA and litigation information (see AIC memos sent to ALL staff dated 11/3/11 (sent Jan 1, 2012); 2/7/12; 2/15/12; 2/27/12).

ADA training is MANDATORY for all state & private facilities.  Every new staff member receives a basic training module and a yearly refresher that includes specific information on where to locate the offender's accommodations and class member status/HCA/medical restrictions. Staff are also informed they may contact the facility ADA coordinator and/or the AIC directly to verify or clarify any information pertaining to their disability accommodations or class member status.

**Response to Interrogatory 13**:  This information is verified at point of entry by the AIC staff.  The AIC staff are the *only* staff who have access to populate the offender's profile for class member status & any HCA/medical restrictions authorized through the screening process OR

the ADA accommodations entered through the ATS system.  NO other staff can alter ANY information into either of these systems.  The AIC (Keith Nordell & Julie Russell) are the only staff who can authorize computer access approval for either ATS or ADA_Montez, which are the only two entry points into the accommodations & screening systems accordingly.  Facility ADA coordinators do have permission granted by the AIC to "read only" computer access for the internal ATS system and ADA_Montez through PCDCIS.  They do not have access to enter or alter any information however.

*See* **Exhibit(s) A-1**, Disk at "Train Staff" and **A-5.**

Interrogatory #14:

Defendants previously responded: "Please find information regarding CI job availability at each facility attached at the document named 'Offender Workload Report' which is current as of November of 2013.  (Int. #14-17 – These requests are *very* broad, however, Defendants provide the above in an abundance of good faith.)" *See* **Exhibit A-3, Letter to Class Counsel, dated 1/17/14**; **Exhibit A-9**, Disk of Voluntary Disclosures 2.0.

To be abundantly clear, the affirmative efforts CDOC has made to ensure equal access to assignments are further comprised of the following:

- Policy: AR 750-04, 850-04, 850-03 (all available at www.doc.state.co.us) *See also* **Exhibit A-1** Disk at ADA Regs.
- Policy and Practice Training: Basic Training (Central training academy upon hire); ADA annual refresher training; various roll call trainings, written releases/communications (*See* RFP 12)
- Meetings/communications with Facility ADA Coordinators (*See* RFP 12)
- ADA audits (See RFP 9)
- See Interrogatories 15, 16, 17 Responses (below) which includes report of responses to grievances alleging ADA assignment discrimination; disabled class members' assignment history; ACA ADA file documents regarding non-discriminatory assignment processes; Report regarding class members working in CI assignments.

Interrogatories #15-16:

Plaintiffs sought information regarding access to Correctional Industries Positions for the class members. Defendants provided information regarding policy which governed these positions. *See* **Exhibit A-3**, Letter, dated 1/17/14. They further indicated that class members are currently CI employees. Once more, if counsel had simply come back after review of what was previously provided and made some more tailored requests, Defendants would have been happy to work with them. Additional information has now been provided with regard to this request. *See* Interrogatory 17 Response(s) for CI job information and explanation of offenders' opportunity to compete for jobs, request accommodation and option to grieve upon denial/termination. *See* **Exhibit A-1**, Disk at "CI" (Enclosed are ACA files from various facilities for the following standard (4-4448): *The institution maintains a written plan for full-time work and/or program assignments for all inmates in the general population. The plan also provides for employment for inmates with disabilities;* Enclosed are ACA files from various facilities for the following standard (4-4451):*The institution provides a variety of work assignments that afford inmates an opportunity to learn job skill and develop good work habits and attitudes that they can apply to jobs after release; See* Approved and Denied assignment accommodation report; *See* Grievance Report regarding ADA-assignment discrimination; Also included is exemplar information regarding five (5) disabled class members' assignment history.

Interrogatory #17:

The provided report (which contains over 30,000 entries) shows class members working in CI jobs across the CDOC which is evidence of non-discrimination and

compliance with governing CDOC policies. *See* **Exhibit A-1**, Disk at "CI". Previously provided information showed which jobs were currently available.

By policy, *all* offenders must maintain an assignment with few exceptions, and are provided the opportunity to apply and compete for assignments regardless of disability. However, in order to be placed in an assignment, offenders must meet the minimum eligibility requirements no different than applicants in employment settings under ADA Title I. Some offenders may personally choose not to compete for certain CI positions and discrimination becomes a moot point. The only conclusion which can be drawn from this report reflecting offenders working in CI assignments is that the opportunity is being afforded to those who chose to compete and were determined eligible for the positions.

The reason a particular individual was denied an assignment can only be researched on a case-by-case basis. It is incumbent upon the offender to file a grievance pursuant to AR 850-04, which the AIC would investigate and remedy if necessary. Again, if there is a specific offender Class Counsel would like to request information with regards to, CDOC would be glad to work with them.

