

**JOHN W. SUTHERS**
Attorney General

**CYNTHIA H. COFFMAN**
Chief Deputy Attorney General

**DANIEL D. DOMENICO**
Solicitor General

**STATE OF COLORADO
DEPARTMENT OF LAW**

**OFFICE OF THE ATTORNEY GENERAL**

**RALPH L. CARR COLORADO JUDICIAL CENTER**
1300 Broadway, 10th Floor
Denver, Colorado 80203
Phone (720) 508-6000

August 13, 2014

Ms. Paula Greisen
KING & GREISEN, LLP
1670 York Street
Denver, CO 80206

RE:   *Montez v. Hickenlooper, et al.* 92-CV00870-CMA

Dear Ms. Greisen,

I hope this correspondence finds you doing well. I am in receipt of your Motion to Compel Discovery with respect to your previously propounded "Plaintiffs' Second Set of 'Monitoring Period' Interrogatories and Requests for Production of Documents to Defendants." I begin by reiterating Defendants' firm position that there is **no formal discovery** during the Monitoring Period.

The charts, reports and statistics along with samples of class members' accommodations provide adequate and valuable information regarding the ongoing policy, process and procedures employed by CDOC that reflect continued compliance with Remedial Plan requirements to ensure offenders are provided appropriate accommodations and given information about their rights under the ADA. However, in response to vague and burdensome requests that Plaintiffs' propounded, Defendants are more than willing to provide **additional** samples of all class member correspondence, accommodations, grievances and medical screening exams; including the policies, facility implementation adjustments (when in existence-not all facilities choose to create a corresponding IA to policies) and procedures that are verifiable through internal ADA/ACA audits and DOC wide annual ADA training required of every staff.

Plaintiffs may identify additional group samples similar in nature and format to those provided to assist in monitoring systemic compliance. Again we are



EXHIBIT A-5

opposed to demands for vague and voluminous discovery that does not support review of systemic compliance with the Remedial Plan and Stipulation Orders as this would be extremely burdensome to sort out 5,000+ class members for each and every database and file that would result in approximately 20,000-30,000 documents. To do so would result in an abrupt halt to internal daily work and create undue delay and hardship for offenders currently seeking response to requests for accommodations, correspondence, grievances, scheduled facility ACA/ADA audits and general work of the AIC office.

Despite this, Defendants remain ready and willing to answer relevant, on-point questions on a voluntary basis in order to aid Class Counsel in the discharge of your monitoring duties. Furthermore, Defendants are willing, as demonstrated by prior efforts, to provide related documentation. Accordingly, attached, please find another compact disk which contains documentation related to the below provision of information.

Please confirm your receipt of this disk at your earliest convenience.

The below information is voluntarily provided to you courtesy of the Office of Legal Service, AIC on behalf of CDOC:

- As an initial matter, your requests related to the First Set of Discovery have been met as you are clearly aware of what systems are in place and are thus, currently seeking information from those systems.

- You allege that certain information prior to 2012 ought to be provided. However, Judge Kane clearly articulated that the Monitoring Period commenced **October 1, 2012** and would expire October 1, 2014. *See* Doc. 5314, p. 4. As you are tasked with monitoring that particular period of time, we respectfully decline to provide irrelevant information which predates the Monitoring Period. In addition, to the extent you seek information earlier than 2012 from ATS, that system was not in place prior to 2012, and accordingly, information does not exist to pull from it.

Interrogatory #2/RFP #16:

As an initial matter, there were, are, and **remain** separate channels and processes for ADA-specific Grievances. *See* AR 850-04 (IV)(E)(2). AR 850-04 was amended in December of 2012 in order to offer an informal resolution option to offenders. However, offenders are **NOT** required to complete an informal resolution prior to pursuing the formal three-step grievance process. In addition, AR 850-04 was recently amended in order to firmly clarify that offenders are **not** obliged to wait on an informal response to proceed to their Step I Grievance. Indeed, if any step is not responded to timely, an offender may proceed to the next step without awaiting response. *See* AR 850-04 (IV)(F)(1)(e). Furthermore, since the inclusion of the informal step, CDOC has not argued or considered that the absence of an informal grievance would foreclose proper exhaustion.

