IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-CV-870-CMA

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

JOHN HICKENLOOPER, et al.,

Defendants.

---

## AMENDED RESPONSE TO SECOND MOTION TO COMPEL DISCOVERY

---

Defendants respectfully submit this Amended[1] Response to the Second Motion to Compel Discovery (Doc. 5462).

### BACKGROUND and FACTS

1.      In September 2012, Judge Kane ruled Defendants are in Substantial Compliance with the Remedial Plan ("RP"). Doc. 5314. That finding triggered the two-year Monitoring Period ("MP") which commenced October 1, 2012. *Id.* at p. 4.

2.      Per the RP, Class Counsel may visit each designated facility twice during the MP. *See* RP, § XXXI (p. 28). No further formal written discovery is authorized. *Id.* Still, CDOC invited Plaintiffs to visit more often than allowed. Doc. 5448, **Ex. A-1**, Letter dated 6/10/13.

3.      From November 2010 to May 2013 (roughly 2.5 years), no visits were scheduled nor information sought. Between the September 2012 substantial compliance finding and May 2013 (roughly eight months), Plaintiffs failed to initiate a single visit.

4.      Subsequently, Plaintiffs visited the following facilities:

---

[1] Amended to comply with the Court's Order re 36 page limitation. Doc. 5479.

- AVCF: 9/16/13
- BCCF: 9/17/13
- BVCC:  8/26/13 & 5/22/14
- CCCF: no visit initiated
- CMC: 9/25/13
- CMRC:  7/20/13
- CTCF: 7/31/13
- DCC: 9/10/13
- RCC: no visit initiated

- DENVER COMPLEX:  5/9/13 (CCC only)
   7/16/13 (DWCF & DRDC)
- FCF:  9/9/13
- KCCF:  8/27/13
- LCF:  8/28/13
- PUEBLO COMPLEX: 9/18/13 (SCCF/LVCF)
- SCF: 8/7/13
- TCF: 6/17/14

Only two visits occurred in 2014 and only BVCC and CCC received more than one visit.

5.      Prior to visits, Class Members were notified. During the visit, they were excused from their jobs and programming to facilitate access. Staff was excluded from the visit to foster communication between Plaintiffs and Class Counsel.

6.      For each visit, Class Counsel received an updated "Daily Roster" detailing where each Class Member resided as well as their disability designation (hearing, vision, lower mobility, or diabetes). Doc. 5448, **Ex. A-4**, Example Daily Roster.

7.      CDOC voluntarily provided *multiple* Quarterly Reports to Plaintiffs. Each Quarterly Report contains systemic information and statistics regarding offenders received at CDOC intake, new requests for Class Member screenings, accommodation requests and litigation resolutions, correspondence, and ADA-specific grievances. There are samples of each disability category, copies of the Administrative Regulations (ARs) pertaining to ADA compliance, AIC procedural hand books, Clinical Services screening forms, templates used for litigation resolutions, and ADA training information, offender diabetic training, facility orientation, identification of facility ADA coordinators, and ADA rosters for every Class Member identifying each individual by disability and current facility. This information provides an overview of the policies, procedures, and practices implemented which documents responses to accommodation requests, accessible housing assignments,

2

transportation needs, access to health care appliances, and restrictions for Class Members. Doc. 5448, **Ex. A-3**, Example Quarterly Report; **Ex. A-1**, Disk (submitted conventionally) at First Quarterly Report 2014; *and see* **Ex. A-6**, Quarterly Report(s) Table of Contents.

8.      Plaintiffs' first set of "Monitoring Discovery" sought information regarding what systems were in place. Rather than merely list systems, CDOC provided Plaintiffs *several thousand pages* of information and examples as voluntary disclosers in a good faith effort to help Counsel(s) discharge their MP duties. The information was organized by subsection of the RP in order to facilitate readability. For a detailed listing of included information, please see **Ex. A-12**, Defendants First MP Disclosures.

9.      CDOC gave Plaintiffs a copy of the AIC *Montez* Database (*Montez* Database) which contains roughly 15,000 entries pertaining to Class Members. Doc. 5448, **Ex. A-5**, Letter dated 11/8/13, p. 2. The *Montez* Database tracks initial contacts, temporary intake accommodations, screening, and accommodation resolution status. Despite averments to the contrary, the database contains recent information relevant to the MP. *Id*. The AIC uses this database daily. *Id*. CDOC recently provided an updated copy of the database as it is constantly utilized and updated. *See* **Ex. A-8**, Disk #2.  CDOC explained how to navigate the *Montez* Database to view the most recent entries. Doc. 5448, **Ex. A-6**, Email dated 10/25/13.

10.     Defendants' Counsel met with Class Counsel(s) for nearly 2.5 hours. Prior to the meeting, Ms. Rich Fredericks made numerous written and oral requests to Class Counsel(s) for a list of questions regarding current programming and systems related to the provision of accommodations and resources for Class Members. Doc. 5448, **Ex. A-7**, Rich Fredericks Email(s). But, Plaintiffs failed to submit a formal list of questions in advance. Just

prior, Ms. Greisen emailed with a handful of broad questions. Doc. 5448, **Ex. A-8**, Greisen Email. Defendants prepared answers.

11.      Plaintiffs arrived at the meeting with a typed four-page list of questions, but refused to provide a copy. Regrettably, it is difficult to answer un-posed questions.

12.      Later, another short list of questions was sent to Defense Counsel. Doc. 5448, **Ex. A-9**, Greisen Email. Upon receipt, CDOC prepared thorough responses supported by additional documentation. Doc. 5448, **Ex. A-5**, Letter dated 11/8/13.

13.      CDOC provided responses and substantiating documents to Plaintiffs' second set of "Discovery". **Ex. A-3**, Letter dated 1/17/14. A disk with numerous folders containing hundreds of pages of information was remitted.

14.      An updated version of the *Montez* Database with entries as recent as this week was provided. CDOC delivered supplementary material and clarification to its prior responses including a DVD (a CD was inadequate to contain the information) rich with extensive data and records. **Ex. A-5**, Letter dated 8/13/14; **Ex. A-1**, Disk.

15.      Yet, Plaintiffs filed two Motion(s) to Compel Discovery. Doc. 5407; 5462.

## ARGUMENT

**I.      Plaintiffs are *NOT* entitled to discovery under the Remedial Plan and their Motion to Compel is improper.**

Plaintiffs base their motion(s) to compel upon the inherently flawed premise that they are entitled to formal written discovery. Throughout the history of this litigation, Plaintiffs insisted, and the Court consistently concluded, that the RP should be interpreted as a **contract**. Doc. 5314, p. 15 (Judge Kane noting issues between the Parties are "a matter of contract."); *and see* Doc. 4224-2, p. 2, ln. 3 (Judge Nottingham stated, "[T]his was a settlement…") An agreement to settle a federal lawsuit is a contract, governed by the

4

principles of contract law. *See Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989). **Both**

Parties are held strictly to the negotiated and codified terms of the RP. Pursuant to the plain

language of the RP, Plaintiffs' oversight during the Monitoring Phase consists *only* of the

following:

> … class counsel will monitor the designated facilities to ensure compliance is maintained during this period. During the **Monitoring Period, class counsel may tour each designated facility up to two times a year** to ensure compliance.[2]

RP, p. 28, ¶ XXXI (emphasis added). Pursuant to that clear and unambiguous language,

Plaintiffs can, and have, visited their clients. If Plaintiffs desired further, formalized written

discovery, they should have bargained for such during the negotiation of the RP. As

discussed at length in Defendants' Response to the First Motion to Compel Discovery (Doc.

5448), incorporated by reference herein, formal discovery is **not** contemplated during the

MP. Hence, Plaintiffs cannot compel CDOC to produce that to which they lack an

entitlement.

The Monitoring Period is **not** the same as, or equivalent to, the Compliance Period.

