# IN THE UNITED STATES DISTRICT COURT OF COLORADO

## CIVIL ACTION NO: 92-CV-870 *CmA*

**Montez, et al, Plaintiffs**

vs.

**Bill Hickenlooper, et al, Defendants**

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

FEB - 2 2015

JEFFREY P. COLWELL
CLERK

PROVIDED TO:
LOWELL CORRECTIONAL ANNEX ON:

**JAN 28 2015**

BY: *MAS*          FOR MAILING

---

Claim No: 03-129, Category 3, Claimant; Jill Coit, *Colorado DC No #26530*
Colorado ID No: 86530, Florida ID No: 163936,
Address of Claimant; LCI 11120 N.W. Gainesville Road, Ocala, Florida 34482

---

## MOTION FOR APPOINTMENT OF COUNSEL *and*

*Violation of Monte and Motion to Be declared Sight and Hearing impaired under Montez.*

**COMES NOW** Jill Coit, pro se in the above captioned matter and hereby requests this Honorable Court to appoint counsel for the following reasons; (one) Coit is legally blind and was declared legally blind on 5-12-2011 according to the Florida Department of Corrections Optometrist. "Patient is legally blind based on criteria and is eligible for services for the legally blind." *Exhibit 1*

    1.    Coit is a Colorado inmate that was transferred to the Florida Department of Corrections on 1-26-2011 after the US District Court issued her a 1983 Civil Rights case number for alleging that she was raped by Colorado Department of Corrections Officer Michael Dussart at La Vista Correctional Facility in Pueblo, Colorado.

    2.    The Florida Department of Corrections does not have any Colorado case sites ( *Pacific* )    and does not have the legal materials she needs to defend this case.

    3. (A) The issues involved in this case are complex.

According to the Order of Special Masters dated April the 22nd, 2011 paragraph two, "Special Masters cannot provide advice to claimant or inmates. The Remedial Plan would have applicability only if claimant remained a Colorado

1

inmate but was housed in a Florida facility." By the court, Richard M. Brochers, Special Masters. *Coit is legally Blind. 9 Exhibit 2.*

3(B)  Coit alleges that she does not have the mental capacity or the legal resources to fight such an extremely complicated legal issue *(a)* as; Does the remedial plan have applicability for an inmate housed in Florida; *(b)* Is the Florida Department of Corrections under any obligation to obey the Montez Remedial Plan; Is Coit as a member of the Montez Remedial Plan entitled to the benefits that are allowed under the Montez Remedial Plan; *(d)* Since Coit is a Colorado inmate is she allowed to have the same benefits that are allowed under the Montez Remedial Plan even though she is housed in Florida.

3(C)  As this court can see the law is extremely complex and Coit is not mentally or physically capable of doing the research or bringing forth the appropriate challenges that would be required.

4.    The case involves medical issues that may require expert testimony *since*

5.    It takes ten to fifteen days for Coit to receive legal mail and unlike Colorado, Florida inmates are only allowed certain hours to visit the law library. The Florida Department of Corrections law library does not have all of the case sites. Coit would need to do research and does not even have all of the case sites available that are listed on the computer. *nor any Pacific case sites.* *CDOC refused to turn over medical records (3...)*

6.    Coit does not have any access to legal assistance or help.  The LCI — *anny* law clerks have never filed a 1983 Civil Rights lawsuit nor are they familiar with the Montez Remedial Plan.  According to the law as Coit understands it she is to get legal resources from Colorado however she has been unsuccessful in obtaining the legal case sites she needs from Colorado.

7.    Coit is physically handicapped and has a hand impairment (dequarian disease) which prohibits her from being able to write legibly.  The Florida Department of Corrections does not allow for inmates to purchase typewriters and there are no typewriters available in the law library. *and Coit is legally Blind.*

8.(A)  Is hearing impaired and the Florida Department of Corrections provided her two right ear only hearing aids.  That's correct she has two hearing aids for the right ear not one hearing aid for the right ear and one hearing aid for the left ear.  The Florida Department of Corrections contacted the Colorado Department of Corrections and received permission for a hearing aid that is behind the ear hearing aid. ( B + E ) *in Colorado* *see # 40 for Coit wearing ITE hearing aids)*

8.(B)  According to Florida Department of Corrections Medical Department the ( B + E ) behind the ear hearing aid causes bleeding and Coit needs an 'In The Ear' hearing aid.  However the *(CDOC)* Department of Corrections refuses to authorize an 'In The Ear' hearing aid for Coit so that she *can* hear.  The Florida Department of Corrections Audiology Specialist has documented as well as the Florida Department of Corrections Medical Department that the 'Behind The Ear' hearing

aid causes bleeding and is a dangerous situation. The Florida Department of Corrections has numerous cases of Mersa and other medical conditions that would be extremely harmful to an inmate with an open cut. *(Bleeding) Exhibits 3 + 4*

*P (C)* The price from Beltone makes the hearing aids for the Florida Department of Corrections *495.00 + earmold 40.00* (costs for behind the ear hearing aid that was submitted to Colorado). *(9-24-11) provide hearing aid*

*P (D)* According to newspapers advertisements throughout the state of Florida and Colorado in the ear ITE which stands for in the ear hearing aids cost *$ 3.35.00* however the Florida Department of Corrections charged the Colorado Department of Corrections *495.00 for a $99. hearing aid*. This amount would purchase Coit an 'In The Ear' (ITE) hearing aid. See attached exhibits. *5, 6, 7*

*(P)(E)* The Florida Department of Corrections female facilities-LCI Annex and other female facilities are extremely dangerous. There are inmate fights daily and they close the entire facility and yard. Coit has already been injured twice because she couldn't get out of the way of two inmates fighting. See attached exhibits. *Ex. Sheet (1) Fighting inmate fell on Coit (2-7-14) Exhibit 22 — Ocala Hospital fall on 11-23-11 due to not hearing wheelchair. Coit was sexually molested in 2014 By EX-F-inmate. Sierra Tom Robertson - report X 8694400551*

*P (F)* There is nothing Coit can do when the *FL* Department of Corrections *(EC 100c)* refuses to authorize ITE (In The Ear hearing aids) versus BTE (behind the ear) hearing aids even though the price quoted was for the ITE hearing aids. Coit has no control over what the Colorado Medical Department authorizes and the Colorado Department of Corrections refuses to authorize Audiology visits. See attached exhibits. *FDOC did audiology testing (Beltone) on their own. See ex. exhibits 9 + 10.*

9.    Coit is at the mercy of the Colorado Department of Corrections Medical the denial of authorization for various medical treatments that the Florida Department of Corrections specialist state Coit needs. As long as the Colorado Department of Corrections refuses to authorize specialist visits the Florida Department of Corrections will not take Coit to the various specialists that she needs. Why is this included? Because Coit wishes to show the court that she is physically not able to do legal research and present her claim adequately so that the Montez Remedial Plan is enforceable. *Ex. Exhibit 12 (A) + (B)*

10.    Coit is unable to afford counsel and has requested/mailed to at least ten Florida attorneys requesting assistance.

11.    At one time Coit was reasonable versed in the law and represented herself as required in the Montez case in October 2005. Coit did not have the medical documentation that was needed to raise her to the next level/category of Montez claims because the Colorado Department of Corrections refused to

authorize Abilities Unlimited to release the medical documentation needed.  See exhibit 13 Coit requested medical records from abilities Unlimited Dated 4-13-04 ( Coit Had Mobility hearing Oct. 2005 )* Bell legally we cannot send her Stuff I should not have correspondence per Facility we are to disregard this request.

12.    Coit alleges that she is a member of the Montez Remedial Plan under mobility category three.  And that she is entitled to other disability claims.

13.    Coit alleges that she is entitled to vision impairment under the Montez Remedial Plan since she was diagnosed as being legally blind in 2011 and the Montez Remedial Plan had not been ~~completed~~ in compliance at that time.

14.    Coit alleges that she is qualified under the hearing impaired for the Montez Remedial Plan.  Coit alleges that she entered the Colorado Department of Corrections in 1995 with two ITE in the ear hearing aids.  Coit alleges that the Denver Health Audiologist specialist stated that there was no legitimate reason to remove Coit's hearing aids.

Coit alleges that she has two unusual shaped hearing canals as documented by Colorado Department of Corrections Medical and the Florida Department of Corrections Medical.  See exhibit 14 & 15

(14) Colorado DOC Screening 4-16-04 " Hearing good with hearing aids" exhibit 15 "... Due to ear canal abnormality - She Has curved canals that are also small"

15.    Coit alleges that due to the numerous physical impairments IE hearing sight and mobility that it would be in the Court's best interest and ~~would be~~ in the interest of Justice for this court to appoint Coit a one time attorney just for the Montez claims.

16.    Coit alleges that the Montez Remedial Plan allows for inmates to bring forth the claims as long as the Montez Remedial Plan was not in total compliance and that Coit alleges in 2011 and 2012 the Montez Remedial Plan was not in total compliance.  Coit also alleges that she is disabled totally disabled that she qualifies under the Montez Remedial Plan and Social Security ex 16.

17. (F) Coit alleges that she does not have the ability to investigate due to being locked up in an out of state facility (Florida Department of Corrections) and that the Florida Department of Corrections does not meet her medical or ADA needs.  One of the reasons that the Florida Department of Corrections does not meet her medical needs is because the Colorado Department of Corrections refuses to allow that Florida Department of Corrections to take her to various specialists that 4 DOC doctors recommend for her disabilities and medical conditions ( serious) . Thus Coit has no proof to send to this Court.

4.



(17)(B) FDOC grievance telling Coit to grieve
CDOC for denial of hearing and ITE # 41

18.     Coit alleges that she is suffering from Post Traumatic Stress Disorder
and that she has been sexually abused, not raped, however sexually assaulted while in
the Florida Department of Corrections. (2014 – PREA report no. 36714605)

Coit alleges that she notified attorney Edward Ramine whom this court appointed/
authorized under Case# 12–cu–00 605 _____ of the
sexual abuse, multiple witnessing of inmate beatings and her witnessing Anita
Gonzales literally bleeding to death over a three day period in FDOC.

19.(A) Coit alleges that the Colorado Department of Corrections knew that
the Florida Department of Corrections suffered from many problems as evidence
by newspaper articles prior to 2011 as well as numerous investigations now of
many Lowell Correctional facilities inmate deaths. see attached articles se 17 (2 pages)

(B)  According to James Welton director of CID in 2011 August Hearing at
Denver Women's with Coit, the Colorado Department of Corrections is
responsible for placing her in a facility that would meet her ADA needs. se 18

(C)  Coit alleges that she also informed investigator J. Kirby when he visited her
in 2011 at the Homestead Correctional Institute that her ADA needs were not being
met.  Coit entered the Florida Department of Corrections on January the 26th 2011
with a wheelchair, hand braces, orthopedic shoes, back pack and other medical
appliances that were issued by the Colorado Department of Corrections. se 19

(d)  Coit's wheelchair was stolen from the HCI medical on a Friday when she
was to pick up her wheelchair on Monday.  Coit alleges that she was told that there
were no inmates that left the facility nor were there any medical trips therefore
the wheelchair had to be on the facility. se 20

After days of searching the entire facility, Coit's wheelchair was not found
however the medical department at HCI issued a letter stating that when the
wheelchair was found it would be returned. se Exibit 20

(e)  Coit alleges that while at Homestead Correctional Institute she had to walk
more than 200 yards to the dining hall three times a day back and forth and that she
would repeatedly fall up and down stairs because she was forced to climb up and
down stairs to enter and exit the building and to go to her cell.

(f)  After numerous falls and her inability to access the prison chapel which was
upstairs to attend Jewish services and after she reported numerous reports of
officers having sex with inmates she was transferred to the LCI Annex.

(g)  Coit has been transferred to back and forth to eight facilities within 36
months.  She alleges that every time she files for ADA accommodations or reports
officers misconduct IE: sex with inmates she is transferred to another facility.

(H)  Coit alleges that according to the Florida Department of Corrections every
time she is transferred she must refile for ADA accommodations.  ADA
accommodations requests take from 4 to 8 months to be responded to and then they



do not even follow their own rules and regulations that state they must give a reason for a denial of an ADA accommodation. 24  21

( I )   Coit alleges that the Florida Department of Corrections has rarely made any accommodations for ADA needs.  Coit was not issued a wheelchair until after November the 23rd, 2011 after falling in the dining hall on a wet floor and being rushed to the Ocala hospital where they glued an inch to an inch and a half cut above and below her right eye.  Coit alleges this is serious because she only has vision in the right eye and that the specialist on duty (plastic surgeon) said that a quarter of an inch either way and Coit would have lost her eye.

( 9 )   After four years of fighting Coit has now been issued a wheelchair that is not broken down and that works properly.  Coit exercises as much as possible. ( 2014 - now ).

20.   Coit alleges that the Florida Department of Corrections has granted numerous ADA accommodations on paper however they do not actually give her the ADA accommodations or allow her to do what the ADA accommodations stated.  For example since 2011 Coit has been granted the privilege of taking courses in the Hadley School for the Blind however despite her applying in each facility and being granted ADA accommodations of being allowed to take courses in the Hadley School for the Blind the Florida Department of Corrections/LCI Annex ~~warden Mazon~~ has ~~reported confiscated the tools~~ that are needed for Coit to learn Braille.  Coit alleges that it would be easier for her to use Braille while she has some sight versus being totally blind.  The Florida Department of Corrections allows inmates to have razors which inmates repeatedly use to cut their throats and wrists on numerous occasions and have locks which can be put into a sock yet she cannot have a blunt tool that will push through paper to make the dots that are needed for Braille.  Nor is she allowed to communicate with anyone in Braille despite learning the Braille alphabet.  The Florida Department of Corrections Rules and Regulations state any inmate corresponding in any language other than English must have permission from the warden even though Braille is in English there isn't anyone at the Florida Department of Corrections that knows Braille therefore she is not being allowed to correspond in Braille or learn Braille despite the fact that she's been authorized to take Braille from the Hadley School for the Blind.

( 21 )   This is just one example of the Florida Department of Corrections refusing to accommodate Coit's ADA issues even though on paper she's been granted ADA accommodations.  Coit is not even being allowed to have the backpack that the LCI warden has been holding for approximately 6 months to go on her wheelchair even though Colorado inmates are issued backpacks for their wheelchair.  Coit has submitted numerous documentations that she was allowed a backpack in Colorado and other medical/ADA accommodations.  However the Florida Department of Corrections does not accommodate disabled inmates in any meaningful form.

21 also 23  ( & dest 41 Coit sent to df DOC doctors that don't even speak English - see grievances No 1 208-314-019

6

(22) The inmates at LCI are not even aware of what ADA accommodations are available because there is nothing in print and when they attempt to find out what is available they run into a stone wall. Coit alleges that this is probably not the issue to bring before an appointment of counsel however she wants the court to realize just what is happening in the Florida Department of Corrections. Coit also wrote the Interstate Corrections Compact officer notifying her of the conditions in Florida and that her ADA accommodations are not being met. Coit wrote the governor of Colorado, the governor of Florida and the Colorado Department of Corrections officials notifying them of the conditions of Florida however no one has come to her rescue or attempted to enforce Florida or request that Florida obey the ADA accommodations that were granted in Colorado.

(23) Coit has been issued orthopedic shoes for diabetics even though it was noted at the time shoes, were issued that her hammer toes touch the top of her shoes. Coit has severe foot problems IE: three hammer toes plantar fibroma, a one and one half inch leg length discrepancy and bone spurs yet she cannot get orthopedic shoes that meet the needs of these severe impairments. When Coit wears the diabetic shoes that were issued to her they cause the tops of her hammer toes to bleed and all medical does is hand her some gauze and _bactricin_ and tells her not to wear the shoes for a long period of time. This is not even in her medical file because Coit got a copy of her medical record and that page was missing.

foot
shoes
don't
fit
{
(2, 25) 7 DOC medical shoes - don't meet ADA needs
(2, 26) CDOC medical shoe - don't meet ADA needs -
(2, 27) Denver health medical report dated
(2, 28) affidavit of Coit - Heavey and post ( 3 pages)

(24) see next page

See exhibit 43 - Where CDOC grievance officer stated "Because of the limited time you are required to wear the state issued Boots, limited to visiting where you are not typically standing on your feet for any length of time, this _discomfort appears to be minor._" Coit's Boots were 2 sizes to small.
See # 44 medical shoes an ADA mandatory accommodation.
CDOC med report - 7-6-10.

7

## US DISTRICT COURT FOR THE STATE OF COLORADO

**MONTEZ, et al**

**v**                                   **CASE NO.: 92-CU-870**

**HICKENLOOPER, et al**

---

## MOTION TO ATTACH TO MOTION FOR APPOINTMENT OF COUNSEL REGARDING CONDITIONS OF CONFINEMENT IN THE FLORIDA DEPARTMENT OF CORRECTIONS _who Refuses to Obey or Recognize Montez Remedial Plan._

(24)     **COMES NOW** Plaintiff Jill Coit, pro se and does hereby declare the following A.

A.     (1)     Coit has been filing grievances for the last 4 years regarding conditions of confinement, failure to protect, excessive sexual misconduct between staff and inmates, PREA, Deliberate Indifference to serious medical needs and most important violation of Montez Remedial Plan and Title II of ADA.

Coit finally received a response to the fact that F.D.O.C. is not in compliance with ADA and the Montez Remedial Plan.

(2)     Coit received response mailed 12-24-14

"Your administrative appeal has been received, evaluated, and referred to the ADA coordinator, who provided the following information:

"The Court order pertaining to v. Hickenlooper et al 92-CU-00870 CMA Class Action Remedial Plan is applicable only to offenders housed in Colorado Department of Corrections. The Colorado court does not have authority over Florida Department of Corrections and therefore the Department is not required to comply with said court order. You have been informed of this on numerous occasions and it will not be addressed again in the future.

Based on the foregoing information, your grievance is denied." T. Bowden exhibit 2 ( attached ).

(3)     Coit alleges she has been verbally told that F.D.O.C. does not have to obey court orders for other states unless they want to. ie: They collect child support payments from inmates on court orders for other states as well as obey other court order detainers, etc. However F.D.O.C. gets to choose which court orders they obey.

8

(4)   This is a direct violation of Montez Special Master: Judge Richard M. Borchers court order dated April 22, 2011.  exhibit 1

Which states, "The Remedial Plan would have applicability only if Claimant remained a Colorado inmate but was housed in a Florida facility."

(5)   Coit alleges she is a Colorado inmate housed in a Florida facility.

(6)   As you can see from the date of Special Master's Richard M. Borchers order dated 4-22-11 coit been battling the F.D.O.C. for almost 4 years.

(7)   This is the first time F.D.O.C. has put that they do not have to obey court orders in writing.  Therefore Coit could not file under the Montez with just her word for F.D.O.C. denying her services, benefits and programs allowed under Montez.

(8)   Coit has been preparing these documents for almost 4 years.

(9)   Coit is not safe in F.D.O.C. female institutions as the below newspaper article shows.

(10) Coit is sending her original copies since L C I — annex law library refuse to copy these exhibits:

No 25 next page.
History of Coit's filing
with his Court Order Montez.

9

*Denver Court Health –*
*History & Claims Court filed prior to this.*

(25)

(A) Case number 1-92-CV-00870 document number 3789 filed 1-21-2009 total of 7 pages Montez et al vs. Owens.

(Final Order of Special Master RE; (1) pleading entitled "denial of hearing aid batteries that work and refusal to repair hearing aids, filed August the 28th 2008; and (2) Coit's motion to make DWCF/C.D.O.C. comply with judge Pringle's order to make Montez tapes available with accommodations for medical handicapped issues, filed January the 9th 2009.

(B) 1. Introduction and history of the proceedings; on August the 28th 2008 Coit filed a petition entitled "denial of hearing aid batteries that work and refusal to repair hearing aids". This is Defendant's exhibit Coit-00080.

(C) Page 2 Defendant's exhibit Coit 0081. On November the 7th 2008, the Special Master entered a preliminary order regarding a motion RE hearing aids. The Special Master considers Coit's motion as a request for refiling under the damage provision of paragraph XXXII of the Remedial Plan and also as a request for enforcement relief under this stipulation regarding status of compliance by the Colorado Department of Corrections of the Montez Remedial Plan, which was approved and made an order of the court on April the 4th 2008. The Special Master rejects the proposition that Coit could initiate a pro se pleadings to enforce the Remedial Plan and/or stipulations entered into the pursuit thereto holdings that such matters must be addressed by counsel."

(D) Coit alleges that this ruling was apparently illegal because Coit can initiate said pleading to enforce the Remedial Plan and/or stipulations entered to pursuant thereto without the involvement of class counsel. As proven by C.D.O.C. inmate filing a motion in 2013 in which the court allowed him to file under provision XXX 12 of the remedial plan and he filed pro se.

(E) Line 16. "After concluding that the motion re hearing aids was not barred by issue or a claim preclusion, the Special Masters November the 7th 2008 order request the parties to brief one very specific threshold issue; whether Coit's pleadings, if treated as a claim for damage pursuant to paragraph XXXII of the Remedial Plan, cognizable by the court and/or the Special Masters Paragraph XXXII, which states that, "if a claim arises during the compliance., then the inmate may amend his/her claim to request compensation for additional damages."

(F) Coit alleges that in 2011 the Florida Department of Corrections did audio tests and determined that Coit's hearing was impaired and that she needed hearing aids. *Coit could not hear instructions given to her.*

(G) Coit alleges that the most important part of this document 3789 is line 6 that the Special Masters reject the proposition that Coit could initiate a pro se pleading. This court has later determined that inmates who are members of the Montez Remedial Plan could initiate said pleading therefore the court was incorrect in denying Coit's petition.

( )(A) Case number 1; 92-CV-00870-EWN-OES document number 3706 filed 11-7-2008 one of seven pages title of document "Order of Special Masters RE pleadings entitled "denial of hearing aid batteries that work and refusal to repair hearing aids", filed August the 28th 2008.

