**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  92-cv-870-CMA

JESSE (JESUS) MONTEZ, *et al.,*

> Plaintiffs, as representatives of themselves and all others similarly situated in this class action,

> v.

JOHN HICKENLOOPER, *et al.,*

> Defendants.

_____

**PLAINTIFFS' CLASS NOTICE
OF DEFENDANTS' NON-COMPLIANCE WITH REMEDIAL PLAN**
_____

Attorneys for the Plaintiff Class, Paula Greisen of KING & GREISEN, LLP;

Edward T. Ramey of HEIZER PAUL, LLP; Lara E. Baker of FOSTER GRAHAM

MILSTEIN & CALISHER, LLP; and Blain D. Myhre of BLAIN D. MYHRE P.C., submit

Notice of Defendants' Non-Compliance with Remedial Plan as follows:

I. **INTRODUCTION**

This is a civil rights class action brought on behalf of four subclasses of disabled

inmates; those who are hearing impaired, vision impaired, mobility impaired, or who

suffer from diabetes. On September 11, 2012, the Honorable John L. Kane found

Defendants in "substantial compliance" with the 2003 Remedial Plan ("RP"), including

the 2006 and 2008 Joint Stipulations. (Doc. #5314.) That determination triggered the

RP's two-year Monitoring Period, which ended on April 2, 2015. (Doc. #5503 at 3 (also

summarizing prior Orders)). The purpose of the Monitoring Period is to "monitor the designated facilities to ensure compliance is maintained during this period." *Id.* at 2.

The evidence shows that DOC has retreated from its earlier attempts to comply with the RP. Shortly after Judge Kane's Order finding substantial compliance, all signage regarding Montez was removed from the walls of almost every facility. DOC staff in most facilities informed class members that "*Montez is dead,*" and that their rights under the RP *no longer existed.* Pursuant to Section XXXI of the RP, the RP is to remain in effect through the end of the Monitoring Period, not just until the initial determination of substantial compliance. Now, DOC no longer supplies many of the accommodations it once provided under the RP and that were relied upon by Judge Kane in finding substantial compliance. Since Judge Kane's decision, Plaintiffs' counsel have toured facilities, met with numerous class members, and reviewed documents provided by class members and by DOC.

There are several key areas in which Defendants have regressed:[1]

1.     The AIC's role has been substantially diminished. Policy changes have divested the AIC of authority to decide accommodations because many requests that were formerly treated as ADA accommodations are now deemed "medical" issues and left to Clinical Services. Routinely, in response to requests for accommodations such as hearing aids, the AIC tells class members the requested accommodations (*e.g.* hearing aids, canes, vibrating watches, etc.) are no longer reasonable accommodations but medical issues. This conflicts with Judge Kane's ruling that the AIC was to decide

---

[1] Counsel for the Parties remain engaged in discussions regarding these issues.

whether and what ADA accommodations would ultimately be provided, not Clinical Services. The AIC has also stopped providing certain accommodations, such as vibrating watches, forcing inmates to purchase the items from the Canteen. This expressly violates the RP. Because these shifts in policy are contained in DOC's Administrative Regulations ("AR" or ARs"), this is a systemic issue.

2.      Another systemic issue is that class members with low security classification rankings are not allowed to progress to low security facilities because of their disabilities. This systemic problem has only intensified since the compliance hearing and is now enshrined in DOC written policy. This violates the language, intent, and spirit of the RP.

3.      The ADA grievance procedures no longer reflect the procedure mandated by the RP. DOC has now set up "gatekeepers" who significantly impede the grievance process, fundamentally changing the ADA grievance procedures required by the RP.

4.      Since the compliance hearing, DOC has regressed in tracking class members. This is evidenced by numerous incomplete and empty AIC files making it difficult, if not impossible, to determine whether a class member has been reasonably accommodated.

5.      DOC's refusal to provide soft-soled shoes to class members with diabetes and severe foot problems unless medical criteria is satisfied has continued to grow since the compliance hearing, violating the RP and the ADA. There is little evidence that the AIC has attempted to intervene despite having the authority to do so.

