IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 92-CV-870-CMA

JESSE (JESUS) MONTEZ, et al.,

Plaintiffs,

v.

JOHN HICKENLOOPER, et al.,

Defendants.

---

**DEFENDANTS' RESPONSE PLAINTIFF'S NOTICE OF NON-COMPLIANCE**

---

Defendants respectfully submit their Response[1] Plaintiff's Notice of Non-Compliance with Remedial Plan (Doc. 5507).

## BACKGROUND

The instant matter is a class action pertaining to the ADA rights of a sub-set of disabled offenders housed in the Colorado Department of Corrections (CDOC). Specifically, the Remedial Plan addressed those offenders with hearing, vision, lower mobility, and diabetic disability. The Plan contains 36 sections which outline various obligations on the part of the CDOC. *See* Doc. 41 (RP); *and see* Doc. 5314 (Order at p. 2 discussing sections of RP). The purpose of the Remedial Plan is to provide CDOC's disabled offenders with access to CDOC programs and services consistent with legitimate penological interests. Along these lines, all CDOC facilities designated to house offenders with disabilities are required to provide comparable programs, services and benefits available throughout comparable CDOC facilities to ensure that offenders with disabilities are not discriminated against because of their disability.

---

[1] This Response complies with this Court's Practice Standard 10.1(C)(2).

In September 2012, Judge Kane ruled CDOC was in Substantial Compliance with the Remedial Plan. Doc. 5314. That finding triggered the two-year Monitoring Period which commenced October 1, 2012. *Id.* at p. 4. After the Court granted two extensions resulting in a 30 month duration, the Monitoring Period ended April 2, 2015. Doc. 5503.

On April 2, 2015, Plaintiffs' filed a Notice of Non-Compliance, wherein they alleged that the CDOC "retreated from its earlier attempts to comply…" *See* Doc. 5501 at p. 2. Plaintiffs enumerate five finite alleged failings.[2] *Id.* at pp. 2, 1 – 3, 5. The allegations raised by Plaintiffs' in their Notice are not supported by any evidence regarding their purported significance, a fatal deficiency previously noted by Judge Kane (Doc. 5314) when it comes to the offering of "anecdotes and incidents collected and catalogued by Plaintiffs…" *Id.* at p. 9 and at p. 14 ("…Plaintiffs' lists and examples were accompanied by no expert or other opinion ascribing any generalized statistical significance to them. They were but lists.")

For each of the foregoing reasons, Plaintiffs are mistaken and the CDOC was, is, and remains in Substantial Compliance with the Remedial Plan.

## ARGUMENT

### A.  Plaintiffs bear the burden of proof.

Plaintiffs bear the burden of proof regarding their allegations of noncompliance. Plaintiffs cite *Joseph A. ex rel. Wolfe v. New Mexico Dep't of Human Servs.,* 69 F.3d

---

[2] Plaintiffs state that they "remain engaged in discussion regarding these issues." *See* Doc. 5507, p. 2 at Fn.1. This is an inaccurate representation of the efforts and present posture of the Parties. The first time in the 30 month Monitoring Period that Class Counsel ever approached Defendants' Counsel regarding any purported "issues" was in an email March 18, 2015 at 2:05 p.m. (copy attached as **Ex. A-10**). Defendants immediately gathered information and provided a thorough response to the enumerated "concerns" on March 27, 2015. (copy attached as **Ex. A-10**). No further dialogue regarding this information was received by Defendants despite their affirmative offer to engage in additional discourse. *See* Letter, dated, 03/27/15 at p. 8. The only subsequent "discussion" has been Plaintiff's filing of their Notice on April 2, 2015. This failing by Plaintiffs to work amicably with Defendants runs afoul of the Plan ¶ XXXI which requires that any disputes during the Monitoring Period be resolved "expeditiously and in good faith" by the Parties. *See also* Doc. 5507 at p. 3 *quoting* Remedial Plan.

1081, 1086 (10th Cir. 1995), for the proposition that it is Defendants' burden to shoot down their post-compliance claims. Plaintiffs are mistaken and misconstrue *Joseph A.*

Prior to the Compliance Hearing(s) this Court ruled Plaintiffs bear the burden of proof in substantiating their claims. *See* Doc. 4853 at Ex. B, copy attached hereto. During a December 29, 2009 hearing, Class Counsel(s) acknowledged, "You previously ruled that we have the burden…" Trans. at pp. 12, 6-7. Judge Kane responded, "[w]hen we get to a hearing, it's your burden [addressing Ms. Greisen, counsel for Plaintiffs]." Trans. at pp. 12, ln. 13-14. Judge Kane reiterated once more, "[w]hen we go to trial, the plaintiffs have the burden of proof. They have to show there hasn't been compliance…" *Id.* at pp. 13, ln. 6-7. Prior to the Compliance Hearing, Plaintiffs argued that the burden belonged to Defendants predicated upon *Joseph A.* because Defendants had the "burden of proving compliance…" Doc. 4853, p. 2.[3] As a result, the Court reconsidered its prior ruling. *See* Doc. 5314 at p. 3; p. 7. Plaintiffs now rely on the same argument, but it no longer carries the day as the situation at bar is markedly different.

