

**JOHN W. SUTHERS**
Attorney General

**CYNTHIA H. COFFMAN**
Chief Deputy Attorney
General

**DANIEL D. DOMENICO**
Solicitor General

**STATE OF COLORADO
DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY
GENERAL**

**RALPH L. CARR
COLORADO JUDICIAL
CENTER**
1300 Broadway, 10th Floor
Denver, Colorado  80203
Phone (720) 508-6000

December 8, 2014

Ms. Jennifer Bezoza
KING & GREISEN, LLP
1670 York Street
Denver, CO 80206

  RE: *Montez v. Hickenlooper, et al.* 92-CV00870-CMA

Dear Ms. Bezoza,

  I hope this communication finds you doing well.  I am writing in response to your correspondence(s), dated November 14, 2014, and November 24, 2014.  It is my hope that this letter will provide further clarification and address some of your concerns which may remain outstanding notwithstanding my November 17, 2014, and December 2, 2014, response(s).

  On September 8, 2014, the Court ordered narrowly tailored information be provided to Class Counsel.  *See* Doc. 5484.  Accordingly, on October 8, 2014, Defendants provided a disk which contained 10% sampling in the designated categories and the other information ordered by the Court.  As part of that production, Defendants integrated their 1(d) sampling with the 1(a) sampling which was provided on October 8, 2014.

  Subsequently, in your correspondence of November 14, 2014, you indicated that Plaintiffs disagreed as to how the 1(d) sampling was provided by Defendants.  At no point were Defendants trying to "hide the ball."  Rather, it appears there is a difference of opinion on how the sampling could be attained congruent with the Honorable Judge Arguello's Order.  To be certain, the AIC previously ensured all electronic files provided includes the documentation even if not previously saved to the electronic files as to ensure 100% compliance with the Court's directives to provide all documentation for Class Counsel.  But, as a sign of good faith, on November 26, 2014, an *additional* 10% sample was provided with respect to category 1(d) of the Court's Order.  *See* Doc. 5484, p. 6.  Please note that there were 458 requests made since

1

A-10

September of 2012 which resulted in a screening and confirmation of class member status. In order of date of receipt, Legal Services provided every 10th RFA and the corresponding resulting disability screening record. Thus, on the 11/26/14 disk a total of 46 further files were provided.

On October 8, 2014, Class Counsel sought 403 further individual offenders' ADA/AIC files. CDOC gathered and provided 310 of the requested 403 files on November 7, 2014. That information was tailored to comply with the Court's Order (Doc. 5484); such that the files provided contained information entered from September of 2012, to the present time. Approximately, 90 of the sought files were empty because no requests were made during that time period. There were also 83 files which were initially denied for various reasons including that the individual was not a class member, was deceased, was in another country, or had otherwise discharged their sentence. Subsequently, Class Counsel inquired as to *when* each of those intervening events may have occurred. Thus, on November 26, 2014, a chart was provided sorted by denial rationale which gave the date on which an offender demised/left CDOC custody/etc. That chart was placed on the tendered disk and labeled "Chart A."

On October 8, 2014, Plaintiffs requested a number of "working files." Defendants articulated a concern that this request was potentially hugely voluminous, not calculated to lead to admissible discovery, and not tailored in *any* manner to the instant litigation or Monitoring Period time frame. As a result, on November 14, 2014, Class Counsel clarified that although they previously broadly requested "working files" what they actually desired was information relevant to class members' ability to progress predicated upon their M-code designation. Thus, on November 26, 2014, the provided disk included offender classification records from September of 2012 to-date for the 32 offenders for whom Class Counsel requested "working files." The tendered records are the best representation of classification and facility placement.

On November 14, 2014, Plaintiffs sought clarification regarding the production tendered on October 8, 2014. Counsel states they are unclear as to whom some of the requests for accommodation (ATS) came from. The ATS report provided *clearly identifies* each offender's name and CDOC number at the beginning of each section documenting the offender's requested accommodations and approved/denied report for each subsequent entry. All successive entries after the offender's name and number listed belong to the offender identified above. Thus, you are correct each entry may not have a name *beside* it as the name appears *above*.

Class Counsel has repeatedly sought paper/hardcopy RFAs. Defendants wish to reiterate that they have trended to an electronic system. Thus, there are *no papers* to be produced. In addition, many, many accommodations are not generated from an offender's request. As previously articulated, staff and the AIC can initiate requests, and do. An offender making an RFA is only one of *many* ways in which a request may be generated. Many entries are initiated when an update is necessary and/or when a class member screening or re-screening is initiated either by staff or the offender. Additional contact from the offender or staff may also result in an ATS entry. Not all forms of request come from a paper source. Thus, there simply is not an inmate RFA to pair with each provided item. To be clear, ATS entries may not have a corresponding paper RFA received from the offender. For example, a voluminous number of entries have also been initiated for ASL interpreters absent a paper RFA and upon notice from DRDC intake.

2

If an offender initiated RFA is received, the offender's request is entered into ATS – largely verbatim – with the exception of spelling and grammatical errors.  But, please understand that ATS is a *database* and not a filing system.  Accordingly, there are not "scans" of such items in ATS.  However, if any actual paper RFA was received form an inmate, a scanned version is placed into that individual's electronic file.  Those would be reflected in the information recently produced in 1(a) and in response to your requested 403 individual files.

Furthermore, ATS documentation includes the accommodation or modification sought and whether it was approved or denied and why.  Please note that the Honorable Judge Arguello did not order CDOC to provide ATS *paper* requests.  Moreover, the information provided to Class Counsel adequately reflects not only the offenders' request but also includes all relevant requested accommodations, often *verbatim* from the offenders request along with the comments and responses issued to the offender.

