CYNTHIA H. COFFMAN
Attorney General

DAVID C. BLAKE
Chief Deputy Attorney General

MELANIE J. SNYDER
Chief of Staff

FREDERICK R. YARGER
Solicitor General



**STATE OF COLORADO
DEPARTMENT OF LAW**

RALPH L. CARR
COLORADO JUDICIAL CENTER
1300 Broadway, 10th Floor
Denver, Colorado 80203
Phone (720) 508-6000

Office of the Attorney General

July 1, 2015

Dear Class Counsel(s),

     We are in receipt of your letter, dated June 12, 2015. In that letter you make specific requests for information and documentation which may or may not actually pertain to the affidavits attached as exhibits to Defendants' Response to the Notice of Noncompliance. Pursuant to my correspondence of June 30, 2015, the documentation Defendants actually relied upon in drafting their affidavits was provided on a disk sent to your attention via U.S. Mail.

     This present correspondence is to address your letter of June 12, 2015. As I articulated in our phone call on June 12, 2015, several of your requests are testamentary in nature as opposed to documentary. Nevertheless, I endeavor to respond to each enumerated request, in turn. To the extent the request seeks something previously produced, I refer to that previously produced information/documentation in order to help guide your inquiry.

     1.    In request number 1, you seek all documents supporting Mr. Nordell's assertion that his "role [as the AIC] has been strengthened." This assertion is based upon Mr. Nordell's personal experience working in the position of AIC over the past several years. Also, Mr. Nordell specifically referenced that the role of the AIC was codified in AR 750-04. *See* Doc. 5530.1 at ¶ 8. This codification represents a strengthening of AIC authority. You were previously provided copies of that AR by Defendants during the Monitoring Period including as part of Quarterly Reports. In addition, copies are publically available on the CDOC's website.

     2.    In your second request you seek "all documents including but not limited to system reports showing that the AIC reviews and exercises its final oversight authority after Clinical Care has denied a request for an accommodation and/or medical or health care device." Defendants previously provided documentation of this regular occurrence repeatedly throughout the Monitoring Period. Certainly, the AIC reviews of final oversight authority exist in *many* forms, which may include but are not limited to ADA accommodations that may or may not have been reviewed as part of an offender's litigation screening (e.g., Offender Approved/Denied Reports); ADA Litigation Resolution forms which document class members' status. Again, you've been provided examples and 10% samples of each of these types of documentation during the Monitoring Period. But, to reiterate for



EXHIBIT A-2

Page 2

clarity, as part of the screening process, the Provider and CMO may or may not agree with each other and/or with the AIC. However, the AIC issues the final determination as to class member status as required by the Remedial Plan. The Remedial Plan at paragraph 26 states as follows: "In the case of a disagreement between the AIC and any other DOC employee, medical provider or contractor *concerning the disability status* of an inmate and/or accommodations to be provided, the conclusion of the ADA Inmate Coordinator will be final." (Emphasis added). To be sure, Judge Kane found CDOC substantially complied with this provision re the AIC's final authority to determine class member status of all offenders screened. The policy and practice around this process has not changed substantively since the finding of substantial compliance. I note that you have not alleged that the process or policy regarding determining whether an individual is or is not a class member or has one of the four disabilities has been altered. Again, please see the previously provided discovery from October and November of 2014, which includes the random 10% sampling of AIC electronic class member files to include emails and offender referrals to Clinical Services.

    3.    In request number 3, you request "[a]ll documents including but not limited to system reports supporting the assertion that AIC staff 'promptly route[]' class member requests deemed medical issues to clinical, and that AIC staff 'immediately follow up with clinical'" Responsive documents were previously provided, In addition, these statements are testamentary in nature predicated upon the daily routines, habits, and experiences of the affiants to which the statements are attributed (Mr. Nordell, Ms. Russell, and Ms. Smith). As indicated by the affiants, it is their practice to promptly follow up with clinical services. Also, specific emails which may substantiate the practice have not necessarily been retained. Although this is, as affiants attested, the practice and routine of AIC staff, it is not a specific requirement of the Remedial Plan itself but was noted by the affiants as part of their sustained efforts to maintain and expand the scope of their service to the disabled population in the CDOC.

    4.    In paragraph number 4 of your letter, you ask: "Is the ADA Offenders Database given to us in September 2013 (and again in August 2014) the same database that Julie Russell refers to in her Affidavit as the ADA Montez database?" The ADA Montez screening system is referred to in Ms. Russell's affidavit on paragraph 7(6)(a). The screening system is a software program developed to refer offender requests to the medical Provider/CMO and AIC for completion of the disability evaluation process. Whereas the ADA Offender Database provided in Sept. 2013 and again in Aug. 2014 is simply a list (a data entry spreadsheet) identifying the offenders who requested a screening, the dates and outcomes which mimics the data of the ADA Montez screening system.

    5.    In paragraph 5 you request "All documents including but not limited to system reports that the AIC tracks the location and accommodation of all Montez

Page 3

Class Members on a daily basis." Defendants previously provided the Daily ADA Report on *numerous* occasions and upon request as needed throughout the Monitoring Period. Also, the ADA Tracking System (which tracks both class members and non-class members) has been previously provided. In addition, the ADA Montez screening system tracks the location of offenders as does DOCnet/Offender Portal. There are also numerous other internal systems and data that track the location of specific offender disability status and ADA tracking. Please note that only the AIC can enter the approval/disapproval of Class members' status. This is also a testamentary statement regarding the daily duties, habits, and routines of AIC staff.

