CYNTHIA H. COFFMAN
Attorney General

DAVID C. BLAKE
Chief Deputy Attorney General

MELANIE J. SNYDER
Chief of Staff

FREDERICK R. YARGER
Solicitor General



**STATE OF COLORADO**
**DEPARTMENT OF LAW**

RALPH L. CARR
COLORADO JUDICIAL CENTER
1300 Broadway, 10th Floor
Denver, Colorado 80203
Phone (720) 508-6000

**Office of the Attorney General**

September 10, 2015

RE:   September 3, 2015 Correspondence

Dear Class Counsel(s),

I hope this correspondence finds you each well. We are in receipt of your letter, dated September 3, 2015. This correspondence is to address the issues raised therein.

Initially, I note that your letter follows up on communication Defendants sent to you through our office on July 1, 2014, sixty-four days ago. Notably, no follow-up in the form of correspondence or a phone call, indeed, no communication of any kind was undertaken by Plaintiffs subsequent to Defendants' voluntary response to your extraneous discovery requests for more than two months, and only subsequent to the issuance of an Order by the Court to tender a Status Report. As Defendants respond herein, I also want to note that the Court previously ruled that Plaintiffs are not entitled to discovery during the Monitoring Period. Doc. 5484. This was reiterated during the Status Conference June 2, 2015. *See* Transcript p. 15, ln. 13-15 ("You don't need discovery… You don't need formal discovery… [w]e are not in litigation at this point."); p. 28, ln. 17-22 ("I am reluctant to open discovery again because I just think that we're too far down the road for any of that. And the Remedial Plan doesn't… doesn't talk about further discovery in this case."). Nonetheless, upwards of 50,000 pages of information and multiple databases have been provided by Defendants to Plaintiffs, over the past thirty-six months. It is also noteworthy, that after three full years of monitoring, Plaintiffs have failed to provide to Defendants a list of any particular individual who has allegedly been denied appropriate accommodation in violation of the ADA or in dereliction of the Remedial Plan. The only such disclosure was made as an attachment to your Notice of Non-Compliance, filed on the eve of the cessation of the Monitoring Period, after two prior extensions of the same. Doc. 5484, Doc. 5503 *compare to* Doc. 5507. If you genuinely believe someone needs something, I would respectfully renew Defendants' request that you let Defendants know so that any individual concerns may be addressed, as appropriate.

The Court's recent Order was narrow in its scope. Defendants were to tender to your attention copies of information relied upon in preparing their affidavits. Doc. 5533, Doc. 5534; Transcript p. 28, ln. 24-25. Defendants have done so. *See*



EXHIBIT
A-4

Page 2

Correspondence dated June 30, 2015; *and see* Doc. 5535. The Court did not grant Plaintiffs' carte blanche access to tender novel requests. Nevertheless, Plaintiffs sought a laundry list of information and documentation in their June 12, 2015 correspondence. As I articulated in our telephone conversation June 12, 2015, Defendants believe your June of 2015 requests extend beyond the Court's Order. Despite this perceived overreach, Defendants in good faith provided responses to your inquiries. *See* Correspondence dated July 1, 2015.

Presently, Defendants believe that your novel follow-up requests are at its core, mere pretext to endeavor to manufacture a sham dispute between the Parties. This view of your September 3, 2015 letter is bolstered by the fact that it was not made until more than two months subsequent to our disclosure of additional information you sought and only after the Court entered an Order requesting a Status Report. In addition, in your September 3, 2015, correspondence your "summaries" of Defendants' responses fail in large part to capture accurately the information which was shared, as codified in our July 1, 2015, correspondence. Simply put, there is not dispute: Defendants have provided what the Court ordered, and then some.