In addition, if an offender requires accommodation to access their job, it is incumbent upon him/her to indicate such on the job description form, verbalize the request to staff, or contact the AIC, in accordance with AR 850-03. (*See* Interrogatories 15-16 Response data which includes grievance report regarding ADA discrimination in assignments located at **Exhibit A-1**, Disk at CI.) Furthermore, all staff participate in ADA training upon hire, on an annual basis, and are required to comply with non-discrimination and equal opportunity policies. (*See* RFP 12).

Interrogatory #18:

Once more, Class Counsel alleges that unnamed persons allege they are not in receipt of their reasonable accommodations.  Doc. 5462. However, they have *never* approached the AIC to follow up on behalf of any of these allegedly deprived individuals. Certainly, if there is an issue, the AIC would love to know who is in need so that they may help solve the problem. Plaintiffs hardly need to dig through copious documents in order to help any aggrieved class member obtain such an accommodation. Alternatively, they could have asked for a handful of files to investigate these alleged claims. Again, this has not been done. Instead, Plaintiffs maintain they must obtain copies of **every** individual's file, which is truly overbroad and unduly burdensome, in addition to being irrelevant.

Defendants previously responded: "Information regarding what accommodations are within the AIC's authority versus clinical and medical equipment as provided by clinical services may be found in CDOC policy including AR 750-04 and AR 700-34 (available on CDOC's website and previously provided). Please also find relevant information contained within the clinical standard which governs the provision of health care appliances, located on the attached disk within sub-folder 'medical shoes – HCA.' (Int. #18)" *See* **Exhibit A-3**, Letter to Class Counsel, Dated 1/17/14; **Exhibit A-9**, Disk at "medical shoes – HCA"; *and see* **Exhibit A-1**, Disk at "HCA".

The CDOC is required by law and as a matter of policy to separate ADA accommodation from medical treatment and health care appliances.  While the ADA is a civil rights law to protect individuals from discrimination based on disability, it does not entitle or provide assurance to any individual the right to health care treatment.  Instead

the Eighth Amendment confers separate rights to appropriate medical treatment.  In 2005, the Tenth Circuit held that the ADA does *not* have authority to review claims of substandard medical treatment.  *See Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005) (holding that claims for substandard medical treatment cannot be pursued under the ADA)"; *see also* Judge Kane's 2012 Order finding Substantial Compliance, "Even if the DOC has deviated from or failed to perform some of these performance criteria, it may still be found to be in "substantial compliance" if it demonstrates that none of the deviations or failures, individually or as a whole, materially adversely affected, or frustrated, the Plan's essential purposes. While the burdens are more those of production rather than proof to any legal or evidentiary standard, out of an abundance of caution I held Defendants to the ultimate burden of demonstrating compliance, including meeting Plaintiffs' evidence of noncompliance with evidence in rebuttal."

CDOC must maintain separate functions for each department and while they may have some overlap or require coordination, it is necessary and essential to maintain separation of duties *e.g.* AIC coordinates offender requests for accommodation, responds to and investigates claims of discrimination; whereas Clinical Services is responsible for assessment and authorization of all medical care, to include but not limited to health care appliances, medical restrictions (housing/work), medication and treatment plans. This does **not** mean that Defendants have "eviscerate(ed)" Judge Kane's orders, as Plaintiffs suggest. *See* Doc. 5462. Rather, it means that there is *increased communication* between the AIC and Clinical Services to make sure that all needs as being addressed efficiently and appropriately.

It is important to point out that the AIC works very closely with Clinical Services to ensure that any restrictions do not result in discrimination due to a medical condition *e.g.* lower bunk restriction by clinical means the AIC ensures offender's programs are available on lower level of facility.  Another analogy they often use to describe their joint effort is when medical restricts an offender the AIC works with clinical and the offender to determine what type of accommodation or modification may be needed (if any) to ensure equal access to all programs, services and activities. So, if clinical restricts offender to "No stairs", again we ensure alternative means is provided *e.g.* elevator access.  The intent of the ADA does not restrict offenders from doing something however Clinical Services may based upon the offender's health care needs as determined by their medical treatment plan.  Instead, when medical determines a restriction is necessary for the offender's health, the AIC provides accommodation/modification to ensure continued equal access and effective participation.  AIC staff are not able to complete medical assessments of any offender, nor is that their job under the ADA.  Instead, the AIC continues to work with Clinical though to make sure offenders are not discriminated against or prevented from access/participation due to a medical condition.