Plaintiffs already possess information sufficient to gauge how the introduction of the informal step impacted Step I behaviors, as they can compare the grievance charts provided as part of each Quarterly Report. *See* Disk at First Quarterly Report 2014.

However, as a sign of good faith, CDOC recently prepared and disclosed a chart which shows the total number of Step I ADA Grievances filed annually between 2003 and 2014, a monthly break down of Step I's for 2012, and a monthly breakdown of Step I's for 2013. *See* ADA Step I Grievance charts. As the charts indicate, there were 172 Step I ADA Grievances filed during the calendar year 2013, and there have been 74 Step I ADA grievances filed to-date for the year 2014. Furthermore, as the chart indicates there is continual ebb and flow regarding the number of Step I's initiated in any particular month. For example, while April of 2012 yielded 56 Step I's, and April of 2013 yielded fewer at 15 Step I's, September and October of 2012 yielded 22 and 20 Step I ADA Grievances respectively, while the same months for 2013 increased to 24 and 30 Step I's each. Defendants also

3

provided a comprehensive Excel spreadsheet pertaining to **ALL** ADA-M Grievances filed between November of 2010 and June of 2014. *See* Disk at All ADA-M Grieve.

Interrogatory #4/ Request for Production (RFP) #20:

Please find copies of exemplar reports. *See* Disk. In addition, a number of facilitates now have 24/7 nurse care available to the inmate population as opposed to merely relying on a diabetic testing kit. Kits are available throughout facilities and may also be sent with work crews.

Specifically:

| | |
|---|---|
| AVCF: | Has 24 hour nursing coverage. DM kit located in Master Control. |
| BVCC: | Has 24 hour nursing coverage. DM kit located in Master Control. |
| CCF: | Has 24 hour nursing coverage. DM kits located in several locations throughout the facility. There have been no incidents where the kits needed to be accessed. |
| CMC: | (ACC, FMCC, SCC) Has 24 nursing coverage. DM kits are located in every unit at FMCC and ACC. There are 2 kits in FMCC, ACC, and SCC Master Control. There are also 2 kits at ACC and FMCC gates. Recreation has one kit at FMCC and ACC. The dog program also has one kit. |
| CTCF: | Has 24 hour nursing coverage. Diabetic kits are not kept at the facility due to the availability of 24 hour nursing coverage. |
| CSP: | Has 24 hour nursing coverage. Several diabetic kits are also located throughout the facility. |
| DCC: | Clinic is open 7 am to 5 pm seven days per week. DM kits located at Master Control, Clinic, in the Man Down Bag, and an extra for work crews if they have a diabetic on crew. |
| DRDC: | Has 24 hour nursing coverage – 17 hours through the clinic from 5 am to 10 pm, thereafter the DRDC Infirmary covers. DM kits are located at Unit 1, 2, 3, 4, 5, and Master Control. |
| FCF: | Has 24 nursing coverage. Due to 24 hour coverage, there have been no incidents where the DM kits have needed to be accessed. |
| LCF: | Has 24 hour nursing coverage. DM kits are located in Master Control and Seg only. |
| LVCF: | Clinic is open 16.5 hours per day. DM kits are located in the Gym, Units 1, 2, 3, 4, 5, 6, 7, Master Control, Gym Control. |
| RCC: | Clinic is open 7 am to 5 pm seven days per week. |

4

|  |  |
|---|---|
|  | DM kits located at Master Control, Clinic, in the Man Down Bag, and an extra for work crews if they have a diabetic on crew.<br>**RCC rarely has diabetics and the ones placed there are only oral medication controlled, no insulin dependent diabetics have been placed at RCC. They have had no incidents where the kit was needed after hours in the past 3 years. |
| SCF: | Has 24 hour nursing coverage.<br>DM Kits are available in each living unit, at Master Control, and in the work crew vehicle. |
| TCF: | Clinic is open 13 hours, 20 minutes per day.<br>DM kits located in each living unit, recreation, master control, 2 transport vans, and 2 work crew vans. |

Interrogatory #5:

The previously provided response clearly indicates that medical/soft shoes **are** being provided as a necessary accommodation where required by offenders. As a courtesy, Defendants are now further providing a random sampling of offenders both approved and denied this accommodation including Offenders Lopeman, Baker, Garza, Martinez, Rivas, and Goddard. *See* Disk at "shoes".