The exchange of information between the Parties during the two distinct phases should not,

nor would it be anticipated to, look the same. During the Compliance Period leading up to

the 2010 Hearings, discovery was needed to ascertain if CDOC had come into compliance.

Judge Kane ruled CDOC substantially complied with the Plan. Doc. 5314. Now, the **limited**

purpose of the twenty-four month MP is simply that – to ***monitor***.  Systemic monitoring is

best accomplished through comprehensive charts, graphs, and information which

---

[2] The Parties are in the Monitoring Period. Plaintiffs mistakenly rely upon the subsequent sentence which mentions "spend[ing] the time and resources reasonably necessary to monitor compliance **during the Compliance Period**" which specifically relates to the Compliance Period, **NOT** the Monitoring Period. *See* RP, § XXXI (emphasis added).

summarize universal efforts, and sampling, rather than reviews of individual files and spelunking through each entry into various databases.

## II.      Formal discovery is inappropriate and unnecessary.

CDOC provided and continues to provide Plaintiffs with a **wealth** of information designed specifically to aid them in their duty to monitor. The purpose of the MP is to *monitor maintenance* of substantial compliance. Doc. 5314. In light of the Court's September 11, 2012, Order finding substantial compliance, the "discovery requests" propounded by Plaintiffs may be analogized to an improper request for post-judgment discovery. "At some point … discovery must come to an end." *Silverstein v. Federal Bureau of Prisons*, 2011 WL 588717, *3 (D.Colo. Feb. 10, 2011). It seems intuitive that discovery would be foreclosed in the post-judgment MP setting. *See Brown v. Plata*, 131 S. Ct. 1910 (U.S. 2011) (Cutting off discovery and excluding evidence not pertinent is appropriate and within the court's sound discretion. Orderly trial management may require clean distinction between "litigation of the merits and the remedy.") There is nothing novel to "discover" as Plaintiffs are tasked only with confirming nothing regressed. This is the narrow and singular task of the MP. "Due process does not require that parties be allowed to present any evidence that they want to, at any time, regarding any subject matter…" *Miller v. Cudahy Co.*, 656 F. Supp. 316, 334 (D. Kan. 1987); *and see Harvey v Schoen*, 245 F3d 718 (8th Cir. Minn. 2001) (denial of discovery re potential on-going violations not an abuse of discretion).

Plaintiffs should not be permitted to obtain limitless materials and information simply because they want them. This is not the first time that a desire for excessive discovery has overtaken this case. In 2009, a Motion to Stop Discovery Requests (Doc. 4186) was file because despite the provision of some *55,000 pages* of documentation, Plaintiffs' sought more. Defense Counsel Ms. McCann wrote, "The enormous amount of personnel and

lawyer time and the extraordinary amount of money being spent on discovery in this case is outrageous. This is time and money that could be so much better spent on actually helping the disabled in prison, instead of going to lawyers… this has got to **STOP!**" Doc. 4186, pp. 4, 9 (emphasis in original). That motion was granted. *See* Doc. 4196, p. 2. In a subsequent January 28, 2010, hearing Judge Kane clarified, "Once we have that [substantial compliance], **I do not think it's going to be necessary to go through entire new waves of discovery** and keep this case going. God knows I don't want that." Doc. 4272, p. 8, ln. 6-18 (transcript) (emphasis added).

Plaintiffs have other avenues through which to obtain some of the information they seek to compel from CDOC. In their Motion(s) Plaintiffs reference "information" gleaned from unnamed persons, ostentatiously through facility visits. According to these unnamed sources, there may be residual anecdotal issues. Yet, so armed with the names of specific offenders who allege particular instances of failed compliance, Class Counsel has **never** requested information regarding any individual throughout the duration of the MP. Instead, Plaintiffs continue to seek files en masse. Requesting the single or handful of files (which CDOC would gladly provide and has previously offered), would enable Plaintiffs to investigate whether the complaint is corroborated. Absent substantiation, it hardly seems appropriate to rummage through several thousand offenders' files who did not report any problems.

Also, full and unfettered access to *every* correspondence, grievance or offender request for accommodation, and class member screenings, the *Montez* Database, Accommodation Tracking System (ATS), and the Grievance Tracking System (GTS), *plus* the files of over 5,000 individuals in search of discrete examples of non-compliance would amount to the same anecdotal and ad hoc evidence Judge Kane denounced as

inconsequential to ascertaining the reality of substantial compliance. To-date, Plaintiffs have not identified *any* area of alleged non-compliance. If they did, it would enable the Parties to work together toward an amicable resolution. Such a transparent approach would alleviate imposition on the Court's time and enable CDOC to skip to the heart of the matter and immediately address any concerns.

### III.   Plaintiffs possess comprehensive and appropriate informal "discovery" to monitor compliance.

CDOC provided a wealth of relevant and applicable statistics to enable Plaintiffs to monitor. Despite the inarguable reality that there is **no** provision for written discovery during the MP, CDOC provided significant and germane records to substantiate continued compliance. Hence, Plaintiffs have "sufficient" relevant evidence. *See Regan v. County of Salt Lake*, 2006 U.S. Dist. LEXIS 89472 (D. Utah Dec. 11, 2006).

The argument that innovation is cause for concern is a red herring. Utilization of modern technology is evidence of CDOC's systemic transformation and commitment to the RP and ADA-impacted persons. That technology evolved and was implemented, such that AIC files are stored electronically, as opposed to in paper form, is hardly a "red flag" indicative of regression. Rather, such progress is an appropriate expansion and natural evolution in record keeping which demonstrates CDOC's continual efforts to maintain compliance and utilize every available resource to provide consistency, accuracy, and the availability of information and access to disabled offenders.

The propounded "discovery" contains overbroad requests for redundant information. Plaintiffs do not need unrestricted access to every offender's file. They have been informed, *repeatedly*, through the abundant voluntary provision of information by Defendants, over the past 22 months, that the electronic files contain the same information previously found within

a paper file. Historical information was scanned into electronic form and new information is similarly added. CDOC offered on multiple occasions to provide a sampling of exemplar offender files or a reasonable number of specific files. Plaintiffs have not accepted this standing offer.[3]  Rather, Plaintiffs maintain they need **everything** for **everyone**. But the Court's finding of substantial compliance was rendered absent systemic perfection (Doc. 5314, p. 3) and clarified that sporadic failures did not remove CDOC from overall systemic compliance.

Providing everything for each Class Member is unnecessary, burdensome, time-consuming, and would operate merely to perpetuate the expense of this litigation. It is not merely the initial effort incumbent upon CDOC's resources in gathering information which such an overly broad request would burden but the time and attention reviewing such expansive and redundant information by Plaintiffs – for which they bill the State of Colorado – would be great. Inevitably, the net result of such a fishing expedition would be the discovery of the rare exception inherent in human error where a handful of individual files might lack a lone document. Again, Judge Kane ruled such omissions do not foreclose substantial compliance.

## IV.    Defendants adequately responded to Plaintiffs' requests.

CDOC maintains its commitment to voluntarily engage in informal disclosures with Plaintiffs with the caveat that they decline to provide broad, unfettered access to irrelevant systems and databases unrelated to the narrowly tailored purpose of monitoring systemic compliance. Like the defendants in *Regan v. County of Salt Lake*, 2006 U.S. Dist. LEXIS 89472 (D. Utah Dec. 11, 2006), Defendants cooperated with Plaintiffs, voluntarily providing

---

[3] In a show of good faith, CDOC selected a sampling of individual offenders' files, based upon the CC list attached to the Motion (Doc. 5462), and have provided those files to Plaintiffs.

responsive information. CDOC has not impeded Class Counsel in meeting with their clients. Indeed, Plaintiffs were invited to visit more frequently, an offer they declined.