(B) See Defendant's exhibit Coit 00088 first paragraph line 6, "the pleading acknowledged that on December the 15th 2005 the Special Masters found and concluded that she was not hearing impaired. However Coit explains as of that time, the department allowed her to have her own hearing aids sent to her.

(C) Coit alleges that the fact that the Colorado Department of Corrections allowed her to have her hearing aids sent in meant that she was hearing impaired. Coit further alleges that because she had hearing aids at the time of her October 2005 hearing before Judge Pringle in the Montez court issue that because she had hearing aids she was not declared hearing impaired. Coit alleges that when she has her hearing aids in her ears she can hear however she cannot hear what is being said when she does not have her hearing aids. Coit alleges that she hears a noise but cannot make out what is being said.

(D) Coit alleges she has a new claim.

(E) See Defendant's exhibit Coit 00089 page 2 1. Damage claim.

"With respect to her alleged hearing disability, the Special Masters found that; claimant testified that she has difficulty hearing particularly when there is background noise. She used hearing aids in 1995 but since 1995 she has not been provided with hearing aids. Claimant was cleared for hearing aids in 2001 and in 2002 and 2003 she was allowed to have her own hearing aids sent in. Claimant asserts that in 2004 she received a discipline that resulted directly from her inability to hear."

(F) Coit alleges that because she received a COPD violation because she was not allowed to hear what was being said because she did not have hearing aids that this validates her claim.

(G) See Defendant's exhibit Coit-00090 line 10.

"Initially, an issue is presented as to whether Coit's current contention that she is hearing impaired under the ADA and/or the Remedial Plan is barred by res judicita and/or collateral estoppel. There is no doubt that there is the identity of parties, and that the final judgment on the merit was entered on her prior claim. There is also no doubt that the parties had a full and fair opportunity to litigate Ms. Coit's allegations that she was hearing impaired under the ADA and the Remedial Plan. The only outstanding question with respect to claim or issues preclusion is whether her present claim or contention is identical with the one advanced under her prior full resolved claim.

(H) <u>The Special Master finds and concludes the facts and circumstances surrounding Coit's present allegation of hearing impairment are different then</u>

those that existed and were litigated in connection with her prior claim. It is clear that by the time of the hearing on her prior claim, she had been allowed to obtain her own hearing aids, and no contention was made that these hearing aids were inoperable, or that the DOC was not supplying her with proper batteries. Under these circumstances, the doctrine of Sutton vs. United Airlines, Inc. 527U.S. 471 (1999) renders Coit's hearing impairment claim problematic. However Coit's current pleading asserts that her hearing aids are not operate able because she is not being provided with proper batteries. Assuming the correction of this allegation, her current hearing aid impairment claim must be resolved without reference to such corrective and mitigating measures.

(I) Even if Coit's current pleading is not barred by claim or issues preclusions, a significant question arises as to whether it falls within the ambient of the Remedial Plan damage provision, or whether it must be raised in a separate and independent lawsuit. The Remedial Plan provides that if a class member files a timely claim and "a claim arises during the compliance period, then the inmate may amend his/her claim to request compensation for additional damages." Clearly, Coit filed a timely claim which was fully adjudicated by the Special Masters December the 15th 2005 order and Judge Kane's affirmative of that order. Whether Coit's present pleadings allege a claim arising during the compliance period, however is a debatable question which the Special Masters declines to address without the benefit of a briefing from both DOC and Coit addressing the specific issues.

2. Claim under the stipulation regarding status of compliance.

(K) The scope of the court's authority is to hear damage claims of class members as defined by the Remedial Plan. There is no provision in the Remedial Plan that would authorize damage claims or enforcement actions by individual class members premised on a failure of DOC to comply that the stipulations entered into between DOC and the class counsel. Absence specific provisions in the Remedial Plan authorizing enforcement by individual class members of such stipulations the matter must be addressed by the class counsel. Johnson v. City of Tulsa, Okalahoma 489 F3d 1089 (10th Cir. 2007); Mac Neil v. Guthrie 945 F2d 1163 (10th Cir. 1991). Class counsel has a continuing duty to receive papers from class members until the class action is closed. Were such papers assert noncompliance with class settlement agreements or stipulation entered into or pursuant thereto, class counsel must make a determination of whether the assertions have sufficient merit to warrant further action, and if so to pursue such actions on behalf of the class.

(L) Consequently, insofar as Coit's present pleadings seek enforcement of the stipulation regarding status of compliance, it is denied without prejudice. Coit's pleadings entitled "denial of hearing aid batteries that work and refusal to repair

hearing aids" will be forwarded to class counsel for whatever action counsel deems appropriate.

(m)   Coit alleges that according to the new 2014 rulings by inmate class counsel does not have to bring class members allegations or violations of the Montez Remedial Plan.

(N)   The fact that this motion was denied without prejudice Coit alleges it can be refiled because she has been denied hearing impaired within the Montez Remedial Plan completion.  Coit submits the Florida Department of Corrections hearing test and results as well as the fact that Coit was provided with a right ear only hearing aid in fact she was provided with two right ear hearing aids that are BTE means behind the ear hearing aids.  The Florida Department of Corrections specialists alleged that Coit needs an ITE-which means in the ear hearing aids not a BTE hearing aid however the Florida Department of Corrections will not pay for an ITE hearing aid they only authorized a BTE hearing aid.

(o)   The Florida Department of Corrections specialists have determined that a BTE hearing aid causing bleeding and that she needs an ITE hearing aid.  An ITE hearing aid costs less than the amount the Florida Department of Corrections charged the Colorado Department of Corrections.

(P)   Second paragraph of Defendant's exhibit 0092 continuing, "Consequently insofar as Coit's present pleading seeks enforcement of the stipulation of the status of compliance, it is denied without prejudice.  Coit's pleading entitled denial of hearing aid batteries that work and refusal to repair hearing aids" will be forwarded to class counsel for whatever action counsel deems appropriate.  Coit alleges that the counsel for the Montez Remedial Plan and for inmates that are members of the Montez Remedial Plan has done nothing and has not contacted Coit regarding this issue.

(Q)   Coit alleges that she is now entitled/or allowed to present a claim for denial of hearing aids and to be declared hearing impaired under the Montez hearing requirements. On 7/00 C specialist clearly documented She need hearing aids to hear. Prison is dangerous for people who can not hear orders or able to get out of the way of fights. Coit needs hearing aids. See exhibit 34 for history of hearing aids

(26) (A) Case 1; 92-CV-00870EWN-OES document number 1253 filed 12-10-2005 page 1 of 17 titled Final Order of Special Masters.

"This matter came before the Special Masters for a hearing on October 17, 2005 on October 31st 2005 and on November the 8th 2005. Present were the following; Jill Coit Claimant Adam Weins from the Attorney General's Office for Defendants. On November the 8th Aaron Atkinson from the Attorney General's Office also appeared for the Defendants. Testimony was received from the following witnesses Claimant; Dr. Mitra Razzaghi; …Cathy Holst…and Cindy Phillips inmate. The first page is Defendant's exhibit Coit 00063.

(B) Defendant's exhibit Coit 00066 page 4 number 10 Claimant testified that she has difficulty hearing, particularly when there is background noise. She has used hearing aids in 1995 but since 1995 she has not been provided hearing aids. Claimant was cleared for hearing aids in 2001 and in 2002 and 2003 she was allowed to have her own hearing aids sent in. Claimant asserts that in 2004 she received discipline that resulted directly from her inability to hear.

(C) 11. Claimant contends she has difficulty with her distance vision. It is undisputed however, it is not fall below 20/200 vision acuity standard of the Montez Remedial Plan.

(d) Coit alleges that the reason she did not fall between the 20-2000 acuity standard is because the Colorado Department of Corrections had not taken her to specialists to determine that she did have a severe vision impairment. That Coit has attached various reports regarding her vision or rather lack of vision from Denver General Hospital where she was taken after she had a series of strokes beginning in 2005. Coit further alleges that if she had had these medical records she would have been determined vision impaired under the Montez Remedial Plan.

(e) Coit alleges that she will provide further documentation however at this time she's merely going over document 123.

(f) Defendant exhibit Coit 0067, 111. Conclusion of law.

(g) 2. The first issue before the Special Masters is whether claimant is a disabled individual who's a member of the class. Under the rehabilitation act and the ADA the term disability means (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment. (42 USC § 12102 (2); 29 USC § 794(d); 29 USC § 705(9)(P). The term substantially limits or refers to disabilities that makes a individual unable to perform a major life activity that the average person of a general population can perform; or that significantly restricts an individual as to the condition, manner or duration under which he or she can perform a major life activity as compared to the condition, manner, under which an average person in the general population can perform that same major life activity. 29 C.F.R. § 1630. 2(j)(1) major life activities includes life functions

14 §

such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. (29CFR § 163.2(h)(2)(i).

(H)   The Remedial Plan limits the class of persons who might otherwise have a disability under the rehabilitation act and the ADA to those with mobility hearing and vision disabilities and those with disabilities due to diabetes. Remedial Plan 111(A) additionally, the Remedial Plan limits participation to inmates with permanent physical disabilities/impairments. Remedial Plan 111(B) a permanent disability impairment is a condition which is not expected to improve within 6 months.

(I)   "The Special Master finds and concludes that claimant is a disabled individual who is a member of the class. Claimant has a permanent physical mobility impairment that substantially limits the major life activities of walking working and perhaps performing manual tasks."

(J)   The Special Master finds and concludes that claimant has not sustained her claim that she has a vision disability within the meetings of ADA and or the Remedial Plan. No testimony or documentary evidence was presented regarding claimant's vision acuity. Remedial Plan V(A)(3)[1]

(K)   Coit alleges that she could not overcome the burden because she did not have the medical records from the Denver Health Hospital that she was sent to.

(L)   Coit alleges that if she had the proper documents from the Denver Health she would have met the requirements for being visually impaired. Clearly the Denver Health Optomality Specialist documented that Coit had no vision in her left eye and had limited vision in her right eye.

(M)   Coit submits C.D.O.C. –DWCF documentation exhibit _____ that shows that the medical provider documented that Coit lost 35 to 40% of her vision in her right eye the only eye that she has sight in Coit alleges that if she had these documents she would have been able to prove that she was visually impaired under the Montez Remedial Plan.

(N)   Coit alleges that in 2011 the Florida Department of Corrections declared her legally blind and entitled to all benefits programs that is allowed for the legally blind inmates.

(O)   See Defendant's exhibit Coit 00069 second paragraph Coit alleged that she fell due to the fact that she did not have proper medical treatment or proper medical devices IE. shoes (orthopedic)

(P)   "What remains are claimant's damage claims on(a) were filed because she was not provided with proper shoes and shoe inserts; and (b) her inability to teach in CWCF GED program because she could not negotiate the stair to get to the

---

[1] Claimant by her own admission agreed that her vision was corrected within the meeting of the Remedial Plan and that she could not overcome the burden.

classroom.  The Special Master finds and concludes that there is sufficient evidence in the record to sustain Coit's claim that the fall and her inability to teach with results of permanent mobility impairments; that her fall was ~~proximately~~ caused by the Defendants failure to provide a requested accommodation for proper shoe inserts; and that her inability was a result the Defendants failure to provide requested accommodations of allowing her to take an alternate route to the classroom.

( C2 )   Claimant presented no evidence regarding the injury sustained or medical treatment necessitated by her fall.  As a result, only in her word of minimum damages is ~~permissible~~ .  Likewise no evidence was presented by claimant as to the extent of damages resulting from her inability to teach the GED class.  In light of dearth damage evidence, the Special Master finds and concludes the sum of $350 is an appropriate amount for damages for these two violations of the ADA, the rehabilitation of the Remedial Plan.

( R )   Coit alleges that she fell in on November 23rd 2011 at the Florida Department of Corrections/Annex due to the fact that the Florida Department of Corrections lost her wheelchair and did not provide her with a new one until her fall.  Coit alleges that she fell numerous times prior to the fall of November 23rd 2011.  The November 2011 fall caused Coit to be rushed to the Ocala Hospital where she was treated for above and below right eye cuts of approximately one inch.  Coit's right eye ball was punctured causing her further loss of vision and numerous medical/vision impairments.

( S )   Coit alleges that the Montez Remedial Plan – under the Colorado Department of Corrections was still in force in November 2011 and had not met the compliance.  The C.D.O.C. was not in compliance in 2011 and that her fall and injury was due partially to the Colorado Department of Corrections not providing backup support to Coit.

( T )   Coit alleges that CID investigator J. Kirby in March of 2011 was advised that the Florida Department of Corrections had not provided her with her wheelchair due do the fact that it was stolen from the medical department at Homestead Correctional Institution.  Coit has provided a letter which is attached stating that the Homestead Correctional Institution will send her wheelchair when they find it as well as her backpack and other medical items.  All of the items were stolen prior to her move to LCI Annex.  Coit alleges that due to the fact that she did not have her wheelchair she sustained a serious injury to her right eye thus further limiting her vision.  Coit also alleges that she was not provided medical shoes to correct the 1 and ½ leg length discrepancy bone spurs and plantar fibroma of her left foot until years later.  ~~24 – 19~~

( U )   Coit alleges that the Florida Department of Corrections still has not provided her with adequate orthopedic shoes.  She further alleges that the Colorado

9 16

Department of Corrections was well aware of her needing deep dish orthopedic shoes which they did not provide at the LaVista facility.

( v)   Coit alleges that LVCF-Colorado Department of Corrections provided shoes that were not deep enough and rubbed and caused bleeding to her hammer toes. There is ample medical evidence of this and Coit will submit documents to this affect.

( w)   Coit alleges that the Colorado Department of Corrections has repeatedly failed to provide her with proper shoes and they had knowledge of the fact that she has been ordered to have custom made orthopedic shoes.  Coit was provided custom made orthopedic shoes from Abilities Unlimited however the first pair of shoes were stolen when she went out on a medical trip to the Denver Hospital. There were stolen from the DWCF property room and were not replaced for over a year.

(x)   Coit alleges that the custom orthopedic shoes provided by Abilities Unlimited wore out they were more than a year old and that she was not provided with proper shoes when she was housed in the LaVista Correctional Facility.  As documented by exhibit _2-7_____.

(2)(1) Coit alleges that due to the fact that she did not have her wheelchair and she did not have orthopedic shoes that met her medical needs when she fell on November the 11th 2011 at the Lowell Correctional Institution – Annex and received permanent substantial damages.

(2-2) Coit alleges that she falls within the Montez Remedial Plan and which was not in compliance at the time therefore should be awarded damages.

(2-3) Coit alleges that she is entitled to damages and that the Montez Remedial Plan was not terminated by time she received the said injuries.

                    or in compliance.

(27) (A)   Case number 1; 92-CV-00870-JLK-OES document number 4770 filed 7-30-10 2pages Order of Dismissal of Special Masters.

"This matter comes before the Special Masters on his own motion. On March the 23rd 2010, Judge Kane issued an order clarifying jurisdiction concerning the claims filed pursuant to Articles XXXII of the Remedial Plan. On the same day, Judge Kane referred to the Special Masters the claimant's motion and request for consideration under the Montez Class Action regarding vision impairment and the hearing impairment. Since that referral, claimant has filed additional documents.

(B)   Judge Kane held that pretrial conference on May the 26th 2010 which was primarily scheduled due to the upcoming compliance hearing. At the same conference, Judge Kane took up individual motions, including that of the claimant. Judge Kane dismissed claimant's motion. The reasons for dismissal were unspecified." Coit alleges that Judge Kane was supposed to give the reasons why he dismissed claimant's motion. Judge Kane clearly stated, "the reasons for dismissal were unspecified."

(C)   Claimant alleges that Judge Kane must give specific reasons why he dismissed claimant's motion for vision and hearing impairment.

(D)   Coit alleges by this time 7-30-10 she had been moved out of the Colorado Department of Corrections. Coit alleges that all of her legal documents were confiscated at Denver Women's Correctional Facility in July of 2010 by Sgt. Fitzgerald. Coit alleges that Sgt. Fitzgerald ordered her to set her legal documents outside her segregation cell door and that she never saw the documents again. Coit alleges that the legal documents "her legal box" contained her journal which contained allegations of sexual abuse/rape by LVCF Michael Dussart it listed the dates times and what was done to claimant. Coit alleges that due to her not having her legal documents she could not properly represent herself in defending Judge Kane's order dismissal. Coit alleges that she was under severe trauma and suffering from PTSD post traumatic stress disorder due to being repeatedly raped by LVCF officer Michael Dussart. Coit alleges that if she had had her medical documents when her legal box was confiscated at DWCF she would have been able to represent herself and prove that she had a vision and hearing impairment.

(E)   Coit alleges that she wrote three letters to the US District Court alleging that an LVCF officer was repeatedly raping an LVCF inmate and that the LVCF officer threatened to kill members of the said inmate's family if she told. Coit alleges that she told investigator Dennis Houhgon that the LVCF rapist was white, over 6 feet, had been in the military, and was a former police officer. Coit alleges that no other officer at LVCF met all of these qualifications except Michael Dussart. Coit alleges that she could not list Michael Dussart's name or tell Michael Dussart's name in fear of the fact that he would kill-shoot her granddaughter. Coit alleges

that Michael Dussart showed her a picture of her granddaughter playing in the front yard and said that he could shoot and kill her at a distance and never be caught. Coit alleges that she was suffering from PTSD and could not reveal any more than she did. Coit alleges that she offered to wear a wire and that she offered to be polygraphed. At that time all Coit wanted was to be transferred out of the Colorado Department of Corrections so that she could be away from Michael Dussart. Coit alleges that she stated repeatedly that she did not believe the Colorado Department of Corrections could protect her or her granddaughter from the LVCF rapist. Coit alleges that she was under severe mental distress and mental handicap and could not represent herself sufficiently to present said claims she also alleges that she did not have the proper medical reports that she needed from Denver Health or medical records from Abilities Unlimited.

Coit alleges that she did not receive medical records from Abilities Unlimited until 2014. That the Colorado Department of Corrections refused to allow Abilities Unlimited to present her with medical records that would support her claims.

(8) Coit further alleges that she meets all of the qualifications for vision and hearing impaired under the Montez Remedial Plan and that in 2011 the Montez Remedial Plan was not in compliance and that she could not file prior because she had not received written proof that the Florida Department of Corrections would not honor the Montez Remedial Plan.

(9) Without written proof the Colorado Department of Corrections or this court would not have believed that the Florida Department of Corrections refused to obey the Montez Remedial Plan.

(H) Coit alleges that she told CID investigator Kirby as well as numerous Colorado Department of Corrections employees that she was being abused and that her ADA needs were not being met Coit alleges that she repeatedly told Colorado Department of Corrections employee John Martin her supposedly case manager that she was not being properly accommodated under ADA.

(I) For all of the above reasons Coit wishes this court to consider her claims of vision and hearing impairment.

(J) Coit alleges she should Be able to use Computer as Montz allows for Vision impaired inmates exhibit 39.

(K) Coit has Been denied all programs and work due to disabilities Even though she is qualified. No room in class for wheel char. She is granted permission to order tapes + desk for computer – But they are not allowed.
I also 42 permission

13/9

(38) (A)   Per case number 1; 92-CV-00870-CMA-OES document number 3789 filed 1-21-2009 page 4 of 7.

(B)   See Defendant's exhibit Coit 0083-111.  The motion rehearing RE hearing aids

(C)   Section XXXII of the Remedial Plan requires that damage claims be filed within 90 days of receipt by the inmate of the damage claim form.  Nevertheless, the Remedial Plan provides the following exception to the 90 day deadline; "If a claim arises during the compliance period then the inmate may amend his/her claim to request compensation for additional damages."

(D)   Coit alleges that her vision impairment occurred prior to the time the Montez compliance period was in effect.  Coit alleges that she may file an amended claim requesting compensation for additional damages.

(E)   Coit alleges that her vision impairment/disability was documented by the Florida Department of Corrections in May-12-2011 as evidenced by 1 which states, "patient is legally blind based on criteria for the visual field and is eligible for services for the legally blind."

(F)   Coit alleges that in 2011 the Colorado Department of Corrections was not in compliance with the Remedial Plan and that she did not have written proof or access to documents that would substantiate her claim until now.

(G)   Coit alleges she can not get her affidavits typed and copied. She will submit it when she gets it. She did not want to wait any longer due to 2-1-15 deadline on Montez. She has been preparing this for about 3 years. She submitted so many exhibits so that court could see Montez violations.

B 20

*Exhibit 35*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

MONTEZ, et al.,

vs.                                   CIVIL ACTION NO.: 92-N-870(OES)

HICKENLOOPER, et al.,

(29) *Issue 3.*

## F.D.O.C. DISREGARD OF THE INTERSTATE CORRECTIONS COMPACT *and Montez Remedial Plan*

(A)     **COMES NOW**, Jill Coit, pro se, and does hereby declare that the Florida Department of Corrections is in violation of the Interstate Corrections Compact *(and Montez.)*

(B)     Per FSA SEC. 941.56, Interstate Corrections Compact ARTICLE IV- Procedures and Rights, (c) inmates confined in an institution pursuant to the terms of this compact shall at all times be subject to the jurisdiction of the sending state and may at any time be removed thereof or transferred to a prison or another institution within the sending state, for transfer to another institution which the sending state may have a contractual or other right to confine inmates....

(C)     Coit alleges that she is Colorado inmate under the jurisdiction of Colorado as referenced above (c). As such, the Florida Department of Corrections must obey Colorado court orders (US District Court order Hickenlooper case number 92-CV-00870-CMA Class Action Remedial Plan (Montez). Coit received grievance number 14-6-37443 by T. Bowden dated 12-19-14 which states, "your administrative appeal has been received, evaluated and referenced to the ADA coordinator who provided the following information; the court order pertaining to v. Hickenlooper et al 92-CV-00870-CMA Class Action Remedial Plan is applicable only to offenders housed in the Colorado Department of Corrections. The court order. The Colorado court does not have authority over the Florida Department of Corrections and therefore the department is not required to comply with such a court order. You have been advised of this on numerous occasions and it will not be addressed again in the future.