It is DOC's burden to demonstrate "substantial compliance." Defendants cannot do so if their performance "in any real substantial measure . . . frustrates the purpose of the contract." *Joseph A. ex rel. Wolfe v. New Mexico Dep't of Human Servs.,* 69 F.3d 1081, 1086 (internal citations omitted) (10th Cir. 1995); (Doc. #5314 at 6.) DOC cannot satisfy its burden: taken individually, each of these issues demonstrates its lack of substantial compliance with aspects of the RP and the accompanying 2008 Joint Stipulation. Defendants' failure to maintain substantial compliance is only compounded when these issues are considered globally.

## II. FOLLOWING JUDGE KANE'S DECISION FINDING SUBSTANTIAL COMPLIANCE, DOC STOPPED PROVIDING MULTIPLE ACCOMMODATIONS -- NOT BECAUSE THEY WERE "UNREASONABLE," -- BUT BECAUSE DOC DECIDED THESE WERE NO LONGER "ACCOMMODATIONS," BUT "MEDICAL ISSUES."

### A. The RP endowed the AIC with the authority to make the required systemic changes, including providing reasonable accommodations.

Under the RP, the AIC is "responsible for ensuring that specific policies and procedures are developed and implemented by DOC to assure nondiscrimination against all inmates who have disabilities, whether or not the disability impacts placement. These policies will provide specific guidelines on the methods to be employed to ensure nondiscriminatory treatment." RP at 1, § II. The AIC is to be consulted before an inmate with a disability is transferred to a different facility so that the transfer is appropriate for the disability and that all assistive devices are provided. RP at 10, § IX. The AIC is also responsible for working with case managers "to ensure that those inmates are not denied access to the programs, benefits and services offered to other inmates, based solely on a disability." *Id.* To ensure an offender's access to

4

services, the AIC is the final decision maker. "In the case of a disagreement between the AIC and any other DOC employee, medical provider or contractor concerning the disability status of an inmate and/or accommodations to be provided, **_the conclusion of the ADA Inmate Coordinator will be final._**" 2008 Joint Stipulation, (Doc. 3326 at ¶ 26.)

Judge Kane was well aware of the AIC's responsibilities and DOC's institutional resistance to someone other than medical personnel deciding who is disabled and what constitutes a reasonable accommodation:

> If Ms. Holst [the AIC] says that something is covered, it is covered. . . . But if she says it is covered, it is covered, period. No overruling of her except by her superior, but no other department can do that. . . . But agency department heads have to comply. . . .

> As to diabetics, the decision as to whether somebody with diabetes is disabled or not is not a medical determination. Ms. Holst determines, and that is because it does come in most instances where she is going to say that it comes within the Americans with Disabilities Act. If there is impairment, there is a failure to provide medication to keep the impairment from happening, that is not purely a medical problem.

> [T]he standard of what is a medical necessity is not determined by any sort of national standards. It is determined by the law under the Americans with Disabilities Act.

> Ex. 1, at 118-119.

**B.    The RP contains multiple examples of reasonable accommodations, including the means for ensuring effective communication.**

To ensure access to comparable programs, services, and benefits as well as effective communication, § X of the RP requires that DOC provide reasonable accommodations, including, but not limited to: auxiliary aids (health care appliances or [Durable Medical Equipment] ("DME")), inmate or staff assistance, sign language interpreters, and telecommunication devices for the deaf. Section XVI of the RP and the

2008 Stipulation require that DOC provide, repair and replace healthcare appliances within certain timeframes. RP at 20-22, §§ A)-(G); (Doc. #3326 at ¶¶ 9,10.) Stipulations were entered in 2008 to ensure specific accommodations were provided to inmates with diabetes.(Doc. #3326 at ¶ 25.)

DOC's definition of "assistive device" is broad: "A tool that enables or assists a person with a disability to complete a task, accomplish a daily living activity, or communicate with others. Such devices may include, but are not limited to, auxiliary aides, adaptive, rehabilitative, or ergonomic equipment; assistive technology; or adaptive clothing." Ex. 2, at 1 ¶ III(E), AR 750-04, Americans with Disabilities Act-Offender Request for Accommodation.