Pursuant to the plain language of the Plan, which this Court has long-construed as a contract between the Parties; the Remedial Plan self-terminated at the conclusion of the Monitoring Period. *See* Doc. 441 (Remedial Plan ay ¶ XXXVI.B); *and see* Doc. 5314 at p. 2 ("after [the monitoring period] it would be dismissed, *sua sponte*, with prejudice"). After extensions to accommodate Class Counsel(s), the thirty-month Monitoring Period ended April 2, 2015. Consequently, Plaintiffs' present reliance on *Joseph A.* is misplaced. That matter is distinguishable because it pertained to a motion for termination of a consent decree by defendants in that matter which pre-dated a finding of substantial

---

[3] Despite these assertions, Plaintiffs presented their evidence first at the Compliance Hearing(s) and were permitted to present a rebuttal case.

compliance and the Tenth Circuit remanded because the Special Master therein failed to make adequate findings as to whether defendants in that matter "satisfied the essential purpose of the decree…" *Id.* at 1089.

The situation at bar is dissimilar in every respect. Here, Defendants were found in substantial compliance and Judge Kane ruled in September of 2012 that Defendants satisfied the essential purposes of the Plan. *See* Doc. 5314. Pursuant to the plain language of the Remedial Plan, after a two year period of monitoring, triggered by that compliance finding, the Plan simply ceases to exist. *See* Doc. 441 (Remedial Plan ay ¶ XXXVI.B); *and see* Doc. 5314 at p. 2 ("after [the monitoring period] it would be dismissed, *sua sponte*, with prejudice"); at p. 3 ("Once the [MP] ran its course, the Plan was to expire by its own terms and 'no longer [be] in effect.'"); at p. 4 ("after [Monitoring] the Plan will go gently into its good night and the case dismissed.") Thus, Defendants have not, nor are they obliged to, seek to terminate because the RP was, and remains, self-terminating at the close of Monitoring (e.g. April 2, 2015). Therefore, *Joseph A.* is neither on-point nor persuasive regarding the allocation of the burden of proof herein.

Defendants in this matter have *already* proven their substantial compliance with the Remedial Plan. *See* Doc. 5314. As a result, the relationship between the Parties has shifted and the burden of proof that Defendants have allegedly "retreated" from substantial compliance, now properly belongs squarely with Plaintiffs. *See* Doc. 5146 at p. 9 (quoting transcript of Sept. 16, 2010, hearing where Judge Kane confirmed that once the "monitoring period begins, and, with it, the actual shifting of the burden of proof with regards to compliance to the plaintiffs.") Plaintiffs cannot satisfy *their* burden.

The Court applies state contract law to issues involving formation, construction, and enforcement of a settlement agreement. *United States v. McCall*, 235 F.3d 1211,

1215 (10th Cir. 2000). "[T]he intent of the parties to a contract is to be determined primarily from the language of the instrument itself. Extraneous evidence is only admissible to prove intent where there is an ambiguity in the terms of the contract. Written contracts which are complete, clear in their terms, and free from ambiguity are enforced because they express the intention of the parties." *Radiology Professional Corp. v. Trinidad Area Health Assoc., Inc.*, 195 Colo. 253, 577 P.2d 748, 750 (Colo. 1978) (citations omitted). The Parties drafted the Plan such that it was self-terminable two years subsequent to the finding of substantial compliance. As a result, there is no obligation to Defendants to seek to terminate, nor can such an affirmative obligation be read into the Plan. Indeed, courts interpret contracts as made by the parties, and do not make new ones for them. *Quad Construction, Inc. v. Wm. A. Smith Contract Co., Inc.*, 534 F.2d 1391 (Colo. 1976); *Gertner v. Limon National Bank*, 257 P. 247 (Colo. 1927). To the extent Plaintiffs believe some material breach has occurred, it is incumbent upon them to make that showing. They fail to do so here.

### B.  Substantial compliance does not require systemic perfection.

The Tenth Circuit interprets the term "substantial compliance" in a consent decree contractually. In *Joseph A.*, the Tenth Circuit considered a class action consent decree regarding the New Mexico foster care system. The Tenth Circuit noted that it must treat the term "substantial compliance" as a contractual term. *See also United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236-38 (1975) (explaining that consent decrees "should be basically construed as contracts"). The Eleventh Circuit in *Reynolds v. McInnes*, 338 F.3d 1201, 1211 (11th Cir. 2003), similarly held that a Court must "apply the same rules that govern contract interpretation…"

The Tenth Circuit in *Joseph A.* went on to explain that the contract law doctrine of substantial compliance is "simply a doctrine to assist the court in determining whether conduct should, in reality, be considered the equivalent of compliance under the contract." *Joseph A.*, 69 F.3d at 1085 (quoting *Peckham v. Gem State Mut.*, 964 F.2d 1043, 1052 (10th Cir. 1993)). The court also quoted Judge Cardozo in *Jacob & Youngs Inc. v. Kent*, 230 N.Y. 239, 129 N.E. 889, 891 (1921) in stating that the inquiry was whether any deviation from the contract requirements "in any real substantial measure. . . frustrates[s] the purpose of the contract." *Joseph A.*at 1086. *Joseph A.* concluded that the "touchstone of the substantial compliance inquiry is whether Defendants frustrated the purpose of the consent decree--i.e. its essential requirements." *Id.*