Although Plaintiffs allege the Honorable Judge Arguello may not have known full details of what the ADA Tracking System entails, the Court's September 8, 2014, Order (Doc. 5484) ensured a random 10% sampling of electronic files which necessarily included the "paper" RFA's in an electronic format.  As a result, the Defendants previously provided a 10% sample of electronic files that included RFA-A and RFA-B forms for class members.  The ATS file documentation submitted to Class Counsel sufficiently meets the Court's Order related to the four types of disabilities covered by the Plan as specified by Judge Arguello.

Re facility placement: an inmate's current facility is what is tracked.  That is because in ATS, the "facility" field automatically populates when someone is entered.  Then, when re-opened, that is updating to show where that person is housed in real time.  This is so structured because accommodations carry over to any subsequent placement.  Thus, the "facility" field you may see in ATS addresses where an offender is presently housed.  The tendered ATS reporting did not include the location of facility the offender was assigned as offender accommodations are valid regardless of which facility they are moved to or are otherwise terminated if facility/job specific upon movement or release from an assignment.

To the extent the goal is to analyze trends that may be better accomplished via review of grievances as this will identify all complaints and disputes regarding accommodations and claims of discrimination under the Remedial Plan.

Plaintiffs could further compare the information contained in the Quarterly Reports which delineate the location of every class member on the given date.  Otherwise, if Plaintiffs would like to request where a specific offender was on a specific date, Defendants would request that Plaintiff's please provide a list of names and relevant dates and Defendants can then answer those specific requests.  That seems the most expeditious course as Plaintiffs have indicated to the Court that these individual files are requested as a result of a specific alleged denial by a class member.  Accordingly, *Plaintiffs* are in the best position to inform Defendants *when* that denial allegedly occurred.  Furthermore, Class Counsel was certainly capable of asking their clients when they were denied something and even where the alleged denial occurred.  Thus, to the extent this information remains pertinent; Defendants look forward to receiving a list of dates to

which they can provide succinct and tailored responses regarding where the individual was housed.

In your most recent correspondence, Plaintiffs indicate that they received some files they were not looking for and did not receive others which they were but believe are class members. Specifically, on December 3, 2014, Ms. Bezoza wrote, "there are several class members for whom you have denied production of information that were never on our list. We recognize that there may have been a few errors in the DOC numbers we provided, but the names we provided were correct. Perhaps you worked off of the incorrect DOC number rather than the name we provided?"

That is absolutely the case. Inmates are tracked by their CDOC inmate tracking number much like free citizens are accounted for via their social security numbers. This is because the inmate tracking number is the most *accurate and efficient* way to track an individual. Certainly, there are *many* "Smiths" and "Trujillos" within CDOC. Now, Class Counsel desires that Defendants would overlook if they have provided wrong or incongruent CDOC inmate tracking numbers. This is unreasonable and Defendants respectfully decline to engage in a guessing game re whose information is being sought by Plaintiffs. If you were informed by a specific individual that they were not adequately provided for, it is your responsibility to provide an accurate inmate tracking number if you would like to obtain access to their AIC file. Accordingly, while Defendants would be more than happy to provide information to the extent Plaintiffs wish to provide the accurate CDOC inmate tracking numbers for those for whom they believe they have not previously been apprised, Defendants decline to engage in a guessing game predicated upon names alone which would only lead to further disagreement and potential unsatisfactory production not to mention be a waste of time and resources for both Parties.

I'd like to make sure we're all on the same page with respect to your request for individual files. Thus, below please find a breakdown which reflects Defendants' understanding with respect to your additional requested files. I believe this is where we are presently with respect to your requested files:

- 403 files sought by Class Counsel
- 310 files were provided
- 173 files were denied for the ensuing reasons:
  - **90 files** did not have any activity/contact with the AIC from September 2012 to October 8, 2014 (date requested by class counsel). These files were provided but are empty to show that they have no documents or activity.
  - **83 files** were not initially provided because the offender was either history/discharged (no longer in custody), paroled, did not qualify as a class member (may have previously attended meeting with Class Counsel while pending evaluation for class member screening but later found not qualified); deceased, in jail custody or previously provided file.[1]

---

[1] Dates of when each offender left custody or died were included on the responsive spreadsheet. *See* "83 Date Chart" provided on Disk of 11/26/14.

- 3 Absconders (failed to report on parole/escape)
- 5 Previously provided (as part of initial 10% sample)
- 5 Deceased
- 1 Escaped
- 19 History/Discharged
- 3 INS/Deported
- 3 County Jail
- 41 Not a class member
- 2 On list twice/duplicated

o Defendants do not believe that the provision of files for offenders who are no longer in custody (abscond, history/discharged, deceased) is relevant to Class Counsel's monitoring. Specifically, Counsel alleged deficiencies and the Court granted leave to obtain based upon that allegation specific offenders' files, to ensure that those persons who alleged a denial had their reasonable accommodations during the MP. Specifically, Plaintiffs wrote this was necessary so that "…you (CDOC) can promptly provide the needed accommodations." *See* Class Counsels' response to AG 11/14/14. But, there can be no provision or remedy for offenders no longer in CDOC's custody.

o Nevertheless, the files of those offenders who were *class members* (**39 files** of the 83 originally denied) were provided. *See* Disk of 11/26/14.

o The remaining approximately **40 files** will be produced to Class Counsel, contingent upon the submission to Defendants of signed waivers/releases from those individuals. As those approximately 40 people were determined not to be class members, Class Counsel does not represent them and Defendants are unable to produce their files without their permission as the files would contain personal medical information. Thus, on November 26, 2014, Defendants provided a copy of a waiver/release for Class Counsel to utilize for that purpose. Upon receipt of signed waiver/release(s) for each non-class member, their AIC/ADA file will be provided as requested. *See* Disk of 11/26/14.

Re Orientation materials and policy: All orientation materials and policies/procedures have been previously provided to Class Counsel to the extent possible. The Sterling Correctional Facility & Trinidad Correctional Facility orientation materials were provided in the voluntary disclosure of documents and interrogatory responses sent to Class Counsel during the summer of 2014. Accordingly, they were not reproduced in the fall. Trinidad Correctional Facility has provided the only documents they have available. Plaintiffs fail to indicate how or why they feel these documents are incomplete. To date, *all* CDOC facilities have provided *all* available policies and procedures, including San Carlos Correctional Facility. The file labeled "LVCF" included policies relevant to SCCF. To be clear, *all* relevant policies and procedures have been provided to Plaintiffs. Please also note that not all facilities have additional policies.