6. In number 6, you request "[a]ll documents including but not limited to system reports "that the cultural shift and changes which grew out of the Montez litigation have simple become culturally ingrained." System reports were previously provided. In addition, this is a testamentary statement based upon the lengthy experience of Mr. Nordell as the AIC.

7. In paragraph 7 you request: A list of Step I ADA grievances denied as untimely after the informal resolution process was initiated." A list of Step I ADA grievances denied as untimely cannot be produced as the informal resolution has *no* bearing on whether or not the offender can file the Step I grievance. Therefore, it is unconnected and furthermore impossible to produce. As indicated in the affidavit of Mr. DeCesaro (at ¶ 18) and as codified in AR 850-04, policy and practice coalesce such that the informal dialogue step does *not* toll the time to file a Step I grievance. As a result, an offender is obliged, as always, to file any Step I grievance within 30 days regardless of whether they've pursued an informal resolution, received a response to the informal resolution, or if they simply disagree with the informal response/resolution.

8. Number 8 seeks "[d]ata on how many step I grievances were filed for the two years prior to the change in the Grievance procedure, through the monitoring period. This request is beyond the Court's present Order. *See* Doc. 5533 and 5534. It also takes great liberty with the information in Mr. DeCesaro's affidavit at the paragraphs you cite to (¶ 12, 16, 17, and 18) when framing your documentary request. As the Court has previously ruled, the relevant time frames for which you permitted information where those timeframes *during* Monitoring. *See* Doc. 5484 at p. 5-7 (specifically ruling that documents at issue where those after Sept. of 2012). Moreover, Defendants have provided data regarding grievance trends to Plaintiffs throughout the Monitoring Period in the form of Quarterly Reports. These reports may be reviewed to glean grievance trends over the past 31 months. The number of Step 1 grievances reflected by each of these reports can be added up in order to ascertain "how many [S]tep 1 grievances were filed... through the [M]onitoring [P]eriod." Also, Mr. DeCesaro indicated (at ¶ 15), the informal step was codified in December of 2012. As a result, the previously provided Quarterly

Page 4

Reports provide the relevant information sought in this request regarding how many Step I grievances were filed each month. Defendants also previously provided a 10% sampling of actual grievances filed in October and November of 2014. It also bears repeating that no offender *has, is, or will be denied* the ability to file a Step I grievance for lack of completing the informal resolution attempt. This is simply an added platform for the offender to resolve a problem with staff.

9.  In paragraph 9 you request "[a]ll documents including but not limited to system reports supporting Julie Russell's assertion that the electronic systems 'ensure the most efficient tracking to provide reasonable accommodation.'" The electronic systems documentation was previously provided to you. This is also a testamentary statement by Ms. Russell predicated upon her yeas of work in this field. Ms. Russell's statement was made based upon the successful training efforts undertaken and staff ability to retrieve information daily, as needed, in real-time without disruption or problems. In addition, it is one of the most comprehensive systems available in any corrections system based upon what the AIC has ascertained from engaging in dialogue with other states.

10.  Paragraph 10 requests "[a]ll documents including but not limited to system reports supporting Julie Russell's assertion that '[i]t became necessary to separate' 'health care equipment and medical restrictions.'" The documents were already provided to you. In addition, this statement is testamentary in nature. Ms. Russell's statement at ¶ 29, when reviewed in full as opposed to in part as in your correspondence, clarifies (as has been previously shared) that ATS (to which that specific paragraph is directly speaking) is used to track *all* disabled persons in CDOC not just those who are affiliated with the *Montez* matter, e.g. class members. Moreover, the law itself changed. The *Montez* Remedial Plan does not include many of the conditions covered as a disability under the ADA-AA. ATS is used more broadly to ensure compliance with the ADA-AA and is not limited to only *Montez*. CDOC needed a way to ensure requests for *reasonable accommodation* would be reviewed, tracked, and implemented for all offenders, including those not covered under the more limited *Montez* umbrella. The Remedial Plan and the instant litigation uses its own narrower subset of criteria to assess disability status. Also, I believe that extensive information has previously been provided through the Monitoring Period which substantiates why the form bifurcation, which appears to have been conflated in this specific request pertaining to ¶ 29 which is more tailed to ATS, was necessary, appropriate, and ultimately undertaken.

11.  Paragraph 11 of you letter seeks "[a]ll documents including but not limited to system reports supporting Janet Smith's assertions at ,11, 26, 27, and 30." Please see this information previously provided to you on June 30, 2015. Also, please see information included previously as attachments to Ms. Smith's affidavit. *See* Doc. 5530.3 *attachments*.

Page 5

12. In paragraph 12 you seek "[a]ll documents including but not limited to system reports that Kerri B[a]roni relied on in preparing Appendix 2 attached to Ms. B[a]roni's Affidavit." This information was provided to you on June 30, 2015.

Again, we sincerely appreciate the chance to discuss this handful of residual concerns with you. We remain heartened that your list of apprehensions was brief and hope that our prior clarifications, the clarifications herein, and the materials provided to you on June 30, 2015 will assuage any lingering doubts that CDOC is, was, and remains in Substantial Compliance with the Remedial Plan as found by Judge Kane in September of 2012.

Sincerely,

FOR THE ATTORNEY GENERAL

s/Jacquelynn N. Rich Fredericks
JACQUELYNN N. RICH FREDERICKS
JAMES X. QUINN
Assistant Attorney General
Corrections and Public Safety Unit
Civil Litigation and Employment Law Section
(720) 508-6603
(720) 508-6032 (FAX)