Defendants do not believe that a present desire on behalf of Plaintiffs to nitpick over voluntary responses made which were above and beyond that which was Court ordered is a reason to further delay cessation of this already stale litigation. To be clear, Defendants disagree that there is any discovery which remains outstanding in this matter from Defendants to Plaintiffs. To the extent there is any information which is due, it is information which Defendants have repeatedly requested from Plaintiffs throughout the Monitoring Period, a request which has been to-date, largely ignored and never responded to by Plaintiffs. Specifically, Defendants have sought, and never received any accounting of Class Members who have allegedly not been accommodated. Defendants are not trying to "hide the ball" and would respectfully request that the same spirit of candor extend bi-directionally. To that end, Defendants provide further clarification and documentation with this letter.

Your correspondence is somewhat ambiguous regarding the purported purpose and scope of retaining Magistrate Judge Hegarty's assistance in this matter. To the extent you wish to retain Magistrate Judge Hegarty's services in order to deal with some perceived discovery deficiencies, Defendants respectfully decline any such invitation. However, as indicated during the Status Conference, Defendants do not oppose a request by Plaintiffs to discuss final conclusion of this litigation with Magistrate Judge Hegarty's assistance. *See* Transcript p. 17, ln. 16-25; p. 26, ln. 21-24; p. 27, ln. 2-23; p. 29, ln. 3-4. However, to be clear, Defendants firmly believe that they are and remain in Substantial Compliance.

Page 3

I now address each of your specific four "needed clarifications" in turn.

Re Question No. 2:

Initially, if this were a traditional discovery request, I would be obliged to respond that any request which broadly seeks "all documents" is overly broad. Moreover, this specific request is unduly burdensome. Furthermore, the narrow scope of Judge Arguello's June 3, 2015, Orders did not provide for such. Rather, Defendants were ordered to, and provided, copies of documents they actually utilized in preparing their affidavits. It is Defendants' firm belief that nothing further is required.

Next, your request conflates two distinctly different issues. The distinction is not without a difference.

Sub-issue #1: The issue regarding placement "overrides" and the ability to progress to the lowest level facility has been previously addressed by the Court. During the June 2, 2015, Judge Arguello specifically ruled on the record, that the issue related to the progressive placement of offenders was not properly before the Court and thus, would not be heard further. *See* Transcript p. 4, ln. 22 – p. 5, ln. 10 ("[M]y review of this is very limited… I do not intend to allow, nor to be believe that plaintiffs are entitled to revisit issues that Judge Kane decided in his order finding substantial compliance."); p. 5, ln. 18-22 (specifically discussing issue of progression to lower level facilities); p. 6, ln. 4-8 ("I just want to make it clear to you all there we are not going to revisit these issues for purposes of these proceedings."); p. 18, ln. 24 – p. 19, ln. 1 ("[Y]ou raised that with Judge Kane and he didn't buy it. He didn't buy that as something being out of compliance."); ln. 7-10 ("That is not something he pointed out as being a problem. And that is why I said, I am not revisiting what has already been presented to him and already been ruled on."). As a result, your continued pursuit of information and documentation regarding that issue does not appear undertaken in good faith. Nevertheless, in an abundance of good faith and fair dealing, attached, please find copies of the finalized placement overrides. *See* Montez/MP 00728-00739. Defendants' provision of this information does not waive their argument, as codified in their Response (Doc. 5530, p. 12), that this allegation of non-compliance is not properly before the Court.

Sub-issue#2:

To begin with, it cannot be reiterated strongly enough that the AIC never has and never will provide medical care and treatment because they are not medical care providers. The Remedial Plan does not require them to do so, nor could it. Rather, the AIC can and does, maintain its authority to offer reasonable accommodation to Class Members and the broader ADA-impacted CDOC offender population, regardless of whether an individual is determined to medically have a particular condition. The "summary" of CDOC's response you cite to in your correspondence,

Page 4

fails to include the following, which directly addresses your current request for clarification:

> *Certainly, the AIC reviews of final oversight authority exist in many forms, which may include but are not limited to ADA accommodations that may or may not have been reviewed as part of an offender's litigation screening (e.g., Offender Approved/Denied Reports); ADA Litigation Resolution forms which document class members' status. Again, you've been provided examples and 10% samples of each of these types of documentation during the Monitoring Period. But, to reiterate for clarity, as part of the screening process, the Provider and CMO may or may not agree with each other and/or with the AIC. However, the AIC issues the final determination as to class member status as required by the Remedial Plan. The Remedial Plan at paragraph 26 states as follows: "In the case of a disagreement between the AIC and any other DOC employee, medical provider or contractor concerning the disability status of an inmate and/or accommodations to be provided, the conclusion of the ADA Inmate Coordinator will be final." (Emphasis added). To be sure, Judge Kane found CDOC substantially complied with this provision re the AIC's final authority to determine class member status of all offenders screened. The policy and practice around this process has not changed substantively since the finding of substantial compliance. I note that you have not alleged that the process or policy regarding determining whether an individual is or is not a class member or has one of the four disabilities has been altered. Again, please see the previously provided discovery from October and November of 2014, which includes the random 10% sampling of AIC electronic class member files to include emails and offender referrals to Clinical Services.*

*See* Correspondence dated July 1, 2015, p. 1-2.

As I understand it, the phenomenon you are seeking documentation of as articulated in your request for clarification is the narrower situation where the medical department determined someone did not meet one of the criteria of the four predicate disabilities but the AIC determined an offender might benefit from reasonable accommodation. The AIC regularly provides reasonable accommodation to offenders who are not determined to be medically disabled. An example of this situation would be where an offender is found not to be hearing disabled under the *Montez* criteria, but, is easily accommodated by placing the offender into the front row of his or her GED class. In addition, please see several examples attached hereto as Montez/MP 00740-00783.

The policies, which have been previously shared with you, and the testamentary nature of Mr. Nordell's affidavit, confirm that the AIC retains the authority to act

Page 5

as contemplated by the Remedial Plan. There are not regularly retained specific emails which codify this practice. However, you have now been provided some examples. *See* Montez/MP 00740-00783. When you compare the Litigation Resolutions with the Approved Denied Reports attached hereto, you can see where a number of individuals may not have been determined to be disabled pursuant to the agreed upon medical criteria, but, nonetheless, the AIC has moved forward with offering reasonable accommodation. These examples support the testimony of the AIC staff.

Re Question No. 3:

I am obliged to reiterate, if this were a traditional discovery request, I would respond that any request which broadly seeks "[a]ll documents" is overly broad. Moreover, this specific request is unduly burdensome. Furthermore, the narrow scope of Judge Arguello's June 3, 2015, Orders did not provide for such. Rather, Defendants were ordered to, and provided, copies of documents they actually utilized in preparing their affidavits. It is Defendants' firm belief that nothing further is required.

Your summary of CDOC's prior response leaves out the following probative responsive information:

> *In addition, these statements are testamentary in nature predicated upon the daily routines, habits, and experiences of the affiants to which the statements are attributed (Mr. Nordell, Ms. Russell, and Ms. Smith). As indicated by the affiants, it is their practice to promptly follow up with clinical services. Also, specific emails which may substantiate the practice have not necessarily been retained. Although this is, as affiants attested, the practice and routine of AIC staff, it is not a specific requirement of the Remedial Plan itself but was noted by the affiants as part of their sustained efforts to maintain and expand the scope of their service to the disabled population in the CDOC.*

*See* Correspondence dated July 1, 2015, p. 2.

As previously shared, the three affidavits you cite to regarding re-routing of requests for medical care provide testamentary information from three long-time members of the AIC team regarding the ingrained practice of that office and its staff.