Moreover, the ADA Montez screening system still requires the AIC to make the final determination for class members who request mobility, hearing, vision.  or diabetes screenings. Initial screening determines current health care appliances, medical restrictions and disability status for class members; follow up requests for additional HCA/restrictions is generally referred to Clinical Services who are trained medical experts and have authority/responsibility under policy & law to assess medical needs.

Offenders often "shop" the AIC for requested medical care, medication, HCA & restrictions when Clinical Services denies as medically unnecessary; however CDOC has a grievance and appeal system in place for offenders to request secondary review of their claims.  This should not and cannot be approved by the AIC because our staff are not trained/licensed to practice medicine.

The AIC also works closely with Clinical Services when referring offenders to Clinical Services for follow up care and treatment.  They do not just drop the issue without following up *e.g.* offender with prosthetic leg filed ADA grievance to request additional socks for his stump, this was denied by the AIC as not being a discrimination/ADA issue and immediately referred to Clinical Services.  The AIC contacted the Chief Medical Officer via email who agreed to provide additional stump socks to the offender and notified the AIC when it was resolved.  *See* **Exhibit A-1**, Disk at "HCA"(re Toliver 159844); *see also*  Clinical Services Administrative Regulation 700-01(Responsibility and Organization of Clinical Services) – for authority/responsibility of Clinical Services to provide medical treatment, AR 700-02 (medical scope of service) & 700-34 (Health Care Appliances; *and see* Clinical Services standards for treatment for procedure.

Interrogatory #19:

Defendants previously indicated that accommodation items come from the AIC while medical equipment would come through clinical services. The latter would go through a potential insurer, while the former would not. Moreover, some items simply do not go through any insurer. For example, a lower bunk or tier would simply be approved internally and required to third party administrator (TPA) review.  However, to be clear regarding what would occur in the case of a denial by an insurer, Defendants further

clarify that when the TPA for DOC denies approval to pay for an accommodation for a clinical or medical device for a class member, CDOC requests a reversal of denial for payment. If the device is not a covered benefit through the TPA referral process then clinical services is responsible to order and pay for the device through the clinical operations budget. Thus, no one is forced to "go without." For example:

- Pittman #87966 was initially denied a larger wheelchair by the TPA as not medically necessary and instructed to lose weight. CDOC overturned the denial. The wheelchair was approved and ordered;
- Bellm #87134 has had his wheelchair maintained and repaired since 2010 on a regular basis. This has been done 14 times since 2010 and another was scheduled July 2014; and
- Salazar # 87966 has had his wheelchair repaired although no authorization number appears in the consult system. There is documentation in the TPA system that this has been approved and completed.

The health care practitioner has the authority to approve medical/housing restrictions based on a physical exam and medical needs. The Chief Medical Officer has the authority to review the electronic health record and alter medical/housing restrictions on a yearly basis. *See* **Exhibit A-5**, Letter to Class Counsel, dated 8/13/14. Finally, it bears repeating that this is not a case regarding medical or Eighth Amendment matters and is so limited by the *Fitzgerald* decision with which both Parties are familiar. Thus, information pertaining to medical matters is beyond the ambit of review.

Interrogatory #21:

Once again, vague, shadowy, and unnamed "class members" allege a denial of equal access" accordingly to Plaintiffs.  *See* Doc. 5462, p. 19. Yet again, absolutely no one from Class Counsel has articulated this concern to the AIC, either generally, or on behalf of any particular offender. Defendants are working diligently to maintain their compliance and to move forward with providing exemplary accommodations and access

to their incarcerated charges. It would certainly benefit all parties involved if when some allege deficiency arises, Plaintiffs actually shared the concern in real time with Defendants so that it can actually be addressed as opposed to make nebulous allegations in pleadings which do not enable the AIC to help problem solve on class members' behalf.

Defendants previously responded: "Information sought regarding the Incentive Unit Program at CTCF may be found on the attached disk under sub-folder "incentive unit" and includes Implementation and Adjustment 650-001, which was last updated 09/15/13. This document provides *very* detailed information regarding benefits which include, but are not limited to, food provided and prepared by the culinary arts program, extended canteen purchasing, extra bedding, access to common area items such as electronics and books, first release during movement, and interlibrary loan for movies and music among other additional privileges. The IA further provides that the relevant units are Cell House 1 3-4 Left, Cell House 7 1-2 Left, and Cell House 3 B Upper Floor. Please also find attached in hard copy, a chart with ADA-M identified inmates presently enrolled in the program highlighted. Finally, there are seven wheelchair accessible cells in CH 7, 1 Left. As of 01/17/14, six of those are presently occupied by ADA-M identified inmates. The seventh is occupied by an inmate who recently progressed from using a wheelchair and will transition into another cell once one becomes available. (Int. #20-21, RFP #22)."