Each example contains the original hand-written request by the inmate along with a copy of the corresponding approve/deny report. Defendants also provide a 21 page medical report broken down by facility which details all inmates with that accommodation, the corresponding clinical standard, and an Excel chart detailing by inmate name and number 90 such approvals and 53 denials including at which facility the decision was rendered and on what date. *Id.*

Interrogatory #6:

OCA III trained offenders are assigned to the CTCF infirmary, DRDC infirmary, and the SMNU. The training provided is more extensive for an OCA III due to their area of assignment. Included in their training is three days of trainer-supervised, hands-on experience in the infirmaries/SMNU. This performance must be safe and satisfactory, to obtain the OCA III certification.

Copies of OCA I-III training PowerPoint Presentations for 2012-the present, copies of some corresponding attendance rosters for OCA trainings, and examples of the tests administered to OCAs have further been provided. *See* Disk at "OCA".

Interrogatory #7:

The 2008 Stipulation you reference pertains *solely* to the percentage of single-cells at **CTCF** equipped with strobe lights. *See* 2008 Stipulation (Doc. 3322-1 at point #17).

To that end please note that at CTCF: the percentage of strobe equipped single-cells at CTCF is 73.9%.

Requests for these cells are infrequent. It is likely because in a correctional environment, freedom of movement is restricted and when movement is permitted for evacuation or otherwise, staff are responsible to alert, engage, and control the movement. When AIC does receive this request from an offender, the AIC completes a case-by-case assessment, hearing testing is requested if necessary, and the relevant criteria is applied.

In most cases, AIC or Clinical Services is *automatically* adding "Cell with strobe alarm when independent egress" as a housing restriction when indicated, without the offender even requesting it. However, it is an accommodation option in ATS and will be addressed when the offender requests it, but this is a rare request. It is otherwise considered a *housing restriction* since not all CDOC cells have a strobe nor are they required, so it has a "restrictive" effect as opposed to an accommodation or modification which fosters access and integration as required by the ADA, and is therefore reviewed carefully and generally documented/reflected in an offender's housing restriction. This restriction can be added by the AIC or Clinical Services. Any cell with strobe "approved" on the ATS Report is also reflected in the housing restriction reports. Any requests that were denied are because the offender did not meet the criteria as outlined in the "AIC orientation checklist & info" document. *See* Disk.

The only designated facilities where offenders have free egress from cells are the following: *CTCF, SCF-Minimum, AVCF\*, CMC, BVMC, LVCF, CCC.* The names of offenders at each facility approved for cells with strobes have been provided. Despite the fact that only CTCF's strobe lighting in single-cells is at issue, Defendants have provided information regarding offenders at multiple facilities in single-cell's equipped with strobe lights and copies of exemplar requests and responses, a chart showing 17 approved requests and approximately 20 denials broken down by offenders name and CDOC number. *See* Disk at "strobes" folder.

Interrogatories #8-9/RFP #21:

Defendants hereby provide an exemplar ATS report for Offender Gallegos to show ongoing use of interpreters and the number of requests (274) made for that individuals offender in a single year and to-date (364) as well as a comprehensive Excel chart which shows approximately 1,305 approvals for 2012 and 2013. (Int. #8-9, RFP #21) Please note that this request was very broad and voluminous but has been provided.