CDOC voluntarily prepared Quarterly Report(s) documenting all major areas of the Remedial Plan and Stipulation Orders from 2006 & 2008. The AIC provided relevant policies and procedures with supporting documentation verifying CDOC's adherence to the overall intent of the plan during the MP. CDOC offered additional explanation and clarification to Plaintiffs upon request. What Plaintiffs refer to as "a few charts, graphs and spreadsheets…" (Doc. 5462, p. 2) are actually a wealth of information compiled regarding systemic compliance and how each system of compliance "currently" (Doc. 5462, p.2) operates. As Judge Kane's wrote, "…If a party has substantially performed, 'it follows that any breach he may have committed is immaterial.' *Joseph A.* at 1086 (citing John D. Calamari & Joseph M. Perillo, The Law of Contracts § 11-15, at 454 (3d ed 1987)). Accordingly, anecdotal or ad hoc evidence that a party deviated or breached specific terms of a consent decree will not, by itself, preclude a finding of substantial compliance." This information is more than sufficient to substantiate continuity both prior to and during the MP.

CDOC additionally responds to each alleged deficiency as follows:

Interrogatory #2/RFP #16:

There were, are, and **remain** separate channels and processes for ADA-specific Grievances. *See* AR 850-04 (IV)(E)(2). AR 850-04 was amended December 2012 to offer an informal resolution option. Additionally, AR 850-04 was recently amended in order to firmly clarify that offenders are **not** obliged to wait on an informal response to proceed to their Step I Grievance. Indeed, if *any* step is not responded to timely, an offender may proceed to the next step without awaiting response. *See* AR 850-04 (IV)(F)(1)(e). Since the

inclusion of the informal step, CDOC has not argued that the absence of an informal grievance would foreclose proper exhaustion.

Plaintiffs possess information sufficient to gauge how the introduction of the informal step impacted Step I behaviors. They can compare the Quarterly Report grievance charts. *See* **Ex. A-1**, Disk at First Quarterly Report 2014. But, as a sign of good faith, CDOC recently disclosed a chart showing the total number of Step I ADA Grievances filed annually between 2003 and 2014 *and* a monthly break down of Step I's for 2012 and 2013. *See* **Ex. A-2**, ADA Step I Grievance Charts. There were 172 Step I ADA Grievances filed in 2013, and there have been 74 Step I ADA Grievances filed in 2014. The charts confirm there is continual ebb and flow regarding the number of Step I's initiated in any particular month: while April 2012 yielded 56 Step I's, and April 2013 yielded fewer at 15 Step I's, September and October 2012 yielded 22 and 20 Step I ADA Grievances respectively, while the same months for 2013 increased to 24 and 30 Step I's each. CDOC disclosed an Excel Table of **ALL** ADA-M Grievances filed between November 2010 and June 2014. *See* **Ex. A-1**, Disk at All ADA-M Grieve.

<u>Interrogatory #4/ Request for Production (RFP) #20:</u>

Plaintiffs sought information regarding access to diabetic kits. Defendants responded:

Information regarding diabetic testing kit(s) access is found on the disk at sub-folder labeled "diabetes" which contains a copy of the relevant clinical standard… last updated in August of 2013. On p. 11 (at Section "F") you will find information specific to the diabetic testing kits, which are available at each facility. Please note that "rosters of inmates" are not kept as sought. Rather, information regarding when kits are used and replenished are maintained as discussed in the disclosed policy. Incident reports may also be generated.

*See* **Ex. A-3**, Letter dated 1/17/14.

Had Plaintiffs requested exemplar incident reports from Defendants *prior* to filing their Motion to Compel, CDOC would have been happy to provide copies. Indeed, copies have

now been provided. *See* **Ex. A-1;** *and see* **Ex. A-5.** Furthermore, a number of facilitates now

have 24/7 nurse care available as opposed to merely relying on a diabetic testing kit. Kits

are available throughout facilities and are sent with work crews. For clarity, CDOC listed

each facility paired with a response regarding the locations of diabetic testing kits at that

facility. *See* **Ex. A-13**, DB Testing Kit Location by Facility.

Interrogatory #5:

Plaintiffs' sought information regarding the provision of soft/medical shoes. CDOC

responded:

> Information regarding the provision of 'medical' (soft) shoes is on the disk [Disk
> Vol. Discl. #2] at 'medical shoes' sub-folder. The Excel chart therein shows
> ninety-one 'approved' requests and thirty-four 'denied' requests from fall 2011 to
> present (the Monitoring Period). Information is **not** provided for periods beyond
> the Monitoring Period. You can use this chart to glean and sort by the identity of
> the offender who made the request, when it was made, and whether the request
> was granted or denied. Please also find a copy of the relevant clinical standard,
> last updated in July of 2013, and a report broken down by facility which shows
> where each offender with such an item is housed. Please note that these shoes
> are not an ADA accommodation, rather, a clinical service medical provider
> determines whether soft 'medical' shoes are medically indicated and appropriate
> for an offender. (Int. #5)

The response clarifies that medical/soft shoes **are** provided as an accommodation.

As a courtesy, CDOC provided a random sampling of offenders both approved and denied

this accommodation. *See* **Ex. A-1** at Shoes. Each example contains the inmate's hand-

written request and copies of the corresponding approve/deny report. Defendants reiterated,

"[a]t any time you are more than welcome to request information regarding *specific*

offender's denials."  *See* **Ex. A-5**. CDOC also provided a 21 page medical report broken

down by facility which details all inmates with soft/medical shoe accommodations, the

corresponding clinical standard, and an Excel Table searchable by inmate name and

number which showed 90 approvals and 53 denials including where and when the determination was made *See* **Ex. A-1** at Shoes.

Interrogatory #6:

CDOC provided information regarding use of Offender Care Aides (OCAs). *See* **Ex. A-3**, Letter dated 1/17/14. The AR explains in detail what services an OCA may perform. Defendants provided an Excel Chart detailing Class Members' requests for OCA care. Plaintiffs *never* followed up to request more specific information regarding why any individual was denied an OCA. Class Counsel was certainly free to inquire of their clients during their facility visits why someone was denied an OCA, or the name of the client's assigned OCA. Defendants also provided copies of trainings provided to OCAs.

CDOC recently confirmed that OCA III trained offenders are assigned to the CTCF infirmary, DRDC infirmary, and Special Medical Needs Unit. The training provided to COA IIIs is more extensive due to their area of assignment. They receive three days of supervised, hands-on experience in the infirmaries/SMNU. This performance must be safe and satisfactory, to obtain the OCA III certification. *See* **Ex. A-5**, Letter dated 8/13/14. Copies of OCA I-III training PowerPoint Presentations for 2012-the present, copies of corresponding attendance rosters for OCA trainings, and examples of the tests administered to OCAs have also been provided. *Id*; *and see* **Ex. A-1**, Disk at OCA.

Interrogatory #7:

The 2008 Stipulation referenced by Plaintiffs pertains *solely* to the percentage of single-cells at **CTCF** equipped with strobe lights. *See* 2008 Stip. (Doc. 3322-1 at point #17). It did not exempt physical plant issue as to other facilities and strobe lights. When quoting from the 2008 Stipulation, Plaintiffs failed to include the precatory language, "All hearing impaired inmates **who are housed at Colorado Territorial Correctional Facility**…"  Doc.

3322-1, p. 4 (emphasis added). Thus, CDOC's position did *not* lack merit as Plaintiffs allege and it is Plaintiffs who are mistaken in seeking information as to other facilities additions of strobe enabled cells. To the extent Plaintiffs wish to inquire into the *narrow* matter of the number of single-cells equipped with strobe lights at **CTCF**: **the percentage of strobe equipped single-cells at CTCF is 73.9%**. To the extent Plaintiffs seek information regarding "accessibility requirements" (Doc. 5462, p. 13) of newly added cells, that specifically pertains to physical plant issues not under review.