Based on the foregoing information your appeal is denied. *N this was Florida's DOC answer to not obeying the Montez Remedial Plan.*

(10)    Coit alleges that the court order entitled Special Order of Special Masters addressed this issue that the Florida Department of Corrections must comply with a Colorado court order.

(11)    On April 22, 2011 the US District Court of Colorado responded with, "the Special Masters cannot advise advice to clients or other inmates.  The Remedial Plan would have applicability only if claimant remained a Colorado inmate but was housed in a Florida facility."

(12)    Coit alleges that the Florida Department of Corrections must obey a Colorado court order.  Coit submits the following Florida case sites to backup the fact that the Florida Department of Corrections must obey court orders; Griffin vs. Gomez 741 F3d 10 (page 14 of 22); Maness vs. Myers 419 US 449, 458, 95 S.Ct. 584; Howat vs. Kansas 258 US 181, 189-190, 42S.Ct.227; Worden vs. Sears 121 US 14, 7S.Ct.214.

(13)    Also in Coleman vs. Brown 92 F.Sup.2d 1004, 1054; State vs. Schmidt 474 So. 2d 899 (Fla. App. 5th District 1985-Ten Fla. L. Wkly 1579. "all orders and judgments of the courts must be complied with promptly."

(14)    Coit alleges that the Montez Remedial Plan was a court order and the Colorado Department of Corrections and the Florida Department of Corrections must comply with court orders because Coit is a Colorado inmate that is housed in the Florida Department of Corrections.  All court orders must be obeyed no matter which institution Coit is imprisoned.

(15) Remedy: Return Coit to Colorado where Montez Remedial Plan is in effect and also have the Benefits of the Montez Remedial Plan

(3 0)    Per FSA SEC. 941.56, interstate corrections compact page 3 of 7 Article IV-Procedures and Rights; (d) each receiving state shall provide regular reports to each sending state on the inmates of that sending state in institutions pursuant to this compact, including a contact record of each inmate, and certify said record to the official designated by sending state, in order that each inmate may have official review of his or her record in determining and altering the disposition of said inmates in according to the law which may obtain in sending state in order that the same may be a source of information for the sending state.

Coit alleges that because the Florida Department of Corrections refuses to obey the US District for the state of Colorado Montez Remedial Plan court order stating "the Remedial Plan would have applicability only if claimant remained a Colorado inmate but was housed in a Florida facility.

Per Special Masters dated April the 22nd 2011-see attached Montez Remedial Plan court order.

(3 1)   Coit alleges that she has been denied copies of the reports that the Florida Department of Corrections sends to Colorado and that she further alleges that the Florida Department of Corrections classification officers are not documenting the fact that Coit has repeatedly advised them that the Florida Department of Corrections is not meeting her ADA needs.  Coit also advised the classification officers that they are not obeying the Montez Remedial Plan and that Coit has been physically injured due to the Florida Department of Corrections refusing to obey the Montez Remedial Plan and court order.  ¢ 36

(3 2)   Coit alleges that she has repeatedly filed grievances on the fact that the Florida Department of Corrections has not obeyed the Montez Remedial Plan or her ADA accommodation requests.  Coit submits grievance number 14-6-37443 dated 12-19-14 by Florida Department of Corrections grievance officer T. Bowden.  Coit calls attention to the fact that the third line down states, the court order pertaining to v. Hickenlooper et al 92-CV-00870-CMA Class Action Remedial Plan is applicable only to offenders housed in the Colorado Department of Corrections.  "The Colorado court does not have authority over Florida Department of Corrections and therefore the department is not required to comply with such a court order."  Colorado

(3 3)   Coit alleges that the Florida Department of Corrections has been in violation of the Montez Remedial Plan and the ADA Americans with Disabilities Act since January 2011 when Coit entered the Florida Department of Corrections until the current date as stated below.  1 – 28-15

(3 4)   FAC SEC. 941.56 Interstate Compact Agreement, ARTICLE IV-Procedures and Rights

(h) any inmate can find pursuant to the terms of this compact shall have any and all rights to participate in and derive any benefits while incur or be relieved any obligations or have any such obligations modified or his or her status changed on account for any action or procedures which the inmate could have participated if confined in an appropriate institution of the sending state located within such state.

Coit alleges that were she confined in Colorado she would be entitled to the Montez Remedial Plan and all of its benefits including the ability to check out a computer-personal computer from the library.

Coit is legally blind as documented by the Florida Department of Corrections see attached medical report. exhibit 1

(3 5)   See page 22 of the Montez Remedial Plan XV 11-Library Equipment. "Electronic equipment, such as audio equipment, tape recorders, and computers will be available for use and when appropriate to be checked out in the general library and in the other areas where appropriate, for use by inmates with disabilities.

Coit alleges that according to the Florida Department of Corrections exhibit _____3 7_____ C.R. Tate, Classification Officer, Homestead C.I. dated 8-26-11 states that pursuant to title II of the ADA a qualified inmate with a documented disability may request an accommodation to allow her to participate in, or benefit by the programs services or activities of the department....auxiliary aids include; Braille machines, tape players with headphones, books and magazines on tape, magnifying device, key lock, cane, blank audio tapes if needed for correspondence, and orientation to the facility.

(3 6)   Coit alleges that she has attempted to get blank audio tapes that she needs for correspondence but was told by AW Lumpkin that the tape player provided in the law library which is an Olympus tape player does not have the capability of using tapes. see exhibit 37 for authorization.

(3 7)   Coit alleges this is a violation of the Florida Department of Corrections title to the ADA. Coit wants to send out correspondence on tapes.

(3 8)   Coit filed grievance number 1409-314-158 where it looks like Mr. Martinez AWP Martinez on 9-17-14 stated, "there's computers in the education department for inmates use as it relates to GED. I spoke with Mr. Glynn, academic teacher who has an office in the law library. He advised he can schedule you hours per week to use the computers there. There is no space in the educational building at the Annex for additional computers; for that reason the computer that you are referring to for use is in the library for correspondence classes only. Mr. Glynn

( exhibit 31 )

2 4

will meet with you to determine the needs of your request. If this is authorized, you will be notified. Approved in part that you have use of a computer." (Con 3 v)

(39) Coit alleges that were she housed in Colorado that she would be allowed to have a computer in her cell that has been checked out in the library or another area. According to Interstate Corrections Compact she is allowed to have any and all rights to participate in and derive any benefits that she would have had she been confined in an institution of an sending state. See H above.

(40) Coit alleges that the only way she can use the computer in the library under Mr. Glynn's authority is for a correspondence course. Coit alleges that per the ADA title two she allowed to send blank tapes for correspondence however this facility does not provide the blank tapes for correspondence.

(41) Coit alleges that at Homestead Correctional Institution associate warden Thornton authorized Coit's family to send in blank cassette tapes for Coit's use however Coit was transferred prior her being allowed to use said tapes. Coit alleges that said tapes are in property at the present time at LCI Annex. (in her legal box).

(42) Coit alleges that she be allowed to either use a tape player that allows the recording of tapes or that she be allowed to use the computer and type her letters correspondence. Coit alleges that she has a hand impairment that is documented with the Florida Department of Corrections and medical mass documentation and that she wears pica hand splints. Coit alleges that she has had numerous grievances returned because they are not legible. Coit alleges that she has no way to write documents that are legible due to her hand impairment.

(43) Coit alleges that under the Interstate Compact's agreement she should be allowed to have a computer because according to FAC SEC 941.56 she is allowed any and all rights she would have been allowed had she been housed in Colorado.

(44) Coit alleges that the Florida Department of Corrections-LCI-Annex is in violation of the Interstate Corrections Compact and thus Monty Remedial Plan.

25

(45)   FAS. SEC. 941.56, Interstate Corrections Compact page 4 of 7 Article IV Procedures and Rules

(i) the parent, guardian or trustee, or other person or persons entitled of the laws of the sending state act 4, advise, or otherwise function with respect to any inmate shall not be deprived of or restricted in his or her exercise of any power and respect of any inmate confined pursuant to the terms of this compact.

(46)   Coit alleges that she is entitled to all benefits under the US District Court State of Colorado under the Montez Remedial Plan because she is a Colorado inmate housed in the Florida Department of Corrections and under the Interstate Corrections Compact she is therefore cannot be deprived of or restricted in her exercise of any power in respect to any inmate confined pursuant to the terms of this compact.

(47)   Article VI-Federal Aid.

Any state partied to this compact may accept federal aid for use in connection with any institution or program, the use of which is or may be affected by the compact or any contract pursuant hereto and any inmate in a receiving state pursuant to this compact may participate in any such federally aided program or activity for which the sending and receiving state have made contractual provisions, provided that if such program or activity is not part of the customary corrections regime, the expressed consent of the appropriate official of the sending state shall be required thereof.

(48)   Coit alleges that since she is over 65 and disabled the Florida Department of Corrections is receiving special aid from the government due to her disability and age. Yet she is denied all programs.

(49)   She is entitled to take part in any programs that are offered by the Florida Department of Corrections and the Colorado Department of Corrections.

(50)   Coit alleges that she is entitled to participate in computer aided drafting design and graphic arts which are programs that she enrolled in prior to being incarcerated in the Florida Department of Corrections in January 2011. And that she is entitled to be enrolled in these programs under the Colorado Administrative Rules but not Florida DOC.

~~Article VII Entry into Force.~~

26

(51) Per 33F.A.C. 33-210.12, Legal documents and legal mail.

(1) All inmates shall have a right of unhindered access to the courts. No provision of this rule shall be applied in such way as to conflict with any rules of court.

(52) Coit alleges that per F.D.O.C. rules and regulations all court orders must be obeyed as referenced in 33-210-102. Coit alleges that the Florida Department of Corrections must obey US District Court of Colorado rules for the Interstate Corrections Compact inmate Jill Coit. Or be in violation of the Interstate Corrections Compact.

(53) The F.D.O.C. did not say that they only had to obey Florida Court rules it said any court rules.

Per 33 F.A.C. 33-401.601, Medical consultants _and_ non department providers.

(54) (8) Any court orders received directing that a medical consultation take place or directing the department to transport an inmate or allow an inmate to be transported to a medical consultation shall be immediately forward to the office of the general counsel for review.

Coit alleges it says any court orders it does not specify a Florida court order. F.D.O.C. is in violation of the US District Court Colorado-Montez Remedial Plan.


(55) FSA section SEC.944.09, Rules of the department; offenders, probationers, and parolees.

Page 2 of 10 (n)…if visiting is restricted by court order; permission for special visitation may be granted only by the judge issuing the order.

Coit alleges that nowhere does it say it has to be a Florida court order it stands to reason that if any US District Court or any court in the United States issues an order restricting visitation by minor children the Florida Department of Corrections must obey the court order.

The Florida Department of Corrections does not get to select which court orders they obey and which court orders they don't. Coit alleges the Florida Department of Corrections is in violation of the Interstate Corrections Compact and all Supreme Court rulings Florida rulings and United States rulings of other courts stating that court orders must be followed.

(56) Again per FAC SEC.944.09 Rules of the department; offenders, probationers, and parolees (4) the department shall; (a) investigate all cases referred to it by the circuit court and make its findings and report there on in writing to such court with its recommendation.

Coit alleges that it does not say only Florida court cases.

(57)    (6) the department shall maintain the following information within its automated inmate information system regarding each inmates; (b) the amount of restitution ordered by the court.

Coit alleges that the Florida Department of Corrections is authorized to withhold restitution by any court in the United States orders from the inmates' inmate banking account.  Nowhere does the Florida Department of Corrections get to decide which court orders they want to obey.  Restitution is owed no matter what state you're in.

(58)   Per 33 F.A.C. 33-104-101 News media visitors.

(1) Permission for visits by a bonified news media representative shall not be reasonably withheld.  This shall apply to visits for inmates other than death row sentenced inmates with an active death row warrant.

Coit alleges that she has been denied a visit with Julie Brown with the Miami Herald and that it is unreasonably being withheld.

"It shall be the responsibility of the news media representative's requesting the visitation to present to the office of the communications evidence sufficient to establish that such person is a bonified news media representative and to provide the information sufficiently in advance so that it may be verified."

(59)   Coit alleges that the Miami Herald reporter Julie Brown contacted the office of communications and was denied visitation with inmate Jill Coit.  There was no reason given for the denial.  Jill Coit is an interstate corrections compact inmate that was physically injured and sexually abused by F.D.O.C. Tom Robertson.  Inmate Coit alleges she has a first amendment right to talk to the press regarding the conditions of confinement.

(2) news media representatives consisting of persons whose principal employment is gathering and reporting news for a; (b) newspaper reporting general interest information news and circulated to the public and the community where it is published;.

(60)   Coit alleges that Miami Herald newspaper is distributed throughout the Ocala community and therefore reporter Julie Brown meets this qualification.  Reporter Brown has a constitutional right to interview inmate Jill Coit regarding the conditions of confinement.

(3) news media visits to correctional facilities shall be prearranged with the office of communications.

(a) news media representatives shall be required to provide news station id and two verifiable contacts for the media group they represent.  Phone numbers for these contacts and for each member of the media crew must also be provided.  If the contacts provided do not confirm the representatives association with respective media group, the representative shall be required to provide two additional contacts.  If such contacts do not confirm the representatives association with the respective media group, the interview shall be canceled and the media representative shall not be permitted for future interviews.

Coit alleges that Julie Brown is a member of the Miami Herald staff and therefore meets these qualifications.

(61)   Page 2 of 4 (k)(3) inmates are not allowed to accept compensation for media interviews.

Coit alleges that she has not been offered nor would she accept compensation for a media interview.

(4) inmate interviews. Media representatives wishing to conduct in person inmate interviews must; write the inmate in accordance with the provision rule 33-210.101 FAC and request a handwritten, signed and dated letter of consent from the inmate.

(63) Coit alleges that she sent Miami Herald interviewer Julie Brown a handwritten signed dated letter of consent stating she would like to meet with reporter Julie Brown.

Page 2 of 4 (1) phone interviews. Phone interviews are not coordinated through the office of communications. To obtain a phone interview, news media representatives must write the inmate and request to be added to his phone list. The inmate will call you collect at his discretion once you have been added. This process can take several months.

(64) Coit alleges that she fears that she will be retaliated against for attempting to bring forth her allegations against the Florida Department of Corrections on the conditions of confinement that she has experienced and will not be allowed to add Julie Brown to her phone list. Inmates are only allowed to add phone numbers twice a year. Coit alleges that her time to add phone numbers and people to her list is February 2015 and she fears she will not be allowed to add Julie Brown to her list.

(65) This violates Coit's first amendment right to address the conditions of confinement. Coit has filed numerous grievances alleging that the Florida Department of Corrections is in violation of the Interstate Corrections Compact and that the conditions of confinement in the Florida Department of Corrections is brutal cruel and unusual. Coit alleges that disabled inmates as well as interstate corrections inmates are not safe in the Florida Department of Corrections. Coit alleges that she has been denied ADA accommodations that she would have been afforded if she had remained in the Colorado Department of Corrections. Coit alleges that she has court orders saying that the Montez Remedial Plan is to be obeyed and the Florida Department of Corrections under the Interstate Corrections Compact. However the Florida Department of Corrections refuses to obey the Colorado US District Court orders under the Montez Remedial Plan.

(4) inmates are allowed only one hour long interviews per month.

Coit alleges she will only take one hour long interview when authorized with Julie Brown with the Miami Herald.

(66) Coit alleges that the Florida Department of Corrections is violating their own administrative regulations in denying Coit access to the media. There is no legitimate penalogical reason for Coit to be denied media access.

Article VII Entry into Force

(67)     This compact shall enter into force; and become effective and binding upon the state so acting when it has been enacted into law by any two states.  Thereafter this compact shall enter into force and become and binding to any other of said states upon similar action by such state.

Coit alleges that the Florida Department of Corrections is in violation of the Interstate Compact and that this above statement proves that they are in violation when they refuse to obey the US District Court of Colorado order.

(68) Coit alleges that she provided This Court with numerous News Media reports of sexual & physical abuse committed By FDOC officers.

that Coit is Not safe here in FDOC and needs to Be returned to Colorado where Montez applies.

Coit is Not even Transported in a Van with heat or air yet she must ride in over 100 degree heat and 34 degrees cold for more than 5 hours on Medical Trips for FDOC Medical Specialist.

See Ex hibit 38 - grievance No 1402-314-116

Is this humane Treatment - Even animals are transported with some means of getting air. There is No air, the Vents were covered up when covering was added to Van.

3 1

*All I want is to Be declared permanently disabled under Montez Vision and hearing and*

For all of the above reasons Coit alleges that in the interest of Justice and to preserve her Montez Remedial Plan case that the Colorado court appoint her an attorney just for reviewing and filing her Montez claim under the following; vision impairment, hearing impairment, mobility, and ADA accommodations.

*Colorado Doc Oked hearing aid for right ear - a BTE hearing aid that covers Bleeding when worn with my glasses - I should not have to chose between seeing or hearing, I should Be able to do Both. I continue to get hurt because the Doc does not meet my ADA needs and* Respectfully Submitted, *the Montez Remedial Plan accomodations are not allowed.*

*Jill Coit*

Jill Coit
Lowell Correctional Institution – Annex
11120 N.W. Gainesville Road
Ocala, Florida 34482

*1-28-15*

*Coit realizes there is a lot of duplication she had to use documents she prepared a long time ago Because she can not get her claims typed or Robust copied.*

## CERTIFICATE OF MAILING

I hereby swear under the penalty of perjury that I have placed in the hands of the LCI Annex officials for mailing to the US District Court the above legal documents.  Postage prepaid and First Class. *and that the above is true and correct to the Best of my ability.*

/s/ *Jill Coit*

dated *1-28-2015*

*1-28-2015
Jill Coit*

## US DISTRICT COURT FOR THE STATE OF COLORADO

**MONTEZ, ET AL**

v                                                    **CASE NO.: 92-CV-870**

**HICKENLOOPER, ET AL**

---

## LIST OF EXHIBITS

---

**COMES NOW** Jill Coit, Plaintiff pro se in the above captioned matter and does hereby submit a list of exhibits.

(1)   Patient is legally blind

(2)   Court ruling-Montez applicability

(3)   BTE hearing aid makes behind the ear bleed when worn with glasses.

(4)   Took new impressions for ITE style aid as recommended by doctor. Due to size of canals and interference with glasses.

(5)   Purchase and delivery agreement for BTE hearing aids $495. plus forty dollars. equals $535.00

(6)   Cost of ITE hearing aid $395.

(7)   Cost of BTE hearing aid $99.

(8)   Location throughout Florida-Beltone

(9)   Email on BTE hearing aid cannot wear because it causes bleeding behind the ear

(10)   See DOC denied ITE hearing aid

(11)   F.D.O.C. Medical-injury in Papa dorm-LCI Annex-inmates fighting—(*LCI-ann 2-7-14*)

(12)   Records review indicate that your state of origin has denied the doctors request for you to see (A) Audiology (B) Orthopedics

(13)   Abilities Unlimited denial records by C.D.O.C.

(14)   C.D.O.C. hearing screening-for 4-16-04 "hearing good with hearing aid."

(15)   C.D.O.C.-DWCF-attempt to do hearing test-"due to ear canal abnormally"-Coit 00326-Defendant's exhibit

(16)   Security-totally disabled

*Exhibit 41 - FDOC telling me to grieve CDOC*
*on denial of ITE hearing aid*
*ex 42. FDOC · letter ADT-*
*ex 43 · insurance Ex. hibit Boots to small - La Cearo*
*ex 44. medical shoes on ADA Mats Reconandation*
*ex 45 - Vision loss - 35 to 40% - right eye.*

(1)

(17)   Article of inmate's death and F.D.O.C. system wide problems-22 pages of exhibits of inmates death or Florida Department of Corrections errors in treating its inmates

(18)   James Walton-DWCF-August 2010 meeting

(19)   J. Kirby CID investigator meeting with inmate Coit at Florida-2011 meeting Homestead Correctional Institution.

(20)   Wheelchair lost letter-letter stating that will return wheelchair backpack and other ADA items that were lost to Coit when they are found

(21)   Every time moved must filed ADA accommodation form-grievance from the Florida Department of Corrections their response.

(22)   Ocala hospital records

(23)   Colorado Department ADA accommodations 2010

(24)   Colorado Department of Corrections ADA accommodations for 2009

(25)   F.D.O.C.-orthopedic shoes top of shoes hit hammer toes

(26)   C.D.O.C. medical shoes – orthoshoe

(27)   Denver health medical report exhibits   Custom Shoe

(28)   F.D.O.C. grievance of refusing to obey Colorado court order

(29)   ADA returned accommodations AW Lumpkin 9-17-14

(30)   Hadley School for the Blind approval for courses letter dated 2011

(31)   Letter for computer correspondence courses being allowed   Mr. Glen

(32)   ADA transfers

(33)   Denial of Montez court order.

(34) Hearing aid issues evidence - affidavit

(35) FDOC not obeying the Interstate Corrections Compact with regard to Montez

(36) Denial of copies of ADA report sent to Colorado.

(37) Toto's letter – "I need to check the status of the initial paper work submitted at Broward CF.   Coit was housed in BCI (1-26-11 to 2-10-11. Con or about)

(38) No heat or air in Van – grievance No 1402-314-116

(39) Montez – Library Equipment

(40) grievance on being (2) sent to doctor that did not even speak English. – grievance No "1208-314-019

# CONSULTANT'S REPORT

**NO PROCEDURE(S) MAY BE PERFORMED WITHOUT PRIOR APPROVAL BY THE REGIONAL MEDICAL EXECUTIVE DIRECTOR, DEPARTMENT OF CORRECTIONS**

**Additional History:**

67 WF        Inf Altitudinal defect
             OD   2° Stroke

**Findings:**

BVA   20/50
      LP

**Recommendations:**

Pt is legally Blind Based on criteria for Visual Field And is eligible for services for the Legally Blind.