C.   **In its Proposed Findings of Fact and Conclusions of Law submitted after the Compliance Hearing, DOC provided detailed lists of accommodations it provided to class members. Many items it then considered accommodations are now deemed medical issues, not accommodations, and the requests for accommodations are denied.**

In DOC's proposed Findings of Fact and Conclusions of Law, (Doc. #5069) identified multiple reasonable accommodations provided to class members:[2]

- ***Vision impaired Class Members***: DOC provides reasonable accommodations in its libraries including "sound amplification, magnifying glasses, large print materials, tape recorders, specialized ear buds, or Braille typewriters" to "assist offenders with disabilities in reading library materials." DOC also provided access to the talking library. 2008 Stipulation (Doc. #5069 at 57, 58-59, 60). In addition, to assist

_____

[2] Sec. X of DOC's Proposed Findings of Fact discusses the multiple reasonable accommodations provided to offenders with disabilities.

vision impaired inmates to track "routine schedules, such as waking up, going to work, going to medline, and going to chow," DOC provided talking watches. *Id.* at 59.

- **Hearing Impaired Class Members**: "Hearing disabled class members are accommodated with hearing aids, batteries, assignments to cells with the strobe alarm, TTY kiosks, sign language interpreters, and ASL classes." *Id.* at 60.

- **Mobility Impaired Class Members**: "Mobility disabled are accommodated with wheelchairs, canes, crutches, walkers, shoe lifts, special shoes, they do not have to stand during count, handicapped accessible cells, first-tier, lower bunk housing assignments, aides, and wheelchair clinics . . . ." *Id.*.

- **Diabetic Class Members**: DOC alleged that it created a detailed checklist of accommodations for diabetic class members, including how to accommodate an inmate outside of regular Medline hours. *Id.* at 61.

Under the RP, Clinical Services prescribes health care appliances, which are assistive devices or medical support equipment, such as "orthopedic prostheses, orthopedic braces or shoes, crutches, canes, walkers, wheelchairs, hearing aids, prescription eyeglasses, artificial eyes, dental prostheses, breathing devices, and gloves for wheelchair use only." RP at § XVI(A)-(B). Accommodations of health care appliances can include modifications or substitutions at state expense. DOC is required to purchase all prescribed health care appliances. RP at § XVI(D). **Repairs and replacements are also required to be provided at DOC expense, including the replacement of hearing aid batteries.** RP at § XVI(E) (emphasis added). Any

disagreement is to be referred to the facility's Warden. RP at § XVI(B).To reiterate, Clinical Services is not the final decision maker.

### D.   It is an express violation of the RP to force class members to purchase accommodations from the Canteen.

Despite the RP's requiring DOC to purchase health care appliances and to provide repairs and replacement for them, RP at § XVI(A)-(B), (D), E; 2008 Stipulation (Doc. #3326 at ¶¶ 1, 2, 9, 10, 16, 18.) *DOC began requiring inmates to purchase their own accommodations such as vibrating watches, hearing aid batteries, and magnifiers from the Canteen shortly after Judge Kane's Order finding substantial compliance was issued*. Not only did numerous class members raise this issue during class counsel's facility tours during the monitoring period, a review of the AIC files provided to us reflects DOC's now routine practice of forcing class members who require these accommodations to purchase those items at the Canteen. Ex 3. *DOC claims it is accommodating class members by allowing those without sufficient funds to go "into the red" to purchase the accommodations, but the class members must repay DOC as money becomes available*, akin to the old-time company store policies, where employees never got out of debt. Some inmates are choosing to do without their accommodations to avoid owing money to DOC. *See* Appendix 1, which is a summary of complaints by class members, including about the Canteen purchases.[3] Even though the sample provided was small, there are multiple complaints from class members about suddenly being required to pay for

---

[3] The supporting documents for each class member are attached to the summary and book-marked in Adobe by class member name. Some documents have been redacted for readability.

accommodations, the very accommodations that DOC has already agreed to provide, and which formed the basis, in part, for Judge Kane's initial determination of substantial compliance. This issue has impacted and continues to impact class members in every DOC facility in the state.

### E. Without a basis for doing so, DOC has reverted to having Clinical Services make many decisions about reasonable accommodations.

A "medical issue" is a request "for or about medical care and treatment, such as prescription medications, health care appliances or medical and housing restrictions." AR 750-04 at 4, § 6(D)(e). A "medical issue" may be a legitimate basis for a denial of a request for an accommodation but should not be used as a barricade.