The Eighth Circuit's rationale in *McDonald v. Carnahan,* 109 F.3d 1319, 1322-23 (8th Cir. 1997), demonstrates judicial reluctance to interpret substantial compliance as requiring one hundred percent compliance. In *McDonald,* the Eighth Circuit found the termination of a prisoner class action consent decree proper. The *McDonald* court excused "shortfalls in the state's compliance with the decree's provisions" in affirming the termination of the decree, including access to medical services and scattering of legal materials, as these "shortfalls" were deemed not to be the result of defendants' bad faith, not retaliatory, and not an impediment to court access or a demonstration of deliberate indifference to medical claims. *See id.* The court found that the state substantially complied, despite some provisions of the decree not being completely fulfilled. In *Wyatt v. Rogers*, 985 F. Supp. 1356, 1388 (M.D. Ala. 1997), the district court observed that substantial compliance is something less than 100 percent compliance, stating "it would be impractical, and thus unreasonable, to expect 100% compliance 100% of the time" with respect to the complex requirements of a consent decree.

Instead, *Wyatt* recommended a case-specific analysis in examining whether the goal of substantial compliance was attained. *Id.*; *see also Johnson*, 489 F.3d at 1110 n.7. Similarly, in *Smith v. Bland*, 856 F.2d 196 (6th Cir. 1988), inmates appealed a district court finding of substantial compliance and alleged that several provisions of a consent decree were not met. Although a number of provisions of the consent decree were apparently not met, the court stated "in the context of the instant case, this 'policy of minimum intrusion' demands that judicial supervision over the Kentucky prison system should be as limited as possible and terminated as quickly as possible once it is determined that the likelihood of future violations has ceased." *Id.* at *10; *see also Battle v. Anderson*, 708 F.2d 1523 (10th Cir.1983); *Taylor v. Sterrett*, 600 F.2d 1135 (5th Cir.1979); *Campbell v. McGruder*, 580 F.2d 521 (D.C.Cir.1978).

### C.  Allegations of anecdotal failings, did not, and do not carry the day.

Plaintiffs' tender vague and anecdotal allegations of non-compliance predicated upon hearsay.[4] *See* Doc. 5507. Such ad hoc evidence did not carry the day before Judge Kane and it should not now. Indeed, substantial Compliance was properly found "notwithstanding… evidence that compliance has and continues to fail individual inmates in certain areas on certain occasions…" Doc. 5314 at p. 3-4. Indeed, "[s]ubstantial performance is not a rigid standard and does not require mathematical precision or perfection…" *Id.* at p. 5 (collecting cases).

---

[4] One such notable departure from provable and admissible evidence is the broad and blanket statement that "staff in most facilities informed class members that '*Montez is dead…*'" (Doc. 5507, p. 2). This rather astounding statement is attributed to no particular person, on no particular date. Speculation, supposition, and unsubstantiated allegations do *not* constitute evidence. *Phillips v. Calhoun*, 956 F.2d 949, 950-51 n.3 (10th Cir. 1992).  Indeed, it is unclear how or when Plaintiff's Counsels would have even been privy to such a statement. Moreover, such a purported statement is impermissible hearsay. Finally, even if some individual line staff person had uttered such a ridiculous statement, that remark hardly evidences that the CDOC, a 6,000 plus person strong entity has failed to maintain substantial compliance with the Remedial Plan between October 1, 2012, and the present.

The cornerstone of the present inquiry is whether the essential tenets of the Remedial Plan have been frustrated between October 1, 2012, and the present. *See* Doc. 5314 (citing *Jacob & Youngs, Inc.* and *Joseph A.*) Plaintiffs' Notice fails because, simply put, they fail to prove that Defendants have in any material manner frustrated the essential tenets of the RP. As a result, allegations of incidental or occasional failings are unpersuasive.

### D. Defendants remain in Substantial Compliance.

Defendants substantially complied with the letter and spirit of the Remedial Plan. *See* Doc. 5314. There has been no "retreat" from that substantial compliance.[5]

### 1. The role of the AIC remains strong and undiminished.

Mr. Keith Nordell is the current AIC. *See* **Ex. A-1**, Nordell Aff. Nordell has held that position for the duration of the MP. *Id.* ¶ 3-7. Under former Executive Director Mr. Zavaras, shortly after the conclusion of the Compliance Hearings, Administrative Regulation 750-04 was revised to codify the role and purview of the AIC. *Id.* ¶ 8. That clarity around the important role of the AIC remains intact, "The associate director of the Office of Legal Services has the final authority on determination and enforcement of the ADA within the CDOC as it pertains to offenders and prison operations and reports directly to the executive director… on such matters." *See* AR 750-04 (V)(A), eff. 12/15/14. *Id.* ¶ 9-10; 18-19; *and see* **Ex. A-2** ¶ 20 (AIC reports directly to ED). Other than conclusory allegations to the contrary,