Defendants have previously provided clear and valid explanations to Class Counsel to identify which files were produced and why as a result of their sampling. Plaintiffs fail to indicate how or why they believe the provided samples were statistically inadequate or otherwise deficient. Accordingly, no further explanation appears necessary. Moreover, the reports utilized by the AIC are based on the same documentation Class Counsel has access to and do not serve any purpose to further the efforts of counsel to discern how the 10% random sample was

identified.  If there is a specific alleged deficiency, please so articulate.  Otherwise, Defendants decline to speculate.

Class Counsels' request for "working files" remains vague and unclear.  Plaintiffs failed to identify a specific document requested for individual offenders.  Although Counsel very recently agreed to constrain their request to the time period from September 11, 2012, to current, and to documents that relate to an offender's "M-Code and ability to progress" this remains obscure and does not provide sufficient information for CDOC to identify a particular document(s).  Indeed, CDOC medical files would include the offender's M-Code.  Meanwhile, working files may not identify an individual's M-Code.  An offender's custody/classification level does not identify the offender's reason for such classification and would not assist Counsel(s) in discerning whether or not the offender was allowed to progress based on their M-Code.  Despite these deficiencies in the predicate request, on November 26, 2014, Defendants produced relevant documentation to enable Plaintiffs to glean the information sought as clarified by their more recent correspondence with Defense Counsel(s).

I'd like to take a moment to address your assertion that anything not specifically *excluded* from Judge Arguello's Order (Doc. 5484), is essentially fair game to request, i.e., your request for working files.  Just because the Court did not specifically exclude a particular item does *not* mean Plaintiffs are therefore entitled to it.  Indeed, Class Counsel did *not* include working files as part of their requests when seeking discovery previously nor did they identify this as a request at any time from 2009 to the present.  The mere fact that Plaintiffs may have received some working files or documents from the working files of offenders prior to the Monitoring Period does not reflexively entitle them to this now.

The CDOC Legal Services department requested that the CDOC Clinical/Medical department provide medical files for those offenders who have submitted a signed release.  Per Plaintiff's request, those will be made available on a rolling basis, as opposed to waiting to receive them in aggregate.  Please note that Defendants do *not* believe it was incumbent upon them to waste staff time and resources gathering these files prior to receipt of the requested releases as opined by Class Counsel in their recent email correspondence.  Moreover, to the extent a number of the releases appear to have been signed months or even years prior, any "delay" appears to have stemmed from Class Counsels' failure to more quickly produce the releases.  As files are received and scanned, Plaintiffs are welcome, per their request, to make an appointment with the AG's Office during business hours, via Ms. Hill, to come by and pick up the medical files.  Otherwise, the files will be mailed to King and Greisen as per the normal course.

In closing, I would respectfully point to the Court's clear and unambiguous reminder to Plaintiffs that the Remedial Plan does *not* permit formal discovery during the MP.  *See* Doc. 5484.  Nevertheless, Defendants have graciously cooperated on an informal basis by providing limited discovery and furthermore provided the Court-ordered 10% sampling.  In addition, Defendants have also provided another approximately **360 individual files** in the past two months, over and beyond the 10% samples.  The Court cautioned Plaintiffs against approaching this case as if the Parties are still in the midst of "hard fought litigation."  The Honorable Judge Arguello clarified that any discovery would be *limited* to information that will allow Counsel(s)

to ascertain whether CDOC has maintained compliance. The Court did *not* rule that Plaintiffs could request documentation outside the narrowly identified parameters of her Order as described in the 10 % allowance. To be sure, Judge Arguello took care to specify the nature and extent of what would be permissible in her Order. For Plaintiffs to suggest that *everything* not specifically excluded is axiomatically included, serves only to propagate an unfettered fishing expedition of the type specifically denounced by the Court as unnecessary and overbroad. Moreover, it unnecessarily serves only to increase the time and expense of this litigation. Accordingly, Defendants respectfully decline the invitation to "go further" as urged by Plaintiffs.

To the extent Plaintiffs find these parameters or the timeline deficient, as articulated in your December of 2014 email correspondence, Plaintiffs' issue is not with the Defendants. I would respectfully assert that the boundaries and timeframe of the materials provided stem from the Court's Order (Doc. 5484).

If there are questions which remain outstanding or issues which I have failed to clarify satisfactorily, please let me know so that they may be addressed. Please let me know if there are further ways I may be of service. Finally, please also confirm your receipt of this information and we look forward to continuing to work with you all for the duration of the Monitoring Period.

Happy Holidays,

FOR THE ATTORNEY GENERAL

s/Jacquelynn N. Rich Fredericks
JACQUELYNN N. RICH FREDERICKS
Assistant Attorney General
Corrections and Public Safety Unit
Civil Litigation and Employment Law Section
(720) 508-6603
(720) 508-6032 (FAX)