There are no "system reports" which pertain to these statements. You likely found limited examples (two in a 10% sample), because the occurrence is a narrow one where an offender miss-routes their request for medical care and diagnosis to the AIC. To the individual, each member of the AIC team attested in their affidavit that they do not simply "deny" such requests. When requests of this nature reach the

Page 6

office of the AIC, staff promptly reaches out to medical, normally via telephone or a quick email correspondence, to get the request properly tracked. This is testamentary information. Emails are not specifically retained to codify this regular occurrence. However, attached, please find several examples of this process at Montez/MP 00784-00795. As you can see from the attached, the AIC staff follows up with medical staff when a request has been miss-routed and Clinical Services and the AIC work closely to insure offenders are properly cared for and accommodated.

You may also observe this practice in Defendants' Appendix 2, which was affixed to Ms. Baroni's affidavit. Therein, you can see numerous examples where an offender made an improper request for medical care and treatment from the AIC and were then redirected to the medical department where medically appropriate care was rendered by medical care professionals. In the first page alone you may note that as a result of this practice, Messrs. Allen and Abeyta were evaluated for special shoes but found not to meet the clinical standard. Mr. Arriola was provided a glucometer. Mr. Bergerud was evaluated for and then provided special footwear. In total, Appendix 2 shows that of 62 rerouted offender requests, 41 ultimately resulted in approved requests for care or specific medical equipment. *See* Doc. 5530 at **Ex. A-5**, Appendix 2; *see also* Doc. 5530, p. 11 (summarizing the same).

<u>Re Question No. 4 & No. 5 (as combined by Plaintiffs):</u>

Your present inquiry combines two separate prior inquiries and also merges the information provided in response. The summary of CDOC's response provided in your correspondence leaves out the following information:

Re ¶ 4:

> *The ADA Montez screening system is referred to in Ms. Russell's affidavit on paragraph 7(6)(a). The screening system is a software program developed to refer offender requests to the medical Provider/CMO and AIC for completion of the disability evaluation process. Whereas the ADA Offender Database provided in Sept. 2013 and again in Aug. 2014 is simply a list (a data entry spreadsheet) identifying the offenders who requested a screening, the dates and outcomes which mimics the data of the ADA Montez screening system.*

Re ¶ 5:

> *Defendants previously provided the Daily ADA Report on numerous occasions and upon request as needed throughout the Monitoring Period. Also, the ADA Tracking System (which tracks both class members and non-class members) has been previously provided. In addition, the ADA Montez screening system tracks the location of offenders as does DOCnet/Offender Portal. There are also numerous*

Page 7

> *other internal systems and data that track the location of specific offender disability status and ADA tracking. Please note that only the AIC can enter the approval/disapproval of Class members' status. This is also a testamentary statement regarding the daily duties, habits, and routines of AIC staff.*

*See* Correspondence dated July 1, 2015, p. 2-3.

There are numerous ways and means by which the AIC staff might ascertain (1) where a particular Class Member resides on a particular day, and (2) what accommodations that individual has been provided. However, it appears that you have misunderstood Defendants' prior response. Please allow me to clarify that the cited testimony does not stand for the proposition that there is a single system where a class member's present location is co-housed with his or her accommodations. Rather, the Daily Roster, of which you have been provided numerous copies through the Monitoring Period (Doc. 5530 at **Ex. A-11**, as the most recent version provided), shows where each and every Class Member resides on any given day. That report can be run by any member of the AIC team at any given point. AIC staff may ascertain what accommodations a particular offender has been provided in a number of ways including accessing an offender's individual file, via PCDCIS, through the *Montez* Database, through the ATS System, and through the offender portal located on DOCNET. Each system is accessible to AIC staff on a daily basis as they perform their jobs. Cross-referencing the Daily Roster with any of the other systems or means of tracking, permits staff to determine quickly both the (1) location of a Class Member, and (2) their particularized accommodations. Also, both present facility and accommodation may also be located in PCDCIS.

In addition, I would respectfully reiterate that the statement attributed to Mr. Nordell is testamentary and describes the daily job duties, functions, and capabilities of AIC staff.