Defendants now further provide an updated copy of the IA, a list of incentive unit members by living unit as of June 30, 2014, but which clearly denotes when that person

moved into the unit, and a copy of the waitlist as of June of 2014. *See* **Exhibit A-1**, Disk at Incentive.

Interrogatory #22:

Defendants previously responded: "Information sought regarding programs and jobs available at DRDC and La Vista Correctional Facility is on the attached disk located within sub-folder labeled 'assignments'. [*See* **Exhibit A-9**] There are three Excel sheets (DRDC, La Vista, and DWCF) which delineate information sought regarding available jobs and programs and the current enrollees for each by facility.  (Int. #22)."

In early 2014, CDOC provided lists of offenders' assignments at DRDC and LVCF. Class counsel complains these lists do not show which are class members, however, they have been provided the daily roster and AIC database *many* times which reflects *all* class members. They simply need to compare the two lists.

To the extent Plaintiffs wish to know which participants are class members, they could readily cross reference the system-wide list of class members broken down by facility which they were provided prior to each and every visit to a facility over the past 22 months. Alternatively, a *complete* list of class members is found within the AIC Montez Database, which they consistently dismiss as not helpful. So armed with their list of class members to compare against the previously provided information, they could also glean who are not class members and therefore determine what percentage of participants are class members. It is further worth mentioning the, once more, the alleged "complaints" raised in the  instant motion have never been brought to the Defendants attention in any sort of proactive effort to address and resolve the alleged issues for any class members. *See also* Interrogatory 17 Response which explains all

offenders have opportunities to compete for jobs, request accommodation, and the option to grieve upon denial/termination.

In response to Class Counsel's demand for information regarding requests for assignments, date of assignment, and reasons for denial, please *see* Interrogatory 15/16 Responses and the related documents produced therein. Indeed, in response to those informational requests, ACA files were provided from various facilities, including LVCF & DRDC, for the following standard (4-4448): *The institution maintains a written plan for full-time work and/or program assignments for all inmates in the general population. The plan also provides for employment for inmates with disabilities*; as well as for the following standard (4-4451):*The institution provides a variety of work assignments that afford inmates an opportunity to learn job skill and develop good work habits and attitudes that they can apply to jobs after release.*

Defendants now further provide exemplar assignment history files for Offender Gregory 43491 (DRDC) and Offender Martinez 157805 (LVCF). *See* **Exhibit A-1**, Disk at Interrog 22.

RFP #2:

It is disingenuous to suggest that Plaintiffs only became aware of the contents of AIC electronic files in November of 2013. *See* Doc. 5462, p. 20. Indeed, as Class Counsel has long been aware and consistently informed that the electronic files are largely mirror images of the old style paper files which are stored electronically in order to be more accessible and to occupy less space, much like one would assume files would be kept in a modern law office.

Class counsel requests the AIC electronic files, including AIC worksheets of **all** inmates who have requested class member status from November 10, 2010, to present. Class counsel incorrectly represents that this is critical in order to assess the "identity of class members." CDOC has disclosed the identity of class members time and time again through the ADA daily roster which class counsel was free to request at any time, and the AIC database, which was provided on a quarterly basis and continues to be updated on a regular basis in order to maintain class member initial contacts and screening information, despite counsels' allegation that the database contains historical data only.

Class counsel represents that the AIC files contain the most comprehensive information about an inmate's ADA accommodation information. This is simply not true since the implementation of GTS (July 2011) and ATS (January 2012). Most of the grievance and accommodation-related records and notes are stored in these new electronic systems. Additionally, the majority of the AIC files were already produced during pre-compliance hearing discovery.

It remains CDOC's firm position that individual files do **not** support monitoring of systemic substantial compliance, and that Class Counsel merely seeks to uncover any individual, anecdotal issues which is contrary to the Court's ruling regarding substantial compliance and an unduly burdensome request on the CDOC. If Plaintiffs want to discuss and collect individual concerns, they can do so through facility visits with their clients as well as written and telephonic communications. As discussed above, Plaintiffs chose to wait until several months into the Monitoring Period before initiating visits with their clients.

In good faith, CDOC has repeatedly offered a *sampling* of class member files for Plaintiffs' review.  This offer has to-date not been accepted. Thus, Defendants now simply affirmatively provide a sample of new class member AIC files for review. CDOC will also continue to honor their prior offer to provide specific offender AIC files upon request to resolve any outstanding individual complaints or concerns. To date, Class Counsel has **not** made such a request.