Furthermore, here is a list of current list of deaf offenders:

| DOC #  | NAME             |
|--------|------------------|
| 139845 | ATKINS, ANDREW N |

6

| | |
|---|---|
| 126891 | AYOTTE, THOMAS G |
| 124604 | GALLEGOS, KERRY |
| 49293 | HEFFNER, MARK |
| 54940 | LEHMAN, JAMES R |
| 120983 | MARTINEZ, DANIEL |
| 143490 | MCDANIEL, HAROLD |
| 138526 | MERINO, GEORGE M |
| 164158 | RABINKOV, LEONID |
| 85286 | SMITH, HARDRICK |
| 114262 | ROBERTS, MICHAEL |
| 138024 | TREVITHICK, MARC |
| 158887 | SCOTT, MAJOR |
| 138526 | MERINO, GEORGE |

*See* Disk at ASL Use (several dozen receipt copies of receipts).

Interrogatory #10:

Defendants would really like to know if/when you hear that items are allegedly not being replaced and/or who is in need, so that an investigation could be undertaken immediately. Indeed, Defendants desire to remedy any such deficiency as quickly as possible to ensure all offenders have their appropriate DME and accommodations.

For further, updated information with respect to this prior request please *See* Disk at "DME Rep Ref."

Interrogatory #11:

Offenders are provided a copy of their ADA Litigation Resolution identifying all health care appliances & medical restrictions they are authorized as a result of any class member screening. Offenders may already be in possession of the HCA and/or have previous authorization for restrictions through clinical that are identified on the offender's property (if permanent) and/or receipt of a medical pass depending upon each facility's operational needs. Offenders will also receive a copy of their ADA Request Approved/Denied Report from the AIC through either the facility ADA coordinator or their case manager. Offenders may also contact the AIC directly to request a copy of either their litigation resolution (ALR) or ADA Request Approved/Denied Report.

Interrogatory #11:

CDOC staff can obtain information about class member ADA accommodations & their resolution via the CDOC intranet (DOCnet) by

7

signing into the Offender Portal and entering their CDOC identification number. The offender's profile will then be populated. At this point staff can view their class member status along with any health care appliances and medical restrictions under the green Medical caduceus symbol and/or their ADA accommodations under the blue wheelchair icon. Staff may also find the exact same information populated in the PCDCIS database under the Admission & Data Summary by either clicking on the offender's Medical/dental code (again for viewing class member status/HCA/Medical restrictions) and/or the ADA alert code (again for viewing ADA accommodations).

Because ATS is a relatively new system that began Jan. 1, 2012 and the implementation of the Offender Portal system in February 2012, the AIC provided additional training for *all* staff to locate the ADA and litigation information (see AIC memos sent to ALL staff dated 11/3/11 (sent Jan 1, 2012); 2/7/12; 2/15/12; 2/27/12).

ADA training is MANDATORY for all state & private facilities. Every new staff member receives a basic training module and a yearly refresher that includes specific information on where to locate the offender's accommodations and class member status/HCA/medical restrictions. Staff are also informed they may contact the facility ADA coordinator and/or the AIC directly to verify or clarify any information pertaining to their disability accommodations or class member status.

Interrogatory #11:

This information is verified at point of entry by the AIC staff. The AIC staff are the *only* staff who have access to populate the offender's profile for class member status & any HCA/medical restrictions authorized through the screening process OR the ADA accommodations entered through the ATS system. NO other staff can alter ANY information into either of these systems. The AIC (Keith Nordell & Julie Russell) are the only staff who can authorize computer access approval for either ATS or ADA_Montez, which are the only two entry points into the accommodations & screening systems accordingly. Facility ADA coordinators do have permission granted by the AIC to "read only" computer access for the internal ATS system and ADA_Montez through PCDCIS. They do not have access to enter or alter any information however.

*See* Disk at "Train Staff."

8

Interrogatory #14:

Please find the following additional information with respect to this enumerated request which confirm Defendants' affirmative efforts to ensure equal access to assignments:
- Policy: AR 750-04, 850-04, 850-03 (all available at www.doc.state.co.us) *See also* **Exhibit A-1** Disk at ADA Regs.
- Policy and Practice Training: Basic Training (Central training academy upon hire); ADA annual refresher training; various roll call trainings, written releases/communications (*See* RFP 12)
- Meetings/communications with Facility ADA Coordinators (*See* RFP 12)
- ADA audits (*See* RFP 9)
- See Interrogatories 15, 16, 17 Responses (below) which includes report of responses to grievances alleging ADA assignment discrimination; disabled class members' assignment history; ACA ADA file documents regarding non-discriminatory assignment processes; Report regarding class members working in CI assignments.