Requests for strobe-equipped cells are infrequent. It is likely because in a correctional environment, freedom of movement is restricted and when permitted for evacuation or otherwise, staff is responsible to alert, engage, and controls the movement. When the AIC receives an offender request they complete a case-by-case assessment, hearing testing is requested if necessary, and the relevant criteria applied.

In most cases, AIC or Clinical Services *automatically* adds "cell with strobe alarm when independent egress" as a housing restriction when indicated, without the offender requesting it. However, it is an accommodation option in ATS and is addressed when requested. It is otherwise considered a *housing restriction* since not all CDOC cells have a strobe nor are they required, so it has a "restrictive" effect as opposed to an accommodation which fosters access and integration as required by the ADA, and is therefore reviewed carefully and generally documented in an offender's housing restriction. This restriction can be added by the AIC or Clinical Services. Any cell with strobe "approved" on the ATS Report is reflected in the housing restriction reports. Denials occur when the offender does not meet the criteria outlined in the "AIC orientation checklist & info" document. *See* **Ex. A-1**.

CTCF, SCF-Minimum, AVCF*, CMC, BVMC, LVCF, CCC are the only designated facilities where offenders have free egress from cells. The names of offenders at each

facility approved for cells with strobes were provided. Despite the fact that only CTCF's strobe lighting in single-cells is at issue, CDOC delivered information regarding offenders at multiple facilities with copies of exemplar requests and responses, with a chart showing 17 approvals and approximately 20 denials broken down by offenders' name and CDOC number. *See* **Ex. A-5** at Strobes.

Interrogatories #8-9/RFP #21:

Plaintiffs seek information which is beyond the finite time frame of the MP, which Judge Kane ordered commenced **October 1, 2012**. Doc. 5314, p. 4. Thus, there is no need to evaluate information from November 1, 2010, which pre-dates the commencement of the MP. Furthermore, CDOC already provided information covering all of 2012 and 2013. *See* **Ex. A-3**, Letter dated 1/17/14.

CDOC replied:

Information regarding the usage of sign-language interpreters is found on the attached disk within the 'sign language' sub-folder. Within an interior sub-folder you will find invoices for interpreter usage for both parole and CDOC for the period of January 2012 to present. A second interior sub-folder contains copies of the approximately five ASL denials (six are shown but one denial was predicated upon the fact that the request was duplicative) and the reasons therefore, spanning the same, relevant, time period. Defendants further provide an exemplar ATS report for Offender Gallegos to show ongoing use of interpreters and the number of requests (274) made for that individuals offender in a single year and to-date (364) as well as a comprehensive Excel chart which shows approximately 1,305 approvals for 2012 and 2013. (Int. #8-9, RFP #21)  Please note that this request was very broad and voluminous but has been provided.

CDOC provided an updated list of deaf offenders which may be cross-referenced with the disclosed interpreter requests. *See* **Ex. A-1**; *and see* **Ex. A-14**, Deaf Offenders List. What is more, during Class Counsel's facility visits sign language interpreters were provided as needed, thus, they know which Class Members required service(s). Previously provided information designated on what dates interpreters were used and whether it was for parole

or CDOC. Plaintiffs can ascertain to whom services are rendered and when from the 1,300+ entries on the Excel Chart. *See* **Ex. A-1**, Disk. They can also ask their clients for specific information. Moreover, a review of the receipts for interpretation services provided shows services for a range of activities, including "revocation hearing," "case manager meeting," "treatment," etc. *See* **Ex. A-7**, Example ASL; *see also* **Ex. A-1**, Disk at ASL Use (several dozen receipts).

Interrogatory #10:

It is unclear why Plaintiffs allege baldly without *any* evidence that they "have reason to believe that DOC is not appropriately providing or replacing DME." Doc. 5462. It would be helpful to know what items were allegedly not replaced, or who is in need, so that an investigation could be undertaken and any deficiency remedied to ensure all Class Member(s) have their needed equipment. At *no point* during the MP have Class Counsel(s) followed up on **any** Class Member's behalf regarding an alleged failure to provide medical equipment. Consequently, it appears that there is neither smoke nor fire to this allegation.

Plaintiffs are **fully aware** that CDOC compensates offenders for delays. Previously, a chart detailing replacement equipment delay was provided detailing who reported a delay, when, regarding what items, the resulting investigation, and the sum of compensation provided to compensate substantiated delays. This chart is updated and provided with *every* Quarterly Report. *See* **Ex. A-10** Quarterly Report(s) Disk. Thus, it is disingenuous to suggest such information was not provided or was provided for *only* three months' time. In a demonstration of its continued good faith and fair dealing, CDOC further provided a comprehensive chart listing DME replacement delay refunds for June 2008 through May 2014. *See* **Ex. A-1**, Disk at DME Rep Ref.

Interrogatories #11-13:

16

Plaintiffs are aware of how CDOC is "collecting, maintaining, and verifying information related to its obligations under the Remedial Plan." Doc. 5453, p. 15-16. Every three months Plaintiffs receive a summary of that precise information via a Quarterly Report. CDOC enumerated the broader systems utilized as a part of this process through its voluntary disclosures and responses to Plaintiffs' numerous questions and document requests. *See* **Ex(s) A-1, A-3, A-5, A-6, A-8, A-9, and A-10.** To clear up any residual confusion, CDOC further responds:

**Response to Interrogatory 11**:  Offenders are provided a copy of their ADA Litigation Resolution identifying all health care appliances & medical restrictions they are authorized as a result of any class member screening. Offenders may already be in possession of the HCA and/or have previous authorization for restrictions through clinical that are identified on the offender's property (if permanent) and/or receipt of a medical pass depending upon each facility's operational needs. Offenders receive a copy of their ADA Request Approved/Denied Report from the AIC through either the facility ADA coordinator or their case manager. Offenders may contact the AIC directly to request a copy of either their litigation resolution (ALR) or ADA Request Approved/Denied Report.

**Response to Interrogatory 12**:  CDOC staff can obtain information about class member ADA accommodations & their resolution via the CDOC intranet (DOCnet) by signing into the Offender Portal and entering their identification number. The offender's profile will then be populated. Staff can view their class member status along with any health care appliances and medical restrictions under the green Medical caduceus symbol and/or their ADA accommodations under the blue wheelchair icon. Staff may find the same information populated in the PCDCIS database under the Admission & Data Summary by clicking on the offender's Medical/dental code (to view class member status/HCA/Medical restrictions) or the ADA alert code (to view ADA accommodations). Because ATS is a newer system that began Jan. 1, 2012, and the implementation of the Offender Portal system in February 2012, the AIC provided additional training for *all* staff to locate the ADA and litigation information (*See* memos sent to ALL staff dated 11/3/11 (sent 1/1/12); 2/7/12; 2/15/12; 2/27/12). ADA training is MANDATORY for all state & private facilities. Every new staff member receives a basic training module and a yearly refresher that includes specific information on where to locate the offender's accommodations and class member status/HCA/medical restrictions. Staff are also informed they may contact the facility ADA coordinator and/or the AIC directly to verify or clarify any information pertaining to disability accommodations or class member status.

**Response to Interrogatory 13**:  This information is verified at point of entry by AIC staff. AIC staff are the **only** staff who have access to populate the offender's profile for class member status & HCA/medical restrictions authorized through the screening process or

ADA accommodations entered through the ATS system. No other staff can alter ANY information in either of these systems. The AIC (Keith Nordell & Julie Russell) are the only staff who can authorize computer access approval for either ATS or the *Montez* Database, which are the only two entry points into the accommodation and screening systems. Facility ADA coordinators have permission granted by the AIC to "read only" computer access for the internal ATS system and the *Montez* Database through PCDCIS. They do not have access to enter or alter information.