S. RAZDAN M.D.
CHO, Chief Health Officer
HOMESTEAD CI

Consultant Signature/Stamp: _____    Date: 5-12-11

**IT IS ABSOLUTELY NECESSARY THAT INMATES ARE NOT MADE AWARE OF ANY INFORMATION PENDING ANY APPOINTMENT OUTSIDE THE INSTITUTION**

Inmate Name COTT, JILL
DC# 163936        Race/Sex W/F
Date of Birth 6/11/1944
Institution HOM CI
EOS DATE: LIFE

USE ADDITIONAL SHEET(S) AS NECESSARY



Form is not to be amended, revised or altered without approval of the Deputy Assistant Secretary of Health Services Administration

DC4-702 (Revised 10/05) Page 2 of 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-CV-870-JLK

JESSE MONTEZ, et al.

     Plaintiffs,

-vs.-

BILL HICKENLOOPER, et al.

     Defendants.

_____

Claim Number 03-129
Category III
Claimant: Jill Coit, #86530
Address of Claimant: HCI, 19000 S.W. 377th Street, #200, Florida City, FL 33034

_____

### ORDER OF SPECIAL MASTER

_____

THIS MATTER comes before the Special Master on the notice of change of address filed by Claimant. *Doc. #5033.* On that document, Claimant has handwritten a question concerning the applicability of the Remedial Plan applying to a Florida correctional facility.

The Special Master cannot provide advice to Claimant or other inmates. The Remedial Plan would have applicability only if Claimant remained a Colorado inmate but was housed in a Florida facility. Claimant should contact class counsel for further clarification.

IT IS HEREBY ORDERED that Claimant's notice of change address is accepted for filing.

SIGNED this 22nd day of April, 2011.

BY THE COURT:

_____
Richard M. Borchers
Special Master

Exhibit 2
c-19 4

# STATE OF FLORIDA
## DEPARTMENT OF CORRECTIONS
### CONSULTATION REQUEST/CONSULTANT'S REPORT

Scanned 4/8/14

| TO Institution: Beltone | FROM Institution: LOWELL CI | DATE OF REQUEST: 4/8/14 |
|---|---|---|
| Reason(s) for consultation: Evaluate and recommend diagnostic plan_____ Evaluate and recommend treatment plan_____ Other (specify):_____ | Type of consultation: Emergency _____ Urgent _____ Routine _____ Follow-up   X | DATE APPOINTMENT MADE: _____ Staff Signature: CSimons |
| Follow-up consults require justification | | APPOINTMENT DATE: See attachments |

Condition is (check one):  ☐ Acute Trauma      ☐ Acute Illness      ☑ Chronic

History of present illness (include onset, presentation, progress, therapy):

Patient to follow up.. took new impressions for ITE style aid,

Physical findings:

Diagnostic findings (explain laboratory, x-ray, or other test findings):

BTE aid makes behind the ear bleed when worn with glasses.

Other pertinent information:

Provisional diagnosis: bilateral hearing loss

Health Care Provider Signature/Stamp: _____ J. ALMEYDA M.D. LOWELL C.I.

CHO/Designee Approval Signature/Stamp: _____

## AUTHORIZATION FOR SPECIALITY EVALUATION

I, the undersigned, have had explained to me and understand that I require _____ which cannot be accomplished at _____

I also understand that should hospitalization and/or surgery be necessary, a separate consent form will be signed prior to such hospitalization and/or surgery.  I therefore consent to be referred to a reception and medical center, or such other health care facility as may be appropriate for the reason(s) stated, and consent to undergo health care services as may be necessary to evaluate my health status.

Signature of Patient: _____          Date: _____

Signature of Witness: _____          Date: _____

## IT IS ABSOLUTELY NECESSARY THAT INMATES ARE NOT MADE AWARE OF ANY SCHEDULING INFORMATION PENDING ANY APPOINTMENT OUTSIDE THE INSTITUTION

Inmate Name  Coil, Jill          w/F
DC# 163936          Race/Sex
Date of Birth  6/11/44          life
EOS DATE: _____

LOWELL CI

DC4-702 (Revised 12/1/10) Page 1 of 2

CSimons
Lowell CI
Scheduler/Corizon

# CONSULTANT'S REPORT

**NO PROCEDURE(S) MAY BE PERFORMED WITHOUT PRIOR APPROVAL BY THE REGIONAL MEDICAL EXECUTIVE DIRECTOR, DEPARTMENT OF CORRECTIONS**

**Additional History:**

**Findings:**

EAM's Unoccluded

BTE Aid makes behind the ear bleed when worn w/ glasses

**Recommendations:** Took new impression for ITE style aid as Recommended by Dr. due to size of canals and interference w/ glasses

G. McNEAL BELTONE
SOPC
RECEPTION MEDICAL CENTER

**Consultant Signature/Stamp:**                                        **Date:** 4/7/14

## IT IS ABSOLUTELY NECESSARY THAT INMATES ARE NOT MADE AWARE OF ANY SCHEDULING INFORMATION PENDING ANY APPOINTMENT OUTSIDE THE INSTITUTION

**Inmate Name** Coit, Jill    W/F
**DC#** 163936    **Race/Sex**
**Date of Birth** 6/11/44
**Institution** cSLCI
**EOS DATE:**

USE ADDITIONAL SHEET(S) AS NECESSARY

LOWELL CI    (N)

DC4-702 (Revised 12/1/10) Page 2 of 2

# PURCHASE AND DELIVERY AGREEMENT

## Beltone™
*Helping the world hear better*

☐ 3383 Sheridan Street • Hollywood, FL 33021     (954) 963-1934
☐ 10041 Pines Blvd. • Ste. D • Pembroke Pines, FL 33024     (954) 362-0444
15100 NW 67 Ave Ste 110 MIAMI LAKES, Fl 33014 (786)235-534

INSTRUMENT ORDERED BY: _Jill Coit_ _DC# 163936_
ADDRESS: _Homestead Correction Institute_
CITY: _____ STATE: _____ ZIP: _____
HOME TELEPHONE: (305) 242-1756     OTHER TELEPHONE: _____

| | |
|---|---|
| ☑Right ☐Left ☐New ☐Used | ORDER DATE: _6/30/11_ |
| MAKE: ☑Beltone ☐Other_____ | DELIVERY DATE _____ |
| MODEL: ☐Invisa ☐Petite ☐Opera ☐Optima | HEARING INSTRUMENT (S) @ $ _495.00_ |
| ☑BTE ☐Open | (1) Ear mold _40.00_ |
| ☐Digital_____ | |
| ☑Other _590_ | FITTING FEE: $ ~~195.00~~ VOID |
| SN RIGHT_____ | TOTAL SALES PRICE: $ _535.00_ |
| SN LEFT_____ | |

**HEARING AID WARRANTY**

REPAIR/LS&D _One_ YEAR(S)

EXP. DATE_____

**THERE IS A $350 PER INSTRUMENT DEDUCTIBLE FOR EACH LS&D CLAIM FILED WITHIN THE WARRANTY PERIOD.**

| |
|---|
| PAYMENT WITH ORDER Method of Payment: _____ $ |
| AMOUNT DUE UPON DELIVERY $ |
| AMOUNT PAID UPON DELIVERY Method of Payment: _____ $ |

A HEARING AID WILL NOT RESTORE NORMAL HEARING NOR WILL IT PREVENT FURTHER HEARING LOSS.

### 30 DAY REFUND PERIOD AND MONEY BACK GUARANTEE

THE 30 DAY REFUND POLICY. The dispenser agrees that the purchaser may return the hearing aid(s) in the original condition less normal wear and tear, for a full refund of the total purchase price, less the preparation fee of $150.00 for one hearing aid and $200.00 for two hearing aids within 30 days of the date of delivery of the hearing instruments, pursuant to Florida State Law, Section 484.0512, FS. In addition there will be a cancellation fee of 5% of the total purchase price. Purchaser shall not be entitled to incidental or consequential damages under this refund policy. The 30-day term of this refund policy begins on the day following the date of delivery and continues for a period of thirty days, not including the day of delivery. This 30-day period will be extended by one day for each day during which the hearing aid(s) is/are out of the Purchaser's possession for any repairs, or circuit option changes. This refund will be paid solely to the purchaser or the customer (if not the Purchaser).

Purchaser (and Customer, if not the same as Purchaser) acknowledges that he or she fully understands the terms of this contract.

_____     _____
Beltone Authorized Dispenser     State License#          Purchaser's Signature

I have been told about the benefits of the Tele-Coil Systems available to me on some hearing aid models. Int._____

Waiver: I have been advised that the Food & Drug Administration has determined that my best health interest would be served if I had a medical evaluation by a licensed Physician (preferably one who specializes in diseases of the ear) before purchasing a hearing aid

_____
Signature

Any complaint concerning the hearing aid and guarantee, if not reconciled with the licensee from whom the hearing aid was purchased should be directed to: Department of Health, Consumer Services Unit, 4052 Bald Cypress Way, Bin C-75, Tallahassee, FL 32399-3275. 1-888-419-3456.

H-19

## FREE $1⁹⁹*

**4-Pack of Batteries**

*Limit 2 packs per customer

## FREE

**10-Point Clean & Check of current instruments**

*(any make or model)*

## FREE

**Hearing Tests & Video Ear Scans**

*(a $275 Value!)*

## $1,000 OFF*

a pair of First™ Hearing Aids

Discount takes off MSRP $500 off a single aid. Does not apply to prior purchase. No other offers or discounts apply. **Offer expires 10/31/14**

---

## Low Cost 100% Digital Hearing Solutions

**100% Digital CIC (Completely-in-Canal)**
*Fits up to 40 dB Loss*

## $795* ea.

**100% Digital ITC (In-the-Canal)**
*Fits up to 40 dB Loss*

## $595* ea.

**100% Digital ITE (In-the-Ear)**
*Fits up to 40 dB Loss*

## $395* ea.

*Valid on single instrument. Cannot be combined with any other offers.  Previous purchases excluded.

FLORIDA TODAY

2S MONDAY, OCTOBER 20, 2014

# Beltone

*Helping the world hear better*

After nearly 75 years of innovations, Beltone introduces the world's first made-for-iPhone™ hearing aid...

## Beltone First™

**FEATURES:**

- Industry-leading 2.4 GHz wireless system to stream clear sound direct to your hearing devices from your Apple iPhone™, iPad™, TV, stereo or PC

- World's smallest instrument of its kind; so it's practically invisible

- Cutting-edge Spatial Directionality™ lets you catch every word, even in noisy situations

- HPF80 NanoBlock™ technology protects the entire instrument inside and out – great for active lifestyles.

Made for iPod □iPhone □iPad



Beltone First is compatible with iPhone 5s, iPhone 5c, iPhone 5, iPad Air, iPad (4th generation), iPad mini with Retina display, iPad mini, and iPod touch (5th generation) using iOS 7.X or later. Apple, the Apple logo, iPhone, iPad and iPod touch are trademarks of Apple Inc., registered in the U.S. and other countries.



# Beltone

*Call to schedule a FREE hearing test today!*

**NEW LOCATION!**

## PALM BAY / WEST MELBOURNE
1663 Georgia Street N.E. # 700

**(321) 216-2286**

## SEARS - VERO BEACH
Indian River Mall, 6200 20th St
(Inside Indian River Mall Sears)

**(772) 925-3808**



ACCREDITED BUSINESS

www.BeltoneFlorida.com

## SEARS - MERRITT ISLAND
Merritt Square Mall
(777 E Merritt Island CSWY)

**(321) 216-2232**

## VERO BEACH
2152 58th Ave.
(Across street from WalMart in the RyanWood Plaza)

**(772) 469-3418**

**Trade-Ins Accepted!**

## MELBOURNE
275 No. Babcock Street
(In Babcock Square 2)

**(321) 821-5064**

## SEBASTIAN
14060 US Hwy. 1, Ste L
(In the Bay St. Square Plaza)

**(772) 228-3320**

**In-Home Service available upon request!**

Hearing Tests are given for the purpose of selection and adjustment of hearing instrumentation. Results may vary related to duration and severity of impairment. Early detection is important.

**From:** Byron McNeal [mailto:gbyron    )gmail.com]
**Sent:** Friday, April 11, 2014 11:13 AM
**To:** Gray, Alisha
**Subject:** Re: FW: coit 163936 beltone impressions taken

This inmate already has a BTE aid that she cannot wear because it causes bleeding behind the ear as noted in the consult. It's in good working order, but she's not wearing it due to the problem noted above. Seems like it would be a waste of money to purchase another if she's not going to wear it, however, I will order a new one if that's what is requested. Please advise.

Thank you,

Byron

On Apr 11, 2014 11:01 AM, "Gray, Alisha" <Alisha.Gray@corizonhealth.com> wrote:
This inmate has been approved for BTE Hearing aid only.

[Description: Corizon logo HEX.jpg]
Alisha Gray- Administrative Assistant/Secretary
RMC Medical Scheduling
Phone (386) 496-6078
Fax (386) 496-6085
Alisha.Gray@corizonhealth.com<mailto:Alisha.Gray@corizonhealth.com>

Confidentiality Notice: This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential and privileged information that is exempt from public disclosure. Any unauthorized review, use, disclosure, or distribution is prohibited. If you have received this message in error please contact the sender (by phone or reply by electronic mail) and then destroy all copies of the original message.

From: Collins, K.C. [mailto:collins.katrina@mail.dc.state.fl.us]
Sent: Friday, April 11, 2014 10:42 AM
To: Simons, Cynthia
Cc: Gray, Alisha; Collins, K.C.
Subject: RE: coit 163936 beltone impressions taken

ITE hearing aid was denied by interstate. Per the interstate only BTE will be approved.
Thanks

K.C. Collins
Office of Health Services
Private/Interstate Coordinator
Collins.katrina@mail.dc.state.fl.us<mailto:Collins.katrina@mail.dc.state.fl.us>
Phone: 386-496-6917
Fax: 386-496-6918

CONFIDENTIAL NOTICE: This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential and privileged information that is exempt from public discloser. Any unauthorized review, use discloser, or distribution is prohibited. If you have received this message in error please contact the sender (by phone or reply electronic mail) and then destroy all copies of the original message.

04/11/2014  08:20  7192264                BEHAVIORAL HEALTH                    PAGE  01/06

From:                                     04/11/2014 11:38    #081 P.001/006

## Collins, K.C.

**From:**      Collins, K.C.
**Sent:**      Thursday, April 10, 2014 11:36 AM
**To:**        liz.meelas@state.co.us; Smith - DOC, Randy
**Cc:**        Collins, K.C.
**Subject:**   COIT, JILL FLDC 163936 "ALSO FAXED TO 719-226-4585"

I have attached a consult request for an <u>ITE Hearing Aid</u>, BTE aid has interference with glasses on the above mentioned inmate. This request is pending the disposition from Colorado. Please reply with approval/disapproval to ensure adequate medical care.
INTERSTATE INMATE: Coit, Jill
FLORIDA DC#: 163936
REQUEST: ITE Hearing Aid
STATE RESPONSIBLE: Colorado
Colorado DC#:
EOS DATE: Life
STATE HOUSED RESPONSIBLE: FLORIDA CORIZON

*K.C. COLLINS*
*OFFICE OF HEALTH SERVICES*
*PRIVATE/INTERSTATE COORDINATOR*
*COLLINS.KATRINA@MAIL.DC.STATE.FL.US*
*PHONE: 386-496-6917*
*FAX: 386-496-6918*

*THE REQUEST FOR AN
ITE HA IS DENIED. ONLY
BTE HAs ARE APPROVED.
R Smith 11 APR 2014
719-226-4302*

**CONFIDENTIAL NOTICE:** This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential and privileged information that is exempt from public disclosure. Any unauthorized review, use, disclosure, or distribution is prohibited. If you have received this message in error please contact the sender (by phone or reply electronic mail) and then destroy all copies of the original message.

1



FLOR[I]   DEPARTMENT OF CORRECTIO[N]
## Chronological Record of Health Care

Allergies: _Nifrofen, Tegrol, Demerol, NSD, Tylenol, Aspirin, Bonivot, Plac_

| DATE/TIME | |
|---|---|
| 2/2/14 8:45 | S- "Two inmates fell on me last night at about 9pm. Told by CO to lie down."<br>O- VS- 122/85-98-20-97.2, No distress, noted at this time. Inmate holding (R) side.<br>A- Alteration in comfort. Lungs clear bilaterally. No bruising to (R) side.<br>P- Advised to return to ER if symptoms persists. _L.M. Wilson RN_ |

Inmate Name _Coit, Jill_
DC# _163 936_   Race/Sex _W/F_
Date of Birth _6-11-44_
Institution _LCI_

S- Subjective Data
O- Objective Data
A- Assessment of S and O Data
P- Plan
E-Education

_Exhibit 11_

13

```
MAILED/FILED
WITH AGENCY CLERK
    MAY 23 2012
   Department of Corrections
Bureau of Inmate Grievance Appeals
```

**PART B - RESPONSE**

| COIT, JILL | 103936 | 12-6-11852 | LOWELL ANNEX | I1107S |
|---|---|---|---|---|
| INMATE | NUMBER | GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

**Appeal Denied:**

Your request for administrative remedy was received at this office and it was carefully evaluated. Records available to this office were also reviewed.

Records reviewed indicate that your state of origin has denied the doctor's request for you to see the Audiologist. Please refer additional concerns to your state of origin.

You are encouraged to cooperate with your health care staff by following the treatment regimen prescribed.

Should you experience problems, sick call is available so that you may present your concerns to your health care staff.

CONFIDENTIAL HEALTH RECORD/CARE INFORMATION INTENDED FOR ADDRESSEE(S) ONLY.
UNAUTHORIZED RELEASE OR DISCLOSURE MAY VIOLATE STATE AND FEDERAL LAW.

Ebony O. Harvey IISC

| SIGNATURE AND TYPED OR PRINTED NAME OF EMPLOYEE RESPONDING | SIGNATURE OF WARDEN, ASST. WARDEN, OR SECRETARY'S REPRESENTATIVE | DATE |
|---|---|---|

---

COPY DISTRIBUTION -INSTITUTION / FACILITY
(2 Copies) Inmate
(1 Copy) Inmate's File
(1 Copy) Retained by Official Responding

COPY DISTRIBUTION - CENTRAL OFFICE
(1 Copy) Inmate
(1 Copy) Inmate's File - Inst./Facility
(1 Copy) C.O. Inmate File
(1 Copy) Retained by Official Responding



**FLORIDA**
**DEPARTMENT of**
**CORRECTIONS**

Governor
**RICK SCOTT**

*An Equal Opportunity Employer*

Secretary
**KENNETH S. TUCKER**

501 South Calhoun Street • Tallahassee, FL 32399-2500

http://www.dc.state.fl.us

December 1, 2011

To: Lowell Correctional Facility Annex
Rosario, Luz
11120 NW Gainesville Road
Ocala, Fl 34482

From: Kaitlin Tomlinson
Utilization Management
Reception & Medical Center
Lake Butler, Fl 32054

Re: Coit Jill # 163936
Initial Orthopedist Consult

Message:
Orthopedist Consult has been reviewed and Denied by the Interstate Committee.

The reason Denial is below:
Per Interstate ~ Request for Ortho has been denied. A recommendation is to give Mrs. Coit in house exercises, have her lose weight and if the facility allows – give her a knee brace.

If you have any questions please let me know.

Thanks,

*Kaitlin Tomlinson*
Kaitlin Tomlinson
Utilization Management
Office of Health Services

Cc: Utilization Management File
Aviles, Juan MD-CHO

4089

4-13904
Dear William,(Mr. Beiswenger)

Thanks for making sure my tennis shoes have velcros strapes as we discussed origianlly due to my handicapped hand/deformed hand.

May I please have a copy of my file including your notes onmy newest fiasco of size 10 shoes with glued in insoles that prevent my feet from entering the boots. Plaease make sure that you verify in your notes that the books are not just to wide in the heal but also men's bootsthat are to long.  They are not women's boots.

*Here are 2 Stamps so it di cost you postag.*

Please make sure I have all of your reports even to Colorado Access getting the ortho shoes made,custom.

Just for the record, I asked the Judge if you could do all my braces. I need back braces and hand praces yearly as well as special insoles for the tennis shoes I am allowed to buy so the mold you took for inserts will not be wasted. DOC is trying to get me to settle and I am making it a condition that you provide me yearly braces, etc.
Thanks.

*Bill*
*legally we can not send her stuff + should not have direct correspondance per Facility we are to disregard this request.*

*Thanks*
*Jill Cot — Unit 3-D*
*86530*
*P.o Box 392005*
*Denver, Co*
*80259*

*9 DuBoT 13*

R-16-2004 16:33 FROM:                                    TO:7192264249                    PAGE:05

## HEARING SCREENING

PATIENT NAME _Coit, Jill_

DOC # _86530_                          DATE _3/16/04_

1.  Does the patient have a permanent hearing impairment so severe that he/she must communicate through signing, lip reading or written communication?   Yes (No) (Circle one)

    Is the impairment so severe that he/she cannot hear an emergency warning?   Yes (No) (Circle one)

    Does the patient wear hearing aid(s)?                    (Yes)   No   (Circle one)
    Is the patient completely deaf in both ears?             Yes    (No)  (Circle one)
    If not, is the patient completely deaf in one ear?       Yes    (No)  (Circle one)

2.  Are there any other problems which would interfere with the patient's hearing?   Yes      No
    If yes, what?   _Back ground noise decreases hearing ability. States cannot hear through regular phone without amplification_

    *If the answers to the above questions are NO, do not proceed with the evaluation. If the answers to the above questions are YES, continue the evaluation and refer the patient for an audiogram if one has not been performed in the past year.*

2.  Was the patient born deaf or was deafness the result of later trauma or illness? If later, at what age did the patient lose hearing and to what cause?   _History of Tympanic Membrane rupture as teenager both ears. Had tympanoplasty. Also history of Meniere's disease. Last Audio +1yrs ago._

3.  Does the patient understand and use sign language? If so, which?   _Hearing good with hearing aids_   _Doesn't use it now but one course of sign language (elective)._

4.  Is the patient English speaking?   _Yes_

    *If you have determined that this patient does meet the Montez criteria for a hearing impairment, contact the AIC to discuss what accommodations, if any, are appropriate.*

_Dr w/ Hng_

_Mike A. Lengel_ _(MD)_
**Signature & Title**

_[signature] 14_
(155)

326

## Colorado Department of Corrections
## Consultation Report Form

**Appt#: 109559**

Page 1 of 2
Run Date: 12/12/2008 11:23
**REQUESTED**

| | | | | |
|---|---|---|---|---|
| **DOC #:** 86530 | **Name:** COIT, JILL | | **Facility:** DW/UNIT2 | **Date Initiated:** 12/12/2008 |
| **Gender:** FEMALE | **Security:** MINIMUM RESTRICTIVE | | **SSN:** 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 | **DOB:** 06/11/1944 |
| **Level:** 1 MONTH | **Tele-Med:** NO | **Provider:** HARRELSON, JAMIE , NP | | **SDD:** 03/16/3004 |
| **Request:** AUDIOGRAM | **Auth #:** | | **Number of Visits:** 1 | **PED:** 03/26/3004 |
| **Location:** DENVER HEALTH | **Appt Dt:** | **Specialist:** | | **DH #:** 2098863 |

**Diagnosis and requested evaluation or care:**

**1. CLINICAL INFORMATION:**

Needs audiogram to reasses hearing loss. ? when the last test was done. Has hearing aids that are broken. Has only been using one for the past 2 yrs.