Class Counsel understand that only Clinical Services can prescribe health care appliances and accommodations. However, that must be done with the approval of the AIC. AR 700-02, Medical Scope of Services, states that ***Clinical Services decides what adaptive devices are "medically necessary."*** §10(c) (emphasis added). ***There is no mention of the AIC's role as mandated by the RP.*** This policy contravenes Judge Kane's ruling that "medical necessity" is not solely a medical decision but a decision under the ADA.

This also conflicts with previous practice as testified to by the former AIC, Cathy Holst, where she was proactive after learning of a potential problem:

> [I]f the provider during the screening and/or the chief medical officer did not address the need for [an] accommodation that the offender identified, then we would have to send them back and have it looked at. Sometimes they had to go through another screening to have it determined, or we could send them directly to the CMO [Chief Medical Officer] and simply ask her if she could make that determination based off of the information

that they already had either in the medical records or the screening information.

Ex. 5, at 2394:18-2395:1.

DOC's fundamental change in policy is reflected in the many, many complaints by class members about being denied accommodations and then referred to Clinical Services. See Appendix 1 and accompanying attachments. There is scant evidence that the current AIC system attempts to move the process forward. This also conflicts with the information DOC gives inmates about requesting accommodations - which is that they are to contact the AIC. Ex. 2, at Attach. D. Telling inmates, essentially, that they must "go to the next window" results in an unwarranted delay directly attributable to DOC's decision to use Clinical Services as the first line of response to ADA inquiries. The resulting harm and delay to class members means that DOC is not in substantial compliance with the RP.

## III.  CLASS MEMBERS WITH LOW SECURITY CLASSIFICATION RANKINGS ARE NOT BEING ALLOWED TO PROGRESS TO LOW SECURITY FACILITIES BECAUSE OF THEIR DISABILITIES.

### A.    The RP was drafted to allow inmates with disabilities to progress through the system.

A fundamental tenet of the RP was that inmates with disabilities would progress through DOC to minimum level facilities and, accordingly, that facilities designated for housing disabled inmates have comparable programs and services. DOC has not only failed to comply with this basic purpose, it now, as a matter of express policy, ensures that numerous disabled inmates cannot progress. Besides being an egregious violation

of the ADA, DOC's policies and actions are a clear, intentional, and systemic violation of the RP.

The RP, § VI, provides:

> The designated facilities in which inmates with disabilities will be housed *shall include facilities at each security level within DOC, including boot camp. Inmates with disabilities shall be allowed to progress through the system in a manner consistent with that of inmates without disabilities. Inmates shall not be housed at higher security facilities solely because of their disability.*

(Emphasis added.)[4]

Section VI identifies the "designated facilities" for each of the five security levels, with Level I being the lowest security level (often referred to as minimum facilities or "camps") and Level V being the highest security level. Thus, for example, according to the RP, disabled inmates are eligible to be housed at Camp George West (also known as Colorado Correctional Center) and Skyline Correctional Center—both Level I facilities—and Buena Vista Minimum Center (diabetics and hearing impaired only), a Level II facility. *See* RP, p. 5, § VI(A). But in practice, and as a matter of express DOC policy, disabled inmates, especially diabetics, are ***automatically*** classified as ineligible for those facilities.

The only evidence produced from Defendants regarding comparable programming and services at the designated facilities was the evidence that the lowest security facilities, all "designated" facilities, had a plethora of unique and highly desirable vocational rehabilitational jobs and programs not available at the other

---

[4] In addition, the 2008 Stipulation, ¶ 25(g), provided that diabetics would have "[a]ccess to all benefits, services and programs offered at CDOC, regardless of diabetes, *including progression to lower level security facilities . . . .*" (Emphasis added.)

facilities.  Of course, since numerous inmates with disabilities were not placed at these facilities, these jobs and programs were not available to them.

    **B.**    **DOC's Medical Coding Process Systemically Interferes With Progression.**

DOC Administrative Regulation 600-01 ("AR 600-01"), effective January 1, 2015,[5] addresses "Offender Classification."  AR 600-01 provides procedures on classifying inmates with a numerical score that determines inmates' custody level eligibility.  That eligibility may be overridden, however, and sometimes must be overridden per DOC policy.  Section IV(H) (page 9) of AR 600-01 provides for mandatory overrides "that are required under policy to restrict offenders from progressing below a level III facility or a level II facility."  Mandatory overrides include overrides for "Mental Health/Medical Code restriction (based on Clinical Time/Needs Matrix (AR 700-2)."  AR 600-01 at 9, Section IV(H)(1)(c).