---

[5] Plaintiffs raise the non-issue of "yellow posters" in their Notice. *See* Doc. 5507 at p. 2. This is a red herring. The posters were *never* required to remain in each unit during monitoring. Rather, they were hung in housing units as a non-compliance stipulation for the duration of the pre-compliance period. *See* **Ex. A-1** ¶ 20. In addition, the posters remain available in standard 8.5" x 11" format to all offenders to access it in the library, which is what is actually required by the Plan. *Id.* ¶ 21. Also, congruent with the requirements of the Remedial Plan, each offender is oriented upon incarceration regarding the Plan; all staff is trained about the ADA and *Montez* matters. *Id.* ¶ 23-26. Staff training has actually expanded over the past few years. *Id.*; *and see* **Ex. A-2** ¶ 8(e).

Plaintiffs fail to prove otherwise. Moreover, according to Nordell, his role has been "strengthened" since the 2010 Compliance Hearing. *Id.* ¶ 9-10; 26-27, 38. Specifically, Nordell has taken efforts to surround himself with a team of "subject matter experts." *Id.* ¶ 11. All three of his on-site staff at the Office of Legal Services in Colorado Springs, CO have gone through training and certification pursuant to the ADA. *Id.* ¶ 12; *and see* **Ex. A-2**, Russell Aff. ¶ 6; **Ex. A-3**, Smith Aff. ¶ 6.

The AIC works alongside Clinical Services to the benefit of all incarcerated persons. Clinical has always been responsible for assessing the medical needs of offenders. **Ex. A-2** ¶ 21-22; 25; **Ex. A-3** ¶ 16-17. Neither the AIC nor his team are medical care providers. **Ex. A-1** ¶ 19. Thus, they rely on Clinical Services staff to provide appropriate medical care and render medical decisions. *Id.* ¶ 28-32. Better front end medical care ultimately leads to fewer necessary accommodations. **Ex. A-2** ¶ 23. Once medical determinations, if needed, are made, then the AIC did and does ensure that all offenders have any and all necessary ADA accommodations they may reasonably request to afford their full participation in the programs and services offered by the CDOC. *Id.* ¶ 22; 26; *and* **Ex. A-1** ¶ 18-19; 27; 28-32.

Plaintiffs appear to conflate accommodation under the ADA with provision of medical or health care appliances. Pursuant to administrative regulations, in place prior to the finding of substantial compliance, and which remain in effect today, Clinical Services properly determines what health care appliances are medically necessary for an individual. **Ex. A-1** ¶ 28-32. Previously, both medical appliances and ADA auxiliary aids were listed on one form. *Id.* ¶ 28; **Ex. A-2** ¶ 29. In an effort to provide clarity to both staff and offenders, that form was bifurcated. *Id.* ¶ 30. This bifurcation means that an inmate or line staff can more quickly and accurately determine where a request for new equipment or repair should be funneled for the most expeditious response: either Clinical Services or the AIC. *See* **Ex. A-6**, Staff

Memo. This action thus advantages offenders, such that their initial request is more likely to flow to the correct service provider and therefore, receive a more prompt response and provision of necessary item. Nevertheless, sometimes inmates will contact the AIC directly with a request for a health care appliance. On the rare occasion when clinical may decline to find a medical necessity regarding something which the AIC feels is appropriate, the AIC retains authority to provide any ADA accommodation it deems reasonable irrespective of the medical determination. *See* **Ex. A-1** ¶ 27; **Ex. A-2** ¶ 22. Besides, Judge Kane ruled Defendants substantially complied absent unmitigated AIC authority. Doc. 5314 at p. 4.

### 2.  Medical care decisions must be made by medical care professionals.

Plaintiffs compound their prior confusion regarding the important distinction around medical care versus accommodation and provide this Court with inaccurate and incomplete information support of their broad claim that offenders are not being accommodated (*see* Doc. 5507, 13-16). However, when such an improperly routed request is received, it is listed in the ATS system as a "denial" (because it is a request for medical care) and promptly routed to Clinical Services where a provider can render appropriate medical care to include provision of health care appliances. *See* **Ex. A-1** ¶ 28-30. Those initial "denials" are what Plaintiffs show at Doc. 55-7 13-16. The *crucial* next step Plaintiffs fail to share candidly with this Court is that the AIC staff sends this re-routed request *immediately* to the Health Services Administrator of the appropriate facility where an appropriate medical care decision can, and is made, to the benefit of the offenders. *See* **Ex. A-1** ¶ 28-30; **Ex. A-5** Appendix 2 (compiled by Clinical Services); *and see* **Ex. A-7**, Def's Appdx. 1; **Ex. A-2** ¶ 22-23; **Ex. A-3** ¶ 7-17. As Appendix #1 demonstrates, although an offender may have mistakenly approached the first window (the AIC) in the "drive through" of accommodation and care, they are *immediately* re-routed to the second window (Clinical Services) where a medically sound

10

recommendation is made and medically appropriate devices issued. *Id.* It is also the case on occasion that an offender requests an item as an accommodation or as medical care equipment, which he simply does not actually need. *Id.* Plaintiffs, in their Notice and the attached charting, fail to account for those occasions where an individual has requested an item or accommodation which they simply have no legitimate need for, and which were, appropriately denied. As a result, it is disingenuous for Plaintiffs to represent that there has been some mass denial of care to the Class. *See also* **Ex. A-5** Appendix 2 (showing of 62 "re-routed" offenders, there were ultimately 41 approved requests for medical care or equipment). Rather, what has actually transpired is that the CDOC has been transparent regarding by whom and how medical care devices are provided. The actual provision of those items to those deemed to require them has not in any way diminished over the preceding 30 months of monitoring. *See* **Ex. A-2 ¶** 10 (no changes to screening criteria).