No entries since 9/12

| | DOC # | Last Name |
|---|---|---|
| 1 | 140144 | Alirez |
| 2 | 126102 | Archuleta |
| 3 | 104071 | Arroya |
| 4 | 98784 | Baldeagle |
| 5 | 106553 | Banks |
| 6 | 45726 | Bartowsheski |
| 7 | 121855 | Bass |
| 8 | 47131 | Benton |
| 9 | 145804 | Benzing |
| 10 | 96564 | Brady |
| 11 | 149562 | Bravo |
| 12 | 46401 | Braxton |
| 13 | 119437 | Broach |
| 14 | 41652 | Buggs |
| 15 | 87781 | Burgess |
| 16 | 135922 | Burkham |
| 17 | 66723 | Caraway |
| 18 | 120075 | Carton |
| 19 | 151914 | Casaus |
| 20 | 154930 | Castro |
| 21 | 114977 | ChavezDiaz |
| 22 | 54052 | Coleman |
| 23 | 52717 | Davis |
| 24 | 84886 | EchemendiaDiaz |
| 25 | 122792 | Ellington |
| 26 | 134810 | Evans |
| 27 | 154282 | Fair |
| 28 | 81794 | Fernandez |
| 29 | 133452 | Franklin |
| 30 | 140198 | GarciaHernandez |
| 31 | 90620 | Garcia |
| 32 | 131202 | Giron |
| 33 | 46594 | Gonzales |
| 34 | 69700 | Guerrero |
| 35 | 148306 | Harnish |
| 36 | 156488 | HarrisFrazier |
| 37 | 49000 | HarrisFrazier |
| 38 | 141898 | Herrera |
| 39 | 52597 | Hibbs |
| 40 | 93300 | Hinojos |
| 41 | 56213 | Hollenbeck |
| 42 | 65737 | Hubbard |
| 43 | 119130 | Hunn |
| 44 | 154067 | Hurtado |
| 45 | 48404 | Kaneta |
| 46 | 132849 | Kizer |

| 47 | 119201 | Lazo |
|----|--------|------|
| 48 | 43666 | Leslie |
| 49 | 118266 | Little |
| 50 | 90431 | Lucero |
| 51 | 48179 | Martin |
| 52 | 110520 | Mavus |
| 53 | 156053 | MaximoRodriguez |
| 54 | 88350 | McKenzie |
| 55 | 153304 | Thomas |
| 56 | 123118 | Mosman |
| 57 | 96372 | Nethken |
| 58 | 135614 | Nival |
| 59 | 2387 | Owens |
| 60 | 149778 | Pena |
| 61 | 108549 | Reed |
| 62 | 112383 | Regnerus |
| 63 | 54332 | Rivera |
| 64 | 154717 | Rodriguez |
| 65 | 86563 | Roever |
| 66 | 126887 | Romero |
| 67 | 68583 | Rowe |
| 68 | 155530 | Ruiz |
| 69 | 63377 | Russell |
| 70 | 134424 | SanchezCortes |
| 71 | 111023 | Santistevan |
| 72 | 83976 | Schaal |
| 73 | 58792 | Sibert |
| 74 | 94476 | Solorio |
| 75 | 141306 | Spencer |
| 76 | 139838 | Steele |
| 77 | 96689 | Stilling |
| 78 | 112957 | Stringer |
| 79 | 148686 | Summers |
| 80 | 123308 | Sutton |
| 81 | 132387 | Tillery |
| 82 | 130265 | Trujillo |
| 83 | 140054 | Valverde |
| 84 | 130452 | Vanfossen |
| 85 | 116758 | Vega |
| 86 | 134749 | Vigil |
| 87 | 133582 | Whisler |
| 88 | 102075 | Woodley |
| 89 | 121763 | Wright |
| 90 | 104641 | Ybarra |

| | Doc # | Last Name | Reason | |
|---|---|---|---|---|
| 1 | 103948 | Abdoulaya | Absconder | DOC 9/11/2013 Parole-4/22/2014 Absconded 5/16/14 |
| 2 | 113636 | Ivey | Absconder | Parole 11/26/13 Absconded 1/17/14 |
| 3 | 121388 | Moore | Absconder | Parole 1/27/14 Absconded 8/28/14 Jail 10/17/14 |
| 4 | 84093 | Amaro | Already provided | Already provided 9/18/14 |
| 5 | 96054 | Martinez | Already provided | Already provided 9/18/14 |
| 6 | 113005 | Ontiveros | Already provided | Already provided 9/18/14 |
| 7 | 57189 | Paige | Already provided | Already provided 9/18/14 |
| 8 | 160301 | Rose | Already provided | Already provided 9/18/14 |
| 9 | 49264 | James | class member | Hearing and Diabetic class member at SCF |
| 10 | 147753 | Gutierrez | Deceased | Deceased 12/11/13 |
| 11 | 68718 | Heisch | Deceased | Parole 9/28/11 Deceased 2/20/12 |
| 12 | 120659 | Lee | Deceased | Parole 3/14/13 Deceased 3/25/13 |
| 13 | 121182 | McNeil | Deceased | Deceased 6/17/12 |
| 14 | 117637 | Hayward | Deceased | Paroled 11/13/03 Deceased 3/4/06 |
| 15 | 138523 | Velarde | Escape | Parole 6/5/13 Escaped 8/26/14 |
| 16 | 66887 | Cash | History | 11/11/13 FCF 12/4/13 History |
| 17 | 160678 | Castillo | History | Parole 10/2/13 History 6/26/14 |
| 18 | 133442 | Cushing | History | History 6/7/14 |
| 19 | 152075 | Eddy | History | History 9/15/14 |
| 20 | 68391 | Grossetete | History | History 1/15/14 |
| 21 | 89916 | Hall | History | History 10/21/13 |
| 22 | 101324 | Harris | History | History 9/28/13 |
| 23 | 154413 | Harvey | History | Parole 9/12/12 History 2/24/14 |
| 24 | 55140 | Lubben | History | Parole 1/24/14 History 8/6/14 |
| 25 | 54577 | Martinez | History | History 9/29/14 |
| 26 | 124461 | Nurse | History | History 3/25/14 |
| 27 | 142191 | Roland | History | Parole 11/25/13 History 12/16/13 |
| 28 | 154198 | Serrano | History | Parole 12/5/11 History 4/17/14 |
| 29 | 151285 | Southern | History | Paroled 12/12/11 History 4/12/14 |
| 30 | 96558 | Vigil | History | History 9/18/14 |
| 31 | 154472 | Ware | History | Paroled 3/13/13 History 7/25/13 |
| 32 | 96396 | Williams | History | History 7/25/14 |
| 33 | 135354 | Zimmerman | History | History 10/8/13 |
| 34 | 56576 | Prince | History | Was a D in 5/17/11 DNQ in 12/21/11 |
| 35 | 148739 | CaveraHernand | Ins/Deport | INS DTNR 4/22/14 INS DEPORT 5/3/14 |