Re Question No. 10:

The summary of CDOC's response provided in your correspondence leaves out the following information:

> *In addition, this statement is testamentary in nature. Ms. Russell's statement at ¶ 29, when reviewed in full as opposed to in part as in your correspondence, clarifies (as has been previously shared) that ATS (to which that specific paragraph is directly speaking) is used to track all disabled persons in CDOC not just those who are affiliated with the Montez matter, e.g. class members. Moreover, the law itself changed. The Montez Remedial Plan does not include many of the conditions covered as a disability under the ADA-AA. ATS is used more broadly to ensure compliance with the ADA-AA and is not limited to only Montez.*

Page 8

> CDOC needed a way to ensure requests for reasonable accommodation would be reviewed, tracked, and implemented for all offenders, including those not covered under the more limited Montez umbrella. The Remedial Plan and the instant litigation uses its own narrower subset of criteria to assess disability status. Also, I believe that extensive information has previously been provided through the Monitoring Period which substantiates why the form bifurcation, which appears to have been conflated in this specific request pertaining to ¶ 29 which is more tailed to ATS, was necessary, appropriate, and ultimately undertaken.

See Correspondence dated July 1, 2015, p. 4.

The specific portion of Ms. Russell's affidavit which is cited to has been taken out of context. Ms. Russell was discussing the implementation of the ATS System in ¶ 29. Ms. Russell wrote, "Prior to the implementation of the [ATS] in January of 2012, both health care equipment and medical restrictions as well as ADA accommodations were enumerated on the offender's Litigation Resolution. It became necessary to separate these two documents with the implementation of ATS to track ADA accommodations for all offenders regardless of Class Member status." See Doc. 5530 at **Ex. A-2** at ¶ 29. As previously articulated, this change was made due to changes in the law (ADA-AA coupled with the *Fitzgerald* decision), to alleviate confusion amongst stakeholders (staff and offenders) around where reasonable accommodations come from (the AIC), versus where medical care and treatment is rendered (Clinical Services), and in this particularized context, so that the form was usable more broadly for *all* disabled incarcerated persons not just Class Members. This transition in record-keeping was also made in conjunction with ADA audits and efforts to educate staff on the difference between durable medical equipment and ADA reasonable accommodations.

As shared previously, ATS is used to track and store information for a broader population than just those offenders who are *Montez* Class Members. The present bi-furcated form style affords the opportunity to distinguish between medical care and reasonable accommodation. It also allows for the inclusion of this broader class of disabled offenders. Ms. Russell's affidavit at ¶ 22-28, 30-31 further contextualizes this rationale. Simply put, this methodology allows the AIC to better serve a larger population beyond the limited sub-set of the four predicate disabilities of the *Montez* matter without diminishing the service afforded Class Members. By repackaging the paperwork in this manner, a larger population was brought into the fold and necessary clarification was made regarding the proper and the most efficacious avenues for obtaining help were clarified.

I would note that this line of inquiry and the focus upon why CDOC ultimately determined it was better to present the accommodations and medical care on separate forms is odd in light of the fact that there are no allegations in Plaintiffs'

Page 9

Notice of Noncompliance that the bi-furcation of this particularized form has in any manner removed the Defendants from substantial compliance. Instead, this methodology of record-keeping has provided needed clarity for stakeholders.

In closing, we appreciate the opportunity to discuss this handful of residual concerns with you. We anticipate that our prior clarifications, the clarifications herein, the materials previously provided, those provided to you on June 30, 2015, and the information provided on July 1, 2015, and herein will assuage any lingering doubts that CDOC was, is, and remains in Substantial Compliance with the Remedial Plan as found by Judge Kane in September of 2012. As a result, we look forward to bringing this matter to its inevitable final resolution as amicably as possible.

Sincerely,

FOR THE ATTORNEY GENERAL

s/Jacquelynn N. Rich Fredericks
JACQUELYNN N. RICH FREDERICKS
JAMES X. QUINN
Assistant Attorney General
Corrections and Public Safety Unit
Civil Litigation and Employment Law Section
(720) 508-6603
(720) 508-6032 (FAX)