CDOC also offers a sample of AIC's ADA Audit Reports from 2010 to present, a system-wide facility auditing system the AIC developed back in 2010 in collaboration with the American Correctional Association (ACA) manager. AIC staff visit nearly every state and private facility on an annual basis during the ACA internal audit, touring the physical plant, meeting with and educating staff, speaking with offenders, and auditing ACA file documentation, to monitor and ensure ADA and litigation compliance.  Audit tools have already been provided to Class Counsel, however, they have been included again, as well as the historical audit tools. AIC has also worked closely with parole and community, providing ADA training and visiting community corrections facilities. *See* **Exhibit A-1**, Disk at "ATS."

RFP #3:

Plaintiffs seek written orientation materials.  *See* Doc. 5462, p. 22. They were previously provided the orientation materials for DRDC.  *Id.* DRDC stands for Denver Reception and Diagnostic Center. Indeed, this is the hub through which **all** offenders enter CDOC and are oriented.

The AIC has further voluntarily provided sample documentation throughout the Monitoring Period with the coordination of the Quarterly Monitoring report to identify how

and when offenders are notified of their rights under the ADA and the Remedial Plan. Quarterly Reports (deemed inadequate by Plaintiffs) provide copies of Administrative Regulation 850-07-Offender Orientation along with copies of the DRDC and YOS facility orientation hand books.  These are representative samples from **the only two intake facilities**.  **Every** new adult offender must enter the DOC through DRDC and youth sentenced directly to YOS must go through YOS intake.  As such, these are representative facilities that provide clear systemic documentation regarding the continuation of notice of rights under the ADA to offenders.  In addition, all offenders are informed of their obligation to read and follow all CDOC Administrative Regulations, accordingly AR 750-04 attachment "E" includes a "Offender Notice Under the Americans with Disabilities Act" and provides additional information to offenders regarding the ADA and Remedial Plan processes to request accommodation and class member status.

Additionally, offenders are required to view the ADA video at intake during their initial assessment on Day One.  **Every** new arrival also undergoes a medical intake screening and is affirmatively offered the opportunity to request a class member screening.  As part of this assessment process, a determination of medical restrictions and housing assignment needs is completed and identification of ADA accommodations, if any is made.  This process has been in place since *prior to* the 2009 compliance hearings with very few, if any procedural changes.  Judge Kane recognized CDOC to be in substantial compliance in this area in particular. Notwithstanding, CDOC maintains a basic orientation and information regarding offender ADA rights and availability to request a class member screening at **EVERY**

39

facility in both the state and privates.  CDOC has provided additional documentation from facility orientation policies and pamphlets as a showing of good faith. *See* **Exhibit A-1**, Disk at Regs (See file for facility IA's for 850-07 & DOC Admin. Regs 850-07 (Facility Orientation) & 750-04 Americans with Disabilities Act-Offender Request for Accommodation) *and* at Orientation.

RFP #4: A/Rs and Implementation Adjustments (IAs):

 **All** ARs are available to Class Counsel and the general public at http://www.doc.state.co.us/administrative-regulations. Furthermore, CDOC has provided courtesy copies of all ADA relevant ARs to Plaintiffs. *See* **Exhibit(s) A-1, 3, 5, and 6**. Facilities are not required to promulgate an IA for each and every AR.  Accordingly, some opt to, while others do not.  Copies of approximately 1,700+ current and historical ADA specific ARs and IAs for participating facilities have been provided to Plaintiffs. *See* **Exhibit A-5** Disk at sub-folder "Regs".

RFP #5:

 Class counsel requested the electronic files for all 5,000+ offenders (*see* RFP #2 Response) to which the CDOC maintains their position that providing copies of **every** kite/correspondence or AIC file would **not** support systemic monitoring of the Department as a whole. Most offenders do not submit kites to the AIC, as this is a document that is generally used within the individual facilities only.  Accordingly, the number of correspondence(s) the AIC has received has dropped by more than 1/3 from 2010 to 2013 with a continuing downward trend. A sample of AIC electronic files has been provided to Class Counsel in response to RFP #2 which also represents the limited number of kites/correspondence received in the AIC office.

A more appropriate methodology for review of systemic compliance monitoring may be gleaned by requesting core samples as provided in the responses to Plaintiffs' demands.  This information may be chosen randomly or selectively from class members (*see* Daily ADA Rosters) and is available to Counsel(s) in the Quarterly Report(s) and/or upon request. *See also* **Exhibit A-1**, Disk at Kites.

<u>RFP #6-7:</u>

CDOC maintains is objection to the carte blanche approach requesting "all information in the Accommodation Tracking System…" Doc. 5462, p. 23. This is hugely overbroad. In addition, this system tracks non-class members and other types of disabilities beyond the four at issue in this matter. Defendants have also previously provided the AIC Montez Database which covers this request and includes Class Members' RFA. *See* **Exhibit A-8**, Database (updated).