Interrogatories #15-16:

Additional information regarding CI is being provided. *See* Interrogatory 17 Response(s) for CI job information and explanation of offenders' opportunity to compete for jobs, request accommodation and option to grieve upon denial/termination. *See* Disk at "CI" (Enclosed are ACA files from various facilities for the following standard (4-4448): *The institution maintains a written plan for full-time work and/or program assignments for all inmates in the general population. The plan also provides for employment for inmates with disabilities;* Enclosed are ACA files from various facilities for the following standard (4-4451):*The institution provides a variety of work assignments that afford inmates an opportunity to learn job skill and develop good work habits and attitudes that they can apply to jobs after release; See* Approved and Denied assignment accommodation report; *See* Grievance Report regarding ADA-assignment discrimination; Also included is exemplar information regarding five (5) disabled class members' assignment history.

Interrogatory #17:

The provided report (which contains over 30,000 entries) shows class members working in CI jobs across the CDOC which is evidence of non-discrimination and compliance with governing CDOC policies. *See* Disk at "CI". Previously provided information showed which jobs were currently available.

By policy, *all* offenders must maintain an assignment with few exceptions, and are provided the opportunity to apply and compete for assignments regardless of disability. However, in order to be placed in an assignment, offenders must meet the minimum eligibility requirements no different than applicants in employment

9

settings under ADA Title I. Some offenders may personally choose not to compete for certain CI positions and discrimination becomes a moot point. The only conclusion which can be drawn from this report reflecting offenders working in CI assignments is that the opportunity is being afforded to those who chose to compete and were determined eligible for the positions.

The reason a particular individual was denied an assignment can only be researched on a case-by-case basis. It is incumbent upon the offender to file a grievance pursuant to AR 850-04, which the AIC would investigate and remedy if necessary. Again, if there is a specific offender Class Counsel would like to request information with regards to, CDOC would be glad to work with them.

In addition, if an offender requires accommodation to access their job, it is incumbent upon him/her to indicate such on the job description form, verbalize the request to staff, or contact the AIC, in accordance with AR 850-03. (*See* Interrogatories 15-16 Response data which includes grievance report regarding ADA discrimination in assignments located on Disk at CI.

Please note that **all** staff participate in ADA training upon hire, on an annual basis, and are required to comply with non-discrimination and equal opportunity policies. (*See* RFP 12).

Interrogatory #18:

As you are undoubtedly aware, the CDOC is required by law and as a matter of policy to separate ADA accommodation from medical treatment and health care appliances. While the ADA is a civil rights law to protect individuals from discrimination based on disability, it does not entitle or provide assurance to any individual the right to health care treatment. Instead the Eighth Amendment confers separate rights to appropriate medical treatment. In 2005, the Tenth Circuit held that the ADA does *not* have authority to review claims of substandard medical treatment. *See Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005) (holding that claims for substandard medical treatment cannot be pursued under the ADA)"; *see also* Judge Kane's 2012 Order finding Substantial Compliance, "Even if the DOC has deviated from or failed to perform some of these performance criteria, it may still be found to be in "substantial compliance" if it demonstrates that none of the deviations or failures, individually or as a whole, materially adversely affected, or frustrated, the Plan's essential purposes. While the burdens are more those of production rather than proof to any legal or evidentiary standard, out of an abundance of caution I held Defendants to the ultimate burden of demonstrating compliance, including meeting Plaintiffs' evidence of noncompliance with evidence in rebuttal."