*See* **Ex(s) A-1**, Disk at Train Staff *and* **A-5.**

Interrogatory #14:

CDOC previously disclosed information regarding CI job opportunities:

Please find information regarding CI job availability at each facility attached at the document named 'Offender Workload Report' which is current as of November of 2013. (Int. #14-17 – These requests are *very* broad, however, Defendants provide the above in an abundance of good faith.)

*See* **Ex. A-3**, Letter dated 1/17/14; **Ex. A-9**, Disk of Voluntary Disclosures 2.0.

CDOC's affirmative efforts to ensure equal access to assignments include:

- Policy: AR 750-04, 850-04, 850-03 *See* **Ex. A-1** Disk at ADA Regs.
- Training: Basic Training (training academy upon hire); ADA annual refresher training; roll call trainings; written releases/communications (*See* RFP 12)
- Meetings/communications with Facility ADA Coordinators (*See* RFP 12)
- ADA audits (*See* RFP 9)
- *See* Interrogatories 15, 16, 17 Responses which include reports of responses to grievances alleging assignment discrimination; Class Members' assignment history; ACA (American Correctional Association) ADA documents about non-discriminatory assignment processes; and Class Member CI assignment report.

Interrogatories #15-16:

Defendants provided information regarding the policies that govern access to

Correctional Industries positions for Class Members. *See* **Ex. A-3**, Letter dated 1/17/14.

CDOC confirmed that Class Members are presently employed by CI. Once more, if Plaintiffs

had simply come back after review of what was previously provided and made tailored

requests, CDOC would have been happy to work with them. Additional information has now

been provided. *See* Interrogatory 17 Response(s) for CI job information and explanation of offenders' opportunity to compete for jobs, request accommodation, and option to grieve upon denial/termination. *See* **Ex. A-1**, Disk at CI (ACA files for standard 4-4448: *The institution maintains a written plan for full-time work and/or program assignments for all inmates in the general population. The plan also provides for employment for inmates with disabilities;* ACA files for standard 4-4451:*The institution provides a variety of work assignments that afford inmates an opportunity to learn job skill and develop good work habits and attitudes that they can apply to jobs after release; see* Assignment Accommodation Report; *see* Grievance Report regarding assignment discrimination; *and see* assignment history of exemplar Class Members.

Interrogatory #17:

The provided report (which contains 30,000+ entries) shows Class Members working in CI jobs across CDOC which is evidence of non-discrimination and compliance with governing policies. *See* **Ex. A-1**, Disk at CI. Previously provided information clarified which jobs are currently available. By policy, *all* offenders must maintain an assignment with few exceptions, and are provided the opportunity to apply and compete for assignments regardless of disability. In order to be placed in an assignment, offenders must meet the minimum eligibility requirements no different than applicants in employment settings under ADA Title I. Some offenders may opt not to compete for certain CI positions and discrimination becomes a moot point. The report reflects that the opportunity to work in CI positions is afforded those who chose to compete and were determined eligible.

The reason a particular individual was denied an assignment can only be researched on a case-by-case basis. It is incumbent upon the offender to file a grievance pursuant to AR 850-04, which the AIC would investigate and remedy, if necessary. Again, if there is a

19

specific Class Member, Plaintiffs would like to request information with regards to, CDOC would be glad to work with them.

If an offender requires accommodation to access their job, it is incumbent upon him/her to so indicate on the job description form, verbalize the request to staff, or contact the AIC, in accordance with AR 850-03. (*See* Interrogatories 15-16 Response which includes ADA Assignment Discrimination Grievance Report located at **Ex. A-1**, Disk at CI.) All staff participate in ADA training upon hire, annually, and are required to comply with non-discrimination and equal opportunity policies. (*See* RFP 12).

Interrogatory #18:

Again, Plaintiffs allege unnamed persons lack needed accommodations. Doc. 5462. But, Class Counsel has *never* approached the AIC to follow up on behalf of **any** of these allegedly deprived individuals, nor is it clear whether in individuals themselves requested or followed up on a request for accommodation. Certainly, the AIC would love to know who is in need so that they may help *solve* the problem. Plaintiffs hardly need to dig through copious documents to help an aggrieved Class Member obtain accommodations. Alternatively, Plaintiffs could request a subset of files to investigate alleged deficiencies. They have not. Instead, Plaintiffs maintain they need copies of **every** file, which is truly overbroad and unduly burdensome, in addition to being irrelevant.

Defendants previously responded:

Information regarding what accommodations are within the AIC's authority versus clinical and medical equipment as provided by clinical services may be found in CDOC policy including AR 750-04 and AR 700-34 (available on CDOC's website and previously provided). Please also find relevant information contained within the clinical standard which governs the provision of health care appliances, located on the attached disk within sub-folder 'medical shoes – HCA.'  (Int. #18)

*See* **Ex. A-3**, Letter dated 1/17/14; **Ex. A-9**, Disk at Medical Shoes – HCA; *and see* **Ex. A-1**, Disk at HCA.

CDOC is required by law and as a matter of policy to separate ADA accommodations from medical treatment and health care appliances. While the ADA is a civil rights law to protect individuals from discrimination based on disability, it does not address the right to health care treatment. Instead the Eighth Amendment confers separate rights to appropriate medical treatment. The Tenth Circuit held that the ADA does *not* have authority to review claims of substandard medical treatment. *See Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005) (claims for substandard medical treatment cannot be pursued under the ADA); *see also* Order finding Substantial Compliance, ("Even if the DOC has deviated from or failed to perform some of these performance criteria, it may still be found to be in "substantial compliance" if it demonstrates that none of the deviations or failures, individually or as a whole, materially adversely affected, or frustrated, the Plan's essential purposes.")

CDOC maintains separate functions for each department and while they may have some overlap or require coordination, it is necessary and essential to maintain separation of duties *e.g.* AIC coordinates requests for accommodation, responds to and investigates claims of discrimination; whereas Clinical Services is responsible to assess and authorize medical care, to include but not limited to health care appliances, medical restrictions (housing/work), medication and treatment plans. This does **not** mean that Defendants "eviscerate(ed)" Judge Kane's orders, as Plaintiffs suggest. *See* Doc. 5462. Rather, it means there is *increased communication* between the AIC and Clinical Services to ensure all needs are addressed efficiently and appropriately.

The AIC works closely with Clinical Services to ensure that any restrictions do not result in discrimination due to a medical condition *e.g.* lower bunk restriction by clinical means the AIC ensures offender's programs are available on lower level of facility. Another analogy they use to describe their joint effort is when medical restricts an offender the AIC works with clinical and the offender to determine what type of accommodation may be needed to ensure equal access to programs, services, and activities. So, if clinical restricts an offender to "no stairs," the AIC ensures alternative means is provided *e.g.* elevator access. When medical determines a restriction is necessary for the offender's health, the AIC provides accommodation to ensure equal access and effective participation. AIC staff are not able to complete medical assessments. But, the AIC works with Clinical to ensure offenders are not discriminated against or prevented from access/participation.

The ADA Montez screening system requires the AIC to make the final determination for Class Members who request lower mobility, hearing, vision, or diabetes screening. Initial screening determines current health care appliances, medical restrictions and disability status for class members; follow up requests for additional HCA/restrictions are generally referred to Clinical Services who are trained medical experts and have authority / responsibility under policy and law to assess medical needs.

Offenders often "shop" the AIC for requested medical care, medication, health care appliances and restrictions which Clinical Services denies as medically unnecessary. The grievance and appeal system is in place for offenders to request secondary claim review. AIC staff are not trained or licensed to practice medicine.

The AIC works closely with Clinical Services when referring offenders for follow up care and treatment. They do not just drop the issue without following up *e.g.* offender with prosthetic leg filed ADA grievance to request additional socks for his stump; this was denied

22

by the AIC as not being a discrimination/ADA issue and immediately referred to Clinical Services. The AIC contacted the Chief Medical Officer who agreed to provide additional stump socks to the offender and notified the AIC when it was resolved. *See* **Ex. A-1**, Disk at HCA (re Toliver 159844); *see* AR 700-01(Responsibility and Organization of Clinical Services) – for authority/responsibility of Clinical Services to provide medical treatment, AR 700-02 (medical scope of service) & 700-34 (Health Care Appliances; *and see* Clinical Services standards for treatment for procedure.