Subjective: Active Medication(s): ASA ENTERIC - 81 MG - ONE TABLET DAILY; CELEBREX - 100 MG - TWO CAPSULES DAILY ***NON-FORM EXP:4/18/09 ***; FOSAMAX - 70 MG - ONE TABLET WEEKY--FOLLOW DIRECTIONS; OYST-CAL-D - 500 MG/200 IU - ONE TABLET TWICE DAILY DO NOT TAKE WITH FOSAMAX; PLAVIX - 75 MG - ONE TABLET DAILY; PREMARIN VAG CREAM - 0.625 MG/GM - VAGINALLY 1/2 APP FULL 2 X WEEKLY FOR VAG ATROPHY.; SINEQUAN - 25MG - ONE CAPSULE AT BEDTIME; ZOCOR - 10 MG - ONE TABLET EVERY EVENING; ZOMIG ZMT - 2.5 MG - 2.5MG AT ONSET, MAY REPEAT IN 2 HR IF NEEDED MAX DOSE 10MG/DAY-30MG/MO

I saw the offender today with numerous requests for various accommodations. i.e. tinted glasses, hearing, Velcro shirts, wheelchair pusher, table to put her papers on, hand dexterity, and lower ext. mobility issues. I advised her that she should put all oftheses req. into ADA.

She brought her hearing aids down today and showed me paperwork from previous hearing aid repairs in DOC in 2002 and 2003. Per her report she has been using them for the past 20 yrs. I am unclear whether she came in with them orwhether we got them. However one of them has been broken since 2004 and the other broke a couple of mo. ago. My plan is to do a new audiogram, I attempted to do the Eros can today but was unable to get the ear plugs to stay in her ears after trying 5 different sizes due to her ear canal abnormality (she has curved canals that are also small). Additionally, I plan to put in a consult to have her hearing aides repaired after the audiogram.

She does have significant arthritis in her C-spine, L-spine, knee, hands, L shoulder rotator cuff tear by MRI and THA. She reports vision loss due to a CVA had sig. vision loss 20/400 in the lt. eye. I will email Frantz MD to see if I can do temporary accommodations until her ADA screening can be done.

Offender Coit also req. a Bone Density scan. States she has never had one and is on Fosamax and Oystershell for these.

Objective: A&Ox3 in NAD

Lungs- CTA
CV- RRR no M/T/G
Abd- S/NT/ND active x 4 (hypoactive)
MSK- limited exam, Gait w/ a limp dueto severe lt. knee pain, had sig. difficulty w/ standing, Is wearing bilat hand braces (well documented weakness in hands previously), Lt. Knee brace on, removed, Hypertrophic knee changes, large effusion at the medial aspect at the joint line, severely TTP.

Assessment:
719.45 - PAIN IN JOINT PELVIC REGION&THIGH
727.00 - UNSPECIFIED SYNOVITIS&TENOSYNOVITIS
715.94 - OSTEOARTHROS UNSPEC GEN/LOC HAND
715.90 - OSTEOARTHROS UNS GEN/LOC UNS SITE
719.44 - PAIN IN JOINT, HAND
354.0 - CARPAL TUNNEL SYNDROME
722.6 - DEGEN INTERVERT DISC SITE UNSPEC
719.41 - PAIN IN JOINT, SHOULDER REGION
99214 - OFFICE/OUTPATIENT VISIT, EST

---- ICD ----- ---- CPT ----

Please do not discuss dates of the follow-up appointments with the offender.
Insurance: Physician Health Partners Phone: (866) 362-1374 FAX: (866) 362-1375
Please send all dictated reports to: Clinical Services - Dept of Corrections - 1410 W. 13th Street, Building 54, Pueblo, CO 81003
Or FAX to your Scheduler @ 719-583-5832

COIT-00326

COIT-MONT 0121

```
.-*** *   REC 2001151   183832 HD0604E0 BCFS   CIP0YA2   FQA2   (F-BCF )   ***

TPQY   DTE:05/31/01   SSN: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           DOC:D29 UNIT:999   PG: 001.
STATUS   NBR YES LOU-05/31 SSACCS NO LOU-05/30 SSR NO LOU-00/00/00
INPUT SOCIAL SECURITY NUMBER 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A   NAME J COIT   USER CODE 999
TPQY CONFIDENTIAL SOCIAL SECURITY DATA - CLAIM NUMBER 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A
INDIVIDUALS OWN SOCIAL SECURITY NUMBER: 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
   JILL L COIT FEMALE BORN:06/11/44 ENTITLED:11/1983
   JILL L COIT                            P O BX 772434   STEAMBOAT CO 80466
PAYMENT STATUS CODE: S7-BENEFITS SUSPENDED IN 05/95
NET MONTHLY BENEFIT IF PAYABLE: $716.00
INPUT SOCIAL SECURITY NUMBER 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A   NAME J COIT   USER CODE 999
TPQY CONFIDENTIAL SUPPLEMENTAL SECURITY INCOME DATA ON 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
***INFORMATION***
NOT IN FILE AS OF 05/31/01
```

EXHIBIT
GGG



Exhibit # 17

( Consist of 22 pages of FDOC
Constitutional Violations and
inmate deaths due to Deliberate
Indifference

There are a few of the on-line
LCI / Florida Department of Corrections
Violations which include;
Sexual Misconduct by guards, guards
Beating and physically abusing
inmates, medical indifference and
refusing to treat Basic medical
conditions causing death to inmates.
Poss Being housed in the Florida
Department of Corrections seems
to be a Death center.

The latest details about Ellington's death on Oct. 1 emerged Saturday following another death at the all-women's prison near Ocala. Michelle Tierney, 48, died Thursday after she was transported from the Lowell Correctional Institution to Ocala Regional Medical Center the day before, her family told the Herald. The problems at Lowell are the latest crisis for the Florida Department of Corrections, which has faced mounting criticism and investigative scrutiny over a rash of unexplained deaths throughout the prison system. The Florida Department of Law Enforcement confirmed Saturday that it is investigating Tierney's death, as it is Ellington's. Tierney's family, as well as sources at the prison, said that Tierney had been seriously ill for some time, and that doctors at the hospital told her family that at the time she arrived at the hospital her feet were blue, she was in septic shock, she had a fever and was suffering from pneumonia.

Exhibit 17 A - 1

20

After inmate's death, sergeant to be questioned Inmate reports threats by guard, turns up dead Florida prison boss fires 32 over inmate deaths Six Florida prison guards arrested on brutality charges For allegedly brutal prison guard, day of reckoning arrives She died early Thursday morning. After serving 14 years, Tierney had been scheduled to go home around the start of the new year. Tierney is the fourth in-custody death this year at Lowell, which was built in 1956. FDLE is investigating all four deaths. Ellington, 48, was found dead in a confinement cell on Oct. 1, just days after she wrote her family telling them that a sergeant at the prison had threatened to beat and kill her.

Three inmate letters, which were given to a Herald reporter by sources who work at the prison, were written by prisoners who did not sign their names because they believe they would be beaten or killed if they told anyone what they know about what happened to Ellington, an inmate known as "Tan." The inmates say that guards have threatened Ellington's cellmate, telling her that if she opens her mouth "the same thing that happened to Tan would happen to her."

"Our families think that we come here and we're safe, but that's not true," wrote one inmate, who has been at Lowell for about a decade. "I've seen lots of injustices but no one cares, and as a means of survival, you learn to turn your head and stay silent in order to stay alive." The inmates asserted that women are routinely beaten by guards for sport, that they suspect that many of the "suicides" at the prison were really killings covered up, and that male guards sexually abuse inmates.

Two of the letters are very detailed, providing the last names of guards, the "cliques" they belong to and how they use inmates as "pawns" in their power struggle to control the prison. "It was almost like a gang," wrote one inmate. Ellington, in the letter to her family, said that "Sgt. Q" — she did not know his name — had threatened to beat and kill her. She said she reported the threats to prison officials. Her family also called the prison, distraught about her safety.

Sgt. Q, later identified as Patrick Quercioli by the union representing prison guards, was scheduled to be questioned last week by FDLE. The inmates, however, said that Quercioli was set up by another officer, who had urged Ellington to complain about Quercioli's threats. It was that officer, the inmates said, who escorted Ellington to confinement the day she died.

In the letters, they urge Ellington's family to check video surveillance cameras in several areas of the prison to see if he may have been the last person to see her alive. The prison system has

14 - A - 2

2-1

opposed letting outsiders — including the Herald — view surveillance video, calling such viewings a security breach. The union said Quercioli was on vacation when Ellington died.

Last week, Ellington's family hired prominent civil rights attorney Daryl Parks to represent them, and paid for a private autopsy. Parks said the autopsy showed that Ellington had signs of blunt-force trauma to her abdomen consistent with being beaten. He and the Florida NAACP wrote a letter to U.S. Attorney General Eric Holder urging him to investigate the death, suspecting that prison officials are covering up what happened. "I continue to have concerns about how we treat inmates in the Department of Corrections. The problem cries out for help on a monumental level," Park said Saturday.

The Herald was unsuccessful in reaching a Department of Corrections spokesperson Saturday. An FDLE spokeswoman, however, confirmed Friday night that it was investigating another death that happened Thursday. Tierney, who had served 14 years for embezzlement, was to be transferred from Lowell on Oct. 30 to another prison, from which she was scheduled to be released in January.

Her son, Ryan Tierney, said she had been mostly healthy during her time at the prison. He said he spoke to her a few months ago and said she was in good spirits and looking forward to getting out and seeing her two sons and her daughter, who are now in their early 20s. They were raised by their maternal grandparents. "I'm more angry than anything," her son said. "Apparently she had cysts everywhere in her body, pneumonia and septic shock. I don't know how any competent medical professional would have let that go."

A nurse at the prison, who did not want to be identified for fear of losing her job, said that Corizon Health, the private health care company contracted by the state to run the prison's medical services, makes it difficult to adequately treat the inmates. "You have to be on a deathbed before you can be sent to the emergency room because Corizon Health doesn't want to pay for it," the nurse said. "The prison is mostly staffed by LPNs (Licensed Practical Nurses) making life-and-death decisions," she said.

Early last month, the Herald requested a year's worth of performance reviews for Corizon Health from the Department of Corrections. The company has been sued hundreds of times in states where it provides prison healthcare. The department delayed responding to the request for nearly a month, then issued a news release in which DOC Secretary Mike Crews threatened to withhold

11-A-3

22

payments to Corizon Health if its performance didn't improve. Three days later, the department provided the public records the Herald was seeking. The records show Corizon Health failing to meet contract standards at virtually every prison it serves. Susan Morgenstern, a spokeswoman for Corizon Health, said her company could not discuss individual patients due to privacy regulations, but she said "clinical decisions are made based on each patient's unique history, physical and/or psychological assessment findings." "Accusations that we make clinical decisions based on financial factors are simply not true," she said in a statement to the Herald.

Tierney's best friend, an inmate who was released last year, said the last letter she received from Tierney was about a week ago. In it, she complained that she was suffering from so much pain in her legs that she couldn't walk and was crying constantly. She was going day and night to the infirmary, but was always sent back to the dorm by the nurses, who told her that it was simply arthritis in her legs. The friend, who would allow the newspaper to use only her first name, Sheri, said the prison is so underfunded that it often doesn't have sanitary napkins in stock. "You have to go ask the male guards for a pad," which is humiliating, she said. "One time an officer told me he didn't have any, and I said 'what am I supposed to do?' and he said, 'use one of your socks.'" Tierney worked as a teacher in the prison, helping other inmates learn how to better read and write. "If it wasn't for her I would have had a hard time there," said Sheri. "She was book-smart, street-smart and educated. She had plans on coming home." Miami Herald staff writer Mary Ellen Klas contributed to this story. The next paragraph starts a new section of the article.

Built in 1956, the Lowell Correctional Institution is Florida's oldest prison for women. It has had a series of suspicious deaths since April. Michelle Tierney is the fourth in-custody death this year.

April 30: Affricka G. Jean, 30. FDLE, with assistance from the Office of Inspector General, classified her case as an "active death investigation."

August 22: Regina A. Cooper, 50. FDLE, with assistance from the Office of Inspector General, classified her case as an "active death investigation."

October 1: Latandra Ellington, 48, was found dead in a confinement cell just days after she wrote her family telling them that a sergeant at the prison had threatened to beat and kill her.

October 9: Michelle Tierney, 48, dies after being ill for some time

Here's one of the article you asked about. It too is from the Miami Harold. I have combined paragraphs.

Randall Jordan-Aparo died weeping and gasping for breath on the concrete floor of his prison isolation cell, naked except for his white boxer shorts. Incensed that he had cursed at a nurse, guards at Franklin Correctional Institution in the Panhandle fired nine blasts of noxious gas into his 13-by-8 cell through a slot in the door and, ultimately, left him there, sobbing. "I can't breathe, I can't take it no more, please help me," he pleaded.

Five hours later, the 27-year-old was found lifeless, face-down on the bare slab. His mouth and nose were pressed to the bottom of the door, as if trying to gulp fresh air through the thin crack. His hair, legs, toes, torso and mouth were dusted with a faint orange residue, a byproduct of the gas. A paperback Bible was under his shoulder.

The Florida Department of Law Enforcement sent two investigators, Michael Kennedy and Michael DeVaney, to look into what had occurred. Their conclusion, summarized in one paragraph: The "disciplinary actions" taken by guards had no bearing on the death. "They just said he got sick," Jordan-Aparo's father, Thomas Aparo, recalled being told by corrections officials.

Four years after the September 2010 incident, Jordan-Aparo's death, and the Florida Department of Corrections' and FDLE's highly questionable account of how and why it occurred have spawned a federal investigation, a new probe by FDLE and an uprising by staff in the prison system's inspector general's office. Four inspectors say their boss, Inspector General Jeffery Beasley, threatened them at last year's Christmas Party, saying he'd "have their asses" if they didn't quit poking their noses into the case, court papers say. Meanwhile, at least three Franklin guards involved in the gassing or its aftermath have been suspended with pay, one since March 2012, the others since summer of 2013. According to documents obtained by the Miami Herald, many others who were involved remain gainfully employed, and some have been promoted.

An investigative detour The Jordan-Aparo case is one of a growing number of deaths being scrutinized by criminal investigators, part of a scandal that has embarrassed the head of the Department of Corrections, Secretary Michael Crews, and begun to tar those closer to Gov. Rick Scott.

17 - A - 5

The current investigations grew out of a 2013 probe of "garden variety" corruption at Franklin, including allegations that a female corrections officer was brazenly engaging in sex with multiple inmates inside the compound. Inmates who were not part of these alleged romps became jealous and complained. Corrections department inspectors Aubrey Land, David Clark, Doug Glisson and John Ulm went to the prison to investigate.

Inmates at Franklin were incredulous, saying the dalliances were a trifling matter compared to the brutal circumstances surrounding Jordan-Aparo's death. Intrigued, the inspectors began digging. They interviewed inmates, studied the use-of-force report, the video captured by surveillance cameras, audio of the incident and photographs of Jordan-Aparo's body. Among their findings:

• A claim by prison staffers that Jordan-Aparo was being "disorderly" before his death was false.
• Initial reports downplayed the fact that Jordan-Aparo was complaining about experiencing extreme pain and simply wanted medical attention, preferably in a hospital.
• Contrary to claims that his cell had been decontaminated after the gassing, photos clearly showed residue everywhere — orange smears on the floor, in the sink and in the toilet bowl. There was a dense orange cloud above the bunk where Jordan-Aparo would have sat.
• Although reports said Jordan-Aparo was issued a fresh set of clothing after the gassing, he was dressed only in dirty, orange-stained boxers.
• Nobody assigned to investigate the matter administratively from the Department of Corrections watched the "use of force" video showing Jordan-Aparo being gassed.

Their conclusion: Jordan-Aparo died as a result of medical negligence and the "sadistic, retaliatory" use of chemical agents on a sick and helpless inmate who did nothing wrong. And that staff reports following the death contained inconsistencies, errors, omissions and outright lies.

According to the four inspectors who went to Franklin, these findings received a frosty reception from Beasley, who soon informed them that *they* were now under investigation. The reason had to do with their handling of the probe into the sexual escapades at Franklin. One inmate, challenged to provide proof of his relationship with the guard, described in detail and diagrammed the tattoos on her buttocks. To verify the inmate's statement, Land obtained a search warrant. A female inspector and lieutenant executed it, located the tattoos and photographed them. The photos were taken as evidence. A lawyer for the corrections officer later complained. For that, they were told, they were now being targeted.

17-A-6

25

Relations between the inspectors and their boss deteriorated further, culminating in the alleged encounter during the 2013 Christmas party. The inspectors went above Beasley's head, approaching Secretary Crews and, ultimately, the governor's chief inspector general, Melinda Miguel. They sought whistle-blower status, essentially a guarantee that they would not face retaliation for bucking the chain of command. In a meeting with Miguel that was tape recorded, with permission, by Land, he detailed what he called the Jordan-Aparo cover-up, other corruption within the department and the retaliation he and others were subjected to by Beasley. Miguel denied whistle-blower status to Land and to the others, who had similarly requested protection.

The four filed suit in federal court in July of this year. In the lawsuit, which names Miguel, her deputy, Beasley and his deputy as defendants, the four say they faced retaliation for trying to investigate alleged departmental wrongdoing, which is their job. Recently, two more inspector general staffers came forward, claiming that they, too, were subjected to threats and intimidation after telling their bosses and Miguel about possible criminal misconduct by prison staff. One of them, inspector James Padgett, claimed that Beasley and deputy Kenneth Sumpter committed perjury and obstruction of justice while trying to squelch other investigations.

In a written statement Friday, Miguel said she and corrections staff are cooperating with the investigation into Jordan-Aparo's death, adding she has "zero tolerance for unethical or abusive behavior" in the department. Crews, in a written statement, said that he is cooperating as well, and working hard to make it clear that "fabrication, lies, deception, retaliation or other unethical behavior" will not be tolerated in the system. Neither Miguel nor Crews would talk about the case with a Miami Herald reporter.

Culture of 'impunity' In May, the Herald began a series of articles about prison deaths with the story of Darren Rainey, a 50-year-old mentally-ill inmate at Dade Correctional Institution south of Homestead. After he defecated in his cell and refused to clean up the mess, Rainey was herded by corrections officers into a locked, closet-like shower and left there, subjected to a stream of unbearably hot water for as long as two hours until he collapsed and died. His pleas for mercy went unheeded, according to inmate witnesses.

Unlike the Jordan-Aparo case, where the recent allegations have been made by highly regarded staffers, the complaints about Rainey's treatment came from fellow inmates, who witnessed what

17- A - 7

went on or heard his screams and sent a string of letters and grievances to prison department leaders. They were ignored. The June 2012 death went uninvestigated for nearly two years, until the Herald began interviewing inmates in May. In the wake of the Herald's reporting, Crews fired Dade Correctional Warden Jerry Cummings and his deputy, Royce Dyke. The guard suspected of being primarily responsible for forcing Rainey into the shower, a beefy former college lineman, resigned in July. To date, no one has been criminally charged. At a pair of news conferences, Crews vowed reforms, not only at Dade Correctional, but across the prison system.

When they filed suit, the prison system inspectors attached copies of the Herald stories on the questionable deaths of Rainey and other inmates to support their claim that the department isn't exercising due diligence in investigating suspicious inmate deaths. Howard Simon, executive director of the ACLU of Florida, said despite Crews' promises of reform, the state's prison system isn't likely to change until people are held accountable and prosecuted. The problem, he said, is not one incident but "a culture within the [Department of Corrections] in which guards feel they can kill inmates with impunity."

Life was not easy for Jordan-Aparo even before he landed in the bleak confines of Franklin Correctional. Shawn Jordan-Aparo, his younger brother, said their birth father was a drug dealer who sexually abused him and his older brother from the time they were little. Their mother, he said, was a drug addict who was in and out of prison and was never able to take care of them. At the ages of 5 and 7, the boys began a nomadic life that Shawn says took them to 28 different foster homes over the next five years, "We got to the point that we didn't even unpack our stuff. We just skipped from home to home," he said. Both boys suffered from a genetic blood disorder, Osler-Weber-Rendu (HHT) syndrome, a treatable but little-known disease that causes abnormal blood vessel formation in the lungs, liver, skin and brain that often leads to chronic nose-bleeding and lesions on the skin and around the mouth. Shawn said he and Randall ended up in an orphanage in Tampa, where they were mentored by the recreation director, who though single, eventually decided to adopt them. "I just knew it would be hard for them to be adopted at their age," Thomas Aparo said. "I wanted to give them a second chance."

But by then, the boys were teenagers, and after spending most of their young lives tethered to foster care, the lure of new-found freedom was too tempting. They struck out on their own and began getting into trouble. "Neither one of us knew anything about drugs, sex, school, friends that get you trouble, having a work ethic. No one really taught us all those things. "We were

17 — A — 8

27

always kind of on our own. We weren't bad people. We did what we had to do to survive. We stole food from Walmart — no gang-banging or violent things,'' Shawn said.