The "Clinical Time/Needs Matrix" referenced in AR 600-01 is an attachment to AR 700-02 "Medical Scope of Service" (effective March 15, 2014).  The matrix lists by row the DOC facilities.  The columns of the matrix contain various categories of codes employed by DOC—*e.g.*, medical, psychological, sexual.  For the medical code, or "M-code," DOC rates inmates on a 1 to 5 scale, with 1 being the category requiring the least medical care and 5 requiring the most.

Diabetics are classified at a minimum of an M-code of 2.  Insulin-dependent diabetics are **automatically** classified at an M-code of 3 or higher, and most non-

---

[5] All DOC administrative regulations are available online, though some regulations cannot be printed off.  *See* http://www.doc.state.co.us/administrative-regulations.  AR 600-01 and 700-02 are included as exhibits to this filing.  *See* Exs. 6 and 7.

insulin-dependent diabetics are also classified at 3 or higher.  Many diabetics have M-codes of 4.  According to the matrix, inmates with an M-code of 3 **are not eligible** for placement at Level I facilities Camp George West (CCC on the matrix) and Skyline Correctional Center (SCC on the matrix) without a waiver from the Chief of Operations.  Inmates with M-codes of 4 **are not eligible** at all to be housed at Level I facilities or at the Buena Vista Minimum Center (BVMC on the matrix), a level II facility.  This restriction is directly contrary to Section VI of the RP that "[i]nmates shall not be housed at higher security facilities solely because of their disability."

Thus, despite the RP's expressly providing that disabled inmates may be housed at Camp George West, Skyline, and Buena Vista Minimum Center, by express policy DOC ensures that no inmates with a medical code of 4 can progress to those facilities, and that many inmates with a medical code of 3 will be excluded from those facilities.  The result is blatant discrimination under the ADA and continual, systemic violations of the RP.  DOC is not in substantial compliance with its agreed-upon obligation to ensure that "[i]nmates shall not be housed at higher security facilities solely because of their disability."  RP, § VI; see examples at App. 2.

IV. **THE ADA GRIEVANCE PROCEDURES NO LONGER REFLECT THE ADA GRIEVANCE PROCEDURE MANDATED BY THE RP.**

A.      **The ADA grievance procedure is Set Forth in the RP.**

Under the RP, the ADA grievance procedure is multi-tiered and moves from an informal grievance to a Step III grievance. RP at § XII. If the issue is not successfully resolved informally, the inmate has five calendar days to file a Step I ADA grievance, which the case managers forward to the AIC within five calendar days. The AIC then

has 25 calendar days to issue a written determination. *Id.* at 2. The Step II grievance procedure is much the same, but with the case manager forwarding the grievance to the Regional Assistant Director. Step III ADA grievances are sent to the Step III Grievance Officer, who has 45 calendar days to make a written determination. *Id.* at 3.

**B.    DOC's new ADA grievance procedure is markedly different from that required by the RP.**

DOC substantially changed the ADA grievance procedure in AR 850-04. Ex. 8, Grievance Procedure.[6] The changes begin with the informal grievance process where disabled inmates must now follow the same procedure as non-disabled inmates. Class members must begin the grievance process by conducting an "informal" meeting with the DOC staff involved.  If that staff member is not available in a timely manner, ***the class member cannot proceed with the grievance because this requirement does not alter the time for filing grievances***. *Id.* at 3, § (B(4). Case managers are then used as "gate keepers: "Case managers/CPOs will review the information presented and research the issue(s) in collaboration with offenders and affected staff in an attempt to resolve the issue, prior to issuance of a grievance." The form to be used is 850-04A, which does not include any ADA designation. *Id.* at 3, § (B)(2) and Attachment A.

Under the section of the AR addressing ADA grievances, there is a new player, the Facility Grievance Coordinator. *Id.* at 2 (defining Facility Grievance Coordinator), 6, § (E(2). This Coordinator decides whether a grievance is ADA related, thereby functioning as a second gatekeeper. *Id.* at 6, § 2(a). ***It is up to the Coordinator to decide whether the AIC should be consulted about whether a grievance is ADA***

---

[6] AR 850-04 governs all inmate grievances.