The allocation of responsibility between AIC and medical staff has always existed. Indeed, non-medical staff should not render medical care or endeavor to make such decisions because they (1) are not personally assessing an individual's medical capabilities and (2) could actually cause harm to an individual via provision of incorrect health care appliances. The law recognizes this important distinction between the two types of care as two distinct legal causes of actions. *See Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005) (holding that claims for substandard medical treatment *cannot* be pursued under the ADA). Judge Kane did as well. *See* Doc. 5314. Efficiency and enhanced communication is key to this successful symbiotic relationship between the AIC and Clinical Services. For example, if a request for equipment repair goes beyond 90 days, pursuant to the Plan an offender is entitled to delay compensation, and the AIC will alert Clinical

Services if it becomes aware of this type of situation. As a result, the rapport and communication between the AIC and Clinical Services is necessarily strong.

### 3. Class Members with low security rankings can and do progress, unfettered.

Class Members can and do progress. Plaintiffs raise a largely speculative fear about the discretion found in Administrative Regulation 600-01. *See* **Ex. A-2** ¶ 32 (Russell Aff. explaining discretionary override process in AR 600-01). Plaintiffs provide a mere nine instances over the course of the thirty month MP of occasions in which individuals did not progress to the absolute *lowest* classification possible in CDOC. Initially, the "exhibit" propounded by Plaintiffs in support of this argument is actually rife with argument[6] as opposed to admissible evidence. Regardless, the handful of anecdotal examples provided by Plaintiffs does not rise to the level of frustration of an essential purpose which operates to remove Defendants from the finding of substantial compliance. "The AIC works in conjunction with Offender Services and Clinical Services to ensure appropriate placement and progression for all disabled offenders. This may be accomplished through authorization of a waiver to a lower custody facility based on the overall needs of an offender." *See* **Ex. A-2** ¶ 33; *see also* **Ex. A-5**, Baroni Aff. ¶ 12-17.

Initially, the concern about which Plaintiffs presently complain, is precisely the way it was *prior* to the finding of Substantial Compliance. *Id.* ¶ 34; Doc. 5146 at p. 51. During the Hearing(s) Plaintiffs complained about the ability of offenders' to progress from Level III to Level II. *Id.* ¶ 35. Notwithstanding this issue, which has neither increased nor decreased, Defendants were found in Substantial Compliance. *Id.* ¶ 36; *and see* 5314; *see also* Doc.

---

[6] To the extent attachment 2 is argument, it is beyond this Court's page limits, without leave for such, and should be disregarded. To the extent attachment 2 is an exhibit; the argumentative portions should be disregarded as unsworn and unattributed hearsay, inadmissible in court.

5146 p. 51-52 (confirming prior testimony that "disabled offenders [are] housed at lower facilities unless their medical conditions made it unsafe to house them in these facilities which do not have regular clinics or 24 hour medical staff."). Then, as now, insulin dependent diabetics are not generally housed at Level I facilities because of concern regarding their medical needs. *Id.* at p. 52. CDOC continually strives to improve the progressive opportunities for all offenders, regardless of disability status. *Id.* ¶ 37. Indeed, Defendants hereby provide a dozen examples of occasions on which the discretionary override function in AR 600-01 was used to the *benefit* of class members to permit the dozen exemplar offenders to be housed at a *lower* custody level than that for which they were properly score. *See* **Ex. A-1** ¶ 38; **Ex. A-8**, Custody Overrides. Thus, Defendants provide 12 specific examples over the same time frame in which the discretionary override contemplated in AR 600-01 was utilized to the *benefit* of Class Members. Plaintiffs' nine anecdotal examples to the contrary are insufficient to remove Defendants from the prior finding of substantial compliance which was made notwithstanding this precise concern.

### 4. The grievance process has not changed fundamentally and there is no "gatekeeping" barring Class Members from filing ADA-related grievances.

The grievance procedure contemplated by the Plan has *always* included an informal component. *See* **Ex. A-4**, DeCesaro Aff. ¶ 15. Plaintiffs admit the same. *See* Doc. 5507 at p. 13 ("Under the RP, the ADA grievance procedure is multi-tiered and moves from an informal grievance to a Step III grievance. RP at § XII.")