| 36 | 158069 | MendozaHernand | Ins/Deport | INS DTNR 11/14/13 INS DEPORT 1/9/14 |
|----|--------|----------------|------------|--------------------------------------|
| 37 | 148293 | VasquezTorreci | Ins/Deport | INS DTNR 8/20/14 INS DEPORT 10/1/14 |
| 38 | 49736 | Gallegos | Jail | Parole 9/25/13 Abscounded 9/27/13 Jail 9/18/14 |
| 39 | 88350 | McKenzie | Jail | Parole 11/12/13 Abscounded 5/12/14 CS/ABSINC 5/13/14 |
| 40 | 158887 | Scott | Jail | Parole 5/20/14 Abscounded 6/20/14 Now in Jail |
| 41 | 104933 | Alvarado | not a class member | left DOC before mobility screening completed parole 6/6/14 |
| 42 | 164156 | Ayala | not a class member | never requested screening. No AIC file. |
| 43 | 87151 | Baskall | not a class member | DNQ hearing/mobility 9/27/13 2/17/11 |
| 44 | 105600 | Blanchard | not a class member | DNQ D/M/H/V 3/24/11 |
| 45 | 98192 | Dumm | not a class member | DNQ D and M 10/21/13   D class member in 12/7/11 |
| 46 | 141356 | Espinoza | not a class member | DNQ Hearing 10/25/11 |
| 47 | 153890 | Fields | not a class member | DNQ Hearing 9/27/11 |
| 48 | 66345 | Fitzgerald | not a class member | History 10/8/12 DNQ MOHVD 2009-2012 |
| 49 | 165572 | Brandenburger | not a class member | never requested screening. No AIC file. |
| 50 | 125619 | Gray | not a class member | DNQ V and M 8/19/13 |
| 51 | 153880 | Griffith | not a class member | no RFA B ever received |
| 52 | 105526 | Haley | not a class member | left DOC before mobility screening completed parole 3/28/13 |
| 53 | 127724 | Harper | not a class member | DNQ D 8/20/13 |
| 54 | 63734 | Holly | not a class member | DNQ H 8/6/13 |
| 55 | 104683 | Hosier | not a class member | DNQ V and M 8/19/13 1/13/10 |
| 56 | 134258 | Jones | not a class member | DNQ M 10/15/12 |
| 57 | 89437 | Kneff | not a class member | no AIC file |
| 58 | 160288 | Makris | not a class member | no RFA B ever received |
| 59 | 128939 | Mason | not a class member | DNQ DV Ref M 2/13/14 |
| 60 | 60886 | McCary | not a class member | DNQ M D 7/5/09 |
| 61 | 135588 | Montano | not a class member | DNQ M H V 6/21/12 |
| 62 | 57381 | Moore | not a class member | DNQ V M 7/28/14 |
| 63 | 88038 | Moreno | not a class member | DNQ H V 7/9/13 |
| 64 | 129315 | Morgan | not a class member | no RFA B ever received Parole 11/12/14 |
| 65 | 113874 | Newcomb | not a class member | DNQ V 4/8/11 |
| 66 | 44875 | Nave | not a class member | Pending |
| 67 | 161965 | Nobles | not a class member | Pending |
| 68 | 56804 | Keyes | not a class member | DNQ M 7/23/09 |
| 69 | 100851 | Richardson | not a class member | DNQ M 10/25/12 |

| 70 | 123536 | Rogers | not a class member | DNQ M V 12/23/11 |
| 71 | 55539 | Preciado | not a class member | no AIC file |
| 72 | 156461 | Savannah | not a class member | no AIC file |
| 73 | 165589 | Simon | not a class member | Pending |
| 74 | 123265 | Smith | not a class member | DNQ V D 10/2/14 previously class D INCORRECT |
| 75 | 113100 | Sommerville | not a class member | DNQ D 2/21/14 Reversed |
| 76 | 110612 | Sweet | not a class member | DNQ M 2/6/14 |
| 77 | 104697 | Swift | not a class member | DNQ D V H 10/16/13 |
| 78 | 68838 | Thames | not a class member | DNQ M 12/2209 |
| 79 | 131889 | Tixier | not a class member | DNQ M V D 2/6/14 |
| 80 | 135527 | Warburton | not a class member | no AIC file Parole 10/16/14 |
| 81 | 162618 | Ward | not a class member | no AIC file |
| 82 | 156053 | MaximoRodrigues | On the list twice | On the list twice |
| 83 | 44338 | McAffee | On the list twice | On the list twice |

| | |
|---|---|
| **From:** | Paula Greisen |
| **To:** | James Quinn; Jacquelynn Rich Fredericks |
| **Cc:** | Ed Ramey; Blain Myhre; Laura Schwartz; Lara Baker; Kim Jones; Laurie Mool |
| **Subject:** | Compliance with the Remedial Plan in Montez |
| **Date:** | Wednesday, March 18, 2015 2:05:31 PM |

Jim and Jacque,

We have reviewed the discovery provided to us and believe that there are a few areas that are still not meeting the substantial compliance standard required by the Remedial Plan.  Specifically, we see the following problems (in no particular order):

1)  There has been a policy changes since the last compliance hearing which has divested the AIC office of having any authority to make decisions which involve medical accommodations.  Routinely, in response to complaints about not being provided accommodations (ie., hearing aids) the AIC tells class members  that the AIC is telling class members that the accommodation the class member has requested (e.g. hearing aids, canes, vibrating watches, etc) is NOT an accommodation because it is a medical issue.  Alternatively, class members are told that the AIC does not have authority to provide the accommodation and the request must be made of the medical department.  We believe that Judge Kane was very clear that the decision to grant accommodations under the ADA was a decision to be made by the AIC, not the medical department.  In addition, the AIC has stopped providing certain accommodations, such as talking watches, and instead stating that they are available to purchase on the canteen.  We do not believe that making an accommodation available to purchase satisfies the requirement of the Remedial Plan.