Defendants further now provide graphs broken down by accommodation and/or equipment type which show approvals versus denials. *See* **Exhibit A-4**, Graphs by Accommodation; *and see* **Exhibit A-1**, Disk at ATS. Also, please see response and documents for RFP #2, which is duplicative and overlapping with this request. Copies of requests can also be found within the provided exemplar files provided.

<u>RFP #8:</u>

This is another duplicative request for copies of the contents of 5,000+ offenders' individual files. As such, it is overly broad and unduly burdensome. Copies of blank forms were previously provided. Now, copies of exemplar forms which demonstrate the movement through the process are provided. *See* **Exhibit A-1**, Disk at ALRs. In addition, CDOC maintains its standing offer to provide a reasonable number of

specifically sought files. Moreover, in light of the fact that Plaintiffs have never availed themselves of this option, Defendants have now simply provided a random sampling.

RFP #9:

Defendants did previously object in full to this request.  However, in furtherance of fostering open and transparent dealing during the Monitoring Period, they now provide examples of extensive ADA audits reports, from 2010 to date, from the designated facilities. *See* **Exhibit A-1**, Disk at ACA Audit (it contains approximately 400 items). Also included are audit tools and some supporting information. The ADA audits are a collaborative effort with the American Correctional Association (ACA) manager and her team across the department. AIC staff participate in the physical plant tour and audit a selection of the ACA files (see audit file review tool), reviewing documentation to ensure compliance with the ACA standard, ADA, and ADA litigation.

RFP #10-11:

Defendants previously responded: "Information as to all approved and denied reports re accommodations has been provided attached at 'ATS approve-deny reports'. (RFP #10-11)."  *See* **Exhibit A-3**, Letter to Class Counsel, dated 1/17/14; *and see* **Exhibit A-9**, Disk re Voluntary Disclosures 2.0. Accordingly, a record summary of *all* such decisions was provided. Plaintiffs summarily dismiss these two detailed Excel charts with over 3,000 entries "worthless".

Plaintiffs *never* subsequently requested any specific individual's approved/denied reports. Again, they simply seek all records for all persons for the entire Monitoring Period as well as a two-year period of time which clearly pre-dates their duty to monitor which began October 1, 2012, pursuant to Judge Kane's Order.

42

This request is essentially duplicative of the same information sought by Plaintiff's in RFP #2, 5, 6, 7.  The ATS system originated January 1, 2012 (not November 1, 2010) therefore **NO** "Request Approved/Denied Reports" or "Offender Accommodation Reports" are *available* prior to Jan. 1, 2012.  However, Defendants also provide exemplar request reports from SCF and CTCF, from January 2012 to-date, which reflects each request entered, the outcome, and if denied, the reason why.

Additionally, Class Counsel is provided not only the Quarterly Report(s) showing who their class members are but also additional information by the AIC presently to indicate for Plaintiff's Counsel(s) what a core sample should look like which is indicative of systemic compliance. This is more probative that an anecdotal fishing expedition through individual files. Thus, to the extent Plaintiffs wish to request and review a reasonable core sample of individual AIC files, ATS files, ADA litigation Resolution screening & results, Correspondence, Grievances, policies & procedure, Defendants affirmatively provide this same information for a reasonable sub-set of files in addition to a comprehensive listing of outcomes. *See* **Exhibit A-1**, Disk at Approve.Deny.

To the extent any Class Member alleges they do not know what their own accommodations are, they are welcome to request a copy of their Accommodation(s) at any time, touch base with Clinical Services, and/or the AIC.

RFP #12:

Defendants hereby provide extensive information regarding the initial, annual, and on-going training for all staffs including case managers and parole personnel. *See* **Exhibit A-1**, Disk at Training (approximately 190 documents including a video clip and PowerPoint Presentations).

RFP #13-15:

Despite the baseless allegation to the contrary, CDOC has **not** changed grievance tracking policies making it more difficult to track ADA grievances: *ADA grievances are still designated accordingly and distinguished from other grievance subject matters. See AR 850-04 located at www.doc.state.co.us.*

Defendants maintain that the Quarterly Reports which show information regarding every ADA Grievance filed within a three month period provides appropriate and more than adequate systemic information regarding this portion of the Remedial Plan.  In addition, Defendants now provide an Excel Spreadsheet containing data about **all** ADA litigation-related grievances filed by class members from November 2010 to present. *See* **Exhibit A-1**, Disk at GTS. One sheet is July 2011 to date reflecting data from the newly developed Grievance Tracking System (GTS). (Note: Some grievances appear extremely past due but are not in reality. *These are system entry errors (grievance is entered twice, voided, or has to be re-entered due to incorrect assignment) which causes the grievance to be incorrectly reported as overdue/not responded to*). The second sheet is November 2010-June 2011 which contains data from the prior grievance database. CDOC does not retain informal grievances in GTS or elsewhere. See AR 850-03. Informal grievances are just that: *an informal process to engage offenders and staff in communication to resolve issues timely and efficiently without having to utilize the formal steps.*

RFP #17-18:

Defendants maintain that this request is overly broad and unduly burdensome. Furthermore Defendants believe it is adequately addressed by the previously disclosed

ADA Montez Database. However, in addition, Defendants now provide an Excel Chart containing over 16,000 entries along with 57 scanned copies of documentation submitted related to the disability determination making process.  *See* **Exhibit A-1**, Disk at Documentation.