Thus, CDOC must maintain separate functions for each department and while they may have some overlap or require coordination, it is necessary and essential to maintain separation of duties *e.g.* AIC coordinates offender requests for accommodation, responds to and investigates claims of discrimination; whereas Clinical Services is responsible for assessment and authorization of all medical care,

10

to include but not limited to health care appliances, medical restrictions (housing/work), medication and treatment plans.

It is important to point out that the AIC works very closely with Clinical Services to ensure that any restrictions do not result in discrimination due to a medical condition *e.g.* lower bunk restriction by clinical means the AIC ensures offender's programs are available on lower level of facility. Another analogy they often use to describe their joint effort is when medical restricts an offender the AIC works with clinical and the offender to determine what type of accommodation or modification may be needed (if any) to ensure equal access to all programs, services and activities. So, if clinical restricts offender to "No stairs", again we ensure alternative means is provided *e.g.* elevator access. The intent of the ADA does not restrict offenders from doing something however Clinical Services may based upon the offender's health care needs as determined by their medical treatment plan. Instead, when medical determines a restriction is necessary for the offender's health, the AIC provides accommodation/modification to ensure continued equal access and effective participation. AIC staff are not able to complete medical assessments of any offender, nor is that their job under the ADA. Instead, the AIC continues to work with Clinical though to make sure offenders are not discriminated against or prevented from access/participation due to a medical condition.

Moreover, the ADA Montez screening system still requires the AIC to make the final determination for class members who request mobility, hearing, vision. or diabetes screenings. Initial screening determines current health care appliances, medical restrictions and disability status for class members; follow up requests for additional HCA/restrictions is generally referred to Clinical Services who are trained medical experts and have authority/responsibility under policy & law to assess medical needs.

Offenders often "shop" the AIC for requested medical care, medication, HCA & restrictions when Clinical Services denies as medically unnecessary; however CDOC has a grievance and appeal system in place for offenders to request secondary review of their claims. This should not and cannot be approved by the AIC because our staff are not trained/licensed to practice medicine.

The AIC also works closely with Clinical Services when referring offenders to Clinical Services for follow up care and treatment. They do not just drop the issue without following up *e.g.* offender with prosthetic leg filed ADA grievance to request additional socks for his stump, this was denied by the AIC as not being a discrimination/ADA issue and immediately referred to Clinical Services. The AIC contacted the Chief Medical Officer via email who agreed to provide additional stump socks to the offender and notified the AIC when it was resolved. *See* Disk at "HCA"(re Toliver 159844); *see also* Clinical Services Administrative Regulation 700-01(Responsibility and Organization of Clinical Services) – for authority/responsibility of Clinical Services to provide medical treatment, AR 700-02 (medical scope of service) & 700-34 (Health Care Appliances; *and see* Clinical Services standards for treatment for procedure.

11

Interrogatory #19:

Defendants previously indicated that accommodation items come from the AIC while medical equipment would come through clinical services. The latter would go through a potential insurer, while the former would not. Moreover, some items simply do not go through any insurer. For example, a lower bunk or tier would simply be approved internally and required to TPA review.

Defendants wish to clarify that when the third party administrator (TPA) for CDOC denies approval to pay for an accommodation for a clinical or medical device for a class member, CDOC requests a reversal of denial for payment. If the device is not a covered benefit through the TPA referral process then clinical services is responsible to order and pay for the device through the clinical operations budget. No one is forced to "go without."

For example:
- Pittman #87966 was initially denied a larger wheelchair by the TPA as not medically necessary and instructed to lose weight. CDOC overturned the denial. The wheelchair was approved and ordered;
- Bellm #87134 has had his wheelchair maintained and repaired since 2010 on a regular basis. This has been done 14 times since 2010 and another was scheduled July 2014; and
- Salazar # 87966 has had his wheelchair repaired although no authorization number appears in the consult system. There is documentation in the TPA system that this has been approved and completed.

The health care practitioner has the authority to approve medical/housing restrictions based on a physical exam and medical needs. The Chief Medical Officer has the authority to review the electronic health record and alter medical/housing restrictions on a yearly basis.