Interrogatory #19:

Defendants explained accommodation items come from the AIC while medical equipment comes through Clinical Services. The latter would go through a potential insurer, while the former would not. Some items do not go through any insurer. For example, a lower bunk or tier would simply be approved internally and not subject to third party administrator (TPA) review. To be clear regarding what would occur in the case of a denial by an insurer; Defendants clarify that when the TPA for CDOC denies approval to pay for an accommodation for a clinical or medical device for a Class Member, CDOC requests a reversal of denial. If the device is not a covered benefit through the TPA referral process then Clinical Services is responsible to order and pay for the device through their operations budget. No one is forced to "go without."

For example:

• Pittman #87966 was initially denied a larger wheelchair by the TPA as not medically necessary and instructed to lose weight. CDOC overturned the denial. The wheelchair was approved and ordered;
• Bellm #87134 had his wheelchair maintained and repaired since 2010 on a regular basis. This has been done 14 times since 2010; and
• Salazar # 87966 had his wheelchair repaired although no authorization number appears in the consult system. There is documentation in the TPA system that this has been approved and completed.

The health care practitioner has the authority to approve medical/housing restrictions based on a physical exam and medical needs. The Chief Medical Officer has the authority to review the electronic health record and alter medical/housing restrictions on a yearly basis. *See* **Ex. A-5**, Letter dated 8/13/14. It bears repeating that this is not a case regarding medical or Eighth Amendment claims and is so limited by the *Fitzgerald* decision. Thus, information pertaining to medical matters is beyond the ambit of review.

Interrogatory #21:

Plaintiffs allege unnamed Class Members were denied equal access. Doc. 5462, p. 19. Yet, Class Counsel has **not** articulated this concern to the AIC, generally, or on behalf of any particular offender. CDOC works diligently to maintain compliance and move forward with providing exemplary accommodations and access to incarcerated persons. It would benefit all Parties if an alleged deficiency arises, Plaintiffs *shared* concerns in real time with CDOC to facilitate remedies. Nebulous allegations in pleadings do not enable the AIC to help problem solve on a class member's behalf.

CDOC previously responded regarding the Incentive Unit at CTCF:

Information sought… may be found on the attached disk under sub-folder "incentive unit" and includes Implementation and Adjustment 650-001, which was last updated 09/15/13. This document provides *very* detailed information regarding benefits which include, but are not limited to, food provided and prepared by the culinary arts program, extended canteen purchasing, extra bedding, access to common area items such as electronics and books, first release during movement, and interlibrary loan for movies and music among other additional privileges. The IA further provides that the relevant units are Cell House 1 3-4 Left, Cell House 7 1-2 Left, and Cell House 3 B Upper Floor. Please also find attached in hard copy, a chart with ADA-M identified inmates presently enrolled in the program highlighted. Finally, there are seven wheelchair accessible cells in CH 7, 1 Left. As of 01/17/14, six of those are presently occupied by ADA-M identified inmates. The seventh is occupied by an inmate who recently progressed from using a wheelchair and will transition into another cell once one becomes available. (Int. #20-21, RFP #22).

Defendants also provided an updated copy of the IA, a list of incentive unit members by living unit as of June 30, 2014, which clearly denotes when each person moved into the unit, and a copy of the waitlist as of June of 2014. *See* **Ex. A-1**, Disk at Incentive.

Interrogatory #22:

> CDOC provided data regarding jobs and programming at DRDC and La Vista:

> Info[]… is… attached… located within sub-folder labeled 'assignments'. [*See* **Ex. A-9**] There are three Excel sheets (DRDC, La Vista, and DWCF) which delineate information sought regarding available jobs and programs and the current enrollees for each by facility. (Int. #22).

In early 2014, CDOC provided lists of offenders' assignments at DRDC and LVCF. Plaintiffs complain these lists do not delineate Class Members.  However, CDOC provided the daily roster and *Montez* database *many* times which reflects *all* Class Members. Plaintiffs simply need to compare the two lists. Plaintiffs can cross-reference the system-wide list of Class Members broken down by facility which they were provided prior to every facility visit over the past 22 months. Alternatively, the *Montez* Database, which they consistently dismiss as not helpful, contains a list of Class Members. Armed with this list of Class Members to compare against the provided information, Plaintiffs may determine what percentage of participants are Class Members. Once more, the alleged "complaints" raised in the Motion have never been brought to CDOC's attention in any proactive effort to address and resolve the alleged issues for the Class. *See also* Interrogatory 17 Response which explains all offenders have opportunities to compete for jobs, request accommodation, and the option to grieve upon denial/termination.

In response to Plaintiffs' demand for information on requests for assignments, date of assignment, and reasons for denial, please *see* Interrogatory 15/16 Responses and the documents produced therein. In response to those requests, ACA files were provided from

various facilities, including LVCF and DRDC, for the standard 4-4448: *The institution maintains a written plan for full-time work and/or program assignments for all inmates in the general population. The plan also provides for employment for inmates with disabilities*; and for standard 4-4451:*The institution provides a variety of work assignments that afford inmates an opportunity to learn job skill and develop good work habits and attitudes that they can apply to jobs after release.*

Defendants further provided exemplar assignment history files for Gregory 43491 (DRDC) and Martinez 157805 (LVCF). *See* **Ex. A-1**, Disk at Interrog 22.

RFP #2:

It is disingenuous to suggest Plaintiffs only became aware of AIC electronic file contents in November 2013. Doc. 5462, p. 20. Plaintiffs were consistently informed the electronic files are largely mirror images of the former paper files which are stored electronically to increase accessibility and to occupy less space, much like files are kept in a modern law office.

Plaintiffs seek AIC electronic files, including AIC worksheets for **all** inmates who requested Class Member status since November 10, 2010. Class Counsel(s) incorrectly represents that this is critical to determine the "identity of class members." But, CDOC disclosed the identity of Class Members time and time again through the ADA daily roster which Counsel(s) were free to request at any time, and the *Montez* Database. Plaintiffs represent the AIC files contain the most comprehensive information about an inmate's ADA accommodations. This is inaccurate since the implementation of GTS (July 2011) and ATS (January 2012). Most of the grievance and accommodation-related records and notes are stored in these new electronic systems. Also, the majority of the AIC files were previously produced during pre-compliance hearing discovery.

It remains CDOC's position that individual file review does **not** support monitoring of systemic compliance, and that Plaintiffs are merely fishing for individual, anecdotal issues which is contrary to the Court's prior ruling and an unduly burdensome request on Defendants. If Plaintiffs want to discuss and collect individual concerns, they can do so through facility visits with their clients and written and telephonic communications.

In good faith, CDOC repeatedly offered a sampling of Class Member files for Plaintiffs' review. This offer was not accepted. Defendants now simply affirmatively provide a sample of new Class Member AIC files for review. CDOC also continues to honor their offer to provide specific AIC files upon request to resolve individual complaints or concerns. To date, Class Counsel has **not** made such a request.

CDOC also offers a sample of ADA Audit Reports from 2010 to present, a system-wide facility auditing system the AIC developed back in 2010 in collaboration with the American Correctional Association (ACA). AIC staff visit nearly every facility annually during the ACA internal audit, touring the physical plant, meeting with and educating staff, speaking with offenders, and auditing ACA file documentation, to monitor and ensure ADA and litigation compliance. Audit tools have were provided to Plaintiffs, however, they have been included again, as well as the historical audit tools. The AIC has also worked closely with parole and community, providing ADA training and visiting community corrections facilities. *See* **Ex. A-1**, Disk at ATS.