He said Randall was like a father figure, taking care of him and sometimes taking the fall when they got into trouble. While both served time in prison on and off, they remained in touch. In 2010, with Randall doing a stretch at Franklin and Shawn on the outside, the brothers started planning a new life. They spoke on the phone three months before Randall's death. "He was talking like he was happy. He was saying 'I'm almost out and maybe we can get together and change.' And three months after that — bam — he is dead.'' At first, Shawn said, the family was told that Randall had suffocated in his cell. Then they were told he died of internal bleeding. But nothing seemed to make sense because, Shawn said, Randall was in good health the last time he spoke to him. After the memorial service, Shawn heard from an inmate's mother. She said her son had written her from Franklin that Randall's death didn't happen the way the department was claiming.

A week before Jordan-Aparo's death on Sept. 19, 2010, he began experiencing bleeding problems, Department of Corrections records indicate. On Sept. 15, senior registered nurse Pamela Housholder noted that Jordan-Aparo had complained of back pain after falling while playing basketball on the prison grounds. Over subsequent days, Jordan-Aparo collapsed several times and was taken at least three times to the infirmary, where nurses did little to help him, records show. He had a fever of 102, told the medical staff his lungs and his heart were hurting and that he was having trouble breathing. At one point, nurse Martha Greene performed an electrocardiogram, but admitted she wasn't good at reading the results. She said his heart was working fine.

Greene contacted the prison doctor, who instructed her to start an intravenous application and keep the inmate in the infirmary. After several unsuccessful attempts at inserting the IV, they gave up and left Jordan-Aparo in the infirmary overnight, records said. The next morning, at 4 a.m. Sept. 18, Greene and LPN Lucy Franklin examined Jordan-Aparo, who complained he was in pain and needed to go to the hospital.

Jordan-Aparo, becoming agitated, at one point blurted: "I am going to sue your f------ ass. I need to go to the hospital!'' Greene summoned Capt. Mitchell Brown, who without consulting a

17 - A - 9

2-8

doctor, decided to remove Jordan-Aparo from the infirmary and place him in an isolation cell —
No. 1104 — for causing a "disturbance," prison records said.

"Ain't nobody comin' to help you," a guard known as Big Jit told Jordan-Aparo, according to
witnesses. He then ordered the inmate to "man up" and shut up. Jordan-Aparo's file was then
reviewed. Although his disease could cause respiratory difficulties and the department was aware
of his affliction, the file indicated that he "had no known medical condition that would be
exacerbated by the use of chemical agents." At 11:25 a.m., after receiving approval of Col.
Timothy Copeland, the duty warden, Lt. Roland Austin gave the order to gas Jordan-Aparo.

First he was given a "final statement," telling him why he was being gassed. Then, with video
surveillance cameras rolling, Officer James Hamm sprayed three one-second bursts of OC, a
concentrated form of pepper spray, striking Jordan-Aparo in the upper torso, Hamm's report
said. Three bursts equaled one application. At 11:59, Hamm sprayed another three bursts.
Approximately six minutes later, after contacting Copeland, Austin gave the order for a third
application, this time using tear gas, an agent that causes severe burning in the lungs, particularly
in confined spaces. In all, Jordan-Aparo was subjected to 600 grams of chemical agents in a
confined space.

Sven-Eric Jordt, a professor of pharmacology at Duke University who studies the effects of
pepper spray and tear gas, said that after just 10 minutes of exposure to the tear gas alone in such
a confined space, the concentrations would have been near lethal. "Obviously, the agent was
sprayed directly onto the inmate and may have deposited on his skin, clothing, eyes and mouth at
much higher concentrations, with less of it airborne, making the concentrations that much
higher," he said.

The guards said they "escorted" Jordan-Aparo to a decontamination cell, although inmates
would later say that Jordan-Aparo was dragged. Photographs and other evidence raise questions
about whether he was decontaminated at all. "He was orange," one inmate told investigators two
years later. "I can't take it, I can't take the gas, I can't breathe" Jordan-Aparo said, according to
another inmate interviewed by prison system inspectors in 2013.

Jordan-Aparo was so weak after a shower that guards had to put him in a wheelchair to take him
back to his cell. Photographs of his body reviewed by the four inspectors in 2013 show that,
despite visiting the shower, he was clearly still coated with residue. If he and his cell were not

17 - A - 10

29

properly decontaminated, Jordt and other experts said, Jordan-Aparo would have continued to be exposed to the chemicals, breathing in the toxins — until breathing would become almost impossible.

At about 12:30 p.m. he was taken to the infirmary and examined. Nurse Ola Riley couldn't get a blood pressure reading because the inmate was uncooperative, prison records said. But she did record wheezing in the lower right lobe of his lung. She and nurse Franklin then contacted the on-call physician, Dr. Mohammad Choudhary, who instructed them to try again to take his blood pressure. Instead, they allowed the guards to take Jordan-Aparo back to his isolation cell.

Nearly two hours later, reports say, Riley and Franklin went to the inmate's cell in a repeat attempt to take his blood pressure. Jordan-Aparo was unable to move, refused to cooperate and wouldn't sign a release form, so the nurses left, records said. At 4:30 p.m. Sgt. Kevin Hampton tried to give Jordan-Aparo his dinner tray and found him sprawled on the floor. He refused to eat. Asked if he was OK, Jordan-Aparo purportedly gave a thumbs-up sign.

Even healthy inmates are supposed to be checked every 30 minutes, but it's not clear whether anyone looked in on Jordan-Aparo from 4:30 until the time his body was found at 6:08 p.m. The Herald also reviewed hundreds of documents, including letters and emails, showing that the prison's then-warden, Diana Andrews, and Miguel had been told from at least 2011 that there were lingering questions about the way Jordan-Aparo had died.

On the night of his death and the following day, another Franklin inmate, Joseph Avram, called his sisters, Kimberly Donovan, and Christina Bullins, who is a probation supervisor with the Department of Corrections. He told them he had witnessed what the guards did to Jordan-Aparo and was worried about his own safety.

Bullins and Donovan began contacting prison officials, repeatedly writing letters. Bullins, who was also a member of the corrections officers' labor union, said she began receiving threats from her bosses that her job was in jeopardy. In April 2011, two years before the four inspectors approached Miguel, she contacted the chief inspector general to request whistle-blower protection. The request was denied, the inspectors' lawsuit says. She was subsequently fired in a dispute over medical leave.

17- A- B 11                    3 0

Dr. Lisa Flanagan, the medical examiner who did the autopsy on Jordan-Aparo, didn't attribute his death to the application of gas. She wrote that the cause was "complications of multiple cardiac and pulmonary abscesses" and mentioned the gas only as an explanation for the staining of Jordan-Aparo's skin. But in a post-autopsy meeting with FDLE investigators, Flanagan noted that had Jordan-Aparo received timely and proper medical care from the onset of his sickness, he may not have died.

Dr. John Balmes, an inhalation injury expert with the University of California's Berkeley School of Public Health, said the gassing almost certainly contributed to Jordan-Aparo's death. "He had a fever. He passed out. He had a serious blood-born infection and they gave him an irritant gas that can cause fluid in his lungs," said Balmes, who reviewed records at the request of the Herald. "They gave him something that made him sicker and that gas contributed to his death."

Cyril Wecht, a nationally known forensic pathologist who also reviewed the records at the Herald's request, called the case one of the worst he has ever seen in terms of how many people were involved . "This prisoner's abscesses didn't develop overnight, and for him to have been in the [infirmary] and then to be gassed ... the people who have ignored this in some ways are even more ignorant than the horrible guards and nurses," said Wecht, who has been involved in various high-profile cases, including reviewing the deaths of John F. Kennedy, Robert Kennedy, Elvis Presley and Anna Nicole Smith.

Despite evidence of medical neglect and excessive force, no one was charged with a crime. The state attorney's office for Franklin County reviewed the findings and declined to prosecute. The FDLE report said: "Though inmate Jordan-Aparo did complain numerous times of medical problems commencing four (4) days prior to this death, it is not the scope of this criminal investigation to address those issues." That was based on the information available at that time, said FDLE spokeswoman Gretl Plessinger. When new information became available, the case was reopened and it remains active, she said Saturday.

Suspended with pay are Sgt. Hampton (aka, "Big Jit") Lt. Austin and Randall Johnson. A fourth guard, Terry Whitlock, was fired in 2012, though it's not clear if that was connected to the Jordan-Aparo case, and prison system officials declined to explain.

The on-call doctor, Choudhary, held a temporary certificate to practice medicine in an area of critical need — in this case, the prisons. Five months after Jordan-Aparo's death, while on call at

17 - A - 12

31

the Alachua County Jail in Gainesville, he was seen driving erratically, running over curbs, state records show.

He was later found passed out drunk behind the wheel of his car, according to state Department of Health records. A review by the state medical board resulted in a reprimand and a fine, but he kept his license. There is no criminal arrest on his record.

One of the nurses who examined Jordan-Aparo, Patricia Lemon, had her license put on probation for three years prior to coming to Franklin. According to the Florida state nursing board, she was found in 2003 to be forging prescriptions for painkillers. After she served her probation, her license was reinstated, state records show. There is no criminal charge in her name. 3 months too late

Jordan-Aparo, who was serving a 19-month stretch for credit card fraud and drug possession when the guards gassed him, would have been released three months later had he lived. Instead he was cremated, with the remains sent home to Thomas Aparo in Palm Harbor.

Aparo, who had drifted apart from Shawn and Randall, declined to discuss Randall's death. Randall Jordan-Aparo's brother, Shawn, had plenty to say. He is angry. "There is no reason he should have passed away, no reason he shouldn't have been to the hospital," Shawn said. "I never got a chance to say goodbye.''

17 - A - 13

32



# Group calls for overhaul of Florida prisons

BY JULIE K. BROWN - JBROWN@MIAMIHERALD.COM

11/13/2014 12:45 PM | Updated: 11/14/2014 12:02 PM



The cell where Randall Jordan-Aparo, a man imprisoned
for credit card fraud and drug charges, died while
gasping for breath. A Florida Department of Corrections
investigator says Jordan-Aparo was gassed after
threatening to sue the prison.    MIAMI

Disturbed by stories of suspicious inmate deaths and systemic abuse by guards, a Florida State
University think-tank called Thursday for an overhaul of the state prison system to stem the tide
of corruption, mismanagement and maltreatment.

Florida's inability and unwillingness to address the system's widespread failings is dangerous to
the public, costly to taxpayers and, in many cases, fatal to inmates, who are often treated
inhumanely, the group's report says.

The Project on Accountable Justice, a think-tank made up of influential academics and headed by
a former South Florida judge and sheriff, contends that the state could save taxpayers billions by
cleaning up the Florida Department of Corrections.

*17 - A - 14*

*23*

The report came out just as the department's inspector general, Jeffery Beasley, issued his annual report showing that complaints filed with his office nearly doubled in 2013-14 over the previous year. The IG investigated 16,000 of the 59,000 complaints generated.

Beasley's report also shows that instances in which force was used on inmates jumped 16 percent over the previous fiscal year, and they have nearly doubled since 2008.

Beasley lists several accomplishments over the previous year, including establishing a cellular phone forensics lab and 10 regional evidence collection areas. The report doesn't mention any initiatives on his office's part to address the systemic problems that have plagued the prisons.

The department issued a statement pointing out that Secretary Michael Crews has, in the past few months, enacted a series of reforms aimed at bringing more accountability to the agency.

"We see promise in the reforms that we have initiated and the progress that we are seeing through our actions," the statement said.

The reforms were prompted in part by a series of articles by the Miami Herald, the Tampa Bay Times, the Palm Beach Post and the News Service of Florida exposing corruption and inmate abuse in the prisons.

Allison DeFoor, the project's chairman and a former Monroe County sheriff and judge, said the group was alarmed by the stories, calling the treatment of some inmates "horrible, medieval and un-American."

Sen. Rob Bradley, R-Fleming Island, said he is encouraged by Crews' recent initiatives, but believes the Legislature needs to take a fresh look at the agency and possibly consider some of the proposals put forth by the think-tank.

"I would anticipate that we would have a robust discussion about the future of the department and to hear from the secretary and governor's office to make sure these things that have happened in the past do not happen again," said Bradley, who serves on the committee that oversees the prison system budget.

The report included a series of recommendations, including:

▪ Follow the lead of Texas and Georgia and create a public safety oversight commission that would set policy and standards for prisons. The commission would have the authority to inspect all corrections facilities, adult and juvenile; obtain all records related to a facility's operation or condition; conduct confidential interviews with prison staff and inmates and develop recommendations for improving the system.

"You can't run a corporation this size without a board of directors, so how can you run a $2.3billion enterprise without accountability?" DeFoor said.

▪ Raise the minimum standard for hiring corrections officers. The current educational standard is a high school diploma or its equivalent. Also, set up incentives to encourage corrections officers to pursue post-secondary education and advanced training. And set up a voluntary early buyout program to encourage those employees who want to leave to do so.

▪ Decouple the terms of Department of Corrections secretaries from those of the governors who currently appoint them. One option would be to have the corrections commission either appoint the secretary or be "integrally involved in the vetting, hiring and performance process." Another would have the appointment of a secretary be subject to approval by the state Senate, as with the head of the Florida Department of Law Enforcement.

▪ In addition to punishing inmates, make a concerted effort to rehabilitate them.

"As taxpayers and citizens that bear direct financial and societal costs of incarceration and recidivism, Floridians should expect more," the report says.

With 20,000 employees and more than 100,000 inmates, Florida's prison system is the third-largest in the country.

While other states have initiated prison reform in recent years, Florida continues on a trajectory of expensive, outmoded and abusive practices in its prisons, DeFoor said. Governor Rick Scott and Florida lawmakers — on both sides of the political aisle — need to take a hard look at what is wrong with the state's prisons, the former sheriff added.

The body that produced the report includes several influential figures, both Democrat and Republican: FSU President Emeritus Sandy D'Alemberte; former Florida Attorney General Richard Doran; former FAMU President Fred Gainous; St. Petersburg College President Bill Law; Jeff

Kronschnabl, instructor in charge, St. Petersburg College of Policy and Legal Studies; and David Rasmussen, dean of the FSU College of Social Sciences and Public Policy.

The study notes that the department's leadership has changed six times in the past eight years.

"The Department of Corrections is crying out for stability, consistent leadership and specialized, professional guidance," the report says.

Republican State Rep. Matt Gaetz, chairman of the House Criminal Justice Subcommittee, agreed that a lack of continuity and leadership has been a challenge that has plagued the agency for years.

"We've gone through far too many secretaries at the Department of Corrections and that lack of continuity has created a culture that people are able to believe they will outlive the tenure of the secretary," he said.

*Mary Ellen Klas, the Miami Herald's Tallahassee bureau chief, contributed to this story.*

We, along with Steve Andrews represent the Estate of Randall Jordan-Spaco and we will be filing suit in the next few days.   Efan

12 - A - 17

# Tampa Bay Times
**WINNER OF 10 PULITZER PRIZES**

## Group calls for overhaul of Florida prison system

By Julie K. Brown, Miami Herald

Thursday, November 13, 2014 1:26pm

Florida's prison system needs a massive overhaul to stem the tide of corruption, mismanagement and inmate abuse that has plagued the agency not just of late, but for decades, a report issued Thursday says.

The state's inability and unwillingness to address the system's widespread failings is dangerous to the public, costly to taxpayers and, in many cases, fatal to inmates, who are often treated inhumanely, the report says.

The Project on Accountable Justice, a think tank based at Florida State University, contends that the state could save taxpayers billions by cleaning up the Florida Department of Corrections.

The report proposes that Florida:

• Follow the lead of Texas and Georgia and create a public safety oversight commission that would set policy and standards for prisons. The commission would have the authority to inspect all corrections facilities, adult and juvenile; obtain all records related to a facility's operation or condition; conduct confidential interviews with prison staff and inmates and develop recommendations for improving the system.

"You can't run a corporation this size without a board of directors, so how can you run a $2.3 billion enterprise without accountability?" said Allison DeFoor, a former judge and Monroe County sheriff who headed the group issuing the recommendations.

• Raise the minimum standard for hiring corrections officers. The current educational standard is a high school diploma or its equivalent. Also, set up incentives to encourage corrections officers to pursue post-secondary education and advanced training. And set up a voluntary early buyout program to encourage those employees who want to leave to do so.

• Decouple the terms of Department of Corrections Secretaries from those of the governors who currently appoint them. One option would be to have the corrections commission either appoint the secretary or be "integrally involved in the vetting, hiring and performance process." Another would have the appointment of a secretary be subject to approval by the state Senate, as with the head of the Florida Department of Law Enforcement.

• In addition to punishing inmates, make a concerted effort to rehabilitate them.

"As taxpayers and citizens that bear direct financial and societal costs of incarceration and recidivism, Floridians should expect more," the report says.

With 20,000 employees and more than 100,000 inmates, Florida's prison system is the third-largest in the country.

While other states have initiated prison reform in recent years, Florida continues on a trajectory of expensive, outmoded and abusive practices in its prisons, DeFoor said. Gov. Rick Scott and Florida lawmakers — on both sides of the political aisle — need to take a hard look at what is wrong with the state's prisons, the former sheriff added.

The body that produced the report includes several influential figures, both Democratic and Republican, but considers itself an independent, bipartisan group that believes in reform.

The report was prompted in part by a series of articles in the *Miami Herald*, the *Tampa Bay Times*, the *Palm Beach Post* and the News Service of Florida exposing corruption and inmate abuse in the prisons.

DeFoor said the group was alarmed by the stories, calling the treatment of some inmates "horrible, medieval and un-American."

**Group calls for overhaul of Florida prison system 11/13/14**

©2014 Tampa Bay Times

ⓘ                    ⓘ
Commenting Guidelines  Abuse Policy

## Articles and offers from around the Web

Ads by Adblade



# Amid turmoil Florida prisons boss exits

BY JULIE K. BROWN AND STEVE BOUSQUET - JBROWN@MIAMIHERALD.COM

11/24/2014 2:17 PM | Updated: 11/25/2014 9:58 AM



Michael Crews spoke this past July at Dade Correctional Institution on the death of Darren Rainey. He resigned Monday.    AL DIAZ / MIAMI HERALD STAFF

Michael Crews stood in front of news reporters on July 10, 2014, fielding questions about allegations that corrections officers had tortured and killed a 50-year-old Miami-Dade inmate by forcing him to endure two hours in a scalding shower closet specially rigged to inflict pain.

It was Crews' first visit to Dade Correctional Institution, just south of Homestead. That morning, amid some fanfare, he announced a crusade to restore the integrity of the agency, then facing a firestorm over abusive corrections officers, suspicious deaths and cut-rate private healthcare contractors.

But as Crews announced the suspension of the prison's warden and pledged to eliminate the "few bad apples" in the department, he was quietly facing yet another crisis. In that same compound, that same morning, an inmate died while sprawled on the floor of the prison's infirmary. For six hours, he had begged for medical attention as he complained about numbness in his arms and legs.

The embattled secretary, appointed by Gov. Rick Scott two years ago, announced Monday that he is stepping down as head of the Florida Department of Corrections, effective Nov. 30. His retirement comes after months of media scrutiny over prison corruption and the failure of Crews' top law enforcement officer, Inspector General Jeffery Beasley, to investigate and prosecute wrongdoing in the prison system.

That day at Dade Correctional four months ago underscored the limits of Crews' power, despite being in charge of the state's largest agency. It would be almost another 24 hours, Crews later said, before he was fully briefed on the circumstances surrounding the death of inmate Michael Branham, a former cop convicted in 2005 of murdering his wife, a Highlands County attorney.

Branham, records show, had collapsed about 5 p.m. the evening before. Sources at the prison told the Miami Herald that prison staff, as well as the nurses and doctors, refused to lift the 394-pound inmate from the floor, telling him to get his "fat ass up," and accusing him of faking pain as he cried on the floor. Miami-Dade Fire Department records show paramedics were not summoned until 5:54 a.m. the following morning. By then, Branham was dead.

In the weeks that followed that death, Crews ousted Dade Correctional's warden, terminated dozens of corrections officers system-wide for excessive force, launched a public inmate mortality online database and ordered an independent audit of the department's soaring use-of-force rate.

He created an ombudsman to monitor how the agency cares for inmates with mental illnesses, and issued an ultimatum to prison healthcare provider Corizon that it must rectify serious deficiencies in its medical care if it wanted to be paid.

Despite his efforts, Crews could not get a handle on the agency's corruption, which has included corrections officers shaking down prisoners and smuggling in contraband.

In recent months, it came to light that Dade Correctional Institution has been so under-staffed that corrections officers, some of them not certified, had routinely lost count of prisoners. In one such security breach last month, prison officials didn't realize that a convict had escaped until at least four hours after he went missing. He was captured two days later in Palm Beach County.

That same month, 36-year-old Latandra Ellington was found dead at Lowell Correctional Institution in Ocala — just 10 days after she wrote a disturbing letter to her aunt claiming that a corrections officer had threatened to kill her. An autopsy commissioned by her family showed

17-A-20

3q
2/4

she died of blunt-force trauma consistent with being beaten. The death is under investigation by the Florida Department of Law Enforcement. Days after her death, another Lowell inmate, Michelle Tierney, 48, died, with her family claiming that she had been ill for weeks and that doctors at the prison refused to treat her or send her to the hospital.

When she finally arrived at the hospital, Tierney was in septic shock, her feet were blue, she had a fever and she was suffering from pneumonia, according to her family. She died a short time later.

Crews, the sixth prisons chief in the past eight years, started his 30-year career as a corrections officer, then spent more than two decades with FDLE, serving in various capacities, including as chief of the department's professionalism program.

In an interview Monday, Crews said "there wasn't any one incident" that prompted his departure. But he cited a persistent budget deficit, which despite multiple rounds of cost-cutting measures, remains at $25 million.