*related. Id.* at 6, § 2(b). If the grievance is deemed ADA related, the Coordinator

designates it as ADA-M (grievances arising out of the RP) or ADA-A (all other

complaints of disability discrimination). *Id.* at 3, ¶ 4. Now, DOC staff respond to ADA

complaints in consultation with "Legal Services' AIC staff trained in the ADA *as*

*necessary*." *Id.* at 6, § 2(f) (emphasis added). The AIC reviews and approves all Step I

ADA-M grievances. Step II ADA grievances were to be decided by the Regional

Assistant Director. RP at § 11, ¶ 3. The AIC responds to the grievance, which is then

approved by the Director of Prisons or a designee. Step III ADA grievances continue to

be decided by the Step III grievance officer. Ex. 8, at 7, ¶ 2(i).

## V. FOLLOWING JUDGE KANE'S DECISION FINDING SUBSTANTIAL COMPLIANCE, DOC LOST CONSIDERABLE GROUND IN EFFECTIVELY TRACKING CLASS MEMBERS

### A.   DOC agreed to track each inmate designated as having a disability.

Under the RP, DOC is required to track each inmate designated as having a

disability "*throughout the inmate's incarceration to ensure that the individual is not*

*denied access* to programs, services and benefits offered by DOC because of his/her

disability." RP at § IX (emphasis added); *see also* RP at § 2.

Before the Compliance Hearing, the AIC created and used a multi-pronged

tracking system, which while not perfect, was indicative of progress. Indeed, the

Proposed Findings of Fact and Conclusions of Law submitted by DOC after the

Compliance Hearing devoted 12 pages to explaining and lauding AIC's tracking system.

(Doc. # 5069 at 42-53, § IX.) Unfortunately, upon Judge Kane's finding of substantial

compliance, DOC's tracking system has fundamentally changed in a way that frustrates

the purposes of the RP and which has made "monitoring" DOC's compliance with the RP extremely difficult.

### B. The AIC files are incomplete, often making it impossible to determine a class member's status.

According to DOC's counsel, AIC files are updated when an inmate makes a request or when entries are necessary during the Monitoring Period. Ex. 9, at 1, Nov. 7, 2014, Letter from Opposing Counsel. That letter also states that *90 of the AIC files provided to Class Counsel are devoid of a single entry during the entire Monitoring Period*. *Id*. Because the files were empty, DOC concluded those inmates had already been accommodated without problems. Attached as Appendix 3 is a table of incomplete AIC files culled from the ten percent of files ordered to be produced by this Court.

These AIC files suffer from a serious lack of documentation including:

1.      The lack of entries during the Monitoring Period,

2.      The lack of accommodation worksheets [a form previously used to track an inmate's disability and accommodations], and

3.      The lack of ADA litigation resolutions [the form replacing the Accommodation Resolution (also referred to as the "AR").

The result is that assessing the DOC's compliance during the Monitoring Period is akin to putting together a puzzle that is missing important pieces. Failing to track these inmates "throughout" incarceration is also an express violation of the RP because it shifts the burden to the inmate, thereby abandoning DOC's obligation to track class members. This is why DOC must affirmatively track class members. DOC's assumption

that 90 empty AIC files indicates that nothing transpired during the Monitoring Period is unwarranted. The bottom line is that DOC **has no information about** those 90 inmates and did not try to learn whether their disabilities are being accommodated or they are being denied access to services. DOC is not in substantial compliance with its obligation under the AIC to track class members.

## VI. **ALTHOUGH DOC REPRESENTED IN ITS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW THAT IT PROVIDED SPECIAL FOR CLASS MEMBERS WHO REQUIRE THEM, A NUMBER OF OBSTACLES STAND BETWEEN THE CLASS MEMBER AND THE REQUIRED SHOES**

In DOC's Proposed Findings of Fact and Conclusions of Law, DOC identified special shoes as a routine accommodation for mobility impaired class members. (Doc #5069 at 60. However, diabetic inmates also require special shoes, and DOC's policy, Clinical Standards and Procedures for diabetes mellitus (*see* Ex. 10 at 7, ¶ 11(c)), requires that a class member either have an "anatomical abnormality, current foot ulcer, or a documented history of foot ulcer. . . ." If a diabetic class member is forced to wear a hard boot as opposed to a soft shoe, the foot can be harmed. The damage has already occurred by the time a foot ulcer or a documented history of a foot ulcer. Ex. 11, Hrg. Test. of Linda Edwards (qualified as expert in diabetes management). DOC should be ordered to revise its policy about providing shoes to diabetic class members.