### i. The codification of the informal step does not operate as a gatekeeping function.

Contrary to Plaintiff's unsubstantiated assertions, policy and practice dictate that *regardless* of whether an offender avails himself of the informal step, s/he is obliged to

move forward with the filing of their formal Step I Grievance within 30 days of their alleged injury. *See* **Ex. A-4** ¶ 17-18; *and see* **Ex. A-9**, AR 850-04. Defendants have reiterated this to Class Counsel throughout monitoring. Further, an inmate's failure to participate in the informal grievance process does not itself preclude exhaustion under the Prison Litigation Reform Act assuming that s/he completes steps 1, 2 and 3. *See* **Ex. A-4** ¶ 17-18, 21. Notably, Plaintiffs fail to point to a *single* instance in which any member of the Plaintiff class have been barred from pursuing a non-frivolous grievance as a result of the codification of the informal resolution attempt. Moreover, it is woefully unclear how encouraging open dialogue between an offender (*See* **Ex. A-4** ¶ 16) who believes they have been wronged and staff in an effort to resolve that purported wrong at the earliest possible time operates other than to benefit an offender by offering them an increased chance to resolve an alleged complaint sooner, rather than later.

### ii. The Grievance Coordinator expedites and enhances accuracy within the grievance process.

The facility Grievance Coordinator is a point-person to ensure that all offender grievances are received, accounted for, and timely responded to. *See* **Ex. A-4** ¶ 19-21; *and see* **Ex. A-9**, AR 850-04. This is not a new position. *Id.* ¶ 25. The Coordinator does not "filter" ADA grievances out; rather, s/he affirmatively acts to ensure that ADA grievances are quickly and efficiently routed directly to the assigned responder at each step. *See* **Ex. A-4** ¶ 23. This position *increases* the accuracy with which grievances are expeditiously routed to responders such that the decision is not left to numerous individuals throughout the CDOC system, but, rather by a single trained individual on the ground at each facility. *Id.* ¶ 23-24, 26. This consolidation of task permits an offender to enjoy increased speed and accuracy in his or her access to the grievance process. *Id.*

14

A separate channel for ADA grievances was and continues to be followed. *Id.* ¶ 12; 27 *and see* ¶ 22 (laying out the process in detail); *and see* **Ex. A-2** ¶ 7(c) (discussing Grievance Tracking System as used to track "ADA subject matter complaints…"). Plaintiffs' allegation ignores the clear progress CDOC has made regarding its efforts to streamline the process for offenders and staff and *enhance* accountability system-wide. *Id.* ¶ 21; 23-26; *and* 28. On July 1, 2011, the CDOC went "live" with its Grievance Tracking System. *Id.* ¶ 20; *and see* **Ex. A-8**, AR 850-04. This electronic based system obviates the need for paper filing of grievances and mailing between and amongst department staff. Instead, when an offender tenders a grievance form to his/her case manager, that individual immediately scans it into the Grievance Tracking System.

Under the old system if the grievance was miss-routed by the complaining offender to the AIC when it was actually a medical issue, bi-directional response time meant delayed response and access for an offender. Under the present system, that same grievance is correctly routed by the Coordinator and assigned for response within hours. *Id.* ¶ 19-24. If an offender mistakenly designates their grievance "ADA" when it in fact pertains to medical care, the AIC staff explains this in their response to the offender. *Id.* ¶ 28 (DeCesaro explaining his Step II review process); *and see* **Ex. A-2** ¶ 7 (Russell explaining AIC process). In addition, the AIC staff will then affirmatively reach out to on-site medical personnel capable of rendering the appropriate medical care decision to make sure the offender's need is addressed. *Id.*; *and see* **Ex. A-1** ¶ 28-30.

### E. Since the Compliance Hearing the CDOC has vastly *expanded* its tracking efforts regarding Class Members.

Over the past several years, the CDOC has *enhanced* and "greatly expanded" its record keeping and ADA inmate tracking by transitioning to a series of electronic tracking

systems. *See* **Ex. A-2** ¶ 7; 9; 12-14; **Ex. A-3** ¶ 38. In November of 2010, the AIC led the way converting paper files to electronic format. *Id.* They maintained their usage of the ADA Montez tracking system which is used specifically to identify and screen offenders for their disability related needs, medical restrictions, health care appliances, and identify any ADA accommodations. *Id.* In addition, in January of 2012, the Accommodation Tracking System was brought online. **Ex. A-1** ¶ 15. The Accommodation Tracking System was implemented in order to help CDOC be proactive in response to the ADA Amendments Act (2009). The Accommodation Tracking System is used to track *all* ADA accommodations, and is not limited to *Montez* Class Members. **Ex. A-2** ¶ *7.* Also, as discussed above the Grievance Tracking System was brought on board which enables real-time electronic tracking of offender grievances and enhances the identification of ADA subject matter complaints. *Id.* As a result of these "sustained effort[s] to improve…", the AIC is able to pinpoint where *any* Class Member is housed on any given day and what accommodations that individual is privy to. *Id.* 12-13; *and see* **Ex. A-1** ¶ 13-17. Mr. Nordell confirms that his AIC team tracks the location and accommodation of all *Montez* Class members "[e]ach day" via "a number of sophisticated systems… [which they] utilize… daily." *Id.* ¶ 13-14; *and see* **Ex. A-1**¶ 18.