2) Class members who have low security classification rankings are not being allowed to progress to the low security facilities because of their disabilities.  This has been a systemic problem that has gotten worse since the compliance hearing and is now enshrined in DOC written policy.  We believe that it is a clear violation of the language, intent and spirit of the Remedial plan.

3)  The ADA grievance procedures has been changed and no longer reflects the ADA grievance procedure mandated by the Remedial Plan.  Now, class members are required to conduct an "informal" meeting with the DOC staff involved with the issue and if that staff is not available in a timely manner, the class member cannot proceed with his/her grievance.  In essence, DOC has set up a "gatekeeper" to significantly decrease the ability to file a grievance, and fundamentally changed the ADA grievance procedures as required by the Remedial Plan.

4)  Class members no longer have the means to know which accommodations they have been granted - which is a policy change since the last compliance hearing.  Previously, class members were provided an Accommodation Resolution form which clearly stated each accommodation that the class member was granted by the AIC.  These are no longer being routinely distributed.  Instead, class members receive a "litigation: resolution form which does not list their accommodations.  As a result, our class members have nothing to show DOC staff to prove that they are entitled to a requested accommodation.  When DOC staff do agree to check the computer system, there is general confusion about where such accommodations are recorded - and often cannot be located.  This undermines the entire Remedial Plan.  If an accommodation is granted, the class member must

know that it has been granted.  If an accommodation has been denied, it is equally important that the class member be informed so that if there is a grievance, it can be timely filed.

5)  The refusal to provide soft-soled shoes to class members with diabetes.  This problem has continued to grow since the compliance hearing and the refusal to provide such shoes unless a medical criteria is met violates the Remedial Plan and the ADA.

We  welcome the opportunity to discuss whether DOC is willing to address any of these issues.  If we cannot resolve them, we will be filing a notice of non-compliance prior to the April deadline.  I will be leaving town on March 25th so would appreciate a response prior to the close of business on March 24th - and preferably earlier so that we may have time to discuss these matters.  Thanks,

Paula Greisen



1670 York St. l Denver l Colorado l 80206 l 303.298.9878 p l 303.298.9879 f
www.kinggreisen.com

CONFIDENTIALITY NOTICE - This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain information that is confidential or legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you must not read or play this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender by telephone or return e-mail and delete the original transmission and its attachments without reading or saving in any manner. Thank you.

**Cynthia H. Coffman**
Attorney General

**David C. Blake**
Chief Deputy Attorney
General

**Melanie J. Snyder**
Chief of Staff

**Daniel D. Domenico**
Solicitor General



**STATE OF COLORADO
DEPARTMENT OF LAW**

**Ralph L. Carr**
**Colorado Judicial**
**Center**
1300 Broadway, 10th Floor
Denver, Colorado 80203
Phone (720) 508-6000

**Office of the Attorney
General**

March 27, 2015

Dear Class Counsel(s),

I hope this correspondence finds you each well. Initially, thanks so much for
the opportunity to engage in some constructive dialog. We certainly appreciate and
always welcome the chance to engage in mutually productive discourse. We're
heartened to see that your list of areas of concern was brief and take this list to be
all-inclusive and comprehensive of your remaining residual concerns.

On behalf of CDOC, I'd like to address each of your five enumerated areas of
concern, as articulated in Ms. Greisen's email, in turn.

**Concern #1:**

*There[1] has been a policy change[] since the last compliance hearing which has
divested the AIC office of having any authority to make decisions which involve
medical accommodations. Routinely, in response to complaints about not being
provided accommodations (i.e. hearing aids) the AIC tells class members that the
AIC is telling class members that the accommodation the class member has
requested (e.g. hearing aids, canes, vibrating watches, etc.) is NOT an
accommodation because it is a medical issue. Alternatively, class members are told
that the AIC does not have authority to provide the accommodation and the request
must be made of the medical department. We believe that Judge Kane was very clear
that the decision to grant accommodations under the ADA was a decision to be made
by the AIC, not the medical department. In addition, the AIC has stopped providing
certain accommodations, such as talking watches, and instead stating that they are
available to purchase on the canteen. We do not believe that making an
accommodation available to purchase satisfies the requirement of the Remedial Plan.*

---

[1] Please note that I have inserted Class Counsel(s)' articulated concerns verbatim.
They are denoted in *italics*, so as to distinguish between the initial articulated
"concern" from Plaintiffs and CDOC's "response" to each.

Page 2

**Response #1:**

This concern appears to cover two areas: decision-making authority and availability of some items on the canteen. I'll address each in turn.

Initially, we wish to reassure Plaintiff Class and their Counsel(s), that **the AIC has not been divested of its decision making authority**. CDOC policy and procedure continues to adhere to the agreed-upon screening process under the *Montez* Remedial Plan as it pertains to class member status review. Offenders are seen by a trained medical provider for their alleged disability and the results are reviewed by the Chief Medical Officer. A final determination of class member disability status is issued **by the AIC** along with a copy of the Litigation Resolution identifying any health care appliances or restrictions identified during the screening process. Clinical Services was, is, and remains responsible for offender *medical treatment* including delivery of medical care in compliance with RP and stipulations. This has not changed since the Compliance Hearing, subsequent to which Judge Kane found Defendants to be in substantial compliance. *See* Doc. 5314.

As CDOC has consistently maintained, the ADA is **not** a health care law and does **not** provide for medical treatment. We believe that Judge Kane did, and on-point legal authority does, recognize this distinction. *See Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134 (10th Cir. 2005) (holding that claims for substandard medical treatment *cannot* be pursued under the ADA).