RFP #19:

Defendants previously stated: "Defendants decline to provide "all information contained in the ATS Database since November 1, 2010 to the present concerning all class members" for a number of reasons.  First, this request is duplicative and has been previously made and denied.  Furthermore, as explained multiple times, the ADA Montez database is more appropriate as a resource for *Montez* class member information.  You have previously been provided this database.  Accordingly, the request is overly broad and unduly burdensome and seeks information on individuals not party to this litigation.  Moreover, it seeks information beyond the scope of the monitoring period.  Finally, as has been previously disclosed ATS went live 01/01/12, thus, it is utterly impossible to provide information from a system which pre-dates its existence.  Despite these issues with the request, you have been provided large amount of information from ATS on the attached disk including approved and denied reports." *See* **Exhibit A-3**, Letter to Class Counsel, dated 1/17/14.

Defendants maintain that a request for "all information contained in [ATS]" is hugely broad and unduly burdensome. However, Defendants have also now further provided, as a sign of good faith, ATS extracted information for SCF (showing 183 RFA) and for CTCF (showing 1,438 RFA). *See* **Exhibit A-1**, Disk at ATS Data.

**V.    Plaintiffs' reliance upon law and procedures relevant to the PLRA-styled termination of a consent decree is misplaced, as the Remedial Plan is a self-terminating *contract*.**

Plaintiffs rely heavily upon the law cited in their First Motion to Compel Discovery (Doc. 5448) for the proposition that discovery ought to be provided to Plaintiffs. However, such reliance is largely misplaced. The cases cited by Plaintiffs pertain to *termination of consent decrees under the PLRA* wherein defendants in those matters were obliged to file an affirmative motion to terminate monitoring. *See Skinner v. Uphoff*, 410 F. Supp. 2d 1104 (D. Wyo. 2006) (Defendants' obliged to file a motion to terminate, to which Plaintiff class then needed information to respond). The instant matter is distinguishable. Indeed, the *Montez* Remedial Plan is a **contract** between the Parties, as opposed to a consent decree. *See* Doc. 5314, p. 15 (Judge Kane noting issues between the Parties to be "a matter of contract."); *and see* Doc. 4224-2, p. 2, ln. 3 (Judge Nottingham stated, "[T]his was a settlement…") An agreement to settle a federal lawsuit is a contract, governed by the principles of contract law. *See Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989). Moreover, even in *Regan v. County of Salt Lake*, 2006 U.S. Dist. LEXIS 89472 (D. Utah Dec. 11, 2006) a consent decree was terminated absent the submission of additional evidence and that court declined to follow the court in *Ginest v. Bd. Of Cnty. Comm'rs*, 295 F. Supp. 2d 1274 (D. Wyo. 2004) (where discovery granted because of specific allegations of current, on-going violations).

Pursuant to the plain language of the contractually binding Remedial Plan agreed to by both Parties, "[o]nce the monitoring period is complete, **this Plan is no longer in effect** unless, prior to the completion of the monitoring period, there has been an objection filed [by Plaintiffs] alleging non-compliance." *See* Remedial Plan Section

XXXI, ¶ 2 (p. 28) (emphasis added). The Honorable Judge Kane confirmed that the Plan will **automatically self-terminate**, without any required action by Defendants, when he ruled Defendants are in substantial Compliance and wrote, "after [the compliance and monitoring periods] it would be dismissed, *sua sponte*, with prejudice. *See* Doc. 5314, p. 2 (citing the Remedial Plan at section XXXVI.B.). His Honor further wrote, "[t]he two-year Monitoring Period triggered by a finding of "Substantial Compliance" shall commence on October 1, 2012, **after which the Plan will go gently into its good night and the case dismissed**." *Id.* at p. 4 (emphasis added). Thus, there can be no doubt that Defendants are **not** obliged to file an affirmative motion to terminate to which Plaintiffs would then need information with which to respond. Therefore, while some of the cases cited might be interesting, or even perhaps somewhat persuasive, they are hardly precedential with respect to the situation in the instant matter.