Interrogatory #21:

Defendants provide an updated copy of the IA, a list of incentive unit members by living unit as of June 30, 2014, but which clearly denotes when that person moved into the unit, and a copy of the waitlist as of June of 2014. *See* Disk at Incentive.

Interrogatory #22:

Please, please compare the previously provided lists of offenders' assignments at DRDC and LVCF with the daily roster and AIC database. When cross referenced you are able to ascertain what you seek. If you still don't find what you're after, please let us know, so that we can work together one this issue.

Defendants also now further provide exemplar assignment history files for Offender Gregory 43491 (DRDC) and Offender Martinez 157805 (LVCF). *See* Disk at Interrog 22.

RFP #2:

       In good faith, CDOC has repeatedly offered a sampling of class member files for Plaintiffs' review. This offer has to-date not been accepted. However the offer stills stands. If you're anticipating an issue within a certain file, please request it. CDOC would be glad to provide it. If there is any issue, Defendants would be amenable to discussing how it may be addressed and resolved.

       Additionally, please find a random sample of new class member AIC files for review.

       Please also find information regarding ADA Audit Reports from 2010 to present, a system-wide facility auditing system the AIC developed back in 2010 in collaboration with the American Correctional Association (ACA) manager. AIC staff visit nearly every state and private facility on an annual basis during the ACA internal audit, touring the physical plant, meeting with and educating staff, speaking with offenders, and auditing ACA file documentation, to monitor and ensure ADA and litigation compliance. Audit tools have already been provided to Class Counsel, however, they have been included again, as well as the historical audit tools. AIC has also worked closely with parole and community, providing ADA training and visiting community corrections facilities. *See* Disk at "ATS."

RFP #3:

       Defendants previously provided DRDC orientation materials. Please be advised that DRDC stands for Denver Reception and Diagnostic Center. Indeed, this is the hub through which **all** offenders enter CDOC and are oriented. Thus, the provision of DRDC materials was intended to provide precise information regarding each and every offender's initial orientation.

       During orientation, offenders are required to view the ADA video at intake during their initial assessment on Day One. **Every** new arrival also undergoes a medical intake screening and is affirmatively offered the opportunity to request a class member screening. As part of this assessment process, a determination of medical restrictions and housing assignment needs is completed and identification of ADA accommodations, if any is made. This process has been in place since *prior to* the 2009 compliance hearings with very few, if any procedural changes. Judge Kane recognized CDOC to be in substantial compliance in this area in particular. Notwithstanding, CDOC maintains a basic orientation and information regarding offender ADA rights and availability to request a class member screening at **EVERY** facility in both the state and privates.

       Defendants are now providing additional documentation from facility orientation policies and pamphlets as a showing of good faith. *See* Disk at Regs (See file for facility IA's for 850-07 & DOC Admin. Regs 850-07 (Facility Orientation) & 750-04 Americans with Disabilities Act-Offender Request for Accommodation) *and* at Orientation.

RFP #4: A/Rs and Implementation Adjustments (IAs):

**All** ARs are available to Class Counsel and the general public at http://www.doc.state.co.us/administrative-regulations.

Please note that facilities are not obliged to promulgate an IA for each and every AR. Accordingly, some opt to, while others do not.

Defendants are also providing requested copies of approximately 1,700+ current and historical ADA specific ARs and IAs for participating facilities. *See* Disk at sub-folder "Regs".

RFP #5:

Kites are largely contained within facilities as a communication tool. The number of correspondence(s) the AIC has received has dropped by more than 1/3 from 2010 to 2013 with a continuing downward trend. A sample of AIC electronic files has been provided to Class Counsel in response to RFP #2 which also represents the limited number of kites/correspondence received in the AIC office. *See* Disk at Kites.

RFP #6-7:

CDOC maintains is objection to the carte blanche approach requesting "all information in the Accommodation Tracking System..."

However, Defendants provide graphs broken down by accommodation and/or equipment type which show approvals versus denials. *See* Disk at ATS.

Also, please see response and documents for RFP #2, which is duplicative and overlapping with this request. Copies of requests can also be found within the provided exemplar files provided.