RFP #3:

Plaintiffs seek written orientation materials. Doc. 5462, p. 22. They were provided the orientation materials for DRDC which stands for Denver Reception and Diagnostic Center. DRDC is the hub through which **all** offenders enter CDOC and are oriented.

The AIC has voluntarily provided documentation throughout the MP with the coordination of the Quarterly Report to identify how and when offenders are notified of their rights under the ADA and the RP. Quarterly Reports (deemed inadequate by Plaintiffs) provide copies of AR 850-07-Offender Orientation along with copies of the DRDC and YOS facility orientation hand books. These are representative samples from the **only** two intake facilities. **Every** new adult offender must enter CDOC through DRDC and youth sentenced directly to YOS must go through YOS intake. As such, these are representative facilities that provide clear systemic documentation regarding the continuation of notice of rights under the ADA. Furthermore, all offenders are obliged to read and follow all CDOC ARs, accordingly AR 750-04 attachment "E" includes an "Offender Notice Under the Americans with Disabilities Act" and provides additional information to offenders regarding the ADA and Remedial Plan processes to request accommodation and Class Member status.

Offenders are required to view the ADA video at intake during their initial assessment on Day One. **Every** new arrival undergoes a medical intake screening and is affirmatively offered the opportunity to request a Class Member screening. As part of this assessment process, a determination of medical restrictions and housing assignment needs is completed and identification of ADA accommodations is made. This process has been in place since *prior to* the 2009 compliance hearings with very few procedural changes. Judge Kane recognized CDOC to be in substantial compliance in this area in particular. Notwithstanding, CDOC maintains a basic orientation and information regarding offender ADA rights and availability to request a class member screening at **every** facility. CDOC provided additional documentation from facility orientation policies and pamphlets as a showing of good faith. *See* **Ex. A-1**, Disk at Regs (*See* file for facility IA's for 850-07 & ARs

850-07 (Facility Orientation) & 750-04 ADA-Offender Request for Accommodation) *and* at Orientation.

RFP #4: A/Rs and Implementation Adjustments (IAs):

**All** ARs are available at http://www.doc.state.co.us/administrative-regulations. Furthermore, CDOC provided courtesy copies of all ADA relevant ARs to Plaintiffs. *See* **Exhibit(s) A-1, 3, 5, and 6**. Facilities are not required to promulgate an IA for every AR. Some opt to, while others do not. Copies of approximately 1,700+ current and historical ADA specific ARs and IAs were provided. *See* **Ex. A-5** Disk at Regs.

RFP #5:

Plaintiffs requested the electronic files for all 5,000+ offenders (*see* RFP #2 Response) to which Defendants maintain their position that providing copies of **every** kite/correspondence or AIC file would **not** support systemic monitoring. Most offenders do not submit kites to the AIC, as this is a document generally used within the individual facilities. Accordingly, the number of correspondence(s) the AIC received has dropped by more than 1/3 from 2010 to 2013 with a continuing downward trend. A sample of AIC electronic files has been provided to Class Counsel in response to RFP #2 which also represents the limited number of kites/correspondence received in the AIC office.

A more appropriate methodology for review of systemic compliance monitoring may be gleaned by requesting core samples as provided in the responses to Plaintiffs' demands. This information may be chosen randomly or selectively from the Class (*see* Daily ADA Rosters) and is available in the Quarterly Report(s) or upon request. *See also* **Ex. A-1**, Disk at Kites.

RFP #6-7:

CDOC objects to the carte blanche approach requesting "all information in the Accommodation Tracking System…" Doc. 5462, p. 23. This is hugely overbroad. This system tracks non-class members and other types of disabilities beyond the four at issue here. Defendants previously provided the *Montez* Database which covers this request and includes Class Members' RFA. *See* **Ex. A-8**, Database (updated).

CDOC provided graphs broken down by accommodation and/or equipment type which show approvals versus denials. *See* **Ex. A-4**, Graphs by Accommodation; *and see* **Ex. A-1**, Disk at ATS. Also, please see response and documents for RFP #2, which is duplicative and overlapping with this request. Copies of requests are also found within the exemplar files provided.

RFP #8:

This is a duplicative request for copies of the contents of 5,000+ offenders' files. It is overly broad and unduly burdensome. Copies of template forms were provided. Now, copies of exemplar forms which demonstrate the movement through the process are provided. *See* **Ex. A-1**, Disk at ALRs. CDOC maintains its standing offer to provide a reasonable number of specific files. In light of the fact that Plaintiffs have never availed themselves of this option, Defendants provided a random sampling.

RFP #9:

Defendants previously objected in full to this request. However, in furtherance of fostering open and transparent dealing during the MP, they now provide examples of extensive ADA audits reports, from 2010 to-date, from the designated facilities. *See* **Ex. A-1**, Disk at ACA Audit (approximately 400 items). Also included are audit tools and some supporting information. The ADA audits are a collaborative effort with the ACA manager and her team. AIC staff participate in the physical plant tour and audit a selection of the ACA

files (see audit file review tool), reviewing documentation to ensure compliance with the ACA standard, ADA, and ADA litigation.

RFP #10-11:

CDOC responded: Information as to all approved and denied reports re accommodations has been provided attached at 'ATS approve-deny reports'. (RFP #10-11)." *See* **Ex. A-3**, Letter dated 1/17/14; *and see* **Ex. A-9**, Disk re Voluntary Disclosures 2.0. Accordingly, a record summary of *all* such decisions was provided. Plaintiffs summarily dismiss these detailed Excel Charts with over 3,000 entries as "worthless". Plaintiffs *never* subsequently requested any specific individual's approved/denied reports. Again, they seek all records for all persons for the entire MP as well as the two years prior to the October 1, 2012 beginning of the Monitoring Period.

This request is duplicative of the information sought by Plaintiff's in RFP #2, 5, 6, 7. The ATS system originated January 1, 2012 (not November 1, 2010) therefore **NO** "Request Approved/Denied Reports" or "Offender Accommodation Reports" are *available* prior to 1/1/12. But, CDOC provided exemplar request reports from SCF and CTCF, from January 2012 to-date, which reflect each request, the outcome, and if denied, the rationale.

Plaintiffs received the Quarterly Report(s) identifying Class Members and additional information as an example of a core sample demonstrative of systemic compliance. This is more probative that an anecdotal fishing expedition through individual files. To the extent Plaintiffs wish to request and review a *reasonable* sample of individual AIC files, ATS files, ADA litigation Resolution screening & results, correspondence, grievances, and policies and procedure, CDOC affirmatively provides this same information for a reasonable sub-set of files in addition to a comprehensive listing of outcomes. *See* **Ex. A-1**, Disk at Approve.Deny.

If a Class Member does not know what their accommodations are, they are welcome to request a copy of their Accommodation(s) at any time, touch base with Clinical Services, and/or the AIC.

RFP #12:

CDOC provides extensive information regarding the initial, annual, and on-going training for all staffs including case managers and parole personnel. *See* **Ex. A-1**, Disk at Training (190 documents including a video clip and PowerPoint Presentations).

RFP #13-15:

Despite the baseless allegation to the contrary, CDOC has **not** changed grievance tracking policies making it more difficult to track ADA grievances: ADA grievances are still designated accordingly and distinguished from other grievance subject matters. *See* AR 850-04.