"It's hard to be the progressive agency you want to be when you're constantly battling budget issues," Crews said.

The union representing corrections officers said Crews, with his law enforcement background, undoubtedly was frustrated with not receiving the support and resources to fully staff and maintain prison facilities.

"This lack of realistic funding and the gradual deterioration of the departmental staff are at the core of the problem," said Bill Curtis, spokesman for Teamsters Local 2011, which represents the system's 21,000 corrections officers.

Sen. Greg Evers, R-Baker, who chaired the Senate Criminal Justice Committee for the past two years, suggested Crews fell out of favor with the governor's office by insisting on money in his next budget for an across-the-board pay raise for correctional officers.

"He was pushing for it and I was pushing for it and that could have been part of the problem," said Evers, whose Panhandle district has more prisons than any other in the state.

Crews, 53, denies there was friction with Scott, who on Monday praised him for working "hard to make Florida communities safer." Deputy Secretary Tim Cannon, who has been with the department for two decades, was appointed interim secretary.

17- A-21

Crews cited stress, combined with the recent death of his mother, in explaining his decision to bow out. He said he has accepted a position as vice president of a Tallahassee-based risk management institute for self-insured sheriffs through the Florida Sheriffs Association.

Crews faced mounting pressure starting in May, after the Herald began an investigation into inmate deaths, starting with a 50-year-old Darren Rainey (http://www.miamiherald.com/news/local/community/miami-dade/article1964620.html), who was serving two years for a drug crime. He died when officers supervising the mental health unit at Dade Correctional forced him into a scalding shower, allegedly as punishment for defecating on the floor of his cell and refusing to clean it.

The Herald then examined the case of Randall Jordan-Aparo (http://www.miamiherald.com/news/politics-government/article1985286.html), a 27-year-old career thief who died in 2010 after he was repeatedly gassed at Franklin Correctional Institution in Florida's Panhandle. Four investigators with the department's inspector general's office subsequently filed a whistle-blower lawsuit (http://www.miamiherald.com/news/local/community/miami-dade/article1974526.html) against Beasley and Scott's chief inspector general, Linda Miguel, claiming Beasley tried to thwart their efforts to expose and punish the officers.

Florida's prison system is the nation's third largest, with more than 100,000 inmates and the second largest Death Row of any state.

Sen. Rob Bradley, R-Fleming Island, a former prosecutor who chairs the Senate budget subcommittee overseeing prisons, said Scott should hire an outsider as the new secretary.

"I think there's a lot of work still to be done to change the culture of that department," Bradley said, "and the only way to effectively change the culture is to bring in someone who has not grown up in the culture."

Exhibit 17 - A - 22

4/4

116

1  run this through the machine because it's come apart.  I

2  need a copy of that so that you're going to know that.

3  You're going to have to put a little piece of Scotch tape on

4  it, but you'll have to hand do the thing.  Did you want a

5  copy of the thing where my glasses--I tell them my glasses--

6  so that you knew that they took my glasses for real?

7          MR. KIRBY:  No, I-- don't think that will be necessary

8          MS. COIT:  Or you don't care, okay.  Okay.  This

9  goes with that.  You can't run--these two sheets you can't

10  run through the normal way, you have to hand do those.

11          MR. KIRBY:  Okay.

12          MS. COIT:  You have the PREA rules, so you don't

13  need that.

14          MR. KIRBY:  Um-hum.

15          MS. COIT:  Okay.  Do you want me to tell you the

16  medical reports you need to get to show the damage?

17          MR. KIRBY:  You know, the--

18          MS. COIT:  Or you don't really care?

19          MR. KIRBY:  --medical side I turn over to medical.

20          MS. COIT:  Oh, that's worthless.  I'm sorry, I

21  don't have a lot of faith in medical.  I didn't go through

22  them on the concussion because every time I would--I hated

23  the doctor at La Vista.  We filed several reports on him.

24  He did not sexually get out of line with me; he was just a

25  total idiot.  And the one that--the doctor that they had

*Exhibit 19.*

COIT-01398



Medical

10-28-11                    Jill, Coit #163936

Medical Dr Rozdon
            When I last saw you
in May/June 2011 - My wheel
chair, Wheel chair cushion, Orange
Back pack and 1 whit Bin was
stored in the closet on your
office.
            You were not present when I
left to Lowell.
            May I please have my
property sent to Lowell? If
you will send it to Sgt. Patterson/
Johns in HCI property room She
will forward it to Dns.

            I was told to file a
Grievance But I see No reason
to do that. Your an
honest person -
            Please Track down my
property

Respectfully

        Jill Coit #163936
        Lowell Correctional Institution
B-Dorm 4102 - Annex
11120 N.W. Gainsville Road
Ocala, Fl. 34482 -

X  Your items will be gathered and sent to you.
        R. FERNANDEZ        12/28/11
           H.S.A.

**PART B - RESPONSE**

| COIT, JILL | 163936 | 1405-314-075 | LOWELL ANNEX | S1101L |
|---|---|---|---|---|
| INMATE | NUMBER | GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

Your request for Administrative Remedy or Appeal has been received, reviewed and investigated with the following response provided.

The response you received to informal grievance # 14-0506 adequately addressed your issue. I have answered all the ADA requests received in this office. According to the attached accommodation request, you were housed at FWRC when it was submitted. You were transferred before the request to FWRC could be answered; therefore your issue was moot at the facility. Anytime you are transferred you must submit a request to your new facility as the accommodations may differ. Lowell CI has not denied your accommodations. The same issue about your library hours was addressed in the grievance #'s 1403-314-185 and 1403-314-186. You should refer back to those grievances for reference.

Your grievance is Denied.

You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal completing the form and providing attachments as required by 33-103 and forwarding your complaint to the Office of Inmate Grievances.

| | |
|---|---|
| SIGNATURE AND TYPED OR PRINTED NAME OF EMPLOYEE RESPONDING | SIGNATURE OF WARDEN, ASST. WARDEN, OR SECRETARY'S REPRESENTATIVE   05/13/14   DATE |

COPY DISTRIBUTION -INSTITUTION / FACILITY
(2 Copies) Inmate
(1 Copy) Inmate's File
(1 Copy) Retained by Official Responding

COPY DISTRIBUTION - CENTRAL OFFICE
(1 Copy) Inmate
(1 Copy) Inmate's File - Inst./Facility
(1 Copy) C.O. Inmate File
(1 Copy) Retained by Official Responding

Mailed
05-15-14

## ACCOMMODATION RESOLUTION

Offender Name: COIT, JILL
DOC#: 86530

### You DO HAVE A MOBILITY DISABILITY

Following a disability screening it has been determined that you have a mobility disability and are therefore, entitled to the following accommodations:

1. Wheelchair
2. Raised Locker Box
3. Medically Necessary Shoes w/ lift
4. Backpack
5. Assignment to a designated facility
6. Assignment to an accessible cell
7. Access to accessible bathroom facilities to include a shower chair or bench and a toilet of appropriate height
8. Seating at an accessible table during meals
9. Lower Bunk
10. Lower Tier
11. Not required to use stairs and when housed at a facility that maintains an elevator for offender use, you are allowed to use the elevator
12. May be seated in wheelchair and present ID for standing count.
13. Additional time to arrive at destinations within the facility
14. Additional time to complete activities of daily living
15. Requires staff assistance when cuffed and/or shackled. Refer to Section XXII of the Remedial Plan
16. Requires staff assistance during transport when embarking and disembarking from the vehicle
17. Reasonable accommodations will be provided during searches. Refer to Section XXIII of the Remedial Plan
18. Requires staff assistance during an emergency or evacuation
19. Transportation in an accessible vehicle. Refer to Section XXIV of the Remedial Plan.
20. Assistance with carrying and disposing of food tray contents by offenders assigned as dining room workers.

In addition to the above accommodations, you are entitled to the benefits enumerated in the Montez Remedial Plan

**You are required to notify clinical services and the AIC immediately if your health care device(s) is broken, lost, stolen or becomes inoperable for any reason.**

The health care device(s) listed above shall fall under the provisions of Administrative Regulation (AR) 850-6, "Offender Property" and shall be placed on your property list. Any misuse of the health care device(s) may result in disciplinary action and may be subject to the provisions of AR 300-06, "Searches & Contraband Control."

## ACCOMMODATION RESOLUTION

## You DO HAVE A MOBILITY DISABILITY

Offender Name: **COIT, Jill**
DOC#: 86530
Date of Resolution: **March 16, 2009**

Following a disability screening it has been determined that you have a mobility disability and are therefore, entitled to the following accommodations:

1. Cane
2. Knee Brace
3. Assignment to a designated facility
4. Not required to climb stairs. When you are housed at a facility that maintains an elevator for offender use, you are allowed to use the elevator
5. Lower Bunk
6. Lower Tier
7. Special cuffing & shackling considerations
8. Staff assistance during an emergency or evacuation
9. Access to accessible bathroom facilities to include a shower chair
10. Medically necessary shoes w/ lift
11. Backpack
12. Special transport considerations
13. Assistance securing, carrying & disposing of food tray contents

In addition to the above accommodations, you are entitled to the benefits enumerated in the Montez Remedial Plan

You are required to notify clinical services and the AIC immediately if your health care device(s) is broken, lost, stolen or damaged.

The health care device(s) listed above shall fall under the provisions of Administrative Regulation (AR) 850-6, "Offender Property" and shall be placed on your property list.   Any misuse of the health care device(s) may result in disciplinary action and may be subject to the provisions of AR 300-06, "Searches & Contraband Control."

If you feel you require additional accommodations, you may submit a new Request For Accommodation to the Office of the AIC. Be advised however, that a new screening will not routinely be performed within one year of a previous screening absent a significant, documented change in conditions and/or a showing of clear error in the prior screening. Please refer to AR 750-04 for detailed information regarding the disability screening process.

*Exhibit 25*

# DEPARTMENT OF CORRECTIONS
## OFFICE OF HEALTH SERVICES

## ACKNOWLEDGMENT RECEIPT OF
## THERAPEUTIC SHOES

I hereby acknowledge receipt of therapeutic shoes.  I understand that replacement will be my personal obligation if such is needed in less than a year.

Shoe Make: _Dr. Comfort Shoes_        Size: _8_      Width: _____

_Hammer toes touch the top of shoe_

_+ will cold_

Inmate Signature

_1639936_            _4-30-14_

Inmate DC Number            Date

Witness Signature         WILLIAM N. LANG
             ADVANCED BRACE/SOPC
              RMC

_____      _4-30-14_

Name Stamp            Date

Reason for issuance of special shoes: _to acco_

_____ Postsurgery recuperation    _(L) log length_
_____ Significant deformities         _discrep_

Issuing institution: _____

Extraneous circumstances (if reissued within one year): _____
_____
_____

Inmate Name _Colt Jill_
DC# _CU8641_      Race/Sex _W/F_
Date of Birth _6-11-44_
Institution _____

Distribution:
     White - Health Record
     Canary - Inmate

**This form is not to be amended, revised, or altered without approval of the Deputy Director of Health Services Administration**

DC4-774 (7/03)

_Exhibit 25_

_49_

Durable Medical Equipment   Sec 4DME CONTRACT

# COLORADO DEPARTMENT OF CORRECTIONS

## Durable Medical Equipment (DME) Contract

Name: _Jill Coit_   DOC #: _86530_   Facility: _LVCF_

I am being issued: _Black Shoes_   Product / Model: _Surefit/Barry_   Size: _8 Med. Width_

Serial/ID #: _Style # S116-1_   Model #: _____   on this date _5|14|10_.

I understand that I share in the responsibility to keep the durable medical equipment listed above in good working order by using it only for its intended purpose.

I will not allow other offenders to use this durable medical equipment. If I allow others to use this equipment, my use of the durable medical equipment may be limited, restricted or removed.

I understand that I must report any issues concerning the repair of this durable medical equipment to Clinical Services staff through the kite system. DOC is responsible to repair or replace the equipment within 60 days of receipt of my kite indicating there is a problem with the equipment.

I understand that, if the preponderance of the evidence shows that I altered, cut on, damaged, or destroyed this equipment, I will be responsible for the replacement cost of the equipment. In this event, I may request replacement of the same equipment at my own cost. Arrangements for payment will need to be made in advance. If I am unable to pay the cost of replacement, that cost will be charged to my inmate account.

I understand that if I misuse, alter, cut on, or otherwise damage or destroy this durable medical equipment, I will face COPD charges for abuse of clinical services, and destruction of state property.

I understand that if I use this durable medical equipment inappropriately and my inappropriate use of such equipment results in a COPD violation, my use of the assigned durable medical equipment may be limited, restricted or removed.

_My Hammer Toe touch top of Left Shoe - rubs - tear opening_
_not deep enough_

Offender signature   Staff signature & date _J. Beeman ASA 5/14/10_

_shoe not sturdy on heavy duty_

Original in Medical File

cc:   Facility Property Officer
      HQ CLS ADA Scheduler          Fax# 719-226-4565
      CLS Medical Case Manager      Fax # 719-269-4075 or 719-269-4072

May 2009

COIT-00143

COIT, JILL 108017500 CCMF Cli___ O,   DOS: 16 JUN 2008 00:00:00___   OP Encounter Record - 06/16/2008

## DENVER HEALTH

## OUTPATIENT ENCOUNTER RECORD

### ORTHOPAEDIC CLINIC

Name, MR#, Pat#, DOB

108017500
06/16/08  HSC: CMF
COIT, JILL
2098863    F   06/11/1944
G08              DVR: Y
1:  2:  RX:  IP:
PCP:
PHN: (719)583-5840

Date: 06/16/08
MM  DD  YY

#2   ID X 2 (Staff Initials)

Do you need any paperwork filled out? ☐ Yes ☑ No
Primary Language: ☑ English ☐ Spanish ☐ Other _____
Do you wish to have an interpreter? ☐ Yes ☐ No ☑ N/A
Interpreter: _____ (name)
☐ AT&T Language Line Used
☐ Patient requests to have significant other/family member or friend interpret

Chief Complaint: _am here to see podiatry (name)_ _painter toes_

Medication(s)? ☐ Yes ☐ No _see chart_    Herbs/Supplements: ☑ Yes ☐ No    Date of Injury/Surgery: N/A
T ___ P ___ RR 20 BP 134/79
Med Profile: ☑ Yes ☐ No  Pharm    Age: ___ WT: ___ HT: ___ BMI: ___
Do you need a medication refill? ☐ Yes ☑ No    EtOH/Substance: ☐ Yes ☐ No  N/A
Tobacco Exposure: ☐ Never ☐ Former ☐ Current  N/A    impairment/function: ___
Med Allergies: ☑ Yes ☐ No _see chart_ Latex Allergy: ☐ Yes ☐ No    Cultural needs: ___
Reason for Appt: _RTC MD_    Pain/Alteration in Comfort: ☑ Yes ☐ No Action: _RTC MD_
Staff Signature ___

| SUBJECTIVE/OBJECTIVE | "Time Out" required for surgical/invasive procedures |
|---|---|
| | ☐ Correct patient identified by procedure team   ☐ N/A |
| | ☐ Correct procedure side/site identified by team |
| | ☐ Team and patient agree on the procedure to be done |
| | ☐ Team agrees that patient position is correct for procedure |
| | ☐ Team agrees correct equipment (including implants) is available |
| | ☐ Time out called |

Consults: ☐ Yes ☐ No _been off feet_
X-ray next visit: ☐ Yes ☐ No X
Castings: ☐ Short Arm Cast
☐ Long Arm Cast
☐ Short Leg Cast
☐ Long Leg Cast
Total Contact Cast:
☐ Splint  Specify Type:
Other Cast Orders:
CAM Boots: Small: ___ Medium: ___ Large: ___
Brace Specify:
☐ Suture Removal
☐ Staple Removal
☐ Dressing Type:
☐ Blood Draw  Test:
☐ Central Line Dressing Change
Test: ☐ MRI ___ ☐ CT: ___
☐ EMG ___ ☐ Ultrasound: ___
☐ P/N Site Care
Date: ___ Time: ___
Provider Signature ___
☐ Counseling/Coordination greater than 50%
Total Time: ___ min  Couns/Coord Time: ___ min

ASSESSMENT/PLAN:

Views:

Patient/Family Education/Instructions:
☐ Diagnosis ☐ Medications to include side effects ☐ 1° care
☐ Tobacco ☐ EtOH ☐ STD prev ☐ Follow-up criteria
☐ Discussed treatment side effects
☐ Topic(s):
Mode: ☐ Video ☐ Verbal ☐ Handout
Other Education Provided:

RETURN VISIT:

Caregiver Signature/Title/Date (mm/dd/yy) (Pager & Provider #)

Attending Signature/Title/Date (mm/dd/yy) (Pager & Provider #)

F60-139 (8/05)

COIT-00556



HEARING AID ISSUES EVIDENCE ~ affidavit ~ 3 pages

aff dand

Coit wore hearing aids for 30 years prior to incarceration. Coit suffered a hearing loss after a scuba diving accident in the 1970ties. Coit had been diagnosed as having Meniers disease which affected her hearing since she constantly heard a ringing and had balance problems.

Upon entering CDOC in 1995 she was told that her hearing aids were not allowed. She was told if CDOC felt she needed hearing aids she would be issued them. After many years of bitching about not being able to hear when background noise was present or someone spoke softly or low pitched or she was in a large room, CDOD finally allowed her to see a hearing specialist. Two different Specialist after testing her hearing recommended that Coit be allowed two hearing aids. Coit asked for and received permission to have her mother

1

send in her own hearing aids. ( ITE ) *In the ear hearing aids*

In 2004 Coit was evaluated for the Montez hearing screening by DWCF Dr. Razzaghi who wrote on the evaluation that "Hearing good with hearing aids." See Jill exhibit dated 3-16-2004 Hearing Screening. *exhibit #14*

Coit filed at the Montez hearing that she had trouble getting hearing aid batteries. Judge Borchers in 2005 at the DWCF hearing for the Montez Remedial Plan ruled that Coit was not hearing impaired because she could hear with her hearing aids therefore she did not qualify as hearing impaired. There was no mention of taking Coit hearing aids away from her at the court proceedings/hearings.

Coit's hearing aids quit working properly and she was evaluated on 12-12-08 by DWCF medical Jamie Harrelson, NP who stated on line 15 that, " I attempted to do the Eros can today but was unable to get the ear plugs to stay in her ears after trying 5 different sizes due to her ear canal abnormality (she has curved canals that are also small). See Defendant's exhibit Coit 003326. Coit alleges this could contribute and be part of her hearing problems.

Dr. Frantz ordered that Denver Health Audiology test Coit's hearing. See Denver Health's Audiological Evaluation that states at the very bottom of the page. "There is no clinical reason to remove hearing aids from patient at this time. " It also stated, "Previous

borderline hearing loss. Need to rule out significant change in hearing. ABR with intensity latency series completed. Result showed responses at 25 db in the mid to high frequency range to a weathband click. The results are compatible with responses to all conduction under earphones obtained on 2-14-05.

It was signed by Fredrics #116434. It was explained to Coit that the tests did not record if she understood the sound just that her brain heard the sound not that she could comprehend words or speech.

[according to all medical reports hearing loss is normal for one who has engaged in scuba diving especially the elderly. Coit was 65 years old at time of test.] Now she is 70 years old

Defendant's exhibit Coit 00282 states, "Hearing test only shows a 25 db loss. does not meet the DOC requirement for hearing impairment. Per Dr. Franz no need for hearing aids at this time, no hearing impairment.

[Coit alleges if she could have heard Dussart sneaking up on her she could have avoided being raped sometimes. Prison is dangerous - & need to be able hear or I well continue it get hurt.

Sworn to under ~~penalty~~ the penalty of perjury.

J Ul Coit #163936 - Cd #6530
1-20-12015

Colorado already OK hearing aid BTE - see
Must Be hearing impaired - & just need hearing aid that does Not cover Bleeding

3

53

**PART B - RESPONSE**

| COIT, JILL | 163936 | 1409-314-158 | LOWELL ANNEX | S1101L |
|---|---|---|---|---|
| INMATE | NUMBER | GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

Your request for Administrative Remedy or Appeal has been received, reviewed and investigated with the following response provided.

There are computers in education department for inmate use as it relates to GED. I spoke with Mr. Glynn, academic teacher who has a office in the law library. He advised he can schedule you hours per week to use the computers there. There is no space in the education building at the annex for additional computers; for that reason the computer you are referring to for use is in the library for correspondance classes only.  Mr. Glynn will meet with you to determined the needs of your request.  If it is authorized, you will be notified.

Approved in part in that you have use of a computer.

9/17/14

| SIGNATURE AND TYPED OR PRINTED NAME OF EMPLOYEE RESPONDING | SIGNATURE OF WARDEN, ASST. WARDEN, OR SECRETARY'S REPRESENTATIVE | DATE |

COPY DISTRIBUTION -INSTITUTION / FACILITY
(2 Copies) Inmate
(1 Copy) Inmate's File
(1 Copy) Retained by Official Responding

COPY DISTRIBUTION - CENTRAL OFFICE
(1 Copy) Inmate
(1 Copy) Inmate's File - Inst./Facility
(1 Copy) C.O. Inmate File
(1 Copy) Retained by Official Responding

STATE OF FLORIDA
DEPARTMENT OF CORRECTIONS

**TE REQUEST**

Mail Number: _____
Team Number: _____
Institution: _____

14 0605 AClass   Ms. Cummings

| TO: (Check One) | ☐ Warden  ☑ Asst. Warden | ☐ Classification  ☐ Security | ☐ Medical  ☐ Mental Health | ☐ Dental  ☐ Other |
|---|---|---|---|---|

| FROM: | Inmate Name | DC Number | Quarters | Job Assignment | Date |
|---|---|---|---|---|---|
| | J. Ellcott | 163536 | S 1101 | HS | 7-31-14 |

**REQUEST**                                Check here if this is an informal grievance ☑

On 7-30-14 I had a ADA group
meeting and I signed a Paper,
please send me a copy of that
paper I signed

— It should have on it all my
ADA claims! Mobility
Impairment — wheelchair and hard
Impairment — legally Blind and
Hearing Impairment. I was
not provided a copy of the last
ADA meeting despect my filing Numerous
grievances. etc. Can

All requests will be handled in one of the following ways:  1) Written Information or  2) Personal Interview. All informal grievances will be responded to in writing.