## VII.  CONCLUSION

In his decision finding DOC in substantial compliance with the RP, he also reminded DOC of its responsibility to continue paying heed to the ADA and the RP. "Performance has not been perfect, and my findings should permit no lessening of effort

on the part of the State to maintain and improve the ADA compliance systems that have been put into place as a result of the RP." (Doc. #5314 at 14.)

Despite Judge Kane's caution, there are discrete areas where DOC has failed to maintain substantial compliance during the monitoring period:

1.      There is little evidence from the Monitoring Period that the AIC investigates requests and concerns raised by individual inmates regarding accommodations. Requests are denied, and the class member is sent to Clinical Services. In the documents provided, there are only a handful of times where the AIC intervened or conferred with Clinical Services to ensure each class member has full access to the same services and benefits as non-class members. Yet, that was one essential element of the RP. The AIC has deferred to Clinical Services instead of acting independently. Additionally, DOC has failed to purchase the reasonable accommodations such as hearing aids, hearing aid batteries, replacement glasses, and vibrating watches, forcing class members to purchase these items at the Canteen even if it means going in the "red" or doing without the accommodation.DOC cannot demonstrate that it is in substantial compliance with §§ II, IX, X, XI, III of the RP.

2.      Class members with low security classification rankings may not progress to low security facilities because of their disabilities. This systemic problem has only intensified since the compliance hearing and is codified in DOC's policies and regulations.DOC cannot demonstrate that it is in substantial compliance with § VI of the RP.

3.      The ADA grievance procedure has been substantially modified in a way that sets-up obstacles that class members must move through before they can file timely grievances - they must now informally meet with the DOC employee(s) involved before they can move into the formal grievance process. Because the time for filing a grievance is not extended, the class member cannot move forward if the DOC employee is unavailable. In addition, class members cannot direct their grievances to the AIC office; instead, the facility grievance officer makes that decision with no requirement that the AIC first be consulted.DOC cannot demonstrate that it is in substantial compliance substantially complies with § XII of the RP.

4.      After Judge Kane's substantial compliance decision, DOC began failing to document disability related contacts with class members, resulting in empty files and inadequate recordkeeping. DOC cannot demonstrate that it is in substantial compliance with §§ II, IX of the RP.

5.      DOC's written policy regarding providing diabetic inmates with soft-soled shoes requires that the class member show harm before the shoes can be approved. DOC cannot demonstrate that it is in substantial compliance with § XV(B) of the RP.

WHEREFORE, Plaintiffs respectfully request this Court grant a hearing on the remedies that should be granted and the procedures that should be implemented to achieve substantial compliance.

Dated this 2nd day of April, 2015.

KING & GREISEN, LLP

*s/ Paula Greisen*
Paula Greisen

19

1670 York Street
Denver, CO  80206
(303) 298-9878 telephone
(303) 298-9879 facsimile
greisen@kinggreisen.com

_s/ Edward T. Ramey_
Edward T. Ramey
Heizer Paul, LLP
2401 15th Street, Suite 300
Denver, CO 80202
(303) 595-4747 telephone
(303) 595-4750 facsimile
eramey@hpgfirm.com

_s/ Lara E. Marks_
Lara E. Marks
Foster Graham Milstein & Calisher, LLP
360 S. Garfield Street, 6th Floor
Denver, CO  80209
(303) 333-9810 telephone
(303) 333-9786 facsimile
lmarks@fostergraham.com

_s/ Blain D. Myhre_
Blain D. Myhre
P.O. Box 3600
Englewood, CO  80155
(303) 250-3932 telephone
blainmyhre@gmail.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2014, I electronically filed the foregoing **PLAINTIFFS' CLASS NOTICE OF DEFENDANTS' NON-COMPLIANCE WITH REMEDIAL PLAN** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

Jacquelynn N. Rich Fredericks
Colorado Department of Law
jacquelynn.richfredericks@state.co.us


*s/ Laurie A. Mool*
Paralegal, King & Greisen, LLP