In reality, Plaintiffs' complaints regarding "tracking" center upon what they believe is "missing" from 56 of the hundreds of excerpted files they were provided during the MP. However, the "empty" files complained about by Plaintiffs is not evidence of inadequate tracking. *See* **Ex. A-2** ¶ 15. Rather, as ordered by the Court, Defendants provided *excerpts* of certain offenders' AIC files for the time frame September 1, 2012 – October of 2014. *Id.* ¶ 16. Thus, an "empty" production file indicated that the offender had not made contact with the AIC or requested accommodation during that snapshot in time. *Id.*

¶ 17; *and see* **Ex. A-10** (explaining the same). In addition, Plaintiffs further fail to account for offenders who (1) left custody during monitoring or (2) did not qualify and/or meet the screening criteria under the condition they sought membership in the class for. *See* **Ex. A-3** ¶ 39-43. Moreover, Plaintiffs reliance on the old "Accommodation Worksheet" is misplaced. As articulated to Plaintiffs throughout the MP, that very information is now tracked via the electronic database(s) discussed above. *See* **Ex. A-2** ¶ 30-31.

### F.  Diabetic Class Members are provided *medically necessary* footwear.

Plaintiffs seek novel relief within their Notice, in the form of an order from this Court that CDOC be obliged to provide soft shoes to *all* diabetic offenders. But, the Parties entered the Plan as a *contract* (Doc. 5314 at p. 1). That contract did *not* include an agreement to provide *all* diabetic offenders with soft shoes. *See* RP; *and see* **Ex. A-2** ¶ 10 (Russell Aff. confirming no changes to screening criteria during monitoring); *see also* doc. 5146 at p. 48 (discussing CDOC's issuance of soft shoes as congruent with the American Diabetes Association standards). Nevertheless, Plaintiffs, in their Notice, now seek *novel* relief in the form of an order from this Court compelling CDOC to "revise its policy [to] provid[e] shoes to diabetic class members. *See* Doc. 5507, p. 17. The Notice is neither the time nor the place to make such a novel request. In addition, this Honorable Court is constrained to the four-corners of the contract negotiated and entered into by the Parties. As a result, Plaintiffs' invitation to craft novel relief should be disregarded by this Court. Moreover, there is an agreed upon clinical standard in place, which is utilized by medical staff to ascertain when the provision of soft shoes[7] might be appropriate for an offender with diabetes. *See* **Ex. A-2** ¶ 10; Doc. 5146 at p. 48. Other than Plaintiffs' general disagreement

---

[7] Defendants' Appendix 2 (attached to **Ex. A-3**), confirms six (6) such instances where offenders who met the clinical standard were provided state-issued medical soft shoes.

with the standard they previously *agreed* to, they offer no substantive evidence that the failure to affirmatively provide soft shoes to *each* individual who is diagnosed with diabetes is a failure of substantial compliance with the RP, nor could they.

### G. Offering assistive devices for self-purchase is not a violation of the Remedial Plan.

Plaintiffs' Notice conflates and combines medical equipment and ADA accommodations (Doc. 5507, p. 5-7) and fails to distinguish which department within the CDOC always has, an presently retains, authority to authorize each. The distinction matters because medical care has properly been the purview of medical care providers while ADA accommodations flow from the AIC. Plaintiffs admit (Doc. 5507, p. 7) that "Clinical Services prescribes health care appliances…" Further review of the cited provision of the Plan confirms that when an initial disagreement arises, it is "referred to the facilities Warden." RP §XVI(B). As a result, the plain language of the Plan confirms that Clinical Services was not, and is not, the final decision maker. *See also* **Ex. A-1** ¶ 9-10; 18-19 (disc. AIC authority); *and see* **Ex. A-2** ¶ 20 (AIC reports directly to Executive Director).

The Notice further fails to adequately distinguish between contractual obligations under the RP and correctional discretion regarding how provision of an item is made available. Initially, replacement accommodations including hearing aid batteries are generally provided for offenders, and as a result, Class Members are not obliged to self-purchase these items. *See* **Ex. A-1** ¶ 36-37. Thus, Plaintiffs' allegation to the contrary is simply mistaken. Previously, CDOC provided hearing impaired offenders with a free vibrating watch. *See* **Ex. A-3** ¶ 19. In April of 2013, "in an effort to make this item more widely available to our entire offender population, the vibrating watch was made available on the offender canteen." *Id.* ¶ 20-21. This is part of CDOC's overall effort to enhance

18

accountability amongst the offender population and encourage self-sufficiency and readiness for reentry. *Id*. ¶ 36; *and see* **Ex. A-1** ¶ 33-34. If an offender meets the clinical standard for hearing loss as set forth in *Montez*, those offenders are able to obtain[8] a vibrating watch, even if they cannot afford one. *Id*. ¶ 22-24. The permission to purchase without available funds is the accommodation the AIC grants in these instances. *Id*. Since April 1, 2013, when the vibrating watch was moved to the canteen, 78 additional/new hearing impaired offenders have been identified. *Id*. ¶ 25. Those individuals were able to request a vibrating watch by submitting Form 750-04 A. *Id*. ¶ 26. Indeed, the AIC authorized 77 individuals to make just such a purchase. *Id*. ¶ 27. Notably, only 10 people or 13% chose to avail themselves of this option. *Id*. ¶ 28-29; 32. Moreover, Plaintiffs complain that an offender would have been obliged to "go into the red" to "the company store" but, a review of documentation substantiates that of the 77 individuals granted permission to procure a vibrating watch, even absent funds to do so, "only 16 of them *actually lacked positive or adequate funds*." *Id*. ¶ 30 (emphasis added). Furthermore, the wider availability of this item has increased access to a broader audience of the offender population and reduced the number which have come up "missing"[9] by reducing incentive to barter for them. *Id*. 34-37.