Moreover, Legal Services-AIC staffs are not and have never been licensed medical professionals. As a result they are not qualified to render medical care and treatment decisions. This has consistently remained the case since before the Compliance Hearing. Health care appliances and treatment are **not** disability accommodations. *See* the ADA (*generally*) *and see* 750-04 IV.C.5.

The AIC office ensures equal access to programs, services, and activities and non-discrimination for incarcerated persons with disabilities. This includes providing reasonable accommodation, effective communication, and modifications to practices or procedures, as well as physical barrier removal and coordination of accessible housing. The AIC and Clinical Services continue to work very closely to ensure accommodation needs are promptly identified and met. Furthermore, ADA policy ensures offenders may seek ADA accommodation *regardless* of whether the medical condition is identified as a class member disability. For example, if no hearing aids are authorized from medical because the offender does not meet the medical criteria, the AIC may authorize permission to sit up close in class, use TTY, and have notice of PA and verbal announcements.

Finally, although your correspondence couches this alleged phenomenon as one which "[r]outinely" occurs you have not cited any particular instance in which this has actually occurred.

Page 3

Regarding devices: Some assistive devices have been made available on canteen for purchase by offenders. This measure was taken to *enhance* ready access to these items. If an offender lacks adequate funds to purchase an item but would benefit from its provision and use due to disability, the AIC may, and *does*, authorize modification of CDOC policy to allow purchase of the item even if no funds are available in the offender's inmate banking account, and allows the inmate to repay the cost as funds become available. This is a reasonable modification of policy to ensure equal access comparable to those offenders who do not have a disability and who wish to purchase a watch, tennis shoes, etc.

One point of clarity with respect to the availability of watches is that *all* offenders may choose to purchase (or not) a watch from the canteen. Both "regular" and vibrating watches are available to any and all offenders for purchase through the canteen. The intent of the ADA is to bring people up to an equal playing field with as those not identified as disabled, not to place those individuals in an elevated or more advantageous status that their non-disabled peers. This provision and practice accomplishes that intent.

The affirmative *one-time* provision of watches to some individuals was made via a Stipulation during the pendency of this matter, but was **not codified** in the Remedial Plan itself. Moreover, talking watches, which you mention in your letter, remain available through the AIC. For example, an offender recently contacted the AIC regarding an issue with his talking watch. The AIC replaced this item.

**Concern #2:**

*Class members who have low security classification rankings are not being allowed to progress to the low security facilities because of their disabilities. This has been a systemic problem that has gotten worse since the compliance hearing and is now enshrined in DOC written policy. We believe that it is a clear violation of the language, intent and spirit of the Remedial plan.*

**Response #2:**

Defendants respectfully disagree. The AIC staff and Offender Services work very closely to ensure equal opportunity for progression to all security levels for disabled offenders. Class Counsel has been provided the Daily ADA Roster which indicates the location of all disabled class members on any given date. This document confirms that a broad range of housing assignments at every custody level, inclusive of all class member disabilities, are available and utilized.

To be clear, CDOC policy and practice do **not** prevent any offender from progressing due to disability alone. There are a number of factors which are considered during the custody/classification process. The Administrative Regulations provide appropriate policy and procedure guidelines to enable

Page 4

custody/security level overrides when necessary and appropriate to ensure this progression is not hindered due to disability. *See* AR 600-01 *and see* attached examples of recent overrides.

Here, the element of inherent discretion has been utilized to allow for security overrides which are *progressive* for our Class Members. *Id.* (Twelve (12) examples of *progressive* overrides: in each instance the offender was scored at a Level III but that score was overridden pursuant to the policy under discussion, such that each of these individuals was *progressed* to a Level II). We would respectfully note that you've not pointed to *any* particular instance where you alleged it has been utilized otherwise.

**Concern # 3:**

*The ADA grievance procedure has been changed and no longer reflects the ADA grievance procedure mandated by the Remedial Plan. Now, class members are required to conduct an "informal" meeting with the DOC staff involved with the issue and if that staff is not available in a timely manner, the class member cannot proceed with his/her grievance. In essence, DOC has set up a "gatekeeper" to significantly decrease the ability to file a grievance, and fundamentally changed the ADA grievance procedures as required by the Remedial Plan.*

**Response #3:**

CDOC respectfully disagrees that the procedure "has been changed" in a manner such that it no longer complies with the letter and spirit of the Remedial Plan. Simply put, you have a misunderstanding of AR 850-04, and its codification of the existent "informal" step.

The informal resolution attempt was memorialized in AR 850-04 to further encourage and facilitate resolution of offender grievance issues or concerns prior to issuance of a formal grievance. The "addition" of the informal resolution attempt merely *formalized* what was already required by the policy. It is often the case that an issue might be wholly addressed, and more efficiently, via constructive dialogue at the lowest level possible without necessarily involving others or prolonging an easy solution during the pendency of the formal grievance process.

What's more, an offender can file a grievance *even if no informal attempt was ever made*. As a result, there is **no** gate keeping intent or effect. Rather, the intended purpose was, is, and remains to resolve issues at lowest level possible, as expeditiously as possible.

Prior to the informal step's formal addition to policy in 2013, AR 850-04 contained the following language regarding desired resolutions on an informal level:

Page 5

It is preferred that offender problems and complaints be resolved by DOC employees, contract workers, volunteers, and offender in the area of the institution where the problem or complaint arose, and whenever possible through discussion or dialogue. Problems that are not solved through dialogue and discussion shall be addressed by the following the procedures in this administrative regulation.

As a result, the codification of the informal step is not novel, nor is it intended to, nor does it operate to, in any manner "decrease the ability to file a grievance…" and it certainly did *not* "fundamentally change[] the ADA grievance process as required by the Remedial Plan." Indeed, the informal resolution does not toll the time to file a Step I grievance and as a result, offenders can, may, and should proceed, as always, with filing their Step I within 30 days of an alleged issue.