Despite this distinct difference and the fact that no formal written discovery during the Monitoring Period is provided for within the Remedial Plan itself, Defendants have undertaken, in good faith, efforts to share relevant information with Class Counsel to enable them to discharge their duties to the Plaintiff class. To that end, as discussed above and in Defendants' Response to Plaintiffs' First Motion to Compel Discovery (Doc. 5448), Defendants have voluntarily and cooperatively produced several thousand pages of relevant and probative documents and responded to reasonable and related questions regarding the Monitoring Period (which Judge Kane ruled "commence[d] on October 1, 2012").

Defendants *continue* to provide quarterly reports to Class Counsel on a wide range of issues including: current policy, grievance statistics and information, offender correspondence, requests for accommodation, recent screenings, monthly intake reports from DRDC which include offender specific information related to date of screening cross referenced with each of the four disability categories, copies of template and exemplar intake, screening, and accommodation forms, and updates to ADA tracking systems which include screen shots of what the programs look like, as well as, information related to recent trainings.

The charts, reports and statistics along with samples of class members' accommodations provide adequate and valuable information regarding the ongoing policy, process and procedures employed by CDOC that reflect continued compliance with Remedial Plan requirements to ensure offenders are provided appropriate accommodations and given information about their rights under the ADA. However, in response to vague and burdensome requests that Plaintiffs' propounded, Defendants are more than willing and have provided (*See* **Exhibit A-5**, Letter to Class Counsel, dated 8/13/14 *and see* **Exhibit A-1**, Disk) additional samples of all class member correspondence, accommodations, grievances and medical screening exams; including the policies, facility implementation adjustments (when in existence-not all facilities choose to create a corresponding IA to policies) and procedures that are verifiable through internal ADA/ACA audits and CDOC wide annual ADA training required of every staff member. Plaintiffs may identify additional group samples similar in nature and format to those provided to assist in monitoring systemic compliance. Again Defendants strongly oppose demands for vague and voluminous discovery that does

48

not support review of systemic compliance with the Remedial Plan and Stipulation Orders as it would be extremely burdensome to sort out 5,000+ class members for each and every database and file that would result in approximately 20,000-30,000 documents. To do so would result in an abrupt halt to internal daily work and create undue delay and hardship for offenders currently seeking response to requests for accommodations, correspondence, grievances, scheduled facility ACA/ADA audits and general work of the AIC office.

Where, as here, Defendants have already provided a wealth of information, no more formalized discovery process is required. *See Cagle v Hutto*, 177 F3d 253 (4th Cir. Va. 1999) (Hearing regarding existence of present violations of federal law not mandatory prerequisite to termination of consent decree pursuant to 18 USCS § 3626(b)(2)).

## CONCLUSION

A present desire on behalf of Class Counsel to re-litigate the matter, delve into minutia, or otherwise engage in an unstructured fishing expedition into immaterial materials, should not be entertained by this Court. Moreover, to the extent Class Counsel persists in seeking "discovery" in furtherance of such goals, Defendants decision not to entertain such is not grounds to extend the contractually limited **two year** Monitoring Period.

**WHEREFORE**, for all of the reasons listed above, and in their Response to Plaintiffs' First Motion to Compel, Defendants respectfully request that the Motion(s) to Compel Discovery be denied.

Respectfully submitted this 14th day of August 2014.

JOHN W. SUTHERS
Attorney General

/s/ Jacquelynn N. Rich Fredericks
JACQUELYNN N. RICH FREDERICKS,
#39932
Assistant Attorney General
Civil Litigation & Employment Law Section
Attorneys for Defendant
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone:  (720) 508-6603

## CERTIFICATE OF SERVICE

I certify that on August 14, 2014, I filed the foregoing via ECF which will serve electronic copies addressed as follows:

KING & GREISEN, LLP
Paula Greisen
Jennifer Weiser Bezoza
1670 York Street
Denver, CO 80206
(303) 298-9878 telephone
(303) 298-9879 facsimile
greisen@kinggreisen.com
bezoza@kinggreisen.com

Edward T. Ramey
Heizer Paul Grueskin, LLP
2401 15th Street, Suite 300
Denver, CO 80202
(303) 595-4747 telephone
(303) 595-4750 facsimile
eramey@hpgfirm.com

Lara E. Baker
Foster Graham Milstein & Calisher, LLP
360 S. Garfield Street, 6th Floor
Denver, CO 80209
(303) 333-9810 telephone
(303) 333-9786 facsimile
lmarks@fostergraham.com

Blain D. Myhre
Blain D. Myhre, P.C.
P.O. Box 3600
Englewood, CO 80155
(303) 250-3932 telephone
blainmyhre@gmail.com
*Attorneys for Plaintiffs*

s/ Jacquelynn N. Rich Fredericks