RFP #8:

This is another duplicative request for copies of the contents of 5,000+ offenders' individual files. As such, it is overly broad and unduly burdensome. Copies of blank forms were previously provided.

However, copies of exemplar forms which demonstrate the movement through the process are provided. *See* Disk at ALRs.

In addition, CDOC maintains its standing offer to provide a reasonable number of specifically sought files. Please let us know, if there are a handful you'd like to sample and Defendants would be glad to gather and provide those.

RFP #9:

Defendants previously objected to this request.
However, in furtherance of fostering open and transparent dealing during the Monitoring Period, they now provide examples of extensive ADA audits reports, from 2010 to date, from the designated facilities. *See* Disk at ACA Audit (it contains approximately 400 items).
Also included are audit tools and some supporting information. The ADA audits are a collaborative effort with the American Correctional Association (ACA) manager and her team across the department. AIC staff participate in the physical plant tour and audit a selection of the ACA files (see audit file review tool), reviewing documentation to ensure compliance with the ACA standard, ADA, and ADA litigation.

RFP #10-11:

Defendants provide exemplar request reports from SCF and CTCF, from January 2012 to-date, which reflects each request entered, the outcome, and if denied, the reason why.
To the extent any Class Member alleges they do not know what their own accommodations are, they are more than welcome to request a copy at any time, touch base with Clinical Services, and/or the AIC.

RFP #12:

Defendants provide extensive information regarding the initial, annual, and on-going training for all staffs including case managers and parole personnel. *See* Disk at Training (approximately 190 documents including a video clip and PowerPoint Presentations).

RFP #13-15:

Please note that CDOC has **not** changed grievance tracking policies making it more difficult to track ADA grievances: *ADA grievances are still designated accordingly and distinguished from other grievance subject matters. See AR 850-04 located at www.doc.state.co.us.*
Defendants maintain that the Quarterly Reports which show information regarding every ADA Grievance filed within a three month period provides appropriate and more than adequate systemic information regarding this portion of the Remedial Plan. In addition, Defendants now provide an Excel Spreadsheet containing data about **all** ADA litigation-related grievances filed by class members from November 2010 to present. *See* Disk at GTS.
One sheet is July 2011 to date reflecting data from the newly developed Grievance Tracking System (GTS). (Note: Some grievances appear extremely past

15

due but are not in reality. *These are system entry errors (grievance is entered twice, voided, or has to be re-entered due to incorrect assignment) which causes the grievance to be incorrectly reported as overdue/not responded to).*

The second sheet is November 2010-June 2011 which contains data from the prior grievance database. CDOC does not retain informal grievances in GTS or elsewhere. See AR 850-03. Informal grievances are just that: *an informal process to engage offenders and staff in communication to resolve issues timely and efficiently without having to utilize the formal steps.*

RFP #17-18:

Defendants believe this request is adequately addressed by the previously disclosed ADA Montez Database (an updated copy is being provided this month, too).

Additionally, Defendants provide an Excel Chart containing over 16,000 entries along with 57 scanned copies of documentation submitted related to the disability determination making process. *See* Disk at Documentation.

RFP #19:

Once again, Defendants maintain that a request for "all information contained in [ATS]" is hugely broad and unduly burdensome.

However, Defendants have also now further provided, as a sign of good faith, ATS extracted information for SCF (showing 183 RFA) and for CTCF (showing 1,438 RFA). *See* Disk at ATS Data.

Once again, thank you for the opportunity to engage in constructive dialogue and an exchange of information. If there are additional questions which Defendants can answer which are on-point and relevant, please let me know. We look forward to continuing to work together through the remainder of the Monitoring Period.

Sincerely,

FOR THE ATTORNEY GENERAL

s/Jacquelynn N. Rich Fredericks
JACQUELYNN N. RICH FREDERICKS
Assistant Attorney General
Corrections Unit
Civil Litigation and Employment Law Section
(720) 508-6603
(720) 508-6032 (FAX)

Encl: One Disk (Vol. Prod. #3)

16