The Quarterly Reports show information regarding every ADA Grievance filed within a three month period which provides appropriate systemic information regarding this portion of the RP. CDOC recently provided an Excel Chart containing data about **all** ADA litigation-related grievances filed by Class Members since November 2010. *See* **Ex. A-1**, Disk at GTS. One sheet is July 2011 to-date reflecting data from the newly developed Grievance Tracking System (GTS). (Note: Some grievances appear extremely past due but are not in reality. These are system entry errors (grievance is entered twice, voided, or has to be re-entered due to incorrect assignment) which causes the grievance to be incorrectly reported as overdue/not responded to). The second sheet is November 2010-June 2011 which contains data from the prior grievance database. CDOC does not retain informal grievances in GTS or elsewhere. *See* AR 850-03. Informal grievances are just that: *an informal process*

*to engage offenders and staff in communication to resolve issues timely and efficiently without having to utilize the formal steps.*

RFP #17-18:

Defendants maintain that this request is overly broad and unduly burdensome. Furthermore, CDOC believes it is adequately addressed by the previously disclosed *Montez* Database. However, Defendants provided an Excel Chart containing over 16,000 entries along with 57 scanned copies of documentation submitted related to the disability determination making process. *See* **Ex. A-1**, Disk at Documentation.

RFP #19:

CDOC responded:

Defendants decline to provide "all information contained in the ATS Database since November 1, 2010 to the present concerning all class members" for a number of reasons. First, this request is duplicative and has been previously made and denied. Furthermore, as explained multiple times, the ADA Montez database is more appropriate as a resource for *Montez* class member information. You have previously been provided this database. Accordingly, the request is overly broad and unduly burdensome and seeks information on individuals not party to this litigation. Moreover, it seeks information beyond the scope of the monitoring period. Finally, as has been previously disclosed ATS went live 01/01/12, thus, it is utterly impossible to provide information from a system which pre-dates its existence. Despite these issues with the request, you have been provided large amount of information from ATS on the attached disk including approved and denied reports.

*See* **Ex. A-3**, Letter dated 1/17/14.

A request for "all information contained in [ATS]" **is** hugely broad and unduly burdensome. However, Defendants further provide, as a sign of good faith, ATS extracted information for SCF (showing 183 RFA) and for CTCF (showing 1,438 RFA). *See* **Ex. A-1**, Disk at ATS Data.

**V.   Plaintiffs' reliance upon law relevant to the PLRA-styled termination of a consent decree is misplaced: the Remedial Plan is a self-terminating *contract*.**

Plaintiffs rely upon the law cited in their First Motion (Doc. 5448) for the proposition that discovery should be provided. Such reliance is misplaced. The cases cited by Plaintiffs pertain to *termination of consent decrees under the PLRA* where defendants were obliged to file a motion to terminate monitoring. *See Skinner v. Uphoff*, 410 F. Supp. 2d 1104 (D. Wyo. 2006) (Defendants' obliged to file a motion to which Plaintiffs needed information to respond). The instant matter is distinguishable. The *Montez* Remedial Plan is a **contract** between the Parties. *See* Doc. 5314, p. 15 (Judge Kane noting issues between the Parties to be "a matter of contract."); *and see* Doc. 4224-2, p. 2, ln. 3 (Judge Nottingham stated, "[T]his was a settlement…") An agreement to settle a federal lawsuit is a contract, governed by contract law. *See Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989). Moreover, in *Regan v. County of Salt Lake*, 2006 U.S. Dist. LEXIS 89472 (D. Utah Dec. 11, 2006) a consent decree was terminated absent the submission of additional evidence and that court declined to follow the court in *Ginest v. Bd. Of Cnty. Comm'rs*, 295 F. Supp. 2d 1274 (D. Wyo. 2004) (discovery granted re specific allegations of current, on-going violations).

Pursuant to the plain language of the contractually binding RP agreed to by the Parties, "[o]nce the monitoring period is complete, **this Plan is no longer in effect** unless, prior to the completion of the monitoring period, there has been an objection filed [by Plaintiffs] alleging non-compliance." *See* RP § XXXI, ¶ 2 (p. 28) (emphasis added). Judge Kane confirmed the Plan will **automatically self-terminate** and wrote, "after [the compliance and monitoring periods] it would be dismissed, *sua sponte*, with prejudice." *See* Doc. 5314, p. 2 (citing RP at §XXXVI.B.). His Honor further wrote, "[t]he two-year Monitoring Period triggered by a finding of "Substantial Compliance" shall commence on October 1, 2012, **after which the Plan will go gently into its good night and the case dismissed**." *Id.* at p. 4 (emphasis added). Thus, there can be no doubt that Defendants are **not** obliged

to file an affirmative motion to terminate to which Plaintiffs would then need information with which to respond. Therefore, while some of the cases cited might be interesting, or even perhaps somewhat persuasive, they are hardly precedential with respect to the situation in the instant matter.

Despite this distinct difference and the fact that no formal written discovery is provided for within the RP, CDOC undertook, in good faith, efforts to share relevant information with Plaintiffs. CDOC voluntarily and cooperatively produced **several thousand pages** of relevant and probative documents and responded to reasonable questions. Defendants *continue* to provide Quarterly Reports on a wide range of issues including: current policy, grievance statistics and information, offender correspondence, requests for accommodation, recent screenings, monthly intake reports from DRDC which include offender specific information related to date of screening cross referenced with each of the four disability categories, copies of template and exemplar intake, screening, and accommodation forms, and updates to ADA tracking systems which include screen shots of what the programs look like, as well as, information related to recent trainings. These charts, reports, and statistics along with samples of Class Members' accommodations provide ample information regarding the policy, processes, and procedures employed by CDOC which reflect sustained compliance with Remedial Plan requirements to ensure offenders are provided accommodations and information about their ADA rights. In response to vague and burdensome requests CDOC provided (*See* **Ex. A-5**, Letter dated 8/13/14 *and see* **Ex. A-1**, Disk) additional samples of correspondence, accommodations, grievances, and medical screening exams; including the ARs and IAs verifiable through internal ADA/ACA audits and CDOC wide annual ADA training required of all staff. Plaintiffs may identify additional group samples but it would be extremely burdensome to sort out 5,000+ Class

Members for each database and file which would yield roughly 20,000-30,000 documents. To do so would result in an abrupt halt to internal daily work and create undue delay and hardship for offenders currently seeking response to requests for accommodations, correspondence, grievances, scheduled facility ACA/ADA audits, and the general work of the AIC office.

Where, as here, Defendants have already provided a wealth of information, no formalized discovery process is required. *See Cagle v Hutto*, 177 F3d 253 (4th Cir. Va. 1999) (Hearing regarding existence of present violations not mandatory prior to termination of consent decree pursuant to 18 USCS § 3626(b)(2)).

## CONCLUSION

Plaintiffs' desire to delve into minutia and immaterial issues should not be entertained by this Court. To the extent Plaintiffs persist in seeking "discovery" in furtherance of such goals, CDOC's decision not to entertain such is not grounds to extend the contractually limited **two year** Monitoring Period.

**WHEREFORE**, Defendants respectfully request that the Motion(s) to Compel Discovery be denied.

Respectfully submitted this 22nd day of August 2014.

JOHN W. SUTHERS
Attorney General

s/ Jacquelynn N. Rich Fredericks
JACQUELYNN N. RICH FREDERICKS,
Assistant Attorney General
Civil Litigation & Employment Law Section
Corrections Unit
Attorneys for Defendants
1300 Broadway, 10th Floor
Denver, Colorado  80203
Telephone:  (720) 508-6603
*Counsel of Record

36

**CERTIFICATE OF SERVICE**

I certify that on August 22, 2014, I filed the foregoing via ECF which will serve electronic copies addressed as follows:

KING & GREISEN, LLP
Paula Greisen
Jennifer Weiser Bezoza
greisen@kinggreisen.com
bezoza@kinggreisen.com

Edward T. Ramey
Heizer Paul Grueskin, LLP
eramey@hpgfirm.com

Lara E. Baker
Foster Graham Milstein & Calisher, LLP
lmarks@fostergraham.com

Blain D. Myhre
Blain D. Myhre, P.C.
blainmyhre@gmail.com
*Attorneys for Plaintiffs*

s/ Jacquelynn N. Rich Fredericks