────────── DO NOT WRITE BELOW THIS LINE ──────────

**RESPONSE**                        DATE RECEIVED: AUG 07 2014

RECEIVED
AUG 04 2014
ASSISTANT WARDEN
PROGRAM OFFICE

Your Grievance has been received,
Veriewed, and evaluated with the following
response Provided. You will not be Provided
A Copy.

[The following pertains to informal grievances only:
Based on the above information, your grievance is **Denied** (Returned, Denied or Approved).  If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.]

Official (Signature): _____          Date: 8/12/14

Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file

This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 10 days, following receipt by the appropriate person.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no later than 15 days after the grievance is responded to.  If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

(Effective 6/12)

Incorporated by Reference in Rule 33-103.005, F.A.C.

Exhibit 36

**NOTICE TO INMATE**

| Inmate Name | DC Number | Date | Housing Assignment |
|---|---|---|---|
| Coit, Jill | 163936 | 8/26/11 | D2110L |

This is to advise you of the following information:

1. Medical staff have received a recommendation to assess you for the need of an impaired inmate assistant who will assist you with reading/writing.

Pursuant to title II of the ADA, a qualified inmate with a documented disability may request an accommodation to allow her to participate in, or benefit by, the programs, services or activities of the department. This request cannot be used to request medical devices, passes, medicine, or any other medical request.

The form to request accommodations is attached.
Auxiliary aids include
1. Braille machines
2. tape player with headphones
3. books and magazines on tape
4. magnifying device
5. key lock
6. cane
7. blank audio tapes if needed for correspondence
8. orientation of facility

I need to check on the status of the initial paperwork submitted at Broward C.I.

_C.R. Tate_
**C.R. Tate**
**Classification Officer**
**Homestead C.I.**

**PART B - RESPONSE**

| COIT, JILL | 163936 | 1402-314-116 | LOWELL ANNEX | S1101L |
|---|---|---|---|---|
| INMATE | NUMBER | GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

Amended Response-

Your administrative appeal has been reviewed and evaluated.

The wheelchair van (DC8700) that you are referring to not having heat had a routine schedule maintenance on February 22, 2014.  There was no documentation of any complaints. All DC2-547 Vehicle Maintenance records reflect no discrepancies with the heat.  It should be noted that this model vehicle has a heating system in the front cabin but no heat system in place in the back.  The vehicle is and had been fully operational as required.

Therefore, your issue at this point is moot, and as such your appeal is Denied.

You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal completing the form and providing attachments as required by 33-103 and forwarding your complaint to the Office of Inmate Grievances.

Colonel Sistrunk

| | | |
|---|---|---|
| SIGNATURE AND TYPED OR PRINTED NAME OF EMPLOYEE RESPONDING | SIGNATURE OF WARDEN, ASST. WARDEN, OR SECRETARY'S REPRESENTATIVE | 3/31/14 DATE |

COPY DISTRIBUTION -INSTITUTION / FACILITY
- (2 Copies) Inmate
- (1 Copy) Inmate's File
- (1 Copy) Retained by Official Responding

COPY DISTRIBUTION - CENTRAL OFFICE
- (1 Copy) Inmate
- (1 Copy) Inmate's File - Inst./Facility
- (1 Copy) C.O. Inmate File
- (1 Copy) Retained by Official Responding

*Mailed*
*04. 01. 2014*

*C1 ShBt 38.*

*5-8*

### G.   MAINTENANCE OF ACCESSIBLE FEATURES AND EQUIPMENT

The DOC has a duty to maintain structural features and equipment in operable working conditions in order to make the prison system's services, programs, and activities accessible to disabled inmates.  Isolated or temporary interruptions in service or access due to maintenance or repairs are not prohibited, as long as the facility is taking prompt action to correct the deficiency.

## XVII. LIBRARY EQUIPMENT



Electronic equipment, such as audio equipment, tape recorders, and computers will be available for use and when appropriate, to be checked out, in the general library and other areas where appropriate, for use by inmates with disabilities.  Each facility will be responsible for training staff and inmates with disabilities, in the proper use of the equipment. Each facility shall provide a list of such equipment available to inmates with disabilities to the AIC and submit a protocol for the use of this equipment to be approved by the AIC. There will be a protocol, approved by the AIC that will be used for each facility. The librarians shall maintain a list of resources regarding available accommodations which can be provided, such as books-on-tape and inter-library loan programs.

## XVIII. INSTITUTION PROCEDURES

### A.    ORIENTATION AT PLACEMENT FACILITY

When an inmate with a disability initially arrives at a new facility, the case manager assigned to the inmate shall ensure that during the orientation process, the inmate is provided relevant information regarding the accommodations and/or assistive devices that will be made available to that inmate to accommodate his/her needs.  The inmate shall also be informed of the availability of the AIC for assistance with programs, services or benefits at DOC and of the ADA Grievance Process.  The information shall be provided in a format that is accessible to the inmate.

### B.    NOTICES, ANNOUNCEMENTS, AND ALARMS

#### 1.   Written and/or Recorded Materials

Each designated facility shall ensure that the printed materials that are distributed to inmates are accessible to inmates with disabilities. Accommodations such as large print, computer assisted devices, audio tapes, and Braille will be made available on a case by case basis.  When such assistive devices are not adequate to communicate with the inmate, then  it is the responsibility of the inmate's case manager to ensure that the inmate is aware of the distributed material.  Each facility will adopt an Implementation/ Adjustments (I/A) or an Operational Memorandum (O/M) that identifies a position that will be responsible for  providing the assistance and equipment necessary to all inmates with disabilities to ensure that inmates who have

## DENVER HEALTH
## AUDIOLOGICAL EVALUATION

Name, MR#, Pat#, DOB

112842315
02/04/09   HSC: AUD
COIT ,JILL
2098863      F    06/11/1944
G08                        DVR: Y
1:  2:   RX:    IP:
PCP:
PHN: (719)583-5840

Date: _____

IDX2 _CF_  (staff initials)

The patient's medical record and/or referral has been reviewed. ☑   The patient requested a medication record. ☐ Yes ☑No

Primary Language: ☑English ☐ Spanish ☐ Other _____

Do you wish to have an interpreter: ☐ Yes ☐ No ☑NA   Interpreter: _____ (name)  ☐ AT&T Language Line Used

☐ Patient requests to have significant other/family member or friend interpret _____ (name)

Impairment: ☐ Physical ☐ Cognitive ☑WNL   Cultural Needs: ☐ Yes ☑No _____

STANDARD ☑   PLAY CONDITIONING ☐   VRA ☐



Insert
SRT
45

PTA (.5, 1, 2 KHz) __53__ dB (Insert)   SRT __50__ dB PBMax. ___ 30 dB SL ___%   SRT/BC ___ dB

PTA (.5, 1, 2 KHz) __55__ dB (Insert)   SRT __45__ dB PBMax. ___ 30 dB SL ___%   SRT/BC ___ dB

Insert
SRT
50

96% discrim.
at 60 dB HL w/
R & L together

OTOACOUSTIC EMISSIONS SCREEN
RIGHT - PASS   FAIL   Could not get probe tip in
LEFT - PASS   FAIL   ear properly
Mode: _____

PB ROLLOVER R __ L __
40dB SL ___%
50dB SL ___%
60dB SL ___%

Patient/Family Education: ☑Verbal ☐ Written ☑Understands

IPSILATERAL REFLEX SCREEN
R ___ L __NR__

History: Patient referred by DOC for c/o ↓ hearing and L unilateral tinnitus for 2 years. Patient currently wearing binaural ITCs.

Results: See backside.

Recommendations: Return PRN.

2-9-09

116426
Pamela Hammond
MA, CCC-A

K Adkisson - student 2/4/09  9:30

Audiologist Signature/Title/Date

COIT-00903   (Provider #)

## PART B - RESPONSE

| COIT, JILL | 163936 | 1208-314-019 | LOWELL C.I. | I1102S |
|---|---|---|---|---|
| INMATE | NUMBER | GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

Your request for Administrative Remedy or Appeal has been received, reviewed and investigated with the following response provided.

Your formal grievance was received and notes complaint of provider not being able to explain issue in English.  After careful review of you medical chart which reveals that you were evaluated by physician on 08/01/12.  Note that you will need to watch the call out for scheduled appointment with physician to discuss your chronic illness clinic results from 8/1/12.

Based on these facts your grievance is approved pending scheduled callout to review (CIC) results.

Dr. Rosario, CHO

DR. LUZ ROSARIO
CHIEF HEALTH OFFICER
LOWELL CI

| SIGNATURE AND TYPED OR PRINTED NAME OF EMPLOYEE RESPONDING | SIGNATURE OF WARDEN, ASST. WARDEN, OR SECRETARY'S REPRESENTATIVE | 8/8/12 DATE |
|---|---|---|

COPY DISTRIBUTION -INSTITUTION / FACILITY

(2 Copies) Inmate

(1 Copy) Inmate's File

(1 Copy) Retained by Official Responding

COPY DISTRIBUTION - CENTRAL OFFICE

(1 Copy) Inmate

(1 Copy) Inmate's File - Inst./Facility

(1 Copy) C.O. Inmate File

(1 Copy) Retained by Official Responding

*Fortune*
*1-27-15*

**PART B - RESPONSE**

| COIT, JILL | 163936 | 1501-314-048 | LOWELL ANNEX | S1101L |
|---|---|---|---|---|
| INMATE | NUMBER | GRIEVANCE LOG NUMBER | CURRENT INMATE LOCATION | HOUSING LOCATION |

Your request for Administrative Remedy or Appeal has been received, reviewed and investigated with the following response provided.

Interstate denied your ITE hearing aid, not the Florida Department of Corrections. They will only approve the BTE. You need to grieve with them, not us.

Your grievance is Denied.

You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal completing the form and providing attachments as required by 33-103 and forwarding your complaint to the Office of Inmate Grievances.

CONFIDENTIAL HEALTH RECORD/CARE INFORMATION INTENDED FOR ADDRESSEE(S) ONLY. UNAUTHORIZED RELEASE OR DISCLOSURE MAY VIOLATE STATE AND FEDERAL LAW

Dr. J. Rodriguez
Medical Director
LOWELL C.I.

| SIGNATURE AND TYPED OR PRINTED NAME OF EMPLOYEE RESPONDING | SIGNATURE OF WARDEN, ASST. WARDEN, OR SECRETARY'S REPRESENTATIVE | DATE |
|---|---|---|
| | | 01-21-15 |
| | | mailed 01-22-15 |

| COPY DISTRIBUTION -INSTITUTION / FACILITY | COPY DISTRIBUTION - CENTRAL OFFICE |
|---|---|
| (2 Copies) Inmate | (1 Copy) Inmate |
| (1 Copy) Inmate's File | (1 Copy) Inmate's File - Inst/Facility |
| (1 Copy) Retained by Official Responding | (1 Copy) C.O. Inmate File |
| | (1 Copy) Retained by Official Responding |

**From:** "Taylor, Martie" <taylor.martie@MAIL.DC.STATE.FL.US>
**To:** 'Julie Russell' <Julie.Russell@doc.state.co.us>
**Date:** 11/1/2011 11:43 AM
**Subject:** RE: Colorado Offender Jill Coit #86530

Just last month I got a request from her for a key lock, books on tape, a magnifying device, blank audio tapes, extra sessions in the law library, to take classes from Hadley School for the blind, to order books and educational material for tape player and   computer. Also she wanted to order a Kindle, a job change and to use the computer for classes and homework.
She was granted two extra sessions in the law library on Tuesdays, She was told the Education Department could schedule 6 hours per week to complete correspondence courses on the computer. If copies are needed she would be charged.   She was told she would be allowed to order educational material for the tape player and the computer. She was not allowed to order a kindle and she will not be changed from her houseman's position due to the number of medical restrictions she has.
By the way, Pilar Tournay is no longer with us. Ebony Harvey has taken her place.

From: Julie Russell [mailto:Julie.Russell@doc.state.co.us]
Sent: Tuesday, November 01, 2011 1:31 PM
To: Taylor, Martie; Tournay, Pilar
Cc: Amy Cosner; John Martin; Keith Nordell
Subject: Colorado Offender Jill Coit #86530

Good Afternoon,
I was previously in contact with you in March, 2011 to inquire about any possible ADA accommodation requests made by Offender Coit since her transfer to Florida.   At that time, I was advised her only requests were clinical in nature and she had not specified a request for ADA accommodation/modification.

Would you please provide me an update from March to October regarding her ADA accommodations and if she has since made any requests that were approved or denied for any reason?


Thank you for your assistance with this matter,
Julie Russell


Julie Russell-AIC
Work Group Leader
Office of Legal Services, ADA Inmate Coordinator
Colorado Department of Corrections
(719) 226-4248
[cid:image002.jpg@01CC989B.E2620810]

Exhibit 42

## Anthony A. DeCesaro

STEP III GRIEVANCE OFFICER
2862 S. Circle Drive, Suite 140
Colorado Springs, CO 80906-4122

March 4, 2004

RE: Grievance #C-DW03/04-0032

Dear Ms. Jill Coit #86530:

I have reviewed your Step III grievance that you filed with regard to boots.

In investigation into this matter I have found that the state issue boots are not able to be altered. You have a medical permit to wear tennis shoes at all times in the facility except when at visiting or leaving the facility, during a transport. Abilities Unlimited are not able to alter the state issue boots, because of their design. Because of the limited time you are required to wear the state issue boots, limited to visiting where you are not typically standing on your feet for any length of time, the discomfort appears to be minor. Because of the inability to alter the boots and the fact that you have the medical order for tennis shoes allowing them to be worn at all times except during visits, I cannot recommend any relief in this matter.

Please except my apology for the late response, as I had some difficulty in contacting certain individuals during this investigation.

It is your burden to prove your allegations stated in your step III grievance. I have reviewed the facts of this case and determined that you did not meet this burden. There was no corroborating evidence to provide proof of your allegations.

Your request for relief is denied. This is the final administrative response in this matter and you have exhausted your administrative remedies.

Enclosed please find the following copies of all the materials you provided to me in support of the grievance that you filed: Informal Resolution Attempt, Step I Grievance, Step II Grievance, and Step III Grievance.

Sincerely,

Anthony A. DeCesaro
Step III Grievance Officer

Cc: working file
    Tom Kolle

Ex 43

## Colorado Department of Correction
### Consultation Report Form

**Appt#: 125423**

Page 1 of 1
Run Date: 04/06/2010 15:28
*REQUESTED*

| | | | |
|---|---|---|---|
| **DOC #:** 86530 | **Name:** COIT, JILL | **Facility:** LVCF/UNIT5 | **Date Initiated:** 03/09/2010 |
| **Gender:** FEMALE | **Security:** MEDIUM | **SSN:** 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 | **DOB:** 06/11/1944 |
| **Level:** 1 MONTH | **Tele-Med:** NO | **Provider:** WERMERS, JOSEPH , MD | **SDD:** 03/16/3004 |
| **Request:** HANGER PROSTHETIC | **Auth #:** | **Number of Visits:** 1 | **PED:** 03/26/3004 |
| **Location:** DR. OFFICE | **Appt Dt:** | **Specialist:** | **DH #:** 2098863 |

**Diagnosis and requested evaluation or care:**

I do not know her shoe size, that needs to be determined by the supplier of the shoe once evaluation by supplier is approved The pertinent diagnostic codes for her ADA disability include 440.9, 735.4, 338.29, 724.3, 727.00 and 736.81
We cannot deny theshoes, courts mandate, regardless of clinical information.
Brief highlights relative to lower extremity include total hip right with increasing degeneration left hip, leg length discrepancy, DJD left knee with meniscus tear, segmental instability lumbar, DDD cervical spine.
If needed can provide the report of the 2 hour staffing with AIC and Headquarters done 11/20/09; copy of her ADA Accommodation resolution; the 10 pages of chart review I have done over past year relative to her ADA and legal procedings.

WERMERS, JOSEPH J ( jjwermer )  4/6/2010 15:28:25
================================================
Will address when next at LVCF. The shoes are mandated per ADA/Montez, thus need for diagnosis puzzles me since I cannot deny them and theryv are damaged. Will look up and reply

WERMERS, JOSEPH J ( jjwermer )  3/29/2010 07:47:50
================================================
1. CLINICAL INFORMATION: Black shoes per ADA/Montez accommodation. Current pair torn, verified per inspection myself and HSA. Needs replacements

Subjective: Kite requests new shoes, here black onesare torn (per HAS both and my inspection one shoe tornat a seam each foot)
Medical shoes are ADA/Montez accommodations

Active Medication(s): ALENDRONATE - 70 MG - ONE EVERY WEEK REMAIN SITTING UP AT LEAST 30 MIN AFTER TAKING DO NOT TAKE WITH CALCIUM,TAKE BEFORE EATING IN MORNING; ASA ENTERIC - 81 MG -ONE TABLET DAILY; ESTROGENS, CONJUGATED - 0.625 MG/GM - ONE-HALF APPLICATORFUL VAGINALLY TWO TIMES WEEK(S); SIMVASTATIN - 20 MG - ONE TABLET AT BEDTIME

Assessment:
V68.89 - ENCOUNTERS OTH SPEC ADMINPRPOS OTH
88325 - COMPREHENSIVE REVIEW OF DATA

| ICD | | CPT | |
|---|---|---|---|
| V68.89 | ENCOUNTERS OTH SPEC ADMIN PRPOS OTH | 88325 | COMPREHENSIVE REVIEW OF DATA |

| | | |
|---|---|---|
| **Provider Signature:** | *Electronically Signed* | **Date:** 03/09/2010  12:55 |
| **Provider Name:** | WERMERS, JOSEPH , MD | jjwermer |

Please do not discuss dates of the follow-up appointments with the offender.
Insurance:  Physician Health Partners  Phone: (866) 362-1374  FAX: (866) 362-1375
Please send all dictated reports to: Clinical Services - Dept of Corrections - 1410 W. 13th Street, Building 54, Pueblo, CO 81003
Or FAX to your Scheduler @ 719-583-5832

## DEPARTMENT OF CORRECTIONS
## AMBULATORY HEALTH RECORD

FOLLOW-UP
Page 1 of 2

MARTINEZ-HOCHBERG, YVETTE M
Printed at: 06/12/2008 14:25:42
Encounter#: 1694620 @ DW

| 86530 | COIT, JILL | Facility: | DW | LU: | DW/UNIT2 | 1 | D | 126 | L |

### SUBJECTIVE

Active Medication(s): ASPIRIN CHEWABLE - 81MG - ONE TABLET DAILY; CELEBREX - 100 MG - TWO CAPSULES DAILY ***NON-FORM EXP: 10/7/08***; CHLOR-TRIMETON 4MG - ONE TABLET TWICE DAILY AS NEEDED; FOSAMAX - 70 MG - ONE TABLET WEEKLY--FOLLOW DIRECTIONS; OYST-CAL-D - 500MG/200 IU - ONE TABLET DAILY EXCEPT DAYS WHEN TAKING FOSAMAX; PREMARIN VAG CR - .625MG/GM - VAGINALLY 1/2 APP FULL 2 X WEEKLY FOR VAG ATROPHY.; SINEQUAN - 25 MG - ONE CAPSULE AT BEDTIME; ZOCOR - 10MG - ONE TABLET DAILY; ZOMIG ZMT - 2.5 MG - 2.5MG AT ONSET, MAY REPEAT IN 2 HR IF NEEDED MAX DOSE 10MG/DAY-30MG/MO

pt seen per podiatry was given custom shoes twice and not given these
I have sent a note to Dr Frantz concerning this

pt also w/ three hammer toes instead of one?
pt has problems w/ visual; perception and fell three times -over mop bucket and went out on her medical -was in leg chains and chain got caught on grill and pt fell onto officer. right hip now hurts and radiates to back buttocks and left buttocks pain from Monday's fall

pt had iv clincymcin last week for SBE prevention /dental clinic now has burning when urinates and low back pain

meds for toes, burn and hurts
hammer toes rub up against the shoes and will bleed

right eye w/ visual loss-inferior quadrant s of right eye

### OBJECTIVE

msk: right hip with tenderness on palpation w/ decreased external rotation and pain w/ adduction, abduction, palp spasm quadricep muscle
nt left hip w/ minimal rom to adduction and abduction
left foot w/ hammer toes 2,3,4 w/ tenderness on palpation

eye filed study-noted 35-40 percent visual field loss right eye -offer reeval of eye and pt declines as it hurts her to go out in van and declines referral

### ASSESSMENT

735.4 - OTHER HAMMER TOE
959.6 - 959.6 - INJURY OTHER&UNSPECIFIED HIP&THIGH - S/P FALL
377.75 - 377.75 - D/O VISL CORTXW/CORTICAL BLINDNESS - RIGHT LOWER VISUAL FIELD EYE LOSSS S/P CVA

| Temperature: | 97.7 | Pulse: | 82 | Weight: | 165 |
| Respiratory: | 16 | BP: | 108 / 77 | |

Vitals Taken: PULSE OXSYM=95.00;

### PLANS / ORDERS

Allergies: PENICILLIN G

copy to Mayanne of letter from MONTEZ so shoes w/ lift may be ordered and ? foot solutions shoe

right hip x-ray 6/13/08

can cut tennis shoe until her orthopedic shoes are in-cut along toes-hammer toe areas

bacitracin packet 3 6-to use sparingly over toes if bleed w/ rubbing, clean area prior to placing ointment on.

UA w/ urine culture

diflucan 200 mg x 1 today

lipid profile 7/1/08

ted hose-knee high xl x 2

pt needs new knee brace left-note to mayanne

| Datetime: | Providers: | MARTINEZ-HOCHBE, YVETT▼ |
| 06/12/2008 13:41 | | |

PA/NP/RD _____
Datetime: 06/12/2008 13:41

PHYSICIAN _____
Provider: MARTINEZ-HOCHBE, YVETT