---

[8] It is important to note that the 2008 stipulation did *not* require the CDOC to provide anyone with a *free* watch. Rather, CDOC did and does make watches available. This is congruent with ample case law that an offender may be charged for their medical care. Pursuant to *Youngblood v. Romeo*, 457 U.S. 307, 314-25 (1982), the State must provide necessary medical care to an incarcerated person. But, as long as an inmate's serious medical needs are met, it is a matter of state law whether the cost of that care shall be borne by the state or the prisoner. *See Revere v. Massachusetts General Hospital*, 463 U.S. 239, 245-46 (1977). "Nothing we say here affects any right a hospital or governmental entity may have to recover from a detainee the cost of the medical services provided to him." *Id*., 463 U.S. at 245 n.7.

[9] Notably, the "denial" of a free replacement pointed to by Plaintiffs in their Notice, shows that the offender, Mr. Roberts (Doc. 5507-3), had previously been provided a fee vibrating watch a mere four months and three days prior to his request for a *second free* vibrating watch. Nevertheless, the AIC accommodated Mr. Roberts by permitting him to self-purchase a replacement even if he lacked adequate current funds. *Id*.

**H. Alternatively, even assuming that Defendants have failed with respect to the five enumerated areas as alleged by Plaintiffs, these five purported "failings" do not divest CDOC's of its overall Substantial Compliance with the Remedial Plan.**

The Remedial Plan consists of 36 enumerated sections (component parts). Plaintiffs allege deficiency regarding implementation of five finite components of the Plan. CDOC disagrees with this unsubstantiated allegation and have proven herein that they *remain* in Substantial Compliance with these five component parts. Nevertheless, even assuming that Plaintiffs are correct – which they are not – and that CDOC has "dropped the ball" regarding these five finite sections, Defendants remain in Substantial Compliance. Plaintiffs tacitly concede that CDOC remains substantially compliant regarding 31 of the 36 sections, which equates to sustained compliance with 88.6% of the Remedial Plan's 36 sections.

The Tenth Circuit recognized in *Wolfe* that "'substantial compliance' is not susceptible of a mathematically precise definition." Thus, there is no mathematically definitive benchmark. CDOC believes that 88.6% compliance, or viewed oppositely, alleged 11.4% deficiency, does not bar a finding of substantial compliance. Furthermore, as of May 15, 2015, there are 18,001 incarcerated persons within the CDOC's custody (excluding parolees, absconders, and jail backlogs) and 1,466 ADA Montez Class Members (including tracking for community corrections, parole in every region, those waiting for regress/county jail and returning to custody as well as those we have on interstate compact and fugitive status). *See* **Ex. A-11**, Daily Roster (submitted conventionally). Plaintiffs allege the Plan failed with respect to nine (9) non-progressions to the lowest possible level, "inadequate" tracking of 56 people, and the "denial" of accommodation to 63 offenders (who wrongly sought medical care via the AIC). *See* Doc. 5507. Those "failings" represent .61% (progression), 3.82% (tracking), and 4.30 %

20

(denials) of the Class Members as a whole. As Judge Kane previously recognized, "none of the deviations or failures, individual or as a whole, materially adversely affect[s]s, or frustrate[s], the Plan's essential purposes." *See* Doc. 5314 at p. 7.

## CONCLUSION

**WHEREFORE**, because "[t]he evidence presented [herein]… supports a finding that [C]DOC has done [and continues to do] an enormous amount of work to develop [and maintains] a system of screening and identifying inmates for disabilities…" (Doc. 5314 at p. 12), Defendants respectfully request that Plaintiff's Notice be overruled, and this matter closed out once and for all.

Respectfully submitted this 18th day of May 2015.

CYNTHIA H. COFFMAN
Attorney General

s/ Jacquelynn N. Rich Fredericks
JACQUELYNN N. RICH FREDERICKS,
JAMES X. QUINN,
Assistant Attorney(s) General
Civil Litigation & Employment Law Section
Attorneys for Defendants
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: (720) 508-6603
*Counsel(s) of Record

## CERTIFICATE OF SERVICE

I certify that on May 18th, 2015, I filed the foregoing via ECF which will serve electronic copies addressed as follows:

Paula Greisen
greisen@kinggreisen.com

Lara E. Baker
lmarks@fostergraham.com

Edward T. Ramey
eramey@hpgfirm.com

Blain D. Myhre
blainmyhre@gmail.com

s/ Jacquelynn N. Rich Fredericks