Moreover, the ADA-M Grievance process remains consistent with grievances for other matters, such that all incorporate the informal process. The intent of the ADA is to bring access of disabled people in-line with that of non-disabled parties. All grievances, including those identified as ADA, include the informal process. Thus, Class Members, like all offenders, can and do maintain the same ability and access to the filing of a grievance as existed prior to the Compliance Hearing.

**Concern #4:**

*Class members no longer have the means to know which accommodations they have been granted - which is a policy change since the last compliance hearing. Previously, class members were provided an Accommodation Resolution form which clearly stated each accommodation that the class member was granted by the AIC. These are no longer being routinely distributed. Instead, class members receive a litigation resolution form which does not list their accommodations. As a result, our class members have nothing to show DOC staff to prove that they are entitled to a requested accommodation. When DOC staff does agree to check the computer system, there is general confusion about where such accommodations are recorded - and often cannot be located. This undermines the entire Remedial Plan. If an accommodation is granted, the class member must know that it has been granted. If an accommodation has been denied, it is equally important that the class member be informed so that if there is a grievance, it can be timely filed.*

**Response #4:**

With respect to this concern, it appears that Plaintiffs' Counsel(s) simply misunderstand both policy and practice.

To clarify, staff provides each offender with copies of their respective ADA Litigation Resolution (formerly known as the Accommodation Resolution) *and* their Offender Approved/Denied Report, indicating status of any ADA

Page 6

accommodations requested. *See* AR 750-04 IV D. 8-9. These **are** distributed to class
members. During the thirty (30) month Monitoring Period *many* samples of these
records have been provided to Class Counsel.

It is accurate that the Litigation Resolution does not list each accommodation
because *that precise information* is listed on the Approved/Denied Report. As a
result, Class Members maintain the appropriate documentation necessary to (1)
identify their class member status, *and* (2) to confirm all ADA accommodations
indicating requests as either approved or denied. Although the name of the form
has changed, its purpose has not. As a result, your assertion that offenders "no
longer have a means to know which accommodation they have been granted…" is
simply incorrect. Indeed, the Offender Approved/Denied Report unequivocally
confirms "each accommodation that the class member was granted by the AIC" as
articulated in your Concern #4. CDOC believes it is disingenuous to allege that this
much cleaner and clearer record keeping approach divests offenders of the ability to
know what has been approved and/or denied. Rather, it makes ascertaining that
very information more readable. Class Members can, and do, show staff these
forms.

**All** CDOC staff receives basic and annual ADA training regarding the
location of Class Member and accommodation information. Class Counsel(s) have
been previously provided copies of that training. Furthermore, staff retains 24/7
access to information through the CDOC intranet system. In addition, staff may
contact the AIC office by phone or email if and when any question or concern may
arise. Moreover, staff has access to a facility ADA coordinator on-site at the
facilities for additional support, as needed.

Although you allege broadly that when staff check the "system" there is
"confusion," Defendants would note that you've failed to identify (1) which "system"
is being referenced, and (2) which staff are confused about any particular topic. As
delineated above, there are *numerous* resources available to staff to obtain
information at any given point, including the opportunity to speak with the on-site
ADA liaison or simply pick up the phone and call the AIC. Moreover, as you are
aware from the training resources previously provided for your review, staff is
trained annually on these very matters.

It remains somewhat unclear *how* it has come to Counsel(s)' attention that
"staff" is "confused," as alleged. We must assume that you have received this
information from one of your offender clients as relayed during one of your
numerous facility visits. To that end, we would question how a particular offender is
aware of what a particular staff member is or is not thinking or experiencing. As
always, if there is a particular example which you could point to, CDOC would be
glad to ensure that any individual staff member who has apparently relayed to an
unnamed offender their personal "confusion" can receive clarity.

Page 7

**Concern #5:**

*The refusal to provide soft-soled shoes to class members with diabetes. This problem has continued to grow since the compliance hearing and the refusal to provide such shoes unless a medical criteria is met violates the Remedial Plan and the ADA.*

**Response #5:**

This is not a "problem" and it is not "growing." It appears that you have been misinformed. Thus, we appreciate the opportunity to clarify and resolve any lingering ambiguity regarding the (1) provision of soft-soled shoes, and (2) ability to wear them in prison.

CDOC has **not** refused to provide soft sole shoes to Class Members who need this health care appliance. Clinical Services is responsible to set the medical standard for soft-soled shoes. This very issue was raised and considered at the Compliance hearings during which Judge Kane *found CDOC to be in Substantial Compliance.* As you are aware "medically necessary shoes" is a determination that must be assessed through Clinical Services as part of an offender's *medical* treatment needs. Once again, the ADA does **not** have purview of medical treatment as previously determined by the Federal Courts. *See Fitzgerald v. Corrections Corp. of America,* 403 F.3d 1134 (10th Cir. 2005) (holding that claims for substandard medical treatment *cannot* be pursued under the ADA).

Soft sole shoes are available on canteen for **all** offenders to purchase regardless of whether they meet the medical standard established by clinicians regarding soft-soled shoes. As a result, *any* offender can obtain them at *any* point.

While Clinical Services may determine that a particular patient does not meet the medical, clinical criteria for soft-soled shoes, the AIC retains its independent authority. As a result, offenders who may not meet the clinical standard but who could still benefit from them can obtain soft-soled shoes via the canteen, and the AIC retains its authority over offering a reasonable accommodation as to where the offender might wear them.

Page 8

Once more, we deeply appreciate the opportunity to discuss this handful of residual concerns with you. We are certainly heartened that your list of apprehensions was brief and hope that our clarifications have assuaged any lingering doubts that CDOC **is, was, and remains** in Substantial Compliance with the Remedial Plan as found by Judge Kane in September of 2012.

Sincerely,

FOR THE ATTORNEY GENERAL

s/Jacquelynn N. Rich Fredericks
JACQUELYNN N. RICH FREDERICKS
JAMES X. QUINN
Assistant Attorney General
Corrections and Public Safety Unit
Civil Litigation and Employment Law Section
(720) 508-6603
(720) 508-6032 (FAX)